1  Paul S. Aronzon (CA State Bar No. 88781)
   Thomas R. Kreller (CA State Bar No. 161922)
2  MILBANK, TWEED, HADLEY & McCLOY LLP
   601 South Figueroa Street, 30th Floor
3  Los Angeles, California 90017
   Telephone:      (213) 892-4000
4  Facsimile:      (213) 629-5063

5  Proposed Reorganization Counsel for
   Debtors and Debtors in Possession
6

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:      (775) 823-2900
Facsimile:      (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

7

8                    **UNITED STATES BANKRUPTCY COURT**
9                         **DISTRICT OF NEVADA**

10  In re:

11  NORTHERN NV ACQUISITIONS, LLC

12  ☐ Affects this Debtor
    ☒ Affects all Debtors
13  ☐ Affects Reno Land Holdings, LLC
    ☐ Affects River Central, LLC
14  ☐ Affects Tropicana Station, LLC
    ☐ Affects FCP Holding, Inc.
15  ☐ Affects FCP Voteco, LLC
    ☐ Affects Fertitta Partners LLC
16  ☐ Affects Station Casinos, Inc.
    ☐ Affects FCP MezzCo Parent, LLC
17  ☐ Affects FCP MezzCo Parent Sub, LLC
    ☐ Affects FCP MezzCo Borrower VII, LLC
18  ☐ Affects FCP MezzCo Borrower VI, LLC
    ☐ Affects FCP MezzCo Borrower V, LLC
19  ☐ Affects FCP MezzCo Borrower IV, LLC
    ☐ Affects FCP MezzCo Borrower III, LLC
20  ☐ Affects FCP MezzCo Borrower II, LLC
    ☐ Affects FCP MezzCo Borrower I, LLC
21  ☐ Affects FCP PropCo, LLC
22
23

Chapter 11

Case No. BK-09-_____
Jointly Administered

**MOTION PURSUANT TO 11 U.S.C.
§§ 105(a), 345(b), 363(c) AND 364 FOR
AUTHORIZATION TO (i) CONTINUE
CASH MANAGEMENT SYSTEM,
(ii) MAINTAIN EXISTING BANK
ACCOUNTS AND BUSINESS FORMS,
AND (iii) MAINTAIN EXISTING
INVESTMENT POLICY**

Hearing Date:      July 30, 2009
Hearing Time:      1:30 p.m.
Place:             300 Booth Street
                   Reno, NV 89509

24
25
26
27
28

LA1:#6398902

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Station Casinos, Inc. ("SCI") and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Station")[1] in the above-captioned chapter 11 cases, hereby submit this motion (the "Motion") for interim and final orders pursuant to sections 105(a), 345(b), 363(c) and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") (i) authorizing the Debtors to maintain and continue to use, without interruption, (a) their existing cash management systems, including existing bank accounts, (b) their existing books, records and business forms and (c) their existing investment policy; and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code, and, in support thereof, respectfully represent as follows:

**LEGAL MEMORANDUM**

### I.    <u>Background</u>

1.     The Debtors commenced these chapter 11 cases on July 28, 2009 (the "Petition Date").  SCI and its non-debtor subsidiaries (collectively, the "Station Group") constitute a gaming entertainment enterprise that owns and operates under the "Station" and "Fiesta" brand names ten major hotels/casinos (two of which are 50% owned) and eight smaller casinos (three of which are 50% owned) in the Las Vegas metropolitan area. The Station Group owns ten of the hotels/casinos' underlying real property in fee and leases the underlying real property for Texas Station Gambling Hall & Hotel ("Texas Station"), Wild Wild West Gambling Hall & Hotel ("Wild Wild West"), Barley's Casino & Brewing Company ("Barley's"), and The Greens Gaming and Dining ("The Greens").  Debtor FCP PropCo, LLC ("FCP PropCo") owns the underlying real estate for Palace Station Hotel & Casino ("Palace Station"), Sunset Station Hotel & Casino ("Sunset Station") and Red Rock Casino Resort Spa ("Red Rock").  FCP PropCo owns a portion of the underlying real property for Boulder Station Hotel & Casino ("Boulder Station") and also

---

[1]     The Debtors in these chapter 11 cases are Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC, Tropicana Station, LLC, FCP Holding, Inc., FCP Voteco, LLC, Fertitta Partners LLC, Station Casinos, Inc., FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, and FCP PropCo, LLC.

leases a portion of Boulder Station's underlying real property.  Station California, LLC ("Station California"), a non-debtor subsidiary of SCI, manages a casino for a Native American tribe.  As of July 17, 2009, the Station Group had approximately 13,174 employees, and the Debtors had approximately 663 employees.

2.    The Station Group owns and operates:  (i) Palace Station, (ii) Boulder Station, (iii) Texas Station, (iv) Sunset Station, (v) Santa Fe Station Hotel & Casino, (vi) Red Rock, (vii) Fiesta Rancho Casino Hotel, (viii) Fiesta Henderson Casino Hotel, (ix) Wild Wild West, (x) Wildfire Casino, (xi) Wildfire Casino – Boulder Highway, formerly known as Magic Star Casino, (xii) Gold Rush Casino, and (xiii) Lake Mead Casino.

3.    The Station Group also holds a 50% interest in the non-debtor entities that own and operate:  (i) Green Valley Ranch Resort Spa Casino ("Green Valley Ranch"), (ii) Aliante Station Casino & Hotel ("Aliante Station"), (iii) Barley's, (iv) The Greens, and (v) Wildfire Casino & Lanes, formerly known as Renata's Casino.

4.    As of June 30, 2009 and based on a general ledger book value, the Debtors owned assets valued in the aggregate in excess of approximately $5.7 billion and had debt and other liabilities of approximately $6.5 billion.

5.    SCI is a privately held company whose shares are held by Debtors Fertitta Partners LLC, FCP Holding, Inc. and FCP VoteCo, LLC.  FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, and FCP PropCo, LLC (collectively, the "CMBS Debtors"), as well as Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC and Tropicana Station, LLC, are all either direct or indirect wholly owned subsidiaries of SCI.

6.    SCI, as borrower, Deutsche Bank Trust Company Americas ("DBTCA"), as administrative agent (in such capacity and in its capacity as collateral agent under the Prepetition Loan Documents (defined below), together with its successors and assigns, the "Prepetition Agent") and a lender, the other lenders from time to time party thereto (together with DBTCA, the

"Prepetition Lenders"), are party to that certain Credit Agreement, dated as of November 7, 2007 (as amended, amended and restated, supplemented, or otherwise modified through the date hereof, the "Prepetition Loan Agreement").  Capitalized Terms used but not defined herein are used as defined in the Prepetition Loan Agreement.

7.     Certain non-debtor wholly owned subsidiaries of SCI listed on Schedule 1 (the "Guarantors" and together with SCI, the "Loan Parties", and collectively with the Holding Companies, the "Credit Parties") have irrevocably guaranteed on a joint and several basis all of the Prepetition Obligations (as defined below) owed by SCI pursuant to the Guaranty Agreement, dated as of November 7, 2007, made by the Guarantors in favor of the Prepetition Agent. The Guarantors are not liable for and have not guaranteed any other third party indebtedness issued by SCI.

8.     On July 28, 2009, the Credit Parties, the Prepetition Agent and certain of the Prepetition Lenders entered into a Second Forbearance Agreement; and Second Amendment to the Credit Agreement (as it may hereafter be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Forbearance Agreement") pursuant to which the Prepetition Agent and the Prepetition Lenders have agreed (subject to the terms thereof) to (i) forbear from exercising their default-related rights, remedies, powers and privileges against the Guarantors, solely with respect to certain Specified Defaults (as defined in the Forbearance Agreement), and (ii) amend certain provisions of the Prepetition Loan Agreement.  The Forbearance Agreement remains in full force and effect, enforceable on a postpetition basis by all parties thereto, pursuant to its terms.

9.     Of SCI's Unrestricted Subsidiaries (including CV HoldCo, LLC ("CV HoldCo") and CV PropCo, LLC ("CV PropCo")) and Joint Ventures named on Schedule 2 hereto, none are currently guarantors under the Guaranty of the Prepetition Loan Agreement and only Reno Land Holdings, LLC and Northern NV Acquisitions, LLC have commenced chapter 11 cases.

10.     Certain of the CMBS Debtors issued a mortgage loan (the "CMBS Mortgage Loan") and related mezzanine financings (the "CMBS Mezzanine Financings") in the

aggregate principal amount of $2.475 billion (the "CMBS Loans").  The CMBS Loans are collateralized by substantially all fee and leasehold real property comprising Palace Station, Boulder Station, Sunset Station, and Red Rock (collectively, the "CMBS Properties").

11.    Filed concurrently herewith, and incorporated herein by reference, is the Omnibus Declaration of Thomas M. Friel in Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "Friel Declaration"), which contains more detail on the Debtors' assets, liabilities, equity ownership, business operations and business plans.

## II.    Jurisdiction and Venue

12.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## III.    Relief Requested

13.    The Debtors seek an order (i) authorizing the Debtors to maintain and continue to use, without interruption, (a) their existing cash management systems, including existing bank accounts, (b) their existing books, records and business forms and (c) their existing investment policy; and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code.

## IV.    The Cash Management Systems

14.    The Station Group is subject to gaming and other regulations in the states in which it operates.  To facilitate the efficient operation of the Station Group's casino, hotel and entertainment enterprise, in the ordinary course of business, SCI historically maintained a single cash management system for the entire Station Group, which was designed to seamlessly collect, transfer, and disburse funds generated by the operations of the Station Group.  Recently, SCI bifurcated the legacy cash management system into two (2) distinct systems.  As a consequence, SCI now maintains its own cash management system (the "SCI Cash Management System") and Past Enterprises, Inc. ("Past Enterprises"), a Guarantor and a wholly owned non-debtor subsidiary of SCI, maintains a second cash management system (the "Non-Debtor Cash Management System") for the Guarantors.

15.     Under this bifurcated approach, SCI continues to manage cash for itself and the Unrestricted Subsidiaries through the use of the SCI Cash Management System, while Past Enterprises separately manages the cash generated by the operations of the Guarantors through the use of the Non-Debtor Cash Management System.[2]

16.     Pursuant to the DIP Financing Order, Vista Holdings LLC ("Vista"), a non-debtor Unrestricted Subsidiary of SCI, will lend from time to time up to an aggregate principal amount of $150,000,000 to SCI (the "Postpetition Financing") in accordance with the terms hereof and the "DIP Credit Agreement" defined in the DIP Financing Order.  SCI shall, in turn, use the proceeds of the Postpetition Financing to fund the SCI Cash Management System.  The SCI Cash Management System will be the only source of postpetition funding for the other Debtors, the Unrestricted Subsidiaries and the Joint Ventures to satisfy disbursements permitted under the "Budget" defined in the DIP Financing Order.  Without limiting Vista's commitment to make loans to SCI to fund certain disbursements, Past Enterprises may also from time to time after Vista has reduced its available cash to $100,000,000 through funding of Postpetition Financings to SCI, transfer cash to SCI, to the extent available, in such amounts as SCI shall determine to be necessary (but in each case subject to the Budget) to pay administrative obligations of the Debtors during the pendency of the chapter 11 cases and to fund operating cash requirements of the Drop Down Borrowers (as defined in the DIP Financing Order) and to fund the CV PropCo Payments (as defined in the DIP Financing Order).  During the pendency of the chapter 11 cases, all cash proceeds of operations of the Guarantors that are not retained at each Guarantor will be concentrated in the Past Enterprises' concentration account and will be subject to the liens of the Prepetition Agent.  Past Enterprises will serve the treasury function for the

---

[2]     SCI is concurrently moving for entry of the Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (I) Authorizing The Debtors To (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans To Non-Debtor Subsidiaries, (II) Granting Adequate Protection To Prepetition Secured Parties, (III) Granting Related Relief, And (IV) Scheduling Final Hearing (the "DIP Financing Order").  The DIP Financing Order and its associated motion more fully explain and authorize the allocation of spending responsibility under the bifurcated cash management system, including cash handling mechanics between SCI, Vista Holdings, LLC and Past Enterprises and operational funding responsibility.

Guarantors that was served by SCI prior to the Petition Date, and will fund disbursements required to be made by or for the account of the Guarantors.

**A.    The SCI Cash Management System**

17.    <u>Overview</u>.  SCI's corporate accounting managers and senior corporate accounting managers are responsible for the cash management process.  Senior Corporate Accounting Managers include the Director of Treasury, Corporate Director of Accounting, Director of Financial Responsibility and Vice President of Finance.  SCI uses a system of bank accounts that concentrate in a concentration account to manage its cash.  The following paragraphs generally describe the SCI Cash Management System.

18.    <u>Centralization of Funds</u>.  SCI maintains a set of accounts including, among others:  a depository/concentration account, an overnight investment account, a health insurance account, a workers' compensation account, a payroll account, and an accounts payable account. With the exception of the depository/concentration account, most of these accounts are "zero-balance" accounts that, as checks or deposits clear, fund to or from SCI's concentration account.

19.    <u>Account Functions</u>.  The functions of SCI's bank accounts may be generally described as follows:

a.    <u>Concentration Account</u>.  This depository and concentration account is the central account for SCI's cash management system.  This account holds cash and supplies cash to all zero-balance accounts.  Any deposits or wires are made directly to or from this account.

b.    <u>Overnight Investment Account (Deutsche Bank Trust Company as Collateral Account)</u>.  This account is an overnight investment money market account.  Depending on SCI's daily cash flow needs, SCI either draws down from or deposits funds into this account.  With respect to funds on deposit in this account, SCI has instructed its bank to only invest funds in financial instruments qualifying as cash or cash equivalents.

c.    <u>Health Account – Benefit Planners</u>.  This account represents outstanding paid health insurance claim checks and always maintains a credit balance.

1    Funds are automatically transferred from the concentration account on a

2    daily basis through SCI's controlled disbursement process.

3    d.    <u>Workers' Compensation Account</u>.  SCI is self-insured for workers'

4    compensation up to $350,000 per claim.  This account represents a reserve

5    for workers' compensation claims that fall within this threshold.

6    e.    <u>Payroll Account</u>.  This account is used to process payroll checks and direct

7    deposit payments.  Payroll checks are issued from this account on a

8    biweekly basis to all employees.  This is a zero-balance account.

9    f.    <u>Accounts Payable Account</u>.  This account is used to process purchase order

10    items and non-purchase order items.  The purchase order items process can

11    start with the receipt of goods and a vendor invoice.  The non-purchase

12    order items process can start with the receipt of a vendor invoice or an

13    internally generated document, such as a check request or team member

14    expense report.  This is a zero-balance account.

15    20.    <u>Deposits to the Concentration Account</u>.  After regular balancing procedures

16    are carried out at SCI, a daily deposit to the depository/concentration account is prepared for

17    incoming payments received and any excess cash not needed for daily activity.

18    21.    <u>Disbursements</u>.  When the Debtors receive invoices, the invoices are

19    approved by the requisite department head and forwarded to the applicable accounts payable

20    department.  Once accounts payable receives the invoice, a check is processed and signed by

21    certain authorized signatories.  The system of disbursement by wire transfer and checks may be

22    generally described as follows:

23    a.    <u>Wire Transfers</u>.  All wire transfers are made directly from SCI's

24    depository/concentration account.  Only Corporate Accounting is

25    authorized to perform wire transfers.  To process a wire transfer, the

26    Corporate Treasury Manager in charge of cash management ("<u>Treasury</u>

27    <u>Manager</u>") "initiates" the wire transfer within the bank's online wire

28    transfer system.  Before the wire transfer is sent, the Treasury Manager will

1    print out a confirmation slip with the relevant wire transfer information.

2    The Treasury Manager then has the Vice President of Finance, Director of

3    Financial Reporting or Director of Treasury sign the confirmation slip

4    evidencing approval to process the wire.  To send the wire transfer, it must

5    be "released" within its bank's online wire transfer system by someone

6    other than the Treasury Manager or "initiator."  The Director of Financial

7    Reporting and Director of Treasury are the wire transfer system account

8    administrators.  They have the authority to set up Treasury Managers to

9    initiate and release wires.  The bank's online wire transfer system does not

10   permit the same Treasury Manager to both initiate and release a wire (if a

11   Treasury Manager is set up to perform both functions).

12   b.    <u>Checks</u>.  Checks are processed by accounts payable upon its receipt of an

13   approved invoice.  SCI utilizes the Positive Pay system of Bank of

14   America, N.A. ("<u>BofA</u>") to help prevent unauthorized payroll, accounts

15   payable, health insurance and workers' compensation checks from clearing

16   the bank.  BofA's Positive Pay system works as follows:

17   At the end of each day, SCI transmits an electronic file to BofA for

18   any payroll and accounts payable checks generated that day.  For health

19   insurance and workers' compensation, each third-party administrator

20   transmits an electronic file to BofA for any checks generated that day.  If a

21   check is presented to BofA (i) that has not been included on a transmission

22   or (ii) whose amount does not equal the transmission data, BofA will not

23   pay it, unless it is approved by SCI.

24   BofA's website contains an exception report of any checks that have

25   not been paid.  The Treasury Manager is responsible for researching any

26   checks appearing on the exception report.  Each morning the Treasury

27   Manager accesses SCI's bank accounts through BofA's website.  If there

28   are any checks listed on the exception report, the Treasury Manager will

research them to determine if they should be paid.  If they are not valid checks, the Treasury Manager will advise BofA not to pay them.

Both valid and invalid checks appearing on the exception report are investigated to determine why they appeared.  Historically, the number of checks appearing on the exception reports is small, usually involving interim payroll checks being cashed the same day.  Occasionally, a large volume of checks will appear which is usually the result of a problem with the electronic transmission.  In these cases, the Treasury Manager will contact the internet technology department to investigate and possibly re-transmit the file.

22.     <u>Excess Cash and Cash Deficits</u>.  The Treasury Manager prepares a Daily Cash Report to ascertain SCI's daily cash position and this report is reviewed by the Vice President of Finance or Director of Treasury each day.  If the Vice President of Finance or Director of Treasury determines there will not be enough cash in SCI's depository/concentration account, he/she will verbally authorize a drawdown on the overnight investment account or borrow against SCI's corporate credit facility.  To draw down on the overnight investment account, Senior Corporate Accounting Management accesses the account by telephone and completes the required information.

23.     If a cash surplus is projected, it is invested in the overnight investment account.  To make an overnight investment, senior corporate accounting management accesses the overnight investment account by telephone and completes the required information.  In the case of either a drawdown or investment in the overnight investment account, a confirmation slip is printed and forwarded to the Treasury Manager who verifies its information to the Previous Day Summary and Detail Report received the following day from the bank that holds the overnight investment account (the "<u>Investment Account Bank</u>").  With respect to overnight investments, SCI has instructed the Investment Account Bank to only invest funds in financial instruments qualifying as cash or a cash equivalent.

24.    <u>General Balance Sheet Account Reconciliation Process</u>.  The Debtors have a formal and extensive balance sheet account reconciliation process.  A balance sheet account assignment log is maintained.  Each balance sheet account is required to be reconciled every month by the assigned Treasury Manager and reviewed by a senior accounting management Treasury Manager at least semiannually.  SCI's Financial Internal Audit group maintains an audit plan to ensure that all balance sheet account reconciliations are audited annually.  Their findings are reported to the Vice President of Internal Audit and Vice President of Finance and other applicable senior management.  All cash accounts are reconciled monthly and most cash account reconciliations are reviewed by Senior Accounting Management on a monthly basis.

25.    SCI's depository/concentration account is reconciled on a daily basis.  The account reconciliation supporting documentation consists of the Cash Deposit Summary Report, Previous Day Summary and Detail Report, Current Day Controlled Disbursement Presentment Report, Bi-weekly Payroll, wire transfer back-up, and other related supporting documentation.  The account reconciliation supporting documentation for SCI's overnight investment account consists of the signed transaction printouts, the monthly Excel spreadsheet documenting the activity, interest accrual, and the monthly bank securities statement.

26.    The SCI Cash Management System facilitates the Debtors' cash forecasting and reporting, monitoring of the collection and disbursement of funds and administration of their numerous bank accounts (the "<u>SCI Bank Accounts</u>").[3]  Any disruption of the SCI Cash Management System would be costly, divert essential administrative and managerial resources at the outset of these cases, and be extremely detrimental to maintaining the Debtors' ongoing operations in the transition to chapter 11.

**B.    The Non-Debtor Cash Management System**

27.    The Non-Debtor Cash Management System operated through a concentration account at Past Enterprises will provide the Guarantors with a treasury function that replicates the treasury function that SCI previously provided to the Guarantors and that SCI continues to provide to the other Debtors and the Unrestricted Subsidiaries.  SCI will continue to

---

[3]    The SCI Bank Accounts are located at various banks and are listed on the chart attached hereto as <u>Exhibit A</u>.

provide certain centralized functions, such as group purchasing, insurance, employee benefits, central reservations, customer affinity programs and progressive games, for which SCI will be reimbursed by the Guarantors through Past Enterprises.  The costs and obligations that the Debtors intend to cause to be paid by Past Enterprises from the Non-Debtor Cash Management System, consist of the following Budget line items: (i) the "Operating Disbursements" line items in the Budget identified as: "Payroll and Taxes / Benefits," "Advertising / Marketing / Entertainment," "Gaming Fees and Taxes," "Maintenance / Utilities," "Food and Beverage," and "Other" and (ii) the "Non-Operating Disbursements" line items in the Budget identified as: "Capital Expenditures," "Required Deposits" and "Other (Shell Gas Deposit)" (the line items identified in clauses (i) and (ii) being the "Excluded Line Items").  The Excluded Line Items generally fall into the categories that follow:

        a.      employee benefits plans and compensation,

        b.      certain group purchases including, without limitation, with respect to the purchase of food and beverage products,

        c.      customer programs,

        d.      insurance coverage (including workers' compensation, directors' and officers' liability, and various other liability, property, and automobile insurance programs) with respect to the property and operations of the Guarantors,

        e.      gaming equipment,

        f.      rental payments made pursuant to the:  (i) ground lease between Texas Station, LLC and Texas Gambling Hall & Hotel, Inc., as amended; (ii) Office/Warehouse Lease Agreement between SCI and JHS, LLC, as amended; and (iii) lease between J.A. Tiberti Construction Company and Tropicana Station, Inc., as amended,

        g.      marketing and promotional expenses,

        h.      information technology services,

i.      management and development services for Native American tribes or gaming facilities owned or operated by Native American tribes,

j.      certain consulting fees, including, but not limited to (i) fees incurred in connection with the retention of Sentinel Advisors to perform property tax consulting and related services; and (ii) fees incurred in connection with the retention of Kimley-Horn and Associates, Inc. to perform traffic consulting and related services, and

k.      costs incurred in connection with development activity, and costs incurred in connection with copier maintenance services performed on behalf of the Station Group by Toshiba Business Solutions and other servicing companies, including certain costs incurred for the provision of information technology services to SCI.

**C.    Certain Payments to Past Enterprises**

28.     After giving effect to the bifurcation, payment in respect of certain costs and obligations began to be made, and is expected to continue to be made during the pendency of these chapter 11 cases, through the Non-Debtor Cash Management System.  However, in the event that SCI's non-debtor subsidiaries experience a liquidity shortfall during the pendency of these chapter 11 cases and SCI believes that the funds concentrated in the Non-Debtor Cash Management System are insufficient to meet the current or projected obligations of such non-debtor subsidiaries, then SCI may determine to make one or more unsecured subordinated loans to Past Enterprises in the aggregate amount that SCI believes is necessary to address any such liquidity deficit, as authorized and more fully described in the DIP Financing Order.

**V.    CMBS Cash Management System and CMBS Bank Accounts[4]**

29.     <u>Overview</u>.  The CMBS Debtors maintain a cash management system (the "<u>CMBS Cash Management System</u>"), separate from the SCI Cash Management System and the Non-Debtor Cash Management System, as required by the definitive documentation governing the

---

[4]      Capitalized terms used but not defined in Section V shall have the meanings ascribed to such terms in the CMBS Loan Documentation (defined below).

CMBS Loans (the "CMBS Loan Documentation").  The CMBS Cash Management System was created to provide the lenders making the CMBS Mortgage Loan (the "CMBS Mortgage Lender") and the CMBS Mezzanine Loans (each, a "Mezzanine Lender" and for each level of mezzanine financing, the "Mezzanine Lender (First Mezzanine)", the "Mezzanine Lender (Second Mezzanine)", the "Mezzanine Lender (Third Mezzanine)" and the "Mezzanine Lender (Fourth Mezzanine)") to the CMBS Debtors (the "CMBS Lenders") with additional security in connection with the CMBS Loans.

30.    In accordance with the CMBS Loan Documentation for the CMBS Mortgage Loan, the CMBS Debtors established a holding account (the "Holding Account") and subaccounts (collectively, the "CMBS Mortgage Loan Accounts") with HSBC Bank USA, N.A., as the cash management bank (the "CMBS Cash Management Bank").  In addition, under the CMBS Loan Documentation for the CMBS Mezzanine Loans, the CMBS Debtors for each level of mezzanine financing (each, a "First Mezzanine Loan," "Second Mezzanine Loan," "Third Mezzanine Loan," and "Fourth Mezzanine Loan") established a mezzanine account and an additional mezzanine debt service reserve account (the "Mezzanine Accounts").

31.    Control of the Accounts.  The CMBS Debtors have granted to the CMBS Mortgage Lender a first priority security interest in and have authorized the CMBS Mortgage Lender to exercise exclusive control of the CMBS Mortgage Loan Accounts, and the CMBS Debtors have granted to the Mezzanine Lenders a first priority security interest in and have authorized the Mezzanine Lenders to exercise exclusive control over the Mezzanine Accounts (the CMBS Mortgage Loan Accounts and the Mezzanine Loan Accounts are, collectively, the "CMBS Bank Accounts").  The CMBS Debtors anticipate that all cash collateral will be retained under the control of the CMBS Mortgage Lenders in the CMBS Mortgage Loan Accounts and that no cash collateral will be permitted to flow to the Mezzanine Accounts during the pendency of the CMBS Debtor bankruptcy cases.

32.    CMBS Account Functions.  The functions of the CMBS Bank Accounts may be generally described as follows:

a.    Holding Account:  The Holding Account is funded by monthly rent payments under the Master Lease received from SCI, additional charges payable by SCI under the Master Lease and amounts payable by FCP PropCo under the interest rate swap agreement entered into in connection with the CMBS Loans (the "Swap Agreement"); in addition, any amounts payable to FCP PropCo under the interest rate cap agreement for the CMBS Mortgage Loan are to be deposited into the Holding Account.  Amounts on deposit in the Holding Account are transferred to the Tax Reserve Account, the Insurance Reserve Account, the Ground Rent Reserve Account, the Debt Service Reserve Account, the Master Lease Rent Shortfall Reserve Account, the Proceeds Reserve Account, the Swap Payment Account, the First Mezzanine Debt Service Reserve Account, the Second Mezzanine Debt Service Reserve Account, the Third Mezzanine Debt Service Reserve Account and the Fourth Mezzanine Debt Service Reserve Account (the "Sub-Accounts"), as provided in the CMBS Loan Documentation for the CMBS Mortgage Loan.

b.    Tax Reserve Account:  Funds in this account are used to pay taxes assessed against the CMBS Properties.

c.    Insurance Reserve Account:  Funds in this account are used to pay any insurance premiums on insurance policies that the CMBS Debtors are required to maintain in accordance with the CMBS Loan Documentation.

d.    Ground Rent Reserve Account:  Funds in this account are used to pay amounts due under the ground lease and sublease between Boulder Station, Inc. and KB Enterprises, as amended.

e.    Debt Service Reserve Account:  This account contains funds used to pay scheduled interest payments under the CMBS Mortgage Loan.

f.    Master Lease Rent Shortfall Reserve Account:  This account contains funds that are used in the event of a shortfall in the Holding Account with respect to all or any portion of the amounts payable by SCI under the Master Lease.

g.    Proceeds Reserve Account:  This account is used to hold funds that FCP PropCo may receive in connection with any casualty or other damage to any of the CMBS Properties or any taking by a governmental authority as a result of or in lieu of the exercise of the right of condemnation or eminent domain with respect to all or a portion of the CMBS Properties in accordance with the CMBS Loan Documentation.

h.    Swap Payment Account:  This account contains funds used to pay any amounts due to the swap counterparty under the Swap Agreement, including  any breakage charges or amounts FCP PropCo may owe in connection with the full or partial termination of the Swap Agreement.

i.    First Mezzanine Debt Service Reserve Account:  This account contains funds used to pay interest payments (and repay principal on the maturity date) under the (i) Amended and Restated First Mezzanine Note A-1, dated as of March 19, 2008, made by FCP MezzCo Borrower I, LLC, in the principal amount of $125,000,000 and (ii) Amended and Restated First Mezzanine Note A-2, dated as of March 19, 2008, made by FCP MezzCo Borrower I, LLC, in the principal amount of $75,000,000 ("First Mezzanine Debt").

j.    First Mezzanine Account:  Funds in the First Mezzanine Debt Service Reserve Account are transferred to the First Mezzanine Account which is security for the First Mezzanine Loan.  Funds in the First Mezzanine Account are transferred to pay (i) any advances pursuant to the terms of the CMBS Loan Documentation ("Protective Advances") made by the Mezzanine Lender (First Mezzanine), (ii) First Mezzanine Debt interest payments ("Debt Service (First Mezzanine)") for the next occurring interest

payment date, (iii) any amounts for any prior months not previously paid, and (iv) any other amounts deducted from this account in any preceding months to pay other amounts then due under the CMBS Loan Documentation for the First Mezzanine Loan. Protective Advances, payments for prior months not previously paid, and sums deducted from this account in any preceding month to pay any other amounts then due under the CMBS Loan Documentation are transferred to the Mezzanine Lender (First Mezzanine). In addition, any amounts that FCP MezzCo Borrower I, LLC is entitled to receive pursuant to the Interest Rate Cap Agreement (First Mezzanine) it entered into pursuant to the CMBS Loan Documentation for the First Mezzanine Loan are deposited in this account.

k.    <u>Mezzanine Debt Service Reserve Account (First Mezzanine)</u>: This is a sub-account of the First Mezzanine Account. Funds representing unpaid Debt Service (First Mezzanine) for the next occurring interest payment date are transferred to this account and applied for the payment of Debt Service (First Mezzanine).

l.    <u>Second Mezzanine Debt Service Reserve Account</u>: This account contains funds used to pay interest payments (and payments of principal on the maturity date) under the (i) Amended and Restated Second Mezzanine Note A-1, dated as of March 19, 2008, made by FCP MezzCo Borrower II, LLC, in the principal amount of $109,375,000 and (ii) Amended and Restated Second Mezzanine Note A-2, dated as of March 19, 2008, made by FCP MezzCo Borrower II, LLC, in the principal amount of $65,625,000 ("<u>Second Mezzanine Debt</u>").

m.    <u>Second Mezzanine Account</u>: Funds in the Second Mezzanine Debt Service Reserve Account are transferred to the Second Mezzanine Account which is security for the Second Mezzanine Loan. Funds in the Second Mezzanine Account are transferred to pay (i) any Protective Advances made by the

1    Mezzanine Lender (Second Mezzanine), (ii) Second Mezzanine Debt

2    interest payments ("Debt Service (Second Mezzanine)") for the next

3    occurring interest payment date, (iii) any amounts for any prior months not

4    previously paid, and (iv) any other amounts deducted from this account in

5    any preceding months to pay other amounts then due under the CMBS Loan

6    Documentation for the Second Mezzanine Loan.  Protective Advances,

7    payments for prior months not previously paid, and sums deducted from

8    this account in any preceding month to pay any other amounts then due

9    under the CMBS Loan Documentation are transferred to the Mezzanine

10   Lender (Second Mezzanine).  In addition, any amounts that FCP MezzCo

11   Borrower II, LLC is entitled to receive pursuant to the Interest Rate Cap

12   Agreement (Second Mezzanine) it entered into pursuant to the CMBS Loan

13   Documentation for the Second Mezzanine Loan are deposited in this

14   account.

15   n.    Mezzanine Debt Service Reserve Account (Second Mezzanine):  This is a

16         sub-account of the Second Mezzanine Account.  Funds representing unpaid

17         Debt Service (Second Mezzanine) for the next occurring interest payment

18         date are transferred to this account and applied for the payment of Debt

19         Service (Second Mezzanine).

20   o.    Third Mezzanine Debt Service Reserve Account:  This account contains

21         funds used to pay interest payments (and repay principal on the maturity

22         date) under the (i) Amended and Restated Third Mezzanine Note A-1-a,

23         dated as of March 19, 2008, made by FCP MezzCo Borrower III, LLC, in

24         the principal amount of $55,312,500; (ii) Amended and Restated Third

25         Mezzanine Note A-1-b, dated as of March 19, 2008, made by FCP MezzCo

26         Borrower III, LLC, in the principal amount of $38,437,500; (iii) Amended

27         and Restated Third Mezzanine Note A-2-a, dated as of March 19, 2008,

28         made by FCP MezzCo Borrower III, LLC, in the principal amount of

$33,187,500; and (iv) Amended and Restated Third Mezzanine Note A-2-b, dated as of March 19, 2008, made by FCP MezzCo Borrower III, LLC, in the principal amount of $23,062,500 ("Third Mezzanine Debt").

p.    Third Mezzanine Account:  Funds in the Third Mezzanine Debt Service Reserve Account are transferred to the Third Mezzanine Account which is security for the Third Mezzanine Loan.  Funds in the Third Mezzanine Account and transferred to pay (i) any Protective Advances made by Mezzanine Lender (Third Mezzanine), (ii) Third Mezzanine Debt interest payments ("Debt Service (Third Mezzanine)") for the next occurring interest payment date, (iii) any amounts for any prior months not previously paid, and (iv) any other amounts deducted from this account in any preceding months to pay other amounts then due under the CMBS Loan Documentation for the Third Mezzanine Loan.  Protective Advances, payments for prior months not previously paid, and sums deducted from this account in any preceding month to pay any other amounts then due under the CMBS Loan Documentation are transferred to the Mezzanine Lender (Third Mezzanine).  In addition, any amounts that FCP MezzCo Borrower III, LLC is entitled to receive pursuant to the Interest Rate Cap Agreement (Third Mezzanine) it entered into pursuant to the CMBS Loan Documentation for the Third Mezzanine Loan are deposited in this account.

q.    Mezzanine Debt Service Reserve Account (Third Mezzanine):  This is a sub-account of the Third Mezzanine Account.  Funds representing unpaid Debt Service (Third Mezzanine) for the next occurring interest payment date are transferred to this account and applied for the payment of Debt Service (Third Mezzanine).

r.    Fourth Mezzanine Debt Service Reserve Account:  This account contains funds used to pay interest payments (and repay principal on the maturity date) under the (i) Fourth Mezzanine Note A-1-a, dated as of March 19,

1    2008, made by FCP MezzCo Borrower IV, LLC, in the principal amount of

2    $46,875,000; (ii) Fourth Mezzanine Note A-1-b, dated as of March 19,

3    2008, made by FCP MezzCo Borrower IV, LLC, in the principal amount of

4    $46,875,000; (iii) Fourth Mezzanine Note A-2-a, dated as of March 19,

5    2008, made by FCP MezzCo Borrower IV, LLC, in the principal amount of

6    $28,125,000; and (iv) Fourth Mezzanine Note A-2-b, dated as of March 19,

7    2008, made by FCP MezzCo Borrower IV, LLC, in the principal amount of

8    $28,125,000 ("Fourth Mezzanine Debt").

9         s.    Fourth Mezzanine Account:  Funds in the Fourth Mezzanine Debt Service

10    Reserve Account are transferred to the Fourth Mezzanine Account which is

11    security for the Fourth Mezzanine Loan.  Funds in the Fourth Mezzanine

12    account are transferred to pay (i) any Protective Advances made by

13    Mezzanine Lender (Fourth Mezzanine), (ii) Fourth Mezzanine Debt interest

14    payments ("Debt Service (Fourth Mezzanine)") for the next occurring

15    interest payment date, (iii) any amounts for any prior months not previously

16    paid, and (iv) any other amounts deducted from the Fourth Mezzanine

17    Account in any preceding months to pay other amounts then due under the

18    CMBS Loan Documentation for the Fourth Mezzanine Loan.  Protective

19    Advances, payments for prior months not previously paid, and sums

20    deducted from this account in any preceding month to pay any other

21    amounts then due under the CMBS Loan Documentation are transferred to

22    the Mezzanine Lender (Fourth Mezzanine).  In addition, any amounts that

23    FCP MezzCo Borrower IV, LLC is entitled to receive, with respect to the

24    Interest Rate Cap Agreement (Fourth Mezzanine) it was required to enter

25    into pursuant to the CMBS Loan Documentation for the Fourth Mezzanine

26    Loan, are deposited in this account.

27         t.    Mezzanine Debt Service Reserve Account (Fourth Mezzanine):  This is a

28    sub-account of the Fourth Mezzanine Account.  Funds representing unpaid

Debt Service (Fourth Mezzanine) for the next occurring interest payment date are transferred to this account and applied for the payment of Debt Service (Fourth Mezzanine).

33.    <u>Funding of Holding Account</u>  FCP PropCo receives monthly rent payments from SCI, pursuant to the Master Lease, which are collected in the Holding Account.  In addition, scheduled additional charges payable by SCI under the Master Lease and amounts payable by FCP PropCo under the Swap Agreement and any amounts payable to FCP PropCo under the interest rate cap agreement for the CMBS Mortgage Loan are paid into the Holding Account.

34.    <u>Transfers to Sub-Accounts</u>.  FCP PropCo has previously authorized the CMBS Lenders to transfer from the Holding Account certain amounts into the Sub-Accounts.  In addition, each Mezzanine Lender is required to deliver a notice to the CMBS Lenders setting forth the amount required to be deposited into such Mezzanine Lender's mezzanine debt service reserve account for such mezzanine loan.  The amounts in each of the mezzanine debt service reserve accounts created under the CMBS Loan Documentation are then transferred to the applicable mezzanine account.

## VI.    **Existing Business Forms and Records**

35.    In the ordinary course of their business, the Debtors use preprinted business forms (the "<u>Business Forms</u>") such as checks, invoices, stationery, letterhead, casino markers, chips and other similar items.  The Debtors also maintain books and records to document, among other things, their profits and expenses (collectively, the "<u>Records</u>").  If the Debtors were required to comply with the Office of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11" (the "<u>Guidelines</u>") as to the SCI Bank Accounts, CMBS Bank Accounts, Business Forms, and Records, their operations could be harmed by the disruption, confusion, delay, and cost that could result from the closure of the SCI Bank Accounts, the CMBS Bank Accounts, the opening of new accounts, new books and records, and the printing of new business forms with a "Debtor in Possession" designation on them.

## VII.    **Investment Practices and Unauthorized Depository Accounts**

36.    As explained above, as part of the SCI Cash Management System, the Debtors keep all of their operating cash in depository/concentration accounts from which excess cash is then transferred to investment accounts.  Excess cash may, among other things, be (i) used to pay down SCI's corporate credit facility, or (ii) invested in financial instruments qualifying as cash or a cash equivalent.  The Debtors do not invest cash other than in this fashion.  Because the Debtors believe that the investment practices (the "Investment Practices"), as described in this Motion, provide the protection contemplated by the "corporate surety" requirement of the Bankruptcy Code, the Debtors seek a waiver of the requirements of section 345(b) of the Bankruptcy Code.

37.    The Debtors' investment practices are conducted through Banc of America Securities LLC ("BAS").  BAS is not on the US Trustee's list of approved depositories.  SCI holds an overnight investment money market account at BAS.  The name on the account is Deutsche Bank Trust Company as Collateral Account.  The average amount invested in the account is approximately $10.8M.  Depending on the Debtors' daily cash flow needs, SCI either draws down from or deposits funds into this account.  SCI has instructed BAS to only invest funds in financial instruments qualifying as cash or cash equivalents.

38.    BAS is a subsidiary of Bank of America.  BAS is 100% owned by Banc of America Securities Holdings Corporation, which is a wholly owned subsidiary of NB Holdings Corporation.  NB Holdings Corporation is wholly owned by Bank of America Corporation.  BAS is registered as a broker-dealer and as an investment advisor with the SEC.  BAS is a member of the Financial Industry Regulatory Authority New York Stock Exchange, and the National Association of Securities Dealers.  BAS is registered as a futures commission merchant with the Commodity Futures Trading Commission, is a member of the National Futures Association and is a clearing member of principal commodity exchanges in the United States.

39.    BAS is not a bank and its deposits and other holdings are not insured by the FDIC.  BAS is a primary dealer in U.S. Government securities and underwrites and deals in U.S. Government agency obligations, corporate debt and equity securities, state and municipal securities, mortgage and other asset-backed securities, money market instruments and other

financial instruments.  BAS offers various investment banking and financial advisory services in connection with public offerings, mergers and acquisitions, restructurings, private placements, loan syndications, loan trading, derivative produce arrangements, project financings, prime brokerage and futures and options on futures.

40.    According to Audited figures published by BAS as of December 31, 2008, its balance sheet reflected $208 billion in assets and $198 billion in liabilities.  BAS's Annual Audited Report for the period of January 1, 2007 though December 31, 2007 reflects $268 billion in assets and $257 billion in liabilities.

41.    Moody's Investors Service gave BAS a short term credit rating of "P-1" on a Liquidity Risk Assessment performed on July 11, 2008.  An issuer with a Prime-1 credit rating has superior ability to repay short-term debt obligations.  Standard & Poor's gave BAS a credit rating of A-1 as of December 19, 2008.[5]  An "A-1" ranking means that the obligor's capacity to meet its financial commitment on the obligation is strong.[6]

## VIII.    Basis For Relief Requested

42.    Continued use of the SCI Cash Management System, CMBS Cash Management System, SCI Bank Accounts, CMBS Bank Accounts, Records and Business Forms is essential to the Debtors' ongoing operations and restructuring efforts.  Pursuant to 28 U.S.C. § 586(a)(3) and the Guidelines, debtors in possession are required to, among other things, (i) close all existing bank accounts and open new debtor in possession bank accounts, (ii) establish one debtor in possession account for all estate monies required for payment of taxes, including payroll taxes, (iii) physically set aside all monies required by law to be withheld from employees or collected from others for taxes, (iv) open a new set of books and records as of the commencement date of the case, and (v) use new business forms indicating the debtor in possession status of the chapter 11 debtor.  These requirements are intended to provide a clear line of demarcation between prepetition transactions and operations and postpetition transactions and operations, and

---

[5]    Attached to the Friel Declaration as Exhibit "G" is a true and correct copy of Standard & Poor's credit rating dated December 19, 2008.

[6]    Attached to the Friel Declaration as Exhibit "F" is a true and correct copy of Standard & Poor's Rating Symbols & Definitions dated December 1, 2008.

1    to prevent inadvertent payment of prepetition claims.  Due to the sophistication of the Debtors'

2    financial controls, these goals can be addressed in a less disruptive manner.  The Debtors

3    respectfully request entry of an order:  (i) authorizing the Debtors to maintain and continue to use,

4    without interruption, (a) their existing cash management systems (the SCI Cash Management

5    System and the CMBS Cash Management System), including existing bank accounts, (b) their

6    existing books, Records and Business Forms and (c) their existing investment policy; and (ii)

7    waiving the requirements of section 345(b) of the Bankruptcy Code.

8             43.     Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession

9    to "use property of the estate in the ordinary course of business without notice or a hearing." 11

10   U.S.C. § 363(c)(1).  "The framework of section 363 is designed to allow a trustee (or debtor in

11   possession) the flexibility to engage in ordinary transactions without unnecessary creditor and

12   bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard

13   when transactions are not ordinary."  In re Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992).

14   Included within the purview of section 363(c) is a debtor's ability to continue the "routine

15   transactions" necessitated by a debtor's cash management system.  Amdura Nat'l Distrib. Co. v.

16   Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1453 (10th Cir. 1996).  Thus, as one

17   bankruptcy court has explained, "[a]pproval of cash management systems and related procedures

18   and transactions employed in the ordinary course of a debtor's business is common, particularly

19   where . . . a bankruptcy case involves large and complex multiple affiliated debtors." In re

20   Federated Dep't Stores, Inc., 1990 Bankr. LEXIS 84,  at *2 (Bankr. S.D. Ohio Jan. 15, 1990); see

21   also In re The Charter Co., 778 F.2d 617, 621 (11th Cir. 1985) (finding that authorizing the

22   debtors to utilize their prepetition cash management system was entirely consistent with the

23   provisions of the Bankruptcy Code).

24             44.     In addition, section 105(a) of the Bankruptcy Code empowers the Court to

25   "issue any order, process or judgment that is necessary or appropriate to carry out the provisions

26   of this title."  11 U.S.C. § 105(a); see also Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re

27   Am. Hardwoods, Inc.), 885 F.2d 621, 625 (9th Cir. 1989) (explaining that section 105 endows the

28   bankruptcy court with general equitable powers).  For the reasons enumerated below, the Debtors

1    submit that approval of the continued use of the SCI Cash Management System, CMBS Cash

2    Management System, SCI Bank Accounts, CMBS Bank Accounts, and Records and Business

3    Forms is appropriate under the foregoing statutory framework.

4          **A.**    **Continuation of Existing Cash Management Systems (SCI Cash Management System and CMBS Cash Management System), SCI Bank Accounts, CMBS Bank Accounts, and the Records and Business Forms Is Necessary**

5

6            45.    The Debtors strongly believe that only through the continuation of the SCI

7    Cash Management System and CMBS Cash Management System in the ordinary course of

8    business can the chapter 11 reorganization process be achieved in an efficient and cost-effective

9    manner.  No party in interest will be prejudiced or injured by the Debtors' continuing to use the

10   existing SCI Cash Management System and CMBS Cash Management System.  The Debtors will

11   maintain records of all prepetition and postpetition transfers within the SCI Cash Management

12   System and CMBS Cash Management System, so that all transfers and transactions will be

13   documented in their books and records to the same extent such information was maintained by the

14   Debtors prior to the Petition Date.

15           46.    In connection therewith, no party in interest will be prejudiced or injured by

16   the Debtors' maintenance of the SCI Bank Accounts and CMBS Bank Accounts (the "Bank

17   Accounts") in the ordinary course of business.  Prepetition checks, drafts, wire transfers, or other

18   forms of tender that have not yet cleared the relevant drawee bank as of the Petition Date will be

19   honored only if authorized by separate order of this Court.[7]  The Debtors strongly believe that if

20   they were required to replace their existing Bank Accounts with new accounts as of the Petition

21   Date pursuant to the Guidelines, such requirement would unnecessarily disrupt the Debtors'

22   business and impair their efforts to preserve the value of their estate and reorganize in an efficient

23   manner.

24           47.    The Debtors submit that no party in interest will be prejudiced if the

25   Debtors are authorized to continue to use their Records and Business Forms, substantially in the

26   forms existing immediately prior to the Petition Date.  For the reasons set forth above, changing

27   
---
[7]    Contemporaneously herewith, the Debtors have filed several motions seeking the authority to make certain prepetition payments and honor outstanding checks or other transfers or forms of tender issued prepetition in connection with such authorized payment.

28

-25-

Records and Business Forms at this critical, early stage of these chapter 11 cases would be expensive and burdensome to the Debtors' estates and extremely disruptive to the Debtors' operations.

48.    Accordingly, the Debtors seek the entry of an order, pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, authorizing the Debtors to continue the collection, concentration and disbursement of cash pursuant to the SCI Cash Management System and CMBS Cash Management System, the maintenance of their existing Bank Accounts and the use of their existing Records and Business Forms.  Ultimately, because the Debtors process large amounts of cash on a daily basis to facilitate the unique needs of gaming and hotel services, any disruption to the SCI Cash Management System and CMBS Cash Management System or Bank Accounts could seriously harm the Debtors and their estates and creditors.

**B.    Continuation of Current Investment Practices Is Necessary**

49.    The Debtors also submit that the Investment Practices comport with the requirements of section 345 of the Bankruptcy Code relating to the investment and deposit of money of the estate.  Section 345(a) of the Bankruptcy Code authorizes such deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a). While section 345(b) of the Bankruptcy Code generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States secured by the undertaking of a United States Trustee approved corporate surety, the section also allows the court to dispense with this limitation "for cause."  11 U.S.C. § 345(b).

50.    Cause exists in these cases for the Court to allow the Debtors to continue their Investment Practices.  Even dispensing with the fact that it is likely impossible for the Debtors to bond their Investment Practices, the Investment Practices are structured so as to comport with the investment objectives of section 345(a).  The Investment Practices are prudent and have a primary goal of protection of principal and a secondary goal of maximizing yield and

liquidity.  The Investment Practices are conducted, and will continue to be conducted throughout the pendency of these cases, via Banc of America Securities LLC, a reputable financial institution. The Investment Practices therefore provide sufficient protection for the Debtors' cash assets, and it would be in the best interests of their estates and creditors for the Debtors to continue to follow them.  Accordingly, the Debtors seek a waiver of the "corporate surety" requirement of section 345 of the Bankruptcy Code to the extent set forth above.

**C.    "Cause" Exists to Approve the Debtors' Use of Unauthorized Depository Accounts**

51.    Section 345 of the Bankruptcy Code provides the guidelines for deposit or investment of the money of the estate by the trustee or debtor in possession.  The purpose of Section 345 is to ensure that the funds of a bankrupt company "are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate."  In re Service Merchandise Co., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).  Section 345(a) directs the trustee to make such an investment to yield the maximum reasonable net return while considering the safety of the deposit.

52.    "Section 345(b) requires certain precautions against the loss of funds of the estate through deposit or investment to protect creditors of the estate."  COLLIER ON BANKRUPTCY ¶ 345.04 (15th ed. rev. 2006).  "Generally, funds of the estate, as deposited or invested, must be insured or guaranteed by the United States or by a department, agency or instrumentality of the United States, or backed by the full faith and credit of the United States." Id.; see also 11 U.S.C. §345(b)(2).  "If not, then the entity with whom the funds have been deposited or invested must either obtain a bond in favor of the United States or provide the United States obligations to the United States trustee to secure the estate's funds it holds."  Id.  However, section 345(b)(2) allows the court to approve investments other than those permitted by section 345(b) for just cause.  "Cause" is not defined in the Bankruptcy Code.  See In re Service Merchandise Co., 240 B.R. at 897.

53.    In In re Service Merchandise Co., the bankruptcy court found just cause existed to waive the section 345(b) requirements.  The bankruptcy court considered the totality of

circumstances in determining if "cause" existed for relief from the strictures of Section 345(b), which included analyzing the following factors:

1.   The sophistication of the debtor's business;
2.   The size of the debtor's business operations;
3.   The amount of investments involved;
4.   The bank ratings (Moody's and Standard & Poor's) of the financial institutions where debtor-in-possession funds are held;
5.   The complexity of the case;
6.   The safeguards in place within the debtor's own business of insuring the safety of the funds;
7.   The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;
8.   The benefit to the debtor;
9.   The harm, if any, to the estate; and
10.  The reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

See 240 B.R. at 896.

54.    "Cause" exists to permit the Debtors to use a non-cooperating depository because all of the factors listed above favor permitting the investment of funds with BAS. SCI is a large, sophisticated debtor with a complex cash management system. SCI relies on multiple banks and multiple accounts to handle millions of dollars that flow through their accounts on a daily basis. SCI uses its investment account with BAS to deposit excess funds or to draw funds depending on the Debtors' daily cash flow needs.

55.    SCI has a total amount of approximately $30,000,000 invested in the depository account with BAS. SCI has instructed BAS to only invest funds in financial instruments qualifying as cash or cash equivalents. SCI's investment practices are prudent and have a primary goal of protection of principal and a secondary goal of maximizing yield and liquidity.

56.    BAS is a financially sound and reputable institution that has the ability to repay its debt obligations based on its credit rating. BAS is a subsidiary of Bank of America, which is one of the largest financial institutions in the United States.

57.    Requiring SCI to cease using its BAS account will undoubtedly disrupt the Debtors' operations. The investment account is used on a daily basis as part of the Debtors'

1    overall cash management system.  The Debtors should not be required to change their investment

2    strategy and account because SCI's investment practices provide sufficient protection for the

3    Debtors' cash assets.  Therefore, it is in the best interest of the Debtors' estates and creditors for

4    the Debtors to continue to use the non-cooperating depository for their investments.

5            58.    Based on the foregoing, the Debtors request this Court permit them to

6    maintain, close, and open new accounts at non-cooperating financial institutions to invest their

7    excess funds.

8        **D.    The Bankruptcy Code and Applicable Case Law Support Granting the Relief
             Requested Herein**
9

10           59.    Based on the foregoing, the Debtors submit that the relief requested herein

11   is necessary and appropriate, is in the best interests of their estates and all other interested parties,

12   and should be granted in all respects.

13           60.    The Debtors further submit that because the relief requested in this Motion

14   is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth

15   herein, Bankruptcy Rule 6003 has been satisfied.

16           61.    To successfully implement the foregoing, the Debtors seek a waiver of the

17   notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule

18   6004(h).

19

20

21

22

23

24

25

26

27

28

## IX.    Conclusion

**WHEREFORE**, the Debtors respectfully request entry of interim and final orders substantially in the form attached hereto granting (i) the relief requested herein, and (ii) such other and further relief as the Court may deem just and proper.

Dated:  July 28, 2009                     Respectfully submitted,

By:  _____/s_____

Paul S. Aronzon, CA State Bar #88781
Thomas R. Kreller, CA State Bar #161922
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley, #1164
Laury Macauley, #11413
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV 89501
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Proposed Local Reorganization Counsel
for Debtors and Debtors in Possession

# Exhibit A to Cash Management Motion

## SCI Bank Accounts

| Debtor | Name of Bank | Account Type |
|---|---|---|
| Station Casinos, Inc. | Bank of America, N.A. | Accounts Payable |
| Station Casinos, Inc. | Bank of America, N.A. | Branded Visa Account |
| Station Casinos, Inc. | Bank of America, N.A. | Concentration Account |
| Station Casinos, Inc. | Banc of America Securities LLC | Overnight Investment |
| Station Casinos, Inc. | Bank of America, N.A. | Payroll Account |
| Station Casinos, Inc. | Bank of America, N.A. | Worker's Compensation |
| Station Casinos, Inc. | Bank of America, N.A. | Health Account – Benefit Planners |
| Fertitta Partners, LLC | Bank of America, N.A. | Depository/Checking Account |
| FCP VoteCo, LLC | Bank of America, N.A. | Depository/Checking Account |
| FCP Holding, Inc. | Bank of America, N.A. | Depository/Checking Account |

## CMBS Bank Accounts

| Debtor | Name of Bank | Account Type |
|---|---|---|
| FCP Mezzco Borrower I LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower I LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower II LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower II LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower III LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower III LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower IV LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower IV LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP PropCo LLC | Bank of America, N.A. | Depository/Borrower's Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Master Lease Rent Shortfall Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Swap Payment Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Second Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Ground Rent Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Insurance Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Holding Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Tax Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | First Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Third Mezzanine Debt Service Reserve |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Fourth Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Proceeds Reserve Account |

# Exhibit B to Cash Management Motion

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:    (213) 892-4000
Facsimile:    (213) 629-5063

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

In re:

NORTHERN NV ACQUISITIONS, LLC

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects Station Casinos, Inc.
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC

Chapter 11

Case No. BK-09-_____
Jointly Administered

**INTERIM ORDER PURSUANT TO 11
U.S.C. §§ 105(a), 345(b), 363(c) AND 364
FOR AUTHORIZATION TO (i)
CONTINUE CASH MANAGEMENT
SYSTEM, (ii) MAINTAIN EXISTING
BANK ACCOUNTS AND BUSINESS
FORMS, AND (iii) MAINTAIN
EXISTING INVESTMENT POLICY**

Hearing Date:    July 30, 2009
Hearing Time:    1:30 p.m.

LA1:#6398902

1    Upon the motion, dated July 28, 2009 (the "<u>Motion</u>")[1], of Station Casinos, Inc.

2  and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>" or "<u>Station</u>")[2] in

3  the above-captioned chapter 11 cases, for interim and final orders pursuant to sections 105(a),

4  345(b), 363(c), and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as

5  amended, the "<u>Bankruptcy Code</u>") (i) authorizing the Debtors to maintain and continue to use,

6  without interruption, (a) their existing cash management systems (the SCI Cash Management

7  System and the CMBS Cash Management System), including existing bank accounts, (b) their

8  existing books, Records and Business Forms, and (c) their existing investment policy, and

9  (ii) waiving the requirements of section 345(b) of the Bankruptcy Code, as described in the

10  Motion; and upon consideration of the supporting declaration of Thomas M. Friel, sworn to on

11  July 24, 2009; and the Court having jurisdiction to consider the Motion and the relief requested

12  therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the

13  relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

14  proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

15  the Motion having been provided, and it appearing that no other or further notice need be

16  provided; and the Court having determined that the relief sought in the Motion is in the best

17  interests of the Debtors, their creditors and all parties in interest; and the Court having

18  determined that the legal and factual bases set forth in the Motion establish just cause for the

19  relief granted herein; and upon all of the proceedings had before the Court and after due

20  deliberation and sufficient cause appearing therefore, it is hereby

21    **ORDERED** that the Motion is hereby granted in its entirety on an interim basis

22  pending a final hearing thereon (the "<u>Final Hearing</u>") and entry of a superseding Final Order by

23  this Court; and it is further

24

25  [1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

26  [2]    The Debtors in these chapter 11 cases are Northern NV Acquisitions, LLC, Reno Land Holdings, LLC,
       River Central, LLC, Tropicana Station, LLC, FCP Holding, Inc., FCP Voteco, LLC, Fertitta Partners LLC,
27      Station Casinos, Inc., FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower
       VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV,
28      LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC,
       and FCP PropCo, LLC.

1    **ORDERED** that the Debtors are authorized and empowered, pursuant to sections

2    105(a) and 363(c) of the Bankruptcy Code, to pay costs and obligations of the Debtors through

3    their existing cash management systems, as described in the Motion; and it is further

4    **ORDERED** that the Debtors are authorized to (i) designate, maintain and

5    continue to use, without interruption, any or all of their existing Bank Accounts, including but

6    not limited to the Bank Accounts with those banks (the "Banks") listed on Exhibit A attached

7    hereto, in the names and with the account numbers existing immediately before the Petition Date,

8    (ii) deposit funds in and withdraw funds from these accounts by all usual means, including,

9    without limitation, checks, wire transfers, automated transfers and other debits, and (iii) treat

10   their prepetition Bank Accounts for all purposes as debtor in possession accounts; and it is

11   further

12   **ORDERED** that the Debtors are authorized to continue using their Business

13   Forms and Records as described in the Motion, without reference to their status as debtors in

14   possession; and it is further

15   **ORDERED** that the Debtors are authorized to continue using their existing

16   Investment Practices as described in the Motion; and it is further

17   **ORDERED** that the Debtors are authorized and empowered, pursuant to section

18   345 of the Bankruptcy Code to maintain, close and open new accounts not located on the U.S.

19   Trustee's list of authorized depositories; and it is further

20   **ORDERED** that the Debtors are authorized and empowered, pursuant to section

21   345 of the Bankruptcy Code, to continue to deposit funds in and withdraw funds from their

22   investment account maintained at BAS by all usual means; and it is further

23   **ORDERED** that as soon as practicable after entry of this order, the Debtors shall

24   serve a copy of this order on the Banks, including BAS; and it is further

25   **ORDERED** that unless otherwise provided in this order or separately ordered by

26   this Court, no Bank shall honor or pay any bank payments drawn on the Bank Accounts or

27   otherwise issued or dated prior to the Petition Date; and it is further

28

LA1:#6398902                                         -3-

1   **ORDERED** that except as otherwise expressly provided in this order, all Banks at

2   which the Bank Accounts are maintained are authorized and directed to continue to service and

3   administer the Bank Accounts as accounts of the Debtors as debtors in possession, without

4   interruption and in the ordinary course, and to receive, process, honor and pay any and all

5   checks, drafts, wires and automated clearing house transfers issued and drawn on the Bank

6   Accounts after the Petition Date by the holders or makers thereof, as the case may be; and it is

7   further

8   **ORDERED** that the Debtors are authorized to open any new bank accounts or

9   close any existing bank accounts as they may deem necessary and appropriate in their sole

10  discretion; and it is further

11  **ORDERED** that the requirement to establish separate accounts for cash collateral

12  and/or tax payments is hereby waived; and it is further

13  **ORDERED** that, subject to the terms of the Interim Order pursuant to 11 U.S.C.

14  §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(b), (c) and (d) (I)

15  authorizing the Debtors to (a) use cash collateral; (b) obtain unsecured, subordinated post-

16  petition financing; and (c) make loans to non-debtor subsidiaries, (II) granting adequate

17  protection to prepetition secured parties, (III) granting related relief, and (IV) scheduling final

18  hearing, the Debtors are authorized to (i) make transfers to their debtor and non-debtor

19  subsidiaries and affiliates, (ii) honor and make payments in respect of prepetition intercompany

20  obligations to debtor and non-debtor subsidiaries and affiliates, and (iii) make postpetition

21  payments on behalf of their debtor and non-debtor subsidiaries and affiliates to third parties in

22  accordance with prepetition practice or as otherwise described in the Motion; and it is further

23  **ORDERED**, that, except as otherwise permitted by other order of this Court or

24  any other court of competent jurisdiction or by the Bankruptcy Code, nothing herein shall

25  authorize transfers from the CMBS Bank Accounts which are not otherwise permitted under the

26  pre-petition agreements applicable to such accounts; and it is further

27

28

**ORDERED** that the requirements relating to the investment and deposit of money of the estate, with respect to (i) the Guidelines promulgated by the United States Trustee, and (ii) section 345(b) of the Bankruptcy Code, are waived; and it is further

**ORDERED** that the Debtors are authorized, but not required, to (i) pay prepetition amounts outstanding as of the date hereof, if any, owed to their Banks as service charges for the maintenance of the SCI Cash Management System and CMBS Cash Management System, and (ii) reimburse the Banks for any claims arising before or after the Petition Date in connection with customer checks deposited with the Banks that have been dishonored or returned as a result of insufficient funds in the Bank Accounts; and it is further

**ORDERED** that no payment sought in the Motion shall be permissible unless such payment is (i) made pursuant to an Interim or Final Order, as applicable, and (ii) otherwise consistent with the limitations set forth in the Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (I) Authorizing the Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans to Non-Debtor Subsidiaries, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Related Relief, and (IV) Scheduling Final Hearing and the Budget (as defined therein); and it is further

**ORDERED** that in the event there shall be an objection to the requested relief in this Motion being granted on a permanent basis, there shall be a Hearing held on _____ at _____ (Pacific Standard Time), or as soon thereafter as counsel may be heard, to consider the relief requested in this Motion on a permanent basis; and it is further

**ORDERED** that, notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Interim Order, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Interim Order; and it is further

**ORDERED** that the terms and conditions of this order shall be immediately effective and enforceable upon its entry; and it is further

LA1:#6398902

-5-

1    **ORDERED** that within _____ days of this Interim Order, the Debtors shall serve

2    this Interim Order upon the Master Service List pursuant to the Court's Order Establishing

3    Notice Procedures; and it is further

4    **ORDERED** that notice of the Motion as provided therein shall be deemed good

5    and sufficient notice of the Motion.

6

7    SUBMITTED BY:

8    Paul S. Aronzon (CA State Bar No. 88781)

9    Thomas R. Kreller (CA State Bar No. 161922)
     MILBANK, TWEED, HADLEY & McCLOY LLP

10   601 South Figueroa Street, 30th Floor
     Los Angeles, California 90017

11
     Proposed Reorganization Counsel for
12   Debtors and Debtors in Possession

13
     Bruce T. Beesley (NV SBN 1164)
14   Laury Macauley (NV SBN 11413)
     LEWIS AND ROCA LLP
15   50 West Liberty Street, Suite 410
     Reno, Nevada 89501
16   bbeesley@lrlaw.com; lmacauley@lrlaw.com

17
     Proposed Local Reorganization Counsel for
18   Debtors and Debtors in Possession

19                                              # # #

20

21

22

23

24

25

26

27

28

LA1:#6398902                                  -6-

# Exhibit A To Interim Order

## SCI Bank Accounts

| Debtor | Name of Bank | Account Type |
|---|---|---|
| Station Casinos, Inc. | Bank of America, N.A. | Accounts Payable |
| Station Casinos, Inc. | Bank of America, N.A. | Branded Visa Account |
| Station Casinos, Inc. | Bank of America, N.A. | Concentration Account |
| Station Casinos, Inc. | Banc of America Securities LLC | Overnight Investment |
| Station Casinos, Inc. | Bank of America, N.A. | Payroll Account |
| Station Casinos, Inc. | Bank of America, N.A. | Worker's Compensation |
| Station Casinos, Inc. | Bank of America, N.A. | Health Account – Benefit Planners |
| Fertitta Partners, LLC | Bank of America, N.A. | Depository/Checking Account |
| FCP VoteCo, LLC | Bank of America, N.A. | Depository/Checking Account |
| FCP Holding, Inc. | Bank of America, N.A. | Depository/Checking Account |

## CMBS Bank Accounts

| Debtor | Name of Bank | Account Type |
|---|---|---|
| FCP Mezzco Borrower I LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower I LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower II LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower II LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower III LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower III LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower IV LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower IV LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP PropCo LLC | Bank of America, N.A. | Depository/Borrower's Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Master Lease Rent Shortfall Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Swap Payment Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Second Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Ground Rent Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Insurance Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Holding Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Tax Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | First Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Third Mezzanine Debt Service Reserve |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Fourth Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Proceeds Reserve Account |

LA1:#6398902

# EXHIBIT C to Cash Management Motion

1

2

3

4

5

6   Paul S. Aronzon (CA State Bar No. 88781)
    Thomas R. Kreller (CA State Bar No. 161922)
7   MILBANK, TWEED, HADLEY & McCLOY LLP
    601 South Figueroa Street, 30th Floor
8   Los Angeles, California 90017
    Telephone:     (213) 892-4000
9   Facsimile:     (213) 629-5063

10  Proposed Reorganization Counsel for
    Debtors and Debtors in Possession

11

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:     (775) 823-2900
Facsimile:     (775) 823-2929
bbeesley@lrlaw.com;  lmacauley@lrlaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

12

13                    **UNITED STATES BANKRUPTCY COURT**
                          **DISTRICT OF NEVADA**

14  In re:

15  NORTHERN NV ACQUISITIONS, LLC

16  ☐ Affects this Debtor
17  ☒ Affects all Debtors
    ☐ Affects Reno Land Holdings, LLC
18  ☐ Affects River Central, LLC
    ☐ Affects Tropicana Station, LLC
19  ☐ Affects FCP Holding, Inc.
    ☐ Affects FCP Voteco, LLC
20  ☐ Affects Fertitta Partners LLC
    ☐ Affects Station Casinos, Inc.
21  ☐ Affects FCP MezzCo Parent, LLC
    ☐ Affects FCP MezzCo Parent Sub, LLC
22  ☐ Affects FCP MezzCo Borrower VII, LLC
    ☐ Affects FCP MezzCo Borrower VI, LLC
23  ☐ Affects FCP MezzCo Borrower V, LLC
    ☐ Affects FCP MezzCo Borrower IV, LLC
24  ☐ Affects FCP MezzCo Borrower III, LLC
    ☐ Affects FCP MezzCo Borrower II, LLC
25  ☐ Affects FCP MezzCo Borrower I, LLC
    ☐ Affects FCP PropCo, LLC
26

27

Chapter 11

Case No. BK-09-_____
Jointly Administered

**FINAL ORDER PURSUANT TO 11
U.S.C. §§ 105(a), 345(b), 363(c) AND 364
FOR AUTHORIZATION TO (i)
CONTINUE CASH MANAGEMENT
SYSTEM, (ii) MAINTAIN EXISTING
BANK ACCOUNTS AND BUSINESS
FORMS, AND (iii) MAINTAIN
EXISTING INVESTMENT POLICY**

Hearing Date:
Hearing Time:

28

LA1:#6398902

1    Upon the motion, dated July 28, 2009 (the "Motion")[1], of Station Casinos, Inc.

2  and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Station")[2] in

3  the above-captioned chapter 11 cases, for interim and final orders pursuant to sections 105(a),

4  345(b), 363(c), and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as

5  amended, the "Bankruptcy Code") (i) authorizing the Debtors to maintain and continue to use,

6  without interruption, (a) their existing cash management systems (the SCI Cash Management

7  System and the CMBS Cash Management System), including existing bank accounts, (b) their

8  existing books, Records and Business Forms, and (c) their existing investment policy, and (ii)

9  waiving the requirements of section 345(b) of the Bankruptcy Code; and upon consideration of

10  the supporting declaration of Thomas M. Friel, sworn to on July 24, 2009; and the Court having

11  jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

12  §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core

13  proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

14  28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and

15  it appearing that no other or further notice need be provided; and the Court having determined

16  that the relief sought in the Motion is in the best interests of the Debtors, their creditors and all

17  parties in interest; and the Court having determined that the legal and factual bases set forth in

18  the Motion establish just cause for the relief granted herein; and upon all of the proceedings had

19  before the Court and after due deliberation and sufficient cause appearing therefore, it is hereby

20    **ORDERED** that the Motion is hereby granted in its entirety; and it is further

21    **ORDERED** that the Debtors are authorized and empowered, pursuant to sections

22  105(a) and 363(c) of the Bankruptcy Code, to pay costs and obligations of the Debtors through

23  their existing cash management systems, as described in the Motion; and it is further

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

[2]    The Debtors in these chapter 11 cases are Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC, Tropicana Station, LLC, FCP Holding, Inc., FCP Voteco, LLC, Fertitta Partners LLC, Station Casinos, Inc., FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, and FCP PropCo, LLC.

LA1:#6398902                    -2-

**ORDERED** that the Debtors are authorized to (i) designate, maintain and continue to use, without interruption, any or all of their existing Bank Accounts, including but not limited to the Bank Accounts with those banks (the "Banks") listed on Exhibit A attached hereto, in the names and with the account numbers existing immediately before the Petition Date, (ii) deposit funds in and withdraw funds from these accounts by all usual means, including, without limitation, checks, wire transfers, automated transfers and other debits, and (iii) treat their prepetition Bank Accounts for all purposes as debtor in possession accounts; and it is further

**ORDERED** that the Debtors are authorized to continue using their Business Forms and Records as described in the Motion, without reference to their status as debtors in possession; and it is further

**ORDERED** that the Debtors are authorized to continue using their existing Investment Practices as described in the Motion; and it is further

**ORDERED** that as soon as practicable after entry of this order, the Debtors shall serve a copy of this order on the Banks; and it is further

**ORDERED** that unless otherwise provided in this order or separately ordered by this Court, no Bank shall honor or pay any bank payments drawn on the Bank Accounts or otherwise issued or dated prior to the Petition Date; and it is further

**ORDERED** that except as otherwise expressly provided in this order, all Banks at which the Bank Accounts are maintained are authorized and directed to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor and pay any and all checks, drafts, wires and automated clearing house transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be; and it is further

**ORDERED** that the Debtors are authorized to open any new bank accounts or close any existing bank accounts as they may deem necessary and appropriate in their sole discretion; and it is further

1    **ORDERED** that the requirement to establish separate accounts for cash collateral

2    and/or tax payments is hereby waived; and it is further

3    **ORDERED** that, subject to the terms of the Interim Order pursuant to 11 U.S.C.

4    §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(b), (c) and (d) (I)

5    authorizing the Debtors to (a) use cash collateral; (b) obtain unsecured, subordinated post-

6    petition financing; and (c) make loans to non-debtor subsidiaries, (II) granting adequate

7    protection to prepetition secured parties, (III) granting related relief, and (IV) scheduling final

8    hearing, the Debtors are authorized to (i) make transfers to their debtor and non-debtor

9    subsidiaries and affiliates, (ii) honor and make payments in respect of prepetition intercompany

10   obligations to debtor and non-debtor subsidiaries and affiliates, and (iii) make postpetition

11   payments on behalf of their debtor and non-debtor subsidiaries and affiliates to third parties in

12   accordance with prepetition practice or as otherwise described in the Motion; and it is further

13   **ORDERED**, that, except as otherwise permitted by other order of this Court or

14   any other court of competent jurisdiction or by the Bankruptcy Code, nothing herein shall

15   authorize transfers from the CMBS Bank Accounts which are not otherwise permitted under the

16   pre-petition agreements applicable to such accounts; and it is further

17   **ORDERED** that the requirements relating to the investment and deposit of

18   money of the estate, with respect to (i) the Guidelines promulgated by the United States Trustee

19   and (ii) section 345(b) of the Bankruptcy Code, are waived; and it is further

20   **ORDERED** that the Debtors are authorized and empowered, pursuant to section

21   345 of the Bankruptcy Code to maintain, close and open new accounts not located on the U.S.

22   Trustee's list of authorized depositories; and it is further

23   **ORDERED** that the Debtors are authorized and empowered, pursuant to section

24   345 of the Bankruptcy Code, to continue to deposit funds in and withdraw funds from their

25   investment account maintained at BAS by all usual means; and it is further

26   **ORDERED** that the Debtors are authorized, but not required, to (i) pay

27   prepetition amounts outstanding as of the date hereof, if any, owed to their Banks as service

28   charges for the maintenance of the SCI Cash Management System and CMBS Cash Management

System, and (ii) reimburse the Banks for any claims arising before or after the Petition Date in connection with customer checks deposited with the Banks that have been dishonored or returned as a result of insufficient funds in the Bank Accounts; and it is further

**ORDERED** that no payment sought in the Motion shall be permissible unless such payment is (i) made pursuant to an Interim or Final Order, as applicable, and (ii) otherwise consistent with the limitations set forth in the Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (I) Authorizing the Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans to Non-Debtor Subsidiaries, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Related Relief, and (IV) Scheduling Final Hearing and the Budget (as defined therein); and it is further

**ORDERED** that all objections to the relief requested in the Motion have been overruled; and it is further

**ORDERED** that the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Motion; and it is further

**ORDERED** that the terms and conditions of this order shall be immediately effective and enforceable upon its entry; and it is further

1    **ORDERED** that notice of the Motion as provided therein shall be deemed good

2    and sufficient notice of the Motion.

3

4    SUBMITTED BY:

5    Paul S. Aronzon (CA State Bar No. 88781)

6    Thomas R. Kreller (CA State Bar No. 161922)
     MILBANK, TWEED, HADLEY & McCLOY LLP

7    601 South Figueroa Street, 30th Floor
     Los Angeles, California 90017

8
     Proposed Reorganization Counsel for
9    Debtors and Debtors in Possession

10

11   Bruce T. Beesley (NV SBN 1164)
     Laury Macauley (NV SBN 11413)
12   LEWIS AND ROCA LLP
     50 West Liberty Street, Suite 410
13   Reno, Nevada 89501
     bbeesley@lrlaw.com; lmacauley@lrlaw.com
14
15   Proposed Local Reorganization Counsel for
     Debtors and Debtors in Possession
16
                                              # # #
17

18

19

20

21

22

23

24

25

26

27

28

LA1:#6398902                          -6-

# Exhibit A To Final Order

## SCI Bank Accounts

| Debtor | Name of Bank | Account Type |
|---|---|---|
| Station Casinos, Inc. | Bank of America, N.A. | Accounts Payable |
| Station Casinos, Inc. | Bank of America, N.A. | Branded Visa Account |
| Station Casinos, Inc. | Bank of America, N.A. | Concentration Account |
| Station Casinos, Inc. | Banc of America Securities LLC | Overnight Investment |
| Station Casinos, Inc. | Bank of America, N.A. | Payroll Account |
| Station Casinos, Inc. | Bank of America, N.A. | Worker's Compensation |
| Station Casinos, Inc. | Bank of America, N.A. | Health Account – Benefit Planners |
| Fertitta Partners, LLC | Bank of America, N.A. | Depository/Checking Account |
| FCP VoteCo, LLC | Bank of America, N.A. | Depository/Checking Account |
| FCP Holding, Inc. | Bank of America, N.A. | Depository/Checking Account |

## CMBS Bank Accounts

| Debtor | Name of Bank | Account Type |
|---|---|---|
| FCP Mezzco Borrower I LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower I LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower II LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower II LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower III LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower III LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP Mezzco Borrower IV LLC | HSBC Bank USA, N.A. | Mezzanine Account |
| FCP Mezzco Borrower IV LLC | HSBC Bank USA, N.A. | Mezzanine Debt Service Account |
| FCP PropCo LLC | Bank of America, N.A. | Depository/Borrower's Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Master Lease Rent Shortfall Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Swap Payment Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Second Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Ground Rent Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Insurance Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Holding Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Tax Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | First Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Third Mezzanine Debt Service Reserve |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Fourth Mezzanine Debt Service Reserve Account |
| FCP PropCo, LLC | HSBC Bank USA, N.A. | Proceeds Reserve Account |