1   Paul S. Aronzon (CA State Bar No. 88781)
    Thomas R. Kreller (CA State Bar No. 161922)
2   MILBANK, TWEED, HADLEY & McCLOY LLP
    601 South Figueroa Street, 30th Floor
3   Los Angeles, California 90017
    Telephone:    (213) 892-4000
4   Facsimile:    (213) 629-5063

5   Proposed Reorganization Counsel for
    Debtors and Debtors in Possession

    Bruce T. Beesley (NV SBN 1164)
    Laury Macauley (NV SBN 11413)
    LEWIS AND ROCA LLP
    50 West Liberty Street, Suite 410
    Reno, Nevada 89501
    Telephone:    (775) 823-2900
    Facsimile:    (775) 823-2929
    bbeesley@lrlaw.com; lmacauley@lrlaw.com

    Proposed Local Reorganization Counsel for
    Debtors and Debtors in Possession

6

7

8                  **UNITED STATES BANKRUPTCY COURT**
                        **DISTRICT OF NEVADA**
9

10  In re:

11  NORTHERN NV ACQUISITIONS, LLC

12  ☐ Affects this Debtor

13  ☐ Affects all Debtors

    ☐ Affects Reno Land Holdings, LLC

14  ☐ Affects River Central, LLC

    ☐ Affects Tropicana Station, LLC

15  ☐ Affects FCP Holding, Inc.

16  ☐ Affects FCP Voteco, LLC

    ☐ Affects Fertitta Partners LLC

17  ☒ Affects Station Casinos, Inc.

18  ☐ Affects FCP MezzCo Parent, LLC

    ☐ Affects FCP MezzCo Parent Sub, LLC

19  ☐ Affects FCP MezzCo Borrower VII, LLC

20  ☐ Affects FCP MezzCo Borrower VI, LLC

    ☐ Affects FCP MezzCo Borrower V, LLC

21  ☐ Affects FCP MezzCo Borrower IV, LLC

22  ☐ Affects FCP MezzCo Borrower III, LLC

    ☐ Affects FCP MezzCo Borrower II, LLC

23  ☐ Affects FCP MezzCo Borrower I, LLC

24  ☐ Affects FCP PropCo, LLC

25

Chapter 11

Case No. BK-09-_____
Jointly Administered

**MOTION PURSUANT TO 11 U.S.C.
§§ 105(a), 363(b) AND 507(a) FOR
INTERIM AND FINAL ORDERS
(i) AUTHORIZING PAYMENT OF
WAGES, COMPENSATION AND
EMPLOYEE BENEFITS, AND
(ii) AUTHORIZING AND DIRECTING
FINANCIAL INSTITUTIONS TO
HONOR AND PROCESS CHECKS
AND TRANSFERS RELATED TO
SUCH OBLIGATIONS**

Hearing Date:     July 30, 2009
Hearing Time:     1:30 p.m.
Place:            300 Booth Street
                  Reno, NV 89509

26

27

28

LA1:#6398884

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Station Casinos, Inc. ("SCI") and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Station")[1] in the above-captioned chapter 11 cases, hereby submit this motion (the "Motion") for interim and final orders pursuant to sections 105(a), 363(b) and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), (i) authorizing the Debtors to pay certain prepetition employee-related obligations and continue their employee benefit programs postpetition and (ii) authorizing and directing the Disbursement Banks (as defined below) to receive, honor and pay all checks and electronic payment requests drawn on the Debtors' disbursement accounts and automatic payroll transfers related to such employee obligations and, in support of the Motion, respectfully represent as follows:

## LEGAL MEMORANDUM

### I.    Background

1.    The Debtors commenced these chapter 11 cases on July 28, 2009 (the "Petition Date").  SCI and its non-debtor subsidiaries (collectively, the "Station Group") constitute a gaming entertainment enterprise that owns and operates under the "Station" and "Fiesta" brand names ten major hotels/casinos (two of which are 50% owned) and eight smaller casinos (three of which are 50% owned) in the Las Vegas metropolitan area. The Station Group owns ten of the hotels/casinos' underlying real property in fee and leases the underlying real property for Texas Station Gambling Hall & Hotel ("Texas Station"), Wild Wild West Gambling Hall & Hotel ("Wild Wild West"), Barley's Casino & Brewing Company ("Barley's"), and The Greens Gaming and Dining ("The Greens").  Debtor FCP PropCo, LLC ("FCP PropCo") owns the underlying real estate for Palace Station Hotel & Casino ("Palace Station"), Sunset Station

---

[1]    The Debtors in these chapter 11 cases are Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC, Tropicana Station, LLC, FCP Holding, Inc., FCP Voteco, LLC,  Fertitta Partners LLC, Station Casinos, Inc., FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, and FCP PropCo, LLC.

Hotel & Casino ("Sunset Station") and Red Rock Casino Resort Spa ("Red Rock").  FCP PropCo owns a portion of the underlying real property for Boulder Station Hotel & Casino ("Boulder Station") and also leases a portion of Boulder Station's underlying real property.  Station California, LLC ("Station California"), a non-debtor subsidiary of SCI, manages a casino for a Native American tribe.  As of July 17, 2009, the Station Group had approximately 13,174 employees, and the Debtors had approximately 663 employees.  The Station Group's growth strategy includes the master-planned expansions of its existing gaming facilities in Nevada, the development of gaming facilities on certain real estate that the Station Group now owns or is under contract to acquire in the Las Vegas valley and Reno, Nevada, the evaluation and pursuit of additional acquisition or development opportunities in Nevada and other gaming markets, and the pursuit of additional management agreements with Native American tribes.

2.     The Station Group owns and operates:  (i) Palace Station, (ii) Boulder Station, (iii) Texas Station, (iv) Sunset Station, (v) Santa Fe Station Hotel & Casino, (vi) Red Rock, (vii) Fiesta Rancho Casino Hotel, (viii) Fiesta Henderson Casino Hotel, (ix) Wild Wild West, (x) Wildfire Casino, (xi) Wildfire Casino – Boulder Highway, formerly known as Magic Star Casino, (xii) Gold Rush Casino, and (xiii) Lake Mead Casino.

3.     The Station Group also holds a 50% interest in the non-debtor entities that own and operate:  (i) Green Valley Ranch Resort Spa Casino ("Green Valley Ranch"), (ii) Aliante Station Casino & Hotel ("Aliante Station"), (iii) Barley's, (iv) The Greens, and (v) Wildfire Casino & Lanes, formerly known as Renata's Casino.

4.     Each of the Station Group's casinos caters primarily to local Las Vegas area residents.  The Station Group markets the eight "Station" casinos (including Green Valley Ranch, Red Rock and Aliante Station) together under the Station Casinos brand and the two "Fiesta" casinos under the Fiesta brand, offering convenience and choices to residents throughout the Las Vegas valley with its strategically located properties.  In addition, Station California manages Thunder Valley Casino in Northern California on behalf of the United Auburn Indian Community.

LA1:#6398884

5.      As of June 30, 2009 and based on a general ledger book value, the Debtors owned assets valued in the aggregate in excess of approximately $5.7 billion and had debt and other liabilities of approximately $6.5 billion.

6.      SCI is a privately held company whose shares are held by Debtors Fertitta Partners LLC, FCP Holding, Inc. and FCP VoteCo, LLC.  FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, and FCP PropCo, LLC (collectively, the "CMBS Debtors"), as well as Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC and Tropicana Station, LLC, are all either direct or indirect wholly owned subsidiaries of SCI.  Certain of the CMBS Debtors issued a mortgage loan and related mezzanine financings in the aggregate principal amount of $2.475 billion (the "CMBS Loans").  The CMBS Loans are collateralized by substantially all fee and leasehold real property comprising Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Sunset Station Hotel & Casino, and Red Rock.

7.      Filed concurrently herewith, and incorporated herein by reference, is the Omnibus Declaration of Thomas M. Friel in Support of the Debtors' Chapter 11 Petitions and First Day Motions, which contains more detail on the Debtors' assets, liabilities, equity ownership, business operations and business plans.

## II.      Jurisdiction and Venue

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## III.      Relief Requested

9.      As of July 18, 2009, the Debtors employed approximately 663 persons (collectively, the "Debtors' Employees").  To maintain operations and to thereby preserve the value of the Debtors' estates, it is essential that the Debtors retain the uninterrupted service of the Debtors' Employees.  Thus, the Debtors request from the Court the entry of an order, in the form

attached hereto as <u>Exhibit C</u> (the "<u>Interim Order</u>"), (i) authorizing, but not requiring, the Debtors to pay in the ordinary course of business claims for all Prepetition Wages, all Prepetition Accrued Vacation, all Prepetition Medical Plan Amounts, all Prepetition Dental and Vision Plan Amounts, all Prepetition Life and AD&D Plan Amounts, all Prepetition Short-Term Disability Plan Amounts, all Prepetition Supplemental Plan Amounts, all Prepetition 401(k) Plan Amounts, all Prepetition TMAP Amounts, all Prepetition Childcare Amounts, all Prepetition COBRA Benefits Amounts, all Prepetition Unreimbursed Expenses, all Prepetition Temporary Employment Obligations, and all Incidental Costs (as all such terms are defined below) (collectively, the "<u>Prepetition Employee Obligations</u>"), pending entry of a final order in the form attached hereto as <u>Exhibit D</u> (the "<u>Final Order</u>"), (ii) authorizing and directing the applicable banks and other financial institutions (the "<u>Disbursement Banks</u>," as listed on <u>Exhibit A</u> hereto) to receive, honor and pay all checks and electronic payment requests drawn on the Debtors' disbursement accounts and automatic payroll transfers related to such obligations, pending entry of the Final Order, and (iii) setting a final hearing (the "<u>Final Hearing</u>") on the relief requested herein.  Absent the relief requested, the Debtors' Employees would likely suffer personal hardship, which would, in turn, harm morale, thereby hurting the Debtors' operations and productivity as well as their prospects for a successful reorganization.

    10. As of July 18, 2009, the Station Group employed approximately 13,174 employees (collectively, the "<u>Station Group Employees</u>").  SCI procures certain employee benefits and plans (collectively, the "<u>Group Benefits</u>") on behalf of the Debtors' Employees as well as the other Station Group Employees.  Prepetition, all costs associated with the Group Benefits (other than costs paid directly by the Station Group Employees) were paid by SCI.  The majority of Station Group Employees are employees of SCI's non-debtor subsidiaries, however, and thus the Debtors anticipate that, postpetition, all costs associated with the Group Benefits (other than costs paid directly by the Station Group Employees), including Group Benefits that benefit the Debtors' Employees, will be paid by the non-debtor subsidiaries.  Specifically, the costs associated with Group Benefits will be paid postpetition by Past Enterprises, Inc., which is

a wholly owned, non-debtor subsidiary of SCI. Cash flow generated by the non-debtor subsidiaries of SCI will generally be concentrated into an account held by Past Enterprises, Inc.

11.    Procuring Group Benefits for all Station Group Employees together creates certain material cost savings, and separating the procurement process between the Debtors and the non-debtor subsidiaries would be onerous, expensive and impracticable. It is therefore essential that Group Benefits continue to be procured for all Station Group Employees as a group. Thus, Station requests from the Court that the Interim Order include an order authorizing, but not requiring, the Debtors to continue to procure Group Benefits for all of the Station Group Employees, as described below and pending entry of the Final Order, with the understanding that SCI's non-debtor Subsidiaries will pay all costs associated with such Group Benefits (including costs paid on behalf of the Debtors' Employees).

12.    In addition to the Prepetition Employee Obligations for which relief is sought, the Debtors also maintain certain plans for the benefit of its executives and upper management, including a Supplemental Executive Retirement Plan, a Supplemental Management Retirement Plan, and a Deferred Compensation Plan for Managers. At this time, the Debtors do not seek relief with respect to these plans, but the Debtors reserve their rights to seek relief with respect to these plans at a later date.

## IV.    Prepetition Employee Obligations

13.    As of the Petition Date, the Debtors owe aggregate Prepetition Employee Obligations of approximately $4,000,000 in connection with 663 Debtors' Employees, which averages to approximately $6,033 per each Debtors' Employee for wages and benefits. As described below, these Prepetition Employee Obligations consist of certain prepetition claims for wages, accrued vacations and other amounts owed to the Debtors' Employees and certain other amounts deducted from the Debtors' Employees' payroll for payment of payroll taxes and certain employee benefits.

14.    Prepetition Employee Obligations are due and owing as of the Petition Date because, among other things:

a.  Many payroll and expense reimbursement checks issued to Debtors' Employees prior to the Petition Date had not yet been presented for payment or had not yet cleared the bank and, accordingly, had not been honored and paid as of the Petition Date;

b.  Debtors' Employees had not yet been paid certain of their wages, salaries, and other accrued and contractual compensation for services previously rendered to the Debtors or had not yet been reimbursed for business expenses previously advanced on behalf of the Debtors; and

c.  Certain other forms of Prepetition Employee Obligations related to prepetition services, including, without limitation, vacation pay and withholdings for benefit plan contributions, had been accrued prior to the Petition Date but were not yet payable under their terms (for example, most Debtors' Employees had accrued vacation time that they had not yet used).

**A.   Wages and Accrued Vacation**

**1.   Wages, Salaries, and Payroll Deductions**

15.     Prior to the Petition Date, Debtor SCI paid their full-time Debtors' Employees on either an hourly wage or salaried basis. None of the Debtors other than SCI has any employees. The SCI's employees are paid on biweekly pay periods. For SCI's pay period ending July 12, 2009, the aggregate biweekly gross payroll for its hourly employees was approximately $241,168, and the aggregate biweekly gross payroll for all of its salaried employees was approximately $1,585,570. For the pay period ending July 12, 2009, the biweekly gross payroll for all Debtors' Employees was therefore approximately $1,826,738.

16.     In the ordinary course of business, the Debtors withhold payroll-related taxes from the wages and salaries of their Debtors' Employees, as required by law, and pay such amounts to the applicable governmental authorities. These payroll-related taxes include federal withholding taxes, Nevada state withholding taxes, FICA taxes, Medicare payments, federal unemployment tax, Nevada state unemployment tax, and Nevada business tax. For the pay period ending July 12, 2009, approximately $388,811 was withheld from the Debtors' Employees' wages and salaries.

17. On July 17, 2009, all of the Debtors' Employees were paid wages, salaries, and overtime for services provided through July 12, 2009. All such transactions, whether by check or automated clearing house direct deposit ("ACH Direct Deposits") were dated July 17, 2009. The Debtors' Employees have not been paid for wages, salaries, or overtime that have accrued from July 13, 2009 through the Petition Date (which represents the wages, salaries, and overtime for twelve days). All payments to Debtors' Employees for such latter period will be distributed on July 31, 2009, by means of checks or ACH Direct Deposits dated July 31, 2009.

18. The Debtors estimate (based on July 17, 2009 payroll data, which the Debtors believe to be a good approximation of the amounts currently owed) that, as of the Petition Date, they owe their 663 Debtors' Employees an aggregate of approximately $2,089,254 in prepetition wages, salaries, and overtime (collectively, "Prepetition Wages"), which averages to approximately $3,151 per Debtors' Employee and which represents salary and wages for sixteen days since the end of the previous pay period. Of the 663 Debtors' Employees, all but twenty Debtors' Employees (the "Highest Wage Employees") have claims for Prepetition Wages less than $10,950. Of the Highest Wage Employees, nine Debtors' Employees have claims for Prepetition Wages between $11,000 and $15,000, and seven have claims between $15,000 and $20,000. The other four Highest Wage Employees have claims totaling approximately $206,945. The Debtors have a schedule listing the claims for Prepetition Wages, as well as Prepetition Accrued Vacation (as such term is defined below), of each Debtors' Employee (the "Employee Claim Schedule"). Because of its size, the Employee Claim Schedule is not attached to this Motion, but the Debtors will have the schedule available at the hearing on this Motion. The Debtors seek to be authorized, but not directed, to pay in the ordinary course of business all Prepetition Wages. The Debtors also seek to be authorized, but not directed, to pay in the ordinary course of business the payroll-related taxes to the appropriate governmental authorities that are payable as of the Petition Date but remain unpaid. Postpetition, the Debtors intend to continue to pay wages and salaries to the Debtors' Employees and pay all payroll-related taxes in the ordinary course of business and in a manner consistent with past practices.

**2.  Accrued Vacation**

19.      The Debtors provide paid vacation to all eligible Debtors' Employees. Full-time, non-supervisory Debtors' Employees who have twelve months of continuous employment are entitled to paid vacation ranging from one to four weeks based on the length of their employment.  Part-time, non-supervisory Debtors' Employees who have twelve months of continuous employment are entitled to paid vacations based on hours worked.  Certain executive Debtors' Employees are entitled to four weeks of paid vacation regardless of the length of their employment.  The value of the employees' vacation time fluctuates over time, but the aggregate value does not fluctuate dramatically.  Based on the July 17, 2009 payroll data, the Debtors estimate the aggregate value of all Debtors' Employees' accrued and unused vacation time as of the Petition Date to be approximately $1,761,463 (collectively, "Prepetition Accrued Vacation"), which averages to approximately $2,657 per Debtors' Employee.  None of the 663 Debtors' Employees have claims for Prepetition Wages and Prepetition Accrued Vacation that exceed, in aggregate, $10,950, except for the twenty Highest Wage Employees and an estimated thirty-seven other Debtors' Employees.  Of these estimated thirty-seven Debtors' Employees, aggregate claims for Prepetition Wages and Prepetition Accrued Vacation range from approximately $11,121 to $24,659 (twenty-five of these thirty-seven Debtors' Employees have claims less than $15,000, and thirty-four have claims less than $20,000).  These estimated thirty-seven claims generally reflect combinations of relatively high base salaries and relatively large numbers of vacation days accrued in the ordinary course, without any additional special benefits. The Employee Claim Schedule (which the Debtors will have available at the hearing on this Motion) sets forth each Debtors' Employee's claims for Prepetition Wages and Prepetition Accrued Vacation.  Exhibit B attached hereto sets forth the claims for Prepetition Wages and Prepetition Accrued Vacation for each Debtors' Employee with aggregate claims in excess of $10,950.  The Debtors seek authority to pay all claims for Prepetition Accrued Vacation in the ordinary course of business.

B.    **Employee Benefit Plans**

1.    **Medical, Vision and Dental Insurance**

20.    The Debtors provide medical, prescription, vision and dental benefits to all full-time Station Group Employees who have been employed for at least 180 days of continuous employment.  Qualified Station Group Employees may participate in a Health Maintenance Organization ("HMO") or a the Preferred Provider Organization ("PPO").  These benefits are Group Benefits that are procured by SCI on behalf of itself, the other Debtors and SCI's non-debtor subsidiaries.  Prepetition, SCI has paid all costs associated with the HMO and PPO, excluding premium amounts for which Station Group Employees are responsible.  For June 2009, SCI paid an aggregate of approximately $4,177,471 for the HMO and PPO medical plans covering 9,578 participating Station Group Employees.  Costs for which Debtors' Employees are responsible are funded from biweekly payroll deductions.  The Debtors anticipate that, postpetition, all costs of the HMO and PPO for all participating Station Group Employees (including costs paid on behalf of the Debtors' Employees participating in such plans) will be entirely funded by SCI's non-debtor subsidiaries (other than amounts for which Station Group Employees are responsible).  The HMO and PPO medical plans are insured fully by Health Plan of Nevada, Inc.

21.    The providers of HMO and PPO plans provide invoices based on their estimate of the number of Station Group Employees participating in the plan.  During the month, the Debtors and the HMO and PPO plan providers reconcile the invoices to reflect the actual number of employees, and at the end of the month, the HMO and PPO plan providers are paid based on the reconciled number of participating Station Group Employees.  Because enrollment in the HMO and PPO may change on a daily basis, however, the actual number of participating Station Group Employees may, in the ordinary course of business, change from the reconciled number of participating Station Group Employees after the month's payment has already been made.  In such case, an adjustment (either a credit or an additional charge) is made to the following month's invoice to the extent necessary to correct for the change in enrollment (an "Invoice Adjustment").  The Debtors do not believe that any amounts associated with the period

prior to the Petition Date are unpaid with respect to the HMO or PPO providers. However,

changes in enrollment may have occurred prepetition, but after the latest month's invoice was

paid. This would require an Invoice Adjustment to the next invoice. Any such Invoice

Adjustment may reflect prepetition expenses of which the Debtors currently have no specific

knowledge. The Debtors seek to be authorized, but not directed, to pay in the ordinary course of

business any amounts associated with the HMO or PPO plans that are payable as of the Petition

Date and that SCI's non-debtor subsidiaries fail to pay (the "Prepetition Medical Plan

Amounts").

    22. The dental plan is self-funded and is administered by UMR (an affiliate of

UnitedHealthcare Services, Inc.). The vision plan is also self-funded and is administered by

UnitedHealthcare Vision (an affiliate of UnitedHealthcare Services, Inc.). Under the terms of

these self-insured plans, Debtors' Employees submit claims to the claims administrator of the

plans, and the Station Group pays the claims administrator in accordance with the terms of the

applicable plan. In addition, the Station Group has paid UMR and UnitedHealthcare Vision, Inc.

a monthly administration fee, which varies from month to month depending on the number of

Station Group Employees participating in the respective plans, and has paid a network access fee

for the dental plan to Sierra Health and Life Insurance Company, Inc. For the month of June

2009, the administration fees payable for coverage of 9643 participating Station Group

Employees were approximately $17,809 payable to UMR and $11,960 payable to

UnitedHealthcare Vision. The network access fee payable in June to Sierra Health and Life

Insurance Company, Inc. was $4,822. For the same month, claims payable to employees under

both plans were an aggregate of approximately $353,720. Prepetition, all claims and fees for all

Station Group Employees were paid by SCI, and the Debtors anticipate that, postpetition, SCI's

non-debtor subsidiaries will pay all such amounts for all participating Station Group Employees

(including amounts paid on behalf of the participating Debtors' Employees). The Debtors do not

believe that any amounts associated with the period prior to the Petition Date are unpaid with

respect to the dental or vision providers or to employees except for any claims filed by plan

participants in the ordinary course of business that have not yet been paid. The Debtors seek to

be authorized, but not directed, to pay in the ordinary course of business any amounts associated with the dental or vision plans that are payable as of the Petition Date and that SCI's non-debtor subsidiaries fail to pay (the "Prepetition Dental and Vision Plan Amounts").  Postpetition, the Debtors intend to continue to maintain all of its medical, dental and vision plans in a manner consistent with past practices, except that the Debtors anticipate that SCI's non-debtor subsidiaries will pay all costs associated with the plans for all participating Station Group Employees (including costs paid on behalf of the participating Debtors' Employees).

## 2.  Life and Accidental Death and Dismemberment Insurance

23.    The Debtors provide basic life and accidental death and dismemberment ("AD&D") insurance for full-time Station Group Employees underwritten by Principal Life Insurance Company.  These policies are Group Benefits that are procured by SCI on behalf of itself and its non-debtor subsidiaries.  Prepetition, all premiums had been paid by SCI, and the Debtors anticipate that, postpetition, all such amounts (including amounts paid on behalf of the participating Debtors' Employees) will be paid by SCI's non-debtor subsidiaries.  Benefits under the basic life and AD&D policies equal to: (i) an aggregate $32,000 in flat benefits per employee for hourly employees; and (ii) for each salaried employee, a basic life benefit equal to the employee's annual salary not to exceed $300,000 and an AD&D benefit equal to double the employee's annual salary plus $2,000 not to exceed $300,000.  Debtors' Employees age seventy or above receive basic life and AD&D benefits equal to half of the amounts described above. The combined monthly premium for the basic life and AD&D policies described in this paragraph varies from month to month, depending on the number of Station Group Employees participating in the plan.  For the month of June 2009, the combined monthly premiums for the basic life and AD&D policies, covering 10,305 participating Debtors' Employees, were approximately $116,498.  Full-time Debtors' Employees at certain of the Debtors' properties may also purchase supplemental life insurance provided by Metropolitan Life Insurance Company which cost is funded entirely by withholdings from Debtors' Employees' wages.  The Debtors believe that, as of the Petition Date, no amounts are owed for unpaid premiums for basic life and AD&D benefits except for amounts that have been deducted from participants' wages

but that have not yet been paid to Metropolitan Life Insurance Company for supplemental life insurance coverage.  The Debtors seek to be authorized, but not directed, to pay in the ordinary course of business any amounts associated with the basic life, AD&D and supplemental life insurance plans that are payable as of the Petition Date and that SCI's non-debtor subsidiaries fail to pay (the "Prepetition Life and AD&D Plan Amounts").  Postpetition, the Debtors intend to continue to maintain these plans in a manner consistent with past practices, except that the Debtors anticipate that SCI's non-debtor subsidiaries will pay all costs associated with the plans for all participating Station Group Employees (including costs paid on behalf of the participating Debtors' Employees).

### 3. Short -Term Disability

24.     Full-time Station Group Employees are eligible to receive company-paid short-term disability insurance through Principal Life Insurance Company, covering disabilities up to 24 weeks.  This insurance is a Group Benefit that is procured by SCI on behalf of itself and its non-debtor subsidiaries.  Prepetition, SCI paid premiums associated with the plans, and the Debtors anticipate that, postpetition, all such premiums (including premiums paid on behalf of the participating Debtors' Employees) will be paid by SCI's non-debtor subsidiaries.  For the month of June 2009, the aggregate monthly premiums, for coverage of 10,305 participating Debtors' Employees, were approximately $147,675.  The Debtors believe that, as of the Petition Date, no amounts are owed for unpaid premiums.  Nevertheless, the Debtors seek to be authorized, but not directed, to pay in the ordinary course of business any amounts associated with the short-term disability plan that are payable as of the Petition Date and that SCI's non-debtor subsidiaries fail to pay (the "Prepetition Short-Term Disability Plan Amounts").  Postpetition, the Debtors intend to continue to maintain this plan in a manner consistent with past practices, except that the Debtors anticipate that SCI's non-debtor subsidiaries will pay all costs associated with the plan for all participating Station Group Employees (including costs paid on behalf of the participating Debtors' Employees).

### 4. <u>Supplemental Benefits for Executives and Management</u>

25.    The Debtors provide special long-term disability insurance (the "<u>Management Long-Term Disability Plan</u>") to certain key members of management of the Debtors and SCI's non-debtor subsidiaries.  The Management Long-Term Disability Plan is a company-paid individual long-term disability insurance policy, underwritten by Principal Financial Group, paying an additional monthly benefit equal to a combined monthly benefit amount of 66% of the average of base salary plus bonus for the two plan years immediately preceding the plan year in which the participating Station Group Employee's employment is terminated due to disability divided by twelve and subject to adjustment for other benefits received.  The monthly premiums for the Management Long-Term Disability Plan vary from month to month, depending on the number of Station Group Employees participating in the plan.  As of the Petition Date, fifty-three Station Group Employee were a participant in the plan, and premiums for June 2009 were approximately $52,321.  The Debtors also provide special disability insurance, underwritten by Principal Financial Group, to one of its executives (the "<u>Executive Disability Insurance Plan</u>").  For the month of June, premiums were approximately $5,617.

26.    As a negotiated benefit, the Debtors provide the Exec-U-Care Medical Plan to certain members of management of the Debtors and SCI's non-debtor subsidiaries.  The plan is fully insured and underwritten by Jefferson Pilot Financial Insurance Company.  Under the plan, participating Station Group Employees first submit claims for medical care to their basic medical plan and any remaining out-of-pocket expenses are then submitted to the Exec-U-Care Medical Plan for reimbursement not to exceed $10,000 per occurrence.  The cost of the plan varies from month to month, depending on the number of participants and their level of use.  As of the Petition Date, approximately twenty-three Station Group Employees were participants in the Exec-U-Care Medical Plan.  For June 2009, the cost of the plan to the Debtors was approximately $24,195.

27.     The Debtors provide certain key executives with supplemental life insurance through several policies and carriers.  The aggregate annual premiums for all participants are approximately $231,345.

28.     SCI procures each of the aforementioned supplemental benefit plans and insurance as a Group Benefit for the eligible executives and managers of the Debtors and SCI's non-debtor subsidiaries.  Prepetition, SCI paid all costs and premiums associated with these plans and insurance, and the Debtors anticipate that, postpetition, SCI's non-debtor subsidiaries will pay all such amounts for all participating Station Group Employees  (including amounts paid on behalf of the participating Debtors' Employees).  The Debtors believe that, as of the Petition Date, no accrued amounts in connection with these plans and insurance remain unpaid.  Nevertheless, the Debtors seek to be authorized, but not directed, to pay in the ordinary course of business any amounts associated with each of the aforementioned plans that are payable as of the Petition Date and that SCI's non-debtor subsidiaries fail to pay (the "Prepetition Supplemental Plan Amounts").  Postpetition, the Debtors intend to continue to maintain these plans in a manner consistent with past practices, except that the Debtors anticipate that SCI's non-debtor subsidiaries will pay all costs associated with the plans for all participating Station Group Employees (including costs paid on behalf of the participating Debtors' Employees).

5. **401(k) Retirement Savings Plan**

29.     The Debtors sponsor a qualified 401(k) retirement savings plan for eligible Station Group Employees employed within the Station Group.  The program permits eligible Station Group Employees to direct a portion of their wages into the plan.  The 401(k) plan is funded entirely from deductions from the wages and salaries of the Station Group Employees and is administered by DWS Investments.  For the payroll period that ended July 12, 2009, 7,302 Station Group Employees participated in the 401(k) savings plan, from whose wages approximately $498,963 was withheld.  The Debtors seek to be authorized, but not directed, to pay to DWS Investments in the ordinary course of business all 401(k)-related funds that are payable as of the Petition Date but remain unpaid (the "Prepetition 401(k) Plan Amounts").  Postpetition, the Debtors intend to continue to maintain the 401(k) plan in a manner consistent with past practices.

6. **Team Member Assistance Program**

30.     The Debtors offer a program (the "Team Member Assistance Program") that provides professional, confidential counseling to Station Group Employees to assist them with certain personal issues (e.g., marriage and family conflicts, child and adolescent problems, single parenthood, stress and anxiety, depression and grief, gambling problems, alcohol problems, drug problems, and financial troubles).  The Team Member Assistance Program is a Group Benefit administered by Behavioral Healthcare Options, Inc., an affiliate of UnitedHealthcare Services, Inc. ("BHO").  BHO receives a monthly administration fee, which varies from month to month depending on the number of participants in the plan.  The administrative fee for the month of June 2009, covering 13,252 participating Debtors' Employees, was approximately $19,878.  Prepetition, SCI paid all fees and costs associated with the Team Member Assistance Program, and the Debtors anticipate that, postpetition, all such amounts for all participating Station Group Employees (including amounts paid on behalf of the participating Debtors' Employees) will be paid by SCI's non-debtor subsidiaries.  The Debtors believe that, as of the Petition Date, no accrued amounts in connection with the Team Member Assistance Program remain unpaid.  Nevertheless, the Debtors seek to be authorized, but not

directed, to pay in the ordinary course of business any amounts associated with the Team

Member Assistance Program that are payable as of the Petition Date and that SCI's non-debtor

subsidiaries fail to pay (the "Prepetition TMAP Amounts").  Postpetition, the Debtors intend to

continue to maintain this plan in a manner consistent with past practices, except that the Debtors

anticipate that SCI's non-debtor subsidiaries will pay all costs associated with the plan for all

participating Station Group Employees (including costs paid on behalf of the participating

Debtors' Employees).

## 7.  Childcare Programs

31.    The Debtors offers certain Station Group Employees two types of

childcare programs (both together, the "Childcare Programs").  Under one of the Childcare

Programs, the Debtors have engaged Children's Choice Learning Centers, Inc. to provide 24-

hour, on-site childcare services to Station Group Employees at certain of the Debtors' properties.

Participants are charged a fee each time they use this service, and the amount of the fees is

deducted from wages of the participants as they are incurred.  Under the second Childcare

Program, Station Group Employees may receive reimbursement for certain qualifying childcare

expenses.  Amounts reimbursed are deducted from the pre-tax wages of the reimbursed Station

Group Employee, thereby allowing the Station Group Employee to pay childcare expenses with

pre-tax wages.  For the month of June 2009, the aggregate cost of the Childcare Programs to the

Debtors was approximately $32,031.  The Debtors believe that, as of the Petition Date, the

accrued and unpaid amounts in connection with both Childcare Programs is less than $10,000, all

of which represents amounts deducted from Station Group Employees' wages and salaries.  The

Debtors seek to be authorized, but not directed, to pay in the ordinary course of business this

amount and any other amounts associated with the Childcare Programs that are payable as of the

Petition Date (the "Prepetition Childcare Amounts") on behalf of the program participants

(whether payable to Children's Choice Learning Centers, Inc. or the participant, depending on

the Childcare Program).  Postpetition, the Debtors intend to continue to maintain this plan in a

manner consistent with past practices.

1

### 8. COBRA Subsidy

2          32.     Under the American Recovery and Reinvestment Act (the "<u>ARRA</u>"),

3  certain employees of the Station Group who were or are involuntarily terminated between

4  September 1, 2008 and December 31, 2009 receive a subsidy of 65% of the amount of their

5  premiums for benefits ("<u>COBRA Benefits</u>") arising under the Consolidated Omnibus Budget

6  Reconciliation Act of 1985.  Under this program, each of the participating terminated employees

7  pay 35% of the applicable premiums for their COBRA Benefits to UMR, acting as the Station

8  Group's COBRA administrator.  Prepetition, each month, UMR forwarded all such amounts

9  collected from the terminated employees to SCI, and SCI would pay the full amount of the

10  COBRA Benefits premiums (including the 35% paid by the terminated employee plus the

11  remaining 65%) to Health Plan of Nevada, the provider of the COBRA Benefits.  Under the

12  ARRA, SCI received a credit towards its payroll taxes that fully reimbursed SCI for its 65%

13  subsidy of the COBRA Benefits premiums.  Postpetition, the Debtors intend to continue to

14  maintain this program in a manner consistent with past practices, except that the Debtors

15  anticipate that SCI's non-debtor subsidiaries will receive the amounts collected by UMR and will

16  pay all COBRA Benefits premiums to Health Plan of Nevada for all eligible terminated

17  employees (included premiums of eligible employees terminated from the Debtors).  For the

18  month of June 2009, total COBRA Benefits premiums paid to Health Plan of Nevada was

19  approximately $87,375.  The Debtors seek to be authorized, but not directed, to pay to D Health

20  Plan of Nevada in the ordinary course of business all COBRA Benefits premiums that are

21  payable as of the Petition Date but remain unpaid (the "<u>Prepetition COBRA Benefits Amounts</u>").

22     **C.     Miscellaneous Employment Expenses**

23          **1.     Expense Reimbursements**

24          33.     Many of the Debtors' Employees regularly incur certain out-of-pocket,

25  business-related expenses, such as necessary travel expenses.  After incurring such expenses, the

26  Debtors' Employees are required to submit an expense report with appropriate supporting

27  documentation.  This report serves as the mechanism for the Debtors' Employees to receive

28  reimbursement for out-of-pocket travel related expenses (such as airfare, lodging, automobile

rentals and allowances, meals and miscellaneous expenses) within the Debtors' travel policy.

Expense reports are also submitted for other business related activities, such as technical and

professional fees, educational programs and supplies.  Expense reports are processed in due

course.  In addition, certain full-time employees are eligible for an annual tuition reimbursement

not to exceed five hundred dollars ($500), and executive vice presidents of SCI are reimbursed

for an annual physical examination and initiation and annual membership fees for a country club,

lunch club or fitness club.  Certain executives have credit cards chargeable to the company that

may be used to incur business-related expenses.

34.     The Debtors estimate that they owe the Debtors' Employees

approximately $100,000 for expenses incurred prior to the Petition Date that have not been

reimbursed (the "Known Prepetition Unreimbursed Expenses").   Although the Debtors request

that the Debtors' Employees submit reimbursement requests promptly after incurring expenses,

not all of the Debtors' Employees do so.  Accordingly, there may be other prepetition expenses

outstanding of which the Debtors have no specific knowledge (collectively, with the Known

Prepetition Unreimbursed Expenses, the "Prepetition Unreimbursed Expenses").  The Debtors

seek to be authorized, but not directed, to pay the Debtors' Employees in the ordinary course of

business for all Prepetition Unreimbursed Expenses that remain unpaid.   Postpetition, the

Debtors intend to continue its policies regarding expense reimbursements in a manner consistent

with past practices.

## 2. Temporary Employees

35.     The Debtors also employ temporary employees provided through

temporary employment agencies.  Generally, the temporary employment agencies provide

invoices to SCI weekly or monthly, and upon receipt of payment from SCI, the temporary

agencies pay the temporary employees they provide.  On average, SCI pays approximately

$15,000 per month in connection with temporary employment.  The Debtors estimate that the

aggregate and unpaid prepetition obligations owed to temporary employment as of the Petition

Date (the "Prepetition Temporary Employment Obligations") are in accordance with average

costs, and the Debtors believe that payment of all Prepetition Temporary Employment

Obligations is necessary so that the temporary employment agencies will continue to provide adequate staffing for the Debtors.    The Debtors seek to be authorized, but not directed, to pay in the ordinary course of business all Prepetition Temporary Employment Obligations that have accrued as of the Petition Date but remain unpaid.    Postpetition, the Debtors intend to continue to engage temporary employment agencies in the ordinary course of business and in a manner consistent with past practices.

### 3. Incidental Costs

36.    The Debtors request that they be permitted, but not directed, to pay all costs incident to the Prepetition Employee Obligations.  Such costs include, without limitation, all processing costs and payments made to outside professionals in order to facilitate the administration of the programs and policies related to the Prepetition Employee Obligations (the "Incidental Costs").

### 4. Bonus Programs

37.    The Debtors provide a range of bonus programs to certain eligible Debtors' Employees, including retention bonuses, guaranteed bonuses, stretch bonuses, and discretionary target bonuses.  The continued postpetition payment of each of these bonuses will be the subject of a subsequent motion to be filed by the Debtors and are not the subject of this Motion.  Nevertheless, each of these bonus programs is described below for sake of full disclosure.

38.    Under the discretionary target bonus program, the Debtors provide certain eligible Debtors' Employees in positions of management or above with a bonus if the company achieves certain performance criteria.  If all such criteria are achieved, eligible Debtors' Employees who are midlevel managers or directors can receive discretionary target bonuses of up to 15% to 25% of base salary, and eligible Debtors' Employees who are general managers or vice presidents can receive discretionary target bonuses of up to 35% of base salary.  In 2008, none of the business properties met their performance goals, and no discretionary target bonus was payable.  As of the Petition Date, 228 Debtors' Employees may be eligible to receive discretionary bonuses for 2009.  The continued postpetition payment of discretionary bonuses

will be the subject of a subsequent motion to be filed by the Debtors and are not the subject of this Motion.

39.      Under the Debtors' "stretch bonus" program, the Debtors provide bonuses to certain eligible Debtors' Employees in positions of management or above in SCI's food and beverage department and its facilities department if the Debtors' Employee's department achieves certain predetermined performance goals.  Approximately $219,500 in stretch bonuses were paid to approximately ten Debtors' Employees for the year 2008.  No stretch bonuses remain unpaid for 2008.  The continued postpetition payment of discretionary bonuses will be the subject of a subsequent motion to be filed by the Debtors and are not the subject of this Motion.

40.      The Debtors pay to three of the Debtors' Employees guaranteed bonuses for which payment is not conditional upon the Debtors' Employees' or company's performance. Each guaranteed bonus automatically becomes payable on its annual payment date.  In 2009, approximately $263,750 in guaranteed bonuses were paid to the three participating Debtors' Employees for the year 2008.  No guaranteed bonuses remain unpaid for 2008.  The continued postpetition payment of guaranteed bonuses will be the subject of a subsequent motion to be filed by the Debtors and are not the subject of this Motion.

41.      The Debtors also provide retention bonuses to certain Debtors' Employees under the Debtors' Long-Term Stay-On Performance Incentive Plan.  Under this plan, participating Debtors' Employees receive a bonus if their employment with the Debtors continues through certain specified target dates.  Each participating Debtors' Employee has a contract with SCI that specifies the amount of his or her bonus and target dates on which such amounts would become payable.  Currently, approximately fifty-four Debtors' Employees who are senior executives or midlevel managers participate under the plan.  If each participating Debtors' Employee was to remain employed with the Debtors through each of their respective target dates, the Debtors would pay the participating Debtors' Employees, in aggregate, approximately $6,355,417 through June 2014.  During the year 2009 through the Petition Date, approximately $1,108,333 has been paid to participating Debtors' Employees under the plan, and

during the remainder of the year 2009, the plan would obligate the Debtors to pay one Debtors'

Employee approximately $50,000 (assuming such Debtors' Employee remains employed

through December 2009). The continued postpetition payment of bonuses under the Long-Term

Stay-On Performance Incentive Plan will be the subject of a subsequent motion to be filed by the

Debtors and are not the subject of this Motion.

### V.    Basis for Relief Requested

42.    The Bankruptcy Code provides a variety of bases for the relief requested

herein. As discussed in detail below, pursuant to section 363(b) of the Bankruptcy Code, a

debtor is authorized to use property of its estate in the ordinary course of business. The Debtors

thus assert that section 363(b), in concert with the other Bankruptcy Code sections and policies

mentioned below, authorize them to honor and pay prepetition compensation and benefits due

and owing to the Debtors' Employees in the ordinary course of business. Further, the retention

of the Debtors' Employees is necessary for the continued operation of the Debtors' business and

to effectuate a successful reorganization. Consequently, the "necessity of payment" doctrine set

forth in section 105 of the Bankruptcy Code supports the Debtors' requested relief. Finally,

pursuant to section 507(a)(4)(A) of the Bankruptcy Code, claims of Debtors' Employees for

"wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned

within 180 days before the Petition Date are afforded priority unsecured status to the extent of

$10,950 per Debtors' Employee. See 11 U.S.C. § 507(a)(4)(A). Similarly, section 507(a)(5) of

the Bankruptcy Code provides that Debtors' Employees' claims for contributions to certain

employee benefit plans are also afforded priority unsecured status to the extent of $10,950 per

Debtors' Employee covered by such plan, less any amount paid pursuant to section 507(a)(4).

The relief requested herein will affect only the timing of the payment of these priority

obligations.

### A.    Paying Prepetition Employee Obligations is Necessary for the Debtors' Rehabilitation

43.    The "necessity of payment" doctrine embedded in section 105 of the Bankruptcy Code supports the Debtors' request for relief.  Under the "necessity of payment" doctrine, first enunciated by the United States Supreme Court (the "Supreme Court") in Miltenberger v. Logansport, C. & S.W.R. Co., 106 U.S. 286 (1882), a bankruptcy court may use its equitable powers under section 105 of the Bankruptcy Code to permit a debtor in possession to pay prepetition claims when payment is necessary to effectuate the Debtors' bankruptcy goals.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (approving payment of prepetition wages due current employees where it is necessary to pay such claims in order to preserve and protect its business and ultimately reorganize and retain its currently working employees and maintain positive employee morale).  The Ninth Circuit Court of Appeals has acknowledged the doctrine of necessity, stating in dicta:  "[c]ases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as . . . pre-petition wages to key employees . . . ."  Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987).

44.    The necessity of payment doctrine "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during [the] reorganization, payment may be authorized even if it is made out of [the] corpus." In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981); see also Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.), 885 F.2d 621, 625 (9th Cir. 1989) (section 105 endows the bankruptcy court with general equitable powers, where not inconsistent with more specific law); In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) (holding that section 105(a) "provides a statutory basis for the payment of prepetition claims" under the necessity of payment doctrine and noting the Supreme Court accepts the authority of the bankruptcy court "to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11"); In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (explaining that under section 105, the court can permit preplan

payments of a prepetition obligation "when essential to the continued operation of the debtor");

In re Gulf Air, Inc., 112 B.R. 152, 154 (Bankr. W.D. La. 1989) ("[R]etention of skills,

organization, and reputation [. . .] must be considered valuable assets contributing to going

concern value and aiding rehabilitation."); In re Chateaugay Corp., 80 B.R. 279, 287 (Bankr.

S.D.N.Y. 1987) (explaining that a bankruptcy court may exercise its equity powers under section

105 to authorize the payment of prepetition claims where such payment is necessary to "permit

the greatest likelihood of survival of the debtor and payment of creditors in full or at least

proportionately").

45.     Any delay in paying Prepetition Employee Obligations could destroy the

Debtors' relationships with the Debtors' Employees and irreparably impair employee morale at

the very time when the dedication, confidence and cooperation of these employees is most

critical.  The Debtors face the imminent risk that their operations may be severely impaired if the

Debtors are not immediately granted authority to make the payments described in this Motion.

Debtors' Employee support for the Debtors' reorganization efforts is crucial to the success of

those efforts, particularly given the unique knowledge the Debtors' Employees have of the

Debtors' hotel and gaming operations.  At this early stage of this Case, the Debtors simply

cannot risk the substantial disruption to their business operations that would inevitably attend

any decline in work force morale attributable to the Debtors' failure to pay the Prepetition

Employee Obligations.

46.     Given the highly regulated and competitive nature of the Debtors'

businesses and the Debtors' financial situation, replacing key Debtors' Employees vital to the

Debtors' continued operation may be extremely difficult.  Accordingly, preserving Debtors'

Employee morale and retaining the Debtors' Employees is essential to the Debtors' ability to

maintain operations and attempt to reorganize their businesses.  Because the amounts represented

by the Prepetition Employee Obligations are needed to enable the Debtors' Employees to meet

their own personal obligations, absent the relief requested herein, the Debtors' Employees could

suffer undue hardship and, in many instances, serious financial difficulties.  Moreover, without

1    the requested relief, the stability of the Debtors will be undermined by the potential threat that

2    otherwise loyal Debtors' Employees at all levels will seek other employment.

3              **B.    Paying Prepetition Employee Obligations is Permissible in the**
              **Ordinary Course of the Debtors' Business**

4

5              47.    Section 363(b)(1) of the Bankruptcy Code further supports granting the

6    relief request herein.  Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing,

7    may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11

8    U.S.C. § 363(b)(1).  Courts acknowledge that a debtor's relationship with its employees,

9    including the terms and conditions of employment, are matters that are subject to the business

10    judgment of the debtor and may be managed by the debtor in the ordinary course of business.

11    See, e.g., In re Pac. Forest Indus., Inc., 95 B.R. 740, 743 (Bankr. C.D. Cal. 1989) ("Debtors'

12    Employees do not need court permission to be paid and are usually paid as part of the ongoing

13    operation of the business.").  Courts often have permitted debtors to pay prepetition wage claims

14    in the ordinary course of business in response to a motion filed by the debtor in possession at the

15    very outset of the case.  See COLLIER ON BANKRUPTCY ¶ l507.05[1], at 507-26 (15th ed. rev.

16    2006).  Accordingly, the Debtors' employee-relations matters are within the ordinary course of

17    business, including employee compensation and benefits matters.

18              48.    Ultimately, payment of all Prepetition Employee Obligations in

19    accordance with the Debtors' prepetition business practices is in the best interests of the Debtors'

20    estates, creditors and all parties in interest and will enable the Debtors to continue to operate

21    their businesses in an economic and efficient manner without disruption.  The relief sought

22    herein does not materially harm the Debtors' estates or creditors, as the vast bulk of the

23    Prepetition Employee Obligations that the Debtors seek authority to pay would be recoverable by

24    the Debtors' Employees as a priority claim if the Motion was denied.

25              **C.    Due to Section 507, Payment of Prepetition Employee Obligations**
              **Will Have a Minimal Impact on Unsecured Creditors**

26

27              49.    The Debtors believe that nearly all of the Prepetition Employee

28    Obligations relating to the period prior to the Petition Date constitute priority claims under

sections 507(a)(4) of the Bankruptcy Code.  As priority claims, the Prepetition Employee

Obligations must be paid in full before any general unsecured obligations of the Debtors may be

satisfied, and Bankruptcy Code Section 1129(a)(9)(B) requires that these claims be paid in full

over time as a condition to confirmation of a plan (unless the employee agrees to different

treatment).  Accordingly, the relief requested herein will affect only the timing of the payment of

these priority obligations and should not prejudice the rights of general unsecured creditors or

other parties in interest.

50.    The Debtors believe that none of the 663 Debtors' Employees, except for

the approximately twenty Highest Wage Employees, have claims for prepetition salary in excess

of $10,950.  As to the twenty Highest Wage Employees, nine of them have prepetition salary

claims less than $15,000, and seven of them have prepetition salary claims between $15,000 and

$20,000.  The other four have prepetition salary claims of $26,110, $37,978, $43,956 and

$98,901, respectively.

51.    The Debtors estimate that, of the 663 Debtors' Employees, fifty-seven

Debtors' Employees (consisting of the twenty Highest Wage Employees plus thirty-seven others)

have claims for prepetition wages and prepetition accrued vacation that, in aggregate, exceed

$10,950.  Amounts of these claims range from approximately $10,989 to $271,978, of which

twenty-six of the fifty-seven claims are less than $15,000; thirty-eight are less than $20,000;

forty-five are less than $30,000; fifty-one are less than $40,000; and fifty-three are less than

$46,000.  The remaining four claims have an aggregate value of approximately $530,637 and

represent claims by four of the twenty Highest Wage Employees.

52.    The Debtors submit that, to the extent any Debtors' Employee is owed in

excess of $10,950 on account of Prepetition Employee Obligations, payment of such amounts is

necessary and appropriate and may be authorized under sections 105(a) and 363(b) of the

Bankruptcy Code.  As to the twenty Highest Wage Employees, many of these Debtors' are

generally senior management and executive officers of the Station Group who are key to the

continued operation and success of the Debtors.  The majority of the other Highest Wage

Employees would not have claims exceeding $10,950 except for the fact that the Petition Date is

sixteen days after the end of the previous pay period, i.e., their prepetition claims represent

sixteen days' salary and wages. In addition, the salary claims of the twenty Highest Wage

Employees represent their ordinary course salary, paid at prepetition levels, and payment of their

full prepetition claims should not be prejudiced by fact that their claims exceed $10,950. As to

the Debtors' Employees with larger claims for prepetition accrued vacation, their claims

generally reflect combinations of relatively high base salaries and relatively large numbers of

vacation days accrued in the ordinary course, without any additional special benefits.

>    **D.    The Bankruptcy Code and Applicable Case Law Support Granting the Relief Requested Herein**

53.    Based on all of the foregoing, the Debtors seek to be authorized, but not

directed, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code to pay the

Prepetition Employee Obligations in the ordinary course of business.

54.    With respect to payroll taxes, the payment of such taxes will not prejudice

other creditors of the Debtors' estate, as the relevant taxing authorities generally would hold

priority claims under section 507(a)(8) of the Bankruptcy Code in respect of such obligations.

Moreover, the portion of the payroll taxes withheld from an Debtors' Employee's wages on

behalf of the applicable taxing authority are held in trust. As such, these payroll taxes are not

property of the Debtors' estates under section 541 of the Bankruptcy Code. See, e.g., Begier v.

IRS, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and,

as such, are not property of the debtor's estate).

55.    To the extent that a check issued or a funds transfer requested prior to the

Petition Date for payment of Prepetition Employee Obligations has not cleared the particular

bank as of the Petition Date, the Debtors also seek entry of an order (a) authorizing and directing

the Disbursement Banks to honor such checks and/or funds transfer requests and (b) authorizing

the Debtors to issue replacement checks, submit replacement funds transfer requests or provide

other means of payment to the appropriate taxing authorities to the extent necessary to pay all

outstanding prepetition taxes and regulatory fees described in the motion.

1    56.    The Debtors submit that, for the reasons set forth herein, the relief

2    requested in this Motion is necessary to avoid immediate and irreparable harm and Rule 6003 of

3    the Federal Rules of Bankruptcy Procedure has been satisfied.

4    57.    To successfully implement the foregoing, the Debtors seek a waiver of the

5    notice requirements under Rule 6004(a) and the ten-day stay under Rule 6004(h) of the Federal

6    Rules of Bankruptcy Procedure.

7

8                                **VI.    Conclusion**

9    **WHEREFORE**, the Debtors respectfully request entry of interim and final orders

10   substantially in the form attached hereto (i) granting the relief requested herein, and (ii) granting

11   such other and further relief as the Court may deem just and appropriate.

12

13   Dated:  July 28, 2009                    Respectfully submitted,

14

15                                By:    _____/s_____
                                         Paul S. Aronzon, CA State Bar #88781
16                                       Thomas R. Kreller, CA State Bar #161922
                                         MILBANK, TWEED, HADLEY & McCLOY LLP
17                                       601 South Figueroa Street, 30th Floor
                                         Los Angeles, California 90017
18
                                         Proposed Reorganization Counsel for
19                                       Debtors and Debtors in Possession

20
                                         Bruce T. Beesley, #1164
21                                       Laury Macauley, #11413
                                         LEWIS AND ROCA LLP
22                                       50 W. Liberty Street, Ste. 410
                                         Reno, NV   89501
23                                       bbeesley@lrlaw.com; lmacauley@lrlaw.com

24                                       Proposed Local Reorganization Counsel
                                         For Debtors and Debtors in Possession
25

26

27

28

LA1:#6398884                                -28-

# __Exhibit A__

**DISBURSEMENT BANKS & ACCOUNTS**

| Bank | Address | Account Number |
|------|---------|----------------|
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc. Payroll Account |
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc Worker's Comp |
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc. Health Account – Benefit Planners |

# **Exhibit B**

### ESTIMATED PREPETITION WAGES AND PREPETITION ACCRUED VACATION TIME OF EMPLOYEES WITH CLAIMS IN EXCESS OF $10,950

The information is presented in alphabetical order of the names of the Debtors' Employees, but the actual names have been withheld to protect their privacy.  The Debtors will have a copy of the same schedule with the names actually included at the hearing on the Motion, and can make the names available as required.  The Debtors will make the names available to interested parties on execution of a confidentiality agreement.

| Debtors' Employee | Prepetition Wages | Prepetition Accrued Vacation | Total |
|---|---|---|---|
| Employee No. 1 | $9,670 | $8,462 | $18,132 |
| Employee No. 2 | $8,791 | $3,846 | $12,637 |
| Employee No. 3 | $17,582 | $20,000 | $37,583 |
| Employee No. 4 | $5,055 | $8,847 | $13,902 |
| Employee No. 5 | $6,791 | $5,942 | $12,734 |
| Employee No. 6 | $7,244 | $12,677 | $19,921 |
| Employee No. 7 | $8,791 | $9,231 | $18,022 |
| Employee No. 8 | $4,320 | $7,560 | $11,880 |
| Employee No. 9 | $8,967 | $15,692 | $24,659 |
| Employee No. 10 | $5,319 | $9,308 | $14,626 |
| Employee No. 11 | $6,813 | $8,942 | $15,755 |
| Employee No. 12 | $6,816 | $5,964 | $12,781 |
| Employee No. 13 | $18,681 | $17,981 | $36,662 |
| Employee No. 14 | $98,901 | $173,077 | $271,978 |
| Employee No. 15 | $6,154 | $7,000 | $13,154 |
| Employee No. 16 | $5,495 | $9,615 | $15,110 |
| Employee No. 17 | $4,349 | $7,611 | $11,961 |
| Employee No. 18 | $19,780 | $25,962 | $45,742 |
| Employee No. 19 | $5,934 | $7,788 | $13,723 |
| Employee No. 20 | $6,593 | $5,769 | $12,363 |
| Employee No. 21 | $11,429 | $10,000 | $21,429 |
| Employee No. 22 | $15,385 | $13,462 | $28,846 |
| Employee No. 23 | $26,110 | $45,692 | $71,802 |
| Employee No. 24 | $9,231 | $12,115 | $21,346 |
| Employee No. 25 | $6,813 | $5,962 | $12,775 |

| Debtors' Employee | Prepetition Wages | Prepetition Accrued Vacation | Total |
|---|---|---|---|
| Employee No. 26 | $4,754 | $8,319 | $13,073 |
| Employee No. 27 | $5,055 | $6,192 | $11,247 |
| Employee No. 28 | $10,989 | $9,615 | $20,604 |
| Employee No. 29 | $43,956 | $38,462 | $82,418 |
| Employee No. 30 | $7,692 | $6,731 | $14,423 |
| Employee No. 31 | $18,110 | $22,185 | $40,295 |
| Employee No. 32 | $7,033 | $8,615 | $15,648 |
| Employee No. 33 | $8,132 | $7,115 | $15,247 |
| Employee No. 34 | $13,187 | $4,615 | $17,802 |
| Employee No. 35 | $10,075 | $13,223 | $23,298 |
| Employee No. 36 | $12,308 | $3,231 | $15,538 |
| Employee No. 37 | $5,275 | $9,231 | $14,505 |
| Employee No. 38 | $14,286 | $25,000 | $39,286 |
| Employee No. 39 | $37,978 | $66,462 | $104,440 |
| Employee No. 40 | $5,495 | $6,731 | $12,225 |
| Employee No. 41 | $10,989 | $0 | $10,989 |
| Employee No. 42 | $6,593 | $5,769 | $12,363 |
| Employee No. 43 | $12,646 | $22,131 | $34,777 |
| Employee No. 44 | $10,989 | $6,731 | $17,720 |
| Employee No. 45 | $5,934 | $5,192 | $11,126 |
| Employee No. 46 | $4,044 | $7,077 | $11,121 |
| Employee No. 47 | $14,286 | $12,500 | $26,786 |
| Employee No. 48 | $19,780 | $12,115 | $31,896 |
| Employee No. 49 | $6,791 | $8,913 | $15,704 |
| Employee No. 50 | $16,044 | $14,038 | $30,082 |
| Employee No. 51 | $7,912 | $4,846 | $12,758 |
| Employee No. 52 | $6,154 | $5,385 | $11,539 |
| Employee No. 53 | $5,934 | $7,788 | $13,723 |
| Employee No. 54 | $5,495 | $7,212 | $12,706 |
| Employee No. 55 | $4,778 | $8,362 | $13,140 |
| Employee No. 56 | $8,791 | $7,692 | $16,484 |
| Employee No. 57 | $6,593 | $5,769 | $12,363 |

# **Exhibit C**

LA1:#6398884

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:     (213) 892-4000
Facsimile:      (213) 629-5063

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:     (775) 823-2900
Facsimile:      (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>NORTHERN NV ACQUISITIONS, LLC<br><br>☐ Affects this Debtor<br>☐ Affects all Debtors<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects FCP Voteco, LLC<br>☐ Affects Fertitta Partners LLC<br>☒ Affects Station Casinos, Inc.<br>☐ Affects FCP MezzCo Parent, LLC<br>☐ Affects FCP MezzCo Parent Sub, LLC<br>☐ Affects FCP MezzCo Borrower VII, LLC<br>☐ Affects FCP MezzCo Borrower VI, LLC<br>☐ Affects FCP MezzCo Borrower V, LLC<br>☐ Affects FCP MezzCo Borrower IV, LLC<br>☐ Affects FCP MezzCo Borrower III, LLC<br>☐ Affects FCP MezzCo Borrower II, LLC<br>☐ Affects FCP MezzCo Borrower I, LLC<br>☐ Affects FCP PropCo, LLC | Chapter 11<br><br>Case No. BK-09-_____<br>Jointly Administered<br><br>**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 507(a) (i) AUTHORIZING PAYMENT OF WAGES, COMPENSATION AND EMPLOYEE BENEFITS, AND (ii) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**<br><br>Hearing Date:     July 30, 2009<br>Hearing Time:     1:30 p.m. |

LA1:#6398884

Upon the motion, dated July 28, 2009 (the "Motion"),[1] Station Casinos, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Station")[2] in the above-captioned chapter 11 cases, for interim and final orders pursuant to sections 105(a), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") (i) authorizing, but not requiring, the Debtors to pay certain prepetition employee-related obligations in the ordinary course of business; and (ii) authorizing and directing the Debtors' banks to receive, honor and pay all checks and electronic payment requests drawn on the Debtors' disbursement accounts and automatic payroll transfers related to the foregoing; and upon consideration of the supporting declaration of Thomas M. Friel, sworn to on July 24, 2009; and the Court having jurisdiction to consider the Motion, and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of Station and its estate and creditors; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is

**ORDERED** that the Motion is granted on an interim basis pending a final hearing thereon (the "Final Hearing") and entry of a superseding Final Order by this Court; and it is further

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

[2]    The Debtors in these chapter 11 cases are Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC, Tropicana Station, LLC, FCP Holding, Inc., FCP Voteco, LLC, Fertitta Partners LLC, Station Casinos, Inc., FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, and FCP PropCo, LLC.

**ORDERED** that the Debtors are hereby authorized, but not directed, to pay all Prepetition Employee Obligations, as more fully described in the Motion, in the ordinary course of the Debtors' businesses and in accordance with the Debtors' stated policies; and it is further

**ORDERED** that the Debtors are hereby authorized, but not directed, to continue to procure Group Benefits for all of the Station Group Employees on the understanding that SCI's non-debtor Subsidiaries will pay all costs associated with such Group Benefits (including costs paid on behalf of the Debtors' Employees); and it is further

**ORDERED** that the Debtors' banks and financial institutions (the "Disbursement Banks"), including, but not limited to those set forth on Exhibit A annexed hereto, are authorized and directed to process, honor and pay, to the extent of funds on deposit, any and all prepetition checks, wire transfer requests or inter-company transfer requests issued by the Debtors in respect of any Prepetition Employee Obligations, whether pre or postpetition; and it is further

**ORDERED** that nothing in the Motion shall be deemed a request by the Debtors for authority to assume, and nothing in this Order shall be deemed authorization to assume, any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; and it is further

**ORDERED** that to the extent the Debtors believe necessary, the Debtors may serve a copy of this Order on each of the Disbursement Banks upon entry of this Order; and it is further

**ORDERED** that no payment sought in the Motion shall be permissible unless such payment is (i) made pursuant to an Interim or Final Order, as applicable, and (ii) otherwise consistent with the limitations set forth in the Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (I) Authorizing the Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans to Non-Debtor Subsidiaries, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Related Relief, and (IV) Scheduling Final Hearing and the Budget (as defined therein); and it is further

1    **ORDERED** that the Final Hearing is set for _____ at _____

2    (prevailing Pacific Standard Time); and it is further

3    **ORDERED** that, notwithstanding any provision in the Federal Rules of

4    Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the

5    implementation, enforcement or realization of the relief granted in this Interim Order, and the

6    Debtors may, in their discretion and without further delay, take any action and perform any act

7    authorized under this Interim Order; and it is further

8    **ORDERED** that within _____ days of this Interim Order, the Debtors shall serve

9    this Interim Order upon the Master Service List pursuant to the Court's Order Establishing

10   Notice Procedures; and it is further

11   **ORDERED** that notice of the Motion as provided therein shall be deemed good

12   and sufficient notice of the Motion and the requirements of Bankruptcy Rule 6004(a) of the

13   Federal Rules of Bankruptcy Procedure are hereby waived; and it is further

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **ORDERED** that nothing in the Motion or this Order shall be construed as

2  impairing the Debtors' right to contest the validity or amount of any of the Prepetition Employee

3  Obligations.

4

5  SUBMITTED BY:

6  Paul S. Aronzon (CA State Bar No. 88781)
7  Thomas R. Kreller (CA State Bar No. 161922)
   MILBANK, TWEED, HADLEY & McCLOY LLP
8  601 South Figueroa Street, 30th Floor
   Los Angeles, California 90017
9
   Proposed Reorganization Counsel for
10  Debtors and Debtors in Possession

11  Bruce T. Beesley (NV SBN 1164)
12  Laury Macauley (NV SBN 11413)
   LEWIS AND ROCA LLP
13  50 West Liberty Street, Suite 410
   Reno, Nevada 89501
14  bbeesley@lrlaw.com; lmacauley@lrlaw.com

15  Proposed Local Reorganization Counsel for
16  Debtors and Debtors in Possession

17                                          # # #

18

19

20

21

22

23

24

25

26

27

28

LA1:#6398884

# <u>Exhibit A To Interim Order</u>

DISBURSEMENT BANKS & ACCOUNTS

| Bank | Address | Account Number |
|------|---------|----------------|
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc. Payroll Account |
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc Worker's Comp |
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc. Health Account – Benefit Planners |

# **Exhibit D**

1

2

3

4

5

6  Paul S. Aronzon (CA State Bar No. 88781)          Bruce T. Beesley (NV SBN 1164)
   Thomas R. Kreller (CA State Bar No. 161922)       Laury Macauley (NV SBN 11413)
7  MILBANK, TWEED, HADLEY & McCLOY LLP               LEWIS AND ROCA LLP
   601 South Figueroa Street, 30th Floor             50 West Liberty Street, Suite 410
8  Los Angeles, California 90017                     Reno, Nevada 89501
   Telephone:      (213) 892-4000                    Telephone:      (775) 823-2900
9  Facsimile:      (213) 629-5063                    Facsimile:      (775) 823-2929
                                                     bbeesley@lrlaw.com; lmacauley@lrlaw.com
10 Proposed Reorganization Counsel for
   Debtors and Debtors in Possession                 Proposed Local Reorganization Counsel for
11                                                   Debtors and Debtors in Possession

12                        **UNITED STATES BANKRUPTCY COURT**
                                **DISTRICT OF NEVADA**
13

14 In re:                                            Chapter 11

15 NORTHERN NV ACQUISITIONS, LLC                     Case No. BK-09-_____
                                                     Jointly Administered
16 ☐ Affects this Debtor
   ☐ Affects all Debtors                             **FINAL ORDER PURSUANT TO 11**
17 ☐ Affects Reno Land Holdings, LLC                 **U.S.C. §§ 105(a), 363(b), AND 507(a)**
   ☐ Affects River Central, LLC                      **(i) AUTHORIZING PAYMENT OF**
18 ☐ Affects Tropicana Station, LLC                  **WAGES, COMPENSATION AND**
   ☐ Affects FCP Holding, Inc.                       **EMPLOYEE BENEFITS, AND**
19 ☐ Affects FCP Voteco, LLC                         **(ii) AUTHORIZING AND DIRECTING**
20 ☐ Affects Fertitta Partners LLC                   **FINANCIAL INSTITUTIONS TO**
   ☒ Affects Station Casinos, Inc.                   **HONOR AND PROCESS CHECKS**
21 ☐ Affects FCP MezzCo Parent, LLC                  **AND TRANSFERS RELATED TO**
   ☐ Affects FCP MezzCo Parent Sub, LLC              **SUCH OBLIGATIONS**
22 ☐ Affects FCP MezzCo Borrower VII, LLC
23 ☐ Affects FCP MezzCo Borrower VI, LLC
   ☐ Affects FCP MezzCo Borrower V, LLC              Hearing Date:
24 ☐ Affects FCP MezzCo Borrower IV, LLC             Hearing Time:
   ☐ Affects FCP MezzCo Borrower III, LLC
25 ☐ Affects FCP MezzCo Borrower II, LLC
26 ☐ Affects FCP MezzCo Borrower I, LLC
   ☐ Affects FCP PropCo, LLC
27

28

Upon the motion, dated July 28, 2009 (the "Motion"),[1] Station Casinos, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Station")[2] in the above-captioned chapter 11 cases, for an order pursuant to sections 105(a), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") (i) authorizing, but not requiring, the Debtors to pay certain prepetition employee-related obligations in the ordinary course of business; and (ii) authorizing and directing the Debtors' banks to receive, honor and pay all checks and electronic payment requests drawn on the Debtors' disbursement accounts and automatic payroll transfers related to the foregoing; and upon consideration of the supporting declaration of Thomas M. Friel, sworn to on July 24, 2009; and the Court having jurisdiction to consider the Motion, and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of Station and its estate and creditors; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is

**ORDERED** that the Motion is granted in its entirety; and it is further

**ORDERED** that the Debtors are hereby authorized, but not directed, to pay all Prepetition Employee Obligations, as more fully described in the Motion, in the ordinary course of the Debtors' businesses and in accordance with the Debtors' stated policies; and it is further

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

[2]     The Debtors in these chapter 11 cases are Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC, Tropicana Station, LLC, FCP Holding, Inc., FCP Voteco, LLC,  Fertitta Partners LLC, Station Casinos, Inc., FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, and FCP PropCo, LLC.

1          **ORDERED** that the Debtors are hereby authorized, but not directed, to continue

2   to procure Group Benefits for all of the Station Group Employees on the understanding that

3   SCI's non-debtor Subsidiaries will pay all costs associated with such Group Benefits (including

4   costs paid on behalf of the Debtors' Employees); and it is further

5          **ORDERED** that the Debtors' banks and financial institutions (the "Disbursement

6   Banks"), including, but not limited to those set forth on Exhibit A annexed hereto, are authorized

7   and directed to process, honor and pay, to the extent of funds on deposit, any and all prepetition

8   checks, wire transfer requests or inter-company transfer requests issued by the Debtors in respect

9   of any Prepetition Employee Obligations, whether pre or postpetition; and it is further

10          **ORDERED** that nothing in the Motion shall be deemed a request by the Debtors

11   for authority to assume, and nothing in this Order shall be deemed authorization to assume, any

12   executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; and it is

13   further

14          **ORDERED** that to the extent the Debtors believe necessary, the Debtors may

15   serve a copy of this Order on each of the Disbursement Banks upon entry of this Order; and it is

16   further

17          **ORDERED** that all objections to the relief requested in the Motion have been

18   overruled; and it is further

19          **ORDERED** that no payment sought in the Motion shall be permissible unless

20   such payment is (i) made pursuant to an Interim or Final Order, as applicable, and (ii) otherwise

21   consistent with the limitations set forth in the Interim Order Pursuant to 11 U.S.C. §§ 105, 361,

22   362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (I) Authorizing the

23   Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition

24   Financing; (C) Make Loans to Non-Debtor Subsidiaries, (II) Granting Adequate Protection to

25   Prepetition Secured Parties, (III) Granting Related Relief, and (IV) Scheduling Final Hearing and

26   the Budget (as defined therein); and it is further

27          **ORDERED** that, notwithstanding any provision in the Federal Rules of

28   Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the

LA1:#6398884

implementation, enforcement or realization of the relief granted in this Order, and the Debtors

may, in their discretion and without further delay, take any action and perform any act authorized

under this Order; and it is further

        **ORDERED** that notice of the Motion as provided therein shall be deemed good

and sufficient notice of the Motion and the requirements of Bankruptcy Rule 6004(a) are hereby

waived; and it is further

        **ORDERED** that nothing in the Motion or this Order shall be construed as

impairing the Debtors' right to contest the validity or amount of any of the Prepetition Employee

Obligations.


SUBMITTED BY:

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

                          # # #

# <u>Exhibit A To Final Order</u>

DISBURSEMENT BANKS & ACCOUNTS

| Bank | Address | Account Number |
|---|---|---|
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc. Payroll Account |
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc Worker's Comp |
| Bank of America, N.A. | P.O. Box 798, Wichita, KS 67201 | Station Casinos, Inc. Health Account – Benefit Planners |