Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:    (213) 892-4000
Facsimile:      (213) 629-5063

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:      (775) 823-2929
bbeesley@lrlaw.com; tdarby@lrlaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

NORTHERN NV ACQUISITIONS, LLC

☐ Affects this Debtor
☐ Affects all Debtor
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☒ Affects Station Casinos, Inc.
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC
.

Chapter 11

Case No. BK-09-_____

**MOTION FOR INTERIM AND FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 552 AND FED. R. BANKR. P. RULE 4001(b) AND (c) (I) AUTHORIZING THE DEBTORS TO (A) USE CASH COLLATERAL, (B) OBTAIN POSTPETITION FINANCING, AND (C) MAKE LOANS TO NON-DEBTOR SUBSIDIARIES; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) GRANTING RELATED RELIEF, AND (IV) SCHEDULING FINAL HEARING**

Hearing Date:    July 30, 2009
Hearing Time:    1:30 p.m.
Place:            300 Booth Street
                  Reno, NV 89509

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Station Casinos, Inc. ("SCI" or the "Borrower") and its affiliated debtors and debtors in

LA1:#6398834v12

1  possession[1] (excluding the CMBS Debtors,[2] collectively, the "Debtors") in the above-captioned

2  chapter 11 cases (the "Chapter 11 Cases"), hereby submit this motion (the "Motion"),[3] for entry

3  of an interim order (the "Interim Order") and final order (the "Final Order") pursuant to sections

4  105(a), 361, 362, 363, 364 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

5  (as amended, the "Bankruptcy Code") and Rules 4001(b) and (c) of the Federal Rules of

6  Bankruptcy Procedure (the "Bankruptcy Rules"): (i) authorizing and approving, among other

7  things, (a) the Debtors' use of the cash collateral (as defined in Section 363 of the Bankruptcy

8  Code, the "Cash Collateral") of its prepetition secured lenders and the grant of certain adequate

9  protection to such prepetition secured lenders, (b) SCI's obtaining postpetition financing (the

10  "Postpetition Financing") from Vista Holdings, LLC ("Vista") a wholly owned non-debtor

11  subsidiary of SCI, on an unsecured and uncommitted Section 364(b) administrative priority

12  basis, (c) SCI's making of unsecured loans for the benefit of non-debtor wholly owned

13  subsidiaries of SCI, and (d) the form and manner of service of this Motion; and (ii) scheduling

14  interim and final hearings with respect to the relief requested herein, and in support thereof

15  respectfully represent as follows:

## LEGAL MEMORANDUM

### I.    Background

18      1.      The Debtors commenced these chapter 11 cases on July 28, 2009 (the

19  "Petition Date"). SCI and its non-debtor subsidiaries (collectively, the "Station Group")

---

[1]  The Debtors in these chapter 11 cases are Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC, Tropicana Station, LLC, SCI, FCP Holding, Inc. ("FCP Holding"). FCP Voteco LLC ("FCP Voteco") and Fertitta Partners LLC ("Fertitta Partners", and together with FCP Holding and FCP Voteco, the "Holding Companies"), FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC and FCP PropCo, LLC. Collectively, the Holding Companies own one hundred percent (100%) of the stock of SCI.

[2]  The "CMBS Debtors" means, collectively, FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, FCP PropCo, LLC.

[3]  The CMBS Debtors do not join in making this Motion, are not seeking any relief under this Motion, and are not awarded any relief under the Interim Order.

constitute a gaming entertainment enterprise that owns and operates under the "Station" and

"Fiesta" brand names ten major hotels/casinos (two of which are 50% owned) and eight smaller

casinos (three of which are 50% owned) in the Las Vegas metropolitan area. The Station Group

owns ten of the hotels/casinos' underlying real property in fee and leases the underlying real

property for Texas Station Gambling Hall & Hotel ("Texas Station"), Wild Wild West Gambling

Hall & Hotel ("Wild Wild West"), Barley's Casino & Brewing Company ("Barley's"), and The

Greens Gaming and Dining ("The Greens").  Debtor FCP PropCo, LLC ("FCP PropCo") owns

the underlying real estate for Palace Station Hotel & Casino ("Palace Station"), Sunset Station

Hotel & Casino ("Sunset Station") and Red Rock Casino Resort Spa ("Red Rock").  FCP PropCo

owns a portion of the underlying real property for Boulder Station Hotel & Casino ("Boulder

Station") and also leases a portion of Boulder Station's underlying real property.  Station

California, LLC ("Station California"), a non-debtor subsidiary of SCI, manages a casino for a

Native American tribe.  As of July 17, 2009, the Station Group had approximately 13,174

employees, and the Debtors had approximately 663 employees.  The Station Group's growth

strategy includes the master-planned expansions of its existing gaming facilities in Nevada, the

development of gaming facilities on certain real estate that the Station Group now owns or is

under contract to acquire in the Las Vegas valley and Reno, Nevada, the evaluation and pursuit

of additional acquisition or development opportunities in Nevada and other gaming markets, and

the pursuit of additional management agreements with Native American tribes.

2.    The Station Group owns and operates: (i) Palace Station, (ii) Boulder

Station, (iii) Texas Station, (iv) Sunset Station, (v) Santa Fe Station Hotel & Casino, (vi) Red

Rock, (vii) Fiesta Rancho Casino Hotel, (viii) Fiesta Henderson Casino Hotel, (ix) Wild Wild

West, (x) Wildfire Casino, (xi) Wildfire Casino – Boulder Highway, formerly known as Magic

Star Casino, (xii) Gold Rush Casino, and (xiii) Lake Mead Casino.

3.    The Station Group also holds a 50% interest in the non-debtor entities that

own and operate:  (i) Green Valley Ranch Resort Spa Casino ("Green Valley Ranch"),

(ii) Aliante Station Casino & Hotel ("Aliante Station"), (iii) Barley's, (iv) The Greens, and

(v) Wildfire Casino & Lanes, formerly known as Renata's Casino.

4.    Each of the Station Group's casinos caters primarily to local Las Vegas area residents. The Station Group markets the eight "Station" casinos (including Green Valley Ranch, Red Rock and Aliante Station) together under the Station Casinos brand and the two "Fiesta" casinos under the Fiesta brand, offering convenience and choices to residents throughout the Las Vegas valley with its strategically located properties. In addition, Station California manages Thunder Valley Casino in Northern California on behalf of the United Auburn Indian Community.

5.    As of June 30, 2009 and based on a general ledger book value, the Debtors owned assets valued in the aggregate in excess of approximately $5.7 billion and had debt and other liabilities of approximately $6.5 billion.

6.    SCI is a privately held company whose shares are held by Debtors Fertitta Partners LLC, FCP Holding, Inc. and FCP VoteCo, LLC. FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, and FCP PropCo, LLC (collectively, the "CMBS Debtors"), as well as Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC and Tropicana Station, LLC, are all either direct or indirect wholly owned subsidiaries of SCI. Certain of the CMBS Debtors issued a mortgage loan and related mezzanine financings in the aggregate principal amount of $2.475 billion (the "CMBS Loans"). The CMBS Loans are collateralized by substantially all fee and leasehold real property comprising Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Sunset Station Hotel & Casino, and Red Rock.

7.    Filed concurrently herewith, and incorporated herein by reference, is the Omnibus Declaration of Thomas M. Friel in Support of the Debtors' Chapter 11 Petitions and First Day Motions, which contains more detail on the Debtors' assets, liabilities, equity ownership, business operations and business plans.

## II.    Jurisdiction and Venue

8.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## III.    Relief Requested

9.    By this Motion, the Debtors seek entry of an order authorizing them to use the cash collateral of their prepetition lenders and to obtain postpetition financing.  Pursuant to Bankruptcy Rules 4001(b) and (c), the principal provisions of the Interim Order, a proposed copy of which is attached as Exhibit A hereto, are as follows (capitalized terms used but not immediately defined herein shall have the meanings ascribed to them later in this Motion or in the Interim Order, as the case may be):

A.    **Summary of Material Relief Relating to Cash Collateral Use**.

(a) **Cash Collateral Use**.[4]  SCI may use cash (which is generated primarily from the operation by the non-debtor Guarantors[5] and Unrestricted Subsidiaries of their casinos and related assets), including all of the Prepetition Secured Parties' cash collateral (as defined in section 363 of the Bankruptcy Code, the "Cash Collateral") and all products and proceeds thereof, now owned or hereafter acquired, in which the Prepetition Agent, on behalf of the Prepetition Secured Parties, purports to have a lien or security interest, to satisfy the Debtors' and certain of their subsidiaries' ongoing general corporate and working capital expenses, to pay operating costs and other expenses, subject to the terms of the Interim Order, including, without limitation, the Budget (defined below) and to make adequate protection payments to the Prepetition Agent (defined below).  Notwithstanding anything herein to the contrary, neither the Debtors nor any other estate representatives (including, without limitation, the Committee or any trustee) shall use or be permitted to use any cash or Cash Equivalents deposited or maintained from time to time in the letter of credit cash collateral account (the "L/C Cash Collateral Account"; and the amounts deposited or maintained therein the "L/C Cash Collateral") established pursuant to the L/C Cash Collateral Agreement, and the term "Cash Collateral" as used herein shall not include the L/C Cash Collateral.

---

[4]    In the event of any conflict or inconsistency between the summaries provided in the introductory paragraphs of the Interim Order, on the one hand, and the specific terms, conditions and provisions set forth elsewhere in the Interim Order, the specific terms, conditions and provisions of the Interim Order shall prevail.

[5]    Capitalized terms used but not defined herein have the meanings given them in the Prepetition Loan Agreement or, if not defined therein, the Forbearance Agreement (each as defined below).

For the avoidance of doubt, cash or Cash Equivalents pledged to Bank of America, N.A by Vista (as defined below), a non-debtor, wholly owned subsidiary of SCI, to secure the Cash Management Obligations of SCI and its Subsidiaries (the "CMO Cash Collateral") shall not be "Cash Collateral" as such term is used herein and nothing herein shall be deemed to authorize the Debtors, their Subsidiaries or any estate representative (including, without limitation, the Committee or any trustee) to use the CMO Cash Collateral.

(b) **Adequate Protection**.  The Prepetition Agent (for the benefit of the Prepetition Secured Parties) shall receive all of the following adequate protection in respect of the use, sale or lease of the Prepetition Collateral, including the use of Cash Collateral, the Carve-Out and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code: (A) replacement liens on all assets (other than "Excluded Assets" as defined in the prepetition Security Agreement) of the Debtors, whether now owned or hereafter acquired, and the products and proceeds thereof, pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code; (B) a superpriority claim against the Debtors pursuant to section 507(b) of the Bankruptcy Code; (C) a catch up payment of all unpaid prepetition interest and fees (including, without limitation, Letter of Credit fees and agency fees); (D) current cash payment of all postpetition interest and fees (including, without limitation, Letter of Credit fees, regularly scheduled amounts payable with respect to Cash Management Obligations and Secured Hedge Agreements (and interest on the termination damages if such Secured Hedge Agreements are terminated) and agency fees) accrued under the Prepetition Loan Agreement or such other applicable prepetition agreements; (E) current cash payment to the prepetition Term Lenders of scheduled principal amortization payments in the amounts and on the dates due in accordance with the Prepetition Loan Agreement (without giving effect to the acceleration of the Obligations); (F) payment of prepetition and postpetition reasonable fees and expenses of the Prepetition Agent's lead co-counsel, local counsel and financial advisor and a single legal counsel to each other Agent; and (G) confirmation of liens on all assets of Past Enterprises, Inc. ("Past Enterprises"), including, without limitation, all deposit accounts of Past Enterprises, in favor of the Prepetition Agent to secure the Prepetition Obligations.

(c) **Automatic Stay**.  The Automatic Stay is modified and vacated to the extent necessary to permit the Prepetition Agent to exercise its rights and remedies following the written notice of the occurrence of an Event of Default (defined below) under the Interim Order, subject to SCI's right to challenge the occurrence of such Event of Default and seek non-consensual use of Cash Collateral.

LA1:#6398834v12

(d) **Drop Down Loans and CV PropCo Contributions**.

(i)    Drop Down Loans: The Drop Down Loans (defined below) are intercompany loans from SCI (as lender) to (x) Past Enterprises and (y) the non-debtor Unrestricted Subsidiaries and Joint Ventures named on Schedule 2 to the Interim Order (Past Enterprises and the entities set forth on Schedule 2 to the Interim Order are referred to herein as the "Drop Down Borrowers", which term, for the avoidance of doubt, shall not include any CMBS Debtors). All proceeds of Drop Down Loans received by Past Enterprises (as a Drop Down Borrower) shall be on-lent to the applicable non-debtor Guarantors set forth on Schedule 1 to the Interim Order, in each case, subject to the Budget. Except for Drop Down Loans to Past Enterprises, SCI shall not make any Drop Down Loans directly to non-debtor Guarantors set forth on Schedule 1 to the Interim Order.

(ii)    CV PropCo Contributions: The CV PropCo Contributions (defined below) are cash equity contributions made by SCI to CV HoldCo, LLC, a wholly owned, non-debtor Subsidiary of SCI ("CV HoldCo"). CV HoldCo, in turn, will immediately contribute the proceeds of such intercompany advances as a cash equity contribution to its wholly owned subsidiary, CV PropCo, LLC ("CV PropCo").

(iii)    Purpose: The proceeds of the Drop Down Loans shall be used by the Drop Down Borrowers for working capital and general corporate purposes and, in each case, subject to the Budget (it being understood and agreed that Past Enterprises shall on-lend the proceeds of all Drop Down Loans that it receives to the applicable non-debtor Guarantors set forth on Schedule 1 to the Interim Order for their working capital and general corporate purposes and, in each case, subject to the Budget). The proceeds of the CV PropCo Contributions shall be used by CV PropCo to make regularly scheduled interest payments at the non-default rate on its Land Loan, and to pay its insurance premiums and property taxes, all of which payments shall be subject to the Budget (collectively, the "CV PropCo Payments").

(iv)    Use of Cash Collateral: Each Drop Down Loan and each CV PropCo Contribution made by SCI shall constitute a use of Cash Collateral. As additional adequate protection for such use of Cash Collateral, each Drop Down Loan and each intercompany on-loan made by Past Enterprises to one or more of the non-debtor Guarantors set forth on Schedule 1 to the Interim Order shall be evidenced by promissory notes which shall be in form and substance satisfactory to the Prepetition Agent and be pledged and promptly delivered (together with endorsements in blank) to the Prepetition Agent and encumbered by the Adequate Protection Liens. The CV PropCo Contributions will be evidenced by the equity of CV HoldCo, LLC. All equity of CV HoldCo has been validly pledged by SCI to, and such pledge duly perfected by, the Prepetition Agent pursuant to the Prepetition Loan Documents (defined below).

(e) **Nature and Amount of DIP Financing**.  Pursuant to a credit agreement, substantially in the form of Exhibit B attached to the Interim Order ("DIP Credit Agreement" and, collectively with any promissory notes executed by SCI in connection with the DIP Credit Agreement, the "DIP Documents"), Vista Holdings, LLC, a wholly owned "unrestricted" subsidiary of SCI ("Vista") shall from time to time, subject to the terms hereof, lend to SCI up to $150,000,000 in cash on an unsecured and subordinated administrative priority basis under section 364(b) of the Bankruptcy Code[6].  SCI shall exclusively use money borrowed from Vista, prior to the use of any other cash maintained at the Debtors' or in any of their other Subsidiaries' accounts, to fund all disbursements permitted under the Budget, other than disbursements made in respect of the amounts set forth in the following line items of the Budget, which specific items may be paid by Past Enterprises.

     (i)     the "Operating Disbursements" line items in the Budget identified as: "Payroll and Taxes/Benefits," "Advertising/Marketing/Entertainment," "Gaming Fees and Taxes," "Maintenance/Utilities," "Food and Beverage," and "Other" and

     (ii)     the "Non-Operating Disbursements" line items in the Budget identified as: "Capital Expenditures," "Required Deposits" and "Other (Shell Gas Deposit)" (the line items identified in clauses (i) and (ii) being the "Excluded Line Items").

Subject to the last sentence hereof, Vista shall fund all disbursements set forth in the Budget (other than disbursements identified in the Excluded Line Items) by making unsecured and subordinated loans to SCI under the DIP Credit Agreement.  SCI, in turn, shall use the proceeds of such loans to make Drop Down Loans, CV PropCo Contributions and such other disbursements as are permitted by the Budget.  Notwithstanding anything herein or in the DIP Documents to the contrary, Vista shall fund all disbursements permitted by the Budget (other than the Excluded Line Items, which may be funded by Past Enterprises) at any time that Vista's cash balance is equal to or greater than $100,000,000 and, at any time that Vista's cash balance is equal to or less than $100,000,000, then Vista may make the Postpetition Financing available to SCI on a discretionary basis to fund disbursements set forth in the Budget and any such amounts not so funded by loans from Vista may be funded by loans from Past Enterprises to SCI in accordance with the terms of the Interim Order or Final Order.

(f) **Parties with Interest in Cash Collateral**. The parties with interest in Cash Collateral are: Deutsche Bank Trust Company Americas ("DBTCA"), as administrative agent (in such capacity, the "Prepetition Agent") and a lender, the other lenders from time to time party thereto (together with DBTCA, the

---

[6]    The Court is advised that matters related to financing and cash collateral use for the CMBS Debtors will be addressed in a separate motion.

"Prepetition Lenders"), under the Prepetition Loan Agreement (defined below). (Interim Order, Recital F).

(g) **Stipulations; Releases by Debtors**.  As a condition to Cash Collateral use, SCI and the other Debtors have stipulated to the validity, extent and priority of the Prepetition Obligations (as defined below) and the Prepetition Liens (as defined below) and have agreed to release and to not bring claims or assert defenses or setoff rights relating to the Prepetition Obligations against the Prepetition Agent and the Prepetition Lenders, subject to the right of any other party-in-interest (including any Committee (as defined below)) to investigate and commence suit against the Prepetition Agent and the Prepetition Lenders in the time frame permitted under the Interim Order and the Final Order ((Interim Order ¶ 13).

(h) **Carve-Out**.  The Adequate Protection Liens and the Superpriority Claim shall be subject to the estates' payment (the "Carve Out") of the following expenses: (i) the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; and (ii) costs, fees and expenses incurred by professionals retained pursuant to Section 327 of the Bankruptcy Code by the Debtors and any Committee, which costs, fees and expenses were accrued and unpaid from and after the date of receipt by the Debtors' of written notice from the Prepetition Agent of the occurrence of an Event of Default (as defined in the Interim Order), and only to the extent such costs, fees and expenses are allowed by the Court, in an aggregate amount not to exceed $100,000, plus (without duplication) all accrued and unpaid allowed costs, fees and expenses incurred by professionals retained by the Debtors and any Committee prior to the occurrence of such date.  The Carve Out shall not limit the ability of Vista to directly pay Debtors' professionals so long as such payment is not made from the Debtors' Cash Collateral.  (Interim Order ¶ 5).

(i) **Termination of Right to Use Cash Collateral**.  Absent the occurrence of an Event of Default under the Interim Order, the right to use Cash Collateral terminates on January 31, 2009.  If the effective date of a plan of reorganization to which the Prepetition Lenders have consented has occurred, use of Cash Collateral will terminate on the earlier of (a) ten (10) days following the plan effective date and (b) February 10, 2010. (Interim Order ¶¶ 15(r) and (s)).

B.      **Summary of Material Provisions of Postpetition Financing**.

(a) **Nature and Amount of Financing**.  Pursuant to a credit agreement, substantially in the form of Exhibit B to the Interim Order (the "DIP Credit Agreement" and, collectively with any other loan agreement, notes, guaranties, security documents or other agreements or instruments executed by Borrower in connection with the DIP Credit Agreement, the "DIP Documents"), Vista will lend to SCI up to $150,000,000 cash on an unsecured, administrative priority basis under § 364(b) of the Bankruptcy Code.  (Interim Order ¶ 4).

(b) **Borrowing Limits**.  Borrowings under the Postpetition Financing cannot exceed (i) an aggregate amount equal to $75,000,000 at any time following the entry of the Interim Order, but prior to the entry of the Final Order, and (ii) an aggregate amount equal to $150,000,000 at any time following the entry of the Final Order. (DIP Credit Agreement § 2.01).

(c) **Borrowing Conditions**.  Each borrowing under the Postpetition Financing is conditioned upon (i) Vista's receipt of Borrower's executed DIP Credit Agreement; (ii) Vista's receipt of an executed Uncommitted Loan Notice, (iii) other than for approvals from Gaming Authorities, all governmental and third party approvals for the Postpetition Financing having been obtained by Borrower and (iv) there being no Events of Default under the DIP Credit Agreement. (DIP Credit Agreement §§ 3.01 and 3.02).

(d) **Interest Rate**. Interest accrues at a fixed rate per annum equal to the LIBOR Rate in effect on the closing date plus 2.5%  (DIP Credit Agreement § 2.06(a)).

(e) **Maturity Date**.  The earliest of (i) the date which is seventy-five days after the date that the Interim Order was entered on the Bankruptcy Court's docket if the Final Order shall not have been approved by the Bankruptcy Court on or before such date (unless extended by Vista), (ii) February 10, 2010, (iii) ten business days after the effective date of a plan of reorganization, as such effective date is specified in such plan and (iv) the date of termination in whole of the Commitments pursuant to Section 2.04 or Section 6.02 of the DIP Credit Agreement or the acceleration of the Postpetition Financing pursuant to Section 6.02 of the DIP Credit Agreement. (DIP Credit Agreement § 1.01).

(f) **Certain Events of Default**.  Among other Events of Default under the DIP Credit Agreement, an Event of Default occurs if (i) SCI fails to timely pay Postpetition Financing obligations, (ii) SCI fails to perform covenants and agreements under the DIP Credit Agreement (after 30 day cure period in most instances), (iii) any DIP Document is determined to be invalid, (iv) a chapter 11 trustee is appointed in any of the Chapter 11 Cases, (v) any of the Chapter 11 Cases are converted to chapter 7, (vi) the Interim Order or the Final Order is revoked, reversed, stayed, modified, supplemented or amended without the consent of Vista, or (vii) any Casino License (as defined in the DIP Credit Agreement) is revoked, suspended, rescinded, denied or not renewed when required in accordance with its terms and as a result the casino or casinos governed thereby are not able to operate for a period of three or more days. (DIP Credit Agreement § 6.01)

(g) **Carve-Out**.  The DIP Credit Agreement contains a carve-out provision which parallels the Carve-Out to which the Prepetition Agent and the Prepetition Lenders have agreed to subordinate their claims.  (DIP Credit Agreement § 2.11(a)).

(h) **Subordination of Repayment**. Vista shall have no right to repayment, reimbursement or enforcement of any kind or nature, other than the prosecution of allowance of an unsecured administrative claim, and the Debtors shall not be authorized to make any cash payment to Vista, on account of the Postpetition Financing until all of the Prepetition Obligations and any Superpriority Claims are indefeasibly paid in full in cash, or otherwise refinanced under a plan of reorganization to which Prepetition Lenders have consented. The Debtors shall not borrow from Vista to finance any uses of cash that are inconsistent with the Interim Order or as otherwise approved by the Prepetition Lenders. (Interim Order ¶ 4)

(i) **Borrower's In demnifications**. SCI will indemnify the Prepetition Agent and the Prepetition Lenders and their affiliates and agents, (collectively, "Indemnitees") against, and hold Indemnitees harmless from, any and all losses, claims, damages, liabilities and related expenses (incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower arising out of, in connection with, or as a result of, among other things, any DIP Document and the Postpetition Financing, irrespective of the Indemnitee's negligence; provided that SCI need not indemnify and hold an Indemnitee harmless on account of an Indemnitees' willful misconduct or gross negligence as determined by a court. (DIP Credit Agreement § 8.04(b)).

In addition to the foregoing relief, the Debtors request that the Court:

(i) schedule, pursuant to Bankruptcy Rule 4001, an interim hearing on this Motion for this Court to consider entry of the Interim Order and the relief set forth therein;

(ii) ) schedule, through the Interim Order, pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2) and 4001(d), the final hearing on this Motion (the "Final Hearing") within 30 days of the entry of the Interim Order to consider entry of a final order in form and substance reasonably satisfactory to the Prepetition Agent and the prepetition Required Lenders (provided that any final order that is substantially consistent with the Interim Order in the form in which the Interim Order was initially presented to the Court shall be subject to approval only by the Prepetition Agent) (the "Final Order") authorizing the use of Cash Collateral, granting of adequate protection to the Prepetition Agent for the benefit of the Prepetition Secured Parties, authorizing borrowings under and approving the terms of the Postpetition Financing, and authorizing SCI's making of Drop Down Loans and CV PropCo Contributions on a final basis as set forth in the Interim Order; and

(iii) approve the Debtors' notice procedures with respect to the Final Hearing.

1    **C.      Overview.**

2          10.    The Debtors' ability to use Cash Collateral and obtain the Postpetition

3    Financing is critical to the Debtors' ability to continue as a going concern during the course of

4    these Chapter 11 Cases.  Cash Collateral and the proceeds of the Postpetition Financing will be

5    used to fund ongoing working capital needs, expenses of operation, including, without limitation,

6    employee payroll expenses and costs of administering the Debtors' estates, including without

7    limitation, fees assessed by the Office of the United States Trustee and the Clerk of Court and

8    fees and expenses of estate professionals.  Due to the structure of the Debtors' organization,

9    SCI's ability to make loans for the benefit of its non-debtor, wholly owned subsidiaries is

10   similarly essential to the Debtors' ongoing operations and also a requirement for the Debtors'

11   Cash Collateral use.

12   **D.      Prepetition Loan Documents.**

13         11.    SCI, as borrower, Deutsche Bank Trust Company Americas ("DBTCA"),

14   as administrative agent (in such capacity and in its capacity as collateral agent under the

15   Prepetition Loan Documents (defined below), together with its successors and assigns, the

16   "Prepetition Agent") and a lender, the other lenders from time to time party thereto (together

17   with DBTCA, the "Prepetition Lenders"), Deutsche Bank Securities, Inc. and J.P. Morgan

18   Securities Inc., as joint lead arrangers and joint bookrunners, JPMorgan Chase Bank, N.A., as

19   syndication agent, and Bank of Scotland plc, Bank of America, N.A. and Wachovia Bank, N.A.,

20   as co-documentation agents, are party to that certain Credit Agreement, dated as of November 7,

21   2007 (as amended, amended and restated, supplemented, or otherwise modified through the date

22   hereof, the "Prepetition Loan Agreement").  The Prepetition Loan Agreement provided for (i) a

23   $250,000,000 term loan facility (the "Term Loan Facility") and (ii) a $650,000,000 revolving

24   credit facility (the "Revolving Credit Facility", and together with the Term Loan Facility, the

25   "Prepetition Credit Facilities").

26         12.    Certain non-debtor wholly-owned subsidiaries of SCI listed on Schedule 1

27   to the Interim Order (the "Guarantors" and together with SCI, the "Loan Parties", and

28   collectively with the Holding Companies, the "Credit Parties") have irrevocably guaranteed on a

joint and several basis all of the Prepetition Obligations (as defined below) owed by SCI

pursuant to the Guaranty Agreement, dated as of November 7, 2007, made by the Guarantors in

favor of the Prepetition Agent. The Guarantors are not liable for and have not guaranteed any

other third party indebtedness issued by SCI.

13.    SCI and certain of the Guarantors[7] have granted liens and security

interests to the Prepetition Agent (on behalf of the secured parties named in the Prepetition

Security Documents, the "Prepetition Secured Parties") as security for repayment of the

Prepetition Obligations in (A) substantially all of their respective personal property, now owned

or hereafter acquired and all products and proceeds thereof, pursuant to that certain (i) Security

Agreement, (ii) Pledge Agreement, and (iii) Intellectual Property Security Agreement, each dated

as of November 7, 2007, and certain other Collateral Documents executed and delivered from

time to time and (B) certain parcels of real property pursuant to certain Mortgages (collectively,

the "Loan Party Collateral").

14.    In addition, each Holding Company has pledged to the Prepetition Agent

(on behalf of the Prepetition Secured Parties) all of its equity interests in SCI and all products

and proceeds thereof (together with the Loan Party Collateral, the "Prepetition Collateral") as

security for the repayment of the Prepetition Obligations, pursuant to that certain Shareholder

Pledge and Security Agreement, dated November 7, 2007 (and together with the Security

Agreement, the Pledge Agreement, the Intellectual Property Security Agreement, the Mortgages,

the other Collateral Documents and any other mortgages, collateral assignments, security

agreement supplements, pledge agreement supplements, security agreements, pledge agreements,

account control agreements or other agreements purporting to grant a lien on or a security

interest in the Credit Parties' assets or properties as security for repayment of the Prepetition

Obligations, delivered to the Prepetition Agent and/or the Prepetition Lenders from time to time

---

[7]    Certain of the Guarantors, designated as "Immaterial Subsidiaries" on Schedule 1 to the Interim
Order, guaranteed the Prepetition Obligations but did not grant liens on their assets to secure the
Prepetition Obligations. In addition, Guarantors designated as "Native American Subsidiaries"
on Schedule 1 to the Interim Order granted liens on some but not all of their assets to secure the
Prepetition Obligations, as provided in the Prepetition Security Documents.

under or in connection with the Prepetition Loan Agreement, the "Prepetition Security Documents", and collectively with the Prepetition Loan Agreement, the Forbearance Agreement (as defined below) and all other documents, agreements or instruments executed or delivered in connection therewith, or relating thereto, the "Prepetition Loan Documents").

**E.     Forbearance Agreement.**

15.     On July 28, 2009, the Credit Parties, the Prepetition Agent and certain of the Prepetition Lenders entered into a Second Forbearance Agreement; and Second Amendment to the Credit Agreement (as it may hereafter be amended, supplemented or otherwise modified from time in accordance with the terms thereof, the "Forbearance Agreement")[8] pursuant to which the Prepetition Agent and the Prepetition Lenders have agreed (subject to the terms thereof) to (i) forbear from exercising their default-related rights, remedies, powers and privileges against the Guarantors, solely with respect to certain Specified Defaults (as defined in the Forbearance Agreement), and (ii) amend certain provisions of the Prepetition Loan Agreement.  The Forbearance Agreement remains in full force and effect, enforceable on a postpetition basis by all parties thereto, pursuant to its terms.

**F.     Stipulations as to Prepetition Credit Facilities.**

16.     Subject in each case to the provisions in paragraph 13 of the Interim Order, the Debtors (for themselves and other Credit Parties admit, stipulate and agree that:

(i)     Prepetition Loan Obligations.  As of the Petition Date, SCI was indebted and liable to the Prepetition Agent and the Prepetition Lenders (except with respect to claims, counterclaims, offsets or defenses that the Credit Parties have specifically preserved against the Non-Funding Lenders pursuant to, and as such term is defined in, the Forbearance Agreement (the "Reserved Claims")) without objection, defense, counterclaim or offset of any kind under the Prepetition Loan Documents, (a) in the aggregate principal amount of not less than $246,250,000 with respect to the Term Loan Facility and $628,236,586.20 with respect to the Revolving Loan Facility (which excludes the undrawn amount of issued Letters of Credit as

---

[8]     Attached hereto as Exhibit B.

1   of the Petition Date), plus accrued (both before and after the Petition Date) and unpaid interest

2   thereon, and the undrawn aggregate amount of issued Letters of Credit as of the Petition Date of

3   $10,184,203, and (b) for fees, expenses and all other Obligations and Secured Obligations (as

4   defined in the Prepetition Loan Documents) whether incurred before or after the Petition Date,

5   including any attorneys', accountants', consultants', appraisers' and financial advisors' fees that

6   are chargeable or reimbursable under the Prepetition Loan Documents) (clauses (a) and (b),

7   collectively, the "Prepetition Obligations").  As used herein, "Prepetition Obligations" shall also

8   include Cash Management Obligations and amounts owed by the Credit Parties to counterparties

9   under any Secured Hedge Agreement.  As of the Petition Date, the value of the Prepetition

10  Collateral exceeds the amount of the Prepetition Obligations.

11                          (ii)      Enforceability of Prepetition Obligations.  The Prepetition

12  Obligations constitute the legal, valid and binding obligations of the Credit Parties, enforceable

13  against the applicable Credit Parties in accordance with the terms of the Prepetition Loan

14  Documents (other than in respect of the stay of enforcement arising from section 362 of the

15  Bankruptcy Code with respect to the Debtors)

16                          (iii)     Enforceability of Prepetition Liens.  The Prepetition Agent (on

17  behalf of the Prepetition Secured Parties) holds perfected, valid, enforceable, and non-avoidable

18  first-priority liens on and security interests in all of the Prepetition Collateral (the "Prepetition

19  Liens").  The respective Prepetition Liens were granted by the Debtors and the other Credit

20  Parties to the Prepetition Agent (on behalf of the Prepetition Secured Parties) for fair

21  consideration and reasonably equivalent value, including the contemporaneous making of Loans

22  and/or Commitments secured thereby

23                          (iv)      No Offsets, Challenges, etc.  Except with respect to the Reserved

24  Claims, no offsets, challenges, objections, defenses, claims or counterclaims of any kind or

25  nature to any of the Prepetition Obligations or the Prepetition Liens exist, and no portion of the

26  Prepetition Obligations or the Prepetition Liens is subject to any contest, attack, obligation,

27  recoupment, defense, counterclaim, offset, subordination, recharacterization, avoidance or any

28  other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under

applicable non-bankruptcy law or otherwise. Except with respect to the Reserved Claims, the Debtors do not have, hereby forever release, and are forever barred from bringing any claims (including, without limitation, claims for subordination, recharacterization, avoidance or other similar claims), counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Obligations, whether arising under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, against the Prepetition Agent or any Prepetition Secured Party and their respective affiliates, subsidiaries, agents, officers, directors, employees and attorneys.

(v)    No Stay or Modification of Rights. Neither the commencement of the Chapter 11 Cases nor anything in this Motion, the Interim Order, the Final Order (as defined below) or any other proceeding in the Chapter 11 Cases shall stay or otherwise limit, delay or modify any rights of the Prepetition Agent or Prepetition Lenders against the Guarantors or any collateral granted by the Guarantors; provided that the exercise of all such rights shall be subject to the Prepetition Lenders' agreement to forbear subject to the terms of, and to the extent provided in, the Forbearance Agreement. The Forbearance Agreement, including the amendments to the Prepetition Loan Agreement set forth therein, was entered into in contemplation of the Chapter 11 Cases as a necessary condition to the use of the Cash Collateral. The Prepetition Lenders have consented to the use of their Cash Collateral, and the Debtors have agreed to provide adequate protection as described above and as fully set forth in the Interim Order, in each case in reliance on the validity and enforceability of the Forbearance Agreement by all parties thereto on a postpetition basis in accordance with its terms. Without the Forbearance Agreement, the Debtors' businesses, property and assets, and those of their non-debtor subsidiaries and affiliates, would have dramatically deteriorated in value causing irreparable harm to the Debtors and their estates. The Forbearance Agreement is (x) legal, valid, binding, and enforceable on a postpetition basis against all of the parties thereto and (y) is not subject to any challenge or action of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

1    **G.      Necessity for and Limitations on Use of Cash Collateral.**

2           17.      The availability to the Debtors of sufficient working capital, liquidity and

3    other financial accommodations are vital to their ability to continue their operations.  The

4    Debtors require use of their cash (which is generated primarily from the operation by the

5    Guarantors and Unrestricted Subsidiaries of their casinos and related assets), including all Cash

6    Collateral, to carry on the operation of their businesses and to administer and preserve the value

7    of their assets, including the Prepetition Collateral.  The Debtors have also requested

8    authorization to obtain the Postpetition Financing (as defined below) from Vista to fund

9    disbursements (other than disbursements identified in the Excluded Line Items, which may be

10   funded from Past Enterprises) set forth in the Budget.  Notwithstanding anything herein or in the

11   DIP Documents to the contrary, Vista has committed to fund all disbursements permitted by the

12   Budget (other than the Excluded Line Items, which may be funded by Past Enterprises) at any

13   time that Vista's cash balance is equal to or greater than $100,000,000 and, thereafter, Past

14   Enterprises may fund all disbursements set forth in the Budget and Vista may make the

15   Postpetition Financing available to SCI on a discretionary basis to fund disbursements set forth

16   in the Budget, in each case subject to the terms of the Interim Order.

17          18.      The preservation and maintenance of the Debtors' businesses and their

18   assets is necessary to maximize returns for all creditors, and is significant and necessary to a

19   successful reorganization of the Debtors under chapter 11 of the Bankruptcy Code.  Absent the

20   Debtors' ability to use Cash Collateral and obtain the Postpetition Financing, in each case in

21   accordance with the terms hereof, the continued operation of their businesses would not be

22   possible, and serious and irreparable harm to the Debtors, their estates, and their creditors and

23   equity holders would occur.  Authorization to use Cash Collateral, and obtain the Postpetition

24   Financing, is thus (i) critical to the Debtors' ability to reorganize pursuant to the Bankruptcy

25   Code, (ii) in the best interests of the Debtors and their estates and (iii) necessary to avoid

26   immediate and irreparable harm to the Debtors, their creditors, and their assets, businesses,

27   goodwill, reputation and employees.

28

19.     Prior to the commencement of the Chapter 11 Cases, the Loan Parties managed their cash through a central concentration account held in the name of SCI.  SCI and each Guarantor issued checks and commenced electronic transfers drawn on zero balance accounts that were electronically tied to the central concentration account at SCI.  In anticipation of the commencement of the Chapter 11 Cases, in cooperation with the Prepetition Agent, a second concentration account was established at Past Enterprises and the principal cash concentration function was transferred from SCI to Past Enterprises.  Other than (i) certain intercompany obligations owed by Past Enterprises to other Loan Parties (the right to repayment of such obligations owed to the Loan Parties is pledged to the Prepetition Agent as part of the Prepetition Collateral), and (ii) the Obligations owing to the Prepetition Agent and the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, Past Enterprises does not have any other Indebtedness or other liabilities.  All property of Past Enterprises now owned or hereafter acquired and all products and proceeds thereof (including the new concentration account at Past Enterprises) is subject to valid, non-voidable and duly perfected liens in favor of the Prepetition Agent.  During the pendency of the Chapter 11 Cases, all cash proceeds of operations of the Guarantors that are not retained at each Guarantor will be concentrated in the Past Enterprises' concentration account and will be subject to the liens of the Prepetition Agent.  Past Enterprises will serve the treasury function for the Guarantors that was served by SCI prior to the Petition Date, and will fund disbursements required to be made by or for the account of the Guarantors.  Without limiting Vista's commitment to make loans to SCI to fund certain disbursements as set forth in the Interim Order, Past Enterprises may also from time to time transfer cash to SCI, to the extent available, in such amounts as SCI shall determine to be necessary (but in each case subject to the Budget) to pay administrative obligations of the Debtors during the pendency of the Chapter 11 Cases and to fund operating cash requirements of the Drop Down Borrowers and the CV PropCo Payments.  Any intercompany amounts transferred or otherwise advanced from Past Enterprises to SCI or any other Guarantor shall be evidenced by promissory notes which shall be in form and substance satisfactory to the Prepetition Agent and shall be pledged and promptly delivered (together with endorsements in

1   blank) to the Prepetition Agent and encumbered by the liens of the Prepetition Agent. The

2   Debtors shall not permit Past Enterprises to make any loans, investments or any other cash

3   disbursements except to the extent permitted by the Interim Order and the Budget and all such

4   loans, investments or other cash disbursements shall be made to SCI or the non-debtor

5   Guarantors set forth on Schedule 1 to the Interim Order.  Loans made by Past Enterprises to SCI

6   shall constitute unsecured, subordinated administrative priority post-petition financings made by

7   Past Enterprises pursuant to Bankruptcy Code section 364(b).

8            20.    Prior to the Petition Date, Past Enterprises granted liens and security

9   interests in substantially all of its now owned or hereafter acquired property and all products and

10  proceeds thereof, including, without limitation, all of its deposit accounts located at Bank of

11  America, N.A., to the Prepetition Agent to secure repayment of the Prepetition Obligations and

12  performance of the Prepetition Loan Documents.  As additional adequate protection for the

13  Prepetition Agent and the Prepetition Secured Parties, Past Enterprises has filed its written

14  consent in support of this Motion and expressly agreed therein that the Court's Interim and Final

15  Orders granting this Motion shall confirm that liens and security interests granted by Past

16  Enterprises are valid, non-voidable and duly perfected prepetition liens in favor of the Prepetition

17  Agent upon Past Enterprises' now owned or hereafter acquired property and all products and

18  proceeds thereof as provided in the Prepetition Security Documents, including, without

19  limitation, valid, enforceable, non-voidable duly perfected pre-petition liens on and security

20  interests in all deposit accounts of Past Enterprises (and all cash therein and all proceeds therein

21  and rights thereto) that are maintained at Bank of America, N.A., as depository.

22           21.    Prior to the Petition Date, SCI centrally purchased a substantial amount of

23  goods and services on behalf of the Drop Down Borrowers and Guarantors in order to realize the

24  benefits of bulk or consolidated purchasing.  During the pendency of the Chapter 11 Cases, SCI

25  may continue to purchase certain goods and services on behalf of all Guarantors and the  Drop

26  Down Borrowers, while certain of these purchases are expected to be effected directly by Past

27  Enterprises for the benefit of the Guarantors.

28

LA1:#6398834v12                          -19-

22.     The "Budget" shall mean the certified 13-week consolidated cash flow forecast prepared by SCI and annexed as Exhibit A to the Interim Order, as such cash flow forecast may be amended or supplemented in accordance with the terms hereof. The Budget is a consolidated cash budget of the Credit Parties, Drop Down Borrowers and CV PropCo. Compliance with the Budget, subject to permitted variances set forth below, shall be determined based upon the consolidated reporting of the Credit Parties, Drop Down Borrowers and  CV HoldCo. The Budget may only be amended or supplemented if the Prepetition Agent and the prepetition Required Lenders give their prior consent (which consent may be granted or withheld in their sole and absolute discretion) to a revised 13-week consolidated cash flow forecast (in the form of the Budget) proposed by the Debtors. The Debtors shall propose a revised 13-week consolidated cash flow forecast (in the form of the Budget) at least once during the four week period following the Petition Date and, thereafter, at least once during every four week period commencing from the date the Prepetition Agent and the prepetition Required Lenders consent to an amended or supplemented Budget; provided that if the Prepetition Agent and the prepetition Required Lenders do not consent to any such proposed revised 13-week consolidated cash flow forecast, the Prepetition Agent or its financial advisor shall notify (either orally or in writing) SCI of the elements of the rejected proposed revised 13-week consolidated cash flow forecast that were unacceptable to the prepetition Required Lenders and the Budget then in existence (without giving effect to any proposed revisions, amendments or supplements) shall remain in full force and effect and the Debtors may continue to use Cash Collateral in accordance with such Budget until the last date covered thereby, but in no event beyond such date, provided that, the Debtors may, upon notice, seek non-consensual use of Cash Collateral and/or continued access to loans from Vista and use of the proceeds of such loans for ordinary course operations of the Guarantors and the Drop Down Borrowers on an emergency basis, and the Prepetition Agent and the Prepetition Secured Parties hereby reserve all of their rights to contest any such further use of Cash Collateral or access to Postpetition Financing from Vista.

23.     The prepetition Required Lenders have consented to the Debtors' use of Cash Collateral from and after the Petition Date, and to the Postpetition Financing, but only on

1   the terms provided herein.  To the extent of the use by the Debtors of the Prepetition Secured

2   Parties' Cash Collateral (on a dollar-for-dollar basis) and any diminution in value of the

3   Prepetition Collateral, including, without limitation, resulting from the Carve Out (as defined

4   below) and the use, sale or lease of the Prepetition Collateral, and the imposition of the automatic

5   stay pursuant to section 362 of the Bankruptcy Code, the Prepetition Secured Parties are entitled

6   to and shall receive the following adequate protection (subject to the Carve Out defined below):

7   (A) valid, binding, enforceable and perfected replacement liens on and security interests in (the

8   "Adequate Protection Liens") all property and assets of the Debtors and all products and

9   proceeds thereof, now or hereafter acquired (subject to certain exceptions set forth herein),

10  pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, and (B) an allowed

11  claim against the Debtors having priority over all other administrative claims now or hereafter

12  asserted in the Chapter 11 Cases (the "Superpriority Claim") pursuant to section 507(b) of the

13  Bankruptcy Code.  As additional adequate protection, (x) the Prepetition Agent (for the benefit

14  of the applicable Prepetition Secured Parties) shall receive (i) all interest and fees (including,

15  without limitation, Letter of Credit fees, regularly scheduled amounts payable with respect to

16  Cash Management Obligations and Secured Hedge Agreements (and interest on the termination

17  damages if such Secured Hedge Agreements are terminated) and agency fees) accrued and

18  unpaid as of the Petition Date in the amounts specified in the Prepetition Loan Agreement, the

19  prepetition agreements with respect to the agency fees and Cash Management Obligations and

20  the prepetition Secured Hedge Agreements (as applicable), all such amounts to be paid within

21  five Business Days of entry of the Interim Order; (ii) all interest and fees (including, without

22  limitation, Letter of Credit fees, regularly scheduled amounts payable with respect to Cash

23  Management Obligations and Secured Hedge Agreements (and interest on the termination

24  damages if such Secured Hedge Agreements are terminated) and agency fees) accrued on and

25  after the Petition Date in the amounts specified in the Prepetition Loan Agreement, the

26  prepetition agreements with respect to the agency fees and Cash Management Obligations and

27  the prepetition Secured Hedge Agreements (as applicable), all such amounts to be paid on the

28  first Business Day of each calendar month following the Petition Date; (iii) scheduled principal

1  amortization payments to the prepetition Term Lenders in the amounts and on the dates due in

2  accordance with the Prepetition Loan Agreement (without giving effect to the acceleration of the

3  Obligations) and (y) the Prepetition Agent shall receive payment of prepetition and postpetition

4  reasonable fees and expenses of the Prepetition Agent's co-lead and local counsel and financial

5  advisor as set forth herein and the Debtors shall pay the pre-petition and post petition reasonable

6  fees and expenses of a single legal counsel for each other Agent as set forth herein; and (vi)

7  continued financial reporting as set forth in, and in accordance with the terms of, the Prepetition

8  Loan Agreement and the Forbearance Agreement.

9       **H.**    **Unsecured Postpetition Financing Provided by Non-Debtor Affiliate Vista**
**Holdings, LLC and Drop Down Loans to the Guarantors and other Drop**

10              **Down Borrowers.**

11       24.    Vista, a non-debtor Unrestricted Subsidiary of SCI, is capitalized with

12  unrestricted cash on hand of approximately $194,000,000.  Vista is prepared to lend from time to

13  time up to an aggregate principal amount of $150,000,000 to SCI (the "Postpetition Financing")

14  in accordance with the terms hereof and the DIP Credit Agreement. SCI shall, in turn, use the

15  proceeds of the Postpetition Financing  to provide the other Debtors, the Drop Down Borrowers

16  and CV HoldCo with capital to satisfy disbursements permitted under the Budget.  The DIP

17  Credit Agreement provides that outstanding borrowings under the Postpetition Financing shall

18  not exceed (i) an aggregate principal amount of $75,000,000 at any time following the entry of

19  the Interim Order, but prior to the entry of the Final Order, and (ii) an aggregate principal

20  amount of $150,000,000 at any time following the entry of the Final Order.  SCI needs

21  immediate access to financing from Vista on an interim emergency basis because SCI does not

22  have immediate access to sufficient Cash Collateral to satisfy the funding requirements of the

23  other Debtors, the Drop Down Borrowers and CV PropCo.  Vista shall fund all disbursements

24  permitted by the Budget (other than the Excluded Line Items, which Excluded Line Items may

25  be funded by Past Enterprises) by making Postpetition Financing available to SCI at any time

26  that Vista's cash balance is equal to or greater than $100,000,000 and, after Vista's cash balance

27  is reduced to $100,000,000, Vista may make the Postpetition Financing available to SCI on a

28  discretionary basis to fund disbursements set forth in the Budget in the event cash flow generated

1   by the Credit Parties is not adequate to fund all of the cash requirements of the Debtors, Drop

2   Down Borrowers and CV PropCo and Past Enterprises shall be authorized to fund all

3   disbursements permitted under the Budget, and otherwise subject to the terms of the Interim

4   Order.

5           25.    SCI has arranged to obtain the Postpetition Financing on a subordinated

6   and unsecured administrative claim basis pursuant to section 364(b) of the Bankruptcy Code.

7   Repayment of the Postpetition Financing is conditional on, and neither Vista nor Past Enterprises

8   (with respect to loans by Past Enterprises to SCI) shall have any right to repayment,

9   reimbursement or enforcement (including exercise of rights of offset, recoupment or otherwise)

10  of any kind or nature, other than the prosecution of allowance (but not payment) of an unsecured

11  administrative claim, and the Debtors shall not be authorized to make, or cause any of their

12  Subsidiaries to make, any cash payment to Vista or Past Enterprises, on account of the

13  Postpetition Financing or loans made by Past Enterprises to SCI (including, without limitation,

14  on account of accrued interest or outstanding principal amounts) until all of the Prepetition

15  Obligations are indefeasibly paid in full in cash, or otherwise refinanced or restructured under a

16  plan of reorganization to which the requisite Prepetition Lenders have consented and all

17  Superpriority Claims are paid in full in cash (collectively, "Acceptable Prepetition Treatment").

18  SCI and Vista shall enter into the DIP Credit Agreement in substantially the form attached to the

19  Interim Order as Exhibit B to evidence the Postpetition Financing.  The terms and conditions of

20  the Postpetition Financing shall be as set forth in the DIP Credit Agreement.  The Debtors will

21  not borrow, and will not permit their Subsidiaries and their respective Affiliates to borrow, from

22  Vista to finance any uses of cash that are inconsistent with the Interim Order and the Budget.

23  The Debtors shall not permit Vista to make any loans, other investments or any other cash

24  distributions except to the extent permitted by the Interim Order and the Budget and all such

25  loans, other investments or other cash distributions shall be made to SCI under the DIP Credit

26  Agreement.

27          26.    SCI, through its wholly owned subsidiary CV HoldCo, owns all of the

28  equity interests in CV PropCo.  CV PropCo owns two assemblages of real property in the City of

1   Las Vegas (the "Tropicana Assemblage" and the "Cactus Assemblage"), which were assembled

2   for future development purposes.  These assemblages of real property are of substantial value,

3   but produce little or no income as presently used.  In 2008, in order to realize additional value

4   from the Tropicana Assemblage and the Cactus Assemblage, SCI caused CV PropCo to enter

5   into the Credit Agreement, dated February 7, 2008 (as amended, amended and restated,

6   supplemented, or otherwise modified through the date hereof, the "Land Loan"), entered into by

7   and among CV PropCo, Deutsche Bank Trust Company Americas, JPMorgan Chase Bank, N.A.

8   and the lenders from time to time party thereto.  SCI thereafter made regular cash investments

9   into CV PropCo in order to enable it to service interest payment obligations on the Land Loan as

10  well as to pay insurance premiums and property taxes (collectively, the "CV PropCo

11  Payments").  Substantially all of the net proceeds of the Land Loan obtained by CV PropCo were

12  distributed to SCI.  Subject to compliance with the Budget, SCI may from time to time  make (i)

13  unsecured loans to one or more of the Drop Down Borrowers (each, a "Drop Down Loan") and

14  (ii) cash equity contributions in CV HoldCo which, in turn, will contribute all such proceeds that

15  it receives to CV PropCo  (each, a "CV PropCo Contribution") to make CV PropCo Payments.

16  The Drop Down Loans and CV PropCo Contributions shall be made from cash on hand at SCI

17  and/or from the proceeds of an advance under the Postpetition Financing.  SCI is a holding

18  company and substantially all assets are held by the Drop Down Borrowers and CV PropCo,

19  therefore, it is in the best interest of the Debtors and their creditors that SCI be permitted to

20  assure the ordinary course operation of the Drop Down Borrowers and CV PropCo.  Each Drop

21  Down Loan and each CV PropCo Contribution made by SCI shall constitute a use of Cash

22  Collateral.  As additional adequate protection for such use of Cash Collateral, each Drop Down

23  Loan, each intercompany on-loan made by Past Enterprises to one or more of the non-debtor

24  Guarantors set forth on Schedule 1 to the Interim Order and each intercompany loan made by

25  Past Enterprises to SCI shall be evidenced by promissory notes which shall be in form and

26  substance satisfactory to the Prepetition Agent and be pledged and promptly delivered to the

27  Prepetition Agent (together with endorsements in blank) and encumbered by the Adequate

28  Protection Liens and, with respect to promissory notes made in favor of non-debtor Loan Parties,

the prepetition liens of the Prepetition Agent. Each loan from Past Enterprises to SCI shall be a subordinated unsecured loan that will constitute an expense of administration pursuant to Bankruptcy Code section 364(b). CV PropCo Contributions made in the form of equity shall be evidenced by the previously pledged equity of CV HoldCo, which equity interests are subject to the valid and unavoidable liens of the Prepetition Agent.

27.    The Postpetition Financing is highly favorable to the Debtors. The Debtors believe that the non-default interest rate offered under the Postpetition Financing is below market. The Postpetition Financing is unsecured and subordinated to the Debtors' prepetition and postpetition obligations to the Prepetition Lenders. It does not grant Vista collateral or superpriority administrative expense status. The Debtors do not believe that any of the terms of the Postpetition Financing are unfavorable to the Debtors. The Debtors believe that given their current circumstances they could not obtain better terms for financing their operations from any other third party. The Debtors will not borrow from Vista for any purposes that are inconsistent with the Interim Order or the Final Order.

28.    In the short term, use of Cash Collateral and access to the proceeds of the DIP Financing and the Drop Down Loans will allow the Debtors to pay employees, suppliers, service providers and taxing authorities, make rent and mortgage payments, and run their businesses to the greatest extent possible as they did prior to commencing these chapter 11 Cases. In the long term, the use of Cash Collateral, the obtaining of the Postpetition Financing, and the making of Drop Down Loans to Affiliate Borrowers is essential to the Debtors' ability to maximize value for creditors and successfully reorganize. Without use of Cash Collateral, access to the proceeds of the DIP Financing and the ability to make the Drop Down Loans, the Debtors would suffer immediate and irreparable harm and be forced to liquidate.

29.    Additional factual background regarding the Debtors, including additional information regarding their operations, their capital and debt structure, business plans and the events leading up to the commencement of these cases, is set forth in detail in the Friel Declaration.

## IV.    Argument

### A.    Use of Cash Collateral Should Be Authorized.

30.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  Even with secured creditor consent, Bankruptcy Code section 361 provides that secured creditors are entitled to adequate protection where the use of collateral decreases the value of such lenders' interest in the collateral.  11 U.S.C. § 361(1)-(3); see also United Savings Ass'n v. Timbers of Inwood Forest Ass'n, 484 U.S. 365, 369-73 (1988) (the "interest in property" entitled to protection is "the value of the collateral" that secures the claim). The legislative history of section 361 makes clear that bankruptcy courts are given broad flexibility in deciding what constitutes adequate protection on a case-by-case basis, stating:

> This section specifies the means by which adequate protection may be provided.  It does not require the court to provide it.  To do so would place the court in an administrative role. Instead, the trustee or debtor-in-possession will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987) (same); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985) (same).

31.    Here, the Prepetition Agent and the Prepetition Lenders have consented to the use of the Prepetition Collateral, including Cash Collateral, as long as the Court authorizes the grant of adequate protection proposed in the Interim Order and Final Order, in particular the Adequate Protection Liens, Superpriority Claims and adequate protection payments.  Therefore,

1    this consensual arrangement satisfies the requirements of Bankruptcy Code Sections 361 and

2    363(c)(2)(A) (use of cash collateral with consent of secured party and grant of adequate

3    protection).  Moreover, the Adequate Protection Liens and Superpriority Claims provided to the

4    Prepetition Agent and Prepetition Lenders do not impair the rights of any other secured creditors

5    as they do not prime any liens other than the Prepetition Liens of the Prepetition Agent and

6    Prepetition Lenders.

7          32.    The adequate protection proposed in this Motion is not unlike that

8    approved by this Court and other bankruptcy courts in similar chapter 11 cases of this magnitude,

9    balances the protections that the Prepetition Agent and Prepetition Lenders are entitled to with

10   the needs of the Debtors for liquidity, and should be approved.

11   **B.     The Debtors' Decision to Enter into the DIP Credit Agreement Is Supported
12          by Sound Business Judgment.**

13         33.    Courts generally give broad deference to the reasonable business decisions

14   of a chapter 11 debtor to obtain financing to sustain operations, as long as (a) the financing

15   agreement does not contain terms that unduly leverage the bankruptcy process in favor of the

16   DIP financing lender, or (b) the purpose of the financing is not so much to benefit the estate as it

17   is to benefit a third party.  See In re Ames Department Stores, Inc., 115 B.R. 34 (Bankr.

18   S.D.N.Y. 1990);  see also In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del.

19   1994) (DIP financing agreement approved because it reflected sound and prudent business

20   judgment of debtor, was reasonable under the circumstances and in the best interest of the debtor

21   and its creditors).

22         34.    Here, the entry into the DIP Credit Facility represents a reasonable

23   exercise of business judgment.  Vista has agreed to make an unsecured post-petition loan in an

24   amount up to $150 million upon approval of the Final Order, and to forego the right to a super-

25   priority administrative claim for the post-petition advances.  Further, Vista has agreed that

26   repayment of its administrative expense claim shall be subordinate to the repayment in full of the

27   Prepetition Obligations (and any Superpriority Claims) owed to the Prepetition Agent and

28   Prepetition Lenders.  Interest on borrowings will accrue at LIBOR plus 2.5%, which the Debtors

believe to be very substantially below the current market rate of interest on chapter 11 DIP financings.

35.     Clearly, Vista is not attempting to obtain any undue leverage in these Chapter 11 Cases.  Moreover, while the proceeds of the DIP Credit Agreement may be loaned by SCI to the Drop Down Borrowers who are not Debtors, the Drop Down Borrowers represent the Debtors principal assets and operating subsidiaries, and the source of substantially all of the Debtors' revenues.  Thus, it is in fact the Debtors and their estates, that are the beneficiaries of the proceeds of the DIP Credit Agreement.  The terms of the transaction are not only fair, reasonable and adequate, but remarkably beneficial to the Debtors and their businesses.

C.     **The Drop Down Loans and CV PropCo Contributions Represents a Sound Exercise of Business Judgment.**

36.     As set forth above, SCI's value and success are tied directly to the value and success of its non-debtor operating subsidiaries.  If those subsidiaries require liquidity, it is in the best interests of SCI to act as the source of that liquidity.  The failure to provide that liquidity puts at risk the Station Group's ability to maintain business relationships with its customers and vendors, to meet payroll and to pay other critical operating expenses essential to the long term value of their businesses.  All such Drop Down Loans will be pledged as further collateral for the Prepetition Agent and Prepetition Lenders, thereby providing such secured creditors with additional adequate protection of their interest in Cash Collateral.  The Debtors submit that the funding of the Drop Down Loans and the making of CV PropCo Contributions as contemplated herein constitutes a sound exercise by them of business judgment and should be approved.

D.     **The Interim Order Should Be Granted**.

37.     Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code § 363 and to obtain credit pursuant to Bankruptcy Code § 364 may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary

expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

38.    Bankruptcy Rules 4001(c) and (b) specifically recognizes that it might be necessary to schedule hearings on requests for interim authorization to obtain postpetition financing such as that which would be provided under the DIP Credit Agreement or the use of cash collateral because of the business exigencies of individual cases. See also, 11 U.S.C.§ 102(1) (defining "after notice and a hearing" to mean after such notice and such opportunity for a hearing as is appropriate in the particular circumstances of a given case).

39.    In this instance, SCI must have immediate use of the Cash Collateral and access to the Postpetition Financing for all of the reasons set forth herein.  In the absence of immediate interim approval, SCI's ability to preserve the going concern value of its businesses and assets will be immediately and harmed, to the detriment of the Debtors' estates and creditors. On an interim basis, SCI will access no more than $75,000,000 of the total Postpetition Financing.

40.    Based on the foregoing, the Debtors respectfully request that, pending a final hearing on this Motion, the terms and provisions of Cash Collateral use, the Postpetition Financing and the making of Drop Down Loans and CV PropCo Contributions be approved on an interim basis to the extent permitted under the Interim Order.

### V.    Final Hearing Date

41.    The Debtors respectfully request that the Court schedule the Final Hearing on this Motion no later than thirty (30) days after the date of entry of the Interim Order.

### VI.    Notice

42.    Notice of this Motion will be given by hand delivery or facsimile to: (i) the Office of the United States Trustee for the District of Nevada, (ii) counsel to the Prepetition Agent, (iii) Vista, (iv) the Debtors' 30 largest unsecured creditors on a consolidated basis (including counsel if known), and (v) all parties requesting notices pursuant to Bankruptcy Rule 2002 (collectively, the "Initial Notice Parties").  The Debtors submit that no other or further notice need be provided.

43.     Prior to the Final Hearing on this Motion, the Debtors also will provide actual notice of this Motion whether by telephone, telecopy, overnight courier, or by hand delivery, to counsel for any Committee that may be appointed in the Chapter 11 Cases.

44.     Any objections to the proposed Final Order shall be in writing and shall be filed with the Court and served by overnight mail service on: (i) Debtors' counsel, Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017, Attn: Paul Aronzon, Esq.; (ii) the Office of the United States Trustee; (iii) Vista Holdings, LLP, 1505 South Pavilion Center Drive, Las Vegas, NY 89135, Attn: Richard Haskins, (iv) counsel for the Prepetition Agent, Simpson Thatcher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandy Qusba, Esq. and Morris Massel, Esq., and (v) McDonald Carano Wilson LLP, 100 W. Liberty Street, 10th Floor, Reno, NV 89501, Attn: Kaaran Thomas, Esq., and (vi) the Office of the United States Trustee so that it is received no later than July 29, 2009 at 4:00 p.m., prevailing Pacific Time.

45.     No previous motion for the relief sought herein has been made to this or any other Court in any of the Chapter 11 Cases.

## VII.    Conclusion

Based upon all the foregoing, the Debtors respectfully request that the Court grant this Motion in its entirety and (i) approve the Debtors' proposed use of the Cash Collateral on an interim basis, (ii) grant adequate protection, including the Adequate Protection Liens, Superpriority Claim and adequate protection payments to the extent provided under the Interim Order, (iii) approve the Postpetition Financing on an interim basis and authorize the Debtors to borrow on an interim basis under the terms of the DIP Credit Agreement and the Interim Order, pending a final hearing on this Motion, (iv) approve SCI's funding of Drop Down Loans and CV PropCo Contributions on an interim basis in accordance with the Interim Order and as determined by SCI as necessary; (v) enter the Interim Order; (v) schedule the Final Hearing on this Motion for approval of the relief requested herein on a final basis; (vi) grant final approval of the relief requested in this Motion following the Final Hearing; and (vii) grant to the Debtors

1    such other relief as the Court deems just and proper.

2
      Dated:  July 28, 2009                    Respectfully submitted,
3
                                               By:  _____/s_____
4                                              Paul S. Aronzon, CA State Bar #88781
5                                              Thomas R. Kreller, CA State Bar #161922
                                               MILBANK, TWEED, HADLEY & McCLOY LLP
6                                              601 South Figueroa Street, 30th Floor
                                               Los Angeles, California 90017
7
                                               Proposed Reorganization Counsel for
8                                              Debtors and Debtors in Possession
9
                                               Bruce T. Beesley, #1164
10                                             Laury Macauley, #11413
                                               LEWIS AND ROCA LLP
11                                             50 W. Liberty Street, Ste. 410
                                               Reno, NV 89501
12
13                                             Proposed Local Reorganization Counsel
                                               For Debtors and Debtors in Possession
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA1:#6398834v12                                -31-