```
              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA

In Re:                    .      Docket No. BK-N 09-52477-GWZ
                          .
STATION CASINOS, INC.,.          Reno, Nevada
                          .      July 30, 2009
          Debtor.        .       1:35:29 p.m.
. . . . . . . . . . .
AND RELATED CASES.        .
. . . . . . . . . . .
```

                            HEARING
          ON MOTIONS FOR INTERIM AND FINAL ORDERS
            DIRECTING JOINT ADMINISTRATION OF
          CHAPTER 11 CASES PURSUANT TO FRBP 1015(b)
          AND LOCAL RULE 1015(b); MOTION PURSUANT TO
           11 U.S.C. 105(a), 345(b), 363(c) AND 364
              FOR AUTHORIZATION TO CONTINUE CASH
            MANAGEMENT SYSTEM, MAINTAIN EXISTING
              BANK ACCOUNTS AND BUSINESS FORMS AND
            MAINTAIN EXISTING INVESTMENT POLICY;
          MOTION PURSUANT TO 11 U.S.C. 105(a) AND
            507(a) FOR INTERIM AND FINAL ORDERS
        AUTHORIZING PAYMENT OF WAGES, COMPENSATION
        AND EMPLOYEE BENEFITS AND AUTHORIZING AND
            DIRECTING FINANCIAL INSTITUTIONS TO
          HONOR AND PROCESS CHECKS AND TRANSFERS
          RELATED TO SUCH OBLIGATIONS; MOTION FOR
           INTERIM AND FINAL ORDERS PURSUANT TO
           11 U.S.C. 105(a), 363, 507(a) AND 541(i)
        AUTHORIZING PAYMENT OF CERTAIN PRE-PETITION
          TAX AND REGULATORY FEES AND DIRECTING
            FINANCIAL INSTITUTIONS TO HONOR AND
          PROCESS CHECKS AND TRANSFERS RELATED


Electronic Court Recorder:   Sylvia Tilton

Transcription:               Typewrite Services Inc.
                             P.O. Box 5804
                             Sparks, Nevada 89432-5804


Proceedings recorded by digital sound recording, transcript
produced by transcription service.

TO CERTAIN PRE-PETITION TAXES AND
REGULATORY FEES; MOTION FOR INTERIM
AND FINAL ORDER PURSUANT TO U.S.C. 105,
361, 362, 363, 364 AND 552 AND FRBP RULE
4001(b) AND (c)(I) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, OBTAIN
POST-PETITION FINANCING, AND MAKE
LOANS TO NON-DEBTOR SUBSIDIARIES,
GRANTING ADEQUATE PROTECTION TO PRE-PETITION
SECURED PARTIES, GRANTING RELATED RELIEF,
AND SCHEDULING FINAL HEARING; MOTION
FOR INTERIM AND FINAL ORDERS PURSUANT
TO 11 U.S.C. 105(a) AND 366(i)
PROHIBITING UTILITY COMPANIES FROM
ALTERING, REFUSING OR DISCONTINUING
SERVICES, DETERMINING THAT UTILITY
COMPANIES ARE ADEQUATELY ASSURED
OF PAYMENT, AND APPROVING PROPOSED
PROCEDURES FOR REQUESTING ADDITIONAL
OR DIFFERENT ADEQUATE ASSURANCE;
MOTION FOR INTERIM AND FINAL ORDERS
ESTABLISHING PROCEDURES FOR RECONCILING
VALID RECLAMATION CLAIMS, PROHIBITING
THIRD PARTIES FROM INTERFERING WITH
DELIVERY OF THE DEBTORS' GOODS AND
AUTHORIZING VENDORS OF GOODS ENTITLED
TO ADMINISTRATIVE PRIORITY UNDER
11 U.S.C. 503(b)(9) AND 507(a)(2); MOTION
PURSUANT TO U.S.C. 105(a) AND FRBP 6004(a)
FOR INTERIM AND FINAL ORDERS AUTHORIZING
PAYMENT OF ALL PRE-PETITION OBLIGATIONS
RELATED TO WORKERS' COMPENSATION,
LIABILITY, PROPERTY AND OTHER INSURANCE
PROGRAMS IN THE ORDINARY COURSE, AND
INSTRUCTING BANKS TO HONOR, PROCESS AND
PAY ANY PAYMENT REQUESTS RELATED TO
FOREGOING; MOTION FOR ORDER PURSUANT
TO SECTIONS 105(a), 362, 363, AND 365 OF THE
BANKRUPTCY CODE TO PERMIT DEBTORS TO HONOR
AND ASSUME REIMBURSEMENT, INDEMNIFICATION
AND RELATED OBLIGATIONS TO DIRECTORS AND
OFFICERS, INCLUDING LIMITED MODIFICATION
OF THE AUTOMATIC STAY TO THE EXTENT
NECESSARY TO ACCESS DIRECTOR AND OFFICER
INSURANCE; MOTION PURSUANT TO 11 U.S.C.
105(a), 327, 328, AND 330 FOR INTERIM
AND FINAL ORDERS AUTHORIZING DEBTORS
TO EMPLOY PROFESSIONALS USED IN ORDINARY
COURSE OF BUSINESS; MOTION PURSUANT TO
11 U.S.C. 521, FRBP 1007 AND LOCAL RULE
1007 FOR INTERIM AND FINAL ORDERS
EXTENDING TIME TO FILE SCHEDULES AND

STATEMENT OF FINANCIAL AFFAIRS; MOTION PURSUANT
TO 11 U.S.C. 105 FOR AUTHORITY TO FILE
CONSOLIDATED LIST OF THE DEBTORS' FORTY
LARGEST UNSECURED CREDITORS; MOTION FOR
INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C.
105(a), FRBP 2002 AND LOCAL RULE 2002
ESTABLISHING NOTICE PROCEDURES; MOTION FOR
ORDER PURSUANT TO 11 U.S.C. 105(a) AND 331,
FRBP 2016 AUTHORIZING AND ESTABLISHING
PROCEDURES FOR INTERIM COMPENSATION AND
REIMBURSEMENT OF EXPENSES OF PROFESSIONALS;
MOTION FOR ORDER AUTHORIZING REJECTION OF
CERTAIN NONRESIDENTIAL REAL PROPERTY LEASE
OF UNOCCUPIED COMMERCIAL PREMISES
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GREGG W. ZIVE
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                     Lewis and Roca LLP
                                    BY: BRUCE T. BEESLEY, ESQ.
                                    BY: LAURY M. MACAULEY, ESQ.
                                    50 West Liberty St., Ste. 410
                                    Reno, Nevada 89501

                                            -and-

                                    Milbank, Tweed, Hadley
                                         & McCloy LLP
                                    BY: PAUL ARONZON, ESQ.
                                    BY: THOMAS R. KRELLER, ESQ.
                                    BY: FRED NEUFELD, ESQ.
                                    601 South Figueroa Street
                                    Los Angeles, CA 90017

For Deutsche Bank:                  McDonald Carano Wilson
                                    BY: KAARAN THOMAS, ESQ.
                                    100 West Liberty Street
                                    Tenth Floor
                                    Reno, Nevada 89501

                                            -and-

(By telephone)                      Simpson Thacher & Bartlett
                                    BY: SANDY QUSBA, ESQ.

For German American                 Lionel, Sawyer & Collins
Capital Corporation:                BY: JENNIFER A. SMITH, ESQ.
                                    1100 Bank of America Plaza
                                    50 West Liberty Street
                                    Reno, Nevada 89501

                                            -and-

                                    Sidley & Austin LLP
(By telephone)                      BY: SHALOM L. KOHN, ESQ.
                                    BY: JEFFREY BJORK, ESQ.
                                    BY: KEVIN HOCHBERG, ESQ.
                                    555 West Fifth Street
                                    Suite 4000
                                    Los Angeles, CA 90013

For Dr. James Main:                 Jones Vargas
                                    BY: JANET L. CHUBB, ESQ.
                                    100 West Liberty Street
                                    12th Floor
                                    Reno, Nevada 89504

```
APPEARANCES:   (Continued)
                                        -and-

                            Skadden Arps
                            BY: VAN DURRER III, ESQ.

For Charleston Pavilion,    Timothy S. Corey
LLC:                          & Associates
                            BY: ADAM BOWLER, ESQ.


For Vista Holdings, LLC:    Woodburn and Wedge
                            BY: JOHN MURTHA, ESQ.
                            BY: JOHN P. FOWLER, ESQ.
                            6100 Neil Road, Ste. 500
                            Reno, Nevada 89505


For Objecting Independent   Downey Brand LLP
Lenders:                    BY: SALLIE B. ARMSTRONG, ESQ.
                            427 West Plumb Lane
                            Reno, Nevada 89509


                                        -and-

                            Paul Hastings, Jonofsky
                              & Walker
                            BY: STEVEN CATLETT, ESQ.
(By telephone)              BY: PAUL HARNER, ESQ.

For Castlereagh Master      Stutman, Treister & Glatt
Investments Ltd.:           BY: ERIC D. GOLDBERG, ESQ.
                            1901 Avenue of the Stars
                            Twelfth Floor
                            Los Angeles, CA 90067-6013


For Netixas:                Hartman and Hartman
                            BY: JEFFREY L. HARTMAN, ESQ.
                            510 West Plumb Lane, Ste. B
                            Reno, Nevada 89509

For the Ad Hoc Committee    Greenberg Traurig, LLP
of Senior & Subordinated    BY: BRETT A. AXELROD, ESQ.
Noteholders:                3773 Howard Hughes Parkway
                            Suite 400 North
                            Las Vegas, Nevada 89169


                                        -and-

                            Jones Day
                            BY: LORI SINANYAN, ESQ.
                            BY: BENNETT L. SPIEGEL, ESQ.
                            555 S. Flower St. - 50th Flr.
                            Los Angeles, CA 90071-2300
```

```
APPEARANCES:   (Continued)

For the Office of the U.S.    WILLIAM B. COSSITT, ESQ.
Trustee:                      300 Booth Street
                              Suite 2129
                              Reno, Nevada 89509

For the CMBS Debtors:         Gibson, Dunn & Crutcher
(By Telephone)                BY: OSCAR GARZA, ESQ.
```

1           THE COURT:  Please be seated.

2           All right.  This is in the matter of Station

3   Casinos, Inc. and various other debtors.

4           May I have appearances, please.

5           MR. BEESLEY:  Your Honor, Bruce Beesley and Laury

6   Macauley, of Lewis and Roca, on behalf of the debtor.

7           With me today are a number of representatives of

8   the debtor and a number of attorneys from Milbank, Tweed,

9   Hadley & McCloy, whose pro hacs are in process.

10          I would like introduce Paul Aronzon, of Milbank,

11  Tweed, Hadley & McCloy, who will introduce those who will

12  be participating.

13          THE COURT:  Thank you.

14          MR. ARONZON:  Good afternoon, your Honor.

15          With me today are Thomas Kreller.

16          MR. KRELLER:  Good afternoon, your Honor.

17          THE COURT:  Good afternoon.

18          MR. ARONZON:  And also Fred Neufeld (pho), sitting

19  right there.

20          MR. NEUFELD:  Good afternoon, your Honor.

21          THE COURT:  Thank you.

22          MR. ARONZON:  Thank you.

23          MS. THOMAS:  Good afternoon, your Honor.  Kaaran

24  Thomas of McDonald Carano.

25          And on the telephone is Sandy Qusba, Q-u-s-b-a,

1  with Simpson Thacher & Bartlett.

2          Together we are counsel for Deutsche Bank as agent

3  and the lead lenders.

4          MR. QUSBA:  Good afternoon, your Honor.

5          THE COURT:  Good afternoon.

6          MS. SMITH:  On behalf of German American Capital

7  Corporation, Jennifer Smith.

8          And with the firm of Sidley & Austin on the

9  telephone, Shalom Kohn.

10          In the courtroom Jeffrey Bjork and Kevin Hochberg.

11          MS. CHUBB:  Good afternoon, your Honor.  Janet

12  Chubb of Jones Vargas for Dr. James Knave, who is the

13  independent director of Station Casinos, Inc.

14          And also present is Van Durrer of Skadden Arps,

15  co-counsel.

16          MR. BOWLER:  Good afternoon, your Honor.  Adam

17  Bowler, of Timothy S. Corey & Associates, appearing for

18  Charleston Pavilion, LLC.

19          MR. MURTHA:  Good afternoon, your Honor, John

20  Murtha.  And with my partner John Fowler, of Woodburn and

21  Wedge, we represent Vista Holdings, LLC, the DIP lender.

22          MS. ARMSTRONG:  Good afternoon, your Honor.

23  Sallie Armstrong, of Downey Brand LLP, local counsel for

24  the independent lenders who have filed an objection for

25  today's hearing.

1          If you'd like for me to go through the individual

2     names?

3          THE COURT:  I know who they are.

4          MS. ARMSTRONG:  Thank you, your Honor.

5          I'd also like to introduce to the Court Mr. Steven

6     Catlett, from Paul Hastings, Jonofsky & Walker.

7          Mr. Paul Harner is also appearing telephonically.

8          And your Honor, I'd like to introduce Mr. Eric

9     Goldberg, from Stutman, Treister & Glatt, counsel for

10    Castlereagh Master Investments, Ltd., one of the

11    independent lenders.

12         THE COURT:  Thank you.

13         MR. HARTMAN:  Your Honor, Jeff Hartman for Netixas

14    (pho), one of the independent lender group.

15         MS. AXELROD:  Good afternoon, your Honor.  Brett

16    Axelrod, of Greenberg Traurig.

17         With me is Lori Sinanyan and Bennett Spiegel of

18    Jones Day.

19         Their pro hac vice applications are pending, your

20    Honor.

21         MS. SINANYAN:  Good afternoon, your Honor.  Lori

22    Sinanyan, of Jones Day.

23         We represent the ad hoc committee of senior and

24    subordinated noteholders who hold approximately 2.3 billion

25    dollars of the debt in this case, 94 percent approximately

1  of the seniors and well over three-quarters of the sub-

2  notes as well.

3          Thank you, your Honor.

4          MR. COSSITT:  Bill Cossitt, Office of the United

5  States Trustee.

6          THE COURT:  Telephonic appearances, please.

7     (No audible response)

8          THE COURT:  I need appearances from those

9  participating telephonically, please.

10          MR. QUSBA:  Your Honor, Sandy Qusba, Simpson

11  Thacher & Bartlett, counsel for the administrative agent

12  and lead lenders.

13          THE COURT:  Thank you.

14          MR. GARZA:  Good afternoon, your Honor.  Oscar

15  Garza, of Gibson, Dunn & Crutcher, on behalf of certain of

16  the debtors described as the CMBS debtors in the pleadings.

17          MR. KOHN:  Good afternoon, your Honor.  Shalom

18  Kohn, Sidley & Austin.

19          We have two of my partners and our co Reno counsel

20  in court.  I doubt I'll be speaking, but I did want to say

21  that.

22          THE COURT:  I have a --

23          MR. HARNER:  Good afternoon, your Honor.

24  Paul --

25          THE COURT:  Excuse me.  The last gentleman, I had

1  a very difficult time understanding.  I don't know if the

2  connection is solid or not.

3          So when you do speak you're going to have to make

4  sure that we can hear you.

5          Go ahead, please.

6          MR. HARNER:  Good afternoon, your Honor.  And I'm

7  sorry to interrupt.  It's Paul Harner, of Paul Hastings,

8  for the independent lenders introduced previously by co-

9  counsel.

10          THE COURT:  Is that everybody?  All right.

11          I have a number of matters that have been placed

12  on the calendar today.

13          The first that I am going to deal with is the

14  motion for joint administration in each of the cases.

15          I have, just for the purpose of the record, read

16  the omnibus declaration of Thomas M. Friel that was filed

17  in support.  I have a courtesy copy, I don't have the

18  docket number.

19          But I believe that that was filed yesterday -- or,

20  excuse me.  Today's the 30th.  That would have been filed

21  the 28th of July, I believe, which is the date that these

22  petitions were all filed.

23          I have read it and all the exhibits that are

24  attached thereto.  Many of the exhibits are redundant in

25  that they are also attached to the individual motions that

1  were filed.

2          Some of the exhibits are extraordinarily complex.

3   I certainly do not want to create the impression that I

4  have studied in detail each of the provisions of many of

5  these documents because one only has to take a look at the

6  number of lawyers here that attempted to do the same thing,

7  and I can't do what you folks can do.

8          However, I think that I have been able to at least

9  gain a sense of what I am being asked to do, and some of

10  which I may allow and some of which I'm pretty sure I

11  won't.

12          And I would rely upon counsel to point me to any

13  particular provisions of any of the exhibits that you think

14  would be germane.  I think that's consistent with Rule 4001

15  as well as 6003.

16          I will say something now and I do not intend to

17  repeat it, but it pertains to every order that I might

18  enter today whether it be denominated an interim order or a

19  final order.

20          This case was filed approximately forty-eight

21  hours ago.

22          It is typical in cases of this nature that a court

23  is requested to enter orders on an interim basis pursuant

24  either to 4001 or 6003 if there is immediate need or the

25  potential for irreparable injury.

1          This Court does not hesitate to do so when it is

2     appropriate.

3          However, there is always the issue early on in the

4     case whether there has been appropriate due process

5     provided to all parties in interest.

6          Now this case is not atypical in the sense that

7     many of the parties in interest have obviously been

8     involved in a long period of negotiations.  That is clear,

9     even when one reads the only opposition that has been filed

10    to any of the motions today, that there has been an ongoing

11    communication.

12         And all of you are far more familiar with the

13    facts and the circumstances as well as what I would

14    consider to be a fairly complex financing request, which is

15    a combination of cash collateral and debtor-in-possession.

16         This case also has an additional complexity

17    because these are simply a few, I think thirteen or

18    fourteen.  I can't remember the number of debtors.

19         But one only has to look at the chart that was

20    attached as Exhibit A to Mr. Friel's declaration to

21    understand that the operating entities themselves have not

22    filed and that -- and because of the schedules and the

23    Statement of Financial Affairs have not been filed--in fact

24    there's a request to extend that through September 22nd if

25    I remember correctly--that it's difficult to fully

14

1    comprehend exactly how the money is going to go in to flow.

2     It's difficult.

3              Obviously Station Casinos, Inc. is a holding

4    company and then there are other holding companies in a

5    sense.  I think that's what the Propco and Hold Company

6    are.

7              But the operating revenues are generated for the

8    most part so far as I can determine by non-debtor entities.

9     And that of course creates a set of issues that I find to

10   be unique.

11             For all of those reasons any order that I enter

12   today whether it be, as I said, interim or final would be

13   subject to an appropriate motion for reconsideration that

14   is brought within an appropriate time period.

15             There may be matters that I have overlooked.

16             It may be that there are parties that have not had

17   an opportunity to adequately review the pleadings and then

18   to object or at least raise issues they think the Court

19   should consider.  All of which would defeat their ability

20   to participate pursuant to Section 1109(b).

21             And I believe that a Chapter 11 is a participatory

22   process and I intend to provide the opportunity for parties

23   in interest to participate.

24             At the same time I understand the urgency that

25   exists for certain of these matters.   But the Court will

1   not consider these to be preclusive in the sense that if a

2   party does raise an appropriate issue after the order is

3   entered that should have been brought to my attention or

4   that I overlooked, I will consider them.  I just put

5   everybody on notice.

6         You will get the protections as provided for by

7   the Code if there -- for any financing that occurs during

8   the interim period.

9         But this Court would reconsider if appropriate and

10  if asked in a timely fashion.  I just want everybody to

11  understand that.

12        Now joint administration.  I have read the motion.

13   The declaration supports it.

14    (Pause in proceedings)

15        THE COURT:  Does anybody wish to be heard

16  regarding the joint -- the motion for joint administration?

17        Mr. Cossitt.

18        MR. COSSITT:  Bill Cossitt, Office of the United

19  States Trustee.

20        The motion includes a request to file consolidated

21  monthly operating reports.

22        THE COURT:  Yes, sir.

23        MR. COSSITT:  I've spoken with Mr. Kreller this

24  afternoon.  We think we can agree on that.  I need only two

25  additional numbers in addition to the consolidated monthly

1  operating reports and this -- these numbers need to be on a

2  debtor-by-debtor basis.

3          The first number is any moneys that are being lent

4  from one debtor to another debtor so that anybody looking

5  at the monthly operating reports can tell whether or not we

6  have what I would call de facto substantive consolidation.

7          So on a debtor-by-debtor basis the reports need to

8  reflect whether there's assets being transferred from one

9  debtor to the other debtor.

10          The second number is on a --

11          THE COURT:  Yeah.  And I think there was an

12  attempt to deal with that issue by splitting the cash

13  management systems as well.

14          MR. COSSITT:  Oh, I think so as well.  And there's

15  all kinds of interesting issues as to allocation of the

16  overhead.

17          But at a minimum the MORs should reflect so that

18  people can attempt to monitor whether we have one debtor

19  servicing another debtor.

20          THE COURT:  I think that's appropriate.

21          MR. COSSITT:  The second number that I would ask

22  for and require is that on a debtor-by-debtor basis the

23  disbursements made by the debtor have to be reported so

24  that we can upload the number and calculate the fees for

25  the U.S. Trustee's office.

1          THE COURT:  I don't see any problem with that.

2          Counsel?

3          MR. KRELLER:  Good afternoon, your Honor.

4          We have no problem working with Mr. Cossitt and

5    his office to accommodate the submission of reports that

6    include that information.  So we will work with him to make

7    sure that we include the information and format it.  That

8    is information that will be available.

9          You will hear in some detail or probably read in

10   some detail there's pretty sophisticated accounting and

11   inter-company tracking systems in place that are even going

12   to be further enhanced by the way the cash is going to

13   work.

14         So I don't think --

15         THE COURT:  And I understand --

16         MR. KRELLER:  -- providing that information --

17         THE COURT:  -- that there are internal reporting

18   procedures that already exist and safeguards are placed

19   regarding treasury managers and that type of thing

20   throughout the system.  So.

21         MR. KRELLER:  That's correct, your Honor.

22         THE COURT:  But I think the reports are necessary.

23         MR. KRELLER:  That's fine, your Honor.  I don't

24   think we'll have a problem complying with that.

25         THE COURT:  Right.

18

1           I am going to grant the motion for joint
2    administration.
3           The lead case shall be Station Casinos.  It will
4    not be Northern Nevada.  And the reason that I'm doing that
5    is that this is a large case and I think that as far as
6    they have a legitimate interest they should be able to have
7    access without trying to guess what the name of the cases
8    are.
9           And throughout the pleadings there is very little
10   reference to Nevada -- Northern Nevada Acquisitions.  All
11   the references are to SCI.  So we're going to use that.
12          And the lead case, even though it wasn't the first
13   filed, will be Station Casinos, Inc.
14          So all pleadings in the future will contain the
15   name Station Casinos, Inc. and they will contain the same
16   type of caption so that if it affects all debtors we know
17   that, or it affects specific or discreet debtors we know
18   that as well.
19          MR. ARONZON:  Your Honor, if I may.
20          We would be happy to provide a revised caption and
21   file it with a notice.
22          THE COURT:  You don't have to do that now.  This
23   is for --
24          MR. ARONZON:  Okay.
25          THE COURT:  I don't believe in wasted time.

1   That's for any pleadings filed in the future.

2        I would also ask--because I've seen these with a

3   number of pleadings--what we have asked counsel to do here

4   is when you do file declarations or affidavits that they be

5   docketed separately from the pleading themselves.

6        In the event that anybody wants to appeal or have

7   review or define the declarations, they can do so because

8   they'll be docketed rather than looking for a motion and

9   then perhaps trying to find the declaration.  That way

10  records can be easily accessed and, as I said, if records

11  have to be compiled for the purpose of review that can be

12  more easily accomplished as well.

13       So please file your declarations.  You can say

14  declaration of, you know, John Jones re motion and do it

15  that way, and then they're easily linked.  But the

16  declaration should be docketed separately.

17       We'd appreciate your assistance in that regard.

18  It makes our clerk's job much easier.

19       All right.

20       So I think -- and there should be orders of joint

21  administration entered in each of the cases.  So I need

22  orders for each of the cases, please.  All right.

23       I have read in addition to the declaration and

24  each of the exhibits -- and I have some -- I guess -- all

25  of the motions that were submitted and filed.

1          Now I am going to try to take them in what I
2    consider to be somewhat of a logical order.  And if -- I'd
3    be always welcome to suggestions by counsel.
4          But I think the first matter I want to deal with
5    is the cash management system.
6          MR. ARONZON:  Your Honor, we have a little bit of
7    pressure.  We need, for purposes of processing payroll
8    tomorrow, we need to make sure we deal with cash
9    management, wages and withholding taxes.
10          THE COURT:  That's how I was going to deal with
11    them.
12          MR. ARONZON:  Thank you, Judge.
13          I had a presentation I wanted to make, but I think
14    we should get that moving if we could.
15          THE COURT:  I want to get this done.
16          MR. ARONZON:  Okay.
17          Mr. Kreller will handle those three with you.
18          THE COURT:  All right.
19          Number one on the 1:45 calendar is the motion for
20    authorization to continue cash management system.
21          Now, that was developed pretty extensively in Mr.
22    Friel's declaration.
23          I understand the distinctions that are now being
24    drawn between the two -- actually I think there's three
25    cash management systems.

1          Is that accurate?

2          MR. KRELLER:  That's accurate, your Honor.

3          THE COURT:  Why don't you take a moment to explain

4   them so everybody understands what the proposal is, please.

5          MR. KRELLER:  I will do that, your Honor.  And

6   I'll be brief and give an overview.  And obviously then --

7   and then open to questions.

8          As Mr. Aronzon said, we've got some timing

9   constraints in terms of trying to get--to the extent we

10  obtain the orders we're asking for today--to get orders out

11  to the banks to keep bank accounts open on our payroll

12  checks that are to be issued tomorrow.

13         So I'll move these few at least along as quickly

14  as I can.

15         Your Honor, you are correct.  The cash management

16  motion and as detailed in the Friel declaration really lays

17  out what I'll call three separate cash management systems,

18  and it's going to mirror some of the things that you'll

19  hear from us later today about debtors versus non-debtors,

20  operating companies versus holding companies, guarantors

21  that are obligors on the pre-petition credit facilities

22  versus what we'll probably refer to often as unrestricted

23  subsidiaries which are other direct and indirect

24  subsidiaries of Station Casinos.

25         THE COURT:  Unrestricted means what?

1            MR. KRELLER:  It means --

2            THE COURT:  I could not find the defined term.

3            MR. KRELLER:  It is --

4            THE COURT:  I saw it throughout these.

5            MR. KRELLER:  It essentially means -- and there

6   are some exceptions to this, but essentially means

7   subsidiaries that are not obligors under the pre-petition

8   credit facilities.  They have not issued guaranties and

9   they have not pledged their assets to the pre-petition bank

10  lenders.  And so they operate separate and kind of outside

11  of the bank cash collateral system.

12           So in terms of -- and the cash management system

13  essentially mirrors that.

14           You have a debtor in Station Casinos, Inc. which

15  is the -- a parent company of the operating subsidiaries.

16  And you've got bank accounts at Station which is the

17  debtor-in-possession.  And there is cash that flows down

18  from Station into the unrestricted non-guarantor subs.

19           THE COURT:  The concentration account was at the

20  Station level.

21           MR. KRELLER:  The concentration account was at the

22  Station level.

23           There's a separate non-debtor cash management

24  system which essentially has been extracted away from

25  Station.

1            THE COURT:  That's Past Entertainment?

2            MR. KRELLER:  That's Past Enterprises.

3            THE COURT:  Enterprises.  Excuse me.

4       I could not find -- is that newly created?

5            MR. KRELLER:  It --

6            THE COURT:  It's not on the chart that I could

7  find.

8            MR. KRELLER:  It actually is on the chart, your

9  Honor.

10           THE COURT:  Maybe I missed it.  I looked.

11           MR. KRELLER:  It's a little hard to find.

12           THE COURT:  I found this but I couldn't find Past.

13           It's very difficult for me to read this, I had to

14  use a magnifying glass.

15           MR. KRELLER:  I apologize, your Honor.

16           THE COURT:  You forgot how old I am.

17           MR. ARONZON:  It's right here.

18           THE COURT:  Oh, I see it.  All right.  Arizona

19  corporation.  Okay.  Thank you.

20           MR. KRELLER:  Correct, your Honor.  And that was

21  an existing entity that -- essentially a non-debtor entity

22  but it is an obligor, is a guarantor of the bank debt.

23           And so cash that resides in Past Enterprises is

24  subject to the liens of the bank group.

25           THE COURT:  Now the companies down the right side

1  of that chart.

2          MR. ARONZON:  These are our operations, your

3  Honor.

4          THE COURT:  Those are operations as well?

5          MR. ARONZON:  Those are basically our operations.

6          THE COURT:  All right.

7          MR. ARONZON:  I'll come back to this --

8          THE COURT:  Okay.  Thank you.

9          I just wanted to know -- I just didn't know

10 exactly what Past Enterprises was.

11         Go ahead.

12         MR. KRELLER:  Essentially, your Honor, Past

13 Enterprises is a non-debtor entity that under the system

14 that we're proposing will act as the concentration account

15 for the non-debtor guarantors.

16         So it's -- that's where cash collateral, not in

17 the bankruptcy sense because those are non-debtor entities,

18 but that cash is cash collateral of the pre-petition bank

19 group.

20         And Past Enterprises serves as the concentration

21 account for all of the entities that are credit parties to

22 the pre-petition bank group.

23         That's an entirely non-bankruptcy system and not

24 one that you need to deal with in the context of this

25 motion.  We're not asking for anything with respect to that

1  because those are non-debtors.

2          THE COURT:  But the cash that is in that account

3  does constitute at least a portion of, I assume, cash

4  collateral for the pre-petition --

5          MR. KRELLER:  It's cash collateral for the pre-

6  petition lenders --

7          THE COURT:  Right.

8          MR. KRELLER:  -- but it's not --

9          THE COURT:  But it's not being utilized for the

10  purpose of the cash collateral request.

11          MR. KRELLER:  -- it's not cash collateral that

12  resides with the debtor-in-possession.

13          THE COURT:  That's what I understood.  Okay.

14          MR. KRELLER:  Yeah.

15          The third cash management system, your Honor, is

16  what we define in the motion as the CMBS cash management

17  system.

18          THE COURT:  What exactly, what does CMBS stand

19  for?

20          MR. KRELLER:  It's --

21          THE COURT:  I know those are the mezzanine loans

22  for the most part.

23          MR. KRELLER:  Right.

24          MR. ARONZON:  It's collateralized mortgage backed

25  securities.

1          THE COURT:  Thank you.

2          MR. KRELLER:  So those entities and the -- in

3    front of the -- that's really the stack, the FCP Propco

4    stack of entities in the mezz entities up above as you go

5    up that chain.

6          THE COURT:  Those were entities created for the

7    purpose of the mezzanine financing as I understand.

8          MR. KRELLER:  That's correct, your Honor.

9          In those entities -- and we'll talk more about

10   this in the context of the background and the DIP

11   financing.

12         For purposes of the cash management motion

13   those -- the bank accounts that reside at the debtor, which

14   is FCP Propco and also there are related accounts that run

15   up the chain in the mezz entities, those -- there are bank

16   accounts there that are pledged to the CMBS mortgage lender

17   and the mezzanine lenders up above.

18         Those accounts essentially receive the rent

19   payments from Station, whereby Station rents the real

20   property that Propco owns.  There's four casinos that

21   Propco owns.  Station runs those properties, pays rent to

22   those entities, to the Propco entities, for the use of

23   their -- of the real property that they own.

24         So when Station makes the rental payment for that

25   real estate into Propco that money, the rental payments and

1   other charges go into the accounts of Propco and ultimately

2   they go out to pay the expense -- the real expenses,

3   insurance, taxes, etc. and debt service associated with the

4   Propco entities.

5         As we sit today there -- we're actually not asking

6   for any relief with respect to those accounts except that

7   they be allowed to remain open.

8         The money that resides in those accounts for now

9   can't really go anywhere.  The accounts are under the

10  control or they are blocked by the mortgage lenders, so the

11  company can't utilize that cash collateral at the moment

12  because the lenders can block.

13        The lenders on the other hand, at this point in

14  time, are prevented by the automatic stay from doing

15  anything with those funds in which they have security

16  interests.

17        So in essence there's no money flowing through the

18  Propco entities at the moment.  We are actually in

19  discussions with the Propco lenders about a separate use of

20  that cash as cash collateral arrangement with the Propco

21  lenders, and it's something that we would -- would be the

22  subject of a separate motion.

23        THE COURT:  Is that that 250,000,000-dollar land

24  loan?

25        MR. KRELLER:  No.  That's the land loan which is a

1  separate obligation.  That's the CV --

2              THE COURT:  Who else has loaned money to --

3              MR. KRELLER:  That's the CV Holdco and CV Propco.

4              THE COURT:  This showed, the chart showed and I

5  could not -- a 250,000,000-dollar land loan to Propco.

6              Is Propco a borrower on other financing as well?

7              MR. ARONZON:  It's a -- mortgage, your Honor.

8              THE COURT:  Where is that on this chart?

9              MR. ARONZON:  If you look at the chart and you

10  look at the bottom of the chart this is Propco.  And if you

11  look directly across it's the --

12              THE COURT:  Is that the same company?

13              MR. ARONZON:  Yes.  This is Propco.

14              THE COURT:  Well one is CD Propco --

15              MR. KRELLER:  Yeah.

16              THE COURT:  -- and the other is FCP Propco.

17              MR. KRELLER:  Yes.

18              MR. ARONZON:  This is Propco at the bottom of it.

19   Okay.  The mezzanines run above.

20              I'll walk you through --

21              THE COURT:  Right.  I see that.  But I thought we

22  were talking about -- let's --

23              MR. ARONZON:  CD Propco is not a debtor.

24              THE COURT:  I know that.

25              MR. ARONZON:  It's to the far left.  That is our

29

1  land loan.

2        THE COURT:  That's right.  It has the 250,000,000-

3  dollar land loan.

4        MR. ARONZON:  Correct.

5        MR. KRELLER:  Correct.

6        MR. ARONZON:  Correct.

7        I will walk through all of this so everyone can

8  see it.

9        THE COURT:  No.  But the debt.  I'm taking a look

10 at the cash management.  It starts at Page 28 of the Friel

11 declaration.

12  (Brief pause)

13       THE COURT:  Actually I -- oh, I see.  It's SEP

14 because when I look PD Propco it deals more with the cash

15 collateral I think than the other financing.  I see the

16 distinction.

17       MR. KRELLER:  Yes.

18       THE COURT:  I see the distinction.

19       MR. KRELLER:  That's right, your Honor.  CV Propco

20 and CV Holdco are the -- will be discussed in the context

21 of the cash collateral.

22       MR. KRELLER:  Collateral and DIP financing.

23       MR. KRELLER:  Because we end up funding down into

24 those entities.

25       THE COURT:  That's what happens.  Now I see it.

1          MR. KRELLER:  But they're not debtors, they're not

2    the subject of cash management.

3          THE COURT:  No, I -- I understand.  All right.

4    That was one of the questions I had.

5          All right.

6          MR. KRELLER:  Okay.

7          So your Honor, essentially what you have is you

8    have a debtor, a debtor-in-possession cash management

9    system at Station Casinos, Inc. which we are requesting

10   authority to maintain, leave open, continue to use those

11   bank accounts in the ordinary course of business.

12         THE COURT:  Okay.

13         MR. KRELLER:  And you have the CMBS cash

14   management system for which we are seeking the same relief.

15         THE COURT:  When I was looking at the non-debtor

16   cash management system, I had the same question when I read

17   the Friel declaration as I did when I read the motion at

18   paragraph 27.

19         That describes the non-debtor cash management

20   system, concentration account at Past Enterprises.  I

21   understood what it is.  It mirrors, it replicates the SCI

22   entity.  I understand that.

23         It makes sense because there's some way that you

24   have to account for the operating entities that are not

25   debtors.  I understand that.

1          What I didn't understand is the language that's

2     used when it says constant obligations that the debtors

3     intend to cause to be paid by Past Enterprises.

4          And this is important, especially when they deal

5     with the insurance and some of the other obligations which

6     SCI collectively intends to pay up through the date of the

7     petition and then have Past Enterprises or the individual

8     non-debtor operating entities pay post-petition I think

9     becomes important.

10          And so that's when I read:

11          "Debtors intend to cause to be paid by Past

12          Enterprises from the non-debtor cash management."

13          And that's how it would happen because it would

14     come through that concentration account.

15          "Consists of the following budget line items."

16          Now the budget line items mean something to you

17     folks but they don't mean anything to me because I couldn't

18     find a budget in any of the pleadings that I looked at.

19          Was one filed?

20          MR. KRELLER:  Your Honor, the budget was attached

21     as an exhibit to the form of interim order.

22          THE COURT:  To what?

23          MR. KRELLER:  To the cash -- to the cash

24     collateral DIP financing motion.

25          THE COURT:  Let's take a look at that.  That was

1  number 5 in your notebook, and perhaps I overlooked it.

2          I've got the motion.  I've read it.

3          I see the interim order.  Are you telling me

4  attached to the interim or -- there it is.  There's the

5  budget.

6          I see Schedule 1, which is the guarantor's

7  schedule 2 is the non-guarantor, unrestricted subs.

8          Ah, there's the budget.  Well I was looking for

9  it.

10          I'm not -- I just want -- I'm not at this point

11  really in a position to approve the budget line items nor

12  the carve-outs.  If I'm going to be asked to do that that's

13  going to at least wait until the final.

14          The entire purpose of this is to get us from this

15  point until the hearing on the final motions.  Does

16  everybody understand?

17          MR. KRELLER:  Understood, your Honor.

18          THE COURT:  Because that's one -- in fact one of

19  the points that was raised in the objection filed by the

20  independent lenders is take a look at some of the large

21  amounts of money and perhaps should be the object of some

22  scrutiny.  And I tend to think that that's right.

23          I did miss the budget.

24          But at any rate, to go back to cash management.

25  There's excluded line items.  And I assume that that means

1  that one of these entities or one of the managements (pho),

2  they're excluded from their obligations to pay.  Who?

3          MR. KRELLER:  Your Honor, the way that the -- the

4  way the budget works and the way the system works, the

5  items that Past Enterprises is obligated to fund and has

6  agreed to fund and that the banks--and remember Past is the

7  bank's cash collateral vehicle--the banks have agreed that

8  money that resides at Past can be used for these items that

9  you see as the budget line items, the operating

10 disbursements.

11          It's essentially the operating -- the ordinary

12 operating expenses and regular customary capital

13 expenditures at the guarantor subsidiaries.

14          THE COURT:  The cash management motion stays and

15 this is the same as in the Friel declaration.

16          "The excluded line items generally fall into the

17          following categories."

18          I've read those.

19          But excluded means excluded from something.  What

20 I'm asking is what are these excluded from?

21          MR. KRELLER:  They're excluded from the amounts

22 that Station is necessarily going to pay.  They're included

23 in the amounts that Past Enterprises --

24          THE COURT:  So in other words --

25          MR. KRELLER:  -- will pay.

1          THE COURT:  -- these are included in the

2    disbursements that will come from Past and not from SCI.

3          Is that accurate?

4          MR. KRELLER:  That's --

5          MR. EISENBERG:  No.

6          THE COURT:  See that's -- so I'm asking the

7    question.  Somebody better explain this to me.

8          MR. ARONZON:  Your Honor, Mr. Eisenberg crafted

9    these along with the banks and Mr. Friel.  I would ask him

10   to address your question.

11         THE COURT:  I just need somebody to tell me what

12   this means.

13         MR. ARONZON:  It's a perfectly legitimate question

14   and it isn't --

15         THE COURT:  Thank you.

16         MR. ARONZON:  It doesn't jump out at you.

17         THE COURT:  As soon as I ask an illegitimate one

18   let me know.

19         MR. ARONZON:  It doesn't jump right out at you.

20         MR. EISENBERG:  Good afternoon, your Honor.  David

21   Eisenberg of Milbank Tweed.

22         I worked on the motion together with lenders'

23   counsel, so I'm --

24         THE COURT:  I know this is --

25         MR. EISENBERG:  -- for better or worse responsible

1  for the language.

2          THE COURT:  What does it mean?

3          MR. EISENBERG:  The way -- there is a

4  differentiation in terms of sources of cash as to what can

5  be used.

6          The budget is a budget for the entire enterprise.

7   It covers --

8          THE COURT:  -- debtor and non-debtor.

9          MR. EISENBERG:  -- debtor and non-debtor.

10          THE COURT:  I understand that.

11          MR. EISENBERG:  We have Vista Holdings which has

12  unrestricted cash available and will be the DIP lender.

13          THE COURT:  Supposed to have a hundred and fifty

14  million dollars, can't go below a hundred million.  I'm

15  familiar with that.

16          MR. EISENBERG:  Right.

17          And it has Past Enterprises where the operating

18  revenue of the operating companies will concentrate.

19          THE COURT:  Good.  Right.

20          MR. EISENBERG:  What excluded line items means is

21  from a Station perspective if a line item is excluded it

22  must be paid with money at Past.  It cannot use Vista money

23  to pay those line items.

24          THE COURT:  Because the Vista money --

25          MR. EISENBERG:  On the other hand --

36

1          THE COURT:  -- and the cash collateral is what is
2  going to finance Stations.
3          MR. EISENBERG:  Correct.
4          THE COURT:  The operating revenue goes into the
5  Past concentration account.
6          MR. EISENBERG:  Right.
7          THE COURT:  And that is intended to finance the
8  op -- what I would call ordinary course operating expenses
9  for the most part.
10          MR. EISENBERG:  Of the non-debtor gaming
11  companies.
12          THE COURT:  Of the non-debtor entities.
13          And excluded then from what Past pays?
14          MR. EISENBERG:  No.  Excluded from what Vista must
15  be used to pay for.
16          THE COURT:  Okay.
17          MR. EISENBERG:  So --
18          THE COURT:  Must be used to.
19          MR. EISENBERG:  -- Vista as a source of funding
20  must be used to pay the budget items other than the
21  excluded items which Past may be used to pay for.
22          THE COURT:  All right.  May but not necessarily.
23  All right.
24          Because it says:
25          "The costs and obligations that the debtors intend

```
 1              to be caused by Past from the non-debtor cash
 2              management system consist of the following budget
 3              line items: the operating disbursements
 4              identified," then it identifies them, "and to the
 5              non-operating disbursement line items in the
 6              budget identified," identifies them.
 7              And then it says:
 8              "The line items identified in clauses one and two
 9              being the excluded line items."
10         That's why I couldn't figure it out.  You said
11    that Past was going to pay them, now they're excluded.  But
12    they are as they're excluded from the payment from
13    Stations, and that's why Past is going to pay them or may
14    pay them?
15              MR. EISENBERG:  That is correct.
16         More technically they're excluded from those line
17    items which Station is obligating itself to pay only from
18    proceeds of loans from Vista.
19              THE COURT:  The SCI cash management system.
20              MR. EISENBERG:  Yes.
21              THE COURT:  All right.  Now I understand.
22              MR. EISENBERG:  Okay.  Thank you, your Honor.
23              THE COURT:  At least I understand better than I
24    did five minutes ago.
25              MR. EISENBERG:  Okay.
```

1          And with the Court's permission I'm going to turn

2     it back over to Mr. Kreller.

3          THE COURT:  Thank you.

4          MR. KRELLER:  Your Honor, --

5          THE COURT:  Then there is a separate cash

6     management system for the mezzanine, what I call the

7     mezzanine loans.  Now I know that those are like a mortgage

8     backed security.

9          All right.  I understand that.

10         Is there anything else?

11         MR. KRELLER:  Your Honor, that's really the

12    description of the systems.

13         And from the perspect -- from the -- viewed in the

14    narrow perspective once we've -- you kind of -- if you set

15    aside the non-debtor entities, the non-debtor cash

16    management system.

17         The specific relief that's sought by the cash

18    management motion is the preservation and maintenance of

19    the existing accounts at Station Casinos and at the

20    mezzanine -- at the Propco and mezzanine lenders so that

21    those accounts --

22         THE COURT:  And you want to continue to use the

23    same forms, etc., etc.

24         MR. KRELLER:  We want to continue.  And yes, in

25    addition to the bank accounts we want to continue to use

1   existing business forms and records and continue the

2   investment practices with respect to money that resides

3   within the Station concentration account..

4           THE COURT:  When I read Mr. Friel's declaration it

5   said the CM mortgage lenders.  There are more than one?

6           I was looking at --

7           MR. KRELLER:  Yes, your Honor.

8           THE COURT:  -- paragraph 67.

9           All right.

10          Because this first says:

11          "The CMBS debtors have granted to the CMBS

12          mortgage lender a first priority security interest

13          and have authorized the CMBS mortgage lender to

14          exercise exclusive control of the CMBS mortgage

15          loan accounts."

16          And then it says:

17          "The CMBS debtors have granted to the mezzanine

18          lenders a first priority."

19          Then the last sentence says:

20          "The CMBS debtors anticipate that all cash

21          collateral will be retained under the control of

22          the CMBS mortgage lenders."

23          And I didn't know how it went from singular to

24   plural.

25          MR. KRELLER:  Your Honor, it does.  And again back

1  to the chart.

2          The mortgage lender is the lender on the 1,8-

3  billion-dollar mortgage loan made to FCP Propco.

4          THE COURT:  I see that.

5          MR. KRELLER:  And that's the mortgage loan there

6  because FCP Propco is where the real property resides.

7          THE COURT:  And the mortgage lender is separate

8  from the mezzanine loans?

9          MR. KRELLER:  That's correct.

10          THE COURT:  Um-hmm.

11          MR. KRELLER:  If you go up from where the real

12  property resides to the first mezzanine level, FCP Mezzco

13  Borrower One LLC, it doesn't own real estate.  It owns the

14  equity of FCP Propco.

15          THE COURT:  I understand that.

16          My question is the 1.8 billion, that's a mortgage

17  loan, that is the mortgage lender.

18          MR. KRELLER:  Correct.

19          THE COURT:  The declaration and this chart says

20  mortgage lender.  The sentence I read says mortgage

21  lenders.

22          All I'm asking is --

23          MR. ARONZON:  There are more than one holder --

24          THE COURT:  That's all I'm asking.

25          MR. ARONZON:  -- of the mortgage.

1           MR. KRELLER:  Multiple institutions, your Honor.

2           THE COURT:  Okay.

3           So earlier on in that paragraph when it says to

4    the CMBS mortgage lender it should say lenders.

5           MR. KRELLER:  Correct, your Honor.

6           THE COURT:  I just don't want there to be any

7    confusion.

8           MR. KRELLER:  Correct.

9           THE COURT:  All right.

10          MR. KRELLER:  Your Honor, I apologize for

11   that --

12          THE COURT:  No.  That's --

13          MR. KRELLER:  -- for that typo.

14          THE COURT:  All right.

15          Does anybody else wish to be heard on this motion?

16          Mr. Cossitt?

17          MR. COSSITT:  A couple of issues --

18          THE COURT:  I looked --

19          MR. COSSITT:  -- I'd like to reserve, your Honor.

20          The debtor is using self-insurance for workers'

21   comp up to three hundred and fifty thousand.

22          THE COURT:  Yes, sir.

23          MR. COSSITT:  That's outside the U.S. Trustee

24   guidelines.

25          And we don't have to address it today.

42

 1          THE COURT:  That's in a different -- that's a
 2   different motion.
 3          MR. COSSITT:  It's in the cash collateral, isn't
 4   it?
 5          THE COURT:  I'm not in cash collateral.  And there
 6   was a separate mo --
 7          MR. COSSITT:  Oh no, the cash management system.
 8          THE COURT:  There was a separate motion regarding
 9    workers' comp.
10          MR. COSSITT:  Yeah.  And this is in the cash
11   management system.
12          MR. KRELLER:  It's a description of -- it's in a
13   description of the workers' comp account.
14          THE COURT:  Right.
15          MR. COSSITT:  I believe so.
16          MR. KRELLER:  Where it's a -- which is a reserve
17   account for workers' comp claims.
18          THE COURT:  That's how they intend to satisfy
19   that.
20          MR. COSSITT:  Okay.
21          My concern is is that we may need to weigh in on
22   that issue later.  I don't know.  Because it is outside the
23   guidelines of the U.S. Trustee.
24          THE COURT:  And I'll deal with that at the time of
25   the workers' comp motion, if necessary.  If it implicates

1  the --

2          MR. COSSITT:  Great.

3          THE COURT:  -- provisions of the cash management

4  system it will necessarily do so.

5          MR. COSSITT:  And then similarly the bank that the

6  debtor is using is a bank that's not on the U.S. Trustee's

7  approved list.

8          I don't know anything about this bank.  I don't

9  know anything about rating the banks.  I don't know whether

10  this is a bank that got TARP money or anybody else.  So

11  that issue needs to be reserved for later addressing if it

12  needs to be.

13          Finally the order, the interim order that's been

14  proposed.  There are two paragraphs that I've spoken to Mr.

15  Kreller about, we think we can remove to satisfy my

16  concerns.

17          And so --

18          THE COURT:  Go ahead, tell me what they are.

19          MS. COSSITT:  Okay.

20          On Page 3 of the interim order, starting on line

21  17 and going through 19 that:

22          "The debtors are authorized and empowered pursuant

23          to Section 345 of the Bankruptcy Code to maintain,

24          close and open new accounts not located on the

25          list."

1          THE COURT:  I'll do that on an interim basis.

2          MR. COSSITT:  And then on --

3          THE COURT:  That will not be a final order.  And

4  that's -- none of this is final.

5          MR. COSSITT:  And then on paragraph --

6          THE COURT:  That's really the 345(b) issue as I

7  understand.

8          MR. COSSITT:  Page 4, 8 to 10, we think that

9  language is too broad and reads 345 out of the Code and

10  allows the debtor to authorize bank accounts solely in its

11  discretion.

12          THE COURT:  I don't -- I didn't -- I don't know

13  why you'd need to open any new bank accounts at this time.

14   I'm not going to have that in the interim order.  If you

15  want to --

16          MR. KRELLER:  Your Honor, we're fine have -- we're

17  find striking that language.

18          THE COURT:  Yeah.

19          MR. COSSITT:  Thank you, your Honor.

20          THE COURT:  I have one other problem with the

21  interim order.  And that is at page 5, line 18.

22          This would indicate that -- the necessity of an

23  objection to set -- to have a final hearing.

24          I'm not going to do that.  This will just be set

25  at our final hearing.  We're not going to do this on

1  negative notice.

2          MR. KRELLER:  That's fine, your Honor.

3          THE COURT:  I'm going to have to set hearings on a

4  number of other motions.  I see no reason to treat this

5  different than any of the others.

6          So that language -- we'll just put in a date and a

7  time.

8          MR. BEESLEY:  Is that being stricken or we're just

9  putting in a date and time?

10          THE COURT:  There will be a final hearing.  There

11  will be a final hearing.

12          It should be obvious even with the time that I've

13  spent on this, you can overlook certain things.  And I want

14  to -- that's what I rely upon parties to bring to my

15  attention.  I don't really want to practice law here, just

16  resolve matters.

17          MR. KRELLER:  Your Honor, we're fine with that.

18          I think as a logistical matter one of our goals

19  right now is to get this order entered.

20          We can either pick a final hearing --

21          THE COURT:  I know what you want to do.

22          Does anybody else wish to be heard regarding this

23  matter?

24     (No audible response)

25          THE COURT:  I am going to grant the interim relief

1   that's being sought subject to the modifications to the

2   interim order that was just placed on the record.

3           Upload that and I'll authorize -- once it's

4   uploaded let me know and we'll sign it.

5           MR. KRELLER:  Your Honor, shall we set the final

6   hearing or shall we just indicate in the order that there

7   will be a final hearing?

8           THE COURT:  Just indicate in the order.  You can

9   do a separate notice.

10          Because I'm going to have to -- we're going to

11  have to deal with dates later.

12          But you can say there will be a final and that

13  notice will be provided.  That's all you have to say in

14  there.

15          MR. KRELLER:  Right.  Thank you very much, your

16  Honor.

17          THE COURT:  I don't think there's any problem with

18  that.

19          All right.  That takes care of cash management.

20          Let's go to number two on my calendar, which is

21  the motion authorizing payment of wages, compensation,

22  employee benefits, authorizing and directing financial

23  institution to honor processed checks and transfers related

24  to such obligations.

25          As to the second part of the motion I'm granting

47

1  that.  All that we're going to deal with is the -- at this
2  time is authorizing the payment.
3          Obviously if I authorize the payment it
4  necessarily includes the authorization to the financial
5  institutions.
6          Now apparently there are approximately six hundred
7  and sixty-three employees of the debtors.  Correct?
8          MR. KRELLER:  That's correct, your Honor.
9          THE COURT:  The entire group, which are all the
10 debtor and non-debtor entities, have about 13,200
11 employees.
12         MR. KRELLER:  Roughly, your Honor, that's correct.
13         THE COURT:  This motion is directed towards the
14 6,000 -- excuse me -- it's towards the six hundred and
15 sixty-three?
16         MR. KRELLER:  That is correct, your Honor.
17         THE COURT:  And that's all?
18         MR. KRELLER:  And that's all.  Those are the only
19 employees of the debtor-in-possession.
20         THE COURT:  All right.
21         The pre-petition obligations I've read.  I know
22 that the biweekly payroll at least of July 12th of both
23 hourly and salaried employees was one million eight hundred
24 and twenty-six thousand seven hundred and thirty-eight
25 dollars.  So that's about four million dollars a month.

1          And then you give me six thousand per employee

2     which is nice to know but not relevant for the purposes of

3     the Code.

4          And that's there's a withholding obligation of

5     three hundred and eighty-eight thousand eight hundred and

6     eleven dollars.

7          Obviously if I allow payments I'm going to require

8     withholding.  I certainly don't want to set up any type of

9     an issue with the Internal Revenue Service and have any

10    administrative claim that takes priority over any other

11    administrative claims.  We're not going to do that.

12         The next payday is tomorrow as I understand?

13         MR. KRELLER:  That's correct, your Honor.

14         THE COURT:  And that you project your payroll at a

15    little over or just approximately, what, two million one

16    hundred thousand dollars; is that correct?

17         MR. KRELLER:  That is correct, your Honor.

18         THE COURT:  Now I've got a -- you're asking me to

19    allow payment to -- for pre-petition.  And I understand

20    it's a 16-day period, so some of the -- so some of these

21    requests are a little bit higher than they would be.  Is

22    that accurate?

23         MR. KRELLER:  That is accurate, your Honor.

24         THE COURT:  You've got all but the twenty-eight

25    highest wage earners or highest salary employees are below

49

1   the priority amount of ten thousand nine hundred and fifty

2   dollars.  Is that accurate?

3           MR. KRELLER:  That is correct, your Honor.

4           THE COURT:  Okay.

5           Now we're speaking -- you know, when you put these

6   together--and I looked at the chart--you combined both

7   vacation and salary.  The Code doesn't do that.  For the

8   ten thousand nine fifty they're one.

9           So really the distinction between vacation and

10  salary doesn't really implicate the Code so far as I can

11  determine.

12          I would also make one other point because I read

13  it throughout some of the pleadings, and I'm only going to

14  say it once, again so I don't have to say it again.

15          The citation in the Ninth Circuit to the doctrine

16  of necessity as utilized by courts in other circuits is not

17  really good law in the Ninth Circuit even if it might be

18  good law in others.

19          The B&W Enterprises case has made it very clear

20  that the railroad reorganization doctrine of necessity,

21  which actually is two pronged, doctrine of necessity is not

22  applicable.  Actually that was a 549 case.

23          I'm well aware of what Adam's Apple says.  Adam's

24  Apple dealt with a cross-collateralization issue and

25  whether there was good faith in the -- in DIP financing and

 1   talked about fundamental tenets.

 2           And one of the fundamental tenets of Chapter 11 is

 3   reorganization which is at least equal to, at least in that

 4   panel's judgment, to the tenet of equitable distribution

 5   and the priorities as established by the Bankruptcy Code.

 6           I will tell you Adam's Apple and that -- and the

 7   language contained therein is often considered to be dicta.

 8    I'm not quite sure that that's accurate because you had to

 9   get to the good faith issue.  We could have a very good

10   philosophical discussion.

11           The Ninth Circuit so far as I can determine in at

12   least two cases has created a separate doctrine of

13   necessity.  And you can look at the Heinz case and I think

14   the other is Sanchez.

15           But they don't -- they both deal with payment of

16   attorney's fees, pre-petition payment.  And so it's

17   interesting.

18           I do think that there is a way through 363(b) and

19   105, perhaps 364, to find that there's some type of a

20   doctrine of necessity that's independent of the railroad

21   reorganization doctrine of necessity.

22           Nobody cited B&W.  I just, I didn't want anyone to

23   think that I was necessarily accepting the legal

24   authorities that were being offered.  I'm not.

25           There are other cases that I've utilized, the

51

1  Poppy case, and Judge Williamson's case out of Florida.

2         You can take a look at some of the orders I've

3  entered, for example in the London Fog case and a couple of

4  other cases, to see how I approach this problem.

5         I do believe that there is a fundamental tenet of

6  rehabilitation and reorganization of Chapter 11.  But I

7  also concur that there's an extraordinary remedy.  And some

8  of the same analysis that you can find in the Seventh

9  Circuit opinion in KMart is what I will utilize as well as

10 CoServe and a number of other cases that talk about the

11 limitations.

12        So I'm well aware of those.  I understand it's an

13 extraordinary request.

14        I have Adam's Apple right here in front of me in

15 case anybody wants to discuss it.

16        But I also unders -- you know the priority

17 amounts, we're really talking about timing in my opinion.

18        Does anybody object to paying the payments of

19 these pre-petition wages and vacation?

20    (No audible response)

21        THE COURT:  No?

22        Mr. Cossitt.

23        MR. COSSITT:  Bill Cossitt, Office of the United

24 States Trustee.

25        This issue was raised earlier with Counsel.  And

52

1  it was my understanding that they were going to withdraw
2  the people over the cap.
3        THE COURT:  I'm just talking about those that --
4  I'm talking up to the priority amount.
5        MR. COSSITT:  Up to the priority amount?  No
6  objection whatsoever.
7        THE COURT:  Yeah.  I don't either.
8        Now I looked at your chart.  And there's one -- I
9   know they're anonymous and just use numbers instead of
10 names and I -- one is significantly over, about two hundred
11 and sixty thousand dollars over if I looked at it
12 correctly.
13       And I know you've got nine of these twenty highest
14 between eleven and fifteen, seven between fifteen and
15 seven, twenty thousand and four, that's two hundred and six
16 thousand dollars.
17       What do you propose to do?  I just don't think I
18 can do that on an interim basis.
19       MR. KRELLER:  Your Honor, on an interim basis we
20 would be willing to put over the request for anything over
21 the cap to final and take an interim order.
22       THE COURT:  And that includes both vacation and
23 salary.  I want you to understand that.
24       Pay them their wages.  We'll deal with vacation,
25 or at least that portion of vacation over the priority

1  amount at the time of the final hearing.

2          MR. KRELLER:  Understood, your Honor.

3          THE COURT:  There are consequences to filing

4  Chapter 11.  All right.

5          Now there are other employee benefits and they

6  have a separate priority amount under 507(a)(5).  Those are

7  employee benefit plans.

8          I'll do the same thing up to the -- for the

9  interim, up to the amount of the -- as provided for by --

10  as a priority, ten thousand nine hundred and fifty dollars.

11          And then we'll deal with the -- if there's any

12  amounts above that.

13          And I couldn't tell if the twenty plus the thirty-

14  seven came in for both the salary and the employee benefit

15  or just the employee benefit.  I couldn't -- I wasn't quite

16  sure of that as I read through this.

17          And no bonuses.  I know there's been no request

18  for bonuses and I'm not going to even address that at this

19  time.

20          MR. KRELLER:  Understood, your Honor.

21          And our intention was solely to educate you that

22  those were out there and not to request any relief.

23          THE COURT:  I will tell you employee

24  reimbursement, I'm willing to allow that.  If employees are

25  out of pocket they get -- they should be repaid.

1            I don't consider that to be salary, I don't

2   consider that to be an employee benefit plan.  That's a

3   benefit they've provided to the debtor and they're entitled

4   to get paid those.  They can least afford it of anybody in

5   this room.

6            I think that takes care of that.

7            MR. KRELLER:  I believe so, your Honor.

8            THE COURT:  Submit the order, please.

9            MR. KRELLER:  We'll do that, your Honor.  Thank

10  you.

11     (Pause in proceedings)

12            MR. KRELLER:  Your Honor, I think that leaves us

13  with one more motion on kind of the expedited list.

14            THE COURT:  Is that the pre-petition tax?

15            MR. KRELLER:  That's correct, your Honor.

16            THE COURT:  That's number three on my calendar.

17  Isn't that correct?

18            MR. KRELLER:  I believe it's -- I'm sorry.  I

19  don't have your calendar.

20            THE COURT:  Yeah.

21            MR. KRELLER:  It's number five on the agenda.

22            THE COURT:  Let me take a look.  I don't have the

23  agenda.  I know somebody provided it to me, but I ignored

24  it.

25            MR. KRELLER:  It's three, item three in your book.

1          THE COURT:  It is.  That's the way we had it.

2          I just don't have -- does anybody wish -- I've

3  reviewed this motion.  I'm familiar with it.  I'm familiar

4  with the authorities.  I see no reason not to grant it.

5  But I'd be glad to listen to anybody at this time.

6          There's no way you don't make these payments.

7  All right.

8          And that's a final order.  That is not an interim

9  order.  That's a final order.  I don't need to revisit it.

10          MR. KRELLER:  Thank you, your Honor.

11          We very much appreciate you taking these items on

12  an expedited basis.  We will get those orders uploaded and

13  start the process of getting them --

14          THE COURT:  Before you leave.  That joint

15  administration order that I allowed, we need it to be

16  lodged in the Stations case first.  Just so there's no

17  problem with that.

18     (Discussion off the record between the Court and the

19  courtroom deputy)

20          MR. KRELLER:  Okay.

21          THE COURT:  And that way we'll be able to enter

22  them.

23          MR. KRELLER:  Okay.

24          THE COURT:  The rest of these orders can be

25  entered more efficiently.

1          MR. KRELLER:  Great, your Honor.

2          THE COURT:  Okay.

3          MR. KRELLER:  We will do that.

4          With that we'll step back.  I'll hand the podium

5   back over to Mr. Aronzon and we can start where first-day

6   hearings often start with the -- with more background and

7   the landscape.

8          Thank you, your Honor.

9          THE COURT:  Thank you.

10         Mr. Aronzon, go ahead, please.

11         MR. ARONZON:  I will try and be a little bit

12  briefer than I otherwise would have been.  You have a good

13  understanding, very good, for one read through these

14  complex documents.

15         THE COURT:  I wouldn't say I have a good

16  understanding.

17         MR. ARONZON:  Well, it sure appears that way.

18         I would like to work through the chart and just

19  touch on some basics.

20         It's obvious to everyone here Sta --

21         THE COURT:  I'm going to ask somebody next time to

22  give me bigger fonts.

23         MR. ARONZON:  A bigger chart?

24         THE COURT:  Bigger fonts.  Or my arms would have

25  to get longer.  So.

1          MR. ARONZON:  Would you like me to put this

2   closer?

3          THE COURT:  No.  I can follow it --

4          MR. ARONZON:  Okay.

5          THE COURT:  -- between the two.

6          MR. ARONZON:  All right.

7          Station Casino is a locals focused gaming and

8   entertainment company.  We operate eighteen casinos.  We

9   have a number of hotels, restaurants, we have joint

10  ventures.  We are in the development business with respect

11  to gaming and entertainment activities.

12          We own land in Reno, hundreds of acres.  Hopefully

13  someday it'll get to be developed.

14          That's not all.  We have, as you noted earlier

15  when you talked about our land loan, we have several

16  parcels that have taken years to accumulate that are part

17  and parcel of part of the strip in Las Vegas.  Hopefully

18  those will be developed someday.

19          So when you talk about what this company is, you

20  can see it's a multi-faceted complex business that touches,

21  as you noted, thirteen-some-odd-thousand employees and it

22  is a company that has produced, you know, eight revenues

23  topping a billion two or a billion three.

24          And it has of course been impacted significantly,

25  as has everybody in this country and across the globe, by

1   the effects of the global recession.

2           Our revenues for '09 in the first quarter are

3   down, net revenues, approximately 20 percent from '08 and

4   EBITDA for the first quarter of '09 is down 28 percent from

5   where we were in '08.  And the trends are continuing.

6   Finding the bottom is not simple.

7           The management has been doing all that it can to

8   cut costs and to keep up with the staggering impact on the

9   economies here.

10          We, as you know, service a community of people who

11  are being laid off, people who are losing their homes.  And

12  it is no surprise that they are not showing up in our

13  casinos and spending money.  They're doing what they need

14  to do to survive.  And we're being impacted along with

15  every other gaming company.

16          I think there was a period of time where people

17  thought entertainment-related businesses and gaming would

18  be recession-proof.  I think we now know that's a fallacy.

19          So we're feeling the effects and that's how we got

20  here.

21          I want to make sure that everyone understands, and

22  certainly the Court noted this a few minutes ago, we have

23  filed bankruptcy for three holding companies and Station

24  Casino, Inc., a fourth holding company.

25          The holding companies at the top of the chart

1  really represent our equity investments and make up the

2  entities that control our voting stock and direct our board

3  of directors to the extent shareholders have anything to

4  say about, you know, what goes on in the board room.

5           Station Casinos, Inc. is our main operating

6  holding company.  And I say operating because, as you noted

7  a few minutes ago, it has six hundred and sixty-some-odd

8  employees and it performs a variety of functions for the

9  business.

10          As you saw when you talked about cash management,

11  it touches all aspects of the business whether it's buying

12  things that will now be shifted down or providing general

13  corporate support or finance or treasury.  So it's a

14  complex business unit in and of itself.

15          To the right of the chart as you touched those are

16  our operating casinos.  And you can run down the list and

17  many of the names will be familiar to you and anyone else

18  who looks at them.

19          Now you asked a number of questions about what's

20  in our CMBS vehicle.  So let me walk over to the chart for

21  a minute.

22          The real estate underneath Boulder Station, the

23  real estate that shows up here under Charleston, the real

24  estate that shows up under the old Palace Station, and the

25  real estate that shows up here under Sunset Station, those

1  are CMBS entities.

2          THE COURT:  I need some help with the chart.

3          MR. ARONZON:  Okay.

4          THE COURT:  When ones goes to the far right and

5  the line that goes from top to bottom, some of the entities

6  are -- like Boulder Station is connected to SC Madera

7  Development, the centerline is connected to SC Madera

8  Management.

9          What does that mean, what is that line?

10          MR. ARONZON:  I think it is just that we couldn't

11  list, without going way way down, everything that Station

12  Casinos owns.  SC Madera is different from Boulder.

13          THE COURT:  That -- I just didn't know if they

14  were related.

15          And then there's no line, I mean Charleston isn't

16  connected to anything.  Gold Rush isn't connected to

17  anything.

18          MR. ARONZON:  Right.  Charleston is actually Red

19  Rock.  That's our Red Rock Casino Hotel.

20          THE COURT:  But that doesn't -- in other words it

21  has no significance if there's no connection.

22          MR. ARONZON:  None.

23          THE COURT:  Thank you.

24          MR. ARONZON:  Right.

25          THE COURT:  That's all I wanted to know.

1           MR. ARONZON:  Right.

2           THE COURT:  Because see Past was connected to

3  Station Holdings --

4           MR. ARONZON:  Correct.

5           THE COURT:  -- which is connected to Town Center.

6   And I'm going --

7           MR. ARONZON:  These are all --

8           THE COURT:  I didn't know what that meant.

9           MR. ARONZON:  These are all subsidiaries that run

10  businesses.  For instance you asked about Madera.  That's

11  our gaming activity.  It's an Indian gaming operation.

12          THE COURT:  All right.

13          MR. ARONZON:  Thunder Valley, outside of

14  Sacramento.

15          THE COURT:  Right.

16          MR. ARONZON:  So you can see quickly that there

17  are four properties that I just touched on that the real

18  estate is in our CMBS.  And I'll come back to that in a few

19  minutes.  But that's how it works.

20          THE COURT:  How can you tell that from this chart?

21          MR. ARONZON:  You couldn't.

22          THE COURT:  Thank you.

23          MR. ARONZON:  That's why I'm walking through it.

24          THE COURT:  Thank you.

25          MR. ARONZON:  That's why I'm here.

1           THE COURT:  Not helpful.

2           MR. ARONZON:  And I realized it when I looked at

3   the chart that people who don't know our businesses and

4   don't know how we operate would be very confused by some of

5   the names.

6           For instance, you would never understand that

7   Charleston was Red Rock.  But if I tell you it's Red Rock

8   you'll say oh, I've been there.  It's in Summerlin.

9           THE COURT:  I know where it is.

10          MR. ARONZON:  Okay.

11          None of these operations, none, are in bankruptcy

12  as you properly noted and as --

13          THE COURT:  Well, River Central is --

14          MR. ARONZON:  River -- yes, yes.

15          THE COURT:  And Tropicana Station is.

16          MR. ARONZON:  The white boxes on this chart are

17  River Central is.  That's our turf club here in Reno,

18  that's our floating license.

19          THE COURT:  That's right.

20          MR. ARONZON:  And Tropicana Station.  It owns, --

21          THE COURT:  That's another re --

22          MR. ARONZON:  -- I don't know, a hundred acres

23  here in Reno.

24          THE COURT:  Isn't that the -- these are the two --

25          MR. ARONZON:  Yeah.

63

1            THE COURT:  -- two Reno entities.

2            MR. ARONZON:  There's actually two others.  One is

3    Reno Land.

4            THE COURT:  Right.

5            MR. ARONZON:  And the other is Northern.

6            THE COURT:  Northern Nevada Acquisitions.

7            MR. ARONZON:  Northern Nevada, Reno, Nevada.

8            THE COURT:  But my point is in terms of operating

9    entities, there are two.

10           MR. ARONZON:  Yes.

11           THE COURT:  But they're only the Northern Nevada

12   operating entities.

13           MR. ARONZON:  They hold -- they own land and

14   floating gaming licenses and they're part of our future

15   development plans.

16           MR. ARONZON:  There are no operations on any of

17   those properties?

18           MR. ARONZON:  Somebody told me that one of the

19   entities actually has a strip mall.  So.

20           MR. ARONZON:  Well, there are no gaming activities

21   then.

22           MR. ARONZON:  Not on that particular property.

23           THE COURT:  All right.

24           MR. ARONZON:  But they are gaming entitled.

25           THE COURT:  Understood.

1          MR. ARONZON:  So.  They also -- a couple of them

2    are guarantors of our bank debt, which is why we're here,

3    to include them in our reorganization in the most

4    appropriate way.

5          But our casinos are not in bankruptcy.  And I

6    can't say it enough because it's the first question people

7    ask, what's the effect on the customers, what's the effect

8    on our vendors at our properties, what's the effect on our

9    customers?

10          And the answer is we hope none.  We expect none.

11          The operating entities, as the Court is aware, are

12    guarantors of our bank debt.

13          The banks recognize the value, as do we, of

14    keeping these entities and our 13,000 employees and

15    everybody that would come into those casinos away from this

16    process.

17          And so they've granted forbearance and they have

18    carefully crafted a cash collateral order that you'll take

19    up in due course today to try and monitor those proceedings

20    that will occur in connection with the operation of those

21    businesses, track cash, understand expenses.

22          But they've been very flexible, very understanding

23    and very helpful in managing this.

24          The last thing we want is to have every one of

25    those entities in bankruptcy.  The last thing we need is

65

1   more people in Nevada suffering in that way.

2            And so we've worked very hard and the lenders have

3   worked very hard to keep these enterprises operational,

4   solvent and functioning properly.

5            So the answer to every customer, to every employee

6   and to every vendor at their property levels is business as

7   usual.  And if you have a problem you come see us.  I can't

8   say it enough.

9            So what is in bankruptcy?  The white boxes.  I

10  identified the four holding companies.  You've already seen

11  the CMBS vehicle, which I'll explain in a minute, and of

12  course our land-holding subs other than the land loan.

13           Okay.  There's a couple of other things on the

14  chart that are important.  We touched on them a few minutes

15  ago.

16           We have here Vista Holdings.  Critical.  And we

17  have Past.

18           I think we've had enough discussion of Past

19  already and we understand that it is a cash management

20  system operation so our non-debtor subs function in a way

21  that they are, from a cash standpoint, like a debtor,

22  accountable, traceable, able to control under the budget

23  and under the cash collateral order.

24           THE COURT:  Does Past operate any property?

25           MR. ARONZON:  No.

1            THE COURT:  Okay.

2            MR. ARONZON:  No, it's strictly a bank account.

3  You said it earlier.  It's our concentration account.

4            THE COURT:  All right.

5            MR. ARONZON:  Okay.

6            Vista requires a little bit of explanation.  In

7  the latter part of last year, November, December, we had

8  availability on our revolving credit facility which I'll

9  describe in a more detail in a minute.  And we made a --

10            THE COURT:  Let me make sure I understand it.

11  Because a couple of revolving -- but that's the six hundred

12  and fifty million dollars?

13            MR. ARONZON:  It is the six hundred and fifty

14  million.  And that's how it got to --

15            THE COURT:  There's nine hundred --

16            MR. ARONZON:  -- six fifty.

17            THE COURT:  There's nine hundred million dollars I

18  think that is --

19            MR. ARONZON:  I'll come to --

20            THE COURT:  There's a lot of debt.

21            MR. ARONZON:  I'll come to that.

22            THE COURT:  There's over five, but there's nine

23  hundred million.  That's where the banks, as I understand,

24  become involved.

25            MR. ARONZON:  I will explain in a little more

1  detail in a moment on that.

2          THE COURT:  But that's six fifty and two fifty?

3          MR. ARONZON:  Correct.

4          THE COURT:  All right.

5          MR. ARONZON:  And you can see that analysis at the

6  top of the chart.

7          THE COURT:  Right.

8          MR. ARONZON:  There's a box that has the debt

9  numbers in it.

10          THE COURT:  Right.

11          MR. ARONZON:  But I'll come back to that.

12          What we did was we were able to drawn down our

13  facility and we did so in compliance with our loan

14  agreements.  And we were able to place the money in a spot

15  where it would be available to finance our business should

16  things continue to deteriorate.  Which unfortunately they

17  have, so here we are.

18          So it's important that you understand what Vista

19  is.  It is an entity owned by Station Casino, Inc..  The

20  stock of that entity is pledged to our bank group, which I

21  will describe in more detail in a minute.  And that entity

22  has in it cash.  I think today it's got a hundred and

23  ninety-six million dollars.

24          It did have more and we've been using the cash in

25  our business, which is exactly what was intended.

1          The Vista enterprise really has no other

2    creditors.  It is strictly a lender.  And it has its own

3    counsel and it has entered into a debtor-in-possession

4    financing agreement.  And you'll hear more detail about why

5    that is a favorable DIP loan arrangement later.

6          So what I would like to do now is walk through the

7    parties and try and put names and faces together because

8    it's a complex group, now that I've laid this background on

9    the chart and you can see where the land is, you can see

10   where the Reno land is, we understand what the development

11   business is, and we can talk more about the CMBS in a

12   minute.

13         Obviously Station Casino, Inc., the holding

14   company, has retained our firm.  We've retained Lazard as

15   our financial adviser.  We have Lewis & Roca as our co-

16   counsel.

17         We have in addition to that Squire, Sanders &

18   Dempsey.  And we also have a number of other financial

19   advisory types like C.B. Richard Ellis.

20         You will be seeing in due course professional

21   retention applications from these firms.

22         Today, I think you recognize Mr. Friel is here.

23   Tom?  The CFO.  So that if we need him to testify he will

24   be here.

25         We also have our general counsel, Rich Haskins, as

1   the key officers of Station who are here today.

2           That's our Station team.

3           We also have our CMBS.  We call that Propco.  It's

4   this line right here.  All of these entities are debtors.

5           Milbank Tweed represents generally, as insolvency

6   counsel, the mezzanine and Propco lenders -- I'm sorry --

7   the mezzanine and Propco debtors.

8           And we have in addition to our firm Lewis and Roca

9   and, in addition to that, on the phone I think is Mr. Garza

10  from Gibson, Dunn & Crutcher.

11          Propco has two independent board members, and Mr.

12  Haskins is a board member.  So it's a three-person board

13  for each one of the entities in the stack.

14          And the independent directors are truly

15  independent and they have independent counsel in Gibson

16  Dunn and Gibson Dunn is available to help us in the event

17  of conflicts.

18          And the reason I mention this is there are two

19  areas that we've learned from our history of the last ten

20  months and negotiations with our creditors and the various

21  parties, there are two areas where we could have conflict

22  and some of it could be significant conflict.

23          One area would be over this master lease which Mr.

24  Kreller touched upon a few moments ago.

25          Optco is the tenant that operates the proper --

1           THE COURT:  Let's be very specific.

2           MR. ARONZON:  Let's be very specific.  Optco is --

3           THE COURT:  When you say Optco --

4           MR. ARONZON:  -- is -- let's be very specific.

5   I'll go to the chart.

6           Station Casino, Inc. operates through these

7   properties our casino operations.

8           The four properties I pointed out earlier that --

9   where the land and the buildings are in our CMBS vehicle,

10  they're actually operated from a casino operation and

11  management standpoint by these entities that are owned by

12  Station.

13          So corporate governance is provided here and

14  corporate direction, hands-on management is at each

15  property.  Okay?

16          There is --

17          THE COURT:  But when you say Optco, which entity

18  is Optco?

19          MR. ARONZON:  It's -- I used that for Station

20  Casino.

21          THE COURT:  That's what --

22          MR. ARONZON:  That's my authority.

23          THE COURT:  That's what I thought but I wanted to

24  make -- well, it's also in the objection that was filed by

25  the independent lenders.

1          MR. ARONZON:  Because after ten months of

2    hammering heads with everybody, everyone uses the same

3    story.

4          THE COURT:  Yeah.  But I don't.

5          MR. ARONZON:  Understood.

6          THE COURT:  And that's what I want to make sure

7    of.  So Optco operates--let's make sure of this--these four

8    operating entities but the land is owned?

9          MR. ARONZON:  In those four instances it's owned

10   by --

11         THE COURT:  -- CMB.

12         MR. ARONZON:  -- by Propco.

13         THE COURT:  Propco.  Which is --

14         MR. ARONZON:  Just Propco.

15         THE COURT:  Propco.

16         MR. ARONZON:  At the very bottom.

17         THE COURT:  And those four again are?

18         MR. ARONZON:  They are Boulder, Red Rock which is

19   Charleston, Palace and Sunset.

20         THE COURT:  Thank you.  I understand.

21         MR. ARONZON:  So to make these properties function

22   properly and to service the debt on the Propco side of the

23   house including the mezzanine, we see that these

24   entities -- Station Casino, Inc. entered into what we call

25   a master lease arrangement.

1          Today the rent payable under the master lease is

2     annually about two hundred and fifty million dollars.  It

3     goes up over time.

4          THE COURT:  And that payment is to?

5          MR. ARONZON:  Propco.

6          Mr. Kreller described how the Propco account works

7     and the rent flows in.

8          THE COURT:  Right.

9          That's FCP Propco LLC?

10          MR. ARONZON:  Correct.  Correct.

11          THE COURT:  And the -- so it's the lessor.  The

12     lessees are those other entities or just Station?

13          MR. ARONZON:  They're sublessees.  The actual

14     operations are sublessees from Station.

15          THE COURT:  That's -- okay.

16          MR. ARONZON:  Okay.

17          So the master lease is with Station.

18          THE COURT:  So Boulder, Charleston, Palace --

19          MR. ARONZON:  Right.

20          THE COURT:  -- and Sunset are sublessees --

21          MR. ARONZON:  Right.

22          THE COURT:  -- and SCI is the lessee.

23          MR. ARONZON:  Correct.

24          THE COURT:  All right.

25          MR. ARONZON:  So those business units operate each

1  casino hotel or casino and restaurant and gaming activity

2  on the properties and they generate cash.

3         And of course, as you noted earlier, the cash go

4  into the concentration account and enters our Optco,

5  Station Casino, Inc., system.

6         Station Casino, Inc. pays the rent.  The rent

7  money goes into Propco and it is used to service debt and

8  covers a certain limited number of expenses.

9         It's really a triple net lease though at the end

10 of the day.

11         Now prior to default the excess money -- and there

12 is excess, you know, you pay twenty-something million

13 dollars a month you're bound to have some surplus above

14 what you need to service your debt at Propco.

15         Before we filed bankruptcy and before there were

16 defaults under the lease and before we tripped covenants,

17 the money actually flowed back after the debt service and

18 the other expenses to Station Casino, Inc.

19         Since we've been in default for some time now,

20 acting under forbearance arrangements and given that we're

21 now in bankruptcy, cash actually is trapped at Propco.  And

22 it will build up quickly because we must pay the rent.

23 Otherwise we will end up losing our properties at some

24 point.

25         So the way this works is we will be back to you

1  hopefully with a form of agreed-upon cash collateral order

2  for Propco in the not too distance future.

3        But for now the rent is due I believe August 14,

4  and we'll be making that payment.  It's in our budget.

5  Okay.

6        So you can see how --

7        THE COURT:  Now it's Propco that pays obviously

8  the mortgage lenders.  Does it pay all the mezzanine?

9        MR. ARONZON:  It does not because of the defaults

10  the cash is frozen at Propco.

11        Previously it did.  Money would be first used to

12  satisfy the mortgage obligations and then it would -- I'm

13  sure it would technically be referred to as a dividend, but

14  it would flow up.

15        THE COURT:  All right.

16        MR. ARONZON:  And then ultimately back to Station.

17        So the bankruptcy case and some of the defaults

18  before that have altered the way that cash flows.

19        THE COURT:  How else would the mezzanine lenders

20  be paid?  Is that the only --

21        MR. ARONZON:  That's it.

22        THE COURT:  All right.

23        MR. ARONZON:  That is it.

24        THE COURT:  All right.

25        MR. ARONZON:  So I mentioned that we had counsel,

1  Gibson, Dunn & Crutcher was working with our independent

2  directors and is also our co-counsel for Propco.  Why?

3  Because we can't be on both sides of this lease.

4          There are assumption/rejection questions that will

5  arise in the future, hopefully in the context of a plan so

6  it won't be a fight.  But we do have issues here.

7          And obviously if we can't work out cash collateral

8  we'll be back on that, too.

9          So now that you understand the players there and

10 you understand their rules, there was one I mentioned for

11 Station Casino, Inc. that I want to come back to.  Which

12 was Squire, Sanders & Dempsey.

13         THE COURT:  That's special litigation counsel.

14         MR. ARONZON:  Correct.

15         As I said a few minutes ago, during the course of

16 the last ten months of our discussions with our creditors

17 and the various parties we've learned a lot.  And one of

18 the things we learned early on was that certain of the

19 creditors felt that the entire transaction that set up our

20 financing under the CMBS and the go-private transaction

21 that was part and parcel of the transactions that happened

22 at the end of '07 that there might be some fraudulent

23 conveyance issues there.

24         So we asked the independent director on our board,

25 Dr. Knave, who's represented by Skadden Arps, if he wanted

1    to take a look at this for us and he did.

2         He has arranged for an independent subcommittee,

3    including two non-director additions to his working group,

4    and they hired independent counsel separate and apart from

5    Skadden and they have spend quite a bit of time

6    interviewing parties and looking at financing activities.

7    They hired a financial advisor to help them.  And they have

8    done an awful lot of work on these issues that may or may

9    not ever see the light of day.

10         We spent a lot of money on this.  And I don't know

11    what the report is going to say but, if we ever need it,

12    the work has been done and we will see a report.  So.

13         I point it out just because you'll see a retention

14    application.

15         THE COURT:  I did.

16         MR. ARONZON:  And some would say why?

17         THE COURT:  Oh, not some.  That was my question.

18         MR. ARONZON:  What are these people doing?

19         And the answer is we needed an in --

20         THE COURT:  It was about a million dollars.

21         MR. ARONZON:  It's more than a million dollars.

22         THE COURT:  Oh.

23         MR. ARONZON:  Unfortunately.

24         THE COURT:  Well, the retainer is a million.

25         MR. ARONZON:  Correct.

1          THE COURT:  But it keeps getting refreshed.

2          MR. ARONZON:  Yeah.  Well, it -- it was -- it has

3   been more than a million dollars.

4          THE COURT:  Okay.

5          MR. ARONZON:  However, it's an important issue and

6   it could be the linchpin of part of the plan discussions at

7   some point.

8          And we need to know, if we're asked, whether it's

9   a good claim or a bad claim.

10          And nobody's going to believe me.  We are part of

11   the corporate transaction group that put this deal

12   together.

13          And nobody is going to believe anybody who had

14   anything to do with it.  So an independent review was

15   necessary and we've done it.  We'll see what they say.

16          So hopefully it'll never come out, but that's what

17   that is.  And I just felt like we needed to tell everybody

18   what we've done because these issues seem to arise.

19   Anytime the discussions about a plan or a restructuring go

20   a little bit south, people turn quickly to their lever

21   points.  And this is one of them potentially.

22          All right.  In addition at Propco, in addition our

23   independent directors not only have Gibson, Dunn & Crutcher

24   but they also have a separate financial advisor which is

25   FTI.  So.

 1          I mentioned Vista and I said they had independent

 2    counsel.  They have a firm called Woodburn and Wedge.  And

 3    obviously we couldn't and shouldn't be on both sides of

 4    that lending transaction.

 5          And I mentioned some of our directors also

 6    having -- have counsel, Skadden.  O'Melveny represents some

 7    of our directors and some of our equity sponsors and so

 8    does Monger Tolls.  So you may see references and documents

 9    of some of these firms.

10          Unfortunately, as you well know, bankruptcy breeds

11    a lot of employment for lawyers.  And we're definitely

12    stepping up here.  So.

13          Now, let's turn our attention to our creditors.

14          At the Station Casino, Inc. level we've talked

15    about our bank group.  We have agents that run those

16    facilities.  And as you properly noted there's a

17    650,000,000-dollar revolver fully drawn, 250,000,000-dollar

18    land loan.

19          These are loans directly to Station Casino, Inc.

20    The loans are secured by stock pledges of virtually all of

21    our material subsidiaries.

22          The agents on that credit facility are Deutsche

23    Bank and JP Morgan.

24          That agency arrangement also has been, since we've

25    been engaged in dialog for a long time here, working with a

 1  steering committee.

 2          The members of the steering committee to the best

 3  of my knowledge are Wells Fargo, Wachovia, Bank of America

 4  and Bank of Scotland.  So it's a good cross-section of our

 5  lenders, it's a variety of different financial institutions

 6  that have been working with us.

 7          There are other lenders, some of them are here

 8  with counsel today.  A group of them filed an objection to

 9  cash collateral.  And I will -- you know, I just recognize

10  that they're here.

11          But we've been working as the debtor with our

12  agents and their steering committee.

13          So the agents and the steering committee have been

14  represented by Simpson Thacher--Mr. Qusba is on the phone--

15  and White & Case.

16          They have a financial advisor, Blackstone.

17          They also, in addition to having a loan with

18  Station Casino, Inc. and the stock pledges I mentioned,

19  have guaranties from most of our material operating and

20  some of our material nonoperating subs.  And the guaranties

21  are secured by hard assets at the operational levels.

22          So that's our bank group.  That's our Optco

23  lending group.  These are the names that people will use

24  when they refer to the Station Casino, Inc. banks.

25          THE COURT:  Are those banks -- and I went through

1  all the lending.  Is that -- are those banks specifically

2  limited to the nine hundred million?

3          MR. ARONZON:  That is the total facility and it is

4  outstanding.

5          THE COURT:  Right.

6          There are different lenders.  Well, I know there's

7  notes; those aren't lenders.  I understand that.  But there

8  are other loans?

9          MR. ARONZON:  Yes.  I'm coming to that right now.

10         THE COURT:  Okay.

11         MR. ARONZON:  The next group of creditors at

12  Station Casino, Inc.--and this one is only at Station

13  Casino, Inc., meaning they don't have guaranties from any

14  of the subsidiaries and their loans are all at our Optco

15  parent--are our unsecured notes.

16         And as was mentioned earlier, we have senior

17  unsecured notes.  The outstanding issue is eight hundred

18  and fifty million.  And then we have subordinated notes.

19  And the outstanding issue is one billion four hundred and

20  fifty million.

21         THE COURT:  To what are they subordinated?

22         MR. ARONZON:  To the borrowed money of the senior

23  notes.

24         THE COURT:  In other words they're --

25         MR. ARONZON:  That's to the best of my knowledge.

1          THE COURT:  -- subordinated to the eight hundred

2  and fifty?

3          MR. ARONZON:  Yes.

4          THE COURT:  All right.

5          MR. ARONZON:  That's to the best of my knowledge.

6   I do not believe they are subordinate to any trade

7  creditors, although we have -- if we have any it's very

8  minor because this is just a holding company.  So.

9          MR. QUSBA:  Your Honor, it's Sandy Qusba from

10  Simpson.

11          Just I think they're subordinated to the bank debt

12  as well.

13          MR. ARONZON:  Yes, of course.

14          THE COURT:  That was my other --

15          MR. ARONZON:  Yes.

16          THE COURT:  That was my next question.  Because I

17  have that situation in another case too.

18          MR. ARONZON:  Yeah.

19          THE COURT:  So they are subordinated to the bank.

20          But as I understand it by reading the pleadings

21  then it's difficult for me.  When I first read the Friel

22  declaration where it said that there was about -- if I read

23  that correct -- let me make sure I'm saying this correctly,

24  please, because I do not want misinformation.

25      (Pause in proceedings)

1          THE COURT:  The total debt for what I would call

2     all of the Station entities is about six five?

3          MR. ARONZON:  It is.  But in --

4          THE COURT:  Six point five billion.

5          MR. ARONZON:  -- in the bankruptcy case there's

6     about 5.7 billion.

7          THE COURT:  Yeah.

8          MR. ARONZON:  And the differences all lie in our

9     joint ventures or, as you noted, our land loan.

10         THE COURT:  It's stated that at least the bank

11    group--which is -- well, I'll just call that nine hundred

12    million--is oversecured.

13         MR. ARONZON:  We believe that to be true.

14         THE COURT:  That's based upon the value of the

15    pledged stock and the secured guaranties, I'm assuming?

16         MR. ARONZON:  Yes.

17         THE COURT:  I didn't see a number for that value.

18         MR. ARONZON:  You didn't see a number for the

19    enterprise?

20         THE COURT:  Did I miss it in the --

21         MR. ARONZON:  Well, we have a --

22         THE COURT:  The total with -- I think the total

23    value that was indicated was about 5.7.

24         MR. ARONZON:  Yeah, about 5.3.  And that's book

25    value, your Honor.  So.

1           THE COURT:  Understood.

2           But is that entire amount or close to that,

3    because there's probably some exceptions, what has been

4    pledged as security to the bank group for the nine hundred

5    million?

6           MR. ARONZON:  Yeah.  Other than the extent to

7    which it would include the CMBS and Propco entity -- and

8    mezzanine entities.  And the equity there is pledged but

9    you have to pull the value apart.

10          THE COURT:  So we're --

11          MR. ARONZON:  The Optco banks --

12          THE COURT:  -- considerable, considerably

13   oversecured debt.

14          MR. ARONZON:  If that -- if the book value were

15   the market value, considerably oversecured.  Don't ask me

16   about market value today.

17          THE COURT:  I haven't.

18          MR. ARONZON:  Yeah.  I couldn't answer it even if

19   I tried.

20          THE COURT:  All right.

21          MR. ARONZON:  Okay.

22          Let's go back to what we were talking about.

23   Which was our notes.

24          Now the notes have been working with us for the

25   last eight, nine months as well.  And as you heard, they

1  have an ad hoc committee that contains both the senior
2  noteholders and the subordinate noteholders.  And they have
3  two sets of counsel, Jones Day and also Wachtel (pho).
4          They have a financial advisor which is Mullis &
5  Co. and now they also have another law firm, Greenberg
6  Traurig, who I guess is their co-counsel here in Nevada.
7          The members of the ad hoc group, as you heard,
8  hold a very large percentage of the issues.  There are
9  multiple issues but the seniors and the subs, huge
10 percentage.  And they are, you know, somewhere between 70
11 and 90 percent, depending on the issue you're looking at,
12 of the total face.
13         The members of the ad hoc group--and I don't know
14 that these people will end up serving on a creditors
15 committee, but we certainly hope that some or all of them
16 do--would include Fidelity, Wamco, Oak Tree and Serengeti.
17         The ad hoc group also has access to other
18 noteholders and they've been very good about talking to us
19 and working with us throughout this entire process.
20         So let's now turn our attention to the creditors
21 over at Propco.  You've already heard about the mortgage
22 loan.
23         There are -- there is more than one mortgage
24 lender.  The two that we speak are Deutsche Bank and JP
25 Morgan, but there are some others.  I'm not sure that they

85

1  hold directly or through some kind of synthetic investment,

2  but there certainly are some other participants.

3          I think the lion's share of the debt is held

4  though by the agents who we talk to.

5          As I mentioned, we have a master lease.  I've

6  described what the assets are.

7          The other creditor of which we are aware at Propco

8  is our same lenders, JP and Deutsche Bank, under a swap

9  arrangement.  And one of the things that would happen when

10 you file a bankruptcy case is the swap would unwind and it

11 wouldn't be stayed.

12         But part of what is going to happen here, we hope,

13 is we'll be able to make monthly payments and keep the

14 interest rate swap in place.

15         We have a similar arrangement on our land loan.

16 So if the swap claim for instance at Propco were to

17 liquidate today, it would be an unsecured claim and it

18 could be somewhere around a hundred and sixty-five million

19 dollars.  So we don't want it to liquidate before we're

20 ready to do something with it.

21         And we are working with our mortgage lenders and

22 their counsel which is Sidley & Austin, and their financial

23 advisor which is Miller Buckfire.

24         So after we look at the mor -- by the way, there

25 would be one other creditor of the Propco entity should we

1  reject the master lease and of course -- well, actually it

2  would be a creditor of Optco if we reject the master lease.

3   It would be our landlord, which is Propco.  So.

4          And that could be a rather large claim given the

5  size of the rent that we pay annually.

6          So now let's turn our attention to the mezzanine

7  stack.  And if you look at your chart and you look at this

8  line right here, you can see how the debt breaks out for

9  each mezzanine loan.

10          And it stops here because there was no more money

11  raised and these entities are just shells.

12          And you can see that Mezz 1 has two hundred

13  million and it is secured by the stock of Propco.

14          You can see that Mezz 2 has a hundred and seventy-

15  five million lent to it and it is secured by the stock of

16  Mezz 1.

17          And Mezz 3 has a hundred and fifty million dollars

18  that is debt and it's secured by the stock of Mezz 2.

19          And the last Mezz entity has a hundred and fifty

20  million dollars and it is secured by the stock of Mezz 3.

21          And there is some interaction that I must confess

22  I don't understand between Mezz 5 and 4, but there's no

23  more debt.  There are some stock pledges here that I'm not

24  sure I get, but I'm not sure they're relevant today.

25          So we have, I don't know, six hundred and seventy-

1   five million of mezzanine debt, if the math is right, on

2   the Propco side of the house too.

3         All of that mezzanine debt is secured only by

4   stock and the value of that stock is open to debate.

5         At the back of that stack is the stock ownership

6   of Station Casino, Inc.  That's at the very top.

7         So that's our mezzanine stack and our Propco debt.

8         Some of the mezzanine lenders have their own

9   counsel.  I've heard various names tossed about from time

10   to time.

11         I believe that they actually as a group, as two

12   through four, were trying to work with an investment bank,

13   Parella Weinberg.

14         We have not engaged at that level, and other than

15   keeping communications open with the actual lenders

16   themselves we have not formally engaged at that level.

17         All right.  We've already talked about the land

18   loan.

19         THE COURT:  And what you told me was the Mezz

20   loans at six hundred and seventy-five million is secured by

21   Propco?

22         MR. ARONZON:  Stock.

23         And of course let's use an example here just so we

24   all understand.  Is there were a foreclosure of the entire

25   chain, the way this would work is that the last guy in

1  line, Mezz 4, would have the first right to basically cure

2  or buy out everybody in front of it and so forth down till

3  you get to the mortgage.

4          If people at the back of the stack in a

5  foreclosure setting didn't step up and write a check,

6  they'd be wiped out and then the next person in line would

7  have a chance to go.

8          Pretty short time periods attached to this right

9  and so on and so forth, until you got down to real estate

10  foreclosure in the mortgage vehicle.  Complicated but

11  understandable.

12          Okay.

13          I mentioned that our Optco banks have granted

14  forbearance, which is why our subsidiaries are not filers.

15   The importance of that I've already stated.  I think

16  everyone here understands it without belaboring the point.

17          THE COURT:  Without the forbearance there'd been

18  an attempt to exercise on the guaranties, then they would

19  have had to file.

20          MR. ARONZON:  Correct.

21          THE COURT:  I understand.

22          MR. ARONZON:  The cash collateral order that you

23  will you take up at some point shortly, and I will sit down

24  and get out of your hair, is directly tied to that

25  forbearance.

```
 1            We don't have cash collateral use.
 2            THE COURT:  Is that the forbearance of July 28th?
 3            MR. ARONZON:  Yes.  Well, it's the one we just
 4  executed.  I -- I --
 5            THE COURT:  That's the second forbearance.  And I
 6  think it was executed three days ago.
 7            MR. ARONZON:  Yes, it was.
 8            MR. QUSBA:  Yes, your Honor.
 9            MR. ARONZON:  In anticipation of what we're doing
10  here.
11            If we don't have a cash collateral order --
12            THE COURT:  I haven't seen that agreement, have I?
13            MR. ARONZON:  No.
14            THE COURT:  All right.
15            MR. ARONZON:  I don't think you have.
16            THE COURT:  I didn't -- I didn't think I had.
17            MR. ARONZON:  If the cash collateral order is not
18  entered and is unacceptable in some way to the Optco
19  lenders, then the forbearance becomes ineffective.
20            THE COURT:  It basically terminates.
21            MR. ARONZON:  It does.  That's the last thing we
22  would want to see happen.
23            So they're tied together.  It's complex but it's a
24  linchpin and it's a critical point for us.
25            THE COURT:  While you're still here, because I
```

1  think it relates at least to the objection that was filed--

2  and I haven't got to the motion yet but while we're

3  explaining things--as I understood the objection that came

4  from the independent lenders it regarded the -- some of the

5  other -- I thought it did -- some of the other loans.  Or

6  perhaps that was because I --

7          MR. ARONZON:  I think their objection is that they

8  need to understand the budget.  I don't -- I saw it right

9  before the hearing.

10         THE COURT:  Yeah.

11         MR. ARONZON:  And that there are line items in the

12  budget that they're questioning including, for instance,

13  investments in some of our future development Indian gaming

14  activities.

15         THE COURT:  Yes.

16         MR. ARONZON:  And one of the line items is our

17  payment, if we do pay, interest on our land loan.

18         And I think they were questioning why we would do

19  that.

20         THE COURT:  That's -- and I am assuming that --

21  and that -- and perhaps I was mistaken in that assumption--

22  is that that was the 250,000,000-dollar land loan.

23         MR. ARONZON:  It is the two fifty.

24         THE COURT:  Okay.  That's through CD Propco as

25  opposed --

1          MR. ARONZON:  Correct.

2          THE COURT:  -- to FCP Propco.

3          MR. ARONZON:  Correct.

4          THE COURT:  And that's where I was confused.

5          MR. ARONZON:  That's our strip land where we

6    took, --

7          THE COURT:  Um-hmm.

8          MR. ARONZON:  -- you know, ten or fifteen years

9    and assembled a massive amount of acreage.

10         THE COURT:  Because they are saying that that

11   payment might reduce the funds available to them and at the

12   same time enhancing the position of the agent.  That's the

13   position that they take.

14         MR. ARONZON:  I don't pretend to understand it.  I

15   know that if we don't pay our interest on our mortgage

16   there we lose our land.  And I know that's the last thing

17   we want to do.

18         We may never build it, we may sell it.  I don't

19   know what happens in the future with all of our development

20   land.  But with the amount of money and time that has been

21   spent assembling these projects --

22         THE COURT:  Well, what's the construction loan?

23   You've got a 410,000,000-dollar construction loan and a

24   20,000,000-dollar revolver through -- is that Alente?

25         MR. ARONZON:  That is Aliente (pho).

1          THE COURT:  Aliente.  What is the status of that

2    loan?

3          MR. ARONZON:  Aliente is a new casino that's up

4    and running.  It's in the north part of Las Vegas.  Its zip

5    code is in the highest zip code foreclosure rate in the

6    state.  It is a dis -- it's a beautiful project.  We've

7    invested a fortune in it.  We need to restructure it.

8          THE COURT:  Who's that lender?

9          MR. ARONZON:  I believe it's Bank of America.

10          Is it a syndicate, David?

11          MR. EISENBERG:  Yes, it is.

12          MR. ARONZON:  Okay.

13          THE COURT:  Is that -- B of A the admin agent?

14          MR. ARONZON:  Yes.  Yes.  So.

15          THE COURT:  Thank you.

16          MR. ARONZON:  Okay.

17          Last thing and then I will sit down.  Because I've

18    already spoken too much I believe.

19          THE COURT:  No, it's been helpful.  Thank you.

20          MR. ARONZON:  Well, I'm sorry we couldn't do this

21    before the emergency motions because it would have answered

22    a lot of questions for everybody about how we operate,

23    who's in, who's not, where we're going.

24          We have spent -- you've heard me say it several

25    times here, I don't know, the last ten months.  We had an

1  exchange offer that we couldn't raise the capital for.  We

2  had another exchange offer that was premised on agreements

3  with our mortgage lender for a restructuring, with our

4  Optco bank group for a restructuring, with the land loan

5  lenders for a restructuring.

6         We know we can get it done because we've done it.

7   We couldn't get that exchange offer off the ground with

8  our bondholders.

9         We have had meeting after meeting after meeting

10  after meeting after meeting.  We've had professionals meet.

11   We've have financial advisors meet.  And we have made

12  unbelievably good progress with every group.

13         To be sure there are still issues.  What we're

14  trying to do is come up with a comprehensive plan that will

15  obviously reduce our debt.  It will convert some creditors

16  into equity.

17         We probably need to raise some new capital to

18  facilitate the funding of some of the obligations on the

19  plans that we've been working on.  We believe that would be

20  done in a rights offering.  And we have to come up with

21  reasonable valuations to attract the capital.

22         We really do have term sheets that exist with

23  respect to the restructuring of our mortgage loan.  We have

24  term sheets that exist with respect to the restructuring to

25  our Optco bank debt.

94

1          We have term sheets that exist with respect to

2    restructuring of our land loan.

3          We have numerous, numerous constructive

4    discussions with all of our bonds about equitizing.

5          We haven't been able to get the finishing touches

6    on a deal.  It stalled out in June.

7          We know that the bondholders have reengaged with

8    the lenders on some of the issues that they raised with our

9    last round, and we know they've made progress.  We're

10   anxiously awaiting to see what they come up with.  We hope

11   that it does the trick.

12         We still have to work on valuation.  We still have

13   to work on our exit financing and our rights offering.  But

14   we are encouraged by everything we've heard, especially

15   from our bondholders, that they've made good progress and

16   that they'll be back to us shortly.

17         So hopefully we'll be engaged in a process that

18   will lead to a plan sooner rather than later.

19         But we are where we are and I think we will build

20   on the progress and of course the money we spent getting

21   there, which was significant, to try and move this case

22   along more quickly than might otherwise be the case.

23         It remains to be seen, because as you've heard

24   there's Propco cash collateral to sort out, there's our

25   master lease, there's our rights offering and there's

1  whatever valuation differences exist.

2          There are lenders in the Optco bank group who
3  don't agree with what we've been doing in the restructuring
4  discussions.  We're going to have to address that.

5          There may be issues in our mezzanine stack,
6  although I understand the bondholders have been talking
7  with the Mezz lenders and maybe they made some progress.

8          So with that, unless there are questions, I'll
9  stop and maybe we can take up the real agenda of the day.

10          THE COURT:  All right.

11          MR. ARONZON:  Thank you, your Honor.

12          THE COURT:  Thank you.

13          One moment, please.

14      (Pause in proceedings)

15          THE COURT:  I've been handed a form of an order
16  regarding the joint administration and it contains a
17  paragraph that states:

18          "Order that the debtor shall be permitted to file
19           their monthly operating reports required by the
20           United States Trustee operating guidelines on a
21           consolidated basis."

22          However based upon what Mr. Cossitt told me there
23  were two matters that he wanted to separate it out, and
24  that's not reflected in the form of this order, one.  So I
25  have a problem with the form of this order.

```
 1          Mr. Cossitt, am I correct?
 2          MR. COSSITT:  Yes, your Honor.
 3          MR. KRELLER:  Your Honor, certainly we've
 4  represented on the record and agree that we will work with
 5  Mr. Cossitt to make sure that that form of report is to his
 6  satisfaction and addresses the points he's raised on the
 7  record.
 8          THE COURT:  I just want to put a text here at the
 9  top.
10          I'm going to add this:
11          "The provision of the order regarding monthly
12          operating reports was modified on the record and
13          supersedes the language found at Page 4."
14          MR. BEESLEY:  Your Honor, would you like us just
15  to submit an amended order?
16          THE COURT:  Is this one you need today?
17          MR. BEESLEY:  We do need this order today.  Yes.
18          THE COURT:  I'll do it today and then you can
19  submit an amended order after that that contains the
20  specific language that Mr. Cossitt asked for.
21          MR. BEESLEY:  Okay.
22          THE COURT:  This takes care of that for this.
23          MR. COSSITT:  It does.
24          THE COURT:  Okay.  Do it that way.
25       (Discussion off the record between the Court and the
```

1 courtroom deputy)

2          THE COURT:  Okay.  That takes care of that.

3          We might as well just dive into the cash

4 collateral matter.

5          MR. KRELLER:  To some degree, your Honor, we

6 already have.

7          THE COURT:  Oh, I'm well aware of that.

8          MR. KRELLER:  Hopefully --

9          THE COURT:  I have read the objection that was

10 filed by the group of banks that have identified themselves

11 as independent lenders, I believe is the term that was

12 used.  So I am aware of that objection;

13          I've read the exhibits attached thereto.  That was

14 filed this morning.

15          So I think those are the only pleading other than

16 the pleadings that have been supplied by the debtor.

17          Did anybody else submit pleadings regarding the

18 motion for the use of cash collateral and debtor-in-

19 possession financing that I have not reviewed?

20     (No audible response)

21          THE COURT:  No?  I've read everything then.

22          I have a couple of questions.  And I tried to

23 familiarize myself with the cash collateral.

24          And first of all, the order has a number of

25 findings that I'm really not prepared not to make at this

98

1    time.  It's very detailed.

2           But now I -- by required lenders, I found the

3    definition.  It's enough to make sure there's 50 percent of

4    the lender group as I understand it.

5           Is that --

6           MR. KRELLER:  That's my understanding, your Honor.

7           THE COURT:  Now the independent lenders, according

8    to what I read, have about -- represent banks that have

9    about 30 percent of the principal amount of the loans.  Is

10   that accurate?

11          Who's representing them?  Who's speaking for the

12   independent --

13          MR. CATLETT:  Your Honor, Steven Catlett from Paul

14   Hastings on behalf of the independent lenders, the

15   objecting parties.

16          That's roughly correct, your Honor, without

17   getting precise about the percentages.  But that's

18   roughly --

19          THE COURT:  Is it Mr. Harner; is that correct?

20   Your name?

21          MR. CATLETT:  Catlett, C-a --

22          THE COURT:  Oh, Mr. Catlett.  I'm sorry.

23          MR. CATLETT:  Yeah.  Harner --

24          THE COURT:  Steven Catlett.  I'm sorry.

25          MR. CATLETT:  My partner, Mr. Harner, is on the

99

1  phone, your Honor.

2          THE COURT:  All right.  I just wasn't sure.  Thank

3  you.

4          And now I know what Optco means when I read it

5  throughout the pleading.  Now I understand.

6          This sounds to me--and then I'll let you deal with

7  it--like an intramural dispute.

8          I have not had an opportunity to review any of the

9  documents that control the relationship or govern the

10  relationship among these lenders--and I assume they exist--

11  that determines the authority that the administrative agent

12  or agents may have.

13          I know, based upon what I've read here, that your

14  clients are dissatisfied with the strategy that's been

15  employed and with the agreements that Deutsche Bank and JP,

16  I assume, have entered into with the debtors.

17          Is that accurate?

18          MR. CATLETT:  Well, your Honor, if I might.

19          THE COURT:  Please.

20          MR. CATLETT:  Our primary objective is that while

21  the debtors' counsel has painted a lovely picture of

22  extended discussions with every single constituent who --

23          THE COURT:  Oh, I know you weren't involved and

24  they tried to pick you off.  I'm well aware.

25          Tell me what you're objecting to.

1          MR. CATLETT:  Exactly right.

2          And our concern, your Honor, is that

3    notwithstanding whatever the documents were, this is a very

4    complex cash management and cash collateral structure

5    without question.

6          And our interests and the cash collateral that is

7    at issue here is our cash collateral, because we are

8    lenders at the Optco level.

9          THE COURT:  I understand.

10         You're in that 900,000,000-dollar group.

11         MR CATLETT:  Correct.  And exclusively in that

12   900,000,000-dollar group.

13         The group that apparently were going to reach an

14   agreement on cash collateral is in -- and where the cash

15   collateral currently is trapped at the Propco level, you

16   know, they're intending to leave that there but at the same

17   time deploy our cash collateral without us being actively

18   involved in the process.

19         So at some level it's in --

20         THE COURT:  But aren't you represented in the

21   process?

22         MR. CATLETT:  Well, your Honor, the --

23         THE COURT:  That's exactly my point.

24         MR. CATLETT:  -- distinction is here we have three

25   really distinct credit facilities and we have one

1  individual agent where there's some tension between them

2  and some uncertainties in terms of where the cash is

3  flowing throughout the organization.

4         So we're not convinced, your Honor, that we have

5  contracted away our ability to have a seat at the table

6  which is really all we're looking for here.

7         So --

8         THE COURT:  I get that part.  But my point is is

9  that the "required lenders" require 50 percent of the

10  amount of the debt.  Really that's a control feature.  Then

11  you've got an administrative agent and there's a number of

12  different titles for other participants.  And that your

13  clients represent 30 percent.

14         I don't know if all the others are the remaining

15  70 percent, but they at least have to be in excess of 50

16  percent.

17         And in a sense, if I were to look at that as a

18  class, if you've got a problem with how the agent is doing

19  its job or the agents are doing their job, why should that

20  preclude me from entering an interim order on this cash

21  collateral stip?

22         MR. CATLETT:  Well, you --

23         THE COURT:  Which is basically a cash collateral

24  and DIP financing stipulation.  That's what it really is.

25         MR. CATLETT:  Well, your Honor, we would submit

1  that there really are issues on two levels.  One is a Code

2  level which is consent is required for cash collateral.

3          THE COURT:  And?

4          MR. CATLETT:  We have not consented.  And if a

5  non --

6          THE COURT:  But you have an agent.

7          MR. CATLETT:  But we --

8          THE COURT:  That's like saying --

9          MR. CATLETT:  Well, your Honor, we don't

10 believe --

11         THE COURT:  -- if you're a member of a class --

12         MR. CATLETT:  We don't believe that in the

13 circumstances here our agent can appropriately stipulate

14 away our consent.

15         We all --

16         THE COURT:  Let me ask you this question.

17         MR. CATLETT:  We also believe, your Honor, that

18 notwithstanding --

19         THE COURT:  Go ahead.

20         MR. CATLETT:  -- that issue about whether our

21 consent is or isn't required as a matter of the Code.  We

22 believe there's a question of adequate protection which,

23 regardless of consent, may well be required.  We don't

24 believe that our interests in the cash collateral at the

25 Optco level is adequately protected under the interim

1  proposal.

2          THE COURT:  But your interests as I understand

3  them are represented by the agents.  Because that's why you

4  have agents so you don't have to deal --

5          MR. CATLETT:  Well, your Honor, I was --

6          THE COURT:  -- with each of the participants.

7          MR. CATLETT:  Your Honor, so we think there are

8  Code level issues in terms of --

9          THE COURT:  I understand that.

10          MR. CATLETT:  -- of adequate protection that we're

11  entitled to regardless of any consent that our agent may

12  have given.  So we think those need to be addressed.

13          The second level, your Honor, is we think in the

14  circum --

15          THE COURT:  Do you disagree that you're

16  oversecured?

17          MR. CATLETT:  No.  We take, you know, the -- we

18  believe that we're oversecured.

19          THE COURT:  That's a pretty good start under 361,

20  isn't it?

21          MR. CATLETT:  It is a good start, your Honor.

22          THE COURT:  Okay.

23          MR. CATLETT:  However, you know, this is a --

24          THE COURT:  Let's get real simple here.  All

25  right?

1          MR. CATLETT:  But what's been presented here, and

2    if we want to strip out from the interim order a lot of the

3    provisions in there and a lot of the findings in there and

4    a lot of the interim adequate protections given the

5    oversecured status that applies to the entire lending

6    group, we'd be fine with that and create some time to --

7          THE COURT:  I've already said --

8          MR. CATLETT:  -- take these up.

9          THE COURT:  -- those findings, even if I were to

10   sign the order that contained those findings I would re --

11   I would not hesitate to revisit them.

12         MR. CATLETT:  And I appreciate those comments very

13   much, your Honor.  Because we think there are some

14   complexities here as I've said.

15         We talked about adequate protection that needs to

16   be addressed we think for my client group at the Code

17   level.

18         But we think in the circumstances of this case

19   there are issues because of the three different credit

20   facilities and the cash collateral that's at stake here

21   involves only one of those credit facilities, namely, the

22   Optco level cash collateral not the propco level cash

23   collateral.

24         THE COURT:  As I understood your objection you

25   were concerned because cash would flow out of Optco into --

1           MR. CATLETT:  Well --

2           THE COURT:  -- into where?

3           What were you concerned about?  You were con --

4  you were concerned about a depletion of your cash

5  collateral if I read this.

6           MR. CATLETT:  That's correct, your Honor.  Our

7  concerns operate at a couple of levels.  One is --

8           THE COURT:  Let's be very specific.

9           MR. CATLETT:  Absolutely.

10          Under the proposed 13-week budget there are

11 contemplated large disbursements of and transfers to non-

12 debtor affiliates that we're concerned that's taking our

13 cash collateral and moving it to a non-debtor entity.

14          There's also, as we understand the proposal, both

15 in the terms of --

16          THE COURT:  Those non-debtor entities have

17 guarantied the obligation though?

18          MR. CATLETT:  In some instances, your Honor.  But

19 the budget --

20          THE COURT:  So in a sense, and it protects your

21 security.  And that would provide you some degree of

22 adequate protection in that sense, would it not?

23          MR. CATLETT:  It would, your Honor, but not in

24 every instance.  Some of the transfers in the budget don't

25 appear to be -- to fall in that category.

1          THE COURT:  All right.

2          MR. CATLETT:  So we have some concerns with that.

3   We don't think we've had adequate time to review the

4   budget.

5          THE COURT:  The interim order doesn't allow --

6   will not provide for all the payments under a 13-week

7   budget.  That's the whole idea of a final hearing.

8          MR. CATLETT:  Understood, your Honor.  I'm just --

9   our concerns are that it appears clear to us that a portion

10  of our cash collateral is contemplated to be transferred

11  away and to be thus dissipated, including transfers to

12  Propco which -- which we've heard --

13         THE COURT:  I think that's accurate.  And of

14  course --

15         MR. CATLETT:  -- which we've heard gets locked

16  there and the cash is locked at the Propco level because

17  there apparently are --

18         THE COURT:  They don't have a deal yet.

19         MR. CATLETT:  -- negotiations between the debtor

20  and the Propco lending group.

21         THE COURT:  I got that.  They don't have the deal

22  yet.

23         MR. CATLETT:  Correct, your Honor.

24         And all we're really suggesting is that we are not

25  a substantial portion of the Optco lending group and we've

1  not been given any seat at the table or any opportunity to

2  get any information from the debtor.

3          THE COURT:  Who gives you that seat though?

4  That's what I'm trying to be able to determine here.

5          MR. CATLETT:  Well we think, your Honor, we're

6  entitled to an un --

7          THE COURT:  The debtor or your own agent?

8          MR. CATLETT:  Both, your Honor.  We think --

9          THE COURT:  The debtor, doesn't the debtor deal

10  with the agent?

11          MR. CATLETT:  The debtor signed the credit

12  agreement which gives participants in the debt certain

13  rights and entitlements.

14          THE COURT:  All you cited to me was one portion of

15  the creditor agreement that had to deal I think with fees

16  or costs.

17          MR. CATLETT:  Yes, your Honor.  We --

18          THE COURT:  Ten point four if I remember right.

19          MR. CATLETT:  That's correct.  And that with one

20  limited aspect.  There are other aspects of the credit

21  agreement which give the credit group certain --

22          THE COURT:  I'm sure there are --

23          MR. CATLETT:  -- rights and entitlements --

24          THE COURT:  -- many aspects of the --

25          MR. CATLETT:  -- to information.

108

1          THE COURT:  -- credit agreement that might be

2   relevant.

3          MR. CATLETT:  And your Honor, we think we have an

4   issue with really both the debtor and with the agent in

5   terms of--and this is the debtor's motion not the agent's

6   motion, but it's our cash collateral--we think we have a

7   legitimate interest in it.

8          THE COURT:  But the a -- I understand.  Okay.

9          Is there anything else?  Do I understand your

10  position?

11         MR. CATLETT:  I believe you do, your Honor, and I

12  guess where I would leave this is we're not suggesting that

13  some kind of an interim relief isn't appropriate.

14         From our perspective we wanted the Court to be

15  aware from the very outset that this substantial lending

16  group at the senior secured level has some serious concerns

17  about what's going on here in terms of the process.

18         THE COURT:  That I do understand.

19         MR. CATLETT:  So we wanted to make sure that was

20  understood at the very outset of the case.  And we

21  appreciate very much your comments in that regard.

22         We also are concerned that the -- what's been

23  submitted here is a 41-page interim order with all kinds of

24  provisions that no one has seen before and it's in our view

25  just too much in terms of interim relief.

1          THE COURT:  And even if I have to sign it because

2   there has to be some utilization of cash collateral, what

3   I'm saying is those are in the form of the order that are

4   not necessarily my findings.  Just so that there's no

5   confusion about that.

6          MR. CATLETT:  Understood, your Honor.

7          THE COURT:  I don't have time here to strike out

8   individual paragraphs.  At the same time there have to be

9   some findings.

10         I have reviewed the declaration.  I am aware to

11  some degree of the complexity.  I understand how it's

12  supposed to flow.  That's why I asked specific questions

13  about excluded line items.

14         I understood that this was the -- not the but

15  the -- well, yeah, I think the primary critical motion

16  before me today, and I've tried to understand it.

17         I read--sir, I have it right here--the form of the

18  order and I read through it.  And I started striking and

19  then I realized I'm simply going to make a blanket

20  statement.

21         If I sign the order and if I sign those findings

22  nobody should take a great deal of comfort in that I am

23  firm with those findings.

24         There is insufficient evidence in my opinion to

25  reach all of those findings.

1          But on an interim basis to preclude what I would

2    think I am convinced of and there is sufficient evidence

3    that there would be immediate and irreparable injury if

4    some type of cash collateral and DIP financing weren't

5    allowed at least through the time of the final hearing,

6    that's really what I'm finding today.

7          MR. CATLETT:  And your Honor, that's almost

8    precisely the finding that we're really asking for.

9          We don't object in principle to the debtor using

10   cash collateral.  They've represented it's essential.

11   We're not looking to have no --

12         THE COURT:  I don't think there's any question

13   about that.

14         MR. CATLETT:  -- no order.  Correct.  No question,

15   your Honor.

16         All we want is to register our objection and to

17   note that before we get to final is there are going to be a

18   number of points where we take serious issue and we think

19   serious concerns need to be raised.

20         And our preferred approach would be to strike

21   those things out, but I can appreciate it's late in the day

22   and the exigencies of time don't allow that.  And we're

23   very comforted by your Honor's approach.

24         THE COURT:  If I could start with a clean slate I

25   would.  And the findings would be that there is and has

1  been established the necessity to preclude immediate and

2  irreparable injury to allow the interim order.

3         And at this time, based upon the representations

4  that were made in the declaration and as contained in the

5  proposed findings, and frankly I'd just label those as

6  proposed findings for the final order and let it go.

7         And if you can make those changes, Counsel, we

8  don't have an issue on this cash collateral DIP financing.

9   We just don't.

10         MR. CATLETT:  And we'd be happy to talk to them

11  about those changes or we also take comfort in your Honor's

12  approach, which is essentially what we're looking for.

13  Which is a truncated let's not stand in the way of getting

14  this done.

15         THE COURT:  Right.

16         So I don't know if you have the capability of

17  making those changes.

18         Who's handling this portion of the -- for the

19  debtor?

20         Mr. Kreller, is this yours?

21         MR. KRELLER:  Your Honor, I was going to -- I'm

22  handling the motion.  Mr. Eisenberg, who spoke to you

23  earlier today, is kind of the architect of the order along

24  with the agent's counsel.

25         THE COURT:  The order is just too -- I am not

1  prepared to say that those are my findings at this time.

2  Those are the type of findings that I'd want to make if I

3  did a final order, not an interim order, when we've had an

4  opportunity for people to weigh in specifically and I've

5  had a chance to look at it.

6          I have looked at it.  I've read the declaration.

7  I think I understand how it works.

8          I learned a lot from the explanation of Vista, but

9  I didn't understand it.  I saw -- understood the hundred

10  million.  I understood the one -- and I know that then you

11  can go back to Past Enterprises.  The whole idea is to try

12  to ensure that the payments come at certain levels, but if

13  you run out of the money then you've set yourself up with a

14  fallback position.  I get all of that.  I believe that it's

15  necessary.

16          Does anybody here -- let me just say before I make

17  that finding.  If a firm -- does anybody here disagree with

18  the position that there has to be, at least on the interim

19  basis, a use of cash collateral as provided in this motion?

20          Do you wish to address this, please?

21          MR. GOLDBERG:  Yes, your Honor.  Eric Goldberg,

22  from Stutmen, Treister & Glatt.

23          My client is Castlereagh Master Investments.  We

24  are one of the members of the independent group but we also

25  did -- I wanted not to repeat what counsel for the group

1  said but just add another few points.

2           And we don't disagree that cash collateral -- that

3  there is a need for cash collateral.  What we do disagree

4  with is the extent and some of the uses.

5           Our basic issue, if you will, is that, you know,

6  people are being adequately protected with our cash

7  collateral.

8           THE COURT:  Well, let me make -- let's see if I

9  can even be more specific then.

10          Is that I only want that -- I only want the use of

11  the cash collateral that's necessary to prevent the

12  immediate and irreparable injury.

13          That I am not approving the budget today.

14          That the ordinary course expenses should be paid.

15          That the properties need to continue to operate to

16  pro -- to I think protect their value.  And if that value

17  isn't protected every party in interest in this room will

18  suffer damage.

19          That's why I said earlier I'm not agreeing to the

20  carveout today.  I'm not agreeing to the thirty-one million

21  in fees.  I'm not agreeing to any of the specific line

22  items at this time.

23          I don't -- unless -- I'm trying to -- you think

24  that I can.  And I just don't see how I can do that.

25          But I don't have any problem with the structure.

114

1  I don't have -- I understand how the money flows and I

2  think it is necessary at this time.

3        I'll be glad to hear you at the time of the final

4  hearing regarding specific line items with which you take

5  issue.

6        MR. GOLDBERG:  Well, my concern then is a

7  practical one in that I think we need to go into the

8  details and determine what is the period, the interim

9  period, that this order is going to cover.

10       Because if -- we understand that you're not going

11 to be making some of these findings.  But for example, some

12 of the expenses that are in this budget will be paid -- are

13 proposed to be paid out in line items.  And without knowing

14 what the interim period will be and without knowing whether

15 expenses or line item amounts paid during that time would

16 be recoverable or undo-able makes things very different for

17 us.

18       THE COURT:  Well, they probably won't be

19 recoverable.

20       MR. GOLDBERG:  And that is exactly our concern.

21       THE COURT:  I mean in a sense -- you know, I

22 shouldn't really say that.  I have no idea really of what

23 the ability would be of any of the non-debtors to repay.

24 And perhaps it might be subject to disgorgement.

25       But then you take a look at the provisions under

1  363 and 364 that protect recipients and that's -- and --

2          MR. GOLDBERG:  And that is exactly --

3          THE COURT:  -- that's the issue.

4          MR. GOLDBERG:  And that is exactly our concern.

5          THE COURT:  And that's why we have a date.

6      (Discussion off the record between the Court and the

7  courtroom deputy)

8          THE COURT:  September 3rd is the date.

9          MR. GOLDBERG:  And if I could just put some

10 examples on what exactly our concern is.

11          Your Honor fing -- you put your finger right on

12 the issue.  We have got our concerns with Deutsche Bank as

13 agent.  Those need -- we believe there's conflicts.  Those

14 need to be worked out.  That's not going to get done before

15 you need to make a decision on this.

16          Our concern is that in the interim decisions will

17 have been made with regard to this interim cash collateral

18 usage and the interim approval of the DIP that will

19 irrevocably change and undermine our position to a greater

20 extent than it already has been.

21          For example some of the items --

22          THE COURT:  Well that assumes you've been

23 undermined.  I'm not --

24          MR. GOLDBERG:  Fair enough.

25          THE COURT:  You know, let's -- come on.

1          MR. GOLDBERG:  But can I just put a few examples

2     on and if they -- if they don't sell they don't sell.

3          For example some of the line items are paying

4     interest on the land loan, four million dollars during the

5     13-week period, a larger one paying the CMBS rent.  This is

6     sixty-five million dollars during the period, approximately

7     twenty million dollars a month.

8          Mr. Aronzon gave us a nice explanation of the

9     capital structure and the question of whether they could

10    not pay the rent.

11         But I think if we were dealing with a situation

12    where you truly had, you know, an independent debtor that

13    independent debtor would be talking to its landlord about a

14    possible use of 365(d)(3) to extend the time period to make

15    that obligation, talking about a renegotiation with the

16    rent.  But meanwhile during this interim period, they are

17    proposing to pay those amounts.

18         There's also twenty-two million dollars of capital

19    expenditures in this budget during the projection period.

20    We don't know because we have not been allowed into the

21    process, we don't know how much of that twenty-two million

22    dollars is going to cap X that inures to our benefit in

23    terms of the Optco collateral package and how much is going

24    to the benefit of Propco or Landco.

25         So again the concern is during this period how

1  much of our cash collateral is going to be dissipated for

2  the benefit of Optco and Landco.  And those area capital

3  structures in which we don't have an interest and those

4  payment are going to the benefit of other lenders.

5        We believe that's happening because of Deutsche

6  Bank's holdings in those other facilities, but the problem

7  is on an interim basis significant amounts of money are

8  proposed to go out the door and we don't -- we don't have

9  at this point any comfort level that most of that money is

10 going to our benefit.

11       Certainly we have issues about the payment to the

12 CMBS rent, about the Gunn (pho) Lake payments, another

13 twenty-six million dollars.

14       So how can we be protected during this interim

15 period?

16       THE COURT:  All right.

17       MR. GOLDBERG:  How do we know that that can be

18 undone?

19       MR. QUSBA:  Your Honor, --

20       THE COURT:  Excuse me.  Excuse me.

21       MR. QUSBA:  -- it's Sandy Qusba.

22       THE COURT:  Excuse me one moment.

23       MR. QUSBA;  Sorry.

24     (Discussion off the record between the Court and the

25 courtroom deputy)

1           THE COURT:  The courtroom deputy gave me that

2  date.

3     (Discussion off the record between the Court and the

4  courtroom deputy)

5           THE COURT:  September 2nd will be the day of the

6  final hearings, folks.  September 2nd, and we'll start at

7  9:30 a.m. for all the final hearings.

8           And that can be the date in all these orders.

9     (Discussion off the record between the Court and the

10  courtroom deputy)

11           MS. THOMAS:  Your Honor, Kaaran Thomas for

12  Deutsche.

13           THE COURT:  I didn't mean to interrupt, Counsel.

14           MS. THOMAS:  All right.

15           THE COURT:  I apologize for it.  I just didn't

16  want folks to start planning to be here.

17           MR. GOLDBERG:  I don't like when people schedule

18  me to be at things either without telling me about it.

19           MS. THOMAS:  Yeah.

20           THE COURT:  No.  She's -- I go where I'm told.

21  But this one --

22           MS. THOMAS:  Your Honor, Kaaran Thomas for

23  Deutsche Bank.

24           I believe that Mr. Qusba, our lead counsel, wanted

25  to make some remarks at this time.  So --

1          THE COURT:  I'm going to let him do that.

2          MS. THOMAS:  -- could I ask that he -- thank you.

3          MR. QUSBA:  I appreciate it, your Honor.

4          First of all I apologize for not being able to

5    attend in person.  I sincerely tried.  But because of

6    weather conditions and flight cancellations I was not able

7    to attend personally.  So again apologies for having to

8    participate telephonically.

9          A couple of points.

10         I think Counsel for the so-called independent

11   lenders has asked or is concerned, has expressed concern

12   with respect to the use of our cash collateral during this

13   interim period until a final hearing is held in front of

14   your Honor on September 2nd at 9:30.

15         The answer to that is there is no cash collateral

16   of ours that's being used other than for some very specific

17   line items which I don't think they have an issue with.

18   But they can speak for themselves.

19         The first cash that is being used in this case,

20   your Honor, is from Vista.

21         The banks unfortunately do not have control

22   agreements or liens on Vista cash.  Okay?

23         So there is no irreparable harm that's occurring

24   to the banks from the use of Vista cash.  And that's the

25   first thing I wanted to address.

1          Second, having read their pleadings or their

2    papers I was dismayed, to say the least--and I think your

3    characterization of it as an intramural dispute is exactly

4    right--I was dismayed with respect to the pages and pages

5    of, in my perspective, from my perspective, false

6    accusations against the agent.

7          And at the hearing today I'm hearing counsel bandy

8    about Deutsche Bank's name and DB this and DB that and

9    Deutsche Bank this and Deutsche Bank that.

10          Your Honor, this is not a case run by Deutsche

11   Bank or for the benefit of Deutsche Bank.  Seventy percent

12   of the banks in the credit facility, the 900,000,000-dollar

13   credit facility, have approved a forbearance agreement,

14   have consented to the use cash collateral in accordance

15   with this order, 70 percent.  Deutsche Bank does not

16   constitute 70 percent.

17          Mr. Aronzon I think very helpfully laid out all

18   the players in this workout, and now Chapter 11 process,

19   over the last seven to nine months.

20          Among the players he identified was a steering

21   committee of senior secured lenders, bank lenders.

22   Deutsche Bank is an agent, JP Morgan is a member. Wachovia,

23   Wells Fargo, members, Bank of Scotland, member, Bank of

24   America, member.

25          At least two of those institutions have their own

1    independent counsel.  I think one might be even in your

2    courtroom.  Bjork is involved.  Catten Muchin is involved.

3     And at least three of those institutions have no exposure

4    on the CMBS side or the land loan side.  They are also so-

5    called independent directors, your Honor.

6              Seventy percent of the banks have agreed and

7    consented to the use of cash collateral, have reviewed

8    the -- have agreed and consented even to the budget.

9              So this is not a case that is being run by or for

10   the benefit of Deutsche.  They are a syndicate member.

11   They, quite candidly, have a lot of exposure to Station

12   Casinos at various levels.  But there's nothing wrong with

13   that.

14             And we've been perfectly open with respect to

15   their holdings, their exposures, and the fact that they do

16   hold and participate in various levels of the capital

17   structure.

18             Now your Honor, one other thing that I think

19   counsel from Paul Hastings mentioned on a couple of

20   occasions.  Everybody clearly acknowledges each of the

21   independent lenders is a signatory to the credit agreement.

22             The credit agreement and the remaining collateral

23   documents are not silent about circumstances such as this.

24    In fact they provide a rational method to deal with

25   circumstances such as this where their borrower, our

1  borrower, goes into Chapter 11.

2          Your Honor, you may not have this document, but we

3  will happily provide it to the Court through the debtors or

4  myself.  But there is a security agreement, Section 6.16,

5  six sixteen, of the security agreement which clearly

6  provides that:

7          "Each secured party"--which is each lender among

8          others--"confirms that the administrative agent

9          shall have the authority to act as the exclusive

10         agent of such secured party," exclusive agent,

11         "for the enforcement of any provisions of this

12         agreement and such other collateral documents and

13         the exercise of remedies hereunder or thereunder

14         and the giving or withholding of any consent or

15         approval hereunder or thereunder relating to any

16         collateral or any grantor's obligations with

17         respect thereto."

18         Your Honor, that dovetails, that provision of the

19 security agreement dovetails with provisions in the credit

20 agreement.

21         I think Paul Hastings, as counsel for the so-

22 called independent lenders, only pointed to one section of

23 the credit agreement in their desire to get immediate

24 reimbursement for legal fees.  But there are other relevant

25 provisions.

1          Those provisions, your Honor, include:

2          "The administrative agent shall take direction

3          from the required lenders."

4          As your Honor pointed out that's in excess of 50

5     percent.  We have that.  We have 70 percent.

6          There are also provisions in the credit agreement

7     which clearly say that the administrative agent cannot vote

8     in connection with a Chapter 11 plan and cannot bind

9     parties with respect to their rights relating to a plan.

10          But what is missing is any mention that the

11    administrative agent can't act in the context of use of

12    cash collateral and DIP financing.

13          Because quite frankly it is contemplated that the

14    admin agent take direction from the required lenders in

15    order to have a process that's rational, that works, and so

16    that not every single institution in this capital structure

17    can rise up and say, "I object to cash collateral because

18    of X or Y or Z."  It wouldn't work.  And that's how these

19    documents are created.

20          THE COURT:  I have a question.

21          You indicated that there would be no use of the

22    cash collateral, that the funding all comes from Vista.

23    And Vista is actually a DIP loan as I understand it.

24          And when I'm reading the proposed order, it

25    states:

1              "SCI may use cash which is generated primarily

2              from the operation of the non-debtor guarantors

3              and unrestricted subsidiaries"--so those are both

4              the guarantors and the non-guarantors--"of their

5              casinos and related assets including all of the

6              pre-petition secured parties' cash collateral and

7              all products and proceeds thereof now owned or

8              hereafter acquired in which the pre-petition

9              agent"--that would be you--"on behalf of the pre-

10             petition secured parties purports to have a lien

11             or security interest to satisfy the debtors and

12             certain of their subsidiaries' ongoing general

13             corporate and working capital expenses to pay

14             operating costs and other expenses subject to the

15             terms of this interim order."

16             And I know there are certain protections built in.

17             Then when I read at Page 53 to Page 54 of Mr.

18     Friel's declaration, particularly paragraph 97, it states,

19     in looking at this that:

20             "As additional adequate protection the pre-

21             petition agent for the benefit of the applicable

22             pre-petition secured parties shall receive all

23             interest and fees," etc., etc.

24             And then it goes on at 98.  This is the unsecured

25     post-petition financing by Vista:

```
 1              "Vista, a non-debtor unrestricted subsidiary of
 2              SCI," which means it's not a guarantor, "is
 3              capitalized with unrestricted cash on hand of
 4              approximately a hundred and ninety-four million
 5              dollars."
 6              This means that that's not cash collateral.
 7   That's Vista's money.
 8              Do I understand that correctly?
 9              MR. QUSBA:  That's exactly right, your Honor.
10              MR. GOLDBERG:  That's correct, your Honor.
11              THE COURT:  Yeah.
12              "Vista is" --
13              MR. QUSBA:  It starts as --
14              THE COURT:  Let me finish.
15              MR. QUSBA:  -- as cash --
16              THE COURT:  Let me finish.
17              MR. QUSBA:  -- that we don't have liens on.
18   Whether we agree or disagree with respect to the validity
19   of the draw on our revolver facility back in December of
20   '08 pursuant to which the now Chapter 11 debtors drew down
21   on that facility and then invested the funds into Vista and
22   without prejudice to any claims or rights we may have with
23   respect to that, the cash is where it is.
24              THE COURT:  Right.
25              MR. QUSBA:  And that's at Vista.
```

1          THE COURT:  And then it says:

2          "Vista is" --

3          MR. QUSBA;  As you note, your Honor --

4          THE COURT:  Sir, let me finish, please.

5          MR. QUSBA:  Sure.

6          THE COURT:  It says:

7          "Vista is prepared to lend from time to time up to

8          an aggregate principal amount of a hundred and

9          fifty million"--so long as it doesn't go below a

10         hundred million.  So really what you're talking

11         about is ninety-four million--"to SCI"--so the

12         loan goes to SCI--"in accordance with the terms

13         thereof in the DIP credit agreement.  SCI shall in

14         turn use the proceeds to provide the other debtors

15         or drop-down borrowers," and I know what those

16         are, "and CV Holdco"--and that goes to the other

17         side.  That's on the -- that goes to CV Propco

18         which goes to the two hundred and fifty million--

19         "to satisfy disbursements."

20         So if I understand it correctly is that first you

21  use the money that comes from Vista before you'd use any of

22  the cash collateral, and before you even do that you might

23  go to Past Enterprises.

24         Do I understand this correctly?

25         MR. QUSBA:  Yeah.  With two exceptions, your

1   Honor.  I mean you do understand it absolutely correctly

2   with two exceptions.

3           Vista has committed to finance disbursements in

4   the budget until its cash hits a hundred million dollars.

5           THE COURT:  That's my point.

6           MR. QUSBA:  Thereafter any funding from Vista, at

7   least in accordance with the way this cash collateral order

8   is drafted, would be discretionary --

9           THE COURT:  My point is --

10          MR. QUSBA:  -- from Vista.

11          THE COURT:  My point is is there's ninety-four

12  million dollars available from the DIP financing before you

13  ever get to the cash collateral, which will not happen

14  before September 2nd.

15          MR. QUSBA:  And here's the second exception, your

16  Honor.

17          THE COURT:  Unless I've missed something here, and

18  I don't think I have.

19          MR. QUSBA:  There's one -- the other exception is

20  something you alluded to or discussed very early in the

21  cash management discussion, the so-called excluded line

22  items.

23          Those excluded line items are not financed by

24  Vista even now, even today.  Those will be financed through

25  our cash collateral.

1          THE COURT:  Because that's where Past gets its

2    money.

3          MR. QUSBA:  Right.

4          MR. ARONZON:  Your Honor, you've got it.

5          MR. QUSBA:  That's exactly right, your Honor.

6          So there is immediate use of cash collateral for

7    those so-called excluded line items.  Other than that Vista

8    is making disbursements and using its cash until it hits a

9    hundred million dollars.

10          THE COURT:  Thank you.

11          MR. ARONZON:  Understanding the background for

12    that, your Honor--this is Paul Aronzon--is important.

13          We moved the cash away the banks.  They wanted it

14    back.  We're putting it back into our system where it will

15    become part of their cash collateral through these steps.

16          We've agreed to put in the ninety-six million, or

17    maybe it's ninety-four.

18          THE COURT:  It says one ninety-four here.

19          MR. ARONZON:  Okay.  It's ninety-four.  And that

20    goes first.  So it's a very important point.

21          THE COURT:  You know, and it even gets a little--

22    I'm going to use a very specific legal term--fuzzy where it

23    states that:

24          "Vista shall fund all disbursements permitted by

25          the budget other than the excluded line items,"

1          which is why I specifically asked that question

2          earlier," which excluded line items may be funded

3          by Past Enterprises," which I understand then

4          would involve the cash collateral of the nine

5          hundred million.

6          Then it goes on to say:

7          "By making post-petition financing available to

8          SCI at any time that Vista's cash balance is equal

9          to or greater than a hundred million and after

10         Vista's cash balance is reduced to a hundred

11         million, Vista may make the post-petition

12         financing available to SCI on a discretionary

13         basis to fund disbursements as set forth in the

14         budget in the event cash flow generated by the

15         credit parties is not adequate to fund all the

16         cash requirements of the debtors."

17         In other words, Vista can still fund even if it

18  falls below the hundred million floor as I understand that.

19         Because I asked -- I had a couple of questions

20  about that and I wanted to make sure in fact what it meant.

21         And then I went on to paragraph 100 when it's

22  talking about the use of cash collateral on each drop-down

23  loan:

24         "As additional adequate protection for use of cash

25         collateral on each drop-down loan, each inter-

```
 1              company on loan"--I don't know what on loan
 2              exactly means.  I think it means -- I saw it--
 3              "made by Past Enterprises to one or more of the
 4              non-debtors, guarantors, as set forth in Schedule
 5              1 and each inter-company loan made by Past
 6              Enterprises to SCI shall be evidenced by
 7              promissory notes."
 8              In other words that's part of the protection.
 9              So I have to tell you, Counsel, what I've heard
10    today confirms what I thought I was reading.  There is
11    about ninety-four million dollars available right now
12    before your cash collateral is ever even maybe implicated.
13              I don't see any way -- well I'll just make it part
14    of the order that in no event shall I allow the use of any
15    of the cash collateral until the hearing on the final
16    order.  Because it doesn't have to be.  All you need is
17    ninety-four million.
18              Am I wrong?  Am I missing something?
19              MR. GOLDBERG:  I understand your position with --
20     what you're saying with regard to the Vista cash.
21              But just to be clear.  I think all parties
22    acknowledge that the cash that Vista has is essentially the
23    remainder of the draw -- the drawdown that was made.  At
24    least I heard --
25              THE COURT:  It's in Vista.
```

1        Nobody has challenged that.

2        MR. GOLDBERG:  I understand.

3        And following from that.  It is our position that

4   that is our -- that is part of our cash collateral.  That

5   is money in which we assert an interest as lenders.

6        THE COURT:  Well, --

7        MR. GOLDBERG:  It's proceeds of that draw.

8        THE COURT:  -- your agent just indicated that in

9   fact that's not the case.

10        Now with --

11        MR. QUSBA:  Your Honor, just to be clear.

12        THE COURT:  -- without prejudice --

13        MR. QUSBA;  It's Sandy Qusba from Simpson Thacher.

14        Just to be clear.  We reserved rights with respect

15   to the --

16        THE COURT:  I was about to say that.

17        MR. QUSBA:  -- propriety of the draw on our

18   revolver back in December of 2008.

19        But as I understand it, cash collateral --

20        THE COURT:  But you have not objected to this use.

21        MR. QUSBA:  I'm sorry?

22        THE COURT:  But you have not object to this use.

23   While you reserve your --

24        MR. QUSBA:  Oh, I've negotiated the consensual

25   use.

1          THE COURT:  That's exactly right.

2          MR. QUSBA:  I'm the one who negotiated with Mr.

3   Eisenberg and Mr. Aronzon and many others with respect to

4   that order.  Okay?

5          So all I'm trying to do is clarify that we're

6   reserve -- everybody is reserving their rights with respect

7   to the draw that was done in December of 2008 where Vista

8   got its cash that it's holding onto now.

9          My only point is cash collateral--and I think Mr.

10  Aronzon or Kreller will speak to this as well, or could--

11  cash collateral my understanding was a cash in which we

12  have a lien on.

13         Unfortunately as much as I would like to say we do

14  have a lien on Vista cash, we don't.

15         THE COURT:  I understand.

16         Anything else?

17         MR. GOLDBERG:  One more.

18         THE COURT:  Sure.

19         MR. GOLDBERG:  I understand everybody position

20  with respect to reserving rights with respect to the draw.

21         Our concern is what happens in the interim if

22  things are not -- are not the way it appears and is

23  presented now.

24         If we are continuing the cash collateral hearing

25  to September 2, which is a 30-day approximately period,

133

1   there's a significant amount of disbursements that are made

2   in the interim.

3          So what we would request, your Honor, is that we

4   continue the cash collateral hearing or just have the

5   interim relief on a shorter basis so that we can come back

6   and have more of an opportunity to pursue this argument

7   before some of these significant payments are done or, in

8   the alternative, that our rights are reserved with respect

9   to the ability to seek recovery of the amounts that are

10  paid during the interim.

11         THE COURT:  The only way that we were able to find

12  a date was because of my calendar, and there is no time.

13         I have with these, if I were to count the non-

14  debtor operating entities, I now have thirty-seven casinos

15  in various cases in this court.

16         We have, I have hearings on disclosure statements

17  and plans.  There's just no time to do it sooner.  In fact,

18  we moved -- on September 2nd we're moving matters around to

19  provide the time to do that.

20         That's --

21         MR. GOLDBERG:  Well, I understand the calendar

22  is --

23         THE COURT:  It's just impossible.

24         MR. GOLDBERG:  -- the calendar is what it is.

25         What then with respect to the idea of preserving

134

1   our ability to recover some of these transfers.  Again

2   going back to the numbers, there are significant numbers

3   here.  Paying interest from Optco cash collateral to Landco

4   interest, no showing.

5          THE COURT:  I understand your position.

6          MR. GOLDBERG:  Nothing in the record about whether

7   there's even equity there to be protected.

8          So what happens then if it turns out that this

9   money is in effect a gift from Propco to Optco to the

10  detriment of the Optco lenders, to the benefit of -- or to

11  the benefit of the Landco lenders.

12         Similar possibility with respect to capital

13  expenditures, multi-millions of dollars are proposed to be

14  spent during this interim period.

15         What happens then if it turns out that that is all

16  or mostly for the benefit of Propco, all to the detriment

17  of Optco?

18         Where is our remedy then for the recovery and

19  preservation of those transfers?  That is our concern.

20         THE COURT:  I understand.  Thank you.

21         I'll hear a response.  Or does somebody else want

22  to speak before I hear from debtors' counsel?

23         MR. BJORK:  Your Honor, Jeff Bjork with Sidley

24  Austin.  We represent the lenders to Propco as well as the

25  land loan, the CV Propco entity.

1          I just want to clarify.  There really is no

2    reservation of rights to the extent that there are rent or

3    lease payments being made under a master lease.  So that

4    that's just the first point.

5          The other point is--and I'll let Mr. Aronzon or

6    Mr. Kreller kind of make their case in terms of the

7    necessity for these payments--but Deutsche Bank would

8    reserve all of its rights to the extent that a failure to

9    make a payment would result in a default.  And I just want

10   to make that clear.

11             THE COURT:  Thank you.

12             MR. BJORK:  Thank you.

13             THE COURT:  One moment, please.

14        (Discussion off the record between the Court and the

15   courtroom deputy)

16             THE COURT:  One moment.

17        (Pause in proceedings)

18             THE COURT:  The language in the interim order

19   regarding the cash management, regarding due process, is

20   only for the purpose of the interim order.  So I don't have

21   any problem with that language.

22             Mr. Kreller.

23             MR. KRELLER:  Your Honor, I guess let me start

24   with this.  I'm not sure that there is any need for you to

25   be delving into issues of adequate protection.

1          363(c)(2) says that a debtor can use cash
2  collateral if one of two things happens:
3          One, if the lender with an interest in the cash
4  collateral consents;
5          Two, if there's no consent then there has to be
6  adequate protection.
7          The agent at the direction of 70 percent of its
8  lenders consented to the use of cash collateral.
9          I don't believe the "independent lenders" have any
10 ability to require adequate protection for anything.  This
11 is a consensual use of cash collateral where adequate
12 protection never comes into play.
13         Second, your Honor, the only use of cash
14 collateral that's happening with respect to their cash
15 collateral, the cash collateral of that bank group, is the
16 money that Past is using to fund the excluded line items
17 that are -- and that is required funding for the guarantor
18 subsidiaries that are in their credit agreement.
19         That's not even a debtor issue.  That's not even
20 before you.  Past is not a debtor.  Past's use of cash
21 collateral is not in question.  So you're not even touching
22 that side of the equation.
23         So I'm not sure that there's -- I don't see
24 anywhere where the use of cash collateral is prejudicing
25 their rights whatsoever.

1          THE COURT:  I'm ready to rule.

2          I appreciate argument of counsel and I thank you

3  for your attendance.

4          But I am convinced and persuaded that the interim

5  use of cash collateral and the debtor-in-possession

6  financing should be granted on an interim basis through the

7  time of the hearing of September 2nd.

8          I believe that based upon the record before me

9  that the agent has the ability to consent to the use.

10          Moreover, based upon the terms as I've read them,

11  it would appear to me that there are funds that do not

12  constitute cash collateral that would be utilized in the

13  first instance and those would go through Vista except for

14  the excluded line items that would be paid by Past that

15  would involve the cash collateral, but Past is not a

16  debtor.  Now I have a better understanding how that flows.

17          I think that all of those, the use of that cash

18  collateral and the DIP financing does protect the security

19  that's available.

20          Even if I had some weighing, some evidence to

21  support the proposition that this agent or the other agents

22  or that the steering committee somehow had breached its

23  agreement with the participants it strikes me, to answer

24  the question of Counsel what happens in that instance?  I

25  guess you get to sue the agent.  And good luck.

138

1          Frankly, the answer is not to set aside a
2   consensual agreement when there doesn't appear to be any
3   evidentiary basis to do that.  And I certainly am not going
4   to make that determination based on the record before me
5   today.
6          And I think there are a lot of safeguards that are
7   built into the use of this cash collateral to make sure
8   that it's not wasted.
9          And candidly, we've got over -- oversecured
10  creditors.
11         There is adequate protection that's built in even
12  if you don't need it, and that's part of the consent.
13         So to answer the question.  I am persuaded to
14  allow the use of the cash collateral and the DIP financing.
15         As I have stated, I do not consider myself bound
16  by all the findings and conclusions that are found in that,
17  in that proposal -- proposed order.
18         I know that's a little bit unusual, but I don't
19  have the time here to go through and strike them.  I have
20  it in front of me.
21         Frankly, I think most of them are probably
22  correct.
23         But I do want to provide the parties with an
24  opportunity to bring before me -- and this -- by having
25  those prop -- I would consider those to be proposed

1  findings in a final order, and you can address them

2  specifically in your points and authorities that you

3  ultimately file.

4          And I want points and authorities filed no later

5  than August 21st regarding the September 2nd hearing so I

6  have enough time to look at them.

7          I do not want to be placed in the same position

8  I'm in today where I have not had an opportunity.

9          And that's simultaneous briefing, folks.

10          I know you won't have a chance to see what the

11  other side says.  But, you know, I'm sure you've been

12  talking a lot anyway and by now you should all have a

13  pretty good idea of what the -- what your positions are.

14          And I'm going to limit the points and authorities

15  to fifteen pages.

16          I don't need a complete recitation of all the

17  facts again.  Bring to me those issues that you have, give

18  me some legal authority and we'll conduct a hearing.

19          And don't use fifty-five footnotes to get around

20  the 15-page limitation.  You can tell I just went through

21  that.

22          And we will start at 9:30 and we'll go the whole

23  day.  I leave the next morning.  And that's what we are

24  going to do.

25          Yes, ma'am.

1          MS. SINANYAN:  Your Honor, Lori Sinanyan for the

2    ad hoc committee of senior and subordinated noteholders.

3          Picking up on a lot of what your Honor said and

4    what was said before me, I want -- we don't have an

5    objection to the use of cash collateral.  We had an

6    objection to certain line items in the order, and I'd like

7    to state what those items are on the record.  We can

8    interlineate them or we can just follow what your Honor was

9    saying that they're not --

10         THE COURT:  Go ahead.

11         MS. SINANYAN:  Okay.

12         On Page 23, paragraph five, so that people follow,

13   there is discussion of --

14         THE COURT:  One moment, please.

15         MS. SINANYAN:  -- of the order specifically.

16         THE COURT:  One moment.

17         The interim order at Page 23?

18         MS. SINANYAN:  Yes.

19         THE COURT:  I have it in front of me.  What line?

20         MS. SINANYAN:  Line 14, to be exact, speaks about

21   the 100,000-dollar carveout, your Honor.

22         And let me make a global statement.  As Mr. Qusba

23   stated on the record and as you correctly recognize,

24   Vista's money is being used first which is not subject to

25   the cash collateral order.

1    And there is no reason to have, I'll say first for

2  short-circuiting this, as many protections as are in here.

3   And I'm going to point out the ones that I think are not

4  necessary at this time and should be excluded or dealt

5  with.

6    The first is this 100,000-dollar carveout.  A

7  100,000-dollar carveout doesn't make sense in this case.

8  This is in the event of default what would it take to do an

9  orderly liquidation of this case.  A hundred -- again a

10  100,000-dollar number doesn't make sense.

11    We're concerned that this number should be larger.

12   That if the budget for professionals provides for 8.8

13  million --

14    THE COURT:  Let me short-circuit that.

15    MS. SINANYAN:  Yes.

16    THE COURT:  Regarding this particular provision

17  and making no findings regarding the amount of the carveout

18  or whether a carveout is necessary at all, now will be

19  reserved till the time of the final hearing.

20    MS. SINANYAN:  Okay.

21    THE COURT:  I'll deal with carveout issues then.

22  I'm not dealing with carveout issues now.  I don't have to

23  deal with them now, I will not deal with them on an

24  expedited basis.  I always deal with -- I always deal with

25  carve-outs --

1          MS. SINANYAN:  I'm just --

2          THE COURT:  I always just deal -- I normally deal

3     with carve-outs at the time of the final hearing so I have

4     enough opportunity to hear from all the parties in

5     interest.

6          MS. SINANYAN:  Understood.  And I will move on,

7     your Honor.

8          On Page --

9          THE COURT:  No, it's a good point.  I'm glad you

10    raised it.

11         MS. SINANYAN:  On Page 27 at the bottom of the

12    page, line -- starting on line 27, liens senior to certain

13    other liens.

14         What we'd like to strike out is the language in

15    Subsec -- that starts with Subsection (a).  This is only --

16    we only need to preserve the status quo here.

17         What the language in Subsection (a) does is it

18    takes away rights that the estate has.  The estate has the

19    right to avoid certain actions for the benefit of the

20    estate, and those shouldn't be subordinated to the adequate

21    protection lien.

22         MR. QUSBA:  Your Honor, it's Sandy Qusba.  Could I

23    just -- from Simpson Thacher.

24         Could I address that point?

25         THE COURT:  Please.

1          MR. QUSBA:  Okay.

2          What we proposed to do on that particular point

3  was to add language at the end of clause (a) just that --

4  that just simply would say, instead of deleting clause (a)

5  just adding to the end of clause (a), to the extent such

6  adequate protection liens were senior prior to such

7  avoidance we're not looking to change priorities but to the

8  extent our adequate protection liens were senior to a lien

9  that was avoided of some third party, whoever it may be,

10  then our adequate protection liens just simply maintain

11  their seniority, whether the lien ultimately resides with

12  the estate because of a successful avoidance or whether it

13  resides with, you know, a third party.

14          So to the extent we were senior it was avoided and

15  now it's -- the lien's for the benefit of the estate, we

16  want to keep our priority, we don't want to be prejudiced

17  either.  And we're not looking to short-circuit or jump

18  ahead of the estate to the extent it's successful in

19  avoiding it.

20          THE COURT:  I'll accept that language at this time

21  and if necessary revisit the issue at the time of the final

22  hearing.

23          MR. QUSBA:  Thank you, your Honor.

24          MS. SINANYAN:  Your Honor, moving on.  On Page 30,

25  the section on limitation on use of cash collateral which

144

1   is paragraph nine.  This paragraph should be limited to the

2   debtor's use of cash collateral and not to anyone else.

3            So there's an interlineation that should be made

4   on line 7 that says --

5            THE COURT:  Let me read this, please.

6            MS. SINANYAN:  I'm sorry?

7            THE COURT:  Let me read it, please.

8            MS. SINANYAN:  Of course.

9        (Pause in proceedings)

10            THE COURT:  In other words what you're saying is

11   is that none of the use of -- whether it's cash collateral

12   or the DIP financing to be used by the debtor and thereby

13   only restricting the debtor's use of it.

14            MS. SINANYAN:  Exactly.  The debtor, the debtor

15   can agree to the limitation and the debtor has agreed to

16   it.

17            THE COURT:  I agree with that.

18            MS. SINANYAN:  So that --

19            THE COURT:  That's I think what -- is there any

20   problem with that?

21            MR. KRELLER:  I don't believe so, your Honor.

22            THE COURT:  No.  And that'll be -- if it can be

23   interlineated, interlineate it.  If not, that's -- that is

24   clearly my intent with this.

25            MS. SINANYAN:  And following up on that same --

1          THE COURT:  Because I don't think the debtor can

2   preclude any other party.

3          MS. SINANYAN:  Exactly.  And --

4          THE COURT:  That's typically what I do here, so

5   that's not a problem.

6          MS. SINANYAN:  And that flows beautifully into my

7   next point.  Which is on line 21, the notwithstanding

8   language attempts to lock in parties other than the debtor

9   and we'd like the rest of that paragraph stricken.

10     (Pause in proceedings)

11         THE COURT:  I'm going to allow it with the

12  understanding that it can be revisited.  I'm not sure that

13  I'm willing to strike that at this time.

14         MS. SINANYAN:  Well, your Honor, the --

15         THE COURT:  Because it talks about the committee.

16         MS. QUSBA:  Your Honor, Sandy Qusba from Simpson

17  Thacher again.

18         THE COURT:  And I don't have a committee yet.

19         MS. SINANYAN:  Understood.

20         THE COURT:  And that's my concern.

21         MS. SINANYAN:  Exactly right and -- your Honor.

22         And if you include this language at least for an

23  interim period it is binding a nonexistent committee, and

24  it's better for the interim period to strike the language.

25         THE COURT:  I interrupted you, sir.  Go ahead.

146

1        MR. QUSBA:  I apologize.  Thank you, your Honor.

2        Again I certainly heeded your warn -- your

3    numerous warnings at this first-day hearing that you're not

4    being bound to any particular findings of fact, etc., given

5    the short time period you've had with this order and the

6    voluminous nature of the filings in front of you.

7        Similarly you've I think reserved on carve-outs,

8    presumably --

9        THE COURT:  Yeah.

10        MR. QUSBA:  -- investigation amounts, etc. until

11    the entry of a final order.  And I appreciate that as well.

12        I do feel that as is typical in Chapter 11 cases,

13    there are usually at least two bites of the apple with

14    respect to carve-outs and amounts set aside for

15    investigations.

16        One is the initial negotiation with the debtors,

17    and then the second bite of the apple comes from the

18    creditors committee counsel itself.

19        I anticipate that, I expect it, and I fully intend

20    to negotiate with whoever that creditors committee counsel

21    may be to the extent a creditors committee is appointed.

22        THE COURT:  Yes, sir.

23        What I typically do is I allow a certain amount of

24    money to be in a carveout that allows the investigation but

25    not necessarily the prosection of those claims.

1         MR. QUSBA:  Exactly.

2         THE COURT:  And I do the same thing -- and with

3    the committee I don't have -- I'll do the carveout but

4    there's no proscription regarding prosecution because

5    sometimes that's absolutely the obligation of the

6    committee.

7         The concern that Counsel just raised and as I read

8    it again is that it puts a 50,000-dollar cap on that of the

9    committee.

10        I'm just going to say the fifty thousand dollars,

11    I'm going to leave it in there.  But I understand that

12   that -- I will be glad to revisit that amount and I don't

13   consider it to be a firm cap.

14        And I think --

15        MR. QUSBA:  Yeah.  And I expect to have a

16   discussion with committee counsel, as we approach the final

17   hearing, with respect to that number among other things.

18        THE COURT:  Based on all the other --

19        MR. QUSBA:  And --

20        THE COURT:  I'll tell you this.  Based upon every

21   other number in this case, --

22        MR. QUSBA:  Yeah.

23        THE COURT:  -- including what I'm being asked to

24   approve for ordinary course professionals, which I will not

25   do today, the fifty thousand dollars is nowhere near

 1  adequate.

 2          MS. SINANYAN:  Yes, your Honor.

 3          MR. QUSBA:  Okay.  Your Honor, I appreciate that

 4  but -- and this isn't the time to argue it.

 5          THE COURT:  I'm not arguing.  That's my point.

 6          MR. QUSBA:  Your Honor, I was warning myself.

 7          THE COURT:  Okay.

 8          MR. QUSBA:  I was warning myself.

 9          But these are just holding company cases.

10          And the other thing I wanted to point out, --

11          THE COURT:  Well, they are and they aren't.

12          MR. QUSBA:  -- you Honor, is --

13          THE COURT:  Let's be clear about -- let's be

14  clear.  They are and they aren't.

15          MR. QUSBA:  They are and they aren't.  You're

16  right.

17          THE COURT:  We've involving a lot of money that

18  goes through a lot of debtors.  And I understand who filed

19  and I understand why who filed.  But let's -- I've also I

20  think got at least a vague understanding of the economic

21  reality of these cases.

22          And if that weren't the case I wouldn't be asked

23  for, I think it's nearly thirty-two million dollars in the

24  budget for attorneys' fees.  I wouldn't be asked for a

25  hundred and fifty thousand dollars a month in ordinary

149

1  course professionals.  I wouldn't be asked for three

2  hundred thousand dollars a month for the financial advisor

3  and with a success fee--and I'm not even sure it's labeled

4  that--of 12.5 million.

5          So I understand the numbers in this case a little

6  bit.

7          MR. QUSBA:  Okay.

8          I appreciate that now.  And your Honor, as Mr.

9  Aronzon pointed out earlier in the hearing, this cash

10 collateral order was a part of the forbearance agreement

11 that, as I mentioned, 70 percent of the banks have

12 approved.

13         THE COURT:  And that's why I'm not just --

14         MR. QUSBA:  And Mr. Aronzon also articulated the

15 great benefit that the estate as well as my bank group

16 receives from keeping those subsidiaries out of Chapter 11.

17         The quid pro quo of course of that is the debtor

18 has to continue to comply with the terms of the forbearance

19 agreement as well as the proposed cash collateral order.

20         I understand we'll be back in front of you in the

21 context of a final hearing.  I hope to resolve as many

22 matters as possible so as not to burden you.

23         And that's it.  I'm okay to move on.

24         THE COURT:  Thank you, sir, and I appreciate that.

25         And I've just being clear.  If I weren't persuaded

1  that that was in fact the case I would not approve this.

2            And I don't intend to upset the consensual

3  arrangement that's been arrived at until I'm given adequate

4  reason for doing so.  And that has not occurred.  That is

5  why I've approved it.

6            And I understand the strenuous objection by the

7  independent lenders.

8            I'm not -- have not made any finding regarding the

9  efficacy of their position whatsoever.

10           What I've said is there's a consensual arrangement

11 I'm following under.

12           I'm going to allow Counsel to put her concerns on

13 the record.

14           I just want everybody to know what I think I'm

15 bound by and what I don't.  I don't think I could be any

16 clearer.

17           And I think I understand the economic realities.

18           I appreciate the fact that the parties are going

19 to negotiate it.  I think they should.  That's the whole

20 point to this process.

21           MS. SINANYAN:  Your Honor, thank you very much.

22           I have one more request for change to the interim

23 order and then I'd have another comment that I wanted to

24 make.

25           The last change that I'd like to make is on the

1  next page -- on Page 32, paragraph 13, binding effect.

2          THE COURT:  Um-hmm.

3          MS. SINANYAN:  Starting on line 17 all the way to

4  the next page, almost at the bottom, where Section 14

5  starts.

6          THE COURT:  Let me read it.

7          MS. SINANYAN:  The entire language should be

8  stricken.  And I -- to give you a moment to read it.  Just

9  I want to preview --

10          THE COURT:  Why?

11          MS. SINANYAN:  -- something.

12          And that's exactly what I was -- that's what I was

13  going to mention.

14          The binding effect should only be on the parties

15  listed on line 14 on Page 32, which is the debtors, each

16  other credit party, Vista and any subsidiary --

17          THE COURT:  I agree with that.

18          MS. SINANYAN:  -- of the debtors.

19          THE COURT:  And for the purpose of the interim

20  order those are the only ones bound by this language.  And

21  I'll consider the remainder of it at the hearing, the

22  final.

23          MS. SINANYAN:  Exactly right.

24          So we --

25          THE COURT:  At the final hearing.

1          MS. SINANYAN:  Perfect.

2          THE COURT:  All right.

3          MS. SINANYAN:  And the only other point that I

4   wanted to make, your Honor, is as Mr. Aronzon spoke briefly

5   about our involvement as the ad hoc committee of

6   noteholders, I'd like to give you some background on the

7   current status of negotiations.

8          I'm not sure that -- if you want to hear from me

9   now or at a later point and go through the motions.

10         THE COURT:  Let me get through the motions.  Let

11  me get through the motions.

12         MS. SINANYAN:  That's why I'd -- sure.

13         THE COURT:  There's a number of people that need

14  to know what's going to happen so I'd like to get through

15  those.

16         MS. SINANYAN:  Understood.  But I'd like to -- I'd

17  like the opportunity to give you the background whenever

18  you want it.

19         THE COURT:  I look forward to hearing from you.

20         MS. SINANYAN:  Thank you.

21         THE COURT:  Thank you.

22         What I'm doing as orders are being passed up I'm

23  reviewing them and authorizing their signature as we go

24  forward.  This is sort of multi-tasking.

25      (Pause in proceedings)

153

1          THE COURT:  I've taken of cash collateral.  That

2    was easy.

3      (Pause in proceedings)

4          THE COURT:  Utilities next.

5          MR. KRELLER:  That's right.

6          THE COURT:  That's number five on my calendar.

7          I have reviewed the procedure.  One of the

8    citations was incorrect, but then there was a correct

9    citation.

10          The thirty days isn't found in 366(a), it's found

11    in 366(c)(2).  That was corrected.  And I know 366(a)

12    refers to 366(c), but it's really only twenty day -- it's

13    twenty days, then there's ten days.  It's one of those well

14    crafted BAPCPA sections.

15          What you want to do is have a cash deposit equal

16    to two weeks of service.  If they disagree or fund that

17    then they have to act within a certain amount of time.

18          I believe this is consistent with 366(c)(3).  It

19    allows them to raise objections in a timely fashion and

20    allows me to rule, if necessary, upon any of the

21    objections.

22          It preserves all rights and at the same time does

23    not offend the prohibitions that are found in Section 366.

24          Those are my preliminary findings based upon my

25    review of the pleadings.

1          I'd be glad to listen if anybody has any concerns

2    in that regard.

3       (No audible response)

4          THE COURT:  No.

5          That'll be order and I'll approve the interim

6    order.

7          I don't know that you need a final order in this

8    case.  I think it is a final order.  It provides for the

9    procedure.  I don't see -- I don't think there'd be

10   anything necessary.

11         If a utility wishes to bring them back in front of

12   me they can do it under 9023 or 9024 and I'll consider it.

13         MR. KRELLER:  I think that's right, your Honor.

14         THE COURT:  All right.

15         So do this as a final order, please.

16         Okay.  One that causes me some pause.

17         The motion for interim and final orders regarding

18   reconciling valid reclamation claims, prohibiting third

19   parties from interfering with delivery of debtors' goods--

20   okay--and authorizing debtors to pay certain pre-petition

21   claims to suppliers.

22         Instead of calling them critical vendors now we

23   call them priority vendors.  All right.  And that's good

24   enough.

25         And I really think that was one of the -- when you

155

1  take a look at 503, I guess it's (b)(9), and that really is

2  what it does.

3         Then you've got the problem with the floating

4  liens.  I understand the procedure that's requested here.

5         The reclamation claims, you want 270 days.  That

6  strikes me as a long time.

7         MR. KRELLER:  Your Honor, I think, you know,

8  obviously the --

9         THE COURT:  Plus it's the reclamation claims that

10 probably don't exist because of the floating liens.

11        MR. KRELLER:  That's correct, your Honor.  I'm

12 not -- it's hard to kind of figure out exactly what

13 everyone's talking about, a null set here --

14        THE COURT:  Yeah, exactly.

15        MR. KRELLER:  -- or not.

16        THE COURT:  But I, you know, I'd rather get it

17 done in 180 days.

18        MR. KRELLER:  I think that's fine, your Honor.

19        THE COURT:  Let's -- you know, I -- if there are

20 not any here then we'll just take it off.  If there are we

21 can always then schedule the amount.

22        So I'd rather do the 180 days.

23        Does anybody wish to be heard?

24        I don't know if the Office of the U.S. Trustee has

25 any position on the priority vendors or not.

156

1          MR. COSSITT:  No position on it at this time, your

2     Honor.

3          THE COURT:  Okay.

4          Once again I'll make the same point.  Don't cite

5     to me some of the law you cited to me.  I've got my own --

6     I don't agree with it, I don't think it's necessarily valid

7     in the Ninth Circuit.

8          But at the same time I do believe that in the

9     proper circumstances that this type of relief can be

10    allowed.  I think it applies more to timing issues than

11    anything else.

12         I have one question though on paragraph 24.  I was

13    disturbed by it.  Because you set up a process where if you

14    pay them they agree that they'll enter into these trade

15    agreements.  And then at the same time you say well, the

16    debtor retains the discretion to make the payments even if

17    they don't.

18         If they don't enter into that trade agreement you

19    don't pay them.  It's that simple.

20         I'm not going to allow -- I just don't see -- if

21    you want to bring that back before me at the time of final

22    hearing, but I just don't know why I should allow that.

23         Do you see the provision I'm concerned about?

24         MR. KRELLER:  Your Honor, I do see that provision.

25    I think it was designed to create flexibility for the

157

1  debtor in dealing with --

2          THE COURT:  It's too much.  It's too -- because

3  the real reason -- if they have a priority they have a

4  priority.  And if they don't want to provide that, fine,

5  then deal with them.  We'll pay them at the effective date

6  under 1129(a)(9) if that's what we need to do.  I don't

7  care.

8          But they don't get to be paid ahead of anybody

9  else unless they are actually providing some benefit to the

10  estate.

11          MR. KRELLER:  I don't have a problem --

12          THE COURT:  And I don't think --

13          MR. KRELLER:  -- with that, your Honor.

14          THE COURT:  And you can tell them I said so.  So I

15  don't agree with that.  That'll be stricken.

16          MR. KRELLER:  Understood, your Honor.  We'll do

17  without that --

18          THE COURT:  Okay.

19          MR. KRELLER:  -- flexibility.  It may well work in

20  our favor.

21          THE COURT:  Well, that's the whole point.

22          MR. KRELLER:  And I understand.

23          THE COURT:  Okay.

24          So otherwise I approve it.  And I don't think that

25  needs -- I don't think you need a final hearing.  I think

1  that that's a final order.

2          I think the priority --

3          MR. KRELLER:  Thank you, your Honor.

4          THE COURT:  -- I think that should be paid.  I

5  think that's the purpose of 508.  And let's pay them, get

6  them done.  And I don't think it's that big an issue.

7          MR. KRELLER:  I agree with that, your Honor.

8          THE COURT:  Workers' comp, number 8.

9          This is a motion pursuant to 105--I always like

10  those citations to 105--363(b) and 6004--by the way, I'm

11  waiving the ten days for any interim order that I enter,

12  just so there's no question about that--authorizing payment

13  of all pre-petition obligations regarding workers' comp

14  liability.

15          I don't have any problem with the insurance.  I

16  think, Mr. Cossitt, you had an issue perhaps with the

17  350,000-dollar reserve?

18          MR. COSSITT:  On an interim basis they can

19  continue to self-insure.  I just want to reserve that if my

20  office has heartburn over it later we can bring it in and

21  make them find workers' company insurance coverage.

22          THE COURT:  Sure.

23          I don't think you'd have any problem with that,

24  will you?

25          MR. KRELLER:  No, I don't, your Honor.

1              THE COURT:  Otherwise I'm going -- does anybody
2    else wish to be heard regarding these matters?
3              I have studied them.  I've got them outlined here.
4              If you need me to make specific findings I'm
5    willing to do that.  But I think you need to pay the pre-
6    petition insurance obligations.
7              Obviously there's -- you need to -- of course it's
8    alleged that there are none -- that they're current on all
9    their policies in any event.
10             I have one question.  The insurance financing
11   appears that may be some -- a pre-petition obligation.  All
12   or part of the 4.2 million?  I couldn't tell.
13             MR. KRELLER:  Your Honor, let me confer with my
14   colleagues on that.  I'm not familiar with the exact
15   mechanics of that.
16             THE COURT:  Sure.
17             Because they financed some of these premiums.
18             MR. KRELLER:  That's correct.
19        (Discussion off the record among counsel)
20             MR. KRELLER:  Your Honor, I apologize.  Can you
21   point me to where you are in the motion on that.
22             THE COURT:  Sure.  Actually I found this one in
23   the declaration.  I'm sure it's mirrored in the motion.
24   Let me take a quick look.
25        (Pause in proceedings)

1          THE COURT:  Same cites to railroad reorganization.

2          MS. SINANYAN:  It's Page 10 in the paragraph 19.

3          THE COURT:  That's where it is.  Thank you.  It's

4    paragraph 19.

5          MS. SINANYAN:  Line 23.

6          THE COURT:  You have finance arrangements with

7    First Funding Corp, Zurich American Insurance.  You pay

8    certain of the insurance premiums in installments instead

9    of a lump sum.  Makes sense.

10         You finance approximately 4.2 million dollars of

11   premiums, down payment of eight hundred and eighty.  Then

12   you make nine monthly installments of three hundred and

13   eighty-three thousand.

14         And it only costs about nine hundred dollars.  I

15   actually did the arithmetic.  And I thought that was pretty

16   cheap for that amount of money.

17         And let me take a quick look at the declaration.

18   Because there may be a distinction here.

19     (Pause in proceedings)

20         THE COURT:  Page 58 I think is where it starts in

21   the declaration.

22         Yes, there it is, 58.  And the paragraph that I

23   looked at was paragraph 108.  Now that's where -- that's

24   the three fifty.  That's simple.

25     (Pause in proceedings)

1          THE COURT:  Oh, there it is.  In fact there's the
2     arithmetic and there's a difference.
3          At paragraph 114, if you'll notice, here you say:
4               "The final installment is scheduled"--there's a
5               typo, it should be scheduled--"to be paid in March
6               2010 in connection with the financing arrangement
7               with Zurich," SCI finances approximately one
8               million of this seven hundred and twenty thousand
9               eight hundred and ninety-two in premiums.
10          This is a 900-dollar charge and that is consistent
11     and it does add up.
12          But what I couldn't tell is is some of this pre-
13     petition that hasn't been paid?  That's all I want to know.
14          I don't have any problem with it, it just wasn't
15     very clear to me.
16          MR. KRELLER:  Does the insurance cover pre-
17     petition periods; is that your question?
18          THE COURT:  Well, you've got financing.
19          MR. KRELLER:  Right.
20          THE COURT:  You've got installments that are due.
21          MR. KRELLER:  Correct.
22          THE COURT:  Have all the pre-petition installments
23     been paid?  That's my question.
24          MR. FRIEL:  They have.
25          THE COURT:  Thank you.

1          MR. KRELLER:  Yes, your Honor, they're current.

2          THE COURT:  Then I don't see any issue with this,

3   this motion then.  I'm not being asked to pay -- approve

4   the payment of any pre-petition.  The rest to me is

5   ordinary course.

6          Does anybody other than the Office of the U.S.

7   Trustee and the workers' comp reserve?  I don't see any

8   issue with this.

9          I'll be glad if any -- if I've missed something

10  I'd like to hear about it.

11         I'm going to grant the motion then.

12         MR. KRELLER:  Thank you, your Honor.

13         THE COURT:  Have the Office of the U.S. Trustee

14  sign off on the order.

15         MR. COSSITT:  You know, if would be better if we

16  didn't, your Honor.

17         THE COURT:  Okay.

18         MR. COSSITT:  My office is very short of people at

19  this point.

20         THE COURT:  All right.  No signature necessary.

21  Submit it.

22         And this can -- I don't have any problem with this

23  being a final order.

24         MR. COSSITT:  I don't, your Honor.

25         THE COURT:  Oh, no.  Make it a final order,

1  please.

2          MR. KRELLER:  Thank you, your Honor.

3          THE COURT:  Nine hundred dollars, I don't -- I

4  looked at that and said did it miss a couple of zeros in

5  this case?  I just didn't understand.

6          The next is the reimbursement and indemnification

7  and related obligations to directors.

8          I understand why -- and once again this is a

9  railroad organization case.  Fine.  I do think that it's

10  probably ordinary course.  I don't have any problem with

11  that.

12          I understand the indemnity.  I understand the

13  insurance.  I will allow the access.

14          But I have an issue -- I found out more about it

15  today.  When I first -- when I read the declaration and

16  when I read the motion, Dr. Knave, is says DVM.  Is that a

17  veterinarian?

18          MR. ARONZON:  Yes.

19          THE COURT:  Yeah.  That's what I thought.

20          And I didn't understand exactly why there was a

21  million-dollar retainer payable, seven hundred and fifty

22  thousand to one firm, two hundred and fifty thousand

23  dollars to another for one of the directors when the others

24  don't get the benefit of that.

25          I think I have a better explanation of that now.

1    But I don't know if anybody has a concern about that.

2          Counsel?

3          MR. GOLDBERG:  Thank you, your Honor.  Eric

4    Goldberg of Stutman, Treister & Glatt, for Castlereagh

5    again.

6          Our concern about this one is it may not be an

7    issue, but we certainly don't think that this is an

8    appropriate motion to be heard on the first day.

9          Given what we've seen --

10         THE COURT:  Which portion of it?  All of it?

11         MR. GOLDBERG:  All of it frankly.

12         It's a couple of concerns.  Basically what they

13   are seeking to do is assume the post-petition D&O

14   indemnification or reimbursement obligations in the

15   ordinary course.

16         Well, if it's ordinary course I don't know why we

17   need to do this at all.

18         And then the other part of it is --

19         THE COURT:  Well, because it's belt and

20   suspenders.

21         MR. GOLDBERG:  But we don't know exactly what

22   those D&O indemnification obligations are.  As far as I can

23   tell they're not spelled out anywhere in here.

24         And it may be they're perfectly fine, and when we

25   see that and other creditors see that on full notice that's

1  okay.

2          THE COURT:  If there are any insurance, what I'm

3  willing to do is provide an interim order that allows the

4  payment of any premiums that become due between now and

5  September 2nd.

6          Then I would like this heard on September 2nd.  I

7  would like a declaration regarding the -- Dr. Knave and why

8  that's treated separately.

9          And I have the same issue that I'm going to deal

10  with on project five.  Because nobody asked me for an order

11  shortening time regarding assumption or rejection.

12          And while it may not be controversial I don't know

13  that.

14          You've touched on a point that was in my notes.  I

15  can either -- I don't know that we need a written interim

16  order.  If the premiums become due between now and

17  September 2nd, pay them.  I don't think there'll be any

18  objection to that, very frankly, on the D&O coverage.

19          And those premiums, based upon what I see here,

20  would not be all that high.

21          And then I'll deal with this matter on September

22  2nd.  That's how I'd rather deal with it.  And I agree with

23  that.

24          MR. GOLDBERG:  And that's fine.

25          Just an additional comments.  And hopefully this

1  can be fleshed out in the --

2          THE COURT:  Let's everybody talk.

3          I suspect now that I've heard what I've heard and

4  what occurred and why it occurred and the role that Dr.

5  Knave played in the independence of that--I don't know if

6  it's an ad hoc committee or a subcommittee--that in fact

7  that there's some real value that may have been brought to

8  this entire process.

9          But I don't know that.

10         MR. GOLDBERG:  We'll bring our concerns to the

11  debtor.

12         THE COURT:  I don't have evidence.  I have

13  representation of counsel.  I would like declarations and

14  affidavits.

15         MR. GOLDBERG:  Understood.

16         THE COURT:  Or a stipulation.

17     (Pause in proceedings)

18         MR. DURRER:  Good afternoon, your Honor.  Van

19  Durrer, Skadden, Arps, Slate, Marr & Flom, on behalf of Dr.

20  Knave.

21         We have -- we would prefer, your Honor, an interim

22  order, understanding all the comments that your Honor has

23  made about an interim order in this context.

24         THE COURT:  What do you need an interim order for?

25         MR. DURRER:  We need an interim order, your Honor,

1   to address two things.

2          One is to ensure that Dr. Knave will have adequate

3   representation going forward in this process.  Because he

4   has stated to the company that he will not participate in

5   the process if he's not assured of that protection.  And he

6   is the only independent director.

7          If your Honor looks at the chart again, if you

8   look at the top of chart, there are two distinct groups of

9   investors.

10          THE COURT:  Oh, there's the family.

11          MR. DURRER:  The family and the money.

12          THE COURT:  I understand.

13          MR. DURRER:  Okay.

14          Well, Dr. Knave is basically the arbiter between

15   the family and the money.  And given the amount of money

16   involved here, the stakeholders, he needs to have that

17   advice.

18          THE COURT:  As long as the fees are reasonable

19   between now and September 2nd I'll be glad to do that.

20          MR. DURRER:  Okay.

21          THE COURT:  He's allowed his representation until

22   the time of the final hearing.  Because he's represented

23   now.  And the contract hasn't been rejected.

24          So I don't have a problem with that on a going

25   forward basis.

1           After September 2nd for the full amount whether

2    that retainer gets refreshed, that's what we'll deal with

3    at that time.

4           So it's not rejected.

5           MR. DURRER:  No.  Understood, your Honor.  I

6    just --

7           THE COURT:  So if that's what -- I don't think you

8    need an order.  I'm just telling you.  Right now he's

9    represented and right now he's entitled pursuant to that

10   agreement to have his reasonable fees and costs paid for

11   what he's doing.

12          And I'll deal with it on September 2nd.  I suspect

13   nothing will change.

14          MR. DURRER:  Understood, your Honor.

15          The other point--and this is also in the order--

16   it's just not only that the debtor pays the insurance in

17   the interim but that the directors and officers can

18   actually access the insurance.

19          THE COURT:  I already said that.

20          MR. DURRER:   Okay.

21          THE COURT:  Oh, absolutely.

22          MR. DURRER:  That's fine.

23          THE COURT:  If there's a -- I'm not going to have

24   you pay the premiums, then when there's a reason to use it

25   and not be allowed to use it.  No.  That wouldn't make any

1  sense.

2          Okay?

3          MR. DURRER:  Thank you, your Honor.

4          THE COURT:  Thank you very much.  I'm sorry if I

5  was ambiguous on that point.

6          MR. ARONZON:  From the company's perspective, your

7  Honor, we greatly appreciate that order or lack of order,

8  to be taken up on the 2nd, the guidance.

9          THE COURT:  To me there's a contract.  You asked

10 me to --

11         MR. ARONZON:  He's extremely important to the

12 process here.

13         THE COURT:  You asked me to allow the assumption,

14 which means that it's still there and it hasn't been

15 rejected.  So my understanding is go forward.

16         MR. ARONZON:  Thank you, your Honor.

17         THE COURT:  Oh, one of my favorites.  Ordinary

18 course professionals.

19         You know, I don't feel about it the same way as

20 Professor Lotucki feels about it.  I don't think that we

21 engage in illegal conduct.  I see a reason for ordinary

22 course professionals.

23         I have -- I don't typically do them on the first

24 day for a number of reasons.

25         I have a difficult time with the hundred and fifty

1    thousand dollars.

2           I would require instead of simply--just to let you

3    know--serving the monthly application, I'd require that

4    they be filed and served.  They don't have to be set for

5    hearing, but there should be some transparency.

6           And I -- also the procedure for ordinary course

7    professionals I find a little difficult.

8           I think that those folks that you -- that the

9    debtor wants to utilize as ordinary course professionals,

10   when they complete -- they complete two documents as I

11   understand it.  Basically it's an application and then

12   there's the equivalent of a 2014 declaration.

13          MR. KRELLER:  Correct.

14          THE COURT:  They were attached as exhibits.

15          But then it's the debtor who makes the decision.

16   But then I read on, and if I read it correctly is once the

17   debtor makes the decision to retain them then you still

18   submit them to the Court for approval.

19          Did I read that correctly?

20      (No audible response)

21          THE COURT:  Is that what's intended?

22          MR. KRELLER:  Your Honor, I believe that's the way

23   it reads.  But my --

24          THE COURT:  Who wrote this one?

25          MR. KRELLER:  Some of my colleagues.

1          THE COURT:  Okay.

2          MR. KRELLER:  Or I don't know who wrote that one,

3  your Honor.

4          THE COURT:  That's fair enough.

5          MR. ARONZON:  He read it.

6          THE COURT:  I like the process.  The process is

7  frankly better than I see in most cases, and I compliment

8  you on that.

9          I just don't know that the debtor can usurp what I

10  believe is the role that the Judge must play.

11          Now a hundred and fifty thousand dollars a month.

12   I don't even know where they are.  When I looked at your

13  chart I had no idea what the normal or average billings

14  were.  I didn't see any numbers.  And perhaps I missed it.

15          You know, I -- .

16   (Pause in proceedings)

17          THE COURT:  Take a large -- take a look at that

18  list.  I didn't add it up.  But there's got to be twenty,

19  thirty, forty names on it.

20          Multiply that times a hundred and fifty thousand

21  cap per month, you're talking money without any review.

22  Without applications under 327.

23          I understand the process that you have here is a

24  sort of a mini quasi 327/2014 process and I appreciate

25  that.

1          I just -- and then I wasn't sure when I first read

2     it if that applied to the supplements.  Because you said

3     you may not have all the ordinary course professionals and

4     you'd want to supplement the list.

5          And then I saw -- that's in paragraph 14.  But

6     then I -- if I read it they would have to comply.

7          And I know that it's funny the cases that talk

8     about the word professional all are fairly old.  And I

9     don't -- I haven't ever seen in a really good appellate

10    court decision whether professional under 327 has some --

11    is a term of art.  I just --

12          MR. KRELLER:  Right.  Right.

13          THE COURT:  Is it actually needed in the

14    reorganization effort I think I saw some -- .

15          And I tend to think that that's probably right.

16    Because really what -- these are -- and I know that some of

17    colleagues believe that these are really ordinary course

18    issues.  And perhaps under 363 it's just ordinary course.

19          Well, if it's ordinary course then why are you

20    asking me?

21          You know, and so I have a -- I think everybody is

22    a little bit uncertain about this procedure.

23          And these are done for convenience.  And I

24    understand that.  But I want to continue this until

25    September 2nd when we take a close look at it.

1          MR. KRELLER:  Yeah.

2          THE COURT:  And I'd like to have some idea of the

3    costs.  Because right now I -- this is a pretty open-ended

4    big ticket item.

5          MR. KRELLER:  Your Honor, I understand your

6    concerns.  And my --

7          THE COURT:  And I'm not -- I'm simply not

8    comfortable with it.

9          MR. KRELLER:  My suggestion actually was that we

10   continue this.  We'll refine this and provide some

11   additional disclosure in terms of costs.

12         THE COURT:  I think that would be helpful to

13   everybody.

14         MR. KRELLER:  And why don't we take this up at

15   September 2nd.

16         THE COURT:  That would be good.  Thank you very

17   much.

18         Next is the interim and final orders for extending

19   time to file schedules and statements.  You want till

20   September 22nd.

21         You've been working on this case some time.

22   You've got extensive pleadings.  Do you need that much

23   time?

24         MR. KRELLER:  Your Honor, you know, clearly

25   there's a lot of -- a lot of work that has gone in on the

174

1   substantive end.  We would certainly appreciate that much

2   time.

3        If --

4        THE COURT:  Does anybody have any objection --

5        MR. KRELLER:  -- it's uncomfortable --

6        THE COURT:  -- to September 22nd?

7        MR. COSSITT:  I don't have an objection, your

8   Honor, but I have a comment and maybe it'll help other

9   people.

10       We have set the 341 hearings for August -- now I

11  won't be able to remember it.  I think it's the 30th.  It's

12  either the 30th or the 31st, at one o'clock.  And we're

13  going to go forward with those 341 hearings even if the

14  schedules and statements aren't on file.

15       THE COURT:  Sure.

16       MR. COSSITT:  Because I want to allow creditors an

17  opportunity to question the debtor under oath.

18       We will then continue that 341 hearing to a date

19  after the schedules and statements and far enough after the

20  schedules and statements that people can review them and

21  come back with additional questions.

22       I have no input on it for knowledge about how long

23  it will take them to put them together.

24       THE COURT:  Can I get a sense of when -- I know

25  there are a lot of negotiations that are ongoing and are

1    obviously with the idea of perhaps getting to a consensual

2    or if not to a consensual plan at least one that you can

3    satisfy the requirements under 1129(a) and (b).  That's

4    what I think I've heard today.

5         Any idea where we are in terms of the timing for

6    that process?

7         MR. KRELLER:  Your Honor, Mr. Aronzon is probably

8    better equipped --

9         THE COURT:  No.  And I understand --

10        MR. KRELLER:  -- to speak to that than I am.

11        THE COURT:  -- that it's a dynamic situation but I

12   need to get a sense of that.

13        MR. ARONZON:  I'm closest to it.

14        Look, we have work to do with some of the

15   creditors obviously.  You've heard from some of them today.

16        I don't know how long the discussions are going to

17   take.  I don't know what their issues are.  For instance

18   some of these bank lenders who are unhappy with pieces of

19   things that are going on here, I don't know what their

20   laundry list looks like.  I don't know how much work we

21   have to do.  I don't know how much to give.

22        THE COURT:  And they would say to you that one of

23   the reasons you don't know is nobody given them a seat at

24   the table.

25        MR. ARONZON:  Well.

1           THE COURT:  Somebody should listen to them.

2           MR. ARONZON:  The reality is that's an

3    overstatement on their part.

4           THE COURT:  I'm sure.  But anyway.

5           MR. ARONZON:  But, you know, if I had Dan Anson

6    from Lazard here you'd hear a different story.

7           But having said that, we all know that things take

8    time to resolve.

9           I am very interested in hearing where our

10   bondholders think their discussion have led.

11          THE COURT:  Right.

12          MR. ARONZON:  Because they're talking to the

13   mezzanine lenders, directly or indirectly, and we've been

14   unable to engage there frankly because of the stall.

15          So look, we have creditors that are unre --

16          THE COURT:  September 22nd you believe is a

17   realistic date for this purpose?

18          MR. ARONZON:  For the schedules?

19          THE COURT:  Yeah.

20          MR. ARONZON:  I do.  And in part it's --

21          THE COURT:  I'm going to grant the motion.

22          MR. ARONZON:  Thank you.

23          THE COURT:  Thank you.

24          And that's a final order.

25          Then the motion for authority to file a

177

1    consolidated list of debtors' forty largest unsecured.

2              Is that enough for your office?

3              MS. COSSITT:  I believe so, your Honor.

4              THE COURT:  Then I'm -- does anybody wish to be

5    heard?

6              MR. COSSITT:  Especially when they've represented

7    the trade creditors are going to be de minimis in

8    relationship --

9              MR. ARONZON:  They really are.

10             THE COURT:  Well, there are no -- there are very

11   few trade creditors of SCI.  Because the trade is all at

12   the operational level.

13             MR. ARONZON:  Correct.

14             MR. KRELLER:  So that's largely correct, your

15   Honor.

16             MR. COSSITT:  I assume there'll be some litigation

17   claims, your Honor, there always are, that are in an

18   unknown amount but are a large dollar amount claimed.

19             But the major lenders will be within the forty.

20             THE COURT:  All right.

21             MR. ARONZON:  The unsecured creditors, your Honor.

22   you'll notice there's no critical vendor payment motion.

23             THE COURT:  Good.

24             MR. ARONZON:  We don't have any.  We pay

25   everybody.

178

1          THE COURT:  No, they're priority vend --

2          MR. ARONZON:  We don't have an issue with those.

3          We might have a very large claim from the

4  landlord, if and when we reject that lease.  It could be a

5  half-a-million-dollar claim.  It could be.

6          THE COURT:  I understand.

7          MR. ARONZON:  Depends on how you calculate the

8  damage caps.

9          THE COURT:  Okay.

10         Well, they'll be --

11         MR. ARONZON:  There are other --

12         THE COURT:  We'll stay with the forty largest

13  right now.

14         And of course that's without prejudice to the

15  Office of the U.S. Trustee to -- if they determine they

16  need to have --

17         MR. COSSITT:  Well, and maybe this would be a good

18  time.  Those are being mailed out today, the solicitations

19  to those forty.

20         Our policy has always been we will accept ballots

21  from anybody.

22         THE COURT:  Okay.

23         MR. COSSITT:  And then we'll weigh the ballots and

24  decide who's going to go on the committee.

25         But just because you didn't get a solicitation

1  from us, if you want one contact us.  We'll get you one.

2  And you can send us in a ballot saying you want to be on

3  the committee.

4        THE COURT:  I don't have any problem with this.

5  And I'm going to grant it.  Final order.

6        Then the motion for noticing procedures.  I

7  reviewed it.  I believe it's consistent with what we've

8  done in the past consistent with 2002(m).

9        And I'm going to -- I'm going to grant it.  And if

10 some -- any requests for special notice make sure they're

11 included.  I think those were.

12       So I don't have a problem with that.  I'll grant

13 that motion.

14       And the next one is the motion establishing

15 procedures for interim compensation, reimbursement,

16 expenses of professionals.

17       It's funny the Ninth Circuit BAP case that still

18 allows it isn't even cited in the points and authorities.

19 That's Knutsen.  That's why I call these Knutsen orders.

20       Once again Professor Lopucki thinks that three

21 bankruptcy judges made a mistake in deciding that case.

22 I think Professor Lopucki is absolutely wrong.

23       Once again I would like those to be applications.

24  And as I said, they should be filed.

25       MR. COSSITT:  This one concerns me, your Honor,

180

1  because -- and I guess it's what you're saying you want and

2  what I was trying to tell them I didn't want.

3         THE COURT:  What's the problem?

4         MR. COSSITT:  If you have monthly applications

5  prepared, not just statements of what their fees are but

6  applications, --

7         THE COURT:  Oh, I --

8         MR. COSSITT:  -- there's a certain cost involved

9  in them preparing those.

10         THE COURT:  Let me -- I just want the title of

11  them changed not what's in them.

12         MR. COSSITT:  Okay.

13         THE COURT:  That's all I'm saying.  And I want

14  that filed.

15         I don't want them to be --

16         MR. COSSITT:  You do want it filed?

17         THE COURT:  I don't want them to be the same as

18  the interim fee application.  I do not want the costs

19  associated, I simply instead -- it says served.  I want

20  them filed and served and I want it called an application.

21         It is called an application.  They actually have

22  that language in the request.  I just want it filed not

23  just serve,d Mr. Cossitt.  Don't misunderstand what I'm

24  saying.

25         MR. COSSITT:  Okay.  Well, that's my

181

1   misunderstanding.  Because I --

2           THE COURT:  No, that's my fault.  I wasn't clear

3   on it.

4           MR. COSSITT:  You want them filed and served,

5   great.

6           THE COURT:  Yeah, that's all.

7           MR. COSSITT:  Okay.

8           THE COURT:  And then the process, then the time to

9   object, etc., etc.

10          And you remember if there's an objection that is

11  filed and served.  That cannot be consensually -- that

12  language is in the motion.

13          MR. COSSITT:  Right.

14          THE COURT:  That says filed and served.

15          MR. COSSITT:  And -- and --

16          THE COURT:  And all I want is the original

17  application filed as well.

18          MR. COSSITT:  And nobody is prohibited from

19  raising is when the actual 120-day application is filed?

20          THE COURT:  They asked for ninety days.  But

21  that's correct.  You're absolutely correct.

22          MR. COSSITT:  You can bring your objection then

23  even though you didn't bring it --

24          THE COURT:  It's not waived.

25          MR. COSSITT:  -- under the 30-day.

182

1          THE COURT:  All it is is on the record, and that

2     allows people to prepare for the interim fee applications.

3      That's it.

4          They are not required to respond to it except as

5     provided in what I call the Knutsen order.  Which is a

6     fairly informal process.

7          Then if there's an objection if it's only an

8     objection to a portion of it, they can get paid the portion

9     to which there's no objection on an 80-percent for fee,

10    100-percent for costs.  No problem with that.

11         Why ninety days?  I mean 331 talks about 120

12    unless otherwise ordered.  Isn't 120 enough?

13         I have -- there's so much -- I just know that when

14    I look at that task analysis that I am going to see a lot

15    of time involved in putting together fee applications.  And

16    I'd rather have it done very 120 days rather than every

17    ninety days.  I think it reduces the costs associated with

18    no production.

19         MR. KRELLER:  That's fine, your Honor, 120 days is

20    fine.

21         THE COURT:  All right.

22         And that provides us all enough time, especially

23    with the interim.  And that's why, in all seriousness I

24    think that's why the process as permitted by Knutsen and

25    other opinions makes a great deal of sense.

183

1           I actually think it provides more control over

2   fees than the other way and it reduces the fees and the

3   administrative expenses that way.  I'm convinced of that.

4           All right.

5           Other than those changes I have no -- I have no

6   issue.  And that can be a final order.

7           Do you waive signature, Mr. Cossitt?

8           MR. COSSITT:  I do, your Honor.

9           THE COURT:  Thank you.

10           Now that was the last -- was that the last one?

11   No.  I have fourteen.

12           MR. KRELLER:  Yes.

13           THE COURT:  Oh, yeah, the real property list.

14   Let's talk about that for a minute.

15           Is counsel for the lessor here?

16           MR. BOWLER:  Yes, your Honor.

17           THE COURT:  Your name, please?  I'm sorry, I

18   forgot.

19           MR. BOWLER:  Adam Bowler.

20           THE COURT:  Mr. Bowler.  I've looked at this.

21   There was no request -- do you object to me hearing this

22   today?

23           MR. BOWLER:  Well, that's the point.  We didn't

24   receive any notice of this.

25           I've known about it for about twenty hours.  I

184

1  haven't really had a chance to talk to my client about it.

2          If this is pushed out to September 2nd I don't

3  think there would be any prejudice to the debtor.

4          THE COURT:  That's what I'm going to do.

5          There was no request for an order shortening time.

6   This is an assumption/rejection issue.

7          This is a lease that was entered into in --

8  October 1, 2007.  It runs through September 30, 2012.

9          I know the rent is fairly expensive.  But -- and I

10  know the premises were vacated in May 2008.

11          I don't think another month is that critical.  And

12  I am concerned about due process.

13          MR. BEESLEY:  It is seventy thousand dollars.

14          THE COURT:  It's between seventy and seventy-six

15  thousand dollars a month.  I know that.

16          And if there had been a request for order

17  shortening time, if the other side had been provided notice

18  consistent with out procedures on orders shortening time, I

19  might consider it.  I won't.  I'll consider it on September

20  2nd.

21          MR. BEESLEY:  Can I ask a rhetorical question,

22  your Honor?

23          THE COURT:  Sure.

24          MR. BEESLEY:  How can you object to the debtor's

25  business judgment in rejecting it?

1          THE COURT:  How can I object to the debtor's

2   business judgment?  Because the Code requires a hearing.

3          MR. BEESLEY:  Yes, your Honor.

4          THE COURT:  And because I had a three-hour hearing

5   in WGI on just that issue.  And I can if I believe that

6   it's been arbitra -- that that judgment has not been

7   exercised properly.

8          MR. BEESLEY:  Yes, your Honor.

9          THE COURT:  Or else you could just, you know, roll

10  anybody up here.

11         MR. COSSITT:  But pushing --

12         THE COURT:  Which not be a bad idea.

13         MR. COSSITT:  But pushing it out you're not ruling

14  for or against --

15         THE COURT:  I'm not --

16         MR. COSSITT:  -- what any damages might be

17  suffered during that interim period.

18         THE COURT:  That's exactly what I'm saying.  I'm

19  not making any decisions on the merits.

20         MR. COSSITT:  The property is vacant today.

21         THE COURT:  The property's vacated.  It's been

22  empty for fifteen months.

23         MR. BEESLEY:  Just one last question.  Would you

24  consider or not rule out at this moment a nunc pro tunc

25  order for today's hearing when we actually hear it?

1           THE COURT:  I would not rule that out.

2           MR. BEESLEY:  Thank you.

3           THE COURT:  Take a look at the way nunc pro tunc

4    was decided -- what was that?  There was just a case that

5    came out of the Ninth Circuit--interesting footnote in that

6    case--about a month ago.  I wish I could remember the name

7    of it.

8           All right.  Does that take care of your concerns?

9           MR. BOWLER:  Yes.  Thank you, your Honor.

10          THE COURT:  Thank you.

11          When I read this that's exactly what I thought.

12          Now those are all the matters I had on calendar.

13          MR. KRELLER:  Your Honor, I believe that does

14   cover everything.

15          I have one housekeeping item for you.  I don't

16   know whether you have others for us at this point.

17          THE COURT:  Well, let me mention one thing.

18          I read through the declaration.  I know there's a

19   number of employment retention motions that I'm going to

20   hear.  And I'm aware of the parties.

21          Obviously I want those set.  I think there's going

22   to have to be some explanation of what -- the market and

23   why I should approve three hundred thousand dollars a month

24   and a success fee.

25          Those are the standard issues I have in all of

1  these cases.

2          And as I heard Mr. Aronzon, there's a number of

3  financial advisors out here.

4          This case obviously has already been expensive and

5  it's going to become more expensive.

6          And, you know, when I look at these cases and I

7  see these different financial advisors, you know,

8  ultimately the success comes if these people are successful

9  in their negotiations.  And it's the way they approach

10  those.

11          And to me, there's almost a melding of those

12  different fees.

13          And I understand what the market is.

14          I'm really concerned what may be the final number

15  that I'll be asked to approve if there is a consensual

16  resolution.  And that troubles me.

17          And that's why--just to let everybody know right

18  now--I am extraordinarily reluctant to approve any of these

19  applications pursuant to Section 328.

20          Because under the law in this circuit and in most

21  circuits it's very difficult to go back and look at and

22  revisit the issue.

23          And I think especially in this case that may be

24  one that I would want to revisit, at least above a certain

25  level.  So I need you folks to be creative.

1          I've tried to articulate my concerns so that

2    nobody is surprised.

3          That whole <u>Circle K</u> case and all of the progeny

4    just cause a lot of problems for judges.

5          And I mean it's very difficult for me at this time

6    to know where we're going to be--I've listened to what Mr.

7    Aronzon said, I'll listen to other counsel--six months from

8    now.  It may be totally justified; it may not be.

9          You know, that's the same thing I do with breakup

10   fees in a 363 case.  I don't know at the beginning.  And I

11   usually reserve.

12         And that's the same thing that I'm being asked to

13   do here.  Just so you understand the context.

14         I would really like to have -- all the various

15   parties in interest who are going to ask to have

16   professionals retained, I wouldn't mind having those on the

17   same day.

18         And if I have to issue a nunc pro tunc, I mean

19   I'll be glad to relate them back to the time that -- I want

20   to get those matters before me as soon as possible.  I want

21   those motions filed so there aren't a lot of fees generated

22   before the motion's filed.

23         Typically what we do in this jurisdiction is I

24   don't have any problem with fees earned before the day of

25   the employment application order, but I do have a problem

1  before the date of the filing of the application when

2  everybody knows.

3          We provide a certain amount of flexibility.  I

4  understand what happens early on in the case.

5          But you know, Atkins is still the law in this

6  circuit.  And so I tend to be -- you can ask local counsel.

7   We look at those things.

8          And so I -- if there's a way of doing that, if

9  there isn't that's okay.  Because right now you don't have

10 a committee and that might not be possible.

11         But certainly some of the others we could -- we

12 should get them on.

13         When you do your interim fee applications what I'd

14 like are summaries, particular period, what have been

15 awarded in the past, what's actually been paid.  Both

16 pursuant to the -- any interim payment as well as the

17 monthly payments.

18         I'm trying to think now.  Oh, you -- I know that

19 you want to employ I think it's Kurtzman Carson Consultants

20 as claims agent.  There was an application that was filed

21 today.

22         MR. KRELLER:  That's correct, your Honor.

23         THE COURT:  It hasn't been set for hearing.  We

24 should set that for September 2nd.

25         MR. KRELLER:  Your Honor --

190

1                THE COURT:  Your --

2                MR. KRELLER:  I'm sorry, your Honor.

3                THE COURT:  There's certain language that our

4    clerk's office requires.  There's a problem with the

5    paragraph in the order regarding -- where it says:

6                "KCC is appointed as agent, is designated as the

7                authorized repository for all proofs of claims, is

8                authorized and directed to maintain official

9                claims registers for each of the debtors and to

10               provide the clerk's office a certified duplicate

11               original."

12               Huh-uh.  We need originals.  Our clerk's office

13   needs originals to comply with their obligations.

14               They have to docket on our claims register.

15               Speak to the clerk's office.  They'll give you the

16   process.  It comes up in all these cases all the time.

17               MR. KRELLER:  We can deal with that, your Honor.

18               The one question I had for you, the 341(a) notices

19   as I understand are going to be going out.  And we'd

20   actually like to be in a position to put Kurtzman Carson on

21   there as claims agent.

22               We don't want to put the cart before the horse.

23   We won't have the application --

24               THE COURT:  I don't think there's any issue with a

25   claims agent just so long as the language is consistent

1  with what we need to do to do our job.

2          I don't think the Office of the U.S. Trustee has

3  any great concern in this regard.

4          MR. COSSITT:  I've never objected to a claims

5  agent before.  But I guess it's possible.  I mean --

6          THE COURT:  Well, I've re --

7          MR. COSSITT:  -- I've not seen their application.

8   But if it's Mr. Kreller's brother-in-law I'll probably

9  have a problem with it, your Honor.

10          THE COURT:  Well, no.  It --

11          MR. KRELLER:  It is not, your Honor.

12          THE COURT:  I can tell you who it is.  I actually

13  reviewed not only the application but I reviewed the

14  declaration of Michael Fishberg that was supplied in the

15  exhibits.

16          I would have absolutely no hesitation about

17  employing him.  I was only concerned about that -- the

18  language.  I would have done it on the first day if it was

19  in front of me very frankly.

20          What I'm going to do is I'm going to allow it.

21  I'll enter it.  But if anybody wants to bring a motion to

22  have me reconsider it I'll do it.

23          But make sure that the language in the order is

24  consistent with what our clerk's office needs to be able to

25  its job, please.

192

1          MR. KRELLER:  We will do that, your Honor.

2          THE COURT:  Yeah.  That way it's done.

3          I can see the real benefit of a claims agent in

4     this case.

5          MR. KRELLER:  Certainly, your Honor.

6          THE COURT:  All right.

7          Is there anything else?

8          MR. KRELLER:  Your Honor, two other items.

9          One obviously, there have been repeated references

10    throughout the hearing and then reliance I think by your

11    Honor on Mr. Friel's declaration.

12         I think at this point we would like to move that

13    declaration into evidence.

14         THE COURT:  It's filed.  It's under oath.  It's in

15    evidence.  I don't think you need to move it.  But if you

16    want me to say it's in evidence I'll say it's in evidence.

17         MR. KRELLER:  Thank you, your Honor.

18         THE COURT:  Okay.

19         MR. KRELLER:  Lastly, your Honor, from my

20    perspective we -- as a housekeeping matter.  We've referred

21    a number of points in the hearing to the negotiations that

22    are occurring with respect to a cash collateral order with

23    respect to the Propco --

24         THE COURT:  Yes, sir.

25         MR. KRELLER:  -- debtors.

1          We do not yet have a stipulation but we certainly

2   hope to get there.  And that's something that we would like

3   to have heard relatively quickly when we get to that point.

4          THE COURT:  If you arrive at that with sufficient

5   time to provide some type of notice I'll hear it on

6   September 2nd.

7          MR. KRELLER:  Your Honor, I think the hope of

8   it and --

9          THE COURT:  If you need an interim --

10         MR. KRELLER:  -- and the counsel for Propco --

11         THE COURT:  If you need an interim order that we

12   can do in relatively short time speak to my deputy and

13   we'll find time.

14         MR. KRELLER:  Okay.

15         MR. BJORK:  Your Honor, Jeff Bjork.

16         We did speak to your deputy and she suggested next

17   Wednesday afternoon.

18         THE COURT:  You did?

19    (Discussion off the record between the Court and the

20   courtroom deputy)

21         THE COURT:  If you can get it done by that time,

22   fine.

23         MR. BJORK:  Okay.

24         THE COURT:  But I need it done by Friday.  Because

25   anytime shorter than that, I mean, how can -- well, let me

1  just say this.

2         MR. KRELLER:  Could we do it Monday, your Honor?

3         THE COURT:  What else do I have Wednesday?

4      (Discussion off the record between the Court and the

5  courtroom deputy)

6         THE COURT:  We'll do it at noon.  Just do it at

7  noon.

8         MR. BJORK:  Okay.

9         THE COURT:  Get it done.

10        When can you have it filed?

11        MR. BJORK:  By Monday.  We're waiting for Monday.

12        THE COURT:  Noon Monday.  Noon.  Noon Monday.

13        MR. KRELLER:  Your Honor, to be clear.  We do not

14  yet have an agreement.  We are certainly going to endeavor

15  to do that.

16        THE COURT:  If you have one file it by noon

17  Monday.

18        MR. KRELLER:  But this is in --

19        THE COURT:  And I'll hear it on shortened time at

20  noon --

21        MR. KRELLER:  -- in pencil.

22        THE COURT:  -- on Wednesday.  That's forty-eight

23  hours.

24        MR. BJORK:  Thank you, your Honor.

25        MR. KRELLER:  Thank you, your Honor.

 1          THE COURT:  Thank you.

 2          MR. KRELLER:  Your Honor, I think the one other

 3  date that I did not have and whether I missed this.  I know

 4  you've requested a supplemental declaration with respect to

 5  Dr. Knave's application.

 6          THE COURT:  I think I gave a deadline for filing

 7  any pleadings prior to September 2nd.  That's the same

 8  deadline.

 9          MR. KRELLER:  The same deadline as we have for the

10  other?

11          THE COURT:  Yes.

12          MR. KRELLER:  Okay.

13          Your Honor, I think that's all I had.

14          And we very much appreciate your taking time to

15  deal with these items, particularly those that needed to be

16  dealt with on an expedited basis.

17          THE COURT:  No problem.  Thank you very much.

18          Counsel?

19          MS. SINANYAN:  Your Honor, I'd like to make --

20  Lori Sinanyan from Jones Day.

21          I'd like to make one clarifying point.  While the

22  declaration is admitted into evidence we'd like to reserve

23  any evidentiary objections to that.

24          THE COURT:  Let me say this.  Feel free.

25          MS. SINANYAN:  Okay.

1          THE COURT:  I know what's admissible.  I

2   understand what hearsay is.  I know what legal conclusions

3   are.

4          MS. SINANYAN:  Thank you, your Honor.

5          THE COURT:  Thank you.

6          I'll be glad to -- you wanted to explain the

7   status of the -- of your discussion, I believe.

8          MS. SINANYAN:  I'll be very brief considering the

9   time, your Honor.

10         As I men --

11         THE COURT:  Take whatever time you think is

12  necessary.

13         MS. SINANYAN:  Okay.

14         As I mentioned, we represent the ad hoc committee

15  of senior and subordinated noteholders.  And as Paul

16  Aronzon mentioned, the senior noteholders hold eight

17  hundred and fifty million dollars in bonds.

18         Our committee represents approximately 94 percent

19  of the senior noteholders.

20         The subordinated notes are 1.45 billion dollars'

21  worth of subordinated bonds and our committee is comprised

22  of 76 percent, approximately, of those subordinated

23  noteholders.

24         We have a five-member steering committee.  Mr.

25  Aronzon forgot Franklin.  So it's Franklin Fidelity, Wamco,

1 Serengeti and Oak Tree.

2          And we've been actively involved in the case.  We

3 were counsel at Kirkland & Allison, then moved to Jones

4 Day.  And we've been involved actively in the case for over

5 eight months.

6          And our steering committee has been very actively

7 negotiating and trying to broker a deal and make sure that

8 all of the parties are at the table.

9          And we've also been in constant communication with

10 the larger committee and given them telephonic and also e-

11 mail updates.

12          We are at the point where we have had a meeting

13 directly with what are called the Propco lenders.  The --

14          THE COURT:  Propco?

15          MS. SINANYAN:  Yes.

16          THE COURT:  I'm sorry.  I know what that is.

17          MS. SINANYAN:  Okay.  I thought I would use the

18 shorthand since --

19          THE COURT:  No, I'm glad you did.  I just didn't

20 under --

21          MS. SINANYAN:  -- you seem very familiar with it.

22          We've had a meeting with the Propco lenders

23 along -- and that is both the main loan and the mezz debt.

24  We had that meeting I believe it was last Tuesday.  On

25 Thursday we received -- last Thursday, a week ago, we

1   received a memorandum of understanding and three term

2   sheets for basically each of the pieces of the pie.

3           And --

4           THE COURT:  Three term sheets?

5           MS. SINANYAN:  Three terms sheets.  So one has

6   to --

7           THE COURT:  Shouldn't it be five?

8           MS. SINANYAN:  Let me explain.

9           THE COURT:  Okay.

10          MS. SINANYAN:  One has to do with the Optco bank

11  debts.  One has to do with the Propco bank debts.  And one

12  has to do with the mezz.

13          THE COURT:  Oh, so --

14          MS. SINANYAN:  Actually --

15          THE COURT:  So the mezzanine is all put together?

16          MS. SINANYAN:  -- I take that -- land loan.  Land

17  loan.  Sorry.  Propco and --

18          THE COURT:  Okay.

19          So the mezzanine has got -- I would call them,

20  they're four separate loans.

21          MS. SINANYAN:  Right.

22          But the mezzanines are actually organized and they

23  have one mezzanine lender that's taking the lead.  And

24  there's counsel and financial advisors.

25          THE COURT:  Who is that?

```
1           MS. SINANYAN:  Goldman is the mezz lender.
2           And who's Goldman's -- I have to check back.
3           THE COURT:  That's okay.  Okay.  Okay.
4           MS. SINANYAN:  Sorry.  Too many professionals to
5    keep track of in this case.
6           THE COURT:  Who exactly when you met, who did you
7    meet with?
8           MS. SINANYAN:  The steering committee members,
9    several of the steering committee members, three of the
10   members met with Deutsche Bank, JP Morgan, and Goldman.
11   And the financial advisors on -- for all of the parties
12   were at the meeting.  Counsel wasn't there.
13          THE COURT:  All right.  Thank you.
14          MS. SINANYAN:  Sidley & Austin, who represents
15   Deutsche Bank in its role as Propco lender, drafted a
16   memorandum of understanding and these three term sheets
17   that I referred to.
18          We, in turn on our end, drafted a term sheet for
19   the bondholders.
20          Because there's the senior and subordinated
21   bondholders represented by our committee collectively.
22   we have co-counsel Wachtel (pho) and Scott Charles who is
23   also representing -- and so we've been representing the
24   interests of both the seniors and the subs.  We needed to
25   figure out internally what the divide would be between the
```

1  seniors and subs.

2          We drafted our own term sheet.

3          We're at the point with Sidley and with the
4  parties where we've traded term sheets.  And we have
5  commented on the memorandum of understanding.

6          They have now seen our bondholder term sheet.
7  We've now seen and started to discuss the other term sheets
8  and tried to get all of the parties on board.

9          But this is substantial progress because we've now
10 started to memorialize what we -- what was agreed to as a
11 conceptual deal at the meeting about ten days ago.

12         And now we're at the point where we are trying to
13 dot our i's and cross our t's and make sure that we have
14 agreement on all of the open points, as of course when you
15 memorialize something you realize how many minor but open
16 issues there are.

17         And so we've made substantial progress.

18         And the filing diverted some of our attention this
19 week.  But we intend to re-focus and move full steam ahead
20 with the continuation of the term sheets and the
21 negotiations and bringing all of the parties together.

22         And the substantial and most important take-away
23 is, if we are successful in reaching an agreement is 5.7
24 billion dollars' worth of the debt that will be in
25 agreement.

201

```
 1              And hopefully we can package that up and present
 2    to the company.  And of course --
 3              THE COURT:  You say 5.7.
 4              MS. SINANYAN:  It's the six hundred seventy-five
 5    million dollars of the mezz debt, 1.8 billion dollars
 6    approximately of the Propco loan, nine hundred million
 7    dollars of the Optco loan, and 2.3 billion dollars of the
 8    notes.
 9              THE COURT:  Then all that's left would be the
10    loans on the far left of this chart that have -- if I
11    understand correctly.
12              In other words all that -- let me pull my chart.
13    All that would be left is the four ten, the construction
14    loan and the land loan.
15              MS. SINANYAN:  The land loan is part of the deal
16    as well.  So.
17              THE COURT:  Oh, it is?  So the two fifty.  So then
18    what you're really only talking about is about four hundred
19    and thirty million that wouldn't be a part of it.
20              MS. SINANYAN:  Right.  So I stand corrected.  It's
21    six --
22              MR. FRIEL:  That's a separate.  That's a --
23              THE COURT:  That's what I'm saying.  That's a --
24              MR. FRIEL:  A separate joint venture, has nothing
25    to do with this.  Correct.
```

1          THE COURT:  Well, I understand that.  But it is

2  debt that's included in this case because those are debtors

3  in this case.

4          What is being resolved is the Propco debt, the

5  Optco debt and --

6          MR. FRIEL:  No, other than that.

7          THE COURT:  -- the land loan.

8          MR. FRIEL:  Yeah.

9          THE COURT:  I got it I think.

10         Is that correct?

11         MS. SINANYAN:  I'm stating that it's six billion,

12 approximately six billion dollars of the debt.  Because if

13 you add in the Landco loan it's another two hundred and

14 fifty million dollars.

15         THE COURT:  Well, you've got one eight on the

16 mortgage loan, you've got a total of -- on the mezz loan

17 six seventy-five, something like that?

18         MS. SINANYAN:  Right.  Nine hundred on the Optco l

19 loan.

20         THE COURT:  Nine hundred on the Optco and --

21         MS. SINANYAN:  And 2.3 billion on the bond debt.

22         THE COURT:  And then there's a -- it says that

23 there's about eighty-three million of other current and

24 long-term debt.

25         MS. SINANYAN:  I think that's your line of credit?

1          MR. FRIEL:  No.

2          MS. SINANYAN:  No?

3          MR. QUSBA:  That might be their -- Sandy Qusba

4    from Simpson Thacher, your Honor.

5          That might be their sale leaseback transaction,

6    etc.

7          THE COURT:  Okay.

8          MR. QUSBA:  Just a point of clarification.

9          THE COURT:  But let me -- what I -- does that

10   include the two hundred and fifty dollar -- 250,000,000-

11   dollar loan?

12         MS. SINANYAN:  Yes.  The land loan is part of the

13   package --

14         THE COURT:  Okay.

15         MS. SINANYAN:  -- that we are trying to --

16         THE COURT:  Thank you.

17         MS. SINANYAN:  -- reach consensual resolution on.

18         THE COURT:  So what's excluded is about this

19   eighty-three million, plus what appears to be about four

20   hundred and thirty million on the construction loan.  Okay?

21         MS. SINANYAN:  Not that those are small numbers.

22   But if you reach agreement on six billion dollars then it's

23   basically done I think.

24         THE COURT:  It's pretty good.  I understand.  I

25   understand.

1          MS. SINANYAN:  And so that's what I wanted to

2   inform your Honor.

3          We've kept in touch with Paul Aronzon obvious --

4   and debtors' counsel.

5          THE COURT:  And the ultimate result if you reach

6   an agreement, what would be -- would that be -- come before

7   me then in terms of a plan or in terms of a financing

8   motion?

9          I am trying to understand where I fit into this

10  picture.

11         MS. SINANYAN:  Without divulging information that

12  I can't divulge --

13         THE COURT:  That would be confidential.  I

14  understand.

15         MS. SINANYAN:  Right.

16         Without divulging information that I can't

17  divulge, what is contemplated is obviously some debt-for-

18  equity conversion.

19         THE COURT:  Oh, I -- oh.  In other words, is it

20  going to come before me in some type of a plan?

21         MR. BJORK:  It'll be in a plan.

22         MS. SINANYAN:  Oh, of course.

23         MR. BJORK:  It'll be in a plan, your Honor.

24         THE COURT:  That's all.

25         MS. SINANYAN:  Yes.

 1          THE COURT:  That's important to me.

 2          MS. SINANYAN:  I'm sorry.  I didn't understand

 3  your question.

 4          Yes, what --

 5          THE COURT:  I don't want to know the details.

 6          MS. SINANYAN:  Right.

 7          When we reach agreement with the six billion

 8  dollars we need to obviously reach agreement with

 9  management and with the debtors themselves and have it be a

10  complete deal.  And it'll be in the form of a consensual

11  plan of reorganization.  That's the ultimate end goal.

12          THE COURT:  That's all.  I wish you godspeed.

13          MS. SINANYAN:  Thank you.

14          THE COURT:  Thank you.

15          MR. ARONZON:  We agree, your Honor, and thank you

16  very much.

17      (Discussion off the record between the Court and the

18  courtroom deputy)

19          THE COURT:  Mr. Beesley?

20          MR. BEESLEY:  Yes, your Honor.

21          THE COURT:  I've just been informed that on noon

22  on the 5th I think that's when we were supposed to meet

23  regarding the --

24          MR. BEESLEY:  The (inaudible)?

25          THE COURT:  Yeah.

1          Could you attend that for me and let me know what

2   happens?

3          MR. BEESLEY:  Yes, your Honor.  I certainly will,

4   your Honor.

5          THE COURT:  Okay.

6          But I will be there if they don't get an agreement

7   brought to me by noon on Monday.

8          Thank you.

9          I just don't have -- obviously I just don't have

10  the time to do it.

11         MR. BEESLEY:  I will attend, your Honor.

12         THE COURT:  And I'll just do what you guys tell me

13  to do anyway.  All right?

14         Is there anything else?

15         I thank you all very much.

16         COUNSEL:  Thank you, your Honor.

17         THE COURT:  You're welcome.

18         COURTROOM DEPUTY:  All rise.

19      (Proceedings concluded at 5:13:10 p.m.)

20

21

22

23

24

25

207

1                              <u>CERTIFICATE</u>

2

3          I certify that the foregoing is a correct

4    transcript from the digital sound recording of the

5    proceedings in the above-entitled matter.

6

7    <u>/s/ Marjorie G. Davall</u>              <u>August 10, 2009</u>

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

208

1

2  y