1

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)

2

MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor

3

Los Angeles, California 90017
Telephone:    (213) 892-4000

4

Facsimile:    (213) 629-5063

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

5

6

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

7

8

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

9

10

In re:

11

STATION CASINOS, INC.

12

☐ Affects this Debtor

13

☒ Affects all Debtors

☐ Affects Northern NV Acquisitions, LLC

14

☐ Affects Reno Land Holdings, LLC

☐ Affects River Central, LLC

15

☐ Affects Tropicana Station, LLC

16

☐ Affects FCP Holding, Inc.

☐ Affects FCP Voteco, LLC

17

☐ Affects Fertitta Partners LLC

18

☐ Affects FCP MezzCo Parent, LLC

☐ Affects FCP MezzCo Parent Sub, LLC

19

☐ Affects FCP MezzCo Borrower VII, LLC

20

☐ Affects FCP MezzCo Borrower VI, LLC

☐ Affects FCP MezzCo Borrower V, LLC

21

☐ Affects FCP MezzCo Borrower IV, LLC

22

☐ Affects FCP MezzCo Borrower III, LLC

☐ Affects FCP MezzCo Borrower II, LLC

23

☐ Affects FCP MezzCo Borrower I, LLC

24

☐ Affects FCP PropCo, LLC

Chapter 11

Case No. BK-09-52477
Jointly Administered
BK 09-52470 through BK 09-52487

**OMNIBUS DECLARATION OF
THOMAS M. FRIEL IN SUPPORT OF
THE PROFESSIONAL RETENTION
APPLICATIONS**

25

26

27

28

LA1:#6410359

I, Thomas M. Friel, hereby declare under penalty of perjury:

1.     I am the Executive Vice President, Chief Accounting Officer, and Treasurer of Station Casinos, Inc., ("SCI"), a Nevada corporation.  In this capacity, I am familiar with the day-to-day business operations, assets and financial affairs of SCI and its subsidiaries and affiliates, including all of the Debtors named above.  I have been employed by SCI since July 6, 1999 and have held the above position since March 30, 2007.

2.     In order to enable the Debtors to operate effectively and avoid certain adverse effects of operating under chapter 11, the Debtors have also filed several applications requesting the retention of various essential professionals (the "Professional Applications").  The Debtors believe that the relief they are seeking in the Professional Applications is a critical element in stabilizing their businesses and is necessary to effect a smooth and orderly transition through chapter 11, preserve value, and facilitate a successful reorganization.  A summary of the relief requested in each of the Professional Applications is set forth below for the Court's ease of reference.  The Debtors respectfully request that such relief be granted.

3.     I am authorized by SCI to submit this Declaration in support of the Debtors' petitions for relief under the Bankruptcy Code and the Professional Applications.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.     Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant Professional Application.

## I.     Summary of  Professional Applications

5.     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the respective application being discussed.

**A.    Application for an Order, Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a), 2016(b) and 5002, and Local Rule 2014, Authorizing Employment and Retention of Milbank, Tweed, Hadley & McCloy LLP as Counsel for the Debtors**

6.     Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rules 2014(a), 2016(b), and 5002, the Debtors seek the Court's approval of the employment of Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), under a general retainer, as their attorneys, to perform the extensive legal services that will be necessary in all phases of the Debtors' chapter 11 cases, in accordance with Milbank's normal hourly rates in effect when services are rendered and normal reimbursement policies.  The Debtors have selected Milbank as their attorneys because of the firm's extensive general experience and knowledge, and, in particular, Milbank's recognized expertise in the fields of gaming law and debtors' protections, creditors' rights and business reorganizations under chapter 11.

7.     Milbank also is familiar with the Debtors' businesses and financial affairs and is well qualified to provide the services required by the Debtors in the Chapter 11 Case. Prior to the Petition Date, the Debtors retained Milbank to advise them on various restructuring matters.  Accordingly, Milbank has represented the Debtors in connection with their restructuring efforts prior to the Petition Date and is familiar with the Debtors, their business operations and their financial condition.  Milbank has worked extensively on the preparation for these chapter 11 cases, including preparing a number of "first-day" pleadings, draft orders, and other documents that have been or will soon be filed in these chapter 11 cases.  Milbank is, therefore, particularly qualified to assist the Debtors in their reorganization efforts.

8.     On February 5, 2009, the Debtors provided Milbank with an advance payment of $1,000,000 to establish a retainer (the "Retainer") to pay for legal services rendered or to be rendered in connection with the Debtors' restructuring efforts.  The Retainer remains unapplied and is held by Milbank according to its standard internal procedures in the same manner as Milbank holds retainers received from each of its other clients.  Milbank intends to hold the Retainer for the duration of the chapter 11 cases and apply the Retainer against fees and expenses allowed after submission of Milbank's final fee application with any balance to be

returned to the Debtors.  In addition to the legal services performed in contemplation of or in connection with the Debtors' restructuring efforts, the legal services performed by Milbank included corporate, real estate, tax and litigation work unrelated to the Debtors' restructuring efforts.

9.    In these Chapter 11 Cases, the Debtors anticipate that Milbank will render general legal services as needed, including as to bankruptcy, financial restructuring, corporate, tax, litigation and securities matters.  Milbank will provide, among others, some or all of the following legal services:

(a)    advise the Debtors of their rights, powers, and duties as debtors and debtors in possession in the continued management of their business and properties;

(b)    assist the Debtors in reviewing and consummating any transactions contemplated during these cases;

(c)    assist the Debtors in reviewing, estimating, and resolving claims asserted against their estates;

(d)    commence and conduct any and all litigation necessary or appropriate to assert rights held by the Debtors or to defend the Debtors, protect assets of their estates, or otherwise further the goal of completing a successful reorganization;

(e)    advise the Debtors concerning actions that they might take to collect and recover property for the benefit of their estates;

(f)    prepare on behalf of the Debtors all necessary and appropriate applications, motions, draft orders, other pleadings, notices, schedules, and other documents, and review all financial and other reports to be filed in the Debtors' chapter 11 cases;

(g)    advise the Debtors concerning, and prepare responses to, applications, motions, other pleadings, notices, and other papers that may be filed and served in the Debtors' chapter 11 cases;

(h)    review the nature and validity of any liens asserted against the Debtors' property and advise the Debtors concerning the enforceability of such liens;

(i)    advise and assist the Debtors in connection with any potential asset dispositions;

> (j)  advise the Debtors concerning executory contract and unexpired lease assumptions, assignments and rejections;
>
> (k)  advise and assist the Debtors in connection with the formulation and confirmation of a plan of reorganization and related documents; and
>
> (l)  perform all other necessary legal services in connection with the Debtors' chapter 11 cases and other general corporate and litigation matters.

10.  The Debtors may, from time to time, request that Milbank undertake specific matters beyond the scope of the responsibilities set forth above.

11.  The Debtors require knowledgeable counsel to render these essential professional services.  Milbank has substantial expertise in each of these areas.  As a result, Milbank is well-qualified to perform these services and represent the Debtors' interests in these Chapter 11 Cases.

12.  Milbank is well suited for the type of representation required by the Debtors.  Milbank is familiar with the Debtors' business operations and capital structure and is therefore able to immediately and knowledgeably assist the Debtors in their reorganization efforts.  To maximize the value of the Debtors' efforts to date, and because of Milbank's expertise in bankruptcy law, the Debtors desire that Milbank represent them in these Chapter 11 Cases.

13.  To the best of the Debtors' knowledge, information and belief, other than as set forth in Milbank's retention application or in the supporting declaration of Paul Aronzon (the "Supporting Declaration"), both filed concurrently herewith, Milbank has no connection with the Debtors, their creditors, the United States Trustee for the District of Nevada, or any other party with an actual or potential interest in the Debtors' Chapter 11 Cases or their attorneys or accountants.

14.  In the last five years, Milbank has represented and advised the Debtors with respect to certain corporate, finance, real estate, tax, litigation and other legal matters.  The nature of these representations is set forth in the Supporting Declaration.

15.     To the best of the Debtors' knowledge, information and belief, based on (and other than as set forth in) the Supporting Declaration, Milbank does not hold or represent any interest adverse to the Debtors' estates.  The Debtors believe that Milbank is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code as modified by section 1107(b) of the Bankruptcy Code, and that the employment of Milbank is necessary and in the best interests of the Debtors, their estates, and their creditors.

16.     I believe that the retention of Milbank as the attorneys for the Debtors is in the best interests of the Debtors, their creditors and all parties in interest.

**B.      Application for an Order, Pursuant to 11 U.S.C. §§ 327(a) and 328(a), and Fed. R. Bankr. P. 2014(a) and 5002, Authorizing Employment and Retention of Lazard Frères & Co. LLC as Financial Advisor and Investment Banker for the Debtors**

17.     Lazard is a financial advisory and investment banking firm focused on providing financial and investment banking advice and transaction execution on behalf of its clients.  Lazard's broad range of corporate advisory services includes services pertaining to: general financial advice; corporate restructurings; domestic and cross-border mergers and acquisitions; divestitures; privatization; special committee assignments; takeover defenses; and strategic partnerships and joint ventures.

18.     The Debtors seek to retain Lazard as their investment banker because, among other things, Lazard and its senior professionals have an excellent reputation for providing high quality financial advisory and investment banking services to debtors and creditors in bankruptcy reorganizations and other debt restructurings, and have extensive knowledge of the Debtors' financial and business operations.

19.     Prior to the Petition Date and pursuant to the Engagement Letter and Indemnification Agreement, the Debtors engaged Lazard to provide advice in connection with the Debtors' attempts to complete a strategic restructuring, reorganization and/or recapitalization and to prepare for the commencement of these cases.  In providing prepetition services to the Debtors in connection with these matters, Lazard's professionals have worked closely with the Debtors' management and other professionals and have become well acquainted with the

Debtors' operations, debt structure, creditors, business and operations and related matters. Accordingly, Lazard has developed significant relevant experience and expertise regarding the Debtors' businesses that will assist it in providing effective and efficient services in these cases. Should the Court approve the Debtors' retention of Lazard as investment banker, Lazard will continue, without interruption, to perform the services for the Debtors as described herein.

20.     In addition to Lazard's understanding of the Debtors' financial history and business operations and the industry in which the Debtors operate, Lazard and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings. Lazard's employees have advised debtors, creditors, equity constituencies and government agencies in many complex financial reorganizations. I am informed that, since 1990, Lazard's professionals have been involved in over 250 restructurings representing over $1 trillion in debtor assets.

21.     The Engagement Letter contemplates that Lazard will provide the following investment banking services to the Debtors in the Chapter 11 Cases:

       (a)    Reviewing and analyzing the Debtors' business, operations and financial projections;

       (b)    Evaluating the Debtors' potential debt capacity in light of its projected cash flows;

       (c)    Assisting in the determination of a capital structure for the Debtors;

       (d)    Assisting in the determination of a range of values for the Debtors on a going concern basis;

       (e)    Advising the Debtors on tactics and strategies for negotiating with the holders of certain existing obligations (the "Stakeholders");

       (f)    Rendering financial advice to the Debtors and participating in meetings or negotiations with Stakeholders and/or rating agencies or other appropriate parties in connection with any restructuring, reorganization and/or recapitalization (as more fully defined in the Engagement Letter, the "Restructuring");

       (g)    Advising the Debtors on the timing, nature and terms of new securities or other consideration to be offered pursuant to the Restructuring;

(h)    Assisting the Debtors in preparing documentation within Lazard's area of expertise that is required in connection with the Restructuring;

(i)    Attending meetings of the Debtors' Board of Directors and its committees with respect to matters on which Lazard has been engaged to advise the Debtors;

(j)    Providing testimony, as necessary, with respect to matters on which Lazard has been engaged to advise the Debtors in any proceeding before the Bankruptcy Court; and

(k)    Providing the Debtors with other financial restructuring advice.

22.    The Debtors require the services of a capable and experienced investment banker in the Chapter 11 Cases.  As noted above, Lazard has substantial expertise in all these areas, and as a result, Lazard is well qualified to perform these services and represent the Debtors' interests in these cases.

23.    The Debtors and Lazard have agreed that the term "Restructuring" (as defined in the Engagement Letter) shall also include any transaction or series of transactions pursuant to which all or a majority of the assets of the Debtors are sold or transferred, directly or indirectly, to one or more other corporations or business entities.

24.    Lazard's willingness to continue with the engagement to advise and assist the Debtors is contingent upon its ability to be retained in accordance with the terms and conditions of the Engagement Letter, including, without limitation, the indemnification and related provisions contained in the Indemnification Agreement, and compensated for its services and reimbursed for the expenses it incurs in accordance therewith.

25.    Except as described below, Lazard intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice of the United States District Court for the District of Nevada, any applicable guidelines established by the United States Trustee for the District of Nevada, and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement

Letter (the "Compensation Structure").  Further, because the Debtors are seeking to compensate Lazard pursuant to section 328(a) of the Bankruptcy Code, the Debtors believe that Lazard's compensation should not be subject to any additional standard of review under section 330 of the Bankruptcy Code.

26.    In summary, the Compensation Structure provides for the following compensation to Lazard, in relevant part:

(a)    A monthly fee of $300,000 (the "Monthly Fee"), payable on the first day of each month of Lazard's engagement until the earlier of the completion of the Restructuring or the termination of Lazard's engagement pursuant to Section 10 of the Engagement Letter.

(b)    A fee equal to $12,500,000 payable upon the consummation of a Restructuring (the "Restructuring Fee").

(c)    All Prior Agreement Fees (as defined in Section 15 of the Engagement Letter) shall be credited (without duplication) against any Restructuring Fee otherwise payable; provided, that, in the event of a Chapter 11 filing, the credit shall only apply to the extent that such fees are approved in entirety by the Bankruptcy Court, if applicable.

(d)    In addition to any fees that may be payable to Lazard and, regardless of whether any transaction occurs, the Debtors shall promptly reimburse Lazard for all: (i) reasonable expenses (including travel and lodging, data processing and communications charges, courier services and other appropriate expenditures); and (ii) other reasonable fees and expenses, including expenses of counsel, if any.

(e)    As part of the compensation payable to Lazard, the Debtors have agreed to the provisions of the Indemnification Agreement.

27.    For the avoidance of any doubt, the Compensation Structure provides that more than one fee may be payable pursuant to the terms of the Engagement Letter as described more fully therein.  None of the fees payable to Lazard pursuant to the Engagement Letter shall constitute a "bonus" or "fee enhancement" under applicable law.

28.    Prior to the Petition Date, Lazard received approximately $3,066,421.73 from the Debtors in full payment of accrued fees and expenses under the Engagement Letter and the Prior Engagement Letter.  The Debtors have agreed that they will not seek to avoid,

recharacterize, recover or subordinate pursuant to the Bankruptcy Code or any applicable nonbankruptcy law, any portion of these fees, or any portion of any other amounts paid by the Debtors pursuant to the Engagement Letter, or the Prior Agreement Fees.  Lazard has received no other compensation from the Debtors in connection with these chapter 11 cases.

29.     As Lazard does not customarily maintain detailed time records similar to those customarily maintained by attorneys, and because Lazard's services would not be compensated by reference to the number of hours and the Engagement Letter provides that Lazard shall receive, among other things, certain fixed fees as described above, the Debtors request that Lazard shall be required to maintain time records for services rendered for the Debtors in one-half hour time increments only.

30.     The  Debtors believe the Compensation Structure is reasonable and comparable to compensation generally charged by investment banking firms of similar stature to Lazard and for comparable engagements, both in and out of bankruptcy proceedings, and reflect a balance between a fixed, monthly fee, and a deferred amount which is tied to the consummation and closing of the transactions and services contemplated by the Debtors and Lazard in the Engagement Letter.  The hours worked, the results achieved, and the ultimate benefit to the Debtors for the work performed by Lazard in connection with its engagement may vary and the Debtors and Lazard have taken this into account in setting the above fees.  The Compensation Structure was established to reflect the difficulty of the challenging nature of the engagement.  Further, the Compensation Structure is consistent with Lazard's normal and customary billing practices for cases of this size and complexity both in and out of bankruptcy proceedings which require the level of services to be provided.  Lazard's restructuring capabilities, mergers and acquisitions expertise as well as its financing skills, some or all of which may be required by the Debtors during the term of Lazard's engagement hereunder, were important factors to the Debtors in determining the Compensation Structure.  The Debtors believe that the ultimate benefit of Lazard's services hereunder cannot be measured by reference to the number of hours expended by Lazard's professionals in the performance of such services.

Accordingly, Lazard and the Debtors believe the Compensation Structure is both reasonable and market-based.

31.    As part of the overall compensation payable to Lazard under the terms of the Engagement Letter, the Debtors have agreed, among other things, to indemnify, and provide contribution and reimbursement to, Lazard and certain related parties in accordance with the provisions of the Indemnification Agreement.  The Debtors believe such provisions are customary and reasonable for Lazard's engagement.  Unlike the market for other professionals that the Debtors may retain, such provisions are standard terms of the market for financial advisors and investment bankers.  Lazard and the Debtors believe that such provisions are comparable to those generally obtained by investment banking and financial advisory firms of similar stature to Lazard and for comparable engagements, both in and out of court.

32.    To the best of the Debtors' knowledge, information and belief:  Lazard is a "disinterested person" within the meaning of section 101 (4) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code and modified by sections 328(c) and 1107(b) of the Bankruptcy Code and holds no interest adverse to the Debtors and their estates for the matters for which Lazard is to be employed.  Lazard has reviewed its databases and, as further described in the Aronson Declaration, provided disclosure regarding engagements it may have had with potential parties in interest, which engagements regard matters that are unrelated to the Debtors or these cases.  To the extent that Lazard discovers any additional material relationships bearing on the matters described in the Aronson Declaration during the period of Lazard's retention, Lazard will use reasonable efforts to supplement the information provided in the Aronson Declaration.

33.    The Debtors submit that the terms and conditions of Lazard's retention appropriately reflect the nature of the services to be provided by Lazard and are consistent with the fee structures and terms and conditions typically used by leading financial advisors and investment banking firms that do not bill their clients on an hourly basis.

34.    I believe the employment of Lazard would be in the best interests of the Debtors, their bankruptcy estates and their creditors.

**C.**    **Application For an Order, Pursuant to 11. U.S.C. § 327(e), Fed. R. Bankr. P. 2014(a), 2016(b) and 6003, and Local Rule 2014, Authorizing Employment and Retention of Squire, Sanders & Dempsey LLP As Special Counsel to the Special Litigation Committee of the Board of Directors of Station Casinos, Inc.**

35.    The Special Litigation Committee of the Board of Directors of SCI (the "Special Litigation Committee") was formed by SCI's Board of Directors on March 31, 2009 to independently investigate and take any actions it is authorized to take with respect to any potential claims, including derivative claims of SCI, arising out of the acquisition in 2007 of SCI by Fertitta Colony Partners LLC, Fertitta Partners, LLC and FCP Vote Co, LLC.  On April 10, 2009, Squire, Sanders & Dempsey, LLP ("Squire Sanders") was retained by the Special Litigation Committee to render all necessary legal services to the Special Litigation Committee that it may require in conducting its in independent investigation.  The Debtors propose to continue the retention of Squire Sanders to render all necessary legal services to the Special Litigation Committee that it may require in conducting its in independent investigation during these Chapter 11 Cases, and have accordingly submitted the Application For an Order, Pursuant to 11. U.S.C. § 327(e), Fed. R. Bankr. P. 2014(a), 2016(b) and 6003, and Local Rule 2014, Authorizing Employment and Retention of Squire, Sanders & Dempsey LLP As Special Counsel to the Special Litigation Committee of the Board of Directors of Station Casinos, Inc. (the "Squire Sanders Application").  In support of  the Squire Sanders Application, Squire Sanders has submitted the Verified Statement of Stephen D. Lerner in Support of Application for an Order Authorizing Employment and Retention of Squire, Sanders & Dempsey LLP as Special Counsel to the Special Litigation Committee of Station Casinos, Inc. (the "Lerner Statement") concurrently herewith.

36.    Squire Sanders has the necessary background to deal effectively with the full range of potential legal issues that will be confronted and addressed by the Special Litigation Committee in the context of these Chapter 11 Cases as well as the services that Squire Sanders has been retained to provide.

37.    To the best of the Debtors' knowledge, information and belief, based on and other than as set forth in the Lerner Statement, Squire Sanders does not hold or represent an

interest adverse to the Debtors' estates and is a "disinterested person," as that term is defined in Bankruptcy Code § 101(14) and modified by Bankruptcy Code § 1107(b), with respect to the matters for which it is to be retained. To the best of the Debtors' knowledge, information, and belief, based on and other than as stated in the Lerner Statement, the partners, counsel, and associates of Squire Sanders do not have any connection with the Debtors or their affiliates, their creditors, their estates, any United States District Judge or United States Bankruptcy Judge for the District of Nevada, the United States Trustee or any person employed in the office of the United States Trustee for Region 17, or any other party in interest, or their respective attorneys and accountants.

38.    To the best of the Debtors' knowledge, information, and belief, based on and other than as set forth in the Lerner Statement, the disclosure made by Squire Sanders in the Lerner Statement (regarding connections with the Debtors, their creditors, any other parties in interest in these cases, their respective attorneys and accountants, any United States District Judge or United States Bankruptcy Judge for the District of Nevada, the United States Trustee or any person employed in the office of the United States Trustee for Region 17) satisfies the requirements of Bankruptcy Rule 2014.

39.    The Debtors respectfully submit that their fee arrangement with Squire Sanders, as set forth above, is similar to fee arrangements that have been authorized in other Chapter 11 Cases in which Squire Sanders has rendered services, is reasonable in light of industry practice, is similar to market rates both in and out of chapter 11 proceedings, is reasonable in light of Squire Sanders' experience in reorganizations, and the claims and legal issues being received by the Special Litigation Committee and is reasonable in light of the scope of the work to be performed pursuant to its retention. The Debtors believe that, given the nature of the services to be provided to the Special Litigation Committee, the fee structure is both fair and reasonable.

40.    The Debtors believe that Squire Sanders is both well qualified and uniquely able to represent the Special Litigation Committee effectively and efficiently in these

Chapter 11 Cases.  The resources, capabilities and experience of Squire Sanders in advising the Special Litigation Committee are crucial to the Debtors' successful restructuring.

41.    I believe that the retention of Squire Sanders is in the best interest of the Debtors, their estates, creditors and other parties-in-interest.

**D.    Application for an Order, Pursuant to 11 U.S.C. § 327(e), Fed. R. Bankr. P. 2014(a), 2016(b) and 6003, and Local Rule 2014, Authorizing Employment and Retention of Odyssey Capital Group, LLC as Financial Advisor and Investment Banker to the Special Litigation Committee of the Board of Directors of Station Casinos, Inc.**

42.    Odyssey is a financial-advisory firm based in Phoenix, Arizona with a national practice in providing financial-advisory and other related services in complex and distressed situations.  Odyssey has focused on financial restructurings, complex/distressed mergers and acquisitions, and financings in connection with financial restructurings, together with matters requiring opinions and expert witness testimony.  Odyssey's professionals have previously provided advisory services in some of the most complex restructuring matters, including Chapter 11 proceedings.

43.    Odyssey also has obtained a detailed familiarity with the Debtors' business, capital structure, and financial affairs through its pre-petition services rendered to the Debtors.  The Debtors engaged Odyssey pursuant to an engagement letter dated April 10, 2009 (the "Engagement Agreement") to report to legal counsel for the Special Litigation Committee with respect to an independent investigation of potential claims against the Debtors arising out of the acquisition in 2007 of SCI by Fertitta Colony Partners LLC, Fertitta Partners, LLC and FCP Vote Co, LLC (the "Transaction").

44.    Accordingly, Odyssey and the professionals it employs are well-qualified to represent the Special Litigation Committee in the matters for which Odyssey is proposed to remain employed.

45.    The Special Litigation Committee was formed by SCI's Board of Directors to independently investigate and take any actions it is authorized to take with respect to any potential claims, including derivative claims of SCI, arising out of the acquisition in 2007 of SCI by Fertitta Colony Partners LLC, Fertitta Partners, LLC and FCP Vote Co, LLC.  In this

regard, the Debtors propose to continue the retention of Odyssey to render all necessary financial

advisor and investment banker services to the Special Litigation Committee and its legal counsel

may be required in conducting such independent investigation, including, but not limited to:

(a) reviewing and analyzing the financial analysis performed by SCI's financial advisors with respect to the Transaction to determine if it was reasonable;

(b) reviewing and analyzing SCI's solvency, on a going concern basis, at the time of and following the Transaction;

(c) conducting interviews with management with respect to (a) and (b) above;

(d) attending meetings of the Special Litigation Committee;

(e) providing testimony, as necessary, with respect to matters which it has been engaged to advise the Special Litigation Committee on in any proceeding before the Bankruptcy Court;

(f) being available to the Special Litigation Committee and its legal counsel to assist them regarding the services to be provided in this paragraph; and

(g) any other services requested by the Special Litigation Committee or its legal counsel.

46.      Odyssey has stated its willingness to act in these Chapter 11 Cases and to

continue to render the necessary professional services as financial advisors and investment

bankers for the Special Litigation Committee.

47.      To the best of the Debtors' knowledge, information and belief, based on

and other than as set forth in the Taylor Statement, Odyssey does not hold or represent an interest

adverse to the Debtors' estates and is a "disinterested person," as that term is defined in

Bankruptcy Code § 101(14) and modified by Bankruptcy Code § 1107(b), with respect to the

matters for which it is to be retained.  To the best of the Debtors' knowledge, information, and

belief, based on and other than as stated in the Taylor Statement, the professionals at Odyssey do

not have any connection with the Debtors or their affiliates, their creditors, their estates, any

United States District Judge or United States Bankruptcy Judge for the District of Nevada, the

United States Trustee or any person employed in the office of the United States Trustee for Region 17, or any other party in interest, or their respective attorneys and accountants.

48.     To the best of the Debtors' knowledge, information, and belief, based on and other than as set forth in the Taylor Statement, the disclosure made by Odyssey in the Taylor Statement (regarding connections with the Debtors, their creditors, any other parties in interest in these cases, their respective attorneys and accountants, any United States District Judge or United States Bankruptcy Judge for the District of Nevada, the United States Trustee or any person employed in the office of the United States Trustee for Region 17) satisfies the requirements of Bankruptcy Rule 2014.

49.     The Debtors, through the Special Litigation Committee, seek to retain and employ Odyssey on an hourly basis at rates consistent with those Odyssey routinely charges in comparable matters.

50.     On or around April 10, 2009, in accordance with Odyssey's engagement by the Debtors before the Petition Date and pursuant to the Engagement Agreement, Odyssey requested and received a payment in the amount of $125,000 for professional services rendered and to be rendered and charges and disbursements incurred by Odyssey in connection with such services, which amount was deemed earned upon receipt.  In addition, pursuant to the Engagement Agreement Odyssey requested and received a retainer in the amount of $125,000 for professional services rendered and to be rendered and charges and disbursements incurred by Odyssey in connection with the services to be performed following the Petition Date (the "Retainer").  Odyssey periodically invoiced the Debtors for services rendered in the ordinary course of business before the Petition Date, and such invoices were promptly paid.

51.     As of the Petition Date, Odyssey had been compensated for all known fees and reimbursed for all known expenses incurred before the Petition Date.  The entire Retainer remained unapplied as of the Petition Date.  Odyssey reserves the right to apply certain amounts of the Retainer to fees and expenses accrued before the Petition Date but not discovered or otherwise accounted for until after the Petition Date.  Odyssey will retain all remaining amounts

of the Retainer in trust during the pendency of these Chapter 11 Cases to be applied to any professional fees, charges and disbursements that remain unpaid at the end of these cases.

52.     Aside from the Retainer, within one year before the Petition Date, Odyssey received $789,936 on account of its pre-petition services to the Debtors.

53.     The Debtors respectfully submit that their fee arrangement with Odyssey, as set forth above and in the Engagement Agreement, is similar to fee arrangements that have been authorized in other Chapter 11 cases in which Odyssey has rendered services, is reasonable in light of industry practice, is similar to market rates both in and out of Chapter 11 proceedings, is reasonable in light of Odyssey's experience in reorganizations, and is reasonable in light of the scope of the work to be performed pursuant to its retention.  The Debtors believe that, given the nature of the services to be provided to the Special Litigation Committee, the fee structure is both fair and reasonable.

54.     The Debtors believe that Odyssey is both well qualified and uniquely able to represent the Special Litigation Committee effectively and efficiently in these Chapter 11 Cases.  The resources, capabilities and experience of Odyssey in advising the Special Litigation Committee are crucial to the Debtors' successful restructuring.  As such, the Debtors believe that the retention of Odyssey is in the best interest of the Debtors, their estates, creditors and other parties-in-interest.

55.     I believe the employment of Odyssey would be in the best interests of the Debtors, their bankruptcy estates and their creditors.

**E.     Application for an Order, Pursuant to 11 U.S.C. § 327(e), Fed. R. Bankr. P. 2014(a), 2016(b) and 5002, and Local Rule 2014, Authorizing Employment and Retention of Gibson, Dunn & Crutcher LLP as Special Counsel for Certain of the Debtors (CMBS Debtors).**

56.     Pursuant to each of their respective operating agreements, each of the CMBS Debtors are "special purpose" entities that are required to maintain their respective separateness and independence from each other and the balance of the Debtors herein.  To achieve such status, the respective Operating Agreement of each of the CMBS Debtors establishes a Board of Directors of three (3) members and expressly mandates that two (2) of

such Directors be "Independent Directors" as defined in each such operating agreement. One key requirement of an Independent Director is that he or she not be a member, manager, officer or employee of any "Affiliate" of any of the other Debtors herein. The operating agreements also obligate each of the CMBS Debtors to "maintain an arm's length relationship with any Affiliate."

57.     Since the current cases involve both the CMBS Debtors and other Affiliated Debtors, two sets of counsel are required for each CMBS Debtor to insure that each of the CMBS Debtors operates within the limited scope of its authority by faithfully observing at all times each of the requirements imposed upon the CMBS Debtors within their respective operating agreements. To do so in the context of these chapter 11 cases, the CMBS Debtors anticipate that Gibson, Dunn & Crutcher LLP ("GD&C") will monitor the status of the cases as they relate to the CMBS Debtors and, to the extent that the interests of any CMBS Debtor, on the one hand and SCI, or any of the other affiliated debtors on the other hand, are determined to be in actual or potential conflict or may raise issues as to independence and separateness of the CMBS Debtors by either the CMBS Debtors or a majority of the Board of Directors of the CMBS Debtors (which has authority to make all decisions where such an actual or potential conflict or issue as to independence and separateness of the CMBS Debtors is determined to exist), GD&C will provide general legal services, as needed, arising from any matters where such a conflict or a potential conflict of interest or issue as to independence and separateness of the CMBS Debtors may exist (as determined by a majority of the members of the Board of Directors of the CMBS Debtors) including with regard to bankruptcy, financial restructuring, corporate, tax and litigation matters, in order to insure that the CMBS Debtors are, and at all times, remain, independent from SCI (or any of the other affiliated debtors) as mandated by the respective operating agreements of each of the CMBS Debtors and to insure that the CMBS Debtors are obtaining independent advice in these chapter 11 cases. GD&C as special counsel will provide legal advice and perform legal services with respect to:

(a)     Board of Directors matters and determinations;

(b)    the Master Lease and, in particular, represent the separate and independent interests of the CMBS Debtors therein;

(c)    advice with respect to the corporate implementation of any restructuring, including the documentation related thereto; and

(d)    general corporate matters.

58.    GD&C will perform the foregoing services, and other similar services, as requested from time to time by the CMBS Debtors. Further, the services rendered and functions to be performed by GD&C will not be duplicative of work performed by any other law firms retained by the CMBS Debtors.

59.    The CMBS Debtors require knowledgeable counsel to render these essential professional services. As described below, GD&C has substantial expertise in each of these areas. As a result, GD&C is well-qualified to perform these services and represent the CMBS Debtors' interests in these chapter 11 cases. Subject to the Court's approval of the Application, GD&C is willing to serve as the CMBS Debtors' special counsel and to perform the services described above.

60.    Prior to the Petition Date, the CMBS Debtors retained GD&C to advise them on various restructuring and general corporate matters. Accordingly, GD&C has represented the CMBS Debtors in connection with their restructuring efforts prior to the Petition Date and is familiar with the CMBS Debtors, their business operations and their financial condition. GD&C is, therefore, particularly qualified to assist the CMBS Debtors in their reorganization efforts.

61.    GD&C is well suited for the type of representation required by the CMBS Debtors. GD&C employs approximately 1,000 lawyers in 15 offices in major cities throughout the United States, Europe, the Middle East and Asia. Its attorneys provide services in numerous practice areas including financial restructuring and sophisticated real estate transactions (including CMBS type financings). The CMBS Debtors have primarily received legal assistance from attorneys working in GD&C's Los Angeles, California and Irvine, California offices.

62.    GD&C is familiar with the CMBS Debtors' business operations, capital structure and, importantly, the Master Lease. GD&C is, therefore, able to immediately and

-19-

knowledgeably assist the CMBS Debtors in their reorganization efforts. To maximize the value of the CMBS Debtors' efforts to date, and because of GD&C's expertise in numerous practice areas, the CMBS Debtors desire that GD&C represent them as special counsel in these chapter 11 cases.

63.    To the CMBS Debtors' knowledge, information and belief, after due inquiry, other than as set forth herein or in the Supporting Declaration, GD&C has no connection with, or any interest adverse to, the CMBS Debtors, their creditors, the United States Trustee for the District of Nevada, or any other party with an actual or potential interest in the CMBS Debtors' chapter 11 cases or their attorneys or accountants, with respect to the matters on which GD&C is to be retained or employed in these chapter 11 cases. As set forth in Exhibit "B" appended to the Supporting Declaration, GD&C currently represents or has recently represented the parties in interest described therein in matters wholly unrelated to the matters for which GD&C is to be retained or employed in these chapter 11 cases. Accordingly, such representations are not disqualifying.

64.    In the last four (4) months, GD&C has represented and advised the CMBS Debtors with respect to certain Board of Directors matters, corporate, finance, real estate, potential litigation and other legal matters.

65.    Additionally, GD&C does not have any connection with the United States Trustee or any persons employed in the office of the United States Trustee.

66.    To the CMBS Debtors' knowledge, after due inquiry, GD&C does not hold or represent any interest that would impair GD&C's ability to objectively perform the services contemplated herein.

67.    GD&C has performed certain prepetition legal services on behalf of CMBS Debtors in connection with the preparation of the chapter 11 cases.

68.    I believe the employment of GD&C would be in the best interests of the Debtors, their bankruptcy estates and their creditors.

**F.    Application for an Order Approving the Employment of FTI Consulting as Financial Advisors for Certain of the Debtors (CMBS Debtors)**

69.    FTI Consulting, Inc. ("FTI") is a leading global business advisory firm with over 50 offices worldwide and more than 3,000 professionals.  FTI's corporate finance/restructuring segment, which has more than 500 professionals, is one of the leading advisors to companies, directors, creditors, acquirers, and other parties-in-interest involved in financially troubled companies both in and outside of bankruptcy.

70.    FTI commenced its engagement with the CMBS Debtors on July 13, 2009 pursuant to an engagement letter (the "Engagement Letter"), a true and correct copy of which is attached to the Greenspan Declaration as Exhibit 1.  Pursuant to the Engagement Letter, Gibson, Dunn & Crutcher LLP ("GD&C"), proposed special counsel to the CMBS Debtors, retained FTI on behalf of the CMBS Debtors to provide financial advisory and consulting services arising from any matters where the interests of any CMBS Debtor, on the one hand and SCI, or any of the other affiliated debtors on the other hand, are determined to be in actual or potential conflict by either the CMBS Debtors or a majority of the Board of Directors of the CMBS Debtors (which has authority to make all decisions where such an actual or potential conflict is determined to exist), in order to insure that the CMBS Debtors are, and at all times, remain, independent from SCI (or any of the other affiliated debtors) as mandated by the respective operating agreements of each of the CMBS Debtors and to insure that the CMBS Debtors are obtaining independent advice in these chapter 11 cases.  The CMBS Debtors and FTI have worked closely with respect to the matters set forth in the Engagement Letter.  FTI has assisted the CMBS Debtors in the financial aspects of their restructuring efforts and in the CMBS Debtors' preparation of these bankruptcy cases.

71.    The CMBS Debtors are familiar with the professional standing and reputation of FTI.  Indeed, the consideration of this professional standing and reputation was a critical element in the decision to retain FTI.  Among other things, the CMBS Debtors understand that FTI has a wealth of experience in providing financial advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered

in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

72.    Since the time FTI was first engaged on behalf of the CMBS Debtors, FTI has developed a great deal of institutional knowledge regarding the CMBS Debtors' operations, finances, systems and the relationship between FCP PropCo and SCI under the Master Lease. The CMBS Debtors believe that this institutional experience and knowledge will be valuable to the CMBS Debtors in their efforts to reorganize and will reduce the cost of administration of their estates. Accordingly, the CMBS Debtors wish to retain FTI to provide assistance during these bankruptcy cases pursuant to the terms of the Engagement Letter.

73.    The CMBS Debtors believe that FTI is well qualified and able to represent the CMBS Debtors in a cost-effective, efficient and timely manner. FTI is currently heavily involved in many of the Debtors' critical activities, such as analysis of the business plan, projections and other forecasts prepared by or on behalf of the CMBS Debtors, analysis of the assets, liabilities and financial statements of the CMBS Debtors, and assistance evaluating various resolutions that may be brought before the Boards of Directors of the CMBS Debtors.

74.    Pursuant to the terms of the Engagement Letter, FTI will provide such consulting and advisory services as FTI and the CMBS Debtors deem appropriate and feasible in order to insure that the CMBS Debtors are, and at all times, remain, independent from SCI (or any of the other affiliated debtors) as mandated by the respective operating agreements of each of the CMBS Debtors and to insure that the CMBS Debtors are obtaining independent advice in these chapter 11 cases. FTI has requested that it be engaged under a general retainer. The CMBS Debtors believe that FTI should be employed under a general retainer because of the variety and complexity of the services that will be required during these proceedings. Specifically, FTI will render various services to the CMBS Debtors with respect to matters where the interests of any CMBS Debtor, on the one hand and SCI, or any of the other affiliated debtors on the other hand, are determined to be in actual or potential conflict by either the CMBS Debtors or a majority of the Board of Directors of the CMBS Debtors (which has authority to

make all decisions where such an actual or potential conflict is determined to exist) including, but not limited to, the following:

> (a)    analysis of the business plan, projections and other forecasts prepared by or on behalf of the CMBS Debtors;
>
> (b)    analysis of the assets, liabilities and financial statements of the CMBS Debtors;
>
> (c)    assistance evaluating various resolutions that may be brought before the Boards of Directors of the CMBS Debtors; and
>
> (d)    such other work as may be requested by the CMBS Debtors and agreed to by FTI.

75.    FTI has performed certain pre-petition financial advisor services on behalf of CMBS Debtors in connection with the preparation of the chapter 11 cases.

76.    To the CMBS Debtors' knowledge, information and belief, after due inquiry, other than in connection with these bankruptcy cases and except as may be set forth herein or in the Greenspan Declaration, FTI (i) has no connection with the CMBS Debtors, their creditors or other parties in interest in this case; (ii) does not hold any interest adverse to the CMBS Debtors' estates; and (iii) believes it is a "disinterested person" pursuant to Bankruptcy Code section 101(14).

77.    FTI's professionals conducted a review of its professional contacts with the CMBS Debtors, their affiliates, and other parties in interest that were reasonably known to FTI.  This review consisted of queries of an internal computer database containing names of individuals and entities that are present or recent former clients of FTI in order to identify potential relationships.  FTI's search included the following types of entities: the Debtors, the Debtors' affiliates, bank lenders, indentured trustees, noteholders, significant shareholders, directors and officers, significant vendors and suppliers, parties to significant contracts, dealers, litigation parties, banks, attorneys and professionals. A listing of the parties reviewed is attached as Exhibit 2 to the Greenspan Declaration.  A summary of such relationships that FTI identified during this process is set forth on Exhibit 3 to the Greenspan Declaration.

78.     As set forth in <u>Exhibit 3</u> appended to the Greenspan Declaration, FTI is or has been involved in engagements involving the parties in interest described therein in matters unrelated to the matters for which FTI is to be retained or employed in these chapter 11 cases. As further discussed in the Greenspan Declaration, as one of the largest providers of financial advisory and restructuring services, FTI has had and currently has engagements involving most major financial institutions and many other entities.

79.     FTI has determined that neither FTI, nor its professionals or staff, is connected with the CMBS Debtors, their creditors, other parties in interest or the United States Trustee for the District of Nevada or any person employed by the Office of the U. S. Trustee, and FTI does not, by reason of any direct or indirect relationship to, connection with or interest in the CMBS Debtors or other parties in interest, hold or represent any interest adverse to the CMBS Debtors, their estate or any class of creditors or equity holders with respect to the matters upon which it is to be engaged, except as set forth herein. If any new relevant facts or relationships are discovered or arise, FTI will promptly file a supplemental declaration pursuant to Bankruptcy Rule 2014(a).

80.     As part of its diverse practice, FTI appears in numerous cases, proceedings and transactions that involve many different professionals, including attorneys, accountants and financial consultants, who may represent claimants and parties-in-interest in the CMBS Debtors' chapter 11 cases. Also, FTI has performed in the past, and may perform in the future, advisory consulting services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these cases. In addition, FTI has in the past, may currently and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to the CMBS Debtors and these cases. Based on the CMBS Debtors' current knowledge of the professionals involved, and to the CMBS Debtors' knowledge, after due inquiry, none of these relationships create interests materially adverse to the CMBS Debtors in matters upon which FTI is to be employed.

81.     After FTI's reconciliation of the pre-petition payments and the completion of necessary adjustments to the amount of the outstanding On-Account Cash for the final pre-

petition services rendered, the CMBS Debtors believe that FTI is not owed any amounts with respect to its pre-petition fees and expenses.

82.    I believe the employment of FTI would be in the best interests of the Debtors, their bankruptcy estates and their creditors.

**G.    Application For an Order Pursuant To 11 U.S.C. §§ 327(a) And Fed. R. Bankr. P. 2014(a) And 5002 Authorizing the Employment And Retention of FTI Consulting, Inc. As Financial Advisors to the Debtors And Debtors In Possession**

83.    The Debtors are familiar with the professional standing and reputation of FTI Consulting, Inc., together with its wholly owned subsidiaries, agents and independent contractors and employees (collectively "FTI"). The Debtors understand that FTI has a wealth of experience in providing financial advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

84.    On August 11, 2009, FTI was engaged to provide financial advisory services to the Debtors.  Since this time, FTI has developed a great deal of institutional knowledge regarding the Debtors' operations, finance and systems.  Such experience and knowledge will be valuable to the Debtors in their efforts to reorganize.  Accordingly, the Debtors wish to retain FTI to provide assistance during this case.

85.    The services of FTI are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.  Further, FTI is well qualified and able to represent the Debtors in a cost-effective, efficient and timely manner.

86.    FTI will provide such consulting and advisory services as FTI and the Debtors deem appropriate and feasible in order to advise the Debtors in the course of these chapter 11 cases, including but not limited to the following:

(a)    Assistance with various accounting and financial matters related to the chapter 11 proceedings, including preparing the Statement of Financial Affairs, Schedules of Assets and Liabilities, and Monthly Operating Reports, and other compliance-related documents to meet the needs of the U.S. Trustee and the Bankruptcy Court; and

       (b)     Such other assistance as the Debtors may request and FTI agrees to perform.

87.     FTI has informed the Debtors that, except as may be set forth in the Affidavit of M. Freddie Reiss (The "Reiss Affidavit"), it (i) has no connection with the Debtors, its creditors or other parties in interest in this case, (ii) does not hold any interest adverse to the Debtors' estates, and (iii) believes it is a "disinterested person" as defined within Section 101(14) of the Bankruptcy Code.

88.     I understand that FTI is acting as financial advisor to the CMBS Debtors, but I believe that it is in the best interests of the Debtors, their bankruptcy estates and their creditors if a separate team from FTI is allowed to provide the general consulting services outlined above to the Debtors.

## II.    Conclusion

89.     I believe that the requested relief is in the best interests of the Debtors, their creditors and all other parties in interest.

90.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

91.     Accordingly, I respectfully request that the Court grant all of the relief requested in the Professional Applications and such other and further relief as may be just.

[Signature Appears on Following Page]

1

Dated: August 13, 2009
          Las Vegas, Nevada

2

3

4                                                    By:  _____/s_____

                                                     Thomas M. Friel, Executive Vice President,
5                                                    Chief Accounting Officer and Treasurer
                                                     Station Casinos, Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28