1
2
3
4

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:     (213) 892-4000
Facsimile:      (213) 629-5063

5
6

Reorganization Counsel for
Debtors and Debtors in Possession

7
8
9

Dennis B. Arnold (CA State Bar No. 70022)
Oscar Garza (CA State Bar No. 149790)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
Telephone:     (213) 229-7000
Facsimile:      (213) 229-7520

10
11

Reorganization Counsel for FCP PropCo, LLC as
Debtor and Debtor in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:     (775) 823-2900
Facsimile:      (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

12
13

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA**

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In re:

STATION CASINOS, INC.

☒ Affects this Debtor
☐ Affects all Debtors
☐ Affects Northern NV Acquisitions, LLC
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☒ Affects FCP PropCo, LLC

Chapter 11

Case No. BK-09-52477
Jointly Administered
BK 09-52470 through BK 09-52487

**JOINT MOTION OF STATION CASINOS, INC. AND FCP PROPCO, LLC PURSUANT TO 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) AND 365(d)(4)(B)(ii) AND FED. R. BANKR. 9019 FOR ENTRY OF AN ORDER APPROVING MASTER LEASE COMPROMISE AGREEMENT**

**[Order Shortening Time Requested]**

#4848-0278-1445v1

TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE,

OFFICE OF THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:

        Station Casinos, Inc. ("SCI") and FCP PropCo LLC ("PropCo", and together with SCI, the "Parties" or the "Debtors") submit this motion (the "Motion") pursuant to sections 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an order approving the Master Lease Compromise Agreement between SCI and PropCo (the "Compromise Agreement")[1] and authorizing SCI and PropCo to abide by the terms of the Compromise Agreement and perform their respective obligations thereunder.  The terms of the Compromise Agreement, as well as the factual background and process by which SCI and PropCo arrived at the Compromise Agreement, are summarized below.  In addition, concurrently herewith and in support of the Motion, PropCo has submitted the Declaration of Robert Kors (the "Kors Declaration") and SCI has submitted the Declaration of Richard Haskins (the "Haskins Declaration").  In support of the Motion, the Parties respectfully represent as follows:

## I.    **Jurisdiction.**

    1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## II.    **Statutory Basis For Relief Requested.**

    2.    The statutory bases for the relief requested in the Motion are contained in Bankruptcy Code sections 105(a), 363(b)(1), 365(d)(3), and 365(d)(4)(B)(ii).  In addition, the Compromise Agreement constitutes a proposed compromise or settlement under Bankruptcy Rule 9019(a).

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Compromise Agreement, a copy of which is attached to the Appendix of Exhibits filed concurrently herewith as Exhibit A.

### III.    The Master Lease: Summary of the Dispute and the Terms of the Compromise.

#### a.    Background Regarding The Master Lease.

3.    As described in more detail in section IV below, PropCo, as lessor, and SCI, as tenant, are parties to a Master Lease under which SCI leases from PropCo the real property and improvements associated with Boulder Station Hotel & Casino, Red Rock Casino Resort Spa, Palace Station Hotel & Casino and Sunset Station Hotel & Casino (collectively, the "Leased Hotels"). The Leased Hotels, in turn, are operated by SCI and certain of its non-debtor operating subsidiaries (defined below as the Operating Subsidiaries).

4.    The Master Lease provides for monthly rental payments from SCI to PropCo in amounts that greatly exceed the amounts that PropCo requires to meet its ordinary debt service obligations and any other expenses not covered by SCI under the "triple net" provisions in the Master Lease. Subject to certain conditions, the governing credit documents permitted some of that surplus cash to be upstreamed as dividends to the mezzanine entities that own equity up the PropCo "stack" to service their debt, with additional amounts then ultimately "flowing back" to SCI as the ultimate parent entity.

5.    Due to the severe recession and its impact on the Las Vegas economy the financial performance of the Leased Hotels (as measured by certain specified financial metrics) deteriorated to the point that the amount of the surplus cash that was paid "up" through the PropCo stack and ultimately "flowed back" to SCI was restricted. Upon the event of default that was triggered when these chapter 11 cases were filed, the rights of the mezzanine lenders to any dividends, as well as the rights of SCI to any "flow back", were cut off altogether, resulting in all of the surplus cash being "trapped" at PropCo.

6.    After these Cases were filed, the Debtors requested and obtained Court approval of consensual cash collateral arrangements that authorized: (a) SCI to continue to make rent payments to PropCo due under the Master Lease, subject to "rolling" budget approval by the Prepetition Lenders (as defined below); and (b) PropCo to continue to service its mortgage debt (as adequate protection for its Mortgage Lenders (as defined below)), to pay certain other expenses and to otherwise accumulate the "trapped" cash in accounts pledged to the Mortgage

1   Lenders, also subject to "rolling" budget approval by the Mortgage Lenders.

2                7.    Notwithstanding the Court's approval of the cash collateral arrangements,

3   the issues surrounding the Master Lease and the resulting flow of funds from SCI to PropCo

4   have continued to be a point of contention for all of the major stakeholders in these cases.  In

5   connection with the cash collateral hearings, both the Official Committee of Unsecured Creditors

6   and the so-called Independent Lenders raised strenuous objections to the "cash trap" and the

7   resulting loss of "flow back" to SCI.  In addition, the Independent Lenders filed a motion seeking

8   appointment of an examiner to investigate, among other things, the workings of the Master Lease

9   and the propriety of any ongoing rental payments thereunder.  In addition, the Debtors repeatedly

10  have acknowledged that the Master Lease arrangements and the issues arising therefrom are

11  extremely important pieces of the puzzle that must be addressed in the context of any overall

12  restructuring of the Debtors.[2]

13               8.    The need to address the Master Lease issues became even more acute in

14  the middle of October, when SCI's Prepetition Lenders advised SCI that the Prepetition Lenders

15  would not approve a cash collateral budget that provided for the payment of rent under the

16  Master Lease beginning in December of 2009.

17               9.    The Master Lease, and the payment of rent thereunder, has also been the

18  focus of PropCo's Mortgage Lenders, who repeatedly have asserted that the relationship between

19  PropCo and SCI was contractually structured as a lessor/lessee relationship and that SCI was

20  facing a Hobson's choice, because of the "cum onere" rule, in December whereby SCI would be

21  forced to decide to either pay the full amount of the scheduled rent under the Master Lease or

22  reject the Master Lease in its entirety.

23               10.   SCI thus was faced with three potential alternatives to consider: (a)

24  moving for non-consensual use of cash collateral in order to pay the full Master Lease rent

25  notwithstanding the objection of the Prepetition Lenders – which would not only trigger a

26  difficult contested cash collateral fight but would also put the forbearance agreement whereby

27  _____

28  [2]        In fact, SCI requested that its Special Litigation Committee analyze the Master Lease and SCI's
    alternatives with respect thereto.

    #4848-0278-1445v1                                    -4-

the Prepetition Lenders thus far have agreed to forbear from forcing SCI's non-debtor operating subsidiaries to file for bankruptcy into a precarious position that likely would require SCI's non-debtor operating subsidiaries to file for bankruptcy protection; (b) rejection of the Master Lease as a result of the inability to perform thereunder, accompanied by the surrender of the Leased Hotels; or (c) engage in discussions with PropCo to try to reach an agreement that would not only protect the existing rights of both Parties under the Master Lease, but would also include the Parties agreement to certain rent deferrals by PropCo in exchange for SCI's agreement to provide certain transition services in the event the Master Lease ultimately is rejected, thereby providing the Parties with much greater clarity regarding the possibility of a future rejection while at the same time avoiding the need for a premature and precipitous rejection of the Master Lease now.

11.     Because the first two alternatives – fighting for non-consensual use of cash collateral or immediate rejection of the Master Lease and the resulting implications for the Leased Hotels – each carry significant risks and uncertainties for both SCI and PropCo, SCI and PropCo instead decided to focus on the third alternative of exploring a negotiated solution to the near-term issues facing the Parties as the December rent payment approaches.  In addition, the Parties believe that the "controlled transition" provided for in the Compromise Agreement in the event of a rejection of the Master Lease will also address many, if not all, of the concerns that the gaming authorities would have regarding rejection and therefore should minimize or eliminate the need for any regulatory involvement in the process.

12.     Although SCI and PropCo shared the desire to prevent the damage that would be suffered by their respective estates if they were unable to arrive at a mutually acceptable solution, it was also clear to SCI and PropCo that they would be sitting on opposite sides of the negotiating table in any discussions regarding the Master Lease.  In order to ensure that those negotiations would occur at arms length and with due consideration for the competing interests of the SCI and PropCo estates, responsibility for the representation of PropCo's interests in those negotiations was assumed by the two independent members of PropCo's board, Messrs. Robert White and Robert Kors (the "PropCo Independent Directors"), who were advised by PropCo's separate counsel, Gibson, Dunn & Crutcher LLP.

13.     Shortly after the Prepetition Lenders notified SCI that they would not consent to payment of the December rent under the Master Lease, SCI and PropCo, through the PropCo Independent Directors, commenced intensive negotiations to try to structure an agreement that would (a) allow for the continued operation of the Leased Hotels in a manner that would appropriately protect and preserve the value of those operations, (b) provide both estates with some appropriate relief from provisions of the Master Lease that have become problematic in the Debtors' current environment, and (c) provide the Parties with a reasonable amount of time to try to solve not only the Master Lease issues, but the overall restructuring puzzle as well.

14.     Those negotiations slowed for a short period of time when SCI's Prepetition Lenders and PropCo's Mortgage Lenders advised the Debtors that the two lender groups were going to engage in direct negotiations themselves to try to resolve the December rent dilemma and the other Master Lease issues.  But when it became clear to SCI and PropCo that those lender negotiations were not going to produce a solution, SCI and PropCo re-convened their negotiations.  The Compromise Agreement is the end product of those negotiations, and SCI and PropCo believe that the Compromise Agreement satisfies the objectives the Parties had coming into the negotiations.

### b.  Risks To The Parties In The Absence Of The Compromise Agreement.

15.     PropCo would be exposed to significant potential risk and uncertainty upon a precipitous or uncontrolled rejection of the Master Lease.  Under the existing documentation, PropCo owns or ground leases the real property and improvements constituting the Leased Hotels, holds a security interest in certain tangible personal property (essentially all furniture, fixtures and equipment) used at the Leased Hotels and, pursuant to the License Agreement (defined below), has temporary use of certain trademarks used at the Leased Hotels, the customer lists for the Leased Hotels and the reservation system used by the Leased Hotels.  *However, neither SCI nor the Operating Subsidiaries have any contractual obligation to operate the Leased Hotels after rejection of the Master Lease.*

16.     PropCo is not a licensed gaming company and cannot conduct gaming operations in the Leased Hotels without being licensed.  Furthermore, as a passive landlord,

1   PropCo currently lacks the infrastructure and employees necessary to run the Leased Hotels as

2   non-gaming hotels, let alone as major casinos.  If SCI were to simply reject the Master Lease and

3   SCI and the Operating Subsidiaries were to cease operation of the Leased Hotels, PropCo would

4   need to engage an outside casino management company on very short notice in order to try to

5   operate the Leased Hotels.  Furthermore, any rejection of the Master Lease by SCI likely would

6   be accompanied by a contemporaneous rejection of the License Agreement, which would

7   deprive PropCo of use of the trademarks, customer lists, and the reservation system, at a

8   minimum.  PropCo would be forced to immediately remove virtually all branding covered by the

9   License Agreement, which could range from the facility names to the names of restaurants and

10  amenities to ashtrays and gaming chips, and would be deprived of its most important marketing

11  tools.  In short, PropCo likely would be unable to operate the Leased Hotels at all in the short

12  term, and any plans for PropCo to operate the Leased Hotels in the future likely would require

13  that the Leased Hotels be re-opened as rebranded, stand alone hotels, entirely unrelated to the

14  Station brand and the Station marketing and operating systems.

15          17.     SCI similarly would be exposed to significant risks and uncertainty if

16  forced to reject the Master Lease and License Agreement and jettison the Leased Hotels

17  prematurely.  Among other things, SCI could experience a profound reputational loss from an

18  uncontrolled rejection of the Master Lease, through the indirect impacts of the abrupt rebranding

19  of the Leased Hotels, disruption of the operations of those properties to accommodate the change

20  in control, and likely customer confusion resulting from the turmoil.  In addition, SCI continues

21  to believe at this time that the value of the Station family of entities will be best preserved for all

22  stakeholders if the Leased Hotels are maintained within the family, but a forced rejection of the

23  Master Lease could prevent SCI from achieving that result.

24          18.     In addition, a premature and uncontrolled rejection of the Master Lease

25  would also create the risk of regulatory intervention by the gaming authorities if that rejection

26  threatened the continued operation of the Leased Hotels.  In contrast, the transition services

27  provided for in the Compromise Agreement are designed in part to create a smooth transition

28  that will alleviate many, if not all, of the concerns that the gaming authorities would otherwise

1    have in this scenario.

2            19.    In the face of potentially significant downside for both Parties, SCI and

3    PropCo negotiated extensively and with urgency to try to reach an agreement in time to seek

4    Court approval prior to the due date for the December rent payment under the Master Lease.

5    Multiple proposals and drafts of the Compromise Agreement were volleyed back and forth

6    between the Parties.  Ultimately, SCI and PropCo reached a compromise that each believes

7    yields a better result for its respective estate than would the alternative scenarios of an SCI cash

8    collateral battle with the Prepetition Lenders or an uncontrolled rejection of the Master Lease and

9    License Agreement.

10           c.   **Summary Of The Compromise Agreement.**

11           20.    The Compromise Agreement includes, among others, the following

12   mutual accommodations[3]:

13
            •   The rent payable in cash to PropCo shall be reduced for December 2009,
14              January 2010 and February 2010 from approximately $21,449,000 per
                month to an amount equal to EBITDAR[4] for the Leased Hotels in the prior
15              calendar month minus up to $1,600,000 per month (which amount was
                calculated to enable SCI to be reimbursed by PropCo for capital
16              expenditures expended by SCI on the Leased Hotels in excess of the
                amount of capital expenditures that SCI is contractually required to make
17              pursuant to the Master Lease) (subject to a floor based upon 120% of the
                aggregate amount of adequate protection payments due to the Mortgage
18              Lenders (defined below) plus all other budgeted amount s paid by PropCo
                (as so calculated, the "Reduced Rent").  SCI estimates that the Reduced
19              Rent for the 3-month period covered by the Compromise Agreement will
                average approximately $13,777,000 per month, for an average monthly
20              reduction of just under $7,700,000 from the full scheduled rent amount.
21
22          •   The difference between Reduced Rent and contract rent under the Master
                Lease (such difference, the "Deferred Rent") will be either (a) paid in cash
23              on an administrative basis if the Master Lease is ultimately assumed by
                SCI, or (b) added to the prepetition rejection damages claim if the Master
24              Lease is ultimately rejected by SCI.
25

26   ───────────────────────

27   [3]        The description of the Compromise Agreement contained in the Motion is intended as a summary only and
     is qualified in its entirety by the actual terms of the Compromise Agreement.

28   [4]        "EBITDAR" means Earnings (or Net Income) Before Interest, Taxes, Depreciation, Amortization and
     Rent.

     #4848-0278-1445v1                              -8-

- Prior to assumption or rejection of the Master Lease, SCI will continue to perform all of its obligations under the Master Lease, with SCI's obligation to pay the Reduced Rent under the Compromise Agreement constituting an administrative claim against SCI, payable in accordance with the terms of the Compromise Agreement.

- Upon rejection of the Master Lease, PropCo will hold an allowed, partially secured prepetition claim against SCI for rejection damages equal to the amount of Deferred Rent plus the amount of PropCo's statutory lease rejection claim in the full amount of $647,000,000. This amount is the full amount of an allowed lease rejection claim, computed using the majority rule, to determine the statutory cap in respect of the Master Lease.

- Because the statutory lease rejection claim cap is lower than the nominal claim for rent under the Master Lease both before and after credit for the value of foreclosed collateral, the amount of the lease rejection damage claim of $647,000,000 will not be reduced by the surrender of any of the collateral securing the lease obligations, but the claim will be rendered fully unsecured upon the transfer of such collateral to PropCo.

- SCI and the Operating Subsidiaries have agreed to provide the following transition services after, and not withstanding, any future rejection of the Master Lease and the License Agreement:

  o SCI and the Operating Subsidiaries shall continue to operate the Leased Hotels under their own gaming licenses on an expense reimbursement and fee-for-service basis for a period of up to 150 days post-rejection. During this period, the Leased Hotels will be operated as if no rejection of the Master Lease or License Agreement had occurred, provided that SCI and the Operating Subsidiaries will not have any financial obligations to PropCo under the Master Lease.

  o SCI and the Operating Subsidiaries shall provide reasonably requested non-confidential and non-competitive information to PropCo and any replacement manager for the Leased Hotels.

  o SCI and the Operating Subsidiaries will provide a reasonable period of time after they cease providing transition services for PropCo to rebrand the Leased Hotels to eliminate all mentions of the name "Station."

  o SCI and the Operating Subsidiaries agree that, pending transfer to PropCo of all collateral granted by SCI and the Operating Subsidiaries to secure the Master Lease and all other personalty to be sold to PropCo under the Compromise Agreement, all such personal property will remain at the Leased Hotels and be available for use in their operation, and, subject to its obligations regarding

re-branding, PropCo will have a license to use all such collateral in the operation of the Leased Hotels after rejection and until transfer of title is completed, including after the termination of other transition services.

o   Upon the occurrence of certain conditions, SCI and the Operating Subsidiaries will cooperate in a consensual foreclosure of PropCo's liens on such collateral and will sell outright certain tangible and intangible personal property, including the names Red Rock, Palace, Boulder and Sunset, that is not subject to a lien to PropCo.

o   PropCo will receive the full benefit of the License Agreement during the transition period, including delivery of the list of SCI customers that predominantly play at a Leased Hotel, and PropCo agrees that, subject to such performance, any monetary claim for rejection damages under the License Agreement shall be a general unsecured claim. PropCo will, however, reserve any Bankruptcy Code section 365(n) rights it may have as licensee under the License Agreement.

21.     The Compromise Agreement provides interim relief with regard to rent for OpCo and provides a floor for transition services for PropCo, while also providing some certainty regarding the nature and extent of claims arising in connection with any future rejection of the Master Lease and License Agreement. The Compromise Agreement otherwise leaves PropCo and SCI's current legal positions unaffected. PropCo and its successor/assigns (including the PropCo Mortgage Lender) will continue to have the ability to argue (if such arguments exist) for additional transition services under the agreements between PropCo and SCI or under otherwise applicable law, while leaving SCI free to argue that no additional transition services are required to be provided to PropCo.

22.     All of the elements of the compromise enumerated above are more fully set forth in the Compromise Agreement, which is incorporated herein by reference. In the event of any inconsistencies, the terms of the Compromise Agreement shall control.

### IV.    **Summary of Relevant Facts.**

23.     <u>The Leased Hotels:</u>  SCI and its wholly owned subsidiaries Boulder Station, Inc. ("<u>Boulder Station</u>"), Charleston Station, LLC ("<u>Charleston Station</u>"), Palace Station Hotel & Casino, Inc. ("Palace Station") and Sunset Station, Inc. ("Sunset Station, and

1    collectively with Boulder Station, Charleston Station and Palace Station, the "Operating

2    Subsidiaries") operate the Leased Hotels.

3             24.    The Master Lease:  PropCo, as landlord, and SCI, as tenant, entered into

4    that certain Master Lease, dated as of November 7, 2007 (as amended as of the Petition Date, the

5    "Master Lease"),[5] under which SCI leases the real property and improvements occupied by the

6    Leased Hotels.  Payments to be made by SCI to PropCo under the Master Lease are due on the

7    day  (the "Rent Payment Date") that is the third (3rd) business day preceding the fifteenth (15th)

8    day of each calendar month.  Such rent payments cover the period from the fifteenth (15th) day of

9    the month in which such rent payment is made through the fourteenth (14th) day of the next

10   month (the "Rental Period").

11            25.    The Stipulations Extending Time Period To Assume Or Reject

12   Nonresidential Real Property Leases:  On October 23, 2009, the Parties jointly filed a motion for

13   an order, pursuant to 11 U.S.C. § 365(d)(4), to extend the time to assume or reject various

14   unexpired nonresidential real property leases, including the Master Lease (extending the date to

15   assume or reject the Master Lease through February 23, 2010) and the ground lease under which

16   PropCo is a lessee for a portion of the property associated with Boulder Station (extending the

17   date for PropCo to assume or reject that lease through March 24, 2010).  The motions to approve

18   these stipulations are set for hearing on November 20, 2009.

19            26.    The License Agreement:  Concurrently with the execution of the Master

20   Lease, SCI and PropCo executed and delivered the License and Reservation Service Agreement

21   (the "License Agreement")[6], dated as of November 7, 2007, pursuant to which SCI agreed to

22   provide to PropCo, among other things, certain trademarks (both exclusive and non-exclusive),

23   the use of customer lists and other items identified therein, and the use of SCI's common

24   reservation system (the "Licensed Assets").  In addition to providing the Licensed Assets,

25   without limiting the agreements contained in the License Agreement, SCI also agreed to provide,

26   under certain circumstances, after termination of the Master Lease: (i) an eighteen month license

27   _____

     [5]      A copy of the Master Lease is attached to the Appendix of Exhibits as Exhibit B.
28   [6]      A copy of the License Agreement is attached to the Appendix of Exhibits as Exhibit C.

on certain specified trademarks; (ii) non-exclusive use of certain customer lists for advertising purposes for an eighteen month period; and (iii) non-exclusive use of SCI's common reservation system for the same eighteen month period.

27.    The PropCo FF&E Security Agreement From SCI:  Section 12.4 of the Master Lease contains a security agreement, pursuant to which SCI pledged, assigned and granted PropCo a security interest and an express contractual lien in and to (i) all of the personal property (including furniture, fixtures, goods, inventory, equipment, furnishings, objects of art, machinery, appliances, appurtenances and signage together with tools and supplies (including spare parts inventories) related to the Leased Hotels) owned by SCI as described in the Master Lease and (ii) the FF&E Reserve Collateral as described in the Master Lease (collectively the "SCI Lease Collateral").

28.    The PropCo FF&E Security Agreement From The Sublessees:  Concurrently with the execution of the Master Lease and the License Agreement, PropCo and the Operating Subsidiaries entered into the Security Agreement (All Furniture, Fixtures and Equipment) (the "Security Agreement")[7] dated November 7, 2007 granting liens on and security interests in all of the personal property (including furniture, fixtures, goods, inventory, equipment, furnishings, objects of art, machinery, appliances, appurtenances and signage together with tools and supplies (including spare parts inventories) related to the Leased Hotels) owned by the Operating Subsidiaries as described in such Security Agreement to PropCo to further secure SCI's obligations to PropCo under the Master Lease (collectively the "Operating Subsidiaries Lease Collateral").

29.    The PropCo Cash Collateral Stipulation:  On September 9, 2009, the Bankruptcy Court entered its final order approving the Stipulation And Final Order For (i) Adequate Protection and (ii) Use Of Cash Collateral With Respect To Secured Loans To FCP Propco, LLC, (the "PropCo Cash Collateral Stipulation")[Docket No. 295, which stipulation was entered into between PropCo, SCI, DB and the Mortgage Lenders.

---

[7]    A copy of the Security Agreement is attached to the Appendix of Exhibits filed concurrently herewith as Exhibit D.

30.    <u>The SCI Cash Collateral Stipulation</u>:  On October 13, 2009, Bankruptcy Court entered its SCI Final Cash Collateral Order [Docket No. 481].[8]  Pursuant to the SCI Final Cash Collateral Order, SCI is required to submit to the Prepetition Lenders on a regular basis a proposed operating budget for the entire Station Group (the "<u>SCI Budget</u>") for approval by the Prepetition Lenders as a condition to SCI's ongoing use of cash collateral.  The existence at all times of an approved SCI Budget is a condition to SCI's use of cash collateral under the SCI Cash Collateral Order.  If SCI loses consensual use of cash collateral due to, among other things, expiration of the most recently approved SCI Budget, the Prepetition Lenders would have the right to terminate the Forbearance Agreement[9] and could potentially take action to force SCI's non-debtor operating subsidiaries to file their own bankruptcy cases.

31.    <u>The SCI Cash Collateral Budget</u>:  In response to SCI's most recent proposed SCI Budget, the Prepetition Lenders objected to the inclusion of any amount for payment of rent under the Master Lease in December 2009 (for the Rental Period of December 15, 2009 to January 14, 2010).  SCI was unable to convince the Prepetition Lenders otherwise and instead was forced to accept the deletion of rent due in December 2009 under the Master Lease from the revised proposed SCI Budget.  The revised proposed SCI Budget (which provides no authority to SCI to pay rent due in December 2009 under the Master Lease) was subsequently approved by the Prepetition Lenders and is the Budget under which SCI is currently operating.

32.    <u>The Consequential Rejection Of The Master Lease And License Agreement</u>:  In light of the refusal of the Prepetition Lenders to consent to SCI's payment of the rent due in December, 2009 under the Master Lease, SCI notified PropCo that, unless SCI can negotiate a reduction of current cash rent that is satisfactory to the Prepetition Lenders, SCI will

---

[8]    "<u>SCI Final Cash Collateral Order</u>" means the Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (i) Authorizing the Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans to Non-Debtor Subsidiaries, (ii) Granting Adequate Protection to Prepetition Secured Parties, and (iii) Granting Related Relief entered on October 13, 2009.

[9]    "<u>Forbearance Agreement</u>" means the Second Forbearance Agreement; and Second Amendment to the Credit Agreement dated July 28, 2009, copies of which have previously been filed with this court and publicly filed at the Securities Exchange Commission.

1    have no authority to use cash collateral to pay rent under the Master Lease in December (or

2    presumably thereafter) and will, therefore, be forced to default under the Master Lease or to seek

3    appropriate relief from the Bankruptcy Court.

4           33.    <u>Agreement to Compromise:</u>  The essential terms of the compromise are set

5    forth in Section III(c) above, and more completely set out in the Compromise Agreement, which

6    is incorporated herein by reference.  PropCo, acting through its independent directors and its

7    special counsel, and SCI, acting through its officers and counsel, have determined that, in light of

8    the financial constraints placed on SCI by the Prepetition Lenders with regard to the SCI Budget

9    and the refusal of the Prepetition Lenders to consent to SCI's payment of full rent in cash under

10   the Master Lease, the payment of Reduced Rent and the treatment of the Deferred Rent as set

11   forth in the Compromise Agreement is a prudent and necessary exercise of business judgment of

12   both SCI and PropCo.  The provisions of the Compromise Agreement in this regard enable the

13   Debtors to operate effectively in chapter 11, while simultaneously preserving the rights of SCI

14   and PropCo *vis a vis* payment of rent under the Master Lease until such time as SCI makes a

15   decision to assume or reject the Master Lease either as part of a plan of reorganization or

16   otherwise.  Moreover, in light of the economic consequences to the Debtors' estates and to the

17   operation of SCI's non-debtor subsidiaries if the Compromise Agreement is not approved and

18   the Parties authorized to abide by it, the decision by SCI and by PropCo to enter into the

19   Compromise Agreement is a proper exercise of business judgment which should be given

20   deference and approved by this Court.

21          34.    In short, both PropCo and SCI, with the advice of legal and financial

22   counsel, have determined, in the reasonable exercise of their sound business judgment, that the

23   compromise set forth in the Compromise Agreement provides the best possible opportunity for

24   the Debtors to continue their efforts to negotiate a viable, confirmable plan of reorganization in

25   an expeditious and effective manner, while at the same time protecting the respective rights of

26   SCI and PropCo with respect to the Master Lease.

27

28

## V.    Legal Arguments.

A.    **The Compromise Agreement Constitutes the Parties' Exercise of Business Judgment, Is Beneficial to the Estate and Should Be Approved under Bankruptcy Code Section 363(b)(1) and Bankruptcy Rule 9019.**

35.    Section 363(b)(l) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l).  Courts have required that such use, sale or lease be based upon a debtor's sound business judgment. *See, e.g.*, *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997), *aff'd* 221 B.R. 243 (B.A.P. 9th Cir. 1998); *Matter of Plaza Family Partnership*, 95 B.R. 166, 173 (E.D. Cal. 1989); *see also In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").

36.    In connection with decisions related to the use of leases to maximize value of the estate, courts show great deference to a debtor's business decisions. *See, e.g.*, *In re Ernst Home Ctr., supra*, 209 B.R. 974.  In *In re Ernst*, the debtor determined that it was unable to reorganize, but that the most prudent way to create value for the estate was to enter into a complex contractual arrangement with a third party to market a substantial number of the debtor's leases pursuant to which the leases would either be assumed by the third party or assigned to new end-users.  The proposed transaction would guarantee the estate a minimum profit, but required, *inter alia*, a 14-month extension of the 365(d)(4) deadline and transferred control over marketing and decision-making concerning lease assignments to a non-debtor. *Id.* 209 B.R. at 978.  The court approved the transaction because the debtor demonstrated an "articulated business justification" for the proposed arrangement and that the intended transaction was in best interests of estate. *Id.*; *see also, In re Trans World Airlines.*, 2001 Bankr. LEXIS 267 at *45-50 (Bankr. D. Del. 2001) (describing business judgment rule as "very deferential

1    standard"); *In re First Wellington Canyon Assocs.*, 1989 U.S. Dist. LEXIS 10687 at *8-9 (N.D.

2    111. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference

3    unless shown that the bankruptcy's decision was taken in bad faith or in gross abuse of the

4    bankrupt's retained discretion.").

5            37.      Courts grant particular deference to a debtor's business judgment

6    concerning the best way to make use of, and generate value from, unexpired nonresidential

7    leases. In the ongoing chapter 11 cases of General Growth Properties, Inc., the debtors have

8    sought relief related to the assumption and rejection of several unexpired leases of nonresidential

9    property that provide the majority of the debtors' revenue stream. Though the income from the

10    leases in question makes up a portion of the security for the debtors' secured credit facilities, the

11    court recognized the proper exercise of the debtors' business judgment and granted the debtors'

12    motion. *In re General Growth Properties, Inc.*, 09-11977-ALG (Bankr. S.D.N.Y. April 16,

13    2009). *See also National Labor Relations Board v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d

14    Cir. 1982), *aff'd*, 465 U.S. 513 (1984) ("[t]he usual test for rejection of an executory contract is

15    simply whether rejection would benefit the estate, the 'business judgment' test"); *In re*

16    *Crystallin, LLC*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (if the debtor establishes that rejection

17    of an executory contract is of benefit to the estate, then the bankruptcy court should not interfere

18    with the debtor's business judgment except upon a finding of bad faith or gross abuse of business

19    discretion, *citing Lubrizol*, 756 F.2d at 1046-47); *In re HQ Global Holdings, Inc.*, 290 B.R. 507,

20    511 (Bankr. D. Del 2003) (the sole issue to consider when evaluating a motion to reject an

21    executory contract under the business judgment test is whether the rejection will benefit the

22    estate).

23            38.      The business judgment test is not limited to decisions to assume or reject

24    contracts or leases, but also to decisions to revise, modify or otherwise negotiate resolutions of

25    issues relating to contractual obligations during a chapter 11 case. *In re Carter Hawley Hale*

26    *Stores*, 1991 Bankr. LEXIS 2185 (Bankr. C.D. Cal. Oct. 24, 1991) ("Debtors and other parties to

27    prepetition executory contracts and leases may agree to modify provisions thereof as part of a

28    negotiated assumption so long as the contract, as modified, is approved by the Court and meets

1    the business judgment standard" (internal citations omitted)).

2           39.    The terms of the Compromise Agreement are the product of extended and

3    comprehensive negotiations between SCI and PropCo.  Throughout the negotiation process, the

4    Parties have worked diligently to ensure the needs of both sides regarding the Master Lease are

5    met while balancing the new realities of SCI's limited ability to use cash collateral with respect

6    to the Master Lease rent payments.  SCI has determined, in its business judgment, that the

7    benefits to SCI of the Reduced Rent and the other protections provided to SCI under the

8    Compromise Agreement are fair consideration for SCI's agreement to provide the transition

9    services and related protections required by PropCo.  PropCo, on the other hand, acting through

10    the Independent PropCo Directors, has determined, in its business judgment, that those transition

11    services and related protections that PropCo has bargained for are fair consideration for

12    PropCo's agreement to accept the Reduced Rent and otherwise agree to the terms of the

13    Compromise Agreement.  Those business judgments were reached following extensive, arms'

14    length negotiations between the Parties and reflect SCI's and PropCo's independent decisions

15    that entry into the Compromise Agreement is in the best interests of each of their respective

16    estates.

17    **B.**    **Partial Deferral of the Rent Due under the Master Lease and the Other**
              **Accommodations and Remedies Regarding Performance of Obligations are**
18                  **Permissible under Section 365(d)(3) and in the Best Interests of the Estates.**

19           40.    Section 365(d)(3) of the Bankruptcy Code provides that a debtor in

20    possession  "shall timely perform all the obligations . . . arising from and after the order for

21    relief under any expired lease of nonresidential real property, until such lease is assumed or

22    rejected, notwithstanding section 503(b)(1)." 11 U.S.C. 365(d)(3).  This section protects

23    landlords from being forced to provide current services to tenant-debtors without receiving

24    current rent payments while the tenant-debtor determines whether to assume or reject the lease.

25    130 Cong. Rec. § 8894-95 (daily ed. Jun 29, 1984).  The compromises regarding current

26    payment of rent and the other accommodations between the Parties do not run afoul of

27    Congressional intent to protect PropCo in this Case.  The Compromise Agreement is an arms'

28    length, consensual arrangement, bargained for between the lessor and its lessee.  PropCo has

1    willingly and in good faith negotiated the terms of the Compromise Agreement and is in no way

2    being "forced" to allow SCI to continue as lessee without paying fair consideration for that right.

3    Rather, PropCo has determined that the exchange of Reduced Rent and the other protections in

4    the Compromise Agreement that benefit SCI for SCI's commitment to provide PropCo with

5    specified transition services and other benefits is a beneficial transaction for PropCo.  Section

6    365(d)(3) was designed to provide "unwilling" landlords with protection against non-performing

7    lessees.  This is not such a case.

8         41.    To be clear, the Parties are not agreeing to forego rent, but rather to defer

9    it in a manner consistent with the prohibition on paying the December Rent as decreed by the

10    Prepetition Lenders as a condition to SCI's use of Cash Collateral.  Moreover, under the

11    Compromise Agreement, SCI is "paying" for the reduction of its current rent obligation by

12    agreeing to provide future transition services that PropCo is not currently entitled to receive

13    under the contracts between the Parties.  The mutual decisions between SCI and PropCo to

14    modify their rights, remedies and obligations under Section 365, in the exercise of their business

15    judgment and in the best interests of the estates and creditors must be given deference.  *See In re*

16    *National Sugar Refining Co.*, 21 B.R. 196 (Bankr. S.D.N.Y. 1982) ("Under the Bankruptcy Act,

17    a majority of the courts applied the "business judgment" test to determine whether a trustee

18    should be permitted to assume or reject an executory lease."); *In re G Survivor Group*, 171 B.R.

19    755 (Bankr. S.D.N.Y. 1994) ("Generally, absent a showing of bad faith, or an abuse of business

20    discretion, the debtor's business judgment will not be altered.").

21    **C.    The Compromise Agreement is an Appropriate Exercise of the Parties'**
22    **Business Judgment under Rule 9019.**

23         42.    Compromises are favored in bankruptcy[10] and are a normal part of the

24    reorganization process. *Anderson*, 390 U.S. at 424, (*quoting Case v. Los Angeles Lumber Prods.*

25    *Co.*, 308 U.S. 106, 130 (1939)); *see also In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir.

26    1986) ("The law favors compromise and not litigation for its own sake . . . .").  Pursuant to

27    _____

28    [10]    10 Collier on Bankruptcy, ¶ 9019.01, at 9019-2 (15th ed. rev. 2008) (*citing Marandas v. Bishop (In re Sassalos)*, 160 B.R. 646, 653 (D. Ore. 1993)).

1  Bankruptcy Rule 9019, in considering compromises, courts determine whether the compromise

2  in question is fair and equitable and in the best interests of the estate. *In re Mickey Thompson*

3  *Entertainment Group Inc.*, 292 B.R. 415, 420 (9th Cir. B.A.P. 2003) ("Although the bankruptcy

4  court has 'great latitude' in authorizing a compromise, it may only approve a proposal that is

5  'fair and equitable' to the creditors" (internal citations omitted)); *see also Protective Comm. for*

6  *Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Best*

7  *Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994). Bankruptcy Rule 9019(a) commits the

8  approval or rejection of a compromise to the sound discretion of the bankruptcy court. *In re*

9  *Michael*, 183 B.R. 230, 232 (Bankr. D. Mont. 1995).

10         43.    To determine whether a compromise satisfies the fair and equitable

11  standard, courts review four basic factors: "(a) The probability of success in the litigation; (b) the

12  difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the

13  litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the

14  paramount interest of the creditors and a proper deference to their reasonable views in the

15  premises." In re Woodson, 839 F.2d 610, 620 (9th Cir. 1988) (quoting *A & C Properties*, 784

16  F.2d at 1381).

17         44.    In pursuing a compromise or settlement, the parties are not required to

18  reach the absolute maximum value for the estate. Rather, settlements should be approved if they

19  fall above the lowest point on the continuum of reasonableness. *In re W.T. Grant Co.*, 699 F.2d

20  599, 608 (2d Cir. 1983) ("responsibility of the bankruptcy judge . . . [is] to canvass the issues and

21  see whether the settlement fall[s] below the lowest point in the range of reasonableness"); *In re*

22  *Blair*, 538 F.2d 849, 851 (9th Cir. 1976) (Court should not conduct a "mini-trial" on the merits of

23  a proposed settlement); *In re Planned Protective Servs., Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D.

24  Cal. 1991) (same).

25         45.    Here, the Parties have been able to reach a compromise that solved a

26  multitude of potential problems. The primary objective was to avoid a premature and potentially

27  precipitous rejection of the Master Lease and the License Agreement. The issue of how to deal

28  with the Master Lease has been one of the main points of contention during these Cases – and

1    one on which almost every constituent has expressed its own views.  Thus, SCI and PropCo were

2    highly motivated to find a compromise that prudently and cost-effectively provides the Debtors

3    with breathing room to determine how to deal with the Master Lease while simultaneously

4    eliminating the risks and costs of an undesirable precipitous rejection of the Master Lease or

5    bankruptcy filing of the Operating Subsidiaries and the concomitant complications from the

6    absence of a program for transition services.  The Compromise Agreement provides a road map

7    on how to deal with the Master Lease up to and through March 12, 2010, while simultaneously

8    preserving PropCo's interests in the Rental Payments for the Deferral Period and providing

9    PropCo with the certainty of some transition services it contractually does not currently possess.

10   The Compromise Agreement therefore addresses the needs of both Parties while maintaining

11   value within the Debtors' estates.  Finally, the Compromise leaves PropCo and SCI's current

12   legal positions with regard to additional transition services unaffected.  PropCo and its

13   successor/assigns (including the PropCo Mortgage Lender) will continue to have the ability to

14   argue for additional transition services while not limiting SCI from arguing that no additional

15   transition services are required to be provided to PropCo.  Under the circumstances, it is both fair

16   and equitable, providing a far less tedious, time-consuming, and expensive outcome than would

17   result from litigation over the Master Lease and Licensing Agreement.

18            46.     In the absence of the Compromise Agreement, SCI would be left to either

19   enter into a contested cash collateral battle with the Prepetition Lenders or reject the Master

20   Lease in December.  Either of these choices would force the Debtors into complex, difficult,

21   uncertain and costly litigation at a time when it is critical that the Debtors and their stakeholders

22   focus their attention on plan discussions and negotiations.  The Compromise Agreement allows

23   the Debtors to avoid that litigation at this time and will allow the parties to focus on plan issues,

24   without prejudicing the rights of either SCI or PropCo should those plan efforts fail.

25   **D.     The Consensual Extension of the Deadline to Assume or Reject the Master
26            Lease Until March 12, 2009 Is in the Best Interests of the Debtors' Estates.**

27            47.     To ensure that there is sufficient time to achieve the objectives of the

28   Parties with regard to the Master Lease, and to provide sufficient breathing room for the Debtors

to try to formulate and achieve consensus among the parties in interest, the Parties have agreed to extend the deadline for SCI to assume or reject the Master Lease up to and until the last day of the deferral period under the Compromise Agreement, March 12, 2009.  Such modification represents the measured and prudent business decisions by the management of SCI and of PropCo to extend the deadline to assume or reject the Master Lease to a date that matches up with the term of the Compromise Agreement so that those agreements dovetail seamlessly. Given PropCo's consent to that extension, the extension satisfies the consent requirement of Section 365(d)(4)(B)(ii).[11]  Generally, under standard interpretative concepts, assumption/rejection deadline extensions are proper if: (i) the lessor continues to receive rental payments; (ii) the lease is a primary asset of the debtor; (iii) the debtor has not had sufficient time to intelligently appraise its financial situation and the potential value of its assets in terms of the formulation of a plan; (iv) the case is exceptionally complex; (v) the property is not vacant (thereby not prejudicing neighboring tenants); and  (vi) the lessor is not damaged by the debtor's continued occupation.  *In re Victoria Station Inc.*, 88 B.R. 231, 236 (B.A.P. 9th Cir. 1988), *aff'd on other grounds*, 875 F.2d 1380 (9th Cir. 1989); *see also In re Ernst Home Ctr., Inc.*, 221 B.R. 243, 253 (B.A.P. 9th Cir. 1998) (similar list of factors).  Without exception, each of these factors has been satisfied (or consensually modified).

**E.    The PropCo Lenders Will Continue To Be Adequately Protected After Implementation Of The Compromise Agreement.**

48.    Under the Compromise Agreement, provision for continued adequate protection payments for the Mortgage Lenders has been made during the Deferral Period, because Reduced Rent can never be less than 120% of all required adequate protection payments due the Mortgage Lenders and their professionals.  Further, the impact of the payment of

---

[11]    PropCo previously consented by stipulation to extend the 365(d)(4) deadline to February 24, 2010.  *See* Exhibit B-3 to Docket No. 508.

Reduced Rent on the accumulation of cash collateral will be mitigated by the anticipated non-payment of the unsecured interest rate swap agreement that is currently being paid on a monthly basis by PropCo under the PropCo Cash Collateral Stipulation. All cash rent that otherwise would have been used to pay such swap payments will accumulate as cash collateral for the Mortgage Lenders if and when the swap payments cease. Moreover, providing PropCo with transition services it currently does not contractually possess for the rent deferral puts PropCo in a better position to address a subsequent rejection of the Master Lease and, therefore, provides the Mortgage Lenders adequate protection of its secured position.

49.     It is also important to note that although the Mortgage Lenders have a security interest in the Master Lease, pursuant to the Assignment of Master Lease, Subleases, Rents and Security Deposits dated November 7, 2007 and made by PropCo in favor of the Mortgage Lenders, Section 104A.2303(5) of the Nevada Revised Statutes limits the Mortgage Lenders' ability to exercise any control over the terms and duties under the Master Lease, because the assignment is deemed to be a mere security interest despite being phrased as an absolute assignment. The commentary to subsection (5) notes that the statute "states a rule of construction that distinguishes a commercial assignment, which substitutes the assignee for the assignor as to rights and duties, and an assignment for security or financing assignment, which substitutes the assignee for the assignor only as to rights." Accordingly, the nature of the assignment to the Mortgage Lenders only grants them contract rights to their secured interest in the value of the Master Lease, but not the ability to dictate the terms or otherwise exercise ownership of the Master Lease.

## V.    <u>Conclusion</u>

**WHEREFORE**, SCI and PropCo respectfully request that the Court approve the Compromise Agreement, authorize the Parties to perform their respective obligations thereunder and grant such other and further relief as the Court deems just and proper under the circumstances.

Dated:  November 19, 2009                Respectfully submitted,


By:    _____/s/_____

Paul S. Aronzon, CA State Bar #88781
Thomas R. Kreller, CA State Bar #161922
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Reorganization Counsel for
Debtors and Debtors in Possession


By:    _____/s/_____

Dennis B. Arnold (CA State Bar No. 70022)
Oscar Garza (CA State Bar No. 149790)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071

Reorganization Counsel for FCP PropCo, LLC as
Debtor and Debtor in Possession

Bruce T. Beesley, #1164
Laury Macauley, #11413
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV   89501
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel
For Debtors and Debtors in Possession