Isaac M. Pachulski (CA 62337)
Eric D. Goldberg (CA 157544)
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email: ipachulski@stutman.com
       egoldberg@stutman.com

Sallie B. Armstrong (NV SBN 1243)
DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 329-5900
Facsimile: (775) 786-5443
Email: sarmstrong@downeybrand.com

# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Northern NV Acquisitions, LLC
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC

Chapter 11

Case No. BK-09-52470-GWZ through BK-09-52487-GWZ

Jointly Administered under
BK 09-52477

Hearing Date: December 11, 2009
Hearing Time: 10:00 a.m.
Place:        300 Booth Street
              Reno, NV 89509

## OBJECTION OF THE INDEPENDENT LENDERS TO THE DEBTORS' JOINT MOTION TO APPROVE MASTER LEASE COMPROMISE

## TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ................................................................................................ 1

II. DISCUSSION ................................................................................................... 2

    A.    OPCO HAS VALUABLE PROPERTY RIGHTS THAT PROPCO DOES NOT. .................................................................................. 3

    B.    THE PROPOSED AGREEMENT IS A HOME RUN FOR PROPCO BECAUSE IT STRIPS OPCO OF FUTURE NEGOTIATING LEVERAGE AND COMPETITIVE ADVANTAGES. ................................ 4

    C.    THE DEBTORS' PROFFERED JUSTIFICATIONS FOR ENTERING INTO THE AGREEMENT ARE UNCONVINCING (AT LEAST WITH RESPECT TO OPCO). ........................................................................ 9

    D.    THE MERE EXISTENCE OF THE AGREEMENT INDICATES THAT THE DEBTORS ARE RIVEN WITH CONFLICTS, AND UNABLE TO PROPERLY EXERCISE THEIR FIDUCIARY DUTIES TO THEIR SEPARATE ESTATES. ........................................................................... 11

III. CONCLUSION ................................................................................................ 13

# TABLE OF AUTHORITIES

Page(s)

## CASES

*AB Liquidating Corp. v. Official Creditors for the Estate of AB Liquidating Corp.*, 416 F.3d 961 (9th Cir. 2005) ............................................................................. 8

*In re A&C Properties*,
784 F.2d at 1381 ............................................................................................. 9

*In re AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984) ........................................................................... 9

*Burton v. Ulrich (In re Schmitt)*,
215 B.R. 417 (B.A.P. 9th Cir. 1997) ................................................................ 9

*In re CFLC, Inc.*,
89 F. 3d 673 (9th Cir. 1996) .......................................................................... 11

*In re Catapult Entertainment, Inc.*,
165 F.3d 747 (9th Cir. 1999) ......................................................................... 11

*In re MCorp Fin., Inc.*,
160 B.R. 941 (S.D. Tex. 1993) ........................................................................ 9

*Oldden v. Tonto Realty Corp.*,
143 F.3d 916 (2d Cir. 1944) ............................................................................ 8

*Reiss v. Hagmann*,
881 F.2d 890 (10th Cir. 1989) ......................................................................... 9

## STATUTES

11 U.S.C. § 365(n) ............................................................................................. 11

The Independent Lenders to Station Casinos, Inc. ("Independent Lenders")[1], by and through their undersigned counsel, hereby file this Objection to the "Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC . . . For Entry Of An Order Approving Master Lease Compromise Agreement" (the "Motion") filed by debtors Station Casinos, Inc. ("OpCo") and FCP PropCo, LLC ("PropCo"). In support of this Objection, the Independent Lenders respectfully represent as follows:

## I.
## INTRODUCTION

Pursuant to the Motion, OpCo and PropCo seek Court approval of an agreement ("Agreement") that purports to "settle" various matters between OpCo and PropCo regarding the Master Lease. Most significantly, from the standpoint of OpCo, the Agreement provides for nothing more than a temporary deferral of a portion of the rent that OpCo is presently required to pay to PropCo under the Master Lease. In exchange for this temporary, partial deferral of rent, OpCo is obligated to provide to PropCo a wide variety of valuable "Transition Services" if the Master Lease is rejected and, in essence, to give away much of its bargaining power in any future negotiations regarding a "permanent" resolution of the Master Lease issues, as well as to provide substantial help to a potential competitor, and undermine its own business.

The Agreement is a great deal – for PropCo. For OpCo, the Agreement is a sugar-coated capitulation, which essentially cedes to PropCo every last bit of leverage

---

[1] The Independent Lenders are comprised of the following entities: BNP Paribas; General Electric Capital Corporation; Genesis CLO; Natixis; Castlerigg Master Investments Ltd.; The Bank of Nova Scotia; Union Bank, N.A.; and U.S. Bank National Association.

533656v.4

that OpCo has. In exchange, OpCo receives temporary rent concessions that are worth no more than $22 million at best, and at worst, worth but a small fraction of that.

The Agreement is the unfair result of an unbalanced process. While approval of the Agreement is almost certainly in the best interests of the PropCo estate, and may even be in the best interests of the debtors' estates <u>as a whole</u>, it is <u>not</u> in the best interests of the <u>OpCo estate</u>. Accordingly, the Motion should be denied.

## II.

## DISCUSSION

In evaluating any proposed compromise, the Court must weigh the benefits obtained against the costs incurred. Where the compromise is between two related bankruptcy estates, there is a tendency to consider the compromise from an "overall," or "gestalt" perspective, i.e., are these estates better off settling than fighting? Framed that way, the answer is almost always "yes," but the question is wrong. The right question here is whether the Agreement is in the best interests of the OpCo estate and its creditors viewed separately, <u>and</u> in the best interests of the PropCo estate and its creditors viewed separately. Because the answer to the first question is "no," the Agreement cannot be approved.

Here, we have a proposed compromise between two bankruptcy estates that are <u>not</u> substantively consolidated and whose interests must be evaluated separately. The OpCo and PropCo estates each have their own, separate creditor bodies, and each of those creditor bodies is owed independent fiduciary duties by the management of OpCo and PropCo, respectively. And, because of the inherent conflicts

2

embedded in the complicated legal and economic relationships between the two estates, what is good for the OpCo estate can be bad for the PropCo estate, and *vice versa.*

As significant secured creditors of OpCo, the Independent Lenders are compelled to do what OpCo has not done: explain why the Agreement is a terrible deal for the OpCo estate.

### A. OPCO HAS VALUABLE PROPERTY RIGHTS THAT PROPCO DOES NOT.

In order to understand why the Agreement is bad for OpCo, it is first necessary to understand the *status quo.* As things stand now, OpCo has several important structural advantages that place it in a much better position to survive if, for any reason, OpCo and PropCo were separated. To put it bluntly, OpCo can survive on its own, but PropCo cannot, for several reasons.

First, unlike OpCo, PropCo does not have its own management or gaming license. Consequently, if the Master Lease were to be rejected, or if OpCo were sold, PropCo would not be able to operate by itself. In those circumstances, PropCo would have to hire qualified, licensed, replacement management, all at a significant expense in terms of downtime/transition costs, as well as management fees.

Second, unlike OpCo, PropCo does not own the rights to the intellectual property ("IP") that it needs to run its business every day. As the Motion acknowledges, OpCo owns all of the IP necessary for PropCo to operate, including trademarks (including the "Station" name), customer lists, reservation systems, etc. Although PropCo presently enjoys certain rights to use this IP pursuant to a License Agreement, without those rights, PropCo would have to shut down, and the PropCo properties would be useless, at least until PropCo could build new systems and completely re-brand itself under a new name, which would require significant time, effort and money.

3

533656v.4

Notwithstanding the foregoing, OpCo has its problems as well. Foremost among these is the Master Lease, which obligates OpCo to pay PropCo approximately $22 million per month in "rent" for four casinos, which "rent" all parties agree is far in excess of the fair market rental value of the properties subject of the Master Lease. But like all debtors in possession, OpCo has the ability (at least theoretically, if it were an independent company) to renegotiate the Master Lease by exercising its rights as a DIP, e.g., by seeking to reject it, or to recharacterize it as a disguised financing.

B. **THE PROPOSED AGREEMENT IS A HOME RUN FOR PROPCO BECAUSE IT STRIPS OPCO OF FUTURE NEGOTIATING LEVERAGE AND COMPETITIVE ADVANTAGES.**

Pursuant to the settlement Agreement, the Debtors are seeking to have OpCo allow PropCo to use the valuable IP rights that PropCo needs to operate on its own (and in which the OpCo lenders have a security interest), all in exchange for PropCo's agreement to <u>temporarily</u> defer the payment of a <u>portion</u> of the Master Lease rent. Thus, while this is a great deal for PropCo, it is a terrible deal for OpCo.

Under the Agreement, PropCo will temporarily defer, for a period of three months, the payment of about one-third of the approximately $22 million monthly rent, for a total deferral of about $22 million. That $22 million, however, does not go away; instead it becomes a claim. This claim then must be paid in full in cash (if the Master Lease is assumed) or, if the Master Lease is rejected, then the $22 million claim becomes part of a rejection damages claim.

Accordingly, the value of this rent deferral to OpCo is <u>at most</u> $22 million, less the distribution on a $22 million claim (assuming the Master Lease is rejected), and <u>at worst</u>, say $1 million (1 year's interest on the deferred $22 million in rent, assuming the Master Lease is assumed). As a practical matter, however, while OpCo might

4

533656v.4

ultimately reject the Master Lease (if it is unable to come to terms with PropCo on a permanent rent reduction), there is virtually no chance that OpCo would ever assume it "as is," which means that the real value of these temporary rent concessions to OpCo is much closer to the lower end of the range than the higher end.

In contrast, the cost to OpCo of obtaining these meager benefits under the Agreement is quite substantial. Under the guise of an obligation to provide PropCo with harmless-sounding "Transition Services," the Agreement essentially requires OpCo to turn over the keys to the kingdom: the valuable IP rights without which PropCo simply could not exist on its own. Thus, while under the Agreement OpCo receives <u>temporary</u> benefits that last no more than 3 months, and which have a <u>minimal value</u>, PropCo obtains <u>permanent</u> benefits, which have an <u>incalculable value</u>.

Specifically, the Agreement provides that, in the event that the Master Lease is rejected, OpCo will provide PropCo with "Transition Services," including the following:

- Management & Operation of the leased hotels during a Transition Period (Agreement, § K(i)).
- Allowing PropCo to use OpCo's trademarks & other IP during the Transition Period (Agreement, § K(ii)).
- Allowing PropCo to use OpCo's customer lists and reservation system during the Transition Period (Agreement, § K(ii)).
- Giving PropCo a copy of OpCo's most recent customer list, at the end of the Transition Period (Agreement, § K(iii)).
- Stipulating to relief from stay, to allow PropCo to enforce the liens it claims against the FF&E in the leased properties (Agreement, § K(iv)).
- Agreeing to sell to PropCo, at the end of the Transition Period, the rights to the names "Red Rock," "Palace," "Boulder," and "Sunset," as used in the operation of the leased properties (Agreement, § K(iv)).

5

533656v.4

- Allowing PropCo to solicit for employment the OpCo employees who worked in the leased properties (Agreement, § K(vi)); and
- Giving PropCo the financial and other information used in the management & operation of the leased properties (Agreement, § K(vii)).

By obtaining the Transition Services from OpCo, PropCo gets something it could not obtain from any party, at any price: a "smooth landing" in the event that the Master Lease is rejected, and a much stronger negotiating position in any future negotiations over the Master Lease.[2] The value of the "smooth landing" that PropCo obtains under the guise of "Transition Services" cannot be overstated: without it, if the Master Lease were rejected, PropCo would have to, among other things, immediately hire new management and employees, re-create OpCo's customer lists, build new reservation systems, and develop a frequent player system, all from scratch. Instead, under the Agreement, OpCo is essentially giving PropCo everything that PropCo needs to avoid this "nuclear winter" scenario. Adding insult to injury is the fact that, after having siphoned tens of millions of dollars from OpCo this year alone (in the form of over-market rent, and the "cash trap"), PropCo is more than able to pay for these Transition Services, but under the Agreement, it does not have to. Instead, PropCo obtains these huge benefits simply by agreeing to defer part of the rent for 3 months.

The Motion is utterly silent as to the value to PropCo of the IP rights that OpCo is giving up to PropCo under the Agreement. Among other things, the Debtors make no mention of the fact that in their most recent SEC filings, the Debtors valued their "brands" and "customer relationships" at $129 million and $41 million,

---

[2] While the Transition Services must be provided for a period of at least 60 days, the Agreement provides that this initial 60 day period can be extended for up to 180 days. Agreement, §§ O-P.

6

respectively.[3] Yet under the Agreement, OpCo proposes to allow PropCo full access to its customer list, and to allow PropCo to use critical names, signs and brands for up to 6 months. The Court cannot approve the Agreement without knowing what these rights are worth to PropCo.

Under the Agreement, OpCo also is agreeing to provide PropCo with interim management services, without which PropCo could not even operate, and for which PropCo otherwise would have to pay $20 million or more per year.[4] The real value of these Transition Services, in fact, is incalculable, because without them, if the Master Lease were rejected, PropCo would not be able to operate at all. Even if PropCo were able to quickly obtain new management, obtain the necessary regulatory approvals, re-brand the properties, and develop its own customer list, the cost of the transition would be staggering under the best of circumstances. Under the Agreement, OpCo is proposing to strip itself of the negotiating leverage that results from this reality, in exchange for no more than a temporary rent deferral.

Make no mistake about it: if the Agreement is approved, OpCo will be in the unique position of having to turn over all of its knowledge, know-how and experience to PropCo, which will then become OpCo's biggest competitor. Significantly, the Motion is utterly devoid of any evidence or analysis regarding the competitive impact that the "Transition Services" will have on OpCo's business. This omission is fatal to the Motion.

---

[3] See Station Casinos, Inc. form 10Q for the period ending September 30, 2009 ("Sept. 30, 2009 10Q"), at 13.

[4] OpCo charges its joint venture partners management fees of 2% of revenues, or 5% of EBITDA. See Sept. 30, 2009 10Q at 44. Applying these rates to PropCo's estimated 2009 revenues & EBITDA would result in a management fee due of approximately $23 million.

7

533656v.4

Moreover, the value of the Agreement to PropCo is even greater than it appears. This is so because hidden within the scope of the Agreement are certain implicit benefits, including what amount to waivers of any recharacterization argument (by OpCo agreeing that the Master Lease is a lease, subject to § 365); a waiver of the right to oppose relief from stay with respect to the FF&E; and a waiver of any argument that PropCo's approximately $650 million rejection claim is subject to subordination, or recharacterization as equity, or a credit for the value of the collateral.

To elaborate on the last point, the Agreement provides that if the Master Lease is rejected, PropCo will have a claim for the maximum amount allowable under section 502(b)(6), calculated as if PropCo has no collateral for its claim.[5] However, PropCo does have collateral for the claim, and the law is clear that if collateral is turned over to PropCo, its "capped § 502(b)(6) claim must be reduced by the value of that collateral.[6] In other words, while the law is clear that the total allowed secured and unsecured claim of PropCo cannot exceed the section 502(b)(6) "cap," the settlement effectively gives PropCo a larger unsecured claim than the one to which it would be entitled if it "won," by ignoring the value of its collateral. Nowhere does the Motion disclose this fact.

The Motion is also conspicuously silent as to the value that OpCo ascribes to these waivers and the "overallowance" of the PropCo claim. Unfortunately, given the

---

[5] See Agreement at ¶ H (providing that upon rejection, PropCo shall have an allowed claim against OpCo for "statutory rejection damages in respect of the Master Lease in the aggregate amount of $647,000,000," but further providing that "the transfer of all SCI Lease Collateral and Operating Lease Collateral shall not result in any reduction of the allowed amount of such claim.) (emphasis added).

[6] See AB Liquidating Corp. v. Official Creditors for the Estate of AB Liquidating Corp., 416 F.3d 961 (9th Cir. 2005) (endorsing Oldden v. Tonto Realty Corp., 143 F.3d 916 (2d Cir. 1944).

fact that the Debtors' own Special Litigation Committee only just recently <u>began</u> its investigation of the Master Lease, it appears that in deciding to enter into the Agreement, OpCo ignored these issues entirely.

### C. THE DEBTORS' PROFFERED JUSTIFICATIONS FOR ENTERING INTO THE AGREEMENT ARE UNCONVINCING (AT LEAST WITH RESPECT TO OPCO).

As the proponents of the compromise embodied in the Agreement, the Debtors have the burden to present competent, meaningful facts, evidence and analysis to demonstrate that the settlement satisfies the applicable <u>A&C Properties</u> standard in the Ninth Circuit.[7] Here, however, the Debtors have failed to meet their burden.

In attempting to explain why the Agreement is a good deal for PropCo, the Debtors' PropCo witness quite rightly observes that:

- SCI has no "contractual obligation to operate the Leased Hotels after termination of the Master Lease."
- "PropCo is not currently a licensed gaming company and cannot conduct gaming operations in the Leased Hotels without becoming licensed."
- ". . . PropCo currently lacks the infrastructure and employees necessary to run the Leased Hotels as non-gaming hotels, let alone as major casinos."
- ". . . rejection of the Master Lease by SCI likely would be accompanied by a contemporaneous rejection of the License Agreement, which would potentially deprive PropCo of the use of the trademarks and reservation system, at a minimum."

---

[7] See In re A&C Properties, 784 F.2d at 1381 ("the party proposing the compromise has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved" ); see also, Burton v. Ulrich (In re Schmitt), 215 B.R. 417, 425 (B.A.P. 9th Cir. 1997) (a "compromise should not be approved where key facts relevant to a cause of action are not revealed"); Reiss v. Hagmann, 881 F.2d 890, 892 (10th Cir. 1989) (overturning approval of compromise because there was "no indication in the record that the trustee or the courts did any legal research or made any attempt to properly separate the issues and evaluate the facts"); In re AWECO, Inc., 725 F.2d 293, 299 (5th Cir. 1984) (reversing order approving a settlement of litigation because there were "gaping holes in the background of information regarding the . . . settlement."); In re MCorp Fin., Inc., 160 B.R. 941, 950 (S.D. Tex. 1993) ("In reviewing the settlement, the court cannot accept the propriety of the settlement on the mere assertion of its value by the proponents.").

- "... PropCo faces the risk that it would be unable to operate the Leased Hotels at all in the short term, and any plans for PropCo to operate the Leased Hotels in the future would require that the Leased Hotels be re-opened as rebranded, stand alone hotels, entirely unrelated to the Station Casinos brand."

Declaration of Robert Kors, ¶¶ 13-14.

In contrast to the parade of horribles that <u>PropCo</u> would suffer if the Master Lease were rejected, the worst thing that the Debtors' <u>OpCo</u> witness can say is:

> SCI would be exposed to significant risks and uncertainty if forced to reject the Master Lease and License Agreement and jettison the Leased Hotels <u>prematurely</u>. Among other things, SCI <u>could</u> experience a profound <u>reputational loss</u> from an uncontrolled rejection of the Master Lease, through the <u>indirect impacts</u> of the abrupt rebranding of the Leased Hotels, <u>disruption of the operations of those properties</u> to accommodate a change of control, and likely <u>customer confusion</u> resulting from the turmoil.

Declaration of Richard J. Baskins, ¶ 17 (emphasis added). This doesn't sound nearly as bad as it does for PropCo, does it?

Interestingly, in their Motion, the Debtors also argue that rejection of the Master Lease "would also create the risk of regulatory intervention by the gaming authorities if that rejection threatened the continued operation of the Leased Hotels." Motion at ¶ 18. This statement raises the question: "Risk of regulatory intervention <u>against whom, OpCo or PropCo</u>?" The answer seems to be that this is a risk only for PropCo, rather than OpCo, because while this factor is discussed in detail by PropCo's witness,[8] it is not even mentioned by OpCo's witness. Thus, there is no evidence that OpCo faces any such regulatory risk.

---

[8] <u>See</u> Kors Decl. at ¶14 ("In addition, based upon the advice of the Professionals, <u>PropCo is concerned</u> that a premature and uncontrolled rejection of the Master Lease would also create the risk of regulatory intervention by the gaming authorities if that rejection threatened the continued operation of the Leased Hotels." (emphasis added).

10

533656v.4

Finally, the Debtors may attempt to justify requiring that OpCo give away its valuable customer list to PropCo on the grounds that, if OpCo rejected the Master Lease, it would likely reject the License Agreement as well. In that event, so goes the argument, PropCo would retain rights to use the customer list as "trade secrets," pursuant to Bankruptcy Code section 365(n). See Motion at p. 10, lines 11-12 (reserving PropCo's 365(n) rights); and the Agreement, at ¶ I(OpCo stipulates to the specific enforcement of PropCo's 365(n) rights).

The flaw in this argument is that it assumes that the Lease Agreement would be rejected by OpCo, rather than PropCo. What the Debtors ignore is that under Ninth Circuit law, a debtor-licensee of a nonexclusive license of certain types of intellectual property may not assume such license without the licensor's consent.[9] Here, if OpCo were to properly exercise its fiduciary duties, after rejecting the Master Lease, OpCo would not reject the License Agreement; instead, it would simply decline to consent to PropCo's assumption of it. Then, because under <u>CFLC</u> and <u>Catapult,</u> the License Agreement could not be assumed by PropCo without OpCo's consent, it would have to be rejected <u>by PropCo</u>. And since the rejection would be by the licensee (PropCo), rather than the licensor (OpCo), PropCo would not get the benefit of section 365(n), and would have no rights thereunder to the customer list.

D.  **THE MERE EXISTENCE OF THE AGREEMENT INDICATES THAT THE DEBTORS ARE RIVEN WITH CONFLICTS, AND UNABLE TO PROPERLY EXERCISE THEIR FIDUCIARY DUTIES TO THEIR SEPARATE ESTATES.**

The aforementioned infirmities in the settlement Agreement (at least from the perspective of the OpCo estate and its creditors), beg the question: How could this

---

[9]  See <u>In re CFLC, Inc.</u>, 89 F. 3d 673 (9th Cir. 1996); <u>In re Catapult Entertainment, Inc.</u>, 165 F.3d 747 (9th Cir. 1999).

11

happen? How could such a one-sided deal even get off the ground, let alone into this Court? The answer is in the personalities and the process that led to the Agreement.

First, as stated in the Motion and elsewhere, in connection with the Master Lease, PropCo was represented by the Gibson Dunn firm, and OpCo was represented by the Milbank firm. However, as was previously pointed out in several pleadings filed with this Court, prior to the petition date the Milbank firm issued an opinion letter to the PropCo lenders, pursuant to which Milbank gave its legal opinion that the Master Lease was a "true lease" for purposes of Bankruptcy Code section 365.[10] Accordingly, the fact that OpCo now gives short shrift to any recharacterization arguments, and even waives them under the Agreement, is not surprising.

Second, the names of the individuals that actually signed the Agreement for OpCo and PropCo demonstrate the conflicts-ridden nature of this deal. On behalf of OpCo, the Agreement is signed by Mr. Thomas M. Friel, an EVP and the Chief Accounting Officer for OpCo; so far, so good. But for PropCo, the Agreement is signed by Mr. Richard J. Haskins, who also happens to be the only witness for OpCo that submitted a declaration in support of the Motion. See Motion, Exhibit A, p. 25. So, while Mr. Haskins is an officer of OpCo, and submitted a declaration in support of the Agreement on behalf of OpCo, he also has authority to bind PropCo to this deal.

The Agreement thus is not exactly the result of the "extensive, arms' length negotiations between the Parties" (Motion at ¶ 39) that the Debtors would have us believe. Rather, this Agreement is simply the latest in a series of transactions designed to implement the Debtors' belief that "the value of the Station family of entities will be best preserved for all stakeholders if the Leased Hotels are maintained within the family, but a forced rejection of the Master Lease could prevent SCI from achieving that

---

[10] See "Independent Lenders' Reply Brief In Support Of Their Motion To Appoint An Examiner," [docket no. 536], at Exhibit A; and the "Response of Deutsche Bank To Committee Objection To PropCo Cash Collateral Order" [docket no. 253], at Exhibit A.

12

533656v.4

result." Motion at ¶ 17 (emphasis added). "Togetherness," apparently, is the goal of SCI (OpCo), regardless of the separateness of the estates, and regardless of the separate interests of OpCo's creditors or OpCo's fiduciary duties to its own creditors.

### III.

### CONCLUSION

For all the foregoing reasons, the Independent Lenders respectfully request that the Court deny the Motion, and decline to approve the settlement embodied in the Agreement.

Dated: December 4, 2009
       Reno, Nevada

Respectfully submitted,

*/s/ Sallie B. Armstrong*
Sallie B. Armstrong
DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 329-5900
Facsimile: (775) 786-5443
Email: sarmstrong@downeybrand.com

-and-

Isaac M. Pachulski (CA 62337)
Eric D. Goldberg (CA 157544)
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email: ipachulski@stutman.com
      egoldberg@stutman.com

ATTORNEYS FOR THE INDEPENDENT LENDERS TO STATIONS CASINOS, INC.