E-FILED ON DECEMBER 4, 2009

Shalom L. Kohn
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5440
Facsimile: (212) 839-5599
skohn@sidley.com

Jeffrey E. Bjork
Gabriel R. MacConaill
SIDLEY AUSTIN LLP
555 W. Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
jbjork@sidley.com; gmacconaill@sidley.com

Jennifer A. Smith
Nevada State Bar No. 610
LIONEL, SAWYER & COLLINS
1100 Bank of America Plaza
50 W. Liberty Street
Reno, NV 89501
Telephone:    (775) 788-8624
Facsimile:    (775) 788-8682
jsmith@lionelsawyer.com

Attorneys for the Collateral Agent to the CMBS Lenders

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.

☒ Affects this Debtor
☐ Affects all Debtors
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☒ Affects FCP MezzCo Borrower I, LLC
☒ Affects FCP PropCo, LLC
☐ Affects Northern NV Acquisitions, LLC
☐ Affects Reno Land Holdings, LLC

Chapter 11

Case No. BK-09-52477-gwz
Jointly Administered

**OBJECTION OF THE CMBS LENDERS TO THE JOINT MOTION OF STATION CASINOS, INC. AND FCP PROPCO, LLC PURSUANT TO 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) AND 365(d)(4)(B)(ii) AND FED. R. BANKR. 9019 FOR ENTRY OF AN ORDER APPROVING MASTER LEASE COMPROMISE AGREEMENT**

Hearing Date:    December 11, 2009
Hearing Time:    10:00 a.m.

LA1 1678394

This objection is being filed on behalf of German American Capital Corporation as collateral agent for itself and JP Morgan Chase as lenders (the "CMBS Lenders") to debtor FCP PropCo, LLC ("PropCo") to address the *Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Master Lease Compromise Agreement* [Docket No. 587] (the "Motion") filed on November 19, 2009, by debtors Station Casinos, Inc. ("SCI" or "OpCo") and PropCo (collectively, the "Debtors").

## OVERVIEW

A scant twenty-seven days after filing a pleading which recognizes that the Master Lease provides "substantial credit enhancement to the value of the Mortgage Loans" (Debtors' Exclusivity Motion [Docket No. 505], at 7), the Debtors filed a Motion that utterly destroys that credit enhancement without adequately protecting the CMBS Lenders' interests.

It is particularly extraordinary that this deal to jettison the rights of the CMBS Lenders was done in a secret negotiation between OpCo and the hand-picked board members of its wholly owned subsidiary, PropCo, without any participation by, and over the objection of, the CMBS Lenders, and despite numerous requests by the CMBS Lenders that they participate in any negotiations. (CMBS Lenders' Objection to Lease Extension [Docket No. 546], at 3.) Putting to one side the actual motives of the PropCo board in negotiating this purported "compromise" (the "Forced Lease Modification"),[1] the result does not withstand scrutiny. It eviscerates what is perhaps the most formidable right under the Bankruptcy Code – the right of a lessor to insist on full payment of rent for an asset which the lessee would like to retain. According to the Motion, the cost of this concession to PropCo, and the resulting diminution of the CMBS Lenders' collateral, is approximately $23 million in reduced rent for the three-month period. In exchange for this concession, the Forced Lease Modification purports to obtain "transition" assistance. But in terms of actually providing the many things needed for a successful transition to a new licensed operator after

---

[1] Given the accelerated briefing schedule and the Thanksgiving holiday, it was not possible to complete the depositions of the PropCo board members in time to incorporate all the results of that examination in this pleading. The CMBS Lenders, accordingly, will present any relevant facts arising from that discovery at the hearing on this matter or in supplemental pleadings.

LA1 1678394

lease rejection, the transition assistance set forth in the so-called Master Lease Compromise Agreement ("MLCA") would be entirely illusory even as to PropCo, and affords no rights or material value to the party most affected, the CMBS Lenders.

The CMBS Lenders and their affiliates (as swap counterparty) are the only creditors of PropCo (Exclusivity Objection [Docket No. 544], at 7; Objection to PropCo Schedules [Docket No. 541], at 3-4; White Dep. at 72:2-16),[2] and OpCo's equity interest in PropCo is completely under water. It thus escapes all understanding why the CMBS Lenders – who have both the economic interest to press for a maximum deal and the knowledge as to what is required for a successful transition – were foreclosed by the PropCo board from even participating in this renegotiation of the value of their collateral, and advised of the deal terms only as the Motion was being filed on shortened notice. It is even more perplexing why the PropCo board felt empowered – on behalf of no constituency whatsoever – to impose its own views as to how to address the Master Lease and to ignore the desires and objectives of PropCo's only creditors.[3] This is hardly consistent with the obligation of those who "stand in a fiduciary relationship to the estate's creditors." In re Perez, 30 F.3d 1209, 1214 n. 5 (9th Cir. 1994).

The CMBS Lenders have been working very hard to negotiate an overall plan which allows OpCo to retain the leased assets which provide 67% of its consolidated EBITDA. If an acceptable plan cannot be negotiated, the CMBS Lenders are prepared to take over these assets, and have already lined up a potential replacement manager which prepared a detailed post-rejection transition plan for that purpose. Thus, whether OpCo can emerge with all its current casinos, or

---

[2] The Deposition of Robert White, Esq., taken December 2, 2009 ("White Dep.") is attached as Exhibit A to the Declaration of Jeffrey E. Bjork in Support of the Objection of the CMBS Lenders to the Joint Motion of Stations Casinos, Inc. and FCP Propco, LLC pursuant to 11 U.S.C §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed.R.Bankr.P 9019 for Entry of an Order Approving Master Lease Compromise Agreement ("Bjork Declaration"). The CMBS Lenders are attaching the entire White Dep. in the most current form available for the convenience of the Court and the other parties, but the CMBS Lenders are only using the White Dep. for the admissions cited herein and are not seeking to admit the entire White Dep. into evidence.

[3] To conceal their actions, the PropCo board agreed with OpCo to maintain the lease modification negotiations as confidential (PropCo-000986, attached as Exhibit B to the Bjork Declaration), and even refused to deliver the finalized agreement before it was filed, based on the concern of OpCo's counsel that giving the CMBS Lenders an unexecuted agreement would prompt a demand that "PropCo not enter into the stip." (PropCo-000301-000304, attached as Exhibit C to the Bjork Declaration). Thus, PropCo succumbed to OpCo's insistence that the secret agreement be presented to this Court as a *fait accompli*.

LA1 1678394

whether these Debtors emerge as separate OpCo and PropCo entities for the benefit of their respective creditors, is not a matter which should concern this Court.  The overriding issue is whether the rights of parties in each estate – and these are separate estates, consolidated for procedural purposes only and not to affect any party's substantive rights (Joint Administration Order [Docket No. 21] at 2) – is being protected.  As for PropCo and its creditors, they are not.

For four reasons, the Forced Lease Modification cannot be approved:

<u>First</u>, it violates the express terms of this Court's prior PropCo Cash Collateral Order [Docket No. 245], which obligates OpCo to pay the full Master Lease rent prior to assumption or rejection of the Master Lease.

<u>Second</u>, by reducing rents by $23 million and waiving the Bankruptcy Code rights of a lessor, the Forced Lease Modification uses and dissipates the CMBS Lenders' collateral without adequately protecting the CMBS Lenders' interests.

<u>Third</u>, the Motion is based on a false premise.  It presents this Court with the specter of a "melt-down" scenario if the Master Lease is rejected for non-payment of required rent and the casinos cease operation.  But the Debtors neglect to advise the Court of the November 8 letter to Debtors' counsel – to which the Debtors did not even deign to reply – in which the CMBS Lenders proposed a post-rejection transition arrangement that preserved jobs and values, and provided well over $50 million more in value for the OpCo estate than a precipitous rejection (the "<u>November 8 Offer</u>" attached as Exhibit D to the Bjork Declaration).  If rejection were to occur, because OpCo ultimately chose to accede to the demands of the OpCo Banks and not seek the use of its unencumbered Vista cash, the consequences would not be a precipitous rejection (even under a business judgment test) because a superior rejection alternative, both to the estate and the public interest, was available under the terms of the November 8 Offer.

<u>Fourth</u>, although advocated as a compromise, the Motion fails to satisfy Rule 9019 standards.  Among other things, the MLCA fails to comply with the key Rule 9019 factor of deference to the views of creditors.  Instead, it was intentionally negotiated in secret – by a Board installed by OpCo in anticipation of bankruptcy after it had fired the two then-existing independent PropCo directors – to *avoid* any input from creditors.  Further, in terms of disproportionate *quid-pro-*

3

*quo*, the MLCA transaction costs the PropCo estate $23 million in foregone rent; OpCo, on the other hand, is fully paid for any work it does and gives up nothing, even if rejection ultimately occurs. And the benefits which PropCo purportedly receives in the form of post-rejection "transition" are so constrained as to be entirely illusory in terms of actually achieving an uninterrupted continuation of operations in the hands of a successor operator. It is no wonder that OpCo demanded that PropCo negotiate this deal without any input from the CMBS Lenders whose rights and assets were being impaired.

## ARGUMENT

### A.  The Forced Lease Modification Violates This Court's Prior Order.

The PropCo Cash Collateral Order is explicit. It states: "Prior to the entry of an order of the Bankruptcy Court approving assumption or rejection of the Master Lease, <u>SCI shall timely pay all amounts due, including, without limitation, rent due under the Master Lease</u> . . . and timely perform all its other obligations under the Master Lease in accordance with its terms in full satisfaction of the requirements of sections 362(d)(3) and 365(d)(3) of the Bankruptcy Code . . . ." (PropCo Cash Collateral Order, [Docket No. 295], Ex. 1 ¶ a.) (emphasis added). This provision was bargained and paid for by the CMBS Lenders in allowing PropCo the use of cash collateral, and embodied in the parties' Stipulation, which this Court "approved and hereby so ordered…." (Id. at 2.)

The Motion does not seek to reject the Master Lease, but only to reduce the rent payable thereunder. Thus, the PropCo Cash Collateral Order is fully applicable by its terms. As a prior final order of this Court, it binds the Debtors and flatly precludes the relief sought in the Motion.[4]

### B.  The Interests of the CMBS Lenders' Are Not Being Adequately Protected Under the Forced Lease Modification.

---

[4] As a post-petition Stipulation, moreover, the PropCo Cash Collateral Order represents a Court-approved agreement which gives the CMBS Lenders an administrative claim in the full amount of any pre-rejection rent shortfall – and thus renders nugatory any purported administrative rent savings under the Forced Lease Modification, even if the binding effect of the Prop Co Cash Collateral Order were otherwise ignored.

4

The CMBS Lenders hold a perfected assignment of rents in the Master Lease, which per the Motion (Motion ¶ 20) requires monthly rent payments (including property taxes) of $21.5 million. By contrast, monthly payments under the Forced Lease Modification are projected by the Debtors to total only $13.8 million, a diminution of $23 million for the three-month period. (Id.) The difference, euphemistically termed "Deferred Rent" (MLCA ¶ B), is payable only in the unlikely event that the Master Lease is assumed (id. ¶ G), but is otherwise stripped of any rights to administrative claim treatment under §§ 365(d)(3) and 503(b), and relegated to a general unsecured claim (id. ¶¶ F, H) which at best has a "remote" chance of recovery (White Dep. at 99:1-24).[5]

Thus, by modifying the Master Lease, the Forced Lease Modification deprives the CMBS Lenders of $23 million which their Master Lease collateral entitles them to receive. The Debtors concede that they are required to provide the CMBS Lenders with adequate protection (Motion ¶ 48), and make the futile effort (discussed below) of purporting to satisfy this requirement, but neither the Motion nor the Forced Lease Modification provides any adequate protection to the CMBS Lenders for this economic loss.[6]

In addition, as parties secured by the Master Lease, the CMBS Lenders are entitled not only to the economic value of their lease collateral, but also to the legal rights which a lease affords in a bankruptcy case – which is the reason the CMBS Loan transaction was structured through the use of a Master Lease in the first place. (Exclusivity Objection [Docket No. 544], at 4-5.) In the case of the Master Lease, these legal rights include the right to current payments of rent prior to rejection under § 365(d)(3) of the Bankruptcy Code, and the general "cum onere" rule of executory contracts that a debtor cannot obtain the benefit of such agreements unless it fully complies with the contract terms. Given that the four PropCo casinos now provide some 67% of the

---

[5] Accordingly, the Debtors' statement that the MLCA "simultaneously preserv[es] the rights of SCI and PropCo *vis a vis* payment of rents under the Master Lease" (Motion ¶ 33; see also id. ¶ 34, ll. 25-26) is at best disingenuous. So is the extraordinary statement that "To be clear, the Parties are not agreeing to forego rent, but rather to defer it in a manner consistent with the prohibitions on paying the December Rent as decreed by the Prepetition Lenders….." (Motion ¶ 41.) Converting an administrative claim due now into a unsecured claim of remote value is far worse than a mere deferral.

[6] The deferred rent request made in the Motion is the same as "use" of the Master Lease outside the ordinary course, which must be approved under § 363(b)(1). See 11 U.S.C. § 363(b)(1). The Debtors admit as much since they seek relief under § 363(b)(1) (Motion ¶¶ 2, 35), and attempt to argue why the "use" contained in the Forced Lease Modification should be approved by the Court (Motion ¶¶ 35-39).

5

aggregate EBITDA of SCI, the leverage of this lessor's position, in plan negotiations and otherwise, is powerful indeed.

Rather than seeking to maximize these legal rights and leverage for the benefit of its creditors, the PropCo board secretly bargained them away for inadequate consideration, and now seeks to justify that action under the loose business judgment rule.[7] (Motion ¶¶ 42-46.) But the controlling test here is the more exacting one of adequate protection of the rights of the CMBS Lenders – as to which issue the Debtors have the burden of proof. 11 U.S.C. § 363(p)(1).

The demanding requirements for adequate protection are well established. Adequate protection "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." In re Am. Mariner Indus., 734 F.2d 426, 435 (9th Cir. 1984), *abrogated on other grounds*, 484 U.S. 365, 368 (1988). "Secured creditors should not be deprived of the benefit of their bargain," and "[w]hether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value." Id. at 431, 432 (quoting H.R. Rep. No. 95-595, at 339 (1978); see also In re Bear River Orchards, 56 B.R. 976, 978 (Bankr. E.D. Cal. 1986) (quoting Martin v. Commodity Credit Corp. (In re Martin), 761 F.2d 472 (8th Cir. 1985)). Because neither cash payments nor replacement collateral is being offered here, PropCo must, under § 361(3), give the CMBS Lenders the indubitable equivalent of the $23 million and other rights they are losing under the Forced Lease Modification. This is an exacting standard indeed. "Indubitable

---

[7] Importantly, the business judgment rule is not applicable to a transaction involving affiliated entities— like the SCI debtor parent and its wholly-owned PropCo debtor subsidiary. Mission Iowa Wind Co. v. Enron Corp., 291 B.R. 39, 43 (S.D.N.Y. 2003) (reversing the bankruptcy court which had deferred to the debtor-parent's business judgment on allocation of sale proceeds). See also C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.), 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (holding sales of debtor's assets to insider "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse"); In re Regensteiner Printing Co., 122 B.R. 323, 326 (N.D. Ill. 1990) ("Courts must scrutinize transactions between insiders and the debtor-in-possession to ensure that the transactions are fair to the estate and creditors."). In related party cases, the transaction must be subjected to "meaningful scrutiny" to ensure that it is not "infected by self-dealing." Mission Iowa Wind Co., 291 B.R. at 93. In such a situation, to fulfill the duty of bankruptcy courts to ensure the integrity of separate bankruptcy estates and appropriately allocate value between the estates, the court should "make an independent determination of whether the proposed transaction is fair and reasonable" to each debtors' estate, and should not defer to a debtor's business judgment. Id. (citing In re White Motor Credit Corp., 14 B.R. 584, 591-92 (Bankr. N.D. Ohio 1981)). The Debtors have cited no authority that this requirement of meaningful scrutiny disappears when one of the affiliates installs a purportedly independent board, and any notion that the PropCo board should be given deference is undermined by its conduct in negotiating the transaction without consultation with or consideration of the wishes of its only creditors. Not surprisingly, the cases relied upon by the Debtors for application of the business judgment rule all deal with transactions between a debtor and an unaffiliated entity, and thus provide no support for the Debtors' position.

LA1 1678394

means too evident to be doubted." In re Arnold & Baker Farms, 85 F.3d 1415, 1421 (9th Cir. 1996) (quoting In re Walat Farms Inc., 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987)). If a debtor seeks to alter a secured creditor's interests, the indubitable equivalent standard "requires that the substitute collateral not increase the creditor's risk exposure." In re Keller, 157 B.R. 680, 683-84 (Bankr. W.D. Wash. 1993).

Needless to say, the Debtors have not provided anything which even resembles adequate protection, let alone protection which satisfies the indubitable equivalence test. Let us examine what the Debtors say on the subject. First, the Debtors say that adequate protection is being provided because "Reduced Rent can never be less than 120% of all required adequate protection payments due to the Mortgage Lenders and their professionals." (Motion ¶ 48.) Presumably, "required adequate protection payments" is a reference to the PropCo Cash Collateral Order, which specified that these payments be made. But payment of interest and fees is not the only adequate protection specified in the PropCo Cash Collateral Order. That Order also provided for the continued payment of the *full amount* of Master Lease Rent before rejection, and for the accumulation of any amounts not spent in a special account. (PropCo Cash Collateral Order ¶ b.) These unspent amounts, which approximated $11 million per month *after* payment of $5.9 million in Swap payments, "accumulate at PropCo as the [CMBS Lenders'] collateral." (Debtors' Omnibus Reply to Exclusivity Objections [Docket No. 559] at 4). Under applicable Ninth Circuit law, moreover, this accumulated surplus is additive to the CMBS Lenders' secured claim.[8] The 120% minimum rent provision would yield a surplus of around $1 million per month. Plainly, a monthly $1 million cash collateral surplus is not the indubitable equivalent of the $11 million in monthly cash collateral surplus which the Forced Lease Modification eliminates.

---

[8] As previously stated in the CMBS Lenders' Statement of Position in Connection with the September 2, 2009 Hearing [Docket No. 153] under applicable Ninth Circuit law, the Master Lease and the rents thereunder are not only the collateral of the CMBS Lenders, but any rents paid under the Master Lease increase the amount of the CMBS Lenders' secured claim. As one court put it, "the law in this Circuit is clear" that when a creditor's liens extend to both "income producing real property" and "rents or other income generated by the property . . . the amount of [its] secured claim includes both the value of the real property and the amount of the accumulated cash collateral." In re Arden Properties, Inc., 248 B.R. 164, 168 & n.1 (Bankr. D. Ariz. 2000), (citing In re Ambanc, 115 F. 3d 650, 654 (9th Cir. 1997)).

7

Equally nonsensical is the Debtors' suggestion that additional adequate protection will be provided by eliminating the Swap payment. ( Motion ¶ 48.) This Swap payment was money which the CMBS Lenders negotiated in the Cash Collateral Order to be paid to one of their affiliates. Depriving that swap affiliate of the cash which the CMBS Lenders wanted it to receive is hardly adequate protection to the CMBS Lenders for depriving them of yet additional cash, through non-payment of their rent collateral under the Master Lease.

The Debtors' last argument is that giving PropCo transition rights provides adequate protection. (Motion ¶ 48.) The deficiencies of this purported transition are addressed below, but on the adequate protection issue, two principal points are immediately relevant. First, the Debtors have made no showing that these transition rights are remotely worth the $23 million and the sacrifice of §§ 365(d)(3) and 503(b) rights which occur under the Forced Lease Modification. Indeed, PropCo never even attempted to place a value on the transition rights it was to receive. (White Dep. at 99:1-24.) Even more important, this is not adequate protection given to the CMBS Lenders, because the CMBS Lenders are not given any current rights to transition services, so the value (if any) of the promised transition to the CMBS Lenders is diluted by continued uncertainty. (See, e.g., MLCA ¶ K(iv) (rights to FF&E and trademarks only if the CMBS Lenders obtain relief from the stay ), id. ¶ Q (relief from stay limited to PropCo and explicitly excludes any successor).) Nor is there any assurance that this Motion is the last word on the subject, because the Forced Lease Modification contemplates that PropCo can come back and extend this arrangement after March 2010. (Id. ¶ D.) Thus, the purported "transition" also fails to provide adequate protection to the CMBS Lenders.

Finally, the Master Lease is subject to an absolute assignment in favor of the CMBS Lenders, and section 26.11 of the Master Lease (which makes the CMBS Lenders a third-party beneficiary in section 26.13), expressly prohibits its modification without the approval of the CMBS Lenders (as does section 5.1.22(g)(i) of the CMBS Loan Agreement). The Motion fails for this reason alone, because one cannot amend an agreement which by its own express terms cannot be amended without the consent of a party which is opposing that amendment.[9] At a minimum, these

---

[9] Notably, in a November 17 e-mail, PropCo's counsel (who seemingly was previously unaware of the issue) raised the CMBS Lenders' argument that "PropCo is not able to consent to modify the rent under the Master Lease." (PropCo-
*(Footnote continued)*

8

third-party beneficiary rights and no-amendment provisions are significant rights of the CMBS Lenders,[10] which are entirely overridden without any compensation or adequate protection of the CMBS Lenders' interests.

For all these reasons, the Debtors have failed to carry their burden of demonstrating adequate protection of the interests of the CMBS Lenders.

### C. The Premise of the Motion as to the Risks of Precipitous Rejection Is Faulty

The central premise of the Motion, from PropCo's perspective, is that it "would be exposed to significant potential risk and uncertainty upon a precipitous or uncontrolled rejection of the Master Lease." (Motion ¶ 15.) This statement assumes without foundation that at the end of the day, either OpCo or the OpCo Banks would risk a precipitous rejection which would threaten the jobs of the 6,300 employees of the four PropCo casinos and further damage the already-fragile Las Vegas economy. Such an action by OpCo would certainly gain the attention of the Nevada Gaming Commission as well as elected and other government officials (as the Motion ¶¶ 11 & 18, concedes), all of which would have a very negative fallout on SCI and its own continuing operation, and thereby impair the value of the OpCo Banks' collateral. Further, the Operating Subsidiaries have agreed in their respective subleases (the "<u>Subleases</u>," a representative copy of which is attached as Exhibit F to the Bjork Declaration) to enter into new leases with PropCo, on the same terms, in the event the Master Lease is terminated, so PropCo could enforce its rights against those non-Debtor entities in the event the Master Lease is rejected.[11] (Subleases § 6(d).)

---

000564-000566, attached as Exhibit E to the Bjork Declaration). In response (<u>id.</u>), OpCo's counsel made the same argument as set forth in the last paragraph of the Motion (¶ 49) – that under Section 104A of the Nevada Revised Statutes, the CMBS Lenders do not have the right to exercise "any control over the terms and duties of the Master Lease." The cited section, however, comes from the Uniform Commercial Code and thus deals with personal property leases, not real property leases like the Master Lease, and therefore provides no authority to justify disregarding state contract law and allowing the Debtors to modify a Master Lease which by its terms cannot be modified.

[10] The MLCA also may be modifying rights under the Subleases to the Operating Subsidiaries, in further violation of the CMBS Lenders' rights. See footnote 11 *infra* and accompanying text.

[11] Because the Subleases incorporate all the provisions of the Master Lease, they necessarily include the provision making the CMBS Lenders into third party beneficiaries of this attornment provision, and preclude modification without the CMBS Lenders' consent. (Subleases §§ 4, 5(a).) In addition, the Subleases contain a provision (Subleases § 6(e)) requiring the Operating Subsidiaries to pay their sublease rent directly to PropCo upon notice of OpCo's default. The MLCA is not explicit in how these Sublease obligations are to be addressed, but to the extent they are being waived or modified for the benefit of the non-debtor Operating Subsidiaries, this creates additional issues which preclude approval of the Forced Lease Modification.

9

1        Nor should PropCo assume that this Court would permit OpCo to effect a precipitous
2   rejection.  Even under ordinary circumstances, a court will order transition arrangements to prevent
3   damage to the non-debtor party.  See, e.g., In re Exide Techs., 340 B.R. 222 (Bankr. D. Del. 2006)
4   (granting transition period following rejection to mitigate business disruption to licensee); In re Tex.
5   Health Enterprises, Inc., 255 B.R. 185 (Bankr. E.D. Tex. 2000) (ordering debtor to continue
6   operating nursing home until lessor could make alternative arrangements post rejection).  Here, there
7   is the additional factor that the November 8 Offer provided a third alternative to the Debtors'
8   fallacious Hobson's choice of either the MLCA or a precipitous rejection.  The November 8 Offer
9   (discussed more fully below) gave OpCo the ability, in the event of rejection, to effect a transition
10  without any cost and with significant benefits to the OpCo estate, thereby providing an option which
11  is far superior for the estate and the public interest than a precipitous rejection.  *It is telling that the*
12  *Motion failed to advise the Court of this alternative.*
13       As a legal matter, the existence of the November 8 Offer is conclusive in preventing
14  any court approval of a precipitous rejection.  If OpCo cannot pay the rent and seeks to reject, the
15  issue then before the Court would not be whether OpCo should or should not reject the Master
16  Lease, but whether *if rejection otherwise were to occur*, it should be done as a precipitous rejection
17  or under the terms of the November 8 Offer.  On that question, the Debtors would have to establish,
18  as a matter of sound business judgment, that the precipitous rejection is superior.  It is clear that they
19  would never be able to do so.  The Debtors admit that "an uncontrolled (or non-negotiated) rejection
20  of the Master Lease . . . would unduly and unnecessarily harm the Parties' respective bankruptcy
21  estates."  (MLCA ¶ 15)  By contrast, the November 8 Offer provides an orderly transition for OpCo
22  and its employees, covers the costs of transition, avoids costs of severance, and pays $1 million for
23  unique trademarks for these casinos which otherwise would be worthless to the estate.
24  Conservatively, the differential positive value of the November 8 Offer to the OpCo estate would
25  exceed $50 million.  In addition, the November 8 Offer would protect the public interest by saving
26  over 6,300 jobs and preventing damage to the Las Vegas economy.  Thus, especially given the
27  November 8 Offer, the Debtors will be unable to establish that a precipitous rejection is for the
28  benefit of the estate.  See generally In re Chi-Feng Huang, 23 B.R. 798, 801 (9th Cir. BAP 1982)

10

("The primary issue is whether rejection would benefit the general unsecured creditors"); In re Pomona Valley Medical Group, Inc., 476 F.3d 665, 671 (9th Cir. 2007) ("There may be cases where the disproportionate damage to the party whose contract is to be rejected demonstrates that the debtor-in-possession's decision could not be based on sound business judgment.").

Yet the Debtors' response to the November 8 Offer has been consistent. They ignored it when received – eschewing any opportunity to tweak its terms or address any issues – and ignored it in arguing the purported rationale for PropCo's entry into the Forced Lease Modification. Mr. White, one of the independent PropCo directors, received a copy of the November 8 letter but never even read it (White Dep. at 126:1-127:16), and thus never considered its effect in evaluating the prudence of the MLCA (Id. at 129:1-5). But because of the November 8 Offer, the core premise of PropCo's entry into this transaction – the risk of a precipitous rejection – collapses of its own weight.

To be sure, certain aspects of the transition arrangements under the Forced Lease Modification borrow liberally (if superficially) from the November 8 Offer, but there are five significant differences between the two. First, the November 8 Offer is not contrary to § 365(d)(3), because it does not purport to keep the existing Master Lease in place without paying full contractual rent. Rather, it is explicitly set forth as a transition arrangement *after* rejection. Thus, the policy and requirements of § 365(d)(3) are not implicated. Second, the November 8 Offer starts the transition process immediately, unlike the Forced Lease Modification, which continues to leave the ultimate disposition of the Master Lease in limbo, without any certainty of how long PropCo and OpCo might agree to extend its terms. (MLCA ¶ D.) This threat of unlimited extension is further directly contrary to the policy of § 365(d)(3), which requires full performance prior to lease rejection. Third, the November 8 Offer was extended with the consent of the CMBS Lenders, and therefore avoids all the dispositive issues noted above as to the violation of the PropCo Cash Collateral Order, the prohibition on nonconsensual amendments, and the lack of adequate protection. Fourth, as a matter of economics, the Forced Lease Modification imposes a three-month cost of $23 million in the form of reduced rent, which the November 8 Offer, by starting transition immediately, does not impose. Fifth, although it uses the word "transition," the actual terms of the transition offered by the Forced

11

1  Lease Modification are both contingent (e.g., MLCA ¶¶ K(iv), Q) and fraught with uncertainties, for
2  all the reasons set forth in the next section of this brief.
3        There is an even deeper reason – even apart from the November 8 letter – that the
4  risks of the precipitous rejection cannot be used to justify the Forced Lease Modification.  Mr.
5  Haskins, General Counsel of OpCo, testified that it was "extremely unlikely" that the Nevada
6  gaming authorities would allow the casinos to go dark (Haskins Dep. at 167:12-16)[12], but would
7  exercise their supervisory authority to "try to figure out a way to keep these doors open."  (Id. at
8  168:1-8)  Per Mr. Haskins, this would include "looking at SCI as a current licensee" to "do the right
9  thing for the State of Nevada."  (Id. at 169:24-169:10).  Thus, while OpCo was negotiating the
10 MLCA on the basis of the threat of precipitous rejection, its own general counsel knew that this was
11 a hollow threat.  PropCo, on the other hand, did not have the benefit of any independent regulatory
12 advice on that issue.  The only persons with regulatory expertise with which PropCo consulted were
13 "people at Stations" (White Dep. at 93:13-21) and in particular Mr. Haskins (id. at 95:1-5) – who
14 apparently did not convey his actual views that a precipitous rejection was "most unlikely."
15       For all these reasons, the resulting Forced Lease Modification was at best based on a
16 faulty premise as to the risks of precipitous rejection.  The decision – and the Motion which seeks to
17 implement it – cannot stand.

**D.  The Alleged Benefits of "Transition" under the Forced Leased Modification Are Illusory and Do Not Support the Concessions Made by PropCo**

The Motion seeks to justify the Forced Lease Compromise as a "compromise" under Rule 9019.  (Motion ¶¶ 42-46.)  Even apart from the issues raised above, the Motion cannot be justified on that basis.  As the Debtors admit (Motion ¶ 43), the "fair and equitable standard" for Rule 9019 requires consideration of "the paramount interest of the creditors <u>and a proper deference to their views in the premises</u>."  In re Woodson, 839 F.2d 610, 620 (9th Cir. 1988) (emphasis supplied).

---

[12] Deposition of Richard Haskins taken December 3, 2009 ("Haskins Dep.").  Relevant portions of the Haskins Dep. are attached as Exhibit G to the Bjork Declaration.

12

Here, PropCo's exclusion of its creditors from the MLCA discussions had a very damaging effect on the process. PropCo knew, for example, that the CMBS Lenders preferred that there not be any lease modification negotiations, but proceeded anyway (White Dep. at 38:24-41:7.) Moreover, the CMBS Lenders were given no opportunity to provide input to the PropCo board about what might be necessary or desirable to effect a transition. Mr. White, for example, knew that the CMBS Lenders had engaged a consultant to advise on that issue (White Dep. at 78:17-79:2), while PropCo never hired anyone for that purpose (id. at 75:8-10), and neither he nor Mr. Kors (the other independent director) nor FTI had expertise as to such operational requirements (id. at 75-77, 91:24-93:22). Indeed, Mr. White did not even know whether the MLCA transition provisions were sufficient to enable a new operator to take over without undue disruption (id. at 89:6-14). See also id. at 89:22-23 ("we did what we did").[13]

Because PropCo excluded the party with both the stake and the knowledge to negotiate the most advantageous transaction, it is no surprise that the outcome of the negotiations was entirely to PropCo's disadvantage. As an overall deal, the MLCA cannot be regarded as a fair exchange, because PropCo bears all the costs and OpCo bears none. The agreement provides for full reimbursement of all of OpCo's costs, and even for the payment of a management fee after the first 60 days (MLCA ¶ O)[14] and then an additional $1 million extension fee (id. ¶ P). PropCo is made to pay for inventory, prepaid expenses, and even certain unique trademarks associated with the four casinos, such as the name "Red Rock," which would be of no use to OpCo after transition. By

---

[13] Mr. White went on to say "But we certainly didn't go out, find an operator, and spend the kind of time that you and your clients have spent with an operator talking about all the specifics of what that particular operator needs. We did not do that." (White Dep. at 90.) The exclusion of the CMBS Lenders from the discussions meant that PropCo negotiated a deal without the benefits of that expertise, with the resulting defects described in more detail below.

The notion that PropCo would negotiate a transition arrangement, without knowledge what an appropriate transition requires, undermines any attempt to rely on the business judgment standard, even if otherwise applicable. See footnote 7 supra. Agarwal v. Pomona Valley Med. Group (In re Pomona Valley Med. Group), 476 F.3d 665, 670 (9th Cir. 2007) (Application of the business judgment rule is premised on the debtor in possession (i) acting prudently, (ii) on an informed basis, (iii) in good faith, and (iv) in the honest belief that the action taken was in the best interests of the bankruptcy estate); see also supra p. 12 (not informed on regulatory issues). These negotiations were neither prudent nor on an informed basis.

[14] In another unexplained windfall for OpCo, OpCo receives the percentage management fees computed based on a full month of revenues and EBITDA, even if it is providing management only for a partial month (MLCA, ¶¶ O, P).

13

1   contrast, PropCo is surrendering $23 million and valuable §§ 365(d)(3) and 503(b) rights, all of
2   which are the CMBS Lenders' collateral.

3      Nor can it be said that this is a "compromise" of "one of the main points of
4   contention" as to "how to deal with the Master Lease." (Motion ¶ 45.) As a legal matter, there is no
5   issue about the Master Lease, because § 365(d)(3) and its requirement to pay full rent is absolutely
6   clear. Nor can the Forced Lease Modification be said to resolve the fate of the Master Lease,
7   because all it does is kick the problem down the road for three months, at a $23 million interim cost
8   to PropCo and the CMBS Lenders. Thus, there is no legitimate "compromise" here.

9      At best, therefore, PropCo's "compromise" argument boils down to the proposition
10  that the benefits it received by assuring transition justify the sacrifice of the CMBS Lenders' rights
11  under § 365(d)(3) and $23 million in reduced rents. The fact is, however, that the "transition"
12  benefits under the Forced Lease Modification are entirely illusory.

13     The object of a transition arrangement is to ensure that, after the Master Lease is
14  rejected, the properties can be transferred to a new licensed operator, without any interruption in the
15  operations of the casinos or in the customer experience. In effecting transition for these casinos, as
16  in virtually any business, a myriad of specific and detailed operational steps are needed to assure the
17  continuity of operations. These encompass all aspects of the complex business. They include, for
18  example, transitioning the critical information technology data and systems used in the business, all
19  books and records, information about vendors and customers, and data about employees. During
20  transition, the successor must be able to access and use the relevant data, systems, and other material
21  on a real-time and seamless basis (rather than, for example, having a mound of papers which it might
22  need to sort though). If a new software system needs to be installed, transition requires cooperation
23  to assure the typically complex migration from the old system to the new one, with data back-up
24  until the new system is stable. Transition also includes the transfer of the assets necessary for
25  continued operation.

26     Even under the best of circumstances, a transition effort can inevitably involve some
27  glitches, but a palpable gap in transition with respect to any material aspects of a complex business
28  will not only increase costs, but risk disrupting the turnover and destroying economic value. In the

14

case of a casino, moreover, the process is complicated by the requirement of obtaining various licensing approvals before a new owner can operate the casino or take possession of gaming equipment. This process takes many months, and requires the would-be licensee to obtain considerable information from the existing operator in order to prepare and prosecute its licensing application.

The Motion trumpets the argument that the Forced Lease Modification provides for "transition" – but it does not provide a transition sufficient to ensure continuity of operation. Rather, the MLCA's sole standard is that SCI "continue the uninterrupted operation of the Leased Hotels by the Operating Subsidiaries as if the Master Lease and License Agreement were in full force and effect." (MLCA ¶ K.) All this says is that the casinos will continue to operate post-rejection. It does not say that anyone will make every effort to ensure that a new manager or owner will be in a position to *continue those operations* when SCI ceases to operate. Thus, under the terms of the Forced Lease Modification, even if the lease is rejected, the benefits of a transition arrangement are not assured, but would become subject to yet an additional series of negotiations (at best) under further threat of precipitous shutdown. The purported benefits of the alleged bargain achieved by PropCo – a give up on $23 million in rent for the three-month period, in exchange for certainty if the parties cannot come to terms and the lease is rejected – simply do not exist.

The terms of the MLCA are so laced with caveats, restrictions, and internal contradictions that many of the purported benefits of the "transition" arrangement evaporate on further scrutiny.[15] For example, apart from the overriding problem of a lack of an unequivocal general obligation to fully cooperate in transition to a new licensee:

- Asset transfers are made subject to the OpCo Bank Forbearance Agreement (MLCA ¶ K(iii)), which generally prohibits asset transfers by OpCo and the Operating Subsidiaries.
- The MLCA is replete with exclusions which allow OpCo to withhold any information which it deems confidential, proprietary, or competitive or which is not exclusively related to these casinos (e.g., MLCA ¶¶ K(iii), K(vii), including "operating practices" (id. ¶ M) at these casinos. Because most casino operations

---

[15] On some of these points, the MLCA is perhaps unclear – but to a successor seeking to transition operation on a real time basis, having a litigation position which might prevail after extended court proceedings provides little comfort.

15

can be viewed as involving the unique or confidential thoughts and ideas of the manager,[16] and because key functions for these casinos are performed, on a joint basis, at the corporate level, these exclusions create huge gaps in the transfer of critical data and records.[17]

- Instead of the 18-month right to *use* the "database of the Primary Customers" provided in the License Agreement (Motion, Ex. C, §3.2) and protected by §365(n), the MLCA speaks only of the turnover of a "list" of Primary Customers (¶ K(ii)), and then only for the duration of the Transition Period

- The MLCA provides for the purchase of trademarks, inventory or prepaid expenses, but does not define a price (or give PropCo a credit for such purchase price as against the Reduced Rent), and does not give PropCo the option to decline to effect that purchase if the price is unacceptable or if the successor manager determines that certain trademarks, inventory or prepaid expenses are unnecessary or undesirable. (MLCA ¶ K(iii).)

- PropCo is allowed to extend offers to employees (MLCA ¶ K(vi)), but this excludes both general managers and corporate employees (id.) and it must do so without any information on compensation (id. ¶ M).

- The trademark license ends at the conclusion of the Transition Period (MLCA, at 16, following ¶ K(viii)), or perhaps some months thereafter (see id. ¶ L), rather than the 18-month period recognized in the License Agreement (§ 2.3) as appropriate for rebranding.

- More broadly, the 150-day transition period is dramatically shorter than the 12 to 18 month period of transition assistance which FTI, PropCo's financial advisor, said would be necessary. (PropCo-002339, attached as Exhibit I to the Bjork Declaration).[18]

Thus, under no circumstances can it be said that the so-called "transition" under the MLCA gives PropCo commensurate value for its surrender of $23 million and its § 365(d)(3) rights. Accordingly, there is no basis which can support approval of the Motion under Rule 9010.

---

[16] This issue is particularly acute as to information technology and software, because the Debtors use proprietary systems for many key aspects of casino operations, and the MLCA contains no provision for providing a replacement manager with all historical data in readable format and for timely transition to replacement computer systems.

[17] As for the "exclusively" restriction, the point was best stated by PropCo's own counsel, who wrote: "using 'exclusively' is so restrictive in this context (where things appear to be readily shared, that it does not provide much of anything." (PropCo-000379-000380, attached as Exhibit H to the Bjork Declaration).

[18] Although FTI offered the optimistic conjecture "that any acquirer can negotiate and pay for a further extension if needed," (PropCo-000567-000568, attached as Exhibit J to the Bjork Declaration), the price for further assistance was not discussed (White Dep. at 135). This obviously creates a threat of hold-up negotiations at that time, which brings into question the benefits of PropCo's paying $23 million for a transition known to be inadequate.

16

**E.  Master Lease Rent Is Due Under §365(d)(3) on December 10, 2009 and Should Be Paid**

Contrary to certain statements made by the Debtors in open court, the due date for the next rent payment under the Master Lease is December 10, 2009.  As the MLCA (¶ 3) recites, rent is due on the "third (3rd) business day preceding the fifteenth (15th) day of each calendar month."  The 15th of December is a Tuesday, and the 12th and 13th are Saturday and Sunday.  Thus, the third business day before the 15th is Thursday, December 10, and the Master Rent payment becomes an administrative expense on that date which OpCo is required to pay under §365(d)(3).

OpCo has sufficient unencumbered cash at Vista to make this payment, as the Bankruptcy Code requires.  To the extent that it is restricted from doing so on a current basis, that arises solely from the limitations of the OpCo Cash Collateral Order [Docket No. 482], ¶ 3, which makes disbursement subject to the budget authority of the OpCo Banks.  However, the Debtors have reserved the right to seek the nonconsensual use of cash collateral or additional SCI loans from Vista without the OpCo Banks' consent (*id.*, ¶ R), and could also effect a loan from Vista to the Operating Subsidiaries who can use it to pay their sublease rents directly to PropCo, as specified in §6(d) of the Subleases.  (See Ex. F to the Bjork Declaration.)  Given the Bankruptcy Code command that these rents be paid when due, the Debtors should be required, to the extent necessary, to seek such relief.

**CONCLUSION**

For the foregoing reasons, the CMBS Lenders respectfully request that the Court enter its order (i) denying the Motion, (ii) if it approves rejection of the Master Lease (though no motion has been made for such relief), doing so under the terms of the November 8 Offer, (iii)

17

requiring payment of Master Rent installment due on December 10, 2009, and (iv) granting such other relief as is reasonable and appropriate.

Dated: December 4, 2009

LIONEL SAWYER & COLLINS

By: /s/ Jennifer A. Smith
    Jennifer A. Smith

SIDLEY AUSTIN LLP

By: /s/ Shalom L. Kohn
    Shalom L. Kohn
    Jeffery E. Bjork
    Gabriel R. MacConaill

Attorneys for the Collateral Agent to the CMBS Lenders

LA1 1678394