Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:    (213) 892-4000
Facsimile:    (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Northern NV Acquisitions, LLC<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects FCP Voteco, LLC<br>☐ Affects Fertitta Partners LLC<br>☐ Affects FCP MezzCo Parent, LLC<br>☐ Affects FCP MezzCo Parent Sub, LLC<br>☐ Affects FCP MezzCo Borrower VII, LLC<br>☐ Affects FCP MezzCo Borrower VI, LLC<br>☐ Affects FCP MezzCo Borrower V, LLC<br>☐ Affects FCP MezzCo Borrower IV, LLC<br>☐ Affects FCP MezzCo Borrower III, LLC<br>☐ Affects FCP MezzCo Borrower II, LLC<br>☐ Affects FCP MezzCo Borrower I, LLC<br>☐ Affects FCP PropCo, LLC | Chapter 11<br><br>Case No. BK-09-52477<br>Jointly Administered<br>BK 09-52470 through BK 09-52487<br><br>**DEBTORS' MOTION FOR ENTRY OF ORDER ESTABLISHING BIDDING PROCEDURES AND DEADLINES RELATING TO SALE PROCESS FOR SUBSTANTIALLY ALL OF THE ASSETS OF STATION CASINOS, INC. AND CERTAIN "OPCO" SUBSIDIARIES**<br><br>Hearing Date:    May 5, 2010<br>Hearing Time:    10:00 a.m.<br>Place:    300 Booth Street<br>        Reno, NV 89509 |

TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE, OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN INTEREST:

Station Casinos, Inc. ("SCI"), together with its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for entry of an order, pursuant to Bankruptcy Code sections 105(a) and 363 and Bankruptcy Rules 2002, 6004, and 6006: (a) approving and establishing bid

#4812-5023-7189              1

procedures for the sale of all or substantially all of the assets of SCI and certain of its "Opco" debtor and non-debtor wholly-owned subsidiaries as more fully described herein (collectively, the "Opco Assets"); and (b) authorizing an auction process to sell the Opco Assets in accordance with the bidding procedures set forth in Exhibit 1 annexed hereto (the "Bidding Procedures").[1] Concurrently herewith, the Debtors submit the declaration of Thomas M. Friel (the "Friel Decl."). In support of the Motion, the Debtors represent as follows:

**I.    Jurisdiction and Venue**

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**II.    Relief Requested**

2. Pursuant to Bankruptcy Code sections 105(a) and 363 and Bankruptcy Rules 2002, 6004, and 6006, the Debtors request that the Court approve the Bidding Procedures annexed as Exhibit 1 and summarized below and authorize the Debtors, under the direction of SCI's independent director, to commence the process to sell the Opco Assets pursuant to and in accordance with the Bidding Procedures by entering the proposed order annexed hereto as Exhibit 2 (the "Bidding Procedures Order"). By this Motion, the Debtors seek only the authority to proceed with the sale process described herein and in the Bidding Procedures. The Debtors will seek approval of the ultimate sale transaction itself separately in conjunction with the confirmation hearing on the Joint Plan (as defined below).

**III.    Background**

3. On July 28, 2009 (the "Petition Date"), the Debtors commenced the above-captioned cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures. To the extent that the Motion and the Bidding Procedures are inconsistent, the Bidding Procedures shall control.

#4812-5023-7189                                  2

4.      As the Court is well aware, these Chapter 11 Cases have given rise to their own vernacular.  Among other things, the Debtors' assets have generally been bifurcated into the "Propco Assets" and the "Opco Assets."

5.      The Propco Assets consist of the four properties owned by debtor FCP PropCo, LLC ("Propco") – Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Sunset Station Hotel & Casino and Red Rock Casino Resort Spa (collectively, the "Propco Properties") – and the related furniture, fixtures and equipment ("FF&E") and other assets used in connection with the operation of those properties.  Almost all of the Propco Assets serve as collateral to secure the repayment of Propco's prepetition mortgage loan (the "Propco Mortgage Loan") from its senior secured lenders (the "Propco Lenders").

6.      The Opco Assets, in turn, consist of all of SCI's assets, including its direct and indirect equity interests in its debtor and non-debtor subsidiaries (collectively with SCI, the "Opco Group"), *other than* the Propco Assets and the chain of subsidiaries that own, directly or indirectly, the equity interests in Propco (also known as the "Mezz Stack" or the "Mezzco Debtors").  Generally speaking, the Opco Assets are comprised of fourteen casino properties and their related assets, as well as SCI's direct and indirect interests in a variety of other management and development opportunities.[2]  Certain, but not all, of the Opco Assets serve as collateral to secure the repayment of SCI's prepetition secured loan (the "Opco Loan") from its senior secured lenders (the "Opco Lenders").  In addition, there are certain assets that are owned by members of the Opco Group but fall within the Propco Assets (as that term is defined herein), because they are used exclusively or predominantly in connection with the operation of the Propco properties (the "Excluded Assets").  The Excluded Assets are detailed on Schedule 2 to the Bidding Procedures.

7.      The Opco Assets and the Propco Assets are under the common management of SCI.  As the Court is well aware, the most contentious moments in these cases have occurred when creditors of SCI and Propco perceived that their respective interests were in

---

[2]  A more detailed description of the Propco Assets and the Opco Assets is contained in the Disclosure Statement (defined below).

#4812-5023-7189                                3

conflict and that either SCI and its estate was receiving a benefit that was coming at the expense of Propco and its estate, or *vice versa*. Perhaps the most notable examples are the controversies that have arisen from time to time regarding the master lease between SCI and Propco, pursuant to which SCI leases the Propco Properties from Propco (the "Master Lease").

8. Throughout these Chapter 11 Cases, the Debtors have attempted to preserve and maximize the value of both the Opco Assets and the Propco Assets and have advocated for a plan of reorganization that would keep all of the properties under SCI management and under the "Station" umbrella, albeit with a significantly restructured balance sheet. The Debtors believed that such a plan would be the best way to maximize value for creditors, maintain the synergies of common management, and reap the benefits of a highly regarded brand and a proven and respected management team. The Debtors also believed that any plan that would separate the Opco Assets from the Propco Assets would have the potential to be both complicated and costly as the parties tried to extricate themselves from their various interrelationships.

9. Until recently, the Debtors thought that their major creditors shared similar beliefs. Indeed, in December of 2009, the Debtors sought and obtained Court approval for a hard-fought and contentious Master Lease compromise agreement, which was designed primarily to provide the parties with a three-month window of time to try to arrive at just such a plan.

10. Notwithstanding the Debtors' desire and efforts to forge a consensual plan to keep the enterprise together, through the Debtors' discussions and negotiations with their stakeholders, it became clear to the Debtors that the interests and desires of the Opco Lenders and the Propco Lenders – the two groups with the principal economic interests in these cases – were sufficiently divergent that a separation of the Opco Assets and the Propco Assets was the only viable plan for the Debtors to pursue. Stated in the simplest of terms, the Propco Lenders demonstrated their desire to own the Propco Assets, while the Opco Lenders demonstrated their desire to have the Opco Assets sold.

#4812-5023-7189                                    4

1      11.     The Debtors heard their lender constituents loudly and clearly and promptly formulated a plan providing for: (a) what is essentially a foreclosure by the Propco Lenders on those Propco Assets that are collateral for the Propco Loan, coupled with the purchase of certain other non-collateral assets; and (b) a sale of the Opco Assets, as the culmination of an auction process designed to procure the highest or otherwise best available offer for those assets.

12.     On March 24, 2010, Debtors filed the *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated March 24, 2010)* [Docket No. 1131-1] (the "Joint Plan") and the *Disclosure Statement to Accompany Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and Its Affiliated Debtors (dated March 24, 2010)* [Docket No. 1130-1] (the "Disclosure Statement").  The hearing on approval of the Disclosure Statement is scheduled for May 5, 2010.[3]

13.     The sale of Opco Assets contemplated by this Motion is an essential component of the Joint Plan.  The Joint Plan contemplates that the Opco Assets will be sold to the highest bidder, with the net proceeds of that sale to be distributed to creditors in accordance with the respective priorities of their claims.  The Joint Plan further contemplates that the sale process will run roughly contemporaneously with the solicitation of votes on the Joint Plan and that the auction will occur shortly before the confirmation hearing on the Joint Plan, but sufficiently in advance of the confirmation hearing so that the terms of the proposed sale to the highest bidder will be known and available for the Court's consideration and approval at the time of the confirmation hearing.

**IV.     The Opco Assets to Be Sold**

14.     Pursuant to the Bidding Procedures, the Opco Group will offer for sale all or substantially all of the Opco Assets.

15.     The Propco Assets, including the Excluded Assets, will **not** be included in the sale.  The Excluded Assets consist entirely of assets that are to be transferred to Propco or

---

[3]  The Debtors anticipate that the Joint Plan and Disclosure Statement will each be modified and/or supplemented prior to the May 5th hearing in order to reflect further evolution of the Joint Plan as a result of ongoing discussions between the Debtors and various interested parties.

#4812-5023-7189                                                    5

New Propco under the Joint Plan and/or pursuant to the Master Lease Compromise Agreement and all amendments thereto approved by the Bankruptcy Court.

16. The Debtors believe that the value of the Opco Assets will be maximized through the Sale of all or substantially all of the Opco Assets. However, the Debtors recognize that certain Potential Bidders may desire to acquire only a portion or portions of the Opco Assets. Accordingly, the Debtors will entertain, in their discretion: (i) bids for all or any portion or portions of the Opco Assets; and (ii) Joint Bids for all, substantially all or portions of the Opco Assets.

17. Each casino property that is an Opco Asset may be sold separately, or multiple casino properties may be sold in groupings of multiple properties. If any casino property is sold separately or as part of a group, all customer data for customers whose primary casino play is at that property ("<u>Primary Customer Data</u>") shall be sold only to the Successful Bidder for that property on an exclusive basis. As a result, only the buyer of any particular casino property will be entitled to maintain and use such Primary Customer Data post-closing. No other party shall be entitled to use or purchase such Primary Customer Data, and no member of the Opco Group shall be entitled to sell the Primary Customer Data related to any casino property to any entity other than the buyer or transferee of such casino property.

18. Upon consummation of the Sale, the participants in a Joint Bid may decide to divide the Opco Assets amongst themselves and operate certain Opco Assets separately from others. In order to operate such stand-alone businesses, the ultimate buyers of the Opco Assets may need to resolve certain interdependencies among the various Opco Assets (the "<u>Interdependencies</u>"), including, without limitation, certain issues relating to the use of intellectual property or the provision of transition services by and between joint bidders. The Debtors do not intend, and shall not be required to undertake any obligation, to resolve any Interdependencies among the various Opco Assets.

## V.  Proposed Bidding Procedures

19. In connection with the Sale of the Assets, Debtors propose to follow and, once approved by this Court, be bound by the Bidding Procedures annexed hereto as Exhibit 1.[4] The Bidding Procedures were developed following consultation with the Debtors' legal and financial professionals. The Debtors believe that the adoption of the Bidding Procedures will provide interested parties with ample opportunity to formulate bids for the Opco Assets and will facilitate the solicitation, submission and evaluation of significant bids for the Opco Assets in a manner that will maximize the value of the Opco Assets for the Debtors' estates.

20. The Bidding Procedures constitute a reasonable and effective method of maximizing a return on the Opco Assets though a competitive sale process. The Bidding Procedures fully describe, among other things, the Opco Assets to be auctioned, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Opco Assets, the manner in which bidders and bids become Qualified Bidders and Qualified Bids, respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction, the ultimate selection of the Successful Bidder, and the Bankruptcy Court's approval thereof, among other aspects of the Auction process. The Debtors intend for the Bidding Procedures to control the Auction process, subject to the interpretation or application of the Bidding Procedures by the Bankruptcy Court in the event of a dispute.

21. The Debtors, under the direction of SCI's independent director, and their advisors believe they are in a position to solicit interest in the Opco Assets from all parties who may potentially have a serious interest in submitting bids. The Debtors have been engaged in restructuring discussions of one form or another for nearly 15 months. During that time, the Debtors and their advisors have received inquiries from several potential purchasers of Opco Assets. As part of the implementation of the Bidding Procedures, the Debtors and their advisors intend to contact all such parties to advise them of the potential opportunity to acquire some or all of the Opco Assets at this time. In addition, if the Court approves the Bidding Procedures, the

---

[4] Capitalized terms in the Motion not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures. To the extent that the Motion and the Bidding Procedures are inconsistent, the Bidding Procedures shall control.

#4812-5023-7189

7

Debtors will promptly publish notice of the Bidding Procedures in The Wall Street Journal and The Las Vegas Review-Journal.

        22. As Potential Bidders are identified and sign up to appropriate confidentiality agreements, they will be provided with such due diligence access to materials and information relating to the Opco Assets as the Debtors reasonably deem appropriate. Among other things, the Bidding Procedures provide that:

- Potential Bidders shall have until 45 days after entry of the Bidding Procedures Order to submit a preliminary letter of intent and certain other information necessary for the Debtors' to assess the Potential Bidders interest in and ability to consummate a transaction regarding the Opco Assets;

- Potential Bidders that are designated Qualified Bidders shall have until the Bid Deadline to submit to the Debtors their definitive bid materials, which shall include, among other things, a duly authorized and executed purchase agreement for the subject Opco Assets that will serve as an irrevocable offer pending the Debtors' selection of a Successful Bidder for such assets;

- A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to result from or be created by such bid in relation to other bids, the relative ability of the counterparties to the Sale proposed by the Qualified Bidder to consummate such Sale, the nature and extent of any proposed revisions to the Purchase Agreement, the effect of the proposed Sale on the value of the ongoing businesses of the Debtors (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the proposed Sale (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), any assets excluded from the bid, the transition services required from the Debtors post-closing and any related restructuring costs, and the likelihood and timing of consummating such Sale, each as determined by the Debtors following consultation with the Consultation Parties;

- If the Debtors do not receive any Qualified Bids, the Debtors shall proceed as set forth in the "<u>No Qualified Bids</u>" section of the Bidding Procedures which, among other things, reserve to the Debtors the right to terminate the sale process or extend, subject to the Bidding Procedures, the deadlines for receiving, evaluating and selecting a Successful Bid;

- If multiple Qualified Bids are submitted for the same or for overlapping subsets of the Opco Assets, the Debtors, under the direction of SCI's independent director, will conduct an auction in accordance with the Bidding Procedures to determine the highest or otherwise best offer for such assets following competitive bidding;

#4812-5023-7189          8

- If the Debtors receive a single Qualified Bid, the Debtors reserve the right, in consultation with the Consultation Parties, to terminate the sale process or extend, subject to the terms hereof, the deadlines set forth in the Bidding Procedures without further notice in an effort to solicit and obtain competing Qualified Bids. Alternatively, Debtors may evaluate the single Qualified Bid on its own merit to determine whether such single Qualified Bid is a Successful Bid; and

- Once a Successful Bid or Successful Bids are selected, the Debtors will promptly seek Court approval of the selected transaction(s) as part of the hearing on confirmation of the Joint Plan.

23. The Bidding Procedures will be conducted by the Debtors simultaneous to, and in furtherance of, the solicitation and confirmation of the Plan. The approval of any sale pursuant to the Bidding Procedures will be contingent upon confirmation of the Joint Plan. In addition, the closing of any Sale may involve additional intermediate steps or transactions to facilitate consummation of such Sale, including the additional chapter 11 filings and/or merger or other corporate transaction of subsidiaries of the Debtors and such other actions or transactions necessary to implement the Joint Plan.

**VI.    Reservation Of Rights in Connection with Bidding  Procedures and Auction Process**

24. The Debtors, after consultation with their financial and legal advisors:  (a) may waive any requirements for a Potential Bidder to become a Qualified Bidder; (b) may waive any requirements for a bid to become a Qualified Bid; (c) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (d) may reject, at any time, any bid that it deems to be:  (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or any other orders applicable to one or more Debtors, or the terms and conditions of the Sale; or (iii) contrary to the best interests of the Debtors, their estates, and stakeholders as determined by the Debtors; (e) may impose additional terms and conditions and otherwise modify the Bidding Procedures at any time; (f) withdraw from sale any Opco Assets at any time and make subsequent attempts to market the same; and (g) reject all bids.

#4812-5023-7189                                          9

## VII. Basis for Relief

### A. Proposed Bidding Procedures are Sound Exercise of SCI's Business Judgment

25. Bankruptcy Code section 363(b)(1) provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Bankruptcy Code section 105(a) provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

26. A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and in connection with the confirmation of a plan of reorganization if it demonstrates a sound business purpose for doing so. *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (finding that "a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction"). *See also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (D. Del. 1999) (finding that in evaluating business purpose of a sale, Bankruptcy Court may consider effect of sale on reorganization).

27. The Bidding Procedures provide a framework for Debtors, under the direction of SCI's independent director, to entertain bids for a potential sale of the Opco Assets and, if Debtors receive such bid(s), to conduct the Auction in a fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction in conjunction with confirmation of the Joint Plan. The Bidding Procedures also set forth a schedule for achieving these objectives on a cost-effective and expeditious manner.

28. Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be made by private sale or by public auction. Consistent with the auction procedures approved routinely by courts presiding over complex chapter 11 cases such as the Chapter 11 Cases, the Debtors believe that the proposed Bidding Procedures are most likely to maximize the realizable value of the Opco Assets for the benefit of SCI's estates, creditors, and other parties-in-interest.

#4812-5023-7189          10

1    29.    Accordingly, the Debtors believe the Court should approve the Bidding Procedures, which are consistent with those procedures that have been previously approved recently in large, complex bankruptcy cases. *See, e.g., Advanced Materials, Inc., et al.,* Case No. 09-16527 (TA) (Bankr. C.D. Cal. July 2, 2009)*; Fleetwood Enterprises, Inc. , et al.,* Case No. 09-14254 (MJ) (Bankr. C.D. Cal. March 10, 2009); *Care Level Management Group, LLC, et al.,* Case No. 08-12913 (MT) (Bankr. C.D. Cal. May 7, 2008); *VI Acquisition Corp.*, Case No. 08-10623 (KG) (Bankr. D. Del. Apr. 3, 2008); *Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May, 2, 2008); *Global Home Products LLC.*, Case No. 06-10340 (KG) (Bankr. D. Del. April 10, 2006).

**B.    Proposed Sale Notice is Appropriate Under Bankruptcy Rule 2002**

30.    A debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections. The Debtors submit that the Procedures Notice fully complies with Bankruptcy Rule 2002 and includes information in the Bidding Procedures necessary to enable interested parties to participate in the Auction. The Debtors propose to make the Bidding Procedures available to all interested parties in a timely and responsive fashion. Such access to the Bidding Procedures ensures that the Bidding Procedures will be disseminated in a manner that will reach the widest possible pool of potential bidders.

31.    The Debtors submit that the notice to be provided through the Procedures Notice of the Bidding Procedures and the method of service proposed herein constitutes good and adequate notice of the Bidding Procedures and the other components of the Auction and the eventual sale of the Assets.

**VIII.    Conclusion**

WHEREFORE, Debtors respectfully request that the Bidding Procedures be approved in their entirety, that the Debtors be authorized to employ the Bidding Procedures in connection with the sale and auction of the Opco Assets and that the Court enter the proposed

/ / /

#4812-5023-7189                                                       11

Bidding Procedures Order annexed hereto as <u>Exhibit 2</u>, together with such other and further relief as is just and appropriate.

Dated: April 7, 2010                                      Respectfully submitted,

By:    /s/ *Thomas R. Kreller*
Paul S. Aronzon, CA State Bar #88781
Thomas R. Kreller, CA State Bar #161922
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley, #1164
Laury Macauley, #11413
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV 89501
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel
For Debtors and Debtors in Possession

#4812-5023-7189                                 12