# Exhibit 1

# Exhibit 1

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

## BIDDING PROCEDURES IN CONNECTION WITH DEBTORS' SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF STATION CASINOS INC. AND CERTAIN OF ITS DEBTOR AND NON-DEBTOR OPCO SUBSIDIARIES

A.    Preliminary Statements

1.    Set forth below are the bidding procedures (the "Bidding Procedures") to be employed by Station Casinos, Inc. ("SCI") in the chapter 11 cases (jointly administered) pending in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") under case number 09-52477-GWZ (the "Chapter 11 Cases") with respect to the proposed sale of certain assets and the assumption of certain liabilities (collectively, the "Sale") of SCI and certain of its debtor subsidiaries (collectively, the "Opco Debtor Subsidiaries") and its non-debtor subsidiaries (collectively, the "Opco Non-Debtor Subsidiaries") (collectively, the "Opco Assets") specified on Schedule 1 annexed hereto (the Opco Debtor Subsidiaries and the Opco Non-Debtor Subsidiaries together, the "Opco Subsidiaries" and the Opco Subsidiaries together with SCI, the "Opco Group").

2.    The Opco Assets do not include any of the following: (a) any assets of FCP Propco LLC ("Propco"), (b) any equity in or assets of any subsidiary of SCI that directly or indirectly owns the equity of Propco, (c) any assets encumbered by liens in favor of Propco or (d) any of the assets specified on Schedule 2 annexed hereto (collectively, the "Excluded Assets") as more fully defined herein.  None of the Excluded Assets will be the subject of the Sale.

3.    The Sale is being conducted and shall be consummated pursuant to and in conjunction with confirmation of Debtors' *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated March 24, 2010)* [Docket No. 1031-1] as the same may be amended, the "Joint Plan") filed in the Chapter 11 Cases.

4.    As used in these Bidding Procedures, the term "Consultation Parties" shall mean: (i) the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee") and (ii) the Administrative Agent under the Opco Loan Agreement (the "Opco Agent").

B.    Bidding Process

1.    The Bidding Procedures set forth herein describe, among other things, the Opco Assets available for Sale, the manner in which Potential Bidders may gain access to or continue to have access to due diligence materials concerning the Opco Assets, the manner in which Potential Bidders and bids may become Qualified Bidders and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined below), the ultimate selection of the Successful

1

#4837-8019-0213

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Bidder (as defined below), and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").

2.      In the event of any dispute regarding the interpretation or application of these Bidding Procedures or the Bidding Process, the Bankruptcy Court will have exclusive jurisdiction to hear and resolve such dispute.

3.      The Bidding Process will be conducted by the Debtors, under the direction of SCI's independent director, simultaneously with, and in furtherance of, the solicitation and confirmation of the Joint Plan.  The approval of any Sale pursuant to these Bidding Procedures will be contingent upon confirmation of the Joint Plan and shall be consummated solely through the Joint Plan.  In addition, the closing of any Sale may involve additional intermediate steps or transactions to facilitate consummation of such Sale, including additional chapter 11 filings and/or mergers or other corporate transactions of subsidiaries of the Debtors and such other actions or transactions necessary to implement the Plan.

C.      Assets To Be Sold

1.      The Opco Group is offering for sale all or substantially all of the Opco Assets *other than* the Excluded Assets.  The Excluded Assets will not be included in the Sale.

2.      The Excluded Assets consist of assets that either (a) constitute the collateral of Propco and/or the lenders (collectively, the "Propco Lenders") under various written security agreements; or (b) assets that are to be transferred to Propco or New Propco under the Joint Plan and/or pursuant to the Master Lease Compromise Agreement and all amendments thereto approved by the Bankruptcy Court.

D.      Bids for Individual Assets and Joint Bids

1.      The Debtors believe that the Debtors' estates will realize maximum value for the Opco Assets through an arms'' length Sale of all or substantially all of the Opco Assets.  However, the Debtors recognize that certain Potential Bidders may desire to acquire only a portion or portions of the Opco Assets to a third-party buyer.  Accordingly, the Debtors, under the direction of SCI's independent director, will entertain, in their discretion: (i) bids for all or any portion or portions of the Opco Assets; and (ii) Joint Bids for all or substantially all or portions of the Opco Assets.

2.      Each casino property to be sold may be sold separately.  All primary customer data ("Primary Customer Data") relating to a Primary Customer (as defined below) for each casino property shall be sold to the Successful Bidder for the applicable casino property on an exclusive basis and, as a result, only the buyer of a casino property can use such Primary Customer Data post-closing of the Sale.  No Debtor or member of the Opco Group (if not sold to the Successful Bidder of the applicable casino property) shall be entitled to use any Primary Customer Data related to any casino property post-

2

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

closing of the Sale.  No member of the Opco Group shall be entitled to sell the Primary Customer Data related to a casino property to any entity other than the buyer or transferee of such casino property.  A customer is a "Primary Customer" of a casino if such customer plays his or her largest percentage of historical play at such casino.

3.      Upon consummation of the Sale, the participants in a Joint Bid may decide to divide the Opco Assets amongst themselves and operate certain Opco Assets separately from others. In order to operate such stand-alone businesses, the ultimate buyers of the Opco Assets may need to resolve certain interdependencies among the various Opco Assets (the "Interdependencies"), including, without limitation, certain issues relating to the use of intellectual property or the provision of transition services by and between joint bidders. The Debtors do not intend, and shall not be required to undertake any obligation, to resolve any Interdependencies among the various Opco Assets.

4.      After submission of an LOI (as defined below) and without limiting the terms set forth under the heading "Creditor Negotiations," any unauthorized contacts between one or more Potential Bidders or Qualified Bidders without the prior written consent of the Debtors are hereby strictly prohibited and may result in disqualification from participation in the Bidding Process and any Auction that may occur, as determined by the Debtors in their sole discretion.  Notwithstanding the foregoing, the Debtors shall have the right to contact parties who have expressed an interest in acquiring only a portion of the Opco Assets or in providing only a portion o the financing necessary to purchase the Opco Assets in order to facilitate the formation of Joint Bids for all or substantially all of the Opco Assets or expanded portions of the Opco Assets.

E.      Creditor Negotiations

1.      Notwithstanding anything herein to the contrary and so long as it is reasonably practicable, a Potential Bidder that desires at any time to contact (whether in person or telephonically) the Committee, the Administrative Agent or the Propco Lenders or their respective advisors to discuss the terms of any bid made or to be made, such Potential Bidder shall coordinate such contact through the Debtors' advisors (who shall promptly act on such request to facilitate such contact).

F.      Sale "As Is"

1.      The Sale of the Opco Assets will be on an "as is" basis and without surviving representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates.

G.      Free Of Any And All Claims And Interests

1.      Except as may be agreed to by a Successful Bidder in its Purchase Agreement (as such terms are defined below), all of the rights, title and interests of the Opco Group in and to the Opco Assets, or any portion thereof, to be acquired as part of

3

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

the Sale will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") as permitted by, and pursuant to, sections 105(a), 363, 365, 1123 and 1129 of the Bankruptcy Code, with such Claims and Interests attaching to the net proceeds of the sale of such Opco Assets, subject to the Debtors' right to challenge the validity of such Claims and Interests.

H.    Publication Notice

1.    As soon as reasonably practicable after entry of the Bidding Procedures Order (as defined below), but in any event no more than five (5) days after the entry of such Order, the Debtors shall publish a notice of these Bidding Procedures approved by Bankruptcy Court (the "Bidding Procedures Notice") in The Wall Street Journal (National Edition), The Las Vegas Review-Journal and The Financial Times (International Edition).

I.    Confidentiality Agreement(s)

1.    Each Potential Bidder must execute and deliver a confidentiality agreement in form and substance reasonably satisfactory to the Debtors (the "Confidentiality Agreement").

J.    Participation Requirements; Deadlines

1.    Unless otherwise ordered by the Bankruptcy Court for cause shown or otherwise consented to by the Opco Group after consultation with the Consultation Parties, in order to participate in the Bidding Process, each bidder (each a "Potential Bidder") must deliver to the Debtors (copies of which the Debtors promptly shall deliver to the Consultation Parties):

(a)    an executed Confidentiality Agreement (to be delivered prior to the distribution of any confidential information by the Debtors to a Potential Bidder) which shall inure to the benefit of any purchaser of the Opco Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Debtors, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Opco Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder to the Consultation Parties);

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Opco Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Potential Bidder who will guarantee the

4

#4837-8019-0213

*In re Station Casinos, Inc., et al.,*
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

obligations of the Potential Bidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Debtors and the Consultation Parties to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale; and

(c)     a preliminary (non-binding) written proposal letter of intent ("LOI") containing all of the following:

    a.     the identification of the specific Opco Assets that the Potential Bidder seeks to acquire,

    b.     the purchase price range for such Opco Assets (including liabilities to be assumed by the Potential Bidder) and form of consideration (including material terms of any "take back" debt (*i.e.*, seller financing));

    c.     any material assets and liabilities expected to be excluded;

    d.     the structure (including, without limitation, in the case of each potential Joint Bid, the structure of such Joint Bid) and financing of the Sale (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance and a description for funding post-acquisition working capital for the target);

    e.     any anticipated third-party (including from the Potential Bidder's existing creditors) corporate, stockholder, internal or regulatory approvals (including, but not limited to, Nevada Control Board, National Indian Gaming Commission or other regulatory or other consents or approvals required to close the Sale);

    f.     the anticipated time frame and any anticipated impediments for

        i.     completing due diligence;

        ii.     obtaining each of the applicable approvals referred to in the preceding clause (e);

        iii.     negotiating definitive agreements; and

        iv.     consummating the Sale.

2.     [The Debtors and the Opco Agent shall provide bidders with proposed terms for any "take back" debt (*i.e.*, seller financing) that may be issued to the Opco Lenders in connection with the Sale.]

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

3.      The LOI and the material identified in Section J.1 above with respect to each Potential Bidder shall be received by the Debtors forty-five (45) days after the entry of the Bidding Procedures Order, the "LOI Submission Date."

4.      A "Qualified Bidder" shall mean a Potential Bidder (or in the case of a Joint Bid, all of the Potential Bidders participating in such Joint Bid, which shall be collectively considered a single Potential Bidder):

(a)      that delivers the documents described above;

(b)      whose financial information and/or credit quality support, or enhancement, demonstrate to the Debtors' satisfaction, after consultation with the Consultation Parties, the financial capability of the Potential Bidder to consummate the Sale;

(c)      that has submitted a reasonably competitive and realistic LOI;

(d)      that has executed a Confidentiality Agreement; and

(e)      that the Debtors, under the direction of SCI's independent director, determine is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale.  For the avoidance of any doubt, in the case of a proposed Joint Bid, the Potential Bidders participating in such Joint Bid shall together constitute a single Qualified Bidder if the Debtors determine that, as a group, the Potential Bidders qualify as a Qualified Bidder.

5.      The Debtors acknowledge that the Propco Lenders (or any of them) and Fertitta Gaming, LLC (or its affiliate(s)) may submit separate bids or a Joint Bid for all or certain of the Opco Assets through an entity owned in whole or in part by such parties (generally, "Acquisition Co").

6.      As promptly as practicable after a Potential Bidder delivers all of the materials required by Section J.1 above, the Debtors, under the direction of SCI's independent director, will determine, after consultation with the Consultation Parties, and will notify the Potential Bidder, if such Potential Bidder either by itself or, in the case of a proposed Joint Bid, in conjunction with other bidders participating in such Joint Bid, is a Qualified Bidder. At the same time that the Debtors notify the Potential Bidder that it is a Qualified Bidder, the Debtors will allow the Qualified Bidder to continue to conduct due diligence as provided in the following section with respect to the Opco Assets.

K.      Due Diligence

1.      The Debtors shall, subject to competitive and other business considerations and their rights hereunder regarding the conduct of the Auction, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has

6

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

executed a Confidentiality Agreement with the Debtors such due diligence access to materials and information relating to the Opco Assets as the Debtors reasonably deem appropriate, after consultation with the Consultation Parties.

2.      Due diligence access shall include management presentations as scheduled by the Debtors, access to electronic data rooms, property tours, and other matters which a Qualified Bidder or other person seeking to become a Qualified Bidder may reasonably request and as to which the Debtors, in their reasonable business judgment, agree after consultation with the Consultation Parties and subject to competitive or other business considerations and their rights hereunder regarding the conduct of the Auction. The Debtors may, in their discretion, coordinate diligence efforts such that multiple parties have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

3.      Neither the Debtors nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Opco Assets to any person other than to Qualified Bidders and any other person seeking to become a Qualified Bidder that has executed a Confidentiality Agreement with the Debtors.

4.      The Debtors make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the definitive sale agreements with any Successful Bidder (defined below) executed and delivered by Debtors.

L.      <u>Notices</u>

1.      A Qualified Bidder that desires to make a bid must deliver written copies of its bid materials to the following parties:

(a)      Station Casinos, Inc., Attn:  Richard J. Haskins, General Counsel, 1505 South Pavilion Center Drive, Las Vegas, NV 89135, Facsimile:  (702) 495-3310;

(b)      Debtors' counsel: Milbank Tweed Hadley & McCloy, Attn: Kenneth J. Baronsky and Paul S. Aronzon, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017-5735, Facsimile:  (213) 629-5063;

(c)      Debtors' financial advisors: Lazard Frères & Co., Attn: Simon Furie, 1999 Avenue of the Stars #1140, Los Angeles, CA 90067-4618, Facsimile: (310) 601-3401;

(d)      Counsel to the Committee: Fried, Frank, Shriver, Harris & Jacobson LLP, Attn: Brad E. Scheler, One New York Plaza, New York, NY 10004, Facsimile:  (212) 859-4000;

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

(e)     Financial advisor to the Committee:  Moelis & Company LLC, Attn:  Robert J. Flachs, 1999 Avenue of the Stars, Suite 1900, Los Angeles, CA 90067, (310) 443-8700;

(f)     Counsel to the Administrative Agent under the Opco Loan Agreement:  Simpson Thacher & Bartlett LLP, Attn:  Sandeep Qusba, 425 Lexington Avenue, New York, NY 10017, Facsimile:  (212) 455-2502; and

(g)     Financial advisor to the Opco Lender Steering Committee:  The Blackstone Group, Attn:  Michael Genereux, 345 Park Avenue, New York, NY 10154, Facsimile:  (212) 583-5707.

M.     Qualified Bid

1.     A bid, including a Joint Bid, will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, and complies with all of the following (a "Qualified Bid"):

(a)     it (x) states that the applicable Qualified Bidder offers to purchase all, substantially all, or a specified portion of the Opco Assets and acknowledges that all Primary Customer Data for each casino property shall run with such casino property on an exclusive basis and, as a result, only the buyer or a transferee of a casino property can use such Primary Customer Data post-closing, no Debtor or member of the Opco Group shall be entitled to use any Primary Customer Data related to any casino property post-closing, and no member of the Opco Group shall be entitled to sell the Primary Customer Data related to a casino property to any entity other than the buyer of such casino property and (y) describes any material modifications to the terms set forth in the Potential Bidder's LOI that have occurred between the submission of the LOI and the Bid Deadline.

(b)     it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its Qualified Bid shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the entry of the Sale Order or Confirmation Order (as applicable), and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)     it includes a duly authorized and executed purchase agreement, including the purchase price for the subject Opco Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto,

8

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

and, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the purchase agreement with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements, including with respect to any "take-back" debt to be issued to the Opco Lenders).

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the Sale, that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Sale contemplated by the purchase agreement and related documents;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder (and includes an acknowledgement and representation that the Qualified Bidder has had an opportunity to conduct any and all required due diligence regarding the Opco Assets prior to making its offer); (ii) obtaining financing and (iii) in the case of a Joint Bid, the resolution of any Interdependencies among the various Opco Assets or entry of a cooperation agreement or similar agreement among the various participants in the Joint Bid;

(f)     it fully discloses the identity of each entity that will be bidding for the Opco Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)     it includes an acknowledgment and representation that the Qualified Bidder will assume the Debtors' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the purchase agreement (or identifies with particularity which of such contracts and leases of the Debtors that the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases of the Debtors that the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(h)     it includes an acknowledgement and representation that the Qualified Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Opco Assets in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Opco Assets or the completeness of any information provided in connection therewith or the Auction; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

9

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

(i)     it includes evidence, in form and substance reasonably satisfactory to Debtors, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the purchase agreement;

(j)     it includes evidence, in form and substance reasonably satisfactory to Debtors, of compliance or anticipated compliance with all required gaming and other regulatory approvals (including, but not limited to, Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), the anticipated time frame and any anticipated impediments for obtaining such approvals;

(k)     it is accompanied by a good faith deposit ("Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to US $[__] million to be dealt with as provided for under "Good Faith Deposit" herein;

(l)     Any Qualified Bid must contain appropriate acknowledgements and covenants with respect to the posting of a Gaming Approval Deposit upon Bankruptcy Court approval of a Successful Bid, such Gaming Approval Deposit (see below) to be relinquished by Successful Bidder in the event of failure to secure required gaming authority consents.

(m)     it contains any proposed measures associated with the continued employment of the employees;

(n)     it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Debtors and assigned or subleased to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases; and

(o)     it contains other information reasonably requested by the Debtors.

2.      **All of the information and material required to be delivered by a Potential Bidder(s) must be received by the Bid Deadline.  The Bid Deadline has been set by the Bankruptcy Court and means [_____, 2010, a date which is ___ days after the entry of the Bidding Procedures Order by the Bankruptcy Court.**

3.      The Debtors, under the direction of SCI's independent director, will determine, in their reasonable business judgment, and after consultation with the

10

*In re Station Casinos, Inc., et al.,*
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Consultation Parties, whether to entertain bids for the Opco Assets that do not conform to one or more of the requirements specified herein and whether to deem such bids to be Qualified Bids. The Debtors shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

N.    Evaluation of Competing Bids

1.    A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to result from or be created by such bid in relation to other bids, the relative ability of the counterparties to the Sale proposed by the Qualified Bidder to consummate such Sale, the nature and extent of any proposed revisions to the Purchase Agreement, the effect of the proposed Sale on the value of the ongoing businesses of the Debtors (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the proposed Sale (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), any assets excluded from the bid, the transition services required from the Debtors post-closing and any related restructuring costs, and the likelihood and timing of consummating such Sale, each as determined by the Debtors, under the direction of SCI's independent director, following consultation with the Consultation Parties.

O.    No Qualified Bids

1.    If the Debtors do not receive any Qualified Bids, the Debtors reserve the right, in consultation with the Consultation Parties, to terminate the sale process or extend, subject to the terms hereof, the deadlines set forth in the Bidding Procedures, without further notice.

P.    Single Qualified Bid

1.    If the Debtors receive a single Qualified Bid, the Debtors reserve the right, in consultation with the Consultation Parties, to terminate the sale process or extend, subject to the terms hereof, the deadlines set forth in the Bidding Procedures without further notice in an effort to solicit and obtain competing Qualified Bids.  Alternatively, Debtors may evaluate the single Qualified Bid on its own merit to determine whether such single Qualified Bid is a Successful Bid.   In evaluating a single Qualified Bid, Debtors shall consider several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to result from or be created by such bid, the relative ability of the counterparties to the Sale proposed by the Qualified Bidder to consummate such Sale, the nature and extent of any proposed revisions to the Purchase Agreement, the effect of the proposed Sale on the value of the ongoing businesses of the Debtors (including ongoing relationships with

11

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

customers and suppliers), other factors affecting the speed, certainty and value of the proposed Sale (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), any assets excluded from the bid, the transition services required from the Debtors post-closing and any related restructuring costs, and the likelihood and timing of consummating such Sale, each as determined by the Debtors following consultation with the Consultation Parties. The Debtors may, after consideration of the foregoing, determine that the single Qualified Bid is the Successful Bid and elect to forego the Auction.  In such case, in lieu of an Auction, the Debtors may proceed to a Sale Hearing for Court approval of such single Qualified Bid.

Q.    Auction Date, Time and Place

1.    If the Debtors receive two or more Qualified Bids, the Debtors will conduct an auction (the "Auction") of the Opco Assets, which shall be transcribed or recorded on video to the extent required under Nevada local practice, at ____ a.m. (prevailing Pacific Time) on _____, 2010, at the offices of Milbank Tweed Hadley & McCloy, located at 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017 or such other location as shall be timely communicated to all entities entitled to attend the Auction.  The Auction may be cancelled or adjourned without consent of any Qualified Bidder.

R.    Auction Procedures

1.    The Auction shall run in accordance with the following procedures:

(a)    Only the Qualified Bidders that have timely submitted Qualified Bids, the Debtors, the Consultation Parties, and any creditor of the Debtors shall attend the Auction in person (and the advisors to such Qualified Bidder or creditor of the Debtors), and only such Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)    At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction, provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder, the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Debtors will provide copies of the Qualified Bid which the Debtors believe, in their reasonable business judgment and with the prior consent of the Required Lenders and the

12

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Administrative Agent, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders that have timely submitted Qualified Bids and have informed the Debtors of their intent to attend the Auction.

(d)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction, provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)    The Debtors, under the direction of SCI's independent director and after consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court and (ii) disclosed to each Qualified Bidder at the Auction.

(f)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Debtors determine, under the direction of SCI's independent director and in consultation with the Consultation Parties, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least US $[__] million over the Starting Bid or the Leading Bid, as the case may be, provided that the Debtors shall retain the right to modify the increment requirements at the Auction, and provided, further that the Debtors in determining the net value of any incremental bid to the estate shall not be limited to evaluating the incremental dollar value of such bid and may consider other factors as identified in the "Selection of Successful Bid" section of these Bidding Procedures, including, without limitation, factors affecting speed and certainty of obtaining Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid (and the value of such bid(s)) that it

13

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids, the Debtors will, at each round of bidding, give effect to any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors.

S.    Selection Of Successful Bid

1.    Prior to the conclusion of the Auction, the Debtors, under the direction of SCI's independent director, will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the Purchase Agreement, the effect of the proposed Sale on the value of the ongoing businesses of the Debtors (including ongoing relationships with customers and suppliers), the ability of the counterparties to such proposed Sale to consummate the Sale, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the Qualified Bidder) provided by such Qualified Bid, the claims likely to result from or be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), any assets excluded from the Qualified Bid, the transition services required from the Debtors post-closing and any related restructuring costs, and the likelihood and timing of consummating the Sale, each as determined by the Debtors, in consultation with the Consultation Parties; (b) identify the highest or otherwise best offer for the Opco Assets received in accordance with the Bidding Procedures (such bid, the "Successful Bid" and the Qualified Bidder making such bid, collectively, the "Successful Bidder"); and (c) communicate to the Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder, if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Debtors, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court.

2.    The Debtors will sell the Opco Assets to the Successful Bidder(s) pursuant to the terms of the Successful Bid(s) (or, under certain circumstances described herein, the Alternate Bidders) upon the approval of such Successful Bid(s) by the Bankruptcy Court at the Sale Hearing (defined below) to be held in conjunction with the Confirmation Hearing (as applicable), and subject to any required gaming or other regulatory approvals (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals).

#4837-8019-0213

*In re Station Casinos, Inc., et al.,*
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

T.     Sale Hearing

      1.     The hearing to approve the Successful Bid(s) and to authorize the Sale in accordance therewith (the "Sale Hearing") will be held before the Honorable Judge Gregg W. Zive (or any substitute therefor) in the Bankruptcy Court, on a date to be scheduled by the Debtors, after notice to all parties in interest.  The Sale Hearing may be adjourned or rescheduled by the Debtors without further notice by an announcement of the adjourned date at the Sale Hearing or other means of communication.  If the Debtors do not receive any Qualified Bids, the Debtors shall proceed as set forth in the "No Qualified Bids" section above. If the Debtors receive one or more Qualified Bid(s), then, at the Sale Hearing the Debtors will seek approval of the Successful Bid, and, at the Debtors' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Debtors' presentation to the Bankruptcy Court of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Debtors' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing.

U.     Circumstances under Which Alternate Bid(s) Will be Deemed
        Successful Bid(s)

      1.     Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Debtors will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court. The Alternate Bid shall remain open until 45 days from the conclusion of the Auction (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Debtors on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court.

V.     Gaming Approval Deposit

      1.     Upon approval by the Bankruptcy Court of the Successful Bid, the Successful Bidder shall post a deposit (the "Gaming Approval Deposit") in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to US $[__].  The Gaming Approval Deposit shall be relinquished by Successful Bidder upon the Successful Bidder's failure to obtain all requisite gaming approvals within [__] months of the entry of the court order approving the Successful Bid.

15

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

W.      Good Faith Deposits

1.      The Good Faith Deposit of any Alternate Bidder shall be retained by the Debtors until the Alternate Bid Expiration Date and returned to the Alternate Bidder within seven (7) days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid.

X.      Debtors' Reservation Of Rights

1.      The Debtors, under the direction of SCI's independent director and in consultation with the Consultation Parties: (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or any other orders applicable to one or more Debtors, or the terms and conditions of the Sale or (iii) contrary to the best interests of the Debtors, their estates, and stakeholders as determined by the Debtors; (c) may impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (d) withdraw from sale any Opco Assets at any time and make subsequent attempts to market the same; and (e) reject all bids.

#4837-8019-0213

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Schedule 1

List of Opco Debtor Subsidiaries and Opco Non-Debtor Subsidiaries

**Debtor Subsidiaries**:

Northern NV Acquisitions, LLC
Tropicana Station, LLC
River Central, LLC
Reno Land Holdings, LLC


**Non-Debtor Subsidiaries**:

Palace Station Hotel & Casino, Inc.
Boulder Station, Inc.
Texas Station, LLC
Sunset Station, Inc.
Santa Fe Station, Inc.
Fiesta Station, Inc.
Rancho Station, LLC
Lake Mead Station, Inc.
Charleston Station, LLC
Magic Star Station, LLC
Gold Rush Station, LLC
LML Station, LLC
Palms Station, LLC:
Green Valley Station, Inc.
Brewing Company
GV Ranch Station, Inc.
Aliante Station, LLC
River Central, LLC
Durango Station, Inc.
SC Durango Development, LLC
Inspirada Station, LLC

SC Rancho Development, LLC
Station Holdings, Inc
Centerline Holdings, LLC
Station California, LLC
Station Development, LLC
Station Construction, LLC
Auburn Development, LLC
SC Butte Development, LLC
SC Butte Management, LLC
SC Sonoma Development, LLC
SC Sonoma Resort Management, LLC
SC Sonoma Alliance, LLC
SC Sonoma Land Holdings, LLC
Sonoma Land Acquisition Company, LLC
Fresno Land Acquisitions, LLC
SC Madera Development, LLC
SC Madera Management, LLC
SC Michigan, LLC
STN Aviation, Inc.
Your Move, Inc.

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

<u>Schedule 2</u>

List of Excluded Assets

EXCLUDED ASSETS

1.  Assets Subject to Lien in Favor of FCP Propco, LLC.  Assets of Station Casinos, Inc. and its wholly owned subsidiaries Boulder Station, Inc. ("Boulder Station"), Charleston Station, LLC ("Charleston Station"), Palace Station Hotel & Casino, Inc. ("Palace Station") and Sunset Station, Inc. ("Sunset Station," and collectively with Boulder Station, Charleston Station and Palace Station, the "Operating Subsidiaries") that are subject to a lien in favor of FCP Propco, LLC granted pursuant to (i) Section 12.4 of the Master Lease, dated as of November 7, 2007 (as amended as of the Petition Date, the "Master Lease"), under which SCI leases the real property and improvements occupied by the (a) Palace Station Hotel & Casino, (b) Boulder Station Hotel & Casino, (c) Sunset Station Hotel & Casino, and (d) Red Rock Casino Resort Spa (collectively, the "Leased Hotels") and (ii) Security Agreement (All Furniture, Fixtures and Equipment) (the "Security Agreement") dated November 7, 2007 executed by the Operating Subsidiaries in favor of FCP PropCo, LLC ("Propco").

2.  Exclusive Propco Trademarks.  All trademarks exclusive to PropCo and that do not contain any branding elements that are used to promote any of the OpCo properties, to be specified in the bid package (and to be updated as of closing date to include derivative and subsequent exclusive marks), together with matching corporate names, trade names, d/b/a names and domain names, and include trademark rights in Internet key words, social networks and new media.  All trademarks exclusive to the Wild Wild West properties (including VIVA) to be specified in the bid package, together with matching corporate names, trade names, d/b/a names and domain names, and include trademark rights in Internet key words, social networks and new media.

3.  Joint Interest Trademarks.  PropCo to have license until later of (i) 12 months from filing date of plan or (ii) 8 months from effective date of plan of reorganization to use BOULDER STATION, SUNSET STATION, PALACE STATION & RED ROCK STATION. License includes trademarks and matching corporate names, trade names, d/b/a names and domain names, and includes trademark rights in Internet key words, social networks and new media.  Neither party will use BOULDER STATION, SUNSET STATION, PALACE STATION & RED ROCK STATION after the transition, whether as trademarks or matching corporate names, trade names, d/b/a names and domain names, and includes Internet key words, social networks and new media.  This does not prevent either party from referring to the Joint Interest trademarks in a non-trademark manner to describe the history of its company or as required by law.  OpCo Purchaser will maintain domain names to avoid acquisition by third parties.  OpCo Purchaser will also maintain trademark registrations for as long as possible to avoid acquisition by third parties.  After end of transition period, users typing in www.boulderstation.com www.sunsetstation.com, www.palacestation.com and if applicable, www.redrockstation.com would go to an inactive page.

4.  <u>Non-Exclusive Trademarks</u>.  A license until later of (i) 12 months from filing date of plan or (ii) 8 months from effective date of plan of reorganization for all non-exclusive marks (including FEAST BUFFET or other restaurants inside both OpCo and Leased Hotels) along same principles as marks in Point 2 above, except for the later of (x) 6 months from filing date of plan or (y) 4 months from effective date of plan of reorganization for JUMBO, BOARDING PASS and STATION ("station" used apart from Boulder, Sunset, etc.).

5.  <u>Other Trade Dress and Branding Features</u>.  Propco shall have the right to use font and color in the existing signage for Boulder, Red Rock, Sunset and Palace.

6.  <u>Patents</u>.  Non-exclusive, unrestricted, perpetual, fully paid up license in favor of PropCo in U.S. Patents and patent applications related to player tracking systems including Patent Nos. 6320793, 6672589 and 7018291 and as otherwise specified in the bid package.

7.  <u>Other Intellectual Property</u>.  PropCo to use current website content accessible on OpCo website (operated by OpCo Purchaser) by clicking on PropCo hotel picture or link for earlier of (i) the later of 12 months from filing date of plan or 8 months from effective date of plan of reorganization or (ii) end of transition services. OpCo not to sever any existing links from www.stationcasinos.com to websites for Leased Hotels for reasonable time during transition.  PropCo not to use OpCo signature branding features in its new website (note: existing website infrastructure, including online guest transaction and account management systems, and related software applications and does not have to re-create website user interface from scratch).  PropCo to own all other works of authorship and intellectual property used exclusively by Leased Hotels.  PropCo to have a non-exclusive, unrestricted, perpetual, fully paid up license to use and create derivative works of any and all non-registered copyrightable artistic, marketing and graphical materials previously used in the ordinary course of operating the PropCo business and not otherwise transferred to PropCo; all such derivative works would be subject to limitations on any use of trademarks retained by OpCo or sold to OpCo Purchaser.

8.  <u>Primary Customer Database</u>.  No later than date that the bankruptcy court approves a motion for transfer of assets, Opco and Propco will cooperatively determine the Primary Customers of each of the Leased Hotels as of such date, as set forth below.  On the effective date of the confirmed plan of reorganization, Opco and Propco will supplement the previously prepared lists to reflect any new Primary Customers of each of the Leased Hotels that were not previously assigned to either Opco or Leased Hotels based upon play during the interim period, and such new Primary Customers shall also be Primary Customers of the applicable Leased Hotel.  A customer is determined to be a "Primary Customer" of a Propco or Opco property (based on ownership of such property after giving effect to all transactions occurring on the Effective Date) based upon a determination of the Propco or Opco property at which such customer plays most,

2

it being understood that such location may receive less than an absolute majority of such customer's total play.  For the purposes of assigning player accounts to the respective entities as Primary Customers, the casino player database will be segmented into active and inactive groups.  The assignment of active player accounts will be determined by the guest having rated play of any gaming type excluding Keno within the last 24 months from the filing date of the plan of reorganization.  Guests qualifying as active will then be assigned to each entity by determining the property of greatest gaming theoretical within the player's last 24 months of play history.  Files relating to new customers during the period between the date that the bankruptcy court approves a motion for transfer of assets and the effective date of the plan of reorganization will be allocated based on the primary play during that period.  The accounts deemed inactive  (more than 24 months since last date of play) will be assigned to a respective entity by determining the property of greatest gaming theoretical from the players last play date back 24 months.  Once a player is assigned to an entity as a Primary Customer, the player's entire history of all property play will be owned by that entity and will be erased at the other.  Gaming theoretical will be calculated by combining any rated play on a Boarding Pass card from slots, table games, poker, race, sports and bingo.  Theoretical calculations will be done for each gaming type individually, then combined to calculate full gaming theoretical.  Keno play is not contained within the database and will have to be handled separately as it is paper ratings contained at the property.  Race and Sports data will not be able to go back the full 24 months as it can only be tracked back to when data was converted to the current system.  For the non-gaming databases (Hotel, Restaurant. Etc.), any entry that has a Boarding Pass account tied to it will be assigned according to where that Boarding Pass account is assigned.  Any entries that are not tied to a Boarding Pass will be given to the property where the activity took place.

9.  <u>Business Information</u>.  All information relating to tracking of operations (e.g., inventory, employee time, HR data, accounting and other Transaction Data as described below) will be posted on a shared drive to which the properties will have access prior to effective date, with such shared drive to be split at time of effectiveness so that each of OpCo and PropCo thereafter only has access to the tracking information relating to its separate properties.  Each of OpCo and PropCo, however, shall be allowed to retain any historical information to the extent that applicable laws require such entity to retain any such information.  PropCo would receive and be able to receive and use company-wide information that is confidential to the public but not confidential as between OpCo and PropCo (e.g., PropCo would receive a human resources manual used by all OpCo and PropCo hotels but confidential from the public).  Business information to be transferred and/or licensed to PropCo will include, without limitation:  employee documentation; overall HR programs documentation; training manuals and policies and procedures; job descriptions and operations standards and performance evaluation processes; new hire processes; time, attendance, labor management, compendium and scheduling forms, systems and reports; operational performance processes, metrics and reports; financial performance

and budgeting processes and reports; departmental project/action item prioritization and organization documentation and systems; construction and design documentation; legal and contractual documentation; compliance/security/ safety documentation and processes; physical plant and engineering documentation and processes; departmental forms; data base and general marketing analytics, segmentation and incentive methodologies; and player development systems, processes and reporting. Marketing and other art materials (e.g., -photographs, video footage, commercials, brochures, manuals, and other art or copyrightable material etc.) to be transferred to PropCo to the extent related to Leased Hotels subject to restrictions on use of Station names and other trademarks as noted elsewhere.  In addition, construction contracts (including warranties, etc. for prior work), architectural agreements, plans, specifications, engineering, and interior, exterior and landscape design material, etc. relating to a Leased Hotel to be transferred to PropCo.  This encompasses both completed work and future plans.  PropCo to have a non-exclusive, unrestricted, perpetual, fully paid up license to create derivative works of any and all non-registered copyrightable materials described in the preceding paragraph previously used in the ordinary course of operating the PropCo business and not otherwise transferred to PropCo; all such derivative works would be subject to limitations on any use of OpCo retained trademarks.  The term "Transaction Data" means, in each case with respect to the PropCo casinos only, all data, information and computer processing systems, and associated hardware used in the ordinary course of business by any of the PropCo casinos, and includes, but is not limited to, data relating to player tracking systems, slot and table games accounting systems, hotel reservations systems and ticket-in/ticket-out systems and all other transaction-based systems; identification of all vendors and existing contracts (which may be redacted to exclude price or other sensitive information which OpCo is contractually prohibited from disclosing); all "Front of house ops systems" such as: casino accounting, cage and count; franchising and merchandising operation systems; performance management (live, syndicated, televised, pay-per-view); value-added guest services systems (Wi-Fi, guest internet, lodgenet, pay-per-view, telephone); convention and conference contract development & management systems; safety, security, surveillance systems and CCTV infrastructure, hotel marketing and reservation channels (including call centers, internet, interfaces with external travel brokers), point of sale, kitchen and restaurant management systems; insurance contracts with third-parties; payroll accounting systems; and all inventory tracking systems, master item lists and similar information.

10. <u>IT Systems</u>.  All hardware and wires located at any Leased Hotel to be acquired by PropCo.  PropCo or any designee of PropCo must acquire its own third-party software licenses, replacement licenses, assignments of licenses or sub-licenses, as applicable, for all non-proprietary software residing with the Opco Debtors or such non-debtor subsidiaries and used in connection with the operation of the Propco assets. If PropCo does not acquire them, PropCo must delete such third-party software or otherwise comply with vendor provisions on termination, subject to verification by  representatives of the OpCo Lenders and the Propco

Lenders.  OpCo and OpCo Purchaser to provide reasonable cooperation regarding third party vendors and potential for price reductions.  OpCo Purchaser to own all software currently owned by OpCo and retain object code and source code for such software.  PropCo to have a non-exclusive, unrestricted, perpetual, fully paid up license to use such software and make modifications of such software.  PropCo to retain a copy of the source code and object code of such software, which is subject to the above license. The proprietary IT System transferred to PropCo (and conversely the one retained by OpCo) will include access to all "Front of house ops systems" described in the definition of "Transaction Data".

11. Unencumbered FF&E.  All vehicles specific to the Leased Hotels together with other FF&E and construction in progress relating to the Leased Hotels.  Warehoused FF&E and base stock to be allocated based on ownership (i.e., so that warehoused FF&E and base stock belonging to the subtenants operating Leased Hotels would be transferred to PropCo).  Telephones at the Leased Hotels to be acquired by PropCo with all related phone numbers subject to any re-engineering needed to sever internal Opco-PropCo connectivity.  All other tangible personal property at or to be delivered to PropCo locations, including all inventory located and/or dedicated to the Leased Hotels.

12. Corporate FF&E.  Corporate headquarters FF&E, including all tangible personal property, subject to PropCo assumption of modified corporate lease.

13. Wild Wild West Real Property and Assets.  Tropicana Station, Inc., Tropicana Acquisitions, , LLC, Vista Holdings, LLC,  and SCI to assign to the Land Loan Borrower, respectively, (i) all of the assets of Tropicana Station, Inc., including without limitation, its leasehold interest in a portion of the "Wild Wild West Assemblage", all fee purchase options under the related ground lease, all equipment, business information and other intellectual property with respect to Wild Wild West (as described above with respect to PropCo) and all working capital and other operating assets and (ii) all of SCI's options to acquire fee title from the Tiberti Company to real property contiguous to the Wild Wild West Assemblage, (iv) the Cohen Lease at Cactus leased by Vista Holdings, LLC and all fee owned parcels (and the rents, issues and profits thereof) owned by Tropicana Acquisitions, LLC that are partially or fully within the Wild Wild West Assemblage or adjacent thereto.

14. Working Capital. accounts receivable, prepaid expenses, inventory, deposits, concession contracts, space leases and any similar contract rights relating to the properties, physical cash used at the Leased Hotels, and other current assets of the operating subtenants or otherwise used primarily in connection with the operation of the Leased Hotels.

15. Headquarters Building.  PropCo shall have the option (but not the obligation) to request assignment and assumption of the lease for the SCI headquarters building located at 1505 South Pavilion Center Drive, Las Vegas.

16. <u>CV PropCo, LLC Real Property and Assets</u>.  Equity of CV PropCo to be assigned by CV HoldCo, LLC to Land Loan Lenders in satisfaction of pledge for no additional consideration.

17. <u>Other Assets to be Identified</u>.  SCI reserves the right to identify additional assets to be excluded.