Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Dennis B. Arnold (CA State Bar No. 70022)
Oscar Garza (CA State Bar No. 149790)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
Telephone:      (213) 229-7000
Facsimile:      (213) 229-7520

Reorganization Counsel for FCP PropCo, LLC as
Debtor and Debtor in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:      (775) 823-2900
Facsimile:      (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

STATION CASINOS, INC

☒ Affects this Debtor
☐ Affects all Debtors
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects Northern NV Acquisitions, LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☒ Affects FCP PropCo, LLC
.

Chapter 11

Case No. BK-09-52477-GWZ
Jointly Administered

**JOINT MOTION OF STATION CASINOS, INC. AND FCP PROPCO, LLC PURSUANT TO 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) AND 365(d)(4)(B)(ii) AND FED. R. BANKR. 9019 FOR ENTRY OF AN ORDER APPROVING SECOND AMENDMENT TO AMENDED AND RESTATED MASTER LEASE COMPROMISE AGREEMENT**

Hearing Date:      May 5, 2010
Hearing Time:      10:00 a.m.
Hearing Place:     300 Booth Street
                   Reno, NV 89509

#4850-8999-0661

TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE, OFFICE OF THE UNITED STATES TRUSTEE, AND ALL PARTIES IN INTEREST:

Station Casinos, Inc. ("SCI") and FCP PropCo LLC ("Propco", and together with SCI, the "Parties" or the "Debtors") submit this motion (the "Motion") pursuant to sections 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an order *inter alia*: (i) approving the Second Amended And Restated Master Lease Compromise Agreement (the "Second Compromise Amendment") (a copy of which is annexed hereto as Exhibit 1) between SCI and Propco[1]; and (ii) authorizing SCI and Propco to carry out and abide by the terms of the Second Compromise Amendment and take all actions reasonably necessary to perform their respective obligations thereunder.  Concurrently herewith and in support of the Motion, Propco submits the Declaration of Robert Kors and SCI submits the Declaration of Richard Haskins.  In support of the Motion, SCI and Propco respectfully represent as follows:

## I.    Jurisdiction and Venue

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## II.    Relief Requested

2.    By this Motion, the Debtors seek entry of an order, a proposed form of which is annexed as Exhibit 2, approving the Second Compromise Amendment and authorizing the Debtors to enter into and abide by the terms of the Second Compromise Amendment and take all actions reasonably necessary to perform their respective obligations thereunder pursuant to sections 105(a), 363(b), 365(d)(3) and 365(d)(4)(B)(ii) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 9019.

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Second Compromise Amendment.

#4850-8999-0661                                    -2-

### III.    Preliminary Statement[2]

3.        As the Court is well aware, the Master Lease has been a lightning rod for controversy throughout these cases, perhaps most notably in late 2009.  At that time the Opco Lenders threatened to refuse to permit SCI to use cash collateral to pay any more rent under the Master Lease, and the Propco Lenders, in turn, threatened to seize the Propco Properties if the Master Lease was rejected and Propco lost the ability to service the Propco Lenders' debt due to a loss of the rent payments.

4.        Rather than subject their respective estates to the risks and uncertainty associated with an uncontrolled separation of the Propco Properties from the Station enterprise, SCI and Propco entered into, and ultimately obtained Court approval of, a "master lease compromise agreement."  That initial compromise significantly reduced SCI's rental payments under the Master Lease for three months (which subsequently was extended for an additional two months).  In exchange, SCI committed to provide Propco with certain "transition services" designed to create for Propco a fair opportunity to transition management of the Propco Properties away from SCI and to a new manager in the event these cases eventually resulted in a separation of SCI and Propco.

5.        At the time of court approval of the First Compromise Agreement in December of 2009, SCI and Propco viewed the "transition services" as "downside" protection for Propco, because the Debtors did not believe that a separation of SCI and Propco was the preferred path for the Debtors' restructuring efforts.  Rather, the Debtors believed that the First Compromise Agreement would provide them with a window of time in which to try to negotiate a consensual plan that both held the enterprise together and maximized value for all of the estates.

6.        As discussed in more detail below, the Debtors' efforts to arrive at such a plan could not overcome the conflicting desires of the Debtors' two principal lender groups.  Stated in the simplest of terms, the Propco Lenders demonstrated their desire to own the Propco

---

[2]        All capitalized terms used in the Preliminary Statement shall have the meanings ascribed to those terms in subsequent sections of the Motion.

Assets, while the Opco Lenders demonstrated their desire to have the Opco Assets sold. As a result, the Debtors have formulated and filed a Joint Plan that achieves both of these objectives, with the Propco Lenders obtaining ownership of the Propco Properties through what is, in essence, a "friendly" foreclosure, and the OpCo Lenders receiving the net proceeds from the sale of the Opco Assets upon culmination of an auction process designed to produce the highest and best offer for those assets.

7.     Thus, the separation of SCI and Propco that existed as a contingency plan under the First Compromise Agreement has now become a reality, as evidenced by the Joint Plan. That evolution from contingency plan to Joint Plan has caused the parties to think in more detailed terms about how the separation will occur and what sort of transitions SCI and Propco will undergo to successfully emerge from bankruptcy after that separation. The Second Compromise Amendment is the result of clarifications, modifications and refinements to the First Compromise Agreement, as amended, that SCI and Propco have concluded are needed to facilitate the more comprehensive separation and transition plan that will be needed as SCI and Propco proceed to extricate themselves from one another. Unlike the First Compromise Agreement (which was strongly opposed by the Propco Lenders), the Second Compromise Amendment has the full support of the Propco Lenders including the further reduction in rent to a "break–even" level for SCI and its estate. The terms of the Second Compromise Amendment are summarized in section IV.C below.

**IV.    Statement of Facts**

    **A.    Case Background and Status.**

8.     The Debtors commenced the Chapter 11 Cases by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 28, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the District of Nevada (this "Court").

9.     The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "Committee") was appointed in the Chapter 11 Cases on August 13, 2009. No trustee or examiner has been appointed in the Chapter 11 Cases.

10.     As the Court is well aware, these Chapter 11 Cases have given rise to their own vernacular.  Among other things, the Debtors' assets have generally been bifurcated into the "Propco Assets" and the "Opco Assets."

11.     The Propco Assets consist of the four properties owned by Propco – Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Sunset Station Hotel & Casino and Red Rock Casino Resort Spa (collectively, the "Leased Hotels" or the "Propco Properties") – together with the related furniture, fixtures and equipment ("FF&E") and other assets used in connection with the operation of those Properties.  Almost all of the Propco Assets serve as collateral to secure the repayment of Propco's prepetition mortgage loan (the "Propco Mortgage Loan") from its senior secured lenders (the "Propco Lenders").

12.     The Opco Assets, in turn, consist of all of SCI's assets, including its direct and indirect equity interests in its debtor and non-debtor subsidiaries (collectively with SCI, the "Opco Group"), *other than* the Propco Assets and the chain of subsidiaries that own, directly or indirectly, the equity interests in Propco (also known as the "Mezz Stack" or the "Mezzco Debtors").  Generally speaking, the Opco Assets are comprised of fourteen casino properties and their related assets, as well as SCI's direct and indirect interests in a variety of other management and development opportunities.[3]  Certain, but not all, of the Opco Assets serve as collateral to secure the repayment of SCI's prepetition secured loan (the "Opco Loan") from its senior secured lenders (the "Opco Lenders").  In addition, there are certain assets that are owned by members of the Opco Group but fall within the Propco Assets (as that term is defined herein), because they are used exclusively or predominantly in connection with the operation of the Propco properties (the "Excluded Assets").  The Excluded Assets are detailed as Annex 1 to the Second Compromise Amendment, which is attached as Exhibit 1 to this Motion.

13.     The Opco Assets and the Propco Assets are under the common management of SCI.  As the Court is well aware, the most contentious moments in these cases have occurred when creditors of SCI and Propco perceived that their respective interests were in

---

[3]     A more detailed description of the Propco Assets and the Opco Assets is contained in the Disclosure Statement (defined below).

1   conflict and that either SCI and its estate was receiving a benefit that was coming at the expense

2   of Propco and its estate, or *vice versa*.  Perhaps the most notable examples are the controversies

3   that have arisen from time to time regarding the Master Lease (defined below), pursuant to which

4   SCI leases the Propco properties from Propco (the "Master Lease").

5           14.     Throughout these Chapter 11 Cases, the Debtors have attempted to

6   preserve and maximize the value of both the Opco Assets and the Propco Assets and have

7   advocated for a plan of reorganization that would keep all of the properties under SCI

8   management and under the "Station" umbrella, albeit with a significantly restructured balance

9   sheet.  The Debtors believed that such a plan would be the best way to maximize value for

10  creditors, maintain the synergies of common management, and reap the benefits of a highly

11  regarded brand and a proven and respected management team.  The Debtors also believed that

12  any plan that would separate the Opco Assets from the Propco Assets would have the potential to

13  be both complicated and costly as the parties tried to extricate themselves from their various

14  interrelationships.

15          15.     Until recently, the Debtors thought that their major creditors shared

16  similar beliefs.  Indeed, in December of 2009, the Debtors sought and obtained Court approval

17  for a hard-fought and contentious First Compromise Agreement, which was designed primarily

18  to provide the parties with a 3-month window of time to try to arrive at just such a plan.

19          16.     Notwithstanding the Debtors' desire and efforts to forge a consensual plan

20  to keep the enterprise together, through the Debtors' discussions and negotiations with their

21  stakeholders, it became clear to the Debtors that the interests and desires of the Opco Lenders

22  and the Propco Lenders – the two groups with the principal economic interests in these cases –

23  were sufficiently divergent that a separation of the Opco Assets and the Propco Assets was the

24  only viable plan for the Debtors to pursue.  Stated in the simplest of terms, the Propco Lenders

25  demonstrated their desire to own the Propco Assets, while the Opco Lenders demonstrated their

26  desire to have the Opco Assets sold.

27          17.     The Debtors heard their lender constituents loudly and clearly and

28  promptly formulated a plan providing for: (a) what is essentially a foreclosure by the Propco

Lenders on those Propco Assets that are collateral for the Propco Mortgage Loan, coupled with the purchase of certain other non-collateral assets; and (b) a sale of the Opco Assets, as the culmination of an auction process designed to procure the highest or otherwise best available offer for those assets.

18. On March 24, 2010, Debtors filed the *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated March 24, 2010)* [Docket No. 1131-1] (the "Joint Plan") and the *Disclosure Statement to Accompany Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and Its Affiliated Debtors (dated March 24, 2010)* [Docket No. 1130-1] (the "Disclosure Statement"). The hearing on approval of the Disclosure Statement is scheduled for May 5, 2010.[4]

19. The sale of Opco Assets is an essential component of the Joint Plan. The Joint Plan contemplates that the Opco Assets will be sold to the highest bidder, with the net proceeds of that sale to be distributed to creditors in accordance with the respective priorities of their claims. The Joint Plan further contemplates that the sale process will run roughly contemporaneously with the solicitation of votes on the Joint Plan and that the auction will occur shortly before the confirmation hearing on the Joint Plan, but sufficiently in advance of the confirmation hearing so that the terms of the proposed sale to the highest bidder will be known and available for the Court's consideration and approval at the time of the confirmation hearing.

20. The Propco Assets, including the Excluded Assets, will **not** be included in the sale. The Excluded Assets consist entirely of assets that are to be transferred to Propco or New Propco (as defined in the Joint Plan) as part of the SCI/Propco separation.

21. As discussed in detail below, the Second Compromise Amendment is an interim step towards effectuating the SCI/Propco separation that is contemplated by the Joint Plan and is fully supported by the Propco Lenders. The Second Compromise Amendment sets forth the manner in which the Parties will address their respective obligations under the Master

---

[4]    The Debtors anticipate that the Joint Plan and Disclosure Statement will each be modified and/or supplemented prior to the May 5, 2010 hearing in order to reflect further evolution of the Joint Plan as a result of ongoing discussions between the Debtors and various interested parties.

Lease during the period prior to confirmation of the Joint Plan, as well as detailing certain asset transfers and transition services that will lay the foundation for the SCI/Propco separation.

**B.     Master Lease Status.**

22.     Propco, as lessor, and SCI, as tenant, are parties to the Master Lease pursuant to which SCI leases from Propco the real property and improvements owned by Propco and associated with the Leased Hotels.  The Leased Hotels, in turn, are operated and managed by SCI and certain of its non-debtor operating subsidiaries.

23.     Among other things, the Master Lease provides for monthly rental payments from SCI to Propco in amounts that exceed the amounts that Propco requires to meet its ordinary debt service obligations and any other expenses not covered by SCI under the "triple net" provisions in the Master Lease.  Subject to certain conditions, the governing credit documents permitted some of that surplus cash to be upstreamed as dividends to the mezzanine entities that own equity up the Propco "stack" to service their debt, with additional amounts then ultimately "flowing back" to SCI as the ultimate parent entity.

24.     Due to the severe recession and its impact on the Las Vegas economy the financial performance of the Propco Casinos (as measured by certain specified financial metrics) deteriorated to the point that the amount of the surplus cash that was paid "up" through the Propco stack and ultimately "flowed back" to SCI was restricted.  Upon the event of default that was triggered when these Chapter 11 Cases were filed, the rights of the mezzanine lenders to any dividends, as well as the rights of SCI to any "flow back", were cut off altogether, resulting in all of the surplus cash being "trapped" at Propco.

25.     On December 11, 2009, after notice and a fulsome hearing attended by all of the Debtors' major creditor constituencies, the Court approved the Debtors' *Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Master Lease Compromise Agreement* dated November 19, 2009 [Docket No. 587] by entering an order approving and authorizing Propco and SCI to enter into and abide by the original Amended and Restated Master Lease Compromise Agreement, dated December 11, 2009 (the "First

Compromise Agreement"). *See Order Approving Master Lease Compromise Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4) And Fed. R. Bankr. P. 9019* entered on December 11, 2009 [Docket No. 962] (the "Compromise Agreement Order"). Pursuant to the First Compromise Agreement and the Compromise Agreement Order, SCI was authorized to pay, and Propco to accept Reduced Rent during the Deferral Period, with Deferred Rent accruing and payable as provided in the First Compromise Agreement. In consideration for the agreement of Propco to accept Reduced Rent, SCI, among other things, agreed to provide transition services to Propco if the Master Lease ultimately was rejected by SCI.

26.    The First Compromise Agreement was extended for an additional two months when this Court approved the *Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019 For Entry of an Order Approving First Amendment to Amended and Restated Master Lease Compromise Agreement*, dated February 24, 2010 [Docket No. 1014], after notice and a hearing held on March 2, 2010. *See Order Approving First Amendment to Amended and Restated Master Lease Compromise Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4) and Fed. R. Bankr. P. 9019* entered on March 4, 2010 [Docket No. 1042].

**C.    The Second Compromise Amendment.**

27.    As was the case in connection with the negotiation of the First Compromise Agreement, because of the diverging interests of the SCI and Propco estates in connection with the Master Lease, responsibility for representation of Propco's interests in connection with the negotiation of the Second Compromise Amendment was assumed by the two independent members of Propco's board, Messrs. Robert White and Robert Kors, who were advised by Propco's separate counsel, Gibson, Dunn & Crutcher LLP (the same individuals and counsel who represented Propco in connection with the First Compromise Agreement and the First Compromise Amendment).

28.    The Second Compromise Amendment represents an evolution from the First Compromise Agreement. The First Compromise Agreement was entered into at a relatively

early stage in these cases, at a time when the parties' attention was focused largely on the Master

Lease and the significant rental payments required of SCI thereunder. During that time, detailed

plan discussions were somewhat stalled due to the impending lender showdown as the December

rent payment approached. In essence, the First Compromise Agreement was forged to break the

deadlock over the Master Lease rental payments in order to permit the parties to focus their

attention on plan discussions and at a time when the Debtors still believed that an SCI/Propco

separation was unlikely.

29.     With the First Compromise Agreement in place, the Master Lease disputes

were set aside and attention turned to plan issues. The Joint Plan is the result of the discussions

and negotiations that ensued. While the First Compromise Agreement was a short-term solution

to buy time, the Second Compromise Amendment represents a more meaningful step towards the

separation of SCI and Propco that the Joint Plan now contemplates. Consequently, the Second

Compromise Amendment is based on the same basic concepts as the First Compromise

Agreement (i.e., rent relief for SCI in exchange for transition assistance for Propco), but those

concepts have been expanded, refined and clarified to convert the First Compromise Agreement

from a short-term solution designed to buy time to a more definitive step towards the SCI/Propco

separation.

30.     The pertinent terms of the Second Compromise Amendment include,

among others, the following mutual accommodations[5]:

- Propco, with the consent of the Propco Lenders, has agreed to further
  reduce rent to a "break–even" level for SCI and its estate. The rent
  payable in cash to Propco shall be reduced for May 2010 and each month
  thereafter until the effective date of a Consensual Plan, as defined in the
  Second Compromise Amendment, (subject to earlier termination if the
  Master Lease is rejected by SCI) from approximately $21,449,000 per
  month under the Master Lease to an amount equal to EBITDAR[6] for the
  Leased Hotels in the prior calendar month <u>minus</u> (i) actual capital
  expenditures not paid from the "FF&E Reserve Accounts," (ii) certain out

---

[5]     The description of the Second Compromise Amendment contained in the Motion is intended as a summary only and is qualified in its entirety by the actual terms of the Second Compromise Amendment.

[6]     "EBITDAR" means Earnings (or Net Income) Before Interest, Taxes, Depreciation, Amortization and Rent.

of pocket operating expenses of the Leased Hotels (defined as "Owner's Expenses") to the extent not already deducted in the computation of EBITDAR, and (iii) rent due under the Boulder Station ground lease (as so calculated, the "<u>Reduced Rent</u>").  The 120% of adequate protection floor included in the Prior MLCA has been removed.  Under the new calculation, Reduced Rent cannot exceed EBITDAR for the Leased Hotels.  The Debtors estimate that Reduced Rent under the Second Compromise Amendment will be approximately $ 1,533,000 less per month than if rent were being calculated under the First Compromise Agreement (and approximately $ 7,780,000 less per month than if rent were being calculated under the Master Lease itself).

- The difference between Reduced Rent and contract rent under the Master Lease (such difference, the "<u>Deferred Rent</u>") will be either (a) paid in cash on an administrative basis if the Master Lease is ultimately assumed by SCI, or (b) added to the prepetition rejection damages claim if the Master Lease is ultimately rejected by SCI.

- Prior to initiation of transition, SCI will continue to perform all of its other obligations under the Master Lease, with SCI's obligation to pay the Reduced Rent under the Compromise Agreement constituting an administrative claim against SCI, payable in accordance with the terms of the Second Compromise Amendment.

- Upon rejection of the Master Lease, Propco will hold an allowed, partially secured prepetition claim against SCI for rejection damages equal to the amount of Deferred Rent <u>plus</u> the amount of Propco's statutory lease rejection claim, subject to determination.

- Because the statutory lease rejection claim cap is lower than the nominal claim for rent under the Master Lease both before and after credit for the value of foreclosed collateral, the amount of the lease rejection damage claim will not be reduced by the surrender of any of the collateral securing the lease obligations, but the claim will be rendered fully unsecured upon the transfer of such collateral to Propco.

- SCI and the Operating Subsidiaries have agreed to provide the following transition services after the occurrence of a Transition Event (as defined in the Second Compromise Amendment):

  - SCI and the Operating Subsidiaries shall assist the Mortgage Lenders (and any designated replacement manager) with licensing by applicable gaming authorities by providing information requested by gaming authorities, among other things.

  - SCI and the Operating Subsidiaries shall continue to operate the Leased Hotels under their own gaming licenses on an expense reimbursement and fee-for-service basis for a period of up to 270

days post-rejection.  During this period, the Leased Hotels will be operated as if no rejection of the Master Lease or License Agreement had occurred, provided that SCI and the Operating Subsidiaries will not have any financial obligations to Propco under the Master Lease.

o   SCI and the Operating Subsidiaries shall permit Propco, the Mortgage Lenders and any designated replacement manager to use the database of Primary Customers, other intellectual property and reservations services, including access to all Transactional Data in an electronically accessible and usable format.

o   SCI and the Operating Subsidiaries shall permit Propco, the Mortgage Lenders and any designated replacement manager to make offers of employment to certain employees of SCI and the Operating Subsidiaries that are exclusively or primarily engaged in the operation of the Leased Hotels.

o   SCI and the Operating Subsidiaries shall deliver to Propco, the Mortgage Lenders and any designated replacement manager financial, accounting and other information that pertains exclusively to the Leased Hotels or is otherwise necessary for the day to day operation of the Leased Hotels for both licensing and transition purposes including preparation of balance sheets for the Leased Hotels, and will permit onsite access to records, onsite observation of operations and access to senior managers, provided that access to confidential or competitive information shall be subject to prior execution of a confidentiality agreement.

o   SCI and the Operating Subsidiaries agree that, following rejection of the Master Lease, SCI and the Operating Subsidiaries shall be deemed to be operating the Leased Hotels for the benefit of Propco, and all cash flow from operations of the Leased Hotels, after payment of all amounts to be paid to SCI and the Operating Subsidiaries under the Second Compromise Amendment, shall be property of and shall be delivered to Propco.  During the first sixty days of transition services, SCI and the Operating Subsidiaries will receive expense reimbursement only.  Thereafter, Propco shall pay SCI and the Operating Subsidiaries a management fee of two percent of gross revenue plus five percent of EBITDA of the Leased Hotels, in addition to expense reimbursement.

o   SCI and the Operating Subsidiaries will provide a reasonable period of time after they cease providing transition services for Propco to rebrand the Leased Hotels to eliminate all mentions of the name "Station."

o   SCI and the Operating Subsidiaries agree that, pending transfer to

Propco of all collateral granted by SCI and the Operating Subsidiaries to secure the Master Lease and all other personalty to be sold to Propco under the Second Compromise Amendment, all such personal property will remain at the Leased Hotels and be available for use in their operation, and, subject to its obligations regarding re-branding, Propco will have a license to use all such collateral in the operation of the Leased Hotels after rejection and until transfer of title is completed, including after the termination of other transition services.

○ SCI and the Operating Subsidiaries will cooperate in a consensual foreclosure of Propco's liens on such collateral and will sell outright certain tangible and intangible personal property, including the names Red Rock, Palace, Boulder and Sunset, that is not subject to a lien to Propco but is used primarily with respect to the Leased Hotels or is essential to the operation of the Leased Hotels, with such sales being subject to Court approval.

○ Propco will receive the full benefit of the License Agreement during the transition period, including delivery of the list of SCI customers that predominantly play at a Leased Hotel, and Propco agrees that, subject to such performance, any monetary claim for rejection damages under the License Agreement shall be a general unsecured claim. Propco will, however, reserve any Bankruptcy Code section 365(n) rights it may have as licensee under the License Agreement.

• SCI and Propco agree that any asset transfer, sale, assignment, or licensing by SCI or an Operating Subsidiary contemplated in the Second Compromise Amendment or under Annex 1 thereto shall be (i) made free and clear of all liens—subject to the approval of the Bankruptcy Court upon reasonable notice and a hearing and without prejudice to the rights (including, without limitation, all rights under the Bankruptcy Code) of any secured creditor holding a perfected lien on the assets to be transferred sold, assigned or licensed and (ii) made subject to the approval of the Bankruptcy Court upon reasonable notice and a hearing.

31. All of the elements of the compromise enumerated above are more fully set forth in the Second Compromise Amendment, which is incorporated herein by reference. In the event of any inconsistencies, the terms of the Second Compromise Amendment shall control.

32. The accommodations and adjustments to the terms of the First Compromise Agreement embodied in the Second Compromise Amendment are essential steps in laying the groundwork for the smooth and effective separation of the businesses of Propco and

#4850-8999-0661

-13-

SCI and its affiliated debtor and non-debtor wholly-owned subsidiaries – a course of action that already has significant support from the Debtors' major creditor constituencies and upon which the Joint Plan is based.  The Debtors believe that accomplishing such a smooth transition is in the best interests of the respective estates of both SCI and Propco.  SCI and Propco seek, at this time, authority to implement the terms of the Second Compromise Amendment.  After the Second Compromise Amendment is approved, to the extent that any issues or disputes arise regarding the process or manner in which the Second Compromise Amendment is implemented by SCI and Propco, whether such issues and disputes are between SCI and Propco or implicate any other parties in interest, the Debtors will seek judicial resolution of such issues or disputes by separate motion, filed on notice to all parties in interest.  The Debtors anticipate that such subsequent motion will be brought before and heard by the Court prior to the confirmation hearing on the Joint Plan.  In particular, any transfers of assets from SCI or the Operating Subsidiaries to Propco that are contemplated by the MLCA and that involve assets that are not presently collateral of Propco or the Mortgage Lenders shall be subject to separate Court approval, and the Debtors will seek to transfer such assets to Propco "free and clear" of any liens, claims and encumbrances.

## V.    Argument

### A.    The Debtors' Decisions to Enter into the Second Compromise Amendment Are Supported by Sound Business Judgment, Are Beneficial to the Estates and Should Be Approved under Bankruptcy Code Sections 363(b)(1) and 365

33.    Section 363(b)(l) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(l).  Courts have required that such use, sale or lease be based upon a debtor's sound business judgment.  *See, e.g.*, *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997), *aff'd*, 221 B.R. 243 (B.A.P. 9th Cir. 1998); *In re Plaza Family Partnership*, 95 B.R. 166, 173 (E.D. Cal. 1989); *see also In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re*

*Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (D. Del. 1985)); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").

34.     Courts grant particular deference to a debtor's business judgment concerning the best way to make use of, and generate value from, unexpired nonresidential leases.  *See National Labor Relations Board v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984) ("[t]he usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test"); *In re Crystallin, LLC*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (if the debtor establishes that rejection of an executory contract is of benefit to the estate, then the bankruptcy court should not interfere with the debtor's business judgment except upon a finding of bad faith or gross abuse of business discretion, *citing Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046-47 (4th Cir. 1985); *In re HQ Global Holdings*, *Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (the sole issue to consider when evaluating a motion to reject an executory contract under the business judgment test is whether the rejection will benefit the estate).

35.     The business judgment test is not limited to decisions to assume or reject contracts or leases, but also to decisions to revise, modify or otherwise negotiate resolutions of issues relating to contractual obligations during a chapter 11 case.  *In re Carter Hawley Hale Stores, Inc.*, 1991 Bankr. LEXIS 2185 (Bankr. C.D. Cal. Oct. 24, 1991) ("Debtors and other parties to prepetition executory contracts and leases may agree to modify provisions thereof as part of a negotiated assumption so long as the contract, as modified, is approved by the Court and meets the business judgment standard" (internal citations omitted)).

36.     The mutually beneficial, arms' length agreements between SCI and Propco to modify their rent rights, remedies and obligations under section 365, in the exercise of their business judgment and in the best interests of the estates and creditors must be given deference.  *See In re National Sugar Refining Co.*, 21 B.R. 196, 197 (Bankr. S.D.N.Y. 1982) ("Under the Bankruptcy Act, a majority of the courts applied the 'business judgment' test to

determine whether a trustee should be permitted to assume or reject an executory lease."); *In re*

*G Survivor Group*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) ("Generally, absent a showing of

bad faith, or an abuse of business discretion, the debtor's business judgment will not be

altered."). Similarly, the decision to extend the deadline to assume or reject the Master Lease, on

consent, is a permissible and rational decision, and must be approved by this Court under section

365(d)(4)(B)(ii) of the Bankruptcy Code.

**B.**    **The Second Compromise Amendment Resolves Disputes Between
SCI and Propco and Represents a Fair and Equitable Settlement
Which Should be Approved under Bankruptcy Rule 9019**

37.    The Second Compromise Amendment is a settlement, as was the First

Compromise Agreement, of disputed issues between SCI and Propco that has been reached

through arms' length negotiations. Therefore, Bankruptcy Rule 9019 supports granting the relief

requested in the Motion. It is axiomatic that compromises are favored in bankruptcy[7] and are a

normal part of the reorganization process. *Protective Committee for Independent Stockholders of*

*TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (*quoting Case v. Los Angeles*

*Lumber Prods. Co*., 308 U.S. 106, 130 (1939)); *see also In re A & C Properties*, 784 F.2d 1377,

1381 (9th Cir. 1986) ("The law favors compromise and not litigation for its own sake . . . .").

Pursuant to Bankruptcy Rule 9019, in considering compromises, courts determine whether the

compromise in question is fair and equitable and in the best interests of the estate. *In re Mickey*

*Thompson Entertainment Group, Inc.*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003) ("Although the

bankruptcy court has 'great latitude' in authorizing a compromise, it may only approve a

proposal that is 'fair and equitable' to the creditors" (internal citations omitted)); *see also*

*Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424; *In re Best*

*Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994). Bankruptcy Rule 9019(a) commits the

approval or rejection of a compromise to the sound discretion of the bankruptcy court. *In re*

*Michael*, 183 B.R. 230, 232 (Bankr. D. Mont. 1995).

38.    In pursuing a compromise or settlement, the parties are not required to

---

[7]    10 Collier on Bankruptcy, ¶ 9019.01, at 9019-2 (15th ed. rev. 2008) (*citing Marandas v. Bishop* (*In re Sassalos*), 160 B.R. 646, 653 (D. Ore. 1993)).

1    reach the absolute maximum value for the estate.  Rather, settlements should be approved if they

2    fall above the lowest point on the continuum of reasonableness.  *In re W.T. Grant Co.*, 699 F.2d

3    599, 608 (2d Cir. 1983) ("responsibility of the bankruptcy judge . . . [is] to canvass the issues and

4    see whether the settlement, fall[s] below the lowest point in the range of reasonableness,")

5    (internal citations omitted); *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976) (Court should not

6    conduct a "mini-trial" on the merits of a proposed settlement); *In re Planned Protective Servs.,*

7    *Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991) (same).

8            39.      Finally, in light of the filing of the Disclosure Statement and Joint Plan,

9    and the current status of the Chapter 11 Cases, the relief requested in the Motion is particularly

10   timely and appropriate.  Specifically, courts routinely conclude that it is permissible for a debtor

11   in possession to take action prior to a confirmation hearing that will enable the debtor to comply

12   with section 1129(a) of the Bankruptcy Code; especially where, as here, the action to be taken

13   will not harm the Debtors' estates but rather will provide considerable financial and

14   administrative benefit in aid of both confirmation and in obtaining the best possible recovery for

15   creditors of the estates.

16           40.      The Second Compromise Amendment is a part of the Debtors' ongoing,

17   established and continuing efforts to confirm a plan that provides for the greatest possible

18   recovery to creditors in an expeditious and cost-effective manner.  As this Motion makes clear,

19   resolution of the contractual obstacles created by the terms of the Master Lease has been a gating

20   issue in these Chapter 11 Cases since the Petition Date.  As the Debtors have informed the Court

21   in the past on numerous occasions, the adjustments and accommodations to the Master Lease

22   embodied in the First Compromise Agreement and now continued in the Second Compromise

23   Amendment were (and are) prerequisites to both the smooth administration of these Chapter 11

24   Cases and the confirmation of the Joint Plan.  Throughout these Chapter 11 Cases, the Debtors

25   have expended significant time and effort in order  to achieve the necessary accommodations and

26   adjustments to the Master Lease that have been presented to this Court for approval.  The First

27   Compromise Agreement, like the Second Compromise Amendment, was negotiated at arms'

28   length between SCI and Propco and entered into with considerable deference to the intricate

1   balance required among the financial needs of the Debtors' estates and the maximization of the

2   recovery to creditors.

3          41.    The Second Compromise Amendment represents the latest step in the

4   Debtors' campaign of substantial and tangible progress towards the confirmation of a plan that

5   provides for the sale of substantially all of the assets of SCI and its debtor and non-debtor

6   subsidiaries pursuant to a public auction that will be approved at the confirmation hearing.  As a

7   result, the negotiation and implementation of the Second Compromise Amendment represents

8   the studied, prudent exercise of the business judgment of Propco and of SCI, as debtors and

9   debtors in possession, and for the reasons set forth herein, this Motion should be granted.

10  **VI.    Conclusion**

11         Wherefore, the Debtors respectfully request that the Court grant this Motion and

12  enter the Order annexed as Exhibit 2, together with such other relief as the Court deems proper.

13  Dated:  April 7, 2010                    Respectfully submitted,

14

15                                    By:    /s/    *Thomas R. Kreller*
                                      Paul S. Aronzon, CA State Bar No. 88781
16                                    Thomas R. Kreller, CA State Bar No. 161922
                                      MILBANK, TWEED, HADLEY & McCLOY LLP
17                                    601 South Figueroa Street, 30th Floor
                                      Los Angeles, California 90017
18
19                                    Reorganization Counsel for
                                      Debtors and Debtors in Possession
20
                                      By:    /s/    *Oscar Garza*
21                                    Dennis B. Arnold, CA State Bar No. 70022
                                      Oscar Garza, CA State Bar No. 149790
22                                    GIBSON, DUNN & CRUTCHER LLP
                                      333 South Grand Avenue
23                                    Los Angeles, California 90071
                                      Telephone:    (213) 229-7000
24                                    Facsimile:    (213) 229-7520

25                                    Reorganization Counsel for FCP PropCo, LLC as
                                      Debtor and Debtor in Possession
26
27                                    Bruce T. Beesley, NV SBN 1164
                                      Laury Macauley, NV SBN 11413
28                                    LEWIS AND ROCA LLP
                                      50 W. Liberty Street, Ste. 410

#4850-8999-0661                              -18-