# Exhibit 1

# Exhibit 1

<u>**SECOND AMENDED AND RESTATED**</u>

<u>**MASTER LEASE COMPROMISE AGREEMENT**</u>

This Second Amended and Restated Master Lease Compromise Agreement (this "<u>Compromise</u>") is entered into as of the __ day of [April, 2010], by and among  Station Casinos, Inc. ("<u>SCI</u>") and its wholly owned subsidiaries Boulder Station, Inc. ("<u>Boulder Station</u>"), Charleston Station, LLC ("<u>Charleston Station</u>"), Palace Station Hotel & Casino, Inc. ("<u>Palace Station</u>") and Sunset Station, Inc. ("<u>Sunset Station</u>," and collectively with Boulder Station, Charleston Station and Palace Station, the "<u>Operating Subsidiaries</u>"), on the one hand, and SCI's indirect wholly owned subsidiary FCP PropCo, LLC ("<u>PropCo</u>"), on the other hand.  This Compromise amends and restates the Amended and Restated Master Lease Compromise Agreement dated as of December 11, 2009, made by SCI and the Operating Subsidiaries, on the one hand, and PropCo, on the other hand, as amended by the First Amendment to Amended and Restated Master Lease Compromise Agreement (the "<u>First Amendment</u>"), dated as of March 2, 2010 made by SCI and the Operating Subsidiaries, on the one hand, and PropCo, on the other hand (as so amended, the "<u>Prior MLCA</u>").  Each of SCI and PropCo make this Compromise as a debtor and debtor-in-possession (sometimes hereinafter SCI and PropCo are collectively referred to as "<u>Debtors</u>" or "<u>Parties</u>"):

<u>**RECITALS**</u>

1.      <u>The Debtors:</u>  The Debtors commenced chapter 11 cases on July 28, 2009 (the "<u>Petition Date</u>") in the United States Bankruptcy Court, District of Nevada, which bankruptcy cases currently are being jointly administered under Case No. 09-52477 (the "<u>Bankruptcy Cases</u>").  SCI and its debtor and non-debtor subsidiaries (collectively, the "<u>Station Group</u>") constitute a gaming entertainment enterprise that owns and operates under the "Station" and "Fiesta" brand names.

2.     The Leased Hotels:  The Station Group operates, among others, (i) Palace Station Hotel & Casino, (ii) Boulder Station Hotel & Casino, (iii) Sunset Station Hotel & Casino, and (iv) Red Rock Casino Resort Spa (collectively, the "Leased Hotels").

3.     The Master Lease:  PropCo, as landlord, and SCI, as tenant, entered into that certain Master Lease, dated as of November 7, 2007 (as amended as of the Petition Date, the "Master Lease"), under which SCI leases the real property and improvements occupied by the Leased Hotels.  The Master Lease is a "triple net" lease under which taxes, insurance, capital expenditures, and other expenses (in each case as provided therein) are born by SCI.  SCI pays rent to PropCo both in the form of cash payments to PropCo and cash payments to third parties on behalf of PropCo, all as required pursuant to the terms of the Master Lease.  Payments to be made by SCI to PropCo under the Master Lease are due on the day (the "Rent Payment Date") that is the third (3rd) business day preceding the fifteenth (15th) day of each calendar month.  Such rent payments cover the period from the fifteenth (15th) day of the month in which such rent payment is made through the fourteenth (14th) day of the next month (the "Rental Period").

4.     The Stipulations Extending Time Period To Assume Or Reject Nonresidential Real Property Leases:  On October 23, 2009, the Parties jointly filed a motion for an order, pursuant to 11 U.S.C. § 365(d)(4), to extend the time to assume or reject various unexpired nonresidential real property leases, including the Master Lease (extending the date to assume or reject the Master Lease through February 23, 2010).  Such motion and the related proposed order were approved, subject to the modifications thereto set forth on the record, at a hearing before the Bankruptcy Court on November 20, 2009.  Subsequently, on March 2, 2010, the  Bankruptcy Court entered its order extending the last day to assume or reject the Master Lease to May 12, 2010, as a component of the relief granted under the Parties' joint motion for an order approving the First Amendment.

5.     The License Agreement:  Concurrently with the execution of the Master Lease, SCI and PropCo executed and delivered the License and Reservation Service Agreement (the "License Agreement"), dated as of November 7, 2007, pursuant to which SCI agreed to

#4814-2594- 5093v1

2

provide to PropCo, among other things, certain trademarks (both exclusive and non-exclusive), the use of certain customer lists and other items identified therein, and the use of SCI's common reservation system (the "Licensed Assets"). In addition to providing the Licensed Assets, without limiting the agreements contained in the License Agreement, SCI also agreed to provide, under certain circumstances, after termination of the Master Lease: (i) an eighteen month license on certain specified trademarks; (ii) non-exclusive use of certain lists of Primary Customers (as defined in the License Agreement) for advertising purposes for an eighteen month period; and (iii) non-exclusive use of SCI's common reservation system for the same eighteen month period.

6.      The PropCo FF&E Security Agreement From SCI:  Section 12.4 of the Master Lease contains a security agreement, pursuant to which SCI pledged, assigned and granted PropCo a security interest and an express contractual lien in and to (i) all of the personal property (including furniture, fixtures, goods, inventory, equipment, furnishings, objects of art, machinery, appliances, appurtenances and signage together with tools and supplies (including spare parts inventories) related to the Leased Hotels) owned by SCI as described in the Master Lease and (ii) the FF&E Reserve Collateral as defined in the Master Lease (collectively the "SCI Lease Collateral").

7.      The PropCo FF&E Security Agreement From The Sublessees: Concurrently with the execution of the Master Lease and the License Agreement, PropCo and the Operating Subsidiaries entered into the Security Agreement (All Furniture, Fixtures and Equipment) (the "Security Agreement") dated November 7, 2007 granting liens on and security interests in all of the personal property (including furniture, fixtures, goods, inventory, equipment, furnishings, objects of art, machinery, appliances, appurtenances and signage together with tools and supplies (including spare parts inventories) related to the Leased Hotels) owned by the Operating Subsidiaries as described in such Security Agreement to PropCo to further secure SCI's obligations to PropCo under the Master Lease and the Sublease FF&E Reserve as defined in the Master Lease (collectively the "Operating Subsidiaries Lease Collateral").

#4814-2594- 5093v1

3

8.    The PropCo Mortgage Loan:  PropCo entered into that certain Amended and Restated Loan and Security Agreement, dated as of March 19, 2008 (the "Mortgage Loan Agreement"), with German American Capital Corporation and JP Morgan Chase Bank (collectively, the "Mortgage Lenders"), pursuant to which the Mortgage Lenders made loans to PropCo in the aggregate amount of $1,800,000,000 (the "Mortgage Loan").

9.    The SCI Loan:  SCI, as borrower, Deutsche Bank Trust Company Americas ("DBTCA"), as administrative agent (the "Prepetition Agent") the other lenders from time to time party thereto (together with DBTCA, the "Prepetition Lenders"), entered into that certain Credit Agreement, dated as of November 7, 2007 (as amended, supplemented or otherwise modified from time to time, the "SCI Loan Agreement").  The SCI Loan Agreement provided for (i) a $250,000,000 term loan facility and (ii) a $650,000,000 revolving credit facility.

10.    The SCI Forbearance Agreement:  On July 28, 2009, SCI and certain of its operating subsidiaries, including the Operating Subsidiaries, the Prepetition Agent and certain of the Prepetition Lenders entered into the Forbearance Agreement[1] pursuant to which the Prepetition Agent and the Prepetition Lenders have agreed (subject to the terms thereof) to forbear from exercising their default-related rights, remedies, powers and privileges against the operating subsidiaries, among other things.  SCI desired to enter into the Forbearance Agreement primarily to permit SCI to reorganize in Chapter 11 without the necessity of commencing bankruptcy cases for most of its subsidiaries, including the Operating Subsidiaries.

11.    The PropCo Cash Collateral Stipulation:  On September 9, 2009, the Bankruptcy Court entered its final order approving the Stipulation And Final Order For (i) Adequate Protection and (ii) Use Of Cash Collateral With Respect To Secured Loans To FCP

---

[1] "Forbearance Agreement" means the Second Forbearance Agreement; and Second Amendment to the Credit Agreement dated July 28, 2009, as amended, supplemented or otherwise modified from time to time pursuant to the terms thereof.

PropCo, LLC, (the "PropCo Cash Collateral Stipulation"), which stipulation was entered into between PropCo, SCI, the Mortgage Lenders and Deutsche Bank AG, as swap counterparty ("DB").  Pursuant to the PropCo Cash Collateral Stipulation, PropCo makes certain adequate protection payments to the Mortgage Lenders, including payment of current interest on the Mortgage Loan and reimbursement of the expenses of the Mortgage Lenders.  As additional adequate protection, PropCo and SCI agreed to continue to perform their respective obligations under the Master Lease.  In consideration for such adequate protection payments, PropCo was authorized to pay its ongoing operating and reorganization expenses, including periodic payments on the Swap in consideration of DB's agreement to forbear from terminating the Swap while such payments continued.  In December 2009 PropCo announced its intention to discontinue making continuing payments under the Swap and the Swap was terminated effective as of January 8, 2010.

      12.    The SCI Cash Collateral Stipulation:  On October 13, 2009, the Bankruptcy Court entered its SCI Final Cash Collateral Order.[2]  Pursuant to the SCI Final Cash Collateral Order, SCI is required to submit to the Prepetition Lenders on a regular basis a proposed operating budget for the entire Station Group (the "SCI Budget") for approval by the Prepetition Agent and the Required Lenders (as defined in the SCI Loan Agreement and referred to herein as the "Required Prepetition Lenders") as a condition to SCI's ongoing use of cash collateral.  Pursuant to the terms of the SCI Final Cash Collateral Order, the existence at all times of a SCI Budget approved by the Prepetition Agent and the Required Prepetition Lenders is one of the conditions to SCI's use of cash collateral under the SCI Final Cash Collateral Order.  As a result, all payments to be made by the Debtors (other than PropCo) under this Compromise are

---

[2] "SCI Final Cash Collateral Order" means the Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (i) Authorizing the Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans to Non-Debtor Subsidiaries, (ii) Granting Adequate Protection to Prepetition Secured Parties, and (iii) Granting Related Relief entered on October 13, 2009.

subject to the SCI Final Cash Collateral Order. If SCI loses consensual use of cash collateral under the SCI Final Cash Collateral Order due to, among other things, expiration of the most recently approved SCI Budget, the Prepetition Lenders would have the right to terminate the Forbearance Agreement and take action against SCI's non-debtor operating subsidiaries and their assets which, in turn, may require such operating subsidiaries to file their own bankruptcy cases. If SCI loses consensual use of cash collateral under the SCI Final Cash Collateral Order, then pursuant to and subject to the terms of, paragraph 15 of the SCI Final Cash Collateral Order, SCI could seek nonconsensual use of cash collateral to make all payments due under this Compromise. Payments will continue to become due and owing under this Compromise whether or not consensual use of cash collateral is permitted under the SCI Final Cash Collateral Order provided, in all cases, that the Master Lease has not been the subject of an entered order approving and/or directing its rejection prior to the due date of such payment and the terms of this Compromise.

13.    The SCI Cash Collateral Budget: Since the Parties entered into the Prior MLCA, the Prepetition Agent and the Required Prepetition Lenders have approved on a month by month basis, the continued payment of rent (as reduced thereunder) for the rent payments due through April 2010. Accordingly, SCI's ability to make any payments proposed to be made by SCI under this Compromise remains subject to the SCI Final Cash Collateral Order; provided that any and all payments due from SCI under this Compromise shall remain obligations of SCI and shall remain due and owing and, if not paid, constitute a breach of the Compromise by SCI provided, in all cases, that the Master Lease has not been the subject of an entered order approving its rejection prior to the due date of such payment and the terms of this Compromise.

14.    The Potential Rejection Of The Master Lease And License Agreement: Because SCI had no authority under the then-approved SCI Budget to make the rental payment due on December 10, 2009, SCI notified PropCo that unless SCI could negotiate a reduction of current cash rent that was satisfactory to the Prepetition Agent and the Required Prepetition Lenders, SCI would have no authority under the then-approved SCI Budget to pay rent under the

Master Lease in December 2009 and would, therefore, be forced to default under the Master Lease or to seek appropriate relief from the Bankruptcy Court.  The parties therefore entered into the Prior MLCA to reduce the rent under the Master Lease and ensure such authority for the payment dates in each of December 2009, January 2010, February 2010, March 2010 and April 2010.  If SCI ceases to have authority under the SCI Budget to make reduced rent payments, SCI could be forced to default and SCI's board of directors would need to determine whether immediate rejection of the Master Lease and the License Agreement is in the best interest of SCI's stakeholders, and instruct management to take appropriate action.

15.    Dispute over Ramifications Arising From Rejection of the Master Lease and License Agreement:  The Parties disagree as to the extent, ramifications, and even availability of an immediate rejection of the Master Lease and the License Agreement.  It is undisputed that an uncontrolled (or non-negotiated) rejection of the Master Lease and the License Agreement would unduly and unnecessarily harm the Parties' respective bankruptcy estates.

16.    Modification of Prior MLCA:  :  The Prior MLCA provides the Parties with a "Deferral Period" ending on the lease payment date in May 2010 and allowed SCI to pay "Reduced Rent" during such Deferral Period pending assumption or rejection of the Master Lease and the License Agreement.  On March 24, 2010, the Debtors filed with the Bankruptcy Court a proposed plan of reorganization (the "Proposed Plan"), which incorporates terms governing a PropCo restructuring involving the Leased Hotels and is supported by the Mortgage Lenders pursuant to that certain Plan Support Agreement dated March 24, 2010, entered into by and among the Mortgage Lenders and Fertitta Gaming, LLC, among others (the "Plan Support Agreement").  In furtherance of confirmation of the Proposed Plan, and to ensure continuity of the operations of the Leased Hotels during the confirmation process, the Parties wish to negotiate an extension of the Deferral Period through the effective date of the Proposed Plan (or through the effective date of any other confirmed plan of reorganization, whether a joint plan for both SCI and PropCo or a standalone plan of reorganization for PropCo, which the Mortgage Lenders

have agreed to support pursuant to the Plan Support Agreement (the Proposed Plan or any such other plan of reorganization, each, a "Consensual Plan")) and further reduce the rent under the Master Lease during that extended Deferral Period to effectively a "break even" level for SCI's estate, in exchange for which concessions PropCo and the Mortgage Lenders have required that certain terms in the Prior MLCA be modified as provided herein.

17.    Compromise Providing An Interim Period Of Relief:  In light of the disputes between the Parties regarding the Master Lease, the License Agreement, the ramifications of a rejection of both the Master Lease and License Agreement, and in furtherance of the mutual goal of providing all the relevant parties in the Bankruptcy Cases the time to confirm the Proposed Plan or a replacement Consensual Plan that maximizes the value of both the PropCo and SCI estates and resolves issues related to the Master Lease, the Parties believe it to be in their respective best interests to resolve their issues regarding the Master Lease, the License Agreement and the potential rejection of both on an interim basis by providing PropCo a level of transition services if the Master Lease and License Agreement are ultimately rejected and/or a Consensual Plan is confirmed.   This Compromise shall neither (i) limit PropCo, or its successors and assigns, or any other party in interest, from seeking different or additional transition services to the extent legally provided for under any written agreements between the Parties or other applicable law, nor (ii) limit SCI and the Operating Subsidiaries, or their successors and assigns, or any other party in interest from defending against any such requested relief and taking the position that, except as provided in this Compromise, no additional transition services are legally required under any written agreements between the Parties or other applicable law and nothing herein shall be deemed to modify the PropCo Cash Collateral Stipulation, the SCI Final Cash Collateral Order or the Forbearance Agreement or any of the rights, remedies or privileges thereunder of the parties thereto.

Therefore, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

#4814-2594- 5093v1

8

## AGREEMENT

A.     <u>Interim Period Rent Reduction under the Master Lease</u>:  Subject to the SCI

Final Cash Collateral Order, provided that no order authorizing and/or directing SCI to reject the

Master Lease has previously been entered, SCI shall continue to make monthly rent payments to

PropCo under the Master Lease on the Rent Payment Date and as required under Bankruptcy

Code section 365(d)(3).  However, the amount of rent payable in cash to PropCo during the

"Deferral Period" (as defined below) shall be reduced for the interim period provided in this

Compromise (as so reduced, the "<u>Reduced Rent</u>").  As used herein, the "Deferral Period" means

the period from the date hereof through the confirmation date of a Consensual Plan, provided

that if a "Transition Event" (as defined on <u>Exhibit C</u>) occurs, then the Deferral Period shall cease

as of the date of such Transition Event, as the case may be, and the "Transition Period" (as

defined below) shall commence.  In the event the Deferral Period ends due to confirmation of a

Consensual Plan, the "Transition Period" shall commence in accordance with the terms and

provisions of the Consensual Plan and such Consensual Plan shall supersede the terms and

provisions of this Compromise.  For purpose of clarity, notwithstanding that SCI's ability to

consensually use cash collateral to pay rent under the Master Lease is subject to the SCI Final

Cash Collateral Order, SCI's obligation to pay such rent hereunder and under the Master Lease is

not subject to the availability of consensual use of cash collateral under the SCI Final Cash

Collateral Order and any rent due under the Master Lease, as modified by this Compromise, shall

remain due and payable on the applicable Rent Payment Date, provided, in all cases, that the

Master Lease has not been the subject of an entered order approving its rejection prior to the due

date of such payment.  If an entered order approving and/or directing rejection of the Master

Lease is entered and, pursuant to this Compromise a payment that became due prior to the entry

of such rejection order remains unpaid after the date of entry of such rejection order, then such

payment shall remain immediately due and payable notwithstanding the intervening entry of

such rejection order.

B.      Computation and Payment of Reduced Rent: True Ups:  SCI shall deliver to PropCo and the Mortgage Lenders:  (i) within 30 days following the approval by the Bankruptcy Court of this Compromise, a schedule of monthly capital expenditures and other expenses made in respect of the Leased Hotels and therefore previously deducted in the computation of Reduced Rent under the Prior MLCA; and (ii) within 30 days following the approval by the Bankruptcy Court of this Compromise and every thirteen weeks thereafter, a detailed budget of scheduled capital expenditures to be made in respect of the Leased Hotels for in the succeeding thirteen week period (and therefore to be deducted in the computation of Reduced Rent payable hereunder for such period or otherwise compensated to SCI after the Deferral Period has ended) which budget must be consistent with the current management and operating expenses for the Leased Hotels under current operating standards and practices and must be mutually acceptable to SCI, PropCo and the Mortgage Lenders (each such budget described in this clause (ii), the "Approved Budget").  SCI shall, and shall cause the Operating Subsidiaries to, fund all capital improvements and acquisition of FF&E relating to the Leased Hotels out of the existing FF&E Reserve Accounts pledged to PropCo before using their own funds to make such expenditures.  Reduced Rent payable on each Rent Payment Date occurring during the Deferral Period shall be calculated by computing the aggregate EBITDAR[3] for the Leased Hotels for the calendar month ending immediately prior to such Rent Payment Date (the "Prior Calendar Month") and deducting therefrom an amount equal to the sum, without duplication, of (i) all capital expenditures made by SCI or the Operating Subsidiaries in the Prior Calendar Month to fund capital improvements at the Leased Hotels, to the extent not funded out of the FF&E Reserve Accounts pursuant to the immediately preceding sentence, and (ii) current

_____

[3] As used in this Compromise, EBITDAR shall be calculated in the manner in which SCI has previously calculated EBITDAR for the Leased Hotels on its books and records.

rent due under the Boulder ground lease,[4] in each case to the extent not previously deducted in the computation of EBITDAR and in amounts that do not, in the aggregate with capital expenditures for the prior months in the applicable 13-week period and the preceding 13-week period, exceed the amounts set forth in the Approved Budget for such combined period. Reduced Rent for each month of the Deferral Period shall initially be paid on the applicable Rent Payment Date on an estimated basis.  Upon calculation by SCI of the final aggregate monthly EBITDAR for the Leased Hotels for the relevant Prior Calendar Month, and in no event later than thirty (30) days after the end of each such Prior Calendar Month, SCI shall deliver to PropCo, the Mortgage Lenders and the Prepetition Agent a certification of the final EBITDAR calculation for such Prior Calendar Month together with either a payment of any additional Reduced Rent due for the corresponding Rent Payment Date (a "True Up Payment") or, if the final certified EBITDAR calculation is less than the corresponding assumed EBITDAR for the applicable Reduced Rent Payment Date, a credit to be applied to future Reduced Rent due under this Compromise; provided that if no further Reduced Rent payments are to be made, then PropCo shall immediately reimburse SCI in cash for all such accumulated credits.  The aggregate amount of scheduled rent due under the Master Lease that is not paid in cash as Reduced Rent during the Deferral Period (after credit for any amounts paid as a True Up Payment), shall constitute deferred rent ("Deferred Rent").  The Parties shall reconcile and true up capital expenditures for the Three Month Period and the Two Month Period (each as defined in the First Amendment) in the manner provided in the First Amendment.  With respect to each successive three calendar month period commencing on May 1, 2010, and ending on the last day of the last full month ending prior to rejection of the Master Lease, SCI shall deliver to PropCo, the Mortgage Lenders and the Prepetition Agent, within 30 days after the end of each such three

---

[4] In compliance with the Master Lease, SCI will continue to remit the monthly property tax reserves and the Boulder ground lease payment to PropCo to be escrowed and paid over to the taxing authorities and the Boulder landlord by PropCo.

#4814-2594- 5093v1

month period or portion thereof, a certified reconciliation computing the aggregate amount of capital expenses ("Three Month CapEx") incurred by SCI or the Operating Subsidiaries in respect of the Leased Hotels (net of any insurance recoveries actually received by SCI or its Operating Subsidiaries) during such three calendar month period (such period, the "Three Month Period"). The certified reconciliation shall further compute whether Three Month CapEx is less than, equal to or more than the capital expenditures deducted from EBITDAR during such Three Month Period for the purpose of computing monthly Reduced Rent during such Three Month Period (the "CapEx Cash"). In the event that Three Month CapEx is less than CapEx Cash, SCI shall deliver together with the reconciliation a payment to PropCo in an amount equal the amount by which Three Month CapEx is less than CapEx Cash. If an order approving and/or directing rejection of the Master Lease is entered and, pursuant to this Compromise a true up payment or credit with respect to a period occurring prior to the entry of such rejection order would become due and payable after the date of entry of such rejection order, then such true up payment or credit shall remain due and payable notwithstanding the intervening entry of such rejection order. Upon the termination of the Deferral Period for any reason, SCI shall continue to pay PropCo Reduced Rent and any True Up Payment owing for the period from the last rent payment date through such date of termination, and, to the extent that the final certified EBITDAR for such period is less than the corresponding assumed EBITDAR used to make Reduced Rent Payments, SCI shall invoice PropCo for such True-Up Payment, which amount shall be immediately due and payable to SCI.

    C.  <u>Cooperation With PropCo and Mortgage Lender re Licensing.</u>
Commencing immediately on the entry of the order approving this Compromise, SCI and the Operating Subsidiaries agree to provide to any potential replacement operator designated by PropCo or the Mortgage Lenders, subject to the receipt by SCI of a confidentiality letter in the form of <u>Exhibit B</u> to this Compromise from such person, a list of all permits and licenses (gaming and otherwise) held by SCI or its subsidiaries that are necessary to the operation of the Leased Hotels as currently operated, together with any information relating to the Leased Hotels

and reasonable and supervised access to senior corporate management and employees of SCI that such replacement operator may reasonably require in order to complete all applications for any replacement gaming licenses, liquor licenses and any other licenses relating to the operation of the Leased Hotels and in order for such operator to respond to any information requests of applicable regulators, including without limitation, information requested by any such regulatory authorities with respect to transition plans for the Leased Hotels.

D.     <u>Authority to Pay Reduced Rent Shall Be Limited To The Deferral Period</u>: Except as otherwise provided herein, and unless SCI, PropCo and the Mortgage Lenders otherwise subsequently agree in a writing approved by the Bankruptcy Court (and provided that the Master Lease has not previously been rejected under Bankruptcy Code Section 365 pursuant to an entered order, with such rejection effective as of  the later of the date that the order authorizing rejection is entered or, if such order included an effective date for such rejection, such effective date), the rent due under the Master Lease for each rent payment date occurring once the Deferral Period has ended shall revert to the scheduled rent amounts as provided under the Master Lease before the execution of this Compromise.  Payment of such reinstated rent amounts shall be subject to the terms of the SCI Final Cash Collateral Order.

E.     <u>SCI Shall Perform All Other Requirements Under The Master Lease</u>: Except for the deferral of payment of Deferred Rent and the payment of the Reduced Rent, SCI shall, subject to its rights to be reimbursed hereunder for any True Up Payments in its favor, otherwise continue to perform all of its other obligations to PropCo and/or the Mortgage Lenders under the Master Lease during the Deferral Period.

F.     <u>PropCo Shall Hold A Claim For Any Deferred Rent; OpCo Shall Hold A Claim For Any Amounts Owed To It</u>:  PropCo shall hold a claim against SCI for Deferred Rent, subject to the limitations described in this Compromise.  SCI and PropCo further agree, in order to clarify the status of the Deferred Rent pending assumption or rejection of the Master Lease, that SCI shall not have any obligation to pay the Deferred Rent in cash under Bankruptcy Code Section 365(d)(3), and PropCo: (i)  shall forbear from enforcing or collecting any such obligation

and hereby waives its right to compel payment of the Deferred Rent under Bankruptcy Code
Section 365(d)(3), unless and until the Master Lease is actually assumed; and (ii) hereby waives
any right to, and agrees not to, seek payment of Deferred Rent as an expense of administration
under Bankruptcy Code Section 503(b) or assert any other priority or secured claim concerning
the Deferred Rent, in each case prior to assumption by SCI of the Master Lease.  For avoidance
of doubt, PropCo is not waiving or releasing (i) its right to its claims against SCI, including the
claim for Deferred Rent, as such claims are allowed and provided pursuant to this Compromise
nor (ii) its right, in the event that the Master Lease is rejected and/or SCI defaults on its
obligations hereunder, to seek to compel performance of such obligations or to claim any
damages resulting from such default as an expense of administration.  Any payments (including,
without limitation, any credits) owed to SCI or its Operating Subsidiaries under this Compromise
shall be deemed allowed administrative expense claims against PropCo under Bankruptcy Code
section 503(b).

G.    If The Master Lease Is Assumed, Payment Of The Deferred Rent Shall Be
Required As Part Of Any Cure Amount And Shall Constitute An Administrative Claim In The
SCI Case:  In the event that SCI seeks to assume the Master Lease, then (i) SCI will be required
to, as a condition of such assumption, pay the accrued and unpaid Deferred Rent as of the
assumption order date to PropCo, in cash, and (ii) such Deferred Rent shall constitute an allowed
administrative claim against SCI pursuant to Bankruptcy Code section 503(b).

H.    PropCo Shall Hold An Allowed Indefeasible Claim Upon Rejection Of
The Master Lease:  In the event that SCI rejects the Master Lease, then the Deferred Rent shall
constitute for all purposes (subject to the immediately succeeding two sentences) a prepetition
claim against SCI arising in favor of PropCo under the Master Lease.  PropCo shall have an
allowed, indefeasible partially secured prepetition claim against SCI (secured solely by the SCI
Lease Collateral and the Operating Subsidiaries Lease Collateral and any other collateral
encumbered pursuant to any other enforceable written security agreement made by SCI or any
Operating Subsidiary in favor of PropCo) for the sum of: (i) the amount of Deferred Rent that

accrued prior to the later of the date that the order authorizing rejection is entered or, if such order included an effective date for such rejection, such effective date, plus (ii) statutory lease rejection damages in respect of the Master Lease (collectively, the "Allowed Indefeasible Claim"). [5] The Parties reserve all rights, defenses and arguments as to the computation of the statutory lease rejection damage claim component of the prepetition Allowed Indefeasible Claim. Upon full compliance by SCI and the Operating Subsidiaries with the transfer of all SCI Lease Collateral and Operating Subsidiaries Lease Collateral as provided for in paragraph M the Allowed Indefeasible Claim shall, except for any claim for proceeds of SCI Lease Collateral and Operating Subsidiaries Lease Collateral, convert to an unsecured claim, provided that the transfer of all SCI Lease Collateral and Operating Subsidiaries Lease Collateral shall not result in any reduction of the allowed amount of such Allowed Indefeasible Claim.  If the Master Lease is rejected by SCI, subject to the last sentence of this paragraph H, (i) for the limited purpose of determining the allowance and character of the Deferred Rent, the date of such rejection of the Master Lease shall be deemed to have occurred on the date of the approval of the Prior MLCA by the Bankruptcy Court, (ii) PropCo's sole remedy with respect to Deferred Rent shall be a prepetition claim as provided in this paragraph and (iii) PropCo shall not have any right to, and shall not, seek payment of Deferred Rent as an expense of administration or other priority claim under Bankruptcy Code Section 503(b) or under any other theory.  SCI agrees that any claim that PropCo may have as a result of a breach by SCI of its obligation to pay Reduced Rent that became due and payable prior to the date that the Master Lease is rejected under Bankruptcy Code Section 365 pursuant to an entered order and if such order included an effective date for such rejection, such effective date has passed, or perform any other acts required by this Compromise whether before or after entry of such order, shall have administrative claim priority in the SCI Bankruptcy Case pursuant to Bankruptcy Code Section 503(b) notwithstanding the

---

[5]   For the avoidance of doubt, statutory lease rejection damages shall be calculated on the basis of the total rent due without giving effect to this Compromise or the Prior MLCA.

relation back of the date of  rejection of the Master Lease to the date of the approval of this Prior MLCA by the Bankruptcy Court.

I.       License Agreement Rejection Claim:  Except as provided for in this Compromise, the Parties reserve all rights, defenses and arguments with respect to any rejection of the License Agreement, including whether any licensee rights under Bankruptcy Code Section 365(n) for PropCo may exist, whether any such licensee rights will be satisfied by SCI through the delivery of Transition Services as contemplated in this Compromise and whether PropCo is entitled to assert any additional licensee rights under Bankruptcy Code section 365(n) with respect to the License Agreement[5].  The Parties hereby agree that: (a) any obligations that SCI may have to honor rights, if any,  that PropCo may have against SCI under Bankruptcy Code section 365(n) in respect of rejection of the License Agreement will constitute specifically enforceable postpetition obligations of SCI; and (b) any claim for monetary damages against SCI in respect of rejection of the License Agreement will constitute a general unsecured prepetition claim.

J.       Interim Resolution Of Rent Under The Master Lease And Minimum Transition Services Only Provided In This Compromise:  The Parties hereby acknowledge and agree, for themselves and their successors and assigns, that the rights and treatment of claims provided under this Compromise constitutes the Parties' sole and exclusive rights and remedies against each other with regard to the Reduced and Deferred Rent.  The Parties hereby acknowledge and agree, for themselves and their successors and assigns, that the transition services required to be provided by SCI under this Compromise are being provided in exchange for and in direct response to PropCo's agreements regarding the treatment of the Reduced Rent and the Deferred Rent.  Neither PropCo, its successors and assigns nor any other party in interest (including PropCo's "Designees" as defined below) shall be limited from seeking different or

---

[5]    SCI does not admit that any claim in respect of rejection by SCI of the License Agreement would result in a claim under Bankruptcy Code Section 365(n).

additional transition services as may be legally required under the written agreements between the Parties or by other applicable law or as may be sought pursuant to the terms of this Compromise; provided, however, that neither SCI nor the Operating Subsidiaries, nor their successors and assigns, nor any other party in interest are limited from defending against any such requested relief and taking the position that, except as provided in this Compromise, no additional transition services are legally required under the written agreements between the Parties or by other applicable law.  The Bankruptcy Court shall have exclusive jurisdiction over all such disputes.  For purposes of this Compromise, "Designee" shall mean (i) any person or entity to which PropCo, with the consent of the Mortgage Lenders, assigns its rights and interests under this Compromise, (ii) any person or entity that PropCo, with the consent of the Mortgage Lenders, designates in writing to act or operate on its behalf, (iii) any person or entity designated under a Consensual Plan as a replacement manager or operator for the Leased Hotels, or (iv) any person or entity having foreclosed on PropCo's rights and interests that are at issue under this Compromise, in each case subject, to the extent of any specific actions requiring regulatory approvals under applicable gaming laws, to such person's having obtained any necessary approvals for performance of such actions.

      K.      SCI Shall Provide, Or Shall Cause To Be Provided, Transition Services To PropCo Upon The Occurrence of a Transition Event:  Commencing upon the occurrence of a Transition Event and continuing  for a period of sixty (60) days after the occurrence of a Transition Event, or such longer initial period as may be applicable pursuant to this paragraph K (such sixty (60) day or longer period, the "Initial Transition Service Period"), SCI shall take all steps reasonably necessary to continue the uninterrupted operation of the Leased Hotels by the Operating Subsidiaries as if the Master Lease and License Agreement were in full force and effect and as otherwise provided hereunder, and to transition such operation to a replacement manager or operator (the "Transition Services") and shall cooperate with PropCo in providing such Transition Services.  Without limiting the generality of the foregoing, the Transition

Services to be provided by SCI (subject to the terms and conditions hereof, including the payment by PropCo of the amounts set forth herein) shall include:

(i)     Operation of the Leased Hotels by the Operating Subsidiaries and SCI during the Transition Period (defined in paragraph T below) in the same general manner in which they were operated immediately prior to the date of this Compromise, including performance by SCI and the Operating Subsidiaries of all performance covenants and other obligations under the Master Lease and the related Subleases, except as expressly modified hereby, subject to the same level of care and diligence with which SCI and its subsidiaries (other than the Operating Subsidiaries) operate the other hotels and casinos owned by SCI or such subsidiaries, including but not limited to marketing activities consistent with prior marketing practices;

(ii)    Allowing PropCo, the Mortgage Lenders and any Designee to use the database of Primary Customers[6] for the Leased Hotels, other intellectual property and reservation services to the same extent currently provided under the License Agreement, in the same manner as if the License Agreement were in full force and effect and as provided herein, which for the avoidance of doubt shall include the receipt by the Designees of all Transaction Data to be provided hereunder in electronic format that can be accessed and downloaded onto the analogous systems of any replacement operator for the Leased Hotels, in each case as necessary to the ability of the Designees to provide continuing operations at the Leased Hotels and transition to a replacement manager at the conclusion of the Transition Period;

---

[6] "Primary Customer" as used herein has the meaning set forth in Annex 1.

(iii)     Providing to PropCo, or its Designees, upon the commencement of the Transition Period every four weeks thereafter until the end of the Transition Period, and as of the end of the Transition Period, copies in readable format of the then current electronic database of all Primary Customers (as defined herein) for the Leased Hotels, including gaming histories, names, addresses, program points, status and such other information as is customarily and has been historically maintained by the Operating Subsidiaries or by SCI for such Primary Customers of the Leased Hotels, to ensure the proper updating of such information;

(iv)     Promptly following the commencement of the Transition Period, (a) permitting, and causing the Operating Subsidiaries to permit to, the extension by PropCo, or its Designee, of offers of employment as provided in Annex 1 hereto to certain employees of SCI and the Operating Subsidiaries as provided in such Annex 1; (b) releasing any such employees described in this paragraph from any non-compete agreements or similar contractual obligations which would otherwise preclude their working for PropCo, and (c) providing a listing for each job title or description that may be solicited pursuant to this subclause by job title or description, of the current salary range for such job title or description at each of the Leased Hotels, broken down between base compensation and the aggregate value of benefits provided;

(v)     Delivery to any potential replacement manager for the Leased Hotels of all Transaction Data, financial information and other books and records that pertain exclusively to, or are otherwise necessary for the day-to-day operation of, the Leased Hotels in order to facilitate licensing of and/or management transition to such potential replacement manager, including without limitation the financial information and other books and records to be provided as set forth in Annex 1; provided, that any provision of confidential or competitive information shall be subject to receipt by SCI of a confidentiality agreement from such replacement

manager substantially in the form of <u>Exhibit B</u> hereto or as otherwise consented to by SCI, and neither SCI nor any Operating Subsidiaries shall be required to disclose any future plans for development or any other confidential or competitive information regarding SCI that is not related to the operations of the Leased Hotels;

(vi)    Providing onsite access at the Leased Hotels to PropCo or its Designees for inspection of books and records (to the extent that such information is agreed to be provided elsewhere herein, in the PropCo Cash Collateral Stipulation, in the Mortgage Loan Agreement, in the Master Lease or in any transaction document executed in connection therewith)  and observation of operations; and make their senior management employees available at reasonable times and on reasonable notice  to discuss with such Designees such matters related to transition as such Designees may reasonably request;

(vii)    Providing such accounting information to PropCo or its Designees as PropCo may reasonably require in order to prepare separate financial statements and separate accounting records for the Leased Hotels, including historical financial information necessary to the preparation of pro forma historical financial statements showing the results of the Leased Hotels as a separate entity, and authorizing its accountants to reasonably cooperate with (and, subject to prior implementation of appropriate confidentiality restrictions acceptable to SCI, to be engaged by) PropCo and its Designees, it being understood that PropCo or its Designees and not SCI shall have sole responsibility for the payment of incremental accounting fees relating to such financial statements;

(viii)    Taking such other and further preparatory steps as may be reasonably requested by PropCo and not otherwise inconsistent with this Compromise to be performed by SCI while Transition Services are being provided to PropCo to facilitate the

continuation of uninterrupted operations from and after the occurrence of a
Transition Event;

(ix)    Taking such other and further commercially reasonable steps as may be requested
by PropCo, or its Designee (subject to paragraph R) to be performed by SCI while
Transition Services are being provided to PropCo, or its Designee to facilitate the
transition of the hotel, hospitality and gaming operations conducted at the Leased
Hotels from SCI and the Operating Subsidiaries to a successor manager or
managers selected by PropCo or its Designee and to enable such successor
manager to promptly assume control over operation of the Leased Hotels upon the
conclusion of the Transition Period;

(x)    Subject to paragraph R, taking all commercially reasonable steps necessary to
keep in full force and effect during the Transition Period all insurance policies
and coverage that are applicable to the Leased Hotels, PropCo, and/or the
business operations (including hotel, hospitality and gaming) and property of SCI
and the Operating Subsidiaries at the Leased Hotels, including, without limitation,
all liability and casualty insurance policies and coverage, as existed as of the date
of this Compromise; and

(xi)    In the event of a conflict between any provision of this Compromise and a
specific provision of Annex 1, Annex 1 shall control.

As used herein, (i) the term "Transaction Data" has the meaning set forth on
Annex 1.  It is the mutual intent of the Parties that the right to receive Transaction Data
shall include the right to access such data through software provided by third party
vendors in the form so provided, and all data collected by such vendor provided software,
and that PropCo and its Designees shall have a temporary license, for the duration of the
Transition Period and subject to any other terms in this Compromise, to use any software
developed by or at the direction of SCI or any Operating Subsidiary ("proprietary
software"), in each case as needed to access such Transaction Data, but shall not, except

as otherwise provided in Annex 1, have any ownership interests in such proprietary software. SCI and the Operating Subsidiaries will provide PropCo and/or any Designee with reasonable access to third party vendors, and all data collected by such vendor provided software, to the extent consist with limitations on access to data set forth elsewhere in this Compromise.

In furtherance of the foregoing Transition Services, each of PropCo and SCI agrees, during the Deferral Period, to cooperate with the Mortgage Lenders, and to cause their respective officers and employees to cooperate, in preparing a business separation plan and transition timeline in order to ensure an orderly implementation of the asset transfers and other transactions described on Annex 1 hereto or as otherwise contemplated under the Proposed Plan or any successor Consensual Plan.

L.    <u>Other Actions to Occur on Transition Event</u>.  The parties agree that if a Transition Event occurs, but the Mortgage Lenders are continuing to support a Consensual Plan, then, at the option of the Mortgage Lenders, the obligation of SCI to provide Transition Services other than such services as are required during the Deferral Period (and the rights of the other parties and beneficiaries hereto to demand such Transition Services other than those required during the Deferral Period)  may be suspended until confirmation of a Plan, and as a result thereof the Initial Transition Service Period shall be deemed to continue until the later of (x) sixty (60) days after the Parties have terminated efforts to confirm a Consensual Plan or (y) confirmation of such Consensual Plan.  It is expressly acknowledged that any postpetition obligations payable to PropCo under the PropCo Cash Collateral Stipulation shall continue to be payable notwithstanding that the commencement of the Transition Period or other actions contemplated under this Compromise constitutes a termination event under the PropCo Cash Collateral Stipulation, in order that PropCo may continue paying its postpetition obligations when due.  The parties further agree that, (i) from and after the commencement of the Transition Period, PropCo will not waive or suspend any of its rights under this Compromise without the prior written consent of the Mortgage Lenders, (ii) PropCo will consult with the Mortgage

Lenders before taking any actions to enforce any of its rights and remedies under this Compromise, and (iii) PropCo will cooperate with the Mortgage Lenders in any actions to enforce their respective rights and remedies against SCI and the Operating Subsidiaries under this Compromise.

              M.      <u>Transfers to Occur at Conclusion of Transition Period</u>, No later than the conclusion of the Transition Period, PropCo shall, whether pursuant to a confirmed plan of reorganization for PropCo or otherwise, transfer to the Mortgage Lenders or their Designees, by deed in lieu of foreclosure or similar instrument and in full satisfaction of their claims under the Mortgage Loan, all of its right, title and interest in and to the Leased Hotels, all of its rights with respect to the SCI Lease Collateral and the Operating Subsidiary Lease Collateral, all of its rights under the License Agreement and under this Compromise and any other real or personal property pledged as collateral to secure the Mortgage Loan, including without limitation the cash collateral held in favor of the Mortgage Lenders under the PropCo Cash Collateral Stipulation, any cash held in the FF&E Reserve Accounts and any pre-petition cash collateral held in the accounts established pursuant to the Mortgage Loan Agreement (subject to payment of any postpetition obligations of PropCo due and payable as provided in <u>paragraph L</u>), and any statutory or other rights of SCI or the Operating Subsidiaries to remain in possession of the premises shall cease and be of no further force and effect.  In connection with the foregoing,  SCI shall and shall cause the Operating Subsidiaries to: (a) consent, pursuant to Uniform Commercial Code Section 9-620(a), to the transfer to PropCo or its Designees, of all the SCI Lease Collateral and the Operating Subsidiaries Lease Collateral in satisfaction of the obligations of SCI and the Operating Subsidiaries with respect to PropCo's liens on such SCI Lease Collateral and Operating Subsidiaries Lease Collateral; provided, that nothing in this Compromise shall in any way modify, impede, impair or delay PropCo's lien and foreclosure rights on the SCI Lease Collateral and Operating Subsidiaries Lease Collateral nor any lien and foreclosure rights of the Mortgage Lenders and/or the mezzanine lenders (the "<u>Mezz I Lenders</u>") who have advanced funds to FCP MezzCo Borrower I, LLC ("<u>Mezz I</u>") and have a lien on the equity of PropCo,

which may be enforced after rejection of the Master Lease and prior to, during or after any transfer of the SCI Lease Collateral and/or Operating Subsidiaries Lease Collateral to PropCo; (b) subject to further court order as noted below, sell and assign to PropCo, at a mutually agreed upon value and form of consideration or, if the Parties cannot mutually agree, as determined by the Bankruptcy Court, all rights to the use of the phrases "Red Rock", "Palace", "Boulder" and "Sunset", as well as all other registered trademarks and applications relating thereto as described on Exhibit A hereto ( including trademark rights in related Internet key words, social networks and new media) and (c) subject to further court order as noted below, sell, assign or license to PropCo if so requested by PropCo, at a mutually agreed upon value and form of consideration or, if the Parties cannot mutually agree, as determined by the Bankruptcy Court, all rights of SCI or the Operating Subsidiaries in certain other tangible and intangible personal property, including net working capital, as specified on Annex 1; provided, however, that (1) PropCo shall not have any obligation to purchase any such property, (2) any such unencumbered inventory or equipment owned by SCI or any SCI subsidiary other than an Operating Subsidiary that is stored at, but is not in use and not contemplated by SCI to be used by, a Leased Hotel shall not be included in such sale, and (3) inventory or equipment which is expected to be used and/or consumed within the Interim License Period described in paragraph O below and any prepaid goods, services or premiums that are not exclusively for the benefit of the Leased Hotels, shall in each case be excluded from such sale.  Any asset sale, assignment, or licensing by SCI or an Operating Subsidiary contemplated hereunder or under Annex 1 shall be made free and clear of all liens subject to the approval of the Bankruptcy Court upon reasonable notice and a hearing and without prejudice to the rights (including, without limitation, all rights under the Bankruptcy Code) of any secured creditor holding a perfected lien on the assets to be sold, assigned or licensed, as such rights may be established at such hearing.

   N. Operating Covenants to Continue During Transition.  SCI and each of the Operating Subsidiaries hereby agree that, from and after the date of this Compromise until PropCo, or its Designee, has taken title to any SCI Lease Collateral, Operating Subsidiaries

Lease Collateral or any other tangible personal property used exclusively at the Leased Hotels that is to be transferred or sold to PropCo or its Designee pursuant to paragraph M, (collectively, the "Operating Assets") shall be substantially the same asset type, value and use, as the assets that had been located at the Leased Hotels prior to the date of this Compromise, and that they will not remove any Operating Assets from the Leased Hotels, other than to replace worn, obsolete, damaged or defective Operating Assets with suitable replacements therefor in the ordinary course of business, and will observe (subject at all times to reimbursement of cash expenses as provided in this Compromise) all covenants under the Master Lease with respect to the maintenance, care and preservation of the SCI Lease Collateral, the Operating Subsidiaries Lease Collateral and the Operating Assets. SCI and each of the Operating Subsidiaries hereby further agree that, from and after the first day of the Initial Transition Service Period until the date that PropCo or a Designee has taken title to the SCI Lease Collateral and Operating Subsidiaries Lease Collateral pursuant to paragraph M, by foreclosure or otherwise and a licensed operator is managing the Leased Hotels in accordance with applicable gaming regulations, PropCo and its Designees shall have an exclusive license, in accordance with applicable gaming laws and regulations, to use the SCI Lease Collateral or Operating Subsidiaries Lease Collateral, at no cost and expense to PropCo, and without any license fee to SCI, in the operation of the Leased Hotels.

      O.      <u>Intellectual Property Matters</u>. The Parties acknowledge that there may be SCI Lease Collateral and Operating Subsidiaries Lease Collateral that contains the word "Station" or the phrase "Station Casinos" (the "Station Marks"). Except as otherwise provided in Annex 1 and unless otherwise subsequently agreed to by the Parties, (i) PropCo is not being transferred any ownership interests in the Station Marks but only a temporary license to use such Station Marks and (ii) PropCo agrees to discontinue the use of the name "Station" or "Station Casinos" at the conclusion of the Interim License Period (as defined below) pursuant to the time frames and otherwise as provided in Annex 1. SCI acknowledges that the Station Marks and other non-exclusive marks not transferred to PropCo or its Designee may be temporarily used in

respect of the Leased Hotels for a period (the "Interim License Period") commencing at the onset of the Transition Period and continuing until the later of (i) the date on which SCI is no longer providing Transition Services under this Compromise and (ii) the date of termination for such license set forth in Annex 1 to this Compromise.  In connection with such limited use, SCI hereby grants to each of PropCo and its Designees a non-transferable, temporary, irrevocable, royalty-free and non-exclusive license (and PropCo acknowledges such temporary use and such temporary license) to use the Station Marks and other non-exclusive marks described in Annex 1, which license, (i) shall concurrently terminate upon expiration of permission to use the Station Marks and other non-exclusive marks as provided in Annex 1,  (ii) shall not confer upon PropCo or its Designee any other or additional rights or interests in such Station Marks or other non-exclusive marks and (iii) shall be subject to reasonable quality control provisions consistent with SCI's current standards.  PropCo acknowledges that, except for the foregoing license to use Station Marks and other non-exclusive marks provided herein, the sale to PropCo or its Designee pursuant to this Compromise of such goods as SCI Lease Collateral and Operating Subsidiaries Lease Collateral or otherwise that incorporate any Station Marks or non-exclusive marks shall not transfer to PropCo or its Designee any rights in the Station Marks or non-exclusive marks so incorporated, or otherwise.  The Parties acknowledge that PropCo is not licensing back to SCI or SCI's other affiliates any rights to use any of the exclusive marks to be transferred to PropCo pursuant to Annex 1,  and SCI covenants, notwithstanding any retention of ownership of the Station Marks, from and after the conclusion of the Transition Period, not to use, and not allow its  other subsidiaries and affiliates, to use the names "Red Rock," "Sunset", "Palace" and/or "Boulder" as an enterprise brand or trademark or trade name in connection with the operation of any casinos or similar operations, except as otherwise permitted on Annex 1.  The Parties further acknowledge that some of the trademarks and other intellectual property to be sold to PropCo or its Designees hereunder may currently be subject to a lien in favor of the Prepetition Lenders.  Each of the Parties hereto shall cooperate and use commercially reasonable efforts to obtain all Bankruptcy Court orders and approvals with respect to any such sale and SCI agrees not to

oppose any motions to approve such sale except on the grounds that such proposed sale is inconsistent with the terms set forth in this Compromise.

        P.     <u>De-Branding Property After The Transition Period</u>:  Upon the termination of the Transition Period, PropCo and its Designees shall cease using the Station Marks and other marks as contemplated and within the time periods described in Annex 1.  PropCo may continue to use, on a royalty free basis, any non-exclusive marks set forth on Annex 1 hereto (the "<u>Secondary Marks</u>"), in each case to the extent that such Secondary Marks are currently used at the Leased Hotels, and shall not be required, prior to the time provided therefor in Annex, 1 to remove such Secondary Marks from any signage, equipment, inventory or other tangible personal property that is transferred to PropCo in accordance with the terms of this Compromise unless such tangible personal property is replaced sooner, in which event the replacement property will no longer use any such Secondary Mark.  It is expressly understood that, prior to the deadline in Annex 1 for replacement of such property, subject to normal maintenance, which will be carried out by PropCo on any property bearing a Station Mark, neither PropCo nor its Designees shall be required to remove such Station Marks from any equipment, inventory or other tangible personal property not consisting solely of exterior or interior signage, including any SCI Lease Collateral or Operating Subsidiaries Lease Collateral, to be transferred to PropCo or such Designees under this Compromise.  To facilitate compliance with the time periods set forth in this <u>paragraph P</u> without diminishing the benefit of the license set forth in <u>paragraph N</u>, SCI and the Operating Subsidiaries agree that all tangible personal property being used pursuant to <u>paragraph N</u> may be modified by PropCo as necessary to comply with the requirements of this <u>paragraph P</u>.

        Q.     <u>Excluded Property</u>:  Except to the extent required in order for SCI to perform its agreement under this Compromise to provide Transition Services to PropCo and its Designees (including its obligation to provide Transaction Data)  and to provide information to successor managers to facilitate transition as described above) neither SCI nor any of the Operating Subsidiaries shall be required to, directly or indirectly, provide to PropCo or its

Designees any information, data or inspection of any of the following: operating practices of properties other than the Leased Hotels; trade secrets (excluding the database for Primary Customers and other Transaction Data as provided in this Compromise); or other competitive information not used in or otherwise necessary to the day-to-day operation of the Leased Hotels. Except to the extent (i) required in order for SCI to perform its agreement under this Compromise to provide Transition Services to PropCo and its Designees or (ii) expressly provided in paragraphs K through P, neither PropCo nor its Designees shall have any use of or rights in any trademarks (including without limitation any Station Marks), customer lists, other intellectual property or reservation services used in connection with the Leased Hotels, all of which shall remain the sole property of SCI.  PropCo agrees that neither SCI's obligations under paragraphs K through L nor SCI's obligations to provide Transition Services creates in favor of PropCo any rights in, and PropCo shall not at any time have any rights in, use of or access to "Boarding Pass", any other customer affinity programs operated by SCI, any brand wide promotions operated by SCI, any brand wide progressive games operated by SCI, any other promotion or system that is used commonly by other hotels and casinos operated by SCI.

   R. <u>PropCo to Cover All Expenses of Operation and Ownership While Transition Services Are Performed / No Additional Compensation For SCI During Initial Transition Services Period (Breakeven For SCI)</u>:  At all times during the Transition Period, SCI and the Operating Subsidiaries shall be deemed to be operating the Leased Hotels on behalf of PropCo in the nature of a manager, and therefore all costs and expenses advanced, accrued or suffered by SCI or the Operating Subsidiaries of any kind or description whatsoever arising from or relating to owning and operating the Leased Hotels and the associated real property and improvements, providing the transition services contemplated hereby or otherwise, including without limitation, mortgage interest, expenses related to the Mortgage Loan and all Operating Costs (as defined on Appendix 1 hereto) of the Leased Hotels, shall be for the sole account of PropCo.  From and after rejection of the Master Lease (which for purposes of this paragraph R will be deemed to have occurred if Reduced Rent is not paid when due), SCI shall, or shall cause

the Operating Subsidiaries to, continue to remit to PropCo on a monthly basis an amount equal to the sum of Reduced Rent (less any management fees) and True Up Payments that would otherwise be owing had the Transition Period not commenced in order to compensate SCI for such Operating Costs.  SCI and the Operating Subsidiaries acknowledge that after rejection of the Master Lease, SCI and the Operating Subsidiaries are receiving the gross cash proceeds generated from operation of the Leased Hotels (such proceeds, net of expenses incurred by SCI in the operation of the Leased Hotels and other amounts, including any management fees, payable to SCI hereunder, the "Excess Cash Flow"), solely in an agency capacity for the benefit of PropCo, and that SCI and the Operating Subsidiaries shall have no ownership or other interest in the amount of such  Excess Cash Flow, which excess shall constitute property of PropCo's bankruptcy estate and not property of the Operating Subsidiaries or the SCI bankruptcy estate. To the extent that True Up Payments during the Transition Period are due and payable to SCI at any time during the Transition Period, then PropCo shall pay such True Up Payments  that are so due and payable within ten (10) business days after presentation of an invoice by SCI, and such payments shall be deemed a permitted use of PropCo's cash collateral under the PropCo Cash Collateral Stipulation.

        S.      Extended Transition Service Amount After Initial Transition Service Period (Payment Of Management Fee After Initial Transition Service Period):  PropCo with the consent of the Mortgage Lenders, or the Mortgage Lenders on its behalf, may request a ninety (90) day (or shorter) extension of the Initial Transition Service Period (such period, the "Extended Transition Service Period"), during which period SCI shall continue to be obligated to provide Transition Services as provided herein, provided that any such request shall be made in writing to SCI (with a copy to the Prepetition Agent) not less than ten (10) business days prior to the end of the Initial Transition Service Period.  During the Extended Transition Services Period, PropCo shall, beginning with the first day following the Initial Transition Service Period, pay to SCI, as consideration for SCI providing the Transition Services during the Extended Transition Service Period (such Transition Services, the "Extended Transition Services"), for each calendar

month or partial calendar month during which SCI is providing Transition Services (beginning with the first day of the Extended Transition Service Period), an amount that is equal to the sum of (i) a management fee that consists of the sum of both (x) two percent (2%) of aggregate gross revenue, to be computed in the manner set forth in Exhibit D, of the Leased Hotels and (y) five percent (5%) of EBITDAR of the Leased Hotels (calculated in the same manner used to calculate Reduced Rent but as reduced by the management fee payable under clause (x) above) in each case during such full or partial calendar month (the sum of (i) and (ii), with (ii) including both (x) and (y) being the "Extended Transition Service Amount"; and all such amounts to constitute an administrative claim in PropCo's bankruptcy case pursuant to section 503(b) of the Bankruptcy Code). For the avoidance of doubt, such fee is in excess of all expenses included in the calculation of EBITDAR which SCI is entitled to retain as reimbursement for its services. For each calendar month or partial calendar month during which SCI is providing Extended Transition Services (the "Billing Period"), the applicable EBITDAR of the Leased Hotels shall be the aggregate EBITDAR amount computed by SCI for the Leased Hotels for the full calendar month immediately preceding the first day of the applicable Billing Period, provided that (i) the Extended Transition Service Amount shall only be earned if active management services for the Leased Hotels are being provided by SCI or the Operating Subsidiaries and such Extended Transition Service Amount shall not be tied to the continuous obligations that may be continuing under this Compromise after termination of active management services and (ii) in the case of any partial month during which SCI is providing Extended Transition Services, the Extended Transition Services Amount shall be pro-rated based on the actual number of days when services were provided during such month divided by thirty (30). For the avoidance of doubt, the services provided under the Extended Transition Services Period shall mirror those provided in the Initial Transition Services Period and payment of the Extended Transition Service Amount shall be made in the same manner as payment of Owners Expenses under paragraph R.

> T.    Further Extension of the Extended Transition Service Period; Payment For Transition Services:

(i)     Provided that PropCo has performed all of its obligations under this Compromise, PropCo with the consent of the Mortgage Lenders or the Mortgage Lenders on its behalf  may request one thirty (30) day extension of the Extended Transition Service Period (i.e. for a potential total of one hundred twenty (120) days of Transition Services beyond the Initial Transition Service Period ) or such longer period as may be ordered by the Court after notice and hearing in order to avoid any shutdown of operations), and SCI shall be obligated to continue providing Transition Services during such extended period; <u>provided</u>, that if PropCo or its Designees certifies in writing that an additional extension is required in order to satisfy any regulatory requirements necessary for the operation of the Leased Hotels and that failure to satisfy such requirements has not been due to negligence on the part of PropCo or its Designees, then PropCo or such Designee may request the Extended Transition Service Period to be further extended for a period of up to an additional ninety (90) days for a potential total of two hundred ten (210) days of Transition Services beyond the Initial Transition Service Period (or longer if ordered by the Court after notice and hearing as described above in order to avoid any shutdown of operations).  Any such request shall be made in writing to SCI (with a copy to the Prepetition Agent) not less than ten (10) business days prior to the end of the Extended Transition Service Period;

(ii)    During the Extended Transition Service Period PropCo shall pay the Extended Transition Service Amount within five (5) business days after being invoiced by SCI therefor and such amount shall constitute an administrative claim in PropCo's bankruptcy case pursuant to section 503(b) of the Bankruptcy Code until paid in cash; and

(iii)   If PropCo requests an extension of the Extended Transition Service Period and as a result thereof the Transition Period continues for more than 180 days after the

entry of the order confirming a plan of reorganization for PropCo, then PropCo shall, in addition to paying the continued Extended Transition Service Amount for such extended period, pay to SCI a fee of $1 million payable on such 180th day.

For the avoidance of doubt, the services provided under the Further Extension of the Extended Services Period referenced in this paragraph T shall mirror those provided in the Initial Transition Services Period and the compensation shall be the same as in the Extended Services Period (the Initial Transition Service Period and, to the extent implemented, the Extended Transition Service Period and the Further Extension of the Extended Transition Service Period referenced in this paragraph T shall be referred to in this Compromise as the "Transition Period").

U.    Relief From Stay:  The automatic stay or any other stay or injunction arising from the Bankruptcy Cases in place and potentially preventing PropCo, SCI, the Mortgage Lenders or their Designees from performing any and all provisions of this Compromise (including but not limited to enforcing obligations to perform under this Compromise and taking such other actions as are reasonably necessary in order to effect the uninterrupted operations of the Leased Hotels and transition to a replacement operator following rejection ) shall be lifted, withdrawn and released.  This provision is for the benefit of PropCo, SCI, the Mortgage Lenders and their Designees individually and exclusively, and shall not modify any such stay or injunction as may otherwise be applicable to any other party or any successor or assign of any such party without the prior written consent of the Party against whom such stay or injunction is proposed to be modified.

V.    Further Extension of Time to Assume or Reject Lease:  The Parties agree that time to assume or reject the Master Lease is further extended to the earlier of: (i) effective date of the Consensual Plan or (ii) the date of the occurrence of a "Transition Event" (as defined on Exhibit C) and the motion to approve this Compromise shall also seek approval of such further extension of time to assume or reject as a component of the requested relief.

W.    <u>Commercially Reasonable Efforts/Bankruptcy Court Approval:</u>  The Parties shall use their commercially reasonable efforts to achieve and accomplish the terms of this Compromise.  The Parties agree that this Compromise is binding and final when executed (subject to Bankruptcy Court approval), and once approved shall not be modified in any way by the confirmation or denial of confirmation of the Consensual Plan or any subsequent plan, without the express written consent of the Parties and the Mortgage Lenders.  This Compromise is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019 and the Parties intend to obtain Bankruptcy Court approval hereof by no later than [May ____, 2010].  This Compromise shall become effective immediately upon the entry of an order by the Bankruptcy Court approving the terms of this Compromise (the "<u>Approval Order</u>") and, absent the granting of a stay pending appeal with respect to the Approval Order by a court of competent jurisdiction pursuant to Federal Rule of Bankruptcy Procedure 8005, each of the Parties shall perform its respective obligations under this Compromise notwithstanding the filing of an appeal of the Approval Order.  If this Compromise is not approved by the Bankruptcy Court for whatever reason, this Compromise shall be null and void and of no force or effect, and shall not be admissible against any Party hereto for any purpose.

X.    <u>Voluntary Compromise:</u>  The Parties to this Compromise acknowledge and agree that each of them is entering into this Compromise freely and voluntarily and not acting under any misapprehension as to the effect hereof, and has acted and does hereby act freely and voluntarily and not under any coercion or duress.

Y.    <u>No Mistake of Fact or Law:</u>  In entering into this Compromise, each Party recognizes that no facts or representations are ever absolutely certain.  Accordingly, each Party assumes the risk of any mistake, and if it should subsequently discover that any understanding of the facts or of the law was incorrect, each Party understands and expressly agrees that it shall not be entitled to set aside this Compromise by reason thereof, regardless of any mistake of fact or law.

Z.    <u>Further Proceedings in Respect of Master Lease:</u>  The Parties acknowledge that nothing set forth herein is intended to limit the relief that the Bankruptcy Court may order in connection with any action or claim that may be brought to recharacterize the Master Lease.

AA.    <u>Treatment of Administrative Claims:</u>  Administrative claims, if any, arising in connection with this Compromise and owed by PropCo to SCI or its Operating Subsidiaries shall be paid by PropCo in accordance with the terms hereof and in any event no later than the earlier of (x) the termination of exclusivity for PropCo or any of the Other CMBS Debtors (as defined in the PropCo Cash Collateral Stipulation), (y) the entry of an order confirming a plan of reorganization or liquidation for PropCo or any of the Other CMBS Debtors and (z) the filing of a motion by the Mortgage Lenders  or any other creditor of the Other CMBS Debtors seeking relief from the automatic stay.  Administrative claims, if any, arising in connection with this Compromise and owed by SCI to PropCo shall be paid by SCI in accordance with the terms hereof and in any event no later than the earlier of (a) the termination of exclusivity for SCI, FCP Holding, Inc., FCP Voteco, LLC or Fertitta Partners, LLC, (b) the entry of an order confirming a plan of reorganization or liquidation for SCI, FCP Holding, Inc., FCP Voteco, LLC or Fertitta Partners, LLC and (c) the filing of a motion by the Prepetition Agent or Prepetition Lenders  or any other creditor of SCI seeking relief from the automatic stay.

BB.    <u>Transition Period Hold Harmless:</u>  PropCo agrees that it will hold SCI and the Operating Subsidiaries harmless with respect to any claims or causes of action of a third party that may be asserted against PropCo by any third party that is judicially determined to have arisen as a result of a PropCo or PropCo designee action or inaction occurring during the Transition Period.

CC.    <u>Miscellaneous Reservation</u>:  Notwithstanding anything to the contrary set forth herein, any party in interest in these Bankruptcy Cases may assert against either Debtor any claim that such party in interest may have as a proximate result of the assertion by a non-debtor counter party to any executory contract or unexpired lease of a claim for damages against either Party hereto that arises as a result of the operation of this Agreement or rejection of the Master Lease and/or the License Agreement.  Notwithstanding anything to the contrary herein, all issues and objections of a party in interest that may arise as to the allocation among the Debtors' estates of costs and expenses associated with the redemption of and reissuance or rebranding of chips, wagers, and tokens, are hereby reserved.  Nothing in this <u>paragraph CC</u> itself creates any rights or claim in favor of any party in interest.

DD.    <u>Mutual Representations and Warranties</u>:  The Parties hereby represent and warrant to each other the following, each of which is a continuing representation and warranty:

(a)    This Compromise is a valid and binding obligation of the Parties, enforceable against each of them in accordance with its terms;

(b)    Except as otherwise expressly provided in this Compromise, no consent or approval (other than required gaming approvals) is required by any other person or entity in order for the Parties to carry out the provisions of this Compromise, and each of the Parties has obtained all necessary corporate and other approval to enter into and perform the obligations under this Compromise.  In addition, each person signing this Compromise warrants that he or she is legally competent and authorized to execute this Compromise on behalf of the Party whose name is subscribed at or above such person's signature;

(c)    Each of the Parties hereto has received independent legal advice from attorneys of its choice with respect to the advisability of making the agreements provided herein and with respect to the advisability of executing this Compromise, and prior to the execution of this Compromise by the Parties hereto, their attorneys reviewed this Compromise with them and have made all desired changes;

(d)    Except as otherwise expressly stated in this Compromise, the Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Compromise, and each of them specifically does not rely upon any statement, representation, or promise of the other party hereto or any other person in entering into this Compromise, except as expressly stated in this Compromise.  Each Party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Compromise and the transactions contemplated herein; and

(e)     The Parties hereto and their respective attorneys have made such investigation of the facts pertaining to this Compromise and all of the matters pertaining thereto, as they deem necessary.

EE.     <u>No Admission Against Interest:</u>  Nothing contained in this Compromise or negotiations and communications leading up to it shall be construed as admissions against the interest of any of the Parties hereto.  Except to enforce this Compromise, the terms of this Compromise, including, without limitation, the recitals and representations made by any Party shall have no force or effect and will not be binding upon, enforceable against, or deemed an admission or acknowledgment of any fact by any Party.  This Compromise shall not be admissible as evidence in any action or proceeding except to enforce this Compromise or to carry out the actions contemplated herein.

FF.     <u>Miscellaneous:</u>

(a)     Except as provided herein, all covenants, warranties, representations, and indemnities made by the Parties to one another pursuant to this Compromise shall be and remain in full force and effect upon this Compromise becoming effective.

(b)     The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be appropriate or reasonably necessary, from time to time, in form and substance satisfactory to the Parties and the Mortgage Lenders, to effectuate the agreements and understandings of the Parties, whether the same occur before or after the date of this Compromise.

(c)     This Compromise is the entire Compromise between the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, whether oral or written, between the Parties hereto with respect thereto.  In addition, this Compromise may not be modified or amended, nor any of its provisions waived, except by an instrument in writing, signed by the Parties.

(d)     This Compromise shall inure to the benefit of and shall be binding upon the successors and assigns of each of the Parties hereto, including without limitation, any committee, trustee or examiner with extended powers that is subsequently appointed in a Bankruptcy Case of either or both of the Parties, and in particular no successor or assign of either Party may object to or otherwise collaterally attack the relief provided to the Parties hereunder under any theory and in particular may not object to, withdraw or modify any claim allowed or limited herein or any waiver herein granted by either Party.  The Mortgage Lenders shall be third-party beneficiaries of this Compromise and shall be entitled to enforce this Compromise directly against SCI and the Operating Subsidiaries as if a party hereto, and this Compromise may not be amended, modified or otherwise extended without the prior written consent of the Mortgage Lenders.

#4814-2594-  5093v1                                                  36

(e)     The headings of all sections of this Compromise are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

(f)     To the extent that performance is to be governed by time, time shall be deemed to be of the essence hereof.

(g)     This Compromise is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of California shall govern.  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Compromise.

(h)     This Compromise may be executed and delivered in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same Agreement.  This Compromise may also be executed by facsimile or electronic signature followed by delivery of the original executed Agreement.

(i)     This Compromise is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Compromise, or any portion hereof, shall not be effective in regard to the interpretation hereof.

(j)     In the event that it becomes necessary for any party to this Compromise to take any action to interpret or enforce this Compromise, or any of its terms, and any Party thereafter incurs costs (including reasonable attorneys' fees) as a result thereof, the prevailing Party in such dispute shall be entitled, in addition to any judgment or award, to an award for all costs incurred (including reasonable attorneys' fees).  The prevailing Party shall further be entitled to an award of reasonable attorneys' fees and related costs in connection with enforcement of any judgment, including enforcement following any appeal.

(k)     The Parties recognize that in the event any party fails to perform, observe or discharge any of its obligations or liabilities under this Compromise, any remedy of law may prove to be inadequate relief to the non-defaulting party and therefore such non-defaulting party, if it so determines and requests, shall, to the extent permitted by applicable law, be entitled to injunctive relief in any proceeding to enforce this Compromise without the necessity of proving actual damages.

*[REMAINDER OF PAGE LEFT  INTENTIONALLY BLANK]*

#4814-2594- 5093v1

IN WITNESS WHEREOF, the Parties have executed this Compromise as of the day and year first above written.

STATION CASINOS, INC.,
a Nevada Corporation,
as Debtor and Debtor In Possession

By: _____
       Name: Thomas M. Friel
       Title:   Executive Vice President, Chief
              Accounting Officer and Treasurer

FCP PROPCO, LLC,
a Delaware limited liability company,
as Debtor and Debtor In Possession

By: _____
       Name: Richard J. Haskins
       Title:   Authorized Signatory

**OPERATING SUBSIDIARIES**:

**BOULDER STATION, INC.**
**CHARLESTON STATION, LLC**
**PALACE STATION HOTEL & CASINO, INC.**
**SUNSET STATION, INC.**

By: _____
Name:  Thomas M. Friel
Title:    Senior Vice President and Treasurer

APPENDIX 1

Operating Costs

"Operating Costs" means all costs and expenses of maintaining, conducting and supervising the operation of the Leased Hotels which are properly attributable to the period of determination, including without limitation:

(i)      the cost of sales of all food, beverages, other goods and services sold or consumed by the Leased Hotels and of all Operating Supplies and Operating Consumables, with the exception of the cost of food, beverages, services and other items sold or consumed by concessionaires and other third party vendors leasing space in the Leased Hotels;

(ii)      salaries, wages and other benefits of the personnel employed with respect to the Leased Hotels, including costs of payroll taxes and employee benefits, the salaries, wages, benefits, and expenses, including travel expenses, of third-party consultants;

(iii)      the cost of all other materials, supplies, goods and services used in connection with the operation of the Leased Hotels including, without limitation, heat and utilities, trash removal, office supplies, security and all other services performed by third parties, telephone and data processing equipment and other equipment;

(iv)      the cost of repairs to and maintenance of the Leased Hotels, to the extent not paid from the actual cash proceeds of any fire or casualty insurance after deducting necessary expenses in connection with the adjustment or collection of such proceeds;

(v)      insurance and bonding premiums with respect to the Leased Hotels, including, without limitation, property damage insurance, public liability insurance, workers' compensation insurance, or insurance required by similar employee benefits acts and such business interruption or other insurance as may be provided for protection against claims, liabilities and losses incurred with respect to deductibles applicable to the foregoing types of insurance;

(vi)      all taxes, assessments, water/sewer charges, and other fees and charges (other than federal, state or local income taxes and franchise taxes or the equivalent) payable by or assessed against the Leased Hotels with respect to the operation of the Leased Hotels;

(vii)      legal, consulting, lobbying, political and charitable contributions, accounting and other fees for professionals for services related to the operation of the Leased Hotels;

(viii)      all expenses for marketing the Leased Hotels, including all expenses of advertising, sales, promotion and public relations activities; and

(ix)    all excise, sales, gross receipts, admission, entertainment, tourist or use taxes, gaming taxes and device fees, real estate taxes, ad valorem taxes, personal property taxes, utility taxes and other taxes (as those terms are defined by GAAP but excluding any federal, state or local income taxes, any franchise taxes or the equivalent thereof), assessments for public improvements, and municipal, county and state license and permit fees.

Operating Costs shall include PropCo's Allocation of Shared Expenses.  The method of calculating Shared Expenses shall fairly distribute the costs of such services provided, however, that such allocation will not discriminate against the Leased Hotels as compared with the allocation of such expenses among other properties operated by SCI.  For example, subject to the prior sentence, Shared Expenses may include the costs incurred by SCI or its subsidiaries for direct salary and wages (including, without limitation, employer's contributions under FICA, unemployment compensation or other employment taxes, and SCI's regular pension fund contributions, worker's compensation, group life, accident, health and other health insurance premiums, profit sharing, and retirement plans, disability and other similar benefits) paid to or accrued for the benefit of employees of SCI and its subsidiaries that are assigned to perform a function for the Leased Hotels that otherwise would be filled by an employee of, or third-party provider to, the Leased Hotels, prorated to the extent actually attributable to each such employee's actual time incurred for the benefit of the Leased Hotels.

"Operating Consumables" means all food, beverages and other immediately consumable items utilized in operating the Leased Hotels, such as soap, cleaning materials, matches, stationary, brochures, folios, and other similar items.

"Operating Supplies" means all non-capital equipment necessary for the day-to-day operation of the Project, including but not limited to chips, tokens, uniforms, playing cards, glassware, linens, silverware, utensils and dishware.

"Shared Expenses" means SCI's or its subsidiaries' (as the case may be) allocated out-of-pocket costs (not including any mark-up or other profit margin) for shared employees and for shared services related to the Leased Hotels (examples of Shared Expenses and method for allocating the same are set forth on Appendix B).

APPENDIX B

Example of Shared Expenses

The following are examples of costs that are allocated between SCI's subsidiaries that operate non-restricted gaming facilities (the "Hotel/Casinos").

*Room Reservations*– Room Reservations is a centralized function that is accounted for at the SCI level. This department books all rooms pre-sold at the Hotel/Casinos. The costs incurred by Room Reservations relate to payroll, telephone service fees, and reservation fees paid for reservations booked by outside vendors. These costs are allocated based on each Hotel/Casino's share of total room inventory controlled by SCI's subsidiaries.

*Station Advertising*– SCI's in-house advertising department performs various advertising functions for the Hotel/Casinos, including the following, the costs of which are allocated as follows:

- Media purchases – billed directly to the Hotel/Casino which required the purchase at one hundred percent (100%) of cost (Purchasing media in-house avoids paying a fifteen percent (15%) media commission to an outside advertising agency).
- Multi-Hotel/Casino media – allocated based upon a formula (generally).
- Public relations—allocated equally between all Hotel/Casinos.
- Special promotions – system-wide (allocated on a formula dependent upon participation).
- Special promotions – single Hotel/Casino; billed to that Hotel/Casino.
- In-house production – publications for human resources, video production, commercials, sign animation, web-site, etc. (allocated based upon the type of activity and the number of Hotel/Casinos participating).
- General operations – allocated based on a total revenue formula.

*Information Technology (IT)* – SCI runs its IT group centrally, allowing for specialists (programmers, help-desk, system administrators, etc.) to perform services at all Hotel/Casinos. This centralization and allocation eliminates the need for each Hotel/Casino to hire specialists and purchase related equipment. Direct costs, such as maintenance or service agreements for on-property equipment, are billed directly to the applicable Hotel/Casinos. Indirect costs (primarily payroll and related benefits costs) are allocated to the Hotel/Casinos based upon percentage of total revenue.

*Central Mail* – SCI processes all direct mail at a central location rather than outsourcing this function. The capital and operating costs of this function are allocated to each Hotel/Casino based upon the actual volume of mailings performed for that Hotel/Casino.

*Food & Beverage Management* – In order to ensure that the food and beverage operations at each of the Hotel/Casinos remains at the highest level of quality and consistency, SCI has centralized the supervision of food and beverage activities. This function is allocated based on food and beverage revenue for each of the Hotel/Casinos. The costs allocated are primarily

payroll and related benefit costs, as well as travel and entertainment, general supplies, and some consulting expenses.

*Relationship Marketing* – SCI operates its relationship marketing (database marketing) function centrally and allocates all costs equally between the Hotel/Casinos. The costs allocated are primarily payroll and related benefit costs as well as travel and entertainment expenses.

*Bank Charges* – SCI manages banking relationships centrally and bills each Hotel/Casino for direct charges generated by that Hotel/Casino. These costs are specifically identifiable to the Hotel/Casino and relate to the transaction charges, primarily generated in the cage. No payroll is allocated for this item. Transactions include check cashing, purchasing and depositing currency, armored car services, etc.

*Sports Book* – SCI manages its race and sports book operations centrally and allocates costs equally to each Hotel/Casino for the personnel required to administer this function. The costs allocated are primarily payroll and related benefit costs.

*Payroll Department* – SCI processes all Nevada payroll from a central location and allocates the costs related to this function based on the number of employees at each Hotel/Casino. The costs allocated are primarily payroll and related benefits costs.

**EXHIBIT A**
**Marks to be Transferred to PropCo**


Absolutely Assigned Registered Marks

*U.S. Trademark Registrations*

| Mark | Class(es) | Reg. No. | Reg. Date |
|------|-----------|----------|-----------|
| A3 | 45 | 3333612 | 11/13/2007 |
| ACTION BUFFET | 42 | 1565241 | 11/7/1989 |
| COSTA DEL SOL | 42 | 2184884 | 8/25/1998 |
| GAUDI BAR | 42 | 2207672 | 12/1/1998 |
| HACHI | 43 | 3321554 | 10/23/2007 |
| LUCKY BAR | 41, 43 | 3204545 | 1/30/2007 |
| PASTA PALACE | 42 | 1634536 | 2/5/1991 |
| PLUNGE | 35 | 3500799 | 9/16/2008 |
| RED ROCK | 16 | 3339158 | 11/20/2007 |
| RED ROCK | 41 | 3424069 | 5/6/2008 |
| RED ROCK | 43 | 3552181 | 12/23/2008 |
| RED ROCK CASINO RESORT SPA | 43 | 3674651 | 8/25/2009 |
| RED ROCK CASINO, RESORT & SPA | 41 | 3424068 | 5/6/2008 |
| RED ROCK LANES | 41 | 3447885 | 6/17/2008 |
| RED ROCK SPA | 44 | 3298840 | 9/25/2007 |
| RED ROCK SPA ESSENTIALS (and design) | 3 | 3533012 | 11/18/2008 |
| ROCKS LOUNGE | 41 | 3458072 | 7/1/2008 |
| ROCKSLOUNGE (and design) | 43 | 3467902 | 7/15/2008 |
| ROYAL COURT | 41 | 1788563 | 8/17/1993 |
| SAND BAR | 41 | 3563154 | 1/20/2009 |
| SANDBAR RED ROCK RESORT (and design) | 43 | 3448576 | 6/17/2008 |
| TERRA ROSSA | 43 | 3149992 | 9/26/2006 |
| WICKED 21 | 41 | 3717829 | 12/1/2009 |

*U.S. Trademark Applications*

| Mark | Class(es) | Filing Date | Application No. |
|------|-----------|-------------|-----------------|
| DETOX/RETOX | 43 | 12/02/2008 | 77/624,741 |
| DETOX/RETOX | 41 | 12/02/2008 | 77/624,819 |
| DETOX/RETOX | 44 | 12/02/2008 | 77/624,749 |
| RED ROCK CASINO, RESORT & SPA | 35 | 9/16/2004 | 78/980,172 |
| RED ROCK CASINO, RESORT & SPA | 25 | 9/16/2004 | 78/978,135 |
| THE RESIDENCES AT RED ROCK (and Design) | 36, 37 | 3/29/2006 | 78/849,420 |
| RED ROCK | 37 | 2/17/2006 | 78/817,475 |
| RED ROCK CASINO, RESORT & SPA | 35 | 9/16/2004 | 78/980,172 |

| RED ROCK CASINO, RESORT & SPA | 25 | 9/16/2004 | 78/978,135 |
| RED ROCK | 36 | 2/17/2006 | 78/817,472 |
| RED ROCK CASINO, RESORT & SPA | 43 | 9/16/2004 | 78/980195 |

*Nevada State Trademark Registrations*

| Mark | Reg. No. | Reg. Date |
|---|---|---|
| A3 | E0272172007-8 | 4/17/2007 |
| ADVENTURE SPA | E0542782007-8 | 7/31/2007 |
| BINGO PALACE | SM00310027 | 6/15/1998 |
| BULLFIGHTER'S BAR | SM00300771 | 3/6/1998 |
| CAPRI | SM00300769 | 3/6/1998 |
| CLUB MADRID | SM00300768 | 3/6/1998 |
| DETOX/RETOX | E0031512010-4 | 1/22/2010 |
| DETOX/RETOX | E0042582010-4 | 1/22/2010 |
| DETOX/RETOX | E0651682009-0 | 12/17/2009 |
| ENDLESS PASTABILITIES! | SM0030616 | 8/10/2004 |
| FROM THE PEOPLE WHO CREATED LOCAL CASINOS | SM00340511 | 2/21/2002 |
| FROM THE PEOPLE WHO CREATED LOCAL CASINOS | SM00340512 | 2/21/2002 |
| LUCKY BAR | E0326522005-4 | 5/26/2005 |
| LUCKY BAR | E0326562005-8 | 5/26/2005 |
| LUCKY BAR | E0326572005-9 | 5/24/2005 |
| ONYX BAR | E0346712006-2 | 5/8/2006 |
| ONYX BAR | E0346732006-4 | 5/8/2006 |
| ONYX BAR | E0346752006-6 | 5/8/2006 |
| PASTA PALACE | SM00230434 | 3/9/1990 |
| RED ROCK | SM00360797 | 10/7/2004 |
| RED ROCK | SM00360798 | 10/7/2004 |
| RED ROCK | SM00360799 | 10/7/2004 |
| RED ROCK | TM00280867 | 3/5/1996 |
| RED ROCK LANES | E0320942007-0 | 5/2/2007 |
| RED ROCK RESORT CASINO | SM00360800 | 10/7/2004 |
| RED ROCK RESORT CASINO | SM00360801 | 10/7/2004 |
| RED ROCK RESORT CASINO | SM00360802 | 10/7/2004 |
| ROSALITA'S | SM00300772 | 3/6/1998 |
| ROYAL COURT | SM00250801 | 12/17/1992 |
| SANDBAR | E0346372006-0 | 5/8/2006 |
| SANDBAR | E0346582006-5 | 5/8/2006 |
| SANDBAR | E0346592006-6 | 5/8/2006 |

| | | |
|---|---|---|
| SANDBAR (and design) | E0343602006-6 | 5/8/2006 |
| SANDBAR (and design) | E0346192006-8 | 5/8/2006 |
| SANDBAR (and design) | E0346262006-7 | 5/8/2006 |
| SEVILLE BAR | SM00300767 | 3/6/1998 |
| STIMULUS FRIDAYS | E0673372008-8 | 10/24/2008 |
| STIMULUS FRIDAYS | E0673322008-3 | 10/24/2008 |
| STRIKE ZONE | E0275772005-1 | 5/10/2005 |
| STRIKE ZONE | E0275852005-1 | 5/10/2005 |
| STRIKE ZONE | E0275862005-2 | 5/10/2005 |
| SUNSET CAFÉ | SM00300770 | 3/6/1998 |
| SUNSET LANES | TN00320481 | 11/5/1999 |
| SUNSET LANES BOWLING CENTER | TN00260598 | 9/17/1993 |
| T BONES CHOPHOUSE & LOUNGE | E0343362006-6 | 5/8/2006 |
| T BONES CHOPHOUSE & LOUNGE | E0345562006-2 | 5/9/2006 |
| T BONES CHOPHOUSE & LOUNGE | E0345582006-4 | 5/9/2006 |
| TERRA ROSSA | E0345802006-2 | 5/8/2006 |
| TERRA ROSSA | E0346912006-6 | 5/9/2006 |
| TERRA ROSSA | E0346952006-0 | 5/9/2006 |
| THE BROILER | E234162008-2 | 4/3/2008 |
| THE GRAND CAFÉ | E0293212005-7 | 5/16/2005 |
| THE GRAND CAFÉ | E0293252005-1 | 5/16/2005 |
| THE GRAND CAFE | SM00360395 | 5/11/2004 |
| THE RESIDENCES AT RED ROCK | E0339772006-9 | 5/04/2006 |
| THE RESIDENCES AT RED ROCK | E0339782006-0 | 5/04/2006 |
| THE RESIDENCES AT RED ROCK | E0339822006-6 | 5/04/2006 |
| THE SPA AT RED ROCK | E0346652006-4 | 5/8/2006 |
| THE SPA AT RED ROCK | E0346672006-6 | 5/8/2006 |
| THE SPA AT RED ROCK | E0346692006-8 | 5/8/2006 |
| VIVA SALSA | SM00300766 | 3/6/1998 |

**EXHIBIT B**

**CONFIDENTIALITY TERMS FOR REPLACEMENT MANAGERS**

Station Casinos, Inc.
1505 South Pavilion Center Drive
Las Vegas, Nevada  89135
Attention:  General Counsel

RE:            Confidentiality

Ladies and Gentlemen:

As you are aware, German American Capital Corporation ("GACC") and JPMorgan Chase Bank, N.A. ("JPMC"; and, together with GACC, collectively, the "Lenders"), are holders of indebtedness (the "Loan") made to certain affiliates of Station Casinos, Inc. ("Station"; Station and its affiliates are collectively referred to herein as "Station Affiliates") which is secured by, inter alia, a first deed of trust lien on the hotel casino properties commonly known as Red Rock, Boulder Station, Palace Station and Sunset Station (collectively, the "Facilities").  The Lenders have requested that Station provide (and hereafter provide) certain documents and information concerning the Facilities and Station Affiliates to the undersigned ("Recipient" or "we"), which we understand Station considers to be non-public, confidential and proprietary.  Accordingly, we hereby agree with Station as follows:

1.  "Confidential Information" shall mean all non-public, confidential and proprietary (to one or more of the Station Affiliates) documents and information concerning the operations of the Station Affiliates and the Facilities (including, without limitation, management and marketing of the Facilities and other operational aspects of the Facilities and all customer databases and information) that Station Affiliates provide to Recipient, or that Station Affiliates provide to the Lenders and the Lenders forward to Recipient, provided that Confidential Information shall not include information which (x) is or has become generally available to the public other than by unauthorized disclosure by Recipient or its Representatives (defined below), or (y) becomes available to Recipient on a non-confidential basis from a source that Recipient can demonstrate is entitled to disclose the same on a non-confidential basis.

2.  We hereby agree that we will keep the Confidential Information confidential and will not disclose the Confidential Information other than (a) to our officers, employees, attorneys, agents, advisors, accountants, consultants and other representatives (collectively, "Representatives"), who shall be informed of and instructed to maintain the confidential nature of the Confidential Information in accordance with this Compromise, and (b) to the Lenders, their Representatives, or as such disclosure may be required by applicable law or regulatory authority.  Without limiting the foregoing, we agree not to use the

Confidential Information in connection with the evaluation, ownership, management, or operation of any hotel, casino or other facility other than the Facilities.

3. Upon the expiration of this letter agreement, or upon Station's earlier request following a consensual agreement between Station and the Lenders to restructure the Loan, we will promptly destroy or deliver to Station all Confidential Information (and any copies thereof) furnished to us or our Representatives by or on behalf of Station pursuant hereto; provided, however, non-destruction of electronic copies of materials or summaries containing or reflecting Confidential Information that are automatically generated through data backup and/or archiving systems shall not be deemed to violate this Agreement so long as the Confidential Information contained therein is not disclosed or used in violation of the other terms of this letter agreement. Notwithstanding the return of the Confidential Information, Recipient and our Representatives shall continue to be bound by the obligations of confidentiality and other obligations and agreements hereunder

4. In the event that we or any of our Representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar legal process) to disclose any of the Confidential Information, we shall provide Station with prompt written notice of any such request or requirement so that Station may, in its sole discretion, seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this letter agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by Station, we or any of our Representatives are nonetheless, in the written opinion of legal counsel, legally compelled to disclose Confidential Information to any tribunal, Recipient or its Representatives may, without liability hereunder, disclose to such tribunal only that portion of the Confidential Information that such counsel advises is legally required to be disclosed, provided that we use our best efforts to preserve the confidentiality of the Confidential Information, including, without limitation, by cooperating with Station to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information by such tribunal; and provided further that we shall promptly notify Station of (a) our determination to make such disclosure and (b) the nature, scope and contents of such disclosure.

5. It is understood and agreed that money damages would not be a sufficient remedy for any breach of this letter agreement by Recipient or any of our Representatives and that Station shall be entitled to equitable relief, including, without limitation, injunction and specific performance, as a remedy for any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach by Recipient of this letter agreement but shall be in addition to all other remedies available at law or equity to Station. We further agree not to raise as a defense or objection to the request or granting of such relief that any breach of this letter agreement is or would be compensable by an award of money damages, and we agree to waive any requirements for the securing or posting of any bond in connection with such remedy.

6.  We understand, acknowledge and agree that neither Station nor any of its Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information.  We agree that neither Station nor any of its Representatives shall have any liability to Recipient or to any of its Representatives relating to or resulting from the use of the Confidential Information or any errors therein or omissions therefrom.

7.  Our obligation to comply with the terms and conditions set forth herein shall expire and terminate on the second anniversary of the date of this letter.


This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.  By its execution and delivery of this Agreement, the undersigned hereby irrevocably and unconditionally agrees that any action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, or in Las Vegas, Nevada or in the bankruptcy court overseeing the bankruptcy proceedings of Station, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the jurisdiction of such courts, generally and unconditionally, with respect to any such action, suit or proceedings

                             Very truly yours,

## EXHIBIT C

## TRANSITION EVENTS

Each of the following shall be deemed a "Transition Event":

1.      The Plan Support Agreement shall have been terminated in accordance with its terms with the result that the parties thereto are no longer bound to support a Consensual Plan.

2.      Entry of an order of the Bankruptcy Court Confirming a Consensual Plan or any other plan of reorganization for PropCo.

3.      Failure of SCI to pay Reduced Rent (net of any amounts not required to be paid except through a True-Up Payment) or failure to pay any required True-Up Payment, in either case in accordance with the terms of this Compromise.

4.      Entry of an order of the Bankruptcy Court Authorizing Rejection of the Master Lease by SCI or PropCo.

5.      Entry of an order of the Bankruptcy Court Authorizing Rejection of the License Agreement by SCI or PropCo.

## EXHIBIT D

## AGGREGATE GROSS REVENUE CALCULATION

"GROSS REVENUES" means all cash revenues and income (excluding interest income) of any kind derived from the use or operation of the Leased Hotels determined in accordance with GAAP consistently applied, including without limitation, "gross revenues" from gaming activities  as calculated pursuant to NRS 463.0161 and 463.3715 and without duplication, income from rental of guest rooms; income from food and beverage sales; income from entertainment programs and merchandise sales; telephone, telegraph and telex revenues; rental or other payments from lessees, sublessees and concessionaires and others occupying space or rendering services at the Leased Hotels (but not (A) reimbursements for utilities, taxes or similar matters, or (B) the gross receipts of such lessees, sublessees or concessionaires except to the extent the same is part of such rental payments); income from vending machines; health club fees; and the actual cash proceeds of business interruption or similar insurance and of temporary condemnation awards after deducting necessary expenses in connection with the adjustment or collection of such proceeds; excluding, however, to the extent included in cash revenues and income of any kind derived from the use or operation of the Leased Hotels and without duplication, (i) any proceeds from the sale, financing or refinancing or other disposition of the Leased Hotels or substantially all of the assets of PropCo or of the Operating Subsidiaries, (ii) any proceeds from the sale, financing, refinancing or other disposition of Furniture, Fixtures and Equipment or other capital assets; (iii) proceeds of any fire, extended coverage or other insurance policies (excluding any proceeds of business interruption or similar insurance); (iv) condemnation (other than temporary) awards and other amounts received by the Operating Subsidiaries in lieu of condemnation; (v) any refunds, rebates, discounts and credits of a similar nature given, paid or returned in the course of obtaining Gross Revenues or components thereof, other than complementaries provided to patrons of the Leased Hotels in the ordinary course of business and consistent with the annual plan and operating budget; (vi) gratuities or service charges or other similar receipts which the Operating Subsidiaries pay to employees or others; (vii) excise, sales, gross receipts, admission, entertainment, tourist, use or similar taxes or charges collected from patrons or guests or as part of the sale price for goods, services or entertainment, other than taxes imposed on gaming revenues; (viii) any sum and credits received for lost or damaged merchandise; (ix) credit card processing fees and costs; and (x) bad debts; provided, that the foregoing definition of Gross Revenues may be modified with the mutual consent of the Mortgage Lenders, PropCo and SCI, subject to input from outside accountants.

"FURNITURE, FIXTURES AND EQUIPMENT" means (for purposes of this compensation definition only) all furniture, fixtures and equipment reasonably required for the operation of the Properties,  including but not limited to office furniture, computer and communications systems, specialized hotel equipment necessary for the operation of the Leased Hotels, food and beverage equipment, laundries and recreational facilities.  Such items also shall include specialized casino equipment, including cashier, money sorting and money counting equipment, slot machines, table games, video gaming equipment, and other similar gaming equipment as well as surveillance equipment.

## ANNEX 1 TO SECOND AMENDED MASTER LEASE COMPROMISE AGREEMENT

Proposed Asset Transfers and Licenses to Occur At End of Transition Period[1]

| IP (other than IT) | Description of Transfer |
|---|---|
| *1.   Exclusive PropCo Trademarks* | |
| • BOULDER<br>• SUNSET<br>• PALACE<br>• RED ROCK<br><br>• Other trademarks containing words "boulder," "sunset," "palace" or "red rock" *but not the word "station"*.<br>• Other trademarks exclusively used by PropCo as more particularly set forth in Exhibit A. <br>. | PropCo to own all trademarks exclusive to PropCo, as set forth on Exhibit A to the Compromise, together with matching corporate names, trade names, d/b/a names and domain names, and including trademark rights in Internet key words, social networks and new media.<br><br>The purchaser of SCI ("OpCo") or its assets, as applicable ("OpCo Purchaser"), will not be restricted from neutral, non-trademark use of such trademarks (e.g., "Happy Hour starts at sunset"). |
| *2.  Joint Interest Trademarks* | |
| • BOULDER STATION<br>• SUNSET STATION<br>• PALACE STATION<br>• RED ROCK STATION | PropCo to have 12-month license running from date of plan filing (or, if later, 8 months from effective date).  License includes trademarks and matching corporate names, trade names, d/b/a names and domain names and includes trademark rights in Internet key words, social networks and new media.<br><br>PropCo to select brands that do not use "Station" as soon as commercially practicable, and make changes that are easier to facilitate (e.g., website use) more quickly than expiration of license period.<br><br>These joint marks will not be transferred but neither party will use these marks after the transition, and OpCo may not use the domain names or trademark registrations in any manner adverse to the interests of PropCo.<br><br>All trademark allocations (exclusive or non-exclusive) will address Internet key words, social networks and new media.<br><br>Transitional linkage between the OpCo website and the new PropCo website under |

---

[1] Subject to further notice and hearing before the Bankruptcy Court to determine rights of any other parties-in-interest. References herein to "Propco" include any Designee entitled to succeed to Propco's property rights under the Compromise, and references to OpCo shall mean and include references to its subsidiaries, in each case as the context may require.

| IP (other than IT) | Description of Transfer |
|---|---|
| | a non-"Station" brand for reasonable period of time, but not beyond the end of transition services.<br><br>After end of transition period, users typing in www.boulderstation.com, www.palacestation.com, www.sunsetstation.com and www.redrockstation.com would go to an inactive page. |
| **3.  Non-Exclusive Trademarks** | |
| • JUMBO PLAY<br>• JUMBO POKER<br>• BOARDING PASS<br>• KENO-TO-GO<br>• STATION or STATION CASINOS (used apart from Boulder, Palace, Red Rock and Sunset)<br>• Any other non-exclusive marks as set forth in  Exhibit A hereto | PropCo to have (i) 12-month license from Plan filing (or if later, 8 months from effective date) for all non-exclusive marks (including FEAST BUFFET or other restaurants inside both OpCo and PropCo hotels) along same principles as marks in Point 2 above, except for (ii) four-month license from effective date for JUMBO, BOARDING PASS and STATION ("station" used apart from Boulder, Sunset, etc.), provided that, if PropCo is transitioned off Boarding Pass and Jumbo programs before four months, license ends earlier. |
| **4.  Other Trade Dress/ Branding Features** | |
| • Specific shade of red<br>• Arch shape of logo<br>• Font and typeface<br>• Other proprietary branding | PropCo would not use OpCo's shade of red, arch design or typefont in new signage and branding.  This would not affect PropCo's rights to use the font and color in existing signage for Boulder, Red Rock, Sunset and Palace but would affect PropCo's rights to use existing font for the Palace Station web site. |
| **5.  Patents** | |
| U.S. Patents and patent applications related to player tracking systems (e.g., Patent Nos. 6320793, 6672589 and 7018291). | Non-exclusive, unrestricted, perpetual, fully paid up license in favor of PropCo to be acquired for all patents necessary to access existing IT system as described below. |
| **6.  Registered Copyrights** | |
| 5 registered US copyrights (appear to cover logo artwork and similar visual material) | No request for ownership or a license by PropCo. |
| **7.  Other Intellectual Property** | |
| OpCo owns IP rights in items such as:<br>• website content (graphics, photography, creative promotional text for hotels)<br>• hard-copy advertising and promotional materials<br>• on-premises textual materials and graphics<br>• proprietary software | PropCo to use current website content accessible on OpCo website by clicking on PropCo hotel picture or link for earlier of six months following effective date of plan or end of transition services.  Opco to link to PropCo website for reasonable time-frame during transition.  PropCo not to use OpCo signature branding features in its new website, but will otherwise be able to use existing website infrastructure (including online guest transaction and account management systems) and related software applications and does not have to re-create website user interface from |

2

| IP (other than IT) | Description of Transfer |
|---|---|
| | scratch. Proprietary software to be addressed along with other IT Systems in Item 10 below.<br><br>PropCo to own all other works of authorship and intellectual property used exclusively by PropCo properties.  PropCo will receive a non-exclusive, unrestricted, perpetual, fully paid up license to create derivative works of any and all non-registered copyrightable materials previously used in the ordinary course of operating the PropCo business and not otherwise transferred to PropCo; all such derivative works would be subject to limitations on any use of OpCo retained trademarks. |
| *8.  Primary Customer Database* | |
| • Database of customers "whose primary casino play" is at a PropCo casino.  (LRSA definition) | Opco and Propco will cooperatively determine the Primary Customers of each of the Propco properties no later than the date the bankruptcy court approves the motion to transfer assets based on the specifics below.  On the date of actual transfer of assets, Opco and Propco will supplement the previously prepared lists to reflect any new Primary Customers of each of the Propco properties that were not previously assigned to either Opco or Propco properties based upon play during the interim period, and such new Primary Customers shall also be Primary Customers of the applicable Propco property.<br><br>A customer is determined to be a "Primary Customer" of a Propco or Opco property (based on ownership of such property after giving effect to all transactions occurring on the Effective Date) based upon a determination of the Propco or Opco property at which such customer plays most, it being understood that such location may receive less than an absolute majority of such customer's total play.<br><br>For the purposes of assigning player accounts to the respective entities, the casino player database will be segmented into active and inactive groups.  The assignment of active player accounts will be determined by the guest having rated play of any gaming type excluding Keno within the last 24 months from the filing date of the plan of reorganization.  Guests qualifying as active will then be assigned to each entity by determining the property of greatest gaming theoretical within the players last 24 months of play history. Files relating to new customers during the period between the date the bankruptcy court approves the motion to transfer assets and the effective date of the plan of reorganization will be allocated based on the primary play during that period.<br><br>The accounts deemed inactive (more than 24 months since last date of play) will be assigned to a respective entity by determining the property of greatest gaming theoretical from the players last play date back 24 months.  Once a player is assigned to an entity, the player's entire history of all property play will be owned by that entity and will be erased at the other. |

3

| IP (other than IT) | Description of Transfer |
|---|---|
| | Gaming theoretical will be calculated by combining any rated play on a Boarding Pass card from slots, table games, poker, race, sports and bingo.  Theoretical calculations will be done for each gaming type individually, then combined to calculate full gaming theoretical.<br><br>Keno play is not contained within the database and will have to be handled separately as it is paper ratings contained at the property.  Race and Sports data will not be able to go back the full 24 months as it can only be tracked back to when data was converted to the current system.<br><br>For the non-gaming databases (Hotel, Restaurant. Etc..), any entry that has a Boarding Pass account tied to it will be assigned according to where that Boarding Pass account is assigned.  Any entries that are not tied to a Boarding Pass will be given to the property where the activity took place. |
| *9.  Business Information* | |
| Information related to the PropCo casinos | All information relating to tracking of operations (e.g., inventory, employee time, HR data, accounting and other Transaction Data as described on Annex A) will be posted on a shared drive to which the properties will have access prior to effective date, with such shared drive to be split at time of effectiveness so that each of OpCo and PropCo thereafter only has access to the tracking information relating to its separate properties.  Each of OpCo and PropCo, however, shall be allowed to retain any historical information to the extent that applicable laws require such entity to retain any such information.<br><br>PropCo would receive and be able to receive and use company-wide information that is confidential to the public but not confidential as between OpCo and PropCo (*e.g.*, PropCo would receive a human resources manual used by all OpCo and PropCo hotels but confidential from the public).<br><br>Business information to be transferred and/or licensed will include, without limitation:  employee documentation; overall HR programs documentation; training manuals and policies and procedures; job descriptions and operations standards and performance evaluation processes; new hire processes; time, attendance, labor management, compendium and scheduling forms, systems and reports; operational performance processes, metrics and reports; financial performance and budgeting processes and reports; departmental project/action item prioritization and organization documentation and systems; construction  and design documentation; legal and contractual documentation; compliance/security/ safety documentation and processes; physical plant and engineering documentation and processes; departmental forms; data base and general marketing analytics, segmentation and incentive methodologies; and player development systems, processes and reporting. Marketing and other art materials (e.g., -photographs, video footage, commercials, |

4

| IP (other than IT) | Description of Transfer |
|---|---|
| | brochures, manuals, and other art or copyrightable material etc.) to be transferred to PropCo to the extent related to Propco properties subject to restrictions on use of Stations names and other trademarks as noted elsewhere.  In addition, construction contracts (including warranties, etc. for prior work), architectural agreements, plans, specifications, engineering, and interior, exterior and landscape design material, etc. relating to a PropCo property to be transferred to PropCo.  This encompasses both completed work and future plans.<br><br>PropCo to non-exclusive, unrestricted, perpetual, fully paid up license to create derivative works of any and all non-registered copyrightable materials described in the preceding paragraph previously used in the ordinary course of operating the PropCo business and not otherwise transferred to PropCo; all such derivative works would be subject to limitations on any use of OpCo retained trademarks. |
| **IT Systems and Other Assets** | **Propco/FG Proposal** |
| *10.  IT Systems* | |
| • Software<br>• Hardware<br>• Systems used by OpCo and PropCo in the operation of their businesses | Transaction Data provided per item 9 above to include rights to proprietary software.  PropCo will have the right to use and modify all proprietary software that is currently used, directly or indirectly, at any PropCo property.  All hardware and wires located at any PropCo property to be acquired by PropCo pursuant to item 12 below.  Prior to transfer, Propco and Opco will cooperate with Opco Lenders to ensure that Opco acquires a duplicate IT system and necessary hardware to operate the same.  The cost of Opco's duplicate IT system will be a factor in determining final purchase price but PropCo will not separately reimburse Opco for such costs.<br><br>PropCo or any designee of PropCo must acquire its own third-party software licenses, replacement licenses, assignments of licenses or sub-licenses, as applicable, for all non-proprietary software residing with the Opco Debtors or such non-debtor subsidiaries and used in connection with the operation of the Propco assets.  If PropCo does not acquire them, PropCo must delete such third-party software or otherwise comply with vendor provisions on termination, subject to verification by  representatives of the OpCo Lenders and the Propco Lenders.  OpCo to provide reasonable cooperation regarding third party vendors and potential for price reductions.<br><br>OpCo to own all software currently owned by it and retain object code and source code for such software.  PropCo to have a non-exclusive, unrestricted, perpetual, fully paid up license to use such software and make modifications of such software.  PropCo to retain a copy of the source code and object code of such software, which is subject to the above license.<br><br> Each of OpCo and PropCo will be able, post-separation, to use and develop its IT system independently from the other company based on the one in use just prior to |

5

| IP (other than IT) | Description of Transfer |
|---|---|
|  | the separation, and to independently develop new back-up systems.  Opco will grant Propco a non-exclusive, unrestricted, perpetual, fully paid up license to use any patents as described above necessary to operate the IT System.  The proprietary IT System transferred to PropCo (and conversely the one retained by OpCo) will include access to all "Front of house ops systems" described in the definition of "Transaction Data". |
| *11.  Employees* |  |
| • PropCo employees | OpCo will provide PropCo with access to (i) those non-corporate employees at the Propco properties at the general manager level and below and compensation information for such employees, (ii) those corporate employees below the vice president level (to the extent that such employees exclusively provide services to one or more of the Propco properties) and compensation information for such employees and (iii) other corporate employees not described above and compensation information for such employees, and will allow PropCo to make employment offers to all such employees described in clauses (i) and (ii) above, and will allow both Propco and OpCo to make employment offers to all employees described in clause  (iii) above. Opco and Propco will consult and cooperate in effecting a reasonable allocation of the corporate employees included in (iii) above in order to ensure that Opco and Propco are adequately staffed from a corporate employee standpoint.<br><br>PropCo will set up its own employee benefit plans and will accept rollovers from the OpCo 401(k) plan.  Except as set forth in item 14 below, PropCo will not assume any liabilities related to transferred employees. OpCo will waive all non-compete agreements with employees who accept employment with PropCo. |
| *12.  FF &E and Reserves* |  |
| • Furniture<br>• Fixtures<br>• Equipment (to include gaming equipment, chips, telephones, dishes, silverware, uniforms, spare parts and any other base stock not described above) | All FF&E, including property-specific vehicles and construction-in-progress, to be transferred to PropCo.  Warehoused FF&E and base stock to be allocated based on ownership (i.e., so that warehoused FF&E and base stock belonging to the subtenants operating PropCo Properties would be transferred to PropCo).  Telephones to be acquired with all related phone numbers subject to any re-engineering needed to sever internal Opco-PropCo connectivity. |
| • Other tangible personal property (e.g., inventory not subject to lien but contemplated to be transferred under MLCA) | All tangible personal property at or to be delivered to PropCo locations, including all inventory located and/or dedicated to the PropCo properties, to be transferred to PropCo. |
| • All FF&E Cash Reserves subject to PropCo lien | All FF&E Reserves to be transferred to PropCo. |
| *13.  Corporate  FF &E* |  |
| • Furniture<br>• Fixtures | Corporate FF&E, including all tangible personal property located at the headquarters, to be transferred to the extent that PropCo assumes the modified |

CH1 5267266v.2<br>#4847-9416-6533v4

| IP (other than IT) | Description of Transfer |
|---|---|
| • Equipment (to include telephones, computer hardware)<br>• Other tangible physical assets located at headquarters | corporate lease except for physical books and records allocated to Opco. |
| *14. Net Working Capital (Current Assets and Certain Operating Liabilities)* | |
| | PropCo to acquire accounts receivable, prepaid expenses, inventory, deposits, concession contracts, space leases and any similar contract rights relating to the properties,  physical cash used at the PropCo properties, and other current assets of the operating subtenants or otherwise used primarily in connection with the operation of the PropCo properties at a purchase price to be determined, and PropCo to assume certain current operating liabilities in connection therewith, provided that PropCo's assumption of current liabilities will be conditioned on receiving a deduction for such liabilities against cash consideration otherwise required to be paid to Opco for the asset transfers described in this Annex 1. |

7

**ANNEX A**

**Description of "Transaction Data"**

The term "Transaction Data" means, in each case with respect to the PropCo casinos only, all data, information and computer processing systems, and associated hardware used in the ordinary course of business by any of the PropCo casinos, and includes, but is not limited to, data relating to player tracking systems, slot and table games accounting systems, hotel reservations systems and ticket-in/ticket-out systems and all other transaction-based systems; identification of all vendors and existing contracts (which may be redacted to exclude price or other sensitive information which OpCo is contractually prohibited from disclosing); all "Front of house ops systems" such as: casino accounting, cage and count; franchising and merchandising operation systems; performance management (live, syndicated, televised, pay-per-view); value-added guest services systems (Wi-Fi, guest internet, lodgenet, pay-per-view, telephone); convention and conference contract development & management systems; safety, security, surveillance systems and CCTV infrastructure, hotel marketing and reservation channels (including call centers, internet, interfaces with external travel brokers), point of sale, kitchen and restaurant management systems; insurance contracts with third-parties; payroll accounting systems; and all inventory tracking systems, master item lists and similar information.

CH1 5267266v.2
**#4847-9416-6533v4**