# Exhibit 1

# Exhibit 1

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

**BIDDING PROCEDURES IN CONNECTION WITH
OPCO DEBTORS' SALE OF ALL OR SUBSTANTIALLY ALL OF
THE ASSETS OF STATION CASINOS INC. AND CERTAIN
OF ITS DEBTOR AND NON-DEBTOR OPCO SUBSIDIARIES**

A.    Preliminary Statements

1.    Set forth below are the bidding procedures (the "Bidding Procedures") to be employed by Station Casinos, Inc. ("SCI") in the chapter 11 cases (jointly administered) pending in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") under case number 09-52477-GWZ (the "Chapter 11 Cases") with respect to the proposed sale of substantially all of the assets (collectively, the "Sale") of SCI and certain of its debtor subsidiaries (collectively, the "Opco Debtor Subsidiaries" and together with SCI, the "Opco Debtors"[1]) and its non-debtor subsidiaries (collectively, the "Opco Non-Debtor Subsidiaries") (collectively, the "Opco Properties") specified on Schedule 1 annexed hereto (the Opco Debtor Subsidiaries and the Opco Non-Debtor Subsidiaries together, the "Opco Subsidiaries" and the Opco Subsidiaries together with SCI, the "Opco Group").

2.    The Opco Properties do not include any of the following: (a) any assets of FCP Propco LLC ("Propco"), (b) any equity in or assets of any subsidiary of SCI that directly or indirectly owns the equity of Propco, (c) any assets encumbered by liens in favor of Propco or (d) any of the assets specified on Schedule 2 annexed hereto (collectively, the "Excluded Assets") as more fully defined herein. None of the Excluded Assets will be the subject of the Sale.

3.    The Sale is being conducted and shall be consummated pursuant to and in conjunction with confirmation of Debtors' *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated March 24, 2010)* [Docket No. 1031-1] as the same shall be modified pursuant to and in accordance with the terms of the Restructuring Support Agreement, dated as of April 15, 2010 (as amended, supplemented or otherwise modified, the "Opco Support Agreement"), by and among the lenders under the Opco Loan Agreement (as defined below) from time to time party thereto, SCI, the Opco Debtor Subsidiaries and the non-debtor subsidiaries and affiliates party thereto, Fertitta Gaming LLC ("FG") and Frank J. Fertitta III and Lorenzo J. Fertitta, as primary equity investors in FG (as so modified, the "Joint Plan") to be filed in the Chapter 11 Cases. An entity owned in whole or in part by FG and the Propco Lenders (as defined below) is referred to herein as the "Stalking Horse Bidder").

4.    As used in these Bidding Procedures, the term "Consultation Parties" shall mean: the Administrative Agent under the Opco Loan Agreement (the "Opco Agent"),

---

[1]  The Opco Debtors, together with Propco (as defined below) and certain of Propco's subsidiaries that are debtors in the Chapter 11 Cases, collectively, the "Debtors".

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

the steering committee of lenders under the Opco Loan Agreement (the "Opco Lender Steering Committee") and the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee").

B.    Bidding Process

1.    The Bidding Procedures set forth herein describe, among other things, the Opco Properties available for Sale, the manner in which Potential Bidders may gain access to or continue to have access to due diligence materials concerning the Opco Properties, the manner in which Potential Bidders and bids may become Qualified Bidders and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").

2.    In the event of any dispute regarding the interpretation or application of these Bidding Procedures or the Bidding Process, the Bankruptcy Court will have exclusive jurisdiction to hear and resolve such dispute.

3.    The Bidding Process will be conducted by the Opco Debtors, under the direction of SCI's independent director and in consultation with the Consultation Parties, simultaneous with, and in furtherance of, the solicitation and confirmation of the Joint Plan (it being understood that the Joint Plan shall be further modified to incorporate the Successful Bidder and the terms of the Successful Bid (as defined below)).  The approval of any Sale pursuant to these Bidding Procedures will be contingent upon confirmation of the Joint Plan and shall be consummated solely through the Joint Plan.  In addition, the closing of any Sale may involve additional intermediate steps or transactions to facilitate consummation of such Sale, including additional chapter 11 filings and/or mergers or other corporate transactions of subsidiaries of the Debtors and such other actions or transactions necessary to implement the Joint Plan.

C.    Assets To Be Sold

1.    The Opco Group is offering for sale all or substantially all of the Opco Properties *other than* the Excluded Assets.  The Excluded Assets will not be included in the Sale.

2.    The Excluded Assets consist of assets that either (a) constitute the collateral of Propco and/or the lenders (collectively, the "Propco Lenders") under various written security agreements; or (b) assets that are to be transferred to Propco or New Propco under the Joint Plan and/or pursuant to the Master Lease Compromise Agreement and all amendments thereto approved by the Bankruptcy Court, which amendments shall be in form and substance reasonably satisfactory to the Required Consenting Lenders (as such term is defined in the Opco Support Agreement).  As such, the Excluded Assets are included in the Stalking Horse Bid.

2

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

D.    The Stalking Horse Bid

1.    SCI, the Opco Debtor Subsidiaries and the non-debtor subsidiaries and affiliates party thereto, have entered into the Opco Support Agreement and term sheet annexed thereto (the "Term Sheet"), pursuant to which the Stalking Horse Bidder is deemed a Qualified Bidder and the bid submitted by the Stalking Horse Bidder in the amount of $772,000,000 (consisting of the consideration and terms described in the Term Sheet) (the "Stalking Horse Bid") is deemed to be a Qualified Bid, provided that the Stalking Horse Bid will terminate in accordance with its terms if the Stalking Horse Bid is not the Successful Bid or the Alternate Bid (as defined below). The Stalking Horse Bidder shall also be deemed a party in interest in the Chapter 11 Cases with respect to all matters concerning the Sale and the conduct of, and determinations made at, the Auction.

E.    Bids for Individual Assets and Joint Bids

1.    The Opco Debtors believe that the Opco Debtors' estates will realize maximum value for the Opco Properties through an arms' length Sale of all or substantially all of the Opco Properties. However, the Opco Debtors recognize that certain Potential Bidders may desire to acquire only a portion or portions of the Opco Properties. Accordingly, the Opco Debtors, under the direction of SCI's independent director, will entertain, in consultation with the Consultation Parties: (i) bids for all or any portion or portions of the Opco Properties; and (ii) Joint Bids for all or substantially all or portions of the Opco Properties.

2.    Each casino property to be sold may be sold separately. All primary customer data ("Primary Customer Data") relating to a Primary Customer (as defined in Schedule 3 annexed to the Term Sheet) for each casino property shall be sold to the Successful Bidder for the applicable casino property on an exclusive basis and, as a result, only the buyer of a casino property can use such Primary Customer Data post-closing of the Sale. No Debtor or member of the Opco Group (if not sold to the Successful Bidder of the applicable casino property) shall be entitled to use any Primary Customer Data related to any casino property post-closing of the Sale.

3.    Upon consummation of the Sale, the participants in a Joint Bid may decide to divide the Opco Properties amongst themselves and operate certain Opco Properties separately from others. In order to operate such stand-alone businesses, the ultimate buyers of the Opco Properties may need to resolve certain interdependencies among the various Opco Properties (the "Interdependencies"), including, without limitation, certain issues relating to the use of intellectual property or the provision of transition services by and between joint bidders. The Opco Debtors do not intend, and shall not be required to undertake any obligation, to resolve any Interdependencies among the various Opco Properties.

4.    After submission of an LOI (as defined below) and without limiting the terms set forth under the heading "Creditor Negotiations," any unauthorized contacts between one or more Potential Bidders or Qualified Bidders without the prior written

3

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

consent of the Opco Debtors are hereby strictly prohibited and may result in disqualification from participation in the Bidding Process and any Auction that may occur, as determined by the Opco Debtors, in consultation with the Consultation Parties. Notwithstanding the foregoing, the Opco Debtors and/or the Consultation Parties shall have the right to contact parties who have expressed an interest in acquiring only a portion of the Opco Properties or in providing only a portion of the financing necessary to purchase the Opco Properties for the purpose of having discussions with respect to financing proposals and/or responding to other inquiries; provided, that the Consultation Parties shall provide the Opco Debtors' advisors advance notice of such discussions that is reasonable under the circumstances and provide the Opco Debtors' advisors the opportunity to participate in such discussions to the extent reasonable under the circumstances (it being understood that the Consultation Parties shall not initiate contact with parties who have not expressed an interest in acquiring all or a portion of the Opco Properties).

F.     Creditor Negotiations

1.     Notwithstanding anything herein to the contrary and so long as it is reasonably practicable, a Potential Bidder that desires at any time to contact (whether in person or telephonically) the Committee, the Opco Agent, any member of the Opco Lender Steering Committee or the Propco Lenders or their respective advisors to discuss the terms of any bid made or to be made, such Potential Bidder shall coordinate such contact through the Opco Debtors' advisors (who shall promptly act on such request to facilitate such contact).

G.     Sale "As Is"

1.     The Sale of the Opco Properties will be on an "as is" basis and without surviving representations or warranties or indemnities of any kind, nature, or description by the Opco Debtors, their agents, or estates.

H.     Free Of Any And All Claims And Interests

1.     Except as may be agreed to by a Successful Bidder in its Purchase Agreement (as such terms are defined below), and subject to the terms of any order of the Bankruptcy Court authorizing and approving the Sale of the Opco Properties to the Successful Bidder, which may be the order confirming the Joint Plan (the "Confirmation Order"), all of the rights, title and interests of the Opco Group in and to the Opco Properties, or any portion thereof, to be acquired as part of the Sale will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") as permitted by, and pursuant to, sections 105(a), 363, 365, 1123 and 1129 of the Bankruptcy Code, with such Claims and Interests attaching to the net proceeds of the sale of such Opco Properties, subject to the Opco Debtors' right to challenge the validity of such Claims and Interests.

4

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

I.      Publication Notice

        1.      As soon as reasonably practicable after entry of an order by the
Bankruptcy Court approving these Bidding Procedures (the "Bidding Procedures Order"),
but in any event no more than five (5) days after the entry of such Order, the Debtors
shall publish a notice of these Bidding Procedures approved by Bankruptcy Court (the
"Bidding Procedures Notice") in The Wall Street Journal (National Edition), The Las
Vegas Review-Journal and The Financial Times (International Edition).

J.      Confidentiality Agreement(s)

        1.      Unless a Potential Bidder has heretofore executed a confidentiality
agreement with SCI appropriate for purposes of participating in the Bidding Procedures,
each Potential Bidder must execute and deliver a confidentiality agreement in form and
substance reasonably satisfactory to SCI (the "Confidentiality Agreement").

K.      Participation Requirements; Deadlines

        1.      Unless otherwise ordered by the Bankruptcy Court for cause shown or
otherwise consented to by the Opco Group after consultation with the Consultation
Parties, in order to participate in the Bidding Process, each bidder (each a "Potential
Bidder") must deliver to the Opco Debtors (copies of which the Opco Debtors promptly
shall deliver to the Consultation Parties):

        (a)     an executed Confidentiality Agreement (to be delivered prior to the
                distribution of any confidential information by the Opco Debtors to a
                Potential Bidder) which shall inure to the benefit of any purchaser of the
                Opco Properties (in the event that the Potential Bidder has already entered
                into a confidentiality agreement with the Opco Debtors, it must provide a
                statement agreeing that its obligations under such agreement shall inure to
                the benefit of any purchaser of the Opco Properties and waiving any of its
                rights under such confidentiality agreement that are in conflict with the
                Bidding Procedures or that would otherwise prohibit disclosures regarding
                the Potential Bidder to the Consultation Parties);

        (b)     current audited financial statements and latest unaudited financial
                statements of the Potential Bidder or, if the Potential Bidder is an entity
                formed for the purpose of acquiring the Opco Properties, current audited
                financial statements and latest unaudited financial statements of the equity
                holders or sponsors of the Potential Bidder who will guarantee the
                obligations of the Potential Bidder, or such other form of financial
                disclosure and/or credit-quality support or enhancement, if any, that will
                allow the Opco Debtors and the Consultation Parties to make a reasonable
                determination as to the Potential Bidder's financial and other capabilities
                to consummate the Sale; and

5

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

(c)     a preliminary (non-binding) written proposal letter of intent ("LOI") containing all of the following:

     a.   the identification of the specific Opco Properties that the Potential Bidder seeks to acquire,

     b.   the purchase price range for such Opco Properties (including liabilities to be assumed by the Potential Bidder) and form of consideration (including material terms of any "take back" debt (*i.e.*, seller financing));

     c.   any material assets and liabilities expected to be excluded;

     d.   the structure (including, without limitation, in the case of each potential Joint Bid, the structure of such Joint Bid) and financing of the Sale (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance and a description for funding post-acquisition working capital for the target);

     e.   any anticipated third-party (including from the Potential Bidder's existing creditors) corporate, stockholder, internal or regulatory approvals (including, but not limited to, Nevada Control Board, National Indian Gaming Commission or other regulatory or other consents or approvals required to close the Sale);

     f.   the anticipated time-frame and any anticipated impediments for

          i.   completing due diligence;

          ii.   obtaining each of the applicable approvals referred to in the preceding clause (e);

          iii.   negotiating definitive agreements; and

          iv.   consummating the Sale.

2.     Notwithstanding anything herein to the contrary, including without limitation the foregoing requirements set forth in section K.1 above, upon termination of the Opco Support Agreement, the Opco Lenders (as defined below) shall be deemed Potential Bidders.

3.     The Opco Agent and the Opco Lender Steering Committee, in consultation with the Opco Debtors, shall provide bidders with proposed terms for any "take back" debt (*i.e.*, seller financing) that may be issued to the lenders under the Opco Loan Agreement (the "Opco Lenders") in connection with the Sale.

*In re Station Casinos, Inc., et al.,*
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

4.    The LOI and the material identified in Section K.1 above with respect to each Potential Bidder shall be received by the Opco Debtors thirty (30) days after the entry of the Bidding Procedures Order, the "LOI Submission Date."  The OpCo Debtors shall promptly distribute any such materials received to the advisors for the Consultation Parties.

5.    A "Qualified Bidder" shall mean a Potential Bidder (or in the case of a Joint Bid, all of the Potential Bidders participating in such Joint Bid, which shall be collectively considered a single Potential Bidder):

(a)    that delivers the documents described in section K.1 above;

(b)    whose financial information and/or credit quality support, or enhancement, demonstrate to the Opco Debtors' satisfaction, after consultation with the Consultation Parties, the financial capability of the Potential Bidder to consummate the Sale;

(c)    that has submitted a reasonably competitive and realistic LOI;

(d)    that has executed a Confidentiality Agreement; and

(e)    that the Opco Debtors, under the direction of SCI's independent director and in consultation with the Consultation Parties, determine is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale.  For the avoidance of any doubt, in the case of a proposed Joint Bid, the Potential Bidders participating in such Joint Bid shall together constitute a single Qualified Bidder if the Opco Debtors, in consultation with the Consultation Parties, determine that, as a group, the Potential Bidders qualify as a Qualified Bidder.

6.    Notwithstanding anything herein to the contrary, including without limitation, the requirements set forth in section K.5 above and section N.1 below, upon termination of the Opco Support Agreement, the Opco Agent, on behalf of the Opco Lenders, shall be deemed Qualified Bidders and any bid submitted by the Opco Agent on behalf of the Opco Lenders in respect of all or a portion of the Opco Properties shall be deemed a Qualified Bid.  The Opco Agent, on behalf of the Opco Lenders, shall be permitted, in their sole discretion, at any time after the termination of the Opco Support Agreement, to credit bid up to the full amount of the claims under the Opco Loan Agreement in respect of all or a portion of the Opco Properties other than the Excluded Assets.  Issues pertaining to credit bid rights with respect to the Excluded Assets will be addressed pursuant to further order of the Bankruptcy Court.  To the extent the transfer of the Excluded Assets is consummated in accordance with and subject to the terms of the Second Amended MLCA (as defined in the Opco Support Agreement), no such credit bid rights shall be available in connection with any sale of any of the Excluded Assets.

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

7.      As promptly as practicable after a Potential Bidder delivers all of the materials required by Section K.1 above, the Opco Debtors, under the direction of SCI's independent director, will determine, after consultation with the Consultation Parties, and will notify the Potential Bidder, if such Potential Bidder either by itself or, in the case of a proposed Joint Bid, in conjunction with other bidders participating in such Joint Bid, is a Qualified Bidder. At the same time that the Opco Debtors notify the Potential Bidder that it is a Qualified Bidder, the Opco Debtors will allow the Qualified Bidder to continue to conduct due diligence as provided in the following section with respect to the Opco Properties.

L.      Due Diligence

1.      The Opco Debtors shall, subject to competitive and other business considerations and their rights hereunder regarding the conduct of the Auction, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a Confidentiality Agreement with the Opco Debtors such due diligence access to materials and information relating to the Opco Properties and related liabilities as the Opco Debtors reasonably deem appropriate, after consultation with the Consultation Parties.

2.      Due diligence access shall include management presentations as scheduled by the Opco Debtors, access to electronic data rooms, property tours, and other matters which a Qualified Bidder or other person seeking to become a Qualified Bidder may reasonably request and as to which the Opco Debtors, in their reasonable business judgment, agree after consultation with the Consultation Parties and subject to competitive or other business considerations and their rights hereunder regarding the conduct of the Auction. The Opco Debtors may, in their discretion, coordinate diligence efforts such that multiple parties have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

3.      Neither the Opco Debtors nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Opco Properties to any person other than to Qualified Bidders and any other person seeking to become a Qualified Bidder that has executed a Confidentiality Agreement with the Opco Debtors.

4.      The Opco Debtors make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the definitive sale agreements with any Successful Bidder (defined below) executed and delivered by Opco Debtors.

M.      Notices

1.      A Qualified Bidder that desires to make a bid must deliver written copies of its bid materials to the following parties:

8

*In re Station Casinos, Inc., et al.,*
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

(a)    Station Casinos, Inc., Attn:  Richard J. Haskins, General Counsel, 1505 South Pavilion Center Drive, Las Vegas, NV 89135, Facsimile:  (702) 495-3310;

(b)    Debtors' counsel: Milbank Tweed Hadley & McCloy, Attn: Kenneth J. Baronsky and Paul S. Aronzon, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017-5735, Facsimile:  (213) 629-5063;

(c)    Debtors' financial advisors: Lazard Frères & Co., Attn: Simon Furie, 1999 Avenue of the Stars #1140, Los Angeles, CA 90067-4618, Facsimile: (310) 601-3401;

(d)    Counsel to the Opco Agent:  Simpson Thacher & Bartlett LLP, Attn: Sandy Qusba, 425 Lexington Avenue, New York, NY 10017, Facsimile: (212) 455-2502;

(e)    Financial advisor to the Opco Agent:  The Blackstone Group, Attn: Michael Genereux, 345 Park Avenue, New York, NY 10154, Facsimile: (212) 583-5707;

(f)    Counsel to the Committee:  Fried, Frank, Shriver, Harris & Jacobson LLP, Attn: Brad E. Scheler, One New York Plaza, New York, NY 10004, Facsimile: (212) 859-4000; and

(g)    Financial advisor to the Committee:  Moelis & Company LLC, Attn: Robert J. Flachs, 1999 Avenue of the Stars, Suite 1900, Los Angeles, CA 90067, Facsimile: (310) 443-8700.

N.    Qualified Bid

1.    A bid, including a Joint Bid, will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, and complies with all of the following (a "Qualified Bid"):

(a)    it (x) states that the applicable Qualified Bidder offers to purchase all, substantially all, or a specified portion of the Opco Properties and acknowledges that all Primary Customer Data relating to a Primary Customer (as defined in Schedule 3 annexed to the Term Sheet) shall be sold to the Successful Bidder for each casino property on an exclusive basis and, as a result, only the buyer or a transferee of a casino property can use such Primary Customer Data post-closing, and (y) describes any material modifications to the terms set forth in the Potential Bidder's LOI that have occurred between the submission of the LOI and the Bid Deadline (as defined below);

9

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

(b)     it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its Qualified Bid shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the entry of the Confirmation Order, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)     it includes a duly authorized and executed purchase agreement with, in the case of a Qualified Bid that is not a Joint Bid, a blacklined copy marked to show all changes from the form of the Purchase & Sale Agreement executed by the Stalking Horse Bidder, in each case with such executed purchase agreement to be in form acceptable to the Opco Debtors, after consultation with the Consultation Parties, including the purchase price for the subject Opco Properties expressed in U.S. Dollars at least equal to the Stalking Horse Bid plus the initial overbid requirement of $17.5 million set forth in section R.1(f) hereof (*i.e.*, $789,500,000) (the "Purchase Price"), together with all exhibits and schedules thereto, and, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the purchase agreement with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements, including with respect to any "take-back" debt (*i.e.*, seller financing) to be issued to the Opco Lenders).

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the Sale, that will allow the Opco Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Sale contemplated by the purchase agreement and related documents;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder (and includes an acknowledgement and representation that the Qualified Bidder has had an opportunity to conduct any and all required due diligence regarding the Opco Properties prior to making its offer); (ii) obtaining financing and (iii) in the case of a Joint Bid, the resolution of any Interdependencies among the various Opco Properties or entry of a cooperation agreement or similar agreement among the various participants in the Joint Bid;

(f)     it fully discloses the identity of each entity that will be bidding for the Opco Properties or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

*In re Station Casinos, Inc., et al.,*
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

(g)     it includes an acknowledgment and representation that the Qualified Bidder will assume the Opco Debtors' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the purchase agreement (or identifies with particularity which of such contracts and leases of the Opco Debtors that the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases of the Opco Debtors that the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(h)     it includes an acknowledgement and representation that the Qualified Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Opco Properties in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Opco Properties or the completeness of any information provided in connection therewith or the Auction; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(i)     it includes evidence, in form and substance reasonably satisfactory to Opco Debtors, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the purchase agreement;

(j)     it includes evidence, in form and substance reasonably satisfactory to Opco Debtors, of compliance or anticipated compliance with all required gaming and other regulatory approvals (including, but not limited to, Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), the anticipated time-frame and any anticipated impediments for obtaining such approvals;

(k)     it is accompanied by a good faith deposit ("Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Opco Debtors), certified check or such other form acceptable to the Opco Debtors, payable to the order of the Opco Debtors (or such other party as the Opco Debtors may determine) in an amount equal to 5% of the Purchase Price, to be dealt with as provided for under "Good Faith Deposit" herein;

(l)     Any Qualified Bid must contain appropriate acknowledgements and covenants with respect to the posting of a Gaming Approval Deposit upon Bankruptcy Court approval of a Successful Bid, such Gaming Approval

11

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Deposit (see below) to be relinquished by Successful Bidder in the event of failure to secure required gaming authority consents;

(m)     it contains any proposed measures associated with the continued employment of the Opco Group's employees;

(n)     it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Opco Debtors and assigned or subleased to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases; and

(o)     it contains other information reasonably requested by the Opco Debtors or the Consultation Parties.

2.     **All of the information and material required to be delivered by a Potential Bidder(s) must be received by the Bid Deadline.  The Bid Deadline has been set by the Bankruptcy Court and means [_____, 2010, a date which is sixty (60) days after the entry of the Bidding Procedures Order by the Bankruptcy Court.**

3.     The Opco Debtors, under the direction of SCI's independent director, will determine, in their reasonable business judgment, and after consultation with the Consultation Parties, whether to entertain bids for the Opco Properties that do not conform to one or more of the requirements specified herein and whether to deem such bids to be Qualified Bids. The Opco Debtors shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

4.     Each Potential Bidder, whether a Qualified Bidder or not, and its partners, affiliates and joint ventures, are deemed to have submitted to the exclusive jurisdiction of the Bankruptcy Court with respect to all matters related to bids, the Auction and the Sale.

O.     Evaluation of Competing Bids

1.     A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to result from or be created by such bid in relation to other bids, the relative ability of the counterparties to the Sale proposed by the Qualified Bidder to consummate such Sale, the nature and extent of any proposed revisions to the Purchase Agreement, the terms of any proposed "take back" debt (*i.e.*, seller financing) to be issued to the Opco Lenders in connection with such Qualified Bid, the effect of the proposed Sale on the value of the ongoing businesses of the Opco Debtors (including

12

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the proposed Sale (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), any assets excluded from the bid, the transition services required from the Opco Debtors post-closing and any related restructuring costs, and the likelihood and timing of consummating such Sale, each as determined by the Opco Debtors, under the direction of SCI's independent director, following consultation with the Consultation Parties.

P.    No Additional Qualified Bids

1.    If the Opco Debtors do not receive any Qualified Bids in addition to the Stalking Horse Bid, the Opco Debtors reserve the right, in consultation with the Consultation Parties, to terminate the sale process or extend, subject to the terms hereof, the deadlines set forth in the Bidding Procedures, without further notice. The Opco Debtors, in consultation with the Consultation Parties, may, after consideration of the foregoing, determine that the Stalking Horse Bid is the Successful Bid and elect to forgo the Auction. In such case, in lieu of an Auction, the Opco Debtors may proceed to a Sale Hearing for Court approval of the Stalking Horse Bid.

Q.    Auction Date, Time and Place

1.    If the Opco Debtors receive one or more Qualified Bids in addition to the Stalking Horse Bid, the Opco Debtors will conduct an auction (the "Auction") of the Opco Properties, which shall be transcribed or recorded on video to the extent required under Nevada local practice, at _____ a.m. (prevailing Pacific Time) on _____, 2010, at the offices of Milbank Tweed Hadley & McCloy, located at 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017 or such other location as shall be timely communicated to all entities entitled to attend the Auction. The Opco Debtors, in consultation with the Consultation Parties, may cancel or adjourn the Auction without consent of any Qualified Bidder.

R.    Auction Procedures

1.    The Auction shall run in accordance with the following procedures:

(a)    Only the Qualified Bidders that have timely submitted Qualified Bids, the Opco Debtors, the Consultation Parties, and any creditor of the Opco Debtors shall attend the Auction in person (and the advisors to such Qualified Bidder or creditor of the Opco Debtors), and only such Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

13

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

(c)     At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Opco Debtors whether it intends to attend the Auction, provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder, the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Opco Debtors will provide copies of the Qualified Bid which the Opco Debtors believe, in their reasonable business judgment and following consultation with the Consultation Parties, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders that have timely submitted Qualified Bids and have informed the Opco Debtors of their intent to attend the Auction.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction, provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)     The Opco Debtors, under the direction of SCI's independent director and after consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Opco Debtors determine, under the direction of SCI's independent director and in consultation with the Consultation Parties, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least US $5 million over the Starting Bid or the Leading Bid, as the case

14

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

may be, provided that the Opco Debtors shall retain the right, after consultation with the Consultation Parties, to modify the increment requirements at the Auction, and provided, further that the Opco Debtors in determining the net value of any incremental bid to the estate shall not be limited to evaluating the incremental dollar value of such bid and may consider other factors as identified in the "Selection of Successful Bid" section of these Bidding Procedures, including, without limitation, factors affecting speed and certainty of obtaining Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale. After the first round of bidding and between each subsequent round of bidding, the Opco Debtors shall announce, after consultation with the Consultation Parties, the bid (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids, the Opco Debtors will, at each round of bidding, give effect to any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Opco Debtors.

S.    Selection Of Successful Bid

1.    Prior to the conclusion of the Auction, the Opco Debtors, under the direction of SCI's independent director and following consultation with the Consultation Parties, will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the Purchase Agreement, the terms of any proposed "take back" debt (*i.e.*, seller financing) to be issued to the Opco Lenders in connection with such Qualified Bid, the effect of the proposed Sale on the value of the ongoing businesses of the Opco Debtors (including ongoing relationships with customers and suppliers), the ability of the counterparties to such proposed Sale to consummate the Sale, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the Qualified Bidder) provided by such Qualified Bid, the claims likely to result from or be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), any assets excluded from the Qualified Bid, the transition services required from the Opco Debtors post-closing and any related restructuring costs, and the likelihood and timing of consummating the Sale, each as determined by the Opco Debtors, in consultation with the Consultation Parties; (b) identify the highest or otherwise best offer for the Opco Properties received in accordance with the Bidding Procedures (such bid, the "Successful Bid" and the

15

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Qualified Bidder making such bid, collectively, the "Successful Bidder"); and (c) communicate to the Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder, if any, and the details of the Successful Bid and Alternate Bid, if any. The determination of the Successful Bid and Alternate Bid by the Opco Debtors, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court.

2.      Upon selection of the Successful Bid and the Successful Bidder pursuant to section S.1 above, the Opco Debtors shall file with the Bankruptcy Court and serve upon the parties on the Opco Debtors' service list in the Chapter 11 Cases notice of the selection of such Successful Bid and Successful Bidder.

3.      The Opco Debtors will sell the Opco Properties to the Successful Bidder(s) pursuant to the terms of the Successful Bid(s) (or, under certain circumstances described herein, the Alternate Bidders) upon the approval of such Successful Bid(s) by the Bankruptcy Court at the Sale Hearing (defined below) to be held in conjunction with the hearing before the Bankruptcy Court to consider confirmation of the Joint Plan (as applicable), and subject to any required gaming or other regulatory approvals (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals).

4.      If the Stalking Horse Bid is not selected as the Successful Bid and the Opco Debtors consummate a transaction with a Successful Bidder other than the Stalking Horse Bidder, then the Stalking Horse Bidder shall be entitled to reimbursement of its reasonable and reasonably documented out-of-pocket expenses incurred since January 1, 2010 in connection with proposing and pursuing the Stalking Horse Bid, which such claim shall be an allowed administrative claim against SCI.

T.      Sale Hearing

1.      The hearing to approve the Successful Bid(s) and to authorize the Sale in accordance therewith (the "Sale Hearing") will be held before the Honorable Judge Gregg W. Zive (or any substitute therefor) in the Bankruptcy Court, on a date to be scheduled by the Opco Debtors, after notice to all parties in interest.  The Sale Hearing may be adjourned or rescheduled by the Opco Debtors without further notice by an announcement of the adjourned date at the Sale Hearing or other means of communication.  If the Opco Debtors do not receive any Qualified Bids in addition to the Stalking Horse Bid, the Opco Debtors shall proceed as set forth in the "No Additional Qualified Bids" section above. If the Opco Debtors receive one or more Qualified Bid(s) in addition to the Stalking Horse Bid, then, at the Sale Hearing the Opco Debtors will seek approval of the Successful Bid, and, at the Opco Debtors' election after consultation with the Consultation Parties, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Opco Debtors' presentation to the Bankruptcy Court of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Opco Debtors' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing.  Following the Sale Hearing, the Debtors shall file such

16

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

modifications to the Joint Plan (and, to the extent necessary, shall file modifications to the related disclosure statement) as may be necessary to incorporate into the Joint Plan the Successful Bidder and the terms of the Successful Bid.

     U.     <u>Circumstances under Which Alternate Bid(s) Will be Deemed Successful Bid(s)</u>

     1.     Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Opco Debtors will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court. The Alternate Bid shall remain open until 45 days from the conclusion of the Auction (the "<u>Alternate Bid Expiration Date</u>"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Opco Debtors on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court.

     V.     <u>Gaming Approval Deposit</u>

     1.     Upon approval by the Bankruptcy Court of the Successful Bid, the Successful Bidder shall post a deposit (the "<u>Gaming Approval Deposit</u>") in the form of a wire transfer (to a bank account specified by the Opco Debtors), certified check or such other form acceptable to the Opco Debtors, payable to the order of the Opco Debtors (or such other party as the Opco Debtors may determine) in an amount equal to US $[__]. The Gaming Approval Deposit shall be relinquished by Successful Bidder upon the Successful Bidder's failure to obtain all requisite gaming approvals within [__] months of the entry of the court order approving the Successful Bid.

     W.     <u>Good Faith Deposits</u>

     1.     The Good Faith Deposit of any Alternate Bidder shall be retained by the Opco Debtors until the Alternate Bid Expiration Date and returned to the Alternate Bidder within seven (7) days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid.

     X.     <u>Opco Debtors' Reservation Of Rights</u>

     1.     The Opco Debtors, under the direction of SCI's independent director and in consultation with the Consultation Parties: (a) after each round of bidding at the

*In re Station Casinos, Inc., et al.,*
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or any other orders applicable to one or more Opco Debtors, or the terms and conditions of the Sale or (iii) contrary to the best interests of the Opco Debtors, their estates, and stakeholders as determined by the Opco Debtors; (c) may impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (d) withdraw from sale any Opco Properties at any time and make subsequent attempts to market the same; and (e) reject all bids.

#4828-5201-2294v1

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Schedule 1

List of Opco Debtor Subsidiaries and Opco Non-Debtor Subsidiaries

## SUBSIDIARY LIST FOR BID PROCEDURES

**Debtor Subsidiaries**:

Northern NV Acquisitions, LLC
Tropicana Station, LLC
River Central, LLC
Reno Land Holdings, LLC

**Non-Debtor Subsidiaries**:

Texas Station, LLC
Santa Fe Station, Inc.
Fiesta Station, Inc.
Rancho Station, LLC
Lake Mead Station, Inc.
Magic Star Station, LLC
Gold Rush Station, LLC
LML Station, LLC
Palms Station, LLC
Green Valley Station, Inc.
Durango Station, Inc.
SC Durango Development, LLC
Inspirada Station, LLC

SC Rancho Development, LLC
Station Holdings, Inc
Centerline Holdings, LLC
Station California, LLC
Station Development, LLC
Station Construction, LLC
Auburn Development, LLC
SC Sonoma Management, LLC
SC Butte Development, LLC
SC Butte Management, LLC
SC Sonoma Development, LLC
Sonoma Land Holdings, LLC
Sonoma Land Acquisition Company, LLC
Fresno Land Acquisitions, LLC
SC Madera Development, LLC
SC Madera Management, LLC
SC Michigan, LLC
STN Aviation, Inc.

#4825-8449-4342

*In re Station Casinos, Inc., et al.*,
U.S.B.C. D. Nevada Case No. BK-09-52477 (Jointly Administered)

Schedule 2

List of Excluded Assets

FINAL VERSION

## EXCLUDED ASSETS LIST FOR STATION CASINOS, INC. BID PROCEDURES

| Category of Assets | Description |
|---|---|
| *1.  Exclusive PropCo Trademarks* | |
| The exclusive Trademarks described on Exhibit A | PropCo to own all trademarks exclusive to PropCo and that do not contain any Opco Elements (as defined below) to be specified in the definitive documents and to be updated as of closing date to include derivative and subsequent exclusive marks), together with matching, corporate names, trade names, d/b/a names and domain names ("<u>Trade Names</u>"), and including trademark rights in Internet key words, social networks and new media. |
| | The purchaser of OpCo or its assets, as applicable ("<u>OpCo Purchaser</u>") agrees to quitclaim to PropCo all of its right, title and interest in and to the terms RED ROCK, BOULDER, SUNSET and PALACE. |
| | Land Loan Borrower to own all trademarks that are exclusive to the Wild Wild West properties (including VIVA), to be specified in the definitive documents, together with matching Trade Names and including trademark rights in Internet key words, social networks and new media. |
| | OpCo Purchaser will not be restricted from (i) neutral, non-trademark use of such trademarks (e.g., "Happy Hour starts at sunset") or (ii) referring to the PropCo trademarks in a non-trademark manner to describe the history of its business, to the extent permitted by law and/or as required by law (the "<u>Permitted Exceptions</u>"). |
| | OpCo Purchaser to acquire all other trademarks used by OpCo, subject to licenses below, together with matching Trade Names and including trademark rights in Internet key words, social networks and new media. |
| | "<u>OpCo Elements</u>" means (i) the terms "Station," "Jumbo," "Boarding Pass," "Cabo," and "Feast", (ii) OpCo's shade of red used in the trademark, "Station Casinos," (iii) the arch shape of the "Station Casinos" mark, and (iv) the type fonts used in the "Station Casinos" mark or the "Santa Fe Station" mark.  The parties agree to negotiate in good faith as to whether any other identifiable  branding elements should be treated as Opco Elements and will specify the same in the definitive documents. |
| *2.  Joint Interest Trademarks* | |
| The Joint Interest Trademarks described on Exhibit B. | PropCo to have a license until later of (i) 12 months from filing date of plan or (ii) 8 months from effective date of plan of reorganization to use BOULDER STATION, SUNSET STATION and PALACE STATION (together, with RED ROCK STATION, the "<u>Joint Interest Trademarks</u>"). |
| | License includes trademarks and matching Trade Names and includes trademark rights in Internet key words, social networks and new media. |
| | Neither party will use the mark RED ROCK STATION from and after the date hereof and neither party will use any of the  Joint Interest Trademarks after the transition period, whether as trademarks or matching Trade Names and including trademark rights in Internet key words, social networks and new media, subject to the Permitted Exceptions.   This does not prevent Propco from referring to the Joint Interest trademarks or to Station Casinos Inc. in a non-trademark manner to describe the history of its company or as required by law. |

| Category of Assets | Description |
|---|---|
| | OpCo Purchaser will maintain domain names to avoid acquisition by third parties.  OpCo Purchaser will also maintain trademark registrations for as long as reasonably possible to avoid acquisition by third parties.<br><br>After end of transition period, users typing in www.boulderstation.com (or the other Trade Names constituting a Joint Interest Mark) would go to an inactive page.<br><br>PropCo to select brands that do not use "Station" as soon as commercially practicable, and use commercially reasonable efforts to make changes that are easier to facilitate (e.g., website use) more quickly than expiration of license period, to be agreed upon prior to the date of plan confirmation and specified in definitive documentation. |
| *3.  Non-Exclusive Trademarks* | |
| | PropCo to have a license until later of (i) 12 months from filing date of plan or (ii) 8 months from effective date of plan of reorganization to continue using all trademarks (and matching Trade Names) that are currently used by both PropCo and OpCo (the "<u>Non Exclusive Trademarks</u>") (including FEAST BUFFET or other restaurants inside both OpCo and PropCo hotels), to be set forth on a mutually agreed schedule, along the same principles as point 2 above, except for the later of (x) 6 months from filing date of plan or (y) 4 months from effective date of plan of reorganization for JUMBO, BOARDING PASS and STATION ("station" used apart from Boulder, Sunset, etc), subject in each case to the Permitted Exceptions.<br><br>PropCo to make changes that are easier to facilitate (e.g., website use) more quickly than expiration of license period.<br><br>Without expanding the licenses described herein, PropCo will not be contractually restricted from using words contained within the OpCo trademarks or Non-Exclusive Trademarks to refer to OpCo Purchaser's trademarks or businesses in a nominative fair use manner so long as such use does not give rise to confusion as to an association or affiliation between the parties or their respective products or services. |
| *4.  Other Trade Dress/ Branding Features* | |
| | Except as permitted in the transitional licenses described above, PropCo will not use any Opco Elements in signage and branding.  This will not affect PropCo's  right to use font and color in the existing signage for Boulder, Red Rock, Sunset and Palace but would affect PropCo's rights to use existing font for the Palace Station web site. |
| *5.  Patents* | |
| | Non-exclusive, perpetual, fully paid up license in favor of Propco in U.S. Patents and patent applications (and any patents issuing therefrom) related to player tracking systems, including U.S. Patents Nos. 6,320,793, 6,672,589 & 7,018,291 and as otherwise specified in the bid packages which is transferable and sub-licensable to all Permitted Users as defined in Item 10 below. |

3

| Category of Assets | Description |
|---|---|
| 6. *Intentionally Omitted* | |
| 7. *Other Intellectual Property* | |
| | PropCo to use current website content accessible on OpCo website (operated by OpCo Purchaser) by clicking on PropCo hotel picture or link for earlier of (i) the later of 12 months from filing date of plan or 8 months from effective date of plan of reorganization or (ii) the end of transition services.  OpCo not to sever any existing links from www.stationcasinos.com to PropCo hotels for a period ending on the earlier of (i) the end of the license period and (ii) the launch of the new website for such PropCo property; <u>provided</u> that OpCo will offer mutually agreed on links for a period ending on the earlier of the end of the license period or 90 days after the launch of PropCo's new website so that users typing in www.boulderstation.com (or the other Trade Names constituting a Joint Interest Mark) during such period would be redirected to PropCo's new website.<br><br>PropCo not to use any OpCo Elements in its new website, but will otherwise be able to use existing website infrastructure and functionality (note: existing website infrastructure, including online guest transaction and account management systems, and related software applications are covered in Point 10) and does not have to re-create website user interface, provided that Propo redesigns all artwork so that website presentation to user avoids brand confusion with OpCo's existing websites for www.stationcasinos.com or www.santafestationlasvegas.com.<br><br>PropCo to own all works of authorship and intellectual property used exclusively in connection with, and all images and text exclusively related to, the PropCo properties, subject to any limitations set forth above on the use of Opco Elements or trademarks retained by OpCo or sold to Opco Purchaser.<br><br>PropCo to have non-exclusive, perpetual, fully paid up license, which is transferable and sub-licensable to all Permitted Users, to use, and create derivative works of, any and all non-registered copyrightable artistic, marketing and graphical materials previously used in the ordinary course of operating the PropCo business and not otherwise transferred to PropCo, all such derivative works would be subject to limitations set forth above on any use of Opco Elements or trademarks retained by OpCo or sold to OpCo Purchaser. |
| 8. *Primary Customer Database* | |
| | The "Primary Customers" for an OpCo or PropCo property, as applicable, will be determined first by determining that a customer's greatest amount of play occurs at such OpCo or PropCo property and then determining the top twenty-five percent (25%) of such customers for each such property, in each case to be determined, as set forth below, based on theoretical play (as defined below) in the last 24 months prior to the date of entry of an order confirming the PropCo plan.<br><br>No later than seven days after the date the Court approves the OpCo bidding procedures, (i) OpCo and PropCo will cooperatively determine the Primary Customers (as defined below) for the Propco properties based on the specifics below and (ii) OpCo shall retain a list of its own Primary Customers and shall provide to Propco a list of PropCo's Primary Customer,  which lists will be held in escrow by a mutually agreed upon third party or otherwise held in escrow pursuant to confidentiality procedures agreed to by the Mortgage Lenders, PropCo and OpCo, with such information to be periodically updated as set forth in the MLCA and released to PropCo upon the date of actual transfer of assets contemplated herein; provided that if a Transition Event occurs under the MLCA other than due to Plan confirmation, this paragraph shall not impair the rights of PropCo and its Designees to receive |

#4842-6136-3974

4

| Category of Assets | Description |
|---|---|
| | customer data pursuant to the MLCA.<br><br>On the effective date of the plan of reorganization, the Primary Customer's entire history of all property play at both OpCo and PropCo properties will be owned by the entity to which such Primary Customer is assigned and will be erased by the other party.  Once a player is identified as a Primary Customer of an OpCo or PropCo property and assigned to OpCo or PropCo, as applicable, all non-gaming databases (hotel, restaurant. etc.) of all OpCo and PropCo properties which are tied to the Boarding Pass of such Primary Customer will be assigned to the party to whom such Primary Customer is assigned and will be erased by the other party.  Any information in the non-gaming databases that is not tied to a Boarding Pass of a Primary Customer will remain in the database of the property where the activity took place and will not be shared with the other party at any time.  In addition, PropCo shall retain at all times all information relating to its customers that are not Primary Customers of OpCo, and the OpCo Purchaser shall receive all information relating to customers of the OpCo and PropCo properties that are not Primary Customers of PropCo.<br><br>On the date of actual transfer of assets, Opco and Propco will supplement the previously prepared lists to add any new customers of each of the OpCo and PropCo properties that were not previously assigned to either OpCo or PropCo properties, and shall be so assigned based upon greatest rate of theoretical play during the interim period.  To the extent that the primary theoretical play of a new customer is at a Propco property, then such new customer shall also be deemed to be Primary Customers of the applicable Propco property.<br><br>OpCo and PropCo shall each have the right to designate an independent observer to ensure the other party's compliance with the foregoing purging obligations.<br><br>A customer's theoretical play for determining a "Primary Customer" of a PropCo and/or OpCo property (such PropCo or OpCo status to be based on who will own such property after giving effect to all transactions occurring on the effective date), is determined as follows:<br><br>For the purposes of assigning player accounts to the respective entities as Primary Customers, the casino player database will be segmented into active and inactive groups.  The assignment of active player accounts will be determined by the guest having rated play of any gaming type excluding Keno within the last 24 months from the filing date of the plan of reorganization.  Guests qualifying as active will then be assigned to each entity by determining the property of greatest combined gaming theoretical within such 24 month period.  Files relating to new customers whose files are created after the initial determination of Primary Customers on or before the seventh day after the date the Court approves the OpCo bidding procedures and before the effective date of the plan of reorganization will be allocated based on the combined theoretical play solely during that period.<br><br>Keno play is not contained within the database and will therefore be disregarded for purposes of determining Primary Customer status.  Race and Sports data will not be able to go back the full 24 months as it can only be tracked back to when data was converted to the current system and whatever Race and Sports data is available will be used in the Primary Customer calculation. |

| Category of Assets | Description |
|---|---|
| *9. Business Information* | |
| | Note: This section addresses business information other than customer history files, which are addressed in Point 8. |
| | Following the confirmation of the plan of reorganization until the date of the actual transfers of the assets, Opco Purchaser and Propco shall have, for purposes of transition, access to all business information pertaining, in the case of the Opco Purchaser, to one or more of the Opco facilities and operations being transferred to such Opco Purchaser or otherwise to be transferred to such Opco Purchaser on the effective date of the confirmed plan of reorganization, and in the case of Propco, to one or more of the Propco facilities and operations being transferred to Propco or otherwise to be transferred to such Propco on the effective date of the confirmed plan of reorganization. To facilitate such access, all information relating to tracking of operations (e.g., inventory, employee time, HR data, accounting and other "Transaction Data" (as defined below) as described below) will be posted on a shared drive to which OpCo and PropCo properties will have access after confirmation and prior to effective date, with such shared drive to be split at time of effectiveness so that each of OpCo and PropCo thereafter only has access to the tracking information relating to its separate properties. Each of OpCo and PropCo, however, shall be allowed to retain any historical information of the other party to the extent that applicable laws require such entity to retain any such information, subject to appropriate confidentiality measures. |
| | PropCo will own and receive a copy of and be able to receive and use all company-wide business information (whether in print, digital, computerized or electronic form) that is not confidential as between OpCo and PropCo (e.g., PropCo would receive a human resources manual used by all OpCo and PropCo hotels but confidential from the public).  OpCo Purchaser will own, retain, and will be able to use all such company-wide business information. |
| | PropCo will receive a copy of and will be able to use all macros, templates and similar items for organizing or presenting business information in digital, computerized or electronic form that PropCo has used at any time until the end of the transition period.  OpCo Purchaser will also retain a copy of and be able to use the foregoing. |
| | Land Loan Borrower or PropCo will receive a copy of and be able to use business information and materials (whether in print, digital, computerized or electronic form) relating exclusively to existing Wild Wild West casino to the extent necessary to operate such casino. |
| | As used above, "business information" is any type of information relating to OpCo or PropCo, including, without limitation employee documentation; overall HR programs documentation; training manuals and policies and procedures; job descriptions and operations standards and performance evaluation processes; new hire processes; time, attendance, labor management, compendium and scheduling forms, systems and reports; operational performance processes, metrics and reports; financial performance and budgeting processes and reports; departmental project/action item prioritization and organization documentation and systems; construction and design documentation; legal and contractual documentation; compliance/security/safety documentation and processes; physical plant and engineering documentation and processes; departmental forms; data base and general marketing analytics, segmentation and incentive methodologies; and player development systems, processes and reporting. |

| Category of Assets | Description |
|---|---|
| | Marketing, artistic and graphical materials that are not "information" are covered in Point 7.  Any reference to "systems" above means data within such systems, but does not include software, which is covered in Point 10.

"Business information" of PropCo also includes construction contracts (including warranties, etc. For prior work), architectural agreements, plans, specifications, engineering, and interior, exterior and landscape design material, etc., encompassing both completed work and future plans for PropCo hotels and the WWW property.

PropCo to have non-exclusive, perpetual, fully paid up license, which is transferable and sub-licensable to all Permitted Users, to create derivative works of any and all non-registered copyrightable materials described in the preceding paragraph previously used in the ordinary course of operating the PropCo business and not otherwise transferred to PropCo; all such derivative works would be subject to limitations on any use of OpCo retained trademarks and Opco Elements.

The term "Transaction Data" means, in each case with respect to the OpCo or PropCo casinos, all data and information, and associated hardware used in the ordinary course of business by any of such casinos, and includes, but is not limited to, data relating to player tracking systems, slot and table games accounting systems, hotel reservations systems and ticket-in/ticket-out systems and all other transaction-based systems; identification of all vendors and existing contracts (which may be redacted to exclude price or other sensitive information which OpCo or PropCo is contractually prohibited from disclosing to the other); all "Front of house ops systems" such as: casino accounting, cage and count; franchising and merchandising operation systems; performance management (live, syndicated, televised, pay-per-view); value-added guest services systems (Wi-Fi, guest internet, lodgenet, pay-per-view, telephone); convention and conference contract development & management systems; safety, security, surveillance systems and CCTV infrastructure, hotel marketing and reservation channels (including call centers, internet, interfaces with external travel brokers), point of sale, kitchen and restaurant management systems; insurance contracts with third-parties; payroll accounting systems; and all inventory tracking systems, master item lists and similar information.

Any reference to "systems" above means data within such systems, but does not include software, which is covered in Point 10.  Any "hardware" referenced above is covered in Point 10. |

| IT Systems and Other Assets | Proposal |
|---|---|
| *10.  IT Systems* | |
| | All hardware and wires located at any PropCo property to be acquired by PropCo.  All hardware and wires located at any OpCo property (except as otherwise provided in Item 13 below with respect to corporate FF&E)  to be acquired by OpCo Purchaser.

PropCo or any designee of PropCo must acquire its own third-party software licenses, replacement licenses, assignments of licenses or sub-licenses, as applicable, for all non-proprietary software residing with OpCo and used in connection with the operation of the PropCo assets. If PropCo does not acquire them, PropCo must delete such third-party software or otherwise comply with vendor provisions on termination, subject to verification by representatives of the OpCo lenders and the PropCo lenders.

OpCo and OpCo Purchaser to provide reasonable cooperation regarding third party vendors and |

| IT Systems and Other Assets | Proposal |
|---|---|
| | potential for price reductions, provided that OpCo is not required to incur unreimbursed out-of-pocket expense in such efforts.<br><br>OpCo Purchaser to own all software currently owned by OpCo and retain object code and source code for such software. PropCo to have a nonexclusive, perpetual, fully paid up license to use such software and make modifications of such software, which license shall be transferable and sub-licensable to Permitted Users. As used herein, "Permitted Users" means any entities owned by, affiliated with, or managed by Propco and/or Fertitta Gaming.<br><br>PropCo to retain a copy of the object code and source code of the above software, which is subject to the above license. Such software will allow each party to have access to all "Front of house ops systems" of such party, as described in the definition of "Transaction Data". |
| *11.  Employees* | |
| | Commencing on the date that a winning bid of the OpCo Purchaser is selected by OpCo, OpCo will provide PropCo and the OpCo Purchaser with access to all employment records with respect to (i) those non-corporate employees at the properties that each is acquiring, respectively, at the general manager level and below; (ii) those corporate employees below the vice president level (as to each, to the extent that such employees exclusively provide services to one or more of the Propco and WWW properties, on the one hand, or the Opco properties, on the other hand), together with compensation information for such employees and (iii) all existing corporate employees of Station Casinos Inc. not described above. Commencing on the date the Bankruptcy Court confirms such winning bidder (or, if no bid is so confirmed, the date of confirmation of the plan), OpCo will provide PropCo and Opco Purchaser with access to all such employees described in clauses (i) and (ii) above and each of Propco and Opco Purchaser may begin making employment offers to such employees.<br><br>For a 14-day period following the date that the winning bid of the Opco Purchaser is confirmed by the Bankruptcy Court (or date of plan confirmation, if no bid is so confirmed), neither Propco nor OpCo Purchaser will solicit or hire any existing corporate employees of Station Casinos, Inc. not described in clauses (i) or (ii) of the preceding paragraph. During such 14-day period, OpCo will provide PropCo and Opco Purchaser with access to all such corporate employees. At the end of such 14- day period, each of Propco and Opco Purchaser may begin making employment offers to those corporate employees.<br><br>PropCo will set up its own employee benefit plans and will accept rollovers from the OpCo 401(k) plan. Propco will assume all employee liabilities related to transferred employees. OpCo will waive all non-compete agreements with employees who accept employment with PropCo.<br><br>In addition to any other transition services provided between PropCo and the OpCo Purchaser, for a period beginning on the closing of the transaction and continuing for 90 days, PropCo shall provide for transition services to the OpCo Purchaser to allow the OpCo Purchaser to utilize the services of PropCo information technology personnel required to maintain the continuity of the operations of the OpCo business by the OpCo Purchaser. |
| *12.  FF&E, Space Leases and Reserves*<br>   • Furniture<br>   • Fixtures<br>   • Equipment (to include gaming equipment, chips, | Property-specific vehicles, concession contracts, space leases and any similar contract rights relating to the retail vendors at the properties, and construction-in progress, to be transferred together with other FF&E. Warehoused FF&E to be allocated based on ownership (i.e., so that warehoused equipment belonging to the subtenants operating PropCo properties would be transferred to PropCo). Slot machine |

| IT Systems and Other Assets | Proposal |
|---|---|
| telephones, dishes, silverware, uniforms, spare parts and any other base stock not described above)<br>• Other tangible personal property (e.g., inventory not subject to a perfected lien but contemplated to be transferred under MLCA)<br>• All FF&E Cash Reserves subject to perfected PropCo lien | licenses and parts not allocated to specific properties will be divided pro rata among OpCo and PropCo properties.  Telephones to be acquired with all related phone numbers subject to any re-engineering needed to sever internal Opco-PropCo connectivity.<br><br>All tangible personal property at or to be delivered to the PropCo locations (including Wild Wild West), including all inventory located and/or dedicated to the PropCo properties, to be transferred to PropCo.  During the transition period, Opco shall operate all of its properties, including with respect to the designation and delivery of personal property to any particular property and the purchase of goods and services on behalf of properties through intercompany transactions among the properties, consistent with prior practice.<br><br>All FF&E Reserves to the extent subject to a perfected PropCo lien to be transferred to PropCo. |
| *13. Corporate  FF&E* | |
| • Furniture<br>• Fixtures<br>• Equipment (to include telephones, computer hardware)<br>• Other tangible physical assets located at headquarters | Corporate headquarters FF&E, including all tangible personal property, to be transferred in connection with PropCo assumption of modified corporate lease except for physical books and records allocated to Opco. |
| *14. Wild Wild West* | |
| • Assets of Tropicana Station, Inc.<br>• Leasehold interest in the "Wild Wild West Assemblage"<br>• Interest in option to acquire fee title from Tiberti Company<br>• The Cohen Lease Parcel at Cactus<br>• Certain Unencumbered Fee Owned Property That is Part of The Wild Wild West Assemblage | Tropicana Station, Inc., Tropicana Acquisitions, , LLC, Vista Holdings, LLC,  and SCI to assign to the Land Loan Borrower, respectively,  (i) all of the assets of Tropicana Station, Inc., including without limitation, its leasehold interest in a portion of the "Wild Wild West Assemblage", all fee purchase options under the related ground lease, all equipment, business information and other intellectual property with respect to Wild Wild West (consistent with the provisions of items 1-10 herein with respect to the other Propco properties, it being understood that all references in this chart to Propco properties shall mean and include the Wild Wild West properties) and all working capital and other operating assets, (ii) all of SCI's options to acquire fee title from the Tiberti Company to real property contiguous to the Wild Wild West Assemblage, (iii) the Cohen Lease at Cactus leased by Vista Holdings, LLC and (iv) all fee owned parcels (and the rents, issues and profits thereof) owned by Tropicana Acquisitions, LLC that are partially or fully within the Wild Wild West Assemblage or adjacent thereto. |
| *15.  CV PropCo, LLC* | |
| | Equity of CV PropCo to be assigned to Land Loan Lenders in satisfaction of pledge for no additional consideration. |
| *16. Net Working Capital* | |
| | Accounts receivable, prepaid expenses, inventory, deposits, and other current assets of the operating subtenants or otherwise used primarily in connection with the operation of the PropCo properties (including Wild Wild West), net of accounts payable, accrued payables, outstanding checks, accrued payroll, payroll taxes and employee benefits, accrued gaming and customer related liabilities (including |

9

| IT Systems and Other Assets | Proposal |
|---|---|
|  | gift certificates and gift cards), accrued gaming, property and other taxes and other current liabilities incurred in the ordinary course of operating the PropCo properties (including Wild Wild West), the corporate office, and corporate functions that are allocable to the PropCo properties.<br><br>Net working capital shall not include (i) liabilities associated with the Summerlin Special Improvement District (which will be assumed by PropCo) and (ii) employee liabilities for corporate employees to the extent that such employees do not exclusively provide services to one or more of the Propco and WWW properties.<br><br>All assumptions by PropCo of liabilities under written contracts, whether or not included in the calculation of net working capital, will be subject to due diligence review. |
| *17. Intentionally Omitted* |  |
| *18. Headquarters Building* |  |
|  | PropCo shall have the option (but not the obligation) to request assignment and assumption of the lease for the SCI headquarters building located at 1505 South Pavilion Center Drive, Las Vegas. |
| *19. Equity of GV Ranch Station and Aliante Station* |  |
|  | The equity of Aliante Station, LLC and GV Ranch Station, Inc. |
| *20. Additional Excluded Assets* |  |
|  | SCI reserves the right to identify additional assets to be excluded with the consent of the Required Consenting Lenders, as defined in the Restructuring Support Agreement, dated April 16, 2010, between the parties appearing on the signatures pages thereto. |

**EXHIBIT A**
**Marks to be Transferred to PropCo**

**Absolutely Assigned Registered Marks**
**(Subject to Limitations on use of Name "Station")**

*U.S. Trademark Registrations*

| Mark | Class(es) | Reg. No. | Reg. Date |
|------|-----------|----------|-----------|
| A3 | 45 | 3333612 | 11/13/2007 |
| ACTION BUFFET | 42 | 1565241 | 11/7/1989 |
| COSTA DEL SOL | 42 | 2184884 | 8/25/1998 |
| GAUDI BAR | 42 | 2207672 | 12/1/1998 |
| HACHI | 43 | 3321554 | 10/23/2007 |
| LUCKY BAR | 41, 43 | 3204545 | 1/30/2007 |
| PASTA PALACE | 42 | 1634536 | 2/5/1991 |
| PLUNGE | 35 | 3500799 | 9/16/2008 |
| RED ROCK | 16 | 3339158 | 11/20/2007 |
| RED ROCK | 41 | 3424069 | 5/6/2008 |
| RED ROCK | 43 | 3552181 | 12/23/2008 |
| RED ROCK CASINO RESORT SPA | 43 | 3674651 | 8/25/2009 |
| RED ROCK CASINO, RESORT & SPA | 41 | 3424068 | 5/6/2008 |
| RED ROCK LANES | 41 | 3447885 | 6/17/2008 |
| RED ROCK SPA | 44 | 3298840 | 9/25/2007 |
| RED ROCK SPA ESSENTIALS (and design) | 3 | 3533012 | 11/18/2008 |
| ROCKS LOUNGE | 41 | 3458072 | 7/1/2008 |
| ROCKSLOUNGE (and design) | 43 | 3467902 | 7/15/2008 |
| ROYAL COURT | 41 | 1788563 | 8/17/1993 |
| SAND BAR | 41 | 3563154 | 1/20/2009 |
| SANDBAR RED ROCK RESORT (and design) | 43 | 3448576 | 6/17/2008 |
| TERRA ROSSA | 43 | 3149992 | 9/26/2006 |

11

| VIVA | 25 | 3735308 | 1/5/2010 |
| VIVA | 41 | 3342201 | 11/20/2007 |
| VIVA | 43 | 3628800 | 5/26/2009 |
| VIVA CASINO | 41 | 3473703 | 7/22/2008 |
| VIVA LAS VEGAS | 43 | 3705345 | 11/3/2009 |
| WICKED 21 | 41 | 3717829 | 12/1/2009 |
| WILD WILD WEST | 41 | 2053006 | 4/15/1997 |
| WILD WILD WEST | 42 | 2053007 | 4/15/1997 |

*U.S. Trademark Applications*

| Mark | Class(es) | Filing Date | Application No. |
|---|---|---|---|
| DETOX/RETOX | 43 | 12/02/2008 | 77/624,741 |
| DETOX/RETOX | 41 | 12/02/2008 | 77/624,819 |
| DETOX/RETOX | 44 | 12/02/2008 | 77/624,749 |
| RED ROCK CASINO, RESORT & SPA | 35 | 9/16/2004 | 78/980,172 |
| RED ROCK CASINO, RESORT & SPA | 25 | 9/16/2004 | 78/978,135 |
| THE RESIDENCES AT RED ROCK (and Design) | 36, 37 | 3/29/2006 | 78/849,420 |
| VIVA | 35 | 5/31/2005 | 78/640,569 |
| VIVA | 36 | 5/31/2005 | 78/640,577 |
| VIVA | 41 | 5/31/2005 | 78/640,590 |
| VIVA | 37 | 4/2/2007 | 77/146,812 |
| VIVA | 35, 36, 37 | 4/25/2005 | 78/616,285 |
| VIVA | 16 | 6/3/2008 | 77/489,501 |
| VIVA | 18 | 6/2/2008 | 77/488,988 |
| VIVA | 21 | 6/2/2008 | 77/488,976 |
| VIVA | 20 | 6/2/2008 | 77/489,163 |
| VIVA | 41 | 6/2/2008 | 77/488,992 |
| VIVA | 38 | 6/2/2008 | 77/488,999 |
| VIVA CASINO | 35 | 5/31/2005 | 78/640,601 |
| VIVA CASINO | 36 | 5/31/2005 | 78/640,607 |
| VIVA CASINO | 43 | 5/31/2005 | 78/640,616 |
| VIVA CASINO | 37 | 7/15/2007 | 77/229,994 |

12

| VIVA ENTERTAINMENT | 25 | 9/2/2009 | 77/818,863 |
|---|---|---|---|
| VIVA ENTERTAINMENT | 35 | 9/2/2009 | 77/818,862 |
| VIVA ENTERTAINMENT | 41 | 2/29/2008 | 77/409,324 |
| VIVA ENTERTAINMENT | 41 | 9/2/2009 | 77/818,859 |
| VIVA ENTERTAINMENT | 43 | 2/29/2008 | 77/409,328 |
| VIVA ENTERTAINMENT | 43 | 2/9/2009 | 77/818,850 |
| VIVA RESORT SPA CASINO | 25 | 4/29/2009 | 77/725,571 |
| VIVA RESORT SPA CASINO | 35 | 5/31/2005 | 78/640,623 |
| VIVA RESORT SPA CASINO | 36 | 5/31/2005 | 78/640,627 |
| VIVA RESORT SPA CASINO | 37 | 7/30/2007 | 77/242,439 |
| VIVA RESORT SPA CASINO | 41 | 5/31/2005 | 78/640,634 |
| VIVA RESORT SPA CASINO | 41 | 1/12/2010 | 77/910,035 |
| VIVA RESORT SPA CASINO | 43 | 5/31/2005 | 78/640,638 |

*Nevada State Trademark Registrations*

| Mark | Reg. No. | Reg. Date |
|---|---|---|
| A3 | E0272172007-8 | 4/17/2007 |
| ADVENTURE SPA | E0542782007-8 | 7/31/2007 |
| BINGO PALACE | SM00310027 | 6/15/1998 |
| BULLFIGHTER'S BAR | SM00300771 | 3/6/1998 |
| CAPRI | SM00300769 | 3/6/1998 |
| CLUB MADRID | SM00300768 | 3/6/1998 |
| DETOX/RETOX | E0031512010-4 | 1/22/2010 |
| DETOX/RETOX | E0042582010-4 | 1/22/2010 |
| DETOX/RETOX | E0651682009-0 | 12/17/2009 |
| ENDLESS PASTABILITIES! | SM0030616 | 8/10/2004 |
| FROM THE PEOPLE WHO CREATED LOCAL CASINOS | SM00340511 | 2/21/2002 |
| FROM THE PEOPLE WHO CREATED LOCAL CASINOS | SM00340512 | 2/21/2002 |
| LUCKY BAR | E0326522005-4 | 5/26/2005 |

| LUCKY BAR | E0326562005-8 | 5/26/2005 |
|---|---|---|
| LUCKY BAR | E0326572005-9 | 5/24/2005 |
| ONYX BAR | E0346712006-2 | 5/8/2006 |
| ONYX BAR | E0346732006-4 | 5/8/2006 |
| ONYX BAR | E0346752006-6 | 5/8/2006 |
| PASTA PALACE | SM00230434 | 3/9/1990 |
| RED ROCK | SM00360797 | 10/7/2004 |
| RED ROCK | SM00360798 | 10/7/2004 |
| RED ROCK | SM00360799 | 10/7/2004 |
| RED ROCK | TM00280867 | 3/5/1996 |
| RED ROCK LANES | E0320942007-0 | 5/2/2007 |
| RED ROCK RESORT CASINO | SM00360800 | 10/7/2004 |
| RED ROCK RESORT CASINO | SM00360801 | 10/7/2004 |
| RED ROCK RESORT CASINO | SM00360802 | 10/7/2004 |
| ROSALITA'S | SM00300772 | 3/6/1998 |
| ROYAL COURT | SM00250801 | 12/17/1992 |
| SANDBAR | E0346372006-0 | 5/8/2006 |
| SANDBAR | E0346582006-5 | 5/8/2006 |
| SANDBAR | E0346592006-6 | 5/8/2006 |
| SANDBAR (and design) | E0343602006-6 | 5/8/2006 |
| SANDBAR (and design) | E0346192006-8 | 5/8/2006 |
| SANDBAR (and design) | E0346262006-7 | 5/8/2006 |
| SEVILLE BAR | SM00300767 | 3/6/1998 |
| STIMULUS FRIDAYS | E0673372008-8 | 10/24/2008 |
| STIMULUS FRIDAYS | E0673322008-3 | 10/24/2008 |
| STRIKE ZONE | E0275772005-1 | 5/10/2005 |
| STRIKE ZONE | E0275852005-1 | 5/10/2005 |
| STRIKE ZONE | E0275862005-2 | 5/10/2005 |
| SUNSET CAFÉ | SM00300770 | 3/6/1998 |
| SUNSET LANES | TN00320481 | 11/5/1999 |

14

| | | |
|---|---|---|
| SUNSET LANES BOWLING CENTER | TN00260598 | 9/17/1993 |
| T BONES CHOPHOUSE & LOUNGE | E0343362006-6 | 5/8/2006 |
| T BONES CHOPHOUSE & LOUNGE | E0345562006-2 | 5/9/2006 |
| T BONES CHOPHOUSE & LOUNGE | E0345582006-4 | 5/9/2006 |
| TERRA ROSSA | E0345802006-2 | 5/8/2006 |
| TERRA ROSSA | E0346912006-6 | 5/9/2006 |
| TERRA ROSSA | E0346952006-0 | 5/9/2006 |
| THE BROILER | E234162008-2 | 4/3/2008 |
| THE GRAND CAFÉ | E0293212005-7 | 5/16/2005 |
| THE GRAND CAFÉ | E0293252005-1 | 5/16/2005 |
| THE GRAND CAFE | SM00360395 | 5/11/2004 |
| THE RESIDENCES AT RED ROCK | E0339772006-9 | 5/04/2006 |
| THE RESIDENCES AT RED ROCK | E0339782006-0 | 5/04/2006 |
| THE RESIDENCES AT RED ROCK | E0339822006-6 | 5/04/2006 |
| THE SPA AT RED ROCK | E0346652006-4 | 5/8/2006 |
| THE SPA AT RED ROCK | E0346672006-6 | 5/8/2006 |
| THE SPA AT RED ROCK | E0346692006-8 | 5/8/2006 |
| VIVA SALSA | SM00300766 | 3/6/1998 |

15

**EXHIBIT B**
**Joint Interest Trademarks**

*U.S. Trademark Registrations*

| Mark | Class(es) | Reg. No. | Reg. Date |
|---|---|---|---|
| BOULDER STATION | 42 | 1661188 | 10/15/1991 |
| BOULDER STATION | 41 | 1634453 | 2/5/1991 |
| PALACE STATION (and design) | 41 | 1494589 | 6/28/1988 |
| PALACE STATION (and design) | 42 | 1494641 | 6/28/1988 |
| PALACE STATION (and design) | 35 | 1494471 | 6/28/1988 |
| PALACE STATION (stylized) | 35 | 1479936 | 3/8/1988 |
| PALACE STATION (stylized) | 41 | 1480097 | 3/8/1988 |
| PALACE STATION (stylized) | 42 | 1491647 | 6/7/1988 |
| RED ROCK STATION | 25 | 2931043 | 3/8/2005 |
| RED ROCK STATION | 35 | 2976428 | 7/26/2005 |
| RED ROCK STATION | 41 | 2845193 | 5/25/2004 |
| RED ROCK STATION | 42 | 3076981 | 4/4/2006 |
| SUNSET STATION | 21 | 2087587 | 8/12/1997 |
| SUNSET STATION | 25 | 2106796 | 10/21/1997 |
| SUNSET STATION | 41 | 2793353 | 12/16/2003 |
| SUNSET STATION | 42 | 2793354 | 12/16/2003 |

16

*Nevada State Trademark Registrations*

| Mark | Reg. No. | Reg. Date |
|---|---|---|
| BOULDER STATION | SM00230432 | 3/9/1990 |
| BOULDER STATION | SM00230433 | 3/9/1990 |
| PALACE STATION | SM00210229 | 7/28/1987 |
| PALACE STATION | TN00180796 | 12/5/1983 |
| PALACE STATION (logo) | SM00210230 | 7/28/1987 |
| PALACE STATION CASINO | TN00180795 | 12/5/1983 |
| PALACE STATION CASINO (and design) | SM00190042 | 4/16/1984 |
| RED ROCK STATION | SM00360831 | 10/21/2004 |
| RED ROCK STATION | SM00360832 | 10/21/2004 |
| RED ROCK STATION | SM00360833 | 10/21/2004 |
| SUNSET STATION | SM00290407 | 9/23/1996 |
| SUNSET STATION | SM00290408 | 9/23/1996 |