Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:    (213) 892-4000
Facsimile:    (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Northern NV Acquisitions, LLC<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects FCP Voteco, LLC<br>☐ Affects Fertitta Partners LLC<br>☐ Affects FCP MezzCo Parent, LLC<br>☐ Affects FCP MezzCo Parent Sub, LLC<br>☐ Affects FCP MezzCo Borrower VII, LLC<br>☐ Affects FCP MezzCo Borrower VI, LLC<br>☐ Affects FCP MezzCo Borrower V, LLC<br>☐ Affects FCP MezzCo Borrower IV, LLC<br>☐ Affects FCP MezzCo Borrower III, LLC<br>☐ Affects FCP MezzCo Borrower II, LLC<br>☐ Affects FCP MezzCo Borrower I, LLC<br>☐ Affects FCP PropCo, LLC | Chapter 11<br><br>Case No. BK-09-52477<br>Jointly Administered<br>BK 09-52470 through BK 09-52487<br><br>**DEBTORS' MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND FED. R. BANKR. P. 9019 AUTHORIZING OPCO DEBTORS TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH OPCO LENDERS**<br><br>**Motion To Shorten Notice Filed Concurrently**<br><br>Hearing Date:    TBD<br>Hearing Time:   TBD<br>Place:          300 Booth Street<br>                Reno, NV 89509 |

TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE,

OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN INTEREST:

      Station Casinos, Inc. ("SCI"), together with its affiliated debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby submit

this motion (the "Motion") for entry of an order pursuant to Bankruptcy Code sections 105(a)

and 363(b) and Bankruptcy Rule 9019 approving the terms of the Opco Support Agreement (as

#4828-2920-3461                              1

defined below and annexed hereto as Exhibit 1) and authorizing those Debtors that are proposed to be parties to the Opco Support Agreement (the "Opco Debtors") to enter into the Opco Support Agreement and abide by the terms, obligations and conditions set forth therein.[1] The Debtors intend to file an *ex parte* application to shorten notice for a hearing on the Motion (the "Application"). In support of the Motion, the Debtors concurrently submit the declaration of Richard J. Haskins (the "Haskins Declaration") and represent as follows:

## I.     Jurisdiction and Venue

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    Relief Requested

2. Pursuant to Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rules 6004 and 9019, the Debtors request that the Court approve the terms of the Opco Support Agreement, determine that the Opco Support Agreement does not constitute a solicitation of acceptances to the Joint Plan (as defined below) or any other plan of reorganization or liquidation in violation of Bankruptcy Code sections 1125 or 1126, and authorize the Opco Debtors to enter into the Opco Support Agreement and abide by the terms, obligations and conditions set forth therein.

## III.   Background

**A.     Introduction.**

3. On July 28, 2009 (the "Petition Date"), the Debtors commenced the above-captioned cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

---

[1] For purposes of this Motion, the Opco Debtors means SCI, Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC, and Tropicana Station, LLC. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Opco Support Agreement or any of the Exhibits annexed thereto, as the case may be. To the extent that terms used in the Motion and in the Opco Support Agreement are inconsistent, the Opco Support Agreement shall control.

#4828-2920-3461                                                  2

4.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.      As the Court is well aware, these Chapter 11 Cases have given rise to their own vernacular.  Among other things, the Debtors' assets have generally been bifurcated into the "Propco Assets" and the "Opco Assets."

6.      The Propco Assets consist of the four properties owned by debtor FCP PropCo, LLC ("Propco") – Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Sunset Station Hotel & Casino and Red Rock Casino Resort Spa (collectively, the "Propco Properties") – and the related furniture, fixtures and equipment and other assets used in connection with the operation of those properties.  Almost all of the Propco Assets serve as collateral to secure the repayment of Propco's prepetition mortgage loan from its senior secured lenders (the "Propco Lenders") or to secure the obligations of the Opco Group to Propco under the Master Lease between SCI and Propco.

7.      The Opco Assets, in turn, consist of all of SCI's assets, including its direct and indirect equity interests in its debtor and non-debtor operating subsidiaries (collectively with SCI, the "Opco Group"), *other than* the Propco Assets and the chain of subsidiaries that own, directly or indirectly, the equity interests in Propco (sometimes referred to as the "Mezzco Debtors").  Generally speaking, the Opco Assets are comprised of fourteen casino properties and their related assets, as well as SCI's direct and indirect interests in a variety of other management and development opportunities.  Certain, but not all, of the Opco Assets serve as collateral to secure the repayment of SCI's prepetition secured loan (the "Opco Loan") from its senior secured lenders (the "Opco Lenders").  In addition, there are certain assets that are owned, in whole or in part, by members of the Opco Group but have been designated for sale to Propco (as that term is defined herein), because they are used exclusively or predominantly in connection with the operation of the Propco Properties (such assets, together with Propco Assets, the "Excluded Assets").

8.      Throughout these Chapter 11 Cases, the Debtors have attempted to preserve and maximize the value of both the Opco Assets and the Propco Assets and have

advocated for a plan of reorganization that would keep all of the properties under SCI management and under the "Station" umbrella, albeit with a significantly restructured balance sheet.  The Debtors believed that such a joint plan would be the best way to maximize value for creditors, maintain the synergies of common management, and reap the benefits of a highly regarded brand and a proven and respected management team.  A joint plan that continued to maintain the Opco Assets and the Propco Assets under common control would also have had the benefit of avoiding the need to separate those assets, formulate a mechanism to transfer the Excluded Assets from the Opco Group to Propco and otherwise transition the businesses into two separate, stand-alone operations.

9. In December of 2009, the Debtors sought and obtained Court approval for a hard-fought and contentious Master Lease Compromise Agreement (the "MLCA"), which was designed primarily to provide the Debtors and the lenders with a window of time to try to negotiate the terms of just such a plan.

10. Efforts to forge a consensual plan to keep the enterprise together stalled early in 2010, however, and at that point, it became clear to the Debtors that the interests and desires of the Opco Lenders and the Propco Lenders – the two groups with the principal economic interests in the Chapter 11 Cases – were sufficiently divergent that a separation of the Opco Assets and the Propco Assets was the only viable plan for the Debtors to pursue.  Stated in the simplest of terms, the Propco Lenders stated their desire to own the Propco Assets, while the Opco Lenders stated their desire to have the Opco Assets sold.

11. The lender constituents delivered their messages to the Debtors loudly and clearly, and the Debtors promptly formulated a plan providing for: (a) what is essentially a "friendly" foreclosure by the Propco Lenders on those Propco Assets that are collateral for the Propco Loan, coupled with the purchase from the Opco Group of the Excluded Assets (the "Propco Restructuring"); and (b) a sale of the Opco Assets through an auction process (the "Opco Sale Process").

**B.     The Joint Plan and the Plan Facilitation Motions.**

12.     On March 24, 2010, Debtors filed the *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated March 24, 2010)* [Docket No. 1131-1] (the "Joint Plan") and the *Disclosure Statement to Accompany Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and Its Affiliated Debtors (dated March 24, 2010)* [Docket No. 1130-1] (the "Disclosure Statement").  The Joint Plan is designed to successfully implement and consummate both the Propco Restructuring and the Opco Sale Process.

13.     Shortly after filing the Joint Plan and the Disclosure Statement, the Debtors prepared and filed two motions designed to facilitate the ultimate confirmation and consummation of the Joint Plan and the Propco Restructuring and Opco Sale Process embedded therein (collectively, the "Plan Facilitation Motions").  The Plan Facilitation Motions consist of the Bidding Procedures Motion and the MLCA Amendment Motion (as defined below).

14.     In furtherance of the proposed Opco Sale Process, on April 7, 2010, the Debtors filed the *Debtors' Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "Opco" Subsidiaries* [Docket No. 1175] (the "Bidding Procedures Motion").  The Bidding Procedures Motion requests approval of certain Bidding Procedures (as defined in the Bidding Procedures Motion and annexed as an exhibit thereto) to sell the Opco Assets in conjunction with and as an essential component of the Joint Plan.  As originally filed, the Bidding Procedures did not, however, provide for a stalking-horse bidder or obligate any Potential Bidder (as defined in the Bidding Procedures) to enter into a specific purchase and sale agreement.[2]

---

[2]     As discussed further below, as a result of the agreements reached in connection with the Opco Support Agreement, the Bidding Procedures have been revised to take into account the selection of the stalking horse bid as provided for in the Opco Support Agreement and to also address the agreed upon exclusion of the Excluded Assets from the Opco Sale Process (as modified pursuant to the Bidding Procedures) so that they may be transferred to Propco as part of the Propco Restructuring.

#4828-2920-3461                                            5

15. In furtherance of the Propco Restructuring, also on April 7, 2010, the Debtors filed the *Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019 for Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement* [Docket No. 1179] (the "MLCA Amendment Motion") seeking approval of a further compromise (the "Second Compromise Amendment") regarding the Master Lease between SCI and Propco. The Second Compromise Agreement is designed to establish the terms and conditions to govern the transition steps necessary to successfully separate the Propco Assets from the Opco Assets, including the terms and conditions under which the Excluded Assets will be sold to Propco.³

**C.    The Lender Group Support Agreements.**

16. The Joint Plan and the Plan Facilitation Motions were filed with the support of the Propco Lenders. In addition, the Propco Lenders and Fertitta Gaming LLC ("FG") have entered into a plan support agreement of their own (the "Propco PSA") that sets forth their agreement to support the Joint Plan and to take certain actions to facilitate confirmation and consummation of the transactions contemplated by the Joint Plan.

17. At the time the Joint Plan and the Plan Facilitation Motions were filed, however, the Debtors did not have corresponding support from the Opco Lenders. The Opco Lenders had expressed their desire for a sale of the Opco Assets, but there was no agreement as to how the Opco Sale Process would be conducted, what the Excluded Assets would be and how they would be treated, or how the issues relating to the MLCA would be resolved (collectively, the "Opco/Propco Separation Issues"). To the contrary, as the Plan Facilitation Motions were being filed, the Agent and the Steering Committee for the Opco Lenders (the "Opco Agent" and the "Opco Lender Steering Committee", respectively) advised the Debtors that the Opco Agent and the Opco Lender Steering Committee would vigorously oppose those motions and the Joint

---

³ As with the Bidding Procedures, the Second Compromise Agreement has been revised to take into account the agreements reached in connection with the Opco Support Agreement.

#4828-2920-3461                                                6

Plan if the parties could not resolve the Opco/Propco Separation Issues consensually and quickly.[4]

18. The Opco/Propco Separation Issues have been the subject of discussions throughout the Chapter 11 Cases, but the filing of the Plan put them center stage – and the filing of the Plan Facilitation Motions placed them squarely under the spotlight.

19. The Debtors believed that resolution of the Opco/Propco Separation Issues was essential to the Debtors' efforts to proceed with a plan that maximizes value, preserves jobs and satisfies regulatory requirements. The Debtors further believed that a negotiated resolution of those issues that had the support of both the Propco Lenders and the Opco Lenders was critical, because complex and protracted litigation over the Opco/Propco Separation Issues would be extremely costly and would jeopardize both the Propco Restructuring and the Debtors' ability to conduct an orderly and value-maximizing Opco Sale Process.

20. The Propco Lenders, in supporting the Plan Facilitation Motions, agreed with the Debtors' view, and the Opco Agent and Opco Lender Steering Committee also shared that view. Immediately after the Plan Facilitation Motions were filed, the parties undertook around-the-clock negotiations in a final attempt to try to reach acceptable resolutions of the Opco/Propco Separation Issues.

21. The parties' extraordinary efforts proved to be successful. On April 16, 2010, the members of the Opco Lender Steering Committee, the Opco Debtors and certain of SCI's non-debtor subsidiaries, FG and the FG Principals entered into the Opco Support Agreement.[5] In addition to agreement on the Opco Support Agreement and the Term Sheet annexed thereto, the parties also reached agreement on revisions to the Bidding Procedures and

---

[4] The Debtors are advised that the members of the Opco Lender Steering Committee own approximately 60% (in the aggregate) of the claims arising under the Opco Loan.
[5] Entry into the Opco Support Agreement by the Opco Debtors was expressly conditioned upon obtaining Court approval thereof – hence the filing of this Motion.

#4828-2920-3461                                  7

the Second Compromise Agreement that will permit the Debtors to enjoy the support of the Opco Agent and the Opco Steering Committee for both of the Plan Facilitation Motions.[6]

22.     The Propco PSA and the Opco Support Agreement are back-to-back support agreements that, taken in tandem, evidence the support of the Propco Lenders and the Opco Lenders Steering Committee for the reorganization path that has been chosen by the Debtors. Those two agreements, when coupled with the Joint Plan, the Bidding Procedures and the Second Compromise Agreement (as each will be modified pursuant to the terms of the Opco Support Agreement), are designed to serve as the building blocks for a smooth, orderly and largely, if not entirely, consensual confirmation process and for the successful consummation of the Propco Restructuring and the Opco Sale Process.

### IV.    The Opco Support Agreement

23.     The Opco Support Agreement is annexed hereto as <u>Exhibit 1</u> and is defined as that certain Restructuring Support Agreement dated as of April 16, 2010, together with each Exhibit, Schedule and Annex attached thereto, entered into by each of (i) the Opco Lenders from time to time party thereto (together with their permitted successors and assigns, the "<u>Consenting Lenders</u>"), (ii) SCI and each of the other its subsidiaries and affiliates set forth on Exhibit A to the Opco Support Agreement (collectively, the "<u>Company</u>"), (iii) Fertitta Gaming LLC ("<u>FG</u>"), and (iv) Frank J. Fertitta III and Lorenzo J. Fertitta, as primary equity investors in FG (the "<u>FG Principals</u>"). The Company, FG, the FG Principals and the Consenting Lenders are hereinafter referred to as the "<u>Parties</u>". FG, the FG Principals and the Consenting Lenders are hereinafter referred to as the "<u>Non-Debtor Parties</u>".

24.     The Opco Support Agreement serves two basic purposes: (a) it evidences the agreement of the Consenting Lenders to support the Joint Plan, the Bidding Procedures Motion and the MLCA Amendment Motion (as each will be modified to incorporate the terms of the Opco Support Agreement and its various attachments), as well as the continued use of cash

---

[6] Revised versions of the Bidding Procedures and Second Compromise Agreement are being filed with the Court concurrently with the filing of this Motion so that the Court and interested parties will have an opportunity to review the proposed revisions more than two weeks in advance of the hearing on the Plan Facilitation Motions.

#4828-2920-3461                                                8

collateral by Opco and its non-debtor subsidiaries and affiliates and the requested extension of the Debtors' exclusive right to file a plan, among other things;[7] and (b) it sets forth the Consenting Lenders' agreement to the designation of the bid for the Opco Assets that has been submitted by FG and the Mortgage Lenders (together, the "Purchaser") as the stalking horse bid in the Opco Sale Process (the "Stalking Horse Bid"). The details of the agreed upon Bidding Procedures and Second Compromise Agreement are addressed in the Plan Facilitation Motions and will not be repeated here. This Motion instead will focus only on the Opco Support Agreement itself.

25. The Opco Support Agreement provides the framework for the Purchaser to acquire the Opco Assets and assume certain liabilities pursuant to the Term Sheet annexed to the Opco Support Agreement (the "Term Sheet"). That acquisition will be effectuated through (a) modifications to the Joint Plan acceptable to SCI, the Purchaser and the Required Consenting Lenders and (b) the negotiation of a purchase and sale agreement by the Purchaser and SCI, subject to the reasonable satisfaction of the Mortgage Lenders, FG and the Required Consenting Lenders (the "Purchase & Sale Agreement"). The Bidding Procedures unequivocally provide, however, that the Stalking Horse Bid will be subject to overbid pursuant to the terms and conditions of the Opco Sale Process. Accordingly, the Debtors believe that the Bidding Procedures and the conduct of the Opco Sale Process, each as modified, will maximize the value of the Opco Debtors' estates, for the benefit of creditors of the Opco Debtors.

26. The Term Sheet sets forth the fundamental terms of the Stalking Horse Bid. The highlights of the bid are as follows:

- Purchase price of $772,000,000 for the Opco Assets.

- Purchase Price consists of $317 million in cash and $455 million in new debt.

- The new debt will be comprised of a $430 million term loan, secured by substantially all of the Opco Assets, and a $25 million land loan secured by Opco's existing unencumbered land parcels (other than the Wild Wild West property). The terms and

---

[7] On April 7, 2010, Debtors filed *Debtors' Motion for an Order pursuant to 11 U.S.C. § 1121(d) Further Extending the Exclusive Period Within Which Debtors May Solicit Acceptances to Joint Plan of Reorganization* [Docket No. 1172] (the "Exclusivity Extension Motion").

#4828-2920-3461          9

conditions of the new loans are summarized in separate loan term sheets that are annexed to the Term Sheet.

- If the Stalking Horse Bidder is not the successful bid and an alternate bid is selected and consummated, the Stalking Horse Bidder shall be entitled to reimbursement of reasonable out-of-pocket expenses and to the consensual transfer and purchase of the Excluded Assets on the terms and conditions set forth in the Term Sheet, but will not be entitled to any break-up fee.

27. The Stalking Horse Bid will be fully documented in the Purchase & Sale Agreement. The Purchase & Sale Agreement will define for potential bidders in detail and with specificity the transaction that potential bidders will be competing with. The Debtors believe that this guidance and clarity will facilitate an orderly and efficient sale process and will prove to be of great assistance to potential bidders in formulating their bids and to the Debtors and their creditor constituents in analyzing those bids. In addition, the Stalking Horse Bid will provide the Debtors and their estates with "downside" protection and a purchase price "floor" by locking in a $772 million bid for the Opco Assets. The Debtors anticipate that the modifications to the Bidding Procedures to incorporate the Stalking Horse Bid and the orderly auction process described above will greatly enhance the Opco Sale Process and the Debtors' efforts to maximize the value of the Opco Assets for the benefit of the Opco Debtors' estates.

28. In addition to establishing the terms of a beneficial Stalking Horse Bid to serve as a cornerstone for the Opco Sale Process, the Opco Support Agreement also evidences the Consenting Lenders' support for the broader Joint Plan process as well, subject to certain specified terms and conditions. The Debtors and the Consenting Lenders acknowledge, however, that the plan and disclosure statement approval processes are still in the early stages and that the parties still have much work to be done in terms of preparing and finalizing critical definitive documents for all of the transactions that must occur in connection with implementation of the Joint Plan. Accordingly, the parties have agreed that the Consenting Lenders' agreement to support the Debtors' plan efforts does not constitute solicitation of an acceptance of the Joint Plan at this stage, nor will any such solicitation occur until the Court has approved the Disclosure Statement (as modified pursuant to the Opco Support Agreement) and

#4828-2920-3461                               10

established related solicitation procedures.  Specifically, Section 6 of the Opco Support Agreement provides that:

> This Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the [Joint] Plan or any plan o f reorganization for the purposes of section 1125 and 1126 of the Bankruptcy Code or otherwise.  Neither the Purchaser and the Administrative Agent nor the Company, as applicable, will solicit acceptances of the Plan from any Consenting Lender until such Consenting Lender has been provided with copies of a Disclosure Statement containing 'adequate information,' as required by section 1125 of the Bankruptcy Code, which is approved by the Bankruptcy Court.  In addition, this Support Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

29.     By this Motion, the Debtors request that the Court determine that Section 6 of the Opco Support Agreement is valid and correct and authorizing the Opco Debtors to enter into and abide by the Opco Support Agreement without being subject to any subsequent arguments that the Consenting Lenders' ultimate votes on the Joint Plan (or any other plan) were in any way tainted by the parties' entry into the Opco Support Agreement.

30.     The Opco Support Agreement represents an arms' length, fully negotiated agreement among the Parties.  The Debtors were represented in the negotiation of the Opco Support Agreement by their management and legal and financial advisors.  The Opco Support Agreement represents the achievement of numerous and hard-fought concessions from the OpCo Lenders, FG, the FG Principals and the Mortgage Lenders, all of which are designed to harmonize with existing motions filed in the Chapter 11 Cases and, most important, to maximize recoveries to creditors of both the Propco Debtors and the Opco Debtors and lead to an expeditious, consensual confirmation of the Joint Plan.

### VII.    Basis for Relief

31.     The Court is authorized to grant the Debtors the relief requested in the Motion to aid them in pursuing and achieving value maximization for the benefit of creditors including, but not limited to: the conducting of an efficient, competitive sale process for the

Opco Assets, the "friendly" – and now supported by the Opco Lenders – consensual foreclosure of the Propco Assets by the Propco Lenders, amendment to the MLCA to, *inter alia*, provide for an effective, consensual separation of the Opco Assets and the Propco Assets and for resolution of the purchase price for the transfer of those Opco Assets set forth on Annex 1 to the Second Compromise Amendment to Propco at an agreed price (in the event that the Purchaser is not the Successful Bidder for the Opco Assets), and modification and revision to the Disclosure Statement and the Joint Plan pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

**A.     The Terms and Compromises Embodied in the Opco Support Agreement Represent the Sound Exercise of Debtors' Business Judgment and the Opco Debtors Should Be Authorized to Enter into the Opco Support Agreement**

32.     Bankruptcy Code section 363(b)(1) provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." It is axiomatic that a debtor should be authorized to use assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and in connection with the confirmation of a plan of reorganization if it demonstrates a sound business purpose for doing so. *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (finding that "a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction"). *See also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (D. Del. 1999) (finding that in evaluating business purpose of a sale, Bankruptcy Court may consider effect of sale on reorganization).

33.     The terms, obligations and conditions of each of the Parties to the Opco Support Agreement provide a detailed, commercially reasonable framework for Debtors to proceed with confirmation of the Joint Plan and also to effectuate the intermediary steps of the Bidding Procedures, the Second Compromise Amendment to the MLCA and the extension of the exclusive solicitation period. The Opco Support Agreement also brings several previously adverse creditor constituencies and a Stalking Horse Bidder for the Opco Assets together to work in a concerted and focused manner and pursuant to an achievable timeline to confirm the Joint Plan in a cost-effective and expeditious manner.

#4828-2920-3461                                        12

34. Accordingly, the Debtors believe the Court should approve the terms of the Opco Support Agreement and authorize the Opco Debtors to enter into the Opco Support Agreement and abide by its terms, obligations and conditions.

**B. The Opco Support Agreement Does Not Constitute Improper Solicitation of the Joint Plan in violation of Sections 1125 and 1126 of the Bankruptcy Code**

35. Debtors do not intend, and the Opco Support Agreement makes abundantly clear, that in negotiating the Opco Support Agreement, the Debtors did not intend to solicit acceptances to the Joint Plan and that by entering into the Opco Support Agreement, the Debtors are not soliciting acceptances to the Joint Plan or any other plan. To the contrary, the Opco Support Agreement expressly conditions the Opco Debtors' ability to enter into the Opco Support Agreement upon this Court's approval and prohibits solicitation of any acceptances to the Joint Plan (including the Consenting Lenders) upon this Court's separate approval of the Disclosure Statement under section 1125 of the Bankruptcy Code.

36. Viewed in its entirety, the Opco Support Agreement represents the Debtors efforts to negotiate and compromise the potential objections of the Opco Lenders to the Disclosure Statement, the Bidding Procedures Motion, the MLCA Amendment Motion, the sale of the Opco Assets and confirmation of the Joint Plan. As such, the Opco Support Agreement is more accurately characterized as a series of compromises and not as a solicitation of acceptances to the Joint Plan, especially, since the Joint Plan filed on March 24, 2010 will be amended and modified before this Court is asked to approve the adequacy of the Disclosure Statement (which also will be modified under the terms of the Opco Support Agreement).

37. Therefore, Bankruptcy Rule 9019 supports granting the relief requested in the Motion. It is axiomatic that compromises are favored in bankruptcy[8] and are a normal part of the reorganization process. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (*quoting Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)); *see also In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir.

---

[8] 10 Collier on Bankruptcy, ¶ 9019.01, at 9019-2 (15th ed. rev. 2008) (*citing Marandas v. Bishop* (*In re Sassalos*), 160 B.R. 646, 653 (D. Ore. 1993)).

#4828-2920-3461                    13

1986) ("The law favors compromise and not litigation for its own sake . . . ."). Pursuant to Bankruptcy Rule 9019, in considering compromises, courts determine whether the compromise in question is fair and equitable and in the best interests of the estate. *In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003) ("Although the bankruptcy court has 'great latitude' in authorizing a compromise, it may only approve a proposal that is 'fair and equitable' to the creditors" (internal citations omitted)); *see also Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424; *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994). Bankruptcy Rule 9019(a) commits the approval or rejection of a compromise to the sound discretion of the bankruptcy court. *In re Michael*, 183 B.R. 230, 232 (Bankr. D. Mont. 1995).

38. In pursuing a compromise or settlement, the parties are not required to reach the absolute maximum value for the estate. Rather, settlements should be approved if they fall above the lowest point on the continuum of reasonableness. *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) ("responsibility of the bankruptcy judge . . . [is] to canvass the issues and see whether the settlement, fall[s] below the lowest point in the range of reasonableness,") (internal citations omitted); *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976) (Court should not conduct a "mini-trial" on the merits of a proposed settlement); *In re Planned Protective Servs., Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991) (same).

39. For all the reasons cited above, the compromises embedded in the Opco Support Agreement constitute a fair and reasonable settlement of the Opco/Propco Separation Issues and prevent the costly and time-consuming litigation that would ensue had the compromises not been reached and the Opco Lender Steering Committee instead proceeded with objections to the Plan Facilitation Motions and the Joint Plan and Disclosure Statement. The consensual resolution of those issues, negotiated in good faith and at arms' length by all of the in-the-money creditor constituents, clearly falls within the range of reasonableness.

///

///

///

# VIII. Conclusion

Wherefore, Debtors respectfully request that the Motion be granted and that the Court enter the proposed order annexed hereto as Exhibit 2, together with such other and further relief as is just and appropriate.

Dated: April 19, 2010                Respectfully submitted,

By:      /s/ *Thomas R. Kreller*
Paul S. Aronzon, CA State Bar #88781
Thomas R. Kreller, CA State Bar #161922
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley, #1164
Laury Macauley, #11413
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV 89501
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel
For Debtors and Debtors in Possession

#4828-2920-3461                15