Isaac M. Pachulski (CA 62337)
Eric D. Goldberg (CA 157544)
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email:  ipachulski@stutman.com
        egoldberg@stutman.com

Sallie B. Armstrong (NV SBN 1243)
DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada  89509
Telephone:  (775) 329-5900
Facsimile:  (775) 786-5443
Email:   sarmstrong@downeybrand.com

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| In re: | |
| STATION CASINOS, INC. | Chapter 11 |
| ☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Northern NV Acquisitions, LLC<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects FCP Voteco, LLC<br>☐ Affects Fertitta Partners LLC<br>☐ Affects FCP MezzCo Parent, LLC<br>☐ Affects FCP MezzCo Parent Sub, LLC<br>☐ Affects FCP MezzCo Borrower VII, LLC<br>☐ Affects FCP MezzCo Borrower VI, LLC<br>☐ Affects FCP MezzCo Borrower V, LLC<br>☐ Affects FCP MezzCo Borrower IV, LLC<br>☐ Affects FCP MezzCo Borrower III, LLC<br>☐ Affects FCP MezzCo Borrower II, LLC<br>☐ Affects FCP MezzCo Borrower I, LLC<br>☐ Affects FCP PropCo, LLC | Case No. BK-09-52470-GWZ through BK-09-52487-GWZ<br><br>Jointly Administered under BK 09-52477<br><br><br>Hearing Date:   May 4, 2010<br>Hearing Time:   2:00 p.m.<br>Place:              300 Booth Street<br>                       Reno, NV  89509 |

## THE INDEPENDENT LENDERS' CONSOLIDATED OPPOSITION TO THE DEBTORS' MOTIONS TO: (1) APPROVE BIDDING PROCEDURES; (2) APPROVE SECOND AMENDMENT TO MASTER LEASE COMPROMISE; AND (3) EXTEND EXCLUSIVITY

539136v5

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION.................................................................................... 1

II.   DISCUSSION ........................................................................................ 4

    A.   The Debtors' Bid Procedures Should Not Be Approved Because They Are
         Designed To Discourage, Rather Than Encourage, Competitive Bidding For
         OpCo's Assets. ............................................................................... 4

        1.   Bidding Procedures That Favor Insiders Are Not Subject To The Business
             Judgment Standard, And Instead Are Subject To A Heightened Level Of
             Scrutiny............................................................................................. 6

        2.   The Debtors' Proposed Bid Procedures Are Designed To Skew the
             Process in Favor of The Debtors' Insiders, And Discourage Other Bidders.
             .................................................................................................... 8

            a.   The Excluded Assets. .................................................. 8

            b.   Conditioning the Sale on Confirmation of the Plan ........................ 10

            c.   No-Shop Provisions .......................................................... 11

            d.   Biased Bid Evaluation ...................................................... 13

            e.   Inadequate Access And Time Periods for Potential Bidders ............. 14

            f.   Debtors' Reservation of Rights to Change the Rules Unilaterally ..... 14

        3.   The Court Should Appoint An Independent Examiner To Oversee The
             Sale Process....................................................................... 16

    B.   The Lease Compromise Motion Should Be Denied, And The Master Lease
         Should
         Be Rejected Immediately................................................................... 17

        1.   The Original MLC Resolved All Issues Between OpCo and PropCo Other
             Than the Formality of Rejection; There is Nothing Left To Settle............. 18

        2.   Rather Than 'Clarifying' The Initial Compromise, The Amended MLC
             Proposes To Transfer Significant Value From OpCo And PropCo In
             Exchange For No Consideration ............................................ 20

        3.   The Court Should Apply A Heightened Level Of Scrutiny To The Amended
             MLC Because It Is An Insider Transaction.............................. 23

        4.   The Amended MLC Does Not Satisfy The Applicable Standard For
             Approval Of A Settlement Involving Insiders Because It Provides No
             Benefit To OpCo, And Actually Harms OpCo. ......................... 26

    C.   The Exclusivity Motion Should Be Denied As To OpCo So That The Parties
         With A Real Economic Interest In OpCo Can Propose Plans That Protect Their
         Interests, Rather Than Those Of PropCo And The Insiders. ........................ 29

III.  CONCLUSION ...................................................................................... 32

# TABLE OF AUTHORITIES

## CASES

*In re A&C Properties*,
  784 F.2d 1377 (9th Cir. 1986) ................................................................ 23, 25

*In re Advanced Materials, Inc., et al.*,
  Case No. 09-16527 (TA) (Bankr. C.D. Cal. July 2, 2009)............................ 16

*In re All Seasons Indus., Inc.*,
  121 B.R. 1002 (Bankr. N.D. Ind. 1990) .................................................. 29, 31

*In re Angelika Films 57th*,
  1997 U.S. Dist. LEXIS 7463 (S.D.N.Y. May 27, 1997) ................................... 6

*Bank of Am. v. 203 N. LaSalle Street Partnership*,
  526 U.S. 434 (1999) ............................................................................... 31, 32

*In re Bidermann Indus. U.S.A.*,
  203 B.R. 547 (Bankr. S.D.N.Y. 1997) .................................................... 6, 7, 8

*In re Blixseth*,
  2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010) .............................. 6

*In re Care Level Management Group, LLC, et al.*,
  Case No. 08-12913 (MT) (Bankr. C.D. Cal. May 7, 2008) ........................... 16

*Century Glove, Inc. v. First Am. Bank*,
  860 F.2d 94 (3rd Cir. 1988) ........................................................................ 31

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured
  Claims (In re Papercraft Corp.)*,
  211 B.R. 813 (W.D. Pa. 1997).......................................................................... 6

*Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp.
  (In re Foster Mortgage Corp.)*,
  68 F.3d 914 (5th Cir. 1995) ......................................................................... 24

*In re Dow Corning Corp.*,
  208 B.R. 661 (Bankr. E.D. Mich. 1997) ...................................................... 31

*In re Drexel Burnham Lambert Group, Inc.*,
  134 Bankr. 493, 498 (S.D.N.Y. 1991).................................................... 24, 25

*In re EUA Power Corp.*,
    130 B.R. 118 (Bankr. D.N.H. 1991) .............................................................. 32

*In re Fleetwood Enters., Inc., et al.*,
    Case No. 09-14254 (MJ) (Bankr. C.D. Cal Mar. 10, 2009) ........................... 16

*In re Flight Transp. Corp. Sec. Litig.*,
    730 F.2d 1128 (8th Cir. 1984) ..................................................................... 23

*In re Fontainebleau Las Vegas Holdings*,
    Case No. 09-21481 (Oct. 14, 2009) ............................................................. 17

*In re Global Home Prods. LLC, et al.*,
    Case No. 06-10340 (KG) (Bankr. D. Del. Apr. 10, 2006) ) ........................... 16

*In re Grossinger's Assoc.*,
    116 B.R. 35 (Bankr. S.D.N.Y. 1990) ............................................................ 31

*In re Integrated Resources, Inc.*,
    147 B.R. 650 (S.D.N.Y. 1992),
    *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) .................................................. 7

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC*
    *(In re Charter Commc'ns)*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) .......................................................... 24

*In re Linens Holding Co, et al.*,
    Case No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008) ............................. 16

*In re Matco Elecs. Group, Inc.*,
    287 B.R. 68 (Bankr. N.D.N.Y. 2002) ........................................................... 24

*In re Phila. Newspapers, LLC*,
    2009 Bankr. LEXIS 3167 (Bankr. E.D. Pa. Oct. 8, 2009) .............................. 6

*In re Public Serv. Co. of N.H.*,
    99 B.R. 155 (Bankr. D.N.H. 1989) .......................................................... 30, 31

*Resorts Int'l v. Lowenschuss (In re Lowenschuss)*,
    67 F.3d 1394 (9th Cir. 1995) ....................................................................... 10

*In re Rook Broadcasting of Idaho, Inc.*,
    154 B.R. 970 (Bankr. D. Idaho 1993) .......................................................... 31

*In re Seminole Oil & Gas Corp.*,
    1992 U.S. App. LEXIS 11858,
    1992 WL 110720 (4th Cir. May 22, 1992) ...................................................... 6

*In re Smith*,
  349 B.R. 28 (Bankr. D. Idaho 2005) ............................................................ 23

*In re Sound Radio, Inc.*,
  93 B.R. 849 (Bankr. D.N.J. 1988) ............................................................... 31

*In re Summit Global Logistics, Inc.*,
  2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008) ................................... 6

*In re VI Acquisition Corp., et al.*,
  Case No., 08-10623 (KG) (Bankr. D. Del. Apr. 3, 2008) .............................. 16

*Westship, Inc. v. Trident Shipworks, Inc.*,
  247 B.R. 856 (M.D. Fla. 2000) ...................................................................... 6

*In re Wingspread Corp.*,
  92 B.R. 97 (Bankr. S.D.N.Y. 1988) ................................................................ 7

## LEGISLATIVE HISTORY

Senate Report No. 99-764 & House Conference Report No. 99-958
  (reprinted in 1986 U.S. Code Cong. & Adm. News, at 5227) ........................ 29

The Independent Lenders to Station Casinos, Inc. ("Independent Lenders"),[1] by and through their undersigned counsel, hereby file this Consolidated Opposition to the Debtors': (1) Motion For Entry Of Order Establishing Bidding Procedures, etc. ("Bid Procedures Motion"); (2) Motion . . . Approving Second Amendment To . . . Master Lease Compromise ("Lease Compromise Motion"); and (3) Motion . . . Further Extending The Exclusive Period ("Exclusivity Motion").[2] In support of this Opposition, the Independent Lenders respectfully represent as follows:

## I.
## INTRODUCTION

Although the three Motions that the Debtors have put before the Court each seek nominally different relief, they are all of a piece. The Bid Procedures Motion, the Exclusivity Motion, and the Lease Compromise Motion (collectively, the "Motions") all reflect and highlight the fundamental conflicts between OpCo and PropCo that have permeated these cases since the Petition Date, and which remain unresolved thus far. In fact, these conflicts have only gotten worse, since it is now clear that the Debtors' insiders, in concert with the PropCo Lenders and the OpCo Agent, have come out in the open with their plan to acquire both PropCo and OpCo. As shown below, the ultimate goal of the Motions is to shift valuable assets from the OpCo estate and OpCo Lenders, to the PropCo estate, from which it then will be delivered to the Debtors' insiders and the PropCo Lenders at a bargain price. The Debtors expect to have all of this take place under the guise of the Debtors' recently-filed Joint Chapter 11 Plan Of Reorganization Dated March 24, 2010) ("Plan"), which does not provide for a "reorganization" in any meaningful sense of the word.

---

[1]  The Independent Lenders are comprised of the following entities: BNP Paribas; Castlerigg Master Investments Ltd.; Genesis CLO; Natixis; Silver Point Capital; The Bank of Nova Scotia; and Union Bank, N.A.

[2]  Two days before the deadline for filing this Consolidated Opposition, the Debtors filed substantially revised versions of the operative documents that are the subject of the Bid Procedures Motion and the Lease Compromise Motion. The Independent Lenders have attempted to review those new documents and incorporate into this Opposition the major changes set forth therein. However, given the short time and inadequate notice, the Independent Lenders reserve the right to supplement this Opposition.

Under the Plan, the PropCo Lenders will foreclose on the PropCo assets that secure the PropCo Loan, and contribute those assets to New PropCo. Exclusivity Motion, ¶ 4. With regard to PropCo, the key elements of the Plan are (a) the PropCo Lenders' intention to "sell 46% of the equity [in New PropCo] to Frank Fertitta III and Lorenzo Fertitta," (b) that Colony Capital, another insider, will also have an ownership stake in New PropCo, and (c) that Fertitta Gaming LLC ("FG Gaming"), an entity owned by the Fertittas "will also manage the PropCo Properties under a long-term management agreement." See Station Casinos, Inc. Press Release dated March 24, 2010, at 1 (copy attached hereto as Exhibit A). Remarkably, none of the Motions discloses these key facts regarding the role of the Debtors' insiders under the Plan, or the insiders' alliance with the PropCo Lenders.

With respect to OpCo, the Plan provides for "a sale of the OpCo Assets by an auction process," Exclusivity Motion, ¶ 10. Under normal circumstances, the Debtors' willingness (however tardy) to sell OpCo would be welcomed by the OpCo creditors. Here, however, the process described under the Bid Procedures Motion is not a real auction designed to maximize value for OpCo's stakeholders, in any sense of the word. Instead, this purported auction is yet another insider deal.

Although they have been in bankruptcy for almost nine months, and have had Lazard employed as their investment banker for most of that time, the Debtors inexplicably have failed to market OpCo actively, as one would expect in a normal bankruptcy sale process for an enterprise of this size and value. Making matters worse is the fact that the "OpCo Assets" that the Debtors are willing to sell, are not the same assets that a buyer would want to buy. Rather, pursuant to the Bid Procedures Motion, the "OpCo Assets" being offered for sale are a subset of the actual assets that OpCo owns, and a subset of the assets that serve as collateral for the OpCo Loans held by the Independent Lenders. The Debtors propose to keep "off the market," and reserve for New PropCo (read "the PropCo Lenders, the OpCo Agent, the Fertittas and

Colony"), certain "Excluded Assets" that are integral to OpCo's business and operations, such as certain intellectual property ("IP") and information technology ("IT"), OpCo's headquarters, and the right to "raid" OpCo's senior management, all of which are key to OpCo's operations, success and value.

Pursuant to the Lease Compromise Motion, these "Excluded Assets" of OpCo instead would be transferred from OpCo to PropCo, for consideration that is but a fraction of the Excluded Assets' true value. Adding insult to injury, from the perspective of OpCo's creditors, the Lease Compromise Motion is completely unnecessary: it gives OpCo and its creditors absolutely nothing that they could not achieve by simply rejecting the Master Lease, which rejection is now inevitable.

From the perspective of the OpCo creditors, the foregoing process makes no sense; it's like selling KFC without the Colonel's secret recipe, or selling Coke without the formula, because the seller fails to capture the full value of the enterprise, and the buyer acquires a business crippled without its competitive advantage. From the perspective of the PropCo Lenders, the Fertittas, and Colony, however, this process makes a great deal of sense. If they can pull it off, this plan would allow them to strip OpCo of key assets; acquire those assets at a discount, without having to expose them to a 'market test' of their real value in an auction; discourage third parties from bidding for the OpCo Assets that will be included in the "auction;" and then "re-assemble the enterprise" after acquiring the OpCo Assets for less than fair value after a skewed auction process (and after depriving OpCo creditors of value that is rightfully theirs). The Exclusivity Motion is an integral part of this scheme because, if granted, it would prevent OpCo creditors from presenting their own plan, and allow the Debtors' insiders to box the OpCo creditors in without an escape route.

Obviously, an auction like this is not going to attract many buyers, but it has already drawn the attention of a stalking horse bidder. Not surprisingly, that stalking horse bidder is another insider: a new entity (the "Insider Buyer") comprised of

the PropCo Lenders (which include the OpCo Agent) and FG Gaming, a fact that the Debtors failed to disclose in these Motions.[3] Thus, OpCo's senior management, which has fiduciary duties to maximize the value of the OpCo estate for OpCo's creditors, has decided to enter into an agreement to sell OpCo to insiders of OpCo.

In short, the conflicts of interest that have pervaded this case since day one are getting worse, rather than getting better. If the Court had any doubts before now, the Motions' coordinated effort to divert value from OpCo to PropCo, and the Debtors' selection of the Insider Buyer as the stalking horse for OpCo, should make clear the need for an independent party, such as an Examiner, to be appointed for the limited purpose of running a fair process to sell OpCo. Accordingly, each of the Motions should be denied.

## II.
## DISCUSSION

### A.    The Debtors' Bid Procedures Should Not Be Approved Because They Are Designed To Discourage, Rather Than Encourage, Competitive Bidding For OpCo's Assets.

Success in a bankruptcy auction is defined as achieving the maximum possible value for creditors. The procedures set forth in the Bid Procedures Motion fail in this basic task, because they are skewed heavily in favor of the Insider Buyer and the PropCo Lenders. Particularly for a large enterprise like OpCo, a bankruptcy auction, and the selection of a stalking horse bidder, must include two key elements. First, the selection of the stalking horse should be preceded by active and open marketing efforts that are not limited to those who approach the debtors and express interest in the properties. Instead, in seeking a stalking horse, debtors and their investment bankers are expected to affirmatively solicit expressions of interest from third parties who might be interested in assets of the type being offered for sale.

---

[3]    *See* Debtors' Motion For Order . . . Authorizing OpCo Debtors To Enter Into Restructuring Support Agreement With OpCo Lenders (Docket # 1219), filed April 19, 2008 ("RSA Motion"), Exhibit 1, p.1.

Second, a bankruptcy auction of a business as a going-concern should include all assets that are part of the going concern, and should not exclude from the auction valuable assets that will be made available only to one bidder, particularly where, as here, that one bidder is an insider. In their Bid Procedures Motion, however, the Debtors have rejected both of these precepts, in favor of a skewed process that has resulted in the selection of the Insider Buyer as the stalking horse, and is designed to ensure that the Insider Buyer will not be subject to any real competition at the auction.

As the Court is also aware, the typical sale process for an operating business in bankruptcy follows a relatively straightforward timeline. First, the debtors and their investment bankers put together a detailed "book" about the company; then they send out to numerous potential buyers "teasers" that summarize the potential transaction; then interested parties are asked to sign confidentiality agreements so that they can gain access to a "data room" and other due diligence. Later, the parties that are most interested and are qualified bidders are asked to submit "letters of intent;" negotiations take place; and eventually a "stalking horse" bidder is selected, and an asset purchase agreement ("APA") is negotiated. Once that is done, the debtor then seeks court approval of bid procedures that allow competing bidders to conduct due diligence, and to make overbids.

In contrast, the procedures set forth in the Bid Procedures Motion take what can most charitably be described as a more lackadaisical approach. According to the Bid Procedures Motion, the Debtors have not actively marketed OpCo or solicited potential buyers; no book has been distributed; and no data room has been made available to potential buyers, all despite the fact that Lazard has been employed as the Debtors' investment banker since last September, and surely knows how to conduct an open sale process. Given this lack of effort, it is no surprise that the only potential buyers of whom the Debtors claim to be "aware" are (a) the Insider Buyer; and (b) Boyd Gaming, which has been trying to pursue its interest in a cash acquisition of PropCo

and/or OpCo for more than one year.  And, given the Debtors' apparent unwillingness to provide Boyd with meaningful due diligence, the Insider Buyer, with the Fertittas' intimate knowledge of OpCo's business, clearly has an advantage over other bidders.

Moreover, in a "normal" auction, all of the bidders are offered the same set of assets.  Here, in contrast, under the guise of a new Master Lease "compromise," a group of essential OpCo Assets has been excluded from the auction, set aside, and made available exclusively for PropCo to purchase at a bargain price.  Since under the Plan, PropCo will be sold to the same entities that comprise the Insider Buyer, again, the insiders have the advantage.

1. **Bidding Procedures That Favor Insiders Are Not Subject To The Business Judgment Standard, And Instead Are Subject To A Heightened Level Of Scrutiny.**

Courts recognize that transactions involving insiders should be subjected to a heightened level of scrutiny.  *See, e.g., In re Blixseth*, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010) (refusing to approve bidding procedures favoring a sale to an entity with very close ties to the debtor and the property at issue before the trustee engaged an experienced broker and intensively explored non-insider proposals; *citing In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997) ("conduct of bankruptcy proceedings not only should be right but must seem right")).[4]

The *Bidermann* case is highly instructive with respect to the facts at hand. In *Bidermann*, the debtor sought approval of a letter agreement by which the debtor would be acquired by a buyer comprised of an outside investor and a firm affiliated with the existing CEO.  203 B.R at 549.  As part of the sale, the debtor's majority shareholder

---

[4] See also, *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoints of the corporation and those with interests therein."); *In re Phila. Newspapers, LLC*, 2009 Bankr. LEXIS 3167 (Bankr. E.D. Pa. Oct. 8, 2009); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008); *Westship, Inc. v. Trident Shipworks*, Inc., 247 B.R. 856, 866 (M.D. Fla. 2000); *In re Angelika Films 57th*, 1997 U.S. Dist. LEXIS 7463, 22-23 (S.D.N.Y. May 27, 1997); *In re Seminole Oil & Gas Corp.*, 1992 U.S. App. LEXIS 11858, 1992 WL 110720 *6 (4th Cir. May 22, 1992).

would receive stock options, a consulting agreement, and a release from the debtors. Id. At 550. However, before entering into the agreement, the debtors "failed to test the waters to see if a more favorable arrangement were available," and did not even respond to the one unsolicited expression of interest they had received before agreeing to proceed with the insider-led acquisition. *Ibid.*

Even though the debtor's creditors committee supported the deal, the *Bidermann* court declined to approve the transaction. In reaching this decision, the *Bidermann* court gave great weight to the fact that the transaction was led by the debtor's CEO ("...the actions of the chief executive officer of the company are imbued with fiduciary obligations..."). Id. at 551. The court observed that "sales to fiduciaries are not *per se* prohibited, 'but they are subject to heightened scrutiny because they are rife with the possibility of abuse.'" *Ibid.* (*citing In re Wingspread Corp.,* 92 B.R. 97, 93 (Bankr. S.D.N.Y. 1988)).

Applying that heightened standard to the facts before it, the *Bidermann* court stated that once the debtors decided to offer themselves for sale, it became the CEO's obligation to help ensure that the debtors received the highest and best offer available. *Bidermann*, 203 B.R. at 551. The CEO failed to satisfy this obligation when he decided to have the debtors proceed with the insider-sponsored acquisition before "testing the waters" for alternate transactions. *Ibid.* In the *Bidermann* court's words, "Viewed as a whole, the proposed transaction does not reveal the effective exercise of business judgment, but rather the 'illicit manipulation of a board's deliberative process by self-interested fiduciaries.'" *Ibid*, quoting *In re Integrated Resources, Inc.*, 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

The *Bidermann* court went on to criticize the bid procedures established by the debtors: "And the whole bidding arrangement is designed not to encourage, but to stifle bidding." *Bidermann*, 203 B.R. at 552-531. After noting that "Transactions like this have a heavy potential to tarnish the luster of this practice," the court issued an

order to show cause why an examiner with expanded powers should not be appointed, because "my confidence in management and the debtor's counsel has been shaken by the manner in which they sought to pursue this transaction." *Id.* at 554.

In the case at hand, the debtors have similarly failed to adequately market OpCo. From the Bid Procedures Motion, it appears that the Debtors did virtually nothing to solicit interest in the OpCo Assets before selecting the Insider Buyer as the stalking horse. In addition, like the debtor in *Bidermann*, the Debtors here have made a point of refusing to allow a qualified potential buyer (Boyd) to conduct the due diligence it would need (but the insiders do not) to submit a meaningful offer, all in order to eliminate competition for the Insider Buyer. Moreover, as was the case in *Bidermann*, the Debtors' bid procedures, as discussed below, are clearly designed to favor the bid from the Insider Buyer, and should not be approved. When such significant and pervasive conflicts exist, a fair and open marketing process can only occur under the supervision and control of an independent third party.

### 2. The Debtors' Proposed Bid Procedures Are Designed To Skew the Process in Favor of The Debtors' Insiders, And Discourage Other Bidders.

Set forth below is a discussion of some of the more egregious provisions of the Bidding Procedures that skew the process in favor of the Debtors' insiders.

### a. The Excluded Assets.

With some neat definitional sleight of hand, the Debtors have attempted to redefine who owns what in these cases. Pursuant to the Bid Procedures Motion, the Debtors are only proposing to market for sale the "OpCo Assets." Bid Procedures Motion at 3. But the Debtors have defined "OpCo Assets" to exclude certain assets that are merely <u>used by PropCo</u>, despite the fact that those assets are in fact <u>owned by OpCo</u>, and <u>part of the OpCo Lenders' collateral</u>. Bid Procedures Motion at ¶ 3. These assets are referred to as the "Excluded Assets," and include, among other things, some

of OpCo's most valuable property, such as the IT systems and IP that are integral to the operation of OpCo's business; OpCo's own headquarters and the personal property therein; and valuable real estate known as the "Wild Wild West Assemblage." This is property that a purchaser of OpCo as a going concern would want to include in the purchase. *Id.* at Exhibit 1, ¶ 13.

The treatment of the Excluded Assets is unfair to OpCo's stakeholders, and siphons value from them, for at least two reasons. First, while PropCo may have an interest in acquiring some of those assets, or rights to use some such assets, it should have to pay fair value for those assets as determined in a market-driven process, rather than have the exclusive right to acquire the Excluded Assets privately. PropCo should have to compete in an open auction for the Excluded Assets, along with third parties bidding on the other OpCo Assets; the Excluded Assets should go to the highest bidder, rather than be reserved for insiders, as the Debtors propose.

Second, the Debtors' unilateral decision to remove the Excluded Assets from the sale process makes no sense from a marketing perspective. Given their value and importance to OpCo, it is likely not only that potential OpCo buyers will want them, but that the OpCo estate would receive more consideration if those assets were sold as part of the OpCo auction sale, than the estate would receive if the Excluded assets were sold or transferred to PropCo, and only the remaining "OpCo Assets" were sold at auction.[5] Giving PropCo the exclusive right to purchase part of OpCo's Assets gives PropCo and the insiders an unfair advantage over third-party purchasers in the purchase of OpCo. The value of the Excluded Assets to OpCo's stakeholders will be maximized by including those assets in a competitive auction, rather than by carving them out and reserving them for sale to PropCo for a price to be determined later.

---

[5] For example, while a strategic buyer with operations in Las Vegas might not want or need all of the operational items that comprise the Excluded Assets (IT, business information, senior management), a financial buyer, or any buyer without Las Vegas operational resources, likely would want and need all of those things. In any event, the decision of which assets, if any, to exclude from the OpCo sale should be made by the ultimate buyer, not by the PropCo Lenders, the OpCo Agent, and the insiders.

**b.    Conditioning the Sale on Confirmation of the Plan**

Another aspect of the Debtors' bid procedures that seems designed to discourage, rather than encourage, competitive bidding is the inappropriate tie-in to the Debtors' Plan.  According to the Bid Procedures Motion, "The approval of any sale pursuant to the Bidding procedures will be contingent upon confirmation of the Joint Plan."  Sale Procedures Motion, ¶ 23.  Such a provision is bound to discourage bidding by third-party purchasers, since tying the sale to confirmation of a plan will result in a buyer's being held hostage to the resolution of intercreditor disputes of the type that are addressed by a plan, and are of no concern to the buyer.  The buyer's sole concern is how much it pays for the assets, not how that consideration is allocated under a plan.  Moreover, the Plan as filed includes in Article X third-party releases that may bar its confirmation as a matter of law;[6] it is highly inappropriate to condition a sale to a third-party bidder on the confirmation of a plan with illegal third-party releases; yet that is exactly the structure that the Debtors are trying to create here.

As the Court knows, the primary advantage of the section 363 sale process is to be able to promptly deliver the assets to the buyer, without the buyer having to wait for a plan to be confirmed and intercreditor disputes resolved.  The conditionality in the Debtors' bid procedures does nothing for OpCo, and will cause potential buyers to discount their bids to reflect the fact that, even if they win the auction, the closing of the transaction could be delayed, or never happen at all, depending on whether the Plan is confirmed.  Moreover, tying the sale to the Plan will give the Debtors undue bargaining leverage to extract improper concessions from creditors, such as the aforementioned third-party releases.

---

[6]    The Ninth Circuit "has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."  *Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995).  Notwithstanding the clear state of the law, the Plan contains just such an impermissible third party injunction (". . . the provisions of this Plan, including the exculpation and release provisions contained in this Article X, constitute a good faith compromise and settlement of . . . all Claims of <u>Causes of Action of any party</u> arising out of or relating to the Going Private Transaction and all transactions relating thereto.") (emphasis added).

So who benefits by tying a sale to the Debtors' Plan?  The PropCo Lenders (which include the OpCo Agent) and the insiders, of course.  Having already committed to sponsor the PropCo side of the Plan, they control when and whether the condition to the closing of the OpCo sale can be satisfied.  In addition, under the Plan the insiders are to receive full releases.  Plan, Article X.A and B.  So, by conditioning the closing of any OpCo sale upon the confirmation of the Plan, the insiders can improperly exert the leverage they want over the OpCo creditors: no release, no sale.

### c.    No-Shop Provisions

Having entered into a stalking horse agreement with the Insider Buyer, the Debtors have also agreed to limit their ability to "shop" OpCo, even while they seek approval of their Bid Procedures Motion.  The bid procedures are very, very carefully phrased in the passive voice: "The OpCo Group is offering for sale . . ." "the OpCo Debtors will conduct an auction . . . ."  Bid Procedures Motion, Exhibit 1 at Sections C-1 and Q (emphasis added).  But nothing in the procedures or the proposed order affirmatively obligates the Debtors to actively market OpCo and solicit potential buyers. The only thing that the Debtors are actually required to do in that regard is to publish notices in three newspapers, within five days of the entry of the bid procedures order, thus giving potential buyers about 25 days notice of the deadline to submit bids of at least $789.5 million. *Id.* at Section I and N.1(c).

As if that were not bad enough, undisclosed in the Bid Procedures Motion is the fact that, in connection with their acceptance of the stalking horse bid from the Insider Buyer, the Debtors have agreed to a "no-shop" provision with respect to the OpCo assets.  Specifically, OpCo has agreed that it will "not, directly or indirectly, propose, seek, support, solicit, encourage, negotiate or participate in the formulation of, or enter into, any plan of reorganization or liquidation in the OpCo Chapter 11 Cases

(other than the Plan) or any Competing Transaction [for the OpCo assets]." RSA

Motion, Exhibit 1 (Restructuring Support Agreement ("RSA")), Section 1.1(e).

The Debtors will argue that the RSA's "no-shop" clause is subject to a

"fiduciary out," but the language of that provision is unavailing:

> Nothing in this Support Agreement shall prevent or limit the
> Company or any of the entities falling within the definition of
> the Company or any of their respective directors or officers
> from fulfilling any applicable fiduciaries to its stakeholders or,
> with respect to any Debtor, its estate.

*Id.* at Section 1.1(d) (emphasis added). Assuming that any of the fiduciaries were

willing to actually invoke and rely upon this clause, the problem here is the "any Debtor"

language. Many of OpCo's senior officers are also senior officers of PropCo, such as

Mr. Haskins, who submitted a declaration in support of the Lease Compromise Motion

on behalf of OpCo, but who is also the authorized signatory for PropCo on the

compromise agreement. Accordingly, the language of this "fiduciary out" appears to

permit parties with "dual fiduciary responsibilities" to invoke whichever fiduciary

responsibility they choose, OpCo or PropCo. Thus, under the RSA, OpCo officers who

are also PropCo officers could decide to simply abide by the "no-shop," notwithstanding

the "fiduciary out," if they determine that not seeking higher and better offers for OpCo

would be in furtherance of their fiduciary responsibilities to PropCo. Again, this situation

is rife with potential and actual conflicts of interest.

The "no-shop," unfortunately, is not limited to the Debtors. The RSA also

includes a similar no-shop provision for those OpCo Lenders that have agreed to "lock

up" with the Insider Buyer under the RSA. RSA, Section 1.1(f). Even further, while the

Debtors have offered to confer with certain parties, including the OCC, the Agent, and

the Steering Committee (the "Consultation Parties") with regard to some aspects of the

auction, the price of admission to that elite group is a commitment not to seek out better

offers for the OpCo assets: "the Consultation Parties shall not initiate contact with

parties who have not expressed an interest in acquiring all or a portion of the OpCo [Assets]." Bid Procedures Motion, Exhibit 1, at Sections A.4 and D.4. The intent here, of course, is to limit the possibility of any competing buyers actually bidding.

### d.    Biased Bid Evaluation

Imagine a beauty contest where the judge is the parent of one of the contestants; who do you think would win, and how many would bother to "compete?" This is the type of "fair" and "competitive process" that the Debtors want to apply to the OpCo auction. Despite the fact that the stalking horse is the Insider Bidder, an entity owned by the OpCo Agent and at least two insiders, Frank Fertitta (SCI's Chairman and CEO) and Lorenzo Fertitta (SCI's Vice-Chairman), the Debtors propose to have all bids evaluated by "the Debtors, under the direction of SCI's independent director." Bid Procedures Motion, Exhibit 1 at ¶ N.

It should go without saying that having the Debtors involved in the evaluation of bids, when their own officers intend to bid, is highly inappropriate. For the same reasons, it is equally inappropriate for the Debtors and their insiders to be involved in any aspect of the sale process, such as due diligence, and the determination of whether a particular bidder is qualified. The mere presence of the Debtors and their insiders in any aspect of the sale process will only chill bids, because buyers will (rightly) be concerned that the process is skewed in the insiders' favor. Any argument to the contrary simply defies common sense.

The fact that bids ostensibly will be evaluated "under the direction" of Dr. Nave (whatever that means), provides no comfort or assurance of a fair and open process. There is <u>no</u> evidence that Dr. Nave is qualified to take the lead in a sale of assets of this magnitude. Moreover, it is quite clear that, from the perspective of OpCo's creditors, Dr. Nave is hardly independent; Dr Nave is a longstanding SCI director; he served on the "independent" committee that approved the failed 2007 LBO

and profited handsomely from that transaction, and he would receive a release under the Plan. Dr. Nave's participation in the process is no substitute for an auction managed by an independent third-party with no ties to the Debtors and their insiders.

### e.    Inadequate Access And Time Periods for Potential Bidders

After having failed to market OpCo (to anyone other than their own insiders) for the 9 months they have been in bankruptcy, the Debtors propose to make up for lost time by requiring potential bidders to conduct due diligence and submit LOIs within a mere 30 days of the approval of the bid procedures. Bid Procedures Motion, Exhibit 1 at Section K.4. Such an abbreviated timeline might make sense in the case of a small business, or a "static" asset like a piece of vacant land, or where an active sale has been under way for months, but such an abbreviated process makes no sense here, where the assets to be sold comprise a billion-dollar, operating enterprise with thousands of employees in a highly-regulated environment, and there has been no active and thorough marketing process of the type one would expect for a business of this size and scope. This timeframe is designed to discourage all bidders except the one that already has intimate knowledge of the assets to be sold, *i.e.*, the Insider Buyer.

Another provision of the bid procedures designed to stymie competing bids is Section I, which obligates the OpCo Debtors to provide due diligence access only to "each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a Confidentiality Agreement." *Id.* at Section L.1. No provision is made for due diligence access to be given to a potential buyer's advisors or professionals. Again, this is highly unusual, and is certain to discourage bidding.

### f.    Debtors' Reservation of Rights to Change the Rules Unilaterally

In order to protect the insiders against the possibility that, despite the obstacles they have set up, a real, third party bidder might come in and outbid them, the

Debtors have built into their bid procedures several rather remarkable "escape clauses." First, under Section Q of the bid procedures, the "OpCo Debtors, in consultation with the Consultation Parties, may cancel or adjourn the Auction without the consent of any Qualified Bidder." Bid Procedures Motion, Exhibit B at Section Q. So, for example, if it looks like the Insider Buyer is going to be outbid, then OpCo can cancel the auction.

Second, under Section X of the bid procedures, OpCo reserves the right to "reject, at any time," any bid that is "inadequate or insufficient," or "contrary to the best interests of the OpCo Debtors, their estates, and stakeholders, as determined by the OpCo Debtors . . . ." Bid Procedures Motion, Exhibit B at Section X (emphasis added). The OpCo Debtors also reserve to themselves the right to "impose additional terms and conditions and otherwise modify the Sale Procedures at any time," "withdraw from sale any OpCo Assets at any time" and "reject all bids." *Ibid*. Meanwhile, if the Insider Buyer decides to drop out of the process, or to fail to honor its stalking horse bid, it can do so without penalty, since the Insider Buyer apparently has not put up any "good faith" deposit, while competing bidders are required to post a good faith deposit of at least 5% of the purchase price, or at least $39.5 million. *See* Bid Procedures Motion, Exhibit 1, Section N.1(c).

The intent here is clear: The Debtors will auction off OpCo (other than the Excluded Assets) pursuant to a strict set of Court-approved rules – unless the Debtors decide to change the rules. And if the Debtors think that their Insider Buyer is going to lose, they can take their marbles and go home, "as determined by the OpCo Debtors." This type of "reservation of rights" serves no legitimate purpose, is utterly without precedent,[7] and should not be approved.

---

[7]  Indeed, although the Debtors contend that the Bidding Procedures here "are consistent with those procedures that have been previously approved recently in large, complex bankruptcy cases," Sale Procedures Motion, ¶ 29, that is just not true. First, in each of the asset sale cases cited in the Bid Procedures Motion, the debtors had thoroughly marketed their assets to a wide-range of potentially interested parties prior to seeking approval of the bidding procedures. Second, in all but one of the cited cases, the debtors sought and obtained approval of a stalking horse bidder in connection with the proposed asset sale. Third, none of the sales cited by the Debtors was anywhere near the transaction size at issue here. Finally, in the cases cited by the Debtors, none of the

3.     **The Court Should Appoint An Independent Examiner To Oversee The Sale Process.**

As the Court is aware, since the Petition Date the Independent Lenders have been very concerned about conflicts between the Debtors' estates, and between the Debtors and their insiders.  Unfortunately, despite the passage of time, these conflicts have become much worse, as the OpCo Agent is now part of the Insider Buyer seeking to acquire OpCo.  Now, with the simultaneous (a) submission to the Court of the insider-biased Bidding Procedures, and (b) the acknowledgment that the Insider Buyer intends to bid for OpCo, finally something must be done to ensure that the sale process will be run for the benefit of OpCo's creditors, rather than the Debtors' insiders.

Facing facts very similar to those presented here, the Bankruptcy Court in the *Fontainebleau* case appointed a "sale examiner" for the limited purpose of overseeing the sale of substantially all the Debtors' assets.  In order to address creditors' concerns regarding the involvement of the debtor's insiders in the sale process, Judge Cristol *sua sponte* appointed an examiner to be responsible for all aspects of the sale process, including the formulation of sale procedures, due diligence, the negotiation of stalking horse bids, and the negotiation and documentation of the

---

proposed sales was subject to any significant contingencies such as the confirmation of a particular chapter 11 plan, as is the case here.  *See, In re Advanced Materials, Inc., et al.*, Case No. 09-16527(TA) (Bankr. C.D. Cal. July 2, 2009) (approving bidding procedures in connection with sale of substantially all of debtors' foam manufacturing business assets for a proposed purchase price of $620,000); *In re Fleetwood Enters., Inc., et al.*, Case No. 09-14254 (MJ) (Bankr. C.D. Cal Mar. 10, 2009) (approving bidding procedures in connection with the sale of substantially all of the assets of the debtors' recreational vehicle business for a proposed purchase price of approximately $53 million, subject to adjustments, to a stalking horse bidder); *In re Care Level Management Group, LLC, et al.*, Case No. 08-12913(MT) (Bankr. C.D. Cal. May 7, 2008) (approving bidding procedures in connection with sale of substantially all of the debtors' in-home physician business assets for a proposed purchase price of $3 million to a stalking horse bidder); *In re VI Acquisition Corp., et al.*, Case No., 08-10623 (KG) (Bankr. D. Del. Apr. 3, 2008) (approving bidding procedures in connection with sale of substantially all of the debtor's family dining and pie production assets for a proposed purchase price of $59 million to a stalking horse bidder); *In re Linens Holding Co, et al.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008) (approving bidding procedures in connection with the sale of certain of certain nonresidential leasehold interests); *In re Global Home Prods. LLC, et al.*, Case No. 06-10340 (KG) (Bankr. D. Del. Apr. 10, 2006) (approving bidding procedures in connection with sale of debtors' remaining assets for a proposed purchase price of $75 million to a stalking horse bidder).

APA.[8]  The appointment of such an examiner here would help ensure the fairness of the OpCo sale process.

**B.     The Lease Compromise Motion Should Be Denied, And The Master Lease Should Be Rejected Immediately.**

The Lease Compromise Motion further implements the Debtors' design to transfer enormous value from OpCo to PropCo.  Although styled as a "settlement," there is no dispute here, and nothing left to settle.  All major issues between OpCo and PropCo with respect to the Master Lease, other than its actual rejection, were resolved last December after a long hearing that resulted in the Court's approval of the original Master Lease Compromise ("Original MLC").  Given the fact that rejection of the Master Lease is inevitable, there is nothing left to "compromise" – the new  Second Amended And Restated Master Lease Compromise ("Amended MLC") gives OpCo nothing of value that it could not accomplish simply by rejecting the Master Lease now.

The Lease Compromise Motion attempts to spin the Amended MLC as necessary in order make certain "clarifications" and "refinements" to the already approved deal, but the proposed Amended MLC is much more far-reaching than this benign characterization.  This "compromise" gives OpCo nothing that it does not already have, or could not obtain simply by rejecting the Master Lease now, and therefore, cannot be approved.  Even worse, under the Amended MLC OpCo is required to transfer the Excluded Assets to PropCo, for a fraction of their actual value.

The OpCo creditors, which, unlike the Debtors, actually have an economic interest in the OpCo estate, do not need the Amended MLC, and get nothing of value from it.  Accordingly, rather than grant the Lease Compromise Motion, the Court should direct OpCo to exercise its fiduciary duty and reject the Master Lease.  The Debtors

---

[8]     See Order Appointing Examiner To Examine, Negotiate And Supervise ¶ 363 Sale Of Assets, *In re Fontainebleau Las Vegas Holdings*, Case No. 09-21481 (Oct. 14, 2009), a copy of which is attached hereto as Exhibit B.

then can implement the "transition" procedures set forth in the previously-approved Original MLC.

### 1. The Original MLC Resolved All Issues Between OpCo and PropCo Other Than the Formality of Rejection; There is Nothing Left To Settle

When the Debtors first proposed the Original MLC last December, they pitched it as the perfect solution to each Debtors' problems. OpCo's problem was that it did not have approval from its lenders to continue paying rent at the contract rate, while PropCo's problem was that, if the Master Lease were rejected, PropCo would need a "soft landing" to be able to acquire the assets it needed be able to operate independently of OpCo. In approving the Original MLC, the Court found that:

- There is a strong public policy against significant disruption in casino operations, including the disruption that would certainly follow a precipitous rejection of the Master Lease if the Master Lease Compromise Agreement were not approved.

- The Master Lease Compromise Agreement represents a timely resolution of issues which, if left unresolved, would result in even greater reductions of value and greater potential for all parties in interest to incur further economic damage while administrative claims continue to increase at a rapid rate.

- The Master Lease Compromise Agreement avoids potential litigation that would be expensive, complex, protracted, and implicate issues such as contribution liability, indemnity and subordination. The litigation would add greatly to the administrative burden on all affected estates.

- The Master Lease Compromise Agreement addresses the needs of both PropCo and SCI while maintaining value for the Debtors' estates and creditors.

Findings Of Fact And Conclusions Of Law In Support Of Order Approving Master Lease Agreement, etc. (Docket # 961), ¶¶ H, F(4)-(5) and G.

At this point, it is clear that the Master Lease is a losing proposition for OpCo. The "rent" payable by OpCo is far in excess of the EBITDAR produced by the

Leased Casinos.  It is equally clear that OpCo should not, and will not, assume the Master Lease.  Thus, all that OpCo needs – and all it has to gain from the proposed "settlement" – is to stop funding losses under the Master Lease.  No "compromise" or "concessions" by OpCo are necessary to accomplish this result.  All OpCo has to do is reject the Master Lease and stop the accrual of the obligations thereunder.

OpCo simply has no need for the Amended MLC.  Because the Original MLC has already been approved, there is no more potential litigation to settle; and, under the Original MLC, PropCo has already achieved the means for a "soft landing" when the Master Lease is rejected, as all agree will happen.  Why not just reject the Master Lease now, and allow the Debtors to implement the detailed "separation" procedures for which they obtained Court approval last year in the Original MLC?

The Debtors seek to portray the Amended MLC as almost ministerial in nature, "the result of clarifications, modifications and refinements to the [Original MLC], as amended, that SCI and PropCo have concluded are needed to facilitate the more comprehensive separation and transition plan that will be needed as SCI and PropCo extricate themselves from one another."  Lease Compromise Motion, ¶ 7.  However, as shown below, this benign characterization grossly distorts the substantive import of the Amended MLC on OpCo.  The Amended MLC embodies numerous substantive provisions, none of which are needed to implement the original compromise, but all of which favor PropCo, and are "necessary" only for the Debtors' insiders and the PropCo Lenders to transfer additional value from OpCo to PropCo before the separation of OpCo and PropCo that is provided for under the Plan and the inevitable rejection of the Master Lease takes place.

2.    **Rather Than 'Clarifying' The Initial Compromise, The Amended MLC Proposes To Transfer Significant Value From OpCo And PropCo In Exchange For No Consideration**

The Amended MLC proposes to change the Original MLC in several respects. This is the additional benefit that OpCo gets under the Amended MLC:

- Rent Reduction – the cash-pay portion of the rent due from OpCo to PropCo is reduced by an additional $1.5 million per month, to achieve a "break-even" level, but is deferred, not waived. Of course, the Master Lease could also become a "break-even" proposition for OpCo if it simply rejected the Master Lease – a point that is obfuscated in the Lease Compromise Motion.

These are the additional benefits that PropCo gets under the Amended MLC:

- IT & Systems – PropCo obtains the right to use and modify the OpCo proprietary software used at the PropCo properties, including source codes. After rejection, all hardware, wires and IT systems located on PropCo properties become PropCo property, *even though they are owned by OpCo.* Accordingly, in order to continue operating, OpCo will have to pay tens of millions of dollars to replicate the IT and systems being transferred to PropCo.

- Employees - PropCo will be permitted to make employment offers to any OpCo corporate employees, and if any such employees are subject to non-compete agreements, OpCo is required to release the non-compete so as to allow PropCo to hire such employees. The value of this to PropCo is incalculable; PropCo is given free reign to raid the most important, senior-level OpCo management, who are responsible for building the OpCo business and the high relative margins it presently maintains. This ability to take an entire management team is something that PropCo could not otherwise buy, at any price.

- IP & Business Information – Under the Original MLC, OpCo was not required to transfer proprietary information regarding operating practices, customer promotions, employee compensation, and other highly competitive information (other than certain customer lists). Under the Amended MLC, OpCo is required to transfer to PropCo, various forms, operating and procedural manuals, personnel data and substantially all other proprietary information that OpCo owns, but that PropCo wants, in order to operate the Leased Hotels, such as OpCo's marketing and other competitive and strategic information.

- <u>Corporate Headquarters & Contents</u> – Under the Amended MLC, PropCo has the option to assume the SCI headquarters lease, and if PropCo exercises that option, then all corporate FF&E and tangible personal property located therein will be transferred to PropCo. Thus, if PropCo exercises this option, the OpCo corporate employees that have not already been raided by PropCo won't ever have a place to work (unless, as is the plan, the Insider Buyer wins the auction).

- <u>Wild Wild West Property</u> – Under the Amended MLC, OpCo is required to transfer to PropCo the Wild Wild West Assemblage. This property has enormous strategic value, as it is the "keystone" for a future casino development located between Tropicana Avenue and Dean Martin Drive. The Wild Wild West Assemblage is adjacent to certain vacant land owned by LandCo, which under the Plan is to be transferred to PropCo, and thus has great value to PropCo.

- <u>Extended Transition Services</u> - OpCo will be required to provide Transition Services to PropCo for 270 days post-rejection, as compared to only 150 days under the existing deal.

- <u>Net Working Capital</u> – Under the Original MLC, upon separation, PropCo was required to pay OpCo for any prepaid goods and services relating to PropCo properties. Under the Amended MLC, the amount that PropCo has to pay OpCo is reduced by certain liabilities assumed by PropCo.

Lease Compromise Motion, Exhibit 1 (Amended), at Annex 1. Significantly, the only item of "value" that OpCo receives under the "compromise" is the deferral of rent under the Master Lease to a "break-even" level – a "benefit" that could just as easily be obtained simply by rejecting the Master Lease.[9] All of the other provisions summarized above represent value given <u>by</u> OpCo to PropCo.

As shown above, the changes proposed under the Amended MLC are far more than the mere, benign "clarifications" and "refinements" that the Debtors claim

---

[9] The Debtors may argue that under the Amended MLC, OpCo gets additional consideration in the form of the "Texas Put Condition." This is the provision of the Amended MLC by which the landlord of the Texas Station Lease "will agree" to "settle" the landlord's "put right" under that lease for $75 million. Lease Compromise Motion, Exhibit 1 (Amended), at Section M(x). However, since (a) the Texas Station landlord is not even party to the Amended MLC; (b) this is, at best, an "agreement to agree," and subject to documentation; and (c) there is no evidence as to whether the $75 million figure is a good deal or a bad deal for OpCo, the Court should ascribe no value to the "Texas Put Condition."

they are. In fact, the changes set forth above represent material, additional transfers of value from OpCo to PropCo. Nevertheless, the Lease Compromise Motion provides absolutely no explanation of why the OpCo Debtors suddenly find it necessary to give away even more value to PropCo. The new $1.5 million incremental rent deferral is meaningless, given the fact that under the existing MLC, OpCo can eliminate the rent obligation entirely, at no marginal cost, by just rejecting the Master Lease. So what changed since the Original MLC was approved, to require the Amended MLC?

What changed is that, since the Original MLC was approved, (a) the PropCo Lenders (which include the OpCo Agent) and the Debtors' insiders have decided to buy PropCo, as set forth in the Plan, and (b) the Insider Buyer has been selected (by the Debtors and an OpCo Lender Steering Committee led by the OpCo Agent, who is part of the Insider Buyer) to act as the stalking horse bidder for OpCo under the insider-friendly bidding procedures. Now, with a deal in place for the insiders and for the PropCo Lenders to emerge as the new owners of PropCo, the PropCo Lenders and the insiders want to make sure that, before the separation is complete, they take from OpCo everything they need to run New PropCo as a strong competitor to OpCo, and make the OpCo Assets less attractive to any buyer other than their own Insider Buyer. So, if the Bidding Procedures are approved, PropCo can acquire these "Excluded Assets" privately, without having to worry that a competing OpCo buyer will acquire them at a competitive auction for fair value (which value would inure to OpCo's creditors).

Killing two birds with one stone, through the Lease Compromise Motion, the PropCo Lenders and the Debtors' insiders can (a) acquire needed assets privately, at the "insider price," and simultaneously (b) weaken their new competitor, OpCo. Then, if the Insider Buyer emerges as the successful buyer for the remaining OpCo assets, the insiders and PropCo Lenders will be able to put PropCo and OpCo back together again, all without having to (a) pay a market-determined, fair value for key

OpCo assets, or (b) distribute to OpCo's creditors the value of the assets siphoned off to PropCo.

The Court should not lend its support to this transparent attempt to effect a significant transfer of value from one non-substantively-consolidated estate to another, outside of a plan, under the guise of "settling" a non-existent dispute. As shown below, the "compromise" embodied in the Amended MLC does not meet the applicable standards for Court approval of such an insider transaction.

### 3. The Court Should Apply A Heightened Level Of Scrutiny To The Amended MLC Because It Is An Insider Transaction.

The Ninth Circuit has identified the following factors for consideration in determining whether a proposed Rule 9019 compromise is reasonable, fair, and equitable:

    (a)    the probability of success in the litigation;

    (b)    the difficulties, if any, to be encountered in the matter of collection;

    (c)    the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it;

    (d)    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*In re A&C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) (quoting *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984)). Nevertheless, courts considering a proposed compromise "should not reflexively reject any other fact or factor that relates to whether the compromise is 'fair and equitable.'" *In re Smith*, 349 B.R. 28, 36 (Bankr. D. Idaho 2005) (concluding from the entirety of the evidence that "credible and legitimate concerns were presented regarding the fairness and adequacy of the settlement.").

Where, as here, a proposed compromise involves an insider, courts must apply a heightened level of scrutiny in determining whether such compromise is reasonable, fair and equitable.  *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 134 Bankr. 493, 498 (S.D.N.Y. 1991) (stating "[w]e subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable.").[10]

To cite but one example of a situation where a Court applied a heightened level of scrutiny to an insider transaction, in *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995), the U.S. Court of Appeals for the Fifth Circuit held that the bankruptcy court had abused its discretion in approving a Rule 9019 settlement agreement between a debtor corporation and its parent.  In that case, unsecured creditors had objected to a settlement agreement in which the debtor released the parent from all claims it might have against it, in exchange for $1.65 million in cash.  *Id.* at 916.  The bankruptcy court approved the settlement agreement under Rule 9019 and the district court affirmed.

In reversing the two lower courts, the Fifth Circuit went into considerable detail regarding the standard that should be applied in a court's determination of whether a Rule 9019 compromise is fair *and* equitable.  In particular, the Fifth Circuit found that one factor bearing heavily on the "wisdom of the compromise" is the extent to which the settlement is truly the product of arms-length bargaining, and emphasized the need for a bankruptcy court to "carefully scrutinize" an agreement wherein a debtor settles a claim it has against a related party, without the participation of the creditors.

---

[10]  See also *In re Matco Elecs. Group, Inc.*, 287 B.R. 68 (Bankr. N.D.N.Y. 2002) (noting that "red flags" weigh against the approval of a settlement agreement where a creditors' committee was not a party to the bargaining that yielded a compromise, "thus raising the inference that the settlement [was] not the result of arms-length bargaining where it involve[d] only insiders."); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 240-242 (Bankr. S.D.N.Y. 2009) (stating, given the counter-party's "position as chairman of Charter's board and controlling shareholder, the Court has viewed the CII Settlement with heightened scrutiny and some skepticism").

(citing In re Drexel Burnham, 134 Bankr. at 498) Id. at 919. (emphasis added).  Turning to the facts before it, the Fifth circuit concluded that "[t]he court below should have examined more carefully this deal between parent and child." Id.  In failing to consider "the familial relationship between [the debtor corporation and it's parent], the bankruptcy court abused its discretion by accepting this settlement." Id.

The Debtors may attempt to blunt the requirement of greater scrutiny of insider transactions by noting that the Agent for the OpCo Lenders and the OpCo Steering Committee appear to support the "compromise."  However, as the Court is aware, the Agent for the OpCo Lenders is also a major PropCo Lender, giving rise to conflicts that magnify those between PropCo and OpCo.  Moreover, the Agent leads the deliberations of the Steering Committee, and does not recuse itself from the Steering Committee's deliberations where the Agent has a conflict.  Even worse, it is now clear that the Agent has yet another conflict, because the Agent is now part owner of the Insider Buyer, which is the stalking-horse bidder for OpCo.  Accordingly, under the circumstances here, the fact that the Agent for the OpCo Lenders – or even the Agent-led Steering Committee – supports the compromise can in no way dilute the heightened level of scrutiny that the Court must apply to the conflict-ridden process present here.[11]

In summary, while not explicitly one of the four factors identified in In re A&C Properties, the relationship between a debtor and its counterparty in a proposed Rule 9019 compromise should be considered as part of the court's determination of whether such an agreement is reasonable, fair and equitable: Where a compromise involves insiders, the compromise must be subject to heightened scrutiny, and is not entitled to deference under a "business judgment" test.

---

[11]   It should also be noted here that Bank of America recently resigned from the Steering Committee, apparently due to concerns over these conflicts.

4.   **The Amended MLC Does Not Satisfy The Applicable Standard For Approval Of A Settlement Involving Insiders Because It Provides No Benefit To OpCo, And Actually Harms OpCo**

The Lease Compromise Motion does not involve a "compromise" in any normal sense of the term, because under a compromise, both sides get something that they might not otherwise receive.  That is not the case here.  Under the Amended MLC, OpCo gets nothing that it could not obtain simply by rejecting the Master Lease, other than leaving open the option to assume that Master Lease.  This "option," however, is worthless to OpCo, because it is now clear to the Debtors (as it has for some time been clear to the Independent Lenders) that OpCo and PropCo will go their separate ways.  Consequently, assuming the Master Lease is not a viable option for OpCo.

With the recent filing of the Plan, the Debtors acknowledge that the ultimate "end game" in this case is that the PropCo Lenders, in concert with insiders FG Gaming and Colony, will obtain ownership of the PropCo properties through a "friendly" foreclosure, while the OpCo creditors will receive the net proceeds of the sale of the OpCo Assets (other than the Excluded Assets, which are not part of the auction).  Under the Lease Compromise Motion, the Excluded Assets will be transferred to PropCo under any scenario, and may not be sold to third parties.  If a Plan is confirmed that keeps OpCo and PropCo together under common ownership (as would be the case if the Insider Buyer acquires OpCo), then the Excluded Assets would simply be transferred outright to PropCo for no additional consideration.  *See* Lease Compromise Motion, Exhibit 1 (Amended), ¶ 17.  On the other hand, if for some reason the Insider Bidder is not the winning bidder for the OpCo Assets, then the Excluded Assets still would be transfered to PropCo, but PropCo would be able to buy them for the bargain price of $35 million, without any "market-test" or appraisal whatsoever.  *Id.* at ¶ 17 and Annex 1 (Amended), Section 17.

Significantly, despite the fact that the Lease Compromise Motion requires OpCo, in effect, to sell the Excluded Assets to PropCo for $35 million, there is no

evidence in any of the Motions that this is a fair price for the Excluded Assets, which include some of OpCo's most valuable assets. There is no evidence in any of the Motions as to the value of the many items that OpCo is giving up in the Amended MLC: the IT systems; the IP and business information, the right to hire away members of OpCo management that are subject to non-compete agreements; the Corporate headquarters; the Wild Wild West property; and the extended Transition Services. However, the following facts are undisputed:

- the Debtors' own publicly-filed financials show that they value their "Brands" and "Customer Relationships" alone (a very small subset of the Excluded Assets) at $99.5 million and $9.8 million, respectively;[12]

- The Excluded Assets give PropCo the ability (which it does not presently have) to operate and manage its own casinos, and thereby avoid having to pay management fees (typically 2% of revenue plus 5% of EBITDAR). Accordingly, PropCo avoids having to spend approximately $25 million per year in perpetuity; and

- The Wild Wild West property, currently owned by OpCo, has enormous strategic value, especially when coupled with certain vacant land presently owned by non-debtor Landco. By stripping the Wild Wild West property out of OpCo, and moving it into PropCo, the insiders are hoping to recombine it with the LandCo parcel, which is being transferred to New PropCo under the Plan. *See* Plan, Article X.A.1.

Accordingly, the likely value of the Excluded Assets being transferred to PropCo vastly exceeds the $35 million price that has been "negotiated" here between (a) OpCo; and (b) the insiders and lenders who seek to acquire these assets through PropCo.

The facts that (a) it would never make sense for OpCo to assume the Master Lease, and (b) the "compromise" set forth in the Amended MLC gives OpCo nothing that it could not get simply by rejecting the Master Lease, are highlighted by a central element of the "compromise": until the Master Lease is rejected, the rent under the Master Lease will be reduced to a "break even" level for SCI. *See* Lease

---

[12]    *See* Station Casinos, Inc. Form 10-K, for the year ended Dec. 31, 2009, at p.99, Note 6.

Compromise Motion, ¶ 30.  In other words, if the Amended MLC is approved, then OpCo will stop losing money on the Master Lease.

But this is nothing more than what would happen if OpCo rejected the Master Lease, which it is already entitled (indeed, obligated) to do.  Meanwhile, pending rejection, SCI will be required to perform all of its obligations under the Master Lease – obligations that it could eliminate by simply rejecting the Master Lease.  If SCI falls short in performing any of these obligations, PropCo will have an administrative claim against SCI – something that would not occur in the event of an outright rejection of the Master Lease.  Heads PropCo wins, tails OpCo loses.

OpCo's embrace of a "compromise" that gives OpCo nothing of value results from the fact that, not only is this an "insider" transaction, but there was no independent party looking out solely for the interests of OpCo and its creditors.  The Lease Compromise Motion itself highlights this point, when it trumpets the fact that responsibility for the representation of *PropCo's* interests in connection with the negotiation of the MLC Amendment "was assumed by the two *independent* directors of PropCo's board, . . . who were advised by PropCo's separate counsel, Gibson, Dunn & Crutcher, . . ."  Motion ¶ 27 (emphasis added).

Of course, the question that immediately comes to mind is:  Who was making sure that *OpCo* received meaningful value from the "compromise" (beyond the ability to stop losing money on a lease that it is already entitled to reject)?  Where were OpCo's "independent directors" and "independent counsel" when the Amended MLC was being negotiated?  Given the Lease Compromise Motion's telling silence on this point, the answers appear to be "No one" and "Nowhere."  The Lease Compromise Motion is utterly devoid of any evidence that OpCo was represented or advised by any independent party or counsel; indeed, no independent party acting solely in OpCo's interest would ever enter into a deal like the MLC Amendment, which provides OpCo

with nothing that it could not obtain (easier, faster and cheaper) by rejecting the Master Lease immediately.  The Lease Compromise Motion should be denied.

**C.    The Exclusivity Motion Should Be Denied As To OpCo So That The Parties With A Real Economic Interest In OpCo Can Propose Plans That Protect Their Interests, Rather Than Those Of PropCo And The Insiders.**

Pursuant to their joint Exclusivity Motion, both OpCo and PropCo seek an extension of their solicitation exclusivity periods, from May 25, 2010, through the date of their confirmation hearing, which is presently scheduled for July 15-16.  The Exclusivity Motion is remarkably devoid of the traditional indicia of an exclusivity extension; there is no mention of any substantive negotiations with the OpCo Lenders, let alone any agreement with respect to a Plan.  So, with respect to OpCo, the only "progress" that the Debtors have made after more than 8 months of bankruptcy is to finally acknowledge that OpCo must be sold, although unfortunately, as discussed above, the Debtors are doing their best to skew the auction to favor a sale to their insiders.

Under these circumstances, there is no rationale for maintaining exclusivity for OpCo.  Creditors and potential buyers now should be free to propose any plan that maximizes returns to creditors.  The Debtors, with no economic interest in the OpCo assets, can propose their own, insider-oriented Plan, but that should not prevent OpCo creditors from having the opportunity to consider other plans.

Courts have made it clear that extensions of exclusivity should be denied where exclusivity is being used as a lever to force creditors to accede to a debtor's demands.[13]  Yet that is precisely the use (or misuse) to which exclusivity is being put here:  The Debtors seek to use a skewed bidding process and a one-sided Lease

---

[13]    *See, e.g., In re All Seasons Indus., Inc.,* 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (denying extension of exclusivity when "such an extension would have the result of continuing to hold creditors hostage to the Chapter 11 process and pressuring them into accepting a plan they believe to be unsatisfactory").  Congress has made clear that exclusivity "should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." Senate Report No. 99-764 & House Conference Report No. 99-958 (reprinted in 1986 U.S. Code Cong. & Adm. News, at 5227)

Compromise Motion to tilt the OpCo sale process in favor of the Insider Bidder, and seek to use exclusivity to box in OpCo's creditors so that neither they, nor any competing bidder, can file a competing plan. This is an inappropriate use of exclusivity; given that a sale of OpCo is inevitable, the plan process should be opened up so that competing plans based on competing bids may be presented.[14]

The Debtors attempt to camouflage the true purpose of their Exclusivity Motion through a series of fanciful arguments. They assert that an extension of exclusivity is "necessary" because the Debtors need time to obtain approval of their disclosure statement; obtain approval of the new Master Lease Motion; and pursue an auction process for OpCo. Exclusivity Motion, ¶ 17. With respect to the disclosure statement, this argument proves too much; if the need to obtain approval of a disclosure statement were "cause" for extending exclusivity, then every debtor would be entitled to maintain exclusivity until its disclosure statement were approved; that is not the law.

With regard to the Master Lease Motion, as discussed above, that sham "compromise" is completely unnecessary, at least from the perspective of OpCo's creditors, and should not be approved. But even if that compromise were necessary or beneficial for OpCo, there is no reason why the Debtors need the unfair advantage of exclusivity to seek or obtain its approval. As to the auction for OpCo, again, the Debtors have failed to articulate any justification for why they need to maintain exclusivity in order to conduct an auction of OpCo's assets, especially when the buyer is an insider.

Similarly, the Debtors cannot point to their recently-filed Plan as evidence of progress justifying an extension of exclusivity. With respect to OpCo, the Plan basically says nothing, other than that OpCo will be sold. This type of plan is no more than a "placeholder," designed to obtain the automatic 60 day extension of exclusivity

---

[14] See, e.g., In re Public Serv. Co. of N.H., 99 B.R. 155 (Bankr. D.N.H. 1989) (termination of the exclusive period created a level playing field and fostered the negotiation of a consensual plan of reorganization).

provided for under section 1121(c)(3), despite the fact that the Debtors' Plan is devoid of any substance as to OpCo.[15]  Under these circumstances, the Court should deny the Exclusivity Motion, and allow the Debtors' exclusivity to expire, at least as to OpCo.

Courts have recognized that the termination of exclusivity benefits both creditors and the debtor; increased competition by other parties frequently helps, rather than hurts, negotiations toward a consensual plan.[16]  Meanwhile, no inequity results to a debtor if exclusivity is terminated, because the debtor retains the concurrent right to file its own plan.  *See, e.g.*, *In re Grossinger's Assoc.*, 116 B.R. 35, 26 (Bankr. S.D.N.Y. 1990) ("loss of plan exclusivity does not mean that the debtor is foreclosed from promulgating a meaningful plan of reorganization, only that the right to propose a chapter 11 plan will not be exclusively with the debtor.")

If anything, the existence of competing plans typically results in a higher and more expeditious recovery for the parties economic stakeholders.  *See, e.g., Bank of Am. v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 457 (1999) (explaining that allowing competing plans is one method of ensuring that property is exposed to the marketplace and tends to increase creditor dividends) (citing scholarly authority); *In re Sound Radio, Inc.*, 93 B.R. 849 (Bankr. D.N.J. 1988) (after court modified exclusivity to authorize filing of three competing plans, plan ultimately confirmed paid more per share to equity, paid creditors in full and allowed debtor to go forward as reorganized

---

[15]  *See, e.g., In re Grossinger's Assocs.*, 116 B.R. at 36 (terminating exclusivity where debtor was "bidding for more time" by filing unconfirmable plan on the last day of plan-filing exclusivity period); *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) (condemning the filing of "placeholder" plans that are merely intended to retain control over the plan process).

[16]  *See, e.g., In re Public Serv. Co. of N.H.*, 99 B.R. 155 (Bankr. D.N.H. 1989) (termination of the exclusive period created a level playing field and fostered the negotiation of a consensual plan of reorganization).  Indeed, "the ability of a creditor to compare the debtor's proposals against other, possibilities is a powerful tool by which to judge the reasonableness of the proposals.  A broad exclusivity provision, holding that only the debtor's plan may be 'on the table,' takes this tool from creditors."  *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 102 (3rd Cir. 1988).  *See also In re Rook Broadcasting of Idaho, Inc.*, 154 B.R. 970, 976 (Bankr. D. Idaho 1993) ([i]t is in the interest of creditors that they have a choice between competing plans"); *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) (denying an extension of exclusivity affords other parties in interest an opportunity to file a plan and "there is no negative effect upon the debtor's co-existing right to file its plan").

company).[17] Indeed, *LaSalle* is particularly apposite here, given the insiders' attempt to acquire the OpCo Assets by way of a process that is skewed in the insiders' favor.

In the case at hand, although the Debtors appear to have made progress on the PropCo side, on the OpCo side, they have in essence admitted that they were unable to come to terms on a plan with any constituency, and that OpCo must be sold. Under these circumstances, further extending exclusivity for OpCo will serve only to further corrupt the sale process, and will most certainly <u>not</u> foster plan negotiations. Accordingly, the Exclusivity Motion should be denied.

## III.
## CONCLUSION

For all the foregoing reasons, the Independent Lenders respectfully request that the Court deny each of the Sale Procedures Motion, the Exclusivity Motion, and the Lease Compromise Motion.

---

[17] It is not necessary at this juncture for the Court "to judge what the likely success of those alternative approaches may be but it is sufficient for [the Court] to recognize and express the judgment that opening up the process to those alternative approaches in this particular case is desirable." *In re EUA Power Corp.*, 130 B.R. 118, 119 (Bankr. D.N.H. 1991).

Dated:    April 21, 2010
          Reno, Nevada

Respectfully submitted,

Sallie B. Armstrong
DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada  89509
Telephone:  (775) 329-5900
Facsimile:   (775) 786-5443
Email:    sarmstrong@downeybrand.com

          -and-

Isaac M. Pachulski (CA 62337)
Eric D. Goldberg (CA 157544)
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email: ipachulski@stutman.com
          egoldberg@stutman.com

ATTORNEYS FOR THE INDEPENDENT
LENDERS TO STATIONS CASINOS, INC.

# EXHIBIT A



CONTACT:    **Thomas M. Friel, (800) 544-2411 or (702) 495-4210**
**Executive Vice President, Chief Accounting Officer and Treasurer**

**Lori B. Nelson, (702) 495-4248**
**Director of Corporate Communications**

### Station Casinos Files Joint Plan of Reorganization

### Fertittas to be Largest Shareholder of Newly-Formed $1.8 Billion Entity

### Station Casinos Expected to Emerge from Bankruptcy by Year End

LAS VEGAS — March 24, 2010 — Station Casinos, Inc. (the "Company") and its subsidiaries that are debtors and debtors in possession (collectively, the "Debtors") in the Chapter 11 cases pending in the United States Bankruptcy Court announced that they have filed a Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code.

As part of the comprehensive plan, the mortgage lenders to FCP Propco, LLC (the "Propco Lenders"), holding debt secured by Red Rock Casino Resort Spa, Palace Station, Boulder Station, and Sunset Station (the "Propco Properties"), will become the equity owners of a newly-formed company and will sell 46% of the equity to Frank Fertitta III and Lorenzo Fertitta, who will make a significant new investment to purchase their equity in the new company. The remaining equity will be owned primarily by the Propco Lenders and Colony Capital, who will also be making a new investment in the company. Fertitta Gaming, an entity owned by the Fertittas, will also manage the Propco Properties under a long-term management agreement.

The Joint Plan of Reorganization also calls for the Company to seek to conduct a sale process for the remaining assets of the Company under the supervision of the Bankruptcy Court.

"Reaching a deal on the Propco Properties marks a significant step toward the restructuring of Station Casinos," said Frank Fertitta III, Chairman of the Board and Chief Executive Officer of Station Casinos. "I'm committed to the successful reorganization of the Company that my family founded," Fertitta said.

The Company said that it anticipates that the plan will be confirmed by the Bankruptcy Court later this summer and, subject to regulatory approvals, for the Debtors to emerge from bankruptcy before the end of the year.

Lazard is acting as exclusive financial advisor to the Debtors in connection with the reorganization and Milbank, Tweed, Hadley & McCloy LLP serves as lead counsel to the Debtors.

The plan and the disclosure statement have not yet been approved by the Bankruptcy Court and are subject to further negotiations with stakeholders. As a result, the plan and the disclosure statement may be materially modified before approval. In addition to customary Chapter 11 proceedings, the completion of the transaction is subject to Hart-Scott-Rodino and other antitrust reviews and customary closing conditions.

This press release is not intended to be, and should not in any way be construed as, a solicitation of votes on the Company's reorganization plan which was filed with the U.S. Bankruptcy Court. The plan was filed together with a proposed disclosure statement which should not be relied on for any purpose until a determination by the U.S. Bankruptcy Court is made that the proposed disclosure statement contains adequate information, as required by the U.S. Bankruptcy Code. Following Bankruptcy Court approval of the disclosure statement and related voting solicitation procedures, the Company will solicit acceptances of the plan and seek its confirmation by the Bankruptcy Court. There can be no assurance that such plan acceptances or confirmation will be obtained.

Company Information and Forward Looking Statements

Station Casinos, Inc. is the leading provider of gaming and entertainment to the residents of Las Vegas, Nevada. The Company's properties are regional entertainment destinations and include various amenities, including numerous restaurants, entertainment venues, movie theaters, bowling and convention/banquet space, as well as traditional casino gaming offerings such as video poker, slot machines, table games, bingo and race and sports wagering. The Company owns and operates Red Rock Casino Resort Spa, Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Santa Fe Station Hotel & Casino, Wildfire Rancho and Wild Wild West Gambling Hall & Hotel in Las Vegas, Nevada, Texas Station Gambling Hall & Hotel and Fiesta Rancho Casino Hotel in North Las Vegas, Nevada, and Sunset Station Hotel & Casino, Fiesta Henderson Casino Hotel, Wildfire Boulder, Gold Rush Casino and Lake Mead Casino in Henderson, Nevada. Station also owns a 50% interest in Green Valley Ranch Station Casino, Aliante Station Casino and Hotel, Barley's Casino & Brewing Company, The Greens and Wildfire Lanes in Henderson, Nevada and a 6.7% interest in the joint venture that owns the Palms Casino Resort in Las Vegas, Nevada. In addition, the Company manages Thunder Valley Casino near Sacramento, California on behalf of the United Auburn Indian Community.

This press release contains certain forward-looking statements with respect to the Company and its subsidiaries, which involve risks and uncertainties that cannot be predicted or quantified, and consequently, actual results may differ materially from those expressed or implied herein.  Such risks and uncertainties include, but are not limited to, failure to obtain necessary bankruptcy court or gaming authority approvals, failure to obtain or loss of continued support of a plan by the Company's stakeholders, delays in the confirmation or effective date of a plan due to factors beyond the Company's control, failure to consummate a restructuring plan, failure to execute a restructuring plan, competition and other economic factors; and other risks described in the filings of the Company with the Securities and Exchange Commission, including, but not limited to, the Company's Annual Report on Form 10-K, as amended, for the year ended December 31, 2008.  All forward-looking statements are based on the Company's current expectations and projections about future events.  All forward-looking statements speak only as of the date hereof and the Company undertakes no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

# EXHIBIT B



**ORDERED in the Southern District of Florida on October 14, 2009.**

A. Jay Cristol, Judge
United States Bankruptcy Court

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]                       Case No. 09-21481-BKC-AJC

            Debtors.                            (Jointly Administered)
_____/

### ORDER APPOINTING EXAMINER TO EXAMINE,
### NEGOTIATE AND SUPERVISE § 363 SALE OF ASSETS

Based upon the order entered *sua sponte* by this Court on October 2, 2009,

requiring parties to show cause why an examiner should not be appointed to examine,

negotiate and supervise a § 363 sale of assets (the "Assets") by the Debtors, and having

considered the arguments raised by parties in interest, including the Term Lenders whose

---

[1] The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings, LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822]. The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida 33180.

1

position this Court has afforded substantial weight (including their express willingness to allow the use of their cash collateral to pay the Examiner's fees and costs, and the costs of Examiner's professionals), this Court finds and concludes that appointment of an Examiner to expedite the sale process and avoid any conflict or appearance of conflict of interest, is in the best interests of the estate and its creditors. Counsel for the Debtors-in-Possession and counsel for the Term Lenders each submitted proposed orders, and the Court considered same, together with the comments submitted by other interested parties, including certain statutory lien holders and Bank of America NA. This order was drafted by the Court after consideration of all of the foregoing submissions.

Accordingly, pursuant to 11 U.S.C. § 1104(c), this Court orders the United States Trustee to appoint a Chapter 11 Examiner. The Court directs the Examiner not to "reinvent the wheel." In addition to the duties specified in 11 U.S.C. § 1106(b), the Examiner's powers, duties and functions shall also consist of the following:

1. The Examiner shall supervise the negotiation of any sale or contract for a "stalking horse" bid and the sale of the Assets, including without limitation, the formulation and implementation of any sale procedures that are approved by order of this Court (the "Sale Procedures"). With respect to the sale process, the Debtors-in-Possession and their professionals, including attorneys, shall report to the Examiner and shall assist the Examiner in the performance of his or her functions. Clearly, counsel for the Debtors-in-Possession may have a conflict of interest if trying to represent the Debtors-in-Possession and the Examiner; therefore, it will probably be necessary for the Examiner to engage independent counsel.

2. The Examiner shall supervise the "Data Room" which, according to the Debtors, has already been created and contains materials to be made available to potential bidders as may be provided in the Sale Procedures. The Examiner

shall confirm that the Data Room includes, without limitation, any and all documents, materials and information provided by the Debtors to Penn Gaming or to any other bidder, and shall supplement the Data Room with such other available materials as the Examiner shall deem advisable. For avoidance of doubt, nothing in this paragraph shall limit the Debtors' access to the Data Room to the extent such access is deemed necessary by the Debtors to operate the business, preserve the Assets, and otherwise perform their functions in these bankruptcy cases.

3. The Examiner shall be responsible for negotiating the terms of any agreements with potential purchasers of the Assets, including any "stalking horse bidder." The Examiner shall have unrestricted access to participate in any negotiations conducted on behalf of the estate with potential purchasers of the Assets. No agreements between the Debtors-in-Possession and a prospective "stalking horse" bidder or buyer shall become final without the approval of the Examiner or without the Court overruling the Examiner's objection, after notice and hearing. In negotiating the terms of any agreement, the Examiner shall consult with the Debtors and representatives of a) the Lenders to the Debtors under that certain Credit Agreement, dated as of June 6, 2007, b) the Administrative Agent under that certain Credit Agreement, dated as of June 6, 2007, and its title insurers, c) the Lenders to Fontainebleau Las Vegas Retail, LLC under that certain Loan Agreement dated June 6, 2007, d) creditors asserting statutory liens against the Assets, e) the Unsecured Creditors Committee, and f) any other party in interest, as determined by the Examiner in his or her discretion.

4. The Examiner shall be given prompt and unrestricted access to all documents and information in the possession, custody or control of the Debtors relating

to the Assets and their sale. In addition, the Examiner shall be given unrestricted access to all professionals and personnel of the Debtors (including any professionals and personnel employed by other entities but paid by the Debtors). Such access shall include, without limitation, any communications with potential purchasers of the Assets.

5. If the Examiner determines that it is in the best interest of the estate and its creditors to make available, to parties in interest, any documents or information otherwise subject to privilege or protection, the Examiner shall be entitled, on notice to the Debtors and other parties in interest, to request such authority from this Court and, upon entry of an order granting such authority, may be entitled to make available such documents or information to parties in interest.

6. Notwithstanding anything in this Order to the contrary, the Examiner shall be bound by the terms of any agreements that have been approved by this Court, and by any orders that have been entered by this Court.

7. Within 10 days of the entry of this Order and every 10 days thereafter, the Examiner shall report to the Court (filed in writing and supplemented orally, if update is necessary, during any hearing) on the status of the sale process. The Examiner shall, at any time, have the right to request, on notice to parties in interest, any relief from the Court that he or she deems to be warranted in connection with the performance of the functions set forth herein.

8. Arguments over whether the expenses of the Examiner shall be paid from cash collateral and given priming lien status or deducted from proceeds of the sale are unimportant. The Examiner, Examiner's expenses and the expense of the Examiner's professionals shall be a first priority and either way will be superior to the disputed liens and mortgage claims on the Debtors' property.

The provisions of this Order shall be effective immediately upon entry of this Order.

# # #

<u>Copies to:</u>

Michael I. Goldberg (Bar No. 886602)
AKERMAN SENTERFITT
One Southeast Third Avenue, 25th Floor
Miami, Florida 33131-1714
Telephone: (305) 374-5600
Facsimile: (305) 374-5095

*(Attorney Goldberg shall upon receipt serve a copy of this Order upon all interested parties and file a certificate of service.)*