| Electronically Filed on April 21, 2010 |
| --- |

BRAD ERIC SCHELER (SBN BS-0397)
BONNIE STEINGART (SBN BS-8004)
**FRIED, FRANK, HARRIS,**
**SHRIVER & JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
Email: brad.eric.scheler@friedfrank.com
            bonnie.steingart@friedfrank.com
Counsel for the Official
Committee of Unsecured Creditors

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
ANNE M. LORADITCH, ESQ.
Nevada Bar No. 8164
**GREENBERG TRAURIG, LLP**
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email: axelrodb@gtlaw.com
            loraditcha@gtlaw.com
Counsel for the Official
Committee of Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Northern NV Acquisitions, LLC
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC

Chapter 11

Case Nos.  BK-N-09-52470-GWZ through
BK-N-09-52487-GWZ

Jointly Administered Under
BK-09-52477-GWZ

**OBJECTION OF THE OFFICIAL**
**COMMITTEE OF UNSECURED**
**CREDITORS TO THE DEBTORS'**
**MOTION FOR ENTRY OF ORDER**
**ESTABLISHING BIDDING**
**PROCEDURES AND DEADLINES**
**RELATING TO SALE PROCESS FOR**
**SUBSTANTIALLY ALL OF THE**
**ASSETS OF STATION CASINOS, INC.**
**AND CERTAIN "OPCO" SUBSIDIARIES**

Hearing Date:      May 4, 2010
Hearing Time:      10:00 a.m.
Place:                   300 Booth Street
                            Reno, Nevada 89509

**TO THE HONORABLE GREGG W. ZIVE AND ALL PARTIES IN INTEREST:**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 bankruptcy cases of the above-captioned debtors and debtors in possession

(collectively, the "Debtors"), hereby objects to the Debtors' Motion For Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process For Substantially All of the Assets of Station Casinos, Inc. and Certain "OpCo" Subsidiaries (the "Motion"). [Docket No. 1175].[1]  The Motion seeks Court authorization to (i) approve and establish certain bid procedures, which are attached as Exhibit A to the Motion (as amended, the "Bidding Procedures"), for the sale of a portion of assets (the "Auction Assets") owned by Station Casinos, Inc. and certain of its debtor and non-debtor direct and indirect subsidiaries (collectively "SCI") and (ii) hold an auction process (the "Auction") to sell the Auction Assets in accordance with the Bidding Procedures.

In support of the Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      It is a debtor's fundamental fiduciary duty to its estate to maximize value for the estate and its creditors.  However, the Debtors are not seeking to maximize the value of SCI's estate.  Rather than seek to authorize bidding procedures and an auction designed to garner the highest or best offer for all of the assets owned by SCI and its estate the Debtors have proposed a process that will work a forfeiture on the value of the SCI estate.  Under the Bidding Procedures and the Debtors' other plan related motions,[2] the Auction is the only opportunity provided for SCI's estate and its creditors to receive the highest or best offer as determined by the market for the Debtors' assets.  Despite what the Auction should provide, the Debtors, under the control of Frank Fertitta, Lorenzo Fertitta, and Colony Capital LLC and its affiliates ("Colony") (i.e., existing equity) have elected (i) to remove certain key assets owned and controlled by SCI (the

---

[1]      The Committee hereby reserves its right to supplement this Objection pending its review of the produced documents and the pending depositions.

[2]      The Debtors' other pending motions include the Debtors' Revised Second Amended and Restated Master Lease Compromise Agreement in Connection with the Joint Motion of SCI and PropCo for Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement [Docket No. 1215] (the "SMLC Motion"); the Debtors' Motion for Order Authorizing OpCo Debtors to Enter into Restructuring Support Agreement with OpCo Lenders [Docket No. 1219] and; the Debtors' Motion for Order Further Extending the Exclusive Period Within Which Debtors May Solicit Acceptance to Filed Joint Plan of Reorganization [Docket No. 1172] (collectively with the Motion, the "Plan Motions").

1    "Relinquished Assets") from the Auction, and (ii) to "sell" the Relinquished Assets to PropCo (as

2    defined below) through a private sale.[3]

3        2.    Instead of being publicly marketed[4] to all interested parties, including interested

4    third party bidders who would vigorously compete, SCI will be denuded of and diminished by the

5    loss of the Relinquished Assets.  Pursuant to the Filed Joint Plan,[5] FCP PropCo, LLC ("PropCo")

6    will get those Relinquished Assets and then transfer such assets to a newly formed entity, New

7    PropCo, owned and controlled by Frank J. Fertitta III and Lorenzo Fertitta (the "Fertitta

8    Brothers") and the Mortgage Lenders.[6]  The Fertitta Brothers, through their vehicle Fertitta

9    Gaming LLC ("FG"), will "purchase" 50% of the equity of New PropCo for $85.6 million.[7]

10   Based on the plan value set forth in the Filed Joint Plan, the Fertitta Brothers' purchase of New

11   PropCo equity will be made at a 15% discount compared to plan value.[8]  The Fertitta Brothers

12   also will permit Colony – another equity holder – to acquire some of the equity in New PropCo.

13   Finally, FG is tapped to be the manager of New PropCo, under a lucrative, 25-year management

14

15   [3]    See Bidding Procedures Exhibit 1, §§C(1),A(2) [Docket No. 1175] (The OpCo Group is offering for sale all
      or substantially all of the OpCo Assets *other than* assets defined in Schedule 2 of Exhibit 1 in the Bidding
16   Procedures.).

17   [4]    In the Matter of Hawwald Co., 497 F.2d 443,444 (7th Cir. 1974) (". . .[i]mplicit in the realization of the
      primary purpose is the presumption that sale by public auction, where all interested parties can be brought together
18   for open, competitive bidding, will result in the highest prices which could be obtained . . .."); In re Landscape
      Props., Inc, 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988) (stating that "[t]here is a strong policy favoring competitive
19   bidding and finality to sales in bankruptcy proceeding.") (citations omitted).

20   [5]    Debtors' proposed joint chapter 11 plan of reorganization filed on March 24, 2010 (the "Filed Joint Plan") §
      V(a)(4), [Docket No.1131].

21   [6]    The Fertitta Brothers, through FG, will own 50% of the equity, have three board seats, and nominate the two
      independent directors.  The remaining three board members will be appointed by the Mortgage Lenders.  PropCo
22   Plan Support Agreement at 37, filed as Exhibit 7.02 to Frank J. Fertitta's (Schedule 13D), Exhibit 7.02 the Plan
      Support Agreement, and Exhibit 7. 04 the Memorandum of Understanding (March 24, 2010) (collectively, the
23   "Fertitta Filings").  Attached as Exhibit A to the Declaration of Bonnie Steingart filed contemporaneously herewith.

24   [7]    See Disclosure Statement to Accompany Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc.
      and its Affiliated Debtors (Dated March 24, 2010), pg. 2 [Docket No. 1130] ("the Mortgage Lenders have agreed to
25   sell 50% of the equity in New PropCo to an affiliate of Fertitta Gaming, LLC, a newly-formed entity owned by Frank
      Fertitta III and Lorenzo Fertitta … for $85.6 million in cash")

26   [8]    See Verified Statement of Robert Flachs in Support of Objection of Committee of Unsecured Creditors to
      the Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1),
27   365(d)(3) AND 365(d)(4)(B)(ii) And Fed. R. Bankr. P. 9019 for Entry of an Order Approving Second Amendment to
      Amended and Restated Master Lease Compromise filed contemporaneously herewith (the "Moelis SMLC
28   Statement").

contract. SCI's estate has been shut out of the process of acquiring equity in New PropCo or having the opportunity to manage the casinos to be owned by New PropCo.

3. The relief sought by the Motion is decisive of issues that will have a direct and clearly negative impact on recoveries by the creditors of SCI and the Debtors' restructuring alternatives. If the Bidding Procedures are approved by the Court:

    a. the Relinquished Assets will be removed from SCI's estate and the open market process in a manner that does not maximize their value and violates binding United States Supreme Court authority,

    b. the value of the remaining SCI assets will be reduced because of lost synergies and competitive advantage associated with the Relinquished Assets

    c. bidding by third parties will be chilled,

    d. in concert with the other Plan Motions, the Bidding Procedures effectuate a transfer of the value of the Relinquished Assets from SCI to the Fertitta Brothers,

    e. instead of providing for Court approval of the highest or best offer received, consummation of the sale of the Auction Assets and the deposit of the value received through such sale into the estate, the Bidding Procedures make consummation of the sale dependent on confirmation of the Filed Joint Plan and other hurdles, and

    f. the "decider" of the highest or best offer will not be an independent financially sophisticated person and instead will be an insider with a vested interest in the success of the Fertitta Brothers and the Filed Joint Plan with its third party releases.

4. The forfeiture of SCI value, as evidenced by the Motion, the Filed Joint Plan[9], the Second Master Lease Compromise Agreement and other publicly filed documents[10], is an intentional transfer of value for the benefit of insiders. These series of transactions are structured, using New PropCo and FG, to camouflage the conflicts of interest and self dealing that are at the heart of the Filed Joint Plan and the Plan Motions. However, despite such efforts, the issues that the Court should consider when evaluating this Motion and the other Plan Motions are simple-- the impact of the proposed relief on each estate — exclusive of the interests of other estates or

---

[9]    Given the April 21, 2010 objection deadline and the Debtors' filing of the OpCo Plan Support Agreement on April 19, 2010, [Docket # 1219], the Committee has not had sufficient time to analyze the terms and conditions that may dictate additional or different treatment that may be proposed in a subsequent version of the plan of reorganization.

[10]    Fertitta Filings, at Exhibit 7.02 the Plan Support Agreement, and Exhibit 7. 04 the Memorandum of Understanding. Attached as Exhibit A to the Steingart Declaration.

interest holders.  Once that is done it is clear that the Motion, the Second Master Lease Compromise Agreement and the Debtors' Exclusivity Motion must be denied.

5.      In addition to the direct transfer of the valuable Relinquished Assets from SCI to PropCo in a manner that precludes the SCI estate from receiving the highest or best offer for such assets, the Bidding Procedures go further to chill bidding and create an unfair and biased process to ensure that the Fertitta Brothers and Colony will be able to acquire the surviving Auction Assets at bargain basement prices.  Reconstituting SCI through the two transactions – (i) the transfer of the Relinquished Assets and (ii) the Auction for just the stripped down Auction Assets rather than a single sale, allows the Fertitta Brothers (along with Colony) to ensure that they will acquire the surviving Auction Assets at their dictated price contained in their "stalking horse" bid. Any other bidder would have to discount their bids to address the fact that existing equity had orchestrated a scheme to transfer to a direct competitor (i.e. PropCo) SCI's valuable assets affecting its entire enterprise (through the transfer dictated in the Master Lease Compromise Agreement), leaving the remaining assets to be sold with the Fertitta Brothers getting a leg up as the "stalking horse" bidder.

6.      Having set up a process by which (i) the Fertitta Brothers own 50% of New PropCo on favorable terms, (ii) have a lucrative management contract, (iii) get to strip away valuable assets from SCI's estate, and (iv) then get to be the stalking horse bidder for SCI's remaining assets – their endgame will result in the Filed Joint Plan, which provides for blanket estate claim releases and (patently illegal) third party claim releases relating to the 2007 LBO transaction being released.  The proposed restructuring is simply a deliberate campaign by those controlling SCI to benefit themselves, its equity owners, at the expense of SCI's creditor constituents. As steward of an insolvent bankrupt estate SCI has fiduciary duties to its creditors rather than to equity holders.  Any purported arm's length negotiations between (i) SCI and the Fertitta Brothers and other existing equity, and (ii) SCI and PropCo are a charade.  The process proposed by the Debtors and the resulting windfall to be provided to the Fertitta Brothers through FG are inappropriate and should not be sanctioned by this Court.

## BACKGROUND

7.      From the inception of these chapter 11 cases the terms "OpCo" and "PropCo" have become case specific terms of art to refer to two distinct legal entities and their related assets and interests.  "OpCo" has been understood to include SCI, and its directly and indirectly owned assets and subsidiaries, other than PropCo and the FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC (the "Mezz Entities").  "OpCo" has referred to the casinos' operating assets associated with the Debtors which are all owned and developed or leased by SCI or a direct or indirect subsidiary of SCI that is not PropCo or a Mezz Entity.[11]  OpCo generates income from SCI's direct and indirect subsidiaries that operate casinos or manage or develop joint ventures with other business entities or Native American tribes.  For illustrative purposes and without limitation, OpCo assets include, among others, (i) the information technology for all of the operating casinos including the SCI casinos that operate on the land allegedly owned by PropCo (the "SCI Operating Subsidiaries"), (ii) the business information for all of the operating casinos including the SCI Operating Subsidiaries, (iii) the customer lists for all of the operating casinos including the SCI Operating Subsidiaries, (iv) the working capital at the operating casinos including the SCI Operating Subsidiaries, (v) the trademarks used by the operating casinos including the SCI Operating Subsidiaries, (vi) the patents of the operating casinos including the SCI Operating Subsidiaries, and (vii) the source code for the operations software used in all SCI casinos.  These assets have never belonged to PropCo and do not belong to PropCo now.[12]

---

[11]     Hr'g Tr. 140:11-15 (Dec. 11, 2009) (Eric Goldberg, counsel to the independent lenders, stating "OpCo has licensing. PropCo does not. OpCo has management. PropCo does not. OpCo has employees, OpCo has intellectual property rights, OpCo has customer lists. These are all things that OpCo has that PropCo and the CMBS structure, by design, does not."); Attached as Exhibit B to the Steingart Declaration.

[12]     To the extent that PropCo has an interest as a licensee in patents and other intellectual property owned by SCI, such licenses are not assumable by PropCo without OpCo's consent, which consent must be withheld unless appropriate value is given to OpCo. Therefore, PropCo's right to use such property must be terminated. See § 365(c)(1) (prohibiting the assumption of an executory contract if applicable law precludes assignment to a hypothetical third party and the non-debtor party does not consent to assignment); In re N.C.P. Marketing Group,

8.      PropCo has always been understood to reference FCP PropCo LLC, the special purpose vehicle created through the November 2007 leveraged buyout transaction (the "LBO Transaction") to purportedly own or lease certain real property which was then leased pursuant to the Master Lease to SCI entities which operate casinos on those properties.[13]  PropCo's sources of income are the real estate and concomitant rental income under the Master Lease.   As the Debtors explained early on in these cases, PropCo is "[j]ust PropCo."[14]

9.      PropCo, as alleged owner of the buildings and land, and SCI, as tenant, entered into the Master Lease pursuant to which SCI leases the real property and improvements occupied by Boulder Station, Inc., Charleston Station, LLC, Palace Station Hotel & Casinos, Inc. and Sunset Station, Inc. (collectively, the "Leased Hotels").  The Leased Hotels are operated by the SCI Operating Subsidiaries that own all of the operational assets and gaming licenses associated with such operations.  SCI owns the intellectual property associated with the Leased Hotels (along with virtually all other intellectual property of the business enterprise).  Although security interests in several assets were granted by SCI and SCI Operating Subsidiaries, to date no foreclosure proceeding has been initiated and no relief from the automatic stay has been granted, and the assets remain the legal property of SCI.

10.     As with the nature and complexity of their operations and assets, OpCo and PropCo also have different capital structures and creditor constituencies.  SCI, as borrower under that certain credit agreement dated November 7, 2007, by and among Deutsche Bank Trust

---

(Continued...)

Inc., 337 B.R. 230, 237 (D. Nev. 2005) (finding that federal trademark licenses are unassumable without the consent of the licensor pursuant to section 365(c)(1) of the Bankruptcy Code); In re Catapult Entertainment, Inc., 165 F.3d 747 (9th Cir. 1999) (holding that where applicable nonbankruptcy law excuses a party from accepting performance under a contract from, or rendering performance to, a party other than the debtor, the debtor may not assume the contract without the nondebtor party's consent whether or not the debtor intends to assign the contract to a third party.).

[13]      As this Court is well aware, the Committee has filed a motion seeking standing to other things, obtain a declaration that the Master Lease is a disguised loan.  This Court held a hearing on the Committee's standing motion on January 25, 2010, and deferred ruling on the motion.

[14]      Hr'g Tr. 71:13-14 (July 30, 2009).  Attached as Exhibit C to the Steingart Declaration.

Company Americas ("DBTCA"), as administrative agent and a lender and the other lenders from time to time party thereto (together with DBTCA, the "OpCo Lenders"). SCI is also the issuer of certain Senior and Subordinated Notes that, in total, exceed $2.3 billion in principal. SCI incurs all of the enterprise's corporate level expenses and is the employer of all corporate employees.[15] PropCo is the borrower under that certain mortgage agreement as amended dated March 19, 2008 by and among German American Capital Corporation and JPMorgan Chase Bank, N.A., (collectively, the "Mortgage Lenders"). PropCo also has intercompany debt related to expenses and operating costs paid for on its behalf by SCI.

11.      The PropCo and SCI estates are not substantively consolidated. Instead, they have continued as stand-alone entities each with a fiduciary duty to maximize its value for the benefit of its creditor constituency and therefore at times have been adversarial to each other.[16] This fundamental understanding of the legal and the financial rights and obligations between the Debtors has been a given since the beginning of these chapter 11 cases. However, through repetition and rhetoric, the Debtors are seeking to distort the basic understanding of these chapter 11 cases by blurring the lines between OpCo and PropCo to allow assets that are legally owned by SCI to be conveyed to PropCo at prices that are not market tested.

12.      Even though on January 25, 2010 this Court indicated that the Committee should have a seat at the negotiating table, the Debtors did not share with the Committee the terms or the

---

[15]      Hr'g Tr. 59:5-9 (July 30, 2009) (the Court stating that "Station Casinos, Inc. is our main operating holding company. And I say operating because, as you noted a few minutes ago, it has six hundred and sixty some-odd employees and it performs a variety of functions for the business."). Attached as Exhibit C to the Steingart Declaration.

[16]      See Conditional Objection of the PropCo and Mezzanine 1 Lenders to the Debtors' Motion to Extend Exclusivity, pg. 4 [Docket No. 544] ("But from a legal perspective, it must be emphasized that this is not a single debtor entity, but a combination of separate debtors with different interests . . . The board and management of each individual debtor have a fiduciary duty to act for the benefit of that particular estate."); Declaration of Richard J. Haskins in Support of Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC for Entry of an Order Approving Master Lease Compromise Agreement, ¶15 [Docket No. 598] (explaining the need for independent members on the board of directors because of the nature of "the competing interests of the SCI and PropCo estates");Haskins Dep. 29:13-30:10; 70:1-8 (Dec. 3, 2009) (explaining that PropCo and OpCo negotiated diametrically opposing terms - PropCo negotiated a lengthy transition period without paying a management fee whereas OpCo preferred a short transition period and a definitive management fee). Attached as Exhibits D, E and F, respectively, to the Steingart Declaration.

1  fact of the existence of the Motion or the other Plan Motions.  Moreover, the Committee has only

2  been provided significantly redacted versions of the Fertitta Filings.  The Committee had no

3  knowledge of the Plan Motions before they were filed with the Court on April 7, 2010.

4  I.    **THE RELINQUISHED ASSETS TRANSFER FOR THE BENEFIT OF INSIDERS IS VIOLATIVE OF 203 NORTH LASALLE**

6        13.    The Filed Joint Plan and Plan Motions provide that the Relinquished Assets are to

7  be conveyed from SCI's estate to the Fertitta Brothers' latest venture, New PropCo, at prices to

8  be determined among self-interested insiders – the SCI board, which is comprised of Frank J.

9  Fertitta, Tom Friel, Richard Haskins and Dr. James Nave, and the PropCo board, which is

10  comprised of Richard Haskins, Robert White and Robert Kors — in a process insulated from free

11  market competition.[17]  This contemplated conveyance of the Relinquished Assets to New PropCo

12  is clearly violative of the "absolute priority rule" of the Bankruptcy Code as elaborated by the

13  United States Supreme Court in Bank of America Nat. Trust and Sav. Assn. v. 203 North Lasalle

14  St. P'ship, 526 U.S. 434 (1999).[18]  In that case, the Supreme Court held that the absolute priority

15  rule "doom[s]" any plan pursuant to which old equity "enjoy an exclusive option…to buy the

16  equity in the reorganized entity."  Id. at 454.  Here, the Fertitta Brothers, through FG, have the

17  exclusive right to purchase not just the equity in New PropCo, as mandated by the Plan Support

18  Agreement but they also have the exclusive right to purchase the Relinquished Assets, the lawful

19  property of SCI, at prices that will not be determined in accordance with 203 North Lasalle.  Id. at

20  458.  It appears that the Debtors' professionals, the Fertitta Brothers and the Mortgage Lenders

21  fully understand this 203 North Lasalle issue, as evidenced by the structuring detailed in the Filed

22  Joint Plan and the Plan Support Agreement and its accompanying term-sheet that reflect the

23  clever use of different entities and staged transfers.  Such an evasion of 203 North Lasalle cannot

24  be countenanced and this Court must assess the opportunities afforded FG as if it were a direct

---

[17]    See Filed Joint Plan at 55.

[18]    Given how the Bidding Procedures are intertwined with the Filed Joint Plan, the Committee submits that both the Filed Joint Plan and the Bidding Procedures must be scrutinized under section 1129 of the Bankruptcy Code.

equity owner of SCI.[19]  Before the Fertitta Brothers can be permitted to have an equity interest in the Relinquished Assets, the Relinquished Assets must be subject to a competitive test of the marketplace.  See In re Dwellco I Ltd. P'ship, 219 B.R. 5 (Bankr. D. Conn. 1998) (with respect to a plan that proposed to give equity interest in the reorganized debtor to old equity, the court declined to approve an auction with notice to a limited audience); In re Bjolmes Realty Trust, 134 B.R. 1000 (Bankr. D. Mass. 1991) (requiring the holding of an auction open to all interested parties before old equities could acquire ownership interests in the reorganized debtor).

14.    Armed with SCI's Relinquished Assets, New PropCo will no doubt be a more viable business enterprise.[20]  Yet the flip side of the coin is also true.  Without the Relinquished Assets, SCI will be a less viable and less valuable business enterprise.  To the extent that prospective buyers are not chilled from participating in the Auction in its entirety, the unavailability of the Relinquished Assets represents a significant loss of synergies and will prompt such bidders to offer lower prices for the Auction Assets.

15.    The conveyance of such benefits at reduced prices exclusively for the benefit of insiders of an otherwise insolvent estate is a recovery that should first be offered to creditors under the clear letter of the law and as such should first be offered in a manner designed to receive the highest or best offer with proceeds of such disposition being applied to recoveries of creditors.[21]  The Committee finds it troubling that there is no indication that the Debtors have even considered the loss of value to SCI that flows from binding SCI, through the Motion, to give the Relinquished Assets to New PropCo.  Although the Motion often references the fact that PropCo has liens[22] on certain of the Relinquished Assets, this is a red herring.  Material

---

[19]    In re Global Ocean Carriers, Ltd., 251 B.R. 31, 48 (Bankr. D. Del. 2000) (rejecting a scheme to give equity interests in the reorganized debtor to the daughter of an old equity owner as a "fundamentally flawed" method to circumvent 203 North Lasalle).

[20]    See, Moelis SMLC Statement.

[21]    For avoidance of doubt, the Committee reserves the right to seek to assert any and all claims of SCI's estate relating to the transactions between Fertittas, Fertittas Gaming, the PropCo lenders, including any claim SCI's estate may have to be the beneficiary of the transactions that the Fertittas have entered into for their own benefit.

[22]    Several material components of the Relinquished Assets, including certain intellectual property that SCI will hand over to New PropCo, are subject to the asserted liens of the OpCo Lenders.

components of Relinquished Assets are NOT subject to any liens in favor of PropCo, even assuming that such liens are valid, enforceable, and not avoidable. To the extent any of the Relinquished Assets are subject to the liens, such assets are protected by the Bankruptcy Code's automatic stay and remain available for sale under section 363 of the Bankruptcy Code. The Bankruptcy Code is designed to provide SCI an opportunity to maximize the value of its assets and the synergies between them, even though such assets may be encumbered by different parties.[23]

II.    **THE PROPOSED BIDDING PROCEDURES WILL IMPEDE AN ACTIVE SALE PROCESS AND REDUCE THE VALUE OF THE AUCTION ASSETS TO ANYONE BUT INSIDERS**

16.    Aside from the wholly inappropriate direct transfer of SCI assets to New PropCo discussed above, the proposed Bidding Procedures go further to frustrate and chill competitive third party bidding and impair the value of the Auction Assets being sold to third parties in comparison to the value of Auction Assets to insiders who own the Relinquished Assets as to make it economically irrational for third parties to submit bids at the same level as the insiders' bid.

Among other things, the Bidding Procedures provide:

•    an impossible timeframe for bidders other than the Fertitta Brothers to conduct the necessary due diligence and acquire the necessary gaming regulators approvals has been made even more impossible by recent amendments to the Bidding Procedures further shortening the time third parties have to participate in the sales process; and

•    Dr. Nave and the Debtors with full discretion in running the sales process despite the Dr. Nave's apparent lack of independence rather than appointing an impartial third party to run the Auction with the advice and input of the Committee, the OpCo Steering Committee, and the Administrative Agent for the OpCo bank debt.

17.    The Debtors have repeatedly stated that all of the Debtors' assets are worth more on a consolidated basis then split apart.[24] However, even with this recognition by both OpCo and

---

[23]    See e.g., 11 U.S.C. § 361 (giving creditors the right to adequate protection); 11 U.S.C. § 362(d)(providing for relief from the automatic stay); and 11 U.S.C. § 1111(b) (giving an under-secured creditor the right to the treat its entire claim as secured for certain purposes).

[24]    Hr'g Tr. 119:23-120 (Dec. 11, 2009) (Thomas Kreller, counsel to the Debtors, stating that "[t]he debtors continue to believe that the best way at this point in time to maximize value for all of the creditors of all of the estates is to keep these properties together"); Hr'g Tr. 126:8-10 (Dec. 11, 2009) (Oscar Garza, counsel to PropCo, stating

PropCo, instead of submitting a plan or a course of action that puts both OpCo and PropCo up for public auction to maximize on the existing synergies and seek the highest available price from third parties, the Debtors opt for the lesser value option – splitting OpCo and PropCo before submitting them to third party bids.  Even in the face of expressions of interest from third parties such as Boyd Gaming Corporation[25] to purchase OpCo and PropCo, the Debtors instead propose to divide the assets into three categories.  This strategy is, of course, unreasonable and contradicts the Debtors' previous characterizations of the acknowledged synergies and co-dependence between the assets.[26]  However, when the ultimate goal of the Debtors' insiders — to only keep the assets together if they are owned and controlled by the Fertitta Brothers — is acknowledged and taken into account, the strategy makes perfect sense.

18.    In order to ensure that the sale of the Debtors' assets is conducted through a fair process that encourages competitive bidding, the Court should deny the request for approval of the proposed Bidding Procedures and approve fair bidding procedures such as those set forth in the column labeled "The Committee's Proposed Change" in Exhibit A, incorporated in its entirety herein by this reference.

---

(Continued…)

that "[w]e all want this to work. We all want the Station's franchise, the Station's enterprise to stay together. We think this is in the best interests of all"); Hr'g Tr. 160:8-9 (Dec. 11, 2009) (Shalom Kohn, counsel to Deutsche Bank, stating that "[e]verybody agrees that this is a case where it would be better if things stay together."); Haskins Dep. 52: 4-7 (Dec. 3, 2009) ("The PropCo directors made it clear that they thought it was in the best interest of the PropCo estate to keep the two companies together."). Attached as Exhibits B and G, respectively, to the Steingart Declaration.

[25]    *See* Boyd Gaming Corporation, Current Report (Form 8-K), at Exhibit 99.1 (Dec. 16, 2009) ("On behalf of the Board of Directors of Boyd Gaming Corporation … we are writing to reaffirm our interest in acquiring, when permitted, the assets of Station Casinos, Inc … and to submit this Proposal, as defined below, for the consideration of Station's Board of Directors. This Proposal is consistent with out previously stated interest in Station and is being submitted pursuant to the recent agreement between Station and certain of its creditors for the benefit of Boyd gaming."). Attached as Exhibit H to the Steingart Declaration.

[26]    *See* Bidding Procedures, § D(3) ("The Debtors do not intend, and shall not be required to undertake any obligation, to resolve any [interdependencies among the various OpCo Asset] among the various OpCo Assets.")

**THE BIDDING PROCEDURES PROPOSE AN IMPOSSIBLE TIMELINE FOR NON-INSIDERS**

19.    Upon information and belief, to date, no offering or marketing materials have been prepared or circulated to attract the attention of prospective buyers of the Auction Assets. Despite this fact, the Bidding Procedures contemplate a truncated sale process.  The Motion states that the Debtors would, upon approval of the Motion, (i) contact certain parties who had approached the Debtors over the course of the past 15 months to inquire about a possible purchase and (ii) publish the Bidding Procedures in certain newspapers.  While these steps are fairly customary as part of an auction process, they are insufficient in and of themselves for the Debtors and their financial advisors to say they have met their fiduciary obligations to find the highest or best offer available.[27]  The Debtors do not propose reaching out to other potential strategic bidders who may not have previously expressed interest.  Pursuant to the revised Bidding Procedures, the Consultation Parties are even prohibited from reaching out to other potential bidders.  Further, given the short amount of time between when the Bidding Procedures will be approved and when the letter of intent are due, a mere thirty (30) days from a Court order approving the Bidding Procedures, the proposed newspaper publication of the Bidding Procedures is by itself of minimum value.

20.    The Auction Assets are substantial, diverse and complex in both value and size. Even for those parties who have already disclosed their interest in purchasing the assets, the

---

[27]    *See e.g.*, Motion to Approve Bidding Procedures with Stalking Horse Protections, Approving Form and Manner, and Authorizing Sale Free and Clear of Liens at ¶¶10-12, In re The Readers' Digest Association, Inc., No. 09-23529 (Bankr. S.D.N.Y. December 4, 2009) [Docket No. 331] (describing a marketing process in which the debtors' financial advisor contacted over 100 potential buyers and permitting certain potential buyers to conduct due diligence before a stalking horse was selected); Motion to Approve Bidding Procedures in Connection with the Sale, Approve the Form and Manner of Notice, Scheduling an Auction and Sale Hearing at ¶¶ 9-10, In re Tropicana Entertainment, LLC, No. 08-10856 (Bankr. D. Del. August 22, 2008) [Docket No. 809] (stating that before a stalking horse was selected the Debtors' financial advisors contacted over 70 potential buyers, provided confidential information to 30 of them and negotiated draft purchase agreements with two of them); Motion to Conduct Auction for Sale of Substantially All Assets at Auction, Establish Bid Procedures, Schedule Bidding Deadline, Approve Form & Manner, Authorize Debtors to Perform at ¶ 4, In re U.S. Aggregates, Inc., No. 02-50656 (Bankr. D. Nev. March 15, 2002) (describing the retention by the debtors of a financial advisor which approached before the selection of stalking horse bidder potential buyers to solicit offers and to provide them with updated financial information and opportunities to conduct due diligence). Attached as Exhibits I, J, and K to the Steingart Declaration.

timeline to finalize the due diligence necessary to submit to a binding offer with no due diligence

out can be fairly lengthy. Therefore, the proposed timelines in the Bidding Procedures, thirty

days for letters of intent and sixty days for binding irrevocable offers — will only discourage

many potential bidders that (i) do not have a significant history with the Debtors or (ii) have not

been working on a purchase for a significant amount of time, which would comprise the majority

of possible strategic bidders. FG, on the other hand, faces no such time constraints as the Fertitta

Brothers are intimately familiar with and have unlimited access to information related to the

Auction Assets. While such an abbreviated sale process almost certainly will diminish the value

of the Auction Assets, the Debtors have offered no justification for the timeline they demand

other than that the conclusory statement that the sale process needs to be run concurrently with

the solicitation of votes for the Filed Joint Plan.[28] The Filed Joint Plan's timeline that the Debtors

rely on, however, is arbitrary and could easily be extended for a reasonable period to maximize

the value of the assets to the estate since the goal of whatever plan of reorganization is proposed

should be congruous to such value maximization. The approach and Bidding Procedures

suggested in the Motion are akin to a fire-sale to ensure that the Fertitta Brothers' stalking horse

bid will be the winning bid.

### DR. NAVE IS NOT INDEPENDENT

21.    The Fertitta Brothers wear multiple and hopelessly conflicting hats in these chapter

11 cases. Accordingly, the Motion contemplates that the Auction and Bidding Procedures would

be overseen by an alleged independent director of SCI, Dr. James Nave. However, Dr. Nave is

not a truly independent director of SCI.

22.    First, upon information and belief, Dr. Nave has had a long-standing professional

and personal relationship with the Fertitta Brothers. Given the expressed interest of the Fertitta

Brothers in acquiring most, if not all, of SCI via FG, the impartiality of Dr. Nave is at best

---

[28]    See Motion, ¶13 ("The Filed Joint Plan further contemplates that the sale process will run roughly contemporaneously with the solicitation of votes on the Filed Joint Plan and that the auction will occur shortly before the confirmation hearing on the Filed Joint Plan, but sufficiently in advance of the confirmation hearing so that the terms of the proposed sale to the highest bidder will be known and available for the Court's consideration and approval at the time of the confirmation hearing.").

debatable as based on their long standing relationship Dr. Nave may prove an advocate for their interest rather than an impartial director overseeing the Bidding Procedures. Second, Dr. Nave received over $3 million in cash from the LBO Transaction. Currently pending before this Court is a motion by the Committee to seek standing to pursue on behalf of the Debtors' estates certain claims and causes of action against Dr. Nave and other parties in connection with the LBO Transaction. All such claims and causes of action will be released if the Filed Joint Plan is confirmed. However, if a plan proposed by third parties is confirmed, such releases almost assuredly will not be necessary to obtain confirmation, and, in any event, they provide no benefit to SCI's estate.

23.    Given his personal financial stakes and potential exposure to liability in these chapter 11 cases, Dr. Nave cannot be impartial in implementing the Bidding Procedures. Third, Dr. Nave has served on the board of SCI prior to the LBO Transaction and he has continued in that role after the consummation of the LBO. To the extent that Dr. Nave desires to serve on the board of SCI, or have other continuing involvement with the Fertitta Brothers after the conclusion of the sales contemplated by the Bidding Procedures, he will naturally be biased in favor of the Fertitta Brothers and FG.

24.    Further, Boyd, a creditor of SCI and potential bidder, earlier accused the Debtors of "focus[ing] on their insider-equity plan" to the exclusion of more viable alternatives. Even if the Committee's assessments are unfairly skeptical of Dr. Nave's ability to rise above such influences, the perception in the market is that the Fertitta Brothers control the Debtors. Bidders other than FG believe that they will not be treated fairly by Dr. Nave as demonstrated by Boyd's pleading. Such a perception in the market place, even if inaccurate, would chill interest in bidding.

25.    Auctions under the auspices of the Bankruptcy Code must be run without the perception of bias and they must not be tilted in favor of an insider. In re John Joseph Edwards, 228 B.R. 552, 560 (Bankr. E. D. Pa. 1998) (the purpose of bidding procedures under section 363

of the Bankruptcy Code is to "facilitate an open and fair public sale designed to maximize value for the estate."). Further, a proposed sale to an insider is subject to heightened scrutiny by the court. The multiple roles played by the Fertitta Brothers and the entities they control in these chapter 11 cases render it impossible for the Debtors or anyone currently associated with them to meet the heightened standard necessary for approval of these transactions. For this reason, the Bidding Procedures must not be approved.

### BLATANT CONFLICTS OF INTEREST REQUIRE THE APPOINTMENT OF A THIRD PARTY TO OVERSEE THE SALE PROCESS

26.     Alternatively, the Court may remedy the conflicts of interest embedded in the Bidding Procedures by (i) appointing an outside examiner to manage the Bidding Procedures ("Sale Examiner") and (ii) requiring the Sale Examiner to meaningfully consult with the Committee during the Auction.[29] In re Fountainbleau Las Vegas, Holdings, LLC. when presented with an analogous circumstance of how best to market the debtor's assets, the court *sua sponte* appointed an examiner under section 1104 of the Bankruptcy Code to supervise a potential sale of the assets of the debtors because of, among other things, possible conflicts of interest that precluded a fair sale process under the auspices of the debtors.[30] In this case, there is no impartial person on the board of SCI who can conduct the Auction with the requisite degree of impartiality and independence. Accordingly, the Committee submits that the appointment of an examiner to supervise the Bidding Procedures is warranted.

27.     Moreover, because the current Bidding Procedures bestow excessive discretion with the party overseeing the Auction and marginalize without justification the role of the Committee in the sale process, the appointment of the Sale Examiner should include the removal of the restrictions currently contemplated in the Bidding Procedures such as the limitation on communications between bidders and the Committee. Motion, at § E. The restriction makes no sense. If there are synergies to be found through potential bidders collaborating with the

---

[29]     In re Fountainbleau Las Vegas, Holdings, LLC., No. 09-21481 (Bankr. S.D. FL. October 1, 2010 and October 14, 2010) [Docket Nos. 661 and 770], attached to the Steingart Declaration as Exhibits L and M.

[30]     Id.

Committee, the Debtors should not be permitted to impose or impede such collaboration when the Debtors, their professionals, and the Committee have fiduciary obligations to do the opposite and maximize the opportunities for such synergies.  Giving the Debtors the opportunity to impede the Committee's communications with potential bidders undermines the Committee's fiduciary obligations.

28.    The Motion cites to six unpublished cases as offering bidding procedures that are purportedly "consistent with" the Bidding Procedures.[31]  The Motion fails to mention an important distinction between those cases and the case at hand — in none of those six cases was the independence of the debtors' directors a contested issue.  And further, the bidding procedures employed in those six cases did not confer upon the debtors the amount of latitude and the level of discretion the Debtors here are attempting to arrogate to themselves.  For example, no potential bidder was precluded from contacting the official committee of unsecured creditors or other creditor constituencies without the intermediation of the debtors' professionals and in one of the six cases a committee was expressly authorized to negotiate with potential bidders.[32]

29.    In light of the violations of 203 N. Lasalle in favor of the former equity holders and board members of SCI and the concomitant questions that arise about Dr. James Nave's independence and impartiality, if this Court will not deny the Motion outright, the Committee submits that the Bidding Procedures should be amended to have a Sale Examiner be appointed by the Court to manage the Bidding Procedures and the Auction in consultation with the Committee and other parties in interest and remove any limitations on the Committee's ability to interact with potential bidders.

---

[31]    See, e.g., Advanced Materials, Inc., et al., Case No. 09-16527 (TA) (Bankr. C.D. Cal. July 2, 2009); Fleetwood Enter., Inc. , Case No. 09-14254 (MJ) (Bankr. C.D. Cal. March 10, 2009); Care Level Mgmt Group, LLC, Case No. 08-12913 (MT) (Bankr. C.D. Cal. May 7, 2008); VI Acquisition Corp., Case No. 08-10623 (KG) (Bankr. D. Del. Apr. 3, 2008); Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May, 2, 2008); Global Home Products LLC., Case No. 06-10340 (KG) (Bankr. D. Del. April 10, 2006), see Motion, ¶ 29.

[32]    In re Fleetwood Enterprises, Inc., Case No. 09-14254 (MJ) (Bankr. C.D. Cal. July 15, 2009) attached to the Steingart Declaration as Exhibit N.

III.    **CONSUMMATION OF A SALE IN THE BEST INTEREST OF THE SCI ESTATE MUST NOT BE CONTINGENT ON THE CONFIRMATION OF THE FILED JOINT PLAN**

30.    The Motion contemplates that, after the Successful Bidder is selected and presented to the Court for approval, the Sale would remain contingent until confirmation of the Filed Joint Plan.[33] The Debtors offer no explanation for holding the sale of the Auction Assets hostage to the Filed Joint Plan's fate. These chapter 11 cases have been "consolidated for procedural purposes only."[34] The courts have made it clear that "[s]eparate estates will exist for each debtor unless and until the court orders substantive consolidation of the estates."[35] If a sale of the SCI's Assets is in the best interests of SCI and its creditors, then the same must be consummated regardless of the status of the Filed Joint Plan and PropCo's reorganization. To the extent the Debtors believe otherwise, a sale motion is not the proper medium pursuant to which to seek an effective substantive consolidation.

---

[33]    See Motion, ¶23 ("The approval of any sale pursuant to the Bidding Procedures will be contingent upon confirmation of the Filed Joint Plan").

[34]    Final Order Directing Joint Administration of Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Local Rule 1015(b) [Docket No. 21] at 2.

[35]    See e.g., In re Stuart, 31 B.R. 18, 19 (Bankr. D. Conn. 1983).

1

2

3        Accordingly, for the foregoing reasons, the Committee respectfully requests that the Court

4  deny the Motion or in the alternative, approve the Motion with the modifications described herein

   and in Exhibit A attached hereto.

5  DATED this 21st day of April 2010.

6                                        Respectfully submitted,
                                         **GREENBERG TRAURIG, LLP**
7

8                                        By___s/ Brett A. Axelrod_____
                                             BRETT A. AXELROD (SBN 5859)
9                                            ANNE M. LORADITCH (SBN 8164)
                                             3773 Howard Hughes Parkway
10                                           Suite 400 North
                                             Las Vegas, Nevada 89169
11                                           Telephone: (702) 792-3773

12                                               and

13                                        _s/ Bonnie Steingart_____

14
                                             BRAD ERIC SCHELER (SBN BS-0397)
15                                           BONNIE STEINGART (SBN BS-8004)
                                             **FRIED, FRANK, HARRIS, SHRIVER**
16                                           **& JACOBSON LLP**
                                             One New York Plaza
17                                           New York, New York 10004
                                             Telephone: (212) 859-8000
18
                                             Counsel for the Official Committee of
19                                           Unsecured Creditors

20
                                          _s/ Eric D. Winston_____
21
                                             SUSHEEL KIRPALANI (SBN 2673416)
22                                           ERIC D. WINSTON (SBN 202407)
                                             JEANINE M. ZALDUENDO (SBN 243374)
23                                           **QUINN EMANUEL URQUHART &**
                                             **SULLIVAN, LLP**
24                                           865 S. Figueroa Street, 10th Floor
                                             Los Angeles, California 90017
25                                           Telephone: (213) 443-3602

26

27

28

7657427

**EXHIBIT 1**

# THE COMMITTEE'S PROPOSED
# CHANGES TO THE BIDDING PROCEDURES

| Feature | SCI | The Committee's Proposed Change |
|---|---|---|
| **Excluded Assets** | Excluded Assets will not be part of the Sale (Section C, Paragraph 1) | All SCI Assets shall be offered for Sale under the Bidding Procedures. |
| **Control of the Bidding Process** | The Bidding Process will be conducted by the Opco Debtors, under the direction of SCI's independent director and in consultation with the Consultation Parties (Section B, Paragraph 3) | The Bidding Process will be conducted by the by a third party neutral sales examiner (the "Sales Examiner"), in consultation with the Consultation Parties. |
| **Reimbursement of Expenses** | The Stalking Horse Bidder may be entitled to reimbursement of its reasonable and reasonably documented out-of-pocket expenses incurred since January 1, 2010 in connection with proposing and pursuing the Stalking Horse Bid, which such claim shall be an allowed administrative claim against SCI | Because the Stalking Horse Bidder is an insider, the Stalking Horse Bidder should only receive an administrative expense claim for reimbursement of its expenses if allowed by the Court after notice and hearing. |
| **Disqualification of bidders for unauthorized contact with each other** | The OpCo Debtors may exclude a Potential Bidder for unauthorized contact with another Potential Bidder or another Qualified Bidder (Section E, Paragraph 4) | Potential Bidders may contact each other except to the extent prohibited by Section 363(n) of the Bankruptcy Code. |
| **Creditor Negotiations** | A Potential Bidder may contact the Committee, the Administrative Agent any member of the Steering Committee or the PropCo Lenders only through the OpCo Debtors' advisors (Section F, Paragraph 1) | A Potential Bidder may contact the Sales Examiner, the Committee, the Administrative Agent, any member of the Steering Committee or the PropCo Lenders, except to the extent prohibited by Section 363(n) of Bankruptcy Code. |
| **Contact by the Consultation Parties** | The Consultation Parties are (i) prohibited from contacting any parties which have not expressed an interest in acquiring the OpCo Properties and (ii) are permitted to contact parties which have expressed an interest in acquiring a portion of the OpCo Properties or provide a portion of financing to purchase the OpCo Properties, but only with advance notice to and a reasonable opportunity to participate by the OpCo Debtors (Section E, Paragraph 4) | The Consultation Parties may contact the Sales Examiner or any parties regardless of their prior expression of interest in acquiring all or a portion of the Opco Properties, except to the extent prohibited by Section 363(n) of the Bankruptcy Code. |
| **Determining if a potential bidder is a qualified bidder** | • The OpCo Debtors shall determine, after consultation with the Consultation Parties[1], the financial capability of the bidder (Section K, Paragraph 4(b))<br><br>• The Opco Debtors shall determine, in consultation with the Consultation Parties, if the bidder is capable of consummating the bid (Section K, Paragraph 4(e))<br><br>• The OpCo Debtors shall determine, after consultation with the Consultation Parties, if a Potential Bidder is a Qualified Bidder (Section K, Paragraph 7) | • The Sales Examiner shall determine, after consultation with the Consultation Parties, the financial capability of the bidder.<br><br>• The Sales Examiner shall determine, in consultation with the Consultation Parties, if the bidder is capable of consummating the bid.<br><br>• The Sales Examiner shall determine, after consultation with the Consultation Parties, if a Potential Bidder is a Qualified Bidder. |
| **Due Diligence** | The OpCo Debtors may grant access after consultation with Consultation Parties (Section L, Paragraphs 1 and 2) | • The Sales Examiner may grant access after consultation with Consultation Parties. |
| **Bidding Procedures** | The OpCo Debtors may decide, after consultation with the Consultation Parties, whether to entertain bids that do not conform to the Bidding Procedures (Section L, Paragraph 3) | • The Sales Examiner may decide, after consultation with the Consultation Parties, whether to entertain bids that do not conform to the Bidding Procedures. |

---

[1] The term "Consultation Parties" shall mean: (i) the Official Committee of Unsecured Creditors; (ii) the Steering Committee and (iii) the Administrative Agent under the Opco Loan Agreement.

| Feature | SCI | The Committee's Proposed Change |
|---|---|---|
| **Evaluation of Competing Bids** | The OpCo Debtors will evaluate bids using established criteria following consultation with the Consultation Parties (Section O, Paragraph 1) | • The Sales Examiner will evaluate bids using established criteria following consultation with the Consultation Parties. |
| **No Qualified Bid** | The OpCo Debtors may terminate the sale or extend the deadlines, in consultation with the Consultation Parties (Section P) | • The Sales Examiner may terminate the sale or extend the deadlines, in consultation with the Consultation Parties. |
| **Auction** | • The Opco Debtors shall select the starting bid, in consultation with the Consultation Parties (Section R, Paragraph 1(c))<br>• The OpCo Debtors shall determine if a Subsequent Bid is better than the Starting Bid or the Leading Bid, , in consultation with the Consultation Parties (Section R, Paragraph 1(f))<br>• The OpCo Debtors may alter the auction increment requirements (*Id.*) | • The Sales Examiner shall select the starting bid, in consultation with the Consultation Parties.<br>• The Sales Examiner shall determine if a Subsequent Bid is better than the Starting Bid or the Leading Bid, in consultation with the Consultation Parties.<br>• The Sales Examiner may alter the auction increment requirements. |
| **Additional Auction Procedures** | The Opco Debtors may announce additional procedures after consultation with the Consultation Parties (Section R, Paragraph 1(e)) | • The Sales Examiner may announce additional procedures after consultation with the Consultation Parties. |
| **Selection of Winning Bid** | • The OpCo Debtors shall make the selection in consultation with the Consultation Parties (Section S, Paragraph 1) | • The Sales Examiner shall make the selection in consultation with the Consultation Parties. |
| **Consideration of Gaming and other Regulatory Approval** | The OpCo Debtors, in multiple sections of the Bidding Procedures, state that consideration of gaming and other regulatory approval (including Nevada Gaming Commission and National Indian Gaming Commission regulatory approvals), including the speed with which a bidder gains such approval, will be factor as to, inter alia, whether a bid will be considered a Qualified Bid, evaluation of Competing Bids, and the selection of the Successful Bid. (See Section N, Paragraph (1)(j); Section O, Paragraph (1); Section R, Paragraph (1)(f); Section S, Paragraph 1.) | • While gaming and other regulatory approval is necessary, the OpCo Debtors have already protected themselves from a lack of compliance through the Gaming Approval Deposit required by bidders, which is forfeited unless regulatory approvals are obtained within a to-be-determined timeframe.  (Section V.)  Given the potential for abuse in favoring the Fertitta Brothers, who already possess gaming approval, and the uncertainty of this factor, the OpCo Debtors should not be allowed to give weight to the speed with which a bidder may gain such approval; or, in the alternative, the Sales Examiner shall determine the requisite deadline for a bidder's regulatory approval, in consultation with the Consultation Parties. |
| **Timeline for Gaming and other Regulatory Approval** | A Qualified Bid must include, inter alia, evidence, in form and substance reasonably satisfactory to OpCo Debtors, of compliance or anticipated compliance with all required gaming and other regulatory approvals (including Nevada Gaming Commission and National Indian Gaming Commission regulatory approvals required to close the Sale), the anticipated time-frame and any anticipated impediments for obtaining such approvals.  Section N, Paragraph (1)(j).  Further, all of the "information and material required" must be received 60 days after the entry of the Bidding Procedures. | • The Bidding Procedures are ambiguous and should clarify that gaming and other regulatory approval is not required within 60 days but that only information concerning the anticipated time frame of receiving such gaming and other regulatory approval should be submitted by the Bid Deadline. |

| Feature | SCI | The Committee's Proposed Change |
|---|---|---|
| **Debtors' Reservation of Rights** | The OpCo Debtors, in consultation with the Consultation Parties: (a) after each round of bidding at the auction may determine which qualified bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or any other orders applicable to one or more Opco Debtors, or the terms and conditions of the sale or (iii) contrary to the best interests of the Debtors, their estates, and stakeholders as determined by the Debtors; (c) may impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (d) withdraw from sale any Opco Properties at any time and make subsequent attempts to market the same; and (e) reject all bids (Section X) | • The Sales Examiner, in consultation with the Consultation Parties: (a) after each round of bidding at the auction may determine which qualified bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or any other orders applicable to one or more Opco Debtors, or the terms and conditions of the sale or (iii) contrary to the best interests of the Debtors, their estates, and stakeholders; (c) may impose additional terms and conditions and otherwise modify the Sale Procedures at any time; and (d) may reject all bids |

7664270