E-filed:  April 21, 2010

BRETT H. MILLER (NY Bar No. 2483691)
*Admitted Pro Hac Vice*
JORDAN A. WISHNEW (NY Bar No. 4106126)
*Pro Hac Vice Pending*
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY  10104-0050
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
BrettMiller@mofo.com; JWishnew@mofo.com

ROBERT R. KINAS (Bar No. 6019)
MARK E. KONRAD (Bar No. 4462)
SNELL & WILMER LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169-5958
Telephone:  702.784.5220
Rkinas@swlaw.com

Attorneys for Boyd Gaming Corporation

G. LARRY ENGEL (CA Bar No. 53484)
VINCENT J. NOVAK (CA Bar No. 233003)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone:  415.268.7000
Facsimile:  415.268.7522
LEngel@mofo.com; VNovak@mofo.com
*Admitted Pro Hac Vice*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.,<br>　　　　　　　Debtor.<br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Northern NV Acquisitions<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects Fertitta Partners, LLC<br>☐ Affects Station Casinos, Inc.<br>☐ Affects FCP Mezzco Parent, LLC<br>☐ Affects FCP Mezzco Parent Sub, LLC<br>☐ Affects FCP Mezzco Borrower VII, LLC<br>☐ Affects FCP Mezzco Borrower VI, LLC<br>☐ Affects FCP Mezzco Borrower V, LLC<br>☐ Affects FCP Mezzco Borrower IV, LLC<br>☐ Affects FCP Mezzco Borrower III, LLC<br>☐ Affects FCP Mezzco Borrower II, LLC<br>☐ Affects FCP Mezzco Borrower I, LLC<br>☐ Affects FCP Propco, LLC | Chapter 11<br><br>Case No.  BK-09-52477<br><br>Jointly Administered<br>BK-09-52470 through BK-09-52487<br><br>**BOYD GAMING CORPORATION'S OBJECTION TO MOTION FOR ORDER ESTABLISHING BIDDING AND DEADLINES RELATING TO SALE PROCESS FOR SUBSTANTIALLY ALL OF THE ASSETS OF STATION CASINOS, INC., AND CERTAIN "OPCO" SUBSIDIARIES**<br><br>Date:　**May 4, 2010**<br>Time:　**2:00 p.m.**<br>Place:　300 Booth Street<br>　　　　Reno, NV 89509 |

BOYD GAMING CORPORATION ("Boyd"), by and through its counsel, Snell &

Wilmer L.L.P., hereby submits its Objection (the "Objection") to the Debtors' Motion For Order

Establishing Bidding and Deadlines Relating to Sale Process For Substantially All of The Assets of Station Casinos, Inc. And Certain "Opco" Subsidiaries [Docket No. 1175] (the "Bid Procedures Motion").[1]

This objection is supported by the accompanying Memorandum of Points and Authorities, the Declarations of J. Soren Reynertson ("Reynertson Decl."), Brian Larson ("Larson Decl.") and David Farlin ("Farlin Decl." together with the Reynertson Decl. and Larson Decl., the "Boyd Declarations"), all pleadings and papers of record, and any oral argument the Court may entertain.

DATED this 21st day of April, 2010.

SNELL & WILMER L.L.P.

By: _____
Robert R. Kinas, Esq. (NV Bar No. 6019)
Mark E. Konrad, Esq. (NV Bar No. 4462)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169

Brett H. Miller, Esq. (NY Bar No. 2483691)
*Admitted Pro Hac Vice*
Jordan A. Wishnew, Esq. (NY Bar No. 4106126)
*Pro Hac Vice Pending*
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104-0050

G. Larry Engel, Esq. (CA Bar No. 53484)
Vincent J. Novak, Esq. (CA Bar No. 233033)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
*Admitted Pro Hac Vice*

Attorneys for Boyd Gaming Corporation

---

[1] Two days before the deadline for filing this brief, the Debtors filed substantially revised versions of the operative documents that are the subject of the Bid Procedures Motion and the Amendment Motion (defined herein). Boyd has reviewed the revised documents but found nothing that resolved our objections. Given the short time and inadequate notice, Boyd reserves the right to supplement this Objection with a more detailed response to the new filings in due course.

1

2

3

# **TABLE OF CONTENTS**

4

**Page**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.    FACTUAL BACKGROUND ................................................................................... 3

    A.    Corporate Structure ................................................................................... 3

    B.    Boyd's Offers ............................................................................................. 5

    C.    The Plan ...................................................................................................... 6

    D.    Excluded Assets ......................................................................................... 7

III.    ARGUMENT .......................................................................................................... 8

    A.    The Bidding Procedures Must Be Denied Because They Do Not Maximize
          Value For Opco's Estate; Rather, The Bidding Procedures Sanction
          Propco's Condemnation of Significant Value From Opco, Especially In
          The "Excluded Assets" Of Opco ................................................................ 8

    B.    The Bidding Procedures Foreclose The Debtors From Viable
          Reorganization Alternatives .................................................................... 17

    C.    The Bidding Procedures Must Be Highly Scrutinized Because They Are
          Being Proposed By The Debtors And Sanction A Transfer of Assets To
          The Insiders, Especially Without Full Disclosure ................................... 19

    D.    The Bidding Procedures Must Be Denied Because They Chill Bidding And
          Favor The Insiders.................................................................................... 25

    E.    The Bidding Procedures Give The Insiders Too Much Control Over The
          Outcome Of The Sale Process With Too Little Disclosure .................... 30

IV.    CONCLUSION ..................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'ship,*
526 U.S. 434 (1999) ........................................................................................... 23

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),*
181 F.3d 527 (3d Cir. 1999) ............................................................................... 25

*Computer Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul Global, Inc.),*
293 B.R. 124 (D. Del. 2003) ............................................................................... 20

*In re Asarco LLC,*
Case No. 05-21207, Docket No. 7430 (Bankr. S.D. Tx. April 16, 2008) ........... 21

*In re Benny,*
29 B.R. 754 (N.D. Cal. 1983), *aff'd sub nom, United States v. Benny,* 786 F.2d 1410
(9th Cir. 1986) ...................................................................................................... 9

*In re Bidermann Indus. USA, Inc.,*
203 B.R. 547 (Bankr. S.D.N.Y. 1997) ............................................................... 20

*In re Fontainebleau Las Vegas Holdings, LLC,*
Case No. 09-21481, Docket No. 770 (Bankr. S.D. Fla. October 14, 2009) ...... 19, 21

*In re Integrated Res., Inc.,*
135 B.R. 746 (Bankr. S.D.N.Y.), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992) ................. 9

*In re Mama's Original Foods, Inc.,*
234 B.R. 500 (Bankr. C.D. Cal. 1999) ............................................................ 23, 24

*In re Public Serv. Co. of New Hampshire,*
90 B.R. 575 (Bankr. D.N.H. 1988) ..................................................................... 19

*In re Sagewood Manor Assocs. LP,*
223 B.R. 756 (Bankr. D. Nev. 1998) ................................................................... 9

*In re Watson,*
No. 04-62118-13, 2006 Bankr. LEXIS 3202 (Bankr. D. Mont. Mar. 22, 2006) ...... 9

*In re Wilde Horse Enters., Inc.,*
136 B.R. 830 (Bankr. C.D. Cal. 1991) ............................................................... 20

# TABLE OF AUTHORITIES
### (continued)

Page

*Kalyna v. Swaine (In re Accomazzo)*,
226 B.R. 426 (D. Ariz. 1998) ............................................................................................... 9

*Knapp v. Seligson*
(*In re Ira Haupt & Co.*), 361 F.2d 164 (2d Cir. 1966) ............................................................. 30

*Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp.*
(*In re Big Rivers Elec. Corp.*), 233 B.R. 739 (W.D. Ky. 1998) ............................................... 10

*Toibb v. Radloff*,
501 U.S. 157 (1991) .............................................................................................................. 9

*U.S. Small Bus. Admin. v. Xact Telesolutions, Inc.*
(*In re Xact Telesolutions, Inc.*), No. Civ. A. DKC 2005-1230, 2006 WL 66665 (D.
Md. Jan. 10, 2006) ............................................................................................................... 20

*United States v. Aldrich (In re Rigden)*,
795 F.2d 727 (9th Cir. 1986) ................................................................................................ 9


**STATUTES**

11 U.S.C.
§ 101(31)(B) ....................................................................................................................... 1
§ 363 .................................................................................................................................. 20
§ 1121(d) ............................................................................................................................ 29


**OTHER AUTHORITIES**

*7 Collier on Bankruptcy* p. 1118.09 (15th Ed. 1996) ............................................................... 9

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    PRELIMINARY STATEMENT**

3    It is no secret that Boyd is very interested in acquiring not only the Opco Properties[2]

4    (including a majority of the Excluded Assets), but, if given the opportunity, substantially all of

5    SCI's Propco Assets for the market value of such assets. However, after reviewing the Bid

6    Procedures Motion, Boyd questions whether it will be given the same opportunities as the

7    Insiders[3] to compete fairly for any of the Debtors' assets.[4]

8    Debtors-in-possession have a fiduciary duty to maximize the value of their assets for the

9    benefit of the creditors; however, as currently drafted, the Bidding Procedures fail to meet this

10    objective. The Debtors assert that the Bidding Procedures promote a "competitive, fair and open

11    sale process."[5] Unfortunately, nothing could be further from the truth. Instead, the Bidding

12    Procedures evidence the Debtors' overwhelming disinterest in running a truly competitive

13    process. The Debtors are advancing Bidding Procedures clearly intended to facilitate an insider-

14    led condemnation of assets from Opco to Propco that chills bidding for the Opco Properties,

15    slants the playing field in favor of the Insiders and circumvents any competitive bidding for the

16    Excluded Assets belonging to the Opco estate. Moreover, the Debtors propose these Bidding

17    Procedures under a cloak of inadequate disclosure and a failure to provide any reasonable

18    justification or explanation for this blatant harm to the Opco estate. While Boyd understands that

19    this is not a forum for airing the grievances of competing bidders, as a creditor Boyd is very

20    [2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Bid Procedures Motion or the
21    Plan.

22    [3] The defined term "Insiders" has the meaning set forth in 11 U.S.C. § 101(31)(B), and includes Fertitta Gaming,
    LLC ("Fertitta Gaming"), and its owners Frank J. Fertitta (SCI's Chairman of the Board, Chief Executive Officer,
    and President) and Lorenzo J. Fertitta (SCI's Vice Chairman of the Board of Directors and a director).

23    [4] Boyd has been, and still remains, interested in acquiring the Opco assets and, if Propco assets become available,
24    both the Propco and Opco assets. However, as expressed in Boyd's objections to the Debtors' pending motions, Boyd
    has concerns about the adverse impact on the value of Opco due to the proposed transfers of Excluded Assets from
25    Opco to Propco, as well as the defects in the Debtors' proposed bidding procedures. Boyd believes that the Debtors'
    proposed process to acquire Opco assets will fail to meet even the Debtors' professed standard of being competitive,
    open and fair. Unless the defective elements of the Debtors' proposal are resolved, Boyd may choose, and believes
26    that other non-insider bidders may choose, not to pursue the acquisition of the applicable assets.

27    [5] See Declaration of Daniel Aronson In Support Of Order Establishing Bidding and Deadlines Relating to Sale
    Process For Substantially All of The Assets of Station Casinos, Inc. And Certain "Opco" Subsidiaries, [Docket No.
28    1177, ¶ 10].

1    concerned that the Bidding Procedures (as proposed) will chill competitive bidding to the

2    detriment of the Debtors' estate.

3          The Plan makes it very clear that, upon its emergence from bankruptcy protection, SCI

4    (defined below) will be broken up into New Propco and New Opco.  New Propco must not be

5    able unilaterally to dictate the composition of New Opco, but if the Excluded Assets are

6    transferred from Opco to New Propco, then that is exactly what will happen.  Moreover, because

7    the Court has yet to approve the Disclosure Statement, it is not appropriate for the Court to

8    sanction such a plan-determinative event at this premature juncture in the case, especially when

9    the primary beneficiaries of the Plan are the Insiders and many important details have yet to be

10   disclosed by the Debtors.

11         New Propco (made up of only four (4) casinos) will be formed utilizing the Master Lease

12   Collateral and the Operating Subsidiaries Lease Collateral, together with the Excluded Assets.

13   The fundamental problem is that the majority of the Excluded Assets belong to Opco and are

14   integral to the operations of SCI's fourteen (14) Opco properties.  By not allowing anyone to bid

15   on the Excluded Assets, the Bidding Procedures pre-approve the contemplated transfer of the

16   more valuable and strategic Opco assets to New Propco at a less than reasonably equivalent

17   value, and make it nearly impossible to claw back the Excluded Assets into the Opco estate.  This

18   would leave Opco as a "shell" of its former self.  Interested bidders will not be bidding on a fully

19   operational Opco, but on only a skeleton of Opco that will require a potential acquirer to rebuild

20   the Opco infrastructure in order to allow Opco to function properly.  It is counterintuitive and a

21   perversion of common sense to think that four casinos actually need all of the Excluded Assets in

22   order to operate.  Ironically, this process began with Opco (the larger segment of SCI) agreeing to

23   provide Propco (the smaller SCI segment) with transition services, but now that the Insiders have

24   locked up Propco, the loss by Opco of the Excluded Assets will cause Opco to require transition

25   services from Propco, thereby necessitating the dependence of a non-insider buyer upon its

26   competitor for those essential services.

27         By sanctioning the asset transfer to New Propco, the Bidding Procedures provide New

28   Propco with an enormous advantage over any other bidder for the Opco Properties because New

11445007.1                              -2-
ny-920091

1  Propco not only obtains possession of the missing pieces of the puzzle without having to compete

2  against interested third parties for such assets, but it also avoids bearing the significant cost that a

3  competing bidder would bear of putting in place a replacement infrastructure to support the Opco

4  Properties.

5        Moreover, given that the proposed Bidding Procedures allocate a significant amount of

6  control and discretion to the Debtors that allows them to favor Insider bids, those Bidding

7  Procedures must be reformed to create a more level playing field for all third-party bidders and

8  ensure that the process does not shift the likelihood that the Insiders will be the Successful Bidder

9  at a lower price than a non-Insider would pay in a reformed process (especially if the more

10 strategic "Excluded Assets" were retained by Opco).  A debtor whose principals are also

11 participants in the auction must not be allowed to retain effective control over the most critical

12 decisions in this process.  Otherwise, the overwhelming conflicts of interest will taint the integrity

13 of the process and disadvantage non-insider third party bidders.  If the Debtors want a truly fair,

14 open, and competitive process, then they should allow <u>all</u> of their assets to be exposed to the

15 market as part of a process run by an independent, neutral arbiter.

16       The Boyd Declarations demonstrate why the relief sought by the Debtors should not be

17 granted without first implementing major reforms, both as to process and as to the scope of the

18 Excluded Assets.

19              **II.**     **FACTUAL BACKGROUND**

20     **A.**    **Corporate Structure**

21       1.     Station Casinos, Inc. ("<u>SCI</u>") is the lead debtor in these Chapter 11 cases,

22 and the other debtors are all either direct or indirect wholly owned subsidiaries of SCI.  SCI is

23 made up of three primary "stacks" — SCI is the operating arm of this enterprise; Propco, as noted

24 below, holds certain real property; and CV Propco, LLC ("<u>Landco</u>"), owns land located on the

25 southern end of Las Vegas Boulevard at Cactus Avenue, as well as land surrounding Wild Wild

26 West in Las Vegas.[6]

27

28 _____
[6] *See* Disclosure Statement, p. 27.

1    2.    In 2007, SCI undertook a going-private transaction (the "2007

2    Transaction") that involved the sale of certain real property to FCP Propco, LLC ("Propco"), and

3    the leaseback of such property to SCI.

4    3.    As a result of the 2007 Transaction, 24.1% of the issued and outstanding

5    shares of non-voting common stock of SCI are owned by debtor Fertitta Partners LLC ("Fertitta

6    Partners"),[7] and the remaining 75.9% of non-voting common stock is owned by debtor FCP

7    Holding, Inc. ("FCP Holdco").  The voting common stock is held by debtor FCP Voteco LLC

8    ("FCP Voteco").[8]

9    4.    At the same time as the 2007 Transaction, Propco, as landlord, and SCI, as

10    tenant, entered into a Master Lease, dated as of November 7, 2007 (the "Master Lease"), under

11    which Propco leased to SCI the real property and improvements associated with four properties

12    — Boulder Station Hotel & Casino, Red Rock Casino Resort Spa, Palace Station Hotel & Casino

13    and Sunset Station Hotel & Casino (collectively, the "Leased Hotels").  SCI, together with its

14    non-debtor operating subsidiaries (the "Operating Subsidiaries"), operates the Leased Hotels.

15    5.    As described in the Special Litigation Committee's report concerning the

16    Master Lease, the Leased Properties are owned by Propco, and SCI only has the right to exclusive

17    possession and use of the Leased Properties; SCI owns all of the improvements made by SCI until

18    the expiration of the Master Lease, at which time title of those improvements transfers to Propco;

19    and SCI owns its personal property, subject to any security interest that Propco has in some, but

20    not all, of SCI's furniture, fixtures, and equipment.[9]

21    6.    As part of the Master Lease, SCI pledged, assigned, and granted to Propco

22    a security interest and an express contractual lien in and to (i) all of the personal property

23    (including furniture, fixtures, goods, inventory, equipment, furnishings, objects of art, machinery,

---

[7] Fertitta Partners is owned by affiliates of Frank J. Fertitta III, Chairman, Chief Executive Officer, and President of SCI. *See* Disclosure Statement, p.22.

[8] FCP Voteco is owned equally by Frank J. Fertitta III ("FJF"), Lorenzo J. Fertitta ("LJF"; together with FJF, the "Fertittas"), and Thomas J. Barrack, Jr. (Chairman and Chief Executive Officer of Colony Capital, LLC ("Colony")). *Id.*

[9] *See* Supplemental Report of Investigation by the Special Litigation Committee of the Board of Directors of Station Casinos, Inc., dated December 18, 2009 [Docket No. 730, p.5].

1  appliances, appurtenances, and signage) together with tools and supplies related to the Leased

2  Hotels and (ii) the FF&E Reserve Collateral (collectively, the "Master Lease Collateral").

3    7.    Concurrently with the execution of the Master Lease, Propco and the

4  Operating Subsidiaries entered into the Security Agreement, dated November 7, 2007, granting

5  Propco liens on and security interests in all of their personal property related to the Leased Hotels

6  owned by the Operating Subsidiaries, as well as FF&E Reserves for each of the Operating

7  Subsidiaries (collectively, the "Operating Subsidiaries Lease Collateral").

8    8.    During these bankruptcy cases, SCI's prepetition lenders notified SCI that

9  they would not consent to payment of the December 2009 rent under the Master Lease, thus

10  prompting negotiations between and among SCI and Propco's independent directors to structure

11  an agreement that would allow for the continued operation of the Leased Hotels in a manner that

12  would protect and preserve the value of those operations.[10]

13    9.    The end result of these parties' efforts was the Master Lease Compromise

14  Agreement (the "MLCA"),[11] which, in part, reduced the rent payable to Propco and crafted a

15  transition service protocol in the event that SCI rejected the Master Lease.  The MLCA provides,

16  in pertinent part, that upon the occurrence of certain conditions, SCI and the Operating

17  Subsidiaries will cooperate in a consensual foreclosure of Propco's liens on such collateral and

18  will sell outright certain tangible and intangible personal property.  In separate papers, Boyd also

19  is opposing the Debtors' pending motion (as modified) to amend yet again the MLCA and

20  transfer more Excluded Assets from Opco to New Propco, which would further harm Opco for

21  the benefit of Propco and the Insiders.

22    **B.    Boyd's Offers**

23    10.    On February 23, 2009, Boyd delivered a non-binding preliminary

24  indication of interest (the "Indication of Interest") to SCI's board of directors expressing its desire

25  to acquire substantially all of the Opco Properties.  In addition, as part of the Indication of

---

26  [10] See Disclosure Statement, p. 34.

27  [11] The Debtors recently filed a motion to further amend the MLCA (the "Amendment Motion").  Boyd objected to
the further amendment of the earlier compromise and the transfer of more Excluded Assets from Opco to New
28  Propco, thus further burdening Opco for the benefit of Propco and New Propco Insiders.

1    Interest, Boyd also stated that if SCI chose to pursue a separate sale transaction with respect to the

2    Propco Assets, Boyd would consider an acquisition that includes those assets as well.[12]

3            11.     On February 24, 2009, SCI filed a Form 8-K indicating that it intended to

4    "continue to work with its lenders and bondholders to pursue the previously proposed plan of

5    reorganization, but would evaluate the terms of the Boyd proposal."

6            12.     On March 3, 2009, SCI advised Boyd that SCI's board reviewed the

7    Indication of Interest and concluded that it was in the best interests of SCI and its stakeholders to

8    proceed with SCI's contemplated restructuring plan. SCI's letter to Boyd noted that SCI's board

9    did not make a determination to pursue, nor had the Company taken any steps toward pursuing, a

10   sale of all or any portion of SCI's assets. Rather, the letter stated that SCI was in the process of

11   soliciting consents from its lenders with respect to a pre-packaged plan of reorganization that

12   would result in a restructuring of substantially all of SCI's debt.[13]

13           13.     On December 16, 2009, Boyd delivered a second, non-binding proposal

14   (the "Proposal") to SCI's board of directors wherein Boyd reaffirmed its interest in acquiring,

15   when permitted, substantially all of SCI's "Opco Properties" and "Propco Assets"[14] free and clear

16   of all liens, claims, and encumbrances for a total of $2.45 billion in cash and assumed debt.[15]

17   **C.     The Plan**

18           14.     On March 24, 2010, the Debtors filed the Joint Chapter 11 Plan of

19   Reorganization for Station Casinos, Inc., and its affiliated Debtors (the "Plan") and the Disclosure

20   Statement to Accompany Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc., and

21   its affiliated Debtors (the "Disclosure Statement").

22           15.     Consistent with the terms of the MLCA, the Plan provides that on the

23   Effective Date (as defined in the Plan), SCI and its Non-Debtor Affiliates will transfer assets

24   included in the Master Lease Collateral to Propco in satisfaction of its liens on such assets.

25   [12] Boyd Gaming Corp., Current Report (Form 8-K), at Ex. 99.1 (Feb. 23, 2009).

26   [13] Station Casinos, Inc., Current Report (Form 8-K), at Ex. 99.1 (Mar. 3, 2009).

27   [14] The Proposal did not include those assets that secure SCI's $250 million delay-draw term loan due February 7, 2011, and all litigation claims unrelated to the Propco Assets and the Opco Assets.

28   [15] Boyd Gaming Corp., Current Report (Form 8-K), at Ex. 99.1 (Dec. 16, 2009).

16.     However, and more importantly, the Plan also provides that the New Propco Purchased Assets (which are not specifically identified in the Plan)[16] shall be sold, conveyed, assigned, transferred, and delivered "free and clear" to New Propco or its designee.[17] Similarly, the Plan also contemplates the transfer of portions of the Wild Wild West assemblage held by SCI and its subsidiaries to the restructured Land Loan Borrower[18] or a subsidiary thereof, including (i) the Wild Wild West real estate and ground leasehold and casino and other operating related assets held by non-debtor Tropicana Station, Inc. (the operator of the Wild Wild West Casino), and (ii) the option to purchase other related property located within the boundary of or adjacent to the Wild Wild West assemblage, at a price to be mutually agreed upon by the Propco Lenders and SCI.

17.     The Plan, as it relates to SCI, simply provides for an orderly going concern sale process for all of the New Opco Acquired Assets, which are defined in the Plan as "all or substantially all of the assets of SCI and the Other Opco Debtors <u>other than</u> the New Propco Purchased Assets and the Master Lease Collateral."[19]

**D.     Excluded Assets**

18.     In order to effectuate the sale of the Opco Properties, the Debtors filed the Bid Procedures Motion to seek approval of an auction process to sell the Opco Properties (the "Bidding Procedures").[20]

19.     In the amended Bidding Procedures, the Debtors designated the Propco Lenders and Fertitta Gaming as the "Stalking Horse Bidder" for the Opco Properties.

20.     Schedule 2 to the Bidding Procedures identifies seventeen (17) Opco asset categories that are to be excluded from an SCI sale.  Though it is not entirely clear from the Plan

---

[16] As discussed below, the only reasonable inference to be drawn from these documents is that the New Propco Purchased Assets are to be comprised of the Excluded Assets set forth in Schedule 2 to the Bidding Procedures.

[17] See Disclosure Statement, p. 55-56.

[18] The Plan also provides that the Land Loan Borrower (Landco) or the assets constituting collateral under the Land Loan will be transferred to New Propco or a subsidiary thereof at the direction of the holders of the Land Loan (Deutsche Bank Trust Company Americas and JP Morgan Chase Bank, N.A.)

[19] See Disclosure Statement, Plan, p. 16.

[20] On April, 19, 2010, the Debtors filed amended Bidding Procedures. [Docket No. 1214].

1  and Disclosure Statement, it seems that the seventeen (17) asset categories set forth in Schedule 2

2  to the Bidding Procedures likely comprise the New Propco Purchased Assets.

3        21.     While there is a shocking lack of disclosure about the relevant details of

4  these dramatic, insider benefits at the expense of the Opco creditor recoveries, the Debtors do not

5  hide from the fact that these asset categories go well beyond the assets encumbered by Propco

6  pursuant to the Master Lease and the Security Agreement. *See* Motion, ¶ 15 ("The Excluded

7  Assets consist entirely of assets that are to be transferred to Propco or New Propco under the Joint

8  Plan and/or pursuant to the Master Lease Compromise Agreement and all amendments thereto

9  approved by the Bankruptcy Court").  What the Debtors fail to discuss is that these categories

10  include assets of significant value, both economic and strategic, including (i) the Wild Wild West

11  real property and assets, (ii) IT systems, (iii) other intellectual property, (iv) the primary customer

12  databases, (v) business information, (vi) Landco's real property and assets, and (vii)

13  unencumbered fixtures, furniture, and equipment.

14        22.     For the reasons discussed herein, Boyd asserts that the Bid Procedures

15  Motion must be denied without prejudice, and the Debtors must be required to modify the

16  Bidding Procedures in order to create a more fair and unbiased process in which non-insider third

17  parties have an equal opportunity to bid for all of the assets of Opco on an informed basis,

18  including all assets not pledged as collateral to the Propco Lenders under the Master Lease and

19  the Security Agreement.

20                          **III.    ARGUMENT**

21    **A.    The Bidding Procedures Must Be Denied Because They Do Not Maximize
           Value for Opco's Estate; Rather, the Bidding Procedures Sanction Propco's**
22         **Condemnation of Significant Value from Opco, Especially in the "Excluded
           Assets" of Opco.**
23

24        The Plan contemplates that New Propco will be reorganized and re-constituted by

25  utilizing the assets obtained from the foreclosure of the Master Lease Collateral and the Operating

26  Subsidiaries Lease Collateral, the sale of certain real and personal property from Opco to New

27  Propco or its designee, and the transfer of certain additional assets from Opco to New Propco.[21]

28  _____
    [21] *See* Disclosure Statement, pp. 55-57.

1  Noticeably absent from this plan structure (as well as from the Bidding Procedures) is the

2  opportunity for third parties to bid for the assets being transferred from Opco to New Propco,

3  especially the strategically and economically valuable Excluded Assets.

4      As a debtor-in-possession, SCI has a fiduciary duty to all of its creditors to maximize the

5  value of its estate. *In re Watson,* No. 04-62118-13, 2006 Bankr. LEXIS 3202, at *9 (Bankr. D.

6  Mont. Mar. 22, 2006) ("As fiduciaries, debtors have an obligation to conserve the assets of the

7  estate and to maximize distributions to creditors."); *United States v. Aldrich (In re Rigden),* 795

8  F.2d 727, 730 (9th Cir. 1986); *Kalyna v. Swaine (In re Accomazzo),* 226 B.R. 426, 429 (D. Ariz.

9  1998); *In re Benny,* 29 B.R. 754, 760 (N.D. Cal. 1983), *aff'd sub nom, United States v. Benny,*

10  786 F.2d 1410 (9th Cir. 1986); *see also 7 Collier on Bankruptcy* P 1118.09 (15th Ed. 1996)). In

11  addition, "[w]hen a debtor desires to sell an asset, its main responsibility, and the primary concern

12  of the bankruptcy court, is the maximization of the value of the asset sold." *In re Integrated Res.,*

13  *Inc.,* 135 B.R. 746, 750 (Bankr. S.D.N.Y.), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992); *see also In re*

14  *Sagewood Manor Assocs. LP,* 223 B.R. 756, 762 (Bankr. D. Nev. 1998) ("In *Toibb v. Radloff,* the

15  court stated that Chapter 11 embodies the general policy of the Bankruptcy Code, which is to

16  maximize the value of the bankruptcy estate." *Toibb v. Radloff,* 501 U.S. 157, 163 (1991)).

17  Maximum value requires competitive bidding. However, the Debtors' process denies competitive

18  bidding for the Excluded Assets, thus chilling bidding overall and reducing the Opco creditor

19  recoveries.[22]

20      The Debtors assert that the Bidding Procedures, as drafted, fulfill their fiduciary duty, *see*

21  Motion, ¶ 20. However, by excluding Opco assets of significant value, as well as the Propco

22  Assets, from the proposed SCI sale, the Debtors are not allowing their assets to be shopped as

23  their fiduciary duty requires. At least one court has held that "no shop" clauses interfere with a

24  debtor's fiduciary duty. *Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big Rivers*

25  *Elec. Corp.),* 233 B.R. 739, 752 (W.D. Ky. 1998). The Bidding Procedures operate as a type of

26  "no shop" because through them, the Debtors cut off their right to initiate, solicit, or negotiate

27  _____

28  [22] *See* Reynertson Decl., ¶ 12.

1    offers and proposals for the sale of the assets being transferred to New Propco under the terms of

2    the Plan. *See id.*

3         Any asset that is not a part of the Master Lease Collateral or the Operating Subsidiaries

4    Lease Collateral should <u>not</u> be included in the list of Excluded Assets and must be exposed to the

5    market with full disclosure in order to ensure that the Debtors' estate receives market value for

6    such assets; otherwise, the SCI estate risks losing significant value and denying its creditors the

7    opportunity to maximize the value of SCI's assets.[23] For the reasons discussed herein, before the

8    Court approves the Bidding Procedures (including the list of Excluded Assets), Propco and Opco

9    must explain to this Court and their creditors why each of the following assets should be

10   transferred to Propco without first exposing them to the market with all relevant data. In addition,

11   if the Court permits Opco assets to be excluded from the contemplated Opco sale, then in order to

12   prevent Propco from receiving a windfall, the Court should ensure that Propco is providing Opco

13   with the fair market value of such assets and/or the cost to Opco of acquiring comparable assets,

14   as well as full indemnity for Opco as to the harm Opco suffers from the loss of the Excluded

15   Assets.

16       <u>Item 10: IT Systems.</u> **This is the single biggest outrage in the Bidding Procedures.**

17   The Debtors believe it is appropriate to transfer and shift Opco's entire core IT system and

18   capability to Propco (and New Propco and its insiders). As a result, Opco will need to replace

19   and rebuild its own IT systems in order for its remaining systems to properly function. In effect,

20   Propco is taking the turnkey system for its use, forcing Opco to depend on Propco and New

21   Propco for Opco's IT needs as it rebuilds its own system. To the astonishment of Opco creditors,

22   Appendix 1 to the most recent amendment to the Master Lease states: ". . . Propco will <u>not</u>

23   separately reimburse Opco for such costs." (emphasis added)

24       One of the core values of the Opco Properties is in its IT and IP assets.[24] As discussed in

25   greater detail herein, these IT assets are critical to the operation of each Opco casino because its

26   core functions are dependent on IT systems.[25]

---

27   [23] *See* Reynertson Decl., ¶ 17.

28   [24] *See* Farlin Decl., ¶ 10.

1    The development of proprietary IT and IP assets can involve substantial costs over long

2    periods of time. For example, the development of a commercially available casino management

3    system to support multi-property casino operations, including player tracking systems and

4    website infrastructure, would cost up to $20 million per reasonably sized property. From this

5    perspective and others, Opco's IT and IP assets are very valuable and desirable.[26] For example, if

6    the Opco IT and IP assets are transferred away from the Opco Properties, as contemplated by the

7    Second Compromise Amendment, those transfers would strip so much IP and IT asset value away

8    from the Opco Properties that Opco would need to rebuild Opco's IT systems and obtain

9    "transition services" from Propco in order to prevent the Opco Properties from "going dark."[27]

10   These IT and IP assets represent key IT and IP assets for a property within the hotel and casino

11   business. To allow this critical component of Opco's infrastructure to be transferred to Propco

12   will bestow a significant windfall on Propco (and New Propco Insiders) at an enormous cost to

13   Opco and in a manner that chills bidding by non-insider bidders for the remainder of Opco.[28]

14   Propco should not be able to burden Opco in this manner, especially without detailed disclosures

15   and full reimbursement of investments and broad indemnity for Opco.

16       Item 13: Wild Wild West Real Property and Assets: Because Wild Wild West is a

17   standalone casino, the loss of its assets could be endured by an Opco buyer; however, the value of

18   the Wild Wild West assets to the Insiders is significant. Landco (now part of the New Propco-

19   Insider deal) needs the Wild Wild West land and casino in order to develop the large, adjacent

20   Landco acreage as a hotel/casino.[29]

21       The apparent strategic value of the Wild Wild West assets could be many times higher

22   than the value of the Wild Wild West assets as a stand-alone existing casino, and the Debtors

23   should be required to disclose to the Court how much it has invested in the planned Viva casino

24

---

25   [25] *See* Farlin Decl., ¶ 9.

26   [26] *See* Farlin Decl., ¶ 10.

     [27] *See* Farlin Decl., ¶ 11.

27   [28] *See* Reynertson Decl., ¶¶ 13-16.

28   [29] *See* Larson Decl., ¶¶13-14 (describing what the Debtors have failed to disclose about this strategic asset).

1    development.  Propco should not be able to grab this Opco asset based on its limited value as a

2    small and old casino.  Indeed, to the extent that Opco has spent any funds on development

3    activities, including for option fees on the Wild Wild West or legal, engineering, architectural,

4    planning, and other work product related to its further development, the products of those would

5    become a windfall gift to the Insiders under the Debtors' Motions and the Plan.  One would

6    expect an Insider buyer to at least reimburse the Opco creditors for any amounts invested by

7    Opco in creating this windfall development opportunity for that buyer.[30]  Because the bankruptcy

8    precedents require "strict scrutiny" of sales of estate assets to insiders, especially without

9    competitive bidding, the Insiders, in attempting to transfer these Opco assets to their New Propco,

10    must first make full disclosure of all relevant facts concerning these transfers.[31]

11        <u>Item 6:  Patents.</u>  Opco's patents cover its proprietary player-tracking system and other

12    techniques for <u>more profitable</u> casino operations than the standard systems that Propco could

13    readily acquire like any other start-up casino. Propco has requested an unrestricted, perpetual

14    fully paid-up license for all patents necessary to access Opco's existing IT system, including the

15    U.S. Patents and patent applications related to player-tracking systems.  A player-tracking system

16    allows a casino to manage, maintain and cultivate its relationship with its players by providing

17    information about player activity such as type of wager, type of game or race, frequency of play

18    and other parameters.  A player-tracking system is not necessary for the general operations of a

19    hotel or casino, nor is a player-tracking system necessary to comply with the rules and regulations

20    of the authorities within the gambling industry.  In addition, there are several commercially

21    available player-tracking systems available on the market, all of which will achieve the basic

22    functionality of a player tracking system and meet any regulatory requirements required by

23    authorities in the gaming industry.  For example, to list a few of many commercially available

24    alternatives, are the player tracking systems offered by Bally Technologies, Inc., International

25    Game Technology (IGT), Aristocrat Technologies, Inc., and Konami Gaming, Inc.[32]

26    _____

[30] *See* Larson Decl., ¶ 16.

27    [31] *See* Larson Decl., ¶ 15.

28    [32] *See* Farlin Decl., ¶ 13.

1    If Opco is forced to grant this license, Opco will lose important competitive advantages to

2    its New Propco competitor, and one more of the appealing aspects to potential bidders of

3    acquiring Opco would be eliminated.  If Propco is to be given rights to this category of assets,

4    then at a minimum, Propco should reimburse Opco for the significant investment that Opco has

5    made in developing the licensed technology with funding from Opco creditors.

6    <u>Item 7:  Other Intellectual Property.</u>  According to Annex 1 to the Second Compromise

7    Agreement, Propco seeks the use of "existing website infrastructure (including online guest

8    transaction and account management systems) and related software applications" within the Opco

9    Properties and requests the right to not "re-create [the] website user interface from scratch."  The

10   website user interface for certain of the Opco Properties is very similar in look and feel to certain

11   of the Propco Properties.  Given the similarities in look and feel of the existing website user

12   interface, if Propco is given these rights, potential customers who visit the websites of the Propco

13   Properties may well be confused and assume that the Opco Properties and the Propco Properties

14   are all part of the same enterprise.  This would harm the Opco Properties and diminish the value

15   of the Opco Properties.  There are many generally available sources of software applications for

16   website infrastructure (including online guest transaction and account management systems).

17   These software applications can be provided by a variety of vendors, ranging from large

18   companies like International Business Machines Corp. (IBM) to small advertising agencies to

19   independent consultants specializing in website design.  New Propco does not need the

20   proprietary website infrastructure and related software applications within the Opco Properties in

21   order to operate continuously and adequately websites for the Propco Properties.[33]

22   Propco also seeks a non-exclusive license of Opco's copyrighted matter so as to be able to

23   further customize them for Propco's uses, including rights to enjoy Opco's source code and rights

24   to create derivative works for Propco.  If this is allowed, Propco, as a future competitor of Opco,

25   will receive a valuable benefit that weakens Opco because Propco's creation of derivative works

26   will reduce the unique "look and feel" of Opco's web assets at no apparent cost to Propco.[34]

27   [33] *See* Farlin Decl., ¶ 14.

28   [34] *See* Farlin Decl., ¶ 15.

1      Like the Patents, if this category of assets is to be excluded from the Opco Properties, then

2   at a minimum, Propco should reimburse Opco for the investment that Opco has made in

3   developing and maintaining these assets.

4      Item 8:  Primary Customer Database.  Player information is a valuable asset within the

5   hotel and casino business.[35]  Under the Debtors' proposed Bidding Procedures, information about

6   Opco customers who have played "primarily" at Propco casinos (as defined for Propco's benefit)

7   will be transferred to Propco as its "Primary Customers."[36]  However, customers often play at

8   more than one casino.  Information about a Propco "Primary Customer" who is also a customer of

9   Opco is of value to a buyer of Propco.  Propco should not have the right to exclusive data on such

10  Opco customers, including the "entire history of all property play" because the customers played

11  more often at Propco casinos.  Requiring this valuable Opco customer list and related information

12  as it relates to Propco's "Primary Customers" who are also Opco customers, to be abandoned to

13  Propco as the Debtors propose, would provide a windfall to Propco and diminish the value of that

14  Opco asset.  In addition, while the allocation of inactive customer accounts is not essential for the

15  operation of the Propco Properties, such information about inactive accounts remains a valuable

16  asset as to whoever holds the information.  Requiring the transfer of inactive account information

17  associated with the Opco Properties also reduces the value of the Opco Properties.[37]

18     In effect, under the Debtors' proposal, Propco walks away with the valuable information

19  about many of the significant and other customers cultivated by Opco who also paid for their

20  marketing and recruitment.

21     Item 9:  Business Information.  This includes more than merely giving Propco turnkey

22  access to all of the data and documentation that it could ever possibly want.  This also includes

23  more IP license transfers with windfall opportunities for Propco, and more harm to Opco, as

24  addressed throughout this Objection.

25

26  _____

    [35] *See* Farlin Decl., ¶ 18.

27  [36] *See* Farlin Decl., ¶ 17.

28  [37] *See* Farlin Decl., ¶ 16.

For example, in item 9 of Annex 1 to the Second Compromise Amendment, Propco has requested splitting between the separate Propco Properties and Opco Properties "[a]ll information relating to tracking of operations (e.g., inventory, employee time, HR data, accounting and other Transaction Data as described on Annex A)" that is "tracking information relating to" the Propco Properties: business information, including without limitation HR programs documentation, training manuals and policies and procedures, physical plant and engineering documentation and processes, player development systems, processes and reporting, and other business information; and marketing and other art materials and construction contracts "to the extent related to" or "relating to" the Propco Properties. The examples of business information that Propco desires to receive and use are valuable assets, and they are not unique or specific to the Propco Properties. Although business information related to the Opco Properties might also be related to Propco in some way, under the Debtors' formulation, Propco would be justified in requiring the transfer or use of that business information from Opco to Propco to the diminishment of the Opco Properties.[38]

Moreover, the definition of Transaction Data described on Annex A is broadly defined and includes, among other things, player-tracking systems, slot and table games accounting systems, hotel reservations systems and all "front of house ops systems" such as casino accounting, cage and count, franchising and merchandising operation systems, performance management, and safety, security and surveillance systems, and CCTV infrastructure. All of these systems are not unique or specific to the Propco Properties and are generally commercially available from third-party vendors. For example, commercially available versions for many of these systems are generally available through companies such as Agilysys, Inc. or MICROS Systems, Inc. In addition, these systems represent assets that are employed enterprise-wide and cannot be separated from the enterprise without impairing their value. Splitting these assets between Propco Properties and Opco Properties will diminish their value and thus diminish the value of the Opco Properties. Also, because these assets are "front of house" and customer-

---

[38] *See* Farlin Decl., ¶ 19.

facing, there is a likelihood of consumer confusion if these systems are employed at both the Propco facilities and the Opco facilities. This consumer confusion will have a material negative impact on the value of the Opco Properties and the ability to operate the Opco Properties.[39]

Item 16: CV Propco, LLC Real Property and Assets. Landco owns land on the southern end of Las Vegas Boulevard, as well as land surrounding the Debtors' Wild Wild West property. As discussed above, the Wild Wild West property is a valuable asset, and its future development prospects are directly related to the land owned by Landco. Accordingly, while the present value of the Wild Wild West real property might not be significant as an isolated parcel, its value dramatically increases when it is added to the surrounding parcels owned by Landco, since the Wild Wild West parcel is the sine quo non of developing a casino project on the combined parcels.[40] Rather than simply allow New Propco to restructure the loan with the Land Loan Lenders, Opco should be given an opportunity to negotiate retention of Landco's real property interests based on its related Wild Wild West assets (described in Item 13 above) and preserve that value for Opco's creditors.

Item 11: Unencumbered FF&E. If the FF&E is not Propco lender collateral under Item 1 of the Excluded Assets, then it needs to be closely examined for appropriateness and value. One of many concerns now and until the closing is that the Debtors' "location" test of allocation between Opco and Propco allows the Propco Insiders managing this process to move Opco FF&E to Propco at the expense of Opco. Another concern is that Opco money may be spent improving or maintaining FF&E then located at Propco, while deferred maintenance problems continue to increase at Opco casinos.

Similarly, the phone system "reengineering" to accommodate Propco can be done either fairly or unfairly to Opco, and there appear to be insufficient safeguards for Opco here as elsewhere. Disruption of phones at Opco to accommodate Propco could directly impact the value and profitability of Opco.

---

[39] *See* Farlin Decl., ¶ 20.

[40] *See* Larson Decl., ¶ 12.

1           <u>Items 12 & 15:  Corporate FF&E/Headquarters Building.</u>  The Debtors must itemize the

2    items of art, vehicles, computer equipment, and other tangible property that is "located" [as of

3    when?] at their corporate headquarters.  Why should the Opco buyer have to replace Opco

4    laptops, computers, and other equipment, merely because the Debtors' insiders claim that the

5    equipment "belongs" in the Opco corporate headquarters building?  Propco's contemplated

6    assumption of the modified office lease is not adequate compensation for such a blanket shift of

7    Opco's assets to Propco, especially since the landlord's claim does not materially dilute the

8    massive unsecured claims in the case against Opco.  Moreover, the confiscation of Opco's

9    corporate phone number is especially outrageous and reveals that the true intent of New Propco is

10   to become New Opco in everything but the name.

11          <u>Item 14:  Net Working Capital.</u>  Propco wants an offsetting dollar-for-dollar credit for

12   liabilities Propco assumes, even if those liabilities are unsecured prepetition claims on which

13   Opco would pay little.  Again, what happens in the Opco contracts and assets not exclusive to

14   Propco?  Apparently, once again, Propco only cares about its interests, without any fair thought to

15   the impact or rights of Opco.

16          For the reasons described above, the Excluded Assets are of great significance to the Opco

17   enterprise.  By withholding those assets from an Opco auction sale, the Debtors are most certainly

18   not maximizing value for their estate.  If the Court is inclined to allow the Excluded Assets to be

19   excluded from the auction, then at a minimum, before the Bidding Procedures are approved, the

20   Court should require the Debtors to (i) disclose the material details about each of the Excluded

21   Assets to the Debtors' creditors (including the insider windfalls), and (ii) demonstrate that Propco

22   is providing the Debtors' estate with the fair market value of such assets and/or the cost to Opco

23   of developing the asset to its current state, thereby ensuring that Propco and the Insiders do not

24   receive a windfall.

25       **B.**     **The Bidding Procedures Foreclose the Debtors from Viable Reorganization**
           **Alternatives**

26

27          Approval of the Bidding Procedures will prematurely lock in the structure of the Plan and

28   limit the estate's reorganization options going forward.

1    The Debtors make it clear that the goal of their reorganization is to divide the SCI

2 enterprise into two entities — New Propco and New Opco. The Plan ensures that New Propco

3 will have far more than the necessary components to "smoothly" begin its operations upon the

4 Effective Date, including, but not limited to, real property, intellectual property, information

5 technology, and business information. This "smooth" transition is only achieved by causing great

6 harm to Opco, as detailed in the Boyd Declarations. If the Debtors are permitted to carve out the

7 Excluded Assets (as proposed) and transfer those to New Propco, then all that would remain for

8 SCI is to try and sell a diminished and incomplete gaming organization that has lost significant

9 value as a result of the transfer of the Excluded Assets from Opco to New Propco.

10    A fundamental problem with the Bidding Procedures is that only part of SCI-Opco is for

11 sale, not the entire enterprise, and to the extent that the Bidding Procedures are approved, the

12 Debtors foreclose Opco, their creditors, and parties-in-interest from exploring potential alternate

13 reorganization options that involve selling the entire Opco and/or Opco-Propco estates to an

14 interested party. As a result, the Debtors are not maximizing the value of their estate for their

15 creditors, but instead, are promoting a split of the enterprise that they know is more problematic

16 for a non-Insider buyer than it would be if the enterprise were sold as a whole. In *In re Am. Dev.*

17 *Corp.*, the court did not permit a debtor to transfer substantially all of its assets to a wholly owned

18 non-debtor subsidiary before the confirmation of a reorganization plan, because the proposed

19 transaction foreclosed other reorganization alternatives. 95 B.R. 735, 739 (Bankr. C.D. Cal.

20 1989). Objecting parties argued that the transaction was premature, and the debtor's proposal

21 would "lock the estate into a particular course of action without the creditor protections

22 surrounding confirmation of a plan of reorganization." *Id.* If the Bidding Procedures are

23 approved, the allocation of assets among New Propco and New Opco will be fixed, parties-in-

24 interest will lose out on any opportunity to bid for the Excluded Assets and Propco, and the

25 structure of the reorganized entities will have been determined in the Insiders' favor without

26 adequate disclosure even before the Court has an opportunity to determine the adequacy of the

27 Disclosure Statement. In light of the significant impact of the Bidding Procedures on the overall

28 structure of the Plan, the Court must consider whether the Bidding Procedures (as proposed) are

-18-

1   fair and make good sense in the overall context of the reorganization process. *See In re Public*

2   *Serv. Co. of New Hampshire*, 90 B.R. 575, 581 (Bankr. D.N.H. 1988). Boyd believes that the

3   answer is "no," and suggests that the Debtors' estate will be best served by making <u>all of the</u>

4   <u>Debtors' assets available for sale</u>, thus allowing the Court to consider offers for either all or part

5   of the current enterprise.[41]

6        Even if the Debtors had intended to reorganize as a stand-alone enterprise, the only way to

7   maximize the value of the estate is to market <u>all</u> of the estate's assets and then solicit interest for a

8   reorganization structure that will provide the highest and best value for creditors.

9       **C.**    **The Bidding Procedures Must Be Highly Scrutinized Because They Are Being Proposed by the Debtors and Sanction a Transfer of Assets to the Insiders, Especially Without Full Disclosure**

10

11        The Bidding Procedures are the first step in a going concern sale process that is predicated

12   on transferring assets of significant strategic and economic value to New Propco without

13   exposing such assets to a competitive auction process and adequate disclosure. As part of its

14   analysis of the Bidding Procedures, the Court should evaluate whether it is in the creditors' best

15   interests and consistent with the Debtors' fiduciary duties for the Excluded Assets and the Propco

16   Assets to be withheld from the proposed sale. In light of the fact that the Excluded Assets are to

17   be transferred to the Insiders, it is <u>not</u> appropriate for the Court to defer to the Debtors' business

18   judgment,[42] especially with inadequate disclosure, as demonstrated in the Boyd Declarations.

19   Instead, the Court's review of the proposed transaction must be one of heightened scrutiny. *See In*

20   *re Bidermann Indus. USA, Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997), *quoting C&J Clark*

21   *Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988)

22   ("sales to fiduciaries in chapter 11 cases are not *per se* prohibited, 'but [they] are necessarily

23   subjected to heightened scrutiny because they are rife with the possibility of abuse.'").

24

25

---

26   [41] *See* Reynertson Decl., ¶ 17.

27   [42] Ordinarily, a debtor will be authorized to sell assets outside the ordinary course of business pursuant to 11 U.S.C. § 363 or in connection with confirmation of a plan of reorganization if the debtor can demonstrate that the sale is being done for a sound business purpose. *See Computer Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul*

28   *Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003).

1   When a debtor proposes to transfer its assets to an insider, the debtor must fully disclose

2   to the court and creditors the relationship between the buyer and seller, the circumstances under

3   which the negotiations have taken place, any marketing efforts (i.e., did the debtor seek other

4   buyers), and the factual basis upon which the debtor determined that price was reasonable or

5   adequate. *U.S. Small Bus. Admin. v. Xact Telesolutions, Inc.* (*In re Xact Telesolutions, Inc.*), No.

6   Civ. A. DKC 2005-1230, 2006 WL 66665, at *6-7 (D. Md. Jan. 10, 2006); *In re Wilde Horse*

7   *Enters, Inc.*, 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991). Therefore, before the Court approves

8   the Bidding Procedures, it should first be satisfied that a transfer of the Excluded Assets to New

9   Propco will maximize value for the Debtors' estate; otherwise, the Court must make all of the

10  assets of Opco available to the market after full disclosure in order to ensure that the Debtors are

11  getting the highest and best price for such assets. As the Boyd Declarations demonstrate, there

12  are many important issues that the Debtors have failed to address.

13          **1.       The Insiders Are the Sellers, Co-Stalking Horse Bidder and Arbiters**
14          **of a Process That Involves a Transfer of Assets to the Debtors'**
                **Principals**

15          The Bidding Procedures provide, *inter alia*, that the Debtors "under the direction of SCI's

16  independent director" (after consultation with the Consultation Parties) (i) shall not only decide

17  whether a Potential Bidder is a Qualified Bidder, *see* Section K.7, (ii) but shall also have the right

18  to exclude a bid for the Opco Properties that, in the Debtors' business judgment, does not

19  conform to one or more of the bid requirements, *see* Section N.3, and (iii) shall make the

20  determination of the Successful Bid and Alternate Bid at the conclusion of the Auction, *see*

21  Section S. The amended Bidding Procedures also provide that the Propco Lenders and Fertitta

22  Gaming, LLC (a newly formed entity owned by Frank J. Fertitta (SCI's Chairman of the Board,

23  Chief Executive Officer and President) and Lorenzo J. Fertitta (SCI's Vice Chairman of the

24  Board of Directors and a director)) will be designated as the Stalking Horse Bidder for the Opco

25  Properties. *See* Section D. This scenario presents a significant conflict of interest and taints the

26  entire sale process.[43] It is especially offensive and disconcerting that the Fertittas do not believe

27

28  _____
    [43] *See* Reynertson Decl., ¶ 18.

1   that it is appropriate to remove themselves from SCI's Board of Directors even though they are

2   directly involved in every aspect of this sale process.[44]

3        Under such circumstances, it is highly questionable whether the Debtors can truly be

4   impartial and fair in their decisions, especially since every one of the Debtors' insiders benefits

5   from the Plan.  The Bidding Procedures provide that Dr. James E. Nave, an independent director,

6   will be involved in the process, but he will not be the only person who decides which entity will

7   be designated the Successful Bidder.  Instead, the decision will ultimately be made by the

8   Debtors, whose board of directors is led by the anticipated co-owners of New Propco and

9   participants in the going concern sale of the Opco Properties.  Any sale process in which the

10  Debtors' fiduciaries are involved on both sides of the transaction and retain such a great degree of

11  discretion to make unilateral decisions that will shape the outcome of this reorganization

12  proceeding must be modified in order to ensure that a truly impartial and independent arbiter is

13  involved;[45] otherwise, all third parties start off at a significant disadvantage vis-à-vis potential

14  bidders, such as the Stalking Horse Bidder.[46]  Moreover, judging by the decisions of the so-called

15  independent decision makers thus far in the reorganization process who have uniformly favored

16  Propco (now locked up by the Insiders), Opco creditors have reason to question both the

17  impartiality and judgment of the independent decision makers.  The appearance of impropriety by

18  itself can chill bidding in such a process.[47]

19       The most recent and offensive example of impropriety manifested itself in the amended

20  Bidding Procedures.  Section C.1 provides that "the Opco Group is offering for sale all or

21  substantially all of the Opco Properties *other than* the Excluded Assets.  The Excluded Assets

22  will not be included in the Sale." (emphasis added)  However, Section C.2 provides, in pertinent

---

[44] By way of comparison, in advance of announcing an equity capital commitment between his investment fund, Pershing Square Capital Management, L.P. ("Pershing") and General Growth Properties, Inc. ("GGP"), Pershing's CEO, William A. Ackman voluntarily resigned from GGP's Board of Directors. *See General Growth Properties, Inc.*, Current Report (Form 8-K) (March 11, 2010).

[45] *See In re Fontainebleau Las Vegas Holdings, LLC*, Case No. 09-21481, Docket No. 770 (Bankr. S.D. Fla. October 14, 2009) (examiner appointed to supervise assets sale); *In re Asarco LLC*, Case No. 05-21207, Docket No. 7430 (Bankr. S.D. Tx. April 16, 2008) (assigning examiner to monitor plan sponsor selection process).

[46] *See* Reynertson Decl., ¶ 19.

[47] *See* Reynertson Decl., ¶ 12.

1   part, that "the Excluded Assets <u>are</u> included in the Stalking Horse Bid." (emphasis added)  The

2   Debtors must explain how assets not available to any other bidder can be included in the Stalking

3   Horse Bid.  If the Court allows the Excluded Assets to be included in the Stalking Horse Bid, then

4   all parties-in-interest must be allowed to bid for the Excluded Assets; otherwise, the only way to

5   have an "apples-to-apples" auction is to deduct the assigned value of the Excluded Assets from

6   the Stalking Horse Bid.

7           **2.      The Plan Structure Is Driven by the Self-Interests of the Debtors'**
                       **Principals**
8

9           The Disclosure Statement discloses to the Court and the creditors that the Propco Lenders

10  will sell 50% of the equity in New Propco[48] to an affiliate of Fertitta Gaming.  However, the

11  Disclosure Statement fails to provide any color about this arrangement.  The devil is in the

12  details, and the pertinent details lie in the support agreements (the "<u>Support Agreements</u>")

13  between and among the Propco Lenders, the Mezzco Lenders, the Swap Counterparty, Fertitta

14  Gaming ("<u>FG</u>"), and the Fertittas.

15          The Support Agreements include:  (A) the Memorandum of Understanding,[49] dated as of

16  March 23, 2010,[50] between and among: (i) Fertitta Gaming, the Fertittas, FJF Investco, LLC ("<u>FJF</u>

17  <u>Investco</u>"), LJF Investco, LLC ("<u>LJF Investco</u>"), and FCP Class B Holdco LLC ("<u>Class B</u>

18  <u>Holdco</u>," together with the Fertittas, FJF Investco, and LJF Investco, the "<u>Fertitta Parties</u>");

19  (ii) FC Investor LLC ("<u>FC Investor</u>"), Thomas Barrack, Jr. (solely in his capacity as an

20  equityholder of VoteCo, as managing member of Colony Capital, LLC, as a director of SCI and a

21  manager of FCP, "<u>Barrack</u>"), and any affiliate of Colony Capital LLC that may be added to this

22  MOU by way of a joinder (such affiliates together with FC Investor and Barrack, "<u>Colony</u>" or the

23  "<u>Colony Parties</u>"); and (iii) Colony Capital, LLC ("<u>Colony Capital</u>") (solely for the purposes of

24  _____

25  [48] In fact, the Fertittas will hold 50% of the equity in the parent company ("<u>Propco Holdco</u>") of New Propco.

26  [49] The Disclosure Statement briefly mentions that certain non-debtor parties, including the Fertittas, have entered into
    support agreements outlining the terms and conditions of their agreement to support the Plan, *see* Disclosure
    Statement, p. 2.

27  [50] The MOU and PSA (defined herein) were each contained in a Schedule 13D/A filing that disclosed the support
28  agreement and MOU — the filing was a joint filing by (i) FJF, (ii) LJF, and (iii) FCP Voteco.

1   giving releases); and (B) the Propco Plan Support Agreement (the "PSA"), dated as of March 24,

2   2010, between and among Fertitta Gaming, the Fertittas, the Propco Lenders, and Deutsche Bank

3   AG.

4            The PSA generally outlines the terms and structure of the Plan and memorializes the

5   commitments by each of the parties thereto to support the Plan and not take any actions that could

6   threaten confirmation and consummation of the Plan.  The MOU provides, in pertinent part, for

7   the Fertittas to receive releases from Colony for all claims involving, directly or indirectly, (i) the

8   2007 Transaction, (ii) any contract, agreement, document, or obligation pursuant to which any of

9   the Fertitta Release Parties (as defined in the MOU) owes, is bound to, or subject to any

10  obligation or duty to any of the Colony Releasing Parties, (iii) the Plan and any transactions

11  described in the Plan, or (iv) any prior transactions referenced in the MOU.  More importantly, if

12  the MOU is terminated, then the Fertittas and others will not get their releases.  Accordingly, the

13  Fertittas and all other released parties are incentivized to ensure that a termination event (as such

14  term is defined in the MOU) never occurs, and that the parties to the PSA only pursue a stand-

15  alone plan consistent with the Propco Plan Term Sheet (as such term is defined in the MOU).

16                        **3.        The Debtors Did Not Market Propco or the Excluded Assets or Make
                                     Adequate Disclosures**

17

18           "In selling property of the estate, a [debtor] is required to market the property in the

19  manner that is customary for property of the kind at issue." *In re Mama's Original Foods, Inc.*,

20  234 B.R. 500, 503 (Bankr. C.D. Cal. 1999).  The best way to determine a property's market value

21  is to expose such property to the marketplace. *Bank of Am. Nat'l Trust & Savs. Ass'n  v. 203 N.*

22  *LaSalle St. P'ship*, 526 U.S. 434 (1999).  In the end, the property's market value will be "the

23  highest price a willing buyer would pay and a willing seller would accept, both being fully

24  informed, after the property has been exposed to the market for a reasonable period of time."

25  *Mama's Original Foods*, 234 B.R. at 504.

26           Neither the Disclosure Statement nor the Bid Procedures Motion discusses the Debtors'

27  efforts to market Propco or the Excluded Assets with full disclosure before deciding to transfer

28  them to New Propco without competitive bidding.  Moreover, the Debtors do not explain why the

1   Excluded Assets should not be put up for auction with full disclosure. The Debtors' justification

2   for transferring the Excluded Assets without exposing them to the market is that they are simply

3   listening to the desires of the Propco Lenders. *See* Motion, ¶ 10. The interests of the Opco

4   creditors are not best served by conveying assets, such as Propco, Opco's IT system, intellectual

5   property, the Wild Wild West real property, Unencumbered FF&E, and Corporate FF&E, to the

6   Propco Lenders simply because they made such a request to the Debtors. It is very possible that a

7   third party, other than the Propco Lenders (i.e., Boyd), might have an interest in such assets and

8   be willing to pay more than the Propco Lenders for such assets. In February 2009 and December

9   2009, Boyd made two offers to SCI to purchase its assets, and neither offer was accepted. In fact,

10  the Debtors did not even engage Boyd in any substantive follow-up discussions on either of those

11  offers; instead, the Debtors simply stated that they were not taking any steps towards pursuing a

12  sale of substantially all of SCI's assets and instead would be moving ahead with the contemplated

13  restructuring of their debt.[51] We now know that the Debtors were only interested in pursuing an

14  insider transaction at the expense of their creditors' interests in breach of the board's fiduciary

15  obligations. The Court should not sanction the Debtors' ongoing blatant disregard for the

16  creditors' interests by approving these one-sided Bidding Procedures.

17  **4.    The Debtors Do Not Disclose the Consideration for the Excluded Assets and Other Relevant Facts, Such as the Harm to the Remaining Opco Business After the Loss of Such Excluded Assets**

18

19  Finally, the Debtors do not even disclose to the Court or the creditors the consideration

20  being provided by the Propco Lenders for the Excluded Assets or the likely harm to the remaining

21  Opco businesses. Instead, creditors are told that the terms of the New Propco Purchase

22  Agreement will be included in a Plan Supplement.[52]

23  Therefore, after closely scrutinizing the Bidding Procedures and examining the underlying

24  facts, it is readily apparent that the Bidding Procedures are flawed and cannot be approved.

25  These procedures are not crafted in a manner that will benefit the estate and protect the Opco

26  creditors. Instead, the Bidding Procedures are drafted in order to facilitate a reorganization plan

27  [51] Station Casinos, Inc., Current Report (Form 8-K) (Mar. 3, 2009).

28  [52] *See* Disclosure Statement, p. 56.

1    negotiated by conflicted insiders whose apparent motivation is to protect their own interests, not

2    maximize value for Opco's creditors.  This becomes abundantly clear when the Court reads the

3    Boyd Declarations as to the impact of removing the Excluded Assets from Opco.

4    **D.    The Bidding Procedures Must Be Denied Because They Chill Bidding and Favor the Insiders**

5

6        Bid procedures must not chill the receipt of higher and better offers and must be consistent

7    with the seller's fiduciary duties.  *See, e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re*

8    *O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535, 538 (3d Cir. 1999) (rejecting bidding procedures

9    that included a break-up fee on the grounds that it would "'not induce further bidding or bidding

10   generally', but would 'unnecessarily chill[] bidding and potentially deplete[] assets that could be

11   better utilized to help fund a plan of reorganization . . .'") (citations omitted).  In addition, when a

12   close relationship exists between the debtors and certain parties-in-interest who are involved in a

13   bankruptcy sale, the Court must be particularly cautious about approving bidding procedures that

14   would favor one of those parties-in-interest.

15       In *In re Yellowstone Mountain Club, LLC*, the holder of substantially all of the debtors'

16   equity was personally indebted to the debtors' DIP lender, and the DIP lender was instrumental in

17   selecting the company then employed by the debtors to oversee all services at the Yellowstone

18   Club. No. 08-61570-11, 2009 WL 982233, at *5 (Bankr. D. Mont. Feb. 18, 2009).  As a result,

19   the court was very cautious about approving bid procedures that would favor the DIP lender to

20   the detriment of other parties in the case.  The court ultimately held that the bid procedures did

21   not encourage third-party bids, but rather, were drafted in such a fashion as to ensure that the DIP

22   lender would be the successful purchaser of the Yellowstone Club. *Id.*

23       As discussed in Section C of this Objection, there is a very close relationship between the

24   Debtors and Fertitta Gaming (the co-Stalking Horse Bidder).  Therefore, the Court must be wary

25   of the following artificial impediments incorporated into the Bidding Procedures that are intended

26   to improve the probability that the Propco Lenders / Fertitta Gaming will be the successful

27   purchaser of the Opco Properties over all other parties.

28

1

### 1.    Opco's "Operating System" Is Among the Excluded Assets

2    A computer cannot properly function without its operating system.  Similarly, a casino

3  cannot properly operate if it does not possess the required business infrastructure elements.  In

4  light of its extensive experience operating casinos in the Las Vegas local market, Boyd submits

5  that Opco's value will be significantly hampered if the Excluded Assets are carved out from

6  Opco's going concern sale.[53]  Individually, the Excluded Assets may or may not have significant

7  economic value, depending on the particular asset.  However, many of the Excluded Assets are

8  strategic, because they are critical components of a larger, more complex business management

9  system.  When synthesized to support a gaming operation, the collective value of those Excluded

10  Assets becomes greater than the sum of its parts, as explained in the Boyd Declarations.[54]

11    If the Court approves the Bidding Procedures (in its current form), only the "shell" of

12  Opco will be available for sale, because the "brains" of the gaming operation (i.e., intellectual

13  property, information technology, business information, etc.) will be excluded and transferred to

14  New Propco.  If an Opco non-insider bidder must first acquire the necessary infrastructure in

15  order to allow the Opco Properties to start generating revenue, then that party is handicapped

16  going into the auction and starts off at a significant disadvantage as compared to New Propco.[55]

17  Under the current terms of the Bidding Procedures and the Plan, New Propco is the only party

18  who would have the immediate capability to extract value from SCI's assets, because it will be

19  the only party that possesses the missing puzzle piece (i.e., the critical business infrastructure

20  components).[56]  Propco (now that it's been locked up by the Insiders) is doing to Opco exactly

21  what Propco complained about in the First Compromise Agreement.  However, Propco's harm to

22  Opco is far worse and cannot be justified; these Excluded Assets are owned by Opco and paid for

23  by Opco creditors.  If the Excluded Assets are allowed to remain outside the scope of Opco's

24  going concern sale and are not available for third parties to acquire with other Opco assets, then

25

26  [53] *See* Reynertson Decl., ¶ 13-16.

    [54] *See* Reynertson Decl., ¶ 13-16.

27  [55] *See* Reynertson Decl., ¶ 13.

28  [56] *See* Reynertson Decl., ¶ 13.

1    the entity that possesses those Opco assets (i.e., New Propco — owned by the Propco Lenders

2    and Fertitta Gaming) will have a significant advantage over all other non-insider parties.

3              **2.      The Debtors Will Not Resolve "Interdependencies"**

4         The Debtors provide interested parties with the option of submitting either (i) bids for all

5    or any portion or portions of the Opco Properties or (ii) Joint Bids for all, substantially all, or

6    portions of the Opco Properties.[57]  However, the Bidding Procedures also provide, in pertinent

7    part, that "[t]he Debtors do not intend, and shall not be required to undertake any obligation, to

8    resolve any Interdependencies (as such term is defined in the Bidding Procedures) among the

9    various Opco Properties." *See* Bidding Procedures, Section E.3.  When they were defending the

10   Master Lease Compromise Agreement, the Debtors argued that, "SCI further believes that, as a

11   licensee of the State of Nevada, it would be required to assist in an orderly transition to a new

12   licensed operator or face significant adverse regulatory action if it failed to do so . . ."[58]

13        If the Interdependencies inhibit the orderly transition of the Opco Properties to a new

14   licensed operator, then why are the Debtors not willing to do what they previously committed

15   themselves to do in the context of the prior Master Lease Compromise Agreement?  The Debtors'

16   blatant refusal to resolve the Interdependencies is nothing more than a means potentially to

17   dissuade non-insider third parties from participating in an auction for the Opco Properties.  And

18   by creating yet another barrier for outsiders to participate in the auction, especially without

19   adequate disclosure, the Debtors minimize outside competition for the Opco Properties and

20   increase the probabilities that the Insiders will be the successful bidder for the Opco Properties.

21             **3.      The Successful Bid Must Be Irrevocable for Six Months**

22        Section N.1(b) of the Bidding Procedures provides, in pertinent part, that a Qualified

23   Bidder must represent to the Debtors that its Qualified Bid, if chosen as the Successful Bid, will

24   be irrevocable for a period as long as six (6) months.  However, the Bidding Procedures do not

25   provide any mechanisms that would assure the Successful Bidder that the assets it agreed to

26

27   [57] *See* Bidding Procedures, Section E.1.

28   [58] *See* Debtors' Reply to Objections to Debtors' Joint Motion For Entry of An Order Approving Master Lease
     Compromise Agreement [Docket No. 685, December 9, 2009], pp. 10-11.

1  purchase will be adequately preserved by the Debtors' insider competitors during the time from

2  the close of the Auction to the close of the sale.  Moreover, the Bidding Procedures do not

3  provide any protections for the Successful Bidder, such as releasing the Successful Bidder from

4  its obligations, if there is a material change of events that alters the fundamental deal terms (even

5  if caused by the Insiders hoping to chase off the Opco buyer).  As a result, the Successful Bidder

6  will have to incur the cost of maintaining regular oversight over the Opco Properties during the

7  interim period, with limited access and protections, absent a creditor plan or other buyer

8  protections against the Insiders, and those chosen by the Insiders, to oversee Opco until the

9  closing in January 2011.  Currently, the only party who has the capability to oversee the assets on

10  a daily basis would be Fertitta Gaming.  Therefore, the Bidding Procedures create a further

11  imbalance by requiring outside bidders to incur a potentially extraordinary cost if they become

12  the Successful Bidder — a cost that would not have to be similarly incurred by an entity such as

13  Fertitta Gaming.[59]

14        **4.    The Bidding Procedures Promote a Truncated Sale Process That Will
                   Not Benefit the Debtors' Estates**
15

16        Section K.4 of the Bidding Procedures provides that Potential Bidders must submit their

17  LOI and related materials to the Debtors no later than thirty (30) days after the date of the entry of

18  the Bidding Procedures Order.  The Debtors commit themselves to determine, as promptly as

19  practicable after a Potential Bidder delivers its bid materials, whether a Potential Bidder is a

20  Qualified Bidder.  Based on recent representations to the Court, the Debtors intend to go forward

21  with a confirmation hearing on the Plan on or about July 15, 2010.[60]  The Debtors will only have

22  approximately six (6)[61] weeks from receiving LOIs to (i) identify Qualified Bidders, (ii) allow

23  Qualified Bidders to review additional due diligence, (iii) have Qualified Bidders submit their

24  Qualified Bid materials (*see* Bidding Procedures, Section N), (iv) select Qualified Bids,

25

---

26  [59] *See* Reynertson Decl., ¶ 25.

27  [60] *See* Debtors' Motion for Order Pursuant to 11 U.S.C. § 1121(d) Further Extending the Exclusive Period Within Which Debtors May Solicit Acceptances to Joint Plan of Reorganization [Docket No. 1172, filed April 7, 2010].

28  [61] Assuming arguendo that the Bidding Procedures Order is entered on May 5, 2010.

1   (v) conduct an auction (which, according to the Debtors, is to occur "shortly before the

2   confirmation hearing on the Joint Plan"),[62] and (vi) negotiate and finalize the Purchase Agreement

3   with the Successful Bidder.

4           Boyd respectfully submits that the Court take judicial notice of the process presently

5   before the U.S. Bankruptcy Court, Southern District of New York in which General Growth

6   Properties, Inc.[63] outlined a timetable for marketing its assets and identifying a plan structure that

7   creates the greatest value for its creditors and equityholders.  More specifically, GGP is running a

8   process in which it will consider offers for either a stand-alone reorganization or a sale of

9   substantially all of its assets to a third party.  In either case, parties-in-interest will have to adhere

10  to a timetable that provides for the following: (i) ten (10) days for the Debtors to decide if first-

11  round bidders advance to a second round of diligence, plus (ii) approximately five (5) weeks to do

12  additional due diligence and submit their "final" bid, plus (iii) approximately fourteen (14) days

13  to allow the Debtors, in conjunction with the statutory committees and their respective

14  professionals, to evaluate and decide on the winning bid, plus (iv) approximately sixteen (16)

15  days to negotiate final documentation, and file a plan and disclosure statement.[64]  In sum, GGP

16  proposes to give itself approximately ten to eleven (10-11) weeks to get from the point of

17  receiving first bids to the point when the deal documentation is finalized, whereas the Debtors

18  have chosen to only give themselves six (6) weeks to do the same.  Given the sheer size of and

19  complexities associated with the Opco Properties and the Excluded Assets, Boyd suggests that the

20  Debtors are doing themselves and their creditors a grave injustice by trying to cram the sale

21  process into a six-week timeframe.[65]  Moreover, this consolidated sale process provides further

22  evidence that the Bidding Procedures are a part of a severely flawed process that is designed

23  solely to convey certain strategic and economically valuable assets to the Insiders.

24

25

26  [62] *See* Bid Procedures Motion, ¶ 19.

    [63] Case No. 09-11977 (ALG).

27  [64] *See* Case No. 09-11977 (ALG), Docket No. 4874 (March 31, 2010).

28  [65] *See* Reynertson Decl., ¶ 23.

1       **E.**    **The Bidding Procedures Give the Insiders Too Much Control Over the**
                **Outcome of the Sale Process with Too Little Disclosure**

2

3       Nearly forty-five years ago, Judge Henry Friendly of the U.S. Court of Appeals for the

4 Second Circuit said that "[t]he conduct of bankruptcy proceedings not only should be right but

5 seem right." *Knapp v. Seligson* (*In re Ira Haupt & Co.*), 361 F.2d 164, 168 (2d Cir. 1966).

6 Throughout this Objection, Boyd has highlighted for the Court why the Bidding Procedures are

7 not right. In addition, the Bidding Procedures do not seem right because, among other things,

8 they permit the Debtors to exercise too much control and discretion over the sale process while

9 providing an insufficient amount of disclosure to the Court and their creditors. For example,

10 Section F of the Bidding Procedures provide that:

11               [a] Potential Bidder that desires at any time to contact
              (whether in person or telephonically) the Committee, the

12               Opco Agent Agent, any member of the Opco Lender
              Steering Committee or the Propco Lenders or their

13               respective advisors to discuss the terms of any bid made or
              to be made, such Potential Bidder shall coordinate such

14               contact through the Opco Debtors' advisors (who shall
              promptly act on such request to facilitate such contact).

15

16 There is no justifiable reason for the Debtors (and persons chosen by the competing Insiders) to

17 have such overly broad and unfettered control over the communications between and among the

18 different interested parties in these cases.[66] In fact, the Debtors already have a built-in protection

19 in the Bidding Procedures to guard against possible wrongdoing by potential bidders. *See* Bidding

20 Procedures, Section R.1(b) ("Each Qualified Bidder shall be required to confirm that it has not

21 engaged in any collusion with respect to the bidding or the Sale"). The Debtors must explain to

22 the Court how the estate's value will be maximized by requiring the Debtors to facilitate such

23 communications, rather than allow the parties-in-interest to freely discuss bid-related matters

24 amongst themselves.

25       In addition, the degree of discretion given to the Debtors (and persons chosen by the

26 competing Insiders) to withhold due diligence from a Qualified Bidder is entirely inappropriate.[67]

27 _____
[66] *See* Reynertson Decl., ¶ 22.

28 [67] *See* Reynertson Decl., ¶ 24.

1    For example, the Bidding Procedures provide, in part, that Qualified Bidders may obtain from the

2    Debtors such information as the Qualified Bidder may reasonably request so long as the "Debtors,

3    in their reasonable business judgment, agree after consultation with the Consultation Parties and

4    subject to competitive or other business considerations . . ." *See* Bidding Procedures, Section L.2.

5    Boyd recognizes that there might be certain types of information that SCI might not want a

6    competitor to have for antitrust reasons, but beyond that, a qualified bidder, including a

7    competitor of the Debtors, should have broad access to the Debtors' books and records so that it

8    can fully evaluate the Debtors' business and prepare a fully vetted offer for the Opco Properties.

9         Finally, the exhaustive criteria to be used by the Debtors when evaluating competing bids

10   includes "the claims likely to result from or be created by such bid in relation to other bids." *See*

11   Bidding Procedures, Section O.1.  This overly broad and subjective provision provides the

12   Debtors with too much latitude to marginalize a potentially superior bid from a competitor.

13   Debtors may certainly consider the risks associated competing bids, but this provision is difficult

14   to interpret and will frustrate the bidding, rather than promote a competitive atmosphere.

15   Therefore, the Debtors should be required to clarify the exact meaning of this provision.

16                           **IV.    CONCLUSION**

17        In summary, Boyd Gaming Corporation respectfully requests that the Court deny, without

18   prejudice, the relief being sought by the Debtors in the Bid Procedures Motion.  However, if the

19   Court is inclined to grant the Bid Procedures Motion, then, at a minimum, the Debtors must

20   modify the Bidding Procedures in such a way that requires more disclosure and does <u>not</u> (i) chill

21   bidding, (ii) favor insider bidding parties, (iii) foreclose the possibility of confirming a

22   reorganization plan other than the plan presently before the Court, (iv) limit potential bidders to

23   only purchase assets other than the Excluded Assets, (v) allow Insiders, and those who they have

24   chosen, to run the process in their discretion, and (vi) allow the Stalking Horse Bidder to include

25   in its bid assets not otherwise available to non-insider third parties.

26   / / /

27   / / /

28

1   DATED this 21st day of April, 2010.

2
                                        SNELL & WILMER L.L.P.
3

4
                                        By: _____
5                                           Robert R. Kinas, Esq. (NV Bar No. 6019)
                                            Mark E. Konrad, Esq. (NV Bar No. 4462)
6                                           SNELL & WILMER L.L.P.
                                            3883 Howard Hughes Parkway, Suite 1100
7                                           Las Vegas, NV 89169

8                                           Brett H. Miller, Esq. (NY Bar No. 2483691)
                                            *Admitted Pro Hac Vice*
9                                           Jordan A. Wishnew, Esq. (NY Bar No. 4106126)
                                            *Pro Hac Vice Pending*
10                                          MORRISON & FOERSTER LLP
                                            1290 Avenue of the Americas
11                                          New York, NY 10104-0050

12                                          G. Larry Engel, Esq. (CA Bar No. 53484)
                                            Vincent J. Novak, Esq. (CA Bar No. 233033)
13                                          MORRISON & FOERSTER LLP
                                            425 Market Street
14                                          San Francisco, CA 94105-2482
                                            *Admitted Pro Hac Vice*
15
                                            Attorneys for Boyd Gaming Corporation
16

17

18

19

20

21

22

23

24

25

26

27

28

11445007.1                              -32-
ny-920091