**E-filed: April 21, 2010**

BRETT H. MILLER (NY Bar No. 2483691)
*Admitted Pro Hac Vice*
JORDAN A. WISHNEW (NY Bar No. 4106126)
*Pro Hac Vice Pending*
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104-0050
Telephone: 212.468.8000
Facsimile: 212.468.7900
BrettMiller@mofo.com; JWishnew@mofo.com

ROBERT R. KINAS (Bar No. 6019)
MARK E KONRAD (Bar No. 4462)
SNELL & WILMER LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169-5958
Telephone: 702.784.5220
RKinas@swlaw.com

Attorneys for Boyd Gaming Corporation

G. LARRY ENGEL (CA Bar No. 53484)
VINCENT J. NOVAK (CA Bar No. 233003)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522
LEngel@mofo.com; VNovak@mofo.com
*Admitted Pro Hac Vice*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.,
                    Debtor.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Northern NV Acquisitions
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects Fertitta Partners, LLC
☐ Affects Station Casinos, Inc.
☐ Affects FCP Mezzco Parent, LLC
☐ Affects FCP Mezzco Parent Sub, LLC
☐ Affects FCP Mezzco Borrower VII, LLC
☐ Affects FCP Mezzco Borrower VI, LLC
☐ Affects FCP Mezzco Borrower V, LLC
☐ Affects FCP Mezzco Borrower IV, LLC
☐ Affects FCP Mezzco Borrower III, LLC
☐ Affects FCP Mezzco Borrower II, LLC
☐ Affects FCP Mezzco Borrower I, LLC
☐ Affects FCP Propco, LLC

Chapter 11

Case No. BK-09-52477

Jointly Administered
BK 09-52470 through 09-52487

**OBJECTION TO JOINT MOTION OF
STATION CASINOS, INC. AND FCP
PROPCO, LLC PURSUANT TO
11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3)
AND 365(d)(4)(B)(ii) AND FED.
BANKR. 9019 FOR ENTRY OF AN
ORDER APPROVING SECOND
AMENDMENT TO AMENDED AND
RESTATED MASTER LEASE
COMPROMISE AGREEMENT**

Date: **May 4, 2010**
Time: **2:00 p.m.**
Place: 300 Booth Street
          Reno, NV 89509

11445008.1

1       Boyd Gaming Corporation ("Boyd"), a creditor of Station Casinos, Inc. ("SCI"), by and

2   through its counsel, Snell & Wilmer L.L.P., hereby objects to the *Joint Motion of Station*

3   *Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and*

4   *365(d)(4)(B)(ii) and Fed. R. Bankr. Proc. 9019 for Entry of an Order Approving Second*

5   *Amendment to Amended and Restated Master Lease Compromise Agreement* [Docket No. 1179],

6   as revised by the *Notice of Submission of Redline Comparison of Revised Second Amended and*

7   *Restated Master Lease Compromise Agreement* [Docket No. 1216] (the "Second Amendment

8   Motion").[1]

9       Boyd has also filed objections contemporaneously herewith to the Debtors' bidding

10  procedures motion (as revised) and motion to extend exclusivity.[2]  This objection is supported by

11  the accompanying Memorandum of Points and Authorities, the Declarations of David Farlin (the

12  "Farlin Declaration"), Brian Larson (the "Larson Declaration"), and Soren Reynertson (the

13  "Reynertson Declaration" and, together with the other aforementioned declarations, collectively

14  the "Boyd Declarations"), each filed contemporaneously herewith, together with all pleadings and

15  papers of record, and any oral argument the Court may entertain.

16

17

18

19

20

21

22

23

---

24  [1] On April 19, 2010, the Debtors filed substantially revised versions of the operative documents that are the subject of
    the Second Amendment Motion [*see* Docket No. 1216].  Boyd has not had a sufficient opportunity to rewrite the

25  brief and declarations to address the newly revised deal. However, from a quick review, we believe that the thrust of
    our objections remains correct and the reforms do not change our central concerns. We expect to provide a
    supplementary response in due course.

26
    [2] *See Boyd Gaming Corporation's Objection to Motion for Order Establishing Bidding and Deadlines Relating to*

27  *Sale Process For Substantially All of the Assets of Station Casinos, Inc. and Certain "Opco" Subsidiaries* (the
    "Bidding Procedures Objection"); and *Objection to Debtors' Motion for Order Pursuant to 11 U.S.C. § 1121(d)*

28  *Further Extending the Exclusive Period Within Which Debtors May Solicit Acceptances to Joint Plan of*
    *Reorganization.*

1    DATED this 21st day of April, 2010.

2

3                                          SNELL & WILMER L.L.P.

4

5                                          By:
                                               Robert R. Kinas, Esq. (NV Bar No. 6019)
6                                              Mark E. Konrad, Esq. (NV Bar No. 4462)
                                               SNELL & WILMER L.L.P.
7                                              3883 Howard Hughes Parkway, Suite 1100
                                               Las Vegas, NV 89169
8
                                               Brett H. Miller, Esq. (NY Bar No. 2483691)
9                                              *Admitted Pro Hac Vice*
                                               Jordan A. Wishnew, Esq. (NY Bar No. 4106126)
10                                             *Pro Hac Vice Pending*
                                               MORRISON & FOERSTER LLP
11                                             1290 Avenue of the Americas
                                               New York, NY 10104-0050
12
                                               G. Larry Engel, Esq. (CA Bar No. 53484)
13                                             Vincent J. Novak, Esq. (CA Bar No. 233033)
                                               MORRISON & FOERSTER LLP
14                                             425 Market Street
                                               San Francisco, CA 94105-2482
15                                             *Admitted Pro Hac Vice*

16                                             Attorneys for Boyd Gaming Corporation

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

|  | | | Page |
|---|---|---|---|

I.    PRELIMINARY STATEMENT ................................................................ 1

     A.    The Purported Compromise Divests Opco of Significant Value. ........................... 2

     B.    The Second Compromise Amendment Improperly Transfers Critical IT and IP. ........................................................................................... 3

     C.    The Second Compromise Amendment Would Severely Degrade Opco's Competitive Viability. ............................................................ 4

II.    FACTUAL BACKGROUND ................................................................. 5

III.    ARGUMENT .................................................................................. 5

     A.    The Proposed Transfers of "Excluded Assets" to Propco Are Improper. ............... 5

         1.    The Asset Transfers to Propco Have No Justification, and Depress Opco's Value. ............................................................... 7

         2.    Transfers of Certain Opco Assets Will Create Material Competitive Disadvantages for Opco. ....................................... 7

         3.    Transfers of Certain Excluded Assets May Harm Opco's Operations. ...................................................................... 8

         4.    Analysis of Specific Excluded Assets: The Transfer of Opco's IP/IT to Propco Without Reasonably Equivalent Auction Value is Improper, and Opco Needs to Preserve Its Own Functionality. ................. 8

         5.    The Proposed Transfers Have Created Risk and Uncertainty for Non-Buyer Insiders. ................................................. 13

         6.    Accommodations for Propco Must Be Reconciled with the Need for Corresponding Safeguards for Non-Insider Opco Buyers. ...................... 13

     B.    The Debtors' Insiders Have Not Satisfied Their Duty of Disclosure and Fairness. .................................................................... 16

     C.    The Debtors' Proposal Is Akin to a Divorce Involving Separate Property in Which a Prenuptial Agreement Previously Resolved the Asset Division. .......... 16

     D.    The Debtors Are Judicially Estopped from Using This Second Compromise Amendment to Grab More Opco Assets for Propco. ...................... 17

     E.    The New "Compromise" Imposes Many Additional Burdens on the Opco Buyer to Provide Unnecessarily Long Transition Services to Propco After the Rejection of the Master Lease. .............................................. 20

     F.    Propco Cannot Expand Its Rights on Opco License Rejection Beyond the Scope of § 365(n). .................................................. 20

IV.    CONCLUSION ............................................................................. 21

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.    PRELIMINARY STATEMENT

3

  The Second Amended and Restated Master Lease Compromise Agreement (the "Second

4

Compromise Amendment") proposed by the Debtors contains numerous fundamental flaws that

5

the Debtors have failed to adequately disclose or address, much less to resolve. At its core, the

6

Second Compromise Amendment is not merely an "amendment" to the existing Court-approved

7

settlement between SCI and Propco, but rather, it is a wholesale retrade on the previous

8

settlement purportedly resolving the Opco-Propco issues by requiring material Opco Transition

9

Services[3] and divesting Opco of valuable property. As demonstrated in Boyd's Bidding

10

Procedures Objection and under the Second Compromise Amendment, Propco would continue to

11

demand more services and to take even more of Opco's valuable and strategic "Excluded Assets"

12

from Opco and its creditors.[4] Neither this Court nor Opco's creditors can fairly address these

13

issues, unless and until the Debtors more comprehensively reveal the details of, and rationale for,

14

15

[3] Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Second Amendment Motion.

16

17

18

19

20

[4] While both the Debtors' Second Amendment Motion and Bidding Procedures Motion would shift Opco assets to Propco as "Excluded Assets," the harm and unfairness are more obvious in the latter case, as shown in Boyd's Bidding Procedures Objection. For example, many such Opco assets stripped away by Propco have no essential connection to the four Propco casinos at all, and, therefore, cannot be shielded by Propco from competitive bidding. One of many examples is Propco's attempt to transfer to Propco, without any competitive bidding, Opco's Wild Wild West Casino and related assemblage (whose primary and large value is as a future hotel casino site combined with some Landco adjacent land). Another example is the FF&E at Opco's main office building. The point of the cross-references here to the common Excluded Asset problem addressed in Boyd's Bidding Procedures Objection is that this Second Compromise Amendment is part of an overall effort to weaken Opco and strengthen Propco without proper justification and without adequate disclosure.

21

22

23

24

This attempt to avoid competitive bidding on Opco assets, such at the Wild Wild West Casino (an asset that is entirely separate and distinct from Propco's four casinos) and the Propco grab for the Opco headquarters' FF&E, begs the obvious question of whether the real motivation of the Debtors' insiders is to: (1) acquire valuable Opco assets for inadequate consideration for Propco, (2) chill and depress non-insider bidding for whatever is left at Opco (after the preemptive Opco asset transfers to Propco), and (3) have New Propco inexpensively acquire the Opco assets that remain, without any meaningful competitive bidding. *See* the many examples addressed in the Boyd Declarations that evidence such unjustified and unfair treatment of Opco for the benefit of Propco and the Debtor's insiders.

25

26

27

28

In order to achieve maximum value for Opco, there must be a fair sale and plan process run by a true neutral on a level playing field for non-insider buyers. There must also be an opportunity for non-insider buyers to protect their purchased assets during the long period between the auction (July 2010) and the earliest contemplated closing on the Joint Plan effective date (January 2011), while managed by the New Propco team purportedly still acting for Opco, but preparing to compete against Opco. This proposed "re-do" of the existing Master Lease "compromise" cannot be fairly assessed without the Debtors more comprehensively revealing the details of these windfalls to Propco that greatly harm Opco and chill bidding for the remaining Opco assets.

1    these windfall transfers from Opco to Propco that would greatly harm Opco and chill bidding for

2    the remaining Opco assets.

3        While Boyd understands that this is not a forum for non-insider buyers to object to the

4    many problems with the Debtors' motions, the goal of creditors generally is to maximize the

5    value of Opco assets for Opco creditors.[5]  As a creditor, Boyd objects to the Second Amendment

6    Motion because, among other reasons, the Second Compromise Amendment harms the Opco

7    estate (while creating windfalls from Opco's Excluded Assets for the Propco estate and the

8    Debtors' insiders).  Furthermore, the Second Compromise Amendment demonstrates a clear

9    conflict of interest by the Debtors' insiders, in which the Debtors' decision-makers (chosen by the

10   insiders) have attempted to settle with the Debtors' insiders by sacrificing Opco's interests (*e.g.*,

11   by transferring without full disclosure, competition, or adequate pricing, the Excluded Assets) for

12   the benefit of Propco, which has been locked up by the insider buyers.

13       This attempted harm to Opco includes assets that have little or no essential relationship to

14   Propco.[6]  Among other such concerns, such transfers are plan-determinative and would chill the

15   bidding for Opco by non-insiders.  As explained in Boyd's related objections and Declarations:

16       **A.    The Purported Compromise Divests Opco of Significant Value.**

17       The transfer of more Opco Excluded Assets and rights to Propco now, especially at

18   objectionably favorable prices to Propco without competitive bidding, makes Opco less attractive

19   to non-insider buyers, while giving many unfair advantages to New Propco and the insiders.[7]  For

20   example, by transferring to Propco, in advance of any approved auction and confirmable plan,

21   valuable Opco assets that a potential buyer of Opco casinos or other assets (*e.g.*, intellectual

22   property ("IP") or information technology("IT")) may desire, the Debtors are placing every other

23

---

24   [5] Boyd has been, and still remains, interested in acquiring the Opco assets and, if Propco assets become available,
     both the Propco and Opco assets. However, as expressed in Boyd's objections to the Debtors' pending motions, Boyd

25   has concerns about the adverse impact on the value of Opco due to the proposed transfers of Excluded Assets from
     Opco to Propco, as well as the defects in the Debtors' proposed bidding procedures. Boyd believes that the Debtors'

26   proposed process to acquire Opco assets will fail to meet even the Debtors' professed standard of being competitive,
     open and fair. Unless the defective elements of the Debtors' proposal are resolved, Boyd may choose, and believes

27   that other non-insider bidders may choose, not to pursue the acquisition of the applicable assets.

     [6] *See* Farlin Decl. ¶¶ 7, 13, 15, 18.

28   [7] *See* Reynertson Decl. ¶¶ 13–16.

1    buyer (other than the New Propco/Debtor insiders) in exactly the position that Propco previously

2    complained about in the Amended and Restated Master Lease Compromise Agreement, dated as

3    of December 11, 2009 (the "First Compromise Agreement").[8]

4         This premature shift of Opco assets and value to the Debtors' insiders should not be

5    tolerated.  Furthermore, giving Propco such Opco assets cannot be justified merely by calling this

6    conversion of property a "settlement."  Under the Second Compromise Amendment, New Propco

7    could have a unique advantage in acquiring the Opco casinos as a going concern after Propco

8    strips away the Opco IT and IP that may be essential to successful Opco casino operations, as

9    demonstrated below and in the Farlin Declaration (¶ 12).  If the First Compromise Agreement

10   was approved by the Court, in effect, to permit Opco to bail out Propco in order to preserve

11   operational functionality at the Propco casinos, it is improper for the Debtors to create a situation

12   now that would relegate the Opco casinos to the same fate from which the Debtors insisted that

13   this Court save Propco in the First Compromise Agreement.  In particular, the Debtors cannot be

14   permitted to transfer the Excluded Assets from the Opco IT/IP owner, which is providing

15   Transition Services to Propco, such that Opco now would be required to obtain such services

16   from Propco.

17   **B.    The Second Compromise Amendment Improperly Transfers Critical IT and
         IP.**

18

19        The modern casino business is a technology-driven enterprise operation that is heavily

20   dependent on sophisticated (and often proprietary) IT and IP for successful operation.[9]  By

21   prematurely transferring significant IT and IP rights to Propco for the benefit of their New

22   Propco/insider buyers, the Debtors would create a significant advantage for those New

23   Propco/insider buyers in bidding on Opco's remaining assets.[10]  Without equivalent IP/IT and

24   Transition Services, comparable at a minimum to what is now enjoyed by Propco under the First

25   Compromise Agreement, any buyer of an individual Opco unit (other than Fertitta Gaming)

26

27   [8] *See* Farlin Decl. ¶ 10.

     [9] *See* Farlin Decl. ¶ 9.

28   [10] *See* Reynertson Decl. ¶¶ 13–16.

1    would be purchasing a lifeless shell (a position even worse than the one to which Propco objected

2    before the First Compromise Agreement).

3        By allowing the transfers of Excluded Assets contemplated by the Second Compromise

4    Amendment, New Propco and its insiders would be able to "cherry-pick" the Opco casinos to

5    which only Propco can provide operational functionality, destroying any opportunity for fair

6    bidding or plan process for Opco and significantly hampering the ability to attract a fair price for

7    Opco from non-insider competitors.[11]  If the Court approves the Second Compromise

8    Amendment, the value of Opco casinos would diminish significantly, and the value of the Propco

9    business locked up by the insiders would correspondingly increase.  Who then would benefit?

10   Not the Opco creditors,[12] even though the difference in value is based solely on Opco assets.

11   **C.    The Second Compromise Amendment Would Severely Degrade Opco's Competitive Viability.**

12

13       Opco creditors are not only concerned about the fair market value at auction of the Opco

14   rights and Excluded Assets transferred to Propco (and subsequently to New Propco and the

15   insiders).  They are also concerned about the costs and risks left behind at Opco to replace the

16   Excluded Assets that Opco has lost to Propco, as well as the decline in the value of the Opco

17   casinos by transferring away the assets (including IP and IT assets) that make Opco uniquely

18   capable of competing with others (including New Propco).  If such intellectual property, trade

19   secrets, customer data, operational benefits, and other intangible assets of Opco are transferred

20   prematurely to Propco as Excluded Assets for the benefit of New Propco as proposed, a buyer for

21   Opco could not be expected to pay top dollar for Opco in light of that competitive and operational

22   disadvantage.[13]  Also, if Propco can buy Opco's assets for a nominal price without competitive

23   bidding, and New Propco can then use that windfall to compete against non-insiders for the

24   remainder of Opco, few non-insider bidders, if any, would want to compete in this unfair process.

25

26   _____

[11] *See* Farlin Decl. ¶ 12.

27   [12] If the insiders bid higher in order to compete with Boyd's offers, some of Opco's lenders may become satisfied with their results.  However, fairness still requires maximum recoveries.

28   [13] *See* Reynertson Decl. ¶ 14.

1   *See* <u>Section III.A</u> below.[14]

2                    **II.    FACTUAL BACKGROUND**

3           Boyd hereby incorporates herein by reference the Statement of Facts from its Bidding

4   Procedures Objection as though set forth in full herein.

5                        **III.    ARGUMENT**

6   **A.    The Proposed Transfers of "Excluded Assets" to Propco Are Improper.**

7           The Second Compromise Amendment would result in the preemptive transfer of key

8   Opco Excluded Assets and rights to Propco *before* the auction and plan process.  Without

9   competitive bidding, non-insider buyers and any Opco creditor plan proponents would be

10  discouraged from participating in the process.  In particular, the transfers of the following

11  Excluded Assets would have a material effect on value for Opco's creditors:

12          1.      Strategically important Opco assets, including the critical IT/IP assets of Opco.

13  *See* <u>Section III.A.4</u>;

14          2.      Valuable Opco assets, transferred free or at discount prices, in a process that

15  seemingly ignores Opco's investments in creating those assets, thereby creating windfalls for the

16  Debtors' insiders, which then can be used to subsidize their bidding for the residual Opco assets;

17          3.      Assets of primary interest to Opco that were created with Opco-invested funds, to

18  be sold without reimbursement by Propco, creating another windfall for Propco at Opco's

19  expense;[15] and

20          4.      Other Opco assets transferred in a manner that allows Propco to cherry-pick assets,

21  and benefit from other unfairness under the bidding procedures run by the Debtors' insiders who

22  have locked up Propco and are competing for the surviving Opco assets.[16]  The burden on Opco's

23  buyer of longer "Transition Services" for Propco only makes this worse.

---

24  [14] *See also* Reynertson Decl. ¶ 12.

25  [15] Because of the admitted Propco "cash trap" and other Propco windfalls that have already been achieved in these
    cases, there is no equity or fairness in further increasing the benefits for Propco at a further loss to Opco.

26  [16] What value can a competing Opco buyer expect to remain after its winning assets are managed for six months or
    more by the Debtors' insiders acquiring Propco?  Will Opco's employees be cherry-picked for Propco?  To what
27  extent should an Opco buyer expect maintenance, marketing and other business qualities at Opco to decline in
    comparison to Propco under that conflicted Debtors' management control?  These are important questions in any
28  such competition with insiders, and the Debtors' three pending motions and Joint Plan are structured to increase those
    anxieties of any non-insider buyer.

1    The proposed Excluded Asset transfers cannot possibly maximize the recoveries of the

2    Opco estate. Boyd, for example, is prepared to compete for Opco assets against the insider

3    stalking horse bidder. However, Boyd's willingness to participate in an auction for Opco would

4    require a reasonable and reformed bidding process for the important Opco assets, and some

5    effective buyer protections, so that the value and benefit to Boyd as the buyer would survive to

6    the effective date of a confirmable plan of reorganization.[17] However, if the Debtors persist in

7    their present pending motions and unconfirmable Joint Plan, substantial Opco asset value will be

8    lost by such Excluded Asset transfers to the Debtors' insiders, and the Debtors' bidding and plan

9    arrangements could create serious risks pending the long-delayed closing.[18]

10    That being said, Boyd has heard this Court express a desire for Propco to achieve greater

11    post-separation functionality than was achieved by the original Master Lease. While the First

12    Compromise Agreement was an extraordinary and serious imposition[19] on the rights of Opco and

13    its creditors for the benefit of Propco, the agreement has assured Propco of its essential

14    functionality. Nothing further needs to be done for Propco, except in connection with the existing

15    Transition Services arrangements. In short, Propco can cover its needs at its own cost during the

16    existing transition process. The proposed Second Compromise Amendment, however, would

17    require Opco, at its expense and loss, to transfer to Propco far more than what is necessary to

18    make Propco operational, as described below and in the Boyd Declarations.

19    Clearly, Propco would prefer to have everything "turnkey," as if Propco had acquired

20    Opco and then put back up for auction whatever Propco did not want (or could not afford until

21    after its actions chilled the Opco auction for the benefit of Propco's insiders). However, that

22    approach would create a windfall for the insiders of Propco at the expense of Opco's creditors.

23

24    [17] *See* Larson Decl. ¶ 6 (describing Boyd's interest and concerns).

25    [18] From the perspective of discouraging outside buyers for Opco there is nothing quite as daunting as having to
compete with insiders in an auction designed and effectively run by insiders (notwithstanding some creditor
oversight), who will thereafter manage the purchased assets for many months until the Debtors' Joint Plan is

26    confirmed, if ever, at the insistence of those same insiders.

27    [19] The Master Lease itself has operated already to funnel above-market value from Opco to Propco in many ways,
including the cash trap. This continued long after the Chapter 11 case at the insistence of the same insider

28    management. More value transfers from Opco to Propco now for the benefit of the acquiring insiders is neither fair
nor necessary.

1    As explained below and in the Boyd Declarations, potential buyers may fear that making Propco

2    more than "turnkey," by transferring to it valuable Excluded Assets, would force Opco to rebuild

3    itself with replacements for the Excluded Assets that may well be inferior to what it had given to

4    Propco.

5              1.    The Asset Transfers to Propco Have No Justification, and Depress Opco's
                      Value.
6

7         To be clear, Propco can continue to operate continuously and adequately with its current

8    rights and assets under the First Compromise Agreement.[20]  To further transfer to Propco the

9    Excluded Assets contemplated under the Second Compromise Amendment would create a

10   significant windfall for New Propco, thereby disproportionately favoring the Debtors' insiders,

11   while depressing the appeal of the residual Opco assets to competing bidders.[21]

12             2.    Transfers of Certain Opco Assets Will Create Material Competitive
                      Disadvantages for Opco.
13

14        Opco's intellectual property and IT technology are valuable and desirable,[22] even by

15   competitors, like Boyd, who have developed their own.  As the Boyd Declarations demonstrate,

16   today's casino business is highly dependent on technology, including, in Opco's case, the

17   proprietary and customized software that it must have developed at significant cost over an

18   extended period of time.[23]

19        This so-called "compromise" also creates an immediately superior competitor to Opco

20   that uses the unique *Opco* assets *against Opco*.  Not only can the insiders cherry-pick the

21   Debtors' best employees and other transferable benefits for New Propco, but those insiders are

22

23   [20] *See* Farlin Decl. ¶ 7.

     [21] *See* Reynertson Decl. ¶ 13–16.
24
     [22] *See* Farlin Decl. ¶ 10.
25
     [23] As a developer of its own comparable intellectual property and proprietary and customized software, Boyd would
     estimate the replacement value of that Opco software and intellectual property to be very material. *See* Farlin Decl.
26   ¶ 10.  To avoid debate, however, the Debtors' insiders managing Opco should be required to reveal the actual costs
     and benefits relating to what those insiders insist be transferred away to New Propco and those insiders.  In addition
27   to those costs, the Debtors should reveal from their player tracking and other management software data how much
     profit is inherent in the Opco gaming software that would be used by New Propco and the insiders free or cheap.
     What is left that is unique in Opco to compete with Propco after the closing?  The Debtors must first answer that
28   question in order to fairly propose such a radical solution to a nonproblem.

1    able to use the Excluded Assets to Opco's competitive disadvantage.  Instead of benefiting from a

2    confiscatory raid on Opco's assets, Propco should start with its own assets, like every other

3    startup casino would.  Opco creditors do not owe New Propco the right to its most valuable

4    assets, particularly where Propco does not pay a fair price for those assets in an open auction or,

5    at least, return Opco's existing investment.

6           3.    Transfers of Certain Excluded Assets May Harm Opco's Operations.

7           The Debtors propose to force Opco to transfer away so many Excluded Assets for its New

8    Propco competitor that buyers may be concerned that Opco could have *to rebuild its own IT*

9    *systems*.[24]  Moreover, particularly if Propco cherry-picks Opco IT employees, Opco's buyer will

10   have the challenging task of covering any deficits that occur in critical-skill jobs or where

11   historical knowledge is critical (*e.g.*, IT workers and those involved in marketing and finance),

12   while at the same time being compelled to provide burdensome Transition Services to Propco

13   over the generous Transition Services period.  Other examples are discussed below and in the

14   Boyd Declarations.

15          4.    Analysis of Specific Excluded Assets:  The Transfer of Opco's IP/IT to
               Propco Without Reasonably Equivalent Auction Value is Improper, and
16             Opco Needs to Preserve Its Own Functionality.

17          The original Master Lease Transition Services arrangements were designed to enable

18   Propco casinos to become fully functional with the necessary equipment.  However, when the

19   Debtors' insiders perceived a chance to win the support of the Propco's lenders for a New Propco,

20   the Debtors utilized the First Compromise Agreement to expand Propco's rights (with

21   corresponding burdens on Opco) and put New Propco in a more competitively advantageous

22   position, at great cost to Opco's value and marketability.  Now that the Debtors' insiders have

23   locked up Propco, Propco's lenders and certain of Opco's lenders, they seek to further transfer

24   Opco's assets and rights to Propco for non-competitive amounts for the purpose of guaranteeing

25   that New Propco begins not only with substantially all of the core IT/IP capabilities of Opco, but

26   also with many Opco-owned advantages that potential bidders worry would both (i) make Propco

27   instantly a strong competitor, and (ii) weaken Opco to the point where Debtors chill the bidding

28   _____
     [24] *See* Farlin Decl. ¶ 11.

1    for the remaining Opco assets.  The result of the Debtors' three pending motions is effectively the

2    same as if Propco had merged Opco into Propco, then spun back out for auction the parts of Opco

3    for which Propco did not want or could not afford in a competitive process.

4        The truth of those statements is demonstrated in the following IP/IT analysis of Annex 1

5    to the Second Compromise Amendment ("Annex 1"), and as further explained in Boyd's Bidding

6    Procedures Objection and in the Boyd Declarations.  For example:

7        **Item 10:  IT Systems.**  *This is the single most improper proposal under the Second*

8    *Compromise Amendment.*  The Debtors must reveal the extent to which Opco's core IT system

9    and capability would be shifted to Propco (and New Propco and its insiders), or potential bidders

10    should expect the worst.  To what extent would Opco need to replace and rebuild its own IT

11    systems in order for its remaining systems to function?  In effect, instead of *Opco* providing

12    Transition Services to Propco, and Propco then replacing what it needs, buyers will fear that

13    Propco would take the turnkey system for its use, and force Opco to depend on Propco and New

14    Propco for its IT needs, as Opco rebuilds its own system—likely while worrying about which

15    Opco IT workers transfer to Propco.  Incredibly, Annex 1 states: ". . . *Propco will not separately*

16    *reimburse Opco for such costs*" (emphasis added).

17        These IT issues are critical to the operation of each Opco casino.  These are technology

18    businesses, where all core functions depend on these common IP and IT systems.[25]  Propco has

19    addressed this issue for itself with elaborate care, but has paid little attention to Opco's future

20    needs for this essential IT.  Where is the "Transition Services" protection from Propco for the

21    benefit of an Opco buyer, similar to what Propco was entitled to under the First Compromise

22    Agreement?  While Opco's business operations are put at risk, Propco would prosper from its

23    receipt of Excluded Assets.

24        Additionally, Opco would need many IT employees to address this IT rebuild-and-restart

25    mandate.  If Propco lures IT employees away from Opco who are needed to handle this massive

26    IT challenge, then the Opco buyer's casino business operations would be at risk.  Even if

27    Propco/New Propco made some *theoretically* adequate arrangement to support the replacement of

28    _____

[25] *See* Farlin Decl. ¶ 9.

1   Opco's IT capacity, could a buyer be expected to trust New Propco and its insider competitors to

2   diligently pursue all the necessary avenues to ensure that the Opco buyer would not be subject to

3   profit-draining "outages" and similar problems?

4         Moreover, under this scenario, Propco would receive valuable IP/IT licenses as well as

5   source code to help it develop derivative works without reimbursing Opco for Opco's significant

6   investment in creating such systems, patents, and rights. According to Annex 1: "The

7   proprietary IT System transferred to Propco . . . will include access to all 'Front of house ops

8   systems' described in the definition of 'Transaction Data.'" Propco should not so burden Opco,

9   particularly without full reimbursement of Opco's investments and broad indemnity for Opco.

10        **Item 11: Propco Employees.** Propco can be expected to cherry-pick the most desired

11  Opco employees, requiring Opco to waive all noncompete agreements. While there is

12  cooperation, in theory, a going concern needs a human memory, and after the stripping of Opco

13  IT systems for Propco, Opco may need significant IT staff support.

14        **Item 5: Patents.** Opco's patents are *not* essential to Propco's successful operating

15  capacity and are *not* unique to the Propco casinos.[26] The patents are for Opco's proprietary

16  player-tracking system, and include other techniques for more profitable casino operations than

17  the standard equivalent systems that Propco could readily acquire from third-party vendors.[27] If

18  compelled to grant the proposed license, Opco would lose some of its important competitive

19  advantages to its New Propco competitor, giving Propco (and New Propco) a windfall, while

20  eliminating one more of the appealing aspects of Opco to competing bidders. At a minimum,

21  Propco should reimburse Opco for the significant investment that Opco made in developing this

22  patented technology with funding from Opco creditors.

23        **Item 6: Registered Copyrights.** Here, as elsewhere, Propco should reimburse Opco for

24  the investment of Opco in the creation of those assets to be transferred to Propco for the benefit of

25  New Propco and the insiders.

26        **Item 7: Other Intellectual Property.** Among the other unnecessary benefits for Propco

27  _____

28  [26] *See* Farlin Decl. ¶¶ 7, 13.

    [27] *See* Farlin Decl. ¶ 13.

1    at Opco's expense is the non-exclusive license to be granted by Opco to Propco giving Propco the

2    right to use Opco copyrighted matter and further customize it for Propco's use.  As part of the

3    license, Propco would have access to Opco's source code and be given rights to create derivative

4    works based on Opco's copyrighted material.  This material benefit for Opco could weaken Opco

5    by, among other things, allowing Propco to copy the unique "look and feel" of Opco's material in

6    competing against Opco—all at no apparent cost to Propco and to Opco's detriment.  *See* Item 9,

7    below.[28]

8         **Item 8:  Primary Customer Database.**  Player information is a valuable asset within the

9    hotel and casino business.[29]  Under the Debtors' proposed Second Amendment, information about

10   Opco customers who have played "primarily" at Propco casinos (as defined for Propco's benefit)

11   will be transferred to Propco as its "Primary Customers".[30]  However, customers often play at

12   more than one casino. Information about a Propco "Primary Customer" who is also a customer of

13   Opco is of value to a buyer of Opco.  Propco should not have the right to exclusive data on such

14   Opco customers, including the "entire history of all property play," merely because the customers

15   played more often at Propco casinos.  Requiring this valuable Opco customer list and related

16   information as it relates to Propco's "Primary Customers" who are also Opco customers to be

17   abandoned to Propco as the Debtors propose, would provide a windfall to Propco and diminish

18   the value of that Opco asset.  In addition, while the allocation of inactive customer accounts is not

19   essential for the operation of the Propco Properties, such information about inactive accounts

20   remains a valuable asset to whoever holds the information. Requiring the transfer of inactive

21   account information associated with the Opco Properties also reduces the value of the Opco

22   Properties.[31]

23         In effect, under the Debtors' proposal, Propco would walk away with the valuable

24   information about many of significant customers cultivated by Opco, which also paid for their

25

---

26   [28] *See also* Farlin Decl. ¶¶ 14–15.

27   [29] *See* Farlin Decl., ¶ 18.

28   [30] *See* Farlin Decl., ¶ 17.

     [31] *See* Farlin Decl., ¶ 16.

1    marketing and recruitment.[32]

2        **Item 9: Business Information.** The proposed transfer of business information includes

3    more than just giving Propco turnkey access to all data and documentation.[33] The transfer also

4    would include further IP license transfers, with windfall opportunities for Propco (with

5    corresponding harm to Opco), as addressed above.

6        **Item 12: Unencumbered FF&E.** If the furniture, fixtures, and equipment ("FF&E") is

7    not Propco lender collateral under Item 1 of the Appendix, then it should be closely examined for

8    appropriateness and value. One of many bidder concerns is that the "location" test of allocation

9    between Opco and Propco would allow the Propco insiders managing the process to move Opco

10    FF&E to Propco. Another concern is that Opco money may be spent improving or maintaining

11    FF&E then located at Propco, while deferred maintenance problems may continue to increase at

12    Opco casinos.

13        Similarly, the phone system "reengineering" to accommodate Propco can be done either

14    fairly or unfairly to Opco, and there appear to be insufficient safeguards for Opco here as

15    elsewhere. Disruption of phones at Opco to accommodate Propco would directly impact the

16    value and profitability of Opco.

17        **Item 13: Corporate FF&E.** The valuable amount of art, vehicles, computer equipment,

18    and other tangible property that is "located" (located when?) at the Debtors' corporate

19    headquarters must be itemized, as addressed in Boyd's Bidding Procedures Objection. There is

20    no reason that the Opco buyer would need to replace Opco laptops, computers, and other

21    equipment, merely because the Debtors' insiders claim that the equipment "belongs" in the Opco

22    corporate headquarters building. The confiscation of Opco's corporate phone number is

23    particularly outrageous and reveals the true intent of New Propco to become New Opco in

24    everything but the name.

25        **Item 14: Net Working Capital.** Propco has proposed an offsetting credit, dollar-for-

26    dollar, for liabilities Propco assumes, even if those liabilities are unsecured prepetition claims on

27

28

---

[32] *See* Farlin Decl. ¶ 18.

[33] *See* Farlin Decl. ¶ 20.

1    which Opco would pay little.  The proposal also fails to address adequately the case of when

2    these Opco contracts and assets are not exclusive to Propco.

3              5.    The Proposed Transfers Have Created Risk and Uncertainty for Non-Buyer
                     Insiders.
4

5              The Debtors have used the Second Compromise Amendment option to cloud the title to

6    Excluded Assets that are critical to Opco, leaving the non-insider buyers of the Opco assets

7    uncertain as to what to expect.[34]  One risk for Opco and its creditors is the open question of who

8    speaks for Opco in litigating these values and other issues against Propco, where the insiders have

9    chosen all of the relevant people.  (Hopefully, decisions will not be left with the same estate

10   representatives who continue to sacrifice Opco's rights in these "compromises" that so favor the

11   Debtors' insiders who engaged them.)  All of the Debtors' insiders appear to be poised to reap the

12   benefits of the Debtors' disputed Joint Plan, as many receive economic benefits and all would

13   receive releases and other benefits, including perpetual indemnities by Opco.  In effect, under the

14   Second Compromise Amendment, Propco (and New Propco and its insiders) have locked up

15   critical Opco assets through a delayed purchase or option in a manner that prematurely and

16   improperly removes such Excluded Assets from the Opco auction and from any competing plan.

17             6.    Accommodations for Propco Must Be Reconciled with the Need for
                     Corresponding Safeguards for Non-Insider Opco Buyers.
18

19             Some parties-in-interest in this case have urged that every possible effort be made in order

20   to create the possibility for a consensual resolution of the Opco case, even at the expense of

21   making unnecessary or overly generous accommodations to the "Propco Parties"—*i.e.*, the

22   Debtors' insiders, the New Propco and their various designees and allies, whether formally or

23   informally.  While such advocates can speak for themselves, a potential buyer of Opco naturally

24   would require that any "settlement" transfers from Opco and demand a fair price without further

25   purported compromises in the future.

26   ───────────────────────
     [34] *See, e.g.*, Second Amendment Motion at p. 14, which invites a "judicial resolution of such issues or disputes by
27   separate motion" only "after the Second Compromise Amendment is approved." *That means that Opco loses the
     assets before the auction and before any competing Opco plan by non-insiders can rescue those Opco assets from
28   Propco.*  All that remains to be decided is the amount that Propco has to pay.  For all the Opco creditors know, that
     Propco price will be the subject of yet another "compromise" by the insiders (or their designees) with themselves.

11445008.1                                    13

Creditors of Opco are entitled to, and the non-insider buyers need, protections from the Court that include:

1.      Preservation at Opco of the essential Opco rights and assets, none of which should be diverted to Propco or New Propco, whether by the Second Compromise Amendment or otherwise;[35]

2.      Preservation of the Opco buyers' ability to transition Opco's own business, including filling vacancies, while at the same time avoiding the distraction of additional Transition Services for Propco or New Propco. This includes shortening—not increasing—the Transition Services period;

3.      Transition Services and funding for Opco by Propco in order to make reparations for whatever Propco is allowed to take away from Opco over its creditors' and non-insider buyer's objections; and

4.      Requiring Propco or New Propco to pay Opco (a) for the full value of the assets that the Propco Parties would strip from Opco, as well as for the harm such stripping does to the value of the other business and assets remaining at Opco, together with (b) the reimbursement of Opco of the amount it invested in the Excluded Assets that are stripped by Propco Parties, where such investment exceeds the market value proven to the Court, especially where such involuntary transfer to Propco Parties forces Opco's buyer to make further replacement investments. This is necessary in order (i) to differentiate further or upgrade Opco assets that are no longer unique and competitive after they are forced to be shared with Propco, (ii) to replace the assets stripped from Opco, or (iii) to more fairly compensate Opco for the savings Propco realizes by stripping Opco assets, instead of making its own investments.

The theme of the Second Compromise Amendment is "accomplishing such a smooth transition is in the best interest of the respective estates of both SCI and Propco." Second Amendment Motion at p. 14, lines 3–4. However, this is a mischaracterization designed to deprive Opco of both critical assts and important procedural protections. First, many Opco

---

[35] This is not an accusation in advance of proof, but rather an understandable and reasonable fear of any non-insider buyer and many Opco creditors. The point is to arrange advance protections to prevent such risks, rather than having to rely solely on the mechanisms to redress such grievances, if and when they occur.

1    Excluded Asset transfers have nothing to do with "smoothness" for Propco, but rather are an

2    attempt by Propco to generate profits for itself and its insiders by exploiting the value in the Opco

3    Assets (without competitive bidding), going far beyond the minimum functionality assured for

4    Propco already in the First Compromise Agreement.  Second, smoothness for Propco in this

5    manner comes with corresponding dysfunction for Opco, and would prevent a fair sale of Opco

6    assets or any alternative plan of reorganization that preserves value for Opco creditors.  Third, no

7    one has yet proposed a process for protecting the competing Opco buyers from the identical

8    problems that previously caused Propco to demand the First Compromise Agreement.

9        Additionally, protection is needed to prevent *future* Propco/insider "settlements" that

10    transfer away more Opco assets and rights.  The Second Compromise Amendment (at Section 17)

11    reserves for Propco the future right to take even more Opco assets and services at any time.

12    These provisions are unacceptable and should be rejected.  Settlements, by their very nature,

13    require an important degree of finality that serve as the basis for the compromise.  This open-

14    ended proposal is particularly discouraging for potential non-insider buyers of Opco in the

15    context of a sale and plan process controlled by the Propco insiders as competing buyers.

16        The Debtors' true intention is revealed in the reservation of rights by Opco versus Propco

17    in Section 17 of the Second Compromise Amendment.  That provision allows Propco to attempt

18    to take more Opco assets and services, *but allows Opco only to defend itself from further takings*

19    *by Propco*, rather than to attempt to take back what Opco needs from Propco's overreaching

20    grasp.  These same problems also arise under Section J (at 16) of the Second Compromise

21    Amendment, where Propco again reserves the right to take more services and assets from Opco,

22    leaving Opco with only a bare right to "defend" itself again against Propco.  There is no end in

23    sight to this eating away at Opco for the benefit of Propco.  One solution is for this to be resolved

24    in competing plans, instead of allowing Propco prematurely to enjoy this preemptive strike for

25    Opco assets before a fair competing process for non-insider buyers.

26    **B.    The Debtors' Insiders Have Not Satisfied Their Duty of Disclosure and
           Fairness.**

27

28        The insiders of Opco, particularly those benefitting directly or indirectly from the Opco

1   transfers to New Propco or from the Joint Plan, have a duty of both disclosure and proof of

2   fairness.[36]  In order to be adequate, the Debtors' disclosure should include information necessary

3   to convince the Opco parties-in-interest that the Debtors' motions and Joint Plan are in the best

4   interest of Opco, *without regard to Propco*, despite the preemptive and premature Propco

5   acquisition of key Opco Excluded Assets contemplated by the Second Compromise Amendment.

6        Propco's most recent efforts to obtain more Opco assets than were available under the

7   Master Lease and the First Compromise Agreement is particularly egregious, in part, because

8   (i) the Debtors are attempting to re-do the Opco-Propco settlement embodied in the First

9   Compromise Agreement at high cost to the Opco creditors, and (ii) Propco is attempting to

10  reserve its rights for further amendments in the future.  Thus far, Propco has enjoyed the benefits

11  of (a) the original Master Lease, and (b) the First Compromise Agreement, but Propco now insists

12  on going further to treat such prior "compromises" and "settlements" as a foundation from which

13  to demand even more in the Second Compromise Amendment and hereafter.  The Debtors'

14  motions suggest that there was no benefit at all to Opco in the prior "compromise."  The Debtors

15  have an obligation to disclose the full cost that the proposed transactions would have on Opco

16  creditors.

17        **C.    The Debtors' Proposal Is Akin to a Divorce Involving Separate Property in
              Which a Prenuptial Agreement Previously Resolved the Asset Division.**

18

19       The proposed Second Compromise Amendment is analogous to a particularly contentious

20  divorce in which one spouse is attempting to walk away with most of the assets earned by the

21  other from separate property.  Under this analogy, the Opco and Propco effectively have a

22  prenuptial agreement in the form of the original Master Lease Transition Services arrangement.

23  The insiders managing the Debtors (who stand to personally benefit from the Joint Plan and

24  Excluded Asset transfers away from Opco) decided to further improve Propco's benefits from

25  that "prenup," and obtained this Court's approval of their prior First Compromise Agreement.

26  That property settlement, with additional Transition Services support from Opco, was intended to

27  be a settlement and compromise in full, thereby preventing further asset grabs by Propco.  *See*

28  _____
    [36] *See* Bidding Procedures Objection at 20–21.

1    Section III.D below (discussing how the Debtors should be judicially estopped from now

2    transferring even more to Propco and the Debtors' insiders at the expense of Opco creditors).[37]

3            Indeed, all of the property at issue is akin to "separate" property—not "community"

4    property—with Propco attempting to obtain the separate Opco property for itself.  Propco

5    separated itself from Opco through the Master Lease and by a narrow set of Propco's lenders'

6    collateral and Transition Services.  Everything at Opco was Opco's separate property and the

7    collateral of the Opco's lenders.  Thereafter, Propco managed to persuade this Court to accept the

8    disputed "compromise and settlement" in the First Compromise Agreement now benefitting New

9    Propco for its insiders, which settlement focused only on *what Propco required in order to*

10   *function as a going business*.  However, the expansion of the initial settlement to the extent

11   proposed in the Second Compromise Amendment—for no reason other than that New Propco

12   wants its future to be "smooth"—is untenable.  *See* Section III.A.6 above.[38]  Such an arrangement

13   is improper and should be rejected.[39]

14       **D.      The Debtors Are Judicially Estopped from Using This Second Compromise
                 Amendment to Grab More Opco Assets for Propco.**

15

16           As addressed in the Exhibit A attached hereto, a review of the existing First Compromise

17   Agreement establishes that this Second Compromise Amendment after the prior settlement was

18   neither contemplated or disclosed, suggesting a "bait and switch" tactic by the Debtors.[40]

19

20   [37] *See also* Exhibit A attached hereto (concerning the proposed provisions that would allow Propco to reserve the
     right in the future to demand even more transfers from Opco, but would allow Opco only to "defend" itself, rather
21   than to counter-demand from Propco)

22   [38] Gaming is a highly IT/IP-rich business.  As Boyd knows from developing its own comparable business, Opco's
     core value is in its IP/IT, in which Opco—not Propco—has invested Opco creditors' money.  As demonstrated herein
23   and in the Boyd Declarations, buyers will be concerned that the proposed transfer of assets to Propco would strip so
     much valuable IP and IT assets from Opco that Opco could need Transition Services from Propco after the closing in
24   order to rebuild Opco's IT and to prevent Opco's casinos from "going dark."  *See* Farlin Decl. ¶ 11.

     [39] Another analogy, is to view the IT/IP of Opco as the lynchpin in an axle.  As the Boyd Declarations demonstrate,
25   that transfer of such an essential part of the system not only would damage the value of what is sold (*i.e.*, the less
     functional analogy without the Excluded Assets), but also would empower the Propco insiders unfairly to compete
26   once they have unique control of the essential missing parts.

27   [40] Despite the record in this case suggesting the contrary, however, the Debtors have now attempted to rewrite history
     by recharacterizing the First Compromise Agreement as a "short-term solution" in their motion seeking approval of
     this newest "amendment."   Second Amendment Motion at 10, line 10.  The prospect of such radical future
28   amendments relating to new asset transfers from Opco to Propco, however, was never contemplated, discussed, or
     even reserved in the period leading up to the execution and approval of the First Compromise Agreement—and

1    According to the Debtors, the First Compromise Agreement was not the final compromise.  Prior

2    to the Debtors' Second Amendment Motion, the Debtors' statements to this Court, both in their

3    filed pleadings, as well as statements made at the hearing on the compromise, created the clear

4    impression that the First Compromise Agreement was a final settlement *with respect to its subject*

5    *matter*, except perhaps for certain limited services that might be required by a then-existing

6    contract or for gaming regulatory purposes.[41]  The Debtors' representations consistently portrayed

7    the First Compromise Agreement as an arm's-length, consensual solution to the parties'

8    difficulties, and a product of comprehensive negotiations.[42]  Perhaps more importantly, they

9    expressed Opco's and Propco's mutual determination that the First Compromise Agreement

10    reflected a fair exchange that satisfied their objectives and protected their rights with respect to

11    the Master Lease.[43]  The heated debates and exchanged concessions, the Debtors claimed,

12    resulted in an ultimate compromise agreement in resolution of the issues.[44]  Taken as a whole,

13    these representations exude a strong sense of finality on which the Opco creditors have relied.

14    The provisions in the First Compromise Agreement did not contemplate the type of

15    massive asset transfers and rights that the Second Compromise Amendment now contains.  Every

16    indication in the representations made by the Debtors in the motions seeking approval of the First

17    Compromise Agreement, in the hearing transcript, in the supporting declarations, and in the

18    language of the First Compromise Agreement, demonstrated a wholesale sense of finality and

19    resolution, and certainly offered no indication that an entirely new Second Compromise

20

21    indeed, if such a possibility had been on the horizon, the motion would have been subject to a host of additional
objections by Opco creditors, who were relying on the finality of the compromise.

22    [41] Certain documents that the Debtors filed with the Court and statements made at hearings appeared to contemplate

23    the possibility of further limited Transition Services or the consummation of a plan of reorganization, but nowhere
did the Debtors suggest that the First Compromise Agreement was intended to be anything other than a full and final

24    compromise and resolution of the disputes between SCI and Propco.  For example, the Debtors left open the
possibility of future amendments only with regard to certain limited necessary Transition Services required by an

25    existing contract or regulation.  *See* Exhibit A ¶ 6 (citing First Compromise Agreement), at 8, Paragraph 16 [Docket
No. 962] ("This Compromise shall neither (i) limit Propco's, or its successors and assigns, from seeking different or

26    additional *transition services* to the extent legally provided for under any written agreements between the Parties or
other applicable law . . . ", quoting First Compromise Agreement, ¶16, p.8) (emphasis added).

27    [42] *See* Exhibit A ¶ 3–4.

      [43] *See id.*

28    [44] *See id.* ¶ 3 (citing Transcript, p.232, lines 9–16).

1    Amendment, of the type addressed in this objection, would be pursued in the future.[45]

2         Because the Debtors portrayed the First Compromise Agreement as a satisfactory end-

3    product of heavy negotiations, while simultaneously failing to address the possibility of a

4    substantial future amendment, Opco creditors were entitled to rely upon the First Compromise

5    Agreement as final.  The Debtors should be estopped from forging a new "compromise" and

6    benefitting from their attempt to switch positions.  Specifically, the Debtors are prohibited by

7    principles of judicial estoppel from retrading on their prior compromise.

8         Judicial estoppel is an "equitable doctrine that precludes a party from gaining an

9    advantage by asserting one position, and then later seeking an advantage by taking a clearly

10   inconsistent position."  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir.

11   2001) (citing *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600–01 (9th Cir.1996);

12   *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990)).  Courts invoke judicial estoppel "not only

13   to prevent a party from gaining an advantage by taking inconsistent positions, but also because of

14   'general consideration[s] of the orderly administration of justice and regard for the dignity of

15   judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'"

16   *Id.* (citing *Russell*, 893 F.2d at 1037).

17        Here, the Debtors took the position, both in their court filings and open representations in

18   hearings with this Court, that the First Compromise Agreement—which provided for very broad,

19   material concessions on the part of both Opco and Propco—was a final resolution of the issues

20   plaguing both companies.[46]  Indeed, the finality of the compromise was a necessary prerequisite

21   to obtain the Court's approval.  The Debtors now take a position that is clearly inconsistent from

22   their original one and are attempting to gain an unfair and prejudicial advantage as a result.

23   ───────────────
     [45] The First Compromise Agreement did allow for possible modification of the agreement as a whole by mutual
24   agreement, naturally.  *See* First Compromise Agreement, Section BB(c).  However, and perhaps more importantly,
     the First Compromise Agreement made clear that its provisions would be binding and final when executed, and
25   would not be subject to modification without the express written consent of the Parties.  *See* Exhibit A ¶ 4(f) (citing
     First Compromise Agreement, Section S, p. 25).  Although the Debtors and their respective representatives have
26   referred to the transitory nature of the First Compromise Agreement in certain documents, calling it, for example, a
     "bridge" (*see* Transcript, p. 119, line 10), "road map" (Exhibit A ¶ 6(e)), and an "interim compromise," (Transcript,
27   p. 119, line 8), these references clearly intended to indicate that an ultimate resolution in the form of a plan of
     reorganization would be necessary—they certainly provided no opportunity for the substantial changes found in the
     Second Compromise Amendment.
28   [46] *See, e.g.*, Exhibit A ¶¶ 2–5.

1
2

**E.     The New "Compromise" Imposes Many Additional Burdens on the Opco Buyer to Provide Unnecessarily Long Transition Services to Propco After the Rejection of the Master Lease.**

3     The proposed list of "Transition Services" for Propco is even more daunting to a non-

4     insider buyer of Opco than it was before, particularly if all of the key employees of Opco (*e.g.*,

5     key financial, IT, and marketing personnel) bail out to follow the Opco insiders to the New

6     Propco base of operations.[47]   Indeed, particularly after the IT/IP asset transfers from Opco to

7     Propco, increasingly it may be Opco that needs transition services from Propco.

8     It is neither necessary nor appropriate to further extend the time to reject (as is inevitable)

9     the Master Lease—and thereby extend the burden of Transition Services—until the confirmation,

10    if ever, of the Debtors' disputed Joint Plan.[48]   This provision imposes a huge burden on Opco and

11    the Opco buyer, but helps Propco further chill the bidding for Opco.

12
13

**F.     Propco Cannot Expand Its Rights on Opco License Rejection Beyond the Scope of § 365(n).**

14    Section 365(n)[49] by its terms prohibits the result that the Debtors have attempted to

15    accomplish in Section I, on page 16, of the Second Compromise Amendment.  For example, the

16    rejection damages or offsets reserved by Propco are forbidden by an election to preserve rights

17    under Section 365(n)(1)(B); *i.e.*, under Section 365(n), Propco must elect *between* (a) the

18    rejection damages under Section 365(n)(1)(A), and (b) the retained rights under

19    Section 365(n)(1)(B).  The specific performance demanded by Propco is barred by

20    Section 356(n)(1)(B), which permits a party " . . . to retain its rights . . . *but excluding* any other

21    right under applicable nonbankruptcy law to specific performance of such contract." (Emphasis

22    added.)  Such election by Propco to retain rights under Section 365(n)(1)(B) has a price under

23    Section 365(n)(2)(C):  the waiver of any setoff by Propco and any claim under Section 503(b).

24    More importantly, Section 365(n) protects only what the Bankruptcy Code defines as

25    "intellectual property," defined in Section 101(35A) to *exclude* trademarks, trade name, domain

26

27    [47] *See* Second Compromise Amendment, Section K at 17.

28    [48] *See* Second Compromise Amendment § V at 32, *et seq.*

      [49] Statutory references herein are to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

1    names, phone numbers, rights of publicity, etc.[50] *See, e.g.*, *In re Centura Software Corp.*, 281

2    B.R. 660 (Bankr. N.D. Cal. 2002) (holding that rejection terminates a trademark license without

3    any Section 365(n) protection, resulting in no remedy other than a prepetition unsecured claim).

4         The Debtors cannot use a settlement with themselves to improperly expand Propco's

5    rights beyond the limitations of law.  Moreover, the Debtors cannot evade Opco's rejection rights

6    under Section 365(n) by such under-compensated and unwise transfers to Propco.

7    

**IV.    CONCLUSION**

8         Because this Second Compromise Amendment is plan-determinative and materially

9    prejudices any fair Opco sale and plan, the Second Amendment Motion must be denied.  By

10    Propco prematurely grabbing in this Second Compromise Amendment more Opco assets and

11    value *before* the Opco plan process, the Debtors will have seriously undermined any fair chance

12    for Opco to achieve maximum value for its assets and to allow a fair plan process.  There is no

13    fair basis in law, equity, or fact for this to occur now, particularly following the First Compromise

14    Agreement, which should estop the Debtors from entering into this new "settlement" on top of

15    that prior settlement.  Indeed, by unfairly reserving the right in the Second Compromise

16    Amendment to grab more Opco assets and value in the future, while Opco is limited to defending

17    itself, Propco is not offering a settlement at all.

18

19

20

21

22

23

24

25

26

27

28

---

[50] Section 365(n) defines "intellectual property" narrowly to include only (A) trade secrets, (B) inventions, processes, designs, or plants protected as patents under Title 35 of the U.S.C., (C) patent applications, (D) plant variety, (E) copyrights protected under Title 17 of the U.S.C., and (F) mark works.  Nothing else is protected.

1    DATED this 21st day of April, 2010.

2

3                                         SNELL & WILMER L.L.P.

4

5    By: _____
                                               Robert R. Kinas, Esq. (NV Bar No. 6019)
6                                              Mark E. Konrad, Esq. (NV Bar No. 4462)
                                               SNELL & WILMER L.L.P.
7                                              3883 Howard Hughes Parkway, Suite 1100
                                               Las Vegas, NV 89169

8                                              Brett H. Miller, Esq. (NY Bar No. 2483691)
                                               *Admitted Pro Hac Vice*
9                                              Jordan A. Wishnew, Esq. (NY Bar No. 4106126)
                                               *Pro Hac Vice Pending*
10                                             MORRISON & FOERSTER LLP
                                               1290 Avenue of the Americas
11                                             New York, NY 10104-0050

12                                             G. Larry Engel, Esq. (CA Bar No. 53484)
                                               Vincent J. Novak, Esq. (CA Bar No. 233033)
13                                             MORRISON & FOERSTER LLP
                                               425 Market Street
14                                             San Francisco, CA 94105-2482
                                               *Admitted Pro Hac Vice*
15

16                                             Attorneys for Boyd Gaming Corporation

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

1.    This Exhibit A contains an analysis of the following documents (collectively, the "<u>Documents</u>") with respect to the nature of the final settlement and compromise:

    **a.**    Joint Motion of Station Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Master Lease Compromise Agreement (11/19/09) [Docket No. 587] ("<u>First Compromise Motion</u>");

    **b.**    Master Lease Compromise Agreement (11/19/09) [Docket No. 590-1] (Exhibit A to First Compromise Motion);

    **c.**    Declaration of Richard J. Haskins in Support of Joint Motion of Station Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Master Lease Compromise Agreement (11/19/09) [Docket No. 588] ("<u>Haskins Declaration</u>");

    **d.**    Debtor's Reply to Objections to Debtors' Joint Motion for Entry of an Order Approving Master Lease Compromise Agreement (12/09/09) [Docket No. 685] ("<u>First Compromise Reply</u>");

    **e.**    Transcript of December 11, 2009 Hearing (12/11/09) ("<u>Transcript</u>");

    **f.**    Order Approving Master Lease Compromise Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4) and Fed. R. Bankr. P. 9019 (2/02/10) [Docket No. 962];

    **g.**    Findings of Fact and Conclusions of Law in Support of Order Approving Master Lease Compromise Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019 (2/02/10) [Docket No. 961] ("<u>Findings of Fact</u>")

    **h.**    Amended and Restated Master Lease Compromise Agreement (12/11/09) Docket No. 962] (the "<u>First Compromise Agreement</u>") (Exhibit 1 to Order Approving Master Lease Compromise Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4) and Fed. R. Bankr. P. 9019);

    **i.**    Joint Motion of Station Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving First Amendment to Amended and Restated Master Lease Compromise Agreement (2/24/10) [Docket No. 1014];

    **j.**    Declaration of Richard J. Haskins in Support of (A) Joint Motion of Station Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving First Amendment to Amended and Revised [sic] Master Lease Compromise Agreement and (B) Ex-Parte Application Pursuant to Fed. R. Bankr. P. 9006 and LR 9006 for an Order Shortening Time to Hear the Joint Motion (2/24/10) [Docket No. 1015];

Exhibit A-1

**k.**  Declaration of Robert Kors in Support of Joint Motion of Station Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019 for Entry of an Order Approving First Amendment to Amended and Restated Master Lease Compromise Agreement (2/24/10) [Docket No. 1016];

**l.**  Stipulation Approving First Amendment to Amended and Restated Master Lease Compromise Agreement (2/24/10) [Docket No. 1019] ("Stipulation");

**m.**  First Amendment to Amended and Restated Master Lease Compromise Agreement (2/24/10) [Docket No. 1019] (Exhibit A to Stipulation);

**n.**  Order Approving First Amendment to Amended and Restated Master Lease Compromise Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4) and Fed. R. Bankr. P. 9019 (3/04/10) [Docket No. 1042];

**o.**  Joint Motion of Station Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement (4/07/10) [Docket No. 1179] ("Second Amendment Motion");

**p.**  Second Amended and Restated Master Lease Compromise Agreement (4/07/10) [Docket No. 1179-1] (Exhibit 1 to Second Amendment Motion);

**q.**  Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4) and Fed. R. Bankr. P. 9019 (4/07/10) [Docket No. 1179-2] (Exhibit 2 to Second Amendment Motion);

**r.**  Declaration of Richard J. Haskins in Support of Joint Motion of Station Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019 for Entry of an Order Approving Second Amendment to Amended and Revised [sic] Master Lease Compromise Agreement (4/07/10) [Docket No. 1180]; and

**s.**  Declaration of Robert Kors in Support of Joint Motion of Station Casinos, Inc. and FCP Propco, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019 for Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement (4/07/10) [Docket No. 1181].

2.    The following statements appearing in the Documents evidence that extensive and comprehensive negotiations occurred between SCI and Propco, the ultimate product of which was the First Compromise Agreement:

**a.**  "The Compromise Agreement is the end product of those negotiations, and SCI and Propco believe that the Compromise Agreement satisfies the objectives the Parties had coming into the negotiations." (First Compromise Motion, p.6, lines 14–16);

b. "The Compromise Agreement is the end product of those negotiations, and SCI believes that the Compromise Agreement satisfies each of SCI's objectives going into the negotiations." (Haskins Decl., p.6, lines 11–13); and

c. "The terms of the Compromise Agreement are the product of extended and comprehensive negotiations between SCI and Propco." (First Compromise Motion., p.17, lines 2–3).

3. The following statements appearing in the Documents evidence that both SCI and Propco perceived the First Compromise Agreement to be a fair and positive result of the parties' negotiations in resolution of their concerns:

a. "Ultimately, SCI and Propco reached a compromise that each believes yields a better result for its respective estate than would the alternative scenarios of an SCI cash collateral battle with the Prepetition Lenders or an uncontrolled rejection of the Master Lease and License Agreement." (First Compromise Motion, p.8, lines 6–9);

b. "In short, both Propco and SCI, with the advice of legal and financial counsel, have determined, in the reasonable exercise of their sound business judgment, that the compromise set forth in the Compromise Agreement provides the best possible opportunity for the Debtors to continue their efforts to negotiate a viable, confirmable plan of reorganization in an expeditious and effective manner, while at the same time protecting the respective rights of SCI and Propco with respect to the Master Lease. (First Compromise Motion, p.14, lines 21–26);

c. "SCI has determined, in its business judgment, that the benefits to SCI of the Reduced Rent and the other protections provided to SCI under the Compromise Agreement are fair consideration for SCI's agreement to provide the transition services and related protections required by Propco. Propco, on the other hand, acting through the Independent Propco Directors, has determined, in its business judgment, that those transition services and related protections that Propco has bargained for are fair consideration for Propco's agreement to accept the Reduced Rent and otherwise agree to the terms of the Compromise Agreement. Those business judgments were reached following extensive, arms' length negotiations between the Parties and reflect SCI's and Propco's independent decisions that entry into the Compromise Agreement is in the best interests of each of their respective estates." (First Compromise Motion, p.17, lines 6–16);

d. "Here, the Parties have been able to reach a compromise that solved a multitude of potential problems. The primary objective was to avoid a premature and potentially precipitous rejection of the Master Lease and the License Agreement." (First Compromise Motion, p.19, lines 25–27);

e. "The terms of the Compromise Agreement are the product of extended and comprehensive negotiations between SCI and Propco. SCI has determined, in its business judgment, that the benefits to SCI of the Reduced Rent and the other protections provided to SCI under the Compromise Agreement are fair consideration for SCI's agreement to provide the transition services

11445008.1

1   and related protections required by Propco." (Haskins Decl., p.7, lines 9–13);

2

   **f.** "Concessions made by both SCI and Propco as independent negotiating
3    parties represented by separate counsel, as reflected in the changes in drafts
    of the Master Lease Compromise Agreement and other evidence before the
4    Court, demonstrate, even under heightened scrutiny, that the Master Lease
    Compromise Agreement was negotiated in good faith and at arm's length."
5    (Findings of Fact, p.7, lines 17–21);

6   **g.** "MR. KRELLER [for Debtors]:  I think that through the declarations of
    both Mr. Haskins and Mr. Kors we've pretty well established that the
7    compromise agreement falls somewhere in between those two points on the
    spectrum. And if you use those as the boundaries of reasonable-- and I
8    think we have good counsel on all sides who should be taking reasonable
    positions-- we've set the boundary and we fall squarely within that with
9    this compromise." (Transcript, p.102, lines 17–24); and

10   **h.** "MR. GARZA [for Propco]:  And it wasn't until the 18th in our view-- and
    maybe SCI has a different view.  But looking at it from Propco's view we
11    were not going to do this deal unless we got certain concessions.  And only
    upon getting those concessions on the 18th did we have a deal.  This is not
12    a situation where the independent directors rolled over on anything.  They
    negotiated a fair compromise and understanding." (Transcript, p.232, lines
13    9–16).

14  4.  The following statements evidence SCI's and Propco's agreement that, upon

15 negotiating the First Compromise Agreement, the terms of the First Compromise Agreement

16 satisfied the needs and objectives of both parties:

17   **a.** "The Compromise Agreement is the end product of those negotiations, and
    SCI and Propco believe that the Compromise Agreement satisfies the
18    objectives the Parties had coming into the negotiations." (First
    Compromise Motion, p.6, lines 14–16);
19

20   **b.** "The terms of the Compromise Agreement are the product of extended and
    comprehensive negotiations between SCI and Propco. Throughout the
21    negotiation process, the Parties have worked diligently to ensure the needs
    of both sides regarding the Master Lease are met while balancing the new
22    realities of SCI's limited ability to use cash collateral with respect to the
    Master Lease rent payments." (First Compromise Motion, p.17, lines 2–6);

23   **c.** "SCI, with the advice of legal and financial counsel, has determined that
    the compromise set forth in the Compromise Agreement provides the best
24    possible opportunity for the Debtors to continue their efforts to negotiate a
    viable, confirmable plan of reorganization in an expeditious and effective
25    manner, while at the same time protecting the respective rights of SCI and
    Propco with respect to the Master Lease."  (Haskins Decl., p.7, lines 4–8);
26

   **d.** "The Master Lease Compromise Agreement addresses the needs of both
27    Propco and SCI while maintaining value for the Debtors' estates and
    creditors." (Findings of Fact, p.6, lines 26–28);

28

11445008.1

e.    "The Compromise Agreement is an arms' length, consensual arrangement, bargained for between the lessor and its lessee. Propco has willingly and in good faith negotiated the terms of the Compromise Agreement and is in no way being 'forced' to allow SCI to continue as lessee without paying fair consideration for that right." (First Compromise Motion, p.17, lines 27–28, p.18, lines 1–2); and

f.    "The Parties agree that this Compromise is binding and final when executed (subject to Bankruptcy Court approval), and once approved shall not be modified in any way by the confirmation or denial of confirmation of the Plan or any subsequent plan, without the express written consent of the Parties." (First Compromise Agreement, Section S, p.25; Master Lease Compromise Agreement, Section S, p.20–21).

5.    The following statements by the Debtors demonstrate that the Debtors perceived the First Compromise Agreement as a necessary compromise in order to satisfy critical regulatory concerns:

a.    "In short, it cannot reasonably be expected that the regulatory authorities of the State of Nevada would sit idly by while thousands of employees are terminated and gaming tax revenue is suspended for an indefinite period of time. In the context of an uncontrolled rejection that could otherwise threaten the ongoing operation of the Leased Casinos, SCI believes that the gaming authorities would step in to protect the public and keep the casinos open and operating (under their police powers, if need be and absent cooperation from SCI as the licensed operator). SCI further believes that, as a licensee of the State of Nevada, it would be required to assist in an orderly transition to a new licensed operator or face significant adverse regulatory action if it failed to do so- including the imposition of fines (against SCI, not Propco) and possible suspension or revocation of its gaming license, which would jeopardize not only the operations of the Leased Casinos, but all of SCI's other casino operations. The creditor losses for SCI's creditors, including the SCI Prepetition Lenders, in such an event would be enormous. This is the last scenario that the Minority Lenders should want, as the regulatory risk of an uncontrolled rejection would fall directly on SCI, its estate and its non-debtor operating subsidiaries." (First Compromise Reply, p.10, lines 22–28, p.11, lines 1–7).

6.    The only statements in the Documents that appeared to contemplate future agreements between SCI and Propco appeared in the First Compromise Agreement, the First Compromise Motion, and the Transcript. Those statements all appear to contemplate the possibility of further transition services or the consummation of a plan of reorganization, but there appears to be no language that suggested that the First Compromise Agreement was intended to be anything other than a full and final compromise and resolution of the disputes between SCI and Propco. Those statements are as follows:

11445008.1

Exhibit A-5

a.  "This Compromise shall neither (i) limit Propco's, or its successors and assigns, from seeking different or additional transition services *to the extent legally provided for under any written agreements between the Parties or other applicable law*, nor (ii) limit SCI and the Operating Subsidiaries, or their successors and assigns, from defending against any such requested relief and taking the position that, except as provided in this Compromise, no additional transition services are legally required under any written agreements between the Parties or other applicable law and nothing herein shall be deemed to modify the Propco Cash Collateral Stipulation, the SCI Final Cash Collateral Order or the Forbearance Agreement or any of the rights, remedies or privileges thereunder of the parties thereto." (First Compromise Agreement, ¶16, p.8) (emphasis added);

b.  "Neither Propco, its successors and assigns nor any other party in interest shall be limited from seeking different or additional transition services as may be legally required *under the written agreements between the Parties or by other applicable law*, provided, however, that neither SCI nor the Operating Subsidiaries, nor their successors and assigns, nor any other party in interest are limited from defending against any such requested relief and taking the position that, except as provided in this Compromise, no additional transition services are legally required under the written agreements between the Parties or by other applicable law." (First Compromise Agreement, Section J, p.6–7) (emphasis added);

c.  "Propco and its successor/assigns (including the Propco Mortgage Lender) will continue to *have the ability to argue (if such arguments exist) for additional transition services under the agreements between Propco and SCI or under otherwise applicable law, while leaving SCI free to argue that no additional transition services are required to be provided to Propco*." (First Compromise Motion, p.10, lines 17–21) (emphasis added);

d.  "MR. KRELLER [for the Debtors]:  Your Honor, there was also a provision in the original agreement which provided for the potential of future asset sales by SCI to Propco in connection with assets that SCI presently owns but that are used largely or exclusively in the operation of the Propco casinos.  The original document did not provide for court approval or other notice of hearing with respect to those sales.

"THE COURT:  I looked at that and I've seen the language that's in the redline, and I assume that's analogous to 363 procedure.

"MR. KRELLER [for the Debtors]:  That's correct, your Honor." (Transcript, p.79, lines 1–12) (clarifying that the language cited in subparagraph 8(d) above is analogous to a procedure in accordance with 11 U.S.C. 363);

e.  "The Compromise Agreement provides a road map on how to deal with the Master Lease up to and through March 12, 2010, while simultaneously preserving Propco's interests in the Rental Payments for the Deferral Period and providing Propco with the certainty of some transition services it contractually does not currently possess." (First Compromise Motion, p.20, lines 6–9).

11445008.1