E-filed: April 21, 2010

| | |
|---|---|
| BRETT H. MILLER (NY Bar No. 2483691)<br>JORDAN A. WISHNEW (NY Bar No. 4106126)<br>MORRISON & FOERSTER LLP<br>1290 Avenue of the Americas<br>New York, NY 10104-0050<br>Telephone: 212.468.8000<br>Facsimile: 212.468.7900<br>BrettMiller@mofo.com; JWishnew@mofo.com | G. LARRY ENGEL (CA Bar No. 53484)<br>VINCENT J. NOVAK (CA Bar No. 233003)<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, CA 94105-2482<br>Telephone: 415.268.7000<br>Facsimile: 415.268.7522<br>LEngel@mofo.com; VNovak@mofo.com |

ROBERT R. KINAS (Bar No. 6019)
SNELL & WILMER LLP
Hughes Center
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169-5958
Telephone: 702.784.5220
Rkinas@swlaw.com

Attorneys for Boyd Gaming Corporation

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.,<br>                     Debtor.<br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Northern NV Acquisitions<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects Fertitta Partners, LLC<br>☐ Affects Station Casinos, Inc.<br>☐ Affects FCP Mezzco Parent, LLC<br>☐ Affects FCP Mezzco Parent Sub, LLC<br>☐ Affects FCP Mezzco Borrower VII, LLC<br>☐ Affects FCP Mezzco Borrower VI, LLC<br>☐ Affects FCP Mezzco Borrower V, LLC<br>☐ Affects FCP Mezzco Borrower IV, LLC<br>☐ Affects FCP Mezzco Borrower III, LLC<br>☐ Affects FCP Mezzco Borrower II, LLC<br>☐ Affects FCP Mezzco Borrower I, LLC<br>☐ Affects FCP Propco, LLC | Chapter 11<br><br>Case No. BK-09-52477<br><br>Jointly Administered<br>BK 09-52470 through 09-52487<br><br>**DECLARATION OF DAVID FARLIN IN OPPOSITION TO: (1) JOINT MOTION OF STATION CASINOS, INC. AND FCP PROPCO, LLC PURSUANT TO 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) AND 365(d)(4)(B)(ii) AND FED. R. BANKR. 9019 FOR ENTRY OF AN ORDER APPROVING SECOND AMENDMENT TO AMENDED AND REVISED MASTER LEASE COMPROMISE AGREEMENT; AND (2) DEBTORS' MOTION FOR ENTRY OF ORDER ESTABLISHING BIDDING PROCEDURES AND DEADLINES RELATING TO SALE PROCESS FOR SUBSTANTIALLY ALL OF THE ASSETS OF STATION CASINOS, INC. AND CERTAIN "OPCO" SUBSIDIARIES; AS WELL AS (3) REVISIONS THERETO**<br><br>Date:  **May 4, 2010**<br>Time:  **2:00 p.m.**<br>Place:  300 Booth Street<br>            Reno, NV 89509 |

sf-2831918
11444994.1

I, DAVID FARLIN, declare:

1. I am the Chief Information Officer of Boyd Gaming Corporation ("Boyd"), which has its principal office at 3883 Howard Hughes Parkway, Ninth Floor, Las Vegas, Nevada 89169.

2. I submit this declaration (the "Declaration") in support of Boyd's opposition to the Debtors' aforementioned pending motions set to be heard on or about May 4, 2010, and relating to Debtors' proposed (i) Second Compromise Amendment to the Master Lease, (ii) bidding procedures, and (iii) extension of exclusivity.

3. I am authorized by Boyd to submit this Declaration for such purpose. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of Boyd's senior management, my review of relevant documents, such as the Debtors' relevant pending motions and declarations, and my opinion based upon my relevant knowledge and experience. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4. In particular, I reviewed the following documents[1]:

   a. Debtors' Motion for Order Establishing Bidding and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "OpCo" Subsidiaries (04/07/10) [Docket No. 1175];

   b. Notice of Submission of Revised Bidding Procedures in Connection with Debtors' Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos, Inc. and Certain "OpCo" Subsidiaries (04/19/10) [Docket No. 1214] (Docket No. 1175 and Docket No. 1214, collectively, the "Bid Procedures Motion");

   c. Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement (4/07/10) [Docket No. 1179];

   d. Notice of Submission of Revised Second Amended and Restated Master Lease Compromise Agreement in Connection with Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a),

---

[1] I briefly reviewed the Debtors' revised or supplemented documents that were filed with the Court on or about April 19, 2010, but I have not had sufficient time to fully address them or discuss them with counsel. Therefore, I may supplement my comments once I have had time to fully consider these additional filings and obtain the advice of counsel.

1

sf-2831918
11444994.1

|   |   |   |
|---|---|---|
| | | 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement (04/19/10) [Docket No. 1215] (the Second Amended and Restated Master Lease Compromise Agreement attached as Exhibit 1 to Docket No. 1179 and Exhibit 1 to Docket No. 1215, collectively, the "Second Compromise Amendment"); |
| | e. | Notice of Submission of Redline Comparison of Revised Second Amended and Restated Master Lease Compromise Agreement in Connection with Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement (04/19/10) [Docket No. 1216]; |
| | f. | Order Approving Master Lease Compromise Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4) and Fed. R. Bankr. 9019 (2/02/10) [Docket No. 962]; |
| | g. | Amended and Restated Master Lease Compromise Agreement (12/11/09) [Docket No. 962]; |
| | h. | Stipulation Approving First Amendment to Amended and Restated Master Lease Compromise Agreement (2/24/10) [Docket No. 1019]; and |
| | i. | First Amendment to Amended and Restated Master Lease Compromise Agreement (2/24/10) [Docket No. 1019] (the Amended and Restated Master Lease Compromise Agreement as amended by the First Amendment to Amended and Restated Master Lease Compromise Agreement, the "First Compromise Agreement"). |

5. Based on my professional experience within the gaming industry, I have knowledge about the assets required to operate hotels and casinos within the gaming industry and the availability of such assets and alternatives to them in the general commercial market.

6. The assets, licenses and transition services owned or allocated to FCP PropCo LLC ("Propco") under the First Compromise Agreement are referred to herein as the "Propco Assets." All of the assets of Station Casinos, Inc. ("SCI", and together with Propco, the "Debtors") other than the Propco Assets, the assets of CV PropCo, LLC ("Landco"), and certain excluded assets identified in the First Compromise Agreement are referred to herein as the "Opco Assets." "Opco" shall mean SCI. The "Propco Properties" shall mean, collectively, the four properties Propco owns: Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Sunset Station Hotel & Casino and Red Rock Casino Resort Spa.

sf-2831918
11444994.1

2

7. Except for the trademarks set forth on Exhibit A to the Second Compromise Amendment, the material additional and different IT/IP assets, licenses and transition services requested by the Debtors to be allocated to Propco under Annex 1 to the Second Compromise Amendment as "Excluded Assets" or in the Bid Procedures Motion as "Excluded Assets" (individually and collectively referred to herein as "Excluded Assets") are not unique or specific to the Propco Properties, and there are alternatives generally available in the commercial marketplace. Except for the trademarks set forth on Exhibit A to the Second Compromise Amendment, I am informed and believe that the transfer of the Excluded Assets from Opco to Propco is not essential for Propco to operate continuously and adequately the Propco Properties.

8. The value of the Opco Assets will be materially diminished if the additional and different IT/IP assets, licenses and transition services requested by the Debtors to be allocated to Propco under the Second Compromise Amendment, such as the Excluded Assets, are allocated to Propco. For example, Propco is requesting a license under the Second Compromise Amendment to common customer-facing marketing and promotional materials used at both the hotels and casinos within the Opco Assets ("Opco Properties") and the Propco Properties, such as website content (graphics, photography, creative promotional text for hotels), hard-copy advertising and promotional materials, on-premises textual materials and graphics. I believe that customers of the Opco Properties will be confused as to the source of origin of the hotel and casino services of Propco if Propco is allowed to use the Excluded Assets, and such consumer confusion has a material negative impact on the value of the Opco Assets. These types of items within the Excluded Assets reflect a singular brand identity recognized by Opco's customers; these assets should remain owned by and be exclusively used to promote Opco, and Propco should not be able to reproduce such brand identity easily and to the confusion of consumers by obtaining a license to use these assets.

9. The modern casino business is a technology operation that is heavily dependent on sophisticated information technology (IT) and intellectual property (IP) for success. IT is critical to the operation of properties in the hotel and casino business, where all core functions depend on

IT systems. Allowing any, or in this case all, IT and IP assets to be transferred to a competitor puts Opco at extreme disadvantage.

10. The initial investment in hardware and software plus the ongoing development of proprietary IT and IP assets can involve huge costs over long periods of time. From this perspective, among others, Opco's IT and IP assets are very valuable and desirable. One of the core values of the Opco Assets is its IT and IP assets, including the Excluded Assets.

11. If the Opco IT and IP assets within the Excluded Assets are given away to Propco to any material extent, such transfer would require Opco to replace and reinstall the same assets, all at Opco's own expense. The time and effort required for this replacement is such that Opco could need "transition services" from Propco in order to rebuild Opco's IT systems and to prevent the Opco Properties from "going dark."

12. The IT and IP assets within the Excluded Assets (including, without limitation, the particular items listed below) represent key IT and IP assets for a property within the hotel and casino business. A transfer of these critical IT and IP assets, which are currently part of the Opco Assets, will destroy any opportunity for a fair bidding or plan process and impair the Debtors' ability to attract a fair price from non-insider competitors. The Excluded Assets include components that are critical to the value of Opco's gaming business. The Excluded Assets are similar to the recipe for a cola drink. A competitor can make a similar (but different) cola product easily without having access to the recipe. However, if the competitor is given the recipe and is thus enabled to make the exact cola drink as the recipe's owner, the recipe owner loses the uniqueness of its cola drink and thus loses value.

13. In item 5 (Patents) on Annex 1 to the Second Compromise Agreement, Propco requested an unrestricted, perpetual fully paid up license under Opco's U.S. Patents and patent applications related to player tracking systems. A player tracking system allows a casino to manage, maintain and cultivate its relationship with its players by providing information about player activity, such as type of wager, type of game or race, frequency of play and other parameters. A player tracking system is a valuable asset for a casino, but there is nothing inherent to a player tracking system (such as the one covered by Opco's patents) that is special or unique

4

to the Propco Properties. In fact, there are several commercially available player tracking systems available in the market which Propco could use, all of which will achieve the basic functionality of a player tracking system and meet any regulatory requirements required by authorities in the gaming industry. For example, to list a few of many commercially available alternatives, are the player tracking systems offered by Bally Technologies, Inc., International Game Technology (IGT), Aristocrat Technologies, Inc., and Konami Gaming, Inc. The uniqueness of a player tracking system is a direct result of an investment of time and money in order to tailor and customize a commercially available player tracking system to meet the actual operating configurations of a particular gaming business (for example, customer loyalty programs, brand positioning, marketing standards and operational demands). The value of the Opco Assets will be greatly diminished, if Opco is forced to hand over a license to patents covering the player tracking system in which I expect that Opco has invested so much time and money to tailor and customize it to fit the actual operating configurations of the Opco gaming business.

14. In item 7 (Other Intellectual Property) on Annex 1 to the Second Compromise Agreement, Propco requested the use of "existing website infrastructure (including online guest transaction and account management systems) and related software applications" within the Opco Assets and requested the right to not "re-create [the] website user interface from scratch." The website user interface for certain of the Opco Properties, printouts of which are attached hereto as Exhibit A, are very similar in look and feel to certain of the Propco Properties, attached hereto as Exhibit B. Given the similarities in look and feel of the existing website user interface, I believe that customers of the websites of the Propco Properties will assume that Opco is the source of origin of the Propco Properties and will consider the Propco Properties as part of the same enterprise as the Opco Properties. The likelihood of this consumer confusion creates harm to the Opco Properties, which are intended to be a separate business from the Propco Properties that will compete with the Propco Properties, and thus diminishes the value of the Opco Assets. There are many alternatives for presenting the website user interface of a property within the hotel and casino business, for example, those set forth on Exhibit C attached hereto. In fact, although the

5

sf-2831918
11444994.1

two properties shown on <u>Exhibit C</u> (the Mirage property and the Treasure Island property) used to have the same owner, the Treasure Island property was sold to a new owner in 2009, who was able to quickly create the different website user interface shown on <u>Exhibit C</u>. If the Propco Properties are presented using an alternative website user interface, customers of the Propco Properties will not be confused as to source of origin and the value of the Opco proprietary website IP will not be harmed thereby. Furthermore, there are many generally available sources of software applications for website infrastructure (including online guest transaction and account management systems). These software applications can be provided by a variety of vendors, ranging from large companies like International Business Machines Corp. (IBM) to small advertising agencies to independent consultants specializing in website design.

15. In item 7 (Other Intellectual Property) on Annex 1 to the Second Compromise Agreement (and again in item 9 (Business Information) with respect to such business information), Propco also requested an "unrestricted, perpetual, fully paid up license to create derivative works of any and all non-registered copyrightable materials previously used in the ordinary course of operating the Propco business and not otherwise transferred to Propco." The meaning of "derivative works" is not further limited, thus encompassing any work based on a preexisting Opco work. In addition, the universe of "non-registered copyrightable materials previously used in the ordinary course of operating the Propco business" is extremely broad and, based on my experience, would include anything from software code (including internally developed software code), human resources manuals, music jingles used in advertising campaigns, marketing brochures, guest surveys, synopses of gambling rules and any other written materials used in operating a property within the hotel and casino business. It is obvious that certain "non-registered copyrightable materials"—for example, the similar look and feel of the website user interface shown on <u>Exhibits A</u> and <u>B</u>—are shared between the Propco Properties and the Opco Properties. As already mentioned above, there are many generally commercially available alternatives to materials that are part of the Opco Assets. They are not unique or specific to the Propco Properties, and allowing Propco to have a broad license to create derivative

6

sf-2831918
11444994.1

works of them allows Propco to pass itself off as associated with the Opco gaming business when, in contrast, Propco is intended to be a separate business from Opco.

16. In item 8 (Primary Customer Database) of Annex 1 to the Second Compromise Amendment, Propco requested that the casino player databases of the Propco Properties and Opco Properties be segmented into active and inactive groups, and that inactive accounts be assigned to either Propco or Opco based on the property of greatest gaming theoretical from the player's last play date back 24 months. The allocation of inactive customer accounts is not essential for the operation of the Propco Properties. Inactive accounts are by their nature not a necessary part of the current operations of a business. However, information about inactive accounts remains a valuable asset, and requiring the transfer of information about inactive accounts within the Opco Assets reduces the value of the Opco Assets.

17. With respect to active customers, Propco requested that Opco customers who played "primarily" at Propco real estate (as defined for Propco's benefit in an unfair standard) be transferred to Propco as its "Primary Customers." Importantly, once a player is "assigned to an entity," Propco requested that "the player's entire history of all property play will be owned by that entity and will be erased at the other." Under the First Compromise Agreement, the Propco Properties received information about customers determined to be primary customers at the Propco Properties, but the Opco Assets were left whole and the customer information was not deleted from the Opco Assets.

18. Player information is a valuable asset within the hotel and casino business. Requiring Opco to delete such information from the Opco Assets greatly diminishes the value of the Opco Assets and allows Propco to walk away with many of the important customers cultivated by Opco at great expense to Opco, who paid for their marketing and recruitment. Moreover, such information is not necessarily restricted to information that is unique and specific to the Propco Properties. For example, a customer determined to be a primary customer of a Propco Property could also have played at the Opco Properties, and Opco should not be denied the information necessary to continue to promote to such customers the Opco Properties which such customers have patronized in the past.

7

sf-2831918
11444994.1

19. In item 9 (Business Information) of Annex 1 to the Second Compromise Amendment, Propco requested splitting between the separate Propco Properties and Opco Properties "[a]ll information relating to tracking of operations (e.g., inventory, employee time, HR data, accounting and other Transaction Data as described on Annex A)" that is "tracking information relating to" the Propco Properties' business information, including without limitation HR programs documentation, training manuals and policies and procedures, physical plant and engineering documentation and processes, player development systems, processes and reporting, and other business information; and marketing and other art materials and construction contracts "to the extent related to" or "relating to" the Propco Properties. The examples of business information that Propco desires to receive and use are valuable assets, and they are not unique or specific to the Propco Properties. It would be difficult, if not impossible, to determine the extent to which they are "related to" the Propco Properties and not the Opco Properties, such that Propco would be justified in requiring the transfer or use of them to the diminishment of the Opco Assets. The value of these kinds of assets is reflected in the First Compromise Agreement, which requires the sale of "physical plant operating records" at a mutually agreed upon value and form of consideration.

20. Moreover, I have reviewed the definition of Transaction Data described on Annex A to Annex 1 to the Second Compromise Amendment, which is broadly defined and includes, among other things, "all data, information and computer processing systems, and associated hardware used in the ordinary course of business." As such, the definition of Transaction Data is not limited to data, but instead sweeps in all systems and associated hardware, including, without limitation, player tracking systems, slot and table games accounting systems, hotel reservations systems and all "Front of house ops systems" such as casino accounting, cage and count, franchising and merchandising operation systems, performance management, and safety, security, surveillance systems and CCTV infrastructure. All of these systems and hardware are not unique and specific to the Propco Properties and are generally available in the commercial marketplace. For example, commercially available versions for many of these systems are generally available through companies such as Agilysys, Inc. or MICROS Systems, Inc. In addition, these systems

8

and hardware represent assets that may be deployed enterprise-wide, representing Opco's investment in their value on an enterprise level throughout the Opco Properties. They cannot be separated from the enterprise without impairing their value. Splitting these assets between Propco Properties and Opco Properties will diminish their value and thus diminish the value of the Opco Assets. Also, because these assets are "front of house" and customer-facing, there is a likelihood of consumer confusion if these systems are employed, as they are currently used at the Opco Properties, at both the Propco Properties and Opco Properties. This consumer confusion has a material negative impact on the value of the Opco Assets.

21. In item 10 (IT Systems) of Annex 1 to the Second Compromise Amendment, Propco requested the transfer of all "hardware and wires located at any Propco [P]roperty." Propco states that Propco and Opco will cooperate to "ensure that Opco acquires a duplicate IT system and necessary hardware to operate the same. The cost of Opco's duplicate IT system will be a factor in determining final purchase price but Propco will not separately reimburse Opco for such costs." Proper integration of hardware and wires into an IT system, particularly for a large enterprise across multiple properties, is a critical, complicated and costly element of the IT infrastructure for a property within the hotel and casino business. The transfer of these assets to Propco simply because they are "located at any Propco [P]roperty," with merely the promise to cooperate in rebuilding Opco's resulting diminished IT system and no reimbursement of Opco's costs for rebuilding, is a clear windfall to Propco to the detriment of the value of the Opco Assets. Assuming that Propco holds an entire data center whose contents can support multiple properties, the value of the contents of such a data center can easily exceed $10,000,000 for each data center (based on an estimate of an equivalent Boyd data center). From the perspective of any buyer of the Opco Properties, the burden of proof should be on the Debtors to prove that Opco's core IT system and capability would still be fully functional after these Excluded Assets are transferred to Propco. If and to the extent that Propco is requiring Opco to replace and rebuild Opco's own IT systems in order for the remaining Opco systems still to function, the Debtors must reveal that problem to the Court and the bidders and Propco must fully compensate Opco creditors. As a result of the Debtors' motion, Opco creditors and bidders worry that, instead of Opco providing

9

sf-2831918
11444994.1

transition services to Propco, and Propco then replacing what it needs, Propco would take the turnkey Opco system for Propco's own use and then force Opco to depend on Propco for Opco's IT needs, while Opco has to rebuild its resulting diminished IT system at its own cost.

22. Propco also requested "the right to use and modify all proprietary software that is currently used, directly or indirectly, at any Propco [P]roperty" and an "unrestricted, perpetual, fully paid up license" to use and make modifications to all Opco software currently owned by it and an equivalent license to use "any patents . . . necessary to operate the IT System[, which] will include access to all 'Front of house ops systems' described in the definition of 'Transaction Data'." As discussed above, these systems are not unique and specific to Propco and are generally available in the commercial marketplace. Propco can obtain alternative systems in the commercial marketplace and does not need to license these systems from Opco in order to operate continuously and adequately the Propco Properties. If Propco receives a free license to the software and IT system in which Opco has invested substantial time and money to develop, it will be a windfall to Propco. As an example, the cost to develop and customize a casino management application can take from five to eight years and cost in excess of $10,000,000 to $15,000,000 (calculated based on Boyd's own proprietary multi-property casino management application). Additionally, the functionality of a proprietary system such as this would be tightly coupled to Opco's marketing and brand strategy programs, making it unique to Opco's gaming business. Propco should not receive such advantage, at least without compensation to Opco, especially given Propco's position as a competitor to Opco.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of April, 2010, at Las Vegas, Nevada.

_____
DAVID FARLIN, Declarant

sf-2831918

10

# Exhibit A

# Screenshots of Website User Interface from Opco Properties

1. http://www.santafestationlasvegas.com/



1

2. http://www.texasstation.com/



sf-2831918
11444994.1

# Exhibit B

## Screenshots of Website User Interface from Propco Properties

1. http://www.sunsetstation.com/



sf-2831918
11444994.1

2. http://www.boulderstation.com/



2

sf-2831918
11444994.1

# Exhibit C

## Screenshots of Alternative Website User Interfaces

1. http://www.mirage.com/



1

2. http://www.treasureisland.com/



sf-2831918
11444994.1