E-filed:  April 21, 2010

1   BRETT H. MILLER (NY Bar No. 2483691)          G. LARRY ENGEL (CA Bar No. 53484)
    JORDAN A. WISHNEW (NY Bar No. 4106126)        VINCENT J. NOVAK (CA Bar No. 233003)
2   MORRISON & FOERSTER LLP                       MORRISON & FOERSTER LLP
    1290 Avenue of the Americas                   425 Market Street
3   New York, NY  10104-0050                      San Francisco, CA  94105-2482
    Telephone: 212.468.8000                       Telephone:  415.268.7000
4   Facsimile: 212.468.7900                       Facsimile:  415.268.7522
    BrettMiller@mofo.com; JWishnew@mofo.com       LEngel@mofo.com; VNovak@mofo.com
5
    ROBERT R. KINAS (Bar No. 6019)
6   SNELL & WILMER LLP
    Hughes Center
7   3883 Howard Hughes Parkway, Suite 1100
    Las Vegas, Nevada 89169-5958
8   Telephone:  702.784.5220
    Rkinas@swlaw.com
9

10  Attorneys for Boyd Gaming Corporation

11                  UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF NEVADA
12

13  In re:                                  |  Chapter 11

14  STATION CASINOS, INC.,                   |  Case No.  BK-09-52477
                     Debtor.
15  ☐ Affects this Debtor                    |  Jointly Administered
    ☒ Affects all Debtors                    |  BK-09-52470 through BK-09-52487
16  ☐ Affects Northern NV Acquisitions
    ☐ Affects Reno Land Holdings, LLC        |  DECLARATION OF BRIAN A. LARSON
17  ☐ Affects River Central, LLC                IN SUPPORT OF OPPOSITIONS TO:  (1)
    ☐ Affects Tropicana Station, LLC            JOINT MOTION OF STATION CASINOS,
18  ☐ Affects FCP Holding, Inc.                 INC. AND FCP PROPCO, LLC PURSUANT
    ☐ Affects Fertitta Partners, LLC            TO 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3)
19  ☐ Affects Station Casinos, Inc.             AND 365(d)(4)(B)(ii) AND FED. R. BANKR.
    ☐ Affects FCP Mezzco Parent, LLC            9019 FOR ENTRY OF AN ORDER
20  ☐ Affects FCP Mezzco Parent Sub, LLC        APPROVING SECOND AMENDMENT TO
    ☐ Affects FCP Mezzco Borrower VII, LLC       AMENDED AND REVISED MASTER
21  ☐ Affects FCP Mezzco Borrower VI, LLC        LEASE COMPROMISE AGREEMENT;
    ☐ Affects FCP Mezzco Borrower V, LLC         (2) DEBTORS' MOTION FOR ENTRY OF
22  ☐ Affects FCP Mezzco Borrower IV, LLC        ORDER ESTABLISHING BIDDING
    ☐ Affects FCP Mezzco Borrower III, LLC       PROCEDURES AND DEADLINES
23  ☐ Affects FCP Mezzco Borrower II, LLC        RELATING TO SALE PROCESS FOR
    ☐ Affects FCP Mezzco Borrower I, LLC         SUBSTANTIALLY ALL OF THE ASSETS
24  ☐ Affects FCP Propco, LLC                    OF STATION CASINOS, INC. AND
                                                 CERTAIN "OPCO" SUBSIDIARIES; and
25                                               (3) DEBTORS' MOTION TO EXTEND
                                                 EXCLUSIVITY
26
                                             |  Date:   May 4, 2010
27                                              Time:   2:00 p.m.
                                                Place:  300 Booth Street
28                                                      Reno, NV 89509

sf-2832059
11444996.1

I, BRIAN A. LARSON, declare:

## I.     BACKGROUND

1.      I currently serve as the Executive Vice President, General Counsel and Secretary of Boyd Gaming Corporation ("Boyd"). In that capacity, I am familiar with Boyd's interest in acquiring some or all of the assets of the Debtors in the above-captioned pending Chapter 11 cases and of certain nondebtor affiliates. I have participated in Boyd's efforts to advance that interest, in addition to Boyd's interest as a creditor seeking to maximize Boyd's recovery in a fair and open process.

2.      I have been the General Counsel of Boyd since January 1998, and the Secretary since February 2001, having begun my employment at Boyd in March 1993 as Associate General Counsel, with responsibility for transactional matters, particularly those applying my corporate, tax, and real estate legal background. In June 1993, I was also promoted to Vice President of Development and Associate General Counsel, with responsibility for Boyd's development activities in gaming jurisdictions outside the State of Nevada. I became Executive Vice President in January 2008. In such capacities, I have focused upon, among other things, casino-hospitality developments and acquisitions. Before joining Boyd, I was a partner at the law firm Snell & Wilmer, LLP. Before that I was a certificated public accountant at Coopers & Lybrand, specializing in real estate and tax issues.

3.      I submit this Declaration in support of Boyd's opposition to the Debtors' pending motions set to be heard on or about May 4, 2010, and relating to the Debtors' proposed (i) Second Amendment to the Amended and Restated Master Lease Compromise Agreement, (ii) bidding procedures, and (iii) extension of exclusivity, as revised and supplemented.[1] I understand that the hearing on the Disclosure Statement will be deferred until June. I am incorporating the definitions used in those objections filed by Boyd to apply to various terms used herein.

---

[1] I briefly reviewed the Debtors' revised or supplemented documents that were filed with the Court on or about April 19, 2010, but I have not had sufficient time to fully address them or discuss them with counsel. Therefore, I may supplement my comments once I have had time to fully consider these additional filings and obtain the advice of counsel.

sf-2832059
11444996.1

1    4.    I am authorized by Boyd to submit this Declaration for such purpose. Except as

2    otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge,

3    my discussions with other members of Boyd's senior management, my review of relevant

4    documents, such as the Debtors' relevant pending motions and declarations, and my opinions

5    based upon my relevant knowledge and experience. If I were called upon to testify, I could and

6    would testify competently to the facts set forth herein.

7    **II.    BOYD OFFERS AND PROCESS CONCERNS**

8    5.    Boyd has made repeated offers to the board of directors of Station Casinos, Inc.

9    ("SCI") to purchase some or all of the relevant assets of the Debtors and certain of their affiliates,

10   without inspiring from the Debtors any meaningful response or discussions. Attached as

11   Exhibit A hereto is Boyd's Current Report on Form 8-K filed with the Securities and Exchange

12   Commission ("SEC") that describes the most recent formal public proposal from Boyd to the

13   Debtors. The Debtors' consistent response has been to dismiss Boyd's proposals out of hand as

14   too conditional or as otherwise not worthy; however, such conditionality by Boyd is a direct

15   function of the nonresponsiveness of the Debtors in sharing basic, essential and customary data

16   on which a buyer must rely in order to make an unconditional bid.

17   6.    Boyd remains interested in competing for the Opco assets and, if Propco assets

18   become available, both the Propco and Opco assets. However, as expressed in Boyd's objections

19   to the Debtors' pending motions, Boyd has concerns about the adverse impact on the value of the

20   Opco assets due to the proposed transfers of Excluded Assets, without competitive bidding, from

21   Opco to Propco. Boyd is also concerned, as all potential non-insider bidders should be, that the

22   proposed auction process will be managed, controlled and governed by the Debtors' insiders (or

23   their designees), who themselves are competing for the same assets. Given this clear conflict of

24   interest, Boyd believes that the auction process will be stacked against non-insider bidders and

25   managed by the Debtors to favor the bid by the Debtors' insiders. To resolve these conflicts, it

26   would seem that a competing creditor plan and a sale process run by a truly independent and

27   neutral third party (*i.e.*, not a party selected by the Debtors' insiders) should be required.

28

sf-2832059
11444996.1

III.    CONCERNS REGARDING "EXCLUDED ASSETS"

7.    I have read the Declaration of Daniel Aronson of Lazard (the "Aronson Decl."), proclaiming a goal for the Debtors of a "competitive, fair and open" process (Aronson Decl. ¶ 10, p. 5, lines 12–13) designed to maximize the value of the Opco Assets (*see id.* ¶ 11, p. 5, lines 25–26). I believe that the Debtors' proposed transfer of the Excluded Assets from Opco to Propco, which carves these Opco assets out of the competitive bidding process, ensures that the process is neither competitive, nor fair and open and will harm the value of Opco.

8.    As discussed below, one example that demonstrates how the proposed transfer of the Excluded Assets can harm Opco's value (and why the proposed bidding procedures are defective) is the treatment of Opco's Wild Wild West assets. In addition, as discussed below, the Debtors fail to include any adequate disclosure regarding the value or importance of any of the Excluded Assets to Opco, including the Wild Wild West assets. By transferring Excluded Assets from Opco to Propco without adequate disclosure or competitive bidding, the Debtors' appear to be proposing a process that would create a windfall for Propco and the Debtors' insiders rather than promoting a competitive, fair and open process.

A.    Wild Wild West Assets

9.    Among the other SCI assets that I have reviewed from available public records is the Wild Wild West assets and related assemblage. I also have read the Declaration of Thomas Friel of SCI (the "Friel Decl."), proclaiming that Excluded Assets are to be stripped away from Opco "because they are used exclusively or dominantly in connection with the operation of the Propco Properties" (Friel Decl. ¶ 6, p. 3, lines 6–11), *i.e.*, the four Propco casinos subject to the Master Lease (*see id.* ¶ 8, lines 17–20). It is my understanding that the Wild Wild West assets are part of, and are owned by, Opco, and that such assets are not used, in any manner, in connection with the operation of Propco.

10.    From my review of public records, I understand that Opco's Wild Wild West assets include approximately 19 acres of leased land (subject to an option to purchase) strategically located along Dean Martin Drive on one side, and along Tropicana Avenue on the other, a portion of which has grandfathered gaming rights and is located within what is known as

1  the "Gaming Enterprise District," an additional 10 acres of land that is also subject to an option to

2  purchase, and approximately 2.7 acres of land that is owned by Opco. SCI's 2009 Form 10-K

3  (defined below) disclosed that SCI previously obtained an extension to its option to purchase the

4  19-acre Wild Wild West land.  Pursuant to the option to purchase, SCI may purchase the 19 acres

5  for $36 million.

6         11.    Opco's Wild Wild West assets are adjacent to approximately 74 acres of land

7  owned by "Landco," which I understand from the relevant SEC and bankruptcy court filings is

8  combining with "New Propco," Fertitta Gaming, and Colony.   According to SCI's Annual

9  Report on Form 10-K filed with the SEC for the fiscal year ended December 31, 2009 (the "2009

10  Form 10-K") (at p. 32), the Wild Wild West land "assemblage," when combined with the

11  adjacent land owned by Landco, includes a total of approximately 106 acres.

12         **B.    Potential Value of the Wild Wild West Assets; Inadequate Disclosure**

13         12.    As noted above, a portion of the Wild Wild West land is located within the

14  "Gaming Enterprise District," which means an area that has been approved by a county, city or

15  town as suitable for operating a gaming establishment that has been issued a nonrestricted gaming

16  license.  In addition, a portion of the Wild Wild West land has grandfathered gaming rights.

17  Further, the Wild Wild West land is located along Dean Martin Drive and Tropicana Avenue,

18  which makes it strategically valuable, given the direct access to, and significant frontage on, each

19  of these thoroughfares.  However, I believe that the 74 acres of land owned by Landco adjacent to

20  the Wild Wild West land is comparably less valuable (on a per-acre basis) as none of it has

21  grandfathered gaming rights, and it does not have significant frontage on Dean Martin Drive or

22  Tropicana Avenue.

23         13.    I have seen reports in the local press indicating that SCI has been planning a major

24  casino development (the Viva project) in the location of the Wild Wild West assemblage.  The

25  proposed transfer of the Wild Wild West land to New Propco as an Excluded Asset appears to be

26  in furtherance of this development strategy.  By owning the Wild Wild West land (and thereby

27  combining it with the 74 acres owned by Landco which is adjacent), New Propco gains prime real

28  estate for any potential major casino development.  However, if Opco were to keep the Wild Wild

4

1  West land, then Landco, or others, would be less likely to be able to develop the adjacent acreage

2  as a significant hotel-casino project.  Thus, based on my experience, which includes at least 14

3  casino-related development properties or projects and/or asset acquisitions, it would seem that the

4  Wild Wild West land is strategically important for the related assemblage of properties owned by

5  Landco and any future casino development project that may be planned by New Propco for this

6  location.

7       14.     In addition, according to the 2009 Form 10-K (at pp. 62 and 110), the defaulted

8  Landco loan of CV Propco, LLC is $250 million with reported concerns about the loan-to-value

9  ratio.  The disassociation of Opco's Wild Wild West land from the adjacent Landco land would

10  not help that value; however, if Landco combines with New Propco, and acquires the Wild Wild

11  West land inexpensively without competitive bidding, the combined assets would appear to be

12  significantly more valuable, particularly when the Las Vegas economic recovery occurs.

13       15.     Given the potential value in the Wild Wild West land, to maximize the value of the

14  Opco assets, the Debtors should be required to (a) provide disclosure regarding the Wild Wild

15  West land, its value (both strategic or otherwise), as well as an accounting of the entire

16  investment of the Debtors in the Wild Wild West land, including any Opco funds spent by the

17  Debtors for planning, engineering, legal, land use, architectural, and other development activities

18  related to the Wild Wild West land, and (b) open such assets up to competitive bidding.  Not

19  doing so creates a potential windfall for Propco and the Debtors' insiders rather than promoting a

20  competitive, fair and open process.  There appears to be no legitimate reason why Opco would

21  transfer the Wild Wild West assets to Propco on such a favored basis, without competitive

22  bidding, other than to accommodate the Debtors' insiders.

23       16.     In addition, to the extent that the Debtors have used Opco funds to pay for any

24  development activities involving the Wild Wild West land, it would seem only appropriate for the

25  Debtors' insiders to reimburse Opco creditors for these funds, including for fees paid by Opco for

26  land options or extensions, and any other expenses that are traditionally involved in such a

27  project.  Before a fair price can be set for these assets, the Court should consider the entire

28

5

sf-2832059
11444996.1

1   investment of SCI in the Wild Wild West and related assets, including all of the planning,

2   engineering, legal, land use, architectural, and other expenses paid by Opco.

3          17.     Unless the treatment of Excluded Assets, the apparent conflicts of interest and the

4   disclosure defects are resolved, Boyd is concerned, as all potential third-party bidders should be,

5   that the process to acquire any of the Debtors' assets will be anything but "competitive, fair and

6   open."

7          I declare under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.

9          Executed on this 21st day of April, 2010 in Las Vegas, Nevada.

10

11

12                                          By _____
                                                    Brian A. Larson

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

sf-2832059

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

**Boyd Current Report on Form 8-K Regarding a Proposal to
Acquire Station Assets**

*(Please see attached)*

Form 8-K

http://www.sec.gov/Archives/edgar/data/906553/000119312509253...

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934

### Date of Report (date of earliest event reported): December 16, 2009

BOYD GAMING

# Boyd Gaming Corporation
### (Exact Name of Registrant as Specified in its Charter)

| Nevada | 001-12882 | 88-0242733 |
|---|---|---|
| (State of Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

| 3883 Howard Hughes Parkway, Ninth Floor | |
|---|---|
| Las Vegas, Nevada | 89169 |
| (Address of Principal Executive Offices) | ( Zip Code) |

### Registrant's Telephone Number, Including Area Code: (702) 792-7200

### (Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

" Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

" Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

" Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

" Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 8.01. Other Events.

On December 16, 2009, Boyd Gaming Corporation ("Boyd Gaming") delivered a non-binding proposal ("Proposal") to the Board of Directors of Station Casinos, Inc. ("Station"). The full text of Boyd Gaming's Proposal delivered to Station is attached as Exhibit 99.1 to this Current Report and is incorporated herein by reference.

## Item 9.01. Financial Statements and Exhibits.

**(d) Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Boyd Gaming Proposal, dated December 16, 2009 |

# # #

This Current Report on Form 8-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Such statements contain words such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology, and may include (without limitation) information regarding Boyd Gaming's expectations, goals or intentions regarding the future, including, Boyd Gaming's Proposal and the forward-looking statements contained therein. These forward-looking statements are subject to business and economic risk and reflect the current expectations of Boyd Gaming, and involve subjects that are inherently uncertain and difficult to predict. Actual results could differ materially from these forward-looking statements because of factors such as: the possibility that Boyd Gaming's Proposal will not be accepted; the possibility that Station, Station's lenders and Boyd Gaming will be unable to reach agreement on the terms of a sale of Station assets; failure to achieve approval of the bankruptcy court; and other risks that are inherent for a transaction of this type, including other factors described in Boyd Gaming's SEC filings. Additional factors that could cause actual results to differ are discussed under the heading "Risk Factors" and in other sections of Boyd Gaming's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, filed with the SEC, and in Boyd Gaming's other current and periodic reports filed from time to time with the SEC. All forward-looking statements in this Current Report on Form 8-K are made as of the date hereof, based on information available to Boyd Gaming as of the date hereof, and Boyd Gaming assumes no obligation to update any forward-looking statement.

Form 8-K

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: December 16, 2009

**Boyd Gaming Corporation**

/s/ Josh Hirsberg
_____
Josh Hirsberg
*Senior Vice President, Chief Financial Officer and Treasurer*

Form 8-K

http://www.sec.gov/Archives/edgar/data/906553/000119312509253...

## Exhibit Index

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Boyd Gaming Proposal, dated December 16, 2009 |

EX-99.1 2 dex991.htm BOYD GAMING PROPOSAL

**EXHIBIT 99.1**

December 16, 2009

Board of Directors
Station Casinos, Inc.
1505 South Pavilion Center Drive
Las Vegas, NV 89135

Attention:
Frank J. Fertitta III
Lorenzo J. Fertitta
Thomas J. Barrack, Jr.
Jonathan H. Grunzweig
James E. Nave

To the Board of Directors of Station Casinos:

On behalf of the Board of Directors of Boyd Gaming Corporation ("Boyd Gaming"), we are writing to reaffirm our interest in acquiring, when permitted, the assets of Station Casinos, Inc. ("Station"), and to submit this Proposal, as defined below, for the consideration of Station's Board of Directors. This Proposal is consistent with our previously stated interest in Station and is being submitted pursuant to the recent agreement between Station and certain of its creditors for the benefit of Boyd Gaming.

Combining Station with our current portfolio is consistent with our strategy of growing our presence in the Las Vegas locals market. The transaction contemplated by this Proposal will allow us to leverage our 35 years of operating experience in the Las Vegas market to maximize the full potential of Station's assets. Given this compelling strategic fit, and Boyd Gaming's position as a licensed operator with strong financial capabilities, we continue to believe that the acquisition of the Station assets by Boyd Gaming is the optimal way forward for Station and will create the most value for Station's creditors.

Importantly, Boyd Gaming is in the best position to execute a smooth transition of ownership and operate the Station properties efficiently from day one. We believe our Proposal is in the best interests of Station's employees, vendors, customers, and the Las Vegas community as it will help to strengthen the local economy and preserve thousands of jobs.

**Proposal**

We hereby submit a non-binding offer for 100% of Station's "OpCo Assets" and "PropCo Assets" free and clear of all liens, claims and encumbrances for a total of $2.45 billion in cash and assumed debt (the "Proposal").

For the purposes of this Proposal, "PropCo Assets" means the assets that secure the CMBS mortgage loan due November 12, 2009, and the "OpCo Assets" means all of Station's other assets, except for the assets that secure Station's $250 million delay-draw term loan due February 7, 2011 ("LandCo") and all litigation claims unrelated to the PropCo Assets and the OpCo Assets.

Given the divergent interests of the parties involved, the unique nature of the assets, and to give due regard to the views of the various creditors, Boyd Gaming remains open and flexible in establishing a transaction structure that is appropriate and feasible.

## Valuation

We believe our offer price represents fair value to Station's stakeholders and takes into account current market conditions, our deep knowledge of the gaming industry, and Station's publicly disclosed financial performance.

For the OpCo Assets and PropCo Assets, we have taken into consideration the publicly disclosed information regarding the operating casino assets, management agreements, and non-operating assets, including, but not limited to, land held for development, joint venture interests and the development arrangements with various Native American tribes. In addition, we have assumed normalized working capital at closing and the continued existence of the OpCo and PropCo structure.

Our Proposal to acquire both the OpCo Assets and the PropCo Assets reflects the belief that there is more value in keeping these assets together rather than separating them. We believe that combining Station's assets with Boyd Gaming will result in the greatest number of benefits for stakeholders.

## Financing

Boyd Gaming has significant availability and flexibility under its revolving credit facility to consummate the proposed transaction. Given our experienced management team and our successful history of operating in the Las Vegas locals market, our access to capital and our existing Nevada gaming licenses, we are well-positioned to consummate this transaction.

## Conditions and Approvals

We have completed our review of Station's publicly available information and our legal and financial advisors remain prepared to review the remaining due diligence that is standard and customary for transactions of this type on an expedited basis. Our Proposal set forth in this letter remains subject to completing this due diligence, negotiating a definitive purchase agreement/ plan of reorganization, and the other conditions that we have previously communicated to Station. In addition, the plan of reorganization or other bankruptcy sale process that implements this Proposal would need to be satisfactory to Boyd Gaming and confirmed by the U.S. Bankruptcy Court, District of Nevada. It is also our intention to work closely with the Nevada Gaming Commission and Nevada Gaming Control Board to obtain the necessary approvals and provide for a smooth transition as this process moves forward.

## Timing

It is clear that the constraints, expense and distractions associated with the bankruptcy process have taken an increasing toll on Station's stakeholders. The negative impact has also been felt dramatically in the community. Boyd Gaming's offer is substantial, fair, and in the best interests of Station's creditors, vendors, employees, customers, and the Las Vegas community.

We are prepared to commit the necessary resources to complete a transaction as quickly as possible. Our financial and legal advisors are ready to meet with your representatives. Upon execution of a definitive purchase agreement, we anticipate consummating a transaction as promptly as possible following receipt of all required consents and approvals.

## Financial Advisor

Boyd Gaming has retained Greenhill & Co., LLC and GLC Advisors & Co., LLC as its financial advisors in connection with its evaluation of Station. Responses to or questions regarding this Proposal should be directed to:

James Stewart                          Soren Reynertson
Managing Director                      Managing General Partner
Greenhill & Co., LLC                   GLC Advisors & Co., LLC
Phone: 310.432.4410                    Phone: 212.542.4550

The submission of this Proposal has been unanimously approved by Boyd Gaming's Board of Directors. We believe our Proposal represents a unique opportunity for Station, its creditors, employees, customers, vendors and the community to move immediately forward in a positive direction. We look forward to hearing from you at your earliest convenience.

Yours Sincerely,

Boyd Gaming Corporation

Keith E. Smith                         William S. Boyd
President and Chief Executive Officer   Executive Chairman of the Board of Directors