E-filed: April 21, 2010

| | |
|---|---|
| BRETT H. MILLER (NY Bar No. 2483691)<br>JORDAN A. WISHNEW (NY Bar No. 4106126)<br>MORRISON & FOERSTER LLP<br>1290 Avenue of the Americas<br>New York, NY 10104-0050<br>Telephone: 212.468.8000<br>Facsimile: 212.468.7900<br>BrettMiller@mofo.com; JWishnew@mofo.com | G. LARRY ENGEL (CA Bar No. 53484)<br>VINCENT J. NOVAK (CA Bar No. 233003)<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, CA 94105-2482<br>Telephone: 415.268.7000<br>Facsimile: 415.268.7522<br>LEngel@mofo.com; VNovak@mofo.com |

ROBERT R. KINAS (Bar No. 6019)
SNELL & WILMER LLP
Hughes Center
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169-5958
Telephone: 702.784.5220
Rkinas@swlaw.com

Attorneys for Boyd Gaming Corporation

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.,<br>          Debtor.<br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Northern NV Acquisitions<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects Fertitta Partners, LLC<br>☐ Affects Station Casinos, Inc.<br>☐ Affects FCP Mezzco Parent, LLC<br>☐ Affects FCP Mezzco Parent Sub, LLC<br>☐ Affects FCP Mezzco Borrower VII, LLC<br>☐ Affects FCP Mezzco Borrower VI, LLC<br>☐ Affects FCP Mezzco Borrower V, LLC<br>☐ Affects FCP Mezzco Borrower IV, LLC<br>☐ Affects FCP Mezzco Borrower III, LLC<br>☐ Affects FCP Mezzco Borrower II, LLC<br>☐ Affects FCP Mezzco Borrower I, LLC<br>☐ Affects FCP Propco, LLC | Chapter 11<br><br>Case No. BK-09-52477<br><br>Jointly Administered<br>BK-09-52470 through BK-09-52487<br><br>**DECLARATION OF J. SOREN REYNERTSON IN OPPOSITION TO:**<br>(1) JOINT MOTION OF STATION CASINOS, INC., AND FCP PROPCO, LLC, PURSUANT TO 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3), AND 365(d)(4)(B)(ii) AND FED. R. BANKR. 9019 FOR ENTRY OF AN ORDER APPROVING SECOND AMENDMENT TO AMENDED AND REVISED MASTER LEASE COMPROMISE AGREEMENT;<br>(2) DEBTORS' MOTION FOR ENTRY OF ORDER ESTABLISHING BIDDING PROCEDURES AND DEADLINES RELATING TO SALE PROCESS FOR SUBSTANTIALLY ALL OF THE ASSETS OF STATION CASINOS, INC., AND CERTAIN "OPCO" SUBSIDIARIES; AND<br>(3) DEBTORS' MOTION TO EXTEND EXCLUSIVITY<br><br>Date:  **May 4, 2010**<br>Time:  **2:00 p.m.**<br>Place:  300 Booth Street<br>         Reno, NV 89509 |

ny-920476
11444990.1

I, J. SOREN REYNERTSON, declare:

## I. Background and Experience

1. I am the Managing General Partner of GLC Advisors & Co., LLC ("GLCA"), which has its principal office at 623 Fifth Avenue, 29th Floor, New York, NY 10022.

2. I submit this declaration (the "Declaration") in support of the opposition of Boyd Gaming Corporation ("Boyd") to the Debtors' pending motions set to be heard on or about May 4, 2010, and relating to Debtors' proposed (i) Second Compromise Amendment to the Master Lease, (ii) bidding procedures, and (iii) extension of plan exclusivity.[1]

3. I am authorized by GLCA to submit this Declaration for such purpose. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of Boyd's senior management, my review of relevant documents, such as the Debtors' relevant pending motions and declarations, and my opinion based upon my relevant knowledge and experience. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4. GLCA is a financial advisory firm founded in 2009 to provide financial advisory services on financial restructuring assignments, with offices in New York and San Francisco. GLCA's professionals include those who have previously served as the heads of restructuring teams at: Credit Suisse First Boston LLC; Donaldson, Lufkin & Jenrette Securities Corporation; Morgan Stanley & Co. International plc; Smith Barney Inc.; and UBS Investment Bank. GLCA's senior professionals, both at GLCA and prior to joining GLCA, have advised debtors, creditors, acquirors, and other parties-in-interest involved in financially distressed companies, both in and outside of bankruptcy, on more than 135 restructuring transactions involving more than $195 billion of debt and preferred securities.

5. GLCA's professionals bring to bear a unique set of skills and experiences with respect to distressed gaming companies. GLCA is engaged as the financial advisor to the ad hoc

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in *Boyd Gaming Corporation's Objection to Motion for Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "Opco" Subsidiaries.*

ny-920476
11444990.1

committee of bondholders in the approximately $2 billion restructuring of the Mashantucket Pequot Gaming Enterprise. GLCA is also currently engaged as advisor to the Official Creditors Committee of Majestic Star Casinos, LLC (Bankr. D. Del. Case No. 09-14136), and to an ad hoc group of lenders in Rivers Casino. Prior to joining GLCA, GLCA's senior professionals were also employed as financial advisors to the debtors in Trump Hotels & Casino Resorts, Inc. (*In Re Trump Hotels & Casino Resorts, Inc.*, No. 04-46898, Bankr. D.N.J.). Also, GLCA's Chairman Tom Benninger was appointed Chairman of the Board of Tropicana Entertainment, LLC, after its Chapter 11 filing (*In Re Tropicana Entertainment, LLC*, No. 08-10856, Bankr. D. Del.).

6. GLCA was retained to act as a financial advisor to Boyd in connection with a potential transaction involving Station Casinos, Inc. ("Station Casinos"). Professionals at GLCA have been working with Boyd since approximately November 2008. GLCA has provided Boyd with financial advisory services including, but not limited to: (a) reviewing the business, assets, and operations of Boyd and its historical and projected financial condition; (b) assisting Boyd in evaluating the business, assets, and operations of Station Casinos and its historical and projected financial condition; (c) evaluating and recommending financial and strategic alternatives with respect to the proposed transaction involving Station Casinos' assets; (d) advising Boyd as to the timing, structure, and pricing of the proposed acquisition of Station Casinos' assets; (e) assisting Boyd in negotiating the proposed acquisition of Station Casinos' assets; (f) assisting Boyd in executing a due diligence process; and (g) providing other financial advisory and investment banking services.

7. I received my undergraduate degree from Emory University in Economics in 1989 and my MBA from Columbia University in 1994. I have successfully completed the following FINRA Administered Qualification Examination: Series 7—General Securities Representative. I have also successfully passed the Financial Services Authority (FSA) securities exams in the UK, including CF21 (Investment Adviser) and CF30 (Customer).

8. Prior to co-founding GLCA, I worked as a Managing Director in the Restructuring & Leveraged Finance Group at UBS Securities LLC ("UBS") in New York from 2008–2009. Before that, I was a Managing Director and Head of the European Strategic Finance Group at

ny-920476
11444990.1

Morgan Stanley International in London from 2007–2008. In addition, I held various titles in the Restructuring Group at UBS from 1997 to 2007, including Managing Director and Head of European Restructuring. Before joining UBS, I was employed as a restructuring advisor at Jay Alix & Associates (now AlixPartners) from 1996 to 1999, prior to which I was employed in the Dispute Analysis & Corporate Recovery practice of Price Waterhouse (now PricewaterhouseCoopers) from 1994 to 1996.

9. I either am or have been actively involved in the following financial and corporate restructuring of corporations both in and out of bankruptcy, including Majestic Star Casino, Mashantucket Pequot Gaming Enterprise, Rivers Casino, Visteon, Pharmanet, Lumenis, Snai S.p.A., Agria Finance f/k/a Arena Finance S.A., Adelphia Communications, Trump Hotels & Casino Resorts, Confederation Life Insurance Company, Integrated Health Services, Venture Industries, NTL, Redback Networks, World Kitchen, Coram Healthcare, EWI, FoxMeyer Drug Company, Maidenform, Color Tile, Accessory Place, Gasboy International, Genesis Health Ventures, and Iridium, among others.

10. I am the Managing General Partner at GLCA, advising Boyd on its potential transaction involving all or part of Station Casinos. By virtue of such role, I am familiar with the business operations, assets, and financial affairs of both Boyd and Station Casinos. I have reviewed the court filings related to the Debtors' decision to sell some of the assets of Opco, excluding a number of assets referred to as the Excluded Assets. I have also reviewed the proposed Bidding Procedures.[2]

## II. Assertions

11. I have read the Declaration of Lazard's Dan Aronson, proclaiming a goal for the Debtors of a "competitive, fair and open" process (*id.*, at ¶ 10, p. 5, lines 12-3) designed to maximize the value of the Opco assets. (*Id.* at ¶ 11, p. 5, lines 25-26.) Based on my knowledge

---

[2] I briefly reviewed the Debtors' revised or supplemented documents that were filed with the Court on or about April 19, 2010, but I have not had sufficient time to fully address them or discuss them with counsel. Therefore, I may supplement my comments once I've had time to fully consider these additional filings and obtain the advice of counsel.

and experience, I believe that the terms of the proposed Bidding Procedures and sale fail to comply with that goal. I further believe that the best chance for the Debtors' estates to realize maximum value is through a competitive, fair, and open auction of all or substantially all of the Opco assets. However, the proposed Bidding Procedures fail to establish auction procedures that will result in an arms' length sale.

12. Specifically, the Debtors, whose principals are also bidders, have retained an overwhelming amount of discretion and control over the auction process, rendering the auction anything but competitive, fair, or open. The conflict of interest inherent in allowing the decision maker to also be a bidder manifests in numerous unfair advantages to the insiders under the proposed Bidding Procedures; this is sure to taint the auction process. The lack of an impartial and independent arbiter creates an obvious conflict of interest and is likely to chill bidding, because bidders will be wary of whether it is worth the time and effort to participate in such a process. Even though the auction is to be held "under the direction of SCI's independent director" and sometimes in consultation with the Consultation Parties, competing buyers will be concerned about the appearance of bias. Moreover, the Debtors' decision to auction only some of the assets of Opco, while excluding the Excluded Assets, is fundamentally unfair and is not likely to maximize value for the Debtors' estates.

### A.  *The Auction of Opco Should Include the Excluded Assets*

13. In my opinion, the current structure of the sale is substantively unfair to third-party bidders. The Excluded Assets, which the Debtors propose be transferred to Propco or New Propco under the Plan (yet to be approved), include components that may be viewed by a potential bidder as critical to running Opco's gaming business. Although these components (consisting of, among other things, certain intellectual property and information systems (respectively, "IP" and "IT")) may be argued to comprise a relatively less material portion of the Opco assets in terms of independent value, without them the remaining Opco assets may not confer upon a purchaser the ability to run a functional gaming business. Conceptually, these assets can be likened to a custom-made lynchpin in an axle. Replacing the lynchpin is expensive

ny-920476
11444990.1

and time consuming and, although it is a relatively minor component, without it the whole mechanism loses functionality.

14. Under the terms of the Joint Plan, the Debtors are proposing to shift important operational components of the business from Opco to New Propco, then auction off the remaining Opco assets. This Excluded Asset transfer has two effects. First, New Propco, as the owner of the Propco Assets and the Excluded Assets, will gain a meaningful advantage in bidding for Opco, because it will hold assets that are critical to running Opco upon confirmation of a plan of reorganization. As a result, New Propco will not have to incur the cost of putting in place a supporting infrastructure, thus placing every other buyer who would have to do so at a disadvantage likely to be reflected in the prices they are willing to pay. In addition, if New Propco takes the Opco IT and IP essential to running Opco casino operations without paying a price driven by competitive bidding in connection with the auction of a comprehensive package of casino assets, New Propco can cost-effectively acquire the Opco casinos as a going concern, while depressing the appeal of the residual Opco assets to competing third-party bidders.

15. Second, because Opco's value may be significantly lower without the Excluded Assets, the transfer limits the opportunity for the Debtors' estates to maximize value through the auction of Opco. Individually, the Excluded Assets may not all have material economic value. However, many of the Excluded Assets are critical components of a larger, more complex business management system. When the Excluded Assets are synthesized with Opco's other assets to support a gaming operation, the collective value of Opco becomes greater than the sum of the parts. Therefore, an auction that does not include the Excluded Assets is likely to generate lower bids or fewer bids.

16. Further, it is my opinion that the Debtors' estates will not maximize value through the proposed transfer of the Opco Excluded Assets following the reorganization. New Propco's acquisition of a perpetual license to use the same IP and IT as Opco in competition with Opco, the former owners of that technology, will impact competition in ways that are not readily calculable. This will further chill bidding on the remaining Opco assets, hampering the "fair sale" of Opco assets.

17. I believe that the best way to conduct a sale process in the Debtors' estates is to auction <u>all</u> of the Debtors' assets together at one time. In the alternative, the Debtors should conduct an auction of Opco "as is" and Propco "as is," putting each entity up for sale with all of its assets. If Propco is deemed to need assets currently owned by Opco in order to run its business, an internal transition services agreement can be put in place between Opco and Propco. If the Opco assets are required to be sold separately from the Propco Assets, then it is even more important to keep the Opco assets together in that sale, including the Excluded Assets. Even an auction of Opco alone, including all of its assets and a transition services agreement (if required), would enhance the probability that the Debtors estates will receive a greater recovery of value than the current proposal, which transfers critical Opco assets to Propco without a competitive bidding process. In any event, a fair sale must be structured in a way that does not involve the insiders extracting key Opco assets and auctioning off the remaining company in a process that inherently favors the insiders and New Propco.

### B. *The Bidding Procedures Are Biased and Permit Insiders Who Are Also a Competing Bidder to Retain Excessive Control and Discretion Over Auction Process*

18. Under the Bidding Procedures, the Debtors, "under the direction of SCI's independent director" and sometimes in consultation with the Consultation Parties, control the auction and will make all the critical decisions, including who is a Qualified Bidder, how bids are evaluated, which bid is the successful bid, whether to halt the auction if only one bidder shows up, and whether to sell single assets or the Debtors' entire business as a going concern. The Debtors are, however, controlled by the principals of Fertitta Gaming, which is the contemplated Stalking Horse Bidder. The conflict of interest under this scenario is obvious.

19. The Bidding Procedures provide that Dr. James E. Nave, an independent director, will be involved in the process, but he will not be the only person who decides which entity will be designated the Successful Bidder. The Debtors' reliance on the "direction" of an independent director is not sufficient to ensure a "competitive, fair and open" process. Dr. Nave will not have ultimate control over the process, and further, he may not necessarily be perceived as independent. A truly "competitive, fair and open" auction requires that a neutral and disinterested

ny-920476
11444990.1

arbiter be responsible for evaluating all proposals and determining the final outcome that will avoid the potential for self-dealing.

20. The Debtors decided to exclude from the Sale both the Excluded Assets and the assets of Propco. *Bidding Procedures* at A.2. As discussed in more detail in the Declaration of David Farlin, also filed by Boyd, the Excluded Assets include certain assets that are critical to the value of Opco. The Excluded Assets are to be transferred to Propco as part of the Plan and without an auction process, giving New Propco possession of certain of the infrastructure important to Opco. This could give New Propco an advantage in bidding compared to any third-party bidder who would have to incur the cost of replacing the infrastructure that has been removed.

21. The Bidding Procedures also contemplate the sale of single assets, as opposed to a sale of Opco as a whole going concern, leaving the determination up to the Debtors' discretion. *Bidding Procedures* at E.1, 2. This type of breakup strategy involves significant separation costs and the analysis of its merits and risks is more than just an empirical analysis; it also involves a tremendous amount of judgment. As stated earlier, it is inappropriate for the Debtors, whose principals are also a bidder, to be involved in such judgments to avoid the opportunity and appearance of self-dealing.

22. The Bidding Procedures also incorporate limitations on the ability of potential bidders to communicate with creditor constituents, requiring bidders to go through the Debtors, whose principals are also a bidder, to discuss with other parties-in-interest the terms of any bid to be made. *Bidding Procedures* at F.1. This provision gives the insiders an unfair advantage because they will be able to monitor and control the flow of information to potential bidders to parties in interest while at the same time allowing themselves, as a competing bidder, to have such conversations.

23. Moreover, based on my previous experience in bankruptcy asset sales, the Bidding Procedures set forth unnecessarily tight timelines that favor the insiders and place any third-party bidder at a disadvantage. Specifically, the Bidding Procedures provide that a letter of intent must be submitted by each potential bidder within thirty (30) days after the entry of the Bidding

ny-920476
11444990.1

Procedures Order. *Bidding Procedures* at K.4. Assuming that the Bidding Procedures Order is entered on May 5, 2010, letters of intent must be delivered by early June. However, the confirmation hearing is currently scheduled for July 15, 2010. This leaves only six weeks for the Debtors to determine which bidders are Qualified Bidders, for the Qualified Bidders to conduct additional due diligence, for the Debtors to hold the auction, review the bids, and select the Successful Bidder, and for the Successful Bidder and the Debtors to negotiate the transaction documents. This process favors no one but the insiders who will have limited need for due diligence and are in a position to expedite negotiations with the Debtors. Given the sheer size of and complexities associated with the Opco assets, I believe that the Debtors' attempt to cram the sale process into such a limited timeframe is unrealistic.

24. Under the Bidding Procedures, the Debtors also determine who will receive access to what due diligence information, which determination is left to "the Debtors, in their reasonable business judgment . . . subject to competitive or other business considerations and their rights [under the Bidding Procedures]." *Bidding Procedures* at L.2. This provision suggests that potential bidders may only receive access to limited information as determined by the Debtors, who are controlled by the insiders. Based on my experience, this is an unnecessary and inappropriate control measure embedded in the Bidding Procedures that will give the insiders the ability to control the flow of information to potential bidders and potentially manipulate the bidding process.

25. The Bidding Procedures provide that a Qualified Bidder must represent to the Debtors that its Qualified Bid, if chosen as the Successful Bid, will be irrevocable for a period as long as six months. *Bidding Procedures* at N.1.(b). However, the Bidding Procedures do not provide any mechanisms that would assure the Successful Bidder that the assets it agreed to purchase will be adequately preserved during the time from the close of the auction to the close of the sale. Moreover, the Bidding Procedures do not provide for the Successful Bidder to be released from the agreed-upon sale if there is a material change of events that changes the fundamental deal terms. As a result, the Successful Bidder will have to incur the cost of maintaining regular oversight over the Opco assets during the interim period in order to ensure

that no dissipation of those assets is occurring. Currently, the only party who has the capability to oversee the assets on a daily basis is the insiders. Therefore, I believe that the Bidding Procedures create an imbalance by requiring outside bidders to incur a potentially extraordinary cost if they become the Successful Bidder—a cost that would not have to be similarly incurred by the insiders. The Bidding Procedures should be modified to provide built-in protections to ensure preservation of the integrity of the purchased assets up to the closing of the Sale.

26. In evaluating competing bids, the Bidding Procedures give the Debtors the right to consider the "claims likely to result from or be created by such bid in relation to other bids." *Bidding Procedures* at O.1. This appears to mean that the Debtors are able to assert claims related to a third-party bid, and then take those claims into consideration in making a decision whether to sell the assets to the third party or the insiders. This term alone is sufficient to taint the entire auction process contrary to the "competitive, fair and open" auction the Debtors assert will be provided by the Bidding Procedures.

27. Based upon my financial restructuring experience in the gaming industry and my experience participating in and conducting asset sales pursuant to section 363 of the Bankruptcy Code and/or in conjunction with the confirmation of a plan, I have never seen bidding procedures, such as the ones presently before the Court, that allow a debtor whose principals are also the likely Stalking Horse Bidder to exercise the degree of control and discretion over the sale process as is being proposed in this instance. In my opinion, the proposed Bidding Procedures will taint the independence, objectivity and openness of the auction process and, as a result, could chill bidding altogether.

*[Remainder of page intentionally left blank.]*

1  I declare under penalty of perjury under the laws of the United States of America that the
2  foregoing is true and correct.
3  Executed this 21st day of April, 2010, at New York, New York.

    _____
    J. SOREN REYNERTSON, Declarant

ny-920476