1  Paul S. Aronzon (CA State Bar No. 88781)
   Thomas R. Kreller (CA State Bar No. 161922)
2  MILBANK, TWEED, HADLEY & McCLOY LLP
   601 South Figueroa Street, 30th Floor
3  Los Angeles, California 90017
   Telephone:    (213) 892-4000
4  Facsimile:    (213) 629-5063

5  Reorganization Counsel for
   Debtors and Debtors in Possession

6

7

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

8  ## UNITED STATES BANKRUPTCY COURT
   ## DISTRICT OF NEVADA

9  In re:

10 STATION CASINOS, INC.

11 ☐ Affects this Debtor
12 ☒ Affects all Debtors
   ☐ Affects Northern NV Acquisitions, LLC
13 ☐ Affects Reno Land Holdings, LLC
   ☐ Affects River Central, LLC
14 ☐ Affects Tropicana Station, LLC
   ☐ Affects FCP Holding, Inc.
15 ☐ Affects FCP Voteco, LLC
   ☐ Affects Fertitta Partners LLC
16 ☐ Affects FCP MezzCo Parent, LLC
   ☐ Affects FCP MezzCo Parent Sub, LLC
17 ☐ Affects FCP MezzCo Borrower VII, LLC
   ☐ Affects FCP MezzCo Borrower VI, LLC
18 ☐ Affects FCP MezzCo Borrower V, LLC
   ☐ Affects FCP MezzCo Borrower IV, LLC
19 ☐ Affects FCP MezzCo Borrower III, LLC
   ☐ Affects FCP MezzCo Borrower II, LLC
20 ☐ Affects FCP MezzCo Borrower I, LLC
   ☐ Affects FCP PropCo, LLC
21

22

Chapter 11

Case No. BK 09-52477
Jointly Administered
BK 09-52470 through BK 09-52487

**DEBTORS' REPLY IN FURTHER
SUPPORT OF MOTION FOR ENTRY
OF ORDER ESTABLISHING BIDDING
PROCEDURES AND DEADLINES
RELATING TO SALE PROCESS FOR
SUBSTANTIALLY ALL OF THE
ASSETS OF STATION CASINOS, INC.
AND CERTAIN "OPCO"
SUBSIDIARIES**

Hearing Date:    May 4, 2010
Hearing Time:    1:00 p.m.
Place:           300 Booth Street
                 Reno, NV 89509

23

24

25

26

27

28

#4827-2697-6006

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT. .......................................................................... 1

   A.    Boyd is the Primary Competitor of the Debtors, Acting Not to Enhance
       Creditor Recoveries But Rather to Derail the Debtors' Reorganization
       Efforts To Gain a Competitive Advantage. ...........................................................4

   B.    The Dissident Lenders' Continue to Try to Use The Court to Overcome
       Their Minority Position Among the Opco Lenders. ...........................................11

   C.    The UCC Continues to Pursue its Misplaced Litigation Strategy. ...................13

II.   REPLY ARGUMENTS. ...................................................................................... 14

   A.    There Will Be No Influence Exerted or Decision-Making by Insiders or
       Affiliates of Insiders Bidding on the Opco Assets in the Auction Process.
       The Auction Process Will Be Run, and All Decisions Will Be Made, by
       Dr. Nave, His Independent Counsel and the Debtors' Legal and Financial
       Advisors in Consultation with the Consultation Parties. ...................................14

   B.    The Request for Appointment of an Examiner is Based on Completely
       Erroneous Assumptions of Insider Influence over the Auction Process and
       a Single, Inapplicable Precedent. .....................................................................16

   C.    Compliance with Applicable, Controlling Law, As Well As Preservation
       of Valuable Tax Attributes for the Debtors' Estates, Obligate the Debtors
       to Consummate the Opco Sale in Conjunction with Plan Confirmation. ..........21

   D.    Contrary to the Objectors' Unsubstantiated Assertions, the Terms of the
       Bidding Procedures Will Promote a Competitive Bidding Process and
       Auction that Comports With Customary, Market-Tested and Approved
       Terms. ..............................................................................................................24

   E.    The Bidding Procedures are the Product of the Debtors' Sound Exercise
       Business Judgment. ..........................................................................................27

   F.    The Opco Sale Does Not Violate the Holding in *203 North LaSalle* ..............28

III.  CONCLUSION. .................................................................................................. 28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434

4

(1999) ........................................................................................................................ 28

5

*Clear Channel Outdoor Inc. v. Knupfer* (*In re PW, LLC*), 391 B.R. 25 (9th Cir. BAP 2008) ..... 23

*Commodity Futures Trading Com'n v. Weintraub*,

6

471 US. 343 (1985) .................................................................................................... 19

7

*In re Bradlees Stores, Inc.*, 209 B.R. 36 (Bankr. S.D.N.Y. 1997) ................................................ 19

8

*In re DBSD North American, Inc.*, 421 B.R. 133 (Bankr. S.D.N.Y. 2009) ................................... 9

9

*In re Federal Mogul Global, Inc.*, 293 B.R. 124 (D. Del. 2003) ................................................. 27

10

*In re Figter,* 118 F.3d 635 (9th Cir. 1997) .................................................................................. 9

11

*In re Fontainebleau Las Vegas, Holding, LLC,* Case No. 09-21481-BKC-AJC (Bankr. S.D.

Fla. October 28, 2009) .............................................................................................. 20

12

*In re Gliatech, Inc.*, 305 B.R. 832 (Bankr. N.D. Ohio 2004) ...................................................... 19

13

*In re Granite Partners, L.P.*, 213 B.R. 440 (Bankr. S.D.N.Y. 1997) .......................................... 19

14

*In re Keyworth*, 47 B.R. 966 (Bankr. D. Colo. 1985) ................................................................. 9

15

*In re MacLeod Co., Inc*., 63 B.R. 654 (Bankr. S.D. Ohio 1986) ................................................. 9

16

*In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D. Del. 1999) ...................................... 28

17

*In re Schepps Food Stores, Inc.*, 148 B.R. 27 (S.D. Tex. 1992) ................................................. 19

18

*Motorola, Inc. v. Official Comm. of Unsecured Creditors*, 478 F.3d 452 (2007) ...................... 22

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d

19

935 (5th Cir. 1983) .................................................................................................... 22

20

*UCC of Equity Security Holders v. Lionel Corp*. (*In re Lionel Corp.*), 722 F.2d 1063 (2d Cir.

21

1983) ........................................................................................................................ 23

22

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) .................................................... 19

23

24

25

26

27

28

1   TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE,

2   OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN INTEREST:

3          Station Casinos, Inc.  ("SCI") and its affiliated debtors and debtors in possession in the

4   above-captioned chapter 11 cases (collectively, the "Debtors") submit this reply (the "Reply"):

5   (a) in further support of *Debtors' Motion for Entry of Order Establishing Bidding Procedures*

6   *and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos,*

7   *Inc. and Certain "Opco" Subsidiaries* [Docket No. 1175] (the "Motion");[1] and (b) in response to

8   the objections to the Motion filed by Boyd Gaming Corporation ("Boyd") [Docket No. 1252]

9   (the "Boyd Objection"),[2] the Official Committee of Unsecured Creditors (the "UCC") [Docket

10  No. 1245] (the "UCC Objection") and a minority group of the Opco Lenders (the "Dissident

11  Lenders") [Docket No. 1243] (the "Dissident Lenders Objection" and together with the Boyd

12  Objection and the UCC Objection, collectively, the "Objections").

13

14         Concurrently herewith, the Debtors also submit the Declaration of Richard J. Haskins and

15  the Supplemental Declaration of Daniel Aronson.  In further support of the Motion and this

16  Reply, the Debtors represent as follows:

17

18  **I.      PRELIMINARY STATEMENT.**

19         1.       Before delving into the details of the Objections, it is important that the

20  Court take notice of the parties that are NOT objecting, and indeed are supporting, the Motion –

---

[1]       The Motion requests approval of  sale procedures in connection with the proposed sale of the Opco Assets. Those sale procedures are set forth in the Debtors' *Notice of Submission of Revised Bidding Procedures in Connection with Debtors' Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "Opco" Subsidiaries"* [Docket No. 1214] (the "Bidding Procedures").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Revised Bidding Procedures.

[2]       On the eve of the Debtors' deadline to file this Reply, Boyd advised the Debtors that Boyd intended to withdraw the Boyd Objection and the supporting declaration submitted therewith.  With the Reply deadline imminent, time did not permit modification of the Reply to reflect that withdrawal.  Boyd's filing and subsequent withdrawal of three objections to motions filed by the Debtors has caused the Debtors to waste time and resources and incur fees in responding, and the Debtors reserve all rights against Boyd in connection therewith.

#4827-2697-6006

namely, the Opco Agent and the Steering Committee of Opco Lenders (the "Opco Steering Committee"), which holds approximately 60% of the debt arising under the Opco Loan, and the Propco Lenders.

2.     The support of the Opco Agent and the Opco Steering Committee is particularly noteworthy for two reasons.  First, the Opco Assets that the Debtors propose to sell pursuant to the Motion is comprised almost entirely of assets on which the Opco Agent holds a perfected lien to secure the Opco Loan.  Opco Lender support for the Motion evidences Opco Lender consent to the sale of their collateral pursuant to the Bidding Procedures.  Second, the Opco Steering Committee represents significantly more than a majority in amount of the Opco Loan claims, which means that the members of Opco Steering Committee have the power under their credit agreement, due to the magnitude of their holdings, to direct the Opco Agent to take a variety of actions necessary to implement the proposed Sale of the Opco Assets contemplated by the Motion.  (As this Court is well aware, the Dissident Lenders, due to the lack of magnitude of their holdings, have no such power.)  Thus, notwithstanding the familiar voice of the Dissident Lenders in the background, more than a majority of the Opco Lenders supports the proposed Sale.

3.     The support of the Propco Lenders is equally noteworthy, but for a different reason.  As the Court is well aware, tensions have run high throughout these cases as the Opco Lenders and the Propco Lenders have often been pitted against one another.  These tensions are largely the product of the Opco/Propco structure under which the Debtors operate and the resulting pushing and pulling that has occurred as both sides of that structure attempt to protect their interests in a family of assets and rights that overlap to some degree.  The support of both a majority of Opco Lenders and 100% of the Propco Lenders for the Motion, as well as a "companion" motion regarding amendments to the Master Lease Compromise Agreement,

#4827-2697-6006

2

reflect a breakthrough in these cases.  In short, the Debtors, the Opco Agent and Opco Steering Committee and the Propco Lenders have reached agreement on how to separate the Opco Assets and the Propco Assets in a manner satisfactory to the Debtors and to their lenders who maintain liens on virtually all of those assets (respectively).  The fact that the only creditors who appear to be "in the money" support the Motion should not be lost among the desperate objections of parties who have no such economic stakes.

4.       In considering the Objections (and perhaps especially the Dissident Lenders Objections), the Court should also take note of one simple fact:  The Stalking Horse Bid proposed by the Debtors and supported by the Opco Agent and Opco Steering Committee would result in a recovery to the Opco Lenders of **approximately 87%** of the amount of their claims.  In addition, the Opco Lenders are also the party that will benefit most from potential overbids – since they will receive the direct dollar-for-dollar benefit of any overbids until such time as their recovery hits 100%.  As the party who will be the direct beneficiary if the Bidding Procedures generate overbids, the Opco Lenders' support for the Bidding Procedures should not be overlooked.

5.       In contrast to the direct and clear interests and motivations of the parties supporting the Motion, the interests and motivations of the Objectors are quite suspect.  The Objectors consist of : (a) Boyd – the Debtors' primary competitor of the Debtors who appears determined to either injure the Debtors' businesses, prevent the buyer of the Opco Assets from succeeding or acquire the Opco Assets itself at an advantageous price; (b) the Dissident Lenders, whose holdings and membership have decreased by one-third but who continue unabated on their unending quest for an examiner and to escape the "majority rule" voting provisions of their credit agreement; and (c) the UCC, which by its own admission has concluded that its only potential avenue for recovery in these cases lies with unrestrained litigation.  This misaligned

triumvirate raises three primary arguments in their Objections: (a) the Bidding Procedures should allow potential bidders to bid on the Excluded Assets; (b) the Bidding Procedures lack independent oversight; and (c) the Bidding Procedures are not market appropriate.

6.    With respect to the Objectors' complaints that the Excluded Assets should be included in the Sale of Opco Assets, detailed explanations of the Excluded Assets and how the Debtors, the Opco Agent and Opco Steering Committee and the Propco Lenders have negotiated the treatment of those assets as part of the overall Opco/Propco separation under the amended Master Lease Compromise Agreement are set forth in the *Debtors' Reply To Objections Re: Debtors' Motion For Approval Of Second Amended And Restated Master Lease Compromise Agreement* and supporting declarations filed concurrently herewith. The discussion of the Excluded Assets contained in those filings is incorporated herein by this reference. A review of such explanations establishes that the Objectors belief that the Excluded Assets should be included in the Auction of Opco Assets is entirely misplaced. For purposes of the Bidding Procedures, it suffices to highlight that Lazard, in discussions with potential bidders for the Opco Assets, have concluded that no potential bidder (other than Boyd) considers the Excluded Assets essential to a bid for the Opco Assets or a prerequisite for making a bid on the Opco Assets.

7.    A review of the balance of the Objections, especially when viewed in light of the motivations of the Objectors (and Boyd in particular), makes clear that the Objections present no factual or legal challenge to the approval of the Bidding Procedures.

**A.    Boyd is the Primary Competitor of the Debtors, Acting Not to Enhance Creditor Recoveries But Rather to Derail the Debtors' Reorganization Efforts To Gain a Competitive Advantage.**

8.    The Boyd Objections are the transparent acts of a competitor seeking to use this Court to aid it in the continuation of its pre-petition campaign to injure the Debtors' business, prevent a competitor from acquiring the Opco Assets or to acquire the Opco Assets for

itself at an advantageous price.  Boyd's attempt to disguise its motives or goals by cloaking itself in "creditor's clothing" to oppose the Motion and feign concern for the process fails miserably, and its competitive motivations to harm Opco and its estate are quickly illuminated.[3]

9.       Boyd's motivations for filing the Boyd Objections is patently obvious. Boyd's business strategy succeeds and its own business is improved if it prevents or slows down the reorganization of Propco or Opco, inhibits the chances that the ultimate buyer of the Opco Assets succeeds in the Las Vegas market as a competitor of Boyd, inhibits New Propco's ability to succeed in the ownership and operation of the Propco Assets or manipulates the Bidding Procedures and Auction process to skew in its own favor as a potential bidder.  Against this backdrop, this Court must view Boyd's protestations against the Motion with skepticism. Where, as here, a debtor's primary business competitor injects itself into the debtor's reorganization efforts, the Court can, and should, take appropriate action to ensure that the competitor does not improperly influence the proceeding.   *See* para 8 below.

10.       The need to deny Boyd a platform to use the chapter 11 process to secure both a public relations outpost (through public Court filings) and a competitive advantage for its own business is particularly appropriate in this Case given Boyd's history of anti-competitive, self-serving acts towards the Debtors' reorganization efforts.

11.       Pre-petition, in early February 2009, at Boyd's request, SCI met with members of Boyd management at which time Boyd expressed a general interest in acquiring some of the Debtors' properties.  Subsequently, Boyd sent SCI an unsolicited preliminary, non-binding written indication of interest in acquiring certain of the Debtors' assets.  After discussions among the Debtors' board and legal and financial advisors, as well as certain

---

[3]       Indeed, Boyd's withdrawal of all of its Objections less than one week after the Objections were filed is simply another example of Boyd's game-playing and efforts to use Court filings to further its public relations campaign against Opco.  Why else would Boyd file three lengthy objections and three accompanying declarations, only to promptly withdraw all three – if not to create the newspaper headlines from the initial filings?

creditors, the Debtors, noting that Boyd's offer was non-binding, non-specific and highly conditional among other commercial infirmities, elected, in the best interests of the Debtors, to pursue a comprehensive restructuring rather than a speculative distressed sale transaction to Boyd. Unfortunately, the foregoing exchange was made public by Boyd in its public filings.

12. During the Chapter 11 Cases, Boyd has continued to express publicly its interest in acquiring the Debtors' businesses. What Boyd has not disclosed publicly or in the Boyd Objections is its post-petition role and access to information in the formulation of the Bidding Procedures, the stalking horse bid and the Auction process. Boyd's active behind-the-scenes role – through direct interactions with Opco Lenders, but with virtually no effort to engage with the Debtors themselves – makes the protestations of "unfairness" contained in the Boyd Objections disingenuous. Specifically, based upon discussion and participation in negotiations with various of the Debtors' creditor groups, including but not limited to the Opco Lenders, the Debtors and its representatives came to believe that in the months leading up to the decision to separate the Propco Assets and Opco Assets and present the proposed reorganization and sale currently embodied in the Joint Plan, Boyd and its advisors had significant access to and involvement in the Chapter 11 Cases, the formulation of the separation of the Propco Assets and Opco Assets, the Bidding Procedures, the Auction process and selection of a stalking horse bidder, as follows:

- Boyd purchased a claim at significant discount in order to present itself in these Chapter 11 Cases as a creditor;[4]
- Boyd entered into a confidentiality agreement with Debtors which precluded communications with the Opco Lenders, but within 24 hours of signing that agreement, Boyd commenced discussions with the Opco Lenders regarding a sale of the Opco Assets to Boyd, potential bid procedures and Boyd becoming the stalking horse for an auction. These discussions commenced in January 2010 and continued well into April 2010;

---

[4]    Boyd has not filed a proof of claim.

- Boyd expressed an interest to creditors of the Debtors, including the Opco Lenders, in becoming the stalking horse bidder -- but refused to engage in negotiations with the Debtors;

- In its discussions with the Opco Lenders, Boyd reviewed the Debtors' proposed terms of the bidding procedures for the sale of the Opco Assets and influenced the negotiations between the Opco Lenders and Debtors, attempting to inject terms in such procedures and process that would inure to Boyd's benefit, including the substantive requirements of minimum bid, initial overbid, incremental bids and break-up fees;

- Boyd was fully aware of the decision to separate the Propco Assets and Opco Assets as part of the Joint Plan and was aware of, and consulted by, the Opco Lenders with regard to the negotiation of the specific terms of the separation of such Assets and the transition of such Assets that are contained in the proposed amendment to the Master Lease Compromise Agreement. Upon information and belief, Boyd attempted to foist its views on the Opco Lenders as to how Boyd would like to see the separation occur, and those views influenced the Opco Lenders' negotiations with the Debtors and the Propco Lenders in that regard. By way of a particularly troubling example, in the negotiations over the schedule of assets to be transferred from Opco to Propco, the mark up of a near final draft of such document clearly indicated that Boyd wanted access to *all* of the Debtors' customer data, not just information relating to the Opco casinos that are the subject of the proposed auction. Further, Boyd tried to limit the use by New Propco of the computer systems being *purchased* by New Propco. Through these actions having little or nothing to do with the value of the Opco assets or businesses, Boyd's competitive desire to harm the Propco Properties – with which Boyd competes directly – became clear;

- Although Boyd did not engage in discussions directly with the Debtors, the Debtors believe that through the Opco Lenders, Boyd had input in the bidding terms and conditions, as well as terms of the stalking horse bid, and that some of Boyd's suggested terms are included in the Bidding Procedures and the stalking horse bid at the insistence of the Opco Lenders. Specifically, the Debtors believe that due to Boyd's comments, the Opco Lenders demanded , among other things, a fixed buy out of the Texas Ground Lease, which demand was included in the Bidding Procedures and in other of the various restructuring agreements;

- Boyd's discussions with the Opco Lenders about acquiring the Opco Assets progressed to the point where the Debtors believed that the Opco Lenders supported Boyd to become the stalking horse bidder. The Debtors, however, were never presented with any proposals from Boyd regarding Boyd's proposed acquisition of the Opco Assets. All such proposals and discussions took place between the Opco Lenders and Boyd.

- On or about April 20, 2010, the Opco Agent and the Opco Lender Steering Committee formally notified the Debtors that they support New Propco and not Boyd as the stalking horse bidder;

- Despite the fact that the Debtors' financial advisors reached out to Boyd and its financial advisors to engage in discussions concerning a possible stalking horse slot for Boyd and proposed bidding procedures, Boyd and its advisors refused to engage in such discussions with the Debtors' advisors;

- Boyd has both pre-petition and post-petition issued press releases which had the effect of negatively impacting the reorganization process and causing issues to arise among the regulatory authorities, Debtors' creditors, employees, contract counterparties, vendors and suppliers;

- Boyd's protestations concerning computer systems and information technology are patently false since Opco will retain a fully functioning system and Boyd, in all likelihood, will use its own computer systems and information technology if it is the Successful Bidder for the Opco Assets; and

- The Debtors' advisors have actively encouraged Boyd to participate in the Auction of the Opco Assets by becoming a bidder, but until such time as Boyd actually makes a bid, it clearly is acting as the Debtors' primary competitor determined to impede reorganization to further its own business needs or to artificially depress the bidding on the Opco Assets so it can obtain such Assets at an advantageous price.  While a bona fide bid from Boyd, in full compliance with the Bidding Procedures, would be welcomed if it served to maximize value, to date the Debtors have seen no evidence that Boyd has made, or is willing to make, such a bona fide offer.

13.    With regard to Boyd's complaints about the terms of the Bidding Procedures and the stalking horse bid, upon information and belief, Boyd, once again, omits to inform this Court and all parties in interest that when Boyd submitted its offer to become the stalking horse, the terms of its' offer were significantly more burdensome to a competitive auction process and considerably more advantageous to Boyd than the stalking horse bid selected in the following ways:

- Boyd wanted a 3% break up fee – the stalking horse bid has no break up fee;

- Boyd wanted the initial overbid to be $25,000,0000 – the stalking horse bid provides for an initial overbid of only $17,500,000; and

- Boyd wanted incremental bids to be in the minimum amount of $10,000,000 – the stalking horse bid requires incremental bids of only $5,000,000.

14.    As the foregoing makes clear, Boyd disingenuously complains that the stalking horse terms are improper when such terms are far less onerous and more conducive to

8

competitive bidding than the terms Boyd itself proposed.  For Boyd to highlight such fact by filing the Boyd Objection defies credulity but lays bare for the Court and all parties in interest the manipulative game Boyd – wearing its competitor mantle – is playing (and expects this Court to approve) in connection with the sale of the Opco Assets.  Again, lest there be any confusion, the Debtors have formulated a competitive sale process and encourage all potential buyers to participate, including Boyd.

15.    Under the foregoing background, the Court must discount all actions and complaints of Boyd.  Boyd is acting in its self-interest as a competitor and not as a creditor and as such has no standing to object to the Motion or to otherwise be heard in these Chapter 11 Cases.  Boyd's actions are destructive to the reorganization process and, if given any credence or weight, will taint the Debtors' reorganization efforts.  The Court has the discretion to silence Boyd's bad faith, ulterior motives when it considers the Motion or any other act taken by Boyd in these Chapter 11 Cases.  *See, e.g., In re Figter Ltd.,* 118 F.3d 635 (9th Cir.) *cert denied*, *Figter Ltd. Teachers Ins. & Annuity Ass'n*, 522 U.S. 996 (1997) (defining the general parameters of good faith and the consequences of bad faith in a chapter 11 case); *In re Keyworth*, 47 B.R. 966, 971-72 (Bankr. D. Colo. 1985) (where an entity was not a pre-prepetition creditor but purchased a claim for the express purpose of blocking an action by the debtor against it, such conduct constituted bad faith and the creditor's vote was not counted); *In re MacLeod Co., Inc*., 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986) (competitor acting with intent to destroy debtor's business in order to further its own had its vote to reject the plan ignored).

16.    Indeed, recently, in *In re DBSD North America, Inc.*, 421 B.R. 133 (Bankr. S.D.N.Y. 2009), the United States Bankruptcy Court for the Southern District of New York took action against a competitor of the debtor who acquired claims in bad faith and with intent to act not as a creditor, but to use the acquired claims to further ulterior business purposes,

and designated the competitor's vote rather than allow the competitor to defeat the plan and to acquire control of the debtor.

17.     In light of Boyd's clear intentions, it is incumbent upon the Debtors and their advisors in the exercise of their fiduciary duties and obligations to maximize and preserve the value of estate assets to treat Boyd with circumspection.  The Debtors, in the interest of protecting and preserving their casinos' competitive position in the market, simply cannot allow Boyd to run rampant, filing (and then quickly withdrawing) reckless and unsubstantiated pleadings, conducting "back room" negotiations with any creditor who will listen, and perhaps most egregiously, using Court filings as a means to try to generate self-serving headlines. Indeed, the UCC, which has a duty to unsecured creditors to act to preserve the estates, should likewise be concerned about these tactics (though they appear not to be).

18.     Boyd has demonstrated, both pre-petition and post-petition, that its expressions of interest in acquiring the Debtors' assets only have the appearance of a commercial transaction and none of the substance.  Under such circumstances, it would be imprudent of the Debtors and their advisors to accede to Boyd's machinations.  If Boyd actually submits a viable offer or otherwise demonstrates that it can abide by the terms of the Bidding Procedures (and not, as it has in the past, perform an "end run" around a signed confidentiality agreement), the Debtors could adopt a different perspective.  However, given the direct competition between Boyd and the Debtors there is a natural and unavoidable tension between them in connection with the Bidding Procedures, which is exacerbated by the conduct of Boyd and the tone and tenor of the Boyd Objections.  Thus, Debtors cannot be faulted for refusing to provide Boyd with unfettered access to proprietary information, trade secrets and other confidential business information.  Even in an open auction process supervised by the Bankruptcy Court and overseen by Dr. Nave, the Debtors and their advisors must ensure that the estates' most valuable assets are

not denuded to appease the complaints of its most direct competitor, who thus far, has not demonstrated that its continuing expressions of interest in acquiring Opco Assets is genuine and not a rouse to impair a competitor, prevent another buyer from operating the Opco Assets profitably or manipulating the Auction process to its own advantage.

**B.     The Dissident Lenders' Continue to Try to Use The Court to Overcome Their Minority Position Among the Opco Lenders.**

19.     The Dissident Lenders Objection to the Motion is an ill-formed attempt by lenders who, upon information and belief, hold less than 20% of the debt outstanding under the Opco Loan Agreement and who continue (as they have since the outset of these Chapter 11 Cases) to air their frustrations and disagreements with the prevailing majority of the Opco Lenders in the guise of *ad hominem* attacks on the Debtors' efforts to reorganize.  In their objection, the Dissident Lenders also revive their campaign for the appointment of an examiner. The Dissident Lenders' attacks fall short (again) for several reasons.

20.     First, the Dissident Lenders have failed to comply with the disclosure requirements of Bankruptcy Rule 2019.  Based upon the Dissident Lenders' filings, the entities that comprise the current group of Dissident Lenders are not the same institutions as the original group.  Not only are there fewer members, but, upon information and belief, the aggregate amount of debt now held by the Dissident Lenders has been reduced from approximately 30% to less than 20%.  The Debtors have compiled this information through review of the Dissident Lenders Objection and their prior pleadings (which list the members of the group as of the time of the various filings) and by reference to the lender register.  The Dissident Lenders have failed to disclose this information in any updated Rule 2019; the only attempt at Rule 2019 disclosure was through a totally inadequate filing by counsel for the Dissident Lenders on September 25, 2009 [Docket No.  377].

21.     Under Rule 2019, this Court has the authority to refuse to allow the Dissident Lenders to participate in these Chapter 11 Cases, including disregarding the Dissident Lenders' Objection, due to their failure to comply with the disclosure requirements of Rule 2019. The Dissident Lenders' failure to comply with Rule 2019 has prejudiced the Debtors.  In the absence of updated disclosures, the Dissident Lenders have fostered the false impression that they hold more debt than they actually hold.  The Dissident Lenders' deception cannot, however, alter the simple fact that the Dissident Lenders are simply a small minority of outliers in a group of Opco Lenders that otherwise supports the Debtors' efforts at this point.

22.     The Dissident Lenders Objection should also be disregarded because it merely continues the streak of unsuccessful and unpersuasive arguments they have repeatedly but always unsuccessfully have presented throughout these Chapter 11 Cases.  Most notably, the Dissident Lenders were unsuccessful in similar campaigns of submitting inflammatory pleadings seeking the appointment of an examiner at the outset of the Chapter 11 Cases – a motion that the Dissident Lenders subsequently withdrew under significant fire.  The failure of that gambit was compounded when this Court invoked the recent rulings of *In re Chrysler, LLC* with regard to futility of the Dissident Lenders' efforts to ignore the "majority vote" rules under their Opco credit agreement.  In denying the proposed settlement of the initial examiner motion, the Court concluded that the appointment of an examiner would provide no benefit to the estate and had the examiner motion proceeded it would have been denied and thus the proposed settlement of such motion was below the range of reasonable outcome and disapproved.  In the face of that ruling, the Dissident Lenders nonetheless have again tried to revive their examiner campaign. The instant Dissident Lenders Objections, like their prior efforts described above, are equally unpersuasive and off point.

**C.    The UCC Continues to Pursue its Misplaced Litigation Strategy.**

23.    Stripped of rhetoric and arguments that are more fictional that factual, the UCC has a single theme in these Chapter 11 Cases, which they deploy yet again in opposition to the Motion – displeasure at the amount of deference they contend the Debtors show the UCC, notwithstanding the fact that the unsecured creditors are "out of the money."  Unfortunately, the UCC's constant deluge of uninformed and reckless attacks will not put the unsecureds "in the money."

24.    While blindly pursuing their complaints about being ignored by the Debtors, the UCC remarkably fails to disclose that in early 2010, the Debtors met with the UCC in Las Vegas.  At that meeting,  the UCC was given a presentation by the Debtors' professionals on the terms and status of the negotiations between the Debtors and the Mortgage Lenders.  The UCC was also informed of the discussions taking place between the Opco Steering Committee and Boyd with respect to a potential sale of the Opco Assets.  Following those meetings, the Debtors continued to share information with the UCC.  Through those discussions, the Debtors were able to broker discussions between the UCC, on the one hand, and representatives of the Propco Lenders and FG, on the other hand (in their capacity as future owners of the Propco Assets and potential Stalking Horse Bidder on the Opco Assets).  The subject of those discussions was whether an agreement might be reached that would potentially provide the UCC members with an opportunity to make an investment in the yet-to-be-formed "New Propco."  As a result of those discussions, in early April of 2010, the Debtors, FG and the Mortgage Lenders delivered a restructuring proposal to the UCC.  As of the date of this Reply, the UCC has yet to respond to that proposal.

25.    The UCC's complaint about not having access to the Debtors is a self-inflicted wound.  After the Motion was filed, the UCC did not contact the Debtors for an

13

explanation or a "walk through" of the terms, conditions and process – and in fact completely

ignored the Debtors repeated invitations to have such a meeting.  The UCC never offered to

work with the Debtors to resolve consensually any objections the UCC has to the sale of the

Opco Assets or the Bidding Procedures.  Instead, consistent with its past practices in these cases,

the UCC's reaction to the Motions (and the other motions as well) was to inundate the Debtors

with document production requests seeking massive amounts of documents and deposition

notices.  By refusing to engage with the Debtors in any way other than massive discovery, the

UCC has imposed significant and entirely unnecessary costs on the estates, and the Debtors

expressly reserve all rights with respect to the UCC's actions in this regard.

26.     Taken as a whole, the Objections, are merely a rehashing of old, tired and

previously unsuccessful themes by the Objectors.  None of the Objectors has previously

presented any evidence to support their well-worn mantras, nor have they done so with their

latest installment of Objections.  As such, and because the allegations contained in the

Objections are rebutted below, the Objections do not provide any factual or legal basis for this

Court to disapprove the Motion or derail the Debtors' efforts to sell the Opco Assets.

## II.     <u>REPLY ARGUMENTS.</u>

**A.     There Will Be No Influence Exerted or Decision-Making by Insiders or Affiliates of Insiders Bidding on the Opco Assets in the Auction Process.  The Auction Process Will Be Run, and All Decisions Will Be Made, by Dr. Nave, His Independent Counsel and the Debtors' Legal and Financial Advisors in Consultation with the Consultation Parties.**

27.     The Objectors' complaints of undue influence and control of the Auction

process by Debtors' insiders or affiliates of insiders actively bidding on the Opco Assets are

simply wrong.  The Bidding Procedures expressly state that the Bidding Procedures and any

Auction will be run and conducted under the direction of SCI's independent director, Dr. Nave.

The Debtors' Board of Directors has charged Dr. Nave as the sole representative of the Debtors

in connection with the Sale process and vested him with all decision-making authority. Dr. Nave will act independently of any influence from any other Board member or affiliate and will take advice from his independent legal advisors, Skadden Arps, Slate, Meagher & Flom, and the Debtors' Court-approved legal and financial advisors. The Bidding Procedures further provide that Dr. Nave will conduct the Sale process in consultation with the Consultation Parties – *which include the UCC*.

28.    Put simply, the process will be totally independent of any influence by an insider, any member of the Fertitta family or any entity with an economic interest in the stalking horse. Moreover, the ultimate decision on whether the Successful Bid should be approved is left entirely to this Court, and the Bidding Procedures likewise acknowledge and provide that any disputes that might arise under the Bidding Procedures or otherwise in connection with the Sale Process shall be resolved by this Court. In essence, this Court shall serve as the "ultimate Independent Director."

29.    The Objectors' unsubstantiated aspersions on the fidelity of Dr. Nave, Skadden Arps, and the Debtors' legal and financial advisors and, incredulously, on the Consultation Parties – which includes the UCC itself – are entirely unwarranted and unsubstantiated. The UCC and the Dissident Lenders have cried "conflict" at every stage of these cases, but have yet to provide a single piece of evidence demonstrating either the existence or manifestation of any conflict.

30.    Since the outset of this Case, the roles of the Fertitta family members and affiliates, Colony Capital and the inter-relationship of Propco and Opco boards and management have been laid bare publicly.[5] The employment applications for the Debtors' professionals fully

---

[5]    Incredibly, paragraph 13 of the UCC Objection manages to incorrectly identify the members of the SCI Board, notwithstanding the prominence of that information in SCI's public filings. The UCC actually identifies **two** individuals (Tom Friel and Richard Haskins) as members of the Board when they are NOT, while at the same time

and openly described any affiliations or prior representations that may exist.  In particular, the

employment application for the Milbank firm contained full disclosure of Milbank's historical

representations of Station-related entities, as well as of the Fertittas and other Fertitta-related

entities in a variety of matters.[6]  Those applications were not objected to by anyone, and the

Court approved those applications after the Court's own independent consideration.  The Court

has also been fully apprised of SCI's decision to appoint and engage an independent Special

Litigation Committee to review various matters, principally in relation to SCI's 2007 "going

private" transaction, as well as the decision to delegate certain negotiations for Propco to the two

independent Propco directors, Robert Kors and Robert White, when potential conflicts between

Opco and Propco arise.  In short, at every turn, the Debtors have taken the initiative to both

disclose and take action to preempt any potential conflicts of interest that might otherwise arise.

The designation of Dr. Nave as the sole independent director with full authority to conduct the

Sale process is simply the latest example of such a measure.

31.    Keeping with the Debtors' consistent program of open, full and frank

disclosures, the Bidding Procedures make all disclosures necessary for the Court to evaluate

whether there is any conflict of interest that would impugn the integrity of the Auction.  The

Objectors are rehashing the same concerns voiced at the outset of this Case, which the Court

dismissed as non-determinative.

**B.    The Request for Appointment of an Examiner is Based on Completely Erroneous Assumptions of Insider Influence over the Auction Process and a Single, Inapplicable Precedent.**

32.    The Objectors' request for appointment of an examiner to supervise the

Auction process is premised on the faulty assumptions: (a) that insiders are controlling the

---

failing to identify two other individuals who ARE on the Board.  As is demonstrated throughout the UCC Objection, the UCC's fact-checking falls quite short.

[6]     Fertitta Gaming is represented in connection with the current transactions by Munger Tolles & Olsen. Milbank performed the ministerial function of forming Fertitta Gaming.

#4827-2697-6006

16

Bidding Process and (b) that the mere assertion that an affiliate of an insider is the stalking horse

bidder and an entity that will undoubtedly participate in the Auction creates an insurmountable

conflict of interest *per se*.  As set forth above, both assumptions are without factual or legal

basis.  As a result, the request for an examiner must be seen for what it is – an ill-conceived and

impotent diversionary tactic.

    33.  At the outset of the Chapter 11 Cases, the Dissident Lenders argued that

the inter-relationships of the Debtors entities, board and management created an inherent conflict

of interest that required the appointment of an examiner to investigate the bona fides of the

November 2007 Going Private Transaction.  That request, like the present request, was based on

conjecture rather than evidence and ignored, as the present request also ignores, the levels of

independent review and supervision of the subject acts the Debtors pursued (and will pursue) to

ensure that no conflict of interest (real or imagined) infects the Debtors' continuing efforts to

take all steps necessary to restructure and reorganize the Debtors' businesses and maximize asset

value in light of the complex and inter-relationships of the Debtors' management.  The Debtors

have undertaken significant, and costly, measures to ensure the integrity of the process and instill

confidence in the creditors and the Bankruptcy Court that all potential conflicts of interest are

avoided.  When the issue of perceived conflicts of interest was litigated before this Court in

November 2009, the Court concluded that no actionable conflict existed and that an examiner

was not warranted.  Specifically, at a hearing on November 20, 2009, the Bankruptcy Court

stated:

> . . . I am not convinced, and nobody has really advocated the
> position that the debtor is -- and the debtor-in-possession is not
> satisfy -- I should say debtors-in-possession are not satisfying their
> obligations, their fiduciary obligations.

Transcript of Hearing [Docket No. 642] p. 54, ln. 25 - p. 55, ln. 4.  In addition, the Court

determined that the risk of a conflict of interest impeding or tainting the Debtors' reorganization

was not present and not necessary given the array of parties in interest actively scrutinizing the

Debtors' conduct, concluding:

> . . . I'm afraid if I have an examiner, then, the examiner is going to
> want their own financial expert. And then we just go down this
> road. And it strikes me at this time, very frankly, that we have
> enough people doing enough investigation.  We've got the
> committee that's active and obviously competently represented by
> a number of law firms and has a good financial advisor. The
> OPTCO [sic] lenders are well represented. The independent
> lenders are well represented.

*Id*. p. 83, ln. 9-18.  Finally, in addition to the Bankruptcy Court's foregoing expression of

confidence in the chapter 11 process and the acuity of the parties involved, determined that

appointment of an examiner was not warranted:

> And, you know, I don't -- I'm not in a position -- I'll be very blunt -
> - where I think that the committee, the lenders or this Court needs
> the assistance of an examiner to do the job of the committee, the
> debtor, or this Court.  And I don't think it could serve any
> meaningful purpose at this time.

*Id*., p. 107, ln. 1-7.

34.    Other than their completely erroneous assumption that insiders will be

supervising the Auction process and selecting the Successful Bid, the Objectors have provided

no evidence that even suggests the Debtors have or will have a conflict of interest in conducting

the Auction process or selecting a Successful Bidder.  Moreover, in light of the complete and

unfettered independence with which the Auction will be conducted, the Debtors have amply

demonstrated that they are capable of exercising their fiduciary duties to creditors and the

reorganization process (just as they have throughout these Chapter 11 Cases), and that such

consistent and continuing proper exercise of fiduciary duty obviates the need for an examiner to

conduct or supervise the Auction process and does not justify the unnecessary expense of an

#4827-2697-6006                                    18

examiner.  *See Commodity Futures Trading Com'n v. Weintraub*, 471 US. 343, 355 (1985)

(stating that the willingness to leave debtors in possession in control of the chapter 11 process "is

premised upon an assurance that the officers and managing employees can be depended upon to

carry out the fiduciary responsibilities of a trustee."); *In re Granite Partners, L.P.*, 213 B.R. 440,

446 (Bankr. S.D.N.Y. 1997) ("Services [performed by an examiner] that duplicate those

rendered by the debtor or other court appointed officers are not compensable because they entail

an excessive and undue burden on the estate.").

35.     To reiterate the same examiner canard now, especially in light of the

undeniable evidence that during these Chapter 11 Cases the Debtors have been able to deftly

ensure that conflicts of interest are avoided and creditor interests fully protected, is abusive and

dilatory and should be denied as another unsubstantiated tactic employed by Boyd and their

supporters in their quest to improve their position at the expense of the Debtors' estates.  *See,

e.g., In re Bradlees Stores, Inc.*, 209 B.R. 36, 39 (Bankr. S.D.N.Y. 1997) (denying request for

appointment of examiner upon finding that such request was "nothing more than a

litigation/negotiation tactic."); *In re Gliatech, Inc.*, 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004)

("'[T]he basic job of an examiner is to examine, not to act as a protagonist in the proceedings.'")

(citation omitted).

36.     Moreover, since the proposed sale process is ready to proceed as soon as

this Court approves the Bidding Procedures, appointing an examiner would be disruptive and

cause considerable, unnecessary cost to the estates and must be denied on that ground as well.

*See In re Schepps Food Stores, Inc.*, 148 B.R. 27, 30 (S.D. Tex. 1992) (citing *United States v.

Ron Pair Enters., Inc.*, 489 U.S. 235 (1989).

37.     The Objectors have no compelling doctrinal precedent for the

extraordinary relief requested.  The Objectors rely on a single order entered in *In re*

19

*Fontainebleau Las Vegas Holdings, LLC,* Case No. 09-21481-BKC-AJC (Bankr. S.D. Fla. Filed June 9, 2009) for their request for an examiner; and such reliance is misplaced. The facts and circumstances in *Fontainebleau* are completely inapposite from those present here. In *Fontainebleau*, the secured lenders and the debtor-developer of a partially completed $2.9 billion casino project were hopelessly deadlocked on all issues. The lenders and debtor could not agree on a program to complete the casino project, use of cash collateral, reorganization or how to market the estate assets for sale. The lenders and debtor were also involved in ancillary litigation which was as equally acrimonious as the chapter 11 case. After the debtor burned through $16,000,000 of the lenders' cash, and with no endgame in sight, the lenders refused to allow the debtors to use cash collateral to complete the project and the two factions hit a irresolvable stalemate over every aspect of the reorganization process. As a result, with construction halted and no funds to administer the estate, the lenders moved to convert the case to chapter 7. In response, Judge Cristobal *sua sponte* decided to appoint an examiner to oversee a quick sale of substantially all of the assets of the estate. Judge Cristobal's decision was based on his view that it was more economical to immediately appoint an examiner than to appoint a trustee whose fees and expenses would exceed the costs and expenses of an examiner and could cause continuing delay, which in turn, would harm the value of the wasting estate assets. The language of Judge Cristobal's order to show cause why an examiner should not be appointed conveys the vast differences between the warring parties in *Fontainebleau* and the carefully and thoughtfully crafted consensual Bidding Procedures here:

> The record in this case indicates that the parties to these proceedings are not cooperating with one another. A motion to convert has been filed by the Term Lender Steering Group seeking to convert this case to one under Chapter 7 of the (bankruptcy) code. The motion is premised upon the lack of meaningful progress made thus far in this case, despite the fact that more than $16 million of the Term Lender Steering Group's cash collateral

> has been used during the administration of this case. . . .The Term
> Lender Steering Group submits that completion of the Las Vegas
> project is not possible and a sale of the project to a third party and
> liquidation of the remaining assets is the only viable course to
> realize any meaningful value for the creditors.

*See* "Order to Show Cause as to Why the Court Should Not Appoint an Examiner, dated October

1, 2009, annexed hereto as <u>Exhibit 1</u>; *see also* "Order Appointing Examiner to Examine,

Negotiate and Supervise § 363 Sale of Assets," dated October 14, 2009, at p. 2, (indicating that

no bidding procedures or stalking horse bid had been achieved prior to the appointment, but

"direct[ing] the Examiner not to 'reinvent the wheel'"), a copy of which is annexed as Exhibit M

to the *Declaration of Bonnie Steingart in Support of Objection of UCC of Unsecured Creditors*

*to Debtors' Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating*

*to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain Opco*

*Subsidiaries* [Docket No. 1249].

**C.     Compliance with Applicable, Controlling Law, As Well As Preservation of Valuable Tax Attributes for the Debtors' Estates, Obligate the Debtors to Consummate the Opco Sale in Conjunction with Plan Confirmation.**

   38. Despite the detailed explanations set forth in the Motion, related Plan

Facilitation Motions and the Joint Plan demonstrating the various mechanical, logistical and

legal reasons why the Opco Sale will close in conjunction with confirmation of the Joint Plan,

the Objectors contend that the Opco Sale should be pursued on a standalone basis purportedly to

encourage bidding.  The Objectors fail to understand the rudimentary facts of separating the

Propco Assets and Opco Assets and the legal benefits (and requirements) of consummating the

Opco Sale simultaneous to, and in furtherance of, the solicitation and confirmation of the Joint

Plan.  Simply put, it is necessary to close the Sale in connection with confirmation for legal

reasons, tax reasons, regulatory reasons, business operational reasons and because closing the

Sale may involve additional intermediate steps or transactions to facilitate consummation of such

21

Sale, including the additional chapter 11 filings and/or merger or other corporate transaction of subsidiaries of the Debtors and such other actions or transactions necessary to implement the Joint Plan.

39.     Controlling precedent obligates the Debtors to avoid any accusation that the sale of Opco Assets is actually a prohibited *sub rosa* plan. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating, LLC*), 478 F.3d 452 (2d Cir. 2007) ("The trustee is prohibited selling substantially all of the assets of an estate "if it would amount to a "sub rosa" plan of reorganization.  The reason "sub rosa" plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, "short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.") citing  *Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d 935, 940 (5th Cir. 1983).  Undoubtedly, given the UCC's, Boyd's and the Dissident Lenders' consistent obstreperous, counter-productive and predictable assaults on the Debtors' ongoing efforts to reorganize and exit bankruptcy, if the Debtors had elected to proceed with the Auction of the Opco Assets on a standalone basis, the Objectors would have objected on the ground that such standalone sale was an improper *sub rosa* plan.

40.     Separately, there is considerable economic benefit to the Debtors if the Sale is consummated in connection with confirmation of the Joint Plan in the same tax year. Linking consummation of the Sale to confirmation of the Joint Plan maximizes the Debtors' ability to structure the transactions required to exit bankruptcy in a way to avoid negative tax consequences for the estates.

41.     Equally important, consummation of the Sale in conjunction with confirmation will provide essential protection to the buyer that the Opco Assets are truly being sold "free and clear" of liens, claims, interests and encumbrances.  Absent completing the sale as

part of a plan, a buyer of the Opco Assets, in light of the decision of the Bankruptcy Appellate Panel of the Ninth Circuit in *Clear Channel Outdoor Inc. v. Knupfer* (*In re PW, LLC*), 391 B.R. 25 (9th Cir. BAP 2008), could have justifiable concern that the sale could be susceptible to economic liability to and attack from junior lien holders.  Such doubt could impact a robust bidding process and thus it would be imprudent to expose any buyer to such risk.  In *Clear Channel*, the Ninth Circuit Appellate Panel has called into question whether the advantages to a buyer of concluding a sale outside of a plan can be realized in situations where, as here, the aggregate claims of the secured creditors exceed the value of the collateral.  For that reason, prudence dictates that the Sale be consummated in conjunction with confirmation of the Joint Plan.

42.     The Debtors believe, as they have repeatedly informed this Court and the parties in interest that in order to fully satisfy fiduciary duties, the Sale should take place in the context of an approved disclosure statement, and after solicitation and voting on the Joint Plan. The Objectors' insistence that the Debtors should de-couple the Sale from the plan process – even if the Debtors were inclined to follow such faulty advice – is legally insufficient grounds for the Debtors to conduct the Sale on a standalone basis.  *See UCC of Equity Security Holders v. Lionel Corp*. (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (the appeasement of creditors is not a sufficient justification for the sale of substantially all of the assets of the estate outside of a plan).  Thus, it is a prudent exercise of the Debtors' business judgment to consummate the Sale as part of confirmation.

43.     Additionally, the Debtors anticipate that any purchaser will require that the Opco lenders agree to roll over some portion of their existing debt as financing for the purchase. Any such rollover or  debt-for-debt exchange can only be implemented through a plan.

44.    The Court is also respectfully reminded that the Debtors concerted exit from chapter 11 is not merely the Opco Sale or even the sale of a discrete portion of estate assets, but rather it is a comprehensive separation of two businesses, consensually, under a joint plan of reorganization.  Absent the cooperation of the Opco Lenders and the Propco Lenders and compliance with the roadmap laid out in the Joint Plan, the Opco Debtors and the Propco Debtors, and the major stakeholders of each, would be embroiled in acrimonious, costly and time-consuming litigation over the separation of the two businesses.  Such non-consensual battle would be economically draining on the estates, delay emergence from chapter 11 and jeopardize the ability of the Debtors to achieve the separation and subsequent value-maximization of the Opco Assets and the Propco Assets.

45.    The UCC's complaint about the completion of the Opco Sale as part of the Joint Plan should be disregarded because the UCC appears to have confused the necessity for such protocol.  In furtherance of their argument that the Sale should proceed without being "hostage" to the Joint Plan's "fate," the UCC argues that "a sale motion is not the proper medium pursuant to which to seek an effective substantive consolidation."  *See* UCC Objection, p. 18, para. 30.  Again, the UCC misunderstands the Debtors' objectives and the terms of the Joint Plan.  The Debtors are separating the Propco Assets and the Opco Assets, not seeking to substantively consolidate them.

**D.    Contrary to the Objectors' Unsubstantiated Assertions, the Terms of the Bidding Procedures Will Promote a Competitive Bidding Process and Auction that Comports With Customary, Market-Tested and Approved Terms.**

46.    The Objections contain a smattering of complaints about the effectiveness of particular terms of the Bidding Procedures. As set forth in detail in the Supplemental Declaration of Daniel Aronson filed concurrently herewith, however, the terms of the Bidding Procedures are fair and will promote a competitive bidding process and Auction and comport

24

with Lazard's assessment of market-appropriate terms and conditions for a sale of the Opco

Assets for the following reasons:

- The Debtors and their advisors have received inquiries from potential purchasers of Opco Assets and have engaged in preliminary discussions with potential bidders as to the nature of their interest.

- As part of such preliminary discussions, Lazard has described the connection between the Excluded Assets and the so-called "Texas put," and thus has provided potential bidders with further clarity as to the threshold for a potential topping bid. During these preliminary discussions, no potential bidder has voiced any concern regarding either the Excluded Assets or the Texas put or indicated that the exclusion of the Excluded Assets from the sale process would discourage them from bidding.

- Based on Lazard's experience participating in and conducting sales of assets pursuant to section 363 of the Bankruptcy Code and the Lazard team's experience in conducting sale processes with respect to gaming properties, the proposed 60-day time period for due diligence and the submission of final bids is sufficient for any interested potential bidders to conduct and conclude due diligence and formulate a bid for the Opco Assets.

- Based on Lazard's experience participating in and conducting sales of assets in conjunction with confirmation of a plan, potential bidders (other than Boyd) would not be dissuaded from bidding by virtue of the fact that the Sale will close in conjunction with confirmation of the Joint Plan. For example, Lazard recently advised Pilgrim's Pride in the successful completion of their chapter 11 reorganization, through the sale of approximately 65% of that company's assets as part of its chapter 11 plan.

- Based on Lazard's experience, limiting contact with potential bidders to Lazard is customary and appropriate to (i) ensure that the flow of information is accurate and up-to-date; (ii) to maintain confidentiality provisions included in the process; and (iii) to ensure a level playing field. Be that as it may, Lazard, based upon observing the Chapter 11 process for the past 9 months is recommending that professionals for the Opco Lenders and the UCC be provided with access to the process and to the bidders (with Lazard as the intermediary) to ensure that any issues any constituency has in relation to the process is dealt with immediately and not held until the conclusion of the process.

- Based on Lazard's experience, any concern the Successful Bidder may have regarding the duration that the Successful Bid must remain irrevocable, in this case while the Joint Plan is being confirmed, is customarily and appropriately addressed in the Asset Purchase Agreement and not in the Bidding Procedures.

47.     In addition, the Objectors raise concerns that a "no shop" provision in the Bidding Procedures is too restrictive and adversely impacts the competitive process.  That is not true.  The "no shop" provision in the Opco Support Agreement in which the Opco Lenders and the Debtors agree not to solicit other bids is intended to cover only the period from the execution of the Opco Support Agreement up to and through this Court's approval of the Bidding Procedures.  The language in the "no shop" provision is clear – the provision is expressly provides that no solicitation may be made ***except as contemplated by the Bidding Procedures.*** All this provision really means is that the Debtors intend to comply with the Bidding Procedures, if and when they are approved by the Court.  If the language of the Opco Support Agreement leaves any doubt, the Debtors are clarifying it here to ensure that all parties in interest understand that the "no shop" is a finite period of time that will not have any impact on the Auction process.  Moreover, the limited "no shop" provision is a rudimentary, standard (and temporary) protection for the stalking horse designed solely to protect the stalking horse position until the hearing on this Motion.  Lest there be any continuing confusion, once this Court approves the Bidding Procedures, the Debtors and their advisors are authorized to, and will, begin soliciting competing bids.

48.     Boyd complains that as part of the Bidding Procedures the Debtors will not resolve any Interdependencies among the Opco Properties.  This is incorrect.  The Debtors have a detailed structure for separating the Propco Assets from the Opco Assets as set forth in the Second Compromise Amendment.  Presumably, what Boyd fails (or feigns) to understand is that under the Bidding Procedures, if the Opco Assets end up being divided and sold to separate buyers (or a single buyer intending to divide the Opco Assets post-closing), then in that instance the Debtors are not pre-resolving any interdependency issues related to such divided Opco

Assets.  At the appropriate time, and under the appropriate circumstances, the Debtors will work with the buyer(s) of the Opco Assets to resolve any interdependency issues.

49.    The Objectors complain that the reservations of rights provide the Debtors with "too many rights."  The reservations of rights contained in the Bidding Procedures, however, employ market-tested, standard reservations formulated to ensure that Dr. Nave, together with the Consultation Parties, has the requisite flexibility to conduct a competitive auction.  The Objections present no plausible challenge to, and provide no evidence disproving, that the Debtors' reserved rights are not fully commensurate with industry standards.  Their concerted reprise of undefined "unfairness" fails in the face of the Debtors' advisors' assessment of the Bidding Procedures.

**E.    The Bidding Procedures are the Product of the Debtors' Sound Exercise Business Judgment.**

50.    As set forth above herein, the Bidding Procedures provide a reasoned, market-tested framework for the Debtors, under the direction of a wholly and irrefutably independent director, to entertain bids for a potential sale of the Opco Assets and, if Debtors receive such bid(s), to conduct the Auction in a fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction in conjunction with confirmation of the Joint Plan.  The Bidding Procedures also set forth a schedule for achieving these objectives on a cost-effective and expeditious manner.  Under such circumstances, the case law makes clear the Debtors should be authorized to sell the Opco Assets pursuant to the Bidding Procedures and in connection with the confirmation of the Joint Plan. *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (finding that "a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction"); *In re Montgomery*

*Ward Holding Corp.*, 242 B.R. 147, 154 (D. Del. 1999) (finding that in evaluating business purpose of a sale, Bankruptcy Court may consider effect of sale on reorganization).

**F.      The Opco Sale Does Not Violate the Holding in *203 North LaSalle.***

51.      The UCC argues, again based on an erroneous assumption, that the sale of the Excluded Assets (which the UCC terms "Relinquished Assets") to New Propco violates the decision in *Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434 (1999) which prohibits old equity from receiving new equity in the reorganized entity in violation of the absolute priority rule.  First, the Joint Plan is not a "new value" plan.  Second, the Excluded Assets, which are being transferred for substantial consideration to New Propco under the Second Compromise Amendment, are not the subject of the Motion and are not part of the Opco Assets to be sold. [7]  Additionally, no part of the Sale or the transfer of the Excluded Assets by Opco to New Propco is an attempt to give the holders of old equity in SCI new equity in reorganized SCI.  This fact should have been particularly evident to the UCC because under the Joint Plan there will not be a reorganized SCI.  As the Joint Plan and the Sale make clear, the Opco Assets are being sold free and clear and the old equity of SCI will be wiped out.  There is no benefit flowing to old equity "on account of" existing equity interests, nor is there any "new value" being contributed to the SCI estate for new equity – both of which are "triggering" factors in the *203 N. Lasalle* analysis.

**III.      <u>CONCLUSION.</u>**

WHEREFORE, Debtors respectfully request that the Objections be overruled and that the Motion be granted, the Debtors be authorized to employ the Bidding Procedures in connection with the sale and auction of the Opco Assets and that the Court enter the proposed

---

[7]      As mentioned above, all issues relating to the Excluded Assets are addressed by the Debtor in their Reply to the MLCA Amendment Motion.

#4827-2697-6006

28

1   Bidding Procedures Order annexed to the Motion as <u>Exhibit 2</u>, together with such other and

2   further relief as is just and appropriate.

3

4   Dated: April 28, 2010                          Respectfully submitted,

5
                                          By:        /s/ *Thomas R. Kreller*
6                                                 Paul S. Aronzon, CA State Bar #88781
                                                  Thomas R. Kreller, CA State Bar #161922
7                                                 MILBANK, TWEED, HADLEY & McCLOY LLP
                                                  601 South Figueroa Street, 30th Floor
8                                                 Los Angeles, California 90017

9                                                 Reorganization Counsel for
                                                  Debtors and Debtors in Possession
10
                                                  Bruce T. Beesley, #1164
11                                                Laury Macauley, #11413
                                                  LEWIS AND ROCA LLP
12                                                50 W. Liberty Street, Ste. 410
                                                  Reno, NV 89501
13                                                bbeesley@lrlaw.com; lmacauley@lrlaw.com

14                                                Local Reorganization Counsel
                                                  For Debtors and Debtors in Possession
15

16

17

18

19

20

21

22

23

24

25

26

27

28

#4827-2697-6006                          29

# Exhibit 1

# Exhibit 1



**ORDERED in the Southern District of Florida on October 01, 2009.**

_____
A. Jay Cristol, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

FONTAINEBLEAU LAS VEGAS,                    Case No.: 09-21481-BKC-AJC
HOLDINGS, LLC, ET AL.,                      Chapter 11
                                            (Jointly Administered)
                Debtors.
_____/

### ORDER TO SHOW CAUSE AS TO WHY THE COURT SHOULD NOT APPOINT AN EXAMINER

THIS CAUSE came before the Court *sua sponte*. The record in this case indicates that the parties to these proceedings are not cooperating with one another. A motion to convert has been filed by the Term Lender Steering Group seeking to convert this case to one under Chapter 7 of the Code. The motion is premised upon the lack of meaningful progress made thus far in this case, despite the fact that more than $16 million of the Term Lender Steering Group's cash collateral has been used during the administration of this case. The Term Lender Steering Group submits that completion of the Las Vegas Project is not possible and a sale of the Project to a third party and liquidation of the remaining assets is the only viable course to realize any meaningful value for the

creditors.

The Debtors have indicated they have made efforts to arrange a sale of the Las Vegas Project, but the Term Lenders appear to be concerned about a possible conflict of interest and accordingly filed the motion to convert. The hearing on the motion to convert is currently scheduled to be heard on October 28, 2009.

The Court believes it is more expeditious to proceed with any potential sale as soon as possible rather than to wait until October 28, 2009 when a Trustee, if appointed, would be required to expend a significant amount of time to obtain counsel, familiarize himself or herself with this case and effectuate a sale. It also appears more economical to immediately appoint an Examiner than to appoint a Trustee whose fees and expenses would likely far exceed the costs and expenses of an Examiner. The Court therefore believes it is in the best interest of the estate and all parties to appoint an Examiner at this time to examine, negotiate and supervise a sale of Debtors' assets pursuant to 11 U.S.C. §363. The opinion of the Term Lenders regarding the appointment of an Examiner should be given substantial weight as the Term Lenders are the holders of the largest secured claim(s) and have a lien on the cash collateral. It is thus

ORDERED that a hearing will be held on Wednesday, October 7, 2009 at 2:30 PM to show cause as to why this Court should not appoint an Examiner to examine, negotiate and supervise a §363 sale of assets.

###

Copies to:

Scott Baena, Esq.

Attorney Baena is directed to immediately mail a conformed copy of this order to all interested parties and to file a certificate of service with the Clerk of Court.