Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:    (213) 892-4000
Facsimile:    (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Northern NV Acquisitions, LLC
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC

Chapter 11

Case No. BK-09-52477
Jointly Administered
BK 09-52470 through BK 09-52487

**DECLARATION OF RICHARD J. HASKINS IN SUPPORT OF DEBTORS': (A) MOTION FOR ENTRY OF ORDER ESTABLISHING BIDDING PROCEDURES AND DEADLINES RELATING TO SALE PROCESS FOR SUBSTANTIALLY ALL OF THE ASSETS OF STATION CASINOS, INC. AND CERTAIN "OPCO" SUBSIDIARIES; AND (B) REPLY TO OBJECTIONS RE: DEBTORS' MOTION FOR APPROVAL OF SECOND AMENDED AND RESTATED MASTER LEASE COMPROMISE AGREEMENT**

Hearing Date:    May 4, 2010
Hearing Time:    1:00 p.m.
Place:           300 Booth Street
                 Reno, NV 89509

#4848-4011-9302                              1

I, Richard J. Haskins, hereby declare under penalty of perjury:

1. I currently serve as the Executive Vice President, General Counsel, and Secretary of debtor and debtor in possession, Station Casinos, Inc. ("SCI"), a Nevada corporation. In this capacity, I am familiar with the day-to-day business operations, assets and financial affairs of SCI and its affiliates, including all of SCI's affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I have been employed by SCI since 1995. In 2002, I became General Counsel and, in 2004, I became Executive Vice President and Secretary.

2. I submit this declaration (the "Declaration") in further support of: (a) the *Debtors' Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "Opco" Subsidiaries* [Docket No. 1175] (the "Motion")[1] and in reply to the oppositions to the Motion filed by the Official Committee of Unsecured Creditors (the "UCC"), Boyd Gaming Corporation ("Boyd") and the minority group of Opco Lenders (the "Dissident Lenders", and together with Boyd and the UCC, collectively the "Objectors"; and (b) *Debtors' Reply To Objections Re: Debtors' Motion For Approval Of Second Amended And Restated Master Lease Compromise Agreement* (the "Reply").

3. I am authorized by SCI to submit this Declaration in support of the Motion and the Reply. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents or based upon my experience and knowledge of the Debtors' operations and financial condition.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings described in the Motion or the Bidding Procedures, as applicable. Any inconsistency contained herein, the Motion and the Bidding Procedures will be controlled by the terms and provisions of the Bidding Procedures.

#4848-4011-9302

2

## The Bidding Procedures Motion

4. As part of my duties as Executive Vice President, General Counsel and Secretary of SCI, I was involved in the negotiations among the Opco Agent and the Steering Committee of Opco Lenders and their financial and legal advisors and the Debtors and their financial and legal advisors in connection with the potential Sale of the Opco Assets.

5. Pre-petition, in early February 2009, at Boyd's request, SCI met with members of Boyd management at which time Boyd expressed a general interest in acquiring some of the Debtors' properties. Subsequently, Boyd sent SCI an unsolicited preliminary, non-binding written indication of interest in acquiring certain of the Debtors' assets. After discussions of Boyd's general expression of interest among the Debtors' board and legal and financial advisors, as well as certain of Debtors' creditors, the Debtors, noting that Boyd's offer was non-binding, non-specific and highly conditional among other commercial infirmities, elected, in the best interests of the Debtors, to pursue a comprehensive restructuring rather than a speculative distressed sale transaction to Boyd. Unfortunately, the foregoing exchange was made public by Boyd in its public filings.

6. During the Chapter 11 Case, Boyd has continued to express publicly its interest in acquiring the Debtors' businesses. I have read the Boyd Objection, and the statements contained therein are misleading. Boyd has not disclosed that Boyd, upon information and belief, has had an active, behind-the-scenes role through direct interactions with Opco Lenders, but with virtually no effort to engage with the Debtors themselves, in the formulation of the Bidding Procedures, the stalking horse bid and the Auction process and the Master Lease Compromise Agreement. Specifically, in the months leading up the decision to separate the Propco Assets and Opco Assets and present the proposed reorganization and Sale currently embodied in the Joint Plan, Boyd and its advisors had access and involvement in the Chapter 11 Cases, the formulation of the terms and conditions regarding the separation of the Propco Assets and Opco Assets, the Bidding Procedures, the Auction process, the Master Lease Compromise Agreement and selection of a stalking horse bidder.

#4848-4011-9302                                             3

7. Upon information and belief, specifically:

- Boyd entered into a confidentiality agreement with Debtors which precluded communications with the Opco Lenders, but within 24 hours of signing that agreement, Boyd commenced discussions with the Opco Lenders regarding a sale of the Opco Assets to Boyd, potential bid procedures and Boyd becoming the stalking horse for an auction. These discussions commenced in January 2010 and continued well into April 2010;

- Boyd expressed an interest to creditors of the Debtors, including the Opco Lenders, in becoming the stalking horse bidder -- but refused to engage in negotiations with the Debtors;

- In its discussions with the Opco Lenders, Boyd reviewed the Debtors' proposed terms of the bidding procedures for the sale of the Opco Assets and influenced the negotiations between the Opco Lenders and Debtors, attempting to inject terms in such procedures and process that would inure to Boyd's benefit, including the substantive requirements of minimum bid, initial overbid, incremental bids and break-up fees;

- Boyd was fully aware of the decision to separate the Propco Assets and Opco Assets as part of the Joint Plan and was aware of, and consulted by, the Opco Lenders with regard to the negotiation of the specific terms of the separation of such Assets and the transition of such Assets that are contained in the proposed amendment to the Master Lease Compromise Agreement. Upon information and belief, Boyd attempted to foist its views on the Opco Lenders as to how Boyd would like to see the separation occur, and those views influenced the Opco Lenders' negotiations with the Debtors and the Propco Lenders in that regard. By way of a particularly troubling example, in the negotiations over the schedule of assets to be transferred from Opco to Propco, the mark up of a near final draft of such document clearly indicated that Boyd wanted access to *all* of the Debtors' customer data, not just information relating to the Opco casinos that are the subject of the proposed auction. Further, Boyd tried to limit the use by New Propco of the computer systems being *purchased* by New Propco;

- Although Boyd did not engage in discussions directly with the Debtors, the Debtors believe that through the Opco Lenders, Boyd had input in the bidding terms and conditions, as well as terms of the stalking horse bid, and that some of Boyd's suggested terms are included in the Bidding Procedures and the stalking horse bid at the insistence of the Opco Lenders. Specifically, the Debtors believe that due to Boyd's comments, the Opco Lenders demanded , among other things, a fixed buy out of the Texas Ground Lease, which demand was included in the Bidding Procedures and in other of the various restructuring agreements;

- Boyd's discussions with the Opco Lenders about acquiring the Opco Assets progressed to the point where the Debtors believed that the Opco Lenders supported Boyd to become the stalking horse bidder. The Debtors, however, were never presented with any proposals from Boyd regarding

#4848-4011-9302　　　　　　　　　　　　4

> Boyd's proposed acquisition of the Opco Assets. All such proposals and discussions took place between the Opco Lenders and Boyd.

- On or about April 20, 2010, the Opco Agent and the Opco Lender Steering Committee formally notified the Debtors that they support New Propco and not Boyd as the stalking horse bidder;

- Despite the fact that the Debtors' financial advisors reached out to Boyd and its financial advisors to engage in discussions concerning a possible stalking horse slot for Boyd and proposed bidding procedures, Boyd and its advisors refused to engage in such discussions with the Debtors' advisors;

- Boyd has both pre-petition and post-petition issued press releases which had the effect of negatively impacting the reorganization process and causing issues to arise among the regulatory authorities, Debtors' creditors, employees, contract counterparties, vendors and suppliers; and

- Boyd's protestations concerning computer systems and information technology are patently false since Opco will retain a fully functioning system and Boyd, in all likelihood, will use its own computer systems and information technology if it is the Successful Bidder for the Opco Assets.

8.      The Debtors' advisors have actively encouraged Boyd to participate in the Auction of the Opco Assets by becoming a bidder, but until such time as Boyd actually makes a bid, it appears to be clearly acting as the Debtors' primary competitor determined to impede reorganization to further its own business needs or to artificially depress the bidding on the Opco Assets so it can obtain such Assets at an advantageous price. While a bona fide bid from Boyd, in full compliance with the Bidding Procedures, would be welcomed if it served to maximize value, to date the Debtors have seen no evidence that Boyd has made, or is willing to make, such a bona fide offer.

9.      Upon information and belief, in its discussions with the Opco Lenders, Boyd was provided with and reviewed the Debtors' proposed terms of the bidding procedures for the sale of the Opco Assets which the Debtors were developing with the Opco Lenders and influenced the negotiations between the Opco Lenders and Debtors by suggesting terms and conditions in such procedures and process to the Opco Lenders that would inure to Boyd's benefit, including the substantive requirements of minimum bid, initial overbid, incremental bids and break-up fees. I understand that Boyd's conditions for becoming a stalking horse for the Opco Assets

1  were the following: (a) a 3% break up fee, (b) the initial overbid had to be $25,000,0000 and (c)
2  incremental bids had to be in the minimum amount of $10,000,000.

3      10.    Boyd was fully aware of the decision to separate the Propco Assets and Opco
4  Assets as part of the Joint Plan and was aware of, and consulted by, the Opco Lenders with
5  regard to the negotiation of the specific terms of the separation of such Assets and the transition
6  of such Assets that are contained in the proposed amendment to the Master Lease Compromise
7  Agreement. Upon information and belief, Boyd's attempted to foist its views on how Boyd
8  would like to see the separation occur, and those views influenced the Opco Lenders'
9  negotiations with the Debtors and the Propco Lenders in that regard. By way of a particularly
10 troubling example, in the negotiations over the schedule of assets to be transferred from Opco to
11 Propco, the mark up of a near final draft of such document clearly indicated that Boyd wanted
12 access to *all* of the Debtors' customer data, not just information relating to the Opco casinos that
13 are the subject of the proposed auction. Further, Boyd tried to limit the use by New Propco of
14 the computer systems being *purchased* by New Propco. Through these actions having little or
15 nothing to do with the value of the Opco Assets or businesses, Boyd's competitive desire to harm
16 the Propco Properties – with which Boyd competes directly – became clear.

17     11.    Although Boyd did not engage in discussions directly with the Debtors, the
18 Debtors believe that through the Opco Lenders, Boyd had input in the bidding terms and
19 conditions, as well as terms of the stalking horse bid, and that some of Boyd's suggested terms
20 are included in the Bidding Procedures and the stalking horse bid at the insistence of the Opco
21 Lenders. Specifically, the Debtors believe that due to Boyd's comments, the Opco Lenders
22 demanded, among other things, a fixed buy out of the Texas Ground Lease, which demand was
23 included in the Bidding Procedures and in other of the various restructuring agreements.

24     12.    At one point during the negotiations between the Debtors and the Opco Lenders,
25 the Opco Lenders gave the Debtors the impression that Boyd was actively in negotiations with
26 the Opco Lenders to become the stalking horse bidder for the Opco Assets and the Opco Lenders
27 were inclined to support Boyd and the terms of its bid, as the stalking horse bid. The terms of
28 the Boyd proposal, however, were never shared with the Debtors or their advisors. To my

#4848-4011-9302    6

knowledge, all such discussions and exchanges of proposals took place between the Opco Lenders and Boyd.

13. Boyd has both pre-petition and post-petition issued press releases which had the effect of negatively impacting the reorganization process and causing issues to arise among the regulatory authorities, Debtors' creditors, employees, contract counterparties, vendors and suppliers;

14. Boyd's complaints in the Boyd Objection regarding Opco computer systems and information technology are patently false since, under the terms of the Second Compromise Amendment, Opco will retain a fully functioning system and Boyd, in all likelihood will use its own computer systems and information technology if it is the Successful Bidder for the Opco Assets.

15. I have also reviewed the UCC's Objection. The UCC fails to disclose that in early 2010, the Debtors met with the UCC in Las Vegas. At that meeting, the UCC was given a presentation by the Debtors' professionals on the terms and status of the negotiations between the Debtors and the Mortgage Lenders. The UCC was also informed of the discussions taking place between the Opco Steering Committee and Boyd with respect to a potential sale of the Opco Assets. Following those meetings, the Debtors continued to share information with the UCC. Through those discussions, the Debtors were able to broker discussions between the UCC, on the one hand, and representatives of the Propco Lenders and FG, on the other hand (in their capacity as future owners of the Propco Assets and potential stalking horse bidder on the Opco Assets). The subject of those discussions was whether an agreement might be reached that would potentially provide the UCC members with an opportunity to make an investment in the yet-to-be-formed "New Propco." As a result of those discussions, in early April of 2010, the Debtors, FG and the Mortgage Lenders delivered a restructuring proposal to the UCC. As of the date of this Reply, the UCC has yet to respond to that proposal.

16. Both Boyd and the UCC object to the consummation of the Sale in conjunction with the confirmation of the Joint Plan. The linking of those two aspects of the Debtors' reorganization are, from the Debtors' point of view, necessary for several business, legal,

mechanical, logistical and operations reasons. By way of example, and not limitation, from a business perspective, the Opco Sale needs to close in conjunction with confirmation of the Joint Plan because closing the Sale may involve additional intermediate steps or transactions to facilitate consummation of such Sale, including the additional chapter 11 filings and/or merger or other corporate transaction of subsidiaries of the Debtors and such other actions or transactions necessary to implement the Joint Plan.

### The Master Lease Motion

17. The MLCA approved in December reflected the Debtors' best efforts at preserving the value of the Debtors' estates in the face of a possible foreclosure by the Propco Lenders and the potential loss of consensual use of cash collateral by SCI. The MLCA achieved significant rent reductions under the Master Lease Agreement, and focused on (a) protecting the unified business by preventing a hostile foreclosure by Propco and a litigation war between the Opco and Propco Lenders over who owned which assets, and (b) avoiding severe disruption to both the Opco and Propco business operations in the event of an unplanned turnover of the Propco Properties to the Propco Lenders. It was a temporary truce that the Debtors hoped would lead to a plan of reorganization that the secured lenders as a whole could support. At that time, the Debtors did not expect that their chapter 11 plan would provide for the separation of the Station Group into two new businesses, as is now a possible outcome of the Joint Plan. However, it later became clear the Propco Lenders wanted a reorganization around their collateral as part of the Joint Plan, and the Opco Lenders wanted a sale of their collateral as part of the Joint Plan. Consequently, the Debtors had no choice but to negotiate with both the Propco Lenders and the Opco Lenders (the entities with liens on substantially all of the Debtors' assets) on the terms of the Separation Agreement, an agreement that would address a potentially permanent separation, and, just as importantly, the terms of the transition period required for each of the separated businesses to have a soft landing upon exit from bankruptcy.

18. The Separation Agreement is the product of more than several months of negotiation with both the Opco Consenting Lenders, the Propco Lenders, and even, indirectly, Boyd. Boyd made its input through the Opco Lenders, because the Opco Lenders were talking to

Boyd in the context of the informal auction that the Opco Lenders conducted over who the Opco Lenders would support as the stalking horse bidder. Boyd was given access to drafts of Annex 1 to the Separation Agreement (the list of assets retained or received by Propco under the Separation Agreement) and Boyd provided markups of Annex 1, albeit indirectly through the Opco Lenders.

19. The MLCA approved by the Court in December authorized Propco to make offers of employment to property level employees below the level of general manager if the Master Lease was rejected and the Propco Lenders found themselves forced to operate the Propco Properties. Now, as a result of the parties' agreements, the Separation Agreement authorizes each of Propco and the Opco purchaser to make employment offers to (a) the employees located at their respective properties, and (b) the SCI corporate employees below the level of vice-president who provide services exclusively to the Opco or Propco side of the business. As to all other SCI corporate employees, both Propco and Opco will be entitled to make job offers.

20. Many of the SCI's employees have employment agreements that contain non-compete and severance provisions. The Support Agreement contains Opco's agreement to waive the non-competes for those employees that accept employment with Propco consistent with the terms of the Separation Agreement. The Debtors believe that enforcement of the non-competes is problematic in any event. Enforcement would require SCI to assume the applicable employment contract, and nearly all such contracts have substantial severance provisions. The aggregate contractual severance liability for the SCI corporate employees covered by this provision of the Support Agreement is in excess of $20 million. The Debtors believe that both Opco and Propco are better off not having to assume that severance liability and thereby making some or all of it an administrative expense liability of the Debtors' estates. Thus, the settlement contained in the Separation Agreement avoids litigation in this Court over the assumption and assignment of numerous employment contracts, including litigation over issues like: (a) whether the contracts are personal services contracts that cannot be assumed without the consent of the non-debtor party; (b) the extent of the administrative expense priority for the contractual

severance obligations (the terms are not the same in each contract); and (c) whether the non-competes are enforceable, as these terms also are not the same in each contract.

21.  Waiver of the non-competes also has the effect of allowing the employees to continue working at their current jobs.  Like the other provisions of the Support Agreement, the Debtors intent to is to accomplish the splitting up of the Station Group assets between Opco and Propco in the most efficient manner possible to preserve the value of both new business enterprises, and in a manner that effects the least disruption to the business operations and employees' lives.  Given the current very difficult employment environment for gaming industry workers, allowing the employees to continue at their old jobs without the prohibitive non-compete rules is eminently reasonable and in the overall interests of the Debtors stakeholders (which includes the Debtors' employees).

22.  One of SCI's wholly owned non-debtor subsidiaries, CV PropCo, LLC, is the borrower on a $250 million term loan facility, entered into in February 2008 (the "Land Loan").  The Land Loan is secured by undeveloped land located on the southern end of Las Vegas Boulevard at Cactus Avenue, and land surrounding the Wild Wild West Gambling Hall & Hotel in Las Vegas, Nevada.  The Land Loan matures in 10 months, on February 7, 2011.  The most recent appraisals of the land provided by CB Richard Ellis (the appraisals were delivered in the first quarter of 2009) indicates value of between $95 million and $145 million.  The property is financially "way under water."  The lenders on the Land Loan are the same institutions that comprise the Propco Lenders.  Under the Separation Agreement, SCI's equity interests in CV Propco, LLC will be transferred to the Land Loan Lenders, in what is in effect a consensual foreclosure on the collateral.  New Propco, the entity that will assume ownership of the Propco Properties, has agreed to assume the liability on the $250 million of debt.

23.  The Debtors advisors have determined that there is no interest in the marketplace to pay the Land Loan Lenders $250 million for the property.  Hence, there is no other practical disposition of the Land Loan property available to the Debtors.  It is the preference of the Land Loan Lenders to take the equity in CV PropCo, LLC rather than have to foreclose under the

#4848-4011-9302                                    10

mortgage, and no party in interest has explained why this is not a reasonable resolution of a $250 million secured liability of the Station Group.

24.     One of the Opco assets is the Texas Station Gambling Hall and Hotel, which is subject to a ground lease. The lease contains a change of control provision that requires the lessee (Texas Station, Inc.) to purchase the ground lease property upon a change of control (the "Put Right") if the lessor elects to exercise the Put Right. The lessor has one year from the change of control to exercise the Put Right. The purchase price is calculated based upon a net present value calculation of the remaining rent due under the ground lease. There is going to be a change of control to the Opco purchaser upon the consummation of the same of the Opco assets. It is estimated that the forced purchase price could be as high as $120 million, depending on the discount factor used in the net present value calculation. The existence of the Put Right is a matter of public record and has been discussed with potential purchasers of the Debtors' assets. The lessor is a member of the Fertitta family. Based upon the negotiations, the lessor has agreed to avoid the process of determining the net present value of the rental stream, with all of the attendant potential disputes, and fix the cost of purchasing Texas Station on a change of control. If the Court approves the Separation Agreement and it becomes effective, the Put Right purchase price will be fixed at $75 million. Thus, if the Separation Agreement is approved, the cost of acquiring the Opco assets for a third party buyer is fixed at a number that may represent a potential saving of as much as $45 million. Further, the lessor has agreed that if the successful bidder at the auction for the Opco assets is the stalking horse bidder currently proposed by the Debtors (which bidder group includes Fertitta Gaming), then the lessor's Put Right will be extinguished altogether, a savings of perhaps $120 million that could enhance the recovery of the Opco Lenders (depending on the outcome of the bidding at the auction) or even have a spillover effect and provide a recovery for creditors junior to the Opco Lenders (depending again on the outcome of the bidding for the Opco assets). Whatever the outcome of the bidding for the Opco assets, the deal negotiated with the Texas Station lessor on the Put Right is a substantial financial enhancement for the Opco creditors. Absent the lessor's agreement to reduce the cost of the Put Right, the 12-month period after the change of control in which the lessor can elect to exercise

the Put Right creates tremendous uncertainty for potential bidders. When the value of the Put Right reduction is added to the $35 million payment being made by Propco to Opco (which $35 million is $15 million more than the cost of a new computer system for Opco), and given the difficult business destroying litigation over the rights to the Debtors' IT that would ensue if the Separation Agreement were not available, the Separation Agreement constitutes a reasonable settlement at a price that is above the lowest end of the range of possible litigation outcomes, and at a price that is "in the ballpark" of reasonable settlement outcomes.

25. Tropicana Station, Inc. is a non-debtor wholly owned subsidiary of SCI that leases the Wild Wild West Gambling Hall & Hotel in Las Vegas from the J.A. Tiberti Construction Co. The revenues generated by the property are not sufficient to meet the rent payments, and the deficiency will be approximately $1.6 million per year starting January 2011. The lease contains an option to purchase the property, but the exercise of the option is tied to four other options to purchase other property. All five options must be exercised in unison, and the overall purchase price is $60 million. The options must be exercised by the end of calendar 2010, and the purchase price paid in 2011. The Debtors believe that, like the rent, the option prices are substantially above market. Because the underlying property is adjacent to the Land Loan property discussed above, the Propco Lenders desire to acquire the rights to the options to purchase the property (but what they are really acquiring is the right to negotiate a better price). Pursuant to the Separation Agreement, Tropicana Station, Inc. and SCI (and non-debtors Tropicana Acquisitions, LLC and Vista Holdings, LLC) will assign all of their rights in respect of Wild Wild West Gambling Hall & Hotel to CV PropCo, LLC, the current owner of the Land Loan property. Under the Separation Agreement, the Land Loan Lenders are receiving the equity in CV PropCo, LLC. In light of the fact that the Wild Wild West property is adjacent to the Land Loan property, it could have development value in the future for the Land Loan Lenders.

26. The current corporate headquarters for the Station Group is located in a building leased from Cole So. LV LLC, an Arizona entity. The lease contains an option to purchase the property for $70 million. The current rent and the lease buyout price are both substantially

1  above market, perhaps as much as 50% above market. The property is somewhat single purpose
2  in that it is located directly across from the main entrance to Red Rock Resort and Casino, and
3  shares with Red Rock a common road entryway. The lease is not an asset being transferred to
4  Propco under the Separation Agreement. Rather, the lease is an Excluded Asset under the
5  bidding procedures in that Propco reserves the right to seek ask SCI to assume and assign the
6  lease to Propco. If Propco does not exercise that right, the lease will be rejected.
7  / / /
8  / / /
9  / / /
10 / / /

#4848-4011-9302                              13

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of April, 2010, in Las Vegas, Nevada.

By: _____
Richard J. Haskins

#4848-4011-9302

9