Electronically Filed on May 3, 2010

BRAD ERIC SCHELER (SBN BS-0397)
BONNIE STEINGART (SBN BS-8004)
**FRIED, FRANK, HARRIS,**
**SHRIVER & JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
Email: brad.eric.scheler@friedfrank.com
        bonnie.steingart@friedfrank.com
*Counsel for the Official*
*Committee of Unsecured Creditors*

BRETT A. AXELROD (SBN 5859)
ANNE M. LORADITCH (SBN 8164)
**FOX ROTHSCHILD LLP[1]**
3800 Howard Hughes Parkway
Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        aloraditch@foxrothschild.com
*Counsel for the Official Committee*
*of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Northern NV Acquisitions, LLC
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC

Chapter 11

Case Nos. BK-N-09-52470-GWZ through
BK-N-09-52487-GWZ

Jointly Administered Under
BK-09-52477-GWZ

**OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS'
MOTION FOR ENTRY OF ORDER
PURSUANT TO 11 U.S.C. §§ 105(a) AND
363(b) AND FED. R. BANK. P. 9019
AUTHORIZING OPCO TO ENTER
INTO RESTRUCTURING SUPPORT
AGREEMENT WITH OPCO LENDERS**

Hearing Date:    May 5, 2010
Hearing Time:    10:00 a.m.
Place:           300 Booth Street
                 Reno, Nevada 89509

**TO THE HONORABLE GREGG W. ZIVE AND ALL PARTIES IN INTEREST:**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 bankruptcy cases of the above-captioned debtors and debtors in possession

(collectively, the "Debtors"), hereby submits this objection (the "Objection") to the Debtors'

---

[1] On April 30, 2010, the Official Committee of Unsecured Creditors filed a Substitution of Attorneys and Notice
of Change of Address (Nevada Counsel Only) [Docket No. 1355] to substitute Fox Rothschild LLP for Greenberg
Traurig, LLP, as the Committee's Nevada counsel.

Motion For Entry of Order Pursuant to Bankruptcy Code §§ 105(a) and 363(b) and Bankruptcy Rule 9019 Authorizing OpCo to Enter Into Restructuring Support Agreement With OpCo Lenders [Docket No. 1219] (the "<u>Motion</u>").  The Motion seeks approval of the terms of the OpCo Support Agreement[2] and Court authorization for the OpCo Debtors to enter into the OpCo Support Agreement and be bound by the terms, obligations and conditions set forth therein.

In support of the Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Motion lacks merit.  The Motion appears to request, pursuant to 11 U.S.C. §§ 105(a) and 363(b), and Bankruptcy Rule 9019(a), that this Court bless the OpCo Debtors' entry into a plan support agreement with four OpCo Lenders (two of whom are the sole lenders to PropCo – such lenders, the "<u>Controlling Lenders</u>"), Frank and Lorenzo Fertitta ("<u>Existing Equity</u>" or the "<u>Fertittas</u>"), and Fertitta Gaming, LLC ("<u>FG</u>"), an entity that, on information and belief, was formed postpetition by the Fertittas, and make a determination that the OpCo Support Agreement is not an improper plan solicitation in violation of 11 U.S.C. §§ 1125 and 1126.  As demonstrated below, the relief sought by the Debtors is wholly unnecessary – whether this Court grants or denies the motion, the arrangements made between the Lenders and the Fertittas will remain in place.

2.      Even if there was any reason to consider the Motion, the Debtors cannot satisfy their heightened burden under the Bankruptcy Code for approval of an insider transaction, and they should not be able to cloak themselves under the guise of a "compromise" under Bankruptcy Rule 9019(a) when there is nothing to compromise.  Moreover, the OpCo Support Agreement is clearly an impermissible lockup agreement that violates the Bankruptcy Code, violates United States Supreme Court holding in *203 North LaSalle*, and constitutes a *sub rosa* plan.

3.      Importantly, there is no reason for the OpCo Debtors to participate in an agreement where the OpCo Lenders and the Fertittas are apparently dividing up the assets that constitute OpCo at a non-competitive price that was apparently negotiated solely by the OpCo

---

[2]      Capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

1    Lenders.  Thus, rather than include the "Excluded Assets" as part of the auction process, the

2    OpCo Lenders instead satisfied themselves with an 87% recovery and a transfer of value to

3    themselves on the other side of the house as PropCo Lenders.

4          4.      The reason for this Motion is that the Debtors, their insiders and favored lenders

5    are attempting to ensure confirmation – well in advance of any confirmation hearing – of the plan

6    of reorganization that was filed on March 24, 2010 (the "<u>Joint Plan</u>").  The bona fides of the Joint

7    Plan will no doubt be the subject of even further briefing and discovery, but it cannot be disputed

8    what the Joint Plan proposes – (i) wiping out general unsecured creditors of OpCo; (ii) allowing

9    holders of equity interests of OpCo to become 50% owners of at least the reorganized PropCo;

10    (iii) finalizing the stripping of value assets of OpCo to the Fertittas and the PropCo Lenders in a

11    manner that that will only chill bidding for the remaining assets of OpCo; and (iv) granting broad

12    estate and third party releases to the PropCo Lenders, most of the OpCo Lenders, and, of course,

13    insiders.  The OpCo Support Agreement is merely the latest step.  By seeking to lock up votes for

14    the Joint Plan now, the OpCo Debtors are committing themselves to a process that is not market

15    based and will not maximize value for the OpCo Debtors' estates.

16          5.      In sum, the restructuring transaction embodied in the OpCo Support Agreement is

17    a deliberate campaign by the Fertittas and the Controlling Lenders to benefit themselves at the

18    expense of OpCo's non-conflicted constituents.  As steward of a bankruptcy estate of an insolvent

19    debtor, the OpCo Debtors have fiduciary duties to all their creditors, not just to favored secured

20    creditors and certainly not just to equity holders, who rank a distant third.  As the replies to the

21    objections raised have demonstrated, the process has been primarily run by Existing Equity and

22    the OpCo and PropCo lenders for their benefit; and any purported arm's length negotiations

23    between those parties and the OpCo Debtors are a charade.  Such a process is inappropriate and

24    should not be sanctioned by this Court.

25                               **<u>BACKGROUND</u>**

26          6.      To avoid unnecessary repetition, the Committee hereby incorporates by reference

27    the background contained in paragraphs 11 through 16 of the *Committee's Objection to the*

28    *Debtors' Motion for Order Pursuant to 11 U.S.C. § 1121(d) Further Extending the Exclusive*

1   *Period Within Which Debtors May Solicit Acceptances to Join Plan of Reorganization* [Docket

2   No. 1282] and paragraphs 7 through 11 of the *Committee's Objection to the Debtors' Motion for*

3   *Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for*

4   *Substantially All of the Assets of Stations Casinos, Inc. and Certain "OpCo" Subsidiaries*

5   [Docket No. 1245].

6          7.     On April 19, 2010, the OpCo Debtors, the OpCo Lenders and the Fertittas

7   (individually and through FG) entered into the OpCo Support Agreement.  The OpCo Support

8   Agreement and the Term Sheet set forth the terms the joint bid of FG and the Controlling Lenders

9   for the OpCo Debtors' assets (the "Stalking Horse Bid") and the OpCo Lenders' agreement to,

10  among other things, (i) support the designation of such bid as the stalking horse bid for the

11  auction of certain OpCo assets and consent to the terms thereof, (ii) support and take actions in

12  furtherance of confirmation of a modified version of the Joint Plan that incorporates the Stalking

13  Horse Bid and other transactions contemplated in the Plan Motions, (iii) consent to continued use

14  of cash collateral (including use of cash collateral held by OpCo as part of the purchase

15  consideration) and (iv) vote in favor of the Plan after the Stalking Horse Bidders are deemed the

16  winning bidders at the auction.

17                          **OBJECTION**

18  **I.    THE OPCO DEBTORS' ENTRY INTO THE OPCO SUPPORT AGREEMENT IS**
19  **      UNNECESSARY**

20         8.     The OpCo Debtors' entry into the OpCo Support Agreement is wholly

21  unnecessary.  No matter what this Court decides with respect to the Motion, the non-debtor

22  parties are still bound to it.  Section 2.1(e) of the OpCo Support Agreement provides that, so long

23  as no other termination events have occurred (i.e., the other Plan Motions have been approved), in

24  the event that the Motion is not approved by this Court by the specified deadline, the OpCo

25  Support Agreement will terminate only with respect to the OpCo Debtors.  One such Plan Motion

26  is the Bidding Procedures Motion, which, as revised, provides for the stalking horse bid.  In other

27  words, even absent approval by this Court of the OpCo Debtors' entry into the OpCo Support

28

- 4 -

1    Agreement, the other parties to the OpCo Support Agreement would still be locked into

2    supporting the deal encapsulated in the Term Sheet.

3    **II.    THE OPCO SUPPORT AGREEMENT AND THE MOTION FAIL TO MEET THE**
     **STANDARDS UNDER SECTION 363(B) OF THE BANKRUPTCY CODE AND, IF**
4    **APPLICABLE, BANKRUPTCY RULE 9019.**

5          *A.    The Debtors Have Not Shown an Adequate Business Justification in Support of*
                *their Decision to Enter Into the OpCo Support Agreement.*
6

7          9.      The OpCo Support Agreement constitutes a use of estate property outside the

8    ordinary course of business, and thus would have to be approved under Bankruptcy Code section

9    363(b).   In order to obtain approval, the Debtors must provide "some articulated business

10   justification" for the transaction.  In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D.

11   Wash. 1997) (quoting In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir.1983)).   The Court must

12   assure that the OpCo Debtors' estates are receiving optimal value in the transaction.  Simantob v.

13   Claims Prosecutor, L.L.C. (In re Lahijani), 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005) ("The

14   court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under

15   the circumstances.").

16         10.     Moreover, the Court should apply a heightened standard in considering whether to

17   grant the Motion because it is a transaction between insiders of the Debtors.   Although courts

18   generally defer to a debtor's business judgment under Bankruptcy Code section 363(b), no such

19   deference is given when the transaction is one between insiders of the debtor, and such

20   transactions are reviewed with heightened scrutiny.  See In re Blixseth, 2010 WL 716198 at *9

21   (Bankr. D. Mont. 2010) (holding that where there is a proposed "sale to an entity with very close

22   ties to the Debtor and the property at issue...the business judgment rule simply does not apply");

23   In re Summit Global Logistics, Inc., 2008 WL 819934 at *11 (Bankr. D. N.J. 2008) (recognizing

24   the debtor's "burden to prove with heightened scrutiny the propriety of the proposed insider

25   transaction").  A debtor's officers and directors do not owe fiduciary duties to insiders, but rather

26   to the debtor's estate and creditors, and therefore they must act in a way that maximizes value for

27   the estate and its creditors and not in their own self interest or in the interests of insiders.

28

- 5 -

11.     Under the appropriate heightened standard, the OpCo Support Agreement in no way serves to benefit the OpCo Debtors' estates, and merely serves to further the interests of the Existing Equity and certain large creditors of PropCo and OpCo by creating a structure that siphons value to the Fertittas and the PropCo Lenders (including the Controlling Lenders) and does not provide a true test of the value of OpCo's estates through an auction process.  Whatever meager justifications the Debtors provide to justify the OpCo Debtors' entry into the OpCo Support Agreement fails under this heightened scrutiny.

12.     Throughout these chapter 11 cases the estates of the OpCo Debtors and PropCo have been treated as wholly separate and distinct from one another, complete with divergent interests and fiduciary duties.  However, these separate estates are nonetheless controlled by the same equity owners (the Fertittas) and their separate creditor bodies are dominated and controlled by the same Controlling Lenders.  These crossover interests are inherently fraught with conflict and have undermined the integrity of the Debtors' reorganization process.  While the Debtors keep touting the compromise they have reached, the mere fact that a group of insiders have hammered out a deal and carved out assets for their exclusive benefit raises serious questions about (i) the process, (ii) the price and (iii) the OpCo Debtors' ability to effectively exercise their fiduciary duties to maximize value of their estates for all constituents.

13.     In essence, the Fertittas negotiated with the Controlling Lenders until they reached the lowest price that the OpCo Steering Committee would agree to accept. The Fertittas and the Controlling Lenders share a common motivation to maximize value for themselves and each other as partners in New PropCo at the expense of the OpCo Debtors and other parties in interest by shielding themselves from the expense of bidding against others for the same package of assets they have arrogated to themselves.  The OpCo Support Agreement acts in tandem with the other insider agreements, each of which has this act of mischief as its centerpiece.  Approval of the OpCo Support Agreement at this time will provide the Existing Equity and the Controlling Lenders with the affirmative blessing of this Court for their transaction, and together with the other Plan Motions, will impermissibly dictate the result in these chapter 11 cases before the first dollar is bid at the auction.  By not approving these "compromises", the Court can ensure that the

true value of the OpCo estates can be determined through an open and fair auction process. For avoidance of doubt, the Committee has no qualms with the amount of the Stalking Horse Bid and the traditional bid protections provided, but instead disputes approval of a Stalking Horse Bid that creates a "heads I win, tails you lose" scenario and permits the Fertittas and the PropCo Lenders to take the Excluded Assets while depriving other bidders from having an opportunity to bid for such assets.

14.     Even under the deferential business judgment standard, it is impossible for the OpCo Debtors to show a valid justification to enter into the OpCo Support Agreement. The OpCo Support Agreement itself does not provide any consideration whatsoever for the OpCo Debtors. The Stalking Horse Bid, which the Committee has no issue with, is subject to approval pursuant to the Bidding Procedures and not this Motion. If the Bidding Procedures are approved, the OpCo Debtors will have their stalking horse, who will receive protections that are traditionally provided to a Stalking Horse Bid.

15.     Moreover, the OpCo Support Agreement appears to seek Court approval of the transfer of the Excluded Assets (even though that same relief is being sought in other Plan Motions). The OpCo Lenders untimely submitted a declaration and expert report by Alvarez & Marsal (the "A&M Report") opining on the value of a subset of the Excluded Assets.[3] The A&M Report does not address all of the Excluded Assets, and specifically excludes the customer lists and both classes of furniture, fixtures and equipment, among others. But even as a subset, the OpCo Lenders' purported expert assigned a value to such Excluded Assets between $34 and $63 million, yet the Debtors apparently contend that for $35 million OpCo is receiving sufficient value for all of the Excluded Assets. The only way to know whether OpCo is receiving fair value for all of its assets, including the Excluded Assets, is through a comprehensive auction process that will test their market value.

---

[3]     *See* A&M Report attached as Exhibit A to the Declaration of Robert Caruso in Support of the Administrative Agent for the Prepetition Lenders' Consolidated Response to the Objections to the Debtors' Motions to (I) Approve Bidding Procedures, (II) Approve Second Amendment to Amended & Restated Master Lease Compromise Agreement and (III) Extend Exclusivity [Docket No. 1320].

16.    In sum, the OpCo Support Agreement, as a further mechanism to keep the "Excluded Assets" out of the auction process, has the very real effect of depriving the OpCo Debtors of the full value of their assets and places significant roadblocks to deter third party purchasers from buying the assets.  If the Plan Motions are approved, the Existing Equity will have successfully locked in a bargain price for the "Excluded Assets" and foreclosed any possibility of the OpCo Debtors receiving greater value for their estates and an increased recovery to their secured and unsecured lenders.

17.    The Debtors seek to use Bankruptcy Rule 9019 as a basis for the approval of the OpCo Support Agreement.  No doubt the Debtors want to rely on Bankruptcy Rule 9019(a) to take advantage of the Rule's lenient "lowest point of reasonableness" standard.  This is improper.  Bankruptcy Rule 9019(a) applies only to compromises of legitimate claims and controversies; it is not to be used to sidestep requirements of the Bankruptcy Code.  Here, the Debtors fail to identify any existing controversies with the OpCo Lenders, the Fertittas, or FG.  That the Debtors have resolved in any advance potential objections to the Joint Plan, the disclosure statement, and the various Plan Motions does not mean that the Debtors can now use Bankruptcy Rule 9019 when they are requesting substantive relief governed by Bankruptcy Code section 363(b)

18.    But even under Bankruptcy Rule 9019(a), the Motion would have to be denied.  Under Bankruptcy Rule 9019(a), the Debtors bear the burden of persuading the Court "that the compromise is fair and equitable and should be approved."  In re A & C Props., 784 F.2d 1377, 1382 (9th Cir. 1986); see also In re Golden Empire Air Rescue, Inc., Case Nos. 05-18746-A-7, 05-19955-A-7, 2006 Bankr. LEXIS 2508, *2 (Bankr. E.D. Cal. Sept. 25, 2006).  Bankruptcy Rule 9019 does not permit debtors to present compromises to the Court for a "rubber-stamping" without a thorough explanation of the justification for each debtor entering into the compromise.  In re Planned Protective Servs., Inc., 130 B.R. 94, 96 (Bankr. C.D. Cal. 1991) ("Approval of a compromise under Bankruptcy Rule 9019 requires more than just a 'rubber-stamping.'").

19.    There is no apparent upside to the OpCo Debtors' limiting a vigorously contested bidding process where the Stalking Horse Bidders would have to pay a purchase price fashioned by competition rather than collusion.  Given this clear detriment to the value of the OpCo estates,

- 8 -

there is simply no justification for the OpCo Debtors to enter into the OpCo Support Agreement, as the OpCo Debtors cannot justify enriching either the Existing Equity or New PropCo or the Controlling Lenders at the expense of the OpCo estate.  The Debtors have failed to carry their burden of persuasion for the reasons set forth herein and above and they should not be allowed to enter into the OpCo Support Agreement.

        B.       *The Stalking Horse Bidders and the Controlling Lenders are Seeking to Use Section 363 and Rule 9019 as an End Run Around the Requirements for Plan Confirmation.*

        20.       Aside from the merits, this Court must deny the Motion because it seeks to sidestep the plan confirmation process.  A debtor may not use section 363(b) to "to sidestep the protection creditors have when it comes time to confirm a plan of reorganization."  In re Continental Air Lines, Inc., 780 F.2d 1223, 1228 (5th Cir. 1986) (providing further that "if a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless").  Courts consider several factors, including (1) has the debtor articulated a business justification for the request; (2) is it good business judgment for the debtor to enter into the proposed transaction; (3) will the proposed transaction further the diverse interests of the debtor, creditors and equity holders alike; (4) is the asset increasing or decreasing in value; (5) does the proposed transaction specify terms for adoption of the reorganization plan; and (6) will approval of the proposed transaction effectuate a de facto reorganization in such a "fundamental fashion" as to render creditors' rights under the other provisions of chapter 11 meaningless.[4]

        21.       All of the enumerated factors point to the OpCo Support Agreement superseding the plan confirmation process outlined in the Bankruptcy Code.  First, as discussed above, the business justification is wholly inadequate and it is in no way an exercise of good business judgment for the OpCo Debtors to enter into the OpCo Support Agreement.  Second, the proposed transactions only facilitate the interests of the Existing Equity and Controlling Lenders in their capacity as equity holders and creditors of PropCo, respectively, and not the OpCo Debtors nor their other creditors, including unsecured creditors.  Third, the Debtors have made no

---

[4]   In re Work Recovery, 202 B.R. 301, 304 (Bankr. D. Ariz. 1996).

1  showing that the OpCo Debtors' assets are decreasing in value that would necessitate the

2  shortened process outlined in the OpCo Support Agreement and the Plan Motions; in fact the

3  opposite is true.  Fourth, the OpCo Support Agreement specifies the terms of the Modified Joint

4  Plan by reference to the Term Sheet and within the document itself.  Finally, execution of the

5  OpCo Support Agreement by the Debtors will secure a binding and enforceable obligation by the

6  OpCo Lenders to vote in favor of the Modified Joint Plan, which pursuant to that structure would

7  likely be the only voting class for the purposes of plan confirmation.  For those reasons, the OpCo

8  Support Agreement effects an impermissible end run around the plan confirmation provisions of

9  the Bankruptcy Code and the creditor protections provided therein and must be denied.

10  **III.    THE TRANSACTIONS CONTEMPLATED BY THE OPCO SUPPORT**
   **AGREEMENT AND THE TERM SHEET ARE VIOLATIVE OF 203 NORTH**
11  **LASALLE**

12       22.    Other of the Committee's objections have demonstrated that the sale of the

13  Excluded Assets to New PropCo violates the absolute priority rule as set forth in Bank of

14  America Nat. Trust and Sav. Assn. v. 203 North Lasalle St. P'ship, 526 U.S.434 (1999).[5]  The

15  Committee fully incorporates their prior arguments herein.

16       23.    The Committee is compelled to note that the Debtors freely admit in their reply

17  concerning the MLCA, upon application of 203 North Lasalle, the consequence would be "that a

18  market test, likely in the form of an auction, would be required."[6]  That is *exactly* what is required

19  here, and what the implementation of the OpCo Support Agreement will expressly prevent

20  through the transfer of the Excluded Assets to PropCo without so much as a single third party bid

21  to determine the value of such assets.  Agreements that attempt to circumvent such a process,

22  including the OpCo Support Agreement, should and must be denied for that purpose.

23  ///

24  ///

25  _____

26  [5]    *See* Committee's Objection to the Debtors' Motion for Entry of Order Establishing Bidding Procedures and
   Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "OpCo"
27  Subsidiaries [Docket No. 1245] (the "Bid Procedures Objection").

   [6]    Debtors' Reply to Objections Re: Debtors' Motion for Approval of Second amended and Restated Master
28  Lease Compromise Agreement [Docket No. 1323] at 19.

IV.   **THE OPCO SUPPORT AGREEMENT VIOLATES SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE.**

24.    Section 1.1(c)(ii) of the OpCo Support Agreement states that each OpCo Lender that is party to the OpCo Support Agreement agrees, severally and not jointly, to "vote its claims … to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) such vote." Despite the Debtors' efforts to preempt the issue,[7] it is undeniable that the OpCo Support Agreement is intended to ensure that the Consenting Lenders are required to vote in favor of the modified Joint Plan.  Such a lockup of votes plainly violates sections 1125 and 1126 of the Bankruptcy Code.

25.    Post-petition solicitation of votes on a plan of reorganization, prior to approval of a disclosure statement, violates sections 1125 and 1126 of the Bankruptcy Code; it is of no consequence what other compromises are embodied in the OpCo Support Agreement.  Section 1125(b) of the Bankruptcy Code states that:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case . . . from a holder of a claim . . . unless, at the time of or before such solicitation, there is transmitted to such holder the plan . . ., and a written disclosure statement approved . . . by the court as containing adequate information.

The Debtors' disclosure statement has not yet been approved by this Court.  Accordingly, the question is whether or not Section 1.1(c)(ii) of the OpCo Support Agreement was a result of a "solicitation" prior to the approval of the Debtors' Disclosure Statement.  In <u>In re Trans Max Technologies, Inc.</u>, 349 B.R. 80 (Bankr. D. Nev. 2006), which concerned whether an improper solicitation occurred after the disclosure statement was approved, Judge Markell of this Bankruptcy Court held that a solicitation occurred where a communication "directly requested that creditors exercise their vote on a specific plan in a particular way." <u>Id</u>. at 86.  In this case, the Debtors are signatories to the OpCo Support Agreement, and the OpCo Support Agreement obligates the lender parties thereto to vote in favor of a specific plan.  The inclusion of this

---

[7]    Section 6 of the OpCo Support Agreement states that "This Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code."  If such a disclaimer could cure violations of Sections 1125 and 1126, those Bankruptcy Code sections would be rendered inoperative.

VG1 37165v1 05/03/10

1  specific provision – 1.1(c)(ii) – in the OpCo Support Agreement constitutes an improper

2  solicitation of votes by the Debtors prior to disclosure statement approval, creating an irrevocable

3  and legally enforceable obligation of certain lenders to vote in favor of the modified Joint Plan,

4  giving rise to a cause of action on behalf of the OpCo Lenders in the event of any breach of the

5  OpCo Support Agreement.

6        26.    Negotiation of the terms of a plan of reorganization with creditors may not

7  necessarily rise to the level of solicitation.  See In re Century Glove, Inc., 860 F.2d 94, 102 (3d

8  Cir. 1988) ("a party does not solicit acceptances when it presents a draft plan for the consideration

9  of another creditor, but does not request that creditor's vote.").  However, the OpCo Support

10 Agreement embodies more than mere negotiation of plan terms, as it effectively *casts* the vote of

11 the OpCo Lenders in favor of the modified Joint Plan.[8]  The OpCo Support Agreement thus

12 violates Sections 1125 and 1126 of the Bankruptcy Code.

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26
    ---
    [8]    Compare In re Texaco, Inc., 81 B.R. 813 (Bankr. S.D.N.Y. 1988), which found that a lock-up agreement did
27 not violate Section 1125(b) when it stated that the creditor will use their "best efforts to obtain confirmation of the
    Plan."  No such "best efforts" language is found in the OpCo Support Agreement, as instead, it is an affirmative
28 obligation of the OpCo Lenders that are signatories to the OpCo Support Agreement to vote in favor of the modified
    Joint Plan.

                                             - 12 -

1      Accordingly, for the foregoing reasons, the Committee respectfully requests that the Court

2  deny the Motion in its entirety.

3      DATED this 3rd day of May 2010.

4                                          Respectfully submitted,

5                                          **FRIED, FRANK, HARRIS,**
                                           **SHRIVER & JACOBSON LLP**

6
                                           By___*s/ Bonnie Steingart*_____
7                                              BRAD ERIC SCHELER (SBN BS-0397)
                                               BONNIE STEINGART (SBN BS-8004)
8                                              One New York Plaza
                                               New York, New York 10004
9                                              Telephone: (212) 859-8000

10
                                           **FOX ROTHSCHILD LLP**
11                                         BRETT A. AXELROD (SBN 5859)
                                           ANNE M. LORADITCH (SBN 8164)
12                                         3800 Howard Hughes Parkway, Suite 500
                                           Las Vegas, Nevada 89169
13                                         Telephone: (702) 262-6899

14                                                        -and-

15
                                           **QUINN EMANUEL URQUART**
16                                         **& SULLIVAN, LLP**
                                           ERIC D. WINSTON (SBN 202407)
17                                         JEANINE M. ZALDUENDO (SBN 243374)
                                           865 South Figueroa Street, 10th Floor
18                                         Los Angeles, California 90017
                                           Telephone:  (213) 443-3000
19

20                                         *Counsel for the Official Committee*
                                           *of Unsecured Creditors*
21

22

23

24

25

26

27

28

VG1 37165v1 05/03/10