Electronically Filed May 18, 2010

BRAD ERIC SCHELER (SBN BS-0397)
BONNIE STEINGART (SBN BS-8004)
**FRIED, FRANK, HARRIS,**
**SHRIVER & JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
Email: bonnie.steingart@friedfrank.com
       brad.eric.scheler@friedfrank.com
*Counsel for the Official Committee*
*of Unsecured Creditors*

BRETT A. AXELROD (SBN 5859)
ANNE M. LORADITCH (SBN 8164)
MICAELA RUSTIA (SBN 9676)
**FOX ROTHSCHILD LLP**[1]
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
       aloraditch@foxrothschild.com
       mrustia@foxrothschild.com
*[Proposed] Nevada Counsel for the Official*
*Committee of Unsecured Creditors*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Northern NV Acquisitions, LLC<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects FCP Voteco, LLC<br>☐ Affects Fertitta Partners LLC<br>☐ Affects FCP MezzCo Parent, LLC<br>☐ Affects FCP MezzCo Parent Sub, LLC<br>☐ Affects FCP MezzCo Borrower VII, LLC<br>☐ Affects FCP MezzCo Borrower VI, LLC<br>☐ Affects FCP MezzCo Borrower V, LLC<br>☐ Affects FCP MezzCo Borrower IV, LLC<br>☐ Affects FCP MezzCo Borrower III, LLC<br>☐ Affects FCP MezzCo Borrower II, LLC<br>☐ Affects FCP MezzCo Borrower I, LLC<br>☐ Affects FCP PropCo, LLC | Chapter 11<br><br>Case Nos. BK-N-09-52470-GWZ<br>through BK-N-09-52487-GWZ<br><br>Jointly Administered under<br>BK-N-09-52477-GWZ<br><br>**SECOND SUPPLEMENTAL OBJECTION OF THE COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTIONS TO APPROVE (I) REVISED SECOND AMENDED AND RESTATED LEASE COMPROMISE AGREEMENT, (II) BIDDING PROCEDURES, AND (III) OPCO PLAN SUPPORT AGREEMENT**<br><br>Hearing Date:  May 27, 2010<br>Hearing Time:  9:00 a.m.<br>Place:         300 Booth Street<br>               Reno, Nevada 89509 |

## **PRELIMINARY STATEMENT**

Pursuant to this Court's directive, the Committee took depositions of three individuals who

---

[1] On April 30, 2010, the Official Committee of Unsecured Creditors filed a Substitution of Attorneys and Notice of Change of Address (Nevada Counsel Only) [Docket No. 1355] to substitute Fox Rothschild LLP for Greenberg Traurig, LLP, as the Committee's Nevada counsel.

1

provided new testimony in replies to the Committee's objections. Those depositions confirmed the following:

First, given the fact that the same parties were on both sides of the negotiating table, it should come as no surprise that the transactions proposed by insiders, accepted by Deutsche Bank/JP Morgan, and subsequently signed off by the Debtors (through votes by such insiders) are tilted in favor of the Fertitta family. The marks of the Fertitta family's domination over the Debtors are apparent throughout the proposed transactions. The Second Compromise Amendment, Bidding Procedures and OpCo Support Agreement work together to transfer value to the Fertitta family and the PropCo Lenders to the detriment of the OpCo estate.

Second, the $35 million to be paid for "Excluded Assets" is a price that does not in any way maximize value of OpCo's assets and is evidently not related to value; indeed, the Debtors never valued any of the Excluded Assets. See infra at section IV. The price to be paid for only a portion of the Excluded Assets is at the low end of the range provided by Alvarez & Marsal ("A&M") to Deutsche Bank. This makes no sense, and is contrary to what is required by the Ninth Circuit Bankruptcy Appellate Panel. What would make sense, of course, is exposing the Excluded Assets to a market test in order to determine their value.

Further, this Court has already heard from the Debtors and the consenting OpCo Lenders that the $35 million to be paid was part of an alleged "global" settlement of disputes of ownership of Excluded Assets, resolution of the so-called Texas Station put, and the delivery of a stalking horse. Such arguments are meritless. The disputes over ownership are shams—PropCo is merely a "landlord" and owns none of the Excluded Assets. The Texas Station put "resolution" presents numerous red flags—there is no written agreement "resolving" it. No one can seem to remember what individuals negotiated on behalf of the Fertitta family member who owns the Texas Station Put. And the structure of the "resolution" is not arm's length. If the Fertittas win, the put liability (if any) goes to zero, but if someone other than the Fertittas win, $75 million is paid in cash to the Fertitta family without so much as a reference in passing to the fact that if Texas Station were placed in chapter 11, the "put" would in all likelihood be unenforceable. Most bizarre of all, under the "resolution," in certain circumstances OpCo would still be required to pay $75 million to the Texas

2

Station landlord even if the proposed plan is not confirmed, OpCo assets are not sold, and thus no "change of control" ever occurs that would trigger the put obligation.[2]

And there was another stalking horse bid—Boyd Gaming. Blackstone made it clear that it gave Fertitta Gaming a chance to outbid Boyd, but not the other way around. See Genereux Dep. Tr. 207:20–211:22. That certain of the OpCo Lenders were willing to take an insider stalking horse bid that does not pay them in full is well and good but for the fact that substantial value was left on the OpCo table to the benefit of the Fertittas, Deutsche Bank and JP Morgan when wearing their PropCo hats but to the detriment of OpCo's estate. The OpCo Lenders have no duty to OpCo's estate or its unsecured creditors and have sought via the Second Compromise Amendment, the Bidding Procedures and the OpCo Support Agreement to create lock-ups and poison pills that will chill bidding and amount to a cost free conveyance of OpCo assets to Fertitta Gaming, Deutsche Bank and JP Morgan.[3]

Lastly, that the OpCo Support Agreement will continue as between the non-OpCo parties whether or not approved by this Court violates sections 1125 and 1126 of the Bankruptcy Code, and no evidence has been offered as to why OpCo needs to enter into this agreement (nor has evidence of any negotiations by OpCo of the OpCo Support Agreement been produced).

There can be no question that the Debtors and their lenders have devised a complicated structure through multiple agreements that purport to resolve these cases before the first dollar has been bid at auction and the first vote cast on the plan, and have designed the agreements to rise and fall together in order to benefit insiders and bind the hands of all parties, including this Court. At this point in time, the Second Compromise Amendment and OpCo Support Agreement need not be reached, and this Court can and should allow these cases to progress through implementing bidding procedures that will provide for an expedient and trustworthy auction process. As the Court stated on May 5, 2010, "constraints are being imposed by those who want to have this plan together with the motions be approved. If they want them to be approved, they should probably demonstrate some

---

[2] Second Compromise Amendment, ¶ M(x); Restructuring Term Sheet attached as Exhibit D to OpCo Support Agreement at the third bullet point under the term "Texas Station Put".

[3] See Genereux Dep. Tr. 42:19-25 (stating that the OpCo Lenders sought to resolve the Texas Station Put as part of "an overall transaction that maximized the overall recovery to the OpCo senior lenders").

3

flexibility." May 4 Hr'g Tr. 42:8-16.

I.  **The Second Compromise Amendment Fails to Protect and is Perilous to OpCo**

1.  The Second Compromise Amendment incorporates by reference the PropCo Plan Support Agreement, the OpCo Support Agreement, the Bidding Procedures and the unseen Texas Put Agreement. It does so in a way that is perilous to the stability and well being of OpCo. In essence, OpCo's obligation to provide wide ranging transition services, transfer significant assets and become liable for a $75 million put exposure is made hostage to Fertitta Gaming, Deutsche Bank and JP Morgan's (i) deal to gain ownership of NewCo and (ii) become the stalking horse to purchase the assets of OpCo.

2.  There is no arguable relationship to OpCo or to the payment of rent of numerous trigger events that obligate OpCo to provide transition services to PropCo. See Exhibit C to Second Compromise Amendment. Thus, transition services are triggered by any termination event in the PropCo Plan Support Agreement (OpCo is not a party to this agreement nor is PropCo). There are twenty-five: six have already occurred (v, vi, vii, viii, ix, xiv), so if the Court approves the Second Compromise Amendment, the transition services have already been triggered; four relate exclusively to Fertitta Gaming and/or PropCo performing their obligations under the PropCo Plan Support Agreement (ii, iii, xvii, xix); two can be triggered by the mortgage lenders without regard to any act by OpCo (xxiv, xxv); one is triggered by principals of Fertitta Gaming revoking their equity commitment (xviii); two are tied to deadlines for plan confirmation and effectiveness (x, xi). There is no justification whatsoever for unilateral acts of Fertitta Gaming and its principals and/or the PropCo mortgage lenders, Deutsche Bank and JP Morgan, to cause OpCo to provide transition services to PropCo. Who was protecting OpCo – apparently no one.

3.  The same analysis and troubling conclusion pertains when assessing the asset transfer events. Why should OpCo be forced to sell the list of Excluded Assets if Frank and Lorenzo Fertitta are not successful bidders. Or in the event that the OpCo Lenders fail to vote in favor of the Plan and the Plan is not confirmed. The transfer of OpCo assets to PropCo is a Plan and confirmation issue and should be subject to creditor vote. In agreeing to this provision, who was protecting OpCo and insuring that the value of its assets are preserved for OpCo's creditors?

4. Last, but of equal stature, is the exposure to OpCo created by the alleged "resolution" to the Texas Station Put. The fact that, under certain circumstances, OpCo can be required to pay the Fertitta's family members $75 million even if there is no change of control that triggers the put is the final insult. The same problematic provision is incorporated in the Restructuring Term Sheet in the OpCo Support Agreement. This, just like the economically irrational Bidding Procedures, is deliberate and undermines any purported claims that these agreements were in OpCo's interest and protect OpCo's estate.

5. The provisions discussed above require rejection of this alleged Rule 9019 compromise and section 363 sale. They are, standing alone, an abandonment of the OpCo estate by those who should be protecting it. The facts discussed *infra* in section IV, showing the failure to do any valuation of the Excluded Assets and the pernicious effect of both the Excluded Assets and the bogus purchase price of $35 million, is simply the coup de grace.

## II. The Bidding Procedures Motion is Incomplete and the Procedures Themselves are Unfair.

6. In the absence of a Purchase and Sale Agreement, the Bidding Procedures Motion is incomplete and not ripe for adjudication by this Court. Bidders seeking to buy all of the OpCo Assets must submit a blacklined copy of their purchase agreement marked to show changes to this yet non-existent Purchase and Sale Agreement. Bidding Procedures, § N.1(c). The Purchase and Sale Agreement was not available (i) on April 19, when the Motion was filed, (ii) during initial discovery from April 25 – May 3, (iii) at the May 4-5 Hearing, (iv) during supplementary discovery from May 10-14 and (v) prior to the May 18 deadline for the filing of this Supplemental Objection. This Court cannot approve the Bidding Procedures without this document, which will be the subject of review, commentary, discovery and controversy like all other proposed agreements have been. The Bidding Procedures Motion should be denied on this basis alone.

7. The Bidding Procedures themselves are unfair in three important ways: (i) though the Debtors admit that an "independent" arbiter is essential in light of the insider status of the stalking horse, many procedures still leave the Debtors with unfettered discretion, (ii) Dr. Nave is not "independent" in a way that will ensure both the appearance and the fact of fairness such that bidders

5

would be willing to participate (see infra section III) and (iii) the Excluded Assets require competing bidders to pay substantially more for fewer assets.

8.  At the hearing held on May 5, 2010, counsel to the Debtors proposed as a concession that the final bid rounds of the auction occur in front of the Court. May 5 Hr'g Tr. 55:22–56:4. This concession does not ensure that the Bidding Procedures will provide a market test or make the bidding process fairer to competing bidders as the structure of the bidding process gives too much discretion to the OpCo Debtors to exclude and disadvantage other potential bidders prior to the final bid rounds before the Court. There are numerous provisions in the Bidding Procedures that give the OpCo Debtors discretion and thus authority to ensure that Fertitta Gaming and the PropCo Lenders are able to purchase the "OpCo Properties."[4] See illustrative chart attached as Exhibit D to the Declaration of Brett Axelrod in Support of this Second Supplemental Objection (the "Axelrod Declaration"), filed contemporaneously herewith. That is not surprising in that Fertitta Gaming's interests were center stage during the formation of the auction procedures.[5]

9.  The Debtors have structured the Bidding Procedures so that "NewCo" (Fertitta Gaming and the PropCo Lenders) is bidding for the OpCo Assets and the Excluded Assets while other bidders who outbid NewCo will receive only the OpCo Assets. NewCo, whenever it is formed, is supposed to submit a stalking horse bid of $772 million for all of the assets of OpCo, including the Excluded Assets. Any third party that wishes to enter a competing bid for the assets will need to bid at least $17.5 million more than the stalking horse bid, or $789.5 million, yet it will not receive the Excluded Assets.[6] See Bidding Procedures at ¶ N.1(c). This structure causes one to

---

[4]  The term "OpCo Properties" means substantially all of the assets of the OpCo Debtors and its non-debtor subsidiaries set forth on Schedule 1 annexed to the Bidding Procedures, minus assets excluded pursuant to section A(2) of the Bidding Procedures.

[5]  See Email from Paul S. Aronzon to Benjamin Tisdell, Daniel Aronson, et al., dated Apr. 15, 2010, Ex. 14 admitted at hearing held on May 5, 2010, Bates No. SCIML017250-57 ("Guys we cant have [the period to submit letters of intent] take 75 plus days, what is going on. Yesterday it was 45 day, what is going on. Cut this down why do we need an loi."); Email from Paul S. Aronzon to Sandy Qusba dated Jan. 19, 2010, Ex. 23 admitted at hearing held on May 5, 2010, Bates No. LAZARD 00005480-81 ("As you know FG is uniquely suited to help your group preserve value with the Texas put, the JV's, the Native Amer. Gaming opportunities, preserving our collateral position for any carry back paper and with the avoidance of excess transition costs."). Dr. Nave's deposition testimony confirms this as well. See infra section III.

[6]  Mr. Genereux suggested at his deposition that revisions to the Bidding Procedures will be filed that will give competing bidders "credit for the $35 million that gets transferred." Genereux Dep. Tr. 82:1—83:24. While revised Bidding Procedures have not yet been filed, it will take more than a mere $35 million reduction to cure the problem.

6

question, as the Court did at the hearing on May 5, 2010, why any third party would outbid Fertitta Gaming and the PropCo Lenders if it is not going to get the same bundle of assets in return. May 5 Hr'g Tr. 136:8-19.

10. But it is not only that a competing bidder will receive assets worth $35 million less than the assets going to the stalking horse. The pricing of the Excluded Assets has a more pernicious effect than that. No one, including the Debtors, has performed a valuation of all of the Excluded Assets[7] or concluded that $35 million is a reasonable or fair price for the Excluded Assets.[8] In fact, when asked whether $35 million is a reasonable price, representatives of the Debtors and the OpCo Lenders have repeatedly stated it is part of a global compromise rather than a price selected to reflect the value of the Excluded Assets.[9] These statements signify that the $35 million purchase price was acceptable to OpCo only because of the alleged value OpCo is receiving elsewhere, and is an admission that $35 million is not a reasonable price for the Excluded Assets. Given the A&M range of $34.4-$63 million for only a portion of the Excluded Assets, the unfairness of this transaction is manifest.

11. The Debtors have advertised the lack of the break-up fee for Fertitta Gaming and the PropCo Lenders as a favorable aspect of the stalking horse bid. May 5 Hr'g Tr. 60:14-21. This is a red herring. NewCo is made up of insiders. The Debtors do not provide any evidence that insiders are entitled to break-up fees, which is unsurprising because break-up fees are supposed to be compensate for opportunity costs associated with investing time and setting aside capital to pursue a transaction. Here, Fertitta Gaming has not done either given its familiarity with OpCo and its failure to provide any committed financing. Attached as Exhibits J, K and L to the Axelrod Declaration are orders entered in three recent cases approving bidding procedures with insiders as stalking horse bidders; none provided for a break-up fee. It is also typical for stalking horse bidders to forgo break-up fees in situations where there is competition among potential stalking horse bidders as was the

---

[7] See Transcript of April 29, 2010 Deposition of Daniel Aronson ("Aronson Dep. Tr.") 27:23-28:7; 96:12-16; Friel Dep. Tr. 62:15-21; 63:6-23; 64:2-21; 71:3–72:2; 72:19–73:2; Richard Haskins Deposition Transcript ("Haskins Dep. Tr.") 117:15-24; 120:22–121:4; 123:3-11; 128:25–130:15 (Apr. 27, 2010); May 5 Hr'g Tr. 182:1–184:17.
[8] Aronson Dep. Tr. 97:9-98:9; May 5 Hr'g Tr. 203:16-19; 204:3-7; Genereux Dep. Tr. 14:4-19; 18:6-20.
[9] May 5 Hr'g Tr. 203:18—204:7; Aronson Dep. Tr. 96:6-16; Friel Dep. Tr. 48:22–49:6; Haskins Dep. Tr. 82:2-11; 83:25–84:9; 156:19–157:1; Genereux Dep. Tr. 18:21–19:12.

7

case in the order attached to the Axelrod Declaration as <u>Exhibit M</u>.

### III. Dr. Nave Should Not Be Considered an Independent Director For Purposes of Cleansing These Transactions

12.    In an attempt to provide a semblance of impartiality while ensuring that the deal can be carried out, the Debtors have dubbed Dr. Nave as the "independent director" to approve the agreements currently under consideration and for purposes of the Bidding Procedures. Counsel to the Debtors noted at the hearing on May 5, 2010 that when directors who have an interest in a transaction participate in its approval, the company "may lose the benefit of the business judgment rule, but you've got the ability to vote and the transaction is simply subject to a higher level of scrutiny. You get out from under the business judgment rule and you look at total fairness." May 5 Hr'g Tr. 20:25–21:15. Neither the facts nor Dr. Nave's testimony satisfy this standard.

13.    Dr. Nave has had a limited role in the sale process. For instance, Dr. Nave was not involved in negotiating the stalking horse bid. Nave Dep. Tr. 64:21-23. Dr. Nave did not know when Fertitta Gaming was formed (<u>Id.</u> at 113:23-25) even though, around March 24, 2010, Debtors filed an 8-K with the SEC that the Fertittas' newly-formed Fertitta Gaming would be 50% owner of NewCo. Until the time the Bidding Procedures Motion was filed in early April, Dr. Nave believed that Boyd was the stalking horse bidder. <u>Id.</u> at 114:8–115:8. The fact that Dr. Nave did not know about Fertitta Gaming's formation and involvement in NewCo prior to early April is willful ignorance. In fact, Dr. Nave was not sure who at OpCo negotiated the stalking horse bid: "I assume the stalking horse bid was negotiated between the Opco Lenders and the New PropCo Fertitta Gaming Partnership, you know, that they negotiated that. I had nothing to do with that." <u>Id.</u> at 64:24–65:4; <u>see also</u> <u>id.</u> at 169:6-15 ("I wasn't involved in the process of picking the stalking horse bidder. I – it was my understanding, you know, that they had negotiated and been worked with and got what they thought was their best deal from Boyd Gaming for some period of time."). According to Dr. Nave, the OpCo Lenders negotiated the stalking horse bid and Dr. Nave was not aware of any other offers other than from Boyd and Fertitta Gaming. <u>Id.</u> at 135:10-19. Dr. Nave believes that the OpCo Lenders "got the best deal they could from Boyd" then approached NewCo and said "Top it," which NewCo did. <u>Id.</u> at 170:8-171:14. Dr. Nave apparently did not question the failure to seek a

8

topping bid from Boyd.

14. With respect to the alleged dispute as to whether OpCo or PropCo owns certain of the Excluded Assets, Dr. Nave was instructed by his counsel not to explain his understanding of the dispute (Id. at 79:21–80:1) and no representative of PropCo ever advised Dr. Nave as to its position with regard to the Excluded Assets. Id. at 164:9-13. Dr. Nave did not attend any of the negotiations regarding the Excluded Assets between the OpCo Lenders and the PropCo Lenders. Id. at 157:24-158:11. Dr. Nave did not negotiate for what was included on the Excluded Assets. Instead, the Excluded Assets "was a negotiation between the Opco Lenders and the PropCo Lenders, and that all the Stations Casino did was sort of facilitate that. And I think that was probably Rich Haskins." Id. at 73:10-24; 77:6-16 ("I'm very satisfied with the way this was handled – a negotiated bid between the two parties that owned the assets, the Opco Lenders and the PropCo Lenders"); 151:2-8; 153:22-25. But OpCo owns OpCo assets – not the OpCo Lenders – not yet at least.

15. Dr. Nave also understands that closing of the sale of OpCo is conditioned on confirmation of the Plan (Id. at 144:10-15) and that he would get a release if the plan is confirmed. Id. at 144:7-9. It is problematic that Dr. Nave does not believe there is a conflict in his role as one of the parties who will make a recommendation to the Court as to which bid to accept and the fact that the sale is tied to a plan that will give him a release if the plan is confirmed. Id. at 145:21-146:1. In any event, Dr. Nave expressed that he is not concerned about the releases in the Joint Plan. Id. at 72:21-24. If the releases are not critical to Dr. Nave, they should be eliminated.

16. Dr. Nave has always voted with the Fertittas in connection OpCo board meetings. May 5 Hr'g Tr. 123:5-12. Dr. Nave apparently did not object to OpCo's failure to value the Excluded Assets or to the economically irrational bidding procedures or to the payment to Frank Fertitta's relatives of $75 million on the Texas put even in the absence of a change of control. Dr. Nave did not seek to prevent OpCo from entering into the Second Compromise Amendment where OpCo become obliged to give PropCo transition services based merely on Frank Fertitta's decision to withdraw his equity commitment to NewCo or the Fertittta's or DB's or JP Morgan's unilateral dissatisfaction with definitive documentation concerning their co-investment in NewCo. Whether

these derelictions are the result of lack of information or misinformation or bias is irrelevant. The only rational conclusion is that Dr. Nave is not "independent" enough to protect OpCo where the Fertittas are involved, the interest of OpCo's unsecured creditors, or to be the arbiter of the auction process

### IV. The Excluded Assets Are Worth Far More Than $35 Millions

17. The Debtors have not conducted any valuation for all of the Excluded Assets. This alone compels denial of the motions. See In re Fitzgerald, No. 09-1314, 2010 WL 1655861, at *7-8 (B.A.P. 9th Cir., Apr. 21, 2010) (faulting the chapter 7 trustee for having "offered no analysis whatsoever regarding the value" of the assets being sold in an auction and stating that the bankruptcy court has the "ultimate responsibility to assure that optimal value was being realized by the estate.").

18. The only "evidence" of value is the A&M Report, which only provides an "indicative value" of a portion of the Excluded Assets, i.e. information technology, some of the Debtors' trademarks, and the land associated with the Wild Wild West assemblage, which "indicative value" has never been questioned or verified by the OpCo board of directors. Nave Dep. Tr. 184:11—186:15. The bottom of the A&M range is $34.4 million. Given that the A&M report addresses only a portion of the Excluded Assets, the fair market value of the Excluded Assets to third parties is no doubt substantially higher than $35 million.

REDACTED

19. Let us consider some of the Excluded Assets that A&M did not value. Consider customer lists, which are considered a part of "the crown jewels for the casino operations," which resulted in such information not being shared with Boyd. Genereux Dep. Tr. 183: 8-11. For example, when the SCI acquired the Fiesta Rancho casino in 2001, the value attributable to that customer list was $5 million.[11] Fiesta Rancho is not a particularly large casino; if the value of its customer list in 2001 was $5 million, the value of the primary customer databases for Red Rock, Palace Station, Texas Station, and Sunset Station are likely significantly higher. Further, customer

---

[10] REDACTED

[11] See Station Casinos 10-K for 2005, at 60 (an excerpt is attached to Axelrod Declaration as Exhibit P.

10

1  lists are especially significant to the Committee because, pursuant to 11 U.S.C. § 552, the value associated with any customers added to the customer database postpetition is unencumbered value available to general unsecured creditors. However, no one valued the customer lists (including the primary customer database that is being transferred) even though A&M valued other items initially referenced in the original Master Lease Compromise Agreement. Caruso Dep. Tr. 53:3-10.

20. The same is true with respect to another unvalued category—patented player tracking systems. If the motions are approved, SCI will license to PropCo patented, proprietary player tracking systems that SCI has developed over years at significant costs.[12] A&M (who made no attempt to value the patents) chose to disregard OpCo's assessment and instead placed no value on such licenses on the theory that the function of player tracking can be accomplished by off the shelf products. Caruso Dep. Tr. 106:18-107:2. This is wrong – as Mr. Kreeger testified, SCI's player tracking systems are custom-made systems modified from "off the shelf" systems and are reliant on SCI's patents.[13] Moreover, SCI's player tracking system is far more detailed, and provides far more valuable information, than any off the shelf system.[14] What a third party competitor in the Las Vegas locals market would pay to obtain licenses to SCI's patents would surely provide a better indication of the true value.

21. Then there are furniture, fixtures and equipment ("FF&E") in SCI's corporate headquarters. Although A&M "considered" corporate FF&E in the scope of its engagement with the OpCo Lenders, a valuation of these assets was not conducted. Caruso Dep. Tr. 63:5-6. Nonetheless, Mr. Caruso has testified to the fact that the book value of the Corporate FF&E was $10 million. Caruso Dep. Tr. 63:21-22. Mr. Friel has corroborated that value in his own testimony, noting that the book value for the corporate FF&E described in category 13 of Annex 1 of the Second Compromise Amendment is somewhere between $10 and $12 million. Friel Dep. Tr. 72:13-18. This value is being given away.

---

[12] See Deposition of Scott Kreeger (May 14, 2010) at 80:3 (surmising that it would cost "close to about 1.5 million" to replace the player tracking software for one property"); 82:20-22 (stating that "we've had a casino management system -- a proprietary casino management system in place for roughly 12 years."); 102:15-17 (admitting that there are ongoing efforts by Stations now to further develop the player tracking software.")
[13] Kreeger Dep. Tr. 102:15-103.7; 163:13-164:22
[14] A document produced by Alvarez & Marsal, Bates A&M0003556, titled "Conversation with Scott Kreeger on 2.25.10," states that Station Casinos' technology allows it to track players better than competitors.

11

22. The few assets for which A&M provided "indicative values" have a purported value range between $34.4 million and $63 million. As will be demonstrated at the May 27, 2010 hearing, A&M's product is woefully inadequate, but a few examples are worth noting now. With respect to OpCo's information technology systems, A&M was aware of a valuation of such assets that had a range of $39.5 million to $54.7 million, but A&M instead chose a valuation methodology – the so-called OpCo Stand-Up Scenario – that has no support in any literature and is internally inconsistent. In the case of the Wild Wild West assemblage, which A&M opined has a value of approximately $1.5 million an acre, A&M ignored a sale of gaming entitled real estate just within blocks of the Wild Wild West assemblage that sold for over $11 million an acre.[15] And in the case of trademarks, A&M's valuation methodology is dependent upon grossly flawed assumptions and "comparable" transactions (a small casino in Argentina and a casino in Hammond, Indiana) that are not remotely comparable. A&M even concluded that the trademark "Viva Las Vegas," which SCI owns for purposes of operating a hotel, has no value. In light of the Elvis Presley song and movie of the same name, and in light of the 14-year old "Viva Las Vegas" rockabilly convention that takes place in Las Vegas and the new "Viva Elvis" show at the Aria, the notion that there is no value whatsoever to the trademark is ludicrous.

## V. The Excluded Assets Should Not Be Excluded from the Sale Process on the Basis of the Purported Ownership Disputes

23. Since filing their motions to approve the Bidding Procedures and the Second Compromise Amendment on April 7, 2010, the Debtors have made a number of conflicting statements regarding the ownership of the Excluded Assets. On the one hand, the Debtors have stated that the Excluded Assets are owned only by OpCo entities, with the majority owned by Station Casinos, Inc. itself.[16] This is entirely consistent with the Debtors' schedules of assets and

---

[15] 2.15 acres was recently sold for $25 million. See Liz Benston, "Pricey land buy on Las Vegas Strip a bit of surprise," Las Vegas Sun, Feb. 8, 2010 (attached to the Axelrod Declaration at Exhibit T).

[16] Joint Motion of Station Casinos, Inc. and FCP PropCo LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3), 365(d)(3), 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement, [Docket No. 1179] at ¶ 12; Debtors' Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "OpCo" Subsidiaries, [Docket No. 1175] at ¶ 6; Declaration of Thomas M. Friel in Support of Debtors' Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "OpCo" Subsidiaries, [Docket No. 1176] at ¶ 6; Friel Dep. Tr. 52:5-24; A&M Presentation Related to Station Casinos Inc., pp. 13, 17.

liabilities and numerous other public statements, including judicial admissions in pleadings filed in other courts. However, the Debtors and their representatives have also made a number of statements—without submitting any evidentiary support—suggesting there is a dispute between OpCo and PropCo regarding ownership and rights to certain of the Excluded Assets, including trademarks (Aronson Dep. Tr. 66:15-67:16; 118:17-119:14), patents (Aronson Dep. Tr. 120:23-121:2), other intellectual property (Aronson Dep. Tr. 121:6-10), the database of primary customers (Aronson Dep. Tr.121:21-122:1), business information (Aronson Dep. Tr.121:21-122:1), corporate FF&E (Aronson Dep. Tr. 126:1-9), and certain IT assets.[17]

24.  The Debtors offer these alleged disputes as a basis for the conveying the Excluded Assets from OpCo to PropCo without including them in the auction. Aronson Dep. Tr. 62:4-63:7 However, the Debtors' timing in raising these disputes and the lack of evidentiary support, suggests that they are nothing more than a pretense for the transfer of the Excluded Assets from OpCo to PropCo. No dispute with respect to the ownership of the Excluded Assets was mentioned by the Debtors or their representatives prior to depositions conducted in connection with the Debtors' pending motions. The Debtors never mentioned these disputes previously in any filings in these cases (including the motions to approve the Second Compromise Amendment and the Bidding Procedures), their schedules of assets and liabilities, or any public filings. No proofs of claim with respect to these disputes have been filed either. PropCo's independent director was not aware of any such disputes prior to the filing of the Second Compromise Motion on April 7, 2010. Robert Kors Dep. Tr. 62:2-4 (April 30, 2010). The Debtors delayed disclosure of these disputes until their representatives were asked about ownership of the Excluded Assets in their depositions. See Haskins Dep. Tr. 97:3–97:7.

## VI. The Texas Station Put "Resolution" is Detrimental to the OpCo Estate

25.  The Second Compromise Amendment contemplates the settlement of an alleged put right (the "Texas Station Put") arising under the Ground Lease (as amended, the "Texas Lease") for the Texas Station property. The current parties under the Texas Lease are Texas Station, LLC

---

[17] Debtors' Reply to Objections re: Debtors' Motion for Approval of Second Amended and Restated Master Lease Compromise Agreement (the "Debtors' Reply"), [Docket No. 1323] at pp. 5-11; Friel Dep. Tr. 50:3—51:11; Haskins Dep. Tr. 23:24—24:19; 84:10—85:23; May 5 Hr'g Tr. 35:17—36:13.

13

("Texas Station"), a non-debtor subsidiary of SCI, and Texas Gambling Hall & Hotel, Inc. (the "Landlord"), an entity owned by Frank and Lorenzo Fertitta's mother. The Debtors and the OpCo Lenders each claim that the Landlord initially demanded $115 million to settle the Texas Station Put but that as part of the "overall deal" the Landlord agreed to fix the obligation at $75 million if a third party is selected as the successful bidder over the stalking horse bid in the auction for OpCo's assets.[18]

26. The Debtors have provided no independent evidence to verify this. The Debtors have not filed or shared with the Committee any writing setting forth the terms of the settlement and have failed to describe its terms beyond the mere settlement amount. Mr. Genereux admitted in his deposition that he has not seen any writing that reflects the agreement of the Landlord to accept the $75 million settlement amount. See Genereux Dep. Tr. 49:14-22. The Landlord is not a signatory to the Second Compromise Amendment or the OpCo Support Agreement and is therefore not bound by any provisions in these agreements related to the Texas Station Put. There are no e-mails or letters evidencing negotiations. Indeed, the Debtors' own financial advisors could not remember who negotiated on behalf of the Landlord.[19]

27. In purportedly agreeing to settle the Texas Station Put for $75 million, the Debtors and the OpCo Lenders failed to consider that the value of the Texas Station Put could be $0 if Texas Station were to file for bankruptcy. See Genereux Dep. Tr. 43:24-44:4, 65:7—66:18. Texas Station could then seek to avoid the Texas Station Put in its entirety as an anti-assignment clause under section 365(f) of the Bankruptcy Code. It is a fundamental tenet of bankruptcy law that a debtor may assign a lease despite contractual anti-assignment clauses under section 365(f)(1) of the Bankruptcy Code, which states, in pertinent part, that "notwithstanding a provision in an executory contract or unexpired lease of the debtor or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C.

---

[18] See Declaration of Michael Genereux in Support of the Administrative Agent for the Prepetition Lenders' Consolidated Response to the Objections to the Debtors' Motions to (i) Approve Bidding Procedures, (ii) Approve Second Amendment to Amended & Restated Master Lease Compromise Agreement and (iii) Extend Exclusivity, [Docket No. 1319] at ¶ 25; Debtors' Reply at 15 [Docket No. 1323].

[19] See also May 5 Hr'g Tr. 219:8—219:10 (Testimony of Dan Aronson) (When asked whom he met with that represented Mrs. Fertitta, Mr. Aronson stated "I don't recall their names.").

§365(f)(1).

28. Under Ninth Circuit law, provisions such as the Texas Station put are invalid anti-assignment clauses. In re Crow Winthrop Operating P'ship, 241 F.3d 1121, 1124 (9th Cir. 2001) (invalidating a provision of a settlement agreement that provided for the termination of certain rights under a settlement agreement upon a change in ownership of a parcel of real property on the basis that such provision constituted a de facto anti-assignment provision).[20]

29. Furthermore, as set forth in the Second Compromise Amendment and the OpCo Support Agreement, the Texas Station Put settlement evidences a troublesome disregard for preserving the integrity of OpCo's assets. For example, if the Fertittas win the auction but their Plan is not confirmed (a distinct possibility) and they thus fail to close on the bid for OpCo's assets, OpCo would still be obligated to sell the Excluded Assets to NewCo for $35 million and would still be obligated for a $75 million liability under the Texas Station Put settlement without necessarily having the benefit of selling OpCo's assets and without there actually being a change of control.[21] It is unconscionable that OpCo could be required to pay $75 million to settle the Texas Station Put even when a "change of control" has not occurred. This settlement may have been acceptable to the OpCo Lenders because it will allow them to receive a recovery that they view as adequate. However, the parties that are the most affected by the prospect of additional recovery (*i.e.*, OpCo's unsecured creditors) were not at the table or consulted when this settlement was agreed upon.

---

[20] See also In re Standor Jewelers West, Inc., 129 B.R. 200, 203 (9th Cir. BAP 1991) (holding that a lease provision requiring lessee to pay landlord 75% of appreciation in value of the lease as a condition to the landlord's consent to assignment was an unenforceable de facto anti-assignment clause); In re Rickel Home Centers, Inc., 240 B.R. 826 (D. Del. 1999) (holding that certain use restrictions that served to prevent the debtor from assigning its leases are unenforceable de facto anti-assignment provisions); In re Jamesway Corp., 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996) (invalidating a clause conditioning assignment of a lease upon payment to landlord of some portion of profit realized from the assignment because such clause restricted the debtor's ability to "realize the intrinsic value of the lease"); In re Howe, 78 B.R. 226, 228 (D.S.D. 1987) (holding invalid a provision conditioning consent to assignment on the debtor's payment of a 4% assumption fee); In re Bradlees Stores, Inc., (Case No. 00-16035) (BRL) (Bankr. S.D.N.Y. February 6, 2001), [Docket No. 230], at 26 (invalidating a master lease provision that allowed the landlord to reallocate rent among fifteen leased properties because it was "likely to have a materially negative impact on the marketability").

[21] Declaration of Richard J. Haskins in Support of Debtors': (A) Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "Opco" Subsidiaries; and (B) Reply to Objections re: Debtors' Motion for Approval of Second Amended and Restated Master Lease Compromise Agreement, [Docket No. 1325], at ¶ 16; Genereux Dep. Tr. 56:17–57:7; 65:7–65:18.

DATED this 18th day of May 2010.

        **FRIED, FRANK, HARRIS,**
        **SHRIVER & JACOBSON LLP**

By   *s/ Bonnie Steingart*
    BRAD ERIC SCHELER (SBN BS-0397)
    BONNIE STEINGART (SBN BS-8004)
    One New York Plaza
    New York, New York 10004
    Telephone: (212) 859-8000

**FOX ROTHSCHILD LLP**
BRETT A. AXELROD (SBN 5859)
ANNE M. LORADITCH (SBN 8164)
MICAELA RUSTIA (SBN 9676)
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899

-and-

**QUINN EMANUEL URQUART
& SULLIVAN, LLP**
ERIC D. WINSTON (SBN 202407)
JEANINE M. ZALDUENDO (SBN 243374)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000

*Counsel for the Official Committee
of Unsecured Creditors*

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

7692913