Isaac M. Pachulski (CA 62337)
Eric D. Goldberg (CA 157544)
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email:  ipachulski@stutman.com
        egoldberg@stutman.com

Sallie B. Armstrong (NV SBN 1243)
DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Telephone:  (775) 329-5900
Facsimile:   (775) 786-5443
Email:   sarmstrong@downeybrand.com

# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Northern NV Acquisitions, LLC<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects FCP Voteco, LLC<br>☐ Affects Fertitta Partners LLC<br>☐ Affects FCP MezzCo Parent, LLC<br>☐ Affects FCP MezzCo Parent Sub, LLC<br>☐ Affects FCP MezzCo Borrower VII, LLC<br>☐ Affects FCP MezzCo Borrower VI, LLC<br>☐ Affects FCP MezzCo Borrower V, LLC<br>☐ Affects FCP MezzCo Borrower IV, LLC<br>☐ Affects FCP MezzCo Borrower III, LLC<br>☐ Affects FCP MezzCo Borrower II, LLC<br>☐ Affects FCP MezzCo Borrower I, LLC<br>☐ Affects FCP PropCo, LLC | Chapter 11<br><br>Case No. BK-09-52470-GWZ through BK-09-52487-GWZ<br><br>Jointly Administered under BK 09-52477<br><br>**THE INDEPENDENT LENDERS' SUPPLEMENTAL BRIEF RE THE "NEW" WITNESSES (CARUSO, GENEREUX, AND KREEGER)**<br><br>**Continued Hearing**<br><br>Hearing Date:  May 26-27, 2010<br>Hearing Time:  9:00 a.m.<br>Place:         300 Booth Street<br>               Reno, NV  89509 |

539975v3

The Independent Lenders to Station Casinos, Inc. ("Independent Lenders"),[1] by and through their undersigned counsel, hereby file this "Independent Lenders' Supplemental Brief Re The 'New' Witnesses (Caruso, Genereux, and Kreeger)" ("Supplement") with respect to the recently-obtained deposition testimony of witnesses Caruso, Genereux, and Kreeger, whose testimony was only obtained after the initial May 4-5 hearings.[2] In support of this Supplement, the Independent Lenders respectfully represent as follows:

## I.
## INTRODUCTION

In their Objections to what have become known as the Debtors' "Plan Facilitation Motions,"[3] the Independent Lenders and the OCC raised several arguments. First, they argued that the Debtors' proposed bidding procedures for the sale of OpCo should be rejected because those procedures would give to "New PropCo" the exclusive right to acquire OpCo's Excluded Assets, outside of the auction process, and without any "market test" as to their value. Second, they argued that the Debtors failed to sustain their burden of proof with respect to the proposed sale of OpCo's Excluded Assets to New Propco because the Debtors did not submit any evidence as to the value of the "Excluded Assets" that were to be transferred to from OpCo to New PropCo. Third, the Independent Lenders and the OCC argued that the Debtors' selection of an insider as the stalking horse for OpCo was improper because there was no evidence that the Debtors had attempted to locate a non-insider stalking horse before choosing the insider entity led by Fertitta Gaming and the Propco Lenders.

---

[1] The Independent Lenders are comprised of the following entities: BNP Paribas; Castlerigg Master Investments Ltd.; Genesis CLO; Natixis; Silver Point Capital; and The Bank of Nova Scotia.

[2] Excerpts of the deposition transcripts cited in this Supplement are attached hereto as Exhibits A (Genereux), B (Caruso) and C (Kreeger), respectively.

[3] The Plan Facilitation Motions are comprised of the Debtor's Motions to (1) Approve Bidding Procedures ("Bid Procedures Motion"); (2) Approve Second Amendment To Master Lease Compromise ("Compromise Motion"); and (3) Approve Restructuring Support Agreement ("RSA Motion").

In their Reply pleadings, the Debtors and the OpCo Agent for the first time submitted declarations from three witnesses whose testimony had not previously been offered into evidence in connection with the Plan Facilitation Motions. These three witnesses (collectively, the "New Witnesses") are Mr. Robert Caruso of Alvarez & Marsal ("A&M"), a financial advisor to the OpCo Agent; Mr. Michael Genereux of Blackstone, another financial advisor to the OpCo Agent; and Mr. Scott Kreeger, the Debtors' Senior V.P. of Corporate Operations. Since the Independent Lenders and the OCC had not had an opportunity to depose the New Witnesses before the hearings on May 4-5, the Court ordered that the New Witnesses be made available for deposition, and those depositions were taken on May 12, 13 and 14 in New York and Las Vegas.

As demonstrated below, the deposition testimony of the New Witnesses actually provides further support for the Independent Lenders' arguments and objections; provides further evidence than the Debtors have failed to meet their burden of proof; and further establishes that the Plan Facilitation Motions should be denied.

## II.
## DISCUSSION

### A. Mr. Genereux's Testimony Confirmed That Virtually No Effort Was Made To Solicit Non-Insider Bids.

In his testimony, Mr. Genereux of Blackstone (the OpCo Agent's financial advisor), confirmed at least three important points. Before addressing those points, however, it should be noted that Mr. Genereux's testimony was offered in response to concerns expressed by the Independent Lenders that OpCo, *the Debtor*, had not properly marketed OpCo's assets before accepting a stalking horse bid from insiders. Thus, the proffer of testimony on this point from Mr. Genereux, an advisor to certain of OpCo's *creditors*, is a tacit admission that OpCo did in fact fail to properly market its assets, and in essence improperly delegated that duty to the OpCo Agent, which, unlike

OpCo, has no fiduciary duties to OpCo's creditors. Just ask the Opco Agent, and it will confirm its view that it has no such duties.

The first important point that Mr. Genereux's testimony confirmed was that, not only did the Debtors fail to perform <u>their duty</u> to market OpCo's assets before accepting an insider bid as the stalking horse, but that the OpCo Agent failed to actively market OpCo as well.

> **Q.** Right. So other than Penn and Ameristar who were initially contacted as managers, Blackstone responded to the expressions of interest it received rather than solicited buyers for the OpCo assets?
>
> **A.** Well, I believed -- I think my belief was shared by others, you know, closely involved in the steering committee -- that the optimal and best bids were going to come from a strategic player, FG, Boyd, Ameristar, Penn. Hedge funds, at this time, we saw what was going on in the marketplace. I mean, Carl Icon's [sic] bid for a 363 that was being done at about the same time was very, very low. To go around and talk to hedge funds wasn't a very fruitful exercise, in our view, and they know who to call if they have something enticing. This meaning hedge funds I'm referring to. Interesting to talk to us about. And I did get some inbound calls, but not many, to be honest.
>
> **Q.** All right.
>
> **A.** So <u>it didn't seem like it was a worthwhile exercise</u>.
>
> > **MS. STEINGART:** Could you read my question back?
>
> (Record read.)
>
> **Q.** So the answer to that is yes?
>
> **A.** Boyd. We talked to Boyd. <u>As I said, no other outbound calls to parties.</u> We felt like we had covered the -
>
> **Q.** Right. And Boyd expressed an interest before you spoke to Boyd, correct?
>
> > **MR. RICE:** Object to the form.

Deposition of Michael Genereux ("Genereux Depo."), 97:24-99:4 (emphasis added).

Thus, no one – not the Debtors, not the Opco Agent, not the Opco steering committee, and not any of their panoply of advisors, actively solicited potential buyers for Opco before they accepted a stalking-horse bid led by insiders. Mr. Genereux's personal belief that hedge funds <u>might</u> not be potential buyers does not explain why no attempt was made to publicize the fact that Opco was for sale, or why no real effort was made to solicit interest on the part of *strategic* buyers in and out of the Las Vegas market. Mr. Genereux offered no cogent explanation for why the process in this case did not include what one would normally expect to see in a sale process designed to maximize value – *i.e.*, (i) assembling a list of potential strategic buyers in this industry – including not just those in Las Vegas, but those outside of Las Vegas who might be interested in the unique opportunity to enter the Las Vegas market offered by the sale of Opco; and (ii) affirmatively going out and attempting to elicit interest in Opco's business and properties. Mr. Genereaux did not even try to explain the logic of a process that seems to contemplate that, <u>after</u> the stalking horse bidder has been chosen, and <u>after</u> the Excluded Assets are taken off the table, <u>maybe</u> then someone will try to solicit potential strategic buyers for what is left of Opco, and give them 30 days to conduct due diligence and submit an LOI on an $800 million deal.

In a similar vein, after first acknowledging that, with respect to the proposed sale of OpCo, a "market test" is "not just important, it's great . . . ." Genereux Depo, 237:9-10, Mr. Genereux conceded that under the bidding procedures proposed by the Debtors, there would be <u>no market test at all with respect to the Excluded Assets</u>:

> **Q.** Okay. And what about then with the case of the excluded assets, is it your understanding that if the bid procedures are approved, there would be a market test for the value of the excluded assets?
>
> > **MR. RICE:** A further market test. Sorry, I withdraw that. Sorry.
>
> **A.** Well, we'll see how it goes. But I think that's a part of the template for the auction, the way I look at it. I mean, we've

> negotiated transfers and we've negotiated the benefit of getting the Texas Station put lower than where they were perceiving it to be. And bids will come in and, you know, my expectation is bids will have to come in and accept the excluded assets and have to deal with the Texas Station put and that's the way the rules are being set up.
>
> **Q.** But with regard specifically to the excluded assets, <u>is it your understanding that the bid procedures would allow for a party other than FG/PropCo to acquire the excluded assets</u>?
>
> **A.** <u>That's not my understanding.</u> Through the -- through the agreement, the transfers will go to FG if they -- FG is not the winner.

Genereux Depo, 237:23-239:20 (emphasis added).

The second important thing that Mr. Genereux's testimony confirmed was that, after delegating to the OpCo Agent (who is also part of the stalking horse bidder) OpCo's duty to select the bid that was best for OpCo's estate and creditors, OpCo essentially rubber-stamped the OpCo Agent's conflicted selection (of itself and the Fertittas):

> **Q.** Once the steering committee selected that bid as the stalking horse bid, did anybody on behalf of OpCo ever say well, we don't accept that selection or have questions about why you selected that bid as the stalking horse bid?
>
> **A.**     Who are you referring to specifically?
>
> **Q.**     Anybody on behalf of OpCo.
>
> **A.**     OpCo the debtor?
>
> **Q.**     OpCo debtor, yes.
>
> **A.**     Not to my knowledge.

Genereux Depo, 140:20-141:7. Thus, the Debtors never tried to solicit bids for OpCo, and left it to the OpCo Lender steering committee – two of whose members are part of the stalking horse bidder – to select the stalking horse bid. Furthermore, given the fact that Mr. Genereux's firm, Blackstone, is the financial advisor to the OpCo Agent, which is one of the participants in the stalking horse bidder, it is not surprising that Blackstone has not enforced the bidding requirements that it seeks to impose on third-party bidders.

See, e.g., Genereux Depo. 160:18-161:3 (the stalking horse bidder has failed to provide a good faith deposit, and Mr. Genereux was also unaware of whether the stalking horse had provided the "equity commitment letter" that the stalking horse is required to deliver).

The third important thing that Mr. Genereux's testimony confirmed was that a key factor in deciding which stalking horse bid to pick was the belief that *if the Fertitta-led insider bid was not selected, the insiders would use their position of control of the Debtors to make things difficult for the OpCo Lenders*:

> *Q. Okay, thank you. I want to focus on your second bucket, which I think you referred to by saying that in order to pursue a Boyd deal, the OpCo lenders would have to pursue -- I think you used the phrase adversarial things, terminating exclusivity and filing a plan to effectuate the Boyd bid; is that accurate?*
>
> *A. Yes.*
>
> *Q. Okay. I just want to make sure I've summarized your point accurately. Why did you or do you consider those things to be adversarial and who would be your adversary?*
>
> *A. Well, they could be adversarial and, certainly, if we're terminating -- if we're seeking to terminate exclusivity, that would be potentially against the wishes of the debtor. The debtor always wants to remain in control, and if we were to pursue the Boyd transaction, we would be looking for the company to [cede] control. That -- that's always fought. A fight, an argument in court will take time. Two months, three months. With the professional fees and overhang of risk from union and everything, that, to us, was a process that would turn into an outcome uncertain and certainly more expense and certainly more risk to the operations, so any time a creditor typically is looking to terminate exclusivity and pursue its own plan against the wishes of the debtor, and debtors typically don't like to give up that right very easily, it's going to be adversarial because the company is going to want to remain in control.*

Genereux Depo, 143:13-144:23 (emphasis added). Thus, through Mr. Genereux, the OpCo Agent acknowledged that there was "execution risk" associated with accepting a

bid from anyone other than the Fertittas, because the OpCo Agent believed that the Fertittas would use their control over the ability to file a plan of reorganization for the Debtors as "leverage." So, while the Debtors gave the appearance of ceding control of the selection of the stalking horse bidder to the OpCo steering committee, the steering committee's reasons for choosing the insider stalking horse bid over a Boyd bid included that the steering committee would have to fight the Debtor, and seek to terminate exclusivity, if the steering committee wanted to support a Boyd bid for OpCo.

Finally, with regard to the question of who, if anybody, had determined whether the $35 million that OpCo had agreed to accept from PropCo as payment for the Excluded Assets was anywhere near the actual value of those assets, Mr. Genereux testified that A&M, rather than Blackstone, did that analysis:

> *Q. Am I correct in saying that Blackstone did not perform a valuation to determine whether the $35 million for the excluded assets set forth in the master compromise agreement was fair from a financial point of view standing alone?*
>
> *MR. RICE: Object to the form.*
>
> *Q. Either you did or you didn't.*
>
> *A. Alvarez & Marsal handled that work.*

Genereux Depo, 20:10-18. However, as discussed below, the deposition of Mr. Caruso, the A&M representative, made very clear that A&M in fact did not even attempt to provide a valuation of all the Excluded Assets. (Nor, of course, did any financial advisor to Opco.)

**B.     Mr. Caruso's Testimony Showed That A&M Made No Effort To Value Many Of The Excluded Assets, And Minimized The Value Of The Excluded Assets That It Actually Considered.**

First and foremost, Mr. Caruso made very clear that, notwithstanding what Mr. Genereux thought A&M had done, A&M did not prepare any type of valuation with respect to all of the Excluded Assets:

> *Q. And was it part of – was part of A & M's engagement to provide an indicative value for all of the excluded assets?*
>
> *A. No.*
>
> *Q. What excluded assets did A & M not prepare an indicative value of?*
>
> *A. I think there are specific assets where we didn't necessarily do a specific assessment of the value. They were considered in some of the work we had done in terms of thinking through the separation and whatnot and in the context of really the overall deal. But where we didn't do specific valuation work related to assets were things involving primary customers, specific valuation related to patents, specific valuation related to employees are some of the ones that would come to mind.*
>
> *Q. Okay, Are there any others that you recall that were not part of the indicative valuation that you prepared?*
>
> *A. We didn't value FF&E at corporate as an example. Those are the ones that come to mind.*

Deposition of Robert Caruso ("Caruso Depo"), 17:5-18:4 (emphasis added). Included among the categories of Excluded Assets that A&M did <u>not</u> value were OpCo's customer lists and customer database, which Mr. Genereux himself described as the "crown jewels" of OpCo's casino operations. Genereux Depo., 183:8-11. Of the eighteen categories of Excluded Assets, A&M thus only purported to value, at most, six of them.

Second, Mr. Caruso's deposition confirmed that he had virtually no relevant experience:

> *Q. Okay. Do you have any licenses or any credentials relating to real estate?*
>
> *A. No.*
>
> *Q. Do you have any specialized education concerning the valuation of intellectual property?*
>
> *A. Nope.*
>
> *Q. Do you have any specialized education concerning the valuation of information technology systems?*
>
> *A. No.*

> *Q. Now, in paragraph one you say, at line item, for the past 20 years, you've worked on restructuring related cases. I assume this includes Chapter 11 of the Bankruptcy Code?*
>
> *A. Yes.*
>
> *Q. And in those 20 years, have you ever worked on a restructuring of a company that operates a casino business?*
>
> *A. No.*
>
> *Q. Prior to today, have you ever given testimony under oath, either in a deposition or at trial?*
>
> *A. Yes.*
>
> *Q. Have you ever been [sic] given such testimony as an expert?*
>
> *A. No.*

Caruso Depo, 44:3-45:5.

Third, with regard to the few categories of Excluded Assets for which A&M did attempt to provide an "indicative value," it is clear from Mr. Caruso's testimony that in almost every case, he used assumptions and methodologies that were most favorable to Propco (as the "buyer" of the Excluded Assets), and least favorable to OpCo (as the seller). For example, with regard to OpCo's options to acquire the "Wild Wild West" and Tiberti parcels (both included in Excluded Asset category #14), A&M prepared no valuation of those options at all. Instead, A&M prepared an "analysis" of whether OpCo should exercise those options, <u>at today's land values</u>. Caruso Depo, 35:21-37:18; 152:20-23. Moreover, in determining whether the options were currently "in the money," Mr. Caruso was unaware of several recent, relevant land sale "comps," including one that was cited in A&M's own report.[4]

The real question, of course, is whether these options, have any <u>value</u> now, because they might be well "in the money" before they expire. Even after acknowledging that the value of each of the parcels subject to the options was currently

---

[4] See A&M Report at 35 ("Based on our research, the indicative value of the land as if vacant ranges from $1,219,680 ($28 psf) to $1,524,000) ($35 psf) per acre"); cf. Caruso Depo, 153:18-154:7 ("Q. Are you aware of a sale in Las Vegas of slightly more than two acres of land in February 2010 for approximately $25 million in the aggregate [$12.5 million per acre]? A. I am not, no.").

539975v3                                    9

down 70-90% from the peak value in 2007 (only 3 years ago), see A&M report at 35-37, Mr. Caruso said he had "no opinion" as to whether the value of the land might increase before the options expire, thus putting the options back in the money. Caruso Depo, 38-39. A&M's analysis thus ignored the value of the "optionality" that is a basic component of an option to buy real estate even if the option is – perhaps only temporarily – "out of the money." A&M's analysis of the options also ignored completely the strategic value that the land subject to the options has when combined with the "LandCo" parcels that New PropCo is to acquire under the Plan.

Mr. Caruso gave similarly short shrift to OpCo when considering the value of the IT components of the Excluded Assets to be transferred to PropCo. The record in this case is undisputed that PropCo presently has no IT staff or software, and has only a disputed claim to the servers located at the Red Rock and Sunset Station properties. If the Plan Facilitation Motions are approved, PropCo will obtain a "turn-key" IT department, ownership of the OpCo servers located at the PropCo facilities, rights to all the software PropCo would need to operate for the first time on a standalone basis (including proprietary software developed by OpCo at a cost of millions), and also have the right to recruit any of OpCo's corporate staff, including IT employees, regardless of whether those employees are subject to non-compete agreements in favor of OpCo.[5] OpCo, meanwhile, will be forced to build an entirely new IT system, hope that all the new components work together perfectly, and hope that it has some employees left to operate the system after PropCo is done cherry-picking the most valuable corporate-level employees, including the 30% of the IT employees that are presently subject to non-compete agreements, see infra. at 13, which will be waived if the Plan Facilitation Motions are granted.

---

[5] The importance of the IT staff cannot be overstated, because as even A&M acknowledges, "There is limited documentation of the code and configuration for custom configurations . . . the support and modification capability for these systems currently resides as knowledge with key IT staff." See A&M Report at 10 (emphasis added).

539975v3                               10

If the transfer of OpCo's Excluded Asset to PropCo is approved, PropCo thereby will obtain something it could not otherwise obtain, at any price, from any party. Notwithstanding this fact, in assessing the value of the IT transfers, Mr. Caruso and A&M adopted an approach that ascribes only minimal value to what they describe as "operations," the benefit of having a proven, reliable IT system and staff in place. Caruso Depo, 22-28. Under the approach adopted by A&M, such "operations" are given a value of only $360,000, rather than the $9.3-11.2 million that A&M believes it would cost PropCo to "replicate" the IT system. A&M Report at 15; Caruso Depo, 23-27. Similarly, A&M gave no weight to the fact absent this deal with OpCo, if OpCo and PropCo were to separate, PropCo also would have to endure considerable time delay and business disruption before it could get its new IT systems up to speed. At the end of the day, Mr. Caruso and A&M ended up attaching to the transferred IT an "indicative value" of only $16-20 million (A&M Report at 3), although at one point in the process they had ascribed a value of $50 million to those same assets. Caruso Depo, 75:4.

Further, although Mr. Caruso testified that A&M had participated in negotiations regarding the "Texas put liability," the A&M report contains no analysis of this issue whatsoever. Neither the A&M report nor Mr. Caruso's testimony contains any evidence to support the position of the Debtors and the OpCo Agent that the $75 million "settlement" figure for that liability, as set forth in the Compromise Motion, is reasonable.

### C.    Mr. Kreeger Acknowledged The Importance Of The IT And Business Information Components Of The Excluded Assets.

Mr. Kreeger's testimony confirmed the magnitude and value of the advantages that PropCo would obtain if the proposed transfers of "Business Information" (Excluded Asset category #9) and "IT Systems" (Excluded Asset category #10) from OpCo to PropCo were to take place. First, Mr. Kreeger acknowledged the superiority of OpCo's IT department, as compared to those of its competitors:

539975v3                                    11

> **Q.** And why is it that strategically you feel that Stations does a better job?
>
> **MR. PERRY:** You're talking about IT now?
>
> **MR. GOLDBERG:** With respect to IT, yes. Thank you.
>
> **THE WITNESS:** I just think that we are better strategic implementers of staying ahead of the curve and bringing new and fresh things to the market.
>
> **MR. PERRY:** You're done with your answer?
>
> **THE WITNESS:** Yes.
>
> **BY MR. GOLDBERG:**
>
> **Q.** And I didn't mean to cut you off. If you are done with your answer, can you give me some examples of things you think your IT Department does better than the IT Departments of some of your competitors?
>
> **A.** I think that we do a better job of data mining, and I think we do a better job of accessing and compiling customer information.
>
> **Q.** What do you mean by "data mining"?
>
> **A.** I think that we use our systems as a resource to interact with our guest in a more frequent and more relevant way than our competitors.
>
> **Q.** And when you say "in a more relevant way", <u>do you believe that your department's ability to do that better positively affects the bottom line of Station Casinos</u>?
>
> **A.** <u>Yes, I do believe that</u>.
>
> **Q.** <u>Do you think it's a significant or immaterial effect</u>?
>
> **MR. PERRY:** Objection; vague. Go ahead.
>
> **THE WITNESS:** <u>I think that it has a – it has a material effect.</u>

Deposition of Scott Kreeger ("Kreeger Depo"), 119:12-120:19 (emphasis added).

Second, Mr. Kreeger testified as to the significant expenditures, in both time and money, that OpCo has made over the years in order to be in the favorable position it now enjoys with respect to its information systems. Thus, while PropCo has no IT staff or assets of its own, OpCo has in place an experienced, highly-functioning IT

department that contributes to the bottom line. *See, e.g.,* Kreeger Depo at 57-58 (annual IT budget is approximately $21 million); 82 (development of player tracking systems took 12 years); and 144 (importance of IT department demonstrated by the fact that approximately 30% of the department's 95 employees are subject to non-compete agreements).

Third, and despite the forgoing, Mr. Kreeger essentially contradicted himself when he attempted to place a value upon the "IT Systems" and "Business Information" categories of Excluded Assets. With respect to the IT Systems, in an effort to measure the "value" to PropCo of obtaining the IT Systems, in paragraph 8 of his Declaration [Docket #1324], Mr. Kreeger stated that in the event of a separation, OpCo would have to spend "$20 million to acquire brand new hardware to build a primary and secondary back-up computer system." At his deposition, however, Mr. Kreeger acknowledged that the $20 million figure he used in his Declaration was woefully inadequate, because it would not put PropCo in the same position that it would enjoy if it received the IT Systems from OpCo:

> ***Q.*** *It's true, is it not, that spending the $20 million would not provide Propco with the same functionality that it would have if the Separation Agreement were approved; is that right?*
>
> ***A.*** *No. Two different things, hardware and software. It would provide Propco with all of the hardware necessary to have a compatible system as Opco.*
>
> ***Q.*** *Okay, And I guess that's my question, although mine was not as well-phrased as your answer.*
>
> *And what I was trying to get at was, if the $20 million, if spent by Propco in that separation scenario, that would not put Propco in the same position it would be in if the Separation Agreement were approved, correct? Propco would have to acquire additional things?*
>
> ***A.*** *It would be absent software applications.*
>
> ***Q.*** *Okay.*
>
> ***A.*** *It would have an IT infrastructure absent software.*

> **Q.** *And the software cost would be approximately what if you –*
>
> **A.** *Another 20 million.*

Kreeger Depo, 127:18-128:14.

Mr. Kreeger further testified that, absent a deal with OpCo for the IT Systems, in addition to having to spend at least $40 million on hardware and software, PropCo would have to "amass an army" of consultants, and would have to hire an entire IT staff before PropCo could be fully functional. Kreeger Depo at 133-34. Notwithstanding the $40 million plus figure that measures the value that PropCo would receive <u>solely with respect to the IT Assets</u> if the Plan Facilitation Motions are granted, OpCo inexplicably has elected to accept $35 million in exchange for the transfer of <u>all the Excluded Assets</u> to PropCo, even though it is now clear that nobody – not OpCo, not Blackstone, and not A&M -- ever even attempted to value the other Excluded Assets.

## III.
## CONCLUSION

The Independent Lenders respectfully request that the Court consider all of the forgoing at the May 26-27 final hearing on the Plan Facilitation Motions.

Dated:  May 18, 2010
        Reno, Nevada

Respectfully submitted,

*/s/ Sallie B. Armstrong*
Sallie B. Armstrong
DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 329-5900
Facsimile: (775) 786-5443
Email: sarmstrong@downeybrand.com

-and-

Isaac M. Pachulski (CA 62337)
Eric D. Goldberg (CA 157544)
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email: ipachulski@stutman.com
       egoldberg@stutman.com

ATTORNEYS FOR THE INDEPENDENT
LENDERS TO STATIONS CASINOS, INC.