UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
RENO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO: 09-52477-GWZ |
| | ) | CHAPTER 11 |
| | ) | |
| STATION CASINOS, INC, | ) | Reno, Nevada |
| | ) | |
| | ) | Thursday, May 27, 2010 |
| Debtor. | ) | ( 9:20 a.m. to 11:06 a.m.) |
| | ) | (11:34 a.m. to  2:16 p.m.) |
| | ) | ( 3:20 p.m. to  7:55 p.m.) |

1    MOTION BY JOINTLY ADMINISTERED DEBTORS STATIONS CASINOS,
INC., ET AL. FOR ENTRY OF ORDER ESTABLISHING BIDDING PROCEDURES
AND DEADLINES RELATING TO SALE PROCESS FOR SUBSTANTIALLY
ALL OF THE ASSETS OF STATION CASINOS, INC., AND CERTAIN "OPCO"
SUBSIDIARIES, DE #1235;

2    MOTION BY DEBTORS STATIONS CASINOS, INC. AND FCP PROPCO,
LLC FOR ENTRY OF AN ORDER APPROVING SECOND AMENDMENT TO AMENDED
AND RESTATED MASTER LEASE COMPROMISE AGREEMENT (11 USC 105(a);
363(b)(1); 365(d)(3); 365(d)(4)(B)(ii) & FRBP 9019), DE #1235;

3    MOTION BY JOINTLY ADMINISTERED DEBTORS STATIONS CASINOS,
ET AL. FOR ORDER AUTHORIZING OPCO DEBTORS TO ENTER INTO
RESTRUCTURING SUPPORT AGREEMENT WITH OPCO LENDERS
(11 USC 105(a); 363(b); & FRBP 9019), DE # 1298

BEFORE THE HONORABLE GREGG W. ZIVE,
CHIEF UNITED STATES BANKRUPTCY JUDGE

| | |
|---|---|
| Appearances: | See next page |
| Court Reporter: | Recorded; FTR |
| Transcribed by: | Exceptional Reporting Services, Inc |
| | 14493 South Padre Island Drive, #A-400 |
| | Corpus Christi, TX 78418-5940 |
| | 361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>COURTROOM APPEARANCES FOR:</u>


Station Casinos, Inc.,        THOMAS KRELLER, ESQ.
etc.:                         PAUL ARONZON, ESQ.
                              DAN PERRY, ESQ.
                              Milbank Tweed, et al.
                              601 South Figueroa St.
                              30th Floor
                              Los Angeles, CA 90017


                              BRUCE BEESLEY, ESQ.
                              Lewis & Roca, LLP
                              50 West Liberty St.
                              Suite 410
                              Reno, NV 89501


FCP PROPCO, LLC:              OSCAR GARZA, ESQ.
                              Gibson Dunn & Crutcher
                              3161 Michelson Dr.
                              Irvine, CA 92612


Independent Lenders:          ERIC GOLDBERG, ESQ.
                              Stutman Triester & Glatt
                              1901 Avenue of the Stars
                              12th Floor
                              Los Angeles, CA 90067


Informal Committee of         KRISTIN MARTIN, ESQ.
Station Employees:            McCracken Stemerman & Holsberry
                              1630 S. Commerce Street, #A-1
                              Las Vegas, NV 89102


Bank of Scotland:             GEORGE PAGANO, ESQ.
                              Katten Muchin Rosenman, LLP
                              575 Madison Ave.
                              New York, NY 10022


German American Capital       LARRY NYHAN, ESQ.
Corporation:                  Sidley Austin, LLP
                              One South Dearborn
                              Chicago, IL 60603


                              JEFFREY BJORK, ESQ.
                              Sidley Austin, LLP
                              555 West 5th St., #4000
                              Los Angeles, CA 90013

<u>COURTROOM APPEARANCES FOR</u>:     (CONTINUED)


Deutsche Bank Trust          SANDY QUSBA, ESQ.
Company Americas:            Simpson Thacher & Bartlett, LLP
                             425 Lexington Ave.
                             New York, NY 10017


German American Capital      JENNIFER SMITH, ESQ.
Corporation, et al.:         Lionel Sawyer & Collins
                             50 West Liberty St.
                             Suite 1100
                             Reno, NV 89501


Official Committee of        BONNIE STEINGART, ESQ.
Unsecured Creditors:         Fried Frank Harris, et al.
                             One New York Plaza
                             New York, NY 10004


                             ERIC WINSTON, ESQ.
                             Quinn Emmanuel, et al.
                             865 S. Figueroa St.
                             10th Floor
                             Los Angeles, CA 90017


                             BRETT AXELROD, ESQ.
                             Fox Rothschild, LLP
                             800 Howard Hughes Pkwy,
                             Suite 500
                             Las Vegas, NV 89169
.
                             PETER SIROKA, ESQ.
                             Fried Frank Harris, et al.
                             One New York Plaza
                             New York, NY 10004


Also present:                JEFF HERMANN, ESQ.
                             LARRY ENGEL, ESQ.
                             DAWN CICA, ESQ.
                             KARL OLSEN, ESQ.
                             THOMAS WAYCER, ESQ.
                             RICHARD TISDALE, ESQ.

4

<u>SCHEDULED TELEPHONIC APPEARANCES FOR:</u>

| | |
|---|---|
| Creditors Committee: | JEAN HANSON, ESQ., (Listen only)<br>Fried Frank, et al. |
| Deutsche Bank Trust<br>Company Americas: | NICHOLAS BAKER, ESQ.<br>(Listen only)<br>PATRICK DOWD, ESQ., (Listen only)<br>JASON FRIEDMAN, ESQ.<br>(Listen only)<br>Simpson Thacher & Bartlett, LLP |
| Station Casinos: | BRETT GOLDBLATT, ESQ.<br>(Listen only)<br>ROBERT C. SHENFELD, ESQ.<br>(Listen only)<br>BEN TISDELL, ESQ., (Listen only)<br>RICH HASKINS, ESQ., (Listen only)<br>BRIA LASALLE-MERTENS, ESQ.<br>(Listen only)<br>GABE WEAVER, ESQ.<br>(Listen only)<br>Milbank Tweed, et al. |
| Bank of Scotland: | GEORGE PAGANO, ESQ.<br>(Listen only)<br>MATTHEW W. OLSEN, ESQ.<br>(Listen only)<br>Katten Muchin Rosenman, LLP |
| Fidelity: | MATTHEW C. HEYN, ESQ.<br>(Listen only)<br>Klee Tuchin, et al. |
| JP Morgan Chase Bank: | JENNIFER LACONO, ESQ.<br>(Listen only)<br>Jennifer Lacono, Attorney at Law |
| Mathew Barnett, Pro se: | MATHEW M. BARNETT, ESQ.<br>(Listen only) |
| Official Committee of<br>Unsecured Creditors: | DANIEL K. CHAN, ESQ.<br>(Listen only)<br>Daniel K. Chan, Pro Se |

<u>SCHEDULED TELEPHONIC APPEARANCES FOR</u>:    (CONTINUED)


| | |
|---|---|
| Deutsche Bank: | JOHN BEACHAM, ESQ., (Listen only) |
| | ROBERT PETTINATO, ESQ. |
| | (Listen only) |
| | Deutsche Bank |
| Deutsche Trust | ROBERT CARUSO, ESQ. |
| Bank of America: | (Listen only) |
| | Alvarez & Marsal |
| | |
| CMBS Lenders: | JOHN CHAPMAN, ESQ. |
| | (Listen only) |
| | Miller Buckfire & Co. |
| | |
| Deutsche Bank Trust | DEUTSCHE BANK TRUST COMPANY |
| Company America: | AMERICAS (Listen only) |
| | |
| | MICHAEL C. LEDLEY, ESQ. |
| | (Listen only) |
| | ELISHA GRAFF, ESQ. |
| | (Listen only) |
| | Simpson Thacher & Bartlett |
| | |
| | THE BLACKSTONE ADVISORY SERVICES |
| | (Listen only) |
| | |
| Interested Party, | GREN DAY, ESQ., (Listen only) |
| Chapdelaine: | Chapdelaine Credit Partners |
| | |
| Bank of America: | BYUNG S. PARK, (Listen only) |
| | Bank of America |
| | |
| Colony Capital NFC | JONATHAN GRUNZWEIG, ESQ. |
| Investor: | (Listen only) |
| | |
| Colony Capital: | ANDREW PARLEN, ESQ. |
| | (Listen only) |
| | SUZZANE S. UHLAND, ESQ. |
| | (Listen only) |
| | O'Melveny & Myers, LLP |
| | |
| Brian Ma.: | BRIAN MA, CLIENT |
| | (Listen only) |

<u>SCHEDULED TELEPHONIC APPEARANCES FOR:</u>    (CONTINUED)


CMBS Lenders:                    KEVIN J. HOCHBERG, ESQ.
                                 (Listen only)
                                 RYAN L. JENSEN, ESQ.
                                 (Listen only)
                                 GABRIEL MACCONAILL, ESQ.
                                 (Listen only)
                                 DAVID SCHIFFMAN, ESQ.
                                 (Listen only)

CMBS Lenders:                    CHARLES SCHRANK, ESQ.
                                 (Listen only)
                                 HILLE R. SHEPPARD, ESQ.
                                 (Listen only)
                                 ARIELLA SIMONDS, ESQ.
                                 (Listen only)
                                 Sidley Austin

Goldman Sachs & Co.:             BRENDAN J. LANE, ESQ.
                                 (Listen only)
                                 Goldman Sachs & Co.

Bank of Scottland:               ALEX WILSON, ESQ.
                                 Lloyds Banking Group

                                 JOANNE SI, ESQ., (Listen only)
                                 The Bank of Scotland

Olivia Mauro:                    OLIVIA MAURO, (Listen only)
                                 Barclays Capital, Inc.

Boyd:                            BRETT H. MILLER, ESQ.
                                 (Listen only)
                                 JORDAN WISHNEW, ESQ.
                                 (Listen only)
                                 Morrison & Foerster, LLP

Silver Point                     LOUIS M. WANG, ESQ.
                                 (Listen only)
Capital:                         Silver Point Capital

PROPCO:                          DANIEL B. DENNY, ESQ.
                                 (Listen only)
                                 Gibson Dunn & Crutcher

7

**SCHEDULED TELEPHONIC APPEARANCES FOR:   (CONTINUED)**

DK Partners:                    EPHRAIM DIAMOND, ESQ.
                                (Listen only)
                                DK Partners

8

1          **Reno, Nevada; Thursday, May 27, 2010; 9:20 a.m.**

2              **(Courtroom and Telephonic Appearances)**

3                       **Call to Order**

4          **THE COURT:**  Please be seated.  Good morning.  We have

5     a number of participants telephonically, and we have a list of

6     those.  I am not going to require or ask that those that are

7     either monitoring or actually perhaps intending to do more,

8     identify themselves at this time.  Only if you wish to address

9     the Court, I will ask you to identify yourself and the party in

10    interest that you may be representing.

11         Otherwise what I will do at this time is ask for

12    appearances of counsel that intend to participate in the

13    proceedings and argument today and tomorrow.

14         **MR. ARONZON:**  Good morning, your Honor.  Paul Aronzon

15    and Thomas Kreller, Milbank, Tweed.  We also have another

16    partner, Daniel Perry.  Between the three of us, we'll be

17    participating.

18         **MS. SMITH:**  Jennifer Smith, Lionel, Sawyer and

19    Collins, Nevada counsel for the CMBS Lenders.  Participating on

20    behalf of the lenders of the Sidley Austin firm will be Larry

21    Nyhan and Jeff Bjork.

22         **MR. QUSBA:**  Good morning, your Honor.  Sandy Qusba,

23    Simpson, Thacher, and Bartlett, counsel for Deutsche Bank Trust

24    Company Americas as OPCO agent.

25         **MR. GARZA:**  Good morning, your Honor.  Oscar Garza,

1  Gibson, Dunn and Crutcher on behalf of FCP PROPCO, LLC.

2          **MR. GOLDBERG:**  Good morning, your Honor.  Eric

3  Goldberg of Stutman, Treister and Glatt, for the independent

4  lenders.

5          **MS. STEINGART:**  Good morning, your Honor.  Bonnie

6  Steingart and Eric Winston, along with Brett Axelrod on behalf

7  of the Official Committee of Unsecured Creditors.

8          **MS. MARTIN:**  Good morning, your Honor.  Kristin

9  Martin of McCracken, Stemerman and Holsberry, representing the

10 Informal Committee of Station Employees.

11         **THE COURT:**  Excuse me.  Have you filed a type of

12 statement pursuant to Federal Rules of Bankruptcy Procedure

13 2019?

14         **MS. MARTIN:**  No, we did not.

15         **THE COURT:**  Then I will not hear you today.

16         **MS. MARTIN:**  Okay.

17         **THE COURT:**  I have reviewed your objection that was

18 filed to plan confirmation.  That's Docket Number 1240.  It was

19 the objection of the Informal Committee of Station Employees to

20 the joint plan of reorganization.

21         One, I don't even know if there is a committee.  Two,

22 I don't know who would be on that committee.  Three, they have

23 not been identified.  Four, there has not been adherence to the

24 Federal Rules of Bankruptcy Procedure.  Five, I've read your

25 points and authorities.  I find them without any basis.

10

1           You cite to one unpublished opinion that we went to

2    the docket to get from Judge Clyde Jones, I believe it was, in

3    the *Aladdin* (phonetic) case, and candidly, you misrepresent the

4    holding of that opinion when you say that he required something

5    to do with the employees as they -- regarding the plan.  That's

6    not what he did.

7           He simply said it might be one of the factors that he

8    would look at, and there's definitely no basis for the relief.

9    There's no collective bargaining agreement that I'm aware of.

10   Nevada is an at will state.

11          Clearly nobody, not a single party in interest in

12   this case, whether it be any of the debtors, any of the

13   creditors, secured or unsecured, have indicated that they would

14   want to do anything that would interfere with the retention of

15   the employees.  In fact, the disputes are, who would hire them,

16   not who would be letting them go.

17          And it would only be in the event of a closure or a

18   failure to continue to operate, which no party in interest has

19   indicated that they want to occur, that would affect the

20   employees.

21          So, for those reasons, and I've looked at Section

22   1109.  I've looked -- I'm well aware of what it provides.  Your

23   -- whomever these people are, are not creditors.  They're not

24   equity interest holders.  Even under the broadest definition of

25   party in interest, which is very broad, and -- because I

11

1   believe in a totally participatory process, I just don't

2   believe that they have any standing to participate in today's

3   hearing.

4           Perhaps those defects can be solved before the

5   hearing on plan confirmation.  But I actually have prepared a

6   memo, if you had followed up with additional authorities or

7   actually intended that you wished to participate today, because

8   I was concerned about the matter when I read it, and I wanted

9   to make sure that I understood the basis.

10          So, that gives you some indication how I look at it.

11  I appreciate your being here, and I think we're going to move

12  forward.  Okay?

13          **MS. MARTIN:**  May I respond, your Honor, briefly?

14          **THE COURT:**  Sure.  Go ahead.

15          **MS. MARTIN:**  We did submit to the Court in advance of

16  our pleading.  I can give you a date when I go back to my seat,

17  of a letter to your Honor identifying --

18          **THE COURT:**  Letters to me do not -- are ex parte

19  communications.  This Court will not accept -- I wouldn't -- I

20  have no idea if you sent a letter to me because my staff is

21  instructed to intercept all such correspondence and

22  communication, and either return it to the sender, and direct

23  it to the Office of the U.S. Trustee or appropriate parties in

24  interest.  So I have no idea of that.

25          **MS. MARTIN:**  Okay.  Well, if it's --

1          **THE COURT:**  And that would be the further indication

2    of not following proper procedure, candidly.

3          **MS. MARTIN:**  Okay.  Then if you -- we will refile

4    that in proper format.  And it does identify who the committee

5    is, who -- the individuals who comprise the committee --

6          **THE COURT:**  Take a look at the rule.

7          **MS. MARTIN:**  -- as well as, as well as why we believe

8    we are a party in interest.

9          **THE COURT:**  All that I ask is -- all that I ask is

10   compliance with the code and the rules.

11         **MS. MARTIN:**  Okay.  Thank you.

12         **THE COURT:**  Thank you.  I'd like to take care of a

13   few housekeeping matters so we don't interrupt the flow of the

14   argument.

15         I conducted an emergency hearing Tuesday afternoon I

16   believe it was dealing with some scheduling matters.  At that

17   time, counsel were able to participate telephonically.  I

18   appreciate their ability to do so.  I know everybody is

19   extraordinarily busy.  I thought last night I was back

20   practicing law and preparing for trial rather than -- so, I

21   imagine how hard all of you have been working.

22         The question that came up was an extension of certain

23   times and resetting certain hearings.  I indicated that I

24   thought, at least based upon the -- found that I had to

25   consider that some of that made some sense, but I of course did

1   not require counsel to take a position until they had the

2   opportunity to confer with their clients.

3        So, I would just like to hear from counsel at this

4   time regarding those matters.  It's really a -- what really

5   happened is that the hearing on the disclosure statement, which

6   is presently set for June 10th, it was proposed to be heard, I

7   think, on July 15th.  I indicated that we would be able to set

8   aside two dates, July 15th and July 16th.

9        As I also indicated during that emergency conference,

10  this is a case where one day easily becomes two.  So, I want to

11  make sure that we have sufficient time.  So, that was the first

12  change.

13        Then the confirmation hearing had been set I think

14  for the 15th.  Is that correct?

15        **MR. KRELLER:**  That's correct.

16        **THE COURT:**  And that would be moved to August 27th,

17  and I think -- what was that -- give me the date.  When was the

18  sale date going to be?

19        **MR. KRELLER:**  The option date, your Honor, the

20  proposed auction date was August 9.

21        **THE COURT:**  That's correct.  Let's deal with that

22  first so I get it chronologically set.  And I indicated that I

23  would probably be able to have two days if necessary for that

24  as well.  The 6th, the Friday -- Monday is the 9th.

25        And then the plan confirmation hearing would have to

14

1   obviously follow any auction, and we set that for the 27th.

2   And then I think it also had a date, the 27th must be a Friday

3   then?

4           **THE CLERK:**  Yes, sir.

5           **THE COURT:**  And -- because as I noted at that time,

6   my evidentiary dates in this court are Thursday, Friday and

7   Monday.  And I thought that those times would be better, and I

8   think it probably solved one of the issues regarding a

9   complaint to the due diligence period.  I think that

10  paraphrases what I discussed.  I'd be glad to hear from

11  anybody.

12          **MS. STEINGART:**  The committee has no objection to the

13  change in the dates that have been proposed by the debtors,

14  your Honor.

15          **THE COURT:**  Well, let me see if I can shorten it.

16  Does anybody have any objection to those dates?

17          **MR. GOLDBERG:**  Your Honor, I haven't had a chance to

18  confer with each of my clients about it, but we generally have

19  no objection.  Obviously the disclosure statement hearing needs

20  to be moved, but we do think the additional time is helpful.

21          **THE COURT:**  Anybody else?  All right.  I do, too.

22  And I think it's a reasonable approach.  Frankly, more time for

23  others to do any due diligence if that is in fact what occurs.

24  It's always beneficial and provides additional time if there is

25  going to be an auction.

15

1          So, at this time, I will vacate the earlier dates.

2     We will set July 15th and 16th for the hearing on the

3     disclosure statement.

4          That leaves the issue of when objections should be

5     filed.  Some have obviously been filed, at least one has.  I

6     just dealt with that a few minutes ago.

7          **MR. KRELLER:**  Your Honor, we have -- we actually have

8     a pending motion to approve the disclosure statement and

9     establish confirmation related deadlines.  If you want to cover

10    -- if you want to go through dates and set them today, that's

11    fine.  What I had contemplated was that at the disclosure

12    statement hearing we would have approval of this schedule.

13         **THE COURT:**  Well, I need objections -- all I'm

14    setting right now is the deadline for objections --

15         **MR. KRELLER:**  Objections to the disclosure statement.

16         **THE COURT:**  -- to the disclosure statement.

17         **MR. KRELLER:**  Okay.

18         **THE COURT:**  I'll worry about --

19         **MR. KRELLER:**  Thank you, your Honor.

20         **THE COURT:**  -- I may not have to set any dates after

21    that, Mr. Kreller.

22         **MR. KRELLER:**  Okay.  I misunderstood, your Honor.

23         **THE COURT:**  Okay.  The deadline for the disclosure

24    statement had been June 10.  I assume, you folks tell me where

25    you were in terms of preparing your objections.

1    **MS. STEINGART:**  Well, your Honor, at this point, we

2  -- right --

3       **THE COURT:**  I'm anticipating you and Mr. Goldberg's

4  plans will be objecting.  I could be wrong, but I'm assuming

5  that.

6       **MS. STEINGART:**  Yeah.  So far.  So far, but hope

7  springs eternally, your Honor.

8       **THE COURT:**  Okay.  Good.

9       **MS. STEINGART:**  You know, at this point, we were at

10 a fairly nascent stage because, as I've discussed with

11 Mr. Kreller, we were expecting the filing of a fairly

12 substantially revised disclosure statement.  Because the first

13 one that was filed was before any of the agreements now before

14 the Court.

15      **THE COURT:**  Understood.

16      **MS. STEINGART:**  So, we were at a nascent stage, and I

17 would ask the Judge -- the Court to, you know, to set, you

18 know, a time that gives us a period after Mr. Kreller tells us

19 we're going to get those revisions to do our response.

20      **THE COURT:**  Well, I will tell you, any revisions -- I

21 can -- I'm going to set some deadlines.  Okay?

22      **MS. STEINGART:**  Okay.

23      **THE COURT:**  We know what the -- what have been called

24 the plan facilitation motions and documents are.  That's what's

25 in front of me today.  I already resolved one of the earlier

1    ones with the extension of exclusivity.

2          We've got, of course, the PROPCO support agreement is

3    in front of me because the debtors are parties to it.  The OPCO

4    restructuring agreement is part of the motions before me today.

5    The bidding procedures are part of the matters before me today,

6    together with the second amended compromise of the master

7    lease, and those are what are referred to as the plan

8    facilitation documents.

9          The -- obviously they can be attached and referred to

10   in the disclosure statement.  I don't think we need to have

11   hundreds of pages of the disclosure statement.  I think that we

12   can refer to them, the parties, and make them available to

13   anybody that's interested.

14         Moreover, the hearings that were conducted May 4th,

15   and 5th, and today, together with all the discovery, people

16   still don't have -- hypothetical investors are not aware of

17   information at this point.  I don't know when they would ever

18   be, candidly.

19         The other objections I assume will be on a more

20   substantive basis on how they'd be told if the plan's patently

21   not confirmable.

22         I will not conduct, just so everybody understands, I

23   do not conduct (indiscernible) confirmation hearings on

24   hearings on disclosures.  Really, that's not the point.  And I

25   also understand that if there are objections that can go to

1    confirmation issues that are appropriately considered at the

2    time.

3           So, when -- I think Ms. Steingart is right.  I think

4    the disclosure statement has to be amended.

5           The bidding procedures have changed, for example.  I

6    mean, somebody finally listened to Mr. Genereau (phonetic) and

7    said, "Oh, we forgot to talk about that $48 million worth of

8    credit."  So, I did notice that.

9           So, I think that I need to know from you how much

10   time you need.

11          **MR. KRELLER:**  Your Honor, you're absolutely right.

12   The bidding procedures have been modified.  The master lease

13   compromise agreement.  Obviously, there's all sorts of moving

14   parts that hopefully have settled.

15          In terms of, and I agree with Ms. Steingart.  It

16   seems to me that the objection deadline should be keyed off

17   when they will see the revised documents.

18          **THE COURT:**  Oh, I -- there's no point to doing it

19   otherwise.

20          **MR. KRELLER:**  We have, you know, obviously I think

21   that they'll need to reflect the developments of what comes out

22   of today and tomorrow.

23          **THE COURT:**  Of course.

24          **MR. KRELLER:**  Your Honor, I -- my proposal on that

25   would be that the plan and disclosure statement as revised be

 1  filed two weeks from tomorrow, which I believe puts us at the

 2  18th.

 3          THE COURT:  Well, that would be June 11th, would it

 4  not?

 5          MR. KRELLER:  It would be June 11th, your Honor.  I

 6  guess actually that's probably a little tight.  If the hearing

 7  is the 15th, if we shoot for the 5th of July -- July 15th, if

 8  we have the plan and disclosure statement roughly 30 days

 9  prior.

10          THE COURT:  Monday, the 14th for revisions, and the

11  filing of amended disclosure statements.

12          MR. KRELLER:  You've made the 12th and the 13th a fun

13  weekend for us all, your Honor.

14          THE COURT:  Well, I -- join me.  Well, if Tuesday's

15  better, I don't have a problem with one day.

16          MS. STEINGART:  I don't have a problem with one day

17  either, your Honor.

18          THE COURT:  Neither do I.  June 15th is fine.

19          MS. STEINGART:  Right.  And under the schedule as it

20  is just now, our objections would be due on July 1st, and we

21  have no problems with that date, your Honor.

22          THE COURT:  Let me take a look.

23          MS. STEINGART:  That's 14 days before the hearing.

24          THE COURT:  Yeah, I know.  And I can shorten that,

25  or --

20

1          **MR. UNIDENTIFIED:**  Lengthen it.

2          **THE COURT:**  I'm -- because I want -- I'm going to

3    provide an opportunity at response --

4          **MS. STEINGART:**  Right.

5          **THE COURT:**  And, as usual, I need to read it.  I will

6    tell you that I do not return to court until the 9th.  You know

7    where I'll be on the 10th.

8          All right.  Objections by the 1st.  Replies by the

9    8th.  That way my staff has them all by the 9th, and I can work

10   the weekend on it.

11         Would you please prepare a scheduling order?

12         **MR. KRELLER:**  We will, your Honor.

13         **THE COURT:**  Thank you.

14         **MR. KRELLER:**  And we'll also provide notice of these

15   dates as well.

16         **THE COURT:**  Yes, please.  Actually, an amended notice

17   of the dates will be sufficient.  We don't need an order.  Just

18   do an amended notice.  The order on the record today is

19   sufficient.  Just do the notice.  Everybody is aware of it.

20         **MR. KRELLER:**  We will do that, your Honor.

21         **THE COURT:**  Thank you.  That takes care of that

22   issue.  And now I'm going to make sure that the evidentiary

23   record is complete.

24         I have reviewed the exhibit list from the hearings

25   conducted on the 4th and 5th.  I've reviewed the transcript,

1    and I have those with me by the way, of May 4th and 5th.  So,

2    I've read those.

3            I've read and I've reviewed the exhibits.  And I have

4    received two volumes of additional exhibits, most of which have

5    been stipulated to by the parties.  There is one or two errors

6    that I need to talk about.

7            The exhibits that were submitted, and I appreciate

8    counsels' efforts in that regard, indicate that certain

9    exhibits perhaps had been admitted, and they haven't been.  And

10   those were Exhibits 14 and 15.  They were not admitted.  And

11   it's indicated here that they were.  And we've checked the

12   transcript.

13           **MS. UNIDENTIFIED:**  Right.  I apologize, your Honor.

14           **THE COURT:**  Okay.

15           **MS. UNIDENTIFIED:**  And actually --

16           **THE COURT:**  Well, that's right.  I should -- because

17   I sat down, I said I know I didn't, because when I stopped you

18   from asking -- reading it into evidence --

19           **MS. UNIDENTIFIED:**  Right.

20           **THE COURT:**  -- because it wasn't admitted, the

21   transcript indicates that they were admitted.  The transcript

22   is wrong.  And I would point that out.  And one is -- 14 is an

23   e-mail, and 15 is also an e-mail.

24           **MS. UNIDENTIFIED:**  Yes, it is, your Honor.

25           **THE COURT:**  And so they are not in evidence.  Those

1    are the only two items that were not in evidence.

2            The deposition transcripts are not admitted.  They're

3    simply marked.  The evidence is what's contained in the

4    transcripts.

5            I have read all the depositions.  I pay particular

6    attention to the designations, but I found some designations

7    ended in a portion of the answer without the whole answer.  So,

8    I decided that I would read the whole answer.

9            And then I would read generally questions and answers

10   before, because many of these depositions I did not have the

11   benefit of having all the exhibits, so I had to kind of figure

12   out what was going on.  And most of them I'm aware of what they

13   were, and the different reports, and the bullet points.  So, I

14   understood what was going on.

15           So those deposition transcripts which are at the end

16   of the books of evidence will be marked but not admitted.  Is

17   that understood?

18           Your designations also are not evidence, but they can

19   be marked.  But I will not consider them to be evidence.  Once

20   again, what the witness said is the evidentiary portion.

21           There were some objections.  I'd like to just deal

22   with those right now since we're dealing with the evidentiary

23   portion.

24           There is an objection to Exhibit 33.  "Hearsay to the

25   extent it is offered for the truth of the matter."

1           I went through it and I didn't think it was being

2    offered for the truth of the matter asserted.  I thought it was

3    just being offered to show that part of the negotiation that

4    occurred.  I'm not sure it's being offered for the truth of

5    what's contained.  I --

6           **MS. STEINGART:**  That's precisely correct, your Honor.

7           **MR. PERRY:**  It's a little bit difficult, your Honor,

8    because I don't, you know, we haven't seen how they're going to

9    use it in the hearing.  So, if it's not being offered for the

10   truth, that's fine.  We'll withdraw the objection.

11          **THE COURT:**  Well, they just told me it's not being

12   offered for the truth.

13          **MS. STEINGART:**  It's not being offered for the truth.

14          **MR. PERRY:**  That's fine.

15          **THE COURT:**  Then I'm overruling the objection.

16          The debtors objected to Number 40 on lack of

17   foundation.  I don't know what it is.  I would -- I'm assuming

18   these came -- I look at the Bates stamps, and I'm assuming that

19   the Bates stamps indicate the source of the document.

20          **MS. STEINGART:**  Yes, your Honor.

21          **THE COURT:**  A and M stands for Alvarez and Marsal.

22   Is that correct?

23          **MS. STEINGART:**  Correct, your Honor.

24          **THE COURT:**  So this is something out of probably

25   Mr. Caruso's (phonetic) file?

24

1          **MR. UNIDENTIFIED:**  Your Honor, this was produced to

2     us by Alvarez, so whether it's from Mister --

3          **THE COURT:**  And was it used during Mr. Caruso's --

4          **MR. UNIDENTIFIED:**  Deposition?  Yes.

5          **THE COURT:**  -- deposition.  And it's his notes

6     regarding conversations with Mr. Kreeger (phonetic)?

7          **MR. WINSTON:**  Mr. Caruso testified that it wasn't his

8     notes, but the notes of one of his teammates.

9          **THE COURT:**  Sounds to me you've got a foundational

10    problem.

11         **MR. WINSTON:**  Your Honor, Eric Winston, for the

12    committee.

13         **THE COURT:**  Sure.

14         **MR. WINSTON:**  To some extent this is putting the cart

15    before the horse on Alvarez and whether it's an expert

16    testimony or not, but let's assume for a second --

17         **THE COURT:**  Well, no.  I can deal with that.  I'll

18    deal with the claim -- Alvarez isn't being offered as an

19    expert.  Alvarez is -- I know, I understand I think what the

20    nature of the Alvarez/Caruso testimony is.  Not an expert, but

21    there's a citation I think that's wrong in the objection, by

22    the way.  But that's okay.

23         And I don't consider him to be an expert.  He -- I

24    look at his testimony as indicating the basis upon which the

25    steering committee negotiated the terms of the agreement.

1   That's all.  And I understand the challenges to that.  That's

2   fine.

3          I know he's not an appraiser.  I know he didn't do

4   evaluations.  I know other people in this firm provided him

5   information.  He used it all to provide advice to his client,

6   and that was used in the negotiations.  That's all it's for,

7   and I'll make a determination on how much weight to give it.

8          That's sort of a clue how I look at your objections.

9          **MR. WINSTON:**  Fair enough.  And if we -- I don't want

10  to get ahead of myself, but there's a different issue if it's

11  not treated as an expert, because we -- we completely agree

12  he's not an expert, but --

13         **THE COURT:**  But you see, I don't also consider him to

14  be a lay witness that's offered me an expert opinion, so when

15  you get into what is it, 701(d) I believe.  I think that was

16  the cite, but it's -- you can't use a lay witness when you

17  can't get him qualified as an expert.  I don't consider his

18  testimony to be that.

19         **MR. WINSTON:**  Okay.  Well --

20         **THE COURT:**  And I will not consider it as such.

21         **MR. WINSTON:**  Fair enough.  I still think, and, you

22  know, I do apologize that we are now moving somewhere else.

23         **THE COURT:**  That's okay.  These all fit together.

24         **MR. WINSTON:**  Sure.  That's why I thought it would be

25  putting the cart before the horse.

26

1          If it's lay testimony, lay opinion under 701 --

2          **THE COURT:**  I didn't say it was opinion.

3          **MR. WINSTON:**  Well, that's what I think the report is

4    offered for.  And in fact he says in Paragraph --

5          **THE COURT:**  The report.

6          **MR. WINSTON:**  -- his report, which is what we've

7    objected to, including Paragraphs 5 and 6.

8          **THE COURT:**  It says, what --

9          **MR. WINSTON:**  This is the A and M report that's

10   attached to his declaration.

11         **THE COURT:**  Oh, I see.  All right.

12         **MR. WINSTON:**  All right.  And that's the problem,

13   because --

14         **THE COURT:**  I already admitted his declaration.

15         **MR. WINSTON:**  Well, you admitted his declaration in

16   connection with our motion to strike it as untimely.  I don't

17   think your Honor said at that hearing, in saying, you get to

18   depose him, that we've lost all ability to say that the

19   testimony or the report itself had evidentiary defects.  That

20   would be --

21         **THE COURT:**  Oh, I -- I understand that.  All right.

22   Fine.

23         **MR. WINSTON:**  That's why we care, because at the end

24   of the day, if all Alvarez or Mr. Caruso was testifying was, I

25   got hired to assist the agent to -- in their negotiations,

27

1    that'll be fine.  That's what we've not objected to in his

2    declaration.  What we have objected to is his statement that "I

3    have concluded that my report indicates indicative values that

4    are fair and reasonable."  And if you -- and I'll come back --

5            **THE COURT:**  Whatever indicative values means.

6            **MR. WINSTON:**  Your guess is as good as mine.  I don't

7    know what it means.  I agree with you it's not expert

8    testimony, so if it's not under 702 --

9            **THE COURT:**  Okay.  I'll deal with that --

10           **MR. WINSTON:**  All right.

11           **THE COURT:**  I will tell you --

12           **MR. WINSTON:**  No, I -- there's a reason --

13           **THE COURT:**  -- I'll hear argument.  I'll be glad --

14   I've studied that objection.  I'll get to that in a moment.

15           **MR. WINSTON:**  Okay, but now --

16           **THE COURT:**  But what are -- what is Exhibit 40?

17           **MR. WINSTON:**  All right.  Now, let's go to Exhibit

18   40.  These are notes that were prepared by, according to

19   Mr. Caruso, his colleague, Ed McDonough (phonetic), in

20   connection with their work.

21           **THE COURT:**  Yes.

22           **MR. WINSTON:**  He clearly had relied upon

23   Mr. McDonough's work --

24           **THE COURT:**  No question.

25           **MR. WINSTON:**  -- right -- no question.  They, in the

1    report, the Alvarez report, they cite to a conversation with

2    Mr. Kreeger as the basis for the $50,000 per location

3    replacement cost for the trademark locations for the

4    restaurants and bars.

5           Exhibit 40 has the same exact reference to $50,000

6    per replacement cost for those restaurants and bars.  So, from

7    a foundational standpoint, and he also testified they've had

8    numerous conversations with Mr. Kreeger.  From a foundational

9    standpoint, if Mister -- if we can't depose Mr. McDonough, and

10   Mr. Caruso is saying, "Well, this is what my team did and I

11   supervised them," we've established foundation.

12         **MR. PERRY:**  We've also interposed a hearsay

13   objection, your Honor, to the extent that they're relying on

14   the truth of Mr. Kreeger's statements.  They actually did that

15   in their brief.

16         And it's an issue for us because Mr. Kreeger's

17   testimony was contrary to the way they characterized what he

18   said in this document.  It's double hearsay, the document, as

19   to Mr. Kreeger's purported statements.

20         So, we actually feel strongly that to the extent they

21   are --

22         **THE COURT:**  But this is one of McDonough's

23   statements.  I would not have a problem, but this is McDonough

24   telling Caruso what Kreeger told him.  And that -- I think

25   that's too extenuated.

1          I think I'll sustain the objection.  I think the

2     point's already made on the $50,000.  I read that in your

3     brief.  I -- right.  I don't think that there's -- that you'll

4     suffer any disability in making your argument.

5          **MR. WINSTON:**  I'm not concerned about the disability

6     in making the argument.  I'm concerned about the foundational

7     point, which I think we've covered.

8          Now, let me respond to --

9          **THE COURT:**  No.  That's fine.

10         **MR. WINSTON:**  Let me respond to hearsay.

11    Mr. Kreeger's statements are party upon admissions.  The

12    question is whether this A and M report that characterizes

13    those statements would also either be excepted from hearsay or

14    not qualify as hearsay at all.

15         A and M is an agent of the OPCO lender.  They are a

16    party to the OPCO plan support agreement.

17         **THE COURT:**  Well, let me say this.  Let me cut this

18    short.  I thought about what you just said, and I just

19    rethought.

20         You know, if I'm going to, and as you -- as I've

21    already indicated, unless I change my mind of my preliminary

22    conclusion, I'm probably going to rely on the Caruso

23    declaration with the report.  I'll give it whatever weight I

24    determine is appropriate.

25         He clearly relied on the work of his associate, and

1    part of that work were these reports that he received, so it

2    seems fair to me if I'm going to listen to it from one side, I

3    should listen to it from another side.

4           So, I'm going to overrule the objection.  It'll come

5    in and then I'll make a determination on how much weight to

6    give it.

7           MR. PERRY:  Thank you, your Honor.

8           THE COURT:  Now, the next item is -- that is a

9    foreshadowing by the way.

10          MR. UNIDENTIFIED:  I --

11          THE COURT:  Okay.

12          MR. UNIDENTIFIED:  -- completely understand.

13          THE COURT:  The next item is 43.  Is this the same --

14          MR. WINSTON:  It's going to be the same issue.

15          THE COURT:  I'm going to overrule the objection on

16   the same basis.

17          Sixty-two.  I didn't understand this.  Can you -- can

18   somebody explain to me the nature of this objection?

19          MR. PERRY:  It's a -- I don't really understand what

20   the document is.  It appears to be --

21          THE COURT:  Well, that's why I'm asking you.

22          MR. PERRY:  Yeah.  I -- well, that's sort of the

23   nature of the objection.  It's a foundational objection.  It's

24   somebody ran a patent search somewhere.  I don't know who ran

25   it.  I don't know what the parameters of the search were.

1          Under Rule 901, they have the ability to get

2  compilations of evidence in, but there's got to be some sort of

3  foundation laid.

4          **MR. WINSTON:**  Your Honor, I will represent to the

5  Court our firm ran the search on the U.S. Patent and Trademark

6  Office website.  We input the patent numbers, and it spits that

7  out.

8          **THE COURT:**  What's it for?  What is the purpose?

9          **MR. WINSTON:**  Oh, it's -- what's the --

10         **THE COURT:**  What's the relevance of this?

11         **MR. WINSTON:**  -- what's the relevance?

12         **THE COURT:**  Yeah.

13         **MR. WINSTON:**  Okay.  Well, the relevance is when we

14  get to the arguments on whether the patents are valuable or not

15  due to their age, because one of the things that Mr. Kreeger --

16         **THE COURT:**  Mr. Kreeger said they had no value.

17         **MR. WINSTON:**  They have no value.  One of the things

18  that is argued is part of the reason why they have no value is

19  they're 12 years old.

20         **THE COURT:**  Yes.

21         **MR. WINSTON:**  In response to that, and this is why we

22  put this in.  Those patents have been cited by numerous

23  subsequent patents, and when you get to Exhibit 60 and 69,

24  which are secondary authorities, the more a patent is cited, it

25  is perceived to be more valuable.

1          So we're demonstrating to the Court that these three

2    patents that have been put into evidence to which there is no

3    objection --

4          THE COURT:  Is there any lack of trustworthiness in

5    the search that was conducted?

6          MR. WINSTON:  I have no idea.  I mean, counsel is

7    representing the nature of the search --

8          THE COURT:  I'm going to reserve ruling on this until

9    I understand how the search was conducted.  I just --

10          MR. WINSTON:  Okay.  Again, all I can represent to

11    the Court is we just sat there, went to the website, and put in

12    the numbers.

13          THE COURT:  I'll wait -- let me wait to -- I'll

14    revisit this at the time of argument, because I'm not sure how

15    critical this is.

16          MR. WINSTON:  Okay.

17          THE COURT:  Go ahead.  And then there is 68.

18          MR. WINSTON:  If I can deal with 68 and 69

19    together because they go together.

20          THE COURT:  Please.  They are.  Yes.

21          MR. WINSTON:  This is just merely to assist the

22    parties.  These are secondary authority law or the articles.

23    This is just -- rather than, I'm not putting it in as evidence.

24          THE COURT:  Good.

25          MR. WINSTON:  It's like this.  When you cite

33

1    sometimes to like a court order, you can't easily access it,

2    but I can talk about it.  This way, you put it as an appendix.

3    We just did it for ease for the parties.

4            THE COURT:  Okay.  They're simply marked for

5    identification.  They're not going to be admitted.

6            MR. WINSTON:  No.

7            THE COURT:  Okay.  Seventy-one.

8            MR. WINSTON:  I think the next one is actually 70.

9    Seventy-one --

10           THE COURT:  I thought it -- oh, 68 and 69 are just

11   a --

12           MR. WINSTON:  Yeah.

13           THE COURT:  -- seventy is also a hearsay objection.

14           MR. WINSTON:  And just to -- I'm sorry.

15           THE COURT:  And, you know, it is.  It's hearsay.

16   It's a newspaper story.

17           MR. WINSTON:  It'd be -- the newspaper story is

18   hearsay.  The statement of course is a party upon admission.

19   It's the problem that the newspaper story --

20           THE COURT:  How do I know it's an accurate statement?

21           MR. WINSTON:  Well --

22           THE COURT:  It's not under oath.  I was a reporter.

23   I was a -- my degree is in Journalism.  I assume that they did

24   a good job, but I'm not going to admit a newspaper story

25   without authentication.

34

1            **MR. WINSTON:**  All right.  Your Honor, let me try my

2    best to respond.  In fact, I -- I understand the humor because

3    I've been misquoted --

4            **THE COURT:**  It wasn't humor.

5            **MR. WINSTON:**  I've been misquoted by reporters even

6    in this case.

7            **THE COURT:**  I mean --

8            **MR. WINSTON:**  It doesn't -- it's not surprising.  But

9    I do want to respond both in terms of the hearsay objection and

10   then another purpose.

11           **THE COURT:**  Please.

12           **MR. WINSTON:**  The Ninth Circuit in *Larez versus City*

13   *of Los Angeles* (phonetic), and this is 946 F.2d 630, 1991 case,

14   held that the residual hearsay exception can apply to newspaper

15   stories if there's trustworthiness.

16           **THE COURT:**  Eight zero seven.  Rule 807.

17           **MR. WINSTON:**  I'm sorry -- 807.  I apologize.  Eight

18   zero seven.

19           **THE COURT:**  It was a Rule 807 though, wasn't it?

20           **MR. WINSTON:**  Yeah.  It's 807.  I apologize.

21           **THE COURT:**  Yeah.

22           **MR. WINSTON:**  And our point is this.  There's already

23   been admitted another newspaper article, Exhibit 46, which is

24   -- this is the one by Ms. Benson (phonetic) with respect to the

25   land that sold in February 2002.

35

1      **THE COURT:**  Where everybody was stunned and shocked

2  at the huge price?

3      **MR. WINSTON:**  Stunned and shocked, $11 million per

4  acre.

5      **THE COURT:**  Yeah, I read it.

6      **MR. WINSTON:**  You read it.  Okay.  Well, from a

7  residual hearsay exception perspective, there's no indication

8  that the statement itself was untrustworthy or the newspaper

9  article was untrustworthy.

10      Now, they can disagree with it, and you can give it

11  -- you could ascribe it little weight because it is a newspaper

12  reporter, but I still think it falls within -- under the

13  residual hearsay exception.

14      And if I'm wrong about that --

15      **THE COURT:**  Don't you have to provide notice that

16  you're going to use that section?

17      **MR. WINSTON:**  That's what the rule does provide, and

18  in this particular case, I would think that a couple days

19  notice has been sort of par for the course.

20      **THE COURT:**  Okay.

21      **MR. WINSTON:**  I mean they clearly had enough time to

22  identify it as --

23      **THE COURT:**  I have to -- I have to determine that the

24  statement is offered as evidence of a material fact.  What --

25      **MR. WINSTON:**  What material fact?  It I think

1   contradicts the statement that they say player tracking

2   stations at Stations Casinos are not valuable because they can

3   be replaced by off the shelf systems.

4           **THE COURT:**  But in fact, Mr. Kreeger, I think, said

5   the IGT system was probably as good.

6           **MR. WINSTON:**  That's what he said.

7           **THE COURT:**  Yeah.

8           **MR. WINSTON:**  So something from May of this year from

9   the chief operating officer saying how important these things

10  are to their operations.  I mean, the point being --

11          **THE COURT:**  Wait a minute.

12          **MR. WINSTON:**  -- they get to stick the card in and

13  learn all this stuff.  That's their patented player tracking

14  system.

15          **THE COURT:**  I know what tracking systems are.  Yeah.

16  "The statement is more probative on the point for which it is

17  offered than any other evidence which a proponent can procure

18  with reasonable efforts."

19          **MR. WINSTON:**  All right.  So how do I respond to that

20  one, because I figured you would ask.

21          **THE COURT:**  Yeah.  How do you do that?

22          **MR. WINSTON:**  This came up in Redirect on

23  Mr. Kreeger's deposition.  Remember, the way these depositions

24  were set up is we moved to strike them or continue, you gave us

25  the continuance.  And you said you can depose them, but that

1   wasn't going -- we were never going to have the opportunity to

2   cross examine them in front of your Honor.  You weren't going

3   to be able to see their candor and their demeanor.  You weren't

4   going to be able to ask them questions like you did on May 4th

5   and May 5th.

6         **THE COURT:**  I don't think I ruled that way.  I think

7   I was told that was what happened --

8         **MR. WINSTON:**  Well, I --

9         **THE COURT:**  -- because then I had a conference with

10  counsel after the hearings asking how long it was going to

11  take, and I was told it probably would be done by deposition.

12  I looked at the transcript.  I don't think I ordered it.  I

13  said that it could be done that way, but, anyway, go ahead.

14        **MR. WINSTON:**  All right.  Well, I don't want to

15  misrepresent what your Honor said.

16        **THE COURT:**  Because I would never preclude anybody

17  from ever examining any witness in this courtroom.  I don't

18  think I've ever done that.

19        **MR. WINSTON:**  Okay.  All right.  Well, I certainly

20  don't want to misrepresent what the Court said, so I -- let me

21  back off on that.

22              As I said though, this came up in Redirect after we

23  had already done our Cross Examination via deposition.  And in

24  Redirect, they, you know, asked the questions that they asked,

25  and they had very lengthy narratives.  And that's to be

38

1  expected when you do Redirect in a deposition.

2          But we had no opportunity thereafter other than to go

3  search around for whatever documents we can find that would

4  impeach his credibility.

5          So, if you're not going to admit it under the

6  residual hearsay exception, I think it still falls under Rule

7  613(b) to -- sorry, 607 and 613(b) to impeach his credibility.

8          So, I think we -- this was the best we could do under

9  the circumstances, but if you're going to overrule that then we

10 at least can impeach his credibility.

11         **MR. PERRY:**  Well, first of all it's not impeachment,

12 your Honor.  This is a newspaper article which talks about

13 player tracking systems across the strip, which is precisely

14 our point.  There's quotations from a Boyd officer about air

15 player tracking systems.

16         Mr. Kelley (phonetic), just so it's in the record,

17 says:

18             "We wanted to be able to understand our guests more

19             through technology.  When you get a card and put it

20             in the slot, you learn an awful lot about what

21             players like and they don't like.  That's -- you can

22             do that with an off the shelf system.  You can do

23             that with our system."

24         It's not impeachment.  They could have offered this

25 in Mr. Kreeger's deposition.  They didn't.  It's also true of

1   Mr. Kreeger's statements, Exhibit 40, which you let in.  They

2   didn't cross examine him on any of this stuff.  This is all --

3           **THE COURT:**  That's right.

4           **MR. PERRY:**  -- eleventh hour.

5           **THE COURT:**  So I'll make a determine how much weight

6   to give it.

7           **MR. PERRY:**  It's not impeachment.  If you want to let

8   it in, it is hearsay.

9           **THE COURT:**  You know, I've read the article.  And you

10  both have cited authority for the proposition, primarily --

11  this is a bench trial.  I think that the Court is capable of

12  being able to separate the wheat from the shaft, and I'm not

13  sure it gets to a material point, but if this was in front of a

14  jury, you'd lose.

15          But I'm going to allow it in and I'll make a

16  determination how much weight to give it.  I've always -- I

17  never really liked that when judges did it to me, but I think

18  we've spent about as much time as this particular exhibit

19  deserves anyway.

20          **MR. WINSTON:**  Fair enough, your Honor.  And I can at

21  least report we have some good news for 71.  We have actually

22  voluntarily withdrawn that before your Honor even took the

23  bench.

24          **THE COURT:**  Good.  Yeah.  That's good.  Because I had

25  a huge question mark by that one.

40

1          **MR. WINSTON:**  Fair enough.

2          **THE COURT:**  Thank you.

3          **MR. WINSTON:**  Thank you, your Honor.

4          **THE COURT:**  All right.  Do you know what's in now?

5          Well, that takes care of the evidentiary objections,

6    and the exhibits are now complete.  Does anybody have any other

7    exhibits they wish to offer?

8          All right.  I'm sorry.

9          **MS. STEINGART:**  The only question I have, your Honor,

10   is shall we mark the revised bidding procedures because we --

11         **THE COURT:**  I'll deal with that in a minute.

12         **MS. STEINGART:**  Okay.

13         **THE COURT:**  Because they were actually filed --

14         **MS. STEINGART:**  That was -- right.  Okay.

15         **THE COURT:**  -- and I can take judicial notice of them

16   as a filed document.

17         **MS. STEINGART:**  Okay.

18         **THE COURT:**  So, I did not intend to mark them.

19         **MS. STEINGART:**  Okay.  Thank you, your Honor.

20         **THE COURT:**  I know I have the issue with the Caruso

21   declaration.  I'll deal with that in a moment.

22         What I am going to do now though is make a record of

23   the pleadings that I have reviewed to ensure to the extent

24   possible that I've read everything.

25         I've already indicated that I did read and I

1    conducted independent research because nobody responded to the

2    objection filed by the purported Informal Committee of Station

3    Employees to the plan of reorganization.  That was Document

4    1240.  I have read it.  I've already gone through it.

5            I have reviewed Docket Number 1130 which is the

6    notice of the filing of the disclosure statement to accompany

7    the joint plan of reorganization.

8            I have reviewed the notice of the filing of the joint

9    Chapter 11 plan of reorganization for Station Casinos, Inc.

10   Those were both filed on March 24th, and I know that they're

11   going to be revised, but I went back.  I reviewed them before

12   May 4th, and I went through them again for the purpose of

13   today's hearing.

14           I have reviewed, as I noted, Docket Numbers 1407 and

15   1408, which are the transcripts of the hearing that occurred

16   May 4th and May 5th.

17           I have reviewed Docket Number 1418 which was an order

18   extending -- first compromise agreement extending deadline by

19   which debtor Station Casinos must assume or reject the lease.

20           And I have reviewed Docket Number 1440, my order

21   entered on May 13th extending exclusivity.

22           I have reviewed the orders -- the order approving the

23   original compromise of the master lease.

24           I have taken -- of course reviewed, as I noted, the

25   transcript of the previous hearing.  Certain witnesses were

42

1    subject to cross examination at that hearing.  I have taken

2    another look just to make sure that I have all the

3    declarations.

4            Docket Number 1180, the declaration of Richard

5    Haskins (phonetic) filed on April 7th.

6            Docket Number 1325, declaration of Richard Haskins

7    filed on April 28th.

8            I have reviewed his deposition that's previously been

9    identified as Number 6.

10           I have reviewed Docket Number 1181 which is the

11   declaration of Mr. Kors (phonetic) dated April 7th, and his

12   deposition taken April 30, which was marked for identification

13   as Exhibit 9.

14           I have read the declaration of Thomas Friel

15   (phonetic), Docket Number 1173, filed on April 7th.  The

16   declaration of Thomas Friel filed as Docket Number 1176 on

17   April 7th.  The deposition of Mr. Friel taken April 27th, and

18   marked as Exhibit 8.

19           I have read the declaration of Daniel Aronson

20   (phonetic), Docket Number 1177, filed on April 7th.  He's with

21   Lazard Freres and Company.  He's the financial advisor to the

22   debtors.  I've read, as I've said, his declaration.  Then he

23   filed a supplemental declaration on April 28th, Docket Number

24   1326, that I've read, and of course his deposition that was

25   taken April 29th, and that has been marked for identification

43

1   as Exhibit 6.

2            I have read the declaration of Jason Friedman

3   (phonetic), Docket Number 1318, and it contains the ground

4   lease regarding the Texas Station, so I've read...

5            Those were all before me at the hearing the first

6   week of this month, but I took another look at them again.

7            I have reviewed the debtor's designation, deposition

8   transcripts to be offered into evidence, Docket Number 1524,

9   filed on May 25th.  And these are the depositions of

10  Mr. Aronson, Mr. Caruso, Mr. Flax (phonetic), Mr. Friel,

11  Mr. Genereau, Mr. Haskins, Mr. Kors, Mr. Kreeger, and

12  Dr. Nave.  I've read them all.

13           I have read the designations that were filed on

14  behalf of the committee.  Those can be found, I think I found

15  them all, 9A.  And the reason that there's a 9A is that 9 was

16  Mr. Kors' deposition.  There were subsequent designations.  As

17  I indicated, I've read them.  I annotated them.

18           The other designations I believe are all found near

19  the end of the exhibit books.  Number 76 -- excuse me.

20           Number 76A, the designation of Mr. Caruso.  I've read

21  that, and I've read all the designations.

22           Seventy-eight A, designations of Michael Genereau.

23  I've read that as well.

24           Seventy-nine A, designations of Scott Kreeger.

25  Eighty, designation of Dr. Nave.  I've read all of those.

44

1          And I've read -- the depositions are Number 76 for

2    Mr. Caruso, 77 for Mr. Flax, 78 for Mr. Genereau.  Am I

3    pronouncing that correctly?

4          Seventy-nine for Mr. Kreeger, and 80 for Mr. Nave.

5          I think that's all the depositions.

6          I would -- we've got a problem.  We have a problem.

7    The Genereau -- let me talk about that right now.

8          With each one, you can't see it, but with each one of

9    the depositions, I have kind of done my own little depo of some

10   of these in addition to what you folks have done.  And I noted

11   that Genereau, starting at about Page 106 and going on for

12   about four pages, it was for attorneys' eyes only.  The exhibit

13   book indicates that the deposition has already been provided to

14   me by debtor, and in fact, it has.  But the transcript I

15   received was the entire transcript.

16          The -- there was a declaration of Mr. Ledley

17   (phonetic), I believe, that contains those -- that exclude

18   those pages.  The confidential portion is actually attached as

19   an exhibit to Ms. Axelrod's declaration.

20          So, I -- and I know that there's -- and this is kind

21   of important because it's cited in footnote 10, I believe, of

22   the debtor's objection, together with a reference to an exhibit

23   that the deponent had at that time, which was Exhibit 14 at the

24   deposition.

25          And Ms. Steingart tied them both together at that

45

1   time, and I think appropriately.  I don't have -- that's not

2   the issue.  The issue is what should be included in this

3   record.

4          Because if you want to seal those four pages, that

5   can be done as opposed to the -- but you've already referred to

6   it.  So I'm interested in how you folks are -- and you both

7   noted -- the lawyers at the time of the deposition both noted

8   that they really didn't go into any specifics.  And I'm -- that

9   has to deal with Penn Gaming.  This is what we're talking

10  about.

11          You know, the question is--

12          **MR. PERRY:**  Your Honor, I think the --

13          **THE COURT:**  -- were there any further debtors or

14  potential buyers?  That type of thing.

15          **MR. PERRY:**  It --

16          **MS. STEINGART:**  Right.  You know, it was on that

17  topic and it was also, your Honor, the exhibit that was under

18  seal and is now before you as Exhibit 34, your Honor.

19          **THE COURT:**  Is it 34?

20          **MS. STEINGART:**  Yes, it is, your Honor.

21          **THE COURT:**  Is it admitted?

22          **MS. STEINGART:**  It is admitted.  There was no

23  objection -- there was --

24          **THE COURT:**  Then why -- then why do we need to -- is

25  that -- I don't see that.

1          **MS. STEINGART:**  Okay.

2          **THE COURT:**  Hold it.  What --

3          **MR. UNIDENTIFIED:**  It's been filed under seal.

4          **THE COURT:**  It is a blue --

5          **MS. STEINGART:**  Yes.

6          **THE COURT:**  So it is under seal.

7          **MS. STEINGART:**  Yes.  Yes, your Honor.

8          **THE COURT:**  That's what that -- Blackstone 11061,

9    that's exactly what it is.

10          **MS. STEINGART:**  Yes, your Honor.  So, it was a

11    combination of the transcript and that exhibit that talks about

12    the interested party, and also about the amounts involved in

13    the expression of interest.  And that's --

14          **THE COURT:**  Right.  Exactly.  And I know how

15    Mr. Genereau described it, so I -- okay.

16          **MS. STEINGART:**  Right.  And that's really all we want

17    to refer to generically.  We didn't want to give a precise

18    number.  We didn't -- we weren't interested, but that will be a

19    component of what we present here today, but in a very -- but

20    in a high level way --

21          **THE COURT:**  Then I need an order sealing that portion

22    of the transcript and this exhibit.

23          **MS. STEINGART:**  Okay.

24          **THE COURT:**  I've signed a number of orders sealing,

25    and I don't -- the fact that I have blue that would indicate

47

1   sealing, that may have already been taken care of for 34, but

2   I'm not sure.

3           **MS. STEINGART:**  Right.  There are several of the

4   exhibits --

5           **THE COURT:**  Yeah.

6           **MS. STEINGART:**  -- that we provided to you, and we

7   had discussions with each issue.

8           **THE COURT:**  But I need to make sure those pages are

9   separate.

10          **MS. STEINGART:**  Right.

11          **THE COURT:**  I'm not going to -- I'm not going to --

12  then what I need is a redacted.  I think what we'll do, I think

13  it's Mr. Ledley's -- am I pronouncing that correctly also?

14          **MR. QUSBA:**  Mr. Ledley (pronouncing).

15          **THE COURT:**  Mr. Ledley.  He's got the non-

16  confidential portions as Exhibit A, I believe, to his

17  declaration.  It's around here somewhere.  I'll get to it.

18  That's what should be -- that is what should be included in the

19  exhibit book as the deposition of the witness.

20          And then the blue pages are already in Mister --

21  excuse me, in Ms. Axelrod's declaration, so they're already

22  there.

23          **MR. PERRY:**  And if -- then the issue is that portion

24  of Ms. Axelrod's declaration has not been sealed then we need

25  to provide you with it.

1              THE COURT:  Oh, it has been.

2              MS. STEINGART:  It has been.

3              THE COURT:  It's actually in blue paper.  So --

4              MS. STEINGART:  Your Honor, we have it here.

5              MR. PERRY:  Oh, so -- so the whole deposition

6    transcript --

7              MS. STEINGART:  Yes.

8              MR. PERRY:  -- is before the Court.  It's just in two

9    separate places.

10             THE COURT:  No, the whole deposition transcript was

11   provided to me, and it's indicated in the deposition book that

12   that's what belongs in there.  It is not.

13             What belongs in there is a combination of two things.

14   Exhibit A to Mr. Ledley's declaration, and I believe it's also

15   Exhibit A to Ms. Axelrod's.  That is a combination of the non-

16   confidential and the confidential portions.  That's what I'm

17   saying.

18             MR. PERRY:  We'll clean that up, your Honor.

19             THE COURT:  Okay.  I just want to make sure that, in

20   case somebody reviews this that they're reviewing what I

21   actually looked at.

22             MR. PERRY:  Okay.

23             THE COURT:  Without violating the confidentiality

24   postscriptions.

25             We'll continue.  I have read Mr. Genereau's May 12th

1   deposition, and of course went back and reviewed his

2   declaration.  And I tried to find all of the relevant exhibits

3   in the exhibit book, and I'm sure they'll be pointed out to me

4   if I missed any as we go along today.

5           That declaration by the way of Mr. Genereau is Docket

6   Number 1319.

7           I went back and reviewed the declaration of --

8   verified statement of Robert Flax, Docket Number 1247, and also

9   the sealed declaration, and his deposition taken on April 29th.

10          Now, Mister, as I noted, Mr. Flax's declaration was

11  not marked.  I should say that.  Mr. Flax's deposition was not

12  marked in May -- May 4th or 5th, but it has been marked and is

13  now part of the record on this case for today.  So that's good.

14          I have reviewed the declaration of Scott Kreeger,

15  Docket Number 11 -- 1324, filed on April 28th, and his

16  deposition taken on May 14th.  And it has been marked for

17  identification as well.

18          I have read the deposition of Dr. Nave taken on May

19  3rd.

20          I have of course reviewed the designation by the

21  committee.

22          I reviewed a designation, counter designation that

23  was filed by counsel for Mr. Nave.

24          And I reviewed supplemental designations to the

25  designations provided by the Unsecured Creditors Committee,

50

1    Docket Number 1527.

2            And Dr. Nave's deposition has also been marked for

3    identification.

4            I'm not aware of any declaration that has been

5    offered to me from Dr. Nave.  Is that correct?

6            **MR. KRELLER:**  That's correct, your Honor.

7            **THE COURT:**  All right.  Good.

8            I have reviewed Docket Number 1320 which is the

9    declaration of Robert Caruso filed on April 28th.  And there

10   was a motion to seal.

11           I've reviewed Docket Number 1332 which is the order.

12   And I've reviewed the unredacted copy of it.

13           I have reviewed the joint evidentiary objection filed

14   by the committee and the independent lenders to that

15   declaration.  Docket Number 1474 filed on May 18th.

16           I read the appendix in support of the joint

17   evidentiary objection filed as Docket Number 1475, and it

18   consists of excerpts from transcript of his deposition recited

19   in the evidentiary objection.

20           And then there were a couple -- the other exhibits is

21   the CV from Mr. McDonough, declaration of Mr. McDonough, and

22   then some testimony where Mr. McDonough testified and the

23   reaction to his testimony, all of which I find not to be of any

24   significant interest to me.

25           Then there is Docket Number 1500 which is errata to

1    the index adding an additional citation.  I've read all of

2    those.

3              And I, once again, have a copy of his deposition

4    here.  I will deal with the -- I will hear argument on the

5    objection in minutes.

6              They only -- there was a response filed in one of the

7    oppositions I know.  That's why I want to make reference to

8    that before I hear arguments.  But this will be the next matter

9    that I consider because I think it's the last evidentiary issue

10   that's before me.

11             There were a number of pleadings that were filed

12   prior to the hearing I conducted May 4th and 5th.  I have

13   reviewed the following:  Docket Number 1522 which is the notice

14   of the submission of the red lined further revised second

15   amended master lease compromise agreement.  That was filed on

16   the 24th of May.

17             I read Docket Number 1521 which is the notice of

18   submission of the further revised -- but that's -- I didn't

19   spend any time with that.  I spent all the time with the red

20   lined.

21             I have reviewed the joint motion of Station Casinos,

22   Inc., also known as OPCO, and FCP PROPCO, Inc., also known as

23   OPCO, for an order approving the second amendment to amended

24   and restated master lease compromise agreement that was filed

25   on the 7th of April, Docket Number 1179.  So, I read those.

52

1          Earlier there had been filed a notice of submission

2    of revised second amended master lease compromise agreement

3    that was filed on April 19th.  There was the opposition that

4    was filed by the, whatever it's called, the independent

5    lenders, Docket Number 1243.  It was part of the omnibus

6    response to all of the motions that were pending before me on

7    the 4th and 5th of May.

8          The objection by the committee, Docket Number 1246.

9          Declaration of Bonnie Steingart, Docket Number 1248.

10          The reply of PROPCO, Docket Number 1314.

11          The joinder, the Bank of Scotland, Docket Number

12    -- and the administrative agent's consolidated response.

13    That's Docket Number 1321.

14          The debtor's reply, Docket Number 1323.

15          In that regard, I mean, that just gave me a

16    background, and I was really of course more concerned with the

17    red lined and what's before me today.

18          As I noted, I did go back and review Docket Number

19    961, the findings of fact, conclusions of law in support of the

20    order approving the master lease compromise agreement that was

21    entered on February 2, as well as my order approving the master

22    lease compromise agreement, Docket Number 962, entered on

23    February 2nd.  Those are as a result of hearings that were

24    conducted on December 11th, 2009.

25          Those are the pleadings I've read in regard to red

53

1    lined -- to the second amended compromise of the master lease.

2            I have also gone back to review the debtor's motion

3    for an order authorizing the OPCO debtors to enter into a

4    restructuring support agreement with the OPCO lenders, Docket

5    Number 1219, filed on April 19th.  The lenders opposition,

6    Docket Number 1361.  The objection by the committee, Docket

7    Number 1362.

8            I don't think there have been any pleadings filed

9    regarding this matter other than the objections that I will

10   refer to, but I didn't see anything that directly related to

11   the OPCO support agreement or the OPCO restructuring support

12   agreement that's been referred to.  Is that correct?

13           **MS. STEINGART:**  Other than the objections, your

14   Honor, correct.

15           **THE COURT:**  I didn't miss any -- okay.  Thank you.

16           I have reviewed as Docket Number 1525 that was filed

17   Wednesday, the 25th of May, notice of submission of further

18   revised bidding procedures in connection with the debtor's

19   motion regarding the -- I've read it.  I've annotated it.

20   Hopefully familiar with it.

21           I also went back and took a look at the motion that

22   was filed on April 7th, Docket Number 1175, the exhibits

23   thereto.  The notice of revised bidding procedures filed as

24   Docket Number 1214 on the 19th.  That was the whole issue what

25   happened on the 19th of April.

**EXCEPTIONAL REPORTING SERVICES, INC**

54

1          I read the Docket Number 1216 which is a notice of

2    submission of the red lined comparison of the second amended

3    and restated master lease compromise agreement.

4          I read Docket 1243, the Independent Lenders omnibus

5    objection.  Docket 1245, the objection by the committee.

6    Twelve forty-nine, the declaration of Ms. Steingart and

7    exhibits attached thereto.

8          There's -- and this is -- I read the consolidated

9    response of the prepetition lenders, those would be the OPCO

10   lenders, filed on behalf of the administration --

11   administrative agent.  That's Docket Number 1317 filed on the

12   28th.  That's where the joinder by Bank of Scotland -- I also

13   think Wells Fargo joined in.

14         I read the omnibus reply of the CMBS Lenders, also I

15   think referred to as -- excuse me, as mortgage lenders.

16         Docket Number 1315, debtor's reply.  The opposition

17   Docket Number 1322.  Supplemental objection filed on May 3rd

18   by the committee, Docket Number 1364.  Declaration of

19   Ms. Steingart in support thereof, and that had to do with those

20   -- with the declarations that were filed.  Request for judicial

21   notice, Docket Number 1366, which I believe I granted.

22         And -- yes.  There's the joinder Wells Fargo in the

23   administrative agent's consolidated response, Docket Number

24   1388.

25         So, all members of the steering committee, Bank of

55

1    Scotland and Wells Fargo, have joined in the position of the

2    administrative agent.  They represent, between the two of them,

3    Bank of Scotland and Wells Fargo, about 23 percent of the

4    outstanding liability.  Is that correct?

5            **MR. UNIDENTIFIED:**  I'm doing the math, your Honor.  I

6    think so.

7            **THE COURT:**  Yeah.  I think that's what's indicated.

8            **MR. QUSBA:**  Yes.  I think that's correct.

9            **THE COURT:**  Okay.  I read the notice of submission of

10   asset purchase agreement, Docket Number 1526.  And I don't mean

11   to make light of anything, but if you ever want to cure

12   insomnia, this is the answer.

13           I have a couple of questions that I need to have

14   answered before I go forward regarding this document.  It was

15   filed about 4:10 p.m. on Wednesday afternoon.

16           A lot of -- all the other parties have numerous

17   counsel.  The committee's got numerous lawyers and advisors,

18   together with the independent lenders.  They have two lawyers,

19   two firms representing them.  So, if I don't understand

20   everything, there's only one lawyer reading this.  Me.  And I'm

21   not sure I understand some of this.

22           I went through the agreement and tried to find the

23   most relevant portions.  I was concerned regarding what was

24   being bought and what wasn't being sold.  So I looked with

25   particular concern regarding definitions, and, for example,

56

1    included properties.  What was being sold there.  I understood

2    that.

3              Alternate bid.  Alternate bid expiration date.  I

4    read that.  And of course when I read the red lined versions of

5    bidding that has been proposed, I understood how those fit

6    together.

7              I was concerned, I think its Paragraph 2.4.  "The

8    purchase assets are defined as the assets listed under A1, B1,

9    C1, modified percent of 2.6."  Well, that just means you have

10   to turn to those.

11             Paragraph 2.4 deals with excluded assets, so I turn

12   to that provision.  I think it's at Page 22.

13             "Nothing contained in this agreement shall be deemed

14              to sell, transfer, assign, or convey the assets and

15              property of the sellers set forth in Schedule 2.4,

16              hereto the excluded assets, and seller shall retain

17              all right, title, and interest to and under the

18              excluded assets."

19             This is really at the heart of the dispute regarding

20   the OPCO sale, as I understand it.  Your -- it's the -- the

21   committee and the independent lender.  I think the word, their

22   qualms were regarding the inability of bidders to buy the

23   excluded assets.  Is that correct?

24             **MS. STEINGART:**  Yes, your Honor, but I think that the

25   definition here, the excluded assets, is not that same

57

1    definition.

2           **THE COURT**:  Well, that's where it gets a little --

3    that's why we're going to go through this.

4           **MS. STEINGART**:  Yeah.

5           **THE COURT**:  Because it gets a little bit confusing.

6    Because I did some cross checking thought.  I turned to

7    Schedule 2.4, and was not of great assistance.

8           So I said, oh, let's see if we can find this

9    somewhere else.  A1 is exhibit of purchased assets.  I

10   understand that.

11          A2, assumed liabilities.

12          B1.  This is -- B1.  Exhibit B purchased assets.

13               "All of the right, title, and interest of sellers and

14               the assets and properties of sellers set forth on

15               this Exhibit B1 as of the -- except for assets and

16               properties defined as excluded assets."

17          That's the same definition, because if you go through

18   Items 1 through 26, they're the same that I found as the

19   excluded assets that were not to be conveyed to a party other

20   than the stalking horse bidder.  Is that accurate?

21          **MR. KRELLER**:  Your Honor, within the bucket of

22   excluded assets, things the third party bidders would not have

23   the right to acquire.

24          There's two subsets.  One is those assets that are

25   being transferred to new PROPCO.  Either it's the stalking

58

1  horse bidder if it prevails or separately --

2       **THE COURT:**  For 35 plus 13.

3       **MR. KRELLER:**  -- separate and apart from a third --

4       **THE COURT:**  That's my point.  I understand that.

5       **MR. KRELLER:**  But 35 plus 13 plus other things we'll

6  talk about.

7       There is a -- the second subset of excluded assets

8  are things that are not being sold to anyone at this point.

9  Not to the third party buyer --

10      **THE COURT:**  That's good.

11      **MR. KRELLER:**  -- not to the stalking horse bidder in

12 PROPCO.

13      **THE COURT:**  But what is B1?  B1 appears to be those

14 that aren't going to be sold to a third party.  Two four does

15 not identify them.  Two four is what's being excluded from

16 anyone.  That's what I understand.  Am I correct or am I

17 incorrect?

18      I just want to make sure that if anybody bids on

19 this, they understand the asset purchase agreement that they're

20 bidding against.

21      **MR. KRELLER:**  Your Honor --

22      **THE COURT:**  I think that's a point you were trying to

23 make, Ms. Steingart, is 2.4 is every -- no one buys those.  B1

24 is, only third parties aren't allowed to buy those.

25      **MS. STEINGART:**  Exactly right, your Honor.

1          **MR. KRELLER:**  That's correct, your Honor.  B -- 2.4

2    is the full category of excluded assets.  Item 1, they're all

3    PROPCO assets, or the items where PROPCO has -- PROPCO or the

4    PROPCO lenders have liens.  They're not purchasing those

5    assets.  A third party is not purchasing those assets.  Those

6    are going over to PROPCO in satisfaction of their security

7    interest and liens.

8          **THE COURT:**  Does 2.4 then subsume what's on B1?  It

9    would have to.  Because 2.4 --

10         **MR. KRELLER:**  B1 is just those that are the subject

11   of the purchase.

12         **THE COURT:**  Right.

13         **MR. KRELLER:**  Of the purchase by a new -- if you --

14   we'll get through this in the bid --

15         **THE COURT:**  By a non-stalking horse purchaser.

16         **MR. KRELLER:**  -- in the bid procedures by a non-

17   stalking horse -- by new PROPCO as non-stalking horse.

18         **THE COURT:**  All right.

19         **MR. KRELLER:**  I call those new PROPCO purchased

20   assets, and that's how we --

21         **THE COURT:**  Now I understand.

22         **MR. KRELLER:**  -- define them in the bid procedure.

23         **THE COURT:**  I understand the distinction now.  I just

24   wanted to make sure that I did, because I went back and checked

25   and I saw that they were the same, and I wanted to make sure I

60

 1  understood.  And more importantly, that anybody who is bidding

 2  understands that their bid does not include those items listed

 3  on B1.

 4          **MR. KRELLER:**  That's correct, your Honor.

 5          **THE COURT:**  That's the critical issue.

 6          **MR. KRELLER:**  And, your Honor, we -- the revisions

 7  that you've seen in the bid procedures on these points are

 8  actually an attempt by me to marry up the bid procedures to

 9  what my corporate counterparts have done in a more verbose way

10  here.

11          **THE COURT:**  Okay.  All right.  I understand.  Anyway,

12  I've reviewed the document.  That helps me understand.  So

13  those are all what I would call the pleadings that are actually

14  -- the original motions and the objections, replies, and

15  subsequent document filings.

16          I am now going to refer to the post May 5th briefing

17  that I allowed, which I thought was limited to an analysis, and

18  are even arising from the depositions that I permitted because

19  of the late filed declarations.  Candidly, some of the

20  arguments go beyond that, and I've already read it, so it

21  really doesn't matter.

22          The first is the second supplemental objection filed

23  by the committee regarding the revised second amended and

24  restated lease compromise agreement, bidding procedures, and

25  OPCO plan support agreement.  So that's Docket Number 1481.

61

1              I will tell you that there -- 1481 was filed under

2    seal.  I have read the pleadings that were filed under seal, so

3    I've read the entire pleading.  I have the copies of the

4    redacted portions just -- we just checked them to make sure

5    that they were consistent.  And I pulled the case law that's

6    been cited, and I've read the cases.

7              I've read Docket Number 1482, which was the

8    independent lenders supplemental brief regarding new witnesses.

9    And it was limited to an examination of the new witnesses even

10   though new was in quotes, as I guess independent lenders could

11   be in quotes.

12             I have a question at -- would you turn to Page 13,

13   please, Mr. Goldberg?  And the reason I'm doing this is I'm

14   going to hear argument and not evidence later, and I want to

15   make sure I understand the evidence.

16             You referred to Mr. Kreeger's declaration, 1324,

17   Paragraph 8, as stating that "In the event of a separation,

18   OPCO would have to spend 20 million to acquire brand new

19   hardware to build a primary and secondary backup system.'

20             I don't think that's right.  I think he said PROPCO

21   would.  And I think that he said, because then at your point,

22   at your deposition, as you note in the next sentence, "At his

23   deposition, Mr. Kreeger acknowledged that $20 million he used

24   in his declaration is woefully inadequate."

25             He didn't say "woefully."  "Because it would not put

62

1   PROPCO in the same position that it would enjoy if it received

2   the IT systems from OPCO," and then you quote.

3         So that has to be --

4         **MR. UNIDENTIFIED:**  OPCO should be PROPCO.  That's

5   correct, your Honor.

6         **THE COURT:**  And it's not in that paragraph.  I have

7   his declaration.

8         His declaration, Paragraph 8, does not refer to

9   anything that PROPCO would have to spend to replicate the

10  system.  I think, and I could be wrong, that it's Paragraph 14.

11  And I'm asking you to clarify that for me, please.

12        **MR. WINSTON:**  Your Honor, that's correct.  That

13  reference should be to Paragraph 14.

14        **THE COURT:**  And it reads, "Option 4 is impractical."

15  That's the rip and tear, replace option.  "It leaves PROPCO

16  with no IT so that PROPCO would have to spend 20 million to

17  acquire brand new hardware and develop primary and secondary

18  backup computer systems.  Under any of the Options 1, 2, or 3,

19  the overall cost is substantially less, and OPCO ends with

20  either a new system or one that a third party purchaser already

21  relies on.  Under any of the options contemplated by the

22  separation agreement, OPCO is better off..."

23        His reference to a separation agreement is to the

24  compromise.  All right.

25        So now we're -- I've read the right one.

63

1          **MR. UNIDENTIFIED:**  Yes, your Honor.

2          **THE COURT:**  Okay.  Thank you.  I read the declaration

3    of Brett Axelrod, Docket Number 1490, and all the exhibits

4    attached thereto.

5          I read Docket Number 1505, and it came in two forms.

6    The confidential form which I read.  That's the response of the

7    administrative agent.  Deutsche Bank Trust Company Americas.

8    That's from the prepetition OPCO lenders.

9          Filed -- there's a separate notebook that I received

10   which was a copy of Docket Number 1505, together with the

11   declaration of Michael Ledley, and I -- which contain a number

12   of exhibits which I have read and annotated.  So, I've read

13   both.

14         I read the debtor's reply to supplemental objections,

15   Docket Number 1509.  That was filed on May 21st, and I pulled

16   the case and read the cases.  At least what I thought were the

17   critical cases.

18         I read Docket Number 1510, the supplemental reply of

19   FCP PROPCO.  This was the debtor, PROPCO the debtor, filed on

20   May 21st, and taken a look at some of the cases cited therein.

21         I didn't refer, but I -- well, I think I did.  I do

22   have the cases also by the committee.

23         I think that that completes my rendition of pleadings

24   I read.  Have I missed any pleadings that were filed by any

25   party regarding the matters that were pending before me on May

64

1    4th, 5th, or today?

2              **MS. STEINGART:**  No, your Honor.

3              **THE COURT:**  No.  Mr. Goldberg?

4              **MR. GOLDBERG:**  No.

5              **MR. KRELLER:** Nothing from the debtors, your Honor.

6              **THE COURT:**  All right.  Good.  I'm going to take a

7    short break and then I'm going to take up the objection to --

8    no, let's just get the Caruso objection out of the way.

9              I didn't bring out my entire research file on Daubert

10   including an article that I wrote on Daubert.  I am familiar

11   with it, so we don't have to spend a lot of time.

12             I will say this.  The Daubert is not relevant.  He's

13   not being offered as an expert.

14             Let me pull your objection.  The opposition, I think

15   it's in the reply that was filed --

16             **MR. WINSTON:**  It's the OPCO agent's reply, your

17   Honor.

18             **THE COURT:**  I think that's where it's at.

19             **MR. WINSTON:**  Where it says "Their witness."

20             **THE COURT:**  Yeah.  One moment.  I had a sheath with

21   my notes.  These are just my notes.

22             Yes.  Let me pull that pleading, please.

23        **(Pause)**

24             Oh, it's on Page 14.

25        **(Pause)**

1          One moment.  Oh, here.  Okay.  As I understand it,

2   this objection is limited, tell me if I'm wrong, to Paragraphs

3   5 and 6 of the declaration.  Is that correct?

4          **MR. WINSTON:**  Five and six, and the report itself.

5          **THE COURT:**  It says five and six of the declaration.

6   Look at Page 2, Line 4.

7          **MR. WINSTON:**  Yeah, and if you could look at Line 8,

8   and the report.

9          **THE COURT:**  Right.  Page 5 simply says what he did.

10  Paragraph 5 simply says what he did.

11         **MR. WINSTON:**  Yeah, if your Honor is concluding it's

12  not being offered for expert testimony, then I think Paragraph

13  5 goes -- it's not --

14         **THE COURT:**  So do I.

15         **MR. WINSTON:**  Yeah.

16         **THE COURT:**  I feel the same way about six.  He

17  explains that indicative values, another analysis he provided,

18  all in his detailed report, gave the steering committee a sound

19  basis.  That's his opinion.  I don't know how much weight I'll

20  -- I mean, I understand its opinion and not a fact.  But I'll

21  be glad to hear your argument at this time.

22         **MR. WINSTON:**  Okay.  Thank you, your Honor.  I've

23  heard what your Honor says.  I completely agree he's not

24  qualified as an expert.  They're saying they're not offering

25  him as an expert.  So we can move on to that.

66

1          The question is, what is it, and what is it being

2  offered for.  If it was being offered solely for the purpose to

3  demonstrate why the OPCO lenders agreed -- what they agreed to,

4  then it's irrelevant because this is the debtors' motion to

5  sell these assets.

6          And if the debtors have no evidence as to why they

7  think this is a good compromise from a valuation perspective,

8  the fact that Mr. Caruso told the OPCO lenders what he thought

9  doesn't matter.

10         I don't think that's why they're actually offering

11 it.  I think they are trying to establish a valuation basis for

12 the debtors to enter into what they entered into.

13         And the reason why I say that is when they filed the

14 motion on April 7th, and then they did their supplement on

15 April 19th, our objections and the objections of Mr. Goldberg's

16 clients said the same thing, which was where is the evidence of

17 value.  There is none.  And it showed up on April 28th in the

18 form of the OPCO lenders seeking to put into evidence not only

19 what Mr. Caruso told his clients, but the report itself.

20         And the reason why that's important is that we've

21 heard the testimony both in the depositions and then when I

22 cross examined Mr. Aronson on May 5th, or May 4th, I forget,

23 that he was told by A and M what the indicative values were,

24 and he reported it to the board on April 16th, and the board

25 took that as a basis for entering into the transactions it

1  entered into.

2          **THE COURT**:  I think that's, if I remember correctly,

3  I read Dr. Nave's deposition and that seems to be what

4  occurred.

5          **MR. WINSTON**:  Okay.  So, if it's being offered for

6  the purpose of establishing why the debtors entered into what

7  they entered into, then this is improper lay opinion because

8  it's based upon Mr. Caruso not having the knowledge himself of

9  what is in the report.  Because that's -- we demonstrated that

10 on a number of occasions.  And then the report itself is based

11 upon lots of hearsay statements.

12         And then, we can go into this.  There's a lot of

13 methodology flaws in the report.  If the purpose is again for

14 the OPCO lenders to say that this is why we've agreed to having

15 the Fertitta gaming entity be the stalking horse bidder, okay.

16 It's irrelevant then for what the debtors need to establish for

17 purposes of their master lease compromise motion.  And for

18 their bidding procedures motion.  And for the OPCO -- other

19 than for potentially the OPCO restructuring support agreement

20 motion, but only for purposes of establishing why the OPCO

21 lenders entered into it.

22         So, from that perspective, if your Honor is going to

23 allow it in for the purposes which I think we're now hearing as

24 why they want to enter it into, you have no record of what the

25 value of any of the excluded assets are.

68

1          If you are taking it for the purposes of establishing

2     what is the value of some of the excluded assets, the three

3     categories that Alvarez did in fact provide indicative values,

4     it's improper lay opinion.

5          Thank you, your Honor.

6          **MS. QUSBA:**  Good morning, your Honor.  Sandy Qusba

7     with Simpson, Thacher and Bartlett, counsel for Deutsche Bank

8     Trust Company Americas as the OPCO agent.

9          I'm not sure how many times we can say this, but the

10    report as well as the declaration are not opinion testimony.

11    They're not being offered as opinion testimony, expert or

12    otherwise.  This is fact testimony.

13         And I'm shocked to hear that there's a relevance

14    objection with respect to the report.  I certainly hope

15    Mr. Winston, the committee, and the splinter banks recognize

16    that one of the principle factors that presumably the Court

17    will consider with respect to the plan facilitation motions is

18    with respect to whether they are in fact in the paramount

19    interest of creditors.

20         And, your Honor, this report, what Mr. Caruso did and

21    Mr. Genereau did, directly relate to that, whether it's in the

22    paramount interest of creditors.  Because we, as creditors,

23    60 percent of the OPCO bank debt, $530 million, made an

24    informed decision.  And what was that informed decision based

25    upon?  It was based upon work.  We did the work.  We hired the

69

1    advisors.  They spent the money.  They educated us as a

2    steering committee.  And that's what we made our decisions

3    based upon.

4          **THE COURT:**  What about the distinction between your

5    client as lender and OPCO as debtor?

6          **MR. QUSBA:**  Your Honor, I cannot speak to what work

7    OPCO did or did not do as a debtor.  This is being offered to

8    demonstrate to you what work we did.  Why we got comfortable.

9    Why we think all these transactions make sense to us.

10          And it's not being offered for the valuation of it.

11    We provided -- Alvarez and Marsal provided a range of

12    valuation.  And we have never --

13          **THE COURT:**  Thirty-four to 63.

14          **MR. QUSBA:**  That sounds correct, your Honor.  But

15    we've never -- we've never suggested that the excluded assets

16    equals X, because quite honestly it's much more than X.  Okay?

17    It's dollars.  It's assumed liabilities.  But more importantly,

18    it's also the backbone, the foundation of a stalking horse bid.

19    It's the foundation of transition should a split occur.

20          There are many other valuable considerations that we

21    took into account when we agreed to the excluded asset concept,

22    the 35 number, the 13 of assumed liabilities, the Texas Station

23    solution.  It is a package deal for us, your Honor.

24          But with respect to putting some range of numbers

25    with respect to the assets that are being excluded, we did the

70

1   homework.  We did it.

2          **THE COURT:**  Rebuttal?  I'm sorry.  Go ahead.

3          **MR. PERRY:**  Your Honor, very briefly, on behalf of

4   the debtors, we have introduced evidence of what we, the

5   debtors, did.  It's in the form of Mr. Haskins' testimony,

6   Mr. Kreeger's testimony, Mr. Friel's testimony.

7          We did, in fact, as Mister -- Dr. Nave's testimony

8   reflects, and Mr. Aronson's testimony reflects, consider the

9   work that the OPCO banks did.  It's not irrelevant because we

10  considered it.  They can certainly attack us for considering

11  it, but that really goes to the weight of the evidence.

12         But from our perspective, we did our own analysis.

13  We also checked that with the A and M analysis.

14         **THE COURT:**  Thank you.

15         **MR. WINSTON:**  Your Honor, thank you.  Just very

16  briefly.

17         First, the notion that the report is somehow a

18  statement of fact as opposed to opinion is -- that's just

19  wrong.  I mean, one has to only flip through the 40 some odd

20  pages of it to see that they're opining as to value.  There's a

21  value range.  Fair enough.

22         It's still opinion.  It's lay opinion is what they're

23  trying to say it is.  It's just not admissible because it's

24  either based upon hearsay.  It's not based upon Mr. Caruso's

25  perception.  We demonstrated that.  It's not admissible.

1          Again, if they're offering it for the purposes of why

2     they entered into the transaction, I would argue its irrelevant

3     because it's not their transaction.  They're not the ones that

4     are allowed to sell these assets.

5          With respect to the debtors, if the decision is that

6     they entered into a transaction based upon what they heard from

7     Alvarez, yes, we can certainly tap what Alvarez did, but that

8     doesn't make this report admissible.

9          Thank you, your Honor.

10     **(Pause)**

11     **THE COURT:**  The Caruso declaration and the Alvarez

12     report that's attached to it was considered by the parties in

13     arriving at the bidding procedures and the compromise, and, it

14     strikes me, the OPCO restructuring support agreement.

15          And they are the debtor, OPCO debtor, and OPCO

16     lenders are parties to that restructuring agreement, so it's

17     relevant for that.  That -- the basis of the objections are

18     that there was no or inadequate weight given to the value of

19     the excluded assets.  By here, I mean, excluded assets that

20     would not be available to a bidder at an auction that I'm being

21     requested to conduct pursuant to the bidding motion.

22          I think that what the steering committee lenders and

23     the OPCO debtors considered is relevant.  I think that the

24     weight given to it by those parties is subject to argument and

25     impeachment, which has been well pleaded and argued already in

72

1    the pleadings that I have received.  And I understand them.

2           But I will not consider either the Caruso declaration

3    nor the report attached thereto as an expert, but I think that

4    when one looks at a number of cases in the Circuit, starting

5    with *Woods and A and C Properties* (phonetic), that in

6    determining whether or not to approve a settlement, one needs

7    to be able to gauge a range of reasonableness and make a

8    determination that the settlement falls somewhere within that

9    range.

10          It is not to conduct a mini trial.  I can make the

11   determination whether or not a range exists and whether or not

12   the settlement falls within that range.  And I believe that

13   this evidence is relevant for that purpose.  Not necessarily to

14   establish the value of any particular asset, because frankly,

15   when I read the responses, I didn't understand some of the

16   objections.  I didn't understand some of the positions that had

17   been taken on the other side either.

18          Because basically what it boils down to is this value

19   might have -- or this asset may have value for -- to PROPCO,

20   but it would not have any value for a potential third party

21   bidder, and hence probably wouldn't have any value for OPCO

22   except that OPCO might be able to use it as leverage against

23   PROPCO.  So, what you're really attacking is the negotiations

24   that led to this agreement.  This is evidence of that.

25          Perhaps it's wrong, but I looked at it as if I knew I

73

1   had a good second baseman in the minor leagues, and I had a

2   second baseman I was paying $10 million on my team, am I going

3   to move that second baseman?  He's not worth $10 million to me

4   anymore, but he might be worth $10 million to someone else.

5         The real issue is what's the value to OPCO as

6   opposed, I think, as what's the value to PROPCO, because nobody

7   has offered any opinion as to what I believe is really fair

8   market value.  I know the argument has been raised and well

9   pleaded.  I haven't seen it.  There's been no expert testimony

10  offered by the objectors.  So, solely within the context of how

11  and why all these parties entered into these agreements and the

12  compromise, I think it's relevant for that purpose.

13        I'm not saying, and I don't want to be misunderstood,

14  that I am accepting any of the indicative values.  To me, that

15  simply means we did some checking, I relied on the folks that

16  told me, and this is what they think it might be worth for the

17  purpose of negotiations.  That's what they mean.  Nothing more.

18        And that's how I'm treating it.  And candidly, that's

19  not -- when one looks at 701(c), and I -- there was a citation

20  in the points and authorities I think that went to 702, and I

21  think that 701 -- it provides "If the witness is not testifying

22  as an expert," and this one is not, "the witness' testimony in

23  the form of opinions or -- is limited to those opinions

24  or inferences which are rationally based on perception."

25        Well here we know that he didn't perceive a lot of

74

1    it.  He relied upon others.

2           "Helpful to -- and helpful to a clear understanding

3    of the witness' testimony, the determination of a fact in

4    issue."  I don't have any trouble with that.

5           And they're not based on scientific, technical, or

6    other specialized knowledge.  Well, they're not.  They're not

7    based on scientific, technical, or other specialized knowledge

8    because he didn't have it.  He so testified.  He compiled it,

9    reported it, and these aren't his opinions as to value.  And

10   he's not testifying as an expert.

11          And I think that he can simply say what he reported

12   in his representative capacity as a financial advisor because

13   -- was that Blackstone couldn't do this type of work.  That's

14   what Genereau testified to.

15          So, for that purpose and that purpose only I'm

16   admitting it.  And if it's good foreshadowing argument by the

17   committee.  Thank you very much.

18          How much time -- can you tell me the order in which

19   you folks are going to argue?

20          **MS. STEINGART:**  Yes, your Honor.  I am going to argue

21   on behalf of the committee most of the issues that are before

22   the Court with respect to the motions.

23          Mr. Winston is going to assist me with respect to the

24   topic of excluded assets.  And then --

25          **THE COURT:**  I assume you've coordinated with

1    Mr. Goldberg.

2            **MS. STEINGART:**  And we have coordinated with

3    Mr. Goldberg who will follow.  I assume --

4            **THE COURT:**  Can you give me an estimate of time?

5            **MS. STEINGART:**  -- you know, I assume that

6    Mr. Winston and I together will take less than the two hours

7    that Mr. Kreller and Mr. Aronson took.  But not significantly

8    less.  Certainly not --

9            **THE COURT:**  Does that include Mr. Goldberg?

10           **MR. GOLDBERG:**  It does not.  Half hour to 45 minutes.

11           **THE COURT:**  All right.

12           **MR. KRELLER:**  Your Honor, just to --

13           **THE COURT:**  And then you'll rebut.

14           **MR. KRELLER:**  -- fill that out, we will rebut, but I

15   think before we rebut, you've yet to hear from -- we obviously

16   had our opportunity at the outset of the May 4th or May 5th

17   hearing.  Both the OPCO agents steering committee counsel and

18   counsel for the PROPCO lenders as well as counsel for the

19   independent PROPCO directors also have arguments to make.  We

20   were going to let them precede our argument.

21           And then the second point, your Honor, if it would be

22   helpful, I'm also prepared at the outset of when we come back,

23   the red lined bid procedures and master lease compromise

24   agreement, I think, do address a number of issues that were

25   contained in the objections.  And if the Court would --

1          **THE COURT:**  No.  I'm going to let them go first.

2          **MR. KRELLER:**  -- like to hear that to streamline --

3          **THE COURT:**  I'm going to let them go first.  You've

4    had your chance.  They get to go.

5          **MR. KRELLER:**  Trying to be helpful, your Honor.

6          **THE COURT:**  I appreciate it.

7          **MR. KRELLER:**  Ten, 15 minutes.

8          **THE COURT:**  No.  I've read it.  I know what's in

9    there.  I saw most of the -- I saw the 60 days, I saw the 35

10   million.  I get it.  You know, I really did read those things.

11         Here's what I -- here's what we're going to do.

12   We're going to take a short break.  We've been going a couple

13   of hours.  Get a chance to get you folks organized and I can

14   get myself a little bit organized.  I've got papers all over

15   here.

16         I hope I don't have to flip through too many of the

17   depositions.  I've showed you I've annotated them.  I know what

18   the witnesses said.  I'll have an opportunity at the conclusion

19   of argument to go back and refresh my memory.

20         You've got one issue that you folks need to talk

21   about.  I don't -- during your argument because -- regarding in

22   the absence of a sale whether or not, I think it's the put

23   agreement (phonetic).  It'd still be -- Paragraph 31 of your

24   response says they can't do certain things, and I'm not sure

25   that that's correct because the other response said "almost

77

1    certainly," which means that there's a little bit of wiggle

2    room.  So, take a look at that, please.  I need you to do that

3    for me.

4           What I'm really looking at is about two, two and a

5    half hours from you folks.  What I'm going to let you do is I'm

6    going to let the committee go, and we'll go through and finish

7    them.  Then I -- then I'll probably let -- a lot of people need

8    -- my staff needs a break.

9           I'm going to ask -- I'll take a break after their

10   argument and pick up with your argument, Mr. Goldberg.  And

11   then we'll go right into yours, and we'll go at least until

12   5:00, and we'll see how we're doing then.  Then if we need to

13   -- we are, as I told you during the telephone conference

14   Tuesday, we'll come back.  I'm going to announce my decision

15   tomorrow.  If I have to -- if I need time to finish argument,

16   I'll allow you to finish argument.  I'd rather get it done

17   today.

18          I have truly gone through your pleadings.  I've

19   checked the cites for the depositions.  I -- all the red ink

20   are my notes.  So, you're just going to have to accept my

21   representation that I'm pretty well prepared, and I think the

22   arguments are going to be very helpful to me.

23          So, if we can get it done today, and my staff is

24   prepared to work a little later if we have to, but I don't want

25   to take them into -- late into the night if I can avoid it.

78

1          So, that being said, we'll start again at 11:30.

2          **THE MARSHAL:**  All rise.

3      **(Recess taken from 11:06 a.m. to 11:34 a.m.)**

4          **THE COURT:**  Please be seated.

5      **(Pause)**

6          **THE COURT:**  Please.

7          **MS. STEINGART:**  Good morning, Your Honor.  Bonnie

8   Steingart on behalf of the Official Committee.

9          In addressing the motions that are currently before

10  the Court, we begin as we must with the process by which the

11  agreements were made.  The facts establish that on the OPCO

12  side of the process there was domination by the Fertittas and

13  the controlling lenders.  Both groups had a personal agenda to

14  own the OPCO assets and to do so at the lowest possible price.

15  Thus, it cannot be disputed that persons who, in terms of their

16  talents and works, are the major asset and primary drivers of

17  OPCO's business and future hope, the Fertittas were still

18  ostensibly running OPCO, but pursuing their own interests and

19  enrichment.

20         Thus, the evidence shows that Fertitta Gaming was

21  formed with the help of Milbank, and that's Exhibit 16 in the

22  hearing transcript, Page 108, Lines 18 to 12, testimony

23  confirming this by Mr. Haskins, just this fall and then almost

24  immediately Fertitta Gaming engaged in discussions with the

25  controlling lenders, these lenders wearing now their PROPCO

1    hats, to leverage the Fertitta's knowledge and control and day-

2    to-day participation in this business into ownership of almost

3    50 percent of New PROPCO at prices below what is -- what are

4    currently plan value.  It is clear that in this regard,

5    Mr. Frank Fertitta was not wearing his OPCO hat when pursuing

6    the opportunities for himself.  And this is true despite the

7    fact that Mr. Fertitta has an employment agreement with SCI,

8    and that employment agreement is now Exhibit 73 before the

9    Court.  In that employment agreement there's a description of

10   Mr. Fertitta's responsibilities, and those responsibilities are

11   to devote time and attention to OPCO, to SCI, and to promote

12   the company's interests, and that's at Section 2.3 of

13   Mr. Fertitta's employment agreement, Pages 5 to 6 of that

14   agreement, which is Exhibit 73.

15            In addition, under the employment agreement,

16   Mr. Fertitta also has an obligation during the term of his

17   employment and for 12 months thereafter not to use, or make use

18   of any confidential information in connection with any business

19   activity, other than that of SCI, of OPCO.  And that's in

20   Section 11.1 of the employment agreement, Exhibit 73, at Page

21   17.

22            Mr. Fertitta's entity, Fertitta Gaming, has been set

23   up to be nothing less than a direct competitor of OPCO and

24   there's testimony about that from Mr. Haskins during the

25   hearing at Page 131, Line 12 to Line 18.  And Mr. Fertitta is

80

1    lending his knowledge of SCI's confidential information to that

2    enterprise to assist to obtain -- and that enterprise being

3    Fertitta Gaming, to assist to obtain those assets for himself,

4    all in abrogation of his employment agreement and his

5    responsibilities to SCI.  As testimony at the hearing has

6    demonstrated, the Fertittas participated in the OPCO Board

7    Meetings and OPCO votes concerning the second master lease

8    compromise amendment, the bidding procedures and the OPCO Plan

9    Support Agreement, each of which provides significant personal

10   benefits to the Fertittas and Fertitta Gaming, and each of

11   which has a major impact on the value and prospects of OPCO.

12          The OPCO Plan Support Agreement between Fertitta

13   Gaming and Deutsche Bank JP Morgan on the one hand was

14   developed with the help of Milbank preparing drafts, a draft

15   prepared by Milbank is Exhibit 12, even though no debtor was or

16   is a party to that agreement, but Fertitta Gaming and the

17   Fertitta owner.  The evidence was also established during the

18   hearing that Milbank continued its ongoing representations of

19   Fertitta --

20          **THE COURT:**  Excuse me.  You're talking about the OPCO

21   Support Agreement?

22          **MS. STEINGART:**  I'm talking about the PROPCO Plan

23   Support Agreement.

24          **THE COURT:**  I thought you said OPCO.

25          **MS. STEINGART:**  I'm talking about --

1          **THE COURT**:  PROPCO.  That I agree, that they're not

2    parties.  I know they're parties to the OPCO.  Go ahead.

3          **MS. STEINGART**:  Right.  Milbank continued its ongoing

4    representation of Fertitta interest in numerous other business

5    and personal matters, and that's set forth in Exhibit 17 and in

6    the hearing transcript at 111 Line 13, to 114 Line 8.

7          Lazard testified here and, as Mr. Haskins confirmed,

8    Lazard was advisor to both OPCO and PROPCO and is receiving

9    transaction fees from both.  And the transaction fee issue, as

10   the Court is aware, is embedded in the OPCO Support Agreement

11   term sheet, which is Exhibit 5, and I think it's at Page 50 of

12   that agreement, which is Exhibit 5.  PROPCO Banks and Fertitta

13   Gaming started their campaign to own OPCO and to obtain

14   excluded assets.

15         Mr. Haskins, who is executive vice president, general

16   counsel and secretary of OPCO, has been employed by OPCO for 15

17   years, has for a number of years reported directly to

18   Mr. Fertitta, has had frequent business dinners with

19   Mr. Fertitta and some social contact, and expects to continue

20   in the employ of either OPCO or PROPCO, was authorized to be a

21   primary negotiator on behalf of OPCO.  We've also seen that

22   Mr. Haskins is a director of PROPCO and by resolution

23   Mr. Haskins was authorized to negotiate plan documents on

24   behalf of PROPCO.

25         As Mr. Kreller recognized when the debtors did their

82

1    openings here, under circumstances where insiders have

2    fiduciary duties, but so involve themselves in decisions that

3    are beneficial to the insiders, a higher standard of review and

4    scrutiny is applied in looking at such decisions and the burden

5    is placed on the debtors to show entire fairness.  This

6    standard is echoed time and again in bankruptcy cases where

7    courts are asked to review and approve insider deals.  And we

8    have numerous citations to such cases in the briefs that we've

9    submitted to the Court.

10          Here the impact of insider participation was

11   heightened by the dual interests of the controlling lenders and

12   the divided loyalty of Mr. Haskins and Lazard.  And that, Your

13   Honor, was the point of the chart that we marked as a

14   demonstrative as Exhibit 19 and that we used during the

15   testimony of Mr. Haskins at Page 127 Line 19 to Page 131 Line

16   9.  Even more disappointing, Your Honor, is that each of OPCO

17   and its professionals, and the Fertittas knew, that these

18   issues were present and that these issues were troublesome and

19   could have ameliorated the impact by including the committee in

20   matters involving OPCO assets, could have involved the

21   committee in pricing those assets, could have involved the

22   committee in creating bid procedures, and could have involved

23   the committee in the discussion of stalking horse arrangements.

24   I've represented a number of committees over a many years,

25   committees who have, according to debtors, been both in and out

1    of the money, and we will get into whether this committee is in

2    the money in a moment, but never as counsel for an official

3    committee have professionals on the committee been so

4    disregarded by a debtor.

5         When identifying and segregating what have become the

6    excluded assets, the committee should have been included and

7    consulted.  These are OPCO's assets.  Mr. Friel, in his

8    affidavit, indicated that these are OPCO assets, the A&M Report

9    refers to them as OPCO assets, and as the Official Committee we

10   are charged with helping to preserve and maximize the estate.

11        **THE COURT:**  The same report that I said I'd allow in

12   over objection?

13        **MS. STEINGART:**  But there's --

14        **THE COURT:**  Just want to make sure.

15        **MS. STEINGART:**  All right.

16        **THE COURT:**  Okay.

17        **MS. STEINGART:**  When valuing or coming to a price for

18   those assets, the committee should have been included and

19   consulted.  Why that didn't happen is a mystery.  Whether they

20   took our suggestions or not would certainly have been up to

21   them, but never to have been at the table and not to have seen

22   any of this until it was filed after it was filed with the

23   Court raises serious issues.  Same is true with bidding

24   procedures.  That will govern how OPCO assets are marketed.  No

25   reason not to include the committee.  And this is also true of

1    a stalking horse bid.

2           The one participant in these proceedings that the

3    debtors could have pointed to and said these people had only

4    OPCO at heart, these people were consulted, were not.  And as a

5    result of that, I think that we have another issue that's

6    presented because this too undermines the process.  It

7    undermines the process that's contemplated by the code and the

8    ability of the arrangements that have been presented to the

9    Court to pass muster.

10          I'd like to raise and mention a case that we have not

11   cited, Your Honor, and that is *In Re Nutritional Sourcing Corp.*

12   It's at 398 B.R. 816 and it's a decision by Judge Walsh in

13   Delaware, and I think it's instructive as to 9019.  In that

14   case, the debtors proposed a specific definition in their plan

15   for a type of trade claim.  The definition was crucial, because

16   creditor holding those claims that were within the definition,

17   would get 100 percent recovery, while those who were general

18   unsecured outside the definition would get approximately 10, 12

19   percent.  The plan proponents defended the deposition of the

20   trade claims as a reasonable compromise and the subject of good

21   faith negotiations.  However, in denying the motion to approve

22   the settlement, Judge Walsh explained that under Rule 9019, the

23   Court should look to the fairness of the settlement to other

24   persons, to the parties who did not settle.  He explained that

25   the plan proponent's definition of trade claim severely impacts

85

1    non-good trade creditors or the ones that were general

2    unsecureds who were not at the negotiating table and who were

3    not adequately represented in their assets.

4         Now here, if we look at our case for a moment, Your

5    Honor, the people at that negotiating table were the debtors,

6    dominated by the insiders and with divided loyalty, and we had

7    the OPCO lenders who were protecting the OPCO lender interests.

8    We certainly can't fault them for protecting their own

9    interests, but the interests that the committee had in having -

10   - in negotiating what should be an excluded asset and being at

11   the table to participate in that discussion and to have input

12   and to have tried to make it otherwise, or the pricing and how

13   the pricing was done and to try to make it otherwise, means

14   that in coming to this decision or agreements that are before

15   the Court, an important voice was not heard and that is a

16   problem of process.

17        Judge Walsh found that the impact of the definition -

18   - and here, the impact of those excluded assets -- were so

19   great that the loss of that voice at the table made the

20   settlement not fair and equitable.  And I think that that case

21   has currency here, Your Honor, and that that concept --

22        THE COURT:  Well, I think that clearly falls within

23   the fourth prong of the test articulated by the Ninth Circuit

24   in *A&C Properties*, because really the four prong test is driven

25   to allow the Court to make a determination that the settlement

86

1    is fair and equitable.  So I -- that would be consistent with

2    the -- all that I've been applying here for about 15 minutes.

3            **MS. STEINGART:**  I think it is consistent, but I think

4    that Judge Walsh was confronted with a situation where a group

5    -- where even though the debtors were at the table, the debtors

6    were not adequately protecting a voice that --

7            **THE COURT:**  No, that's why I'm saying it goes to the

8    fourth prong.

9            **MS. STEINGART:**  -- yeah.  Right.  Exactly.

10           **THE COURT:**  Paramount interest of creditors.

11           **MS. STEINGART:**  Right.  Right.  And from an

12   evidentiary point of view, why is all this important?  It's

13   important because we know that the burden is on the debtors to

14   establish the fairness and the appropriateness of this.  And in

15   the context we're in now, that burden is heightened and we'll

16   get to pointing out the portions of these agreements that have

17   signs of value forfeiture and insider favoritism, things that

18   the debtors like to pejoratively refer to as the committee

19   cherry picking, but they demonstrate that the debtors cannot

20   meet the standard of fairness, let alone entire fairness.

21           **THE COURT:**  When making an analysis of what's fair

22   and equitable, and also good faith, and I look at the *Health*

23   *Co.* case for assistance with that, should a court attempt to

24   analyze or consider what would occur in the absence of the

25   settlement?

1        **MS. STEINGART:**  Well, I think, Your Honor, under the

2   circumstances that we have present in this case that it is

3   fortunate that the debtors are doing well, in terms of their

4   business, that they have been, as I read the monthly operating

5   reports, they have been performing to expectation, and that the

6   markets are improving and that, to the extent that the Court

7   determines we need here a do-over, and it takes several weeks

8   to present the Court with that do-over, because I think that

9   the parties here are talented enough and smart enough to do

10  that if it's necessary, that what we will have is a four- to

11  six-week bump in the timeframes that are before the Court.

12  There is nothing currently on the debtors' plate that is going

13  to make the debtor -- with that additional time period that

14  might be required to bring new arrangements before the Court,

15  that's going to be a terrible disadvantage to it.  So I don't

16  think that there is --

17       **THE COURT:**  So I should consider it, but I should put

18  it in the context of circumstances the evidence of this case is

19  what you're telling me?

20       **MS. STEINGART:**  Right. Right.  And I think that the

21  circumstances of this case are that if you don't approve the

22  agreements, the sky is not going to fall.  I think that the

23  parties here are interested enough in pursuing the kinds of

24  transactions that have been suggested in these agreements and

25  that can still be pursued if presented in a way that I think is

88

1  better justified and more fair and, you know, better -- there's

2  evidence that the pricing is appropriate.  I think that this

3  can be done, but I don't think it has been done.  And I don't

4  think that asking them to do it or requiring them to do it is

5  going to present damage.

6          **THE COURT:**  As I read your pleadings I was struck by

7  one question and I don't mean this facetiously at all.  If the

8  price being that was being paid for the excluded assets was

9  higher would there be an objection to the bidding procedures,

10  the restructuring agreement and the compromise?  My question

11  is, are we simply discussing price?  Because I haven't seen,

12  candidly, a evidentiary basis that credibly attacks the

13  practicality.  I understand the position regarding parties on

14  both sides of the table.  I understand that.  I'm familiar with

15  Exhibit 19, you've made that point, and I'm not disregarding

16  that point, but there is business and economic reality.  And my

17  question to you very bluntly is, if in fact the committee had

18  been at the table and if it had been able to achieve a higher

19  price and perhaps be satisfied that the Texas put situation is

20  real and something has to be done about it because bidders want

21  to know so they don't have to worry about what may happen a

22  year now when all of a sudden they get a demand to make a

23  payment of millions of dollars, if the committee had

24  participated and had they been able to achieve higher price,

25  would we be in the process as you have identified had been, in

1  your mind, fair and more inclusive, would I still be hearing

2  the objections?  I'm trying to find out really what is at the

3  heart of this.

4       **MS. STEINGART:**  Right.  I think there -- I think

5  price and process dovetail in certain respects, Your Honor.

6       **THE COURT:**  I don't disagree.

7       **MS. STEINGART:**  I think that to the -- you know, and

8  when I say price and process, I don't only mean the creditors

9  committee being at the table.  I mean the process by which the

10  auction is held and the impact of the excluded assets on that

11  process of --

12       **THE COURT:**  I haven't seen really the objection not

13  so much to the process itself, especially now with the length,

14  and I've gone through and read even the bidding procedures and

15  don't -- and I under -- and I've read your redline and I think

16  a lot of it's been addressed and there are a couple of issues

17  that I have.  I'm still concerned a little bit about the

18  control that the debtor might have as opposed to me.  If I'm

19  going to do the auction, I will control the auction.  That's a

20  foreshadow.

21       **(Laughter)**

22       **THE COURT:**  That -- but I'm really trying to find out

23  exactly what we're talking about here.

24       **MS. STEINGART:**  Right.

25       **THE COURT:**  And it strikes me, when I read

1　everything, that these are good arguments.  We just -- we had

2　these discussions in December, you know, leverage and being

3　able to get to the table and you know, because I placed it on

4　the record, that's why I didn't enter a final ruling on the SDN

5　Motion.  And I am concerned about process; I've been concerned

6　about process throughout this case and I don't think that

7　that's a surprise to anybody sitting in this courtroom.  But I

8　will tell you my -- just so you have some understanding of how

9　I'm looking at this, that it seems to me that if the price were

10　better -- and it's a finite number.  I understand there's no

11　expert opinion, but what is the real value of the computer

12　system that's in two properties that may be owned by New

13　PROPCO, the others at Texas, are we going to rip it -- you

14　know, you could probably have five guys tell you five different

15　ways of doing it, but we know that there's going to be some

16　expense involved and the real question is, who's negotiating

17　that.  That's what you're really telling me.

18　　　　　　And if I understand -- so I want to make sure I

19　understand.  If you could negotiate and you were convinced by

20　your participation yeah, this is not a bad deal, then I'm not

21　sure we'd be having these objections.

22　　　　　　**MS. STEINGART:**  Yes, Your Honor.  I think that is a

23　component -- an important component of the objection.  If we

24　thought the price for the excluded assets was a fair price, and

25　the process for keeping them out of the auction or including

1    them in some form was a fair process, so that we could optimize

2    what we were receiving on the other end, that would be

3    significant.  But --

4            THE COURT:  What's the -- go ahead.  I don't mean to

5    cut you off.  Go ahead.

6            MS. STEINGART:  But just so that I can foreshadow a

7    little something I'm going to get to in --

8            THE COURT:  No, tell me.

9            MS. STEINGART:  -- a minute or two, part of the issue

10   with the excluded assets is the optionality in the hands of

11   PROPCO because as you could see from the revised bidding

12   procedures, PROPCO can take them or not take them.  And I think

13   that you have to fish or cut bait on that a little sooner,

14   because if they're not going to take them, they should be in

15   the auction.

16           THE COURT:  You mean the excluded assets?

17           MS. STEINGART:  The excluded assets.  So I think

18   that, you know, that we have a confluence of a couple of things

19   here and I think that you can make the moving parts work, I

20   agree.  I agree that they can work.  I think that if we had --

21           THE COURT:  Notwithstanding that you may have an

22   affiliate that is one of the potential participants in the

23   purchase.

24           MS. STEINGART:  Yes, I agree.

25           THE COURT:  Because there's real money in here.  I

1    mean, let's not disregard what's happening here.  I mean, it's

2    easy to say things, but there's real money in the pot here too.

3         **MS. STEINGART:**  And we're going to talk about that in

4    a minute or two.  Yes, there is real money here and, you know,

5    and I don't for a moment dispute the desire of the stalking

6    horse to own the assets.  And when I say the "stalking horse" I

7    mean --

8         **THE COURT:**  I understand.

9         **MS. STEINGART:**  -- the combined entity, nor do I --

10   but also I think that given other things we've seen that other

11   people want to own it.  And so the question is, when you have

12   that, Your Honor, you do have  situation where if bidding is

13   transparent and fair, you get to higher numbers.  And some of

14   the higher numbers that you've seen, that we've submitted under

15   seal, put us in the money.  I want that opportunity.  I think

16   that before we --

17        **THE COURT:**  Let me ask you this question.

18        **MS. STEINGART:**  Uh-huh.

19        **THE COURT:**  We're -- because we're talking about what

20   I think is germane.  The sale is contingent upon a confirmed

21   plan of reorganization.  I know that's one of the basis of your

22   objections.  I look at it a different way, I look at it as a

23   protection.  And I think that's what the Supreme Court of the

24   United States has said, I think that's what the Ninth Circuit

25   has said, I think that's what the Ninth Circuit has said and

1  what I've said in cases I've had in front of me, the plan

2  process is supposed to ensure due process, transparency.

3  That's why I like auctions in the courtroom, that's why I like

4  to have a hand in them.  Some judges don't believe in that. I

5  actually think that that is a preferable for -- especially in

6  the bankruptcy setting.

7           To make a determination that the process worked,

8  would have to be, I would think, the critical issue before that

9  I -- before I could ever confirm the plan of reorganization.

10  So as I was thinking through everything that I've read, should

11  the process go forward, assuming that I find that bidding

12  process works, and we see what the result is, because then I

13  won't be speculating; I'll know whether it worked or it didn't

14  work.  And that delay also, based upon what you just told me,

15  would not be all that significant.  If it didn't work, fine.

16           **MS. STEINGART:**  Right.

17           **THE COURT:**  Start over.  So --

18           **MS. STEINGART:**  Right.

19           **THE COURT:**  -- that's what I'm weighing.  Do you

20  think I'm --

21           **MS. STEINGART:**  But -- and, Your Honor --

22           **THE COURT:**  -- because understand, I don't think it's

23  arguing with me if you tell me no, I understand what you're

24  saying, but I don't think it works.  I need -- I'm asking for

25  your opinion as a regard.

1        **MS. STEINGART:**  Right.  And my view of that, Your

2   Honor, I think yes.  I think that we don't need to deal with

3   master lease compromise today.  I think the current master

4   lease compromise can be extended.  It certainly pays a rent

5   that PROPCO has orally found to be sufficient and one that the

6   debtor can afford to pay or OPCO can afford to pay, excuse me.

7        **THE COURT:**  Yeah, because there are benefits -- there

8   is a reduced rent.  There are benefits in there, we know that.

9        **MS. STEINGART:**  But they're marginal.  It's a

10  marginal benefit.  It's a million or a million-and-a-half --

11       **THE COURT:**  Maybe.

12       **MS. STEINGART:**  -- a month.

13       **THE COURT:**  I understand.

14       **MS. STEINGART:**  Okay.  But the other things that --

15  the dragalong, tagalong, which we'll talk about in second

16  master lease, I think is inappropriate.

17       **THE COURT:**  I just wanted you --

18       **MS. STEINGART:**  Okay.

19       **THE COURT:**  I wanted everybody here to understand at

20  least some of the thoughts that I've applied to this process

21  because I really do believe in the process.

22       **MS. STEINGART:**  Right.

23       **THE COURT:**  And I think before I would ever confirm

24  the sale, I'd have to -- I would have -- finalize the sale, I

25  guess, I would have to confirm the plan of reorganization and

1    that would take a hard look at.  The sale is not final, it's

2    just like the point that was made, you know, the process that

3    has been gone through -- that has already been exercised by the

4    people that you think excluded you, only came up -- a stalking

5    horse bid came up with a compromise.  The sale has not occurred

6    and the sale will not occur unless I confirm the plan.  And the

7    plan is going to have to satisfy 1129(a)(1) and (a)(2), as well

8    as (a)(3), which deals with some of the issues you've already

9    mentioned to me today.  And that's -- I keep placing it in the

10    context of plan confirmation.

11         **MS. STEINGART:**  Your Honor, I understand that you

12    place that -- that you place it in that context.  I think that

13    the master lease compromise agreement and OPCO Plan Support

14    Agreement, in a sense, limit the Court's flexibility in terms

15    of when you get to confirmation.  So putting those aside and

16    just looking at the auction -- let me just look at the auction.

17         **THE COURT:**  No, I'm going to let everybody -- I'm not

18    going to interrupt.  I try not to anyway.

19         **MS. STEINGART:**  Right.

20         **THE COURT:**  I thought everybody at least have some

21    idea of how I'm looking at this.

22         **MS. STEINGART:**  All right.

23         **THE COURT:**  And then you can tell me if I should look

24    at a different way.

25         **MS. STEINGART:**  Right.  And just looking -- there's

96

1  no reason why an auction should not proceed, but that auction

2  can proceed in the face of the excluded assets, unless those

3  have priced in a way that is appropriate --

4          **THE COURT:**  How do you know that?

5          **MS. STEINGART:**  -- and that meets the standard.

6          **THE COURT:**  How do you know that?  That's --

7          **MS. STEINGART:**  I know that because -- well, just

8  stepping back for a moment.  If we look at the amended bid

9  procedures, while the amendments do, and the fix that they try

10 to create it, is one where if the stalking horse wins, well the

11 stalking horse just gets it all.  Competing bidders now are

12 bidding for the whole package and if what happens is they win,

13 they get to think about oh, I have the whole package unless

14 PROPCO decides that it wants the bucket of assets, okay?

15          Now, the problem with the assets being priced at 35

16 is that if a competing bidder thinks they're worth 100, they're

17 only going to put 35 in their bid for the excluded assets.  I'm

18 not getting, as a creditor of OPCO, the benefit of their view

19 that the excluded asset is worth 100.  Now they can decide it's

20 worth 100 and then if PROPCO still wants it, PROPCO can have

21 it, but I don't want the price or the package of assets to be

22 capped at an artificially low price because this bucket that

23 now, in the revised procedures, everyone will be included, is

24 called 35.  I want that bucket called 100.  I want that bucket

25 called 75.  I want it called whatever the winning bidder is

97

1    willing to call it.

2         And then if PROPCO wants to have the right to buy it

3    at that price --

4         **THE COURT:**  In other words, do you want a segregation

5    of the bid to indicate what the bid would be with or without

6    the excluded assets?

7         **MS. STEINGART:**  I think that that might help us value

8    the excluded assets, but --

9         **THE COURT:**  Because right now if PROPCO -- under the

10   revised bidding agreement, if PROPCO purchases -- New PROPCO

11   purchases the excluded assets, it pays 35, assumes 13 million

12   in debt, at least $48 million in --

13        **MS. STEINGART:**  Well --

14        **THE COURT:**  Let me finish.

15        **MS. STEINGART:**  Yeah.

16        **THE COURT:**  And the 35 million becomes cash that

17   belongs to the buyer and is subject to the security interest

18   that OPCO Lenders have.

19        **MS. STEINGART:**  Right.  But it caps -- it

20   artificially caps the price for OPCO assets.  If those -- if

21   that -- if you just think of it, if those -- and forget about a

22   bidding process.  Your Honor, you asked me before if I was at

23   the table and I was satisfied with the price of that excluded

24   assets and then we went into the auction with the exact

25   framework that we have now with respect to bidding -- there are

98

1   other things about the auction that we'll talk about -- would I

2   be satisfied.  And my answer is yes, because I would be

3   satisfied that the whole package for OPCO assets was the

4   highest, best price, but if the excluded assets should really

5   be 100 million, I'm 75 short.  And it's those little 75 million

6   increments that these people are willing to give away that get

7   me to be in the money.

8           THE COURT:  It's actually like 65 or 53.

9           MS. STEINGART:  Yeah, right.

10          THE COURT:  Ten million here and there, it adds up.

11          MS. STEINGART:  Well, you know, the range was 34 to

12  60 -- you know, was --

13          THE COURT:  About 63, I think.

14          MS. STEINGART:  Yeah, but it didn't include a lot of

15  stuff.

16          THE COURT:  I understand, I read your pleading.  I

17  know what --

18          MS. STEINGART:  Yeah, yeah, okay.  So it could be

19  much higher.  That's why it has a pernicious effect.

20          THE COURT:  Okay.

21          MS. STEINGART:  That's why it has a pernicious

22  effect, even in the context now --

23          THE COURT:  What you're saying is it would

24  artificially lower the bid.  That's what you're telling me.

25          MS. STEINGART:  Yes.  Yes.  And I think that -- you

1  know, and I also think that at this point there's not enough

2  information for the Court to make a decision about the range of

3  reasonableness, and that is something that Mr. Winston will get

4  to.

5         **THE COURT:**  Oh, I assumed he would.

6         **MS. STEINGART:**  Yeah.  You know, but that is, you

7  know, that's an important component of our position here.  So,

8  you know, the Court does understand the significance of the

9  process.  I was going to allude to something that one of my

10  professors used to say, that process is about -- it's important

11  because if you don't do it right, you don't get it right.  It's

12  not just, you know, that you're playing a game and you have to

13  get your foot in the line.  It's that if you don't hear from

14  everyone and take those interests into account, then chances

15  are you're going to come up with something that's not going to

16  pass muster.

17         And let's start with how this doesn't pass muster.

18  Let's start with the second master lease compromise amendment.

19  Now to the extent that the Court is not inclined to deal with

20  it at this point, or the Court is inclined to sort of do this

21  in confirmation, I certainly don't want to take a lot of time.

22         **THE COURT:**  No, you better address it.

23         **MS. STEINGART:**  I'm sorry?

24         **THE COURT:**  Address it.

25         **MS. STEINGART:**  Okay.  Well --

1        **THE COURT:**  I mean, I've read your pleadings, it's

2   been addressed at length.

3        **MS. STEINGART:**  Right.

4        **THE COURT:**  I don't --

5        **MS. STEINGART:**  Right.

6        **THE COURT:**  -- if you can --

7        **MS. STEINGART:**  Right.  And I will address the

8   amendment because right now, Your Honor, it's still not right.

9   Right now, the fixes have not fixed the problem.  OPCO still

10  remains at risk of being required to provide substantial

11  transition services at the whim and caprice of the Fertittas

12  and Deutsche Bank and JP Morgan.

13       **THE COURT:**  Doesn't OPCO already have that obligation

14  pursuant to an order that I entered on the first compromise?

15       **MS. STEINGART:**  Not at the whim and caprice.  In the

16  first compromise agreement, Your Honor, the trigger for

17  transition service was rejection.  Now, the trigger for

18  transition are many events that have nothing to do with what

19  OPCO does and indeed what PROPCO does.  Now we had lengthy

20  examination of Mr. Haskins about the PROPCO Plan Agreement,

21  right, and how the PROPCO Plan Agreement was being used in

22  Exhibit C to the master lease compromise to create risks and

23  perils to OPCO that were unrelated to rent and unrelated to any

24  breach or failure of OPCO to do what it was supposed to do

25  under the master lease.

1           And so there's been an amendment.  And there's been

2    an amendment to Section C, okay, and I'm going -- I'm just

3    going to address that.  I don't know if the Court has the

4    amendment before it.

5           **THE COURT:**  Hold on a second.  Are you talking about

6    the redline --

7           **MS. STEINGART:**  I am --

8           **THE COURT:**  -- that I've utilized, Docket Number

9    1522?

10          **MS. STEINGART:**  Well, what I'm talking about now is

11   the new redline.  There's the old redline that we prepared for

12   the Court that we marked as --

13          **THE COURT:**  This is May 24th.  It couldn't be much

14   newer than this.

15          **MS. STEINGART:**  Right, May 24th is the new redline.

16          **THE COURT:**  Okay.  I've read it.

17          **MS. STEINGART:**  Okay.  So if we could look at Exhibit

18   C together, Your Honor.

19          **THE COURT:**  C?

20          **MS. STEINGART:**  C, which is Page 58 of 78.

21          **THE COURT:**  I've already marked it.  I'm there.

22   Okay.

23          **MS. STEINGART:**  So Exhibit C are transition events.

24   And what we have here is the removal -- if we look at Number 1,

25   we have the removal or the ostensible removal, of the plan

1   support agreement as a trigger for -- or termination of the

2   plan support agreement as trigger for transition service.  But

3   lo and behold, Your Honor, if we look at Number 2, the

4   provisions of Number 2 bring back the plan support agreement

5   and we're going to have to work through a couple of documents

6   here, because it's not straightforward.  What Number 2 of

7   Exhibit C says is if the proposed plan, as may be amended

8   pursuant to the terms of the plan support agreement, okay which

9   we both now understand are -- is the PROPCO Plan Support

10   Agreement, is confirmed the effective date of the proposed plan

11   shall not have occurred prior to January 3rd.

12        So that would be a transition event, no problem

13   there, but let's get to Number 2.  Number 2 says at any time

14   prior to such date, so at any time prior to January 3, 2011,

15   any of the conditions to the effectiveness of the proposed plan

16   are no longer capable of being satisfied, okay.  Now, Your

17   Honor, if we look at the proposed plan, one of the conditions

18   to effectiveness is PROPCO Plan Support Agreement.  So if

19   PROPCO Plan Support Agreement is terminated for any reason at

20   all, this provision is triggered.  And I can walk the Court

21   through the proposed plan that's on file with the Court to show

22   you how that happens.

23        **THE COURT:**  No, that's fine.

24        **MS. STEINGART:**  The proposed plan, which was filed

25   with the Court on March 24th --

1          **THE COURT:**  As I've indicated, I reviewed that before

2   today's hearing.

3          **MS. STEINGART:**  Okay.  So if we look at Article IX,

4   which are conditions precedent to plan confirmation, and

5   Article IX, Part B talks about conditions precedent to the

6   effective date and consummation of the plan, which is what's

7   referred to in Number 2, and we go to Item 4, that item says

8   all actions necessary to implement the plan, shall have been

9   effected, including without limitation the restructuring

10  agreement.  And the restructuring agreement is defined in the

11  plan at Page 21, Number 143 of definitions, as that certain

12  agreement between Fertitta Gaming and the mortgage lenders, so

13  it's the PROPCO Plan Support Agreement.

14          **THE COURT:**  I understand.

15          **MS. STEINGART:**  Okay.  So all of the infirmities that

16  we spoke about during cross-examination and that are -- haven't

17  been eliminated, okay, it hasn't been fixed.

18          Now -- and, you know, as a result of that, you know,

19  OPCO is exposed if someone decides to pull their equity

20  commitment to doing transition service.  There's no reason for

21  that.  They're exposed if people aren't satisfied with dozens

22  and dozens of documents to do transition service.  There's no

23  basis for that.  There was testimony by Mr. Haskins that the

24  board did not discuss the termination events that would lead to

25  transition events in Exhibit C.  They didn't talk about that to

1  make a determination about whether the second master lease

2  compromise was fair and reasonable to OPCO.  And that's at Page

3  173, Lines 17 to 25.

4          Let's look at some other purported fix with respect

5  to the master lease compromise.  Let's look at Number 4 that

6  has now been added to Exhibit C.  Another transition event is

7  now further tied to the proposed plan rather than to

8  obligations that exist under the master lease, okay.  And on

9  Number 4 we have -- you know, so it sort of makes the master

10 lease compromise a plan support agreement from the consequences

11 that follow from OPCO at any time withdrawing its support for

12 the proposed plan.  OPCO --

13          **THE COURT:**  What'd you just say?

14          **MS. STEINGART:**  Number 4 says PROPCO or SCI at any

15 time withdraws or revokes the proposed plan or announces their

16 intention not to support the proposed plan.

17          **THE COURT:**  Right.

18          **MS. STEINGART:**  Or files a different plan.

19          **THE COURT:**  Either of the debtors?

20          **MS. STEINGART:**  Either of the debtors.  The master

21 lease compromise is an agreement that amends the master lease.

22 It's not a plan support agreement.  There are other plan

23 support agreements and there's no reason why the master lease

24 compromise agreement should become a plan support agreement.

25 You know --

1          **THE COURT:**  This indicates that if either of the

2    debtors withdraws, revokes or renounces its intention not to

3    support the proposed plan, or files a plan other than the

4    proposed plan, the transition starts.  What you're saying is,

5    is this is included as a transition event, that that means that

6    the compromise agreement then becomes --

7          **MS. STEINGART:**  A plan support agreement.

8          **THE COURT:**  -- a plan support agreement.  All right.

9          **MS. STEINGART:**  And the question is, why?  Why should

10   that be?  Why should OPCO be exposed to do transition events

11   unless there is a trigger that's related to their performance

12   of their obligations under the master lease or confirmation or

13   rejection of the lease?  I mean, certainly that -- you know,

14   we're not tussling --

15         **THE COURT:**  Well, rejection --

16         **MS. STEINGART:**  -- we're not tussling with those

17   triggers, Your Honor.

18         **THE COURT:**  Under your parade of horribles, would

19   that mean then if OPCO just said okay, we no longer intend to

20   support the plan, that would then trigger the transition event

21   and OPCO would have to provide transition events that it would

22   not have been obligated to provide under the order approving

23   the first compromise?

24         **MS. STEINGART:**  Exactly right, Your Honor.  Here

25   again, Mr. Haskins testified that when the board voted to

1   approve the second master lease compromise, it did not walk

2   through the various transfer provisions that were in Exhibit C,

3   and that's at 181 Line 8 to Line 18.  You know, of course these

4   have changed somewhat, so we're talking about the prior

5   version.

6          **THE COURT:**  Yeah.  Let me ask you this question again

7   -- be asking the same thing on the other side -- the master

8   lease compromise agreement -- or the second does not tie

9   directly to plan confirmation like the sale does?  I mean, ask

10  to approve that compromise now, am I correct?

11         **MS. STEINGART:**  The compromise agreement as it exists

12  now, I do not believe it is tied --

13         **THE COURT:**  It's a standalone, in a sense.

14         **MS. STEINGART:**  It's a standalone, but certainly it

15  can be dealt with in confirmation.

16         **THE COURT:**  And that's -- that's what I'm asking you.

17         **MS. STEINGART:**  Uh-huh.

18         **THE COURT:**  If, I would say, I should include that

19  agreement as part of the overall plan confirmation analysis,

20  would that not provide the process that you're concerned about?

21         **MS. STEINGART:**  Right.  I --

22         **THE COURT:**  Is that a yes or no?

23         **MS. STEINGART:**  Right.

24         **THE COURT:**  I'm reading all these depositions where

25  people ask that.

1           **MS. STEINGART:**  Yes.  My answer to that is yes.

2           **THE COURT:**  Okay.

3           **MR. WINSTON:**  To the extent that it remains in its

4  present form and any other -- and anything in addition to that

5  is dealt with at plan confirmation, I have no -- I have no

6  objection to that.

7           **THE COURT:**  Thank you.

8           **MR. WINSTON:**  Okay.  And the same is true as we

9  discussed during testimony with respect to transfer events.

10          **THE COURT:**  Transfer is different than transition.

11          **MS. STEINGART:**  Transfer is different indeed, Your

12  Honor.

13          **THE COURT:**  Transition is simply -- well, it's been -

14  - I first dealt with this at the hearing we had -- what was

15  that, December 11th, I believe it was.  This is a bridge, those

16  bridges -- like that bridge they're building out south of town,

17  it just gets longer and longer, which is not bad in and of

18  itself, but it is a bridge and the transition events were

19  intended -- this is what I was told -- to allow the new entity

20  or I guess the PROPCO Lenders if they foreclose, the ability to

21  maintain operations, to keep people employed, to satisfy the

22  regulatory agencies.  That doesn't seem like such a horrible

23  thing to me.

24          **MS. STEINGART:**  It's not a horrible thing, Your

25  Honor.  We support that.  There's no reason why that shouldn't

1    happen.  And to the extent that people want to change that from

2    150 days to 170 days as part of the confirmation, we have no

3    problem with that, and until that point, you know, nothing

4    adverse can happen without Your Honor being aware of it.

5            THE COURT:  Then what bothers you about the

6    transition events; that they impose a potential burden upon

7    OPCO?

8            MS. STEINGART:  Right.

9            THE COURT:  Isn't there consideration for that?

10           MS. STEINGART:  Less now than there was before.

11           THE COURT:  So that would be yes, but you don't think

12   it's enough?

13           MS. STEINGART:  Yes, but it's not enough.  And -- and

14   again, that can be dealt with in confirmation, because nothing

15   untoward can happen before then.  And at that time, it's part

16   of a plan, it's part of a process that's before the Court and

17   the changes suggested here can certainly be part of that

18   process.

19           THE COURT:  Go ahead.

20           MS. STEINGART:  You know, so then we get to transfer

21   events, Your Honor, okay.  Transfer events are another problem

22   within the master lease compromise and something that we talked

23   about during the hearings on May 4th and 5th.

24           THE COURT:  Transfer events are in MX, I believe it

25   is --

1       **MS. STEINGART:**  Exactly, Your Honor.  And during the

2  cross of Mr. Haskins, Mr. Haskins conceded that transfer events

3  had nothing to do with the payment of rent at Page 177, Line 4

4  to Line 7, but rather incorporate provisions from the OPCO Plan

5  Support Agreement.  That's really what Provision MX is, just a

6  taking of provisions of OPCO Plan Support and putting it in the

7  master lease compromise.  Again, the use of the master lease

8  compromise not for what it's original purpose is, but as a tool

9  for a plan support agreement.

10      You know, here again, you know, to the extent that

11  excluded assets are going to get transferred, it certainly

12  doesn't have to be part of a master lease compromise agreement.

13  In the amendment that was first put before the Court hasn't

14  been changed, we had the beginning of the optionality for OPCO.

15  So in the master lease compromise that exists now there are no

16  transfer events and there's no ability for OPCO to take or

17  leave -- I'm sorry, there's no ability for PROPCO to take or

18  leave the assets, okay.  And in the revision that was filed

19  with the Court that -- on April 16th, PROPCO all of a sudden

20  has this optionality of taking transferred assets or not.  And

21  if they don't, where that leaves OPCO is unclear, but we'll get

22  more to that when we get to bidding procedures.

23      And again, you know, and I may have misspoke before,

24  Mr. Haskins said that the transition events weren't discussed

25  at the board and he also said the transfer events were not

1   walked through so that they could be -- so that the board could

2   assess what the reasonableness was of the transfer events to

3   OPCO.

4           To the extent that assets are to be added to the

5   current list in the master lease compromise agreement because

6   the excluded assets are an expansion of that list and the

7   package is to be priced and sold to New PROPCO in the event

8   that Fertitta Gaming and the controlling lenders don't win the

9   bid, that package should be subject to a fair valuation and to

10  a fair price before it can begin to dictate the results of

11  other -- you know, of the bid in a way that really drives down

12  the value of OPCO.  And as the Court knows, the excluded assets

13  were never valued by anyone at OPCO or any debtor.  That

14  whatever this Alvarez report is, and whatever weight you give

15  it, Your Honor, it didn't exist on April 16th.  It didn't exist

16  until after April 22nd when one of the Counsel asked Mr. Caruso

17  to prepare it.  Time and time again Lazard said they never

18  valued it and all they told the board was, taken as a whole,

19  this looks good to us, okay.  They didn't say -- they refused

20  to say they didn't say it under deposition and they didn't say

21  it to the board, that they thought that 35 was fair for these

22  assets.  And I say 35 because the credit that's being given to

23  other bidders in the bidding procedures is 35, that's what they

24  get.  That's what it says.

25          And at this point I'm going to defer to Mr. Winston

1    and then come back and deal with a couple of remaining issues,

2    Your Honor.

3            **MR. WINSTON:**  Good afternoon again, Your Honor.  Eric

4    Winston for the committee.  In this portion of the committee's

5    presentation, I will address the so-called excluded assets and

6    I'm going to be mostly going off the list as it's contained in

7    Exhibit B-1 to the asset purchase agreement, which is the 26

8    categories of assets that will be conveyed.

9            **THE COURT:**  That's what I referred to earlier.

10           **MR. WINSTON:**  Yes.  There's just been some different

11   uses of the phrase excluded assets.  That's primarily what I'm

12   going on.

13           **THE COURT:**  Thank you.

14           **MR. WINSTON:**  And I'm going to divide the

15   presentation up into three parts.  First, I'm going to address

16   several categories of excluded assets that, at least prior to

17   two days ago, were going to be conveyed to PROPCO and weren't

18   in any way valued by Alvarez.  Second, I'm going to address

19   several categories that are in the APA, Exhibit B-1, that as

20   best we can tell are brand new.  And third, I am going to

21   address the three categories of assets that were provided for

22   which there are indicative values by Alvarez.  I had actually

23   had hoped I could junk all that when I was preparing my script,

24   but just to be safe, I thought I better cover it.  And those

25   three, of course, are in information technology systems,

1    certain of the trademarks, and the Wild Wild West land parcels.

2         Now before I go into all of this, I do think it's

3    important to set the table why valuation of these excluded

4    assets is important.  You've already alluded to this, Your

5    Honor, when you asked my colleague if there was more money on

6    the table, how would we feel about this would we still be

7    objecting?  And there's -- there are other issues, but there's

8    no doubt that if there was more money on the table -- a lot

9    more money hopefully, but if there was more money on the table,

10   the concerns about the value of the excluded assets would be

11   probably ameliorated in significantry, if not completely

12   eliminated.  And it's not just what happen --

13        **THE COURT:**  And some of those other concerns would

14   not be as important as they are now.

15        **MR. WINSTON:**  Probably -- and more importantly --

16        **THE COURT:**  I understand how this works.

17        **MR. WINSTON:**  Yeah, you sit down and you talk it

18   through.  You don't send -- you don't spend four days worth of

19   court time.  And it's not just what has been valued, but it's

20   the lack of value and how this Court is to apply the legal

21   standards under 363, to the extent it's applicable, and

22   Bankruptcy Rule 9019 and the Ninth Circuit's *A&C* test, when

23   considering whether this transaction maximizes the value to the

24   OPCO estate.  And it is important to look at it from that

25   perspective because we're the objecting parties, we're -- our

1    constituencies, I think overwhelmingly creditors of the OPCO

2    estate, and we think it's not fair.  So you need to make sure

3    when you're considering whether it's 363 or under 9019 --

4            THE COURT:  I understand most of your constituency is

5    part of that 2.45 billion.

6            MR. WINSTON:  I think that's probably right, yeah.

7    Certainly it's -- whenever I hear people -- if I just make an

8    aside -- that the vast majority of creditors of the OPCO estate

9    support that, that's just not remotely correct.  It's -- a

10   majority of OPCO Lenders apparently support it, but not the

11   majority of creditors.

12           THE COURT:  The secured lenders?

13           MR. WINSTON:  Secured lenders.

14           THE COURT:  That may be under secured, but who knows.

15           MR. WINSTON:  Yeah.  And, Your Honor, I think

16   correctly noted in connection with the Caruso declaration

17   evidentiary objection, that Your Honor is supposed to make an

18   informed and independent judgment as to whether this is above

19   or low the lowest point of reasonableness.  Now the Supreme

20   Court, in *TMT Trailer*, did still instruct all bankruptcy courts

21   that there cannot be an informed and independent judgment --

22   and I'm quoting here --

23           "as to whether a compromise is fair and equitable

24           until the bankruptcy judge has apprised himself of

25           all facts necessary for an intelligent and objective

114

1            opinion of the probabilities of ultimate success

2            should the claim be litigated."

3        That's 390 US at 424.  And there's a number of

4    courts, and I can you give citations, but I'll sum it up, that

5    have held that if you're not provided definite numbers, proof,

6    things that are not just merely guessed or mentioned or

7    assessed based upon the opinion of the debtors themselves or

8    the proponents to the settlement, it ain't good enough.  That's

9    not what this Court needs in order to make its informed and

10   independent judgment.

11       So in that context, I want to turn first to what has

12   not been valued.  And there's a lot of categories that haven't

13   been valued, but I'm going to focus only on five.  And the five

14   ones I'm going to specifically focus in on are patents, other

15   intellectual property, business information, the primary

16   customer database and the non-competes.  And I've picked these

17   for several reasons.  One, they are in and of themselves assets

18   that are valuable to a casino business.  Two, they happen to be

19   assets that probably work with most -- work most closely with

20   what has in fact been valued by Alvarez, in particular the IT

21   assets.  So when we think about the IT assets, these five

22   categories become a lot more relevant.

23       Let me turn first to patents.  The motions propose to

24   have Station Casinos Inc., OPCO, license to PROPCO any and all

25   patents and patent applications relating to player tracking

1   systems.  Now according to what we have as Exhibit 1, which was

2   the April 19th schedule of excluded assets, Stations will

3   license, for no compensation, three specific patents and then

4   there's an unidentified list of additional patents and patent

5   applications.  And this is the first flaw that your Court needs

6   to consider for purposes of the gaping hole in the record.  We

7   don't even know what in fact is being assigned.  We know the

8   three specific ones, and in fact, Exhibits 59 to 61 are those

9   specific patents and that's why I wanted to put them in, but we

10  also put in Exhibit 74.  And this is a patent application that

11  Station Casinos filed on October 23rd, 2008, that when I read

12  it, and I'm not a patent expert at all, but when I read it, it

13  seems to relate to player tracking.  So I would like to know --

14  and you should know -- is it included or isn't it?  And if it

15  is included, why wasn't it listed?  If it is included, what's

16  the value of it?  How important is it to Station Casinos?  We

17  don't know.

18          Now let me turn briefly to ownership issues with

19  respect to patents, because there has been some argument that,

20  with respect to the IT systems, there's an ownership dispute

21  and I will definitely get to that in a little bit, but let me

22  start with the patents themselves.  It cannot be legitimately

23  disputed that Station Casinos Inc. owns all of the patents and

24  patent applications relating to player tracking.  The exhibits

25  that I referred to are U.S. Patent Trademark Office documents,

1    they clearly indicate Station Casinos Inc. is the owner.

2    Further, Exhibit 63, which is the PROPCO schedule of assets and

3    liabilities, they didn't check the box when it says do you have

4    any patents or other intellectual property; it was checked no.

5    So that's why we put that in, to show that at least PROPCO

6    doesn't think it has any patents.  So the record before this

7    Court, at least with respect to the patented player tracking

8    systems, whatever that scope is, PROPCO has no ownership issue

9    in its opinion.

10         Now they've also made a lot of noise in their papers

11   that patents -- oh, sorry that some of the assets were already

12   part of the first master lease compromise and it's just really

13   a continuation, maybe clarification, that's -- I've seen that

14   argument.  Clearly doesn't apply to patents.  In fact, I think

15   the PROPCO reply quite clearly states that the patents being

16   transferred or being licensed are brand new.  This is a brand

17   new asset.

18         THE COURT:  When you read the chart that's what it

19   says.

20         MR. WINSTON:  That's what it says.  So I at least,

21   again setting the table, patents and the value of that license

22   is brand new, whatever that value is.

23         Now since they have provided no valuation of the

24   patents themselves, what the debtors have argued is that the

25   patents are effectively valueless, because they're old, 12

117

1    years approximately, and because player tracking systems are

2    available off the shelf now.  And the evidence they have

3    supplied is the declaration of Mr. Kreeger, as well as his

4    deposition testimony, that I will note that just about every

5    portion of his deposition testimony is on that redirect.  These

6    arguments fall flat.

7            First, there is absolutely no evidence or argument to

8    demonstrate that as a patent agent, including patented player

9    tracking systems, such patent becomes automatically less

10   valuable.  By contrast -- and this is why I put these in -- we

11   have supplied secondary authority, and this was demonstrative

12   Exhibit 68 and 69, larger studies have shown that as a patent

13   is cited by other patents it becomes more valuable.  It's not a

14   function of age necessarily, because you know, you can file a

15   patent two weeks ago and it could be cited a 100 times, but

16   clearly if there's an older one and it's been cited a lot, that

17   suggest it's quite valuable, which is why I go back to Exhibit

18   62, which you've reserved ruling on, and I understand that.

19   But that document shows that these patents have been cited

20   quite often.  In particular, Patent 6302793 has been cited by

21   subsequent patents 47 times.  So under that secondary authority

22   that we've cited, that --

23            THE COURT:  Does that exhibit show when those

24   citations happened?

25            MR. WINSTON:  I believe the -- if -- let me get

118

1  Exhibit 62 out.  I think it does show --

2          **THE COURT:**  And I guess my next question would be,

3  without reading all the law review articles, can a patent be

4  cited for one particular component as opposed to other?

5          **MR. WINSTON:**  Sure, it's certainly possible.

6          **THE COURT:**  So, I find that very difficult, unless I

7  know exactly why the person was citing it, what the purpose is

8  and how to ascribe any increase or decrease of value based upon

9  the number of citations, unless I know why.

10         **MR. WINSTON:**  Your Honor, that's completely fair

11  point.

12         **THE COURT:**  Does that make sense?

13         **MR. WINSTON:**  It does make sense, absolutely.  Let me

14  first respond to your question about does it show the dates.

15  The document does not show the dates.  It shows the patent

16  numbers.  I'm going to guess, and these are links, if you click

17  on it, it will show the date, but we don't --

18         **THE COURT:**  I don't have that time.

19         **MR. WINSTON:**  You don't have that time, I understand.

20  I mean, there's 47 of them, so there's quite a few of them to

21  go through, but you know, it doesn't show the date.  To answer

22  the question of --

23         **THE COURT:**  And it can't tell me why?

24         **MR. WINSTON:**  Well, if you go in and click on them it

25  will tell you why, but that's -- I understand.  The point we

1   were making is Your Honor has no evidence of what the value of

2   this is.

3            THE COURT:  Correct.

4            MR. WINSTON:  Instead, because there's no value, what

5   the debtors have argued is well, they're just old and there's

6   other systems available.

7            THE COURT:  What Mr. Kreeger said in his deposition

8   was -- especially as I saw it, and I can get to the page

9   citations, that the player tracking system, which was developed

10  in-house, as I believe, by Stations and apparently concerned

11  that it remain proprietary so others wouldn't have the same

12  benefit of that system, has aged to a degree, and those patents

13  have aged, that for the purpose -- he said, of Stations that

14  would have little or no value.  That's, I think, exactly what

15  he said, and what I didn't -- what I wasn't sure because I

16  think there was a reference to CMS?

17           MR. PARRY:  Casino Management System.

18           THE COURT:  That's another tracking -- is that the

19  tracking system?

20           MR. PARRY:  Different.  There's -- it's within a

21  casino.

22           THE COURT:  That's what I thought, okay.  My point

23  being is that I -- if I read the -- I did not see in the

24  deposition that Stations was going to discontinue using it.

25           MR. WINSTON:  Oh, I don't think Stations will

120

1  discontinue using it.

2          THE COURT:  And I don't think that OPCO continues to

3  discontinue, or else why would it be transferred?

4          MR. WINSTON:  I completely agree with that.

5          THE COURT:  So that makes it seem to me if you're

6  going to still use something, it probably has some value.

7          MR. WINSTON:  Oh, I --

8          THE COURT:  So that's why I was wondering --

9          MR. WINSTON:  There's clearly some value.  In fact, I

10  was going to skip this over, but when there's an infringement,

11  which hasn't obviously occurred here because it hasn't been

12  handed off to PROPCO -- I mean, if Your Honor were to deny this

13  and Fertitta Gaming took it over, maybe there will be an

14  infringement case, but in the infringement context there's a

15  very famous case called *Georgia Pacific* from 1970, 15 factor

16  test that's been cited, I don't know, 100 times, Federal

17  Circuit has adopted it.  And the 15 factor test is designed to

18  figure out what's the reasonable royalty rate for the

19  infringement.  That would be the proper analysis that someone

20  should go through to figure out what the value is to PROPCO to

21  license it from Stations.

22          THE COURT:  Why -- let me ask you this question

23  because running throughout your objection is the value to

24  PROPCO.  Is the value to PROPCO the same as the value to OPCO?

25          MR. WINSTON:  Not necessarily.

1          **THE COURT:**  I would agree with that.  So why -- how

2     do you expect there to be an extrapolation?  Because the one

3     point was made, it was either in your pleadings or it may have

4     been in Mr. Goldberg's, that look, it's going to cost 20, maybe

5     40 million for PROPCO to replace its computer systems, hardware

6     and software, and then there's costs associated with the people

7     involved, and therefore that's the value to OPCO?  I -- to me,

8     that's a syllogism that doesn't work, maybe you or Mr. Goldberg

9     can explain it to me.  I think it was in Mr. Goldberg's papers,

10    I could --

11         **MR. GOLDBERG:**  Yes, it was.

12         **THE COURT:**  -- but really, the argument in your

13    papers are the same.  This is what the value is to PROPCO, this

14    is of the value to PROPCO.  Okay, fine, and that makes sense to

15    me because you've had these entities that have been operating,

16    in a sense, in a consolidated sense with their IT and other

17    matters, their trade names or patents, they've all been sharing

18    ownership.  There's no doubt, I think you're right.  I see

19    nothing in the evidence that would indicate to me that the

20    patents are owned by anyone other than OPCO.  They may be

21    subject to security interests and we'll talk -- and the claims,

22    and we'll talk about -- I guess I'll hear about that, but the

23    ownership interest, I think, is beyond dispute.

24         But my point being, if PROPCO -- or New PROPCO does

25    not have the ability to utilize what had previously been

1   shared, what is the value?  Then the -- I guess -- then I

2   thought, well, if the new bidder -- because the bidder is the

3   bidder for the OPCO assets, not PROPCO.  And if it doesn't have

4   any use for them, the only value, I guess, is what can I compel

5   PROPCO to pay me for them.  That's not a willing buyer and

6   willing seller, necessarily.  I don't know if that really

7   indicates fair market value in the classic test that we're all

8   familiar with.  And I think -- that's what I'm wrestling with.

9   Do you understand my concern?

10        **MR. WINSTON:**  I do and I'm going to address it in a

11   number of responses because I --

12        **THE COURT:**  Okay.  Good.  Just so you know what I'm

13   looking at.

14        **MR. WINSTON:**  I got the insert --

15        **THE COURT:**  I understand -- I really do understand

16   the value of these to PROPCO.  I don't need any -- really, I

17   mean, I think that's a matter within my perception.  My ability

18   to arrive and draw those inferences.  I've been using the name

19   Bolish Boulder (phonetic), it has some value, if I've been

20   using a player tracking system and now I don't have to replace

21   it, it has value.  If I've been using certain customer lists,

22   it has value.  I mean, and I need to get that transitioned so I

23   can stand alone.  I understand all that.  Or if I don't have to

24   stand alone and actually can have them transferred to me and

25   the person or the entity who is transferring them to me has no

1   use for them, and that assists a debtor in its reorganization

2   here, because PROPCO is also a debtor in its own reorganization

3   in a sense, that -- all that does is establish value for

4   PROPCO.  I'm not sure it establishes value for OPCO.  And

5   that's -- I'll let you address it, but that's what I've been

6   trying to work through.

7          **MR. WINSTON:**  Sure.  Okay.  There's -- I'm going to

8   approach this from a variety of angles here.  What you've been

9   asked to approve is a transaction by which PROPCO gets this.

10  So --

11         **THE COURT:**  If it wants it.

12         **MR. WINSTON:**  If it --

13         **THE COURT:**  That's their optionality argument.

14         **MR. WINSTON:**  That's what the optionality is.  But

15  let's assume that if they actually decided that they actually

16  want to operate casinos and they don't want to have --

17         **THE COURT:**  I'm going to assume they're going to

18  exercise their option and --

19         **MR. WINSTON:**  And take it.  And maybe they'll

20  exercise their option of not buying the off-the-shelf systems

21  that are supposedly so much better and they'll just take the

22  ones that, you know, Stations has already been license -- or

23  has been using for years.

24         All right.  From a perspective of what is the range

25  of reasonableness for what should be paid for these assets, the

1    whole basket, which patents licensing is one of them, you need

2    to figure out what is the fair market value of the license.

3    And the license goes in two ways.  It goes from the perspective

4    of the licensor and the perspective of the licensee.  In fact,

5    when I mentioned the *Georgia Pacific* factors, those are

6    specific factors.  What's the value -- what's the special value

7    to the licensee, what is in the historical and projected use to

8    the licensor.  So you do look at it from both angles, and the

9    last factor in the *Georgia Pacific* test is, assume a

10   hypothetical negotiation of the licensor and licensee, what

11   would they come up as the reasonable royalty rate?

12          That's the negotiations because here Station Casinos

13   is presumably going to continue to use its own player tracking

14   systems.  I don't -- you know, I guess it's possible if someone

15   is -- if Boyd comes in or Harrah's comes in or somebody else

16   comes in, they may want to implement their own, I don't know,

17   but part of the arguments I'm going to point out to Your Honor

18   in just a second is, supposedly Station's is much better than

19   everybody else's, but there is a value to the acquisition of

20   the asset itself from the OPCO perspective to make sure its

21   competitor doesn't have the same system it is using.  And

22   that's -- when you ask the question, do you understand the

23   value from PROPCO's perspective, now you're partially

24   understanding the asset valuation concern from OPCO's

25   perspective.

1           Now let me give you a hypothetical, because if we

2  were at the disclosure statement hearing or the confirmation

3  hearing, we would do exactly this.  Suppose we were in a

4  hypothetical liquidation, the casinos shut down.  You still own

5  the patents and you have the ability to sell that patent and

6  there's all sorts of entities out there, I've been learning

7  this since I've been at my -- the firm I'm with because they do

8  this, there's all sorts of firms out there that go around

9  buying patent portfolios.  Why?  For two reasons, because they

10 can find people they can license it to and then they can go sue

11 lots of people to -- you know, for anyone that's infringing.

12 There's value in and of that that's being ignored here.  Your

13 question is a great one and I can't give you the precise answer

14 of what's OPCO's valuation perspective and PROPCO's because no

15 one has.  I'm just pointing out the facts.

16          And just to kind of build the point, I do want to go

17 back to the issue of how good are these systems based on what

18 Station thinks, okay, what Station thinks.  And I realize

19 Exhibit 70, which was the newspaper article that you clearly

20 signaled not a lot of weight to, so I'm not going to, you know,

21 I'm not going to go over that one, but I do want to go to

22 Exhibit 72.  And this is the 10(k) from Stations, and that one

23 they're talking about their boarding pass program and their

24 ability to market through existing and potential customers.

25 And they actually -- there's a quote that we have -- that we

1    want to point out is, "We believe that these products creates

2    sustainable, competitive advantages and distinguish us from our

3    competition."  The boarding pass program, the ability to market

4    to existing and potential customers flows from player tracking.

5            Now, I go back to my newspaper article, which little

6    weight, but the point of it is, the statement in there was, you

7    slip that card into the machine, it tells you a lot about that

8    customer.  That's why it's so valuable.  Similarly, Exhibit 40,

9    which is the note that --

10           **THE COURT:**  I don't think I needed a newspaper

11   article to --

12           **MR. WINSTON:**  Yeah, I know, but that's -- these

13   aren't my words.

14           **THE COURT:**  Yeah, I understand.

15           **MR. WINSTON:**  It's the newspaper saying it's

16   Stations' words.  And that's the point, is they know these

17   things are valuable.

18           Now let me go to Exhibit 40.  This is the one we

19   fought about a little bit in terms of evidentiary objections --

20           **THE COURT:**  Forty?

21           **MR. WINSTON:**  Forty.  This is the note that A&M

22   prepared in its conversation with Mr. Kreeger sometime in

23   February 2010.  There is a provision in that exhibit or one of

24   the summaries is -- what I think occurred is the question was

25   asked of Mr. Kreeger, why is Stations better?  And the response

1   was, because it tracks players on 170 different segments of

2   data, whereas other player tracking systems track three to four

3   segments of data.  That's a reason -- not the only one that was

4   said in the notes, but a reason why Stations does better.  The

5   timing of that conversation is important.  It was not timed to

6   coincide with this litigation.  It wasn't a declaration to

7   support a deal that values patents at virtually nothing.  It

8   wasn't in connection with a deposition where we've been

9   criticizing the statement that the value of the patents is

10  zero.  Instead, it was done at a time when Mr. Qusba's clients

11  hadn't signed onto a deal and therefore had every incentive to

12  try to maximize the value of the excluded assets that would be

13  conveyed to Fertitta Gaming, if they're going to get conveyed

14  at all.

15          **THE COURT:**  One moment, please.

16          **MR. PARRY:**  Your Honor, this was precisely the nature

17  of my evidentiary objection.  If you read the document, it

18  indicates Station tracks 170 characteristics, somebody else

19  does three or four.  It's not that the software allows Station

20  -- Station software look deeper, it's that Station's management

21  pays attention to more parameters, okay.  They could have asked

22  Mr. Kreeger about this document in his deposition, they didn't.

23  They introduced this document two days before, so they were

24  aware of the document, they knew about it.  Mr. Kreeger gave

25  testimony precisely on this point.  They didn't try to impeach

1   him with the document.  The document is hearsay when used in

2   the manner that Mr. Winston is trying to use it.

3           **THE COURT:**  I think it is.  I think you're offering

4   it for the truth -- you're saying it's an admission?

5           **MR. WINSTON:**  Yeah, Your Honor, that -- we argued

6   about that.  It's a party opponent admission, so --

7           **THE COURT:**  I -- I under -- I thought I ruled on

8   this --

9           **MR. PARRY:**  It's an A&M document, it's not my

10  admission.

11          **THE COURT:**  I thought I ruled -- now, it's -- the

12  statement made to the A&M, I guess it was to Mr. Caruso or

13  maybe it was McDonough.

14          **MR. WINSTON:**  We think it's Mr. McDonough.

15          **MR. PARRY:**  Well, it's not quoted.

16          **THE COURT:**  So it's a hearsay on hearsay issue.

17          **MR. PARRY:**  Yeah, it's not quoted, it's just sort of

18  a bullet point summary of what --

19          **THE COURT:**  I don't know what Mr. Kreeger said.  I

20  know what Mr. McDonough wrote that he said Mr. Kreeger said and

21  Mr. McDonough hasn't been deposed, Mr. Kreeger has been

22  deposed.  I am going to rely to a great extent on Mr. Kreeger's

23  sworn testimony.

24          **MR. PARRY:**  Thank you, Your Honor.

25          **THE COURT:**  And I -- I'm aware the document was

1   available and I'm aware that there was no attempt to ask

2   Mr. Kreeger about it, which candidly tends to reduce the weight

3   that I place on it because it doesn't give the witness a chance

4   to explain it, if he said it and what he meant by what he said

5   it.  Now, I've already ruled, now I've even amplified how I

6   intend to utilize it.  I'm more concerned what people say under

7   oath out of their own mouth.

8           MR. WINSTON:  I understand, Your Honor.

9           THE COURT:  Fair enough.  Let's go.

10          MR. WINSTON:  I understand.  All right, so let's --

11  I'm going to finish this section of my presentation with a

12  statement from Mr. Kreeger during his deposition.  This is at

13  Page 106, Lines 9 through, I think it's 18, where he was asked

14  the question --

15          THE COURT:  Is this Kreeger?

16          MR. WINSTON:  Yeah.

17          THE COURT:  One moment.  What page?

18          MR. WINSTON:  Page 106, 9 to 18, I think.

19          THE COURT:  I'm there, go ahead.

20          MR. WINSTON:  I want to make sure I got the page

21  right.

22          THE COURT:  I've got it marked up somewhere else.

23  I've got about four copies of all these depositions.  Go ahead.

24          MR. WINSTON:  Completely understand.  Now you just

25  heard Mr. Parry say that there was some talk about software and

1    I fully understand that.  He was asked, "How about in 2009, do

2    you know the amount that Stations paid to customize its

3    software?"  "Answer: A specific software or all our software?"

4    "Question: All your software."  "A:  I don't know the exact

5    number, but I could take a swag at it.  You know, it's probably

6    somewhere in the tune of half-a-million dollars to a million

7    dollars."  "And you think the number would be roughly the same

8    for 2008?"  "Yeah, I would imagine so."

9           Why do I bring this up?  If Station Casinos

10   believed --

11          **THE COURT:**  Oh, it indicated -- when I read that, and

12   I did read it before, that's an annual cost that the debtor

13   spends to make sure that its software stays up to speed,

14   doesn't become obsolete.

15          **MR. WINSTON:**  Fair enough.

16          **THE COURT:**  That's what I read that for.

17          **MR. WINSTON:**  I guess, here's my point of this.  If

18   the off-the-shelf systems were function -- on a functionality

19   basis were better, why would Stations ever spend any money on

20   it, why not just buy the new software?  There would be a little

21   downtime, I get that.  I get that, but when you take this

22   entire package of statements, and in the face of complete lack

23   of any valuation testimony, this Court has to conclude there's

24   a gaping hole in the record as to the value of this particular

25   asset.

1          All right.  Let me move on.  Primary customer

2    database.  Again, I don't think it can be legitimately disputed

3    that customer databases are valuable to casinos, including

4    Station Casinos Inc.  Mr. Genereau stated at his deposition

5    that the customer lists are to be part of the crown jewels of a

6    casino operation.  The debtors and the lenders -- and we put

7    this into evidence for a reason, certainly talked about in our

8    papers.  The debtors and the lenders don't deal with the fact

9    that we were able to find in one of their 10(k)'s the situation

10   where Station Casinos bought another casino, it was the Fiesta

11   Rancho, I believe.  And that's not one of their larger

12   properties -- it's not the smallest one, but it's not one of

13   their larger ones.  In the connection with that sale in 2001,

14   the customer list of that casino was valued at $5 million and

15   then it was depreciated over time.

16          The debtors and the lenders also ignore that the

17   customer database is itself a direct result of the time and

18   money spent on player tracking systems.  That's how you build

19   up your customer database, you convince them to get a card,

20   that card reads them, it starts to figure out what they like

21   and what they don't like and that's how they become part of

22   that customer database.  I believe that Stations has spent lots

23   of money to build up its customer database for all of its

24   properties and it owns those -- it owns those.

25          Now under the current deal, PROPCO gets access to the

 1   customer database, because -- and when I say the current deal,

 2   the first master lease compromise, and that is true, but there

 3   is a massive change that has occurred if this deal is approved

 4   and that deal is this.  They get the exclusive right to the

 5   information of its top 25 percent of the primary customers that

 6   have played at the four casinos.  Station Casinos will have to

 7   delete any reference to those top 25 percent primary customers.

 8   In other words, after investing substantial costs building up a

 9   customer database over years, I mean three of the casinos are -

10   - have been around a long time, Station Casinos will in fact

11   have to surrender that information database sometime in the

12   near future.  If -- now, if Fertitta Gaming continues to own

13   it, it's sort of a wash, I mean, you know, who cares, but if

14   somebody else were to come and try to bid for that, including

15   the casinos that the debtors have pointed out compete with

16   those four casinos, they've just lost the ability to access a

17   potentially valuable data source.  And I'm not kidding when I

18   say casinos care about this stuff, just in 2008 Harrah's sued

19   Station Casinos over a customer list, you know, alleged theft

20   for the Thunder Valley Casino in Sacramento, California -- or

21   outside of Sacramento.  Casinos really care about this stuff

22   and you're -- and by depriving the purchaser of the OPCO assets

23   the ability to get these names, you're depriving them of a

24   potentially valuable source for which there is no value before

25   this Court.

133

1          **THE COURT:**  And are you saying that the use of the

2   top 25 percent of the customer base for the four casinos that

3   are to be spun off would continue to have value for OPCO after

4   the sale or what -- to New PROPCO?

5          **MR. WINSTON:**  Assuming it's not Fertitta Gaming that

6   bids for it?

7          **THE COURT:**  Well, let -- Fertitta Gaming also --

8          **MR. WINSTON:**  Obviously it's a wash, right?  Because

9   they own everything, it doesn't matter.

10          **THE COURT:**  Right.  That's right.  What you're

11   telling me is, if I were interested in bidding on OPCO, that

12   even though I was not going to purchase the four casinos that

13   are intended to go to New PROPCO, that the top 25 percent of

14   the customer database for those casinos would be important to

15   me at OPCO?

16          **MR. WINSTON:**  Certainly could be.

17          **THE COURT:**  Yes to block PROPCO from access for

18   actually providing me with some affirmative benefit?

19          **MR. WINSTON:**  I could see both situations.

20          **THE COURT:**  Do you understand my question?

21          **MR. WINSTON:**  Of course.  Of course.  And I see both

22   situations.  Let me -- again, it has been argued that Boyd has

23   casinos located close by to the PROPCO casinos.

24          **THE COURT:**  And, in fact, deposition testimony is

25   that was one of the concerns about Boyd, that Boyd could get a

134

```
 1   lot of this proprietary information, withdraw from the deal,

 2   and then would have all the --

 3          MR. WINSTON:  And by the way, that feeds into my

 4   exact point about why customer databases are really important.

 5          THE COURT:  Oh, I don't think you have to convince

 6   anybody in this room of that.

 7          MR. WINSTON:  Well, it would be nice to have a

 8   valuation, because that's the problem; we don't know.

 9          THE COURT:  But I'm trying to figure out, what is the

10   value to OPCO --

11          MR. WINSTON:  All right.  So --

12          THE COURT:  -- once the casinos are no longer owned

13   by OPCO.

14          MR. WINSTON:  Let's give the Boyd example.  Let's say

15   Boyd, in our hypothetical world, decides to bid for the OPCO

16   assets and wins.  If Boyd has other casinos within its empire

17   that compete with the four casinos, you think they're going to

18   want to know about the asset they just bought, about that

19   customer database?  And do you think they will bid more or less

20   if they know that part of that database has the top 25 percent

21   at this four casinos that compete with its casinos?

22          THE COURT:  So what you're really telling me is that

23   -- not just Boyd, but if anybody had the ability to retain that

24   information, deprive New PROPCO of that information, they would

25   have a significant competitive edge that's now being
```

1   surrendered?

2        **MR. WINSTON:**  Certainly could be.

3        **THE COURT:**  Is that what your position is?

4        **MR. WINSTON:**  Essentially, yes.  And the best test

5   for this, put it up for auction and see if I'm wrong.   I do

6   want to make one last point about customer databases.

7        **THE COURT:**  Well, I guess --

8        **MR. WINSTON:**  Yeah.

9        **THE COURT:**  -- that gets me back to my point; the

10  auction process itself.  And what you're saying is that the

11  auction process itself would not -- there is no market for the

12  excluded assets.  There's no second market test, just as there

13  is a second market test for the non-excluded assets.

14       **MR. WINSTON:**  That is correct, Your Honor.

15       **THE COURT:**  I got you.

16       **MR. WINSTON:**  All right.  I do want to make one last

17  point about customer databases; this is very specific to the

18  committee.  If there have been customers since the petition

19  date that have been added to the customer database, including

20  for those four casinos, we would submit since Station Casinos

21  Inc. owns the database, that those are assets that are not

22  encumbered by any lien under 552.  So when those are being

23  given away -- and I have no idea what that valuation is,

24  because guess what, no one has done it yet, including us.  This

25  may become a plan confirmation issue if we're going down that

136

1    road, but from my perspective, anytime a customer is a post-

2    petition, including within those four casinos, that's an asset

3    -- an unencumbered asset that's being deprived for my

4    constituents.

5         **THE COURT:**  Not proceeds, et cetera --

6         **MR. WINSTON:**  I don't think so.

7         **THE COURT:**  -- so excluded by 552?

8         **MR. WINSTON:**  Excluded by 552.

9         All right.  Next category, this is the other

10   intellectual property, and I'm also going to combine it with

11   business information.  This should actually go pretty quickly

12   because my point for both of these is, no one has any clue what

13   actually is being transferred here and that's dangerous for

14   purposes of establishing what other people are going to be

15   bidding on and what value is being given away.

16        When I looked at the definition of other intellectual

17   property, there are certainly some examples that have been

18   given in it, but it's very broadly defined.  I even asked

19   PROPCO's independent director, Mr. Kors, at his deposition

20   whether he knew what was on that list and his answer was, "I

21   have no idea."

22        Now PROPCO, in its reply, has contended that the only

23   difference between the original deal and the proposed new deal

24   is that in addition to mutually agreed upon value and form of

25   consideration being finalized, there's going to be a non-

1    exclusive perpetual paid up license provided to PROPCO for this

2    other intellectual property, but that's actually not the other

3    change and there's a pretty significant change that hasn't been

4    highlighted.  The new deal includes proprietary software --

5    this is at the revised compromise, go back to Annex 1, Section

6    7, whereas the original deal only included non-proprietary

7    operating software and software necessary to access and use the

8    SCI lease collateral and the operating subsidiaries lease

9    collateral.  Now I don't actually know what is meant by

10   proprietary software.  I don't know if it's the player tracking

11   stuff, I don't know if it's additional customized software, and

12   there are examples for that, but the problem is again, we have

13   a gaping hole in the record.

14          Same thing goes with business information.  The

15   original deal they were entitled to certain business

16   information and it was non-competitive, non-confidential and --

17   business information and it had to be used exclusively at one

18   of the four casinos.  That's changed.  Now they can get a lot

19   of competitive and confidential and not necessarily exclusively

20   used only in those four casinos business information.  I have

21   no idea what's the extent of it, I have no idea what's the

22   value of it.  Again, a gaping hole in the record.

23          Last -- in terms of the assets that haven't been

24   valued, I want to talk about the non-competes.  If this deal is

25   approved, Stations will be compelled to waive covenants not to

138

1   compete so that PROPCO for a period of time can pitch for key

2   corporate level employees.  Why do I care about this?  I am not

3   interested at all in preventing someone who wants to go work

4   for PROPCO from having the opportunity to go work for PROPCO if

5   that's what he or she wants to do.

6          **THE COURT:**  And Mr. Genereau testified that they

7   considered this by the folks who were loyal, that they didn't

8   see any reason to block them.  I think the word "blocker" was

9   used.

10         **MR. WINSTON:**  That was pretty much the -- you hit the

11  nail on the head.  It is interesting that -- I think his exact

12  words were loyal to Frank or Fertitta Gaming.  I find it sort

13  of surprising that anyone could be loyal to Fertitta Gaming

14  right now, but that's just me maybe in my paranoid world.  I

15  don't understand how it's possible.

16         **THE COURT:**  No, if you read that whole deposition

17  there was the use of FG and Fertitta, and just like everybody

18  else in this case there's been a lot of --

19         **MR. WINSTON:**  Lot of loose language.

20         **THE COURT:**  -- lot of usage of terms.  That didn't

21  bother me at all, but I read exactly what he said.

22         **MR. WINSTON:**  Sure.  And this is a big change because

23  before they could only go after certain employees at the four

24  casinos.

25         **THE COURT:**  And your points were that, especially in

1    the area of technology, that this could cause significant harm

2    to OPCO?

3           **MR. WINSTON:**  That was actually Mr. Goldberg's point

4    in his papers, that 30 percent of the IT department at Station

5    Casinos Inc. is subject to non-competes.  And one of the things

6    that was in the Alvarez report was it's what's in the heads of

7    these people that is in many way the most valuable aspect of

8    the IT systems, because they know how to actually operate and

9    improve upon it.

10          What ought to have happened here, if this Court is

11   even interested in letting --

12          **THE COURT:**  Are you saying that OPCO then should

13   enforce the non-compete.

14          **MR. WINSTON:**  Well, this is what ought to have happen

15   -- ought to happen if this Court is going to even go down this

16   road.  Whoever buys OPCO should be able to have the first dibs

17   at all the employees that are subject to non-competes.  If they

18   don't want them, if they just don't want to hire them, then

19   they should waive them.

20          **THE COURT:**  In other words, enforce it.

21          **MR. WINSTON:**  Well, no the difference is -- the

22   difference is, anyone who is buying the OPCO assets, and this

23   is actually provided for in the APA, is supposed to get a

24   business.  That business includes the people that can operate

25   it.  If the minute somebody walks in the door, the most

1    valuable employees all have left, after they've bid for this

2    asset, that's unfair to that purchaser, indeed that's going to

3    chill bidding.  They should have first dibs.  What I don't want

4    to see happen, and this would be the unfairness, is they don't

5    want to hire somebody, and then they say, but you can't go to

6    PROPCO.  That would be the unfairness, because now you're

7    depriving an individual of an opportunity to have a living for

8    reasons that there's no rational basis, other than to be sort

9    of -- extracting unproper leverage against PROPCO.

10           **THE COURT:**  You're saying, they're going to let them

11    -- repeat that.  I'm not sure I understand your argument.

12           **MR. WINSTON:**  Okay.  So what should happen is whoever

13    is the OPCO purchaser comes in and says all right, the 100 guys

14    that have non-competes, I'm offering you employment on these

15    terms and conditions, do you want it or not?  And for the ones

16    that say yes, there's no -- then the non-compete is still

17    there, PROPCO can't go after them.  But for the ones where they

18    say no, then you let them go to PROPCO if PROPCO wants to hire

19    them.  That's what they're buying.

20           **THE COURT:**  All right.  I understand.

21           **MR. WINSTON:**  Or if -- and the thing is, going back

22    to my full point of lack of valuation, covenants of non-compete

23    are valuable assets.  You spend a lot of money training

24    somebody, you expose them to their -- to your business secrets,

25    you don't want some competitor come by and steal them away.  So

1   there has to be some way to make sure an OPCO purchaser, other

2   than Fertitta Gaming, isn't left in the cold.

3           **THE COURT:**  Well, that's the key, it has to be some

4   third-party.

5           **MR. WINSTON:**  Of course.  Now again, I only go to my

6   situation where I'm assuming Fertitta Gaming isn't it, because

7   it kind of washes itself out, but I do want to go to this

8   hypothetical.  Suppose it wasn't Fertitta Gaming that wasn't

9   the buyer of PROPCO, but somebody else, Boyd, Wynn, MGM or

10  Harrah's, somebody like that.

11          **THE COURT:**  The buyer of?

12          **MR. WINSTON:**  PROPCO.  And wanted to cut the same

13  exact deal.  Do you think there's a chance that there would be

14  a waiver of the non-competes without any consideration?

15  Absolutely not.  We all know that.

16          All right.  Now let me talk -- turn to the new assets

17  that I think have been added to the APA.  This is in Exhibit B-

18  1 to the APA, there's a couple of categories --

19          **THE COURT:**  I'm right there.

20          **MR. WINSTON:**  -- that I think are new.  First, let me

21  go to Category 14, and this is says -- let me quote it just to

22  make sure I get it right.  That the -- the lead in is all the

23  right title and interest to the sellers, that all rights,

24  claims, rebates, discounts and credits, including all

25  indemnities, warranties and similar rights, security and other

1    deposits, excluding bank deposits, refunds, causes of action,

2    rights of recovery, rights of setoff, rights of recruitment,

3    other than tax refunds, and rights to insurance proceeds, to

4    the extent relating to the PROPCO properties or the Wild Wild

5    West assemblage, that category is to be transferred to PROPCO.

6    That's how I understand this works.  I'm -- I doubt this is

7    what the parties intended, but I have to ask because this is

8    the type of thing that ends up before the U.S. Supreme Court.

9    The phrase, "To the extent relating to the PROPCO properties

10   and the Wild Wild West assemblage" if you apply the last

11   antecedent rule, applies only to insurance proceeds.  And then

12   taken literally, every cause of action of Station Casinos Inc.

13   would get transferred.  I doubt that's what they intended, but

14   I think there needs to be a clarification that that's the case.

15   If I'm wrong about that, then somebody needs to value every

16   cause of action that Station Casinos Inc. would otherwise be

17   providing.

18          Okay.  Now turning --

19          **THE COURT:**  I think you've picked up on the

20   draftsmanship.

21          **MR. WINSTON:**  Maybe so, but I wasn't kidding when I

22   said this goes to the Supreme Court.

23          **THE COURT:**  Oh, I understand that.

24          **MR. WINSTON:**  And that may be what they intended; I

25   don't know.  I mean, the --

1          **THE COURT:**  We'll hear.

2          **MR. WINSTON:**  Yeah.  My estate claims are getting

3    release under the plan -- this is a great way to make sure they

4    get released, so I don't -- you know, who knows.

5          Now let's go to Category 17.  Category 17 is all

6    supplies owned by sellers and allocated to the PROPCO

7    properties or the Wild Wild West assemblage.  Now this one,

8    best I can tell, is also new.  And I don't know what is meant

9    by supplies.  If we're talking paper napkins and things like

10   that, it's probably not worth the time and energy to fight

11   about.

12         **THE COURT:**  That's what I assumed it to be.

13         **MR. WINSTON:**  I assume it's the case, but it is a new

14   ask, so we wanted to make sure that we understand what it is

15   because it also does lead me back to Category 11.  Category 11

16   is actually in what was filed on April 19th.

17         **THE COURT:**  Which is inventory and tangible personal

18   property.  Wouldn't that include supplies?

19         **MR. WINSTON:**  I would think so, which is --

20         **THE COURT:**  That's -- I asked the same question.

21         **MR. WINSTON:**  That's why -- you know, this is -- it

22   could be again just draftsmanship.

23         **THE COURT:**  I agree.

24         **MR. WINSTON:**  But there is an interesting thing about

25   this category.  This category says that inventory located or

1    dedicated to the PROPCO properties or the Wild Wild West

2    assemblage is to be transferred.  Now I will carve out for a

3    second inventory that is located at those -- at the four

4    casinos, because putting everything else aside, there is a lien

5    that has been asserted against those, but there clearly hasn't

6    been a lien asserted against the Wild Wild West, and if you

7    look at the UCC1 that PROPCO filed, it only applies to

8    inventory at the location of the PROPCO facilities.  So that if

9    it's dedicated to, but not located on, they're getting

10   something new.  And my point is, I'd like to know what the

11   value of that is and we don't know.

12            All right.  Getting there.  Let me go to the last

13   sort of global category.  This was what Alvarez did, in fact,

14   provide indicative values to.  Let me first go to IT Systems,

15   and this will be relatively short.  Alvarez did provide this

16   Court in its report two scenarios.  I mean, there was actually

17   three scenarios, but I'm going to focus on two because that was

18   the focus of the papers.

19            One scenario is the so-called OPCO Standup Scenario.

20   And the range of value for that is between $16 and $20 million

21   dollars.  The theory behind that scenario is, OPCO needs to get

22   it's Texas server up to speed, needs a redundant one somewhere

23   else and in effect, PROPCO would be reimbursing them for that

24   cost out of $35 million.  The second scenario, which is the one

25   that had been advocated by the OPCO Lenders up until the time

1    they cut their deal, is the PROPCO replacement scenario.  And

2    this is the one that looks at what it would cost PROPCO to

3    replace the systems at Red Rock and at Sunset Station, and the

4    range there is between $40 and $55 million.

5             So which one is the best indicator of fair market

6    value of the IT systems?  I think the answer is clearly the

7    PROPCO replacement scenario.  And the reason why is that not

8    only does it reflect what is the value to PROPCO, which is the

9    buyer, but it maximizes the value to OPCO.  And the most

10   glaring flaw with the OPCO Standup Scenario is that it is

11   internally inconsistent.  It is a variable valuation.  Consider

12   this hypothetical, if today the Texas server was completely up

13   to speed and Stations had somewhere else a replacement server,

14   according to the OPCO Standup Scenario, the value to be

15   transferred to PROPCO is zero.  That makes no sense.  They're

16   buying something, it has to have some value, but in the OPCO

17   Standup Scenario, it would be zero.

18            So what's the default?  The default is, what would it

19   cost PROPCO to go out into the market and buy what is already

20   there?  And they estimated it at between $40 and $55 million.

21   Sitting here today, I can't quibble with it.  I don't know

22   enough to quibble with it, so we're sort of accepting it, but

23   that isn't what was the basis by which Stations has entered

24   into the deal.  So they've gone into the deal using a valuation

25   that makes no sense.

1           Let me turn to ownership disputes, because this has

2    been something that was of heated discussion in the papers,

3    particularly by the PROPCO entity.  We said in our papers the

4    ownership disputes were phony.  Here's why when it comes to the

5    IT systems.  The master lease compromise executed in November

6    2007 does -- as PROPCO correctly states, does provide for the

7    transfer of fixtures to PROPCO, but IT systems are not fixtures

8    and PROPCO has not offered any evidence that they are.

9           First, and this would be painful to go through, but

10   if you look through Exhibit 63, the PROPCO schedules, you will

11   see there are no assets listed in those schedules that

12   constitute the IT systems.  Then go look at Exhibit 66, this is

13   why we put this in, this is the Milbank opinion letter rendered

14   in connection with the 2007 LBO.  This is -- and this opinion

15   letter is the one that indicated that the purported sale of

16   land and buildings to PROPCO was not a sale of substantially

17   all of the assets of Station Casinos.  At Page 21 of that

18   opinion letter, Milbank stated,

19           "The sale and leaseback transaction does not include

20           a transfer of intellectual property (e.g. trademarks

21           or proprietary software and systems) or certain

22           personal property (e.g. furniture)."

23           That's the end of the quote.  The use of the word

24   "systems" in that opinion letter is consistent with the use of

25   the word systems in virtually every pleading in this case in

1   connection with this dispute.  Opposing parties refer to the IT

2   systems as systems.  OPCO Lenders refer to them as systems at

3   Page 13 of their reply.  And just to sort of buttress the

4   point, if this was truly an issue of ownership dispute, one

5   would have thought you would have seen a lot of evidence of it

6   long before April 7th.  There would have been letters and

7   emails going back between Gibson Dunn and maybe Milbank,

8   depending what hat they're wearing that day, maybe Simpson, not

9   entirely sure, but you would have seen something.  There wasn't

10  any that was produced.  There's been none put into evidence.

11  You would have seen emails, at least between the principals,

12  saying we're aware of an ownership dispute.  Some sort of

13  documentation, we're aware of an ownership dispute, but I ask

14  Mr. Kors, the PROPCO Independent Director, at his deposition,

15  whether he could remember any ownership disputes before April

16  7th and he says he could not recall.  So when we wrote that the

17  ownership dispute, with respect to the IT systems, was phony,

18  we meant it.

19          Trademarks.  Here Alvarez determined that the

20  indicative value of the trademarks category was between $16

21  million and change and $40 million and change.  Now if

22  approved, just so that we know what's happening, Station

23  Casinos will absolutely assigned to NewCo, or PROPCO, 3

24  federally registered trademarks, 34 federal trademark

25  applications and then several dozen Nevada state trademarks.

1   Of these trademarks, Alvarez assigned value only to four

2   portions of the trademarks.  The Boulder portion of Boulder

3   Station, the Sunset portion of Sunset Station, the Palace

4   portion of Palace Station and then Red Rock.  Now, Alvarez also

5   determined that it would cost $50,000 per location to replace

6   the signage containing the words Boulder Station, Palace

7   Station and so on, at a cost of a little over a million

8   dollars.  With respect to the other trademarks being absolutely

9   assigned, Alvarez concluded that those trademarks had

10  absolutely no value.

11          That's not all that's happening here.  Stations is

12  also licensing for free on an exclusive basis Boulder Station,

13  Palace Station, Sunset Station and Red Rock -- Red Rock

14  Station, sorry.  Alvarez did not provide an indicative value

15  for this licensing.  And then Stations also licenses for free

16  on a non-exclusive basis numerous other trademarks.  There's

17  lots of others, like Boarding Pass and Jumbo Jackpot, and

18  things like that they use throughout their entire system.

19  Alvarez did not provide an indicative value for those licenses.

20          So now I've sort of explained what happened with

21  respect to the trademarks, let's look at what Alvarez did for

22  valuation purposes.  Now they considered four methodologies to

23  determine its indicative value and this was the net book value

24  of brands, the fair share comparable analysis of revenues, the

25  25 percent rule of thumb, and then comparable transactions.  As

1   we identified in our papers, the fair market value of a

2   trademark that you are selling is what a willing purchaser

3   would have paid a willing -- willing seller -- let me strike --

4            **THE COURT:**  What a willing buyer would pay a willing

5   seller.

6            **MR. WINSTON:**  Got it, thank you.

7            **THE COURT:**  Not tainted by fraud or compulsion.

8            **MR. WINSTON:**  Exactly.

9            **THE COURT:**  Okay.

10           **MR. WINSTON:**  The methodologies that Alvarez has

11  employed really relate to the licensing of trademarks, not to

12  the ownership of trademarks.  And Alvarez did not engage in any

13  sort of analysis as to the ownership valuation.  Putting that

14  aside, if you're going to look at what the value is from a

15  licensing perspective, that same 15 factor *Georgia Pacific*

16  test, which I mentioned with respect to patents, can be

17  extended to trademarks; it has been by a number of cases.

18  Further, Alvarez failed to identify or engage in very

19  rudimentary analyses when valuing trademarks.  It didn't study

20  the geographic strength of the trademarks, didn't figure out if

21  any of the trademarks had developed a secondary meaning, didn't

22  test the strength of the marks generally, and there was no

23  survey regarding the customer recognition of the PROPCO casinos

24  with the Station brand in it and the value of the composite

25  marks if you were to strip out the name Station.  Alvarez

150

1   didn't do any of that.

2          Now let's look at the comparables that Alvarez did

3   consider.  According to the report, and then what Mr. Caruso

4   said in his deposition, Alvarez believes that there's two

5   casino trademark transactions that were comparable.  One is a

6   casino in Hammond, Indiana and the other is a small casino in

7   Argentina.  Now Alvarez offered absolutely no analysis to

8   determine whether a casino in Indiana and a casino in Argentina

9   is actually comparable to any of the four casinos in Las Vegas.

10  There's no discussion, there's no work papers, there's nothing

11  that indicates yes, in fact, these are comparable.

12         Now I did ask during the deposition, well why do

13  think they're comparable?  And he said well, putting aside Red

14  Rock, the other three are small and local and tend to cater to

15  a local audience.  This is why we put in the request for

16  judicial notice.  Exhibit 3 of the request for judicial notice

17  is Mr. Haskins declaration in support of a state -- of a non-

18  bankruptcy court action to enforce its trademarks effectively.

19  It's trademark infringement, cyber-squatting --

20         **THE COURT:**  I dealt with this in May -- or earlier in

21  May?

22         **MR. WINSTON:**  Right, but this is Mr. Haskins

23  declaration.  I'm not talking --

24         **THE COURT:**  You're not talking about the complaint.

25  You're talking about --

1          **MR. WINSTON:**  -- about the complaint, I'm talking

2    about Mr. Haskins' declaration.  Mr. Haskins said he believed

3    that Boulder Station, Palace Station and Sunset Station have

4    become famous throughout the United States and the world.  So

5    at least for purposes of wondering whether the Alvarez

6    methodology of picking a small casino in Argentina and a casino

7    in Indiana is comparable, at least according to Stations' own

8    officers, they seem to think that the casinos are pretty famous

9    beyond just Las Vegas.

10          Further, Exhibit 53 is a motion for default judgment

11    that Stations filed in January of this year, in the same action

12    for which Mr. Haskins submitted his declaration.  That motion

13    repeated and referred to Mr. Haskins' statements in his

14    declaration in seeking the motion for default judgment.  So

15    thus, even as late as this year, after the first compromise

16    motion was approved, and after it appears that the PROPCO

17    Lenders had chosen Fertitta Gaming, Station Casinos was still

18    taking the position that these casinos were famous throughout

19    the United States and the world.  I therefore would submit that

20    comparing those three casinos, putting aside Red Rock, to a

21    casino in Indiana and a casino in Argentina, it just doesn't

22    fly.

23          There's other reasons why that comparable analysis

24    doesn't work.  Each of those two casinos, the transaction, was

25    the licensing of trademarks on a non-exclusive basis.  It was

1    not an assignment outright of the names.  Consider Exhibit 45,

2    this is one of the two transactions -- the documents evidencing

3    the two transactions or discussing the two transactions that

4    Mr. Caruso and the Alvarez team looked at.  It's on a non-

5    exclusive basis.  So I asked during the deposition, did you

6    consider whether these transactions were comparable if they

7    didn't involve ownership?  And the answer was, they didn't do

8    it.  Another mistake with their comparables is that what is

9    being licensed is the name for operating a casino.  Here, the

10   assigned trademarks go beyond operating a casino.  It also goes

11   to merchandise and to room reservations, which Alvarez didn't

12   consider either.

13            So when trying to understand the value of the

14   trademarks and the -- I think it was $16 to $40 million

15   valuation range, I think Alvarez left a lot on the table when

16   it selected those two comparables.  To make matters worse, it

17   actually used lower royalty rates than in the comparables,

18   because it believed it was justified in doing so because only a

19   portion of the trademarks were being transferred.  So in the

20   Argentina casino case, the royalty rate was two percent of

21   gross income, for the Indiana casino it was 0.5 percent of

22   gross gambling revenues.  And relying upon these alleged

23   comparables, for Boulder, Palace and Sunset, Alvarez picked 0.5

24   percent and for Red Rock it picked 1.5 percent.  Aside from the

25   ownership versus licensing problem, there are four mistakes

153

1    here.

2         First, Alvarez did not account for the fact that even

3    -- that once even a portion of the trademarks are assigned,

4    Station Casinos loses the value of the goodwill that has been

5    built up in the composite market; just doesn't factor it in at

6    all.  The reason why that's important is people -- a licensor

7    is going to charge more for a license if it's built up a lot of

8    good will into it.  Indeed, he did, in fact, testify during his

9    deposition that the value of the composite mark is higher than

10   just the portions, but that will be gone -- that goodwill

11   that's behind that will be gone the minute it is assigned.

12        Second, in making the determination that it did,

13   Mr. Caruso admitted that Alvarez did not consider or examine

14   any comparables where only a portion of the trademark was being

15   licensed and did not consider, as I said before, any study to

16   test its strength of the marks with and without the name

17   Stations in them.  I think they say the document, but as best I

18   can tell from the report, it wasn't part of the analysis, is

19   that in 2007 and 2008 Stations engaged Duff & Phelps to perform

20   two valuations, one was a purchase price allocation, the other

21   was impairment testing.  And in part of those documents, it

22   looked at the trademarks.  Exhibits 54 and 55 are the relevant

23   excerpts from each report.

24        In those documents, Duff & Phelps determined that the

25   royalty rate just for Station was 1.5 percent of all revenue.

154

 1   And the basis for this analysis was the relief from royalty

 2   approach, which in this case was the -- which when applied to

 3   this case was the statement,

 4            "Station realizes a benefit from owning the brands,

 5            rather than paying a rent or royalty charge for the

 6            use of these assets."

 7            Now those two Duff & Phelps' reports did not

 8   expressly address Red Rock, it didn't do so, but it did look at

 9   Palms, and it concluded that was 2.0 percent royalty rate.

10   That is 0.5 percent higher than what they thought was worth for

11   Station.  In the Alvarez report, Alvarez thinks Red Rock is a

12   full percentage point higher than Boulder, Palace and Sunset.

13   So if we were to just be a little quick and dirty with the

14   math, one would expect the Red Rock rate to be two-and-a-half

15   percent and the Station rate for the three casinos to be 1.5

16   percent.  And then last, Mr. Caruso said the reason why they

17   used 1.5 percent for Red Rock is that well, Red Rock is part of

18   the Station casino brand, but Red Rock doesn't use the word

19   Station in its trade name or marketing.  The actual name of the

20   facility is the Red Rock Casino Resort and Spa, no mention of

21   Station, which is different than the other three.  So there is

22   no basis demonstrated to depart downward for Red Rock, as

23   Alvarez apparently thought was appropriate for the other three.

24   Now debtors have said that there's little value to these

25   trademarks once divorced from the word Stations, because in the

1   case of the three casinos, they refer to streets, and in the

2   case of Red Rock they refer to a geographic location.

3        Now I'm going to go back to request for judicial

4   notice, Exhibit 4, and this was one of the complaints that we

5   referred to.  I think Your Honor mentioned it was unverified

6   and that's true.  Even unverified complaints in non -- in

7   actions other than before this Court have the weight of

8   evidentiary admissions.  That's why we've included it.  And for

9   purposes of understanding the issue of whether Red Rock has

10  developed a secondary meaning above and beyond the geographic

11  location, there is now an evidentiary admission by Stations

12  that has not been contradicted by any competent evidence, that

13  it has in fact happened.

14       In 2006, in that complaint, right on the verge or I

15  think right after they opened up the casino, they said that

16  Stations had developed a secondary meaning for its trademark

17  Red Rock that had gone back a decade before.  They had started

18  with beer, and then when they announced they were opening up

19  their casino, they had done a lot of marketing for the casino

20  when it opened up.  The world knew the name Red Rock implied

21  their casino, not the geographic location.  Alvarez completely

22  ignored that.

23       Indeed, request for judicial notice, Exhibit 5, is

24  the consent judgment that was entered in that action.  And that

25  action, what they did, was make sure a saloon couldn't say --

156

1    call themselves the Red Rock Saloon.  They had to take out the

2    word "Rock", so it became Red Saloon or I think they -- there

3    was a different variation of it, but it couldn't be Red Rock.

4    I don't know if a consent judgment would be equal to say like a

5    default judgment where no one responds to it, but there are

6    cases that hold a default judgment can give rise to judicial

7    estoppel, much less an evidentiary admission, that Stations

8    would be judicially estopped from taking the position that the

9    name Red Rock has no significance above and beyond the

10   geographic location.

11           **THE COURT:**  Judgment judicial estoppel?

12           **MR. WINSTON:**  A default judgment; there are cases

13   that hold that.  I don't know if a consent judgment --

14           **THE COURT:**  Are you talking about judicial estoppel

15   or are you talking about issuing a plan preclusion?

16           **MR. WINSTON:**  Judicial estoppel.

17           **THE COURT:**  Judicial estoppel requires reliance by a

18   judicial officer.

19           **MR. WINSTON:**  If a Court enters a -- the theory is,

20   when a Court enters a default judgment based upon the

21   assertions in the complaint --

22           **THE COURT:**  Oh, then it's relied upon --

23           **MR. WINSTON:**  -- then it's relied upon.

24           **THE COURT:**  Because the judgment itself may or may

25   not be -- have preclusive effects.

1          **MR. WINSTON:**  Exactly.  And I don't -- I'm not

2   suggesting issue or preclusion or --

3          **THE COURT:**  Okay.  I just want to make sure.

4          **MR. WINSTON:**  No, I was careful with my words,

5   judicial estoppel.  And not actually saying it has to apply

6   here --

7          **THE COURT:**  It estops the Plaintiff who receives

8   the --

9          **MR. WINSTON:**  Exactly.

10          **THE COURT:**  -- default judgment.

11          **MR. WINSTON:**  Exactly.

12          **THE COURT:**  I understand what you're saying.

13          **MR. WINSTON:**  I'm not saying it actually has to apply

14   here, but at minimum you have the evidentiary admissions that

15   are uncontradicted.  Other than -- well, you have their

16   assertions saying well, we think it doesn't mean anything, but

17   there's no basis for it, and it doesn't make sense given what

18   they said in 2006.

19          Okay.  So I look at as, I'm no expert when it comes

20   to trademarks.  I'm not -- I don't deal with trademark

21   litigation, but I do point out again, that this Court is left

22   with a gaping hole in the record as to the value even with what

23   Alvarez did.

24          All right, last -- I'm going to skip over the other

25   trademarks that aren't getting -- didn't even get valued at all

158

```
 1    that are getting transferred.  I talked about that in the
 2    pleadings.  Let me talk last about the Wild Wild West.  And
 3    this one is -- our papers talked about again, Your Honor
 4    referred to the newspaper article that we referred to and has
 5    been admitted into evidence, so I do want to highlight the
 6    following things.
 7              As Your Honor already pointed out, Alvarez is not an
 8    expert, certainly obtained no appraisal of the Wild Wild West
 9    land.  It just has sort of thrown out a number between a
10    million and a million two-fifty per acre.  And then it did
11    consider a land transaction that occurred in November 2009, it
12    said in its report it didn't think the land was all that
13    comparable, but it did miss that February 2010 transaction for
14    a little over $11 million per acre.  I don't --
15              THE COURT:  This according to the same news article
16    people are supposed to have some idea what goes on in this
17    transaction didn't think that that price -- that an operation
18    could be placed on that property that would justify that price?
19              MR. WINSTON:  Absolutely.  Absolutely.
20              THE COURT:  It said it was non-sustainable, if I read
21    the article correctly.  I have no idea.
22              MR. WINSTON:  Your absolutely correct and what you
23    just said again hammers the point.  You have no idea?
24              THE COURT:  I have no idea why anybody would pay that
25    much for that piece of property, that's what I'm saying.
```

1          **MR. WINSTON:**  Right.  Let me add this, you have no

2     idea why a 90 percent departure from that most recent land

3     transaction is justified.

4          **THE COURT:**  Well okay, I understand your position.

5     Go ahead.

6          **MR. WINSTON:**  Okay.  I'm now effectively done.  I

7     have spoken for a long time, gone through a lot of details.

8     This is much more in the weeds than what my other colleagues

9     are going to do, but --

10          **THE COURT:**  What about your point that you, I think -

11     - I thought it related to Wild Wild West, and if I

12     misunderstood please tell me, isn't this the property --

13     there's an assemblage of property and there's an option?

14          **MR. WINSTON:**  There are two options.

15          **THE COURT:**  And the consideration was that the strike

16     price far exceeds its value at the current time?

17          **MR. WINSTON:**  Yes.

18          **THE COURT:**  And your question is, well who knows what

19     it will be in the future?

20          **MR. WINSTON:**  This was more in the independent

21     lenders' papers, but yes, we're sort of on the same side on

22     that.  I --

23          **THE COURT:**  Doesn't have it to be exercise -- isn't

24     there the one year time limit?

25          **MR. WINSTON:**  For the two options?  I --

160

1          **THE COURT:**  Well, for the excluded assets and this is

2  part of the transaction, so you -- how far out in the future do

3  you have to go, is my question?  If I read it correctly, it's

4  one year.

5          **MR. WINSTON:**  For the two -- not Texas Point, but the

6  other --

7          **THE COURT:**  No, no, the options -- but the point is,

8  in establishing the value now, you -- maybe it was in

9  Mr. Goldberg's papers, that I had to analyze -- it was improper

10  to analyze it now -- and it was in Mr. Goldberg's because he

11  also did the examination, that nobody could say what the value

12  would be in the future and maybe the property is going to go

13  up, and he tried to get the witness to say that that would

14  happen, the witness said I have no idea if the property value

15  is going to go up or down and neither do I or anybody in this

16  room.

17          The point being, when you read those -- I believe

18  it's the transfer - I think it's MX, when you read that has

19  that one year provision in it.  So I was -- maybe Mr. Goldberg

20  can address that point, because I didn't think you have to go

21  too far.  In other words, to make the determination whether or

22  not to exercise the option is going to have -- that question is

23  going to have to be answered within a year or so.  That's how I

24  remember it.

25          **MR. WINSTON:**  Your Honor, I will confess, I don't

161

1   know the answer, but I think -- I've been seeing some nods

2   here.

3           **THE COURT:**  Okay.  I'll be interested -- I didn't see

4   anybody address that and perhaps I misread it.

5           **MR. WINSTON:**  All right.  Let me close on this

6   point --

7           **THE COURT:**  I mean, I understand the point.  Nobody

8   has given any value, there's no basis for the values they've

9   given me for all these reasons.

10          **MR. WINSTON:**  We're done.

11          **THE COURT:**  Thank you.

12          **MR. WINSTON:**   Thank you.

13          **THE COURT:**  I'm sorry.

14      **(Court and Clerk confer)**

15          **THE COURT:**  There apparently -- if anyone in this

16  courtroom has a white Nissan Altima, it is idling in the

17  parking lot and nobody is in it.  It's a rental vehicle.

18  Somebody, if they have a Nissan Altima, failed to turn it off.

19          **MR. WINSTON:**  I think it's one of the excluded

20  assets.

21      **(Laughter)**

22          **THE COURT:**  The value of the gasoline has been

23  reduced by the time that it was idling.  Ms. Steingart?

24          **MS. STEINGART:**  Thank you, Your Honor.  Which brings

25  us now -- we're still in second master lease compromise.  The

162

1   issues with respect to excluded assets, as the Court is very

2   aware, is a factor in master lease and bidding procedures and

3   in OPCO Plan Support, but we go now to the rest of master

4   lease, which may also impact other agreements.

5        We go to the Texas put.  Why in the world is it in

6   the second master lease compromise agreement?  It's not related

7   to transition services, it's not related to rent, it's not

8   related to any of the PROPCO properties.  There was testimony

9   confirming that at Page 175, Lines 22 to 176, Lines 23, at the

10  hearing.  There is no evidence of actual negotiation, there is

11  no agreement signed by the landlord, there is no analysis by

12  OPCO of why this --

13       **THE COURT:**  There was deposition testimony that

14  indicated the representative indicated value, they wanted 115

15  million.  I thought that that was some evidence of negotiations

16  or did I misread the testimony?

17       **MS. STEINGART:**  Well, there was testimony that the

18  position was taken by the owners of the put of 115 million.

19       **THE COURT:**  Yeah.

20       **MS. STEINGART:**  I haven't seen any emails from any of

21  the owners of the put, I haven't seen any --

22       **THE COURT:**  Well, you may not like -- I understand

23  that, but don't say there's no evidence.  I think that you

24  might say that there's very little evidence, but at least

25  there's some evidence that a price was put on the table, it was

1   $115 million, and it was negotiated down.

2          **MS. STEINGART:**  I think that there was evidence that

3   there was a price of 115, Your Honor, put on the table, but I

4   didn't see any evidence of discussions among people that

5   brought it down.

6          **THE COURT:**  Except we know it got to 75?

7          **MS. STEINGART:**  Yeah, I have no idea how it got to

8   75, Your Honor.

9          **THE COURT:**  All right.  I'm not sure that everything

10  in the world is reflected in letters or emails, but I do know,

11  as I have testimony, that said the representatives wanted 115,

12  they negotiated 75.  The 75 is included in the 772, it's not

13  included in the 772 if somebody else buys it, and somebody else

14  -- and some third-party bidder, which is the problem that you

15  have with the entire Texas put situation.

16         **MS. STEINGART:**  It's a problem I have and the other

17  problem I have is, is who the people are on both sides of the

18  negotiation.

19         **THE COURT:**  I got that.

20         **MS. STEINGART:**  Okay.  And so, because of those

21  issues, I find it -- and because usually when transactions of

22  this size are dealt with by actual opposing parties, you see

23  pieces of paper and you see other things.

24         **THE COURT:**  So you say the absence of what you'd

25  normally see, perhaps indicates what, there was no negotiation?

1          **MS. STEINGART:**  I think --

2          **THE COURT:**  It just went down 40 million by itself?

3    I don't understand that.

4          **MS. STEINGART:**  Neither do I.

5          **THE COURT:**  Okay.

6          **MS. STEINGART:**  There's no evidence of how or why or

7    under what circumstances it occurred or if it was actually, you

8    know, a negotiation, as opposed to some number that an insider

9    sort of said this is the number that we think -- we'll make

10   sure that we get these assets, okay.  We have no idea how that

11   happened.  There's no analysis by OPCO of why Texas Station, in

12   connection with other non-debtor subs, cannot be placed in

13   Chapter 11.  It is significant that the beneficiary of the put

14   is a Fertitta family member.  The liability of this put may

15   have a direct impact on the recovery of unsecured creditors.

16   $75 million amounts to about 10 percent of the value of the

17   stalking horse bid.  It's a meaningful amount and it's clear

18   that if a fair auction process is approved, we will have other

19   bidding participants who will care about this number.

20          As the Court has seen from Exhibit --

21          **THE COURT:**  Which apparently Boyd has?

22          **MS. STEINGART:**  Boyd has, and they care about the

23   number.  I'm not really sure how much or what the caring was

24   about the number --

25          **THE COURT:**  Well, there was testimony regarding what

165

 1  Boyd's attitude was about that.

 2          **MS. STEINGART:**  There was hearsay about what Boyd's

 3  attitude was about that.  We haven't heard from Boyd and

 4  hopefully Boyd will participate in the auction.  But also, as

 5  can be seen from Exhibit 34, which is one of the things under

 6  seal that I'm not going to talk about in detail, there's

 7  another strategic buyer with some knowledge of these assets,

 8  not a financial buyer, not someone unfamiliar with this

 9  company, that has put a number in excess of the OPCO secured

10  debt on the table.

11          Absent the liability on the Texas put, this

12  indication of interest would put unsecured creditors well into

13  the money.  So the fight on the Texas put is an important one

14  and it's a fight that we believe a debtor, whose sole interest

15  was in providing to a recovery to creditors, would have

16  undertaken.  And --

17          **THE COURT:**  I thought about this.  I thought about

18  this because -- ask that, some question about the 75 million

19  and that's when he talked about the 35 million credit.  I'm not

20  sure that I fully understood his response regarding the 75.

21  Seventy-five would be the -- I know your point is that it may

22  start to be paid by OPCO even if there was no transfer of

23  assets, I'm aware of that argument, but I think your argument

24  is, is that that 75 million would have to be paid by any third-

25  party purchaser.

1           **MS. STEINGART:**  Or it would reduce the value that

2    OPCO, as an entity, would receive.

3           **THE COURT:**  Seventy-five million being the settlement

4    amount as to a discount rental, whatever the formula is, as

5    provided in whatever the documents are.  I think that that

6    ground lease, that was Mr. -- that was the exhibit to

7    Mr. Friedman's declaration, I think, if memory serves me

8    correctly, I took a look at that.  The point being is, I want

9    to make sure I understand your argument, is that any buyer

10   knowing that they have a $75 million obligation would probably

11   reduce their offer by that $75 million.

12          **MS. STEINGART:**  Well, if it's an agreement that's

13   approved by the Court and embodied in these other documents, I

14   don't think that they would have any choice, Your Honor.

15          **THE COURT:**  My question to you would be, how would

16   they be able to make a determination regarding their bid in the

17   absence of this agreement, that knowing the potential liability

18   is out there and knowing, if they've paid any attention to

19   what's going on, that at least it is alleged and under oath

20   asserted that a representative of the landlord said it was

21   worth 115 million.

22          **MS. STEINGART:**  I do understand that.  I think that

23   having an understanding of what others would value that

24   liability at and how long and under what circumstances they

25   would request possibly that funds be escrowed, is an important

1    part of the process.  If the bidding gets above -- or gets

2    above where we are now, certainly if the funds that -- if there

3    are sufficient funds to pay the OPCO Lenders, and that money is

4    going to be escrowed, that might be something that we would

5    have an interest in seeing pursued.  It depends on where the

6    bidding ends up, what significance that is.

7            **THE COURT:**  Seeing what pursued? I want to make sure

8    I understand you.

9            **MS. STEINGART:**  Seeing the -- you know, whether a

10   better price on the Texas put can be achieved by having people

11   actually involved in the negotiations who have a tangible

12   benefit from it.  Our view -- stepping back for a moment, Your

13   Honor.  Our view is that a number was achieved that satisfied

14   the secured lenders and that was 87 cents on the dollar, and

15   that's a nice recovery.  If I was a secured lender, maybe I'd

16   be satisfied with that as well.  And then there was a situation

17   where these other bells and whistles were attached and there

18   was less interest in the number being zero.  Certainly, the

19   upside from any value left on the table by the OPCO secured

20   lenders to the benefit of Fertitta Gaming, and the controlling

21   lenders in their PROPCO hat.

22           So they reached a number that they were happy with

23   it.  It could be that someone who was more aggressively seeking

24   value would want that number to be higher, and that's us, Your

25   Honor.  And I don't think that there needs to be a risk by

1  having that -- by having the Texas put be part of the auction

2  process and by having Texas put -- Texas Station consider the

3  possibility of filing for bankruptcy.

4       **THE COURT:**  Are you telling me that I should consider

5  denying plan confirmation if a company doesn't file bankruptcy?

6       **MS. STEINGART:**  No, I'm not saying that at all, Your

7  Honor.  I'm saying that people who bid on the Texas put will

8  mark up --

9       **THE COURT:**  The Texas put is not separately being bid

10  on.

11       **MS. STEINGART:**  Okay.  People who bid on the package

12  of assets will have an indication of how their bid is being

13  impacted by the value of the Texas put.  If you look at the

14  bidding procedures now, the revised bidding procedures asks

15  bidders to describe the characteristics or the impact of the

16  Texas put on their bid.  And so I think bidders can indicate if

17  they are bidding less or if they want a portion of the bid held

18  in escrow until some -- until they, or others, negotiate with

19  the owners of the put.  And just as an aside, Your Honor, in

20  the asset purchase agreement, there is provision for putting

21  Texas put -- Texas Station into Chapter 11.

22       **THE COURT:**  My question is this -- because I'm not --

23  if I'm a third-party bidder at the auction, are you saying that

24  the bidder should be able to segregate that portion of its bid

25  that relates to the Texas put?

1          **MS. STEINGART:**  To whatever uncertainty they perceive

2    is created by the Texas put.  There may be a bidder that puts

3    it at zero, Your Honor.

4          **THE COURT:**  And what would be the point of that,

5    unless they thought they had some, what, legal challenge to the

6    put, assuming that 365(f)(1) is not even applicable, because

7    they're not -- it's not a debtor in bankruptcy, that for some

8    other -- that it would want to study the formula to be able to

9    figure out what the value would be?  I don't understand.

10          **MS. STEINGART:**  Well, Your Honor, the asset purchase

11   agreement currently provides that Texas Station will be in

12   bankruptcy.  It provides that Texas Station will be put into

13   Chapter 11.

14          **THE COURT:**  Okay.

15          **MS. STEINGART:**  Okay.  And I'll show you where --

16          **THE COURT:**  And then, what you're saying is, the

17   asset purchase agreement --

18          **MS. STEINGART:**  -- it says that.

19          **THE COURT:**  -- which is the agreement upon which the

20   stalking horse is proceeding, states that Texas Station will be

21   placed into --

22          **MS. STEINGART:**  Chapter 11.

23          **THE COURT:**  -- Chapter 11 and then you're saying at

24   least the effort could be made under 365 to find that this was

25   a violation of the anti-insider -- anti-anti assignment

170

1    provision?

2            **MS. STEINGART:**  Right.  And, Your Honor, I do

3    believe --

4            **THE COURT:**  All right.  I get your point.

5            **MS. STEINGART:**  -- that given the magnitude of the

6    liability, that a debtor whose sole interest was in providing

7    recovery to creditors would have undertaken that challenge.

8            **THE COURT:**  All right.

9            **MS. STEINGART:**  And that there are people who will

10   undertake that challenge.  And importantly, the law in the

11   Circuit supports the conclusion that the put is an unreasonable

12   restraint on assignment under 365(a).

13           **THE COURT:**  I'm not going to review all those cases.

14   I've looked at them.  I'm not going to even begin to give an

15   advisory opinion.

16           **MS. STEINGART:**  And I don't want an advisory opinion,

17   Your Honor, but I do -- but I think that the important point

18   here is that there's significant authority to make that way

19   more than --

20           **THE COURT:**  There is certainly a significant dispute.

21           **MS. STEINGART:**  It is a significant dispute and --

22   and, you know, the hockey case is just not relevant.  So, you

23   know, so I think that there's a dispute and there's significant

24   authority that would support the proposition and it's

25   surprising that the debtor, given the magnitude of this, hasn't

1    pursued it.

2            Bidding procedures.  The purchase and sale agreement,

3    which has now become the asset purchase agreement, that was

4    delivered yesterday evening is not executed, Your Honor.  I

5    haven't seen an executed one.  Here again, some of the

6    termination provisions make it unclear, even if this has

7    actually been signed, whether the stalking horse agreement or

8    the APA has any vitality.  Here again, as we will show, all the

9    infirmities discussed at length earlier caused by incorporation

10   of plan support agreement make this agreement stillborn.

11           Now just so that we're clear on this, we have not

12   seen, as is required by the Revised Bidding Procedures, Section

13   N1B, an irrevocable commitment.  We have not seen, as required

14   by bidding procedures N1K, a good faith deposit.  The

15   commitment letter that was required under the OPCO plan

16   restructuring agreement and provided as attached to an SEC

17   filing on May 5th, raises real issues.  And Your Honor, that's

18   at Exhibit 75.

19           I'd like to draw the Court's attention to Exhibit 75

20   and to the beginning of the second full paragraph.

21           **THE COURT:**  One moment.

22           **MS. STEINGART:**  At the beginning --

23           **THE COURT:**  What page?

24           **MS. STEINGART:**  The first page.  Okay, at the

25   beginning of the second full paragraph it says, "Subject to the

172

1   conditions set forth herein and in the RSA."  And as you can

2   see above, the RSA is the restructuring support agreement

3   and --

4           **THE COURT:**  That's OPCO restructuring --

5           **MS. STEINGART:**  That's the OPCO --

6           **THE COURT:**  I know that.

7           **MS. STEINGART:**  Okay.  So anything in this letter is

8   subject to the conditions in the OPCO Restructuring Support

9   Agreement, Your Honor.  And just to complete the picture, on

10  Page 2 -- on Page 2, in the third full paragraph on the page it

11  says,

12          "This letter agreement shall automatically terminate

13          and be of no further force or effect without further

14          action by the parties hereto upon termination of the

15          restructuring support agreement."

16          So in essence, this imports all conditionality in the

17  OPCO Restructuring Support Agreement.  Hardly a very strong

18  commitment, given the outs in the OPCO Restructuring Support

19  Agreement.  And maybe we can just look at those briefly.  This

20  has previously been marked as Exhibit -- it's one of the

21  earlier exhibits, the restructuring support agreement.  It's

22  either 1, 2, 3, 4 or 5, gentlemen?

23          **MR. WINSTON:**  Five.

24          **MS. STEINGART:**  It's Exhibit 5, Your Honor.  Let's

25  look at these, and fortunately for us, they're right at the

173

1    beginning.  They're the second section of the OPCO

2    Restructuring Support Agreement.

3              THE COURT:  Go ahead.

4              MS. STEINGART:  Now for instance, there are

5    termination events here that have already occurred.

6              THE COURT:  What page are you on?

7              MS. STEINGART:  I'm on Page 7 of the OPCO

8    Restructuring Support Agreement, it's at Section 2, titled

9    "Termination Events."

10             THE COURT:  I'm there.

11             MS. STEINGART:  Okay.  There are some of these

12   termination events that have already occurred, as in 2.1(g),

13   the May 1st deadline, 2.1(i), the May 10th deadline, 2.1(w),

14   the May 5th deadline.  There are a number of discretionary

15   termination events as well; 2.1(t), Fertitta Gaming announcing

16   it will not support the plan, 2.1(0), the termination of the

17   asset purchase agreement.  And importantly, perhaps, Your

18   Honor, most importantly, 2.1(y), 2.1(y) incorporates, by

19   reference, all of the termination events of the PROPCO Plan

20   Support agreement into the OPCO Plan Support agreement.  So we

21   have a commitment letter here that is conditional.  A

22   commitment letter that is optional at this point because of the

23   triggering events that have already occurred.

24             With respect to the APA, the APA itself has

25   termination events that include, on Page 30 -- and I need to

174

1    just get mine out -- on Page 30, in Section 4.4, and I think

2    it's L --

3              **THE COURT:**  One moment, please.  Thirty?

4              **MS. STEINGART:**  Thirty.

5              **THE COURT:**  Of the APA?

6              **MS. STEINGART:**  Right.  And just so that the Court is

7    clear, on Page 28 the termination events begin in Section 4.4

8    and continue onto 29 and then onto 30.

9              **THE COURT:**  Right.

10             **MS. STEINGART:**  And termination event in 30(l) is by

11   purchaser at any time prior to June 21, 2010, if purchaser is

12   not satisfied with its tax diligence of the tax consequences of

13   the transactions contemplated under this agreement.  And we

14   will see how this also conflicts with the portion of the

15   bidding procedures themselves, which indicates that there can't

16   be a due diligence out.  So this creates conditionality in the

17   asset purchase agreement and a sort of tension with a revised

18   bidding procedures.

19             And, of course, we have 4.4(m), which is a

20   termination event of the APA, and 4.4(m) deals with the

21   purchaser or seller can terminate if the OPCO Plan Support

22   agreement has been terminated, and the OPCO Plan Support

23   agreement has all of its termination provisions and has all the

24   termination provisions in the PROPCO Plan Support agreement.

25   So again, this makes the APA optional with respect to the

1   purchasers and I think that that reflects some concerns that we

2   have at this point with respect to the asset purchase

3   agreement.

4          The PROPCO -- did you have a question, Your Honor?

5   No.  Okay.  The PROPCO --

6          **THE COURT:**  Except, you know, if somebody were to

7   attempt to exercise some of those timing deadlines, apparently

8   -- at least as I read them, that have past or cannot be

9   satisfied as a result of a request to extend the hearing dates,

10  do you think we'd go much further?  Do you think I could

11  confirm a plan making the finding as required by 1129(a)(3)?  I

12  understand your fears, but I think if somebody were to do that,

13  we would have a far different discussion.

14         **MS. STEINGART:**  Well, Your Honor, we might --

15         **THE COURT:**  I could be wrong.

16         **MS. STEINGART:**  But my concern is about the

17  optionality between now and when the bidding is over.  And my

18  other concern is that this is the model --

19         **THE COURT:**  I think we can deal with those issues.

20         **MS. STEINGART:**  Right.

21         **THE COURT:**  But are legitimate points.

22         **MS. STEINGART:**  Right.

23         **THE COURT:**  But --

24         **MS. STEINGART:**  Right, but we've only had less than

25  24 hours, you know, to look at this, but also this is the

176

1   model.  This is going to be the model for other purchasers and

2   there's no reason why, if the bidding procedures say --

3          **THE COURT:**  Obviously I'm not going to go forward

4   unless the timing provisions reflect the reality of what's in

5   here.  I mean, I'm not about to engage in that type of a

6   process.

7          **MS. STEINGART:**  The other thing that we wanted to

8   point out is that the commitment letters that have been

9   provided, along with the APA, by the two banks have the same

10  termination provisions and conditionality as were in -- present

11  in the letter from Fertitta Gaming that we've just discussed.

12  I won't go through it, but sufficed it to mention, and they're

13  attached to the APA.

14         **THE COURT:**  Oh, I have no doubt that they're

15  consistent.

16         **MS. STEINGART:**  As I mentioned before, Your Honor,

17  the APA conflicts the bidding procedures.  N1E states that a

18  qualified bid shall not be conduct -- conditioned on the

19  outcome of due diligence and they have the due diligence --

20         **THE COURT:**  And now you're talking about the --

21         **MS. STEINGART:**  Right.

22         **THE COURT:**  Excuse me, let me make sure I under --

23         **MS. STEINGART:**  The bidding procedures at N1E --

24         **THE COURT:**  Right, let me turn --

25         **MS. STEINGART:**  Sure.

177

1        **THE COURT:**  -- because I went through those.

2        **MS. STEINGART:**  And I don't have a page for that, I'm

3   -- I apologize.

4        **THE COURT:**  I'm getting there.  It's okay, because N

5   goes on for awhile.

6        **MS. STEINGART:**  Right.

7        **THE COURT:**  I paid particular attention to N1C, I

8   looked at the change at the bottom of that.  N1E, I'm aware of

9   that.

10       **MS. STEINGART:**  Right.

11       **THE COURT:**  I've already reviewed that.  I have some

12  issues with P, perhaps.  I have an issue with RE -- is that

13  right?  Yeah, R1E.  I think I understand what F says.  I have -

14  - I looked at T, I've got an issue that we need to discuss

15  regarding T.  I need some explanation for X.  And here is where

16  I went through, Schedule 3 is the same as B-1, and that's where

17  I made -- that's where I checked to make sure they were the

18  same.  Okay, now that we've clarified that earlier when I

19  looked at B-1.  So I've looked -- I've paid a lot of attention

20  to N.

21       **MS. STEINGART:**  Right. Well, the APA as it currently

22  exists now, because of the due diligence out, conflicts with

23  this provision.

24       **THE COURT:**  I think that can be resolved.

25       **MS. STEINGART:**  Okay.  Right.  And N1D states that a

```
 1   bidder shall have a firm, irrevocable commitment, and certainly

 2   the current APA --

 3          THE COURT:  And your point is that conditional is not

 4   irrevocable.

 5          MS. STEINGART:  Right.  Move on.  We've discussed

 6   briefly before, Your Honor, the PROPCO option to take the

 7   assets or not take the assets.  And we did that in the context

 8   of our overall discussion, would a better price make it better.

 9   And I think we've sort of covered that, but I didn't want to

10   fail to include it here, Your Honor.

11          THE COURT:  Point me to the exact provision which

12   you're referring to.

13          MS. STEINGART:  I'm sorry?

14          THE COURT:  Please point me to the provision which

15   you relied upon for that.

16          MS. STEINGART:  It's at AC2 --

17          THE COURT:  Of?

18          MS. STEINGART:  I'm sorry, A2C on Page 3 of the

19   bidding procedures.

20          THE COURT:  Let me turn to that.

21          MS. STEINGART:  A2C, I misspoke, on Page 3.

22          THE COURT:  Okay.  Maybe you can see it, is that what

23   I've -- I've highlighted certain portions.

24          MS. STEINGART:  Okay.

25          THE COURT:  Is this where it states the OPCO property
```

1    -- 2 says, "The OPCO properties do not include any of the

2    following" --

3              **MS. STEINGART:**  Right.

4              **THE COURT:**  -- and C says, "Any of the assets

5    specified on Schedule 3 attached hereto, collectively the New

6    PROPCO purchase assets."

7              **MS. STEINGART:**  Right.  And then at the end of it,

8    Your Honor, that goes over onto Page 4, it says none of the

9    excluded assets will be subject -- will be the subject of the

10   sale to any party other than the stalking horse bidder,

11   unless --

12             **THE COURT:**  PROPCO or its designee decides not to

13   purchase it?

14             **MS. STEINGART:**  Right.  Okay.  And then -- and then

15   that, Your Honor, is repeated on N1C --

16             **THE COURT:**  That's -- and I already mentioned N1C.

17             **MS. STEINGART:**  Right, at Page 13 to 14.

18             **THE COURT:**  I wanted to make sure I was in the same

19   place you were.

20             **MS. STEINGART:**  Yes.  Yes.

21             **THE COURT:**  Okay.

22             **MS. STEINGART:**  Those were the provisions.  So there

23   all the excluded assets in the bid procedure, you know, has

24   already been discussed.  Problematic that when these were first

25   put together and Lazard opined as their reasonableness -- as to

180

1    the reasonableness of the original bid procedures on the 19th

2    and when the board considered it, no one really thought about

3    the economic irrationality that was brought out during the

4    examination of Mr. Haskins, neither Dr. Nave, nor Lazard,

5    brought that to the attention of the board.  And as the revised

6    bid procedures still create a burden for competing bidders with

7    respect to the excluded assets because of the pricing that we

8    discussed.

9            The bidding procedures also fail to isolate those

10   whose loyalties are not solely to OPCO from the decision making

11   process.  There are a number of instances in the bid procedures

12   where there is the exercise of discretion.  Now there has been

13   some adjustment to the bid procedures and I understand that,

14   you know, there is some language at the beginning about Dr.

15   Nave being the voice or something like that of the bidders.

16   However, there is still a number of discretionary provisions in

17   the OPCO -- in the bid procedures that don't include Dr. Nave.

18   To the extent that --

19           **THE COURT:**  That do not include?

20           **MS. STEINGART:**  Which do not include under the

21   direction of Dr. Nave.  There are still a number of

22   discretionary items that don't include that and we can go

23   through those if you'd like, Your Honor.

24           **THE COURT:**  Yes, I would.

25           **MS. STEINGART:**  Okay.  The ones that haven't been

```
 1   revised to include Dr. Nave are Section F, a potential bidder

 2   must coordinate any contact --

 3           THE COURT:  Let me take a look.

 4           MS. STEINGART:  Sure.

 5           THE COURT:  Because I went -- I had -- this is

 6   exactly what I was looking for.  Notwithstanding anything

 7   herein to the contrary?

 8           MS. STEINGART:  Uh-huh.

 9           THE COURT:  I've already highlighted that, let's just

10   read that.

11               "Notwithstanding anything herein to the contrary, so

12               long as it's reasonably practical, potential bidder

13               that desires to contact the committee, OPCO, any

14               member of the OPCO steering committee, or the PROPCO

15               lenders, or their respective advisors, to discuss

16               shall coordinate with the OPCO debtors' advisors who

17               will promptly act."

18               To me, that was a coordination issue.  I didn't see

19   really the exercise of discretion; it just provides a process.

20   So I wasn't overly concerned, but I had looked at it.  What's

21   the next one?

22           MS. STEINGART:  J -- Section J.1, Your Honor.

23           THE COURT:  "Unless a potential bidder has hereto

24   executed a confidentiality agreement."

25           MS. STEINGART:  Right.  In form and substance
```

182

1    satisfactory to OPCO.  And we see it in other circumstances

2    where that consumed substantial amounts of time in connection

3    with others trying to look at these assets.

4              THE COURT:  Okay.  Next.

5              MS. STEINGART:  Section N1 -- oh, I'm sorry, not N1,

6    Your Honor, L1.

7              THE COURT:  One moment, please.  I have already

8    looked at that.  The --

9              MS. STEINGART:  Okay.

10             THE COURT:  The debt --

11             "OPCO Debtor shall, subject to competitive and other

12             business considerations, and the rights hereunder

13             regarding the conduct of the auction, afford each

14             qualified bidder, and any person seeking to become a

15             qualified bidder, that has executed a confidentiality

16             agreement" -- I guess that relates back to J1 --

17             "with the OPCO Debtor such due diligence access to

18             materials and information relating to the OPCO

19             properties and related to liabilities as the OPCO

20             Debtors reasonably deem appropriate after

21             consultation with the consultation parties."

22             MS. STEINGART:  Right.

23             THE COURT:  So what I saw there was yes, the OPCO

24   Debtors did have some discretion, but they had to consult with

25   the consulting parties, which included the committee --

1          **MS. STEINGART:**  It does.

2          **THE COURT:**  -- and I will tell you if these bidding

3    procedures become part of an order of mine, I expect them to be

4    followed in good faith.  And if you believe they're not, then

5    any one of these are subject to a court review if brought to my

6    attention, and that should provide anybody with enough solace.

7          **MS. STEINGART:**  Thank you, Your Honor.

8          **THE COURT:**  What's next?

9          **MS. STEINGART:**  L2 has the same --

10         **THE COURT:**  Same --

11         **MS. STEINGART:**  -- that Debtors may deny request --

12         **THE COURT:**  Same thing.

13         **MS. STEINGART:**  Okay.

14         **THE COURT:**  I think there was -- I found this far

15    superior, just to let you know when I went through it, because

16    it does provide the committee with the ability to participate

17    in the consultation if the committee, or any of the other

18    parties, consultation parties, believe -- and not just -- I

19    mean, truly believe that there has been an absence of good

20    faith or unreasonable behavior, I would be glad to consider it

21    and consider it on an expedited basis, because of the

22    importance and the nature of this entire proceeding, and that's

23    how I was going to deal with those issues.  I just -- I was

24    aware -- what's -- I want to make sure I didn't overlook.  What

25    did you have next?

1           **MS. STEINGART:**  Okay.  N1C.

2           **THE COURT:**  Yeah.

3           **MS. STEINGART:**  It has consultation, but the bidder

4  must submit an executed purchase agreement, which must be in

5  form acceptable to the debtors.

6           **THE COURT:**  Yeah.

7           **MS. STEINGART:**  P1 --

8           **THE COURT:**  It says in form acceptable to the debtors

9  after consultation with the --

10          **MS. STEINGART:**  After consultation.  It does have

11  consultation.

12          **THE COURT:**  So I -- I read that -- of course, this is

13  the provision that contains the 17.5 overbid.

14          **MS. STEINGART:**  Right.

15          **THE COURT:**  And then I looked at the next one as

16  well.  I highlighted the next provision, just so I make sure I

17  understand it, but go ahead.  What's your next one?

18          **MS. STEINGART:**  Right.

19          **THE COURT:**  I just want to show you that I have

20  considered this.  Go ahead.

21          **MS. STEINGART:**  P -- R1C.

22          **THE COURT:**  R1C, one moment.  Well, I'm going to

23  bring up one just so they can deal with it.

24          **MS. STEINGART:**  Right.

25          **THE COURT:**  My P1, where it says,

1           "If the OPCO Debtors do not receive any qualified

2           bids in addition to the stalking horse bid, the OPCO

3           Debtors reserve the right in consultation with the

4           consultation parties" -- so once again, the

5           protection is there -- "to terminate the sale process

6           or extend subject to the terms of the deadlines set

7           forth without further notice."

8           Somebody is going to have to ask me.  It has see

9    court approval.  As I said, if this is going to be an auction

10   that's going to be conducted under the auspicious of this

11   Court, then I think I have to -- I don't think I can abdicate

12   my judicial responsibilities.

13           **MS. STEINGART:**  Right.  Well -- well --

14           **THE COURT:**  So that's when -- and that's further

15   protection.

16           **MS. STEINGART:**  Yes.

17           **THE COURT:**  Now go to R.

18           **MS. STEINGART:**  R.1C.

19           **THE COURT:**  1C.  "At least two business days" what's

20   your issue there?  I've read this.  That's a starting bid.

21           **MS. STEINGART:**  Right.  That the debtors, in their

22   discretion, shall determine the highest or otherwise best

23   offer, with which to start the auction.  Now, that is in

24   consultation with the consultation parties.

25           **THE COURT:**  I would expect if there's disagreement, I

1  would hear long and hard about it.  And once again, that's the

2  other built-in protection of making sure it's in the plan

3  process.  Yeah, they're in here and if anybody feels that

4  they've been breached or violated because it will be part of my

5  court order, that's what I do.

6          MS. STEINGART:  Well, when we get to R1F, Your Honor,

7  which is also one of those, I presume we will be here under

8  Court supervision.

9          THE COURT:  Yes.

10          MS. STEINGART:  So we had --

11          THE COURT:  That's -- oh, the bidding itself?

12          MS. STEINGART:  Yes.

13          THE COURT:  Yeah, that's -- and I want to talk --

14  well, we'll get to that in a moment.

15          MS. STEINGART:  Okay.  Which brings us, Your Honor,

16  to --

17          THE COURT:  I'm not going to allow -- my problem is

18  E, you didn't even talk about it.  My problem -- take a look at

19  E.  The OPCO Debtors under the director and Dr. James Nave --

20  by the way, I read his deposition.  I know there's a lot of --

21  I understand the releases, I understand all of that.  I took

22  some comfort in his examination, just to let you know that, but

23  I still am going to keep -- if it's going to be under my

24  supervision, it will be under my supervision.  I don't know how

25  else to do it.

187

1          So here we say,

2          "The OPCO Debtors, under the director and Dr. James

3          Nave, SCI's independent director, and after

4          consultation with the consultation parties, may

5          employ and announce at the auction additional

6          procedural rules that are reasonable under the

7          circumstances."

8          No, I think they can ask the Court to adopt

9   reasonable procedural rules.  That's the way it should happen.

10  I don't think -- and it isn't -- I hope it isn't a matter of

11  judicial lido, but I don't think that parties can come in and

12  say, Judge, here's what you're going to do.  If they want to do

13  that, they probably should find another venue, because I think

14  I ought -- I think I'm capable of understanding the

15  practicalities and realities of the situation, but I think to

16  have a truly transparent process, it has to be under the

17  Court's auspices, or else there's an absence -- perhaps there's

18  an absence of process, so that -- and once again, that builds

19  in protection for all the other parties, including your

20  clients.

21          MS. STEINGART:  It does, Your Honor.

22          THE COURT:  So -- and then the bidding, I will run.

23  Certainly reduces any commission.

24      (Laughter)

25          THE COURT:  And I wanted to make sure I -- I will

1    tell you, as I read it, I did not have any problems with the

2    bidding procedure as set forth herein.

3             **MS. STEINGART:**  Okay.

4             **THE COURT:**  As to the conduct of the auction itself.

5    I don't have any -- I mean, I understand there's argument about

6    the 17 part, I get that.

7             **MS. STEINGART:**  Right.  Right.

8             **THE COURT:**  But as to the process itself, I think

9    that the process is appropriate.  I would have no problems

10   using that.

11            **MS. STEINGART:**  Right.  Well, Your Honor, you know,

12   you know we do have some difficulties with Dr. Nave.  No

13   evidence has been presented to suggest that he can distance

14   himself from the Fertittas, no questions were raised to protect

15   the interest of OPCO when it was --

16            **THE COURT:**  But hasn't that been greatly ameliorated

17   by the change to the bidding process and by the participation

18   by this Court?

19            **MS. STEINGART:**  Well no, Your Honor, because the

20   bidding procedures cover a significant period of time, there

21   are many discretionary decisions that need to be made.  I know

22   that people can keep calling you or running to you, that is

23   really not the process --

24            **THE COURT:**  I don't expect that to happen with good

25   lawyers.

189

```
1            MS. STEINGART:  Right.  Right.

2            THE COURT:  That's why you have the consultation

3   parties.

4            MS. STEINGART:  Right.  And we don't expect it to

5   happen either, but --

6            THE COURT:  And that's why I asked you the question I

7   asked you before.  I think we all understand where we want to

8   be at the end of the day, I mean to get the greatest price

9   possible, to protect the constituencies, to keep people

10  employed, to keep these operations open because that's how you

11  preserve value and maximize the assets for the benefit of

12  everyone, that we have a -- I totally agree with you about the

13  process.

14           MS. STEINGART:  Okay.

15           THE COURT:  So I don't -- I think we're capable of

16  doing that.  And I think I made mention of this last -- earlier

17  in the proceedings, that I had issues regarding what I thought

18  was too much discretion being placed in one person.  I think

19  that that has been greatly ameliorated.  I'd be glad to listen,

20  and of course will -- and I think I have, I've tried to find --

21           MS. STEINGART:  You have listened, Your Honor.

22           THE COURT:  I've tried to find the issues that I

23  found in the document myself that will -- I want to foster

24  competence in the process.

25           MS. STEINGART:  Right.  That's -- just as we do, Your
```

190

1    Honor.

2            THE COURT:  That's what I'm trying to do.

3            MS. STEINGART:  Okay.  You know, I'm sure once

4    adjustments are made to ensure that the Court can review

5    anything that has a material impact on the process and the

6    committee is involved, and hopefully we will have a collegial

7    and professional open process --

8            THE COURT:  I don't know that I'll ever be able to

9    resolve the fundamental disputes that exist, because they do

10   exist, and I understand those.

11           MS. STEINGART:  Right.

12           THE COURT:  But that isn't the point of the process.

13           MS. STEINGART:  It's not the point.  And, Your Honor,

14   what we want is a process that is fair and that is seen to be

15   fair and is seen to be one that people who will be investing

16   time and money in sort of, you know, bidding for these assets,

17   you know, feel that they will be able to engage in, in a level

18   way.  And, you know, to the extent that that's achieved -- we

19   are in the agreement with the Court on the --

20           THE COURT:  For me, the bidding process is

21   independent of the considerations regarding what is being sold

22   and what isn't being sold, really the APA issues.  And if I'm

23   satisfied with the process, that still preserves all of your

24   arguments and all of your positions, if not now, certainly at

25   the time of plan confirmation, because the sale is not complete

1  until plan confirmation and when we can make all those

2  determinations.

3         **MS. STEINGART:**  Right.  Right.  We do understand the

4  sale is not completed until plan confirmation, but we want

5  people to come in and bid a lot of money.

6         **THE COURT:**  I do too.

7         **MS. STEINGART:**  And we want them to bid on all of the

8  assets so that we have a fair value.

9         **THE COURT:**  I understand your position.  Got it.

10        **MS. STEINGART:**  Last thing we have is the OPCO Plan

11 Support agreement and I am -- you know, at this point I think

12 that we have said -- made the arguments with respect to that

13 and presentations in our brief in opposition to that.  We do

14 think that it will remain viable without the debtors and

15 importantly, it is a violation of 1125, 1126.  If there are any

16 questions the Court has --

17        **THE COURT:**  No, I don't.

18        **MS. STEINGART:**  -- we're happy to address those.

19        **THE COURT:**  And I appreciate the argument.

20        **MS. STEINGART:**  Thank you, Your Honor.

21        **THE COURT:**  All right.  This took a little longer

22 than we thought.

23        **MS. STEINGART:**  I'm sorry.  I apologize.

24        **THE COURT:**  No, that's all right.  You don't have to

25 apologize.  When you're dealing with this -- it's a lot of --

1    these are significant, important issues and they deserve to

2    have full discussion and that's why I've asked the questions

3    that I've asked.  I assume people wanted me to read these

4    pleadings and if I had questions to ask them, and that's what

5    I've tried to do.

6          Mr. Goldberg, I know you're going to argue.  I think

7    we covered a lot of what -- at least, I thought Mr. Winston

8    went into pretty exhaustively.  I'm going to give you your

9    chance to argue.  I'm going to ask you, please not to be

10   duplicative of --

11         **MR. GOLDBERG:**  I really try not to be duplicative in

12   my argument and I've been trying to slice things down as we go.

13         **THE COURT:**  Thank you.  I just appreciate it.  I'm

14   not trying to cut you off, but just be aware of it, because I

15   really would like to get as much done today as we can.

16         **MR. GOLDBERG:**  I understand.  That's my goal as well.

17         **THE COURT:**  Because, you know, everybody who is here

18   is working and some people are charging a lot of money and we -

19   and that's fine.  That's not a criticism.  My point is, is that

20   the sooner we get it done, the -- as long as everybody has a

21   full and fair opportunity to be heard, the better off we are.

22   And we're coming up -- people have flight schedules and we're

23   coming up on a holiday and I'm sure people have other things

24   they'd like to do with their families.

25         So we're going to take a lunch break.  We've been

1    going hot and heavy.  I think with this many people getting

2    served, we'll start in an hour from now.  That's -- I just

3    don't think it's practical to do it any other way.  We'll go --

4    I know already that we're going to go at least until 6:00

5    o'clock tonight and maybe later.  Thank you.

6            **THE CLERK:**  All rise.

7        **(Recess taken from 2:16 p.m. to 3:20 p.m.)**

8            **THE COURT:**  Please be seated.  Mr. Goldberg.

9            **MR. GOLDBERG:**  Good afternoon, your Honor, Eric

10   Goldberg for the independent lenders.  Before I start, I want

11   to talk a little bit about who the independent lenders are

12   because I think there has been much made of who we are in

13   addition to all the various names ascribed to our group but as

14   we disclosed in the Amended 2019 Statement that we filed, we

15   are very significant creditors at the OPCO bank level.  We have

16   $224 million of that OPCO bank loan as shown on the 2019 and by

17   way of comparison, recall that the OPCO agent recently stated

18   in their reply pleadings -- they made much of the fact that

19   there were joinders and statements in support of the motions

20   filed by Bank of Scotland and by Wells Fargo, each of which

21   holds about 11 percent and the point that they were making was,

22   well, if you take away the lenders that we believe are

23   allegedly conflicted -- Deutsche Bank and JP Morgan -- that

24   still shows about $200 million or 22 percent of the OPCO loan

25   that is in favor of that deal.

1          Well, if that's a meaningful metric, then our metric

2     is just as meaningful showing we have about 224 million, 25

3     percent of that OPCO loan that is opposed to this current deal

4     and it also means something in connection with one of the

5     arguments that the Debtors have made in support of what they

6     call the plan facilitation motions is that they have made the

7     argument that this is somewhat of a pathway toward a consensual

8     deal.  We've got the OPCO lenders.  Now we have the PROPCO

9     lenders but you don't.  We don't have the OPCO lenders on board

10    this deal yet for a consensual plan because the numbers don't

11    work.

12         Mr. Qusba has acknowledged that the group of lenders

13    that as signed on to the restructured support agreement is 60

14    percent.  Sixty percent doesn't do it.  We're at 25 percent.

15    Somewhere in the middle is where the rubber hits the road with

16    regard to acceptance for confirmation purposes but also with

17    regard to numerosity which has not previously been focused on.

18    We believe we're there and that we have a numerosity blocking

19    position.  Things can still happen but we want to say those are

20    the numbers that need to be put in context about who the

21    independent lenders are, how we fit into this context today and

22    then also the fact that this is not the end of the road.  We

23    still have plenty of things ahead of us with regard to a plan

24    and this doesn't solve all those problems that are in front of

25    us.

1          So just -- with that out of the way then, I want to

2    start -- and I'm going to try not to run over what my

3    colleagues Ms. Steingart and Mr. Winston were discussing

4    earlier today.  And I want to start off with a quotation and

5    this is from a case called *Ira Halpt (phonetic) and Company* and

6    almost 50 years ago Judge Friendly sitting in the Second Court

7    of Appeals gave everybody, judges, clients, Counsel some words

8    to live by in bankruptcy cases and what he said was, "The

9    conduct of bankruptcy proceedings not only should be right but

10   should seem right" and unfortunately here that principle seems

11   to have been forgotten.

12         What's happening now in this case we just don't

13   believe is right and it certainly doesn't, at least to us, seem

14   right and individually perhaps each issue that we've raised

15   today -- and we have raised a lot of them -- may not be

16   dispositive with regard to what decisions your Honor is going

17   to make today but when presented together in the context in

18   which this case has been conducted from the petition date to

19   the current date -- when presented together as they are in the

20   bidding procedures motion, the master lease compromise

21   amendment, the restructured support agreement, all of these

22   plan dispositive motions as well as -- that are taking place

23   before the Court well in advance of the disclosure statements

24   having been approved and indeed even before one is now on file,

25   make it clear that this is not an accident the way that things

1    have been presented and the way that we've going piecemeal step

2    by step incrementally toward a creeping plan.

3         We think this is not an accident and that deliberate

4    efforts here are being made in contravention of what Judge

5    Friendly's advice to those parties in bankruptcy cases was, to

6    both make sure that things are, in fact, right and that they

7    seem right.  Well, what then are we talking about here?  What

8    is it that we think is not right in this case?  And I'm going

9    to talk about each of these in turn and they are, first, the

10   process and tactics used by the Debtors and the proponents of

11   these motions.  Second item is the number and severity of

12   conflicts of interest involved in the case and the third is the

13   concept of fiduciary duty which we think has to a great extent

14   been ignored or abdicated by the Debtors here.

15        And our concern is that with multiple parties,

16   multiple Counsels, negotiations taking place between lenders

17   over which insiders are going to team with which lenders to buy

18   the assets from the estate, in the midst of all this there is

19   no single party.  There is no real fiduciary whose job it is to

20   protect the interests of our clients, the creditors of OPCO

21   alone.  There's parties who are representing creditors that

22   have cross-holdings.  There are parties representing creditors

23   who are also bidders for assets.  There are interests of both

24   estates together and how the interest that is being protected

25   is the interest of the unitary whole to prevent loss of jobs

197

1    and destruction of value that might occur when they're

2    separated and all of those are fine but it doesn't mitigate the

3    fact that absent in all of this is a fiduciary whose job it is

4    to protect the interests of the OPCO creditors who don't have

5    any of those other interests.

6             So the first point with regard to the process and

7    tactics -- I've been involved in many big cases as just about

8    everybody in this room has and by my standard, I think this

9    case is very unique and I have not seen -- and comments to this

10   effect were made by committee Counsel as well.  I have not seen

11   a situation that is equivalent to this in terms of the Debtor's

12   unwillingness to share information with other creditors to

13   bring creditors into the process.  Just about everything that's

14   happened in this case we find out about it when it hits the

15   Docket and not a moment earlier and in essence what we think is

16   happening here and what has happened is that there is a

17   deliberate effort to, in effect, hide the ball from the

18   parties.

19            There's no reason -- as Ms. Steingart said, no reason

20   that any of the motions now before the Court could not and

21   should not have been previewed with the significant parties,

22   certainly the OCC, my clients holding 25 percent of the bank

23   debt.  No reason these things could not have been previewed

24   with them, discussed with them, said, hey, here's what we're

25   doing.  Do you have any objections before we file it?  It

1    hasn't happened and so what we're reduced to, unfortunately, is

2    a game of Whack-A-Mole.  You know, a problem comes up and we

3    try and scramble and address as best we can and then as soon as

4    we do that, another issue comes up or the document changes or

5    the motion changes and we're scrambling to address that one and

6    it's a great waste of attorney resources and time and money but

7    it's certainly not a way to get to an effective solution in

8    this case.

9            Examples of the manner in which that has happened, I

10   just mentioned the idea -- or the timing of the motions.

11   Recall that all of these motions were filed without any advance

12   notice to the -- our significant parties on April 7th.  We went

13   about them.  We tried -- we started putting together our

14   oppositions.  Then two days before the oppositions were due,

15   substantial revisions to the master lease compromise agreement,

16   the bidding procedures motion.  Then there was a restructuring

17   support agreement filed requested here and on short notice.

18   Again, we had to scramble to address that.  No time spent

19   talking, negotiating, trying to solve problems but only having

20   to respond.

21           Again, this happened earlier this week.  Further

22   revisions were filed with regard to the master lease compromise

23   agreement and the bidding procedures -- again things we hadn't

24   seen before -- on Tuesday night, only two days before the

25   hearing and in each case we have to scramble to respond to

1  these things instead of trying to engage in a constructive

2  process and prevent -- or come to a consensus on them.  And the

3  way this works out is it's been, sort of, a seriatim Whack-A-

4  Mole process for all of us in trying to respond.

5          Examples here, when the motions first were filed --

6  and I'm talking here specifically about the bidding procedures

7  and the master lease compromise agreement -- we reviewed those

8  and several things jumped right out to us as our main problems,

9  first, that no evidence had been presented by the Debtors to

10  support the 35 million-dollar valuation at which the excluded

11  assets were going to be transferred from OPCO to PROPCO and

12  that there had been no evidence submitted in connection with

13  those motions, that the Debtors had engaged in any efforts to

14  shop OPCO before they agreed to accept a stalking horse bid

15  from their Chairman and CEO in conjunction with the banks.

16          So we start discovery, take depositions of multiple

17  witnesses in multiple cities, start reviewing thousands of

18  pages of documents.  Then the replies are filed and lo and

19  behold, there's three new witnesses there whose testimony had

20  not been presented as part of the Debtor's case-in-chief and

21  again the story changes.  The Whack-A-Mole game continues.

22  With regard to value, we find out, well, the Debtors didn't

23  actually do the valuation but A&M did the valuation work.  We

24  also find out for the first time, because it had not been

25  mentioned in any of the moving papers, that something that we

200

1   need to consider in the context of what the value of the assets

2   is is that there is a dispute about ownership.  Again,

3   something new, it was not there in the moving papers.  So we

4   have to start dealing with that.

5          Then with regard to marketing and our allegation that

6   the Debtors had not engaged in -- or not provided any evidence

7   that they had engaged in any efforts to shop OPCO, we find out,

8   oh, well, the reason why is that the Debtors didn't actually do

9   that.  They outsourced that.  They outsourced it to the OPCO

10  agent who ran the process and so then the tide turns and we

11  have to follow those leads down.  More discovery, more

12  witnesses, more depositions and we find, as Mr. Winston

13  mentioned, with regard to the dispute, not only was it not in

14  the pleadings -- or the alleged dispute, let's call it.  It's

15  not in the disclosure statement.  It was not in the Debtor's

16  SEC filings.  It's not in the schedules.  It, from our

17  perspective, certainly appears as nothing more than a ruse,

18  something that's been manufactured in the opposition pleadings

19  to address our argument as to why there is no evidentiary

20  support for the value at which they propose to transfer the

21  excluded assets.

22         Moving on to the marketing response, there the story

23  again changes a little bit.  They say, well, you know, OPCO and

24  Blackstone didn't actually market OPCO either.  They spoke to

25  several buyers who -- they spoke to rather several parties who

201

1   didn't actually -- they didn't reach to them as potential

2   buyers but they reached out to them as possible parties that

3   they may want to seek as managers.  So they spoke to them.

4   They also spoke to Boyd which was not really a marketing effort

5   since as we know, Boyd has been trying to knock the door down

6   to make an offer and get in and do due diligence since last

7   year.

8           But tellingly, one of the comments that Mr. Genereau

9   made in his deposition was that, you know, essentially other

10  than contacts with two parties and Boyd, they made no outbound

11  calls and remember, this is not the Debtor.  This is the party

12  to whom the Debtor has outsourced the job of soliciting bids

13  for the Debtor's assets and they're not even doing it.  So in

14  essence, in response to the charge that there is no evidence in

15  support of the -- in the initial motion that OPCO had been

16  shopped, they say the agent did it but then

17  Mr. Genereau essentially confirmed that they did not.  They

18  spoke to a couple of people but really engaged in almost no

19  affirmative marketing efforts.

20          With A&M, similar hide-the-ball despite the fact that

21  it's the Debtor's burden here.  The Debtor, not the OPCO agent,

22  has the burden to show the reasonableness of these

23  transactions, both the bidding procedures, the master lease

24  compromise.  It's the Debtor's burden to show the

25  reasonableness of both the transactions and how it's purposing

1    to dispose of the excluded assets and not just dispose of the

2    excluded assets but dispose of them -- transfer them to an

3    insider thus invoking a higher standard.  All of this is the

4    Debtor's burden but what it comes down to is they say again,

5    well, okay.  We outsourced that to the agent and the agent

6    says, well, Blackstone handled this and, well, what did

7    Blackstone say?  Blackstone says, well, we hired A&M to do

8    this.

9           And when you get to the bottom of the chain, it turns

10   out, in fact, that as Mr. Caruso testified in his deposition,

11   that's not, in fact, what A&M did.  It may have been what

12   Mr. Genereau wanted A&M to do but Mr. Caruso in his deposition

13   was very clear that they did not conduct any type of valuation

14   assuming we set for the moment this idea of indicative value

15   but they did not go through the list of excluded assets and

16   even attempt to put indicative value on all of those items.

17   They took a subset when you group them maybe five or six out of

18   the 17 categories but that's all they did and so, again, the

19   story shifts and we're constantly having to move to get to the

20   bottom of it.

21          With regard to the excluded assets, something that

22   we've been fighting about for quite a long time, ever since

23   these were filed, again more Whack-A-Mole, more story-shifting.

24   As we went through and did more discovery and were given the

25   opportunity that your Honor gave us to conduct discovery of

1    A&M, we found out what we did there that there was no valuation

2    work to support the numbers that they had put in but then just

3    the premise of what it took to be an excluded asset.  How did

4    that concept come about and who decided what assets were going

5    to fall into the excluded assets bucket that goes to PROPCO?

6    Well, we found out more about that too and we discussed this a

7    little bit at the first -- or the second trial date in early

8    May.

9           If you recall, Mr. Freel in his declaration -- he

10   described the excluded assets as those -- this is Paragraph 6

11   of his declaration -- excluded assets are those "used

12   exclusively or predominantly in connection with the operation

13   of the PROPCO properties" and we tested him that -- on that.

14   When he was on the stand over there, we went through one of the

15   categories of excluded assets and this is the Wild Wild West

16   package which include the options and some related properties

17   and we went seriatim down the line and there we found out that

18   what was in the declaration was wrong.

19          What Mr. Freel testified to under oath -- and this is

20   at Page 247 of the trial transcript is that the Wild Wild West

21   assets are not used by PROPCO and the other items in that

22   bucket are not used exclusively or predominantly in the

23   operation of the properties, something that was simply wrong

24   and that was in the papers that they presented to the Court as

25   to why the excluded assets came about but then when he was here

1   in front of oath, he told us the truth which was that those

2   assets are not used in the operation -- predominantly or

3   exclusively in the operation of PROPCO properties.  It simply

4   wasn't true.

5          It continues on with the player tracking systems.

6   Mr. Genereau in his declaration -- or sorry -- in his

7   deposition, he testified that the customer lists and the

8   customer data were OPCO's crown jewels.  He says that on Page

9   83 of his deposition and their SEC filings -- this is the

10  December '09 10-K.  I believe it's Exhibit 48.  The Debtors

11  valued their customer relationships and their brands alone at

12  over $40 million.  Now, however, when they're trying to

13  transfer those assets or rather justify the transfer of those

14  assets from PROPCO to OPCO where insiders have an interest on

15  both sides -- on both the buyer and the seller's side of the

16  deal, there's a much different story.  They rely on the A&M

17  report that not only they didn't prepare but their OPCO

18  lenders, also participants in the stalking horse bid, had

19  prepared that comes to a much lower number, 16 to $40 million

20  which is included or subsumed within the 35 million-dollar

21  number.

22          More thumbs on the scale when it came to talking

23  about the IT transfer.  If you recall when your Honor corrected

24  me earlier on the mistake in my pleading where I referred to

25  Mr. Kreeger's declaration, part of the analysis that both

1    Mr. Kreeger did and A&M adopted had to do with comparing what

2    the cost would be for PROPCO if it did not acquire these IT

3    assets, what is its alternative?  Well, one of those

4    alternatives was the replication scenario where PROPCO would

5    have to go out and buy new stuff itself and in his declaration,

6    Paragraph 14, he gave that cost as approximately $20 million

7    but we tested him on that during his deposition and it turns

8    out that that number was very light.

9           It underestimated the cost that PROPCO would have to

10   incur because it did not include software which he estimated at

11   $20 million.  It did not include what he referred to would be a

12   required army of consultants nor did it include the time that

13   it would take PROPCO to get up to speed and the logistical and

14   financial problem of how to generate an IT staff from nothing.

15   So when they considered as part of the negotiation as to what

16   value to ascribe to the IT that PROPCO is getting, they

17   completely unbalanced the scales because they, in this case,

18   underestimated the cost to PROPCO by over a hundred percent,

19   the $20 million that Mr. Kreeger used versus -- in his

20   declaration versus the $40 million plus that comes out in his

21   deposition.

22          So the bottom line here with regard to the first

23   subcategory I've been talking about, the tactics is -- in any

24   big case we all understand there's going to be changes.  Things

25   are going to move fast.  There's going to be inconsistencies.

1    There will be exigencies that sometimes require that things

2    have to get done at the last minute.  You may have to short

3    notice.  That's how life works in big cases.

4           Here it happens every time.  Every document gets

5    modified.  No document gets previewed to the Committee or the

6    independent lenders.  Everything happens at the last minute,

7    even up until the hearing and in addition and more

8    substantively, the story changes and the story changes

9    constantly from the creation after the fact when the motions

10   were filed of this dispute as to ownership to changes in the

11   story about who, if anybody, marketed the assets, changes in

12   the story about who valued the assets, changes in the story

13   about what the IT costs would be to PROPCO.  Everything changes

14   and it is not a way a case should be conducted.  It's certainly

15   not following Judge Friendly's guidance about making sure

16   things not only are right but seem right because the way things

17   have gone tactically in this case is not right.

18          The second issue I want to talk about is conflicts

19   and there are a lot of them in this case.  From the ones you

20   knew about on Day 1 with regard to the capital structure, we

21   have separate groups of creditors under both the OPCO and

22   PROPCO stacks.  With regard to the next level of complication

23   on conflict is the existence of the master lease magnifies

24   those conflicts by creating a landlord/tenant relationship

25   between OPCO and PROPCO and it's a major one with a 250

1    million-dollar contract rent obligation per year and it

2    matters.  It's not the case as it is in many bankruptcies where

3    you might have -- this might all come out in the wash where you

4    have a substantive consolidation where you have the same group

5    of creditors.  You don't have that here.  You have very

6    different groups of creditors.  So the existence of the master

7    lease as we've seen has material differences in how it's going

8    to affect the creditors in the case.

9         The third problem with regard to conflicts is the

10   cross-holdings which further complicate things.  In addition to

11   having the two creditor groups, the OPCO and the PROPCO stack,

12   we also have the only two creditors of PROPCO which are

13   Deutsche Bank and JP Morgan also happen to be the largest

14   creditors on the OPCO side.  One of those two, Deutsche Bank

15   also happens to be the agent for the OPCO lenders and I know

16   you've heard this before and I know you've heard me harp on

17   conflicts before.  So I just want to beg your indulgence a

18   little bit because I'm going to go further because it's not

19   just those three now.

20        Those were the three that really were there when the

21   case commenced and I know what your Honor had to say about the

22   agency issue in the *Chrysler* decision.  I've heard it all but

23   also there are many more conflicts now than there were then and

24   the conflicts also are significantly worse and made more

25   complicated by the fact of the motions that are before the

 1   Court today.  The existence of a stalking horse bidder

 2   comprised of the senior officers and directors of OPCO

 3   combining with the OPCO agent and the PROPCO lenders to try and

 4   acquire the OPCO assets at the same time of the bidding

 5   procedures, the transfers contemplated under the master lease

 6   compromise agreement and the restructure and support agreement

 7   and then layer on top of that the plan and you have almost a

 8   law school issue-spotter question of conflicts of interest here

 9   and they continue.

10           With regard to the officers, we've all heard the

11   adage, "One cannot serve two masters" or at least not

12   adequately and we think that still is a standard worth

13   listening to.  As we've heard before, Mr. Freel, Chief

14   Accounting Officer of OPCO, but he's also an officer of PROPCO.

15   That fact is not in any of his prior declarations.  That fact

16   only came out in deposition.  With regard to Mr. Haskins, we

17   know he is the General Counsel for OPCO.  We also know he's one

18   of the three independent -- or one of the three directors for

19   PROPCO and, in fact, Mr. Haskins is also a signatory for PROPCO

20   on the master lease compromise agreement.  At trial May 5th and

21   6th, we saw the board resolution that gave authority to

22   negotiate the master lease compromise and related documents to

23   Mr. Haskins and Mr. Freel.  That is Haskins and Freel, who have

24   offered testimony here on behalf of OPCO, were given authority

25   to negotiate those transactions by PROPCO, the party on the

1    other side of the table.

2            And the conflicts of interest continue as you go

3    higher up the chain of command.  Recall Mr. Frank Lorenzo is

4    the Chairman and CEO.  His brother Lorenzo is the President and

5    Vice Chairman.  However, the Fertitta also own Fertitta Gaming

6    whose stated purpose is to invest in the gaming business which

7    also happens to be, of course, the business that we are all

8    creditors of here.  The Fertittas are also the 46-percent

9    owners of the stalking horse which is seeking to acquire from

10   the company that they serve as Chairman and Vice Chairman of

11   the OPCO assets in conjunction with the lenders.  The Fertittas

12   are also part of the group acquiring the PROPCO assets from the

13   PROPCO lenders.

14           So this is a situation that's obviously fraught with

15   great danger and more than potential conflict, but actual

16   conflict.  As an example, one of the cases that we cited in our

17   initial brief, the combined brief that addressed all three

18   motions -- we cited to the *Bieterman* (phonetic) case out of the

19   Southern District and there the Court pointed out the inherent

20   conflict in this type of situation.  On the one hand, you have

21   the director and officer whose duty it is to maximize the value

22   for the estate, to get when selling assets the highest price

23   for those assets but here and as was the case in *Bieterman*, you

24   also have a buyer.  Well, the buyer's interest is directly

25   contrary.  The interest of buyer is paying as little as

1    possible for the assets that your other half tells you you have

2    to get the most for.  So again you cannot serve two masters but

3    that is the position that all of these people are in, both the

4    directors and the officers.

5          Now, at the hearing on May 5th, the Debtors argued --

6    and I believe it was Mr. Kreller when he made the point that,

7    well, there's no requirement that the Fertittas abstain from

8    negotiations or discussions regarding issues in which they have

9    an interest and he also said, this is a practical issue.  These

10   are corporate entities.  Corporate entities can only act

11   through their board of directors and if you took them out, you

12   no longer have a quorum.  So there could be no action.  Well,

13   it's a false dichotomy because first of all, we're not saying

14   OPCO and PROPCO shouldn't have officers -- more particularly

15   OPCO at issue.  We're saying they shouldn't have these

16   officers.

17         Who do Frank and Lorenzo Fertitta represent on the

18   board?  We've been arguing about whether the committee is out

19   of the money.  I don't think there's anybody in the room who's

20   going to argue that equity is out of the money.  So who are

21   they representing on that board of directors?  Why are they

22   still sitting there?  Why haven't they been replaced by

23   independent directors?  They are simply there representing the

24   dead hand of the out-of-the-money equity and in that capacity

25   as we've seen undisputed testimony, they vote on every issue

1    including those issues that affect them.  It's not right.  It

2    doesn't even seem right.

3           The conflicts continue with the advisors.  Despite

4    all the conflicts of the President and the directors and the

5    officers and the creditors, the fact is that PROPCO and OPCO

6    share advisors and interestingly, PROPCO has separate Counsel

7    in Gibson, Dunn & Crutcher so that on conflicted matters, they

8    have the -- PROPCO has the benefit of Gibson Dunn's advice.

9    There is no separate Counsel for OPCO.  OPCO has as its Counsel

10   Milbank.  There's no conflicts Counsel for OPCO on that side.

11   It's all Milbank.  Milbank not only represents OPCO and PROPCO

12   simultaneously but the testimony has also shown that it

13   represents Fertitta Gaming.  It's represented other Fertitta

14   entities, all of which were in the disclosures and the

15   documents submitted at the first hearing.

16          So there's just too many relationships here.  How can

17   they possibly effectively represent OPCO when they're also

18   representing PROPCO?  They're also representing the Fertittas

19   and it is really no surprise then that the suggested response

20   to any potential dispute is settle.  Make a global settlement,

21   master compromise agreement, joint plan, sell to an insider and

22   in all of this, there is nobody representing solely the

23   interests of the OPCO creditors.

24          Lazard, similar problem -- Lazard also simultaneously

25   represents OPCO and PROPCO.  Although it's interesting that

212

1   several of the directors and officers were under the impression

2   that Lazard only represented them.  That is, several officers

3   and directors testified that their belief was that Lazard was

4   OPCO's investment banker, not that Lazard represented both OPCO

5   and PROPCO, which is the fact.  For example, at trial

6   Mr. Haskins testified that he thought Lazard was OPCO's

7   investment banker.  That's at 85 and 86 of the trial

8   transcript.

9           Mr. Nave -- or Dr. Nave in his deposition testified

10  -- this is at Pages 145 and 146 -- that he believed Lazard was

11  his investment banker.  So the question then, would they have

12  regarded the advice that they received from Lazard differently

13  if they knew what the facts were, that is, if they knew that

14  Lazard wasn't their investment banker.  That is, wasn't the

15  investment banker just for OPCO, the seller of the excluded

16  assets?  But in fact, Lazard also was the investment banker for

17  PROPCO, the buyer of the excluded assets and an even bigger

18  question is why didn't they know that.  Why didn't the

19  independent director of OPCO know who Lazard represented?  Why

20  didn't he ask before relying on his advice?

21          There's also another conflict with regard to Lazard.

22  As joint financial advisor for OPCO and PROPCO, it stands to

23  get a 12-and-a-half-million-dollar success fee.  Now, it

24  doesn't get more if the OPCO assets are sold for more.  It

25  doesn't get more if there's better terms of a restructuring

1   negotiated for OPCO.  It gets a flat 12 and a half million

2   dollars although it has another disincentive to keep

3   negotiating to get a better deal for OPCO in that the way that

4   fee works is that the 12 and a half million dollars gets

5   reduced by the monthly advisory fees that Lazard gets.  I

6   believe it's $350,000 a month.  So their incentive is to get it

7   done, not necessarily to get the best deal done for OPCO.

8           Mr. Aronson highlighted this conflict better than I

9   could when in his deposition we were discussing the issue of

10  the 35 million-dollar number for the excluded assets and we

11  were talking about the negotiation on this point between the

12  OPCO lenders and the PROPCO lenders and keep in mind, we

13  weren't talking about a negotiation between OPCO and PROPCO

14  because that didn't happen.  This is a negotiation between two

15  lender groups, neither of which is the Debtor, neither of which

16  has a fiduciary duty to any of the creditors in this case but

17  the question put to Mr. Aronson was this.  "Was OPCO, as far as

18  you know, independently advised during that negotiation?"

19          Mr. Aronson asked me a clarifying question, "OPCO

20  lenders or OPCO company?"  And I clarified, "OPCO company."

21  And Mr. Aronson's answer -- and this is at, I believe Page 100,

22  Lines 12 through 25 of Mr. Aronson's deposition.  He says,

23          "OPCO company was in that discussion to try to

24          facilitate a transaction.  Whether that transaction

25          was going to be with Fertitta Gaming or Boyd, the

1          OPCO estate at the end of the day didn't really

2          matter.  We wanted to get on with the process."  The

3   OPCO estate didn't matter is what the OPCO estate's financial

4   advisor testified to.

5          The last conflict point, plan and the leases and at

6   this point I think we all recognize that there's going to be a

7   divorce and whether it's going to be amicable or ugly remains

8   to be seen and the question then is on what terms.  Well, the

9   Debtors have filed a joint plan and, again, it's unclear why

10  that's necessary given the imminent nature of the divorce.

11  Well, then the sensible thing at least to us seemed to be,

12  well, have separate plans.  We don't have an issue, your Honor,

13  to clarify, I think, some comments you made earlier of tying

14  the sale of OPCO to a plan.  That makes sense but that's not

15  quite what they're doing.  They're doing more than that.

16         The sale here is not tied to a plan, meaning a plan

17  for OPCO.  It's not tied to a plan for OPCO and PROPCO even.

18  The sale is made contingent on this plan.  This plan is the

19  joint plan.  The joint plan provides for releases to be given

20  to OPCO -- to the officers and directors, including those who

21  voted on this decision, including on those who participated in

22  the decision in the 2007 LBO.  So that is another conflict and

23  Mr. Nave somewhat troublingly testified during his deposition

24  that he was aware of the release issue but he didn't at all

25  consider it a conflict, didn't think that it was conflict to be

1  voting as a board member to approve bid procedures that tied

2  the ability to close the sale of OPCO -- that tied that upon

3  the confirmation of a plan of reorganization that gave him and

4  his fellow directors a release.  He didn't think there was a

5  problem with that at all.

6          So again on the conflicts, there's always going to be

7  a conflict in a multidebtor case.  It's hard to avoid and you

8  deal with it as best you can.  Here, there are way too many

9  conflicts.  There are more conflicts than I've ever seen in a

10 case, conflicts among the principals acting and their advisors.

11 There's just too many.  It's not right and it doesn't certainly

12 seem right.

13         The next issue I want to talk about is fiduciary duty

14 and the concept of fiduciary duty is one that's always

15 important in a bankruptcy but here it's even more so because of

16 the number and the severity of the conflicts of interest.  Now,

17 unfortunately despite the number of professionals and the

18 sophisticated corporate structure, again, the problem is that

19 there is no real fiduciary whose job it is or who's carrying

20 out the job of protecting the interests of the OPCO creditors.

21         Let's talk about who isn't.  It's not Milbank.

22 They're representing OPCO and PROPCO.  They also represent the

23 Fertittas.  They also did formation work for FG Gaming.  So

24 it's not Milbank.  It's not Lazard.  Lazard represents OPCO and

25 PROPCO although some of the officers and directors actually

216

 1   weren't sure who Lazard represented.  It's not the OPCO board.

 2   Let's break it down and see who's on the OPCO board.  Well, the

 3   Fertittas, they obviously have divergent interests.  They're

 4   part of the stalking horse.  They're owners of FG Gaming.

 5   They're not the ones who are going to be carrying out their

 6   fiduciary duties to protect the interests of the OPCO

 7   creditors.

 8        So then who's left?  It really comes down to Dr. Nave

 9   who is the -- or the Debtors have characterized him the sole

10   independent director of OPCO.  Where is Dr. Nave in all this?

11   We have lots of declarations that have been filed in this case,

12   four or five for Mr. Haskins, multiple declarations for

13   Mr. Freel, several declarations for Mr. Aronson.  We even have

14   a declaration for Mr. Kors who is the -- one of the two PROPCO

15   independent directors but not a word from Dr. Nave.  Why and

16   where are the Debtors hiding him?  That was a question we had

17   when we saw the declarations that were filed in connection with

18   the motions and we saw the statements that were made therein.

19        So we took his deposition to find out and this is

20   what we learned.  Dr. Nave is a very nice man.  He's a hard-

21   working man, a self-made man, a very patriotic man, nothing but

22   the greatest level of admiration for Dr. Nave but the Debtors

23   and Dr. Nave's advisors, I think, failed him.  Dr. Nave was not

24   adequately prepared for the key role that he should be playing

25   and, in fact, is required to play in this case.  He is the sole

217

1   independent director of a bankruptcy case involving multiple

2   billions of dollars and he simply -- I'm sure if it had been

3   explained to him, he would understand it and he would work hard

4   to do it but it never happened.

5           In a very telling moment, I asked Dr. Nave during his

6   deposition what his understanding was of the phrase "fiduciary

7   duty." This is at Pages 122 and 123 of his deposition and in

8   essence what he said was that to him, it means working hard,

9   doing the best he can without conflicts and with all due

10  respect, that's good. It's a good start but it's not

11  sufficient. It's not enough. Fiduciary duty means more than

12  that. It means understanding the parties that you have the

13  duty to protect, understanding what those interests are and

14  serving as a zealous guardian of those interests whose duty it

15  is to protect.

16          And unfortunately that's not what he did and I don't

17  think it's out of malice or part of a grand conspiracy but the

18  fact is that is not how Dr. Nave viewed his role. He simply

19  did not understand what his responsibilities were and his

20  testimony is pretty consistent on that point. As a threshold

21  matter, we asked Mr. Aronson about Dr. Nave and he told us that

22  Nave always voted with Frank Fertitta when he was -- when he,

23  Aronson, was present at board of directors' meetings. That's

24  Page 95 of Mr. Aronson's deposition.

25          Then in the context of the motions that were before

1    the Court, Mr. Nave testified repeatedly that he viewed his

2    role as that of a facilitator, someone whose job it was to get

3    a deal done, not necessarily someone whose job it was to

4    protect the interests of the creditors for whom he served as a

5    fiduciary, the OPCO creditors.  Examples, in connection with

6    the discussion during his deposition of the stalking horse bid

7    at Pages 64 to 65, he was asked whether OPCO was involved in

8    the negotiation of the stalking horse bid.  Dr. Nave said, "I

9    had nothing to do with that."  The negotiation of the stalking

10   horse bid -- the sole independent director of the company being

11   sold had nothing to do with that.

12            On Page 73 in the context of a discussion about the

13   excluded assets, Dr. Nave testified, "My understanding is that

14   that was a negotiation between the OPCO lenders and the PROPCO

15   lenders."  He also said, "All that OPCO did in that connection

16   was to facilitate that."  In connection with the master lease

17   compromise agreement on Pages 103 to 104, he testified that he

18   was not personally involved in any negotiations with the PROPCO

19   lenders regarding a master lease compromise.  At 152, he told

20   us he never even met Mr. Kors.  The independent director for

21   PROPCO never even met the other independent director.  On 164,

22   he testified he never had a discussion with anybody from

23   PROPCO.  So a facilitator is not a fiduciary and certainly from

24   the testimony adduced from Dr. Nave, Dr. Nave was not acting as

25   a fiduciary for the OPCO creditors.

1          And he was not the only problem here.  Mr. Genereau

2   during his deposition confirmed how this process worked, that

3   motions that we've ended up with today are not the product of a

4   process negotiated vigorously by fiduciaries protecting their

5   interests.  Rather with regard to these negotiations,

6   Mr. Genereau testified that in the context of the master lease

7   compromise and the excluded assets that the OPCO lenders led

8   the negotiations, that while although OPCO representatives

9   Freel and Haskins were present, Dr. Nave was not.

10          On Page 140, Mr. Genereau confirmed that the OPCO

11  lenders selected the stalking horse, not OPCO, not Dr. Nave.

12  The OPCO lenders selected the stalking horse and then I asked

13  the question, "Well, did you ever -- did OPCO ever question

14  your decision -- the lender's decision?  Did it ever say we're

15  not going to follow that decision?"  "Not to my knowledge" was

16  the answer.

17          This same concept of parties who should be

18  fiduciaries acting as brokers or facilitators was confirmed by

19  Mr. Freel.  On Page 12 of his deposition, he describes his role

20  again as a facilitator between the OPCO lenders and the PROPCO

21  lenders.  He even confirms on Page 21, he never even spoke to

22  Boyd, one of the parties who was negotiating supposedly to

23  become a bidder.

24          On Page 48 of his deposition when we were talking

25  about the bid procedures and the excluded assets, the question

220

1     I asked was, "Who represented OPCO in those discussions?"

2     Answer, "I don't know.  I was not involved."  This is the

3     officer of OPCO who's testified and submitted his declaration

4     in support of the bid procedures.

5           Similar story with regard to Mr. Haskins -- at Page

6     40 of his deposition, he described his role as a facilitator

7     and at Pages 90 through 92 with regard to the Texas put and the

8     excluded assets said that "Those concepts were negotiated

9     between lenders."

10          On the PROPCO side, a similar story happening there

11    -- when we asked about his interactions with PROPCO, he

12    testified on Pages 57 through 58.  We asked who interacts with

13    OPCO.  His answer was, "I'm not in that loop."  He didn't know

14    who was in the loop.  Pages 98 through 100, he confirms that

15    the negotiations were between the banks, he was told.  He

16    doesn't know because he certainly wasn't involved.

17          So thus the bottom line here with all this, your

18    Honor, is that the Debtor's witnesses are consistent, that they

19    did not act as representatives of the OPCO creditors.   They

20    did not act as fiduciaries.  Rather, they were in these

21    situations acting as facilitators with the goal not of

22    protecting the interest of the OPCO lenders but rather the goal

23    of getting the deal done and that is not what a fiduciary does.

24    Essentially what happened here is that the parties at OPCO with

25    fiduciary duties to the OPCO creditors basically delegated or

1    outsourced those duties to the OPCO lenders and then just did

2    their best and from all the testimony, they certainly worked

3    hard in trying to get a deal done but they had to do more than

4    that.

5           Certainly Dr. Nave as the sole independent director

6    had to do more than that and he did not and the reason why it

7    matters is that all of these problems, the conflicts, the

8    abdication of fiduciary duty create a flawed process and from a

9    flawed process, you're not going to get anything better than a

10   flawed product which is what we believe has been achieved here.

11          The abdication of fiduciary duty further manifested

12   itself in a couple of more particular instances.  First with

13   regard to the Texas put, recall that the problem here is that

14   the landlord under this lease is Mrs. Fertitta who is the

15   mother of Frank and Lorenzo, the Chairman and Vice Chairman who

16   are also part of the stalking horse bid and the lease provides

17   that upon a change in control, the landlord has the right to

18   put its interest to the tenant.  So the key factor here, the

19   way the put works, is it's at the fair market value.

20          So the question -- the first question at least in my

21   mind was, well, what's the value of the property and you asked

22   some questions earlier about this when we were talking about, I

23   think, the back-and-forth on the numbers and the issue, I

24   think, in that colloquy was, well, it's clear there was a

25   negotiation and whether it's hearsay or not, if it -- you know,

222

1   a hundred and twenty-five and 50 -- if that was the bid and the

2   asked, clearly there was a negotiation.  We ended up at 75.

3           Well, that's not enough.  That's what a fiduciary is

4   supposed to do.  You don't just start, you know, bargaining

5   like you're in a carpet bazaar about a lower number than

6   somebody has put on the table.  If we were having a negotiation

7   about what's the -- you know, the fair price for that Nissan

8   that was left running in the parking earlier, it's not enough

9   for you to say 15 and I come back with five and we horse-trade

10  for a while and come to ten.  That's not enough.  As a

11  fiduciary, my job would be to try and get all the information I

12  need to conduct that negotiation in an intelligent manner.

13  There's got to be some outside absolute references.  In the

14  case of the car, certainly you'd want to know what's the Blue

15  Book value of that car, what are the costs but there's evidence

16  that anybody ever did that with regard to the value of the

17  property subject of the put.

18          Putting aside the issues about the legal trigger

19  whether it is a change of control, whether you can get around

20  it in a Texas Station bankruptcy, there's been no testimony

21  that anybody ever even undertook that first step to say, well,

22  what is the property worth because maybe you'd find out that

23  even at the bottom end, you know -- because, you know, there's

24  just no basis for that support.  You can argue all day long but

25  if there's some outside piece of information that tells you

1    that the other guy's position is completely out of the money,

2    you are not doing your job as a fiduciary and that's what

3    happened here.

4             These negotiations were between lenders.  That was

5    confirmed by all the parties whose depositions we took but the

6    lenders are conflicted.  They're buyers and sellers and the

7    buyers, the people who get the benefit of a lower price, are

8    all in the stalking horse bid.  There's simply, again, nobody

9    protecting the interests of the OPCO creditors.  Ms. Steingart

10   made the point this can -- you know, maybe this is a great deal

11   but we don't know that.  There's no evidence about that.  So

12   how then can we approve all these transactions when it may well

13   be that this 75 million-dollar number which, by the way, is

14   supposed to be subject to documentation that as far as we know

15   has not -- certainly not been put on the record, let alone

16   completed.

17            **THE COURT:**  That documentation would have been some

18   type of binding agreement by the lessor which so far as I can

19   determine hasn't come into existence.

20            **MR. GOLDBERG:**  Exactly right.  Exactly right.  So it

21   may well be that the 75 million-dollar number is the worst kind

22   of poison pill, that nobody views that property as having a

23   market value in the neighborhood.  So all this effectively does

24   is chill bidding, discourage people from bidding on PROPCO --

25   or OPCO because they know that there's a 75 million-dollar

1    number that's attributed to the Texas Station put.

2            Another example, it's what I call the A&M Daisy

3    Chain.  Now, from the first day that these motions were filed,

4    I made to the point -- the point to your Honor that our concern

5    was value.  What basis is there for the Court to determine that

6    the 35 million-dollar number is a reasonable number?  Where is

7    evidence that supports that number?  And really all that there

8    is -- and we don't think it's much but all that there is the

9    fact that people have testified there were negotiations and

10   there's an A&M report but as Mr. Winston did a very thorough

11   job of explaining, the A&M report doesn't address most of the

12   excluded assets.  At best, it hits five or six categories.

13           So how did we get into this position then where OPCO

14   has signed on to an agreement, the key component of which is a

15   35 million-dollar value ascribed to the excluded assets and the

16   only evidence of that $35 million is -- and we don't think it's

17   good evidence -- was provided by the financial advisor, not the

18   Debtor but the financial advisor to the creditor of the Debtors

19   who is the financial advisor to one of the parties that's on

20   the buying side of that transaction, the OPCO agent.

21           Well, here's how it happened.  It started with

22   Mr. Genereau.  He testified that -- and this is Page 32 of his

23   deposition -- that A&M's mandate was to value the excluded

24   assets.  We asked him, you know, whether Blackstone had done

25   that and he said, "No.  A&M handled that work" -- Page 20, Line

1   18.  Well, Mr. Caruso then turned that around and contradicted

2   it.  We said, "Was part of A&M's engagement to provide an

3   indicative value for all of the excluded assets?"  His answer,

4   "No" -- Page 17, Line 5 continuing to Page 18, Line 4.  So

5   Genereau says A&M's job is to value all the excluded assets.

6   Caruso says no, it was not.

7          Mr. Haskins, he did not understand the A&M report the

8   way A&M did because he testified that he believed that the

9   Steering Committee had retained A&M to value "each and every

10  one of the excluded assets."  That's at Page 69 of his

11  deposition.  He also understood A&M to have okayed or signed

12  off on the 35 million-dollar number and that's on Page 92 of

13  his deposition.  So Haskins never actually saw the report but

14  his understanding was that A&M actually did value all the

15  assets which is, in fact, not -- or exactly the opposite of

16  what Mr. Caruso said.  He said, "We didn't do that."

17          Dr. Nave similarly misunderstood what A&M was doing.

18  He never saw the report although it was discussed at a board

19  meeting.  His view was that Lazard signed off -- or thought

20  that that number was reasonable but at the time Dr. Nave also

21  thought that Lazard was his financial advisor when, in fact, we

22  know Lazard was the financial advisor for both OPCO and PROPCO.

23  Further, Dr. Nave also testified that he thought the A&M report

24  was only about computers.  That's at Page 185 of his

25  deposition.

1        So in this daisy chain, we go from Mr. Genereau

2   saying we hired A&M.  And it's significant that the Debtors

3   didn't hire A&M.  This is the lender's advisor but Genereau

4   says, we hired A&M to value all the assets.  Haskins said, "I

5   thought A&M was valuing each and every asset."  Caruso says,

6   no, no, no, we did not value all the assets."  At the end of

7   the day, where do we end up with Dr. Nave the sole independent

8   director believing that his banker Lazard had blessed the

9   report but had only dealt with a very tiny subset of the

10  excluded assets and nevertheless the board authorized this

11  transaction that apparently nobody had any understanding, any

12  idea of what the A&M report actually did or said.

13       And the bottom line here on the fiduciary duty again,

14  your Honor, is a flawed process.  It can only lead to a flawed

15  result.  We think that's what happened here.  Simply, there's

16  an insufficient basis for the Court to approve the transactions

17  of the magnitude that have been proposed here, transfer of the

18  excluded assets, bid procedures that provide for an auction of

19  not all of OPCO but most of OPCO and very significantly provide

20  for a very key subset of OPCO assets to be kept off the market,

21  to be excluded assets.  So all in, your Honor, in Judge

22  Friendly's words, this is not right and it doesn't even seem

23  right.

24       I want to add a few things, if I may, to try and

25  address some comments that your Honor made with regard to -- in

1    the presentations of Mr. Winston and Ms. Steingart.  With

2    regard to the A&M report and the issue that valuing the Tiverti

3    (phonetic) options and the Wild Wild West options -- to be real

4    clear with what our position is, A&M also was very clear that

5    they did not value the options.  What they did was determine

6    whether it made sense that then -- at current prices to

7    exercise the option but a key component to the value of any

8    option, your Honor, is the optionality, the fact that it gives

9    you a right to acquire an asset at a fixed point in time.

10        So -- and you'll see -- if you'll look up in the

11    stock tables -- if you look for, you know, any out-of-the-money

12    option, it doesn't trade at zero.  It trades at some value

13    because you are locking in a price and, you know, in effect

14    obviating any market changes.  So we don't know whether that

15    value might be -- we have no idea because nobody has testified

16    to it but the point I was trying to make with regard to A&M is

17    they didn't value the option.  There is some value to the

18    option but what he did was simply to -- Caruso did was simply

19    determine whether it made sense to exercise that today.  It

20    doesn't if those numbers are right but we also pointed out that

21    they ignored some land values that they didn't like in the

22    article that was being discussed with Mr. Winston before.

23        With regard to a colloquy that you had with

24    Ms. Steingart about tying the plan to the sale and you said,

25    "This is a good thing because by tying the closing of the sale

1    to the plan, I have effectively incorporated into the sale

2    process all the protections that are built into the

3    confirmation process" and that's a good thing and I agree and

4    that's why I think that in most cases a sale tied to a plan is

5    a good thing but, again, the problem here is that this is more

6    than that.  What these bid procedures say is that the sale is

7    tied to this plan, this plan that has the releases.  Those

8    releases that we think are violative of Ninth Circuit law.

9              So look at it from one sense, you'd say, well, you

10   have all the protection you need there.  If those leases and

11   anything else in the plan is invalid, all is okay because that

12   sale won't get approved but the problem is that you don't

13   necessarily know what would have happened.  If no other bidders

14   show up -- what if no other bidders show up because they look

15   at those procedures and their lawyer tells them, well, you

16   could put in a bid and you could put in the highest bid and you

17   could make it a blockbuster bid but you don't get to take home

18   your assets unless and until that plan is confirmed.

19              That's a huge overhang and how do we know if the

20   process worked if buyers don't show up because of those

21   provisions?  What we have then is a stalking horse.  Is that,

22   your Honor, you know, a success or a failure?  If they then

23   say, okay, fine, we'll take the releases out of the plan, they

24   win.  They win because they have successfully chilled other

25   bids.  They get to acquire the assets at the stalking horse

1   bid.  It could be viewed as a success because we got rid of the

2   releases but in the bigger picture, it could be viewed also as

3   a failure because we'll never know what would have happened,

4   what bidders didn't show up because they said, you know what, I

5   don't want to get involved in the confirmation process.  That's

6   not what I'm into as a buyer.  As a 363 buyer, I want to go in,

7   get my assets and come home.

8           **THE COURT:**  Mr. Goldberg, I hear that at almost every

9   363 sale without a plan.  The buyer doesn't want to be burdened

10  with all the costs and expenses and the time delays in every

11  Chapter 11 and of course 363s become dominant and typically

12  what you have at the end of the day is a liquidating plan with

13  the proceeds from the sale because Courts are convinced that

14  that is, in fact, based upon the economic circumstances of the

15  cases, the best way to maximize the assets.  So I hear that all

16  the time.  Don't burden us with the plan and I don't know

17  candidly in this case whether that is accurate or not because

18  you're right.  This is not a very unique case -- because

19  that's, kind of, redundant.  This is a unique case, at least it

20  is in my experience.

21          **MR. GOLDBERG:**  I'm hoping it is in mine.

22          **THE COURT:**  The issue that I'm concerned about -- one

23  of the issues that I'm concerned about regarding the plan issue

24  is exactly what you've touched on.  Is the sale going to be

25  burdened with incidents regarding plan issues that might

230

1    preclude someone from either participating or making a maximum

2    bid?  And if what you've just told me -- if I understand what

3    you just told me -- and it was certainly in the papers earlier

4    -- that you did not think it was appropriate to tie this sale

5    to plan confirmation because it might chill the sale somehow --

6    at least I thought that's what you were telling me a few months

7    ago.

8             **MR. GOLDBERG:**  Yes.  The requirement that it be tied

9    not necessarily to a plan -- an OPCO plan, that could make

10   sense but a joint plan and a joint plan that includes --

11            **THE COURT:**  So it's just this plan you object to?

12            **MR. GOLDBERG:**  It's the tie to this plan with

13   releases.

14            **THE COURT:**  I want to make sure I understand our

15   position.

16            **MR. GOLDBERG:**  Yes.

17            **THE COURT:**  All right.  Because buyers in this case

18   -- at least at this stage of the proceedings if there is a

19   sale, it will be part of a plan process.

20            **MR. GOLDBERG:**  And I think a fix for that would be to

21   say, let's make -- it should be a buyer's choice issue.  The

22   buyer should have the ability to say, I will pay X in a

23   straight up 363 sale but if -- you know, we can also entertain

24   bids where the sale is tied to a plan for OPCO but --

25            **THE COURT:**  That gets a little --

231

1        **MR. GOLDBERG:**  It does but --

2        **THE COURT:**  I have a very difficult time being able

3   to conceive of an ability to conduct an auction that I could

4   make sure that the bids are -- were equal, in other words, that

5   Bidder 1 would be bidding on a certain sale, Bidder 2 on

6   another sale, Bidder 3 on a third version of a sale and then it

7   becomes extraordinarily difficult --

8        **MR. GOLDBERG:**  I --

9        **THE COURT:**  -- in being able to measure what would be

10  the highest and the best offer that would maximize and moreover

11  I don't know how -- I find it difficult to imagine how you

12  would advise your client if your client was one of the bidders

13  on how to bid or what you're even bidding for.

14       **MR. GOLDBERG:**  I appreciate --

15       **THE COURT:**  So I think you begin to slice this thing

16  up --

17       **MR. GOLDBERG:**  I agree, your Honor.

18       **THE COURT:**  -- and the bidding procedures do provide

19  that any bidder can buy some or all of these assets.

20       **MR. GOLDBERG:**  That's correct but --

21       **THE COURT:**  So that's already there.

22       **MR. GOLDBERG:**  -- the real objection that we have

23  here, your Honor, is the tie to this plan, the tie with the

24  releases.

25       **THE COURT:**  I understand that.  I understand that.

1          **MR. GOLDBERG:**  Okay.  And lastly, I -- you know, I

2     realize I've gone way over my time limit and I apologize but I

3     wanted to be clear.  I didn't come just with problems.  I tried

4     to bring a couple of solutions up here with regard to some

5     other fixes for the bid procedures.  The first, I think, is

6     that one issue that hasn't been addressed by the clarifications

7     as to the role of Dr. Nave is the issue of communication.  I

8     think a concern that buyers may well have is that they are

9     concerned that if -- about who they can talk to and that if the

10    Fertittas as board members and significant players in OPCO are

11    involved and know what discussions are taking place about the

12    bids that that will chill the bidding.

13          So what I would request is that to the extent that

14    there are parties that do come in and want to have discussions

15    and make bids that the parties on the OPCO side -- and that

16    would include Dr. Nave -- you know, observe strict requirements

17    of confidentiality and moreover that representatives of the

18    stalking horse bidder cannot be involved in those discussions

19    because it's certainly not going to be helpful and it may not

20    only chill bidding but eliminate competitive bidding if

21    somebody knows --

22          **THE COURT:**  I assumed that that was the premise upon

23    which Dr. Nave was selected to do this and that would

24    certainly --

25          **MR. GOLDBERG:**  I would hope so but it's not explicit.

233

1          **THE COURT:**  I understand.  That would certainly be

2     the premise upon which I would go forward if I go forward.

3          **MR. GOLDBERG:**  Okay.  And that's terrific.  And then

4     with regard to the excluded assets problem and I recognize it's

5     a huge problem without an easy solution.  One -- and our

6     concern that I think we've stated a number of times is that we

7     have no confidence in this 35 million-dollar number and as

8     Ms. Steingart said, part of this may go away if we had more

9     confidence in the process.  If we thought that this was a

10    vigorous process with representatives adequately representing

11    the --

12         **THE COURT:**  You mean the prior process?

13         **MR. GOLDBERG:**  Well, the process that -- yeah, going

14    forward or, you know, if the prior process --

15         **THE COURT:**  The -- as I think Mr. Genereau described

16    it, the one-market test that's already happened, the

17    negotiations have already occurred.

18         **MR. GOLDBERG:**  Right.  And his -- market tests are

19    great and they may as well -- then let's -- are we having a

20    market test for the excluded assets?  No.

21         **THE COURT:**  You already know the answer.  I think

22    that's about here on Page -- well, I think it's --

23         **MR. GOLDBERG:**  Right.  And I think there's a way

24    to --

25         **THE COURT:**  -- 240 -- 177 or 240 except I didn't get

234

1    the --

2         **MR. GOLDBERG:**  I think there's a way to do that and

3    it's this.  The first master lease compromise already has what

4    OPCO and PROPCO negotiated last fall was what PROPCO needed to

5    prevent the -- you know, the calamitous separation in the event

6    of a rejection.  They've already negotiated.  You've already

7    approved what they need and really what's in the excluded

8    assets now is what they want.

9         These are things that weren't in part of the prior

10   negotiation I think primarily because at that point the

11   Fertittas hadn't committed to buy in on the PROPCO side,

12   certainly not buy in on the OPCO side and I think there's a way

13   to market-test that and it's -- these are called multi-lot

14   auction and it's complicated but it's doable and you solicit

15   bids and you say there are three -- there's going to be, in

16   effect, three things that we're soliciting bids for, the OPCO

17   only assets or the included assets just the way that we have

18   it, the included assets and the excluded assets and a separate

19   auction for the excluded assets and that way we avoid any

20   problems, any disputes about what the excluded assets are worth

21   because they can pay for them.

22        They can put money on the table to say what they're

23   willing to pay for those excluded assets.  That will determine

24   what the real value is and if there's buyers out there who want

25   the excluded assets, they can incorporate that into their bid.

1    They'll say, I'm bidding on included and excluded.  If there's

2    buyers who just want the included assets, you know, a local

3    strategic buyer, they can do that and PROPCO can put in a bid

4    for the excluded assets and then you just simply determine

5    which has the best value for the estate.  Is the estate of OPCO

6    getting more money by selling them as a package or breaking

7    them up?

8          Obviously a lot harder in reality to do but in my

9    view, it's really the only fair way.  It's the only fair way of

10   determining whether OPCO gets fair value and determining what

11   the -- you know, how you can do a market test for the excluded

12   assets because I think anything short of that -- by never

13   exposing the excluded assets to a market test, we'll never know

14   whether OPCO is getting fair value for them.  Thank you, your

15   Honor.

16          **MR. QUSBA:**  Good afternoon, your Honor.  Sandy Qusba,

17   Simpson Thacher & Bartlett, Counsel for the Administrative

18   Agent for the OPCO bank facility.  Your Honor, does this

19   settlement fall within the range of reasonableness?  And I want

20   to focus at the beginning at least on the interest of creditors

21   being of paramount of importance.

22          **THE COURT:**  Let me just say that I did read the case

23   that you cited ...

24          **MR. QUSBA:**  Okay.  Let's start with who the creditors

25   are, who's supporting and who's not.  Your Honor, you've heard

1    that the Steering Committee is on board with this transaction.

2    The Steering Committee is comprised of Deutsche Bank obviously

3    as the Administrative Agent, JP Morgan Chase.  You have

4    Wells/Wachovia and Bank of Scotland as the four Steering

5    Committee members and they collectively hold 60 percent of the

6    bank debt, approximately $530 million, roughly.

7           I want to focus a bit on Wells Wachovia/ -- and Bank

8    of Scotland in particular.  They have each got independent

9    Counsel.  They have each filed joinders in connection with the

10   plan facilitation motions.  Neither one of them has a single

11   cent of exposure to PROPCO and both of them have been

12   intimately involved in the hand-to-hand combat that we've been

13   engaged in for the last -- well, since December of 2008.

14          Now, let's go over to the PROPCO side.  You have over

15   2 and a half billion dollars of PROPCO debt supporting this

16   transaction, $1.8 billion of mortgage debt held by JPM in

17   German American Capital Corp, an affiliate of Deutsche Bank.

18   You have 675 million in mezzanine debt that's also supporting

19   this and you have a fairly large swap exposure claim at the

20   PROPCO side.  I think it's roughly $75 million.  I'm not

21   positive on that number.  Overall, you combine the OPCO

22   Steering Committee and the PROPCO SAC, you have over $3 billion

23   supporting this transaction and the mezzanine debt on the

24   PROPCO stack is not just Deutsche Bank and JPM.  There are

25   third-party investors that hold that exposure.

1          Now, your Honor, let's move over to this side of the

2    table.  We have the splinters, the independents, the

3    dissidents.  They now apparently hold approximately 25 percent

4    of the debt -- of the bank debt.  I believe in one of

5    Mr. Goldberg's very recent pleadings he'd identified seven

6    institutions in his group although I think his latest 2019

7    filed on Monday seems to suggest there are six institutions.

8          **MR. UNIDENTIFIED:**  Six.

9          **MR. QUSBA:**  Six.  Two of those institutions, your

10   Honor, are distressed buyers.  They bought on the secondary

11   market at far below par prices and are now in the transaction.

12         **THE COURT:**  Doesn't matter.

13         **MR. QUSBA:**  It does.

14         **THE COURT:**  Why?

15         **MR. QUSBA:**  Because Mr. Goldberg complains about all

16   the conflicts.  He's got new investors in his group that bought

17   into the conflict.  Mr. Goldberg spent a lot of time, as did

18   some of the others, on conflicts and conspiracies, Deutsche

19   Bank, JPM.  I'll let the Debtors address the conflict

20   allegations made against the Fertittas and others but with

21   respect to Deutsche Bank and JPM, again, both institutions on

22   the OPCO and PROPCO side have separate Counsel.  They have

23   separate financial advisors.  We on the OPCO side have

24   Blackstone.  We have Alvarez and Marsal.  On the PROPCO side,

25   they have Miller Buckfire.  On the PROPCO side, they're

238

1   represented by Sidley Austin and Katt Wallager (phonetic).

2          The splinters ignore that we're living in a fishbowl,

3   that any step we take in this case has to be done by a public

4   motion.  Any step we take in this case has to be approved by

5   your Honor.  They ignore the fact that Wells and Bank of

6   Scotland were intimately involved in the negotiations for the

7   plan facilitation motions and they do not hold any PROPCO

8   exposure.  They ignore it but worst of all, your Honor, they

9   ignore their own contractual provisions, our loan documents.

10          And I know Mr. Goldberg came up here and said he

11  remembers the admonitions of *Chrysler* and other remarks made at

12  prior hearings but apparently he doesn't.  Your Honor, I'm

13  looking at the OPCO security agreement.  I have additional

14  copies if you'd like it or I could just read it into the

15  record.  I have copies for you.  Do you want them?  Sure.

16      **(Pause)**

17      **MS. UNIDENTIFIED:**  I'll take it so I don't have to

18  read it (laughter).

19      **MR. QUSBA:**  Your Honor, would you like a copy?  May I

20  approach?

21      **THE COURT:**  You better have it marked.

22      **MR. QUSBA:**  I believe this has been submitted in --

23      **THE COURT:**  Is it in the depo?  Is it in the exhibit

24  book?  I didn't see it.

25      **MR. QUSBA:**  It has in prior hearings including in the

1   first day of hearings --

2          **THE COURT:** Well, probably -- I know that it's

3   probably been brought before this Court in some pleading

4   probably early on but let's just mark it.  Let's have a

5   complete record that we don't have to search for.  What's the

6   next in order?

7          **THE CLERK:** Eighty-one, your Honor.

8          **THE COURT:** Is there any objection to this?

9          **MS. UNIDENTIFIED:** No, your Honor.

10          **THE COURT:** Thank you.

11          **MS. UNIDENTIFIED:** I'd like to but I won't.

12          **THE COURT:** I don't know what the basis would be.

13   It's in except I thought I closed the evidence but I'll let

14   them reopen for the purpose of introducing and admitting this

15   exhibit.  I really don't want any more.

16          **(Exhibit Number 81 was received in evidence)**

17          **MR. QUSBA:** You won't have any more, not after what I

18   read.

19          **THE COURT:** Well, there comes a point, you know, this

20   -- I don't want to hear about Whack-A-Mole and I -- we've had

21   enough.  Okay.  The evidentiary portion is concluded now

22   finally.  All right, go ahead.

23          **MR. QUSBA:** Your Honor, Page 20, Section 6.16.

24          **THE COURT:** Let me get there, please.

25          **MR. QUSBA:** Sure.

240

1          **THE COURT:**  General authority?  I --

2          **MR. QUSBA:**  Yes, your Honor.

3          **THE COURT:**  Go ahead.

4          **MR. QUSBA:**  I'm going to just read two parts of it,

5     the lead-in and then Clause B.  "By acceptance of the benefits

6               of this agreement and any other collateral documents,

7               each secured party, which means each lender in the

8               OPCO syndicate, whether or not a signatory hereto

9               shall be deemed irrevocably."  Clause B, "To confirm

10              that the administrative Agent shall have the

11              authority to act as the exclusive agent of such

12              secured party for the enforcement of any provisions

13              of this agreement and such other collateral documents

14              against any grantor, the exercise of remedies

15              hereunder or there under in the giving or withholding

16              of any consent or approval hereunder or there under

17              relating to any collateral or any grantor's

18              obligations with respect thereto."  Okay.  The other

19     provision, your Honor, since this refers to consents hereunder

20     is Section 4.01, Page 13.

21          **THE COURT:**  I believe that that section number is the

22     one that I applied earlier on -- in this case.  I remember

23     4.10.

24          **MR. QUSBA:**  4.01, Remedies Upon Default, your Honor.

25          **THE COURT:**  Zero one, that's --

241

1          **MR. QUSBA:**  "Subject to any" --

2          **THE COURT:**  I thought -- I'm not sure it was in this

3     agreement or in the actual creditors agreement.

4          **MR. QUSBA:**  I think your Honor referred or cited to

5     the Credit Agreement as well as perhaps the Security Agreement.

6     I'm not positive.

7          **THE COURT:**  I know.

8          **MR. QUSBA:**  In any event, "Subject to any applicable

9              gaming laws upon the occurrence and during the

10             continuance of an event of default, it is agreed that

11             the Administrative Agent shall have the right to

12             exercise any and all rights afforded to a secured

13             party with respect to the obligations under the UCC

14             or other applicable law."  And now *Chrysler,*

15    *Mettledine* (phonetic) and other cases have interpreted this

16    exact language including the reference to applicable law to

17    cover the Bankruptcy Code and in particular 363.

18         **THE COURT:**  I'm aware of that.  I think I made that

19    record months ago.

20         **MR. QUSBA:**  So now with respect to the excluded

21    assets, your Honor, 60 percent of the OPCO banks, much more

22    than what's required under our collateral documents and our

23    Credit Agreement, support the transaction.  We can consent to

24    the sale of the excluded assets under 363(f)(2).

25         Your Honor, let me now turn to the Committee --

242

1          **THE COURT:**  You can consent to the sale of the

2     excluded assets because they are all your collateral.

3          **MR. QUSBA:**  Exactly, your Honor.  Let me now turn to

4     the Committee.

5          **THE COURT:**  In other words, when Dr. Nave testified

6     in his deposition, Page 77, that he was satisfied with the way

7     -- he was asked the question.

8          "MS. AXELROD:  Do you believe that it would be

9               helpful to have a market test to determine the value

10              of the excluded assets?"

11         "MR. (indiscernible):  The question is vague but you

12              can answer it.

13         "THE WITNESS:  "I'm very satisfied with the way this

14              was handled.  Again, remember, it was negotiated

15              between the two parties that owned the assets, the

16              OPCO lenders and PROPCO lenders."  Quote, "owned" it,

17              period.

18         **MR. QUSBA:**  That's right.

19         **THE COURT:**  Then he continues, "And in a situation

20              like this, I'm sure there's lots of give-and-takes in

21              the negotiating process (indiscernible) negotiated

22              deal for some parts you think maybe (indiscernible)

23              and at the end of the day, they came to an agreement

24              that I believe is, with the knowledge that I have

25              that's been presented to me by a measurement; by

243

1              that, I mean Tom and Rich Lazard (phonetic), by

2              Milbank and certainly as I've done everything I've

3              sought to (indiscernible) but I believe this process,

4              this end result is good."

5          He apparently believed that the control over the

6    assets rested with you.

7          **MR. QUSBA:**  He's a smart man.

8          **THE COURT:**  And you're agreeing with that?

9          **MR. QUSBA:**  I am agreeing with that.

10         **THE COURT:**  Okay.  Just so we understand what your

11   position is.

12         **MR. QUSBA:**  Yep.  Now, let's turn to the Committee.

13   Who is this Committee?  The Committee is comprised of only

14   bondholders or indentured trustees as representative of the

15   bondholders.  Where do the bonds reside?  They reside at

16   Station Casinos, Inc., the Parent company.  They do not have

17   any claims, guaranteed or otherwise, against any of the

18   subsidiaries.  The OPCO banks, including Mr. Goldberg's

19   clients, do.  We have guarantee claims and we have liens on

20   substantially all the assets of OPCO including at the

21   casino/sublevel, at the subsidiary level.

22         So in essence, your Honor, the bonds are like equity

23   because we have structurally senior claims at the subsidiaries

24   and where the value resides.  The value in this company resides

25   at the sublevel.  You need people to come into the casinos to

244

1    generate cash, to generate IBITDA and that's the only way it

2    will rise up to the Parent company.  So unless that -- those

3    subsidiaries and those casinos, by virtue of their guarantees

4    to the OPCO banks, are able to pay us $900 million in cash as

5    they contractually promised to do or we accept consensually

6    some other settlement, the bonds shouldn't be getting any

7    recovery.  They're equity.  We're structurally senior and with

8    respect to a big slug of the bonds, contractually senior

9    because they're subordinated.  So, your Honor --

10             **THE COURT:**  That wasn't me.

11             **MR. QUSBA:**  Oh, okay.  So, your Honor, the Committee

12   is out of the money because no one -- no one has come close to

13   offering us $900 million in cash.  Your Honor, if this deal is

14   blown up, we will be mired in litigation and it's an option for

15   the Committee right now.  It really is because right now they

16   are out of the money, based on the bids that have come forward.

17   We'll be mired in litigation with respect to ownership, title

18   issues, liens, scope of liens, attachment, perfection issues,

19   Texas Station liability off the table, the master lease

20   rejection, transition, use of cash collateral, potentially

21   lift-stay motions from the PROPCO lenders.  I have no idea.

22             Everything will be up for grabs and the Committee,

23   they will simply fight on and no bidder, your Honor, will touch

24   us while we thrash around in this litigation.  No bidder will

25   touch us because of the uncertainty as to what it is that they

1    think they're buying or that they could be buying.  It

2    certainly won't drive value up with all this litigation going

3    on.  Can there be any doubt, your Honor, if these plan

4    facilitation motions are not approved that we will be mired in

5    protracted litigation?  Just look at all the lawyers here.

6    Look at all the lawyers that have attended every hearing and

7    almost every issue has been contested.

8              Your Honor, in this --

9              **THE COURT:**  So is the choice then that the Court has

10   is approve this because if you don't, the only alternative is

11   some kind of crater chaotic result?

12             **MR. QUSBA:**  I wouldn't say it's the only choice but,

13   your Honor, I think I asked Ms. Steingart earlier in the

14   hearing, don't I have to consider what happens if I don't

15   approve the motions.

16             **THE COURT:**  Well, I think so.  I mean, even if you

17   were to read the opinion that she asked me to read and I did

18   and I did not -- it was usually when I read Judge Walsh's

19   (phonetic) opinion.  It's very well thought out but really

20   unremarkable in terms of the legal principles that are applied.

21   He had an unusual case in front of him but the 9019 analysis is

22   consistent with the laws I understand it to be in the Ninth

23   Circuit and that you do.  You consider a broad range of factors

24   to try to ensure that a compromise is, in fact, fair and

25   equitable.

1          That's the bottom line and I think you do have to

2    consider -- and I thought I made that clear if I didn't.  What

3    would happen in the event that I were to not approve because

4    that has an effect upon creditors as well and, you know, the

5    sense that I get -- maybe I should say this now.  It goes back

6    to what I heard months and months ago.  Leverage is really the

7    critical issue because I am not comfortable that any party --

8    by that I mean any party, any of the lenders, certainly not the

9    Debtor and I doubt the Committee really wants a result that

10   could lead to a devaluation of these assets in a significant --

11   and it is somewhat -- I look at this that some of you have

12   negotiated as really -- is this really the end of the line

13   because if I heard what I thought I heard from Mr. Goldberg and

14   Mr. Winston, we understand that there has to be a process.  We

15   understand that there has to be a sale.  We do not like some of

16   the terms of this sale.

17          I think the process itself, the issues that are left

18   to be resolved, I made that -- I'm fairly confident of that.

19   Of course if you start changing some of the details, you have

20   to change the restructuring agreement. I understand that.

21   That's really the plan, in essence.  I brought that up

22   (indiscernible) right.  So it's really -- as I see it, where is

23   the end of the negotiations?  And that puts the Court in a

24   difficult position.  That -- it's not a complaint.  It's just

25   simply the fact and that position has tried to somehow measure

1   -- balance this all out because values 35 million below could

2   not even -- may not even have that value to OPCO.  If PROPCO

3   decides, to heck with you.  You can have them all and good luck

4   to you and see what somebody really pays for them other than us

5   -- I don't know what that would be and then I hear Mr. Goldberg

6   say, well, try the multi-lot approach.

7           So I'm getting suggestions on how to do it really

8   trying to, I think -- I won't have me say, I won't approve this

9   but if you do these changes, I might.  I don't negotiate.

10  Okay.  I've been asked to approve or disapprove what's in front

11  of me and it's not my job necessarily to worry about what the

12  business consequences are but to think that I am going to

13  ignore jobs, ignore financial reality is wrong but to think

14  that I am going to allow -- likewise allow myself to be forced

15  into a corner to accept a deal that may not be the result of a

16  good process, that's not going to happen either.

17          So I'm still weighing this.  I don't really disagree

18  with your legal position regarding the independent lenders

19  (indiscernible) but at the same time, the arguments that he has

20  raised I think I need to consider and I will.  I just want

21  everybody to understand that.  I -- it's really the same thing

22  in a sense that I heard in December.  If you don't do this,

23  there's going to be the option of we may have to close down.

24  We don't know what's -- well, fine.  You know, if that's what

25  you-all want, that's what you-all may get.  That's what the

1    Committee is going to get.  I don't know but I really can't

2    worry about that except in light of trying to evaluate what's

3    fair and equitable and what is in the best interest of all the

4    creditors in this case.  So I just wanted to put that in

5    context because I really think that's where I'm at.

6              **MR. QUSBA:**  Okay.

7              **THE COURT:**  If you disagree, tell me because that's

8    really where I think I'm at.

9              **MR. QUSBA:**  I'm going to address your concerns with

10   respect to process but before I do, I'm going to give you just

11   a sense -- my sense, at least, of what I think just the

12   professional burn rate consequences will be if we don't -- if

13   we do go backwards and into litigation

14             **THE COURT:**  Well, I've looked at fee applications in

15   this case.  I have some idea what the financial consequences

16   are.

17             **MR. QUSBA:**  My understanding is it's six to $10

18   million a month and if you extend -- if we extend this case out

19   by even three months -- I know Ms. Steingart suggested four to

20   six weeks.  I cannot see how that's possible given the -- all

21   the various issues that will be unraveled if this settlement

22   doesn't get approved.  Just three months, that's 18 to $30

23   million, your Honor.  These settlements are designed to avoid

24   costly, uncertain and value-destructive litigation.  This --

25   these settlements are creating the framework for the further

1   and final administration of this case through the Chapter 11

2   plan and auction process.

3           Now, let me, your Honor, talk about process because

4   we've been criticized quite a bit.  I'll begin, I think, in

5   December of 2009, your Honor.  We had just come back from Reno

6   after the initial master lease compromise agreement hearing, a

7   contested hearing -- more evidence of the fact that there is no

8   conspiracy here.  PROPCO was on one side.  OPCO banks and OPCO

9   itself was on another side.  PROPCO wasn't even together with

10  its own company with PROPCO -- the PROPCO lenders, excuse me,

11  weren't on the same side even with PROPCO -- a very contested

12  hearing.

13          We get back to New York and we're in the throes of

14  plan negotiations because your Honor made it quite clear this

15  was a three-month deal, that you would not be happy if we came

16  back and had made no progress and if you had to make decisions,

17  you would make decisions and you just apply the law to the

18  facts and business results be damned.

19          Your Honor, mid to late December Boyd Gaming makes a

20  public bid for approximately $2.45 billion while we're in the

21  middle of these negotiations.  It was a whole company

22  transaction, PROPCO and OPCO.  PROPCO didn't want to

23  participate in it.  They had their own reasons.  So we

24  approached Boyd immediately.  We wanted to know, well, how much

25  of that 2.45 are you allocating to us, naturally.  We

1    facilitated a confidentiality agreement with the Debtors, two

2    of them, in fact, and Boyd.  We wanted to make sure Boyd was

3    real.  There were concerns and I'll get more to that in a

4    moment or two, your Honor.

5           We were concerned because Boyd is Station's Number 1

6    competitor.  They're a locals player.  They have casinos in the

7    same market in the same area.  So we were concerned and we

8    wanted to make sure through confirmatory discussions as well as

9    initial diligence whether Boyd was real and genuine with

10   respect to its proposals.

11          **MR. UNIDENTIFIED:**  One moment.

12          **MS. STEINGART:**  Sorry for interrupting, your Honor.

13   I don't know if this is new evidence that they're putting in a

14   new affidavit.  It's not in the record.  It's not in the record

15   before the Court.  I'm loath to interrupt Mr. Qusba but --

16          **THE COURT:**  Where is it in the record?

17          **MR. QUSBA:**  Your Honor, what I'm talking about I

18   think Mr. Genereau covered in his deposition with respect to

19   the process.

20          **THE COURT:**  There was certainly --

21          **MR. QUSBA:**  Mr. Caruso to a lesser extent.

22          **THE COURT:**  I know what Mr. Genereau testified to.

23   He testified to some of the issues regarding Boyd.  I'll let

24   you argue from that but I'm not accepting this argument as

25   evidence.

1          **MR. QUSBA:**  Thank you, your Honor.  So that's

2    December of 2009.  We go into January of 2010 and we're

3    informed that Fertitta Gaming has been formed and that there

4    was a deal in principle with the PROPCO lenders and Fertitta

5    Gaming.  We then appear before your Honor in late January for

6    the standing hearing and immediately after the standing hearing

7    we go to Vegas for meetings.  There, your Honor, we leave with

8    a proposal from Fertitta Gaming and PROPCO subject to two big

9    caveats, asset transfers completely open issues still.  PROPCO

10   wanted them.  We wanted value for them and Texas Station, we

11   wanted that liability solved.

12          In February, your Honor, after making some progress

13   with the PROPCO lenders and Fertitta Gaming, we have a bank

14   call February 11th.  Mr. Goldberg was on it.  Mr. Goldberg's

15   financial advisor was on it.  I believe Mr. Goldberg's clients

16   were on it and we presented three alternatives.  We told the

17   banks where we were with Fertitta Gaming and PROPCO.  We told

18   them that we were having initial discussions and productive

19   discussions with Boyd and we told them we were even looking at

20   a stand-alone plan where the banks would have to equitize their

21   debt if they didn't find a bidder that was suitable or

22   presented enough value.  We also told them that asset transfers

23   were a big issue.  We told them that we had engaged Alvarez and

24   Marsal.  That's February, mid-February.  None of this is a

25   surprise to Mr. Goldberg, your Honor.

1          In March we intensify negotiations with both parties,

2     Boyd and FG PROPCO.  With Boyd, we negotiated a support

3     agreement substantially final.  We negotiate a plan term sheet,

4     debt term sheets.  With PROPCO and FG, we negotiate a credit

5     agreement which is 85 percent done and attached to one of the

6     plan facilitation motions, maybe our support agreement.  We

7     hold another bank call, your Honor.  We again explain where we

8     are with Boyd and we hear from the banks.  Again Mr. Goldberg

9     is on the call.  His financial advisor is on the call.  His

10    clients are on the call and what do we hear from the banks?

11    Cash is king.  Cash is king.  Try to get as much cash in our

12    recovery as possible.  Debt terms, to the extent we're

13    providing seller financing -- and we are -- get it cash pay.

14    Have it secured by assets that are operating, not just raw land

15    and an auction is a must.

16          We go into April now.  We redouble their efforts,

17    shuttle negotiations, FG PROPCO, Boyd.  And let me stop there

18    for a moment with respect to Boyd, your Honor.  I was involved

19    in 98 percent of the discussions with both sides and in

20    particular with Boyd, I just want the record to be clear, I

21    believe that they are -- they were a good faith participant in

22    those negotiations.  They helped us immensely with respect to

23    understanding what were important issues as well as driving up

24    value.

25          In April, your Honor, the Debtors began to file

1    papers.  The train is starting to leave the station.  The

2    disclosure statement is filed.  A plan is filed.  A revised

3    master lease compromise agreement is filed and bid procedures

4    are filed for a naked auction for OPCO.  We were not on board

5    but what it did, it became the fulcrum to bring us to the

6    essence of the negotiations, the elephant in the room, the

7    asset transfers and Texas Station.

8            The PROPCO lenders, as we got involved in those

9    negotiations, made allegations and continue to allege liens on

10   certain assets.  So title became an issue and it was clear that

11   PROPCO always wanted assets from us.  It's no secret and we

12   wanted value in return and we wanted Texas Station solved and

13   we wanted to get a stalking horse and we wanted to improve on

14   the bids that we had, the January bid from FG PROPCO as well as

15   the negotiations that we were having with Boyd.  It was a

16   competitive process. We consistently argued, your Honor, that

17   we needed to get fair consideration for those assets.  OPCO

18   could not be harmed.  We needed to resolve Texas Station and

19   get a stalking horse.

20           Now, let's talk about Texas Station because I think

21   there's been a lot of back-and-forth today about it.  Texas

22   Station, the casino, leases the ground it sits on from a

23   Fertitta affiliate.  The landlord under the lease has a 65-year

24   ground lease.  Under the terms of that lease -- under the terms

25   of the ground lease, the landlord can put the lease to Texas

1    Station, the subsidiary when there's a change of control at

2    Station Casinos, Inc.  It was obvious to us that there's going

3    to be a change of control at Station Casinos, Inc.  There's no

4    doubt about it.

5          Either Fertitta Gaming -- or excuse me.  Either the

6    Fertittas will leave and just operate PROPCO and invest in

7    PROPCO if they're not the successful bidder with respect to

8    OPCO and even if they are the successful bidder because of

9    PROPCO's participation in that joint bid, there will be a

10   change of control.  There's no doubt about it.  Under any

11   circumstance, any scenario, there will be a change of control

12   and if we don't go with the Fertittas or PROPCO or Boyd or

13   anyone else, there will be a change of control because the

14   banks will end up owning OPCO, having to convert their debt

15   into equity.

16         So solving the Texas Station lease liability became

17   very important to us.  There was a substantial disagreement

18   with respect to the amount of the liability.  The liability is

19   supposed to be at the lowest level.  It's supposed to be a

20   discounted cash flow of the remaining lease payments, the

21   lowest level.  So a fundamental assumption that people have to

22   agree on is the discount rate and that drives the amount of the

23   liability, a substantial portion of it.  There are other

24   factors as well.

25         For example, the rent increases over time under the

1   Texas Station ground lease because the cost of living

2   increases.  It's also tied to the consumer price index, a

3   number of assumptions and so there was a lot of disagreement

4   about the amount of the liability.  On the high end, the

5   landlord was arguing through its representatives who did attend

6   meetings that the liability was anywhere between a hundred and

7   ten and a hundred and twenty million dollars.  I think 115 was

8   a number that's been cited in deposition testimony.  We

9   obviously were arguing for a much lower number.

10          Boyd, because we were in, again, shuttle negotiations

11  -- we knew real time what Boyd's position was with respect to

12  the Texas Station ground lease.  They didn't want to be a

13  contractual counterparty to the Fertittas.  When they buy this,

14  they want to buy it free and clear and unless we had the Texas

15  Station liability fixed, there was uncertainty to their bid and

16  the value deduction that would occur until we did get it fixed.

17  So we went to negotiating the Texas Station ground lease

18  liability and the asset transfers in tandem.  It was a natural

19  interconnected negotiation.

20          Your Honor, as we conducted negotiations between the

21  two parties, the Fertitta Gaming/PROPCO bid increased and it

22  became apparent to us that the Boyd transaction would include a

23  substantial amount of risk, closing risk, uncertainty,

24  litigation and what we didn't want to do is pick a stalking

25  horse and then have it potentially disappear because of the

1   litigation associated with getting them into the pole position.

2   Termination of exclusivity, becoming a co-proponent, getting

3   their bid procedures approved, no agreement on excluded assets,

4   those were just some of the issues we faced with Boyd.

5           Meanwhile, FG PROPCO's bid is increasing because they

6   want the asset transfers.  We want a stalking horse.  We want

7   Texas Station liability solved.  And so what we saw, your

8   Honor, over the course of those final stages of the negotiation

9   was a resolution of Texas Station negotiated at $75 million if

10  a third party purchases OPCO and zero and the waiver of the put

11  if the stalking horse, the proposed stalking horse ultimately

12  is the successful bidder.  We also negotiated $35 million of

13  cash and $13 million of assumed liabilities associated with the

14  excluded assets but I want to be very clear on that.  That is

15  not the value of the assets.  We got substantially more, your

16  Honor -- substantially more than 35 million and 13.  We got

17  Texas Station resolved.

18          The MLCA, the proposed MLCA before your Honor now,

19  another million and a half rent reduction per month -- amortize

20  that out to the end of the year.  Assume emergence on 12/31.

21  That's seven months, another ten and a half million dollars we

22  picked up.  We got a stalking horse bid finally with FG PROPCO

23  and that bid from the January proposal to the one we chose

24  increased in total consideration by $35 million.  The currency

25  that we're receiving was dramatically different.  We went from

1  $200 million of cash to 317 guaranteed.  We went from $410

2  million of debt that was cash pay and secured by current

3  operating assets to 430.  That was cash pay secured by

4  operating assets and we reduced a hundred-and-twenty-five-

5  million-dollar PIC loan -- which was not cash pay.  It was

6  payment in kind -- to $25 million in the stalking horse bid.

7        We in essence, your Honor, converted the PIC

8  exposure, the ugliest part of the capital structure that we

9  were about to receive, into cash, the highest priority that our

10  banks through a series of bank meetings told us was critical

11  and the most important type of currency.  And most importantly,

12  your Honor, we have a path to exit with $3 billion of debt

13  supporting the transaction.

14        Your Honor, the Committee has made -- and the

15  independent lenders or the splinters obviously have spent a lot

16  of time talking about the excluded assets because I think your

17  Honor put your finger on it early in the hearing that this is

18  what it's about, the excluded assets and the right price for

19  the excluded assets.  If the price was higher, I think you

20  asked Ms. Steingart, would you be okay?  And that's what this

21  is about.  They want the excluded assets to be subject to a

22  market test because by excluding them, so they think, we're

23  depressing values but we are not getting 35 and 13 for the

24  excluded assets.

25        We are getting a lot more, the litany of things that

1   I just went through including the substantial increase in the

2   stalking horse and I don't believe we can proceed to an

3   auction.  Certainly we won't proceed with a stalking horse if

4   the excluded assets are kicked out or the MLCA is not approved.

5   Their bid goes away.  I don't know where we are and even if we

6   do get to an auction, again, I'm not sure how anybody can bid

7   when people are litigating about whose got what asset and whose

8   got what rights.

9           **THE COURT:**  I don't know how a Court can settle

10  something if the ownership has not been resolved.  It's the

11  position of the objectors that ownership is not at issue.

12  Ownership was not placed at issue in any pleading until the

13  earliest, I think, April -- probably April 7th and maybe even a

14  week later, that the schedules, the disclosure statement and

15  other pleadings did not reflect ownership.  I do think that the

16  lien that PROPCO had has always been before the Court.  That

17  was not anything new and so -- in that sense but that lien is

18  not ownership.  It would only convert to ownership in the event

19  of foreclosure.

20          So -- but I was also told that the risks of

21  foreclosure were significant.  I think Mister (indiscernible)

22  made that very clear to me at one argument at length.  So I

23  understand what -- I don't remember the Texas put issue coming

24  before me until the April -- let me check.  I think the April

25  16th is the date of the filings.  I think that's the first time

1    I became aware of a Texas put.  I -- so -- but that -- just

2    because that is when I became aware of them does not

3    necessarily mean that they aren't issues that might not have to

4    be litigated.

5            It's really -- once again, my evaluation of this is

6    that it's -- I'm being urged that these are not real issues and

7    that if I just say "No," they'll go away.  That's -- no.

8    That's what I'm being -- strip it away.  That's what I'm being

9    told after hours of argument.

10           **MR. QUSBA:**  I --

11           **THE COURT:**  I may have misunderstood but I'll tell

12   you that's what I heard.

13           **MR. QUSBA:**  That's what I heard, your Honor, and the

14   other thing I heard was just wave at the excluded asset issue

15   and we'll just keep moving forward.  It's not going to happen.

16           **THE COURT:**  I don't know what that means.

17           **MR. QUSBA:**  Just take it out of the plan facilitation

18   motions.  Have a separate lot auction for it or do something

19   else.

20           **THE COURT:**  Well, that was the proposed alternative.

21   Yes, I heard that.

22           **MR. QUSBA:**  It all goes to the same thing.  We're not

23   going to have any deal here with certainly this stalking horse

24   and we will have issues to resolve.

25           **THE COURT:**  And what they're saying is, that's your

1    argument.  They're not convinced and I shouldn't be convinced.

2    That's exactly where we're at.  Am I wrong?

3            **MR. UNIDENTIFIED:**  (indiscernible).

4            **THE COURT:**  Okay.  I understand.  I now understand

5    what's going on.  I thought I did a few hours ago but that's --

6            **MS. STEINGART:**  Well, if I --

7            **THE COURT:**  No, I'm --

8            **MS. STEINGART:**  Yes.  No, no, no.  You do understand

9    that this -- that there's --

10           **THE COURT:**  Oh, I know that that's --

11           **MS. STEINGART:**  -- gloss on it.  That makes it

12   less --

13           **THE COURT:**  I understand the gloss.  I really do but

14   I don't have time to go back all through it, Ms. Steingart.  I

15   really do understand your position.

16           **MR. QUSBA:**  So the Committee tries to make a lot of

17   hay, your Honor, out of the Caruso report after trying to

18   exclude it and the independent -- and the splinters do as well.

19   I've got to stop that habit.  And they criticize the Caruso

20   report for not looking at various buckets.  Again, it's easy to

21   pick and choose discrete issues in a multiparty, extremely

22   complex negotiation that's been going on since December of

23   2008, your Honor.

24           We have a 772 million-dollar bid staring us in the

25   face.  I'm sorry, but three patents related to a player-

1    tracking system that you can buy off the shelf, according to

2    the Debtor's witness, isn't going to move the needle.  A

3    headquarters lease that's underwater and we're not keeping

4    isn't going to move the needle.  A human resource manual as

5    part of the business information package that is being

6    delivered to the PROPCO FG side of the house isn't going to

7    move the needle for us, not to mention the fact we have liens

8    on all this stuff.  If we thought it mattered, the value would

9    accrete to us, not to the Creditors Committee.  Again, until

10   those subsidiaries and casinos can pay us off in full in cash

11   or we accept something from those subs that we consent to, the

12   Committee shouldn't be getting a return in this case.  I'm

13   sorry.  This is the capital structure they bought into.

14           I also want to be very clear, your Honor, about --

15   that if this stalking horse proposal doesn't get approved

16   tomorrow by your Honor or if it does get approved and later on

17   blows up and never gets to closing, other than very few

18   discrete issues -- or events, we will be back to Square 1 on

19   transfers.  They're not happening.  Okay?  They are not

20   happening.  Assets do not get transferred for $35 million and

21   13 of assumed liabilities do not happen unless -- again,

22   Mr. Nyhan I think will speak about this -- they do everything

23   they're supposed to do, FG PROPCO, and we can't get to a plan

24   that's confirmed on a crammed-down basis.

25           That's the only event where they actually get the

```
 1   asset transfers.  When we get to 35, we rid ourselves of 13 of

 2   assumed liabilities and we also negotiated for the benefit of

 3   the 75 million-dollar Texas Station liability being locked in

 4   for another year but those are the only events.  If the deal

 5   blows up for any other reason, they don't get the transferred

 6   assets, not for 35.

 7          Your Honor, I'd be happy to talk about the OPCO

 8   support agreement if you want.  I think you'd mentioned on the

 9   May 4th or May 5th hearing that the support agreement concerned

10   you a bit because you just didn't want to be approving things

11   that you didn't necessarily know or understand.

12          THE COURT:  I don't want to approve a support

13   agreement and then at plan confirmation be told, I've already

14   approved the plan.  Therefore, what's the purpose of this

15   hearing?  That's what I don't want to hear.

16          MR. QUSBA:  Yeah.  A couple of things, your Honor --

17          THE COURT:  That's my fear and I think that's -- I

18   think part of the objectors were tying it all back into the

19   support agreements for showing -- to try to convince me that

20   that is, in fact, what might happen.  I thought that was

21   what --

22          MR. QUSBA:  That's not what will happen, your Honor,

23   at all.  The support agreement has a ten-page term sheet

24   attached to it.  The plan has yet to be negotiated.  I haven't

25   seen a revised plan or a revised disclosure statement.
```

1    Mr. Goldberg and Ms. Steingart are not alone.

2              **THE COURT:**  Well, it's easy for me to --

3              **MR. QUSBA:**  They're working on it.

4              **THE COURT:**  It's easy for me to protect that and

5    maybe it introduces some uncertainty in the process but if I

6    approve the support agreement -- or actually the -- I

7    understand that it refers to certain matters that have not been

8    concluded.  I would not consider it to be binding.  In other

9    words, I could revisit it at any time and would intend to do so

10   if necessary at the time of plan confirmation.  In other words,

11   okay, I would look at it more as evidence of intent, like one

12   huge LOI as --

13             **MR. QUSBA:**  That's all it is.

14             **THE COURT:**  -- as opposed to anything else and --

15             **MR. QUSBA:**  It's --

16             **THE COURT:**  -- I just tell everybody that I can deal

17   with those issues.

18             **MR. QUSBA:**  That's all it is, your Honor.  It is just

19   one big letter of intent and the intent is to work towards a

20   plan and disclosure statement that effectuates a ten-page term

21   sheet which is now being built out because we just --

22             **THE COURT:**  Then why do I have to approve it at all?

23             **MR. QUSBA:**  -- finished the asset purchase agreement.

24             **THE COURT:**  Why do I have to approve it at all?

25             **MR. QUSBA:**  Because the Debtor --

1          **THE COURT:**  I think a judge should try to do as --

2    the smallest amount of damage possible.

3          **MR. QUSBA:**  This is not damage, your Honor.  This is

4    simply authorizing the Debtors to enter into that support

5    agreement.  It has fiduciary outs.  It has -- all it says is

6    that they will proceed and work towards a plan of

7    reorganization which effectuates a term sheet --

8          **THE COURT:**  That's a lot of words to say that.

9          **MR. QUSBA:**  What -- I'm sorry, your Honor?

10         **THE COURT:**  That's a lot of words to say that.

11         **MR. QUSBA:**  There are a lot of parties to it.

12         **THE COURT:**  Okay.

13         **MR. QUSBA:**  And we can't say anything simply in this

14   case.  In any event -- and there are other covenants in

15   there --

16         **THE COURT:**  I have no problem authorizing the Debtor

17   to enter into negotiations that lead to a plan.  I kind of

18   thought that was what their duty was to begin with.

19         **MR. QUSBA:**  But --

20         **THE COURT:**  I'm not being facetious.

21         **MR. QUSBA:**  But, your Honor -- but a plan that

22   reflects the ten-page term sheet that's attached.

23         **THE COURT:**  Right.  And I understand that that -- I

24   understand that but that authorization should not be mistaken

25   as -- if I do it -- to anything other than go forward and good

1   luck to you because I'm not bound by anything that you agree to

2   do and that -- so, I mean, it's a matter of protecting

3   fiduciaries in the sense that the Court said we could go

4   forward on this basis with the understanding that the Court

5   hasn't given us blessing to the final product, I think is what

6   you're telling me.

7          **MR. QUSBA:**  I am absolutely not assuming a blessing

8   to any -- I can't assume for tomorrow, let alone a plan

9   confirmation way out in --

10         **THE COURT:**  Well, you can't.  I've got a disclosure

11  statement that needs to be amended and a plan that needs to be

12  amended.

13         **MR. QUSBA:**  Absolutely, your Honor.

14         **THE COURT:**  So give me a break.

15         **MR. QUSBA:**  Absolutely.  No question about it.  A

16  couple of other things on the OPCO support agreement.

17         **THE COURT:**  Okay.  I think that helps me understand

18  the OPCO support agreement.  Thank you.

19         **MR. QUSBA:**  Your Honor, a couple of other things on

20  the OPCO support agreement.  Ms. Steingart, I think, spent a

21  little bit of time and said, hey, look, the support -- the OPCO

22  support agreement and the PROPCO support agreement, they can

23  each blow up.  We've got dates that have past.

24         **THE COURT:**  That's exactly right.

25         **MR. QUSBA:**  Your Honor, we would not be wasting your

266

1    time if we weren't those dates.  We would not be wasting your

2    time.  We will amend those dates.  In fact, we will use the

3    dates that you suggested at the beginning of this hearing with

4    respect to disclosure statements, confirmation hearings,

5    auctions and the like.

6          **THE COURT:**  Well, if you don't, as I indicated, I'd

7    have a difficult time confirming any plan consistent with

8    1129(a)(1), (2) or (3).

9          **MR. QUSBA:**  I'd have a difficult time appearing

10   before you then.

11         **THE COURT:**  Good.

12         **MR. QUSBA:**  I understand that.  We all understand

13   that.

14         Lastly, your Honor, the splinters reference in their

15   papers that -- something about vote designation because of the

16   plan support agreement, the OPCO plan support agreement.  First

17   of all, they did it in a response.  Certainly that's not

18   procedurally adequate and they cite to a couple of Delaware

19   cases which subsequent to the Delaware decisions, actually

20   there's been a bench decision and *Owens Corning Ware* -- the

21   Delaware Court tried to distance itself with some of the plan

22   support agreements, I think, by -- or decisions by Judge

23   Walrath but more importantly in this Circuit, the cases in this

24   Circuit have taken a different view with respect to plan

25   support agreements, particularly with respect to whether they

1   constitute or should lead to vote designation with respect to

2   the parties who execute them.

3           In particular, your Honor, Courts here in the Ninth

4   Circuit, I believe, Nevada -- I have cites, *In Re: Snyder*

5   B.R.432, *In Re: Pioneer* 246 B.R. 626 take a very narrow

6   interpretation of solicitation in order to promote negotiations

7   and that's exactly what this support agreement is, as you

8   referenced, a giant LOI negotiation.  And those Courts, I think

9   *Snyder* at 437 says, "Anything short of a request for an

10  official vote either accepting or rejecting a plan is not

11  solicitation."  We don't have a plan that we could possibly be

12  soliciting votes for.  We don't have a disclosure statement.

13  All of that the Debtor is working on and they'll get it around

14  when they can get it around obviously subject to your

15  requirements as far as dates are concerned.

16          So if there are any other questions, your Honor, I

17  turn the podium over to Mr. Nyhan.

18          **MR. NYHAN:**  Good afternoon, your Honor, Larry Nyhan

19  on behalf of the PROPCO lenders.  Your Honor, is it okay if I

20  put my water bottle up on that?

21          **THE COURT:**  That's fine.

22          **MR. NYHAN:**  Thank you.  Your Honor, I'm not -- I'm

23  going to endeavor not to repeat any of the issues that

24  Mr. Qusba has discussed and I'll try to be brief.  I'd like to

25  first address the transition events.  Ms. Steingart expressed a

1  great deal of concern about the number of transition events in

2  the amended MLCA and your Honor did ask as part of that whether

3  OPCO had the obligation to provide the transition services and

4  the answer to that is "Yes."  I think that -- and also I think

5  Ms. Steingart suggested that the services would be provided for

6  less than what was contemplated under the original MLCA and

7  that is not the case.  In fact, the compensation is the same

8  except that it actually could be more expensive.  If your Honor

9  looks at Section S, Romanette ii of the amended MLCA --

10          **THE COURT:**  Hang on.  Please --

11          **MR. NYHAN:**  Yes, your Honor.

12          **THE COURT:**  -- citation?

13          **MR. NYHAN:**  It was Section S, Romanette ii of the

14  amended MLCA.  There is now a requirement --

15          **THE COURT:**  What page?

16          **MR. NYHAN:**  I --

17          **THE COURT:**  M2?

18          **MR. NYHAN:**  S2.

19          **THE COURT:**  S2.  I'm sorry.  I'm sorry.  One moment.

20  That would be at Page 38 based, at least on the redline.

21          **MR. NYHAN:**  That's correct, your Honor.

22          **THE COURT:**  All right.

23          **MR. NYHAN:**  There is now an obligation to begin

24  paying management fees at the time that another bidder is

25  selected as the successful bidder.  Now, your Honor will recall

1    that under the original MLCA there was an initial transition

2    period of 60 days during which no management fee was -- it was

3    essentially without cost to PROPCO from the perspective of a

4    management fee.  So in effect, just -- not that it's a huge

5    issue, we could end up having to pay management -- excuse me.

6    PROPCO could end up paying management fees sooner than it would

7    under the original MLCA.

8         But the real issue concerning the transition events,

9    your Honor, I think goes to the question of the timing at which

10   transition services can be required and I think we have to put

11   it in context of the -- again, the mechanics of the original

12   MLCA.  The original MLCA was going to be a three-month deal, as

13   we know, and a couple of different things happened and, your

14   Honor, recall the PROPCO lenders were not at the table in

15   negotiating the original MLCA.  PROPCO and OPCO negotiated that

16   and it was very clear that there would be a three-month period

17   of time during which the rent would be reduced.  It was a

18   deferral period.  The time within which OPCO had to assume or

19   reject the master lease was deferred for that period of time

20   and at the conclusion of that three-month period, the original

21   rent terms snapped back.

22        So the reduced rent that OPCO enjoyed during that

23   deferral period was eliminated and the original rent terms were

24   reinstated.  Now, that period of time has been extended by

25   agreement, the deferral period, as the different matters

1    proceeded before the Court but the latest extension runs out in

2    mid-June and if the PROPCO lenders were to say -- fold our arms

3    on our chest and say, there's no agreement for any further

4    accommodation to OPCO, OPCO would be faced with both a deadline

5    in mid-June to assume or reject the master lease and a snap-

6    back of the rent obligation to the full amount if it didn't --

7    if it elected to assume the lease.

8         In that circumstance, mechanically there's virtually

9    no question based upon what's transpired in the last six months

10   before your Honor that the lease would be rejected and the

11   consequence of the lease being rejected is that the transition

12   services period would initiate.  Now, what have we done in the

13   modified MLCA?  Well, the PROPCO lenders have agreed to reduce

14   the rent to essentially break even.  They further agreed to

15   extend the period of time and, your Honor, that reduced rent

16   continues -- that agreement for reduced rent continues until we

17   confirm the plan.  Also have agreed to extend the time within

18   which OPCO can assume or reject the lease again until we get to

19   plan confirmation.

20        So the mechanics resident in the original compromise

21   agreement that would have permitted the PROPCO lenders to say,

22   we want transition services and we want them now.  We're not

23   going to give you any further accommodation on the rent or on

24   the time period within which to assume or reject.  Those

25   mechanics are gone and we replace those mechanics with a series

271

1    of events that are tied to, are we going with the joint plan or

2    not.  Are we getting to a point where something has occurred

3    which indicates that there's going to be a separation and

4    therefore a need for the transition services?

5           And, your Honor, Ms. Steingart pointed you to Exhibit

6    C, Transition Events on Page 58, Paragraph 4 --

7           **THE COURT:**  I'm there.

8           **MR. NYHAN:**  -- and I wanted to go back to this one,

9    your Honor, because she left out some language which I think is

10   very relevant to the point I'm trying to make and it's not --

11   Section 4 does not say that it's a termination event if the

12   existing plan -- support for the existing plan is revoked.  It

13   says that if the Debtor withdraws or revokes the proposed plan

14   or announces its intention not to support the proposed but

15   there's a bid exception and the exception is connection with

16   pursuing a stand-alone plan of reorganization supported by the

17   mortgage lenders.

18          Again, the concept is if we end up this plan doesn't

19   go forward but we are working with the Debtor to confirm a

20   stand-alone plan for PROPCO, this agreement remains in effect.

21          **THE COURT:**  Your definition of Debtor would be the

22   PROPCO Debtor?

23          **MR. NYHAN:**  It's either PROPCO or OPCO, either one.

24          **THE COURT:**  All right.  So it's a stand-alone plan of

25   either Debtor as long as it --

1            **MR. NYHAN:**  Oh, no, no.  I beg your pardon.  It would

2    be a stand-alone -- I misunderstood your question, your Honor.

3    It would be a stand-alone plan for PROPCO.

4            **THE COURT:**  That's what I thought.

5            **MR. NYHAN:**  Yes, your Honor.

6            **THE COURT:**  That's why I asked the question.

7            **MR. NYHAN:**  Yes, your Honor.

8            **THE COURT:**  It would have to be, I would think.

9            **MR. NYHAN:**  So I don't want to dwell on the

10   termination events.  It's not a substantive change to what had

11   been in the MLCA.  It is a tweaking, if you will, of those

12   circumstances in which the transition services -- it's a timing

13   issue under which those -- the transition services will be made

14   available based upon events that we believe indicate that we're

15   no longer going forward on a combined basis.

16           **THE COURT:**  Let me ask you this.  There's a date of

17   June 21st.  Confirmation is -- go back through this.

18           **THE CLERK:**  The confirmation hearing date is --

19           **THE COURT:**  The confirmation hearing date is now --

20           **THE CLERK:**  August --

21           **THE COURT:**  -- August 27th, is it not?

22           **THE CLERK:**  August 27th.

23           **THE COURT:**  And the sale date is?

24           **THE CLERK:**  August 9th.

25           **THE COURT:**  August 9th.  So that -- what is the

273

1   implication of those two hearing dates with the June 21st?

2          **MR. NYHAN:**  The June 21st relating to the tax

3   contingency -- the diligence contingency?

4          **THE COURT:**  Yes.

5          **MR. NYHAN:**  Your Honor, we're going to have to fish

6   or cut bait on that contingency by June 21st.  So by the time

7   any other bids come into place, if we're still standing, that

8   contingency is gone.

9          **THE COURT:**  If we are still standing -- who is "we"?

10         **MR. NYHAN:**  I beg your pardon, your Honor.  If PROPCO

11  -- excuse me.  If the purchasers are still standing -- have not

12  exercised the diligence out --

13         **THE COURT:**  That would be FG and --

14         **MR. NYHAN:**  FG and the PROPCO lenders.  If they have

15  not exercised the out by June 21st, they are bound.  That

16  diligence contingency is gone and we're moving forward.

17         Your Honor, let me turn to the transfer event.

18  Again, Ms. Steingart asked the question of why would the

19  transfer event occur in a circumstance in which the plan of

20  reorganization embodying our proposed -- when I say "our," I

21  mean again the PROPCO lenders and FG's proposal to acquire

22  OPCO.  If that's not confirmed, why is that a transfer event?

23  And the answer -- and it's a good question and the answer is

24  very straightforward, your Honor.  Again as Mr. Qusba

25  indicated, the deal we negotiated was that if we give a firm

274

1    stalking horse bid and we honor our obligations under the bid

2    in connection with that bid and that bid does not close for

3    reasons beyond our control, we then are entitled to receive the

4    assets on the terms agreed.

5            Now, the transfer events, therefore, track primarily

6    two situations when that occurs.  Mr. Qusba referenced this.

7    The first is if there's a topping bid and the period of time

8    for us to get an alternate bid has expired.  So essentially if

9    there's a topping bid, people are going for it.  At that point

10   we're not going to be the bidder -- excuse me -- the buyer and

11   so we get the benefit of our bargain.

12           The other circumstance is if the Court, your Honor,

13   refuses to confirm a plan on a cram-down basis.  Now, why do we

14   do that?  The reason, your Honor, is that I can point to

15   Mr. Goldberg who claims to have numerosity -- a numerosity

16   block was his statement -- with respect to the splinter group

17   of banks.  Now, part of the transaction, your Honor, in this

18   plan involves the extension of financing by the PROPCO lenders

19   to the buyer, material part of the plan and quite frankly, I

20   expect it's going to be a material part of any bidder's

21   proposal here.

22           As your Honor knows, we cannot expect to have the --

23   outside of a bankruptcy proceeding and in particular outside of

24   a plan of reorganization, we cannot cause lenders, require

25   lenders to extend financing in connection with an acquisition.

275

1    So either the class of PROPCO -- excuse me -- OPCO lenders is

2    going to agree by a requisite class vote to support the

3    extension of financing to the bidder or the Court is going to

4    have to determine that the Court can impose that extended

5    financing on a cram-down basis and if the Court -- if the class

6    either accepts or the Court believes that the Court is

7    appropriate to cram down, the plan gets confirmed and we're all

8    on our way.

9         If, on the other hand, the Court does not -- excuse

10   me -- there is not class acceptance and the Court is not

11   comfortable cramming down -- we think it is a cram-down issue,

12   that it can be crammed down but if the Court disagrees and

13   declines to confirm the plan, in that circumstance, we are

14   still entitled to the benefit of our bargain, that is the

15   transferred assets at the agreed price because we did

16   everything that we agreed to do and it was factors beyond our

17   control, namely the dissidents of the OPCO lenders that

18   prevented the transaction from being completed.  So that's why

19   the transfer event will occur in a circumstance where the plan

20   is not confirmed or the Court declines to cram it down.

21        That, your Honor, also addresses another issue that's

22   been raised and that is the question as to why does this

23   transaction have to be tied to a plan of reorganization.  It's

24   the very same answer, your Honor.  There is no way that anybody

25   could reasonably expect to get unanimity from the group of OPCO

276

1   lenders with respect to debt financing for this plan, no way

2   and we expect -- we don't know but we expect -- and Mr. Qusba

3   could be -- is more knowledgeable about this than I am but we

4   expect that any bidder who comes in here is going to want that

5   financing.

6           So certainly with respect to the plan that's on the

7   table and the stalking horse bid and in all likelihood with

8   respect to any competing bid, there is going to have to be a

9   means of approving that extended financing and the only way to

10  do it absent unanimity -- excuse me -- absent unanimity is

11  through a plan of reorganization.  So all other issues aside,

12  this transaction is going to have to be done through a plan.

13          A point of clarification, your -- I'm sorry.  Did

14  your Honor have questions?

15          **THE COURT:**  No.

16          **MR. NYHAN:**  A point of clarification, Ms. Steingart

17  referred to --

18          **THE COURT:**  Excuse me, yes, I do.  I understand the

19  reasons that the stalking horse bidder and PROPCO wants the

20  benefit of its bargain but does that address the issue of the

21  benefit that may not be accruing to the -- to all the OPCO

22  creditors in that situation if that bargain is at a number --

23  is valued at a number that is less than what could be obtained

24  if -- subject to its own auction --

25          **MR. NYHAN:**  Well --

1          **THE COURT:**  -- for those assets?  I hope that

2   question makes sense.

3          **MR. NYHAN:**  I think I understand the question, your

4   Honor, and I want to get to it in a minute, the whole issue of

5   a separate auction or an auction of these assets but I think

6   the answer to that question is -- turns on the reasonableness

7   of the proposed settlement because if -- given all the factors

8   that are germane to evaluating the reasonableness of that

9   settlement, the Court concludes that it should be approved or

10  it warrants approval, then the fact that the bargain, as it

11  were, will be effected even if a plan is not confirmed on the

12  basis that I've stated should withstand any scrutiny.

13          I just wanted to touch briefly, your Honor, on the --

14  what I think was the phrase, "the excluded asset optionality"

15  and just to be clear, while I understand that the Debtor's bid

16  procedures envision the circumstance where the stalking horse

17  bidder may elect to exclude -- let me not use a double exclude

18  -- to omit from taking title to certain of the excluded assets

19  and has provided in the bid procedures to deal with that

20  circumstance, there is no optionality from the perspective of

21  the stalking horse bidder with respect to paying the

22  consideration required, the 35 million and assuming the

23  liabilities.  If the stalking horse bidder takes any excluded

24  liability, computers, software, anything, we pay the full

25  price, full stop and while I --

1          **THE COURT:**  What if they don't take any?

2          **MR. NYHAN:**  Pardon me?  If we don't take any?  Your

3     Honor, I can assure you that we wouldn't have spent the time

4     that's been spent here to fight for this agreement to not take

5     the assets that are very important to us.

6          **THE COURT:**  Then why is that contingency in the

7     bidding process?

8          **MR. NYHAN:**  The contingency is in there, your Honor,

9     I assumed to deal with the circumstance in which we elect to

10    exclude some portion of the excluded assets from our taking

11    title to them in which case the question is, what happens to

12    them and the answer is that the --

13         **THE COURT:**  They're sold.

14         **MR. NYHAN:**  They're sold the bidder subject to the

15    liens of the --

16         **THE COURT:**  Sold to the bidder and you still have the

17    obligation to pay the 35 plus assume that in all of that

18    other --

19         **MR. NYHAN:**  That is correct, your Honor.

20         **THE COURT:**  -- the consideration still flows.

21         **MR. NYHAN:**  That is correct, your Honor.  So we do

22    not have an option to scale down what we're paying here.

23         **THE COURT:**  That probably needs some clarification.

24         **MR. NYHAN:**  Your Honor, I'd like to turn now to this

25    question of a market test for the excluded assets and what I

1    really want to talk about are the assets that are subject to

2    the modified lease agreement -- compromise agreement.

3           We've got, by my count, basically five categories of

4    assets.  We've got computers and software.  We've got

5    furniture, fixtures and equipment.  We've got the customer

6    lists, or more accurately, the primary customer lists.  We've

7    got what I would refer to as temporary transitional licenses --

8    essentially those licenses that are granted to PROPCO to use;

9    for example, the Station brand for a limited period of time as

10   it de-brands and transitions out of the use of those property

11   rights.  And then we've got the PROPCO brands; that is, brands

12   that are unique to PROPCO.

13          Now, I think the real question and your Honor really

14   put your finger on it earlier when you said that the relevant

15   inquiry should be, "What is the value," or certainly a relevant

16   inquiry is, "What is the value to PROPCO versus what is the

17   value to OPCO?"  But when we talk about an auction process or

18   including excluded assets in the auction, then what we're

19   talking about is what is the value of these assets to a buyer

20   of OPCO's assets?  Because the question is, is it going to

21   increase?  Is it going to raise the needle on the purchase

22   price or not?  And I think if we look carefully at each of

23   these categories, we'll see that it's not and, in fact, there

24   are restrictions in the existing compromise agreement that

25   would be violated if, in fact, these were put into an auction

280

1    like that.

2         Now, let me first identify or go back on those

3    categories and identify those to which PROPCO is entitled under

4    the existing MLCA -- not amended MLCA, but the existing MLCA --

5    without paying additional consideration or the PROPCO lenders

6    are entitled to under the MLCA.

7         First is the furniture, fixtures and equipment at the

8    different OPCO subsidiaries that are operating the four

9    casinos.  Those are all subject to liens in favor of the PROPCO

10   lenders and under the existing MLCA we are entitled to get

11   those.  So, those can't be put in the auction.

12        Second is the customer list.  Well, your Honor, under

13   the existing MLCA, PROPCO is entitled to get the customer list.

14   Now, I know there's an issue of exclusivity and I want to come

15   back to that in a minute.  But PROPCO doesn't have to pay for

16   the customer list.  It's entitled to get it.  So, customer

17   list, subject to the exclusivity point, shouldn't be in an

18   auction.

19        The third is temporary transitional licenses.  Again,

20   under the existing MLCA, PROPCO's entitled to it.  It doesn't

21   pay any additional amount for it.

22        And then, finally, there are the PROPCO brands and

23   the PROPCO brands -- I'm sorry.  I skipped over the computers

24   and software.

25        The IT and IP system and the PROPCO exclusive brands

1    are two categories of property to which PROPCO is entitled but

2    for which a price must be determined.

3          Now, before I turn to those two, let me go back to

4    the customer list for a moment.  As I understand the objectors'

5    argument, they're saying the primary customer list that belongs

6    to PROPCO, or PROPCO's primary customer list, basically should

7    be offered to a competitor -- namely the only one identified is

8    Boyd -- to see if Boyd would pay for this very sensitive

9    competitor information.  Now, I acknowledge, your Honor, that

10   the existing MLCA is silent on the issue of exclusivity.  It

11   says that PROPCO is entitled to the primary customer list.  It

12   doesn't say to the exclusive use of the primary customer list.

13         But your Honor, I cannot believe -- and again, we

14   were not at the table -- "we" meaning the PROPCO lenders were

15   not at the table -- negotiating this.  But I cannot believe

16   that the parties who did negotiate this, or the Court for that

17   matter, understood that giving PROPCO the right to its primary

18   customer list under the MLCA also meant that OPCO could turn

19   around and run down the street right after doing that and sell

20   that very -- that exact, highly competitive information to

21   Boyd.  That could not have been the intention.

22         And, in fact, it's clearly not the debtor's

23   intention, as reflected in the bid procedures, because the

24   debtor has provided, as your Honor pointed out earlier, that

25   the casinos -- the different casino properties -- can be sold

1  separately or that is to say that bidders can bid for

2  individual casinos, or they can bid for all the casinos.  It's

3  up to the bidder.

4          But the debtor has been very careful to provide that

5  the primary customer list information relating to a particular

6  casino will remain with that casino and will be exclusively

7  used by that casino.  And, in fact, the debtors have required,

8  in connection with the agreements with PROPCO, that PROPCO

9  agreed that if PROPCO is not the buyer of OPCO and PROPCO

10 receives the customer list as it's entitled to receive it under

11 the MLCA, then PROPCO must purge the customer list it receives

12 of primary customer data from the other casinos.

13         That's how it's all set out right now, your Honor.

14 So, while I can't believe that the interpretation suggested by

15 the objectors is anything that anyone expected when the

16 original MLCA was negotiated and when the agreement to give

17 PROPCO its own customer -- primary customer -- list was

18 included in that agreement, I would say, your Honor, if there

19 was ever a case of a circumstance where what's good for the

20 goose is good for the gander, this is one.  It would be highly

21 inequitable to permit the OPCO estate to essentially sell

22 highly competitive customer list information from PROPCO to

23 PROPCO's competitors, but at the same time require PROPCO to

24 purge from the customer list to which it is entitled any

25 primary customer information from the other casinos.

1          But let me go back.  How is a market test going to

2   demonstrate that people would pay more for the excluded assets?

3   Well, I don't think it's going to, your Honor.  Now, we've

4   already talked about FF and E.  We've talked about the customer

5   list.  We've talked about transitional licenses.  None of those

6   are being sold to PROPCO.  PROPCO's got a right to them under

7   the MLCA as it exists today.  Period.  Full stop.

8          So, what's being sold and therefore under the

9   objectors' argument should be subject to some form of market

10  test are the computers, the IT systems and the IP systems --

11  excuse me -- the IT systems and the software that runs those --

12  and the PROPCO brands -- PROPCO exclusive brands.

13         Let's look at those individually.  The deal that's

14  been cut with respect to the excluded assets essentially

15  requires that the stalking horse pay -- the PROPCO lenders pay

16  -- $30 million cash.  Everyone will deduct from that the what I

17  think is an undisputed $15 million that's going to be required

18  to stand up, I think is the expression, OPCO.

19         Now, any buyer of OPCO, if this transaction is

20  approved, any buyer of OPCO will end up with a turnkey state of

21  the art computer system.  They will end up with all ownership

22  of all of the software.  So, if you were to say to a bidder,

23  "Well, you know, you're not going to get a turnkey system.

24  You'll get all the software but not a turnkey system.  But you

25  will get the two server systems that are on PROPCO properties.

1   It's just going to take a while to get it.  And then, you can

2   use those to run your operations or sell them, if you wish,"

3   what is the impact going to be on the price?  No buyer is going

4   to increase its price for the privilege of getting ten-year-old

5   computer systems that reside in PROPCO, particularly when they

6   don't have a turnkey system because of that arrangement for

7   their own operations the day after they close.

8           We've heard the testimony of Mr. Krieger about the

9   nightmare associated with trying to shut down those servers,

10  bring them over -- this is the rip out, as your Honor has read

11  the testimony.  Any purchaser facing that I suggest to your

12  Honor is going to say, "No, thank you.  I want a stand-up

13  system and whatever it cost.  I'm not going to wait."  And by

14  the way, your Honor, let's not forget that under the existing

15  MLCA, PROPCO has the right to be serviced with those computers

16  uninterrupted -- uninterrupted -- for 150 days once the

17  transition period starts.

18          So, it's not only a question of the problems

19  associated with taking those servers out, putting them into the

20  operations and starting them up again, it's also the question

21  of a purchaser can't even begin to do that until the full

22  transition period has expired.

23          And I suggest to your Honor that in that

24  circumstance, the purchaser -- unless they're just not going to

25  use the system at all because they've got their own systems, in

285

1  which case they're not going to be prepared to pay much for

2  them, if anything -- I suggest, your Honor, that in that

3  circumstance, a purchaser is going to say, "Uh-uh.  I've got to

4  be stand up.  I've got to have a new computer as my backup and

5  I've got to have the upgrades that are necessary so that my

6  business runs from day one.  And whether I pay for it and

7  reduce the purchase price or whether the case comes out of

8  OPCO, either way, it's going to have to be done."

9        So, with respect, your Honor, to the computer

10  systems, I don't think any buyer is going to pay one dime more.

11  In fact, they will reduce their price if they don't get the

12  turnkey system that this deal affords them.

13        But that's not where the trouble stops, again on the

14  computers.  I know that we've heard that the ownership dispute

15  and lien disputes relative to the computer systems, they've

16  been characterized, I think, by Mr. Goldberg as a ruse; that we

17  haven't, you know, heard about this before.  So, people have

18  evidently made up this issue.

19        Well, let me address the timing.  There's a good

20  reason why you haven't heard these fights -- battles -- before,

21  your Honor.  And that's because there's not been a reason to

22  have to determine ownership or lien overlap, because we weren't

23  separating things.  When we engaged in negotiations with the

24  OPCO lenders and when both the OPCO lenders and the PROPCO

25  lenders looked to the respective debtors and said, "Who owns

1   this stuff?  Where is title?  How was it acquired?  Where's it

2   located?  How does it work?" everyone began to learn a lot more

3   than we thought we ever needed to know about the IT systems.

4   And a couple of very serious potential disputes arose out of

5   that investigation.

6           Your Honor has heard the testimony of how the debtor

7   believes that the fractionalized ownership concept; that is to

8   say, they allocate expenses between OPCO and PROPCO on a

9   percentage basis and all these computer systems and everything

10  else are acquired -- software, as well -- developed, based upon

11  a 40/60 split and, in their view, it's a 40/60 ownership split.

12  One dispute, that because 40 percent of the expenses were

13  attributable to the PROPCO side, 60 percent to OPCO side, so if

14  they had to determine who owned this equipment and the software

15  that was purchased and/or developed on a shared expense basis,

16  they would say 40/60 -- 40 percent OPCO, 60 percent PROPCO.

17  Excuse me.  I reversed that.  It sounds better that way,

18  though.

19          The OPCO lenders would certainly dispute that.  But

20  there's going to have to be a basis and there's going to have

21  to be a determination by this Court as to how title is

22  determined with respect to that equipment.  That's argument

23  number one.

24          Fight number two you saw in FG PROPCO's pleadings

25  concerning the question of whether the servers that have been

1   in the PROPCO locations for some ten years now and are fixed to

2   the premises are fixtures, which, under law would become part

3   of the PROPCO -- would be owned by PROPCO.  Fight number two.

4          Fight number three, under the agreements that exist

5   in connection with the PROPCO financing, PROPCO receives a lien

6   -- was granted a lien by OPCO on equipment and other mechanical

7   devices that are situated at and used in the operation of the

8   PROPCO properties.

9          So, you have three separate fights that are going to

10  have to be addressed:  Who owns it and how much? -- the

11  fractionalized interest fight; Are there fixtures? -- the

12  PROPCO fixtures, they're mine fight.  And then the third fight

13  is under the relevant loan documents and security agreements,

14  whose got the prior lien on this?  So, are these potential

15  fights a ruse?  I think not, your Honor.  You see how much time

16  and energy is devoted to challenging the settlement on the

17  excluded assets.  I can assure you that a multiple of that will

18  be spent on fighting these issues if the settlement's not

19  approved.

20          Now, there's one other issue that complicates this,

21  your Honor, as it relates not only to the computers but also to

22  the PROPCO brands -- unique PROPCO brands.  Now, we've heard,

23  your Honor, that PROPCO doesn't really compete with OPCO and

24  OPCO, a buyer of OPCO, would not have -- certainly from the

25  debtor's side, at least -- any use for the PROPCO brands.  But

288

1    let's just put that aside, because what's being proposed is

2    that we take the brands and we auction them and the highest

3    bidder wins -- same thing with the computers, presumably,

4    although as I explained, I don't see how that works.

5          But there's another problem and the problem is that

6    under the existing MLCA, PROPCO's got the right to buy those

7    brands.  It's unequivocal.  It doesn't say it's got the right

8    to buy them in an auction.  It doesn't even mention auction.

9    It says, "PROPCO will have the right to buy those brands."

10         Now, it's got to pay for them and the pricing term is

11   left open.  And how does the MLCA deal with the pricing term?

12   It says, well, there's got to be an agreement as to pricing.

13   And if there's no agreement, it says your Honor's going to

14   determine the value.  There's going to be a valuation fight in

15   front of your Honor.  That's how it is determined.

16         Now, how can you put an asset in an auction, your

17   Honor, and say, "This is going to go to the highest bidder,"

18   when there's already a Court order in place saying that PROPCO

19   gets that asset?  You just can't do it, your Honor.  It would

20   violate the MLCA.

21         Now, we were all aware of the provision of the MLCA.

22   We wanted to get a deal on the excluded assets.  And we said,

23   "Let's try to reach an agreement."  And who did we -- and when

24   I say "we," I mean PROPCO and the PROPCO lenders, and FG -- who

25   did we negotiate with?  Well, we negotiated with OPCO.  We

 1   negotiated with the OPCO lenders.

 2          And why?  Well, because OPCO owns a substantial

 3   amount of the excluded assets, although not all.  And the OPCO

 4   lenders have liens on all -- most all -- of that which OPCO

 5   owns.  And it's pretty evident, at least based upon the level

 6   of the stalking horse bid and the level of the OPCO debt, that

 7   the OPCO lenders, any way you look at this, are going to have a

 8   significant deficiency claim.  They have the primary economic

 9   interest in those assets.  They have an economic interest that

10   is completely adverse to the economic interest of the PROPCO

11   lenders and FG as it relates to those assets.  And the

12   negotiations ensued.  They were very difficult and they

13   concluded.

14          Now, your Honor, I believe that the intent of the

15   MLCA was to say, "Adverse parties should negotiate and reach

16   agreement on the price and if they do, that's the price."  And

17   if they cannot reach agreement, then your Honor will decide.

18   Well, your Honor, that's precisely what's occurred here.  There

19   can be no question but that the OPCO lenders had every economic

20   interest to maximize what they received from those assets and

21   that the PROPCO lenders had every bit as much interest in

22   minimizing it.

23          So, your Honor, I think that that --

24          **THE COURT:**  Where are the debtors in this?

25          **MR. NYHAN:**  They are participating.  They are

1    providing information.  They are assisting the parties and

2    resolving open issues.

3              **THE COURT:**  It's their assets.

4              **MR. NYHAN:**  That is correct.  I don't mean to

5    suggest, your Honor, that the debtors did not have a very

6    active role in this.

7              **THE COURT:**  What was it?

8              **MR. NYHAN:**  They were fully involved in the

9    negotiations.

10             **THE COURT:**  What was OPCO's role?  I don't have --

11   where's the testimony regarding the active negotiations by OPCO

12   as the debtor?  What I have read, unless I missed a point --

13   and perhaps Mr. Kreller could help me when he argues -- is that

14   as Dr. Nave said, "The negotiations occurred between the

15   lenders because the lenders were the owners and they kept us

16   informed."  And as Mr. Goldberg said, "We facilitated the

17   discussions."  Mr. Haskins said, "I facilitated and provided

18   information."

19             The sense I get from this is that it was a

20   recognition that the real economic control or leverage in that

21   was at the level of the lenders and not at the level of the

22   debtors.

23             **MR. NYHAN:**  Oh, I think that's right, your Honor.

24   When it goes to the question of the economics -- in other

25   words, the price -- if the OPCO lenders were prepared to accept

1  a price for their collateral that the PROPCO lenders were

2  prepared to pay, I don't think that the debtors viewed it, and

3  certainly the debtors can speak for themselves, but viewed it

4  to be their position to say, "You people don't know what's in

5  your own best interest.  These numbers are not right."

6          I mean, clearly, the economic stakeholder on --

7          THE COURT:  Well, a debtor in possession has the duty

8  to maximize the value of the assets for all of its creditors.

9          MR. NYHAN:  Yes, your Honor.  Well, it wasn't the

10  question, though.

11          THE COURT:  So, if I'm the debtor, I say -- 'cause

12  here's what I'm being told.  "You're selling these assets.  You

13  don't even have good valuations; in fact, you don't have any

14  real valuation testimony.  You've got some indicative value of

15  some, if not all, of the assets.  I understand others have

16  already been subject to a master lease compromise agreement.

17  But those that aren't, even aren't subject to that, we think

18  could further benefit our creditors and you should get more."

19  How do you respond to that?

20          MR. NYHAN:  I mean, I guess --

21          THE COURT:  Because that's what I've been told.

22          MR. NYHAN:  Well, first of all, your Honor, the

23  debtors were fully involved in these discussions, because their

24  knowledge of the assets was essential for parties to be

25  informed with respect to negotiations.

1          **THE COURT:**  Did the debtors negotiate the

2     consideration?

3          **MR. NYHAN:**  I think that it is fair to say that the

4     debtors were involved in the negotiations and the

5     consideration.

6          **THE COURT:**  So, the answer is no.  They were

7     involved.

8          **MR. NYHAN:**  Well, your Honor, I don't think --

9          **THE COURT:**  Did I miss it?  Because I didn't see any

10    testimony by any representative of the debtor that they

11    negotiated the value to be paid, or the consideration to be

12    paid for the excluded assets other than they were satisfied

13    with the work that had been done by the lenders and the

14    lenders' advisors.  That's what I thought I read.

15         **MR. NYHAN:**  Well, I think that's fair, your Honor.

16         **THE COURT:**  All right.

17         **MR. NYHAN:**  So, your Honor, at this point I will echo

18    Mr. Qusba, but only briefly.  This is a comprehensive

19    settlement.  The OPCO estate receives a firm stalking horse

20    bid; got the Texas put issue fixed.  If there's an overbid,

21    they will also receive the $35 million plus the assumed

22    liabilities of $13 million in connection with the excluded

23    assets.  It will eliminate litigation over who owns the

24    excluded assets and who's got liens on them.  Importantly, it

25    provides a turnkey operation for any OPCO buyer.

1            In the PROPCO lenders and FG's perspective, if

2    there's no overbid, we end up with the OPCO assets.  If there

3    is an overbid or if the plan cannot get confirmed, we have the

4    certainty of a fixed price for the excluded assets.  And that

5    is -- and I'm sure your Honor appreciates that -- but that is

6    critical to the willingness to provide a stalking horse bid.

7            Your Honor, I'm delighted to answer any further

8    questions you might have, but that concludes my presentation.

9    Thank you, your Honor.

10           **THE COURT:**  Who's next?

11           **MR. GARCIA:**  Your Honor, I'll be very brief.

12           **THE COURT:**  Does anybody need a break right now?  Let

13   me just ask you.  Okay.  Let's get going.  You all right,

14   David?  You all right?  Okay.

15           **MR. GARCIA:**  Your Honor, I will narrow my comments as

16   much as I can to not restate what's already been stated by

17   Mr. Qusba and Mr. Nyhan.

18           I think it is important, though, your Honor, that we

19   view this compromise from all angles, including the angle of

20   PROPCO; and that is that it's been sort of lost here through

21   all this litigation and noise and it should be clear is that --

22   and Mr. Goldberg stated this a little bit -- and that is PROPCO

23   has its own creditors.  OPCO has its own creditors.  PROPCO is

24   a debtor in possession.  PROPCO is entitled to all of the

25   protections of the Bankruptcy Code.  It's entitled to the

1    equitableness and the protections that the Bankruptcy Code

2    provides regarding the automatic stay, with regard to not being

3    gouged.

4         It's important, your Honor, that we view this from

5    the PROPCO side, at least at some point, and that is there are

6    no objections at all on the PROPCO side.  There have been no

7    objections whatsoever.  PROPCO lenders are on board.  The mezz

8    lenders are on board.  There are no objections whatsoever on

9    the PROPCO side.  The only objections are from the OPCO side,

10   which is the committee and the splinter group.

11        **THE COURT:**  And their response is, "Well, there

12   shouldn't be any objections because you're getting such a great

13   deal."  I can figure that one out.

14        **(Laughter)**

15        **MR. GARCIA:**  Fair enough.  So, let's address the

16   "great deal" that PROPCO is getting, but I do want to clarify

17   some points that were made by Ms. Steingart and Mr. Goldberg.

18        **THE COURT:**  Please.

19        **MR. GARCIA:**  And I'll turn a phrase from

20   Mr. Goldberg.  They stated earlier, both of them did, with

21   regard to the conflict issue that Mr. Haskins was both an

22   officer at OPCO and an officer and a board member of PROPCO;

23   and that through resolution Mr. Haskins was allowed to

24   negotiate on behalf of PROPCO.

25        Your Honor, we clarified that when we were here on

 1    the 5th and I'll clarify it again today, because we've been

 2    very clear on this point.  That resolution states -- if you

 3    read the rest of that sentence -- that there shall be no

 4    changes whatsoever to documents to which they've been granted -

 5    - willing to negotiate whatsoever unless they go back to the

 6    independent directors and the complete board would vote in

 7    favor of it.

 8              So, to turn a phrase, their statement was not right

 9    and it didn't seem right when they said it and Mr. Haskins does

10    not have the ability to negotiate on behalf of PROPCO.

11              **THE COURT:**  He does not have the ability to enter

12    into any agreement.

13              **MR. GARCIA:**  Exactly.  Or make changes to any

14    agreement that has been previously approved by PROPCO.

15              **THE COURT:**  Then what is he doing?

16              **MR. GARCIA:**  Quite frankly, your Honor, there has

17    been no changes after it goes to the board of PROPCO unless it

18    goes back to PROPCO and we do a quick check with the

19    independent directors.  Those changes are fine.  We move

20    forward.

21              **THE COURT:**  All right.

22              **MR. GARCIA:**  Your Honor, the other, I think,

23    miscalculation and this was stated a little bit by Mr. Nyhan

24    and that is the pending compromise agreement is set to expire

25    in 20 days -- approximately 20 days.  At that point, your

296

1  Honor, unless it's extended further, the rent will go back to

2  the original rent.  So, we're not talking about $1.5 million.

3          **THE COURT:**  When you say the pending compromise

4  agreement --

5          **MR. GARCIA:**  The original compromise agreement.  The

6  one that's already been approved by this Court.

7          **THE COURT:**  Because I consider the pending one to be

8  the one that's in front of me now.

9          **MR. GARCIA:**  My fault, your Honor.

10         **THE COURT:**  Okay.

11         **MR. GARCIA:**  That compromise agreement that was

12  previously approved by this Court and is an order of this Court

13  and is binding on the parties.

14         **THE COURT:**  The existing.

15         **MR. GARCIA:**  The existing one.

16         **THE COURT:**  Thank you.

17         **MR. GARCIA:**  So, when we talk about, "Well, it's $1.5

18  million; it's not a big deal," it is a big deal.  Because in

19  that 20-day period that rent reduction can very much go away

20  and, I think, where we would end up is likely -- unless fees

21  agreements are approved -- is a lease rejection.  And then, I

22  do think we have litigation like we've not seen before in this

23  case.

24         Where the issues of ownership of assets, lien issues

25  and then whether or not any of these assets to which have been

1   complained of as the excluded assets would violate the

2   contract, that compromise that's already been approved by this

3   Court, by doing anything other than what we've already agreed

4   to in the pending compromise, and as stated by Mr. Nyhan, what

5   we said before when we were here back in December in that

6   agreement was that those assets would be transferred to PROPCO.

7   And those to which PROPCO had a lien on -- and I want to go

8   over that a little bit, because there's very few times that

9   PROPCO has been more aggressive than the PROPCO lenders, but

10  maybe this is one of them, but also even if it didn't have a

11  lien on them, contractually by that pending compromise those

12  assets were to be transferred to PROPCO.

13          And what were going to be the valuations of that --

14  to be determined by the parties and the parties to that

15  agreement is OPCO and PROPCO -- and we've agreed.  We were here

16  pursuant to the original compromise and we've agreed.  It was

17  only if we didn't come to agreement would we come to this Court

18  and seek this Court's valuation of what would be paid.  That's

19  already approved.  That's an order of this Court.

20          With regard to the liens, your Honor, the master

21  lease states and this is part of the compromise -- the

22  compromise states that PROPCO is to receive all lease

23  collateral -- SCI lease collateral.  It states that in the

24  compromise.  What is that?  When we get to the master lease

25  compromise, it talks about FF and E, that section 12.4 of the

1    lease.  When they defined FF and E in the lease, the master

2    lease that's been filed at least ten times in this case, it

3    includes the computer equipment.

4            I know the senior lenders disagree, the pre-petition

5    lenders disagree and we will have a fight.  And that's okay,

6    because I think PROPCO has a lien on that property.  I think

7    that property is to get transferred.  They disagree.  But

8    what's important is the pending compromise resolves all those

9    issues.

10           And as your Honor is well aware, my client, PROPCO,

11   is willing to move forward with or without the PROPCO lenders

12   if that's what's in the best interest of PROPCO.  In this

13   particular instance, we're staying on the same side of the

14   table.  In this particular instance, your Honor, I think what

15   we have looked at and said, "What makes the most sense for

16   PROPCO," that PROPCO has stated, "Quite frankly, all of the

17   estates."

18           And I think that OPCO has stated it well and that is

19   this is a holistic approach.  It's a holistic approach to the

20   entire transaction in which looking at the economics and what

21   makes sense for both OPCO and PROPCO is this compromise.  Did

22   they get every penny they could out of PROPCO with regard to

23   the excluded assets?  Unsure.  Don't know.  But what they did

24   get was a package that makes sense for everybody.

25           What doesn't make sense is to not move forward with

1   these plan facilitation motions, stop the process; and then, I

2   think what you have is ugly, nasty litigation which is exactly

3   what PROPCO wanted to avoid back at the end of 2009.  And if

4   your Honor will recall, it was the PROPCO lenders' position

5   that, "We don't want a deal.  We don't want any deal.  We're

6   happy to take our assets, foreclose on what we have liens on

7   everything.  We're ready to go home."  PROPCO didn't want to

8   see that train wreck occur.  It made sense to keep this thing

9   together, to enter into this compromise.

10          But now, our point is, "You've got to live up to that

11  compromise," and that compromise requires the transfer of

12  assets to PROPCO.  And you can't sell them separately.  Not

13  allowed to.  And if you breach the compromise, it's clear in

14  the compromise those are admin claims.  Those are admin claims

15  PROPCO would have in the OPCO estate for any breach whatsoever

16  of that compromise.

17          One point I did want to make and that was how do we

18  know whether or not we've hit the range of reasonableness with

19  regard to these assets?  And I think, your Honor, from PROPCO's

20  perspective, the way to look at this is if there had been a

21  million dollars more paid or a million dollars less paid, who

22  would benefit?  And those folks were at the table.  You had the

23  PROPCO lenders and you had the OPCO lenders and it was taking a

24  dollar out of the OPCO lenders' pocket to go into the PROPCO

25  lenders' pocket, or vice versa.

1              And your Honor, if you've got the folks who are going

2     to be the ones that are losing the money and they've agreed to

3     this transaction and they are the ones supporting this

4     agreement, your Honor, I think what you have is a fair and

5     reasonable resolution.  That's all I have.

6              **THE COURT:**  I have a question.  You represent the

7     debtor PROPCO, correct?

8              **MR. GARCIA:**  Correct.

9              **THE COURT:**  It's been alleged that what I'm being

10    asked to approve is an agreement arrived at by parties that

11    were serving two masters.  (Indiscernible) you've responded to

12    that -- corporate resolution.  And that there is -- I think,

13    primarily that OPCO -- a failure to satisfy the fiduciary

14    obligations because those folks have to be more than

15    facilitators.  What's your response to that argument?

16             **MR. GARCIA:**  What's my response that OPCO did not

17    fulfill its duty?

18             **THE COURT:**  No.  Well, first of all, the conflicts --

19    because the conflicts were also on the PROPCO side.  You've got

20    the same financial advisor, Lazard, and in fact, the folks

21    don't even know who their financial advisor is.

22             **MR. GARCIA:**  Your Honor, let me address that in two

23    points, because I do want to get a process issue first, and

24    that is there's been no objection that PROPCO didn't fulfill

25    its duty.

301

1          **THE COURT:**  I think that's correct.  I think that's

2     correct.

3          **MR. GARCIA:**  In fact, these folks don't even have

4     standing to raise the issue.  But to hit the point with regard

5     to Lazard, because I want to be specific; with regard to

6     Lazard, I can tell you PROPCO hired -- PROPCO has as its

7     investment advisor -- its financial advisor -- FTI.  We have a

8     separate financial advisor at PROPCO.

9          Do you have an objection to that?

10          **MS. STEINGART:**  Yes.

11          **MR. GARCIA:**  Okay.

12          **MS. STEINGART:**  There's no evidence in the record

13     that FTI provides any advice with respect to any of these

14     transactions that are before the Court.  There's no evidence in

15     the record of that.

16          **THE COURT:**  I think -- has FTI been hired?

17          **MR. GARCIA:**  Yes, they have, your Honor.

18          **THE COURT:**  I think that I can take judicial notice

19     of that.  I understand your point --

20          **MS. STEINGART:**  Right.  My point is --

21          **THE COURT:**  -- that they didn't have a role.  They

22     may have been hired, but they didn't participate.

23          **MS. STEINGART:**  Right.

24          **THE COURT:**  That's argument.

25          **MS. STEINGART:**  Right.  Okay.

1          **THE COURT:**  He's arguing.

2          **MS. STEINGART:**  Right.  No, no.

3          **THE COURT:**  That's all this is.

4          **MS. STEINGART:**  That was the only objection, that

5     there was not evidence.

6          **THE COURT:**  I'm fully aware of that.

7          **MS. STEINGART:**  Thank you, your Honor.

8          **MR. GARCIA:**  Your Honor, I will concede -- I'll have

9     to go back and look through the depositions -- that there is

10    zero evidence that FTI didn't provide any advice, because they

11    did to PROPCO independent lenders.

12         That said, your Honor, and I can tell you from the

13    PROPCO specific position, we don't look at Lazard as our

14    financial advisor.  Would we listen to what they had to say?

15    Absolutely.  Would we listen to what a financial advisor for

16    anyone would have to say?  We'd certainly listen to them.  But

17    PROPCO does not view Lazard as its investment advisor, its

18    financial advisor and that's clear as to -- if we'd look at the

19    rationale as to why FTI was employed in the PROPCO case.

20    Because we needed at the PROPCO side when we were addressing

21    issues with OPCO to have an independent --

22         **THE COURT:**  I want to make sure that I heard

23    Mr. Goldberg correctly.  It was during your argument.  You

24    indicated that the same -- even worse -- because the same with

25    Lazard -- represents both.  Mr. Haskins thought Lazard was the

1    financial advisor for -- in my notes -- PROPCO or PROPCO

2    lenders?

3            **MR. GOLDBERG:**  Mr. Haskins, I believe, testified that

4    he thought Lazard was the advisor for OPCO --

5            **THE COURT:**  You said Nave thought Lazard was the

6    financial advisor for OPCO?

7            **MR. GOLDBERG:**  Yes.  And I think I -- at least I

8    meant to say Haskins also thought that Lazard was the financial

9    advisor for OPCO only, not OPCO and PROPCO.

10           **THE COURT:**  Well, who thinks they represent PROPCO,

11   then, when you said it was both?  Because that's what you told

12   me and I don't understand.

13           **MR. GOLDBERG:**  Aronzon said we represent both.

14           **THE COURT:**  Because you did make a different -- okay.

15   Now, I've sorted that out.

16           **MR. PARRY:**  Your Honor, if I may, very briefly?

17           **THE COURT:**  Yes.

18           **MR. PARRY:**  A lot of this we're getting just from

19   Mr. Goldberg.

20           **THE COURT:**  Right.  But he cited to certain

21   provisions of the Haskins --

22           **MR. PARRY:**  And I want to talk about that, at least

23   with respect to Nave.  I've been trying to go through and

24   verify what he's saying.

25           **THE COURT:**  Okay.  I've got Nave in front -- I've got

1    that transcript.  I just want to get this straightened out now.

2          MR. PARRY:  With respect to Dr. Nave, if we look at

3    146, lines 17 through 22 --

4          THE COURT:  One moment, please.  Yes, I'm already

5    there.  I have that marked.

6    "What is your understanding of who Lazard -- or which entities

7    Lazard represents in these bankruptcy cases?"

8    "Lazard is the financial advisor to our board."

9    "When you say 'our board,' do you mean the OPCO board?"

10   "Yes."

11   "Do you know whether Lazard is also the financial advisor and

12   investment broker to PROPCO?"

13   Answer:  "PROPCO has their own financial advisors.  I don't

14   know the names of them."

15   "Do you understand or do you have any understanding as to

16   Lazard, whether Lazard represents PROPCO in any capacity?"

17   "When there isn't a conflict, Lazard has been financial advisor

18   to PROPCO, but in this situation, Lazard is strictly OPCO and

19   it's my understanding PROPCO has their own legal and financial

20   advisors."

21          That's what I remembered.

22          MR. PARRY:  That's not what he told us and it's, you

23   know, again, we're doing a lot of this on the fly.

24          THE COURT:  Fair enough.  I've already marked that.

25   I was aware.  Thank you.  That answers at least what Dr. Nave

1  thought.  Thank you.  Is there anything else?

2          MR. PARRY:  No, your Honor.  I was answering your

3  question.

4          THE COURT:  No, I know.  Is that it?  Okay.  Thank

5  you.  Next?  It's getting late.  We're going to keep going.

6  We're going to get done.  I don't have any choice.  I'm not

7  going to get -- this is -- in case I wasn't clear earlier, I

8  heard from the proponents May 4th and 5th -- 5th, I think.

9  I'll hear then from the objectors and hear again from the

10  proponents and that's it.  So, that's why I'm spending as much

11  time as I can verifying my notes.  Go ahead, please.

12          MR. DURRER:  Good evening, your Honor, Van Durrer,

13  Skadden Arps Slate Meagher and Flom on behalf of Dr. Nave.  I

14  believe that my partner, Eric Waxman, who defended Dr. Nave's

15  deposition is also still on the phone with us, but he may not

16  be at this hour.  His senior daughter is graduating today.

17          THE COURT:  I see his name all the way through the

18  transcript, yes, sir.

19          MR. DURRER:  Yes.  He has a graduation today, so we

20  apologize --

21          THE COURT:  Congratulations.

22          MR. DURRER:  -- that he's not able to be here in

23  person.

24          I rise for, hopefully, less than ten minutes;

25  hopefully five, to address three points, your Honor, that I

1    think are important.  One is there was a question raised, you

2    know, where was Dr. Nave?  Where is Dr. Nave?  The second is,

3    what's Dr. Nave's understanding of his responsibilities with

4    respect to the bidding procedures process?  And the third is,

5    to the extent that -- well, has there been a market test with

6    respect to the excluded assets and, if not, why not?  And I

7    think that Dr. Nave does have some information to shed on that.

8              So, first, where was Dr. Nave?  Go back to his

9    deposition transcript, page 128, quoting from the witness, he

10   actually -- most of this argument comes right out of Dr. Nave's

11   mouth.  He did me a big favor here today.

12   "Okay.  I work a lot of hours, you know.  I generally get up at

13   4:30 in the morning.  I'm at my office around 5:30.  I try to

14   end my day at 10:00.  Don't always succeed.  And I work seven

15   days a week."

16             And I'm going to skip, by the way, your Honor, "ums"

17   and "uhs" and "you knows" whenever I can to speed this up.

18             **THE COURT:**  I can read the transcript.

19             **MR. DURRER:**  I think it's important that everybody

20   hear this, your Honor, so I apologize for --

21             **THE COURT:**  No, I said don't worry about leaving out

22   -- I can read the transcript.

23             **MR. DURRER:**  Okay.

24   "But last year, you know, Stations took a mountain of my time,

25   several hundred hours, you know, pushing 900, I would say."

1          So, Dr. Nave has been in this process.  He's been in

2     it perhaps more than most people in this room and certainly at

3     considerably less compensation than the folks in this room.

4          Ironically, your Honor, and I'm a little bit ashamed

5     to say this, while some of the lawyers involved, following Dr.

6     Nave's deposition, went to dinner after the deposition, Dr.

7     Nave actually went back and performed two surgeries.  So, you

8     know, we take a little bit of offense at the comment that he's

9     not been around.  He is around.  He's very much involved.

10         All right.  You know, frankly, in this world of

11    nuance, hyperbole, whack-a-mole, Dr. Nave actually is a simple

12    guy and that doesn't mean that he doesn't have a very

13    sophisticated understanding of what's going on here.

14         So, although it might not have been in the words that

15    Mr. Goldberg would have preferred in terms of what his

16    fiduciary duty is, I think that, again, Dr. Nave is very clear

17    on what his fiduciary duty is here.  And I'm going, again, to

18    his deposition transcript; specifically, page 63 -- I'm sorry.

19    I apologize.  Page 122.

20          "What is your understanding of what that means?"

21          His fiduciary duty.  And this is starting on page 122

22    at lines 15.

23          "Well, that means I need to do my homework."

24         **THE COURT:**  Well, why don't you start at 8?

25         **MR. DURRER:**  Start at 8?  Yeah, the question by

1   Mr. Goldberg:

2           "And in the course of your service as a director on

3           various boards of directors, have you come to an

4           understanding of the term fiduciary duty?"

5           "Yes."

6           "And what is your understanding of what that means?"

7           "Well, that means I need to do my homework to make

8           sure that I'm fully informed either through written

9           material or seeking advice from the appropriate

10          people whether -- and that might be on a different

11          thing -- different on different things, but do the

12          work to have myself fully informed and then make the

13          best business decision that I can make on that vote."

14          "And is there anything else that is encompassed

15          within the meaning of that term as you understand

16          it?"

17          "I think, to me, the term is that I just do the very

18          best I can and that I do that in an honest and

19          ethical manner without conflicts."

20          I think that's pretty clear.  Dr. Nave also says in

21  this similar context, and this goes back to page 61, your

22  Honor.  He's talking about what he's responsible for.

23  Mr. Alexrod had asked him about discussions regarding

24  amendments to the bidding procedures.  And this is starting at

25  line 6.

1          **THE COURT:**  One moment, please.  Sixty-one?

2          **MR. DURRER:**  Page 61, your Honor, starting at line 6,

3   "Who were those discussions with?"

4          **THE COURT:**  Yes.  I've got that in front of me.

5          **MR. DURRER:**  Line 7, his answer:

6          "At the present time, you know, as I stated earlier,

7          I'm responsible for this and maybe it's a quirk in my

8          personality, but I have to be deeply informed and I

9          have to be very hands on.  That's just who I am.

10         We've had discussions with Lazard about how we're

11         going to do this process; telephonic meetings with

12         several people from Lazard; and also with Skadden to

13         start the process.  And one of the things that we

14         wanted was flexibility to make sure that we could do

15         what we needed to do to get the result that I

16         mentioned to you earlier."

17         And he goes on.

18         **THE COURT:**  Well, I highlighted the next paragraph.

19   You might as well read it.

20         **MR. DURRER:**  Certainly, your Honor.

21         **THE COURT:**  I'll read it, because I highlighted it.

22         "And with that meeting with Lazard and Skadden, we've

23         gone through this where we are now, where things that

24         they're doing right now, things that I've asked them

25         to do, I've told them I want to be involved in

1              everything and I want to be hands on to look at this,

2              set up exactly how we're going to do it and that's

3              where we are."

4         MR. DURRER:  And then lastly, your Honor, on this

5    point --

6         THE COURT:  By the way, just so there's no question,

7    this is my yellow highlight.

8         MR. DURRER:  This is on page 56, your Honor.  And

9    again, it's in the context of Dr. Nave speaking about what his

10   responsibility is in connection with the bidding procedures and

11   the auction process.

12        THE COURT:  You're starting at line 14?

13        MR. DURRER:  Yes, your Honor.  The question is:

14              "Please take a look at Exhibit 1.  What is your

15              understanding of your role under the proposed bidding

16              procedures?"

17        There's references to the exhibits.  The witness

18   finally answers:

19              "I'm responsible for everything about this motion.

20              Everything about it.  And I'm responsible for making

21              sure that the rules are applied in a fair manner…"

22        THE COURT:  "In a transparent manner."

23        MR. DURRER:  Yeah, I apologize, your Honor.

24        THE COURT:  Did you lose it?

25        MR. DURRER:  I did lose it.

1    **THE COURT:**  Well, I'll finish it just so we get done.

2    **MR. DURRER:**  I appreciate that.

3    **THE COURT:**  "…in a fair manner and a transparent

4    manner and that I will work with Lazard and Milbank

5    and Skadden to make sure that these rules are

6    transparent and fair.  They will do everything they

7    can to get the best result and then evaluate all of

8    that and then, at the end of the day, I'll make a

9    recommendation."

10   **MR. DURRER:**  Right.

11   **THE COURT:**  And then, Ms. Axelrod asks:

12   "And that recommendation is going to be based on

13   what?"

14   "Well, it's outlined in here.  I could turn to it if

15   you want.  There's several things.  But at the end of

16   the day, you know, our goal is to get the very best

17   deal we can for these OPCO assets and a deal that has

18   the greatest chance of closing.  You know, we want to

19   get the best price, best deal we can get and we want

20   to get it to close.  This company has been in this

21   process for a long time and this needs to happen.  We

22   need to do this in a manner that will be successful,

23   but we need to get as much as we can for these

24   lenders and need -- and close it."

25   Once again -- I read that.  Once again, the answer

1  indicates to me that he would work hard, just so you know how I

2  read this, but that so far as I can determine from this, based

3  upon the earlier reference that I read in, Dr. Nave believes

4  that the real benefit to this transaction is realizing he can

5  go to the lenders because of the amount that they're owed and

6  the value of the assets.  That's my interpretation of his

7  testimony.

8            MR. DURRER:  And as to the last issue, your Honor,

9  you know, whether there's been a market test, whether there

10 needs to be a market test for the excluded assets, he says that

11 -- and this starts on page 101 when he answers questions about

12 what drove his business judgment to come to the decision.  And

13 it's exactly what we've already heard.  We've already heard it

14 from Mr. Nyhan.  We've already --

15           THE COURT:  Page 101, line 11?

16           MR. DURRER:  Yes, your Honor.

17           THE COURT:  Read it.  Because his independence is

18 really at the crux of what these objections are, I paid a great

19 deal of attention to this deposition.  Do you want me to read

20 it?

21           MR. DURRER:  No, no.  I'm there, your Honor.  He

22 says, starting at line 14:

23           "I think that the first agreement bought time.  It

24           clearly stated that there would be more negotiations

25           on certain assets.  And I think that as it became

1          clear that this company was going to separate, that

2          everybody realized that these issues needed to be

3          addressed and more clarity brought to the situation

4          of who owned what and how they were -- how it was

5          going to be done.  And I think that, you know, OPCO

6          needed to know what was theirs, what was not theirs,

7          what they could sell, what they couldn't sell, how

8          they could come up with a plan to get to this bidding

9          process that we got now and that we had to come to

10          some agreement.

11          "Likewise, we wanted some more concessions on the

12          rent and I think it was part of the overall general

13          agreement.  But I think that the things that the

14          second compromise did was necessary and critical to

15          get to this joint plan and to get to where we are

16          today."

17          And then, the last point I want to make, your Honor,

18    is he uses a fantastic analogy; again, Dr. Nave has a way with

19    words.  And this is on page 180 of his deposition starting at

20    line 2:

21          "If there's a car sitting out there and you think you

22          own half of it and I think I own half of it, neither

23          one of us can drive it because of that, you know.  If

24          we can settle who owns it, you know, that's an

25          advantage to both of us."

1          And that's why this is all wrapped together.  That's

2     why all the plan facilitation motions are a package and they're

3     designed to get all of these debtors out of bankruptcy in a

4     reasonably prompt way.  Thank you, your Honor.

5          **THE COURT:**  Who's next?

6          **MR. WALPER:**  Your Honor, Thomas Walper, Munger Tolles

7     and Olson, representing Frank and Lorenzo Fertitta, as well as

8     Fertitta Gaming.  Your Honor, just 60 seconds, I beg the

9     indulgence of the Court before Milbank comes on with their

10    presentation.

11         I think it's just really important in light of the

12    accusations of fiduciary duty this and insider that and so

13    forth and so on.  I sort of feel like I'm having a discussion

14    with my teenagers and they're raising this and that with me.

15    But as a result of that, I think it's very important to this

16    Court and that this Court understand that the Fertittas, as

17    well as Fertitta Gaming, are independently represented by my

18    law firm.

19         We have been working tirelessly with respect to

20    issues involving fiduciary duty, issues involving board

21    meetings, negotiations, acquisition agreements, support

22    agreements, commitments and so forth and so on.  A number of

23    our lawyers have been doing it.  We get up at very early hours

24    to do it.  We are tired as well as the rest of the lawyers in

25    the room, I'm sure, are tired, as well.

1        But as well, the Fertittas know it because they're

2   paying our very large but very reasonable bills out of their

3   pockets.

4        And while, yes, the Fertittas are parties to these

5   negotiations and parties to these acquisitions and they are

6   also sitting on the OPCO board, we firmly believe and they

7   firmly believe that they have been important catalysts to this

8   reorganization process.  They've lent cash as well as they have

9   lent their experience and management of these properties to the

10  PROPCO bid.  They have provided an absolute exit to OPCO by

11  supporting without any kind of break-up fee the OPCO stalking

12  horse bid.

13       Your Honor, I think that --

14       **THE COURT:**  Well, I kind of look at the break-up fee,

15  to be candid with you, as kind of a wash.  They're not getting

16  a break-up fee, but the result is (indiscernible) PROPCO

17  assets.  So, there's kind of a benefit.

18       **MR. WALPER:**  Sure, your Honor, but at the same time,

19  you know, I'm not telling you anything new, break-up fees are

20  fairly standard.  We've advised them, of course, that break-up

21  fee in this context doesn't make any sense at all.

22       **THE COURT:**  I pretty well second that advice.

23       **MR. WALPER:**  Tirelessly, your Honor.  But at any

24  rate, they've worked hard.  They believe they've been the

25  catalyst of this process.  They absolutely believe that they

316

1    have discharged their fiduciary duties to the fullest.

2          **THE COURT:**  It's argument.  Thank you.

3          **MR. WALPER:**  Thank you, your Honor.

4          **THE COURT:**  Mr. Kreller, do you want to take a minute

5    or do you just want to go?

6          **MR. KRELLER:**  Let's go, your Honor.

7          **THE COURT:**  All right.

8          **MR. KRELLER:**  Been sitting here a while, stretch my

9    legs.  Your Honor, I'm going to answer your biggest question

10   head on.  What did the debtors do here to maximize value?

11         **THE COURT:**  That's my question.

12         **MR. KRELLER:**  Your Honor, on the OPCO side what the

13   debtors did is they concluded that they needed to run an

14   auction and an auction of the OPCO assets needed to be held,

15   given the relative values, given the position of the secured

16   lenders and the inability to come to an agreement on a

17   different kind of a plan with the OPCO secured lenders, that an

18   auction was the path here.

19         In order to run an auction -- and by the way, I think

20   that's a pretty well-recognized concept in terms of maximizing

21   value.  Our Supreme Court in *203 North LaSalle* certainly

22   recognizes that in other contexts.  Your Honor, if you want to

23   run an auction, the first thing you need to do is figure out

24   what you've got to sell and that goes right to the heart of the

25   issues that we've spent the better part of three days, I

1    suppose, now in these hearings.

2            I note as an aside, your Honor, we're talking about a

3    bucket of assets that even at the high end of whatever ranges

4    people are talking about in terms of indicative values is less

5    than ten percent of the transaction value here.  Talking about

6    a bucket of assets of 35, even if you want to call it 50, even

7    if you want to call it 75; is under ten percent of the

8    transaction value here.  So, it is a little bit remarkable

9    we've got quite a bit of the tail wagging the dog here.

10           That being said, your Honor, again, to get to

11   conducting a meaningful and open auction which was OPCO's goal,

12   you've got to clear the underbrush, figure out what you can and

13   can't tell bidders about what you do and don't have to sell.

14   And that puts the new PROPCO purchase assets or the excluded

15   assets -- whatever else you want to call them -- directly in

16   play.

17           In terms of evidence on this issue; in terms of the

18   debtors' role, your Honor, the debtors sat in meetings in New

19   York with all of the parties who were involved in those

20   negotiations -- the PROPCO lenders, the OPCO lenders, Fertitta

21   Gaming.  The OPCO debtors never sat with Boyd, but that's

22   because Boyd refused to engage with the OPCO debtors.  And so,

23   if you want to wonder -- and Mr. Goldberg likes to talk about

24   this a lot -- about why the deference to the OPCO lenders, I'll

25   give you two reasons.

1          One, Boyd wouldn't get in a room with the OPCO

2    debtors.  So, if people wanted to understand what Boyd had to

3    offer, we weren't given a choice of testing that for ourselves.

4    That was run through the OPCO agent and the OPCO steering

5    committee, not by our choice and not willingly on our part; but

6    those were the circumstances we were faced with.

7          Second, your Honor, and we've pointed to this before,

8    but I'll do it again at the risk of redundancy.  The OPCO

9    lenders are being asked to finance this bid as they were being

10   asked to finance a potential Boyd bid, as they likely will be

11   asked to finance any other bid that comes in here.

12         And so, this isn't just a garden variety case where

13   you say the secured lenders are overreaching in terms of their

14   control as secured lenders.  This is where you're looking at

15   them and saying, "Given values of these assets, given existing

16   credit markets, given debt levels, you guys are the only ones

17   who are likely to show up at the table and finance this bid."

18   And then, wearing that hat, they indeed do have a lot more

19   leverage than a garden variety secured lender sitting there

20   with his collateral and threatening to take it.

21         From an evidentiary standpoint, your Honor, you've

22   got an awful lot of testimony from Mr. Haskins in his

23   deposition.  I guess I'd point you first to page 93 in his

24   deposition transcript where he talks about the process of

25   negotiations between OPCO and PROPCO regarding the prices being

1    discussed on the transferred assets.  He characterizes the

2    negotiations as:

3    "In the process of negotiations between OPCO and PROPCO, which

4    were very actively participated in by the lenders on both

5    sides, you know, on the PROPCO side, that number for the asset

6    transfer started at ten million and during the course of 30 to

7    45 days, the parties tended to push that number together to get

8    to the compromise you ended up at."

9               And then, he goes on on that page to talk about who

10   attended those meetings.  It was the steering committee of

11   lenders, it was the PROPCO lenders, it was the company and its

12   advisors.

13              Your Honor, similarly, pages 82 and 83 of the Haskins

14   deposition go on to discuss how the $35 million figure was part

15   of a global compromise.  And it talks about what things PROPCO

16   wanted and what things OPCO wanted.  It talks about views of

17   the OPCO lenders and the steering committee with respect to the

18   Texas put.  And it talks about --

19   "These really were things that weren't focused on in December,

20   since the issue in December was really resolving rent and now

21   that separation became real and everybody focused and they

22   realized on both sides that there needed to be a number of

23   gives and gets for everybody to maximize value."

24              Your Honor, if you want more, and this is kind of

25   sprinkled throughout the Haskins deposition testimony on page

1   70, at lines 6 through 10 is a discussion about --

2   "We were starting the negotiation to close the gap between the

3   bid and the asking…"

4           He's talking specifically about the Wild, Wild West

5   in this context.  But again, testimony about OPCO's

6   participation -- active participation in the ongoing

7   negotiations.

8           And your Honor, I'd also point you to page 57 of that

9   transcript, starting at line 3:

10  "There were whole company discussions going on, at least as

11  early as the middle of December, which then evolved into

12  separation discussions during January and February.  So, I

13  would be comfortable saying that there were discussions going

14  on with OPCO since January 1st."

15          Your Honor, that's just a sampling of the Haskins

16  deposition, clearly putting the company in the middle of these

17  negotiations.

18          There's also a great deal of testimony in the Krieger

19  deposition, as well as the Haskins deposition, as well, about

20  the OPCO debtors' analysis of the value of the excluded assets

21  and how those different components factored in different

22  scenarios for resolution of those issues and how the components

23  factored in and what ultimately became a resolution at the $35

24  million number.

25          I hesitate to shorthand that, because as you've heard

1  and as I will repeat, there's a lot more to it.  This is not,

2  "We are buying X assets for $35 million."  There's a lot more

3  to this compromise than that in both directions.  I think

4  you've heard a lot of that and I think you've read a lot of

5  that in the testimony.

6       But if you're looking for where's the evidence of the

7  role the debtor played, I think I've just pointed you to a

8  number of examples and there's more.

9       Your Honor, I'm going to step back for a minute and

10  I, too, am going to try to avoid repeating a lot of what's been

11  said.  Frankly, all of my colleagues who've spoken in support

12  of these motions have covered an awful lot of the points that I

13  think we covered in our opening argument.  And I'm going to try

14  not to repeat, but I think there are a few points that are

15  particularly relevant.

16       I want to first talk about process a little bit

17  because to be honest with you, I find it remarkable that we're

18  standing here, we're 50 days -- 50, five zero days -- from the

19  day that the original motions were filed on April 7th.  We are

20  38 days from the filing of the April 19 revised bidding

21  procedures and revised MLCA.  There are nine depositions, nine

22  declarations, three days of hearings under our collected belt.

23  And we still have the objectors complaining about the April 7

24  declarations didn't include evidence about events that didn't

25  even happen until later in time.  And we still have

1  Ms. Steingart saying, "I want a do over."  I'm going to start

2  keeping track of how many do overs and continuances are

3  requested by our objectors here, your Honor.

4       So, let's think about the process.  Think about the

5  amount of time that's elapsed.  We're two times any notice

6  period that's required under any local rules that I'm aware of

7  for these kind of motions.

8       March 24th, we filed the plan and disclosure

9  statement.  That was kind of the first, I think, really public

10 statement that this was going to go to an auction scenario on

11 the OPCO side.  And the importance there is not just that an

12 auction was going to occur.  The importance there is that the

13 auction was going to necessitate separation.

14      As we've talked about, the original MLCA was really a

15 safety net.  With the filing of the plan and the separation

16 becoming a reality, it became the platform for the deal.  And

17 to begin setting the stage for that separation, we needed to

18 deal with sale procedures that told bidders what they could buy

19 from auction and we needed revisions to the MLCA in order to

20 deal with what assets were not going in the auction, what

21 assets were going to PROPCO or staying with the debtors.

22      And those two things did go hand in hand, your Honor,

23 and the objectors can argue, "You don't need to approve the

24 master lease compromise agreement today.  You can let that

25 wait."  Well, you can't, your Honor, and the reason you can't

1    is twofold, but item number one from the OPCO debtor

2    perspective is I can't run an auction until I know what I'm

3    selling.  And as long as I've got disputes over that, those

4    assets, whether it's because of pre-petition rights or whether

5    it's because of rights that vested in PROPCO and the PROPCO

6    lenders as a result of the original master lease compromise, I

7    can't run that auction.  I can't tell bidders what it is

8    they're getting or how I'm going to deliver it to them.  That's

9    answer number one.

10           So, your Honor, at this point in time we have -- we

11   know we're going to pursue an auction.  We're going to pursue

12   revisions to the master lease compromise agreement.  And we've

13   got a May 5th disclosure statement hearing staring at us.  And

14   we look at our disclosure statement and think we're going to

15   have to deal with the bidding procedures in the MLCA to have a

16   meaningful disclosure statement to tell people what path we're

17   on here.  And so, in the face of a May 5th hearing, on April 7

18   we rush and we file our motions -- the original motions.  And

19   remember, the April 7 motions -- no agreement with the OPCO

20   lenders.  Mr. Qusba's made that clear; in fact, quite the

21   opposite.

22           No stalking horse bid in place.  The OPCO agent and

23   steering committee are talking to Boyd in a room that we're not

24   allowed in, but it's nowhere near in place.  No settlement on

25   excluded assets or the price for those.  There's a provision in

1    the April 7 master lease compromise that says, like the

2    original December version, PROPCO gets to buy certain of the

3    excluded assets, most of the excluded assets, but at a price to

4    be determined later.

5           So, Mr. Goldberg argues, "Why didn't the April 7

6    declarations have the $35 million evidence in it?"  The answer

7    is, "That hadn't been negotiated yet."  That was a wide open

8    issue, their rights to purchase reside in the December version

9    and we were proposing to build on those in the April 7 version,

10   but we're not there yet.  That's why.

11          Between April 7 and April 18, it was a pretty tough

12   10 to 12 days; meetings in New York around the clock;

13   conference calls around the clock; really just reflecting the

14   multi-party, multi-issue negotiations that you see embodied in

15   these agreements.  You had negotiation between the OPCO lenders

16   and Boyd over the Boyd bid.  You had negotiations between

17   Fertitta Gaming and the mortgage lenders over their bid with

18   the OPCO lenders, with the debtors having some visibility into

19   that, no visibility into Boyd.

20          You had the OPCO debtors negotiating with the OPCO

21   lenders about all of these issues, collaborating when they can

22   about issues where they have a common interest and otherwise

23   trying to figure out where we land and how we go about this

24   with the OPCO lenders saying, "We're going to run the process

25   because we've got Boyd and you don't."  A tense, tough, 10 to

1    12 days.  You've got everybody negotiating on the MLCA.  You've

2    got everyone negotiating on the purchased assets and the Texas

3    put gets thrown into play.

4            And your Honor, I believe Ms. Steingart argued that

5    there is no evidence in the record about the Texas put

6    settlement or the justification for the back and forth.  I

7    would just direct you to the Haskins declaration of April 28 at

8    page 4 -- at page 24 -- and also to the Genereau declaration

9    that I believe was also filed on the 28th -- paragraphs 24 and

10   25 in the Genereau declaration.

11           The result, your Honor?  A whole bunch of tired

12   lawyers and grumpy business people, but the deals were cut and

13   on April 19, the revised compromise agreement, the revised bid

14   procedures and the OPCO support agreement which embodied the

15   stalking horse bid were filed.

16           And your Honor, here's where we come to reason two

17   why the bid procedures and the master lease compromise go hand

18   in hand.  And Mr. Nyhan has stated this, as well.  You can't

19   break it apart because the stalking horse bid is conditioned

20   upon the master lease compromise agreement.  They go hand in

21   hand.  It's a prerequisite.  If you don't have the master lease

22   compromise -- and here's the "so what," Bonnie.  I'm hearing

23   that.

24           **THE COURT:**  Talk to me.

25           **MR. KRELLER:**  If I'm the only one talking to you, I'm

326

1   happy to do that, your Honor.

2          **THE COURT:**  Talk to me.  I don't hear it.  I'm just

3   listening to you.

4          **MR. KRELLER:**  I understand, your Honor.

5          **THE COURT:**  Reason two why the bid and the master

6   lease compromise agreement go together is because the stalking

7   horse bid is conditioned upon approval of the compromise.

8          **MR. KRELLER:**  Right, your Honor.

9          **THE COURT:**  That's where you stopped.

10         **MR. KRELLER:**  Thank you, your Honor.  I appreciate

11  that.

12         So, without the master lease compromise agreement and

13  the resolutions embodied therein, you do not have a stalking

14  horse bid.  And the committee and the splinter lenders can

15  disagree with me and can disagree with OPCO, but the conclusion

16  from the OPCO debtors was that having a $772 million stalking

17  horse bid was better than not having a $772 million stalking

18  horse bid, particularly when the OPCO lenders were prepared to

19  finance that bid.

20         Your Honor, on an aside, I think you've got some

21  pretty good testimony from Mr. Genereau that there's actually

22  some significant benefit to having an insider sponsored

23  stalking horse bid, because the market takes that as an

24  indicator that the folks who know the most about the business

25  are willing to pay a relatively high price here.  And let's

327

1   make no bones about it, at $772 million we're talking about ten

2   times EBITDA multiple here as a purchase price.  I think that

3   would be pretty tough to find a comp in the market anywhere at

4   those kind of levels.

5         So, your Honor, the April 19th filings happened.

6   There's more filings.  There's the hearings on the 4th and the

7   5th.  There's nine depositions.  There's more filings.  Here we

8   are on May 27th, again 50 days since the motions were filed, 38

9   days since the revisions.  And still, the objectors stand here

10  and say, "We want a do over.  We want four to six weeks."

11        We've had four to six weeks.  And your Honor, the

12  argument that four to six weeks doesn't mean anything here,

13  we're talking about eight to ten million dollars of cash burned

14  a month -- six to ten, I guess, was Mr. Qusba's estimate in

15  professional fee burned.  That's something.  That's his

16  client's cash collateral, not theirs.

17        We're also talking about a scenario where the

18  stalking horse bid goes away and you're talking about a

19  scenario where unless OPCO finds a way to pay the full rent

20  under the master lease for June and months thereafter -- we're

21  in transition now, June 15th I suppose -- the much dreaded

22  transition that Ms. Steingart fears so much is upon us, your

23  Honor, in that scenario.  The committee may not care.  The

24  splinters may not care.  The debtors do, because there's some

25  pretty dire consequences.

1          The bottom line, your Honor, we think it's awfully

2    hard for anybody to argue that we have anything less than a

3    completely full, probably overfull, and sufficient record at

4    this point.  So, I want to move past that noise, your Honor,

5    and talk a little bit about what issues really are being

6    discussed here.

7          Number one, and this is kind of common to all --

8    across the motions -- and I'll address a few of these in this

9    manner.  You know, we've heard the argument that the process is

10   tainted by conflicts.  Familiar arguments, we've heard them

11   since August of last year.  Familiar also in the sense that

12   they continue to be supported by no evidence whatsoever, other

13   than allegations that people occupy multiple roles.  I don't

14   think there's any dispute about that.

15        **THE COURT:**  Well, the evidence is they do occupy

16   multiple roles.

17        **MR. KRELLER:**  I don't think there's any dispute about

18   that, your Honor, but multiple roles do not mean that there are

19   conflicts of interest that are tainting any process.  The

20   conflicts have been disclosed since day one to the extent they

21   exist.  They've been attacked and challenged throughout these

22   cases through multiple rounds of discovery on multiple issues.

23   And here's what they come up with, your Honor.  Milbank

24   performed the ministerial task of forming the FG entity by

25   filing something with the Secretary of State's Office, or

1    however it's done.  That's it.  You've heard Milbank doesn't

2    represent Fertitta Gaming; never have once the entity was

3    formed.

4         Milbank drafted some iterations of the PROPCO support

5    agreement.  Well, your Honor, two things there:  One, when that

6    document was being negotiated, there was a possibility that

7    PROPCO was going to be a party to the agreement.  That turned

8    out not to be the case, but that was not always the case.

9         Number two, that support agreement is something that

10   the parties to that agreement were ultimately going to come to

11   PROPCO with -- and to OPCO -- and say, "This is a plan that we

12   will be asking you to pursue."

13        So, your Honor, rather than go off and negotiate a

14   cull than come to the debtors and have the debtors say, "That

15   doesn't work for us at all," we were involved in the process.

16   A very commercial thing, your Honor, that they would be

17   negotiating over something that they thought they at least had

18   a chance of convincing us that we should pursue.

19        Your Honor, conflict evidence number three, Dan

20   Aronson's testimony regarding whether it was Boyd or Fertitta

21   Gaming and PROPCO as the stalking horse bidder.  This is in the

22   Aronson deposition testimony at page 100, lines 18 through 22

23   and it's the language that Mr. Goldberg quoted earlier.  The

24   language is:

25        "Whether or not that transaction was going to be with

1          Boyd or whether or not that transaction was going to

2          be with Fertitta Gaming and PROPCO, the OPCO estate

3          at the end of the day didn't really matter."

4     And then, Mr. Goldberg dramatically repeated, "The

5  OPCO estate at the end of the day didn't really matter."

6     Your Honor, I would submit that what Mr. Aronson was

7  testifying to was that it didn't matter to the OPCO estate

8  whether the stalking horse was Boyd or Fertitta Gaming and

9  PROPCO.  We just wanted to pick a stalking horse and get on

10  with the process.  Subject to interpretation, I suppose, your

11  Honor, but if you're going to give much weight to that

12  statement, I suggest you take a closer look and think about

13  that alternate reading.

14     That's it, your Honor.  That's the evidence of

15  conflicts of interest.

16     And then, we get into the familiar refrains.  "The

17  UCC is not being included; we're being disregarded; we want

18  input."  Your Honor, again, I'll point you to the Robert Flachs

19  deposition as the degree to which the committee wanted input

20  and wanted to analyze these things in a meaningful way, where

21  Mr. Flachs testified that he did no analysis of any of the

22  excluded assets.  That doesn't sound like a committee to me

23  that's engaged in the process of trying to figure out what an

24  appropriate transaction is.  And your Honor, I will represent

25  to you that, once again, my repeated invitations to meet with

1    the debtors to discuss these matters went unresponded to.

2              The other conflicts issues argued by Mr. Goldberg

3    were that there are conflicts in the capital structure, there's

4    conflicts due to the master lease structure, there's conflicts

5    that reside with the agent.  Your Honor, these lenders --

6    presumably some of them -- invested into this scenario; and

7    presumably, they did some diligence before they did so.

8              Now, we don't know that, because the 2019 disclosure

9    that Mr. Goldberg filed doesn't contain any of the information

10   -- or maybe one piece of information, it does -- but doesn't

11   contain any of the information that 2019(a) actually requires.

12   So, we don't know when they bought their debt.  We don't know

13   what they bought it for.  I would submit to you that it is very

14   likely that they bought right into this structure.

15             Your Honor, I may be wrong, but there's no smoke

16   here, let alone any fire.  And the reason is simple.  People

17   are mindful and aware of the multiple roles that they occupy.

18   And people are mindful and aware of fiduciary duties that

19   exist.  And you've seen appropriate measures taken throughout

20   the case to deal with those situations.  You've seen a special

21   litigation committee to investigate claims.  You see

22   independent directors on the PROPCO side and you see the

23   independent director on the OPCO side being put in charge and

24   giving sole and exclusive authority over sale process.  These

25   are the kinds of things, your Honor; these are the kinds of

1    measures that are appropriate to mitigate against the risk of

2    potential conflicts that have not manifested themselves.

3          And your Honor, I would also argue that these are not

4    really insider transactions in the nefarious sense that the

5    objectors want to suggest.  And here's why.  These are multi-

6    party, multi-issue negotiations with a bunch of extremely well-

7    represented parties and extremely sophisticated parties.  You

8    urged us early in the case to get in a room around a big table

9    and talk to people and that's what we've done.

10         And ultimately, your Honor, we're coming back to you

11   when we need approval for anything that's outside the ordinary

12   course.  And as you've noted a number of times today, for any

13   of this to happen it's got to come through you as part of the

14   plan, as part of the confirmation hearing.  We carry a burden,

15   a substantial burden, to prove to you the propriety of the

16   transactions.  I'm convinced that we'll be able to do that, but

17   that is our burden.  This is not the plan.  This is not the

18   confirmation hearing.

19         Your Honor, I think I've addressed this issue at the

20   outset with respect to Mr. Goldberg's argument about the

21   debtors abdicating their responsibilities.  I don't want to

22   revisit too much on that, but I think that it is important to

23   note the assets were analyzed.  You've got an awful lot of

24   testimony from Mr. Krieger, Mr. Haskins on that.  Read

25   Mr. Krieger's redirect if you'd like a nice summary of it.

1   Those issues -- those declarations -- they go to the analysis,

2   the negotiations and the ultimate settlement that came out over

3   the terms -- over the assets.

4       The stalking horse bid decision is, I find, ironic to

5   hear Mr. Goldberg say, "The debtors abdicated their duties with

6   respect to selecting the stalking horse bid." Because if the

7   debtors did abdicate their duties, which I don't think they

8   did, they abdicated their duties under his theory to his agent.

9   It's an interesting argument.

10      And your Honor, the fact of the matter is, we

11  ultimately have the decision about who was the stalking horse

12  bid.  The OPCO lenders, the steering committee, the agent, had

13  a large say -- maybe an oversized say.  But ultimately, they

14  came to us.  We were prepared to deal with it.  If it was FG

15  and the mortgage lenders, we were prepared to deal with it and

16  consider it if it were a Boyd bid.  They came to us with a bid

17  that they had, that they had chosen; we concluded that was the

18  best alternative; again, handicapped by the fact that Boyd

19  would not engage with the debtors.

20      And at the end of the day, your Honor, the board, led

21  by its independent director Dr. Nave, gave due consideration

22  and made its decisions.  And let's think about the inputs that

23  the board looked at when it was considering this.  You've got a

24  transaction that has OPCO lender support from a majority of the

25  OPCO lenders, the steering committee and its agent.  You have

1    PROPCO lender and mezz lender support on the PROPCO side.

2    That's 100 percent of the creditors on the PROPCO side.  As

3    Mr. Qusba indicated, $3 billion of debt in support of a

4    transaction.  Certainly, the board needs to consider the

5    paramount interest of creditors there.

6         You've got an auction process that has now resolved,

7    cleared the underbrush with respect to these miscellaneous cats

8    and dogs excluded assets.  So, you've got an auction process

9    where you can now go to bidders and say, "Okay, here's what

10   you're bidding on."

11        You've got a plan underlying all of this -- a game

12   plan, not a capital P bankruptcy plan -- a game plan for

13   separating these two businesses in a way that people have

14   concluded -- the debtors have concluded; OPCO has concluded;

15   PROPCO has concluded -- best preserves the continuity of

16   business and value and jobs for their respective constituents.

17   And I'll be repetitive.  OPCO concluded that for OPCO's

18   creditors and constituents; PROPCO concluded it for PROPCO's

19   creditors and constituents.  And on the very narrow issue, your

20   Honor, of the IP and the IT, which has become so much the focus

21   of these hearings, both businesses can go and stand up.  There

22   is no rip and replace scenario here.  So, that's what the board

23   had looking in favor of the transactions before it.

24        The alternatives -- and are the alternatives

25   relevant?  You bet they are.  I think they certainly are

1   relevant to the board.  I think they're relevant to you under

2   the standards that you apply.  And you've heard the laundry

3   list of things that would happen.  And I think they're

4   absolutely right.  Would people see through to settling those

5   issues in some other fashion in some other way?  Maybe.  But

6   you've got an awful lot of fights to resolve with respect to

7   the litigation over the ownership and lien rights, on systems

8   and other common and shared assets.

9           Again, an aside.  The ownership issues, you know, a

10  big deal was made about no prior disclosure.  Mr. Nyhan's

11  absolutely right.  This business, up until this point, up until

12  the April 19th version of the deal came together, people

13  weren't thinking about how do you really end up pulling this

14  thing apart piece by piece.  People had thought about it in

15  broader terms in the December MLCA, but by the time you got to

16  the 19th and it was a reality and we had to figure out how to

17  do it, people had gotten much more granular about what it means

18  to take this thing apart.  And there, you've got Haskins'

19  testimony on that at pages 84 and 85 of his deposition.

20          Your Honor, you'd be facing -- I think it's pretty

21  likely you'd be facing relief from stay and foreclosure actions

22  on the PROPCO side.  A big part of this deal, as I understand

23  it, from the PROPCO side is that to some extent, this is -- the

24  deal going forward is a bit of a forbearance by the PROPCO

25  lenders, you know.  They had said, "We'll take reduced rent for

1  a limited period of time to try to get to a deal."  Well, now

2  they've got to a deal.  There's something on the table for

3  them.  No doubt about it.  They want the excluded assets.  But

4  if this thing goes sideways and starts to fall apart, whether

5  because you don't approve it today or something else happens

6  downstream, they've more than indicated their willingness to go

7  get their assets.

8       Who knows what you have at OPCO, your Honor.

9  Mr. Qusba said it well, "Who knows what you have without your

10  stalking horse bid here?"  Very hard to predict.  Multiple cram

11  down plans?  I don't know.  Has anybody ever seen that before?

12  You've almost certainly got contested cash collateral.  You

13  have no certainty on -- no path to solve the Texas put

14  liability.

15       So, are those alternatives you should consider?  I

16  think absolutely.  I think those all go to all of the factors -

17  - the four factors you look at.  Is it a reasonable settlement?

18  What is the prospect in litigation?  What's the paramount

19  interest of creditors?  I think these things all factor in,

20  because they're costly, time-consuming, very dangerous path to

21  head down.  The board certainly considered them.  I think Dr.

22  Nave's deposition, some of the citations you've just heard from

23  Mr. Durrer established that.

24       Your Honor, I'm going to drill down into a couple of

25  the more discreet issues.  You know, the valuation issue we've

1   kind of gone round and round.  In terms of the argument that

2   the assets that are being auctioned needed to be subjected to a

3   full market test before they were market tested, I don't know

4   how many auctions you're supposed to run under Mr. Goldberg's

5   scenario, but it seems to me that where you've got the two most

6   likely bidders -- the now stalking horse bidder and Boyd Gaming

7   -- pitted against each other in pretty heated bidding, I think

8   that counts as your pre-auction.  I think you get to count that

9   as the pre-auction.  I don't know how many more times you have

10  to go through that.

11          The cases he cites on this are not even close to

12  these facts or really even close to what he cites them for.

13  The *Blixeth* case, there a trustee proposed to sell some real

14  estate for an $8 million credit bid from a secured lender.  The

15  only evidence the trustee had on value on which the purchase

16  price was based was the appraisal of the property that was in

17  the file at the lender's office.  The lien that the lender was

18  purporting to credit bid was actually disputed by other

19  creditors in the case and the trustee proposed to limit notice

20  of the sale only to parties who were already participating in

21  the case as stakeholders.

22          Your Honor, no public auction, no concept, no idea,

23  no conception of a public auction there.  Clearly an

24  intercreditor dispute; a trustee who didn't have much money to

25  do anything other than say, "I'm going to sell it to the first

338

1    guy who makes me an offer."  Not this case.

2        The *Biderman* (phonetic) case, your Honor, a lot of

3    bad facts in that one.  Probably the key one, though, was that

4    the MOU under which the proposed leverage buyout was to be

5    sponsored actually contained a no shop, which prohibited the

6    debtor from encouraging, soliciting, seeking any other bids.

7    Again, no public auction contemplated.  Almost the antithesis

8    of the situation we have here.

9        Your Honor, on the smaller point -- kind of a smaller

10   valuation issue -- you have a separate auction for the excluded

11   assets.  Why, your Honor?  Why would you value those assets

12   when you have a negotiation between probably the only party

13   who's interested in buying them?  And the seller.  You've got

14   testimony in the Krieger and Caruso depositions that these are

15   not likely assets that have much, if any, value to other

16   buyers.  And to the extent they have value, that value is more

17   than captured by the $35 million and additional consideration

18   flowing to OPCO.

19       And your Honor, it is important -- and I will repeat

20   -- to remember.  This isn't $35 million for specified assets.

21   OPCO gets a lot under this agreement.  The $35 million, yes;

22   the $13 million working capital assumption, yes.  You've got

23   the stalking horse bid of $772 million that gets locked in

24   under this proposal that otherwise is not there.  You've got

25   the certainty when you go to auction that you can deliver the

1   assets you're promising to deliver and that you can deliver a

2   buyable standup OPCO business.  You've got certainty with

3   respect to the Texas put liability.  You've got no actual --

4   you've got the additional rent reduction and no actual

5   rejection now, which would trigger a transition, as you've

6   heard.  And you've got potential compensation for extended

7   transition later.

8           And then, your Honor, you've got a provision in the

9   master lease compromise agreement, which I cited to you in my

10  opening argument.  It's paragraph EE and it's transition

11  support for OPCO purchaser.  And I'm not going to read it.  I

12  actually read it into the record, or portions of it, last time.

13  But essentially it says PROPCO is going to obligate itself and

14  contractually bind itself to support consummation of an OPCO

15  sale to a third party bidder and will provide and cooperate in

16  orderly transition, including getting the IT systems split

17  apart and stood up.  Huge benefit, your Honor, on the OPCO side

18  debt our objectors choose to ignore.

19          Your Honor, the MLCA -- I'm trying to wrap up this

20  portion -- you know, the argument is really the same we've

21  heard back from Mr. Goldberg back in December.  It's quite a

22  bit of deja vu.  Mr. Goldberg would argue OPCO has leverage

23  over PROPCO because OPCO can do great harm to PROPCO and OPCO

24  should exercise that leverage.  Put another way, PROPCO isn't

25  paying enough because PROPCO would have to pay more to buy

1   similar assets elsewhere.  Your Honor, that is legitimate

2   leverage that exists.  It's been exercised.  That's why the

3   list of things I've just described to you were obtained by OPCO

4   in the negotiations.

5         And your Honor, I think, you know, you've said it and

6   I think it's the same concept that everybody has kind of

7   struggled with here, which is what is the value to OPCO?  Now,

8   Mr. Goldberg would have you believe that the value to OPCO is

9   whatever PROPCO would pay and on an economic theory PROPCO will

10  pay up to one dollar less than it would have to pay to go out

11  and acquire all of the assets elsewhere.

12        Your Honor, the problem with that and it's an

13  economic theory that's interesting, the problem with it is that

14  OPCO -- if you flip that and you turn it on OPCO -- then OPCO

15  should accept whatever number is a dollar more than OPCO could

16  obtain, if it went out and tried to sell these assets somewhere

17  else.  Somewhere in that wide range, your Honor, is a

18  settlement.  I think that, frankly, is the range that sets the

19  range of reasonableness, as you think the outer boundaries of

20  the range of reasonableness as you think about this.

21        You asked about, you know, you mentioned -- observed

22  -- that there's no fair market value testimony.  Well, your

23  Honor, there's no market.  OPCO's market is PROPCO.  You've got

24  evidence from Mr. Friel, from Mr. Krieger, from Mr. Caruso,

25  from Mr. Genereau; you've got testimony to that effect.

1          A couple of discreet points, your Honor, with respect

2     to the assets.  On the systems, assume we understand the

3     argument that you should basically stare down PROPCO and say,

4     "Go buy it elsewhere or pay more to me.  If you think you can

5     get it cheaper, go buy it elsewhere."  The problem with that is

6     -- and that's a perfectly legitimate negotiating position --

7     the problem with that is it ignores the fact that what does

8     OPCO do?  What does OPCO do when PROPCO says, "Okay.  That's

9     what I'm going to do"?  OPCO has to figure out a way to get two

10    servers off of PROPCO properties, climate controlled

11    environment for 12 years running continuously; get them out of

12    there; put them on a flatbed; truck them across town; find a

13    place to put them; turn on the air conditioning; plug them in

14    and see what happens.  Good luck.

15         Your Honor, we talked about this a little bit in

16    December:  What does leverage mean?  Leverage means you've got

17    to have some basis and rationale for taking that position.

18         Your Honor, the primary customer information:

19    Mr. Nyhan actually articulated this very well so I don't want

20    to spend a lot of time on it.  But, you know, the bottom line

21    is that the assumption made by the objectors here is that an

22    OPCO buyer will find value by poaching PROPCO from PROPCO's top

23    25.  And that's based on a couple of assumptions.  It assumes

24    OPCO and PROPCO are direct competitors.  They're not.

25    Mr. Krieger testified as much.  And it makes sense if you think

1    about it.  Why would the Station entity as a combined entity

2    build casinos that were direct competitors with each other?

3    Mr. Krieger has good testimony about kind of concentric circles

4    of geographic areas that you try to cover strategically.

5              So, if OPCO and PROPCO are not direct competitors,

6    sure, there's probably some migration, some play, and people

7    move back and forth a little bit, but they're not direct

8    competitors.  And having the PROPCO customer list of their top

9    25, you're not likely to be able to do much with that.

10             If you're Boyd and you've got properties that are

11   direct competitors with PROPCO properties, it's a completely

12   different story, very valuable, because you can go in and try

13   to gut your main competitor's business.

14             Your Honor, other bidders don't see it that way.

15   Exhibit 34 is an indication of interest from another potential

16   bidder whose analysis of this issue basically leads them to the

17   conclusion that they are skeptical of the value of the PROPCO

18   customer list to an OPCO buyer.

19             And your Honor, we also do, I think, have to deal

20   with the scenario that the bid procedures contemplate that

21   folks can and may well bid for less than all of these assets.

22   Now, if I'm someone who's interested in coming in and buying

23   two, three, four of these casinos and I want to make a bid, but

24   I know that someone else in the auction has the ability to come

25   in and purchase the customer information from the top 25

1    percent of my customers, it's going to have a big effect on

2    whether I bid and at what level I bid.  Your Honor, that is

3    precisely why we set it up the way we did.

4          Your Honor, on employees, there's something about

5    Mr. Winston repeating, "When you buy a business you get the

6    people," that sits wrong with me.  I don't know in what market

7    you buy people, but it's no markets I reside in.  But what, you

8    know, what he's really arguing and it really does come down to

9    the situation of you boil down -- if you want a third party

10   buyer to choose who they want -- to be able to choose who they

11   want and keep them, which is his premise, then you get to the

12   question of how can you force the employee to stay with the

13   bidder?

14         And the answer is they can assume the employee

15   agreement, I suppose, and thereby continue to keep the non-

16   compete in effect in some fashion to whatever extent it's

17   enforceable.  And then, you force the non-compete when they

18   say, "You know what?  You're not the folks I came to work for.

19   I came to work for somebody else.  I'm going to go find

20   something else to do."  And then the bidder says, "Oh, no, you

21   don't.  I've got a non-compete.  I'm going to keep you here."

22   No matter how you look at this issue, it comes down to the same

23   point which is you are ultimately trying to block employees who

24   don't want to stay from going and taking other employment.

25         Wild, Wild West, your Honor, you asked the question

344

1    in Mr. Haskins' testimony; your question was, "When is that

2    option exercisable?"  It's actually exercisable at the end of

3    2010.  I know that was a question that you had.  I don't have

4    the cite to the Haskins' testimony, but it's in there.

5            The reality is, your Honor, the restructuring --

6            **THE COURT:**  At the end of this year?

7            **MR. KRELLER:**  The end of this year.  I believe

8    payment would be due in 2011.  But the reality is, your Honor,

9    we will either -- even if we march along the time table that

10   we've set here, that's going to be a challenge to even have the

11   restructuring close and the plan effective by the option comes

12   due.

13           **THE COURT:**  When is there going to be a signed,

14   binding agreement from the lessor regarding the treatment

15   (indiscernible)?

16           **MR. KRELLER:**  Your Honor, I was speaking to Wild,

17   Wild West.

18           **THE COURT:**  I know, but I'm thinking of the other

19   one.

20           **MR. KRELLER:**  But if you want to switch to the Texas

21   put, there is one.  That agreement is in place.

22           **THE COURT:**  I haven't seen it.

23           **MR. KRELLER:**  You have not, your Honor.  It's not an

24   agreement to which the debtor is a party.

25           **THE COURT:**  Is there an agreement?

345

1        **MR. KRELLER:** We can certainly file that and describe

2   it in the disclosure statement. I think Mr. Qusba can --

3        **THE COURT:** I would like it filed, just so there's no

4   question about that.

5        **MR. UNIDENTIFIED:** We can file it, your Honor.

6        **THE COURT:** Thank you.

7        **MR. KRELLER:** But we can certainly do that, your

8   Honor.

9        **THE COURT:** Because that was raised and let's clear

10  that up. I would, once again -- I'll be honest with you -- it

11  wasn't a great concern of mine because you've come to this

12  Court and asked this Court to make a ruling based upon an

13  agreement that you ultimately don't sign, you're going to have

14  a serious problem. So, I would expect that it would be signed

15  and I didn't see that as a major obstacle.

16       **MR. KRELLER:** Thank you, your Honor. Your Honor,

17  Ms. Steingart likes to argue about how easy it would be to blow

18  away the change of control provision in that lease. Even if

19  she's right -- and I'm not so sure she is -- even if she's

20  right, that leaves you with a lease with Mrs. Fertitta at what

21  is probably above market rent. So, that's one where -- that's

22  a fight where you figure out whether you want to win it or not.

23       What the resolution provides is that a bidder knows

24  that it doesn't have to deal with the uncertainty of a

25  bankruptcy filing, a 365 fight, and it doesn't have to deal

1   with the uncertainty of, "Do I have a lease?  Do I have a put?

2   Do I trigger a put that I have to pay later at some bigger

3   amount?"  A bidder can look at it and say, "You know what?  I

4   can put this away for $75 million and I own the fee.  I own the

5   fee interest in the land at 75 and I'm done."  So, it's not a

6   restriction on assignment of the lease.  It's actually an

7   opportunity to purchase the land.

8           Your Honor, on the master lease compromise, again,

9   the bottom line is this is about leverage.  They wish they had

10  more.  We wish we had more.  We have what we have.  It got

11  negotiated and we think we got an awful lot for it.  They've

12  got no evidence on their side to support the notion that more

13  could have been gotten.  They didn't even bother to try to

14  analyze the value of the assets through their financial advisor

15  clicking away $200,000 a month and not analyzing things.  These

16  are not their assets.  They don't have liens on them.  Many of

17  these assets, as Mr. Qusba pointed out -- or probably the bulk

18  of these assets -- reside at subsidiaries where they don't even

19  have claims -- the committee that is.  Mr. Goldberg's in a

20  different situation.

21          Your Honor, on the bid procedures, we've been through

22  these in some detail.  First of all, obviously, we've heard you

23  and are not surprised in terms of what you've had to say about

24  dates -- changes in the dates are already under works, the

25  various dates and deadlines.  We didn't have the firm dates of

1    hearings and auction and everything until we sat down with you

2    this morning.  Those agreements will be modified appropriately.

3            The asset purchase agreement was executed by the

4    buyer late yesterday.  We will file that, as well.

5            I don't want to belabor the arguments about Dr. Nave

6    other than to note that Ms. Steingart argues that there's no

7    evidence that Mr. Nave can distance himself from the Fertittas.

8    I would argue that she has no evidence that he is anything

9    other than independent and has acted independently.

10           Your Honor, I think in the revised bid procedures we

11   tried to be clear.  I'll just read you the relevant provision

12   in B-3.

13               "For all purposes under these bidding procedures, Dr.

14               James Nave shall have the sole and exclusive

15               authority to act on behalf of the OPCO debtors and to

16               direct the actions of other representatives or

17               advisors of the OPCO debtors."

18           If there is a clearer way to say it, your Honor, I

19   welcome it.

20           Your Honor, you've clearly read the revised bid

21   procedures.  I don't want to delve into areas that you don't

22   need to hear more about and so I'm not going to.  If you

23   have --

24           **THE COURT:**  Did you hear my comments earlier when we

25   went through the bidding procedures?

1          **MR. KRELLER:**  Your Honor, I did.  I did.  And I've

2    marked the places where I think you indicated that things can't

3    happen without your approval.

4          **THE COURT:**  Correct.  What do you have?  Let's make

5    sure we have the same thing.

6          **MR. KRELLER:**  Your Honor, I have in P-1 --

7          **THE COURT:**  I'm sorry?

8          **MR. KRELLER:**  P-1.

9          **THE COURT:**  P-1.

10         **MR. KRELLER:**  P as in Peter, one.

11         **THE COURT:**  Yes, sir.

12         **MR. KRELLER:**  The changes to the bidding procedures

13   where we had "without further notice" -- I have that as being

14   subject to Court approval.

15         **THE COURT:**  Correct.

16         **MR. KRELLER:**  I have in R-1(e) --

17         **THE COURT:**  Yes.

18         **MR. KRELLER:**  "Any additional auction rules" -- I

19   think that's subsumed in your oversight.  But I'm happy to

20   insert that -- of the actual auction.

21         **THE COURT:**  It said -- my concern was that it says,

22             "The OPCO debtors, under the direction of Dr. James

23             Nave, after consultation with the consultation

24             parties, (indiscernible) announced that the auction

25             additional procedural rules that are reasonable under

1           the circumstance conducting the auction, provided

2           that they're not inconsistent with the bidding

3           procedures, the Code -- or order of the Bankruptcy

4           Code -- and disclosed to each qualified bidder at the

5           auction."

6           My point is I think that that should be requested of

7     the Court and have the Court make a decision --

8           **MR. KRELLER:**  Right.

9           **THE COURT:**  -- what the rules will be.

10          **MR. KRELLER:**  I agree with that, your Honor.  All I

11    was commenting on was that because those happened at the

12    auction, I assumed that was -- that all falls under your

13    authority.

14          **THE COURT:**  I just want --

15          **MR. KRELLER:**  But the language will be in.

16          **THE COURT:**  Thank you.  Then there was T -- I had

17    initialed a "T."  I don't know that we discussed it.

18          **MR. KRELLER:**  I don't have T marked, your Honor, so I

19    apologize if I missed the --

20          **THE COURT:**  It said, "The sale hearing may be

21    adjourned or rescheduled by the OPCO debtors without further

22    notice…"  No.  You'd have to ask me.

23          **MR. KRELLER:**  That's certainly --

24          **MS. STEINGART:**  T as in Tom, your Honor?

25          **MR. KRELLER:**  T as in Tom.

1     **THE COURT:**  T-1 on page 18, Ms. Steingart.  It says,

2  "The sale hearing may be adjourned or rescheduled by the OPCO

3  debtors without further notice by an announcement of the

4  adjourned date of the sale hearing."  No.  You can request a

5  continuance and I'll make a determination.

6     **MR. KRELLER:**  How about, "Adjourned or rescheduled by

7  the Court," your Honor?

8     **THE COURT:**  That's correct.  I don't have a problem

9  if you don't -- then I've got a question regarding the

10  remainder of this.  It says, "If the OPCO debtors do not

11  receive any qualified bids in addition to the stalking horse

12  bid, the OPCO debtors shall proceed as set forth in the no

13  additional qualified bid section."

14     I know that you've got a very good process here, or

15  at least a process to determine qualified bidders.  My question

16  to you would be what do we do when this happens?  I call tell

17  you the *Debbie Reynolds* case and others where all of a sudden

18  you get an appearance at the auction by someone who would

19  otherwise be a qualified bidder under your own rules and nobody

20  likes postponing, adjourning, serial hearings.  *Debbie Reynolds*

21  is actually a great example of the difficulties that arise in

22  that situation and for the appeals that come thereafter.

23     And it's always difficult, candidly, for the Court.

24  And I assume it's difficult for particularly the debtor in

25  possession when the obligation is to maximize the value of the

1   assets.  I am extraordinarily reluctant to turn away anybody

2   who might be qualified.

3           I will set strict rules.  Some of your local counsel

4   may have told you this.  I was selling a ranch and I had all

5   these folks that said, "We want to buy it.  We want to buy it."

6   So, I said, "Fine.  The stalking horse has got $300,000.

7   You're going to need $300,000 plus the $300,000 overbid and

8   it's non-refundable and you need it now."

9           "Okay."  And they deposited it.  And the rest of

10  their financing didn't come through and then they came in to

11  get their $600,000 back.  And I said, "No."  I mean, so they

12  lost $600,000.  The point being is that I think that we're

13  capable of dealing with someone who shows up at the hearing who

14  would otherwise be qualified.  I don't want to encourage it.

15  That's not the point.  But I want to deal with the potential

16  contingency.

17          So, I just -- in this, I think that you could

18  announce that there are no qualified bids and I think I would

19  want to reserve the ability to see if anybody was present at

20  that auction that would consider themselves to be a qualified

21  bidder and then could establish that to my satisfaction.  It's

22  a difficult thing.

23          **MR. ARONZON:**  Can I ask a question, your Honor?

24          **THE COURT:**  Sure.

25          **MR. ARONZON:**  If there are a number of qualified bids

352

1   and the auction runs in accordance with its rules, you're not

2   suggesting that someone then could just ignore those rules and

3   show up?

4        **THE COURT:**  No, I'm not at all.

5        **MR. ARONZON:**  Okay.

6        **THE COURT:**  What I'm saying is if you tell me you

7   don't have any qualified bidder, but somebody's there then.

8        **MR. ARONZON:**  Okay.

9        **THE COURT:**  And all of a sudden they say, you know,

10  "Judge."  Maybe Exhibit 34 guy shows up and says, "I got a

11  billion."  I'm not going to turn him away.

12        **MR. ARONZON:**  I've had this fight before and the

13  rules are there for a reason.  And we like them enforced so

14  that we know what we're doing.

15        **THE COURT:**  If there are qualified bidders, I'll

16  enforce the rules and they should play by the rules.  If there

17  are no qualified bidders and somebody shows up and they have --

18  look.  I'm just not going to let somebody show up and just say

19  they disregarded the rules.  We'll listen to them.  I want to

20  be able to consider it and then I'll make, I would hope, an

21  informed decision based on their ability to bid at that time.

22  I just don't want to be foreclosed from that exercise of

23  discretion.

24        **MR. ARONZON:**  I appreciate the clarification.

25        **THE COURT:**  So, that was T.

1              **MR. KRELLER:** Well, your Honor, as I interpret it,

2  your question was, when you said, "What will we do at…" -- I

3  think that was the question.  What will you do?

4              **THE COURT:** Yeah.

5              **MR. KRELLER:** Your Honor, and just from purely

6  drafting, I guess, at the end of that sentence, comma, "unless

7  the Court orders otherwise"?

8              **THE COURT:** That will work.  But I wanted everybody

9  here to understand that is not an open invitation.  And it is

10  not.  I follow the rules.  That's why I have some difficulty

11  with the *Fitzgeralds* case, for example, where nobody followed

12  the rules and the judge got reversed.

13              The judge should have just said, "No, I won't listen

14  to anybody," then, I guess, she would have been okay.  That

15  case befuddles me, especially footnote 12; since footnote 12

16  talks about *Espinosa* and statutory requirements and then it

17  says, "Perhaps also decisional," and the only decision that

18  it's talking about is a BAP decision and which the last time I

19  checked BAPs aren't precedential.  So, I consider that kind of

20  a bootstrap footnote.

21              I did read the case.  And the case that it relied

22  upon, *Suter versus Goddard* (phonetic) was this Court's

23  decision.  And the district judge said that the appeal was

24  moot; got reversed by the Ninth Circuit.  Then, the process

25  that I utilized to approve that settlement was affirmed because

1   I did a combination 363 and 9019.  That was actually, I think,

2   around Mickey Thompson.  So, I'm fairly used to doing these

3   things.  Settlements in those type of sales are always

4   difficult and in that case particularly difficult because

5   you've got somebody buying their way out of a lawsuit.  So,

6   that always makes it really heightened scrutiny.

7           So, I am satisfied.  Let me see here, X; I'd looked

8   at X.  This is your client's reservation of rights.  I don't

9   have any problem with A, B -- because I would ask the parties,

10  especially the consultation parties, what they thought was the

11  highest and best offer.  And then, I'll make the determination.

12  So, that to me is beneficial.  I may reject any time a bid that

13  is inadequate or insufficient.  That doesn't really bother me,

14  because there's no doubt in my mind that any legitimate offer

15  will be considered.  And, of course, anybody who thinks that

16  that discretion has not been properly exercised would probably

17  be there and I could listen to them in any event.

18          I don't know what C and D and E add to the process.

19  "May impose additional terms and conditions or otherwise modify

20  the sale procedure"; no way.  Not after going through all of

21  this work.  You can request to modify and it'll be up to the

22  Court.  There may be circumstances that change.  There may be

23  financing.  There may be a lot of issues.  I don't know what

24  could occur, but I think the determination must be made by the

25  Court and not by the debtor.

1          **MR. KRELLER:**  That's fine, your Honor.  I was

2     actually trying to --

3          **THE COURT:**  And I'm not going to allow a withdrawal

4     at any time.  I think you've got to come here and tell me why

5     and then you've got to ask me to allow that to happen.  After

6     all the money that's been spent; after all the time that's been

7     put in; after all the depositions that have been taken; no.

8     I'm not going to do it that way.

9          And "reject all bids"?  You're going to have to tell

10    me why you've rejected all bids.  Because if I read that

11    correctly, that means also rejection of the stalking horse bid;

12    and once again, I'm going to want to know why before I allow

13    it.

14          **MR. KRELLER:**  So, your Honor --

15          **THE COURT:**  Because rejecting that bid may, in fact,

16    trigger certain ramifications under either the transitional

17    service of transfer events and I'm not going to let that occur

18    without my review.  So, that's got to be worked out a little.

19          **MR. KRELLER:**  Your Honor, is it sufficient to say

20    that all of those -- C, D and E -- are all subject to Court

21    approval?

22          **THE COURT:**  With seeking Court approval and obtaining

23    it.  Seeking and obtaining.  I want to know.  And the reason I

24    say that is I want you to actually ask me and not have me raise

25    it sua sponte.  That's what I want to avoid.

1          **MR. KRELLER:**  Understood, your Honor.  I understand

2    that clarification.

3          **THE COURT:**  I think I could.  I don't have any --

4    take a look at *Beavo* (phonetic).  I think I could.  There's no

5    question about it, but I'd rather not have that issue arise.

6    Otherwise, those are my concerns and you heard the concerns --

7    I've heard the concerns by the objectors.  But those are my

8    concerns of the bidding procedures.

9          **MR. KRELLER:**  All right, your Honor.  We'll make

10   those clarifications.  The only other thing, just so you know I

11   had noted was from Mr. Nyhan's comments, clarifications around

12   the $35 million number being a number that it is zero or 35,

13   nothing in between.

14         **THE COURT:**  Yes.  That has to be clarified.  I think

15   I mentioned that.  It's not a reduction based upon what's

16   actually transferred.  If one item's transferred, it's $35

17   million.

18         **MR. KRELLER:**  Your Honor, that's all I have on the

19   bid procedures.

20         Briefly, on the support agreement -- the OPCO support

21   agreement and I wholeheartedly agree with your assessment of

22   that agreement as basically an LOI.  I've described it to other

23   courts as really a deal tool that allows parties to kind of

24   look at each other and make sure they're moving kind of at the

25   same pace and in the same direction.  And the recourse tends to

1  be that if you're not and one party decides to go slower,

2  faster or a different direction, the support agreement blows up

3  and they're all free -- and everybody's free to go their own

4  way.  And that's how we view this.

5          You know, you asked the question, "Why?  Why do you

6  need to approve it?  Why does OPCO want it?"  Your Honor, I

7  think the answer is simple; maybe not terribly satisfying, but

8  in the context of this kind of a deal, it actually, I think,

9  becomes pretty meaningful where you've had so much acrimony and

10  so many different views on different issues.  And the answer is

11  because it enhances our ability as debtors to maintain the hard

12  fought peace that we've achieved at this point with our OPCO

13  lenders.

14          And it's not just about trying to lock people into a

15  particular plan.  Remember that the OPCO lenders control things

16  like cash collateral and whether subsidiaries can continue to

17  stay out of bankruptcy and under forbearance.  This also builds

18  an orderly separation, as we've talked about.  And it also

19  tells the market -- and I think it tells bidders, frankly --

20  that the sale process is going forward consensually and that

21  this is being done with the support of the folks whose

22  collateral these assets are.

23          And it's at little or no cost to the OPCO estate

24  because, frankly, as I've said before, on the OPCO side it's an

25  agreement to do things that we are already doing; that we've

1  already negotiated for and that we would be doing as the right

2  thing to do in the right way to maximize value.

3          On the issue of whether it's an illegal solicitation,

4  you know, clearly we don't believe so.  As Mr. Qusba noted,

5  there's not even a plan right now that reflects where we stand

6  today that we could be soliciting folks on.  This is

7  negotiation.  It's a negotiating tool.  There's an awful lot of

8  wood to chop before we get to a plan that we can actually

9  solicit votes on.

10         Your Honor, I just wrap up by saying again, this

11 isn't the confirmation hearing.  These are significant motions,

12 no question about it, and they're difficult issues to deal

13 with.  But at the end of the day, we're talking about bid

14 procedures and establishing a process.  And I think that's

15 something we're capable of to conduct a fair auction.

16         And we're talking about a master lease compromise

17 agreement that's an incremental build on something that's

18 already been approved and rights have already been vested.  But

19 it's also a facilitator for that auction so that we can provide

20 clarity to bidders.  It creates and helps create the platform

21 on the PROPCO side for the separation that both of these

22 businesses need.

23         And keep in mind, as I said in the opening, it's not

24 a separation only because there may be a sale to a third party.

25 It's a separation that the lenders, as exit financers, are

359

```
1    mandating because they want collateral packages that stand

2    alone when they enter into and give this financing to these two

3    businesses.

4              I think you've got ample evidence in the record from

5    the debtors and also from the other entities that support the

6    motion to support the findings you need to make here.  I think

7    you've got a very reasonable settlement in front of you for

8    approval under all the four factors that you need to analyze.

9              And the bid procedures, again, are really just

10   procedural.  And if you're comfortable -- and it sounds like

11   you are -- at this point with the modifications and your

12   clarifications, that that will set up a fair process going

13   forward; then I think they're both suitable for approval.

14             THE COURT:  Thank you.

15             MR. KRELLER:  Thank you, your Honor.

16             THE COURT:  Thank you, counsel.  It's been a long

17   day.  Ms. Steingart?

18             MS. STEINGART:  Your Honor, (indiscernible) you know,

19   we expected to have very, very (indiscernible).  I'd like to be

20   able to respond to Mr. Kreller and Mr. Kreller has been able to

21   respond to us.

22             THE COURT:  They have the burden.  They went first.

23   They went third.  You went second.  That's generally how it

24   goes.  I'll give you 15 minutes.

25             MS. STEINGART:  Thank you, your Honor.  If I use
```

1   all --

2           **THE COURT:**  And no more.  I mean, we will end at 8:00

3   o'clock.  If you're in the middle of a sentence, it's sort of

4   like the red light in an appellate.

5           **MS. STEINGART:**  Understood.

6           **THE COURT:**  That's it.

7           **MS. STEINGART:**  Understood, your Honor.  To start

8   with, the fact that PROPCO and Fertitta Gaming did a mating

9   dance before they came to the PROPCO agreement does not

10  legitimize the kinds of things that they're asking for at this

11  point.

12          Mr. Qusba talks about his $3 billion in credit that's

13  supporting him.  Well, we have two and a half billing dollars

14  of bond debt.  And this is real money that was invested before

15  all these machinations of sending PROPCO assets down and we

16  have approximately $225 million.  So, we're talking --

17          **THE COURT:**  Excuse me.  Invested when?

18          **MS. STEINGART:**  I'm sorry?

19          **THE COURT:**  Invested when?

20          **MS. STEINGART:**  It was invested before 2007, your

21  Honor.  So, when people say that we bought into systems or

22  bought into structures, that is just absolutely not the case.

23          So, that's two and a half billion dollars that are

24  against what's going on here, plus the amount that Mr. Goldberg

25  has.  So, we're about $3 billion and $3 billion, you know, so

1    there's not a, you know, a sort of ocean of support on one side

2    and nothing on the other.

3          **THE COURT:**  There is a distinction between the

4    secured and unsecured nature of those obligations.

5          **MS. STEINGART:**  I do understand there's secured and

6    unsecured, but there are opportunities here for bids to exceed

7    the secured --

8          **THE COURT:**  I understand your point.

9          **MS. STEINGART:**  You know, we really don't care about

10   the Caruso report.  The point is that there's no proof of

11   value.

12         As to plan support, there's no reason for OPCO to be

13   part of that plan support agreement.  To the extent that it's

14   an agreement to work in good faith towards a term sheet, as the

15   Court has pointed out, the debtors already have an obligation

16   to work in good faith towards a term sheet.  This will bind

17   them to work towards that term sheet.

18         And I think, your Honor, it's premature to do that.

19   They have a restructuring term sheet.  They can work towards

20   that, but for them to be bound by agreement -- because it is an

21   agreement.  It is an agreement that's being approved by this

22   Court and there's really nothing that is in dispute among the

23   parties to that ostensible agreement.  There is no dispute

24   among OPCO and Fertitta Gaming and the OPCO lenders about

25   anything.  There's no 9019; there's nothing that's being

362

1    resolved there.

2              As to the Texas put, if what people are telling us

3    here is there's some agreement to which the debtor is not a

4    party, that's not going to be binding on the debtor.  That is

5    not going to be binding on anyone who takes that property.  I

6    couldn't care less about it.  What Mr. Aronzon or Mr. Qusba

7    told you is that the debtor is not a party to that agreement.

8              **THE COURT:**  Okay.  I get that.  I see your point.

9              **MS. STEINGART:**  All right.  They told you that with

10   respect to the Texas --

11             **THE COURT:**  You mean the agreement signed by the

12   lessor.

13             **MS. STEINGART:**  Right.  They said that there is an

14   agreement; that it is signed; that it's not in the court, even

15   though it's in both these -- it's in the master lease

16   compromise and it's in the OPCO term sheet.  If the debtor's

17   not bound, then the debtor's not bound.  I couldn't care less.

18   It shouldn't be in those documents.

19             **THE COURT:**  Go ahead.

20             **MS. STEINGART:**  So, that's another important issue.

21             Under the current MCLA (sic), you know, Mr. Nyhan

22   gave the Court the impression that, "Well, what the current

23   MCLA provides is that if I agree with OPCO, I get it for that

24   price.  I only come to you if I can't agree.  Uh-uh.  What the

25   current MCL says is that they have to pay for the assets.  And

1    if they came to this Court and said that they wanted an

2    agreement approved for the assets where they were trying to

3    transfer them at a price without coming here, your Honor, you

4    would hear from us.  Because it's still a 363 sale and even

5    though they've agreed to sell it to one party, it doesn't mean

6    they don't have to come here and get approval for that number.

7              Which leads us to the most important point here, your

8    Honor.  The auction cannot go forward until there is an

9    appropriate price for the excluded assets.  Everyone who has

10   stood before you today has admitted that whatever the number is

11   now, it's not the number they're worth.  And it's not the

12   number they're worth because there are alleged other benefits.

13   We don't think the other benefits exist.  But if you're going

14   to have an auction, and you're going to make someone pay the

15   exact amount as someone who gets the excluded assets minus 35,

16   but they're worth 50, you're not going to have a fair auction.

17             And they say that, "Well, you know, we need to have

18   the stalking horse bid.  We need to have it now."  Well, the

19   APA says you don't have it until June 21st and even after June

20   21st -- even after June 21st -- there are a large number of

21   outs.

22             So, I don't know what we have here and to the extent

23   that they say without it, you know, you have to have the master

24   lease compromise, too, because we have no stalking horse.  We

25   have to sell at 35, even though 35 is the wrong price, because

364

```
 1   we're not going to have the stalking horse.  The stalking horse

 2   is entitled to it, because they're entitled to a break-up fee.

 3          We provided the Court with cases that show that when

 4   an insider is a stalking horse and it's attached to one of the

 5   affidavits -- I don't remember which one now, your Honor --

 6   when an insider is a stalking horse, there is generally no

 7   break-up fee.

 8          THE COURT:  I think I already commented on that

 9   earlier.

10          MS. STEINGART:  Right.  And, in addition, when

11   there's competition to be a stalking horse, as in the most

12   recent ESH case that we provided to you, your Honor, there is

13   no break-up fee.  So, to the extent that the stalking horse

14   says, "I need these things to be the stalking horse" --

15          THE COURT:  I generally don't award break-up fees in

16   cases until after the auction, so I can determine that there's

17   actually been a benefit brought, because that should be the

18   basis of the break-up fee.

19          MS. STEINGART:  So, the point here is, your Honor --

20          THE COURT:  That's my understanding.

21          MS. STEINGART:  The point here is, your Honor, why;

22   why should the entry into the MCL2 and the $35 million price be

23   seen, as Mr. Nyhan says, the benefit of his bargain?  He's not

24   entitled to that as a stalking horse.  And the Court shouldn't

25   give it to them.
```

1          The MCL2 now is still a toxic agreement.  It creates

2   a lot of consequences without actions of OPCO.  At this point,

3   it should be at plan confirmation.  No one here wants to see a

4   rejection of that lease.  The parties will cooperate to extend

5   the current agreement, because it's in everyone's interest to

6   do so.

7          I'm going to leave some time for Mr. Winston, but,

8   you know, I sort of would like to put it -- we have the lawyer

9   for the Fertittas here in the courtroom -- and I thought it

10  would be interesting to put it to them.  Is he going to tell

11  this Court that the Fertittas will not bid or participate or

12  withdraw the number that they have on the table if this Court

13  does not approve the MCL2 or determines that because there's no

14  value --?

15          **THE COURT:**  Do you think it's appropriate for a Court

16  to ask for a stipulation from counsel before counsel's had or

17  has an opportunity to confer with their client?  I think -- I

18  don't think it's proper to offer a stipulation until you talk

19  to opposing counsel first.  So, I'm not going to do that.

20          It might be interesting, but I just don't think it's

21  appropriate.  I understand your point.

22          **MS. STEINGART:**  Right.  Well, at this point, your

23  Honor, we do believe that the quid pro quo for the stalking

24  horse is really inappropriate and certainly is a diminution

25  with respect to the value of OPCO and is a forfeiture of value

1    from creditors to an insider of the company.

2          And given the fact that we don't know if we have a

3    stalking horse bid for a number of weeks from now, there's

4    really no impediment to putting a process in place where the

5    Court can get a reliable set of values for these assets so that

6    the bid can go ahead.

7          Just one last thing as to what happens under the bid

8    procedures with respect to the PROPCO option.  First of all,

9    there's nothing currently in the procedures that says PROPCO

10   gets to cherry pick among the excluded assets.  I mean,

11   Mr. Nyhan said, Mr. Kreller said, "I can't have an auction if I

12   don't know what I'm auctioning."

13         Well, but we don't know what they're auctioning,

14   because we don't know if PROPCO is going to take the excluded

15   assets if the stalking horse doesn't win.  Not only don't we

16   know if they're going to take it, we don't know which ones

17   they're going to want if they decide to take some and not all.

18   There's nothing here that says -- and there's nothing anywhere

19   else that says -- they get to pick and choose.  They either

20   take the basket or they don't take the basket.

21         THE COURT:  When you went through and discussed the

22   optionality, was it your position then that the choice was two:

23   all or none?  Is that what you're saying?

24         MS. STEINGART:  I think that what this says is all or

25   none.  That's number one.  Number two is, with respect to the

1    credit that's being given to the person who has to bid the

2    price, assuming they'll get it, it says $35 million, your

3    Honor.  It doesn't say 35 plus 13.  It doesn't say --

4              **THE COURT:**  No.  It's a $35 million credit.

5              **MS. STEINGART:**  It's a 35 --

6              **THE COURT:**  But they get -- all right.

7              **MS. STEINGART:**  Yeah, I don't know what's happening

8    to that other basket of liabilities --

9              **THE COURT:**  To the 13?

10             **MS. STEINGART:**  -- so I don't know what people get or

11   don't get.

12             **THE COURT:**  I thought I did.  But that's okay.

13             **MS. STEINGART:**  Okay.  Thank you, your Honor.

14             **THE COURT:**  Congratulations.  First lawyer in 15

15   years that did it shorter than I allowed.  Thank you.

16   Actually, that's not true.

17             Okay.  It's been a long day.  Nobody's had dinner.

18   My staff's been here for quite a while.  I need some time to go

19   through my notes.  I want to review some of the exhibits and

20   deposition testimony.  What I need to know is if -- all I'm

21   going to do tomorrow is go through and try to orally put my

22   findings and conclusions on the record.  I may ask some

23   questions, because I'm sure -- as I said, these are my notes

24   that I've already prepared.  Most of the questions that I had

25   here to be asked have been answered by you all and I appreciate

368

1   it because it was good argument.

2          I'm trying to find out what time you folks need to

3   get out of town.  Not that we don't love you.  But I'm trying

4   to accommodate counsel here to a certain degree.  I like to

5   start at 10:00 so I have enough time to really get ready.  Is

6   that a problem for anybody?

7          **MR. QUSBA:**  Your Honor, I'm going to defer to the New

8   Yorkers.  I think they probably have a tougher, tighter

9   schedule than I do for getting back.

10         **MS. STEINGART:**  We'd be grateful if we could make

11  flights that are between 1:30 or 2:00.

12         **THE COURT:**  I'll get it done by noon.

13         **MR. QUSBA:**  Your Honor, we'd rather get it approved

14  and take a later flight.

15      **(Laughter)**

16         **THE COURT:**  I'm not able to negotiate that.  I can't

17  do it.

18         All right.  I'm going to start at 10:00 because, very

19  frankly, I'm pretty tired and I would like to clear my mind a

20  little bit and kind of start over with my notes.

21         Candidly, last night was like, sort of reminded me of

22  my trial days.  I was thinking about this stuff.  I don't know

23  how many -- do you ever get the pads by your bed just to take

24  down things or else you can't go to sleep?  First time in 15

25  years that that happened and I want to avoid that tonight.

369

1          So, we will start at 10:00 and if anybody here -- if

2   you can't be here, that's fine.  I mean, I understand that you

3   may have other commitments.  I'm going to announce the

4   decision.  There'll be a transcript.  I'm not going to really

5   hear any argument, but just so I do have some questions I have

6   the primary counsel here that would be sufficient and I think

7   we can go from there.  And I thank you all very much.

8          **THE CLERK:**  All rise.

9      **(Proceeding was adjourned at 7:55 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    June 7, 2010

                Signed                                              Dated


                        *TONI HUDSON, TRANSCRIBER*