UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
RENO DIVISION


IN RE:                          )       CASE NO:  09-52477-GWZ
                                )       CHAPTER 11
                                )
STATION CASINOS, INC,           )          Reno, Nevada
                                )
                                )       Monday, June 21, 2010
            Debtor.             )
_____    )       (3:55 a.m. to 5:24 p.m.)


EMERGENCY MOTION BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR STAY PENDING APPEAL OF ORDER GRANTING MOTION
FOR ORDER ESTABLISHING BIDDING PROCEDURES AND DEADLINES
RELATING TO SALE PROCESS FOR SUBSTANTIALLY ALL OF THE ASSETS
OF STATIONS CASINOS, INC AND CERTAIN "OPCO" SUBSIDIARIES

BEFORE THE HONORABLE GREGG W. ZIVE,
CHIEF UNITED STATES BANKRUPTCY JUDGE


Appearances:              See next page

Court Reporter:           Recorded; FTR

Transcribed by:           Exceptional Reporting Services, Inc
                          14493 South Padre Island Drive, #A-400
                          Corpus Christi, TX 78418-5940
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**COURTROOM APPEARANCES FOR:**</u>


Station Casinos, Inc.,        THOMAS KRELLER, ESQ.
etc.:                         Milbank Tweed, et al.
                              601 South Figueroa St.
                              30th Floor
                              Los Angeles, CA 90017

                              BRUCE BEESLEY, ESQ.
                              LAURY MACCAULEY, ESQ.
                              Lewis & Roca, LLP
                              50 West Liberty St.
                              Suite 410
                              Reno, NV 89501

Deutsche Bank:                BUD HICKS, ESQ.
                              McDonald Carano Wilson
                              100 W. Liberty St., 10th Floor
                              Reno, NV 89505

German American Capital       JENNIFER SMITH, ESQ.
Corporation, et al.:          Lionel Sawyer & Collins
                              50 West Liberty St.
                              Suite 1100
                              Reno, NV 89501

Official Committee of         BRETT AXELROD, ESQ.
Unsecured Creditors:          Fox Rothschild, LLP
                              800 Howard Hughes Pkwy,
                              Suite 500
                              Las Vegas, NV 89169


<u>**TELEPHONIC APPEARANCES FOR:**</u>


Debtor:                       PAUL ARONZON, ESQ.
                              KEN BARONSKY, ESQ.
                              FRED NEUFELD, ESQ.
                              GABE WEAVER, ESQ. (Listen only)
                              BRIA LASALLE-MERTENS, ESQ. (Listen)
                              Milbank Tweed, et al.

                              ALEX WILSON, ESQ.
                              The Bank of Scotland

3

<u>TELEPHONIC APPEARANCES FOR</u>:    (CONTINUED)


MSRE Station SPV A:         NILE LEATHAM, ESQ.
                           Kolesar & Leatham

Mathew Barnett:            MATHEW M. BARNETT, PRO SE
                           (Listen only)

Deutsche Bank:             JOHN BEACHAM, ESQ., (Listen only)
                           Deutsche Bank

Deutsche Bank Trust        SANDY QUSBA, ESQ.
Company Americas:          THOMAS C. RICE, ESQ.
                           Simpson Thacher & Bartlett, LLP

CMBS Lenders:              JEFFREY BJORK, ESQ.
                           GABRIEL MACCONAILL, ESQ.
                           Sidley Austin

Bloomberg News:            STEVEN H. CHURCH, ESQ., (Listen only)
                           Bloomberg, LLP

Deutsche Bank Trust        DEUTSCHE BANK TRUST COMPANY AMERICAS
Company Americas:          (Listen only)

                           JASON FRIEDMAN, ESQ., (Listen only)
                           KIMBERLY HAMM, ESQ., (Listen only)
                           Simpson Thacher & Bartlett

Dr. Nave:                  MEREDITH EDELMAN, ESQ.
                           ERIC S. WAXMAN, ESQ.
                           Skadden Arps, et al.

Boyd:                      G. LARRY ENGEL, ESQ.
                           VINCENT NOVAK, ESQ.
                           Morrison & Foerster

Propco:                    OSCAR GARZA, ESQ.
                           Gibson Dunn & Crutcher

Castle Ridge               ERIC D. GOLDBERG, ESQ.
Master Investors:          Stutman Treister & Glatt

Colony Capital:            JONATHAN GRUNZEWEIG, ESQ.,
                           (Listen only)
                           Colony Capital

<u>TELEPHONIC APPEARANCES </u>FOR:    (CONTINUED)


Dr. James Nave:            RODRIGO GUERRA, ESQ.
                           Skadden Arps, et al.

Fidelity:                  MATTHEW C. HEYN, ESQ., (Listen only)
                           Klee Tuchin, et al.

Las Vegas Review           ARNOLD KNIGHTLY, ESQ., (Listen only)
Journal:                   Las Vegas Review Journal

JPMorgan Chase:            ALEX LIN, ESQ., (Listen only)
                           Cadwalader Wickersham & Taft

Bank of Scotland:          GEORGE PAGANO, ESQ.
                           (Listen only)
                           MATTHEW W. OLSEN, ESQ.
                           (Listen only)
                           Katten Muchin Rosenman, LLP

Creditors Committee:       BONNIE STEINGART, ESQ.
                           Fried Frank Harris, et al.

Deutsche Bank:             ROBERT PETTINATO, ESQ.
                           (Listen only)
                           Deutsche Bank

Deutsche Bank Trust        THE BLACKSTONE ADVISORY SERVICES
                           (Listen only)

Bank of America:           BYUNG S. PARK, (Listen only)
                           Bank of America

Colony Capital:            ANDREW PARLEN, ESQ.
                           (Listen only)
                           SUZZANE S. UHLAND, ESQ.
                           (Listen only)
                           O'Melveny & Myers, LLP

MSRE Station SPV A LLC:    HARVEY STRICKON, ESQ.
                           Paul Hastings, et al.

CMBS Lenders:              CHARLES SCHRANK, ESQ.
                           (Listen only)
                           Sidley Austin

Morgan Stanley:            ERIC TAM, ESQ., (Listen only)
                           Morgan Stanley

<u>**TELEPHONIC APPEARANCE FOR:**</u>     (CONTINUED)


Bank of Scotland:                JOANNE SI, ESQ, (Listen only)
                                 The Bank of Scotland

1          **Reno, Nevada; Monday, June 21, 2010; 3:55 p.m.**

2                              **(Call to Order)**

3          **THE COURT:**  Be seated.

4          May I have appearances in the courtroom, please?

5          **MS. AXELROD:**  Good afternoon, your Honor; Brett

6     Axelrod, Fox Rothschild, for the unsecured creditors committee.

7          **THE COURT:**  Are you going to argue?

8          **MS. AXELROD:**  I am, your Honor.

9          **THE COURT:**  Thank you.

10         **MR. BEESLEY:**  Your Honor, Bruce Beesley and Laury

11    MacCauley of Lewis and Roca, and Tom Kreller of Milbank Tweed

12    Hadley and McCloy for the debtor.

13         **THE COURT:**  Are you going to argue, Mr. Kreller?

14         **MR. KRELLER:**  Yes, I am.

15         **THE COURT:**  Thank you.

16         **MS. SMITH:**  Jennifer Smith, Nevada counsel for the

17    CMBS lenders, and, no.

18         **THE COURT:**  Who is going to argue?

19         **MS. SMITH:**  We have not filed a pleading.

20         **THE COURT:**  That's what I thought.  I just wanted to

21    make sure; thank you.

22         **MR. HICKS:**  Your Honor, Bud Hicks of McDonald, Carano

23    Wilson, counsel for Deutsche Bank as administrative agent for

24    the pre-petition senior secured lenders.  I will not be

25    arguing.  There will be counsel from Simpson Thacher arguing on

7

1  this.

2          THE COURT:  Can counsel for Simpson Thacher hear me?

3          MR. QUSBA:  Yes, your Honor; a bit difficult, but,

4  yes.  It's Sandy Qusba from Simpson Thacher and Bartlett.

5          THE COURT:  I can hear you, which is more important.

6  And are you going to argue on behalf of your client?

7          MR. QUSBA:  I'm sorry, your Honor; if you said, 'Am I

8  arguing on behalf of our clients?', the answer is yes.

9          THE COURT:  Thank you.

10          MR. PARDO:  I may be in the wrong hearing.  Is this

11  with Judge Zive?

12          THE COURT:  Yes.  Who was that that just asked the

13  question?

14          MR. PARDO:  Rene Pardo in Toronto.

15          THE COURT:  No, you're done, sir.  You can hang up.

16  We ended the Mega-C hearing about an hour ago.

17          MR. WALTER:  Glenn Walter from --

18          MR. PARDO:  It's very hard to hear.

19          MR. WALTER:  -- Skadden Arps on behalf of Dr. James

20  Nave.  Glenn Walter from Skadden Arps on behalf of Dr. Nave.  I

21  will not be arguing.

22          THE COURT:  Right.

23          Are there other counsel that are on the telephone who

24  intend to argue the matter before me today?

25          **(No audible response)**

8

1          **THE COURT:**  No.  Do you know of anybody, Mr. --

2          **MR. BJORK:**  Your Honor, this is Jeff Bjork from

3  Sidley Austin for the PropCo lenders.  I don't plan to argue,

4  but if the Court has questions, I'd be happy to address them as

5  it pertains to our client.

6          **THE COURT:**  Thank you.

7          **MR. KRELLER:**  Your Honor, I believe Oscar Garza from

8  FCP PropCo from Gibson Dunn was going to be on the line, and I

9  believe he was going to argue as well.  They did submit papers.

10          **MR. GARZA:**  Yeah; Oscar Garza is on the line, your

11  Honor, for PropCo.

12          **THE COURT:**  Thank you.  I can hear you.

13          I want to apologize to everybody.  I have no idea how

14  we find ourselves in this situation except to tell you that

15  I've notified our Chief Judge, the Clerk of the Court, anybody

16  else I could find, because this is unacceptable to us, and I

17  apologize to counsel, and I have no idea.  Technology is

18  wonderful until it fails.

19          I have read the following pleadings, and I'm assuming

20  the recording is working.

21          **THE REPORTER:**  It looks like it.

22          **THE COURT:**  No, that's not the right answer.  Is this

23  being recorded?

24          **THE REPORTER:**  As far as I know, yes, sir, it is.

25          **THE COURT:**  Okay.  Can you monitor?

1          **THE REPORTER:**  I am monitoring now, sir, and --

2          **THE COURT:**  Okay, thank you.

3          **THE REPORTER:**  -- I am getting the delay.

4          **THE COURT:**  Make sure it's being recorded.

5          I signed an order shortening time to hear an

6  emergency motion for stay pending appeal regarding the order

7  establishing bidding procedures which I believe is still the

8  only order I've entered as a result of the hearings I conducted

9  at the end of May, is that correct?

10          **MR. KRELLER:**  That's correct, your Honor.

11          **THE COURT:**  All right.  That's docket number 1603.

12          I read the emergency motion itself, docket number

13  1589; I read the debtor's objection, docket number 1638; I read

14  the response by the administrative agent that's filed on behalf

15  of Simpson Thacher, docket number 1639; I read the opposition

16  filed by debtor FCP PropCo, and that's Mr. Garza, docket number

17  1640; I read the declaration of Jason Friedman, docket number

18  1643; I've read the joinder of Bank of Scotland, docket number

19  1647; I've read the response of the official committee.

20          Have I read all the pleadings that have been filed in

21  support of and in opposition to this motion?

22          **MS. AXELROD:**  Yes, your Honor.

23          **MR. KRELLER:**  I believe so, your Honor.

24          **THE COURT:**  All right.  I have read the transcript of

25  a hearing conducted May 28th and May 27th.  I apologize for

1    being as inarticulate as I generally am, but I'm accustomed to

2    reading to myself that way.  But I do actually think there were

3    some errors made by the reporter in that situation, but, so

4    I've read it.  I'm very familiar, and I went back and reviewed

5    all my notes so that I was familiar with the arguments that

6    were raised on that day as well as the arguments.

7           I also conducted a hearing, and I believe that that

8    was conducted -- I thought it was on June -- the emergency

9    hearing when I dealt with this issue and I pointed out that I

10   had applied the heightened scrutiny test, and I --

11           **THE CLERK:**  June 10th, your Honor.

12           **THE COURT:**  That was June 10th, and I have the

13   minutes of that hearing.  And I've familiarized myself and I

14   have reviewed docket number 1563, which was the order

15   establishing bidding procedures.  I've read the appellant's

16   statement of issues and designation of record on appeal, and I

17   just took a quick look at docket number 1554, which is another

18   submission for the revised bidding procedures, just so I knew

19   what was in front of me.  So I think I'm familiar with all the

20   facts in this case.

21           I'm going to make -- Before I hear argument, I want

22   to indicate the legal basis upon which I'm evaluating this

23   motion for a stay.  Both parties really have not disagreed to

24   any great extent regarding the test, but let's just review it

25   so that we know what it is.

11

1         Generally, the test is applied when one looks at

2    Federal Rule of Civil Procedure 62 and also Rule 65, which

3    deals with injunctions, and it's a four-part test.  To obtain

4    an -- excuse me.  And then also Rule, Federal Rule of

5    Bankruptcy Procedure 8005.

6         Generally the appellant must establish the following

7    elements in order to obtain a discretionary stay pending

8    appeal, which is what's being sought here: That the appellant

9    is likely to succeed on the merits of the appeal.  That, so

10   that you-all know, is both on substantive and procedural

11   grounds.  Judge Markell noted that in *Smith*.  I've done the

12   same thing in other matters, and the procedural issue at the

13   forefront here is whether or not this appeal is interlocutory.

14   I'll deal with that.

15        I do recognize that that decision, whether it's

16   interlocutory and whether leave would be granted then to allow

17   the appeal, would be before the United States District Court

18   and not me, but it does play in to the analysis of whether or

19   not the appellant would have a reasonable likelihood of

20   success.

21        The second element: The appellant will suffer

22   irreparable injury if no stay is granted.  I understand the

23   allegations of irreparable injury.  I would say that there's

24   very little, if any, evidence of those, but I understand the

25   allegations.

1           No substantial harm will come to the appellee as the

2      result of the stay.  It's the committee's position that the

3      debtors and their non-debtor operating subsidiaries can

4      continue to operate and there's no prejudice overlooking the

5      reorganization effort itself and the fact that revenues have

6      been declining and that there are deadlines provided for in

7      certain orders and other documents that compel some action to

8      be taken in fairly short order.

9           Four, the stay will do no harm to the public

10     interest.  There is a public interest in reorganization; I'm

11     familiar with the committee's arguments in that regard.

12          There is also the assertion that there's a sliding

13     scale test.  I will tell you I'm skeptical of that, and let me

14     explain why.  The four-part test was articulated thirty years

15     ago by the Ninth Circuit in the *Wymer*, W-y-m-e-r, case.  That

16     can be found at 5 B.R. 802.

17          The potential for the sliding scale, which is if

18     there's a greater likelihood of success, you don't need as much

19     of a showing of irreparable injury, or if you have great

20     irreparable injury, you don't need to show even a greater

21     likelihood of success.

22          Well, the United States Supreme Court in *Winter*

23     *versus Natural Resources Defense Council* at 129 Supreme Court

24     365, 208, rejected an argument that if a plaintiff seeking a

25     preliminary injunction showed a strong likelihood of prevailing

1   on the merits, the plaintiff could obtain a preliminary

2   injunction by showing only the possibility of irreparable harm.

3   The Supreme Court made it clear that the likelihood of

4   irreparable harm is the standard regardless of how strong the

5   likelihood of prevailing on the merits.  And I agree with the

6   majority of the courts that each of the four elements must be

7   satisfied by a preponderance of the evidence.  They are

8   conjunctive; they all must be satisfied.

9        And I thought a good discussion of that was found in

10   a case decided two years ago, *In Re: North Plaza, LLC*, at 395

11   B.R. 113, from the Southern District of California Bankruptcy

12   Court 2008, an appeal from the United States Bankruptcy Court

13   from the Southern District of California.  It articulated the

14   four elements that I've just placed on the record; indicated

15   that those factors were imported from the standard for deciding

16   preliminary injunctions or staying them pending appeal.

17        District courts have not agreed on how to apply the

18   discretionary stay factors when deciding whether to stay a

19   final bankruptcy order pending appeal.  Notice it did say a

20   'final' bankruptcy order.  It compared certain cases, *Rose*

21   *Townsend Trust versus Johnson*, and *Silicon Valley Bank versus*

22   *Pawn* with *Lynch*.  In the first two cases, it was held that

23   there had to be a showing of likely to succeed rather than

24   merely presenting a substantial case, and that each of the four

25   factors were conjunctive and the movant would not win a stay

14

1   unless each factor is established by a preponderance of the

2   evidence.  I've already indicated that's the test I'm going to

3   apply.

4           *Lynch* held that there was a traditional Ninth Circuit

5   sliding scale balancing test used for preliminary injunctions

6   and temporary restraining orders which the Court in the

7   Southern District found that the *Lynch* sliding scale approach

8   ignored the procedural posture of a Rule 805 stay -- 8005 stay,

9   excuse me -- when the movant is appealing a Bankruptcy Court's

10   final determination on the merits.  Quote:

11           'A sliding scale approach, which often results in

12           disproportionately waiving the irreparable harm

13           prong, is appropriate for preliminary injunctions

14           because a court deals with a dispute on first

15           impressions, relies on the less-than-developed

16           factual and legal record and will ultimately revisit

17           the issue down the road.  In contrast, whereas here,

18           a court has taken extensive evidence and briefing and

19           issued a determination on the merits, an interest in

20           finality arises.  This finality would be rendered

21           impotent if an enjoined party could always raise the

22           specter of irreparable injury to trump the trial

23           court's order no matter how unlikely an appellant

24           victory on the merits.  Thus, the Court considers *In*

25           *Re: Johnson* and *In Re: Pawn* persuasive and requires

1          that appellants show that it is more likely than not

2          that they will succeed on the merits whatever the

3          possibility of irreparable injury.'

4          So, no sliding scale.  And I think that that opinion

5   is consistent with the determination made by the United States

6   Supreme Court.  And I have a number of other cases in front of

7   me that the parties have cited, but other than that I didn't

8   see any distinction.

9          As indicated, I've read the transcripts; I'm familiar

10  with the facts.

11         When I first read this, before I read any of the

12  oppositions, because I read the oppositions long after I read

13  the motion itself, and my notes were it appears to me, and I am

14  not making a determination, that there is at least a

15  substantial likelihood that this would be considered an

16  interlocutory order.  And in any event, that would be decided

17  by the United States District Court.

18         And let me explain my thinking so you can respond if

19  you care to.  The bidding procedure is one of two orders that I

20  granted at the end of the hearings that were conducted May

21  28th.  The other was of course I approved the compromise, the

22  second compromise, under the master lease.  And it's important

23  to remember that that was the second compromise, because there

24  was a prior order that had already set in place certain

25  obligations that the parties to that agreement would have in

16

1   the future.  And those aren't changed by the order that I

2   orally approved on May 28th.

3          But the bidding procedures clearly are related to the

4   master lease compromise agreement insofar as the excluded

5   assets.  And one of the bases of the appeal is that I should

6   have required a valuation of each of the assets that's being

7   excluded and that will go to new PropCo and will not be

8   available to the bidder for the OpCo assets.  I believe that

9   that's right at the heart of the entire appeal.

10         And I understand that.  And when I read the

11  transcript, I made it clear then and I'll make it clear now, I

12  understood, and in fact it was argued that there was no

13  specific valuation.  At best, there was some type of indicative

14  value, some implied value, to establish a range, and I tried to

15  make that clear in my findings.  And so that's clearly a

16  legitimate, I think, basis to have it reviewed, and I

17  understand that.

18         But the bidding procedures, because of that,

19  necessarily have to relate to the master lease compromise

20  agreement because that's where those valuations, to the best

21  that they are valuations, actually occur and the obligations of

22  the parties are established.

23         And then finally, the bidding procedures only

24  establish a process for the auction itself.  They don't result

25  in the sale of anything.  By itself, nothing occurs except

1   triggering the auction process.  The sale which is set for

2   August 6th does not result in a consummated transaction.  That

3   only occurs if I approve the plan of reorganization, and it's

4   certainly not preordained.

5          And at that time, because I noticed in the pleadings

6   there was reference to 1129, I believe (a)(3), in good faith

7   because of the assertions regarding the fact that insiders are

8   benefitting to the detriment of creditors, unsecured creditors

9   I should state, the OpCo estate.  It should be pointed out that

10  all other creditors in all of these estates, other than the

11  unsecured creditors and certain independent lenders, have not

12  opposed or in fact have supported not only the bidding

13  procedure orders but the master lease compromise agreement.

14         I also denied, it should be noted, at that hearing on

15  May 28th, giving any jurisdictional approval to the

16  restructuring agreement because I did not want anyone to

17  believe that the plan was locked into place, because it is not.

18  And I thought I made that record clear on the 28th of May, and

19  I'll reiterate it, as I just did, today.

20         So, the prior master lease compromise agreement did

21  set in place, as I've already indicated, certain obligations

22  and transition services that the second master lease compromise

23  agreement placed some definitive price tag to in the absence of

24  any definitive valuation.  And all of that, in my mind, and the

25  reason I approved it, established certain certainty for anybody

1   who is bidding on the OpCo assets, and also allowed me and all

2   other parties-in-interest to object if it did not believe that

3   the sale could be part of a confirmed plan and satisfy the

4   confirmation requirements, including 1129(a)(3) or (a)(1) or

5   (a)(2).  So all of that's been preserved.

6          So when I evaluated all of that, when I read the

7   points and authorities, my notes originally all of this will be

8   addressed and dealt with, placed into a confirmation order,

9   either -- and I don't think denial of a confirmation order is

10  probably appeal; I think that's probably interlocutory, but --

11  because you can get additional plans.  But if I were to approve

12  the plan of reorganization, then all those matters are set to

13  go forward; that would be the time, I think, to seek any stay

14  and that would allow a full review of the matters that are

15  before me.

16         The idea is -- And I know there's -- I believe that

17  there is an issue that was raised, collaterally perhaps, on

18  some type of equitable mootness.  Well, I don't see that

19  happening because everything is preserved until the time of

20  plan confirmation, and moreover, equitable mootness by itself

21  it not an adequate basis upon which to obtain a stay.  Judge

22  Markell, in his *Fulmer* decision, and I don't know if anybody's

23  cited that in this case, that's at 323 B.R. 287, in 2005 cited

24  all the authorities for that proposition, and I think he's

25  absolutely correct.

1          So that's the -- that was the legal analysis, and

2   that was my initial impression when I read the -- when I read

3   the points and authorities.  And I paid particular attention to

4   the reply, page five of the reply that was filed Friday, the

5   18th.  I think this is the paragraph; I found it in line

6   eleven:

7               'Further, the stay only lasts as long as the appeal

8               is pending and the committee is committed to working

9               with the debtors in district court to have all the

10              issues determined as expeditiously as possible by

11              seeking both expedited briefing and an expedited

12              hearing with respect to the appeal.  Such expedition

13              will lessen any impact of the appeal on the debtors'

14              estates and will reduce the length of time that any

15              such stay will have.'

16          Then it's pointed out below that any decision

17   regarding whether it's interlocutory rests with the district

18   court pursuant to Rule 8003, and I totally agree.  But my point

19   is, is that I have to take into consideration likelihood, and I

20   don't think you disagreed with that.

21          **MS. AXELROD:**  No, your Honor.

22          **THE COURT:**  All right.  So that's -- And then you

23   argue it's a final order.  First you tell me I don't make the

24   decision; then you say it's a final order, and I assume you

25   want me to look at it as a final order for the purpose of the

1   evaluation of the reasonable likelihood of success, and, I did.

2           All right.  I think that's all I need.  That gives

3   you my legal approach, a little quick look at how I've applied

4   the facts as I understand them to that -- to those factors, and

5   I'll be glad to hear argument.

6               **ARGUMENT OF UNSECURED CREDITORS COMMITTEE**

7           **MS. AXELROD:**  Thank you, your Honor.  Brett Axelrod

8   for the unsecured creditors committee.  And thank you for the

9   preliminary comments; that can shorten up the time because I

10  know it's difficult for people to also hear on the phone with

11  the technical difficulties.

12          To first start, your Honor, on --

13          **THE COURT:**  Let me make sure.  Can everybody hear Ms.

14  Axelrod?

15      **(No audible response)**

16          **THE COURT:**  Can you hear me?

17          **MR. SPEAKER:**  Yes, your Honor.

18          **THE COURT:**  Can you hear Ms. Axelrod?

19          **MR. SPEAKER:**  Yes, your Honor.

20          **THE COURT:**  Go ahead.

21          **MS. AXELROD:**  First, your Honor, to address some of

22  the concerns that were raised, the committee's position is that

23  the bidding procedures must stand or fall on its own merits

24  even though they were presented by the debtors and the

25  supporting parties to that in a holistic approach.

1          **THE COURT:**  What is final about it?

2          **MS. AXELROD:**  What's final about it, your Honor, is

3    that the bidding procedures determine finally what will be

4    exposed to the market place and take off the table the excluded

5    assets.  The bidding procedures set the price at the $35

6    million dollars.  The bidding procedures also set the benefits

7    to the insiders as part of the stalking horse bid and a

8    stalking horse bidder is bidding on one set of assets, your

9    Honor, versus the third parties are bidding on a different set

10   of assets, and the bidding procedures set, for lack of better

11   terminology, the purchase price adjustment that those third

12   parties would be entitled to receive that does not equate to a

13   valuation under traditional standard.

14          **THE COURT:**  But those benefits that the third parties

15   might be able to receive, nobody provided me any valuation,

16   including your experts, that they have any significant value to

17   OpCo.  If they have value at all, it is value to the new

18   PropCo.  So in that event, any bidder will know what it is

19   getting, and only after that will we have any real hard

20   evidence of how that's evaluated.

21          I mean anything that we decide at this time is

22   speculation based upon how they will bid, except that we know,

23   based upon the evidence that I had that Boyd, who was heavily

24   involved in negotiations, was concerned about a number of these

25   items, including the computer system; was concerned -- we know

1    that pan gaming (phonetic), when you take a look at Exhibit 34,

2    it looked at the customer lists and was skeptical about the

3    value of those.

4         So if you -- the argument on the other side this

5    provides certainty and the only -- insofar as I can determine,

6    the only concrete way to make that determination is to allow

7    the process to go forward to see if there are bidders.  That's

8    the other position.  And frankly, I was persuaded of that at

9    the end of May; I don't know why I wouldn't be today.

10        **MS. AXELROD:**  I understand, your Honor.

11        The committee's position is that under the 363

12   traditional-view analysis, as the Court stated, that if you're

13   doing a traditional analysis of this, you would have needed to

14   have more valuation evidence than was presented to you at the

15   May hearings.

16        **THE COURT:**  If I were doing a sale, by itself in the

17   absence of all the other considerations in this case, not only

18   is there $35 million dollars, but there is a $13 million dollar

19   assumption of debt.  There are a number of other non-monetary

20   considerations that we've placed on the table, including

21   established certainty, including putting a price on the Texas

22   Station PUT which was at least $25 million dollars less than

23   Boyd thought.

24        I mean there's a number of elements that provided, in

25   my mind, a stability that allowed the process to go forward

1   that make it difficult to place a financial value on it, and in

2   any event, there wasn't really any, and I know that.  And if

3   that's a mistake, somebody can tell me, but my point is that's

4   not a mistake that's happened yet because we don't know.

5        **MS. AXELROD:**  And your Honor, what the committee's

6   concern is, is that by looking at this without establishing

7   some type of market test at the beginning of this process and

8   instead --

9        **THE COURT:**  Well, you want a second market test,

10   because the whole point was everybody said there was a first

11   market test when they went through the negotiations that were

12   primarily done by the OpCo lenders, because they came up with

13   the stalking horse bid, because the debtor couldn't even

14   participate in the conversations with Boyd.  So the point is,

15   is that there will be a second marketing allowed for the non-

16   excluded assets but not for the excluded assets.

17        **MS. AXELROD:**  Exactly, your Honor.

18        And the problem that the committee has is that the

19   OpCo lenders do not have a fiduciary duty to our clients of the

20   unsecured creditors.

21        **THE COURT:**  Well, the debtor's bringing the motion.

22        **MS. AXELROD:**  I understand, and the debtor has been

23   briefed before.  The point is that the committee has concerns

24   about the stalking horse bidder being inclusive of two members

25   of the debtor's board.  And when you have insiders who are

1    selecting the stalking horse participating in this, you have

2    the concern that we have is without the market test, we don't

3    have that heightened scrutiny.

4         **THE COURT:**  I understand the concern.  And as I

5    indicated on May 28th, and as I went back through it again, and

6    also the joinder of Bank of Scotland emphasizes at this point

7    is that there are parties that had economic interests that were

8    not tainted, they're not on the new PropCo side, they're on the

9    steering committee for the administrative agent, and they

10   believe that this is the best way of proceeding and this is the

11   best deal that will maximize the value of the assets for them.

12   And if it only gets them eighty-seven cents on the dollar,

13   that's fine, but of course if it goes -- if the bidding

14   procedure actually results in a sale that brings in more money,

15   that's even better for them I would assume, and of course that

16   would have to be better for you because until that additional

17   thirteen percent is paid to the secured lenders and the

18   administrative priority claims are paid, your clients aren't in

19   the money.  That's just -- I don't think that's in dispute.

20        **MS. AXELROD:**  I'd say it's the practical reality of

21   the posture right now.

22        **THE COURT:**  Right.  So the folks that have the same

23   economic interests were those that were supporting this bidding

24   procedure motion, and also the treatment of the excluded

25   assets.  And I fail to recognize or see why they would act in a

1   way that would be contrary to their economic interests.  I

2   don't care about equity, you know, the former equity.  I

3   understand your arguments about that.  I've looked at Exhibit

4   19 again and again and again.

5         The point being though is that those that have a real

6   economic stake that would want to maximize the value of the

7   assets has said: 'This is what we believe is the best way of

8   proceeding.'  The only ones that disagree, of course, would be

9   your constituency, because they wouldn't share right now based

10  at the $772 million dollar price, and the independent group of

11  lenders which I've already dealt with on numerous occasions,

12  that may, as I said, that may lead to disputes with the

13  administrative agent but it has nothing to do with the matters

14  in front of me, and I've given them every opportunity.

15        So I've got to tell you, Ms. Axelrod, that's how I'm

16  looking at this.

17        **MS. AXELROD:**  And I understand, your Honor.  But the

18  $2.4 billion dollar of debt that --

19        **THE COURT:**  Big money.

20        **MS. AXELROD:**  -- yeah, that my clients, you know, are

21  also in this proceeding, and they're looking at it from this

22  point of view is to have the pragmatic approach applied, as we

23  briefed, when it comes to if this is deemed to be an

24  interlocutory order by the District Court because, on one part,

25  yes, there's extremely serious money here, and also, too, when

1   you have the pay-to-play in a bankruptcy proceeding, that even

2   if the unsecured creditors are not currently in the money, that

3   their voices and their concerns are entitled to that appellate

4   review.  Standing alone, as we said in our briefs, while that

5   may not be enough on its own when it comes to the irreparable

6   harm, it's certainly a consideration that the Court can take

7   into account, and we cited to the *Adelphi* case and other

8   cases --

9           **THE COURT:**  I read it.

10          **MS. AXELROD:**  -- in the Second Circuit, while not

11  binding, we found persuasive because of the stakes in this case

12  and the amount of money that is at issue.

13          **THE COURT:**  Why shouldn't I let the District Court

14  make all of those determinations?

15          **MS. AXELROD:**  And your Honor, I do believe it's

16  appropriately before the District Court.  We responded in our

17  pleadings because I think it does go to the success on the

18  merits.

19          **THE COURT:**  I think there's a motion to strike a

20  portion -- I don't know if there's been a ruling on the motion

21  to strike.  Isn't there -- Was there a motion to strike?  No,

22  that's in the other matter.  I'm sorry.

23          **MR. KRELLER:**  That's the other one, your Honor.

24          **THE COURT:**  I had two --

25          **MS. AXELROD:**  I was going to say I hadn't seen it,

1   your Honor.

2          **THE COURT:**  I had two state proceedings in two casino

3   cases today, and I apologize.  That was in the other one

4   dealing with subordination issues.

5          **MR. KRELLER:**  That's right.

6          **THE COURT:**  We don't have that issue here.

7          **MR. KRELLER:**  Your Honor, the answer to that question

8   is no, by the way; there's been no resolution on that motion.

9          **THE COURT:**  Okay.  That one, we had a bleeding over.

10  I apologize.

11         **MS. AXELROD:**  On the surface, your Honor, those can

12  be very similar when looking at the cases.  But what we have

13  here which makes this case different than some of the cases

14  that were cited is, as your Honor has previously said, this is

15  a very unique case.  And also historically how the debt was set

16  up and created to address the first master lease compromise and

17  the second master lease compromise.

18         As we stated before you for the three days of

19  hearings, that we acknowledge that the first master lease

20  compromise put certain things in place, but what it did not put

21  in place was the price tag, and we'll be addressing that order

22  when it's entered, and we'll be before --

23         **THE COURT:**  Well, absolutely.  See, that's my point,

24  is that there is no doubt in my mind those findings and

25  conclusions would support the granting of the two motions and

1    the denial of the third, and it was agreed on the record that

2    we would do one consolidated set of findings and conclusions.

3    That if appeal was taken from the other two by the parties who

4    did not prevail, that there's very little doubt in my mind that

5    there wouldn't be some kind of a motion or stipulation to

6    consolidate those appeals.

7              And that's exactly the point that I was driving to

8    earlier.  That automatically happens upon my determination of

9    what to do with the plan.  It's all there, and that's what

10   makes it final, because I'm at a loss to determine, candidly,

11   how an appellate court could look at just the bidding or just

12   the second compromise order in a vacuum.  I just don't see how

13   it's possible and come up with any rational resolution.  And

14   it's not as though time is imminent because the sale itself

15   doesn't take place until August 6th.   And the plan

16   confirmation is set, if I remember, sometime in September.

17             **MR. KRELLER:**  End of August, your Honor.

18             **THE COURT:**  End of August.  So, that's right.

19             **MS. AXELROD:**  Part of the determination about the

20   public interests factor is also the judicial economy and do we

21   want to be going through a sales process that if --

22             **THE COURT:**  Do you want to do piecemeal appeals?  I

23   mean that's the whole idea of finality is to eliminate

24   piecemeal appeals and why generally appeals aren't allowed from

25   interlocutory orders.  I understand the balance.

29

1              MS. AXELROD:  Uh-huh.

2              THE COURT:  And, you know, let me say this, that by

3     going through with the sales process might eliminate a lot of

4     speculation, and --

5              MS. AXELROD:  The committee's --

6              THE COURT:  -- who knows what the result -- You can't

7     tell me.  Nobody sitting here can tell me what will happen as a

8     result of this auction process.

9              MS. AXELROD:  That's correct, your Honor.  The

10    committee's concern is that this bid procedures as approved and

11    this auction process that we are not going to have anyone show

12    up at the auction and that the bid procedures themselves --

13             THE COURT:  And when will I find that out?

14             MS. AXELROD:  -- will chill the bidding.

15             THE COURT:  I'll find that out on August 6th.

16             MS. AXELROD:  I understand, your Honor.  But that is

17    the committee's position.

18             THE COURT:  So what irreparable injury would the

19    committee members suffer if there is not an imposition of a

20    stay since nothing's going to happen until August 6th and even

21    that isn't final?

22             MS. AXELROD:  When it comes to the committee's

23    irreparable injury is that we're going down again, your Honor,

24    this path and the concern that we raised in the brief, which I

25    know your Honor's agreed with, about the failure to seek a stay

30

1   and the equitable mootness and what an appellate court --

2          THE COURT:  Well, I don't think you said that

3   equitable mootness by itself was the basis.  I mean --

4          MS. AXELROD:  No.

5          THE COURT:  -- the law is pretty clear on that area.

6          MS. AXELROD:  No, your Honor, but that is an element

7   that an appellate court will be taking up.

8          THE COURT:  What's moot?

9          MS. AXELROD:  Yeah.

10         THE COURT:  If I don't grant the stay today, what

11  will be moot?

12         MS. AXELROD:  The issue regarding the setting of the

13  price of the excluded assets, that the market -- that they will

14  not be exposed to the market place and that the sale will

15  occur.

16         THE COURT:  And how is that moot if the sale is not

17  finally approved until the hearing on the plan of

18  reorganization?

19         MS. AXELROD:  Because of what your Honor earlier had

20  said about these two orders being so intertwined, that part of

21  the mootness is it's so complicated that an appellate court

22  can't effectively remedy if there --

23         THE COURT:  Well, I'm pretty sure an appellate court

24  can do it.  If I can figure it out, I know they can.

25         MS. AXELROD:  But that is really the committee's

1   concern, is because of the complicated stature of these cases

2   and these orders --

3        **THE COURT:**  Which is my point exactly.  Why look at

4   them piecemeal?  One time, here it is, here's the plan, here's

5   how the plan's affected; then we determine whether or not

6   there'll be a sale, because then you can tell me, this is the

7   irreparable injury, they can tell me, this is irreparable

8   injury if you don't, and then everybody knows.  Every party-in-

9   interest is well aware that you have a right to appeal from

10  that plan confirmation.  That is a final -- there is no

11  question, and I don't think Mr. Kreller would argue to the

12  contrary, that an order confirming a plan is a final order.

13       Because it's the position in all the oppositions is

14  that's the only final order, and then it's all properly before

15  the Court, there's an absence of speculation, we know what

16  happened and whether it's good, bad or indifferent, we can make

17  that determination.  And maybe these assets have more value.

18  Maybe the approach that Boyd has taken is the right one.  I

19  mean Boyd objected, then withdrew its objections.  That says

20  something to me very candidly, and it was the original entity

21  with whom the lenders were negotiating for the stalking horse

22  bid.

23       This is Bankruptcy Court, and we all know that

24  everybody, until they actually show up with money, people don't

25  have money, and here we don't know that people don't have money

32

1    until they don't show up.  It's kind of the flip side.  I have

2    to admit I'm pretty stuck on that point.

3          **MS. AXELROD:**  And I understand, your Honor.  We don't

4    think that this is by any nature a cut and dry or easy call

5    because of the fact that this is such a unique coupling and

6    because the committee is very much concerned from an outside

7    point looking in if they look at the record, they look at the

8    second master lease compromise, they look at the asset purchase

9    agreements, the bid procedures, that we're going to be deprived

10   of our ability to get the appellate review, and that is why

11   we're seeking the appellate review now, because this is not

12   your simple asset purchase agreement for a casino.  This is

13   something much more different than that, and that is why we

14   thought that this is ripe now for appeal.

15          Unless the Court has any other questions, I'll rest

16   on the pleadings.

17          **THE COURT:**  No, thank you.  Good job; thank you very

18   much.

19          **MS. AXELROD:**  Thank you.

20          **THE COURT:**  I'm going to hear from the folks on the

21   telephone first because I'm assuming you can still hear me.

22   Can you?

23          **MR. QUSBA:**  Yes, your Honor.

24          **THE COURT:**  Who wants to argue first?

25          **MR. QUSBA:**  I'm happy to go, your Honor.  It's Sandy

33

 1   Qusba from Simpson Thacher and Bartlett, counsel for the

 2   administrative agent, Deutsche Bank Trust Company Americas as

 3   the agent on the OpCo Bank facility.

 4                **ARGUMENT OF DEUTSCHE BANK TRUST COMPANY**

 5             **MR. QUSBA:**  Your Honor, I think you've correctly

 6   identified, both at the hearing and at this motion, that the

 7   committee's central focus really is with respect to the

 8   excluded assets.

 9             They're asking two principle questions and have been

10   since the motions were originally filed in April: whether OpCo

11   could have gotten more for the excluded assets as part of the

12   auction process itself, and two, whether we've chilled the

13   bidding in OpCo by keeping these assets out of the auction.

14   Two legitimate questions, your Honor, but questions that have

15   been thoroughly briefed, subject of substantial discovery,

16   testified to and ultimately determined by your Honor after

17   three days of hearings.

18             And the reasons for the Court's decision made three

19   weeks ago or so are equally operative now.  And while the

20   committee may ask the right questions, they certainly don't

21   want to hear the right answer.

22             And in the context now of the stay hearing in

23   particular and the four elements that have to be established,

24   and I do believe that *North Plaza* and the rationale expressed

25   in *North Plaza* is the appropriate rationale, that each of the

34

1    elements must be satisfied.  And the committee, I think, fails

2    on all four of the elements.  And we can certainly start with

3    the harm and the substantial harm to the OpCo banks if a stay

4    is granted, and certainly if the appeal is ultimately

5    prosecuted successfully by the committee.

6            But with respect to the stay itself, your Honor, we

7    are incurring -- we, the OpCo estate -- is incurring

8    substantial administrative costs, as your Honor is I'm sure

9    aware having reviewed the fee statements submitted from time to

10   time by the various estate professionals, committees as well as

11   the debtors as well as ordinary-course professionals.  And one

12   need only look to the Friedman declaration and the two exhibits

13   attached thereto, which were essentially snapshots, or meant to

14   be snapshots of the company's cash position from immediately

15   prior to the bankruptcy filing and a more recent budget which

16   shows the company's balance sheet cash as of a more recent

17   date.

18           And if you look at the exhibits to the Friedman

19   declaration, the two budgets, your Honor, and you just focus on

20   line 5.9, which is total unrestricted cash, and it's on page

21   two of each of the budgets.  Your Honor, if you look at the

22   Exhibit A, I believe, which was the budget attached to the DIP

23   order, and it shows that as of July 24th -- and the filing

24   occurred on the 28th of July, your Honor -- this company had in

25   line 5.9 approximately $310 million dollars of cash.

1          You compare that now, your Honor, to an April 30th,

2    2010, cash balance, which is, again, line 5.9 of Exhibit B to

3    the Friedman declaration, and we're about a hundred million

4    dollars off of where we were at the beginning of this case.

5    That's a diminution in our value, in our collateral value, your

6    Honor, and we are effectively subsidizing all the litigation in

7    this case.  So it is us, the banks who suffer a direct

8    diminution in value and substantial loss by any delay in these

9    proceedings, and certainly a stay would delay these

10   proceedings.

11         Now, the committee, excuse me, has argued that

12   they're certainly willing to prosecute the appeal on an

13   expedited basis, et cetera, but nothing has happened in the

14   District Court that would certainly evidence that intent to

15   move on an expeditious basis.  In fact, it appears to us that

16   there are a hundred and thirty-seven designated items for the

17   record on appeal from just the committee itself.  So to suggest

18   that this is going to be done in a very short time frame I

19   think is not really practical, and certainly we would bear the

20   cost of that, which, from our perspective, again, is

21   unacceptable.  That's a direct cost that we suffer.

22         There are also other costs, and that's the risk of

23   losing the settlement in the stalking horse bid itself, which,

24   in my mind, could result in an irreparable injury to the OpCo

25   banks.  In particular, your Honor, the consideration in the

36

1    stalking horse bid that's been secured is, so to speak,

2    guaranteed.  We are guaranteed a recovery of $317 million

3    dollars of cash and some amount of debt, $455 million dollars

4    of debt.  But that guarantee is tied to, obviously, the asset

5    purchase agreement and the conditions set forth therein.

6           One of the conditions included in the asset purchase

7    agreement is that we have to go effective -- we have to close

8    by December 31, subject to some discrete extension mechanics.

9    But the general premise here of the stalking horse bid is that

10   we have to emerge by 12/31.  And in order to emerge by 12/31,

11   what was negotiated is that you have to have a confirmation

12   order in place by October 31.

13          And the time difference between October 31 and

14   December 31 will certainly be used, for example, to get

15   regulatory approvals and other closing conditions satisfied.

16   But if you can't get to confirmation by the end of October,

17   you're never going to be able to hit the end of December

18   emergence date that's required by the stalking horse bid.

19          Now, to get to confirmation by the end of October, we

20   have to run an auction process, so you have to have sixty days

21   set aside for that.  You have to have a disclosure statement;

22   that has to be approved.  And if you stay these proceedings and

23   the bid procedures at this point, it seems very, very unlikely

24   that we would be able to maintain that October 31 confirmation

25   date, let alone December 31 emergence date.  And the loss, or

1   the risk of loss, is a very real risk with respect to the

2   stalking horse bid.  And again, I submit, your Honor, would

3   cause us irreparable injury and certainly should be considered

4   by the Court.

5          In addition, your Honor, the committee argues that

6   the steering committee didn't have the fiduciary duties to

7   maximize the value of the OpCo estate.  While we don't have a

8   fiduciary obligation, we certainly have something perhaps just

9   as important as a fiduciary obligation, and that's economic

10  incentive, your Honor.  Because one thing we have to recognize

11  is while we do have a very substantial and real bid staring us

12  in the face, the $772 million-dollar-stalking horse number,

13  that bid does not get the OpCo banks out in whole.

14         Okay, we were owed $900 million dollars.  Our

15  expectation when we made the loan was to be paid in cash.

16  We're getting less than half of that in cash, and the balance

17  of it in long-term debt.  So, your Honor, we're structurally

18  senior creditors with liens, are taking less than par, and a

19  significant portion is less-than-optimal long-term debt, your

20  Honor.  The concerns and the hypotheticals conjured up by the

21  committee whose constituents are the bondholders at a

22  structurally junior position in the capital structure should

23  really be given their due weight, if any weight at all.

24         I understand the committee's position that, you know,

25  right now they may be out of the money, but perhaps by

38

1   including the excluded assets in the auction process, they

2   somehow, some way would become in the money.  But those are

3   purely hypotheticals, your Honor, while the OpCo banks would

4   suffer real economic damage by not only funding the case for an

5   extended period of time but arguably or conceivably losing the

6   benefit of a $772 million dollar floor bid, which does

7   represent a substantial but incomplete recovery still to the

8   OpCo banks.

9           Your Honor, on the second factor, the likelihood of

10  success, I again think the creditors committee fails with a

11  preponderance of the evidence to establish that they in fact

12  would be more likely than not to succeed on the merits on

13  appeal.  Your Honor I think has appropriately analyzed what

14  value we received for -- 'we' meaning the OpCo lenders as well

15  as the OpCo estate -- received for the excluded assets, and

16  it's not just $35 million dollars of cash; it's also $13

17  million dollars of assumed liabilities.  It's also a further

18  reduction of a million and a half in rent under the master

19  lease because it is tied inextricably to the compromise

20  agreement that was approved as well.

21          And if you amortize the one and a half million

22  dollars out through to the end of the year which, again, as I

23  mentioned earlier, is the assumption by -- or the sunset date

24  in the asset purchase agreement that the stalking horse

25  executed, that's another nine to ten and a half million dollars

1   of economic savings for the OpCo estate and the OpCo lenders in

2   particular.  So, that plus the thirty-five plus the thirteen,

3   we're now up to somewhere in the fifty-seven to $58 million

4   dollar range of economic consideration.

5           And then there were substantial non-economic

6   considerations that the OpCo estate and the lenders received,

7   first and foremost obviously the $772 million dollar stalking

8   horse bid, which is somewhere along the lines of a nine to ten

9   times EBITDA multiple on the last twelve months of EBITDA for

10  this company.

11          We also, as additional consideration, significantly

12  improved over the original proposal made by the stalking horse

13  bid in January of 2010, which the record reflects as well.  We

14  converted almost a hundred million dollars of PIC debt which we

15  would have received in consideration to cash, all of which are

16  very material improvements in our position, all of which we

17  would obviously be threatened to lose should this -- should the

18  bidding procedures be stayed and the settlements unwound.

19          The Texas Station PUT liability, another material

20  consideration that we received.  We were in contact with

21  bidders, as your Honor knows, as it was established by the

22  evidence.  We had substantial dialogue with Boyd as well as

23  other parties.  Boyd in particular expressed grave concern with

24  respect to the uncertainties surrounding the Texas Station

25  master lease, the ability for the landlord to PUT it and then

1    at what price.

2            And in fact, a substantial benefit of the stalking

3    horse bid was not only to secure the 772 but also put a pinhole

4    on the liability, the amount of the liability associated with

5    the Texas Station lease, which gives other bidders a lot of

6    comfort and it gives us as the recipients of the consideration

7    an understanding as to what's going to be deducted from our

8    consideration in order to satisfy certain other liabilities.

9            And obviously, as your Honor has noted on the record

10   in connection with your decision, there was substantial

11   consideration associated by having a more formal separation

12   plan for the OpCo and PropCo assets, avoiding litigation

13   associated with the original compromise agreement, avoiding

14   litigation with respect to title issues, lien issues, and

15   giving us basically a path towards exit.  Again, nothing's been

16   decided and won't be decided until your Honor confirms a

17   Chapter 11 plan, but we can't even get there until we're able

18   to auction off these assets.  And this is the path, this is the

19   methodology by which the OpCo lenders, the OpCo estate and the

20   PropCo lenders have agreed to pursue.

21           And your Honor, all those considerations of value

22   that you took into account, those are really factual

23   determinations, and there's no real dispute, I don't believe,

24   with respect to the application of the law.  And your Honor

25   obviously used heightened scrutiny on these motions, and, as

1  you mentioned earlier in this hearing, didn't even approve one

2  of them, meaning the OpCo support agreement.

3        And anything on appeal with respect to the bid

4  procedures as well as the master lease compromise agreement, in

5  particular with respect to the issue of whether OpCo and the

6  lenders received significant or enough consideration for the

7  excluded assets, I think will be subject to an abuse-of-

8  discretion review and highly unlikely to be overturned given

9  the amount of testimony, given the amount of discovery, and

10 given the three days of evidentiary hearings before your Honor.

11        Finally, your Honor, there was also concern whether

12 with respect to keeping the excluded assets out of the auction

13 we've chilled the bid process, and this I think relates also to

14 the public policy argument I'm about to make, which is as soon

15 as your Honor, orally at least, approved the bid procedures and

16 the MLCA, the master lease compromise agreement, on the 28th of

17 May, Lazard was hard at work.  Lazard is the financial advisor

18 and investment banker for the debtors.  They are the ones in

19 charge of actually marketing these assets, the OpCo assets,

20 together with, obviously, Dr. Nave and Skadden Arps as Dr.

21 Nave's counsel, being the independent arbiter on behalf of the

22 OpCo estate with respect to the auction process.

23        And Lazard put a process letter together.  They've

24 gone to market, they've had substantial conversations and many

25 conversations with potential bidders.  Parties have entered

1  into non-disclosure agreements.  Parties are spending time,

2  effort and money with respect to doing due diligence on the

3  OpCo assets and getting ready for a date that's coming, which

4  is June 30th, as to when letters of intent have to be

5  submitted.

6          So, you know, the parties and the market has an

7  expectation now of this process going forward which, again, I

8  think, helps with the public policy argument with respect to

9  the market's expectation and putting this case towards a path

10  of reorganization.  And I think to unwind that would due

11  substantial damage to the M and A process for really purely

12  speculative purposes because, as you've pointed out, the

13  committee certainly hasn't demonstrated any degree of certainty

14  with respect to the excluded assets somehow fetching enough

15  consideration whereby they are now in the money and are being

16  adversely affected by the fact that the excluded assets aren't

17  part of the auction process.

18          So I think Lazard's effort to date, the fact that the

19  compromise agreement with the bid procedures actually puts this

20  case on a path to exit are all public policy considerations

21  that your Honor should take into account in denying the

22  creditors committee's stay motion.

23          And if your Honor has any questions, I'd be happy to

24  answer them.

25          **THE COURT:**  No, thank you.  Mr. Garza?

43

1           **MR. GARZA:**  Your Honor, I'm going to just focus on

2    one issue, and that is the likelihood of success on the merits

3    of the appeal.  The committee ignores the fact that the

4    original master lease compromise agreement already provided

5    PropCo, my client, the exclusive right to acquire the majority

6    of the excluded assets, so I'm unclear how the committee having

7    the right to have some right after this to market these assets

8    to third parties since under the first compromise, which was

9    not appealed by any party, the majority of those assets were

10   already required to be sold to PropCo.

11          Second, and I feel like we've already talked about

12   this many times before, without the compromise, and we may not

13   have a compromise if we don't have this bid process go forward,

14   without the compromise, there's going to be a real dispute as

15   to what assets belong to FCI and what assets belong to PropCo.

16   And as we stated before in the previous hearings, there is

17   going to be a lot of litigation that's going to ensue between

18   the parties in order to determine what can be sold.  And so at

19   this point, your Honor, I would suggest that the orders that

20   were approved or properly approved, they took into

21   consideration all the issue, including the massive litigation

22   that would ensue between the parties if both the bid procedures

23   motion and the compromise were not approved.

24          **THE COURT:**  All right.  Mr. Kreller?

25                     **ARGUMENT OF STATION CASINOS**

44

1          **MR. KRELLER:**  Your Honor, I'll and be brief, but Mr.

2    Qusba and Mr. Garza have touched on points that I'll try not to

3    reiterate.

4          Just opening and to step back, let's remember that a

5    request for a stay like this pending appeal is an extraordinary

6    remedy.  The cases, the *Smith* case and the *Fulmer* case that we

7    cite to I think established that pretty clearly.  It's an

8    extraordinary remedy, and the UCC bears the burden to prove

9    each of the four elements, the four prongs we've been talking

10   about.

11         Just really very briefly on each of the four, the

12   likelihood of success on the merits.  Your Honor, I agree

13   entirely with your analysis of how the interlocutory order

14   issue plays in here.  I agree with the committee that that's an

15   issue ultimately that that decision is a decision for the

16   District Court, but I also agree that that is something that

17   you take into account when assessing the likelihood on the

18   merits, and if you conclude that it's likely that the District

19   Court concludes that it's a non-appealable interlocutory order,

20   I think that weighs heavily on the factor of the lack of

21   likelihood of success on the merits.

22         And your Honor, when you look at and think about

23   whether an order is a final order, what the cases tell you is

24   that a final order is one that finally determines the discrete

25   issue to which it is addressed and seriously affects

1   substantive rights.  I think for all the reasons that you've

2   actually identified in your preliminary remarks indicate that

3   this is not that kind of a final order.

4            The issues that the committee has been concerned

5   about that they raise in this motion and that they've raised

6   throughout are issues about bid chilling, insider dealings,

7   self-dealing, a tainted process, some sort of wrongdoing by the

8   debtors.  Your Honor, this is simply an order that establishes

9   a process that is designed to lead to a sale.

10           And as you recognized at the outset, we're going to

11  have to be back in front of you at a confirmation hearing

12  seeking approval of that sale, subject to all of the applicable

13  requirements in 1129 and 1122 and 1123.  That's the final order

14  that ultimately will be appealable.  That's the final order

15  that will finally determine the discrete issues about the

16  disposition of these assets and it will seriously affect

17  substantive rights.  This bid procedures order that initiates

18  the sale process is not such a final order.

19           Your Honor, if we look at the issues set forth in the

20  committee's motion and think about them in the context of the

21  likelihood of success on the merits, I think it becomes pretty

22  clear that the burden has not been met here.  Frankly, even as

23  pled, the motion pleads them under the wrong standard.  It says

24  the committee will be able to meet its burden that it has a

25  fair chance of success on the merits of the appeal.  That's not

46

1    the standard, your Honor.  The standard is that they have to

2    prove to you by a preponderance of the evidence that it's more

3    likely than not that they will prevail on the merits.  So

4    simply as pled, their motion fails.

5         But if we look at the four factors, the four issues

6    on which they think they have a fair chance of success, I think

7    that it's pretty clear that their burden, even on those issues,

8    they've failed to carry their burden.

9         They talk about the Court having insufficient

10   evidence that the bidding procedures were an exercise by the

11   debtors of their business judgment.  Your Honor, I won't go

12   back through; we did in some extent in our papers cite you to

13   the record on this.  But clearly you've got Haskins, Aronzon,

14   and Friel (phonetic) declarations on the evolution of the bid

15   procedures and a wealth of a record on why the bid procedures

16   in this process is in the best interest of the estate; nothing

17   other than this naked statement by the committee on this issue.

18        Item number two, the debtors didn't value the

19   excluded assets, and there was no evidence before the Court

20   that the excluded assets were being transferred for fair

21   consideration.  Your Honor, if there was no evidence before the

22   Court, I don't know what we were doing here for three or four

23   days on this stuff.  You've have live testimony, you've had

24   deposition transcripts of nine witnesses.  You've had, in

25   addition to Mr. Haskins and Mr. Friel, you had Mr. Krieger,

47

1    from Mr. Qusba's client you had Mr. Genera and Mr. Caruso's

2    testimony on this issue.  Remarkable that the committee can say

3    there was no evidence before the Court.  They may not like the

4    evidence, they can even try to argue that the evidence wasn't

5    sufficient, but there was an awful lot of evidence in favor of

6    those findings and nothing to the contrary coming from the

7    committee or the other objectors.

8           Your Honor, point number three, the Court applied the

9    incorrect legal standard in evaluating a sale to an insider.

10   You didn't evaluate a sale to an insider.  This goes right to

11   the interlocutory order point.  You didn't conduct a 363

12   analysis of this transaction because the stalking horse

13   transaction was not and is not in front of you for approval,

14   and may never be.  We will run this process, there will be an

15   auction, the stalking horse bid may prevail; it may not.  A

16   different bid may prevail that looks very different than the

17   stalking horse bid.  We don't know.  That's what makes this all

18   interlocutory and speculative.

19          So just the very way they've phrased this shows you

20   the problem with this motion.  This isn't about the bid

21   procedures order.  They don't like what they see down the road

22   in a confirmation hearing in the plan.  They'll have the

23   ability to let you know about that.

24          Finally, your Honor, the Court did not consider

25   whether the bidding procedures were in the interest of OpCo.

48

1    I'll just refer you to the transcript cites, your own

2    statements on the record at the hearing on the 27th and I

3    believe on the 28th in terms of how you considered and how you

4    viewed this transaction and these bid procedures.

5             Your Honor, on irreparable harm, again, I'm going to

6    go back to this theme: The assets will not be sold until you

7    order them to be sold.  This order initiates a process where

8    the debtors will proceed in good faith with the auction

9    process, as approved and as defined in the bid procedures

10   order.  At some point in the future, hopefully the very end of

11   August, we will show up with the prevailing bid from the

12   auction, and we will have to prove to you all of the elements:

13   that we proceeded in good faith, that it was the highest or

14   otherwise best auction -- the best bid coming out of an auction

15   over which you will be presiding.

16            The committee I'm sure will pursue discovery on all

17   of their allegations again of conflicts and insider taint and

18   all that other good stuff that makes the headlines.  All of

19   that will get vetted.  If they find something that proves to

20   you that we haven't carried our burden, the assets don't get

21   sold and their rights have not been affected.  But as we sit

22   today, your Honor, number one, they've yet to find anything

23   like that in this case on any of these various issues.  And

24   number two, all of this is remote and speculative.  It is not

25   the kind of actual, imminent or irreparable harm that they need

1   to prove to you by a preponderance of the evidence in this kind

2   of a motion.

3         Your Honor, on the third prong and the harm to other

4   parties if the stay is granted, I think Mr. Qusba articulated

5   the risks, and because of the way the deal has been put

6   together, I think the estates and the OpCo lenders are very

7   much aligned in a number of these issues.  I'm not going to

8   reiterate that.  This is obviously a very carefully crafted and

9   balanced resolution on a number of fronts, with a number of

10  constituents, with a lot of economics at stake here.  And a

11  stay that is simply a perpetuation of Ms. Steingart's request

12  for a do-over really threatens to unravel something that the

13  economic stakeholders in this case have worked long and hard to

14  put in place.  And it puts the estate in real jeopardy if we're

15  not allowed to proceed in good faith after these transactions.

16        Finally, your Honor, on the public interest

17  component, I think the Court has appropriately recognized the

18  need here.  Given this capital structure, given this

19  organizational structure, given the way these assets have been

20  operated historically, I think you've recognized on a couple of

21  occasions the need for a rational, well-thought-out and

22  economically sensible separation of the businesses.  That's

23  what we're pursuing.  We're pursuing it in good faith.  We're

24  working around the clock to do so.  We continue to do so, and

25  we're doing it at this point with substantial creditor support.

1          I think that's precisely the kind of a reorganization

2    that is at the heart of Chapter 11 and the public policy behind

3    the reorganization in allowing reorganizations to go forward in

4    this manner.  That is not -- that does not prejudice the

5    committee's rights to come in and object to plan confirmation

6    or come in and object to the disclosure statement.  We've got

7    big hearings coming up in this, and there will be a lot put in

8    front of you I am sure.  So they retain their right to

9    challenge our efforts to pursue this reorganization.  But given

10   the economic realities here, the public interest really

11   attaches to the debtors' right to pursue its attempted

12   reorganization, particularly when we have the level of creditor

13   support we have here.

14          Unless you have any questions, your Honor, I don't

15   have anything else.

16          **THE COURT:**  Ms. Axelrod?

17          **FINAL ARGUMENT OF UNSECURED CREDITORS COMMITTEE**

18          **MS. AXELROD:**  I'll be brief, your Honor.  To address

19   some of the points that were raised, the one overwhelming issue

20   and theme here really is that in bankruptcy, there really is no

21   community property, and you are really looking at, for

22   separation of these two businesses, OpCo is entitled to its

23   assets and the value of its assets.  And to leave some of that

24   value on the table for the PropCo creditors is one of the real

25   issue of irreparable harm and lack of fairness that you've

1    heard from the committee throughout these cases.

2         And there is always the temptation for the

3    practicality that these are businesses that were operated

4    together.

5         **THE COURT:**  No, and I'm aware of that temptation, and

6    I attempted to address it on May 28th, because this is a little

7    -- this is a different type of case.  I'm well aware of the

8    values.  And I don't remember if I did make the baseball

9    analogy, if I've got two shortstops, you don't have any.  The

10   same shortstop may not have much value to me while it has great

11   value to you, but if I'm going to buy the ball club, how much

12   am I going to pay for the extra shortstop?  I don't know the

13   answer to that question.

14        So, I feel I've got some assets that perhaps have

15   value for another party but not to any other party, and

16   somebody is going to buy the estate that has those extra

17   assets, how do they know that new PropCo is going to buy it and

18   maybe they'll go ahead with the stand alone IT; who knows?  So

19   that's -- I did attempt it.  I'm well aware of that.

20        In addition to that, you know, the PropCo debtors

21   have their own fiduciary obligations to maximize value.  So you

22   had the competing tensions, which is why I looked at what I

23   thought were the economic motivations between both parties

24   which, once again, gets me back to where I was, that those that

25   have no relationship to the debtors other than that they were

1     lenders and will not be part of the new PropCo group support

2     this process; those being the other members of the steering

3     committee.

4          So I didn't want anybody to think I didn't look at

5     it.  I'm fully aware, because it's a legitimate point, and I

6     wrestled with it.  And somebody may well disagree with me, but

7     I -- because it just looked like if you didn't have a new

8     PropCo, what would those values be to OpCo?  Not very much.

9     Everybody, for the most part; I don't think there's any real

10    doubt about that --

11         **MS. AXELROD:**  Well --

12         **THE COURT:**  -- unless you have somebody that wants to

13    buy them.  What is the value of the word, you know, over

14    (phonetic) or stations?  What is the value of a computer system

15    where servers are located in competing facilities?  I don't

16    know the answer to that question, but I get a sense it isn't

17    great.  And so -- And that's reflected, as I said, by the Penn

18    expression of interest, Exhibit 34.

19         The point is you're right, and I thought about it.

20    And, as I said, others may disagree with the final result, but

21    I didn't want anybody to be mistaken to think that I did not

22    appreciate the legal issue itself.

23         **MS. AXELROD:**  And I recall hearing that at the

24    hearing when the Court struggling with that.  But part of what

25    we have here is that we've heard a lot about the value is not

53

1    there, no one else but PropCo, and it was the debtors' burden

2    under 363 to come forth with that valuation.  It wasn't the

3    committee's burden.

4          THE COURT:  Oh, I understand, and that goes right

5    back to the valuation issue.  And counsel, you and Ms.

6    Steingart and Mr. Winston and Mr. Goldberg on behalf of the

7    independent lenders, you did a great job of emphasizing that.

8    No, I understand --

9          MS. AXELROD:  And that just --

10         THE COURT:  I understand the concern.

11         MS. AXELROD:  And that's where we're addressing the

12   irreparable harm, and I just wanted to clarify the record --

13         THE COURT:  It will --

14         MS. AXELROD:  -- because of some of the statements

15   made about --

16         THE COURT:  Sure, go ahead.

17         MS. AXELROD:  -- evidence right now about what's

18   going on with market expectation and the market test, and

19   there's no evidence.

20         THE COURT:  I have -- I was about to object myself,

21   okay, but I -- but I thought --

22         MS. AXELROD:  I don't like objecting during argument,

23   your Honor.

24         THE COURT:  I thought the point was, okay, I'm not

25   going to rely on anything Lazard's doing because I have no

54

1   evidence of whatever Lazard is doing except that I would have

2   to think that we would all be stunned if there weren't

3   something going on because I'm aware of the deadline, okay?

4        **MS. AXELROD:**  And then the last issue, and this again

5   gets to the heart of why we brought -- part of the reason why

6   we brought this motion now, is that you're hearing a lot about

7   the deadlines: the deadline of October 31st, confirmation order

8   in place, effective date 12/31.  Without doing an expeditious

9   appeal, those deadlines are at risk, and if we wait till the

10  end of August and take the appeal then, and so that is also --

11       **THE COURT:**  Well, I don't place -- Just so that the

12  record is clear, and maybe I should, but I don't place a huge

13  emphasis on those deadlines.  I didn't do it before earlier --

14  at earlier stages in this case and I'm not doing it now.  I do

15  take account of them.  But in terms of the weight that I place

16  on them, those are the same deadlines established by the

17  parties that want me to go forward with the bidding procedure

18  and, I'm sure, with the plan of reorganization.

19       And if that deal -- if this deal is really in the

20  benefit -- provides the benefit that is asserted, as I said

21  earlier, I would assume there's some flexibility with

22  deadlines, because they're in a sense self-imposed.  But at the

23  same time, they're real in the other sense because, remember,

24  the administrative agent represents a consortium.

25       And you also have to remember that, you know, really

1   the OpCo lenders are acting as the equivalent of exit financing

2   in this case, at least for OpCo.  I mean the committee, as I

3   indicated, has not been able to provide me with any evidence

4   that anybody else is willing to make any financing.  And this,

5   more than half the purchase price, is being financed by those

6   that presently have the debt on these assets.  So, I took all

7   that into account.

8          **MS. AXELROD:**  The --

9          **THE COURT:**  And the unsecured creditors don't have

10  any of that risk.  I mean they're either in or out of the

11  money.  I mean they made their decision regarding their risk

12  when they made their investments.

13         **MS. AXELROD:**  Yeah, as did all the creditors in this

14  case.

15         **THE COURT:**  Right, and now they have the security and

16  now these same creditors say 'We realize we're only getting

17  eighty-seven cents on the dollar, but we think this is in our

18  best interest'.  And as I said, those that do not have any

19  interest in new PropCo have arrived at the same conclusion.  I

20  understand the independent lenders are looking at it

21  differently, but they're the minority and they're bound by the

22  agreements they entered into with the administrative agent.  So

23  I just didn't want you to think that I hadn't looked at it.

24         **MS. AXELROD:**  No, I know you have, your Honor.

25         And then the last is to address the administrative

56

1    cost to this estate.  If the OpCo lenders, they're in the

2    position that if they didn't want to have this process and this

3    run forward and bear part of that cost, they could always file

4    the lift stay in front of your Honor if that's truly where the

5    values are at.  Thank you.

6         **THE COURT:**  All right.  Obviously I did a lot of work

7    in advance of this hearing, and I asked Ms. Axelrod some pretty

8    tough questions that I was interested in the response to them.

9                          **RULING OF THE COURT**

10        **THE COURT:**  When I first looked at this and wrote up

11   my notes, there were several things that came to mind.  First

12   of all, the legal basis, and I've already put on the record the

13   legal analysis that I'm applying to the facts that are before

14   me.  The four-prong test must be established by the movant by a

15   preponderance of the evidence in order to get the extraordinary

16   remedy of the discretionary stay pending appeal.

17            In applying that burden of proof, I am going to deny

18   the motion.  And my analysis is on each of the prongs, I think

19   -- I don't believe that the burden has been established

20   regarding the substantial likelihood of success on the merits,

21   both on the substantive issues as well as on the procedural

22   issue.  And even if I'm wrong, certainly on the procedural

23   issue, the committee is not foreclosed from seeking exactly the

24   same relief from the United States District Court.  And the

25   United States District Court will have to make a determination

57

1    on whether or not the appeal is interlocutory, and if it is

2    interlocutory, whether or not it will grant leave to appeal,

3    which it can do when certain tests are met in a bankruptcy

4    context.

5            I think earlier in the hearing today, and by

6    reference to my findings on May 28th, indicated why I think the

7    bidding procedures motion was properly granted.  I've looked at

8    it again, and I mean in a sense this almost compels you to go

9    through a 9023-type of -- Federal Rule 9023 analysis, and I've

10   done that, and I do believe that the committee has not been

11   able to establish a reasonable likelihood of success.  It may

12   have, quote, 'a fair chance', quote and there may well be

13   significant issues, but at least as regards to the bidding

14   procedure, no.

15           And I also believe that it's clearly interlocutory,

16   but I'll leave -- and so that leads me to the conclusion that

17   you will not -- that not only do you have little -- you don't

18   have a substantial likelihood, I don't think you have even the

19   possibility, but Judge Jones may disagree with me.

20           You know, the sale won't occur unless a plan is

21   confirmed, and that first requires a sale, a disclosure

22   statement and the plan.  Anything that we would try to do in

23   anticipation of those events is just speculation.  And it's far

24   easier to evaluate those when the events have occurred and when

25   the parties have had their rights preserved to be able to

58

1   object.

2           And I, while not stated, because I think parties are

3   somewhat reluctant to make this argument but I'll address it.

4   There's nothing, as I indicated, preordained.  And we've heard

5   the argument of counsel.  I rely on that argument.  They're not

6   going to be able to come back in August and say 'All these

7   meets are decided by your earlier orders' when they've told me

8   clearly that all those issues have been reserved.  They have

9   been and they will be treated that way.

10          So, you know, and the same for the master lease

11  compromise agreement, which is a transfer of those excluded

12  assets for $35 million cash, $13 million in assumption, you've

13  got non-monetary consideration, you've got about nine million

14  dollars in reduced rent.  You know, nine million dollars covers

15  some of the administrative costs if nothing else in this case.

16  But even there, nothing is final until the plan of

17  reorganization.

18          And, of course, if I don't approve the plan of

19  reorganization, the prior compromise still is effective, and

20  that did, as indicated, provide for the transfer of certain

21  assets.  And I just don't see any irreparable injury that the

22  committee or the committee members will suffer if I do not

23  grant this stay, and that's a test.  There isn't any.  What's

24  going to happen?  There's going to be a bidding procedure.

25  Maybe it will result in a great benefit to the secureds,

1    administrative claimants, priority claimants and the unsecured

2    claimants.  I don't know that.  As I said, nobody knows that.

3           If in fact it is and there's evidence that the sale

4    was chilled, we'll know that.  We will know that.  But there's

5    no injury.  I just don't see the injury.

6           And I do see that there is a potential for

7    substantial harm to other parties-in-interest, and this ties in

8    with the earlier comment that some of the other parties-in-

9    interest are also debtors and they have the responsibility to

10   maximize the value of the assets for their creditors.

11          And, as I noted and I think counsel had it right, Mr.

12   Qusba had it right that the secured lenders have made certain

13   decisions.  They have agreed to take certain monetary haircuts.

14   They have agreed to provide financing.  They have negotiated

15   and they are at risk, and at greater risk than when they

16   entered into this transaction.  So whether it's irreparable, I

17   would tend to think it is because I don't see where the

18   ultimate monetary recovery would be, and that's the test.  So I

19   do think that they are at risk.

20          As to the stay will do no harm to the public

21   interest; there is a public interest in the reorganization

22   process.  There's a public interest in maximizing economic

23   value that provides jobs for thousands and thousands or people.

24   That is an important cog in the economic vitality of a

25   community.  And keeping these casinos operating with the

1   potential to sell or reorganize that provides that benefit, in

2   the absence of any evidence to the contrary, is an important

3   consideration.  That's the underlying theory of rehabilitation

4   in a Chapter 11, and that's something that I indicated on May

5   28th I think is important.

6           There's also potential issues, I believe, with

7   regulatory authorities in the event it doesn't go forward, and

8   then of course then there's a whole laundry list of, you know,

9   the parade of horribles.  I don't know, but I get a sense that

10  -- in fact I think the committee stated that these ownership

11  and lien issues and potential litigation were all a ruse.

12  Well, as I indicated then, that's asking me to accept

13  statements made by officers of the Court that would not be

14  true, and also the evidence that's in various declarations, and

15  I'm not in a position, in the absence of any evidence to the

16  contrary, to do that.

17          I think that what still underlies this entire

18  position is leverage in an attempt to arrive at some type of

19  negotiated resolution that would provide some economic benefit

20  to the committee that. in the absence of, it is difficult to

21  see how it would obtain because of the economic realities in

22  these cases.  And the bidding procedure order itself is an

23  attempt at perhaps to provide that benefit to the committee,

24  but the committee is convinced it won't.  But if it doesn't the

25  remedy still exists; and if it does, we'll know on August 6th.

61

1          So I just can't arrive at the result that the

2    committee is asking.  There is no evidence that the excluded

3    assets will or could result in a higher bid, and we don't know

4    at this point whether or not the stalking horse bid will be

5    exceeded or not.

6          I don't see any potential for equitable mootness in

7    this case because until the plan of reorganization is before

8    the Court, there's nothing final.  So I looked at that issue as

9    well.

10         I have considered the relative harm to other parties,

11   and I don't believe that the UCC is in any imminent risk, and I

12   don't think that they've shown that there would be any harm to

13   the public interest in the absence of a stay.  And in fact, as

14   I've indicated, I believe just the opposite could well result.

15         You know, when you look at *Adelphi*, *Adelphi* is

16   interesting, and I think what you want to do there is wait

17   until the confirmation order.  I sort of thought that's what

18   *Adelphi* was saying, and I think you cited it, and I agree with

19   that, but that's the whole idea of the confirmation order.

20         I see far more risk to the debtor and the lenders and

21   the other parties if a stay were to be issued by this Court

22   than any harm at all from this order that would be incurred by

23   the constituents of the committee because, truly, this order is

24   an adjunct to confirmation.

25         All of the factors that I analyzed in making the

1   determination and approving the bidding procedure order was

2   done based upon the obligation that I had to apply heightened

3   scrutiny, and that's why I looked at them as hard and as long

4   as I did.  And that's also one of the factors that played into

5   my decision to deny approval of the OpCo support, restructuring

6   support agreement.

7            And I believe that the orders I entered preserved

8   this Court's discretion and avoided a crimp to a plan,

9   preserved the rights of the parties to object after testing

10  these assets to the market, which I really believe is the

11  entire purpose of the process.

12           And as indicated for the excluded assets, there was a

13  lot of evidence regarding the negotiations, the participation

14  by Boyd Gaming, other interests owned by others regarding the

15  Texas Station PUT, ownership issues and a number of other

16  matters.  And I think that certainly this provided -- could

17  well provide a benefit and, as I've already stated, the result

18  of the auction itself will be a better indication than anything

19  we can speculate about at this time.

20           And I know the MCLA, master lease compromise

21  agreement, is before me today, but I had to arrive at that

22  range of reasonableness to be able to approve the settlement,

23  and that's what I did, and that order is likewise in my mind an

24  interlocutory as the bidding procedure order because nothing's

25  final, pursuant to that order, until a plan of reorganization

1   is confirmed.  And if I don't confirm the plan, as I've already

2   stated, then you have to go back to the obligations as set

3   forth in the original compromise agreement.

4        My notes indicated that I have reviewed the UCC's

5   concern that the OpCo assets are not being sold for enough

6   value so the unsecured creditors might get some dividend.  I

7   found that to be very speculative as to what that might be.

8   There was concern that the sale will be chilled; there's no

9   evidence it will be chilled.

10        And in fact, the evidence is that the compromise

11   removes the potential for litigation, provides certainty; it

12   obtains value for assets that would have little value to OpCo

13   since they're not used for the OpCo operations.  And there's no

14   evidence that it would enhance the bidding at all, and it's

15   supported by the majority of the secured lenders and by the

16   unaffiliated members of the steering committee, the Bank of

17   Scotland and Wells Fargo.  And then of course the plan process

18   itself provides the final protection.

19        So, for all of those reasons, I am not going to grant

20   the extraordinary remedy of a discretionary stay.  I've made my

21   findings and conclusions on the record pursuant to Federal Rule

22   of Bankruptcy Procedure 7052 that incorporates by reference

23   Federal Rule of Civil Procedure 52.

24        I'm instructing counsel for the debtor to prepare

25   written findings and conclusions consistent with the oral

64

1    findings and conclusions and then a separate order consistent

2    therewith.  Submit them to all parties who have filed written

3    objections and, of course, to the movant.

4              Is there anything I've overlooked?

5              **MR. KRELLER:**  I don't believe so, your Honor.  And we

6    will do so.

7              **THE COURT:**  Okay, thank you.  I apologize for the

8    technical difficulties.  Usually the technology works well, and

9    it's the human element that you've got to question, but in this

10   case it's the other way around, for which I am greatly

11   appreciative.

12             Thank you all very much.

13             **ATTORNEYS:**  Thank you, your Honor.

14             **THE CLERK:**  All rise.

15       **(This proceeding was adjourned at 5:24 p.m.)**

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATION**</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>July 2, 2010</u>

            Signed                                        Dated


                    *TONI HUDSON, TRANSCRIBER*