1

2

3

**Entered on Docket**
**July 14, 2010**

_____
**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

4

5

6

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:     (213) 892-4000
Facsimile:     (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley (NV SBN 1164)
Laury Macauley (NV SBN 11413)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:     (775) 823-2900
Facsimile:     (775) 823-2929
bbeesley@lrlaw.com; lmacauley@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

7

8

9

10

11

12

13

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In re:

STATION CASINOS, INC.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects Northern NV Acquisitions, LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC

Chapter 11

Case No. BK-09-52477-GWZ
Jointly Administered

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW IN SUPPORT
OF ORDERS: (I) APPROVING REVISED
SECOND AMENDED AND RESTATED
MASTER LEASE COMPROMISE
AGREEMENT; (II) ESTABLISHING
BIDDING PROCEDURES AND
DEADLINES RELATING TO SALE
PROCESS FOR SUBSTANTIALLY ALL
OF THE ASSETS OF STATION
CASINOS, INC. AND CERTAIN "OPCO"
SUBSIDIARIES; AND (III) DENYING
MOTION FOR ORDER AUTHORIZING
OPCO DEBTORS TO ENTER INTO
RESTRUCTURING SUPPORT
AGREEMENT WITH OPCO LENDERS**

Hearing Dates:  May 4, 5, 27 and 28, 2010

#4842-9594-1638

In connection with the *Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019 For Entry of an Order Approving Second Amendment to Amended and Restated Master Lease Compromise Agreement*, dated April 7, 2010 [Docket No. 1179] and amended on April 19, 2010 [Docket No. 1215] (the "Master Lease Motion") and the *Debtors' Motion for Entry of Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos, Inc. and Certain "OpCo" Subsidiaries*, dated April 7, 2010 [Docket No. 1175] and amended April 19, 2010 [Docket No. 1214] (the "Bidding Procedures Motion") and *Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 9019 Authorizing OpCo Debtors to Enter into Restructuring Support Agreement with OpCo Lenders* [Docket No. 1219] (the "Support Agreement Motion" and, together with the Master Lease Motion and the Bidding Procedures Motion, the "Motions"),[1] Station Casinos, Inc. ("SCI" or "OpCo") and FCP PropCo, LLC ("PropCo" and together with SCI, the "Parties"), debtors and debtors in possession in the above captioned Chapter 11 Cases, hereby submit these *Findings of Fact and Conclusions of Law in Support of Orders: (1) Approving Revised Second Amended and Restated Master Lease Compromise Agreement; (2) Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos, Inc. and Certain "OpCo" Subsidiaries; and (3) Denying Motion for Order Authorizing OpCo Debtors to Enter into Restructuring Support Agreement with OpCo Lenders* (collectively, the "Findings of Fact and Conclusions of Law").

The Court hereby makes the following Findings of Fact and Conclusions of Law:

## I. BACKGROUND

PropCo, as lessor, and SCI, as tenant, are parties to a Master Lease Agreement (the "Master Lease") under which SCI leases from PropCo real property and improvements associated with four of its hotels and casinos. SCI's prepetition lenders refused to approve a cash collateral budget that provided for payments under the Master Lease beginning in December 2009. SCI and PropCo, through PropCo's independent directors, therefore

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Motions.

commenced good faith, arm's length negotiations to structure an agreement with respect to the Master Lease that would allow for the continued operation of SCI's hotels and casinos in a manner that would appropriately protect and preserve the value of those operations, provide both estates with appropriate relief from provisions of the Master Lease that are problematic in the current economic environment (including a temporary reduction in cash rent payments due under the Master Lease), and provide SCI and PropCo with a reasonable amount of time to try to solve not only the Master Lease issues, but the overall restructuring of the Debtors' estates.

On December 11, 2009, after the filing of a motion and a hearing attended by all of the Debtors' major creditor constituencies, the Court approved the *Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving Master Lease Compromise Agreement*, dated November 19, 2009, as amended on December 10, 2009, and entered an order authorizing PropCo and SCI to enter into the original Amended and Restated Master Lease Compromise Agreement, dated December 11, 2009 (the "First Master Lease Compromise Agreement") [Docket 962]. In addition, the Court issued findings of fact and conclusions of law approving the First Master Lease Compromise Agreement on February 2, 2010 [Docket No. 961]. Pursuant to the First Master Lease Compromise Agreement, SCI was authorized to pay, and PropCo to accept, Reduced Rent during the Deferral Period specified in the agreement ("Reduced Rent"). In consideration for PropCo's agreement to accept Reduced Rent, SCI, *inter alia*, agreed to provide certain transition services (the "Transition Services") to PropCo in the event that SCI rejected the Master Lease. These Transition Services were necessary in order to allow PropCo to operate as a stand-alone business in the event of a separation of SCI and PropCo. SCI also agreed to sell certain assets and grant certain rights to PropCo, either at a negotiated price or at a price to be determined by the Court, in the event of a rejection of the Master Lease.

On March 4, 2010, the First Master Lease Compromise Agreement was extended for an additional two months when the Court entered an order approving *Joint Motion of Station Casinos, Inc. and FCP PropCo, LLC Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and*

1    *365(d)(4)(B)(ii) and Fed. R. Bankr. 9019 for Entry of an Order Approving First Amendment to*

2    *Amended and Restated Master Lease Compromise Agreement* [Docket No. 1042].

3         The First Master Lease Compromise Agreement was an interim solution to issues

4    surrounding the Master Lease and was designed to allow SCI to pay Reduced Rent while at the

5    same time providing downside protection to PropCo in the form of Transition Services in the

6    event that SCI rejected the Master Lease.  The parties entered into the First Master Lease

7    Compromise Agreement at a relatively early stage in these cases in order to break a deadlock

8    among the respective creditor constituencies over the December 2009 rent payment.  SCI and

9    PropCo did not, however, contemplate that the First Master Lease Compromise Agreement

10   would be a complete and final resolution of all issues surrounding the Master Lease and the

11   potential separation of PropCo and SCI.  At the time of the First Master Lease Compromise

12   Agreement, the Debtors believed SCI and PropCo would remain together and intended to work

13   toward a plan of reorganization that would achieve that goal.  It became clear after December

14   2009, however, that the interests of the OpCo Lenders and PropCo's lenders (the "CMBS

15   Lenders") were sufficiently divergent that a separation of SCI and PropCo was the only viable

16   plan for the Debtors to pursue.

17        Toward that end, and after consultation and negotiation with its major stakeholders, the

18   Debtors formulated a plan that contemplates: (a) a foreclosure of the PropCo assets by the

19   CMBS Lenders, coupled with the purchase of certain other non-collateral assets as contemplated

20   by the First Master Lease Compromise Agreement; (b) an agreement by and between Fertitta

21   Gaming, LLC ("FG") and the CMBS Lenders pursuant to which FG and the CMBS Lenders

22   would form a new company ("New PropCo") to be capitalized with cash and the PropCo Assets;

23   (c) a transfer of the Excluded Assets (defined below) to New PropCo; and (d) a sale of all or

24   substantially all of the remaining OpCo Assets as the culmination of an auction process designed

25   to produce the highest or best available offer for those assets (the "Auction").  There was no

26   evidence that the UCC had any significant role, or any role at all, in the negotiation of the

27   foregoing matters.  The Second Amendment to Amended and Restated Master Lease

28   Compromise Agreement (the "Second Amended Master Lease Compromise Agreement") helps

to facilitate that plan by building on the concepts embodied in the First Master Lease Compromise Agreement (*i.e.*, rent relief for OpCo in exchange for Transition Services for PropCo). As a result of intensive, good faith negotiations among the Debtors' major stakeholders, those concepts have been expanded, refined, and clarified from a short term solution designed to buy time to a definitive step toward the separation of OpCo and PropCo.

On April 7, 2010, SCI and PropCo jointly submitted the Master Lease Motion, seeking approval of the Second Amended Master Lease Compromise Agreement which was subsequently amended on April 19, 2010 and on May 24, 2010. Also on April 7, 2010, the Debtors submitted a bidding procedures motion (the "Bidding Procedures Motion") designed to establish the "ground rules" for the Auction, which was amended on April 19, 2010 and on May 25, 2010 to reflect the support of the Administrative Agent for the OpCo Lenders ("Administrative Agent") and the Steering Committee for the OpCo Lenders ("Steering Committee") and the adoption of a Stalking Horse Bid. On April 19, 2010, the Debtors also filed the Support Agreement Motion.

On April 21, 2010, the Independent Lenders filed a consolidated opposition to: (1) the Master Lease Motion; (2) the Bidding Procedures Motion; and (3) the Debtors' Motion to Extend Exclusivity [Docket No. 1243]. That same day, the UCC filed objections to the Bidding Procedures Motion [Docket No. 1245] and the Master Lease Motion [Docket No. 1246]. On May 3, 2010, the UCC filed a consolidated supplemental objection to the Master Lease Motion and the Bidding Procedures Motion [Docket No. 1364].

On April 28, 2010, PropCo filed a Reply in support of the Master Lease Motion [Docket No. 1315] and the Administrative Agent filed a consolidated response to the objections of the UCC and Independent Lenders to the Master Lease Motion and the Bidding Procedures Motion [Docket No. 1317], which was joined by the Bank of Scotland and Wells Fargo Bank, both OpCo secured creditors [Docket Nos. 1321 and 1388, respectively]. Also on April 28, 2010, the Debtors filed replies in support of the Master Lease Motion [Docket No. 1323] and the Bidding Procedures Motion [Docket No. 1322]. That same day, the CMBS Lenders filed a consolidated reply in support of the Master Lease Motion and the Bidding Procedures Motion [Docket No.

1   1315].

2          The parties conducted discovery in connection with the Motions, including the

3   production of thousands of documents and eight depositions.  The UCC and the Independent

4   Lenders conducted examinations of:  (1) Richard Haskins, SCI's General Counsel; (2) Tom

5   Friel, SCI's Chief Accounting Officer; (3) Scott Kreeger, SCI's Senior Vice President of

6   Corporate Operations; (4) Dr. James Nave, SCI's Independent Director; (5) Robert Kors, one of

7   PropCo's two Independent Directors; (6) Daniel Aronson, Managing Director of Lazard Freres

8   & Co. LLC ("Lazard"), financial advisor to the Debtors; (7) Michael Genereux, Senior

9   Managing Director at Blackstone Advisory Services, L.P., financial advisor to the

10  Administrative Agent; and (8) Robert Caruso, Managing Director at Alvarez & Marsal, North

11  America, LLC ("Alvarez & Marsal"), which was retained to provide advisory services (including

12  assessments of the indicative value of certain SCI assets) to Simpson Thacher and Bartlett, LLP

13  ("Simpson Thacher"), in connection with Simpson Thacher's representation of the

14  Administrative Agent.  On May 4 and 5, 2010, the Court held hearings on the Master Lease

15  Motion and the Bidding Procedures Motion and heard live testimony from Messrs. Haskins,

16  Friel, and Aronson.  The Court deferred ruling on the Motions to a later date and allowed the

17  UCC and the Independent Lenders to conduct further discovery and submit additional briefing in

18  opposition to the Motions.

19         On May 18, 2010, the UCC and the Independent Lenders each filed supplemental

20  objections to the Motions and the Bidding Procedures Motion [Docket Nos. 1481 and 1482].  On

21  May 21, 2010, PropCo, SCI, and the Administrative Agent each filed supplemental replies in

22  support of the Motions and the Bidding Procedures Motion [Docket Nos. 1510, 1509, and 1505].

23         On May 27, 2010, the Court held an additional hearing and entertained further argument

24  on the Motions and the Bidding Procedures Motion.  The Court indicated prior to the hearing on

25  May 27 that it had requested of the Debtors copies of, and reviewed, the deposition transcripts of

26  all deponents.  The Court overruled various evidentiary objections, including an evidentiary

27  objection to the declaration of Mr. Caruso and a report attached thereto.  On May 28, 2010, the

28  Court granted the Master Lease Motion and the Bidding Procedures Motion and denied the

Support Agreement Motion and entered oral findings of fact and conclusions of law and instructed the preparation of written findings of fact and conclusions of law consistent therewith.

## II.    DISCUSSION

**A.    Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b), 1334(a), 1408, and 1409).**  The Court has jurisdiction over the Motions and the relief requested therein pursuant to 28 U.S.C. § 1334 and over the persons and property affected hereby.  Consideration of the Motions constitute core proceedings under 28 U.S.C. § 157(b)(2).  Venue for these cases and proceedings on the Motions is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

**B.    Due, Sufficient, and Appropriate Notice Provided (11 U.S.C. § 102(1), Fed. R. Bankr. P. 2002 and 4001).**  Under the circumstances, the Court concludes that the notice given by the Debtors of the Motions and the relief requested in the Motions constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Rules 2002 and 4001(b), (c), and (d) of the Federal Rules of Bankruptcy Procedure and the local rules of the Court, and that no further notice of, or hearing on, the relief sought in the Motions and the relief granted herein is necessary or required.

**C.    Cause for Requested Relief Demonstrated (11 U.S.C. §§ 105(a), 363(b)(1), 365(d)(3), and 365(d)(4)(B)(ii), Fed. R. Bankr. P. 9019).**  SCI and PropCo have each demonstrated "cause" for the relief requested in the Motions under sections 105(a), 363(b)(1), 365(d)(3), and 365(d)(4)(B)(ii) of the Bankruptcy Code and Fed. R. Bankr. P. 9019.

**D.    The Second Amended Master Lease Compromise Agreement Satisfies the Requirements of Bankruptcy Code Section 363(b)(1).**  Section 363(b)(l) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(l).  Such use, sale or lease of estate property must be based upon a debtor's sound business judgment.  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  In connection

with decisions related to the use of leases to maximize the value of the estate, courts show deference to a debtor's sound business decisions. *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997). As described below (*infra* at II.F), SCI and PropCo each exercised proper business judgment in entering into the Second Amended Master Lease Compromise Agreement. In addition, as described below (*infra* at II.J), the Court also evaluated each of the Motions under a heightened standard of scrutiny and concluded that SCI and PropCo satisfied a heightened review of the transactions at issue in entering into the Second Amended Master Lease Compromise Agreement. *Brown v. Kinross Gold U.S.A., Inc.,* 531 F. Supp. 2d 1234, 1246 (D. Nev. 2008) (articulating the "entire fairness" standard which "entails evaluating both whether the offer price constituted fair value and whether the offer was the product of fair dealing"); *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999).

**E.     Reduction of the Rent Due under the Master Lease and the Other Accommodations and Remedies Regarding Performance of Obligations.** Section 365(d)(3) of the Bankruptcy Code provides that a debtor in possession "shall timely perform all the obligations . . . arising from and after the order for relief under any expired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1)." This section protects landlords from being forced to provide current services to tenant-debtors without receiving current rent payments while the tenant-debtor determines whether to assume or reject the lease. 130 Cong. Rec. § 8894-95 (daily ed. Jun 29, 1984). PropCo, as landlord under the Master Lease, has willingly and in good faith negotiated the terms of the Second Amended Master Lease Compromise Agreement and has not been coerced to allow SCI to continue as lessee without paying full rent contemporaneously. Rather, PropCo has, in good faith and the exercise of its business judgment, determined that the exchange of Reduced Rent and the other protections in the Second Amended Master Lease Compromise Agreement that benefit SCI in exchange for SCI's commitment to provide PropCo with specified transition services and other benefits is a beneficial compromise for PropCo.

**F.     The Second Amended Master Lease Compromise Agreement Is Approved under Rule 9019.** Compromises are favored in bankruptcy and are a normal part of the

reorganization process. *Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). The fundamental compromise reflected in the Second Amended Master Lease Compromise Agreement is the agreement of OpCo and its subsidiaries, under specified circumstances, to grant, sell and assign to PropCo certain assets, licenses and rights (the "Excluded Assets") and provide Transition Services. Among the Excluded Assets are assets and rights that SCI was already obligated to sell to PropCo in the event of rejection of the Master Lease, subject to the terms of the First Master Lease Compromise Agreement.

1)    **Fair And Equitable Standard For Approval of a Compromise.** To determine whether a compromise satisfies the fair and equitable standard, courts review four basic factors: "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988); *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986).

2)    **Maximum Value Not Required.** The parties are not required to reach the absolute maximum value for the estate. Rather, settlements should be approved if they fall above the lowest point on the continuum of reasonableness. *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

3)    **Results if Compromise Not Reached With Respect to Master Lease.** In the absence of the Second Amended Master Lease Compromise Agreement, SCI would face complex, difficult, uncertain, and costly litigation with other parties in interest, regarding issues that include, but are not limited to, (1) ownership of certain of the Excluded Assets, (2) the purchase price of certain Excluded Assets that SCI was already obligated to sell to PropCo under the First Master Lease Compromise Agreement, (3) the nature and extent of the Transition Services SCI is obligated to provide in event the Master Lease is rejected, (4) lien and lien priority issues, (5) cash collateral issues, (6) ownership of fixtures, and (7) practical issues regarding how one entity can utilize computer servers located on the property of a competitor.

1    (Haskins Tr. 23:15-24:19, 75:23-76:14, 84:10-85:13, 102:15-104:4, 136:21-137:20; Friel Tr.

2    49:15-50:14, 52:5-24; Aronson Tr. 62:4-64:2, 66:17-67:22, 101:1-102:15.)

3        4)    **The Second Amended Master Lease Compromise Agreement**

4    **Prevents Unnecessary Litigation.**  The Second Amended Master Lease Compromise

5    Agreement avoids potential litigation over the issues identified above.  Such litigation would be

6    expensive, complex, protracted, and implicate issues such as contribution liability, indemnity,

7    and subordination.  The Court concludes that such litigation would greatly add to the

8    administrative burden on the estates of OpCo and PropCo.

9        5)    **The Second Amended Master Lease Compromise Agreement Resolves**

10   **Complex Separation Issues.**  The eighteen casinos in the Station enterprise have been operated

11   jointly for a lengthy period of time.  There is a symbiotic relationship between the OpCo and

12   PropCo properties that will make the separation of those businesses complex and difficult, and

13   there are many business issues that must be resolved if there is to be separate ownership and

14   operation of the businesses.  Any such separation must be accomplished in a manner consistent

15   with the Bankruptcy Code and the Bankruptcy Rules.  Based on the testimony and the

16   documentary evidence presented to the Court, there is little doubt that a separation of the OpCo

17   and PropCo properties, if it were to occur in the absence of a rational and comprehensive

18   business approach, could: (1) create economic disaster for many of the participants in these

19   cases; (2) jeopardize the continued operation of *all* of the casinos; (3) result in the intervention of

20   the relevant regulatory agencies; (4) have adverse effects upon the Debtors' and related non-

21   Debtor employees; and (5) destroy substantial value for *both* OpCo and PropCo creditors.  The

22   Second Amended Master Lease Compromise Agreement is an attempt to manage a complex set

23   of relationships that are difficult to disentangle.  Absent the agreement, there would be legal

24   issues at every step of that separation.  The resolution of those issues would likely involve the

25   incurrence of substantial professional fees, costs, expenses, and delay—all of which would cause

26   economic harm to the ongoing operations of these entities, potentially jeopardizing the

27   employment of thousands of people.

28        Hearing Exhibit 34, which is a preliminary indication of interest from a potential third-

party bidder for the OpCo Assets, provides evidence that potential bidders value certainty in determining which assets they are bidding for and are willing to take a commercial approach rather than subjecting the Debtors and their principal creditor constituencies to litigation in separating the PropCo and OpCo businesses.  This is a reasonable approach for any potential good faith bidder.  Unless there is certainty as to the ability of a bidder to take a concrete set of assets free and clear of any litigation over the ownership of those assets, the Court does not believe that any rational, good faith bidder will participate in the Auction.  (Haskins Tr. 23:15-23, 82:2-83:21; Aronson Tr. 51:8-52:25, 60:14-63:7.)  There is no evidence now before the Court to suggest otherwise.  By providing potential third-party bidders with certainty as to their ability to take a concrete set of assets, the Debtors are, in part, recognizing and protecting the paramount rights and interests of creditors.

6)    **The Second Amended Master Lease Compromise Agreement Has the Support of Key Creditor Constituencies.**  Though the UCC does not support the Master Lease Motion or the Bidding Procedures Motion, the Second Amended Master Lease Compromise Agreement and the Bidding Procedures and the approach to the Excluded Assets contained therein prevent unnecessary litigation because they are supported by the CMBS Lenders and the Administrative Agent (which is related to one of the CMBS Lenders), which has sole authority to consent to these agreements and transactions on behalf of the OpCo Lenders.  The Second Amended Master Lease Compromise Agreement (and the Bidding Procedures) are supported by OpCo Lenders holding 60% of the outstanding obligations under the OpCo Loan Agreement, including the Bank of Scotland and Wells Fargo Bank, both OpCo Lenders that sit on the Steering Committee and do not have (either themselves or through any affiliates) any interest in PropCo's estate.  [Docket Nos. 1321 and 1388, respectively].  The support of Bank of Scotland and Wells Fargo Bank is significant to the Court's determination that the Second Amended Master Lease Compromise Agreement promotes the paramount interest of creditors, which is the most important factor in the Rule 9019 analysis.  Finally, the Independent Lenders are bound by the contractual terms and conditions set forth in the OpCo Loan Agreement and Security Agreement (as defined in the OpCo Loan Agreement) (including Sections 4.01 and 6.16 thereof)

and, as such, the Administrative Agent consent to the relief requested in the Motions is binding on all of the OpCo Lenders.

G.     **The Bidding Procedures and the Second Amended Master Lease Compromise Agreement are Fair and Equitable.**  The Second Amended Master Lease Compromise Agreement addresses the needs of both PropCo and SCI while maintaining value for the Debtors' estates and creditors.  Under the circumstances, it is both fair and equitable to approve the Second Amended Master Lease Compromise Agreement.  The agreement provides for a fair and rational separation of the OpCo and PropCo businesses.  As set forth above, absent a fair and rational business solution, the separation of OpCo and PropCo could create economic disaster for many of the constituencies represented in these cases and lead to unnecessary litigation and delay.

The parties did not conduct a formal expert valuation of all of the Excluded Assets in connection with the Motions.  There is no evidence of any valuation of any of the Excluded Assets.  Nevertheless, the Administrative Agent and the Debtors did conduct an analysis of the nature and value of the Excluded Assets in connection with the negotiations with FG and the CMBS Lenders.  The evidence before the Court indicates that the Excluded Assets have more value to New PropCo than they would to any other potential outside bidder. (*See, e.g.*, Kreeger Tr. 153:18-155:13 (Category 1, Exclusive PropCo Trademarks); 157:25-159:21 (Category 2, Joint Interest Trademarks); 161:4-15 (Category 3, Non-Exclusive Trademarks); 163:2-25, 164:23-167:12 (Category 5, Patents); 168:14-169:7, 174:14-176:19 (Category 7, Other Intellectual Property); 182:4-14 (Category 9, Business Information).)  In order to get a better sense of the value of these assets to PropCo and to inform their negotiations, the Debtors conducted an extensive analysis of the replacement cost of the bulk of the Excluded Assets. (Haskins Tr. 95:24-96:14; Kreeger Tr. 87:24-88:6, 39:2-18, 44:2-24, 123:24-1235:2.)  Based upon information provided by its advisors, the Administrative Agent and the Steering Committee believe in good faith that the proposed transfer of the Excluded Assets to PropCo would not harm OpCo. (Genereux Tr. 191:19-193:13; 212:10-213:2.)  Simpson Thacher engaged Alvarez & Marsal on behalf of the Administrative Agent to, *inter alia*, conduct an analysis of certain

1    assets of OpCo and provide assessments of the indicative value of such assets.  Alvarez &

2    Marsal determined a range of indicative value of between $34.4 million and $63.0 million for

3    certain of the Excluded Assets.  (Caruso Tr. 14:14-15:25.)  The OpCo Lenders saw the Excluded

4    Assets as a way to capture additional value for the OpCo estate from PropCo, because PropCo

5    needed those assets to maintain continuity in its business.  (Genereux Tr. 191:19-193:13.)  The

6    OpCo Lenders used the asset transfers (and PropCo's unique need for those assets) as a way to

7    lock in additional value for the OpCo estate without any detriment to OpCo.  (Genereux Tr.

8    191:15-193:10.)

9        When considering the value OpCo received for the Excluded Assets, the Stalking Horse

10    Bid is a crucial component of the overall transaction.  Moreover, the Stalking Horse Bid is a fair

11    and reasonable reflection of what stakeholders who know the most about the Station enterprise

12    believe to be the true potential worth of such enterprise in the right hands.  (Genereux Tr. 205:9-

13    206:2.)  The Steering Committee and SCI conducted a vigorous competition between Boyd and

14    the ultimate Stalking Horse Bidder to determine who they would propose to be the stalking horse

15    bidder.  The Stalking Horse Bid sets a minimum floor price of $772 million for the sale of the

16    OpCo Assets, which the OpCo Lenders believed was "the highest and best bid" resulting from

17    months of intense negotiations leading up to the filing of the Motions.  (Genereux Tr. 162:11-

18    20.)

19        The SCI Board also considered the value of the Excluded Assets.  Lazard advised that the

20    $35 million purchase price was fair in the context of the overall transaction and did not advise on

21    the fairness of the price offered for the Excluded Assets.  (5/3/10 Tr. at 204:3-205:12; Aronson

22    Tr. 98:3-9.)  The Board considered its financial advisor's advice, as well as SCI's internal

23    analysis, and unanimously voted to approve the Second Amended Master Lease Compromise

24    Agreement and the Bidding Procedures.  (Nave Tr. 60:7-13; Haskins Tr. 69:6-25; Aronson Tr.

25    98:3-99:17.)

26        OpCo will receive substantial monetary and non-monetary consideration for the Excluded

27    Assets.  In cash consideration alone, OpCo stands to receive $35 million, plus $13 million in

28    assumed liabilities.  If the Stalking Horse Bidder is not the successful bidder, the aforementioned

$35 million, subject to the Administrative Agent's liens, will be available to any such Successful Bidder for OpCo Assets in the Auction to contribute as additional consideration or purchase as a working capital asset. Beyond cash consideration, the Second Amended Master Lease Compromise Agreement includes further Reduced Rent of approximately $1.5 million per month, which is a significant amount of savings considering that these cases will continue for additional time. The Second Amended Master Lease Compromise Agreement also includes the resolution of (1) potential disputes over the ownership of the assets, (2) liens on those assets, and (3) the Texas Station Put Liability. The Second Amended Master Lease Compromise Agreement also clarifies and refines the nature and extent of Transition Services provided for in the First Master Lease Compromise Agreement and, in doing so, allows for a smooth separation of OpCo and PropCo if such separation becomes necessary. In the absence of this type of negotiated resolution there well could be significant, expensive, and time-consuming litigation. (Haskins Tr. 23:15-24:19, 75:23-76:14, 84:10-85:13, 102:15-104:4, 136:21-137:20; Friel Tr. 49:15-50:14, 52:5-24; Aronson Tr. 62:4-64:2, 66:17-67:22, 101:1-102:15.) Moreover, there is additional non-monetary consideration—the resolution of a potential dispute over the Excluded Assets provides certainty for any Successful Bidder. (Haskins Tr. 23:15-23, 82:2-83:21; Aronson Tr. 51:8-52:25, 60:14-63:7.) On the basis of the evidentiary record, the Court concludes that it would likely be impossible to conduct a sale of the OpCo Assets until the Debtors were able to provide potential bidders with certainty about which assets are being auctioned.

**H.      The Resolution of the Texas Station Put Benefits OpCo.** The Court also concludes that the uncertainty regarding the put right maintained by the landlord under the Texas Station Lease would likely chill potential bids for the OpCo Assets. The Second Amended Master Lease Compromise Agreement and the Bidding Procedures resolve that uncertainty, thereby clearing the way for the Auction. The Texas Station landlord sought at least $115 million in exchange for agreeing to sell the fee simple interest in the Texas Station property to the Successful Bidder in the Auction. (5/5/10 Tr. 218:22-219:7 (Landlord insisted on a discount rate of zero percent, less than the risk free discount rate).) In any event, it is clear that the liability associated with the Texas Station put right could lead to future litigation as the

calculation of the net present value of the future rental income stream is potentially subject to dispute.  After extensive negotiation, the Texas Station landlord agreed to provide the Successful Bidder in the Auction with the option to purchase its fee simple interest in Texas Station for $75 million.  This agreement is of significant value to SCI because at least one potential stalking horse bidder, Boyd Gaming, demanded a credit of $100 million against its proposed purchase price on account of the uncertainty caused by the put right contained in the Texas Station Lease. (Genereux Tr. 154:2-12.)

**I.    Certainty Regarding Ownership of the Excluded Assets will Enhance the OpCo Auction.**  On the basis of the evidence presented, the Court concludes that resolution of all of these potential issues regarding Transition Services, ownership, and liens on the Excluded Assets will provide stability and certainty that will enhance the participation of third-party bidders.  The resulting certainty will help to maximize the value of the OpCo estate for the benefit its creditors.  Maximizing the value of assets to benefit creditors is ultimately the paramount consideration driving the Court's determination.  In the absence of the Second Amended Master Lease Compromise Agreement, the First Master Lease Compromise Agreement would remain in effect and require the Debtors either to move to assume or to reject the Master Lease and likely engage in substantial litigation.  Such litigation will cause significant uncertainty with respect to the Debtors' chapter 11 cases and the Auction process.  Any resulting uncertainty would likely have the effect of chilling potential bids with respect to the Auction  (if the Auction could even proceed until lien and title disputes were resolved) and negatively impacting creditor recoveries.  (Haskins Tr. 23:15-23, 82:2-83:21; Aronson Tr. 51:8-52:25, 60:14-63:7.)

**J.    Negotiations Surrounding the Second Amended Master Lease Compromise Agreement and the Bidding Procedures Were Done in Good Faith and at Arm's Length.**  The evidence demonstrates, even under the heightened scrutiny of the entire fairness standard, the Second Amended Master Lease Compromise Agreement was negotiated in good faith and at arm's length.  This transaction involves many parties that were all represented by experienced, capable counsel and sophisticated advisers.  The parties themselves also have considerable

sophistication.  PropCo was led in such negotiations by its independent directors and its counsel, Gibson, Dunn & Crutcher, LLP.  (Kors Tr. 14:1-20.)  OpCo was led in such negotiations by its management and its counsel, Milbank, Tweed, Hadley & McCloy LLP.  [Dockets 1322 and 1323].  OpCo's independent director, Dr. James Nave, was advised by Skadden Arps Meagher & Flom, LLP.  (Nave Tr. 55:10-56:3.)  The Administrative Agent was advised by Simpson Thacher.  [Docket 1317].  Certain members of the Steering Committee, Wells Fargo and Bank of Scotland, were advised by separate counsel, Orrick, Herrington & Sutcliffe LLP and Katten Muchin Rosenman, LLP, respectively.  [Dockets 1388 and 1321, respectively].  The CMBS Lenders were advised by Sidley Austin, LLP [Docket No. 1315].

The evidentiary record reflects that SCI participated in the settlement negotiations with respect to the Second Amended Master Lease Compromise Agreement, the Bidding Procedures and the Stalking Horse Bid.  (Haskins Tr. 8:19-10:21.)  The SCI board, in turn, considered and approved the settlement and the selection of the Stalking Horse Bidder.  (Haskins Tr. at 17:2-18:2; Nave Tr. 60:7-13.)  In doing so, the SCI Board had the support of the Administrative Agent, the unanimous support of the CMBS Lenders [Docket Nos. 1317 and 1315, respectively] and the support of OpCo Lenders, Bank of Scotland and Wells Fargo Bank [Docket Nos. 1321 and 1388, respectively].  The Court finds on the basis of the evidentiary record presented that the OpCo board, in the exercise of its discretion, appropriately determined that the Second Amended Master Lease Compromise Agreement and related Auction process would collectively result in the maximization of the value of the OpCo estate for the benefit of the OpCo constituencies.

Both SCI and PropCo made significant concessions as independent negotiating parties represented by separate counsel.  Those concessions are reflected in changes in drafts of the Second Amended Master Lease Compromise Agreement and the Bidding Procedures along with other evidence presented to the Court.  The Second Amended Master Lease Compromise Agreement is not merely a sale of assets pursuant to section 363 of the Bankruptcy Code; rather it is a comprehensive settlement of disputes pursuant to Rule 9019.  The "range of reasonableness" for evaluating the compromise cannot be limited to just the $35 million in cash, $13 million in assumed liabilities, and $1.5 million per month Reduced Rent.  OpCo and PropCo

each receive numerous other benefits that have monetary value. *See supra* II.G, H, and I. Those benefits are, however, not monetized and are thus more difficult to quantify. The record reflects that the parties took a commercial approach to negotiation of the settlement. The Steering Committee and the CMBS Lenders, as well as SCI and PropCo, engaged in intensive negotiations over a period of several months regarding the Excluded Assets, which resulted in a market test of the value of the Excluded Assets. (*See e.g.* Haskins Tr. 8:19-11:21, 29:17-20, 30:21-31:3, 32:15-21, 35:6-37:13, 69:6-25, 76:19-78:10, 87:17-97:25, 102:24-103:10.)

In sum, the evidentiary record demonstrates that the settlement was the result of a fair and impartial process, and that taken as a whole, both OpCo and PropCo received fair consideration for the transaction. Accordingly, the Court finds that the process underlying the transaction satisfies the heightened scrutiny of the "entire fairness" standard.

**K.      Failure to Approve the Second Amended Master Lease Compromise Agreement Would Pose Significant Risks With Minimal Corresponding Potential Rewards.** Under the current Stalking Horse Bid, OpCo's secured creditors' recovery may approach 87 cents on the dollar. It would take a very significant additional recovery to result in any distribution to unsecured creditors in these cases. Because the Excluded Assets are primarily valuable only to New PropCo, rejecting the Master Lease Motion would be a very high risk proposition with a low potential for any significant additional recovery. The risks include, as set forth above, potential disputes over ownership and liens over the assets, revocation of the Stalking Horse Bid, potential interruption of ongoing enterprises, and additional administrative expenses. The realization of any or all of these risks presents a substantial threat to value that might otherwise be available to creditors. When weighed with the remote potential for obtaining more money for the Excluded Assets, the Court concludes that the terms of the Second Amended Master Lease Compromise Agreement satisfy the entire fairness standard.

**L.      The Bidding Procedures Are Fair and Reasonable and Satisfy the Heightened Scrutiny of the Entire Fairness Standard.** As stated in the Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "OpCo" Subsidiaries [Docket 1563] (the "Bidding Procedures

Order"), and incorporated by reference herein, the Court finds that approval of the Bidding Procedures is in the best interests of the SCI estate and all of its stakeholders. As amended, the Bidding Procedures ensure that the Auction will take place pursuant to appropriate court supervision and overseen by Dr. James Nave, SCI's Independent Director and the consultation parties. Further, the $772 million Stalking Horse Bid, which includes a very substantial cash component in addition to new financing, is fair and reasonable to SCI's creditor constituencies. The amount of the Stalking Horse Bid provides an adequate floor from which to commence the Auction. (Nave Tr. 173:6-16; 174:17-175:1.) And the Stalking Horse Bid is only the starting point in the Auction; the final bid could be higher. Accordingly, the Court finds that the Bidding Procedures are fair and appropriate and result from fair dealing among the parties and are an integral part of the overall compromise (which includes the Second Amended Master Lease Compromise Agreement). Accordingly, the bidding procedures meet the heightened scrutiny of the "entire fairness" standard.

**M.    The OpCo Support Agreement Motion is Denied.** The plan proponents assert that the OpCo Support Agreement is necessary so that the Debtors can maintain progress toward a common plan of reorganization. The Debtors' commitment to crafting a consensual plan of reorganization, as articulated and set forth in the Second Amended Master Lease Compromise Agreement and in the Bidding Procedures, should be sufficient to satisfy the OpCo Lenders. Approval of the OpCo Support Agreement will not demonstrate a greater commitment to craft such a consensual plan. In the view of the Court, the OpCo Support Agreement fits the definition of an impermissible "creeping plan." If, as the plan proponents assert, the OpCo Support Agreement is nothing more than a very lengthy letter of intent, that manifestation of intent does not require the blessing of this Court. The OpCo Support Agreement reflects support from the OpCo Lenders, reflects the support implied by the Debtors, and evidences the support of the Administrative Agent and the Steering Committee. In addition, the core terms of the OpCo Support Agreement are already contained in the Master Lease Motion and/or in the Bidding Procedures Motion. As such, Court approval of the OpCo Support Agreement is not necessary.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUBMITTED BY:

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Reorganization Counsel for
Debtors and Debtors in Possession

Bruce T. Beesley, SBN 1164
Laury Macauley, SBN 11413
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV 89501

Local Reorganization Counsel
For Debtors and Debtors in Possession

# CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 9021(c)

In accordance with LR 9021, counsel submitting this document certifies as follows:

___ The court has waived the requirement of approval under LR 9021.

___ This is a chapter 7 or 13 case, and either with the motion, or at the hearing, I have delivered a copy of these findings of fact and conclusions of law to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

_X_ This is a chapter 9, 11, or 15 case, and I have delivered a copy of these findings of fact and conclusions of law to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

| | |
|---|---|
| FCP PropCo, LLC | Approved |
| Deutsche Bank Trust Company Americas, as Administrative Agent for OpCo Lenders | Approved |
| Collateral Agent to the CMBS Lenders | Approved |
| Official Committee of Unsecured Creditors | Approved |
| Independent Lenders comprised of BNP Paribas, Castlerigg Master Investments, Ltd., Genesis CLO, Natixis, Silver Point Capital and Bank of Nova Scotia | Approved |

___ I certify that I have served a copy of these findings of fact and conclusions of law with the motion, and no parties appeared or filed written objections.

###

#4842-9594-1638