# Exhibit 1

# Exhibit 1

Paul S. Aronzon (CA SBN 88781)
Thomas R. Kreller (CA SBN 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000
Facsimile: (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone: (775) 823-2900
Facsimile: (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:

STATION CASINOS, INC.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Northern NV Acquisitions, LLC
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC

Chapter 11

Case No. BK-09-52477
Jointly Administered
BK 09-52470 through BK 09-52487

**FIRST AMENDED JOINT
CHAPTER 11 PLAN OF
REORGANIZATION FOR STATION
CASINOS, INC. AND ITS AFFILIATED
DEBTORS (DATED JULY 28, 2010)**

# TABLE OF CONTENTS

## ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

A.    Rules of Interpretation and Computation of Time ..............................................................7
B.    Defined Terms .................................................................................................................8

## ARTICLE II.

### TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS

A.    Administrative Claims ......................................................................................................30
    1.    Bar Date for Administrative Claims ...........................................................31
    2.    Professional Compensation and Reimbursement Claims ..................................31
B.    Priority Tax Claims...........................................................................................................31
C.    Other Priority Claims ........................................................................................................32

## ARTICLE III.

### CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.    Classification of Classified Claims and Equity Interests....................................................32
    1.    Claims and Equity Interests Against Parent Debtors...........................................32
        (a)    FCP Holding, Inc. ............................................................................32
        (b)    Fertitta Partners LLC ........................................................................33
        (c)    FCP Voteco, LLC .............................................................................33
    2.    Claims and Equity Interests Against Propco .....................................................33
    3.    Claims and Equity Interests Against Mezzco Debtors .......................................34
        (a)    FCP MezzCo Parent, LLC .................................................................34
        (b)    FCP MezzCo Parent Sub, LLC...........................................................34
        (c)    FCP Mezzco Borrower VII, LLC ........................................................34
        (d)    FCP Mezzco Borrower VI, LLC .........................................................34
        (e)    FCP Mezzco Borrower V, LLC ..........................................................35
        (f)    FCP Mezzco Borrower IV, LLC .........................................................35
        (g)    FCP Mezzco Borrower III, LLC .........................................................35
        (h)    FCP Mezzco Borrower II, LLC ..........................................................35
        (i)    FCP Mezzco Borrower I, LLC............................................................36
    4.    Claims and Equity Interests Against SCI............................................................36
    5.    Claims and Equity Interests Against Other Opco Debtors .................................36
        (a)    Northern NV Acquisitions, LLC.........................................................36
        (b)    Reno Land Holdings, LLC..................................................................36
        (c)    River Central, LLC ...........................................................................37

|  |  | (d) | Tropicana Station, LLC | 37 |
| B. | | Treatment of Claims and Equity Interests. | | 37 |
|  | 1. | Claims and Equity Interests Against Parent Debtors | | 37 |
|  |  | (a) | FCP Holding, Inc. | 37 |
|  |  | (b) | Fertitta Partners LLC | 39 |
|  |  | (c) | FCP Voteco, LLC | 40 |
|  | 2. | Claims and Equity Interests Against Propco | | 42 |
|  | 3. | Claims and Equity Interests Against Mezzco Debtors | | 44 |
|  |  | (a) | FCP MezzCo Parent, LLC | 44 |
|  |  | (b) | FCP MezzCo Parent Sub, LLC | 45 |
|  |  | (c) | FCP Mezzco Borrower VII, LLC | 45 |
|  |  | (d) | FCP Mezzco Borrower VI, LLC | 46 |
|  |  | (e) | FCP Mezzco Borrower V, LLC | 47 |
|  |  | (f) | FCP Mezzco Borrower IV, LLC | 48 |
|  |  | (g) | FCP Mezzco Borrower III, LLC | 49 |
|  |  | (h) | FCP Mezzco Borrower II, LLC | 50 |
|  | 4. | Claims and Equity Interests Against SCI | | 52 |
|  | 5. | Claims and Equity Interests Against Other Opco Debtors | | 58 |
|  |  | (a) | Northern NV Acquisitions, LLC | 58 |
|  |  | (b) | Reno Land Holdings, LLC | 59 |
|  |  | (c) | River Central, LLC | 60 |
|  |  | (d) | Tropicana Station, LLC | 61 |
| C. | | Reservation of Rights Regarding Unimpaired Claims | | 63 |
| D. | | Subordination Rights. | | 63 |
| E. | | Withholding Taxes. | | 63 |
| F. | | Set Offs. | | 63 |
| G. | | Timing of Payments and Distributions. | | 63 |

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

| A. | Voting Classes | 64 |
| B. | Acceptance by Impaired Classes of Claims and Equity Interests | 64 |
| C. | Presumed Acceptance of Plan | 64 |
| D. | Presumed Rejection of Plan | 64 |
| E. | Non-Consensual Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 64 |

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

| A. | | Transfers Under the Plan, Generally | 65 |
| B. | | Plan Transactions. | 66 |
|  | 1. | Formation of New Propco Entities. | 66 |
|  | 2. | Subsidiary Bankruptcy Filings | 66 |

3.     Transfer of Master Lease Collateral to Propco. ...................................................66
4.     Landco Assets. ....................................................................................................67
5.     Transfer of New Propco Transferred Assets from Propco to New Propco
       Entities. ................................................................................................................67
6.     Mezzco Debtors. .................................................................................................67
7.     Transfer of New Propco Purchased Assets from Opco Entities to New
       Propco Entities. ...................................................................................................67
8.     Transfer of New Opco Acquired Assets to New Opco...........................................67
9.     License of IP Assets to New Propco...................................................................68
10.    New Propco Transactions in Connection with Receipt of New Propco
       Acquired Assets. ..................................................................................................68
11.    New Propco Employment Related Matters...........................................................68
12.    The Propco Rights Offering................................................................................68
13.    New Opco Transactions in Connection with Receipt of New Opco
       Acquired Assets. ..................................................................................................69
14.    The New Opco Credit Agreement and the New Opco PIK Credit
       Agreement.............................................................................................................70
C.     Second Amended MLCA.............................................................................................70
D.     General Settlement of Claims......................................................................................70
E.     Release of Liens, Claims and Equity Interests............................................................70
F.     Corporate Action........................................................................................................71
G.     Cancellation of Notes, Certificates and Instruments Without Further Action...................71
H.     Dismissal of Officers and Directors, Dissolution of Debtors and Dissolution of the
       Boards of Directors of Each Debtor............................................................................72

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     Assumption of Executory Contracts and Unexpired Leases...........................................72
B.     Assignment of Executory Contracts or Unexpired Leases............................................73
C.     Claims on Account of the Rejection of Executory Contracts or Unexpired Leases...........74
D.     Director and Officer Insurance Policies.......................................................................74

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.     Distributions for Claims and Equity Interests Allowed as of the Effective Date ..............75
B.     Post-Petition Interest on Claims.................................................................................75
C.     Distributions under the Plan ......................................................................................75
D.     Delivery and Distributions and Undeliverable or Unclaimed Distributions.....................75
       1.     Record Date for Distributions..........................................................................76
       2.     Delivery of Distributions in General.................................................................76
       3.     Minimum Distributions....................................................................................76
       4.     Undeliverable Distributions .............................................................................76
              (a)    Holding of Certain Undeliverable Distributions.......................................76

|  |  | (b) | Failure to Claim Undeliverable Distributions | 77 |
|  |  | (c) | Failure to Present Checks | 77 |
| E. | Compliance with Tax Requirements/Allocations | | | 77 |
| F. | Means of Cash Payment | | | 78 |
| G. | Timing and Calculation of Amounts to Be Distributed | | | 78 |
| H. | Setoffs and Recoupments | | | 78 |
| I. | Preservation of Subordination Rights | | | 78 |

ARTICLE VIII.

PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS AND EQUITY INTERESTS

| A. | Authority to Prosecute Objections to Disputed Claims | | 79 |
| B. | Resolution of Disputed Claims and Equity Interests | | 79 |
|  | 1. | Allowance of Claims and Equity Interests | 79 |
|  | 2. | Prosecution of Objections to Claims and Equity Interests | 79 |
|  | 3. | Estimation | 80 |
|  | 4. | Deadline to File Objections to Claims and Equity Interests | 80 |
| C. | No Distributions Pending Allowance | | 80 |
| D. | Reserves for Disputed Claims | | 80 |
| E. | Distributions on Account of Disputed Claims and Equity Interests Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims and Equity Interests | | 80 |

ARTICLE IX.

CONDITIONS PRECEDENT TO CONFIRMATION,
EFFECTIVE DATE AND CONSUMMATION OF THE PLAN

| A. | Conditions Precedent to Confirmation | 81 |
| B. | Conditions Precedent to the Effective Date and Consummation of the Plan | 81 |
| C. | Waiver of Conditions | 82 |
| D. | Effect of Non Occurrence of Conditions to Consummation | 83 |

ARTICLE X.

RELEASES, EXCULPATION, INJUNCTION, PRESERVATION OF CAUSES OF ACTION
AND RELATED PROVISIONS

| A. | General | | 83 |
| B. | Comprehensive Settlement of Claims and Controversies | | 83 |
| C. | Releases Among Releasing Parties and Released Parties | | 84 |
| D. | Exculpation | | 86 |
| E. | Preservation of Causes of Action | | 87 |
|  | 1. | Maintenance of Causes of Action | 87 |
|  | 2. | Preservation of All Causes of Action Not Expressly Settled or Released | 87 |

F.   Supplemental Injunction ................................................................88
G.   Integral to Plan .............................................................................89
H.   Binding Nature Of Plan .................................................................89

ARTICLE XI.

RETENTION OF JURISDICTION

ARTICLE XII.

MISCELLANEOUS PROVISIONS

A.   Dissolution of the Committee ........................................................91
B.   Payment of Statutory Fees ............................................................92
C.   Modification of Plan .....................................................................92
D.   Revocation of Plan ........................................................................92
E.   Successors and Assigns..................................................................92
F.   Reservation of Rights.....................................................................93
G.   Further Assurances ........................................................................93
H.   Severability ...................................................................................93
I.   Service of Documents ....................................................................93
J.   Exemption from Registration Pursuant To Section 1145 of the Bankruptcy Code..........94
K.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the
     Bankruptcy Code ...........................................................................94
L.   Governing Law ..............................................................................94
M.   Tax Reporting and Compliance .....................................................94

## JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
## STATION CASINOS, INC. AND ITS AFFILIATED DEBTORS

This Joint Chapter 11 Plan of Reorganization (the "Plan") is proposed by Station Casinos, Inc., a Nevada corporation ("SCI"), FCP PropCo, LLC, a Delaware limited liability company ("Propco"), and the following affiliated debtors and debtors in possession (collectively, the "Debtors"):

- The three entities that own the existing equity interests in SCI (collectively, the "Parent Debtors"):

    o   FCP Holding, Inc. (owner of 74.8294% of non-voting stock in SCI);
    o   Fertitta Partners, LLC (owner of 25.1706% of non-voting stock in SCI); and
    o   FCP VoteCo, LLC (owner of 100% of voting stock in SCI);

- Four entities that are direct or indirect wholly owned subsidiaries of SCI (collectively, the "Other Opco Debtors"):

    o   Northern NV Acquisitions, LLC;
    o   Tropicana Station, LLC;
    o   River Central, LLC; and
    o   Reno Land Holdings, LLC.

- The nine entities that comprise the "MezzCo" debtors (collectively, the "Mezzco Debtors"):

    o   FCP MezzCo Parent, LLC;
    o   FCP MezzCo Parent Sub, LLC;
    o   FCP MezzCo Borrower VII, LLC;
    o   FCP MezzCo Borrower VI, LLC;
    o   FCP MezzCo Borrower V, LLC;
    o   FCP MezzCo Borrower IV, LLC;
    o   FCP MezzCo Borrower III, LLC;
    o   FCP MezzCo Borrower II, LLC; and
    o   FCP MezzCo Borrower I, LLC.

SCI also has various other direct and indirect subsidiaries and affiliates (collectively, the "Non-Debtor Affiliates") that have not filed for bankruptcy relief and have continued to operate their businesses in the ordinary course during the pendency of the Debtors' chapter 11 cases. If the Plan is confirmed, certain Non-Debtor Affiliates may file for bankruptcy relief in order to effectuate certain of the transactions contemplated by, or required under, the Plan. The Debtors expect that any such filings would not affect or disrupt the ordinary course operations of the Debtors or the Non-Debtor Affiliates in any material way. This Plan contemplates certain transactions involving the Debtors and various of the Non-Debtor Affiliates, including certain asset transfers, and other transactions, as part of the implementation of the Plan (including transactions that may be implemented in connection with bankruptcy filings by certain Non-

Debtor Affiliates). For a description of those transactions, please see Article V of this Plan ("Means for Implementation of the Plan") and the related discussion in the Disclosure Statement (as defined below). If a Person other than the Stalking Horse Bidder is the Successful Bidder, the Plan may be confirmed, and/or may become effective, in stages as to one or more Debtors as the conditions to confirmation and/or effectiveness of the Plan in respect of such Debtor(s) are satisfied.

The Debtors are the proponents of this Plan within the meaning of Bankruptcy Code section 1129. Reference is made to the Disclosure Statement distributed contemporaneously herewith for a discussion of the Debtors' history, business, results of operations, historical financial information, accomplishments during the Chapter 11 Cases (as defined below), projections and properties, and for a summary and analysis of this Plan. There also are other agreements and documents that are referenced in this Plan or the Disclosure Statement that are or will be filed with the Bankruptcy Court as part of the Plan Supplement (as defined below). All such agreements or documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Fed. R. Bankr. P. 3019, the terms hereof and of the Confirmation Order, and the terms of the New Opco Purchase Agreement, the Second Amended MLCA, and any other applicable orders of the Bankruptcy Court, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan and any of the Plan Supplement documents prior to substantial consummation of the Plan.

The Plan contemplates the sale of the New Opco Acquired Assets pursuant to the Successful Bid that emerges from the Opco Auction. The Successful Bid may differ in a variety of respects from the Stalking Horse Bid. Subject to the Second Amended MLCA and any applicable Bankruptcy Court orders, to the extent the Stalking Horse Bid is not the Successful Bid and the Successful Bid varies in terms or structure from the Stalking Horse Bid, the Debtors reserve the right to amend the Plan to reflect those variations as appropriate and to provide such supplemental disclosure of those amendments as the Bankruptcy Court may require.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    *Rules of Interpretation and Computation of Time*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions as amended, modified or supplemented; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" or "Sections" are references to Articles or Sections in this Plan;

(e) unless otherwise stated, the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in Bankruptcy Code section 102 shall apply; and (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    *Defined Terms*

The following terms shall have the following meanings when used in capitalized form herein:

1.    "*Accredited Investor*" shall be as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended.

2.    "*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date (including, without limitation, expenses of the members of the Committee incurred as members of the Committee in discharge of their duties as such).

3.    "*Administrative Agent*" means Deutsche Bank Trust Company Americas in its capacity as (i) the administrative agent under the Prepetition Opco Credit Agreement and (ii) the collateral agent under the other Prepetition Opco Loan Documents.

4.    "*Administrative Claim*" means a Claim for costs or expenses of administration of the Chapter 11 Cases that is Allowed under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs or expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and leased premises); (b) Accrued Professional Compensation and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the DIP Facility Claims; (e) any expense reimbursement payable under and in accordance with the Bid Procedures Order, and (f) any payment to be made under the Plan or otherwise to cure a default on an assumed executory contract or unexpired lease, including any "Seller Contract" that is to be a "Purchased Asset" (as such terms are defined in the New Opco Purchase Agreement).

5.    "*Administrative Claims Bar Date*" means the applicable date or dates established by order of the Bankruptcy Court as the deadline or deadlines for asserting Administrative Claims.

6.    "*Affiliate*" means an "affiliate" as defined in Bankruptcy Code section 101(2).

7.    "*Allocated Pro Rata Share of NPH Investment Rights*" means the pro rata share of an Eligible Opco Unsecured Creditor that is an Accredited Investor of the NPH Investment Rights to be issued under the Plan, with such pro rata share calculated as the proportion that (a) the Allowed amount of such creditor's claim bears to (b) the total Allowed amount of Claims of Eligible Opco Unsecured Creditors in Classes S.4 (including the Class S.4 Claims held by Prepetition Opco Secured Lenders that do not vote to accept the Plan but excluding the Class S.4 Claims held by Prepetition Opco Secured Lenders that do vote to accept the Plan), S.5 and S.6; provided, however, that the Put Parties (so long as they hold at least 40% in aggregate principal amount of the Senior Notes) shall have the right to purchase at least one-half of the NPH Equity available for purchase in the Propco Rights Offering (which equity shall be allocated among the Put Parties as they shall mutually agree).

8.    "*Allocated Pro Rata Share of NPH Warrants*" means the pro rata share of an Eligible Opco Unsecured Creditor of the NPH Warrants to be issued under the Plan, with such pro rata share calculated as the proportion that (a) the Allowed amount of such creditor's claim bears to (b) the total Allowed amount of Claims of Eligible Opco Unsecured Creditors in Classes S.4 (including the Class S.4 Claims held by Prepetition Opco Secured Lenders that do not vote to accept the Plan but excluding the Class S.4 Claims held by Prepetition Opco Secured Lenders that do vote to accept the Plan), S.5 and S.6.

9.    "*Allowed*" means, with respect to any Claim or Equity Interest, except as otherwise provided herein, any of the following: (a) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which (i) the Debtors or any other party in interest have not filed an objection and (ii) no contrary Proof of Claim has been filed; (b) a Claim or Equity Interest that either is not a Disputed Claim or Equity Interest or has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation with the Debtors of the amount and nature of such Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with the Debtors of the amount and nature of such Claim executed on or after the Confirmation Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture or other agreement entered into or assumed in connection with this Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that (i) is not a Disputed Claim or Equity Interest or (ii) has been allowed by a Final Order; or (f) a Claim or Equity Interest that is allowed pursuant to the terms of this Plan.

10.    "*Allowed _____ Claim or Equity Interest*" means an Allowed Claim or Equity Interest of the type or in the Class described.

11.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, recharacterization or other actions or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including,

without limitation, actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code.

12.    "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan.

13.    "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

14.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Nevada, or any other court having jurisdiction over the Chapter 11 Cases.

15.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

16.    "*Beneficial Holder*" means, as of the applicable date of determination, a beneficial owner of claims arising under the Prepetition Opco Credit Agreement, the Prepetition Opco Swap Agreement, the Prepetition Mortgage Loan Agreement, any of the Prepetition Mezzanine Loans, the Senior Notes or the Subordinated Notes, as applicable, as reflected in the records maintained by the Administrative Agent, Registered Record Owner or Intermediary Record Owner, as applicable.

17.    "*Beneficial Holder Ballots*" means the Ballots upon which Beneficial Holders of Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

18.    "*Bid Procedures Order*" means the "Order Establishing Bidding Procedures And Deadlines Relating To Sale Process For Substantially All Of The Assets Of Station Casinos Inc. And Certain 'Opco' Subsidiaries" entered by the Bankruptcy Court on June 4, 2010 [Docket No. 1563].

19.    "*Blockerco*" means a newly organized corporation or limited liability company taxable as a corporation to which the NPH Warrants, NPH Investment Rights and certain other NPH Equity will be issued and through which the same will be exercisable. Blockerco will, in turn, issue warrants, investment rights and equity to, and exercisable by, the Eligible Opco Unsecured Creditors (subject to, and in accordance with, the terms set forth in the Term Sheet) and such securities will give such Eligible Opco Unsecured Creditors substantially similar rights to those they would have had if the NPH Warrants, NPH Investment Rights and NPH Equity had been issued directly to them. There may be more than one Blockerco entity (but not more than five) established if reasonably requested by the holders of a majority of the equity interests issued by all then existing Blockerco entities, and, in the event that there is more than one Blockerco entity established, all such Blockerco entities shall collectively be deemed to be, and shall be collectively referred to as, "Blockerco" for all purposes under this Plan. For all purposes under this Plan, references to issuance, acquisition, distribution or ownership of NPH Equity, NPH Investment Rights or NPH Warrants with respect to Eligible Opco Unsecured Creditors shall mean such issuance, acquisition, distribution or ownership through Blockerco.

20.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21.    "*Cash*" means the legal tender of the United States of America or other immediately available funds.

22.    "*Causes of Action*" means any and all claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counter-claims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring at any time prior to the Effective Date.

23.    "*Chapter 11 Cases*" means the chapter 11 bankruptcy cases commenced by the Debtors on the Petition Date in the Bankruptcy Court.

24.    "*Claim*" means any "claim" against any Debtor as defined in Bankruptcy Code section 101(5), whether or not asserted or Allowed.

25.    "*Claims Bar Date*" means January 15, 2010, as ordered by the Bankruptcy Court.

26.    "*Claims Objection Bar Date*" means, for each Claim and Equity Interest, the later of:  (a) one hundred twenty (120) days after the Effective Date; and (b) such other date as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claim or Equity Interest.

27.    "*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

28.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to Bankruptcy Code section 1122(a) and 1123(a).

29.    "*Collateral*" means any property or interest in property of any Debtor's Estate that is subject to a valid and enforceable Lien to secure the payment or performance of a Claim.

30.    "*Committee*" means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102, as reconstituted from time to time.

31.    "*Committee Plan Support Stipulation*" means that certain Stipulation and Order dated July ___, 2010, by and between SCI and the Committee, which sets forth the terms and conditions upon which the Committee has agreed to support the Plan, a copy of which is included in the Plan Supplement.

32.    "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

33.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Code section 1128 to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

34.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code section 1129, which shall be consistent with the definition of Confirmation Order in the New Opco Purchase Agreement and the provisions of Article V.A herein, and in form and substance reasonably satisfactory to the Debtors, the Successful Bidder, the Required Consenting Lenders, the Mortgage Lenders and FG.

35.    "*Consenting Opco Lenders*" means those Prepetition Opco Secured Lenders that are parties to the Opco Lender Restructuring Support Agreement.

36.    "*Consummation*" means the occurrence of the Effective Date.

37.    "*Debtor(s) in Possession*" means, individually, each Debtor, as a debtor in possession in its Chapter 11 Case and, collectively, all Debtors, as debtors in possession in these Chapter 11 Cases.

38.    "*DIP Facility Claims*" means all obligations of any of the Debtors arising under the postpetition financing agreement with Vista Holdings, LLC and Past Enterprises, Inc. pursuant to that certain "Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 552 And Fed. R. Bankr. P. Rule 4001(b), (c) And (d):  (I) Authorizing The Debtors To (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans To Non-Debtor Subsidiaries, (II) Granting Adequate Protection To Prepetition Secured Parties, And (IV) Granting Related Relief" entered by the Bankruptcy Court on October 13, 2009 [Docket No. 481], as such order has been amended from time to time.

39.    "*Disclosure Statement*" means that certain Disclosure Statement for Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. And Its Affiliated Debtors Filed in these Chapter 11 Cases, as amended, supplemented, or modified from time to time, in each case in form and substance reasonably satisfactory to the Debtors, the Required Consenting Lenders and the Mortgage Lenders, and that was approved by the Disclosure Statement Order and describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

40.    "*Disclosure Statement Order*" means that certain Order *(A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (D) Approving the Manner and Forms of Notice and Other Related Documents*, entered by the Bankruptcy Court on July __, 2010 [Docket No. ____], as the order may be amended from time to time, in each case in form and substance reasonably satisfactory to the Debtors, the Required Consenting Lenders and the Mortgage Lenders.

41. "*Disputed Claim or Equity Interest*" means a Claim or Equity Interest, or any portion thereof: (a) listed on the Schedules as unliquidated, disputed or contingent; (b) that is the subject of a Filed objection or request for estimation or is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; or (c) that is in excess of the amount scheduled as other than disputed, contingent or unliquidated.

42. "*Distribution Agent*" means the Plan Administrator or any other entity designated, employed or contracted with by the Plan Administrator for purposes of making distributions under this Plan.

43. "*Distribution Record Date*" means _____, 2010 at 5:00 p.m. prevailing Pacific Time.

44. "*D&O Liability Insurance Policies*" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Effective Date.

45. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in Article IX hereof.

46. "*Eligible Opco Unsecured Creditors*" means all Holders of Allowed Claims classified in Classes S.4, S.5 and S.6, except Holders of Class S.4 Claims that also hold Class S.2 Claims and vote to accept the Plan on account of such Class S.2 Claims.

47. "*Entity*" means an "entity" as defined in Bankruptcy Code section 101(15).

48. "*Equity Interest*" means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to such Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights, in each case as in existence immediately prior to the Effective Date.

49. "*Equity Security*" means an "equity security" as defined in Bankruptcy Code section 101(16).

50. "*Estates*" means the bankruptcy estates of the Debtors created by virtue of Bankruptcy Code section 541 upon the commencement of the Chapter 11 Cases.

51. "*Excess AMT Amount*" means the amount, if any, of any administrative Tax claim(s) for alternative minimum tax resulting from or arising out of the implementation of the transactions contemplated by the New Opco Purchase Agreement or the Plan in excess of $15 million in the aggregate.

52. "*Excluded Assets*" means, collectively, the Existing Propco Assets, the New Propco Purchased Assets and the SCI Retained Assets.

53.    "*Exculpated Parties*" means, collectively:   (a) the Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h) the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the Committee and its members, provided that the Committee Support Stipulation has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Effective Date; and (s) the respective Related Persons of each of the foregoing Entities.

54.    "*Exculpation*" means the exculpation provision set forth in Article X.E hereof.

55.    "*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

56.    "*Existing Propco Assets*" means any assets owned by Propco as of the Effective Date, any equity in or assets of any subsidiary of SCI that directly or indirectly owns the equity of Propco, and any assets encumbered by liens in favor of Propco (excluding any assets not located on a Propco Property and on which Propco's lien attaches to only an undivided percentage interest in, and less than 100% of, such assets).

57.    "*FG*" means Fertitta Gaming LLC, a Nevada limited liability company.

58.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases.

59.    "*Final Order*" means an order of the Bankruptcy Court as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, no stay pending appeal has been granted or such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

60.    "*General Unsecured Claim*" means any Claim against any Debtor that is not: (a) a/an (1) Administrative Claim; (2) Priority Tax Claim; (3) Other Priority Claim, (4) Other Secured Claim; (5) Senior Note Claim; (6) Subordinated Note Claim; (7) Intercompany Claim; or (8) Equity Interest; or (b) otherwise classified in a Class other than and separate from the Class of General Unsecured Claims with respect to the applicable Debtor.

61. "*Going Private Transaction*" means the buy-out transaction that occurred in November of 2007, pursuant to which, among other things, SCI was acquired by virtue of a merger of FCP Acquisition Sub with and into SCI, with SCI continuing as the surviving corporation, and the sale-and-leaseback transaction with respect to the Propco Properties was consummated.

62. "*Going Private Transaction Causes of Action*" means any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other legal or equitable remedies against any Person arising from any transaction comprising or related to the Going Private Transaction, regardless of whether such Claims, Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

63. "*Governmental Unit*" means a "governmental unit" as defined in Bankruptcy Code section 101(27).

64. "*Gun Lake Reimbursement*" means any amounts actually paid to and received by SCI or any of its Subsidiaries prior to Closing under the Stalking Horse APA by Gun Lake Tribal Gaming Authority in respect of amounts owed to MPM Enterprises, LLC and SC Michigan, LLC for advances made by them to Gun Lake Tribal Gaming Authority.

65. "*Holdco*" means the Delaware limited liability company formed by the Mortgage Lenders to serve, along with Voteco, as one of the equity interest holders in New Propco.  Upon occurrence of the Effective Date, Holdco will be owned by the Mortgage Lenders, FG and potentially other parties, with additional NPH Equity available for acquisition through the NPH Investment Rights and the NPH Warrants, subject to the terms and conditions of the NPH Term Sheet.

66. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, any Debtor.

67. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of Bankruptcy Code section 1124.

68. "*Intercompany Claims*" means any unsecured Claims of a Debtor against any other Debtor, other than the Master Lease Rejection Damage Claim.

69. "*IP Assets*" means those assets identified on Schedule 1 of this Plan, all of which will be (a) if the Successful Bidder is the Stalking Horse Bidder, transferred to IP Holdco pursuant to the New Opco Purchase Agreement, and (b) if the Successful Bidder is any Person or Persons other than the Stalking Horse Bidder, (i) transferred to the Successful Bidder or its designated subsidiary pursuant to the New Opco Purchase Agreement and (ii) licensed to New Propco and its designated subsidiaries pursuant to the IP License Agreement with New Propco in the form attached to the New Opco Purchase Agreement of the Successful Bidder and consistent with the terms of the Second Amended MLCA.

70. "*IP Holdco*" means the trust or other entity identified as "IP Holdco" in, and formed in accordance with, the Stalking Horse APA.

71.    "*IP License Agreement*" means the license agreement with New Propco in the form attached to the New Opco Purchase Agreement of the Successful Bidder which shall be in form and substance reasonably satisfactory to the Required Consenting Lenders, the Successful Bidder and, if the Stalking Horse Bidder is not the Successful Bidder, New Propco.

72.    "*Intermediary Record Owners*" means, as of the applicable date of determination, the banks, brokerage firms, or the agents thereof as the Entity through which the Beneficial Holders hold Claims.

73.    "*Landco Assets*" means those assets identified on Schedule 5 of this Plan.

74.    "*Landco Assets Transfer Agreement*" means that certain agreement, or those certain agreements, pursuant to which (a) all Landco Assets not now owned by CV Propco, LLC will be transferred to CV Propco, LLC and (b) all of the Equity Interests in CV Propco, LLC will be transferred to the designee of the Land Loan Lenders, which shall be in form and substance reasonably satisfactory to the Required Consenting Lenders and New Propco.

75.    "*Land Loan Agreement*" means that certain Credit Agreement, dated February 7, 2008 by and among CV PropCo, LLC, Deutsche Bank Trust Company Americas, JPMorgan Chase Bank, N.A. and the lenders from time to time party thereto.

76.    "*Land Loan Borrower*" means CV PropCo, LLC, a Nevada limited liability company.

77.    "*Land Loan Collateral*" means the land located on the southern end of Las Vegas Boulevard at Cactus Avenue and land surrounding the Wild Wild West in Las Vegas, Nevada, that serves as collateral for the loans made under the Land Loan Agreement.

78.    "*Land Loan Guaranty Claims*" means any and all Claims arising under the guarantees of the obligations under the Land Loan Agreement issued to the Land Loan Lenders by each of the Parent Debtors pursuant to the Recourse Guaranty dated as of February 7, 2008 made jointly and severally by FCP holding, Inc., FCP Voteco, LLC, and Fertitta Partners, LLC in favor of Deutsche Bank Trust Company Americas, as administrative agent.

79.    "*Land Loan Lenders*" means, collectively, Deutsche Bank Trust Company Americas and JPMorgan Chase Bank, N.A., each in their capacity as a lender under the Land Loan Agreement (each a "*Land Loan Lender*").

80.    "*Lien*" means a "lien" as defined in Bankruptcy Code section 101(37), and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

81.    "*Litigation Claims*" means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any Person, including, without limitation, the Causes of Action of the Debtors.

82.    "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Nevada.

83.    "*Master Ballots*" means the ballot distributed to the Registered Record Owners or Intermediary Record Owners, as applicable, to record the votes of the Beneficial Holders of Claims as of the Voting Record Date.

84.    "*Master Lease and License*" means that certain:  (a) Master Lease, dated as of November 7, 2007, between Propco, as lessor, and SCI, as lessee, with respect to the Propco Properties (the "*Master Lease*"); and (b) License and Reservation Service Agreement, also dated as of November 7, 2007 (the "*License Agreement*"), between Propco, as licensee, and SCI, as licensor.

85.    "*Master Lease Collateral*" means:  (i) all "FF&E" and the "FF&E Reserve Collateral", each as defined in the Master Lease; and (ii) all "Collateral" under and as defined in the Propco Security Agreement.  Section 12.4 of the Master Lease contains a security agreement, pursuant to which SCI pledged, assigned and granted Propco a security interest and an express contractual lien in and to the FF&E and FF&E Reserve Collateral and the Operating Subtenants pledged, assigned and granted Propco a security interest and an express contractual lien in all such "Collateral" under the Propco Security Agreement.

86.    "*Master Lease Rejection Damage Claim*" means any and all claims assertable by Propco against SCI in connection with or relating to SCI's rejection of the Master Lease and License pursuant to this Plan.

87.    "*Mezzco Debtors*" means FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II, LLC; and FCP MezzCo Borrower I, LLC.

88.    "*Mezz I Loan*" means Amended and Restated Mezzanine Loan and Security Agreement (First Mezzanine), dated as of March 19, 2008, among FCP Mezzco Borrower I, LLC, a Delaware limited liability company, German American Capital Corporation, a Maryland corporation and JPMorgan Chase Bank, N.A., a national banking association.

89.    "*Mezz II Loan*" means Amended and Restated Mezzanine Loan and Security Agreement (Second Mezzanine), dated as of March 19, 2008, among FCP Mezzco Borrower II, LLC, a Delaware limited liability company, German American Capital Corporation, a Maryland Corporation and JPMorgan Chase Bank, N.A., a national banking association, as subsequently assigned to certain other lender parties.

90.    "*Mezz III Loan*" means Amended and Restated Mezzanine Loan Security Agreement (Third Mezzanine), dated as of March 19, 2008, among FCP Mezzco Borrower III, LLC, a Delaware limited liability company, German American Capital Corporation, a Maryland corporation and JPMorgan Chase Bank, N.A., a national banking association, as subsequently assigned to certain other lender parties.

91.    "*Mezz IV Loan*" means Mezzanine Loan and Security Agreement (Fourth Mezzanine), dated as of March 19, 2008, among FCP Mezzco Borrower IV, LLC, a Delaware limited liability company, German American Capital Corporation, a Maryland corporation and JPMorgan Chase Bank, N.A., a national banking association, as subsequently assigned to certain other lender parties.

92.    "*Mezz IV Pledge Claims*" means any and all Claims against FCP Mezzco Borrower V, LLC arising under or relating to its pledge of its Equity Interests in FCP Mezzco Borrower IV, LLC as collateral to secure repayment of the Mezz IV Loan.

93.    "*Mortgage Lender Claims Against SCI*" means any and all claims asserted by the Mortgage Lenders against SCI, including without limitation the claims asserted in the Proof of Claim the Mortgage Lenders filed against SCI, which are recorded as claim no. 19375849 on the Claims Register.

94.    "*Mortgage Lender/FG Restructuring Agreement*" means that certain agreement among FG, the Mortgage Lenders and the other parties thereto dated as of March 24, 2010 (as amended, supplemented or modified from time to time), a copy of which is included in the Plan Supplement.

95.    "*Mortgage Lenders*" means German American Capital Corporation and JPMorgan Chase Bank N.A., as lenders to Propco under the Amended and Restated Loan and Security Agreement, dated as of March 19, 2008.

96.    "*New FG Management Agreement*" means one or more management agreements pursuant to which FG will manage certain New Propco properties, including, if the Stalking Horse Bidder is the Successful Bidder, the New Opco properties, substantially in the form(s) included in the Plan Supplement.

97.    "*New Land Loan Agreement*" means the Land Loan Agreement, and related documents, in each case in form and substance acceptable to the Mortgage Lenders, as it will be amended and restated upon the occurrence of the Effective Date.

98.    "*New Opco*" means the entity that obtains or acquires ownership, directly or indirectly, of the New Opco Acquired Assets under the Plan pursuant to the Successful Bid (as determined in accordance with the Bid Procedures Order) and the New Opco Purchase Agreement.

99.    "*New Opco Acquired Assets*" means substantially all of the assets of the Opco Group Sellers, including the IP Assets, other than the Excluded Assets, which are to be acquired by the Successful Bidder pursuant to the New Opco Purchase Agreement.

100.    "*New Opco Credit Agreement*" means that certain credit agreement, along with related documents, in each case, in form and substance satisfactory to the Required Consenting Lenders, and if the Stalking Horse Bid is the Successful Bid, to the Stalking Horse Bidder, to be entered into by New Opco and the other parties identified therein in connection with New Opco's acquisition of the New Opco Acquired Assets, a copy of which is included in the Plan Supplement and which provides for (i) a new revolving credit facility in the aggregate principal

amount of $25 million and (ii) a term loan facility deemed issued on the Effective Date in the aggregate principal amount of $430 million.

101.    "*New Opco PIK Credit Agreement*" means that certain credit agreement, along with related documents, in each case in form and substance reasonably satisfactory to the Required Consenting Lenders, and if the Stalking Horse Bid is the Successful Bid, to the Stalking Horse Bidder, to be entered into by a Subsidiary of New Opco and the Prepetition Opco Secured Lenders in connection with New Opco's acquisition of the New Opco Acquired Assets, a copy of which is included in the Plan Supplement and which provides for a term loan facility deemed issued on the Effective Date in the original aggregate principal amount of $25 million.

102.    "*New Opco Purchase Agreement*" means the Stalking Horse APA or, if a Person other than the Stalking Horse Bidder is the Successful Bidder, then the asset purchase agreement of such Successful Bidder, as the same may be amended, supplemented or otherwise modified from time to time, and in each case, in form and substance reasonably satisfactory to the Required Consenting Lenders, a copy of which is included in the Plan Supplement.

103.    "*New Opco Transition Services Agreement*" means that certain form of agreement, along with related documents, in each case in form and substance reasonably satisfactory to the Required Consenting Lenders, New Opco and New Propco, to be entered into by New Opco, New Propco and the other parties identified therein in connection with New Opco's acquisition of the New Opco Acquired Assets, a copy of which is included in the Plan Supplement, and which provides for, among other things, transition services to be provided to New Opco by New Propco, including reasonable cooperation and collaboration by New Propco with respect to diligence on existing systems, data transfer, testing and acceptance in connection with New Opco's development within one year of the closing of the New Opco Purchase Agreement, a computer system for New Opco that has at least the capacity and functions of the computer systems acquired by New Propco.

104.    "*New Propco*" means the newly formed limited liability company, owned by Holdco and Voteco, that will acquire or obtain, directly or indirectly through one or more Subsidiaries, all of the New Propco Acquired Assets, the equity interests in CV PropCo, LLC, and all of the Landco Assets, and if the Stalking Horse Bid is the Successful Bid, all of the New Opco Acquired Assets, in each case under or in connection with the Plan.

105.    "*New Propco Acquired Assets*" means, collectively, the New Propco Purchased Assets and the New Propco Transferred Assets.

106.    "*New Propco Credit Agreement*" means that certain Credit Agreement and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG, a copy of which is included in the Plan Supplement.

107.    "*New Propco Holdco*" or "*NPH*" means Holdco.

108.    "*New Propco LLCA*" means that certain Limited Liability Company Agreement of New Propco and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG, a copy of which is included in the Plan Supplement.

109.     "*New Propco Non-Compete Agreement*": means that certain Non-Compete Agreement and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG, by and among Holdco, New Propco, the Mortgage Lenders and their assigns, FG and Frank and Lorenzo Fertitta regarding certain obligations and commitments with respect to future investment and management opportunities (as contemplated by the Mortgage Lender/FG Restructuring Agreement).

110.     "*New Propco Purchase Agreement*" means that certain agreement, or those certain agreements and related documents, in each case in form and substance acceptable to the Mortgage Lenders, FG and the Required Consenting Lenders, pursuant to which New Propco will purchase the New Propco Purchased Assets from SCI and/or the applicable Non-Debtor Affiliates in accordance with the Second Amended MLCA.  If the Stalking Horse Bid is the Successful Bid, then New PropCo will acquire the New Propco Purchased Assets under and pursuant to the Stalking Horse APA and the Stalking Horse APA will be deemed to be the New Propco Purchase Agreement for purposes of the Plan.

111.     "*New Propco Purchased Assets*" means those assets identified on Schedule 2 to this Plan, all of which will be transferred from SCI and/or the applicable Non-Debtor Affiliate to New Propco or its designee(s) in accordance with, and subject to the payment of the consideration and, if applicable, assumption of specific liabilities identified in, the Second Amended MLCA and pursuant to the New Propco Purchase Agreement, subject to the rights and obligations of Propco under the Second Amended MLCA (or, if the Stalking Horse Bidder is the Successful Bidder, to the rights of the Stalking Horse Bidder under the Stalking Horse APA) to elect not to purchase certain of such assets.

112.     "*New Propco Retained Available Cash*" means Propco Cash in the amount of $80 million, less any transition costs incurred by Propco or the Mortgage Lenders, which will be transferred to and retained by and for the benefit of New Propco.

113.     "*New Propco Transfer Agreement*" means that certain agreement, or those certain agreements and related documents, in each case in form and substance acceptable to the Mortgage Lenders, FG and the Required Consenting Lenders, pursuant to which New Propco or its designated subsidiaries will acquire the New Propco Transferred Assets from Propco in accordance with Article V of this Plan.

114.     "*New Propco Transferred Assets*" means (a) all of Propco's right, title and interests in, to and under the Propco Properties and the Master Lease Collateral, and (b) Propco Cash in an amount equal to the New Propco Retained Available Cash.

115.     "*NPH Equity*" means equity interests in Holdco.

116.     "*NPH Investment Rights*" means the rights to purchase, pursuant to the Propco Rights Offering and on the terms and conditions set forth in the NPH Term Sheet, NPH Equity to be issued through Blockerco to each Eligible Opco Unsecured Creditor that is an Accredited Investor.

117.     "*NPH Post-Effective Investment Rights*" means the rights to purchase NPH Equity to be issued through Blockerco to each Qualified Eligible Opco Unsecured Creditor in

connection with any Post-Effective Equity Raise (as defined in the NPH Term Sheet) on the terms and conditions set forth in the NPH Term Sheet.

118.    "*NPH Term Sheet*" means that certain term sheet attached hereto as Schedule 6, which sets forth, among other things, the terms and conditions for the issuance of the NPH Warrants, the NPH Investment Rights, the NPH Post-Effective Investment Rights and certain other related rights and obligations of the parties to the Put Parties Support Agreement and the Committee Plan Support Stipulation.

119.    "*NPH Warrants*" means the warrants to purchase NPH Equity to be issued through Blockerco to each Eligible Opco Unsecured Creditor, the terms and conditions of which shall be as set forth in the NPH Term Sheet.

120.    "*Opco Auction*" means any auction that occurs pursuant to the Bid Procedures Order.

121.    "*Opco Cash Collateral Order*" means the Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (i) Authorizing the Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans to Non-Debtor Subsidiaries, (ii) Granting Adequate Protection to Prepetition Secured Parties, and (iii) Granting Related Relief, entered by the Bankruptcy Court on October 13, 2009 [Docket No. 481].

122.    "*Opco Group Sellers*" means all sellers under the New Opco Purchase Agreement, which are identified in Schedule 3 to this Plan.

123.    "*Opco Lender Restructuring Support Agreement*" means that certain Restructuring Support Agreement dated as of April 16, 2010 (as amended, supplemented or modified from time to time) by and among the Consenting Opco Lenders, FG and certain of its principals, and certain Non-Debtor Affiliates, a copy of which is included in the Plan Supplement.

124.    "*Operating Subtenants*" means, collectively, Charleston Station, LLC; Boulder Station, Inc; Palace Station Hotel and Casino, Inc. and Sunset Station, Inc.

125.    "*Ordinary Course Professionals Order*" means that certain *Order Authorizing the Debtors to Employ and Compensate Certain Professionals in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date*, entered by the Bankruptcy Court on September 23, 2009 [Docket No. 355], as such order may be amended from time to time.

126.    "*Other Opco Debtors*" means Northern NV Acquisitions, LLC; Tropicana Station, LLC; River Central, LLC; and Reno Land Holdings, LLC.

127.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under Bankruptcy Code section 507(a), other than a Priority Tax Claim or an Administrative Claim.

128.    "*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, Secured Tax Claim, the Master Lease Rejection Damage Claim or Secured Claims arising under the Prepetition Opco Credit Agreement, Prepetition Opco Swap Agreement, the Prepetition Mortgage Loan Agreement or any of the Prepetition Mezzanine Loans.

129.    "*Parent Debtor Pledges*" means the pledges of the Equity Interests in SCI by each of the Parent Debtors to secure the obligations arising under the Prepetition Opco Credit Agreement, the Prepetition Opco Swap Agreement and related guaranties pursuant to that certain Shareholder Pledge And Security Agreement dated as of November 7, 2007 among the Parent Debtors, SCI and the Administrative Agent.

130.    "*Parent Debtors*" means FCP Holding, Inc. (owner of 74.8294% of non-voting stock in SCI); Fertitta Partners, LLC (owner of 25.1706% of non-voting stock in SCI); and FCP Voteco, LLC (owner of 100% of voting stock in SCI);

131.    "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

132.    "*Petition Date*" means July 28, 2009, the date on which the Debtors commenced the Chapter 11 Cases.

133.    "*Plan*" means this *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors*, dated June 15, 2010, which shall be in form and substance satisfactory to the Successful Bidder, FG, the Mortgage Lenders and the Required Consenting Lenders.

134.    "*Plan Administrator*" means:  (a) SCI, or such other entity as may be designated by SCI and approved by the Bankruptcy Court to administer implementation of the Plan as to SCI, the Parent Debtors and the Other Opco Debtors; and (b) Propco, or such other entity as may be designated by Propco and approved by the Bankruptcy Court to administer implementation of the Plan, as to Propco and the Mezzco Debtors.

135.    "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which hereby are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, all of which be Filed with the Bankruptcy Court ten (10) days before the Voting Deadline.

136.    "*Prepetition Mezzanine Loans*" means, collectively, the Mezz I Loan, Mezz II Loan, Mezz III Loan and Mezz IV Loan.

137.    "*Prepetition Mezzanine Loan Guaranty Claims*" means any and all claims arising under the guarantees of the obligations under the Prepetition Mezzanine Loans issued by each of the Parent Debtors.

138.    "*Prepetition Mortgage Loan Agreement*" means that certain Amended and Restated Loan and Security Agreement, dated as of March 19, 2008, among Propco, as Borrower, and German American Capital Corporation and JPMorgan Chase Bank N.A., as lenders.

139.    "*Prepetition Mortgage Loan Claims*" means any and all Claims arising under the Prepetition Mortgage Loan Agreement and the Propco Cash Collateral Order.

140.    "*Prepetition Mortgage Loan Guaranty*" means individually, each guaranty of the obligations arising under the Prepetition Mortgage Loan Agreement issued to the Mortgage Lenders by each of the Parent Debtors.

141.    "*Prepetition Mortgage Loan Guaranty Claims*" means any and all claims arising under Prepetition Mortgage Loan Guaranty.

142.    "*Prepetition Opco Credit Agreement*" means that certain Credit Agreement, dated as of November 7, 2007, among SCI, as borrower, Deutsche Bank Trust Company Americas, as Administrative Agent, the other lenders party thereto, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as joint lead arrangers and joint book runners, JPMorgan Chase Bank, N.A., as Syndication Agent, and Bank of Scotland plc, Bank of America, N.A., and Wachovia Bank, N.A., as Co-Documentation Agents, as amended, supplemented or otherwise modified from time to time.

143.    "*Prepetition Opco Credit Agreement Claim*" means any and all Claims arising under the Prepetition Opco Credit Agreement and the Opco Cash Collateral Order.

144.    "*Prepetition Opco Credit Agreement Guaranty Claims*" means any and all Claims arising under that certain Guaranty Agreement dated as of November 7, 2007 among SCI, certain specified Subsidiaries of SCI and the Administrative Agent.

145.    "*Prepetition Opco Loan Documents*" means, collectively, the Prepetition Opco Credit Agreement and each other loan document executed from time to time in connection therewith.

146.    "*Prepetition Opco Secured Claim*" means, collectively, the Prepetition Opco Credit Agreement Claim and the Prepetition Opco Swap Claim, to the extent of the value of the Collateral securing those claims.  Any amounts of Prepetition Opco Secured Claim in excess of the value of that Collateral shall be a General Unsecured Claim.

147.    "*Prepetition Opco Secured Lenders*" means the Administrative Agent and the other lenders party from time to time to the Prepetition Opco Credit Agreement.

148.    "*Prepetition Opco Swap Agreement*" means that certain Secured Hedge Agreement dated as of February 12, 2008, by and between JPMorgan Chase Bank, N.A. and SCI.

149.    "*Prepetition Opco Swap Claim*" means the secured termination claim under the Prepetition Opco Swap Agreement, together with all interest accrued and unpaid thereon as of

the Effective Date, and all unpaid reasonable fees, costs, expenses and other charges required to be paid or reimbursed (as applicable) pursuant to the terms of the Prepetition Opco Swap Agreement.

150.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in Bankruptcy Code section 507(a)(8).

151.    "*Pro Rata*" means the proportion that (a) the Allowed principal amount of a Claim in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed principal amount of all Claims in such Class (or several Classes taken as a whole), unless this Plan provides otherwise.

152.    "*Professional*" means (a) any Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code section 327, 363 or 1103 or otherwise and (b) any Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code section 503(b)(4).

153.    "*Professional Fee Claim*" means a Claim under Bankruptcy Code sections 328, 330(a), 331, 363, 503 or 1103 for Accrued Professional Compensation.  For the avoidance of doubt, the definition of Professional Fee Claim shall not include the fees and expense of the Put Parties and their legal advisors, which fees and expenses shall be paid in accordance with the NPH Term Sheet.

154.    "*Professional Fees Bar Date*" means the Business Day that is sixty (60) days after the Effective Date or such other date as approved by Final Order of the Bankruptcy Court.

155.    "*Proof of Claim*" means a proof of Claim or Equity Interest Filed against any Debtor in the Chapter 11 Cases.

156.    "*Propco*" means FCP Propco, LLC, a debtor and debtor in possession.

157.    "*Propco Cash*" means all Cash on hand at Propco as of the Effective Date, immediately prior to all the transfers and allocations pursuant to the Plan as of and following the Effective Date; provided, however, Propco Cash does not include, and shall not be deemed to include, any "cage cash" utilized at any of the Propco Properties.

158.    "*Propco Cash Collateral Order*" means the Final Order Pursuant to 11 U.S.C. §§ 361, 362 and 363 Approving Stipulation for (i) Adequate Protection and (ii) Use of Cash Collateral with Respect to Secured Loans to FCP Propco, LLC entered on September 9, 2009 [Docket No. 295].

159.    "*Propco Commitment*" means that certain firm and irrevocable put commitment of the Put Parties, in form and substance acceptable to the Put Parties, the Debtors, FG and the Mortgage Lenders, to purchase through Blockerco: (a) $35.3 million of NPH Equity, to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors or the Put Parties (pursuant to the proviso to the definition of Allocated Pro Rata Share of NPH Investment Rights herein) in accordance with the terms and conditions of the Propco Rights Offering; and (b) up to a maximum of $100 million (*i.e.*, up to a maximum of $64.7 million in

addition to the $35.3 million commitment specified in clause (a)) of NPH Equity in connection with any Equity Raises (as defined in the NPH Term Sheet) consummated during the Upsizing Commitment Period (as defined in the NPH Term Sheet), to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors (pursuant to the proviso to the definition of Allocated Pro Rata Share of NPH Investment Rights herein)  or the Put Parties in accordance with the terms and conditions of the NPH Term Sheet.

160.    "*Propco Excess Effective Date Cash*" means any Propco Cash in excess of the amount of New Propco Retained Available Cash, which Propco Excess Effective Date Cash shall be distributed as additional recovery to the Mortgage Lenders or their applicable designees on account of their Allowed Class P.2 Claims; provided, that, if the Stalking Horse Bidder is the Successful Bidder, such Propco Excess Effective Date Cash may, to the extent required under the Stalking Horse APA, be paid to the Prepetition Opco Secured Lenders and the Holders of the Prepetition Opco Swap Claim.

161.    "*Propco Properties*" means: (a) Palace Station Hotel & Casino; (b) Boulder Station Hotel & Casino; (c) Sunset Station Hotel & Casino; and (d) Red Rock Casino Resort Spa.

162.    "*Propco Rights Offering*" means the offering of the NPH Investment Rights to each Eligible Opco Unsecured Creditor that is an Accredited Investor pursuant to this Plan, on the terms and conditions set forth in the NPH Term Sheet.

163.    "*Propco Security Agreement*" means that certain Security Agreement (All Furniture, Fixtures and Equipment), dated as of November 7, 2007 by and among Propco and the Operating Subtenants.

164.    "*Put Parties*" means certain entities affiliated with Fidelity Management & Research Company, Oaktree Capital Management, L.P. and Serengeti Asset Management, L.P. that are reasonably acceptable to the Debtors, FG and Propco Lenders.

165.    "*Put Parties Support Agreement*" means that certain Support Agreement dated as of July ___, 2010 (as amended, supplemented or modified from time to time) by and among the Put Parties, the Mortgage Lenders, FG, Frank J. Fertitta III and Lorenzo Fertitta, a copy of which is included in the Plan Supplement.

166.    "*Put Premium*" means $3,000,000 in cash to be paid to the Put Parties by New Propco Holdco on the Effective Date, on the terms and subject to the conditions set forth in the NPH Term Sheet.

167.    "*Qualified Eligible Opco Unsecured Creditor*" means any Eligible Opco Unsecured Creditor that (a) is an Accredited Investor, (b) owns indirectly (together with affiliated funds or other investment vehicles with a common investment manager) through Blockerco at least 0.5% of the outstanding NPH Equity and (c) participates in the Propco Rights Offering and purchases NPH Equity therein.  Qualified Eligible Opco Unsecured Creditors shall have the rights and obligations of "Qualifying Creditors" as that term is defined in the NPH Term Sheet.

168.    "*Registered Record Owners*" means, as of the applicable date of determination, the respective owners of the Senior Notes or Subordinated Notes, as applicable, whose holdings thereof are in their own name on the books and records of SCI.

169.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and Subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, and any Person claiming by or through any of them.

170.    "*Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.C hereof.

171.    "*Released Party*" means: (a) the Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h) the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the Committee and its members, provided that the Committee Support Stipulation has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Effective Date; and (s) the respective Related Persons of each of the foregoing Entities.

172.    "*Releasing Party*" has the meaning set forth in Article X.C hereof.

173.    "*Required Consenting Lenders*" shall mean three or more Consenting Opco Lenders holding greater than 66.6% of the aggregate Claims (without including in such determination the termination value of the Prepetition Opco Swap Agreement prior to its termination; provided, that, all obligations under the Secured Hedge Agreement (whether or not terminated) remain *pari passu* with all other Prepetition Opco Secured Claims held by all Consenting Opco Lenders.

174.    "*Rights Offering Record Date*" means the date for determining which Holders of Claims are entitled to participate in the Propco Rights Offering, which date is July 15, 2010 at 5:00 p.m. prevailing Pacific Time, as set forth in the Disclosure Statement Order.

175.    "*Schedule of Executory Contracts and Unexpired Leases To Be Assumed*" means the Schedule to be Filed with the Bankruptcy Court that identifies each Executory Contract and Unexpired Lease that will be assumed in accordance with Article VI.A of this Plan.

176.    "*Scheduled*" means with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules.

177.    "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs filed by the Debtors pursuant to Bankruptcy Code

section 521 and the applicable Bankruptcy Rules, as such Schedules they may be amended, modified, or supplemented from time to time.

178.    "*SCI*" means Station Casinos, Inc., debtor and debtor in possession.

179.    "*SCI Retained Assets*" means any assets of SCI or any of its Subsidiaries specified on Schedule 4 to this Plan and such other assets of SCI and its Subsidiaries that are designated in or pursuant to the New Opco Purchase Agreement as excluded assets (and are not Existing Propco Assets or New Propco Purchased Assets).

180.    "*Second Amended MLCA*" means that certain Second Amended and Restated Master Lease Compromise Agreement (2nd Revised) dated May 24, 2010, by and among SCI and certain of its affiliates, on the one hand, and Propco, on the other hand, as approved by the "Order Approving Revised Second Amended and Restated Master Lease Compromise Agreement Pursuant to U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019" entered by the Bankruptcy Court on July 14, 2010 [Docket No. 1778], a copy of which is included in the Plan Supplement.

181.    "*Secured Cash Management Agreement*" means one or more agreements among the Debtors or Non-Debtor Affiliates, on the one hand, and one or more Prepetition Opco Secured Lenders or Affiliates thereof, on the other than, in respect of any overdraft and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds.

182.    "*Secured Claim*" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or, in the case of setoff, pursuant to Bankruptcy Code section 553.

183.    "*Senior Notes*" means, collectively, the $450 million 6% Senior Notes due 2012 and the $400 million 7¾% Senior Notes due 2016, in each case issued by SCI.

184.    "*Senior Notes Trustee*" means Law Debenture Trust Company of New York, not in its individual capacity, but solely as Trustee under the Senior Notes Indentures.

185.    "*Senior Notes Indentures*" means, collectively: (a) that certain indenture dated as of March 17, 2004 providing for the issuance by SCI of 6% Senior Notes due 2012; and (b) that certain indenture dated as of August 1, 2006 providing for the issuance by SCI of 7¾% Senior Notes due 2016 (in each case, as supplemented or amended from time to time).

186.    "*Stalking Horse APA*" means that certain Asset Purchase Agreement dated June ___, 2010, by and among the Opco Group Sellers and the Stalking Horse Bidder, as amended, supplemented or otherwise modified from time to time subject to the terms thereof, a form of which was filed with the Bankruptcy Court on May 25, 2010 [Docket No. 1526].

187.    "*Stalking Horse Bid*" means the agreement by the Stalking Horse Bidder to purchase the New Opco Acquired Assets on the terms and conditions set forth in the Stalking Horse APA, subject to the Opco Auction.

188.    "*Stalking Horse Bidder*" means FG Opco Acquisitions LLC, a Delaware limited liability company, or any of its assignees as permitted under the Stalking Horse APA.

189.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

190.    "*Subordinated Notes*" means, collectively, the $450 million 6½% Senior Subordinated Notes due 2014, the $700 million 6⅞% Senior Subordinated Notes due 2016 and the $300 million 6⅝% Senior Subordinated Notes due 2018, in each case issued by SCI.

191.    "*Subordinated Notes Indentures*" means, collectively: (a) that certain indenture dated as of January 29, 2004 providing for the issuance by SCI of 6½% Senior Subordinated Notes due 2014; (b) that certain indenture dated as of February 27, 2004 providing for the issuance by SCI of 6⅞% Senior Subordinated Notes due 2016; and (c) that certain indenture dated March 13, 2006 providing for the issuance by SCI of 6⅝% Senior Subordinated Notes due 2018 (in each case, as supplemented or amended from time to time).

192.    "*Subordinated Notes Trustee*" means Wilmington Trust Company, not in its individual capacity, but solely as Trustee under the Subordinated Notes Indentures.

193.    "*Subsidiaries*" means, with respect to any Person, a wholly-owned or partially owned subsidiary of such Person.

194.    "*Successful Bid*" means the bid for the New Opco Acquired Assets that the Bankruptcy Court determines is the highest or otherwise best bid as of the conclusion of the Opco Auction, or any such alternate bid as the Bankruptcy Court may subsequently approve.[1]

195.    "*Successful Bidder*" means the Person or Persons that submits the Successful Bid.

196.    "*Super Priority Notes Election*" means the election available to the Stalking Horse Bidder under, and subject to the terms of, the Stalking Horse APA to elect to pay up to $43 million of the cash purchase price required under the Stalking Horse APA in the form of Super Priority Notes issued pursuant to the New Propco Credit Agreement.

---

[1]    The Plan contemplates the sale of the New Opco Acquired Assets pursuant to the Successful Bid that emerges from the Opco Auction. The Successful Bid may differ in a variety of respects from the Stalking Horse Bid. To the extent the Stalking Horse Bid is not the Successful Bid and the Successful Bid varies in terms or structure from the Stalking Horse Bid, the Debtors reserve the right to amend the Plan to reflect those variations as appropriate and to provide such supplemental disclosure of those amendments as the Bankruptcy Court may require.

197.    "*Swap Counterparty*" means Deutsche Bank AG, solely in its capacity as counterparty to Propco under that certain interest rate swap transaction dated as of November 29, 2007 with Reference Global No. N723525N between Propco and Deutsche Bank, A.G., as further modified by that certain Novation Confirmation dated as of March 5, 2008.

198.    "*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

199.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of Bankruptcy Code section 1124.

200.    "*Voteco*" means the Delaware limited liability company to be owned by certain individuals who, as of the Effective Date, will be licensed for gaming regulatory purposes that will serve, along with Holdco, as one of the equity interest holders in New Propco as of the Effective Date.

201.    "*Voting and Claims Agent*" means KCC, in its capacity as solicitation, notice, claims and balloting agent for the Debtors, pursuant to that certain order entered by the Bankruptcy Court on August 3, 2009 [Docket No. 35].

202.    "*Voting Classes*" means, collectively, Classes FHI.1, FP.1, VC.1, P.2, M.5.2, M.4.1, M.3.1, M.2.1, M.1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2.

203.    "*Voting Deadline*" means August 20, 2010 at 5:00 p.m. prevailing Nevada Time for all Holders of Claims and Equity Interests, which is the date and time by which all Ballots, Beneficial Holder Ballots and Master Ballots, as applicable, must be received by the Voting and Claims Agent in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

204.    "*Voting Record Date*" means the date for determining which Holders of Claims and Equity Interests are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is July 15, 2010 at 5:00 p.m. prevailing Pacific Time, as set forth in the Disclosure Statement Order.

205.    "*Wild Wild West Assemblage*" means the parcels of real estate, options, leasehold interests and ground lease set forth in Section 14 of Annex 1 to the Second Amended MLCA.

## ARTICLE II.

## TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS

Pursuant to Bankruptcy Code section 1123(a)(1), the Claims against each of the Debtors set forth in this Article 2 are not classified within any Classes. The Holders of such Claims are not entitled to vote on this Plan. The treatment of the Claims set forth below is consistent with the requirements of Bankruptcy Code section 1129(a)(9)(A).

The Chapter 11 Cases for each of the Debtors will not be substantively consolidated. Accordingly, Holders of unclassified Claims again a particular Debtor shall have their Claim allowed and treated in such respective Debtor's Estate.   As such, for each category of unclassified Claims, a sub-category shall be deemed to exist for each Debtor.

## A.    *Administrative Claims*

Except as otherwise provided herein, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim other than the Holder of the DIP Facility Claims will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash from the Debtor(s) against which the Administrative Claim is Allowed for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by such Holder.

Notwithstanding anything herein to the contrary but subject to the immediately following paragraph, to the extent applicable, all Allowed Administrative Claims (including, without limitation, professional fees and expenses, whether incurred on an hourly, monthly, "success" or other basis) shall be subject to an allocation among SCI and the Other Opco Debtors, on the one hand, and Propco, the Parent Debtors and the Mezzco Debtors, on the other hand, to ensure that the Allowed Administrative Claims are being allocated to the Debtor(s) that incurred the obligations or received the benefit thereof.   Such allocation will be either acceptable to the Required Consenting Lenders and the Holders of the Prepetition Mortgage Loan Claims or ordered by the Bankruptcy Court following notice and a hearing; provided further that, any expense reimbursement payable pursuant to the Bid Procedures Order shall constitute an Allowed Administrative Claim against SCI and its Estate only.

Notwithstanding anything herein to the contrary, the Allowed Administrative Claim of Lazard Frères & Co. LLC (*"Lazard"*) for any *"Restructuring Fee"* (as that term is defined in the Order approving Lazard's retention [Docket No. 326] (the *"Lazard Retention Order"*)) as Debtors' financial advisor and investment banker shall be subject to the following allocation: (i) SCI and the Other Opco Debtors, shall be responsible for payment of half of the Restructuring Fee    on the one hand, and (ii) Propco, the Parent Debtors and the Mezzco Debtors, shall be responsible for payment of the other half of the Restructuring Fee on the other hand.   For the avoidance of doubt, none of Lazard's other fees, including without limitation its Monthly Fees (as that term is defined in the Lazard Retention Order), shall be allocated, and SCI and the Other Opco Debtors shall remain obligated to pay such fees to the extent Allowed.

All Superpriority Claims under, and as defined in the Opco Cash Collateral Order, and any other Administrative Claims relating to SCI's adequate protection obligations arising under the Opco Cash Collateral Order shall be afforded the treatment set forth in Article III.B.4. under the heading "Prepetition Opco Secured Claims against SCI."  All Administrative Claims relating to SCI's and Propco's respective adequate protection obligations arising under the Propco Cash Collateral Order shall be afforded the treatment set forth in Article III.B.2 under the hearing "Prepetition Mortgage Loan Claims against Propco."

The DIP Facility Claims held by Vista Holdings, LLC and Past Enterprises, Inc. shall receive no distribution under the Plan and shall be extinguished and discharged upon the Effective Date, without payment of any consideration.

### 1.    **Bar Date for Administrative Claims**

Except as otherwise provided in this Article II.A hereof, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims but do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims and such Administrative Claims shall be deemed discharged as of the Effective Date. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F hereof. Objections to such requests must be Filed by the later of (a) 120 days after the applicable Administrative Claims Bar Date and (b) 90 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by order of the Bankruptcy Court.

### 2.    **Professional Compensation and Reimbursement Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File an application for final allowance of such Professional Fee Claim against the applicable Debtor and its estate no later than the Professional Fees Bar Date; <u>provided</u> that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered to the Debtors before the Effective Date in accordance with the terms of the Ordinary Course Professionals Order and without further Bankruptcy Court order. Objections to any Professional Fee Claim must be Filed by the later of (a) 90 days after the Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim.

### B.    *Priority Tax Claims*

The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by this Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by such Holder; or (c) pursuant to and in accordance with Bankruptcy Code sections 1129(a)(9)(C) and (D), Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; <u>provided</u>, <u>further</u>, that Priority Tax Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms

and conditions relating thereto in the discretion of the Debtors without further notice to or order of the Bankruptcy Court.

**C.    *Other Priority Claims***

Each Allowed Other Priority Claim, if any, shall, in full and final satisfaction of such Claim, be paid in full in Cash by the applicable Debtor upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.  If there are no Claims or Interests in a particular Class, then such Class of Claims or Interests shall not exist for all purposes of the Plan.

**A.    *Classification of Classified Claims and Equity Interests.***

**1.    Claims and Equity Interests Against Parent Debtors**

**(a)    FCP Holding, Inc.**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| FHI.1 | Prepetition Mortgage Loan Guaranty Claims | Impaired | Entitled to Vote |
| FHI.2 | Prepetition Mezzanine Loan Guaranty Claims | Impaired | Deemed to Reject |
| FHI.3 | Land Loan Guaranty Claims | Impaired | Deemed to Reject |
| FHI.4 | General Unsecured Claims | Impaired | Deemed to Reject |
| FHI.5 | Intercompany Claims | Impaired | Deemed to Reject |

| | | | |
|---|---|---|---|
| FHI.6 | Equity Interests | Impaired | Deemed to Reject |

### (b)    Fertitta Partners LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| FP.1 | Prepetition Mortgage Loan Guaranty Claims | Impaired | Entitled to Vote |
| FP.2 | Prepetition Mezzanine Loan Guaranty Claims | Impaired | Deemed to Reject |
| FP.3 | Land Loan Guaranty Claims | Impaired | Deemed to Reject |
| FP.4 | General Unsecured Claims | Impaired | Deemed to Reject |
| FP.5 | Intercompany Claims | Impaired | Deemed to Reject |
| FP.6 | Equity Interests | Impaired | Deemed to Reject |

### (c)    FCP Voteco, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| VC.1 | Prepetition Mortgage Loan Guaranty Claims | Impaired | Entitled to Vote |
| VC.2 | Prepetition Mezzanine Loan Guaranty Claims | Impaired | Deemed to Reject |
| VC.3 | Land Loan Guaranty Claims | Impaired | Deemed to Reject |
| VC.4 | General Unsecured Claims | Impaired | Deemed to Reject |
| VC.5 | Intercompany Claims | Impaired | Deemed to Reject |
| VC.6 | Equity Interests | Impaired | Deemed to Reject |

### 2.    Claims and Equity Interests Against Propco

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| P.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| P.2 | Prepetition Mortgage Loan Agreement Claims | Impaired | Entitled to Vote |
| P.3 | General Unsecured Claims | Impaired | Deemed to Reject |

| | | | |
|---|---|---|---|
| P.4 | Intercompany Claims | Impaired | Deemed to Reject |
| P.5 | Equity Interests | Impaired | Deemed to Reject |

### 3.    Claims and Equity Interests Against Mezzco Debtors

#### (a)    FCP MezzCo Parent, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| MP.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| MP.2 | Intercompany Claims | Impaired | Deemed to Reject |
| MP.3 | Equity Interests | Impaired | Deemed to Reject |

#### (b)    FCP MezzCo Parent Sub, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| MS.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| MS.2 | Intercompany Claims | Impaired | Deemed to Reject |
| MS.3 | Equity Interests | Impaired | Deemed to Reject |

#### (c)    FCP Mezzco Borrower VII, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| M7.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| M7.2 | Intercompany Claims | Impaired | Deemed to Reject |
| M7.3 | Equity Interests | Impaired | Deemed to Reject |

#### (d)    FCP Mezzco Borrower VI, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| M6.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| M6.2 | Intercompany Claims | Impaired | Deemed to Reject |
| M6.3 | Equity Interests | Impaired | Deemed to Reject |

**(e)      FCP Mezzco Borrower V, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| M5.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| M5.2 | Mezz IV Pledge Claims | Impaired | Entitled to Vote |
| M5.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M5.4 | Equity Interests | Impaired | Deemed to Reject |

**(f)      FCP Mezzco Borrower IV, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| M4.1 | Mezz IV Loan Claims | Impaired | Entitled to Vote |
| M4.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| M4.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M4.4 | Equity Interests | Impaired | Deemed to Reject |

**(g)      FCP Mezzco Borrower III, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| M3.1 | Mezz III Loan Claims | Impaired | Entitled to Vote |
| M3.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| M3.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M3.4 | Equity Interests | Impaired | Deemed to Reject |

**(h)      FCP Mezzco Borrower II, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| M2.1 | Mezz II Loan Claims | Impaired | Entitled to Vote |
| M2.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| M2.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M2.4 | Equity Interests | Impaired | Deemed to Reject |

(i)      **FCP Mezzco Borrower I, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| M1.1 | Mezz I Loan Claims | Impaired | Entitled to Vote |
| M1.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| M1.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M1.4 | Equity Interests | Impaired | Deemed to Reject |

4.      **Claims and Equity Interests Against SCI**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| S.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| S.2 | Prepetition Opco Secured Claims | Impaired | Entitled to Vote |
| S.3 | Master Lease Rejection Damage Claim | Impaired | Entitled to Vote |
| S.4 | General Unsecured Claims | Impaired | Entitled to Vote |
| S.5 | Senior Notes Claims | Impaired | Entitled to Vote |
| S.6 | Subordinated Notes Claims | Impaired | Entitled to Vote |
| S.7 | Mortgage Lender Claims Against SCI | Impaired | Entitled to Vote |
| S.8 | Intercompany Claims | Impaired | Deemed to Reject |
| S.9 | Equity Interests | Impaired | Deemed to Reject |

5.      **Claims and Equity Interests Against Other Opco Debtors**

(a)      **Northern NV Acquisitions, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| NA.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| NA.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| NA.3 | Equity Interests | Impaired | Deemed to Reject |

(b)      **Reno Land Holdings, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| RL.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| RL.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| RL.3 | Equity Interests | Impaired | Deemed to Reject |

(c)    **River Central, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| RC.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| RC.2 | Prepetition Opco Credit Agreement Guaranty Claims | Impaired | Entitled to Vote |
| RC.3 | General Unsecured Claims | Impaired | Deemed to Reject |
| RC.4 | Equity Interests | Impaired | Deemed to Reject |

(d)    **Tropicana Station, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| TS.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TS.2 | Prepetition Opco Credit Agreement Guaranty Claims | Impaired | Entitled to Vote |
| TS.3 | General Unsecured Claims | Impaired | Deemed to Reject |
| TS.4 | Equity Interests | Impaired | Deemed to Reject |

**B.**    *Treatment of Claims and Equity Interests.*

**1.**    **Claims and Equity Interests Against Parent Debtors**

(a)    **FCP Holding, Inc.**

Class FHI.1 – Prepetition Mortgage Loan Guaranty Claims against FCP Holding, Inc.

> *Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged.  Holders of Class FH.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

*Voting*: Class FHI.1 is Impaired, and the Holders of Class FHI.1 Claims are entitled to vote to accept or reject this Plan.

## Class FHI.2 – Prepetition Mezzanine Loan Guaranty Claims against FCP Holding, Inc.

*Treatment*: On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged. Holders of Class FHI.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class FHI.2 is Impaired. The Holders of Class FHI.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FHI.2 Claims are not entitled to vote to accept or reject this Plan.

## Class FHI.3 – Land Loan Guaranty Claims Against FCP Holding, Inc.

*Treatment*: On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by FCP Holding, Inc. shall be extinguished and discharged. Holders of Class FHI.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class FHI.3 is Impaired. The Holders of Class FHI.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FHI.3 Claims are not entitled to vote to accept or reject this Plan.

## Class FHI.4 – General Unsecured Claims against FCP Holding, Inc.

*Treatment*: Holders of Class FHI.4 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class FHI.4 Impaired. The Holders of Class FHI.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FHI.4 Claims are not entitled to vote to accept or reject this Plan.

## Class FHI.5 – Intercompany Claims against FCP Holding, Inc.

*Treatment*: Holders of Class FHI.5 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FHI.5 Impaired. The Holders of Class FHI.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are

conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FHI.5 Claims are not entitled to vote to accept or reject this Plan.

Class FHI.6 – Equity Interests in FCP Holding, Inc.

*Treatment*: On the Effective Date, all Equity Interests in FCP Holding, Inc. shall be cancelled and extinguished. Holders of Class FHI.6 Equity Interests shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FHI.6 Impaired. The Holders of Class FHI.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FHI.6 Claims are not entitled to vote to accept or reject this Plan.

**(b)    Fertitta Partners LLC**

Class FP.1 – Prepetition Mortgage Loan Guaranty Claims against Fertitta Partners LLC.

*Treatment*: On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged. Holders of Class FH.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

*Voting:* Class FP.1 is Impaired, and the Holders of Class FP.1 Claims are entitled to vote to accept or reject this Plan.

Class FP.2 – Prepetition Mezzanine Loan Guaranty Claims against Fertitta Partners LLC

*Treatment*: On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged. Holders of Class FP.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FP.2 is Impaired. The Holders of Class FP.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.2 Claims are not entitled to vote to accept or reject this Plan.

Class FP.3 – Land Loan Guaranty Claims Against Fertitta Partners LLC

*Treatment*: On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by Fertitta Partners LLC shall be

extinguished and discharged. Holders of Class FP.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FP.3 is Impaired. The Holders of Class FP.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.3 Claims are not entitled to vote to accept or reject this Plan.

Class FP.4 – General Unsecured Claims against Fertitta Partners LLC

*Treatment*: Holders of Class FP.4 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FP.4 Impaired. The Holders of Class FP.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.4 Claims are not entitled to vote to accept or reject this Plan.

Class FP.5 – Intercompany Claims against Fertitta Partners LLC

*Treatment*: Holders of Class FP.5 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FP.5 Impaired. The Holders of Class FP.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.5 Claims are not entitled to vote to accept or reject this Plan.

Class FP.6 – Equity Interests in Fertitta Partners LLC

*Treatment*: On the Effective Date, all Equity Interests in Fertitta Partners LLC shall be cancelled and extinguished. Holders of Class FP.6 Equity Interests shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class FP.6 Impaired. The Holders of Class FP.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.6 Claims are not entitled to vote to accept or reject this Plan.

**(c)    FCP Voteco, LLC**

Class VC.1 – Prepetition Mortgage Loan Guaranty Claims against FCP Voteco, LLC

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged.  Holders of Class VC.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

*Voting*:  Class VC.1 is Impaired, and the Holders of Class VC.1 Claims are entitled to vote to accept or reject this Plan.

Class VC.2 – Prepetition Mezzanine Loan Guaranty Claims against FCP Voteco, LLC

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged.  Holders of Class VC.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class VC.2 is Impaired.  The Holders of Class VC.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.2 Claims are not entitled to vote to accept or reject this Plan.

Class VC.3 – Land Loan Guaranty Claims Against FCP Voteco, LLC

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by FCP Voteco, LLC shall be extinguished and discharged.  Holders of Class VC.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class VC.3 is Impaired.  The Holders of Class VC.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.3 Claims are not entitled to vote to accept or reject this Plan.

Class VC.4 – General Unsecured Claims against FCP Voteco, LLC

*Treatment*:  Holders of Class VC.4 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class VC.4 is Impaired.  The Holders of Class VC.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.4 Claims are not entitled to vote to accept or reject this Plan.

Class VC.5 – Intercompany Claims against FCP Voteco, LLC

*Treatment*:  Holders of Class VC.5 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class VC.5 is Impaired.  The Holders of Class VC.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.5 Claims are not entitled to vote to accept or reject this Plan.

Class VC.6 – Equity Interests in FCP Voteco, LLC

*Treatment*:  On the Effective Date, all Equity Interests in FCP Voteco, LLC shall be cancelled and extinguished.  Holders of Class VC.6 Equity Interests shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class VC.6 is Impaired.  The Holders of Class VC.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.6 Claims are not entitled to vote to accept or reject this Plan.

**2.        Claims and Equity Interests Against Propco**

Class P.1 – Other Secured Claims against Propco

*Classification*:  Each Class P.1 Claim, if any, is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class P.1A, Class P.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:  The legal, equitable and contractual rights of the Holders of Class P.1 Claims, if any, are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class P.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class P.1 Claim shall either (at the election of the Debtors):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class P.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such claim by New Propco and retention of all existing liens to secure such claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:  Class P.1 is an Unimpaired Class, and the Holders of Class P.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of

the Bankruptcy Code. Therefore, the Holders of Class P.1 Claims are not entitled to vote to accept or reject this Plan.

Class P.2 – Prepetition Mortgage Loan Claims against Propco

*Allowance*: On the Effective Date, the Prepetition Mortgage Loan Claims shall be deemed Allowed in an aggregate amount equal to principal in the amount of not less than $1,800,000,000, plus all interest accrued and unpaid thereon as of the Effective Date, and all unpaid fees, costs, expenses and other charges required to be paid or reimbursed, as applicable, pursuant to the Prepetition Mortgage Loan Agreement and the Propco Cash Collateral Order.

*Treatment*: On the Effective Date, Holders of Allowed Class P.2 Claims shall receive, on account, and in full satisfaction, of those Claims their respective Pro Rata shares of:

    (a)    the New Propco Transferred Assets, which will be delivered to New Propco or one or more Subsidiaries thereof, as the designee(s) of the Mortgage Lenders for purposes of distribution of such assets; and

    (b)    their respective Pro Rata shares of (i) Propco Excess Effective Date Cash; and (ii) any recoveries received by Propco on account of any claims Propco has against SCI, including the Master Lease Rejection Damage Claim, all or a portion of which the Mortgage Lenders may direct to be delivered to New Propco or one or more subsidiaries thereof as the designees of the Mortgage Lenders for purposes of distribution of such assets. If the Stalking Horse Bid is the Successful Bid, then the distributions resulting from the Master Lease Rejection Damage Claim will be limited to the transfer of the Master Lease Collateral to Propco and then, in turn, to the Holders of Class P.2 Claims.

*Voting*: Class P.2 is Impaired, and Holders of Class P.2 Claims are entitled to vote to accept or reject this Plan.

Class P.3 – General Unsecured Claims against Propco

*Treatment*: Holders of Class P.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class P.3 is Impaired. The Holders of Class P.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class P.3 Claims are not entitled to vote to accept or reject this Plan.

Class P.4 – Intercompany Claims against Propco

> *Treatment*:  Holders of Class P.4 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class P.4 is Impaired.  The Holders of Class P.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class P.4 Claims are not entitled to vote to accept or reject this Plan.

Class P.5 – Equity Interests in Propco

> *Treatment*:  On the Effective Date, all Equity Interests in Propco shall be deemed to be surrendered to the lenders under the Mezz I Loan to FCP MezzCo Borrower I, LLC in satisfaction of its pledge of those Equity Interests.  Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished.  Holders of Class P.5 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under this Plan.

> *Voting*:  Class P.5 is Impaired, and Holders of Class P.5 Equity Interests are deemed to reject the Plan.

**3.    Claims and Equity Interests Against Mezzco Debtors**

**(a)    FCP MezzCo Parent, LLC**

Class MP.1 – General Unsecured Claims against FCP MezzCo Parent, LLC

> *Treatment*:  Holders of Class MP.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class MP.1 is Impaired.  The Holders of Class MP.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MP.1 Claims are not entitled to vote to accept or reject this Plan.

Class MP.2 – Intercompany Claims against FCP MezzCo Parent, LLC

> *Treatment*:  Holders of Class MP.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class MP.2 is Impaired.  The Holders of Class MP.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MP.2 Claims are not entitled to vote to accept or reject this Plan.

Class MP.3 – Equity Interests in FCP MezzCo Parent, LLC

> *Treatment*:  On the Effective Date, all Class MP.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

> *Voting*:  Class MP.3 is Impaired, and the Holders of Class MP.3 Equity Interests are deemed to have rejected this Plan.

**(b)    FCP MezzCo Parent Sub, LLC**

Class MS.1 — General Unsecured Claims against FCP MezzCo Parent Sub, LLC

> *Treatment*:  Holders of Class MS.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class MS.1 is Impaired.  The Holders of Class MS.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MS.1 Claims are not entitled to vote to accept or reject this Plan.

Class MS.2 — Intercompany Claims against FCP MezzCo Parent Sub, LLC

> *Treatment*:  Holders of Class MS.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class MS.2 is Impaired.  The Holders of Class MS.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MS.2 Claims are not entitled to vote to accept or reject this Plan.

Class MS.3 — Equity Interests In FCB MezzCo Parent Sub, LLC

> *Treatment*:  On the Effective Date, all Class MS.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

> *Voting*:  Class MS.3 is Impaired, and the Holders of Class MS.3 Equity Interests are deemed to have rejected this Plan.

**(c)    FCP Mezzco Borrower VII, LLC**

Class M7.1 — General Unsecured Claims against FCP MezzCo Borrower VII, LLC

> *Treatment*:  Holders of Class M7.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M7.1 is Impaired.  The Holders of Class M7.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M7.1 Claims are not entitled to vote to accept or reject this Plan.

Class M7.2 — Intercompany Claims against FCP MezzCo Borrower VII, LLC

*Treatment*:  Holders of Class M7.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M7.2 is Impaired.  The Holders of Class M7.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M7.2 Claims are not entitled to vote to accept or reject this Plan.

Class M7.3 — Equity Interests In FCP MezzCo Borrower VII, LLC

*Treatment*:   On the Effective Date, all Class M7.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class M7.3 is Impaired, and the Holders of Class M7.3 Equity Interests are deemed to have rejected this Plan.

**(d)     FCP Mezzco Borrower VI, LLC**

Class M6.1 — General Unsecured Claims against FCP MezzCo Borrower VI, LLC

*Treatment*:  Holders of Class M6.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M6.1 is Impaired.  The Holders of Class M6.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M6.1 Claims are not entitled to vote to accept or reject this Plan.

Class M6.2 — Intercompany Claims against FCP MezzCo Borrower VI, LLC

*Treatment*:  Holders of Class M6.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M6.2 is Impaired.  The Holders of Class M6.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the

Bankruptcy Code. Consequently, the Holders of Class M6.2 Claims are not entitled to vote to accept or reject this Plan.

Class M6.3 — Equity Interests In FCP MezzCo Borrower VI, LLC

*Treatment*: On the Effective Date, all Class M6.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*: Class M6.3 is Impaired, and the Holders of Class M6.3 Equity Interests are deemed to have rejected this Plan.

**(e) FCP Mezzco Borrower V, LLC**

Class M5.1 — General Unsecured Claims against FCP MezzCo Borrower V, LLC

*Treatment*: Holders of Class M5.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class M5.1 is Impaired. The Holders of Class M5.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M5.1 Claims are not entitled to vote to accept or reject this Plan.

Class M5.2 — Mezz IV Pledge Claims against FCP MezzCo Borrower V, LLC

*Treatment*: Holders of Class M5.2 Claims will receive the Equity Interests in FCP Mezzco Borrower IV, LLC on account of their Claims under this Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*: Class M5.2 is Impaired. The Holders of Class M5.2 Claims are entitled to vote to accept or reject this Plan.

Class M5.3 — Intercompany Claims against FCP MezzCo Borrower V, LLC

*Treatment*: Holders of Class M5.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class M5.3 is Impaired. The Holders of Class M5.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M5.3 Claims are not entitled to vote to accept or reject this Plan.

Class M5.4 — Equity Interests In FCP MezzCo Borrower V, LLC

> *Treatment*:  On the Effective Date, all Class M5.4 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

> *Voting*:  Class M5.4 is Impaired, and the Holders of Class M5.4 Equity Interests are deemed to have rejected this Plan.

> **(f)    FCP Mezzco Borrower IV, LLC**

Class M4.1 — Mezz IV Loan Claims against FCP MezzCo Borrower IV, LLC

> *Treatment*:  Holders of Class M4.1 Claims will receive the Equity Interests in FCP Mezzco Borrower III, LLC on account of their Claims under this Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

> *Voting*:  Class M4.1 is Impaired.  The Holders of Class M4.1 Claims are entitled to vote to accept or reject this Plan.

Class M4.2 — General Unsecured Claims against FCP MezzCo Borrower IV, LLC

> *Treatment*:  Holders of Class M4.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class M4.2 is Impaired.  The Holders of Class M4.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M4.2 Claims are not entitled to vote to accept or reject this Plan.

Class M4.3 — Intercompany Claims against FCP MezzCo Borrower IV, LLC

> *Treatment*:  Holders of Class M4.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class M4.3 is Impaired.  The Holders of Class M4.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M4.3 Claims are not entitled to vote to accept or reject this Plan.

Class M4.4 — Equity Interests In FCP MezzCo Borrower IV, LLC

> *Treatment*:  On the Effective Date, all Class M4.4 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class M4.4 is Impaired, and the Holders of Class M4.4 Equity Interests are deemed to have rejected this Plan.

### (g)    FCP Mezzco Borrower III, LLC

<u>Class M3.1 — Mezz III Loan Claims against FCP MezzCo Borrower III, LLC</u>

*Treatment*:  Holders of Class M3.1 Claims shall receive the Equity Interests in FCP Mezzco Borrower II, LLC on account of their Claims under this Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*:  Class M3.1 is Impaired.  The Holders of Class M3.1 Claims are entitled to vote to accept or reject this Plan.

<u>Class M3.2 — General Unsecured Claims against FCP MezzCo Borrower III, LLC</u>

*Treatment*:  Holders of Class M3.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M3.2 is Impaired.  The Holders of Class M3.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M3.2 Claims are not entitled to vote to accept or reject this Plan.

<u>Class M3.3 — Intercompany Claims against FCP MezzCo Borrower III, LLC</u>

*Treatment*:  Holders of Class M3.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M3.3 is Impaired.  The Holders of Class M3.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M3.3 Claims are not entitled to vote to accept or reject this Plan.

<u>Class M3.4 — Equity Interests In FCP MezzCo Borrower III, LLC</u>

*Treatment*:  On the Effective Date, all Equity Interests in FCP MezzCo Borrower III, LLC shall be deemed to be surrendered to the Holders of Mezz IV Loan Claims in satisfaction of its pledge of those Equity Interests.  Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished. Holders of Class M3.4 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under this Plan.

*Voting*:  Class M3.4 is Impaired, and the Holders of Class M3.4 Equity Interests are deemed to have rejected this Plan.

(h)    **FCP Mezzco Borrower II, LLC**

Class M2.1 — Mezz II Loan Claims against FCP MezzCo Borrower II, LLC

>   *Treatment*:  Holders of Class M2.1 Claims shall receive the Equity Interests in FCP Mezzco Borrower I, LLC on account of their Claims under this Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

>   *Voting*:  Class M2.1 is Impaired.  The Holders of Class M2.1 Claims are entitled to vote to accept or reject this Plan.

Class M2.2 — General Unsecured Claims against FCP MezzCo Borrower II, LLC

>   *Treatment*:  Holders of Class M2.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

>   *Voting*:  Class M2.2 is Impaired.  The Holders of Class M2.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M2.2 Claims are not entitled to vote to accept or reject this Plan.

Class M2.3 — Intercompany Claims against FCP MezzCo Borrower II, LLC

>   *Treatment*:  Holders of Class M2.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

>   *Voting*:  Class M2.3 is Impaired.  The Holders of Class M2.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M2.3 Claims are not entitled to vote to accept or reject this Plan.

Class M2.4 — Equity Interests In FCP MezzCo Borrower II, LLC

>   *Treatment*:  On the Effective Date, all Equity Interests in FCP MezzCo Borrower II, LLC shall be deemed to be surrendered to the Holders of Mezz III Loan Claims in satisfaction of its pledge of those Equity Interests.  Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished. Holders of Class M2.4 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under this Plan.

>   *Voting*:  Class M2.4 is Impaired, and the Holders of Class M2.4 Equity Interests are deemed to have rejected this Plan.

(i)      FCP Mezzco Borrower I, LLC

### Class M1.1 — Mezz I Loan Claims against FCP MezzCo Borrower I, LLC

*Treatment*:  Holders of Class M1.1 Claims shall receive the Equity Interests in Propco on account of their Claims under this Plan.  Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*:  Class M1.1 is Impaired.  The Holders of Class M1.1 Claims are entitled to vote to accept or reject this Plan.

### Class M1.2 — General Unsecured Claims against FCP MezzCo Borrower I, LLC

*Treatment*:  Holders of Class M1.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M1.2 is Impaired.  The Holders of Class M1.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M1.2 Claims are not entitled to vote to accept or reject this Plan.

### Class M1.3 — Intercompany Claims against FCP MezzCo Borrower I, LLC

*Treatment*:  Holders of Class M1.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M1.3 is Impaired.  The Holders of Class M1.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M1.3 Claims are not entitled to vote to accept or reject this Plan.

### Class M1.4 — Equity Interests In FCP MezzCo Borrower I, LLC

*Treatment*:  On the Effective Date, all Equity Interests in FCP MezzCo Borrower I, LLC shall be deemed to be surrendered to the Holders of Mezz II Loan Claims in satisfaction of its pledge of those Equity Interests.  Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished.  Holders of Class M1.4 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under this Plan.

*Voting*:  Class M1.4 is Impaired, and the Holders of Class M1.4 Equity Interests are deemed to have rejected this Plan.

4.     **Claims and Equity Interests Against SCI**

Class S.1 – Other Secured Claims against SCI

*Classification*:  Each Class S.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class S.1A, Class S.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.  Any and all Claims arising under the Secured Cash Management Agreement shall be classified in this Class as an Other Secured Claim against SCI.

*Treatment*:  Unless otherwise agreed to by the Holders of any Class S.1 Claim, the legal, equitable and contractual rights of the Holders of Class S.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class S.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class S.1 Claim shall either (at the election of the Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class S.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:  Class S.1 is an Unimpaired Class, and the Holders of Class S.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class S.1 Claims are not entitled to vote to accept or reject this Plan.

Class S.2 – Prepetition Opco Secured Claims against SCI

*Allowance*:  On the Effective Date, and without limiting the Debtors' rights under the heading "Reserved Claims," the Prepetition Opco Secured Claims shall be deemed Allowed in the aggregate principal amount of not less than $882,015,849.96, plus all interest accrued and unpaid thereon as of the Effective Date, and all unpaid fees, costs, expenses and other charges, claims and obligations (including indemnification claims) required to be paid or reimbursed, as applicable, pursuant to the Prepetition Opco Credit Agreement and the Prepetition Opco Swap Agreement.  To the extent the value of the Collateral securing Prepetition Opco Secured Claims is less than the amount of those Claims, such deficiency shall be classified as a General Unsecured Claim in Class S.4.  Any Holder of a Class S.2 Claim that votes to accept the Plan, however, shall not be an Eligible Opco Unsecured Creditor and shall be deemed to have

elected to waive any and all rights to receive any distributions on account of its Class S.4 deficiency claim and therefore shall not receive any NPH Warrants and shall not have any rights to participate in the Propco Rights Offering, any Equity Raise or in any NPH Post-Effective Investment Rights on account of its Class S.4 deficiency claim.

*Treatment*:  On the Effective Date, Holders of Allowed Claims arising under the Prepetition Opco Credit Agreement and the Prepetition Opco Swap Agreement shall receive on account, and in full satisfaction, of those Claims and their Superpriority Claims (as defined in the Opco Cash Collateral Order) and any other Administrative Claims arising under the Opco Cash Collateral Order, their respective Pro Rata shares of:

(a)  If the Stalking Horse Bidder is the Successful Bidder (subject in all respects to the terms of the Stalking Horse APA):

(1) an amount in cash equal to $317 million, plus the Gun Lake Reimbursement proceeds in excess of $20 million, less the Excess AMT Amount, if any, less the Super Priority Principal Amount if the Stalking Horse Bidder has made the Super Priority Notes Election pursuant to the terms of the Stalking Horse APA;

(2) $430 million in aggregate principal amount of term loans less the Gun Lake Reimbursement proceeds in excess of $20 million, which term loans shall be subject to the terms of the New Opco Credit Agreement; provided that notwithstanding anything herein to the contrary, letters of credit issued and that remain undrawn under the Prepetition Opco Credit Agreement shall be replaced or backstopped by letters of credit issued under the New Opco Credit Agreement on the Effective Date.

(3) $25 million in aggregate principal amount of term loans, which shall be subject to the terms of the New Opco PIK Credit Agreement; and

(4) If the Stalking Horse has made the Super Priority Notes Election pursuant to the terms of the Stalking Horse APA, then Deutsche Bank Trust Company Americas and JP Morgan Chase Bank, N.A., in their capacities as Prepetition Opco Secured Lenders, have consented to receive, and shall receive on the Effective Date, the Super Priority Notes in the Super Priority Principal Amount in lieu of a like amount of Cash that they would otherwise receive as part of their Pro Rata Share of Cash under clause (1) above.

(b) If the Successful Bidder is a Person other than the Stalking Horse Bidder:

**[SUPPLEMENTAL DISCLOSURE TO COME FOLLOWING OPCO AUCTION]**

*Voting*:  Class S.2 is Impaired, and Holders of Class S.2 Claims are entitled to vote to accept or reject this Plan.  Any Holder of a Class S.2 Claim that votes to accept the Plan, however, shall not be an Eligible Opco Unsecured Creditor and shall be deemed to have elected to waive any and all rights to receive any distributions on account of its Class S.4 deficiency claim and therefore shall not receive any NPH Warrants and shall not have any rights to participate in the Propco Rights Offering, any Equity Raise or in any NPH Post-Effective Investment Rights on account of its Class S.4 deficiency claim.

*Reserved Claims*:  Unless otherwise settled, SCI reserves the right to set off against distributions to be made under this Section III.B.4 to any Non-Funding Lender (as defined in the Opco Cash Collateral Order) any amounts recoverable by SCI on account of any Reserved Claims (as defined in the Opco Cash Collateral Order) against any such Non-Funding Lender.

Class S.3 – Master Lease Rejection Damage Claim against SCI

*Treatment*:  On the Effective Date, Propco, in its capacity as Holder of the Master Lease Rejection Damage Claim, shall receive from SCI and the Operating Subtenants a transfer of all of the Master Lease Collateral in full satisfaction of the secured portion of the Master Lease Rejection Damage Claim.  If the Stalking Horse Bid is the Successful Bid, Propco will not receive any other distributions on account of its Allowed Class S.3 Claim.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class S.3 is Impaired and Holders of Class S.3 Claims are entitled to vote to accept or reject this Plan.

Class S.4 – General Unsecured Claims against SCI

*Treatment*:  On the Effective Date or promptly following any subsequent date on which an applicable claim becomes an Allowed Claim, Holders of Allowed General Unsecured Claims against SCI:

(a)  That are Eligible Opco Unsecured Creditors shall receive their Allocated Pro Rata Share of NPH Warrants;

(b)  That are Eligible Opco Unsecured Creditors and Accredited Investors shall receive their Allocated Pro Rata Share of NPH Investment Rights; and

(c)  That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

*Voting*: Class S.4 is Impaired, and Holders of Class S.4 Claims are entitled to vote to accept or reject this Plan. In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.4 Claims as of the Rights Offering Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering. Any Holder that is an Accredited Investor that indicates an interest in so participating will then be given the opportunity to subscribe in the Propco Rights Offering, provided that it subscribes for the purchase of at least $250,000 of NPH Equity. Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

## Class S.5 – Senior Notes Claims against SCI

*Treatment*: On the Effective Date, Holders of Allowed Senior Notes Claims against SCI:

(a) That are Eligible Opco Unsecured Creditors shall receive their Allocated Pro Rata Share of NPH Warrants;

(b) That are Eligible Opco Unsecured Creditors and Accredited Investors shall receive their Allocated Pro Rata Share of NPH Investment Rights; and

(c) That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

In addition, the reasonable and documented fees and expenses of the Senior Notes Trustee (including reasonable legal fees and expenses) in an amount to be mutually agreed by the Debtors, FG, the Mortgage Lenders and the Senior Notes Trustee or as otherwise determined by the Bankruptcy Court, shall be paid upon confirmation of the Plan (with respect to amounts then accrued), and with respect to fees and expenses incurred between confirmation of the Plan and the Effective Date, shall be paid on the Effective Date subject in each case to Bankruptcy Court approval to be included in the Confirmation Order (it being understood that such "reasonable" fees and expenses shall not include any legal fees or expenses incurred by the Senior Notes Trustee after July 27, 2010 in opposing implementation of the terms of the NPH Term Sheet (including confirmation of the Plan) or engaging in litigation activity against any of the Debtors, FG or the Mortgage Lenders, or any of their respective affiliates).

*Voting*: Class S.5 is Impaired, and Holders of Class S.5 Claims are entitled to vote to accept or reject this Plan. In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.5 Claims as of the Rights Offering

Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering. Any Holder that is an Accredited Investor that indicates an interest in so participating will then be given the opportunity to subscribe in the Propco Rights Offering, provided that it subscribes for the purchase of at least $250,000 of NPH Equity. Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

Class S.6 – Subordinated Notes Claims against SCI

*Treatment*: On the Effective Date and subject to the immediately following proviso, Holders of Allowed Subordinated Notes Claims against SCI:

(a)    That are Eligible Opco Unsecured Creditors shall be entitled to their Allocated Pro Rata Share of NPH Warrants;

(b)  That are Eligible Opco Unsecured Creditors and Accredited Investors shall be entitled to their Allocated Pro Rata Share of NPH Investment Rights; and

(c)    That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

**PROVIDED, HOWEVER,** that the distributions described above to which the Holders of Subordinated Notes Claims otherwise may be entitled shall be subject, in each case, to any applicable contractual subordination arrangements or obligations, including any such arrangements or obligations with respect to (a) Holders of Allowed Class S.4 Claims that also hold Class S.2 Claims and that do not vote to accept the Plan on account of such Class S.2 Claims and (b) Holders of Allowed Senior Notes, except to the extent the parties otherwise agree and such agreement is reflected in the Plan and approved by the Bankruptcy Court. Absent such agreement, the application of any such arrangement or obligations may result in Holders of Class S.6 Claims receiving no recovery under the Plan. There can be no assurance that any such agreement will be reached that would result in Holders of Class S.6 Claims retaining a recovery under the Plan.

In addition, the reasonable and documented fees and expenses of the Subordinated Notes Trustee (including reasonable legal fees and expenses) in an amount to be mutually agreed by the Debtors, FG, the Mortgage Lenders and the Subordinated Notes Trustee or as otherwise determined by the Bankruptcy Court, shall be paid upon confirmation of the Plan (with respect to amounts then accrued), and with respect to fees and expenses incurred between confirmation of the Plan and the

Effective Date, shall be paid on the Effective Date subject in each case to Bankruptcy Court approval to be included in the Confirmation Order and such fees and expenses shall not be subject to the subordination or turn-over provisions of the Subordinated Notes Indentures (it being understood that such "reasonable" fees and expenses shall not include any legal fees or expenses incurred by the Subordinated Notes Trustee after July 27, 2010 in opposing implementation of the terms of the NPH Term Sheet (including confirmation of the Plan) or engaging in litigation activity against any of the Debtors, FG or the Mortgage Lenders, or any of their respective affiliates).

*Voting*:  Class S.6 is Impaired, and Holders of Class S.6 Claims are entitled to vote to accept or reject this Plan.  In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.6 Claims as of the Rights Offering Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering in the event the Plan results in NPH Investment Rights being distributed to such Holders.  Any Holder that is an Accredited Investor that indicates an interest in so participating may be given the opportunity to subscribe in the Propco Rights Offering in the event the Plan results in NPH Investment Rights being distributed to such Holders.  Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

### Class S.7 – Mortgage Lender Claims against SCI

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class S.7 Claims will be deemed to have their Class S.7 Claims satisfied by the distributions to Holders of Class S.3 and Class P.2 Claims described above.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class 7 is Impaired and Holders of Class S.7 Claims are entitled to vote to accept or reject this Plan.

### Class S.8 – Intercompany Claims against SCI

*Treatment*:  Holders of Class S.8 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class S.8 is Impaired.  The Holders of Class S.8 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class S.8 Claims are not entitled to vote to accept or reject this Plan.

### Class S.9 – Equity Interests in SCI

*Treatment*:  On the Effective Date, all Class S.9 Equity Interests shall be deemed canceled and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise.   Upon the cancellation and extinguishment of the Class S.9 Equity Interests, the Parent Debtor Pledges shall be deemed to be cancelled and extinguished.

*Voting*:  Class S.9 is Impaired, and the Holders of Class S.9 Equity Interests are deemed to have rejected this Plan.

### 5.    Claims and Equity Interests Against Other Opco Debtors

#### (a)    Northern NV Acquisitions, LLC

Class NA.1 – Other Secured Claims against Northern NV Acquisitions, LLC

*Classification*:  Each Class NA.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class NA.1A, Class NA.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:   The legal, equitable and contractual rights of the Holders of Class NA.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class NA.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class NA.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class NA.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:   Class NA.1 is an Unimpaired Class, and the Holders of Class NA.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class NA.1 Claims are not entitled to vote to accept or reject this Plan.

Class NA.2 – General Unsecured Claims against Northern NV Acquisitions, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class NA.2 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class NA.2 Claims are not expected to receive or retain any property under the Plan.  Class NA.2 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class NA.2 Claims are not entitled to vote to accept or reject this Plan.

Class NA.3 – Equity Interests in Northern NV Acquisitions, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class NA.3 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class NA.3 is Impaired.  Holders of Allowed Class NA.3 Equity Interests are entitled to vote to accept or reject the Plan.

**(b)    Reno Land Holdings, LLC**

Class RL.1 – Other Secured Claims against Reno Land Holdings, LLC

*Classification*:  Each Class RL.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class RL.1A, Class RL.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:    The legal, equitable and contractual rights of the Holders of Class RL.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class RL.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class RL.1 Claim shall either (at the election of the Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class RL.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:    Class RL.1 is an Unimpaired Class, and the Holders of Class RL.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class RL.1 Claims are not entitled to vote to accept or reject this Plan.

Class RL.2 – General Unsecured Claims against Reno Land Holdings, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class RL.2 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class RL.2 Claims are not expected to receive or retain any property under the Plan.  Class RL.2 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class RL.2 Claims are not entitled to vote to accept or reject this Plan.

Class RL.3 – Equity Interests in Reno Land Holdings, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class RL.3 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class RL.3 is Impaired.  Holders of Allowed Class RL.3 Equity Interests are entitled to vote to accept or reject the Plan.

**(c)     River Central, LLC**

Class RC.1 – Other Secured Claims against River Central, LLC

*Classification*:  Each Class RC.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class RC.1A, Class RC.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:   The legal, equitable and contractual rights of the Holders of Class RC.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class RC.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class RC.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class RC.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:  Class RC.1 is an Unimpaired Class, and the Holders of Class RC.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class RC.1 Claims are not entitled to vote to accept or reject this Plan.

Class RC.2 – Prepetition Opco Credit Agreement Claims against River Central, LLC

*Treatment*:  Same treatment as that provided for Allowed Class S.2 Claim Holders under Section III.B.4 above.

*Voting*:  Class RC.2 is Impaired, and Holders of Class RC.2 Claims are entitled to vote to accept or reject this Plan.

Class RC.3 – General Unsecured Claims against River Central, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class RC.3 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class RC.3 Claims are not expected to receive or retain any property under the Plan.  Class RC.3 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class RC.3 Claims are not entitled to vote to accept or reject this Plan.

Class RC.4 – Equity Interests in River Central, LLC

*Treatment*: If the Stalking Horse Bid is the Successful Bid, the Holders of Class RC.4 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class RC.4 is Impaired.  Holders of Allowed Class RC.4 Equity Interests are entitled to vote to accept or reject the Plan.

**(d)    Tropicana Station, LLC**

Class TS.1 – Other Secured Claims against Tropicana Station, LLC

*Classification*:  Each Class TS.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class TS.1A, Class TS.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:  The legal, equitable and contractual rights of the Holders of Class TS.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class TS.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class TS.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class TS.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*: Class TS.1 is an Unimpaired Class, and the Holders of Class TS.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class TS.1 Claims are not entitled to vote to accept or reject this Plan.

## Class TS.2 – Prepetition Opco Credit Agreement Claims against Tropicana Station, LLC

*Treatment*:  Same treatment as that provided for Allowed Class S.2 Claim Holders under Section III.B.4 above.

*Voting*:  Class TS.2 is Impaired, and Holders of Class TS.2 Claims are entitled to vote to accept or reject this Plan.

## Class TS.3 – General Unsecured Claims against Tropicana Station, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class TS.3 Claims will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class TS.3 Claims are not expected to receive or retain any property under the Plan.  Class TS.3 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class TS.3 Claims are not entitled to vote to accept or reject this Plan.

## Class TS.4 – Equity Interests in Tropicana Station, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class TS.4 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class TS.4 is Impaired.  Holders of Allowed Class TS.4 Equity Interests are entitled to vote to accept or reject the Plan.

**C.**      **Reservation of Rights Regarding Unimpaired Claims.**

Except as otherwise provided herein, nothing under this Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**D.**      **Subordination Rights.**

The classification and treatment of all Claims and Equity Interests under the Plan take into consideration all contractual, legal, and equitable subordination rights, whether arising under general principles of equitable subordination, sections 510(b) and 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any distribution made in accordance with the Plan.  As of the Effective Date and subject to full compliance with the respective treatment of the Senior Notes Claims and the Subordinated Notes Claims in accordance with this Plan, all contractual, legal, or equitable subordination rights that a holder of a Claim or Equity Interest may have with respect to any Distribution to be made in accordance with the Plan are discharged and terminated, and all actions related to the enforcement of such subordination rights are permanently enjoined. Subject to full compliance with the respective treatment of the Senior Notes Claims and the Subordinated Notes Claims in accordance with this Plan, distributions under the Plan are not subject to payment to any beneficiaries of such terminated subordination rights, or to levy, garnishment, attachment, or other legal process by any beneficiary of such terminated subordination rights.

**E.**      **Withholding Taxes.**

The Debtors or the Plan Administrator, as the case may be, may deduct any applicable federal or state withholding taxes from any distributions made pursuant to the Plan.

**F.**      **Set Offs.**

The Debtors may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever which the Debtors or the Estates may have against the holder of such Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such claim or counterclaim that they may have against such holder.

**G.**      **Timing of Payments and Distributions.**

Except (i) as to Class S.2, (ii) as to Class P.2, (iii) as otherwise provided in Article V, and (iv) as otherwise required or provided for under the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement or the Landco Assets Transfer Agreement or to effectuate the transactions contemplated by the New Opco Purchase Agreement,

the New Propco Purchase Agreement, the New Propco Transfer Agreement or the Landco Assets Transfer Agreement, any payments or distributions to be made under the Plan shall be deemed to be timely made if made within twenty (20) days after the date specified in the Plan, or as soon thereafter as reasonably practicable.  Whenever any distribution to be made under the Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.  The value of any distributions received by Holders of Claims in satisfaction of interest-bearing obligations shall be allocated first to the full satisfaction of the principal of such interest-bearing obligations and second in satisfaction of any accrued and unpaid interest.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.**      ***Voting Classes***

Each Holder of an Allowed Claim or Allowed Equity Interest as of the applicable Voting Record Date in each of the Voting Classes shall be entitled to vote to accept or reject this Plan.

**B.**      ***Acceptance by Impaired Classes of Claims and Equity Interests***

Pursuant to Section 1126(c) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept this Plan.  Pursuant to Section 1126(d) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, a Class of Equity Interests has accepted this Plan if at least two-thirds in amount of the Allowed Equity Interests in such Class actually voting have voted to accept this Plan.

**C.**      ***Presumed Acceptance of Plan***

Classes that are Unimpaired under this Plan are presumed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code.

**D.**      ***Presumed Rejection of Plan***

Classes FHI.2, FHI.3, FHI.4, FHI.5, FHI.6, FP.2, FP.3, FP.4, FP.5, FP.6, VC.2, VC.3, VC.4, VC.5, VC.6, P.3, P.4, P.5, MP.1, MP.2, MP.3, MS.1, MS.2, MS.3, M7.1, M7.2, M7.3, M6.1, M6.2, M6.3, M5.1, M5.3, M5.4, M4.2, M4.3, M4.4, M3.2, M3.3, M2.2, M2.3, M2.4, M1.2, M1.3, M1.4, S.8, S.9, NA.2, NA.3, RL.2, RL.3, RC.3, RC.4, TS.3 and TS.4 are Impaired and shall receive no distribution under this Plan on account of their Claims and are therefore presumed to have rejected this Plan pursuant to Section 1126(g) of the Bankruptcy Code.

**E.**      ***Non-Consensual Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code***

With respect to any Class that does not accept this Plan pursuant to Section 1126 of the Bankruptcy Code, the Debtors will request confirmation of this Plan under Section 1129(b) of

the Bankruptcy Code.  The Debtors reserve the right to modify this Plan in order to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.*      *Transfers Under the Plan, Generally.*

As described in detail below, implementation of the Plan will include, among other things, numerous conveyances, assignments, transfers and deliveries among various parties.  All conveyances, assignments, transfers and deliveries to any transferee pursuant to the transactions described under Section V.B.3, Section V.B.4, Section V.B.5, Section V.B.7 and Section V.B.8 below shall be made, and such assets shall vest in the applicable transferee, free and clear of all Liens, Claims, Equity Interests, and any other interests asserted by the Debtors, any creditors of the Debtors, or other Persons (including, without limitation, any Liens, Claims, Equity Interests, or other interests, whether presently known or unknown, in any way relating to or arising from the operations of the Debtors prior to the Effective Date), in accordance with and as contemplated by, among others, sections 105(a), 363, 1123 and 1129 of the Bankruptcy Code, save and excepting any specific obligations expressly undertaken by such transferee or its designee in the Plan or in any document to which such transferee is a party (including the New Opco Purchase Agreement) and which is necessary for Consummation of the Plan.  No such transferee or any of its Subsidiaries, creditors or equity holders shall be or be deemed to be a successor of any of the Debtors or any of the Non-Debtor Affiliates by reason of any theory of law or equity and shall not have any successor or transferee liability of any kind, nature or character, including liabilities arising or resulting from or relating to the transactions contemplated hereby; provided that the Confirmation Order shall not provide that the sale of any property that constitutes New Opco Acquired Assets is free and clear of any environmental liability imposed by a Governmental Unit (as defined in the Stalking Horse APA) arising from or related to such property to the extent that the Bankruptcy Court determines that such property cannot be sold to the Successful Bidder free and clear of such liability pursuant to the Bankruptcy Code.

The transactions consummated pursuant to the Plan, the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement and the Landco Assets Transfer Agreement shall not constitute a de facto merger, or a merger, as between any Debtors or any of the Non-Debtor Affiliates and any transferee pursuant to the Plan, the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement and the Landco Assets Transfer Agreement under any applicable law (including Nevada law).

Except for any specific obligations expressly undertaken by such transferee or its designee(s) in the Plan or in any agreement or other document to which such transferee or designee is a party and which is entered into in connection with the Consummation of the Plan, none of such transferee, Holdco, Voteco, New Propco or its Subsidiaries, New Opco or its Subsidiaries, the Mortgage Lenders, the Landco Lenders, the Successful Bidder, any of the Subsidiaries of the Successful Bidder or any of their respective designees or affiliates shall have

any liability, obligation or responsibility with respect to any Claims against or Equity Interests in any of the Debtors or any of the Non-Debtor Affiliates, including without limitation any amounts owed by the Debtors to holders of Claims or Equity Interests or any obligations of the Debtors pursuant to the Plan.

After the Effective Date, each such transferee and its designated subsidiaries will own the assets conveyed to it and operate its business and manage its affairs free of any restrictions contained in the Bankruptcy Code.  The terms, provisions and conditions of the agreements governing the transactions described in Section V.B.3, Section V.B.4, Section V.B.5, Section V.B.7 and Section V.B.8 below shall govern the obligations of the Debtors and the other parties thereto and to the extent inconsistent with the Plan, such agreements shall control.

Without further approvals or notice, the Debtors, the Administrative Agent and any other applicable Person shall have the power and authority to terminate and discharge (and to consent to terminate and discharge) Liens on any assets to effectuate the terms hereof and the terms of the New Opco Purchase Agreement, the New Propco Transfer Agreement, the Landco Assets Transfer Agreement and the New Propco Purchase Agreement on the Effective Date.

**B.    *Plan Transactions.***

The following transactions shall be consummated as specified below in the order specified below or in such other order as is set forth in the Plan Supplement:

**1.    Formation of New Propco Entities.**

On or prior to the Effective Date, Holdco, Voteco, New Propco and the following direct or indirect Subsidiaries shall be formed for the purpose of acquiring all of New Propco Acquired Assets and all of the equity interests in CV Propco, LLC as owner of the Landco Assets.  New Boulder LLC, New Red Rock LLC, New Palace, LLC, New Sunset, LLC, New Tropicana, LLC, New Cactus Lessee, LLC and New Landco Holdco, LLC.  (The legal names of these entities may differ from the names specified herein.)

**2.    Subsidiary Bankruptcy Filings**

To the extent required under the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement, the Landco Assets Transfer Agreement or otherwise necessary to Consummate the Plan (including consummation of the transfers contemplated by Article V.A herein) and the sale of the New Opco Acquired Assets or the sale or transfer of the New Propco Acquired Assets hereunder, following the entry of the Confirmation Order, certain or all of the Non-Debtor Affiliates that are direct or indirect subsidiaries of SCI, may commence voluntary chapter 11 cases in the Bankruptcy Court for the purpose of effectuating the sale or transfer of all or a portion of their assets pursuant to and in accordance with the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement or the Landco Assets Transfer Agreement, as the case may be.

**3.    Transfer of Master Lease Collateral to Propco.**

On the Effective Date, pursuant to the New Propco Transfer Agreement, SCI and any Non-Debtor Affiliates (including the Operating Subtenants) that own assets that are included in the Master Lease Collateral shall convey, assign, transfer and deliver all such assets to Propco in satisfaction of Propco's lien on such assets under the Master Lease and License and in partial satisfaction of the Master Lease Rejection Damage Claim.

4.    **Landco Assets.**

On or prior to the Effective Date, pursuant to the Landco Assets Transfer Agreement and the Second Amended MLCA: (a) all of the equity interests in CV Propco, LLC shall be conveyed, assigned, transferred and delivered by CV Holdco, LLC to the designee of the Landco Lenders, subject to the New Land Loan Agreement; (b) New Landco Holdco shall contribute all of the equity of New Tropicana, LLC and New Cactus Lessee, LLC to CV PropCo, LLC; and (c) all of the Landco Assets not then owned by CV Propco, LLC and not otherwise designated as excluded assets under the Landco Assets Transfer Agreement, shall be conveyed, assigned, transferred and delivered to CV Propco, LLC or to a subsidiary of New Propco, as determined by New Propco.

5.    **Transfer of New Propco Transferred Assets from Propco to New Propco Entities.**

On the Effective Date, in accordance with the Second Amended MLCA and pursuant to the New Propco Transfer Agreement and in implementation of the distributions to the Mortgage Lenders provided for in Section III.B.2 above on account of their Allowed Class P.2 Claims, all of the New Propco Transferred Assets shall be conveyed, assigned, transferred and delivered to New Propco or any of its designated Subsidiaries, each in their capacities as designee of the Mortgage Lenders.

6.    **Mezzco Debtors.**

On the Effective Date, the distributions to the holders of Class M5.2 Claims, Class M4.1 Claims, Class M3.1 Claims, Class M2.1 Claims and Class M1.1 Claims provided for in Section III.B.3(e) through Section III.B.3(h) shall be made, and the Equity Interests so distributed shall be cancelled and extinguished as provided for in such Sections.

7.    **Transfer of New Propco Purchased Assets from Opco Entities to New Propco Entities.**

On the Effective Date and subject to the receipt by the Holders of the Prepetition Opco Secured Claims of the consideration set forth in Section III.B.4, pursuant to the Second Amended MLCA and the New Opco Purchase Agreement (if the Stalking Horse Bidder is the Successful Bidder) or the New Propco Purchase Agreement (if the Stalking Horse Bidder is not the Successful Bidder), for good and valuable consideration set forth in the Second Amended MLCA, all of the New Propco Purchased Assets shall be sold, conveyed, assigned, transferred and delivered to New Propco or its applicable designated Subsidiaries.

8.    **Transfer of New Opco Acquired Assets to New Opco.**

On the Effective Date and subject to the Holders of the Prepetition Opco Secured Claims receipt of the consideration set forth in Section III.B.4, for good and valuable consideration, all of the New Opco Acquired Assets shall be sold, conveyed, assigned, transferred and delivered to the Successful Bidder or its designee(s) pursuant to and in accordance with the New Opco Purchase Agreement.

**9.      License of IP Assets to New Propco.**

If the Successful Bidder is any Person or Persons other than the Stalking Horse Bidder, to the extent required by the Second Amended MLCA, on the Effective Date the Successful Bidder shall license the IP Assets to New Propco and its designated subsidiaries pursuant to the IP License Agreement.

**10.      New Propco Transactions in Connection with Receipt of New Propco Acquired Assets.**

In connection with Consummation of the Plan and New Propco's receipt of the New Propco Acquired Assets, Voteco, Holdco and New Propco will enter into or cause to be entered into a number of agreements and transactions designed to allow New Propco to operate the New Propco Acquired Assets as a going concern business.  Those agreements and transactions will include, without limitation, the following:

a.      The New Propco LLCA.

b.      The New FG Management Agreement.

c.      The New Propco Credit Agreement.

d.      The New Land Loan Agreement.

e.      The IP License Agreement.

f.      The New Propco Non-Compete Agreement.

**11.      New Propco Employment Related Matters**

Upon or promptly following the Effective Date of the Plan, New Propco contemplates taking steps to mitigate the impact on SCI employees of the restructuring process. Specifically, New Propco plans to make offers of employment to SCI's hourly employees at the Propco Properties and, if the Stalking Horse Bidder is the Successful Bidder, to SCI's hourly employees at all other SCI casinos:  (a) at not less than the same hourly wage rate and position in effect for the respective employee immediately prior to the Effective Date; (b) with substantially similar benefits as the current Section 401(k) plan of SCI; and (c) with health and welfare benefits that in the aggregate are substantially similar to those provided by SCI under its broad-based employee benefit plans in effect immediately prior to the Effective Date.

**12.      The Propco Rights Offering**

The NPH Term Sheet sets forth a detailed summary of the terms and conditions of the Propco Rights Offering and any additional Equity Raises (as defined in the NPH Term Sheet) that may occur. Taken together, the Propco Rights Offering and the Upsizing Committed Amount (as defined in the NPH Term Sheet) are intended to provide New Propco Holdco with up to $100 million in equity investments, all on the terms of and subject to the conditions of the NPH Term Sheet. As set forth in the NPH Term Sheet, the net proceeds from the Propco Rights Offering shall be contributed by New Propco Holdco as equity to New Propco and utilized by New Propco for general corporate purposes, including, without limitation, to reduce debt or for one or more Acquisitions (as defined in the NPH Term Sheet). Pursuant to the terms and subject to the conditions of the Propco Commitment: (a) the Put Parties (so long as they hold at least 40% in aggregate principal amount of the Senior Notes) shall have the right to purchase at least one-half of the NPH Equity available in the Propco Rights Offering (with such portion of the NPH Equity to be allocated among the Put Parties as they mutually agree), (b) to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors, or the Put Parties (pursuant to the proviso to the definition of "*Allocated Pro Rata Share of NPH Investment Rights*") in accordance with the terms and conditions of the Propco Rights Offering, the Put Parties shall purchase $35.3 million of NPH Equity, and (c) in connection with any Equity Raises (as defined in the NPH Term Sheet) consummated during the Upsizing Commitment Period (as defined in the NPH Term Sheet), to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors, or the Put Parties (pursuant to the proviso to the definition of "*Allocated Pro Rata Share of NPH Investment Rights*") in accordance with the terms and conditions of the NPH Term Sheet, the Put Parties shall purchase such unpurchased portion of each such Equity Raise up to a maximum of $100 million (*i.e.*, up to a maximum of $64.7 million in addition to the $35.3 million commitment specified in clause (b)) of NPH Equity. In consideration for their agreement to the Propco Commitment, the Put Parties shall receive the Put Premium. The payment of the Put Premium to the Put Parties on the Effective Date shall be effected in such manner (such as a deduction from the purchase price otherwise payable by the Put Parties for the NPH Equity being purchased by them through Blockerco) as the Debtors, FG, the Mortgage Lenders and the Put Parties shall reasonably determine.

### 13. New Opco Transactions in Connection with Receipt of New Opco Acquired Assets.

In connection with Consummation of the Plan and New Opco's receipt of the New Opco Acquired Assets, New Opco will enter into or cause to be entered into a number of agreements and transactions designed to allow New Opco to operate the New Opco Acquired Assets as a going concern business. Those agreements and transactions will include, without limitation, the following:

       a.      The New Opco Credit Agreement.

       b.      The New Opco PIK Credit Agreement.

       c.      The New FG Management Agreement.

       d.      The IP License Agreement.

### 14.    The New Opco Credit Agreement and the New Opco PIK Credit Agreement

The collateral agent under the New Opco Credit Agreement and the New Opco PIK Credit Agreement shall have valid, binding and enforceable liens on the collateral specified in the relevant agreements executed by New Opco and its Subsidiaries in connection with the New Opco Credit Agreement and the New Opco PIK Credit Agreement. The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New Opco Credit Agreement and the New Opco PIK Credit Agreement are granted in good faith as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the definitive documentation executed in connection therewith. The New Opco Credit Agreement and the New Opco PIK Credit Agreement together with all notes, documents or agreements delivered in connection therewith shall be valid, binding and enforceable in accordance with their terms on and after the Effective Date (it being understood and agreed that each Holder of an Allowed S.2 Claim shall be deemed a party to the New OpCo Credit Agreement and the New OpCo PIK Credit Agreement and bound by the terms thereof without the requirement of any such Holder to execute a signature page thereto). Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the New Opco Credit Agreement and the New Opco PIK Credit Agreement or any rights or remedies related thereto.

### C.    Second Amended MLCA

If the Stalking Horse Bidder is the Successful Bidder, and so long as the Stalking Horse APA has not terminated, then, notwithstanding anything to the contrary in the Second Amended MLCA, the entry of the Confirmation Order will not automatically trigger a Transition Event and the obligation of SCI and its Subsidiaries to provide transition services thereunder shall be suspended (other than such services as are required during the "Deferral Period" (as defined therein)) and the "Deferral Period" shall be deemed to continue for all purposes under the Second Amended MLCA, including with respect to the payment of Reduced Rent, and the Initial Transition Services Period shall not be deemed to commence, until the earlier of (i) the date on which a Transition Event (other than due solely to the occurrence of the Confirmation Date) occurs or (ii) the date designated in writing by the Mortgage Lenders and acceptable to the Required Consenting Lenders as the date on which transition services should commence. Except as modified above, the Second Amended MLCA will remain in full force and effect and shall be enforceable pursuant to its terms.

### D.    General Settlement of Claims

Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan.

### E.    Release of Liens, Claims and Equity Interests

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan (including the New Opco Credit Agreement, the New Opco PIK Credit Agreement, the New Propco Credit Agreement, the New Land Loan Agreement and their respective related documents), on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or interests shall, pursuant to Section 1142 of the Bankruptcy Code, promptly execute and deliver such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the applicable Debtor.

## F.      *Corporate Action*

Each of the Debtors, as applicable, may, and may cause any of its Non-Debtor Affiliates to, take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors (except for those expressly required pursuant hereto).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors or members of any Debtor (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or partners of such Debtor, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of any Debtor and any legal or corporate action required by any Debtor in connection with this Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor, or by any other Person. On the Effective Date, the appropriate officers of each Debtor are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

## G.      *Cancellation of Notes, Certificates and Instruments Without Further Action*

Except as otherwise provided in this Plan or the Confirmation Order or for the purpose of evidencing a right to distribution hereunder or the exercise of the right of the Senior Notes Trustee or the Subordinated Notes Trustee, as applicable to assert any rights or charging liens for fees, costs and expenses in accordance with the terms of the applicable Indenture, on the Effective Date, all notes, stock, instruments, certificates, agreements and other documents evidencing Claims and Equity Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

On the Effective Date, the Senior Notes Indentures and the Subordinated Notes Indentures each shall be deemed to be canceled, as permitted by Section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released, terminated, extinguished and discharged; provided, however, that the Senior Notes Indentures and the Subordinated Notes Indentures shall remain in effect for the sole purpose of facilitating distributions by the respective trustee to the holders thereunder of any amounts received on account of Allowed Claims held by the applicable trustee, and to permit such trustee to perform such other necessary administrative tasks related thereto and to exercise any right under the applicable Indenture to assert any rights or charging liens for fees, costs and expenses.

**H.**    ***Dismissal of Officers and Directors, Dissolution of Debtors and Dissolution of the Boards of Directors of Each Debtor***

Upon the Effective Date, (i) the existing boards of directors of each Debtor shall be dissolved without any further action required on the part of any such Debtors, the shareholders of any such Debtor, or the officers and directors of such Debtors, (ii) any and all remaining officers of each shall be dismissed without any further action required on the part of any such Debtors, the shareholders of such Debtors, or the officers and directors of such Debtors and (iii) each Debtor shall be deemed dissolved without any further action required on the part of any such Debtors, the shareholders of such Debtors, or the officers and directors of such Debtors.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    ***Assumption of Executory Contracts and Unexpired Leases***

1.    On the Effective Date, all Executory Contracts and Unexpired Leases identified on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed will be deemed assumed by the applicable Debtor in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.

2.    On the Effective Date, any Executory Contract or Unexpired Lease will be deemed rejected if such Executory Contract or Unexpired Lease:

(i)    Is not listed on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed;

(ii)     has been rejected by order of the Bankruptcy Court;

(iii)    is the subject of a motion to reject pending on the Effective Date;

(iv)    is identified in the Plan Supplement as a contract or lease to be rejected or in the New Opco Purchase Agreement as an Excluded Asset;

(v)     is rejected pursuant to the terms of this Plan;

(vi)    expired by its own terms on or prior to the Effective Date; or

(vii)   has not been assumed or is not the subject of a motion to assume pending on the Effective Date.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

## B.     *Assignment of Executory Contracts or Unexpired Leases*

Unless and as otherwise provided by a prior order to the Bankruptcy Court, in the event any Debtor proposes to assign an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.  Any applicable cure amounts shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Subject to the foregoing, any Executory Contract or Unexpired Lease that constitutes a New Propco Acquired Asset shall be assigned to New Propco or its designated Subsidiary in accordance with the terms of this Plan and pursuant to the New Propco Purchase Agreement or New Propco Transfer Agreement, as applicable, and any Executory Contract of Unexpired Lease that is to be assigned to New Opco or its designated Subsidiary in accordance with the terms of the New Opco Purchase Agreement shall be so assigned in accordance with the terms of this Plan.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by

the Debtors at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Debtors, with the consent of New Propco and/or the Successful Bidder, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

## C.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to this Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Estates or any of their respective property, and such Claim shall be forever discharged. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F hereof.

## D.    Director and Officer Insurance Policies

The Debtors shall obtain (at market-based premiums) prior to the Effective Date insurance policies providing substantially similar coverage as the existing D&O Liability Insurance Policies coverage for claims (as defined in such policies) made for any wrongful acts (as defined in such policies) or other covered conduct, acts or omissions occurring prior to the Effective Date (also referred to as "tail coverage") with coverage (in scope and substance) and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the date of entry of the Confirmation Order, which insurance policies shall be reasonably acceptable to the Mortgage Lenders (the *"Tail Coverage Insurance Policies"*). The costs of the Tail Coverage Insurance Policies shall be allocated among the Debtors in a manner satisfactory to the Required Consenting Lenders and the Mortgage Lenders, or as otherwise ordered by the Bankruptcy Court after notice and a hearing, such that each Debtor bears the expense of its own coverage.

# ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    *Distributions for Claims and Equity Interests Allowed as of the Effective Date*

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, distributions to be made on account of Claims and Equity Interests that are Allowed Claims or Equity Interests as of the Effective Date shall be made on the initial distribution date or as soon thereafter as is practicable.  Other than with respect to Classes P.2 and S.2, any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Disputed Claims and Equity Interests that first become Allowed Claims and Equity Interests after the Effective Date shall be made pursuant to Article VIII hereof.

### B.    *Post-Petition Interest on Claims*

Unless otherwise specifically provided for in this Plan or the Confirmation Order or any other Final Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### C.    *Distributions under the Plan*

Other than as specifically set forth below or in the New Propco Purchase Agreement, the New Propco Transfer Agreement, the New Opco Purchase Agreement or the Landco Assets Transfer Agreement, the Plan Administrator or Distribution Agent shall make all distributions required to be distributed under this Plan; provided, however, that the Plan Administrator or Distribution Agent may employ or contract with other entities to assist in or make the distributions required by this Plan; provided, further, that SCI or the Successful Bidder shall make all cash distributions to Holders of Allowed Claims in Class S.2 and Propco shall make all cash distributions to Holders of Allowed Claims in Class P.2.  Neither New Propco nor New Opco shall have any obligation to fund the expenses incurred by the Plan Administrator from and after the Effective Date.  Distributions made on account of Allowed Senior Notes Claims shall be deemed complete when made to the Senior Notes Trustee for distribution pursuant to the terms of the Senior Notes Indentures.  Distributions on account of Allowed Subordinated Notes Claims shall be deemed complete when made to the Senior Notes Trustee until such time as the Allowed Senior Notes Claims are paid in full to effectuate the subordination provisions as provided for in the Subordinated Notes Indentures.  Thereafter, distributions made on account of Allowed Subordinated Notes Claims shall be deemed complete when made to the Subordinated Notes Trustee.

### D.    *Delivery and Distributions and Undeliverable or Unclaimed Distributions*

1. **Record Date for Distributions**

On the Distribution Record Date, the Claims Register shall be closed. Accordingly, the Plan Administrator and Distribution Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Plan Administrator or any other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date.

2. **Delivery of Distributions in General**

Except as otherwise provided herein, the Plan Administrator or Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims and Equity Interests, or in case of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' books and records as of the date of any such distribution; provided, however, that if a Holder of an Allowed Claim or Equity Interest Files a Proof of Claim, the address for such Holder shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3. **Minimum Distributions**

Notwithstanding anything herein to the contrary, no Debtor, Plan Administrator or Distribution Agent shall be required to make distributions or payments of less than Five Hundred ($500.00) Dollars (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar under this Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

4. **Undeliverable Distributions**

(a) **Holding of Certain Undeliverable Distributions**

If the distribution to any Holder of an Allowed Claim or Equity Interest is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Subsequent Distribution Date. Undeliverable distributions shall remain in the possession of the Distribution Agent, subject to Article VII.D.4(b) hereof, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

**(b)      Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim or Equity Interest (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors, their Estates or their property.   In such cases, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions shall become the property of the Estates free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.   Nothing contained in this Plan shall require the Debtors or any Distribution Agent to attempt to locate any Holder of an Allowed Claim or Equity Interest.

**(c)      Failure to Present Checks**

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim or Equity Interest with respect to which such check originally was issued.   Any Holder of an Allowed Claim or Equity Interest holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred eighty (180) days after the date of mailing or other delivery of such check shall have its Claim or Equity Interest for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim or Equity Interest against the Debtors, the Debtors' Estates or their property.

**E.      *Compliance with Tax Requirements/Allocations***

In connection with this Plan and all distributions hereunder, the Debtors and any Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.   The Debtors or any Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.   All persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.   Notwithstanding any other provision of this Plan to the contrary, each Holder of an Allowed Claim or Equity Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution.   Any Cash and Documents and/or other consideration or property to be distributed pursuant to this Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Article VII.D.4 of this Plan.   To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### F.    *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Debtors, by (a) checks drawn on, or (b) wire transfer from, a domestic bank selected by the Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### G.    *Timing and Calculation of Amounts to Be Distributed*

On the Initial Distribution Date (or if a Claim or Equity Interest is not an Allowed Claim or Equity Interest on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Equity Interests in the applicable Class.  If and to the extent that there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII hereof.  Except as otherwise provided herein, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### H.    *Setoffs and Recoupments*

Without altering or limiting any of the rights and remedies of the Debtors or any other party in interest under Section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors may hold against the Holder of any such Allowed Claim.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors may, pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off or exercise recoupment against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff or exercise recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claims, Causes of Action or Litigation Claims.

### I.    *Preservation of Subordination Rights*

Except as otherwise provided herein, all subordination rights and claims relating to the subordination by the Debtors or either Plan Administrator of any Allowed Claim shall remain valid, enforceable and unimpaired in accordance with Section 510 of the Bankruptcy Code or otherwise.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND EQUITY INTERESTS

**A.    *Authority to Prosecute Objections to Disputed Claims***

Upon the Effective Date, the Plan Administrator shall be responsible for pursuing any objection to the allowance of all Disputed Claims and Equity Interests with respect to which an objection has been filed with the Bankruptcy Court and notice thereof has been given to the Holder of the Disputed Claim.  Prior to the Effective Date, the Debtors shall have the right to object to the allowance of Claims with respect to which they dispute liability or allowance in whole or in part.  The Plan Administrator shall have the authority to file, settle, compromise or withdraw any objections to Disputed Claims against Debtors without approval of the Bankruptcy Court.  However, the Bankruptcy Court may approve any compromises and settlements in accordance with Bankruptcy Rule 9019.

**B.    *Resolution of Disputed Claims and Equity Interests***

### 1.    Allowance of Claims and Equity Interests

After the Effective Date, the Plan Administrator shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.

### 2.    Prosecution of Objections to Claims and Equity Interests

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Plan Administrator, shall have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether the allowance of such Claims or Equity Interests are in an Unimpaired Class or otherwise; provided, however, this provision shall not apply to Professional Fee Claims; and provided further that (a) the Successful Bidder may object to the allowance of any Administrative Claim against SCI or any of the Other Opco Debtors, and (b) the Mortgage Lenders may object to the allowance of any Administrative Claim against Propco or any of the Mezzco Debtors.  Subject to the foregoing, from and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim or Equity Interest without any further notice to or action, order or approval of the Bankruptcy Court.  The Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.      **Estimation**

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Plan Administrator may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned Claim or Equity Interests and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claim or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

4.      **Deadline to File Objections to Claims and Equity Interests**

Any objections to Claims and Equity Interests shall be Filed no later than the Claims Objection Bar Date.  Moreover, notwithstanding the expiration of the Claims Objection Bar Date, the Debtors, and, after the Effective Date, the Plan Administrator, shall continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim or Equity Interest until such Disputed Claim or Equity Interest is Allowed.

C.      *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim or Equity Interest unless and until all objections to such Disputed Claim or Equity Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or Equity Interest has become an Allowed Claim or Equity Interest.

D.      *Reserves for Disputed Claims*

To the extent necessary or appropriate for Classes entitled to receive distributions hereunder, each Debtor may separately maintain a reserve for any distributable amounts required to be set aside on account of Disputed Claims and shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein as, when and if such Disputed Claims are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date, provided that no interest shall be distributable or accrue with respect thereto.  No such reserves shall be necessary for any Classes that will not receive any distributions under the Plan.

E.      *Distributions on Account of Disputed Claims and Equity Interests Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims and Equity Interests*

On each subsequent distribution date (or such earlier date as determined by the Debtors or the Plan Administrator in their sole discretion, as applicable), the Debtors, the Plan Administrator or another applicable Distribution Agent will make distributions (a) on account of any Disputed Claim or Equity Interest that has become an Allowed Claim or Equity Interest during the preceding ninety (90) days, and (b) on account of previously Allowed Claims or Equity Interests of property that would have been distributed to the Holders of such Claim or Equity Interest on the dates distributions previously were made to Holders of Allowed Claims or Equity Interests in such Class had the Disputed Claims or Equity Interests that have become Allowed Claims or Equity Interests or disallowed by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates.  Such distributions will be made pursuant to the applicable provisions of Article III of this Plan.

## ARTICLE IX.

### CONDITIONS PRECEDENT TO CONFIRMATION, EFFECTIVE DATE AND CONSUMMATION OF THE PLAN

*A.*    *Conditions Precedent to Confirmation*

Confirmation of this Plan shall be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C hereof of the following:

1.    The Bankruptcy Court shall have entered a Final Order in form and in substance satisfactory to the Debtors, the Required Consenting Lenders and the Mortgage Lenders approving the Disclosure Statement with respect to this Plan as containing adequate information within the meaning of Section 1125 of the Bankruptcy Code.

2.    This Plan and all schedules, documents, supplements and exhibits relating to this Plan shall have been filed in form and substance acceptable to the Debtors.

3.    The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders and the Mortgage Lenders.

*B.*    *Conditions Precedent to the Effective Date and Consummation of the Plan*

Consummation of this Plan shall be conditioned upon, and the Effective Date shall not occur until, the satisfaction or waiver pursuant to the provisions of Article IX.C hereof of the following:

1.    The Confirmation Order shall have been entered (and in the event that the Stalking Horse Bidder is not the Successful Bidder, such order shall have become a Final Order in respect of Propco and New Propco) in a form and in substance satisfactory to the Debtors, the Successful Bidder, the Mortgage Lenders, FG and the Required Consenting Lenders and no stay of the Confirmation Order shall have been entered.  The Confirmation Order shall provide that, among other things, the Debtors or the Plan Administrator, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases,

leases, indentures and other agreements or documents created in connection with or described in this Plan.

2.       The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order and, in the event the Stalking Horse Bidder is not the Successful Bidder, such order(s) shall have become Final Order(s) in respect of Propco and New Propco) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in this Plan and the Plan Supplement.

3.       All documents and agreements necessary to implement this Plan, including, without limitation, all documents included in the Plan Supplement, in each case in form and substance acceptable to the Debtors shall have (a) been tendered for delivery, and (b) been effected by executed by, or otherwise deemed binding upon, all Entities party thereto.   All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

4.       All actions necessary to implement the Plan shall have been effected, including, without limitation, all actions specified in and in furtherance of the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the Committee Plan Support Stipulation, the Put Parties Support Agreement and the New Opco Purchase Agreement.

5.       The Committee Plan Support Stipulation has not been terminated as of the Effective Date.

6.       Each of the Put Parties Support Agreement and the Propco Commitment has not been terminated as of the Effective Date.

7.       Upon or before the occurrence of the Effective Date, each of the New Propco Purchase Agreement, the Landco Assets Transfer Agreement, the New Propco Transfer Agreement and the New Opco Purchase Agreement shall close according to its terms.

8.       All material consents, actions, documents, certificates and agreements necessary to implement this Plan, including any required governmental or regulatory consents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

9.       The Confirmation Date shall have occurred.

**C.       *Waiver of Conditions***

The conditions to confirmation of this Plan and to Consummation of this Plan and the occurrence of the Effective Date set forth in this Article IX may be waived by the Debtors without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; provided, however, that (i) any waiver of the conditions specified in Article IX.B.5 or B.6 above shall be acceptable to the Debtors, the Mortgage Lenders and FG, and (ii) any such other waiver shall be reasonably acceptable to the Successful Bidder, the Mortgage Lenders, FG and the Required Consenting Lenders and shall

not be inconsistent with the terms of the New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Agreement, the Committee Plan Support Stipulation, the Put Parties Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement, the Second Amended MLCA or the Landco Assets Transfer Agreement. The failure to satisfy or waive a condition to the Effective Date or Consummation may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

### D.      *Effect of Non Occurrence of Conditions to Consummation*

If the Effective Date or Consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE X.

## RELEASES, EXCULPATION, INJUNCTION, PRESERVATION OF CAUSES OF ACTION AND RELATED PROVISIONS

### A.      *General*

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, Section 510 of the Bankruptcy Code or otherwise.

In accordance with the provisions of this Plan, including Article VIII hereof, and pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Plan Administrator may, in this sole and absolute discretion, compromise and settle Claims against the Debtors and (2) the Plan Administrator may, in its sole and absolute discretion, compromise and settle Causes of Action against other Entities.

### B.      *Comprehensive Settlement of Claims and Controversies.*

1.      <u>General</u>. Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan, including the exculpation and release provisions contained in this Article X, constitute a good faith compromise and settlement of all Claims, Litigation Claims, Causes of Action or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Claim or

Interest against any Debtor, any distribution to be made pursuant to these Plans on account of any such Claim or Interest, and any and all Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction and all transactions relating thereto.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (x) the Debtors, the Non-Debtor Affiliates and their respective Estates and property, and (y) the Holders of Claims and Interests, and are fair, equitable and reasonable.

2. <u>Global Settlement</u>.  Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, of all Going Private Transaction Causes of Action among the Debtors, the non-Debtor Affiliates of the Debtors, and the Debtors' Estates, and any Person (the "*Global Settlement*").  Any distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement, which, upon the Effective Date of the Plan, shall be binding on the Debtors and their Estates, the non-Debtor Affiliates of the Debtors, and all Holders of Claims or Interests (whether or not Allowed) that indicate on their Ballots their agreement to grant the releases provided for in Article X.C.2 of this Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, the Non-Debtor Affiliates, and the Holders of Claims and Interests providing such releases, and is fair, equitable and reasonable.

## C. *Releases Among Releasing Parties and Released Parties*

1. <u>RELEASES BY DEBTORS AND ESTATES</u>.  EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION, AS THE CASE MAY BE, THE DEBTORS' ESTATES, THE NON-DEBTOR AFFILIATES, AND EACH OF THEIR RESPECTIVE RELATED PERSONS (COLLECTIVELY, THE "RELEASING PARTIES") SHALL, AND SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE, WAIVE, VOID, EXTINGUISH AND DISCHARGE EACH AND ALL OF THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES AND RELATED PERSONS OF AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS, AVOIDANCE ACTIONS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, JUDGMENTS AND LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, THE GOING PRIVATE TRANSACTION CAUSES OF ACTION), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, EXISTING

AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR RESPECTIVE ASSETS, PROPERTY AND ESTATES, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THIS PLAN OR THE SOLICITATION OF VOTES ON THIS PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THIS PLAN OR ANY PLAN SUPPLEMENT; (II) WITH THE EXCEPTION OF THE GOING PRIVATE TRANSACTION CAUSES OF ACTION, ANY CAUSES OF ACTION ARISING FROM ACTUAL OR INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (III) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THIS PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS PLAN OR ASSUMED PURSUANT TO THIS PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON.

2.    <u>Releases by Holders of Claims and Interests</u>.  Effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in this Article X.C.2 shall, and shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish and discharge the Released Parties from any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other obligations, rights, suits, damages, judgments, debts, remedies and liabilities whatsoever (including, without limitation, the Going Private Transaction Causes of Action), including any Claims or Causes of Action that could be asserted on behalf of or against the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such holder of a Claim or Equity Interest would have been legally entitled to assert in its own right (whether individually, derivatively or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (v) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (w) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (x) the Chapter 11 Cases, (y) the

negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement; and (z) the Going Private Transaction Causes of Action; *provided*, *however*, that, with the exception of the Going Private Transaction Causes of Action, these releases will have no effect on the liability of any Released Party arising from any act, omission, transaction, agreement, event or other occurrence, constituting willful misconduct, gross negligence, fraud or criminal conduct as determined by a Final Order; *provided further*, *however*, the foregoing shall not constitute a waiver or release of any right of the Holder of an Allowed Claim or Equity Interest, obligee under any Assumed Liability (whether assumed under this Plan or in accordance with a prior Bankruptcy Court Order), or party to an Assumed Contract to payment under this Plan or otherwise on account of such Allowed Claim or any of the rights of any parties in respect of Assumed Liabilities or Assumed Contracts under or in connection with this Plan or prior order of the Bankruptcy Court.  The Releases set forth in this Article X shall be binding upon and shall inure to the benefit of the any chapter 7 trustee in the event the Chapter 11 Cases are converted to chapter 7.

       3.    <u>Injunction Related to Releases</u>.  Except as provided in the Plan or the Confirmation Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other Cause of Action, Litigation Claim, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to this Article X.C of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and of all Equity Interests or other rights of a Holder of an equity security or other ownership interest:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person discharged under Article X.D; and (e) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

## D.    *Exculpation*

       The Exculpated Parties shall neither have nor incur any liability to any Person for any Claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effecting the Consummation of this Plan, the Disclosure Statement or any sale, contract,

instrument, release or other agreement or document created or entered into in connection with this Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement, confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; *provided*, *further*, *however* that the foregoing provisions shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by this Plan or the Plan Supplement.

## E.    *Preservation of Causes of Action*

### 1.    Maintenance of Causes of Action

Except as otherwise provided in this Article X or elsewhere in this Plan or the Confirmation Order, after the Effective Date, the Plan Administrator shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case. The Plan Administrator, as the successor in interest to the Debtors and their Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court.  To the extent any such Causes of Action or Litigation Claims exist as of the Effective Date, they may be assigned to a liquidating trust, distributions from which will be in accordance with this Plan.

### 2.    Preservation of All Causes of Action Not Expressly Settled or Released

(a)    Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or by the Plan Administrator (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the confirmation of this Plan or Consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in this Plan (including, without limitation, and for the avoidance of doubt, the Release contained in Article X.C hereof) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the

Debtors and the Plan Administrator expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor or Propco Debtor, respectively, is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.  For the avoidance of doubt, any litigation with respect to the Going Private Transaction is not preserved by any provision of this Plan including this section X.E.2.a.

(b)      Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors and the Plan Administrator reserve all rights to pursue:

(i)      Any other Causes of Action, whether legal, equitable or statutory in nature;

(ii)      Any and all actions arising under or actionable pursuant to the Bankruptcy Code, including, without limitation, sections 544, 545, 547 (except as provided below), 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code; and

(iii)      Any other Causes of Action that currently exist or may subsequently arise and which have not been otherwise set forth herein or in any schedule of Causes of Action, because the facts upon which such Causes of Action are based are not currently or fully known by the Debtors, (collectively, the "Unknown Causes of Action").  The failure to list or describe any such Unknown Cause of Action herein is not intended to limit the rights of the Debtors or the Plan Administrator to pursue any Unknown Cause of Action.

## F.    *Supplemental Injunction*

The Confirmation Order shall provide for the following injunctions to take effect as of the Effective Date.

1.      ***Terms.  In order to preserve and promote the settlements contemplated by and provided for in the Plan and as described in this Article, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to***:

(a)      *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;*

(b)      *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;*

(c)      *creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;*

(d)      *except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest; and*

(e)      *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order relating to such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest*.

2.      *Bankruptcy Rule 3016 Compliance.  The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code*.

## G.      *Integral to Plan*

Each of the releases and injunctions provided in this Article X of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties, the Debtors and the Reorganized Debtors and any other Person protected thereby, as applicable, shall have the right to seek independently the enforcement of such releases, discharges and injunctions.

## H.      *Binding Nature Of Plan*

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, ALL HOLDERS

OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN OR AFFIRMATIVELY VOTED TO REJECT THIS PLAN.

## ARTICLE XI.

## RETENTION OF JURISDICTION

A.     Pursuant to Sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest, and the resolution of any claim for taxes of any kind arising prior to the Effective Date or as a result of any transactions occurring on or before the Effective Date in accordance with this Plan and the rights of the Debtors or the Plan Administrator to apply tax attributes in satisfaction or offset of any such claims;

2.     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date;

3.     resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.     resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6.     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted after the Effective Date;

7.     enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

8.     resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan; *provided*, *however*, that any dispute arising under or in connection with the New Opco Credit Agreement, the New Opco PIK Credit Agreement and the New Propco Credit Agreement shall be addressed and resolved in accordance with the provisions of the applicable document;

9.     hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.     issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

11.     enforce the terms and condition of this Plan and the Confirmation Order;

12.     resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

13.     hear and determine the Litigation Claims by or on behalf of the Debtors or The Plan Administrator;

14.     enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15.     resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; *provided*, *however*, that any dispute arising under or in connection with the New Opco Credit Agreement, the New Opco PIK Credit Agreement or the New Propco Credit Agreement shall be addressed and resolved in accordance with the provisions of the applicable document; and

16.     enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.     *Dissolution of the Committee*

On the Effective Date, the Committee shall dissolve automatically and its members shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

**B.      *Payment of Statutory Fees***

All outstanding fees payable pursuant to Section 1930 of title 28, United States Code shall be paid on the Effective Date.  All such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 Cases when due or as soon thereafter as practicable.

**C.      *Modification of Plan***

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:   (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with Section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan, provided, however, that any amendment, modification or supplement to the Plan shall be reasonably acceptable to the Successful Bidder, the Mortgage Lenders, FG and the Required Consenting Lenders and shall not be inconsistent with the terms of the New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the Committee Plan Support Stipulation or the Put Parties Support Agreement.  A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder.

**D.      *Revocation of Plan***

The Debtors reserve the right to revoke or withdraw this Plan in its entirety for all Debtors, or in respect of any Debtor, prior to the Confirmation Date and, if applicable, to File subsequent chapter 11 plans or to amend this Plan to reflect such revocation or withdrawal of this Plan as to specific Debtor(s).  If the Debtors revoke or withdraw this Plan or if confirmation of this Plan or Consummation of this Plan or the Effective Date does not occur, then (as it pertains to any Debtor for which the Plan has been revoked or withdrawn):  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

**E.      *Successors and Assigns***

This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**F.    *Reservation of Rights***

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order, the Effective Date occurs and this Plan is Consummated. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

**G.    *Further Assurances***

The Debtors or the Plan Administrator, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtors shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**H.    *Severability***

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**I.    *Service of Documents***

All notices, requests, and demands to or upon the Debtors or the Plan Administrator to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

***To the Debtors***:
Richard Haskins

Executive Vice President,
General Counsel & Secretary
Station Casinos, Inc.
1505 South Pavilion Center Drive
Las Vegas, NV 89135
Tel:  702-495-3000
Fax:  702-495-3000

**with copies to**:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Tel:  213-892-4000
Fax:  213-629-5063
Attention:    Paul S. Aronzon, Esq.
              Thomas R. Kreller, Esq.

### J.    *Exemption from Registration Pursuant To Section 1145 of the Bankruptcy Code*

Pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of any securities or interests on account of, and in exchange for the Claims against the Debtors shall be exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and any other applicable non-bankruptcy law or regulation.

### K.    *Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan, including without limitation the recordation of any mortgage pursuant to the New Propco Credit Agreement.

### L.    *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Nevada, without giving effect to the principles of conflicts of law of such jurisdiction.

### M.    *Tax Reporting and Compliance*

The Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors are for all taxable periods ending after the Petition Date through, and including, the Effective Date.