# Exhibit 1

# Exhibit 1

Paul S. Aronzon (CA SBN 88781)
Thomas R. Kreller (CA SBN 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:       (213) 892-4000
Facsimile:       (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:       (775) 823-2900
Facsimile:       (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Chapter 11 |
| STATION CASINOS, INC. | Case No. BK-09-52477 |
| | Jointly Administered |
| ☐ Affects this Debtor | BK 09-52470 through BK 09-52487 |
| ☒ Affects all Debtors | |
| ☐ Affects Northern NV Acquisitions, LLC | |
| ☐ Affects Reno Land Holdings, LLC | **DISCLOSURE STATEMENT TO ACCOMPANY** |
| ☐ Affects River Central, LLC | **FIRST AMENDED JOINT CHAPTER 11 PLAN OF** |
| ☐ Affects Tropicana Station, LLC | **REORGANIZATION FOR STATION CASINOS,** |
| ☐ Affects FCP Holding, Inc. | **INC. AND ITS AFFILIATED DEBTORS** |
| ☐ Affects FCP Voteco, LLC | **(DATED JULY 28, 2010)** |
| ☐ Affects Fertitta Partners LLC | |
| ☐ Affects FCP MezzCo Parent, LLC | **(AFFECTS ALL DEBTORS)** |
| ☐ Affects FCP MezzCo Parent Sub, LLC | |
| ☐ Affects FCP MezzCo Borrower VII, LLC | **Disclosure Statement Hearing** |
| ☐ Affects FCP MezzCo Borrower VI, LLC | Hearing Date:       July 15, 2010 |
| ☐ Affects FCP MezzCo Borrower V, LLC | Hearing Time:       10:00 a.m. (Pacific time) |
| ☐ Affects FCP MezzCo Borrower IV, LLC | |
| ☐ Affects FCP MezzCo Borrower III, LLC | **Plan Confirmation Hearing** |
| ☐ Affects FCP MezzCo Borrower II, LLC | Hearing Date:       August 27 and 30, 2010 |
| ☐ Affects FCP MezzCo Borrower I, LLC | Hearing Time:       10:00 a.m. (Pacific time) |
| ☐ Affects FCP Propco, LLC | |

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN.   ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN.   THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE UNLESS AND UNTIL A DETERMINATION HAS BEEN MADE BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.**

Legend to be removed upon entry of Disclosure Statement Order by the Clerk of the Bankruptcy Court.

PURSUANT TO BANKRUPTCY CODE SECTION 1128, A CONFIRMATION HEARING WILL BE HELD WITH RESPECT TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR STATION CASINOS, INC. AND ITS AFFILIATED DEBTORS (DATED JULY 28, 2010) (THE "PLAN") ON AUGUST 27, 2010, AT 10:00 A.M. (PREVAILING PACIFIC TIME) AND, IF NECESSARY, CONTINUING ON AUGUST 30, 2010 AT 10:00 A.M. (PREVAILING PACIFIC TIME), BEFORE THE HONORABLE GREGG W. ZIVE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, 300 BOOTH STREET, RENO, NEVADA 89509 (THE "CONFIRMATION HEARING"). OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE AUGUST 12, 2010 AT 5:00 P.M. (PREVAILING PACIFIC TIME). THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE CONFIRMATION HEARING OR AT ANY SUBSEQUENT ADJOURNED DATE OF THE CONFIRMATION HEARING.

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN FROM THE PARTIES ENTITLED TO VOTE ON THE PLAN. THE DEBTORS INTEND TO SEEK TO CONFIRM THE PLAN AND TO CAUSE THE EFFECTIVE DATE OF THE PLAN TO OCCUR AS PROMPTLY AFTER CONFIRMATION OF THE PLAN AS POSSIBLE, SUBJECT TO OBTAINING ANY NECESSARY GAMING REGULATORY APPROVALS AND TAX PLANNING CONSIDERATIONS. HOWEVER, THERE CAN BE NO ASSURANCE AS TO WHETHER OR WHEN THE CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR.

THE PLAN CONTEMPLATES THE SALE OF THE NEW OPCO ACQUIRED ASSETS PURSUANT TO THE SUCCESSFUL BID THAT EMERGES FROM THE OPCO AUCTION. THE SUCCESSFUL BID MAY DIFFER IN A VARIETY OF RESPECTS FROM THE STALKING HORSE BID. TO THE EXTENT THE STALKING HORSE BID IS NOT THE SUCCESSFUL BID AND THE SUCCESSFUL BID VARIES IN TERMS OR STRUCTURE FROM THE STALKING HORSE BID, THE DEBTORS RESERVE THE RIGHT TO AMEND THE PLAN TO REFLECT THOSE VARIATIONS AS APPROPRIATE AND TO PROVIDE SUCH SUPPLEMENTAL DISCLOSURE OF THOSE AMENDMENTS AS THE BANKRUPTCY COURT MAY REQUIRE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A HERETO. ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. UNLESS OTHERWISE SPECIFIED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS

DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.  YOU ARE ADVISED TO OBTAIN INDEPENDENT EXPERT ADVICE ON SUCH SUBJECTS.

THE OFFER OF NEW DEBT INSTRUMENTS OR EQUITY SECURITIES TO HOLDERS OF CERTAIN CLASSES OF CLAIMS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT") OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS.  THE OFFERS AND ISSUANCES ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE OR OTHER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT.  NONE OF THE NEW DEBT INSTRUMENTS OR EQUITY SECURITIES TO BE ISSUED UNDER OR IN CONNECTION WITH THE PLAN OR UPON EXERCISE OF ANY WARRANTS OR OPTIONS CONTEMPLATED BY THE PLAN HAS BEEN APPROVED OR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  NOTHING HEREIN SHALL BE DEEMED AN ACKNOWLEDGEMENT THAT DEBT INSTRUMENTS OFFERED OR ISSUED PURSUANT TO THE PLAN ARE SUBJECT TO THE SECURITIES ACT OR SIMILAR STATE OR "BLUE SKY" LAWS.

ONLY ACCREDITED INVESTORS ARE ELIGIBLE TO PARTICIPATE IN THE PROPCO RIGHTS OFFERING AND TO RECEIVE THE NPH INVESTMENT RIGHTS AND THE NPH POST-EFFECTIVE RIGHTS IN CONNECTION THEREWITH, IN ALL CASES ON THE TERMS AND SUBJECT TO THE CONDITIONS OF THE PLAN.  THE NPH INVESTMENT RIGHTS AND THE NPH POST-EFFECTIVE RIGHTS ARE NOT BEING OFFERED TO ANY PARTY THAT IS NOT AN ACCREDITED INVESTOR.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995:  ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL.  ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.  SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO OR HAVE BEEN OR WILL BE SEPARATELY FILED WITH THE BANKRUPTCY COURT.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION OF THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER SUCH DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED,

FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. SUBJECT TO THE TERMS OF ANY DEFINITIVE DOCUMENTATION TO BE EXECUTED IN CONNECTION WITH THE PLAN, THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VIII.A HEREIN, "RISK FACTORS – CERTAIN BANKRUPTCY CONSIDERATIONS."

EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE FINANCIAL INFORMATION CONTAINED HEREIN HAS BEEN PRODUCED BASED UPON THE DEBTORS' BOOKS AND RECORDS AS THEY ARE MAINTAINED IN THE ORDINARY COURSE OF BUSINESS AND IN ACCORDANCE WITH THE DEBTORS' ORDINARY AND CUSTOMARY ACCOUNTING PRACTICES.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**DISCLOSURE STATEMENT TO ACCOMPANY JOINT
CHAPTER 11 PLAN OF REORGANIZATION FOR
STATION CASINOS, INC. AND ITS AFFILIATED  DEBTORS**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .......................................................................................................................1

        A.      The Plan, Generally..............................................................................................1

        B.      Support For The Plan From The Propco Creditors. ..............................................1

        C.      Support For The Plan From The Prepetition Opco Secured Lender Steering Committee.................2

        D.      The Committee Supports the Plan..........................................................................3

        E.      Purpose, Limitations and Structure of this Disclosure Statement .......................4

        F.      Summary of Classification and Treatment of Claims and Equity Interests Under the Plan.............5

                1.      Claims and Equity Interests Against Parent Debtors ..............................6
                2.      Claims and Equity Interests Against Propco............................................8
                3.      Claims and Equity Interests Against Mezzco Debtors.............................8
                4.      Claims and Equity Interests Against SCI.................................................12
                5.      Claims and Equity Interests Against Other Opco Debtors.......................16

        G.      Voting on the Plan................................................................................................18

        H.      Confirmation Hearing...........................................................................................20

        I.      Overview of Chapter 11 Process..........................................................................20

II.     GENERAL INFORMATION ABOUT STATION CASINOS ................................................21

        A.      Description and History of Station Casinos' Business.........................................21

        B.      The Debtors' Prepetition Financing Arrangements..............................................31

        C.      Pending Litigation and Other Legal Matters........................................................34

        D.      Events Leading to the Commencement of the Chapter 11 Cases.........................35

III.    EVENTS DURING CHAPTER 11 CASES.............................................................................38

        A.      Commencement of Chapter 11 Cases...................................................................38

        B.      First Day Orders...................................................................................................38

        C.      Postpetition Financing and Use of Cash Collateral.............................................38

        D.      The Independent Lenders' Examiner Motion.......................................................39

        E.      Issuance of the SLC Report Regarding Its Investigation of the 2007 Going Private Transaction.......40

        F.      Supplemental Investigation by SLC of the Master Lease and Supplemental SLC Report.............41

        G.      The Master Lease Compromise Agreement..........................................................41

        H.      The Committee's Motion to Obtain Standing to Assert Claims Relating to the 2007 Going Private Transaction .......47

        I.      Bidding Procedures for the New Opco Acquired Assets ......................................48

        J.      Opco Lender Restructuring Support Agreement...................................................52

        K.      Extension of Exclusivity.......................................................................................55

        L.      Bar Date and Schedules........................................................................................55

IV.     THE PLAN...............................................................................................................................55

        A.      Administrative Claims, Priority Tax Claims and Other Priority Claims..............56

| | 1. | Administrative Claims | 56 |
| | 2. | Priority Tax Claims | 57 |
| | 3. | Other Priority Claims | 58 |
| B. | | Classification and Treatment of Holders of Claims and Equity Interests | 58 |
| | 1. | Claims and Equity Interests Against Parent Debtors | 58 |
| | 2. | Claims and Equity Interests Against Propco | 62 |
| | 3. | Claims and Equity Interests Against Mezzco Debtors | 63 |
| | 4. | Claims and Equity Interests Against SCI | 69 |
| | 5. | Claims and Equity Interests Against Other Opco Debtors | 73 |
| C. | | Means For Implementation of the Plan | 77 |
| | 1. | Transfers Under the Plan, Generally | 77 |
| | 2. | Plan Transactions | 78 |
| D. | | Comprehensive Settlement And Releases | 84 |
| E. | | Gaming Regulatory Compliance | 84 |
| F. | | Cancellation of Existing Securities and Agreements | 84 |
| G. | | Provisions for Resolving and Treating Disputed Claims | 85 |
| H. | | Treatment of Executory Contracts and Unexpired Leases | 85 |
| I. | | Effect of Confirmation of the Plan on Debtors | 87 |
| J. | | Summary of Other Provisions of the Plan | 91 |
| V. | | CONFIRMATION AND CONSUMMATION PROCEDURE | 92 |
| A. | | Confirmation of the Plan | 92 |
| B. | | Conditions to Confirmation and Effectiveness | 95 |
| | 1. | Conditions Precedent to Confirmation | 95 |
| | 2. | Conditions Precedent to the Effective Date and Consummation of the Plan | 96 |
| | 3. | Effect of Failure of Conditions Precedent | 97 |
| VI. | | SECURITIES LAW MATTERS | 97 |
| A. | | U.S. Securities Law Matters | 97 |
| B. | | Section 1145 of the Bankruptcy Code | 97 |
| C. | | Section 4(2) of the Securities Act/Regulation D | 98 |
| D. | | Rule 144 and Rule 144A | 98 |
| VII. | | FINANCIAL INFORMATION | 99 |
| A. | | NEW PROPCO | 99 |
| B. | | NEW OPCO | 99 |
| C. | | ADDITIONAL FINANCIAL INFORMATION | 100 |
| VIII. | | RISK FACTORS | 100 |
| A. | | General | 100 |
| | 1. | The Debtors Have No Duty To Update | 100 |
| | 2. | Information Presented Is Based On The Debtors' Books And Records, And Is Unaudited | 100 |
| | 3. | Projections And Other Forward-Looking Statements Are Not Assured, And Actual Results Will Vary | 100 |
| | 4. | This Disclosure Statement Was Not Approved By The SEC | 101 |
| | 5. | Certain Tax Implications of the Plan | 101 |
| B. | | Certain Bankruptcy Considerations | 101 |
| | 2. | Risk of Non-Occurrence of Effective Date | 102 |
| | 3. | Risk that Claims Will Be Higher Than Estimated | 102 |

| | 4. | Liquidity Risks Prior to Consummation of the Plan. | 103 |
| | 5. | The Debtors' Management Team May Allocate Less Time to the Operation of the Debtors' Business Operations. | 103 |
| | 6. | Estimated Valuation and the Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent the Potential Market Value (if any) of the Plan Consideration. | 103 |
| | 7. | No Representations Outside of this Disclosure Statement are Authorized. | 103 |
| C. | | Risks Related to the Reorganized Debtors' Significant Indebtedness. | 103 |
| | 1. | Continuing Leverage and Ability to Service Debt. | 103 |
| | 2. | Restrictive Financial and Operating Covenants under Credit Facilities for New Opco and New Propco. | 104 |
| D. | | Risks Relating to New Propco Membership Interests | 104 |
| | 1. | A Liquid Trading Market for the New Propco Membership Interests is Unlikely to Develop. | 104 |
| | 2. | Potential Dilution of the New Propco membership interests. | 105 |
| | 3. | Dividends. | 105 |
| | 4. | Restrictions on Transfer. | 105 |
| E. | | Risks Relating to Holdco Membership Interests | 105 |
| | 1. | A Liquid Trading Market for the Holdco Membership Interests is Unlikely to Develop. | 105 |
| | 2. | Potential Dilution of the Holdco Membership Interests. | 105 |
| | 3. | Dividends. | 106 |
| | 4. | Restrictions on Transfer. | 106 |
| F. | | Business Risks | 106 |
| | 1. | Risks Related to the Chapter 11 Cases. | 106 |
| | 2. | Prolonged Continuation of the Chapter 11 Cases May Harm the Debtors' Business. | 107 |
| | 3. | Recent Instability in the Financial Markets Have Had an Impact on the Debtors' Business and May Continue to Adversely Affect the Debtors in the Future. | 107 |
| | 4. | The Debtors' Business is Sensitive to Reductions in Discretionary Consumer Spending as a Result of Downturns in the Economy. | 107 |
| | 5. | Factors Affecting the Economy May Harm the Debtors' Operating Results. | 107 |
| | 6. | The Debtors Depend on Key Markets and May Not Be Able to Continue to Attract a Sufficient Number of Guests and Gaming Customers in Nevada to Make the Debtors' Operations Profitable. | 108 |
| | 7. | The Debtors Face Substantial Competition in the Gaming Industry | 108 |
| | 8. | The Debtors May Incur Losses that are Not Adequately Covered By Insurance Which May Harm the Debtors' Results of Operations. | 109 |
| | 9. | Certain Construction Risks May Arise During the Building of Any New Property. | 109 |
| | 10. | The Debtors Rely on Key Personnel, the Loss of the Services of Whom Could Materially and Adversely Affect their Results of Operations. | 110 |
| | 11. | The Debtors Regularly Pursue New Gaming Acquisition and Development Opportunities and May Not Be Able to Recover their Investment or Successfully Expand to Additional Locations. | 110 |
| | 12. | The Debtors are Subject to Extensive State and Local Regulation and Licensing and Gaming Authorities Have Significant Control Over the Debtors' Operations Which Could Have an Adverse Effect on their Business. | 111 |
| | 13. | The Debtors are Subject to Native American Gaming Regulations Which Could Have an Adverse Effect on the Debtors' Business. | 111 |
| | 14. | Factors Affecting Tax Laws Could Have an Adverse Effect on the Debtors' Business. | 112 |
| IX. | | Material Gaming Law Considerations | 112 |
| X. | | Material United States Federal Income Tax Considerations | 118 |

A.       CONSEQUENCES TO THE DEBTORS ..................................................................119
       1.       SCI Group gain and loss. .................................................................................121
       2.       SCI Group CODI and Future NOL Limitations................................................123
B.       CONSEQUENCES TO CERTAIN HOLDERS OF CLAIMS ....................................124
       1.       Consequences to Mortgage Lenders and Mezzco Lenders. ............................124
       2.       Consequences to Holders of  Prepetition Opco Credit Agreement Claims, General
                Unsecured Claims, Senior Notes and Subordinated Notes. ..............................124
       3.       Consequences to Land Loan Lenders ...............................................................125
       4.       Distributions in Discharge of Accrued but Unpaid Interest...............................126
       5.       Market Discount. .............................................................................................126
C.       Consequences of holding New Propco Debt, New Opco Notes, The New Land Loan  and
         New Propco Equity ...........................................................................................126
       1.       Ownership and Disposition of New Debt ..........................................................126
       2.       Ownership and Disposition of Holdco Equity Interests....................................127
       3.       Ownership and Disposition of NPH Warrants, NPH Investment Rights and NPH
                Post-Effective Investment Rights ....................................................................127
D.       INFORMATION REPORTING AND WITHHOLDING .........................................128
XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN..........................128
A.       Liquidation Under Chapter 7 ...........................................................................128
B.       Alternative Plans of Reorganization .................................................................129
XII.   CONCLUSION AND RECOMMENDATION ...........................................................129

<u>**SCHEDULES AND EXHIBITS**</u>

**List of Debtors** ......................................................................................................................**Schedule I**

**List of Opco Group Sellers**.................................................................................................... **Schedule II**

**The Plan**.................................................................................................................................. **Exhibit A**

**Schematic of Restructuring Transactions** ...........................................................................**Exhibit B**

**Liquidation Analysis**................................................................................................................ **Exhibit C**

**Projected Financial Information For New Propco** ................................................................. **Exhibit D**

**New Propco Holdco Term Sheet** ..........................................................................................**Exhibit E**

## I.    INTRODUCTION

### A.    The Plan, Generally.

Station Casinos, Inc. ("**SCI**"), FCP Propco, LLC ("**Propco**") and certain of their subsidiaries and affiliates, as debtors and debtors in possession (each, a "**Debtor**," and, collectively, the "**Debtors**"), submit this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") to holders of Claims against and Equity Interests in the Debtors in connection with: (i) the solicitation of acceptances of the Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. And Its Affiliated Debtors, dated June 15, 2010, as the same may be amended (the "**Plan**"), filed with the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"); and (ii) the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), scheduled for August 27 and 30, 2010 at 10:00 a.m. (prevailing Pacific time).  **Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement shall have the meanings ascribed to them in the Plan.  Headings are for convenience of reference and will not affect the meaning or interpretation of the Disclosure Statement.**

This solicitation is being conducted at this time in order to obtain sufficient votes to enable the Plan to be confirmed by the Bankruptcy Court.

The Plan sets forth how the Debtors' assets and operations will be reorganized and how Claims against and Equity Interests in the Debtors will be treated if the Plan is confirmed by the Bankruptcy Court and is thereafter consummated.  This Disclosure Statement describes certain aspects of the Plan and how it will be implemented if confirmed, the Debtors' business operations, significant events leading to and occurring during the Chapter 11 Cases, and related matters.  **FOR A COMPLETE UNDERSTANDING OF THE PLAN**, **YOU SHOULD READ THIS DISCLOSURE STATEMENT**, **THE PLAN**, **THE PLAN SUPPLEMENT AND ALL RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

Attached as Schedules and Exhibits to this Disclosure Statement are copies of the following documents:

- Schedule I          List of Debtors
- Schedule II         List of Opco Group Sellers
- Exhibit A           The Plan
- Exhibit B           Schematic of Restructuring Transactions
- Exhibit C           Liquidation Analysis
- Exhibit D           Projected Financial Information
- Exhibit E           New Propco Holdco Term Sheet

THE DEBTORS BELIEVE THAT THE PLAN COMPLIES WITH ALL PROVISIONS OF THE BANKRUPTCY CODE AND WILL ENABLE THEM TO RESTRUCTURE OR OTHERWISE SATISFY THEIR DEBT SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11.   THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THE DEBTORS' ESTATES AND THEIR RESPECTIVE CREDITORS.

### B.    Support For The Plan From The Propco Creditors.

**The Plan has the support of creditors holding substantially all the Claims against Propco and the Mezzco Debtors (as defined in the Plan).  Those creditors include: (i) the Mortgage Lenders to Propco, who collectively are owed approximately $1.8 billion in principal amount; (ii) the lenders to each of the Mezzco Debtors (the "Mezzco Lenders"), who collectively are owed approximately $675 million in principal amount from their respective borrowers; and (iii) Propco's Swap Counterparty, which holds an**

unsecured Claim against Propco of approximately $144 million, which constitutes the only third party unsecured claim against Propco.

As described below, the Plan also has the support of the Consenting Opco Lenders, who in the aggregate hold approximately 60% in dollar amount of the Claims arising under the Prepetition Opco Credit Agreement, the Holder of all of the Claims under the Prepetition Opco Swap Agreement, and the Official Committee of Unsecured Creditors in these cases.

Propco's obligations to the Mortgage Lenders are secured by Red Rock, Palace Station, Boulder Station, and Sunset Station (each as defined below) and certain related assets (collectively, the "**Propco Properties**"). Under the Plan, the Propco Properties will be transferred to New Propco or one or more of its Subsidiaries as the Mortgage Lenders' designee in satisfaction of the Mortgage Lenders' existing secured claims against Propco. New Propco will be an entity newly formed by the Mortgage Lenders to own and operate the Propco Properties upon consummation of the Plan. Under and subject to the terms of the Second Amended MLCA or the Stalking Horse APA, New Propco will also acquire certain additional assets from Propco (the "**New Propco Transferred Assets**"), and from SCI and certain of its affiliates (the "**New Propco Purchased Assets**" and the "**Landco Assets**").

The Debtors are advised that, in conjunction with these transfers to New Propco under the Plan:

- the Mortgage Lenders have agreed to sell up to 50% of the equity in New Propco to an affiliate of Fertitta Gaming, LLC, a newly-formed entity owned by Frank Fertitta III and Lorenzo Fertitta ("**FG**"), for a purchase price (assuming all 50% is sold) of $85.0 million in cash (a portion of which interest may be subsequently sold to an affiliate of Colony Capital, LLC pursuant to an option granted by FG to Colony Capital LLC);

- New Propco will enter into a new $1.6 billion credit facility with the Mortgage Lenders;

- New Propco will enter into a long-term management agreement with FG, whereby FG will operate the Propco Properties and provide comprehensive management services to New Propco in connection therewith; and

- the Mortgage Lenders have agreed to: (a) assign certain equity interests in New Propco to the Mezzco Lenders; and (b) assign $7.9 million of their cash recovery from Propco to Propco's Swap Counterparty.

The Debtors are further advised that the Mortgage Lenders, the Mezzco Lenders, the Swap Counterparty, FG and the Fertittas have entered into agreements (the "**Propco Lender Support Agreements**" or the "**Propco PSA**") outlining the terms and conditions of their agreement to support the Plan and the various transactions relating to the ownership and operation of New Propco upon consummation of the Plan. None of the Debtors are parties to those Propco Lender Support Agreements, but the Debtors have reviewed the Propco Lender Support Agreements and believe that the Plan is (and as amended as described below will be) consistent with the Propco Lender Support Agreements.

**C.    Support For The Plan From The Prepetition Opco Secured Lender Steering Committee.**

The obligations of SCI and various subsidiaries under the Prepetition Opco Credit Agreement and the Opco Cash Collateral Order are secured by substantially all of the assets of SCI and those subsidiaries. The Plan contemplates that SCI and certain of its subsidiaries (collectively, the "**Opco Group Sellers**") will conduct an orderly sale process for substantially all of their assets (other than those assets that will be sold or transferred to Propco or New Propco and certain other Excluded Assets) (collectively, the "**New Opco Acquired Assets**") on a going concern basis, under the supervision of the Bankruptcy Court and in a manner designed to procure the highest and best transaction available (the "**Sale Process**"). The procedures and deadlines governing the Sale Process have been approved by the Bankruptcy Court in its "Order Establishing Bidding Procedures And Deadlines Relating To Sale Process For Substantially All of The Assets Of Station Casinos Inc. And Certain 'Opco' Subsidiaries" entered by the Bankruptcy Court on June 4, 2010 [Docket No. 1563] (the "**Bid Procedures Order**").

As authorized under the Bid Procedures Order, the Opco Group Sellers have accepted (subject to all requirements of the Sale Process) an offer from, and entered into an asset purchase agreement with, FG Opco Acquisitions LLC (the "**Stalking Horse Bid**," the "**Stalking Horse APA**," and the "**Stalking Horse Bidder**", respectively). The Stalking Horse Bidder is an entity owned in whole or in part by FG and the Mortgage Lenders. The purchase price to be paid under the Stalking Horse APA is approximately $772 million (based upon the face amount of the debt components of the purchase price[1]), consisting of the following:

(1)     an amount in cash equal to $317 million, plus the Gun Lake Reimbursement[2] proceeds in excess of $20 million, less the Excess AMT Amount, if any, less the Super Priority Principal Amount if the Stalking Horse Bidder has made the Super Priority Notes Election pursuant to the terms of the Stalking Horse APA;

(2)     $430 million in aggregate principal amount of term loans less the Gun Lake Reimbursement proceeds in excess of $20 million, which term loans shall be subject to the terms of the New Opco Credit Agreement; provided that notwithstanding anything herein to the contrary, letters of credit issued and that remain undrawn under the Prepetition Opco Credit Agreement shall be replaced or backstopped by letters of credit issued under the New Opco Credit Agreement;

(3)     $25 million in aggregate principal amount of term loans, which shall be subject to the terms of the New Opco PIK Credit Agreement; and

(4)     If the Stalking Horse Bidder has made the Super Priority Notes Election pursuant to the terms of the Stalking Horse APA, then Deutsche Bank Trust Company Americas and JP Morgan Chase Bank, N.A., in their capacities as Prepetition Opco Secured Lenders, have consented to receive, and shall receive on the Effective Date, the Super Priority Notes in the Super Priority Principal Amount in lieu of a like amount of Cash that they would otherwise receive as part of their Pro Rata Share of Cash under clause (1) above.

**The Bid Procedures Order provides for a competitive bidding process, culminating in the Opco Auction commencing on August 6, 2010. If the Stalking Horse Bid is not the Successful Bid as a result of the Opco Auction, the Debtors anticipate (a) amending the Plan to reflect and incorporate the terms and conditions of the Successful Bid, and (b) providing such supplemental disclosure of such amendments as the Bankruptcy Court may require.**

The Consenting Opco Lenders (a group comprised of the members of the Steering Committee of Prepetition Opco Secured Lenders), certain Non-Debtor Affiliates, FG and the Fertittas have entered into an agreement (as amended, supplemented or otherwise modified from time to time, the "**Opco Lender Restructuring Support Agreement**") outlining the terms and conditions of their mutual agreements to support the Sale Process, the Plan and the various transactions relating thereto. None of the Debtors are parties to the Opco Lender Restructuring Support Agreement, but the Debtors have reviewed that agreement and believe that the Plan is consistent therewith.

**D.      The Committee Supports the Plan**

The Official Committee of Unsecured Creditors (the "Committee") also supports the Plan and has recommended that unsecured creditors vote in favor of the Plan. Although the Committee originally objected to the Disclosure Statement and noted its intention at that time to oppose confirmation of the Plan, the Committee has negotiated for and obtained modifications to the Plan, including provisions that will result in a recovery to SCI's unsecured creditors. On the basis of those modifications, the Committee now supports the Plan and has entered into

---

[1]     The Debtors have not reached any conclusion regarding the extent, if any, to which the trading value of the debt components of the purchase price may differ from the face value.

[2]     Capitalized terms used herein that are not otherwise defined herein or in the Plan shall have the meanings ascribed to them in the Stalking Horse APA.

a stipulation with SCI (the "Committee Plan Support Stipulation") that sets forth the terms and conditions upon which the Committee will support confirmation of the Plan.

      **E.**      **Purpose, Limitations and Structure of this Disclosure Statement**

          The purpose of this Disclosure Statement is to provide those holders of Claims against and Equity Interests in the Debtors that are entitled to vote on the Plan with adequate information to make an informed decision as to whether to accept or reject the Plan. The information in this Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement shall constitute an admission of any fact or liability or as a stipulation or waiver by any party, or be admissible in any other case or any bankruptcy or nonbankruptcy proceeding involving any of the Debtors or any other party, or be deemed conclusive advice on the tax, securities or other legal effects of the Plan.

          On July __, 2010, after notice and a hearing, the Bankruptcy Court issued an order (the "**Disclosure Statement Order**") approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor being solicited to make an informed judgment whether to accept or reject the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT CONSTITUTES A DETERMINATION THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING THE PLAN, BUT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

          Unless otherwise specified herein, the statements contained in this Disclosure Statement are made only as of the date hereof. Delivery of this Disclosure Statement after such date does not mean that the information set forth in this Disclosure Statement remains unchanged since such date or the date of the materials relied upon in preparing this Disclosure Statement. The Debtors have prepared the information contained in this Disclosure Statement in good faith, based upon the information available to them. Moreover, certain of the statements contained in this Disclosure Statement, by their nature, are forward-looking and contain estimates, assumptions and projections, and there can be no assurance that these forward-looking statements will be correct at any later date. Except as otherwise expressly stated, no audit of the financial information contained in this Disclosure Statement has been conducted.

          If you are eligible to vote on the Plan, this Disclosure Statement and certain related solicitation materials should have been delivered to you. There are certain documents and other materials identified in this Disclosure Statement and the Plan that are not attached to this Disclosure Statement or the Plan (such documents and materials, the "**Plan Supplement**"). The Plan Supplement will be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the deadline to vote to accept or reject the Plan. Once it is filed, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. You may obtain a copy of the Plan Supplement once it is filed, or any of the schedules and exhibits to this Disclosure Statement, by accessing the website of the claims agent appointed in these chapter 11 cases (the "**Chapter 11 Cases**"), at *www.kccllc.net/stationcasinos*, or by sending a written request to the Debtors' counsel, Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017, Attention: Robert C. Shenfeld, Esq.

          The Plan Supplement will include at least the following documents:

     o   New FG Management Agreement (Opco)

     o   New FG Management Agreement (Propco)

     o   New Opco Credit Agreement

     o   New Opco PIK Credit Agreement

     o   New Opco Purchase Agreement

     o   New Opco Transition Services Agreement

- o   New Propco Credit Agreement

- o   New Propco LLCA.

- o   Opco Lender Support Agreement

- o   Propco Lender Support Agreement

- o   Second Amended MLCA.

If you have any questions about the packet of materials you have received, you may contact the Debtors' counsel by mail at the address listed above, or by phone at (213) 892-4000.

**F.      Summary of Classification and Treatment of Claims and Equity Interests Under the Plan**

The Plan is proposed by SCI, Propco and the following affiliated debtors and debtors in possession:

- • The three entities that own the existing equity interests in SCI (collectively, the "**Parent Debtors**"):

  - o   FCP Holding, Inc. (owner of 74.8294% of non-voting stock in SCI);

  - o   Fertitta Partners, LLC (owner of 25.1706% of non-voting stock in SCI); and

  - o   FCP VoteCo, LLC (owner of 100% of voting stock in SCI);

- • Four entities that are direct or indirect wholly owned subsidiaries of SCI (collectively, the "**Other Opco Debtors**"):

  - o   Northern NV Acquisitions, LLC;

  - o   Tropicana Station, LLC;

  - o   River Central, LLC; and

  - o   Reno Land Holdings, LLC.

- • The nine entities that comprise the "MezzCo" debtors (collectively, the "**Mezzco Debtors**"):

  - o   FCP MezzCo Parent, LLC;

  - o   FCP MezzCo Parent Sub, LLC;

  - o   FCP MezzCo Borrower VII, LLC;

  - o   FCP MezzCo Borrower VI, LLC;

  - o   FCP MezzCo Borrower V, LLC;

  - o   FCP MezzCo Borrower IV, LLC;

  - o   FCP MezzCo Borrower III, LLC;

  - o   FCP MezzCo Borrower II, LLC; and

  - o   FCP MezzCo Borrower I, LLC.

SCI also has various other direct and indirect subsidiaries and affiliates (collectively, the "**Non-Debtor Affiliates**") that have not filed for bankruptcy relief and have continued to operate their businesses in the ordinary course during the pendency of the Debtors' chapter 11 cases. If the Plan is confirmed, certain Non-Debtor Affiliates may file for bankruptcy relief in order to effectuate certain of the transactions contemplated by, or required under, the Plan. The Debtors expect that any such filings would not affect or disrupt the ordinary course operations of the Debtors or the Non-Debtor Affiliates in any material way. This Plan contemplates certain transactions involving the Debtors and various of the Non-Debtor Affiliates, including certain asset transfers, and other transactions, as part of the implementation of the Plan (including transactions that may be implemented in connection with bankruptcy filings by certain Non-Debtor Affiliates). *For a description of those transactions, please see Article V of the Plan ("**Means for Implementation of the Plan**"), Section IV.C of this Disclosure Statement and Exhibit B to this Disclosure Statement, which contains a schematic outlining the various transactions that are proposed to implement the Plan.*

**Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are <u>not</u> proposing the substantive consolidation of their respective bankruptcy estates.** Thus, the Plan provides for the separate classification and treatment of creditors and equity holders for each of the respective eighteen Debtors. The Debtors are submitting the Plan jointly, covered by a single Disclosure Statement, to simplify drafting and to avoid duplicative costs relating to the preparation and distribution of multiple plans and disclosure statements. Accordingly, the Plan generally applies to all of the Debtors, except where otherwise indicated.

As described more fully in this Disclosure Statement, the Plan provides for significant distributions on account of certain Allowed Claims in the form of asset transfers, cash payments, assumption of specified liabilities, new debt instruments and new equity securities that will result from the Debtors' realization of value for their respective assets pursuant to various Plan-related transactions. The Plan distributions will be in various amounts and will take various forms, depending on the classification and treatment of any particular Claim against or Equity Interest in any particular Debtor. The following tables summarize the classification and treatment of Claims and Equity Interests for each Debtor under the Plan. *For a more detailed description of the classification and treatment of Claims and Equity Interests under the Plan, please see Section IV.B*

1.    **Claims and Equity Interests Against Parent Debtors**

(A)    **FCP Holding, Inc.**

| Class | Claim | Treatment | Status | Estimated Amount of Claims[3] | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|-------------------------------|-------------------------------------------|
| FHI.1 | Prepetition Mortgage Loan Guaranty Claims | See treatment of Class P.2 Claims below | Impaired | Contingent | See treatment of Class P.2 Claims below |
| FHI.2 | Prepetition Mezzanine Loan Guaranty Claims | Extinguished with no recovery | Impaired | Contingent | 0% |
| FHI.3 | Land Loan Guaranty Claims | Extinguished with no recovery | Impaired | Contingent | 0% |
| FHI.4 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |

---

[3]    These estimates were compiled based upon a review of the Debtors' schedules and filed proofs of claim. These estimates may change as the claims analysis and objection process proceeds.

| Class | Claim | Treatment | Status | Estimated Amount of Claims[3] | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|-------------------------------|--------------------------------------------|
| FHI.5 | Intercompany Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| FHI.6 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**(B)     Fertitta Partners LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|-----------------------------|--------------------------------------------|
| FP.1 | Prepetition Mortgage Loan Guaranty Claims | See treatment of Class P.2 Claims below | Impaired | Contingent | See treatment of Class P.2 Claims below |
| FP.2 | Prepetition Mezzanine Loan Guaranty Claims | Extinguished with no recovery | Impaired | Contingent | 0% |
| FP.3 | Land Loan Guaranty Claims | Extinguished with no recovery | Impaired | Contingent | 0% |
| FP.4 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| FP.5 | Intercompany Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| FP.6 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**(C)     FCP Voteco, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|-----------------------------|--------------------------------------------|
| VC.1 | Prepetition Mortgage Loan Guaranty Claims | See treatment of Class P.2 Claims below | Impaired | Contingent | See treatment of Class P.2 Claims below |
| VC.2 | Prepetition Mezzanine Loan Guaranty Claims | Extinguished with no recovery | Impaired | Contingent | 0% |
| VC.3 | Land Loan Guaranty Claims | Extinguished with no recovery | Impaired | Contingent | 0% |

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|----------------------------|--------------------------------------------|
| VC.4 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| VC.5 | Intercompany Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| VC.6 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

2.    **Claims and Equity Interests Against Propco**

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|----------------------------|--------------------------------------------|
| P.1 | Other Secured Claims | Payment in full in Cash or otherwise left Unimpaired | Unimpaired | 0 | 100% |
| P.2 | Prepetition Mortgage Loan Claims | a. All New Propco Transferred Assets, delivered to New Propco as designee of Mortgage Lenders b. Pro Rata shares of Propco Excess Effective Date Cash and any recoveries received by Propco on account of its Claims against SCI | Impaired | $1,801,271,958.33 | Transfer of all Collateral securing the Prepetition Mortgage Loan Claims, which has a value of less than the Allowed Prepetition Mortgage Loan Claims. |
| P.3 | General Unsecured Claims | Extinguished with no recovery | Impaired | $144,002,857.00 | 0% |
| P.4 | Intercompany Claims | Extinguished with no recovery | Impaired | $8,804,953.00 | 0% |
| P.5 | Equity Interests | Surrendered to FCP MezzCo Borrower I, LLC in satisfaction of its pledge of those Equity Interests, then immediately shall be cancelled and extinguished with no recovery | Impaired | n/a | 0% |

3.    **Claims and Equity Interests Against Mezzco Debtors**

**(A)      FCP MezzCo Parent, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| MP.1 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| MP.2 | Intercompany Claims | Extinguished with no recovery | Impaired | $5,972,107.00 | 0% |
| MP.3 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**(B)      FCP MezzCo Parent Sub, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| MS.1 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| MS.2 | Intercompany Claims | Extinguished with no recovery | Impaired | $5,972,107.00 | 0% |
| MS.3 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**(C)      FCP Mezzco Borrower VII, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| M7.1 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| M7.2 | Intercompany Claims | Extinguished with no recovery | Impaired | $5,972,107.00 | 0% |
| M7.3 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**(D)      FCP Mezzco Borrower VI, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| M6.1 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| M6.2 | Intercompany Claims | Extinguished with no recovery | Impaired | $5,972,107.00 | 0% |

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| M6.3 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

(E)    FCP Mezzco Borrower V, LLC

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| M5.1 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| M5.2 | Mezz IV Pledge Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| M5.3 | Intercompany Claims | Extinguished with no recovery | Impaired | $5,972,107.00 | 0% |
| M5.4 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

(F)    FCP Mezzco Borrower IV, LLC

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| M4.1 | Mezz IV Loan Claims | Equity Interests in FCP Mezzco Borrower III, LLC; then extinguished and discharged with no recovery | Impaired | $150,437,940.76 | 0% |
| M4.2 | General Unsecured Claims | Extinguished with no recovery | Impaired | $1,866.97 | 0% |
| M4.3 | Intercompany Claims | Extinguished with no recovery | Impaired | $5,972,107.00 | 0% |
| M4.4 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

(G)    FCP Mezzco Borrower III, LLC

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| M3.1 | Mezz III Loan Claims | Equity Interests in FCP | Impaired | $150,337,750.00 | 0% |

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|--------------------------------------------|
| | | Mezzco Borrower II, LLC; then extinguished with no recovery | | | |
| M3.2 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| M3.3 | Intercompany Claims | Extinguished with no recovery | Impaired | $5,972,107.00 | 0% |
| M3.4 | Equity Interests | Deemed surrendered to the Holders of Mezz IV Loan Claims in satisfaction of its pledge of those Equity Interests; extinguished with no recovery immediately upon such surrender | Impaired | n/a | 0% |

(H)    FCP Mezzco Borrower II, LLC

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|--------------------------------------------|
| M2.1 | Mezz II Loan Claims | Equity Interests in FCP Mezzco Borrower I, LLC; then extinguished with no recovery | Impaired | $175,000,000.00 | 0% |
| M2.2 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| M2.3 | Intercompany Claims | Extinguished with no recovery | Impaired | $5,972,107.00 | 0% |
| M2.4 | Equity Interests | Deemed surrendered to the Holders of Mezz III Loan Claims in satisfaction of its pledge of those Equity Interests; extinguished with no recovery immediately upon such surrender | Impaired | n/a | 0% |

(I)    FCP Mezzco Borrower I, LLC

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|--------------------------------------------|
| M1.1 | Mezz I Loan Claims | Equity Interests in Propco; | Impaired | $200,000,000.00 | 0% |

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
|  |  | then extinguished with no recovery |  |  |  |
| M1.2 | General Unsecured Claims | Extinguished with no recovery | Impaired | 0 | 0% |
| M1.3 | Intercompany Claims | Extinguished with no recovery | Impaired | $6,689,503.00 | 0% |
| M1.4 | Equity Interests | Deemed surrendered to the Holders of Mezz II Loan Claims in satisfaction of its pledge of those Equity Interests; extinguished with no recovery immediately upon such surrender | Impaired | n/a | 0% |

4.      **Claims and Equity Interests Against SCI**

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| S.1 | Other Secured Claims | Paid in full in Cash or otherwise left Unimpaired | Unimpaired | 0 | 100% |
| S.2 | Prepetition Opco Secured Claims | New Opco Acquired Asset sale proceeds of $772 million, consisting of:<br><br>(1) An amount in cash equal to $317 million, plus the Gun Lake Reimbursement[4] proceeds in excess of $20 million, less the Excess AMT Amount (subject to the Super Priority Notes Election);<br><br>(2) $430 million in aggregate principal amount of term loans under the New Opco Credit Agreement (less the amount of Gun Lake Reimbursement | Impaired | Approx. $880 – 890 million as of Petition Date, plus all interest accrued and unpaid thereon as of the Effective Date, and all unpaid fees, costs, expenses and other charges, claims and obligations (including indemnification claims) required to be paid or reimbursed, as | Approximately 87% (based upon the face amount of the debt components of the purchase price, with no adjustment for any potential variations in the trading price of that debt from |

---

[4]      Capitalized terms used herein that are not otherwise defined herein or in the Plan shall have the meanings ascribed to them in the Stalking Horse APA.

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| | | proceeds in excess of $20 million); and<br><br>(3) $25 million in aggregate principal amount of term loans under the New Opco PIK Credit Agreement. | | applicable, pursuant to the Prepetition Opco Credit Agreement and the Prepetition Opco Swap Agreement | the face amount[5]) |
| S.3 | Master Lease Rejection Damage Claim | Transfer from SCI of all Master Lease Collateral | Impaired | Unliquidated | Secured portion of claim satisfied through transfer of all Master Lease Collateral; balance of claim receives no recovery |
| S.4 | General Unsecured Claims | Holders of Allowed General Unsecured Claims against SCI:<br><br>(a) That are Eligible Opco Unsecured Creditors shall receive their Allocated Pro Rata Share of NPH Warrants;<br><br>(b) That are Eligible Opco Unsecured Creditors and Accredited Investors shall receive their Allocated Pro Rata Share of NPH Investment Rights; and<br><br>(c) That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and | Impaired | $8,975,000, plus unsecured deficiency claim portion of Prepetition Opco Secured Claims | NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights, as applicable |

---

[5]    The Debtors have not reached any conclusion regarding the extent, if any, to which the trading value of the debt components of the purchase price may differ from the face value.

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| | | subject to the conditions set forth in the NPH Term Sheet.<br><br>NOTE: Any Holder of a Class S.2 Claim that votes to accept the Plan, however, shall not be an Eligible Opco Unsecured Creditor and shall be deemed to have elected to waive any and all rights to receive any distributions on account of its Class S.4 deficiency claim and therefore shall not receive any NPH Warrants and shall not have any rights to participate in the Propco Rights Offering, any Equity Raise or in any NPH Post-Effective Investment Rights on account of its Class S.4 deficiency claim. | | | |
| S.5 | Senior Notes Claims | Holders of Allowed Senior Notes Claims against SCI:<br><br>(a) That are Eligible Opco Unsecured Creditors shall receive their Allocated Pro Rata Share of NPH Warrants;<br><br>(b) That are Eligible Opco Unsecured Creditors and Accredited Investors shall receive their Allocated Pro Rata Share of NPH Investment Rights; and<br><br>(c) That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term | Impaired | $1,283,207,555.26 | NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights, as applicable |

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| | | Sheet. | | | |
| S.6 | Subordinated Notes Claims | Holders of Allowed Subordinated Notes Claims against SCI:<br><br>(a) That are Eligible Opco Unsecured Creditors shall be entitled to their Allocated Pro Rata Share of NPH Warrants;<br><br>(b) That are Eligible Opco Unsecured Creditors and Accredited Investors shall be entitled to their Allocated Pro Rata Share of NPH Investment Rights; and<br><br>(c) That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.<br><br>PROVIDED, HOWEVER, that the distributions described above to which the Holders of Subordinated Notes Claims otherwise may be entitled shall be subject, in each case, to any applicable contractual subordination arrangements or obligations, including any such arrangements or obligations with respect to (a) Holders of Allowed Class S.4 Claims that also hold Class S.2 Claims and that do not vote to accept the Plan on account of such Class S.2 Claims and (b) Holders of Allowed Senior Notes, except to the extent | Impaired | $1,558,094,741.08 | NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights, as applicable and subject to contractual subordination provisions |

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| | | the parties otherwise agree and such agreement is reflected in the Plan and approved by the Bankruptcy Court. **Absent such agreement, the application of any such arrangement or obligations may result in Holders of Class S.6 Claims receiving no recovery under the Plan**. There can be no assurance that any such agreement will be reached that would result in Holders of Class S.6 Claims retaining a recovery under the Plan. | | | |
| S.7 | Mortgage Lender Claims Against SCI | Transfer from Propco of all Master Lease Collateral received by Propco from SCI (based on Propco's assignment to Mortgage Lenders of claims, liens, etc. arising under Master Lease), plus Class P.2 treatment | Impaired | Unliquidated | Secured portion of claim satisfied through transfer of all Master Lease Collateral; balance of claim receives no recovery |
| S.8 | Intercompany Claims | Extinguished with no recovery | Impaired | Unliquidated | 0% |
| S.9 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

5.     **Claims and Equity Interests Against Other Opco Debtors**

(A)     **Northern NV Acquisitions, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| NA.1 | Other Secured Claims | Paid in full in Cash or otherwise left Unimpaired | Unimpaired | 0 | 100% |
| NA.2 | General Unsecured | No distribution under | Impaired | $21,734.72 | 0% |

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
|  | Claims | Stalking Horse Bid, subject to higher/better bids at Opco Auction |  |  |  |
| NA.3 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**(B)      Reno Land Holdings, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| RL.1 | Other Secured Claims | Paid in full in Cash or otherwise left Unimpaired | Unimpaired | 0 | 100% |
| RL.2 | General Unsecured Claims | No distribution under Stalking Horse Bid, subject to higher/better bids at Opco Auction | Impaired | 0 | 0% |
| RL.3 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**(C)      River Central, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|-------|-------|-----------|--------|---------------------------|-------------------------------------------|
| RC.1 | Other Secured Claims | Paid in full in Cash or otherwise left Unimpaired | Unimpaired | 0 | 100% |
| RC.2 | Prepetition Opco Credit Agreement Guaranty Claims | See treatment of Class S.2 Claims | Impaired | See Class S.2 | See treatment of Class S.2 Claims |
| RC.3 | General Unsecured Claims | No distribution under Stalking Horse Bid, subject to higher/better bids at Opco Auction | Impaired | 0 | 0% |
| RC.4 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**(D)      Tropicana Station, LLC**

| Class | Claim | Treatment | Status | Estimated Amount of Claim | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| TS.1 | Other Secured Claims | Paid in full in Cash or otherwise left Unimpaired | Unimpaired | 0 | 100% |
| TS.2 | Prepetition Opco Credit Agreement Guaranty Claims | See treatment of Class S.2 Claims | Impaired | See Class S.2 | See treatment of Class S.2 Claims |
| TS.3 | General Unsecured Claims | No distribution under Stalking Horse Bid, subject to higher/better bids at Opco Auction | Impaired | 0 | 0% |
| TS.4 | Equity Interests | Extinguished with no recovery | Impaired | n/a | 0% |

**G.**     **Voting on the Plan**

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from holders of Claims against and Equity Interests in the Debtors, which procedures are described below.

1.     *Classes Entitled to Vote*

Pursuant to the provisions of the Bankruptcy Code, only holders of claims or interests that are members of a class that (a) is "impaired" within the meaning of section 1124 of the Bankruptcy Code (an "**Impaired Class**") and (b) is not deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code are entitled to vote to accept or reject a plan of reorganization (each, a "**Voting Class**"). Classes of claims or interests that are not impaired under Bankruptcy Code section 1124 are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Impaired Classes consisting of members that will receive no recovery under the plan are deemed to have rejected the plan under Bankruptcy Code section 1126(g) and are not entitled to vote to accept or reject the plan.

Only holders of record of Claims or Equity Interests as of the Voting Record Date (*i.e.* July 15, 2010) that are classified in Voting Classes have been sent a copy of this Disclosure Statement and an appropriately customized Ballot.

Under the Plan, the Voting Classes are Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2.

Under the Plan, the Classes that are not entitled to vote (each, a "**Non-Voting Class**") are:

- FHI.2, FHI.3, FHI.4, FHI.5, and FHI.6

- FP.2, FP.3, FP.4, FP.5, and FP.6

- VC.2, VC.3, VC.4, VC.5, and VC.6

- P.1, P.3, P.4, and P.5

- MP.1, MP.2 and MP.3

- MS.1, MS.2 and MS.3

- M7.1, M7.2, and M7.3

- M6.1, M6.2, and M6.3

- M5.1, M5.3, and M5.4

- M4.2, M4.3, and M4.4

- M3.2, M3.3, and M3.4

- M2.2, M2.3, and M2.4

- M1.2, M1.3, and M1.4

- S.1, S.8, and S.9

- NA.1, NA.2, and NA.3

- RL.1, RL.2 and RL.3

- RC.1, RC.3 and RC.4

- TS.1, TS.3 and TS.4

2.    *Votes Required for Acceptance of the Plan by a Class*

Pursuant to the Bankruptcy Code, a class of claims is considered to have accepted a proposed plan of reorganization if the plan is accepted by more than one-half of the class members that actually voted on the plan, holding at least two-thirds in terms of dollar amount of the claims in that class for which a valid ballot was submitted.  Thus, for each of the Voting Classes under the Plan, the Class will have accepted the Plan if, of the total number of Class members that vote, more than one-half vote to accept the Plan, and such majority of voters holds at least two-thirds of the total dollar amount of the Claims in that Class for which a Ballot was properly submitted.

3.    *Tabulation of Votes*

A vote to accept or reject the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  A Ballot that does not indicate the acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will be disregarded.  If the holder of a Claim or Equity Interest does not properly submit its Ballot, or that holder's vote is disregarded, that holder and that holder's Claim or Equity Interest will not be included in deciding whether the requisite number of Class members and amount of Claims or Equity Interests voted to accept or reject the Plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of the plan by one or more Impaired Classes of claims or interests.  Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non accepting class.  The Plan contemplates the deemed rejection (under Bankruptcy Code section 1126(g)) of those Classes of Claims and Equity Interests for which there will be no distributions.  In addition, the Voting Classes may not vote to accept the Plan.  Accordingly, the Debtors will be requesting confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code at the Confirmation Hearing.  *For a more detailed description of the requirements for confirmation of a plan that has been rejected by one or more classes, please see Section V.A.*

4.    *Voting Instructions*

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement.  If you are entitled to vote in more than one Class, you will receive separate Ballots for each Claim or Equity Interest,

which must be used for each separate Class of Claims and Equity Interests. Please refer to your Ballot and the Disclosure Statement Order for more specific instructions on voting on the Plan.

**The Debtors, the Mortgage Lenders, the Consenting Opco Lenders and the Committee recommend that you <u>vote in favor</u> of confirmation of the Plan.**

**<u>If you are a holder of record of a Claim or Equity Interest:</u>**

Please vote and return your Ballot(s) in accordance with the instructions set forth herein and in the instructions accompanying your Ballot(s), to:

> Station Casinos Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA 90245

**TO BE COUNTED, YOUR EXECUTED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED AT THE ADDRESS ABOVE NO LATER THAN 5:00 P.M. (PREVAILING PACIFIC TIME) ON AUGUST 20, 2010 (THE "<u>VOTING DEADLINE</u>"). ANY BALLOT RECEIVED THAT IS NOT EXECUTED, DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL BE DISREGARDED. DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT. FACSIMILE BALLOTS WILL NOT BE ACCEPTED.**

> 5.    *Inquiries*

If you are a holder of a Claim or Equity Interest entitled to vote on the Plan and either did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have questions about the procedures for voting your Claim or Equity Interest, or about the packet of materials that you received, please contact Kurtzman Carson Consultants LLC (the "**Voting Agent**"), at 2335 Alaska Avenue, El Segundo, CA 90245, Attention: Station Casinos Ballot Processing, or by telephone at (877) 499-4512.

If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, Los Angeles, CA 90017, Attention: Robert C. Shenfeld, Esq. by telephone at (213) 892-4000 or by electronic mail at rshenfeld@milbank.com.

**H.    Confirmation Hearing**

Pursuant to Bankruptcy Code section 1128, the Confirmation Hearing will commence on August 27, 2010, beginning at 10:00 a.m. (prevailing Pacific time), before the Honorable Gregg W. Zive, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Nevada, 300 Booth Street, Reno, Nevada 89509. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before August 12, 2010 at 5:00 p.m. (prevailing Pacific time). The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Subsequent to the Confirmation Hearing, the Bankruptcy Court may issue an Order confirming the Plan (the "**Confirmation Order**").

**I.    Overview of Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of the debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor in property as of the Petition Date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the terms for satisfying claims against and equity interests in a debtor. Upon confirmation of a plan of reorganization, it is binding on the debtor, any issuer of securities under the plan, and any creditor or equity interest holder of the debtor. Subject to certain limited exceptions, the confirmation order discharges the debtor from any debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a chapter 11 plan has been filed, holders of certain claims against and equity interests in a debtor are permitted to vote to accept or reject such plan. Before soliciting acceptances of the proposed plan, however, a debtor is required under section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Debtors are submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement sets forth specific information regarding the pre-bankruptcy history of the Debtors (within the context of the greater Station Casinos enterprise), the nature and progress of the Chapter 11 Cases, and the anticipated organizational and capital structure and operations of the Station properties after confirmation of the Plan and emergence from chapter 11. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, certain risk factors associated with the debt and equity securities that will be issued to holders of certain Classes of Claims and Equity Interests, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Equity Interests entitled to vote must follow in order for their votes to be counted.

## II.    GENERAL INFORMATION ABOUT STATION CASINOS

The Debtors and their Non-Debtor Affiliates form a consolidated gaming and entertainment enterprise that currently owns and operates ten major hotel/casino properties (two of which are 50% owned) under the SCI and Fiesta brand names and eight smaller casino properties (three of which are 50% owned) in the Las Vegas metropolitan area, as well as manages a casino for a Native American tribe (such consolidated enterprise, "**Station Casinos**").

### A.    Description and History of Station Casinos' Business

#### 1.    *Operations*

Station Casinos is a gaming and entertainment company that currently owns and operates ten major hotel/casino properties (two of which are 50% owned) under the Station and Fiesta brand names and eight smaller casino properties (three of which are 50% owned) in the Las Vegas metropolitan area. Station Casinos also manages a casino for a Native American tribe. Station Casinos' growth strategy includes the master-planned expansions of its existing gaming facilities in Nevada, the development of gaming facilities on certain real estate that it owns or is under contract to acquire in the Las Vegas valley and Reno, Nevada, the evaluation and pursuit of additional acquisition or development opportunities in Nevada and other gaming markets and the pursuit of additional management agreements with Native American tribes. New Propco (as the new owner of the Propco Properties and certain other assets) and the Successful Bidder (as the new owner of the New Opco Acquired Assets) may or may not elect to pursue the growth strategy previously adopted by Station Casinos.

SCI and its subsidiaries own and operate Palace Station Hotel & Casino ("**Palace Station**"), Boulder Station Hotel & Casino ("**Boulder Station**"), Texas Station Gambling Hall & Hotel ("**Texas Station**"), Sunset Station Hotel & Casino ("**Sunset Station**"), Santa Fe Station Hotel & Casino ("**Santa Fe Station**"), Red Rock Casino Resort Spa ("**Red Rock**"), Fiesta Rancho Casino Hotel ("**Fiesta Rancho**"), Fiesta Henderson Casino Hotel ("**Fiesta Henderson**"), Wild Wild West Gambling Hall & Hotel ("**Wild Wild West**"), Wildfire Casino— Rancho ("**Wildfire Rancho**"), Wildfire Casino—Boulder ("**Wildfire Boulder**"), Gold Rush Casino ("**Gold Rush**")

and Lake Mead Casino. SCI and its subsidiaries also own a 50% interest in Green Valley Ranch Resort Spa Casino ("**Green Valley Ranch**"), Aliante Station Casino + Hotel ("**Aliante Station**"), Barley's Casino & Brewing Company ("**Barley's**"), The Greens Gaming and Dining ("**The Greens**") and Wildfire Lanes and Casino ("**Wildfire Lanes**"). Each of the Station casinos caters primarily to local Las Vegas area residents. In addition, SCI and its subsidiaries manage Thunder Valley Casino ("**Thunder Valley**") in Sacramento, California on behalf of the United Auburn Indian Community ("**UAIC**").

**Properties**

Set forth below is certain information as of December 31, 2009 concerning the Station Casinos properties, all of which are owned and/or operated by subsidiaries of SCI except as otherwise indicated. The properties are more fully described following the table.

| | Hotel Rooms | Slots(1) | Gaming Tables(2) | Parking Spaces(3) | Acreage |
|---|---|---|---|---|---|
| Casino Properties | | | | | |
| Palace Station | 1,000 | 1,722 | 46 | 2,600 | 30 |
| Boulder Station | 300 | 2,749 | 41 | 4,800 | 54 |
| Texas Station | 200 | 1,994 | 31 | 5,900 | 47 |
| Sunset Station | 457 | 2,463 | 41 | 5,500 | 82 |
| Santa Fe Station | 200 | 2,825 | 47 | 5,200 | 38 |
| Red Rock | 815 | 2,989 | 64 | 6,800 | 64 |
| Green Valley Ranch (50% owned) | 490 | 2,392 | 55 | 3,900 | 40 |
| Aliante Station (50% owned) | 202 | 2,013 | 44 | 4,800 | 40 |
| Fiesta Rancho | 100 | 1,412 | 16 | 2,050 | 25 |
| Fiesta Henderson | 224 | 1,628 | 19 | 3,000 | 46 |
| Other Properties | | | | | |
| Wild Wild West | 262 | 200 | 6 | 600 | 19 |
| Wildfire Rancho | — | 194 | — | 265 | 5 |
| Wildfire Boulder | — | 172 | — | 230 | 2 |
| Gold Rush | — | 154 | — | 125 | 1 |
| Lake Mead Casino | — | 75 | — | 64 | 3 |
| Barley's (50% owned) | — | 199 | — | — | — |
| The Greens (50% owned) | — | 36 | — | — | — |
| Wildfire Lanes (50% owned) | — | 196 | — | — | — |
| Managed Properties | | | | | |
| Thunder Valley (4) | — | 2,426 | 102 | 4,500 | 49 |

_____

(1) Includes slot and video poker machines and other coin-operated devices.

(2) Generally includes blackjack ("21"), craps, roulette, pai gow poker, mini baccarat, let it ride, three-card poker, Texas hold'em and wild hold'em. The Casino Properties, with the exception of Green Valley Ranch, also offer a keno lounge and bingo parlor. The Casino Properties also offer a race and sports book and the Other Properties offer a sports book with the exception of The Greens and Lake Mead Casino.

(3) Includes covered parking spaces of 1,900 for Palace Station, 1,900 for Boulder Station, 3,500 for Texas Station, 2,900 for Sunset Station, 4,500 for Santa Fe Station, 5,100 for Red Rock, 2,700 for Green Valley Ranch, 3,300 for Aliante Station, 1,000 for Fiesta Rancho and 1,100 for Fiesta Henderson.

(4) A Non-Debtor Affiliate of SCI manages Thunder Valley on behalf of the UAIC.

**Casino Properties**

*Palace Station*

Palace Station is strategically located at the intersection of Sahara Avenue and Interstate 15, one of Las Vegas' most heavily traveled areas. Palace Station is a short distance from McCarran International Airport and from major attractions on the Las Vegas Strip and downtown Las Vegas. Palace Station features a turn-of-the-20th-

century railroad station theme with non-gaming amenities including newly remodeled hotel rooms, seven full-service restaurants, a 275-seat entertainment lounge, four additional bars, two swimming pools, an approximately 20,000-square-foot banquet and convention center, a gift shop and a non-gaming video arcade.

*Boulder Station*

Boulder Station, which opened in August 1994, is strategically located on Boulder Highway, immediately adjacent to the Interstate 515 interchange. Boulder Station is located approximately four miles east of the Las Vegas Strip and approximately four miles southeast of downtown Las Vegas. Boulder Station features a turn-of-the-20th-century railroad station theme with non-gaming amenities including five full-service restaurants, a 750-seat entertainment lounge, six additional bars, an 11-screen movie theater complex, a Kid's Quest child care facility, a swimming pool, a non-gaming video arcade and a gift shop.

*Texas Station*

Texas Station, which opened in July 1995, is strategically located at the corner of Lake Mead Boulevard and Rancho Drive in North Las Vegas. Texas Station features a friendly Texas atmosphere, highlighted by distinctive early Texas architecture with non-gaming amenities including five full-service restaurants, a Kid's Quest child care facility, a 300-seat entertainment lounge, a 1,700-seat event center, eight additional bars, an 18-screen movie theater complex, a swimming pool, a non-gaming video arcade, a gift shop, a 60-lane bowling center and approximately 40,000 square feet of meeting and banquet space.

Texas Station is subject to a ground lease. The lessor is Texas Gambling Hall & Hotel, Inc., which is an affiliate of a member of the Fertitta family but is not owned or controlled by Frank or Lorenzo Fertitta or FG. The ground lease contains a change of control provision that requires the lessee (Texas Station, LLC) to purchase the ground lease property upon a change of control (the "Texas Put Right") if the lessor elects to exercise the Texas Put Right. The lessor has one year from the change of control to exercise the Texas Put Right. The ground lease provides that the purchase price would be calculated based upon a net present value calculation of the remaining rent due under the ground lease. The amount of the forced purchase price thus would depend upon, among other things, the remaining term of the ground lease at the time of the triggering change of control, as well as the discount factor used in the net present value calculation. In connection with negotiations regarding the Sale Process and potential bids for the New Opco Acquired Assets, the lessor, the Mortgage Lenders and the lessee (Texas Station, LLC) entered into a binding settlement to avoid the process of determining the net present value of the rental stream, with all of the attendant potential disputes, and to fix the cost of purchasing the Texas Station real estate upon a change of control resulting from the Sale Process as follows: (i) if the Acquisition is consummated and the Stalking Horse Bidder is the Successful Bidder, the Texas Put will be extinguished and no longer exercisable; (ii) if a person other than the Stalking Horse Bidder is selected as the Successful Bidder for the Opco assets, the price for the settlement of the Texas Put will be $75 million and shall be required to be paid at closing of purchase pursuant to such bid; and (iii) if the Plan is not confirmed, a person other than the Stalking Horse Bidder is not selected as the successful bidder under the Plan and the Asset Transfers occur, the price for the settlement of the Texas Put (and the buyout of the ground lease) will be $75 million and shall not he required to he paid until the first anniversary of the consummation of the transfer of the New Propco Purchased Assets.

The Committee has disputed the bona fides of the settlement of the Texas Put Right and has appealed the Bankruptcy Court's approval of the inclusion of the settlement of the Texas Put Right in the Bidding Procedures Order and expects to raise the same issue in its appeal of the Second Amended MLCA. Pursuant to the Committee Plan Support Stipulation, if the Plan is confirmed and becomes effective, that appeal will be dismissed.

*Sunset Station*

Sunset Station, which opened in June 1997, is strategically located at the intersection of Interstate 515 and Sunset Road. Multiple access points provide customers convenient access to the gaming complex and parking areas. Situated in a highly concentrated commercial corridor along Interstate 515, Sunset Station has prominent visibility from the freeway and the Sunset commercial corridor. Sunset Station is located approximately nine miles east of McCarran International Airport and approximately seven miles southeast of Boulder Station. Sunset Station features a Spanish/Mediterranean-style theme with non-gaming amenities including seven full-service restaurants themed to capitalize on the familiarity of the restaurants at Station Casinos' other properties, a

520-seat entertainment lounge, a 4,000-seat outdoor amphitheater, eight additional bars, a gift shop, a non-gaming video arcade, a 13-screen movie theater complex, a 72-lane bowling center, a Kid's Quest child care facility and a swimming pool.

### Santa Fe Station

In October 2000, a subsidiary of SCI purchased Santa Fe Station which is strategically located at the intersection of Highway 95 and Rancho Drive, approximately five miles northwest of Texas Station. Santa Fe Station features non-gaming amenities including five full-service restaurants, a gift shop, a non-gaming video arcade, a swimming pool, a 500-seat entertainment lounge, seven additional bars, a 60-lane bowling center, a 16-screen movie theater complex, a Kid's Quest child care facility and over 14,000 square feet of meeting and banquet facilities.

### Red Rock

Red Rock, which opened on April 18, 2006, is strategically located on Charleston Boulevard at the Interstate 215/Charleston interchange in the Summerlin master-planned community in Las Vegas, Nevada. Red Rock features an elegant desert oasis theme with a contemporary design, offering 815 hotel rooms featuring ultra-modern design filled with the most up-to-date luxury amenities. In addition to its standard guestrooms, the hotel offers six styles of suites, including one-of-a-kind custom villas and penthouse suites. Additional non-gaming amenities include ten full-service restaurants, a 16-screen movie theater complex, 94,000 square feet of meeting and convention space, a night club, a full-service spa, a 72-lane bowling center and a Kid's Quest child care facility.

### Green Valley Ranch

Green Valley Ranch, which opened in December 2001, is strategically located at the intersection of Interstate 215 and Green Valley Parkway in Henderson, Nevada. Green Valley Ranch is approximately five minutes from McCarran International Airport and seven minutes from the Las Vegas Strip. A subsidiary of SCI jointly developed the project on 40 acres of a 170-acre multi-use commercial development with GCR Gaming. In addition to SCI's indirect 50% ownership interest in Green Valley Ranch, a subsidiary of SCI is also the managing partner of Green Valley Ranch and receives a management fee equal to 2% of the property's revenues and approximately 5% of Earnings Before Interest, Taxes, Depreciation and Amortization ("**EBITDA**").

Green Valley Ranch was designed to complement the Green Valley master-planned community. The AAA Four Diamond resort features a Mediterranean-style villa theme with non-gaming amenities including eight full-service restaurants, a 4,200-square-foot non-gaming arcade, a state-of-the-art spa with outdoor pools, a 10-screen movie theater complex, two gift shops, approximately 65,000 square feet of meeting and convention space and an entertainment lounge. Green Valley Ranch also offers an 8-acre complex featuring private poolside cabanas, a contemporary poolside bar and grill, one and a half acres of vineyards and an outdoor performance venue.

GV Ranch Station, Inc. ("GVRS"), a wholly owned subsidiary of SCI, owns a 50% equity interest in the joint venture that owns Green Valley Ranch and also manages Green Valley Ranch. GVRS has filed a chapter 11 case that is being jointly administered with SCI's chapter 11 case and those of SCI's other Affiliates. The joint venture that owns Green Valley Ranch has commenced discussions with its own lenders about restructuring alternatives. Neither Green Valley Ranch nor GVRS' equity interest in the joint venture that owns Green Valley Ranch will be included in the Opco Auction or the New Opco Acquired Assets. The Debtors do not believe that GVRS' equity interests in the joint venture that owns Green Valley Ranch have any value.

### Aliante Station

Aliante Station, which opened in November 2008, is strategically located at the intersection of Interstate 215 and Aliante Parkway in North Las Vegas, Nevada. A subsidiary of SCI jointly developed the project on 40 acres in the Aliante master-planned community with The Greenspun Corporation. Aliante Station features a contemporary desert theme with non-gaming amenities including 202 hotel rooms, six full-service restaurants, a 16-screen movie theater complex, an entertainment lounge and approximately 14,000 square feet of meeting and banquet space. A subsidiary of SCI receives a management fee equal to 2% of the property's revenues and approximately 5% of EBITDA.

The joint venture that owns Aliante Station has commenced discussions with its own lenders about restructuring alternatives. Neither Aliante Station nor SCI's indirect equity interest in the joint venture that owns Aliante Station will be included in the Opco Auction or the New Opco Acquired Assets. The Debtors do not believe that that SCI's indirect equity interests in the joint venture that owns Aliante Station have any value.

*Fiesta Rancho*

Fiesta Rancho was purchased in January 2001 and is strategically located at the intersection of Lake Mead Boulevard and Rancho Drive in North Las Vegas across from Texas Station. Fiesta Rancho features a Southwestern theme with non-gaming amenities including three full-service restaurants, a gift shop, a non-gaming video arcade, a swimming pool, a 700-seat entertainment lounge, a regulation-size ice skating rink and four additional bars.

*Fiesta Henderson*

Fiesta Henderson was purchased in January 2001 and is strategically located at the intersection of Interstate 215 and Interstate 515 in Henderson, Nevada. The property features four full-service restaurants, a 12-screen movie theater complex, a gift shop, a swimming pool, three bars and lounges and meeting space.

**Other Properties**

*Wild Wild West*

Wild Wild West was acquired in July 1998 and is strategically located on Tropicana Avenue and immediately adjacent to Interstate 15. Wild Wild West's non-gaming amenities include a full-service restaurant, a bar, a gift shop and a truck plaza.

*Wildfire Rancho*

Wildfire Rancho was acquired in January 2003 and is located on Rancho Drive across from Texas Station. Wildfire Rancho's non-gaming amenities include a lounge, outdoor patio and a full-service restaurant.

*Wildfire Boulder & Gold Rush*

Wildfire Boulder (formerly known as Magic Star) and Gold Rush were acquired in August 2005. Wildfire Boulder is located on Boulder Highway in Henderson, Nevada. Gold Rush is located at the intersection of Interstate 515 and Sunset Road, adjacent to Sunset Station in Henderson, Nevada. Both properties offer non-gaming amenities which include a full service restaurant and a bar.

*Lake Mead Casino*

In September 2006, SCI purchased Lake Mead Casino located in Henderson, Nevada. Lake Mead Casino's non-gaming amenities include a full-service restaurant and bar.

*Barley's, The Greens and Wildfire Lanes*

Barley's, which opened in January 1996, is a casino and brew pub located in Henderson, Nevada. Barley's non-gaming amenities include a full-service restaurant, a pizza kitchen and a bar. In November 2005, a subsidiary of SCI purchased a 50% interest in The Greens, a restaurant and lounge, located in Henderson, Nevada. The Greens' non-gaming amenities include a full-service restaurant and bar. In October 2007, a subsidiary of SCI purchased a 50% interest in Wildfire Lanes (formerly known as Renata's) located in Henderson, Nevada. Wildfire Lanes' non-gaming features include a full-service restaurant, a bar and an 18-lane bowling center. A subsidiary of SCI is the managing partner for Barley's, The Greens and Wildfire Lanes and receive a management fee equal to approximately 10% of EBITDA.

**Managed Properties**

*Thunder Valley*

A subsidiary of SCI entered into a Development Services Agreement and a Management Agreement with the UAIC. The seven-year Management Agreement was approved by the National Indian Gaming Commission (the "**NIGC**"); that agreement expired in June, 2010. Pursuant to those agreements, and in compliance with a Memorandum of Understanding entered into by the UAIC and Placer County, California, a subsidiary of SCI developed, with the UAIC, Thunder Valley Casino, a gaming and entertainment facility located approximately seven miles north of Interstate 80 on Highway 65, in Placer County, California, near Sacramento, opened in June 2003. Prior to expiration of the Management Agreement, a subsidiary of SCI received a management fee equal to 24% of the facility's net income (as defined in the management agreement). Thunder Valley's non-gaming amenities include three specialty restaurants, a 500-seat buffet, a food court and a center pit bar.

**Expansion Opportunities**

Although Station Casinos has a number of development and management opportunities in the Las Vegas Valley, Northern California, Reno, Nevada and other locations, such development and management opportunities require significant financial support and/or third party financing, which may not be available on satisfactory terms and conditions. In addition, the timing of these types of project is difficult to predict and is dependent upon the receipt of the necessary governmental and regulatory approvals. The decision of any acquirer or purchaser of Station Casinos' assets to proceed with any new gaming or development opportunity is dependent upon future economic and regulatory factors, the availability of acceptable financing and competitive and strategic considerations. As many of these considerations are beyond SCI's control, no assurances can be made that any particular project will proceed. Future decisions on such opportunities shall be made by New Opco and/or any Successful Bidder, as applicable.

*Development and Acquisition Opportunities*

In December 2006, a subsidiary of SCI entered into an amended and restated operating agreement with FBLV Holding Company LLC ("**FBLV**"), pursuant to which the parties contributed approximately 52 acres (with approximately 20 acres contributed by SCI and its subsidiaries for its 50% ownership and approximately 32 acres contributed by FBLV for their 50% ownership) of improved and unimproved real property located along Rancho Road south of Palace Station in Las Vegas, Nevada into a joint venture. It was anticipated that the joint venture would develop, construct and manage, pursuant to a master development plan, a mixed-use residential, retail and entertainment project on all or a portion of such property. The timing, cost and scope of the project have yet to be determined.

*Land Held for Development*

SCI and its subsidiaries have land held for development consisting primarily of eleven sites that are owned or leased, which includes 368 acres in the Las Vegas valley, 1,321 acres in northern California and 200 acres in Reno, Nevada. The primary gaming-entitled land owned by SCI and its subsidiaries in the Las Vegas valley consists of 77 acres of land (106 acres including those leased or under contract) on which the Wild Wild West is located and the surrounding area, 71 acres located at the intersection of Durango Road and the Southern Beltway/Interstate 215 in the southwest area of Las Vegas, 58 acres also located in southwest Las Vegas at the intersection of Town Center and Interstate 215, 45 acres in the master-planned community of Inspirada located in Henderson, Nevada, 61 acres located on the southern end of Las Vegas Boulevard at Cactus Avenue of which SCI leases and has an option to purchase 2.5 acres, and 30 acres on Boulder Highway at the site formerly known as the Castaways Hotel Casino and Bowling Center.

In December 2008, SCI amended the lease and purchase agreement for the 19-acre parcel of land on which the Wild Wild West is located. Under the amended agreement, Tropicana Station, Inc. has an option to purchase the land on or before December 28, 2011, for a purchase price of $36 million. The exercise of that option, however, is tied to and conditioned upon the concurrent exercise of four other options to acquire separate parcels of property. All five options must be exercised in unison, with the aggregate purchase price totaling $60 million. The

amended lease also includes options to purchase the land in July 2023, 2044 and 2065 for a purchase price equal to fair market value as of July 2022, 2043 and 2064, respectively.

The properties and options associated with the Wild Wild West are among the Landco Assets to be transferred, directly or indirectly, to the designee of the Landco Lenders under the Plan. The revenues generated by the Wild Wild West property are not sufficient to meet the rent payments, and the deficiency will be approximately $1.6 million per year starting January 2011. In addition to generating negative cash flow, the Debtors believe that the option prices for acquiring the property are substantially above market and therefore have no value to SCI.

### Native American Development

#### The Federated Indians of Graton Rancheria

Non-Debtor Subsidiaries of SCI have entered into Development and Management Agreements with the Federated Indians of Graton Rancheria (the "**FIGR**"), a federally recognized Native American tribe. Pursuant to those agreements, the SCI Subsidiaries will assist the FIGR in developing and operating a gaming and entertainment project to be located in Sonoma County, California. The FIGR selected Station Casinos to assist them in designing, developing and financing their project and, upon opening, the SCI subsidiary will manage the facility on behalf of the FIGR. The Management Agreement has a term of seven years from the opening of the facility and the SCI subsidiary will receive a management fee equal to 24% of the facility's net income. A Subsidiary of SCI will also receive a development fee equal to 2% of the cost of the project upon the opening of the facility. SCI's equity interests in the Subsidiaries involved with this property are among the Opco Assets included in the Opco Auction.

#### Gun Lake Tribe

On November 13, 2003, a Non-Debtor Subsidiary of SCI agreed to purchase a 50% interest in MPM Enterprises, LLC, a Michigan limited liability company ("**MPM**"). Concurrently with execution of the agreement to purchase that interest, MPM and the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, a federally recognized Native American tribe commonly referred to as the Gun Lake Tribe ("**Gun Lake**"), entered into amended Development and Management Agreements, pursuant to which MPM agreed to assist Gun Lake in developing and operating a gaming and entertainment project to be located in Allegan County, Michigan. The proposed project will be located on approximately 147 acres on Highway 131 near 129th Avenue, approximately 25 miles north of Kalamazoo, Michigan. As currently contemplated, the project will include approximately 1,400 slot machines, 28 table games and various dining options. Construction of the project includes the conversion of an existing 76,000 square-foot building into the casino and entertainment facility (the "**Casino**"). Development of the gaming and entertainment project and operation of Class III gaming is subject to certain governmental and regulatory approvals, including, but not limited to, final approval of the Management Agreement by the National Indian Gaming Commission (the "**NIGC**").

Under the terms of the amended and restated development agreement with Gun Lake, MPM has agreed to arrange financing for the ongoing development costs and construction of the Casino, including periodic loans to Gun Lake for operating expenses and credit support in the form of a $15,000,000 cash deposit to secure completion and keep well obligations. As a result of these obligations, MPM has made loans for development expenses in the approximate amount of $58,600,000 as of May 31, 2010, and SC Michigan LLC (an affiliate of the Manager) has made construction advances to Gun Lake in the approximate amount of $17,600,000 as of May 31, 2010 (collectively referred to as the "**Manager Loans**"). The Manager Loans made by the Manager will be partially repaid in the amount of approximately $25,000,000 (of which 85% or $21,250,000 will be distributed to SC Michigan, LLC) at the closing of any construction financing that Gun Lake may obtain and the Manager Loans made by SC Michigan LLC as construction advances will be paid in full at the closing of any construction financing that Gun Lake may be able to obtain. Thus total proceeds to SC Michigan LLC at a closing of construction funding, if received, will be approximately $38,850,000. These potential proceeds are defined as the "Gun Lake Reimbursement" in the Stalking Horse APA.

The amended and restated management agreement with Gun Lake has a term of seven years from the opening of the facility and provides for a management fee of 30% of the project's net income to be paid to

MPM. Pursuant to the terms of the MPM Operating Agreement, Station Casinos' portion of the management fee is 50% of the first $24 million of management fees earned, 83% of the next $24 million of management fees and 93% of any management fees in excess of $48 million.

SCI's equity interests in the Subsidiaries involved with this property are among the Opco Assets included in the Opco Auction.

*Mechoopda Indian Tribe*

A Non-Debtor Subsidiary of SCI entered into Development and Management Agreements with the Mechoopda Indian Tribe of Chico Rancheria, California (the "**MITCR**"), a federally recognized Native American tribe. Pursuant to those agreements, SCI's subsidiary will assist the MITCR in developing and operating a gaming and entertainment facility to be located on a portion of an approximately 650-acre site in Butte County, California, at the intersection of State Route 149 and Highway 99, approximately 10 miles southeast of Chico, California and 80 miles north of Sacramento, California. Under the terms of the Development Agreement, SCI's subsidiary has agreed to arrange the financing for the ongoing development costs and construction of the facility. Funds advanced by SCI and its subsidiaries are expected to be repaid from the proceeds of the project financing or from the MITCR's gaming revenues.

The Management Agreement has a term of seven years from the opening of the facility and provides for a management fee of 24% of the facility's net income. As currently contemplated, the facility will include approximately 700 slot machines, 12 table games and dining and entertainment amenities. Development of the facility is subject to certain governmental and regulatory approvals, including, but not limited to, negotiating a gaming compact with the State of California, the Department of the Interior (the "**DOI**") accepting land into trust on behalf of the MITCR and approval of the Management Agreement by the NIGC.

SCI's equity interests in the Subsidiaries involved with this property are among the Opco Assets included in the Opco Auction.

*North Fork Rancheria of Mono Indian Tribe*

A Non-Debtor Subsidiary of SCI has entered into Development and Management Agreements with the North Fork Rancheria of Mono Indians (the "**Mono**"), a federally recognized Native American tribe located near Fresno, California. Pursuant to those agreements, SCI's subsidiary will assist the Mono in developing and operating a gaming and entertainment facility to be located in Madera County, California. A subsidiary of SCI has purchased, for the benefit of the Mono, a 305-acre parcel of land located on Highway 99 north of the city of Madera. Under the terms of the Development Agreement, SCI's subsidiary has agreed to arrange the financing for the ongoing development costs and construction of the facility. Funds advanced are expected to be repaid from the proceeds of the project financing or from the Mono's gaming revenues. The Management Agreement has a term of seven years from the opening of the facility and provides for a management fee of 24% of the facility's net income. As currently contemplated, the facility will include approximately 2,000 slot machines, 60 table games, restaurants, a hotel and entertainment amenities. Development of the gaming and entertainment project is subject to certain governmental and regulatory approvals, including, but not limited to, approval by the California Legislature of the gaming compact with the State of California, the DOI accepting the land into trust on behalf of the Mono and approval of the Management Agreement by the NIGC.

SCI's equity interests in the Subsidiaries involved with this property are among the Opco Assets included in the Opco Auction.

2.    *Corporate History*

SCI was incorporated in 1976 and became a publicly traded company on the New York Stock Exchange in 1993. In August 2006, Frank J. Fertitta III and Lorenzo J. Fertitta (collectively, the "**Fertittas**") began discussions with SCI's senior management regarding the possibility of a go-private transaction (the "**2007 Going Private Transaction**" or "**Transaction**," which definitions include the Sale and Leaseback defined below). In November 2006, SCI's Board of Directors (the "**Board**") formed a Special Committee of Independent Directors (the "**2006 Special Committee**") to investigate and take any necessary actions in connection with any proposals, offers,

or expressions of interest for a business combination.  In December 2006, Fertitta Colony Partners, LLC ("**FCP**"), an entity jointly owned by affiliates of Colony Capital, LLC ("**Colony**") and affiliates of the Fertittas, delivered a letter to SCI's Board proposing to acquire all of SCI's outstanding shares for $82.00 per share in cash.  For the next two and a half months, FCP and the 2006 Special Committee negotiated and then agreed to a transaction price of $90 per share plus dividends.  The 2006 Special Committee unanimously recommended that the Transaction be approved and determined that the terms of the Sale and Leaseback were fair and reasonable to SCI.  The Board approved the 2007 Going Private Transaction, including the sale of certain real property to Propco and the leaseback of such property to SCI (the "**Sale and Leaseback**").

       In February 2007, SCI issued a press release announcing the 2007 Going Private Transaction.  The negotiating history was set forth in the Definitive Proxy, which was distributed to all of SCI's shareholders in advance of their vote on the 2007 Going Private Transaction.  On August 13, 2007, the 2007 Going Private Transaction was approved by holders of 79% of the shares of SCI, including 72% of the shares not held by insiders.

       As part of the 2007 Going Private Transaction, Colony invested approximately $2.7 billion in cash (through a contribution to FCP) to obtain an approximately 75% equity interest in SCI.  The Fertittas, other members of the Fertitta family, and certain of SCI's officers invested almost $900 million through their roll-over stock contribution to obtain an approximately 25% equity interest in SCI.  A group of the world's most sophisticated lenders also participated in the 2007 Going Private Transaction, lending more than $3.65 billion in funds necessary to consummate the 2007 Going Private Transaction.  All of these negotiations took place at arm's length with a robust and highly involved 2006 Special Committee.  Concurrent with these negotiations and throughout the closing period, the 2007 Going Private Transaction was subjected to a substantial due diligence and credit review process by sophisticated lenders and investors, represented by experienced counsel and financial advisors.  In addition, details of the 2007 Going Private Transaction were reported publicly in SCI's public filings.

       There was no transfer from SCI to any of individual employees or officers of SCI under any of their respective employment agreements as part of the 2007 Going Private Transaction.  Rather, the Board determined to remove the restriction on sale and the forfeiture contingency for the restricted stock held by officers and employees of SCI at the time of the 2007 Going Private Transaction.  The Board removed such restriction at the specific request of FCP, who like any buyer in a take-private transaction, was seeking to purchase 100% of the outstanding stock of the Debtor.  The Board acceded to FCP's demand and acted under the authority vested to it by the stock compensation plans then in effect—not under any employee's employment contract.  Finally, none of the SCI employees or officers held any unvested options at the time of the 2007 Going Private Transaction, and all of the restricted stock held by management (including the Fertittas) was sold directly to Colony through FCP—no SCI assets were used to effect the purchase.

       As a result of the 2007 Going Private Transaction, 24.1% of the issued and outstanding shares of non-voting common stock of SCI are owned by Fertitta Partners LLC, a Nevada limited liability company and a Parent Debtor ("**Fertitta Partners**") owned by affiliates of Frank J. Fertitta III, Chairman, Chief Executive Officer and President of Station, affiliates of Lorenzo J. Fertitta, Vice Chairman of SCI, affiliates of Blake L. Sartini and Delise F. Sartini, and certain officers and other members of management of SCI.  The remaining 75.9% of the issued and outstanding shares of non-voting common stock of SCI are owned by FCP Holding, Inc., a Nevada corporation and one of the Parent Debtors ("**FCP HoldCo**"), which is a wholly-owned subsidiary of FCP.  Substantially simultaneously with the consummation of the 2007 Going Private Transaction, shares of voting common stock of SCI were issued for nominal consideration to FCP VoteCo LLC, a Nevada limited liability company and one of the Parent Debtors ("**FCP VoteCo**"), which is owned equally by Frank J. Fertitta III, Lorenzo J. Fertitta and Thomas J. Barrack, Jr., the Chairman and Chief Executive Officer of Colony.

       Following the consummation of the 2007 Going Private Transaction, SCI was privately owned through the Parent Debtors (FCP HoldCo, Fertitta Partners and FCP VoteCo).  SCI common stock ceased trading on the New York Stock Exchange at market close on November 7, 2007, and is no longer listed on any exchange or quotation system.  SCI's voting common stock is registered pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended.

       3.     *Corporate Governance*

**SCI**.  Set forth below are the names, ages, position or positions and biographical information of the directors and executive officers of SCI:

| Name | Age | Position |
| --- | --- | --- |
| Frank J. Fertitta III | 48 | Chairman of the Board, Chief Executive Officer and President |
| Thomas M. Friel | 46 | Executive Vice President, Chief Accounting Officer and Treasurer |
| Richard J. Haskins | 46 | Executive Vice President, General Counsel and Secretary |
| Kevin L. Kelley | 52 | Executive Vice President and Chief Operating Officer |
| Scott M Nielson | 52 | Executive Vice President and Chief Development Officer |
| Lorenzo J. Fertitta | 41 | Vice Chairman of the Board |
| Thomas J. Barrack, Jr. | 62 | Director |
| Jonathan H. Grunzweig | 46 | Director |
| James E. Nave, D.V.M. | 65 | Director |

**Frank J. Fertitta III.**    Mr. Fertitta has served as Chairman of the Board of SCI since February 1993, Chief Executive Officer since July 1992 and President since July 2008.  Mr. Fertitta also served as President of SCI from 1989 until July 2000.  He has held senior management positions since 1985, when he was named General Manager of Palace Station.  He was elected a director of SCI in 1986, at which time he was also appointed Executive Vice President and Chief Operating Officer.  Mr. Fertitta is a co-owner of Zuffa, LLC which is the parent company of the Ultimate Fighting Championship.

**Thomas M. Friel.**    Mr. Friel was appointed Executive Vice President, Chief Accounting Officer and Treasurer of SCI in March 2007.  He served as Vice President of Finance and Corporate Controller from July 1999 to March 2007.  Mr. Friel is a Certified Public Accountant.  He is a member of the Board of Directors of Big Brothers and Big Sisters of Southern Nevada.

**Richard J. Haskins.**    Mr. Haskins was appointed Executive Vice President and Secretary of SCI in July 2004 and has served as General Counsel of SCI since April 2002.  He previously served as Assistant Secretary from September 2003 to July 2004, as Vice President and Associate General Counsel from November 1998 to March 2002 and as General Counsel of Midwest Operations from November 1995 to October 1998.  Mr. Haskins is a member of the American Bar Association, Kansas Bar Association, Missouri Bar Association and Nevada Bar Association.

**Kevin L. Kelley.**    Mr. Kelley became Executive Vice President and Chief Operating Officer of SCI on January 7, 2008.  He was previously employed as Senior Vice President for Las Vegas Sands Corp.  From January 2003 to May 2006, he served as President and Chief Operating Officer of Hard Rock Hotel, Inc.  Prior to joining Hard Rock Hotel, Inc., Mr. Kelley served SCI in various capacities from August 1993 to January 2003, most recently as President of Westside Operations, where he oversaw all operations of SCI's five west side properties.

**Scott M Nielson.**    Mr. Nielson was appointed Chief Development Officer of SCI in July 2004 and has been an Executive Vice President of SCI since June 1994.  He served as Chief Legal Officer from March 2002 to July 2004 and General Counsel from 1991 to March 2002.  In 1992, he was appointed Secretary of SCI and served in that position until July 2004.  From 1991 through June 1994, he served as Vice President of SCI. From 1986 to 1991, Mr. Nielson was in private legal practice as a partner in the Las Vegas firm of Schreck, Jones, Bernhard, Woloson & Godfrey (now Brownstein Hyatt Farber Schreck, LLP), where he specialized in gaming law and land use planning and zoning.  Mr. Nielson is a member of the American Bar Association, the Nevada Bar Association and the International Association of Gaming Attorneys.

**Lorenzo J. Fertitta.**    Mr. Fertitta was appointed Vice Chairman of the Board of SCI in December 2003 and has served as a director since 1991.  Mr. Fertitta also served as President of SCI from July 2000 until June 30, 2008.  Mr. Fertitta is a co-owner of Zuffa, LLC which is the parent company of the Ultimate Fighting Championship and has served as its chairman and chief executive officer since June 2008.  From 1991 to 1993, he served as Vice President of SCI.  Mr. Fertitta served as President and Chief Executive Officer of Fertitta Enterprises,

Inc. from June 1993 to July 2000, where he was responsible for managing an investment portfolio consisting of marketable securities and real property. Mr. Fertitta is currently a member of the Board of Directors of the Nevada Resort Association. Mr. Fertitta served as a director of the American Gaming Association from December 2005 to May 2008 and as a commissioner on the Nevada State Athletic Commission from November 1996 until July 2000.

**Thomas J. Barrack, Jr.**    Mr. Barrack was appointed to the Board of Directors in connection with the 2007 Going Private Transaction on November 7, 2007. Mr. Barrack is the Founder, Chairman and Chief Executive Officer of Colony Capital, LLC. Colony Capital, LLC is the sole managing member of Colony Capital Acquisitions, LLC. During the past five years, Mr. Barrack has, in such positions, provided overall strategic and investment direction and leadership to Colony Capital, LLC and its affiliates.

**Jonathan H. Grunzweig.**    Mr. Grunzweig was appointed to the Board of Directors on December 19, 2007. He is currently a member of the Audit Committee. Mr. Grunzweig is a Principal and the Chief Investment Officer of Colony Capital, LLC. Prior to joining Colony Capital, LLC in 1999, Mr. Grunzweig was a Partner with the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, where he specialized in corporate finance and mergers and acquisitions. Mr. Grunzweig also served as General Counsel for Colony Capital, LLC's global investment program for a period of time prior to a two-year relocation to London for Colony Capital, LLC.

**James E. Nave**, D.V.M.    Dr. Nave was appointed to the Board of Directors on December 19, 2007. Dr. Nave had served as a director of SCI from March 2001 until November 7, 2007 at which time he voluntarily resigned from the Board of Directors upon the consummation of the 2007 Going Private Transaction. During that period, he was the Chairman of the Audit Committee and served on the Governance and Compensation Committee. He is currently a member of the Audit Committee. Dr. Nave has been an owner of the Tropicana Animal Hospital since 1974 and has been the owner and manager of multiple veterinary hospitals since 1976. Dr. Nave has also served on the Board of Directors of Bank West of Nevada since 1994, where he also serves as Chairman of the Site Committee. Dr. Nave has served on the Board of Directors of Western Alliance Bancorporation since 2003, where he also serves as a member of the Audit and Compensation Committees. Dr. Nave is also the Globalization Liaison Agent for Education and Licensing for the American Veterinary Medical Association and was the Chairperson of the National Commission for Veterinary Economics Issues from 2001 through July 2007. In addition, Dr. Nave is a member and past President of the Nevada Veterinary Medical Association, the Western Veterinary Conference and the American Veterinary Medical Association. He is also a member of the Clark County Veterinary Medical Association, the National Academy of Practitioners, the American Animal Hospital Association and the Executive Board of the World Veterinary Association. Dr. Nave was a member of the University of Missouri, College of Veterinary Medicine Development Committee from 1984 to 1992. He was also a member of the Nevada State Athletic Commission from 1988 to 1999 and served as its chairman from 1989 to 1992 and from 1994 to 1996.

**Other Debtors**. Each of the other Debtors is managed by its own board of directors, board of managers or members, as applicable. In some cases, persons currently serving on the managing body of a Debtor are officers of SCI or members of the Board of Directors of SCI. FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC and FCP Propco, LLC are each member managed, subject to the requirement that specified actions are approved by a board of directors consisting of a majority of members that qualify as independent pursuant to the terms of the organizational documents of such entities. The members of the boards of managers of each of Propco and the MezzCo Debtors are Richard J. Haskins, Robert A. Kors and Robert J. White.

4.    *Employees*

As of January 31, 2010, Station Casinos had approximately 11,689 employees in Nevada, which includes employees of Green Valley Ranch, Aliante Station, Barley's, and The Greens and Wildfire Lanes. From time to time, certain of Station Casinos' employees are contacted by unions and Station Casinos engages in discussions with such employees regarding establishment of collective bargaining agreements.

**B.    The Debtors' Prepetition Financing Arrangements**

1.    *Prepetition Opco Credit Agreement*

In connection with the 2007 Going Private Transaction, SCI, as borrower, entered into a $900 million senior secured credit agreement (the "**Prepetition Opco Credit Agreement**") consisting of a $650 million revolving facility (the "**Revolver**") and a $250 million term loan (the "**Term Loan**"). The maturity date for both the Term Loan and the Revolver is August 7, 2012 subject to a single 15-month extension. The obligations of SCI under the Prepetition Opco Credit Agreement are guaranteed by certain Debtors and non- Debtor subsidiaries of SCI. The obligations of SCI under the Prepetition Opco Credit Agreement are secured by a first priority security interest in certain real property owned by SCI and the guarantors under the Prepetition Opco Credit Agreement, pledges of certain equity interests owned by SCI and the guarantors and tangible and intangible personal property owned by SCI and the guarantors, other than excluded assets.

Other parties to the Prepetition Opco Credit Agreement include Deutsche Bank Trust Company Americas, as Administrative Agent, Deutsche Bank Securities and J.P. Morgan Securities Inc., as Joint Lead Arrangers and Joint Bookrunners, JPMorgan Chase Bank, N.A., as Syndication Agent, Bank of Scotland plc, Bank of America, N.A., and Wachovia Bank, N.A., as Co- Documentation Agents, and the lenders party thereto from time to time.

As of the Petition Date, outstanding amounts under the Prepetition Opco Credit Agreement (including unpaid interest) aggregated approximately $880-890 million.

2.    *CMBS Loans*

In connection with the 2007 Going Private Transaction, in November 2007, Propco entered into a mortgage loan in an the original principal amount of $2.05 billion (the "**Original Mortgage Loan**"), FCP Mezzco Borrower I, LLC ("**Mezzco I**") entered into a mezzanine loan in the original principal amount of $150 million (the "**Original Mezz I Loan**"), FCP Mezzco Borrower II, LLC ("**Mezzco II**") entered into a mezzanine loan in the original principal amount of $150 million (the "**Original Mezz II Loan**") and FCP Mezzco Borrower III, LLC ("**Mezzco III**") entered into a mezzanine loan in the original principal amount of $125 million (the "**Original Mezz III Loan**"), for the purpose of financing the 2007 Going Private Transaction and related transactions. In March 2008, the Original Mortgage Loan was amended and resized to $1.8 billion (as amended and resized, the "**Mortgage Loan**"), the Original Mezz I Loan was amended and resized to $200 million (as amended and resized, the "**Mezz I Loan**"), the Original Mezz II Loan was amended and resized to $175 million (as amended and resized, the "**Mezz II Loan**"), the Original Mezz III Loan was amended and resized to $150 million (as amended and resized, the "**Mezz III Loan**") and FCP Mezzco Borrower IV, LLC ("**Mezzco IV**") entered into a mezzanine loan in the original principal amount of $150 million (the "**Mezz IV Loan**") and together with the Mortgage Loan, the Mezz I Loan, the Mezz II Loan and the Mezz III Loan, the "**CMBS Loans**").

The Mortgage Loan is secured by substantially all fee and leasehold real property comprising Palace Station, Boulder Station, Sunset Station and Red Rock. The Mezz I Loan, the Mezz II Loan, the Mezz III Loan and the Mezz IV Loans are secured by pledges of the equity interests in Propco, Mezzco I, Mezzco II and Mezzco III, respectively. As additional security for the Mezz IV Loan, Mezzco V pledged its ownership interest in the equity of Mezzco IV. In addition, the Mortgage Loan is secured by liens on the deposit accounts of Propco, which had a cash balance of approximately $100 million as of March 31, 2010.

Other parties to the CMBS Loans include German American Capital Corporation and JPMorgan Chase Bank, N.A., as lenders under the Mortgage Loan.

As of the Petition Date, outstanding amounts under the CMBS Loans (including unpaid interest) aggregated approximately $1.801 billion for the Mortgage Loan, $200.3 million for the Mezz I Loan, $175.2 million for the Mezz II Loan, $150.3 million for the Mezz III Loan and $150.4 million for the Mezz IV Loan.

Propco is required to hedge the LIBOR interest rate such that it will not exceed 5.5% on a blended basis. As a result, Propco purchased interest rate caps with a combined notional amount of $1.11 billion and a cap rate of 5.8% for an initial premium of $3.6 million. In addition, Propco entered into an interest rate swap with a notional amount of $1.36 billion in which the borrower pays a fixed rate of approximately 5.3% and receives one-month LIBOR, terminating in November 2012. The swap was terminated voluntarily on January 6, 2010, resulting in an unsecured claim against Propco of no less than $144,002,857.00.

3.        *The Master Lease and Related Agreements*

a.        The Master Lease

Propco, as landlord, and SCI, as tenant, entered into a Master Lease, dated as of November 7, 2007 (as amended as of the Petition Date, the "**Master Lease**"), under which SCI leases the real property and improvements associated with Boulder Station Hotel & Casino, Red Rock Casino Resort Spa, Palace Station Hotel & Casino and Sunset Station Hotel & Casino (collectively, the "**Leased Hotels**").  The Leased Hotels, in turn, are operated by SCI and certain of its non-debtor operating subsidiaries (defined herein as the Operating Subsidiaries).

The Master Lease provides for monthly rental payments from SCI to Propco in amounts that exceed the amounts that Propco requires to meet its ordinary debt service obligations and any other expenses not covered by SCI under the "triple net" provisions of the Master Lease.  Subject to certain conditions, the governing documents permit some of the surplus cash to be upstreamed as dividends to the Mezzanine Entities that own equity up the Propco "stack" to service such Mezzanine Entities' debt, with any residual amounts then ultimately "flowing back" to SCI as the ultimate parent entity.

b.        The License Agreement

Concurrently with the execution of the Master Lease, SCI and Propco executed and delivered the License and Reservation Service Agreement (the "**License Agreement**") dated as of November 7, 2007, pursuant to which SCI agreed to license to Propco, among other things, certain trademarks (both exclusive and non-exclusive), the use of customer lists and other items identified therein, and the use of SCI's common reservation system (the "**Licensed Assets**").  In addition to providing the Licensed Assets, without limiting the agreements contained in the License Agreement, SCI also agreed to provide, under certain circumstances, after termination of the Master Lease: (i) an eighteen month license on certain specified trademarks; (ii) non-exclusive use of certain customer lists for advertising purposes for an eighteen month period; and (iii) non-exclusive use of SCI's common reservation system for the same eighteen month period.

c.        The Propco FF&E Security Agreement From SCI

Section 12.4 of the Master Lease contains a security agreement, pursuant to which SCI pledged, assigned and granted Propco a security interest and an express contractual lien in and to (i) all of the personal property (including furniture, fixtures, goods, inventory, equipment, furnishings, objects of art, machinery, appliances, appurtenances and signage together with tools and supplies (including spare parts inventories) related to, now or in the future contained in, used in connection with, attached to, or otherwise placed on any part of the Leased Hotels) owned by SCI or the Operating Subtenants as more fully described in the Master Lease and (ii) the FF&E Reserve Collateral as described in the Master Lease (collectively the "**Master Lease Collateral**").

d.        The Propco FF&E Security Agreement From The Sublessees

Concurrently with the execution of the Master Lease and the License Agreement, Propco and the Operating Subsidiaries entered into the Security Agreement (All Furniture, Fixtures and Equipment) (the "**Security Agreement**")  dated November 7, 2007 granting to Propco liens on and security interests in (i) all of the personal property (including furniture, fixtures, goods, inventory,  equipment, furnishings, objects of art, machinery, appliances, appurtenances and signage together with tools and supplies (including spare parts inventories) related to, now or in the future contained in, used in connection with, attached to, or otherwise placed on any part of the Leased Hotels) owned by the Operating Subsidiaries (ii) the "**Sublease FF&E Reserve**" of each Operating Subsidiary (as defined in each of the Operating Subsidiaries' subleases (the "**Subleases**")) maintained under each of the Subleases, and (iii) any and all products, rents, proceeds and products of the foregoing, each as more fully described in such Security Agreement to further secure SCI's obligations to Propco under the Master Lease (collectively the "**Operating Subsidiaries Lease Collateral**").

4.        *Senior Notes*

SCI is obligated under certain $450 million 6% Senior Notes due 2012 (the "**2012 Senior Notes**") issued pursuant to an Indenture dated as of March 17,2004 by and between SCI and Law Debenture Trust Company

of New York, as trustee and $400 million 7¾% Senior Notes due August 15, 2016 issued pursuant to an Indenture dated as of August 1, 2006 by and between SCI and Law Debenture Trust Company of New York, as trustee (the "**2016 Senior Notes**" and together with the 2012 Senior Notes, the "**Senior Notes**").  The 2012 Senior Notes and 2016 Senior Notes are unsecured and are not guaranteed.  As of the Petition Date, $450 million in principal amount of the 2012 Senior Notes and $400 million in principal amount of the 2016 Senior Notes were outstanding.

> 5.     *Senior Subordinated Notes*

SCI is obligated under certain $450 million 6½% Senior Subordinated Notes due 2014 issued pursuant to an Indenture dated as of January 29, 2004 by and between SCI and Law Debenture Trust Company of New York, as trustee (the "**2014 Subordinated Notes**"), $700 million $6^{7}/_{8}$% Senior Subordinated Notes due 2016 issued pursuant to an Indenture dated as of February 27, 2004 by and between SCI and Law Debenture Trust Company of New York, as trustee (the "**2016 Subordinated Notes**") and $300 million $6^{5}/_{8}$% Senior Subordinated Notes due 2018 issued pursuant to an Indenture dated as of March 13, 2006 by and between SCI and Law Debenture Trust Company of New York, as trustee (the "**2018 Subordinated Notes**") and together with the 2014 Subordinated Notes and the 2016 Subordinated Notes, the "**Subordinated Notes**")).  The 2014 Subordinated Notes, 2016 Subordinated Notes and 2018 Subordinated Notes are unsecured and are not guaranteed.  In addition, such notes are subordinated in right of payment to senior debt of SCI.  As of the Petition Date, $450 million in principal amount of the 2014 Subordinated Notes, $700 million in principal amount of the 2016 Subordinated notes and $300 million in principal amount of the 2018 Subordinated Notes were outstanding.

> 6.     *Land Loan*

On February 7, 2008, CV Propco, LLC, a wholly-owned, indirect subsidiary of SCI that is a Non-Debtor Affiliate, as borrower, entered into a $250 million delay-draw term loan which is secured by land located on the southern end of Las Vegas Boulevard at Cactus Avenue and land surrounding Wild Wild West in Las Vegas, Nevada (the "**Land Loan**").  The Land Loan contains no principal amortization and matures on February 7, 2011.  In addition, the borrower entered into two interest rate swap agreements with notional amounts of $200 million as required by the terms of the Land Loan.  Those swap agreements were terminated as of November 19, 2009.

> 7.     *Headquarters Lease*

In November 2007, SCI entered into a sale-leaseback agreement related to its corporate office building with a third-party real estate investment firm.  SCI sold the corporate office building for approximately $70 million and subsequently entered into a lease with the purchaser for an initial period of 20 years with four options to extend the lease, each option for an extension of five years.  The lease also contains an option to purchase the property for $70 million.  The Debtors believe that the current rent and the lease buyout price are both substantially above market.  Under the terms of the Stalking Horse APA, the Stalking Horse Bidder has the right to take assignment of the headquarters lease.  If the Stalking Horse Bidder or any other party does not take assignment of the lease, SCI anticipates that the lease will be rejected.

> **C.     Pending Litigation and Other Legal Matters**

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings and claims arising out of their respective businesses.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings and claims.  Nevertheless, they do not believe that the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their business, financial condition or results of operations.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, to the stay of any litigation upon the commencement of the Chapter 11 Cases, the Debtors' liability for any such litigation is subject to discharge in connection with the confirmation of a plan of reorganization, with certain exceptions.  Therefore, certain litigation claims against the Debtors may be subject to compromise in connection with the Chapter 11 Cases.  This may reduce the Debtors' exposure to losses in connection with adverse determination of such litigation.

*Luckevich, Scott and St. Cyr Litigation*

On February 4, 2008, Josh Luckevich, Cathy Scott and Julie St. Cyr filed a purported class action complaint against SCI and certain of its subsidiaries in the United States District Court for the District of Nevada, Case No. CV-00141 (the "Federal Court Action"). The plaintiffs are all former employees of SCI or its subsidiaries. The complaint alleged that SCI (i) failed to pay its employees for all hours worked, (ii) failed to pay overtime, (iii) failed to timely pay wages and (iv) unlawfully converted certain earned wages. The complaint in the Federal Court Action sought, among other relief, class certification of the lawsuit, compensatory damages in excess of $5,000,000, punitive damages and an award of attorneys' fees and expenses to plaintiffs' counsel.

On October 31, 2008, SCI filed a motion for judgment on the pleadings. During a hearing on that motion, the United States District Court questioned whether it had jurisdiction to adjudicate the matter. After briefing regarding the jurisdiction question, on May 16, 2009, the United States District Court dismissed the Federal Court Action for lack of jurisdiction and entered a judgment in SCI's favor. Subsequently, on July 21, 2009, the plaintiffs filed a purported class action complaint against SCI and certain of its subsidiaries in the District Court of Clark County, Nevada, Case No. A-09-595614-C (the "State Court Action"). The complaint in the State Court Action alleges substantially the same claims that were alleged in the complaint in the Federal Court Action.

On August 19, 2009, the corporate defendants, other than SCI, filed an answer responding to the complaint. Subsequently, on August 27, 2009, the corporate defendants, other than SCI, filed a motion to stay the State Court Action pending the resolution of SCI's bankruptcy petition. That motion was granted on September 30, 2009.

On or about April 30, 2010, the plaintiffs and Defendants reached preliminary agreement on the terms of a global settlement of all claims asserted in the Complaint. Pursuant to the settlement, the current and former employees of Defendants that are members of the class will have: (a) an aggregate allowed $5 million general unsecured claim against SCI in the bankruptcy case in respect of all of the claims alleged in the Complaint that arose prior to January 28, 2009; and (b) an aggregate allowed $1.2 million (Section 507(a)(4) priority wage and Section 503(b)(1)(A)(i) administrative expense) claim against SCI in respect of all of the claims alleged in the Complaint that arose on and after January 28, 2009 through the date of final approval of the settlement by the Bankruptcy Court. The settlement remains subject to final documentation, and will further require (i) preliminary approval by the Bankruptcy Court, (ii) notice to the current and former employees covered by the Complaint of their right to object to the settlement and/or be excluded therefrom, and (iii) final approval by the Bankruptcy Court. If approved by the Bankruptcy Court, SCI has agreed to set aside $1.2 million in an interest bearing account to fund payments to the class members on account of their Section 507(a)(4) priority wage and Section 503(b)(1)(A)(i) administrative expense claims.

*NLRB Complaint*

On May 28, 2010, the National Labor Relations Board filed a 127 count complaint against SCI alleging various unfair labor practices. A hearing on the complaint is scheduled for October 25, 2010.

**D.    Events Leading to the Commencement of the Chapter 11 Cases**

1.    *Overview*

The 2007 Going Private Transaction, which was completed in November 2007, left the Debtors highly, but not unreasonably, leveraged. Under the business circumstances prevailing at the time of the 2007 Going Private Transaction, such leverage would not have hindered the Debtors' business operations or ability to service their indebtedness. However, shortly after the consummation of the 2007 Going Private Transaction, the economy in the United States sharply declined, consumer spending deteriorated and the credit markets severely contracted. The decline in the economy, diminished consumer confidence and the unavailability of credit have been devastating to the gaming industry generally and Las Vegas in particular. Foreclosure and unemployment rates in Nevada are among the highest in the United States, and many planned construction projects for new casinos have been delayed or cancelled, causing further deterioration of the Las Vegas economy and reduced discretionary consumer spending by Las Vegas residents. The Debtors have been severely impacted by the economic downturn because all of their owned casinos are located in Las Vegas, and their properties have historically attracted customers from the Las

Vegas valley. In addition, the value of real estate in Nevada has significantly eroded as a result of the deterioration of the economy.

As a result of the economic conditions, including the credit crisis and a decrease in consumer confidence levels, the Debtors experienced a significant reduction in revenues. Although the Debtors and the Non-Debtor Affiliates engaged in cost reduction, reductions in workforce and other efforts to mitigate the impact of the decline in revenues, the results of operations of the Debtors and their affiliates have been materially and adversely impacted by the economic downturn and impaired their ability to service their debt obligations. In addition, the decline in real estate values in Nevada has adversely affected the value of the Debtors' assets. The deterioration of the Debtors' results of operations and asset values and their significant debt levels, coupled with the unavailability of credit generally, negatively impacted their ability to refinance their outstanding indebtedness or otherwise raise capital for a restructuring. In December 2008, SCI submitted a borrowing request for the remaining $257 million available under the revolving credit facility portion of its Prepetition Opco Credit Agreement, $245.75 million of which was funded. As a result of the outstanding balance under the Prepetition Opco Credit Agreement and the results of operations for the period ended December 31, 2008, as of December 31, 2008, SCI was not in compliance with the financial covenants contained in its Prepetition Opco Credit Agreement. In addition, beginning in February 2009, SCI elected not to make the scheduled interest payments on its Senior Notes and Subordinated Notes. Noncompliance with the financial covenants in the Credit Facility and the failure to make interest payments on the Senior Notes and Senior Subordinated Notes gave rise to events of default under such obligations following the expiration of applicable grace periods.

2.      *Restructuring Efforts*

During 2008 and the first six months of 2009, the Debtors engaged in various discussions with the lenders under the Prepetition Opco Credit Agreement and the CMBS Loans and holders of the Senior Notes and Senior Subordinated Notes regarding restructuring alternatives for the Debtors' outstanding indebtedness.

In November 2008 the Debtors made an offer to exchange new secured term loans for the outstanding Senior Notes and Senior Secured Notes, which would have included a restructuring of the Prepetition Opco Credit Agreement and the CMBS Loans. The November 2008 exchange offer was unsuccessful.

In February 2009, the Debtors solicited votes from the holders of the Senior Notes and Senior Subordinated for a prepackaged plan of reorganization pursuant to which the holders of the Senior Notes and Senior Subordinated Notes would have received second and third lien notes, respectively, and cash in a plan of reorganization, and the outstanding indebtedness under the Prepetition Opco Credit Agreement and CMBS Loans would have been restructured. The solicitation for the prepackaged plan of reorganization did not receive sufficient votes to approve the plan, and that plan did not proceed.

SCI elected not to make scheduled interest payments on its outstanding Senior Notes and Senior Subordinated Notes beginning with the interest payment due on the 2014 Subordinated Notes on February 1, 2009. In March 2009, the holders of a majority in principal amount of each series of Senior Notes and Senior Subordinated Notes entered a forbearance agreement with SCI with respect to the events of default resulting from the failure to pay interest on the Senior Notes and Senior Subordinated Notes. Majority lenders under the Prepetition Opco Credit Agreement likewise entered into a forbearance agreement with SCI relating to various potential events of default, including the failure to meet certain financial covenants for the quarter ended December 31, 2008. Such forbearance agreements had an initial term that expired on April 15, 2009, but were extended to May 29, 2009. During the period from March 2009 to the commencement of the Chapter 11 Cases, the Debtors continued to negotiate the terms of a consensual restructuring with the various creditors of the Debtors. Despite the efforts of the Debtors to negotiate the terms of a restructuring with their creditors, the Debtors were unable to reach an agreement among the various creditor constituencies and commenced the Chapter 11 Cases on July 28, 2009 to avail themselves of an opportunity to achieve a restructuring and thereby preserve the value of their business through the chapter 11 process.

In connection with the filing of the Chapter 11 Cases, on July 28, 2009, SCI entered into a Second Forbearance Agreement and Second Amendment to the Prepetition Opco Credit Agreement with the lenders holding a majority of the commitments under its Prepetition Opco Credit Agreement pursuant to which the lenders agreed, among other things, to forbear from exercising their default-related rights, remedies and powers or privileges against

the Non-Debtor Affiliates that guarantee SCI's obligations under the Prepetition Opco Credit Agreement through January 31, 2010, unless earlier terminated. The forbearance agreement expired on January 31, 2010, but the Consenting Opco Lenders have agreed to support this Plan, the Bid Procedures Order, the Stalking Horse Bid subject to the Auction Process and the Second Compromise Agreement pursuant to the Opco Lender Restructuring Support Agreement and SCI has had periodic discussions with the Administrative Agent regarding formalizing a new forbearance agreement.

3.    *Pre-Petition Formation of the Special Litigation Committee*

During the course of the restructuring negotiations described above, certain holders of the Senior Notes and Subordinated Notes expressed that SCI might have fraudulent conveyance and related claims against third parties that could be asserted by SCI in connection with the 2007 Going Private Transaction. SCI's Board, as responsible fiduciaries, took seriously the suggestion that certain of its creditors apparently believed that valuable litigation claims might exist. In response, in March 2009, SCI's Board authorized the formation of an independent Special Litigation Committee (the "**SLC**") to investigate and report to the Board regarding whether SCI had colorable claims that could be brought against lenders, former stockholders or others, in connection with the 2007 Going Private Transaction.

SCI's Directors understood their fiduciary obligation to investigate allegations of claims that might exist for two reasons. First, the Board understood that if such claims existed, they might represent valuable assets that SCI should pursue. Second, the Board also understood that if such claims were not colorable but nonetheless were likely to be asserted as leverage by creditor constituents in any restructuring discussions, those threats could seriously impede SCI's ability to reorganize in a value-maximizing way. With these considerations in mind, the Board formed the SLC and authorized it to conduct an independent review and investigation of any and all claims that reasonably could be brought in connection with the 2007 Going Private Transaction. And if the SLC had determined that viable claims existed, the SLC would have been given full authority to prosecute and/or settle the claims consistent with its fiduciary duties to the entire estate.

The SLC consists of three members, one of whom is himself an independent member of SCI's Board and two additional independent members with no prior relationship to SCI who are experts in financial and restructuring matters. Dr. James Nave is an independent director of SCI, in accordance with the standards set by the New York Stock Exchange. He has served as a director of SCI since March 2001. He is chairman of the Audit Committee and served on the Governance and Compensation Committee when SCI was a publicly-traded company. David Weekly had no prior relationship or business dealings with SCI, SCI's current or former officers and directors or any other of the parties involved in the Transaction prior to being elected as a member of the SLC. He is a Principal and Senior Managing Director of Fenix Financial Forensics LLC. Prior to joining Fenix Financial Forensics LLC, Mr. Weekly served as the Partner-in-Charge of KPMG's United States Dispute Advisory Services practice. Mr. Weekly also served as the worldwide director of Litigation Services, Partner-in-Charge of the United States Complex Claims and Events practice, and Partner-in-Charge of National Law Firm Relationships for Arthur Anderson LLP. He is a certified public accountant, a certified insolvency and restructuring advisor, and a certified fraud examiner. Jerry Coffey is the General Counsel of Entegra Power Group LLC. He had no prior relationship or business dealings with SCI, SCI's current or former officers and directors or any other of the parties involved in the Transaction prior to being elected as a member of the SLC.

The SLC retained its own independent legal counsel, Squire Sanders & Dempsey L.L.P. ("**Squire Sanders**"), and hired its own independent financial advisor, Odyssey Capital Group, LLC ("**Odyssey**" and together with Squire Sanders, the "**SLC Professionals**"), to perform expert financial analysis in connection with its investigation. Neither professional firm has ever performed work for SCI, its affiliates, the Fertitta family, or any of their affiliates. In sum, the SLC and its professionals are *the only participants in these cases* that truly have no interest in the outcome of any potential (or theoretical) fraudulent conveyance or other claims derived from the 2007 Going Private Transaction.

The SLC was formed and began its investigation of the 2007 Going Private Transaction in March of 2009, but that investigation was not completed until after the filing of the Chapter 11 Cases. The SLC's issuance of a report of its findings, as well as certain additional work the SLC did in connection with the Master Lease, are discussed in sections III.E, F and H below.

### III.    EVENTS DURING CHAPTER 11 CASES

#### A.    Commencement of Chapter 11 Cases

On July 28, 2009 (the "**Petition Date**"), SCI and certain of its subsidiaries and affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. All 18 of these Chapter 11 Cases are jointly administered in the Bankruptcy Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

On February 10, 2010, GV Ranch Station, Inc., a subsidiary of SCI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to the Bankruptcy Court's *Order: (1) Further Directing Joint Administration Of Chapter 11 Cases; And (2) Applying Certain Prior Orders Entered In This Jointly Administered Case To The Bankruptcy Case Of GV Ranch Station, Inc.* [Docket No. 133], GV Ranch Station, Inc.'s case is being jointly administered with the cases of the other Debtors. GV Ranch Station, Inc. is not subject to the Plan.

#### B.    First Day Orders

On July 30, 2009, the Bankruptcy Court approved certain "first day" orders designed to minimize the disruption of the Debtors' business operations and to facilitate their reorganization (certain of the orders were entered on an interim basis at the time and entered as final relief on later dates).

#### C.    Postpetition Financing and Use of Cash Collateral

In connection with the filing of the Chapter 11 Cases, on July 31, 2009, SCI entered into a $150 million unsecured, subordinated administrative priority debtor in possession credit agreement (the "**DIP Credit Agreement**") among SCI, as borrower, Vista Holdings, LLC (a non-debtor subsidiary of SCI), as administrative agent (the "**Administrative Agent**") and lender, and the lenders party thereto. The DIP Credit Agreement provides for a $150 million revolving credit facility that will be funded on a committed basis for so long as Vista Holdings, LLC has cash and cash equivalents on hand in an amount in excess of $100 million. The proceeds of the loans incurred by the DIP Credit Agreement will be used for working capital and other general corporate purposes of SCI and will be available for intercompany loans to its subsidiaries during the pendency of the Chapter 11 Cases. As of May 31, 2010, advances under the DIP Credit Agreement totaled approximately $172 million, and Vista Holdings, LLC had cash and cash equivalents on hand of approximately $12.9 million.

SCI's obligations under the DIP Credit Agreement will be an administrative expense claim in the Chapter 11 Case having *pari passu* priority with other administrative expense claims, provided that repayment of the loan by SCI shall be subordinate to the full repayment of the lenders under SCI's prepetition Credit Facility. Repayment of the Postpetition Financing is conditional on, and Vista shall not have any right to repayment, reimbursement or enforcement (including exercise of rights of offset, recoupment or otherwise) of any kind or nature, other than the prosecution of allowance (but not payment) of an unsecured administrative claim, all as provided in the Final DIP Order. The Postpetition Financing is unsecured and subordinated to the Debtors' prepetition and postpetition obligations to the Prepetition Lenders. It does not grant Vista collateral or superpriority administrative expense status. The Debtors cannot borrow from Vista for any purposes that are inconsistent with the Final DIP Order and the Budget. As a result of the subordination provisions, the Plan provides that the DIP Facility Claims will not receive any recovery or repayment under the Plan.

Also, in connection with the filing of the Chapter 11 Case, on July 31, 2009, SCI entered into an Unsecured Revolving Loan Promissory Note in favor of Past Enterprises, Inc. (a non-debtor subsidiary of SCI) pursuant to which Past Enterprises provides to SCI an unlimited revolving credit facility (the "**Past Revolving Loan**" and together with the DIP Credit Agreement, the "**DIP Financing**") at an interest rate of 2.78% per annum, the proceeds of which will be used for working capital and other general corporate purposes of SCI and will be available for intercompany loans to its subsidiaries, including the Non-Debtor Affiliates, including the Non-Debtor Affiliates.

The Past Revolving Loan matures on the earlier of (i) demand, or (ii) July 31, 2011, and provides for a default rate of interest of 4.78% if principal or interest due thereunder is not paid when due. As of May 31,

2010, advances under the Past Revolving Loan totaled approximately $154.4 million, and Past Enterprises had cash and cash equivalents on hand of approximately $87.1 million. All of the Past Enterprise's tangible and intangible assets (including all cash on hand) are subject to the Liens of the Administrative Agent.

SCI's obligations under the Past Revolving Loan will be an administrative expense claim in the Chapter 11 Case having *pari passu* priority with other administrative expense claims, provided that repayment of the loan by SCI shall be subordinate to the full repayment of the lenders under SCI's prepetition Credit Facility. As a result of the subordination provisions, the Plan provides that the DIP Facility Claims will not receive any recovery or repayment under the Plan.

The Final DIP Order and the DIP Credit Agreement provided maximum borrowings from Vista of $150 million. With the consent of the lenders under the Prepetition Opco Credit Agreement, SCI subsequently requested authority from the Court to increase SCI's previously authorized debtor in possession borrowing authorization under the Final DIP Order to an increased amount of $185 million, provided that all borrowings and the repayment thereof and any rights related thereto shall be on the same terms and conditions as are set forth in the DIP Credit Agreement and the Final DIP Order. In addition, the DIP Credit Agreement originally provided for an outside maturity date of February 10, 2010. SCI and Vista were willing to extend such outside maturity date to August 10, 2010, in order to facilitate SCI's continued access to debtor in possession financing from Vista under the same terms and conditions as are set forth in the DIP Credit Agreement and the Final DIP Order. On February 2, 2010 [Docket No. 963], the Court approved the request to amend the DIP Credit Agreement to so extend the outside maturity date to August 10, 2010 and increase the borrowing under the DIP Credit Agreement to $185 million.

The DIP Financing claims (defined in the Plan as "DIP Facility Claims") held by Vista Holdings, LLC and Past Enterprises, Inc. shall receive no distribution under the Plan and shall be extinguished and discharged upon the Effective Date, without payment of any consideration.

<u>The Propco Cash Collateral Stipulation</u>

On September 9, 2009, the Bankruptcy Court entered a final order approving the Stipulation And Final Order For (i) Adequate Protection and (ii) Use Of Cash Collateral With Respect To Secured Loans To FCP Propco, LLC, (the "**Propco Cash Collateral Stipulation**") [Docket No. 295], which stipulation was entered into between Propco, SCI, the Mortgage Lenders and Deutsche Bank AG as swap counterparty. As of the date of this Disclosure Statement, the Propco Cash Collateral Stipulation continues in full force and effect.

<u>The SCI Cash Collateral Stipulation</u>

On October 13, 2009, Bankruptcy Court entered the SCI Final Cash Collateral Order [Docket No. 481]. Pursuant to the SCI Final Cash Collateral Order, SCI is required to submit to the Prepetition Lenders on a regular basis a proposed operating budget for the entire Station Group (the "**SCI Budget**") for approval by the Prepetition Lenders as a condition to SCI's ongoing use of cash collateral. The existence at all times of an approved SCI Budget is a condition to SCI's use of cash collateral under the SCI Cash Collateral Order. If SCI loses consensual use of cash collateral due to, among other things, expiration of the most recently approved SCI Budget, the Prepetition Lenders have the right to terminate the Forbearance Agreement and could potentially take action to force SCI's non-debtor operating subsidiaries to file their own bankruptcy cases.

The SCI Final Cash Collateral Order provides, among other things, that the Administrative Agent shall receive various forms of adequate protection in respect of the use, sale or lease of its prepetition collateral. That adequate protection includes the grant of: (a) replacement liens on substantially all of SCI's assets and the assets of the Other Opco Debtors, and (b) a superpriority claim against SCI and the Other Opco Debtors, in each case to the extent of the diminution in value of the prepetition collateral of the Administrative Agent. The Administrative Agent has advised the Debtors that it believes there has been substantial diminution in value of the prepetition collateral, perhaps most notably in the reduction in the amount of cash on hand at the Opco Debtors from the Petition Date to the present, such that the superpriority claims against the Opco Debtors are far in excess of $100 million.

**D.**    **The Independent Lenders' Examiner Motion**

On September 3, 2009, a group of lenders holding approximately 30% of the debt under the Prepetition Opco Credit Agreement (the "**Independent Lenders**") filed the "Amended Motion of The Independent Lenders to Stations Casinos, Inc. for the Appointment of an Examiner"[Docket No. 272] (the "**Examiner Motion**") seeking the appointment of an examiner in the Chapter 11 Cases pursuant to Section 1104(c)(2) of the Bankruptcy Code.  The Examiner Motion was opposed by the Debtors, the Committee, the Mortgage Lenders and Deutsche Bank Trust Company Americas, in its capacity as Administrative Agent for the Prepetition Lenders.

On September 30, 2009, the Court held a status conference regarding the Examiner Motion.  A further hearing on the matter was scheduled for November 20, 2009.  Prior to the November 20 hearing, the Independent Lenders and Debtors attempted to reach a consensual resolution of the Examiner Motion.  The parties reached agreement on the morning of the scheduled hearing which was memorialized in a stipulation that was expressly subject to Court approval.  The stipulation resolving the Examiner Motion provided that:

- the Examiner Motion would be withdrawn without prejudice;

- Debtors would have regular status meetings with the Independent Lenders and provide them with information updates and due diligence materials; and

- Debtors would  pay the reasonable fees and costs incurred by the legal and financial advisors to the Independent Lenders in set amounts and subject to a monthly aggregate cap, subject to the parties reservation of all rights.

On December 28, 2009, Debtors filed a motion seeking Court approval of the foregoing stipulated resolution.  The Committee objected, arguing that there was no legal basis for the Independent Lenders' legal fees to be paid out of the estate and that the terms of the proposed stipulation were not in the best interests of the estate.  In addition, the Deutsche Bank Trust Company Americas, in its capacity as Administrative Agent for the Prepetition Lenders, filed a limited objection to the motion seeking approval of the stipulated resolution of the Examiner Motion.

A hearing on the Motion was held on January 28, 2010.  At the conclusion of the Hearing, the Court denied the motion.  *See* the Court's findings of fact and conclusions of law [Docket No. 1138] and Order [Docket No. 1139].  Among the Court's findings in connection with the denial of the motion were:  (a) the Independent Lenders have a low probability of success on the Examiner Motion because the SLC has already completed a substantial amount of work on many of the topics that are subject of the Examiner Motion and appointment of an examiner would be duplicative and wasteful of that effort, and would not benefit the estate; (b) litigation in connection with the Examiner Motion would likely be complex but raise many of the same issues that have been investigated in connection with the Committee Standing Motion (*see* Section III.H below) and thus, appointment of an Examiner would be duplicative of the litigation already conducted in connection with such motion and would result in an additional layer of expense, would be inconvenient, and would delay the Debtors' reorganization efforts; (c) the costs associated with the stipulated resolution (payment of Independent Lenders' professionals fees) is further indicia that the Examiner Motion is unlikely to succeed on the merits; (d) denial of the motion is consistent with the position the Committee took in opposition to the Examiner Motion as well as the concerns regarding the settlement of the Examiner Motion raised by the Committee; and (e) based on the Court's review of the Examiner Motion, the Court determined that the payment of the Independent Lenders' fees and expenses is not fair and reasonable because the Independent Lenders have an exceedingly low probability of success on the Examiner Motion.

E.    **Issuance of the SLC Report Regarding Its Investigation of the 2007 Going Private Transaction**

As discussed in section III.D.3 above, the SLC began its investigation of the 2007 Going Private Transaction in March 2009, but that work was not completed until after the commencement of the Chapter 11 Cases.  The SLC's findings were memorialized in a publicly available report that was filed with the Court on September 22, 2009 (the "**SLC Report**") [Docket No. 353].  The SLC Report is a publicly available document.  In the course of its investigation, the SLC and the SLC Professionals reviewed several hundred thousand pages of documents and information obtained from SCI and other sources. The SLC interviewed 19 people—some of them on multiple occasions—including Company representatives and third parties.  In addition to its own review, the SLC requested

that Odyssey perform an additional investigation and make findings regarding the 2007 Going Private Transaction. SCI did not limit the SLC or the SLC Professionals in any way, including in its access to documents or information. Based on the SLC's investigation, including the findings of its independent financial advisor, the SLC determined:

- The financial projections for the 2007 Going Private Transaction were reasonable when made and were not unduly optimistic or overly aggressive.

- SCI was not insolvent at the time of the Transaction and did not become insolvent as a result of the Transaction.

- SCI was not left with unreasonably small capital.

- SCI did not intend or expect to incur debts beyond its ability to pay those debts as they matured.

- No person or entity intended to nor believed the Transaction would defraud, hinder, or delay a creditor of SCI.

- The participants in the Transaction had a good faith belief that the Transaction would succeed and that SCI would enjoy continued growth.

- No person or entity engaged in inequitable conduct in connection with the Transaction.

### F.    Supplemental Investigation by SLC of the Master Lease and Supplemental SLC Report

Upon issuance and filing of the SLC Report, the Committee expressed concern that the SLC Report did not fully review and investigate the Sale and Leaseback. In response, on October 5, 2009, SCI's Board directed the SLC to investigate the Sale and Leaseback, including the potential recharacterization of the Master Lease. The Supplemental Report of Investigation (the "**Supplemental SLC Report**") was issued December 18, 2009 [Docket No. 721].

In investigating the Sale and Leaseback, the SLC reviewed voluminous written materials and interviewed all relevant individuals. Supplemental SLC Report at 9-10. The SLC hired another independent expert advisor, Global Gaming and Hospitality LLC ("**Global Gaming**"), to assist with this aspect of the investigation. *Id.* at 10-11. SCI did not limit the SLC in any way, including in its access to documents or information in connection with the investigation of the Sale and Leaseback. *Id.* at 11.

As a result of its substantial investigation, the SLC concluded that the Master Lease has real economic substance, is a true lease (not a disguised financing), and should be treated as a lease in the bankruptcy cases. *Id.* at 28. Based on its conclusion, the SLC recommended that SCI's Board refuse any demand to commence or authorize an action seeking to recharacterize the Master Lease as a disguised secured financing. *Id.* at 30. The SLC concluded that any litigation seeking to recharacterize the Master Lease would be unsuccessful, inappropriate, and a waste of the Estates' resources. *Id.* at 29-30.

### G.    The Master Lease Compromise Agreement

Due to the severe recession and its impact on the Las Vegas economy, the financial performance of the Leased Hotels deteriorated to the point that the amount of the surplus cash that was "upstreamed" pursuant to the Master Lease through the Propco stack and ultimately "flowed back" to SCI was restricted. Upon the event of default under the Master Lease that was triggered when the Chapter 11 Cases were filed, the rights of the Mezzanine Entities to any dividends, as well as the rights of SCI to receive any "flow back," were cut off altogether, resulting in all of the surplus cash being "trapped" at Propco.

After these Chapter 11 Cases were filed, the Debtors requested and obtained Court approval of consensual cash collateral arrangements with the Prepetition Lenders and Mortgage Lenders that, collectively, authorized: (a) SCI to continue to make rent payments to Propco due under the Master Lease, subject to "rolling" budget approval by the Prepetition Lenders; and (b) Propco to continue to service its mortgage debt (as adequate protection for the Mortgage Lenders), to pay certain other expenses and to otherwise accumulate the "trapped" cash

in accounts pledged to the Mortgage Lenders which are also subject to "rolling" budget approval by the Mortgage Lenders.

Notwithstanding the Court's approval of the cash collateral arrangements, the issues surrounding the Master Lease and the resulting flow of funds from SCI to Propco were a point of contention for all of the major stakeholders in these Chapter 11 Cases. For example, in connection with the cash collateral hearings, both the Committee and the Independent Lenders raised objections to the "cash trap" and the resulting loss of "flow back" to SCI. The Debtors acknowledged that resolving the issues raised by the Master Lease and the "upstream" and "flow back" restrictions are integral to the overall restructuring of the Debtors.

The need to address the Master Lease issues became acute in October, 2009, when the Prepetition Lenders advised SCI that they would not approve a cash collateral budget that provided for the payment of rent under the Master Lease beginning in December 2009. At this same time, the Master Lease, and the payment of rent thereunder, became the focus of the Mortgage Lenders, who asserted that the relationship between Propco and SCI was contractually structured as a lessor/lessee relationship and that SCI was facing the choice to either accept all the terms of the Master Lease or none of the terms in an effort to force SCI to either assume the Master Lease and pay the full amount of the Master Lease monthly rent or reject the Master Lease in its entirety.

As a result of the competing pressures exerted by the Prepetition Lenders and the Mortgage Lenders, SCI faced three potential alternatives: (a) seeking Court approval of non-consensual use of cash collateral in order to pay the full Master Lease monthly rent notwithstanding the objection of the Prepetition Lenders – which would trigger a difficult contested cash collateral fight and put the Opco Forbearance Agreement in default and force SCI's non-debtor operating subsidiaries to file for bankruptcy; (b) rejection of the Master Lease as a result of the inability to perform thereunder, accompanied by the surrender of the Leased Hotels and the creation of a massive rejection damages claim against SCI; or (c) engage in discussions with Propco to try to reach an agreement that would both protect the existing rights of both Propco and SCI under the Master Lease, and provide for certain rent deferrals by Propco in exchange for SCI's agreement to provide certain transition services in the event the Master Lease ultimately is rejected, thereby providing the Master Lease parties with much greater clarity regarding the possibility of a future rejection while at the same time avoiding the need for a premature and precipitous rejection of the Master Lease in December 2009.

Because the first two alternatives – fighting for non-consensual use of cash collateral or immediate rejection of the Master Lease and the resulting implications for the Leased Hotels – each carried significant risks and uncertainties for both SCI and Propco, SCI and Propco decided instead to focus on the third alternative of exploring a negotiated solution to the near-term issues facing the parties as the December rent payment approached. Propco and SCI believed (and the Court ultimately concurred) that it was in the best interests of both Propco's and SCI's estates that they enter into a postpetition compromise regarding the Master Lease in a controlled manner that assured the continued ability of all Debtors to restructure their businesses for the benefit of the Debtors' Estates. Accordingly, SCI and Propco, in conjunction with the major stakeholders, embarked on an intense and heavily negotiated compromise agreement regarding the Master Lease, subject to Court approval (the "**First Compromise Agreement**"). The "controlled transition" aspects of the Compromise Agreement were designed to provide assurance to all parties in interest that in the event of a rejection of the Master Lease concerns that the gaming authorities could have regarding rejection would be minimized and eliminate the need for regulatory involvement in the process.

In connection with the negotiation of the First Compromise Agreement (and before the negotiations commenced in earnest), it was clear to SCI and Propco that they would be sitting on opposite sides of the negotiating table in any discussions regarding the Master Lease. In order to ensure that those negotiations would occur at arms' length and with due consideration for the competing interests of the SCI and Propco estates, responsibility for the representation of Propco's interests in the negotiations was assumed by the two independent members of Propco's board, Messrs. Robert White and Robert Kors (the "**Propco Independent Directors**"), who were advised by Propco's separate counsel, Gibson, Dunn & Crutcher LLP ("**Gibson**").

Thus, shortly after the Prepetition Lenders notified SCI that they would not consent to payment of the December rent under the Master Lease, SCI and the Propco Independent Directors, commenced intensive negotiations to try to structure an agreement that would (a) allow for the continued operation of the Leased Hotels in a manner that would appropriately protect and preserve the value of those operations, (b) provide both estates with

some appropriate relief from provisions of the Master Lease that have become problematic in the Debtors' current environment, and (c) provide the Propco and SCI with a reasonable amount of time to try to solve not only the Master Lease issues, but to formulate an overall restructuring of the Debtors' businesses as well.

Upon reaching the final terms of the First Compromise Agreement, SCI and Propco presented it to the Bankruptcy Court for approval.  Certain of the major stakeholders filed oppositions to the First Compromise Agreement, and after a lengthy and hotly contested hearing, the First Compromise Agreement, as amended prior to such hearing, was approved by the Court.

The First Compromise Agreement included, among others, the following mutual accommodations:

- The rent payable in cash to Propco shall be reduced for December 2009, January 2010 and February 2010 from approximately $21,449,000 per month to an amount equal to EBITDAR[6] for the Leased Hotels in the prior calendar month minus up to $1,600,000 per month (as so calculated, the "**Reduced Rent**").  SCI estimates that the Reduced Rent for the 3-month period covered by the First Compromise Agreement will average approximately $13,777,000 per month.

- The difference between Reduced Rent and contract rent under the Master Lease (such difference, the "**Deferred Rent**") will be either (a) paid in cash on an administrative basis if the Master Lease is ultimately assumed by SCI, or (b) added to the prepetition rejection damages claim if the Master Lease is ultimately rejected by SCI.

- SCI and the Operating Subsidiaries have agreed to provide certain transition services to Propco after, and notwithstanding, any future rejection of the Master Lease and the License Agreement:

  - SCI and the Operating Subsidiaries shall continue to operate the Leased Hotels under their own gaming licenses on an expense reimbursement and fee-for-service basis for a period of up to 150 days post-rejection.  During this period, the Leased Hotels will be operated as if no rejection of the Master Lease or License Agreement had occurred, provided that SCI and the Operating Subsidiaries will not have any financial obligations to Propco under the Master Lease.

  - SCI and the Operating Subsidiaries shall provide reasonably requested non-confidential and non-competitive information to Propco and any replacement manager for the Leased Hotels.

  - SCI and the Operating Subsidiaries will provide a reasonable period of time after they cease providing transition services for Propco to rebrand the Leased Hotels to eliminate all mentions of the name "Station."

  - SCI and the Operating Subsidiaries agree that, pending transfer to Propco of all collateral granted by SCI and the Operating Subsidiaries to secure the Master Lease and all other personalty to be sold to Propco under the First Compromise Agreement, all such personal property will remain at the Leased Hotels and be available for use in their operation, and, subject to its obligations regarding re-branding, Propco will have a license to use all such collateral in the operation of the Leased Hotels after rejection and until transfer of title is completed, including after the termination of other transition services.

  - Upon the occurrence of certain conditions, SCI and the Operating Subsidiaries will cooperate in a consensual foreclosure of Propco's liens on such collateral

---

[6]    "EBITDAR" means Earnings (or Net Income) Before Interest, Taxes, Depreciation, Amortization and Rent.

and will sell outright certain tangible and intangible personal property, including the names Red Rock, Palace, Boulder and Sunset, that is not subject to a lien in favor of Propco.

- Propco will receive the full benefit of the License Agreement during the transition period, including delivery of the list of SCI customers that predominantly play at a Leased Hotel, and Propco agrees that, subject to such performance, any monetary claim for rejection damages under the License Agreement shall be a general unsecured claim. Propco will, however, reserve any Bankruptcy Code section 365(n) rights it may have as licensee under the License Agreement.

The First Compromise Agreement provided interim relief with regard to SCI's rent obligations and provided a floor for transition services for Propco, while also providing some certainty regarding the nature and extent of claims arising in connection with any future rejection of the Master Lease and License Agreement. The First Compromise Agreement otherwise left Propco and SCI's current legal positions unaffected. Propco and its successor/assigns (including the Mortgage Lender) continued to have the ability to argue (if such arguments exist) for additional transition services under the agreements between Propco and SCI or under otherwise applicable law, while leaving SCI free to argue that no additional transition services are required to be provided to Propco.

As plan negotiations progressed, Propco and SCI agreed to extend the First Compromise Agreement by an additional 60 days and to make additional, non-material adjustments to the terms of the First Compromise Agreement to reflect the practical reality of operating the Leased Hotels during the additional 60-day extension. As a result, the Propco Independent Directors and SCI again negotiated an arms' length agreement to extend the protections afforded each party under the First Compromise Agreement and entered into the First Amendment to the Amended and Restated Compromise Agreement (the "**Compromise Amendment**").

Propco and SCI sought and obtained the agreement of the major stakeholders not to oppose their application to the Court for approval of the Compromise Amendment. As a result, Propco and SCI sought and obtained an order from the Court approving the Compromise Amendment on March 4, 2010. [Docket No. 1042].

In the days that followed the Court's approval of the Compromise Amendment, it became clear to the Debtors that the interests and desires of the Opco and Propco Lenders were sufficiently divergent that a separation of SCI's assets and the four properties owned by Propco, including the related fixtures, furniture, and equipment (collectively, the "**Propco Assets**"), was the only viable plan for the Debtors to pursue. Further articulation of the transition services included in the First Compromise Agreement became critical. SCI and the Propco Independent Directors returned to the negotiating table to reach agreement on a second amended and restated version of the First Compromise Agreement (the "**Second Compromise Agreement**"). A product of arms' length negotiation, the Second Compromise Agreement represents a meaningful step towards the separation of SCI and Propco contemplated by the Joint Plan. Where the First Compromise Agreement provided for a short-term solution regarding rent reductions and intermediate transition services, the Second Compromise Agreement provides more definitive steps towards the SCI/Propco separation.

The Second Compromise Agreement includes, among others, the following mutual accommodations:

- Propco, with the consent of the Propco Lenders, agreed to further reduce rent to a "break–even" level for SCI and its estate. The rent payable in cash to Propco shall be reduced for May 2010 and each month thereafter until the effective date of a Consensual Plan, as defined in the Second Compromise Amendment, (subject to earlier termination if the Master Lease is rejected by SCI) from approximately $21,449,000 per month under the Master Lease to an amount equal to EBITDAR[7] for the Leased Hotels in the prior calendar month <u>minus</u> (i) actual capital expenditures not paid from the "FF&E Reserve Accounts," (ii)

---

[7]    "EBITDAR" means Earnings (or Net Income) Before Interest, Taxes, Depreciation, Amortization and Rent.

certain out of pocket operating expenses of the Leased Hotels (defined as "Owner's Expenses") to the extent not already deducted in the computation of EBITDAR, and (iii) rent due under the Boulder Station ground lease (as so calculated, the "Reduced Rent").  The 120% of adequate protection floor included in the Prior MLCA has been removed.  Under the new calculation, Reduced Rent cannot exceed EBITDAR for the Leased Hotels.  The Debtors estimate that Reduced Rent under the Second Compromise Amendment will be approximately $ 1,533,000 less per month than if rent were being calculated under the First Compromise Agreement.

- The Deferred Rent (defined above) will be either (a) paid in cash on an administrative basis if the Master Lease is ultimately assumed by SCI, or (b) added to the prepetition rejection damages claim if the Master Lease is ultimately rejected by SCI.

- Prior to initiation of transition, SCI will continue to perform all of its other obligations under the Master Lease, with SCI's obligation to pay the Reduced Rent under the Compromise Amendment constituting an administrative claim against SCI, payable in accordance with the terms of the Second Compromise Amendment.

- Upon rejection of the Master Lease, Propco will hold an allowed, partially secured prepetition claim against SCI for rejection damages equal to the amount of Deferred Rent plus the amount of Propco's statutory lease rejection claim, subject to determination.

- SCI and the Operating Subsidiaries have agreed to provide the following transition services after the occurrence of a Transition Event (as defined in the Second Compromise Amendment):

    o SCI and the Operating Subsidiaries shall assist the Mortgage Lenders (and any designated replacement manager) with licensing by applicable gaming authorities by providing information requested by gaming authorities, among other things.

    o SCI and the Operating Subsidiaries shall continue to operate the Leased Hotels under their own gaming licenses on an expense reimbursement and fee-for-service basis for a period of up to 270 days post-rejection. During this period, the Leased Hotels will be operated as if no rejection of the Master Lease or License Agreement had occurred, provided that SCI and the Operating Subsidiaries will not have any financial obligations to Propco under the Master Lease.

    o SCI and the Operating Subsidiaries shall permit Propco, the Mortgage Lenders and any designated replacement manager to use the database of Primary Customers, other intellectual property and reservations services, including access to all Transactional Data in an electronically accessible and usable format.

    o SCI and the Operating Subsidiaries shall permit Propco, the Mortgage Lenders and any designated replacement manager to make offers of employment to certain employees of SCI and the Operating Subsidiaries that are exclusively or primarily engaged in the operation of the Leased Hotels.

    ○   SCI and the Operating Subsidiaries shall deliver to Propco, the Mortgage Lenders and any designated replacement manager financial, accounting and other information that pertains exclusively to the Leased Hotels or is otherwise necessary for the day to day operation of the Leased Hotels for both licensing and transition purposes including preparation of balance sheets for the Leased Hotels, and will permit onsite access to records, onsite observation of operations and access to senior managers, provided that access to confidential or competitive information shall be subject to prior execution of a confidentiality agreement.

    ○   SCI and the Operating Subsidiaries agree that, following rejection of the Master Lease, SCI and the Operating Subsidiaries shall be deemed to be operating the Leased Hotels for the benefit of Propco, and all cash flow from operations of the Leased Hotels, after payment of all amounts to be paid to SCI and the Operating Subsidiaries under the Second Compromise Amendment, shall be property of and shall be delivered to Propco.  During the first sixty days of transition services, SCI and the Operating Subsidiaries will receive expense reimbursement only.  Thereafter, Propco shall pay SCI and the Operating Subsidiaries a management fee of two percent of gross revenue plus five percent of EBITDA of the Leased Hotels, in addition to expense reimbursement.

    ○   SCI and the Operating Subsidiaries will provide a reasonable period of time after they cease providing transition services for Propco to rebrand the Leased Hotels to eliminate all mentions of the name "Station."

    ○   SCI and the Operating Subsidiaries agree that, pending transfer to Propco of all collateral granted by SCI and the Operating Subsidiaries to secure the Master Lease and all other personalty to be sold to Propco under the Second Compromise Amendment, all such personal property will remain at the Leased Hotels and be available for use in their operation, and, subject to its obligations regarding re-branding, Propco will have a license to use all such collateral in the operation of the Leased Hotels after rejection and until transfer of title is completed, including after the termination of other transition services.

    ○   SCI and the Operating Subsidiaries will cooperate in a consensual foreclosure of Propco's liens on such collateral and will sell outright certain tangible and intangible personal property, including the names Red Rock, Palace, Boulder and Sunset, that is not subject to a lien to Propco but is used primarily with respect to the Leased Hotels or is essential to the operation of the Leased Hotels, with such sales being subject to Court approval.

    ○   Propco will receive the full benefit of the License Agreement during the transition period, including delivery of the list of SCI customers that predominantly play at a Leased Hotel, and Propco agrees that, subject to such performance, any monetary claim for rejection damages under the License Agreement shall be a general unsecured claim. Propco will, however, reserve any Bankruptcy Code section 365(n) rights it may have as licensee under the License Agreement.

•    SCI and Propco agree that any asset transfer, sale, assignment, or licensing by SCI or an Operating Subsidiary contemplated in the Second Compromise Amendment or under Annex 1 thereto shall be (i) made free and clear of all

liens—subject to the approval of the Bankruptcy Court upon reasonable notice and a hearing and without prejudice to the rights (including, without limitation, all rights under the Bankruptcy Code) of any secured creditor holding a perfected lien on the assets to be transferred sold, assigned or licensed and (ii) made subject to the approval of the Bankruptcy Court upon reasonable notice and a hearing.

SCI and Propco filed a joint motion seeking Court approval of the Second Compromise Agreement on April 7, [Docket No. 1179]. The Second Compromise Agreement continued to evolve in the days that followed, and a revised version was filed on April 19, 2010 (the "**Revised Second Compromise Agreement**") [Docket No. 1215]. The notable changes reflected in the Revised Second Compromise Agreement are as follows:

- The members of the Opco Steering Committee support the Revised Second Compromise Agreement.

- The Revised Second Compromise Agreement represents the resolution of complex issues about transition issues and asset transfers necessary to permit Propco to reorganize and SCI to conduct an orderly sale process, in each case as contemplated by the Debtors' Joint Plan. In particular:

  - The Revised Second Compromise Agreement details specifically the assets that the parties have agreed will be transferred as part of any orderly separation of SCI and Propco that may be necessary if the SCI sale process results in a sale of the New Opco Acquired Assets to a third party;

  - The Revised Second Compromise Agreement specifies the agreed-upon purchase price of $35 million plus assumption of certain liabilities for those assets to be paid to SCI (subject to the Administrative Agent's prepetition and postpetition Liens) in the event of a such a separation, as well as the terms and conditions under which the asset transfers will occur and the terms and conditions under which that purchase price will be paid; and

  - The Revised Second Compromise Agreement also recognizes that the assets of SCI, the Parent Debtors, the Other Opco Debtors and the Non-Debtor Affiliates, excluding the SCI Retained Assets (the "**Opco Assets**") and the Propco Assets may remain under common ownership and management if FG and the Mortgage Lenders are the winning bidder for the New Opco Acquired Assets and provides for that alternative as well.

A hearing on SCI's and Propco's joint motion to approve the Revised Second Compromise Agreement was held on May 4 and 5, 2010. The Court deferred ruling on the joint motion in order to allow the Committee and the Independent Lenders to conduct further discovery and submit additional briefings regarding their opposition. Following an additional hearing on May 27, 2010, the Court granted the joint motion to approve the Revised Second Compromise Agreement on May 28, 2010. The Court found that, among other things, SCI and Propco exercised proper business judgment in entering into the Revised Second Compromise Agreement, and that the elements of compromise were adequately satisfied under Bankruptcy Rule 9019. The Committee has appealed the order approving the Revised Second Compromise Agreement. Pursuant to the Committee Plan Support Stipulation, if the Plan is confirmed and becomes effective, that appeal will be dismissed.

H.    **The Committee's Motion to Obtain Standing to Assert Claims Relating to the 2007 Going Private Transaction**

1.    *The Committee's Status Report and Demand for Authority to Prosecute Derivative Claims Derived from the 2007 Going Private Transaction and Sale Leaseback*

On November 18, 2009 – before the SLC had finished its investigation into the Sale and Leaseback or issued its Supplemental SLC Report – the Committee filed a "Status Report Regarding the Investigation into the 2007 Leveraged Buyout Transaction and Characterization of the Master Lease Transaction" (the "Committee Status Report") [Docket No. 580]. In the Committee Status Report, the Committee asserted that there are colorable fraudulent conveyance actions to pursue related to the 2007 Going Private Transaction.

On December 8, 2009, the Committee sent a letter to the Debtors demanding that the Debtors consent within just a few days to the Committee prosecuting such claims. For the following two weeks, the Committee and the Debtors exchanged letters in which the Debtors sought to better understand the basis of the demand and the factual information upon which the Committee purported to rely in coming to a conclusion that differed from the conclusion reached by the SLC and the SLC Professionals after their extensive investigation. On December 28, 2009, without having provided the factual information requested by the Debtors or waiting for Debtors to respond to the demand, the Committee filed a motion seeking standing and authority (the "**Committee Standing Motion**") to prosecute civil actions on behalf of the Debtors' Estates attacking (1) the 2007 Going Private Transaction; and (2) the Sale and Leaseback. The claims alleged in the Committee Standing Motion included claims that: (a) various components of the 2007 Going Private Transaction constituted actual fraudulent conveyances, constructive fraudulent conveyances, or otherwise avoidable transactions; (b) the Master Lease should be recharacterized and/or was an actual and constructive fraudulent conveyance; (c) insiders of SCI breached their fiduciary duties to SCI and its creditors through pursuing the 2007 Going Private Transaction; and (d) claims raised by the named defendants against the Debtors' estates should be equitably subordinated. The redacted version of the Committee Standing Motion, supporting papers and replies are available on the Docket as items 737-743, 746-748, 884-888, 894-899 and 901. On July 8, 2010, the Committee filed a supplement to the Committee Standing Motion, which is available on the Docket as item 1734. Response to that supplement are due on August 13, 2010. The Committee Standing Motion was opposed by the Debtors, the SLC, Frank and Lorenzo Fertitta, the Administrative Agent on behalf of the Prepetition Opco Lenders and the Mortgage Lenders. The oppositions are available on the Docket as items 807, 804, 826, and 828.

2.    *The Court Ruling on the Standing Motion*

At the conclusion of hearing on the Committee Standing Motion, the Bankruptcy Court elected to defer its ruling on the Committee Standing Motion until no earlier than the time of the hearing on the Disclosure Statement. The Court subsequently deferred its ruling on the Committee Standing Motion further to permit the filing of responses to the Committee's supplement. Pursuant to the Committee Plan Support Stipulation, if the Plan is confirmed and becomes effective, the Committee will withdraw the Committee Standing Motion and the claims asserted therein will be released under the Plan.

I.    **Bidding Procedures for the New Opco Acquired Assets**

An essential component of the Plan is the sale of the New Opco Acquired Assets (i.e. the assets of the Opco Group Sellers other than those assets that will be sold or transferred to Propco or New Propco and certain other excluded Assets) to the highest bidder in a sale process that will run contemporaneously with the solicitation of votes on the Plan, culminating in an auction shortly before the confirmation hearing on the Plan, but sufficiently in advance of the confirmation hearing so that the terms of the proposed sale to the highest bidder will be known and available for the Court's consideration and approval at the time of the confirmation hearing. The Debtors established a series of procedures by which bids for the New Opco Acquired Assets would be solicited and accepted, which the Court has approved in the Bidding Procedures Order (the "**Bidding Procedures**"). The Bidding Procedures were developed following consultation with the Debtors' legal and financial professionals. The Debtors believe that the adoption of the Bidding Procedures will provide interested parties with ample opportunity to formulate bids for the New Opco Acquired Assets and will facilitate the solicitation, submission and evaluation of bids for the New Opco Acquired Assets in a manner that will maximize the value of the New Opco Acquired Assets for the Debtors' Estates.

The Debtors, under the direction of SCI's independent director, and their advisors believe they are in a position to solicit interest in the New Opco Acquired Assets from all parties who may potentially have a serious interest in submitting bids.  Among other things, the Bidding Procedures provide that:

- Potential Bidders shall have until June 30, 2010 to submit a preliminary letter of intent and certain other information necessary for the Debtors' to assess the Potential Bidders interest in and ability to consummate a transaction regarding the New Opco Acquired Assets;

- Potential Bidders that are designated Qualified Bidders shall have until the Bid Deadline, July 30, 2010, to submit to the Debtors their definitive bid materials, which shall include, among other things, a duly authorized and executed purchase agreement for the subject New Opco Acquired Assets that will serve as an irrevocable offer pending the Debtors' selection of a Successful Bidder for such assets;

- A Qualified Bid will be valued based upon several factors including, without limitation, items such as the amount of the purchase price, the type of consideration constituting the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to result from or be created by such bid in relation to other bids, the relative ability of the counterparties to the Sale proposed by the Qualified Bidder to consummate such Sale, the nature and extent of any proposed revisions to the Purchase Agreement, the effect of the proposed Sale on the value of the ongoing businesses of the Debtors (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the proposed Sale (including Nevada Gaming Commission, National Indian Gaming Commission or other regulatory or other approvals required to close the Sale), any assets excluded from the bid, the transition services required from the Debtors post-closing and any related restructuring costs, and the likelihood and timing of consummating such Sale (including an evaluation of closing conditions), each as determined by the Debtors following consultation with the Consultation Parties;

- If the Debtors do not receive any Qualified Bids, the Debtors shall proceed as set forth in the "No Qualified Bids" section of the Bidding Procedures which, among other things, reserve to the Debtors the right to terminate the sale process or extend the deadlines for receiving, evaluating and selecting a Successful Bid, in each case, subject to the terms of the Bidding Procedures;

- If multiple Qualified Bids are submitted for the same or for overlapping subsets of the New Opco Acquired Assets, the Debtors, under the direction of SCI's independent director, will conduct an auction under the supervision of the Court in accordance with the Bidding Procedures to determine the highest or otherwise best offer for such assets following competitive bidding;

- Subject to the terms of the Bidding Procedures, if the Debtors receive a single Qualified Bid, the Debtors reserve the right, in consultation with the Consultation Parties, to terminate the sale process or extend, subject to the terms hereof, the deadlines set forth in the Bidding Procedures without further notice in an effort to solicit and obtain competing Qualified Bids.  Alternatively, Debtors may evaluate the single Qualified Bid on its own merit to determine whether such single Qualified Bid is a Successful Bid;

- Once a Successful Bid or Successful Bids are selected, the Debtors will promptly seek Court approval of the selected transaction(s) as part of the hearing on confirmation of the Joint Plan.

Following the Debtors' submission of the Bidding Procedures to the Court, further negotiations ensued amongst the Debtors, the Opco Agent, the Opco Steering Committee, the Mortgage Lenders, and FG. A revised version of the Bidding Procedures (the "Revised Bidding Procedures") was filed on April 19, 2010 [Docket No. 1214]. The Revised Bid Procedures reflect the following changes to the Bidding Procedures:

- The members of the Opco Steering Committee support the Revised Bidding Procedures.

- With the support of the Opco Steering Committee, the Revised Bidding Procedures reflect the adoption of a Stalking Horse Bid (as defined in the Revised Bidding Procedures) for the Opco Assets.

- The Stalking Horse Bid provides for a purchase price of $772,000,000 for the Opco Assets (calculated based upon the face amount of the debt components of the purchase price, not on any estimates of the potential trading price of that debt[8]).

- The Stalking Horse Bidder is an entity owned in whole or in part by FG and the Mortgage Lenders.

- The Stalking Horse Bid shall be subject to overbids by Qualified Bidders, with initial letters of intent due June 30, 2010 and definitive bids due July 30, 2010.

- If the Stalking Horse Bidder is not the successful bid and an alternate bid is selected and consummated, the Stalking Horse Bidder shall be entitled to reimbursement of reasonable out-of-pocket expenses not to exceed $4 million, but will not be entitled to any break-up fee.

- The sale process contemplated by the Revised Bidding Procedures will be conducted by SCI, under the direction of SCI's independent director and in consultation with the Opco Agent, the Opco Steering Committee and the official committee of unsecured creditors appointed in the Chapter 11 Cases.

A hearing on the motion to approve the Revised Bidding Procedures was held on May 4 and 5, 2010. The Court deferred ruling on the motion in order to allow the Committee and the Independent Lenders to conduct further discovery and submit additional briefings regarding their opposition. Following an additional hearing on May 27, 2010, the Court granted the motion to approve the Revised Bidding Procedures on May 28, 2010. The Court found that Opco stands to receive significant benefits under the Revised Bidding Procedures, particularly by securing a stalking horse and in the resolution regarding the value of the Texas Put. The Court also found, among other things, that uncertainty on that matter would likely chill potential bids for the New Opco Acquired Assets.

Further, the Court found that the Revised Bidding Procedures were negotiated in good faith and at arm's length. The Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "Opco" Subsidiaries (the "**Bidding Procedures Order**") was entered on June 4, 2010 [Docket No. 1563].

---

[8]     The Debtors have not reached any conclusion regarding the extent, if any, to which the trading value of the debt components of the purchase price may differ from the face value.

The Committee has appealed the Bidding Procedures Order.  In addition, the Committee filed a motion to stay the Bidding Procedures Order pending resolution of that appeal.  At a hearing held on June 21, 2010, the Bankruptcy Court denied the Committee's motion for such a stay.

Among the Committee's objection to the Bidding Procedures Order was the Committee's assertion that SCI had not sufficiently evaluated, considered or market-tested the value of the New Propco Purchased Assets and therefore could not justify the exclusion of those assets from the Opco Auction.  SCI strongly disputes that assertion.  Contrary to the Committee's assertions, in connection with the negotiations with the Propco Lenders regarding the Second Compromise Agreement, the Debtors and the Opco Steering Committee analyzed the nature and value of the Excluded Assets.  In order to get a better sense of the value of these assets to New Propco and to inform their negotiations, the Debtors conducted an extensive analysis of the replacement cost of the bulk of the Excluded Assets.  For the Exclusive Propco, Joint Interest and Non-Exclusive Trademarks, the Debtors concluded that New Propco would incur a cost of $12-14 million for replacement of signs and all other branded products or marketing materials, and for other intellectual property, a cost of $400,000-600,000 to recreate the back-end infrastructure for the websites of the four Propco properties.  The Debtors also evaluated the replacement costs for IT Systems and determined that New Propco would incur costs of $40 million $20 million for hardware and $20 million for software.  In addition, the Debtors concluded that the cost to New Propco of replacing the player tracking software by itself would be approximately $1.5 million.

The Debtors also analyzed the material present value of the remaining Excluded Assets and determined that none of the Excluded Assets had any significant value to any potential purchaser except New Propco.  The only value ascribed to Excluded Asset Category 7, Other Intellectual Property, was its ability to facilitate business continuity for New Propco.  Similarly, the Debtors ascribed no value to Excluded Asset Category 9, Business Information.  The Debtors concluded that Opco would suffer no harm from sharing Business Information for a limited time with Propco to make transition easier as the operations complete the separation process and that any value is in business continuity for Propco alone.

With respect to the Primary Customer Database, its value is in the ability to properly market to the top customers at a particular property.  However, under the First Master Lease Compromise Agreement, New Propco already had the right to access the Primary Customer Database.  The only change related to the Primary Customer Database in the Second Compromise Agreement is that Opco and New Propco each receive exclusivity for top 25% of players at their respective properties. The only real value in doing so is to keep the information in the database from direct competitors of Propco, i.e., Boyd, seeking an unfair and inappropriate competitive advantage.

The Debtors analyzed the value of the Employee Non-Compete Contracts, and determined that release of the Non-Compete Contracts would not harm Opco.  Issues with assignability render the contracts of little value to any third party purchasers.  The Debtors also considered the need to treat employees fairly and determined that it is unlikely that any strategic buyer would seek to hire a substantial number of the current corporate employees because elimination of such redundancies is one of the primary synergies a strategic buyer would hope to achieve with a purchase of the Opco Assets.

In addition, the Debtors analyzed the value of the Corporate Offices and FF&E and ascribed no value to either.  The corporate office lease is underwater—approximately twice the market rate and are located within the Red Rock property and of minimal value to a potential purchaser other than Propco.

Finally, the Debtors considered the value of the lease of the Wild Wild West Assemblage and the associated option to purchase the fee simple interest.  The Debtors determined that the lease on the assemblage is underwater and as of December 2010, will have a negative cash flow of $1.6 million.  Consequently, the Debtors assigned no value to the lease. Similarly, the option to purchase the leased land is at a rate substantially in excess of the market and no feasible development options for the land for a long period of time.  Accordingly, the Debtors ascribe no value to the option to purchase the Wild Wild West Assemblage.

The Administrative Agent and the Opco Steering Committee both carefully considered the value of the Excluded Assets and concluded that the proposed transfer of the Excluded Assets to Propco would not harm Opco.  Alvarez & Marsal, on behalf of the Administrative Agent, conducted an analysis of certain assets of Opco and provided assessments of the indicative value of such assets.  Primarily, though, the Opco Lenders saw the Excluded Assets as a way to capture additional value for the Opco estate from Propco, because Propco needed those

assets to maintain continuity in its business.  The Opco Lenders used the asset transfers (and Propco's unique need for those assets) as a way to lock in additional value for the Opco estate without any detriment to Opco.

The value of the Excluded Assets was established when those assets were subjected to an arms-length negotiation where the Administrative Agent and the Opco Steering Committee and the Opco Debtors (negotiating, as set forth above, with an informed view of value) attempted to extract additional concessions from Propco.  It was through this process (an arms-length negotiation between a willing buyer and a willing seller) that the various parties arrived at a rigorously negotiated compromise.

The SCI Board also considered the value of the Excluded Assets.  Lazard advised the Board that the $35 million in cash consideration was fair in the context of the overall transaction (which included the other forms of monetary and non-monetary consideration cited above).  SCI's Board of Directors included an independent director, Dr. James Nave. Dr. Nave was advised by separate and independent counsel, Skadden Arps Meagher & Flom, LLP, and sought Skadden's advice in connection with the Bidding Procedures.  As SCI's independent director, Dr. Nave voted first before the other board members.  Dr. Nave voted in favor of the Bidding Procedures and then the other four members of the Board voted  in favor of the proposal.

The value of the Excluded Assets should not be determined in a vacuum, but rather as a single component of a complex transaction.  When considering the value Opco received for the Excluded Assets, it is also important to remember that the Stalking Horse Bid is a crucial component of the overall transaction.  The Opco Steering Committee and SCI conducted a vigorous competition between Boyd and the ultimate Stalking Horse Bidder to determine who they would propose to be the stalking horse bidder and believed they had squeezed "all the juice out of the orange" in taking both bidders as far as they would go.  The Stalking Horse Bid sets a minimum floor price of $772 million for the sale of the Opco Assets, which the Opco Lenders which was "the highest and best bid" resulting from months of intense negotiations leading up to the filing of the Motions.  The Stalking Horse Bid adds value to the Opco estate and encourages bids because it is a fair and reasonable reflection of what stakeholders who know the most about the Station enterprise believe to be the true potential worth of such enterprise in the right hands.  The Opco Lenders believed, and the evidence shows, that in a naked auction with no stalking horse bidder, the price ultimately paid for the Opco Assets would be lower.

Opco will receive substantial monetary and non-monetary consideration for the Excluded Assets.  In cash consideration alone, Opco stands to receive $35 million, plus $13 million in assumed liabilities.  If the Stalking Horse Bidder is not the successful bidder, the aforementioned $35 million, subject to the Administrative Agent's liens, will be available to any such Successful Bidder for Opco Assets in the Auction to contribute as additional consideration or purchase as a working capital asset.  Beyond cash consideration, the Second Amended Master Lease Compromise Agreement includes further Reduced Rent of approximately $1.5 million per month, which is a significant amount of savings considering that these cases will continue for additional time.  The Second Compromise Agreement also includes the resolution of (1) potential disputes over the ownership of the assets, (2) liens on those assets, and (3) the Texas Station Put Option.  The Second Compromise Agreement also clarifies and refines the nature and extent of Transition Services provided for in the First Compromise Agreement and, in doing so, allows for a smooth separation of Opco and Propco if such separation becomes necessary.  In the absence of this type of negotiated resolution there well could be significant, expensive, and time-consuming litigation.  Moreover, there is additional non-monetary consideration—the resolution of a potential dispute over the Excluded Assets provides certainty for any Successful Bidder.  Indeed, it would likely be impossible to conduct a sale of the Opco Assets until the Debtors were able to provide potential bidders with certainty about which assets are being auctioned.

The Committee asserts that the Debtors did not subject the Excluded Assets to a formal valuation or market test and that the fair market value of the Excluded Assets is unknown.  Pursuant to the Committee Plan Support Stipulation, if the Plan is confirmed and becomes effective, the Committee will dismiss its appeal of the Bidding Procedures Order.

**J.**    **Opco Lender Restructuring Support Agreement**

The Plan and the Plan Facilitation Motions were filed with the support of the Propco Lenders.  In addition, the Propco Lenders and FG have entered into a plan support agreement of their own (the "**Propco PSA**") that sets forth their agreement to support the Plan and to take certain actions to facilitate confirmation and

consummation of the transactions contemplated by the Plan. A copy of the Propco PSA will be included in the Plan Supplement. At the time the Plan and the motions to approve the Second Compromise Agreement and Bidding Procedures were filed (the "**Plan Facilitation Motions**"), the Debtors had the support of the Propco Lenders but did not have corresponding support from the Opco Lenders. The Opco Lenders had expressed their desire for a sale of the Opco Assets, but there was no agreement as to how the Opco Sale Process would be conducted, what the Excluded Assets would be and how they would be treated, or how the issues relating to the Second Compromise Agreement would be resolved (collectively, the "**Opco/Propco Separation Issues**"). To the contrary, the Opco Agent and Opco Lender Steering Committee informed the Debtors that the Plan Facilitation Motions would receive vigorous opposition from the Opco Agent and Opco Lender Steering Committee, as would the Plan, if the Opco/Propco Separation Issues were not resolved consensually and quickly.

The Debtors believe that resolution of the Opco/Propco Separation Issues was essential to the Debtors' efforts to proceed with a plan that maximizes value, preserves jobs and satisfies regulatory requirements. The Debtors further believe that a negotiated resolution of those issues that had the support of both the Propco Lenders and the Opco Lenders was critical, because complex and protracted litigation over the Opco/Propco Separation Issues would be extremely costly and would jeopardize both the Propco Restructuring and the Debtors' ability to conduct an orderly and value-maximizing Opco Sale Process. The Propco Lenders, in supporting the Plan Facilitation Motions, agreed with the Debtors' view, and the Opco Agent and Opco Lender Steering Committee also shared that view. Immediately after the Plan Facilitation Motions were filed, the parties undertook around-the-clock negotiations in a final attempt to try to reach acceptable resolutions of the Opco/Propco Separation Issues.

The parties' extraordinary efforts proved to be successful. On April 16, 2010, the members of the Opco Lender Steering Committee, the Opco Debtors and certain of SCI's non-debtor subsidiaries, FG and the FG Principals entered into the Opco Lender Support Agreement. A copy of the Opco Lender Support Agreement will be included in the Plan Supplement. The Debtors' entry into the Opco Lender Support Agreement was expressly conditioned on receiving Court approval thereof, and the Debtors filed a motion seeking such Court approval on April 19, 2010 [Docket No. 1219]. Although the Court did not ultimately authorize the Debtors' entry into the Opco Lender Support Agreement, it remains in full force and effect with respect to the other parties thereto. In addition to agreement on the Opco Lender Support Agreement and the Term Sheet annexed thereto, the parties also reached agreement on revisions to the Bidding Procedures and the Second Compromise Agreement that will permit the Debtors to enjoy the support of the Opco Agent and the Opco Steering Committee for both of the Plan Facilitation Motions. The Propco PSA and Opco Lender Support Agreement are back-to-back support agreements that, taken in tandem, evidence the support of the Propco Lenders and the Opco Lenders Steering Committee for the reorganization path that has been chosen by the Debtors.

The Opco Lender Support Agreement serves two basic purposes: (a) it evidences the agreement of the Consenting Lenders to support the Plan and the Plan Facilitation Motions, as well as the continued use of cash collateral by Opco and its non-debtor subsidiaries and affiliates and the requested extension of the Debtors' exclusive right to file a plan, among other things; and (b) it sets forth the Consenting Lenders' agreement to the designation of the bid for the Opco Assets that has been submitted by FG and the Mortgage Lenders (together, the "**Purchaser**") as the stalking horse bid in the Opco Sale Process (the "**Stalking Horse Bid**"), subject to the terms of the Bid Procedures. The Opco Lender Support Agreement provides the framework for the Purchaser to acquire the Opco Assets and assume certain liabilities pursuant to the Term Sheet annexed to the Opco Lender Support Agreement (the "**Term Sheet**"). The Bidding Procedures unequivocally provide, however, that the Stalking Horse Bid will be subject to overbid pursuant to the terms and conditions of the Opco Sale Process. Accordingly, the Debtors believe that the Bidding Procedures and the conduct of the Opco Sale Process, each as modified, will maximize the value of the Opco Debtors' Estates, for the benefit of creditors of the Opco Debtors.

The Term Sheet sets forth the fundamental terms of the Stalking Horse Bid. The highlights of the bid are as follows:

- Purchase price of $772,000,000 for the Opco Assets (based upon the face amount of the debt components of the purchase price[9]).

---

[9]    The Debtors have not reached any conclusion regarding the extent, if any, to which the trading value of the debt components of the purchase price may differ from the face value.

- Purchase Price consists of $317 million in cash and $455 million in new debt.

- The new debt will be comprised of a $430 million term loan, secured by substantially all of the Opco Assets, and a $25 million land loan secured by Opco's existing unencumbered land parcels (other than the Wild Wild West property). The terms and conditions of the new loans are summarized in separate loan term sheets that are annexed to the Term Sheet and will be set forth in full in the Plan Supplement.

- If the Stalking Horse Bidder is not the successful bid and an alternate bid is selected and consummated, the Stalking Horse Bidder shall be entitled to reimbursement of reasonable out-of-pocket expenses not to exceed $4 million and to the consensual transfer and purchase of the Excluded Assets on the terms and conditions set forth in the Revised Compromise Agreement, but will not be entitled to any break-up fee.

The Stalking Horse Bid has since been fully documented in the Stalking Horse APA. The Stalking Horse APA provided the Debtors and their estates with "downside" protection and a purchase price "floor" by locking in a $772 million bid for the Opco Assets.

The Stalking Horse Bid will provide a recovery to the Prepetition Opco Secured Lenders of approximately 87%, based upon the face amount of the debt components of the purchase price and without taking into account any variations in the potential trading price of that debt from the nominal face amount. That bid, however, will not be sufficient to generate recoveries for unsecured creditors. The Debtors believe there may be some unencumbered assets that do not serve as collateral for the Prepetition Opco Secured Claims, and the Committee asserts that the Debtors have a number of assets not specifically identified in the Plan that should be available for distribution to creditors. The Debtors, on the other hand, believe that all of these assets will be included in the sale of the New Opco Acquired Assets and thus are not available for distribution to creditors in some other fashion. These assets include two copyrights registered with the United States Copyright Office that do not appear to have liens recorded against them in the United States Copyright Office by the Prepetition Opco Lenders. Absent perfection by a proper recording in the United States Copyright Office, the two copyrights are unencumbered.

In addition, the Committee believes that there are parcels of real property in Reno, Nevada that SCI transferred to Tropicana Station, LLC (which is a guarantor of SCI's obligations to the Prepetition Opco Lenders) in January 2009. The Committee asserts that virtually no value was exchanged for such transfer and that the land was not, and does not appear to be, subject to any mortgage or other encumbrance. The Committee believes that the transfer is avoidable, such that SCI could recover the real property from Tropicana Station, LLC. Tropicana Station, LLC's schedules indicate its total real property has a book value in excess of $11 million.

The Committee believes that since the Petition Date, SCI has engaged in the development of new intellectual property assets and acquired additional customers visiting and becoming patrons of SCI's casinos such that SCI's customer list has grown post-petition. The Committee believes that these assets are also unencumbered by any liens.

Since the Petition Date there have been approximately 32 new trademarks issued to or trademark applications submitted by SCI. The Committee also believes that SCI has applied for and/or been granted various patents postpetition. Further, the Committee believes that intellectual property developed postpetition includes promotions, new marketing programs designed to attract and retain customers, and innovative gaming strategies that are intended to identify and exploit customer preferences, all developed after the Petition Date, which may have resulted in new customers visiting and/or becoming patrons of SCI's casinos. To the extent the names of any individuals have been tracked or added to SCI's customer list post-petition, the Committee asserts that the value of such information, along with the value of any post-petition intellectual property (which itself has been supported in case law), belongs to SCI's general unsecured creditors.

The Debtors do not necessarily agree with the Committee's assertions, arguments or theories described above, and also believe that all of the foregoing assets likely are encumbered by the replacement liens and

superpriority claims of the Prepetition Opco Secured Lenders under the Final DIP Order and are not of sufficient value to generate any recovery for unsecured creditors. (The superpriority claims of the Prepetition Opco Secured Lenders likely are far in excess of $100 million.). In addition, even if the Committee is correct on one or more of their theories, there are significant obligations, including administrative and priority claims and the superpriority claims of the Prepetition Opco Secured Lenders, that would have to be satisfied before any recovery from those assets would flow down to SCI's general unsecured creditors. The Debtors do not believe there is sufficient value in the assets that the Committee alleges to exist to result in any recovery to SCI's general unsecured creditors. As a result of the settlement with the Committee memorialized in the Committee Plan Support Stipulation, if the Plan is confirmed and becomes effective, the Committee will not be taking any action to pursue its assertions, arguments or theories with respect to the assets described above.

A hearing on the Debtors' motion seeking Court approval of the Opco Lender Support Agreement was held on May 4 and 5, 2010. The Court deferred ruling on the motion in order to allow the Committee and the Independent Lenders to conduct further discovery and submit additional briefings regarding their opposition. Following an additional hearing on May 27, 2010, the Court denied the motion to approve the Opco Lender Support Agreement on May 28, 2010, but that agreement remains binding among all of the non-Debtor parties thereto.

**K.      Extension of Exclusivity**

After a fulsome hearing, the Court entered an order extending the Debtors' initial exclusive plan filing period from November 25, 2009 to March 25, 2010, and the initial exclusive plan solicitation period from January 24, 2010 to May 24, 2010 [Docket No. 703]. On April 7, 2010, the Debtors filed a motion seeking an additional extension of the exclusive plan solicitation period from May 24, 2010 to the dates on which the Court schedules confirmation hearings on the Plan [Docket No. 1172]. By order entered on May 13, 2010 [Docket No. 1440], the Court granted the Debtors' request and extended the Debtors' exclusivity through the Confirmation Hearing Date, subject to the Exclusive Period being terminated by subsequent order of the Court for cause shown, whether such request for termination was brought by motion or made *sua sponte*.

**L.      Bar Date and Schedules**

1.      *Schedules and Statements*

On October 20, 2009, the Debtors filed with the Bankruptcy Court their respective Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, as amended, the "**Schedules**").

2.      *Bar Date*

By order dated November 20, 2009 (the "**Bar Date Order**"), pursuant to Bankruptcy Rule 3003(c)(3), the Bankruptcy Court set January 15, 2010 at 5:00 p.m. (prevailing Pacific time) (the "**Bar Date**"), as the date and time by which general proofs of claim were required to be filed by substantially all claimants of the Debtors. Unless specifically exempted by the Bar Date Order, all potential creditors were required to file proofs of claim notwithstanding section 1111(a) of Bankruptcy Code and Bankruptcy Rule 3003(c)(2), which generally requires a proof of claim be filed only with respect to prepetition claims that are not scheduled in the Debtors' Schedules or which is listed in the Schedules as disputed, contingent or unliquidated.

Notice of the Bar Date and a proof of claim form were mailed to (i) all creditors and other known holders of claims, including all creditors listed in the Debtors' Schedules; (ii) all parties to executory contracts and unexpired leases of the Debtors; (iii) all parties to litigation with the Debtors; (iv) all members of the Creditors' Committee; (v) all persons and entities included in the Debtors' Master Service List; and (vi) all persons and entities requesting notice pursuant to Bankruptcy Rule 2002 as of the entry of the Bar Date Order.

# IV.      THE PLAN

THIS SECTION DESCRIBING THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN PROVIDES A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED

HERETO, AND TO THE PLAN SUPPLEMENT.  IN THE EVENT OF ANY INCONSISTENCIES, THE PROVISIONS OF THE PLAN SHALL GOVERN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective bankruptcy estates.  Thus, the Plan is really 18 distinct chapter 11 plans, one separate plan for each Debtor.  However, because many of the procedural provisions of those separate plans are the same, and to save the Debtors' Estates the cost of duplicative efforts to draft multiple disclosure statements and separately solicit approval of multiple plans, the Debtors are submitting a single Plan and this Disclosure Statement.

## A.    Administrative Claims, Priority Tax Claims and Other Priority Claims

Pursuant to Bankruptcy Code section 1123(a)(1), the Claims against each of the Debtors set forth in this Article 2 are not classified within any Classes.  The Holders of such Claims are not entitled to vote on the Plan.  The treatment of the Claims set forth below is consistent with the requirements of Bankruptcy Code section 1129(a)(9).

The Chapter 11 Cases for each of the Debtors will not be substantively consolidated.  Accordingly, Holders of unclassified Claims again a particular Debtor shall have their Claim allowed and treated in such respective Debtor's Estate.  As such, for each category of unclassified Claims, a sub-category shall be deemed to exist for each Debtor.

### 1.    <u>Administrative Claims</u>

Except as otherwise provided herein, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim other than the Holder of the DIP Facility Claims will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash from the Debtor(s) against which the Administrative Claim is Allowed for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by such Holder.

Notwithstanding anything herein to the contrary but subject to the immediately following paragraph, to the extent applicable, all Administrative Claims (including, without limitation, professional fees and expenses, whether incurred on an hourly, monthly, "success" or other basis) shall be subject to an allocation among SCI and the Other Opco Debtors, on the one hand, and Propco, the Parent Debtors and the Mezzco Debtors, on the other hand, to ensure that the Allowed Administrative Claims are being allocated to the Debtor(s) that incurred the obligations or received the benefit thereof.  Such allocation will be either acceptable to the Required Consenting Lenders and the Holders of the Prepetition Mortgage Loan Claims or ordered by the Bankruptcy Court following notice and a hearing; provided further that, any expense reimbursement payable pursuant to the Bid Procedures Order shall constitute an Allowed Administrative Claim against SCI and its Estate only.

Notwithstanding anything herein to the contrary, the Allowed Administrative Claim of Lazard Frères & Co. LLC ("*Lazard*") for any "*Restructuring Fee*" (as that term is defined in the Order approving Lazard's retention [Docket No. 326] (the "*Lazard Retention Order*")) as Debtors' financial advisor and investment banker shall be subject to the following allocation: (i) SCI and the Other Opco Debtors, shall be responsible for payment of half of the Restructuring Fee   on the one hand, and (ii) Propco, the Parent Debtors and the Mezzco Debtors, shall be responsible for payment of the other half of the Restructuring Fee on the other hand.  For the avoidance of doubt, none of Lazard's other fees, including without limitation its Monthly Fees (as that term is defined in the Lazard Retention Order), shall be allocated, and SCI and the Other Opco Debtors shall remain obligated to pay such fees to the extent Allowed.  The allocation of the Restructuring Fee is the result of good faith, arms length negotiation between and among SCI and the Other Opco Debtors, Propco, the Prepetition Opco Secured Lenders and the

Mortgage Lenders, based upon the nature and extent of services rendered by Lazard to the various Debtor entities throughout the restructuring process.

The Debtors estimate that the amount of Allowed Administrative Claims that will be outstanding as of the Effective Date, excluding DIP Facility Claims and Superpriority Claims under the Opco Cash Collateral Order, will be approximately $55-65 million if the Debtors are able to reach a settlement with the Committee prior to Confirmation and approximately $65-75 million if no such settlement is reached.  These estimates do *not* include any Administrative Claims, including adequate protection or professional fee claims, that have been or will be paid in the ordinary course or otherwise pursuant to applicable Court-approved procedures prior to the Effective Date."

All Superpriority Claims under, and as defined in the Opco Cash Collateral Order, and any other Administrative Claims relating to SCI's adequate protection obligations arising under the Opco Cash Collateral Order shall be afforded the treatment set forth in Article III.B.4. under the heading "Prepetition Opco Secured Claims against SCI."  All Administrative Claims relating to SCI's and Propco's respective adequate protection obligations arising under the Propco Cash Collateral Order shall be afforded the treatment set forth in Article III.B.2 under the hearing "Prepetition Mortgage Loan Claims against Propco."

The DIP Facility Claims held by Vista Holdings, LLC and Past Enterprises, Inc. shall receive no distribution under the Plan and shall be extinguished and discharged upon the Effective Date, without payment of any consideration.

### (A)    Bar Date for Administrative Claims

Except as otherwise provided in Section IV.A of the Plan, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims but do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims and such Administrative Claims shall be deemed extinguished as of the Effective Date.

### (B)    Professional Compensation and Reimbursement Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File an application for final allowance of such Professional Fee Claim against the applicable Debtor and its estate no later than the Professional Fees Bar Date; underlined provided that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered to the Debtors before the Effective Date in accordance with the terms of the Ordinary Course Professionals Order and without further Bankruptcy Court order.

### 2.    **Priority Tax Claims**

The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by the Plan.  Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by such Holder; or (c) pursuant to and in accordance with Bankruptcy Code sections 1129(a)(9)(C) and (D), Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; provided, further, that Priority Tax Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or the Plan Administrator without further notice to or order of the Bankruptcy Court.

3.    **Other Priority Claims**

        Each Allowed Other Priority Claim, if any, shall, in full and final satisfaction of such Claim, be paid in full in Cash by the applicable Debtor or Plan Administrator upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

B.    **Classification and Treatment of Holders of Claims and Equity Interests**

        One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court or other court of appropriate jurisdiction determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.

        The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to holders of such claims or interests, including the right to vote on the plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, grants such holder a claim for damages incurred, and does not otherwise alter the holders' legal, equitable and contractual rights.

        The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1). The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date. If there are no Claims or Interests in a particular Class, then such Class of Claims or Interests shall not exist for all purposes of the Plan.

1.    **Claims and Equity Interests Against Parent Debtors**

(A)    **FCP Holding, Inc.**

*Class FHI.1 – Prepetition Mortgage Loan Guaranty Claims against FCP Holding, Inc.*

        *Treatment*: On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged. Holders of Class FH.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

        *Voting*: Class FHI.1 is Impaired and the Holders of Class FHI.1 Claims are entitled to vote to accept or reject the Plan.

*Class FHI.2 – Prepetition Mezzanine Loan Guaranty Claims against FCP Holding, Inc.*

        *Treatment*: On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged. Holders of Class FHI.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class FHI.2 is Impaired.  The Holders of Class FHI.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FHI.2 Claims are not entitled to vote to accept or reject the Plan.

*Class FHI.3 – Land Loan Guaranty Claims Against FCP Holding, Inc.*

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by FCP Holding, Inc. shall be extinguished and discharged.  Holders of Class FHI.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class FHI.3 is Impaired.  The Holders of Class FHI.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FHI.3 Claims are not entitled to vote to accept or reject the Plan.

*Class FHI.4 – General Unsecured Claims against FCP Holding, Inc.*

*Treatment*:  Holders of Class FHI.4 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class FHI.4 Impaired.  The Holders of Class FHI.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FHI.4 Claims are not entitled to vote to accept or reject the Plan.

*Class FHI.5 – Intercompany Claims against FCP Holding, Inc.*

*Treatment*:  Holders of Class FHI.5 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting:*  Class FHI.5 Impaired.  The Holders of Class FHI.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FHI.5 Claims are not entitled to vote to accept or reject the Plan.

*Class FHI.6 – Equity Interests in FCP Holding, Inc.*

*Treatment*:  On the Effective Date, all Equity Interests in FCP Holding, Inc. shall be cancelled and extinguished.  Holders of Class FHI.6 Equity Interests shall not receive or retain any property on account of their Claims under the Plan.

*Voting:*  Class FHI.6 Impaired.  The Holders of Class FHI.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FHI.6 Claims are not entitled to vote to accept or reject the Plan.

### (B)    Fertitta Partners LLC

*Class FP.1 – Prepetition Mortgage Loan Guaranty Claims against Fertitta Partners LLC.*

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged.  Holders of Class FH.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

*Voting*:  Class FP.1 is Impaired and Holders of Class FP.1 Claims are entitled to vote to accept or reject the Plan.

*Class FP.2 – Prepetition Mezzanine Loan Guaranty Claims against Fertitta Partners LLC*

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged.  Holders of Class FH.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class FP.2 is Impaired.  The Holders of Class FP.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FP.2 Claims are not entitled to vote to accept or reject the Plan.

*Class FP.3 – Land Loan Guaranty Claims Against Fertitta Partners LLC*

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by Fertitta Partners LLC shall be extinguished and discharged.  Holders of Class FP.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting:*  Class FP.3 is Impaired.  The Holders of Class FP.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FP.3 Claims are not entitled to vote to accept or reject the Plan.

*Class FP.4 – General Unsecured Claims against Fertitta Partners LLC*

*Treatment*:  Holders of Class FP.4 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting:*  Class FP.4 Impaired.  The Holders of Class FP.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FP.4 Claims are not entitled to vote to accept or reject the Plan.

*Class FP.5 – Intercompany Claims against Fertitta Partners LLC*

*Treatment*:  Holders of Class FP.5 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting:*  Class FP.5 Impaired.  The Holders of Class FP.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FP.5 Claims are not entitled to vote to accept or reject the Plan.

*Class FP.6 – Equity Interests in Fertitta Partners LLC*

*Treatment*:  On the Effective Date, all Equity Interests in Fertitta Partners LLC shall be cancelled and extinguished.  Holders of Class FP.6 Equity Interests shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class FP.6 Impaired.  The Holders of Class FP.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FP.6 Claims are not entitled to vote to accept or reject the Plan.

### (C)    FCP Voteco, LLC

*Class VC.1 – Prepetition Mortgage Loan Guaranty Claims against FCP Voteco, LLC*

> *Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged.  Holders of Class VC.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

> *Voting*:  Class VC.1 is Impaired and the Holders of Class VC.1 Claims are entitled to vote to accept or reject the Plan.

*Class VC.2 – Prepetition Mezzanine Loan Guaranty Claims against FCP Voteco, LLC*

> *Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged.  Holders of Class FH.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

> *Voting*:  Class VC.2 is Impaired.  The Holders of Class VC.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.2 Claims are not entitled to vote to accept or reject the Plan.

*Class VC.3 – Land Loan Guaranty Claims Against FCP Voteco, LLC*

> *Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by FCP Voteco, LLC shall be extinguished and discharged.  Holders of Class VC.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

> *Voting*:  Class VC.3 is Impaired.  The Holders of Class VC.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.3 Claims are not entitled to vote to accept or reject the Plan.

*Class VC.4 – General Unsecured Claims against FCP Voteco, LLC*

> *Treatment*:  Holders of Class VC.4 Claims shall not receive or retain any property on account of their Claims under the Plan.

> *Voting*:  Class VC.4 is Impaired.  The Holders of Class VC.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.4 Claims are not entitled to vote to accept or reject the Plan.

*Class VC.5 – Intercompany Claims against FCP Voteco, LLC*

> *Treatment*:  Holders of Class VC.5 Claims shall not receive or retain any property on account of their Claims under the Plan.

> *Voting*:  Class VC.5 is Impaired.  The Holders of Class VC.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.5 Claims are not entitled to vote to accept or reject the Plan.

*Class VC.6 – Equity Interests in FCP Voteco, LLC*

> *Treatment*: On the Effective Date, all Equity Interests in FCP Voteco, LLC shall be cancelled and extinguished. Holders of Class VC.6 Equity Interests shall not receive or retain any property on account of their Claims under the Plan.

> *Voting*: Class VC.6 is Impaired. The Holders of Class VC.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class VC.6 Claims are not entitled to vote to accept or reject the Plan.

### 2. **Claims and Equity Interests Against Propco**

*Class P.1 – Other Secured Claims against Propco*

> *Classification*: Each Class P.1 Claim, if any, is an Other Secured Claim. This Class will be further divided into subclasses designated by letters of the alphabet (Class P.1A, Class P.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

> *Treatment*: The legal, equitable and contractual rights of the Holders of Class P.1 Claims, if any, are unaltered by the Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class P.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class P.1 Claim shall either (at the election of the Debtors): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class P.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such claim by New Propco and retention of all existing liens to secure such claim, in either case upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

> *Voting*: Class P.1 is an Unimpaired Class, and the Holders of Class P.1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class P.1 Claims are not entitled to vote to accept or reject the Plan.

*Class P.2 – Prepetition Mortgage Loan Claims against Propco*

> *Allowance*: On the Effective Date, the Prepetition Mortgage Loan Agreement Claims shall be deemed Allowed in an aggregate amount equal to principal in the amount of not less than $1,800,000,000, plus all interest accrued and unpaid thereon as of the Effective Date, and all unpaid fees, costs, expenses and other charges required to be paid or reimbursed, as applicable, pursuant to the Prepetition Mortgage Loan Agreement and the Propco Cash Collateral Order.

> *Treatment*: On the Effective Date, Holders of Allowed Class P.2 Claims shall receive, on account, and in full satisfaction, of those Claims their respective Pro Rata shares of:

> > (a)       the New Propco Transferred Assets, which will be delivered to New Propco or one or more Subsidiaries thereof, as the designee(s) of the Mortgage Lenders for purposes of distribution of such assets; and

> > (b)       their respective Pro Rata shares of (i) Propco Excess Effective Date Cash; and (ii) any recoveries received by Propco on account of any claims Propco has against SCI, including the Master Lease Rejection Damage Claim, all or a portion of which the Mortgage Lenders may direct to be delivered to New Propco or one or more subsidiaries

thereof as the designees of the Mortgage Lenders for purposes of distribution of such assets.

*Voting*:  Class P.2 is Impaired, and Holders of Class P.2 Claims are entitled to vote to accept or reject this Plan.

*Class P.3 – General Unsecured Claims against Propco*

*Treatment*:  Holders of Class P.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class P.3 is Impaired.  The Holders of Class P.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class P.3 Claims are not entitled to vote to accept or reject the Plan.

*Class P.4 – Intercompany Claims against Propco*

*Treatment*:  Holders of Class P.4 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class P.4 is Impaired.  The Holders of Class P.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class P.4 Claims are not entitled to vote to accept or reject the Plan.

*Class P.5 – Equity Interests in Propco*

*Treatment*:  On the Effective Date, all Equity Interests in Propco shall be deemed to be surrendered to the lenders under the Mezz I Loan to FCP MezzCo Borrower I, LLC in satisfaction of its pledge of those Equity Interests.  Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished.  Holders of Class P.5 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under the Plan.

*Voting*:  Class P.5 is Impaired, and Holders of Class P.5 Equity Interests are deemed to reject the Plan.

3. **Claims and Equity Interests Against Mezzco Debtors**

(A) **FCP MezzCo Parent, LLC**

*Class MP.1 – General Unsecured Claims against FCP MezzCo Parent, LLC*

*Treatment*:  Holders of Class MP.1 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class MP.1 is Impaired.  The Holders of Class MP.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MP.1 Claims are not entitled to vote to accept or reject the Plan.

*Class MP.2 – Intercompany Claims against FCP MezzCo Parent, LLC*

*Treatment*:  Holders of Class MP.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class MP.2 is Impaired.  The Holders of Class MP.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have

rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class MP.2 Claims are not entitled to vote to accept or reject the Plan.

*Class MP.3 – Equity Interests in FCP MezzCo Parent, LLC*

> *Treatment*: On the Effective Date, all Class MP.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

> *Voting*: Class MP.3 is Impaired, and the Holders of Class MP.3 Equity Interests are deemed to have rejected the Plan.

### (B)    FCP MezzCo Parent Sub, LLC

*Class MS.1 — General Unsecured Claims against FCP MezzCo Parent Sub, LLC*

> *Treatment*: Holders of Class MS.1 Claims shall not receive or retain any property on account of their Claims under the Plan.

> *Voting*: Class MS.1 is Impaired. The Holders of Class MS.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class MS.1 Claims are not entitled to vote to accept or reject the Plan.

*Class MS.2 — Intercompany Claims against FCP MezzCo Parent Sub, LLC*

> *Treatment*: Holders of Class MS.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

> *Voting*: Class MS.2 is Impaired. The Holders of Class MS.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class MS.2 Claims are not entitled to vote to accept or reject the Plan.

*Class MS.3 — Equity Interests In FCB MezzCo Parent Sub, LLC*

> *Treatment*: On the Effective Date, all Class MS.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

> *Voting*: Class MS.3 is Impaired, and the Holders of Class MS.3 Equity Interests are deemed to have rejected the Plan.

### (C)    FCP Mezzco Borrower VII, LLC

*Class M7.1 — General Unsecured Claims against FCP MezzCo Borrower VII, LLC*

> *Treatment*: Holders of Class M7.1 Claims shall not receive or retain any property on account of their Claims under the Plan.

> *Voting*: Class M7.1 is Impaired. The Holders of Class M7.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M7.1 Claims are not entitled to vote to accept or reject the Plan.

*Class M7.2 — Intercompany Claims against FCP MezzCo Borrower VII, LLC*

> *Treatment*: Holders of Class M7.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class M7.2 is Impaired.  The Holders of Class M7.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M7.2 Claims are not entitled to vote to accept or reject the Plan.

*Class M7.3 — Equity Interests In FCP MezzCo Borrower VII, LLC*

*Treatment*:  On the Effective Date, all Class M7.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class M7.3 is Impaired, and the Holders of Class M7.3 Equity Interests are deemed to have rejected the Plan.

### (D)    FCP Mezzco Borrower VI, LLC

*Class M6.1 — General Unsecured Claims against FCP MezzCo Borrower VI, LLC*

*Treatment*:  Holders of Class M6.1 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class M6.1 is Impaired.  The Holders of Class M6.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M6.1 Claims are not entitled to vote to accept or reject the Plan.

*Class M6.2 — Intercompany Claims against FCP MezzCo Borrower VI, LLC*

*Treatment*:  Holders of Class M6.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class M6.2 is Impaired.  The Holders of Class M6.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M6.2 Claims are not entitled to vote to accept or reject the Plan.

*Class M6.3 — Equity Interests In FCP MezzCo Borrower VI, LLC*

*Treatment*:  On the Effective Date, all Class M6.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class M6.3 is Impaired, and the Holders of Class M6.3 Equity Interests are deemed to have rejected the Plan.

### (E)    FCP Mezzco Borrower V, LLC

*Class M5.1 — General Unsecured Claims against FCP MezzCo Borrower V, LLC*

*Treatment*:  Holders of Class M5.1 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class M5.1 is Impaired.  The Holders of Class M5.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M5.1 Claims are not entitled to vote to accept or reject the Plan.

*Class M5.2 — Mezz IV Pledge Claims against FCP MezzCo Borrower V, LLC*

*Treatment*:  Holders of Class M5.2 Claims will receive the Equity Interests in FCP Mezzco Borrower IV, LLC on account of their Claims under the Plan.  Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*:  Class M5.2 is Impaired.  The Holders of Class M5.2 Claims are entitled to vote to accept or reject the Plan.

*Class M5.3 — Intercompany Claims against FCP MezzCo Borrower V, LLC*

*Treatment*:  Holders of Class M5.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class M5.3 is Impaired.  The Holders of Class M5.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M5.3 Claims are not entitled to vote to accept or reject the Plan.

*Class M5.4 — Equity Interests In FCP MezzCo Borrower V, LLC*

*Treatment*:  On the Effective Date, all Class M5.4 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class M5.4 is Impaired, and the Holders of Class M5.4 Equity Interests are deemed to have rejected the Plan.

### (F)    FCP Mezzco Borrower IV, LLC

*Class M4.1 — Mezz IV Loan Claims against FCP MezzCo Borrower IV, LLC*

*Treatment*:  Holders of Class M4.1 Claims will receive the Equity Interests in FCP Mezzco Borrower III, LLC on account of their Claims under the Plan.  Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*:  Class M4.1 is Impaired.  The Holders of Class M4.1 Claims are entitled to vote to accept or reject the Plan.

*Class M4.2 — General Unsecured Claims against FCP MezzCo Borrower IV, LLC*

*Treatment*:  Holders of Class M4.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class M4.2 is Impaired.  The Holders of Class M4.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M4.2 Claims are not entitled to vote to accept or reject the Plan.

*Class M4.3 — Intercompany Claims against FCP MezzCo Borrower IV, LLC*

*Treatment*:  Holders of Class M4.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*:  Class M4.3 is Impaired.  The Holders of Class M4.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M4.3 Claims are not entitled to vote to accept or reject the Plan.

*Class M4.4 — Equity Interests In FCP MezzCo Borrower IV, LLC*

*Treatment*: On the Effective Date, all Class M4.4 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*: Class M4.4 is Impaired, and the Holders of Class M4.4 Equity Interests are deemed to have rejected the Plan.

### (G)  FCP Mezzco Borrower III, LLC

*Class M3.1 — Mezz III Loan Claims against FCP MezzCo Borrower III, LLC*

*Treatment*: Holders of Class M3.1 Claims shall receive the Equity Interests in FCP Mezzco Borrower II, LLC on account of their Claims under the Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*: Class M3.1 is Impaired. The Holders of Class M3.1 Claims are entitled to vote to accept or reject the Plan.

*Class M3.2 — General Unsecured Claims against FCP MezzCo Borrower III, LLC*

*Treatment*: Holders of Class M3.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*: Class M3.2 is Impaired. The Holders of Class M3.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M3.2 Claims are not entitled to vote to accept or reject the Plan.

*Class M3.3 — Intercompany Claims against FCP MezzCo Borrower III, LLC*

*Treatment*: Holders of Class M3.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*: Class M3.3 is Impaired. The Holders of Class M3.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M3.3 Claims are not entitled to vote to accept or reject the Plan.

*Class M3.4 — Equity Interests In FCP MezzCo Borrower III, LLC*

*Treatment*: On the Effective Date, all Equity Interests in FCP MezzCo Borrower III, LLC shall be deemed to be surrendered to the Holders of Mezz IV Loan Claims in satisfaction of its pledge of those Equity Interests. Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished. Holders of Class M3.4 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under the Plan.

*Voting*: Class M3.4 is Impaired, and the Holders of Class M3.4 Equity Interests are deemed to have rejected the Plan.

### (H)  FCP Mezzco Borrower II, LLC

*Class M2.1 — Mezz II Loan Claims against FCP MezzCo Borrower II, LLC*

*Treatment*: Holders of Class M2.1 Claims shall receive the Equity Interests in FCP Mezzco Borrower I, LLC on account of their Claims under the Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*: Class M2.1 is Impaired. The Holders of Class M2.1 Claims are entitled to vote to accept or reject the Plan.

*Class M2.2 — General Unsecured Claims against FCP MezzCo Borrower II, LLC*

*Treatment*: Holders of Class M2.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*: Class M2.2 is Impaired. The Holders of Class M2.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M2.2 Claims are not entitled to vote to accept or reject the Plan.

*Class M2.3 — Intercompany Claims against FCP MezzCo Borrower II, LLC*

*Treatment*: Holders of Class M2.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*: Class M2.3 is Impaired. The Holders of Class M2.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M2.3 Claims are not entitled to vote to accept or reject the Plan.

*Class M2.4 — Equity Interests In FCP MezzCo Borrower II, LLC*

*Treatment*: On the Effective Date, all Equity Interests in FCP MezzCo Borrower II, LLC shall be deemed to be surrendered to the Holders of Mezz III Loan Claims in satisfaction of its pledge of those Equity Interests. Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished. Holders of Class M2.4 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under the Plan.

*Voting*: Class M2.4 is Impaired, and the Holders of Class M2.4 Equity Interests are deemed to have rejected the Plan.

### (I)    FCP Mezzco Borrower I, LLC

*Class M1.1 — Mezz I Loan Claims against FCP MezzCo Borrower I, LLC*

*Treatment*: Holders of Class M1.1 Claims shall receive the Equity Interests in Propco on account of their Claims under the Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*: Class M1.1 is Impaired. The Holders of Class M1.1 Claims are entitled to vote to accept or reject the Plan.

*Class M1.2 — General Unsecured Claims against FCP MezzCo Borrower I, LLC*

*Treatment*: Holders of Class M1.2 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*: Class M1.2 is Impaired. The Holders of Class M1.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M1.2 Claims are not entitled to vote to accept or reject the Plan.

*Class M1.3 — Intercompany Claims against FCP MezzCo Borrower I, LLC*

*Treatment*: Holders of Class M1.3 Claims shall not receive or retain any property on account of their Claims under the Plan.

*Voting*: Class M1.3 is Impaired. The Holders of Class M1.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M1.3 Claims are not entitled to vote to accept or reject the Plan.

**Class M1.4 — *Equity Interests In FCP MezzCo Borrower I, LLC***

*Treatment*: On the Effective Date, all Equity Interests in FCP MezzCo Borrower I, LLC shall be deemed to be surrendered to the Holders of Mezz II Loan Claims in satisfaction of its pledge of those Equity Interests. Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished. Holders of Class M1.4 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under the Plan.

*Voting*: Class M1.4 is Impaired, and the Holders of Class M1.4 Equity Interests are deemed to have rejected the Plan.

### 4. <u>Claims and Equity Interests Against SCI</u>

**Class S.1 – *Other Secured Claims against SCI***

*Classification*: Each Class S.1 Claim is an Other Secured Claim. This Class will be further divided into subclasses designated by letters of the alphabet (Class S.1A, Class S.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*: The legal, equitable and contractual rights of the Holders of Class S.1 Claims are unaltered by the Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class S.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class S.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class S.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*: Class S.1 is an Unimpaired Class, and the Holders of Class S.1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class S.1 Claims are not entitled to vote to accept or reject the Plan.

**Class S.2 – *Prepetition Opco Secured Claims against SCI***

*Allowance*: On the Effective Date, the Prepetition Opco Secured Claims shall be deemed Allowed in the aggregate principal amount of not less than $882,015,849.96 plus all interest accrued and unpaid thereon as of the Effective Date, and all unpaid fees, costs, expenses and other charges, claims and obligations (including indemnification claims) required to be paid or reimbursed, as applicable, pursuant to the Prepetition Opco Credit Agreement and the Prepetition Opco Swap Agreement. To the extent the value of the Collateral securing Prepetition Opco Secured Claims is less than the amount of those Claims, such deficiency shall be classified as a General Unsecured Claim in Class S.4. Any Holder of a Class S.2 Claim that votes to accept the Plan, however, shall not be an Eligible Opco Unsecured Creditor and shall be deemed to have elected to waive any and all rights to receive any distributions on account of its Class S.4 deficiency claim and therefore shall not receive any NPH Warrants and shall not have any rights to participate in the Propco Rights Offering, any Equity Raise or in any NPH Post-Effective Investment Rights on account of its Class S.4 deficiency claim.

*Treatment*: On the Effective Date, Holders of Allowed Claims arising under the Prepetition Opco Credit Agreement and the Prepetition Opco Swap Agreement shall receive on account, and in full satisfaction, of those Claims and their Superpriority Claims (as defined in the Opco Cash Collateral Order) and any other Administrative Claims arising under the Opco Cash Collateral Order, their respective Pro Rata shares of:

(a) If the Stalking Horse Bidder is the Successful Bidder (subject in all respects to the terms of the Stalking Horse APA and with capitalized terms having the meanings ascribed to them in the Stalking Horse APA):

(1) an amount in cash equal to $317 million, plus the Gun Lake Reimbursement proceeds in excess of $20 million, less the Excess AMT Amount, if any, less the Super Priority Principal Amount if the Stalking Horse Bidder has made the Super Priority Notes Election pursuant to the terms of the Stalking Horse APA;

(2) $430 million in aggregate principal amount of term loans less the Gun Lake Reimbursement proceeds in excess of $20 million, which term loans shall be subject to the terms of the New Opco Credit Agreement; provided that notwithstanding anything herein to the contrary, letters of credit issued and that remain undrawn under the Prepetition Opco Credit Agreement shall be replace or backstopped by letters of credit issued under the New Opco Credit Agreement;

(3) $25 million in aggregate principal amount of term loans, which shall be subject to the terms of the New Opco PIK Credit Agreement; and

(4) if the Stalking Horse has made the Super Priority Notes Election pursuant to the terms of the Stalking Horse APA, then Deutsche Bank Trust Company Americas and JP Morgan Chase Bank, N.A., in their capacities as Prepetition Opco Secured Lenders, have consented to receive, and shall receive on the Effective Date, the Super Priority Notes in the Super Priority Principal Amount in lieu a like amount of Cash that they would otherwise receive as part of their Pro Rata Share of Cash under clause (1) above.

(b) If the Successful Bidder is a Person other than the Stalking Horse Bidder:

**[SUPPLEMENTAL DISCLOSURE TO COME FOLLOWING OPCO AUCTION]**

*Voting*: Class S.2 is Impaired, and Holders of Class S.2 Claims are entitled to vote to accept or reject this Plan. Any Holder of a Class S.2 Claim that votes to accept the Plan, however, shall not be an Eligible Opco Unsecured Creditor and shall be deemed to have elected to waive any and all rights to receive any distributions on account of its Class S.4 deficiency claim and therefore shall not receive any NPH Warrants and shall not have any rights to participate in the Propco Rights Offering, any Equity Raise or in any NPH Post-Effective Investment Rights on account of its Class S.4 deficiency claim.

*Reserved Claims:* Unless otherwise settled, SCI reserves the right to set off against distributions to be made under this Section III.B.4 to any Non-Funding Lender (as defined in the Opco Cash Collateral Order) any amounts recoverable by SCI on account of any Reserved Claims (as defined in the Opco Cash Collateral Order) against any such Non-Funding Lender under applicable law. Natixis, New York Branch, a Non-Funding Lender, disputes that it is liable to SCI for any Reserved Claims and reserves any and all rights, claims and defenses it may have.

*Class S.3 – Master Lease Rejection Damage Claim against SCI*

*Treatment*: On the Effective Date, Propco, in its capacity as Holder of the Master Lease Rejection Damage Claim, shall receive from SCI and the Operating Subtenants a transfer of all of the Master Lease Collateral in full satisfaction of the secured portion of the Master Lease Rejection Damage

Claim. If the Stalking Horse Bid is the Successful Bid, Propco will not receive any other distributions on account of its Allowed Class S.3 Claim. If the Stalking Horse Bid is not the Successful Bid, the Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*: Class S.3 is Impaired and Holders of Class S.3 Claims are entitled to vote to accept or reject the Plan.

### Class S.4 – General Unsecured Claims against SCI

*Treatment*: On the Effective Date or promptly following any subsequent date on which an applicable claim becomes an Allowed Claim, Holders of Allowed General Unsecured Claims against SCI:

(a)  That are Eligible Opco Unsecured Creditors shall receive their Allocated Pro Rata Share of NPH Warrants;

(b)  That are Eligible Opco Unsecured Creditors and Accredited Investors shall receive their Allocated Pro Rata Share of NPH Investment Rights; and

(c)  That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

*Voting*: Class S.4 is Impaired, and Holders of Class S.4 Claims are entitled to vote to accept or reject this Plan. In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.4 Claims as of the Rights Offering Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering. Any Holder that is an Accredited Investor that indicates an interest in so participating will then be given the opportunity to subscribe in the Propco Rights Offering, provided that it subscribes for the purchase of at least $250,000 of NPH Equity. Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

### Class S.5 – Senior Notes Claims against SCI

*Treatment*: On the Effective Date, Holders of Allowed Senior Notes Claims against SCI:

(a)  That are Eligible Opco Unsecured Creditors shall receive their Allocated Pro Rata Share of NPH Warrants;

(b)  That are Eligible Opco Unsecured Creditors and Accredited Investors shall receive their Allocated Pro Rata Share of NPH Investment Rights; and

(c)  That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

In addition, the reasonable and documented fees and expenses of the Senior Notes Trustee (including reasonable legal fees and expenses) in an amount to be mutually agreed by the Debtors, FG, the Mortgage Lenders and the Senior Notes Trustee or as otherwise determined by the

Bankruptcy Court, shall be paid upon confirmation of the Plan (with respect to amounts then accrued), and with respect to fees and expenses incurred between confirmation of the Plan and the Effective Date, shall be paid on the Effective Date subject in each case to Bankruptcy Court approval to be included in the Confirmation Order (it being understood that such "reasonable" fees and expenses shall not include any legal fees or expenses incurred by the Senior Notes Trustee after July 27, 2010 in opposing implementation of the terms of the NPH Term Sheet (including confirmation of the Plan) or engaging in litigation activity against any of the Debtors, FG or the Mortgage Lenders, or any of their respective affiliates).

*Voting*:  Class S.5 is Impaired, and Holders of Class S.5 Claims are entitled to vote to accept or reject this Plan.  In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.5 Claims as of the Rights Offering Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering.  Any Holder that is an Accredited Investor that indicates an interest in so participating will then be given the opportunity to subscribe in the Propco Rights Offering, provided that it subscribes for the purchase of at least $250,000 of NPH Equity.  Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

*Class S.6 – Subordinated Notes Claims against SCI*

*Treatment*:  On the Effective Date and subject to the immediately following proviso, Holders of Allowed Subordinated Notes Claims against SCI:

(a)  That are Eligible Opco Unsecured Creditors shall be entitled to their Allocated Pro Rata Share of NPH Warrants;

(b)  That are Eligible Opco Unsecured Creditors and Accredited Investors shall be entitled to their Allocated Pro Rata Share of NPH Investment Rights; and

(c)  That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

**PROVIDED, HOWEVER, that the distributions described above to which the Holders of Subordinated Notes Claims otherwise may be entitled shall be subject, in each case, to any applicable contractual subordination arrangements or obligations, including any such arrangements or obligations with respect to (a) Holders of Allowed Class S.4 Claims that also hold Class S.2 Claims and that do not vote to accept the Plan on account of such Class S.2 Claims and (b) Holders of Allowed Senior Notes, except to the extent the parties otherwise agree and such agreement is reflected in the Plan and approved by the Bankruptcy Court.**

**PLEASE NOTE:  Absent agreement otherwise among the parties, the application of any such subordination arrangement or obligations may result in Holders of Class S.6 Claims receiving no recovery under the Plan.  There can be no assurance that any such agreement will be reached that would result in Holders of Class S.6 Claims retaining a recovery under the Plan.**

In addition, the reasonable and documented fees and expenses of the Subordinated Notes Trustee (including reasonable legal fees and expenses) in an amount to be mutually agreed by the Debtors, FG, the Mortgage Lenders and the Subordinated Notes Trustee or as otherwise determined by the Bankruptcy Court, shall be paid upon confirmation of the Plan (with respect to amounts then accrued), and with respect to fees and expenses incurred between confirmation of the Plan and the

Effective Date, shall be paid on the Effective Date subject in each case to Bankruptcy Court approval to be included in the Confirmation Order and such fees and expenses shall not be subject to the subordination or turn-over provisions of the Subordinated Notes Indentures (it being understood that such "reasonable" fees and expenses shall not include any legal fees or expenses incurred by the Subordinated Notes Trustee after July 27, 2010 in opposing implementation of the terms of the NPH Term Sheet (including confirmation of the Plan) or engaging in litigation activity against any of the Debtors, FG or the Mortgage Lenders, or any of their respective affiliates).

*Voting*:  Class S.6 is Impaired, and Holders of Class S.6 Claims are entitled to vote to accept or reject this Plan.  In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.6 Claims as of the Rights Offering Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering in the event the Plan results in NPH Investment Rights being distributed to such Holders.  Any Holder that is an Accredited Investor that indicates an interest in so participating may be given the opportunity to subscribe in the Propco Rights Offering in the event the Plan results in NPH Investment Rights being distributed to such Holders.  Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

*Class S.7 – Mortgage Lender Claims against SCI*

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class S.7 Claims will be deemed to have their Class S.7 Claims satisfied by the distributions to Holders of Class S.3 and Class P.2 Claims as described herein.  If the Stalking Horse Bid is not the Successful Bid and the Successful Bid yields additional consideration for distribution to Class S.7, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class S.7 is Impaired, and the Holders of Class S.7 Claims are entitled to vote to accept or reject this Plan.

*Class S.8 – Intercompany Claims against SCI*

*Treatment*:  Holders of Class S.8 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class S.8 is Impaired.  The Holders of Class S.8 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class S.8 Claims are not entitled to vote to accept or reject this Plan.

*Class S.9 – Equity Interests in SCI*

*Treatment*:  On the Effective Date, all Class S.9 Equity Interests shall be deemed canceled and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Upon the cancellation and extinguishment of the Class S.9 Equity Interests, the Parent Debtor Pledges shall be deemed to be cancelled and extinguished.

*Voting*:  Class S.9 is Impaired, and the Holders of Class S.9 Equity Interests are deemed to have rejected this Plan.

5.    **Claims and Equity Interests Against Other Opco Debtors**

(A)    **Northern NV Acquisitions, LLC**

*Class NA.1 – Other Secured Claims against Northern NV Acquisitions, LLC*

*Classification*:  Each Class NA.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class NA.1A, Class NA.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:  The legal, equitable and contractual rights of the Holders of Class NA.1 Claims are unaltered by the Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class NA.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class NA.1 Claim shall either (at the election of the Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class NA.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:   Class NA.1 is an Unimpaired Class, and the Holders of Class NA.1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class NA.1 Claims are not entitled to vote to accept or reject the Plan.

*Class NA.2 – General Unsecured Claims against Northern NV Acquisitions, LLC*

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class NA.2 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class NA.2 Claims are not expected to receive or retain any property under the Plan.  Class NA.2 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class NA.2 Claims are not entitled to vote to accept or reject this Plan.

*Class NA.3 – Equity Interests in Northern NV Acquisitions, LLC*

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class NA.3 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class NA.3 Interests are not expected to receive or retain any property under the Plan.  Class NA.3 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class NA.3 Interests are not entitled to vote to accept or reject this Plan.

**(B)      Reno Land Holdings, LLC**

*Class RL.1 – Other Secured Claims against Reno Land Holdings, LLC*

*Classification*:  Each Class RL.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class RL.1A, Class RL.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself,

except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*: The legal, equitable and contractual rights of the Holders of Class RL.1 Claims are unaltered by the Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class RL.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class RL.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class RL.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*: Class RL.1 is an Unimpaired Class, and the Holders of Class RL.1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class RL.1 Claims are not entitled to vote to accept or reject the Plan.

*Class RL.2 – General Unsecured Claims against Reno Land Holdings, LLC*

*Treatment*: If the Stalking Horse Bid is the Successful Bid, the Holders of Class RL.2 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims. If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*: Holders of Class RL.2 Claims are not expected to receive or retain any property under the Plan. Class RL.2 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class RL.2 Claims are not entitled to vote to accept or reject this Plan.

*Class RL.3 – Equity Interests in Reno Land Holdings, LLC*

*Treatment*: If the Stalking Horse Bid is the Successful Bid, the Holders of Class RL.3 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests. If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*: Holders of Class RL.3 Interests are not expected to receive or retain any property under the Plan. Class RL.3 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class RL.3 Interests are not entitled to vote to accept or reject this Plan.

### (C)    River Central, LLC

*Class RC.1 – Other Secured Claims against River Central, LLC*

*Classification*: Each Class RC.1 Claim is an Other Secured Claim. This Class will be further divided into subclasses designated by letters of the alphabet (Class RC.1A, Class RC.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*: The legal, equitable and contractual rights of the Holders of Class RC.1 Claims are unaltered by the Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class RC.1 Claim becomes an

Allowed Claim, each Holder of an Allowed Class RC.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class RC.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:   Class RC.1 is an Unimpaired Class, and the Holders of Class RC.1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class RC.1 Claims are not entitled to vote to accept or reject the Plan.

Class RC.2 – *Prepetition Opco Credit Agreement Claims Against River Central, LLC*

*Treatment:* Same treatment as that provided for Allowed Class S.2 Claim Holders under Section III.B.4 above.

*Voting:* Class RC.2 is Impaired, and Holders of Class RC.2 Claims are entitled to vote to accept or reject this Plan.

*Class RC.3 – General Unsecured Claims against River Central, LLC*

*Treatment*: If the Stalking Horse Bid is the Successful Bid, the Holders of Class RC.3 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims. If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*: Holders of Class RC.3 Claims are not expected to receive or retain any property under the Plan. Class RC.3 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class RC.3 Claims are not entitled to vote to accept or reject this Plan.

*Class RC.4 – Equity Interests in River Central, LLC*

*Treatment*: If the Stalking Horse Bid is the Successful Bid, the Holders of Class RC.4 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests. If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*: Holders of Class RC.4 Interests are not expected to receive or retain any property under the Plan. Class RC.4 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class RC.4 Interests are not entitled to vote to accept or reject this Plan.

**(D)      Tropicana Station, LLC**

*Class TS.1 – Other Secured Claims against Tropicana Station, LLC*

*Classification*: Each Class TS.1 Claim is an Other Secured Claim. This Class will be further divided into subclasses designated by letters of the alphabet (Class TS.1A, Class TS.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*: The legal, equitable and contractual rights of the Holders of Class TS.1 Claims are unaltered by the Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class TS.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class TS.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class TS.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*: Class TS.1 is an Unimpaired Class, and the Holders of Class TS.1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class TS.1 Claims are not entitled to vote to accept or reject the Plan.

*Class TS.2 – Prepetition Opco Credit Agreement Claims Against Tropicana Station, LLC*

*Treatment:* Same treatment as that provided for Allowed Class S.2 Claim Holders under Section III.B.4 above.

*Voting:* Class TS.2 is Impaired, and Holders of Class TS.2 are entitled to vote to accept or reject this Plan.

*Class TS.3 – General Unsecured Claims against Tropicana Station, LLC*

*Treatment*: If the Stalking Horse Bid is the Successful Bid, the Holders of Class TS.3 Claims will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests. If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*: Holders of Class TS.3 Claims are not expected to receive or retain any property under the Plan. Class TS.3 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class TS.3 Claims are not entitled to vote to accept or reject this Plan.

*Class TS.4 – Equity Interests in Tropicana Station, LLC*

*Treatment*: If the Stalking Horse Bid is the Successful Bid, the Holders of Class TS.4 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Claims. If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*: Holders of Class TS.4 Interests are not expected to receive or retain any property under the Plan. Class TS.4 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class TS.4 Interests are not entitled to vote to accept or reject this Plan.

## C.    Means For Implementation of the Plan

### 1.    Transfers Under the Plan, Generally.

As described in detail below, implementation of the Plan will include, among other things, numerous conveyances, assignments, transfers and deliveries among various parties. All conveyances, assignments, transfers and deliveries to any transferee pursuant to the transactions described under Section V.B.3, Section V.B.4, Section V.B.5, Section V.B.7 and Section V.B.8 below shall be made, and such assets shall vest in the applicable

transferee, free and clear of all Liens, Claims, Equity Interests, and any other interests asserted by the Debtors, any creditors of the Debtors, or other Persons (including, without limitation, any Liens, Claims, Equity Interests, or other interests, whether presently known or unknown, in any way relating to or arising from the operations of the Debtors prior to the Effective Date), in accordance with and as contemplated by, among others, sections 105(a), 363, 1123 and 1129 of the Bankruptcy Code, save and excepting any specific obligations expressly undertaken by such transferee or its designee in the Plan or in any document to which such transferee is a party (including the New Opco Purchase Agreement) and which is necessary for Consummation of the Plan.  No such transferee or any of its Subsidiaries, creditors or equity holders shall be or be deemed to be a successor of any of the Debtors or any of the Non-Debtor Affiliates by reason of any theory of law or equity and shall not have any successor or transferee liability of any kind, nature or character, including liabilities arising or resulting from or relating to the transactions contemplated hereby; provided, that the Confirmation order shall not provide that the sale of any property that constitutes New Opco Acquired Assets is free and clear of any environmental liability imposed by a Governmental Unit (as defined in the Stalking Horse APA) arising from or related to such property to the extent that the Bankruptcy Court determines that such property cannot be sold to the Successful Bidder free and clear of such liability pursuant to the Bankruptcy Code.

The transactions consummated pursuant to the Plan, the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement and the Landco Asset Transfer Agreement shall not constitute a de facto merger, or a merger, as between any Debtors or any of the Non-Debtor Affiliates and any transferee pursuant to the Plan, the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement and the Landco Asset Transfer Agreement under any applicable law (including Nevada law).

Except for any specific obligations expressly undertaken by such transferee or its designee(s) in the Plan or in any agreement or other document to which such transferee or designee is a party and which is entered into in connection with the Consummation of the Plan, none of such transferee, Holdco, Voteco, New Propco or its Subsidiaries, New Opco or its Subsidiaries, the Mortgage Lenders, the Landco Lenders, the Successful Bidder, any of the Subsidiaries of the Successful Bidder or any of their respective designees or affiliates shall have any liability, obligation or responsibility with respect to any Claims against or Equity Interests in any of the Debtors or any of the Non-Debtor Affiliates, including without limitation any amounts owed by the Debtors to holders of Claims or Equity Interests or any obligations of the Debtors pursuant to the Plan.

After the Effective Date, each such transferee and its designated subsidiaries will own the assets conveyed to it and operate its business and manage its affairs free of any restrictions contained in the Bankruptcy Code.  The terms, provisions and conditions of the agreements governing the transactions described in Section V.B.3, Section V.B.4, Section V.B.5, Section V.B.7 and Section V.B.8 below shall govern the obligations of the Debtors and the other parties thereto and to the extent inconsistent with the Plan, such agreements shall control.

Without further approvals or notice, the Debtors, the Administrative Agent and any other applicable Person shall have the power and authority to terminate and discharge (and to consent to terminate and discharge) Liens on any assets to effectuate the terms hereof and the terms of the New Opco Purchase Agreement and the New Propco Purchase Agreement on the Effective Date; provided, that such order shall not provide that the sale of any property that constitutes New Opco Acquired Assets is free and clear of any environmental liability imposed by a Governmental Unit arising from or related to such property to the extent that the Bankruptcy Court determines that such property cannot be sold to the Successful Bidder free and clear of such liability pursuant to the Bankruptcy Code.

    2.    **Plan Transactions.**

The following transactions shall be consummated as specified below in the order specified below or in such other order as is set forth in the Plan Supplement:

        (A)    **Formation of New Propco Entities.**

On or prior to the Effective Date, Holdco, Voteco, New Propco and the following direct or indirect Subsidiaries shall be formed for the purpose of acquiring all of New Propco Acquired Assets and all of the equity interests in CV Propco, LLC as owner of the Landco Assets.  New Boulder LLC, New Red Rock LLC, New Palace,

LLC, New Sunset, LLC, New Tropicana, LLC, and New Landco Holdco, LLC. (The legal names of these entities may differ from the names specified herein.)

### (B)    Subsidiary Bankruptcy Filings

To the extent required under the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement, the Landco Asset Transfer Agreement or otherwise necessary to Consummate the Plan and the sale of the New Opco Acquired Assets or the sale or transfer of the New Propco Acquired Assets hereunder, following the entry of the Confirmation Order, certain or all of the Non-Debtor Affiliates that are direct or indirect subsidiaries of SCI, all of which are Opco Group Sellers, shall commence voluntary chapter 11 cases in the Bankruptcy Court for the purpose of effectuating the sale of all or a portion of their assets pursuant to and in accordance with the New Opco Purchase Agreement and the Second Amended MLCA, the New Propco Purchase Agreement or the New Propco Transfer Agreement, as the case may be.

### (C)    Transfer of Master Lease Collateral to Propco.

On the Effective Date, pursuant to the New Propco Transfer Agreement, SCI and any Non-Debtor Affiliates (including the Operating Subtenants) that own assets that are included in the Master Lease Collateral shall convey, assign, transfer and deliver all such assets to Propco in satisfaction of Propco's lien on such assets under the Master Lease and License and in partial satisfaction of the Master Lease Rejection Damage Claim.

### (D)    Landco Assets.

On or prior to the Effective Date, pursuant to the Landco Assets Transfer Agreement and the Second Amended MLCA: (a) all of the equity interests in CV Propco, LLC shall be conveyed, assigned, transferred and delivered by CV Holdco, LLC to the designee of the Landco Lenders, subject to the New Land Loan Agreement; (b) New Landco Holdco shall contribute all of the equity of New Tropicana, LLC and New Cactus Lessee, LLC to CV PropCo, LLC; and (c) all of the Landco Assets not then owned by CV Propco, LLC and not otherwise designated as excluded assets under the Landco Assets Transfer Agreement, shall be conveyed, assigned, transferred and delivered to CV Propco, LLC or to a subsidiary of New Propco, as determined by New Propco.

### (E)    Transfer of New Propco Transferred Assets from Propco to New Propco Entities.

On the Effective Date, in accordance with the Second Amended MLCA and pursuant to the New Propco Transfer Agreement and in implementation of the distributions to the Mortgage Lenders provided for in Section III.B.2 above on account of their Allowed Class P.2 Claims, all of the New Propco Transferred Assets shall be conveyed, assigned, transferred and delivered to New Propco or any of its designated Subsidiaries, each in their capacities as designee of the Mortgage Lenders.

### (F)    Mezzco Debtors.

On the Effective Date, the distributions to the holders of Class M5.2 Claims, Class M4.1 Claims, Class M3.1 Claims, Class M2.1 Claims and Class M1.1 Claims provided for in Section III.B.3(e) through Section III.B.3(h) shall be made, and the Equity Interests so distributed shall be cancelled and extinguished as provided for in such Sections.

### (G)    Transfer of New Propco Purchased Assets from Opco Entities to New Propco Entities.

On the Effective Date and subject to the receipt by the Holders of the Prepetition Opco Secured Claims consideration set forth in Section III.B.4, pursuant to the Second Amended MLCA and the New Opco Purchase Agreement (if the Stalking Horse Bidder is the Successful Bidder) or the New Propco Purchase Agreement (if the Stalking Horse Bidder is not the Successful Bidder), for good and valuable consideration set forth in the Second Amended MLCA, all of the New Propco Purchased Assets shall be sold, conveyed, assigned, transferred and delivered to New Propco or its applicable designated Subsidiaries.

### (H)    Transfer of New Opco Acquired Assets to New Opco.

On the Effective Date and subject to the Holders of the Prepetition Opco Secured Claims receipt of the consideration set forth in Section III.B.4, for good and valuable consideration, all of the New Opco Acquired Assets shall be sold, conveyed, assigned, transferred and delivered to the Successful Bidder or its designee(s) pursuant to and in accordance with the New Opco Purchase Agreement.  To the extent necessary to effectuate distributions to Holders of Claims or Equity Interests in SCI or the Other Opco Debtors under this Plan, the Bankruptcy Court shall determine an appropriate allocation of the New Opco Plan Consideration among the New Opco Acquired Assets.

(I)        <strong>License of IP Assets to New Propco.</strong>

If the Successful Bidder is any Person or Persons other than the Stalking Horse Bidder, to the extent required by the Second Amended MLCA on the Effective Date the Successful Bidder shall license the IP Assets to New Propco and its designated subsidiaries pursuant to the IP License Agreement.

(J)        <strong>New Propco Transactions in Connection with Receipt of New Propco Acquired Assets.</strong>

In connection with Consummation of the Plan and New Propco's receipt of the New Propco Acquired Assets, Voteco, Holdco and New Propco will enter into or cause to be entered into a number of agreements and transactions designed to allow New Propco to operate the New Propco Acquired Assets as a going concern business.  Those agreements and transactions will include, without limitation, the following:

a.        The New Propco LLCA.

The New Propco LLCA will govern the operations of New Propco, including providing that New Propco will be managed through a board of directors.  The New Propco LLCA will provide for voting and non-voting interests which will be held by Voteco and Holdco, respectively.

b.        The New FG Management Agreement.

An affiliate of Fertitta Gaming LLC will enter into a management agreement with New Propco to manage and operate the hotels/casinos commonly known as the Red Rock Casino Resort & Spa, Sunset Station Hotel & Casino, Boulder Station Hotel & Casino and Palace Station Hotel & Casino.  The term of the Propco Management Agreement will consist of twenty-five (25) years.  During the term, the manager will receive a base management fee equal to two percent (2%) of the gross revenues attributable to the properties and an incentive management fee equal to five percent (5%) of EBITDA with respect to each fiscal year, to the extent such EBITDA is positive.

c.        The New Propco Credit Agreement.

New Propco will enter into a new secured credit facility with a group of lenders, initially consisting of affiliates of the Mortgage Lenders, consisting of a term loan facility in the principal amount of $1,600 million (the "Term Facility") and a revolving credit facility in the maximum amount of $100 million (the "Revolving Credit Facility").  Interest shall accrue on the principal balance at the rate per annum of not more than LIBOR plus 3.00% or prime rate plus 2.00% for first three years; and LIBOR plus 3.50% or prime rate plus 2.50% for years 4 and 5.  The initial maturity date will be the fifth anniversary of the closing date.  New Propco shall have two options to extend the maturity date for an additional year (i.e., years 6 and 7) to be available subject to absence of default, payment of 1% extension fee for each year, a step-up in interest rate to LIBOR plus 4.50% or prime rate plus 3.50% (in year 6) and LIBOR plus 5.50% or prime rate plus 4.50% (in year 7) and pro forma compliance with a total leverage test to be determined (in year 7).  New Propco shall pay an excess cash flow sweep of 75% to be applied as permanent repayment/amortization to the Term Facility.  Aside from the excess cash flow sweep, there is no scheduled minimum amortization prior to final stated maturity.  The Term Facility and the Revolving Credit Facility shall have customary annual fees, including a commitment fee, as well as customary mandatory prepayment provisions.  The Term Facility and the Revolving Credit Facility shall be guarantied by all subsidiaries of New Propco except unrestricted subsidiaries.  The Term Facility and the Revolving Credit Facility will be secured by a pledge of New Propco equity (including equity held by Holdco and Voteco in New Propco), together with all tangible and intangible assets of New Propco and its subsidiaries (other than (i) any assets of IP Holdco, (ii) liens

prohibited by applicable gaming laws, (iii) equity issued by, and any assets of, New Opco or its subsidiaries, or (iv) equity issued by, or any property of, CV Propco and its subsidiaries). Documentation shall include customary representations, warranties, covenants, including financial ratio covenants and events of default for a credit of this nature. The new loan documents will provide that, following default, New Propco and FG will provide full transition services under documentation satisfactory to Mortgage Lenders to the Mortgage Lenders and their designees.

     d.  The IP License Agreement.

     If the Stalking Horse is not selected as the Successful Bidder, the Successful Bidder (and certain of its subsidiaries) will enter into a License Agreement with New Propco pursuant to which the Successful Bidder (and/or such subsidiaries) will grant New Propco and its applicable subsidiaries a license in and to use certain intellectual property, as provided for in the Second Amended MLCA and as more fully described in the License Agreement.

     e.  The New Propco Non-Compete Agreement.

     New Propco will enter into a non-competition agreement with Fertitta Gaming, Frank J. Fertitta III and Lorenzo J. Fertitta which will permit Fertitta Gaming and its affiliates to enter into management agreements with respect to gaming and non-gaming enterprises in which they do not own equity. The noncompetition agreement will, however, provide that under certain circumstances compensation payable to Fertitta Gaming or certain of its affiliates enters for the management of hotels or casinos that operate in the Las Vegas locals market that exceeds the base and incentive management fee that would be payable if the terms of such management agreement were the same as the Management Agreement will be remitted to New Propco. The non-competition agreement will provide a right of first refusal for New Propco for investment opportunities in the Las Vegas locals market (other than entities that do not have hotels and hold a "restricted" license) and certain gaming opportunities outside of Las Vegas and will limit the ability of Fertitta Gaming, Frank J. Fertitta III, Lorenzo Fertitta and certain of their respective affiliates to make cash investments in casinos in the Las Vegas locals market in excess of their initial cash investment in New Propco. The non-competition agreement will terminate upon the later of (x) the termination of the management agreement or (y) the date that neither Frank J. Fertitta III or Lorenzo J. Fertitta is no longer chief executive officer of New Propco.

    **(K)**  **New Propco Employment Related Matters**

     Upon or promptly following the Effective Date of the Plan, New Propco contemplates taking steps to mitigate the impact on SCI employees of the restructuring process. Specifically, New Propco plans to make offers of employment to SCI's hourly employees (a) at not less than the same hourly wage rate and position in effect for the respective employee immediately prior to the Effective Date, (b) with substantially similar benefits as the current Section 401(k) plan of SCI, and (c) with health and welfare benefits that in the aggregate are substantially similar to those provided by SCI under its broad-based employee benefit plans in effect immediately prior to the Effective Date.

    **(L)**  **The Propco Rights Offering**

     The NPH Term Sheet sets forth a detailed summary of the terms and conditions of the Propco Rights Offering and any additional Equity Raises (as defined in the NPH Term Sheet) that may occur. Taken together, the Propco Rights Offering and the Upsizing Committed Amount (as defined in the NPH Term Sheet) are intended to provide New Propco Holdco with up to $100 million in equity investments, all on the terms of and subject to the conditions of the NPH Term Sheet. As set forth in the NPH Term Sheet, the net proceeds from the Propco Rights Offering shall be contributed by New Propco Holdco as equity to New Propco and utilized by New Propco for general corporate purposes, including, without limitation, to reduce debt or for one or more Acquisitions (as defined in the NPH Term Sheet). Pursuant to the terms and  subject to the conditions of the Propco Commitment: (a) the Put Parties (so long as they hold at least 40% in aggregate principal amount of the Senior Notes) shall have the right to purchase at least one-half of the NPH Equity available in the Propco Rights Offering (with such portion of the NPH Equity to be allocated among the Put Parties as they mutually agree), (b) to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors, or the Put Parties (pursuant to the proviso to the definition of "*Allocated Pro Rata Share of NPH Investment Rights*") in accordance with the terms

and conditions of the Propco Rights Offering, the Put Parties shall purchase $35.3 million of NPH Equity, and (c) in connection with any Equity Raises (as defined in the NPH Term Sheet) consummated during the Upsizing Commitment Period (as defined in the NPH Term Sheet), to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors, or the Put Parties (pursuant to the proviso to the definition of "*Allocated Pro Rata Share of NPH Investment Rights*") in accordance with the terms and conditions of the NPH Term Sheet, the Put Parties shall purchase such unpurchased portion of each such Equity Raise up to a maximum of $100 million (*i.e.*, up to a maximum of $64.7 million in addition to the $35.3 million commitment specified in clause (b)) of NPH Equity.  In consideration for their agreement to the Propco Commitment, the Put Parties shall receive the Put Premium.  The payment of the Put Premium to the Put Parties on the Effective Date shall be effected in such manner (such as a deduction from the purchase price otherwise payable by the Put Parties for the NPH Equity being purchased by them through Blockerco) as the Debtors, FG, the Mortgage Lenders and the Put Parties shall reasonably determine.

(M)    <b>New Opco Transactions in Connection with Receipt of New Opco Acquired Assets.</b>

In connection with Consummation of the Plan and New Opco's receipt of the New Opco Acquired Assets, New Opco will enter into or cause to be entered into a number of agreements and transactions designed to allow New Opco to operate the New Opco Acquired Assets as a going concern business.  If the Stalking Horse Bidder is the Successful Bidder, those agreements and transactions will include, without limitation, the following:

a.    The New Opco Credit Agreement.

New Opco will enter into a new secured credit facility with a group of lenders, initially consisting of the Prepetition Opco Lenders, consisting of a term loan in the principal amount of $430 million (the "Term Facility") and a new "super priority" revolving credit facility in the maximum amount of $25 million (lender agreement to provide the revolver is pending) the availability of which will be subject to standard closing and continuing conditions (the "Revolving Credit Facility" and, together with the Term Facility, the "Senior Facilities"). In addition, New Opco shall have the option, after the first anniversary of the Effective Date, to solicit lending commitments to increase the amount of the Revolving Credit Facility by up to an additional $25 million.   Interest shall accrue on the principal balance at the rate per annum of not more than LIBOR plus 3.00% or prime rate plus 2.00% for first three years; and LIBOR plus 3.50% or prime rate plus 2.50% for years 4 and 5.  The initial maturity date will be the fifth anniversary of the closing date.  New Opco shall have two options to extend the maturity date for an additional year (i.e., years 6 and 7) to be available subject to absence of default, payment of up to 1% extension fee for each year, a step-up in interest rate to not more than LIBOR plus 4.50% or prime rate plus 3.50% (in year 6) and not more than LIBOR plus 5.50% or prime rate plus 4.50% (in year 7).  Financial ratio covenants shall include maximum total leverage ratio, minimum interest coverage ratio, and a maximum capital expenditure amount, all to be determined.  Covenant compliance testing shall enjoy an initial holiday and shall commence with respect to a quarter to be determined following the Effective Date.  Beginning with the fiscal year ending December 31, 2011,  New Opco shall pay an excess cash flow sweep of not more than 75% to be applied as permanent repayment/amortization to the Term Facility.  Aside from the excess cash flow sweep, there is no scheduled minimum amortization prior to final stated maturity.  The Senior Facilities shall have customary annual fees, including a commitment fee, as well as customary mandatory prepayment provisions.  The Senior Facilities shall be guarantied by all subsidiaries of New Opco except unrestricted subsidiaries.  The Term Facility and the Revolving Credit Facility will be secured by a pledge of New Opco equity, together with all tangible and intangible assets of New Opco Holdings, New Opco and its subsidiaries (other than property of unrestricted subsidiaries and subject to limitations required by applicable gaming laws).   Documentation shall include customary  representations, warranties, covenants, including financial ratio covenants and events of default for a credit of this nature.  The new loan documents will provide that, following default, New Propco and FG will provide full transition services under documentation satisfactory to New Opco Lenders and their designees.

b.    The New Opco PIK Credit Agreement.

New Opco Landco will enter into a new secured credit facility with a group of lenders, initially consisting of affiliates of the Prepetition Opco Lenders pursuant to which New Opco Landco will receive acquisition financing consisting of a term loan in the principal amount of  $25 million term loan (the "New Opco Landco Term Facility").  Interest shall accrue on the principal balance at the rate per annum of LIBOR plus 3.500% for first five

years.  All interest on the New Opco Landco Term Facility will be paid in kind (i.e., capitalized as principal under the New Opco Landco Term Facility) for the first five years. The initial maturity date will be the fifth anniversary of the Effective Date.  New Opco Landco shall have two options to extend the maturity date for an additional year (i.e., years 6 and 7) to be available subject to absence of default, payment of up to 1% extension fee for each year, a step-up in interest rate to not more than LIBOR plus 4.50% (in year 6) and not more than LIBOR plus 5.50% (in year 7). Interest accruing in years 6 and 7 shall be payable in cash. There is no scheduled minimum amortization prior to final stated maturity.  The New Opco Landco Term Facility shall provide for release of collateral upon payment of release prices to be specified.  The New Opco Landco Term Facility shall have customary annual fees, including a commitment fee, as well as customary mandatory prepayment provisions.  The New Opco Landco Term Facility shall be guarantied by all subsidiaries of New Landco except unrestricted subsidiaries.  The New Opco Landco Term Facility will be secured by a pledge of New Opco Landco equity, together with all tangible and intangible assets of New Landco Holdings New Opco Landco and its subsidiaries (other than property of unrestricted subsidiaries), principally consisting of parcels of undeveloped land known as: Inspirada, Castaways, Durango, Flamingo, Reno Boyd, Mt Rose Highway Site, Reno Convention Center Site, and Sunset/Landell.  Documentation shall include customary representations, warranties, covenants, and events of default for a credit of this nature.  The carry costs of New Opco Landco will be supported by New Opco under a Support Agreement that provides for subordinated loans from New Opco to New Opco Landco to fund taxes, insurance premiums and other land carry costs (excluding debt service)  payable by New Opco Landco.  The new loan documents will provide that, following default, New Opco, New Propco and FG will provide full transition services under documentation satisfactory to New Opco Landco Lenders and their designees.

c.      The New FG Management Agreement.

If the Stalking Horse Bidder is the Successful Bidder, an affiliate of Fertitta Gaming will enter into a management agreement with New Opco to manage and operate the hotels/casinos that are acquired by the Stalking Horse Bidder from the Opco Group Sellers on substantially the same terms as provided under the Propco Management Agreement.

d.      The IP License Agreement.

If the Stalking Horse is not selected as the Successful Bidder, the Successful Bidder (and certain of its subsidiaries) will enter into a License Agreement with New Propco pursuant to which the Successful Bidder (and/or such subsidiaries) will grant New Propco and its applicable subsidiaries a license in and to use certain intellectual property, as provided for in the Second Amended MLCA and as more fully described in the License Agreement.

If the Stalking Horse Bidder is not the Successful Bidder, the agreements and transactions needed to consummate the Successful Bid may differ, and the Plan and Plan Supplement may be amended, modified or supplemented to conform to the requirements of the Successful Bid.

(N)      **The New Opco Credit Agreement and the New Opco PIK Credit Agreement**

The collateral agent under the New Opco Credit Agreement and the New Opco PIK Credit Agreement shall have valid, binding and enforceable liens on the collateral specified in the relevant agreements executed by New Opco and its Subsidiaries in connection with the New Opco Credit Agreement and the New Opco PIK Credit Agreement.  The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New Opco Credit Agreement and the New Opco PIK Credit Agreement are granted in good faith as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the definitive documentation executed in connection therewith. The New Opco Credit Agreement and the New Opco PIK Credit Agreement together with all notes, documents or agreements delivered in connection therewith shall be valid, binding and enforceable in accordance with their terms on and after the Effective Date.  Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the New Opco Credit Agreement and the New Opco PIK Credit Agreement or any rights or remedies related thereto.

(O)        **Second Amended MLCA**

If the Stalking Horse Bidder is the Successful Bidder, then, notwithstanding anything to the contrary in the Second Amended MLCA, the entry of the Confirmation Order will not automatically trigger a Transition Event and the obligation of SCI and its Subsidiaries to provide transition services thereunder shall be suspended (other than such services as are required during the "Deferral Period" (as defined therein)) and the "Deferral Period" shall be deemed to continue for all purposes under the Second Amended MLCA, including with respect to the payment of Reduced Rent, and the Initial Transition Services Period shall not be deemed to commence, until the date on which a Transition Event (other than due solely to the occurrence of the Confirmation Date) occurs.

## D.        Comprehensive Settlement And Releases

As expressly set forth in the Plan, pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the exculpation and release provisions contained in Article X of the Plan, constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest against any Debtor, any distribution to be made pursuant to the Plan on account of any such Claim or Interest, and any and all Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction and all transactions relating thereto.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (x) the Debtors and their respective Estates, the Non-Debtor Affiliates and any of their respective property, and (y) Claim and Interest Holders, and are fair, equitable and reasonable.  Any distributions to be made pursuant to the Plan shall be made on account of and in consideration of this comprehensive settlement, which, upon the Effective Date, the settlement shall be binding on all Persons, including the Debtors and their respective Estates, the Non-Debtor Affiliates, all Holders of Claims or Interests (whether or not Allowed), and all Persons entitled to receive any payments or other distributions under the Plan.

## E.        Gaming Regulatory Compliance

To the extent the distribution of any Plan Consideration under the Plan requires the approval of the Nevada Gaming Commission or other gaming regulatory authorities, including any distribution, issuance or sale to any entity required to be found suitable by the Nevada Gaming Commission or other gaming regulatory authorities, such Plan Consideration will not be distributed, issued or sold until such time as such finding of suitability has been made or the Nevada Gaming Commission or other gaming regulatory authorities have approved such distribution as applicable.

## F.        Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan or the Confirmation Order or for the purpose of evidencing a right to distribution hereunder or the exercise of the right of the Senior Notes Trustee or the Subordinated Notes Trustee, as applicable to assert any rights or charging liens for fees, costs and expenses in accordance with the terms of the applicable Indenture, on the Effective Date, all notes, stock, instruments, certificates, agreements and other documents evidencing Claims and Equity Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

On the Effective Date, the Senior Notes Indentures and the Subordinated Notes Indentures each shall be deemed to be canceled, as permitted by Section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released, terminated, extinguished and discharged; provided, however, that the Senior Notes Indentures and the Subordinated Notes Indentures shall remain in effect for the sole purpose of facilitating distributions by the respective trustee to the holders thereunder of any amounts received on account of Allowed Claims held by the applicable trustee, and to permit such trustee to perform such other necessary

administrative tasks related thereto and to exercise any right under the applicable Indenture to assert any rights or charging liens for fees, costs and expenses.

### G.    Provisions for Resolving and Treating Disputed Claims

If any portion of a Claim is Disputed, no payment or distribution provided under the Plan will be made on account of that Claim unless and until, and only to the extent, such Claim becomes Allowed.  At the time that a Disputed Claim becomes an Allowed Claim, the holder of that Allowed Claim will be entitled to receive a distribution equal in percentage of recovery to the distribution(s) made to date on previously-allowed Allowed Claims of the same priority without interest.

#### 1.    *Objections*

As of the Effective Date, the Plan Administrator will have the right, to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 328, 330, 331 and 503 of the Bankruptcy Code), to make, file and prosecute objections to Claims.  The Debtors will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtors), but in no event will the service of such an objection be later than 120 days after the Effective Date, unless such date is extended by order of the Bankruptcy Court.  The Bankruptcy Court, for cause, may extend the deadline on the *ex parte* request of the Debtors.

#### 2.    *Estimation of Claims*

The Plan Administrator may, at any time, request the Bankruptcy Court to estimate any Claim, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator previously has objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim, at any time, including during litigation concerning any objection to such Claim.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, the applicable Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

#### 3.    *Other Provisions Relating to Disputed Claims*

If, on or after the Effective Date, any Disputed Claim (or portion thereof) becomes an Allowed Claim, the applicable Plan Administrator will, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided in the Plan, distribute to the holder of such Allowed Claim an amount, without any interest thereon, that provides such holder with the same percentage recovery, as of the Effective Date, as holders of Claims in the class that were Allowed on the Effective Date.

To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim will not receive any distribution on account of the portion of such Claim that is disallowed.  Any Disputed Claim, for which a proof of claim has not been deemed timely filed as of the Effective Date, will be disallowed.

### H.    Treatment of Executory Contracts and Unexpired Leases

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the counterparty to such executory contract or unexpired lease may file a claim for damages incurred by reason of the rejection.  In the case of rejection of leases of real property, damage claims are subject to certain limitations imposed by the Bankruptcy Code.  To assume an executory contract or an unexpired lease, the debtor may be required cure all outstanding defaults (a "**Cure Amount**") (subject to certain exceptions) and provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code).  If there is a dispute regarding (i) the nature or size of any Cure Amount; (ii) the ability of the Debtors or any assignee to provide adequate assurance of future performance under the contract or lease to be assumed; or (iii) any other matter

pertaining to assumption, the Cure Amount will occur following the entry of a Final Order resolving the dispute and approving the assumption (or assumption and assignment, as the case may be).

The Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases identified on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed will be deemed assumed by the applicable Debtor in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  The Plan further provides that, on the Effective Date, any Executory Contract or Unexpired Lease will be deemed rejected if such Executory Contract or Unexpired Lease: (a) is not listed on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed; (b) has been rejected by order of the Bankruptcy Court; (c) is the subject of a motion to reject pending on the Effective Date; (d) is identified in the Plan Supplement as a contract or lease to be rejected; (e) is rejected pursuant to the terms of this Plan; (e) expired by its own terms on or prior to the Effective Date; or (f) has not been assumed or is not the subject of a motion to assume pending on the Effective Date.

The Debtors reserve the right, on or prior to the Effective Date, to (i) modify the Cure Amount for any executory contract or unexpired lease set forth in the Schedule of Executory Contracts and Unexpired Leases To Be Assumed or (ii) amend such Schedule to add or delete any executory contract or unexpired lease, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, assumed or rejected.  The Debtors will provide notice of any amendments to the Schedule to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed will not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

Unless otherwise specified on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed, each executory contract and unexpired lease listed or to be listed therein will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed.

Unless and as otherwise provided by a prior order to the Bankruptcy Court, in the event any Debtor proposes to assign an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.  Any applicable cure amounts shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Subject to the foregoing, any Executory Contract or Unexpired Lease that constitutes a New Propco Acquired Asset shall be assigned to New Propco or its designated subsidiary in accordance with the terms of this Plan and pursuant to the New Propco Purchase Agreement or New Propco Transfer Agreement, as applicable, and any Executory Contract of Unexpired Lease that is to be assigned to New Opco or its designated subsidiary in accordance with the terms of the New Opco Purchase Agreement shall be so assigned in accordance with the terms of this Plan.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the

Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to this Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Estates or any of their respective property, and such Claim shall be forever discharged.

## I.    Effect of Confirmation of the Plan on Debtors

### 1.    *Vesting of Assets*

Pursuant to the New Propco Transfer Agreement and the New Propco Purchase Agreements, on the Effective Date, the New Propco Acquired Assets shall vest in New Propco and/or its designee(s), free and clear of all Liens, Claims, Interests, encumbrances and Other Interests.  After the Effective Date, New Propco and its subsidiaries and/or its designee(s) will own the New Propco Acquired Assets and operate their businesses and manage their affairs free of any restrictions contained in the Bankruptcy Code.

Pursuant to the New Opco Purchase Agreement, on the Effective Date, the New Opco Acquired Assets shall vest in New Opco and/or its designee(s), free and clear of all Liens, Claims, Interests, encumbrances and Other Interests.  After the Effective Date, New Opco and/or its designee(s) will own the New Opco Acquired Assets and operate their businesses and manage their affairs free of any restrictions contained in the Bankruptcy Code.

### 2.    *Compromise of Controversies*

General.  Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the exculpation and release provisions contained in Article X of the Plan, constitute a good faith compromise and settlement of all Claims, Litigation Claims, Causes of Action or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest against any Debtor, any distribution to be made pursuant to these Plans on account of any such Claim or Interest, and any and all Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction and all transactions relating thereto.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (x) the Debtors, the Non-Debtor Affiliates and their respective Estates and property, and (y) Claim and Interest Holders, and are fair, equitable and reasonable.

Global Settlement.  Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, of all Going Private Transaction Causes of Action among the Debtors and their respective Estates, the non-Debtor Affiliates of the Debtors, respective Estates, and any Person (the "*Global Settlement*").  Any distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement, which, upon the Effective Date of the Plan, shall be binding on all Persons, including the Debtors and their respective Estates, the non-Debtor Affiliates of the Debtors, all Holders of Claims or Interests (whether or not Allowed), and all Persons entitled to receive any payments or other distributions under the Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, their respective Estates, the non-Debtor Affiliates of the Debtors, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

3.      _Binding Effect_

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code or in the Confirmation Order, and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan will bind any holder of a Claim against or Equity Interest in the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.  The rights, benefits and obligations of any entity named or referred to in the Plan whose actions may be required to effectuate the terms of the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

4.      _Exculpation_

The Exculpated Parties shall neither have nor incur any liability to any Person for any Claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any sale, contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement, confirmation or Consummation of the Plan; _provided_, _however_, that the foregoing provisions shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; _provided_, _further_, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; _provided_, _further_, _however_ that the foregoing provisions shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement as not being released under the Plan.

The self-styled "Independent Lenders" assert that the exculpation provisions described above constitute an improper _de facto_ release from liability of the Exculpated Parties that is contrary to established law and intend to object to the inclusion in the Plan of the exculpation provisions.  The Debtors dispute this assertion, believe that the exculpation is entirely consistent with Bankruptcy Code section 1125(e) and applicable law, and will respond to any objection that may be asserted.

5.      **_Releases_**

The Plan contains the following provision, which will become effective upon occurrence of the Effective Date:

RELEASES BY DEBTORS AND ESTATES.  EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION, AS THE CASE MAY BE, THE DEBTORS' ESTATES, THE NON-DEBTOR AFFILIATES, AND EACH OF THEIR RESPECTIVE RELATED PERSONS (COLLECTIVELY, THE "RELEASING PARTIES") SHALL, AND SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE, WAIVE, VOID, EXTINGUISH AND DISCHARGE EACH AND ALL OF THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES AND RELATED PERSONS OF AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS, AVOIDANCE ACTIONS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, JUDGMENTS AND LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, THE GOING PRIVATE TRANSACTION CAUSES OF ACTION), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON

ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR RESPECTIVE ASSETS, PROPERTY AND ESTATES, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR ANY PLAN SUPPLEMENT; (II) WITH THE EXCEPTION OF THE GOING PRIVATE TRANSACTION CAUSES OF ACTION, ANY CAUSES OF ACTION ARISING FROM ACTUAL OR INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (III) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON.

PURSUANT TO THE FOREGOING PARAGRAPH, THE RELEASING PARTIES WILL RELEASE CLAIMS RAISED BY THE COMMITTEE IN THE COMMITTEE STANDING MOTION INCLUDING CLAIMS THAT:  (A) VARIOUS COMPONENTS OF THE 2007 GOING PRIVATE TRANSACTION CONSTITUTED ACTUAL FRAUDULENT CONVEYANCES, CONSTRUCTIVE FRAUDULENT CONVEYANCES, INCLUDING CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER THE NEWLY ADDED BANKRUPTCY CODE SECTION 548(A)(1)(B)(II)(IV) OR WERE OTHERWISE AVOIDABLE TRANSACTIONS; (B) THE MASTER LEASE SHOULD BE RECHARACTERIZED AS A SECURED FINANCING TRANSACTION AND/OR WAS AN ACTUAL AND CONSTRUCTIVE FRAUDULENT CONVEYANCE; AND (C) INSIDERS OF SCI BREACHED THEIR FIDUCIARY DUTIES TO SCI AND ITS CREDITORS THROUGH PURSUING THE 2007 GOING PRIVATE TRANSACTION.  THE COMMITTEE HAS INVESTIGATED THESE CLAIMS AND BELIEVES THAT THEY ARE COLORABLE.  IF THE DEBTORS SUCCESSFULLY PURSUED THESE CLAIMS, THE PROCEEDS OF ANY RECOVERY COULD POTENTIALLY BE DISTRIBUTED TO UNSECURED CREDITORS.  PURSUANT TO THE COMMITTEE PLAN SUPPORT STIPULATION, IF THE PLAN IS CONFIRMED AND BECOMES EFFECTIVE, THE COMMITTEE STANDING MOTION WILL BE WITHDRAWN AND THE CLAIMS ALLEGED THEREIN BY THE COMMITTEE WILL BE RELEASED UNDER THE PLAN.

FURTHER EMBEDDED IN THESE RELEASES ARE RELEASES OF EQUITABLE SUBORDINATION CLAIMS UNDER BANKRUPTCY CODE SECTION 510(C).  THE COURT NOTED AT THE JANUARY 25 HEARING ON THE COMMITTEE'S STANDING MOTION THAT THE COMMITTEE HAS INDEPENDENT STANDING TO ASSERT EQUITABLE SUBORDINATION CLAIMS.  HOWEVER, THIS SECTION WILL ACT TO RELEASE THOSE CLAIMS.  THE COMMITTEE HAS ASSERTED THAT THE POTENTIAL VALUE OF SUCH CLAIMS IS HUNDREDS OF MILLIONS OF DOLLARS.  PURSUANT TO THE COMMITTEE PLAN SUPPORT STIPULATION, IF THE PLAN IS CONFIRMED AND BECOMES EFFECTIVE, THE EQUITABLE SUBORDINATION CLAIMS PREVIOUSLY ALLEGED BY THE COMMITTEE WILL BE RELEASED UNDER THE PLAN.

Throughout the Chapter 11 Cases, the Debtors have disputed the Committee's assertions in this regard. Among other things, the SLC Report described in Section III.E, as supplemented, provides the Debtors with significant guidance in analyzing the claims alleged by the Committee and leads to the conclusion that those claims are not worthy of pursuit.  The flaws in the Committee's alleged claims, as well as the existence of significant defenses to any such claims, were also set forth in detail in the responses to the Committee Standing Motion.  Based upon that record, and also based upon the consideration being provided to the Debtors by the active and constructive

support, contributions and commitment of the Released Parties to the restructuring process and Consummation of the Plan and the ensuing preservation of going concern value and continued employment opportunities for thousands of employees, the Debtors believe that the releases are both permissible under applicable law and entirely appropriate under the relevant facts and circumstances.

<u>Releases by Holders of Claims and Interests</u>.  Effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in Article X.C.2 of the Plan shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish and discharge the Released Parties from any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other obligations, rights, suits, damages, judgments, debts, remedies and liabilities whatsoever (including, without limitation, the Going Private Transaction Causes of Action), including any Claims or Causes of Action that could be asserted on behalf of or against the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such holder of a Claim or Equity Interest would have been legally entitled to assert in its own right (whether individually, derivatively or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (v) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (w) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (x) the Chapter 11 Cases, (y) the negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement; and (z) the Going Private Transaction Causes of Action; *provided*, *however*, that, with the exception of the Going Private Transaction Causes of Action, these releases will have no effect on the liability of any Released Party arising from any act, omission, transaction, agreement, event or other occurrence, constituting willful misconduct, gross negligence, fraud or criminal conduct as determined by a Final Order; *provided further*, *however*, the foregoing shall not constitute a waiver or release of any right of the Holder of an Allowed Claim or Equity Interest, obligee under any Assumed Liability (whether assumed under the Plan or in accordance with a prior Bankruptcy Court Order, or party to an Assumed Contract to payment under the Plan or otherwise on account of such Allowed Claim or any of the rights of any parties in respect of Assumed Liabilities or Assumed Contracts under or in connection with the Plan or prior order of the Bankruptcy Court.  The Releases set forth in this Article X shall be binding upon and shall inure to the benefit of the any chapter 7 trustee in the event the Chapter 11 Cases are converted to chapter 7.

<u>Injunction Related to Releases</u>.  Except as provided in the Plan or the Confirmation Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other Cause of Action, Litigation Claim, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to this Section X.C of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and of all Equity Interests or other rights of a Holder of an equity security or other ownership interest:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person discharged under Section X.D; and (e) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

Notwithstanding anything herein, no Unsecured Creditor of SCI is being asked to grant or shall be deemed to have granted the release contained in Article X.C.2 of the Plan with respect to any direct claims any such Unsecured Creditor may have against any of the Released Parties.

6.        *Retention of Causes of Action/Reservation of Rights*

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Person or entity, to the extent such Person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code, and (iii) the turnover of any property of the Debtors' Estates.

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Plan.  The Debtors will have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  To the extent any such Causes of Action or Litigation Claims exist as of the Effective Date, they may be assigned to a liquidating trust, distributions from which will be in accordance with this Plan.

The Debtors have conducted a review of potential claims or causes of action that the Estates might have under chapter 5 of the Bankruptcy Code.  After taking into account the facts and circumstances, including the amounts at stake, the probability of success on the merits (including an assessment of any available defenses), the costs of pursuing any such actions and the difficulty in collecting any judgments that might be obtained, the Debtors do not believe that there are any material chapter 5 claims or causes of action that are worthy of being pursued or that would yield any meaningful recovery to the Estates.

**J.        Summary of Other Provisions of the Plan**

The following subsections summarize certain other significant provisions of the Plan.  The Plan should be referred to for the complete text of these and other provisions.

1.        *Plan Supplement*

The Plan Supplement will be filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement on the website of the Claims Agent (*www.epiqbankruptcysolutions.com*) or upon written request to the Debtors' bankruptcy counsel.

2.        *Modification of Plan*

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, provided, however, that any amendment, modification or supplement to the Plan shall be reasonably acceptable to the Successful Bidder, the Mortgage Lenders, FG and the Required Consenting Lenders and shall not be inconsistent with the terms of the New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement or the Opco Lender Restructuring Support Agreement.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder.

3.        *Withdrawal or Revocation of Plan*

The Debtors may withdraw or revoke the Plan as to any or every Debtor at any time prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date does not occur, then the Plan will be deemed null and void with respect to the applicable Debtor(s). In such event, nothing contained in the Plan will be deemed to constitute a waiver or release of any Claim by or against the applicable Debtor(s) or any other Person or to prejudice in any manner the rights of the applicable Debtor(s) or any other Person in any further proceedings involving the applicable Debtor(s).

### 4.    *Dissolution of the Creditors' Committee*

On the Effective Date, the Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention and employment of the Committee's attorneys, accountants, and other agents will terminate.

The Committee will continue in existence after the Effective Date solely for the purpose of reviewing and being heard by the Bankruptcy Court, and on any appeal, with respect to applications for compensation and reimbursement of expenses pursuant to section 330 and/or 503(b) of the Bankruptcy Code. With respect only to the foregoing, the Debtors will pay the reasonable fees and expenses of counsel for the Committee.

### 5.    *Exemption from Securities Laws*

The issuance of securities in satisfaction of existing Claims pursuant to the Plan will be exempt from any securities laws registration to the fullest extent permitted by Section 1145 of the Bankruptcy Code.

### 6.    *Exemption from Transfer Taxes*

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the assignment or surrender of any lease or sublease, or the delivery of any deed or other Instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection with any disposition of assets contemplated by the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

### 7.    *Severability*

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court will, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision held to be invalid, void or unenforceable, and such provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms. Notwithstanding the foregoing, the provisions in the Plan relating to releases and exculpations are not severable from the remainder of the Plan.

## V.    CONFIRMATION AND CONSUMMATION PROCEDURE

### A.    Confirmation of the Plan

#### 1.    *Bankruptcy Code Section 1129(a)*

In order to meet the requirements for confirmation, the Plan (among other things) must: (i) be accepted by all Impaired Classes of Claims and Equity Interests, or if rejected by an Impaired Class, not "discriminate unfairly" and be "fair and equitable" as to such class; (ii) be "feasible," and (iii) be in the "best interests" of holders of Claims and Equity Interests in Impaired Classes.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the following requirements of section 1129 of the Bankruptcy Code:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after confirmation of the Plan.

- The Debtors, as proponents of the Plan, have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as the Plan Administrator, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy.

- The Debtors have disclosed the identity of any insider that will be employed or retained as or by the Plan Administrator and the nature of any compensation for such insider.

- Each holder of an impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

- The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors' assets in the context of a chapter 7 liquidation (such amount, the "**Liquidation Proceeds**"). The Liquidation Proceeds must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses, a chapter 7 trustee's fees, and the fees and expenses of professionals retained by the chapter 7 trustee). The potential chapter 7 liquidation distribution in respect of each Class must be reduced further by costs imposed by the delay caused by conversion to chapter 7. In addition, inefficiencies in the claims resolution process in a chapter 7 would negatively impact the recoveries of creditors. The net present value of a hypothetical chapter 7 liquidation distribution in respect of an impaired claim is then compared to the recovery provided by the Plan for such impaired claim.

- Based on the Debtors' liquidation analysis set forth as Exhibit B hereto (the "**Liquidation Analysis**"), the Debtors believe that each Class of Creditors and Equity Interest Holders with respect to each Debtor will receive under the Plan a recovery at least equal in value to the recovery such Impaired Class would receive pursuant to a liquidation of each Debtor under chapter 7 of the Bankruptcy Code.

- Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the Plan or is not an Impaired Class under the Plan.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims, Priority Tax Claims and Other Priority Claims will be paid in full or otherwise treated in accordance with Bankruptcy Code section 1129(a)(9) as required by the Bankruptcy Code.

- At least one Impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Impaired Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of any Debtor or any successor to any Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. This requirement is commonly referred to as the "feasibility test."

  - With respect to Propco and the Mezzco Debtors, in order to determine whether the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code, the Debtors' obligations under the Plan are to deliver the New Propco Acquired Assets to New Propco in accordance with and pursuant to the terms and conditions of the Plan and the related documents. From and after the Effective Date, New Propco will own and operate those assets, and Propco and the Mezzco Debtors will have no rights or obligations with respect thereto. Nonetheless, in order to demonstrate that Propco will be delivering the New Propco Acquired Assets as a viable going concern, the Debtors have prepared the projections set forth in Exhibit D hereto (the "**Propco Financial Projections**"). Based upon the Propco Financial Projections, the Debtors believe that the Plan will meet the feasibility requirements of the Bankruptcy Code with respect to Propco and the Mezzco Debtors

  - With respect to SCI and the Other Opco Debtors, the Plan contemplates the sale of all or substantially all of the assets of those entities as a result of the Opco Auction. In essence, the Plan thus already contemplates the complete liquidation of those assets through a going concern sale. Upon the sale of those assets to the Successful Bidder, SCI and the Other Opco Debtors will have no rights or obligations with respect thereto. Because the liquidation of the Opco Assets in this manner is already contemplated by the Plan, no further showing of "feasibility" is required.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee will be paid as of the Effective Date.

  2.    *Bankruptcy Code Section 1129(b)*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a chapter 11 plan of reorganization even if not all impaired classes have accepted the plan; provided that such plan has been accepted by at least one impaired class. The Debtors will seek to confirm the Plan notwithstanding its rejection by any of the Impaired Classes. In order to obtain such nonconsensual confirmation (or "cramdown") of the Plan, the Debtors must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that voted to reject the Plan (each such Impaired Class, a "**Non Accepting Class**").

  a.    Fair and Equitable Test

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable," and includes the general requirement that no class receive more than 100% of the amount of the allowed claims in such class. The "fair and equitable" test sets different standards for secured creditors, unsecured creditors, and equity holders, as follows:

  (i)    Secured Creditors

With respect to Non-Accepting Classes of Secured Claims, the "fair and equitable" test requires that (i) each impaired secured creditor retains the liens securing its allowed secured claim and receives on account of that claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (ii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) above; or (iii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

With respect to the Mortgage Lenders and the Mezzco Lenders, the Debtors believe that those parties will vote to accept the Plan and that the fair and equitable test will not need to be applied to the Classes of Secured Claims held by those parties.

With respect to the Prepetition Opco Secured Lenders, the Debtors likewise believe that Class S.2, which contains the Claims asserted by those lenders, will vote to accept the Plan after the Opco Assets are market tested pursuant to the bidding procedures.  If for some reason Class S.2 votes to reject the Plan, the Debtors nonetheless believe that the fair and equitable test will be satisfied with respect to that Class, based upon the provisions in the Plan that provide for the sale of the Opco Assets free and clear of the liens of the Agent for the Prepetition Opco Secured Lenders, with those liens attaching to the proceeds of the sale and with those proceeds being distributed to the Prepetition Opco Secured Lenders as set forth herein.

(ii)     Unsecured Creditors

With respect to Non-Accepting Classes of Unsecured Claims, the "fair and equitable" test requires that (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed claim; or (ii) the holders of any claims (or Equity Interests) that are junior to the Non Accepting Class will not receive any property under the Plan.  (This provision is often referred to as the "absolute priority" rule.)

There are numerous Classes of Unsecured Claims that are deemed to have rejected the Plan under Bankruptcy Code section 1126(g) because those Classes will not retain any property or receive any distributions under the Plan.  The Debtors believe that the fair and equitable test is satisfied for each such Class, as the Plan strictly adheres to the absolute priority rule for each Debtor and nowhere does the Plan provide for distributions to the holders of any Claims or Interests that are junior to any Non-Accepting Class of Claims or Interests of the subject Debtor.

(iii)     Equity Interests

With respect to Non-Accepting Classes of Equity Interests, the "fair and equitable" test requires that (i) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of an interest that is junior to the Non Accepting Class will not receive or retain any property under the Plan.

b.     No Unfair Discrimination

A plan does not "discriminate unfairly" with respect to a Non Accepting Class if the value of the cash and/or securities to be distributed to the Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the Non Accepting Class.  Exact parity is not required.  The Debtors believe that any discrepancy in treatment or potential distributions to otherwise unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.

The Debtors will establish at the Confirmation Hearing that each of these requirements has been satisfied under the Plan.

**B.     Conditions to Confirmation and Effectiveness**

1.     **Conditions Precedent to Confirmation**

Confirmation of the Plan shall be conditioned upon the satisfaction of the following:

    a.    The Bankruptcy Court shall have entered a Final Order in form and in substance satisfactory to the Debtors, the Required Consenting Lenders and the Mortgage Lenders approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of Section 1125 of the Bankruptcy Code.

    b.    The Plan and all schedules, documents, supplements and exhibits relating to the Plan shall have been filed in form and substance acceptable to the Debtors.

    c.    The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders and the Mortgage Lenders.

    2.    **Conditions Precedent to the Effective Date and Consummation of the Plan**

Consummation of the Plan shall be conditioned upon, and the Effective Date shall not occur until, the satisfaction or waiver of the following conditions:

    a.    The Confirmation Order shall have been entered (and in the event that the Stalking Horse Bidder is not the Successful Bidder, such order shall have become a Final Order in respect of Propco and New Propco) in a form and in substance satisfactory to the Debtors, the Successful Bidder, the Mortgage Lenders, FG and the Required Consenting Lenders and no stay of the Confirmation Order shall have been entered. The Confirmation Order shall provide that, among other things, the Debtors or the Plan Administrator, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan.

    b.    The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order and, in the event the Stalking Horse Bidder is not the Successful Bidder, such order(s) shall have become Final Order(s) in respect of Propco and New Propco) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement.

    c.    All documents and agreements necessary to implement the Plan, including, without limitation, all documents included in the Plan Supplement, in each case in form and substance acceptable to the Debtors shall have (a) been tendered for delivery, and (b) been effected by executed by, or otherwise deemed binding upon, all Entities party thereto. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

    d.    All actions necessary to implement the Plan shall have been effected, including, without limitation, all actions specified in and in furtherance of the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the Committee Plan Support

Stipulation, the Put Parties Support Agreement and the New Opco Purchase Agreement.

e.    The Committee Plan Support Stipulation has not been terminated as of the Effective Date.

f.    Each of the Put Parties Support Agreement and the Propco Commitment has not been terminated as of the Effective Date.

g.    Upon or before the occurrence of the Effective Date, each of the New Propco Purchase Agreement, the New Propco Transfer Agreement and the New Opco Purchase Agreement shall close according to its terms.

h.    All material consents, actions, documents, certificates and agreements necessary to implement the Plan, including any required governmental or regulatory consents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

i.    The Confirmation Date shall have occurred.

3.    **Effect of Failure of Conditions Precedent**

In the event that the Effective Date does not occur:  (i) the Confirmation Order shall be vacated without further order of the Bankruptcy Court; (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (iv) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or will prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## VI.    SECURITIES LAW MATTERS

### A.    U.S. Securities Law Matters

Except as set forth below, all debt instruments, to the extent they constitute securities, and equity securities to be issued in conjunction with the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

### B.    Section 1145 of the Bankruptcy Code

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering.  Therefore, the securities issued pursuant to a section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code.  In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states.  However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(l) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, or (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer." Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Plan, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law, Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act

**C.      Section 4(2) of the Securities Act/Regulation D**

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act,

**D.      Rule 144 and Rule 144A**

Under certain circumstances, affiliates and holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act. Rule 144 provides that:  (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one-year holding period if there is not current public information regarding the issuer at the time of the sale; and (ii) an affiliate may sell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sate and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system.

Any holder of securities issued under the Plan may transfer such membership interests to a new holder at such times as (i) such membership interests are sold pursuant to an effective registration statement under the Securities Act or (ii) such holder delivers to the issuer an opinion of counsel reasonably satisfactory to the issuer, to the effect that such shares are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to the issuer an opinion of counsel reasonably satisfactory to the issuer to the effect that such shares are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such shares may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE ISSUER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE ANY SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## VII.    FINANCIAL INFORMATION

### A.    NEW PROPCO.

In essence, the restructuring of the obligations of Propco and the Mezzco Debtors consists of a quasi-foreclosure on the Propco assets by the Mortgage Lenders, which, when combined with the purchase of the New Propco Acquired Assets, will result in a transfer of the Propco Properties to the Mortgage Lenders in essence as a going concern. In connection therewith, the Mortgage Lenders have entered into agreements with FG under which FG will, among other things, acquire a portion of the equity interests in New Propco and will manage the properties under the New FG Management Agreement. Upon Consummation of the Plan and subject to the various transition obligations remaining among the parties, the Propco Properties will be operated and financed separately from the Opco Assets.

Exhibit D to this Disclosure Statement contain certain financial projections for New Propco. The projections are based upon the separation of the businesses provided for under the Plan and are subject to the assumptions and limitations contained in Exhibit D, as well as any business, operational, strategic or financial decisions that New Propco and/or FG, as manager, may make with respect to the operations of New Propco in the future. Subject to those limitations and assumptions and to the Risk Factors set forth in this Disclosure Statement, the Debtors believe that Exhibit D demonstrates that New Propco has a reasonable prospect of success in its future operations post-Consummation of the Plan.

### B.    NEW OPCO.

The New Opco Acquired Assets, which consist of substantially all of the assets of SCI, the Other Opco Debtors and the equity or assets of substantially all of their Subsidiaries, are to be sold to the highest or otherwise best bidder pursuant to the Opco Auction. Where, as here, substantially all of a debtor's assets are being liquidated by auction, such plan complies with the "feasibility" test of section 1129(a)(11) as long as the liquidation is contemplated under the plan. A plan cannot fail the feasibility test if there is a possibility, or even a probability,

of a liquidation under the plan, so long as the means for a liquidation is proposed in the plan or, as in the Chapter 11 Cases, the liquidation is the plan.  To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success.  *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).  Because the Plan provides for the sale of the New Opco Acquired Assets and the operation of those assets in the hands of the Successful Bidder will be subject to the discretion of that Succesful Bidder, this Disclosure Statement does not contain financial projections for New Opco.  Nontheless, the Debtors will be able to satisfy the feasibility test at the Confirmation Hearing by demonstrating the ability and wherewithal of the Successful Bidder to close the purchase of the New Opco Acquired Assets in a manner that has a reasonable prospect of resulting in the Consummation of the Plan.  *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 433 (Bankr. S.D. Tex. 2009) (plan that provides for a sale of substantially all of a debtor's assets offers a reasonable probability of success and can satisfy section 1129(a)(11)); *In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) ("under the literal wording of § 1129(a)(11) of the Bankruptcy Code, [it] is unnecessary to [show feasibility] when 'liquidation . . . is proposed in the plan.'"); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) ("The feasibility test has no application to a liquidation plan.").

C.      ADDITIONAL FINANCIAL INFORMATION.

The Debtors have filed periodic financial reports throughout the Chapter 11 Cases.  Various reports have been filed with the SEC, the Bankruptcy Court and the Office of the United States Trustee, and all of those reports are publicly available to interested parties.  The Debtors' SEC filings are available on the Company's website at www.stationcasinos.com.  The Debtors' Bankruptcy Court filings and other important documents are available at www.kccllc.net/stationcasinos.com.

VIII.   RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT.  THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.      General

1.      The Debtors Have No Duty To Update.

The statements in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein.  The delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.

2.      Information Presented Is Based On The Debtors' Books And Records, And Is Unaudited.

While the Debtors have endeavored to present information fairly in this Disclosure Statement, there is no assurance that the Debtors' books and records upon which this Disclosure Statement is based are complete and accurate.  The financial information contained herein has been produced based upon the Debtors' books and records as they are maintained in the ordinary course of business and in accordance with the Debtors' ordinary and customary accounting practices.  The financial information contained herein, however, has not been audited.

3.      Projections And Other Forward-Looking Statements Are Not Assured, And Actual Results Will Vary.

Certain information in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and projections which may differ materially from actual future results. There are uncertainties associated with all assumptions, projections and estimates, and they should not be considered assurances or guarantees of the amount of funds that will be distributed or the amount of Claims in the various Classes that will be allowed. The allowed amount of Claims in each Class, as well as Administrative Claims, could be significantly more than projected, which in turn, could cause the value of Distributions to be reduced substantially.

4.       This Disclosure Statement Was Not Approved By The SEC.

Although a copy of this Disclosure Statement was served on the SEC and the SEC was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it, this Disclosure Statement has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the Exhibits contained herein, and any representation to the contrary is unlawful.

5.       Certain Tax Implications of the Plan.

Holders of Allowed Claims should carefully review Section XII herein, "Material United States Federal Income Tax Considerations," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect Holders of Allowed Claims and the Reorganized Debtors. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of an Allowed Claim should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Equity Interest.

In addition, in connection with the Restructuring Transactions, the Debtors expect to recognize significant losses and gains, which will generally offset for federal income tax purposes. However, the Internal Revenue Code ("IRC") contains various limitations on the ability to utilize losses, including rules disallowing losses recognized on sales between related parties. The definition of related party for these purposes is highly complex and depends on the application of elaborate attribution rules. While the Debtors do not expect that a material amount of tax will be due by reason of the transactions contemplated by the Plan, if any loss disallowance rules applied to all or a significant portion of the losses recognized by the Debtors, the Restructuring Transactions could give rise to substantial federal income taxes. Such taxes would likely preclude the confirmation of the Plan. Due to this and other related issues, the Debtors have requested a ruling from the Internal Revenue Service ("IRS") regarding the application of IRC section 267 to the Restructuring Transactions, and are engaging in discussions with the IRS regarding the maximum federal income taxes that will be payable by SCI and its Affiliates in connection with the Restructuring Transactions in light of the fact that the Debtors intend to seek determinations of the Bankruptcy Court regarding (1) the maximum federal income taxes of the SCI Group that will be payable in connection with the Restructuring Transactions, and (2) whether Holdco and its Subsidiaries will have any successor (or other similar) liability for any unpaid taxes of the Debtors. There can be no assurance of the outcome of these discussions or as to whether or when the IRS may issue any ruling. The receipt of a ruling from the IRS is not a closing condition under the Stalking Horse APA nor is the failure to receive such a ruling a termination event thereunder.

B.       Certain Bankruptcy Considerations

1.       Risk of Non-Confirmation of the Plan.

In order for the Debtors to implement the Plan, the Debtors, like any other chapter 11 debtors, must obtain approval of the Plan from their creditors and confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan. The foregoing process requires the Debtors to: (a) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement; (b) solicit and obtain creditor acceptances of the Plan; and (c) fulfill other statutory conditions with respect to the confirmation of the Plan.

The Debtors may or may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors will seek confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors will nevertheless seek confirmation of the Plan pursuant to the

"cramdown" provisions of the Bankruptcy Code as long as at least one Impaired Class has accepted the Plan (determined without including the acceptance of any "insider" in such Impaired Class).

Even if the requisite acceptances of the Plan are received, or the Debtors are able to seek a "cramdown" confirmation, the Bankruptcy Court may not confirm the Plan as proposed.  A holder of a Claim in a Non-Accepting Class could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code.  Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  See Section V.A above for a discussion of these requirements.

The Bankruptcy Court may determine that the Plan does not satisfy one or more of these applicable requirements, in which case the Plan could not be confirmed by the Bankruptcy Court.  If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions holders of Claims and Equity Interests ultimately would receive with respect to their Claims or Equity Interests.  In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Chapter 11 Cases that is acceptable to the Bankruptcy Court and the holders of Claims and Equity Interests.  Furthermore, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

2.    Risk of Non-Occurrence of Effective Date.

Although the Debtors anticipate that the Effective Date will occur soon after the Confirmation Date, if any, there can be no assurance as to such timing.  If each of the Conditions Precedent are not satisfied or duly waived, the Confirmation Order will be vacated without further order of the Bankruptcy Court, in which event the Plan would be deemed null and void.

In connection with the consummation of the Plan, the Debtors will enter into a number of agreements and transactions designed to transfer assets to and facilitate the operations of New Propco and New Opco as going concern businesses.  These agreements include the New Propco Purchase Agreement, the New Propco Transfer Agreement, the New Opco Purchase Agreement, the New Propco LLCA, the New FG Management Agreement, the New Propco Credit Agreement, the IP License Agreement, the New Propco Non-Compete Agreement, the New Opco Credit Agreement, the New Opco PIK Credit Agreement, the New FG Management Agreement, the IP License Agreement and potentially certain related and ancillary documents.  The Plan cannot become effective until each of the New Propco Purchase Agreement, the New Propco Transfer Agreement and the New Opco Purchase Agreement shall close according to its terms. If the Debtors and the relevant counterparties are unable to agree to the terms of the foregoing agreements, or if there is an event under any of the foregoing agreements which results in their termination prior to Plan effectiveness, the Plan will not become effective and the Debtors will need to consider other restructuring alternatives or transactions.  The events of default and other potential termination events are set forth in detail in the terms of the agreements themselves, as contained in the Plan Supplement.

3.    Risk that Claims Will Be Higher Than Estimated.

The projected distributions and recoveries set forth in this Disclosure Statement and the Liquidation Analysis are based on the Debtors' initial estimate of Allowed Claims, without having undertaken a substantive review of all filed Claims.  The Plan allows for the establishment of reserves (the "**Disputed Claims Reserve**") for the purposes of satisfying the Disputed Claims, as necessary or appropriate.  The Debtors reserve the right to seek estimation of such Disputed Claims pursuant to section 502(c) of the Bankruptcy Code.  The actual amount at which such Disputed Claims are ultimately allowed may differ from the estimates.  Holders of Disputed Claims are entitled to receive distributions under the Plan upon allowance of such Claims solely from the Disputed Claim Reserve.  If insufficient Plan consideration is available for distribution from the Disputed Claim Reserve at the time of allowance of a Disputed Claim, the distributions on account of such Allowed Claim will be limited to such available amounts and the holder of such Allowed Claim will have no recourse against the Debtors for any deficiency that may arise.  The Debtors project that the Claims and Equity Interests asserted against them will be resolved in and reduced to an amount that approximates their estimates.  There can be no assurance, however, that

the Debtors' estimates will prove accurate.  If claims are ultimately allowed in amounts higher than estimated, for example, distributions and recoveries on account of claims may be lower than estimated.

    4.    <u>Liquidity Risks Prior to Consummation of the Plan</u>.

    a.    <u>The DIP Financing May Be Insufficient to Fund the Debtors' Business Operations</u>.Although the Debtors project that they will have sufficient liquidity to operate their businesses through the Effective Date, there can be no assurance that the revenue generated by the Debtors' business operations together with amounts available under the DIP Financing will be sufficient to fund the Debtors' operations, especially as the Debtors expect to incur substantial professional and other fees related to the Chapter 11 Cases.  In the event that revenue flows and available borrowings under the DIP Financing are not sufficient to meet the Debtors' liquidity requirements, the Debtors may be required to seek additional financing.  There can be no assurance that such additional financing would be available or, if available, offered on terms that are favorable to the Debtors or terms that would be approved by the Bankruptcy Court.  If, for one or more reasons, the Debtors are unable to obtain such additional financing, the Debtors' businesses and assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Debtors may cease to continue as going concerns.

    b.    <u>Reduction in Availability of Trade Credit</u>.

    The public disclosure of the Debtors' liquidity constraints and the Chapter 11 Cases has impaired the Debtors ability to maintain normal credit terms with certain of its suppliers.  As a result, the Debtors have been required to pay cash in advance to certain vendors and have experienced restrictions on the availability of trade credit, which has further reduced the Debtors' liquidity.  If liquidity deteriorates further, the Debtors' suppliers could refuse to provide key products and services.

    5.    <u>The Debtors' Management Team May Allocate Less Time to the Operation of the Debtors' Business Operations</u>.

    So long as the Chapter 11 Cases continue, the Debtors' management team will be required to spend a significant amount of their time attending to the Debtors' restructuring instead of focusing exclusively on the Debtors' business operations.

    6.    <u>Estimated Valuation and the Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent the Potential Market Value (if any) of the Plan Consideration</u>.

    The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of any components of the Plan Consideration.  The estimated recoveries are based on numerous assumptions (the realization of many of which are beyond the control of the Debtors), including, without limitation: (a) the successful implementation of the Plan; (b) an assumed date for the occurrence of the Effective Date; (c) the ability of New Opco and New Propco to achieve the operating and financial results included in the Financial Projections; (d) the ability of New Opco and New Propco to maintain adequate liquidity to fund operations meet their debt service obligations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

    7.    <u>No Representations Outside of this Disclosure Statement are Authorized</u>.

    No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

**C.**    **Risks Related to the Reorganized Debtors' Significant Indebtedness**

    1.    <u>Continuing Leverage and Ability to Service Debt</u>.

Although the consummation of the Plan will significantly reduce the debt service obligations of the Opco Debtors and their subsidiaries and the Propco Debtors, both New Opco and New Propco will remain significantly leveraged. The Debtors believe that, following consummation of the Plan, New Opco and New Propco will be able to meet their anticipated future operating expenses, capital expenditures and debt service obligations. However, the ability of New Opco and New Propco to meet their debt service obligations will depend on a number of factors, including future operating performance and ability to achieve the business plan. These factors will be affected by general economic, financial, competitive, regulatory, business and other factors beyond the control of New Opco and New Propco.

The Financial Projections for New Propco attached as Exhibit D reflect the most recent data collected in connection with the proposed business plans of New Propco. The projections rely upon the success of New Propco's business strategy and assumes increases in revenues and profitability over the course of the business plan. However, there can be no assurance that such strategy will be successful or, even if successful, that it will have the effects upon sales and earnings that are reflected in and anticipated by the Financial Projections. Although the Debtors believe that the Financial Projections are achievable if all assumptions are met, and that those assumptions are reasonable, there can be no assurance that the results set forth in such Financial Projections will be obtained.

      2.    <u>Restrictive Financial and Operating Covenants under Credit Facilities for New Opco and New Propco</u>.

The level of debt and the covenants that are expected to be contained in the credit facilities for New Opco and New Propco could have important consequences, including:

- Requiring New Opco and New Propco to dedicate a substantial portion of their cash flow from operations to required payments of principal and interest on indebtedness, thereby reducing the availability of such cash flow to fund operations, working capital, capital expenditures, future business opportunities and other general corporate activities of New Opco and New Propco, respectively.

- Making New Opco and New Propco vulnerable to increases in interest rates to the extent that their outstanding indebtedness bears interest at variable rates.

- Limiting the ability of New Opco and New Propco to react to changes in the economy or the gaming industry.

- Limiting the ability of New Opco and New Propco to obtain additional financing in the future to fund their operations, working capital, capital expenditures, future business opportunities and other general corporate activities.

- Placing New Opco and New Propco at a competitive disadvantage compared to their competitors who are less leveraged.

The terms of the New Opco and New Propco credit facilities may permit New Opco and New Propco and their respective subsidiaries to incur substantial additional indebtedness in the future. If New Opco or New Propco incur additional indebtedness, the risks associated with being highly leveraged could intensify.

**D.**     **Risks Relating to New Propco Membership Interests**

      1.    <u>A Liquid Trading Market for the New Propco Membership Interests is Unlikely to Develop</u>.

A liquid trading market for the New Propco Membership Interests is unlikely to develop. As of the Effective Date, the New Propco membership interests will not be listed for trading on any stock exchange or trading system. Although it is expected that New Propco will file reports with the SEC, the trading liquidity of the New Propco membership interests will be limited. The future liquidity of the trading market for the New Propco

membership interests will depend, among other things, upon the number of holders of the New Propco membership interests and whether the New Propco membership interests are listed for trading on an exchange.

> 2.    Potential Dilution of the New Propco membership interests.

The ownership percentage represented by the New Propco membership interests distributed on the Effective Date under the Plan will be subject to dilution from (i) the issuance of New Propco membership interests and (ii) any additional New Propco membership interests issued after the Effective Date. In the future, additional equity financings or other issuances of membership interests by New Propco could adversely affect the market price of the New Propco membership interests. Sales by existing holders of a large number of shares of the New Propco membership interests, or the perception that additional sales could occur, could cause the market price of the New Propco membership interests to decline.

> 3.    Dividends.

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Propco membership interests in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which New Propco and New Opco and their respective subsidiaries will be party, including the New Propco Credit Agreement, the New Opco Credit Agreement and the New Land Loan, will restrict the ability of the respective obligors thereunder to pay dividends.

> 4.    Restrictions on Transfer.

The New Propco membership interests will be distributed without registration under the Securities Act and without qualification or registration under state securities laws, pursuant to exemptions from such registration and qualification contained in section 4(2) of the Securities Act. With respect to certain persons who receive the New Propco membership interests pursuant to the Plan, the Bankruptcy Code exemptions apply only to the distribution of such securities under the Plan and not to any subsequent sale, exchange, transfer or other disposition of such securities or any interest therein by such persons. Therefore, subsequent sales, exchanges, transfers, or other dispositions of such securities or any interest therein will not be permitted except pursuant to (ii) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws or (iii) the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements. In addition, the organizational documents of New Propco will set forth other transfer restrictions applicable to the New Propco membership interests.

**E.    Risks Relating to Holdco Membership Interests**

> 1.    A Liquid Trading Market for the Holdco Membership Interests is Unlikely to Develop.

A liquid trading market for the Holdco membership interests  is unlikely to develop. As of the Effective Date, the Holdco membership interests will not be listed for trading on any stock exchange or trading system.  It is not expected that Holdco will file reports with the SEC, making the trading liquidity of the Holdco membership interests limited. The future liquidity of the trading market for Holdco membership interests will depend, among other things, upon the number of holders of the Holdco membership interests and whether the Holdco membership interests are listed for trading on an exchange.

> 2.    Potential Dilution of the Holdco Membership Interests.

The ownership percentage represented by the Holdco membership interests distributed on the Effective Date under the Plan will be subject to dilution from (i) the issuance of Holdco membership interests, (ii) the exercise of the NPH Warrants for Holdco membership interests (when and if such warrants are exercised) and (iii) any additional Holdco membership interests issued after the Effective Date. In the future, additional equity financings or other issuances of membership interests by Holdco could adversely affect the market price of the Holdco membership interests. Sales by existing holders of a large number of shares of the Holdco membership

interests, or the perception that additional sales could occur, could cause the market price of the Holdco membership interests to decline.

    3.    <u>Dividends</u>.

        The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the Holdco membership interests in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which Holdco, New Propco and New Opco and their respective subsidiaries will be party, including the New Propco Credit Agreement, the New Opco Credit Agreement and the New Land Loan, will restrict the ability of the respective obligors thereunder to pay dividends.

    4.    <u>Restrictions on Transfer</u>.

        The Holdco membership interests and NPH Warrants will be distributed without registration under the Securities Act and without qualification or registration under state securities laws, pursuant to exemptions from such registration and qualification contained in the Bankruptcy Code or section 4(2) of the Securities Act, or certain other exemptions. With respect to certain persons who receive the Holdco membership interests or the NPH Warrants pursuant to the Plan, these exemptions may apply only to the distribution of such securities under or pursuant to the Plan and not to any subsequent sale, exchange, transfer or other disposition of such securities or any interest therein by such persons. Therefore, subsequent sales, exchanges, transfers, or other dispositions of such securities or any interest therein will not be permitted except pursuant to (i) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws or (ii) the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements. In addition, the organizational documents of Holdco and an equityholders agreement to which holders of Holdco membership interest will be subject will set forth other transfer restrictions applicable to the Holdco membership interests and NPH Warrants.

    **F.**    **Business Risks**

    1.    <u>Risks Related to the Chapter 11 Cases</u>.

        During the Chapter 11 Cases, the Debtors' operations are subject to the risks and uncertainties associated with bankruptcy, but not limited to, the following:

- The Chapter 11 Cases may adversely affect the Debtors' business prospects and/or the Debtors' ability to operate during the reorganization.

- The Chapter 11 Cases and attendant difficulties of operating the Debtors' properties while attempting to reorganize the business in bankruptcy may make it more difficult to maintain and promote the Debtors' properties and attract customers to the Debtors' properties.

- The Chapter 11 Cases may cause the Debtors' vendors and service providers to require stricter terms and conditions.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for professional fees and other expenses associated with the bankruptcy.

- The Chapter 11 Cases may adversely affect the Debtors' ability to maintain gaming licenses in the jurisdictions in which they operate.

- The Chapter 11 Cases will prevent the Debtors from continuing to grow their business through acquisitions and may restrict the Debtors' ability to pursue other business strategies. Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell or

otherwise dispose of all or substantially all of the Debtors' assets or grant liens.  These restrictions may place the Debtors at a competitive disadvantage.

- The Chapter 11 Cases may adversely affect the Debtors' ability to maintain, expand, develop and remodel their properties.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit their ability to respond timely to certain events or take advantage of certain opportunities.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and they may have difficulty attracting new employees.

2.    Prolonged Continuation of the Chapter 11 Cases May Harm the Debtors' Business.

If the Chapter 11 Cases continue for a prolonged amount of time, the proceedings could adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers, suppliers and agents will lose confidence in the Debtors' ability to successfully reorganize the Debtors' business and seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the Chapter 11 Cases.  Prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing.  It may not be possible for the Debtors to obtain additional financing during or after the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, their chances of successfully reorganizing their business may be seriously jeopardized.

3.    Recent Instability in the Financial Markets Have Had an Impact on the Debtors' Business and May Continue to Adversely Affect the Debtors in the Future.

Recently, the residential real estate market in Las Vegas and the U.S. has experienced a significant downturn due to declining real estate values, substantially reducing mortgage loan originations and securitizations, and precipitating more generalized credit market dislocations and a significant contraction in available liquidity globally.  These factors, combined with declining business and consumer confidence and increased unemployment, have precipitated an economic slowdown and a recession.  Individual consumers are experiencing higher delinquency rates on various consumer loans and defaults on indebtedness of all kinds have increased.  All of these factors have materially and adversely affected the Debtors' results of operations.  In addition, further declines in real estate values in Las Vegas and the U.S. or elsewhere and continuing credit and liquidity concerns could continue to have an adverse affect on the Debtors' results of operations.

4.    The Debtors' Business is Sensitive to Reductions in Discretionary Consumer Spending as a Result of Downturns in the Economy.

Consumer demand for casino hotel properties, such as the Debtors', is sensitive to downturns in the economy and the corresponding impact on discretionary spending on leisure activities.  Changes in discretionary consumer spending or consumer preferences brought about by factors such as perceived or actual general economic conditions, the current housing crisis and the credit crisis, the impact of high energy and food costs, the increased costs of travel, the potential for continued bank failures, perceived or actual disposable consumer income and wealth, effects of the current recession and changes in consumer confidence in the economy, or fears of war and future acts of terrorism could further reduce customer demand for the amenities that the Debtors offer, thus imposing practical limits on pricing and harming the Debtors' operations.  The current housing crisis and economic slowdown in the United States has resulted in a significant decline in the amount of tourism and spending in Las Vegas.  This decline has adversely affected, and may continue to adversely affect the Debtors' financial condition, results of operations and cash.

5.    Factors Affecting the Economy May Harm the Debtors' Operating Results.

The Debtors' properties draw a substantial number of customers from the Las Vegas valley, as well as certain geographic areas, including Southern California, Arizona and Utah. The economies of these areas have recently been negatively impacted due to a number of factors, including the credit crisis and a decrease in consumer confidence levels. The resulting severe economic downturn and adverse conditions in these local markets have negatively affected the Debtors' operations, and may continue to negatively affect their operations in the future. Based on information from the Las Vegas Convention and Visitors Authority, gaming revenues in Las Vegas for the year ended December 31, 2009 declined by 9.8% from the level in the comparable period of the prior year. During periods of economic contraction such as the current period, the Debtors' revenues may decrease while some of their costs remain fixed or even increase, resulting in decreased earnings. Gaming and other leisure activities offered by the Debtors represent discretionary expenditures and participation in such activities may decline during economic downturns, during which consumers generally earn less disposable income. The current economic condition has adversely affected consumer spending at the Debtors' gaming operations and related facilities and may continue to adversely affect their business. Furthermore, other uncertainties, including national and global economic conditions, other global events, or terrorist attacks or disasters in or around Southern Nevada or Northern California could have a significant adverse effect on the Debtors' business, financial condition and results of operations.

The Debtors' properties use significant amounts of electricity, natural gas and other forms of energy. While no shortages of energy have been experienced, the substantial increase in the cost of electricity, natural gas and gasoline in the United States has negatively affected the Debtors' operating results. In addition, energy price increases in the regions that constitute a significant source of customers for the Debtors' properties has resulted in a decline in disposable income of potential customers and a corresponding decrease in visitation and spending at the Debtors' properties, which has had a negative impact on their revenues.

6.    The Debtors Depend on Key Markets and May Not Be Able to Continue to Attract a Sufficient Number of Guests and Gaming Customers in Nevada to Make the Debtors' Operations Profitable.

The Debtors' operating strategies emphasize attracting and retaining customers from the Las Vegas local and repeat visitor market. All of the Debtors' owned casino properties are dependent upon attracting Las Vegas residents. The Debtors cannot be sure that they will be able to continue to attract a sufficient number of guests, gaming customers and other visitors in Nevada to make their operations profitable. In addition, the Debtors' operating strategy, including the master-planning of their casinos for future expansion, has been developed, in part, based on expected population growth in Las Vegas. There can be no assurance that growth will continue in Las Vegas or that the Debtors will be able to successfully adapt to the current economic downturn or any further economic slowdown.

7.    The Debtors Face Substantial Competition in the Gaming Industry.

The Debtors' Nevada casino properties face competition from all other casinos and hotels in the Las Vegas area, including to some degree, from each other. In addition, the Debtors' casino properties face competition from all smaller non-restricted gaming locations and restricted gaming locations (locations with 15 or fewer slot machines) in the greater Las Vegas area. As of December 31, 2009, there were approximately 1,415 restricted gaming locations with approximately 14,169 slot machines. The Debtors compete with other hotel/casinos and restricted gaming locations by focusing on repeat customers and attracting these customers through innovative marketing programs. The Debtors' value-oriented, high-quality approach is designed to generate repeat business. Additionally, the Debtors' casino properties are strategically located and designed to permit convenient access and ample parking, which are critical factors in attracting local visitors and repeat patrons. Currently, there are approximately 37 major gaming properties located on or near the Las Vegas Strip, 16 located in the downtown area and several located in other areas of Las Vegas. Major additions, expansions or enhancements of existing properties or the construction of new properties by competitors, could also have a material adverse effect on the business of the Debtors' casino properties.

The Debtors' Nevada casino properties also face competition from 93 non-restricted gaming locations in the Las Vegas area primarily targeted to the local and the repeat visitor markets. Some of these competitors have completed construction or expansions and other existing competitors are under construction on other projects. Although the Debtors have competed strongly in these marketplaces, there can be no assurance that additional capacity will not have a negative impact on their business.

In 1997, the Nevada legislature enacted Senate Bill 208. This legislation identified certain gaming enterprise districts wherein casino gaming development would be permitted throughout the Las Vegas valley and established more restrictive criteria for the establishment of new gaming enterprise districts. The Debtors believe the growth in gaming supply in the Las Vegas locals' market has been, and will continue to be, limited by the provisions of Senate Bill 208.

To a lesser extent, the Debtors' Nevada operations compete with gaming operations in other parts of the state of Nevada, such as Reno, Laughlin and Lake Tahoe, riverboat gaming markets in the Midwest and South, facilities in Atlantic City, New Jersey, casinos located on Native American land and in other parts of the world, with state-sponsored lotteries, on-and-off-track pari-mutuel wagering, card rooms and other forms of legalized gambling.

Native American gaming in California, as it currently exists, has had little, if any impact on the Debtors' Nevada operations to date, although there are no assurances as to future impact. In total, the State of California has signed and ratified Tribal-State Compacts with 68 Native American tribes. Currently there are 58 Native American casinos in operation in the State of California. These Native American tribes are allowed to operate slot machines, lottery games, and banking and percentage games (including "21") on Native American lands. It is not certain if any expansion of Native American gaming in California will affect the Debtors' Nevada operations given that visitors from California make up Nevada's largest visitor market. Moreover, it is uncertain how soon any expansion would affect the Debtors' interests in Native American gaming in California. Increased competition from Native American gaming may result in a decline in the Debtors' revenues and may have a material adverse effect on their business.

The gaming industry also includes land-based casinos, dockside casinos, riverboat casinos, racetracks with slots, casinos located on Native American land and other forms of legalized gaming. There is intense competition among companies in the gaming industry, some of which have significantly greater resources than the Debtors do. Several states are currently considering legalizing casino gaming in designated areas. Legalized casino gaming in such states and on Native American land will result in strong competition could adversely affect the Debtors' operations, particularly to the extent that such gaming is conducted in areas close to their operations.

8. **The Debtors May Incur Losses that are Not Adequately Covered By Insurance Which May Harm the Debtors' Results of Operations.**

Although the Debtors maintain insurance customary and appropriate for their business, there can be no assurance that insurance will be available or adequate to cover all loss and damage to which the Debtors' business or assets might be subjected. The lack of adequate insurance for certain types or levels of risk could expose the Debtors to significant losses in the event that a catastrophe occurred for which the Debtors are underinsured. Any losses incurred that are not adequately covered by insurance may decrease the Debtors' future operating income, require them to find replacements or repairs for destroyed property and reduce the funds available for payments of their obligations.

9. **Certain Construction Risks May Arise During the Building of Any New Property.**

The Debtors are currently providing funding for the proposed gaming facilities for the Federated Indians of Graton Rancheria, the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, the Mechoopda Indian Tribe of Chico Rancheria, California and the North Fork Rancheria of Mono Indians (collectively the "**Native American Tribes**"). The Debtors evaluate expansion opportunities as they become available, and they may in the future develop projects in addition to the above listed projects.

Construction projects, such as the proposed gaming facilities for the Native American Tribes entail significant risks, including the following:

- shortages of material, or skilled labor;

- unforeseen engineering, environmental or geological problems;

- work stoppages;

- weather interference;

- floods; and

- unanticipated cost increases;

any of which can give rise to delays or cost overruns.

The anticipated costs and construction periods are based upon budgets, conceptual design documents and construction schedule estimates prepared by the Debtors in consultation with their architects and contractors. Construction, equipment, staffing requirements, problems or difficulties in obtaining any of the requisite licenses, permits, allocations or authorizations from regulatory authorities can increase the cost or delay the construction or opening of each of the proposed facilities or otherwise affect the project's planned design and features. The Debtors cannot be sure that they will not exceed the budgeted costs of these projects or that the projects will commence operations within the contemplated time frame, if at all. Budget overruns and delays with respect to expansion and development projects could have a material adverse impact on the Debtors' results of operations.

     10.    <u>The Debtors Rely on Key Personnel, the Loss of the Services of Whom Could Materially and Adversely Affect their Results of Operations</u>.

The Debtors' ability to operate successfully and competitively is dependent, in part, upon the continued services of certain of their officers and key employees. In the event that these officers and/or employees were to leave, the Debtors might not be able to find suitable replacements. The Debtors believe that the loss of the services of these officers and/or employees could have a material adverse effect on their results of operations.

     11.    <u>The Debtors Regularly Pursue New Gaming Acquisition and Development Opportunities and May Not Be Able to Recover their Investment or Successfully Expand to Additional Locations</u>.

The Debtors regularly evaluate and pursue new gaming acquisition and development opportunities in existing and emerging jurisdictions. These opportunities have in the past, and may in the future, take the form of joint ventures. To the extent that any purchaser decides to pursue any new gaming acquisition or development opportunities, their ability to benefit from such investments will depend upon a number of factors including:

- the ability to identify and acquire attractive acquisition opportunities and development sites;

- the ability to secure required federal, state and local licenses, permits and approvals, which in some jurisdictions are limited in number;

- certain political factors;

- the availability of adequate financing on acceptable terms (including waivers of restrictions in existing credit arrangements); and

- the ability to identify and develop satisfactory relationships with joint venture partners.

Most of these factors are beyond the Debtors' or a purchaser's control. Therefore, the ability to recover any investment in any new gaming development opportunities or acquired facilities, or successfully expand to additional locations, is uncertain.

The Debtors have invested in real property in connection with the pursuit of expansion opportunities. These investments are subject to the risks generally incident to the ownership of real property, including:

- changes in economic conditions;

- environmental risks;

- governmental rules and fiscal policies; and

- other circumstances over which the Debtors may have little or no control.

The Debtors cannot be sure that any purchaser will be able to recover their investment in any such properties or be able to prevent incurring investment losses.

12.    The Debtors are Subject to Extensive State and Local Regulation and Licensing and Gaming Authorities Have Significant Control Over the Debtors' Operations Which Could Have an Adverse Effect on their Business.

The ownership and operation of casino gaming facilities are subject to extensive state and local regulation. The Debtors currently conduct licensed gaming operations in Nevada and California through wholly-owned subsidiaries and joint ventures. The State of Nevada, the State of California and the applicable local authorities require the Debtors to hold various licenses, findings of suitability, registrations, permits and approvals. The Nevada Gaming Commission may, among other things, limit, condition, suspend or revoke a license or approval to own the stock of any of the Debtors' Nevada subsidiaries for any cause deemed reasonable by such licensing authority. The Debtors are also responsible for the acts and conduct of their employees on the premises. Substantial fines or forfeiture of assets for violations of gaming laws or regulations may be levied against them, their subsidiaries and the persons involved. The suspension or revocation of any of the Debtors' licenses or the levy on them of substantial fines or forfeiture of assets would have a material adverse effect on their business.

To date, the Debtors have obtained all governmental licenses, findings of suitability, registrations, permits and approvals necessary for the operation of their gaming activities. Gaming licenses and related approvals are deemed to be privileges under Nevada and California law, and the Debtors' cannot be sure that any new licenses, findings of suitability, registrations, permits and approvals that may be required in the future will be given or that existing ones will not be revoked. Any expansion of the Debtors' gaming operations in Nevada or into new jurisdictions will require various licenses, findings of suitability, registrations, permits and approvals of the gaming authorities. The approval process can be time consuming and costly and has no assurance of success.

Gaming authorities have the authority generally to require that any beneficial owner of the Debtors' securities file an application and be investigated for a finding of suitability. If a record or beneficial owner of the Debtors' securities is required by any gaming authority to be found suitable, such owner will be required to apply for a finding of suitability within 30 days after request of such gaming authority or within such earlier time prescribed by such gaming authority. The applicant for a finding of suitability must pay all costs of the investigation for such finding of suitability. If a record or beneficial owner the Debtors' securities is required to be found suitable and is not found suitable, the Debtors may be required by law to dispose of such securities.

13.    The Debtors are Subject to Native American Gaming Regulations Which Could Have an Adverse Effect on the Debtors' Business.

The terms and conditions of management contracts and the operation of casinos and all gaming on land held in trust for Native American tribes in the United States are subject to the Indian Gaming Regulatory Act of 1988 ("**IGRA**"), which is administered by the NIGC and the gaming regulatory agencies of tribal governments. IGRA is subject to interpretation by the NIGC and may be subject to judicial and legislative clarification or amendment.

Native American tribes are sovereign nations with their own governmental systems, which have primary regulatory authority over gaming on land within the tribes' jurisdiction. Therefore, persons engaged in gaming activities, including the Debtors, are subject to the provisions of tribal ordinances and regulations on gaming. These ordinances are subject to review by the NIGC under certain standards established by the IGRA. The NIGC may determine that some or all of the ordinances require amendment, and those additional requirements, including additional licensing requirements, may be imposed on the Debtors. The Debtors have received no such

notification regarding Thunder Valley.  The possessions of valid licenses from the UAIC are ongoing conditions of SCI's management agreement with that tribe.

Several bills have been introduced in Congress that would amend the IGRA.  While there have been a number of technical amendments to the IGRA, to date there have been no material changes.  Any amendment of the IGRA could change the governmental structure and requirements within which Thunder Valley could conduct gaming, and may have an adverse effect on the Debtors' results of operations or impose additional regulatory or operational burdens.

14.    Factors Affecting Tax Laws Could Have an Adverse Effect on the Debtors' Business.

The gaming industry represents a significant source of tax revenue, particularly to the State of Nevada and its counties and municipalities.  From time to time, various state and federal legislators and officials have proposed changes in tax law, or in the administration of such law, affecting the gaming industry.  The Nevada Legislature meets every two years and is currently in session. An increase in the gaming tax could have an adverse effect on the Debtors' results of operations.

## IX.    MATERIAL GAMING LAW CONSIDERATIONS

*Nevada Gaming Regulations in General*

The ownership and operation of casino gaming facilities and the manufacture and distribution of gaming devices in Nevada are subject to: (i) the Nevada Gaming Control Act and the rules and regulations promulgated thereunder (collectively, the "Nevada Act"); and (ii) various local ordinances and regulations. SCI's gaming operations in Nevada are subject to the licensing and regulatory control of the Nevada Gaming Commission (the "Nevada Commission"), the Nevada State Gaming Control Board (the "Nevada Board"), the City of Las Vegas, the Clark County Liquor and Gaming Licensing Board (the "Clark County Board"), the City of North Las Vegas, the City of Henderson and certain other local regulatory agencies. The Nevada Commission, Nevada Board, City of Las Vegas, Clark County Board, City of North Las Vegas, City of Henderson, and certain other local regulatory agencies are collectively referred to as the "Nevada Gaming Authorities".

The laws, regulations and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy which are concerned with, among other things: (i) the prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity; (ii) the establishment and maintenance of responsible accounting practices and procedures; (iii) the maintenance of effective controls over the financial practices of licensees, including the establishment of minimum procedures for internal controls and the safeguarding of assets and revenues, providing reliable record keeping and requiring the filing of periodic reports with the Nevada Gaming Authorities; (iv) the prevention of cheating and fraudulent practices; and (v) providing a source of state and local revenues through taxation and licensing fees.

*Existing Licenses and Registrations*

SCI's direct and indirect subsidiaries that conduct gaming operations in Nevada (the "Licensed Subsidiaries") are required to be licensed by the Nevada Gaming Authorities. The SCI subsidiaries (individually a "Gaming Subsidiary" and collectively the "Gaming Subsidiaries") that own and operate, operate as tenants or own manage Nevada casinos have all received the necessary licenses to carry on those activities (individually, a "Gaming License" and collectively the "Gaming Licenses"). The gaming licenses require the periodic payment of fees and taxes and are not transferable. SCI is registered by the Nevada Commission as a publicly traded corporation (a "Registered Corporation") and has been found suitable to own the equity of the Gaming Subsidiaries. SCI is also licensed as a manufacturer and distributor of gaming devices. As a Registered Corporation, SCI is required periodically to submit detailed financial and operating reports to the Nevada Commission and the Nevada Board and furnish any other information, which the Nevada Commission or the Nevada Board may require. No person may become a stockholder or holder of an interest of, or receive any percentage of profits from the Gaming Subsidiaries without first obtaining licenses and approvals from the Nevada Gaming Authorities.

The Nevada Gaming Authorities may investigate any individual who has a material relationship to, or material involvement with, a Registered Corporation, such as Station or the Gaming Subsidiaries, which hold licenses, in order to determine whether such individual is suitable or should be licensed as a business associate of a Registered Corporation or a gaming licensee. Officers, directors and certain key employees of the Gaming Subsidiaries must file applications with the Nevada Gaming Authorities and may be required to be licensed or found suitable by the Nevada Gaming Authorities. The officers, directors and key employees of a Registered Corporation who are actively and directly involved in gaming activities of the Gaming Subsidiaries may be required to be licensed or found suitable by the Nevada Gaming Authorities. The Nevada Gaming Authorities may deny an application for licensing for any cause that they deem reasonable. A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation. The applicant for licensing or a finding of suitability must pay all the costs of the investigation.

*Relationship of Nevada Gaming Laws to Plan Transactions*

Various transactions contemplated under the Plan will require approvals from the Nevada Gaming Authorities, including, but not limited to the following.  The direct and indirect subsidiaries of New Propco to which the New PropCo Acquired Assets are to be transferred will have to be licensed by the Nevada Gaming Authorities before such transfer occurs in order to avoid interruption of gaming and liquor operations. New Propco will be required, as part of the process of the licensing of its subsidiaries, to be registered with the Nevada Commission. It is anticipated that New Propco will be a Registered Corporation that registers its voting securities with the Securities and Exchange Commission and issues all of the same to Voteco, which will, as a consequence, be required to be registered as a holding company and found suitable by the Nevada Commission as part of the licensing process for the New Propco subsidiaries. The individual members of Voteco will be required to be found suitable by the Nevada Commission in order for Voteco and New Propco to become registered and in order for the New Propco subsidiaries to obtain licenses.

Based upon several precedents, it is anticipated that Holdco, as the owner of non-voting securities of New Propco, will not be required to file an application for registration and a finding of suitability. However, any beneficial owner of New Propco's voting or non-voting securities, regardless of the number of shares owned, may be required to file an application, be investigated, and obtain a finding of suitability as a beneficial owner of such voting securities if the Nevada Commission has reason to believe that such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. The applicant must pay all costs of investigation incurred by the Nevada Gaming Authorities in conducting any such investigation.

The transfer of New Opco Purchased Assets to New Opco will also require various prior approvals from the Nevada Gaming Authorities in order to avoid interruption of existing gaming and liquor operations, the exact nature of which will depend on the structure of the transfer transaction or transactions.  New Opco, as the indirect owner of gaming  subsidiaries, will be required to be registered with and found suitable by the Nevada Gaming Authorities as a holding company.  Unless New Opco becomes a Registered Corporation,  it will be a privately held holding company and, as a result, all of its equity owners will be required to file applications and to be found suitable as such.  If New Opco becomes a Registered Corporation, the following requirements for registered Corporations will apply to New Opco as well as New Propco.

*Requirements for Security Holders*

The Nevada Act provides that persons who acquire beneficial ownership of more than 5% of the voting securities of a Registered Corporation must report the acquisition to the Nevada Commission. The Nevada Act also requires that beneficial owners of more than 10% of the voting securities of a Registered Corporation must apply to the Nevada Commission for a finding of suitability within thirty days after the Chairman of the Nevada Board mails the written notice requiring such filing. An "institutional investor," as defined in the Nevada Commission's regulations, which acquires beneficial ownership of more than 10%, but not more than 25% of a registered Corporation's voting securities may apply to the Nevada Commission for a waiver of such finding of suitability if such institutional investor holds the voting securities for investment purposes only. An institutional investor that has obtained a waiver may, in certain circumstances, hold up to 29% of our voting securities and maintain its waiver for a limited period of time. An institutional investor shall not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held in the ordinary course of business as an institutional

investor and not for the purpose of causing, directly or indirectly, the election of a majority of the members of the Registered Corporation's Board of Directors, any change in its corporate charter, bylaws, management policies or operations, or those of any of its gaming affiliates, or any other action which the Nevada Commission finds to be inconsistent with holding our voting securities for investment purposes only. Activities which are not deemed to be inconsistent with holding voting securities for investment purposes only include: (i) voting on all matters voted on by stockholders; (ii) making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and (iii) such other activities as the Nevada Commission may determine to be consistent with such investment intent. If the beneficial holder of voting securities who must be found suitable is a corporation, partnership or trust, it must submit detailed business and financial information including a list of beneficial owners.

Any person who fails or refuses to apply for a finding of suitability or a license within thirty days after being ordered to do so by the Nevada Commission or the Chairman of the Nevada Board may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any security holder who is found unsuitable and who holds, directly or indirectly, any beneficial ownership of the securities of a Registered Corporation beyond such period of time as may be prescribed by the Nevada Commission may be guilty of a criminal offense. New Propco will be subject to disciplinary action if, after it receives notice that a person is unsuitable to be a stockholder or to have any other relationship with New Propco or its Gaming Subsidiaries, (i) pays that person any dividend or interest upon our voting securities, (ii) allows that person to exercise, directly or indirectly, any voting right conferred through securities held by that person, (iii) pays remuneration in any form to that person for services rendered or otherwise, or (iv) fails to pursue all lawful efforts to require such unsuitable person to relinquish his voting securities including, if necessary, the immediate purchase of said voting securities for cash at fair market value. Additionally, the Clark County Board has the authority to approve all persons owning or controlling the equity of any business entity controlling a gaming licensee.

The Nevada Commission may, in its discretion, require the holder of any debt security of a Registered Corporation to file applications, be investigated and be found suitable to own the debt security of a Registered Corporation if the Nevada Commission has reason to believe that such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. If the Nevada Commission determines that a person is unsuitable to own such security, then pursuant to the Nevada Act, the Registered Corporation can be sanctioned, including the loss of its approvals, if without the prior approval of the Nevada Commission, it: (i) pays to the unsuitable person any dividend, interest, or any distribution whatsoever; (ii) recognizes any voting right by such unsuitable person in connection with such securities; (iii) pays the unsuitable person remuneration in any form; or (iv) makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation or similar transaction.

New Propco will be required to maintain a current stock ledger in Nevada, which may be examined by the Nevada Gaming Authorities at any time. If any New Propco securities are held in trust by an agent or by a nominee, the record holder may be required to disclose the identity of the beneficial owner to the Nevada Gaming Authorities. Failure to make such disclosure may be grounds for finding the record holder unsuitable. New Propco will also be required to render maximum assistance in determining the identity of the beneficial owner. The Nevada Commission has the power to require New Propco's certificates in respect of its securities to bear a legend indicating that the securities are subject to the Nevada Act. This requirement may or may not be imposed on New Propco.

*Public Offerings and Changes of Control*

New Propco may not make a public offering of its securities without the prior approval of the Nevada Commission if the securities or proceeds therefrom are intended to be used to construct, acquire or finance gaming facilities in Nevada, or to retire or extend obligations incurred for such purposes.

Changes in control of a Registered Corporation through merger, consolidation, stock or asset acquisitions (including stock issuances in connection with restructuring transactions), management or consulting agreements, or any act or conduct by a person whereby such person obtains control, may not occur without the prior approval of the Nevada Commission. Entities seeking to acquire control of a Registered Corporation must satisfy the Nevada Board and the Nevada Commission that they meet a variety of stringent standards prior to assuming control of such Registered Corporation. The Nevada Commission may also require controlling stockholders, officers, directors and

other persons having a material relationship or involvement with the entity proposing to acquire control, to be investigated and licensed as part of the approval process relating to the transaction.

The Nevada legislature has declared that some corporate acquisitions opposed by management, repurchases of voting securities and corporate defense tactics affecting Nevada corporate gaming licensees, and Registered Corporations that are affiliated with those operations, may be injurious to stable and productive corporate gaming. The Nevada Commission has established a regulatory scheme to ameliorate the potentially adverse effects of these business practices upon Nevada's gaming industry and to further Nevada's policy to: (i) assure the financial stability of corporate gaming licensees and their affiliates; (ii) preserve the beneficial aspects of conducting business in the corporate form; and (iii) promote a neutral environment for the orderly governance of corporate affairs. Approvals are, in certain circumstances, required from the Nevada Commission before a Registered Corporation can make exceptional repurchases of voting securities above the current market price thereof and before a corporate acquisition opposed by management can be consummated. The Nevada Act also requires prior approval of a plan of re-capitalization proposed by the Registered Corporation's Board of Directors in response to a tender offer made directly to the Registered Corporation's stockholders for the purpose of acquiring control of the Registered Corporation.

*Officers and Directors*

If the Nevada Gaming Authorities were to find an officer, director or key employee of unsuitable for licensing or unsuitable to continue to have a relationship with New Propco or its Gaming Subsidiaries, the companies involved would have to sever all relationships with such person. In addition, the Nevada Commission may require New Propco or its Gaming Subsidiaries to terminate the employment of any person who refuses to file the appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review in Nevada.

*Financial Reporting*

New Propco and its Gaming Subsidiaries will be required to submit detailed financial and operating reports to the Nevada Commission. Substantially all material loans, leases, sales of securities and similar financing transactions by New Propco or its Gaming Subsidiaries must be reported to or approved by the Nevada Commission and/or the Nevada Board.

*Disciplinary Matters*

If it were determined that the Nevada Act was violated by a Gaming Subsidiary, the gaming licenses it holds could be limited, conditioned, suspended or revoked, subject to compliance with certain statutory and regulatory procedures. In addition, New Propco, its Gaming Subsidiaries and the persons involved could be subject to substantial fines for each separate violation of the Nevada Act at the discretion of the Nevada Commission. Further, a supervisor could be appointed by the Nevada Commission to operate ay property operated by a Gaming Subsidiary and, under certain circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of the Gaming Licenses of the New Propco Gaming Subsidiaries or the appointment of a supervisor could (and revocation of any Gaming License would) have a material adverse affect on New Propco's gaming operations.

*License Fees and Taxes*

License fees and taxes, computed in various ways depending on the type of gaming or activity involved, are payable to the State of Nevada and to the counties and cities in which the Nevada licensee's respective operations are conducted. Depending upon the particular fee or tax involved, these fees and taxes are payable either monthly, quarterly or annually and are based upon either: (i) a percentage of the gross revenues received; (ii) the number of gaming devices operated; or (iii) the number of table games operated. A live entertainment tax is also paid by casino operations where entertainment is furnished in connection with admission charges, the serving or selling of food or

refreshments or the selling of any merchandise. Nevada licensees that hold a license as an operator of a slot route, or manufacturer's or distributor's license also pay certain fees and taxes to the State of Nevada.

*Foreign Gaming*

Any person who is licensed, required to be licensed, registered, required to be registered, or is under common control with such persons (collectively, "Licensees"), and who proposes to become involved in a gaming venture outside of Nevada, is required to deposit with the Nevada Board, and thereafter maintain, a revolving fund in the amount of $10,000 to pay the expenses of investigation by the Nevada Board of their participation in such foreign gaming. The revolving fund is subject to increase or decrease at the discretion of the Nevada Commission. Thereafter, licensees are required to comply with certain reporting requirements imposed by the Nevada Act. Licensees are also subject to disciplinary action by the Nevada Commission if they knowingly violate any laws of the foreign jurisdiction pertaining to the foreign gaming operation, fail to conduct the foreign gaming operation in accordance with the standards of honesty and integrity required of Nevada gaming operations, engage in activities or enter into associations that are harmful to the State of Nevada or its ability to collect gaming taxes and fees, or employ, contract with or associate with a person in the foreign operation who has been denied a license or finding of suitability in Nevada on the grounds of unsuitability or whom a court in the state of Nevada has found guilty of cheating. The loss or restriction of our gaming licenses in Nevada would have a material adverse effect on our business and could require us to cease gaming operations in Nevada.

*Nevada Liquor Regulations*

The sale of alcoholic beverages at locations operated by the SCI Gaming Subsidiaries is subject to liquor licensing, control and regulation by several local authorities, including the City of Las Vegas, the Clark County Board, the City of North Las Vegas and the City of Henderson. All liquor licenses are revocable and are not transferable. The agencies involved have full power to limit, condition, suspend or revoke any such license, and any such disciplinary action could (and revocation would) have a material adverse effect on the operations of the Gaming Subsidiaries.

*Native American Gaming Regulations*

It is anticipated that New Opco will succeed to SCI's interests in an existing Native American gaming management arrangement under which SCI manages the Thunder Valley Casino ("Thunder Valley") in Sacramento, California on behalf of the United Auburn Indian Community ("UAIC"). New Opco will also likely succeed to SCI's interests in several Native American gaming development projects including management components in California and Michigan.

The terms and conditions of management contracts and the operation of casinos and all gaming on land held in trust for Native American tribes in the United States are subject to the Indian Gaming Regulatory Act of 1988 (the "IGRA"), which is administered by the National Indian Gaming Commission (the "NIGC") and the gaming regulatory agencies of tribal governments. The IGRA is subject to interpretation by the NIGC and may be subject to judicial and legislative clarification or amendment.

The IGRA established three separate classes of tribal gaming-Class I, Class II and Class III. Class I gaming includes all traditional or social games solely for prizes of minimal value played by a tribe in connection with celebrations or ceremonies. Class II gaming includes games such as bingo, pull-tabs, punchboards, instant bingo and non-banked card games (those that are not played against the house), such as poker. Class III gaming is casino-style gaming and includes banked table games such as blackjack, craps and roulette, and gaming machines such as slots, video poker, lotteries and pari-mutuel wagering. The IGRA requires NIGC approval of management contracts for Class II and Class III gaming as well as the review of all agreements collateral to the management contracts. The management agreement relating to SCI's management of the casino owned by the UAIC was approved by the NIGC with respect to Thunder Valley in December 2002. The NIGC will not approve a management contract if a director or a 10% shareholder of the management company: (i) is an elected member of the governing body of the Native American tribe which is the party to the management contract; (ii) has been or subsequently is convicted of a felony or gaming offense; (iii) has knowingly and willfully provided materially important false information to the NIGC or the tribe; (iv) has refused to respond to questions from the NIGC; or (v) is a person whose prior history, reputation

and associations pose a threat to the public interest or to effective gaming regulation and control, or create or enhance the chance of unsuitable activities in gaming or the business and financial arrangements incidental thereto. In addition, the NIGC will not approve a management contract if the management company or any of its agents have attempted to unduly influence any decision or process of tribal government relating to gaming, or if the management company has materially breached the terms of the management contract or the tribe's gaming ordinance or resolution, or a trustee, exercising the skill and due diligence that a trustee is commonly held to, would not approve the management contract. A management contract can be approved only after the NIGC determines that the contract provides, among other things, for: (i) adequate accounting procedures and verifiable financial reports, which must be furnished to the tribe; (ii) tribal access to the daily operations of the gaming enterprise, including the right to verify daily gross revenues and income; (iii) minimum guaranteed payments to the tribe, which must have priority over the retirement of development and construction costs; (iv) a ceiling on the repayment of such development and construction costs and (v) a contract term not exceeding five years and a management fee not exceeding 30% of net revenues (as determined by the NIGC); provided that the NIGC may approve up to a seven year term and a management fee not to exceed 40% of net revenues if the NIGC is satisfied that the capital investment required, and the income projections for the particular gaming activity require the larger fee and longer term. There is no periodic or ongoing review of approved contracts by the NIGC. The only post-approval action that could result in possible modification or cancellation of a contract would be as the result of an enforcement action taken by the NIGC based on a violation of the law or an issue affecting suitability.

The IGRA prohibits all forms of Class III gaming unless the tribe has entered into a written agreement with the state that specifically authorizes the types of Class III gaming the tribe may offer (a "tribal-state compact"). These tribal-state compacts provide, among other things, the manner and extent to which each state will conduct background investigations and certify the suitability of the manager, its officers, directors, and key employees to conduct gaming on Native American lands. SCI has been licensed by the UAIC's tribal gaming agency to manage Thunder Valley. As SCI's successor, New Opco will have to undergo the same licensing process.

Title 25, Section 81 of the United States Code states that "no agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value... in consideration of services for said Indians relative to their lands... unless such contract or agreement be executed and approved" by the Secretary or his or her designee. An agreement or contract for services relative to Native American lands which fails to conform to the requirements of Section 81 is void and unenforceable. All money or other things of value paid to any person by any Native American or tribe for or on his or their behalf, on account of such services, in excess of any amount approved by the Secretary or his or her authorized representative will be subject to forfeiture. SCI has represented that it has complied with the requirements of Section 81 with respect to its management contract for Thunder Valley. As the successor to SCI, New Opco will have to comply with Section 81 with respect to any other contract to manage casinos located on Native American land in the United States.

Native American tribes are sovereign nations with their own governmental systems, which have primary regulatory authority over gaming on land within the tribes' jurisdiction. Therefore, persons engaged in gaming activities, including Station, are subject to the provisions of tribal ordinances and regulations on gaming. These ordinances are subject to review by the NIGC under certain standards established by the IGRA. The NIGC may determine that some or all of the ordinances require amendment, and those additional requirements, including additional licensing requirements, may be imposed on a manager.

Several bills have been introduced in Congress that would amend the IGRA. While there have been a number of technical amendments to the IGRA, to date there have been no material changes. Any amendment of the IGRA could change the governmental structure and requirements within which Thunder Valley could conduct gaming, and may have an adverse effect on the results of operations there or impose additional regulatory or operational burdens.

*California Gaming Regulations*

In California, licensing and registration requirements for tribal financing sources are governed by the compact, amended compact and by regulations adopted by the California Gambling Control Commission and the Tribal Gaming Agency (the "TGA").

The UAIC's compact was set to expire on December 31, 2020. The Amended Compact extended the term until December 31, 2030. The UAIC's compact and amended compact require that any person who directly or indirectly extend financing to the UAIC's gaming facility or gaming operation must be licensed as a "financial source" by the TGA. However, as permitted by the compact and amended compact, the TGA has the discretion to exempt federally and state regulated banks, savings and loan associations and other federal and state regulated lending institutions, entities identified by Regulation CGCC-2, subdivision (f) of the California Gambling Control Commission, as well as persons who hold less than 10% of notes issued by the UAIC or a related entity. The Amended Compact further specifies that entities identified by Regulation CGCC-2, subdivision (h) of the California Gambling Control Commission, and persons or entities whose sole connection with extending financing to the UAIC is to provide loan brokerage or debt servicing for a financial source at no cost to the UAIC or the Gaming Operation are not considered financial sources. For an applicant who is a non-exempted business entity, these licensing provisions also apply to the entity's officers, directors, principal management employees, owners (if an unincorporated entity), partners and greater than 10% shareholders. Under the compact and amended compact, a permanent license cannot be issued unless the TGA has conducted an investigation as to the suitability of the applicant. Any application for a gaming license may be denied, and any license issued may be revoked, if the TGA determines the applicant to be unsuitable or otherwise unqualified for a gaming license. Each license is subject to review for compliance at least every two years.

Prior to receiving a license, an applicant must apply to the California Gambling Control Commission for a determination of suitability. The California Department of Justice, Division of Gambling Control will then conduct an investigation of the applicant following the guidelines set forth in the California Gambling Control Act and will provide its suitability recommendation to the California Gambling Control Commission. If the TGA receives notice that the Commission has determined that a person is unsuitable, the compact requires that the TGA revoke any license it has issued to such person.

The compact and amended compact state that any agreement between the UAIC and a financial source terminates upon revocation or non-renewal of the financial source's license because of a determination of unsuitability by the California Gambling Control Commission. Upon such a termination, the UAIC's only liability is for a bona fide repayment of all outstanding sums (exclusive of interest) owed as of the termination date, exclusive of unpaid accrued interest.

Further, the UAIC is not permitted to enter into, or continue to make payments under, any financing agreement with anyone whose application to the California Gambling Control Commission for a determination of suitability has been denied or has expired without renewal. Station California, LLC, SCI's wholly owned subsidiary, has been found suitable as a Gaming Resource Supplier and Financial Source by the California Gambling Control Commission. This finding of suitability is subject to review for compliance annually.

## X.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN THIS SECTION X OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTORS AND FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

The following discussion summarizes the material federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the federal income tax consequences to holders whose Claims are not impaired (*e.g.*, certain Claims of secured lenders or of trade creditors).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such

rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  Except as described below, the Debtors have not requested a ruling or advice from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as  broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, persons who received their claims in whole or in part as compensation, regulated investment companies, persons holding a Claim as part of an integrated transaction, constructive sale, straddle or as part of a conversion transaction, and investors in pass-through entities).  It also does not address the federal income tax consequences to foreign taxpayers and tax-exempt organizations (including, without limitation, certain pension funds) or to the Put Parties in their capacities as such and of inter-Claimant agreements.  This summary assumes, and the Debtors believe, that instruments issued pursuant to the Plan that are denominated as notes, debt or indebtedness will be treated as debt for federal income tax purposes.

*Accordingly, the following summary of material federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

**IRS Circular 230 Notice***:  **To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the IRC, (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein, and (c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.*

A.      **CONSEQUENCES TO THE DEBTORS**

For federal income tax purposes, the Debtors are either members of an affiliated group of corporations of which Station Casinos, Inc. is the common parent (the "SCI Group") or limited liability companies owned by such members and treated as disregarded entities for income tax purposes.  The members of the SCI Group join in the filing of a consolidated federal income tax return.  The Debtors estimate that, as of December 31, 2009, the SCI Group had incurred consolidated net operating loss ("NOL") carryforwards of approximately $855 million and, based on year to date performance, the SCI Group expects to incur additional NOLs in 2010.  The amount of such losses, and any limitations with respect to the utilization of such losses, remain subject to audit by the IRS.

The capitalization of the SCI Group is set forth above under "II. GENERAL INFORMATION ABOUT STATION CASINOS – B.  The Debtors' Prepetition Financing Arrangements."  The SCI Group debt falls into two large categories.  First there is nonrecourse, asset based  secured debt that was issued as part of the Going Private Transaction.  To issue that debt, the SCI Group established FCP MezzCo Parent, LLC, a limited liability company that has elected to be treated as a corporation for federal income tax purposes and a  chain of limited liability company subsidiaries owned by FCP MezzCo Parent, LLC.  SCI and other members of the  SCI Group then sold the Propco Properties to FCP Propco, LLC, one of the subsidiaries indirectly owned by  FCP MezzCo Parent, LLC.  FCP Propco LLC then leased the Propco Properties back to the SCI Group.  The Propco Properties and the rents under the leases with the SCI Group became, directly and indirectly, the collateral for the debt incurred by the FCP MezzCo Parent, LLC subsidiaries.  The sale of the Propco Properties created a large gain.  Because FCP MezzCo Parent, LLC was a member of the SCI Group, the gain was not recognized immediately, but was treated as a deferred intercompany gain.  Second, SCI is the obligor under certain secured and recourse Opco Credit Agreement Claims and under the unsecured recourse Senior Notes and Subordinated Notes.  Members of the SCI Group directly or through joint ventures have also incurred a variety of debt secured by specific assets (e.g. Claims against River Central, LLC, Tropicana Station, LLC or the debt incurred by the Green Valley Ranch and Aliante joint ventures).

Corresponding to the two major classes of debt to which the SCI Group is subject, the Plan contemplates a restructuring with two principal parts, both principal parts being effected on the Effective Date (the two parts together with certain restructuring of debt encumbering other SCI Group assets, or the assets of or interests in joint ventures in which the SCI Group members are partners, being referred to as the "Restructuring Transactions"). The first principal part relates to the Mortgage Lenders, the Mezzco Lenders and the New Propco Acquired Assets. In that part, (i) the Mortgage Lenders will create a series of limited liability companies (the "LLCs") for the purpose of acquiring the New Propco Acquired Assets; the LLCs will include Voteco, which will ultimately have voting control, but no economic interest in the remaining LLCs, and Holdco, which will indirectly own the remainder of the economic interests in the LLCs; (ii) New Propco, a subsidiary of Holdco, will take possession of the assets securing the Prepetition Mortgage Loan subject to $1.6 billion of New Propco debt, together with certain other assets, as a designee of the Propco Lenders and will contribute those assets to certain of its LLC subsidiaries, (iii) the Land Loan will be restructured and the collateral under the Land Loan will be transferred to New Propco or a subsidiary thereof at the direction of the holders of the Land Loan and subject to the New Land Loan, (iv) remaining Claims against Propco, including Claims held by the Mezzco Lenders will be cancelled without any consideration and (v) certain current indirect equity holders in SCI or their affiliates ("New Equity") will purchase or otherwise receive equity interests in Holdco and/or Warrants to acquire equity in Holdco**.**

The second principal part of the Restructuring Transactions relates to Claims against SCI. In that part, the assets of SCI not transferred to New Propco and its subsidiaries, the New Opco Acquired Assets, will be sold in a taxable transaction, possibly to Holdco or an affiliate thereof, in exchange for the New Opco Plan Consideration. The New Opco Plan Consideration (which may include interests in a company that acquires (directly or indirectly) the New Opco Acquired Assets, or the proceeds of the sale of the New Opco Acquired Assets) will be paid to the holders of Prepetition Opco Secured Claims and after such holders have been paid, possibly to holders of other Claims against SCI including the holders of General Unsecured Claims, Senior Notes and Subordinated Notes (subject to the subordination provisions governing the Senior Notes and Subordinated Notes). Any Claims against SCI that are not paid will be cancelled.

In addition, other debt encumbering assets held directly or indirectly by SCI Group members through joint ventures may also be restructured. In particular, a corporate SCI Group member, GV Ranch Station, Inc. ("GVR, Inc.") owns a 50% interest in a limited liability company that is treated as a partnership for federal income tax purposes, Green Valley Ranch Gaming, LLC ("GVR LLC"). GVR LLC owns a casino, Green Valley Ranch Resort. GVR LLC is the obligor under a senior nonrecourse loan and a junior nonrecourse loan, each of which is secured by the casino. GVR LLC previously distributed substantial amounts from the loan proceeds to its members, resulting in substantial negative capital accounts for the members in their GVR LLC membership interests. As of December 31, 2009, GVR Inc.'s negative capital account was approximately $212 million. GVR Inc is the subject of a separate title 11 case and GVR LLC is expected to file its own title 11 case. GVR LLC is currently negotiating with its lenders. The results of that negotiation cannot be predicted. Furthermore, a limited liability company, Aliante Holding, LLC ("Aliante LLC"), which is wholly owned by SCI and is treated as a disregarded entity for federal income tax purposes, owns a 50% interest in a limited liability company, Aliante LLC, which is treated as a partnership for federal income tax purposes. Aliante LLC owns a casino, Aliante Station Casino + Hotel. Aliante LLC is the obligor under nonrecourse debt secured by the casino. SCI, as the tax owner of Aliante Station LLC's membership interest in Aliante LLC, has a positive capital account in its membership interests in Aliante LLC. Aliante LLC is currently negotiating with its lenders. The results of that negotiation cannot be predicted.

The Restructuring Transactions are expected to be treated for federal income tax purposes as taxable sales of assets by the respective sellers and, as such, are expected to result in the SCI Group recognizing (i) significant amounts of both gain and loss and (ii) significant cancellation of indebtedness income ("CODI"). More specifically, as described in more detail below, the SCI Group is expected to recognize significant income relating to the triggering of a large deferred intercompany gain, income relating to certain excess loss accounts in subsidiary stock and CODI that is expected to be excluded from taxable income. The SCI Group is also expected to generate significant losses relating to the asset transfers that are part of the Restructuring Transactions. The losses generated on the asset transfers are not expected to fully offset the income related to the deferred intercompany gain and excess loss accounts. The SCI Group does, however, expect to have NOLs in excess of the amount of such gain that is not offset by losses, and, therefore, does not expect to have a significant tax liability as a result of the Restructuring Transactions. A fuller discussion of these tax consequences is provided below.

1.    **SCI Group gain and loss.**

The precise computation of the gain and loss to be recognized by the SCI Group in connection with the Restructuring Transactions is extremely complex. The following is a general summary of the manner in which such gain and loss will arise.

The transfer of the New Propco Acquired Assets to New Propco as designee of the Mortgage Lenders is expected to be treated for federal income tax purposes as if the Mortgage Lenders had foreclosed on (or received a deed in lieu of foreclosure with respect to) those assets, transferred the assets to Holdco in exchange for interests in Holdco and Holdco then contributed them to New Propco. The transfer will trigger a deferred intercompany gain of approximately $2 billion resulting from intercompany sales entered into in connection with the Going Private Transaction as described above.

The transfer of the New Propco Acquired assets to New Propco is also expected to trigger a loss. The loan made by the Mortgage Lenders is likely treated as nonrecourse debt for federal income tax purposes. The transfer of assets securing a nonrecourse debt in satisfaction of such debt is treated for federal income tax purposes as a sale of those assets for an amount equal to the adjusted issue price (as defined below under "Consequences to Holders of Prepetition Opco Credit Agreement Claims, Senior Notes and Subordinated Notes") of the nonrecourse debt with respect to which those assets are received. Thus, on the transfer of New Propco Acquired Assets to New Propco in satisfaction of the Prepetition Mortgage Loan Agreement Claims, the SCI Group should recognize loss in an amount equal to the difference between the adjusted issue price of such debt and the SCI Group's tax basis in the New Propco Acquired Assets. This loss is expected to be substantial, but significantly less than the deferred intercompany gain that will be triggered.

The SCI Group's loss on its taxable transfer to New Propco of the New Propco Acquired Assets is expected to result in an "excess loss account" in the stock of the SCI corporate subsidiary (FCP MezzCo Parent, LLC, a limited liability company that elected to be taxed as a corporation) that indirectly owns the New Propco Acquired Assets, and the Restructuring Transactions will result in the SCI Group being required to recognize gain equal to the excess loss account,[10] which gain is expected to be significant.

The combination of triggered deferred intercompany gain, loss on the transfer of the New Propco Acquired Assets to New Propco and the taxable excess loss account is expected to result in an overall significant net taxable gain to the SCI Group but, as described further below, is not expected to give rise to a material amount of tax.

The transfer of the New Opco Acquired Assets is expected to be a taxable transaction. To the extent these assets are sold for cash, the SCI Group will recognize gain or loss measured by the difference between the cash received and the SCI Group's basis in the assets. The cash received will presumably approximate the fair market value of the assets. Substantially all the Claims against SCI other than the Propco related Claims discussed above relate to recourse debt. If a recourse lender the assets of borrower in exchange for its debt, the recourse lender is treated as having purchased the assets for their fair market value and as having cancelled the rest of its debt. Thus, whether the New Opco Acquired Assets are sold to a third party for cash (or other property) or transferred to a new entity owned, in whole or in part, by the Opco lenders, the disposition of the New Opco Acquired Assets outside the SCI group should trigger gain or loss, equal to difference between the fair market value of the assets and the SCI Group's basis in those assets. Because the amount of gain or loss will depend on the fair market value of the New Opco Acquired Assets at the time they are transferred, it is not possible at this time to determine the amount of gain or loss; however, based on the Stalking Horse Bid, and other information currently

---

[10] Generally, within a consolidated group a corporation's basis in the stock of a subsidiary corporation is increased by the income of the subsidiary and is decreased by any losses of the subsidiary which are used by the group. If the subsidiary's tax losses exceed its parent's basis in the subsidiary stock, that excess is called an excess loss account. The consolidated group must recognize income equal to an excess loss account in a subsidiary's stock in certain events, including on the subsidiary's recognition of CODI where the CODI is excluded from income and the subsidiary does not reduce its tax attributes by the amount of the CODI. As discussed below, FCP Mezzco Parent LLC will recognize CODI in connection with the Restructuring Transactions, which CODI is expected to meet the foregoing conditions.

available, the Debtors expect that the SCI Group will recognize a substantial loss on the disposition of the New Opco Acquired Assets. That loss will reduce the SCI Group's net gain resulting from triggering the deferred intercompany gain and the excess loss account that arise in connection with the transfer of the New Propco Acquired Assets, though it is expected that there will be a material amount of net gain remaining after application of the loss.

A restructuring of the GVR LLC debt may result in GVR Inc recognizing gain. The maximum amount of such gain should be the negative balance of GVR Inc's capital account in its interest in GVR LLC. However, to the extent that GVR LLC retains ownership of its casino and debt is otherwise restructured, GVR LLC (and thus GVR Inc as a member of GVR LLC) may recognize CODI (as discussed below) and then recognize a correspondingly smaller amount of gain. A restructuring of the Aliante LLC debt may result in Aliante Station LLC (and thus SCI) recognizing loss up to the positive balance of Aliante Station LLC's capital account in its interest in Aliante LLC. However, if Aliante LLC retains the Aliante casino, Aliante LLC may recognize CODI and not recognize a loss.

As noted above, the SCI Group has approximately $855 million of NOLs as of December 31, 2009, and, based on year to date performance, expects to generate additional NOLs in 2010. Subject to the limitation on the use of NOLs discussed below, the SCI Group can use its NOLs to offset its net gain resulting from the Restructuring Transactions. If the available NOLs exceed the net gain, the SCI Group should not be required to pay any regular tax as a result of any net gain triggered by the Restructuring Transactions. Generally, prior year NOLs may only reduce 90% of alternative minimum taxable income or gain for purposes of the 20% corporate alternative minimum tax. Thus, to the extent the SCI Group uses prior year NOLs (as opposed to current year losses) to offset gain arising in connection with the Restructuring Transactions, it will be subject to tax at an effective 2% rate on that gain, although the Debtors expect that they would be able to offset a portion of any such tax with certain tax credits. Under existing law, it may be possible to take the position that certain NOLs generated in 2008 or 2009 can be carried forward and used for alternative minimum tax purposes without regard to the 90% limitation. However, regardless of whether the 90% limitation applies to the SCI Group's use of a portion of its NOLs, it is likely the SCI Group will be required to pay some alternative minimum tax.

A corporation's use of its NOLs is subject to various limitations in the IRC. For example, under IRC section 382, if a corporation is treated as undergoing an ownership change, its annual use of its pre-ownership change NOLs is limited to a certain amount, generally the product of its equity value immediately before the ownership change multiplied by a rate published by the IRS monthly. Any amount of this limitation that is not used in any taxable year can be carried forward to the next taxable year. A corporation generally undergoes an ownership change if (1) a 50% shareholder (within the meaning of IRC section 382(g)(4)(D)) claims a worthless stock deduction with respect to the corporation's equity and remains a shareholder on the first day of the following taxable year, or (2) the percentage of the corporation's stock owned by certain shareholders increases by 50 percentage points over a certain period, usually three years. The SCI Group underwent an ownership change in November of 2007. At that time, the SCI Group had approximately $244 million of NOL carryforwards which became subject to the limitation of IRC section 382. Its annual limitation on the use of these pre-ownership change NOLs is $47 million. Taking into account carry forwards of unused annual limitation, approximately $150 million of the Debtors' $855 million of NOLs (as of December 31, 2009) are currently restricted as a result of that change. The Debtors do not believe that an IRC section 382 ownership change has occurred since November 2007. Other than as required by the IRC section 382 limitation on the use of NOLs to offset alternative minimum tax noted in the previous paragraph, the Debtors expect to have sufficient unrestricted NOLs to offset all of the projected gain from the Restructuring Transactions.

Under IRC section 267, losses cannot be recognized on sales between related parties. The definition of related party for this purpose is highly complex and depends on the application of elaborate attribution rules. If IRC section 267 applies to all or a portion of the losses recognized by the Debtors, the Restructuring Transactions could give rise to net gain which would be taxed at a 35% federal income tax rate. If this net gain were substantial, which is possible, it would likely preclude the confirmation of the Plan as the Debtors' assets would not be sufficient to satisfy the IRS's resulting claim.

The IRS may challenge the amount of debt that is being exchanged for the Propco assets pledged to the Mortgage Lenders. The Debtors expect to treat the $1.8 billion of debt held by the Mortgage Lenders as being exchanged for Propco assets securing that debt and the remainder as being cancelled without consideration. The IRS may argue that a larger amount (including a portion of the debt of the Mezzco Debtors) is being exchanged and

a smaller amount cancelled.  This will reduce the loss expected to be recognized on the transfer of the New Propco Acquired Assets.  A reduction in loss will, in most circumstances, be offset by a reduction in the triggered excess loss account.  The IRS may also challenge the precise computations of taxable income—it could disagree with the amount of available NOLs, the basis in any given asset and the computation of the excess loss account.  It may also challenge the calculation of losses subject to limitation under IRC section 382 or disallowance under IRC section 267.  These challenges could cause the SCI Group to recognize a significant net gain and to pay significant taxes with respect to that gain.

Due to the foregoing, the Debtors have requested a ruling from the IRS regarding the application of IRC section 267 to the Restructuring Transactions and are engaging in in discussions with the IRS regarding the maximum federal income taxes of the SCI Group that will be payable in connection with the Restructuring Transactions in light of the fact that the Debtors intend to seek determinations from the Bankruptcy Court regarding (1) the maximum federal income taxes of the SCI Group that will be payable in connection with the Restructuring Transactions, and (2) whether Holdco and its Subsidiaries will have any successor (or other similar) liability for any unpaid taxes of the Debtors.  There can be no assurance of the outcome of these discussions.

2.    **SCI Group CODI and Future NOL Limitations**

In connection with the implementation of the Plan, it is expected that the SCI Group will incur a significant amount of CODI for federal income tax purposes.  The Prepetition Opco Credit Agreement Claims, the Senior Notes and the Subordinated Notes are recourse debt.  In the case of recourse indebtedness, CODI is the amount by which the issue price of the indebtedness discharged (reduced by any unamortized original issue discount ("OID")) exceeds the consideration given in exchange therefor, i.e. the amount of any cash, the issue price of any debt and the fair market value of any other consideration paid to holders of such debt.  The Debtors estimate that the CODI attributable to the Prepetition Opco Credit Agreement Claims, Senior Notes and the Subordinated Notes will be substantial.  The debt held by the Mortgage Lenders, the debt held by the Mezzco Lenders, the Land Loan, the GVR LLC debt, the Aliante LLC debt, and certain other loans are  nonrecourse debt.  In the case of nonrecourse debt, CODI will arise in connection with any indebtedness cancelled without consideration or which is cancelled for cash (in an amount equal to the excess of  the indebtedness discharged (reduced by any unamortized OID) over the cash received.  CODI does not arise in connection with any nonrecourse debt satisfied by the property (other than cash) securing such debt, regardless of the value of the property.  The tax treatment associated with nonrecourse debt that is satisfied by property securing the debt is discussed above.  The Debtors estimate that they will incur significant CODI with respect to the debt held by the Mezzco Lenders.  In addition the SCI Group may recognize significant CODI related to GVR LLC and Aliante LLC debt and to other debt.

Generally, CODI results in taxable income.  However, a statutory exception provides that CODI may be excluded from income if it results from debt discharged in a title 11 bankruptcy case.  CODI of the SCI Group will generally qualify for this statutory exception.  In the case of debt of an entity, such as a limited liability company taxed as a partnership, the bankruptcy exception is applied at the member or partner level.  Generally, if a corporation excludes CODI under the bankruptcy exception, it must reduce its tax attributes  – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of the excluded CODI.  Such reduction in tax attributes in respect of excluded CODI occurs after the computation of tax for the taxable year in which the CODI is incurred.  This reduction in tax attributes of the SCI Group required as a result of CODI recognized in connection with the Restructuring Transactions should eliminate any SCI Group NOLs that are not used to offset SCI Group income or gain resulting from the Restructuring Transactions.  Application of the CODI attribute reduction rules in the context of a consolidated tax group are complex, although as a general matter, any reduction should not be significant for the SCI Group because the Restructuring Transactions result in the SCI Group not having any remaining material assets.  It should be noted that GVR Inc. is, and GVR LLC expects to be, in a title 11 case.  Thus any CODI recognized by GVR LLC and allocated to GVR Inc. should be eligible for the bankruptcy exception to income recognition.  As to Aliante LLC, SCI is in a title 11 case and Aliante Station LLC and Aliante LLC expect to be in title 11 cases.  Thus, if Aliante LLC recognizes CODI while SCI is in its title 11 case, any CODI recognized by Aliante LLC and allocated to SCI (through Aliante Station LLC) should be eligible for the bankruptcy exception to CODI recognition,  If it appears that Aliante LLC will not be able to complete its negotiations with its lenders in time to recognize any CODI prior to the Effective Date, the Debtors will attempt to structure the SCI title 11 case so that any Aliante LLC CODI is still treated as being discharged in SCI's title 11 case, though there can be no assurance that it will succeed in that attempt.  If SCI does

not benefit from the bankruptcy exclusion of CODI from taxable income, it may be able to benefit from the exclusion from CODI for a taxpayer that is insolvent.

IRC section 382 limits a corporation's use of its NOLs and certain "built-in losses" if that corporation undergoes an "ownership change." Because the Restructuring Transactions will result in the SCI Group not having any remaining material assets, that limitation, if otherwise applicable, will have no material effect.

### B.    CONSEQUENCES TO CERTAIN HOLDERS OF CLAIMS

#### 1.    **Consequences to Mortgage Lenders and Mezzco Lenders.**

Pursuant to the Plan, each Mortgage Lender will receive Holdco Equity Interests and New Propco debt, while each Mezzco Lender will have its debt cancelled without consideration.

In general, while the federal income tax consequences of this transaction are not totally clear, the Debtors believe that each Mortgage Lender should be treated as receiving an undivided interest in Propco assets and should recognize gain or loss in respect of its Claim in an amount equal to the difference, if any, between (i) the "amount realized" in satisfaction of its Claim (other than any amount treated as received in respect of accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). For a discussion of the tax consequences of property received for accrued but unpaid interest, see "Distributions in Discharge of Accrued but Unpaid Interest" below. The amount realized by a Mortgage Lender will equal the fair market value of the holder's undivided interest in the Propco assets deemed received, other than any amount treated as received in respect of accrued but unpaid interest. Each Mortgage Lender's basis in the Prepetition Mortgage Loan Agreement Claims will equal the amount paid for the Claim and any market discount previously taken into income and less any payments received by the Mortgage Lender other than payments of qualified stated interest (as defined in Section X(C)(1)(A) below).

The character of any gain or loss recognized by a Mortgage Lender on its deemed exchange of its Prepetition Mortgage Loan Agreement Claim for an undivided interest in New Propco Acquired Assets as either long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, whether the Prepetition Mortgage Loan Agreement Claim constitutes a capital asset in the hands of the Mortgage Lender and how long it has been held.

The Mortgage Lenders will be deemed to hold their undivided interests in the New Propco Acquired Assets with a basis equal to the fair market value of such assets. A Mortgage Lender's holding period in its Holdco Equity Interests and in the New Propco debt generally should begin the day following the receipt of such interests and debt.

#### 2.    **Consequences to Holders of Prepetition Opco Credit Agreement Claims, General Unsecured Claims, Senior Notes and Subordinated Notes.**

The consequences to holders of Prepetition Opco Credit Agreement Claims, Senior Notes and Subordinated Notes will depend on the precise consideration received by these holders.

Generally, a holder of a Prepetition Opco Credit Agreement Claim will recognize gain or loss on the exchange of its Claim for a combination of cash, new notes, if any, and other property equal to the difference between its "amount realized" in satisfaction of its Claim (other than in respect of accrued but unpaid interest) and the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). The amount realized will equal the cash, if any, received plus the issue price of new notes, if any (New Opco Notes), received and the fair market value of other property (such as NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights), if any, received.

If New Opco Notes are issued, the "issue price" of the New Opco Notes generally will equal their fair market value if the New Opco Notes are considered to be publicly traded for U.S. federal income tax purposes, and if the Prepetition Opco Credit Agreement Claims Senior Notes are considered to be publicly traded but the New Opco Notes are not, the issue price of the New Opco Notes will be the fair market value of the Prepetition Opco Credit Agreement Claims exchanged therefor. If neither the Prepetition Opco Credit Agreement Claims nor the

New Opco Notes are considered to be publicly traded, the issue price of the New Opco Notes will be their principal amount. In general, a debt instrument will be treated as publicly traded if (i) it is listed on a national securities exchange or certain interdealer quotation systems; (ii) it appears on a system of general circulation that provides a reasonable basis to determine its fair market value by disseminating either recent price quotations of one or more identified brokers, dealers or traders or actual prices of recent sales transactions; or (iii) under certain circumstances, price quotations for the debt instrument are readily available from dealers, brokers or traders.

Each holder's basis in its Prepetition Opco Credit Agreement Claims will equal the amount paid for the Claims and any market discount previously taken into income and less any payments received by the holder on the Claims other than payments of qualified stated interest. The character of any gain or loss  as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Prepetition Opco Credit Agreement Claims constitute a capital asset in the hands of the holder, how long the Claim has been held, whether the Prepetition Opco Credit Agreement Claims were acquired at a market discount (in which case the market discount rules described below may apply to recharacterize a portion of any gain as ordinary income), and whether and to what extent the holder previously had claimed a bad debt deduction.

Holders of Prepetition Opco Credit Agreement Claims will hold the New Opco Notes, if any, with a basis equal to the New Opco Notes' issue price. The holders' holding period in their New Opco Notes, if any, generally should begin the day following the receipt of the New Opco Notes.

Certain holders of General Unsecured Claims, Senior Notes and Subordinated Notes ("Unsecured Creditors") may receive NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights through Blockerco. The treatment of such receipt is not totally clear. An Unsecured Creditor that receives any of the above may be treated as receiving NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights in consideration for its Claim. In that case, the Unsecured Creditor should recognize gain or loss in respect of its Claim in an amount equal to the difference, if any, between (i) the "amount realized" in satisfaction of its Claim (other than any amount treated as received in respect of accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). For a discussion of the tax consequences of property received for accrued but unpaid interest, see "Distributions in Discharge of Accrued but Unpaid Interest" below. The amount realized by an Unsecured Creditor will equal the fair market value of any NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights received, other than any amount treated as received in respect of accrued but unpaid interest. An Unsecured Creditor's basis in its Claim will generally equal the amount paid for the Claim and any market discount previously taken into income and less any payments received by the Unsecured Creditor in respect of its Claim other than payments of qualified stated interest (as defined in Section X(C)(1)(A) below.

Alternatively, an Unsecured Creditor may be treated as not receiving any consideration for its Claim and as recognizing a loss equal to its basis in its Claim. The character of such loss as long-term or short-term capital loss or as ordinary loss will be determined by a number of factors, including, among others, whether the Unsecured Creditor's Claim constitutes a capital asset in the hands of the holder, and how long the Claim was held by the holder. If an Unsecured Creditor's receipt of any NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights is not treated as received in exchange for the Unsecured Creditor's Claim, the holder may be treated as receiving a payment in the nature of a fee, which fee may be treated as ordinary income in an amount equal to the fair market value of the NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights received by the holder (if such rights have a fair market value).

### 3.    Consequences to Land Loan Lenders

The terms of the loan held by the Land Loan Lenders  will be substantially modified and interest on the loan will be payable solely at maturity. It is likely that the loan will be treated as being exchanged for the New Land Loan for federal income tax purposes. A Land Loan Lender will recognize gain or loss on its deemed exchange of its loan for the New Land Loan equal to the difference between its "amount realized" in satisfaction of its loan (other than in respect of accrued but unpaid interest)  and its adjusted tax basis in its loan (other than any tax basis attributable to accrued but unpaid interest). The amount realized will equal the issue price of the New Land Loan  received. Each Land Loan Lender's basis in its loan will equal the amount paid for the Land Loan plus any accrued OID and any market discount previously taken into income and less any payment received by the holder on

the Land Loan other than payments of qualified stated interest. The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, whether the Land Loan Lender's loan constitutes a capital asset in the hands of the lender and how long the loan has been held.

4.    **Distributions in Discharge of Accrued but Unpaid Interest**

In general, to the extent that any consideration received pursuant to the Plan by a holder of any of the SCI debt is received in satisfaction of interest or OID that accrued during the holder's holding period, such amount will be taxable to the holder as ordinary interest income if not previously included in the holder's gross income. Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all amounts received in exchange for any debt will be allocated first to the principal amount of such debt as determined for federal income tax purposes, and thereafter to accrued but unpaid interest or OID. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

The tax basis of any property received in exchange for accrued but unpaid interest will be the fair market value of such property and the holding period of such property will begin on the day after receipt. Each holder of any SCI debt is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

5.    **Market Discount.**

A holder of any debt acquired after the original issuance of the debt at a market discount (generally defined as the amount, if any, by which a holder's tax basis in the debt immediately after its acquisition is less than the adjusted issue price of the debt at such time, subject to a *de minimis* exception) generally will be required to treat any taxable gain recognized with respect to the debt as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.

C.    **Consequences of holding New Propco Debt, New Opco Notes, The New Land Loan and New Propco Equity**

1.    **Ownership and Disposition of New Debt**

(A)    **Stated Interest and Original Issue Discount**

A holder of the New Propco debt, New Opco debt, if any, or the New Land Loan will be required to include stated interest on these new debt instruments in income in accordance with the holder's regular method of accounting.

The new debt may be issued with OID. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt, other than qualified stated interest. A holder of debt that is issued with OID generally will be required to include any OID in income over the term of the debt (for so long as the debt continues to be owned by the holder) in accordance with a constant yield-to-maturity method, regardless of whether the holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the debt (other than cash interest that is qualified stated interest). Stated interest is qualified stated interest if it is payable in cash at least annually at a fixed rate or at a floating rate, such as LIBOR, that can reasonably be expected to measure contemporaneous variations in the costs of newly borrowed funds.

The "issue price" of any new debt will depend on whether, at any time during the 60-day period ending 30 days after the issuance of the new debt, the new debt is treated as traded on an "established market," or, if it is not, the debt exchanged for the new debt was so traded. If either of those conditions is met, the issue price of

the new debt will be based on the fair market value of the new debt or old debt surrendered in exchange therefor, as the case may be, as of the issue date of the new debt and the new debt will be treated as issued with OID to the extent that its issue price is less than its principal amount by more than a *de minimis* amount. If neither the new debt nor the old debt for which it is exchanged is traded on an established market, the issue price for such new debt should be the stated principal amount of the new debt.

With respect to the New Land Loan, because no interest is payable currently, all interest is included in "stated redemption price at maturity" and the New Land Loan will have OID. It will have additional OID if its issue price is less than its stated principal amount.

### (B)    Sale, Exchange or Redemption of New Debt

Unless a non-recognition provision applies, a holder generally will recognize gain or loss upon the sale, exchange or redemption of any new debt equal to the difference, if any, between the holder's adjusted tax basis and the amount realized on the sale, exchange or redemption. Any gain or loss generally will be capital gain or loss, and generally should be long-term if the holder's holding period in the debt is more than one year at the time of the sale, exchange or redemption. Long-term capital gains of certain non-corporate U.S. holders (including individuals) may qualify for a maximum 15% tax rate (which is currently effective for tax years through 2010). The deduction of capital losses is subject to certain limitations under the IRC.

### 2.    Ownership and Disposition of Holdco Equity Interests

Holdco is expected to be treated as a partnership for federal income tax purposes. As such, it will not itself be subject to federal income tax. Instead, Holdco will file an annual information return with the IRS, reporting its taxable income, gain, loss, deduction and credit (which will include income and loss of New Propco and each other entity in which Holdco owns a direct or indirect equity interest and that is treated as a partnership or disregarded entity for tax purposes) and each partner's allocable share of such taxable income, gain, loss, deduction and credit. Each holder of Holdco Equity Interests must include in income its distributive share of Holdco's net long-term capital gain and loss, net short-term capital gain or loss and all other items of ordinary income, loss, deduction or credit whether or not the holder receives a distribution from Holdco. Thus, a holder of New Holdco Equity Interests may incur tax liability without being distributed cash to pay such tax liability. A number of limitations may apply to losses allocated by Holdco to a holder of a Holdco Equity Interest.

A holder will recognize gain or loss upon disposing of the Holdco Equity Interests equal to the excess (or deficiency) of the holder's amount realized with respect to the sold Holdco Equity Interests over the holder's basis in such equity. Any gain or loss on a sale of the Holdco Equity Interests generally will be capital gain or loss and gain will be long-term gain if the Holdco Equity Interest has been held for over a year. However, any gain will be ordinary income to the extent that it is attributable to IRC section 751 assets generally assets that if sold by Holdco or its subsidiaries would give rise to ordinary income.

Generally, a person exercising a Holdco Warrant will not recognize gain or loss, though under proposed regulations, such person may be allocated income or loss in certain circumstances to cause the person's capital account balance in Holdco to properly reflect its proportional interest in Holdco. Such allocation need not be made if there is sufficient unrealized gain or loss in Holdco's assets to so properly adjust the person's capital account. The person's basis in its Holdco Equity Interest will equal its basis in the Holdco Warrant plus any amount paid to exercise the Holdco Warrant plus any income or loss allocated with respect to the exercise. The person's holding period in its Holdco Equity Interest will begin the day after the exercise of the Holdco Warrant.

Holdco intends to limit trading in its interests to avoid becoming a publicly traded partnership taxable as a corporation. If Holdco becomes a corporation or a publicly traded partnership taxed as a corporation, adverse federal income tax consequences could result to Holdco and the holders of Holdco Equity Interests.

### 3.    Ownership and Disposition of NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights

Unsecured Creditors will hold any interest in NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights indirectly through Blockerco. The rules described above will apply to Blockerco, i.e., Blockerco will be taxable on any income allocated to its and will recognize gain on the sale of Holdco interests. Distributions by Blockerco to its equity owners, other than distributions in liquidation of Blockerco, will be treated as dividends to the extent of Blockerco's earnings and profits (determined under U.S. tax rules). Corporate recipients of dividends may be entitled to a 70% (possibly 80%) dividends received deduction and, under current law, individuals may be eligible for the reduced (15%) rate applicable to qualified dividends (this reduced rate is currently scheduled to expire at the end of 2010). Distributions by Blockerco in complete liqudation will be treated as payments in exchange for Blockerco equity and holders receiving such distributions will recognize gain or loss measured by the difference between the distributions and their basis in the equity. The use of Blockerco may thus result in greater tax for certain owners of Blockerco as compared to holding direct equity in Holdco.

While this Disclsoure Statement does not generally address the consequences to foreign persons, such persons should note that dividends distributed to them would be subject to 30% U.S. federal withholding tax (which rate may be reduced by applicable treaties). In addition, a foreign person's sale of the stock of Blockerco could be subject to United States tax if Blockerco were a United States real property holding corporation ("USRPHC"). A United States entity taxed as a corporation is a USRPHC if 50% or more of the value of its assets consist of United States real property interests during certain peiods. The Debtors cannot predict whether Blockerco would be a USRPHC.

## D.    INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

## XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) liquidation of all of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans of reorganization.

### A.    Liquidation Under Chapter 7

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) or (b) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for

distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. In that event, all creditors holding Allowed General Unsecured Claims likely would receive distributions of a lesser value on account of their Allowed Claims and would have to wait a longer period of time to receive such distributions than they would under the Plan. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is attached hereto as Exhibit C.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or any other party in interest, may attempt to formulate an alternative chapter 11 plan, which might provide for the liquidation of the Debtors' remaining assets other than as provided by the Plan. Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for under the Plan. Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Equity Interests with the least delay.

## XII.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims and Equity Interests. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Debtors urge holders of impaired Claims and Equity Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than 5:00 p.m., prevailing Pacific time, on August 12, 2010.

Dated:          Las Vegas, Nevada
                July 28, 2010


                                        STATION CASINOS, INC.
                                        And its affiliated Debtors

**EXHIBIT A**

**<u>The Plan</u>**

**EXHIBIT B**

<u>**Schematic of Restructuring Transactions**</u>

**EXHIBIT C**

**Liquidation Analysis**

**EXHIBIT D**

**Projected Financial Information**

**EXHIBIT E**

**New Propco Holdco Term Sheet**