VAN C. DURRER II (*ADMITTED PRO HAC VICE*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
300 S. Grand Ave., Ste. 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Facsimile: (213) 687-5600
eric.waxman@skadden.com
van.durrer@skadden.com

JANET CHUBB (NEVADA STATE BAR #176)
JONES VARGAS, LLP
100 West Liberty Street, Twelfth Floor
Reno, NV  89594
Telephone: (775) 786-5000
Facsimile: (775) 786-1177
jlc@jonesvargas.com

Counsel to Dr. James E. Nave

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Reno Land Holdings, LLC<br>☐ Affects River Central, LLC<br>☐ Affects Tropicana Station, LLC<br>☐ Affects FCP Holding, Inc.<br>☐ Affects FCP Voteco, LLC<br>☐ Affects Fertitta Partners LLC<br>☐ Affects Station Casinos, Inc.<br>☐ Affects FCP MezzCo Parent, LLC<br>☐ Affects FCP MezzCo Parent Sub, LLC<br>☐ Affects FCP MezzCo Borrower VII, LLC<br>☐ Affects FCP MezzCo Borrower VI, LLC<br>☐ Affects FCP MezzCo Borrower V, LLC<br>☐ Affects FCP MezzCo Borrower IV, LLC<br>☐ Affects FCP MezzCo Borrower III, LLC<br>☐ Affects FCP MezzCo Borrower II, LLC<br>☐ Affects FCP MezzCo Borrower I, LLC<br>☐ Affects FCP PropCo, LLC | Chapter 11<br><br>Case No. BK-09-52477-GWZ<br>Jointly Administered<br><br>**Declaration of Daniel Aronson in Support of Status Report of Dr. James E. Nave, Independent Director, Regarding Compliance with Auction Procedures and Resulting Bids with respect to the Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain "Opco" Subsidiaries**<br><br>Hearing Date:  August 6, 2010<br>Hearing Time:  10:00 a.m.<br>Place:  300 Booth Street<br>           Reno, NV 89509 |

Daniel Aronson, being duly sworn according to law, upon his oath, deposes and says:

1. I am a Managing Director of Lazard Frères & Co. LLC ("**Lazard**"), which has its principal office at 30 Rockefeller Plaza, New York, New York 10020.

2. I am authorized on behalf of Lazard to submit this declaration (the "**Declaration**") in support of the status report (the "**Status Report**") of Dr. James E. Nave ("**Dr. Nave**"), the independent director of the debtor and debtor in possession Station Casinos, Inc. ("**SCI**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"),[1] filed contemporaneously herewith.

3. Unless otherwise stated, all facts and circumstances set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Lazard team; discussions with Debtors' senior management, Milbank, Tweed, Hadley & McCloy LLP; SCI's independent director, Dr. Nave, and his independent counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") and the Consultation Parties; selected discussions with Potential Bidders and Qualified Bidders; my review of relevant documents or my opinion based upon my experience and knowledge of financial restructuring. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4. I have extensive hands-on experience in matters relating to corporate restructuring, having worked as a restructuring professional for approximately twenty two years. Prior to joining Lazard in 2000, I was an Associate Director with Peter J. Solomon's Restructuring Practice. I joined Peter J. Solomon Company in 1999 from Ernst & Young, where I was a Partner in the Restructuring Practice. I began my career as a financial professional in 1988 with Ernst & Young Entrepreneurial Services Group, where I provided clients with audit, tax, and systems consulting. Over the course of my career as a financial professional, I have been involved in a broad range of financial advisory assignments and engagements.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Status Report.

2

5. Lazard is an investment banking firm focused on providing investment banking, financial advice, and transaction execution on behalf of its clients. Lazard's broad range of corporate advisory services includes general financial advice, corporate restructurings, domestic and cross-border mergers and acquisitions, divestitures, privatizations, special committee assignments, takeover defenses, and strategic partnerships/joint ventures.

**The Engagement**

6. Lazard has been retained to represent the Debtors as financial advisor and investment banker in the Chapter 11 Cases. Among other things, as the Debtors' financial advisor and investment banker, Lazard over the course of these Chapter 11 Cases has (i) advised the Debtors on strategies for restructuring the Debtors' business and maximizing recovery to the Debtors' creditors and equity interest holders, (ii) assisted the Debtors and Debtors' counsel in evaluating the benefits of a sale of, and the decision to sell, the Opco Assets and formulating, and overseeing administration of, the Bidding Procedures; and (iii) provided the Debtors with other financial restructuring advice.

7. As part of these responsibilities, I, along with members of my team, have rendered financial advice to the management of the Debtors with respect to the transactions contemplated under the Debtors' proposed plan of reorganization (the "**Plan**") as described in the accompanying disclosure statement approved by order entered on July 29, 2010 [Docket No. 1868] (the "**Disclosure Statement**"), pursuant to which (i) the Propco Properties will be transferred to New Propco and the Mortgage Lenders will sell up to 50% of the equity of New Propco to an affiliate of Fertitta Gaming, LLC ("FG") and (ii) FG Opco Acquisitions LLC agreed to act as the "Stalking Horse Bidder" for substantially all of the assets of SCI and its subsidiaries. In addition, Lazard has, under my supervision, managed the sales process set forth in the Bidding Procedures (approved by this Court on June 4, 2010) with respect to the sale of all or substantially all of the Opco Assets. The Bidding Procedures were overseen by SCI's independent director, Dr. Nave.

1  Dr. Nave was advised by Skadden and regularly sought Skadden's advice in connection with
2  administration of the Bidding Procedures.

3        8.    I am familiar with the terms of the Stalking Horse APA and the terms of the
4  Bidding Procedures Order, the Bidding Procedures, the Plan and the Disclosure Statement.

### The Bidding Procedures Were Reasonable and the Sale Process Conducted Thereunder Was Fair and Open

7        9.    As stated in my initial declaration filed with this Court on April 7, 2010
8  [Docket No. 1177] and my supplemental declaration filed with this Court on April 28, 2010
9  [Docket No. 1326], I believed, under the circumstances present in the Chapter 11 Cases and the
10 current economic climate, that the Bidding Procedures would facilitate the solicitation, submission
11 and evaluation of significant bids for the Opco Assets and that the Bidding Procedures would
12 constitute a reasonable and effective method of maximizing a return on the Opco Assets though a
13 competitive sale process, especially in light of the robust process and increase in proposed
14 purchase price by over $135 million that had already occurred in connection with the selection of
15 the Stalking Horse Bid as the leading bid as of the commencement of the Bidding Procedures.

16       10.    Subsequent to the approval of the Bidding Procedures, Lazard, acting under
17 the supervision of Dr. Nave and Skadden, and in regular consultation with the "Consultation
18 Parties,"[2] conducted a comprehensive 60-day marketing process to solicit alternative proposals to
19 the Stalking Horse Bid to produce the highest and best bid for the Opco Assets. During this period,
20 Lazard contacted seventy-nine (79) parties, thirty-nine (39) of which expressed interest and were
21 sent a confidentiality agreement. The initial contacts included the following types of potential
22 purchasers identified by Lazard: strategic bidders, financial bidders, and persons who had
23 contacted either SCI or Lazard.

---

[2] The "Consultation Parties" under the Bidding Procedures are the Administrative Agent under the Opco Loan Agreement, the steering committee of lenders under the Opco Loan Agreement and the official committee of unsecured creditors appointed in the Chapter 11 Cases. In addition to the Consultation Parties themselves, Lazard consulted, and provided regular updates to the financial advisors and legal advisors to the Consultation Parties.

4

11. Lazard prepared and circulated draft Confidentiality Agreements among Dr. Nave, the Consultation Parties and their respective advisors for review and comment. Final versions of the Confidentiality Agreements were offered to parties expressing interest in the Opco Assets. To the extent that potential bidders requested modifications to the form of the Confidentiality Agreement, the Opco Debtors, under the direction of Dr. Nave, were able to accommodate or reach agreement on such modifications in every case. Thirty-nine (39) parties expressed a preliminary interest in participating in the Auction, and twenty-six (26) parties have executed and delivered Confidentiality Agreements.

12. Lazard developed a package of preliminary due diligence information, which included access to a "Phase 1 Data Room," which included informational materials describing the Opco Assets and various other financial and legal information that Lazard felt would allow bidders to put forth thoughtful LOIs (defined below). The package was prepared with particular sensitivity to the concerns of SCI and other interested parties that competitive information not be shared prematurely with parties whose interest in acquiring the Opco Assets might not be genuine, while still providing sufficient information such that Potential Bidders could determine whether or not they wished to proceed with the Auction process. Parties who executed and delivered Confidentiality Agreements were provided with preliminary due diligence information.[3]

13. Eight parties submitted Letters of Intent ("**LOIs**") by June 30, 2010. Seven of these parties were determined to be Qualified Bidders within the meaning of the Bidding Procedures. Lazard advised that an LOI submitted by one party reflected uncertain financing. Based on Lazard's advice, the Opco Debtors, under the direction of Dr. Nave and in consultation with the Consultation Parties, determined that the LOI did not qualify with respect to the financing of the proposed sale because of the uncertainty identified by Lazard. In that case, the Opco Debtors, under Dr. Nave's direction and in consultation with the Consultation Parties, required that Lazard communicate to such party that its LOI did not comply with the Bidding Procedures with

---

[3] Because one of the parties to submit a Non-Conforming Bid did not do so until July 30, 2010, that party was not provided with the preliminary due diligence information.

respect to the financing of the proposed sale. Lazard did communicate this message to such party, and further dialogue ensued, but Lazard was unable to arrive at any greater comfort with respect to the financing issue. The seven Qualified Bidders included (i) Boyd Gaming, which purported to seek to purchase substantially all of the Opco Assets and (ii) six Qualified Bidders who submitted LOIs seeking to purchase selected assets (collectively, the "**Selected Asset Bidders**"). Because the Selected Asset Bidders could not be combined to form a bid for substantially all of the Opco Assets, both Boyd Gaming and the Stalking Horse Bidder were contacted regarding their potential interest in forming a bidding group with some or all of the Selected Asset Bidders. Boyd Gaming expressed such an interest, and Lazard provided the Selected Asset Bidders with Boyd Gaming's contact information. It is my understanding that certain of the Selected Asset Bidders followed up with Boyd Gaming.

14. In addition to being given access to an electronic data room that contained 115 documents (representing over 4,600 pages of confidential due diligence information), bidders that signed confidentiality agreements were offered the opportunity to conduct property tours and hold meetings with SCI management in order to review recent operating performance and answer detailed questions about the business. In particular, Boyd Gaming conducted multiple due diligence meetings with SCI management and the Debtors' advisors. In situations where bidders requested the opportunity to meet with third parties with whom the Opco Debtors have contractual relationships (particularly with respect to gaming assets that are merely under construction or are the subject of long-range future construction plans), Lazard worked with SCI management to facilitate such interaction, but could not, in every case, guarantee that such third parties would agree to such meetings. In every case, however, Lazard has confirmed that no Qualified Bidder had any outstanding diligence request for which Lazard had not provided a response.

15. Throughout the process, I personally communicated with advisors for both the Stalking Horse Bidder and Boyd Gaming in an attempt to (i) ensure a level playing field; (ii) to make sure that both bidders needs were being met and (iii) to make sure that each bidder knew

what was expected of them upon the Bid Deadline. Either I or other members of the Lazard team also kept in regular contact with the other potential bidders for the same purposes.

16. Throughout the process, I also personally participated in regular, almost weekly, update conferences with the Consultation Parties and their advisors to update them on the status of the Sale and the process as well as to obtain their feedback.

17. I believe that the sale and bidding process was conducted in accordance with the Bidding Procedures, that potential bidders were provided with fair and open access to all reasonable diligence materials and that the Bidding Procedures provided an open and level playing field for all potential bidders. Following Court approval of the Bidding Procedures, at no point during the process did any potential bidder voice any complaints to me about the Bidding Procedures or request that the Debtors deviate from or modify the Bidding Procedures.

18. The Bid Deadline with respect to all Qualified Bids passed on July 30, 2010 at 4:00 p.m. (Pacific Time), by which time no Qualified Bidders submitted a Qualified Bid for all or substantially all of the Opco Assets (or otherwise contacted Lazard). Two parties submitted letters of intent (the "**Non-Conforming Bids**") regarding their interest in purchasing real property. The Non-Conforming Bids were not submitted in compliance with the Bidding Procedures because, among other reasons, they were not submitted by parties who submitted timely LOIs, and are not considered Qualified Bids. Lazard is aware of a press release that Boyd Gaming purportedly issued on July 30, 2010 indicating, among other things, that the Opco Assets' opportunity no longer fits within Boyd Gaming's needs. That press release also contains comments regarding certain provisions of the Bidding Procedures. As of the date hereof, neither I nor my team has received any communications from Boyd Gaming or their advisors with respect to the purchase of the Opco Assets since the Bid Deadline nor with respect to Boyd Gaming's reasons for not proceeding with respect to the Opco Assets. Lazard does note, however, that the press release comments about the Bidding Procedures appear to be inconsistent with Boyd Gaming's LOI which purported to have the full support of its board of directors. More importantly, Lazard is

7

not aware of any due diligence request of Boyd Gaming that it did not respond to fully or promptly as outlined above.

19. In light of the foregoing facts, Lazard believes that the Stalking Horse Bid is the highest and best bid for the Opco Assets that is available to the Debtors to date. Moreover, Lazard does not believe that it would be in the best interests of the Debtors to terminate the sale process or extend the deadlines set forth in the Bidding Procedures. The OpCo Debtors, acting under the direction of Dr. Nave, and after consulting with the Consultation Parties, concur with Lazard's conclusion and recommendation.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

20. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 3rd day of August, 2010, in New York, New York.

By: _____
Daniel Aronson