UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
RENO DIVISION


| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  09-52477-GWZ |
| | ) | CHAPTER 11 |
| | ) | |
| STATION CASINOS, INC., | ) | Reno, Nevada |
| | ) | |
| | ) | Friday, August 6, 2010 |
| Debtor. | ) | (10:03 a.m. to 10:36 a.m.) |
| | ) | (10:46 a.m. to 11:57 a.m.) |


MOTIONS HEARING

BEFORE THE HONORABLE GREGG W. ZIVE,
CHIEF UNITED STATES BANKRUPTCY JUDGE


CALENDARED MOTIONS:        See pages 2, 3

APPEARANCES:               See pages 4, 5, 6, 7

Court Reporter:            Recorded; FTR

Transcribed by:            Exceptional Reporting Services, Inc
                           14493 South Padre Island Drive, #A-400
                           Corpus Christi, TX 78418-5940
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>CALENDARED MOTIONS:</u>

#1   AUCTION:  SUBSTANTIALLY ALL OF THE ASSETS OF STATIONS CASINOS, INC AND CERTAIN 'OPCO' SUBSIDIARIES, DE #1823;

#4   SECOND INTERIM FEE APPLICATION OF QUINN EMANUEL URQUHART & SULLIVAN, LLP FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES AS CONFLICTS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE PERIOD FROM DECEMBER 1, 2009 THROUGH MARCH 31, 2010 FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FEES: $899,700.50, EXPENSES: $38,945.79, DE #1470;

#5   SECOND INTERIM APPLICATION FOR PAYMENT OF FEES AND EXPENSES FOR MOELIS & COMPANY, LLC, FINANCIAL ADVISOR AND INVESTMENT BANKER TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FEES: $800,000.00, EXPENSES: $17,494.11, DE #1470;

#6   SECOND INTERIM FEE APPLICATION OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM DECEMBER 1, 2009 THROUGH MARCH 31, 2010 FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FEES: $1,533,227.25, EXPENSES: $128,582.33, DE #1470;

#7   FIRST INTERIM APPLICATION OF MAUPIN, COX & LEGOY FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS NEVADA CONFLICTS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE PERIOD FROM DECEMBER 1, 2009 THROUGH MARCH 31, 2010; FEES: $24,114.75, EXPENSES: $389.62, DE #1493;

#8   SECOND INTERIM APPLICATION FOR LAZARD FRERES & CO. LLC, INVESTMENT BANKER & FINANCIAL ADVISOR TO THE DEBTOR, FOR COMPENSATION FOR THE PERIOD DECEMBER 1, 2009 THROUGH MARCH 31, 2010; FEES: $1,200,000.00, EXPENSES: $41,212.48, DE #1767;

#9   SECOND INTERIM APPLICATION BY FTI CONSULTING, INC, FINANCIAL ADVISORS TO THE CMBS DEBTORS - FOR COMPENSATION 12/1/09 THROUGH 3/31/10; FEES: $130,342.90, EXPENSES: $218.90, DE # 1767;

#10  SECOND INTERIM APPLICATION FOR FTI CONSULTING, INC., FINANCIAL ADVISORS TO STATIONS CASINOS, INC, ET AL, FOR COMPENSATION 12/1/09 THROUGH 3/31/10; FEES $820,485.00, EXPENSES: $50,576.33, DE #1767;

<u>CALENDARED MOTIONS:</u>        (CONTINUED)


#11  SECOND INTERIM APPLICATION OF MILBANK, TWEED, HADLEY
& MCCLOY, LLP, REORGANIZATION COUNSEL FOR DEBTORS,
FOR COMPENSATION 12/1/09 THROUGH 3/3/10, FEES: $4,879,407.75,
EXPENSES: $177,342.23, DE #1767;


#12  SECOND INTERIM APPLICATION OF GIBSON, DUNN & CRUTCHER,
LLP, AS SPECIAL COUNSEL FOR FCP MEZZCO BORROWER I-V, LLC & FCP
PROPCO LLC, FOR COMPENSATION 12/1/09 THROUGH 3/31/10;
FEES: $481,040.50, EXPENSES: $13,882.73, DE #1571;


#13  SECOND INTERIM APPLICATION FOR LEWIS & ROCA LLP, LOCAL
REORGANIZATION COUNSEL FOR THE DEBTORS, FOR COMPENSATION
12/1/09 THROUGH 3/31/10; FEES: $248,617.50,
EXPENSES: $13,169.62, DE #1767;


#14  FIRST INTERIM APPLICATION OF CAMPBELL AND WILLIAMS,
SPECIAL LITIGATION COUNSEL TO DEBTORS, FOR COMPENSATION 1/28/10
THROUGH 3/31/10; FEES: $312,990.50, EXPENSES: $3,496.90,
DE #1561;


#15  FIRST INTERIM APPLICATION OF SHEA & CARLYON LTD., LOCAL
COUNSEL FOR DEBTOR, GV RANCH STATION, INC., FOR COMPENSATION
3/9/10 THROUGH 6/30/10; FEES: $28,133.25, EXPENSES: $688.83,
DE #1773

4

<u>COURTROOM APPEARANCES FOR</u>:


CMBS Lenders, et al.:     JENNIFER A. SMITH, ESQ.
                             Lionel Sawyer & Collins
                             50 W. Liberty Street, Suite 1100
                             Reno, NV 89501


Deutsche Bank Trust     KAARAN E. THOMAS, ESQ.
Company Americas:        McDonald Carano Wilson
                             100 W. Liberty Street, 10th Floor
                             Reno, NV 89505


Lorenzo Fertitta,      KARL OLSON, ESQ.
et al.:
                             - And -

                             THOMAS B. WALPER, ESQ.
                             Munger Tolles & Olson
                             355 S. Grand Avenue, 35th Floor
                             Los Angeles, CA 90071


Official Committee of   BRETT AXELROD, ESQ.
Unsecured Creditors:     Fox Rothschild, LLP
                             800 Howard Hughes Pkwy,
                             Suite 500
                             Las Vegas, NV 89169

                             BONNIE STEINGART, ESQ.
                             Fried Frank Harris, et al.
                             One New York Plaza
                             New York, NY 10004


Station Casinos, Inc.,  THOMAS KRELLER, ESQ.
etc.:                PAUL ARONZON, ESQ.
                             Milbank Tweed, et al.
                             601 South Figueroa St.
                             30th Floor
                             Los Angeles, CA 90017


U.S. Trustee:        BILL COSSITT, ESQ.
                             Office of the U.S. Trustee
                             300 Booth Street
                             Room 3009
                             Reno, NV 89509

<u>COURTROOM APPEARANCES FOR:</u>     (CONTINUED)


James E. Nave:              JANET L. CHUBB, ESQ.
                           Jones Vargas
                           100 W. Liberty St., 12th Floor
                           P.O. Box 281
                           Reno, NV 89504

                           GLENN WALTER, ESQ.
                           Skadden Arps, et al.

Creditors Committee:       CHRISTOPHER D. JAIME, ESQ.
                           Walther Key Maupin, et al.
                           P.O. Box 30000
                           Reno, NV 89520

Station Casinos, Inc.,     DAWN CICA, ESQ.
et al.:                    LAURY MACCAULEY, ESQ.
                           Lewis & Roca, LLP
                           50 West Liberty St.
                           Suite 410
                           Reno, NV 89501

Propco:                    OSCAR GARZA, ESQ.
                           Gibson Dunn & Crutcher


<u>SCHEDULED TELEPHONIC APPEARANCES:</u>

Morgan Stanley:            ERIC ALLENDORF, (Listen only)
                           Morgan Stanley

Deutsche Bank:             JOHN BEACHAM, (Listen only)
                           ROBERT PETTINATO, (Listen only)
                           Deutsche Bank

Wall Street Journal:       ALEXANDRA BERZON, (Listen only)
                           The Wall Street Journal

Station Casinos:           WALT BROWN, ESQ.
                           RICH HASKINS, ESQ.
                           THOMAS KRELLER, ESQ.
                           BRIA LASALLE-MERTENS, ESQ.
                           JOLEEN LEGAKES, ESQ.
                           LORI NELSON, ESQ.
                           FRED NEUFELD, ESQ.
                           ROBERT C. SHENFELD, ESQ.
                           Milbank Tweed, et al.

SCHEDULED TELEPHONIC APPEARANCES:    (CONTINUED)


| | |
|---|---|
| GV Ranch Station: | CANDACE CARLYON, ESQ.<br>Shea & Carlyon |
| Bloomberg: | STEVEN H. CHURCH, (Listen only)<br>Bloomberg, LLP |
| Deutsche Bank Trust<br>Company America: | DEUTSCHE BANK TRUST COMPANY AMERICAS<br>(Listen only) |
| | BLACKSTONE ADVISORY SERVICES<br>(Listen only) |
| CMBS Lenders: | PETER DODSON, (Listen only)<br>DOUGLAS MINTZ, (Listen only)<br>Cadwalader Wickersham & Taft |
| | KEVIN J. HOCHBERG, ESQ.<br>GABRIEL MACCONAILL, (Listen only)<br>ARIELLA SIMONDS, (Listen only)<br>Sidley Austin |
| Las Vegas Review<br>Journal: | JOHN G. EDWARDS, (Listen only)<br>Las Vegas Review Journal |
| Deutsche Bank Trust<br>Company Americas: | JASON FRIEDMAN, (Listen only)<br>Simpson Thacher & Bartlett |
| Independent Lenders: | ERIC D. GOLDBERG, ESQ.<br>SANDY QUSBA, ESQ.<br>Stutman Treister & Glatt |
| Station Casinos: | RON F. GREENSPAN, ESQ.<br>MARY ANN KAPTAIN, ESQ.<br>F.T.I. Consulting |
| Colony Capital NFC<br>Investor: | JONATHAN GRUNZWEIG, (Listen only)<br>Jonathan Grunzweig, Interested Party |
| Wells Fargo Bank, N.A.: | JEFFREY D. HERMANN, (Listen only)<br>Orrick Herrington & Sutcliffe |
| Castlerigg Master<br>Investors: | DAVID JACOBSON, (Listen only)<br>Heller Gaming |
| Brian Ma: | BRIAN MA, ESQ.<br>Lazard Freres & Company |

<u>SCHEDULED TELEPHONIC APPEARANCES FOR</u>:    (CONTINUED)


Bank of Scotland:            GEORGE PAGANO, (Listen only)
                             Katten Muchin, et al.

                             JOANNE SI, ESQ.
                             The Bank of Scotland

Bank of America:            BYUNG S. PARK, (Listen only)
                             Bank of America

Colony Capital:             ANDREW PARLEN, (Listen only)
                             SUZZANE S. UHLAND, ESQ.
                             O'Melveny & Myers

RBS Securities:             DALE STOHR, (Listen only)
                             RBS Securities

MSRE Station SPV A,         HARVEY STRICKON, (Listen only)
LLC, et al.:                Paul Hastings, et al.

Lloyds Bank of             JAMES TRUITT, (Listen only)
Scotland:                   Katten Muchin Rosenman

Fried Frank:                MINYAO WANG, (Listen only)
                             Fried Frank

Deutsche Bank:              SCOTT WAYNEBERN, (Listen only)
                             JEFFREY WELCH, (Listen only)
                             Deutsche Bank

Colby Williams:             COLBY WILLIAMS, ESQ.
                             Campbell & Williams

Bank of Scotland:           ALEX WILSON, (Listen only)
                             Lloyds Banking Group

Unsecured Creditors        JEANINE ZALDUENDO, ESQ.
Committee:                   Quinn Emanuel, et al.

Morgan Stanley:             KEVORK ZORYAN, (Listen only)
                             Morgan Stanley

8

1        **Reno, Nevada; Friday, August 6, 2010; 10:03 a.m.**

2           **(Courtroom and telephonic appearances)**

3                    **(Call to Order)**

4        **THE COURT:**  Please be seated.

5        This is the matter of *Stations Casino*.  May I have

6   appearances in the courtroom, please?

7        **MR. ARONZON:**  Good morning, your Honor.  Paul Aronzon

8   and Tom Kreller for the Debtors.  We're with Milbank.

9        **MR. AXELROD:**  Good morning, your Honor.  Brett

10  Axelrod and Bonnie Steingart for the Official Unsecured

11  Creditors Committee.

12       **MS. THOMAS:**  Good morning, your Honor.  Kaaran Thomas

13  for Deutsche Bank Trust Company Americas as administrative

14  agent; and I believe Sandy Qusba is on the phone.

15       **MR. QUSBA:**  Good morning, your Honor.

16       **MR. COSSITT:**  Bill Cossitt, Office of the United

17  States Trustee.

18       **MS. CHUBB:**  Good morning, your Honor.  Janet Chubb,

19  and may I introduce Glenn Walter.

20       **MR. WALTER:**  Good morning, your Honor.

21       **MS. CHUBB:**  We've filed his -- from Skadden Arps.

22  We've filed his pro hac papers, they have not been processed

23  yet, but we will get a check over here today.

24       **MR. WALTER:**  Thank you, your Honor.

25       **MS. SMITH:**  Good morning, your Honor.  On behalf of

1   the CMBS Lenders, Larry Nyhan of Sidley Austin; Jennifer Smith,

2   Lionel Sawyer & Collins.

3          **MR. JAIME:**  Good morning, your Honor.  Chris Jaime,

4   Nevada conflicts counsel for the Unsecured Creditors Committee.

5          **MS. MACAULEY:**  Good morning, your Honor.  Laury

6   Macauley and Dawn Cica of Lewis & Roca, local counsel for the

7   Debtors.

8          **MR. OLSON:**  Good morning, your Honor.  Karl Olson and

9   Tom Walper for Frank and Lorenzo Fertitta, Fertitta Gaming.

10          **THE COURT:**  Are there any appearances by anyone that

11   is participating telephonically that intend to do more than

12   monitor the proceedings?

13          **MR. GOLDBERG:**  Yes, your Honor.  This is Eric

14   Goldberg of Stutman, Treister & Glatt for the Independent

15   Lenders.

16          **THE COURT:**  Thank you.  Anybody else?

17          **MS. CARLYON:**  Good morning, your Honor.  Candace

18   Carlyon of Shea & Carlyon, counsel for GV Ranch Station Inc.

19   We received word that you would be considering the fee

20   application at today's hearing.

21          **THE COURT:**  Yeah.  I'll deal --

22          **MS. CARLYON:**  Thank you, your Honor.

23          **THE COURT:**  I should point out I'll deal with the

24   applications after concluding the hearing regarding the

25   auction, so I'm going to ask counsel to withhold appearances in

10

1    that regard.  So I just need appearances from those who intend

2    to participate in the hearing regarding the auction, please.

3              **MR. QUSBA:**  Your Honor, Sandy Qusba, Simpson

4    Thacher & Bartlett, counsel for Deutsche Bank Trust Company

5    Americas as the Opco admin agent.

6              **THE COURT:**  Thank you.  Anyone --

7              **MR. ARONZON:**  Your Honor, there is one more person in

8    the courtroom I would like introduce for the record.

9              **THE COURT:**  Please.

10             **MR. ARONZON:**  Mr. Frank Fertitta III is here,

11   your Honor, today.  As you know, he's the head of Station

12   Casinos, Inc.  He's also the head of Fertitta Gaming.

13             **THE COURT:**  All right, thank you very much.

14             All right.  Today and Monday were set for an auction

15   of the -- what have been called the Opco properties.

16        **(Court confers with clerk)**

17             I have reviewed the pleadings in preparation for this

18   hearing and the first I read was the Order establishing the

19   bidding procedures and deadlines.  That was Docket Number 1653

20   entered on June 4th.  That followed two days of hearings

21   conducted May 27th and May 28th.

22             I read the Findings of Fact and Conclusions in

23   support of the Orders approving the Revised Second Amended and

24   Restated Master Lease Compromise Agreement establishing bidding

25   procedures regarding the sale of substantially all of the

11

1   assets of Station Casinos.  That was Docket Number 1777 entered

2   on July 14th.

3          I have reviewed, just so I had an idea what was

4   occurring, some of the pleadings filed in the United States

5   District Court action because they related to a settlement that

6   was brought to my attention that led to the new Disclosure

7   Statement and Plan.  And so I've looked at Docket Number 10 in

8   that action.

9          I have taken a quick look at Docket Number 1526,

10  which is the submission of the Asset Purchase Agreement, and I

11  have reviewed portions of the transcripts of the June 21st

12  hearing, Docket Number 1715, the May 27th hearing, Docket

13  Number 1574, and the -- those are transcripts, I should say,

14  and the transcript of the hearing of May 28th, Docket

15  Number 1552.

16         Now, following those hearings and the entries of

17  those Orders there have been, so far as I can -- oh, I also

18  reviewed an Order entered on July 26th regarding the stay

19  pending appeal and the Findings of Fact and Conclusions of Law

20  that were entered in that regard, Docket Number 1852, just so

21  that I was relatively up to speed.

22         All that's been filed that I can determine from our

23  review of the docket were two pleadings filed on the 4th of

24  August, Wednesday, the status report of Dr. James E. Nave, the

25  independent director, regarding compliance with auction

12

1    procedures and resulting bids, I have reviewed it, and I've

2    read the Declaration of Daniel Aronson (phonetic) of Lazard

3    Freres regarding the same matter.

4           Has anybody else filed any pleadings regarding this

5    auction other than the two that I have just referred to?

6        **(No audible response)**

7           No?  So it appears that I have reviewed everything.

8           Now, when I went through the Order establishing the

9    bidding procedures and the bidding procedures themselves which

10   were attached to the Order there were several things that came

11   to my attention that I had previously ordered.

12          Let me take a quick look.  I thought I had marked

13   the….

14          "P" provides that if the Opco Debtors did not receive

15   any qualified bids in addition to the stalking horse bid:

16          "The Opco Debtors reserve the right in consultation

17          to consultation parties and subject to seeking and

18          obtaining Bankruptcy Court approval to terminate the

19          sales process," et cetera.

20          "The Opco Debtors in consultation with the

21          consultation parties and subject to seeking and

22          obtaining Bankruptcy Court approval may after

23          consideration of the foregoing determine the stalking

24          horse bid is the successful bid and elect to forego

25          the auction."

13

```
1            Has that in fact occurred?
2         MR. ARONZON:  I think we'll hear from the independent
3    representatives as the hearing proceeds.  I believe that's what
4    they will tell you, but we might as well wait for Skadden to
5    come up here and make that report to you.  But I believe that's
6    where we will be today.
7         THE COURT:  All right.  And then "T" provided -- and
8    I've reviewed all the bidding procedures.  "T" provided that
9    the sale hearing would be held before this Court and the third
10   sentence provides:
11            "Unless the Bankruptcy Court orders otherwise, if the
12            Opco Debtors do not receive any qualified bids in
13            addition to the stalking horse bid the Opco Debtors
14            shall proceed as set forth in the no additional
15            qualified bid section above."
16            That would be "P," which I just read.
17         MR. ARONZON:  Correct.
18         THE COURT:  And it's mandatory.
19         MR. ARONZON:  Correct.
20         THE COURT:  So I'd be glad to hear the report.
21         MR. ARONZON:  If I may just for one minute, because I
22   think it's pertinent to everybody, and it's a little bit of a
23   digression, but I wanted to mention fully that we have, as you
24   know, reached an agreement with our Unsecured Creditors
25   Committee on the Plan of Reorganization and it has -- it
```

1   provides for support for the Plan process.

2           THE COURT:  Two things, and I should put -- I should

3   make a record.  I have prepared a notebook for myself dealing

4   with Docket Numbers 1863, 1864, 1867, and 1868 and I reviewed

5   those in preparation for today's hearing as well.

6           MR. ARONZON:  Correct.

7           I bring it up because I think it's a milestone and I

8   think it's very important and we appreciate all of the

9   constructive efforts of everybody in helping achieve that

10  agreement.  It also provides for a backstop arrangement to a

11  rights offering.  And those documents were executed and

12  signatures exchanged this morning.  So not only is there a

13  settlement with the Creditors Committee, there is a process in

14  place built into the Plan for participation by bondholders and

15  it's fully backstopped.

16          THE COURT:  I've read that.  I had to read that when

17  I reviewed --

18          MR. ARONZON:  Docket --

19          THE COURT:  -- the redline versions.  And just so

20  that record once again is complete, I read all of those redline

21  versions and was very cognizant of the changes before I signed

22  the Amended Disclosure Statement --

23          MR. ARONZON:  I bring it up --

24          THE COURT:  -- and Orders relating thereto.

25          MR. ARONZON:  I bring it up because I think it's

1   relevant to the process from this point forward and it's

2   important to underscore that it facilitates the sale

3   transaction that we've been talking about.

4           In addition, while not finished yet, and Mr. Qusba

5   and Mr. Goldberg can correct me if I misstate anything, we have

6   the basic contours of an agreement in principle with the

7   Independent Lenders.  A couple of things need to happen.  Each

8   of the lawyers I just mentioned are working with their clients

9   to finalize some pieces of what we hope will be a settlement

10  that's final.  It will embody itself in a stipulation of some

11  sort to look very similar to what we did with our Official

12  Creditors Committee and should be forthcoming toward the end of

13  next week, hopefully before the objection deadline for the

14  actual confirmation process.

15          So I just wanted all the parties to know where we

16  were on some very critical points.  I think they pave the way

17  for us to move forward in the case quickly and I appreciate the

18  work by every one of the lawyers and their clients to get us

19  there.

20          **THE COURT:**  Who's going to address the Court --

21          **MR. ARONZON:**  I think Skadden, your Honor.

22          **THE COURT:**  Thank you.

23          **MR. WALTER:**  Good morning, your Honor.  Glenn Walter

24  of Skadden Arps on behalf of Dr. Nave, the independent director

25  of Station Casinos, Inc.

1        Under the bidding procedures the Opco Debtors under

2   the direction of Dr. Nave and in consultation with the

3   consultation parties conducted an auction process to obtain the

4   highest and best bid for the Opco properties.  On August 4th,

5   as indicated by this Court, Dr. Nave filed his report and there

6   is a companion declaration of Dan Aronson from Lazard

7   establishing the facts set forth in the report.  The report

8   goes through a detailed recitation of all the steps that were

9   taken in the conduct of the auction process.  Unless the Court

10  has specific questions on that I will rely on the report and

11  the declaration and not go through step by step on all those

12  facts.

13        **THE COURT:**  No, as I've indicated, I studied those,

14  went back and reviewed the bidding procedures as well as the

15  Order to ensure that the conduct of the process was consistent

16  with what I ordered, and I believe that it was.  And nobody has

17  indicated to me in any pleading that it was anything other than

18  consistent with my Order and the bidding procedures.

19        **MR. WALTER:**  Thank you, your Honor.

20        As set forth in the report, after the conclusion of

21  the auction process Dr. Nave, in consultation with his advisors

22  and in consultation with the consultation parties, determined

23  that the only qualified bid was the bid set forth by the

24  stalking horse bidder.  Accordingly, we'd move under

25  Paragraph P of the procedures to officially close the auction,

1  designate the stalking horse bidder as the successful bid, and

2  have the official hearing to approve the sale process -- or the

3  sale hearing to be heard concurrently with the confirmation

4  hearing.  A form of Order setting forth such relief was

5  attached as a draft to the report and if your Honor has no

6  other questions we would move that that Order be entered.

7          **THE COURT:**  Thank you.

8          Does anybody wish to be heard?

9      **(No audible response)**

10         No response to my question.

11         I have reviewed the proposed Order, indicated I have

12 already reviewed the pleadings.  It struck me that that was the

13 procedure that was anticipated in the Order and in the bidding

14 procedures.

15         I would point out that when we conducted the hearings

16 that there had been some objections that had been filed then

17 withdrawn, but apparently some of those that participated in

18 the procedure decided not to go forward and there have been no

19 objections, as I've noted, to how the process was conducted and

20 all those had full opportunity to bring any concerns that they

21 had before this Court prior to the commencement of the process

22 and chose not to.

23         And I believe, and I think the absence of any

24 objection corroborates that belief, that in fact the process

25 was done consistent with the Order therefore I am going to

18

1  grant the motion.

2          **MR. WALTER:**  Thank you, your Honor.

3          **THE COURT:**  That takes care of the non-auction.

4  What's --

5          Mr. Kreller?

6          **MR. KRELLER:**  Your Honor, if I might before getting

7  to the fee applications --

8          **THE COURT:**  I have a question.  I need to interrupt.

9  I conducted a hearing regarding the standing motion and

10 provided for additional briefing and I don't know -- is there

11 anyone participating from Quinn Emanuel, are they on --

12         **MS. ZALDUENDO:**  Good morning, your Honor, Jeanine

13 Zalduendo.

14         **THE COURT:**  Thank you.  The settlement that was

15 arrived at with the Committee, based upon my review at least

16 put a standstill regarding that matter conditioned upon

17 confirmation of the Plan.  Is that correct?

18         **MS. ZALDUENDO:**  Yes, that's correct.

19         **THE COURT:**  All right.  So I'm not looking for

20 briefing and if I don't confirm the Plan then I'll have to

21 address that issue at the time of the Plan confirmation

22 hearing, is that also correct?

23         **MS. ZALDUENDO:**  Yes.

24         **THE COURT:**  All right, that's what we'll do.  Thank

25 you.

1          I just wanted to make sure the record was clear in that

2     regard.

3               **MR. KRELLER:**  Your Honor --

4               **THE COURT:**  I'm sorry to interrupt, Mr. Kreller.

5               **MR. KRELLER:**  No, that's fine.  I believe a

6     stipulation has actually been prepared, and I'm not sure

7     whether frankly it's been filed yet or not, extending that

8     August 13th briefing deadline for responses to the supplement

9     consistent with the standstill on all the --

10              **THE COURT:**  Well, it makes no --

11              **MR. KRELLER:**  -- litigation activity.

12              **THE COURT:**  It makes no sense to do anything else

13    other than that, so okay.

14              **MR. KRELLER:**  Agreed, your Honor.

15          I think the only other item on the agenda were the

16    fee applications that you moved up, but I did want to touch on

17    a couple of what I'll call housekeeping matters before we get

18    to that coming off of the closure of the auction and also just

19    to note that the settlement with the Creditors Committee, while

20    we signaled that that might be coming at the Disclosure

21    Statement hearing, that was never formally announced to you

22    other than through the submission of the revised Plan and

23    Disclosure Statement.

24              **THE COURT:**  That was formal enough.

25              **MR. KRELLER:**  There's a few items that kind of result

20

1    from all of this.

2            Number one, as we talked about at the Disclosure

3    Statement hearing, we are in the process of preparing a

4    supplement to the Disclosure Statement to report the results of

5    the auction process to the creditors.

6            THE COURT:  That's going to -- when I went back and

7    reviewed there were some blanks that really concerned what

8    would be necessary for additional disclosure in the event that

9    there was a non-stalking horse bidder that prevailed.  So I

10   think the changes are going to be relatively insignificant

11   compared to what would have been required.

12           MR. KRELLER:  I think that's right, your Honor.  I

13   will say in particular -- I think what we contemplate in the

14   supplement is attaching the report as an exhibit, the report

15   from Dr. Nave, that will set out for creditors in full the

16   process and the results and attaching it to the Order that

17   you'll be entering for --

18           THE COURT:  I have no objection to that.

19           MR. KRELLER:  There was also contemplated at the

20   Disclosure Statement hearing and discussed with Mr. Goldberg,

21   among others, the notion that supplemental projections would

22   also be included, depending on who the winning bidder was.

23   Those projections will be included in the supplemental

24   disclosure and I've advised Mr. Goldberg of that, as well as

25   confirmed for him that those will be included.  I know he is

1    looking for those.

2         **THE COURT:**  Thank you.

3         **MR. KRELLER:**  I think it will be relevant, as

4    Mr. Aronzon noted, the commitments for the backstopping

5    bondholders have been executed and delivered.  That will be

6    referred to in the supplement so that the general unsecured

7    creditors who are being solicited for the rights offering will

8    understand that the rights offering is now fully underwritten

9    by the backstoppers pursuant to their commitments.

10        And then there's a couple of other minor cleanup

11   items that we'll include in that supplement.

12        **THE COURT:**  When will that be completed?

13        **MR. KRELLER:**  Your Honor, my suggestion on that is I

14   think we will have something that we'll be in a position to

15   circulate to the parties later today and I would hope that we

16   would be able to simply submit an Order with signoff from all

17   of the relevant parties to you early next week for an early

18   next week mailing.

19        **THE COURT:**  All right.

20        **MR. KRELLER:**  Given that it's in addition to the

21   Disclosure Statement, we thought getting an Order approving the

22   supplement would be appropriate.

23        **THE COURT:**  I will be gone for an ABI conference and

24   then I go right to the Ninth Circuit conference, but I can take

25   a look at them.  We've done it before -- in case people don't

1   know how I was able to read the redlines, I had pounds,

2   literally, of materials and pleadings that were sent by courier

3   to a conference I was at for the Federal Judicial Center in San

4   Francisco and I spent most of last Wednesday night reading

5   them.  So I appreciate the work to provide me with those while

6   I was not here.  But they have all been read.  I left some of

7   them behind --

8        **(Laughter)**

9             -- to be recycled.

10       **MR. KRELLER:**  We apologize for burdening you with

11  those --

12       **THE COURT:**  No, I had to read them.

13       **MR. KRELLER:**  -- your Honor, but it wasn't enough to

14  stop us from settling.

15       **THE COURT:**  No, I had --

16       **(Laughter)**

17            -- I had to read them and I figured if everybody else

18  was working that hard it's the least we could do.

19       **MR. KRELLER:**  I appreciate it, your Honor.  This

20  supplement, as you noted, I think is going to be very short.

21  It won't be nearly the volume of paper.

22            A couple of other items just by way of preview:

23            As you know, there is a settlement stipulation with

24  the Creditors Committee.  We will be filing a motion seeking

25  approval of that.  Frankly, much of that has already been

 1   implemented through the Committee's submission of its support

 2   letter to the revisions to the Plan.  So we will be filing a

 3   motion seeking approval of that from you.

 4          The backstop commitment agreement, while the Debtors

 5   are not a party to that, it's a rights offering from --

 6          **THE COURT:**  Right.

 7          **MR. KRELLER:**  -- essentially New Propco Securities,

 8   there is a component of that that we will be seeking approval

 9   of, and that is there's a piece of that agreement and it's in

10   the term sheet that embodies all of that, where the estates

11   have agreed to pay the fees, a certain amount of the fees of

12   the backstopping parties.  So we'll be seeking authority to

13   make those payments.

14          There will be -- the mechanics and the documentation

15   for the rights offering will require approval.  That

16   documentation, now that the commitments are in place, is

17   anticipated we'll be preparing subscription agreements and

18   other materials that will go out to those folks who will

19   indicate that -- will have indicated an interest for the rights

20   offering.  So we'll be filing a motion probably a few weeks

21   from now seeking approval of the rights offering documents and

22   also setting appropriate deadlines for subscriptions.  That's a

23   process that I think will lag confirmation, assuming we confirm

24   at the end of August.

25          **THE COURT:**  I think that's set for the 27th, isn't

24

1    it?

2            THE CLERK:  Yes, your Honor.

3            MR. KRELLER:  That's correct, your Honor.  I

4    believe --

5            THE COURT:  Now, if you do have a settlement I'm

6    assuming then you have a consensual Plan?

7            MR. KRELLER:  We believe we will, your Honor.

8            THE COURT:  All right.

9            MR. KRELLER:  When the Independent Lenders settlement

10   is done I think we are then fully consensual.

11           THE COURT:  Which will obviate the need for a great

12   deal of evidence.

13           MR. KRELLER:  I would --

14           THE COURT:  I'm trying to determine how much --

15           We also set aside the Monday, didn't we?

16           THE CLERK:  Yes, your Honor.

17           MR. KRELLER:  We did.

18           THE COURT:  -- how much time you believe will be

19   necessary for the confirmation hearing.

20           MR. KRELLER:  Your Honor, our hope and our

21   contemplation is that we will be filing a full set of

22   declarations and with a consensual deal I don't think we're

23   going to have a need to put witnesses on.  I actually don't

24   think it will be an evidentiary hearing, assuming the

25   declarations.

1        **THE COURT:**  But I want the declarations and I want to

2   read them.

3        **MR. KRELLER:**  Absolutely, your Honor.  Absolutely.

4        **THE COURT:**  All right.  If you can set those hearings

5   for the 27th or the 30th, that would work, for those matters

6   that you just mentioned.

7        **MR. KRELLER:**  I think we --

8        **THE COURT:**  I'll be glad to -- I don't see why I

9   wouldn't grant the shortening time.  If we've got agreement on

10   those, the sooner the better that we can have them.

11        **MR. KRELLER:**  I think --

12        **THE COURT:**  Because, as I see them, they're related

13   to the Plan itself.

14        **MR. KRELLER:**  I think that's right, your Honor.  The

15   one caveat to that is the rights offering documentation may --

16   the terms of the agreement with the parties require that

17   documentation to be done on August 23rd, which means those

18   documents won't be done until August 23rd.

19        **THE COURT:**  Well, I don't think I need the documents

20   themselves.  In other words, you want to get the motion filed,

21   get the matter before me -- if the documents are signed, the

22   documents are signed.  I don't think anybody is going to be

23   greatly concerned about the absence of those documents together

24   with the motion.  If problems arise thereafter you have four to

25   seven days to deal with it, so….

1         **MR. KRELLER:**  That's perfect, your Honor.  So we will

2    work to get everything on calendar for the 27th and have all

3    those motions heard.

4         There's one other piece to that, which you just

5    noted, you'll see there is also, I think as you know from the

6    Disclosure Statement, a settlement with Colony, one of the

7    other major shareholders here.  There's a stipulation that has

8    been reached with the shareholders with respect to their

9    restraint from taking any actions that might impair the

10   company's net operating loss tax attributes, a fairly

11   straightforward standstill stipulation, if you will.  We'll be

12   filing a short motion on that as well.

13        **THE COURT:**  All right.

14        **MR. KRELLER:**  So we'll include that in the bucket of

15   things that we'll set for the 27th.

16        Last preview for you, your Honor, and this is just

17   for your calendar purposes, a number of the sellers under the

18   stalking horse bid are operating subsidiaries that to this

19   point we've worked hard to keep out of bankruptcy.  In

20   implementation of the sale we likely will be filing some of

21   those subsidiaries in order to deliver those assets free and

22   clear to the stalking horse bidder.  We anticipate that those

23   filings will occur sometime in the middle of September,

24   sometime post-confirmation, but we wanted to let you know that

25   those were coming.  We likely will be seeking to jointly

27

1    administer those cases with these cases.  Those cases likely

2    will be filed with a Plan and Disclosure being filed on day one

3    or very soon thereafter and that Plan will essentially be an

4    implementation of the sales transaction to the stalking horse

5    bidder that we'll be seeking approval of at the confirmation

6    hearing.  So we just wanted to give you a heads up on that.

7              **THE COURT:**  Good, we needed more cases.

8              **MR. ARONZON:**  There is one more piece to that though,

9    your Honor.  As you know, we have two subsidiaries that operate

10   very large casinos, the Aliante and the Green Valley Ranch.

11             **THE COURT:**  I'm aware of that.

12             **MR. ARONZON:**  Those two will also be joining in these

13   cases, so….

14             **THE COURT:**  Green Valley Ranch has already filed.

15             **MR. ARONZON:**  The manager, which is the Station

16   Casinos entity that manages that property, has filed.

17             **THE COURT:**  Right.

18             **MR. ARONZON:**  The joint ventures will be filing

19   alongside our other subsidiaries.

20             **THE COURT:**  Because Station owns a hundred percent,

21   then there's a 50 percent ownership --

22             **MR. ARONZON:**  Correct.

23             **THE COURT:**  -- as I remember it --

24             **MR. ARONZON:**  Correct.

25             **THE COURT:**  -- GCR and the SCI entity.

1          **MR. ARONZON:**  Correct.

2          **THE COURT:**  All right.

3          **MR. ARONZON:**  So I just wanted you to know that among

4    the subsidiaries coming in those two will be coming in.

5          **THE COURT:**  All right.  Thank you.

6          Do you have any idea what is that number?  I know

7    that that was anticipated and contemplated by the Disclosure

8    Statement and the Plan, but I don't know --

9          **MR. ARONZON:**  The number of filings?

10          **THE COURT:**  Yes.

11          **MR. KRELLER:**  Your Honor, I think it's

12    approximately 30.

13          **THE COURT:**  The Clerk's office likes to know that.

14          **MR. KRELLER:**  And, your Honor, just so you know, our

15    anticipation and our hope is that through jointly administering

16    those with these cases we can do as we did with the GV Ranch

17    sub, roll over some of the procedural orders --

18          **THE COURT:**  Please coordinate with my courtroom

19    deputy, because it sounds like you may need some orders at

20    least regarding administration fairly early, and if you have an

21    idea when you're going to file they can set them, because I

22    know I'm gone September 14th, 15th, and 16th and then I'm gone

23    at the end of the month as well.

24          **THE CLERK:**  The 22nd.

25          **MR. ARONZON:**  You're gone on the 22nd.

1               From an operations standpoint --

2               **THE COURT:**  One second.

3          **(Court confers with clerk)**

4               **THE COURT:**  Yeah, that's why we've got to set the

5     dates.

6               **MR. ARONZON:**  We were tentatively circling the 22nd

7     as one of the better days for us from an operations standpoint.

8     Remember, this involves --

9               **THE COURT:**  What date?

10              **MR. ARONZON:**  The 22nd.

11              **THE COURT:**  Maybe I can work with that.  I don't know

12    when I'm speaking.  We'll find out.

13              **MR. ARONZON:**  Thank you, your Honor.  We will

14    certainly coordinate though with your staff, your Honor.

15              **MS. CARLYON:**  This is Ms. Carlyon, if I can

16    interrupt.  The 22nd for the ABI Southwest Conference is just

17    the opening reception.

18              **THE COURT:**  Well, that's -- that's fine.  If we need

19    to set it on the -- I always enjoy -- but that's okay, we can

20    use the day of the 22nd.

21              Thank you, Ms. Carlyon, that's helpful.

22              **MS. CARLYON:**  No, I apologize; the 23rd is actually

23    the opening reception.  That's the Thursday.

24              **THE COURT:**  Okay, then that shouldn't be a problem.

25    We can adjust my calendar for that.

1          **THE CLERK:**  Yes, your Honor.

2      **(Clerk confers with Court)**

3          **MR. ARONZON:**  All right, your Honor, we'll continue

4    to coordinate --

5          **THE COURT:**  All right.

6          **MR. ARONZON:**  -- with your staff on that.

7          **THE COURT:**  Thank you.

8          **MR. ARONZON:**  That's really all I had on the list of

9    things that I wanted to alert you to.

10          **THE COURT:**  All right.  Thank you very much.

11          **MR. GOLDBERG:**  Your Honor, if I may, this is Eric

12   Goldberg; I just had one brief comment I'd like to make.

13          **THE COURT:**  Please.

14          **MR. GOLDBERG:**  On behalf of the Independent Lenders

15   Mr. Aronzon mentioned the settlement discussions and

16   Mr. Kreller referred to the possibility of a fully consensual

17   Plan.  I just wanted to reiterate that while discussions are

18   ongoing and we have a framework in place, you know, as you

19   know, the devil is always in the details, so it may or may not

20   be that we end up in a settlement.  But we are proceeding and

21   it is our hope that we can reach one, but it's of course still

22   possible that we don't make a deal and in that case we may be

23   objecting to confirmation.

24          With regard to scheduling, I don't anticipate there'd

25   be many or any evidentiary issues, but we should know much more

31

1   where we are by the Plan objection deadline.  We certainly

2   appreciate the Debtors' optimism as to the possibility of a

3   settlement and I think the parties are working in good faith to

4   make that happen.

5          THE COURT:  Well, that's good, and of course we

6   always have to wait till the vote.  As you pointed out at the

7   last hearing, your group may well support the Plan.

8          All right, I appreciate that.

9          I had a number of hearings set for Monday, but I

10  could not -- I had one request perhaps to accelerate a hearing

11  on the numerous fee applications.  I have three substantive

12  matters that are set for Monday and I'm leaving them on

13  calendar, two of which are unopposed and the third of which has

14  been vacated and I don't think there's been any objection to

15  the vacation of that hearing, because it was actually based

16  upon information that was provided by the Debtor to the moving

17  party a day or two after the pleadings were filed.  So that

18  will just leave two motions that are, so far as I can

19  determine, unopposed.

20         Is that --

21         MR. KRELLER:  I believe that's correct, your Honor.

22         THE COURT:  But I did -- I had a number of fee

23  applications and once I had a request by one counsel to perhaps

24  consider the matter today while present in Reno it made sense,

25  and I checked with the Office of the U.S. Trustee to see if

32

1   they had any -- if that office had any objection and it did

2   not, to move the hearings up to today.  If I've got everybody

3   here and they're participating telephonically in an attempt to

4   be as efficient and economical as possible I thought I'd at

5   least conduct the hearings.

6           There have been no objections filed to any of the fee

7   applications.  I have reviewed them all.

8           I assume the Office of the U.S. Trustee has reviewed

9   them?

10          **MR. COSSITT:**  We have, your Honor.

11          **THE COURT:**  All right.

12          **MR. COSSITT:**  And we have not filed any objections at

13  this time.

14          **THE COURT:**  Thank you.

15          But I'm not going to enter any orders.  What I'll do

16  is I'll consider those today for those firms or professionals

17  who are here.  If none are here I will consider them of course

18  Monday.  And I will call them on Monday just to ensure that

19  there are no objections.

20          And if there are objections, all you need to do is be

21  available and we can place a telephone call and just join you.

22  So make sure that my courtroom deputy has a number, a phone

23  number or contact number, in case we do have to place that call

24  Monday morning.

25          Frankly, the objection deadline has passed and, as I

33

1    said, there have been no objections, so I do not anticipate

2    that being necessary.  But just as a backup position that's

3    what I wanted to do.

4            Yes, sir?

5            **MR. ARONZON:**  I was just going to ask, your Honor,

6    for those who were only interested in the sale, perhaps we

7    could be dismissed?

8            **THE COURT:**  Yes.  Anyone that --

9            **MR. ARONZON:**  Help you clear out the courtroom a

10   little bit.

11           **THE COURT:**  Well, why don't I do this, I'm going

12   to -- I'll come back at a quarter to and allow people, if they

13   want to collect their belongings or hang up on the telephone, I

14   only need those that are requesting fees.  And I know there's

15   no objectors, but I have comments on several of them.

16           But I'll start again at quarter to.  Thank you very

17   much.

18           **MR. ARONZON:**  Your Honor, on behalf of the Debtors I

19   want to thank everybody who's participated in this in

20   connection with the sale, and in particular your Honor and the

21   Court.

22           **THE COURT:**  Thank you very much.

23           Thank you.

24           **THE CLERK:**  All rise.

25           **(A recess was taken from 10:36 a.m. to 10:46 a.m.; parties**

34

1    **present)**

2            **THE COURT:**  That's okay.  I was just thinking before

3    Mr. Aronzon left I have a couple questions about his travel

4    time, maybe you can answer them.

5            **MR. KRELLER:**  I'll do my best, your Honor.

6            **THE COURT:**  All right.

7            The first application I have is Number -- it's 4 on

8    Monday's calendar, and that is of Quinn Emanuel.  And I believe

9    counsel is on the telephone, is that correct?

10           **MS. ZALDUENDO:**  Yes.  Good morning, your Honor,

11   Jeanine Zalduendo.

12           **THE COURT:**  I have -- by the way, I've reviewed the

13   notice, that's Docket Number 1465, and that is for the

14   application for Quinn Emanuel, Moelis, and Fried Frank.  So

15   it's been properly noticed.

16           Let's deal with Quinn Emanuel.

17           You're seeking for the second interim $938,646.29 and

18   I understand 80 percent of the fees and a hundred percent of

19   the expenses have been paid pursuant to my August 7th, 2009

20   compensation Order.  The blended rate is $538.26, including

21   non-lawyer time.  Attorney time by itself is $565.19.

22           Now, I've gone through it and I have a couple of

23   questions.

24           It took, according to my calculations, one, two,

25   three, four, five, six, seven lawyers to draft what was

35

1    denominated as the LBO complaint at a cost of $42,750.50.  That

2    does not include conferences, legal research, just entries

3    indicating drafting.  For the complaint regarding the master

4    lease there was an additional $14,465.80.  That just strikes me

5    as a large amount of time.  People were working Christmas Eve,

6    one on Christmas day, in this regard.

7              I studied those complaints and while they're well

8    done I candidly have a real problem in thinking that there was

9    duplication and that it could have been accomplished for far

10   less.  I'll be glad to hear a response.

11             **MS. ZALDUENDO:**  Thank you, your Honor.  We took the

12   drafting of these complaints very seriously.  They were our

13   main focus during -- or one of our main focuses during this

14   interim period.  A lot of review of factual information and

15   consulting over the factual information went into the drafting.

16   And in particular, part of the time that was spent and the

17   reason that a number of individuals worked on these complaints

18   was in part because it was over the holidays and certain people

19   were traveling and other people needed to step in at the last

20   moment to assist.  And specifically in that regard a lot of

21   time was spent redacting the complaint for confidential

22   information that we felt we wouldn't be able to share and

23   certain decisions had to be made as to what portions of the

24   complaint were and were not confidential.  So that, you know,

25   unfortunately took additional manpower and time considerations

36

1    over the holidays.

2         We thought that we were on sort of an expedited

3    schedule to get this filed with the Court as soon as possible,

4    you know, we were afraid that certain of our rights would be

5    compromised if we let certain deadlines run.  Again that was

6    part of the reason that the manpower was needed over the

7    holidays while certain of the core team members were traveling.

8         **THE COURT:**  You and Mr. Winston have the majority of

9    the time.

10        **MS. ZALDUENDO:**  Yes.

11        **THE COURT:**  You have 25.3 hours and he had 27.4 hours

12   just on the LBO complaint.  And as I read the entries -- and I

13   tried to make sure that I had the correct entries, because they

14   actually fall under two different tasks when I went through it.

15   You had the executory contract and unexpired leases, there were

16   liens and setups, then you had the potential litigation.  It's

17   under potential litigation where the draft complaint regarding

18   the LBO was actually found, if I have read this correctly.

19        And it really started on the 4th of December,

20   Mr. Winston draft complaint 2.3 hours, and then it continues,

21   and that's after research had been conducted.  On the 6th he

22   revises the draft, 5.5 hours.  You reviewed the draft for the

23   first time the next day on the 7th.  And I appreciate what you

24   did because it's difficult for me to figure out exactly how

25   much time Mr. Winston spent on the 6th on the complaint because

1    he also worked on the standing motion and extension motion.

2    And what I did is I only -- when I went through this, to be

3    fair I only attributed one hour of that to reviewing the

4    complaint, just so I didn't want you to think I included all

5    5.50 hours.  And you did a good job of breaking out your time

6    rather than lumping it all together and you had 3.1 hours on

7    the 7th.  And then KS, and I'm sorry, has .8 also on the 7th.

8    Mr. Winston on the 9th has 3 hours revising the complaint.  The

9    same day you have 4.1 hours.  You have a conference with

10   Mr. Winston, I didn't count the conference.  On the 10th I

11   think it's Ms. Taggart, I think it's Erica Taggart, has

12   1.7 hours on reviewing the draft complaint.  Then we go back on

13   the 13th you've got 4.4 to review and revise the complaint.  On

14   the 14th Mr. Winston has revise complaint/standing motion, he

15   doesn't break that down, he had 2.6; I just split that

16   fifty/fifty.

17              And I could go on and on.  I can give you exactly

18   with the dates.  It just seems to me, when you're just

19   writing -- on the 16th, for example, 2.7 revise LBO complaint.

20   It is a lot of time without a great amount of detail spent in

21   doing it.  And then I've got the senior partner at $860 an hour

22   reviewing the complaint.  And he also said he reviewed the

23   motion for standing and revised the same, so I didn't know how

24   much to contribute just to the complaint.  But it's just a lot

25   of time to revise a pleading.  And I understand, nobody I think

38

1   is more aware than I am of how important that issue was, but as

2   I went through this, without more detail as to why so much time

3   was spent, I have a very difficult time with it.

4           I frankly thought that it could be done more

5   economically and I am going to reduce the application by

6   $10,000 in that respect.

7           Then the -- one of the problems with this case is the

8   number of lawyers that either appear personally or by telephone

9   at every hearing.  And I took a look at some of this, I was

10  looking and I'm not sure I understood exactly what was meant at

11  Pages 13 and 14 of the application.  I'm at Page 14, Line 4:

12          "As a result, four Quinn Emanuel attorneys were

13           present at the hearing on the standing motion in

14           preparation for and execution thereof.  This hearing

15           lasted a full day.  Attorney time for working travel

16           to and from the hearings described and in preparation

17           of the hearings was also billed in this category."

18           that category being court hearings.

19          Well, when I looked at the category what I couldn't

20  tell whether the four lawyers were the lawyers who actually

21  appeared or those that just worked in preparation, but I

22  believe there were actually four lawyers that appeared either

23  telephonically or in person.

24          Is that accurate?

25          **MS. ZALDUENDO:**  I believe only two appeared on the

1    record and then two attorneys were present to assist in the

2    courtroom with documents and whatnot, but all four participated

3    in the preparation for the hearing.

4         THE COURT:  BF1, EDW, JMZ, and SK2, that's what my

5    notes indicate.  Would that be accurate?

6         MS. ZALDUENDO:  Yes, that's correct.

7         THE COURT:  Okay.  And I -- why was it necessary for

8    all four?

9         MS. ZALDUENDO:  Well, primarily the motion was argued

10   by Susheel Kirpalani and he had sort of a small role in the

11   case up until that point --

12        THE COURT:  That's pretty obvious from the review.

13   And I was wondering -- you know, I've heard Mr. Winston argue

14   and I think he does a really great job.  I'm trying to figure

15   out what was the necessity of bringing a higher priced lawyer.

16   I mean he spent --

17        MS. ZALDUENDO:  We felt that --

18        THE COURT:  -- he spent 9.5 hours reviewing

19   everything then bills travel time and then shows up.  And I

20   have -- I don't understand that, very frankly.

21        MS. ZALDUENDO:  Mr. Kirpalani is the senior

22   bankruptcy partner here at our firm and we felt that -- and

23   Mr. Winston agreed that it would be in the best interests of

24   the client to have Mr. Kirpalani argue and he had more

25   experience with standing motion hearings and various legal

40

1    aspects of the argument.

2         **THE COURT:**  And he did a fine job.  He did an

3    excellent job.  I understand that.  But if he's going to be

4    here then why is Mr. Winston here?

5         **MS. ZALDUENDO:**  For the reason that where

6    Mr. Kirpalani may have had some legal expertise, Mr. Winston

7    had the factual background to assist Mr. Kirpalani where it was

8    needed.

9         **THE COURT:**  And then why were those folks, I believe

10   you were one of them, also here?

11        **MS. ZALDUENDO:**  There's a lot of preparation that

12   goes into a standing motion hearing.  There were very

13   voluminous pleadings, very voluminous factual documents and

14   declarations, and we were there to assist.  Mr. Finestone was

15   assisting Mr. Kirpalani on legal issues, helping him with legal

16   research, helping him in his preparation of his argument, and I

17   was doing the same for Mr. Winston and for both men regarding

18   all of the pleadings and preparation of the materials that may

19   be needed.  We had some demonstratives.  Issues such as that

20   were attended by Mr. Finestone and I in preparation for the

21   hearing.

22        **THE COURT:**  And he does -- Mr. Feinstein -- stone --

23   is it Finestone?

24        **MS. ZALDUENDO:**  Yes.

25        **THE COURT:**  At $550 an hour and you do that at $520

41

1   an hour.

2          **MS. ZALDUENDO:**  Yes.

3          **THE COURT:**  Now, let's take a look -- and I also

4   looked at other entries in January because there were other

5   hearings.  And I appreciate the fact -- you know, I could find

6   yours, you do one of the better jobs timekeeping, for example

7   on 1/24 working travel from Los Angeles to Reno, I could not

8   quite find --

9          Mr. Winston has on 1/26 travel Reno to LAX 1 hour

10  $740, it doesn't say he's working.  I don't know what he'd be

11  working on going home from the hearing.  So I'm going to make

12  an adjustment for that $740.

13         Oh, yes, and I was going -- I'm looking at Page 28 of

14  61 of Docket Number 1012 and then I go back to Page 8 of 61,

15  because I found I think how you got to Reno, because I was

16  trying -- I'm very concerned about the travel time and the

17  amount spent.  The summary by lawyer is at Page 16, so let's

18  take a look at that.

19         **(Pause)**

20         The only reduction that I saw was for .5 hours -- is

21  that correct -- a $26 decrease.  That was the only reduction

22  that I found.  Is that accurate?

23         **MS. ZALDUENDO:**  Yes, your Honor, that was from a

24  billing mistake.

25         **THE COURT:**  Yeah, well, in addition to the 10,000 I

42

1   earlier reduced this bill I'm going to reduce it by an

2   additional $10,000 for duplication regarding the matters

3   already talked about and travel time.  So I'm reducing this

4   application by $20,000.

5          I reviewed the expenses.  I believe that the expenses

6   are appropriate.

7          So that's going to be my ruling.  The fees will be

8   reduced to $879,700.50.  All right?

9          **MS. ZALDUENDO:**  Thank you, your Honor.

10         **THE COURT:**  Just submit -- all orders regarding fees

11  have to be signed off by a representative of the Office of the

12  U.S. Trustee.

13         Thank you very much.

14         The next application I have is that of Moelis &

15  Company.  I reviewed that.  That's Docket Number 1460.  I read

16  the Declaration of Mr. Flachs (phonetic), Docket Number 1461.

17  And I've read -- I know that they've all been supported and

18  approved by the Committee.

19         Correct?

20         **MS. STEINGART:**  Yes, they have --

21         **THE COURT:**  Yeah.

22         **MS. STEINGART:**  Yes, they have, your Honor.

23         **THE COURT:**  I've reviewed this.  There's been no

24  objection.  I'm going to grant the Moelis application.

25         **(Court confers with clerk)**

43

1          Now, the next I have is Fried Frank.  I have reviewed

2     the application, Docket Number 1462, Ms. Steingart's

3     Declaration, 1463, and then Mr. Vanduga (phonetic), who

4     obviously supports this on behalf of the Committee.

5          **MS. STEINGART:**  Yes, your Honor.

6          **THE COURT:**  Okay.  There was a voluntary reduction of

7     $57,647.

8          **MS. STEINGART:**  Yes, your Honor.

9          **THE COURT:**  That's appreciated.  I find the hourly

10    rate, including all paraprofessionals is $495.68 an hour, which

11    is commendable.

12          I have the same issue regarding the number of lawyers

13    at a hearing.  I have a note.

14        **(Pause)**

15          I can't read my own writing.  That's the problem.

16    There was a lawyer, first initial M. and it looks like the last

17    name is G-R-O-N-D-O.  Is that --?

18          **MS. STEINGART:**  G-R-O-N-D-O?

19          **THE COURT:**  I'm looking for it.  I don't think that

20    that's -- I just don't think I wrote it correctly.  And then,

21    there was a Soto and a de Leeuw (phonetic) and they were all

22    present at a hearing.  Does that help you?

23          **MS. STEINGART:**  Right.  There was a Mr. Kaplan and a

24    Mr. de Leeuw who were present and that was a hearing for which

25    I was traveling and -- well, no.  I don't think Mr. Kaplan and

44

1    Mr. de Leeuw were at the same hearing.  Mr. de Leeuw attended

2    the hearing where Mr. Winston argued the standing motion.  I

3    was traveling --

4         **THE COURT:**  Right.  It says -- my notes said, "See

5    page 12."  And I'm looking at the application, page 12, but I

6    can't find the reference there that I was --

7         **MS. STEINGART:**  Right.  And Mr. de Leeuw was here to

8    argue, if you recall, your Honor, for that hearing, there was

9    an argument with respect to a settlement, just of the fees that

10   the debtors had with the independent lenders.

11        **THE COURT:**  That's right.  They want some $900,000.

12        **MS. STEINGART:**  And if the Court remembers, we were

13   the only party -- the committee was the only party -- that

14   objected to that.  I could not come to Reno for that hearing.

15   Mr. de Leeuw came --

16        **THE COURT:**  Oh, you know who I was referring to?

17   That was Mr. Grow (phonetic), because my question is, "What did

18   Mr. Grow do?"

19        **MS. STEINGART:**  If Mr. Grow was at the January 25th

20   hearing with Mr. de Leeuw, then Mr. Grow helped to prepare

21   Mr. de Leeuw for that hearing.  To the extent that the Court

22   believes that Mr. Grow's time is redundant, we are happy to

23   write that off.

24        **THE COURT:**  I was looking -- because it's working

25   travel time and see, that's my concern.  If you'll take a look,

45

1   you've got Ms. Soto on 12/2 -- I'm looking at Exhibit 1.

2          **MS. STEINGART:**  Right.

3          **THE COURT:**  And I look at this and 12/10 your time

4   you worked from New York to Reno.

5          **MS. STEINGART:**  Oh, that was the 12/10 hearing.

6          **THE COURT:**  Yeah, that's what I'm looking at.

7          **MS. STEINGART:**  That hearing was the hearing on the

8   master lease compromise, your Honor.

9          **THE COURT:**  Right.  Exactly.

10          **MS. STEINGART:**  And if you recall, that was -- we

11   were on the way -- that was the first one, which we didn't

12   settle with the debtors until -- actually I was grounded in San

13   Francisco and traveling by car from San Francisco --

14          **THE COURT:**  Never go to San Francisco.

15          **MS. STEINGART:**  Well, you know, there you go.

16          **THE COURT:**  No, seriously.  Go to Oakland.

17          **MS. STEINGART:**  Yeah, lessons learned.  But so, we

18   were preparing for an evidentiary hearing, your Honor, and we

19   were working on that plane.  I can tell you --

20          **THE COURT:**  I have no problem with that.  I looked at

21   your time sheets.

22          **MS. STEINGART:**  I mean, we were -- yeah.

23          **THE COURT:**  I have no problem.  I remember everything

24   was coming quickly.

25          **MS. STEINGART:**  Yeah, we were flat out for that

46

1    hearing.

2            THE COURT:  And there were four lawyers.

3            MS. STEINGART:  Right.  There was Mr. Grow; there was

4    Ms. Soto --

5            THE COURT:  Actually, there were three.  Mr. de Leeuw

6    wasn't there.  Only the three of you.

7            MS. STEINGART:  Right, yeah.  You know --

8            THE COURT:  And all three of you were working.

9            MS. STEINGART:  Yeah.  And Mr. de Leeuw was just at

10   that one hearing, your Honor, at the end of January.  It was a

11   January 25th hearing and I had a previously planned vacation

12   that I took.

13           THE COURT:  Now, then I looked forward to see how you

14   guys go home.  Did you spend the night somewhere?  I mean, I've

15   got you leaving both on the 11th and on the 12th from Reno and

16   I don't understand that.

17           MS. STEINGART:  That shouldn't have happened.  You

18   know, I don't think that there was any -- for any of the

19   hearings.  One of my colleagues may have flown somewhere and

20   then flown from there home, because there are no direct

21   flights.

22           THE COURT:  Take a look at Exhibit 1 to the

23   application, if you would.

24           MS. STEINGART:  Right.  Right.  And which page are

25   you on?

47

1          **THE COURT:**  That's 1462-1, page 1 of 1.  It's Exhibit

2    12, the interim fee application.

3          **MS. STEINGART:**  1462.

4          **THE COURT:**  It's got a Bates stamp, it looks like at

5    the bottom it's 7690582.  It's just before all your billing

6    statements.

7          See, there's Mr. Grow.  Travel time from New York to

8    Reno, prepared for hearing.  And he only -- see, that's what

9    I --

10          **MS. STEINGART:**  Well, you know what?  He lost his

11    suit -- he had to go somewhere on the way home.  He lost his

12    suitcase and we lost all our documents.  And if the Court

13    believes that's an inappropriate charge -- he had to go back to

14    San Francisco to find his things.

15          **THE COURT:**  That's not a problem.

16          **MS. STEINGART:**  Because we had taken the car.

17          **THE COURT:**  I just -- but if you take a look, you

18    see --

19          **MS. STEINGART:**  Yeah, it was bad.

20          **THE COURT:**  -- it's got you leaving on the 11th.

21          **MS. STEINGART:**  Yeah.

22          **THE COURT:**  Ms. Soto on the 11th.  Then, it's got you

23    leaving again and Mr. Grow leaving again on the 12th and I'm

24    going --?

25          **MS. STEINGART:**  Yeah.

1          **THE COURT:**  How did that happen?  Because it looked

2     like --

3          **MS. STEINGART:**  Yeah.  It was because he had to go

4     find our boxes of documents and his clothing.

5          **THE COURT:**  What I'm trying to figure out is, for

6     example, on the 11th, you've got non-working travel time, so

7     that's half time?  Is that what that's supposed to be, the 4.9?

8          **MS. STEINGART:**  That's right.  That's right.

9          **THE COURT:**  And then, the 6.2?

10         **MS. STEINGART:**  Yes.

11         **THE COURT:**  I've flown.  I know what it's like to

12    make connections out of Reno.

13         **MS. STEINGART:**  Right.  You know, it generally takes,

14    you know, between the flights and the delays the waiting --

15         **THE COURT:**  But if that's half time, that means it's

16    a 22-hour trip.

17         **MS. STEINGART:**  That's half time.  Yeah, yeah.

18    Because of cancellation of planes, it could have been 12 hours.

19    Many times it's 12 hours.

20         **THE COURT:**  Twelve I get; 22 I don't.

21         **MS. STEINGART:**  No.  It shouldn't be 22.

22         **THE COURT:**  But see, if this is half time, it would

23    have to be.  That's my point.  Let's just add yours together.

24    That would be 11.1 hours.

25         **MS. STEINGART:**  Well, then, there's a date wrong

49

1  here.  There has to be a date wrong here, your Honor.

2        **THE COURT:**  If it's half time, it's half time.

3        **MS. STEINGART:**  Right.  Right.  May I make a

4  correction?

5        **THE COURT:**  I'm willing to accept -- I would like to

6  cut all of those by 50 percent, because I'm not sure that's

7  what happened.

8        **MS. STEINGART:**  I have no objection to that, your

9  Honor.

10        **THE COURT:**  Okay.

11        **MS. STEINGART:**  It's clearly an error.

12        **THE COURT:**  Yeah.  I think --

13        **MS. STEINGART:**  Clearly an error.

14        **THE COURT:**  And Mr. Grow -- so, I'd cut all those in

15  half:  Ms. Soto, yours, Mr. Grow's.  And if they're cut 50

16  percent, then I'm satisfied.

17        **MS. STEINGART:**  Okay.  Very good.  We will make that

18  change.

19        **THE COURT:**  Okay.  And when I went through the time

20  sheets themselves, just to show you, I looked at Mr. Grow was

21  at page 3 of 45 in your billing sheets.  And he shows 12 time

22  travel from New York to Reno; 6.5 prepare for hearing; 3 -- and

23  I'm going, did he prepare on the airplane?  'Cause he billed

24  for his airplane time -- 13 hours.  And then he billed for an

25  additional --

1      **MS. STEINGART:**  Yes, we prepared on the airplane and

2  then we worked more when we got here.

3      **THE COURT:**  Fair enough.  That's what I wanted to

4  know.

5      **MS. STEINGART:**  We absolutely did.

6      **THE COURT:**  See, your travel is actually -- when you

7  go to the next page -- would indicate that all -- you've got

8  travel listed on 12/11 and 12/12 and that's what really --

9  we've just straightened it out, but that's where I got -- I

10  just didn't understand that.

11      **MS. STEINGART:**  As I stand here, your Honor, each

12  trip is memorable in its own way.  I do not understand.

13      **THE COURT:**  I've had people say, you know, if you had

14  better airline service you might be busier.  And I'm going,

15  "No, I deliberately hope that they cut more flights out."

16      Okay.  We've solved the problem.  Okay.

17      **MS. STEINGART:**  Yes.  I will fix that and I apologize

18  for the error.

19      **THE COURT:**  Okay.  And I found Ms. Soto's time.  It

20  was under two different task billings, but I was able to

21  reconcile that.

22      At the time you filed this, you had just filed your

23  eighth monthly -- you had no objections to any of the earlier

24  ones?  I'm assuming there is no objection to the eighth, which

25  is March 1 to March 31.  Is that correct?

51

1          **MS. STEINGART:**  That's correct, your Honor.

2          **THE COURT:**  Okay.  With that additional reduction, I

3    will approve the application.

4          **MS. STEINGART:**  Fine.  And we will make the

5    correction and submit a corrected order.  Thank you, your

6    Honor.

7          **THE COURT:**  Thank you very much.

8          **MS. STEINGART:**  And if it's acceptable to the Court,

9    if Ms. Axelrod and I might leave?

10          **THE COURT:**  You don't have a fee app?

11          **MS. AXELROD:**  We don't have one on at this time, your

12    Honor.

13          **THE COURT:**  All right.  Sure.  Thank you very much.

14          **MS. STEINGART:**  Thank you, your Honor.

15          **MS. AXELROD:**  Thank you.

16          **THE COURT:**  The next is the application of Maupin,

17    Cox and Legoy.

18          **MR. JAIME:**  Chris Jaime, your Honor.

19          **THE COURT:**  I've reviewed the application.  It's

20    seeking $24,504.37.  It's $395 an hour.  I've reviewed it.  It

21    appears to me there had been a clear attempt to avoid

22    duplication and I'm going to grant the application in the

23    amount being sought.

24          **MR. JAIME:**  Thank you, your Honor.

25          **THE COURT:**  You're welcome.  Next is the second

52

1    interim application of Lazard.  Is somebody appearing on behalf

2    of Lazard?  Please step forward.

3              **MR. ARONSON:**  Your Honor, Daniel Aronson from Lazard.

4    Also, my colleague is on the phone, Simon Furie, who's got a

5    copy in front of him.

6              **THE COURT:**  All right.

7              **MR. ARONSON:**  I came unprepared, except for the

8    hearing -- the first part of it.

9              **THE COURT:**  There's no documentation of expenses.

10             **MR. ARONSON:**  We don't have documentation of

11   expenses?

12             **THE COURT:**  No.

13             **MR. ARONSON:**  We can correct that.

14             **THE COURT:**  Unless I've missed it.  Who's on the

15   telephone?

16             **MR. ARONSON:**  Simon Furie.

17             **THE COURT:**  Sir, is there any -- I've looked at the

18   application and what's attached.  I see the fees and I know

19   it's $300,000 per month and I know that that was approved.

20   Expenses are listed but only for December of $18,172.  And

21   that's a total amount.  But I don't see any back-up and then

22   there's an expense summary at page 5.

23             **MS. SPEAKER:**  (Indiscernible)

24             **THE COURT:**  Okay.  Let me know.

25             **(Off the record from 11:15 a.m. to 11:18 a.m. working on**

53

1   **recording system)**

2          **THE COURT:**  We're back on the record.  The problem is

3   this.  Let me explain.  There's a summary of fee applications

4   on page 2 of 22, which is on the second interim fee application

5   at Docket Number 1483.  It shows approved expenses.  Those are

6   on the monthly submissions.

7          **MR. ARONSON:**  Yes.

8          **THE COURT:**  Of $18,172.99 and that's for December 1

9   through December 31, 2009, with no expenses for January,

10  February and March, which struck me as anomalous.

11         And then, at page 4 of 22, same docket number, there

12  is listed -- actually, it's the next page, page 5 -- cumulative

13  expense summary.  It should be the same number, $18,000 --

14         **MR. ARONSON:**  Yes.

15         **THE COURT:**  It's not.  It's $41,212.48 and it shows

16  $25,025.31 for travel and $12,122 for legal.  So, I -- as you

17  can tell with the other applications -- tried to find the back-

18  up, because now I have about a $23,000 delta and where is it?

19  And I can't find it.  So, I'm not going to award any expenses

20  at this time without prejudice to proper documentation at the

21  next application.

22         **MR. ARONSON:**  That was going to be my suggestion.

23         **THE COURT:**  I will approve the fees, but no expenses.

24         **MR. ARONSON:**  That was going to be my recommendation.

25  Thank you, your Honor.

54

1          **THE COURT:**  I just wanted you to know.

2          **MR. ARONSON:**  Yes.

3          **THE COURT:**  What I had tried to do.  Thank you very

4    much.

5          **MR. ARONSON:**  We'll make it right the next time.

6          **THE COURT:**  Thank you.

7          **MR. ARONSON:**  Thank you.

8          **THE COURT:**  Appreciate it.

9          **MR. ARONSON:**  And I'm going to hit a plane if you

10   don't mind.

11         **THE COURT:**  Good.  Have a good trip.

12         Next is Docket Number 9, which is the second interim

13   application by FTI Consulting, Inc. Financial Advisors to CMBS

14   debtors.  I have reviewed it.

15         Is there anybody on the telephone regarding this

16   application?  I just want to know if the retainer's been

17   exhausted.  I assume it has, because they've been paid.  I've

18   reviewed the application.  It's consistent with the orders.

19   I'm going to grant the application.

20         **MR. GARZA:**  Your Honor, Oscar Garza of Gibson Dunn

21   representing FCP PROPCO.

22         **THE COURT:**  Yes.

23         **MR. GARZA:**  I'll appear specially on behalf of FTI.

24   They have about $25,000 left on their retainer.

25         **THE COURT:**  They should apply it.  Is there any

1   reason --?

2          **MR. GARZA:**  I think what they'd stated before they

3   were just going to hold it in trust until the final fee

4   application.

5          **THE COURT:**  Either way.  All right.  I just want them

6   on the next application to tell me how much is left.  All

7   right?

8          **MR. GARZA:**  Okay.  Thank you, your Honor.

9          **THE COURT:**  I like to know those things.

10         I would point out, and I wanted to do this, that at

11  page 10 of Docket Number 1487, which is the -- what appears to

12  be the -- second interim application by FTI Consulting

13  Financial Advisors to Station Casinos.  Remember, we had to

14  make those distinctions; that they indicated they -- based on

15  comments I made at the previous fee application hearing, they

16  are no longer billing time for travel.  And I appreciate this.

17  And that's actually reflected on Exhibit 2.

18         I would point out in my review is taxis are pretty

19  expensive.  But where they live, I think, it's the only way

20  they can work.

21         I've reviewed the summary of fees by category.  I

22  reviewed this in detail and I am going to grant this

23  application.

24         The next is the second interim application of Milbank

25  Tweed Hadley and McCloy.  And when I review the applications,

1    I'm not going to refer necessarily to each declaration.  I've

2    read all the pleadings that have been filed in support of each

3    of these.

4            I've reviewed this and I have an arithmetical issue

5    to begin with.  I've also reviewed not only the original

6    application, Docket Number 1496, but the supplement and the

7    supplement relates to work that was done on the GB Ranch case.

8    Is that accurate?

9            **MR. KRELLER:**  That's correct, your Honor.

10           **THE COURT:**  And they've been added together.  So,

11   what is being sought now, pursuant to the amendment and the

12   exhibits thereto, a total of $6,275,334.25 in fees; $188,023.55

13   in expenses; for a total of $6,463,357.50.  Is that correct?

14           **MR. KRELLER:**  That is correct, your Honor.

15           **THE COURT:**  That's a blended rate of $754.19 an hour

16   based on total hours of 8,609.  There was a reduction of

17   $41,438 reflecting timekeepers who had ten or fewer hours if I

18   read that correctly.

19           **MR. KRELLER:**  That's correct, your Honor.

20           **THE COURT:**  All right.  Now.  The fees as stated on

21   the cover sheet of the original application state

22   $4,879,407.75.  When you go to Exhibit 1, which is the summary

23   and it's broken down between work that was done OPCO and

24   PROPCO, correct?

25           **MR. KRELLER:**  Correct, your Honor.

1          **THE COURT:**  Yeah.  I add the $3,933,231.50 for what

2    is called the debtor ensemble -- I'll call that OPCO -- and the

3    $1,073,130 for PROPCO, I get $5,006,451.  I don't get

4    $4,879,000.  So, I'm just telling you, I'm going to hold you to

5    the $4,879,000.  I subtracted the $41,438 and that comes up to

6    $4,964,000.  So, that doesn't get us there, either,

7    Mr. Kreller.

8          And then, I think -- let's see -- Exhibit 5, these

9    are expenses, but they're okay because then I realized I hadn't

10   added in the additional expenses for the PROPCO, which is

11   Exhibit 6.  So, that came up to the 77, so that's fine.  But I

12   just wanted to be clear, it's the $4,879,000 that I'm using;

13   notwithstanding the arithmetic on the summary.  All right?

14         **MR. KRELLER:**  Your Honor, and then added to that

15   would be the supplement?

16         **THE COURT:**  Yes.  Oh, the supplement's approved.  I

17   have no problem with that.  That arithmetic is fine.

18         Let's talk about something else.  There are eight

19   lawyers -- eight.  Five here, I believe, and three listening,

20   in the hearings.  Is that eight?  Especially the ones listening

21   for 6.5 hours?  I've got to think they're going to be listening

22   to things they don't care a lot about and they're probably

23   doing other work at the same time.  I could be wrong.  Can you

24   explain to me why eight lawyers are necessary?

25         **MR. KRELLER:**  Your Honor, I think -- which hearings

58

1    in particular are you referring to?

2            **THE COURT:**  Well, let's take a look at this.  I think

3    I looked at -- let me pull out -- I think I figured it out by

4    expenses, going through the expenses.  Let's see here.

5            **(Pause)**

6            Exhibits 3 and 4 is what -- those are summaries.  I

7    went through the monthly statements.  Let's see if I can find

8    it.  That would be under -- Chapter 11 -- probably the

9    litigation, correct?

10           **MR. KRELLER:**  There's a litigation category.  There's

11   also a court hearing category.

12           **THE COURT:**  Which is the court hearing?  Maybe it's

13   under the court hearing.  Oh, I've got court hearings.  I found

14   it.  I did mark that.  That's probably where they're at.

15           Okay.  Mr. Aronson on 12/10, he was here;

16   Mr. Baronsky -- is that correct pronunciation?

17           **MR. KRELLER:**  That's correct, your Honor, Baronsky.

18           **THE COURT:**  Mr. Kreller, you were here.  There's

19   three lawyers.  Mr. Isenberg was here on the 11th.  I believe

20   Mr. Gregory Evans was here.  Is that correct?

21           **MR. KRELLER:**  That's correct, your Honor.

22           **THE COURT:**  That's one, two -- there's five that were

23   here.  And Bria LaSalle-Mertens, 6.8 to monitor it; Robert

24   Shenfeld, 6.0 hours to monitor it.  The 25th, Mr. Aronson was

25   here, Mr. Baronsky was here, Mr. Isenberg was here, Mr. Kreller

59

```
1    was here, Mr. Shenfeld listened, Mr. Torres listened, Gabriel
2    Weaver listened.  That's a whole lot of lawyers billing at
3    pretty significant rates.
4         MR. KRELLER:  Your Honor, by way of explanation, the
5    hearing on December 10th, as you recall, was the master lease -
6    - the original master lease compromise agreement, which was
7    extremely contentious.  I can tell you, you know, and kind of
8    break out the responsibilities there, but we did have -- true
9    for the 25th, as well; that was the hearing on the committee's
10   standing motion, I believe --
11        THE COURT:  Yes, sir.
12        MR. KRELLER:  We did have litigation teams separate
13   from our bankruptcy teams.  The litigation teams have been
14   taking charge of all of the various discovery that had been
15   undertaken.  There were witnesses, depositions; I don't recall
16   whether there were actually any witnesses put on at any of
17   those hearings, but that was certainly a potential.
18        So, for example, Mr. Evans, Mr. Torres, Mr. Weaver,
19   those are all members of our litigation team who were either
20   here or available.  Mr. Torres and Mr. Weaver, for example,
21   were at the depositions or conducted some of the depositions
22   and, therefore, were available by phone.
23        Mr. Baronsky and Mr. Isenberg are our corporate and
24   finance people who are historically the primary people on the
25   Station relationship on the corporate finance side.
```

1   Mr. Isenberg, in particular, was the draftsperson of the master

2   lease compromise agreement and, frankly, I insisted that he be

3   here to assist me with the ins and outs of that document to the

4   extent that stuff became relevant.

5          **THE COURT:**  I know the work that was done pretty much

6   by you and by him and Mr. Aronson, because I could see it.

7          What about LaSalle-Mertens?

8          **MR. KRELLER:**  I certainly understand, your Honor.

9   Bria LaSalle-Mertens is the principal junior associate in our

10  bankruptcy group working on this matter with me.  I understand

11  the concern about having multiple associates on the phone and I

12  think we can -- I think it's certainly appropriate to have an

13  associate on the phone rather than bringing someone here to

14  Reno with us.  But I would be willing to limit that to one

15  associate --

16         **THE COURT:**  I think so.

17         **MR. KRELLER:**  -- participating by phone on these

18  hearings.

19         **THE COURT:**  What I am going to do -- you've got her

20  hourly rate in this summary.

21         **MR. KRELLER:**  I do, your Honor.  I believe it's $450

22  an hour if I'm not mistaken.

23         **THE COURT:**  I'd just reduce that by her --

24         **MR. KRELLER:**  I'm sorry, your Honor.  She's actually

25  went up this year to $575.

1      **THE COURT:**  I'd reduce -- I'd eliminate 6.8 hours

2  times that amount.  And then, in January, three folks on the

3  telephone.  I want ten hours eliminated at the lowest billing

4  rate.

5      **MR. KRELLER:**  We will do that, your Honor.

6      **THE COURT:**  Thank you.  Then, I looked at this

7  bracket -- or this one -- I wasn't sure I understood what it

8  was.  It's H travel, H -- I think that's an expense

9  classification.  Is that correct?  If you'll help me.

10      **MR. KRELLER:**  I'm sorry, your Honor, I'm not sure

11  where you are.

12      **THE COURT:**  Okay.  It was something identified --

13  let's go back to the summary -- as travel H.  It's a category.

14  I'd have to see if it was non-working travel.  I've got that.

15  Let's check the summaries.  Summaries of professionals Exhibit

16  2 -- what did I highlight?  Summary of total fees by category -

17  - and by the way, I did review the fees by category.  It's

18  exactly what I expected.  There's only 13,000 through 75 of

19  non-working travel.  Court hearings were nearly 149,000.  This

20  is just on the original --

21      Well, travel is the first of the expenses.  For the

22  debtor ensemble, it was $45,085; for PROPCO, it was nothing.

23  So, I'm assuming -- and I think that's because there was only

24  one time there was an appearance.  That was done at

25  (indiscernible) about two and a half hours one day.  So, I

62

1    understand why that was done.

2            But when I go through the expense detail -- yeah.

3    It's called travel H.  It's at page 160 of 178, Docket Number

4    1496-5, 5 being the exhibit number.  There's a page number 160

5    at the bottom of it.  Are you with me, Mr. Kreller?

6            **MR. KRELLER:**  I am, your Honor.

7            **THE COURT:**  Explain -- I don't mean to be wasting

8    everybody's time, but look.  Mr. Aronson's travel -- he went to

9    bankruptcy court hearing; that would be here.  And includes RT.

10   I assume that means round trip?

11           **MR. KRELLER:**  I would think that's what that means,

12   your Honor.

13           **THE COURT:**  $1,064.  When Mr. Evans came here on the

14   7th, round trip, $387.  Mr. Aronson for client meetings,

15   $3,078.  Mr. Baronsky comes to Reno, $334.  He's right in there

16   with Mr. Evans.

17           **MR. KRELLER:**  Your Honor, the --

18           **THE COURT:**  Travel -- I'm going to keep going.

19   Mr. Evans, when he came, December 11th hearing for travel --

20   and that's to Gregory Evans' travel expense and it's probably

21   more than air fare, but he's got $1,300 there.  Isenberg travel

22   expense for December 11th hearing was $445.  Yours,

23   Mr. Kreller, was only $652.  When you came in December, it was

24   $944.

25           Mr. Aronson, $2,542 to attend meetings.

63

1   Mr. Baronsky, travel expense December 15th to attend client --

2   I don't know, must be meeting -- I don't know if those -- those

3   have to be more than simply air fare.

4        **MR. KRELLER:**  Your Honor, the meetings that -- the

5   bigger dollar items that you've referred to, the $3,900 --

6        **THE COURT:**  Right.

7        **MR. KRELLER:**  For Mr. Aronson on the 4th of December;

8   the $2,500 on the meetings from December 15th; those are trips

9   to New York.  Those were bank group meetings.  That's not Reno

10  travel.

11       **THE COURT:**  I assumed that.

12       **MR. KRELLER:**  And, yes.  These are all in expense

13  reports, not just air fare, but hotel, meals, et cetera.

14       **THE COURT:**  Was any of this air fare at a billed rate

15  to the estate at higher than coach?

16       **MR. KRELLER:**  I do not know the answer to that.

17       **THE COURT:**  I want to know the answer.  If any of it

18  was greater than coach, then that should be reflected in the

19  next fee application.  Because when I see the disparities in

20  the travel to Reno -- when you came here on the 25th, $625.

21  Mr. Perry, when he traveled here, $625.  Mr. Baronsky's up to

22  $977.  One wonders why.

23       Some of them just don't make sense to me.  I have a

24  decent idea.  Now, maybe there were last minute flights that

25  had to be obtained.  That's fine.  But it has to be coach fare.

64

1          **MR. KRELLER:**  Your Honor, in terms of the New York

2  flights, I don't know the answer.  In terms of the Reno/LA

3  flights, there is no first class.

4          **THE COURT:**  Isn't it Horizon or Alaska, what airlines

5  is it?

6          **MR. KRELLER:**  I don't believe they do.

7          **THE COURT:**  Isn't that the airlines?  That's my

8  question.

9          **MR. KRELLER:**  There's -- it's Alaska or Horizon.

10         **THE COURT:**  Yeah.  And I don't think they have first

11 class, either.

12         **MR. KRELLER:**  Nor does Southwest.

13         **THE COURT:**  I think it's lucky to have the seats

14 stapled to the floor in some of those aircraft.  I've been on

15 those.

16         **MR. KRELLER:**  Your Honor, the other think I would

17 note, that some of these entries cover multiple days.  For

18 example, the Baronsky travel --

19         **THE COURT:**  That's why I assume -- that's exactly why

20 I assumed they were more than air fare.  But they should be

21 broken down -- hotel, food.  That's what I'm used to seeing.

22 And that's why when I see that huge number for travel, I go

23 time out.  What is that?  That's all I need broken down.

24         So, I'm going to approve this application, subject to

25 a reduction in the next application if any of the air fares

1    were at a rate greater than coach.  And I want the reduction

2    for the hours for the multiple appearances.

3            Otherwise, I appreciate the $41,438 reduction.  So,

4    other than those deductions, I am going to approve the

5    application and amended applications.

6            **MR. KRELLER:**  Thank you, your Honor.

7            **THE COURT:**  Thank you.

8            Gibson, Dunn and Crutcher -- one moment, please.

9    That's Docket Number 1566.  I reviewed the application,

10   exhibits.  Who's on the telephone?  Mr. Garza?

11           **MR. GARZA:**  Yes, your Honor, Oscar Garza on behalf of

12   the firm.

13           **THE COURT:**  Okay.  I wanted to make sure that I was

14   doing this correctly when I went through these.  And I spent --

15   let me check my notes -- I think I spent a lot of time with

16   your declaration.  It was broken out -- the application was

17   broken out -- in two parts, one for December; then, I think,

18   the others were put together for the basis of one summary.  Is

19   that accurate?

20           **MR. GARZA:**  It was only broken out that way, your

21   Honor, just to identify that there was a rate increase in

22   January and so, they were broken out that way because there

23   were different rates.

24           **THE COURT:**  Right.

25           **MR. GARZA:**  But they are broken up.  The exhibits are

1   month by month.

2          THE COURT:  Yes.  And I went through them.  I'm

3   trying to find -- most of the work that was done, if I've done

4   my arithmetic correctly, you have about 40 percent of the work

5   and Mr. Denny has about 21 percent of the work that was done.

6   Is that accurate?

7          MR. GARZA:  That sounds accurate, your Honor.

8          THE COURT:  Okay.

9          MR. GARZA:  In addition, I'd point out that probably

10  -- well, more than half of the fees were in one month, which

11  was in December and it was for that contentious master lease

12  compromise.

13         THE COURT:  Is that why we had three lawyers at the

14  hearing and one by telephone?

15         MR. GARZA:  That's correct, your Honor.  I think we

16  had three lawyers total.  There were two lawyers in the

17  courtroom.

18         THE COURT:  That's correct.  You're right.  There

19  were three lawyers total; one by telephone.

20         MR. GARZA:  Yeah.  Ms. Lewis was a litigator who took

21  a few of the depositions and defended a few of the depositions,

22  and I were at the hearing with our witness and Mr. Denny was on

23  the phone.

24         THE COURT:  I saw one no charge and it was yours from

25  March 11th reviewing fee application.  I wasn't sure.  I

1   checked.

2           **MR. GARZA:**  Your Honor, we no-charged or wrote off

3   approximately 12 hours.

4           **THE COURT:**  11.6.

5           **MR. GARZA:**  Correct.  And there's no travel time.

6           **THE COURT:**  I saw that.  Because I went through it

7   and I noticed there was no travel time.  I said, "I don't see

8   time for Mr. Garza," because your expenses are only $13,882.73,

9   which is travel only, and no time, if I've read that correctly.

10  Is that accurate?

11          **MR. GARZA:**  That's correct, your Honor.  And most of

12  that are deposition transcripts.  Somehow, I don't know how, I

13  ended up paying for my own flight.  But other than that, I

14  think it's a pretty low number.

15          **THE COURT:**  Yeah, I looked at that.  You should talk

16  to some of your colleagues.  They do much better than you.  I

17  know one colleague is somewhere between $6.00 and $6.66 to go

18  from his home when he's commuting.  I saw that show up.

19  Amazing, some of it.

20          I had one concern.  The application through January

21  26th had 65.4 hours regarding fees.  All the work that was

22  done, that looks like it was done at a fairly high level, I

23  think.  Two associates and one partner and no use of paralegals

24  in terms of preparing fee applications.  It went down in

25  February to just $4,726 and March, $6,338; but why was it so

1   expensive in that first month?

2          **MR. GARZA:**  Your Honor, the first month was the first

3   interim fee application.  It was the work done for that and the

4   hearing on that.

5          **THE COURT:**  But why no -- I don't understand the

6   absence of using paraprofessionals at least to accumulate the

7   data, review the pre-bills; why is that done by lawyers billing

8   $545 an hour?

9          **MR. GARZA:**  Your Honor, in this particular instance,

10  we did have a lawyer prepare it and our view was that it would

11  take less time, obviously at a higher rate.

12         **THE COURT:**  If this took less time, I think you're

13  better off with a paraprofessional that absolutely know what

14  they're doing.  I mean, that's a lot of time, Mr. Garza.  You

15  take a look at that and I took a long look at it.  Because when

16  I saw it I was concerned.  Let me go back here.  I want to make

17  sure that I'm looking at the right one, sir.  Like the invoice

18  of February 16th, there's employment and fee applications,

19  $26,183.  And then, it goes down to $4,726, as I noted, and

20  then up a little bit on the sixth interim application to

21  $6,338.

22         It's that -- and I'll refer to it once again -- it's

23  the exhibit to the fourth interim and it's $26,183.50.  So, I

24  took a look at that particular category, 31231-0011, and

25  Mr. Denny has nearly 28 hours, Ms. Wasser has 13 hours, you've

69

1    got 4 hours.  And I looked at this.  And it's for time in

2    January and it just seems -- do you have that exhibit in front

3    of you?

4            MR. GARZA:  Your Honor, I'm looking through it now,

5    yes.

6            THE COURT:  Mr. Garza, it just seems pretty high.

7    Who's D. Arnold?

8            MR. GARZA:  Dennis Arnold is also a partner at our

9    firm.

10           THE COURT:  Yeah.  Well, he didn't bill any time,

11   though.  That's good.  He was just consulted.

12           MR. GARZA:  Right.

13           THE COURT:  I just don't see -- I'm going to reduce

14   this application by $5,000.  I just think there's too much

15   duplication there, Mr. Garza.

16           MR. GARZA:  Okay.

17           THE COURT:  And, candidly, I would have reduced it

18   more, but because of the treatment of the travel time, I think

19   your firm has been more than reasonable in every other respect.

20   So, other than the reduction of $5,000, I'm going to grant the

21   application.  All right?

22           MR. GARZA:  Thank you, your Honor.

23           THE COURT:  Thank you.  That leaves Lewis and Roca.

24           MS. MACAULEY:  Laury Macauley, appearing on behalf of

25   Lewis and Roca.

1      **THE COURT:**  You know, I reviewed this application and

2  it's nice to know that the lawyers in Reno pay attention.

3  There was 44 hours of attorneys' time uncharged; 17 hours of

4  assistant hours uncharged; a significant reduction.  By lawyers

5  only, it's $423 an hour.  Blended rate using paraprofessionals,

6  $299.65, which indicates a proper and appropriate use of

7  paraprofessionals.  Of the $248,000 in fees being sought, only

8  $211,000 of them are attorneys.  The attorney time is 499 out

9  of 829 hours.  That's exactly what we're looking for.  I'm

10  going to grant this application in the amount being sought.

11      **MS. MACAULEY:**  Thank you, your Honor.

12      **THE COURT:**  You're welcome.

13      Next is Campbell and Williams.  Is anybody from that

14  firm on the phone?

15      **MR. WILLIAMS:**  Your Honor, this is Colby Williams.

16  I'm on the phone.

17      **THE COURT:**  Thank you, Mr. Williams.  I've reviewed

18  your application.  It's very detailed.  This is how I knew the

19  ownership.  It wasn't that I remembered everything from months

20  ago, but he said it before, so I know that SCI owns GB Ranch

21  Station, which is the debtor; which owns 50 percent of Green

22  Valley Ranch Gaming; which is also owned 50 percent by GCR

23  Gaming; which owns 100 percent of Green Valley Ranch.

24      I've look at it.  What is the status -- you had one

25  mistake.  On page 2, you say your application goes through

1   April 30th, but your time sheets conclude on March 31.  So, I

2   assume this is --

3           **MR. WILLIAMS:**  Oh.

4           **THE COURT:**  -- I assume this is only an application

5   through the 31st of March.  Would that be accurate?

6           **MR. WILLIAMS:**  That is correct, your Honor.

7           **THE COURT:**  All right.  The arithmetic is correct,

8   except for one instance.  You're saying that your fees are

9   $312,990.50.  You're wrong.  We looked at page 10; you were off

10  by $7.  So, we're adding $7 to that for you.

11          **MR. WILLIAMS:**  Oh, thank you.

12          **THE COURT:**  That's all right.  What is the status of

13  that arbitration proceeding with Mr. Wright?

14          **MR. WILLIAMS:**  Sure, your Honor.  A couple of things

15  have happened since this application was submitted.  Number

16  one, the dispute with GCR Gaming has been resolved.

17          **THE COURT:**  That I know.

18          **MR. WILLIAMS:**  And though our firm was not

19  specifically approved to be handling that aspect of the

20  litigation, the practical reality is a lot of what was going on

21  in the litigation being pursued by the Katwitz (phonetic) firm

22  out of New York on behalf of GCR did directly impact the

23  arbitration, because the nature of the claims were nearly

24  identical being asserted therein.  So, that is done.

25          The arbitration --

72

1          **THE COURT:**  Well, GCR was pretty much bootstrapping

2     is what Mr. Wright said.

3          **MR. WILLIAMS:**  That's exactly right.

4          **THE COURT:**  Right.

5          **MR. WILLIAMS:**  That's exactly right.  And the irony

6     is, your Honor, that while GCR was bootstrapping on what

7     Mr. Wright said, Mr. Wright, in turn, was bootstrapping on the

8     legal team retained by GCR to push the matter into bankruptcy.

9          Where we stand in the arbitration now is an

10    arbitrator has been selected.  The arbitrator asked Mr. Wright

11    or his counsel to reassert his claim with greater specificity

12    because the nature of the original filing was such that it was

13    just a one-page document instituting the arbitration.  That was

14    filed last week.  We are to respond next week and then we will

15    commence with the discovery that remains to be done in the

16    arbitration, some of which has already been accomplished

17    through the previous depositions that were taken in the GCR

18    Gaming litigation.

19         **THE COURT:**  All right.  I've reviewed the application

20    and I appreciate the summary report.  I'm going to grant the

21    application with the addition of $7.  Thank you.

22         **MR. WILLIAMS:**  Thank you, your Honor.

23         **THE COURT:**  Ms. Carlyon, are you still on the phone?

24         **MS. CARLYON:**  Yes, your Honor.

25         **THE COURT:**  I'm sorry you're at the bottom of this,

73

1   but I have your application.  I've looked at it.  It's more

2   than reasonable.  I'm granting it in the amount being sought.

3            **MS. CARLYON:**  Thank you, your Honor.  Two things.

4   One is that we had requested that this be paid from the DIP

5   line as necessary and the other is was it just Mr. Costa that

6   would need to sign off on the order?

7            **THE COURT:**  Yes.

8            **MS. CARLYON:**  Thank you, your Honor.

9            **THE COURT:**  Thank you all.  I think we're done.  Is

10  there anything else, Mr. Kreller?

11           **MR. KRELLER:**  No, there's not, your Honor.

12           **THE COURT:**  All right.  Thank you.  Thank everybody

13  for our hard work.  I should have thanked everybody that were

14  here before.  And we'll see you on the 27th.  We're done.

15           **(Proceeding adjourned at 11:57 a.m.)**

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>August 11, 2010</u>

          Signed                                            Dated

*TONI HUDSON, TRANSCRIBER*