# Exhibit 1

# Exhibit 1

**EXECUTION COPY**

## STIPULATION AND ORDER

This STIPULATION (the "Agreement") is made and entered into as of July 28, 2010 by and among the following parties:

(a)     The Official Committee of Unsecured Creditors of Station Casinos, Inc. (the "Committee"); and

(b)     Station Casinos, Inc. ("SCI" or "Opco") and FCP Propco, LLC (collectively, the "Debtor Parties").


## RECITALS

**WHEREAS**, on December 28, 2010, the Committee filed its *Motion of the Official Committee of Unsecured Creditors of Station Casinos, Inc., et. al., Pursuant to 11 U.S.C. §§ 105(a), 503(b), 1103(c), and 1109(b), for Entry of an Order Granting Leave, Standing, and Authority to Prosecute and, if Appropriate, Settle Causes of Action on Behalf of the Debtors Estates* [Docket No. 738] (collectively, with the Standing Supplement (as defined below), the "Standing Motion");

**WHEREAS**, on July 14, 2010 the Bankruptcy Court approved [Docket No. 1778], the Second Amended and Restated Master Lease Compromise Agreement (2d Revised), which provides, *inter alia*, for pre-confirmation transition assistance in aid of, and to facilitate, the transactions contemplated in the Plan (as defined below) (the "Second Amended MLCA");

**WHEREAS**, on June 8, 2010, the Committee filed a notice of appeal of the Bid Procedures Order (as defined in the Plan) [Docket No. 1583] (the "Bidding Procedures Appeal");

**WHEREAS**, on June 15, 2010, the Debtors[1] filed their *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated June 15, 2010)* [Docket No. 1629-1], as amended on July 13, 2010 [Docket No. 1771-1], (the "Plan") and their *Disclosure Statement to Accompany Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated June 15, 2010)* [Docket No. 1630-1], as amended on July 14, 2010 [Docket No. 1774-1], (the "Disclosure Statement"), and on July 8, 2010 the Committee filed its objection to the Debtors' motion to approve the Disclosure Statement [Docket No. 1730] (collectively, the "Disclosure Statement Objection");

**WHEREAS**, on July 15, 2010, the Committee filed a notice of appeal of the Second Amended MLCA [Docket No. 1784] (the "Second Amended MLCA Appeal");

**WHEREAS**, the summary of terms annexed hereto as Attachment 1 sets forth the material terms of the settlement of various issues among the parties thereto, including the distribution of certain interests in the entities formed as part of the transactions contemplated in

---

[1]     Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Term Sheet.

the Plan to the Opco Unsecured Creditors (as such summary of terms may be amended from time to time in accordance with the terms of this Agreement and including all exhibits, the "Term Sheet"); and

WHEREAS, in furtherance of confirmation of the Plan (as amended to incorporate the terms of the Term Sheet, the "Amended Plan"), the Parties hereby agree and stipulate as follows.

## AGREEMENT

1. **Committee Obligations**

The Committee hereby agrees that it will:

(a)    cease and desist, and seek appropriate stays of, all litigation activity of any kind or description (including, without limitation, with respect to any and all Going Private Transaction Causes of Action (as defined in the Plan) or any other claims relating to, or arising out of, directly or indirectly, the Going Private Transaction (as defined in the Plan)) and related pleadings (including any pending appeals) involving any Debtor Party or any affiliate thereof, FG, the Propco Lenders, Deutsche Bank Trust Company Americas, Deutsche Bank Securities and J.P. Morgan Securities Inc., J.P. Morgan Chase Bank N.A., Frank J. Fertitta III, Lorenzo J. Fertitta or the lenders under the Prepetition Mezzanine Loans (as such term is defined in the Plan) and to refrain from hereafter engaging in any such litigation activity (including appeals) and/or filing any related pleadings in the Chapter 11 Cases or in any other matter relating, directly or indirectly, thereto (whether such matter is before the Bankruptcy Court or otherwise), including, without limitation, the Standing Motion, the Bidding Procedures Appeal, the Disclosure Statement Objection, and any pleadings or appeals related to the Second Amended MLCA (provided that the Committee may take only those actions necessary in order to preserve or perfect the Second Amended MLCA Appeal, including the filing of the designation of the record on appeal and the statement of the issues to be presented) (collectively, the "Litigation Actions");

(b)    upon the occurrence of the Effective Date (as defined in the Plan), withdraw each and every Litigation Action with prejudice and file appropriate dismissals for any and all Litigation Action (including, without limitation, with respect to any and all appeal rights the Committee may have been permitted to preserve or perfect pursuant to Section 1(a)); and

(c)    provide a letter for inclusion in the plan solicitation materials (or statement to be included in the Disclosure Statement) from the Committee recommending that all Opco Unsecured Creditors vote to accept the Amended Plan in form and substance reasonably acceptable to the Debtors, FG and the Propco Lenders.

2. **Termination.**

(a)    The Committee may terminate this Agreement by providing two (2) business days advance written notice to the Debtors, the Propco Lenders, FG and the Put Purchasers if the Committee determines that its fiduciary duties require it to act or refrain from acting contrary to its obligations under this Agreement, provided that the failure to obtain class

2

acceptance of one or more classes of Opco Unsecured Creditors shall not be a basis to terminate this Agreement on fiduciary duty or any other grounds.

(b)    The Debtors may terminate this Agreement by providing two (2) business days advance notice to the Committee, the Propco Lenders, FG and the Put Purchasers if the Committee breaches its obligations under this Agreement.

(c)    Except as provided in Section 3(b) below, this Agreement shall terminate, without notice, if any condition set forth in the Term Sheet is not satisfied in accordance with its terms unless otherwise waived by mutual agreement of the Committee, the Debtors, FG and the Propco Lenders.

**3.        Effect of Termination and Certain Other Events.**

The Parties hereby acknowledge and agree that:

(a)    in the event this Agreement is terminated, the Debtors shall modify the Amended Plan (as amended to reflect the Term Sheet) to eliminate all consideration being offered to the Opco Unsecured Creditors as specified in the Term Sheet; and

(b)    this Agreement shall not terminate as a result of the Propco Commitment having been terminated, the failure of the Put Purchasers to satisfy any condition or obligation specified in the Term Sheet relating to the Propco Commitment or the Support Agreement having been terminated, it being understood and agreed that in the event that any of the foregoing events occurs, so long as this Agreement remains in effect and the Debtor Parties have determined not to effect the rights offering (and subject to the satisfaction of the conditions contained in the Term Sheet that do not relate to the Propco Commitment, the Support Agreement or the obligations of the Put Parties), the Amended Plan shall be modified to eliminate the rights offering specified in the Term Sheet but shall continue to provide for distribution of New Propco Holdco Warrants to Opco Unsecured Creditors (on the terms specified in the Term Sheet) and the Committee shall continue to support confirmation of the Amended Plan as so modified, including the settlement of the Going Private Transaction Causes of Action and the releases as currently provided in the Plan.

3

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

**The Official Committee of Unsecured Creditors of Station Casinos, Inc.**

By: *Bonnie Steingart*

Name: Bonnie Steingart

Title: Counsel to Official Committee of Unsecured Creditors

**Station Casinos, Inc.**

By: _____

Name: _____

Title: _____

**FCP Propco, LLC**

By: _____

Name: _____

Title: _____

SO ORDERED, _____

**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

LA1 1848420v.1

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

**The Official Committee of Unsecured Creditors of Station Casinos, Inc.**

By: _____

Name: _____

Title: _____

**Station Casinos, Inc.**

By: _____

Name: *Richard T. Haskins*

Title: *Secretary*

**FCP Propco, LLC**

By: _____

Name: *Frank J. Fertitta III*

Title: *Authorized Signatory*

SO ORDERED, _____

**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

# Exhibit 2

# Exhibit 2

*July 28, 2010*                                                                STRICTLY CONFIDENTIAL

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL -
-SUBJECT TO RULE 408-

# New Propco Holdco
## Summary of Terms

*Set forth below is a summary of certain material terms of the possible investment to be made by the Opco Unsecured Creditors (as such term is defined below) in New Propco Holdco (as such term is defined below). This summary of terms does not purport to identify all material terms and conditions of any possible investment or restructuring transaction. This summary of terms does not constitute (nor shall it be construed as) an offer with respect to any securities or a solicitation of acceptances or rejections as to any plan of reorganization, it being understood that such offer or solicitation, if any, shall only be made in compliance with applicable provisions of securities and bankruptcy law.*

| | |
|---|---|
| **Key Parties** | "Debtors":  Station Casinos, Inc. ("Opco") and its subsidiaries and affiliates identified in footnote 1 below, collectively.[1] |
| | "FG":  Fertitta Gaming LLC. |
| | "FG/Propco Lenders":  FG and the Propco Lenders (as such term is defined below), collectively. |
| | "Propco Lenders":  German American Capital Corporation and JPMorgan Chase Bank, N.A. in their respective capacities as lenders under the Amended and Restated Loan and Security Agreement, dated as of March 19, 2008. |
| | "Put Parties":  Entities affiliated with Fidelity Management & Research Company, Oaktree Capital Management, L.P. and Serengeti Asset Management, L.P. reasonably acceptable to the Debtors, FG and Propco Lenders.[2] |
| | "UCC":  Opco Official Committee of Unsecured Creditors. |
| **New Propco Holdco Warrants** | ***In General:***  Subject to the conditions and other limitations set forth herein, the issuance to Opco for distribution to the unsecured creditors of Opco (collectively, the "Opco Unsecured Creditors") through a newly organized corporation or limited liability company  taxable as a corporation ("Blockerco") of warrants (the "New Propco Holdco Warrants") exercisable |

---

[1]  FCP Holding, Inc., FCP Voteco, LLC, Fertitta Partners LLC, Northern NV Acquisitions, LLC, Reno Land Holdings, LLC, River Central, LLC, Tropicana Station, LLC, GV Ranch Station, Inc., FCP Propco, LLC ("FCP Propco"), FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower I, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower VI, LLC and FCP MezzCo Borrower VII, LLC.

[2]   It is understood that representatives of Fidelity Management and Research Company and Serengeti Asset Management, L.P. are on the UCC and therefore may, in their capacities as members of the UCC, have fiduciary duties to the Opco Unsecured Creditors. Nothing in this summary of terms (or the agreements contemplated hereby) shall prohibit or limit the ability of such members of the UCC, in their respective capacities as such, to act on matters before the UCC in accordance with such fiduciary duties; provided, however, that the existence of such fiduciary duties shall not permit such members to act, in their individual capacities, in a manner that is inconsistent with their obligations in this summary of terms (or the agreements contemplated hereby).

STRICTLY CONFIDENTIAL

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

by holders indirectly through Blockerco for equity interests in the entity ("New Propco Holdco") formed to hold the non-voting interests issued by New Propco (as such term is defined in the Plan)[3], other than (i) the holders of Master Lease Rejection Damage Claims (as such term is defined in the Plan) and (ii) the Mortgage Lenders as holders of claims in Class S.7 [4] in connection with the Joint Chapter 11 Plan of Reorganization filed by Opco, FCP Propco, LLC and the other Debtors on June 15, 2010 or a Propco-only plan (alternatively and without differentiation, and as amended from time, the "Plan"). Certain terms and provisions relating to Blockerco and the representations and warranties to be made by the owners of Blockerco and various provisions relating thereto are set forth in Exhibit A hereto. For purposes hereof, references to ownership of New Propco Holdco Warrants and purchase or ownership of New Propco Holdco Equity shall mean purchase or ownership by the Opco Unsecured Creditors through Blockerco. The Debtors shall amend the Plan to provide that Opco Secured Lenders that vote in favor of the Plan will not have the right as Opco Unsecured Creditors to receive New Propco Holdco Warrants or to purchase New Propco Holdco Equity as provided herein.

*Amount:* Exercisable for 2.5% of the total equity of New Propco Holdco, subject to adjustment as described under "Other Terms."

*Exercise Price:* During the first two years after the Effective Date (as such term is defined in the Plan, the "Effective Date"), the product of (A) 2.5 times (B) the per unit value of equity interests in New Propco Holdco issued under the Plan (with the total value of such equity interests under the Plan being the sum of (i) the amount of $200 million plus the amount of any additional equity issued or capital contributions made as of the Effective Date, excluding the contribution of the New Propco Acquired Assets, as defined in the Plan, and (ii) the amount of any reduction in the debt agreed to by the Propco Lenders (with the consent of the Debtors and FG and approval, if required, of the Bankruptcy Court) in exchange for New Propco Holdco

---

[3] It is contemplated that the New Propco Holdco Warrants would be issued through the Blockerco structure in connection with the Plan to all of the Opco Unsecured Creditors in a transaction exempt from the securities laws pursuant to Section 1145 of the Bankruptcy Code. There may be more than one (but not more than five) Blockerco entities (each of which shall be considered "Blockerco" hereunder) established if reasonably requested by the holders of a majority of the shares issued by all of the Blockerco entities. The holders of a majority of Blockerco shares shall control Blockerco, including the right to design and control tax mitigation techniques at Blockerco (the costs of which shall be borne by the shareholders of Blockerco) that do not adversely affect New Propco Holdco or its equityholders (except for adverse effects that are clearly de minimis). The New Propco Holdco Equity (as such term is defined below) would be issued only to Accredited Investors in all cases.

[4] It is understood that certain Opco Unsecured Creditors may request to structure their investments in a manner which complies with applicable Nevada gaming regulations for investments of this type. The parties intend to use reasonable efforts to accommodate such requests to the extent reasonably practicable.

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Equity, the "Plan Value"), with such price thereafter increasing by 15% per year in each of years 3, 4, 5, 6 and 7 following the Effective Date; provided, that the exercise price may be adjusted as may be reasonably necessary in the discretion of the Debtors, FG or the Propco Lenders to satisfy the Tax Condition (as defined below).

**Allocation:** The allocation by Blockerco of New Propco Holdco Warrants among the classes or categories, as the case may be, of Opco Unsecured Creditors shall be effected on a *pro rata* basis in proportion to allowed unsecured claims, subject, in each case, to any applicable contractual subordination arrangements except to the extent the parties otherwise agree and such agreement is reflected in the Plan and approved by the Bankruptcy Court.

**Treatment in Forced Exercise:** In the case that the New Propco Holdco Warrants are subject to any forced exercise provision as part of a capital raise or similar transaction, the sole consequence to the nonexercising holders would be the termination of such warrants.

**Other Terms:** Additional terms (including those relating to dilution) substantially similar to the terms provided for "Lender Warrants" referred to in Annex 3 to the Opco and FCP Propco Restructuring Term Sheet, dated March 24, 2010 (the "Propco Term Sheet"), except that future equity issuances by New Propco Holdco the proceeds of which are utilized to fund the acquisition of the New Opco Acquired Assets (as such term is defined in the Plan), and issuances of equity pursuant to conversion or exchange rights relating to debt securities the proceeds of which are utilized for such purpose, each shall not have a dilutive effect on the New Propco Holdco Warrants.

| | |
|---|---|
| **New Propco Holdco Investment Right** | *In General:* In connection with the Plan and subject to the conditions and other limitations set forth herein, each Opco Unsecured Creditor that is an "accredited investor" ("Accredited Investor") as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended, shall be entitled to participate in a rights offering through Blockerco (the "Propco Rights Offering") pursuant to which it may subscribe for and purchase through Blockerco equity interests issued by New Propco Holdco (the "New Propco Holdco Equity"). |

*Amount:* $35.3 million in New Propco Holdco Equity (unless such amount is increased in accordance with the terms set forth below in this sub-section or under the caption entitled "Effect of Subsequent Equity Offerings"), which amount represents approximately 15% of the equity interests in New Propco

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Holdco.[5]

*Allocation:*  The opportunity to purchase New Propco Holdco Equity through Blockerco  shall be allocated among the classes or categories, as the case may be, of Opco Unsecured Creditors on a *pro rata* basis in proportion to allowed unsecured claims (but with a minimum purchase being $250,000), subject, in each case, to any applicable contractual subordination arrangements except to the extent the parties otherwise agree and such agreement is reflected in the Plan and approved by the Bankruptcy Court; provided, that the Put Parties (so long as they hold at least 40% in aggregate principal amount of the unsecured senior notes of Opco) shall have the right to purchase at least one-half of the New Propco Holdco Equity available in the Propco Rights Offering (which equity shall be allocated among the Put Parties as they shall mutually agree).

*Put Condition:*  The Propco Rights Offering shall only be available if the Put Parties have duly executed and delivered by July 29, 2010 (the "Commitment Submission Deadline") a firm and irrevocable put commitment (the "Propco Commitment"), in form and substance acceptable to the Put Parties, Debtors and FG/Propco Lenders, to purchase through Blockerco $35.3 million of New Propco Holdco Equity which the Opco Unsecured Creditors or Put Parties are contemplated to be entitled to subscribe for hereunder as provided under "New Propco Holdco Investment Right—Amount" (the "Committed Propco Amount") and which is not so purchased by the Opco Unsecured Creditors or the Put Parties pursuant to the proviso under "New Propco Holdco Investment Right—Allocation."  As used herein, the term "Commitment Percentage" shall mean 15%.

The Propco Commitment shall also cover the amount (the "Upsizing Committed Amount") up to a maximum of $100  million (i.e., up to a maximum of $64.7 million in addition to the original $35.3 million, the "Cap") of New Propco Holdco Equity the Put Parties will irrevocably commit to purchase through Blockerco (to the extent not purchased by Opco Unsecured Creditors or by the Put Parties pursuant to the proviso under "New Propco Holdco Investment Right—Allocation") in the event that any Acquisition or Additional Equity Issuance (in each case as such terms are defined below, with any equity raises to fund any Acquisition or any Additional Equity Issuances being collectively referred to as "Equity Raises") is consummated.  The Upsizing Committed Amount shall be expressed as the Commitment Percentage of any Equity Raises, it being understood that no

---

[5] Investment percentages contained throughout this summary of terms are predicated upon, and subject to, $200 million initial valuation, as may be adjusted for additional capital contributions to or new equity raised at New Propco Holdco prior to closing.  For example, assuming no additional equity is raised at closing other than that contemplated under this sub-section, a $35.3 million total investment would result in the acquisition of approximately 15% of the equity interests in New Propco Holdco (before giving effect to potential future exercises of warrants or options or the issuance of any equity interests upon the conversion of any convertible securities).

*July 28, 2010*                                                              **STRICTLY CONFIDENTIAL**

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

purchase price in respect of any Acquisition is expected to be definitively determined by the Commitment Submission Deadline.[6] The irrevocable commitment of the Put Parties in respect of the Upsizing Committed Amount shall survive until June 30, 2011 (the period from the date of the Propco Commitment until June 30, 2011, the "Upsizing Commitment Period") and shall be deemed to apply to, among other things, any equity raise consummated during the Upsizing Commitment Period.

*Remedies for Failure to Purchase:*  If an Opco Unsecured Creditor fails to close on a purchase of New Propco Holdco Equity it agreed to make pursuant to the Propco Rights Offering through Blockerco, Blockerco shall have no liability with respect to such failure other than the loss of any equity it would have otherwise acquired on behalf of such Opco Unsecured Creditor, it being understood that New Propco Holdco shall have all rights to pursue any such Opco Unsecured Creditor; including any Put Party, for any failure to meet any commitment to make such a purchase or effect a purchase required under a put arrangement, and Blockerco shall cooperate with New Propco Holdco to the extent reasonably requested by New Propco Holdco in connection therewith.  The Put Parties would purchase any New Propco Holdco Equity as to which an Opco Unsecured Creditor defaulted in its purchase commitment.

*Use of Proceeds:*  Net proceeds derived by New Propco Holdco from any investment by the Opco Unsecured Creditors in the Propco Rights Offering shall be contributed by New Propco Holdco as equity to New Propco and utilized by New Propco for general corporate purposes, including, without limitation, to reduce debt or for one or more Acquisitions.

**Effect of Subsequent Equity Offerings:**

*Upsizing:*  In the event that (i) (a) any bid submitted by New Propco Holdco or any of its subsidiaries to purchase (x) the New Opco Acquired Assets or any substantially similar collection of assets held by Opco or its subsidiaries (as the same may be amended from time to time, the "Stalking Horse Bid") prevails and the transactions contemplated thereby (the "Opco Acquisition") are contemplated to be consummated during the Upsizing Commitment Period, (y) equity interests in the reorganized successor to, or all or substantially all of the assets of, Green Valley Ranch Gaming, LLC and/or Aliante Gaming, LLC is accepted and any resulting transactions (such transactions, the "JV Acquisitions") are contemplated to be consummated during the Upsizing Commitment Period or (z) equity interests in, or all or substantially all of the assets of, any other material gaming operating entity located within a 100-mile radius of the city limits of Las Vegas, Nevada is accepted, and the resulting transactions (the "Additional Acquisitions," and

---

[6] Capital contributions will be deemed to include Propco cash/cash collateral or equivalents delivered to New Propco Holdco or one of its subsidiaries at the direction of the Propco Lenders that would otherwise be distributed to the Propco Lenders as part of their recovery under the Plan.

CH1 5361473v.25

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

together with the Opco Acquisition and the JV Acquisitions, the "Acquisitions") are contemplated to be consummated during the Upsizing Commitment Period (it being understood that no transaction shall be deemed to be an "Additional Acquisition" unless the Put Parties agree that the Propco Commitment shall apply to such transaction) and (b) any such Acquisition is to be funded, in whole or in part, through an Equity Raise in which existing equityholders of New Propco Holdco or others participate or (ii) any additional Equity Raises ("Additional Equity Issuances") are contemplated to be consummated during the Upsizing Commitment Period (including, without limitation, an equity issuance approved by the Debtors, FG and the Propco Lenders the proceeds of which are used to repay not more than $50 million of debt owed to the Propco Lenders (the "Debt Paydown Issuance"), but excluding any equity issuances contemplated by the Propco Term Sheet) by New Propco Holdco for other purposes (it being understood that no equity issuance shall be deemed to be an Additional Equity Issuance, other than the Debt Paydown Issuance, unless the Put Parties agree that the Propco Commitment shall apply to such equity issuance), *then* the Opco Unsecured Creditors collectively shall be provided an opportunity to increase the amount of New Propco Holdco Equity they are entitled to subscribe for and purchase through Blockerco in the Propco Rights Offering (the amount of such increase, the "Upsizing Amount") by the product resulting from the amount of the Equity Raises, multiplied by the Commitment Percentage; provided, that the aggregate opportunity offered to the Opco Unsecured Creditors shall not exceed the Cap. Such amounts which exceed the Cap shall be subject, with respect to the Opco Unsecured Creditors that own at least .5% of the outstanding New Propco Holdco Equity (aggregating, for this purpose and for purposes of determining eligibility to purchase as described under "Post-Effective Investment Right," holdings by affiliated funds or other investment vehicles with a common investment manager) to preemptive rights substantially similar to those described under "Post-Effective Investment Right." With respect to any Acquisitions or Additional Equity Issuances information will be provided to the Put Parties and other Opco Unsecured Creditors in reasonable detail, subject to reasonable confidentiality restrictions and any procedures designed to deal with competitive interests. With respect to Additional Acquisitions and any Additional Equity Issuances as to which the consent of the Put Parties is required for the Propco Commitment to apply, the Put Parties shall reply not later than 15 days after the delivery of information as to whether they so consent. It is understood that no acquisitions shall constitute JV Acquisitions or Additional Acquisitions to the extent the consideration to the sellers in the transaction constitutes equity or other securities or property of New Propco Holdco or any affiliate thereof, and no such acquisition shall give rise to rights of the Opco Unsecured Creditors to purchase New Propco Holdco Equity under "Post-Effective Investment Right" except to the extent equity offerings are

6

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

being made to finance such acquisition.  In addition, there would be customary exceptions (such as offerings to employees) to triggering the right of Opco Unsecured Creditors to purchase New Propco Holdco Equity either in connection with an equity raise or in connection with the rights described under "Post-Effective Investment Right," which customary exceptions shall also apply generally to preemptive rights held by other equityholders of New Propco Holdco.

Irrespective of whether any Opco Unsecured Creditors determine to increase the amount of New Propco Holdco Equity they subscribe for and purchase in accordance with the immediately preceding paragraph, the Put Parties shall continue to be irrevocably obligated to satisfy any obligations they have undertaken in respect of the Upsizing Committed Amount pursuant to the Propco Commitment.

**Subscriptions of the Opco Unsecured Creditors in Propco Rights Offering**

If the Propco Commitment is duly and timely delivered by the Put Parties, then the Opco Unsecured Creditors shall collectively have the opportunity to subscribe through Blockerco for New Propco Holdco Equity in the Propco Rights Offering in an amount up to, as applicable, the (i) Committed Propco Amount, in the event that no Acquisitions requiring additional equity or Additional Equity Issuances are contemplated to be consummated during the Upsizing Commitment Period, or, (ii) the sum of the Committed Propco Amount plus the Upsizing Amount, in the event that any such Acquisition or Additional Equity Issuance is contemplated to be consummated during the Upsizing Commitment Period.

In order to be effective, each such subscription shall (i) be delivered by the Opco Unsecured Creditor tendering the same by no later than the deadline for doing so established by the Bankruptcy Court, (ii) be accompanied by a firm and irrevocable funding commitment of such Opco Unsecured Creditor to purchase the amount of New Propco Holdco Equity during the Upsizing Commitment Period for which it has subscribed, (iii) contain such other relevant information as the Debtors and FG/Propco Lenders shall reasonably direct and (iv) be in form and substance reasonably acceptable to the Debtors and FG/Propco Lenders.

**Pricing in Propco Rights Offering; Put Premium**

All purchasers in the Propco Rights Offering shall purchase New Propco Holdco Equity through Blockerco at Plan Value.  The Put Parties shall be paid a premium in cash by New Propco Holdco (the "Put Premium") equal to $3,000,000 on the Effective Date, assuming that the Propco Commitment has not been terminated and each of the Put Parties has complied with its respective obligations hereunder and thereunder (including having made the purchases contemplated thereby which are required to be made on or before the Effective Date).  The payment of the Put Premium to the Put Parties on the Effective Date shall be effected in such manner (such as a deduction from the purchase price otherwise payable by the Put Parties for the New Propco

7

*July 28, 2010*                                                              STRICTLY CONFIDENTIAL

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Holdco Equity being purchased by them through Blockerco) as the Debtors, FG/Propco Lenders and the Put Parties shall reasonably determine. The Put Premium shall be treated as a non-refundable payment once made; provided, however, that each Put Party shall repay, in whole or in part, as the case may be, its proportionate share of the aggregate Put Premium provided for herein in the event that such Put Party (i) breaches its obligation to fund any equity raise following the Effective Date (in which case, such Put Party shall return to New Propco Holdco that portion of the Put Premium received by it which is attributable to the amount of any such equity raise which is not so funded), (ii) intentionally or recklessly breaches any representation set forth on Exhibit A that it made or was required to make on or as of the Effective Date and such breach results in the rescission of all or a portion of the amount invested in any equity raise by such Put Party pursuant to the terms hereof (in which case, the Put Premium attributable to the rescinded amount shall be returned), or (iii) (x) cannot make any representations or provide support for verifications set forth on Exhibit A on or as of the Effective Date and (y) enters into escrow or other arrangements to permit funding of its investment pending confirmation of such representations or verifications, but such representations or verifications cannot be finalized as a result of any intentional act by or on behalf of such Put Party undertaken for the purpose of having such representations or verifications being unable to be made and such failure results in any portion of the purchases contemplated by such Put Party's Propco Commitment not being completed or being rescinded (in which case, the Put Premium attributable to the unpurchased or rescinded amount so placed in escrow by such Put Party shall be returned to New Propco Holdco).

**Post-Effective Investment Right**

In the event that any equity raise is contemplated from existing equityholders of New Propco Holdco to fund an acquisition of an operating property or business or for other purposes, which equity raise is contemplated to be consummated following the end of the Upsizing Commitment Period (a "Post-Effective Equity Raise"), ***then*** the Opco Unsecured Creditors that are (i) Accredited Investors, (ii) own indirectly (together with affiliated funds or other investment vehicles with a common investment manager) through Blockerco at least .5% of the outstanding New Propco Holdco Equity and (iii) participated in the Propco Rights Offering (the "Qualifying Creditors") shall be entitled to participate in any such Post-Effective Equity Raise and subscribe for and purchase such amount of the New Propco Holdco Equity through Blockerco offered in such Post-Effective Equity Raise or make such amount of capital contributions through Blockerco, as the case may be, as shall enable each Qualifying Creditor electing to participate to retain a position in the New Propco Holdco Equity equal to the percentage of the outstanding New Propco Holdco Equity so held by it immediately prior to such Post-Effective Equity Raise. The Qualifying Creditors will be provided

8

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

with information in reasonable detail (subject to reasonable confidentiality restrictions and any procedures designed to deal with competitive interests) on a timely basis relating to each such Post-Effective Equity Raise and, to the extent they elect to do so, shall be entitled to participate in any Post-Effective Equity Raise (i) on a *pro rata* basis in proportion to their respective investments in the Propco Rights Offering and (ii) at the same price at which other equityholders of New Propco Holdco are entitled to participate in the same. To the extent a Qualifying Creditor does not elect to exercise its rights to purchase in a Post-Effective Equity Raise, such rights may be exercised by other Qualifying Creditors (it being understood that there may be sharing arrangements with respect to preemptive rights involving other holders of New Propco Holdco Equity). Notwithstanding the foregoing, the participation of the Qualifying Creditors in any Post-Effective Equity Raise shall be subject to such parameters as the Board of Directors or similar governing body of New Propco Holdco (the "Board") shall determine are appropriate in order to ensure successful execution, including, without limitation, parameters with respect to the put commitments or similar arrangements relating to such Post-Effective Equity Raise. Any Qualifying Creditor that does not purchase the full amount of New Propco Holdco Equity offered to it in connection with any equity raise (whether a Post-Effective Equity Raise or an Equity Raise) shall lose its rights to participate in future Post-Effective Equity Raises.

*Use of Proceeds:* Net proceeds derived by New Propco Holdco from any investment by the Qualifying Creditors in a Post-Effective Equity Raise shall be contributed by New Propco Holdco as equity to New Propco and utilized by New Propco for general corporate purposes or to fund one or more acquisitions.

**Voting Rights**    Subject to the requirements of applicable gaming laws and regulations (and following receipt of any applicable approvals required thereby), the New Propco Holdco Equity and the equity interests for which the New Propco Holdco Warrants are exercisable shall carry voting rights as set forth in the definitive agreements developed by FG/Propco Lenders.

**Tag-Along Rights**    Qualifying Creditors will have the right to tag along with a sale or series of related sales of at least 10.5% of the outstanding New Propco Holdco Equity sold by other holders of New Propco Holdco Equity, except transfers between affiliates or other specified related parties and certain transfers between FG and Colony Capital ("Exempted Transfers"). It is understood that for purposes of computing whether the 10.5% threshold has been reached (i) sales made at least three months apart shall be deemed not to be related and (ii) any increase in the amount of New Propco Holdco Equity sought to be sold pursuant to the Top-Up right described under "Rights of First

9

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Refusal" shall be disregarded.  Any such other holder (collectively, the "Initiating Holder") would give notice to the Qualifying Creditors, as well as other equityholders with tag-along rights ("Other Tag Holders") of an intent to sell at least 10.5% of such equity and a proposed price.  To participate in the tag-along, the Qualifying Creditor would need to respond within 15 days.  If such creditor (an "Electing Creditor") gives notice of its desire to participate, the Initiating Holder would market its holdings as well as the proportionate holdings of the Electing Creditors and Other Tag Holders that responded affirmatively (collectively, the "Electing Holders") at a price not less than 95% of the price specified in the original notice, and the electing Qualifying Creditors would give a power of attorney to the Initiating Holder to sell these interests, subject to the process described under "Rights of First Refusal."  Such proportionate participation right of each Electing Holder and electing Other Tag Holder would be determined by multiplying its ownership of New Propco Holdco Equity by the percentage of the New Propco Holdco Equity owned by the Initiating Holder that the Initiating Holder is seeking to sell as set forth in the notice given by the Initiating Holder.  If not all of the interests could be sold, the amount sold would be allocated among the Initiating Holder and the Electing Holders in the respective proportions of the New Propco Holdco Equity sought to be sold by them; provided, that if the sale is of amounts remaining after a partial purchase described under "Rights of First Refusal" and the Initiating Holder has determined to increase the amount of New Propco Holdco Equity being sold pursuant to the Top-Up right described therein, such proportionate allocation among sellers shall also reflect such additional equity sought to be sold by the Initiating Holder and the other Electing Holders.  All interests would be sold in the form of New Propco Holdco Equity, so Blockerco would have the ability to make such tag sale itself directly and then redeem the underlying Blockerco shares held by Electing Creditors, except as provided in the following sentence.  In connection with a sale involving Qualifying Creditors that are Electing Holders, the Initiating Holder will, if requested by the holders of a majority of the equity sought to be sold by such Electing Holders, request potential buyers to quote, if they are willing to do so, a price at which they would buy Blockerco shares, as well as a price at which they would buy units of New Propco Holdco Equity, and (if the prospective buyer and such majority holders agree) such sales could be consummated as sales of Blockerco shares at a price not less than 95% of the price the prospective buyer originally quoted for the Blockerco shares; provided, that the Initiating Holder is also able to sell the equity sought to be sold by it to such buyer in compliance with the requirements of this paragraph. To the extent a Qualifying Creditor does not elect to exercise its tag rights, such rights may be exercised by other Qualifying Creditors (it being understood that there may be sharing arrangements with respect to tag rights involving other holders of New Propco Holdco Equity, which sharing arrangements by the Qualifying

*July 28, 2010*                                                                  STRICTLY CONFIDENTIAL

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

|  |  |
|---|---|
|  | Creditors or the other holders of New Propco Holdco Equity shall not be subject to tag rights by persons not party to such sharing arrangements). |
| **Rights of First Refusal** | Qualifying Creditors that indirectly own at least 2.5% of the outstanding equity of New Propco Holdco through Blockerco and their affiliates (collectively, "2.5% Holders") would have the right to purchase their pro rata share of any New Propco Holdco Equity sought to be sold by other holders of New Propco Holdco Equity (other than Exempted Transfers).  In addition, all Opco Unsecured Creditors that purchase New Propco Holdco Equity would be bound by the obligation to offer their equity to other direct or indirect holders of New Propco Holdco Equity pursuant to the first refusal procedures described herein; provided, that (i) the Opco Unsecured Creditors may effect such sales in Blockerco shares (other than in a tag-along sale with New Propco Holdco Equity, except as provided in the last sentence under "Tag-Along Rights") rather than being required to exchange such shares for New Propco Holdco Equity and (ii) a transfer by Blockerco of New Propco Holdco Equity to a shareholder of Blockerco in exchange for or redemption of the shares of Blockerco held by such shareholder shall not trigger such first refusal process, it being understood that such transferees will be bound by such first refusal requirements.  If a holder of New Propco Holdco Equity or shares in Blockerco (a "Selling Holder") desires to sell its interest in New Propco Holdco Equity or Blockerco shares, it would give notice to the 2.5% Holders and all other holders having purchase rights (the 2.5% Holders and such other holders, collectively, "Other Holders") of the amount it wanted to sell and the proposed price per unit of New Propco Holdco Equity; provided, that if the amount of New Propco Holdco Equity sought to be sold causes the tag-along provisions to be applicable,  the total amount after giving effect to tag-along rights also will be disclosed.  The Other Holders would have 15 days after the expiration of the 15-day notice period described under "Tag-Along Rights" applicable to the contemplated transaction to decide whether to purchase or not at such price and would be entitled to purchase their proportionate share (based on the respective proportionate ownership of New Propco Holdco Equity held by the Other Holders that desire to purchase) of the amount offered.  To the extent the Other Holders do not agree to purchase all of the New Propco Holdco Equity, so offered, then the Selling Holder (for itself and as agent for the holders exercising tag-along rights) could sell the remaining equity (plus any additional equity up to the amount originally offered that does not cause the amount being sold to the Other Holders to exceed 10% of the amount of outstanding New Propco Holdco Equity) at a price of at least 95% of the amount originally specified.  If the application of the first refusal rights would result in the amount remaining to be sold by the Selling Holders (including any amounts to be sold by holders exercising tag-along rights) to be less than 10% of the outstanding New Propco Holdco Equity, the Initiating Holder and the Electing Holders would have the right on |

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

a pro rata basis (the "Top-Up") to increase the amount of equity being sold by it and the Electing Holders to the lesser of the (i) amount originally sought to be sold by them before the partial purchase by the Other Holders and (ii) amount necessary to cause such remaining amount to be sold by the Selling Holder and the holders exercising tag-along rights to be at least 10% of the outstanding New Propco Holdco Equity. Furthermore, there would be no obligation of the Selling Holders to sell pursuant to the first refusal rights in a sale of less than all the New Propco Holdco Equity offered if the related Top-Up would cause the amount of New Propco Holdco Equity owned by the Initiating Holder to be less than 10% of the outstanding New Propco Holdco Equity after giving effect to all contemplated sales.  A purchase by a 2.5% Holder would be made through Blockerco as described in the antepenultimate sentence under "Tag-Along Rights."  To the extent a 2.5% Holder does not elect to exercise its rights of first refusal, such rights may be exercised by other 2.5% Holders (it being understood that there may be sharing arrangements with respect to rights of first refusal involving other holders of New Propco Holdco Equity).

**Board Observation Rights**

For so long as they collectively continue to indirectly hold through Blockerco at least one-half of the percentage of equity interests in New Propco Holdco indirectly acquired by them solely as a result of their participation in the transactions contemplated hereby (the "Minimum Ownership Condition"), the Qualifying Creditors (acting by vote of the holders of a majority of the New Propco Holdco Equity owned indirectly by them through Blockerco) collectively shall be entitled to nominate and appoint (the "Appointment Right") an independent observer (the "Independent Observer") to the Board of New Propco Holdco in accordance with the procedures specified in the immediately two succeeding paragraphs; provided, however, that the Board may direct such observer to recuse himself from meetings or proceedings of the Board in the event that information of competitive significance, as determined by the Board, concerning New Propco Holdco is reasonably expected to be discussed at any such meeting or proceeding or in order to preserve any legal privileges at any such meeting or proceeding.

Subject to reasonable confidentiality restrictions, the Independent Observer shall be provided, at the same time as the members of the Board are provided, with copies of materials prepared for and provided to the members of the Board in connection with their service on the Board (including a meeting agenda and Board package, in the event that such materials are prepared); provided, however, that the Board may exclude or redact from those materials made available to the Independent Observer information of competitive significance concerning New Propco Holdco and its subsidiaries and information which, if disclosed to the Independent Observer, would jeopardize the preservation of any legal privileges attaching thereto, in each case, as determined by the Board in its good faith discretion.

12

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

In order to exercise the Appointment Right, the Qualifying Creditors shall submit to the Board for its consideration a list of no fewer than three candidates (the "Candidate List") to serve as the Independent Observer, it being understood and agreed that the Qualifying Creditors shall include on the Candidate List only candidates who they reasonably believe the Board will consider to be acceptable. Each such candidate shall (i) not be affiliated with any competitor of New Propco Holdco or a subsidiary thereof, (ii) be independent of New Propco Holdco within the meaning of Section 303A.02 of the New York Stock Exchange Listing Standards and, accordingly, without a direct or indirect material relationship with New Propco Holdco, and (iii) be able to serve in the capacity of Independent Observer without contravening any applicable laws or regulations, including gaming laws or regulations. The Board shall use its reasonable efforts to screen the candidates appearing on the Candidate List (which screening shall consist of such interviews, background examinations and similar vetting processes as the Board shall determine in its reasonable discretion) within forty-five (45) days following the submission of the Candidate List to the Board by the Qualifying Creditors, provided that the Qualifying Creditors and the candidates whose names appear on the Candidate List promptly comply with the reasonable requests made by the Board pursuant to this sentence. Following the completion of the aforementioned screening exercise, in the event that the Board determines in its sole discretion that any one or more of the screened candidates appearing on the Candidate List is acceptable to it, the Board shall so advise the Qualifying Creditors, whereupon the Qualifying Creditors shall be entitled to exercise the Appointment Right with respect to any such screened candidate that the Board has determined to be acceptable. In the event that the Board determines in its sole discretion not to approve any candidate appearing on the Candidate List, it shall promptly so advise the Qualifying Creditors and the Qualifying Creditors shall thereafter supplement such Candidate List with additional candidates who satisfy the requirements set forth in the first and second sentences of this paragraph and resubmit the same to the Board for screening in accordance with the third sentence of this paragraph. The Board and the Qualifying Creditors shall use their respective reasonable efforts to promptly complete the actions contemplated to be undertaken by each of them pursuant to this paragraph in order to meet the timeframes set forth in the third sentence of this paragraph and in order that the Appointment Right be completed within ninety (90) days following the date on which the Board receives the initial applicable Candidate List from the Qualifying Creditors. It is understood and agreed that the Board's exercise of its sole discretion as provided for in the fourth and fifth sentences of this paragraph shall be carried out in good faith.

In the event that the Independent Observer resigns or is removed from office

13

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

and the Qualifying Creditors continue to satisfy the Minimum Ownership Condition, then the Qualifying Creditors collectively shall be entitled to exercise the Appointment Right in the manner specified herein in order to replace the outgoing Independent Observer.

**Certain Additional Rights**

The Qualifying Creditors shall be entitled to certain additional rights with respect to their indirect equity interests in New Propco Holdco, which rights shall be memorialized in the operating agreement of New Propco Holdco, an equityholders agreement or a separate agreement with or through Blockerco. Such rights, which may in some instances overlap with other contemplated rights of the Opco Unsecured Creditors specified herein, shall be limited to (i) customary piggyback registration rights, (ii) the tag-along rights described under "Tag-Along Rights," (iii) with respect to the Qualifying Creditors that own at least .5% of the outstanding New Propco Holdco Equity, the preemptive rights described under "Post-Effective Investment Right," (iv) with respect to 2.5% Holders, the rights of first refusal described under "Rights of First Refusal," (v) the ability to vote through pass-through voting arrangements at Blockerco on certain matters submitted to all voting equityholders of New Propco Holdco and (vi) the right to an Independent Observer as provided under "Board Observation Rights;" provided, however, that such rights under clauses (v) and (vi) shall in no event be deemed to include any other rights set forth under the caption entitled "Corporate Governance" in the Propco Term Sheet or on Annex 7 to the Propco Term Sheet, including, without limitation, any inspection rights (other than limited inspection rights required under the Delaware Limited Liability Company Act to be granted to equityholders) or Board designation rights. The organizational documents of New Propco Holdco will provide for (x) the making of distributions to equityholders of amounts estimated to be necessary to pay taxes (including estimated taxes) on taxable income allocated to them by New Propco Holdco from time to time (taking into account losses or other tax benefits previously allocated and subject to the availability of distributable cash and compliance with credit or other agreements relating to New Propco Holdco or any of its affiliates (which agreements shall permit such tax distributions except during the continuation of an event of default but without any requirement to permit distributions with respect to income attributable to a subsidiary if such subsidiary does not make such a tax distribution)) and (y) distribution to equityholders of annual and quarterly consolidated balance sheets, income statements, statements of cash flows and (in the case of annual periods) statements of changes in members' equity of New Propco Holdco if they are not publicly available (including any audit report with respect thereto if such an audit report is prepared), subject to reasonable confidentiality provisions. Notwithstanding the foregoing, each of the preceding rights, other than the registration rights, shall terminate upon the occurrence of a *bona fide* public offering of at least 15% of the New

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Propco Holdco Equity.  In connection with any initial public offering by New Propco Holdco, Blockerco shall be offered the opportunity, in its sole discretion, to engage in a merger whereby the shares of Blockerco would be converted into shares of the entity going public on a tax-free basis to the extent permitted by applicable law.

The New Propco Holdco Equity and the New Propco Holdco Warrants (and the equity interests issuable upon the exercise thereof) issued through Blockerco  to the Qualifying Creditors shall also be subject to (i) certain drag-along duties with respect to such securities, (ii) a prohibition on transfer for six months following the Effective Date and certain other limitations on transfer pursuant to applicable gaming and securities laws, (iii) an obligation to provide a right of first refusal with respect to such securities to FG/Propco Lenders and any other parties so provided for in the equityholders agreement of New Propco Holdco and (iv) obligations substantially similar to the obligations set forth under the caption entitled "Corporate Governance" in the Propco Term Sheet, including, a prohibition on selling any such securities without the consent of the other equityholders to any "strategic buyer" listed on Annex 6 to the Propco Term Sheet.

| | |
|---|---|
| **Compliance with Gaming Law Requirements** | Opco Unsecured Creditors receiving New Propco Holdco Warrants or New Propco Holdco Equity through Blockerco will be required to furnish all information concerning themselves and their direct and indirect owners as shall be required under applicable gaming laws. |
| **Gaming Redemptions** | The New Propco Holdco Equity, the New Propco Holdco Warrants and the equity interests for which the New Propco Holdco Warrants are exercisable, in each case, issued to the Opco Unsecured Creditors through Blockerco as contemplated herein, shall be subject to certain mandatory disposition and redemption requirements pursuant to applicable gaming laws and regulations. |
| **Representations and Warranties** | Customary representations and warranties of Blockerco and the Opco Unsecured Creditors, including, without limitation, those representations and warranties described below under the caption entitled "Conditions" and any as may be required from time to time under applicable securities laws. |
| **Documentary Review Rights** | Opco will utilize its commercially reasonable efforts to furnish to the UCC and its designated counsel for their review draft copies of pleadings and filings (including, without limitation, the Plan, the Disclosure Statement and any motions or other filings seeking approval of the UCC Stipulation or seeking approval of Opco's contemplated payment of certain legal fees and expenses as provided herein) (the "Relevant Pleadings") relating to the consideration contemplated to be made available to the Opco Unsecured Creditors hereunder or the other terms hereof prior to the filing by the Debtors of such pleadings and filings with the Bankruptcy Court.  Designated counsel to the UCC shall be entitled to proffer to Opco, through Opco's |

15

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

counsel, reasonable comments with respect to the Relevant Pleadings. Provided that they are timely delivered to Opco through its counsel, Opco shall give such comments its reasonable consideration, it being understood and agreed that Opco shall in no event have any obligation to accept such comments or otherwise incorporate the same into the Relevant Pleadings. In addition, in the event that the Debtors request a determination from the Internal Revenue Service (the "IRS") concerning the application of certain tax laws and regulations to their proposed restructuring, Opco shall furnish a copy of the documentation evidencing such request to the UCC and its counsel promptly following the submission thereof to the IRS; provided, however, that Opco shall be entitled to redact from such documentation any confidential or privileged information contained therein prior to furnishing such documentation to the UCC and its counsel. Subject to the proviso set forth in the preceding sentence, Opco shall furnish to the UCC and its counsel promptly after delivery of the executed UCC Stipulation a copy of the current draft of such documentation described in the preceding sentence.

| | |
|---|---|
| **Consideration** | In consideration for the rights contemplated to be granted herein under the captions entitled "New Propco Holdco Warrants," "New Propco Holdco Investment Right," "Effect of Subsequent Equity Offerings," "Subscriptions of the Opco Unsecured Creditors in Propco Rights Offering," "Pricing in Propco Rights Offering; Put Premium," "Post-Effective Investment Right," "Tag-Along Rights," "Rights of First Refusal," "Board Observation Rights" and "Certain Additional Rights," (i) the Put Parties shall deliver to FG/Propco Lenders and the Debtors a funding commitment letter consistent with the terms hereof, in form and substance satisfactory to FG/Propco Lenders and the Debtors, by no later than July 29, 2010; and (ii) the Put Parties shall execute a definitive agreement in the form attached hereto as Exhibit B (the "Support Agreement"). |
| | The UCC shall enter into a stipulation with the Debtors in the form attached hereto as Exhibit C (the "UCC Stipulation"). Notwithstanding any termination of the UCC Stipulation, the Put Parties shall remain obligated to fund their equity commitments consistent with the terms of the Propco Commitment and so long as the Support Agreement has not been terminated. |
| | Opco shall promptly file a motion seeking Bankruptcy Court approval of the UCC Stipulation and related transactions, and the UCC shall provide a support letter or statement for inclusion in the plan solicitation materials for both a joint Plan and/or individual plans of reorganization for Propco and Opco in form and substance acceptable to the Debtors and FG/Propco Lenders. |
| **Implementation and Documentation** | The UCC Stipulation to be approved by the Bankruptcy Court as soon as practicable following agreement thereof to the terms set forth herein. The Support Agreement will not be subject to Bankruptcy Court Approval. |

*July 28, 2010*                                                                                       STRICTLY CONFIDENTIAL

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Distribution of New Propco Holdco Warrants and certain rights set forth under the captions entitled "New Propco Holdco Investment Right," "Effect of Subsequent Equity Offerings," "Subscriptions of the Opco Unsecured Creditors in Propco Rights Offering" and "Pricing in Propco Rights Offering; Put Premium" to be accomplished pursuant to a confirmed Plan or as the parties shall otherwise agree. Certain other terms provided for herein, including, without limitation, those described under the captions entitled "Post-Effective Investment Right," "Voting Rights," "Tag-Along Rights," "Rights of First Refusal," "Board Observation Rights," "Certain Additional Rights," "Compliance with Gaming Law Requirements" and "Gaming Redemptions," shall be set forth in an equityholders agreement among New Propco Holdco, Blockerco, FG/Propco Lenders and the Opco Unsecured Creditors as well as in such other definitive documentation as the parties shall agree.

**Conditions**        The above proposal is conditioned, *inter alia*, upon (i) execution of a Support Agreement by the Put Parties no later than July 28, 2010, (ii) execution of the UCC Stipulation by the UCC and the Debtors no later than July 28, 2010, (iii) approval of the UCC Stipulation by the Bankruptcy Court, (iv) satisfaction of all conditions specified herein, including the Tax Condition, (v) the UCC Stipulation and the Support Agreement having not been terminated, (vi) the Bankruptcy Court entering an order approving the amendments to the Disclosure Statement and Plan to incorporate the terms hereof and authorizing solicitation in respect of the Plan as so amended such that the confirmation hearing scheduled for August 27, 2010 is not delayed as a result of such amendments, (vii) transfer to New Propco of additional transition and related assets of types and on terms supported by the Debtors and FG/Propco Lenders, free and clear of all liens and encumbrances, (viii) confirmation and effectiveness of the Plan providing for the transfers, settlement of the Going Private Transaction Causes of Action and releases specified in the Plan (and described herein), (ix) approval of the respective investment committees of the Put Parties not later than July 29, 2010 and the execution and delivery of the Propco Commitment on or before such date and (x) the occurrence of the Effective Date on or before June 30, 2011. This proposal also is conditioned on the negotiation and execution of documentation mutually acceptable to Debtors, FG/Propco Lenders, the UCC and the Put Parties.

Notwithstanding the foregoing, the right of the Opco Unsecured Creditors to receive the New Propco Holdco Warrants and the other terms of this proposal not relating to the Propco Rights Offering shall not be subject to clauses (i), (iv) (to the extent it relates only to the Propco Rights Offering, including the Tax Condition to such extent), (v) (to the extent it relates only to the Support Agreement), (vi) (to the extent it relates only to the Propco Rights Offering) and (ix).

It shall be a condition to an Opco Unsecured Creditor's receipt of the New

17

STRICTLY CONFIDENTIAL

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Propco Holdco Warrants that such Opco Unsecured Creditor shall represent and warrant, on the Effective Date, that it has no present plan or intention as of the Effective Date to exercise the New Propco Holdco Warrants (it being understood that an intent to exercise if the strike price is in the money due to increases in equity value after the Effective Date shall not be considered a present plan or intention), subject to future reexamination during the exercise period thereof based upon then current value information.

Notwithstanding anything else to the contrary contained herein, the terms hereof are subject in their entirety to applicable state and federal securities laws and applicable tax limitations (including, without limitation, those relating to section 267 of the Internal Revenue Code of 1986, as amended (the "Code").  In furtherance of the foregoing and not in limitation thereof, an Opco Unsecured Creditor's purchase of New Propco Holdco Equity through Blockerco shall be subject to the conditions set forth in Exhibit A. It is understood that any liability for breach of any representations in Exhibit A shall be several and not joint and limited to the greater of (i) the initial investment by the breaching party in New Propco Holdco Equity through Blockerco and (ii) $250,000, it being understood that New Propco Holdco shall have the additional right in the case of any such breach to rescind the investment by the breaching party by paying the breaching party the amount of its investment (i.e., the amount paid less any dividends received) whereupon such breaching party shall surrender its direct or indirect equity interests in New Propco Holdco (subject to a right of the breaching party to promptly cure any immaterial breaches, if such breaches are capable of cure), provided that to the extent that an investment is rescinded, the liability for breach shall be measured giving effect to such rescission, including any liabilities or benefits incurred pursuant to the rescission. It is expressly acknowledged and agreed that any and all consideration provided, directly or indirectly, to the Opco Unsecured Creditors hereunder shall be conditioned (the "Tax Condition") on (i) the Bankruptcy Court having issued a final order in form and substance acceptable to the Debtors and FG/Propco Lenders, including as to tax matters, and (ii) the IRS having issued a private letter ruling to Opco, in form and substance acceptable to the Debtors and FG/Propco Lenders, regarding the application of Section 267 of the Code to the transactions contemplated by the Plan, including, without limitation, if the Stalking Horse Bidder is the Successful Bidder (each as defined in the Plan), the transactions contemplated by the Stalking Horse APA (as defined in the Plan, the "Stalking Horse APA").  If the Debtors, FG or the Propco Lenders determine, in their sole discretion, that such order or ruling is likely not to be issued by reason of any of the terms described herein (including, without limitation, a requirement that the Debtors, FG or the Propco Lenders provide a representation to the IRS or the Bankruptcy Court with respect to the direct or indirect ownership of New Propco Holdco or the Debtors by or through the

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Opco Unsecured Creditors or the Put Parties that cannot be fully supported by the representations described in Exhibit A), such terms, including without limitation the terms set forth in Exhibit A, shall be modified as the Debtors and FG/Propco Lenders deem necessary (including, without limitation, the elimination of any equity issuances or modifications of the terms of such equity) to enable the Bankruptcy Court to issue such order or the IRS to issue such ruling; provided, that if such modifications or the terms of any such Bankruptcy Court order or IRS private letter ruling are materially adverse to the terms of the arrangements described herein related to the Opco Unsecured Creditors, the UCC may terminate any agreements entered into that embody this summary of terms and, if such modifications or the terms of any such Bankruptcy Court order or IRS private letter ruling are materially adverse to the rights of the Put Parties, the Put Parties may terminate the Propco Commitment.  In the event of a termination of the arrangements contemplated hereby with respect to the Put Parties arising from the Tax Condition (including, without limitation, a termination by the Put Parties arising from a materially adverse modification of the terms herein relating to the Put Parties), which in any such case results from the failure of the Debtors, FG or the Propco Lenders to act reasonably with respect to the Tax Condition (it being understood that the unwillingness of the Debtors, FG or the Propco Lenders to proceed if the final order of the Bankruptcy Court does not contain the findings described in the Confirmation Order (as defined in the Stalking Horse APA, the "Confirmation Order") shall be deemed to be reasonable), then each Put Party whose Propco Commitment has been terminated shall be paid an aggregate amount equal to 1.333 times the portion of the Put Premium attributable to its terminated Propco Commitment; provided, that no payment shall be due unless the UCC Stipulation remains in effect through the Effective Date.

This summary of  terms assumes that the reasonable and documented fees and expenses of the UCC (and its legal advisors and financial advisor) and the reasonable and documented fees and expenses of the Put Parties (and their legal advisors), up to an amount to be mutually agreed by the Debtors, FG/Propco Lenders and Put Parties, shall be paid by Opco, with respect to the fees and expenses of the UCC, and by Opco and Propco (as such term is defined in the Plan, "Propco"), with respect to the fees and expenses of the Put Parties (with Opco and Propco each paying one-half of such fees and expenses), it being understood that such expenses (other than those of the UCC, or as otherwise provided below) shall be paid only if the Effective Date occurs; provided, that the agreed legal expenses of the Put Parties shall be paid as follows: one-half of the agreed legal expenses of the Put Parties shall be paid within 15 days of the execution of the Propco Commitment and the remainder of the agreed legal expenses of the Put Parties shall be paid promptly after confirmation of the Plan, subject in each case to Bankruptcy

19

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

Court approval, it being understood that the failure to procure a Bankruptcy Court approval shall not cause a termination of the Propco Commitment; provided, that the Debtors comply with the immediately succeeding sentence. In case such Bankruptcy Court approval is not received, the parties shall negotiate alternate arrangements with respect to Opco's and Propco's payment of such legal expenses. The Debtors shall promptly file for, and use reasonable efforts to, seek the entry of an order from the Bankruptcy Court authorizing payment by the Debtors of the first one-half of the agreed legal expenses within 15 days after the Propco Commitment is executed and the balance at confirmation of the Plan.

This summary of terms also assumes that the reasonable and documented fees and expenses of the trustees for the outstanding unsecured notes of Opco (including the legal fees and expenses) in an amount to be mutually agreed by the Debtors, FG/Propco Lenders and the respective indenture trustees, or as otherwise determined by the Bankruptcy Court, shall be paid by Opco upon confirmation of the Plan (with respect to amounts accrued), and with respect to fees and expenses incurred between confirmation of the Plan and the Effective Date, shall be paid by Opco on the Effective Date, subject in each case to Bankruptcy Court approval to be included in the Confirmation Order (it being understood that (i) such "reasonable" fees and expenses shall not include any legal fees or expenses incurred by the trustees after the date hereof in opposing implementation of the terms hereof (including confirmation of the Plan) or engaging in litigation activity against any of the Debtors, FG or the Propco Lenders, or any of their respective affiliates and (ii) the failure to obtain Bankruptcy Court approval to pay such fees and expenses upon Plan confirmation shall not cause a termination of the UCC Stipulation, so long as such fees and expenses are paid on the Effective Date.)

**Non-Solicitation**          This summary of terms is not and shall not be deemed to be a solicitation for votes in favor of any Chapter 11 plan or for consent to the Plan and, if applicable, a Propco-only plan (collectively, the "Plans") in contravention of applicable non-bankruptcy law or section 1125(b) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, the acceptance of any person shall not be solicited until, and any obligation to support confirmation of the Plans is expressly conditioned on, the receipt by such person of the Plans and a copy of the disclosure statements that shall have previously been approved by the Bankruptcy Court, after notice and a hearing, as containing adequate information as required by section 1125 of the Bankruptcy Code. Notwithstanding the foregoing provisions, nothing in this summary of terms or any related definitive documentation shall require any person to take any action prohibited by the Bankruptcy Code, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated under any of the foregoing, any other applicable law or regulation or any order or direction of any court or

**- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -**
**- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-**
**-SUBJECT TO RULE 408-**

---

any state or federal governmental authority.

**Confidentiality**  The terms and conditions of this summary of terms, the identities of participants in discussions relating hereto and the existence of such discussions are confidential and no party receiving a copy hereof shall disclose any of the foregoing to anyone; <u>provided</u>, <u>however</u>, that such parties may disclose such information to their respective legal and financial advisors as necessary in connection with their evaluation of the proposed terms; <u>provided</u>, <u>further</u>, that such advisors are informed of the confidential nature of such information and instructed to comply with the non-disclosure provisions hereof.  Notwithstanding the foregoing, the Debtors shall be permitted to file this document with the Bankruptcy Court, and the confidentiality obligations provided herein will be of no further effect after this document is so filed.

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

<u>Exhibit A</u>

- The Opco Unsecured Creditors and, possibly, participating lenders ("<u>Mezzanine Creditors</u>") under the Prepetition Mezzanine Loans (as such term is defined in the Plan) would form a domestic C corporation or limited liability company taxable as a corporation ("<u>Blockerco</u>") to hold the New Propco Holdco Warrants and any New Propco Holdco Equity. There may be more than one Blockerco entity established, each of which shall be considered as "Blockerco" hereunder.

  o The New Propco Holdco Warrants and rights to acquire New Propco Holdco Equity in the Propco Rights Offering would be issued directly to Blockerco; Blockerco would issue mirror warrants and rights to acquire equity in Blockerco to the Opco Unsecured Creditors; similar arrangements may be implemented for Mezzanine Creditors based on their rights to purchase equity in New Propco Holdco.

  o Blockerco would function as the Put Party, subject to the Put Parties duly executing and delivering a mirror commitment to acquire equity in Blockerco to fund Blockerco's commitment.

  o Blockerco would have the right to raise funds, on a pro rata basis (it being understood that shareholders of Blockerco would be required to subscribe for their pro rata percentage of these securities), for purchase of New Propco Holdco Equity through issuance of debt or warrants (to purchase Blockerco's underlying New Propco Holdco Equity) for cash (provided that the Put Parties agree on such capital structure).

- No numerical limit or restriction on non-U.S. holders of Blockerco.

- Blockerco would agree that any equity held by it in New Propco Holdco would be voted only in the respective amounts so directed by the individual holders of equity in Blockerco.

- Reasonable administrative costs of the single principal Blockerco entity (including annual state corporate franchise fees, the costs of preparing reports to holders, preparing tax returns and dealing with warrant exercises, transfers, etc. but excluding the costs associated with any tax mitigation strategies) would be reimbursed by New Propco Holdco up to an amount to be agreed upon in the definitive documents. The costs associated with any additional Blockerco entities shall not be borne by New Propco Holdco.

- An Opco Unsecured Creditor or Mezzanine Creditor would be required to provide a representation at the time of its commitment and on the Effective Date, that it has no present plan or intention as of such date (i) to exercise the New Propco Holdco Warrants (it being understood that an intent to exercise if the strike price is in the money due to increases in equity value after the Effective Date shall not be considered a present plan or intention), subject to future reexamination during the exercise period thereof based upon then current value information or (ii) to acquire any New Propco Holdco Equity (either directly or through Blockerco) or any interest in Blockerco from any other holder thereof (it being understood that an intent to acquire in the event of an opportunity arising after the Effective Date that is not part of a commitment, arrangement or understanding existing prior to the Effective Date shall not be considered a present plan or intention).

22

STRICTLY CONFIDENTIAL

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

- Any Opco Unsecured Creditor or Mezzanine Creditor who would directly own 5 percent or more in value of the stock of Blockerco ("Large Investor") would be required to provide the following:

  o    A representation that, based on the Large Investor's Actual Knowledge (as defined below), the Equity List (as defined below) identifies any equity interest through which such Large Investor could own, through Colony funds to be identified or Axon Rising Sun, LLC, any stock of Opco (for purposes of Section 267 of the Code and the Treasury regulations promulgated thereunder).

  o    A representation that the Large Investor has provided the Clearinghouse (i) a list accurately reflecting its records of record owners owning a direct interest of 5% or more of the Large Investor and (ii) to the Actual Knowledge of the Large Investor, the list provided in (i) above (expanded at the time the representation is made, to the extent necessary, to reflect any additional persons in (x) or (y) below) identifies (x) any record owners of 5 percent or more of such Large Investor and (y) any Upper-Tier 5% Investors (as defined below) of such Large Investor.  In applying the foregoing, for any Large Investor that is a mutual fund, relying upon the precise name of the account registration for each record owner and for any Large Investor that is a partnership, such ownership being measured using K-1 reporting criteria, and it being understood that any flaw in the Large Investor's records shall not constitute a breach hereof.

  o    A representation that the Large Investor has provided the Clearinghouse a list (the "Equity List") accurately reflecting its records of all equity interests in other persons directly held by the Large Investor (except for any wholly-owned subsidiaries which do not own any direct or indirect equity interests in any other person (other than any equity interest in another such direct or indirect wholly-owned subsidiary)).

  o    A Large Investor's ability to acquire New Propco Holdco Equity (other than Blockerco warrants or equity acquired upon exercise of the Blockerco warrants) would be conditioned upon verification by Ernst & Young LLP or such other nationally recognized accounting or financial advisory or consulting firm acceptable to Fidelity, OakTree, Serengeti, Debtors and FG/Propco (the "Clearinghouse") that, based solely on information received from all the Large Investors and the Small Investors (as defined below), and assuming such information is true, correct and complete, there is no evidence that (i) the Large Investor owns, directly or indirectly, any interest in the stock of Opco for purposes of Section 267 of the Code and (ii) any of the Upper-Tier 5% Investors of such Large Investor own, directly or indirectly (for purposes of Section 267 of the Code, applying the limitations in Section 267(e)(3)(A) and (B) of the Code), 5 percent or more in value of the stock of Blockerco (it being understood that the Clearinghouse has no obligation to independently determine the identities of Upper-Tier 5% Investors of such Large Investor).

    ▪    To the extent the Clearinghouse can verify item (i), but not item (ii), the Large Investor would have the right (but not the obligation) to invest if it provides the Clearinghouse any and all information that the Clearinghouse may request (including representations from any Upper-Tier 5% Investor), necessary for the Clearinghouse to verify that an Upper-Tier 5% Investor will not be treated as an owner of both Opco and New Propco Holdco for purposes of Section 267 of the Code.

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

- ▪ To the extent the Clearinghouse determines that a Large Investor owns an interest in the stock of Opco for purposes of Section 267 of the Code (an "Overlapping Large Investor") and that ownership percentage can be determined based on the information in the possession of the Clearinghouse, the Large Investor would be entitled to acquire New Propco Holdco Equity (without the requirement of making the first representation set forth above) if the Debtors and FG/Propco Lenders determine, in their sole discretion, that an investment by such Overlapping Large Investor will not cause the same persons to own more than 50 percent in the value of the stock of Opco and more than 50 percent of the capital interest or the profits interest in New Propco Holdco within the meaning of Section 267 of the Code.  If there is more than one Overlapping Large Investor (or another potential investor that creates an overlap), the Debtors and FG/Propco Lenders may make such determination on an individual basis using whatever criteria they deem reasonable (including, without limitation, the percentage ownership of the Overlapping Large Investor or other investor, the quality of the information used to determine such percentage ownership, and the likelihood of such percentage ownership increasing between the time of such determination and the Effective Date).

- Any Opco Unsecured Creditor or Mezzanine Creditor who would directly own less than 5 percent  in value of the stock of Blockerco ("Small Investor") would be required to provide the following:

  - o   (i) A representation that such Small Investor does not own directly 5 percent or more in value of the stock of Blockerco and, (ii) (A) a list accurately reflecting its records of all equity interests in other persons directly held by the Small Investor (except for any wholly-owned subsidiaries which do not own any direct or indirect equity interests in any other person (other than any equity interest in another such direct or indirect wholly-owned subsidiary)) and a representation that, based on the Small Investor's Actual Knowledge, such list identifies any equity interests through which such Small Investor could own stock of Blockerco (for purposes of Section 267 of the Code, applying the limitations in Section 267(e)(3)(A) and (B) of the Code), or (B) a representation that to the Actual Knowledge of the Small Investor, such Small Investor does not own indirectly (for purposes of Section 267 of the Code, applying the limitations in Section 267(e)(3)(A) and (B) of the Code) 5 percent or more in value of the stock of Blockerco.

  - o   A representation that the Small Investor has provided the Clearinghouse (i) a list accurately reflecting its records of record owners owning a direct interest of 5% or more of the Small Investor and (ii) to the Actual Knowledge of the Small Investor, the list provided in (i) above (expanded at the time the representation is made, to the extent necessary, to reflect any additional persons in (x) or (y) below) identifies (x) any record owners of 5 percent or more of such Small Investor and (y) any Upper-Tier 5% Investors of that Small Investor.  In applying the foregoing, for any Small Investor that is a mutual fund, relying upon the precise name of the account registration for each record owner and for any Small Investor that is a partnership, such ownership is measured using K-1 reporting criteria and it being understood that any flaw in the Small Investor's records shall not constitute a breach hereof.

24

- FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY -
- PREPARED AT THE REQUEST AND DIRECTION OF COUNSEL-
-SUBJECT TO RULE 408-

  o A Small Investor's ability to acquire New Propco Holdco Equity (other than Blockerco warrants or equity acquired upon exercise of the Blockerco warrants) would be conditioned upon verification by the Clearinghouse that, based solely on information received from all the Large Investors and the Small Investors, and assuming such information is true, correct and complete, there is no evidence that any of the Upper-Tier 5% Investors of such Small Investor own, directly or indirectly (for purposes of Section 267 of the Code, applying the limitations in Section 267(e)(3)(A) and (B) of the Code), 5 percent or more in value of the stock of Blockerco (it being understood that the Clearinghouse has no obligation to independently determine the identities of Upper-Tier 5% Investors of such Small Investor).

    ▪ To the extent the Clearinghouse cannot so verify, the Small Investor would have the right (but not the obligation) to invest if it provides the Clearinghouse any and all information that the Clearinghouse may request (including representations from any Upper-Tier 5% Investor), necessary for the Clearinghouse to verify that an Upper-Tier 5% Investor will not be treated as an owner of both Opco and New Propco Holdco for purposes of Section 267 of the Code.

    ▪ To the extent the Clearinghouse determines that an Upper-Tier 5% Investor of a Small Investor owns an interest in the stock of Opco for purposes of Section 267 of the Code (an "<u>Overlapping Upper-Tier 5% Investor of the Small Investor</u>") and that ownership percentage can be determined based on the information in the possession of the Clearinghouse, the Upper-Tier 5% Investor of the Small Investor would be entitled to acquire New Propco Holdco Equity (without the requirement of making the first representation set forth above) if the Debtors and FG/Propco Lenders determine, in their sole discretion, that an investment by such Overlapping Upper-Tier 5% Investor of the Small Investor will not cause the same persons to own more than 50 percent in the value of the stock of Opco and more than 50 percent of the capital interest or the profits interest in New Propco Holdco within the meaning of Section 267 of the Code.  If there is more than one Overlapping Upper-Tier 5% Investor of the Small Investor (or another potential investor that creates an overlap), the Debtors and FG/Propco Lenders may make such determination on an individual basis using whatever criteria they deem reasonable (including, without limitation, the percentage ownership of the Overlapping Upper-Tier 5% Investor of the Small Investor or other investor, the quality of the information used to determine such percentage ownership, and the likelihood of such percentage ownership increasing between the time of such determination and the Effective Date.)

- Any Large Investor's or Small Investor's ability to invest may be conditioned on entering  into a confidentiality and non-disclosure agreement with the Clearinghouse, and executing a hold-harmless letter and, if such Large Investor or Small Investor is a client of the Clearinghouse, a conflict waiver provided by the Clearinghouse, all based on customary terms.

- A Large Investor or a Small Investor shall only be required to provide the Clearinghouse the information set forth in this Exhibit A (including, without limitation, the identity of any person or any investment) if the Clearinghouse first agrees in form and substance reasonably satisfactory to such Large Investor or Small Investor, to keep all such information confidential.  Absent written consent

STRICTLY CONFIDENTIAL

from the relevant Large Investor or Small Investor, the Clearinghouse shall not request information of or regarding (i) a person owning 5% or more of a Large Investor or a Small Investor or (ii) an Upper-Tier 5% Investor of a Large Investor or a Small Investor by contacting a person described in clause (i) or clause (ii) of this sentence based on information supplied by the Large Investor or Small Investor, but instead all requests for information of or regarding such a person shall be submitted directly and solely to the relevant Large Investor or Small Investor.

- For purposes of Exhibit A, (i) Actual Knowledge means actual knowledge (without duty of inquiry, investigation or validation) of the appropriate persons who would normally be responsible for maintaining such information (it being understood that in the case of the Fidelity funds, such person will be the person executing such definitive documents), and such persons will be identified in the definitive documents and (ii) Upper-Tier 5% Investor means a person owning an indirect beneficial interest of 5% or more of a Large Investor or Small Investor as the case may be.

- The representations and information described above will be required to be provided (i) in the case of a Blockerco Put Party, at the time of its commitment and (ii) in the case of any other Large Investor or Small Investor, at the time it elects to purchase equity in Blockerco. All Large Investors and Small Investors will be required to reaffirm such representations and information as of the Effective Date. To the extent the required representations or verifications cannot be made on the Effective Date for whatever reason, the parties shall enter into appropriate escrow or other arrangements to permit funding pending confirmation of such information and if such representations or verifications cannot be finalized for whatever reason, the investment shall be rescinded and any funds shall be returned to such Blockerco Put Party and such Blockerco Put Party shall have no liability as a result thereof other than the return of any Put Premium in the case of a breach of, or failure to make, a representation or verification to the extent such return is required under "Pricing in Propco Rights Offering; Put Premium."

# Exhibit 3

# Exhibit 3

EXECUTION COPY

## SUPPORT AGREEMENT

This SUPPORT AGREEMENT (the "<u>Agreement</u>") is made and entered into as of July 28, 2010 by and among the following parties:

(a)     German American Capital Corporation ("<u>GACC</u>") and JPMorgan Chase Bank, N.A. ("<u>JPM</u>" and together with GACC, the "<u>Mortgage Lenders</u>") in their capacities as lenders under (i) that certain Amended and Restated Loan and Security Agreement, dated as of March 19, 2008 (the "<u>Mortgage Loan Agreement</u>"), pursuant to which the Mortgage Lenders made loans and other financial accommodations to FCP Propco, LLC ("<u>Propco</u>") and (ii) that Amended and Restated Mezzanine Loan and Security Agreement (First Mezzanine), dated as of March 19, 2008 (the "<u>Mezz 1 Loan Agreement</u>") among FCP Mezzco Borrower I, LLC and GACC and JPM in their capacity as "Lenders" thereunder;

(b)     Fertitta Gaming LLC, a Nevada limited liability company ("<u>FG</u>");

(c)     Frank J. Fertitta III and Lorenzo J. Fertitta (collectively, the "<u>FG Principals</u>" and with FG, the "<u>FG Parties</u>") who are the primary equity investors in FG; and

(d)     Fidelity Management & Research Company, Oaktree Capital Management, L.P. and Serengeti Asset Management, LP affiliates reasonably acceptable to FG and the Mortgage Lenders, each in their capacity as a Put Party (collectively, the "<u>Put Parties</u>").

Each party named above is a "<u>Party</u>", and collectively are referred to as the "<u>Parties</u>".

## RECITALS

**WHEREAS**, on July 28, 2009, SCI, Propco and certain of their affiliates (collectively, the "<u>Debtors</u>")[1] commenced voluntary cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Nevada (the "<u>Bankruptcy Court</u>");

**WHEREAS**, on June 15, 2010, the Debtors filed their *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated June 15, 2010)* [Docket No. 1629-1], as amended on July 13, 2010 [Docket No. 1771-1], (the "<u>Plan</u>") and their *Disclosure Statement to Accompany Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated June 15, 2010)* [Docket No. 1630-1], as amended on July 14, 2010 [Docket No. 1774-1], (the "<u>Disclosure Statement</u>");

**WHEREAS**, the Parties have negotiated a summary of terms annexed hereto as <u>Attachment 1</u> that sets forth the material terms of the settlement of various issues among the Parties, including the distribution of certain interests in the entities formed as part of the

---

[1]     Debtor GV Ranch Station Inc. commenced its voluntary case under the Bankruptcy Code on February 10, 2010 and is included in the definition of the term Debtors in this Agreement.

transactions contemplated in the Plan to the Opco Unsecured Creditors[2] (as such summary of terms may be amended from time to time in accordance with the terms of this Agreement and including all exhibits, the "<u>Term Sheet</u>");

WHEREAS, the Term Sheet contemplates that the Put Parties will provide a firm and irrevocable commitment by July 29, 2010, in form and substance acceptable to the Put Parties, the Debtors, FG and the Mortgage Lenders, to commit to the purchase, through Blockerco, at least $35.3 million of equity in New Propco Holdco and to make such other firm and irrevocable commitments as are set forth in the Term Sheet (the "<u>Propco Commitment</u>");

WHEREAS, the Parties are willing to support the Debtors in seeking to obtain approval of the Disclosure Statement and confirmation of the Plan as the same shall be amended to incorporate the terms of the Term Sheet.

<u>AGREEMENT</u>

NOW THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.  <u>Term Sheet.</u>

The Term Sheet is incorporated herein by reference and is made part of this Agreement as if fully set forth herein; provided, however, that the Term Sheet is supplemented by the terms and conditions of this Agreement.

2.  <u>Commitments of the Parties to this Agreement.</u>

(a)  Put Party Obligations.

As long as this Agreement has not terminated, in addition to the commitments contained throughout this Agreement and the Term Sheet, each Put Party agrees for itself, that it will:

> i.      negotiate in good faith with the Mortgage Lenders and FG a mutually acceptable Propco Commitment, on terms and conditions and in form and substance acceptable to the Put Parties, the Debtors, FG and the Mortgage Lenders and pursuant to the terms of the Term Sheet, no later than July 29, 2010;
>
> ii.     refrain from commencing or maintaining litigation activity of any kind or description (including, without limitation, with respect to any and all Going Private Transaction Causes of Action (as defined in the Plan) or any other claims relating to, or arising out of,

---

[2]      Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Term Sheet.

2

directly or indirectly, the Going Private Transaction (as defined in the Plan)) and related pleadings (including any pending appeals) involving any Debtor or any affiliate thereof, FG, the Mortgage Lenders, Deutsche Bank Trust Company Americas, Deutsche Bank Securities and J.P. Morgan Securities Inc., J.P. Morgan Chase Bank N.A., Frank J. Fertitta III, Lorenzo J. Fertitta or the lenders under the Prepetition Mezzanine Loans (as such term is defined in the Plan) and to refrain from hereafter engaging in any such litigation activity (including appeals) and/or filing any related pleadings in the Chapter 11 Cases or in any other matter relating, directly or indirectly, thereto (whether such matter is before the Bankruptcy Court or otherwise), except as necessary in respect of an action to enforce the terms of this Agreement (which incorporates the Term Sheet) and the Propco Commitment;

iii.     use commercially reasonable efforts to support approval of the Disclosure Statement and confirmation of the Plan, including, without limitation, the release and settlement of all claims (including, without limitation, with respect to any and all Going Private Transaction Causes of Action (as defined in the Plan) or any other claims relating to, or arising out of, directly or indirectly, the Going Private Transaction (as defined in the Plan)) against the Released Parties (as defined in the Plan) as specified in the Plan;

iv.      (a) use commercially reasonable efforts to support, and will not object to or oppose, approval of the Stalking Horse Bid (and any increase in such bid), the JV Acquisitions (and each other Acquisition) and the consummation of the transactions contemplated thereby and relating thereto, and (b) not solicit or support approval of any bid, offer or similar proposal to the Stalking Horse Bid, the JV Acquisitions (or any other Acquisition), provided this provision shall not apply in respect of any actions that any Put Party may take outside of the Debtors' Chapter 11 Cases with respect to      any      Acquisition (other      than      the Stalking Horse Bid and any increase in such bid), where such Put Party is a record or beneficial owner of debt or securities of the selling entity (including without limitation, any actions which Oaktree Capital Management, L.P. and its affiliates (other than OCM Principal Opportunities Fund IV Delaware, L.P. and OCM Opportunities Fund VIIb Delaware, L.P.) may take outside of the Debtors' Chapter 11 Cases with respect to the JV Acquisitions); it being understood that neither Oaktree Capital Management, L.P. nor any of its affiliates, other than the funds and accounts that are signatories hereto (and all alternative investment funds, sub-funds, holding companies and special purpose entities formed for, by, or for the benefit of, such funds and accounts), are

3

"Put Parties" for purposes of this Agreement or are bound by any obligations as Put Parties, and nothing in the foregoing proviso shall infer or be interpreted otherwise;

v. not object in the Debtors' Chapter 11 Cases to the transfer of the Transition Assets free and clear of all liens, claims and encumbrances;

vi. take all actions reasonably necessary to consummate the transactions described in the Term Sheet as the same is incorporated into and in accordance with the Plan; and

vii. from and after the date hereof, not directly or indirectly seek, solicit, support or vote in favor of, as applicable, any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of any of the Debtors that could reasonably be expected to prevent, delay or impede solicitation, confirmation or consummation of the Plan or any document filed with the Bankruptcy Court in furtherance of soliciting or confirming the Plan or consummating the transactions contemplated thereby.

(b) FG/Mortgage Lender Obligations.

As long as this Agreement has not terminated, in addition to the commitments contained throughout this Agreement and the Term Sheet, the Mortgage Lenders, FG and the FG Principals agree that they will:

i. support modification of the Plan and Disclosure Statement to incorporate the terms of the Term Sheet, and to provide copies of the same to the Put Parties in advance of filing with the Bankruptcy Court, and use their respective best efforts to obtain confirmation of the Plan as amended;

ii. not support any further amendment or modification of the Plan as modified to incorporate the terms of the Term Sheet in a manner materially adverse to the consideration and treatment proposed to be provided to the Put Parties other than in accordance the Term Sheet;

iii. not take any action to hinder or delay prosecution of the Plan or implementation of the transactions contemplated thereunder or under the Term Sheet; and

iv. take all actions reasonably necessary to consummate the transactions described in the Term Sheet as the same is incorporated into and in accordance with the Plan.

4

(c)    Transfers of Claims.

Each Put Party may sell, assign, transfer, hypothecate or otherwise dispose of, directly or indirectly (each such sale, assignment, transfer, hypothecation or other disposition, a "Transfer"), all or any portion of its Relevant Claims (as defined below), if any, or any right related thereto, including any voting rights associated with such Relevant Claims; provided that, the transferee thereof (i) agrees in writing, prior to such Transfer, to assume the rights and obligations of the Party making such Transfer under this Agreement and (ii) promptly delivers such writing to each other Party to this Agreement (each such transferee becoming, upon the Transfer, a Party hereunder).  Any sale, transfer or assignment of a Relevant Claim that does not comply with the procedure set forth in the first sentence of this Subsection 2(c) shall be deemed void *ab initio*.

(d)    Representations of the Put Parties.

Each Put Party represents, with respect to itself only, that, as of the date hereof:

    i.     it is the owner, affiliate and/or the trustee, investment advisor or manager for the owner of all claims each Put Party and its affiliates hold against the Debtors (collectively, the "Relevant Claims");

    ii.    none of the Put Parties nor any of their affiliates have made any prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or any part, any portion of its right, title or interest in the Relevant Claims.

## 3.   **Mutual Representations, Warranties, and Covenants.**

Each Party makes the following representations and warranties, solely with respect to itself, to each of the other Parties:

(a)    Enforceability.

Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, and except as set forth herein, this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)    Power and Authority.

It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement and the Plan.

5

(c)    Authorization.

The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(d)    No Conflicts.

The execution, delivery and performance of this Agreement does not and shall not: (a) violate any provision of law, rule or regulations applicable to it or any of its subsidiaries; or (b) violate its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries.

4.    **Acknowledgement.**

This Agreement and the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives.  This Agreement is not and shall not be deemed to be a solicitation for votes in favor of any chapter 11 plan or for consent to the Plan in contravention of applicable non-bankruptcy law or section 1125(b) of the Bankruptcy Code.  Notwithstanding anything to the contrary contained herein, the acceptance of any Party shall not be solicited until, and any obligation to support confirmation of the Plan is expressly conditioned on, the receipt by such Party of the Plan and a copy of the Disclosure Statement that shall have previously been approved by the Bankruptcy Court, after notice and a hearing, as containing adequate information as required by section 1125 of the Bankruptcy Code.  Notwithstanding the foregoing provisions, nothing in this Agreement shall require any Party to take any action prohibited by the Bankruptcy Code, the Securities Act of 1933 (as amended), the Securities Exchange Act of 1934 (as amended), any rule or regulations promulgated thereunder, or by any other applicable law or regulation or by an order or direction of any court or any state or federal governmental authority.

5.    **Termination.**

(a)    By the Put Parties.

Each of the Put Parties may terminate this Agreement by providing five (5) days (the "Put Party Notice Period") advance written notice to the Mortgage Lenders and FG (the "Put Party Notice") of the occurrence of any of the following termination events (the "Put Party Termination Events"), unless the occurrence of such Put Party Termination Event is waived in writing by each of the Parties prior to the expiration of such Put Party Notice Period:

i.    any court of competent jurisdiction or other competent governmental or regulatory authority issues a ruling, determination, or order making illegal or otherwise restricting, preventing or prohibiting the consummation of the restructuring transactions specified in the Plan and the Term Sheet, including an order of the Bankruptcy Court denying confirmation of the Plan, which ruling, determination or order (i) has been in effect for 30 days and (ii) is not subject to stay;

6

ii.     the Plan as modified is not consistent in all material respects with the terms of the Term Sheet, provided that any Put Party that desires to terminate this Agreement under this clause (ii) must provide a Put Party Notice no later than two (2) business days after such Put Party's receipt of the Plan as so modified and such termination shall only be effective upon the expiration of the Put Party Notice Period;

iii.     any of the FG Parties, or any of the Mortgage Lenders, breaches its obligations under this Agreement;

iv.     the Propco Commitment is terminated in accordance with its terms;

v.     any condition or term contained in the Term Sheet is not satisfied according to its terms;

vi.     the Plan is modified in a manner, or the Bankruptcy Court enters a Confirmation Order (as defined in the Plan), that is materially adverse to the consideration and treatment proposed to be provided to the Put Parties, in accordance the Term Sheet, under the Plan;

vii.     the Propco Commitment contemplated by section 2(a)(i) hereof is not entered into on or before July 29, 2010;

viii.     if the Plan is confirmed, the effective date of the Plan has not occurred on or prior to June 30, 2011; or

ix.     the Chapter 11 Case of Propco shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed, or a chapter 11 trustee with plenary powers, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases.

(b)    By FG/Mortgage Lenders

The Mortgage Lenders and FG may terminate this Agreement by providing five (5) days advance written notice to the Put Parties (the "Notice Period") of the occurrence of any of the following termination events (the "Termination Events"), unless the occurrence of such Termination Event is waived in writing by each of the Parties prior to the expiration of such Notice Period:

i.     any court of competent jurisdiction or other competent governmental or regulatory authority issues a ruling, determination, or order making illegal or otherwise restricting,

7

preventing or prohibiting the consummation of the restructuring transactions specified in the Plan and the Term Sheet, including an order of the Bankruptcy Court denying confirmation of the Plan, which ruling, determination or order (i) has been in effect for 30 days and (ii) is not subject to stay;

ii.  the Put Parties breach, or any individual Put Party breaches, their obligations under this Agreement;

iii.  the Propco Commitment is terminated in accordance with its terms;

iv.  any condition or term contained in the Term Sheet is not satisfied according to its terms;

v.  the Propco Commitment contemplated by section 2(a)(i) hereof is not entered into on or before July 29, 2010

vi.  if the Plan is confirmed, the effective date of the Plan has not occurred on or prior to June 30, 2011; or

vii.  the Chapter 11 Case of Propco shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed, or a chapter 11 trustee with plenary powers, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases.

(c)  Effect of Termination.

This Agreement shall cease to be of any effect upon its termination and, without limiting the scope of the foregoing clause, upon termination of this Agreement:

i.  the Mortgage Lenders and FG shall have no obligations under this Agreement or the Term Sheet; and

ii.  the Put Parties shall have no obligations under this Agreement or the Term Sheet.

For the avoidance of doubt, termination of this Agreement shall not affect the binding effect of, and commitments made by, the Put Parties in the Propco Commitment, and the Propco Commitment shall remain enforceable by its terms, subject to the conditions thereof. If the Propco Commitment is terminated in accordance with its terms, however, the Plan may be amended to remove the terms of the Propco Rights Offering.

8

6. **Miscellaneous Terms**.

    (a)    Binding Obligation; Assignment.

    **Binding Obligation**.  This Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their representatives upon its execution.  Nothing in this Agreement, express or implied, shall give to any entity, other than the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, successors, assigns, heirs, executors, administrators and representatives, any benefit or any legal or equitable right, remedy or claim under this Agreement.

    **Assignment.**  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity except as provided in Section 2(c) hereof.

    (b)    FG Capacity.

    Nothing in this Agreement shall prevent or limit either of the FG Principals from fulfilling his fiduciary duties to SCI by voting or taking other actions in his capacity as a director or officer of SCI; provided, however, if any such votes or actions result in a breach of any material covenant or provision of this Agreement, then each Party other than the FG Principals shall have the right to terminate this Agreement pursuant to Section 5 above as its sole and exclusive remedy for such breach.

    (c)    Fiduciary Obligations of Put Purchasers

    It is understood that representatives of Fidelity Management and Research Company and Serengeti Asset Management, L.P. are on the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (the "UCC") and therefore may, in their capacity as a member of the UCC, have fiduciary duties to the Opco Unsecured Creditors. Nothing in this Agreement shall prohibit or limit the ability of such members of the UCC, in their capacity as such, to act on matters before the UCC in accordance with such fiduciary duties; provided, however, that the existence of such fiduciary duties shall not permit such members to act, in their individual capacities, in a manner that is inconsistent with their obligations in the Term Sheet (or the agreements contemplated hereby).

    (d)    Further Assurances.

    The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occurs before or after the date of this Agreement.

9

(e)    Headings.

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

(f)    Governing Law.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in the Bankruptcy Court. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.

(g)    Specific Performance.

The Parties hereby acknowledge that the rights of the Parties under this Agreement are unique and that remedies at law for breach or threatened breach of any provision of this Agreement would be inadequate and, in recognition of this fact, agree that, in the event of a breach or threatened breach of the provisions of this Agreement, in addition to any remedies at law or remedies provided herein, the Parties shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available and the Parties hereby waive any objection to the imposition of such relief.

(h)    Complete Agreement, Interpretation and Modification.

i.    **Complete Agreement.**  This Agreement and the Term Sheet constitute the complete agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between or among the Parties with respect thereto.

ii.    **Interpretation.**  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner.  There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

10

iii.    **Modification of this Agreement.** This Agreement (including the Term Sheet) may only be modified, altered, amended or supplemented, or otherwise deviated from in accordance with the Term Sheet or otherwise in an agreement in writing signed by each Party hereto.

(i)    Effectiveness.

This Agreement shall be immediately effective once each Party hereto has duly executed and delivered a counterpart to this Agreement to each other Party hereto.

(j)    Execution of this Agreement.

This Agreement may be executed and delivered (by facsimile, email or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(k)    Settlement Discussions.

This Agreement, the Plan and the Term Sheet are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.  None of the Parties hereto shall be liable, on any theory of liability, for any special, indirect, consequential or punitive damages on any claim (whether founded in contact, tort, legal duty or any other theory of liability) arising from or related in any manner to this Agreement or the negotiation, execution, administration, performance, breach, or enforcement of this Agreement or the instruments and agreements evidencing, governing or relating to the Plan contemplated hereby or any amendment thereto or the consummation of, or any failure to consummate, the Plan or any act, omission, breach or wrongful conduct in any manner related thereto.

Except as expressly provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including, but not limited to, any and all of its claims and causes of action against any of the Debtors, any liens or security interests it may have in any assets of any of the Debtors or any of the non-debtor affiliates of the Debtors, or its full participation in the Chapter 11 Cases.

Without limiting the immediately foregoing paragraph of this Agreement in any way, if the transactions contemplated by this Agreement, the Plan or the Term Sheet are not consummated as provided herein, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies and interests under the applicable documents to which it is a party or otherwise has rights, applicable law and in equity.

11

(l)    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

       i.      If to the Mortgage Lenders, to:

German American Capital Corporation
60 Wall Street, 10th Floor
New York, NY 10005
Attn:  Robert W. Pettinato, Jr. and General Counsel
Tel: 212-250-5579
Fax: 212-797-4489

with a copy (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Attn:  Larry J. Nyhan and Jeffrey E. Bjork
Tel:  312-853-7000
Fax: 312-853-7036

-and-

JPMorgan Chase Bank, N.A.
383 Madison Avenue, 31st Floor
New York, NY 10179
Attn: Joseph Geoghan and Scott Dauer
Tel: 212-834-9303
Fax: 917-463-0946

with a copy (which shall not constitute notice) to:

Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W.
Washington, DC 20001
Attn: Peter M. Dodson, Esq.
Tel: 202-862-2200
Fax: 202-862-2400

12

ii.        If to FG or the FG Principals, to:

Fertitta Gaming LLC
1505 South Pavilion Center Drive
Las Vegas, NV  89135
Attn:  Frank Fertitta
Tel: 702-495-3000
Fax:

with a copy (which shall not constitute notice) to:

Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Attn:  Thomas B. Walper
Tel: 213-683-9100
Fax: 213-687-3702

with a courtesy copy to:

Debtors's Counsel:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Attn: Paul S. Aronzon and Thomas R. Kreller
Tel:  213-892-4000
Fax: 213-629-5063

-and-

Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Attn:  Oscar Garza and Dennis Arnold
Tel: 213-229-7000
Fax: 213-229-7520

iii.        If to the Put Parties, to:

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Attn:  Allan S. Brilliant
Tel:  212-698-3600
Fax:  212-698-0612

13

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or email shall be effective upon oral or machine confirmation of transmission.

(m)   Time of the Essence.

The Parties agree that time is of the essence with respect to each and every term and provision of this Agreement.

(n)   Mortgage Lenders Capacity

The Parties acknowledge that the terms of this Agreement relating to the rights and obligations of any Mortgage Lender relate solely to such Mortgage Lender's rights and obligations as a Mortgage Lender or secured party under the Mortgage Loan Agreement and the Mezz 1 Loan Agreement and other Security Instruments, Security Documents or other Loan Documents (as defined in either such document) and do not bind such Mortgage Lender or its affiliates (collectively, the "Lender Parties") with respect to any other indebtedness owed by SCI, Propco or any affiliate thereof (other than indebtedness owed by any SCI affiliate to Propco) to any such Lender Party or any affiliate of such Lender Party.

(o)   Exclusion of Certain Oaktree Entities

Notwithstanding anything in this Agreement to the contrary, the Parties acknowledge that Oaktree Fund GP II, L.P., solely in its capacity as general partner of those high yield commingled funds that own senior debt of the Debtors, and Oaktree Capital Management, L.P., solely in its capacity as investment manager of those high yield separate accounts that own senior debt of the Debtors (collectively, the "Non-Participating Oaktree Funds"), will not be participating in the Propco Commitment and, therefore, the provisions of this Agreement relating to the Put Parties' obligations as Put Parties with respect to the Term Sheet and the Propco Commitment, including Section 2(a)(i) hereof, shall not apply to the Non-Participating Oaktree Funds and, therefore, the Non-Participating Oaktree Funds shall not have any obligations under this Agreement as Put Parties with respect to the Term Sheet and the Propco Commitment, except that the Non-Participating Oaktree Funds shall otherwise have the same obligations as the Put Parties as specified in Section 2(a)(ii) – (vii) hereof.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

14

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

**German American Capital Corporation**

By: _____

Name: _____ John K. Beacham _____

Title: _____ Director _____

By: _____

Name: _____

Title: _____

LA1 1846931
LA1 1842722

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

**German American Capital Corporation**

By: _____

Name: _____ John K. Beacham

Title: _____ Director

By: _____

Name: Scott Waynebeen

Title: Managing Director

LA1 1846931
LA1 1842777

**JPMorgan Chase Bank, N.A.**

By: _____

Name: ___Scott Dauer___

Title: ___Executive Director___

**Fertitta Gaming LLC**

By: _____

Name: Frank J. Fertitta III

Title: Authorized Signatory

**Frank J. Fertitta**

Lorenzo J. Fertitta

SERENGETI STATION HOLDCO LTD.

By: _____

Name: _____ **Alexander Lemond** _____

Title: _____

SERENGETI PARTNERS LP

By: _____

Name: _____
~~Alexander Lemond~~

Title: _____
~~Director~~

**Fidelity Puritan Trust: Fidelity Puritan Fund**

By: _____

Name: Kenneth Robins

Title: Treasurer

Fidelity Advisor Series I: Fidelity Advisor High
Income Advantage Fund

By: _____

Name: Kenneth Robins

Title: Treasurer

**Fidelity School Street Trust: Fidelity Strategic Income Fund**

By: _____

Name: Kenneth Robins

Title: Assistant Treasurer

**Fidelity Summer Street Trust: Fidelity Capital & Income Fund**

By: _____

Name: Kenneth Robins

Title: Treasurer

**Fidelity Advisor Series II: Fidelity Advisor
Strategic Income Fund**

By: _____

Name: ___Kenneth Robins___

Title: ___Assistant Treasurer___

**Variable Insurance Products Fund V: Strategic Income Portfolio**

By: _____

Name: Kenneth Robins

Title: Assistant Treasurer

**OCM Principal Opportunities Fund IV Delaware, L.P.**

By:  OCM Principal Opportunities Fund IV Delaware GP Inc., its general partner

By: *Skardon F. Baker*

Name: SKARDON F. BAKER

Title: Authorized Signatory

By: *[signature]*

Name: AKIRA OKUBO

Title: Authorized Signatory

**OCM Opportunities Fund VIIb Delaware, L.P.**

By:  Oaktree Fund GP, LLC, its general partner

By:  Oaktree Fund GP I, L.P., its managing member


By: _____

Name: ____Kenneth Liang_____

Title: Authorized Signatory


By: _____

Name: ____Rajath Shourie_____

Title: Authorized Signatory

**Oaktree Fund GP II, L.P., solely in its capacity as general partner of those high yield commingled funds that own senior debt of Station Casinos, Inc.**

By: _Sheldon M Stone_

Name: _Sheldon M. Stone_

Title: Authorized Signatory


By: _Robert S. Perelson_

Name: Robert S. Perelson _____

Title: Authorized Signatory

**Oaktree Capital Management, L.P., solely in its capacity as investment manager of those high yield separate accounts that own senior debt of Station Casinos, Inc.**

By: _Sheldon M Stone_

Name: _Sheldon M. Stone_

Title: Authorized Signatory

By: _____

Name: **Robert S. Perelson** _____

Title: Authorized Signatory

# Exhibit 4

# Exhibit 4

**PUT PARTY COMMITMENT AGREEMENT**

August 5, 2010

German American Capital Corporation
60 Wall Street, 10th Floor
New York, NY 10005
Facsimile:  (212) 797-4489
Attention:  Robert W. Pettinato, Jr.
            John Beacham

JPMorgan Chase Bank, N.A.
383 Madison Avenue, 31st Floor
New York, NY 10179
Facsimile:  (917) 463-0946
Attention:  Joseph Geoghan
            Scott Dauer

Frank J. Fertitta III
Lorenzo J. Fertitta
Fertitta Gaming, LLC
10801 W. Charleston Boulevard
Suite 600
Las Vegas, NV 89135
Facsimile:  (702) 362-5889
Attention:  Frank J. Fertitta, III

Ladies and Gentlemen:

       Reference is made to that certain Support Agreement, dated as of July 28, 2010
(together with the exhibits, annexes and other attachments thereto, as such agreement may be
amended, modified or otherwise changed from time to time, the "Support Agreement"),
including the Term Sheet attached to the Support Agreement as Attachment 1 (as amended,
modified or otherwise changed from time to time, the "UCC Term Sheet"), by and among (a) the
funds managed by Fidelity Management & Research Company or its affiliates listed on the
signature pages hereto (collectively, "Fidelity"), (b) the funds managed by Oaktree Capital
Management, L.P. or its affiliates listed on the signature pages hereto (collectively, "Oaktree"),
(c) the funds managed by Serengeti Asset Management, LP or its affiliates listed on the
signature pages hereto (collectively, "Serengeti" and, together with Fidelity and Oaktree, the "Put
Parties"), (d) JPMorgan Chase Bank, N.A. ("JPM") and German American Capital Corporation
("GACC" and, together with JPM, the "Mortgage Lenders"), (e) Fertitta Gaming, LLC ("FG")
and (f) Frank J. Fertitta III and Lorenzo J. Fertitta (together with FG and the Mortgage Lenders,

1

the "ML/FG Parties").  Except as otherwise noted herein, capitalized terms used and not defined herein have the meanings given to such terms in the UCC Term Sheet.

WHEREAS, on July 28, 2009 (the "Petition Date"), the Debtors commenced cases under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").

WHEREAS, New Propco Holdco proposes to offer and sell equity interests of New Propco Holdco issued in accordance with the Plan (the "New Propco Holdco Equity"), pursuant to a Propco Rights Offering (the "Propco Rights Offering") whereby New Propco Holdco will distribute purchase rights (each, a "Right") to each Opco Unsecured Creditor that is an Accredited Investor with allowed unsecured claims ("Claims") outstanding and held of record as of a record date (the "Record Date" and the holders of such Claims on such date, the "Claimholders").

WHEREAS, the Propco Rights Offering shall be conducted in connection with the Plan containing terms consistent with the UCC Term Sheet to be confirmed pursuant to an order of the Bankruptcy Court administering the Chapter 11 Cases (the "Confirmation Order").

WHEREAS, the Rights shall be allocated among the classes or categories, as the case may be, of Opco Unsecured Creditors on a pro rata basis in proportion to Claims (but with a minimum purchase being $250,000), subject, in each case, to any applicable contractual subordination agreements except to the extent the parties otherwise agree and such agreement is reflected in the Plan and approved by the Bankruptcy Court.

WHEREAS, the Plan proposes to conduct the Propco Rights Offering utilizing a two-step process by which the Claimholders that are Accredited Investors will have the opportunity to indicate whether such Claimholders are interested in participating in the Propco Rights Offering on their ballot for voting on the Plan (the "Interest Solicitation"), and then, after the deadline for voting on the Plan, the Claimholders that indicated in the Interest Solicitation that they had interest in participating in the Propco Rights Offering will have the opportunity to subscribe to the Propco Rights Offering (the "Subscription Solicitation").

WHEREAS, in order to facilitate the Propco Rights Offering, pursuant to this letter agreement and subject to the terms, conditions and limitations set forth herein, each of the Put Parties agrees to purchase New Propco Holdco Equity, on the terms and conditions set forth in this letter agreement.

WHEREAS, in exchange for the Committed Amount (as defined below), the Put Parties will receive from New Propco Holdco a Put Premium in the aggregate amount of $3,000,000 and, in addition, the Put Parties will receive (so long as they hold at least 40% in aggregate principal amount of the unsecured senior notes of Opco) the right to purchase at least one half of New Propco Holdco Equity available in the Propco Rights Offering.

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

2

1.    <u>The Put Commitment</u>.

       (a)    Upon the terms and subject to the conditions set forth in this letter agreement (including in section 1(c)), each of the Put Parties hereby, severally but not jointly, irrevocably commits, covenants and agrees to purchase from New Propco Holdco through one or more (but no more than ten (10)) Blockercos (and to take each and every action necessary in order to cause each such Blockerco to effect such purchase, it being understood that the formation and use of up to ten (10) Blockercos contemplated herein shall not impose on New Propco Holdco or the ML/FG Parties any additional expense obligations beyond those currently contemplated in the UCC Term Sheet), in a cumulative amount not exceeding the dollar amount (its "<u>Committed Amount</u>") set forth under its signature hereto as follows: (a) on the Effective Date or at such other time as may be specified in the definitive documents, the New Propco Holdco Effective Date Put Equity (as defined below) at the New Propco Holdco Effective Date Put Price (as defined below) (the "<u>Initial Commitment Amount</u>") and (b) on any Applicable Equity Raise Date (as defined below) on or prior to June 30, 2011 and at the time specified in the definitive documents, the Applicable Equity Raise Put Equity at the Applicable Equity Raise Put Price (the "<u>Upsizing Commitment Amount</u>"); <u>provided</u>, <u>however</u>, that the obligation of each Put Party to purchase New Propco Holdco Equity hereunder shall not require it to fund an aggregate amount in excess of its Committed Amount.  Each Put Party's obligations to purchase new Propco Holdco Equity hereunder shall terminate on the earlier of (x) June 30, 2011 and (y) the date on which the outstanding dollar amount funded by such Put Party pursuant hereto equals its Committed Amount.  The aggregate Committed Amounts shall be $100 million, of which the aggregate Initial Commitment Amounts shall be $35.3 million and the aggregate Upsizing Commitment Amount shall be $64.7 million.

       (b)    The ML/FG Parties hereby acknowledge and agree, that the Put Parties will, subject to the terms and conditions hereof (including having funded the commitments required to be made on of before the Effective Date) and those in the UCC Term Sheet, be entitled to receive from New Propco Holdco, on the Effective Date and as a condition of their obligations to fund hereunder, the aggregate amount of $3 million (the "<u>Put Premium</u>"), which payment shall be effected, at the ML/FG Parties' sole discretion, through a cash payment by wire transfer in immediately available funds to the accounts specified by the Put Parties to New Propco Holdco within two (2) Business Days prior to the Effective Date or as a deduction from the purchase price otherwise payable by the Put Parties for New Propco Holdco Equity being purchased by them through Blockerco on the Effective Date.  The Put Premium will be paid to the Put Parties ratably based on their respective Committed Amounts.  The Put Premium will be treated as non-refundable when paid, <u>provided</u>, <u>however</u>, that each Put Party shall repay, in whole or in part, as the case may be, its proportionate share of any Put Premium received by it as provided for herein in the event that such Put Party (i) breaches its obligation to fund any equity raise following the Effective Date (in which case, such Put Party shall return to New Propco Holdco that portion of the Put Premium received by it which is attributable to the amount of any such equity raise which is not so funded), (ii) intentionally or recklessly breaches any representation set forth on Exhibit A of the UCC Term Sheet that it made or was required to make on or as of the Effective Date and such breach results in the rescission of all or a portion of the amount invested in any equity raise by such Put Party pursuant to the terms hereof (in which case, the Put Premium attributable to the rescinded amount shall be returned), or (iii) (x) cannot make any representations or provide support for verifications set forth on Exhibit A of the UCC

3

Term Sheet on or as of the Effective Date and (y) enters into escrow or other arrangements to permit funding of its investment pending confirmation of such representations or verifications, but such representations or verifications cannot be finalized as a result of any intentional act by or on behalf of such Put Party undertaken for the purpose of having such representations or verifications being unable to be made and such failure results in any portion of the purchases contemplated by such Put Party's Committed Amount not being completed or being rescinded (in which case, the Put Premium attributable to the unpurchased or rescinded amount so placed in escrow by such Put Party shall be returned to New Propco Holdco).

          (c)      The obligations of the Put Parties hereunder are several and not joint, and Serengeti Overseas MM L.P. shall by separate document executed concurrently herewith guarantee the payment obligations of Serengeti Station Holdco Ltd.  All purchases of New Propco Holdco Effective Date Put Equity and Applicable Equity Raise Put Equity hereunder shall be allocated among the Put Parties ratably in proportion to the unfunded portion of their respective Committed Amounts on the Effective Date or Applicable Equity Raise Date, as applicable, or as the Put Parties shall, otherwise mutually agree.  Any allocation from one Put Party to another Put Party shall be treated as a permitted assignment under Section 9(a) hereof and written notice of such re-allocation shall be provided to the other parties hereunder, it being understood and agreed that such permitted assignment shall be subject to the final sentence of Section 9 hereof.  No failure of any Put Party to fund any such purchase on any date required hereunder shall relieve any other Put Party of its corresponding obligation to do so on such date or on any other date, and no Put Party shall be responsible for the failure of any other Put Party to so fund any such purchase; provided, however, that if any Put Party indicates that it will not purchase, or fails to purchase, its pro rata share of any purchase that it is obligated to make hereunder (a "Defaulting Purchaser"), then each of the other Put Parties (or the sole Put Party that is not a Defaulting Purchaser in the event that each other Put Party is a Defaulting Purchaser) (each, a "Performing Purchaser"), on not less than five Business Days' written notice from the ML/FG Parties, will purchase (the "Curative Purchase") the lesser of (x) the amount of New Propco Holdco Equity which each Defaulting Purchaser failed to purchase (or indicated that it would not purchase) and (y) the amount of New Propco Holdco Equity which would cause the outstanding dollar amount funded by such Performing Purchaser pursuant hereto to equal its Committed Amount, it being understood that in the event that there is more than one Performing Purchaser, the obligation to make the Curative Purchase shall be allocated ratably between or among, as the case may be, the Performing Purchasers in the proportion that their respective Committed Amounts bear to one another.[1]  In the event that any Performing Purchaser makes a Curative Purchase pursuant to the immediately preceding sentence, and such Performing Purchaser thereafter is afforded the opportunity to participate in a future Post-Effective Equity Raise as described in the UCC Term Sheet under the caption "Post-Effective Investment Right," then (i) such Performing Purchaser shall be entitled to reduce its participation in such Equity Raise to the amount (which amount may be $0) that would keep its total investment in New Propco Holdco at the level (the "Baseline Committed Level") that would have occurred but for

---

[1]      By way of illustration, if there were three Put Purchasers, each Put Purchaser had a Committed Amount of $33 mm, no unsecured creditors had purchased their pro rata allocation of equity interests in the Propco Rights Offering, and one of the three purchasers failed to satisfy its purchase obligations hereunder, the other Put Purchasers would each purchase 50% of the initial $35.3 mm purchase of New Propco Holdco Effective Date Put Equity on the Effective Date and their Upsizing Commitment Amounts would be reduced by the excess of their initial funding over their pro rata share of the Initial Commitment Amount.

its making of such Curative Purchase and (ii) such Performing Purchaser shall be treated as having purchased the full amount of New Propco Holdco Equity offered to it for purposes of determining whether it retains its rights to participate in future Post-Effective Equity Raises, it being understood and agreed that the rights and privileges of a Performing Purchaser under this sentence shall terminate and be of no further force or effect at such time as such Performing Purchaser no longer requires the same in order to remain at the Baseline Committed Level. Notwithstanding the foregoing, it is understood and agreed that the addressees hereof shall have all rights to pursue a Put Party for any failure by such Put Party to satisfy any commitment to make any purchase required hereunder or any other obligation contained herein.

For purposes of this letter agreement:

(i)          "Actual Knowledge" means actual knowledge (without duty of inquiry, investigation or validation) of the appropriate Persons who would normally be responsible for maintaining such information (it being understood that in the case of any Put Party managed by Fidelity Management & Research Company, such Person will be the Person executing such definitive documents), a list of which Persons will be provided to the parties hereto concurrently with the provision of the information described in clauses (g), (h), (i) or (j) of Section 2.

(ii)          "Allocated Equity Raise Portion" means, with respect to any Equity Raise, 15% of such Equity Raise (it being understood and agreed that capital contributions by or on behalf of the Mortgage Lenders will be deemed to include Propco cash/cash collateral or equivalents delivered to New Propco Holdco or one of its subsidiaries at the direction of the Mortgage Lenders that would otherwise be distributed to the Mortgage Lenders as part of their recovery under the Plan).

(iii)          "Applicable Equity Raise Date" means, with respect to any Equity Raise, the date of consummation thereof (or, if the definitive documentation provides for pre-funding not earlier than four Business Days prior to the consummation date, such pre-funding date), provided that no Applicable Equity Raise Date shall occur after June 30, 2011. For the avoidance of doubt, if an Equity Raise occurs on the Effective Date, such date shall be deemed to be both the Effective Date and an Applicable Equity Raise Date.

(iv)          "Applicable Equity Raise Put Price" means, with respect to any Equity Raise, the aggregate purchase price for the Applicable Equity Raise Put Equity.

(v)          "Applicable Equity Raise Put Equity" means, with respect to any Equity Raise, the amount by which the Allocated Equity Raise Portion thereof exceeds the portion of such Equity Raise actually purchased on the Applicable Equity Raise Date by the Opco Unsecured Creditors and Put Parties in accordance with the allocation procedures described under "New Propco Holdco Investment Right—Allocation" of the UCC Term Sheet. Applicable Equity Raise Put Equity shall be priced at the same per unit value as the units offered to other investors under the related Equity Raise.

5

(vi)                "Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.

(vii)                "New Propco Holdco Effective Date Put Equity" means (i) $35.3 million of New Propco Holdco Equity, allocated as being available for subscription and purchase on the Effective Date through Blockerco by the Opco Unsecured Creditors and Put Parties in accordance with the allocation procedures described under "New Propco Holdco Investment Right—Allocation" of the UCC Term Sheet (but excluding any New Propco Holdco Equity available for subscription and purchase as a result of any Equity Raise on such date) less (ii) New Propco Holdco Equity actually purchased by the Opco Unsecured Creditors and Put Parties on the Effective Date pursuant to such allocation procedures (but excluding any New Propco Holdco Equity subscribed for and purchased as a result of any Equity Raise on such date) (such New Propco Holdco Equity actually purchased pursuant to this clause (ii), the "Purchased Equity").  For the avoidance of doubt, (i) the $35.3 million figure set forth in the immediately preceding sentence is predicated on an initial Plan Value of $200 million before giving effect to any purchase of New Propco Holdco Equity by the Put Parties and any other Opco Unsecured Creditors, (ii) any increases in such Plan Value above $200 million due to additional capital contributions or equity issuances as of or prior to the Effective Date (including any reduction in the debt agreed to by the Mortgage Lenders below the Effective Date level contemplated by the Plan as currently filed with the Bankruptcy Court (with the consent of the Debtors and FG and approval, if required, of the Bankruptcy Court) in exchange for additional New Propco Holdco Equity or as a capital contribution to New Propco Holdco), shall be treated as the Mortgage Lenders' participation in an Additional Equity Issuance as to which the Propco Commitment is deemed to apply under the UCC Term Sheet with respect to the participation obligations of the Put Parties, as described under the caption thereunder entitled "Effect of Subsequent Equity Offerings", (iii) any reduction in debt described in clause (ii) above shall not exceed $50,000,000 without the prior written consent of the Put Parties and (iv) the amount of any reduction in the debt described in clause (ii) shall count towards the maximum amount of any Debt Paydown Issuance permitted without the consent of the Put Parties under the UCC Term Sheet. [2]

(viii)                "New Propco Holdco Effective Date Put Price" means $35.3 million less the gross amount paid on the Effective Date to New Propco Holdco through Blockerco by the Opco Unsecured Creditors and Put Parties to purchase through Blockerco the Purchased Equity in accordance with the allocation procedures described under "New Propco Holdco Investment Right—Allocation" of the UCC Term Sheet.

(ix)                "Person" means any individual, partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or other business entity or any governmental entity (or any department, agency or political subdivision thereof).

---

[2] By way of clarity, if there is a reduction in debt which occurs on the Effective Date, but such reduction is funded in part with cash from New Propco Holdco (including the $35.3 million described in clause (i) of the definition of "New Propco Holdco Effective Date Put Equity"), the portion that is so funded with cash shall not be deemed to be an Additional Equity Issuance, and the Allocated Equity Raise Portion shall not apply to such portion of such debt reduction.

(x)              "Upper-Tier 5% Investor" means a Person owning an indirect beneficial interest of five percent or more of the applicable Put Party.

2.    Representations and Warranties of the Put Parties.

Each of the undersigned Put Parties, severally and not jointly, makes the following representations and warranties to the addressees of this letter agreement:

(a) this letter agreement is a legal, valid and binding obligation of such undersigned Put Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b) such undersigned Put Party has all requisite power and authority to enter into this letter agreement and to carry out the transactions contemplated by, and perform its obligations under, this letter agreement;

(c) the execution and delivery of this letter agreement and the performance of the obligations hereunder of such undersigned Put Party have been duly authorized by all necessary action of the Put Party;

(d) the execution, delivery and performance of this letter agreement does not and shall not violate such undersigned Put Party's articles or certificate of incorporation, certificate of formation or other organizational documents;

(e) such undersigned Put Party has the funds necessary to fund its Committed Amount and on the Effective Date and the Applicable Equity Raise Date will have the funds necessary to fund its Initial Commitment Amount and Upsizing Commitment Amount, respectively;

(f) such Put Party has no present plan or intention (i) to exercise any New Propco Holdco Warrant (it being understood that an intent to exercise if the strike price is in the money due to increases in equity value after the Effective Date shall not be considered a present plan or intention), subject to future reexamination during the exercise period thereof based upon then current value information or (ii) to acquire any New Propco Holdco Equity (either directly or through Blockerco) or any interest in Blockerco from any other holder thereof (it being understood that an intent to acquire in the event of an opportunity arising after the Effective Date that is not part of a commitment, arrangement or understanding existing prior to the Effective Date shall not be considered a present plan or intention);

(g) for a Put Party owning five percent or more in value of the stock of a Blockerco, based on the Put Party's Actual Knowledge the Equity List (as defined below) identifies any equity interest through which such Put Party could own through any of FC Co-investment Partners, L.P., Colony Investors VII, L.P., Colony Investors VIII, L.P., Colony Parallel Investors VIII, L.P., Colony Parallel NA-RE Investors VIII, L.P., or Axon Rising Sun, LLC, any stock of Station Casinos, Inc. ("SCI") (for purposes of Section 267 of the Internal Revenue Code of 1986, as amended (the "Code"), and the U.S. Treasury regulations promulgated thereunder);

7

(h) such Put Party has provided Ernst & Young LLP (i) a list accurately reflecting its records of record owners owning a direct interest of five percent or more of the Put Party as of the date set forth thereon and (ii) to the Actual Knowledge of the Put Party, the list provided in (i) above (expanded at the time the representation is made, to the extent necessary, to reflect any additional persons in (x) or (y) below) identifies (x) any record owners of five percent or more of such Put Party and (y) any Upper-Tier 5% Investors of such Put Party.  In applying the foregoing, for any Put Party that is a mutual fund, relying upon the precise name of the account registration for each record owner and for any Put Party that is a partnership, such ownership being measured using K-1 reporting criteria, and it being understood that any flaw in the Put Party's records shall not constitute a breach thereof;

(i) for a Put Party owning five percent or more in value of the stock of a Blockerco, such Put Party has provided Ernst & Young LLP a list (the "Equity List"), accurately reflecting its records of all equity interests in other persons directly held by the Put Party (except for any wholly-owned subsidiaries which do not own any direct or indirect equity interests in any other person (other than any equity interest in another such direct or indirect wholly-owned subsidiary)) as of the date set forth thereon;

(j) for a Put Party owning less than five percent in value of the stock of a Blockerco, such Put Party (i) does not own directly five percent or more in value of the stock of such Blockerco, and (ii)(A) has provided a list accurately reflecting its records of all equity interests in other persons directly held by the Put Party (except for any wholly-owned subsidiaries which do not own any direct or indirect equity interests in any other person (other than any equity interest in another such direct or indirect wholly-owned subsidiary)) as of the date set forth thereon and based on the Put Party's Actual Knowledge, the list provided in (ii)(A) above identifies any equity interests through which such Put Party could own stock of Blockerco (for purposes of Section 267 of the Code, applying the limitations in Section 267(e)(3)(A) and (B) of the Code), or (B) to the Actual Knowledge of the Put Party, does not own indirectly (for purposes of Section 267 of the Code, applying the limitations in Section 267(e)(3)(A) and (B) of the Code) five percent or more in value of the stock of such Blockerco;

(k)    such Put Party is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "<u>Securities Act</u>");

(l)    New Propco Holdco Equity is being acquired pursuant to this letter agreement and other applicable documentation by such Put Party in good faith solely for its own account, for investment and not with a view toward resale or other distribution within the meaning of the Securities Act, <u>provided</u>, <u>however</u>, that subject to compliance with the Securities Act, applicable securities laws and the respective rules and regulations promulgated thereunder, nothing contained herein shall be deemed to be a representation or warranty to hold New Propco Holdco Equity for any period of time following the Effective Date;

(m)    such Put Party (i) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in New Propco Holdco Equity being acquired hereunder and (ii) understands and is able to bear any economic risks associated with such investment (including, without limitation, the possibility of

8

holding New Propco Holdco Equity for an indefinite period of time or losing the entire value of its investment);

(n)       the financial information provided by such Put Party to the Mortgage Lenders in connection with this letter agreement with respect to itself accurately and fairly presents the liquid net assets and (if applicable) undrawn capital or similar undrawn commitments of such Put Party; and

(o)       such Put Party acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning New Propco Holdco and the Chapter 11 Cases.

Notwithstanding anything in this Section 2 to the contrary, such Put Party shall not be in breach of this letter agreement if it has not provided the representations or the information described in clauses (g), (h), (i) or (j), before the latest to occur of (a) August 13, 2010 and (b) the date on which Ernst & Young LLP ("E&Y") has entered into an agreement, in form and substance reasonably satisfactory to such Put Party (x) to keep all such information confidential and (y) not to, absent written consent from such Put Party, request information of or regarding (i) a person owning 5% or more of such Put Party or (ii) an Upper-Tier 5% Investor of such Put Party by contacting a person described in clause (i) or clause (ii) of this sentence based on information supplied by such Put Party, but instead all requests for information of or regarding such a person shall be submitted directly and solely to such Put Party; provided, that each Put Party agrees to use its reasonable efforts to diligently negotiate the terms of such confidentiality agreement in order to ensure the execution thereof within five (5) Business Days after the date of execution of this letter agreement, it being understood that such negotiation shall be carried out in good faith by such Put Party.

3.       Representations and Warranties of the ML/FG Parties. Each of the ML/FG Parties, severally and not jointly, makes the following representations and warranties to the Put Parties:

(a)                              this letter agreement is a legal, valid and binding obligation of such undersigned ML/FG Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)                              such undersigned ML/FG Party has all requisite power and authority to enter into this letter agreement and to perform its obligations hereunder;

(c)                              except with respect to signatories hereto who are natural persons, the execution, delivery and performance by it of this letter agreement has been duly authorized by all necessary action of such undersigned ML/FG Party; and

(d)                              except with respect to signatories hereto who are natural persons, the execution, delivery and performance of this letter agreement does not and shall not violate such undersigned ML/FG Party's articles or certificate of incorporation, certificate of formation or other organizational documents.

4.       Covenants.

(a)        Subject to the satisfaction by Ernst & Young LLP of the last sentence of Section 2, each Put Party shall, prior to the Effective Date, provide updated information to Ernst & Young, LLP with respect to the information concerning such Put Party as described in clauses (g), (h), (i) and (j) of Section 2 above, so that such information shall be true and accurate (subject to the exceptions set forth in such clauses) as of the anticipated Effective Date.  It is a condition to the rights of any Put Party to purchase New Propco Holdco Equity hereunder that each of the above-described representations and warranties (as supplemented by such additional information in the case of clauses (g), (h), (i) and (j) of Section 2) remain true and accurate as of the Effective Date.)  If a Put Party cannot make any representations or provide support for verifications set forth in clauses (g), (h), (i) and (j) above as of the Effective Date for whatever reason, other than as a result of any intentional act by or on behalf of such Put Party undertaken for the purpose of having such representations or verifications being unable to be made, then the Put Party shall have no right except as provided in Exhibit A to the UCC Term Sheet (and no obligation) to purchase New Propco Holdco Equity hereunder unless and until such representations can be made and verified.  The Put Parties acknowledge and agree that the occurrence of the Effective Date is subject to, among other things, the satisfaction or waiver of the conditions set forth in the Plan and that any and all consideration contemplated by the UCC Term Sheet to be provided, directly or indirectly, to the Opco Unsecured Creditors is subject to the Tax Condition and may be modified as contemplated by the UCC Term Sheet.

(b)        Each of the Parties hereto reaffirms its obligations under Section 2 of the Support Agreement to take all actions reasonably necessary on their parts to consummate the transactions contemplated hereunder as well as under the UCC Term Sheet.

5.    <u>Conditions to the Obligations of the Put Parties.</u>

(a)    The obligation of the Put Parties to purchase New Propco Holdco Equity pursuant to the Committed Amount on the Effective Date are subject to the following conditions:

    (i)    The Effective Date shall have occurred on or before June 30, 2011;

    (ii)    The Support Agreement shall not have been terminated prior to the Effective Date (other than due to a termination by the UCC or by any Put Party due to a Put Party Termination Event caused primarily by any action or omission of the Put Parties);

    (iii)    An order (which may form part of the Confirmation Order instead of a separate standalone order) approving the form, substance, and procedures of the Propco Rights Offering in form and substance reasonably satisfactory to the Put Parties (the "<u>Rights Offering Procedure Order</u>") shall have been entered by the Bankruptcy Court;

    (iv)    The Propco Rights Offering shall have been consummated in accordance with the Rights Offering Procedure Order and in accordance with definitive documentation consistent with the UCC Term Sheet (including that the Put Parties (so long as they hold a least 40% of an aggregate principal amount of unsecured senior notes of Opco) shall have had the

right to purchase at least one half of New Propco Holdco Equity available in the Propco Rights Offering) and in form and substance reasonably satisfactory to the Put Parties (except that there will be an Interest Solicitation and Subscription Solicitation rather than the one-step process set forth in the UCC Term Sheet);

(v)    (A) The Confirmation Order shall have been entered by the Bankruptcy Court in the Chapter 11 Cases and shall be consistent in all material respects with the UCC Term Sheet and this letter agreement and (B) the provisions of the Confirmation Order approving the releases and exculpation of the Put Parties shall be reasonably acceptable to the Put Parties (it being understood that language consistent with the release and exculpation provisions contained in the Plan as filed with the Bankruptcy Court on July 28, 2010 will be conclusively deemed to be reasonably acceptable to the Put Parties); provided, that if any Put Party desires to revoke its commitment under this clause (B), the applicable Put Party or Put Parties must provide a Two Put Party Notice or One Put Party Notice, as applicable, as contemplated in Section 5(a)(ii) of the Support Agreement within ten (10) Business Days of the entry of the Confirmation Order or all Put Parties shall be deemed to have waived the condition set forth in this clause 5(a)(v);

(vi)    Neither the Plan as filed with the Bankruptcy Court on July 28, 2010 nor the Confirmation Order shall have been modified in any way that is inconsistent in any material respect with the terms of the UCC Term Sheet, the Support Agreement or this letter agreement or so as to modify or otherwise affect any of the release or exculpation provisions of the Plan as filed with the Bankruptcy Court on July 28, 2010 or the provisions of the Confirmation Order approving the releases and exculpation of the Put Parties, in each case in a manner adverse in any material respect to the Put Parties; provided, that if any Put Party desires to revoke its commitment as a result of any such modification, the applicable Put Party or Put Parties must provide a Two Put Party Notice or One Put Party Notice, as applicable, as contemplated in Section 5(a)(ii) of the Support Agreement within ten (10) Business Days of the date such proposed modification is filed with the Bankruptcy Court or all Put Parties shall be deemed to have waived the condition set forth in this Section 5(a)(vi);

(vii)    The Debtors shall, not later than 15 days after the date hereof, have filed a motion and supporting papers (the "Agreement Motion") in a form reasonably acceptable to the Put Parties, seeking entry of an order (which may form part of the Confirmation Order (as defined herein)) by the Bankruptcy Court approving the payment of the fees and expenses of the Put Parties and their legal counsel pursuant to the UCC Term Sheet and the terms hereof (the "Agreement Order");

CH1 5409984v.1

(viii)    New Propco Holdco Equity to be issued on the Effective Date shall be, upon payment of the aggregate purchase price as provided herein, validly issued, fully paid, non-assessable and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as contemplated in the UCC Term Sheet and the definitive documentation embodying the same;

(ix)    The Put Parties shall have received, or shall receive substantially contemporaneously with the funding of the commitment contemplated hereby, the Put Premium as required by the UCC Term Sheet and the fees and expenses of the Put Parties and their legal counsel shall have been paid as required by the UCC Term Sheet and the Agreement Order;

(x)    The representations and warranties of the ML/FG Parties in Section 4 shall be true and correct in all material respects as if made on the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct in all material respects as of such specified date) and representations and warranties substantially similar to those set forth on Exhibit I hereto (with such modifications as may reasonably be required for the passage of time or changed circumstances) shall be provided by New Propco Holdco on the Effective Date and shall be true and correct as of such date;

(xi)    No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a ruling, determination, or order making illegal or otherwise restricting, preventing or prohibiting the consummation of the restructuring transactions specified in the Plan and the UCC Term Sheet, including an order of the Bankruptcy Court denying confirmation of the Plan, which ruling, determination or order (x) has been in effect for sixty (60) days and (y) is not subject to stay;

(xii)    The Put Parties shall have received a fully executed copy of the limited liability company agreement, equityholders agreement and any other organizational documents of New Propco Holdco containing the provisions described in the UCC Term Sheet under the captions "Post-Effective Investment Right," "Voting Rights," "Tag-Along Rights," "Rights of First Refusal," "Board Observation Rights," and "Certain Additional Rights" and otherwise reasonably acceptable to the Put Parties, including a tax distribution provision consistent with the description contained in the provision of the UCC Term Sheet entitled "Certain Additional Rights" (which provision shall be deemed to be satisfactory to the Put Parties so long as it is consistent with such description in all

12

material respects even though the tax rate applicable to the calculation of such distributions is based on the individual tax rate);[3]

(xiii)    All other instruments, agreements and all other definitive documents in connection with the Propco Rights Offering and equity investment transactions contemplated hereby shall conform to the UCC Term Sheet and be in form and substance reasonably satisfactory to the Put Parties;

(xiv)    The conditions to the obligations of the Put Parties to purchase New Propco Holdco Equity on any date after the Effective Date (an "Upsizing Effective Date") shall have been mutually agreed by the parties to this letter agreement; and

(xv)    No appeal to the Confirmation Order shall have been filed and be continuing which is materially adverse to the rights of the Put Parties under the Confirmation Order, the Plan, the UCC Term Sheet, the Support Letter and this letter agreement; provided, that if any Put Party, after reasonably and in good faith determining that such appeal is materially adverse to such rights, seeks to terminate this Agreement as a result of the filing and continuation of any such appeal, then the applicable Put Party or Put Parties must provide a Two Put Party Notice or a One Put Party Notice, as applicable, as contemplated in Section 5(a)(ii) of the Support Agreement no later than the date which is six calendar weeks after the entry of such Confirmation Order (which notice shall be deemed to bind all Put Parties) or all Put Parties shall be deemed to have waived the condition set forth in this Section 5(a)(xv).

(b)    The obligation of the Put Parties to purchase New Propco Holdco Equity pursuant to the terms hereof on an Upsizing Effective Date will be subject to the conditions and procedures agreed pursuant to Section 5(a) hereof.

(c)    The parties hereto agree to negotiate diligently and in good faith the documentation described in clauses 5(a)(iii), (iv), (xii) and (xiv) in order to ensure that the same shall be mutually agreed to by the parties to this letter agreement on or prior to the end of the tenth (10th) Business Day after each such document is provided to the Put Parties (such deadline with respect to each document so delivered, the "Documentation Deadline").

6.    <u>Intentionally Omitted.</u>

---

[3] The definitive organizational documents or equityholders agreement of New Propco Holdco will provide that any Blockerco would be able to sell equity interests of New Propco Holdco solely to fund a Tax Distribution Shortfall without compliance with any obligations to allow other equityholders to tag along with such sale, it being understood that any such sale would be subject to compliance with all first refusal and other restrictions that are otherwise applicable to transfers of equity interests in New Propco Holdco. The term "Tax Distribution Shortfall" shall mean an amount equal to the difference between the income taxes payable by the relevant Blockerco and the cash distributions made by New Propco Holdco to such Blockerco.

CH1 5409984v.1

7.      Survival of Representations and Warranties, Etc. Notwithstanding any investigation at any time made by or on behalf of any party hereto, all representations and warranties made in this letter agreement will survive the execution and delivery of this letter agreement as follows: (i) representations and warranties made herein or on Exhibit I with respect to due authorization, execution and delivery and valid issuance of New Propco Holdco Equity shall survive indefinitely; (ii) any representations and warranties herein or made on Exhibit I with respect to securities law issues will survive for a period of two years after the Effective Date (or, with respect to any such representations made on an Upsizing Effective Date, two years after such Upsizing Effective Date) and (iii) all other representations and warranties made herein or on Exhibit I will survive for a period of one year after the Effective Date (or, with respect to any such representations made on an Upsizing Effective Date, one year after such Upsizing Effective Date); provided, however, that if this agreement is terminated in accordance with its terms (other than by performance on the Effective Date or any Upsizing Effective Date, as applicable), such representations and warranties will not survive such termination.

8.      Termination.

        (a)      The Put Parties may terminate this letter agreement:

                (i)      On or after the Effective Date, if the Put Premium has become payable and has not been received by Put Parties or has not been paid substantially contemporaneously with their initial purchase of New Propco Holdco Equity;

                (ii)      On or after 15 days following the date hereof, if the Agreement Motion shall not have been filed with the Bankruptcy Court by the 15th day following the date hereof;

                (iii)      On or after July 1, 2011;

                (iv)      Upon the failure of any of the conditions set forth in Section 5 hereof to be satisfied, provided that if the Put Parties do not, on or prior to the fifth (5th) Business Day after the applicable Documentation Deadline, terminate this letter agreement on account of the agreement(s) to which the applicable Documentation Deadline applies not being reasonably satisfactory to the Put Parties, then the Put Parties will be deemed to have waived their right to terminate this letter agreement on account of a failure of any such agreement to be reasonably satisfactory to the Put Parties (it being understood that if any changes or amendments to any agreement referenced in Section 5(c) are made on or after the applicable Documentation Deadline which are adverse (other than in a de minimis respect) to the rights and interests of the Put Parties, and with respect to any other documents described in clause (5)(a)(xiii), then the Put Parties shall be granted an additional time frame, not to exceed ten (10) Business Days of receiving copies of such proposed changes, amendments or documents, as applicable, within which to terminate this letter agreement on account of such new or modified provisions or additional documents not being reasonably satisfactory to them); and

                (v)      Upon failure to satisfy the Tax Condition as of the Effective Date.

(b)    In no event will the Put Premium be refundable upon termination of this letter agreement pursuant to this Section 8, except as set forth in Section 1(b).

(c)    Upon termination under this Section 9, the covenants and agreements made by the parties herein under Sections 7 and 9 through 12 will survive indefinitely in accordance with their terms.

(d)    In the event of any such termination for failure to satisfy the Tax Condition which in any such case results from the failure of the Debtors, FG or the Propco Lenders to act reasonably with respect to the Tax Condition (it being understood that the unwillingness of the Debtors, FG or the Propco Lenders to proceed if the final order of the Bankruptcy Court does not contain the findings described in the Confirmation Order (as defined in the Stalking Horse APA) shall be deemed to be reasonable), then each Put Party whose Committed Amount has been terminated shall be paid by New Propco Holdco (or if for any reason there is no New Propco Holdco or New Propco Holdco is unable or unwilling to fund, then the Propco Lenders will direct the payment of such amounts by FCP Propco, LLC out of cash collateral held for the account of the Propco Lenders) an aggregate amount equal to 1.333 times the portion of the Put Premium attributable to its terminated Committed Amount provided that no payment shall be due unless the UCC Stipulation remains in effect through the Effective Date.

(e)    Notwithstanding anything to the contrary contained herein, this letter agreement may only be terminated pursuant to Section 8(a) by two or more of Fidelity, Oaktree and Serengeti (each of which shall be deemed to be a single Put Party for purposes of this paragraph) provided that (i) if two Put Parties desire to terminate their commitments (any Put Party that desires to terminate its commitment, a "Non-Consenting Put Party") pursuant to Section 8(a) and one Put Party desires not to terminate its commitment (any Put Party that desires not to terminate its commitment, a "Consenting Put Party"), each Non-Consenting Put Party shall offer its commitment to the Consenting Put Party and if the Consenting Put Party does not desire to accept and assume all of the commitments of the Non-Consenting Put Parties, (x) the Non-Consenting Put Parties shall provide a notice of termination (a "Two Put Party Notice") to the ML/FG Parties and (y) the ML/FG Parties may terminate the commitments and other rights and obligations solely of the Non-Consenting Put Parties under this letter agreement or terminate this letter agreement, in each case, within 10 Business Days' of receipt of such Two Put Party Notice by written notice to the Put Parties; and (ii) if two Put Parties desire not to terminate their commitments and one Put Party believes in good faith that any document to which clauses (iii), (iv), (v), (vi), (vii), (xii), (xiii) or (xv) of Section 5(a) applies contains a provision that materially, adversely and disproportionately affects such Put Party as compared to the other Put Parties and desires to terminate its commitment pursuant to Section 8(a), the Non-Consenting Put Party shall offer its commitment to the Consenting Put Parties and if the Consenting Put Parties do not desire to accept and assume all of the commitment of the Non-Consenting Put Party, (x) the Non-Consenting Put Party shall provide a notice of termination to the ML/FG Parties stating that it will be materially, adversely and disproportionately affected by a provision in such applicable document (a "One Put Party Notice") and (y) the ML/FG Parties may agree to terminate the commitment, rights and obligations  solely of the Non-Consenting Put Party under this letter agreement or terminate this letter agreement in each case, within 10 Business Days' of receipt of such One Put Party Notice by written notice to the Put Parties.  The

15

parties all agree, however, that the ML/FG Parties may conclusively rely on any Put Party Notice (whether a Two Put Party Notice or a One Put Party Notice) given pursuant to this Section or Section 5 without any inquiry as to whether such notice complies with this immediately preceding sentence.

9.    <u>Third Party Beneficiaries; Assignments</u>.

        (a)    There is no express or implied intention to benefit any Person not party hereto other than New Propco Holdco and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and New Propco Holdco.  New Propco Holdco is an intended third party beneficiary of all the rights and benefits of the addressees hereof pursuant to this letter agreement (including, without limitation, each of the representations and warranties made herein) and shall have the right to enforce this letter agreement to the same extent as the addressees hereof.  No party may assign this letter agreement or any of its obligations hereunder; <u>provided</u>, <u>however</u>, (i) that to the extent any Mortgage Lender transfers any of its claims against Opco or any of its subsidiaries to any Person, such Mortgage Lender may also transfer to such Person a proportionate amount of its rights hereunder, (ii) that the ML/FG Parties may assign this letter agreement to New Propco Holdco ; (iii) that any Put Party may assign this letter agreement to any Affiliate (as defined in Rule 12b-2 under the Exchange Act) of the Put Parties which is an "accredited investor" within the meaning of rule 501 under the Securities Act and over which such Put Party or any of its Affiliates exercises investment authority, including, without limitation, with respect to voting and dispositive rights; and (iv) Oaktree may assign to Serengeti a portion of its commitment to the extent any commitment relates to funding an acquisition of the Green Valley Ranch casino; <u>provided, further,</u> that any such assignee assumes the obligations of such Put Party hereunder and agrees in writing to be bound by the terms of this letter agreement in the same manner as such Put Party. Notwithstanding the foregoing or any other provisions herein, no such assignment by a Put Party will relieve such Put Party of its obligations hereunder if such assignee fails to perform such obligations.

        (b)    The parties hereby acknowledge that the rights of the parties under this letter agreement are unique and that remedies at law for breach or threatened breach of any provision of this letter agreement would be inadequate and, in recognition of this fact, agree that, in the event of a breach or threatened breach of the provisions of this letter agreement, the parties shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available and the parties hereby waive any objection to the imposition of such relief.

10.    <u>Amendment</u>.

        This letter agreement may not be amended, and no provision of this letter agreement may be waived or modified, except by an instrument in writing signed by the addressees of this letter agreement and each undersigned Put Party.

11.    <u>Effect on Support Agreement</u>

Each Put Party and each addressee hereof, by executing this letter agreement, agrees that (i) any Put Party Termination Event or Termination Event that may have occurred under the Support Agreement, including under 5(a)(vii) or 5(b)(v) thereof, respectively, due to failure of this letter agreement to have been entered into on or before July 29, 2010, shall be deemed to be finally and irrevocably waived by each such party; and (ii) the UCC Term Sheet as incorporated by reference into the Support Agreement is hereby amended for purposes of the Support Agreement by replacing the words "before such date" contained in clause (ix) under the caption entitled "Conditions" with the words "August 5, 2010".

12.    Miscellaneous.

(a)        THIS LETTER AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.  By its execution and delivery of this letter agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this letter agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in the Bankruptcy Court.  By execution and delivery of this letter agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.

(b)        All notices, requests and other communications to any party hereunder shall be in writing and shall be given to the ML/FG Parties at their respective addresses set forth on page 1 hereof and to each Put Party at the address set forth below its signature on the signature pages hereof or such other address as any such party may hereafter specify by notice to the other parties hereto.  Any notice, request or other communication given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or email shall be effective upon oral or machine confirmation of transmission.

(c)        This letter agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

(d)        The headings in this letter agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this letter agreement.

(e)        This letter agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in any Chapter 11 Case. The Put Parties' votes with respect to the Plan will not be solicited until the Put Parties have received the Disclosure Statement approved by the Bankruptcy Court. Each party hereto acknowledges that it has been represented by counsel in connection with this letter agreement and the transactions

contemplated hereby. The provisions of this letter agreement shall be interpreted in a reasonable manner to effectuate the intent of the parties hereto.

        (f)        Each of the parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other parties hereto may reasonably request, in order to effectuate the intent and purposes of, and to carry out the terms of, this letter agreement.

*[Signature Page Follows]*

CH1 5409984v.1

Very truly yours,

FIDELITY PURITAN TRUST: FIDELITY
PURITAN FUND

By:
Name:    Kenneth Robins
Title:    Treasurer
Committed Amount:  $
Notice Address:

c/o Fidelity Investments
82 Devonshire Street
Boston, MA 02109
Attn:  Nate Van Duzer
Tel:  617-392-8129
Fax:  617-392-1605
Nate.VanDuzer@fmr.com

Signature Page for Put Party Commitment Letter

FIDELITY ADVISOR SERIES I:  FIDELITY
ADVISOR HIGH INCOME ADVANTAGE
FUND

By: _____
Name: Kenneth Rens
Title: _____ Treasurer _____
Committed Amount:  S _____
Notice Address:


c/o Fidelity Investments
82 Devonshire Street
Boston, MA 02109
Attn:  Nate Van Duzer
Tel:  617-392-8129
Fax:  617-392-1605
Nate.VanDuzer@fmr.com

Signature Page for Put Party Commitment Letter

**FIDELITY SCHOOL STREET TRUST:**
**FIDELITY STRATEGIC INCOME FUND**

By: _____

Name: _____

Title: _____

Committed Amount: $ _____

Notice Address:

c/o Fidelity Investments
82 Devonshire Street
Boston, MA 02109
Attn:  Nate Van Duzer
Tel:  617-392-8129
Fax:  617-392-1605
Nate.VanDuzer@fmr.com

Signature Page for Put Party Commitment Letter

FIDELITY SCHOOL STREET TRUST:
FIDELITY CAPITAL & INCOME FUND

By:
Name:  Kenneth Robins
Title:  Treasurer
Committed Amount: $
Notice Address:

c/o Fidelity Investments
82 Devonshire Street
Boston, MA 02109
Attn:  Nate Van Duzer
Tel:  617-392-8129
Fax:  617-392-1605
Nate.VanDuzer@fmr.com

Signature Page for Put Party Commitment Letter

**FIDELITY ADVISOR SERIES II: FIDELITY ADVISOR STRATEGIC INCOME FUND**

By: _____
Name: _____
Title: _____
Committed Amount: $ _____
Notice Address:

c/o Fidelity Investments
82 Devonshire Street
Boston, MA 02109
Attn: Nate Van Duzer
Tel: 617-392-8129
Fax: 617-392-1605
Nate.VanDuzer@fmr.com

Signature Page for Put Party Commitment Letter

**VARIABLE INSURANCE PRODUCTS FUND**
**V: STRATEGIC INCOME PORTFOLIO**

By:
Name:  Kenneth Kotyk
Title:  Assistant Treasurer
Committed Amount:  $
Notice Address:

c/o Fidelity Investments
82 Devonshire Street
Boston, MA 02109
Attn:  Nate Van Duzer
Tel:  617-392-8129
Fax:  617-392-1605
Nate.VanDuzer@fmr.com

Signature Page for Put Party Commitment Letter

**SERENGETI STATION HOLDCO LTD.**

By: _____
Name: ~~Alexander Lemond~~
Title: ~~Director~~

\* **Committed Amount: $**_____
**Notice Address:**

c/o Serengeti Asset Management LP
632 Broadway, 12th Floor
New York, NY 10012
ATTN: Operations/Compliance
Tel: 212-672-2280
Fax: 212-672-2281
Email: sam.ops@serengeti-am.com

Signature Page for Put Party Commitment Letter

**SERENGETI PARTNERS LP**

By: _____
Name:    Alexander Lemond
Title:           Director
**Committed Amount:  $**_____
**Notice Address:**

c/o Serengeti Asset Management LP
632 Broadway, 12th Floor
New York, NY 10012
ATTN: Operations/Compliance
Tel: 212-672-2280
Fax: 212-672-2281
Email: sam.ops@serengeti-am.com

Signature Page for Put Party Commitment Letter

**OCM PRINCIPAL OPPORTUNITIES FUND
IV DELAWARE, L.P.**

**By:  OCM Principal Opportunities Fund IV
Delaware GP Inc., its general partner**

By: _____

Name: _SKARDON BAKER_____

Title: Authorized Signatory

By: _____

Name: _AKIRA OKUBO_____

Title: Authorized Signatory

**Committed Amount:  $_____**

**Notice Address:**

**333 S. Grand Ave., 28th Floor
Los Angeles, CA  90071
Attn:  Skardon Baker
sbaker@oaktreecapital.com
Fax: 213-830-6394**

Signature Page for Put Party Commitment Letter

**OCM OPPORTUNITIES FUND VIIb
DELAWARE, L.P.**

**By: Oaktree Fund GP, LLC, its general partner**

**By: Oaktree Fund GP I, L.P., its managing
member**

By: _____
Name: Scott Graves
Title: Authorized Signatory

By: _____
Name: Raj Varates
Title: Authorized Signatory

**Committed Amount: $_____
Notice Address:**

333 S. Grand Ave., 28th Floor
Los Angeles, CA 90071
Attn: Ken Liang
kliang@oaktreecapital.com
Fax: 213-830-8522

Signature Page for Put Party Commitment Letter

FOOTNOTES TO SIGNATURE PAGES

\* The aggregate Commitment Amount for Fidelity is $47,000,000.  This amount will be divided among the six Fidelity signatories as provided in a separate writing within five (5) Business Days after the date of this letter agreement.

\* The aggregate Commitment Amount for Oaktree is $39,000,000.  This amount will be divided among the two Oaktree signatories as provided in a separate writing within five (5) Business Days after the date of this letter agreement.

\* The aggregate Commitment Amount for Serengeti is $14,000,000.  This amount will be divided among the two Serengeti signatories as provided in a separate writing within five (5) Business Days after the date of this letter agreement.

Agreed and accepted:

**GERMAN AMERICAN
CAPITAL CORPORATION**

By: _____
Name:   John K. Beacham
Title:      Director

By: _____
Name:
Title:     Robert W. Pettinato
            Managing Director

**JPMORGAN CHASE BANK, N.A.**

By: _____
Name:
Title:

**FERTITTA GAMING, LLC**

By: _____
Name:
Title:

_____
Frank J. Fertitta III

_____
Lorenzo J. Fertitta

Signature Page for Put Party Commitment Letter

Agreed and accepted:

**GERMAN AMERICAN
CAPITAL CORPORATION**

By: _____
Name:
Title:

By: _____
Name:
Title:

**JPMORGAN CHASE BANK, N.A.**

By: _____
Name:    SCOTT DAYER
Title:    EXECUTIVE DIRECTOR

**FERTITTA GAMING, LLC**

By: _____
Name:
Title:

_____
Frank J. Fertitta III

_____
Lorenzo J. Fertitta

Signature Page for Put Party Commitment Letter

Agreed and accepted:

**GERMAN AMERICAN**
**CAPITAL CORPORATION**

By: _____
Name:
Title:

By: _____
Name:
Title:

**JPMORGAN CHASE BANK, N.A.**

By: _____
Name:
Title:

**FERTITTA GAMING, LLC**

By: _____
Name:
Title:

_____
Frank J. Fertitta III

_____
Lorenzo J. Fertitta

Signature Page for Put Party Commitment Letter

Agreed and accepted:

**GERMAN AMERICAN
CAPITAL CORPORATION**


By: _____
Name:
Title:


By: _____
Name:
Title:


**JPMORGAN CHASE BANK, N.A.**


By: _____
Name:
Title:


**FERTITTA GAMING, LLC**


By: _____
Name:
Title:


_____
Frank J. Fertitta III


_____
Lorenzo J. Fertitta


Signature Page for Put Party Commitment Letter

EXHIBIT I

REPRESENTATIONS AND WARRANTIES OF NEW PROPCO HOLDCO TO BE MADE
AT TIME OF SALE OF NEW PROPCO HOLDCO EQUITY

(a)    on the Effective Date, the authorized capital stock of New Propco Holdco consists of [Describe capitalization of New Propco Holdco]; (ii) all of the issued shares of capital stock of New Propco Holdco have been, or will be, as applicable, duly and validly authorized and issued and are fully paid and non-assessable, and none of them has been issued in violation of preemptive or similar rights and (iii) there are, or will be, as applicable, no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other agreements or rights to purchase or otherwise acquire shares of capital stock of New Propco Holdco, except, in the case of clauses (ii) and (iii), as contemplated in the UCC Term Sheet and the definitive documentation embodying the same;

(b) (i) on the Effective Date, the issuance and sale of New Propco Holdco Equity to the Put Parties has been duly and validly authorized, and, when New Propco Holdco Equity is issued and delivered against payment therefor in the Propco Rights Offering or to the Put Parties, will be duly and validly issued, fully paid and non-assessable, and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as contemplated in the UCC Term Sheet and the definitive documentation embodying the same;

(c) subject to the entry of the Agreement Order and the Confirmation Order (the "Court Orders") and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the sale, issuance and delivery of New Propco Holdco Equity upon the consummation of the Propco Rights Offering by New Propco Holdco (assuming compliance by the Put Parties with their obligations hereunder and thereunder) (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent provided in or contemplated by the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which New Propco Holdco is a party or by which it or any of its subsidiaries are bound or to which any of the property or assets of any of New Propco Holdco or any of its subsidiaries is subject, (ii) will not result in any violation of the provisions of the Certificate of Incorporation or By-laws or similar organization documents of New Propco Holdco, and (iii) will not result in any violation of, or any termination or impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over New Propco Holdco or any of its subsidiaries or their respective properties, except in any such case described

in subclause (i) or (iii), as will not have, individually or in the aggregate, a material adverse effect on the business or condition (financial or otherwise) of New Propco Holdco giving effect to the Effective Date (a "Material Adverse Effect");

(d) assuming compliance by the Put Parties with their obligations hereunder, no material consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over New Propco Holdco or any of its subsidiaries or their respective properties (in, each case, which has not yet been obtained or will not be obtained on or about the date hereof) is required for the issuance and delivery of New Propco Holdco Equity to the Put Parties hereunder and the consummation of the Propco Rights Offering by New Propco Holdco and the performance of and compliance in all material respects by New Propco Holdco with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Court Orders and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) such consents, approvals, authorizations, registrations or qualifications as may be required under applicable gaming laws and regulations and (iii) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase of New Propco Holdco Equity by the Put Parties.

(e) assuming the accuracy of the Put Parties' and the other Opco Unsecured Creditors' representations and warranties set forth, as applicable, in the Commitment Agreement and in the applicable subscription documentation, neither New Propco Holdco nor anyone acting on its behalf has distributed prior to the Effective Date any offering material in connection with the sale, issuance and delivery of New Propco Holdco Equity upon the consummation of the Propco Rights Offering other than the Plan, the Disclosure Statement and subscription documentation in form and substance reasonably acceptable to the Put Parties [representation may include any other documentation in form and substance reasonably acceptable to the Put Parties]

(f) assuming the accuracy of the Put Parties' and the other Opco Unsecured Creditors' representations and warranties set forth, as applicable, in the Commitment Agreement and in the applicable subscription documentation, no registration under the Securities Act or any state securities or Blue Sky law is required for the issuance and delivery of New Propco Holdco Equity upon the consummation of the Propco Rights Offering by New Propco Holdco, except, in the case of any state securities or Blue Sky law, as may have previously been obtained, as may be obtained on or about the date hereof or as is not material; and

(g) assuming the accuracy of the Put Parties' and the other Opco Unsecured Creditors' representations and warranties set forth, as applicable, in the Commitment Agreement and in the applicable subscription documentation, neither New Propco Holdco, nor any person acting on its behalf has sold, offered

for sale or solicited offers to buy any security (as defined in the Securities Act) which is integrated with the sale of New Propco Holdco Equity by New Propco Holdco pursuant to the Propco Rights Offering in a manner that would require registration under the Securities Act of the New Propco Holdco Equity.

# Exhibit 5

# Exhibit 5

1

2

3

4

5

6   Paul S. Aronzon (CA SBN 88781)              Laury M. Macauley (NV SBN 11413)
    Thomas R. Kreller (CA SBN 161922)           Dawn M. Cica (NV SBN 004595)
7   MILBANK, TWEED, HADLEY & McCLOY LLP         LEWIS AND ROCA LLP
    601 South Figueroa Street, 30th Floor       50 West Liberty Street, Suite 410
8   Los Angeles, California 90017               Reno, Nevada 89501
    Telephone:      (213) 892-4000              Telephone:      (775) 823-2900
9   Facsimile:      (213) 629-5063              Facsimile:      (775) 823-2929
                                                lmacauley@lrlaw.com; dcica@lrlaw.com
10
    Reorganization Counsel for
11  Debtors and Debtors in Possession          Local Reorganization Counsel for
                                                Debtors and Debtors in Possession
12
                       **UNITED STATES BANKRUPTCY COURT**
13                            **DISTRICT OF NEVADA**

14  In re:                                      Chapter 11

15  STATION CASINOS, INC.                       Case No. BK-09-52477
                                                Jointly Administered
16      ☐ Affects this Debtor                   BK 09-52470 through BK 09-52487 and
        ☒ Affects all Debtors                   BK 10-50381
17      ☐ Affects Northern NV Acquisitions, LLC
        ☐ Affects Reno Land Holdings, LLC
18      ☐ Affects River Central, LLC            **ORDER GRANTING DEBTORS' MOTION**
        ☐ Affects Tropicana Station, LLC        **FOR ORDER:  (1) APPROVING**
19      ☐ Affects FCP Holding, Inc.             **STIPULATION WITH OFFICIAL**
        ☐ Affects FCP Voteco, LLC               **COMMITTEE OF UNSECURED**
20                                              **CREDITORS; AND (2) AUTHORIZING**
        ☐ Affects Fertitta Partners LLC         **PAYMENT OF CERTAIN RELATED**
21      ☐ Affects FCP MezzCo Parent, LLC        **FEES AND EXPENSES**
        ☐ Affects FCP MezzCo Parent Sub, LLC
22      ☐ Affects FCP MezzCo Borrower VII, LLC
        ☐ Affects FCP MezzCo Borrower VI, LLC
23      ☐ Affects FCP MezzCo Borrower V, LLC
        ☐ Affects FCP MezzCo Borrower IV, LLC   Hearing held _____, 2010
24      ☐ Affects FCP MezzCo Borrower III, LLC
        ☐ Affects FCP MezzCo Borrower II, LLC
25      ☐ Affects FCP MezzCo Borrower I, LLC
        ☐ Affects FCP PropCo, LLC
26      ☐ Affects GV Ranch Station, Inc.
27

28

#4843-4604-0839

1       The Court has considered *Debtors' Motion for Order: (1) Approving Stipulation with*
2   *Official Committee of Unsecured Creditors; and (2) Authorizing Payment of Certain Related*
3   *Fees and Expenses* (the "<u>Motion</u>").  The Motion was filed by chapter 11 debtors Station Casinos,
4   Inc. ("<u>SCI</u>"), FCP Propco, LLC ("<u>Propco</u>") and the other above-captioned debtors and debtors in
5   possession (collectively, the  "<u>Debtors</u>"), and seeks approval of (a) the Stipulation entered into
6   by and among SCI, Propco and the Official Committee of Unsecured Creditors ("<u>UCC</u>")
7   regarding agreed modifications to the Debtors' Plan and related matters, and (b) the payment of
8   certain fees and expenses required by the Term Sheet attached to the Stipulation.  The Stipulation
9   is attached to the Motion as <u>Exhibit 1</u>.  Terms used but not defined herein are used as defined in
10  the Motion.

11      Based upon the Motion and the other papers filed in support of the Motion, and having
12  determined that notice of the Motion was proper and adequate under the circumstances, and good
13  cause appearing for the granting of the Motion, **IT IS HEREBY ORDERED AS FOLLOWS**:

14      1.    The Motion is granted, the Stipulation is approved, and SCI, Propco and the UCC
15  are authorized to perform their obligations under the Stipulation.

16      2.    SCI shall pay the Put Parties' actual and documented costs associated with the
17  negotiation and documentation of the matters described in the Term Sheet, in an amount not to
18  exceed $1.7 million; 50% of such amount shall be paid upon entry of this Order, and the
19  remainder promptly after confirmation of the Plan.

20      3.    This Order does not approve or disapprove the Term Sheet, the Support
21  Agreement or the Commitment Letter that are attached as exhibits to the Motion.

22
23  Submitted by:

24  Paul S. Aronzon, CA State Bar #88781
    Thomas R. Kreller, CA State Bar #161922
25  Fred Neufeld, CA State Bar # 150759
    MILBANK, TWEED, HADLEY & McCLOY LLP
26  601 South Figueroa Street, 30th Floor
    Los Angeles, California 90017
27
28  Reorganization Counsel for
    Debtors and Debtors in Possession

#4843-4604-0839                                          -1-

1    and

2    Laury Macauley, #11413
     LEWIS AND ROCA LLP
3    50 W. Liberty Street, Ste. 410
     Reno, NV   89501
4    lmacauley@lrlaw.com

5    Local Reorganization Counsel
     For Debtors and Debtors in Possession
6                                                      # # #

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#4843-4604-0839                                -2-