1  Paul S. Aronzon (CA SBN 88781)
   Thomas R. Kreller (CA SBN 161922)
2  MILBANK, TWEED, HADLEY & McCLOY LLP
   601 South Figueroa Street, 30th Floor
3  Los Angeles, California 90017
   Telephone:    (213) 892-4000
4  Facsimile:    (213) 629-5063

5  Reorganization Counsel for
   Debtors and Debtors in Possession

6

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

7

8

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

9   In re:

10  STATION CASINOS, INC.

11  ☐ Affects this Debtor
    ☒ Affects all Debtors
12  ☐ Affects Northern NV Acquisitions, LLC
13  ☐ Affects Reno Land Holdings, LLC
    ☐ Affects River Central, LLC
14  ☐ Affects Tropicana Station, LLC
    ☐ Affects FCP Holding, Inc.
15  ☐ Affects FCP Voteco, LLC
    ☐ Affects Fertitta Partners LLC
16  ☐ Affects FCP MezzCo Parent, LLC
17  ☐ Affects FCP MezzCo Parent Sub, LLC
    ☐ Affects FCP MezzCo Borrower VII, LLC
18  ☐ Affects FCP MezzCo Borrower VI, LLC
19  ☐ Affects FCP MezzCo Borrower V, LLC
    ☐ Affects FCP MezzCo Borrower IV, LLC
20  ☐ Affects FCP MezzCo Borrower III, LLC
21  ☐ Affects FCP MezzCo Borrower II, LLC
    ☐ Affects FCP MezzCo Borrower I, LLC
22  ☐ Affects FCP PropCo, LLC
23  ☐ Affects GV Ranch Station, Inc.

24

25

Chapter 11

Case No. BK-09-52477
Jointly Administered
BK 09-52470 through BK 09-52487 and
BK 10-50381

**SECOND PLAN SUPPLEMENT IN
CONNECTION WITH FIRST
AMENDED JOINT CHAPTER 11
PLAN OF REORGANIZATION FOR
STATION CASINOS, INC. AND ITS
AFFILIATED DEBTORS (DATED
JULY 28, 2010)**

**Plan Confirmation Hearing**

Hearing Date:    August 27 and 30, 2010
Hearing Time:    10:00 a.m.
Place:    300 Booth Street
         Reno, NV 89509

26

27

28

#4835-8171-1623v2

1    TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE,

2    OFFICE OF THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:

3             PLEASE TAKE NOTICE that, on August 11, 2010, Station Casinos, Inc. ("SCI")

4    together with its affiliated debtors and debtors in possession in the above-captioned chapter 11

5    cases (collectively, the "Debtors") submitted the *Plan Supplement in Connection With First*

6    *Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated*

7    *Debtors* (the "First Supplement") [Docket No. 1914] to supplement the *First Amended Joint*

8    *Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors* (as amended, the

9    "Plan") [Docket No. 1863-1].

10            PLEASE TAKE FURTHER NOTICE that the Debtors hereby submit the

11   following document to further supplement the Plan:

12            •       Exhibit 1 – New FG Management Agreement (Opco)

13            This document, together with the First Supplement, any or all of which may be

14   amended, modified, supplemented or further revised from time to time, constitute the Plan

15   Supplement, as such term is defined in the Plan.

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28

#4835-8171-1623v2                          -2-

1   Dated:  August 13, 2010                Respectfully submitted,

2                                          By:        /s/ *Fred Neufeld*

3                                          Paul S. Aronzon, CA State Bar #88781
                                           Thomas R. Kreller, CA State Bar #161922
                                           Fred Neufeld, CA State Bar #150759
4                                          MILBANK, TWEED, HADLEY & McCLOY LLP
                                           601 South Figueroa Street, 30th Floor
5                                          Los Angeles, California 90017

6
                                           Reorganization Counsel for
7                                          Debtors and Debtors in Possession

8                                          Laury M. Macauley, NV State Bar #11413
                                           Dawn M. Cica, NV State Bar # 004595
9                                          LEWIS AND ROCA LLP
                                           50 W. Liberty Street, Ste. 410
10                                         Reno, NV 89501

11
                                           Local Reorganization Counsel
12                                         For Debtors and Debtors in Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#4835-8171-1623v2                          -3-

**Exhibit 1**

**Exhibit 1**

MILBANK DRAFT
8/13/2010

MANAGEMENT AGREEMENT

for

Barley's Casino & Brewing Company

Fiesta Henderson Casino Hotel

Fiesta Rancho Casino Hotel

Gold Rush Casino

The Greens Gaming and Dining

Lake Mead Casino

Santa Fe Station Hotel & Casino

Texas Station Gambling Hall & Hotel

Wildfire Casino and Lanes

Wildfire Casino—Boulder

Wildfire Casino—Rancho

Dated as of August __, 2010

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I DEFINITION OF TERMS | | 2 |
| **1.1** | Certain Defined Terms | 2 |
| ARTICLE II APPOINTMENT OF MANAGER; OPERATION OF THE PROPERTIES | | 31 |
| **2.1** | Appointment | 31 |
| **2.2** | Delegation of Authority | 31 |

| | | |
|---|---|---|
| **2.3** | Limitations on Manager's Authority | 32 |
| **2.4** | Leases | 33 |
| **2.5** | Legal Action | 34 |
| **2.6** | Standard for Performance by Manager | 34 |
| **2.7** | Names of the Properties | 35 |
| **2.8** | Operating Permits and Licenses | 35 |
| **2.9** | Reservation System | 36 |
| **2.10** | Sales, Marketing and Advertising | 36 |
| **2.11** | Compliance with Legal Requirements | 37 |
| **2.12** | Credit Policy | 37 |
| **2.13** | Food and Beverage; Entertainment; Complimentary Services | 37 |
| **2.14** | Internal Control Systems; Surveillance System | 38 |
| **2.15** | Exclusivity | 38 |
| **2.16** | Change in Competitive Sets | 40 |

ARTICLE III TERM; TERMINATION RIGHT FOR PERFORMANCE ....... 40

| | | |
|---|---|---|
| **3.1** | Term | 40 |
| **3.2** | Termination for Failure of the Performance Test | 40 |

ARTICLE IV WORKING CAPITAL; OPERATING SUPPLIES ............. 43

| | | |
|---|---|---|
| **4.1** | Working Capital | 43 |
| **4.2** | Operating Supplies | 44 |

ARTICLE V COMPENSATION OF MANAGER ............. 44

| | | |
|---|---|---|
| **5.1** | Fees | 44 |
| **5.2** | Coverage of Manager's Cost | 45 |
| **5.3** | Reimbursements | 47 |

ARTICLE VI INFORMATION TECHNOLOGY; INTELLECTUAL PROPERTY; CUSTOMER DATABASE ............. 47

| | | |
|---|---|---|
| **6.1** | Information Technology | 47 |
| **6.2** | Intellectual Property | 48 |
| **6.3** | Customer Database and Business Information | 51 |
| **6.4** | Administration and Management of IP Holdco | 53 |

ARTICLE VII REPAIRS, MAINTENANCE AND RESERVE FUNDS .......... 54

| | | |
|---|---|---|
| **7.1** | Routine Repairs and Maintenance | 54 |

[Management Agreement - Opco]

**7.2**    Capital Improvements; Reserve Funds ............................................................... 55

**7.3**    Liens.................................................................................................................... 56

ARTICLE VIII BOOKS AND RECORDS; BANK ACCOUNTS; ANNUAL PLAN
      AND OPERATING BUDGET .................................................................... 57

**8.1**    Books and Records .............................................................................................. 57

**8.2**    Bank Accounts; Disbursement of Funds............................................................ 58

**8.3**    Annual Plan and Operating Budget .................................................................... 59

**8.4**    Emergency Expenditures ..................................................................................... 63

**8.5**    Legal Requirements ............................................................................................. 63

**8.6**    Consultation ........................................................................................................ 64

ARTICLE IX POSSESSION AND USE OF PROPERTIES AND RELATED ASSETS.......... 64

**9.1**    Owner's Right to Inspect .................................................................................... 64

ARTICLE X INSURANCE; RESPONSIBILITY FOR CLAIMS ............................................. 64

**10.1**    Insurance Coverages ........................................................................................... 64

**10.2**    Coverage ............................................................................................................. 66

**10.3**    Costs and Expenses ............................................................................................ 66

**10.4**    Policies and Endorsements ................................................................................. 66

**10.5**    Responsibility for Claims ................................................................................... 67

ARTICLE XI TAXES ............................................................................................................... 68

**11.1**    Payment of Taxes ............................................................................................... 68

ARTICLE XII EMPLOYEES .................................................................................................... 68

**12.1**    Employees ........................................................................................................... 68

**12.2**    Labor Relations ................................................................................................... 69

**12.3**    Non-Solicitation .................................................................................................. 70

ARTICLE XIII DAMAGE, CONDEMNATION AND FORCE MAJEURE............................. 70

**13.1**    Casualty................................................................................................................ 70

**13.2**    Condemnation ...................................................................................................... 71

**13.3**    Emergencies; Force Majeure ............................................................................... 73

**13.4**    Manager's Compensation .................................................................................... 73

**13.5**    Manager's Reinstatement.................................................................................... 74

ARTICLE XIV TERMINATION ............................................................................................... 74

**14.1**    Termination Rights of Owner ............................................................................. 74

(iii)                                    [Management Agreement - Opco]

**14.2**    Termination Rights of Manager ................................................................... 76

**14.3**    Termination Notice ................................................................................... 77

**14.4**    Events on Termination .............................................................................. 79

ARTICLE XV MORTGAGES, SALE AND ASSIGNMENT;  OWNERSHIP
REQUIREMENTS OF MANAGER ........................................................... 80

**15.1**    Mortgages ................................................................................................ 80

**15.2**    Sale Termination Rights .......................................................................... 81

**15.3**    Assignment by Owner .............................................................................. 82

**15.4**    Assignment by Manager ........................................................................... 82

**15.5**    Binding Effect .......................................................................................... 82

**15.6**    Public Offering ......................................................................................... 82

**15.7**    Manager Cooperation ............................................................................... 83

ARTICLE XVI REPRESENTATIONS AND WARRANTIES ................................... 83

**16.1**    Representations and Warranties ............................................................... 83

ARTICLE XVII MISCELLANEOUS ........................................................................... 85

**17.1**    Right to Make Agreement ........................................................................ 85

**17.2**    Actions by Manager; Owner Representative ........................................... 85

**17.3**    No Lease, Partnership, Joint Venture or Agency Relationship ............... 86

**17.4**    Applicable Law ........................................................................................ 86

**17.5**    Construction of Agreement ...................................................................... 86

**17.6**    Notices ...................................................................................................... 87

**17.7**    Waiver of Covenants, Conditions or Remedies ...................................... 88

**17.8**    Severability .............................................................................................. 88

**17.9**    Financial Projections ............................................................................... 88

**17.10**    Obligations of Manager to Owner ........................................................... 89

**17.11**    Counterparts and Execution ..................................................................... 91

**17.12**    Entire Agreement ..................................................................................... 91

**17.13**    Interest ...................................................................................................... 91

**17.14**    Time of the Essence ................................................................................. 91

**17.15**    Further Assurances ................................................................................... 91

**17.16**    Resolution of Disputes ............................................................................. 91

**17.17**    Limitation on Damages ............................................................................ 94

(iv)                                    [Management Agreement - Opco]

#4811-5012-8391

**17.18**  Attorneys' Fees ..................................................................................... 94

**17.19**  Cooperation with Gaming Authorities .............................................. 94

**17.20**  Confidential Information ....................................................................... 95

**17.21**  Estoppel Certificates ................................................................................ 95

**17.22**  Use of Hazardous Substances ............................................................ 96

**17.23**  Anti-Money Laundering ......................................................................... 96

**17.24**  Not an Interest in Real Estate; No Recordation .............................. 96

**17.25**  Limitations of Personal Liability ....................................................... 97

**17.26**  Guaranty of Manager Obligations by Fertitta Management Holdco .................. 97

Exhibits

Exhibit "A"        Financial Terms

Exhibit "B"        IP License Agreement

Exhibit "C"        Guaranty

Exhibit "D"        Technology Systems License

Schedules

Schedule "1A"      Initial Comparable Manager Properties

Schedule "1B"      Initial Operating Competitive Set

Schedule "1C"      Initial Performance Competitive Set

Schedule "2"       Initial Credit Policy

Schedule "3A"      Legal Descriptions for Barley's Land

Schedule "3B"      Legal Descriptions for Fiesta Henderson Land

Schedule "3C"      Legal Descriptions for Fiesta Rancho Land

Schedule "3D"      Legal Descriptions for Gold Rush Land

Schedule "3E"      Legal Descriptions for Greens Land

Schedule "3F"      Legal Descriptions for Lake Mead Casino Land

Schedule "3G"      Legal Descriptions for Santa Fe Station Land

[Management Agreement - Opco]

Schedule "3H"    Legal Descriptions for Texas Station Land

Schedule "3I"    Legal Descriptions for Wildfire Boulder Land

Schedule "3J"    Legal Descriptions for Wildfire Lanes Land

Schedule "3K"    Legal Descriptions for Wildfire Rancho Land

Schedule "4"    Approved Annual Plan and Operating Budget 2011

Schedule "5"    Transition Services

Schedule "6"    Sample Calculation of Deemed Budgeted EBITDA

Schedule "7"    Sample Calculation of Market Test

[Management Agreement - Opco]

#4811-5012-8391

<u>INDEX</u>

Page(s)

Actual Corporate Overhead ................................................................................................ 3
Affiliate ............................................................................................................................... 3
Agreement ........................................................................................................................... 1
Annual Plan and Operating Budget .................................................................................... 3
Anti-Money Laundering Laws ........................................................................................ 105
Approval ............................................................................................................................ 93
Approval Amount ................................................................................................................ 3
Approved Annual Plan and Operating Budget ................................................................... 3
Bank Accounts .................................................................................................................... 3
Bankrupt.............................................................................................................................. 4
Barley's ............................................................................................................................... 2
Barley's Improvements ....................................................................................................... 4
Barley's Land ...................................................................................................................... 4
Barley's Property ................................................................................................................ 4
Barley's Property Facilities................................................................................................. 4
Barley's Property Related Facilities ................................................................................... 4
Base Management Fee ......................................................................................................... 5
Budget Test ....................................................................................................................... 45
Budgeted EBITDA .............................................................................................................. 5
Business Day........................................................................................................................ 5
Business Information ........................................................................................................... 5
Cage Cash ........................................................................................................................... 5
Cage Cash Minimum Balance ............................................................................................ 5
Cap Ex Assumed Rate of Return ........................................................................................ 6
Capital Improvements and Replacements........................................................................... 6
Casino .................................................................................................................................. 6
Commencement Date........................................................................................................... 6
Comparable Manager Properties......................................................................................... 6
Competitor EBITDA ........................................................................................................... 6
Confidential Information ................................................................................................. 104
Consumer Price Index ......................................................................................................... 6
Copyrights............................................................................................................................ 7
Corporate Overhead and Expenses ..................................................................................... 7
Corporate Overhead Excess ................................................................................................ 7
Corporate Services .............................................................................................................. 7
CPI ....................................................................................................................................... 6
Credit Policy ........................................................................................................................ 7
Cure Amount ....................................................................................................................... 7
Customer Databases........................................................................................................... 56
Deemed Budgeted EBITDA ................................................................................................ 7
Discretionary Amendment ................................................................................................. 67
Disputes............................................................................................................................. 100

[Management Agreement - Opco]

EBITDA ................................................................................................................ 8
EBITDA Percentage ............................................................................................. 8
EBITDA Percentage Adjustment Event ............................................................... 8
Effective Date ...................................................................................................... 1
Emergency Expenditure ..................................................................................... 69
Employees .......................................................................................................... 75
Equity Holders Agreement ................................................................................. 93
Executive Employees ........................................................................................... 8
Fertitta Affiliate ................................................................................................... 9
Fertitta Controlled Affiliate ................................................................................. 9
Fertitta Family Entities ........................................................................................ 9
Fertitta Family Parties .......................................................................................... 9
Fertitta Gaming .................................................................................................... 2
Fertitta Manager Control Requirements .............................................................. 9
FG Management Programs and Procedures ......................................................... 9
Fiesta Henderson .................................................................................................. 1
Fiesta Henderson Improvements ........................................................................ 10
Fiesta Henderson Land ....................................................................................... 10
Fiesta Henderson Owner ...................................................................................... 1
Fiesta Henderson Property .................................................................................. 10
Fiesta Henderson Property Facilities .................................................................. 10
Fiesta Henderson Property Related Facilities ..................................................... 10
Fiesta Rancho ....................................................................................................... 1
Fiesta Rancho Improvements ............................................................................. 11
Fiesta Rancho Land ............................................................................................ 11
Fiesta Rancho Owner ........................................................................................... 1
Fiesta Rancho Property ....................................................................................... 11
Fiesta Rancho Property Facilities ....................................................................... 11
Fiesta Rancho Property Related Facilities .......................................................... 11
Fiscal Month ....................................................................................................... 11
Fiscal Quarter ..................................................................................................... 12
Fiscal Year .......................................................................................................... 12
Force Majeure ..................................................................................................... 80
Full Fiscal Year .................................................................................................. 12
Furniture, Fixtures and Equipment .................................................................... 12
GAAP .................................................................................................................. 12
Gaming ................................................................................................................ 12
Gaming Authority ............................................................................................... 12
Gaming Laws ...................................................................................................... 13
General Manager ................................................................................................. 13
Gold Rush ............................................................................................................. 1
Gold Rush Improvements ................................................................................... 13
Gold Rush Land .................................................................................................. 13
Gold Rush Owner ................................................................................................. 1
Gold Rush Property ............................................................................................ 13
Gold Rush Property Facilities ............................................................................ 13

[Management Agreement - Opco]

Gold Rush Property Related Facilities ......................................................................... 13
Governmental Approvals ............................................................................................... 14
Greens ........................................................................................................................... 2
Greens Improvements ................................................................................................... 14
Greens Land .................................................................................................................. 14
Greens Property ............................................................................................................ 14
Greens Property Facilities ............................................................................................ 14
Greens Property Related Facilities ............................................................................... 14
Gross Revenues ............................................................................................................. 15
GV Station Owner ......................................................................................................... 2
Hospitality Product ....................................................................................................... 17
Impositions ................................................................................................................... 17
Improvements ............................................................................................................... 17
Incentive Management Fee ........................................................................................... 17
Indexed EBITDA .......................................................................................................... 17
Industry Consultant ...................................................................................................... 17
Initial Corporate Overhead Budget .............................................................................. 17
Initial Gross Revenues Budget ..................................................................................... 17
Initial Owned IP ........................................................................................................... 53
Initial Technology Systems .......................................................................................... 52
Intellectual Property ..................................................................................................... 17
Interim Statements ........................................................................................................ 62
Internal Control Systems .............................................................................................. 42
Internet Domain Names ................................................................................................ 18
IP Holdco ...................................................................................................................... 18
IP License ...................................................................................................................... 54
Lake Mead Casino ........................................................................................................ 1
Lake Mead Casino Improvements ................................................................................ 18
Lake Mead Casino Land ............................................................................................... 18
Lake Mead Casino Owner ............................................................................................ 1
Lake Mead Casino Property .......................................................................................... 18
Lake Mead Casino Property Facilities .......................................................................... 18
Lake Mead Casino Property Related Facilities ............................................................. 19
Land .............................................................................................................................. 19
Legal Requirements ...................................................................................................... 19
Liabilities ...................................................................................................................... 106
Licensed Copyrights ..................................................................................................... 54
Licensed IP ................................................................................................................... 54
Licensed Patents ........................................................................................................... 54
Licensed Trademarks .................................................................................................... 54
Line of Credit ............................................................................................................... 47
Loan Documents ........................................................................................................... 19
Losses ........................................................................................................................... 74
Management Fees .......................................................................................................... 19
Manager ........................................................................................................................ 1
Manager Centralized Services ...................................................................................... 20

[Management Agreement - Opco]

#4811-5012-8391

Manager IP ........................................................................................................ 54
Manager LV Properties ...................................................................................... 20
Manager Overhead and Expenses ...................................................................... 50
Manager Unrelated Subsidiaries ........................................................................ 20
Manager's Executive Staff .................................................................................. 20
Manager's Gross Negligence or Willful Misconduct .......................................... 20
Manager's Response Notice ................................................................................ 46
Market Test ......................................................................................................... 45
Material Action ................................................................................................... 37
Material Default .................................................................................................. 20
Material Item ...................................................................................................... 93
Material Loan Default ......................................................................................... 21
Material Nevada Governmental Approval .......................................................... 21
Measurement Year .............................................................................................. 44
Mortgage ............................................................................................................ 21
Net Income ......................................................................................................... 21
Nevada Gaming Licenses ................................................................................... 21
New Fertitta Agreement ...................................................................................... 89
Non-Compete Agreements .................................................................................. 22
Non-Performing Period ....................................................................................... 45
Opco Credit Agreement ...................................................................................... 22
Opco Loan ........................................................................................................... 19
Opco Loan Documents ........................................................................................ 22
Operating Bank Accounts .................................................................................... 22
Operating Competitive Set .................................................................................. 22
Operating Consumables ...................................................................................... 22
Operating Costs ................................................................................................... 22
Operating Standards ............................................................................................ 25
Operating Supplies .............................................................................................. 26
Other Manager Properties ................................................................................... 26
Owned IP ............................................................................................................. 53
Owned IP Upgrades ............................................................................................. 53
Owner .................................................................................................................... 1
Owner Account .................................................................................................... 26
Owner Indemnitees .............................................................................................. 74
Owner IP .............................................................................................................. 26
Owner Property Interest ...................................................................................... 42
Owner Representative .......................................................................................... 94
Owner Unrelated Subsidiaries ............................................................................ 26
Owner's Termination Notice ............................................................................... 45
Owner-Related Affiliates ..................................................................................... 26
Parties .................................................................................................................. 26
Patent ................................................................................................................... 26
Performance Competitive Set .............................................................................. 26
Performance Test ................................................................................................. 45
Performance Test Data ........................................................................................ 45

[Management Agreement - Opco]

Person ........................................................................................................................... 26
Plan .............................................................................................................................. 26
Promotional Allowance ............................................................................................ 27
Properties ................................................................................................................... 27
Property ...................................................................................................................... 32
Property Facilities ..................................................................................................... 27
Property Owners ......................................................................................................... 2
Property Related Facilities ....................................................................................... 27
Quarterly Statements ................................................................................................. 63
Receiving Party ........................................................................................................ 104
Reconciliation Dispute Notice ................................................................................. 49
Reimbursable Expenses ............................................................................................ 51
Reservation Systems .................................................................................................. 39
Reserve Cap ............................................................................................................... 61
Reserve Fund .............................................................................................................. 27
Routine Repairs and Maintenance ........................................................................... 27
Santa Fe Station .......................................................................................................... 2
Santa Fe Station Improvements ............................................................................... 27
Santa Fe Station Land ............................................................................................... 28
Santa Fe Station Owner .............................................................................................. 2
Santa Fe Station Property ......................................................................................... 28
Santa Fe Station Property Facilities ........................................................................ 28
Santa Fe Station Property Related Facilities .......................................................... 28
Shared Expenses ........................................................................................................ 28
Shared Services .......................................................................................................... 29
Specially Designated National or Blocked Person ................................................. 29
Subsidiary ................................................................................................................... 29
Subsidiary-Owned IP ................................................................................................ 58
Technology Systems ................................................................................................... 52
Technology Systems License .................................................................................... 52
Technology Systems Upgrades ................................................................................. 52
Term ............................................................................................................................ 44
Terminating Party ...................................................................................................... 85
Termination ................................................................................................................ 29
Termination Avoidance Period ................................................................................. 29
Termination Fee ......................................................................................................... 29
Termination Notice .................................................................................................... 85
Texas Station ............................................................................................................... 2
Texas Station Improvements ..................................................................................... 29
Texas Station Land ..................................................................................................... 29
Texas Station Owner .................................................................................................... 2
Texas Station Property .............................................................................................. 29
Texas Station Property Facilities ............................................................................. 30
Texas Station Property Related Facilities ............................................................... 30
Third Party Sale ......................................................................................................... 88
Trademarks ................................................................................................................. 30

[Management Agreement - Opco]

#4811-5012-8391

Transfer ........................................................................................................................ 30
Transition Period ........................................................................................................ 30
Transition Services ..................................................................................................... 30
TTMF .......................................................................................................................... 30
Variable Expense ....................................................................................................... 67
Wildfire Boulder ........................................................................................................... 1
Wildfire Boulder Improvements ................................................................................. 30
Wildfire Boulder Land ................................................................................................. 31
Wildfire Boulder Owner ................................................................................................ 1
Wildfire Boulder Property ........................................................................................... 31
Wildfire Boulder Property Facilities .......................................................................... 31
Wildfire Boulder Property Related Facilities ............................................................. 31
Wildfire Lanes ............................................................................................................... 2
Wildfire Lanes Improvements .................................................................................... 31
Wildfire Lanes Land .................................................................................................... 32
Wildfire Lanes Property Facilities .............................................................................. 32
Wildfire Lanes Property Related Facilities ................................................................ 32
Wildfire Rancho ............................................................................................................. 1
Wildfire Rancho Improvements .................................................................................. 32
Wildfire Rancho Land .................................................................................................. 33
Wildfire Rancho Owner ................................................................................................. 1
Wildfire Rancho Property ............................................................................................ 33
Wildfire Rancho Property Facilities ........................................................................... 33
Wildfire Rancho Property Related Facilities ............................................................. 33
Working Capital ........................................................................................................... 33
Working Capital Balance ............................................................................................ 47
Working Capital Requirement .................................................................................... 48
Year End Statements .................................................................................................. 63

[Management Agreement - Opco]

#4811-5012-8391

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT (this "Agreement") is executed as of August __, 2010 (the "Effective Date"), by and between [_____[1]], a limited liability company organized under the laws of Delaware ("Owner"), and FG Propco Management LLC, a limited liability company organized under the laws of Nevada ("Manager").

## RECITALS

A.    [New Fiesta Station LLC], a limited liability company organized under the laws of Delaware ("Fiesta Rancho Owner"), owns that certain hotel and casino complex commonly known as the "Fiesta Rancho Casino Hotel" located at 2400 North Rancho Drive, North Las Vegas, NV 89130 ("Fiesta Rancho").

B.    [New Gold Rush Station LLC], a limited liability company organized under the laws of Delaware ("Gold Rush Owner"), owns that certain casino complex commonly known as the "Gold Rush Casino" located at 1195 West Sunset Road Henderson, NV 89014 ("Gold Rush").

C.    [New Lake Mead Station LLC], a limited liability company organized under the laws of Delaware ("Fiesta Henderson Owner"), owns that certain hotel and casino complex commonly known as the "Fiesta Henderson Casino Hotel" located at 777 West Lake Mead Parkway Henderson, NV 89015 ("Fiesta Henderson").

D.    [New LML Station LLC], a limited liability company organized under the laws of Delaware ("Lake Mead Casino Owner"), owns that certain casino complex commonly known as the "Lake Mead Casino" located at 846 East Lake Mead Parkway Henderson, NV 89015 ("Lake Mead Casino").

E.    [New Magic Star Station LLC], a limited liability company organized under the laws of Delaware ("Wildfire Boulder Owner"), owns that certain casino complex commonly known as the "Wildfire Casino – Boulder Highway" located at 2000 South Boulder Highway Henderson, NV 89002 ("Wildfire Boulder").

F.    [New Rancho Station LLC], a limited liability company organized under the laws of Delaware ("Wildfire Rancho Owner"), owns that certain casino complex commonly known as the "Wildfire Casino – Rancho" located at 1901 North Rancho Drive Las Vegas, NV 89106 ("Wildfire Rancho").

G.    [New Santa Fe Station LLC], a limited liability company organized under the laws of Delaware ("Santa Fe Station Owner"), owns that certain hotel and casino complex commonly known as the "Santa Fe Station Hotel & Casino" located at 4949 North Rancho Drive Las Vegas, NV 89130 ("Santa Fe Station").

---

[1] This will be the Borrower under the Opco Loan Documents.

[Management Agreement - Opco]

#4811-5012-8391

H. [New Texas Station LLC], a limited liability company organized under the laws of Delaware ("Texas Station Owner"), owns that certain hotel and casino complex commonly known as the "Texas Station Gambling Hall & Hotel" located at 2101 Texas Star Lane North Las Vegas, NV 89032 ("Texas Station").

I. [New Green Valley Station], a limited liability company organized under the laws of Delaware ("GV Station Owner"), owns fifty percent (50%) of (i) that certain casino and dining complex commonly known as the "Barley's Casino & Brewing Company" located at 4500 East Sunset Road Henderson, Nevada 89014 ("Barley's"), (ii) that certain casino and dining complex commonly known as "The Greens Gaming and Dining" located at 2241 North Green Valley Parkway Henderson, NV 89014 (the "Greens") and (iii) that certain casino and bowling complex commonly known as "Wildfire Casino and Lanes" located at 4451 East Sunset Road Suite #1 Henderson, NV 89014 ("Wildfire Lanes").

J. Fiesta Rancho Owner, Gold Rush Owner, Fiesta Henderson Owner, Lake Mead Casino Owner, Wildfire Boulder Owner, Wildfire Rancho Owner, Santa Fe Station Owner, Texas Station Owner and GV Station Owner are sometimes collectively hereinafter referred to as "Property Owners").

K. Owner is the sole member of each of the Property Owners.

L. Manager is a wholly-owned subsidiary of Fertitta Gaming LLC, a Nevada limited liability company ("Fertitta Gaming").

M. Owner desires to have Manager manage and operate the Properties for the benefit of the respective Property Owners, and Manager is willing to perform such services for the account of Owner and the Property Owners in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, the Parties agree as follows:

**ARTICLE I**
**DEFINITION OF TERMS**

**1.1** <u>Certain Defined Terms</u>. The following terms when used in this Agreement shall have the meanings indicated:

"<u>Actual Corporate Overhead</u>" shall have the meaning set forth in Exhibit "A".

"<u>Affiliate</u>" shall mean, with respect to any Person, (i) any other Person directly or indirectly controlling, controlled by, or under common control with, such Person (excluding employees of a Person, other than officers, directors and board members of such Person); (ii) any Person who is an officer, director or board member of any Person described in clause (i) of this definition; or (iii) with respect to Manager, in addition to any Person described in clause (i) or

[Management Agreement - Opco]

(ii) of this definition, each of Fertitta Gaming, any Fertitta Affiliate and/or any Fertitta Family Party; provided, however, clause (iii) shall not apply to any children or grandchildren over the age of twenty-one (21) that would otherwise be included in the definition of Fertitta Family Party or Fertitta Affiliate.  The term "control" as used herein (including the terms "controlling", "controlled by", and "under common control with") shall mean the possession, directly or indirectly, of the power to (A) vote more than fifty percent (50%) of the outstanding voting interests of such Person or (B) otherwise direct management policies of such Person by contract or otherwise.  Without otherwise limiting the foregoing, neither Zuffa, LLC, a Nevada limited liability company, nor its Subsidiaries or joint ventures shall constitute an Affiliate of Manager unless engaged in the investment in, ownership of, or management of a Hospitality Product or any activity (other than online gaming) that requires licensing as a casino gaming company.

"Annual Plan and Operating Budget" shall mean the operating plan and budget for each Fiscal Year during the Term, as proposed by Manager, which sets forth the information described in Section 8.3(a).

"Approval Amount" shall mean $250,000, as adjusted by the percentage increase in the CPI.

"Approved Annual Plan and Operating Budget" shall mean the Annual Plan and Operating Budget for any Fiscal Year as approved by Owner pursuant to Section 8.3 hereof or otherwise resolved pursuant to Section 17.16.  For the avoidance of doubt, all references herein to "subject to the Approved Annual Plan and Operating Budget" or similar language, shall mean the Approved Annual Plan and Operating Budget, any variances thereto permitted under Section 8.3(e), any amendments thereto under Section 8.3(c), any amount in excess of the Promotional Allowance permitted under Section 8.3(f), and any Emergency Expenditures.

"Bank Accounts" shall mean those bank or financial institution accounts as are necessary for the day-to-day and long-term management and operation of the Properties, including the Operating Bank Accounts and the Reserve Funds.

"Bankrupt" shall mean, with respect to any Person, the occurrence of any of the following:

(i)    Applying for or consenting to the appointment of a receiver, trustee or liquidator of the Person or of all or a substantial part of the Person's assets which appointment is not discharged within sixty (60) days from the date of such appointment;

(ii)   Filing of a voluntary petition in bankruptcy or for reorganization or for adoption of an arrangement under the United States Bankruptcy Code, as amended, from time to time (or any corresponding provisions of succeeding law);

(iii)  Making a general assignment for the benefit of creditors;

(iv)   The entry of an order for relief in the case of an involuntary petition in bankruptcy; or

-3-                    [Management Agreement - Opco]

#4811-5012-8391

(v)     The assumption of custody or sequestration by a court of competent jurisdiction of all or substantially all of such Person's assets.

"Barley's Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Barley's Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Barley's Land" shall mean the lands described in Schedule "3A", together with the benefit of all easements and appurtenant rights thereto.

"Barley's Property" shall mean (i) the Barley's Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Barley's Property Facilities" shall mean (i) the Barley's Land; (ii) the Barley's Improvements; (iii) the Barley's Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by _____, the owner of the Barley's Property; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Barley's Property Related Facilities" shall mean (i) the common areas of the Barley's Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Barley's Property; (ii) the parking facilities servicing the Barley's Property; (iii) those rooms within the Barley's Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Barley's Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Barley's Property; (vii) any land or improvements not within or located upon the Barley's Land, but which provide shared benefits to the Barley's Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Barley's Improvements or other improvements, whether or not located upon the Barley's Land, which Manager is to manage for the benefit of the Barley's Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by _____ , the owner of the Barley's Property.

"Base Management Fee" shall mean a fee equal to two percent (2%) of Gross Revenues with respect to each Fiscal Month during the Term.

[Management Agreement - Opco]

"Budgeted EBITDA" shall mean the amount of "Budgeted EBITDA" as set forth in the Approved Annual Plan and Operating Budget.

"Business Day" shall mean a day, other than a Saturday, Sunday, or statutory holiday, on which banks are open for the transaction of business in both New York, New York and Las Vegas, Nevada.

"Business Information" shall mean all files, documents, instruments, papers, books and records relating exclusively to (i) Owner; (ii) the Property Owners; the (iii) Properties; and (iv) the business, operations, condition of (financial or other), results of operations and assets and properties of Owner and/or the Property Owners, including, without limitation: data information generated from or stored in the Technology Systems (e.g., financial statements, tax returns and related work papers and letters from accountants, budgets, pricing guidelines, ledgers, journals, deeds, title policies, minute books, stock certificates and books, stock transfer ledgers, contracts, permits, computer files and programs, retrieval programs, operating data and plans and environmental studies and plans, including employee documentation); personnel records; construction and design documentation; legal and contractual documentation; compliance/security/safety documentation; physical plant and engineering documentation, insurance contracts with third parties. For the avoidance of doubt, Business Information shall not include the FG Management Programs and Procedures.

"Cage Cash" shall mean all so-called "cage cash" maintained at each of the respective Properties in order to compensate casino patrons for their winnings.

"Cage Cash Minimum Balance" shall mean the sum of the (i) minimum Cage Cash required for the operation of "non-restricted" (as such term is defined by applicable Gaming Laws) Gaming at each of the respective Properties in accordance with applicable Gaming Laws; and (ii) the additional Cage Cash amount expressly approved by Owner pursuant to the Annual Plan and Operating Budget not to exceed $45,000,000 so long as the Opco Credit Agreement remains in effect.

"Cap Ex Assumed Rate of Return" shall mean an assumed rate of return equal to the product of (i) ten percent (10%); multiplied by (ii) the amount by which expenditures for Capital Improvements that are completed or substantially completed and in either event actually incorporated into and used in the operation of the applicable Properties during any Fiscal Year exceed six percent (6%) of Gross Revenues for the same Fiscal Year.

"Capital Improvements and Replacements" shall mean a capital expenditure, as defined under GAAP, for a modification, refurbishment, alteration, addition, improvement or renovation to any portion of any Property, including the Furniture, Fixtures and Equipment associated with such Property.

"Casino" shall mean that portion of the respective Properties specifically identified as the casino floor where Gaming is conducted.

[Management Agreement - Opco]

#4811-5012-8391

"Commencement Date" shall mean the later of (i) the effective date of the Plan; and (ii) the date the Property Owners have taken possession of each respective Property in accordance with the Plan.

"Comparable Manager Properties" shall mean, for each Property, the casino/hotel properties operated by Fertitta Gaming or any Fertitta Controlled Affiliates that are most closely comparable to such Property in quality, price and market. A list of initial Comparable Manager Properties for each Property appears on Schedule "1A".

"Competitor EBITDA" shall mean, for any period, the "EBITDA" as reported by the properties in the Performance Competitive Set in their public filings; provided that, Competitor EBITDA shall be adjusted and reconciled by the Parties to the extent that the public filings evidence a discrepancy in the calculation of "EBITDA" when compared to the calculation of EBITDA as set forth in this Agreement.

"Consumer Price Index" or "CPI" shall mean the 1988 Revised Consumer Price Index, All Item Figures for Urban Wage Earners and Clerical Workers (1982-84=100), applicable to the Las Vegas metropolitan area as published by the United States Department of Labor, Bureau of Labor Statistics. If such index shall be inapplicable or discontinued, then it shall mean such substitute comparable and recognized index as shall be designated by Owner, subject to Manager's reasonable approval.

"Copyrights" shall mean any copyrights (whether registered or unregistered) in unpublished and published works.

"Corporate Overhead and Expenses" shall have the meaning set forth in Exhibit "A".

"Corporate Overhead Excess" shall have the meaning set forth in Exhibit "A".

"Corporate Services" shall mean those corporate allocations and centralized services to be provided by Manager (regardless of whether such allocations and/or services are provided by Manager, Fertitta Gaming or at the level of each Property) as more specifically set forth on Exhibit "A".

"Credit Policy" shall mean the policy for extending credit to guests and/or patrons at each of the Properties as same may be modified pursuant to the provisions of Section 2.12 hereof, which policy will include, without limitation, the maximum amount of credit that Manager may extend to any individual patron without Owner's consent, the maximum amount of cumulative credit that may be outstanding at each of the Properties at any one time, and the respective Property's policy with respect to when credit losses will be recognized on the books of the applicable Property (as used herein, "credit losses" means a determination that, after reasonable and customary efforts to collect have failed, a patron is not going to repay a "marker" or credit extended to such patron for the purpose of participating in Gaming at each of the Properties).

[Management Agreement - Opco]

"Cure Amount" shall mean the amount equal to the sum of (i) with respect to the first (1st) Measurement Year of the Non-Performing Period, the difference between eighty-five percent (85%) of the aggregate Budgeted EBITDA for all of the Properties for such Measurement Year and actual EBITDA achieved by all of the Properties in the first (1st) Measurement Year of the Non-Performing Period; and (ii) with respect to the second (2nd) Measurement Year of the Non-Performing Period and every Fiscal Year thereafter until the conclusion of the Termination Avoidance Period, the difference between eighty-five percent (85%) of the aggregate Deemed Budgeted EBITDA for all of the Properties for such Measurement Year of the Termination Avoidance Period and actual EBITDA achieved by all of the Properties for such Measurement Year of the Termination Avoidance Period.

"Deemed Budgeted EBITDA" shall mean, (i) with respect to the second (2nd) Measurement Year of the applicable Performance Test (i.e., whereas the Properties have failed the Performance Test for the initial Measurement Year, as applicable), an amount equal to the sum of (1) the immediately prior Measurement Year's Budgeted EBITDA and (2) the Cap Ex Assumed Rate of Return, if any, for such Fiscal Year; and (ii) with respect to any successive Fiscal Year thereafter (where applicable in accordance with Section 3.2), an amount equal to the sum of (1) the Deemed Budgeted EBITDA for the immediately prior Measurement Year and (2) the Cap Ex Assumed Rate of Return, if any, for the then applicable Measurement Year (which shall, for avoidance of doubt, be in addition to the cumulative Cap Ex Assumed Rate of Return included in the Deemed Budgeted EBITDA for the immediately prior Measurement Year as referenced in clause (1)).  A sample calculation of Deemed Budgeted EBITDA is attached as Schedule "6" hereto.

"EBITDA" shall mean, for the period in question, Net Income for such period PLUS (without duplication and to the extent and only to the extent actually deducted in the calculation of Net Income): (i) interest expense, net of interest income, (ii) income tax expense, (iii) depreciation and amortization, (iv) non-cash impairment losses, (v) extraordinary, non-recurring losses or expenses as determined by the Owner or on the sale of assets for such period, (vi) losses attributable to the early extinguishment of indebtedness, (vii) losses attributable to hedging obligations or other derivative instruments and (viii) expenses actually reimbursed by a Subsidiary of Owner (other than the Property Owners) pursuant to an expense sharing arrangement; MINUS (without duplication and to the extent and only to the extent actually included in the calculation of net income), (A) non-operating, non-recurring gains on the sale of assets for such period, (B) gains attributable to the early extinguishment of indebtedness, (C) gains attributable to hedging obligations or other derivative instruments and (D) distributions made by Owner to its parent companies to fund payment of the expenses of such parent companies in an amount not to exceed _____, in each case, determined on a consolidated basis for the Owner and Property Owners in accordance with GAAP.  [Subject to confirmation of the Parties]

"EBITDA Percentage" shall mean [___ percent (__%)], as may be adjusted, from time to time, in accordance with Section 3.2(d)(2), representing the ratio, expressed as a percentage, of (i) the aggregate EBITDA achieved at all of the Properties to (ii) the aggregate Competitor EBITDA achieved at all of the properties in the Performance Competitive Set, both

for the most recent twelve (12) month period prior to the Effective Date for which financial reporting is available for the Properties and the Initial Performance Competitive Set.

"EBITDA Percentage Adjustment Event" shall mean the occurrence of any of the following: (i) if there is a material change in the physical composition (e.g., size, quality and/or such property no longer operates a casino or converts to condominiums) of any of the Properties; (ii) if there is a material change in the physical composition of the properties in the Performance Competitive Set (whether in accordance with Schedule "1C" with respect to the Initial Performance Competitive Set or otherwise generally with respect to the Performance Competitive Set pursuant to Section 2.16); or (iii) if material capital improvements or replacements are made to any property in the Performance Competitive Set.

"Executive Employees" shall mean and include the General Manager (for both the hotel and casino components of each Property, as applicable) and, if applicable, the following to the extent employed at the level of each Property: chief executive officer, chief operating officer, and/or chief financial officer (or similar positions in lieu thereof).

"Fertitta Affiliate" shall mean any Affiliate of Owner in which a Fertitta Family Party has a direct or indirect equity or other beneficial interest.

"Fertitta Controlled Affiliate" means Manager, Fertitta Gaming, the Fertitta Family Parties, Frank J. Fertitta III, Lorenzo J. Fertitta and any Subsidiary of any of the foregoing; provided that neither Zuffa, LLC, a Nevada limited liability company, nor any Subsidiaries or joint ventures of Zuffa, LLC, a Nevada limited liability company, shall constitute a Fertitta Controlled Affiliate unless engaged in the investment in, ownership of, or management of a Hospitality Product or any activity (other than online gaming) that requires licensing as a casino gaming company.

"Fertitta Family Entities" shall mean, any trust or entity one hundred percent (100%) owned and controlled by, and established for the benefit of, or the estate of, any of Frank J. Fertitta III, Lorenzo J. Fertitta or their spouses or lineal descendants (including adopted children and their lineal descendants).

"Fertitta Family Parties" shall mean Frank J. Fertitta III or Lorenzo J. Fertitta, such Persons' spouses and lineal descendants, and any Fertitta Family Entities.

"Fertitta Manager Control Requirements" shall mean each of the following requirements: (i) Manager shall be and remain controlled by Fertitta Gaming; (ii) Fertitta Gaming shall be and remain controlled by Frank J. Fertitta III and/or Lorenzo J. Fertitta; (iii) Manager and Fertitta Gaming shall each be and remain at least fifty-one percent (51%) owned by the Fertitta Family Parties; (iv) Frank J. Fertitta III or Lorenzo J. Fertitta, as applicable, control the voting of the equity interests in Manager and Fertitta Gaming (provided that, any Fertitta Family Entity holds only an economic interest in Manager and/or Fertitta Gaming, as applicable); and (v) either Frank J. Fertitta III or Lorenzo J. Fertitta shall be the chief executive officer (or equivalent) of Manager and Fertitta Gaming and shall dedicate the preponderance of his time and attention to the business and affairs of Manager and devote reasonable time and

[Management Agreement - Opco]

#4811-5012-8391

attention to Manager's performance of its duties under this Agreement and to the business and affairs of the Properties and Owner.

"FG Management Programs and Procedures" shall mean (i) the general operating procedures; know-how; generic training manuals and procedures; general financial performance and budgeting processes; general marketing strategies; general new hire processes; overall human resources programs and documentation; general time, attendance, labor management and scheduling systems not specific and/or unique to the Properties; and/or (ii) any such files, documents, instruments, papers, books and records created or developed by Manager or any Fertitta Controlled Affiliate independent, separate and apart from Manager's operation and management of the Properties following the Commencement Date in connection with the provision of Shared Services to the Properties and, Manager LV Properties not specific and/or unique to the Properties.

"Fiesta Henderson Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Fiesta Henderson Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Fiesta Henderson Land" shall mean the lands described in Schedule "3B", together with the benefit of all easements and appurtenant rights thereto.

"Fiesta Henderson Property" shall mean (i) the Fiesta Henderson Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Fiesta Henderson Property Facilities" shall mean (i) the Fiesta Henderson Land; (ii) the Fiesta Henderson Improvements; (iii) the Fiesta Henderson Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by Fiesta Henderson Owner; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Fiesta Henderson Property Related Facilities" shall mean (i) the common areas of the Fiesta Henderson Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Fiesta Henderson Property; (ii) the parking facilities servicing the Fiesta Henderson Property; (iii) those rooms within the Fiesta Henderson Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Fiesta Henderson Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Fiesta Henderson Property; (vii) any land or improvements not within or located upon the Fiesta Henderson Land, but which provide shared benefits to the

-9-                                    [Management Agreement - Opco]

Fiesta Henderson Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Fiesta Henderson Improvements or other improvements, whether or not located upon the Fiesta Henderson Land, which Manager is to manage for the benefit of the Fiesta Henderson Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by Fiesta Henderson Owner.

"Fiesta Rancho Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Fiesta Rancho Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Fiesta Rancho Land" shall mean the lands described in Schedule "3C", together with the benefit of all easements and appurtenant rights thereto.

"Fiesta Rancho Property" shall mean (i) the Fiesta Rancho Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Fiesta Rancho Property Facilities" shall mean (i) the Fiesta Rancho Land; (ii) the Fiesta Rancho Improvements; (iii) the Fiesta Rancho Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by Fiesta Rancho Owner; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Fiesta Rancho Property Related Facilities" shall mean (i) the common areas of the Fiesta Rancho Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Fiesta Rancho Property; (ii) the parking facilities servicing the Fiesta Rancho Property; (iii) those rooms within the Fiesta Rancho Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Fiesta Rancho Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Fiesta Rancho Property; (vii) any land or improvements not within or located upon the Fiesta Rancho Land, but which provide shared benefits to the Fiesta Rancho Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Fiesta Rancho Improvements or other improvements, whether or not located upon the Fiesta Rancho Land, which Manager is to manage for the benefit of the Fiesta Rancho Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed);

[Management Agreement - Opco]

and (ix) any related land, buildings and improvements which in the future may be owned or leased by Fiesta Rancho Owner.

"Fiscal Month" shall mean each calendar month during each Fiscal Year of the Term.

"Fiscal Quarter" shall mean each fiscal quarter during each Fiscal Year of the Term, commencing on January 1, April 1, July 1 and October 1 in each calendar year.

"Fiscal Year" shall begin on January 1 and end on December 31 in each calendar year. Any partial Fiscal Year between the Commencement Date and the commencement of the first full calendar year, or between the end of the last Full Fiscal Year and Termination shall, for purposes of this Agreement, constitute a separate Fiscal Year.

"Full Fiscal Year" shall mean any Fiscal Year commencing on January 1 of a calendar year and ending on December 31. For the avoidance of doubt, if the initial Fiscal Year commences on or after January 2, the first Full Fiscal Year shall commence on the next January 1.

"Furniture, Fixtures and Equipment" shall mean all furniture, fixtures and equipment reasonably required for the operation of the Properties (including, but not limited to, office furniture, computer and communications systems, specialized hotel equipment necessary for the operation of the Properties, food and beverage equipment, laundries and recreational facilities) as well as all specialized casino equipment (including, but not limited to, cashier, money sorting and money counting equipment, slot machines, table games, video gaming equipment, and other similar gaming equipment and surveillance equipment).

"GAAP" shall mean United States generally accepted accounting principles consistently applied, as in effect, from time to time.

"Gaming" shall mean, as such definition is modified, from time to time, in accordance with the Nevada Gaming Control Act (as codified in Chapter 463 of the Nevada Revised Statutes), or other applicable Gaming Laws, to deal, operate, carry on, conduct, maintain or expose for play any game played with cards, dice, equipment or any mechanical, electromechanical or electronic device or machine for money, property, checks, credit or any representative of value (including, without limiting the generality of the foregoing, sports book, faro, monte, roulette, keno, bingo, fan-tan, twenty-one, blackjack, seven-and-a-half, big injun, Klondike, craps, poker chuck-a-luck, Chinese chuck-a-luck (dai shu), wheel of fortune, chemin de fer, baccarat, pai gow, beat the banker, panguingui, slot machine, any banking or percentage game or any other game or device approved by the Nevada Gaming Commission), but does not include games played with cards in private homes or residences in which no person makes money for operating the game (except as a player), or games operated by charitable or educational organizations which are approved by the Nevada State Gaming Control Board pursuant to the Nevada Gaming Control Act (as codified in the Chapter 463 of the Nevada Revised Statutes).

[Management Agreement - Opco]

"Gaming Authority" shall mean those federal, state and local governmental, regulatory and administrative authorities, agencies, boards and officials responsible for or involved in the regulation of Gaming or Gaming activities in any jurisdiction (including, within the State of Nevada, the Nevada Gaming Commission, the Nevada State Gaming Control Board, and applicable local authorities).

"Gaming Laws" shall mean those laws pursuant to which any Gaming Authority possesses regulatory, licensing or permit authority over Gaming within any jurisdiction (and within the State of Nevada, the Nevada Gaming Control Act, as codified in the Chapter 463 of the Nevada Revised Statutes, and the regulations of the Nevada Gaming Commission and Nevada State Gaming Control Board promulgated thereunder, as amended, from time to time).

"General Manager" shall mean, from time to time, the general manager at each of the Properties.

"Gold Rush Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Gold Rush Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Gold Rush Land" shall mean the lands described in Schedule "3D", together with the benefit of all easements and appurtenant rights thereto.

"Gold Rush Property" shall mean (i) the Gold Rush Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Gold Rush Property Facilities" shall mean (i) the Gold Rush Land; (ii) the Gold Rush Improvements; (iii) the Gold Rush Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by Gold Rush Owner; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Gold Rush Property Related Facilities" shall mean (i) the common areas of the Gold Rush Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Gold Rush Property; (ii) the parking facilities servicing the Gold Rush Property; (iii) those rooms within the Gold Rush Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Gold Rush Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Gold Rush Property; (vii) any land or improvements not within or located upon the Gold Rush Land,

-12-                            [Management Agreement - Opco]

but which provide shared benefits to the Gold Rush Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Gold Rush Improvements or other improvements, whether or not located upon the Gold Rush Land, which Manager is to manage for the benefit of the Gold Rush Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by Gold Rush Owner.

"Governmental Approvals" shall mean all permits, licenses, consents, approvals, declarations, concessions, orders, filings, notices, findings of suitability, entitlements, waivers, variances, certificates and other authorizations granted or issued by any agency(ies) of the City of North Las Vegas, Nevada, Clark County, Nevada, the State of Nevada and the United States necessary for the operation of the Properties in accordance with this Agreement (including, without limitation, as required under any Gaming Laws).

"Greens Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Greens Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Greens Land" shall mean the lands described in Schedule "3E", together with the benefit of all easements and appurtenant rights thereto.

"Greens Property" shall mean (i) the Greens Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Greens Property Facilities" shall mean (i) the Greens Land; (ii) the Greens Improvements; (iii) the Greens Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by _____, the owner of the Greens Property; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Greens Property Related Facilities" shall mean (i) the common areas of the Greens Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Greens Property; (ii) the parking facilities servicing the Greens Property; (iii) those rooms within the Greens Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Greens Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Greens Property; (vii) any land or improvements not within or located upon the Greens Land, but which provide shared benefits

to the Greens Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Greens Improvements or other improvements, whether or not located upon the Greens Land, which Manager is to manage for the benefit of the Greens Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by _____, the owner of the Greens Property.

"Gross Revenues" shall mean with respect to any period, all revenues and income (excluding interest income) of any kind derived by Owner from the use or operation of the Properties determined in accordance with GAAP consistently applied, expressly including (i) "gross revenues" from Gaming activities and without duplication; (ii) income from rental of guest rooms; (iii) subject to the limitations in clause (vi) of the definition, income from food and beverage sales; (iv) income from entertainment programs and merchandise sales; (v) telephone, telegraph and telex revenues; (vi) rental or other similar payments from lessees, sublessees and concessionaires and others occupying space or rendering services at any of the Properties (but not (A) reimbursements for utilities, taxes or similar matters, or (B) the gross receipts of such lessees, sublessees or concessionaires except to the extent the same is part of such rental payments); (vii) income from vending machines; (viii) health club fees; and (ix) the actual net proceeds of (x) business interruption or similar insurance and (y) temporary condemnation awards representing compensation for loss of Gross Revenues and, to the extent applicable, after deducting expenses incurred in connection with the adjustment or collection thereof; but specifically and expressly excluding (to the extent included in revenues and income of any kind derived from the use or operation of the Properties and without duplication) any and all:

(a)    proceeds from the sale, financing or refinancing or other disposition of a Property or all or substantially all of the assets of a Property Owner;

(b)    proceeds from the sale, financing, refinancing or other disposition of Furniture, Fixtures and Equipment or other capital assets;

(c)    proceeds of any fire, extended coverage or other insurance policies (excluding any proceeds of business interruption or similar insurance representing compensation for loss of Gross Revenues);

(d)    receipts from awards or sales in connection with any condemnation (other than a temporary condemnation) or from other transfers in lieu of and under the threat of condemnation and other receipts in connection with any taking to the extent that such amounts are specifically identified as compensation for alterations or physical damage to the Properties;

(e)    refunds, rebates, discounts and credits of a similar nature given, paid or returned in the course of obtaining Gross Revenues or components thereof (other than complementaries provided to patrons of the Properties in the ordinary course of business and consistent with the Annual Plan and Operating Budget);

-14-                    [Management Agreement - Opco]

(f)     gratuities or service charges or other similar receipts which are paid to Employees or others;

(g)     excise, sales, gross receipts, admission, entertainment, tourist, use or similar taxes or charges collected from patrons or guests or as part of the sale price for goods, services or entertainment, other than taxes imposed on Gaming revenues;

(h)     sum and credits received for lost or damaged merchandise;

(i)     credit card processing or servicing fees not retained by Owner;

(j)     contributions by Owner of any additional Working Capital and any contributions to any reserve fund (and any interest or other investment income earned on such amounts deposited);

(k)     refund of taxes that were overpaid in a prior year;

(l)     proceeds from inter-company transfers of cash or dividends;

(m)     proceeds from the settlement or successful prosecution of any legal claim with respect to an amount that would not have otherwise been included in Gross Revenue;

(n)     revenues derived from the provision of employee meals to the extent of the food costs associated therewith and the costs incurred in the provision thereof;

(o)     security deposits (except as applied or forfeited);

(p)     refunds to any Property guests of any sums previously paid or credits to any Property customer for lost or damaged items, the price of any merchandise given in exchange of other merchandise which does not result in additional income;

(q)     vending machine revenues not payable to Owner or Manager on behalf of Owner;

(r)     uncollectible amounts as determined by Manager in applying its standards and practices in the ordinary course; provided that any recovered bad debts shall again become part of Gross Revenues in the Fiscal Year that they are recovered to the extent of a previous corresponding deduction; and

(s)     interest accrued or paid on any amounts (including, without limitation, amounts in the Reserve Funds or Operating Bank Accounts) or income derived from securities and similar property acquired and held solely for investment.

"Hospitality Product" shall mean any hotel, condominium, condo-hotel, timeshare, resort property or other transient hospitality product.

[Management Agreement - Opco]

"Impositions" shall mean all taxes, assessments, duties, rates and charges, levies, license feels, permit fees, inspection fees and other authorized fees and charges imposed by any Governmental Authority that at any time may be assessed, levied, confirmed or imposed on any of the Properties or its respective operations (specifically excluding income, franchise or similar taxes imposed on Owner).

"Improvements" shall mean the Barley's Improvements, the Fiesta Henderson Improvements, the Fiesta Rancho Improvements, the Gold Rush Improvements, the Greens Improvements, the Lake Mead Casino Improvements, the Santa Fe Station Improvements, the Texas Station Improvements, the Wildfire Boulder Improvements, the Wildfire Lanes Improvements and the Wildfire Rancho Improvements.

"Incentive Management Fee" shall mean, subject to and calculated in accordance with Section 5.1 of this Agreement, a fee equal to five percent (5%) of EBITDA for each Fiscal Month.

"Indexed EBITDA" shall mean, for any Fiscal Year, the product of (i) the Competitor EBITDA achieved by the properties in the Performance Competitive Set for that applicable Fiscal Year; multiplied by (ii) the then applicable EBITDA Percentage.

"Industry Consultant" shall mean a reputable hospitality and casino industry consultant that is mutually acceptable to both Parties, which consultant (i) shall have not fewer than ten (10) years of experience in the casino/hotel business; (ii) shall not be an Affiliate of or a person who has any past, present, or currently contemplated future business or personal relationship with either Owner or Manager; and (iii) whose compensation is not fixed based upon the results of the issue at dispute.

"Initial Corporate Overhead Budget" shall have the meaning set forth on Exhibit "A".

"Initial Gross Revenues Budget" shall have the meaning set forth on Exhibit "A".

"Intellectual Property" shall mean and include all (i) Trademarks; (ii) Patents; (iii) Copyrights; (iv) Customer Database; (v) Business Information; (vi) rights in computer programs (including in both source code and object code therefor, together with related documentation and explanatory materials and databases, including any Copyrights, Patents, Initial Technology Systems, and trade secrets therein); (vii) trade secrets and other confidential or proprietary information (including with respect to recipes, menus and unpatented inventions); and (viii) any registrations, application for registration or issuances, recordings, renewals and extensions relating to any of the foregoing (including, without limitation, all Initial Owned IP).

"Internet Domain Names" shall mean the unique addresses on the Internet consisting of at least a top-level domain (generic top-level domain (gTLD) or country or region code top-level domain (ccTLD)) and a second-level domain, regardless of whether there is any content on the website related thereto.

[Management Agreement - Opco]

#4811-5012-8391

"IP Holdco" shall mean [_____], a Delaware statutory trust (or a limited liability company) and a special-purpose subsidiary of Owner, established solely for the purposes of holding certain Trademarks and other Intellectual Property used non-exclusively by Owner and its Affiliates and for licensing such Trademarks and other Intellectual Property to Owner and its Affiliates and to Manager.

"Lake Mead Casino Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Lake Mead Casino Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Lake Mead Casino Land" shall mean the lands described in Schedule "3F", together with the benefit of all easements and appurtenant rights thereto.

"Lake Mead Casino Property" shall mean (i) the Lake Mead Casino Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Lake Mead Casino Property Facilities" shall mean (i) the Lake Mead Casino Land; (ii) the Lake Mead Casino Improvements; (iii) the Lake Mead Casino Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by Lake Mead Casino Owner; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Lake Mead Casino Property Related Facilities" shall mean (i) the common areas of the Lake Mead Casino Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Lake Mead Casino Property; (ii) the parking facilities servicing the Lake Mead Casino Property; (iii) those rooms within the Lake Mead Casino Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Lake Mead Casino Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Lake Mead Casino Property; (vii) any land or improvements not within or located upon the Lake Mead Casino Land, but which provide shared benefits to the Lake Mead Casino Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Lake Mead Casino Improvements or other improvements, whether or not located upon the Lake Mead Casino Land, which Manager is to manage for the benefit of the Lake Mead Casino Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by Lake Mead Casino Owner.

"Land" shall mean the Barley's Land, the Fiesta Henderson Land, the Fiesta Rancho Land, the Gold Rush Land, the Greens Land, the Lake Mead Casino Land, the Santa Fe Station Land, the Texas Station Land, the Wildfire Boulder Land, the Wildfire Lanes Land and the Wildfire Rancho Land.

"Legal Requirements" shall mean any federal, state, or local law, statute, code, rule, ordinance, regulation or order of any governmental authority, regulatory authority or agency having jurisdiction over the business or operation of the Properties, as applicable, or the matters that are the subject of this Agreement (including, without limitation, those related to zoning, building, employees, health, safety, environmental matters and accessibility of public facilities, and the Gaming Laws).

"Loan" shall mean those certain loans made and letters of credit extended pursuant to the terms of the Opco Credit Agreement.

"Loan Documents" shall mean (i) the Opco Loan Documents and any subsequent amendments or modifications of the same and (ii) any loan documents entered into as a rearrangement, replacement, renewal, refinancing, consolidation, modification or enlargement of debt, evidenced by the Opco Loan Documents or other debt of Owner or Property Owners, now or hereafter existing, or to secure new debt of Owner or Property Owners.

"Management Fees" shall mean, collectively, the Base Management Fee and the Incentive Management Fee.

"Manager Centralized Services" shall have the meaning set forth on Exhibit "C".

"Manager LV Properties" shall mean the Hospitality Products operated by Manager or any Fertitta Controlled Affiliate other than the Properties.

"Manager Unrelated Subsidiaries" shall mean Fertitta Gaming's Subsidiaries (excluding Manager) that are single-purpose Subsidiaries which (i) have no recourse obligation to Manager or Fertitta Gaming; and (ii) are unrelated to Manager's activities at the Properties.

"Manager's Executive Staff" shall mean and include those designated senior executive personnel employed by Manager or its Affiliates as more specifically listed on Exhibit "A" (and any replacement position or position with authority and/or duties similar to the foregoing named positions).

"Manager's Gross Negligence or Willful Misconduct" shall mean the fraud, gross negligence or willful misconduct of Manager, Fertitta Gaming and their respective officers, directors and members and the successors and assigns of each of the foregoing (which shall be deemed to include the Executive Employees and/or any of Manager's Executive Staff), including, without limitation, fraud, gross negligence or willful misconduct in the hiring, training or supervising the Employees; provided, however, (i) any fraud, gross negligence or willful misconduct of a member of the Executive Employees and/or Manager's Executive Staff acting solely for his or her personal benefit (and not, for example, at the direction of Manager or Fertitta

[Management Agreement - Opco]

Gaming or any of the Fertitta Family Parties) shall not constitute Manager's Gross Negligence or Willful Misconduct so long as Manager promptly takes action to terminate or permanently remove the applicable member of the Executive Employees and/or Manager's Executive Staff from the Property and Manager promptly repays any and all damages sustained by Owner or Property Owners in connection with such fraud, gross negligence or willful misconduct; (ii) the act or omission of an Employee who is not an Executive Employee, which act or omission constitutes fraud, willful misconduct or gross negligence on the part of such Employee, shall not constitute Manager's Gross Negligence or Willful Misconduct unless Manager's corporate staff or an Executive Employee acted with gross negligence or willful misconduct in employing, training, supervising or continuing the employment of such Employee; and (iii) the violation of Legal Requirements with respect to wages and hours of labor shall not be deemed to be Manager's Gross Negligence or Willful Misconduct if Manager's actions are consistent with generally prevailing industry practices, as long as Manager discontinues the practices if Owner requests Manager to do so.

"Material Default" shall mean any breach or failure by a Party to comply with any of its covenants and agreements contained in this Agreement following the expiration of any applicable cure periods contained herein, other than any such breach or failure that in the context hereof is minor, immaterial or insubstantial or not reasonably likely to prejudice any other Party or any part of the Properties in any material way.

"Material Loan Default" shall mean, unless amended or waived, (i) a failure to pay interest required under the Loan Documents when due and payable or failure to pay principal under the Loan Documents when due and payable, at maturity or upon acceleration, each case following the expiration of any applicable grace periods; (ii) a breach of a financial covenant which remains uncured following the expiration of any and all applicable cure periods contained in the Loan Documents; or (iii) a breach of any other material covenant in the Loan Documents that results in an acceleration of the Loan or any future replacement secured loans.

"Material Nevada Governmental Approval" shall mean any material Governmental Approval issued by any agency(ies) of the City of North Las Vegas, Nevada; Clark County, Nevada; or the State of Nevada, the denial, revocation or suspension of which would have a material adverse effect on the economics of Owner, any Property Owner and/or any Property.

"Mortgage" shall mean any and all mortgages, deeds of trust or similar security instruments now or hereafter encumbering the Properties or any part thereof that are (i) evidenced by the Loan Documents or (ii) other debt of Owner or Property Owners *and,* in each case, the purpose of which are for the sole benefit of any one or more the Properties together with any subsequent amendment or modification of the same, whether as a rearrangement, replacement, renewal, refinancing, consolidation, modification or enlargement of the same.

"Net Income" shall mean, for the period in question, the net income (loss) of the Owner and the Property Owners for such period determined on a consolidated basis in accordance with GAAP (after deduction of the Base Management Fee for such period but prior

to any deduction of the Incentive Management Fee for such period), excluding, without duplication, (i) the cumulative effect of a change in accounting principles during such period to the extent included in Net Income, (ii) the purchase accounting effects of adjustments to property and equipment, software and other intangible assets and deferred revenue (including the effects of such adjustments pushed down to the Owner and the Property Owners) as a result of any acquisitions, or the amortization or write-off of any amounts thereof, and (iii) the income (or loss) of any Person that is not the Owner or a Property Owner (including joint venture investments recorded using the equity method and dividends and distributions paid to the Owner or a Property Owner by any Subsidiary during such period (including pursuant to any tax sharing agreement)).  [Subject to confirmation of the Parties]

"Nevada Gaming Licenses" shall mean all licenses, consents, permits, approvals, authorizations, registrations, findings of suitability, franchises and entitlements issued by any Gaming Authority necessary for or relating to the conduct of activities under the Gaming Laws within the State of Nevada.

"Non-Compete Agreements" shall mean, collectively, [_____].

"Opco Credit Agreement" shall mean that certain Credit Agreement among Owner, as borrower, and the institutions from time to time party thereto, as lenders, and Deutsche Bank Trust Company Americas, as administrative agent, as same may be amended, restated, amend and restated, refinanced, replaced or otherwise modified, from time to time.

"Opco Loan Documents" shall mean the "Loan Documents" as defined in the Opco Credit Agreement.

"Operating Bank Accounts" shall mean the Bank Accounts in the name of Owner for the payment of Operating Costs and any other costs to be paid pursuant to this Agreement and the deposit of monies related to the Properties, which accounts shall be (i) separate and distinct from any other accounts, reserves or deposits required by this Agreement, and (ii) interest bearing accounts if such an account is reasonably available (all interest earned shall be retained in the Operating Bank Accounts).

"Operating Competitive Set" shall mean the sets of casino/hotel properties (expressly excluding any properties owned, operating or licensed by Fertitta Family Entities) which are identified and agreed by the Parties as competing directly in the marketplace with the Properties.  A list of the initial Operating Competitive Set appears on Schedule "1B".

"Operating Consumables" shall mean all food, beverages and other immediately consumable items utilized in operating the Properties (including, without limitation, soap, cleaning materials, matches, stationary, brochures, folios, and other similar items).

"Operating Costs" shall mean, to the extent included within the then-current Annual Plan and Operating Budget, or to the extent otherwise approved by Owner at any time and, from time to time, pursuant to the terms of this Agreement, all costs and expenses of maintaining, conducting and supervising the operation of the Properties which are properly

[Management Agreement - Opco]

attributable to the Fiscal Month or Fiscal Year under consideration in accordance with GAAP, including, without limitation: [Subject to confirmation of the Parties]

(a)    the Base Management Fee;

(b)    the cost of all food and beverages sold or consumed at the Properties and of all Operating Supplies and Operating Consumables (with the exception of the cost of food and beverages and other items sold or consumed by lessees and sublessees);

(c)    salaries, wages and other benefits of the Employees, including costs of payroll taxes and employee benefits, the salaries, wages, benefits, and expenses (including travel expenses, of third-party consultants);

(d)    the cost of all other materials, supplies, goods and services used in connection with the operation of the Properties (including, without limitation, heat and utilities, trash removal, office supplies, security and all other services performed by third parties, telephone and data processing equipment and other equipment);

(e)    the cost of repairs to and maintenance of the Properties to the extent not paid for from the Reserve Fund or by the actual cash proceeds of any fire or casualty insurance after deducting necessary expenses in connection with the adjustment or collection of such proceeds;

(f)    legal, consulting, lobbying, political and charitable contributions, accounting and other fees for professionals for services related to the development or operation of the Properties;

(g)    any insurance premiums for insurance obtained by or on behalf of Owner with respect to any of the Properties;

(h)    all Impositions;

(i)    all expenses for marketing the Properties (including all expenses of advertising, sales, promotion and public relations activities); and

(j)    all excise, sales, gross receipts, admission, entertainment, tourist or use taxes, Gaming taxes and device fees, real estate taxes, ad valorem taxes, personal property taxes, utility taxes and other taxes (as those terms are defined by GAAP), assessments for public improvements, and municipal, county and state license and permit fees.

Operating Costs and Shared Expenses will not include any of the following:

(i)    any costs incurred by the Properties that are not expressly reimbursable by Owner pursuant to the then-current Annual Plan and Operating Budget or otherwise (including, without limitation, Corporate Overhead and Expenses);

-21-                [Management Agreement - Opco]

(ii)　　the Incentive Management Fee;

(iii)　　any repayments of advances by Manager on account of Capital Improvements and Replacements;

(iv)　　[any cost, expense or payment made on account of or in relation to the duties of Manager regarding the ongoing maintenance of the Intellectual Property set forth in Section 6.2(f)] [Subject to confirmation of the Parties];

(v)　　any cost, expense or payment made on account of or in relation to the duties of Manager regarding the administration and operation of IP Holdco set forth in Section 6.4;

(vi)　　any insurance premiums for insurance obtained by Manager as required under Section 10.1 (excluding insurance obtained by Manager on behalf of Owner);

(vii)　　all taxes, rates, duties, levies, charges and assessments whatsoever, whether municipal, legislative, or otherwise, including ad valorem real property taxes, commercial personal property taxes and association dues and assessments, whether extraordinary, general or special, ordinary or extraordinary foreseen or unforeseen which are, from time to time, levied, imposed, rated, charged or assessed by governmental, quasi-governmental, or property owners associations or similar entities and any taxes or other amounts which are levied, imposed, rated, charged or assessed instead of, or in addition to any such taxes against (A) Furniture, Fixtures and Equipment, Operating Equipment, Operating Supplies, and any other personal property located in any of the Properties; (B) the Properties or any part thereof; or (C) with respect to any occupancy or use of the Properties;

(viii)　　any payments, whether principal or interest, relating to Capital Improvements and Replacements to, or encumbrances with respect to, any of the Properties (including expenditures for initial Furniture, Fixtures and Equipment and replacements or substitutions therefore or additions thereto);

(ix)　　land rental, building rental or Mortgage payments;

(x)　　depreciation and amortization expenses;

(xi)　　income, capital or franchise taxes of a Party;

(xii)　　any Capital Improvements and Replacements or other expenditures from the Reserve Fund, and any deposits into the Reserve Fund;

(xiii)　　excise, sales, use and other taxes (including room taxes) or similar charges (i) collected directly from patrons or guests or as part of the sale price of any goods or services or displays, (ii) remitted to a Governmental Authority and (iii) excluded from Gross Revenues;

[Management Agreement - Opco]

(xiv)   salaries, wages, asset management fees or amounts paid to Owner's Representative, third party individuals and/or independent entities not employed by Manager and not under the supervision or direction of Manager but nevertheless upon the instruction of Owner;

(xv)   interest payable on any credit facility provided to fund Working Capital or amounts that would otherwise be deposited in the Reserve Fund pursuant to Section 7.2(b);

(xvi)   any rent or other charges (specifically excluding use charges and/or fees) payable by Owner with respect to the Properties and the systems and related facilities necessary for the operation of the Properties (including, without limitation, all life/safety, heating, ventilation, air conditioning, telephone, computer, sanitation and mechanical systems and facilities);

(xvii)   any expenses incurred in the adjustment or collection of property insurance claims (including use and occupancy or business interruption insurance);

(xviii)   any cost, expense or payment made on account of or in relation to any claims relating to the Properties which have accrued as of the Effective Date or any defects in the design and construction the Properties (including, without limitation, any Improvements installed thereon);

(xix)   any cost or expense incurred in connection with the creation of any item of revenue, income or proceeds that is excluded from the definition of "Gross Revenues" under this Agreement;

(xx)   any cost, expense or payment specified in this Agreement to not constitute an Operating Cost or Shared Expense; or

(xxi)   Corporate Overhead and Expenses.

"Operating Standards" shall mean with respect to any Property, that such Property shall be managed, operated, serviced (including, without limitation, customer service), maintained, repaired and refurbished (a) to a standard of operation equal to or exceeding the standard of operation at which such Property was operated as of the Effective Date to the extent that funds available pursuant to the Approved Annual Plan and Operating Budget, as amended, from time to time, or otherwise provided by Owner, permit the operation, management, service, repair, maintenance and refurbishment of the applicable Property to such standard, (b) consistent with the terms and conditions of this Agreement, and (c) in accordance with the standards, policies and programs in effect, from time to time, that are applicable to the operation of such Property; provided that, to the extent that funds available pursuant to the Approved Annual Plan and Operating Budget, as amended, from time to time, or otherwise provided by Owner, permit operation of the applicable Property to such standard, the Operating Standards with respect to such Property will not be less than the standard of operations for (i) the properties in the Operating Competitive Set, and (ii) the Property's Comparable Manager Properties, but in each

[Management Agreement - Opco]

case taking into account any differences in age, quality, size, location, amenities, amount of meeting space, business mix, and other physical and operation variations for such properties in the Operating Competitive Set and for such properties consisting of Comparable Manager Properties, and specifically with respect to Comparable Manager Properties, any differences in Manager Centralized Services that are provided to such properties and not provided to the Properties.

"Operating Supplies" shall mean all non-capital equipment necessary for the day-to-day operation of the Properties (including but not limited to chips, tokens, uniforms, playing cards, glassware, linens, silverware, utensils and dishware).

"Other Manager Properties" shall mean, collectively the Manager LV Properties and any other Hospitality Product (other than the Properties) which Manager owns, manages or licenses (as licensor).

"Owner Account" shall mean the account(s) in the name of Owner that are designated by Owner to Manager, from time to time, for the remittance of funds by Manager in accordance with the terms of this Agreement.

"Owner IP" shall mean Owned IP and Licensed IP.

"Owner Unrelated Subsidiaries" shall mean [_____].

"Owner-Related Affiliates" shall mean [_____] and [_____].

"Parties" shall mean Owner and Manager.

"Patent" shall mean any and all United States and/or foreign patents and patent applications and all substitutions, divisions, continuations, continuations-in-part, request for continued examinations, reissues, divisionals, provisionals, reissues, reexaminations and extensions thereof.

"Performance Competitive Set" shall mean the set of casino/hotel properties (expressly excluding any properties owned, operated or licensed by Manager or its Affiliates) which are identified and agreed by the Parties, from time to time, as competing directly in the marketplace with the Properties and provide public financial reporting necessary to determine Competitor EBITDA.  A list of the initial Performance Competitive Set appears on Schedule "1C".

"Person" shall mean any individual, corporation, limited liability company, partnership, trust or other entity.

"Plan" shall mean that certain joint plan of reorganization under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 of Station Casinos, Inc. and certain of its subsidiaries dated as of [_____, 2010].

[Management Agreement - Opco]

"Promotional Allowance" shall mean the maximum amount of the retail value of transportation, complimentary hotel accommodations, food, beverages, merchandise, chips, tokens, entertainment, or similar services provided to guests or patrons for promotional purposes.

"Properties" shall mean the Barley's Property, the Fiesta Henderson Property, the Fiesta Rancho Property, the Gold Rush Property, the Greens Property, the Lake Mead Casino Property, the Santa Fe Station Property, the Texas Station Property, the Wildfire Boulder Property, the Wildfire Lanes Property and the Wildfire Rancho Property.

"Property Facilities" shall mean the Barley's Property Facilities, the Fiesta Henderson Property Facilities, the Fiesta Rancho Property Facilities, the Gold Rush Property Facilities, the Greens Property Facilities, the Lake Mead Casino Property Facilities, the Santa Fe Station Property Facilities, the Texas Station Property Facilities, the Wildfire Boulder Property Facilities, the Wildfire Lanes Property Facilities and the Wildfire Rancho Property Facilities.

"Property Related Facilities" shall mean the Barley's Property Related Facilities, the Fiesta Henderson Property Related Facilities, the Fiesta Rancho Property Related Facilities, the Gold Rush Property Related Facilities, the Greens Property Related Facilities, the Lake Mead Casino Property Related Facilities, the Santa Fe Station Property Related Facilities, the Texas Station Property Related Facilities, the Wildfire Boulder Property Related Facilities, the Wildfire Lanes Property Related Facilities and the Wildfire Rancho Property Related Facilities.

"Reserve Fund" shall mean the Bank Accounts maintained in the name of Owner for the payment of Capital Improvements and Replacements for each Property, which accounts shall be (i) separate and distinct from any other accounts, reserves or deposits required by this Agreement, and (ii) interest bearing accounts if such an account is reasonably available (all interest earned shall be retained in the Reserve Funds).

"Routine Repairs and Maintenance" shall mean repairs, replacements, corrections and maintenance items to the Properties as shall be required in the normal and ordinary course of operation of the Properties other than Capital Improvements.

"Santa Fe Station Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Santa Fe Station Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Santa Fe Station Land" shall mean the lands described in Schedule "3G", together with the benefit of all easements and appurtenant rights thereto.

[Management Agreement - Opco]

"<u>Santa Fe Station Property</u>" shall mean (i) the Santa Fe Station Property Facilities and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"<u>Santa Fe Station Property Facilities</u>" shall mean (i) the Santa Fe Station Land; (ii) the Santa Fe Station Improvements; (iii) the Santa Fe Station Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by Santa Fe Station Owner; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"<u>Santa Fe Station Property Related Facilities</u>" shall mean (i) the common areas of the Santa Fe Station Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Santa Fe Station Property; (ii) the parking facilities servicing the Santa Fe Station Property; (iii) those rooms within the Santa Fe Station Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Santa Fe Station Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Santa Fe Station Property; (vii) any land or improvements not within or located upon the Santa Fe Station Land, but which provide shared benefits to the Santa Fe Station Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Santa Fe Station Improvements or other improvements, whether or not located upon the Santa Fe Station Land, which Manager is to manage for the benefit of the Santa Fe Station Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by Santa Fe Station Owner.

"<u>Shared Expenses</u>" shall mean out-of-pocket costs (not including any mark-up or other profit margin) of the Manager allocated to the Properties for shared employees and for Shared Services as approved by Owner.

"<u>Shared Services</u>" shall have the meaning set forth on Exhibit "B".

"<u>Specially Designated National or Blocked Person</u>" shall mean either: (i) a person or entity designated by the U.S. Department of Treasury's Office of Foreign Assets Control, from time to time, as a "specially designated national or blocked person" or similar status; (ii) a person or entity described in Section 1 of U.S. Executive Order 13224, issued on September 23, 2001; or (iii) a person or entity otherwise identified by a government or legal authority as a person with whom Manager or Owner, as applicable, is prohibited from transacting business.

"<u>Subsidiary</u>" shall mean, with respect to any Person, any other Person at least fifty percent (50%) of the economic or voting interest of which is owned by such Person.

[Management Agreement - Opco]

#4811-5012-8391

"Termination" shall mean the expiration of the Term or any sooner cessation of this Agreement as permitted herein.

"Termination Avoidance Period" shall mean the Non-Performing Period and every Fiscal Year thereafter until the respective Property(ies) which are the subject of any Performance Test failure have passed the Performance Test for two (2) consecutive Fiscal Years.

"Termination Fee" shall have the meaning set forth on Exhibit "A".

"Texas Station Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Texas Station Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Texas Station Land" shall mean the lands described in Schedule "3H", together with the benefit of all easements and appurtenant rights thereto.

"Texas Station Property" shall mean (i) the Texas Station Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Texas Station Property Facilities" shall mean (i) the Texas Station Land; (ii) the Texas Station Improvements; (iii) the Texas Station Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by Owner; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Texas Station Property Related Facilities" shall mean (i) the common areas of the Texas Station Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Texas Station Property; (ii) the parking facilities servicing the Texas Station Property; (iii) those rooms within the Texas Station Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Texas Station Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Texas Station Property; (vii) any land or improvements not within or located upon the Texas Station Land, but which provide shared benefits to the Texas Station Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Texas Station Improvements or other improvements, whether or not located upon the Texas Station Land, which Manager is to manage for the benefit of the Texas Station Property pursuant to a separate written agreement approved

-27-                                    [Management Agreement - Opco]

by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by Owner.

"Trademarks" shall mean all trademarks, service marks, trade names, trade dress, Internet Domain Names, logos, slogans, and other similar source identifiers (whether registered or unregistered), together with all registrations and applications for any of the foregoing and the goodwill of any business connected with the use of and symbolized by the foregoing.

"Transfer" shall mean, as a noun, any voluntary or involuntary transfer, sale, assignment, pledge, hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, assign, pledge, hypothecate or otherwise dispose.

"Transition Period" shall have the meaning set forth on Schedule "5".

"Transition Services" shall have the meaning set forth on Schedule "5".

"TTMF" shall have the meaning set forth on Exhibit "A".

"Wildfire Boulder Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Wildfire Boulder Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Wildfire Boulder Land" shall mean the lands described in Schedule "3I", together with the benefit of all easements and appurtenant rights thereto.

"Wildfire Boulder Property" shall mean (i) the Wildfire Boulder Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Wildfire Boulder Property Facilities" shall mean (i) the Wildfire Boulder Land; (ii) the Wildfire Boulder Improvements; (iii) the Wildfire Boulder Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by Wildfire Boulder Owner; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Wildfire Boulder Property Related Facilities" shall mean (i) the common areas of the Wildfire Boulder Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Wildfire Boulder Property; (ii) the parking facilities servicing the Wildfire Boulder Property; (iii) those rooms within the Wildfire Boulder Property to be used for meetings and conferences; (iv) the receiving facilities for the

[Management Agreement - Opco]

delivery of laundry and other goods and services; (v) the restaurant facilities located within the Wildfire Boulder Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Wildfire Boulder Property; (vii) any land or improvements not within or located upon the Wildfire Boulder Land, but which provide shared benefits to the Wildfire Boulder Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Wildfire Boulder Improvements or other improvements, whether or not located upon the Wildfire Boulder Land, which Manager is to manage for the benefit of the Wildfire Boulder Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by Wildfire Boulder Owner.

"Wildfire Lanes Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Wildfire Lanes Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Wildfire Lanes Land" shall mean the lands described in Schedule "3J", together with the benefit of all easements and appurtenant rights thereto.

"Wildfire Lanes Property" shall mean (i) the Wildfire Lanes Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Wildfire Lanes Property Facilities" shall mean (i) the Wildfire Lanes Land; (ii) the Wildfire Lanes Improvements; (iii) the Wildfire Lanes Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by _____, owner of the Wildfire Lanes Property; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Wildfire Lanes Property Related Facilities" shall mean (i) the common areas of the Wildfire Lanes Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Wildfire Lanes Property; (ii) the parking facilities servicing the Wildfire Lanes Property; (iii) those rooms within the Wildfire Lanes Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Wildfire Lanes Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Wildfire Lanes Property; (vii) any land or improvements not within or located upon the Wildfire Lanes Land, but which provide shared benefits to the Wildfire Lanes Property pursuant to a separate written agreement approved by Owner (such approval not to be

[Management Agreement - Opco]

unreasonably withheld, conditioned or delayed); (viii) any Wildfire Lanes Improvements or other improvements, whether or not located upon the Wildfire Lanes Land, which Manager is to manage for the benefit of the Wildfire Lanes Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by _____, owner of the Wildfire Lanes Property.

"Wildfire Rancho Improvements" shall mean all buildings, structures and improvements situated on, in, under or over the Wildfire Rancho Land and all Furniture, Fixtures and Equipment attached to or forming a part thereof (including, without limitation, heating, lighting, plumbing, sanitation, air conditioning, laundry, refrigeration, kitchen, elevator and similar items or systems, guest rooms, restaurants, bars and banquet, meeting and other public areas, commercial space, including concessions and shops, garage and parking space, storage and service areas, recreational facilities and areas, public grounds and gardens, permanently affixed signage, aquatic facilities, and other facilities and appurtenances).

"Wildfire Rancho Land" shall mean the lands described in Schedule "3k", together with the benefit of all easements and appurtenant rights thereto.

"Wildfire Rancho Property" shall mean (i) the Wildfire Rancho Property Facilities; and (ii) the Furniture, Fixtures and Equipment, the Operating Supplies and the Operating Consumables relating thereto and/or used in connection therewith.

"Wildfire Rancho Property Facilities" shall mean (i) the Wildfire Rancho Land; (ii) the Wildfire Rancho Improvements; (iii) the Wildfire Rancho Property Related Facilities; (iv) any related land, buildings and improvements which in the future may be owned or leased by Wildfire Rancho Owner; and (v) all entrances, exits, rights of ingress and egress, licenses and easements related to any of (i) through (iv) above.

"Wildfire Rancho Property Related Facilities" shall mean (i) the common areas of the Wildfire Rancho Property, as the same may, from time to time, be altered, reconstructed or expanded, which are, from time to time, intended, made available and maintained for the use and enjoyment in common of Manager and occupants of the Wildfire Rancho Property; (ii) the parking facilities servicing the Wildfire Rancho Property; (iii) those rooms within the Wildfire Rancho Property to be used for meetings and conferences; (iv) the receiving facilities for the delivery of laundry and other goods and services; (v) the restaurant facilities located within the Wildfire Rancho Property; (vi) any amenities and facilities made available for the use and enjoyment of the occupants of the Wildfire Rancho Property; (vii) any land or improvements not within or located upon the Wildfire Rancho Land, but which provide shared benefits to the Wildfire Rancho Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed); (viii) any Wildfire Rancho Improvements or other improvements, whether or not located upon the Wildfire Rancho Land, which Manager is to manage for the benefit of the Wildfire Rancho Property pursuant to a separate written agreement approved by Owner (such approval not to be unreasonably withheld,

[Management Agreement - Opco]

conditioned or delayed); and (ix) any related land, buildings and improvements which in the future may be owned or leased by Wildfire Rancho Owner.

"Working Capital" shall mean funds which are reasonably necessary for the day-to-day operation of the Properties' business (including, without limitation, amounts sufficient for the maintenance of change, cage cash and petty cash funds, Operating Bank Accounts, Reserve Funds, receivables, payrolls, prepaid expenses and funds required to maintain the necessary amounts of Operating Supplies and Operating Consumables).

## ARTICLE II
## APPOINTMENT OF MANAGER; OPERATION OF THE PROPERTIES

2.1    <u>Appointment</u>.    Owner hereby appoints and employs Manager as an independent contractor to supervise, direct and control the management, personnel and operation of the Properties for the Term.  Manager accepts said appointment and agrees to manage the Properties during the Term in accordance with the terms, conditions and limitations hereinafter set forth. Subject to the terms of this Agreement, the sole responsibility and authority for the management of the Properties is vested in Manager, and Manager shall have the complete right and authority to manage the Properties.  The rights, duties and obligations of Manager hereunder are personal to Manager based on Manager's unique experience and, except as expressly set forth in this Agreement, may not be transferred or assigned without the prior approval of Owner (which approval may be granted or withheld in Owner's sole and absolute discretion).  Manager acknowledges that the scope of both Manager's authority and duties hereunder is limited to the authority and duties set forth in this Agreement (and reasonably derived therefrom) and Manager shall not use (and shall use commercially reasonable efforts to not permit third parties to use) the Properties for any purpose not contemplated by this Agreement.  Owner agrees that, subject to all rights and remedies of Owner pursuant to the terms and conditions of this Agreement, Owner shall use commercially reasonable, good faith efforts to cooperate with Manager as reasonably requested by Manager in carrying out its duties under this Agreement and in complying with any restrictions placed on Manager or Owner by any Gaming Authority.

2.2    **Delegation of Authority**.    Subject to the terms of this Agreement (including, without limitation, Sections 2.3, 2.4(a), 2.5, 2.6, 2.7, 2.11 and 2.12 below) and the limitations set forth in the Approved Annual Plan and Operating Budget, Manager shall have the exclusive supervision, control, right, authority, obligation and duty to, except as otherwise specifically provided in this Agreement, operate and manage the Properties in accordance with the Operating Standards.  Subject to the Approved Annual Plan and Operating Budget, Section 2.3 below and such other limitations as are specifically imposed in this Agreement, Manager (as an independent contractor) shall have the right and obligation, free from interference, interruption and disturbance, to conduct all matters relating to the management and operation of the Properties, including, without limitation, (i) the management and oversight of all Gaming, hotel and resort operations and other day-to-day operations of the Properties; (ii) all non-day-to-day supervision and operational and strategic planning of the Properties; (iii) customer relations management and revenue management services; (iv) reservation system operation and management; (v) sales and marketing services, promotions, promotional services and publicity (including, without

[Management Agreement - Opco]

limitation, rewards programs); (vi) brand and trademark development, promotion, maintenance and management; (vii) food and beverage services; (viii) human resources; (ix) personnel selection, employment policies and employee fringe benefits; (x) assistance and cooperation with internal audit functions to be performed by the Owner Representative; (xi) purchasing, contracting and leasing, including, without limitation, the procurement of inventories, supplies and services; (xii) maintenance and repairs (including, without limitation, physical plant maintenance); (xiii) security services; (xiv) books and records maintenance; (xv) real estate tax audits and challenges; (xvi) licensing and regulatory matters; (xvii) information technology services, maintenance, development and support (including, without limitation, Customer Database management and development as part of the marketing, promotions and rewards programs); (xviii) the right to provide complimentary items to guests and patrons of the Properties (including complimentary or discounted food, beverages, lodging or other use of the Properties' facilities, subject to the Promotional Allowance contained in the Approved Annual Plan and Operating Budget); (xix) determining charges for rooms and commercial space; (xx) implementing the approved Credit Policy; (xxi) receipt, holding and disbursement of funds, and maintenance of bank accounts; and (xxii) generally, control of all activities necessary for or reasonably related to the operation of the Properties.  Except as set forth in Sections 2.3, 2.4(a), 2.5, 2.6, 2.7, 2.11 and 2.12 below or otherwise in this Agreement and subject to the Approved Annual Plan and Operating Budget, Manager shall have the authority to execute on Owner's behalf and for the account of Owner, in Owner's name, all agreements relating to the operation of the Properties, including, without limitation, contracts for electricity, gas, telephone, cleaning, maintenance, security, pest control, elevator and boiler maintenance, life/safety systems maintenance, air conditioning maintenance, laundry and dry cleaning, television service, rooftop license agreements, use of copyrighted materials (such as music and videos), and other services that Manager, from time to time, considers (in its commercially reasonable business judgment) appropriate and, subject to Section 2.5, Manager shall use commercially reasonable efforts to enforce all such agreements in a manner which is consistent with sound business practices (as if each agreement was entered into by Manager for its own account).

      **2.3**   <u>Limitations on Manager's Authority</u>.  Notwithstanding anything to the contrary set forth in this Agreement, other than as specifically contemplated in the Approved Annual Plan and Operating Budget, Manager shall not, without Owner's approval (which approval may be granted or withheld in Owner's sole and absolute discretion):

      (a)   except as otherwise permitted under Section 2.3(g), enter into, amend, extend, renew, cancel or terminate any contract or other agreement which provides for (i) payments or potential liability that are, in the aggregate, in excess of the Approval Amount (including any extensions thereof); and (ii) a term exceeding one (1) year, unless the same is terminable at will (without penalty) on no more than sixty (60) days' notice or less;

      (b)   enter into any agreement creating a voluntary lien or encumbrance of any kind affecting the real property upon which the Properties are situated;

[Management Agreement - Opco]

(c)     purchase items from Affiliates other than in accordance with Section 4.2 below and/or enter into, amend, renew, cancel or terminate any contract or other agreement with an Affiliate;

(d)     other than the disposition of Furniture, Fixtures and Equipment that are obsolete (i.e., reached the end of their respective useful life) so long as such items of Furniture, Fixtures and Equipment are concurrently being replaced in accordance with the Approved Annual Plan and Operating Budget and such dispositions made in the ordinary course of business, dispose of assets, whether individually or in the aggregate, worth in excess of the Approval Amount in any Fiscal Year;

(e)     except in connection with trade payables for goods and services and other payments or obligations incurred in accordance with each Property's Approved Annual Plan and Operating Budget, borrow any money or execute any credit obligation in the name and on behalf of Owner or any Owner-Related Affiliates or any of their respective Affiliates and/or Subsidiaries;

(f)     take any action or make any decision which (i) requires approval of any lender, administrative agent or servicer pursuant to the Opco Loan Documents; or (ii) otherwise violates any term or limitation of the Opco Loan Documents (or, with respect to any refinancing of the terms and conditions of the Opco Loan or any other future financing the terms and conditions thereof are provided to Manager, take any action or make any decision which requires approval of any lender, administrative agent or servicer pursuant thereto or otherwise violates any term or limitation thereof so long as the same does not materially increase the obligations of Manager and/or materially decrease the rights and remedies available to Manager under this Agreement);

(g)     enter into, materially amend, extend, renew, cancel or terminate any lease to a single tenant or license, concession or other similar arrangements with respect to other space and facilities, in a Property (i) covering more than five thousand (5,000) square feet of rentable area with respect to a Property; or (ii) with a term of more than ten (10) years;

(h)     except as permitted or required under this Agreement, take any action or make any decision which binds Owner, any Property Owner or any Owner-Related Affiliate to a third party; or

(i)     take any action or make any decision which constitutes a Material Item.

2.4     Leases.  All leases and occupancy agreements for any portion of the Properties entered into by Manager (i) shall be consistent with the terms of this Agreement; and (ii) shall require the respective third party thereto to operate the subject portion of the Property substantially in a manner consistent with the Operating Standards (to the extent applicable) and the other terms of this Agreement.  Manager shall use commercially reasonable efforts to enforce all leases or other occupancy agreements in a manner consistent with sound business practices, as if such lease or occupancy agreement was entered into by Manager for its own account. Manager shall use commercially reasonable efforts to comply with and not to default under any

and all leases and occupancy agreements unless such action is approved in writing by Owner (which approval may be granted or withheld in Owner's sole and absolute discretion), to the extent so affected.

**2.5**    Legal Action.    Manager shall have the obligation to defend, and the right to institute, on behalf of and in the name of Owner, any and all legal actions or proceedings affecting the Properties (including, without limitation, to collect charges, rent or other income from the Properties or to remove any tenants, terminate a lease, license, or concession agreement, a breach thereof or default entered by any tenant, licensee, concessionaire, supplier, or contractor, or to protect and/or litigate to final decision in any appropriate forum, any violation, rule, regulation or agreement concerning the Properties); provided, however, that the prior written approval of Owner (such approval not to be unreasonably withheld, conditioned or delayed) shall be required with respect to the hiring of counsel and/or the institution or defense of one or a series of related actions (or settlement thereof) where there is a reasonable possibility of (i) loss, cost or expense (including all attorneys' fees and costs) to Owner or the Properties in excess of the Approval Amount; or (ii) a material adverse effect on Owner or the operation of the Properties (an action under clause (i) or (ii), a "Material Action"), unless such action is incurred during the ordinary course of business at the Properties (e.g., so-called "slip and fall" claims where uninsured legal fees and potential claims do not exceed the Approval Amount) in which case Manager shall be required to provide only prior written notice to Owner.  The Approved Annual Plan and Operating Budget shall contain an amount with respect to any litigation or legal fees that Manager (on behalf of Owner) or Owner anticipate incurring for the respective Fiscal Year (as the same shall be amended pursuant to Section 8.3, from time to time, at the request of Manager in the event of the need to incur litigation or legal fees after the establishment of the Approved Annual Plan and Operating Budget).  For avoidance of doubt, Manager shall have the right, without Owner's approval, to defend and/or settle any claim or legal action brought against Manager in connection with the operation of the Properties, provided that all liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) incurred in defending and/or settling any such claim or legal action which are not covered by insurance shall be paid by Manager, except to the extent Owner is obligated to indemnify Manager pursuant to Section 10.5.

**2.6**    Standard for Performance by Manager.

(a)    Subject to the terms of this Agreement, the Operating Standards and the Approved Annual Plan and Operating Budget, Manager shall use diligent and commercially reasonable efforts to discharge its obligations hereunder in an expeditious, economical and professional manner.  In discharging its obligations hereunder, Manager shall be held to the respective Operating Standards for each Property; provided, however, and notwithstanding anything to the contrary set forth in this Agreement, Manager's obligations to meet the respective Operating Standards for each Property shall be subject to the Approved Annual Plan and Operating Budget for each Fiscal Year and Owner's funding of the amounts approved therein, all pursuant to and in accordance with the procedures set forth in Sections 8.3(b) and/or (c).  For avoidance of doubt, notwithstanding any limitation on Manager's obligations to meet the Operating Standards for each Property pursuant to the immediately preceding sentence,

-34-                                   [Management Agreement - Opco]

Manager shall not be relieved from otherwise performing Manager's services, duties and responsibilities under this Agreement in an expeditious, economical and professional manner to the extent not adversely impacted by Owner's failure to approve an Annual Plan and Operating Budget prepared by Manager in accordance with Section 8.3 or Owner's failure to fund the amounts under any Annual Plan and Operating Budget approved by Owner pursuant Section 8.3 or otherwise resolved pursuant to Section 17.16.

(b)     Manager shall not be held responsible for the defaults of contractors or other third parties with whom it deals at arms' length and Manager's responsibility is limited being professional and prudent in the selection and supervision of contractors and other third parties.  Owner and Manager agree that if any fiduciary duties are imposed on Manager hereunder, such fiduciary duties shall be deemed modified by the provisions of this Agreement. Owner and Manager further agree that it is the intent of the parties that this Agreement be interpreted and construed solely in accordance with the laws and principles applicable to commercial contracts.  Owner agrees that Owner's power and right to terminate this Agreement are solely as expressly provided for in this Agreement.

(c)     Manager shall use its best efforts, skills and abilities to perform its obligations under this Agreement and to promote the interests of Owner, provided that if Manager is managing properties other than the Properties, Manager shall conduct its affairs so as not to prefer the interests and management of such other properties to the interests and management of the Properties.  Owner hereby acknowledges and agrees that Manager and its Affiliates intend to acquire and manage other Hospitality Products of a similar Operating Standard, and Owner agrees that the mere ownership and/or operation of such other Hospitality Products by Manager or any of its Affiliates shall not, to the extent permitted under the Non-Compete Agreements, be deemed to be a breach of this Section 2.6(c) so long as Frank J. Fertitta III or Lorenzo J. Fertitta (or the survivor of the two, if applicable) continues to use his best efforts, skills and abilities to promote the interests of Owner with respect to the Properties.

**2.7**     <u>Names of the Properties</u>.  The Properties shall be operated under the names "Barley's Casino & Brewing Company", "Fiesta Henderson Casino Hotel", "Fiesta Rancho Casino Hotel", "Gold Rush Casino", "The Greens Gaming and Dining", "Lake Mead Casino", "Santa Fe Station Hotel", "Texas Station Gambling Hall & Hotel", "Wildfire Casino—Boulder", "Wildfire Lanes and Casino", and "Wildfire Casino—Rancho", respectively, so long as Owner is permitted to use the Licensed IP as described in Section 6.2 below.

**2.8**     <u>Operating Permits and Licenses</u>.  Manager shall, at Owner's sole cost and expense, with Owner's assistance and cooperation, use commercially reasonable efforts to (i) obtain, maintain and keep in full force and effect, all Governmental Approvals for Manager, the Properties, Owner and/or any Property Owners (including, without limitation, Nevada Gaming Licenses and liquor, bar, restaurant, sign and hotel licenses for all applicable individuals and entities), as may be required for the ownership and operation of the Properties pursuant to the Operating Standard and the terms and conditions of this Agreement; and (ii) if applicable, assist Owner and/or any Property Owners with obtaining any Governmental Approvals for the Properties as soon as reasonably possible taking into consideration all facts and circumstances;

provided, however, that in the event the expenses incurred by Owner or Property Owners in obtaining any Governmental Approvals obtained by Manager (including, without limitation, Nevada Gaming Licenses and liquor, bar, restaurant, sign and hotel licenses for all applicable individuals and entities) pursuant to this Agreement are utilized by or otherwise benefit Manager by reducing or otherwise eliminating the actual out-of-pocket costs which would have been incurred by Manager in obtaining such Governmental Approvals for the benefit of any Other Managed Properties operated by Manager, Manager shall notify Owner and promptly reimburse Owner a fair and equitable portion of Owner's actual out-of-pocket costs and expenses incurred in connection with obtaining such applicable Governmental Approvals.  Owner shall, with respect to any Governmental Approvals (including, without limitation, Nevada Gaming Licenses and liquor, bar, restaurant, sign and hotel licenses for all applicable individuals and entities) required to be maintained by Owner, in its individual capacity, use commercially reasonable efforts to maintain and keep in full force and effect all requisite Governmental Approvals (including the timely submission of all applications and disclosures required or requested by the Gaming Authorities and liquor licensing authorities).  Manager shall operate and manage the Properties in a manner that will not materially adversely affect the Governmental Approvals necessary for the operation of the Properties, but in all events shall use all commercially reasonable efforts to cause the Properties to comply with all material conditions or requirements set out in any Governmental Approvals.

2.9    Reservation System.    Subject to the Approved Annual Plan and Operating Budget, Manager shall manage, maintain and supervise, directly or indirectly, for each Property and its guests such global reservation system, web site and other reservations services as shall be determined by Manager to be reasonably necessary or advisable in connection with the operation of the Properties (the "Reservation Systems"); provided, however, Manager acknowledges and agrees that the Reservation Systems constitute part of the Initial Technology Systems belonging to Owner and such Reservation Systems shall not be shared with, cross-referenced or linked to the reservation systems used by the Other Manager Properties without the prior written approval of Owner (which approval may be granted or withheld in Owner's sole and absolute discretion).

2.10    Sales, Marketing and Advertising.    Subject to the Approved Annual Plan and Operating Budget and the limitations thereof, Manager shall advertise and promote (including, without limitation, the development, implementation and supervision of a sales and marketing program, including, without limitation, development and implementation of a marketing and sales program for) the Properties, and shall provide for the planning, publicity, internal communications, organizing and budgeting activities to be undertaken in connection therewith (which may include, without limitation, the following to the extent deemed advisable by Manager in connection with the operating of the Properties: (i) production, distribution and placement of promotional materials relating to the Properties (including materials for the promotion of employee relations); (ii) development and implementation of promotional offers or programs that benefit the Properties (including direct mailings, player development and Owner's player's club programs); (iii) selection of and guidance to advertising agency and public relations personnel; (iv) coordination with tour programs marketed by airlines, travel agents and government tourist departments; and (v) preparation and dissemination of news releases for national and international trade and consumer publications).  Additionally, subject to, not only

the Approved Annual Plan and Operating Budget, but also the terms and conditions of Article VI hereof, Manager shall be responsible for all database management, brand management, call centers, hotel booking engines and website management.

     **2.11**   Compliance with Legal Requirements.  Manager shall take all commercially reasonable actions necessary to comply in all material respects with, and to cause the Properties to comply in all material respects with, all Legal Requirements affecting the Properties or the ownership or operations thereof.  Additionally, Manager shall prepare and, upon Owner's approval, file all statements and reports required by the Nevada Gaming Control Act and the regulations of the Nevada Gaming Commission and all other applicable regulatory agencies. Owner shall, in its sole and absolute discretion, determine whether to contest any tax payment or assessment, or any Legal Requirement; provided, however, Manager may take all such reasonably necessary actions without Owner's prior approval if the failure to so comply might (i) expose Manager to criminal or material civil liability; (ii) materially and adversely affect the operation of any one or more of the Properties; or (iii) jeopardize any Nevada Gaming License or any other Gaming license held by Manager or Owner or their respective Affiliates.  Manager shall use reasonable efforts to promptly notify Owner in writing of all material allegations of non-compliance with, or violations of, Legal Requirement (A) with respect to which Manager takes any action pursuant to the proviso contained in the immediately preceding sentence; and (B) with respect to the Properties if allegations are made by a reputable agency (or its designee) and which are known to Manager.

     **2.12**   Credit Policy.  As part of the Annual Plan and Operating Budget submitted by Manager pursuant to and in accordance with Section 8.3, Manager shall develop and implement the Credit Policy.  The initial Credit Policy for the Properties is set forth on Schedule "2" attached hereto.  Manager may extend credit to patrons of the respective Properties as long as individual credit decisions and the cumulative amount of credit outstanding conform to the express terms and conditions set forth in the approved Credit Policy for the applicable Property. Manager may make changes to the Credit Policy, from time to time, provided that any material changes to terms of the Credit Policy shall be subject to Owner's prior approval (such approval not to be unreasonably withheld, conditioned or delayed); provided, however, that if Owner objects to any changes made to the Credit Policy during the then applicable Fiscal Year, Owner and Manager shall revisit such Credit Policy items and discuss Owner's objections and Manager shall resubmit a revised Credit Policy for approval as part of the next Fiscal Year's Annual Plan and Operating Budget.  If Owner notifies Manager that it reasonably objects to a material change in the terms of the Credit Policy and the Parties have not reached agreement on such change within thirty (30) days after the notice of such request has been given, such dispute shall be submitted to the Industry Consultant pursuant to Section 17.16(c) to determine to whether the requested change is consistent with the credit policies in place at the applicable properties in the Operating Competitive Set or is otherwise reasonably required or advisable in connection with the operation of the applicable Property or Properties.

     **2.13**   Food and Beverage; Entertainment; Complimentary Services.  Manager shall, subject to limitations set forth in the Approved Annual Plan and Operating Budget, and subject

       [Management Agreement - Opco]

#4811-5012-8391

to any applicable terms of any third party leases, licenses or occupancy agreements and all Legal Requirements:

        (a)     Establish food and beverage policies (including pricing) with respect to each of the Properties (including the right to conduct catering operations outside the Properties for the account of the applicable Property providing such services);

        (b)     Determine all terms for admittance and charges to be made for guest and function rooms, commercial space privileges, and, subject to any applicable terms of any third party leases, licenses and occupancy agreements, entertainment and food and beverages and establish entertainment and amusement policies (including pricing) with respect to each of the Properties, on a per-Property basis; and

        (c)     Subject to the Promotional Allowance, provide such guest rooms or other facilities, and any food or beverages, on a complimentary or discount basis to any guest or patron as Manager may reasonably determine to be advisable.

    **2.14**   <u>Internal Control Systems; Surveillance System</u>.  Subject to the Approved Annual Plan and Operating Budget, Manager shall install systems on behalf of Owner for monitoring of all funds (the "Internal Control Systems") which control systems shall be installed with the intent to comply with all Legal Requirements, and Manager shall make reasonable efforts to give Owner notice prior to any such change, but in any event, promptly thereafter.  Owner shall have the right to select and retain an auditor, at Owner's sole cost and expense, to review the adequacy of the Internal Control Systems.  Subject to the Approved Annual Plan and Operating Budget, Manager shall operate and maintain each Property's surveillance system (including, without limitation, closed-circuit television) and propose, from time to time, any and all suggested upgrades and/or additional systems for monitoring the activities of the customers, employees, supervisors and management personnel, as well as the tracking and movement of all funds into, within and out of each Property as shall be determined by Manager to be reasonably required or advisable in connection with the operation of the Properties.   Additionally, the Owner Representative shall have the right to inspect and oversee the Internal Control Systems upon reasonable prior notice and during business hours.

    **2.15**   <u>Exclusivity</u>.

        (a)     Until the expiration or earlier termination of this Agreement, Owner hereby agrees that Manager and its Affiliates shall have the right to manage any Hospitality Product in which Owner or any Fertitta Affiliate acquires a direct or indirect interest (such interest, an "Owner Property Interest").  Promptly following Owner or any Fertitta Affiliate entering into an agreement or term sheet to acquire an Owner Property Interest, Owner shall provide Manager with written notice of such agreement or term sheet.  Owner shall meet with Manager as soon as reasonably practicable after entering into such agreement or term sheet but in no event later than fifteen (15) days thereafter, and the Parties shall negotiate in good faith to enter into a management agreement for the management by Manager or any of its Affiliates of the applicable Hospitality Product.  Any such management agreement shall (i) include the same calculations for Management Fees as found herein; (ii) otherwise be on the same terms and

-38-

[Management Agreement - Opco]

conditions as set forth in this Agreement with any necessary changes to account for differences in age, quality, size, location, amenities and other physical and operation variations for such Hospitality Product; and (iii) be effective as of the closing date of the acquisition of such Owner Property Interest, provided that such management agreement may allow for a reasonable transition period for interim management, if applicable, to the extent necessary to avoid unnecessary costs or other economic detriments to the owner of such Hospitality Product during the transition period.

(b)    [Manager or an Affiliate of Manager will provide asset management and development services to the properties located in (i) Chico, California, (ii) Graton, California, (iii) North Fork, California and (iv) Gun Lake, Michigan (collectively, the "Additional Gaming Properties") pursuant to a separate agreement to be agreed upon by the Parties prior to the Effective Date (the "AGP Management Agreement").  The terms, conditions and fees for the asset management, and if applicable, the development of such Additional Gaming Properties shall be mutually agreed upon by the Parties prior to [____]. The AGP Agreement will terminate upon the earlier of (i) the opening for business to the general public of the Additional Gaming Properties, or (ii) the sale of the Additional Gaming Properties or the indirect interest of the owner therein.  In the event that the owner of any Additional Gaming Property sells or otherwise transfers any direct or indirect interest in such Additional Gaming Property prior to such Additional Gaming Property opening for business to the general public, Manager or such Affiliate shall receive a fee equal to [___]% of the gross sales price.]

(c)    [Manager or an Affiliate of Manager, as operator, and the applicable owner will enter into a management agreement for (i) the properties located in Auburn, California (the "Auburn Property") and (ii) the Additional Gaming Properties that contain Hospitality Products.  Such agreement will provide for Manager or such Affiliate's supervision and oversight of the individual property managers at each of the Auburn Property and the applicable Additional Gaming Properties on terms and conditions substantially similar to the terms hereof (subject to changes necessary to address the specific legal and structural constraints pertaining to gaming activities on lands held by Native American tribes), but in all instances, any such agreement shall provide for (i) a base management fee equal to two percent (2.0)% of EBITDA and an incentive management fee equal to five percent (5.0%) of EBITDA generated at such properties, (ii) an operating term of twenty-five years, and (iii) termination rights substantially similar to those set forth in Article 14 hereof.]

(d)    [In addition, Manager or an affiliate of Manager will provide asset management and development services to the properties owned SC Rancho Development, LLC and its Subsidiaries on substantially the same terms as the AGP Management Agreement.  In the event that any of such properties becomes a Hospitality Product, Manager or an affiliate of Manager shall enter into an agreement with the owner of the applicable properties to provide management and operational services on terms and conditions substantially similar to the terms hereof, but in all instances, any such agreement shall provide for (i) a base management fee equal to two percent (2.0)% of EBITDA and an incentive management fee equal to five percent (5.0%) of EBITDA generated at such properties, (ii) an operating term of twenty-five years, and (iii) termination rights substantially similar to those set forth in Article 14 hereof.]

**2.16** <u>Change in Competitive Sets</u>.  If Owner or Manager seeks a change in the list of the Comparable Manager Properties, Operating Competitive Set and/or the Performance Competitive Set from those listed on Schedules "1A", "1B", and/or "1C" respectively, for the reasons identified in this Section 2.16, (i) with respect to the Comparable Manager Properties (based upon the engagement by Manager or any of its Fertitta Controlled Affiliates to operate properties previously not included in the list Comparable Manager Properties or otherwise), the Party requesting such change shall notify the other in writing of such request; (ii) with respect to the Operating Competitive Set (based on the commencement of operations of one (1) or more casino/hotel properties in any of the Properties' market area, or based on any cessation of operations or significant change in operations (such as a change in operator or a change in market positioning) of any of the casino/hotel properties listed in the then current Operating Competitive Set), the Party requesting such change shall notify the other in writing of such request; and (iii) with respect to the Performance Competitive Set (including the corresponding change in the EBITDA Percentage resulting from a change in the Performance Competitive Set and based upon (1) any of the properties in the then current Performance Competitive Set no longer providing public financial reporting necessary to determine Competitor EBITDA; (2) operations commencing at one or more casino/hotel properties in any one of the Properties' market area (provided that such additional casino/hotel properties provide public financial reporting necessary to determine Competitor EBITDA); or (3) any cessation of operations occurring at any of the casino/hotel properties listed in the then current Performance Competitive Set, the Party requesting such change shall notify the other in writing of such request.  In the event that the Parties have not reached agreement as to any such change hereby requested pursuant to clauses (i), (ii) or (iii), within thirty (30) days after the written notice of such request has been given, such dispute shall be submitted to an Industry Consultant in accordance with Section 17.16(c).  The removal of any property from the Performance Competitive Set and/or a change to the Comparable Manager Properties and/or the Operating Competitive Set that are agreed upon by the Parties or are otherwise determined by an Industry Consultant shall be deemed effective as of the date of notice requesting such change or, with respect to the addition of any property to the Performance Competitive Set, as soon as Competitor EBITDA is publicly available.

### ARTICLE III
### TERM; TERMINATION RIGHT FOR PERFORMANCE

**3.1** <u>Term</u>.  The term of this Agreement shall commence on the Effective Date and, subject to the earlier termination hereof in accordance with the terms and conditions of this Agreement, shall expire at 11:59 p.m. on the date which is the twenty-fifth (25th) anniversary of the Effective Date (the "Term").

**3.2** <u>Termination for Failure of the Performance Test</u>.

(a) <u>Right of Termination</u>.  Subject to Section 3.2(b), (c) and (d), Owner shall have the right to terminate this Agreement with respect to all of the Properties, without payment of any Termination Fee, penalty or other consideration, if, for any two (2) consecutive Fiscal Years (each, a "Measurement Year") beginning with the eighth (8th) Full Fiscal Year (the first

two Measurement Years being the sixth (6th) and seventh (7th) Full Fiscal Years) where, for each Measurement Year:

(1)     The aggregate EBITDA for the Properties is less than eighty-five percent (85%) of (i) with respect to the first (1st) Measurement Year of the applicable Performance Test, Budgeted EBITDA; or (ii) with respect to the second (2nd) Measurement Year of the applicable Performance Test, Deemed Budgeted EBITDA (the "Budget Test"); provided, however, in the event that the Properties fail the Performance Test (as hereinafter defined) for the first (1st) Measurement Year, Deemed Budgeted EBITDA shall thereafter be used for purposes of this Budget Test, for successive Measurement Years, unless and until the Properties have passed the Performance Test for two (2) consecutive and successive Measurement Years (in which case following the passing of the Performance Test, the Budget Test shall once again consist of two Measurement Years and Deemed Budgeted EBITDA shall not apply in any Measurement Year until the aggregate EBITDA for the Properties is less than eighty-five percent (85%) of Budgeted EBITDA during the first (1st) Measurement Year of the applicable Performance Test); and

(2)     EBITDA for the Properties is less than eighty-five percent (85%) of the Indexed EBITDA achieved by the properties in the Performance Competitive Set (the "Market Test," and, together with the Budget Test, hereinafter referred to as the "Performance Test") (the Measurement Years for which the Performance Test is not satisfied shall be deemed to be a "Non-Performing Period").

For example purposes only, a sample calculation of the Market Test is set forth on Schedule "7" attached hereto.  Owner expressly acknowledges that Manager's failure to achieve the Performance Test in and of itself, or its election not to cure any such failure pursuant to its rights under Section 3.2(c), shall not constitute a breach of this Agreement.

(b)     Termination.  Owner may exercise its right to terminate this Agreement pursuant to Section 3.2(a) above by delivering written notice to Manager of its intent to terminate this Agreement ("Owner's Termination Notice") at any time within one hundred twenty (120) days after Owner's receipt of (i) the Year End Statements; and (ii) the reported financial statements (or other financial information required for determination of the Performance Test if such reported financial statements are not available) for the Performance Competitive Set (together with the Year End Statements, the "Performance Test Data").  If Manager fails to timely exercise its right to cure under Section 3.2(c) below, Owner may terminate this Agreement on the date specified in Owner's Termination Notice (subject to Manager's obligation to provide Transition Services in accordance with this Agreement) which termination date shall in no event be less than thirty (30) days after Manager's receipt of Owner's Termination Notice.  Owner's Termination Notice shall include a reasonably detailed description and accounting of Manager's failure to meet the Performance Test.

(c)     Payment of Cure Amount.  Notwithstanding the foregoing, Manager shall have the option (but not the obligation) to cure any Performance Test failure by delivering written notice to Owner within thirty (30) days after Manager's receipt of Owner's Termination

[Management Agreement - Opco]

Notice ("Manager's Response Notice") and paying to Owner the Cure Amount; provided, however, in the event Manager shall within such thirty (30) day period dispute in good faith Owner's description and accounting with respect to Manager's failure to meet the Performance Test, the matter shall be submitted to arbitration in accordance with Section 17.16 hereof.

(d)  Adjustment of the Performance Test.

(1)  The Parties acknowledge and agree that the Budget Test and/or the Market Test shall each be equitably adjusted in the event that Manager's ability to satisfy the Performance Test is adversely affected by (i) any Force Majeure that had an impact on EBITDA after giving effect to the proceeds received from any applicable business interruption insurance or award or other compensation payable in connection therewith; (ii) an Owner Event of Default under this Agreement that has an impact on EBITDA; (iii) disapproval by owner of an Annual Plan and Operating Budget, or any line item thereof, or any proposed Discretionary Amendment to an Approved Annual Plan and Operating Budget, or any line item thereof, or failure or delay by Owner in providing funds requested by Manager (including as a result of any delay caused by submission of any dispute to arbitration or the Industry Consultant pursuant to Section 17.16 hereof) that has an impact on EBITDA for the Properties; or (iv) with respect to the Market Test only, Capital Improvements and Replacements; provided that with respect to (iii) and (iv) (1) Manager has provided written notice to Owner prior to the commencement of such Capital Improvements and Replacements that such Capital Improvements and Replacements will have an adverse impact on EBITDA, (2) such Capital Improvements and Replacements are nevertheless approved by Owner as part of the Approved Annual Plan and Operating Budget or any Discretionary Amendment and (3) such Capital Improvements and Replacements in fact have an adverse impact on EBITDA.  In the event of any of the foregoing, following the delivery of the audited Year End Statements for the applicable Measurement Year(s), Manager shall deliver written notice to Owner requesting an adjustment to the Performance Test and setting forth the basis for such adjustment whereupon the Parties shall meet (if necessary) to determine, in good faith, the appropriate equitable adjustment to the Performance Test.  If the Parties fail to agree on such equitable adjustment, either Party may submit the matter to arbitration in accordance with Section 17.16 hereof.

(2)  In the event an EBITDA Percentage Adjustment Event occurs, (i) the EBITDA Percentage shall be recalculated by the Parties when a corresponding twelve (12) month period of financial reporting is available for both the Properties and the Performance Competitive Set; and (ii) until such time as the data necessary for the recalculation of the EBITDA Percentage is available, the Parties will endeavor to determine the appropriate equitable adjustment of the EBITDA Percentage for such interim period.  In the event of any of the foregoing, following the delivery of the audited Year End Statements for the applicable Measurement Year(s), Manager shall deliver written notice to Owner requesting an adjustment to the Performance Test and setting forth the basis for such adjustment whereupon the Parties shall meet (if necessary) to determine, in good faith, the appropriate equitable adjustment to the Performance Test.  If the Parties fail to agree on such equitable adjustment or on a new EBITDA Percentage (or the equitable adjustment during any interim period), either Party may submit the matter to arbitration in accordance with Section 17.16 hereof.

[Management Agreement - Opco]

#4811-5012-8391

## ARTICLE IV
## WORKING CAPITAL; OPERATING SUPPLIES

**4.1**    <u>Working Capital</u>.

(a)    Owner shall approve, as part of the Approved Annual Plan and Operating Budget, the maximum aggregate amount of Working Capital that may be retained in the Operating Bank Accounts on a daily basis for the day-to-day operation of the Properties (the "Working Capital Balance").  Notwithstanding the establishment and funding of the Working Capital Balance, Manager shall promptly notify Owner if funds on deposit in the Operating Bank Accounts are insufficient to maintain Working Capital at levels reasonably necessary to satisfy the needs of each of the Properties as their operation may, from time to time, require and Owner may advance such funds, or not, in its sole and absolute discretion, provided that, to the extent that Owner elects to provide such funds, Owner shall determine the source of funds for such Working Capital requirements, so long as the source of such funds is not reserved for, or otherwise required to fund, other costs under the Approved Annual Plan and Operating Budget.  In the event that Owner elects not to fund or Owner fails to fund Working Capital within ten (10) Business Days after receipt of manager's written request, Manager shall be authorized to draw down on the Line of Credit solely to the extent to pay amounts due and owing and which were previously approved by Owner in the Approved Annual Plan and Operating Budget.  Except as otherwise mutually agreed by the Parties, Manager shall remit to the Owner Account on a daily basis any funds in the Operating Bank Accounts in excess of the Working Capital Balance.  So long as the Opco Credit Agreement remains in effect, the Manager shall cause all Operating Bank Accounts to be subject to a control agreement in accordance with the requirements of the Opco Credit Agreement.

(b)    Owner shall establish a line of credit ("Line of Credit"), readily accessible by Manager without interference from Owner, sufficient in amount to backstop the Working Capital required for the uninterrupted and efficient operation of the Properties in accordance with the Approved Annual Plan and Operating Budget in an amount equal to the sum of the estimated funds necessary to satisfy (i) the operating costs of the Properties for the thirty (30) day period immediately succeeding the date of determination, including, without limitation, sufficient funds to pay current liabilities as they become due, to replace necessary Operating Supplies as they are consumed and otherwise to operate, repair and maintain the Properties in accordance with, and in each case consistent with the Approved Annual Plan and Operating Budget; and (ii) the costs and expenses of all Employees for the sixty (60) day period immediately succeeding the date of determination as projected in the Approved Annual Plan and Operating Budget (collectively, the "Working Capital Requirement").  The Working Capital Requirement shall remain fixed for the immediately successive Fiscal Year (A) with respect to the costs and expenses of all Employees, at the amount estimated for the last sixty (60) days of the Fiscal Year; and (B) with respect to other costs of operating the Properties, at the amounts required for the last thirty (30) days of the Fiscal Year, until such time as the Annual Plan and Operating Budget for the immediately succeeding Fiscal Year has been approved by Owner (and subject to change, from time to time), pursuant to and in accordance with Section 8.3.

(c)    Notwithstanding the foregoing, so long as the Opco Credit Agreement remains outstanding and the revolving credit facility thereunder has not been terminated, (i) Manager shall not deposit or otherwise withhold any amounts under Section 4.1(a) as a Working Capital Balance whenever the combination of cash in the Operating Bank Accounts and the undrawn amount of revolving loans that may be borrowed under the Opco Credit Agreement are equal to or greater than _____; and (ii) the requirement for a separate Line of Credit under Section 4.1(b) shall be waived.

4.2    Operating Supplies.  The Working Capital Balance shall include funds necessary to supply the Properties with Operating Supplies, Operating Consumables, operating systems, services and equipment, consistent with the Approved Annual Plan and Operating Budget, as applicable, as such budget may be amended or supplemented as permitted pursuant to this Agreement, from time to time, or otherwise as approved in advance by Owner.  Manager shall, on behalf of Owner, use commercially reasonable efforts to obtain and maintain such Operating Supplies and Operating Consumables as it deems reasonably necessary for the operation of the Properties subject to the provisions of this Agreement and the then-current Approved Annual Plan and Operating Budget.  In purchasing goods, supplies, equipment and services for the Properties (including, without limitation, Operating Supplies, Operating Consumables and long distance telephone services and other telecommunications), Manager may utilize purchasing procurement services of Affiliates of Manager and/or other group buying techniques involving other properties managed by Manager, provided that the cost thereof shall be no more than that which would be charged by non-affiliated third-party vendors in an arm's length transaction for goods and services of comparative quality.  Manager shall afford each of the Properties the benefit of and any savings (without mark-up or fees), rebates, reimbursements or other payments resulting from any purchasing procurement services and/or group buying techniques.  Owner shall have the right, from time to time, to "opt-out" of or "opt-in" to any such purchasing procurement services for any one or more groups or categories of goods and services by delivering written notice to Manager.

### ARTICLE V
### COMPENSATION OF MANAGER

5.1    Fees.  In consideration of the services to be performed by Manager, Owner shall pay to Manager (and Manager shall be entitled to retain from the results of operation of the Properties) the Base Management Fee and, if applicable, the Incentive Management Fee, payable for each Fiscal Month in arrears on the date that is ten (10) days following the delivery to Owner of the Interim Statements for the Properties for each Fiscal Month delivered pursuant to Section 8.1(a) below (including an invoice detailing the monthly Management Fees then due and payable); provided, however, that if EBITDA is negative in any Fiscal Month, the amount of negative EBITDA shall be carried forward to immediately successive Fiscal Month(s) (whether in the current or any successive Fiscal Years) and no Incentive Management Fee shall be earned for any successive Fiscal Month unless and until, and Incentive Management Fee shall be payable only to the extent that, cumulative EBITDA for all Fiscal Months from and after such Fiscal Month in which EBITDA was first negative is greater than the amount of cumulative negative EBITDA (beginning in such Fiscal Month in which EBITDA was first negative);

provided, further, in no event shall Manager be required to repay any Incentive Management Fee received during Fiscal Months of positive EBITDA on account of subsequent Fiscal Months with negative EBITDA (for example, if EBITDA is positive for the first six (6) Fiscal Months following the Effective Date, but EBITDA is negative in the cumulative amount of $1,000,000 for Fiscal Months seven (7) through nine (9) following the Effective Date, and EBITDA is positive in the amount of $1,500,000 for Fiscal Month ten (10) following the Effective Date, (i) no Incentive Management Fee paid to Manager in Fiscal Months one (1) through (6) shall be repaid on account of the negative EBITDA in Fiscal Months seven (7) through nine (9), (ii) no Incentive Management Fee shall be payable to Manager for Fiscal Months seven (7) through nine (9), and (iii) an Incentive Management Fee shall be paid to Manager on EBITDA of $500,000 for Fiscal Month ten (10)).  The amount of the Management Fees paid to Manager shall be reconciled annually by Manager after receipt of the Year End Statement pursuant to Section 8.1(c) below.  Upon Owner's receipt of the audited Year End Statements, Owner shall have until December 31 of the immediately following Fiscal Year to audit the proposed reconciliation of Management Fees and notify Manager of any disputes thereof (the "Reconciliation Dispute Notice"); provided, however, Owner shall have access to and the right to audit the Year End Statements, and bring a claim for gross negligence or fraud in the preparation of the Year End Statements, for three (3) Full Fiscal Years following the Fiscal Year in question.  Manager shall cooperate with Owner and promptly provide Owner with all reasonably requested supporting documentation required by Owner to conduct the audit.  Upon receipt of the Reconciliation Dispute Notice, Manager shall, within fifteen (15) Business Days, either, notify Owner that it accepts Owner's reconciliation of Management Fees as set forth in the Reconciliation Dispute Notice, or require the matter to be submitted to arbitration in accordance with Section 17.16 below.  Any adjustments (overpayment or underpayment) thereto shall be made (i) with respect to the Base Management Fee, on the next monthly installment of Base Management Fees due after the final reconciliation of the Base Management Fee (whether by Manager's acquiescence or upon the final ruling of the arbitrator in accordance with Section 17.16); and (ii) with respect to the Incentive Management Fee, on the next monthly installment of Incentive Management Fees due after the final reconciliation of the Incentive Management Fee (whether by Manager's acquiescence or upon the final ruling of the arbitrator in accordance with Section 17.16).

> 5.2    Coverage of Manager's Cost.

(a)    In consideration for the Management Fees payable hereunder, and otherwise at Manager's sole cost and expense, Manager shall provide and maintain, and shall be responsible for the payment of the costs and expenses of, sufficient operating capacity, functionality and senior management personnel of Manager devoted to the operation of the Properties including all Corporate Services and Manager's costs and expenses incurred in connection therewith, including, without limitation, (i) all salaries, compensation, bonuses and other employment benefits of executives and employees of Manager and/or Fertitta Gaming (including, but not limited to, Manager's Executive Staff); and (ii) notwithstanding any provision of this Agreement to the contrary, all corporate overhead and expenses allocated to Manager pursuant to Exhibit "A" attached hereto as the same may be supplemented pursuant to this Section 5.2 (collectively, "Manager Overhead and Expenses").  The Parties have mutually

[Management Agreement - Opco]

agreed upon the Initial Corporate Overhead Budget and Manager hereby acknowledges and agrees that Manager shall be liable for its allocable share of any Corporate Overhead Excess (as defined in Exhibit "A") pursuant to and in accordance with Exhibit "A" and for the Manager Overhead and Expenses as allocated under Exhibit "A".   All Corporate Overhead Excess allocated to Manager under Exhibit "A", or any Manager Overhead and Expenses or other amounts allocated to the Manager under Exhibit "A," shall be paid by Manager from its own funds (and not from Gross Revenues) and Manager shall be deemed to have breached this Agreement if Manager knowingly uses Gross Revenues to pay the same; provided, however, if any such amounts are inadvertently (or in breach of this Agreement are) paid or incurred by Owner or through the use of Gross Revenues (rather than paid directly by Manager, or reimbursed by Manager to Owner from Manager's own funds and not from Gross Revenues (any such reimbursement to be excluded from Gross Revenues)), Owner shall have the right (notwithstanding any prohibition on offset otherwise provided in this Agreement) to offset such amounts paid against the Management Fees and all other reimbursements and other amounts otherwise due and owing to Manager pursuant to and in accordance with this Agreement, it being acknowledged and agreed that such offset shall be consistent with the terms and conditions set forth in Exhibit "A".   Manager and Owner acknowledge that the Initial Corporate Overhead Budget is inclusive of any and all necessary corporate responsibility and/or functionality necessary for the ownership of the Properties and, a detailed list of such underlying functionality, and the allocation thereof to Manager Overhead and Expenses, shall in good faith be mutually agreed upon between Owner and Manager and adopted by the Parties (and shall constitute an incorporated supplement to Exhibit "A" upon its adoption).   Manager covenants that in no event shall Manager attempt to reduce or minimize Manager's Overhead and Expenses and increase Owner Overhead and Expenses or otherwise circumvent its obligations and covenants contained in this Section 5.2 and Exhibit "A" (as the same may be supplemented pursuant to the preceding sentence) by allocating any employee and/or responsibilities to the Property level or any other means of allocation which would result in such costs and expenses attributable thereto to be treated as Operating Costs or Owner Overhead and Expenses.   Notwithstanding anything the contrary (including, without limitation, the adjustments permitted pursuant to paragraph I.(d) of Exhibit "A"), in the event that Manager reasonably determines to allocate certain employees and/or functionality from Owner's corporate level to the Property level, Manager shall deliver prompt written notice to Owner of such change and the Parties shall equitably adjust the Initial Corporate Overhead Budget and the allocations of Corporate Overhead and Expenses to Manager so that Manager shall continue to pay (using its own funds and not Gross Revenue) the costs thereof (notwithstanding that certain employees and/or functionality is shifted from Owner's corporate level to the Property level).   For the avoidance of doubt, Manager shall maintain its levels of operating capacity, functionality and senior management personnel devoted to the operation of the Properties (including all Corporate Services and Manager's costs and expenses incurred in connection therewith) that are consistent with those reflected in the allocations of Corporate Overhead and Expenses and the functionality, cost centers, personnel and other items to Manager as described in Exhibit "A" attached hereto as the same may be supplemented.

(b)    In consideration for the Management Fees payable hereunder and otherwise at Manager's sole cost and expense, Manager will coordinate and supervise corporate

personnel of FCP Propco, LLC, a Delaware limited liability company ("Propco"), which personnel will provide services to the Owner and the Properties. Owner will enter into a Corporate Cost Allocation Agreement (as such term is defined in the Opco Credit Agreement) with Propco to reimburse Propco for (i) the costs and expenses associated with such personnel, and (ii) the allocable portion of overhead expenses that can be attributed to corporate functions performed at the Propco properties for the benefit of Owner or any of the Properties.

       **5.3**    <u>Reimbursements</u>. If a specific circumstance arises which necessitates the direct payment by Manager, on behalf of Owner, of costs and expenses which are set forth in the applicable Approved Annual Plan and Operating Budget and such direct payment by Manager is necessary for the continuous and uninterrupted operation and management of the Properties in accordance with the Operating Standard, then in addition to the Management Fees payable to Manager, Owner shall reimburse Manager and its Affiliates therefor. In addition all other actual out-of-pocket costs incurred by Manager or its Affiliates (without mark-up or profit by Manager or its Affiliates) in the performance of this Agreement ("Reimbursable Expenses"), including, without limitation, reasonable costs of travel, telephone, postage, air express and other incidental expenses (but expressly excluding Manager Overhead and Expenses), shall be reimbursed as well so long as such Reimbursable Expense is reasonable, is made for the benefit of the Properties, has been approved in advance and in writing by Owner if not included in the Approved Annual Plan and Operating Budget, and does not include any profit or other mark-up. Any Reimbursable Expense permitted under this Section 5.3 may be paid by Manager directly from Gross Revenues of the Properties consistent with the priority set forth on Exhibit "A".

## ARTICLE VI
## INFORMATION TECHNOLOGY; INTELLECTUAL PROPERTY; CUSTOMER DATABASE

       **6.1**    <u>Information Technology</u>. Owner owns and/or licenses certain technology platforms which are integral to the management, operation and performance of the Properties, including, without limitation, the Reservation Systems; standard property management systems; sales, catering and accounting systems; player tracking systems; slot and table games accounting systems; hotel reservations systems; ticket-in/ticket-out systems and all other transaction-based systems; "Front of house ops systems" such as: casino accounting, cage and count; franchising and merchandising operation systems; performance management (live, syndicated, televised, pay-per-view); value-added guest services systems (Wi-Fi, guest internet, lodgenet, pay-per-view, telephone); convention and conference contract development and management systems; safety, security, surveillance systems and CCTV infrastructure; hotel marketing and reservation channels (including, without limitation, call centers, Internet, interfaces with external travel brokers); point of sale, kitchen and restaurant management systems; payroll accounting systems; and all inventory tracking systems; all related proprietary hardware and software and any other items as more particularly described in the Plan (the "Initial Technology Systems"). Manager may, from time to time, develop certain necessary and desirable improvements, modifications, enhancements, upgrades, derivative works and additions to the Initial Technology Systems (collectively, the "Technology Systems Upgrades") in which case Manager shall, to the extent practicable, cause the Technology Systems Upgrades to be integrated into the then existing

Initial Technology Systems. The Initial Technology Systems and any Technology Systems Upgrades (collectively, the "Technology Systems") shall at all times be made available to and constitute the property or rights of Owner regardless of whether made by Manager on behalf of Owner, Owner or an entity controlled by either of them. The Technology Systems shall be used by Manager solely for the operation and management of the Properties in accordance with this Agreement and Owner shall license the Technology Systems to Manager or an Affiliate of Manager designated by Manager on a royalty free basis solely for such purposes pursuant to a separate license agreement in the form annexed hereto as Exhibit "D" (the "Technology Systems License"), pursuant to which Manager shall have the right to use the Technology Systems at Other Managed Properties. The Technology Systems License shall not be assigned, pledged or encumbered, or sub-licensed by Manager or its Affiliate, as applicable, and the Technology Systems License shall terminate upon Termination of this Agreement. Manager shall have no right, title or interest in or to the Technology Systems except for use rights as aforesaid or more specifically granted under the Technology Systems License. Manager acknowledges and agrees that the Technology Systems shall be treated in all respects as owned and/or licensed by Owner and is to be used by Manager for no purpose other than the operation and management of the Properties except as otherwise permitted under the Technology Systems License. To the extent that any rights in any of the Technology Systems are deemed to accrue to Manager, Manager hereby irrevocably and automatically assigns and transfers to Owner any and all such rights at such time as they may be deemed to accrue. Manager shall not contest the rights of Owner or its Affiliates in respect of the Technology Systems. The parties hereto expressly agree that, to the fullest extent allowed by law, any copyrightable material contained in the Technology Systems developed by Manager shall be considered a "work made for hire," as that term is defined in Section 101 of the United States Copyright Act, as amended, but, if any such works are not considered "works made for hire" for any purpose, then they are deemed automatically covered by the assignment provisions set forth in this Section 6.1.

      **6.2**    <u>Intellectual Property</u>Owner represents that it is the owner of and has the exclusive rights to certain trademarks and all other brands, trade names, Internet Domain Names, service marks, logos and all other source indicators and goodwill associated with the foregoing (including all trademarks and other intellectual property previously owned by Station Casinos, Inc., or its affiliates and used exclusively in the operation of the Properties but excluding, in each case, trademarks and other rights constituting Licensed IP and any Intellectual Property licensed from third parties) (collectively, the "Initial Owned IP"). Owner also is the owner of and has the exclusive right to use any and all trademarks containing or derived from the Initial Owned IP or upgrades to Initial Owned IP (collectively, the "Owned IP Upgrades" and together with the Initial Owned IP, hereinafter referred to as the (the "Owned IP"), whether developed by Owner or Manager in connection with its performance of its duties hereunder, in which case Manager shall, to the extent practicable, cause the Owned IP Upgrades to be integrated into the then existing Owned IP. Manager acknowledges and agrees that Manager shall not acquire any right, title or interest of any kind or nature whatsoever in or to the Initial Owned IP and/or any Owned IP Upgrades or the goodwill associated therewith. To the extent that any rights in any of the Initial Owned IP and/or the Owned IP Upgrades are deemed to accrue to Manager, Manager hereby irrevocably and automatically assigns and transfers to Owner any and all such rights at such time as they may be deemed to accrue. Manager shall not contest the rights of Owner or its

        [Management Agreement - Opco]

Affiliates in respect of the Initial Owned IP or the Owned IP Upgrades.  The parties hereto expressly agree that, to the fullest extent allowed by law, any copyrightable material contained in the Owned IP Upgrades developed by Manager shall be considered a "work made for hire," as that term is defined in Section 101 of the United States Copyright Act, as amended, but, if any such works are not considered "works made for hire" for any purpose, then they are deemed automatically covered by the assignment provisions set forth in this Section 6.2.

(b)    Owner is the licensee of a non-exclusive license to: (i) use the trademarks ["Station," "Station Casinos," "Boarding Pass," and "Jumbo"] and all brands, trade names, service marks, logos and/or certain other source indicators associated therewith as more particularly described in the Plan (including, without limitation, any improvements, enhancements, upgrades and additions thereto) (the "Licensed Trademarks"); (ii) certain Patents related to player tracking systems (including, without limitation, any improvements, modifications, enhancements, upgrades and derivative works thereto) (the "Licensed Patents"); and (iii) certain Copyrights (including, without limitation, any improvements, modifications, enhancements, upgrades and derivative works thereto) (the "Licensed Copyrights" and, together with the Licensed Trademarks and Licensed Patents, the "Licensed IP").  If Owner's license to use any of the Licensed IP expires or terminates, Manager shall, in accordance with clause (vi) of Section 2.2 of this Agreement, cause replacement Licensed IP to be developed and registered to be used in connection with the Properties and develop and implement a marketing plan for the promotion of such new Licensed IP in connection with the Properties.

(c)    Owner shall license the Owned IP and Licensed IP to Manager or an Affiliate of Manager designated by Manager on a royalty-free basis, solely for the purpose of operating and managing the Properties, pursuant to a separate license agreement in the form attached hereto as Exhibit "B" (the "IP License").  The IP License shall not be assigned, pledged or encumbered, or sub-licensed by Manager or its Affiliate, as applicable and the IP License shall terminate upon the Termination of this Agreement.  Manager shall have no right, title or interest in or to the Licensed IP or Owned IP except for use rights as aforesaid or more specifically granted under the IP License.  Manager acknowledges and agrees that the Owned IP and the Licensed IP shall be treated in all respects as owned and/or licensed by Owner and is to be used by Manager for no purpose other than the operation and marketing of the Properties except as otherwise permitted under the IP License.  Manager further acknowledges and agrees that Owner and its subsidiaries have the right and duty to control the quality of the goods and services offered under the Trademarks owned by them and the manner in which such Trademarks are used in order to maintain the validity and enforceability and its ownership of such Trademarks.

(d)    Manager acknowledges and agrees that the Owned IP and the Licensed IP shall be treated in all respects as owned and/or licensed by Owner to be used by Manager for no purpose other than the operation and marketing of the Properties.

(e)    Owner acknowledges and agrees that Manager may, at Manager's sole cost and expense and solely in connection with its permitted management and operation of properties other than the Properties, create brands, trademarks, trade names, service marks,

[Management Agreement - Opco]

Internet Domain Names, logos and/or other intellectual property that are separate from, and not used in connection with, any or all of the Properties (together with any improvements, enhancements, upgrades and additions thereto, the "Manager IP"). The Manager IP shall be Manager's exclusive property and not the property of Owner. In the event Manager makes a good faith determination that the Manager IP may be used or useful in connection with the operation of the Properties, Manager may notify Owner of its desire to use the Manager IP for such purpose and, subject to Owner's prior written approval (which approval may be granted or withheld in Owner's sole and absolute discretion) and mutually satisfactory licensing arrangements, Manager shall be permitted to use such Manager IP at one or more of the Properties as mutually agreed. Any such licensing arrangements shall permit the use of the Manager IP for its specified purpose during the Term of this Agreement and following Termination, during the Transition Period.

(f)     In addition to the foregoing duties, and without limiting any of Manager's duties set forth in the IP License, Manager shall, subject to the availability of funds pursuant to the Approved Annual Plan and Operating Budget, be responsible for the performance of the following services related to the ongoing maintenance of the Owned IP:[2]

(1)     using commercially reasonable efforts to search, screen and clear any after-arising Trademarks, Patents or Copyrights developed or created by Manager after the Effective Date to assess the risk of potential infringement of the Owned IP;

(2)     using commercially reasonable efforts to file, prosecute and maintain applications and registrations for any Trademarks, Patents or Copyrights in Owner's name (including, without limitation, timely filing of evidence of use, applications for renewal and affidavits of use and/or incontestability, applications to register Trademarks created after the Effective Date, timely payment of all registration and maintenance fees, responding to third-party oppositions of applications or challenges to registrations, and responding to any office actions, reexaminations, interferences or other office or examiner requests or requirements);

(3)     using commercially reasonable efforts to monitor third-party use and registration of Intellectual Property and taking appropriate actions to oppose or contest the use and any application or registration for Trademarks, Patents or Copyrights that could reasonably be expected to infringe, dilute or otherwise violate the Owned IP or Owner's rights therein;

(4)     confirming Owner's legal title in and to the Owned IP, including using commercially reasonable efforts to obtain written assignments of Intellectual Property to such Owner and, if applicable, record transfers of title in the appropriate Intellectual Property registry;

---

[2]     Note: duties set forth in this section are subject to negotiation and finalization of the IP License and may be changed as needed to conform to the license.

#4811-5012-8391

(5)    with respect to Owner's rights and obligations with respect to any Intellectual Property licensed to third parties, using commercially reasonable efforts to monitor the licensee's use of each licensed Trademark and the quality of its goods and services offered in connection with such Trademarks, rendering approvals (or disapprovals) that are required under the applicable license agreement(s), and ensuring that any use of such Trademarks by any such licensee satisfies the quality control standards and usage provisions of the applicable license agreement and is in compliance with all applicable laws and the requirements of each of the Transaction Documents;

(6)    with respect to any Licensed IP, using commercially reasonable efforts to ensure that Owner's use of such Licensed IP does not violate the terms of the applicable license agreements; and

(7)    using commercially reasonable efforts to protect, police, and, in the event that Manager becomes aware of any unlicensed copying, imitation, infringement, dilution, misappropriation, unauthorized use or other violation of the Owned IP, or any portion thereof, enforce such Owned IP, including, (i) preparing and responding to and further prosecuting cease-and-desist, demand and notice letters, and requests for a license; and (ii) commencing, prosecuting and/or resolving claims or suits involving imitation, infringement, dilution, misappropriation, the unauthorized use or other violation of the Intellectual Property, and seeking all appropriate monetary and equitable remedies in connection therewith; provided that Owner shall, and hereby agrees to, join as a party to any such suits, at Owner's expense, to the extent necessary to maintain standing.

**6.3**    Customer Database and Business Information.  Without limiting Section 6.1 and Section 6.2, the Parties hereby acknowledge and agree to the following:

(a)    Owner owns additional technology platforms which are integral to Manager's management and management performance of the Property which include (i) the customer and player databases (including, without limitation, any and all information obtained or collected by Manager at the Properties from guests or customers of each Property[3]); (ii) all related proprietary hardware and software; and (iii) any necessary and desirable improvements, enhancements, modifications, upgrades, derivative works and additions thereto regardless of whether made by Manager on behalf of Owner, Owner or an entity controlled by either of them (such systems, the "Customer Databases").  The Customer Databases shall at all times be made available to and constitute the exclusive property of Owner.  The Customer Databases shall be used by Manager solely for the operation and marketing of the Properties in accordance with this Agreement.  Manager shall maintain and regularly update in electronic form for Owner as part of the books and records of each of the Properties, on a per-Property basis, the Customer Databases with customer and guest profiles, contact information including any such information relating specifically to such guests' stay at the applicable Property that Manager tracks from his or her folio (including, to the extent reasonably available, guest name, address, telephone numbers, email address, frequency of visit to the applicable Properties, room type, room rate, amenities

---

[3] [Note: Shouldn't this relate to primary customers only?]

and/or in-room services purchased, restaurant, nightclub or other entertainment reservations and spa appointments, as applicable), Gaming or device play and other customer histories, preferences and other information necessary or desirable for the operation of the Properties, in each instance, whether initially available on the Effective Date or thereafter obtained by Manager or Owner.  Any new customers or guests that are identified by Manager as participating in Gaming at the Properties shall be added to the Customer Database by Manager so that the Customer Database includes a reasonably current and complete list of all customers and guests for each of the Properties.  Manager shall have no right, title or interest in or to the Customer Databases (except as necessary to perform its duties, obligations and responsibilities under this Agreement) and the Customer Databases shall not be included in the Technology Systems License to Manager.  Manager covenants that the Customer Databases shall be treated in all respects as proprietary information of Owner to be used by Manager during the Term only and for no purpose other than the operation and management of the Properties.

(b)    Owner owns the Business Information and such Business Information, to the extent obtained by Manager on Owner's behalf, shall at all times be made available to and constitute the exclusive property of Owner.  Manager shall have no right, title or interest in or to the Business Information (except as necessary to perform its duties, obligations and responsibilities under this Agreement) and the Business Information shall not be included in the Technology Systems License to Manager.  All Business Information shall be held by Manager as property of Owner and any reports, records or other information developed by Manager utilizing the Technology Systems shall similarly be deemed the exclusive property of Owner and not Manager and be deliverable to Owner in electronically readable format upon Owner's request.

(c)    With respect to the Business Information and the information contained in the Customer Databases, Manager may not: (i) use, share, store, resell or transfer such information for any reason except as necessary to perform its duties, obligations and responsibilities under this Agreement (including, without limitation, no right to use, share, resell or transfer such information for any commercial purpose or in any commercial manner); (ii) make any unauthorized copies of any proprietary or Confidential Information; or (iii) destroy or cause the destruction of any proprietary or Confidential Information.  Manager shall have no right, title or interest in or to the Business Information (except for the FG Management Programs and Procedures) or the Customer Databases.  Manager acknowledges and agrees that the Business Information and the Customer Databases shall be treated in all respects as proprietary information of Owner to be used by Manager for no purpose other than the operation and management of the Properties.  Owner acknowledges and agrees that the use of Business Information, including, without limitation, information in the Customer Database and personnel records, shall be subject to the privacy policies and commitments applicable to Properties and applicable Legal Requirements

(d)    FG Management Programs and Procedures shall constitute the joint property of Owner and Manager or a Fertitta Controlled Affiliate, as applicable, and may be used by such parties as they see fit.

[Management Agreement - Opco]

#4811-5012-8391

**6.4**    <u>Administration and Management of IP Holdco</u>.  To the extent that any Licensed IP is owned by IP Holdco (such Licensed IP, the "Subsidiary-Owned IP"), Manager shall perform, for the benefit of IP Holdco, all duties and observe all obligations with respect to such Subsidiary-Owned IP that Manager would be obligated to perform under this Article VI for the benefit of Owner if such Subsidiary-Owned IP were Owned IP (including, without limitation, the duties to maintain the registration and policing of such Subsidiary-Owned IP to the same extent as if Owner owned such Licensed IP), and IP Holdco shall be a third-party beneficiary hereof for such purposes.  Manager hereby acknowledges that it has no right, title or interest in or to the Subsidiary-Owned IP and that such Subsidiary-Owned IP shall be treated in all respects as proprietary rights of IP Holdco consistent with Manager's obligations in respect of the Owned IP and Licensed IP generally.  In addition to the foregoing, Manager shall, at the sole cost and expense of Owner (which for purposes of clarity, shall not be an Operating Cost), to the extent funds are provided for such purpose, be responsible for the following administrative duties with respect to the administration and operation of IP Holdco:

(a)    selecting and appointing an owner trustee to act on behalf of IP Holdco and selecting any managers or directors required to be appointed under, and in accordance with the requirements of, IP Holdco's organizational documents;

(b)    negotiating on behalf of, and performing IP Holdco's obligations as licensor under, each of the license agreements to which it is a party as licensor (including, without limitation, any reporting obligations);

(c)    exercising IP Holdco's rights under such license agreements (including, without limitation, in connection with any termination of such license agreements);

(d)    maintaining proper books of account and complete records of all transactions undertaken or performed by it on behalf of IP Holdco as well as all other books and records required to be maintained by IP Holdco under applicable law or the license agreements to which it is a party (including financial statements), cooperating in all audits of IP Holdco, and providing access to such books and records on behalf of Owner to any third parties to the extent required under the Loan Documents or any documents to which IP Holdco is a party;

(e)    preparing, or causing its third-party tax advisors to prepare, any tax returns or tax reporting statements of IP Holdco required under applicable law;

(f)    convening meetings of IP Holdco's beneficial interest holders and or directors, from time to time, as may be required under the laws of State of Delaware or IP Holdco's organizational documents and to prepare, circulate and publish the agenda for any such meetings and any papers to be considered at such meetings;

(g)    generally attending to all routine matters touching or concerning the affairs of IP Holdco including the making and keeping of all returns and records required to be made and kept under IP Holdco's organizational documents to the extent not maintained by the owner trustee on its behalf;

[Management Agreement - Opco]

(h)    providing facilities for the safekeeping of all documents, securities and other valuable instruments and taking due care of all such documents, securities and other valuable instruments;

(i)    dealing with and replying to all correspondence and other communications directed to IP Holdco;

(j)    causing IP Holdco to (i) keep in full effect its existence, rights and franchises as a Delaware statutory trust; and (ii) observe and comply in all material respects with (1) all laws applicable to it, and (2) all requisite and appropriate organizational and other formalities in the management of its business and affairs and the conduct of the transactions contemplated thereby (including, without limitation, arranging for the payment of all franchise taxes and doing business taxes as may be required to be paid by IP Holdco under applicable law), and taking all other steps as are necessary to maintain IP Holdco in good standing under the laws of the State of Delaware and the State of Nevada;

(k)    ensuring that IP Holdco is operated in accordance with all provisions designed to maintain its separate existence from Owner and Owner's other Affiliates and refraining from taking any actions that would cause IP Holdco to engage in any business other than that permitted under its organizational documents;

(l)    keeping confidential all documents, materials and other information relating to the business of IP Holdco and not disclosing any of the aforesaid without the prior consent of IP Holdco and Owner unless Manager shall be required so to disclose pursuant to any law or regulation; and

(m)    taking any and all ancillary actions as may be necessary to effect the foregoing obligations of Manager for the benefit of IP Holdco;

provided, however, notwithstanding the foregoing, (i) Manager's rights remain subject to all of the terms, conditions and limitations set forth in this Agreement, (ii) Manager and Owner hereby agree that Manager's right to implement any decision or recommendation shall expressly remain subject to Owner's prior written approval, and (iii) Owner may revoke any one or more of the rights granted to Manager pursuant to this Section 6.4; provided, however, that Owner shall not revoke Manager's rights granted herein to such a degree that Manager is unable to perform its duties as described herein in accordance with the Operating Standard.

## ARTICLE VII
## REPAIRS, MAINTENANCE AND RESERVE FUNDS

**7.1**    <u>Routine Repairs and Maintenance</u>.  Each year, as part of the Annual Plan and Operating Budget, Manager shall propose and prepare a budget for expected and reasonably necessary Routine Repairs and Maintenance.  In conjunction therewith and subject at all times to this Agreement and limitations set forth in the Approved Annual Plan and Operating Budget, Manager shall use its commercially reasonable efforts to make all such Routine Repairs and Maintenance, and subject to the applicable limitations set forth in Section 2.3 (including, without

limitation, the delivery to Owner of plans and specifications prior to the commencement of any material Routine Repairs and Maintenance that require material Capital Expenditures), to the extent reasonably required or prudent in such applicable year, Manager is authorized to make and enter into in the name of, and for the account of, Owner, all such contracts and agreements as in Manager's opinion are reasonably necessary for the repair and maintenance of the Properties. The cost of such Routine Repairs and Maintenance shall be paid from Gross Revenues and shall be treated as an Operating Cost. The cost of Capital Improvements and Replacements (other than as described in this Section 7.1), either to the Properties or their Furniture, Fixtures and Equipment, shall be paid for in the manner described in Section 7.2.

       **7.2**    <u>Capital Improvements; Reserve Funds</u>.

       (a)    Each year, as part of the Annual Plan and Operating Budget, Manager shall propose and prepare a budget for expected and reasonably necessary Capital Improvements and Replacements (including the design and specifics thereof). If Owner approves such Capital Improvements and Replacements (including a budget therefor), Manager shall use its commercially reasonable efforts to make all such Capital Improvements and Replacements to the extent reasonably required or prudent in such applicable year and, in furtherance thereof but subject to Section 7.2(c) below, Manager is authorized to make and enter into in the name of, and for the account of, Owner, all such contracts and agreements as in Manager's opinion are reasonably necessary for approved Capital Improvements and Replacements. All such Capital Improvements and Replacements approved by Owner shall, to the extent reasonably feasible, be made in a manner that does not unreasonably interfere with Manager's operation of the Properties in compliance with the Operating Standards and which will minimize any adverse impact on the normal operation of the Properties.

       (b)    Manager shall establish a Reserve Fund for each Property to fund Capital Improvements and Replacements for such Property. During the Term, Manager shall, to the extent funds are available following the disbursement of funds in accordance with the Disbursement Priority Schedule set forth on Exhibit "A", set aside concurrently with the delivery of the Interim Statement with respect to any Fiscal Month an amount equal to three percent (3%) of Gross Revenues for each such Fiscal Month for each Property, which amounts shall be deposited into the Reserve Fund for each Property and spent only in accordance with the Approved Annual Plan and Operating Budget. In the event there is a balance in the Reserve Fund at the end of any Fiscal Year, such balance shall be carried over to the next Fiscal Year; provided that the Reserve Fund shall not exceed six percent (6%) of Gross Revenue for the immediately preceding twelve (12) Fiscal Months (the "Reserve Cap") and Manager shall not deposit or otherwise withhold any amounts in excess of the Reserve Cap for the respective Property's Reserve Fund. Notwithstanding the foregoing, this Section 7.2(b) shall be waived and Manager shall not deposit or otherwise withhold any amounts as a Reserve Fund so long as (x) the Opco Credit Agreement remains outstanding and the combination of unrestricted cash and the undrawn amount of revolving loans that may be borrowed under the Opco Credit Agreement are not less than the amounts required for the Capital Improvements and Replacements projected to be spent in the next Fiscal Month as set forth in the Approved Annual Plan and Operating Budget, or (y) Manager otherwise has unrestricted funds and/or the ability to borrow under lines

of credit readily accessible to Owner (under which there are no defaults or events of default thereunder continuing, or that would be caused by the incurrence of such indebtedness and the application of the proceeds of such borrowings for the purchase of Capital Improvements and Replacements), in an amount equal to or greater than the difference between the current amounts held in the Reserve Fund and the amount that would have otherwise been required to be held in the Reserve Fund pursuant to this Section 7.2(b) (e.g., three percent (3%) of Gross Revenue for the immediately preceding twelve (12) Fiscal Months, as may be increased to an aggregate maximum of the Reserve Cap in accordance with this Section 7.2(b)).  For avoidance of doubt, the Reserve Funds shall be in addition to and not in lieu of the Working Capital Requirements required under Section 4.1.  So long as amounts remain outstanding under the Opco Credit Agreement and the commitments thereunder have not been terminated, the Manager shall cause the Reserve Fund to be subject to a control agreement in accordance with the requirements of the Opco Credit Agreement.

(c)    Any expenditures for Capital Improvements and Replacements during any Fiscal Year which have been budgeted in the Approved Annual Plan and Operating Budget or otherwise approved by Owner in writing may be made by Manager without additional Owner approval, subject to the applicable limitations set forth in Section 2.3 (including, without limitation, the delivery to Owner of plans and specifications prior to the commencement of any Capital Improvements and Replacements that require material Capital Expenditures), and, to the extent funds are available, such payments shall be made by Manager from the Reserve Funds; provided that Owner shall have the right to approve the plans, specifications, vendors and vendor contracts to be used with respect to the Capital Improvements and Replacements that require material Capital Expenditures.

(d)    To the extent the Reserve Funds are insufficient at a particular time, or to the extent the Reserve Funds plus anticipated contributions for the existing Fiscal Year is less than the amount required by the Approved Annual Plan and Operating Budget for the ensuing Fiscal Year, then additional expenditures shall be subject to the prior written approval of Owner (which approval may be granted or withheld in Owner's sole and absolute discretion) and, if such expenditures are approved, Owner shall determine the source of funds for such Capital Improvements and Replacements.

(e)    Manager shall not be separately compensated for any technical services in connection with supervising, consulting and/or completing any Capital Improvements and Replacements at the Properties and Manager shall provide such services, if applicable, as part of Manager's services hereunder (it being the intent of the parties that the Management Fees are intended to cover any such technical services); provided, however, Manager's duties hereunder shall not extend to architectural planning, construction management and similar technical services for capital improvements for new buildings, expansions to existing buildings or any major renovations to accomplish a comprehensive repositioning of a Property that has been approved by Owner.

7.3    Liens.  Owner and Manager shall use their respective commercially reasonable efforts to prevent any liens from being filed against the Properties as the result of any

[Management Agreement - Opco]

maintenance, repairs, alterations, improvements, renewals or replacements in, to or of the Properties.  Both Parties shall cooperate fully in obtaining the release of any such liens.

# ARTICLE VIII
# BOOKS AND RECORDS; BANK ACCOUNTS; ANNUAL PLAN AND OPERATING BUDGET

**8.1**    <u>Books and Records</u>.

(a)    On or before the twenty-fifth (25th) day of each Fiscal Month during the Term, Manager shall prepare and deliver to Owner (and Owner's lender, if requested by Owner) the following statements for each Property (or such different statements as may be required by Owner's lender all as set forth in Loan Documents copies of which are from time to time delivered by Owner to Manager)(collectively, the "Interim Statements"):

(1)    a profit and loss statement in reasonable detail showing the results of operations of the respective Property for such immediately preceding Fiscal Month and for the portion of the Fiscal Year to date;

(2)    a variance report showing any variances that have occurred or that are anticipated between the applicable Approved Annual Plan and Operating Budgets and each Property's actual results;

(3)    the balance of all Bank Accounts and the Owner Account; and

(4)    a reasonably detailed statement of all complimentary hotel accommodations, food, beverage, merchandise, chips, tokens, entertainment provided and/or other similar services provided to guests or patrons for promotional purposes at the Properties.

(b)    Within forty-five (45) days after the end of each Fiscal Quarter (other than the fourth Fiscal Quarter of each Fiscal Year) beginning with the Fiscal Quarter ended immediately after the Effective Date, Manager shall prepare (or cause to be prepared) and deliver to Owner (and Owner's lender, if requested by Owner), a consolidated balance sheet of Owner and each Property Owner and the related (i) consolidated statements of income or operations for such Fiscal Quarter and for the portion of the Fiscal Year then ended setting forth in each case in comparative form (A) the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, and (B) comparisons to the Approved Annual Plan and Operating Budget for such Fiscal Quarter and the portion of the Fiscal Year then ended, for the elapsed portion of the Fiscal Year then ended, all in reasonable detail; and (ii) consolidated statements of cash flows for the portion of the Fiscal Year then ended (the "Quarterly Statements").  The Quarterly Statements shall be prepared in accordance with GAAP and also include a computation of Gross Revenue, EBITDA, the Base Management Fee and Incentive Management Fee for each Fiscal Month of such preceding Fiscal Quarter and the Fiscal Year to date and an itemization of Emergency Expenditures and Reimbursable Expense incurred during the Fiscal Quarter in question, if any.

[Management Agreement - Opco]

(c)      Within ninety (90) days after the end of each Fiscal Year beginning with the Fiscal Year ended December 31, 2010, Manager shall prepare (or cause to be prepared) and deliver to Owner (and Owner's lender, if requested by Owner) (i) an audited, and consolidated balance sheet of Owner; and (ii) the related consolidated statements of income or operations for such Fiscal Year and consolidated statements of cash flows for such Fiscal Year, setting forth in each case in comparative form after the first Full Fiscal Year (A) the figures for the previous Fiscal Year, and (B) comparisons to the Approved Annual Plan and Operating Budget for such Fiscal Year (the "Year End Statements").   The Year End Statement shall also include a computation of Gross Revenues, EBITDA, the Base Management Fee, the Incentive Fee and, to the extent such information is available, Indexed EBITDA, in each case for such Fiscal Year.

(d)      At Owner's election, Manager shall, as an Operating Cost, cause an audit of the Year End Statements to be performed by and accompanied by a report and opinion of a "Big Four" accounting firm with expertise in gaming following the end of each Fiscal Year (and upon termination of this Agreement if not coincident with the end of the Fiscal Year).  Owner and Manager shall cooperate with and assist the auditor as necessary in the preparation of the Year End Statements (which auditor shall report directly to the board of directors of Owner).

(e)      The books and records reflecting the operations of the Properties shall be kept by Manager in accordance with GAAP and the Securities Act of 1933, the Securities Exchange Act of 1934 and/or any other requirements of the United States Securities and Exchange Commission or any other Federal or state agency regulating the sale, registration or other handling of securities, and shall be maintained in the Las Vegas, Nevada metropolitan area, provided that, Manager shall also provide Owner, if available, with electronic access to daily "flash" reports or similar financial reports and material operating information reflecting the day-to-day operations of the Properties.   Owner and its accounting firms shall have the right to examine and copy the books and records of the Properties on reasonable prior notice to Manager. Manager shall provide the Owner Representative with a copy of such daily rate and occupancy report as it may prepare and deliver to its home office.

(f)      Notwithstanding the foregoing, upon at least thirty (30) days prior written notice from Owner, Manager shall prepare and deliver to Owner (and Owner's lender, if requested by Owner) any and all additional books, records, financial statements and/or reports in form and substance as required under the Loan Documents.

**8.2**      Bank Accounts; Disbursement of Funds.

(a)      Subject to the terms and conditions of this Agreement, all funds received from operation of the Properties and all sums advanced by Owner for purposes other than Capital Improvements and Replacements shall be deposited in the Operating Bank Accounts. Withdrawals from the Operating Bank Accounts shall be made by representatives of Manager whose signatures have been authorized by both Manager and Owner; provided, however, Manager's signing authority shall be limited solely to the specified purposes designated in writing by Owner and Manager and, provided further, Owner shall have the right to rescind, from time to time, in its sole and absolute discretion, the representatives holding such signing

authority so long as Manager can appoint a replacement representative simultaneously therewith. Manager shall be entitled to maintain at each of the Properties (i) the Cage Cash Minimum Balance; and (ii) reasonable change and petty cash funds in amounts consistent with the Approved Annual Plan and Operating Budget.  With respect to each Fiscal Month, Manager shall, on behalf of Owner, disburse funds from the Operating Bank Accounts in the order of priority and to the extent available in accordance with the Disbursement Priority Schedule set forth on Exhibit "A" with any and all amounts remaining in the Operating Bank Accounts following such disbursements being promptly swept to the Owner Account.

(b)    All payments made by Manager hereunder shall be made from authorized Bank Accounts or petty cash funds.  Manager shall not be required to make any advance or payment to or for the account of Owner except out of such funds, and Manager shall not be obligated to incur any liability or obligation for Owner's account without sufficient assurances (as reasonably determined by Manager) that necessary funds for the discharge thereof will be provided by Owner.  The Management Fees, Reimbursable Expenses and/or other amounts payable by Owner to Manager under this Agreement shall be promptly paid by Owner to the extent funds are not available for that purpose from the operation of the Properties.

**8.3**    <u>Annual Plan and Operating Budget</u>.  Owner and Manager acknowledge and agree to adopt the annual plan and operating budget attached hereto as Schedule "4" as the Approved Annual Plan and Operating Budget for the first Fiscal Year for the Properties.  Not fewer than sixty (60) days prior to the commencement of each Full Fiscal Year thereafter (i.e., on or before November 1st of each Fiscal Year), Manager shall submit a proposed Annual Plan and Operating Budget to Owner for Owner's review and approval.  Manager shall use commercially reasonable efforts to base each Annual Plan and Operating Budget upon current and reliable information then available, taking into account the location of the applicable Properties and Manager's experience in operating other comparable hotels, casinos and resorts.  Each proposed Annual Plan and Operating Budget shall include the following:

(1)    Monthly and annual projections of the following: (i) estimated results of operations (including estimated Gross Revenue, Operating Costs and Budgeted EBITDA), together with estimates of total labor costs; estimates of the average daily room rate and occupancy; projected monthly balance sheets; and estimates of the Management Fees and Reimbursable Expenses; (ii) existing debt service requirements as well as a description of proposed borrowings; (iii) a description of proposed Routine Repairs and Maintenance to be made during such Fiscal Year pursuant to and in accordance with Section 7.1; (iv) a description of proposed Capital Improvements and Replacements to be made during such Fiscal Year; (v) a statement of cash flow and description of Working Capital requirements; and (vi) the initial Cage Cash Minimum Balance;

(2)    A description of the current status of any material pending suits concerning each of the Properties;

(3)    In accordance with Exhibit "A" to this Agreement, (i) the proposed allocation of Corporate Overhead and Expenses to the Properties for such Fiscal Year; and

(ii) with respect to the Annual Plan and Operating Budget for the 2010 Fiscal Year, the Initial Gross Revenues Budget and Initial Corporate Overhead Budget, excluding bonuses payable to Employees and employees of Manager, for the first two (2) Full Fiscal Years;

(4)     The proposed Promotional Allowance; and

(5)     Any other items required to be included in the Annual Plan and Operating Budget pursuant to the terms and conditions of this Agreement and such other materials reasonably requested by Owner, from time to time.

(b)     Manager shall make its representatives available during normal business hours to meet with Owner, from time to time, at Owner's reasonable prior written request made no later than ten (10) Business Days prior to the proposal meeting date to review and discuss the proposed Annual Plan and Operating Budget.  Owner shall have the right to approve or disapprove the proposed Annual Plan and Operating Budget (including, without limitation, each and every line item or the amount thereof contained therein), and/or to direct Manager to make whatever changes thereto Owner elects, in Owner's sole and absolute discretion; provided, however, notwithstanding anything to the contrary contained herein, subject further to Manager's rights to make expenditures pursuant to and in accordance with Sections 8.4 and 8.5 below, Owner shall not withhold its approval with respect to: (i) Manager's reasonable projections of Gross Revenues or the components thereof; and (ii) subject to Manager's obligation to use commercially reasonable efforts to estimate and include all such amounts in the applicable Annual Plan and Operating Budget, Impositions, reservation fees, utilities, insurance premiums, license and permit fees as well as amounts necessary to fund the cost and expense of food safety, life safety, and compliance with Gaming laws; provided, further, in the event Owner does not approve in writing any specific item or items or the amounts thereof referenced in clause (ii) immediately above set forth in the Annual Plan and Operating Budget and the Parties are unable to resolve such monetary dispute prior to the commencement of the Fiscal Year in question, either Manager or Owner may submit the same for resolution as set forth in Section 17.16 below and pending the same, the specific item or items of expense (not revenue) shall be suspended and replaced for the Fiscal Year in question by an amount equal to the lesser of (1) that proposed by Manager for such Fiscal Year or (2) such budget items as set forth in the immediately prior Approved Annual Plan and Operating Budget (subject to escalation per item by the percentage increase in the CPI over the twelve (12) Fiscal Month period immediately preceding the start of the Fiscal Year in question).  In the event that Owner shall approve or disapprove, and/or direct Manager to make whatever changes to the proposed Annual Plan and Operating Budget (including, without limitation, each and every line item or the amount thereof contained therein) in Owner's sole and absolute discretion, Manager shall revise such Annual Plan and Operating Budget in accordance therewith and resubmit the same to Owner for approval and, other than the limitations on Owner's approval rights referenced in clauses (i) and (ii) above, Manager shall have no right to object thereto except that Owner shall not have the right to disapprove, and/or direct Manager to make changes thereto, that would effectively prevent Manager from operating any one or more of the Properties (for example, Owner shall have the right to disapprove and/or direct Manager to make changes to the security payroll line item in Owner's sole and absolute discretion but Owner shall not have the right to disapprove the payroll line item in its entirety or

[Management Agreement - Opco]

to make such other changes that would prevent Manager from employing a sufficient number of security personnel that are necessary to ensure public safety, to monitor gaming operations in an effort to prevent theft and fraud, and to comply with all Legal Requirements, the failure of Owner to approve a security payroll line item in the amount thereof would necessitate a closing of a Property and effectively prevent Manager from operating such Property) and, in any such event, Manager shall have the right to dispute such disapproval or such changes as Owner may direct Manager to make and submit the same for resolution as set forth in Section 17.16 below.

         (c)     Owner acknowledges that the projections contained in the Approved Annual Plan and Operating Budget for any particular Fiscal Year may be affected by changes in financial, economic, market, competitive, labor, natural and other conditions and circumstances beyond Manager's control.  If, by reason of any of such changes, Manager determines that, in its reasonable judgment, (i) amounts set forth in the Approved Annual Plan and Operating Budget are not sufficient to satisfy the Operating Standards or otherwise permit Manager to perform its responsibilities in the manner required hereunder, Manager shall notify Owner with respect to such deficiencies (accompanied by a narrative summary detailing the reasons for the request for additional funds) and propose revisions to the Approved Annual Plan and Operating Budget for Owner's approval; or (ii) that a major renovation of one or more of the Properties is required, which renovation is not contained in the Approved Annual Plan and Operating Budget and is not otherwise permitted under this Section 8.3, Manager shall notify Owner with respect to such major renovation (accompanied by a narrative summary detailing the reasons for such major renovation) and propose revisions to the Approved Annual Plan and Operating Budget for Owner's approval (each an "Discretionary Amendment").  If Owner fails to approve any Discretionary Amendment within thirty (30) days after the date of such submission, the Properties shall continue to be operated in accordance with the then-current Approved Annual Plan and Operating Budget; provided, however, Owner's approval shall be subject to the same standards and limitations as set forth to the initial Annual Plan and Operating Budget for such Fiscal Year and, further, Owner shall not unreasonably withhold its approval with respect to variable changes in line items of expense (unless otherwise required under this Agreement) which are related to and necessitated by changes in the projected occupancy rate (a "Variable Expense"), provided that such Variable Expense may be increased or decreased to the extent such increases or decreases are warranted and the re-projected occupancy rate of the applicable Property (to which such allocation is sought) for any Full Fiscal Year exceeds or falls below the projected occupancy and Gross Revenue (in avoidance of doubt, the Variable Expenses shall not automatically increase proportionally with increases in occupancy rate or Gross Revenues but shall only increase to the extent such increases in occupancy rate reasonably require greater expenditures with respect to the line item in question; for example, an increase in occupancy rate will require greater and perhaps proportionate expenditures for housekeeping but will not require greater expenditures for the General Manager) and, in any such event, Manager shall have the right to dispute such disapproval or such changes as Owner may direct Manager to make and submit the same for resolution as set forth in Section 17.16 below.  If Owner approves any such Discretionary Amendment, the Annual Plan and Operating Budget, as amended and approved pursuant to the Discretionary Amendment, shall be the Approved Annual Plan and Operating Budget for the remainder of the Fiscal Year to which the Approved Annual Plan and Operating Budget, as amended by the Discretionary Amendment, relates; provided, however, such

[Management Agreement - Opco]

amended and restated Approved Annual Plan and Operating Budget shall neither result in a change to the Budgeted EBITDA set forth in the initial Approved Annual Plan and Operating Budget for such Fiscal Year nor Manager's obligations to meet the Performance Test pursuant to the thresholds set forth in the initial Approved Annual Plan and Operating Budget for such Fiscal Year.

(d)     Other than those disputes with respect to which Manager shall have the right to submit the same for resolution under Section 17.16 as expressly set forth in paragraph (b) or (c) above, no proposed Annual Plan and Operating Budget or any proposed Discretionary Amendment shall be subject to dispute nor subject to arbitration under Section 17.16; provided, however, if (i) in any Fiscal Year, Owner disapproves of the proposed Annual Plan and Operating Budget or any Discretionary Amendment thereto prepared by Manager in accordance with Sections 8.3(a) or (c), as applicable, with expenditures at levels reasonably required in order to comply with the Operating Standards; and (ii) Manager can reasonably demonstrate that Owner's refusal to approve such proposed Annual Plan and Operating Budget and/or Discretionary Amendment will have an adverse effect on the Operating Standards for such Fiscal Year, then Manager shall not be in breach of those Operating Standards for such Fiscal Year (but Manager shall not be relieved from the performance of Manager's services duties and responsibilities under this Agreement and the Performance Test shall be equitably adjusted in accordance with Section 3.2) to the extent Manager was effectively prevented from complying with such Operating Standards as a result of differences between those expenditures in the proposed Annual Plan and Operating Budget and/or Discretionary Amendment and those permitted under the Approved Annual Plan and Operating Budget.  Notwithstanding the foregoing, under no circumstances shall Manager be relieved from its obligations to maintain the Operating Standards in any Fiscal Year on account of amounts budgeted for Capital Improvements if Owner approves an Annual Plan and Operating Budget providing for at least five percent (5%) of Gross Revenues to be made available for Capital Improvements in the Approved Annual Plan and Operating Budget.  NOTWITHSTANDING THE FOREGOING OR ANYTHING TO THE CONTRARY SET FORTH HEREIN, OTHER THAN (A) THOSE ITEMS FOR WHICH OWNER IS EXPRESSLY PROHIBITED FROM WITHHOLDING ITS APPROVAL OVER PURSUANT TO SECTION 8.3(b) ABOVE; (B) EMERGENCY EXPENDITURES AS PERMITTED UNDER SECTION 8.4; (C) EXPENDITURES REQUIRED TO COMPLY WITH LEGAL REQUIREMENTS AS PERMITTED UNDER SECTION 8.5; AND/OR (D) OWNER'S OBLIGATIONS TO FUND WORKING CAPITAL SHORTFALLS UNDER SECTION 4.1, OWNER SHALL HAVE NO OBLIGATION TO ADVANCE OR APPROVE ANY ADDITIONAL FUNDS FOR THE OPERATION, MANAGEMENT AND MAINTENANCE OF THE PROPERTIES AND NOTWITHSTANDING OWNERS DETERMINATION NOT TO ADVANCE SUCH FUNDS, MANAGER SHALL NEVERTHELESS REMAIN OBLIGATED TO PERFORM ANY AND ALL OBLIGATIONS AND DUTIES SET FORTH HEREIN.

(e)     Manager makes no assurances that the actual performance of the Properties shall correspond to estimates in the Annual Plan and Operating Budget.  Manager shall use best efforts (but without the obligation to incur any additional cost to Manager which is not reimbursable by Owner hereunder) to operate the Properties within the Approved Annual

[Management Agreement - Opco]

#4811-5012-8391

Plan and Operating Budget; provided, however, Manager shall not be required to obtain Owner's prior approval for additional expenditures which: (i) will cause the total expenses in the Approved Annual Plan and Operating Budget to be exceeded by less than five percent (5%); or (ii) will cause the total expenses for an applicable department of the Properties or each category of undistributed expenses to be exceeded by seven percent (7%) of the Approved Annual Plan and Operating Budget for such department or category.

       (f)    Manager shall use its commercially reasonable efforts to expend funds for Promotional Allowances and otherwise provide complimentary or discount goods and services in an amount not to exceed the amount set forth in the Approved Annual Plan and Operating Budget.  In the event Manager believes in good faith that expenses in excess of the Promotional Allowance as provided in any Approved Annual Plan and Operating Budget are reasonably required or advisable to compete effectively with other hotel-casinos similarly to the applicable Property, Manager shall have the right to exceed the approved Promotional Allowance by an amount not to exceed twenty-five percent (25%) for each Fiscal Quarter; provided, however, Manager shall give notice to Owner of any such variance and any such variances will be subject to review by Owner at the end of the Fiscal Quarter.  Any Promotional Allowance variance exceeding twenty-five percent (25%) shall be subject to Owner's approval in its sole and absolute discretion.  For avoidance of doubt, Manager shall not be in default of this Agreement for any Promotional Allowance variance, not exceeding twenty-five percent (25%) and made by Manager in its good faith, reasonable discretion.

    **8.4**    <u>Emergency Expenditures</u>.  In the event a condition should exist with respect to a Property of an emergency nature, including structural repairs, which requires that immediate repairs are necessary to protect the health and safety of its guests or Employees (an "Emergency Expenditure"), Manager, as an Operating Cost, is authorized to take all steps and to make all Emergency Expenditures reasonably necessary to repair and correct any such condition, whether or not provisions have been made in the applicable Approved Annual Plan and Operating Budget for any such emergency expenditures, up to a maximum of $500,000 for any single emergency.  Manager agrees that it shall make such repairs and replacements only after it has made a reasonable attempt (if circumstances permit) to inform Owner of the existence of such emergency, the repairs and replacements it proposes to make, and the estimated amount of expenditures to be incurred.  If Manager has been unable to advise Owner in advance, it shall promptly notify Owner after taking any necessary action.  Expenditures made by Manager in connection with an emergency shall be paid for first from the Reserve Funds to the extent funds are available, and then from the Operating Bank Accounts.

    **8.5**    <u>Legal Requirements</u>.  In the event that repairs to, or additions, changes or corrections in, any of the Properties of any nature shall be required by reason of any purported violation of any Legal Requirements, Manager shall inform Owner of the existence of the applicable Legal Requirement and the repairs, additions, changes or corrections it believes are required to be made and the estimated expenditures to be incurred.  Owner shall, in its sole and absolute discretion, determine whether to contest the validity or application of any such Legal Requirements or to make such repairs; provided, however, that Manager shall be authorized and empowered to (i) take all actions it reasonably believes are necessary to comply with applicable

-63-

Legal Requirements if the failure to so comply might expose Manager to criminal liability or material civil liability; (ii) materially and adversely affect the operation of any one or more of the Properties; or (iii) jeopardize any Nevada Gaming License or any other Gaming license held by Manager or Owner or their respective Affiliates. Manager shall promptly notify Owner in writing of (A) all such orders and notices or requirements that are received by Manager; and (B) any such action taken by Manager pursuant to the preceding sentence. The cost of any expenditures provided for in this Section 8.5 shall be paid for first from the Reserve Funds or the Operating Bank Accounts and, if sufficient funds are not available, Manager shall request such necessary amounts from Owner.

     **8.6** <u>Consultation</u>. When requested to do so, representatives of Manager and the General Managers shall meet with the Owner Representative to discuss the performance of the Properties and of Manager of its obligations hereunder and Manager's plans and expectations for the Properties for the remaining Fiscal Year. Upon request by Owner and at Owner's expense Manager will arrange for necessary personnel to attend meetings of the board of directors of Owner.

## ARTICLE IX
## POSSESSION AND USE OF PROPERTIES AND RELATED ASSETS

     **9.1** <u>Owner's Right to Inspect</u>. Owner, Owner's Representative and/or any existing or prospective lender or their respective accountants, attorneys and agents shall have access to any one or more of the Properties at any and all reasonable times for the purpose of inspecting the Properties, reviewing Manager's operation of the Properties or showing the Properties to prospective purchasers or mortgagees. Owner, Owner's Representative and/or any existing or prospective lender or their respective accountants, attorneys and agents shall not, however, unreasonably interfere with Manager's exercise of its rights and duties hereunder or otherwise displace or unreasonably interfere with the rights of tenants or guests of the Properties. Manager shall make available to Owner, Owner's Representative and/or any equity holders of Owner that are not Affiliates of Manager in a useable manner and format, upon Owner's request, the Owned IP, the Technology Systems, the Customer Database, and the other books, records, contracts, licenses, permits and any other information or data pertaining to the Properties reasonably requested by Owner (other than information not otherwise owned by Owner or its Affiliates that is subject to an obligation of confidentiality to a third party, attorney client privilege or is otherwise proprietary) at any and all times during the regular business hours of Manager.

## ARTICLE X
## INSURANCE; RESPONSIBILITY FOR CLAIMS

     **10.1** <u>Insurance Coverages</u>. Subject to the terms and limitations of the Loan Documents, Manager shall procure and maintain, as an Operating Cost, at terms and rates and providing the types of coverage reasonably acceptable to Owner, and with insurance companies reasonably acceptable to Owner, the following levels of insurance for each Property:

          (a) Insurance on each Property and contents against loss or damage by fire, lightning, flood, earthquake (to the extent earthquake coverage is commercially reasonable),

    [Management Agreement - Opco]

terrorism (covering foreign and domestic acts to the extent the same is commercially reasonable), ordinance and law and all other risks covered by the Special Form Property Insurance, and in such amounts and with such deductible limits as are determined by Owner;

(b)    Boiler and machinery and mechanical breakdown coverage providing for loss or damage from explosion of boilers, pressure vessels, pressure pipes and sprinklers installed in the Properties;

(c)    Business interruption insurance against interruptions caused by any occurrence covered by the insurance referred to in Sections 10.1(a) and (b), of a type and in amounts sufficient to cover loss of profits and rent, any mortgage payments, real estate taxes, hazard insurance premiums and adequate cleaning, lighting and maintenance of each of the Properties for a period of at least eighteen (18) months with an extended period of indemnity clause of one hundred and eighty (180) days, and with a waiting period of no more than seven (7) days;

(d)    Workers' compensation and employer's liability insurance as required by the Legal Requirements of the state in which the applicable Property is located;

(e)    Commercial general liability insurance against claims for bodily injury, death or property damage occurring on, in or about each of the Properties on a per-Property basis, and with provisions for liquor liability, with a per occurrence limit for personal injury, death and property damage in an amount which is not less than that generally provided in policies of insurance procured by operators of other hotels/casinos in the county where the applicable Property is located, but in no event less than [$1,000,000];

(f)    Automobile Liability Insurance on all owned, hired and non-owned vehicles used for business at the Properties to a limit of not less than [$1,000,000] for any one (1) accident or occurrence;

(g)    Garage keeper's legal liability insurance for vehicles under the Properties' and/or employee's responsibility to a limit of not less than [$1,000,000] for any one (1) accident;

(h)    Crime insurance covering (i) robbery, burglary and theft of property belonging to the Properties or any guest, invitee or licensee; (ii) loss of money belonging to the Properties or in transit; and (iii) a fidelity loss sustained by any Property by reason of any act of fraud or dishonesty on the part of any employee, servant or agent of the Owner or Manager for a minimum of [$5,000,000] per loss; and

(i)    Umbrella liability insurance coverage to a limit of not less than [$100,000,000] which shall provide excess coverage of all underlying insurance required hereunder.

Notwithstanding the foregoing and except for commercial liability insurance under clause (e) above, Owner may, in its reasonable discretion, change (i.e., increase or decrease) the limits of insurance coverage and/or deductibles and/or change the types of coverages set forth clauses

[Management Agreement - Opco]

(a) through (i) of this Section 10.1 and may reasonably require Manager to carry other additional insurance of the types and in the amounts generally carried on other Comparable Manager Properties and the cost thereof shall also be an Operating Cost.  Unless Owner otherwise directs Manager to procure such insurance on behalf of Owner, Owner shall obtain and maintain such insurance.  Additionally, Manager shall obtain, at Manager's sole cost and expense (and not as an Operating Cost), (A) such industry standard professional liability coverage in respect of Manager's liabilities pursuant to this Agreement (including, without limitation, errors and omissions insurance) that is otherwise generally carried on other comparable facilities in the marketplace and at commercially reasonable terms; and (B) an additional policy or rider for all business interruption insurance against interruptions caused by any occurrence covered by the insurance referred to in Sections 10.1(a) and (b), of a type and in amounts to be determined by Manager in its sole discretion (the "BI Policy/Rider").

**10.2**    Coverage.  All insurance described herein may be obtained by endorsement or equivalent means under its blanket insurance policies, and provided further that such blanket policies substantially fulfill the requirements specified in this Article X and shall be issued by reputable companies authorized to do business in the state where the Properties are located and rated A-IX or better in the most recent AM Best's Insurance Guide or otherwise reasonably acceptable to Owner.  Upon Owner's request, Manager shall provide Owner with copies of the policies and procedures for Manager's blanket insurance policies.  Upon Owner's request, Manager shall also provide Owner with evidence that the terms, conditions and costs of such policies and procedures are comparable to those available from a competitive outside source.  Deductible limits shall be provided in the blanket policies covering the properties managed by Manager or the Fertitta Controlled Affiliates, subject to approval by Owner.  If Owner does not approve the deductible limits under one or more blanket policies, Manager shall obtain insurance coverage under policies with deductible limits approved by Owner.

**10.3**    Costs and Expenses.  Subject to Owner's approval, Manager may elect to maintain all or part of the insurance policies required to be maintained under Section 10.1 under a policy or policies covering one (1) or more of the risks referred to and covering one or more hotel/casino properties in addition to the Properties in which Owner maintains an ownership interest.  When insurance coverage is obtained by Manager by endorsement or equivalent means under its or its Affiliates' blanket insurance policies, the insurance charges shall be fairly allocated among all hotels/casino properties covered by such policies.  Any reserves, losses, costs, damages or expenses which are insured, or fall within deductible limits, together with any costs of administration of the insurance program allocated to the Properties by Manager or its Affiliates, shall be treated as a cost of insurance.

**10.4**    Policies and Endorsements.

(a)    All insurance policies (other than workers' compensation, fidelity bond and/or Manager's professional liability coverage which shall be in the name of Manager and name Owner, Owner's lenders and their appropriate Affiliates as an additional insured), provided under this Article X shall name Manager, Owner, and Owner's lenders and their appropriate Affiliates as additional insureds and shall name Owner's lenders as mortgagee and loss payee for

#4811-5012-8391

building, contents and business interruption insurance (but specifically excluding Manager's own business interruption insurance). The Party procuring such insurance shall deliver to the other Party certificates of insurance evidencing all policies so procured and, in the case of insurance about to expire, shall deliver certificates of insurance with respect to the renewal concurrent with the expiration of such policies. Any losses shall be paid to the insureds as their respective interests may appear. All policies of insurance provided for under this Article X shall have attached thereto an endorsement that such policy shall not be canceled or materially changed without at least thirty (30) days' prior written notice to each named insured. Manager shall provide Owner with evidence of renewal of each policy at least thirty (30) days prior to the expiration thereof.

(b)    Any insurance policy which does not name as an insured Owner, Manager and other parties entitled to be additional insureds or loss payees pursuant to the provisions of this Article X shall provide that the insurance company issuing said policy shall have no rights of subrogation against those parties specified above which are not so named on the policy.

**10.5**    <u>Responsibility for Claims</u>.

(a)    All debts and liabilities arising in the course of business of the Properties or otherwise in connection with the use, occupancy or operation thereof (including, without limitation, all such liabilities under or with respect to environmental laws, hazards or claims, and all losses relating to property damage, personal injury or death) during the Term are and shall be the obligation of Owner, and Manager shall not be liable or otherwise responsible for any such debts or liabilities by reason of its management, supervision and operation of the Properties during said Term, except and to the extent any such debt or liability arises because of Manager's Gross Negligence or Willful Misconduct. Manager shall defend, indemnify and hold harmless Owner and its Affiliates, and their respective agents, officers, employees, directors, members, trustees, partners, managers, employees and shareholders and the successors and assigns of each of the foregoing (collectively, the "Owner Indemnitees"), from and against any and all losses, costs, liabilities, expenses and claims (whether administrative or judicial), including, without limitation, reasonable attorneys' fees and expenses (all of the foregoing being referred to as "Losses"), arising from Manager's Gross Negligence or Willful Misconduct (excluding, however, any such loss, cost, liability, expense or claim covered by the insurance required to be maintained in accordance with this Agreement).

(b)    Except as to specific acts or omissions for which Manager has agreed to indemnify Owner in paragraph (a) above, Owner hereby agrees to defend, indemnify and hold harmless Manager and its Affiliates, and their respective agents, officers, employees, directors, members, trustees, partners, managers, employees and shareholders and the successors and assigns of each of the foregoing, from and against any Losses occurring out of or by reason of Manager's performance of its duties and obligations under this Agreement or otherwise arising in connection with the ownership, use, occupancy or operation of the Properties to the extent arising or occurring after the Commencement Date.

[Management Agreement - Opco]

(c)    Except as may be set forth in an subordination agreement with a holder of a Mortgage and as otherwise expressly set forth herein, no Person shall be deemed to be a third-party beneficiary of any term or provision of this Agreement (including, without limitation, the terms and provisions of this Section 10.5), and no Person shall have any rights of subrogation or similar rights under this Section 10.5, other than Affiliates of Owner and Manager, respectively, entitled to indemnification pursuant to the provisions of this Section 10.5.  All indemnification obligations under this Agreement and the provisions of this Section 10.5 shall survive the expiration and any termination of this Agreement.  Notwithstanding anything to the contrary herein, Owner and Manager acknowledge that Owner's and Manager's right, title and interest under this Agreement and all other agreements related hereto shall be subject to the valid first priority liens of the administrative agent under the Opco Loan Documents.

## ARTICLE XI
## TAXES

**11.1**    Payment of Taxes.  Except as otherwise agreed upon by the Parties, during the Term, all taxes, assessments and other fees and charges set forth in [clauses (vi) and (ix)] of the definition of Operating Costs shall be paid by Manager as Operating Costs in accordance with the Disbursement Priority Schedule set forth on Exhibit "A", before any fine, penalty or interest is added thereto or lien placed upon the Properties or this Agreement, unless contested by Owner pursuant to Section 2.11.  Owner shall promptly provide Manager with copies of any evidence of its contest of any tax or assessment and any proceedings related thereto.  Manager shall, within the earlier of thirty (30) days after payment or three (3) days following written demand by Owner, furnish Owner with copies of official tax bills and assessments and evidence of payment or contest and stay thereof.

## ARTICLE XII
## EMPLOYEES

**12.1**    Employees.

(a)    Other than as set forth in Section 12.2 below, all personnel employed at the Properties, including all General Managers of the Properties and the corporate staff of Owner engaged for the operation of the Properties (collectively, "Employees"), shall at all times be the employees of Owner, and all costs of every kind and nature arising out of the employer-employee relationship (including costs incurred in connection with governmental laws and regulations and insurance rules), shall be a direct expense of each Property or equitably allocated among all Properties, as applicable.  The salary (including any bonuses) and employee benefits (including costs of attendance at required Manager training and other meetings) of the Employees shall be an Operating Cost and reimbursed to Manager by Owner, whether the claim or amount for which such reimbursement is sought arises during or after the Term.  Subject to the Approved Annual Plan and Operating Budget and the limitations on Manager's authority as set forth in this Section 12.1(a) and Sections 2.1, 2.3, 12.1(b) and 12.2, Manager shall have absolute discretion to recruit, hire, promote, supervise, direct, train and terminate all Employees, to fix their compensation, fringe benefits, pension, retirement, bonus and employee benefits

[Management Agreement - Opco]

plans and collective bargaining agreements, and, generally, to establish and maintain all policies relating to employment. The general hiring policies and the discharge of employees at the Properties shall in all material respects comply with all "Equal Employment Opportunity" laws and regulations, and Manager shall take (or cause to be taken) all reasonably necessary actions to comply with all applicable Legal Requirements with respect to the recruiting, hiring, promoting, training, supervising and terminating Employees on behalf of Owner. Owner may consult, advise or communicate with Manager or the General Manager and or Executive Employees regarding Employees or problems related to Employees at any time, but Owner shall not interfere with or give orders or instructions to any Employees.

(b)    Manager shall be required to obtain Owner's prior written approval (which approval shall not be unreasonably withheld, conditioned or delayed) with respect to the hiring, terminating, and replacement of the General Manager for both the hotel and casino components of each Property, as applicable, and all other Executive Employees. Prior to appointing any General Manager or Executive Employee, Manager shall inform Owner of its recommended candidate for any prospective General Manager or Executive Employee position and provide Owner with a written summary of such individual's professional experience and qualifications and shall offer Owner the opportunity to interview the candidate at one of the Properties or another mutually acceptable location. In the event Owner fails to approve or disapprove any such candidate within fifteen (15) days after Owner's receipt of a resume or written summary of such individual's professional experience and qualifications and opportunity to interview such individual, Manager shall resubmit the written summary for the proposed candidate along with a notice stating in bold block letters that "THIS IS A SECOND SUBMITTAL, FAILURE TO RESPOND TO THIS NOTICE WITHIN FIVE (5) BUSINESS DAYS WILL RESULT IN THE DEEMED REJECTION BY OWNER OF THE PROPOSED EXECUTIVE EMPLOYEE CANDIDATE," provided that if Owner fails to approve or disapprove such candidate within such five (5) Business Days after Owner's receipt of the second submittal, Owner shall be deemed to have rejected such candidate; provided, however, Owner shall not reject and/or be deemed to reject more than three (3) consecutive candidates, which Manager, in its reasonable judgment, determines are qualified to fill such General Manager or Executive Employee position; and in the event of three (3) such rejections and/or deemed rejections, Manager shall have the right to hire a candidate of its choice that it believes is qualified to fill such General Manager or Executive Employee position (so long as the same is not one of the three (3) candidates rejected by Owner). Additionally, the salary, bonuses and other compensation and benefits of the General Manager and other Executive Employees shall be approved by Owner as part of the applicable Approved Annual Plan and Operating Budget.

**12.2**    <u>Labor Relations</u>. Manager shall keep Owner informed of all negotiations with labor unions representing Employees and not enter into any union contracts covering Employees without the prior approval of Owner (which approval may be granted or withheld by Owner in its sole and absolute discretion), unless required by law to do so (which contracts, in all cases, shall be furnished to Owner as soon as reasonably possible after receipt by Manager but in any event before the execution thereof). Manager shall not agree to, or execute, any agreement, side letter or collective bargaining agreement with a labor organization unless written approval has been received from Owner (which approval may be granted or withheld by Owner in its sole and

[Management Agreement - Opco]

#4811-5012-8391

absolute discretion). Subject to the foregoing, at Owner's request, Manager shall negotiate for the best interests of Owner with any labor unions representing the Employees, but any collective bargaining agreement or labor contract resulting therefrom shall be executed by Owner or its Affiliate as the employer of the Employees. In addition, it is understood that the Parties shall mutually agree on labor counsel for labor negotiations involving any one or more of the Properties or involving multi-employer bargaining arrangements applicable to the Properties and other hotel properties not owned or managed by Owner. If the Parties are unable to mutually agree on labor counsel, Owner shall have the right to select labor counsel. Prior to hiring any labor counsel, Owner shall inform Manager of its recommended counsel and provide Manager with a written summary of such counsel's professional experience and qualifications and shall offer Manager the opportunity to interview such counsel at one of the Properties or another mutually acceptable location. Manager shall forego its right to interview any such counsel if it or its authorized representative is unwilling or unable to participate in the interview within fifteen (15) Days following receipt of Owner's written offer. Manager shall consult with Owner in advance of, and during the course of, negotiations with any labor union. Manager shall use its commercially reasonable efforts to promptly notify Owner of any material defaults under collective bargaining agreements, proceedings involving material union disputes and other similar proceedings and otherwise provide Owner the same level of information and protection provided to Owner in the negotiation of new agreements as provided in the proviso of the first sentence of this Section 12.2.

**12.3** <u>Non-Solicitation</u>. Manager agrees that it shall not (and hereby agrees on behalf of the Fertitta Controlled Affiliates that none of them shall) directly or indirectly solicit or hire for employment any Employees at any time during the Term or within eighteen (18) months following the expiration or termination of this Agreement without Owner's prior written approval (which approval may be granted or withheld by Owner in its sole and absolute discretion) unless such Employee voluntarily resigns without any solicitation, promise or inducement from Manager, Fertitta Gaming and/or any of their respective Affiliates, or any Person for which Manager or its Affiliates operates any Other Manager Property on behalf of, and any individual acting directly for or on behalf of any of them; provided that any general solicitation that is not targeted specifically to Employees of Owner shall not constitute solicitation for purposes of this Section 12.3.

## ARTICLE XIII
## DAMAGE, CONDEMNATION AND FORCE MAJEURE

**13.1** <u>Casualty</u>.

(a)    If, during the Term, a Property incurs damage by fire, casualty or other cause and the cost of restoration at the Property is:

(1)    twenty percent (20%) or less of the replacement cost of such Property (excluding land), Owner shall with all reasonable diligence, repair or replace the damaged portion of such Property (including the Casino) to a complete architectural unit which can be operated as a hotel and casino of substantially the same type and class as existed before,

[Management Agreement - Opco]

provided that Owner shall have no obligation to incur costs of restoration in excess of the total proceeds of any insurance policies payable to Owner (excluding applicable insurance deductibles and any self-insurance maintained by, or on behalf of, Owner and further subject to any limitations imposed on Owner by any lender), to repair, rebuild or replace the Property; or

(2)    more than twenty percent (20%) of the replacement cost of such Property (excluding land), Owner shall have the option (but not the obligation), in its sole discretion, to commence and complete repairing, rebuilding or replacement of such Property (including the Casino) to substantially the same character as existed prior to the damage or destruction.  In the event Owner chooses to not undertake the repairs, rebuilding or replacements specified above, Manager or Owner may terminate this Agreement upon sixty (60) days' advance written notice to the other Party.

(b)    Actions as to casualty as set forth in this Section 13.1 shall be taken only in a manner that is consistent with the terms and conditions of the Loan Documents and in the event of any conflict between those terms and conditions and the provisions of this Agreement, the Parties hereby acknowledge and agree that the Loan Documents shall control to the extent that such Loan Documents do not materially increase the obligations of Manager and/or materially decrease the rights and remedies available to Manager under this Agreement.  No Termination Fee (or partial Termination Fee), penalty, fee or other consideration shall be owed by one Party to the other upon any termination of this Agreement pursuant to this Section 13.1.

**13.2**    <u>Condemnation</u>.

(a)    In the event all or substantially all of a Property shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or in the event a portion of a Property shall be so taken, but the result is that it is infeasible, in the reasonable opinion of Owner or Manager, to restore and continue to operate the remaining portion of the respective Property for the purposes and in accordance with the Operating Standards contemplated herein (as adjusted to the extent necessary to reflect any changes to the operation of such Property covered by such taking and restoration), then upon the date that Owner shall be required to surrender possession of the applicable Property (or portion thereof), this Agreement shall terminate with respect to such Property (or portion thereof) and neither Party shall have any further obligation to the other Party in connection therewith.  Notwithstanding the foregoing, in the event of any taking of a Property (or portion thereof) and the Parties elect not to terminate under the immediately preceding sentence, but (i) Owner's lender fails or refuses to make available to Owner sufficient proceeds of such eminent domain proceedings in order to permit Owner to make appropriate alterations, restorations or repairs to the remainder of the respective Property so that such Property would continue to be operable for the purposes herein contemplated; or (ii) Owner cannot, despite the exercise of diligent efforts to do so, substantially complete restoration within a timeframe that the Parties mutually agreed upon (in good faith) at the time of such taking, then Owner or Manager shall have the right to terminate this Agreement with respect to the applicable Property (or portion thereof) upon written notice to the other Party whereupon this Agreement shall terminate with respect to such Property (or portion thereof) upon the date that Owner shall

be required to surrender possession of the applicable Property (or portion thereof) to the condemning authority, and neither Party shall have any further obligation to the other Party with respect to the applicable Property (or portion thereof) surrendered.  Owner and Manager shall each have the right to initiate such proceedings as they deem advisable to recover any damages to which they may be entitled; provided, however, that except as expressly set forth in Section 13.2(b) below, any and all proceeds resulting from such eminent domain, condemnation, compulsory acquisition or similar proceeding shall belong solely to Owner at the time of award, excepting any portion of an award made expressly to Manager for loss of (A) any personal property owned by Manager or relocation costs and (B) lost Management Fees.

(b)    In the event a portion of a Property shall be taken by the events described in Section 13.2(a) or the entire Property is affected but on a temporary basis, and the result is not to make it infeasible, in the reasonable opinion of Owner, to continue to operate the Property for the purposes and in accordance with the Operating Standards contemplated herein, this Agreement shall not terminate with respect to such Property and Owner may elect to repair any damage to the Property or to alter or modify the Property and so much of any award for any such partial taking or condemnation as shall be necessary to render the Property a complete architectural unit which can be operated as a hotel and casino of substantially the same type and class as before shall be used for such purpose (and the balance of such award, if any, shall be paid to Owner).  If Owner elects not to repair any damage to the Property or to alter or modify the Property, or Owner cannot, despite the exercise of diligent efforts to do so, substantially complete restoration within a timeframe that the Parties mutually agreed upon (in good faith) at the time of such taking, then Manager shall have the right to terminate this Agreement with respect to such Property (or portion thereof) upon written notice to Owner whereupon this Agreement shall terminate with respect to such Property (or portion thereof) upon the date that Owner shall be required to surrender possession of the applicable Property (or portion thereof) to the condemning authority, and neither Party shall have any further obligation to the other Party with respect to the applicable Property (or portion thereof) surrendered.  Notwithstanding the foregoing, if Owner, by reason of a Force Majeure event (other than the condemnation), shall be unable to commence or substantially complete the repairs or restoration thereof, the time during which Owner shall be able to commence or substantially complete the repairs or restoration shall be extended (on a day-by-day basis) by the number of days of delay caused by such Force Majeure event.

(c)    If any Property is taken by the power of eminent domain, Owner and Manager shall each have the right, subject to applicable Legal Requirements, to initiate separate claims for any award and to cooperate with the other to enable the other to pursue any available administrative proceedings as they deem advisable to recover any damages to which they may be entitled; provided, however, that except as expressly set forth in Section 13.2(b) any and all awards and/or proceeds resulting from such eminent domain, condemnation, compulsory acquisition or similar proceeding shall belong solely to Owner at the time of award, excepting any portion of an award made expressly to Manager for loss of any personal property owned by Manager or relocation costs.

[Management Agreement - Opco]

(d)      Subject to Section 13.2(a), in the event all or any portion of the Casino at a Property shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or in the event a portion of the Casino shall be so taken, Owner shall restore the remaining portion of the Casino and Manager shall continue to operate the Casino within the Operating Standards contemplated herein (as adjusted to the extent necessary to reflect any changes to the operations of the applicable Casino caused by such taking and restoration); provided, that such restoration and operation is reasonably feasible within the opinion of Owner or Manager.

(e)      Actions as to condemnation as set forth in this Section 13.2 shall be taken only in a manner that is consistent with the terms and conditions of the Loan Documents and in the event of any conflict between those terms and conditions and the provisions of this Agreement, the Parties hereby acknowledge and agree that the Loan Documents shall control to the extent that such Loan Documents do not materially increase the obligations of Manager and/or materially decrease the rights and remedies available to Manager under this Agreement. For avoidance of doubt, no Termination Fee (or partial Termination Fee), penalty, fee or other consideration shall be owed to one Party by the other upon a termination of this Agreement by either Party with respect to any Property(ies) pursuant to and in accordance with this Section 13.2.

**13.3**      Emergencies; Force Majeure.

(a)      Except as otherwise provided in Sections 13.1 and 13.2 above, if at any time it becomes necessary in Manager's reasonable judgment to cease operations of all or any part of a single Property or the Properties to protect one or more of the Properties from material and adverse consequences and/or to protect the health, safety or welfare of the guests, invitees or Employees of the Properties, then Manager may close and cease operations of that portion of such Property(ies), reopening the same when Manager reasonably believes that such event has passed; provided, however, that Manager shall (i) immediately notify Owner of such event; and (ii) shall keep that portion of the Properties closed for the minimum reasonable period of time necessary to avoid such emergency and the adverse affects associated therewith.

(b)      With respect to any obligation to be performed by a Party during the Term, such Party shall in no event be liable for failure to perform such obligation when prevented by any Force Majeure.  The time within which such obligation shall be performed shall be extended for a period of time equivalent to the delay resulting from such Force Majeure cause.  As used herein, the term "Force Majeure" shall mean war, insurrection, strikes, walkouts, riots, floods, earthquakes, fires, casualties, acts of God, acts of the public enemy, epidemics, quarantine restrictions, freight embargoes, lack of transportation, unusually severe weather, inability to secure necessary labor, materials or tools, delays of any contractor, subcontractor or supplier outside the reasonable control of the affected Party; provided, however, that such event actually affects such Party's ability to perform and only for so long as it does affect such Party's ability to perform.

**13.4**      Manager's Compensation.

(a)     At any time during a closure or partial closure of a Property as a result of damage, condemnation or Force Majeure, Manager shall continue to be paid Management Fees that would have been paid to Manager during such period of closure based on the average monthly Management Fees paid during the period of time provided for under the BI Policy/Rider prior to such casualty had such damage or loss not occurred, provided that (i) Manager has paid the portion of the business interruption insurance costs attributed to the payment of interim Management Fees; and (ii) such business interruption proceeds are actually received by Owner, Manager or their respective Affiliates, as applicable, and all proceeds of such insurance shall be paid to Manager upon receipt by Owner notwithstanding the same is included in a lump sum or other amounts received by Owner in settlement of all such claims.  For avoidance of doubt, if Owner settles any insurance claim and there is no separate allocation made by the carrier with respect to business interruption and/or the lost Management Fees, so long as Manager has paid the portion of the business interruption insurance costs attributed to the payment of interim Management Fees, Owner shall promptly pay to Manager an amount equal to the lost Management Fees for the applicable period pursuant to and in accordance with the policy or rider actually obtained by Manager pursuant to Section 10.1.

(b)     Notwithstanding anything to the contrary contained herein, (i) Manager shall receive 100% of all proceeds of insurance from the BI Policy/Rider if a separate award is received from any insurance company following a casualty or condemnation of all or any part of the Properties, (ii) if such insurance company(ies) pays one amount in settlement of all claims arising under any insurance policy maintained hereunder in lieu of separate awards to such Parties, Manager shall receive its pro rata share of such amount based on the percentage that the Management Fees bear to the aggregate amount of the claim made by Owner and Manager and (iii) Manager shall have the sole right to negotiate, settle or adjust any claims arising from or relating to the BI Policy/Rider.

**13.5**     Manager's Reinstatement.  If this Agreement is terminated with respect to any Property in accordance with Section 13.1, 13.2 or 13.3 and at any time during the twenty-four (24) month period following such termination, Owner or any of its Affiliates elects to repair, rebuild or replace such Property to a complete architectural unit which can be operated as a hotel and casino of substantially the same type and class as existed before, Owner shall promptly give notice to Manager in writing of such determination or commencement, and, at Manager's election (which shall be exercised by written notice given to Owner within sixty (60) days of receipt by Manager of the written notice given by Owner or, if no such notice is given by Owner, Manager's actual knowledge of such commencement), this Agreement shall be reinstated with respect to such Property (with only such amendments as are required due to changes in the type, scope or design of the Property).  This Section 13.5 shall survive the termination of this Agreement.

## ARTICLE XIV
## TERMINATION

**14.1**     Termination Rights of Owner.  In addition to Owner's rights to terminate this Agreement either in its entirety or in connection with a particular Property or Properties as set

forth in Sections 3.2, 13.1(b), 13.2(a) and 15.2, Owner shall have the right to terminate this Agreement in its entirety if any of the following occur:

(a)    The occurrence and continuance of a Material Loan Default on the part of Owner that remains uncured following the expiration of any applicable cure period under any Mortgage encumbering the Properties or the Loan Documents related thereto;

(b)    (i) Owner or its direct or indirect Subsidiaries, other than the Owner Unrelated Subsidiaries, become Bankrupt; or (ii) Manager, Fertitta Gaming or its Subsidiaries, other than the Manager Unrelated Subsidiaries, become Bankrupt; or (iii) any Owner-Related Affiliates become Bankrupt;

(c)    The institution by (i) Owner or its direct or indirect Subsidiaries, other than the Owner Unrelated Subsidiaries; (ii) Manager, Fertitta Gaming or its Subsidiaries, other than the Manager Unrelated Subsidiaries; or (iii) any Owner-Related Affiliates, of proceedings of any nature under any law or statute of any jurisdiction as now existing or hereafter amended or becoming effective, for the relief of debtors wherein such Person is seeking relief as debtor on account of its insolvency, which proceedings are not discharged or dismissed within a period of sixty (60) days after the institution thereof;

(d)    (i) The denial, revocation or suspension of (A) the Nevada Gaming License of Manager or Fertitta Gaming; (B) the Nevada Gaming License of Owner or any Property Owner which is caused by any action or inaction of Manager, Fertitta Gaming or their respective Affiliates; (C) any Material Nevada Governmental Approval of Manager or Fertitta Gaming; or (D) any Material Nevada Governmental Approval of Owner or any Property Owner which is caused by any action or inaction of Manager, Fertitta Gaming or their respective Affiliates; or (ii) the commencement of any action by the applicable Nevada regulatory authority seeking such a revocation or suspension that, if adversely determined, would be more likely than not to result in the denial, revocation or suspension of (w) the Nevada Gaming License of Manager or Fertitta Gaming; (x) the Nevada Gaming License of Owner or any Property Owner which is caused by any action or inaction of Manager, Fertitta Gaming or their respective Affiliates; (y) any Material Nevada Governmental Approval of Manager or Fertitta Gaming; or (z) any Material Nevada Governmental Approval of Owner or any Property Owner which is caused by any action or inaction of Manager, Fertitta Gaming or their respective Affiliates; provided, however, Manager shall have the lesser of (1) one hundred eighty (180) days from the commencement of such action, (2) such time period as may be granted by the applicable Gaming Authority and (3) such time period required by Owner (as reasonably determined based upon the advice of outside counsel) to avoid the denial, revocation or suspension of a Nevada Gaming License or Material Nevada Governmental Approval held by Owner, as applicable, to cure any event giving rise to the commencement of such action described in clause (ii) hereof.

(e)    Manager shall have failed to remedy a Material Default on the part of Manager within thirty (30) days after notice thereof given by Owner; provided, however, if (i) the Material Default is not susceptible of cure within such thirty (30) day period; (ii) the default cannot be cured solely by the payment of a sum of money; and (iii) the default would not expose

Owner to an imminent and material risk of criminal liability or of material damage to its business reputation, the thirty (30) day cure period shall be extended for up to an additional ninety (90) days (for an aggregate cure period of up to one hundred twenty (120) days if Manager commences to cure the default within such thirty (30) day period and thereafter proceeds with reasonable diligence to complete such cure);

(f)      Manager engages in an act or omission that constitutes Manager's Gross Negligence or Willful Misconduct and such action or omission has a material adverse effect on the Properties or Owner;

(g)      If, at any time, Manager and Fertitta Gaming is no longer controlled by Frank J. Fertitta III and/or Lorenzo J. Fertitta;

(h)      The Fertitta Manager Control Requirements are otherwise no longer satisfied (including, without limitation, as the result of the death or disability of both Frank J. Fertitta III and Lorenzo J. Fertitta);

(i)      If, at any time prior to the consummation of an initial public offering of FCP Propco, LLC, (i) Frank J. Fertitta III, Lorenzo J. Fertitta and the Fertitta Family Entities collectively beneficially own less than fifty-one percent (51%) of the split-adjusted membership interests in FCP Propco, LLC held by Frank J. Fertitta III, Lorenzo J. Fertitta and/or the Fertitta Family Entities on the Commencement Date (after giving effect to (A) the Plan and (B) any Transfers to Colony Capital, LLC and/or its permitted designees occurring on or after the Commencement Date resulting from the exercise of options held by Colony Capital, LLC as of the Commencement Date), on a fully diluted basis; and (ii) any person other than Frank J. Fertitta III, Lorenzo J. Fertitta and the Fertitta Family Entities beneficially owns common equity interests in the Owner with a greater percentage interest than is represented by the common equity interests beneficially owned by Frank J. Fertitta III, Lorenzo J. Fertitta and the Fertitta Family Entities collectively;

(j)      If [Fertitta Gaming or Manager] breaches the material terms of the Non-Compete Agreements and such breach continues beyond all applicable grace periods set forth therein;

(k)      Manager fails to disburse any amounts, subject to the restrictions set forth in the Loan Documents, as provided for in this Agreement within ten (10) Business Days following the date on which written notice of such failure has been delivered by Manager by Owner; or

(l)      If Fertitta Management Holdco commits a monetary default pursuant to the terms and conditions of the Guaranty and/or Fertitta Management Holdco breaches any of the material representations and warranties set forth therein and such monetary default or breach continues beyond all applicable grace periods set forth therein.

**14.2**    Termination Rights of Manager.  In addition to Manager's rights to terminate this Agreement either in its entirety or in connection with a particular Property or Properties set forth

[Management Agreement - Opco]

in this Agreement, including under Sections 13.1(b) and 13.2(a), Manager shall have the right to terminate this Agreement in its entirety without penalty upon not fewer than thirty (30) days' prior written notice (subject to Manager's obligation to provide the Transition Services) if any of the following occur:

(a)     Owner fails to make any payment of Management Fees or Reimbursable Expenses or other amounts due and owing to Manager (unless such payment shall be the subject of a bona fide dispute) within ten (10) Business Days following written notice thereof given by Manager;

(b)     The institution by (i) Owner or its direct or indirect Subsidiaries, other than the Owner Immaterial Subsidiaries; or (ii) the Owner-Related Affiliates, of proceedings of any nature under any law or statute of any jurisdiction as now existing or hereafter amended or becoming effective, for the relief of debtors wherein such Person is seeking relief as debtor on account of its insolvency, which proceedings are not discharged or dismissed within a period of sixty (60) days after the institution thereof;

(c)     The denial, revocation or suspension of Owner's Nevada Gaming License, or any other material licenses of Owner related to the Properties, the denial, revocation or suspension of which would have a material adverse affect on Manager or the Properties except to the extent caused by any action or inaction of Manager, Fertitta Gaming or their respective Affiliates; or

(d)     Owner shall have failed to remedy a Material Default on the part of Owner within thirty (30) days after written notice thereof given by Manager; provided, however, if (i) the Material Default is not susceptible of cure within such thirty (30) day period; (ii) the default cannot be cured solely by the payment of a sum of money; and (iii) the default would not expose Manager to an imminent and material risk of criminal liability or of material damage to its business reputation, the thirty (30) day cure period shall be extended for up to an additional ninety (90) days (for an aggregate cure period of up to one hundred twenty (120) days if Owner commences to cure the default within such thirty (30) day period and thereafter proceeds with reasonable diligence to complete such cure).

**14.3**     <u>Termination Notice</u>.  Notwithstanding anything to the contrary contained herein, if either Owner or Manager elects to terminate this Agreement (as applicable, the "Terminating Party") in accordance with its rights under Section 14.1 or Section 14.2 above, respectively, it shall give the other Party notice of its desire to terminate this Agreement (a "Termination Notice") within ninety (90) days after such Terminating Party has actual knowledge of the events giving rise to the right to terminate this Agreement.  If the Terminating Party does not give such written notice to the other Party within such ninety (90) day period, then such Terminating Party shall not have a right to terminate this Agreement based on the grounds for which it had such actual knowledge; provided, however, that nothing herein shall prevent the Terminating Party from terminating this Agreement if it subsequently has actual knowledge of further ground(s) for termination; provided, further, that in the event that Owner fails to deliver written notice to Manager within ninety (90) days after Owner has actual knowledge of the events giving rise to

the right of Owner to terminate this Agreement pursuant to Section 14.1(g) or (i), Owner hereby waives its right to then terminate this Agreement under Section 14.1(g) or Section 14.1(i), as applicable, unless and until the ownership interests of Frank J. Fertitta III, Lorenzo J. Fertitta and/or the Fertitta Family Entities in Manager or Owner, as applicable, are further diluted by five percent (5%) or more of then current ownership interests held by Frank J. Fertitta III, Lorenzo J. Fertitta and/or the Fertitta Family Entities (for example, if this Agreement is not terminated for any reason following the dilution of the ownership interests of Frank J. Fertitta III, Lorenzo J. Fertitta and/or the Fertitta Family Entities from fifty-one percent (51%) to forty-nine percent (49%), Owner's termination would again be triggered if the ownership interests of Frank J. Fertitta III, Lorenzo J. Fertitta and/or the Fertitta Family Entities transferred two and forty-five tenths percent (2.45%) or more their collective ownership interests [e.g., five percent (5%) of the forty-nine percent (49%) ownership interest then held]).  In connection therewith, if Sections 14.1(g) and/or (i) are breached, regardless of whether this Agreement is terminated as a result thereof, Manager hereby covenants and agrees to provide Owner with immediate written notice of any and all direct or indirect transfers of ownership interests in Manager and/or Owner made by Manager or any Affiliate.

(b)    Owner's right to terminate this Agreement under Sections 3.2, 13.1(a)(ii), 13.2(a), and Sections 14.1(b), (c), (f), (g), (h) or (i) shall be Owner's sole remedy and shall not be subject to any claim by Owner for damages, other penalty or liability of Owner or the obligation to pay any Termination Fee (or partial Termination Fee) in connection therewith other than the payment of all unpaid amounts in accordance with Section 14.4.

(c)    Manager's right to terminate this Agreement under Sections 13.1(a)(ii) and 13.2(a) shall be Manager's sole remedy and shall not be subject to any claim by Manager for damages, other penalty or liability of Manager in connection therewith other than the payment of all unpaid amounts in accordance with Section 14.4.

(d)    Notwithstanding anything to the contrary set forth in this Agreement, (i) in the case of Owner, if Manager breaches Section 14.1(a), (d), (e), (f), (k) or (l); and (ii) in the case of Manager, if Owner breaches Sections 14.2(a) through (c) (each an "Event of Default"), neither the right of termination nor the right to sue for damages nor any other remedy available to Owner or Manager, as applicable, hereunder shall be exclusive of any other remedy given hereunder or now or hereafter existing at law and/or in equity and (A) with respect to Owner, the termination of this Agreement pursuant to Section 14.1(b), (c), (f), (g), (h) or (i), the termination of this Agreement shall in no event act to limit or waive any claims Owner may have against Manager for an Event of Default which occurs simultaneously therewith or directly results in the termination of this Agreement pursuant to Section 14.1(b), (c), (f), (g), (h) or (i).  In avoidance of doubt, in the event that either Party commits an Event of Default and, as a result, a claim is made by a third party against the other Party, the Party against whom such claim is made may include in its damage claim against the Party that committed such breach or default any and all attorneys' and other fees and costs and all amounts paid to such third party and other damages suffered thereby.  Except as expressly stated otherwise, this Agreement shall terminate upon the date specified in the applicable Termination Notice, which date shall not be less than thirty (30) days (or such shorter time as may be required to avoid an adverse impact on the Terminating Party

(e.g., fraud, misappropriation, etc.) and/or any Nevada Gaming Licenses held by such Terminating Party) nor more than one hundred twenty (120) days after such Termination Notice is delivered.

(e)    No dispute regarding either Party's right to terminate this Agreement under this Article XIV shall be submitted to the dispute resolution process pursuant to Section 17.16 hereof.

**14.4**    Events on Termination.  If this Agreement is terminated, expired, or is deemed to have been terminated pursuant to the provisions hereof, either in its entirety or with respect to a Property, the following provisions shall apply with respect to all the Properties or to a specific Property, as applicable:

(a)    Manager shall render a final accounting within sixty (60) days after the end of the month of termination, regardless of the reason for such termination, which final accounting shall set forth any amounts due and payable to either Party hereunder.  If Owner objects to all or any matter set forth in the final accounting (i) Owner shall pay the amount which is not in dispute Owner and the remaining disputed amount shall be placed by Owner into escrow; and (ii) the Parties shall work in good faith to resolve such dispute, failing which either Party may submit the matter to arbitration in accordance with Section 17.16 for the determination of such disputed amounts.  Upon the resolution of such dispute, the proceeds in escrow shall be paid to the prevailing party.  Manager shall again render a final accounting in accordance with this Section 14.4(a) within sixty (60) days of the end of any Transition Period that may occur in accordance with this Agreement (which, for avoidance of doubt, may be disputed by Owner as provided in the immediately preceding sentence);

(b)    all amounts due and owing between the Parties under this Agreement accrued to the Termination shall become due and payable (including any accrued, unfunded or underfunded liabilities under any pension plans, disability, worker compensation or other benefit plans benefiting the Employees and any unpaid Management Fees and other charges and reimbursements due Manager hereunder) within ten (10) Business Days following receipt of the final accounting described in Section 14.4(a);

(c)    Manager shall transfer to Owner all of Owner's books and records respecting the Properties, or specific Property, respectively, in the custody and control of Manager, so as to ensure the orderly continuance of the operation of the Properties, or specific Property, respectively, but such books and records shall thereafter be available to Manager as reasonably necessary to perform the Transition Services, as applicable, and otherwise at all reasonable times, upon reasonable notice, for inspection, audit, examination and transcription for a period of three (3) years;

(d)    Manager shall, to the extent permitted by applicable laws, and at the end of any Transition Period, assign and transfer to Owner Manager's right, title and interest (if any) in and to all liquor, restaurant and other licenses and permits (if any) used by Manager in the operation of the Properties, or specific Property, respectively, and shall cooperate with Owner, at the sole cost of Owner, in obtaining all consents necessary therefor;

[Management Agreement - Opco]

(e)     Manager shall peaceably and quietly surrender and deliver up to Owner possession of the Properties, or specific Property, respectively, in accordance with its obligations contained herein, with the specific intent to effectuate a smooth transition of management of the Properties, or specific Property, respectively, to Owner or a third party so as to minimize any potential disturbance of customers and guests, and in connection with the foregoing, if requested by Owner in writing, Manager shall provide the Transition Services for the duration of the Transition Period;

(f)     upon the Termination of this Agreement in connection with all the Properties and upon payment to Manager of all amounts due and owing to Manager hereunder, all remaining amounts in the Properties' accounts shall be transferred to Owner at the end of any Transition Period; and

(g)     Manager shall provide the holder of any Mortgage with assistance similar to the obligations set forth in this Section 14.4 to the extent requested by such holder (including, without limitation, the Transition Services), provided that such assistance shall not materially increase Manager's obligations under this Section 14.4 or Manager's potential liability as result of the actions contemplated under this Section 14.4.

This Section 14.4 shall survive the expiration or Termination of this Agreement.

## ARTICLE XV
## MORTGAGES, SALE AND ASSIGNMENT;
## OWNERSHIP REQUIREMENTS OF MANAGER

**15.1**     <u>Mortgages</u>.  Owner shall have the right to grant, either in connection with original financing and/or renewals, replacements, refinancings and extensions thereof, a Mortgage encumbering all of the assets that comprise the Properties (any part thereof or any interest therein) and, in furtherance thereof, to assign to any mortgagee (as collateral security for any loan secured by a Mortgage) and/or all of Owner's right, title, and interest in and to this Agreement.  Manager's interests hereunder (and all Management Fees) shall be subordinate to any Mortgage placed on the Properties by Owner pursuant to any Loan Documents and to any and all advances made or to be made thereunder, to the interest thereon, all renewals, replacements, refinancings and extensions thereof.  The provisions of this Section 15.1 shall be self-operative and shall not require the execution of any further documentation; provided, however, Manager shall upon the request of such holder of such Mortgage, subordinate its rights under this Agreement, including its rights to be paid the Management Fees and its rights under Sections 13.1 and 13.2 with respect to a casualty or condemnation of the Properties, respectively, to such Mortgage, and shall deliver a subordination and attornment agreement to each holder of a Mortgage satisfactory to such holder of a Mortgage.  Subject to the terms and provisions hereof, Manager shall use commercially reasonable efforts to cooperate with Owner and any current or prospective holder of a Mortgage, and shall execute and deliver such commercially reasonable documents as may be required by any such holder of a Mortgage, including, without limitation, a cash management agreement and a collateral assignment of Owner's rights under this Agreement and under all contracts and permits relating to the Properties to the holder of a Mortgage.  In

[Management Agreement - Opco]

addition, such subordination and attornment agreement shall provide such holder of such Mortgage with a separate right to terminate this Agreement, without fee or penalty, upon the occurrence of (i) a foreclosure or deed-in-lieu of foreclosure of the Properties; (ii) in the event of Owner becomes Bankrupt; and/or (iii) pursuant to any right Owner would have otherwise had under the terms of this Agreement.  Owner shall pay the reasonable out-of-pocket costs and expenses of Manager and Manager's counsel pertaining to the negotiation, execution and delivery of any agreements to be entered into by Manager in connection with any Mortgage.

      **15.2**    <u>Sale Termination Rights</u>.  In addition to the termination rights contained in Article XIV, upon any voluntary sale by Owner to a bona fide third-party purchaser of (i) all or any one or more specific Properties, respectively, or any substantial interest therein; or (ii) Owner, whether by the sale of Owner's assets or the direct or interest equity in Owner (as applicable, a "Third Party Sale"), Owner shall have the right to terminate this Agreement with respect to any such Properties that are subject to the Third Party Sale upon thirty (30) days' written notice to Manager.  In connection with any such termination of this Agreement by Owner pursuant to a Third Party Sale of one (1) or more but fewer than all eleven (11) of the Properties or a sale of Owner's assets or the equity in Owner (but expressly excluding any Third Party Sale of less than all eleven (11) Properties), as a condition to the effectiveness thereof, Owner shall pay to Manager the Termination Fee calculated in accordance with the formula set forth on Exhibit "A" (provided that, for avoidance of doubt, no such Termination Fee shall be payable if, in connection with such Third Party Sale, this Agreement is not terminated and the successor to Owner assumes this Agreement or the successor to Owner executes a new management agreement with Manager).  In connection with any such termination pursuant to a Third Party Sale of less than all eleven (11) Properties, Owner shall pay to Manager a portion of the Termination Fee calculated in accordance with the formula set forth on Exhibit "A", but accounting for only those TTMF attributable to the Property(ies) sold pursuant to such Third Party Sale (provided that, for avoidance of doubt, no such Termination Fee shall be payable if, in connection with such Third Party Sale, this Agreement is not terminated with respect to one or more the Properties and the successor to Owner assumes this Agreement or the successor to Owner executes a new management agreement with Manager with respect to the Property or Properties which are the subject of such Third Party Sale).  If for any reason the Third Party Sale is not consummated with respect to one or more of the Properties, Owner shall be deemed to have revoked its election to terminate under this Section 15.2 and shall no longer be obligated to pay the Termination Fee (or any portion thereof) in connection with the failed Third Party Sale and any such revocation shall in no event constitute a waiver of, or otherwise impact, Owner's future right to terminate this Agreement upon the occurrence of a Third Party Sale under the provisions of this Section 15.2.  Notwithstanding the foregoing or anything to the contrary set forth herein, if at any time prior to the date which is twelve (12) calendar months following the effective date of termination of this Agreement pursuant to this Section 15.2, an operation, management, license, franchise or other agreement of any kind for any such Properties that are subject to the Third Party Sale is entered into under which Manager or a Fertitta Controlled Affiliate or their respective successors or assigns (acting in its sole and absolute discretion) realizes any economic benefit therefrom (the "New Fertitta Agreement"), such party shall promptly notify Owner in writing and in any event shall remit to Owner within ten (10) days after entering such New Fertitta Agreement the Termination Fee actually paid to Manager with

[Management Agreement - Opco]

respect to such Property as calculated in accordance with Exhibit "A". Any successor owner's decision to retain Manager and the proposed terms of any New Fertitta Agreement shall be at such successor owner's sole and absolute discretion and Manager's decision to accept such New Fertitta Agreement and the terms thereof shall be at Manager's sole discretion.

**15.3**   Assignment by Owner.  Subject to the terms of Section 15.2, Owner, without the consent of Manager, shall have the right to transfer its interests in this Agreement or any ownership interests in Owner to any Party whatsoever as determined by Owner in its sole and absolute discretion.

**15.4**   Assignment by Manager.  Manager shall not assign or in any manner sell, Transfer, encumber or pledge as security for any indebtedness (or other obligation) any of its rights and interests as Manager hereunder to any Person whatsoever without the prior written consent of Owner (which approval may be granted or withheld in Owner's sole and absolute discretion), provided that Manager may make any direct or indirect Transfer of ownership or other beneficial interests in Manager so long as such Transfer does not constitute a breach of the Fertitta Manager Control Requirements.  Notwithstanding the generality of the foregoing:

(a)   Manager may request in connection with an organizational restructuring of Manager that Owner consent to an assignment and assumption of this Agreement by the successor to Manager's business, and Owner's consent shall not be unreasonably withheld; provided that (i) assignment and assumption documentation reasonably satisfactory to Owner is completed by Manager and the successor to Manager's business; (ii) such successor maintains a Nevada Gaming License and the other material licenses of Manager set forth herein that are required for the operation of the Properties; (iii) the Fertitta Manager Control Requirements shall be and continue to be satisfied by the successor to Manager's business; and (iv) Fertitta Management Holdco shall remain liable under this Agreement and the Guaranty; and

(b)   Manager shall have no right to encumber and pledge, as security for any loan or other indebtedness (or obligation) incurred by Manager and/or its Affiliates, Manager's interest in the Management Fees and any other proceeds of Manager and its Affiliates under this Agreement without the prior written approval of Owner (which approval may be granted or withheld in Owner's sole and absolute discretion); provided, however, Manager shall have the right to collaterally assign up to fifty percent (50%) of its interest in the Management Fees without Owner's approval.

**15.5**   Binding Effect.  Subject to the restrictions on assignment set forth elsewhere in this Agreement, this Agreement shall be binding upon and inure to the benefit of Owner and its successors and assigns, and shall be binding upon and inure to the benefit of Manager and its successors and assigns.

**15.6**   Public Offering.  Neither any Transfer of publicly traded stock nor any public offering of equity ownership interests (whether partnership interest, corporate stock, shares or otherwise) in Owner or by its parent company, or other owner of Owner, or entity that itself or through its ownership of legal or beneficial interests in one or more other entities holds legal or

beneficial interests or voting power in such an owner shall be deemed to be a Transfer under this Article XV.

**15.7** <u>Manager Cooperation</u>. In addition to the Transition Services, Manager shall reasonably cooperate with Owner and any prospective purchaser, lessee, holder of a Mortgage or other lender in connection with any proposed Transfer, lease or financing of or relating to the Properties but shall not be required to release any information that is confidential or proprietary to Manager or its Affiliates unless such prospective purchaser, lessee or mortgagee or other lender executes a commercially reasonable confidentiality agreement upon terms and conditions acceptable to each party thereto. Owner shall reimburse Manager for any associated out of pocket expenses (including reasonable attorneys' fees) actually and reasonably incurred by Manager in connection therewith.

# ARTICLE XVI
# REPRESENTATIONS AND WARRANTIES

**16.1** <u>Representations and Warranties</u>. As of the Effective Date, Owner and Manager, hereby make each of the representations and warranties applicable to Owner or Manager as set forth in this Article XVI, and such representations and warranties shall survive the execution of this Agreement, and be for the benefit of Owner and Manager:

(a) <u>Due Incorporation or Formation; Authorization of Agreement</u>. Such Person is a limited liability company, it is duly organized or duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, limited liability company, or partnership power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such Person is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Person has the limited liability company power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary limited liability company action. This Agreement constitutes the legal, valid, and binding obligation of such Person enforceable in accordance with its respective terms (except as enforceability may be limited by applicable bankruptcy, insolvency or other similar laws affecting creditor's rights generally, and except that the availability of equitable remedies is subject to judicial discretion).

(b) <u>No Conflict With Restrictions; No Default</u>. Neither the execution, delivery, and performance of this Agreement nor the consummation by such Person of the transactions contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Person; (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of organization or operating agreement of such Person or of any

-83-                    [Management Agreement - Opco]

material agreement or instrument to which such Person is a party or by which such Person is or may be bound or to which any of its material properties or assets is subject; (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, Mortgage, lease agreement, or instrument to which such Person is a party or by which such Person is or may be bound; or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Person.

(c)    <u>Governmental Authorizations</u>.  Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any Governmental Authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance, and performance by such Person under this Agreement or the consummation by such Person of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date, except as set forth in this Agreement.

(d)    <u>No Broker</u>.  Such Person has not sought the services of a broker or agent in this transaction, and neither has employed nor authorized any persons to act in that capacity.

(e)    <u>Litigation</u>.  Except for the pending bankruptcy cases of Station Casinos, Inc., and its affiliated debtors, to such Person's actual knowledge, there is no litigation or proceeding pending or threatened against such Person or any Affiliate of such Person that could adversely affect the validity of this Agreement or the ability of such Person to comply with the obligations under this Agreement.

(f)    <u>Specially Designated National or Blocked Person</u>.  To such Person's actual knowledge: (i) neither it (including its directors and officers), nor any of its Affiliates, subsidiaries, respective shareholders, beneficial owners of non publicly traded shareholders or, to such Person's knowledge, the funding sources for any of the foregoing is a Specially Designated National or Blocked Person; (ii) neither it nor any of its Affiliates, subsidiaries, respective shareholders, or beneficial owners of non publicly traded shareholders is directly or indirectly owned or controlled by the government of any country that is subject to an embargo or economic or trade sanctions by the United States government; (iii) neither it nor any of its Affiliates, subsidiaries, respective shareholders, or beneficial owners of non publicly traded shareholders is acting on behalf of a government of any country that is subject to such an embargo; and (iv) neither it nor any of its Affiliates, subsidiaries, respective shareholders, or beneficial owners of non publicly traded shareholders is involved in business arrangements or otherwise engaged in transactions with countries subject to economic or trade sanctions imposed by the United States government.  From and after the Effective Date, such Person shall notify the other Party in writing immediately upon the occurrence of any event which would render the foregoing representations and warranties of this Section 16.1(f) incorrect; provided that, notwithstanding such Person's obligations herein, it's inadvertent or unintentional failure to disclose such information shall not be a breach of this Section 16.1(f).

[Management Agreement - Opco]

#4811-5012-8391

# ARTICLE XVII
# MISCELLANEOUS

**17.1** <u>Right to Make Agreement</u>.  Each Party warrants, with respect to itself, that neither the execution of this Agreement nor the performance of the obligations contemplated hereby shall violate any provision of law or any judgment, writ, injunction, order or decree of any court or governmental authority having jurisdiction over it; result in or constitute a breach or default under any indenture, contract, other commitment or restriction to which it is a party or by which it is bound; or require any consent, vote or approval which has not been obtained.  Each Party covenants that it has and will continue to have throughout the Term and any extensions thereof, the full right to enter into this Agreement and perform its obligations hereunder.

**17.2** <u>Actions by Manager; Owner Representative</u>.

(a)    Where by a provision of this Agreement an approval, consent or agreement of a Party (individually or collectively, an "Approval") is required, the request for such Approval shall be in writing, shall be accompanied by reasonable detail if the circumstances require and shall refer to the Section pursuant to which such approval is requested, and, unless a different time period in which to respond is expressly provided, (i) the Party whose Approval is requested shall, within five (5) calendar days after receipt of a request for approval, notify the requesting Party in writing either that it grants or that it withholds its Approval, setting forth in reasonable detail its reasons for withholding its approval; (ii) if the notification referred to in clause (i) is not given within the applicable period of time, the Party whose Approval is requested shall be deemed to have disapproved the proposed request as submitted; and (iii) a dispute as to whether or not an Approval has been unreasonably withheld shall be resolved by arbitration as provided in Section 17.16.

(b)    [Manager has received a copy of the limited liability company agreement and other governing documents of Owner (the "Equity Holders Agreement") and hereby acknowledges that the same contain provisions requiring the approval of applicable thresholds of equity holders of Owner for certain actions specified therein (each a "Material Item").  Without limiting any restrictions on Manager's authority set forth herein, Manager agrees that it will not take any action pursuant to this Agreement which is the subject of a Material Item unless it receives evidence in writing from Owner that the appropriate approvals of the equity holders of Owner have been obtained.]

(c)    Notwithstanding Section 17.2(a), all of the rights and remedies of Owner under this Agreement, including, without limitation, the right of Owner to consent to certain matters as described more fully herein, shall be exercised on behalf of Owner by a representative(s) of Owner as appointed, from time to time, by Owner (the "Owner Representative") and designated to Manager in writing by Owner.  Simultaneously with the execution of this Agreement, Owner shall notify Manager in writing of the identity of the initial Owner Representative.  The Owner Representative shall be responsible for the internal audit, monitoring and administration of this Agreement on behalf of Owner, including, without limitation, monitoring of Corporate Overhead and Expenses and the corresponding allocation

[Management Agreement - Opco]

procedures set forth on Exhibit "A". In connection therewith, Manager shall use its commercially reasonable efforts to assist and cooperate with the Owner Representative and provide the Owner Representative with reasonable access to (i) the Properties; (ii) the executive officers of Manager; and (iii) the books and records and any other information or data pertaining to the Properties in accordance with Section 9.2 as may be reasonably requested by the Owner Representative. Manager may conclusively rely on, and shall be protected from acting or refraining from acting on, any instruction or direction of the Owner's Representative. In the event that Manager disagrees with any determination made by the Owner's Representative, such matter shall be submitted to the board of directors of Owner [and determined in accordance with the provisions of the Equity Holders Agreement].

**17.3** <u>No Lease, Partnership, Joint Venture or Agency Relationship</u>. Manager and Owner are independent contractors. Nothing contained in this Agreement shall be construed to be or create a lease, partnership, agency or joint venture between Owner, its successors or assigns, on the one part, and Manager, its successors and assigns, on the other part. Notwithstanding the terms and conditions of this Agreement, nothing in this Agreement, nor the actions of the Parties pursuant to the provisions of this Agreement, shall, directly or indirectly, expressly or impliedly, create, establish or impose any principal agent relationship between Owner, its successors or assigns, as principal, and Manager, its successors or assigns, as agent, nor create, establish or impose any fiduciary duty under the laws governing principal agent relationships or otherwise; provided, however, that Manager shall be a limited agent for purposes of executing documents on Owner's behalf to the extent expressly permitted under this Agreement.

**17.4** <u>Applicable Law</u>. This Agreement shall be construed and interpreted under and shall be governed by the laws of the State of New York without regard to such jurisdiction's principals of conflicts of law.

**17.5** <u>Construction of Agreement</u>. The Article and Section headings used in this Agreement are for reference purposes only, and are not intended to be used in construing this Agreement. The Exhibits and Schedules attached hereto are incorporated herein by reference and expressly made a part of this Agreement for all purposes. References to any Exhibit or Schedule in this Agreement shall be deemed to include this reference and incorporation. As used in this Agreement, the masculine gender shall include the feminine and neuter, and singular number shall include the plural, and vice versa. Each Party hereto acknowledges, represents and warrants that (i) each Party hereto is of equal bargaining strength; (ii) each such Party has actively participated in the drafting, preparation and negotiation of this Agreement; (iii) each such Party hereto and such Party's independent counsel have reviewed this Agreement; and (iv) any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not apply in the interpretation of this Agreement, any portion hereof, any amendments hereto, or any Exhibits or Schedules attached hereto. Unless otherwise specified in this Agreement, references to any number of days set forth in this Agreement shall refer to calendar days.

[Management Agreement - Opco]

#4811-5012-8391

**17.6**    Notices.    All notices or other communications required or permitted hereunder shall be in writing and shall be delivered or sent, as the case may be, by any of the following methods:    (i) personal delivery; (ii) overnight commercial carrier or delivery service; (iii) registered or certified mail (with postage prepaid and return receipt requested); (iv) facsimile; or (v) e-mail.  Any such notice or other communication shall be deemed received and effective upon the earlier of (A) if personally delivered, the date of delivery to the address of the Party to receive such notice; (B) if delivered by overnight commercial carrier or delivery service, one (1) Business day following the receipt of such communication by such carrier or service from the sender, as shown on the sender's delivery invoice from such carrier or service, as the case may be; (C) if mailed, three (3) Business Days after being deposited in the United States mail, postage prepaid, return receipt requested; (D)  if given by facsimile, when sent; or (E) if given by e-mail, when sent.  Any notice or other communication sent by facsimile or e-mail must be confirmed within forty-eight (48) hours by letter mailed or delivered in accordance with the foregoing.  Any reference herein to the date of receipt, delivery or giving, as the case may be, of any notice or other communication shall refer to the date such communication becomes effective under the terms of this Section 17.6.  Rejection or other refusal to accept, or the inability to deliver because of a changed address of which no notice was given, shall be deemed to constitute receipt of the notice or other communication sent.  The addresses for giving notice are as follows:

If to Owner, to:            _____

_____

_____

_____

Attn:  _____

Fax No.:  _____

E-mail:  _____

with a copy to:

Deutsche Bank Trust Company Americas
60 Wall Street
New York, New York 10005
Attention:    Mark Cohen
David Crescenzi
Facsimile No.:  (212) 797-5695
Email:        mark.b.cohen@db.com
david.crescenzi@db.com

and to:            Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

-87-                    [Management Agreement - Opco]

Attention:      Sandy Qusba, Esq.
Facsimile No.:  455-2502
Email: SQusba@stblaw.com


If to Manager, to:           FG Propco Management LLC
Fertitta Gaming, LLC
10801 W. Charleston Blvd.
Suite 600
Las Vegas, Nevada 89135
Attn:  Frank J. Fertitta, III
Fax No.:  (702) 362-5889
E-mail: _____

with a copy to:              Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa St., 30th Fl.
Los Angeles, California 90017
Attn:  Peter Benudiz
Fax No.:  (213) 892-4714
E-mail:  pbenudiz@milbank.com

Additionally, Owner may, from time to time, designate in writing additional officers or employees of Owner (including the Owner Representative) or the members of Owner, who shall be entitled to receive copies of all notices delivered by Manager pursuant to this Agreement.

**17.7**    <u>Waiver of Covenants, Conditions or Remedies</u>.  The waiver by one Party of the performance of any covenant, condition or promise under this Agreement shall not invalidate this Agreement, nor shall it be considered a waiver by it of any other covenant, condition or promise under this Agreement.  The waiver by either or both Parties of the time for performing any act under this Agreement shall not constitute a waiver of the time for performing any other act or an identical act required to be performed at a later time.  The exercise of any remedy provided in this Agreement shall not be a waiver of any consistent remedy provided by law, and the provision in this Agreement for any remedy shall not exclude other consistent remedies unless they are expressly excluded.

**17.8**    <u>Severability</u>.  If any provision of this Agreement or application to any Party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such Person or circumstances, other than as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and shall be enforced to the fullest extent permitted by law.

**17.9**    <u>Financial Projections</u>.  Financial projections, budgets or similar forecasts as may have been prepared or in the future are prepared by Manager or its Affiliates do not take into account, nor make provisions for, any rise or decline in local or general economic conditions or

-88-                          [Management Agreement - Opco]

other factors beyond the control of Manager. Manager and its Affiliates cannot and do not warrant or guaranty in any way said financial projections, budgets or other forecasts; provided, however, Manager shall utilize its expertise and best judgment in preparing the same. Owner hereby acknowledges that in entering into this Agreement, Owner has not relied on any projection of earnings, statements as to the possibility of future success, or other similar information which may have been prepared by Manager or its Affiliates. Owner further understands and acknowledges that no guaranty is made or implied by Manager or its Affiliates as to the cost, or the future financial success or profitability, of the Properties.

     **17.10** <u>Obligations of Manager to Owner</u>. Subject to the approval rights vested in Owner and/or Owner's board of directors, and in consideration for, and as an inducement to Owner entering into this Agreement at Owner's sole cost and expense (which shall be deemed to be an Operating Cost) but for no additional consideration except for the Management Fees payable hereunder, Manager on behalf of itself and its Affiliates (including, without limitation, Fertitta Gaming), hereby covenants and agrees to diligently, continuously and proactively manage the overall management of the business and corporate affairs of Owner, Property Owners and the Owner-Related Affiliates. In furtherance thereof, Manager is hereby delegated the following actions:

     (a)    advise Owner's board or directors with respect to the existing and future capital structure evidenced by the Loan Documents and any subsequent financing and/or refinancing of Owner, Property Owners and/or any Owner-Related Affiliates including, without limitation, to identify new equity sources and recommending modifications, amendments and/or alternative financing opportunities;

     (b)    subject to the rights of Manager and its Affiliates to pursue gaming opportunities to the extent permitted pursuant to the Non-Compete Agreements, seek, evaluate and recommend future acquisition and strategic opportunities;

     (c)    subject to the terms and conditions of this Agreement, implement all decisions and resolutions approved by Owner's board of directors;

     (d)    prepare and file all required federal, state and local income tax returns and related documentation for Owner, Property Owners and the Owner-Related Affiliates;

     (e)    maintain copies of the federal, state and local income tax or information returns and reports, if any, for the six (6) most recent taxable years of Owner, Property Owners and the Owner-Related Affiliates;

     (f)    use commercially reasonable efforts to cause to be sent to each member of Owner, Property Owners and the Owner-Related Affiliates (within one hundred twenty (120) days after the end of each Fiscal Year or at such later time as is necessary taking into account Manager's receipt of information), a copy of Schedule K-1 (or any successor form) indicating such member's share of income in Owner, the applicable Property Owner and the applicable Owner-Related Affiliate, and any other information reasonably requested by Owner in connection therewith;

-89-

(g)        recommend to Owner, Property Owners and the Owner-Related Affiliates, all applicable elections, determinations and other decisions under the Internal Revenue Code of 1986, as amended, from time to time, and under applicable state and local tax law, including the positions to be taken on the federal, state and local information returns of Owner, Property Owners and the Owner-Related Affiliates, as applicable, provided such elections, determinations and other decisions are consistent with the allocation provisions contained in the Owner Organizational Documents and are reasonably intended to legitimately reduce the taxable income of Owner, Property Owners and the Owner-Related Affiliates, as applicable, and thus the taxable income allocable to all members thereto, for the Fiscal Years in question;

(h)        maintain the corporate existence of Owner, Property Owners and the Owner-Related Affiliates;

(i)        schedule and manage shareholder meetings for each of Owner, Property Owners and the Owner-Related Affiliates;

(j)        maintain copies of the Owner Organizational Documents;

(k)        prepare and maintain all books and records and financial statements as required under Section 8.1 and/or as otherwise required under the Loan Documents;

(l)        prepare and submit to Owner for Owner's approval, any and all filings as required under the Securities Act of 1933 and/or the Securities Exchange Act of 1934 and/or any other requirements of the United States Securities and Exchange Commission or any other Federal or state agency regulating the sale, registration or other handling of securities (including, without limitation, any notices required under the Sarbanes–Oxley Act of 2002), as requested by the board of directors of Owner, Property Owners and the Owner-Related Affiliates, as applicable;

(m)        prepare and submit to Owner for Owner's approval, any and all filings as may be required to obtain or maintain any Government Approvals for any Person with respect to Owner, Property Owners and/or the Owner-Related Affiliates in connection with the ownership and operation of the Properties;

(n)        recommend and maintain corporate employee benefit plans and welfare plans for Owner, Property Owners and the Owner-Related Affiliates;

(o)        prepare and deliver all notices required to be delivered by or on behalf of [Opco Holdco] to shareholders [pursuant to and in accordance with the Equity Holders Agreement];

(p)        maintain copies of all material contracts and agreements of Owner, Property Owners and the Owner-Related Affiliates, including any amendments thereto, including, without limitation, all Loan Documents;

[Management Agreement - Opco]

provided, however, notwithstanding the foregoing, (i) Manager's obligations under this Section 17.10 remain subject to all of the terms, conditions and limitations set forth in this Agreement; (ii) Manager shall not be in breach of this Section 17.10 if Owner, Property Owners and/or the Owner-Related Affiliates, as applicable, refuse to reasonably cooperate with Manager and/or otherwise prevent Manager to comply with this Section 17.10; (iii) Manager and Owner hereby agree that Manager's right to implement any decision or recommendation under this Section 17.10 shall expressly remain subject to Owner's prior written approval; and (iv) Owner may revoke any one or more of the rights granted to Manager pursuant to this Section 17.10.

**17.11**  Counterparts and Execution.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.  The signature page or any counterpart may be detached therefrom without impairing the legal effect of the signature thereon so long as such signature page is attached to any other counterpart of this Agreement identical thereto.

**17.12**  Entire Agreement.  This Agreement contains the entire agreement between the Parties and all prior negotiations and agreements are merged herein.  Neither this Agreement nor any provision hereof may be changed, waived, altered or modified, except by written instrument signed by the Party against which enforcement of the change, waiver, discharge or termination is sought.  The failure of either Party to enforce at any time, or for any period of time, any provision of this Agreement shall not be construed to be a waiver of such provision.

**17.13**  Interest.  Any amount payable to Manager or Owner by the other which has not been paid when due shall accrue interest at the lesser of: (i) the highest legal limit in the state in which the Properties are located, which limit shall remain fixed; or (ii) two percent (2%) over the published base rate of interest charged by Citibank, N.A., New York, New York (or successor thereto), which rate shall float based on such published base rate, to borrowers on ninety (90) day unsecured commercial loans, as the same may be changed, from time to time.

**17.14**  Time of the Essence.  Time is of the essence with respect to each of the material provisions of this Agreement.

**17.15**  Further Assurances.  The Parties agree to execute such further documents and take such other actions as may be reasonably necessary to implement the purposes, objectives, terms and provisions of this Agreement.

**17.16**  Resolution of Disputes.

(a)  General.  Except as otherwise prohibited in this Agreement, if any dispute, controversy, claim or disagreement arising out of or relating to this Agreement (collectively, "Disputes"), the Parties shall use all reasonable endeavors to resolve the matter amicably.  If one Party gives the other written notice that a Dispute exists and the Parties are unable to resolve the Dispute within thirty (30) days of service of notice, the such Dispute shall be referred to the American Arbitration Association for binding arbitration under the then existing Commercial Arbitration Rules of the American Arbitration Association pursuant to and in accordance with Section 17.16(b).  Without prejudice to a Party's rights under Section 17.16(b), neither Party

[Management Agreement - Opco]

shall resort to arbitration against the other under this Agreement until thirty (30) days after the referral.  This shall not affect a Party's right, where appropriate, to immediately seek equitable relief in an appropriate federal or state court which relief may consist of a temporary restraining order, preliminary injunction, an order compelling specific performance or similar order enforcing the obligations under this Agreement.  The Parties expressly waive any right or entitlement they may otherwise have to a jury trial in the event such action is filed.

        (b)      <u>Arbitration</u>.

        (1)      The Parties agree that, except those Disputes which are expressly required to be resolved by an Industry Consultant pursuant to Section 17.16(c) and those matters expressly excluded from arbitration pursuant to the terms and conditions of this Agreement (e.g., Annual Plan and Operating Budget Disputes and/or Disputes over a Party's right to terminate this Agreement), all other Disputes with respect to this Agreement or any other agreement between Owner and Manager shall be resolved by arbitration administered by the American Arbitration Association as provided in this Section 17.16(b) and the then existing Commercial Arbitration Rules of the American Arbitration Association, except that to the extent the Commercial Arbitration Rules of the American Arbitration Association are inconsistent with the provisions of this Section 17.16(b), the terms hereof shall control.  The arbitration shall be governed by the United States Federal Arbitration Act and this Section 17.16(b), and judgment upon the award entered by the arbitrator may be entered in any court having jurisdiction.  Such arbitration shall be conducted by a single arbitrator selected in accordance with such rules to conduct the arbitration; provided, however, that such single arbitrator shall have not fewer than ten (10) years of experience in the casino/hotel business in the market area where the Properties located, and shall not be an Affiliate of or a person who has any past, present, or currently contemplated future business or personal relationship with either Owner or Manager.  The arbitrator shall be instructed to apply the internal laws of the State of New York (without regard to conflict of laws principles) in resolving the subject dispute, controversy or claim.  The decision of the arbitrator shall be made within thirty (30) days of the close of the hearing with respect to the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld, conditioned or delayed) and when such decision is reduced to writing and signed by the arbitrator shall be final, conclusive and binding upon the Parties hereto, and may be enforced in any court having jurisdiction.  The arbitration shall be held in New York, New York, and, except for those procedures specifically set forth in this Section 17.16(b), including, without limitation, the application of the internal laws of the State of New York (without regard to conflict of laws principles), shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date thereof.  The arbitrator shall be directed to establish (i) a schedule for the conduct of the arbitration which shall yield a conclusion within one hundred twenty (120) days following the appointment of the arbitrator and (ii) economic or procedural sanctions (which may include default judgment) for any Party the arbitrator determines has intentionally delayed the conduct of the proceedings.

        (2)      The arbitrator may consolidate proceedings with respect to any Dispute under this Agreement with proceedings with respect to any related controversy under

-92-

this Agreement.   However, except as specifically set forth in the preceding sentence: (i) arbitration only will be conducted on an individual, not class-wide, basis; (ii) only Manager (and its Affiliates and their respect officers, directors, owners, employees, agents and representatives) and Owner (and its Affiliates and their respect officers, directors, owners, employees, agents and representatives) may be parties to any arbitration proceeding described in this Section 17.16; and (iii) no such arbitration proceeding shall be consolidated with any other arbitration proceeding involving Manager and/or any other Person.   Except in connection with claims by third parties for which a party is entitled to indemnification pursuant to this Agreement (including claims where such third party is seeking multiple, exemplary or punitive damages), the award may not include, and the parties specifically waive any right to an award of multiple, exemplary or punitive damages.

(3)   During the pendency of the arbitration, the Parties shall share equally the fees and expenses of the arbitrator.   As part of the award, the arbitrator shall designate the Party whose position is substantially upheld, who shall recover from the other Party all of its reasonably attorneys' fees, costs and expenses, including its share of the fees and costs paid to the arbitrator, expert witness fees, compensation for in-house counsel, and all other fees and expenses incurred in connection with the arbitration.   The arbitrator may determine that neither Party's position was substantially upheld or otherwise allocate the fees and expenses in accordance with the relative extent to which either Party's position was upheld.

(c)   <u>Industry Consultant Determination</u>.   All Disputes relating to any of the (i) Operating Competitive Set; (ii) Performance Competitive Set (including, without limitation, if the Performance Competitive Set does not contain properties which publicly file the results of their operations and/or establishing a comparable metric in the event that Competitor EBITDA is not publicly available at any time when the Performance Test is to be calculated pursuant to this Agreement); (iii) Comparable Manager Properties; and/or (iv) the Credit Policy shall be resolved according to this Section 17.16(c).   If a Party is entitled to and elects to have an Industry Consultant designated, it shall notify the other Party in writing and the Parties shall attempt to designate a mutually acceptable Industry Consultant within five (5) Business Days of such notice.   If the Parties are unable to select an Industry Consultant, then each of Owner and Manager shall select one (1) Industry Consultant and the two (2) selected Industry Consultants shall thereafter meet in good faith within five (5) Business Days and select a third Industry Consultant in accordance with the qualifications set forth in this Agreement, in which instance, the decision of the majority of the Industry Consultants shall be binding.   The Industry Consultant(s) shall establish the procedure for resolving the dispute, including what evidence to consider, whether to allow written submissions, and whether to hold a hearing, subject to the following: unless otherwise agreed by the Parties, the Industry Consultant(s) shall hold at least one (1) proceeding at which the Parties present and respond to evidence, which shall take place on a Business Day not later than fifteen (15) Business Days, nor earlier than five (5) Business Days, from the date notice of the dispute is given or as soon thereafter as the Industry Consultant(s) is/are available.   Unless otherwise agreed, all proceedings shall be conducted at one of the Properties;

(1)   no discovery may be conducted between the Parties;

(2)      no attorneys may appear on behalf of either Party (although either Party may use attorneys for their own consultation or advice);

(3)      the Industry Consultant shall schedule and conduct all proceedings with the objective of resolving the dispute as quickly and efficiently as possible; and

(4)      the Parties shall not engage in any communications with any Industry Consultants except in response to formal requests by a Industry Consultant or at proceedings scheduled by a Industry Consultant.

All decisions of the Industry Consultant(s), absent fraud, willful misconduct or demonstrated conflict of interest, are final and binding on the Parties (without appeal or review) and are enforceable in any court of competent jurisdiction.  The Parties shall bear their own costs and expenses of the Industry Consultant resolution proceedings, including each Party's respective attorneys' fees and costs.

**17.17**  <u>Limitation on Damages</u>.   In no event shall either Party be liable for any consequential, indirect, punitive or special damages relating to its performance of its duties under this Agreement, excepting only damages caused by such Party's willful misconduct or fraud.

**17.18**  <u>Attorneys' Fees</u>.  If either of the Parties hereto obtains a judgment against the other Party in connection with a dispute arising under or in connection with this Agreement (whether in an action or through arbitration), the prevailing Party shall be entitled to recover its court (or arbitration) costs, and reasonable attorneys' fees and disbursements incurred in connection therewith (including reasonable fees of experts or consultants required in connection therewith) and in any appeal or enforcement proceeding thereafter, in addition to all other recoverable costs.  Any such attorneys' fees and other expenses incurred by a Party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment.

**17.19**  <u>Cooperation with Gaming Authorities</u>.

(a)      This Agreement and all other agreements contemplated herein shall be executed subject to all required approvals and authorizations, if any, by all applicable Governmental Authorities, including, without limitation, any Gaming Authorities.  Owner, at its expense, promptly after the date hereof shall take such commercially reasonable actions as may be reasonably required to record or register this Agreement with, or obtain such required approval or authorization from, the applicable Governmental Authorities to make effective this Agreement as and if required by law and all related agreements, and permit Owner to make the payments required to be made to Manager under this Agreement and all related agreements.  Owner and Manager each agree to cooperate with all applicable Gaming Authorities in connection with the administration of their regulatory jurisdiction over Owner, Manager and their respective Affiliates, including the provision of such documents or other information as may be requested by such Gaming Authorities relating to Owner, Manager or any of their

Affiliates or to this Agreement; provided, however, any cooperation by Owner with respect to any properties owned and/or operated by Manager and its Affiliates other than the Properties shall be at Manager's sole cost and expense.

(b)    If any Governmental Authority requires, as a condition of its approval of the initial effectiveness of this Agreement, directly or indirectly, the modification of any terms or provisions of this Agreement, the Parties shall use their best efforts to comply with such request; provided, however, that if such requested modification would have a material and adverse effect to any Party, then such Party shall have the right to terminate this Agreement by giving written notice to the other Party within thirty (30) days after receipt of such request for modification, with no liability whatsoever to the other Party for such termination.

**17.20**    Confidential Information.    Owner and Manager agree that any information received during the performance of this Agreement, regarding Manager, on the one hand, and Owner or the Properties, on the other hand, including, without limitation, either Party's organization, financial matters, marketing plans, customer data, trade secrets or other information of a proprietary nature (the "Confidential Information"), will be treated by the other Party (the "Receiving Party") in full confidence and except in response to legal process or appropriate and necessary inquiry or as required by Gaming Laws, state or federal securities, or other Legal Requirements, and will not be revealed to any other persons, firms or organizations. This provision shall survive the termination of this Agreement for a period of two (2) years. In the event that any Receiving Party is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information that it has agreed to keep confidential hereunder, it will provide the other party with prompt notice of such request to the extent reasonably practicable and permitted by law so that the other party may seek an appropriate protective order or waive its compliance with the provisions of this Section 17.20. In the event that such protective order or other remedy is not obtained, or the Company waives compliance with the provisions of this Section 17.20, such Receiving Party agrees that it will furnish only that portion of any Confidential Information that is legally required and will exercise its best efforts to obtain reliable assurance that confidential treatment will be accorded to that portion of any Confidential Information being disclosed.

**17.21**    Estoppel Certificates.    Manager and Owner each agree, at any time and, from time to time, but in no event more often than two (2) times in any rolling twelve (12) month period, upon not less than ten (10) days' prior notice by the requesting party, to provide a statement in writing (i) that attaches a true and correct copy of this Agreement (as amended, if applicable); (ii) certifying that the attached copy of the Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications); and (iii) stating whether or not to the knowledge of the signer of such certificate, there exists any default in the performance of any obligation contained in this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that any such statement delivered pursuant hereto may be relied upon by Manager, Owner, any proposed assignee or transferee of Owner or the holder of any Mortgage or any prospective mortgagee or purchaser, as the case may be.

[Management Agreement - Opco]

**17.22**  Use of Hazardous Substances.  Manager shall take all commercially reasonable actions necessary to not cause or knowingly permit any hazardous or toxic substance, material, or waste that is or becomes regulated by any federal, state, or local governmental entity to be generated, brought onto, used, stored, released, or disposed of in or about the Properties by Manager or its agents, employees, contractors, or invitees.  The preceding sentence will not be interpreted to prohibit Manager from using limited quantities of standard office or janitorial supplies containing chemicals as long as such use is in compliance with Legal Requirements in all material respects.

**17.23**  Anti-Money Laundering.  Manager hereby represents, warrants and covenants as follows:

(a)    No officer, director or employee of Manager (i) has been convicted or charged with a felony relating to money laundering or other similar or related illegal activity; or (ii) is, to the knowledge of Manager, under investigation by any governmental authority relating to money laundering or other similar or related illegal activity.

(b)    Manager will comply, and will cause the Properties to comply, in all material respects with the U.S. Bank Secrecy Act, as amended, the U.S. Money Laundering Control Act of 1986, as amended, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended, all similar foreign laws and regulations, and the rules and regulations administered to date by the U.S. Treasury Department's Office of Foreign Assets Control, to the extent such laws, rules and regulations are applicable (collectively, "Anti-Money Laundering Laws").

(c)    Manager shall take any and all actions customary and standard of hotel and casino operators located within the Las Vegas market, in order to cause the Properties to, maintain and comply with reasonably adequate "Know-Your-Customer" and risk-based anti-money-laundering procedures, including, without limitation, procedures to identify and verify the identities of their respective customers, detecting and identifying transactions that raise suspicions of money laundering or other illicit activities, and screening for persons, entities, and jurisdictions that may be subject to the sanctions regime administered by the U.S. Treasury Department's Office of Foreign Assets Control.  Without limiting the generality of the foregoing, such procedures shall be subject to the approval of Owner (such approval not to be unreasonably withheld, conditioned or delayed), and Manager will implement, and cause the Properties to implement, all modifications to such procedures or additions to such procedures as Owner may reasonably request.

**17.24**  Not an Interest in Real Estate; No Recordation.  Manager and Owner agree that it is not the intention of the Parties to this Agreement to convey or create an interest in real property.  Neither this Agreement nor any memorandum hereof shall be recorded against the Properties and any recordation or attempted recordation of this Agreement or any memorandum of this Agreement by Manager shall constitute a Material Default, and in addition to any other remedies therefor, Owner is hereby granted a power of attorney (which power is coupled with an interest and shall be irrevocable) to execute and record on behalf of Manager a notice or

-96-                                [Management Agreement - Opco]

memorandum removing this Agreement or such memorandum of this Agreement from the public records or evidencing the termination hereof (as the case may be).    ALL RECORDING OFFICERS ARE HEREBY DIRECTED NOT TO RECORD THIS AGREEMENT.

**17.25**    _Limitations of Personal Liability_.    Except for Fertitta Management Holdco's obligations pursuant to Section 17.26, the principals, partners, shareholders, members, managers, officers, directors, trustees, employees, agents, representatives and Affiliates of Manager and/or Owner shall never be personally liable for any monetary claim, damages, costs or expenses (including attorneys' fees awarded under this Agreement) arising from or related to any defaults described in this Agreement (altogether, "Liabilities") and there shall be no levy of execution against the assets of such Persons on account of any Liabilities.    Notwithstanding the foregoing, the foregoing limitations shall not apply to any Liability which is proven by final judgment to have resulted from the gross negligence, fraud or the knowingly willful misconduct of Manager or Owner, as applicable (provided, however, that the foregoing shall not be deemed to make any such partner, shareholder, officer, director, trustee, employee, agent representative or Affiliate personally liable for such Liability except to the extent that such Liability would otherwise exist under applicable Legal Requirements), nor shall this Section 17.25 limit non-monetary equitable remedies and relief or the return of overpaid fees.    This Section 17.25 shall survive any termination or expiration of this Agreement.

**17.26**    _Guaranty of Manager Obligations by Fertitta Management Holdco_.    For value received, and in consideration for, and as an inducement to Owner entering into this Agreement, Fertitta Management Holdco has executed that certain Guaranty dated as of the date hereof by Fertitta Management Holdco for the benefit of Owner, a copy of which is attached hereto as Exhibit "C" whereby Fertitta Gaming unconditionally and irrevocably guarantees to Owner and Owner's successors and assigns, the full performance and observance of all the covenants, conditions and agreements, herein provided to be performed and observed by Manager.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

[Management Agreement - Opco]

#4811-5012-8391

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first written above.

OWNER:

_____,
a Delaware limited liability company

By:  _____
Name_____
Title:_____

[ADD PROPERTY OWNERS]

MANAGER:

_____,
a Nevada limited liability company

By:  _____
Name:_____
Title:_____

AGREED AND ACCEPTED BY:

_____,
a Nevada limited liability company

By:  _____
Name:_____
Title:_____

-1-