Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:      (775) 823-2900
Facsimile:      (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.

☒ Affects this Debtor
☐ Affects all Debtors
☒ Affects Northern NV Acquisitions, LLC
☒ Affects Reno Land Holdings, LLC
☒ Affects River Central, LLC
☒ Affects Tropicana Station, LLC
☒ Affects FCP Holding, Inc.
☒ Affects FCP Voteco, LLC
☒ Affects Fertitta Partners LLC
☒ Affects FCP MezzCo Parent, LLC
☒ Affects FCP MezzCo Parent Sub, LLC
☒ Affects FCP MezzCo Borrower VII, LLC
☒ Affects FCP MezzCo Borrower VI, LLC
☒ Affects FCP MezzCo Borrower V, LLC
☒ Affects FCP MezzCo Borrower IV, LLC
☒ Affects FCP MezzCo Borrower III, LLC
☒ Affects FCP MezzCo Borrower II, LLC
☒ Affects FCP MezzCo Borrower I, LLC
☒ Affects FCP PropCo, LLC
☐ Affects GV Ranch Station, Inc.

Chapter 11

Case No. BK-09-52477
Jointly Administered BK 09-52470 through
BK 09-52487 and BK 10-50381

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE "FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR STATION CASINOS, INC. AND ITS AFFILIATED DEBTORS (DATED JULY 28, 2010)"**

Hearing Date:      August 27, 2010
Hearing Time:      10:00 a.m.
Place:             300 Booth Street
                   Reno, NV 89509

#4841-5833-8822

1

## I.    <u>INTRODUCTION</u>.

2      1.      On July 28, 2010, Station Casinos, Inc. ("<u>SCI</u>") and the other above-captioned

3 debtors and debtors in possession (excluding Debtor GV Ranch Station, Inc.) [1] (collectively, the

4 "<u>Debtors</u>") filed their "First Amended Joint Chapter 11 Plan of Reorganization for Station

5 Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 1863) (the "<u>Plan</u>").

6 Also on July 28, 2010, the Debtors filed their "Disclosure Statement to Accompany First

7 Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated

8 Debtors (Dated July 28, 2010)" (docket no. 1864) (the "<u>Disclosure Statement</u>").

9      2.      On July 29, 2010, the Court entered the "Amended Order (I) Approving

10 Disclosure Statement, (II) Determining Treatment of Certain Claims for Notice and Voting

11 Purposes, (III) Establishing Record Date and Procedures for Filing Objections to the Plan and

12 Temporary Allowance of Claims and (IV) Approving Solicitation Procedures for Confirmation"

13 (docket no. 1279) (the "<u>Disclosure Statement Order</u>").  Declarations regarding service of the of

14 the Solicitation Package[2] in accordance with the requirements of the Disclosure Statement Order

15 were filed with the Court.  The Debtors expect that the Voting Agent will file the tabulation of

16 the ballots shortly, but <u>preliminary results indicate that all seventeen Voting Classes voted to</u>

17 <u>accept the Plan</u>.

18      3.      On August 11, 2010, the Debtors filed and served the Plan Supplement (docket

19 no. 1914), which included copies of the following Restructuring Transactions (defined below)

20 related documents: New FG Management Agreement (Propco); New Opco Credit Agreement;

21 New Opco PIK Credit Agreement; New Opco Asset Purchase Agreement; New Propco Credit

22 Agreement; New Propco Limited Liability Company Agreement; Opco Lender Support

23 Agreement; Propco Lender Support Agreement; Second Amended Master Lease Compromise

24 Agreement; Put Parties Support Agreement; and the Committee Plan Support Stipulation

25 (collectively, with the Plan, the "<u>Restructuring Transactions Related Documents</u>").  On August

26

---

27 [1]  GV Ranch Station, Inc. is a debtor in these jointly administered cases, but it is not a proponent of the Plan and its estate is not the subject of the Plan.

28 [2]  Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to them in the Plan or Disclosure Statement, as applicable.

13, 2010, the Debtors filed and served the Second Plan Supplement (docket no. 1935), which included a copy of the following Restructuring Transactions Related Document: the New FG Management Agreement (Opco).

4.    On August 13, 2010, the Court entered its "Order Approving Supplement To Disclosure Statement to Accompany First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 1932), and the Debtors then distributed the Supplement to Disclosure Statement to Holders of Claims and Equity Interests who received the Disclosure Statement.  Included with the Supplement to Disclosure Statement were financial projections for New Opco, a copy of the Nave Report (defined and discussed below), and the Put Party Commitment Agreement.

5.    No objections to confirmation of the Plan, or any other objections to the terms of the Plan, were filed by any Holder of Claims or Equity Interests or any other party in interest by the deadline established in the Disclosure Statement Order, or otherwise.  The Debtors hereby submit this Memorandum of Law in support of confirmation of the Plan.  In support of the Memorandum of Law the Debtors have filed the Declaration of Richard Haskins, Executive Vice President, General Counsel and Secretary of SCI, and the Declaration of Daniel Aronson, Managing Director of Lazard Frères & Co. LLC ("Lazard").

## II.    ARGUMENT.

### A.    THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF BANKRUPTCY CODE.

6.    The Debtors, as the proponents of the Plan, must demonstrate that the Plan satisfies the applicable provisions of Section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See, In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997).  As illustrated below, all of the applicable requirements of Section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

#### 1.    Applicable Provisions of Bankruptcy Code

7.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  This provision

1  encompasses the requirements of Sections 1122 and 1123 of the Bankruptcy Code governing

2  classification of claims and contents of plans.  *See, H.R. Rep. No. 95-595*, at 412 (1977); *S. Rep.*

3  *No. 95-989*, at 126 (1978); *see also, In re Western Asbestos Co.*, 313 B.R. 832, 840 (Bankr. N.D.

4  Cal. 2003).  As demonstrated in below, the Plan complies fully with the requirements of Sections

5  1122 and 1123 of the Bankruptcy Code.

6         **a.**      **Sections 1122 and 1123(a)(1)–(4)**

7               **Classification and Treatment of Claims and Equity Interests.**

8       8.    Sections 1122[3] and 1123(a)(1) require that the Plan designate Classes of Claims

9  and Equity Interests (other than Administrative Claims and Priority Claims) and place a Claim or

10  an Equity Interest in a particular class only if such Claim or Equity Interest is substantially

11  similar to the other Claims or Equity Interests of such class.  In accordance with the requirements

12  of  Section 1122(a), each Class of Claims and Equity Interests in the Plan contains only Claims

13  or Equity Interests that are substantially similar to the other Claims or Equity Interests within

14  that Class.

15       9.    Under the Plan, Claims of creditors holding general unsecured claims against

16  Debtor SCI, Classes S.4 through S.7, are classified separately because they are different in

17  substance and nature, and the claimholders have different rights against SCI and, in some cases,

18  *vis-à-vis* each other.  Therefore, there are justifiable, nondiscriminatory economic and business

19  reasons for separate classification of the unsecured claims in Classes S.4, S.5, S.6 and S.7 in

20  compliance with the requirements of Bankruptcy Code Sections 1122(a) and 1129(a)(1).

21       10.    No Holder of Claims of Equity Interests or any other party in interest objected to

22  the Plan's methodology for classifying Claims, and each of Classes S.4, S.5, S.6 and S.7 voted to

23  accept the Plan.  Moreover, Section 1122(a) does not require that all unsecured Claims be placed

24  in the same Class.  *See In re Montclair Retail Ctr., L.P.*, 177 B.R. 663, 665 (B.A.P. 9th Cir.

25  1995).  Rather, when a court is reviewing the propriety of separate classification of unsecured

26  Claims outside the context of a single, disproportionately large deficiency claim, the test is

27

28  [3]  Unless otherwise specified, all "Section" references are to chapter 11 of Title 11 of the U.S. Code, the "Bankruptcy Code."

whether there is a nondiscriminatory, business justification for classifying unsecured Claims separately. *See e.g.*, *Steelcase, Inc. v. Johnston* (*In re Johnston*) 21 F.3d 323 (9th Cir. 1994); *State St. Bank & Trust Co. v. Elmwood, Inc.* (*In re Elmwood, Inc.*), 182 B.R. 845 (D. Nev. 1995); *In re Montclair Retail Ctr., L.P.*, 177 B.R. 663 (B.A.P. 9th Cir. 1995); *In re Hawaiian Telcom Commc'ns.,* No 08-2005, 2009 WL 5386130 (Bankr. D. Hawaii, Dec. 30, 2009). In evaluating whether separate classification of unsecured Claims is proper, the Court may consider the kind, species, or character of each category of applicable Claims. *In re Johnston*, 21 F. 3d at 327; *In re Montclair Retail Ctr.*, 177 B.R. at 665; *In re Elmwood, Inc.*, 182 B.R. at 849.

11.     Class S.4 Claims are general unsecured Claims consisting of trade Claims, employee Claims, rejection damages Claims and the deficiency Claims of certain secured creditors that did not vote to accept the Plan. Class S.5 consists of Senior Notes Claims, which are general unsecured Claims that are contractually senior in right of repayment to the Subordinated Notes that comprise Class S.6. The size, nature and underlying terms of the Claims held by vendors, employees and other trade creditors in Class S.4 are distinctly different from the Senior Note Claims in Class S.5 held by large financial institutions, mutual funds, private equity funds and hedge funds. Similarly, due to the contractual subordination of the Subordinated Note Claims, Class S.6, it is not appropriate under the distribution mechanisms of the Plan to classify those Claims in the same Class as the Senior Note Claims, Class S.5. Thus, under the circumstances of these Chapter 11 Cases, it is appropriate to separately classify Classes S.4, S.5 and S.6. *See e.g.*, *In re Hawaiian Telcom Communc'ns.,* 2009 WL 5386130 at *17-18 (holding that senior note claims and subordinated note claims are different and thus may be classified separately, and that general unsecured claims are distinct from senior note claims and thus may be classified separately).

12.     Class S.7 consists of the Mortgage Lender Claims against SCI. Class S.7 Claims arise from Propco's prepetition, contractual assignment of all of Propco's rights under the Master Lease as collateral to the Mortgage Lenders to secure the Mortgage Loan. Class S.7 Claims are based upon security interests granted by Propco to the Mortgage Lenders, pursuant to which the Mortgage Lenders are entitled to receive whatever Propco will receive from SCI on account of

Propco's Master Lease rejection damages claim.  Thus, the Claims in Class S.7 are not even substantially similar to the Class S.4, S.5 and S.6 Claims, and the Debtors were required to separately classify Class S.7.  *See e.g. In re Johnston*, 21 F.3d 323 at 326 (approving separate classification of unsecured claims where one class was comprised of disputed unsecured claims secured by valid perfected liens against property of a co-debtor and guaranteed by the debtor, another class contained claims based on the debtor's guarantor liability, and the third class contained claims for which the debtor was solely responsible).

13.    The Debtors submit that they have posited good business reasons for the separate classification of Classes S.4 through S.7., and have shown that 3 of the 4 Classes have substantially differing legal rights that may indeed require separate classification.  Moreover, the separate classification is not intended to effect, and does not result in an economic advantage for the Debtors, or for any group of creditors over another, and there is no intent to  gerrymander a Class for the purpose of creating an impaired consenting Class.  Accordingly, the separate classification of Classes S.4, S.5, S.6 and S.7 complies with all of the applicable provisions of Sections 1122, 1123 and 1129.

14.    Sections 1123(a)(2) and 1123(a)(3) require that the Plan specify all Classes of Claims and Equity Interests that are not impaired under the Plan and specify the treatment of all Classes of Claims and Equity Interests that are impaired under the Plan.  In accordance with the requirements of  Sections 1123(a)(2) and 1123(a)(3), Article III of the Plan specifies which Classes of Claims are not impaired, and specifies the treatment of each class of impaired Claims.

15.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same treatment for each Claim or Equity Interest within a particular Class, unless the Holder of a Claim or Equity Interest agrees to less favorable treatment of its Claim or Equity Interest.  In accordance with the requirements of  Sections 1123(a)(2) and 1123(a)(3), Article III of the Plan provides the same treatment for each Claim or Equity Interest within a particular Class, unless the Holder of the Claim or Equity Interest agrees to less favorable treatment of its Claim.

**b.**     **Section 1123(a)(5) – Adequate Means for Implementation.**

16.     Section 1123(a)(5) requires that the Plan provide adequate means for implementation of the Plan and lists ten examples of such implementation provisions. Article V of the Plan contains the principal means for the Plan's implementation. Those provisions relate to, among other things: (a) the formation of the New Propco entities; (b) the transfer of the Master Lease Collateral to Propco; (c) the transfer of the Landco Assets; (d) the transfer of the New Propco Transferred Assets from Propco to the New Propco entities; (e) the transfer of the New Propco Purchased Assets from the Opco entities to the New Propco entities; (f) the transfer of the New Opco Acquired Assets to New Opco; (g) the New Propco Rights Offering; (h) the cancellation of prepetition instruments evidencing Claims and Equity Interest; and (i) the eventual dissolution of the Debtors (the foregoing transactions, the other implementation provisions of the Plan, and all of the transactions documented in the Restructuring Transactions Related Documents are hereinafter referred to as the "Restructuring Transactions"). The Restructuring Transactions carry out several of the methods for implementing a chapter 11 plan expressly provided for in Section 1123(a)(5): Section 1123(A)(5)(B) (transfer of all or any part of the property of the estate to one or more entities); Section 1123(a)(5)(D) (sale of property of the estate, and distribution or other property of the estate to the Holders of interests in such property); Section 1123(a)(5)(E) (satisfaction or modification of liens); Section 1123(a)(5)(F) (cancellation of indentures and similar instruments); Section 1123(a)(5)(J) (issuance of securities by entities receiving property of the estate in exchange for claims against the Debtors). Based on the foregoing, the Debtors submit that the Plan satisfies the requirements of Section 1123(a)(5) of the Bankruptcy Code regarding the means for implementation of the Plan

The Sale of the New Opco Acquired Assets

17.     On June 4, 2010, the Court entered its "Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos Inc. and Certain 'Opco' Subsidiaries" (the "Bidding Procedures Order") (docket no. 1563). Pursuant to the Bidding Procedures Order, the Court, among other things, (a) authorized the Debtors to conduct a process for the marketing and sale of substantially all of the Debtors' Opco business

and certain related assets (the "<u>New Opco Acquired Assets</u>"), conduct an auction, select the successful bid, and (b) deemed the Stalking Horse Bidder to be a Qualified Bidder.

18.    The Debtors provided notice of the Opco Auction and Bidding Procedures to: (a) the Office of the United States Trustee; (b) the Official Committee of Unsecured Creditors (the "<u>Official Creditors Committee</u>)"; (c) the Nevada Gaming Commission; (d) all (i) creditors of the Debtors as defined in Section 101(1) of the Bankruptcy Code; (ii) entities known to the Debtors to possess and/or exercise any control over any of the New Opco Acquired Assets; (iii) entities known to the Debtors to assert any rights in any of the New Opco Acquired Assets; (iv) parties in interest and other entities and persons so entitled and known to the Debtors; (v) non-Debtor parties to the Assumed Contracts; (vi) other entities that Debtors believe may have a claim against any of the Debtors; (vii) applicable federal, state and local tax authorities with jurisdiction over the Debtors or the New Opco Acquired Assets, including the Internal Revenue Service; (viii) federal, state and local environmental authorities in jurisdictions in which the Debtors operate and/or in which the New Opco Acquired Assets are located; and (ix) entities that requested notice in the Debtors' chapter 11 cases; and (e) any known party which has expressed a bona fide interest in writing to the Debtors regarding any purchase of the New Opco Acquired Assets.

19.    Pursuant to the "Order, Pursuant to 11 U.S.C. §§ 327(a) and 328(a), and Fed. R. Bankr. P. 2014, Authorizing Employment and Retention of Lazard Freres & Co. LLC as Financial Advisor and Investment Banker for the Debtors," entered on September 18, 2009 (docket no. 326), the Court authorized the Debtors to utilize the services of Lazard to market for sale the New Opco Acquired Assets. The marketing of the New Opco Acquired Assets took place over a several month period. Notice of the Auction and the Bidding Procedures Order was published in the Las Vegas Review-Journal, the Wall St. Journal, and the Financial Times. Lazard contacted seventy nine potential bidders, and received expressions of interest from thirty nine potential bidders; and twenty six potential bidders signed confidentiality agreements and received a package of preliminary due diligence information. Of those initial twenty six parties conducting due diligence, eight signed Letters of Intent that entitled them to additional, more

comprehensive due diligence.  *See* "Status Report of Dr. James E. Nave, Independent Director, Regarding Compliance with Auction Procedures and Resulting Bids with Respect to the Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries," filed August 5, 2010 (docket no. 1885) (the "Nave Report"), at ¶¶ 3-6.  Dr. Nave was the independent director of SCI tasked with overseeing the Sale Process.

20.    The Opco Debtors, under the direction of Dr. Nave and in consultation with the Consultation Parties,[4] determined that six of the Letter of Intent signatories satisfied the requirements to be Qualified Bidders (not including the Stalking Horse Bidder).  However, by the July 30, 2010 deadline under the Bidding Procedures for receipt of Qualified Bids, the Debtors had received only one Qualified Bid, that of the Stalking Horse Bidder.  As a result, there was no Opco Auction.  Nave Report at ¶¶ 7-10.

21.    Daniel Aronson, a Managing Director at Lazard, filed a Declaration in support of the Nave Report (docket no. 1886) (the "Aronson Sale Process Report").  Aronson has worked as restructuring professional for twenty two years, and has headed up Lazard's efforts as financial advisor and investment banker for the Debtors.  In addition to confirming the facts in the Nave Report, Aronson noted that the process of the selection of the Stalking Horse Bid resulted in an increase of more than $135 million in the proposed purchase price.  Aronson Sale Process Report at ¶ 9.

22.    Aronson reported that Lazard's efforts were especially focused on ensuring a level playing field for all bidders, including in particular potential bidder Boyd Gaming.  He opines that the Bidding Procedures approved by the Court provided an open and level playing field for all potential bidders, and the Sale Process provided fair and open access to all reasonable due diligence materials.  Aronson notes that, following Court approval of the Bidding Procedures, no bidder voiced any complaint about the Bidding Procedures, or requested that the Debtors deviate from or modify the Bidding Procedures.  He concludes that the Stalking Horse

---

[4]  The Consultation Parties were the Administrative Agent under the Prepetition Opco Credit Agreement, the steering committee of lenders under the Prepetition Opco Credit Agreement, and the Official Creditors Committee.  *See* Aronson Sale Process Report, *infra*, at p.4, fn. 2.

1   Bid is the highest and best bid for the New Opco Acquired Assets to date.   Aronson Sale Process

2   Report at ¶¶ 15-19.

3        23.     At a hearing on August 6, 2010, the date the Auction had been scheduled for, the

4   Debtors reported that the Stalking Horse Bid was the prevailing bid, and that the purchaser

5   would be the Stalking Horse Bidder FG Opco Acquisition LLC (together with any of its

6   assignees as permitted under the Stalking Horse APA, "Acquisition LLC"), an entity that is a

7   subsidiary of New Propco (Acquisition LLC, New Propco and the other New Propco subsidiaries

8   receiving the New Opco Acquired Assets, collectively, the "Purchaser").  On August 9, 2010, the

9   Court entered its "Order Closing Auction and Designating Successful Bid With Respect to Order

10  Establishing Bidding Procedures and Deadlines Related to Sale Process For Substantially All of

11  the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries" (docket no. 1909), in which

12  it designated Purchaser as the Successful Bidder.

13       24.     Notice of the Bidding Procedures Order and the Sale Hearing, and of the Debtors'

14  intent to seek approval and authorization of the Stalking Horse APA and of the Restructuring

15  Transactions, and to assume and assign the Assumed Contracts, was proper, timely, adequate and

16  sufficient notice under the circumstances of these Chapter 11 Cases and complied with the

17  various applicable requirements of the Bankruptcy Code and the Bankruptcy Rules; and a

18  reasonable opportunity to object and be heard with respect to the relief requested by the Debtors

19  was afforded to all interested parties.  Based upon the record of the Chapter 11 Cases and the

20  Sale Process, all Holders of Claims and Equity Interests, and all other parties-in-interest and

21  prospective purchasers were afforded a reasonable and fair opportunity to bid for the New Opco

22  Acquired Assets.

23       25.     Good and sufficient legal and business reasons justify approving the Stalking

24  Horse APA and the other Restructuring Transactions in connection with confirmation of the

25  Plan.  Such reasons include, but are not limited to, the following: (i) the Stalking Horse APA

26  constitutes the highest and best offer for the New Opco Acquired Assets; and (ii) the Stalking

27  Horse APA and the closing thereon will present the best opportunity to realize the value of the

28  New Opco Acquired Assets and avoid the possible decline and devaluation of such assets in a

protracted chapter 11 process.  Thus, the Debtors submit that the sale contemplated by the

Stalking Horse APA, and the consummation of the other Restructuring Transactions, are in the

best interests of the Debtors, their estates, their creditors and all other parties in interest.

**c.    Section 1123(a)(6) – Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

26.    Section 1123(a)(6) does not apply to the Plan.  The Debtors are not issuing any

equity securities.

**d.    Section 1123(a)(7) – Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

27.    The Plan complies with the requirements of Section 1123(a)(7) because, under the

Plan, on the Effective Date, all current boards of directors of the Debtors will be dissolved and

all current officers will be dismissed.  In their place, a Plan Administrator will be appointed prior

to the Effective Date.  The Plan requires that the appointment of the Plan Administrator shall be

subject to prior Court approval.  As a result, the Plan contains no provisions with respect to the

manner of selection of new officers and directors that is inconsistent with public policy or the

interests of Holders of Claim and Equity Interests.

**e.    Sections 1123(b)(1) and (2) – Impairment of Claims and Equity Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases: Plan Impairs Certain Classes and Leaves Others Unimpaired.**

28.    Section 1123(b)(l) of the Bankruptcy Code provides that a plan may "impair or

leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C.

§ 1123(b)(l).  Consistent with Section 1123(b)(1), Article III of the Plan impairs or leaves

unimpaired, as the case may be, each Class of Claims and Equity Interests.

29.    Section 1123(b)(2) of the Bankruptcy Code allows a Plan to provide for

assumption, assumption and assignment, or rejection of executory contracts and unexpired leases

pursuant to Section 365 of the Bankruptcy Code.  Consistent with 1123(b)(2) of the Bankruptcy

Code, Article VI of the Plan provides for the assumption by the Debtors and assignment to the

applicable transferee on the Effective Date of certain designated Executory Contracts and

Unexpired Leases, and the rejection of all other Executory Contracts and Unexpired Leases, in all cases in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of Section 1123(b)(2) of the Bankruptcy Code.

**f.    Section 1123(b)(3) – Retention, Enforcement and Settlement of Claims Held by the Debtors.**

30.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may provide for the settlement or adjustment of any claim or interest belonging to the Debtors or their Estates. In accordance with Section 1123(b)(3)(A), (i) Article X.E. of the Plan provides for the retention by the Debtors of Causes of Action and Litigation Claims not expressly released or settled under the Plan, and (ii) Articles X.B. and X.C. of the Plan provide for certain settlements and releases.

**g.    Section 1123(b)(4) – Sale of Assets of the Estate.**

31.    Section 1123(b)(4) of the Bankruptcy Code provides that a plan may provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among Holders of claims or interests. While the Plan does not provide for a sale of substantially all of the Debtors' assets, the New Opco Acquired Assets were marketed and will be sold to the Successful Bidder, which was the Stalking Horse Bidder, pursuant to the Plan.

**h.    Section 1123(b)(5) – Modification of the Rights of Holders of Claims.**

32.    Section 1123(b)(5) of the Bankruptcy Code provides that a plan may modify the rights of Holders of certain secured claims or of Holders of unsecured claims, or leave unaffected the rights of Holders of any class of claims. Consistent with Section 1123(b)(5), Article III of the Plan modifies, or leaves unaffected, as the case may be, the rights of Holders of each Class of Claims. Some Classes of Claims or Equity Interests receive nothing under the Plan. Some Classes of Claims receive cash and new secured notes issued by Purchaser. Some Classes of Claims receive the NPH[5] Warrants, NPH Investment Rights and the NPH Post-Effective Investment Rights. Some classes of Claims are unimpaired.

---

[5]    NPH means New Propco Holdco, and it is also sometimes referred to as Holdco.

**i.    Section 1123(b)(6) – Other Appropriate Provisions.**

33.    Section 1123(b)(6) of the Bankruptcy Code is a catchall provision that permits inclusion in the Plan of any appropriate implementation provision as long as it is not inconsistent with applicable provisions of the Bankruptcy Code.  In accordance therewith, the Plan includes additional appropriate implementation provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including: (i) the provisions of Article VII of the Plan governing distributions on account of Allowed Claims; (ii) the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (iii) the provisions of Article X of the Plan regarding the treatment of the provisions of the Plan as a Comprehensive Settlement, releases by the Debtors, releases by Holders of Claims and Equity Interests, and certain exculpation provisions.

**j.    Section 1123(d) – Cure of Defaults.**

34.    Section 1123(d) provides that if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.  In accordance with Section 1123(d), Article VI of the Plan provides for the cure of defaults in respect of all executory contracts and unexpired leases that are being assumed under the Plan and assigned to Purchaser, and requires that such cure payments be made consistent with the requirements of Section 365(b) and 365(c).

**2.    Section 1129(a)(2) – Compliance with
Applicable Provisions of the Bankruptcy Code.**

35.    Section 1129(a)(2) of the Bankruptcy Code provides that a court may confirm a plan only if the proponent of the plan complies with the applicable provisions of title 11.  Legislative history to Section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements under Sections 1125 and 1126 of the Bankruptcy Code.  *See H.R. Rep. No, 95-595*, at 412 (1977); *S. Rep. No. 95-989*, at 126 (1978) (Section 119(a)(2) requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as Section 1125 regarding disclosure).  As set forth below, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the

provisions of Sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and plan solicitation.

36.     On July 29, 2010, after notice and a hearing, the Court entered the Disclosure Statement Order, in which the Court determined that the  Disclosure Statement contained adequate information.  Subsequent thereto, the Debtors provided Holders of Claims and Equity interests with additional disclosure materials prior to the deadline for voting on the Plan.  Moreover, during the course of the Chapter 11 Cases and the Sale Process, the Debtors provided disclosures of the current financial condition of the Debtors and their Non-Debtor Subsidiaries, and of the terms and purposes of the Restructuring Transactions (including the proposed dispositions of the New Opco Acquired Assets and New Propco Acquired Assets).  The Debtors submit that they complied with the requirements of Section 1125.

### 3.     11 U.S.C. § 1129(a)(3) – Good Faith.

37.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith and not by any means forbidden by law.  "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code."  *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002).  The requisite good faith determination is based on the "totality of the circumstances."  *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 761-62 (Bankr. D. Nev. 1998).

38.     The Plan is an effort to maximize the value of the Debtors' assets for the benefit of the Debtors' creditors, through (a) the marketing and sale of the New Opco Acquired Assets for the highest and best price, and (b) the transfer of the New Propco Acquired Assets to the secured creditors with the senior interests in such assets.  The Plan itself, and the extensive arms' length negotiations among the Debtors, the Official Creditors Committee, the Opco Lenders and the Mortgage Lenders, leading to the Plan's formulation and modification, and the public support of the Plan by the Official Creditors Committee, evidences the Debtors' good faith in proposing the Plan.  Those negotiations ultimately resulted in the Plan being supported by the Mortgage Lenders, the Opco Lenders, and the Official Creditors Committee -- a broad cross-section of the various stakeholders of the Debtors.

39.     The Plan results in: (a) the New Propco Acquired Assets being transferred to the Mortgage Lenders, the creditors of Propco; and (b) the New Opco Acquired Assets being transferred to the Successful Bidder for the Purchase Price, with the liens of the Opco Lenders attaching to the sale proceeds.  There is express statutory authority, and ample precedent in numerous confirmed chapter 11 plans, for these principal components of the Restructuring Transactions.  Section 1123(a)(5)(D) expressly authorizes a chapter 11 plan to provide for the distribution of property of the estate to creditors having an interest in such property, and to provide for the sale of some or all of property of the estate.  Thus, the Plan falls well within the four corners of settled chapter 11 practice, and, if confirmed, achieves a result consistent with the objectives and purposes of the Bankruptcy Code.

### 4.     11 U.S.C. § 1129(a)(4) – Bankruptcy Court Approval of Certain Payments as Reasonable.

40.     Section 1129(a)(4) provides in relevant part that all payments of professional fees made from estate assets must be subject to review and approval by the Court as to their reasonableness.  11 U.S.C. § 1129(a)(4).  In accordance with the requirements of Section 1129(a)(4): (a) Article II.A.2. of the Plan makes all payments on account of Professional Fee Claims for services rendered prior to the Effective Date subject to the requirements of Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, as applicable, by requiring Professionals to file final fee applications with the Court; and (b) Article XI. of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.

### 5.     11 U.S.C. § 1129(a)(5) – Disclosure of New Management and Compensation of Insiders.

41.     The Plan complies with the requirements of Section 1129(a)(5) because, pursuant to the Plan, prior to the Effective Date, the Debtors will propose an individual to serve as the Plan Administrator, and such appointment will be subject to prior Court approval.  None of the entities receiving estate assets under the Restructuring Transactions is a successor to any Debtor

or an affiliate of any Debtor participating in a joint plan with the Debtors, therefore Section 1129(a)(5) does not apply to the transferees of the New Opco Acquired Assets and the New Propco Acquired Assets.

**6.      11 U.S.C. § 1129(a)(6) – Regulatory Approvals.**

42.     The Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction, therefore Section 1129(a)(6) does not apply to the Plan.

**7.      11 U.S.C. § 1129(a)(7) – Best Interests Test.**

43.     Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired Class of Claims or Equity Interests, each Holder of a Claim or Equity Interest in such impaired Class has either (a) accepted or is deemed to have accepted the Plan or, (b) as demonstrated by the Liquidation Analysis included as Exhibit C to the Disclosure Statement, will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (the so-called "best interests of creditors test").

44.     The starting point in determining whether the Plan meets the best interests of creditors test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors in the context of a chapter 7 liquidation.  The Liquidation Analysis separates the 28 affiliated Debtors (and the related Claims and Equity Interests) into two analytical frameworks:  (i) one with respect to SCI, the Parent Debtors (FCP Holding, Inc., Fertitta Partners, LLC, FCP Voteco LLC) and the Other Opco Debtors (Northern NV Acquisition, LLC, Tropicana Station, LLC, River Central, LLC and Reno Land Holdings, LLC); and (ii) one with respect to Propco and the Mezzco Debtors.  *See* Disclosure Statement, Exhibit C.

45.     Under the Plan, the creditors of SCI, the Parent Debtors and the Other Opco Debtors are receiving the net proceeds of the sale of New Opco Acquired Assets, after an extensive marketing and sale process that was approved by the Court.  If those very same assets

#4841-5833-8822                                   -16-

were liquidated in a hypothetical chapter 7 case, the net proceeds of the sale could only be less than what is being achieved under the Plan because, in a chapter 7 liquidation, one would have to factor in: (i) the substantial delay that would be incurred in connection with the appointment of a chapter 7 trustee and the time required for the trustee and his or her professionals to fully understand the Debtors' situation; (ii) the fees payable to a chapter 7 trustee and newly appointed estate professionals; and (iii) the likely discounts that would be realized in one or more chapter 7 auctions of the New Opco Acquired Assets.  *See* Liquidation Analysis at 2.

46.    Under the Plan, the creditors of Propco and the Mezzco Debtors are receiving the full value of the assets that would otherwise be liquidated in a chapter 7 case because the assets are being turned over to such creditors in accordance with the respective priorities of their interests in the assets.  A chapter 7 liquidation could only yield a discount from the value of the assets for the reasons discussed above, therefore, those creditors are also receiving at least as much under the Plan as they would receive in a chapter 7 liquidation.  *See* Liquidation Analyses at 3-10.  Accordingly, the Plan complies with the requirements of Section 1129(a)(7) with respect to each creditor that voted to reject the Plan or that was deemed to have rejected the Plan. Further, no Holder of a Claim or Equity Interest objected to confirmation of the Plan on the basis that it was not receiving or retaining under the Plan as much as it would receive in a chapter 7 liquidation of the Debtors.

### 8.    11 U.S.C. § 1129(a)(8) – Acceptance by or Unimpairment of Each Class.

47.    Subject to the exceptions contained in Section 1129(b) of the Bankruptcy Code including the "cram-down" provisions discussed below, Section 1129(a)(8) of the Bankruptcy Code requires that each Class of Claims or Equity Interests must either have accepted the Plan or not be impaired under the Plan.  A Class of Claims accepts the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in the number of Claims that actually vote on the Plan vote to accept the Plan.  *See* 11 U.S.C. § 1126(c).  A Class of Equity Interests accepts the Plan if Holders of at least two thirds of the amount of Equity Interests that actually vote on the Plan vote to accept the Plan.  *See* 11 U.S.C. § 1126(d).

48.     As indicated in the Plan and Disclosure Statement: (a) the following are Classes of Unimpaired Claims that were deemed to have accepted the Plan and were not entitled to vote on the Plan – Classes P.1, S.1, NA.1, RL.1, RC.1 and  TS.1; (b) the following are Classes of Unimpaired Claims that are deemed to have rejected the Plan and were not entitled to vote on the Plan – Classes FHI.2, FHI.3, FHI.4, FHI.5, FHI.6, FP.2, FP.3, FP.4, FP.5, FP.6, VC.2, VC.3, VC.4, VC.5, VC.6, P.3, P.4, P.5, MP.1, MP.2,  MP.3,  MS.1, MS.2, MS.3, M7.1, M7.2, M7.3, M6.1, M6.2, M6.3, M5.1, M5.3, M5.4, M4.2, M4.3, M4.4, M3.2, M3.3, M3.4, M2.2, M2.3, M2.4, M1.2, M1.3, M1.4, S.8, S.9, NA.2, NA.3, RL.2, RL.3, RC.3, RC.4, TS.3 and TS.4; and (c) the Voting Classes were Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2.  Based upon the preliminary report of the Voting Agent, of the seventeen Voting Classes, all Classes voted to accept the Plan, and no Classes of Claims voted to reject the Plan.

49.     The Plan does not comply with the requirement of Section 1129(a)(8) that all impaired Classes of Claims and Equity Interests vote to accept the Plan because Classes of Claims and Equity Interests that receive nothing under the Plan are deemed to have rejected the Plan.  Nevertheless, the Plan is confirmable because, as determined below, the Plan satisfies the cramdown requirements of Section 1129(b) of the Bankruptcy Code with respect to all non-accepting Classes.

**9.      11 U.S.C. § 1129(a)(9) – Priority Claims.**

50.     Section 1129(a)(9) of the Bankruptcy Code encompasses several requirements concerning the payment of unsecured Claims entitled to priority distribution pursuant to Section 507(a).  *See* 11 U.S.C. § 1129(a)(9).  The Plan complies with each of those requirements because the Plan provides that with respect to Administrative Claims (subject to certain exceptions for DIP Facility Claims, Superpriority Claims and other adequate protection Claims), on the later of the Effective Date or when an Administrative Claim becomes an Allowed Administrative Claim, the Administrative Claim shall be paid in cash in the full unpaid Allowed amount of the Claim, unless the Holder agrees to less favorable treatment. The Plan also provides that the rights of the Holders of Priority Tax Claims are unaltered under the Plan.  Under Section II.B. of the Plan,

Holders of Priority Tax Claims will receive, at the election of the Debtors, (i) payment in full in cash of the Allowed amount of such Claim, (ii) less favorable treatment if the Holder agrees, or (iii) installment payments in accordance with the requirements of Sections 1129(a)(9)(C) and (D). Finally, the Plan provides that the rights of the Holders of Other Priority Claims are unaltered under the Plan. Under Section II.B. of the Plan Holders of Other Priority Claims will receive payment in full in cash of the Allowed amount of such Claim. Accordingly, the Plan satisfies the requirements of Section 1129(a)(9).

### 10.    11 U.S.C. § 1129(a)(10) – One Consenting Impaired Class.

51.    Section 1129(a)(10) of the Bankruptcy Code requires that at least one Class of Claims or Equity Interests that is impaired under the Plan, has accepted the Plan, determined without including any acceptance of the Plan by any insider. Here, (based upon the preliminary report of the Voting Agent) all seventeen Classes of Claims entitled to vote voted to accept the Plan. The Plan complies with the requirements of Section 1129(a)(10) because Section 1129(a)(10) does not require an accepting impaired class for each Debtor under the joint Plan. *See, In re Charter Commc'ns, Inc.*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) (joint plan of 110 debtors that did not involve substantive consolidation; court held that only a single accepting impaired class under the plan required to satisfy Section 1129(a)(10)); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 at *234-235 (Bankr. S.D.N.Y. July 15, 2004) (joint chapter 11 plan for 177 debtors confirmed although majority of debtors lacked an impaired consenting class); *In re SGPA, Inc.*, Case No. 1-01-02609, 2001 WL 34750646, at p.7 (Bankr. M.D. Pa. Sept. 8, 2001) (bankruptcy court confirmed joint plan for multiple debtors and held that "in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan.").

52.    As stated by the *Enron* court, the plain language and inherent fundamental policy behind Section 1129(a)(10) supports the view that the affirmative vote of one impaired class under the joint plan of multiple debtors is sufficient to satisfy Section 1129(a)(10). 2004 Bankr. LEXIS 2549 at *234-235. Accordingly, the acceptance of the Plan by the seventeen Voting

Classes (based upon the preliminary report of the Voting Agent) is sufficient to satisfy the requirements of Section 1129(a)(10).

### 11. 11 U.S.C. § 1129(a)(11) – Plan is Not Likely to Be Followed By Liquidation or Need for Further Reorganization.

53.     Section 1129(a)(11) requires the Court to find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan.  The Debtors have filed with Court and distributed as part of the Disclosure Statement financial projections for New Propco covering calendar years 2010 through 2014.  The Debtors stated in their Disclosure Statement that they believe that the assumptions underlying the New Propco financial projections are reasonable, and that New Propco will be able to meet its debt service obligations.  The discussion of such New Propco financials by Dan Aronson in his Declaration in support of this Memorandum of Law indicate that New Propco is reasonably likely to be able to service its debt obligations issued in connection with the Plan.

54.     After service of the Solicitation Packages that included the financial projections for New Propco, the Debtors filed and served a Supplement to Disclosure Statement that included a set of financial projections for New Opco, covering calendar years 2011 through 2014.  The additional financial information contained therein and in the Aronson Declaration support the conclusion that New Opco is reasonably likely to be able to service its debt obligations issued in connection with the Plan.

55.     Since the Debtors are being liquidated under the Plan, the question of further financial reorganization of the Debtors is moot.  *See e.g., In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) ("under the literal wording of § 1129(a)(11) of the Bankruptcy Code, [it] is unnecessary to [show feasibility] when 'liquidation . . . is proposed in the plan.'"); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) ("The feasibility test has no application to a liquidation plan.").  Moreover, none of the entities receiving the Debtors' assets are successors to the Debtors; therefore, no feasibility finding is required with respect to those entities either.

56.    Nevertheless, where, as here, all of the New Opco Acquired Assets are being liquidated through an approved Sale Process and all of the New Propco Acquired Assets are being transferred under the Plan to the creditors with the senior interests in those assets, the Plan complies with the "feasibility" test of Section 1129(a)(11) as long as the liquidation is contemplated under the Plan, as it is here, and can be consummated.  *See e.g.*, *In re Cypresswood Land Partners, I*, 409 B.R. 396, 433 (Bankr. S.D. Tex. 2009) (plan that provides for a sale of substantially all of a debtor's assets offers a reasonable probability of success and can satisfy Section 1129(a)(11)).  Here, the New Opco Acquired Assets and New Propco Acquired Assets will be transferred to the applicable transferees under the Plan on the Effective Date.  Thus, the Plan is feasible if the transferees of the Debtors' assets under the Plan have the financial wherewithal to close on the Restructuring Transactions in a manner that has a reasonable prospect of resulting in the consummation of the Plan.  To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success.  *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

57.    Based upon (i) the financial projections for New Propco and New Opco, (ii) the clear financial wherewith and desire of the parties to the Restructuring Transactions to close on the Effective Date, (iii) the evidence that the Backstop Parties are willing to purchase up to $100 million of equity in New Propco, and (v) the willingness of the Official Creditors Committee to shift from zealous opponent to strong supporter of the Plan because the Plan now provides general unsecured creditors with the NPH Warrants, NPH Investment Rights and the NPH Post-Effective Investment Rights, the Debtors submit that is more likely than not that: (a) Purchaser will close on the Stalking Horse APA, (b) New Propco, its affiliates and the Debtors will be able to effectuate all of the other Restructuring Transactions, and (c) New Propco and New Opco will be able to service the debt obligations they are issuing in connection with the Restructuring Transactions.  No contrary evidence was submitted, and no objection to confirmation of the Plan was filed on feasibility grounds, by any Holder of Claims or Equity Interests or any other party in interest.

### 12.    11 U.S.C. § 1129(a)(12) – All Statutory Fees Have Been or Will Be Paid.

58.    Section 1129(a)(12) of the Bankruptcy Code requires that all fees payable under 28 U.S.C. § 1930, be paid or provided for in the Plan.  In accordance with the requirements of Section 1129(a)(12), Article XII.B. of the Plan provides that Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash on the Effective Date.  After the Effective Date, the Reorganized Debtors shall pay all required fees pursuant to 28 U.S.C. § 1930 or any other statutory requirement and comply with all statutory reporting requirements.

### 13.    11 U.S.C. §§ 1129(a)(13) through (a)(16) – Inapplicable Provisions.

59.    The Debtors are liquidating, and after the Effective Date will have no obligations regarding any retiree benefits of the kind referred to in Section 1114.  Therefore, Section 1129(a)(13) does not apply to the Plan.  Sections 1129(a)(14), (15) and (16) address domestic support obligations, individual debtors, and non-moneyed businesses, and they do not apply to the Debtors.

### 14.    11 U.S.C. §§ 1129(b) – Confirmation of the Plan Over the Nonacceptance of Impaired Classes.

60.    Section 1129(b) of the Bankruptcy Code authorizes the Court to confirm the Plan even if not all Impaired Classes have accepted the Plan (a "cramdown"), provided that such Plan has been accepted by at least one impaired Class and the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class that voted to reject the Plan.  Here, all seventeen impaired Voting Classes voted to accept the Plan (based upon the preliminary report of the Voting Agent).  Thus, the Court may "cram down" the Plan over the dissenting vote of an Impaired Class or Classes as long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting Class or Classes.  Section 1129(b)(2) outlines what may be considered "fair and equitable" with respect to the various types of Claims asserted against the Debtors.

#4841-5833-8822

61.     The Plan is fair and equitable with respect to non-accepting Classes of Secured Creditors because the Plan expressly complies with the requirements of Section 1129(b)(2)(A). With respect to the Opco Lenders, the Plan provides them with the cramdown treatment contained in Section 1129(b)(2)(A)(ii).

62.     The Plan is fair and equitable with respect to all non-accepting Classes of Unsecured Claims because: (a) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed Claim; or (b) the Holders of any Claims (or Equity Interests) that are junior to the non-accepting Class will not receive any property under the Plan (the "absolute priority rule").  The Plan strictly adheres to the absolute priority rule for each Debtor and nowhere does the Plan provide for distributions to the Holders of any Claims or Equity Interests that are junior to any non-accepting Class of Claims of the subject Debtor.

63.     The Plan is fair and equitable with respect to all non-accepting Classes of Equity Interests because: (a) each Holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the interest; or (b) the Holder of an interest that is junior to the Non Accepting Class will not receive or retain any property under the Plan.

64.     Furthermore, the Plan does not discriminate unfairly with respect to any non-accepting Class because the value of the cash and/or securities to be distributed to each Class under the Plan is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the non-accepting Class.  Exact parity is not required.  Any discrepancy in treatment or potential distributions to unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.   Accordingly, the Plan may be confirmed under Section 1129(b).

1          **15.      Bankruptcy Rule 3016(a).**

2          65.      In accordance with the requirements of Bankruptcy Rule 3016(a), the Plan is

3    dated and identifies the entities submitting the Plan.

4          **16.      Section 1129(d) – Purpose of Plan.**

5          66.      The primary purpose of the Plan is not avoidance of taxes or avoidance of the

6    requirements of Section 5 of the Securities Act, and there has been no objection filed by any

7    governmental unit asserting any such avoidance.  Accordingly, the Plan is in compliance with

8    Section 1129(d) of the Bankruptcy Code.

9          **B.      SETTLEMENT, RELEASE, INJUNCTION AND
                EXCULPATION PROVISIONS OF PLAN ARE**
10               **APPROPRIATE AND SHOULD BE APPROVED.**

11         67.      Article X. of the Plan sets forth various settlement, releases, exculpations and

12   related injunction provisions.  As discussed in greater detail below, based upon the wide ranging

13   support for the Plan among the Debtors' creditors, and the fact that the Plan is the best option the

14   Debtors' have to maximize the value of their assets for the creditors, the settlement, release,

15   exculpation and related provisions of Article X. of the Plan are fair and necessary for the

16   successful implementation of the Plan.

17         **1.      The Comprehensive Settlement.**

18         68.      Article X.B.1. of the Plan provides that the Plan constitutes a general

19   comprehensive settlement (the "Comprehensive Settlement") of all Claims, Litigation Claims,

20   Causes of Action and controversies relating to (a) the rights that Holders of Claims or Equity

21   Interests may have with respect to any Claim or Equity Interest against any Debtors, (b) the

22   distributions, if any, made under the Plan on account of such Claims and Equity Interests, and

23   (c) any Claims or Causes of Action of any party arising out of or relating to the Going Private

24   Transaction and all transactions relating thereto (discussed in more detail in the very next section

25   below).  No party in interest objected to the Comprehensive Settlement.

26         69.      The Comprehensive Settlement is a fundamental component of the overall

27   restructuring contained in the Plan because it assures the Debtors and the Estates that the Plan

28   and the distributions made thereunder will result in the final settlement and satisfaction of the

various Claims and Equity Interests against the Debtors.  In addition, the Comprehensive

Settlement promotes the finality of the Plan and repose.

### 2. The Global Settlement.

70. Article X.B.2 of the Plan also sets forth and implements the Global Settlement,

which provides for the compromise and settlement of all of the Going Private Transaction

Causes of Action among the Debtors, the non-Debtor Affiliates of the Debtors, the Debtors

Estates, and any Person.  Article X.B.3. provides for a release of the Going Private Transaction

Causes of Action by the Releasing Parties, which Releasing Parties includes the Debtors, their

Estates and any Holder of a Claim or Equity Interest that would have been able to assert the

Going Private Transaction Causes of Action for or on behalf of the Debtors or their Estates.  As a

practical matter, the Going Private Transaction Causes of Action will be released when the Plan

becomes effective.

71. As defined in the Plan, and discussed in greater detail in the Disclosure Statement

and various reports discussed below, the Going Private Transaction means the buy-out

transaction that occurred in November of 2007, pursuant to which, among other things, SCI was

acquired by virtue of a merger of FCP Acquisition Sub with and into SCI, with SCI continuing as

the surviving corporation, and the sale-and-leaseback transaction with respect to the Propco

Properties was consummated.  Also as defined in the Plan, the Going Private Transaction Causes

of Action means any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions

and any other legal or equitable remedies against any Person arising from any transaction

comprising or related to the Going Private Transaction, regardless of whether such Claims,

Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted

pursuant to the Bankruptcy Code or any other applicable law.

72. As described in the Disclosure Statement at Article II.D.3., during the course of

the Debtors' prepetition restructuring negotiations efforts, certain Holders of the Senior Notes

and Subordinated Notes expressed that SCI might have fraudulent conveyance and related claims

against third parties that could be asserted by SCI in connection with the 2007 Going Private

Transaction.  SCI's Board of Directors authorized the formation of an independent Special

1  Litigation Committee (the "SLC") to investigate and report to the Board regarding whether SCI

2  had colorable claims that could be brought against lenders, former stockholders or others, in

3  connection with the 2007 Going Private Transaction.  The SLC retained its own independent

4  legal counsel, Squire Sanders & Dempsey L.L.P., and hired its own independent financial

5  advisor, Odyssey Capital Group, LLC, to perform expert financial analysis in connection with its

6  investigation.  Neither professional firm had ever performed work for SCI, its affiliates, the

7  Fertitta family, or any of their affiliates.

8         73.    The SLC filed its findings with the Court on September 22, 2009 (docket no 353)

9  (the "SLC Report").  The SLC determined that:

10       i.  The financial projections for the 2007 Going Private Transaction were
   reasonable when made and were not unduly optimistic or overly
11  aggressive.

12      ii.  SCI was not insolvent at the time of the Going Private Transaction and did
   not become insolvent as a result of the Going Private Transaction.

13     iii.  SCI was not left with unreasonably small capital.

14      iv.  SCI did not intend or expect to incur debts beyond its ability to pay those
15  debts as they matured.

16      v.  No person or entity intended to nor believed the Going Private Transaction
   would defraud, hinder, or delay a creditor of SCI.

17      vi.  The participants in the Going Private Transaction had a good faith belief
18  that the Going Private Transaction would succeed and that SCI would
   enjoy continued growth.

19     vii.  No person or entity engaged in inequitable conduct in connection with the
20  Going Private Transaction.

21         74.    After the issuance of the SLC Report the Official Creditors Committee raised a

22  number of questions regarding the SLC Report.  On December 18, 2009, the SLC filed its

23  Supplemental SLC Report (docket no. 721) responsive to the issues raised by the Official

24  Creditors Committee.  In the Supplemental SLC Report, the SLC concluded that the Master

25  Lease[6] was a true lease, not a disguised financing, and that any litigation seeking to

26  ---

27  [6] The Master Lease (as discussed in the Disclosure Statement and in numerous pleadings filed with the Court in
   connection with Court approved amendments to the Master Lease) is between Debtor Propco as landlord and Debtor
   SCI as tenant, and was entered into at the same time as the Going Private Transaction.  Under the Master Lease, SCI
28  leases the real property and improvements associated with Boulder Station Hotel & Casino, Red Rock Casino Resort
   Spa, Palace Station Hotel & Casino and Sunset Station Hotel & Casino (collectively, the "Leased Hotels").  The

1   recharacterize the Master Lease as disguised secured financing would be unsuccessful and a

2   waste of Estate resources.

3          75.    On December 28, 2009, the Official Creditors Committee filed a motion seeking

4   standing and authority to prosecute the Going Private Transaction Causes of Action.  The

5   Debtors, the Administrative Agent for the Opco Lenders, the Mortgage Lenders and others filed

6   oppositions to the motion.  A hearing was held on the motion but the Court deferred ruling on the

7   Motion until the hearing on approval of the Debtors' Disclosure Statement.  By the time the

8   Court entered the Disclosure Statement Order on July 29, 2010, the Official Creditors Committee

9   had (a) announced its support for the Plan, including the Global Settlement and the other terms

10  of the Plan, and (b) announced that it would not be pursuing the motion for standing to pursue

11  the Going Private Transaction Causes of Action.

12         76.    Based upon the SLC Report and SLC Supplementary Report, it is a reasonable

13  exercise of the Debtors' business judgment to propose a chapter 11 plan that avoids the years of

14  delay in effectuating a restructuring that would be caused by launching litigation based upon the

15  Going Private Transaction Causes of Action.  Moreover, as demonstrated by the SLC Report, the

16  plaintiffs in any such litigation would have had a very difficult time proving that SCI was

17  insolvent at the time of the Going Private Transaction.  Among other things, at the time of the

18  transaction in 2007, very sophisticated investors made a $2.7 billion dollar equity investment; the

19  management of SCI invested over $900 million in stock (stock that was publicly traded and

20  could have been sold to a third party buyer for substantial value in 2007); and large sophisticated

21  financial institutions loaned $3.65 billion into the transaction.  The notion that all of these

22  entities would make these investments knowing or having good reason to believe that SCI was

23  insolvent appears implausible.  Thus the proponents of a litigation strategy, and there are none,

24  would be unable to show a likelihood of success in any such litigation.

25  ────────────────────────

26  Leased Hotels, in turn, are operated by SCI and certain of its non-debtor operating subsidiaries.  The Master Lease
    provides for monthly rental payments from SCI to Propco in amounts that exceed the amounts that Propco requires
    to meet its ordinary debt service obligations and any other expenses not covered by SCI under the "triple net"

27  provisions of the Master Lease.  Subject to certain conditions, the governing documents permit some of the surplus
    cash to be upstreamed as dividends to the Mezzanine Entities that own equity up the Propco "stack" to service such

28  Mezzanine Entities' debt, with any residual amounts then ultimately "flowing back" to SCI as the ultimate parent
    entity.

77.    In addition, the Going Private Transaction litigation would be extremely complex litigation, extremely costly litigation, and the delay attendant to such litigation could put a serious damper on the ability of the Debtors to ever obtain the benefits of chapter 11.  Thus, it is not surprising that the Debtors' principal creditor constituencies support the Plan and the release of the Going Private Transaction Causes of Action.

78.    The Debtors submit that the Global Settlement is consistent with the factors enunciated in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), and *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377 (9th Cir. 1986), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854 (1986), for approval of settlements in bankruptcy cases.  The extremely low probability of success in the litigation, the complexity, expense and delay necessarily attending it, and the paramount interest of the creditors and a proper deference to their reasonable views all weigh heavily in favor of settlement here, not litigation.  The most important factor, however, and the one that weighs most heavily in favor of the result achieved under the Plan, is that the litigation might not just delay, but might kill what would otherwise be a very successful chapter 11 deleveraging and restructuring during a time of severe economic disruption in the gaming industry and in the State of Nevada.  The Debtors submit that the Global Settlement and the provisions of Article X.B.2. constitute a fair and equitable settlement that is in the best interests of the creditors and their estates, and one that satisfies in all respects the requirements of *TMT Trailer* and *In re A & C Properties* for settlements proposed by chapter 11 debtors.  In connection with the Confirmation Hearing, no party in interest has objected to the Global Settlement.

### 3.    The Plan's Release Provisions.

79.    Article X.C. of the Plan provides for certain releases.  The releases are: (a) releases of claims held by the Debtors and their Estates (Article X.C.1.) against the identified released parties, to the fullest extent permissible under applicable law; and (b) voluntary releases of claims held by Holders of Claims and Equity Interests against the identified released parties, to the fullest extent permissible under applicable law (Article X.C.2.).

### a.    The Debtors' Release.

80.    Article X.C.1. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, the Debtors, the Debtors' Estates, the Non-Debtor Affiliates and each of their respective Related Persons fully releases and discharges (the "Debtors' Release") each of the following parties and their respective properties and Related Persons from any and all claims and causes of action (including, without limitation, the Going Private Transaction Causes of Action) based on any act, omission or event that takes place on or prior to the Effective Date and arises from or is related to the Debtors, the Reorganized Debtors or their respective assets, property, Estates, the Chapter 11 Cases, the Disclosure Statement, the Plan or the solicitation of votes on the Plan that either the releasing parties could assert or that any Holder of a Claim or Equity Interest could assert for or on behalf of the Debtors or their Estates (whether directly or derivatively):  (a) the Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h) the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the Official Creditors Committee and its members, provided that the Committee Support Stipulation has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Effective Date; and (s) the respective Related Persons of each of the foregoing Entities (defined in the Plan as the "Released Parties").

81.    The Debtors' Release is an appropriate term of the Plan and expressly authorized by Section 1123(b)(3)(A) (the settlement or adjustment of any claim belong to the debtor or the estate).  Moreover, given the particular circumstances of these Chapter 11 Cases, the Debtors' Release reflects a sound exercise of the Debtors' business judgment.  The Chapter 11 Cases involved a multitude of complex issues.  In order to effectively implement the Plan and the Restructuring Transactions, the non-Debtor parties thereto need assurance that they will not be

subject to any further liability to the Debtors, their Estates, or any party that seeks to bring a claim on behalf of the Debtors or their Estates.  Absent the Debtors' Release, it is likely that the various Released Parties would not commit to support the Plan because they would remain exposed to potential claims and causes of action.

### b. The Third Party Release.

82.    Article X.C.2. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, each Holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in Article X.C.2 fully releases and discharges (the "Third Party Release") each of the Released Parties from any and all claims and causes of action (including, without limitation, the Going Private Transaction Causes of Action) based on any act, omission or event that takes place on or before the Effective Date in any way relating or pertaining to (v) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (w) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (x) the Chapter 11 Cases, (y) the negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement; and (z) the Going Private Transaction Causes of Action.

83.    Similar to the Debtors' Release, the Third Party Release provides additional assurance to the parties to the Restructuring Transactions and the other parties in interest in the Chapter 11 Cases that their liability on account of claims related to the Debtors (including the Going Private Transaction Causes of Action) will be minimized, and provides an additional incentive for such parties to settle and consent to the Plan.  In addition, a release of non-debtor third parties voluntarily and knowingly given by a creditor or equity holder in connection with a chapter 11 plan is not an impermissible third party release.

84.    Section 524(e) provides in relevant part that the "discharge of a debt of the debtor does not affect the liability of any other entity, on or the property of any other entity for, such debt."  In *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), the Court of Appeals for the Ninth

Circuit held that Section 524(e) applies to chapter 11 plan bankruptcy discharges. However, a voluntary creditor release does implicate the concerns expressed in *Lowenschuss*. *See e.g., In re Pacific Gas & Elec. Co.*, 304 B.R. 395, 416-18 (Bankr. N.D. Cal. 2004) (confirming plan that included governmental agency's release of debtor's parent entity and its officers and directors because the agency had consented to the release); *see also In re Hotel Mt. Lassen, Inc.*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("[a]ny third-party release in connection with a plan or reorganization, at a minimum, must be fully disclosed and purely voluntary on the part of the releasing parties and cannot unfairly discriminate against others.").

85.    Here, the Third Party Releases set forth in Article X.C.2. of the Plan are being made on a wholly voluntary basis by such Holder of a Claim or Equity Interest that has indicated on its Ballot that it is consenting to such release. The Ballots sent to each Holder of a Claim or Equity Interest entitled to vote on the Plan unambiguously stated that the election to consent to such release was at such Holder's option. The entirely voluntary Third Party Release is an effective tool in winning the necessary support for the Plan and the Restructuring Transactions, and does not unnecessarily trample on the rights of any party that did not agree to such Third Party Release. Accordingly, the Third Party Release does not violate Section 524(e) or any of the concerns discussed in *Lowenschuss* and is an appropriate term of the Plan under Section 1123(a)(5). Also, in connection with the Confirmation Hearing, no party in interest objected to the Debtors' Release or the Third Party Release.

**4.    The Plan's Exculpation of Certain Parties.**

86.    Article X.D. of the Plan provides, subject to certain identified exceptions, an exculpation of the following parties from any claims or causes of action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effecting the consummation of the Plan, the Disclosure Statement or any sale, contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the

approval of the Disclosure Statement, confirmation or Consummation of the Plan: the Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h) the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the Official Creditors Committee and its members, provided that the Committee Support Stipulation has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Effective Date; and (s) the respective Related Persons of each of the foregoing Entities.

87.    The Plan's exculpation provision provides additional incentive for the various major parties to the Chapter 11 Cases to commit to and support the Plan and the Restructuring Transactions.  The exculpation ensures that such parties will not be subject to any claims or causes of action relating to their good faith acts or omissions in the restructuring efforts that began almost a year prior to the Petition Date.  The exculpation ensures that the Plan and Restructuring Transactions will have finality, and that the parties thereto will not be subject to collateral attacks through litigation against the Plan's proponents and supporters.

88.    The Plan exculpation provisions do not violate Section 524(e) or the concerns expressed in *Lowenschuss*, *supra,* because they are based upon the more limited exculpation provisions that are expressly contemplated and permitted by Bankruptcy Code Section 1125(e), which provides a grant of immunity from liability not only under the securities laws, but also under any law, rule, or regulation governing solicitation or acceptance of a plan, to any person that participates in good faith in the solicitation of acceptances of a plan or the offer, issuance, sale or purchase of a security offered or sold in connection with the plan.  Moreover, read literally, nothing in Section 1125(e) limits that protection to post-petition activities.  In addition, another related provision of Section 1125, Section 1125(g), contemplates and authorizes

solicitation of acceptances of a chapter 11 plan prior to commencement of a bankruptcy case if solicited in compliance with applicable non-bankruptcy law.

89.     Here, as discussed in Article II. of the Disclosure Statement, the Debtors conducted such pre-bankruptcy solicitations as part of their ongoing restructuring efforts dating back to late 2008.  Specifically, during 2008 and the first six months of 2009, the Debtors engaged in various discussions with the lenders under the Prepetition Opco Credit Agreement and the CMBS Loans and Holders of the Senior Notes and Senior Subordinated Notes regarding restructuring alternatives for the Debtors' outstanding indebtedness.  Indeed, in November 2008, the Debtors made an offer to exchange new secured term loans for the outstanding Senior Notes and Senior Subordinated Notes, which would have included a restructuring of the Prepetition Opco Credit Agreement and the CMBS Loans.  The November 2008 exchange offer was unsuccessful.

90.     In February 2009, the Debtors solicited votes from the Holders of the Senior Notes and Senior Subordinated Notes for a prepackaged plan of reorganization pursuant to which the Holders of the Senior Notes and Senior Subordinated Notes would have received second and third lien notes, respectively, and cash in a plan of reorganization, and the outstanding indebtedness under the Prepetition Opco Credit Agreement and CMBS Loans would have been restructured.  The solicitation for the prepackaged plan of reorganization did not receive sufficient votes to approve the plan, and that plan did not proceed.

91.     In March 2009, the Holders of a majority in principal amount of each series of Senior Notes and Senior Subordinated Notes entered into a forbearance agreement with SCI with respect to the events of default resulting from SCI's failure to pay interest on the Senior Notes and Senior Subordinated Notes.  Majority lenders under the Prepetition Opco Credit Agreement likewise entered into a forbearance agreement with SCI relating to various purported events of default.  During the period from March 2009 to the commencement of the Chapter 11 Cases, the Debtors continued to negotiate the terms of a consensual restructuring with the various creditors of the Debtors.

92.     The pre-petition restructuring efforts are precisely the type of activity that Section 1125(e) is designed to protect.  It would be inequitable, and would not comport with the plain intent of Section 1125(e) if, after confirmation of the Plan and implementation of the Restructuring Transactions, the Exculpated Parties -- the persons and entities on the Debtor and creditor sides that actively participated in the process of reaching a consensual chapter 11 plan -- could then be sued for their good faith prepetition and post-petition restructuring efforts.[7] Accordingly, the Debtors submit that each of the Exculpated Parties is entitled to the protections afforded them by Section 1125(e) and Article X.D. of the Plan.

93.     Based on the foregoing, the Debtors submit that the settlement, release, injunction and exculpation provisions set forth in Article X. of the Plan (i) are integral to the agreement among the various parties in interest and the overall objectives of the Plan and the Restructuring Transactions, (ii) are essential to the formulation and successful implementation of the Plan and the Restructuring Transactions for the purposes of Section 1123(a)(5) of the Bankruptcy Code, (iv) are being provided for valuable consideration and have been negotiated in good faith and at arms' length, (v) confer material and substantial benefits on the Debtors' Estates, and (vi) are in the best interests of the Debtors, their Estates and other parties in interest and, as to the releases made by, or on behalf of, the Debtors or the Estates, are based on sound business judgment.

### 5.     The "No Successor Liability" Provisions of the Plan.

94.     Section 1141(c) provides in relevant part that "after confirmation of a plan, the property dealt with by a plan is free and clear of all claims and interests of creditors, equity security Holders, and of general partners of the debtor.  11 U.S.C. § 1141(c).[8]  Section 363(f) provides statutory authority for the sale of estate property free and clear of "interests in the

---

[7]  Other bankruptcy courts in recent contested chapter 11 cases have approved plan exculpation clauses at least as broad, if not broader, in scope than that proposed in these Chapter 11 Cases.  *See, e.g., In re Citadel Broadcasting, Inc.*, Case No. 09-17442, 2010 WL 210808, at *30 (Bankr. S.D.N.Y. May 19, 2010) ("Exculpated Claims" included all claims relating to the debtors' in or out of court restructuring efforts, and "Exculpated Parties" included, among others, the Holders of the senior secured debt and their agent, the agent and indenture trustee for the subordinated noteholders, and each of their respective professionals and affiliates); *In re CIT Group, Inc.*, Case No. 09-16565, 2009 WL 4824498 (Bankr. S.D.N.Y. Dec. 8, 2009) at *25 (the exculpated parties included a steering committee of prepetition lenders, the DIP lenders and their agent, the exit facility lenders and their agent, the indenture trustees for the unsecured note issuances)

[8] Section 1141(c) is expressly subject to the provisions of Section 1141(d)(3), which provides that confirmation of a plan does not discharge a liquidating debtor, but Section 1141(c) refers to *property* of the debtor,  not the debtor.

property," and courts have generally interpreted Section 363(f) to authorize sales free and clear

of liens and claims.  *See e.g., In re Trans World Airlines*, 322 F.3d 283, 290 (3d Cir. 2003)

(holding that unsecured claims of debtor's employees "are interests within the meaning of

Section 363(f) in the sense that they arise from the property being sold*."); Myers v. United*

*States*, 297 B.R. 774, 781-82 (S.D.Cal. 2003) (concluding that purchaser had acquired assets of

debtor free and clear of plaintiff's unsecured personal injury claims).  Courts have also expressly

held that transferees of a debtor's assets pursuant to a sale approved under Section 363 or

pursuant to confirmation of a chapter 11 plan are not liable for claims against the debtor under

successor liability theories.  *See e.g., In re Trans World Airlines, supra* (Section 363 sale); *Myers*

*v. United States*, *supra* (Section 363 sale); *In re White Motor Credit Corp.*, 75 B.R. 944, 950

(Bankr. N.D. Ohio 1987) (confirmation of plan).  The court in *White Motor Credit Corp.* held

that state law successor liability theories are preempted by the Bankruptcy Code.  75 B.R. at 950.

95.    The Plan provides that the entities receiving the New Opco Acquired Assets and

New Propco Acquired Assets and their subsidiaries, creditors and equity Holders, shall have no

successor liability for creditors' Claims (including Claims of governmental entities) against the

Debtors and the Non-Debtor Affiliates, or otherwise based upon the implementation of the Plan,

and such intent of the Plan was plainly described in the Disclosure Statement.  No party in

interest objected to such Plan term.

96.    Even if the Court were to apply traditional successor liability analysis to the

transfers of the New Opco Acquired Assets and New Propco Acquired Assets under the Plan, the

default rule under state law is that purchasers have no successor liability.  *Village Builders 96,*

*L.P. v. U.S. Laboratories, Inc.*, 112 P.3d 1082, 1087 (Nev. 2005) ("[I]t is the general rule that

when one corporation sells all of its assets to another corporation the purchaser is not liable for

the debts of the seller." (*quoting Lamb v. Leroy Corp.*, 454 P.2d 24, 26–27 (Nev. 1969)).

Successor liability against purchasers is only applied when one of the exceptions to the default

rule against successor liability has been proven.  *Village Builders*, 121 Nev. At 268 (purchasers

of assets have no successor liability unless one of the following four exceptions are met: (a) the

transferee has agreed to assume the transferor's liabilities; (b) the transaction is a *de facto*

1    *merger*; (c) the transferee is mere continuation of transferor; or (d) the transaction is a fraud to

2    escape liabilities).

3        97.    The evidence here strongly supports a finding of no successor liability because

4    none of the *Village Builders* exceptions to the general rule of no successor liability apply to the

5    Restructuring Transactions and implementation of the Plan.  <u>First</u>, the transferees of the New

6    Opco Acquired Assets and New Propco Acquired assets are not assuming the Debtors' liabilities;

7    the Plan and the other Restructuring Transactions Related Documents are clear and unequivocal

8    on that point.

9        98.    <u>Second</u>, courts generally will not find a *de facto* merger unless the consideration

10   for the assets is the stock of the transferee, which is not the case here.  *See Louisiana-Pacific*

11   *Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264-65 (9th Cir. 1990) (overruled on other grounds)

12   (finding no continuity of shareholders where consideration paid by purchaser was a combination

13   of cash, promissory note and payment of some debts, and no stock in purchaser or its parent

14   company was exchanged as part of the sale); *see also Ferguson v. Arcata Redwood Co., LLC*,

15   No. C03-05632, 2004 WL 2600471, *4 (N.D.Cal. Nov. 12, 2004) (purchaser was not alleged to

16   have purchased seller's assets with stock, precluding a finding of successor liability); *Kaleta v.*

17   *Whittaker Corp.*, 221 Ill. App. 3d 705, 709 (1991) (when payment for assets by stock of

18   transferee is not present, sound policy does not support imposing the predecessor's liabilities

19   upon the successor "when it has already paid a substantial price for the assets of the

20   predecessor.").  Here, the consideration for New Opco Acquired Assets is cash and secured notes

21   issued by Purchaser; and the New Propco Acquired Assets are being transferred in exchange for

22   and on account of the secured claims of the creditors of Propco.  None of the consideration for

23   the assets being transferred under the Plan is the stock of transferee.

24       99.    <u>Third</u>, courts will not find a *de facto* merger or that the transferee is a mere

25   continuation of the transferor unless the shareholders of the transferor and transferee are

26   substantially the same, which is not the case here.  *See e.g. Village Builders*, 121 Nev. at 274 (no

27   showing of mere continuation without "<u>identity</u> of stock, stockholders and directors between the

28   two corporations") (emphasis added).  *See also*, *Commercial Nat'l Bank v. Newtson,* 39

1   Ill.App.3d 216, 217 (1976) (applying the general rule against corporate successor liability in a

2   situation where one shareholder owned 25% of the predecessor corporation, and after the asset

3   transfer the same shareholder owned 40% of the successor corporation); *Joseph Huber Brewing*

4   *Co., Inc. v. Pamado, Inc.*, No. 05 C 2783, 2006 WL 2583719, *12-13 (N.D.Ill., September 5,

5   2006) (finding that a continuity of minority ownership—approximately 15%—does not weigh in

6   favor of a finding for the continuation exception); *Jeong v. Onada Cement Co., Ltd.*, No. CV 99-

7   11092, 2000 WL 33954824, *4 fn 4 (C.D.Cal., May 17, 2000) (acknowledging that under

8   California law, successor liability exists where shareholders are "practically" the same).

9       100.    Here, there is no identity of stock, stockholders or directors between the transferor

10  and the transferee.  The transferors, the Debtors and their Non-Debtor Subsidiaries, are currently

11  owned directly and indirectly by Colony Capital and the Fertitta family.  Colony owns

12  approximately 74% of the economic value of such stock, the Fertitta family approximately 26%.

13  The transferee, however, New Propco and its affiliates, will be owned 40% by the current

14  Mortgage Lenders and Mezzco Lenders, 15% by the general unsecured creditors of the Debtors

15  that acquire equity through the Propco Rights Offering, and 45% by Fertitta Gaming LLC.  Not

16  only will there be no identity of stock and stockholders between transferee and transferor, but a

17  majority of the transferee stock will be held by entities that hold no stock in the transferor

18  Debtors.  Moreover, while the majority of the current directors of the Debtors are appointed by

19  Colony and the Fertittas, the majority of the directors of the transferee will be appointed by the

20  creditors receiving the stock in transferee.  Thus, transferee is not, under Nevada law, a mere

21  continuation of the Debtors.

22      101.    <u>Fourth</u>, numerous courts, including Nevada courts, have not found the transferee

23  to be a mere continuation of the transferor where the selling corporation continues to exist, even

24  if the selling corporation ceases its business operations.  For example, in *Village Builders*, *supra*,

25  where the Nevada Supreme Court declined to find successor liability, the transferor had sold all

26  of its assets, but the transferor corporation was maintained for the purpose of a pending lawsuit.

27  121 Nev. at 272.  Other jurisdictions have reached similar conclusions. *See, e.g.*, *Schumacher v.*

28  *Richards Shear Co.*, 59 N.Y.S.2d 239, 245 (1983) ("Since Richards Shear survived the instant

purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly

concluded that Logemann cannot be considered a mere continuation of Richards Shear.");

*Gavette v. The Warner & Swasey Co.*, No. 90-CV-217, 1999 WL 118438, at *5 (N.D.N.Y. Mar.

5, 1999) (finding that *de facto* merger did not lie because the seller corporation continued to exist

"at least transcendentally for one year.").  Here, like the transferor in *Village Builders*, the

Debtors will continue to exist after the Effective Date for the purpose of facilitating Plan

implementation, claims adjudication and distribution related processes, including possibly

pursuing retained causes of action.[9]

102.    Other facts relevant to a finding of no successor liability are: (a) Purchaser is not

purchasing all of the Debtors' assets in that Purchaser is not purchasing any of the assets listed

on Schedule 2.4 of the Stalking Horse APA; and (b) those of the Debtors' employees who are to

be employed by New Opco and New Propco are being hired under new employment contracts or

other arrangements to be entered into or to become effective at the time of the asset transfers.

103.    Finally, the Plan is unmistakably not a fraud to escape liabilities.  The record of

the Chapter 11 Cases shows that the parties to the Plan have acted in good faith, the Plan has

been proposed in good faith, and the Plan accomplishes the goals of maximizing the value of the

Debtors' assets for the benefits of the Debtors' creditors.  Thus, based upon the facts of these

Chapter 11 Cases, none of the exceptions to the rule against successor liability under Nevada law

apply.

104.    In summary, the operation of Sections 363 and 1141 foreclose the ability of

creditors to obtain a finding of successor liability against the transferees of the Debtors' assets.

It would undermine the purposes of chapter 11 if creditors could get around the effect of

confirmation of a chapter 11 plan by asserting successor liability claims after confirmation.  *See*

*e.g., In re Trans World Airlines*, 322 F.3d at 292 (to allow some general unsecured creditors to

assert successor liability claims against transferee of debtors' assets, while limiting other

creditors' recourse to proceeds of sale, would be inconsistent with Bankruptcy Code's priority

---

[9]    The Debtors intend to file a number of non-material Plan modifications, one of which will provide for the
continuation of the Debtors post-Effective Date.

scheme).  Even if the Court performed the successor liability analysis under Nevada law, it would find no basis at all for successor liability.  Accordingly, the "no successor liability" provisions of the Plan are consistent with applicable law and should be enforced.

**III.    CONCLUSION.**

105.    Several days prior to the Confirmation Hearing, the Debtors will lodge their proposed:

(a)    "Findings of Fact and Conclusions of Law Regarding Confirmation of 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010),'" and

(b)    "Order Confirming 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010).'"

The Debtors respectfully request that the Court enter the proposed Confirmation Order and proposed Findings of Fact and Conclusions of Law.

Dated:  August 20, 2010                    Respectfully submitted,

By: ___/s/ *Paul S. Aronzon*_____
Paul S. Aronzon, CA State Bar #88781
Thomas R. Kreller, CA State Bar #161922
Fred Neufeld, CA Bar #150759
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Reorganization Counsel for
Debtors and Debtors in Possession

and

Laury M. Macauley, NV State Bar No. 11413
Dawn M. Cica, NV State Bar No. 004595
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV 89501

Local Reorganization Counsel
For Debtors and Debtors in Possession

#4841-5833-8822                    -39-