**Entered on Docket**
**August 27, 2010**

_____
**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:     (213) 892-4000
Facsimile:     (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:     (775) 823-2900
Facsimile:     (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Chapter 11 |
| STATION CASINOS, INC. | Case No. BK-09-52477<br>Jointly Administered BK 09-52470 through<br>BK 09-52487 and BK 10-50381 |

☒ Affects this Debtor
☐ Affects all Debtors
☒ Affects Northern NV Acquisitions, LLC
☒ Affects Reno Land Holdings, LLC
☒ Affects River Central, LLC
☒ Affects Tropicana Station, LLC
☒ Affects FCP Holding, Inc.
☒ Affects FCP Voteco, LLC
☒ Affects Fertitta Partners LLC
☒ Affects FCP MezzCo Parent, LLC
☒ Affects FCP MezzCo Parent Sub, LLC
☒ Affects FCP MezzCo Borrower VII, LLC
☒ Affects FCP MezzCo Borrower VI, LLC
☒ Affects FCP MezzCo Borrower V, LLC
☒ Affects FCP MezzCo Borrower IV, LLC
☒ Affects FCP MezzCo Borrower III, LLC
☒ Affects FCP MezzCo Borrower II, LLC
☒ Affects FCP MezzCo Borrower I, LLC
☒ Affects FCP PropCo, LLC
☐ Affects GV Ranch Station, Inc

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF "FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR STATION CASINOS, INC. AND ITS AFFILIATED DEBTORS (DATED JULY 28, 2010)"**

#4844-2396-4935v21

I.    **INTRODUCTION.**

1.    On July 28, 2010, Station Casinos, Inc. ("SCI") and the other above-captioned debtors and debtors in possession (but excluding GV Ranch Station, Inc.[1]) (collectively, the "Debtors") filed their "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 1863) (the "Plan"). Also on July 28, 2010, the Debtors filed their "Disclosure Statement to Accompany First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 1864) (the "Disclosure Statement").

2.    On July 29, 2010, the Court entered the "Amended Order (A) Approving Disclosure Statement, (B) Establishing Voting Record Date, Voting Deadline and Other Dates, (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on Plan and for Filing Objections to Plan, (D) Setting Confirmation Hearing and Related Deadlines and (E) Approving Forms of Notices and Ballots" (docket no. 1868) (the "Disclosure Statement Order").

3.    On August 11, 2010, the Debtors filed and served the Plan Supplement[2] (docket no. 1914), which included drafts of the following Restructuring Transactions (defined below) related documents: New FG Management Agreement (Propco); New Opco Credit Agreement; New Opco PIK Credit Agreement; New Opco Asset Purchase Agreement; New Propco Credit Agreement; New Propco Limited Liability Company Agreement; Opco Lender Support Agreement; Propco Lender Support Agreement; Second Amended Master Lease Compromise Agreement; Put Parties Support Agreement; and the Committee Plan Support Stipulation (collectively the "Restructuring Transactions Related Documents").  On August 13, 2010, the Debtors filed and served the Second Plan Supplement (docket no. 1935), which included a copy of the following Restructuring Transactions Related Document: the New FG Management Agreement (Opco).

---

[1]   GV Ranch Station, Inc. is a debtor in these jointly administered cases, but it is not a proponent of the Plan and its estate is not the subject of the Plan.

[2]   Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to them in the Plan or Disclosure Statement, as applicable. The rules of interpretation set forth in Article I.A. of the Plan shall apply to these Findings of Fact and Conclusions of Law.

4.      Among other things, the documents in the Plan Supplement disclosed that the parties intended to modify the $430 million term loan New Opco Credit Agreement by incorporating into it the $25 million loan that was intended to be an obligation under the New Opco PIK Credit Agreement, and make that $25 million loan an additional term loan tranche under the New Opco Credit Agreement (the "PIK Credit Agreement Rollup").

5.      On August 13, 2010, the Court entered its order (docket no. 1932) approving, and authorizing the Debtors to distribute a Supplement to the Disclosure Statement (the "Disclosure Statement Supplement"), which the Debtors then distributed to Holders of Claims and Equity Interests and other parties in interest that had previously been served with the Disclosure Statement.  Included with the Disclosure Statement Supplement were financial projections for New Opco, a copy of the Nave Report (defined and discussed below), and the Put Party Commitment Agreement.

6.      In connection with the Confirmation Hearing, the Debtors filed three motions to approve stipulations with key constituencies.  Specifically, the Debtors filed: (a) "Debtors' Motion for Order Approving Stipulation Between Debtors and the Shareholders of Station Casinos, Inc. Regarding Preservation of the Value of the Debtors' Net Operating Losses (docket no. 1922); (b) Debtors' Motion for Order: (1) Approving Stipulation with Official Committee Of Unsecured Creditors; and (2) Authorizing Payment of Certain Related Fees and Expenses (docket no. 1921); and (c) Debtors' Motion For Order  Approving Global Settlement With Independent Lender Group (docket no. 1965) (collectively the "Plan Support Motions").

7.      On August 23, 2010, the Debtors filed their "Debtors' Motion for Order Under 11 U.S.C. § 1127 Approving  Modifications to 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (docket no. 1997, the "Plan Modifications Motion").  On August 26, 2010, the Debtors filed an amendment to the Stalking Horse APA (docket no. 2031, the "APA Amendment").

8.      On August 16, 2010, declarations of service of the Solicitation Package in accordance with the requirements of the Disclosure Statement Order were filed with the Court

(docket no. 1944).  On August 25, 2010, the report of the Voting Agent was filed with the Court, reporting that all Voting Classes, without exception, voted to accept the Plan (docket no. 2007).

9.      On August 24, 2010, the Debtors filed their "Notice of Submission of Stipulations Between Debtors and Landlords Consenting to the Extension of Deadline to Assume or Reject Leases" (docket no. 1997, the "Lease Stipulations").  Pursuant to the Lease Stipulations, the applicable lessors agreed to extend to the Effective Date the Debtors' deadline to assume, assign or reject the underlying real property leases (with the exception of the Wild Wild West Tiberti lease, as to which the subject landlord agreed to extend the deadline to the earlier of Sept. 30, 2010 or the date that the non-debtor lessee breaches the lease).

10.      No objections to confirmation of the Plan, or any other objections to the terms of the Plan, were filed by any Holder of Claims or Equity Interests or any other party in interest by the deadline established in the Disclosure Statement Order, or otherwise.  On  August 20, 2010, the Debtors filed their Memorandum of Law in support of confirmation of the Plan (docket no. 1984).  In support of the Memorandum of Law the Debtors filed the Declaration of Richard Haskins, Executive Vice President, General Counsel and Secretary of SCI (docket no. 1986), and the Declaration of Daniel Aronson, Managing Director of Lazard Frères & Co. LLC ("Lazard") (docket no. 1985, the "Aronson Declaration").

11.      A hearing pursuant to Sections 1127, 1128 and 1129 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 3017, 3018, 3019(a), 3020(b) through (e) and 7052 to consider confirmation of the Plan was held on August 27, 2010 (the "Confirmation Hearing")

12.      The Court has considered all of the papers filed in support of confirmation of the Plan, including supporting declarations, and the testimony presented and evidence admitted at the Confirmation Hearing.  In connection therewith, the Court takes judicial notice of all of the papers and pleadings filed by the supporters and opponents of the Plan during the course of the proceedings leading to the Confirmation Hearing.  The Court has entered a separate order confirming the Plan (the "Confirmation Order"), and makes the following Findings of Fact and Conclusions of Law in connection therewith.

13.     These Findings of Fact and Conclusions of Law refer to, in summary fashion, numerous provisions of the Plan.  All such descriptions are qualified by the express terms of the Plan, which Plan terms control unless expressly modified in the Confirmation Order.  In addition, the failure to specifically include or discuss any particular provision of the Plan in these Findings of Fact and Conclusions of Law shall not diminish the effectiveness of any such provision, it being the intent of the Court that the Plan shall be confirmed in its entirety, and the Plan is incorporated herein in its entirety by this reference.

14.     Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact. These written Findings of Fact and Conclusions of Law shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Confirmation Hearing in accordance with Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014.

II.     **FINDINGS OF FACT.**

A.     **JURISDICTION AND VENUE.**

15.     On July 28, 2009 (the "Petition Date"), the Debtors commenced their respective Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors were and are qualified to be debtors under Section 109(a) of the Bankruptcy Code.  Each of the Debtors has its principal place of business and principal assets in Nevada.

B.     **COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.**

1.     **Section 1129(a)(1)[3] – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

16.     The Plan complies with all applicable provisions of the Bankruptcy Code, as required by Section 1129(a)(1) of the Bankruptcy Code, including Sections 1122 and 1123 of the Bankruptcy Code.

---

[3]   Unless otherwise specified, all "Section" references are to chapter 11 of Title 11 of the U.S. Code, the "Bankruptcy Code."

**a.    Sections 1122 and 1123(a)(1)-(4) – Classification
and Treatment of Claims and Equity Interests.**

17.    In accordance with the requirements of Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Equity Interests, other than Administrative Claims and Priority Tax Claims.[4]  In accordance with the requirements of Section 1122(a), each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class. The Plan designates sixty Classes of Claims and eighteen Classes of Interests.  Such classification is proper under Section 1122(a) of the Bankruptcy Code because such Claims and Equity Interests have differing rights among each other and against the Debtors' assets or differing interests in the Debtors.  Valid business, factual and legal reasons exist for classifying the various Classes of Claims and Equity Interests in the manner set forth in the Plan.

18.    In accordance with the requirements of Sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies all Classes of Claims and Equity Interests that are not impaired under the Plan and specifies the treatment of all Classes of Claims and Equity Interests that are impaired under the Plan.  Consistent with Section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan also provides the same treatment for each Claim or Interest within a particular Class, unless the Holder of a Claim or Interest agrees to less favorable treatment of its Claim or Interest.

**b.    Section 1123(a)(5) – Adequate Means
for Implementation of the Plan.**

19.    Article V and certain other of the provisions of the Plan contain the principal means for the Plan's implementation.  Those provisions relate to, among other things: (a) the formation of the New Opco entities and New Propco entities; (b) the transfer of the Master Lease Collateral to Propco; (c) the transfer of the Landco Assets; (d) the transfer of the New Propco Transferred Assets from Propco to the New Propco entities; (e) the transfer of the New Propco

---

[4]  Pursuant to Section 1123(a)(1) of the Bankruptcy Code, classes of Administrative Claims and Priority Tax Claims are not required to be classified.

Purchased Assets from the Opco entities to the New Propco entities; (f) the transfer of the New

Opco Acquired Assets to New Opco; (g) the New Propco Rights Offering; (h) the issuance of

debt under, and the entering into the New Opco Credit Agreement and the related loan and

collateral documents by New Opco and its affiliates; (i) the issuance of debt under, and the

entering into the New Propco Credit Agreement and the related loan and collateral documents by

New Propco and its affiliates; (j) the cancellation of prepetition instruments evidencing Claims

and Equity Interest; and (k) the eventual dissolution of the Debtors (the foregoing transactions,

the other implementation provisions of the Plan, and all of the transactions documented in the

Restructuring Transactions Related Documents, are hereinafter referred to as the "<u>Restructuring

Transactions</u>").  The Restructuring Transactions carry out several of the methods for

implementing a chapter 11 plan expressly provided for in Section 1123(a)(5): Section

1123(A)(5)(B) (transfer of all or any part of the property of the estate to one or more entities);

Section 1123(a)(5)(D) (sale of all or any part of property of the estate, and distribution of other

property of the estate to the holders of interests in such property); Section 1123(a)(5)(E)

(satisfaction or modification of liens); Section 1123(a)(5)(F) (cancellation of indentures and

similar instruments); Section 1123(a)(5)(J) (issuance of securities by entities receiving property

of the estate in exchange for claims against the Debtors).

### i.    The Sale of the Opco Assets

20.    On June 4, 2010, this Court entered its "Order Establishing Bidding Procedures

and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos Inc.

and Certain 'Opco' Subsidiaries" (the "<u>Bidding Procedures Order</u>") (docket no. 1563).  Pursuant

to the Bidding Procedures Order, the Court, among other things, (a) authorized the Debtors to

conduct a process for the marketing and sale of substantially all of the Debtors' Opco business

and certain related assets (the "<u>Opco Assets</u>", which comprise the New Opco Acquired Assets

and the New Propco Purchased Assets under the Plan), conduct an auction and select the

successful bid, and (b) deemed the Stalking Horse Bidder to be a Qualified Bidder.

21.    In accordance with the Bidding Procedures Order, notice of the Opco Auction and

Bidding Procedures was transmitted to: (a) the Office of the United States Trustee; (b) the

Official Committee of Unsecured Creditors (the "Official Creditors Committee"); (c) the Nevada Gaming Commission; (d) all (i) creditors of the Debtors as defined in Section 101(1) of the Bankruptcy Code; (ii) entities known to the Debtors to possess and/or exercise any control over any of the Opco Assets; (iii) entities known to the Debtors to assert any rights in any of the Opco Assets; (iv) parties in interest and other entities and persons so entitled and known to the Debtors; (v) non-Debtor parties to the Assumed Contracts[5]; (vi) other entities that Debtors believe may have a claim against any of the Debtors; (vii) applicable federal, state and local tax authorities with jurisdiction over the Debtors or the Opco Assets, including the Internal Revenue Service; (viii) federal, state and local environmental authorities in jurisdictions in which the Debtors operate and/or in which the Opco Assets are located; and (ix) entities that requested notice in the Debtors' Chapter 11 Cases; (e) the Securities and Exchange Commission; and (f) any known party which has expressed a bona fide interest in writing to the Debtors regarding any purchase of the Opco Assets.

22.    Pursuant to the "Order, Pursuant to 11 U.S.C. §§ 327(a) and 328(a), and Fed. R. Bankr. P. 2014, Authorizing Employment and Retention of Lazard Freres & Co. LLC as Financial Advisor and Investment Banker for the Debtors," entered on September 18, 2009 (docket no. 326), the Court authorized the Debtors to utilize the services of Lazard to market for sale the New Opco Acquired Assets.

23.    The marketing of the New Opco Acquired Assets took place over a several month period. Notice of the Auction and the Bidding Procedures Order was published in the Las Vegas Review-Journal, the Wall St. Journal, and the Financial Times. Lazard contacted seventy nine potential bidders, and received expressions of interest from thirty nine potential bidders; and twenty six potential bidders signed confidentiality agreements and received a package of preliminary due diligence information. Of those initial twenty six parties conducting due diligence, eight signed Letters of Intent that entitled them to additional, more comprehensive due diligence. *See* "Status Report of Dr. James E. Nave, Independent Director, Regarding

---

[5]  "Assumed Contracts" means the contracts and leases to be assumed by the Debtors and assigned to the transferees of the New Opco Acquired Assets and New Propco Acquired Assets.

Compliance with Auction Procedures Procedures and Resulting Bids with Respect to the Order

Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of

the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries," filed August 5, 2010

(docket no. 1885) (the "Nave Report"), at ¶¶ 3-6.

24.    Dr. Nave was the independent director of SCI tasked with overseeing the Sale

Process.  The Opco Debtors, under the direction of Dr. Nave and in consultation with the

Consultation Parties, determined that six of the Letter of Intent signatories satisfied the

requirements to be Qualified Bidders (not including the Stalking Horse Bidder).[6]  However, by

the July 30, 2010 deadline under the Bidding Procedures for receipt of Qualified Bids, the

Debtors had received only one Qualified Bid, that of the Stalking Horse Bidder.  As a result,

there was no Opco Auction.  Nave Report at ¶¶ 7-10.

25.    Daniel Aronson, a Managing Director at Lazard, filed a Declaration in support of

the Nave Report (docket no. 1886) (the "Aronson Sale Process Report").  Aronson has worked as

restructuring professional for twenty two years, and has headed up Lazard's efforts as financial

advisor and investment banker for the Debtors.  In addition to confirming the facts in the Nave

Report, Aronson noted that the process of the selection of the Stalking Horse Bid resulted in an

increase of more than $135 million in the proposed purchase price.  Aronson Sale Process Report

at ¶ 9.

26.    Aronson reported that Lazard's efforts were especially focused on ensuring a

level playing field for all bidders, including in particular potential bidder Boyd Gaming.  He

opined that the Bidding Procedures approved by the Court provided an open and level playing

field for all potential bidders, and the Sale Process provided fair and open access to all

reasonable due diligence materials.  He noted that, following Court approval of the Bidding

Procedures, no bidder voiced any complaint about the Bidding Procedures, or that the Debtors

should deviate from or modify the Bidding Procedures.  He concluded that the Stalking Horse

---

[6]  The Consultation Parties were the Administrative Agent under the Prepetition Opco Credit Agreement,
the steering committee of lenders under the Prepetition Opco Credit Agreement and the Official Creditors
Committee.  *See* Aronson Sale Process Report, *infra*, at p.4, fn. 2.

Bid is the highest and best bid for the Opco Assets to date.  Aronson Sale Process Report at ¶¶ 15-19.

27.    At a hearing on August 6, 2010, the date for which the Auction had been scheduled, the Court determined that the Stalking Horse Bid was the prevailing bid, and that the purchaser would be the Stalking Horse Bidder FG Opco Acquisitions LLC (together with any of its assignees permitted under the Stalking Horse APA, "Acquisitions LLC"), an entity that is a subsidiary of New Propco (Acquisitions LLC and its controlled Affiliates, IP Holdco, New Propco and the other New Propco affiliates receiving the New Opco Acquired Assets and the New Propco Acquired Assets, collectively, the "Purchaser").  On August 9, 2010, the Court entered its "Order Closing Auction and Designating Successful Bid With Respect to Order Establishing Bidding Procedures and Deadlines Related to Sale Process For Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries" (docket no. 1909), in which it designated Purchaser as the Successful Bidder.  In connection with confirmation of the Plan, the Debtors sought approval of the sale of the Opco Assets to Purchaser, free and clear[7] of all Liens, Claims, Equity Interests and any Liabilities (as defined in the Stalking Horse APA) arising or resulting from or related to the transactions contemplated by the Stalking Horse APA or by the 363 Sale Orders (as defined in the Stalking Horse APA) (such liabilities, "Other Liabilities") in accordance with the terms and conditions of the Stalking Horse APA and pursuant to Sections 363, 365, 1123, 1129 and 1141 of the Bankruptcy Code.

28.    Notice of the Bidding Procedures Order and the Sale Hearing, and of the Debtors' intent to seek approval and authorization of the Stalking Horse APA and of the Restructuring Transactions, and to assume and assign the Assumed Contracts, was proper, timely, adequate and sufficient notice under the circumstances of these Chapter 11 Cases and complied with the various applicable requirements of the Bankruptcy Code and the Bankruptcy Rules; and a reasonable opportunity to object and be heard with respect to the relief requested by the Debtors

---

[7]    All references in these Findings of Fact and Conclusions of Law to transfers of property free and clear of Liens, Claims, Equity Interests, Other Liabilities or other interests (or any combination of any of the foregoing), shall mean free and clear except as otherwise expressly provided in writing in the applicable transfer documents with respect to assumed liabilities and permitted exceptions.

was afforded to all interested parties. Based upon the record of the Chapter 11 Cases and the Sale Process, all Holders of Claims and Equity Interests, and all other parties-in-interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the New Opco Acquired Assets.

29.     The Debtors have articulated good and sufficient business reasons justifying the approval of the Stalking Horse APA and the Restructuring Transactions. Such business reasons include, but are not limited to, the following: (i) the Stalking Horse APA constitutes the highest and best offer for the Opco Assets; and (ii) the Stalking Horse APA and the closing thereon will present the best opportunity to realize the value of the Opco Assets and avoid the possible decline and devaluation of such assets in a protracted chapter 11 process. The Debtors' entry into the Stalking Horse APA and consummation of the Restructuring Transactions constitute the Debtors' exercise of sound business judgment and the sale contemplated by the Stalking Horse APA is in the best interests of the Debtors, their estates and creditors and all other parties in interest, and is supported by each of the Debtors' key creditor constituencies.

30.     The purchase price provided by Purchaser for the Opco Assets is the highest and best offer received by the Debtors, and the purchase price constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia  ((a), (b)  and (c) collectively, "Value"), for the Opco Assets.

31.     Purchaser would not have entered into the Stalking Horse APA and would not consummate the Restructuring Transactions, thus adversely affecting the Debtors, their estates, and their creditors, if the transfer to Purchaser of the Opco Assets, including without limitation the Assumed Contracts, was not free and clear of all Liens, Claims, Equity Interests and Other Liabilities, or if Purchaser or any of their Related Persons would, or in the future could, be liable for any such Liens, Claims, Equity Interests and Other Liabilities, or if Purchaser or any of their Related Persons would otherwise be subject to any liability with respect to the operation of the

Debtors' businesses on or prior to the Effective Date. Accordingly, a sale of the Opco Assets other than one free and clear of Liens, Claims, Equity Interests and Other Liabilities would impact materially and adversely the Debtors' estates, and would yield substantially less value for the Debtors' estates, with less certainty than the sale pursuant to the Stalking Horse APA. In reaching this determination, the Court has taken into account both the consideration to be realized directly by the Debtors and their creditors, and the indirect benefits of the Restructuring Transactions for the Debtors' employees, the Debtors' vendors and suppliers and the public interest served, directly and indirectly, by the preservation of the value of the Opco Assets resulting from the transfer of such assets to the Purchaser.

32. There was no evidence of insider influence or improper conduct by any of the Purchaser or their Related Persons, or by any other party in interest, in connection with the negotiation of the Stalking Horse APA with the Debtors, in connection with the marketing of the New Opco Acquired Assets, or otherwise in connection with the Sale Process. The Debtors established a due diligence room in which the information provided to the Purchaser in connection with the negotiation of the Stalking Horse APA was also provided to other potential bidders for the New Opco Acquired Assets. There was also no evidence of fraud or collusion among the Purchaser, their Related Persons and any other bidders for the Debtors' assets, or collusion between the Debtors and the Purchaser or their respective Related Persons to the detriment of any other bidders, the Sale Process or the Debtors' estates.

33. The Debtors and the other Opco Group Sellers[8] are entering into the Stalking Horse APA and performing their obligations thereunder and under the other Restructuring Transactions in good faith and with lawful purpose, and have the legal power and authority to convey all of their right, title and interest in and to the Opco Assets to Purchaser. Each Opco Group Seller has: (i) full power and authority to execute the Stalking Horse APA and all other documents contemplated thereby, and the sale of the Opco Assets by the Opco Group Sellers has been duly and validly authorized by all necessary company action of each Opco Group Seller; (ii) the necessary power and authority to perform its obligations under the Restructuring

---

[8] The Opco Group Sellers are defined in the Plan as the sellers under the Stalking Horse APA.

Transactions contemplated by the Plan; and (iii) taken all company action necessary to authorize, approve and enter into the Stalking Horse APA and consummate the Restructuring Transactions contemplated by the Plan.  No consents or approvals or further actions, other than those expressly required by the terms of the Stalking Horse APA or in the Schedules thereto (including the Nevada Gaming Commission consent), are required for the Opco Group Sellers to close the sale and consummate the Restructuring Transactions.

34.     No brokers were involved in consummating the sale or the Restructuring Transactions, and no brokers' commissions are due to any person or entity in connection with the sale or the Restructuring Transactions.

**c.     Section 1123(a)(6) – Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

35.     The Plan complies with the requirements of Section 1123(a)(6) because the Debtors are not issuing any equity securities.  Rather the Debtors will be dissolved as soon as reasonably practical.

**d.     Section 1123(a)(7) – Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

36.     The Plan complies with the requirements of Section 1123(a)(7) because, under the Plan, on the Effective Date, all current boards of directors of the Debtors will be dissolved and all current officers will be dismissed.  In their place, a Plan Administrator will be appointed prior to the Effective Date.  The Plan requires that the appointment of the Plan Administrator shall be subject to prior Court approval.  As a result, the Plan contains no provisions with respect to the manner of selection of new officers and directors that is inconsistent with public policy or the interests of Holders of Claim and Equity Interests.

**e.     Section 1123(b)(1)-(2) – Impairment of Claims and Equity Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.**

37.     In accordance with the requirements of Section 1123(b)(1) of the Bankruptcy Code, Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Equity Interests.  Consistent with 1123(b)(2) of the Bankruptcy Code, Article VI of

the Plan provides for the assumption by the Debtors and assignment to the applicable transferee on the Effective Date of certain designated Executory Contracts and Unexpired Leases, and the rejection of all other Executory Contracts and Unexpired Leases, in all cases in accordance with, and subject to the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1123(b)(2) of the Bankruptcy Code.

**f.      Section 1123(b)(3) – Retention, Enforcement
and Settlement of Claims Held by the Debtors.**

38.      As authorized by Section 1123(b)(3), (i) Article X.E. of the Plan provides for the retention by the Debtors of Causes of Action and Litigation Claims not expressly released or settled under the Plan, and (ii) Articles X.B. and X.C. of the Plan provide for certain settlements and releases, as discussed in more detail below.

**g.      Section 1123(b)(4) – Sale of Assets of the Estate.**

39.      The Plan does not provide for a sale of substantially all of the assets. However, as discussed above, the New Opco Acquired Assets were marketed and will be sold to Purchaser pursuant to the Plan.

**h.      Section 1123(b)(5) – Modification of
the Rights of Holders of Claims.**

40.      In accordance with the requirements of Section 1123(b)(5), Article III of the Plan modifies, or leaves unaffected, as the case may be, the rights of holders of each Class of Claims. Some Classes of Claims receive nothing under the Plan. Some Classes of Claims receive cash and new notes issued by Purchaser. Some Classes of Claims receive real and personal property. Some Classes of Claims receive equity interests in certain of the Mezzco Debtors. Some Classes of Claims receive the NPH Warrants, NPH Investment Rights and the NPH Post-Effective Investment Rights. Some Classes of Claims are unimpaired.

\ \ \

### i.    Section 1123(b)(6) – Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code.

41.    The Plan includes additional appropriate implementation provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including: (i) the provisions of Article VII of the Plan governing distributions on account of Allowed Claims; (ii) the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (iii) the provisions of Article X of the Plan regarding the treatment of the provisions of the Plan as a Comprehensive Settlement, releases by the Debtors, voluntary releases by Holders of Claims and Equity Interests, and certain exculpation provisions.

### j.    Section 1123(d) – Cure of Defaults.

42.    In accordance with the requirements of Section 1123(d), Article VI of the Plan provides for the cure of defaults in respect of all executory contracts and unexpired leases that are being assumed under the Plan and assigned to the applicable transferee, and requires that such cure payments be made consistent with the requirements of Section 365(b) and 365(c).

### 2.    Section 1129(a)(2) – Compliance with Applicable Provisions of the Bankruptcy Code.

43.    In accordance with the requirements of Section 1129(a)(2), the Debtors have complied with all applicable provisions of the Bankruptcy Code, including Section 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  The Court finds that adequate disclosures of the current financial condition of the Debtors and their principal non-Debtor subsidiaries, and of the terms and purposes of the Restructuring Transactions (including the proposed dispositions of the New Opco Acquired Assets and New Propco Acquired Assets), were made during the course of the Chapter 11 Cases, the Sale Process, and the solicitation of acceptances of the Plan, and in connection with the Confirmation Hearing.

44.    The Court previously determined in the Disclosure Statement Order that the Disclosure Statement contained adequate information, and the Debtors provided Holders of Claims and Equity interests with substantial additional disclosure materials during the period

between entry of the Disclosure Statement Order and the commencement of the Confirmation

Hearing.  The procedures by which the Ballots for acceptance or rejection of the Plan were

solicited and tabulated were fair, properly conducted and in accordance with Sections 1125 and

1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement

Order.  The Debtors and the other Exculpated Parties, and their respective directors, officers,

employees, agents, members and professionals, as applicable, have acted in good faith within the

meaning of Section 1125(e) of the Bankruptcy Code.

**3.**    **Section 1129(a)(3) – Proposal of the Plan in Good Faith.**

45.    In accordance with the requirements of Section 1129(a)(3), the Debtors proposed

the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has

been proposed in good faith, the Court has examined the totality of the circumstances

surrounding the formulation of the Plan, including the support thereof by the Mortgage Lenders,

nearly all of the Opco Lenders, and the Official Creditors Committee.  Based on the evidence

presented at the Confirmation Hearing, the Court finds and concludes that the Plan has been

proposed with the legitimate and honest purpose of maximizing the returns available to creditors

of the Debtors through the marketing and sale of the Opco Assets for the highest and best price

and the transfer of the New Propco Acquired Assets to the secured creditors with the senior

interests in such assets.  Moreover, the Plan itself and the arms' length negotiations among the

Debtors, the Official Creditors Committee, the Opco Lenders and the Mortgage  Lenders, leading

to the Plan's formulation and modification, and the public support of the Plan by the Official

Creditors Committee, provide independent evidence of the Debtors' good faith in proposing the

Plan.

**4.**    **Section 1129(a)(4) – Bankruptcy Court**
**Approval of Certain Payments as Reasonable.**

46.    In accordance with the requirements of Section 1129(a)(4), Article II.A.2. of the

Plan makes all payments on account of Professional Fee Claims for services rendered on or prior

to the Effective Date subject to the requirements of Sections 327, 328, 330, 331, 503(b) and 1103

of the Bankruptcy Code, as applicable, by requiring Professionals to file final fee applications

1   with the Court.  The Court will review the reasonableness of such applications under Sections

2   328 and 330 of the Bankruptcy Code and any applicable case law.  Article XI. of the Plan

3   provides that the Court will retain jurisdiction after the Effective Date to hear and determine all

4   applications for allowance of compensation or reimbursement of expenses authorized pursuant to

5   the Bankruptcy Code or the Plan.

6           **5.       Section 1129(a)(5) – Disclosure of Post-Effective Date**
                       **Management of Debtors and Compensation of any Insiders.**
7

8           47.     The Plan complies with the requirements of Section 1129(a)(5) because, pursuant

9   to the Plan, prior to the Effective Date, the Debtors will propose an individual to serve as the

10  Plan Administrator, and such appointment will be subject to prior Court approval.  None of the

11  entities receiving estate assets under the Restructuring Transactions is a successor to any Debtor

12  or an affiliate of any Debtor participating in a joint plan with the Debtors, therefore Section

13  1129(a)(5) does not apply to the transferees of the New Opco Acquired Assets and the New

14  Propco Acquired Assets.  No insider is currently proposed to be employed by the Debtors after

15  the Effective Date.  If an insider of the Debtors is proposed to serve as Plan Administrator or as

16  an employee of the Plan Administrator, any compensation arrangements will be disclosed.

17          **6.       Section 1129(a)(6) – Approval of Rate Changes.**

18          48.     The Debtors' current businesses do not involve the establishment of rates over

19  which any regulatory commission has jurisdiction.   Accordingly, Section 1129(a)(6) does not

20  apply to the Plan.

21          **7.       Section 1129(a)(7) – Best Interests of Holders of Claims and Equity**
                       **Interests.**
22

23          49.     In accordance with the requirements of Section 1129(a)(7), with respect to each

24  impaired Class of Claims or Equity Interests, each holder of a Claim or Interest in such impaired

25  Class has either (a) accepted or is deemed to have accepted the Plan or, (b) as demonstrated by

26  the Liquidation Analysis included as Exhibit C to the Disclosure Statement, will receive or retain

27  under the Plan on account of such Claim or Interest property of a value, as of the Effective Date,

28

#4844-2396-4935v21                          -17-

1    that is not less than the amount such holder would receive or retain if the Debtors were liquidated

2    on the Effective Date under chapter 7 of the Bankruptcy Code.

3        50.    The Court finds that the methodology used by the Debtors and their financial

4    advisors in estimating the liquidation value of the Debtors, as set forth in the Liquidation

5    Analysis, is reasonable.  The Liquidation Analysis establishes that each Holder of a Claim or

6    Equity Interest that voted to reject the Plan or was deemed to reject the Plan, will receive or

7    retain under the Plan on account of such Claim or Interest property of a value, as of the Effective

8    Date, that is not less than the amount such holder would receive or retain if the Debtors were

9    liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  Further, no Holder of

10   a Claim or Equity Interest objected to confirmation of the Plan on the basis that it was not

11   receiving or retaining under the Plan as much as it would receive in a chapter 7 liquidation of the

12   Debtors.

13       **8.    Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class.**

14       51.    As indicated in the Plan and Disclosure Statement: (a) the following are Classes

15   of Unimpaired Claims that were deemed to have accepted the Plan and were not entitled to vote

16   on the Plan – Classes P.1, S.1, NA.1, RL.1, RC.1 and  TS.1; (b) the following are Classes of

17   Impaired Claims that are deemed to have rejected the Plan and were not entitled to vote on the

18   Plan – Classes FHI.2, FHI.3, FHI.4, FHI.5, FHI.6, FP.2, FP.3, FP.4, FP.5, FP.6, VC.2, VC.3,

19   VC.4, VC.5, VC.6, P.3, P.4, P.5, MP.1, MP.2,  MP.3,  MS.1, MS.2, MS.3, M7.1, M7.2, M7.3,

20   M6.1, M6.2, M6.3, M5.1, M5.3, M5.4, M4.2, M4.3, M4.4, M3.2, M3.3, M3.4, M2.2, M2.3,

21   M2.4, M1.2, M1.3, M1.4, S.8, S.9, NA.2, NA.3, RL.2, RL.3, RC.3, RC.4, TS.3 and TS.4; and

22   (c) the Voting Classes were Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2,

23   S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2.  Each of the seventeen Voting Classes, without exception,

24   voted to accept the Plan.  However, the Plan does not comply with the requirement of Section

25   1129(a)(8) because certain Classes of Claims and Equity Interests were deemed to have rejected

26   the Plan.  Nevertheless, the Plan is confirmable because, as determined below, the Plan satisfies

27   the cramdown requirements of Section 1129(b) of the Bankruptcy Code with respect to all non-

28   accepting Classes.

#4844-2396-4935v21                              -18-

9.    **Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

52.    In accordance with the requirements of Section 1129(a)(9), the Plan provides that with respect to Administrative Claims (subject to certain consensual exceptions for DIP Facility Claims, Superpriority Claims and other adequate protection claims), on the later of the Effective Date or when an Administrative Claim becomes an Allowed Administrative Claim, the Allowed Administrative Claim shall be paid in cash in the full unpaid Allowed amount of the Claim, unless the Holder agrees to less favorable treatment.

53.    In accordance with the requirements of Section 1129(a)(9), the Plan provides that the rights of the Holders of Priority Tax Claims are unaltered under the Plan.  Under Section II.B. of the Plan, Holders of Priority Tax Claims will receive, at the election of the Debtors, (i) payment in full in cash of the Allowed amount of such claim, (ii) less favorable treatment if the Holder agrees, or (iii) installment payments in accordance with the requirements of Sections 1129(a)(9)(C) and (D).

54.    In accordance with the requirements of Section 1129(a)(9), the Plan provides that the rights of the Holders of Other Priority Claims are unaltered under the Plan.  Under Section II.B. of the Plan, Holders of Other Priority Claims will receive payment in full in cash of the Allowed amount of such Claim.

10.    **Section 1129(a)(10) – Acceptance by at Least One Impaired Class.**

55.    In accordance with the requirements of Section 1129(a)(10), as indicated in the report of the Voting Agent and as reflected in the record of the Confirmation Hearing, at least one Class of Claims or Equity Interests that is Impaired under the Plan voted to accept the Plan. Seventeen Classes of Claims voted to accept the Plan, in each case determined without including any acceptance of the Plan by any insider.  They are Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2.

11.    **Section 1129(a)(11) – Feasibility of the Plan.**

56.    The Plan is a liquidating Plan.  The record of these Chapter 11 Cases evidences that the parties to the Restructuring Transactions have the financial wherewithal and desire to

1    close on the Restructuring Transactions, including the transfer of the New Opco Acquired Assets

2    and New Propco Acquired Assets to the applicable transferees pursuant to the Plan.  Thus, the

3    liquidating Plan is feasible.

4          57.      Under the Plan, part of the consideration received by the Debtors for the Opco

5    Assets and transferred to the Opco Lenders are secured notes issued by Purchaser.  In addition,

6    certain unsecured creditors receive NPH Warrants, NPH Investment Rights and NPH Post-

7    Effective Investment Rights.  The Debtors have filed with Court and distributed as part of the

8    Disclosure Statement (Exhibit D to the Disclosure Statement) financial projections for New

9    Propco covering calendar years 2010 through 2014.  The Debtors stated in their Disclosure

10   Statement that they believe that the assumptions underlying the New Propco financial projections

11   are reasonable, and that New Propco will be able to meet its debt service obligations.  Based

12   upon the New Propco financials and the discussion in the Aronson Declaration with respect

13   thereto, it appears reasonably likely that New Propco will be able to service its debt obligations

14   issued in connection with the Plan.  No contrary evidence was submitted to the Court.

15         58.      After service of the Solicitation Packages that included the financial projections

16   for New Propco, the Debtors filed and served the Disclosure Statement Supplement, which

17   included a set of financial projections for New Opco, covering calendar years 2011 through

18   2014.  Based upon the New Opco financials and the discussion in the Aronson Declaration with

19   respect thereto, it appears reasonably likely that New Opco will be able to service its debt

20   obligations issued in connection with the Plan.  No contrary evidence was submitted to the

21   Court.

22         59.      Based upon the Aronson Declaration, the aggregate transaction value for the

23   acquisitions of the New Propco Acquired Assets and the New Opco Acquired Assets  is

24   $2.572 billion (based upon capitalization of $1.8 billion for New Propco prior to the acquisition

25   of the Opco Assets, and an additional $772 million based upon the acquisition of the Opco

26   Assets), and, after deducting the amount of debt issued by New Propco and New Opco, the

27   equity value of New Propco is $326 million (which equity value may be adjusted based upon

28

actual borrowings and cash on hand on the Effective Date); and the Confirmation Order shall so provide.

60.     Under the Plan, certain general unsecured creditors will receive the NPH Warrants.  Lazard analyzed the value of the NPH Warrants using the traditional Black-Scholes model, which, when analyzing non-dividend paying stock, is based upon an analysis of five principal factors: stock price, exercise price, volatility of the common stock, term and risk free rate.  Applying the Black Scholes model to the NPH Warrants and an equity value of $326 million for New Propco, it was determined that the value of the NPH Warrants is between $0.4 million and $2.3 million; and the Confirmation Order shall so provide.

### 12.     Section 1129(a)(12) – Payment of Bankruptcy Fees.

61.     In accordance with the requirements of Section 1129(a)(12), Article XII.B. of the Plan provides that Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash on the Effective Date.  After the Effective Date, the Reorganized Debtors shall pay all required fees pursuant to 28 U.S.C. § 1930 or any other statutory requirement and comply with all statutory reporting requirements.

### 13.     Section 1129(a)(13) – Retiree Benefits.

62.     The Debtors are liquidating and after the Effective Date will have no obligations regarding any retiree benefits of the kind referred to in Section 1114.  Therefore, Section 1129(a)(13) does not apply to the Plan.

### 14.     Section 1129(a)(14), (15) and (16) Do Not Apply.

63.     Sections 1129(a)(14), (15) and (16) address domestic support obligations, individual debtors, and non-moneyed businesses, and they do not apply to the Debtors.

### 15.     Section 1129(b) – Confirmation of the Plan Over the Nonacceptance of Impaired Classes.

64.     Section 1129(b) of the Bankruptcy Code authorizes the Court to confirm the Plan even if not all Impaired Classes have accepted the Plan (a "cramdown"), provided that such Plan has been accepted by at least one impaired class and the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class that voted to reject the Plan.  Here,

Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2., each an impaired Class of Claims, voted to accept the Plan.

All classes of secured Claims are either unimpaired and deemed to have accepted the Plan, or impaired but voted to accept the Plan. Therefore, Section 1129(b) does not apply to Classes of secured Claims. In any event, the Plan expressly complies with the requirements of Section 1129(b)(2)(A) with respect to all Classes of secured Claims.

65. The Plan is fair and equitable with respect to all non-accepting Classes of Unsecured Claims because: (a) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed Claim; or (b) the holders of any Claims (or Equity Interests) that are junior to the non-accepting Class will not receive any property under the Plan (the "absolute priority rule"). The Plan strictly adheres to the absolute priority rule for each Debtor and nowhere does the Plan provide for distributions to the holders of any Claims or Equity Interests that are junior to any non-accepting Class of Claims of the subject Debtor.

66. The Plan is fair and equitable with respect to all non-accepting Classes of Equity Interests because: (a) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest; or (b) the holder of an interest that is junior to the Non Accepting Class will not receive or retain any property under the Plan.

67. The Plan does not discriminate unfairly with respect to any non-accepting Class because the value of the cash and/or securities to be distributed to each Class under the Plan is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the non-accepting Class. Exact parity is not required. The Court finds that any discrepancy in treatment or potential distributions to unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of

#4844-2396-4935v21

risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.  Accordingly, the Plan may be confirmed under Section 1129(b).

**16.      Bankruptcy Rule 3016(a).**

68.      In accordance with the requirements of Bankruptcy Rule 3016(a), the Plan is dated and identifies the entities submitting the Plan.

**17.      Section 1129(d) – Purpose of Plan.**

69.      The primary purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act.  There has been no objection filed by any Governmental Unit asserting any such avoidance.  The Plan and Disclosure Statement provide adequate notice to all Persons and Entities, including the Internal Revenue Service, the U.S. Securities and Exchange Commission and other applicable Governmental Units, of the intent of the Plan: (a) to preserve the ability of the Debtors to seek a Court determination of the tax liabilities arising from the implementation of the Plan; and (b) to cause the issuance of securities exempt from registration requirements under applicable state and federal securities laws.

**18.      Issuance of Securities to Eligible Opco Unsecured Creditors.**

70.      In connection with the Plan, Eligible Opco Unsecured Creditors (meaning Holders of Allowed Claims in Classes S.4, S.5 and S.6, excluding, however, Holders of Class S. 4 Claims that also hold Class S.2 Claims and vote to accept the Plan on account of such Class S.2 Claims), will receive on account of and in exchange for their Claims: (a) their Pro Rata Share of NPH[9] Warrants; (b) if they are Accredited Investors, their Allocated Pro Rata Share of NPH Investment Rights; and (c) if they are Qualified Eligible Opco Unsecured Creditors, the NPH Post-Effective Investment Rights ((a), (b) and (c), whether issued directly by New Propco Holdco or indirectly through Blockerco, collectively the "UC Securities").  A detailed description of the proposed UC Securities is contained in the New Propco Holdco Summary of Terms (the "NPH Term Sheet"), which was distributed as Exhibit E to the Disclosure Statement, to which was also attached the Support Agreement dated July 28, 2010, among certain affiliates of Fidelity Management & Research Company, Oaktree Capital Management, L.P. and Serengeti

---

[9]  NPH means New Propco Holdco, and it is also sometimes referred to as Holdco.

Asset Management, LP (collectively, the "Put Parties"), the Mortgage Lenders, Fertitta Gaming, LLC, and Frank and Lorenzo Fertitta (the "Put Parties Support Agreement"). Subsequently, as part of the Disclosure Statement Supplement, the Debtors filed and served the Put Party Commitment Agreement, dated August 5, 2010, among the parties to the Support Agreement (the "Put Party Commitment Agreement"). The NPH Term Sheet, the Put Parties Support Agreement and the Put Party Commitment Agreement are hereinafter referred to as the "UC Securities Documents."

## C. SETTLEMENTS, RELEASES, EXCULPATIONS AND INJUNCTIONS.

71.     The settlement, release and exculpation provisions set forth in Article X of the Plan are made in exchange for consideration, and are: (1) the result of a carefully-negotiated good-faith settlement among the Debtors and their major stakeholders; (2) meant to provide relief from future litigation and the prospect of future litigation that would have substantially derailed the Debtors' restructuring efforts; (3) fair and necessary for successful Plan confirmation; and (4) supported by creditors holding billions of dollars in allowed undisputed secured and unsecured Claims that will be impaired under the Plan, including all of the Debtors' key creditor constituencies. In connection with the Confirmation Hearing, no party in interest filed an objection to Article X of the Plan, which also provides for an injunction in support of the settlements, releases and exculpations contained therein.

### 1. Article X.B.1. of the Plan – The Comprehensive Settlement of Claims and Controversies.

72.     Article X.B.1. of the Plan provides that the Plan constitutes a general comprehensive settlement (the "Comprehensive Settlement") of all Claims, Litigation Claims, Causes of Action and controversies relating to (a) the rights that Holders of Claims or Equity Interests may have with respect to any Claim or Equity Interest against any Debtors, (b) the distributions, if any, made under the Plan on account of such Claims and Equity Interests, and (c) any Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction and all transactions relating thereto (discussed in more detail below). In connection with the Confirmation Hearing, no party in interest objected to the Comprehensive Settlement.

73.     The Comprehensive Settlement is a fundamental component of the overall restructuring contained in the Plan because it assures the Debtors and the Estates that the Plan and the distributions made thereunder will result in the final settlement and satisfaction of the various Claims and Equity Interests against the Debtors.  The Comprehensive Settlement promotes the finality of the Plan and repose.  The Court finds that the Comprehensive Settlement is in the best interests of Holders of Claims and Equity Interests, and the Debtors and their respective Estates and  property, and is fair and equitable, and any distributions to be made pursuant to the Plan shall be deemed to have been made on account of the Comprehensive Settlement and in consideration thereof.

### 2.     Article X.B.2. of the Plan - The Global Settlement of the Going Private Transaction Causes of Action.

74.     Article X.B.2. of the Plan provides for the compromise and settlement of all of the Going Private Transaction Causes of Action among the Debtors, the non-Debtor Affiliates of the Debtors, the Debtors Estates and any Person (the "Global Settlement") .  Article X.C.1. provides for a release of the Going Private Transaction Causes of Action by the Releasing Parties, which Releasing Parties includes the Debtors, their Estates and any Holder of a Claim or Equity Interest that would have been able to assert the Going Private Transaction Causes of Action for or on behalf of the Debtors or their Estates. In connection with the Confirmation Hearing, no party in interest has objected to the Global Settlement.[10]

75.     As defined in the Plan, and discussed in greater detail in the Disclosure Statement and various reports discussed below, the Going Private Transaction means the buy-out transaction and related financings that occurred in November of 2007, pursuant to which, among

[10]    On December 28, 2009, the Official Creditors Committee filed a motion seeking standing and authority to prosecute the Going Private Transaction Causes of Action (the "Standing Motion").  The Debtors, the Administrative Agent for the Opco Lenders, the Mortgage Lenders and others filed oppositions to the Standing Motion.  A hearing was held on the motion but the Court deferred ruling on the motion until the hearing on approval of the Debtors' Disclosure Statement.  On July 8, 2010, the Official Creditors Committee filed a supplement to the Standing Motion.  On July 16, 2010, the Court entered an order further deferring a decision on the Standing Motion and establishing August 13, 2010 as the deadline for certain parties to file response to the supplement to the Standing Motion.  By the time the Court entered the Disclosure Statement Order, the Official Creditors Committee had (a) announced its support for the Plan, including the Global Settlement and the other terms of the Plan, and (b) announced that it would not be pursuing the Standing Motion.

other things, SCI was acquired by virtue of a merger of FCP Acquisition Sub with and into SCI, with SCI continuing as the surviving corporation, and the sale-and-leaseback transaction with respect to the Propco Properties was consummated.  Also as defined in the Plan, the Going Private Transaction Causes of Action means any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other legal or equitable remedies against any Person arising from any transaction comprising or related to the Going Private Transaction, regardless of whether such Claims, Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

76.    As described in the Disclosure Statement at Article II.D.3., during the course of the Debtors' prepetition restructuring negotiation efforts, certain holders of the Senior Notes and Subordinated Notes expressed that SCI might have fraudulent conveyance and related claims against third parties that could be asserted by SCI in connection with the 2007 Going Private Transaction.  SCI's Board of Directors authorized the formation of an independent Special Litigation Committee (the "SLC") to investigate and report to the Board regarding whether SCI had colorable claims that could be brought against lenders, former stockholders or others, in connection with the 2007 Going Private Transaction.  The SLC retained its own independent legal counsel, Squire Sanders & Dempsey L.L.P., and hired its own independent financial advisor, Odyssey Capital Group, LLC, to perform expert financial analysis in connection with its investigation.  Neither professional firm had ever performed work for SCI, its affiliates, the Fertitta family, or any of their affiliates.

77.    The SLC filed its findings with the Court on September 22, 2009 (docket no 353) (the "SLC Report").  The SLC determined that:

a.    The financial projections for the 2007 Going Private Transaction were reasonable when made and were not unduly optimistic or overly aggressive.

b.    SCI was not insolvent at the time of the Going Private Transaction and did not become insolvent as a result of the Going Private Transaction.

c.    SCI was not left with unreasonably small capital.

1        d.      SCI did not intend or expect to incur debts beyond its ability to pay those

2   debts as they matured.

3        e.      No person or entity intended to nor believed the Going Private Transaction

4   would defraud, hinder, or delay a creditor of SCI.

5        f.      The participants in the Going Private Transaction had a good faith belief

6   that the Going Private Transaction would succeed and that SCI would enjoy continued growth.

7        g.      No person or entity engaged in inequitable conduct in connection with the

8   Going Private Transaction.

9        78.     On December 18, 2009, the SLC filed its Supplemental SLC Report (docket no.

10  721) responsive to certain questions raised by the Official Creditors Committee.  In the

11  Supplemental SLC Report, the SLC concluded that the Master Lease[11] was a true lease, not a

12  disguised financing, and that any litigation seeking to recharacterize the Master Lease as

13  disguised secured financing would be unsuccessful and a waste of Estate resources.

14       79.     Based upon the SLC Report and Supplemental SLC Report, it was a reasonable

15  exercise of the Debtors' business judgment to propose a chapter 11 plan that avoids the years of

16  delay in effectuating a restructuring that would be caused by launching litigation based upon the

17  Going Private Transaction Causes of Action.  Among other things, the SLC Report and

18  Supplemental SLC Report demonstrate that any party attempting to pursue any of the Going

19  Private Transaction Causes of Action would face significant legal and factual obstacles.  In

20  addition, it is unclear what benefit, if any, the Estates would obtain from the pursuit of any such

21  claims.  When compared to the benefits received by the Estates from the consensual restructuring

22  ───────────────────
    [11]  The Master Lease (as discussed in the Disclosure Statement and in numerous pleadings filed with the

23  Court in connection with Court approved amendments to the Master Lease) is between Debtor Propco as
    landlord and Debtor SCI as tenant, and was entered into at the same time as the Going Private

24  Transaction.  Under the Master Lease, SCI leases the real property and improvements associated with
    Boulder Station Hotel & Casino, Red Rock Casino Resort Spa, Palace Station Hotel & Casino and Sunset

25  Station Hotel & Casino (collectively, the "Leased Hotels").  The Leased Hotels, in turn, are operated by
    SCI and certain of its non-debtor operating subsidiaries.  The Master Lease provides for monthly rental

26  payments from SCI to Propco in amounts that exceed the amounts that Propco requires to meet its
    ordinary debt service obligations and any other expenses not covered by SCI under the "triple net"

27  provisions of the Master Lease.  Subject to certain conditions, the governing documents permit some of
    the surplus cash to be upstreamed as dividends to the Mezzanine Entities that own equity up the Propco

28  "stack" to service such Mezzanine Entities' debt, with any residual amounts then ultimately "flowing
    back" to SCI as the ultimate parent entity.

that will be effectuated under the Plan, including benefits from the contributions of the Released Parties thereto, the likelihood of success in any litigation regarding the Going Private Transaction Causes of Action is sufficiently low to justify the release of the Going Private Transaction Causes of Action on the terms and conditions set forth in the Plan as being fair and equitable.

80.    The Court has also considered the fact that the Going Private Transaction litigation would be extremely complex litigation, extremely costly litigation, and the delay attendant to such litigation could put a serious damper on the ability of the Debtors to ever obtain the benefits of chapter 11.  Thus it is not surprising that the Debtors' principal creditor constituencies support the Plan and the release of the Going Private Transaction Causes of Action.  Based upon their contribution, the SLC, its members and agents (including attorneys and financial advisors) are entitled to be included in the Plan definitions of Released Parties and Exculpated Parties, and the Confirmation Order shall so provide.

### 3.    Article X.C. of the Plan – Releases Among Releasing Parties and Released Parties.

81.    Article X.C. of the Plan provides for certain releases.  The releases are (a) releases of claims held by the Debtors and their Estates (Article X.C.1.) against the identified released parties, to the fullest extent permissible under applicable law, and (b) voluntary releases of claims held by Holders of Claims and Equity Interests against the identified released parties, to the fullest extent permissible under applicable law (Article X.C.2.).

82.    The Debtors' Release.  Article X.C.1. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, the Debtors, the Debtors' Estates, the Non-Debtor Affiliates and each of their respective Related Persons fully releases and discharges (the "Debtors' Release") each of the following parties and their respective properties and Related Persons from any and all claims and causes of action (including, without limitation, the Going Private Transaction Causes of Action) based on any act, omission or event that takes place on or prior to the Effective Date and arises from or is related to the Debtors, the Reorganized Debtors or their respective assets, property,

Estates, the Chapter 11 Cases, the Disclosure Statement, the Plan or the solicitation of votes on the Plan that either the releasing parties could assert or that any Holder of a Claim or Equity Interest could assert for or on behalf of the Debtors or their Estates (whether directly or derivatively):  (a) the Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h) the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the Official Creditors Committee and its members, provided that the Committee Support Stipulation has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Effective Date; and (s) the respective Related Persons of each of the foregoing Entities (defined in the Plan as the "Released Parties").  Pursuant to the Plan Modifications, the Released Parties will include the Settling Lenders (subject to the satisfaction of certain terms and conditions in the Settling Lender Stipulation) and the Mezzco Lenders.

83.     The Debtors' Release reflects a sound exercise of the Debtors' business judgment. The Chapter 11 Cases involved a multitude of complex issues.  In order to effectively implement the Plan, the non-Debtor parties thereto need assurance that they will not be subject to any further liability to the Debtors, their Estates, or any party that seeks to bring a claim on behalf of the Debtors or their Estates.  Absent the Debtors' Release, it is likely that the various Released Parties would not commit to support the Plan because they would remain exposed to potential claims and causes of action.

84.     The Third Party Release.  Article X.C.2. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, each Holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in Article X.C.2 fully releases and discharges (the "Third Party Release") each of the Released Parties from any and all claims and causes of action

(including, without limitation, the Going Private Transaction Causes of Action) based on any act, omission or event that takes place on or before the Effective Date in any way relating or pertaining to (v) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (w) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (x) the Chapter 11 Cases, (y) the negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement; and (z) the Going Private Transaction Causes of Action.

85.    Similar to the Debtors' Release, the Third Party Release provides additional assurance to the parties to the Plan and the other parties in interest in the Chapter 11 Cases that their liability on account of claims related to the Debtors (including the Going Private Transaction Causes of Action) will be minimized, and provides an additional incentive for such parties to settle and consent to the Plan.

86.    The Third Party Releases set forth in Article X.C.2. of the Plan are being made on a wholly voluntary basis by such Holder of a Claim or Equity Interest that has indicated on its Ballot that it is consenting to such release.  The Ballots sent to each Holder of a Claim or Equity Interest entitled to vote on the Plan unambiguously stated that the election to consent to such release was at such Holder's option.  The entirely voluntary Third Party Release is an effective tool in winning the necessary support for the Plan, and does not unnecessarily trample on the rights of any party that did not agree to such Third Party Release.

87.    In connection with the Confirmation Hearing, no party in interest objected to the Debtors' Release or the Third Party Release.

### 4.    Article X.D. of the Plan – Exculpation.

88.    Article X.D. of the Plan provides, subject to certain identified exceptions, an exculpation of the following parties from any claims or causes of action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effecting the consummation of the Plan, the Disclosure

Statement or any sale, contract, instrument, release or other agreement or document created or

entered into in connection with the Plan or any other prepetition or postpetition act taken or

omitted to be taken in connection with or in contemplation of the restructuring of the Debtors,

the approval of the Disclosure Statement, confirmation or Consummation of the Plan: (a) the

Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the

Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h)

the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative

Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured

Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan

Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the

Official Creditors Committee and its members, provided that the Committee Support Stipulation

has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties

Support Agreement and the Propco Commitment have not been terminated as of the Effective

Date; and (s) the respective Related Persons of each of the foregoing Entities (the "Exculpated

Parties").  Pursuant to the Plan Modifications, the Exculpated Parties will include the Settling

Lenders (subject to the satisfaction of certain terms and conditions in the Settling Lender

Stipulation) and the Mezzco Lenders.

89.    The Plan's exculpation provision provides additional incentive for the various

major parties to the Chapter 11 Cases to commit to and support the Plan.  The exculpation

ensures that such parties will not be subject to any claims or causes of action relating to their

good faith acts or omissions in the restructuring efforts that began almost a year prior to the

Petition Date.  The exculpation ensures that the Plan will have finality, and that the parties

thereto will not be subject to collateral attacks through litigation against the Plan's proponents

and supporters.  In connection with the Confirmation Hearing, no party in interest objected to the

exculpation provisions of the Plan.

90.    The Court finds that the settlement, release, injunction and exculpation provisions

set forth in Article X. of the Plan (i) are integral to the agreement among the various parties in

interest and the overall objectives of the Plan, (ii) are essential to the formulation and successful

implementation of the Plan for the purposes of Section 1123(a)(5) of the Bankruptcy Code,
(iv) are being provided for valuable consideration and have been negotiated in good faith and at
arms' length, (v) confer material and substantial benefits on the Debtors' Estates, and (vi) are in
the best interests of the Debtors, their Estates and other parties in interest and, as to the releases
made by, or on behalf of, the Debtors or the Estates, are based on sound business judgment.

### 5.    No Successor Liability

91.    Section 1141(c) provides in relevant part that "after confirmation of a plan, the
property dealt with by a plan is free and clear of all claims and interests of creditors, equity
security holders, and of general partners of the debtor.  11 U.S.C. § 1141(c).[12]  In addition,
Section 363(f) provides statutory authority for the sale of estate property free and clear of
"interests in the property," and courts have generally interpreted Section 363(f) to authorize sales
free and clear of liens and claims.  *See e.g., In re Trans World Airlines*, 322 F.3d 283, 290 (3d
Cir. 2003) (holding that unsecured claims of debtor's employees "are interests within the
meaning of section 363(f) in the sense that they arise from the property being sold.*"); Meyers v.
United States*, 297 B.R. 774, 781-82 (S.D.Cal. 2003) (concluding that purchaser had acquired
assets of debtor free and clear of plaintiff's unsecured personal injury claims).  Courts have also
expressly held that transferees of a debtor's assets pursuant to a sale approved under Section 363
or pursuant to confirmation of a chapter 11 plan are not liable for claims against the debtor under
successor liability theories.  *See e.g., In re Trans World Airlines, supra* (Section 363 sale); *Myers
v. United States, supra* (Section 363 sale); *In re White Motor Credit Corp.*, 75 B.R. 944, 950
(Bankr. N.D. Ohio 1987) (confirmation of plan).  The court in *White Motor Credit Corp.* held
that state law successor liability theories are preempted by the Bankruptcy Code.  75 B.R. at 950.

92.    The Plan provides that the entities receiving the New Opco Acquired Assets and
New Propco Acquired Assets and their subsidiaries, creditors and equity holders, shall have no

---

[12]    Section 1141(c) is expressly subject to the provisions of Section 1141(d)(3), which provides that
confirmation of a plan does not discharge a liquidating debtor, but Section 1141(c) refers to *property* of
the debtor, not the debtor.  *See e.g., In re Regional Bldg. Sys., Inc.*, 251 B.R. 274, 282 (Bankr. D. Md.
2000), aff'd, 254 F.3d 528, 531 (4th Cir. 2001) (free and clear provision of Section 1141(c) applies to
liquidating chapter 11 plans); *In re Shenandoah Realty,* 248 B.R. 505, 513 (W.D. Va. 2000) (same); *In re
Van Dyke*, No. 88-81521, 1996 WL 33401578 at *4 (Bankr. C.D. Ill. Jan. 10, 1996) (same).

successor liability for creditors' Claims (including Claims of governmental entities) against the Debtors and the Non-Debtor Affiliates, or otherwise based upon the implementation of the Plan, and such intent of the Plan was plainly described in the Disclosure Statement.  During the course of the Chapter 11 Cases, and in connection with the Confirmation Hearing, no party in interest objected to such Plan term.

93.     Even when the Court applies applicable nonbankruptcy law to the analysis of the transfers of the New Opco Acquired Assets and New Propco Acquired Assets under the Plan, the default rule under state law is that purchasers have no successor liability.  *Village Builders 96, L.P. v. U.S. Laboratories, Inc.*, 112 P.3d 1082, 1087 (Nev. 2005) ("[I]t is the general rule that when one corporation sells all of its assets to another corporation the purchaser is not liable for the debts of the seller." (*quoting Lamb v. Leroy Corp.*, 454 P.2d 24, 26–27 (Nev. 1969)).  Successor liability against purchasers is only applied when one of the exceptions to the default rule against successor liability has been proven.  *Village Builders*, 121 Nev. at 268 (purchasers of assets have no successor liability unless one of the following four exceptions are met: (a) the transferee has agreed to assume the transferor's liabilities; (b) the transaction is a *de facto merger*; (c) the transferee is mere continuation of transferor; or (d) the transaction is a fraud to escape liabilities).

94.     There is no evidence of successor liability because none of the *Village Builders* exceptions to the general rule of no successor liability apply to the Restructuring Transactions and implementation of the Plan.  First, the transferees of the New Opco Acquired Assets and New Propco Acquired assets are not assuming the Debtors' liabilities (except with respect to certain expressly assumed liabilities and permitted exceptions); the Plan and the other Restructuring Transactions Related Documents are clear and unequivocal on that point.

95.     Second, courts generally will not find a *de facto* merger unless the consideration for the assets is the stock of the transferee, which is not the case here.  *See Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264-65 (9th Cir. 1990) (overruled on other grounds) (finding no continuity of shareholders where consideration paid by purchaser was a combination of cash, promissory note and payment of some debts, and no stock in purchaser or its parent

company was exchanged as part of the sale); *see also Ferguson v. Arcata Redwood Co., LLC*, No. C03-05632, 2004 WL 2600471, *4 (N.D.Cal. Nov. 12, 2004) (purchaser was not alleged to have purchased seller's assets with stock, precluding a finding of successor liability); *Kaleta v. Whittaker Corp.*, 221 Ill. App. 3d 705, 709 (1991) (when payment for assets by stock of transferee is not present, sound policy does not support imposing the predecessor's liabilities upon the successor "when it has already paid a substantial price for the assets of the predecessor."). Here, the consideration for the Opco Assets is cash and secured notes issued by Purchaser; and the New Propco Transferred Assets are being transferred in exchange for and on account of the secured claims of the creditors of Propco. None of the consideration for the assets being transferred under the Plan is the stock of transferee.

96.     <u>Third</u>, courts will not find a *de facto* merger or that the transferee is a mere continuation of the transferor unless the stock, stockholders and directors of the transferor and transferee are substantially the same, which is not the case here. *See e.g. Village Builders*, 121 Nev. at 274 (no showing of mere continuation without "<u>identity</u> of stock, stockholders and directors between the two corporations") (emphasis added). *See also*, *Commercial Nat'l Bank v. Newtson,* 39 Ill.App.3d 216, 217 (1976) (applying the general rule against corporate successor liability in a situation where one shareholder owned 25% of the predecessor corporation, and after the asset transfer the same shareholder owned 40% of the successor corporation); *Joseph Huber Brewing Co., Inc. v. Pamado, Inc.*, No. 05 C 2783, 2006 WL 2583719, *12-13 (N.D.Ill., September 5, 2006) (finding that a continuity of minority ownership—approximately 15%—does not weigh in favor of a finding for the continuation exception); *Jeong v. Onada Cement Co., Ltd.*, No. CV 99-11092, 2000 WL 33954824, *4 fn 4 (C.D.Cal., May 17, 2000) (acknowledging that under California law, successor liability exists where shareholders are "practically" the same).

97.     Here, there is no identity of stock, stockholders or directors between the transferor and the transferee. The transferors, the Debtors and their Non-Debtor Subsidiaries, are currently owned directly and indirectly by Colony Capital and the Fertitta family. Colony owns approximately 74% of the economic value of such stock, the Fertitta family approximately 26%.

The transferee, however, New Propco and its affiliates, will be owned 40% by the current Mortgage Lenders and Mezzco Lenders, 15% by the general unsecured creditors of the Debtors that acquire equity through the Propco Rights Offering, and 45% by Fertitta Gaming LLC. Not only will there be no identity of stock and stockholders between transferee and transferor, but a majority of the transferee stock will be held by entities that hold no stock in the transferor Debtors. Moreover, while all of the current directors of the Debtors are appointed by Colony and the Fertittas, three of the eight directors of the transferees will be appointed by the creditors receiving the stock in transferee, and they will have reasonable approval rights over the appointment of the two independent directors. Thus, the transferees of the New Opco Acquired Assets and New Propco Acquired Assets are not, under applicable law, including Nevada law, a mere continuation of the Debtors.

98. _Fourth_, numerous courts, including Nevada courts, have not found the transferee to be a mere continuation of the transferor where the selling corporation continues to exist, even if the selling corporation ceases its business operations. For example, in _Village Builders_, _supra_, where the Nevada Supreme Court declined to find successor liability, the transferor had sold all of its assets, but the transferor corporation was maintained for the purpose of a pending lawsuit. 121 Nev. at 272. Other jurisdictions have reached similar conclusions. _See, e.g._, _Schumacher v. Richards Shear Co._, 59 N.Y.S.2d 239, 245 (1983) ("Since Richards Shear survived the instant purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly concluded that Logemann cannot be considered a mere continuation of Richards Shear."); _Gavette v. The Warner & Swasey Co._, No. 90-CV-217, 1999 WL 118438, at *5 (N.D.N.Y. Mar. 5, 1999) (finding that _de facto_ merger did not lie because the seller corporation continued to exist "at least transcendentally for one year."). Here, like the transferor in _Village Builders_, the Debtors will continue to exist after the Effective Date for the purpose of facilitating Plan implementation, claims adjudication and distribution related processes, including possibly pursuing retained causes of action.[13]

---

[13]    The Debtors will not be pursuing Avoidance Actions against counterparties to any Purchased Assets or Assumed Liabilities (as defined in the Stalking Horse APA), including, without limitation, Assumed Contracts, because they are being released pursuant to the Confirmation Order.

99.     Other facts relevant to a finding of no successor liability are: (a) Purchaser is not purchasing all of the Debtors' assets in that Purchaser is not purchasing any of the assets listed on Schedule 2.4 of the Stalking Horse APA; and (b) those of the Debtors' employees who are to be employed by New Opco and New Propco are being hired under new employment contracts or other arrangements to be entered into or to become effective at the time of the asset transfers.

100.     Finally, the Plan is unmistakably not a fraud to escape liabilities.  The record of the Chapter 11 Cases shows that the parties to the Plan have acted in good faith, the Plan has been proposed in good faith, and the Plan accomplishes the goals of maximizing the value of the Debtors' assets for the benefits of the Debtors' creditors.  Thus, based upon the facts of these Chapter 11 Cases, none of the exceptions to the rule against successor liability under Nevada law apply.

**D.     DEBTORS' PROPOSED PLAN MODIFICATIONS**

101.     The Plan Modifications Motion proposes four modifications to the Plan (the "Plan Modifications").  The first Plan Modification modifies Article I.B. of the Plan as follows:

(a)  The definition of Exculpated Parties shall include the Settling Lenders and Mezzco Lenders; provided, however, that the Settling Lenders shall be Exculpated Parties only if all of the applicable terms and conditions of the Settling Lender Stipulation are satisfied by the Settling Lenders.

(b)  "Mezzco Lenders" means the lenders to the Mezzco Debtors.

(c)  The definition of Released Parties shall include the Settling Lenders and Mezzco Lenders; provided, however, that the Settling Lenders shall be Released Parties only if all of the applicable terms and conditions of the Settling Lender Stipulation are satisfied by the Settling Lenders.

(d)  "Settling Lenders" means the Prepetition Opco Secured Lenders referred to as the Settling Lenders in the Stipulation (the "Settling Lender Stipulation") that is Exhibit 1 to the "Debtors' Motion For Order  Approving Global Settlement With Independent Lender Group" (docket no. 1965).

102.     The second Plan Modification: (a) amends Articles IX.B. of the Plan, entitled Conditions Precedent to Effective Date and Consummation of the Plan; and (b) amends Article IX.C. of the Plan, entitled Waiver of Conditions.  Article IX.B. is amended by adding, after the ninth condition, the following condition:

10.     All documentation relating to the issuance of the NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights, and all documentation and

other matters relating to the exemption of such issuances from any registration requirements imposed under any federal or state securities laws, shall be acceptable in all respects to the Debtors, FG and the Mortgage Lenders.

103.    Article IX.C. of the Plan is amended as follows:  The reference in Article IX.C. to ". . . the conditions specified in Article IX.B.5 or B.6 . . . "  shall be replaced with ". . . the conditions specified in Article IX.B.5, B.6 or B.10 . . . ".

104.    The underlined third Plan Modification adds the following language to the Confirmation Order:

> Notwithstanding anything in the Plan to the contrary, the Debtors shall have until December 1, 2010 to file and serve motions to assume, assume and assign, or reject Executory Contracts and Unexpired Leases (and may obtain additional time by filing a motion for additional time prior to such deadline and upon notice and a hearing and a showing of good cause).  If the Debtors reject an Executory Contract or Unexpired Lease, the non-debtor party shall have 30 days from entry of the order approving the rejection to file a Proof of Claim for rejection damages.

105.    The underlined fourth Plan Modification modifies Article V.H. of the Plan by deleting clause (iii) and adding the following at the end of the paragraph:

> The Debtors shall be dissolved as soon as practicable after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.  After the Effective Date, the Plan Administrator shall act as the sole officer or manager, as the case may be, of each of the Debtors.

106.    The Plan Modifications appear to be reasonable and non-material revisions to the Plan.  The additional condition precedent to the Effective Date with respect to the issuance and documentation of the NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights is based upon the practical reality that the settlement between the Debtors and the Official Creditors Committee did not leave sufficient time prior to the Confirmation Hearing to get the subscription and related documents prepared prior to the Confirmation Hearing.  Since there is expected to be a several month delay between the Confirmation Date and the Effective Date, the Plan Modification does not burden or change the treatment of the Claim of any creditor.  Similarly, the Plan Modification that adds additional time for completing the process of assuming and assigning contracts and leases to the transferees of the New Opco Acquired Assets and New Propco Acquired Assets rationalizes a process that might otherwise have delayed entry

of the Confirmation Order.  Since the Debtors are obligated to perform under these contracts and leases until they reject them, the counterparties are protected, and are not prejudiced by the delay in the final decision of assumption or rejection.  Finally, the Plan Modification that delays dissolution of the Debtors to some time after the Effective Date simply reflects the practical reality that there will likely be Plan implementation actions that will be required of the Debtors after the Effective Date.

107.    The Plan Modifications do not alter the classification and treatment of Claims and Equity Interests, and do not otherwise make the Plan unconfirmable.  The Plan Modifications do not require resolicitation of votes because the Plan Modifications do not materially affect the rights of any Holders of Claims and Equity Interests, and it is unlikely that Holders that voted to accept the Plan would reconsider their acceptance based upon the Plan Modifications.  Each non-Debtor party to an unexpired lease of real property consented in writing to extending until the Effective Date the deadline to assume or reject such lease.

### E.    AMENDMENTS TO THE STALKING HORSE APA

108.    The Required Consenting Lenders, FG and the Mortgage Lenders have each consented to the APA Amendment to the extent required under the Stalking Horse APA and related support agreements.  The APA Amendment modifies certain provisions of the Stalking Horse APA related to the timetable for assuming and assigning contracts and leases.

109.    The APA Amendment also modifies the definition of an acceptable Confirmation Order.  The original definition of "Confirmation Order" in the Stalking Horse APA required, among other things, that the Court find, in connection with confirmation of the Plan, that no administrative tax claims for income tax will result from or arise out of the implementation of the transactions contemplated by the Stalking Horse APA or the Plan, other than alternative minimum taxes that in the aggregate are less than $15 million (the "Maximum Tax Determination").  As the Debtors disclosed in their Disclosure Statement at Articles VIII.A.5. and X.A.1.: (i) the Debtors have requested a private letter ruling from the Internal Revenue Service regarding the application of Internal Revenue Code section 267 to the Restructuring Transactions, though, as set forth in the Disclosure Statement, the receipt of a ruling from the

Internal Revenue Service is not a closing condition under the Stalking Horse APA, as amended, nor is the failure to receive such a ruling a termination event thereunder; and (ii) the Debtors intend to seek a ruling from this Court regarding the Maximum Tax Determination. By the APA Amendment, the requirement of the Stalking Horse APA that the Confirmation Order include the Maximum Tax Determination is deleted. In its place, the Maximum Tax Determination becomes a condition precedent to the closing of the sale under the Stalking Horse APA, the Consummation of the Plan and the occurrence of the Effective Date, subject, in each case, to the cure rights during the Seller Excess AMT Period (as defined in the Stalking Horse APA), which rights are not modified by the APA Amendment and are preserved.

**F.    SATISFACTION OF CONDITIONS TO CONFIRMATION.**

110.    Each of the conditions precedent to the entry of these Findings of Fact and Conclusions of Law and the Confirmation Order, as set forth in Article IX.A. of the Plan, has been satisfied.

**III.    CONCLUSIONS OF LAW.**

**A.    JURISDICTION AND VENUE.**

111.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtors were and are qualified to be debtors under Section 109 of the Bankruptcy Code. Venue of the Chapter 11 Cases in the United States Bankruptcy Court for the District of Nevada was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.

**B.    COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.**

112.    As set forth above, the Plan complies in all respects with the applicable requirements of Section 1129(a) of the Bankruptcy Code, except Section 1129(a)(8). Notwithstanding the fact that Section 1129(a)(8) has not been satisfied, the Plan satisfies the requirements of Section 1129(b) with respect to all non-accepting Classes of Claims and Equity Interests. The Court will confirm the Plan and enter the Confirmation Order contemporaneous with these Findings of Fact and Conclusions of Law.

1

2

### 1. The Classification of Claims Under the Plan Complies With the Requirements of the Bankruptcy Code.

3

113. Under the Plan, Claims of creditors holding general unsecured claims against

4

Debtor SCI, Classes S.4 through S.7, are classified separately. In the Memorandum of Law, the

5

Debtors argue that the separately classified Claims are different in substance and nature, and the

6

claimholders have different rights against SCI and, in some cases, *vis-à-vis* each other.

7

Therefore, the Debtors argue, there are justifiable, nondiscriminatory economic and business

8

reasons for separate classification of the unsecured claims in Classes S.4, S.5, S.6 and S.7 in

9

compliance with the requirements of Bankruptcy Code Sections 1122(a) and 1129(a)(1).

10

114. Section 1122(a) provides in relevant part that "a plan may place a claim or an

11

interest in a particular class only if such claim or interest is substantially similar to the other

12

claims or interests of such class." 11 U.S.C. § 1122(a). Section 1122(a) does not require that

13

similar claims be placed in the same class. *See In re Montclair Retail Ctr., L.P.*, 177 B.R. 663,

14

665 (B.A.P. 9th Cir. 1995). Rather, when a court is reviewing the propriety of separate

15

classification of unsecured claims outside the context of a single, disproportionately large

16

deficiency claim, the test is whether there is a nondiscriminatory, business justification for

17

classifying similar claims separately. *See e.g.*, *Steelecase, Inc. v. Johnston* (*In re Johnston*) 21

18

F.3d 323 (9th Cir. 1994); *State St. Bank & Trust Co. v. Elmwood, Inc.* (*In re Elmwood, Inc.*), 182

19

B.R. 845 (D. Nev. 1995); *In re Montclair Retail Ctr., L.P.*, 177 B.R. 663 (B.A.P. 9th Cir. 1995);

20

*In re Hawaiian Telcom Commc'ns.*, No 08-2005, 2009 WL 5386130 (Bankr. D. Hawaii, Dec. 30,

21

2009). In evaluating whether separate classification is proper, the Court may consider the kind,

22

species, or character of each category of applicable claims. *In re Johnston*, 21 F. 3d at 327; *In re*

23

*Montclair Retail Ctr.*, 177 B.R. at 665; *In re Elmwood, Inc.*, 182 B.R. at 849.

24

115. Class S.4 Claims are general unsecured claims consisting of trade claims,

25

employee claims, rejection damages claims and deficiency claims of certain secured lenders.

26

Class S.5 consists of Senior Notes Claims, which are general unsecured claims that are

27

contractually senior in right of repayment to the Subordinated Notes Claims that comprise Class

28

S.6. The size, nature and underlying terms of the Claims held by vendors, employees and other

trade creditors in Class S.4 are distinctly different from the Senior Note Claims in Class S.5 held by large financial institutions, mutual funds, private equity funds and hedge funds.  Similarly, due to the contractual subordination of the Subordinated Note Claims, Class S.6, it is not appropriate under the distribution mechanisms of the Plan to classify those claims in the same Class as the Senior Note Claims, Class S.5.  Thus, under the circumstances of these Chapter 11 Cases, it is appropriate to separately classify Classes S.4, S.5 and S.6.  *See e.g.*, *In re Hawaiian Telcom Communc'ns.,* 2009 WL 5386130 at *17-18 (holding that senior note claims and subordinated note claims are different and thus may be classified separately, and that general unsecured claims are distinct from senior note claims and thus may be classified separately).

116.    Class S.7 consists of the Mortgage Lender claims against SCI.  Class S.7 Claims arise from Propco's prepetition, contractual assignment of all of Propco's rights under the Master Lease as collateral to the Mortgage Lenders to secure the Mortgage Loan.  Class S.7 Claims are based upon security interests granted by Propco to the Mortgage Lenders, pursuant to which the Mortgage Lenders are entitled to receive whatever Propco will receive from SCI on account of Propco's Master Lease rejection damages claim.  Thus, the Claims in Class S.7 are not substantially similar to the Class S.4, S.5 and S.6 Claims, and the Debtors were required to separately classify Class S.7.  *See e.g. In re Johnston,* 21 F.3d 323 at 326 (approving separate classification of unsecured claims where one class was comprised of disputed unsecured claims secured by valid perfected liens against property of a co-debtor and guaranteed by the debtor, another class contained claims based on the debtor's guarantor liability, and the third class contained claims for which the debtor was solely responsible).

117.    The Court concludes that the Debtors have posited good business reasons for the separate classification of Classes S.4 through S.7., and have shown that 3 of the 4 Classes have substantially differing legal rights that may indeed require separate classification.  Moreover, there does not appear to be any evidence that the separate classification is intended to effect an economic advantage for the Debtors, or for any group of creditors over another, and there is no evidence of any intent to  gerrymander a class for the purpose of creating an impaired consenting

class.  Accordingly, the Court concludes that the separate classification of Classes S.4, S.5, S.6 and S.7 complies with all of the applicable provisions of Sections 1122, 1123 and 1129.

### 2.    The Plan Complies With the Requirements of Section 1129(a)(10).

118.    Seventeen Classes of Claims voted to accept the Plan, in each case determined without including any acceptance of the Plan by any insider.  They are Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2. However, several of the Debtors had no Voting Classes.  The bankruptcy courts that have expressly considered the matter have uniformly held that compliance with Section 1129(a)(10) is tested on a per-plan basis, not on a per-debtor basis, and that Section 1129(a)(10) therefore does not require an accepting impaired class for each debtor under a joint plan.  *See e.g. In re Charter Communcations, Inc.*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) (joint plan of 110 debtors that did not involve substantive consolidation; court held that only a single accepting impaired class under the plan required to satisfy Section 1129(a)(10)); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 at *234-235 (Bankr. S.D.N.Y. July 15, 2004) (joint chapter 11 plan for 177 debtors confirmed although majority of debtors lacked an impaired consenting class); *In re SGPA, Inc.*, Case No. 1-01-02609, 2001 WL 34750646, at p.7 (Bankr. M.D. Pa. Sept. 8, 2001) (bankruptcy court confirmed joint plan for multiple debtors and held that "in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan.").

119.    The Court agrees with the *Enron* court that the plain language and inherent fundamental policy behind Section 1129(a)(10) supports the view that the affirmative vote of one impaired class under the joint plan of multiple debtors is sufficient to satisfy Section 1129(a)(10).  *See In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *234-235.  The Court concludes, therefore, that the acceptance of the Plan by seventeen Classes of Claims is sufficient for the Plan to satisfy the requirements of Section 1129(a)(10).

### 3.    The Plan Complies With the Requirements of Section 1129(a)(11).

120.    Section 1129(a)(11) requires the Court to find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any

successor to the Debtors under the Plan. Since the Debtors are being liquidated under the Plan, the question of further financial reorganization of the Debtors is moot. *See e.g., In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (under the literal wording of Section 1129(a)(11), it is unnecessary to show feasibility when liquidation is proposed in the plan); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) (the feasibility test has no application to a liquidation plan). Moreover, none of the entities receiving the Debtors' assets are successors to the Debtors; therefore, no feasibility finding is required with respect to those entities either.

121.    Nevertheless, where, as here, all of the Opco Assets are being liquidated through an approved Sale Process and all of the New Propco Transferred Assets are being transferred under the Plan to the creditors with the senior interests in those assets, the Court can determine that the Plan complies with the "feasibility" test of Section 1129(a)(11) as long as the liquidation is contemplated under the Plan, as it is here, and can be consummated. *See e.g.*, *In re Cypresswood Land Partners, I*, 409 B.R. 396, 433 (Bankr. S.D. Tex. 2009) (plan that provides for a sale of substantially all of a debtor's assets offers a reasonable probability of success and can satisfy Section 1129(a)(11)). Here, the New Opco Acquired Assets and New Propco Acquired Assets will be transferred to the applicable transferees under the Plan on the Effective Date. Thus, the Debtors are able to satisfy the feasibility test of Section 1129(a)(1) by demonstrating the financial wherewithal of the transferees to close on the Restructuring Transactions in a manner that has a reasonable prospect of resulting in the consummation of the Plan. To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success. *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

122.    Based upon (i) the financial projections for New Propco and New Opco, (ii) the clear financial wherewith and desire of the parties to the Restructuring Transactions to close on the Effective Date, (iii) the evidence that the Put Parties are willing to purchase up to $100 million of equity in New Propco, and (v) the willingness of the Official Creditors Committee to shift from zealous opponent to supporter of the Plan because the Plan now provides general unsecured creditors with the UC Securities, the Court concludes that it is more

likely than not that: (a) Purchaser will close on the Stalking Horse APA, (b) New Propco, its affiliates and the Debtors will be able to effectuate all of the other Restructuring Transactions, and (c) New Propco and New Opco will be able to service the debt obligations they have agreed to issue in connection with the Restructuring Transactions.  Thus, the Court concludes that the Plan meets the feasibility test of Section 1129(a)(11).

## C.    THE TERMS OF THE SALE OF THE OPCO ASSETS TO THE SUCCESSFUL BIDDER ARE APPROVED IN ALL RESPECTS.

123.    On the Effective Date, the transfer of the Opco Assets and the New Propco Transferred Assets to Purchaser will be a legal, valid, and effective transfer of the Opco Assets and the New Propco Transferred Assets, and will vest Purchaser with all right, title, and interest of the Debtors to the Opco Assets and the New Propco Transferred Assets free and clear of all Liens, Claims and Equity Interests, including but not limited to all claims arising under doctrines of successor liability.

124.    The Stalking Horse APA and the other Restructuring Transactions, including the transfer of the Propco Transferred Assets to Purchaser, were negotiated and have been and are undertaken by the Debtors and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code.  The Sale Process, including the marketing of the New Opco Acquired Assets and the negotiations surrounding the New Propco Purchased Assets, were conducted at arms' length and in good faith within the meaning of Section 363(m) of the Bankruptcy Code.  Purchaser is a purchaser in good faith of the Opco Assets as that term is used in Section 363(m) of the Bankruptcy Code, and Purchaser and the Debtors are entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to the Opco Assets and the Propco Transferred Assets.  Moreover, neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the Stalking Horse APA, the consummation of the Sale, the related Restructuring Transactions, including the transfer of the Propco Transferred Assets to Purchaser, or the assumption and assignment of the Assumed Contracts to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code.  All debt incurred by Purchaser in connection with the Restructuring

Transactions, and all Liens granted by Purchaser in connection with such incurrence of debt, are entitled to the protections of Section 364(e) of the Bankruptcy Code.

125.    The consideration provided by Purchaser for the Opco Assets under the Stalking Horse APA is fair and reasonable and shall be deemed for all purposes to constitute Value under the Bankruptcy Code and any other applicable law.

126.    The Debtors are authorized to sell the Opco Assets free and clear of all Liens, Claims, Equity Interests and Other Liabilities, because, with respect to each creditor asserting a Lien, Claim, Equity Interest or Other Liability, one or more of the standards set forth in Sections 363(f)(1)-(5) has been satisfied.  Those Holders of Liens, Claims, Equity Interests and Other Liabilities who did not object or withdrew objections to the sale, Stalking Horse APA and the related Restructuring Transactions are deemed to have consented thereto pursuant to Section 363(f)(2) of the Bankruptcy Code.  Those Holders of Liens, Claims, Equity Interests and Other Liabilities who did object fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code.

127.    Except as expressly provided in the Stalking Horse APA, Purchaser is not assuming, nor shall it or any of its affiliates, or their respective Related Persons, be deemed in any way liable or responsible as a successor or otherwise for, any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership of the Opco Assets or use of such assets on or prior to the Effective Date.  The Confirmation Order shall provide that all such liabilities, debts and obligations are extinguished as to all Persons, Entities and Governmental Units on the Effective Date insofar as they may give rise to liability, successor or otherwise, under any theory of law or equity against Purchaser and their Related Persons.

128.    Pursuant to the terms of the Stalking Horse APA and Sections 363(b), 363(f) and 1141(c) of the Bankruptcy Code, the Debtors are authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of  the New Opco Acquired Assets and the New Propco Acquired Assets to Purchaser on the Effective Date free and clear of: (i) all Liens, Claims, Equity Interests and Other Liabilities, including without

limitation any Claim, whether arising prior to or subsequent to the commencement of these bankruptcy cases, arising under doctrines of successor liability; and  (ii) any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership of the Opco Assets.  The Confirmation Order shall provide that, except as otherwise expressly provided in the Stalking Horse APA, on the Effective Date all such Liens, Claims, Equity Interests and restrictions shall be released, terminated and discharged as to the Purchaser and the Opco Assets.

129.    Purchaser shall not be deemed a successor of or to the Debtors or the Debtors' estates with respect to any Liens, Claims, Equity Interests and Other Liabilities against the Debtors or the Opco Assets, and Purchaser shall not be deemed liable in any way for any such Liens, Claims, Equity Interests and Other Liabilities, including, without limitation, the Excluded Liabilities or Excluded Assets (as those terms are used in the Stalking Horse APA).  The Confirmation Order shall provide that, on the Effective Date, all creditors and equityholders of the Debtors, including all Governmental Units, are permanently and forever barred, restrained and enjoined from (a) asserting any claims or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against Purchaser, their Related Persons or the New Opco Acquired Assets or New Propco Acquired Assets on account of any Liens, Claims, Equity Interests and Other Liabilities, Excluded Liabilities or Excluded Assets, or (b) asserting any claims or enforcing remedies against Purchaser or their Related Persons under any theory of successor liability, merger, *de facto* merger, substantial continuity or similar theory.

130.    Without limiting the generality of the foregoing paragraph, other than as specifically set forth in the Stalking Horse APA: (a) Purchaser and their Related Persons shall have no liability or obligation (x) to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or any other payment to employees of the Debtors, and (y) in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program  to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or

other termination of any such plan, program agreement or benefit); and (b) Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against Purchaser and their Related Persons any Claims arising from or relating to such employee benefit, agreement, plan or program.

131.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign and sell the Assumed Contracts to Purchaser in connection with the consummation of the sale of the Opco Assets to Purchaser, and the assumption, assignment, and sale of the Assumed Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed Contracts being assigned and sold to Purchaser are an integral part of the Opco Assets being purchased by Purchaser, and accordingly, such assumption, assignment, and sale of the Assumed Contracts are reasonable and enhance the value of the Debtors' estates.

132.    By implementing the Stalking Horse APA, (a) the Debtors will have provided adequate assurance of cure of any monetary default existing prior to the Closing under any of the Assumed Contracts, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code, and will have provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code, and (b) Purchaser will have  provided adequate assurance of its future performance of and under any of the Assumed Contracts, within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code.

### D.    APPROVAL OF THE SETTLEMENTS, RELEASES AND EXCULPATIONS PROVIDED UNDER THE PLAN.

133.    Based upon the wide ranging support for the Plan among secured and unsecured creditors, and the Court's finding that the Plan is the best option the Debtors' creditors have to preserve the economic viability and job sustaining value of the Debtors' assets, the Court concludes that each of the settlement, release, exculpation and related provisions of Article X. of the Plan are fair and necessary for the successful implementation of the Plan and are approved.

1     **1.**  **The Global Settlement in Article X.B.2. of the Plan is Approved.**

2     134.  The Official Creditors Committee announced its support of the Plan and

3 withdrawal of its motion for standing to prosecute the Going Private Transaction Causes of

4 Action around the time that the Solicitation Packages were distributed for voting purposes.

5 Based upon the record of the Chapter 11 Cases, the Court concludes that the Debtors were

6 justified in proposing to settle and release the Going Private Transaction Causes of Action

7 pursuant to the Plan, because such settlement and compromise is consistent with the factors

8 enunciated in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*

9 *Anderson*, 390 U.S. 414, 424 (1968), and *Martin v. Kane (In re A & C Properties)*, 784 F.2d

10 1377 (9th Cir. 1986), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854 (1986), for

11 approval of settlements in bankruptcy cases.  The low probability of success in the litigation, the

12 complexity, expense and delay necessarily associated with any such litigation, and the paramount

13 interest of the creditors and a proper deference to their reasonable views all weigh heavily in

14 favor of settlement here, not litigation.  Accordingly, the Court concludes that the Global

15 Settlement and the provisions of Article X.B.2. constitute a fair and equitable settlement that is in

16 the best interests of the creditors and their estates, and one that satisfies in all respects the

17 requirements of *TMT Trailer* and *In re A & C Properties* for settlements proposed by chapter 11

18 debtors.

19     **2.**  **The Exculpation Provisions of Article X.D. of the Plan Are Approved.**

20     135.  Section 524(e) provides in relevant part that "discharge of a debt of the debtor

21 does not affect the liability of any other entity, on or the property of any other entity for, such

22 debt."  In *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), the Court of Appeals for the Ninth

23 Circuit held that Section 524(e) applies to chapter 11 plan bankruptcy discharges.  However,

24 bankruptcy courts generally recognize that Section 524(e) is silent on whether a chapter 11 plan

25 or confirmation order could affect the liability of a non-debtor on statutory grounds *other than* a

26 bankruptcy discharge.  Here the exculpation provision of Article X.D. does not violate section

27 524(e) because it is based upon the more limited exculpation provisions that are expressly

28 contemplated and permitted by Bankruptcy Code section 1125(e).

136.    Section 1125(e) provides a grant of immunity from liability not only under the securities laws, but also under any law, rule, or regulation governing solicitation or acceptance of a plan, to any person that participates in good faith in the solicitation of acceptances of a plan or the offer, issuance, sale or purchase of a security offered or sold in connection with the plan. Read literally, nothing in section 1125(e) limits that protection to post-petition activities. Moreover, another related provision of Section 1125, Section 1125(g), contemplates and authorizes solicitation of acceptances of a chapter 11 plan prior to commencement of a bankruptcy case if solicited in compliance with applicable non-bankruptcy law.

137.    Here, as discussed in Article II. of the Disclosure Statement, the Debtors conducted such pre-bankruptcy solicitations as part of their ongoing restructuring efforts dating back to late 2008.  Specifically, during 2008 and the first six months of 2009, the Debtors engaged in various discussions with the lenders under the Prepetition Opco Credit Agreement and the CMBS Loans and holders of the Senior Notes and Senior Subordinated Notes regarding restructuring alternatives for the Debtors' outstanding indebtedness.  Indeed, in November 2008, the Debtors made an offer to exchange new secured term loans for the outstanding Senior Notes and Senior Subordinated Notes, which would have included a restructuring of the Prepetition Opco Credit Agreement and the CMBS Loans.  The November 2008 exchange offer was unsuccessful.

138.    In February 2009, the Debtors solicited votes from the holders of the Senior Notes and Senior Subordinated Notes for a prepackaged plan of reorganization pursuant to which the holders of the Senior Notes and Senior Subordinated Notes would have received second and third lien notes, respectively, and cash in a plan of reorganization, and the outstanding indebtedness under the Prepetition Opco Credit Agreement and CMBS Loans would have been restructured.  The solicitation for the prepackaged plan of reorganization did not receive sufficient votes to approve the plan, and that plan did not proceed.

139.    In March 2009, the holders of a majority in principal amount of each series of Senior Notes and Senior Subordinated Notes entered a forbearance agreement with SCI with respect to the events of default resulting from SCI's failure to pay interest on the Senior Notes

and Senior Subordinated Notes.  Majority lenders under the Prepetition Opco Credit Agreement likewise entered into a forbearance agreement with SCI relating to various purported events of default.  During the period from March 2009 to the commencement of the Chapter 11 Cases, the Debtors continued to negotiate the terms of a consensual restructuring with the various creditors of the Debtors.

140.    The Court is of the view that, as long as the pre-petition restructuring efforts were made in good faith and in compliance with the applicable provisions of chapter 11 (as expressly required by Section 1125(e)), such conduct is precisely the type of activity that section 1125(e) is designed to protect.  It would be inequitable, and would not comport with the plain intent of Section 1125(e) if, after confirmation of the Plan and implementation of the Restructuring Transactions, the Exculpated Parties -- the Persons and Entities on the Debtor and creditor sides that actively participated in the process of reaching a consensual chapter 11 plan -- could then be sued for their good faith prepetition and post-petition restructuring efforts.  Accordingly, the Court concludes that each of the Exculpated Parties is entitled to the protections afforded them by Section 1125(e) and Article X.D. of the Plan. [14]

### 3.    The Releases in Article X.C. of the Plan are Approved.

141.    A release of non-debtor third parties voluntarily and knowingly given by a creditor or equity holder in connection with a chapter 11 plan does not implicate the concerns regarding third party releases discussed by the Ninth Circuit Court of Appeals in *Lowenschuss*, *supra*.  *See e.g., In re Pacific Gas & Elec. Co.*, 304 B.R. 395, 416-18 (Bankr. N.D. Cal. 2004) (confirming plan that included governmental agency's release of debtor's parent entity and its officers and directors because the agency had consented to the release); *In re Hotel Mt. Lassen*,

---

[14]    Other bankruptcy courts in recent contested chapter 11 cases have approved plan exculpation clauses at least as broad, if not broader, in scope than that proposed in these Chapter 11 Cases. *See, e.g., In re Citadel Broadcasting, Inc.*, Case No. 09-17442, 2010 WL 210808, at *30 (Bankr. S.D.N.Y. May 19, 2010) ("Exculpated Claims" included all claims relating to the debtors' in or out of court restructuring efforts, and "Exculpated Parties" included, among others, the holders of the senior secured debt and their agent, the agent and indenture trustee for the subordinated noteholders, and each of their respective professionals and affiliates); *In re CIT Group, Inc.*, Case No. 09-16565, 2009 WL 4824498 (Bankr. S.D.N.Y. Dec. 8, 2009) at *25 (the exculpated parties included a steering committee of prepetition lenders, the DIP lenders and their agent, the exit facility lenders and their agent, the indenture trustees for the unsecured note issuances).

*Inc.*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("[a]ny third-party release in connection with a plan or reorganization, at a minimum, must be fully disclosed and purely voluntary on the part of the releasing parties and cannot unfairly discriminate against others.").

142.    Here, the Third Party Release was plainly described on the Ballot used to solicit votes in favor of the Plan.  Thus, the Third Party Release does not violate Section 524(e) or any of the concerns discussed in *Lowenschuss* and is an appropriate term of the Plan under Section 1123(a)(5), and is an appropriate term of the Plan expressly authorized by Section 1123(b)(3)(A) (the settlement or adjustment of any claim belong to the debtor or the estate).

143.    The Court concludes that the settlements, compromises, releases, exculpations, discharges and injunctions set forth in the Plan are fair, equitable, reasonable and in the best interests of the Debtors and their respective Estates and the Holders of Claims and Equity Interests, and are approved.

### 4.    The Transferees of the New Opco Acquired Assets and New Propco Acquired Assets Shall Not be Liable Under Any Successor Liability Theories.

144.    The operation of Sections 363 and 1141 foreclose the ability of creditors to obtain a finding of successor liability against the transferees of the Debtors' assets.  It would undermine the purposes of chapter 11 if creditors could get around the effect of confirmation of a chapter 11 plan by asserting successor liability claims after confirmation.  *See e.g., In re Trans World Airlines*, 322 F.3d at 292 (to allow some general unsecured creditors to assert successor liability claims against transferee of debtors' assets, while limiting other creditors' recourse to proceeds of sale, would be inconsistent with Bankruptcy Code's priority scheme).  In this case, if the Plan did not foreclose successor liability, the purchaser of the Opco Assets likely would not go forward with the sale, and the transferees of the New Propco Transferred Assets likely would not support the Plan.  It is not insignificant that the Purchaser was the only entity at the end of the day that made a Qualified Bid.

145.    Even if the Court performed the successor liability analysis under applicable non-bankruptcy law, including under Nevada law, it would find no basis at all for successor liability.

Therefore, the Court concludes that the transferees of the New Opco Acquired Assets and the New Propco Acquired Assets and their Related Persons are not successors of the Debtors or the Debtors' non-debtor subsidiaries, and, therefore, the "no successor liability" provisions of the Plan are consistent with applicable law and shall be enforced in the Confirmation Order.

146. **PLAN SUPPORT MOTIONS APPROVED**.

147. The three Plan Support Motions reflect reasonable settlements of complicated disputed issues of bankruptcy law, and each settlement is in itself a significant achievement for the Estates. The underlying settlements and compromises are consistent with the factors enunciated in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), and *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377 (9th Cir. 1986), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854 (1986), for approval of settlements in bankruptcy cases. Each of the Plan Support Motions is independently approved, and the Confirmation Order shall provide that the terms of the underlying settlements, stipulations and agreements thereof are incorporated into the Plan and Confirmation Order, and the parties to such settlements, stipulations and agreements shall be authorized and directed to comply with their obligations thereunder.

E. **THE PLAN MODIFICATIONS ARE APPROVED.**

148. The Plan Modifications comply with each of the applicable requirements of Section 1127 and Federal Rule of Bankruptcy Procedure 3019 concerning adequate notice, adequate disclosure, and compliance with the procedural and substantive requirements of Sections 1121 through 1129. Accordingly, the Confirmation Order will provide that the Plan Modifications are approved and all references to the Plan in these Finding of Fact and Conclusions of Law and in the Confirmation Order shall mean as modified by the Plan Modifications.

F. **THE AMENDMENT TO THE STALKING HORSE APA IS APPROVED**

149. The Court is of the view that the APA Amendment contains reasonable accommodations by the Parties consistent with the Plan Modification in respect of the assumption and assignment of contracts and leases. Further, the parties agreement to push out

the deadline for any determination of the Debtors' tax liability arising from the Plan, the Stalking

Horse APA and the other Restructuring Transactions to a time after the Confirmation Date and

before the Effective Date is a reasonable accommodation to the reality that the Debtors have not

yet received the private letter ruling they are seeking from the Internal Revenue Service, which

request they disclosed and discussed in the Disclosure Statement.  *See* Disclosure Statement at

Articles VIII.A.5. and X.A.1.  Accordingly, the Confirmation Order will provide that the APA

Amendment is approved, and all references to the Stalking Horse APA in these Findings of Fact

and Conclusions of Law and in the Confirmation Order shall mean as amended by the APA

Amendment.

### G.    **EXEMPTIONS FROM SECURITIES LAWS.**

150.    Article VI.A. of the Disclosure Statement, entitled "U.S. Securities Law Matters,"

provides adequate notice to all parties in interest that, subject to certain exceptions discussed in

Article VI, "all debt instruments, to the extent they constitute securities, and equity securities to

be issued in conjunction with the Plan will be issued without registration under the Securities Act

or any similar federal, state, or local law in reliance upon the exemptions set forth in

Section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth in

section 4(2) of the Securities Act or Regulation D promulgated thereunder."

### H.    **EXEMPTIONS FROM TAXATION.**

151.    Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property

pursuant to the Plan shall not be subject to any Stamp or Similar Tax.  The Confirmation Order

will provide that all federal, state or local governmental officials or agents shall forgo the

collection of any such Stamp or Similar Tax or governmental assessment in connection with

transfers of property under the Plan, and accept for filing and recordation instruments or other

documents pursuant to such transfers of property without the payment of any such Stamp or

Similar Tax or governmental assessment.  Such exemption specifically applies, without

limitation, to all actions, agreements and documents necessary to evidence and implement the

provisions of and the distributions to be made under the Plan and the transfers of property under

the Restructuring Transactions, including without limitation the recordation of any mortgage pursuant to the New Propco Credit Agreement.


SUBMITTED BY:

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
Fred Neufeld (CA State Bar No. 150759)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Reorganization Counsel for
Debtors and Debtors in Possession

and

Laury M. Macauley, NV State Bar No. 11413
Dawn M. Cica, NV State Bar No. 004595
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV 89501

Local Reorganization Counsel
For Debtors and Debtors in Possession

# # #