**Entered on Docket**
**August 27, 2010**

_____
**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:      (775) 823-2900
Facsimile:      (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.

☒ Affects this Debtor
☐ Affects all Debtors
☒ Affects Northern NV Acquisitions, LLC
☒ Affects Reno Land Holdings, LLC
☒ Affects River Central, LLC
☒ Affects Tropicana Station, LLC
☒ Affects FCP Holding, Inc.
☒ Affects FCP Voteco, LLC
☒ Affects Fertitta Partners LLC
☒ Affects FCP MezzCo Parent, LLC
☒ Affects FCP MezzCo Parent Sub, LLC
☒ Affects FCP MezzCo Borrower VII, LLC
☒ Affects FCP MezzCo Borrower VI, LLC
☒ Affects FCP MezzCo Borrower V, LLC
☒ Affects FCP MezzCo Borrower IV, LLC
☒ Affects FCP MezzCo Borrower III, LLC
☒ Affects FCP MezzCo Borrower II, LLC
☒ Affects FCP MezzCo Borrower I, LLC
☒ Affects FCP PropCo, LLC
☐ Affects GV Ranch Station, Inc

Chapter 11

Case No. BK-09-52477
Jointly Administered BK 09-52470 through
BK 09-52487 and BK 10-50381

**ORDER CONFIRMING "FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR STATION CASINOS, INC. AND ITS AFFILIATED DEBTORS (DATED JULY 28, 2010)"**

#4827-8537-6007v12

On August 27, 2010, the Confirmation Hearing[1] with respect to the above-captioned Debtors'[2] "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 1863, the "<u>Plan</u>") commenced before this Court in the above-captioned Chapter 11 Cases.  After receiving evidence submitted by the parties, hearing the arguments of counsel, and weighing all the admitted evidence, and having determined that the Plan meets all of the requirements for confirmation under Section 1129 of the Bankruptcy Code and that there is good cause to confirm of the Plan, and as set forth in the "Findings of Fact and Conclusions of Law Regarding Confirmation of 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (the "<u>Findings of Fact and Conclusions of Law</u>") entered contemporaneously herewith, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

    1.    <u>Confirmation of the Plan</u>.  The Plan and each of its provisions are confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code (subject to the modifications contained in paragraph 37 below).  Any objections, responses to and reservations of right regarding confirmation of the Plan or any terms of the Plan, whether filed on the docket or stated orally in court, and whenever filed or stated, other than those withdrawn with prejudice in their entirety prior to, or on the record at the Confirmation Hearing, are overruled on the merits.

    2.    The failure to specifically make reference to any particular provision of the Plan in this Confirmation Order shall not impair or diminish the effectiveness of any such provision, it being the intent of the Court that the Plan is confirmed in its entirety, and that each term and provision of the Plan (including as expressly modified herein) is valid and enforceable pursuant to its terms.  A copy of the Plan without exhibits[3] is attached hereto as <u>Exhibit 1</u> and

---

[1]  Unless otherwise specified, capitalized terms and phrases used in this Confirmation Order have the meanings assigned to them in the Plan, Disclosure Statement, or the Court's Findings of Fact and Conclusions of Law, as applicable. The rules of interpretation set forth in Article I.A. of the Plan shall apply to this Confirmation Order.

[2]  GV Ranch Station, Inc. is a debtor in these jointly administered cases, but it is not a proponent of the Plan and its estate is not the subject of the Plan.

[3]  A copy of the Plan with exhibits can be found at docket no. 1863.  The Plan Supplements, which contain additional Plan exhibits, can be found at docket nos. 1914 and 1935.

incorporated herein in its entirety by this reference.  A copy of the Findings of Fact and Conclusions of Law is attached hereto as Exhibit 2.

3.  Restructuring Transactions.  The Stalking Horse APA is approved and the sale of the Opco Assets to Purchaser is approved.  The APA Amendment is approved, and all references to the Stalking Horse APA in the Plan, the Findings of Fact and Conclusions of Law and in this Confirmation Order shall mean as amended by the APA Amendment.

4.  Each of the Restructuring Transactions Related Documents and the other agreements and documents implementing the Plan are approved, and the parties to such agreements and documents are authorized and directed to execute and deliver them in accordance with the Plan.  The  PIK Credit Agreement Rollup is approved.

5.  The Debtors are authorized to take or to cause to be taken all corporate actions necessary or appropriate to consummate and implement the provisions of the Plan, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Court, including, without limitation, the transfer of the New Opco Acquired Assets and New Propco Acquired Assets to the applicable transferees pursuant to the Plan, without any requirement of further action by the stockholders, directors, managers, partners or members of any of the Debtors.  On the Effective Date, each of the appropriate officers, directors, members and managers of the Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, including the documents required to effectuate each and every one of the Restructuring Transactions.  After the Effective Date, the Plan Administrator is authorized to take all such actions on behalf of the Debtors.  The appropriate officers of the Debtors under applicable non-bankruptcy law are authorized to cause the filing of chapter 11 petitions for their subsidiaries and affiliates and to achieve a result in such chapter 11 cases consistent with the Stalking Horse APA, the Plan and this Confirmation Order.

6.  All conveyances, assignments, transfers and deliveries of the New Opco Acquired Assets and New Propco Acquired Assets to any transferee pursuant to the Plan are made to and

#4827-8537-6007v12

shall vest in the applicable transferee free and clear[4] of all Liens, Claims, Equity Interests, any

Liabilities (as defined in the Stalking Horse APA) arising or resulting from or related to the

transactions contemplated by the Stalking Horse APA or by the 363 Sale Orders (as defined in

the Stalking Horse APA) (such liabilities, "Other Liabilities") or other interests, whether

presently known or unknown, in any way relating to or arising from the operations of the

Debtors on or before the Effective Date, asserted by the Debtors, any creditors of the Debtors or

any other Persons or Entities, including any Governmental Unit, save and excepting any specific

obligations expressly undertaken by such transferee or its designee in the Plan or in any

document to which such transferee is a party (including the New Opco Purchase Agreement) and

which is necessary for Consummation of the Plan.  On and after the Effective Date, all Holders

of Liens, Claims, Equity Interests, Other Liabilities, or other interests, and all other Persons and

Entities, including Governmental Units, are permanently and forever barred, restrained and

enjoined from asserting any claims or enforcing remedies, or commencing or continuing in any

manner any action or other proceeding of any kind, on account of any such Liens, Claims or

Equity Interests, or other interests, against the entities receiving the New Opco Acquired Assets

or New Propco Acquired Assets under the Plan, and their subsidiaries, creditors, equity holders

and affiliates (each individually a "Transferee Party" and collectively the "Transferee Parties").

      7.    The transactions consummated pursuant to the Stalking Horse APA and the Plan,

including without limitation the New Opco Purchase Agreement, the New Propco Purchase

Agreement, the New Propco Transfer Agreement and the Landco Assets Transfer Agreement,

shall not constitute a *de facto* merger, or a merger, as between any Debtors or any of the Non-

Debtor Affiliates and any of the Transferee Parties.  The Transferee Parties, the Mortgage

Lenders and the Prepetition Opco Secured Lenders shall not be or be deemed to be a successor of

any of the Debtors or any of the Non-Debtor Affiliates by reason of any theory of law or equity

and shall not have any successor or transferee liability of any kind, nature or character, including

---

[4]  All references in this Confirmation Order to transfers of property free and clear of Liens, Claims, Equity Interests, Other Liabilities or other interests (or any combination of any of the foregoing), shall mean free and clear except as otherwise expressly provided in writing in the applicable transfer documents with respect to assumed liabilities and permitted exceptions.

liabilities arising or resulting from or relating to the transactions contemplated under the Plan. Without limiting the generality of the foregoing, except for any specific obligations expressly undertaken by such transferee or its designee(s) in the Plan or in any agreement or other document to which such transferee or designee is a party and which is entered into in connection with the Consummation of the Plan, none of the Transferee Parties, including without limitation Holdco, Voteco, New Propco or its Subsidiaries, New Opco or its Subsidiaries, the Mortgage Lenders, the Landco Lenders, the Successful Bidder, any of the Subsidiaries of the Successful Bidder or any of their respective designees or affiliates, shall have any liability, obligation or responsibility with respect to any Claims against or Equity Interests or Other Liabilities in any of the Debtors or any of the Non-Debtor Affiliates, including without limitation any amounts owed by the Debtors to holders of Claims or Equity Interests or any obligations of the Debtors pursuant to the Plan.  On and after the Effective Date, all Holders of Claims and Equity Interests and all other Persons and Entities, including Governmental Units, are permanently and forever barred, restrained and enjoined from asserting any claims or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind against any of the Transferee Parties under any theory of successor liability, merger, *de facto* merger, mere continuation, substantial continuity or similar theory.

8.     This Confirmation Order shall be construed and shall constitute for all purposes a full and complete general assignment, conveyance and transfer of all of the New Opco Acquired Assets and the New Propco Acquired Assets on the Effective Date, transferring good and marketable title in such assets to the respective transferee pursuant to the Plan (and with respect to the Opco Assets, pursuant also to the Stalking Horse APA).  On and after the Effective Date, any and all of the New Opco Acquired Assets and the New Propco Acquired Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee of the Debtors shall be transferred to the applicable transferee free and clear of Liens, Claims and Equity Interests.

9.     On and after the Effective Date, each Transferee Party will own the assets conveyed to it and operate its business and manage its affairs free of any restrictions contained in

the Bankruptcy Code.  The terms, provisions and conditions of the Restructuring Transactions Related Documents and the other agreements and documents governing the transactions described in Section V.B.3, Section V.B.4, Section V.B.5, Section V.B.7 and Section V.B.8 of the Plan or otherwise implementing the Plan shall govern the obligations of the Debtors and the other parties thereto and, to the extent inconsistent with the Plan, such agreements shall control.

10.    The transferees of the New Opco Acquired Assets and New Propco Acquired Assets are hereby authorized to allocate such assets, including the Assumed Contracts[5], among their affiliates, designees, assignees, and/or successors in a manner as they in their sole discretion deems appropriate and to assign, sublease, sublicense, transfer or otherwise dispose of any of such assets or the rights under any Assumed Contract to their affiliates, designees, assignees, and/or successors with all of the rights and protections accorded under this Confirmation Order and the Plan.

11.    The guaranties, mortgages, pledges, Liens and other security interests granted pursuant to each of the Opco Loan Credit Agreement, the Landco Loan Credit Agreement[6], the New Propco Loan Credit Agreement and the New Propco Land Loan Agreement (as such terms are defined in the Stalking Horse APA), and the obligations thereunder, and the related collateral and other loan documents: (i) are granted in good faith as an inducement to the applicable lenders to provide credit thereunder; (ii) are legal, valid, enforceable and non-avoidable, and, with respect to the Liens, upon all necessary filings and recordings duly perfected; (iii) shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance; and (iv) the payment priorities among the tranches (if any) of debt included in each such credit agreement, shall be fully enforceable as set forth therein.  As of the Effective Date, all holders of Prepetition Opco Secured Claims shall be

---

[5]  "Assumed Contracts" means the contracts and leases to be assumed by the Debtors and assigned to the transferees of the New Opco Acquired Assets and New Propco Acquired Assets.

[6]  The documents in the Plan Supplement disclosed that the parties intended to modify the $430 million Opco Loan Credit Agreement by incorporating into it the $25 million loan that was intended to be an obligation under the Landco Loan Credit Agreement (as such terms are defined in the Stalking Horse APA), making such $25 million loan an additional term loan tranche under the Opco Loan Credit Agreement (the "PIK Credit Agreement Rollup").

deemed to have executed the Opco Loan Credit Agreement and all other related collateral and other loan documents.

12.     The UC Securities Documents (as defined in paragraph 70 of the Findings of Fact and Conclusions of Law) are approved, and each party thereto is authorized and directed to perform its obligations under the UC Securities Documents and to enter into any additional agreements and documents necessary, appropriate or advisable for the: (a) implementation of the UC Securities Documents and the consummation of any transactions contemplated thereby; and (b) issuance of the UC Securities.

13.     On and after the Effective Date, without the need for further approvals or notice, the Debtors and the Administrative Agents under the applicable prepetition loan agreements and any other applicable Person shall have the power and authority to terminate and discharge (and to consent to terminate and discharge), and will terminate and discharge on the Closing Date (as defined in the Stalking Horse APA) Liens on any assets and any guaranties arising under that certain Guaranty Agreement dated as of November 7, 2007 among SCI, certain specified Subsidiaries of SCI, and the Administrative Agent, in each case to effectuate the terms of the Plan and the terms of the Restructuring Transactions Related Documents, including, without limitation, the New Opco Purchase Agreement, the New Propco Transfer Agreement, the Landco Assets Transfer Agreement and the New Propco Purchase Agreement.

14.     For purposes of certainty and not in limitation of the terms, breadth and scope of any other provision of this Confirmation Order or of the Plan, on the Effective Date, the existing Liens, Claims and Equity Interests evidenced by the instruments specified on Exhibit 3 attached hereto are declared terminated and of no force or effect.  The omission from Exhibit 3 of any Lien, Claim or Equity Interest, whether such omission was intentional or inadvertent, shall not limit in any way the effect of the Plan and this Confirmation Order on any such omitted Lien, Claim or Equity Interest.  Exhibit 3 is incorporated into this Confirmation Order by this reference.

15.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Liens listed on Exhibit 4 hereto survive the occurrence of the Effective Date and the transfer

1    of the New Opco Acquired Assets and New Propco Acquired Assets to the applicable

2    transferees.

3          16.    Exhibit 5 hereto sets forth the legal descriptions of certain real property being

4    transferred pursuant to the Plan and this Confirmation Order free and clear of Liens, Claims and

5    Equity Interests, and, on and after the Effective Date, this Confirmation Order may be recorded

6    in the real property records of applicable jurisdictions as conclusive evidence of the removal of

7    all Liens, Claims and Equity Interests in existence against such real property on or prior to the

8    Effective Date.  On and after the Effective Date, the Debtors and Plan Administrator as

9    applicable are hereby authorized to file lien termination documents with the filing officers

10   designated under the Uniform Commercial Code as enacted in applicable jurisdictions to provide

11   public notice of the termination on Liens, Claims and Equity Interests in personal property.  The

12   omission from Exhibit 5 of any real property being transferred under the Plan or this

13   Confirmation Order, whether such omission was intentional or inadvertent, shall not limit in any

14   way the fact that such omitted real property is being transferred free and clear of Liens, Claims

15   and Equity Interests.  Exhibit 5 is incorporated into this Confirmation Order by this reference.

16         17.    On and after the Effective Date, each of the Debtors and the Plan Administrator,

17   as applicable, shall, and shall cause any of Debtors' Non-Debtor Affiliates to take any and all

18   actions to execute, deliver, File or record such contracts, instruments, releases and other

19   agreements or documents and take such actions as may be necessary or appropriate to effectuate

20   and implement the provisions of the Plan, and in each case without further notice to or order of

21   the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any

22   requirement of further action, vote or other approval or authorization by the security holders,

23   members, managers, partners, officers or directors of the Debtors.

24         18.    Prior to, on or after the Effective Date (as appropriate), all matters provided for

25   pursuant to the Plan that would otherwise require approval of the stockholders, directors,

26   managers, partners or members of any Debtor (as of prior to the Effective Date) shall be deemed

27   to have been so approved and shall be in effect prior to, on or after the Effective Date (as

28   appropriate) pursuant to applicable law and without any requirement of further action by the

stockholders, directors, managers, members or partners of such Debtor, or the need for any approvals, authorizations, actions or consents of any Person.

19.     On and after the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of any Debtor and any legal or corporate action required by any Debtor in connection with the Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, managers, members, partners or directors of any Debtor, or by any other Person.

20.     The Stalking Horse APA and the transactions contemplated thereby may be specifically enforced against and shall be binding upon the parties thereto, and shall not be subject to rejection or avoidance by the Opco Sellers thereunder or any trustee of such Opco Sellers pursuant to chapter 7 or chapter 11 of the Bankruptcy Code.

21.     <u>Assumed Contracts</u>.   Upon Court approval of a motion to assume and assign executory contracts and/or unexpired leases to the Transferee Parties (an "<u>Assignment Motion</u>"), the Debtors are hereby authorized to assume the applicable Assumed Contracts, execute and deliver such assignment documents as may be necessary to sell, assign and transfer the Assumed Contracts, and sell, assign and transfer each of the Assumed Contracts to the respective transferee in accordance with the Plan.   The Assumed Contracts, upon assignment and sale to the respective transferee pursuant to the Plan, shall be deemed valid and binding, and in full force and effect in accordance with their terms, and the respective transferees shall be fully and irrevocably vested in all right, title and interest of the Debtors in, to or under each such Assumed Contract.

22.     All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing on or prior to the Effective Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in Section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by the payment or other satisfaction of the Cure Amounts. The Cure Amounts are not subject to further dispute or audit, including based on performance prior to

1    the assumption, assignment and sale thereof, irrespective of whether such Assumed Contract

2    contains an audit or similar clause.

3        23.    Each non-Debtor party to an Assumed Contract is hereby forever barred,

4    estopped, and permanently enjoined from asserting against the transferee under the Plan of the

5    Assumed Contract any default, additional amounts or other Claims existing as of the Effective

6    Date related to any Assumed Contract, whether declared or undeclared or known or unknown;

7    and such non-Debtor parties to the Assumed Contracts are also forever barred, estopped, and

8    permanently enjoined from asserting against the transferees of the Assumed Contracts under the

9    Plan any counterclaim, defense or setoff, or any other claim, lien or interest, asserted or

10   assertable against the Debtors related to any Assumed Contract.

11       24.    There shall be no rent accelerations, assignment fees, increases or any other fees

12   charged or chargeable to the transferees hereunder as a result of the assumption, assignment and

13   sale of the Assumed Contracts.  Any provisions in any Assumed Contract that prohibit or

14   condition the assignment of such Assumed Contract, allow the party to such Assumed Contract

15   to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term

16   or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-

17   assignment provisions, and are void and of no force and effect.  The validity of the assumption,

18   assignment and sale of the Assumed Contracts to the transferees under the Plan shall not be

19   affected by any existing dispute between any of the Debtors and any non-Debtor party to such

20   Assumed Contract. Any party that may have had the right to consent to the assignment of its

21   Assumed Contract is determined to have consented for the purposes of Section 365(e)(2)(A)(ii)

22   of the Bankruptcy Code.

23       25.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order

24   to the contrary, or otherwise, on the Effective Date, all Avoidance Actions against counterparties

25   to any Purchased Assets or Assumed Liabilities (as defined in the Stalking Horse APA),

26   including, without limitation, Assumed Contracts, are hereby released by the Debtors with such

27   releases to be effective as of the Effective Date.

28

#4827-8537-6007v12                               -10-

26.    <u>Cancellation of Notes, Certificates and Instruments</u>.   Except as otherwise provided in the Plan or this Confirmation Order or for the purpose of evidencing a right to distribution hereunder or the exercise of the right of the Senior Notes Trustee or the Subordinated Notes Trustee, as applicable, to assert any rights or charging liens for fees, costs and expenses in accordance with the terms of the applicable Indenture, on the Effective Date, all notes, stock, instruments, certificates, agreements and other documents evidencing Claims and Equity Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

27.    Without limiting the generality of the foregoing paragraph, on the Effective Date, the Senior Notes Indentures and the Subordinated Notes Indentures each shall be deemed to be canceled, and the obligations of the Debtors thereunder shall be fully released, terminated, extinguished and discharged; provided, however, that the Senior Notes Indentures and the Subordinated Notes Indentures shall remain in effect for the sole purpose of facilitating distributions by the respective trustee to the holders thereunder of any amounts received on account of Allowed Claims held by the applicable trustee, and to permit such trustee to perform such other necessary administrative tasks related thereto and to exercise any right under the applicable Indenture to assert any rights or charging liens for fees, costs and expenses.

28.    <u>Dismissal of Officers and Directors</u>.   Upon the occurrence of the Effective Date, (i) the existing boards of directors of each Debtor shall be dissolved without any further action required on the part of any such Debtors, the partners, shareholders or members of any such Debtor, or the officers, managers or directors of such Debtors, and (ii) any and all remaining managers or officers of each Debtor shall be dismissed without any further action required on the part of any such Debtors, the shareholders, partners or members of such Debtors, or the officers, managers or  directors of such Debtors.  After the Effective Date, the Plan Administrator shall have full legal and corporate authority, as if the Plan Administrator were an officer or manager

of the Debtors, to take any action required or authorized by the Plan, this Confirmation Order or subsequent order of this Court.  The Plan Administrator may use as its legal counsel the same law firms currently engaged as counsel to the Debtors.

29.    <u>Settlements, Releases, Injunctions Related to Release, and Exculpation</u>.  The Comprehensive Settlement and Global Settlement contained in Article X.B. of the Plan, the releases and related injunction contained in Article X.C. of the Plan, including the Third Party Release provided for in Article X.C.2. of the Plan consistent with the indications granting such Third Party Release by those Holders of Claims or Equity Interests on their ballots (as detailed in paragraphs 84-87 of the Findings of Fact and Conclusions of Law), the exculpation contained in Article X.D. of the Plan, and the preservation of causes of action contained in Article X.E. of the Plan, are hereby approved in all respects as if fully restated herein.

30.    On the Effective Date, and effective as of the Effective Date, the Plan shall bind, and shall be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtors, and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder (i) will receive or retain any property or interest in property under the Plan, (ii) has filed a proof of claim or interest in the chapter 11 case, or (iii) failed to vote to accept or reject the Plan or affirmatively voted to reject the Plan.

31.    <u>Supplemental Injunction</u>.   In order to preserve and promote the settlements contemplated by and provided for in the Plan, except as otherwise expressly provided in the Plan or this Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and

shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising on or prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)    commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;

(b)    enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;

(c)    creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;

(d)    except as otherwise expressly provided in the Plan or this Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights,

remedies or liabilities, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest; and

(e)   taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order relating to such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.

32.   Bankruptcy Rule 3016 Compliance.  The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

33.   Plan Classification Controlling.  The classifications of Claims and Equity Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots tendered to the Debtors' creditors in connection with voting on the Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent and in no event shall be deemed to modify or otherwise affect, the actual classifications of such Claims under the Plan or for distribution purposes, and (c) shall not be binding on the Debtors, their Estates or the Reorganized Debtors.

34.   Valuation of New Propco and NPH Warrants.  For all purposes arising in connection with the Plan and the transactions contemplated by the Plan: (a) the aggregate transaction value for the acquisitions of the New Propco Acquired Assets and the New Opco Acquired Assets is $2.572 billion, and the equity value of New Propco is $326 million (which equity value may be adjusted based upon actual borrowings and cash on hand on the Effective Date); and (b) the value of the NPH Warrants is between $0.4 million and $2.3 million.

35.   Retention of Jurisdiction.  Pursuant to Sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11

Cases, the Debtors and the Plan as legally permissible, including, without limitation, jurisdiction to:

    i.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest, and the resolution of any claim for taxes of any kind arising on or prior to the Effective Date or as a result of any transactions occurring on or before the Effective Date in accordance with the Plan and the rights of the Debtors or the Plan Administrator to apply tax attributes in satisfaction or offset of any such claims;

    ii.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

    iii.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

    iv.    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

    v.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

    vi.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted after the Effective Date;

    vii.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

    viii.    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, or arising out of or relating to the Stalking Horse APA or a breach thereof; *provided*, *however*, that the Court's retention of jurisdiction shall not govern the enforcement of the New Opco Credit Agreement and New Propco Credit Agreement, and any dispute arising under or in connection with the New Opco Credit Agreement or New Propco Credit Agreement shall be addressed and resolved in accordance with the provisions of the applicable document;

    ix.    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

    x.    issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

xi.    enforce the terms and condition of the Plan and the Confirmation Order;

xii.    resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, and other provisions contained in the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

xiii.    hear and determine the Litigation Claims by or on behalf of the Debtors or the Plan Administrator;

xiv.    if the Effective Date does not occur, enter an order vacating the Confirmation Order;

xv.    enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

xvi.    resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; _provided_, _however_, the Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the New Opco Credit Agreement, the New Propco Credit Agreement and the New Opco PIK Credit Agreement or any rights or remedies related thereto, and any dispute arising under or in connection with such credit agreements shall be addressed and resolved in accordance with the provisions of the applicable document; and

xvii.    enter an order concluding or closing the Chapter 11 Cases.

36.    <u>Plan Support Motions Approved</u>.    Each of the Plan Support Motions is approved, and the terms of the underlying settlements, stipulations and agreements thereof are incorporated into the Plan and this Confirmation Order, and the parties to such settlements, stipulations and agreements are authorized and directed to comply with their obligations thereunder.

37.    <u>Plan Modifications Approved</u>.  The Plan Modifications are approved.  All references to the Plan in the Finding of Fact and Conclusions of Law and in this Confirmation Order shall mean as modified by the following Plan Modifications:

(a)    Article I.B. of the Plan is modified as follows:

(i)  The definition of Exculpated Parties shall include the Settling Lenders and Mezzco Lenders; provided, however, that the Settling Lenders shall be Exculpated Parties only if all of the applicable terms and conditions of the Settling Lender Stipulation are satisfied by the Settling Lenders.

(ii)  "Mezzco Lenders" means the lenders to the Mezzco Debtors.

(iii)  The definition of Released Parties shall include the Settling Lenders and Mezzco Lenders; provided, however, that the Settling Lenders shall be Released

Parties only if all of the applicable terms and conditions of the Settling Lender Stipulation are satisfied by the Settling Lenders.

(iv) "Settling Lenders" means the Prepetition Opco Secured Lenders referred to as the Settling Lenders in the Stipulation (the "Settling Lender Stipulation") that is Exhibit 1 to the "Debtors' Motion For Order Approving Global Settlement With Independent Lender Group" (docket no. 1965).

(b)    Article IX.B. of the Plan is modified as follows:

After the ninth condition in Article IX.B. the following condition is added: "10. All documentation relating to the issuance of the NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights, and all documentation and other matters relating to the exemption of such issuances from any registration requirements imposed under any federal or state securities laws, shall be acceptable in all respects to the Debtors, FG and the Mortgage Lenders."

(c)    Article IX.C. of the Plan is modified as follows:

The reference in Article IX.C. to ". . . the conditions specified in Article IX.B.5 or B.6 . . . " shall be replaced with ". . . the conditions specified in Article IX.B.5, B.6 or B.10 . . . ".

(d)    Article VI. of the Plan is modified as follows:

The following provision supersedes any contrary provisions of Article VI: "Notwithstanding anything in the Plan to the contrary, the Debtors shall have until December 1, 2010 to file and serve motions to assume, assume and assign, or reject Executory Contracts and Unexpired Leases (and may obtain additional time by filing a motion for additional time prior to such deadline and upon notice and a hearing and a showing of good cause). If the Debtors reject an Executory Contract or Unexpired Lease, the non-debtor party shall have 30 days from entry of the order approving the rejection to file a Proof of Claim for rejection damages."

(e)    Article V.H. of the Plan is modified as follows:

Class (iii) of Article V.H. is deleted and the following is added to Article V.H.: "The Debtors shall be dissolved as soon as practicable after the Effective Date, but in no event later than the closing of the Chapter 11 Cases. After the Effective Date, the Plan Administrator shall act as the sole officer or manager, as the case may be, of each of the Debtors."

38.    Section 505 Proceedings. The Plan provides that the Debtors shall be entitled to seek an expedited determination under Section 505 of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date. The Court's reservation of jurisdiction in paragraph 35 above shall include the determination of any

such tax liability of the Debtors, including the rights of the Debtors or the Plan Administrator to apply tax attributes in satisfaction or offset of any such claims.

39.     Dissolution of Committee.  On the Effective Date, the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee shall dissolve automatically and its members shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

40.     Dissolution of SLC:  On the Confirmation Date, the SLC (as defined in paragraph 76 of the Findings of Fact and Conclusions of Law) shall be terminated, dissolved and discharged from any further duties and responsibilities, and the members of the SLC and their agents (including attorneys and financial advisors) shall be released and discharged from any Claims of any Person or Entity arising from any acts or omissions related to the prepetition and post-petition activities of the SLC.  The SLC, its members and agents (including attorneys and financial advisors) shall be included in the Plan definitions of Released Parties and Exculpated Parties.

41.     Payment of Statutory Fees.  All outstanding fees payable pursuant to Section 1930 of title 28, United States Code shall be paid on the Effective Date.  All such fees payable after the Effective Date shall be paid by the Debtors prior to the closing of the Chapter 11 Cases when due or as soon thereafter as practicable.

42.     Additional Modifications of Plan.   Subject to any limitations contained in the Plan, the Debtors or the Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, provided, however, that any amendment, modification or supplement to the Plan shall be reasonably acceptable to the Purchaser, the Mortgage Lenders, FG and the Required Consenting Lenders and shall not be inconsistent with the terms of the New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the Committee Plan Support Stipulation or the Put Parties Support Agreement.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to

have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder.

43.     Substantial Consummation.  Upon the occurrence of the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

44.     Successors and Assigns.    The Plan is and shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan is and shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

45.     Further Assurances.   The Debtors or the Plan Administrator, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Persons and Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and this Confirmation Order.  On or before the Effective Date, the Debtors shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

46.     Exemption from Registration.   Pursuant to Section 1145, any securities or interests issued on account of or in exchange for (in whole or in part) Claims against the Debtors, or otherwise in conjunction with the Plan, including the UC Securities, shall not be required to be registered under the Securities Act of 1933 or any similar federal, state, or local law.

47.     Filing and Recording.  This Confirmation Order is and shall be: (a) effective as a determination that, except as otherwise provided in the Plan or this Confirmation Order, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with Consummation of the Plan, on the Effective Date, all Claims existing prior to such date have been unconditionally released, discharged, and terminated; and (b) binding upon and shall govern the acts of all Persons and Entities including, without limitation, all filing

agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.

48.    Exemption from Certain Transfer Taxes.   Any transfers of property pursuant to the Plan shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States.  All  federal, state or local governmental officials or agents are directed by this Confirmation Order to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to all actions, agreements and documents necessary to evidence and implement the provisions of, and the distributions and transfers to be made under the Plan, including without limitation the recordation of any mortgage pursuant to the New Propco Credit Agreement.

49.    Bulk Sales Laws.  No bulk sales law or similar law of any state or other jurisdiction shall apply to any of transfers pursuant to the Stalking Horse APA or the other Restructuring Transactions.

50.    Bar Dates.  Within 10 business days after entry of this Confirmation Order, the Debtors shall give notice of entry of the Confirmation Order, and that the bar date for Administrative Claims arising on or before December 1, 2010 shall be December 21, 2010. Within five business days after the occurrence of the Effective Date, the Plan Administrator shall file and serve notice of the occurrence of Effective Date and of the following bar dates and deadlines: (a) the Administrative Claim Bar Date for the period December 2, 2010 through and including the Effective Date shall be 30 days after the Effective Date; (c) the Professional Fees Bar Date shall be 60 days after the Effective Date; and (b) the Claims Objection Bar Date shall be 120 days after the Effective Date.  Prior to the expiration of the foregoing deadlines and bar

1    dates, the Debtors or Plan Administrator, as applicable, may move the Court for an order

2    extending any of the foregoing bar dates and deadlines for good cause.

3        51.    The failure of any Person or Entity to file a proof of Administrative Claim or an

4    application for payment of professional fees by the deadlines and bar dates referred to in the

5    immediately preceding paragraph shall result in such Person or Entity being forever barred,

6    estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable,

7    against the Debtors, the Estates or any of their respective property, and such Claim shall be

8    forever discharged.

9        52.    Appeals.  The reversal or modification on appeal of the authorization provided

10   herein to transfer the New Opco Acquired Assets and New Propco Acquired Assets to the

11   applicable transferees pursuant to the Plan shall not affect the validity of such transfers

12   (including the assumption, assignment, and sale of any of the Assumed Contracts) unless such

13   authorization and such transfers are duly stayed pending such appeal.  The reversal or

14   modification on appeal of the authorization provided herein to implement the Restructuring

15   Transactions shall not affect the validity of any debt incurred or the priority of any Lien granted

16   pursuant to the Restructuring Transactions, including with respect to the New Opco Credit

17   Agreement (and related loan and collateral documents) and the New Propco Credit Agreement

18   (and related loan and collateral documents).

19       53.    Separate Confirmation Orders.  This Confirmation Order is and shall be deemed

20   to be a separate Confirmation Order with respect to each of the Debtors and estates that are the

21   subject of the Plan, and it shall be sufficient for the purposes thereof that the Clerk of Bankruptcy

22   Court enters this Confirmation Order in the docket of the jointly administered case, Case No.

23   09-52477-GWZ.

24       54.    Effect of Non-Occurrence of Effective Date.   In the event that the Effective Date

25   does not occur:  (i) this Confirmation Order shall be vacated; (ii) no distributions under the Plan

26   shall be made, (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to

27   the *status quo ante* as of the day immediately preceding the Confirmation Date as though the

28   Confirmation Date never occurred; and (iv) the Debtors' obligations with respect to Claims and

Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or will prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

55.    <u>Waiver of F.R.B.P. Rule 3020(e) and F.R.C.P. Rule 62(a) Stays</u>:  The fourteen day stays of F.R.B.P. Rule 3020(e) and F.R.C.P. Rule 62(a) shall not apply to this Confirmation Order, and this Confirmation Order shall be effective immediately upon entry.

56.    The Lease Stipulations (as defined in paragraph 9 of the Findings of Fact and Conclusions of Law) are approved, and the Debtors time to assume, assign or reject the leases that are the subject of the Lease Stipulations shall be the Effective Date (with the exception of the Wild Wild West Tiberti lease, as to which the deadline shall be the earlier of Sept. 30, 2010 or the date that the non-debtor lessee breaches the lease).

SUBMITTED BY:

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
Fred Neufeld (CA State Bar No. 150759)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Reorganization Counsel for
Debtors and Debtors in Possession

and

Laury M. Macauley, NV State Bar No. 11413
Dawn M. Cica, NV State Bar No. 004595
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV 89501

Local Reorganization Counsel
For Debtors and Debtors in Possession

# # #

# Exhibit 1

# Exhibit 1

Paul S. Aronzon (CA SBN 88781)
Thomas R. Kreller (CA SBN 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000
Facsimile:  (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone: (775) 823-2900
Facsimile: (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:

STATION CASINOS, INC.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Northern NV Acquisitions, LLC
☐ Affects Reno Land Holdings, LLC
☐ Affects River Central, LLC
☐ Affects Tropicana Station, LLC
☐ Affects FCP Holding, Inc.
☐ Affects FCP Voteco, LLC
☐ Affects Fertitta Partners LLC
☐ Affects FCP MezzCo Parent, LLC
☐ Affects FCP MezzCo Parent Sub, LLC
☐ Affects FCP MezzCo Borrower VII, LLC
☐ Affects FCP MezzCo Borrower VI, LLC
☐ Affects FCP MezzCo Borrower V, LLC
☐ Affects FCP MezzCo Borrower IV, LLC
☐ Affects FCP MezzCo Borrower III, LLC
☐ Affects FCP MezzCo Borrower II, LLC
☐ Affects FCP MezzCo Borrower I, LLC
☐ Affects FCP PropCo, LLC

Chapter 11

Case No. BK-09-52477
Jointly Administered
BK 09-52470 through BK 09-52487

**FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR STATION CASINOS, INC. AND ITS AFFILIATED DEBTORS (DATED JULY 28, 2010)**

#4833-4529-7670v5

# TABLE OF CONTENTS

## ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

A.    Rules of Interpretation and Computation of Time ............................................................7
B.    Defined Terms ................................................................................................................8

## ARTICLE II.

### TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS

A.    Administrative Claims .....................................................................................................30
    1.    Bar Date for Administrative Claims .........................................................................31
    2.    Professional Compensation and Reimbursement Claims ........................................31
B.    Priority Tax Claims ........................................................................................................31
C.    Other Priority Claims .....................................................................................................32

## ARTICLE III.

### CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.    Classification of Classified Claims and Equity Interests.....................................................32
    1.    Claims and Equity Interests Against Parent Debtors............................................32
        (a)    FCP Holding, Inc. ...............................................................................32
        (b)    Fertitta Partners LLC ...........................................................................33
        (c)    FCP Voteco, LLC ...............................................................................33
    2.    Claims and Equity Interests Against Propco ........................................................33
    3.    Claims and Equity Interests Against Mezzco Debtors .........................................34
        (a)    FCP MezzCo Parent, LLC ...................................................................34
        (b)    FCP MezzCo Parent Sub, LLC.............................................................34
        (c)    FCP Mezzco Borrower VII, LLC ........................................................34
        (d)    FCP Mezzco Borrower VI, LLC..........................................................34
        (e)    FCP Mezzco Borrower V, LLC............................................................35
        (f)    FCP Mezzco Borrower IV, LLC ..........................................................35
        (g)    FCP Mezzco Borrower III, LLC ..........................................................35
        (h)    FCP Mezzco Borrower II, LLC ...........................................................35
        (i)    FCP Mezzco Borrower I, LLC.............................................................36
    4.    Claims and Equity Interests Against SCI..............................................................36
    5.    Claims and Equity Interests Against Other Opco Debtors ...................................36
        (a)    Northern NV Acquisitions, LLC...........................................................36
        (b)    Reno Land Holdings, LLC....................................................................36
        (c)    River Central, LLC ..............................................................................37

|  |  | (d) | Tropicana Station, LLC | 37 |
|---|---|---|---|---|
| B. | | | Treatment of Claims and Equity Interests. | 37 |
| | 1. | | Claims and Equity Interests Against Parent Debtors | 37 |
| | | (a) | FCP Holding, Inc. | 37 |
| | | (b) | Fertitta Partners LLC | 39 |
| | | (c) | FCP Voteco, LLC | 40 |
| | 2. | | Claims and Equity Interests Against Propco | 42 |
| | 3. | | Claims and Equity Interests Against Mezzco Debtors | 44 |
| | | (a) | FCP MezzCo Parent, LLC | 44 |
| | | (b) | FCP MezzCo Parent Sub, LLC | 45 |
| | | (c) | FCP Mezzco Borrower VII, LLC | 45 |
| | | (d) | FCP Mezzco Borrower VI, LLC | 46 |
| | | (e) | FCP Mezzco Borrower V, LLC | 47 |
| | | (f) | FCP Mezzco Borrower IV, LLC | 48 |
| | | (g) | FCP Mezzco Borrower III, LLC | 49 |
| | | (h) | FCP Mezzco Borrower II, LLC | 50 |
| | 4. | | Claims and Equity Interests Against SCI | 52 |
| | 5. | | Claims and Equity Interests Against Other Opco Debtors | 58 |
| | | (a) | Northern NV Acquisitions, LLC | 58 |
| | | (b) | Reno Land Holdings, LLC | 59 |
| | | (c) | River Central, LLC | 60 |
| | | (d) | Tropicana Station, LLC | 61 |
| C. | | | Reservation of Rights Regarding Unimpaired Claims | 63 |
| D. | | | Subordination Rights. | 63 |
| E. | | | Withholding Taxes. | 63 |
| F. | | | Set Offs. | 63 |
| G. | | | Timing of Payments and Distributions. | 63 |

ARTICLE IV.

ACCEPTANCE OR REJECTION OF THE PLAN

| A. | Voting Classes | 64 |
|---|---|---|
| B. | Acceptance by Impaired Classes of Claims and Equity Interests | 64 |
| C. | Presumed Acceptance of Plan | 64 |
| D. | Presumed Rejection of Plan | 64 |
| E. | Non-Consensual Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 64 |

ARTICLE V.

MEANS FOR IMPLEMENTATION OF THE PLAN

| A. | | Transfers Under the Plan, Generally | 65 |
|---|---|---|---|
| B. | | Plan Transactions. | 66 |
| | 1. | Formation of New Propco Entities. | 66 |
| | 2. | Subsidiary Bankruptcy Filings | 66 |

|   | 3. | Transfer of Master Lease Collateral to Propco. | 66 |
|---|----|------------------------------------------------|----|
|   | 4. | Landco Assets. | 67 |
|   | 5. | Transfer of New Propco Transferred Assets from Propco to New Propco Entities. | 67 |
|   | 6. | Mezzco Debtors. | 67 |
|   | 7. | Transfer of New Propco Purchased Assets from Opco Entities to New Propco Entities. | 67 |
|   | 8. | Transfer of New Opco Acquired Assets to New Opco. | 67 |
|   | 9. | License of IP Assets to New Propco. | 68 |
|   | 10. | New Propco Transactions in Connection with Receipt of New Propco Acquired Assets. | 68 |
|   | 11. | New Propco Employment Related Matters | 68 |
|   | 12. | The Propco Rights Offering | 68 |
|   | 13. | New Opco Transactions in Connection with Receipt of New Opco Acquired Assets. | 69 |
|   | 14. | The New Opco Credit Agreement and the New Opco PIK Credit Agreement | 70 |
| C. | Second Amended MLCA | | 70 |
| D. | General Settlement of Claims | | 70 |
| E. | Release of Liens, Claims and Equity Interests. | | 70 |
| F. | Corporate Action | | 71 |
| G. | Cancellation of Notes, Certificates and Instruments Without Further Action | | 71 |
| H. | Dismissal of Officers and Directors, Dissolution of Debtors and Dissolution of the Boards of Directors of Each Debtor | | 72 |

ARTICLE VI.

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

| A. | Assumption of Executory Contracts and Unexpired Leases. | 72 |
|----|---------------------------------------------------------|----|
| B. | Assignment of Executory Contracts or Unexpired Leases | 73 |
| C. | Claims on Account of the Rejection of Executory Contracts or Unexpired Leases | 74 |
| D. | Director and Officer Insurance Policies | 74 |

ARTICLE VII.

PROVISIONS GOVERNING DISTRIBUTIONS

| A. | Distributions for Claims and Equity Interests Allowed as of the Effective Date | 75 |
|----|--------------------------------------------------------------------------------|----|
| B. | Post-Petition Interest on Claims | 75 |
| C. | Distributions under the Plan | 75 |
| D. | Delivery and Distributions and Undeliverable or Unclaimed Distributions | 75 |
|    | 1. | Record Date for Distributions | 76 |
|    | 2. | Delivery of Distributions in General | 76 |
|    | 3. | Minimum Distributions | 76 |
|    | 4. | Undeliverable Distributions | 76 |
|    |    | (a) | Holding of Certain Undeliverable Distributions | 76 |

        (b)      Failure to Claim Undeliverable Distributions............................................77

        (c)      Failure to Present Checks................................................................................77

E.     Compliance with Tax Requirements/Allocations .................................................77

F.     Means of Cash Payment........................................................................................78

G.    Timing and Calculation of Amounts to Be Distributed ........................................78

H.    Setoffs and Recoupments......................................................................................78

I.      Preservation of Subordination Rights ...................................................................78

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND EQUITY INTERESTS

A.     Authority to Prosecute Objections to Disputed Claims .......................................79

B.     Resolution of Disputed Claims and Equity Interests ...........................................79

     1.      Allowance of Claims and Equity Interests...............................................79

     2.      Prosecution of Objections to Claims and Equity Interests.....................79

     3.      Estimation ................................................................................................80

     4.      Deadline to File Objections to Claims and Equity Interests ..................80

C.     No Distributions Pending Allowance ...................................................................80

D.    Reserves for Disputed Claims...............................................................................80

E.     Distributions on Account of Disputed Claims and Equity Interests Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims and Equity Interests.............................................................................................80

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION, EFFECTIVE DATE AND CONSUMMATION OF THE PLAN

A.     Conditions Precedent to Confirmation..................................................................81

B.     Conditions Precedent to the Effective Date and Consummation of the Plan ...................81

C.     Waiver of Conditions.............................................................................................82

D.    Effect of Non Occurrence of Conditions to Consummation.................................83

## ARTICLE X.

## RELEASES, EXCULPATION, INJUNCTION, PRESERVATION OF CAUSES OF ACTION AND RELATED PROVISIONS

A.     General...................................................................................................................83

B.     Comprehensive Settlement of Claims and Controversies.....................................83

C.     Releases Among Releasing Parties and Released Parties......................................84

D.    Exculpation ...........................................................................................................86

E.     Preservation of Causes of Action..........................................................................87

     1.      Maintenance of Causes of Action ...........................................................87

     2.      Preservation of All Causes of Action Not Expressly Settled or Released............87

F.    Supplemental Injunction .................................................................................88
G.    Integral to Plan ...............................................................................................89
H.    Binding Nature Of Plan ..................................................................................89

ARTICLE XI.

RETENTION OF JURISDICTION

ARTICLE XII.

MISCELLANEOUS PROVISIONS

A.    Dissolution of the Committee .........................................................................91
B.    Payment of Statutory Fees .............................................................................92
C.    Modification of Plan .......................................................................................92
D.    Revocation of Plan..........................................................................................92
E.    Successors and Assigns...................................................................................92
F.    Reservation of Rights......................................................................................93
G.    Further Assurances..........................................................................................93
H.    Severability .....................................................................................................93
I.    Service of Documents .....................................................................................93
J.    Exemption from Registration Pursuant To Section 1145 of the Bankruptcy Code..........94
K.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code ................................................................................................94
L.    Governing Law ...............................................................................................94
M.    Tax Reporting and Compliance ......................................................................94

## JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
## STATION CASINOS, INC. AND ITS AFFILIATED DEBTORS

This Joint Chapter 11 Plan of Reorganization (the "Plan") is proposed by Station Casinos, Inc., a Nevada corporation ("SCI"), FCP PropCo, LLC, a Delaware limited liability company ("Propco"), and the following affiliated debtors and debtors in possession (collectively, the "Debtors"):

- The three entities that own the existing equity interests in SCI (collectively, the "Parent Debtors"):

  o FCP Holding, Inc. (owner of 74.8294% of non-voting stock in SCI);
  o Fertitta Partners, LLC (owner of 25.1706% of non-voting stock in SCI); and
  o FCP VoteCo, LLC (owner of 100% of voting stock in SCI);

- Four entities that are direct or indirect wholly owned subsidiaries of SCI (collectively, the "Other Opco Debtors"):

  o Northern NV Acquisitions, LLC;
  o Tropicana Station, LLC;
  o River Central, LLC; and
  o Reno Land Holdings, LLC.

- The nine entities that comprise the "MezzCo" debtors (collectively, the "Mezzco Debtors"):

  o FCP MezzCo Parent, LLC;
  o FCP MezzCo Parent Sub, LLC;
  o FCP MezzCo Borrower VII, LLC;
  o FCP MezzCo Borrower VI, LLC;
  o FCP MezzCo Borrower V, LLC;
  o FCP MezzCo Borrower IV, LLC;
  o FCP MezzCo Borrower III, LLC;
  o FCP MezzCo Borrower II, LLC; and
  o FCP MezzCo Borrower I, LLC.

SCI also has various other direct and indirect subsidiaries and affiliates (collectively, the "Non-Debtor Affiliates") that have not filed for bankruptcy relief and have continued to operate their businesses in the ordinary course during the pendency of the Debtors' chapter 11 cases. If the Plan is confirmed, certain Non-Debtor Affiliates may file for bankruptcy relief in order to effectuate certain of the transactions contemplated by, or required under, the Plan. The Debtors expect that any such filings would not affect or disrupt the ordinary course operations of the Debtors or the Non-Debtor Affiliates in any material way. This Plan contemplates certain transactions involving the Debtors and various of the Non-Debtor Affiliates, including certain asset transfers, and other transactions, as part of the implementation of the Plan (including transactions that may be implemented in connection with bankruptcy filings by certain Non-

Debtor Affiliates).  For a description of those transactions, please see Article V of this Plan ("Means for Implementation of the Plan") and the related discussion in the Disclosure Statement (as defined below).  If a Person other than the Stalking Horse Bidder is the Successful Bidder, the Plan may be confirmed, and/or may become effective, in stages as to one or more Debtors as the conditions to confirmation and/or effectiveness of the Plan in respect of such Debtor(s) are satisfied.

The Debtors are the proponents of this Plan within the meaning of Bankruptcy Code section 1129.  Reference is made to the Disclosure Statement distributed contemporaneously herewith for a discussion of the Debtors' history, business, results of operations, historical financial information, accomplishments during the Chapter 11 Cases (as defined below), projections and properties, and for a summary and analysis of this Plan.  There also are other agreements and documents that are referenced in this Plan or the Disclosure Statement that are or will be filed with the Bankruptcy Court as part of the Plan Supplement (as defined below).  All such agreements or documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Fed. R. Bankr. P. 3019, the terms hereof and of the Confirmation Order, and the terms of the New Opco Purchase Agreement, the Second Amended MLCA, and any other applicable orders of the Bankruptcy Court, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan and any of the Plan Supplement documents prior to substantial consummation of the Plan.

The Plan contemplates the sale of the New Opco Acquired Assets pursuant to the Successful Bid that emerges from the Opco Auction.  The Successful Bid may differ in a variety of respects from the Stalking Horse Bid.  Subject to the Second Amended MLCA and any applicable Bankruptcy Court orders, to the extent the Stalking Horse Bid is not the Successful Bid and the Successful Bid varies in terms or structure from the Stalking Horse Bid, the Debtors reserve the right to amend the Plan to reflect those variations as appropriate and to provide such supplemental disclosure of those amendments as the Bankruptcy Court may require.

<div align="center">

**ARTICLE I.**

**RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS**

</div>

*A.*      *Rules of Interpretation and Computation of Time*

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions as amended, modified or supplemented; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" or "Sections" are references to Articles or Sections in this Plan;

(e) unless otherwise stated, the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in Bankruptcy Code section 102 shall apply; and (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

### B.    *Defined Terms*

The following terms shall have the following meanings when used in capitalized form herein:

1.    "*Accredited Investor*" shall be as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended.

2.    "*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date (including, without limitation, expenses of the members of the Committee incurred as members of the Committee in discharge of their duties as such).

3.    "*Administrative Agent*" means Deutsche Bank Trust Company Americas in its capacity as (i) the administrative agent under the Prepetition Opco Credit Agreement and (ii) the collateral agent under the other Prepetition Opco Loan Documents.

4.    "*Administrative Claim*" means a Claim for costs or expenses of administration of the Chapter 11 Cases that is Allowed under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs or expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and leased premises); (b) Accrued Professional Compensation and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the DIP Facility Claims; (e) any expense reimbursement payable under and in accordance with the Bid Procedures Order, and (f) any payment to be made under the Plan or otherwise to cure a default on an assumed executory contract or unexpired lease, including any "Seller Contract" that is to be a "Purchased Asset" (as such terms are defined in the New Opco Purchase Agreement).

5.      "*Administrative Claims Bar Date*" means the applicable date or dates established by order of the Bankruptcy Court as the deadline or deadlines for asserting Administrative Claims.

6.      "*Affiliate*" means an "affiliate" as defined in Bankruptcy Code section 101(2).

7.      "*Allocated Pro Rata Share of NPH Investment Rights*" means the pro rata share of an Eligible Opco Unsecured Creditor that is an Accredited Investor of the NPH Investment Rights to be issued under the Plan, with such pro rata share calculated as the proportion that (a) the Allowed amount of such creditor's claim bears to (b) the total Allowed amount of Claims of Eligible Opco Unsecured Creditors in Classes S.4 (including the Class S.4 Claims held by Prepetition Opco Secured Lenders that do not vote to accept the Plan but excluding the Class S.4 Claims held by Prepetition Opco Secured Lenders that do vote to accept the Plan), S.5 and S.6; provided, however, that the Put Parties (so long as they hold at least 40% in aggregate principal amount of the Senior Notes) shall have the right to purchase at least one-half of the NPH Equity available for purchase in the Propco Rights Offering (which equity shall be allocated among the Put Parties as they shall mutually agree).

8.      "*Allocated Pro Rata Share of NPH Warrants*" means the pro rata share of an Eligible Opco Unsecured Creditor of the NPH Warrants to be issued under the Plan, with such pro rata share calculated as the proportion that (a) the Allowed amount of such creditor's claim bears to (b) the total Allowed amount of Claims of Eligible Opco Unsecured Creditors in Classes S.4 (including the Class S.4 Claims held by Prepetition Opco Secured Lenders that do not vote to accept the Plan but excluding the Class S.4 Claims held by Prepetition Opco Secured Lenders that do vote to accept the Plan), S.5 and S.6.

9.      "*Allowed*" means, with respect to any Claim or Equity Interest, except as otherwise provided herein, any of the following:  (a) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which (i) the Debtors or any other party in interest have not filed an objection and (ii) no contrary Proof of Claim has been filed; (b) a Claim or Equity Interest that either is not a Disputed Claim or Equity Interest or has been allowed by a Final Order; (c) a Claim that is allowed:  (i) in any stipulation with the Debtors of the amount and nature of such Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with the Debtors of the amount and nature of such Claim executed on or after the Confirmation Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture or other agreement entered into or assumed in connection with this Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that (i) is not a Disputed Claim or Equity Interest or (ii) has been allowed by a Final Order; or (f) a Claim or Equity Interest that is allowed pursuant to the terms of this Plan.

10.      "*Allowed _____ Claim or Equity Interest*" means an Allowed Claim or Equity Interest of the type or in the Class described.

11.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, recharacterization or other actions or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including,

without limitation, actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code.

12.    "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan.

13.    "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

14.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Nevada, or any other court having jurisdiction over the Chapter 11 Cases.

15.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

16.    "*Beneficial Holder*" means, as of the applicable date of determination, a beneficial owner of claims arising under the Prepetition Opco Credit Agreement, the Prepetition Opco Swap Agreement, the Prepetition Mortgage Loan Agreement, any of the Prepetition Mezzanine Loans, the Senior Notes or the Subordinated Notes, as applicable, as reflected in the records maintained by the Administrative Agent, Registered Record Owner or Intermediary Record Owner, as applicable.

17.    "*Beneficial Holder Ballots*" means the Ballots upon which Beneficial Holders of Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

18.    "*Bid Procedures Order*" means the "Order Establishing Bidding Procedures And Deadlines Relating To Sale Process For Substantially All Of The Assets Of Station Casinos Inc. And Certain 'Opco' Subsidiaries" entered by the Bankruptcy Court on June 4, 2010 [Docket No. 1563].

19.    "*Blockerco*" means a newly organized corporation or limited liability company taxable as a corporation to which the NPH Warrants, NPH Investment Rights and certain other NPH Equity will be issued and through which the same will be exercisable. Blockerco will, in turn, issue warrants, investment rights and equity to, and exercisable by, the Eligible Opco Unsecured Creditors (subject to, and in accordance with, the terms set forth in the Term Sheet) and such securities will give such Eligible Opco Unsecured Creditors substantially similar rights to those they would have had if the NPH Warrants, NPH Investment Rights and NPH Equity had been issued directly to them. There may be more than one Blockerco entity (but not more than five) established if reasonably requested by the holders of a majority of the equity interests issued by all then existing Blockerco entities, and, in the event that there is more than one Blockerco entity established, all such Blockerco entities shall collectively be deemed to be, and shall be collectively referred to as, "Blockerco" for all purposes under this Plan. For all purposes under this Plan, references to issuance, acquisition, distribution or ownership of NPH Equity, NPH Investment Rights or NPH Warrants with respect to Eligible Opco Unsecured Creditors shall mean such issuance, acquisition, distribution or ownership through Blockerco.

20.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21.    "*Cash*" means the legal tender of the United States of America or other immediately available funds.

22.    "*Causes of Action*" means any and all claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counter-claims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring at any time prior to the Effective Date.

23.    "*Chapter 11 Cases*" means the chapter 11 bankruptcy cases commenced by the Debtors on the Petition Date in the Bankruptcy Court.

24.    "*Claim*" means any "claim" against any Debtor as defined in Bankruptcy Code section 101(5), whether or not asserted or Allowed.

25.    "*Claims Bar Date*" means January 15, 2010, as ordered by the Bankruptcy Court.

26.    "*Claims Objection Bar Date*" means, for each Claim and Equity Interest, the later of: (a) one hundred twenty (120) days after the Effective Date; and (b) such other date as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claim or Equity Interest.

27.    "*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

28.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to Bankruptcy Code section 1122(a) and 1123(a).

29.    "*Collateral*" means any property or interest in property of any Debtor's Estate that is subject to a valid and enforceable Lien to secure the payment or performance of a Claim.

30.    "*Committee*" means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102, as reconstituted from time to time.

31.    "*Committee Plan Support Stipulation*" means that certain Stipulation and Order dated July ___, 2010, by and between SCI and the Committee, which sets forth the terms and conditions upon which the Committee has agreed to support the Plan, a copy of which is included in the Plan Supplement.

32. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

33. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Code section 1128 to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

34. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code section 1129, which shall be consistent with the definition of Confirmation Order in the New Opco Purchase Agreement and the provisions of Article V.A herein, and in form and substance reasonably satisfactory to the Debtors, the Successful Bidder, the Required Consenting Lenders, the Mortgage Lenders and FG.

35. "*Consenting Opco Lenders*" means those Prepetition Opco Secured Lenders that are parties to the Opco Lender Restructuring Support Agreement.

36. "*Consummation*" means the occurrence of the Effective Date.

37. "*Debtor(s) in Possession*" means, individually, each Debtor, as a debtor in possession in its Chapter 11 Case and, collectively, all Debtors, as debtors in possession in these Chapter 11 Cases.

38. "*DIP Facility Claims*" means all obligations of any of the Debtors arising under the postpetition financing agreement with Vista Holdings, LLC and Past Enterprises, Inc. pursuant to that certain "Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 552 And Fed. R. Bankr. P. Rule 4001(b), (c) And (d): (I) Authorizing The Debtors To (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans To Non-Debtor Subsidiaries, (II) Granting Adequate Protection To Prepetition Secured Parties, And (IV) Granting Related Relief" entered by the Bankruptcy Court on October 13, 2009 [Docket No. 481], as such order has been amended from time to time.

39. "*Disclosure Statement*" means that certain Disclosure Statement for Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. And Its Affiliated Debtors Filed in these Chapter 11 Cases, as amended, supplemented, or modified from time to time, in each case in form and substance reasonably satisfactory to the Debtors, the Required Consenting Lenders and the Mortgage Lenders, and that was approved by the Disclosure Statement Order and describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

40. "*Disclosure Statement Order*" means that certain Order *(A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (D) Approving the Manner and Forms of Notice and Other Related Documents*, entered by the Bankruptcy Court on July __, 2010 [Docket No. ____], as the order may be amended from time to time, in each case in form and substance reasonably satisfactory to the Debtors, the Required Consenting Lenders and the Mortgage Lenders.

41.    "*Disputed Claim or Equity Interest*" means a Claim or Equity Interest, or any portion thereof:  (a) listed on the Schedules as unliquidated, disputed or contingent; (b) that is the subject of a Filed objection or request for estimation or is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; or (c) that is in excess of the amount scheduled as other than disputed, contingent or unliquidated.

42.    *"Distribution Agent"* means the Plan Administrator or any other entity designated, employed or contracted with by the Plan Administrator for purposes of making distributions under this Plan.

43.    "*Distribution Record Date*" means _____, 2010 at 5:00 p.m. prevailing Pacific Time.

44.    "*D&O Liability Insurance Policies*" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Effective Date.

45.    "*Effective Date*" means the Business Day that this Plan becomes effective as provided in Article IX hereof.

46.    "*Eligible Opco Unsecured Creditors*" means all Holders of Allowed Claims classified in Classes S.4, S.5 and S.6, except Holders of Class S.4 Claims that also hold Class S.2 Claims and vote to accept the Plan on account of such Class S.2 Claims.

47.    "*Entity*" means an "entity" as defined in Bankruptcy Code section 101(15).

48.    "*Equity Interest*" means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to such Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights, in each case as in existence immediately prior to the Effective Date.

49.    "*Equity Security*" means an "equity security" as defined in Bankruptcy Code section 101(16).

50.    "*Estates*" means the bankruptcy estates of the Debtors created by virtue of Bankruptcy Code section 541 upon the commencement of the Chapter 11 Cases.

51.    "*Excess AMT Amount*" means the amount, if any, of any administrative Tax claim(s) for alternative minimum tax resulting from or arising out of the implementation of the transactions contemplated by the New Opco Purchase Agreement or the Plan in excess of $15 million in the aggregate.

52.    *"Excluded Assets"* means, collectively, the Existing Propco Assets, the New Propco Purchased Assets and the SCI Retained Assets.

53.    "*Exculpated Parties*" means, collectively:  (a) the Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h) the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the Committee and its members, provided that the Committee Support Stipulation has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Effective Date; and (s) the respective Related Persons of each of the foregoing Entities.

54.    "*Exculpation*" means the exculpation provision set forth in Article X.E hereof.

55.    "*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

56.    "*Existing Propco Assets*" means any assets owned by Propco as of the Effective Date, any equity in or assets of any subsidiary of SCI that directly or indirectly owns the equity of Propco, and any assets encumbered by liens in favor of Propco (excluding any assets not located on a Propco Property and on which Propco's lien attaches to only an undivided percentage interest in, and less than 100% of, such assets).

57.    "*FG*" means Fertitta Gaming LLC, a Nevada limited liability company.

58.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases.

59.    "*Final Order*" means an order of the Bankruptcy Court as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, no stay pending appeal has been granted or such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; underlined provided, underlined however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

60.    "*General Unsecured Claim*" means any Claim against any Debtor that is not: (a) a/an (1) Administrative Claim; (2) Priority Tax Claim; (3) Other Priority Claim, (4) Other Secured Claim; (5) Senior Note Claim; (6) Subordinated Note Claim; (7) Intercompany Claim; or (8) Equity Interest; or (b) otherwise classified in a Class other than and separate from the Class of General Unsecured Claims with respect to the applicable Debtor.

61.    "*Going Private Transaction*" means the buy-out transaction that occurred in November of 2007, pursuant to which, among other things, SCI was acquired by virtue of a merger of FCP Acquisition Sub with and into SCI, with SCI continuing as the surviving corporation, and the sale-and-leaseback transaction with respect to the Propco Properties was consummated.

62.    "*Going Private Transaction Causes of Action*" means any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other legal or equitable remedies against any Person arising from any transaction comprising or related to the Going Private Transaction, regardless of whether such Claims, Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

63.    "*Governmental Unit*" means a "governmental unit" as defined in Bankruptcy Code section 101(27).

64.    "*Gun Lake Reimbursement*" means any amounts actually paid to and received by SCI or any of its Subsidiaries prior to Closing under the Stalking Horse APA by Gun Lake Tribal Gaming Authority in respect of amounts owed to MPM Enterprises, LLC and SC Michigan, LLC for advances made by them to Gun Lake Tribal Gaming Authority.

65.    "*Holdco*" means the Delaware limited liability company formed by the Mortgage Lenders to serve, along with Voteco, as one of the equity interest holders in New Propco.  Upon occurrence of the Effective Date, Holdco will be owned by the Mortgage Lenders, FG and potentially other parties, with additional NPH Equity available for acquisition through the NPH Investment Rights and the NPH Warrants, subject to the terms and conditions of the NPH Term Sheet.

66.    "*Holder*" means an Entity holding a Claim against, or Equity Interest in, any Debtor.

67.    "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of Bankruptcy Code section 1124.

68.    "*Intercompany Claims*" means any unsecured Claims of a Debtor against any other Debtor, other than the Master Lease Rejection Damage Claim.

69.    "*IP Assets*" means those assets identified on Schedule 1 of this Plan, all of which will be (a) if the Successful Bidder is the Stalking Horse Bidder, transferred to IP Holdco pursuant to the New Opco Purchase Agreement, and (b) if the Successful Bidder is any Person or Persons other than the Stalking Horse Bidder, (i) transferred to the Successful Bidder or its designated subsidiary pursuant to the New Opco Purchase Agreement and (ii) licensed to New Propco and its designated subsidiaries pursuant to the IP License Agreement with New Propco in the form attached to the New Opco Purchase Agreement of the Successful Bidder and consistent with the terms of the Second Amended MLCA.

70.    "*IP Holdco*" means the trust or other entity identified as "IP Holdco" in, and formed in accordance with, the Stalking Horse APA.

71.      *"IP License Agreement"* means the license agreement with New Propco in the form attached to the New Opco Purchase Agreement of the Successful Bidder which shall be in form and substance reasonably satisfactory to the Required Consenting Lenders, the Successful Bidder and, if the Stalking Horse Bidder is not the Successful Bidder, New Propco.

72.      *"Intermediary Record Owners"* means, as of the applicable date of determination, the banks, brokerage firms, or the agents thereof as the Entity through which the Beneficial Holders hold Claims.

73.      *"Landco Assets"* means those assets identified on Schedule 5 of this Plan.

74.      *"Landco Assets Transfer Agreement"* means that certain agreement, or those certain agreements, pursuant to which (a) all Landco Assets not now owned by CV Propco, LLC will be transferred to CV Propco, LLC and (b) all of the Equity Interests in CV Propco, LLC will be transferred to the designee of the Land Loan Lenders, which shall be in form and substance reasonably satisfactory to the Required Consenting Lenders and New Propco.

75.      *"Land Loan Agreement"* means that certain Credit Agreement, dated February 7, 2008 by and among CV PropCo, LLC, Deutsche Bank Trust Company Americas, JPMorgan Chase Bank, N.A. and the lenders from time to time party thereto.

76.      *"Land Loan Borrower"* means CV PropCo, LLC, a Nevada limited liability company.

77.      *"Land Loan Collateral"* means the land located on the southern end of Las Vegas Boulevard at Cactus Avenue and land surrounding the Wild Wild West in Las Vegas, Nevada, that serves as collateral for the loans made under the Land Loan Agreement.

78.      *"Land Loan Guaranty Claims"* means any and all Claims arising under the guarantees of the obligations under the Land Loan Agreement issued to the Land Loan Lenders by each of the Parent Debtors pursuant to the Recourse Guaranty dated as of February 7, 2008 made jointly and severally by FCP holding, Inc., FCP Voteco, LLC, and Fertitta Partners, LLC in favor of Deutsche Bank Trust Company Americas, as administrative agent.

79.      *"Land Loan Lenders"* means, collectively, Deutsche Bank Trust Company Americas and JPMorgan Chase Bank, N.A., each in their capacity as a lender under the Land Loan Agreement (each a *"Land Loan Lender"*).

80.      *"Lien"* means a "lien" as defined in Bankruptcy Code section 101(37), and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

81.      *"Litigation Claims"* means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any Person, including, without limitation, the Causes of Action of the Debtors.

82.    "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Nevada.

83.    "*Master Ballots*" means the ballot distributed to the Registered Record Owners or Intermediary Record Owners, as applicable, to record the votes of the Beneficial Holders of Claims as of the Voting Record Date.

84.    "*Master Lease and License*" means that certain:  (a) Master Lease, dated as of November 7, 2007, between Propco, as lessor, and SCI, as lessee, with respect to the Propco Properties (the "*Master Lease*"); and (b) License and Reservation Service Agreement, also dated as of November 7, 2007 (the "*License Agreement*"), between Propco, as licensee, and SCI, as licensor.

85.    "*Master Lease Collateral*" means:  (i) all "FF&E" and the "FF&E Reserve Collateral", each as defined in the Master Lease; and (ii) all "Collateral" under and as defined in the Propco Security Agreement.  Section 12.4 of the Master Lease contains a security agreement, pursuant to which SCI pledged, assigned and granted Propco a security interest and an express contractual lien in and to the FF&E and FF&E Reserve Collateral and the Operating Subtenants pledged, assigned and granted Propco a security interest and an express contractual lien in all such "Collateral" under the Propco Security Agreement.

86.    "*Master Lease Rejection Damage Claim*" means any and all claims assertable by Propco against SCI in connection with or relating to SCI's rejection of the Master Lease and License pursuant to this Plan.

87.    "*Mezzco Debtors*" means FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II, LLC; and FCP MezzCo Borrower I, LLC.

88.    "*Mezz I Loan*" means Amended and Restated Mezzanine Loan and Security Agreement (First Mezzanine), dated as of March 19, 2008, among FCP Mezzco Borrower I, LLC, a Delaware limited liability company, German American Capital Corporation, a Maryland corporation and JPMorgan Chase Bank, N.A., a national banking association.

89.    "*Mezz II Loan*" means Amended and Restated Mezzanine Loan and Security Agreement (Second Mezzanine), dated as of March 19, 2008, among FCP Mezzco Borrower II, LLC, a Delaware limited liability company, German American Capital Corporation, a Maryland Corporation and JPMorgan Chase Bank, N.A., a national banking association, as subsequently assigned to certain other lender parties.

90.    "*Mezz III Loan*" means Amended and Restated Mezzanine Loan Security Agreement (Third Mezzanine), dated as of March 19, 2008, among FCP Mezzco Borrower III, LLC, a Delaware limited liability company, German American Capital Corporation, a Maryland corporation and JPMorgan Chase Bank, N.A., a national banking association, as subsequently assigned to certain other lender parties.

91.    "*Mezz IV Loan*" means Mezzanine Loan and Security Agreement (Fourth Mezzanine), dated as of March 19, 2008, among FCP Mezzco Borrower IV, LLC, a Delaware limited liability company, German American Capital Corporation, a Maryland corporation and JPMorgan Chase Bank, N.A., a national banking association, as subsequently assigned to certain other lender parties.

92.    "*Mezz IV Pledge Claims*" means any and all Claims against FCP Mezzco Borrower V, LLC arising under or relating to its pledge of its Equity Interests in FCP Mezzco Borrower IV, LLC as collateral to secure repayment of the Mezz IV Loan.

93.    "*Mortgage Lender Claims Against SCI*" means any and all claims asserted by the Mortgage Lenders against SCI, including without limitation the claims asserted in the Proof of Claim the Mortgage Lenders filed against SCI, which are recorded as claim no. 19375849 on the Claims Register.

94.    "*Mortgage Lender/FG Restructuring Agreement*" means that certain agreement among FG, the Mortgage Lenders and the other parties thereto dated as of March 24, 2010 (as amended, supplemented or modified from time to time), a copy of which is included in the Plan Supplement.

95.    "*Mortgage Lenders*" means German American Capital Corporation and JPMorgan Chase Bank N.A., as lenders to Propco under the Amended and Restated Loan and Security Agreement, dated as of March 19, 2008.

96.    "*New FG Management Agreement*" means one or more management agreements pursuant to which FG will manage certain New Propco properties, including, if the Stalking Horse Bidder is the Successful Bidder, the New Opco properties, substantially in the form(s) included in the Plan Supplement.

97.    "*New Land Loan Agreement*" means the Land Loan Agreement, and related documents, in each case in form and substance acceptable to the Mortgage Lenders, as it will be amended and restated upon the occurrence of the Effective Date.

98.    "*New Opco*" means the entity that obtains or acquires ownership, directly or indirectly, of the New Opco Acquired Assets under the Plan pursuant to the Successful Bid (as determined in accordance with the Bid Procedures Order) and the New Opco Purchase Agreement.

99.    "*New Opco Acquired Assets*" means substantially all of the assets of the Opco Group Sellers, including the IP Assets, other than the Excluded Assets, which are to be acquired by the Successful Bidder pursuant to the New Opco Purchase Agreement.

100.    "*New Opco Credit Agreement*" means that certain credit agreement, along with related documents, in each case, in form and substance satisfactory to the Required Consenting Lenders, and if the Stalking Horse Bid is the Successful Bid, to the Stalking Horse Bidder, to be entered into by New Opco and the other parties identified therein in connection with New Opco's acquisition of the New Opco Acquired Assets, a copy of which is included in the Plan Supplement and which provides for (i) a new revolving credit facility in the aggregate principal

amount of $25 million and (ii) a term loan facility deemed issued on the Effective Date in the aggregate principal amount of $430 million.

101. "*New Opco PIK Credit Agreement*" means that certain credit agreement, along with related documents, in each case in form and substance reasonably satisfactory to the Required Consenting Lenders, and if the Stalking Horse Bid is the Successful Bid, to the Stalking Horse Bidder, to be entered into by a Subsidiary of New Opco and the Prepetition Opco Secured Lenders in connection with New Opco's acquisition of the New Opco Acquired Assets, a copy of which is included in the Plan Supplement and which provides for a term loan facility deemed issued on the Effective Date in the original aggregate principal amount of $25 million.

102. "*New Opco Purchase Agreement*" means the Stalking Horse APA or, if a Person other than the Stalking Horse Bidder is the Successful Bidder, then the asset purchase agreement of such Successful Bidder, as the same may be amended, supplemented or otherwise modified from time to time, and in each case, in form and substance reasonably satisfactory to the Required Consenting Lenders, a copy of which is included in the Plan Supplement.

103. "*New Opco Transition Services Agreement*" means that certain form of agreement, along with related documents, in each case in form and substance reasonably satisfactory to the Required Consenting Lenders, New Opco and New Propco, to be entered into by New Opco, New Propco and the other parties identified therein in connection with New Opco's acquisition of the New Opco Acquired Assets, a copy of which is included in the Plan Supplement, and which provides for, among other things, transition services to be provided to New Opco by New Propco, including reasonable cooperation and collaboration by New Propco with respect to diligence on existing systems, data transfer, testing and acceptance in connection with New Opco's development within one year of the closing of the New Opco Purchase Agreement, a computer system for New Opco that has at least the capacity and functions of the computer systems acquired by New Propco.

104. "*New Propco*" means the newly formed limited liability company, owned by Holdco and Voteco, that will acquire or obtain, directly or indirectly through one or more Subsidiaries, all of the New Propco Acquired Assets, the equity interests in CV PropCo, LLC, and all of the Landco Assets, and if the Stalking Horse Bid is the Successful Bid, all of the New Opco Acquired Assets, in each case under or in connection with the Plan.

105. "*New Propco Acquired Assets*" means, collectively, the New Propco Purchased Assets and the New Propco Transferred Assets.

106. "*New Propco Credit Agreement*" means that certain Credit Agreement and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG, a copy of which is included in the Plan Supplement.

107. "*New Propco Holdco*" or "*NPH*" means Holdco.

108. "*New Propco LLCA*" means that certain Limited Liability Company Agreement of New Propco and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG, a copy of which is included in the Plan Supplement.

109.    "*New Propco Non-Compete Agreement*": means that certain Non-Compete Agreement and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG, by and among Holdco, New Propco, the Mortgage Lenders and their assigns, FG and Frank and Lorenzo Fertitta regarding certain obligations and commitments with respect to future investment and management opportunities (as contemplated by the Mortgage Lender/FG Restructuring Agreement).

110.    "*New Propco Purchase Agreement*" means that certain agreement, or those certain agreements and related documents, in each case in form and substance acceptable to the Mortgage Lenders, FG and the Required Consenting Lenders, pursuant to which New Propco will purchase the New Propco Purchased Assets from SCI and/or the applicable Non-Debtor Affiliates in accordance with the Second Amended MLCA.  If the Stalking Horse Bid is the Successful Bid, then New PropCo will acquire the New Propco Purchased Assets under and pursuant to the Stalking Horse APA and the Stalking Horse APA will be deemed to be the New Propco Purchase Agreement for purposes of the Plan.

111.    "*New Propco Purchased Assets*" means those assets identified on Schedule 2 to this Plan, all of which will be transferred from SCI and/or the applicable Non-Debtor Affiliate to New Propco or its designee(s) in accordance with, and subject to the payment of the consideration and, if applicable, assumption of specific liabilities identified in, the Second Amended MLCA and pursuant to the New Propco Purchase Agreement, subject to the rights and obligations of Propco under the Second Amended MLCA (or, if the Stalking Horse Bidder is the Successful Bidder, to the rights of the Stalking Horse Bidder under the Stalking Horse APA) to elect not to purchase certain of such assets.

112.    "*New Propco Retained Available Cash*" means Propco Cash in the amount of $80 million, less any transition costs incurred by Propco or the Mortgage Lenders, which will be transferred to and retained by and for the benefit of New Propco.

113.    "*New Propco Transfer Agreement*" means that certain agreement, or those certain agreements and related documents, in each case in form and substance acceptable to the Mortgage Lenders, FG and the Required Consenting Lenders, pursuant to which New Propco or its designated subsidiaries will acquire the New Propco Transferred Assets from Propco in accordance with Article V of this Plan.

114.    "*New Propco Transferred Assets*" means (a) all of Propco's right, title and interests in, to and under the Propco Properties and the Master Lease Collateral, and (b) Propco Cash in an amount equal to the New Propco Retained Available Cash.

115.    "*NPH Equity*" means equity interests in Holdco.

116.    "*NPH Investment Rights*" means the rights to purchase, pursuant to the Propco Rights Offering and on the terms and conditions set forth in the NPH Term Sheet, NPH Equity to be issued through Blockerco to each Eligible Opco Unsecured Creditor that is an Accredited Investor.

117.    "*NPH Post-Effective Investment Rights*" means the rights to purchase NPH Equity to be issued through Blockerco to each Qualified Eligible Opco Unsecured Creditor in

connection with any Post-Effective Equity Raise (as defined in the NPH Term Sheet) on the terms and conditions set forth in the NPH Term Sheet.

118.    "*NPH Term Sheet*" means that certain term sheet attached hereto as Schedule 6, which sets forth, among other things, the terms and conditions for the issuance of the NPH Warrants, the NPH Investment Rights, the NPH Post-Effective Investment Rights and certain other related rights and obligations of the parties to the Put Parties Support Agreement and the Committee Plan Support Stipulation.

119.    "*NPH Warrants*" means the warrants to purchase NPH Equity to be issued through Blockerco to each Eligible Opco Unsecured Creditor, the terms and conditions of which shall be as set forth in the NPH Term Sheet.

120.    "*Opco Auction*" means any auction that occurs pursuant to the Bid Procedures Order.

121.    "*Opco Cash Collateral Order*" means the Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (i) Authorizing the Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans to Non-Debtor Subsidiaries, (ii) Granting Adequate Protection to Prepetition Secured Parties, and (iii) Granting Related Relief, entered by the Bankruptcy Court on October 13, 2009 [Docket No. 481].

122.    "*Opco Group Sellers*" means all sellers under the New Opco Purchase Agreement, which are identified in Schedule 3 to this Plan.

123.    "*Opco Lender Restructuring Support Agreement*" means that certain Restructuring Support Agreement dated as of April 16, 2010 (as amended, supplemented or modified from time to time) by and among the Consenting Opco Lenders, FG and certain of its principals, and certain Non-Debtor Affiliates, a copy of which is included in the Plan Supplement.

124.    "*Operating Subtenants*" means, collectively, Charleston Station, LLC; Boulder Station, Inc; Palace Station Hotel and Casino, Inc. and Sunset Station, Inc.

125.    "*Ordinary Course Professionals Order*" means that certain *Order Authorizing the Debtors to Employ and Compensate Certain Professionals in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date*, entered by the Bankruptcy Court on September 23, 2009 [Docket No. 355], as such order may be amended from time to time.

126.    "*Other Opco Debtors*" means Northern NV Acquisitions, LLC; Tropicana Station, LLC; River Central, LLC; and Reno Land Holdings, LLC.

127.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under Bankruptcy Code section 507(a), other than a Priority Tax Claim or an Administrative Claim.

128.    "*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, Secured Tax Claim, the Master Lease Rejection Damage Claim or Secured Claims arising under the Prepetition Opco Credit Agreement, Prepetition Opco Swap Agreement, the Prepetition Mortgage Loan Agreement or any of the Prepetition Mezzanine Loans.

129.    "*Parent Debtor Pledges*" means the pledges of the Equity Interests in SCI by each of the Parent Debtors to secure the obligations arising under the Prepetition Opco Credit Agreement, the Prepetition Opco Swap Agreement and related guaranties pursuant to that certain Shareholder Pledge And Security Agreement dated as of November 7, 2007 among the Parent Debtors, SCI and the Administrative Agent.

130.    "*Parent Debtors*" means FCP Holding, Inc. (owner of 74.8294% of non-voting stock in SCI); Fertitta Partners, LLC (owner of 25.1706% of non-voting stock in SCI); and FCP Voteco, LLC (owner of 100% of voting stock in SCI);

131.    "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

132.    "*Petition Date*" means July 28, 2009, the date on which the Debtors commenced the Chapter 11 Cases.

133.    "*Plan*" means this *Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors*, dated June 15, 2010, which shall be in form and substance satisfactory to the Successful Bidder, FG, the Mortgage Lenders and the Required Consenting Lenders.

134.    "*Plan Administrator*" means:  (a) SCI, or such other entity as may be designated by SCI and approved by the Bankruptcy Court to administer implementation of the Plan as to SCI, the Parent Debtors and the Other Opco Debtors; and (b) Propco, or such other entity as may be designated by Propco and approved by the Bankruptcy Court to administer implementation of the Plan, as to Propco and the Mezzco Debtors.

135.    "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which hereby are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, all of which be Filed with the Bankruptcy Court ten (10) days before the Voting Deadline.

136.    "*Prepetition Mezzanine Loans*" means, collectively, the Mezz I Loan, Mezz II Loan, Mezz III Loan and Mezz IV Loan.

137.    "*Prepetition Mezzanine Loan Guaranty Claims*" means any and all claims arising under the guarantees of the obligations under the Prepetition Mezzanine Loans issued by each of the Parent Debtors.

138.    "*Prepetition Mortgage Loan Agreement*" means that certain Amended and Restated Loan and Security Agreement, dated as of March 19, 2008, among Propco, as Borrower, and German American Capital Corporation and JPMorgan Chase Bank N.A., as lenders.

139.    "*Prepetition Mortgage Loan Claims*" means any and all Claims arising under the Prepetition Mortgage Loan Agreement and the Propco Cash Collateral Order.

140.    "*Prepetition Mortgage Loan Guaranty*" means individually, each guaranty of the obligations arising under the Prepetition Mortgage Loan Agreement issued to the Mortgage Lenders by each of the Parent Debtors.

141.    "*Prepetition Mortgage Loan Guaranty Claims*" means any and all claims arising under Prepetition Mortgage Loan Guaranty.

142.    "*Prepetition Opco Credit Agreement*" means that certain Credit Agreement, dated as of November 7, 2007, among SCI, as borrower, Deutsche Bank Trust Company Americas, as Administrative Agent, the other lenders party thereto, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as joint lead arrangers and joint book runners, JPMorgan Chase Bank, N.A., as Syndication Agent, and Bank of Scotland plc, Bank of America, N.A., and Wachovia Bank, N.A., as Co-Documentation Agents, as amended, supplemented or otherwise modified from time to time.

143.    "*Prepetition Opco Credit Agreement Claim*" means any and all Claims arising under the Prepetition Opco Credit Agreement and the Opco Cash Collateral Order.

144.    "*Prepetition Opco Credit Agreement Guaranty Claims*" means any and all Claims arising under that certain Guaranty Agreement dated as of November 7, 2007 among SCI, certain specified Subsidiaries of SCI and the Administrative Agent.

145.    "*Prepetition Opco Loan Documents*" means, collectively, the Prepetition Opco Credit Agreement and each other loan document executed from time to time in connection therewith.

146.    "*Prepetition Opco Secured Claim*" means, collectively, the Prepetition Opco Credit Agreement Claim and the Prepetition Opco Swap Claim, to the extent of the value of the Collateral securing those claims.  Any amounts of Prepetition Opco Secured Claim in excess of the value of that Collateral shall be a General Unsecured Claim.

147.    "*Prepetition Opco Secured Lenders*" means the Administrative Agent and the other lenders party from time to time to the Prepetition Opco Credit Agreement.

148.    "*Prepetition Opco Swap Agreement*" means that certain Secured Hedge Agreement dated as of February 12, 2008, by and between JPMorgan Chase Bank, N.A. and SCI.

149.    "*Prepetition Opco Swap Claim*" means the secured termination claim under the Prepetition Opco Swap Agreement, together with all interest accrued and unpaid thereon as of

the Effective Date, and all unpaid reasonable fees, costs, expenses and other charges required to be paid or reimbursed (as applicable) pursuant to the terms of the Prepetition Opco Swap Agreement.

150.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in Bankruptcy Code section 507(a)(8).

151.    "*Pro Rata*" means the proportion that (a) the Allowed principal amount of a Claim in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed principal amount of all Claims in such Class (or several Classes taken as a whole), unless this Plan provides otherwise.

152.    "*Professional*" means (a) any Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code section 327, 363 or 1103 or otherwise and (b) any Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code section 503(b)(4).

153.    "*Professional Fee Claim*" means a Claim under Bankruptcy Code sections 328, 330(a), 331, 363, 503 or 1103 for Accrued Professional Compensation.  For the avoidance of doubt, the definition of Professional Fee Claim shall not include the fees and expense of the Put Parties and their legal advisors, which fees and expenses shall be paid in accordance with the NPH Term Sheet.

154.    "*Professional Fees Bar Date*" means the Business Day that is sixty (60) days after the Effective Date or such other date as approved by Final Order of the Bankruptcy Court.

155.    "*Proof of Claim*" means a proof of Claim or Equity Interest Filed against any Debtor in the Chapter 11 Cases.

156.    "*Propco*" means FCP Propco, LLC, a debtor and debtor in possession.

157.    "*Propco Cash*" means all Cash on hand at Propco as of the Effective Date, immediately prior to all the transfers and allocations pursuant to the Plan as of and following the Effective Date; provided, however, Propco Cash does not include, and shall not be deemed to include, any "cage cash" utilized at any of the Propco Properties.

158.    "*Propco Cash Collateral Order*" means the Final Order Pursuant to 11 U.S.C. §§ 361, 362 and 363 Approving Stipulation for (i) Adequate Protection and (ii) Use of Cash Collateral with Respect to Secured Loans to FCP Propco, LLC entered on September 9, 2009 [Docket No. 295].

159.    "*Propco Commitment*" means that certain firm and irrevocable put commitment of the Put Parties, in form and substance acceptable to the Put Parties, the Debtors, FG and the Mortgage Lenders, to purchase through Blockerco: (a) $35.3 million of NPH Equity, to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors or the Put Parties (pursuant to the proviso to the definition of Allocated Pro Rata Share of NPH Investment Rights herein) in accordance with the terms and conditions of the Propco Rights Offering; and (b) up to a maximum of $100 million (*i.e.*, up to a maximum of $64.7 million in

addition to the $35.3 million commitment specified in clause (a)) of NPH Equity in connection with any Equity Raises (as defined in the NPH Term Sheet) consummated during the Upsizing Commitment Period (as defined in the NPH Term Sheet), to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors (pursuant to the proviso to the definition of Allocated Pro Rata Share of NPH Investment Rights herein)  or the Put Parties in accordance with the terms and conditions of the NPH Term Sheet.

160.    "*Propco Excess Effective Date Cash*" means any Propco Cash in excess of the amount of New Propco Retained Available Cash, which Propco Excess Effective Date Cash shall be distributed as additional recovery to the Mortgage Lenders or their applicable designees on account of their Allowed Class P.2 Claims; provided, that, if the Stalking Horse Bidder is the Successful Bidder, such Propco Excess Effective Date Cash may, to the extent required under the Stalking Horse APA, be paid to the Prepetition Opco Secured Lenders and the Holders of the Prepetition Opco Swap Claim.

161.    "*Propco Properties*" means: (a) Palace Station Hotel & Casino; (b) Boulder Station Hotel & Casino; (c) Sunset Station Hotel & Casino; and (d) Red Rock Casino Resort Spa.

162.    "*Propco Rights Offering*" means the offering of the NPH Investment Rights to each Eligible Opco Unsecured Creditor that is an Accredited Investor pursuant to this Plan, on the terms and conditions set forth in the NPH Term Sheet.

163.    "*Propco Security Agreement*" means that certain Security Agreement (All Furniture, Fixtures and Equipment), dated as of November 7, 2007 by and among Propco and the Operating Subtenants.

164.    "*Put Parties*" means certain entities affiliated with Fidelity Management & Research Company, Oaktree Capital Management, L.P. and Serengeti Asset Management, L.P. that are reasonably acceptable to the Debtors, FG and Propco Lenders.

165.    *"Put Parties Support Agreement"* means that certain Support Agreement dated as of July ___, 2010 (as amended, supplemented or modified from time to time) by and among the Put Parties, the Mortgage Lenders, FG, Frank J. Fertitta III and Lorenzo Fertitta, a copy of which is included in the Plan Supplement.

166.    "*Put Premium*" means $3,000,000 in cash to be paid to the Put Parties by New Propco Holdco on the Effective Date, on the terms and subject to the conditions set forth in the NPH Term Sheet.

167.    "*Qualified Eligible Opco Unsecured Creditor*" means any Eligible Opco Unsecured Creditor that (a) is an Accredited Investor, (b) owns indirectly (together with affiliated funds or other investment vehicles with a common investment manager) through Blockerco at least 0.5% of the outstanding NPH Equity and (c) participates in the Propco Rights Offering and purchases NPH Equity therein.  Qualified Eligible Opco Unsecured Creditors shall have the rights and obligations of "Qualifying Creditors" as that term is defined in the NPH Term Sheet.

168.    "*Registered Record Owners*" means, as of the applicable date of determination, the respective owners of the Senior Notes or Subordinated Notes, as applicable, whose holdings thereof are in their own name on the books and records of SCI.

169.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and Subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, and any Person claiming by or through any of them.

170.    "*Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.C hereof.

171.    "*Released Party*" means: (a) the Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h) the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the Committee and its members, provided that the Committee Support Stipulation has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Effective Date; and (s) the respective Related Persons of each of the foregoing Entities.

172.    "*Releasing Party*" has the meaning set forth in Article X.C hereof.

173.    "*Required Consenting Lenders*" shall mean three or more Consenting Opco Lenders holding greater than 66.6% of the aggregate Claims (without including in such determination the termination value of the Prepetition Opco Swap Agreement prior to its termination; provided, that, all obligations under the Secured Hedge Agreement (whether or not terminated) remain *pari passu* with all other Prepetition Opco Secured Claims held by all Consenting Opco Lenders.

174.    "*Rights Offering Record Date*" means the date for determining which Holders of Claims are entitled to participate in the Propco Rights Offering, which date is July 15, 2010 at 5:00 p.m. prevailing Pacific Time, as set forth in the Disclosure Statement Order.

175.    "*Schedule of Executory Contracts and Unexpired Leases To Be Assumed*" means the Schedule to be Filed with the Bankruptcy Court that identifies each Executory Contract and Unexpired Lease that will be assumed in accordance with Article VI.A of this Plan.

176.    "*Scheduled*" means with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules.

177.    "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs filed by the Debtors pursuant to Bankruptcy Code

section 521 and the applicable Bankruptcy Rules, as such Schedules they may be amended, modified, or supplemented from time to time.

178.    "*SCI*" means Station Casinos, Inc., debtor and debtor in possession.

179.    "*SCI Retained Assets*" means any assets of SCI or any of its Subsidiaries specified on Schedule 4 to this Plan and such other assets of SCI and its Subsidiaries that are designated in or pursuant to the New Opco Purchase Agreement as excluded assets (and are not Existing Propco Assets or New Propco Purchased Assets).

180.    "*Second Amended MLCA*" means that certain Second Amended and Restated Master Lease Compromise Agreement (2nd Revised) dated May 24, 2010, by and among SCI and certain of its affiliates, on the one hand, and Propco, on the other hand, as approved by the "Order Approving Revised Second Amended and Restated Master Lease Compromise Agreement Pursuant to U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019" entered by the Bankruptcy Court on July 14, 2010 [Docket No. 1778], a copy of which is included in the Plan Supplement.

181.    "*Secured Cash Management Agreement*" means one or more agreements among the Debtors or Non-Debtor Affiliates, on the one hand, and one or more Prepetition Opco Secured Lenders or Affiliates thereof, on the other than, in respect of any overdraft and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds.

182.    "*Secured Claim*" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or, in the case of setoff, pursuant to Bankruptcy Code section 553.

183.    "*Senior Notes*" means, collectively, the $450 million 6% Senior Notes due 2012 and the $400 million 7¾% Senior Notes due 2016, in each case issued by SCI.

184.    "*Senior Notes Trustee*" means Law Debenture Trust Company of New York, not in its individual capacity, but solely as Trustee under the Senior Notes Indentures.

185.    "*Senior Notes Indentures*" means, collectively: (a) that certain indenture dated as of March 17, 2004 providing for the issuance by SCI of 6% Senior Notes due 2012; and (b) that certain indenture dated as of August 1, 2006 providing for the issuance by SCI of 7¾% Senior Notes due 2016 (in each case, as supplemented or amended from time to time).

186.    "*Stalking Horse APA*" means that certain Asset Purchase Agreement dated June ___, 2010, by and among the Opco Group Sellers and the Stalking Horse Bidder, as amended, supplemented or otherwise modified from time to time subject to the terms thereof, a form of which was filed with the Bankruptcy Court on May 25, 2010 [Docket No. 1526].

187. *"Stalking Horse Bid"* means the agreement by the Stalking Horse Bidder to purchase the New Opco Acquired Assets on the terms and conditions set forth in the Stalking Horse APA, subject to the Opco Auction.

188. *"Stalking Horse Bidder"* means FG Opco Acquisitions LLC, a Delaware limited liability company, or any of its assignees as permitted under the Stalking Horse APA.

189. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

190. "*Subordinated Notes*" means, collectively, the $450 million 6½% Senior Subordinated Notes due 2014, the $700 million 6⅞% Senior Subordinated Notes due 2016 and the $300 million 6⅝% Senior Subordinated Notes due 2018, in each case issued by SCI.

191. "*Subordinated Notes Indentures*" means, collectively: (a) that certain indenture dated as of January 29, 2004 providing for the issuance by SCI of 6½% Senior Subordinated Notes due 2014; (b) that certain indenture dated as of February 27, 2004 providing for the issuance by SCI of 6⅞% Senior Subordinated Notes due 2016; and (c) that certain indenture dated March 13, 2006 providing for the issuance by SCI of 6⅝% Senior Subordinated Notes due 2018 (in each case, as supplemented or amended from time to time).

192. "*Subordinated Notes Trustee*" means Wilmington Trust Company, not in its individual capacity, but solely as Trustee under the Subordinated Notes Indentures.

193. "*Subsidiaries*" means, with respect to any Person, a wholly-owned or partially owned subsidiary of such Person.

194. *"Successful Bid"* means the bid for the New Opco Acquired Assets that the Bankruptcy Court determines is the highest or otherwise best bid as of the conclusion of the Opco Auction, or any such alternate bid as the Bankruptcy Court may subsequently approve.[1]

195. *"Successful Bidder"* means the Person or Persons that submits the Successful Bid.

196. "*Super Priority Notes Election*" means the election available to the Stalking Horse Bidder under, and subject to the terms of, the Stalking Horse APA to elect to pay up to $43 million of the cash purchase price required under the Stalking Horse APA in the form of Super Priority Notes issued pursuant to the New Propco Credit Agreement.

---

[1]    The Plan contemplates the sale of the New Opco Acquired Assets pursuant to the Successful Bid that emerges from the Opco Auction. The Successful Bid may differ in a variety of respects from the Stalking Horse Bid. To the extent the Stalking Horse Bid is not the Successful Bid and the Successful Bid varies in terms or structure from the Stalking Horse Bid, the Debtors reserve the right to amend the Plan to reflect those variations as appropriate and to provide such supplemental disclosure of those amendments as the Bankruptcy Court may require.

197.    "*Swap Counterparty*" means Deutsche Bank AG, solely in its capacity as counterparty to Propco under that certain interest rate swap transaction dated as of November 29, 2007 with Reference Global No. N723525N between Propco and Deutsche Bank, A.G., as further modified by that certain Novation Confirmation dated as of March 5, 2008.

198.    "*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

199.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of Bankruptcy Code section 1124.

200.    "*Voteco*" means the Delaware limited liability company to be owned by certain individuals who, as of the Effective Date, will be licensed for gaming regulatory purposes that will serve, along with Holdco, as one of the equity interest holders in New Propco as of the Effective Date.

201.    "*Voting and Claims Agent*" means KCC, in its capacity as solicitation, notice, claims and balloting agent for the Debtors, pursuant to that certain order entered by the Bankruptcy Court on August 3, 2009 [Docket No. 35].

202.    "*Voting Classes*" means, collectively, Classes FHI.1, FP.1, VC.1, P.2, M.5.2, M.4.1, M.3.1, M.2.1, M.1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2.

203.    "*Voting Deadline*" means August 20, 2010 at 5:00 p.m. prevailing Nevada Time for all Holders of Claims and Equity Interests, which is the date and time by which all Ballots, Beneficial Holder Ballots and Master Ballots, as applicable, must be received by the Voting and Claims Agent in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

204.    "*Voting Record Date*" means the date for determining which Holders of Claims and Equity Interests are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is July 15, 2010 at 5:00 p.m. prevailing Pacific Time, as set forth in the Disclosure Statement Order.

205.    "*Wild Wild West Assemblage*" means the parcels of real estate, options, leasehold interests and ground lease set forth in Section 14 of Annex 1 to the Second Amended MLCA.

## ARTICLE II.

## TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS

Pursuant to Bankruptcy Code section 1123(a)(1), the Claims against each of the Debtors set forth in this Article 2 are not classified within any Classes.  The Holders of such Claims are not entitled to vote on this Plan.  The treatment of the Claims set forth below is consistent with the requirements of Bankruptcy Code section 1129(a)(9)(A).

The Chapter 11 Cases for each of the Debtors will not be substantively consolidated. Accordingly, Holders of unclassified Claims again a particular Debtor shall have their Claim allowed and treated in such respective Debtor's Estate. As such, for each category of unclassified Claims, a sub-category shall be deemed to exist for each Debtor.

## A.    *Administrative Claims*

Except as otherwise provided herein, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim other than the Holder of the DIP Facility Claims will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash from the Debtor(s) against which the Administrative Claim is Allowed for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by such Holder.

Notwithstanding anything herein to the contrary but subject to the immediately following paragraph, to the extent applicable, all Allowed Administrative Claims (including, without limitation, professional fees and expenses, whether incurred on an hourly, monthly, "success" or other basis) shall be subject to an allocation among SCI and the Other Opco Debtors, on the one hand, and Propco, the Parent Debtors and the Mezzco Debtors, on the other hand, to ensure that the Allowed Administrative Claims are being allocated to the Debtor(s) that incurred the obligations or received the benefit thereof. Such allocation will be either acceptable to the Required Consenting Lenders and the Holders of the Prepetition Mortgage Loan Claims or ordered by the Bankruptcy Court following notice and a hearing; provided further that, any expense reimbursement payable pursuant to the Bid Procedures Order shall constitute an Allowed Administrative Claim against SCI and its Estate only.

Notwithstanding anything herein to the contrary, the Allowed Administrative Claim of Lazard Frères & Co. LLC (*"Lazard"*) for any *"Restructuring Fee"* (as that term is defined in the Order approving Lazard's retention [Docket No. 326] (the *"Lazard Retention Order"*)) as Debtors' financial advisor and investment banker shall be subject to the following allocation: (i) SCI and the Other Opco Debtors, shall be responsible for payment of half of the Restructuring Fee   on the one hand, and (ii) Propco, the Parent Debtors and the Mezzco Debtors, shall be responsible for payment of the other half of the Restructuring Fee on the other hand. For the avoidance of doubt, none of Lazard's other fees, including without limitation its Monthly Fees (as that term is defined in the Lazard Retention Order), shall be allocated, and SCI and the Other Opco Debtors shall remain obligated to pay such fees to the extent Allowed.

All Superpriority Claims under, and as defined in the Opco Cash Collateral Order, and any other Administrative Claims relating to SCI's adequate protection obligations arising under the Opco Cash Collateral Order shall be afforded the treatment set forth in Article III.B.4. under the heading "Prepetition Opco Secured Claims against SCI." All Administrative Claims relating to SCI's and Propco's respective adequate protection obligations arising under the Propco Cash Collateral Order shall be afforded the treatment set forth in Article III.B.2 under the hearing "Prepetition Mortgage Loan Claims against Propco."

The DIP Facility Claims held by Vista Holdings, LLC and Past Enterprises, Inc. shall receive no distribution under the Plan and shall be extinguished and discharged upon the Effective Date, without payment of any consideration.

### 1.    **Bar Date for Administrative Claims**

Except as otherwise provided in this Article II.A hereof, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims but do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims and such Administrative Claims shall be deemed discharged as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F hereof.  Objections to such requests must be Filed by the later of (a) 120 days after the applicable Administrative Claims Bar Date and (b) 90 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by order of the Bankruptcy Court.

### 2.    **Professional Compensation and Reimbursement Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File an application for final allowance of such Professional Fee Claim against the applicable Debtor and its estate no later than the Professional Fees Bar Date; <u>provided</u> that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered to the Debtors before the Effective Date in accordance with the terms of the Ordinary Course Professionals Order and without further Bankruptcy Court order.  Objections to any Professional Fee Claim must be Filed by the later of (a) 90 days after the Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim.

### B.    *Priority Tax Claims*

The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by such Holder; or (c) pursuant to and in accordance with Bankruptcy Code sections 1129(a)(9)(C) and (D), Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; <u>provided</u>, <u>further</u>, that Priority Tax Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms

and conditions relating thereto in the discretion of the Debtors without further notice to or order of the Bankruptcy Court.

### C.    Other Priority Claims

Each Allowed Other Priority Claim, if any, shall, in full and final satisfaction of such Claim, be paid in full in Cash by the applicable Debtor upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.  If there are no Claims or Interests in a particular Class, then such Class of Claims or Interests shall not exist for all purposes of the Plan.

### A.    Classification of Classified Claims and Equity Interests.

### 1.    Claims and Equity Interests Against Parent Debtors

#### (a)    FCP Holding, Inc.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| FHI.1 | Prepetition Mortgage Loan Guaranty Claims | Impaired | Entitled to Vote |
| FHI.2 | Prepetition Mezzanine Loan Guaranty Claims | Impaired | Deemed to Reject |
| FHI.3 | Land Loan Guaranty Claims | Impaired | Deemed to Reject |
| FHI.4 | General Unsecured Claims | Impaired | Deemed to Reject |
| FHI.5 | Intercompany Claims | Impaired | Deemed to Reject |

| FHI.6 | Equity Interests | Impaired | Deemed to Reject |

### (b)    Fertitta Partners LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| FP.1 | Prepetition Mortgage Loan Guaranty Claims | Impaired | Entitled to Vote |
| FP.2 | Prepetition Mezzanine Loan Guaranty Claims | Impaired | Deemed to Reject |
| FP.3 | Land Loan Guaranty Claims | Impaired | Deemed to Reject |
| FP.4 | General Unsecured Claims | Impaired | Deemed to Reject |
| FP.5 | Intercompany Claims | Impaired | Deemed to Reject |
| FP.6 | Equity Interests | Impaired | Deemed to Reject |

### (c)    FCP Voteco, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| VC.1 | Prepetition Mortgage Loan Guaranty Claims | Impaired | Entitled to Vote |
| VC.2 | Prepetition Mezzanine Loan Guaranty Claims | Impaired | Deemed to Reject |
| VC.3 | Land Loan Guaranty Claims | Impaired | Deemed to Reject |
| VC.4 | General Unsecured Claims | Impaired | Deemed to Reject |
| VC.5 | Intercompany Claims | Impaired | Deemed to Reject |
| VC.6 | Equity Interests | Impaired | Deemed to Reject |

### 2.    Claims and Equity Interests Against Propco

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| P.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| P.2 | Prepetition Mortgage Loan Agreement Claims | Impaired | Entitled to Vote |
| P.3 | General Unsecured Claims | Impaired | Deemed to Reject |

| | | | |
|---|---|---|---|
| P.4 | Intercompany Claims | Impaired | Deemed to Reject |
| P.5 | Equity Interests | Impaired | Deemed to Reject |

3.  **Claims and Equity Interests Against Mezzco Debtors**

  (a)    **FCP MezzCo Parent, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| MP.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| MP.2 | Intercompany Claims | Impaired | Deemed to Reject |
| MP.3 | Equity Interests | Impaired | Deemed to Reject |

  (b)    **FCP MezzCo Parent Sub, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| MS.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| MS.2 | Intercompany Claims | Impaired | Deemed to Reject |
| MS.3 | Equity Interests | Impaired | Deemed to Reject |

  (c)    **FCP Mezzco Borrower VII, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| M7.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| M7.2 | Intercompany Claims | Impaired | Deemed to Reject |
| M7.3 | Equity Interests | Impaired | Deemed to Reject |

  (d)    **FCP Mezzco Borrower VI, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| M6.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| M6.2 | Intercompany Claims | Impaired | Deemed to Reject |
| M6.3 | Equity Interests | Impaired | Deemed to Reject |

### (e)     FCP Mezzco Borrower V, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| M5.1 | General Unsecured Claims | Impaired | Deemed to Reject |
| M5.2 | Mezz IV Pledge Claims | Impaired | Entitled to Vote |
| M5.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M5.4 | Equity Interests | Impaired | Deemed to Reject |

### (f)     FCP Mezzco Borrower IV, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| M4.1 | Mezz IV Loan Claims | Impaired | Entitled to Vote |
| M4.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| M4.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M4.4 | Equity Interests | Impaired | Deemed to Reject |

### (g)     FCP Mezzco Borrower III, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| M3.1 | Mezz III Loan Claims | Impaired | Entitled to Vote |
| M3.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| M3.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M3.4 | Equity Interests | Impaired | Deemed to Reject |

### (h)     FCP Mezzco Borrower II, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| M2.1 | Mezz II Loan Claims | Impaired | Entitled to Vote |
| M2.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| M2.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M2.4 | Equity Interests | Impaired | Deemed to Reject |

### (i)    FCP Mezzco Borrower I, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| M1.1 | Mezz I Loan Claims | Impaired | Entitled to Vote |
| M1.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| M1.3 | Intercompany Claims | Impaired | Deemed to Reject |
| M1.4 | Equity Interests | Impaired | Deemed to Reject |

### 4.    Claims and Equity Interests Against SCI

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| S.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| S.2 | Prepetition Opco Secured Claims | Impaired | Entitled to Vote |
| S.3 | Master Lease Rejection Damage Claim | Impaired | Entitled to Vote |
| S.4 | General Unsecured Claims | Impaired | Entitled to Vote |
| S.5 | Senior Notes Claims | Impaired | Entitled to Vote |
| S.6 | Subordinated Notes Claims | Impaired | Entitled to Vote |
| S.7 | Mortgage Lender Claims Against SCI | Impaired | Entitled to Vote |
| S.8 | Intercompany Claims | Impaired | Deemed to Reject |
| S.9 | Equity Interests | Impaired | Deemed to Reject |

### 5.    Claims and Equity Interests Against Other Opco Debtors

### (a)    Northern NV Acquisitions, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| NA.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| NA.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| NA.3 | Equity Interests | Impaired | Deemed to Reject |

### (b)    Reno Land Holdings, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| RL.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| RL.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| RL.3 | Equity Interests | Impaired | Deemed to Reject |

**(c)    River Central, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| RC.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| RC.2 | Prepetition Opco Credit Agreement Guaranty Claims | Impaired | Entitled to Vote |
| RC.3 | General Unsecured Claims | Impaired | Deemed to Reject |
| RC.4 | Equity Interests | Impaired | Deemed to Reject |

**(d)    Tropicana Station, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| TS.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TS.2 | Prepetition Opco Credit Agreement Guaranty Claims | Impaired | Entitled to Vote |
| TS.3 | General Unsecured Claims | Impaired | Deemed to Reject |
| TS.4 | Equity Interests | Impaired | Deemed to Reject |

**B.    *Treatment of Claims and Equity Interests.***

**1.    Claims and Equity Interests Against Parent Debtors**

**(a)    FCP Holding, Inc.**

Class FHI.1 – Prepetition Mortgage Loan Guaranty Claims against FCP Holding, Inc.

> *Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged.   Holders of Class FH.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

*Voting*:   Class FHI.1 is Impaired, and the Holders of Class FHI.1 Claims are entitled to vote to accept or reject this Plan.

Class FHI.2 – Prepetition Mezzanine Loan Guaranty Claims against FCP Holding, Inc.

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged.  Holders of Class FHI.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:   Class FHI.2 is Impaired.  The Holders of Class FHI.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FHI.2 Claims are not entitled to vote to accept or reject this Plan.

Class FHI.3 – Land Loan Guaranty Claims Against FCP Holding, Inc.

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by FCP Holding, Inc. shall be extinguished and discharged.  Holders of Class FHI.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:   Class FHI.3 is Impaired.  The Holders of Class FHI.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FHI.3 Claims are not entitled to vote to accept or reject this Plan.

Class FHI.4 – General Unsecured Claims against FCP Holding, Inc.

*Treatment*:  Holders of Class FHI.4 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:   Class FHI.4 Impaired.  The Holders of Class FHI.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FHI.4 Claims are not entitled to vote to accept or reject this Plan.

Class FHI.5 – Intercompany Claims against FCP Holding, Inc.

*Treatment*:  Holders of Class FHI.5 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:*   Class FHI.5 Impaired.  The Holders of Class FHI.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are

conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FHI.5 Claims are not entitled to vote to accept or reject this Plan.

Class FHI.6 – Equity Interests in FCP Holding, Inc.

*Treatment*: On the Effective Date, all Equity Interests in FCP Holding, Inc. shall be cancelled and extinguished. Holders of Class FHI.6 Equity Interests shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FHI.6 Impaired. The Holders of Class FHI.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FHI.6 Claims are not entitled to vote to accept or reject this Plan.

**(b)    Fertitta Partners LLC**

Class FP.1 – Prepetition Mortgage Loan Guaranty Claims against Fertitta Partners LLC.

*Treatment*: On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged. Holders of Class FH.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

*Voting:* Class FP.1 is Impaired, and the Holders of Class FP.1 Claims are entitled to vote to accept or reject this Plan.

Class FP.2 – Prepetition Mezzanine Loan Guaranty Claims against Fertitta Partners LLC

*Treatment*: On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged. Holders of Class FP.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FP.2 is Impaired. The Holders of Class FP.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.2 Claims are not entitled to vote to accept or reject this Plan.

Class FP.3 – Land Loan Guaranty Claims Against Fertitta Partners LLC

*Treatment*: On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by Fertitta Partners LLC shall be

extinguished and discharged. Holders of Class FP.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FP.3 is Impaired. The Holders of Class FP.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.3 Claims are not entitled to vote to accept or reject this Plan.

Class FP.4 – General Unsecured Claims against Fertitta Partners LLC

*Treatment*: Holders of Class FP.4 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FP.4 Impaired. The Holders of Class FP.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.4 Claims are not entitled to vote to accept or reject this Plan.

Class FP.5 – Intercompany Claims against Fertitta Partners LLC

*Treatment*: Holders of Class FP.5 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting:* Class FP.5 Impaired. The Holders of Class FP.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.5 Claims are not entitled to vote to accept or reject this Plan.

Class FP.6 – Equity Interests in Fertitta Partners LLC

*Treatment*: On the Effective Date, all Equity Interests in Fertitta Partners LLC shall be cancelled and extinguished. Holders of Class FP.6 Equity Interests shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class FP.6 Impaired. The Holders of Class FP.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FP.6 Claims are not entitled to vote to accept or reject this Plan.

**(c)    FCP Voteco, LLC**

Class VC.1 – Prepetition Mortgage Loan Guaranty Claims against FCP Voteco, LLC

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mortgage Loan Guaranty shall be terminated, and the Prepetition Mortgage Loan Guaranty shall be extinguished and discharged.  Holders of Class VC.1 Claims shall receive the treatment set forth for Holders of Class P.2 Claims in Section III.B.2 below.

*Voting*:   Class VC.1 is Impaired, and the Holders of Class VC.1 Claims are entitled to vote to accept or reject this Plan.

## Class VC.2 – Prepetition Mezzanine Loan Guaranty Claims against FCP Voteco, LLC

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Prepetition Mezzanine Loan Guaranty shall be terminated, and the Prepetition Mezzanine Loan Guaranty shall be extinguished and discharged.  Holders of Class VC.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:   Class VC.2 is Impaired.  The Holders of Class VC.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.   Consequently, the Holders of Class VC.2 Claims are not entitled to vote to accept or reject this Plan.

## Class VC.3 – Land Loan Guaranty Claims Against FCP Voteco, LLC

*Treatment*:  On the Effective Date, all outstanding obligations of any nature under the Land Loan Agreement guaranty issued by FCP Voteco, LLC shall be extinguished and discharged.  Holders of Class VC.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:   Class VC.3 is Impaired.  The Holders of Class VC.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.   Consequently, the Holders of Class VC.3 Claims are not entitled to vote to accept or reject this Plan.

## Class VC.4 – General Unsecured Claims against FCP Voteco, LLC

*Treatment*:  Holders of Class VC.4 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:   Class VC.4 is Impaired.  The Holders of Class VC.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.   Consequently, the Holders of Class VC.4 Claims are not entitled to vote to accept or reject this Plan.

## Class VC.5 – Intercompany Claims against FCP Voteco, LLC

*Treatment*:  Holders of Class VC.5 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class VC.5 is Impaired.  The Holders of Class VC.5 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.5 Claims are not entitled to vote to accept or reject this Plan.

Class VC.6 – Equity Interests in FCP Voteco, LLC

*Treatment*:  On the Effective Date, all Equity Interests in FCP Voteco, LLC shall be cancelled and extinguished.  Holders of Class VC.6 Equity Interests shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class VC.6 is Impaired.  The Holders of Class VC.6 Equity Interests will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VC.6 Claims are not entitled to vote to accept or reject this Plan.

**2.      Claims and Equity Interests Against Propco**

Class P.1 – Other Secured Claims against Propco

*Classification*:  Each Class P.1 Claim, if any, is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class P.1A, Class P.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:  The legal, equitable and contractual rights of the Holders of Class P.1 Claims, if any, are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class P.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class P.1 Claim shall either (at the election of the Debtors):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class P.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such claim by New Propco and retention of all existing liens to secure such claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:  Class P.1 is an Unimpaired Class, and the Holders of Class P.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of

the Bankruptcy Code.  Therefore, the Holders of Class P.1 Claims are not entitled to vote to accept or reject this Plan.

Class P.2 – Prepetition Mortgage Loan Claims against Propco

*Allowance*:  On the Effective Date, the Prepetition Mortgage Loan Claims shall be deemed Allowed in an aggregate amount equal to principal in the amount of not less than $1,800,000,000, plus all interest accrued and unpaid thereon as of the Effective Date, and all unpaid fees, costs, expenses and other charges required to be paid or reimbursed, as applicable, pursuant to the Prepetition Mortgage Loan Agreement and the Propco Cash Collateral Order.

*Treatment*:  On the Effective Date, Holders of Allowed Class P.2 Claims shall receive, on account, and in full satisfaction, of those Claims their respective Pro Rata shares of:

(a)     the New Propco Transferred Assets, which will be delivered to New Propco or one or more Subsidiaries thereof, as the designee(s) of the Mortgage Lenders for purposes of distribution of such assets; and

(b)     their respective Pro Rata shares of (i) Propco Excess Effective Date Cash; and (ii) any recoveries received by Propco on account of any claims Propco has against SCI, including the Master Lease Rejection Damage Claim, all or a portion of which the Mortgage Lenders may direct to be delivered to New Propco or one or more subsidiaries thereof as the designees of the Mortgage Lenders for purposes of distribution of such assets.  If the Stalking Horse Bid is the Successful Bid, then the distributions resulting from the Master Lease Rejection Damage Claim will be limited to the transfer of the Master Lease Collateral to Propco and then, in turn, to the Holders of Class P.2 Claims.

*Voting*:  Class P.2 is Impaired, and Holders of Class P.2 Claims are entitled to vote to accept or reject this Plan.

Class P.3 – General Unsecured Claims against Propco

*Treatment*:  Holders of Class P.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class P.3 is Impaired.  The Holders of Class P.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class P.3 Claims are not entitled to vote to accept or reject this Plan.

Class P.4 – Intercompany Claims against Propco

> *Treatment*:  Holders of Class P.4 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class P.4 is Impaired.  The Holders of Class P.4 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class P.4 Claims are not entitled to vote to accept or reject this Plan.

Class P.5 – Equity Interests in Propco

> *Treatment*:  On the Effective Date, all Equity Interests in Propco shall be deemed to be surrendered to the lenders under the Mezz I Loan to FCP MezzCo Borrower I, LLC in satisfaction of its pledge of those Equity Interests.  Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished.  Holders of Class P.5 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under this Plan.

> *Voting*:  Class P.5 is Impaired, and Holders of Class P.5 Equity Interests are deemed to reject the Plan.

**3.**     **Claims and Equity Interests Against Mezzco Debtors**

**(a)**     **FCP MezzCo Parent, LLC**

Class MP.1 – General Unsecured Claims against FCP MezzCo Parent, LLC

> *Treatment*:  Holders of Class MP.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class MP.1 is Impaired.  The Holders of Class MP.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MP.1 Claims are not entitled to vote to accept or reject this Plan.

Class MP.2 – Intercompany Claims against FCP MezzCo Parent, LLC

> *Treatment*:  Holders of Class MP.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class MP.2 is Impaired.  The Holders of Class MP.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MP.2 Claims are not entitled to vote to accept or reject this Plan.

Class MP.3 – Equity Interests in FCP MezzCo Parent, LLC

*Treatment*:  On the Effective Date, all Class MP.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class MP.3 is Impaired, and the Holders of Class MP.3 Equity Interests are deemed to have rejected this Plan.

**(b)    FCP MezzCo Parent Sub, LLC**

Class MS.1 — General Unsecured Claims against FCP MezzCo Parent Sub, LLC

*Treatment*:  Holders of Class MS.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class MS.1 is Impaired.  The Holders of Class MS.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MS.1 Claims are not entitled to vote to accept or reject this Plan.

Class MS.2 — Intercompany Claims against FCP MezzCo Parent Sub, LLC

*Treatment*:  Holders of Class MS.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class MS.2 is Impaired.  The Holders of Class MS.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class MS.2 Claims are not entitled to vote to accept or reject this Plan.

Class MS.3 — Equity Interests In FCB MezzCo Parent Sub, LLC

*Treatment*:  On the Effective Date, all Class MS.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class MS.3 is Impaired, and the Holders of Class MS.3 Equity Interests are deemed to have rejected this Plan.

**(c)    FCP Mezzco Borrower VII, LLC**

Class M7.1 — General Unsecured Claims against FCP MezzCo Borrower VII, LLC

*Treatment*:  Holders of Class M7.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class M7.1 is Impaired. The Holders of Class M7.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M7.1 Claims are not entitled to vote to accept or reject this Plan.

Class M7.2 — Intercompany Claims against FCP MezzCo Borrower VII, LLC

*Treatment*: Holders of Class M7.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class M7.2 is Impaired. The Holders of Class M7.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M7.2 Claims are not entitled to vote to accept or reject this Plan.

Class M7.3 — Equity Interests In FCP MezzCo Borrower VII, LLC

*Treatment*: On the Effective Date, all Class M7.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*: Class M7.3 is Impaired, and the Holders of Class M7.3 Equity Interests are deemed to have rejected this Plan.

**(d)     FCP Mezzco Borrower VI, LLC**

Class M6.1 — General Unsecured Claims against FCP MezzCo Borrower VI, LLC

*Treatment*: Holders of Class M6.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class M6.1 is Impaired. The Holders of Class M6.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class M6.1 Claims are not entitled to vote to accept or reject this Plan.

Class M6.2 — Intercompany Claims against FCP MezzCo Borrower VI, LLC

*Treatment*: Holders of Class M6.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*: Class M6.2 is Impaired. The Holders of Class M6.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the

Bankruptcy Code. Consequently, the Holders of Class M6.2 Claims are not entitled to vote to accept or reject this Plan.

### Class M6.3 — Equity Interests In FCP MezzCo Borrower VI, LLC

*Treatment*:  On the Effective Date, all Class M6.3 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class M6.3 is Impaired, and the Holders of Class M6.3 Equity Interests are deemed to have rejected this Plan.

#### (e)    FCP Mezzco Borrower V, LLC

### Class M5.1 — General Unsecured Claims against FCP MezzCo Borrower V, LLC

*Treatment*:  Holders of Class M5.1 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M5.1 is Impaired.  The Holders of Class M5.1 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M5.1 Claims are not entitled to vote to accept or reject this Plan.

### Class M5.2 — Mezz IV Pledge Claims against FCP MezzCo Borrower V, LLC

*Treatment*:  Holders of Class M5.2 Claims will receive the Equity Interests in FCP Mezzco Borrower IV, LLC on account of their Claims under this Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*:  Class M5.2 is Impaired.  The Holders of Class M5.2 Claims are entitled to vote to accept or reject this Plan.

### Class M5.3 — Intercompany Claims against FCP MezzCo Borrower V, LLC

*Treatment*:  Holders of Class M5.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M5.3 is Impaired.  The Holders of Class M5.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M5.3 Claims are not entitled to vote to accept or reject this Plan.

Class M5.4 — Equity Interests In FCP MezzCo Borrower V, LLC

> *Treatment*:  On the Effective Date, all Class M5.4 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

> *Voting*:  Class M5.4 is Impaired, and the Holders of Class M5.4 Equity Interests are deemed to have rejected this Plan.

> **(f)      FCP Mezzco Borrower IV, LLC**

Class M4.1 — Mezz IV Loan Claims against FCP MezzCo Borrower IV, LLC

> *Treatment*:  Holders of Class M4.1 Claims will receive the Equity Interests in FCP Mezzco Borrower III, LLC on account of their Claims under this Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

> *Voting*:  Class M4.1 is Impaired.  The Holders of Class M4.1 Claims are entitled to vote to accept or reject this Plan.

Class M4.2 — General Unsecured Claims against FCP MezzCo Borrower IV, LLC

> *Treatment*:  Holders of Class M4.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class M4.2 is Impaired.  The Holders of Class M4.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M4.2 Claims are not entitled to vote to accept or reject this Plan.

Class M4.3 — Intercompany Claims against FCP MezzCo Borrower IV, LLC

> *Treatment*:  Holders of Class M4.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

> *Voting*:  Class M4.3 is Impaired.  The Holders of Class M4.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M4.3 Claims are not entitled to vote to accept or reject this Plan.

Class M4.4 — Equity Interests In FCP MezzCo Borrower IV, LLC

> *Treatment*:  On the Effective Date, all Class M4.4 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

*Voting*:  Class M4.4 is Impaired, and the Holders of Class M4.4 Equity Interests are deemed to have rejected this Plan.

**(g)    FCP Mezzco Borrower III, LLC**

Class M3.1 — Mezz III Loan Claims against FCP MezzCo Borrower III, LLC

*Treatment*:  Holders of Class M3.1 Claims shall receive the Equity Interests in FCP Mezzco Borrower II, LLC on account of their Claims under this Plan. Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*:  Class M3.1 is Impaired.  The Holders of Class M3.1 Claims are entitled to vote to accept or reject this Plan.

Class M3.2 — General Unsecured Claims against FCP MezzCo Borrower III, LLC

*Treatment*:  Holders of Class M3.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M3.2 is Impaired.  The Holders of Class M3.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M3.2 Claims are not entitled to vote to accept or reject this Plan.

Class M3.3 — Intercompany Claims against FCP MezzCo Borrower III, LLC

*Treatment*:  Holders of Class M3.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M3.3 is Impaired.  The Holders of Class M3.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M3.3 Claims are not entitled to vote to accept or reject this Plan.

Class M3.4 — Equity Interests In FCP MezzCo Borrower III, LLC

*Treatment*:  On the Effective Date, all Equity Interests in FCP MezzCo Borrower III, LLC shall be deemed to be surrendered to the Holders of Mezz IV Loan Claims in satisfaction of its pledge of those Equity Interests.  Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished. Holders of Class M3.4 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under this Plan.

*Voting*:  Class M3.4 is Impaired, and the Holders of Class M3.4 Equity Interests are deemed to have rejected this Plan.

### (h)    FCP Mezzco Borrower II, LLC

Class M2.1 — Mezz II Loan Claims against FCP MezzCo Borrower II, LLC

>   *Treatment*:  Holders of Class M2.1 Claims shall receive the Equity Interests in
>   FCP Mezzco Borrower I, LLC on account of their Claims under this Plan.
>   Immediately upon receipt, those Equity Interests shall be cancelled and
>   extinguished.

>   *Voting*:  Class M2.1 is Impaired.  The Holders of Class M2.1 Claims are entitled
>   to vote to accept or reject this Plan.

Class M2.2 — General Unsecured Claims against FCP MezzCo Borrower II, LLC

>   *Treatment*:  Holders of Class M2.2 Claims shall not receive or retain any property
>   on account of their Claims under this Plan.

>   *Voting*:  Class M2.2 is Impaired.  The Holders of Class M2.2 Claims will not
>   receive any distributions from any of the Debtors' Estates and therefore are
>   conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the
>   Bankruptcy Code.  Consequently, the Holders of Class M2.2 Claims are not
>   entitled to vote to accept or reject this Plan.

Class M2.3 — Intercompany Claims against FCP MezzCo Borrower II, LLC

>   *Treatment*:  Holders of Class M2.3 Claims shall not receive or retain any property
>   on account of their Claims under this Plan.

>   *Voting*:  Class M2.3 is Impaired.  The Holders of Class M2.3 Claims will not
>   receive any distributions from any of the Debtors' Estates and therefore are
>   conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the
>   Bankruptcy Code.  Consequently, the Holders of Class M2.3 Claims are not
>   entitled to vote to accept or reject this Plan.

Class M2.4 — Equity Interests In FCP MezzCo Borrower II, LLC

>   *Treatment*:  On the Effective Date, all Equity Interests in FCP MezzCo Borrower
>   II, LLC shall be deemed to be surrendered to the Holders of Mezz III Loan
>   Claims in satisfaction of its pledge of those Equity Interests.  Immediately upon
>   such surrender, those Equity Interests shall be cancelled and extinguished.
>   Holders of Class M2.4 Equity Interests shall not receive or retain any other
>   property from any Debtor on account of their Claims under this Plan.

>   *Voting*:  Class M2.4 is Impaired, and the Holders of Class M2.4 Equity Interests
>   are deemed to have rejected this Plan.

(i)    FCP Mezzco Borrower I, LLC

### Class M1.1 — Mezz I Loan Claims against FCP MezzCo Borrower I, LLC

*Treatment*:  Holders of Class M1.1 Claims shall receive the Equity Interests in Propco on account of their Claims under this Plan.  Immediately upon receipt, those Equity Interests shall be cancelled and extinguished.

*Voting*:  Class M1.1 is Impaired.  The Holders of Class M1.1 Claims are entitled to vote to accept or reject this Plan.

### Class M1.2 — General Unsecured Claims against FCP MezzCo Borrower I, LLC

*Treatment*:  Holders of Class M1.2 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M1.2 is Impaired.  The Holders of Class M1.2 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M1.2 Claims are not entitled to vote to accept or reject this Plan.

### Class M1.3 — Intercompany Claims against FCP MezzCo Borrower I, LLC

*Treatment*:  Holders of Class M1.3 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class M1.3 is Impaired.  The Holders of Class M1.3 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class M1.3 Claims are not entitled to vote to accept or reject this Plan.

### Class M1.4 — Equity Interests In FCP MezzCo Borrower I, LLC

*Treatment*:  On the Effective Date, all Equity Interests in FCP MezzCo Borrower I, LLC shall be deemed to be surrendered to the Holders of Mezz II Loan Claims in satisfaction of its pledge of those Equity Interests.  Immediately upon such surrender, those Equity Interests shall be cancelled and extinguished.  Holders of Class M1.4 Equity Interests shall not receive or retain any other property from any Debtor on account of their Claims under this Plan.

*Voting*:  Class M1.4 is Impaired, and the Holders of Class M1.4 Equity Interests are deemed to have rejected this Plan.

4.    **Claims and Equity Interests Against SCI**

Class S.1 – Other Secured Claims against SCI

*Classification*:  Each Class S.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class S.1A, Class S.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.  Any and all Claims arising under the Secured Cash Management Agreement shall be classified in this Class as an Other Secured Claim against SCI.

*Treatment*:  Unless otherwise agreed to by the Holders of any Class S.1 Claim, the legal, equitable and contractual rights of the Holders of Class S.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class S.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class S.1 Claim shall either (at the election of the Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class S.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:  Class S.1 is an Unimpaired Class, and the Holders of Class S.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class S.1 Claims are not entitled to vote to accept or reject this Plan.

Class S.2 – Prepetition Opco Secured Claims against SCI

*Allowance*:  On the Effective Date, and without limiting the Debtors' rights under the heading "Reserved Claims," the Prepetition Opco Secured Claims shall be deemed Allowed in the aggregate principal amount of not less than $882,015,849.96, plus all interest accrued and unpaid thereon as of the Effective Date, and all unpaid fees, costs, expenses and other charges, claims and obligations (including indemnification claims) required to be paid or reimbursed, as applicable, pursuant to the Prepetition Opco Credit Agreement and the Prepetition Opco Swap Agreement.  To the extent the value of the Collateral securing Prepetition Opco Secured Claims is less than the amount of those Claims, such deficiency shall be classified as a General Unsecured Claim in Class S.4.  Any Holder of a Class S.2 Claim that votes to accept the Plan, however, shall not be an Eligible Opco Unsecured Creditor and shall be deemed to have

elected to waive any and all rights to receive any distributions on account of its Class S.4 deficiency claim and therefore shall not receive any NPH Warrants and shall not have any rights to participate in the Propco Rights Offering, any Equity Raise or in any NPH Post-Effective Investment Rights on account of its Class S.4 deficiency claim.

*Treatment*:  On the Effective Date, Holders of Allowed Claims arising under the Prepetition Opco Credit Agreement and the Prepetition Opco Swap Agreement shall receive on account, and in full satisfaction, of those Claims and their Superpriority Claims (as defined in the Opco Cash Collateral Order) and any other Administrative Claims arising under the Opco Cash Collateral Order, their respective Pro Rata shares of:

(a)  If the Stalking Horse Bidder is the Successful Bidder (subject in all respects to the terms of the Stalking Horse APA):

> (1) an amount in cash equal to $317 million, plus the Gun Lake Reimbursement proceeds in excess of $20 million, less the Excess AMT Amount, if any, less the Super Priority Principal Amount if the Stalking Horse Bidder has made the Super Priority Notes Election pursuant to the terms of the Stalking Horse APA;

> (2) $430 million in aggregate principal amount of term loans less the Gun Lake Reimbursement proceeds in excess of $20 million, which term loans shall be subject to the terms of the New Opco Credit Agreement; provided that notwithstanding anything herein to the contrary, letters of credit issued and that remain undrawn under the Prepetition Opco Credit Agreement shall be replaced or backstopped by letters of credit issued under the New Opco Credit Agreement on the Effective Date.

> (3) $25 million in aggregate principal amount of term loans, which shall be subject to the terms of the New Opco PIK Credit Agreement; and

> (4) If the Stalking Horse has made the Super Priority Notes Election pursuant to the terms of the Stalking Horse APA, then Deutsche Bank Trust Company Americas and JP Morgan Chase Bank, N.A., in their capacities as Prepetition Opco Secured Lenders, have consented to receive, and shall receive on the Effective Date, the Super Priority Notes in the Super Priority Principal Amount in lieu of a like amount of Cash that they would otherwise receive as part of their Pro Rata Share of Cash under clause (1) above.

(b) If the Successful Bidder is a Person other than the Stalking Horse Bidder:

**[SUPPLEMENTAL DISCLOSURE TO COME FOLLOWING OPCO AUCTION]**

*Voting*: Class S.2 is Impaired, and Holders of Class S.2 Claims are entitled to vote to accept or reject this Plan. Any Holder of a Class S.2 Claim that votes to accept the Plan, however, shall not be an Eligible Opco Unsecured Creditor and shall be deemed to have elected to waive any and all rights to receive any distributions on account of its Class S.4 deficiency claim and therefore shall not receive any NPH Warrants and shall not have any rights to participate in the Propco Rights Offering, any Equity Raise or in any NPH Post-Effective Investment Rights on account of its Class S.4 deficiency claim.

*Reserved Claims*: Unless otherwise settled, SCI reserves the right to set off against distributions to be made under this Section III.B.4 to any Non-Funding Lender (as defined in the Opco Cash Collateral Order) any amounts recoverable by SCI on account of any Reserved Claims (as defined in the Opco Cash Collateral Order) against any such Non-Funding Lender.

## Class S.3 – Master Lease Rejection Damage Claim against SCI

*Treatment*: On the Effective Date, Propco, in its capacity as Holder of the Master Lease Rejection Damage Claim, shall receive from SCI and the Operating Subtenants a transfer of all of the Master Lease Collateral in full satisfaction of the secured portion of the Master Lease Rejection Damage Claim. If the Stalking Horse Bid is the Successful Bid, Propco will not receive any other distributions on account of its Allowed Class S.3 Claim. If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*: Class S.3 is Impaired and Holders of Class S.3 Claims are entitled to vote to accept or reject this Plan.

## Class S.4 – General Unsecured Claims against SCI

*Treatment*: On the Effective Date or promptly following any subsequent date on which an applicable claim becomes an Allowed Claim, Holders of Allowed General Unsecured Claims against SCI:

(a) That are Eligible Opco Unsecured Creditors shall receive their Allocated Pro Rata Share of NPH Warrants;

(b) That are Eligible Opco Unsecured Creditors and Accredited Investors shall receive their Allocated Pro Rata Share of NPH Investment Rights; and

(c) That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

*Voting*: Class S.4 is Impaired, and Holders of Class S.4 Claims are entitled to vote to accept or reject this Plan.  In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.4 Claims as of the Rights Offering Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering.  Any Holder that is an Accredited Investor that indicates an interest in so participating will then be given the opportunity to subscribe in the Propco Rights Offering, provided that it subscribes for the purchase of at least $250,000 of NPH Equity.  Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

Class S.5 – Senior Notes Claims against SCI

*Treatment*:  On the Effective Date, Holders of Allowed Senior Notes Claims against SCI:

(a)  That are Eligible Opco Unsecured Creditors shall receive their Allocated Pro Rata Share of NPH Warrants;

(b)  That are Eligible Opco Unsecured Creditors and Accredited Investors shall receive their Allocated Pro Rata Share of NPH Investment Rights; and

(c)  That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

In addition, the reasonable and documented fees and expenses of the Senior Notes Trustee (including reasonable legal fees and expenses) in an amount to be mutually agreed by the Debtors, FG, the Mortgage Lenders and the Senior Notes Trustee or as otherwise determined by the Bankruptcy Court, shall be paid upon confirmation of the Plan (with respect to amounts then accrued), and with respect to fees and expenses incurred between confirmation of the Plan and the Effective Date, shall be paid on the Effective Date subject in each case to Bankruptcy Court approval to be included in the Confirmation Order (it being understood that such "reasonable" fees and expenses shall not include any legal fees or expenses incurred by the Senior Notes Trustee after July 27, 2010 in opposing implementation of the terms of the NPH Term Sheet (including confirmation of the Plan) or engaging in litigation activity against any of the Debtors, FG or the Mortgage Lenders, or any of their respective affiliates).

*Voting*:  Class S.5 is Impaired, and Holders of Class S.5 Claims are entitled to vote to accept or reject this Plan.  In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.5 Claims as of the Rights Offering

Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering. Any Holder that is an Accredited Investor that indicates an interest in so participating will then be given the opportunity to subscribe in the Propco Rights Offering, provided that it subscribes for the purchase of at least $250,000 of NPH Equity. Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

Class S.6 – Subordinated Notes Claims against SCI

*Treatment*: On the Effective Date and subject to the immediately following proviso, Holders of Allowed Subordinated Notes Claims against SCI:

(a) That are Eligible Opco Unsecured Creditors shall be entitled to their Allocated Pro Rata Share of NPH Warrants;

(b) That are Eligible Opco Unsecured Creditors and Accredited Investors shall be entitled to their Allocated Pro Rata Share of NPH Investment Rights; and

(c) That become Qualified Eligible Opco Unsecured Creditors through participation in the Propco Rights Offering and the purchase of NPH Equity therein shall be entitled to exercise NPH Post-Effective Investment Rights in the manner, on the terms and subject to the conditions set forth in the NPH Term Sheet.

**PROVIDED, HOWEVER,** that the distributions described above to which the Holders of Subordinated Notes Claims otherwise may be entitled shall be subject, in each case, to any applicable contractual subordination arrangements or obligations, including any such arrangements or obligations with respect to (a) Holders of Allowed Class S.4 Claims that also hold Class S.2 Claims and that do not vote to accept the Plan on account of such Class S.2 Claims and (b) Holders of Allowed Senior Notes, except to the extent the parties otherwise agree and such agreement is reflected in the Plan and approved by the Bankruptcy Court. Absent such agreement, the application of any such arrangement or obligations may result in Holders of Class S.6 Claims receiving no recovery under the Plan. There can be no assurance that any such agreement will be reached that would result in Holders of Class S.6 Claims retaining a recovery under the Plan.

In addition, the reasonable and documented fees and expenses of the Subordinated Notes Trustee (including reasonable legal fees and expenses) in an amount to be mutually agreed by the Debtors, FG, the Mortgage Lenders and the Subordinated Notes Trustee or as otherwise determined by the Bankruptcy Court, shall be paid upon confirmation of the Plan (with respect to amounts then accrued), and with respect to fees and expenses incurred between confirmation of the Plan and the

Effective Date, shall be paid on the Effective Date subject in each case to Bankruptcy Court approval to be included in the Confirmation Order and such fees and expenses shall not be subject to the subordination or turn-over provisions of the Subordinated Notes Indentures (it being understood that such "reasonable" fees and expenses shall not include any legal fees or expenses incurred by the Subordinated Notes Trustee after July 27, 2010 in opposing implementation of the terms of the NPH Term Sheet (including confirmation of the Plan) or engaging in litigation activity against any of the Debtors, FG or the Mortgage Lenders, or any of their respective affiliates).

*Voting*:  Class S.6 is Impaired, and Holders of Class S.6 Claims are entitled to vote to accept or reject this Plan.  In addition to voting to accept or reject the Plan, the Ballots distributed to Holders of Class S.6 Claims as of the Rights Offering Record Date will provide such Holders that are Accredited Investors with the opportunity to indicate whether they are interested in participating in the Propco Rights Offering in the event the Plan results in NPH Investment Rights being distributed to such Holders.  Any Holder that is an Accredited Investor that indicates an interest in so participating may be given the opportunity to subscribe in the Propco Rights Offering in the event the Plan results in NPH Investment Rights being distributed to such Holders.  Any Holder that does not indicate that it is interested in participating in the Propco Rights Offering by a properly completed Ballot received by the Voting and Claims Agent prior to the Voting Deadline shall not be given an opportunity to subscribe to the Propco Rights Offering.

## Class S.7 – Mortgage Lender Claims against SCI

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class S.7 Claims will be deemed to have their Class S.7 Claims satisfied by the distributions to Holders of Class S.3 and Class P.2 Claims described above.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class 7 is Impaired and Holders of Class S.7 Claims are entitled to vote to accept or reject this Plan.

## Class S.8 – Intercompany Claims against SCI

*Treatment*:  Holders of Class S.8 Claims shall not receive or retain any property on account of their Claims under this Plan.

*Voting*:  Class S.8 is Impaired.  The Holders of Class S.8 Claims will not receive any distributions from any of the Debtors' Estates and therefore are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class S.8 Claims are not entitled to vote to accept or reject this Plan.

## Class S.9 – Equity Interests in SCI

*Treatment*:  On the Effective Date, all Class S.9 Equity Interests shall be deemed canceled and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise.    Upon the cancellation and extinguishment of the Class S.9 Equity Interests, the Parent Debtor Pledges shall be deemed to be cancelled and extinguished.

*Voting*:  Class S.9 is Impaired, and the Holders of Class S.9 Equity Interests are deemed to have rejected this Plan.

5.    **Claims and Equity Interests Against Other Opco Debtors**

    (a)    **Northern NV Acquisitions, LLC**

Class NA.1 – Other Secured Claims against Northern NV Acquisitions, LLC

*Classification*:  Each Class NA.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class NA.1A, Class NA.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:    The legal, equitable and contractual rights of the Holders of Class NA.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class NA.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class NA.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class NA.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:    Class NA.1 is an Unimpaired Class, and the Holders of Class NA.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class NA.1 Claims are not entitled to vote to accept or reject this Plan.

Class NA.2 – General Unsecured Claims against Northern NV Acquisitions, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class NA.2 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class NA.2 Claims are not expected to receive or retain any property under the Plan.  Class NA.2 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class NA.2 Claims are not entitled to vote to accept or reject this Plan.

Class NA.3 – Equity Interests in Northern NV Acquisitions, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class NA.3 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class NA.3 is Impaired.  Holders of Allowed Class NA.3 Equity Interests are entitled to vote to accept or reject the Plan.

**(b)    Reno Land Holdings, LLC**

Class RL.1 – Other Secured Claims against Reno Land Holdings, LLC

*Classification*:  Each Class RL.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class RL.1A, Class RL.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:    The legal, equitable and contractual rights of the Holders of Class RL.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class RL.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class RL.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class RL.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:    Class RL.1 is an Unimpaired Class, and the Holders of Class RL.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class RL.1 Claims are not entitled to vote to accept or reject this Plan.

Class RL.2 – General Unsecured Claims against Reno Land Holdings, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class RL.2 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class RL.2 Claims are not expected to receive or retain any property under the Plan.  Class RL.2 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class RL.2 Claims are not entitled to vote to accept or reject this Plan.

Class RL.3 – Equity Interests in Reno Land Holdings, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class RL.3 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class RL.3 is Impaired.  Holders of Allowed Class RL.3 Equity Interests are entitled to vote to accept or reject the Plan.

**(c)      River Central, LLC**

Class RC.1 – Other Secured Claims against River Central, LLC

*Classification*:  Each Class RC.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class RC.1A, Class RC.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:  The legal, equitable and contractual rights of the Holders of Class RC.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class RC.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class RC.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class RC.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:  Class RC.1 is an Unimpaired Class, and the Holders of Class RC.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class RC.1 Claims are not entitled to vote to accept or reject this Plan.

Class RC.2 – Prepetition Opco Credit Agreement Claims against River Central, LLC

*Treatment*:  Same treatment as that provided for Allowed Class S.2 Claim Holders under Section III.B.4 above.

*Voting*:  Class RC.2 is Impaired, and Holders of Class RC.2 Claims are entitled to vote to accept or reject this Plan.

Class RC.3 – General Unsecured Claims against River Central, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class RC.3 Claims will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class RC.3 Claims are not expected to receive or retain any property under the Plan.  Class RC.3 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class RC.3 Claims are not entitled to vote to accept or reject this Plan.

Class RC.4 – Equity Interests in River Central, LLC

*Treatment*: If the Stalking Horse Bid is the Successful Bid, the Holders of Class RC.4 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class RC.4 is Impaired.  Holders of Allowed Class RC.4 Equity Interests are entitled to vote to accept or reject the Plan.

**(d)    Tropicana Station, LLC**

Class TS.1 – Other Secured Claims against Tropicana Station, LLC

*Classification*:  Each Class TS.1 Claim is an Other Secured Claim.  This Class will be further divided into subclasses designated by letters of the alphabet (Class TS.1A, Class TS.1B and so on), so that each holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment*:   The legal, equitable and contractual rights of the Holders of Class TS.1 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Class TS.1 Claim becomes an Allowed Claim, each Holder of an Allowed Class TS.1 Claim shall either (at the election of the Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class TS.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting*:  Class TS.1 is an Unimpaired Class, and the Holders of Class TS.1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, the Holders of Class TS.1 Claims are not entitled to vote to accept or reject this Plan.

## Class TS.2 – Prepetition Opco Credit Agreement Claims against Tropicana Station, LLC

*Treatment*:  Same treatment as that provided for Allowed Class S.2 Claim Holders under Section III.B.4 above.

*Voting*:  Class TS.2 is Impaired, and Holders of Class TS.2 Claims are entitled to vote to accept or reject this Plan.

## Class TS.3 – General Unsecured Claims against Tropicana Station, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class TS.3 Claims will not receive any distributions from any of the Debtors' Estates on account of those Equity Interests.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Holders of Class TS.3 Claims are not expected to receive or retain any property under the Plan.  Class TS.3 therefore is deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g), and the Holders of Class TS.3 Claims are not entitled to vote to accept or reject this Plan.

## Class TS.4 – Equity Interests in Tropicana Station, LLC

*Treatment*:  If the Stalking Horse Bid is the Successful Bid, the Holders of Class TS.4 Equity Interests will not receive any distributions from any of the Debtors' Estates on account of those Claims.  If the Stalking Horse Bid is not the Successful Bid, this Plan will be modified as appropriate to incorporate the terms of the Successful Bid.

*Voting*:  Class TS.4 is Impaired.  Holders of Allowed Class TS.4 Equity Interests are entitled to vote to accept or reject the Plan.

### C.     Reservation of Rights Regarding Unimpaired Claims.

Except as otherwise provided herein, nothing under this Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### D.     Subordination Rights.

The classification and treatment of all Claims and Equity Interests under the Plan take into consideration all contractual, legal, and equitable subordination rights, whether arising under general principles of equitable subordination, sections 510(b) and 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any distribution made in accordance with the Plan.  As of the Effective Date and subject to full compliance with the respective treatment of the Senior Notes Claims and the Subordinated Notes Claims in accordance with this Plan, all contractual, legal, or equitable subordination rights that a holder of a Claim or Equity Interest may have with respect to any Distribution to be made in accordance with the Plan are discharged and terminated, and all actions related to the enforcement of such subordination rights are permanently enjoined. Subject to full compliance with the respective treatment of the Senior Notes Claims and the Subordinated Notes Claims in accordance with this Plan, distributions under the Plan are not subject to payment to any beneficiaries of such terminated subordination rights, or to levy, garnishment, attachment, or other legal process by any beneficiary of such terminated subordination rights.

### E.     Withholding Taxes.

The Debtors or the Plan Administrator, as the case may be, may deduct any applicable federal or state withholding taxes from any distributions made pursuant to the Plan.

### F.     Set Offs.

The Debtors may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever which the Debtors or the Estates may have against the holder of such Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such claim or counterclaim that they may have against such holder.

### G.     Timing of Payments and Distributions.

Except (i) as to Class S.2, (ii) as to Class P.2, (iii) as otherwise provided in Article V, and (iv) as otherwise required or provided for under the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement or the Landco Assets Transfer Agreement or to effectuate the transactions contemplated by the New Opco Purchase Agreement,

the New Propco Purchase Agreement, the New Propco Transfer Agreement or the Landco Assets Transfer Agreement, any payments or distributions to be made under the Plan shall be deemed to be timely made if made within twenty (20) days after the date specified in the Plan, or as soon thereafter as reasonably practicable.  Whenever any distribution to be made under the Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.  The value of any distributions received by Holders of Claims in satisfaction of interest-bearing obligations shall be allocated first to the full satisfaction of the principal of such interest-bearing obligations and second in satisfaction of any accrued and unpaid interest.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

### A.    *Voting Classes*

Each Holder of an Allowed Claim or Allowed Equity Interest as of the applicable Voting Record Date in each of the Voting Classes shall be entitled to vote to accept or reject this Plan.

### B.    *Acceptance by Impaired Classes of Claims and Equity Interests*

Pursuant to Section 1126(c) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept this Plan.  Pursuant to Section 1126(d) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, a Class of Equity Interests has accepted this Plan if at least two-thirds in amount of the Allowed Equity Interests in such Class actually voting have voted to accept this Plan.

### C.    *Presumed Acceptance of Plan*

Classes that are Unimpaired under this Plan are presumed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code.

### D.    *Presumed Rejection of Plan*

Classes FHI.2, FHI.3, FHI.4, FHI.5, FHI.6, FP.2, FP.3, FP.4, FP.5, FP.6, VC.2, VC.3, VC.4, VC.5, VC.6, P.3, P.4, P.5, MP.1, MP.2, MP.3, MS.1, MS.2, MS.3, M7.1, M7.2, M7.3, M6.1, M6.2, M6.3, M5.1, M5.3, M5.4, M4.2, M4.3, M4.4, M3.2, M3.3, M2.2, M2.3, M2.4, M1.2, M1.3, M1.4, S.8, S.9, NA.2, NA.3, RL.2, RL.3, RC.3, RC.4, TS.3 and TS.4 are Impaired and shall receive no distribution under this Plan on account of their Claims and are therefore presumed to have rejected this Plan pursuant to Section 1126(g) of the Bankruptcy Code.

### E.    *Non-Consensual Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

With respect to any Class that does not accept this Plan pursuant to Section 1126 of the Bankruptcy Code, the Debtors will request confirmation of this Plan under Section 1129(b) of

the Bankruptcy Code.  The Debtors reserve the right to modify this Plan in order to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

<div align="center">

**ARTICLE V.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

</div>

*A.*      *Transfers Under the Plan, Generally.*

As described in detail below, implementation of the Plan will include, among other things, numerous conveyances, assignments, transfers and deliveries among various parties.  All conveyances, assignments, transfers and deliveries to any transferee pursuant to the transactions described under Section V.B.3, Section V.B.4, Section V.B.5, Section V.B.7 and Section V.B.8 below shall be made, and such assets shall vest in the applicable transferee, free and clear of all Liens, Claims, Equity Interests, and any other interests asserted by the Debtors, any creditors of the Debtors, or other Persons (including, without limitation, any Liens, Claims, Equity Interests, or other interests, whether presently known or unknown, in any way relating to or arising from the operations of the Debtors prior to the Effective Date), in accordance with and as contemplated by, among others, sections 105(a), 363, 1123 and 1129 of the Bankruptcy Code, save and excepting any specific obligations expressly undertaken by such transferee or its designee in the Plan or in any document to which such transferee is a party (including the New Opco Purchase Agreement) and which is necessary for Consummation of the Plan.  No such transferee or any of its Subsidiaries, creditors or equity holders shall be or be deemed to be a successor of any of the Debtors or any of the Non-Debtor Affiliates by reason of any theory of law or equity and shall not have any successor or transferee liability of any kind, nature or character, including liabilities arising or resulting from or relating to the transactions contemplated hereby; provided that the Confirmation Order shall not provide that the sale of any property that constitutes New Opco Acquired Assets is free and clear of any environmental liability imposed by a Governmental Unit (as defined in the Stalking Horse APA) arising from or related to such property to the extent that the Bankruptcy Court determines that such property cannot be sold to the Successful Bidder free and clear of such liability pursuant to the Bankruptcy Code.

The transactions consummated pursuant to the Plan, the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement and the Landco Assets Transfer Agreement shall not constitute a de facto merger, or a merger, as between any Debtors or any of the Non-Debtor Affiliates and any transferee pursuant to the Plan, the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement and the Landco Assets Transfer Agreement under any applicable law (including Nevada law).

Except for any specific obligations expressly undertaken by such transferee or its designee(s) in the Plan or in any agreement or other document to which such transferee or designee is a party and which is entered into in connection with the Consummation of the Plan, none of such transferee, Holdco, Voteco, New Propco or its Subsidiaries, New Opco or its Subsidiaries, the Mortgage Lenders, the Landco Lenders, the Successful Bidder, any of the Subsidiaries of the Successful Bidder or any of their respective designees or affiliates shall have

any liability, obligation or responsibility with respect to any Claims against or Equity Interests in any of the Debtors or any of the Non-Debtor Affiliates, including without limitation any amounts owed by the Debtors to holders of Claims or Equity Interests or any obligations of the Debtors pursuant to the Plan.

After the Effective Date, each such transferee and its designated subsidiaries will own the assets conveyed to it and operate its business and manage its affairs free of any restrictions contained in the Bankruptcy Code.  The terms, provisions and conditions of the agreements governing the transactions described in Section V.B.3, Section V.B.4, Section V.B.5, Section V.B.7 and Section V.B.8 below shall govern the obligations of the Debtors and the other parties thereto and to the extent inconsistent with the Plan, such agreements shall control.

Without further approvals or notice, the Debtors, the Administrative Agent and any other applicable Person shall have the power and authority to terminate and discharge (and to consent to terminate and discharge) Liens on any assets to effectuate the terms hereof and the terms of the New Opco Purchase Agreement, the New Propco Transfer Agreement, the Landco Assets Transfer Agreement and the New Propco Purchase Agreement on the Effective Date.

**B.    *Plan Transactions.***

The following transactions shall be consummated as specified below in the order specified below or in such other order as is set forth in the Plan Supplement:

**1.    Formation of New Propco Entities.**

On or prior to the Effective Date, Holdco, Voteco, New Propco and the following direct or indirect Subsidiaries shall be formed for the purpose of acquiring all of New Propco Acquired Assets and all of the equity interests in CV Propco, LLC as owner of the Landco Assets.  New Boulder LLC, New Red Rock LLC, New Palace, LLC, New Sunset, LLC, New Tropicana, LLC, New Cactus Lessee, LLC and New Landco Holdco, LLC.  (The legal names of these entities may differ from the names specified herein.)

**2.    Subsidiary Bankruptcy Filings**

To the extent required under the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement, the Landco Assets Transfer Agreement or otherwise necessary to Consummate the Plan (including consummation of the transfers contemplated by Article V.A herein) and the sale of the New Opco Acquired Assets or the sale or transfer of the New Propco Acquired Assets hereunder, following the entry of the Confirmation Order, certain or all of the Non-Debtor Affiliates that are direct or indirect subsidiaries of SCI, may commence voluntary chapter 11 cases in the Bankruptcy Court for the purpose of effectuating the sale or transfer of all or a portion of their assets pursuant to and in accordance with the New Opco Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement or the Landco Assets Transfer Agreement, as the case may be.

**3.    Transfer of Master Lease Collateral to Propco.**

On the Effective Date, pursuant to the New Propco Transfer Agreement, SCI and any Non-Debtor Affiliates (including the Operating Subtenants) that own assets that are included in the Master Lease Collateral shall convey, assign, transfer and deliver all such assets to Propco in satisfaction of Propco's lien on such assets under the Master Lease and License and in partial satisfaction of the Master Lease Rejection Damage Claim.

4.      **Landco Assets.**

On or prior to the Effective Date, pursuant to the Landco Assets Transfer Agreement and the Second Amended MLCA: (a) all of the equity interests in CV Propco, LLC shall be conveyed, assigned, transferred and delivered by CV Holdco, LLC to the designee of the Landco Lenders, subject to the New Land Loan Agreement; (b) New Landco Holdco shall contribute all of the equity of New Tropicana, LLC and New Cactus Lessee, LLC to CV PropCo, LLC; and (c) all of the Landco Assets not then owned by CV Propco, LLC and not otherwise designated as excluded assets under the Landco Assets Transfer Agreement, shall be conveyed, assigned, transferred and delivered to CV Propco, LLC or to a subsidiary of New Propco, as determined by New Propco.

5.      **Transfer of New Propco Transferred Assets from Propco to New Propco Entities.**

On the Effective Date, in accordance with the Second Amended MLCA and pursuant to the New Propco Transfer Agreement and in implementation of the distributions to the Mortgage Lenders provided for in Section III.B.2 above on account of their Allowed Class P.2 Claims, all of the New Propco Transferred Assets shall be conveyed, assigned, transferred and delivered to New Propco or any of its designated Subsidiaries, each in their capacities as designee of the Mortgage Lenders.

6.      **Mezzco Debtors.**

On the Effective Date, the distributions to the holders of Class M5.2 Claims, Class M4.1 Claims, Class M3.1 Claims, Class M2.1 Claims and Class M1.1 Claims provided for in Section III.B.3(e) through Section III.B.3(h) shall be made, and the Equity Interests so distributed shall be cancelled and extinguished as provided for in such Sections.

7.      **Transfer of New Propco Purchased Assets from Opco Entities to New Propco Entities.**

On the Effective Date and subject to the receipt by the Holders of the Prepetition Opco Secured Claims of the consideration set forth in Section III.B.4, pursuant to the Second Amended MLCA and the New Opco Purchase Agreement (if the Stalking Horse Bidder is the Successful Bidder) or the New Propco Purchase Agreement (if the Stalking Horse Bidder is not the Successful Bidder), for good and valuable consideration set forth in the Second Amended MLCA, all of the New Propco Purchased Assets shall be sold, conveyed, assigned, transferred and delivered to New Propco or its applicable designated Subsidiaries.

8.      **Transfer of New Opco Acquired Assets to New Opco.**

On the Effective Date and subject to the Holders of the Prepetition Opco Secured Claims receipt of the consideration set forth in Section III.B.4, for good and valuable consideration, all of the New Opco Acquired Assets shall be sold, conveyed, assigned, transferred and delivered to the Successful Bidder or its designee(s) pursuant to and in accordance with the New Opco Purchase Agreement.

**9.      License of IP Assets to New Propco.**

If the Successful Bidder is any Person or Persons other than the Stalking Horse Bidder, to the extent required by the Second Amended MLCA, on the Effective Date the Successful Bidder shall license the IP Assets to New Propco and its designated subsidiaries pursuant to the IP License Agreement.

**10.      New Propco Transactions in Connection with Receipt of New Propco Acquired Assets.**

In connection with Consummation of the Plan and New Propco's receipt of the New Propco Acquired Assets, Voteco, Holdco and New Propco will enter into or cause to be entered into a number of agreements and transactions designed to allow New Propco to operate the New Propco Acquired Assets as a going concern business.  Those agreements and transactions will include, without limitation, the following:

      a.      The New Propco LLCA.

      b.      The New FG Management Agreement.

      c.      The New Propco Credit Agreement.

      d.      The New Land Loan Agreement.

      e.      The IP License Agreement.

      f.      The New Propco Non-Compete Agreement.

**11.      New Propco Employment Related Matters**

Upon or promptly following the Effective Date of the Plan, New Propco contemplates taking steps to mitigate the impact on SCI employees of the restructuring process. Specifically, New Propco plans to make offers of employment to SCI's hourly employees at the Propco Properties and, if the Stalking Horse Bidder is the Successful Bidder, to SCI's hourly employees at all other SCI casinos:  (a) at not less than the same hourly wage rate and position in effect for the respective employee immediately prior to the Effective Date; (b) with substantially similar benefits as the current Section 401(k) plan of SCI; and (c) with health and welfare benefits that in the aggregate are substantially similar to those provided by SCI under its broad-based employee benefit plans in effect immediately prior to the Effective Date.

**12.      The Propco Rights Offering**

The NPH Term Sheet sets forth a detailed summary of the terms and conditions of the Propco Rights Offering and any additional Equity Raises (as defined in the NPH Term Sheet) that may occur. Taken together, the Propco Rights Offering and the Upsizing Committed Amount (as defined in the NPH Term Sheet) are intended to provide New Propco Holdco with up to $100 million in equity investments, all on the terms of and subject to the conditions of the NPH Term Sheet. As set forth in the NPH Term Sheet, the net proceeds from the Propco Rights Offering shall be contributed by New Propco Holdco as equity to New Propco and utilized by New Propco for general corporate purposes, including, without limitation, to reduce debt or for one or more Acquisitions (as defined in the NPH Term Sheet). Pursuant to the terms and subject to the conditions of the Propco Commitment: (a) the Put Parties (so long as they hold at least 40% in aggregate principal amount of the Senior Notes) shall have the right to purchase at least one-half of the NPH Equity available in the Propco Rights Offering (with such portion of the NPH Equity to be allocated among the Put Parties as they mutually agree), (b) to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors, or the Put Parties (pursuant to the proviso to the definition of "*Allocated Pro Rata Share of NPH Investment Rights*") in accordance with the terms and conditions of the Propco Rights Offering, the Put Parties shall purchase $35.3 million of NPH Equity, and (c) in connection with any Equity Raises (as defined in the NPH Term Sheet) consummated during the Upsizing Commitment Period (as defined in the NPH Term Sheet), to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors, or the Put Parties (pursuant to the proviso to the definition of "*Allocated Pro Rata Share of NPH Investment Rights*") in accordance with the terms and conditions of the NPH Term Sheet, the Put Parties shall purchase such unpurchased portion of each such Equity Raise up to a maximum of $100 million (*i.e.*, up to a maximum of $64.7 million in addition to the $35.3 million commitment specified in clause (b)) of NPH Equity. In consideration for their agreement to the Propco Commitment, the Put Parties shall receive the Put Premium. The payment of the Put Premium to the Put Parties on the Effective Date shall be effected in such manner (such as a deduction from the purchase price otherwise payable by the Put Parties for the NPH Equity being purchased by them through Blockerco) as the Debtors, FG, the Mortgage Lenders and the Put Parties shall reasonably determine.

## 13. New Opco Transactions in Connection with Receipt of New Opco Acquired Assets.

In connection with Consummation of the Plan and New Opco's receipt of the New Opco Acquired Assets, New Opco will enter into or cause to be entered into a number of agreements and transactions designed to allow New Opco to operate the New Opco Acquired Assets as a going concern business. Those agreements and transactions will include, without limitation, the following:

      a.      The New Opco Credit Agreement.

      b.      The New Opco PIK Credit Agreement.

      c.      The New FG Management Agreement.

      d.      The IP License Agreement.

14.    **The New Opco Credit Agreement and the New Opco PIK Credit Agreement**

The collateral agent under the New Opco Credit Agreement and the New Opco PIK Credit Agreement shall have valid, binding and enforceable liens on the collateral specified in the relevant agreements executed by New Opco and its Subsidiaries in connection with the New Opco Credit Agreement and the New Opco PIK Credit Agreement. The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New Opco Credit Agreement and the New Opco PIK Credit Agreement are granted in good faith as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the definitive documentation executed in connection therewith. The New Opco Credit Agreement and the New Opco PIK Credit Agreement together with all notes, documents or agreements delivered in connection therewith shall be valid, binding and enforceable in accordance with their terms on and after the Effective Date (it being understood and agreed that each Holder of an Allowed S.2 Claim shall be deemed a party to the New OpCo Credit Agreement and the New OpCo PIK Credit Agreement and bound by the terms thereof without the requirement of any such Holder to execute a signature page thereto). Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the New Opco Credit Agreement and the New Opco PIK Credit Agreement or any rights or remedies related thereto.

C.    *Second Amended MLCA*

If the Stalking Horse Bidder is the Successful Bidder, and so long as the Stalking Horse APA has not terminated, then, notwithstanding anything to the contrary in the Second Amended MLCA, the entry of the Confirmation Order will not automatically trigger a Transition Event and the obligation of SCI and its Subsidiaries to provide transition services thereunder shall be suspended (other than such services as are required during the "Deferral Period" (as defined therein)) and the "Deferral Period" shall be deemed to continue for all purposes under the Second Amended MLCA, including with respect to the payment of Reduced Rent, and the Initial Transition Services Period shall not be deemed to commence, until the earlier of (i) the date on which a Transition Event (other than due solely to the occurrence of the Confirmation Date) occurs or (ii) the date designated in writing by the Mortgage Lenders and acceptable to the Required Consenting Lenders as the date on which transition services should commence. Except as modified above, the Second Amended MLCA will remain in full force and effect and shall be enforceable pursuant to its terms.

D.    *General Settlement of Claims*

Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan.

E.    *Release of Liens, Claims and Equity Interests*

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan (including the New Opco Credit Agreement, the New Opco PIK Credit Agreement, the New Propco Credit Agreement, the New Land Loan Agreement and their respective related documents), on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or interests shall, pursuant to Section 1142 of the Bankruptcy Code, promptly execute and deliver such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the applicable Debtor.

*F.*      *Corporate Action*

Each of the Debtors, as applicable, may, and may cause any of its Non-Debtor Affiliates to, take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors (except for those expressly required pursuant hereto).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors or members of any Debtor (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or partners of such Debtor, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of any Debtor and any legal or corporate action required by any Debtor in connection with this Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor, or by any other Person. On the Effective Date, the appropriate officers of each Debtor are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

*G.*      *Cancellation of Notes, Certificates and Instruments Without Further Action*

Except as otherwise provided in this Plan or the Confirmation Order or for the purpose of evidencing a right to distribution hereunder or the exercise of the right of the Senior Notes Trustee or the Subordinated Notes Trustee, as applicable to assert any rights or charging liens for fees, costs and expenses in accordance with the terms of the applicable Indenture, on the Effective Date, all notes, stock, instruments, certificates, agreements and other documents evidencing Claims and Equity Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

On the Effective Date, the Senior Notes Indentures and the Subordinated Notes Indentures each shall be deemed to be canceled, as permitted by Section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released, terminated, extinguished and discharged; provided, however, that the Senior Notes Indentures and the Subordinated Notes Indentures shall remain in effect for the sole purpose of facilitating distributions by the respective trustee to the holders thereunder of any amounts received on account of Allowed Claims held by the applicable trustee, and to permit such trustee to perform such other necessary administrative tasks related thereto and to exercise any right under the applicable Indenture to assert any rights or charging liens for fees, costs and expenses.

**H.    *Dismissal of Officers and Directors, Dissolution of Debtors and Dissolution of the Boards of Directors of Each Debtor***

Upon the Effective Date, (i) the existing boards of directors of each Debtor shall be dissolved without any further action required on the part of any such Debtors, the shareholders of any such Debtor, or the officers and directors of such Debtors, (ii) any and all remaining officers of each shall be dismissed without any further action required on the part of any such Debtors, the shareholders of such Debtors, or the officers and directors of such Debtors and (iii) each Debtor shall be deemed dissolved without any further action required on the part of any such Debtors, the shareholders of such Debtors, or the officers and directors of such Debtors.

## ARTICLE VI.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.    *Assumption of Executory Contracts and Unexpired Leases***

1.    On the Effective Date, all Executory Contracts and Unexpired Leases identified on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed will be deemed assumed by the applicable Debtor in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.

2.    On the Effective Date, any Executory Contract or Unexpired Lease will be deemed rejected if such Executory Contract or Unexpired Lease:

(i)    Is not listed on the Schedule of Executory Contracts and Unexpired Leases To Be Assumed;

(ii)     has been rejected by order of the Bankruptcy Court;

(iii)    is the subject of a motion to reject pending on the Effective Date;

(iv)    is identified in the Plan Supplement as a contract or lease to be rejected or in the New Opco Purchase Agreement as an Excluded Asset;

(v)     is rejected pursuant to the terms of this Plan;

(vi)    expired by its own terms on or prior to the Effective Date; or

(vii)   has not been assumed or is not the subject of a motion to assume pending on the Effective Date.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

## B.     *Assignment of Executory Contracts or Unexpired Leases*

Unless and as otherwise provided by a prior order to the Bankruptcy Court, in the event any Debtor proposes to assign an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.  Any applicable cure amounts shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Subject to the foregoing, any Executory Contract or Unexpired Lease that constitutes a New Propco Acquired Asset shall be assigned to New Propco or its designated Subsidiary in accordance with the terms of this Plan and pursuant to the New Propco Purchase Agreement or New Propco Transfer Agreement, as applicable, and any Executory Contract of Unexpired Lease that is to be assigned to New Opco or its designated Subsidiary in accordance with the terms of the New Opco Purchase Agreement shall be so assigned in accordance with the terms of this Plan.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by

the Debtors at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Debtors, with the consent of New Propco and/or the Successful Bidder, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

### C.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to this Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Estates or any of their respective property, and such Claim shall be forever discharged. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F hereof.

### D.    Director and Officer Insurance Policies

The Debtors shall obtain (at market-based premiums) prior to the Effective Date insurance policies providing substantially similar coverage as the existing D&O Liability Insurance Policies coverage for claims (as defined in such policies) made for any wrongful acts (as defined in such policies) or other covered conduct, acts or omissions occurring prior to the Effective Date (also referred to as "tail coverage") with coverage (in scope and substance) and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the date of entry of the Confirmation Order, which insurance policies shall be reasonably acceptable to the Mortgage Lenders (the *"Tail Coverage Insurance Policies"*). The costs of the Tail Coverage Insurance Policies shall be allocated among the Debtors in a manner satisfactory to the Required Consenting Lenders and the Mortgage Lenders, or as otherwise ordered by the Bankruptcy Court after notice and a hearing, such that each Debtor bears the expense of its own coverage.

# ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    *Distributions for Claims and Equity Interests Allowed as of the Effective Date*

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, distributions to be made on account of Claims and Equity Interests that are Allowed Claims or Equity Interests as of the Effective Date shall be made on the initial distribution date or as soon thereafter as is practicable.  Other than with respect to Classes P.2 and S.2, any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Disputed Claims and Equity Interests that first become Allowed Claims and Equity Interests after the Effective Date shall be made pursuant to Article VIII hereof.

### B.    *Post-Petition Interest on Claims*

Unless otherwise specifically provided for in this Plan or the Confirmation Order or any other Final Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### C.    *Distributions under the Plan*

Other than as specifically set forth below or in the New Propco Purchase Agreement, the New Propco Transfer Agreement, the New Opco Purchase Agreement or the Landco Assets Transfer Agreement, the Plan Administrator or Distribution Agent shall make all distributions required to be distributed under this Plan; provided, however, that the Plan Administrator or Distribution Agent may employ or contract with other entities to assist in or make the distributions required by this Plan; provided, further, that SCI or the Successful Bidder shall make all cash distributions to Holders of Allowed Claims in Class S.2 and Propco shall make all cash distributions to Holders of Allowed Claims in Class P.2.  Neither New Propco nor New Opco shall have any obligation to fund the expenses incurred by the Plan Administrator from and after the Effective Date.  Distributions made on account of Allowed Senior Notes Claims shall be deemed complete when made to the Senior Notes Trustee for distribution pursuant to the terms of the Senior Notes Indentures.  Distributions on account of Allowed Subordinated Notes Claims shall be deemed complete when made to the Senior Notes Trustee until such time as the Allowed Senior Notes Claims are paid in full to effectuate the subordination provisions as provided for in the Subordinated Notes Indentures.  Thereafter, distributions made on account of Allowed Subordinated Notes Claims shall be deemed complete when made to the Subordinated Notes Trustee.

### D.    *Delivery and Distributions and Undeliverable or Unclaimed Distributions*

### 1.    Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed.  Accordingly, the Plan Administrator and Distribution Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Plan Administrator or any other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date.

### 2.    Delivery of Distributions in General

Except as otherwise provided herein, the Plan Administrator or Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims and Equity Interests, or in case of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' books and records as of the date of any such distribution; provided, however, that if a Holder of an Allowed Claim or Equity Interest Files a Proof of Claim, the address for such Holder shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

### 3.    Minimum Distributions

Notwithstanding anything herein to the contrary, no Debtor, Plan Administrator or Distribution Agent shall be required to make distributions or payments of less than Five Hundred ($500.00) Dollars (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fraction of a dollar under this Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### 4.    Undeliverable Distributions

#### (a)    Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim or Equity Interest is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Subsequent Distribution Date.  Undeliverable distributions shall remain in the possession of the Distribution Agent, subject to Article VII.D.4(b) hereof, until such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

**(b)      Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim or Equity Interest (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors, their Estates or their property.  In such cases, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions shall become the property of the Estates free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Nothing contained in this Plan shall require the Debtors or any Distribution Agent to attempt to locate any Holder of an Allowed Claim or Equity Interest.

**(c)      Failure to Present Checks**

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim or Equity Interest with respect to which such check originally was issued.  Any Holder of an Allowed Claim or Equity Interest holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred eighty (180) days after the date of mailing or other delivery of such check shall have its Claim or Equity Interest for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim or Equity Interest against the Debtors, the Debtors' Estates or their property.

**E.      *Compliance with Tax Requirements/Allocations***

In connection with this Plan and all distributions hereunder, the Debtors and any Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Debtors or any Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of this Plan to the contrary, each Holder of an Allowed Claim or Equity Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution.  Any Cash and Documents and/or other consideration or property to be distributed pursuant to this Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Article VII.D.4 of this Plan.  To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### F.    *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Debtors, by (a) checks drawn on, or (b) wire transfer from, a domestic bank selected by the Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### G.    *Timing and Calculation of Amounts to Be Distributed*

On the Initial Distribution Date (or if a Claim or Equity Interest is not an Allowed Claim or Equity Interest on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Equity Interests in the applicable Class.  If and to the extent that there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII hereof.  Except as otherwise provided herein, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### H.    *Setoffs and Recoupments*

Without altering or limiting any of the rights and remedies of the Debtors or any other party in interest under Section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors may hold against the Holder of any such Allowed Claim.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors may, pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off or exercise recoupment against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff or exercise recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claims, Causes of Action or Litigation Claims.

### I.    *Preservation of Subordination Rights*

Except as otherwise provided herein, all subordination rights and claims relating to the subordination by the Debtors or either Plan Administrator of any Allowed Claim shall remain valid, enforceable and unimpaired in accordance with Section 510 of the Bankruptcy Code or otherwise.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND EQUITY INTERESTS

**A.**    *Authority to Prosecute Objections to Disputed Claims*

Upon the Effective Date, the Plan Administrator shall be responsible for pursuing any objection to the allowance of all Disputed Claims and Equity Interests with respect to which an objection has been filed with the Bankruptcy Court and notice thereof has been given to the Holder of the Disputed Claim.  Prior to the Effective Date, the Debtors shall have the right to object to the allowance of Claims with respect to which they dispute liability or allowance in whole or in part.  The Plan Administrator shall have the authority to file, settle, compromise or withdraw any objections to Disputed Claims against Debtors without approval of the Bankruptcy Court.  However, the Bankruptcy Court may approve any compromises and settlements in accordance with Bankruptcy Rule 9019.

**B.**    *Resolution of Disputed Claims and Equity Interests*

**1.**    **Allowance of Claims and Equity Interests**

After the Effective Date, the Plan Administrator shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.

**2.**    **Prosecution of Objections to Claims and Equity Interests**

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Plan Administrator, shall have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims or Equity Interests are in an Unimpaired Class or otherwise; provided, however, this provision shall not apply to Professional Fee Claims; and provided further that (a) the Successful Bidder may object to the allowance of any Administrative Claim against SCI or any of the Other Opco Debtors, and (b) the Mortgage Lenders may object to the allowance of any Administrative Claim against Propco or any of the Mezzco Debtors.  Subject to the foregoing, from and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim or Equity Interest without any further notice to or action, order or approval of the Bankruptcy Court.  The Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.      **Estimation**

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Plan Administrator may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned Claim or Equity Interests and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claim or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

4.      **Deadline to File Objections to Claims and Equity Interests**

Any objections to Claims and Equity Interests shall be Filed no later than the Claims Objection Bar Date.  Moreover, notwithstanding the expiration of the Claims Objection Bar Date, the Debtors, and, after the Effective Date, the Plan Administrator, shall continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim or Equity Interest until such Disputed Claim or Equity Interest is Allowed.

C.      *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim or Equity Interest unless and until all objections to such Disputed Claim or Equity Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or Equity Interest has become an Allowed Claim or Equity Interest.

D.      *Reserves for Disputed Claims*

To the extent necessary or appropriate for Classes entitled to receive distributions hereunder, each Debtor may separately maintain a reserve for any distributable amounts required to be set aside on account of Disputed Claims and shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein as, when and if such Disputed Claims are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date, provided that no interest shall be distributable or accrue with respect thereto.  No such reserves shall be necessary for any Classes that will not receive any distributions under the Plan.

E.      *Distributions on Account of Disputed Claims and Equity Interests Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims and Equity Interests*

On each subsequent distribution date (or such earlier date as determined by the Debtors or the Plan Administrator in their sole discretion, as applicable), the Debtors, the Plan Administrator or another applicable Distribution Agent will make distributions (a) on account of any Disputed Claim or Equity Interest that has become an Allowed Claim or Equity Interest during the preceding ninety (90) days, and (b) on account of previously Allowed Claims or Equity Interests of property that would have been distributed to the Holders of such Claim or Equity Interest on the dates distributions previously were made to Holders of Allowed Claims or Equity Interests in such Class had the Disputed Claims or Equity Interests that have become Allowed Claims or Equity Interests or disallowed by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates. Such distributions will be made pursuant to the applicable provisions of Article III of this Plan.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION, EFFECTIVE DATE AND CONSUMMATION OF THE PLAN

*A.*     *Conditions Precedent to Confirmation*

Confirmation of this Plan shall be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C hereof of the following:

1.     The Bankruptcy Court shall have entered a Final Order in form and in substance satisfactory to the Debtors, the Required Consenting Lenders and the Mortgage Lenders approving the Disclosure Statement with respect to this Plan as containing adequate information within the meaning of Section 1125 of the Bankruptcy Code.

2.     This Plan and all schedules, documents, supplements and exhibits relating to this Plan shall have been filed in form and substance acceptable to the Debtors.

3.     The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders and the Mortgage Lenders.

*B.*     *Conditions Precedent to the Effective Date and Consummation of the Plan*

Consummation of this Plan shall be conditioned upon, and the Effective Date shall not occur until, the satisfaction or waiver pursuant to the provisions of Article IX.C hereof of the following:

1.     The Confirmation Order shall have been entered (and in the event that the Stalking Horse Bidder is not the Successful Bidder, such order shall have become a Final Order in respect of Propco and New Propco) in a form and in substance satisfactory to the Debtors, the Successful Bidder, the Mortgage Lenders, FG and the Required Consenting Lenders and no stay of the Confirmation Order shall have been entered. The Confirmation Order shall provide that, among other things, the Debtors or the Plan Administrator, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases,

leases, indentures and other agreements or documents created in connection with or described in this Plan.

2.       The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order and, in the event the Stalking Horse Bidder is not the Successful Bidder, such order(s) shall have become Final Order(s) in respect of Propco and New Propco) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in this Plan and the Plan Supplement.

3.       All documents and agreements necessary to implement this Plan, including, without limitation, all documents included in the Plan Supplement, in each case in form and substance acceptable to the Debtors shall have (a) been tendered for delivery, and (b) been effected by executed by, or otherwise deemed binding upon, all Entities party thereto.   All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

4.       All actions necessary to implement the Plan shall have been effected, including, without limitation, all actions specified in and in furtherance of the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the Committee Plan Support Stipulation, the Put Parties Support Agreement and the New Opco Purchase Agreement.

5.       The Committee Plan Support Stipulation has not been terminated as of the Effective Date.

6.       Each of the Put Parties Support Agreement and the Propco Commitment has not been terminated as of the Effective Date.

7.       Upon or before the occurrence of the Effective Date, each of the New Propco Purchase Agreement, the Landco Assets Transfer Agreement, the New Propco Transfer Agreement and the New Opco Purchase Agreement shall close according to its terms.

8.       All material consents, actions, documents, certificates and agreements necessary to implement this Plan, including any required governmental or regulatory consents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

9.       The Confirmation Date shall have occurred.

**C.       *Waiver of Conditions***

The conditions to confirmation of this Plan and to Consummation of this Plan and the occurrence of the Effective Date set forth in this Article IX may be waived by the Debtors without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; provided, however, that (i) any waiver of the conditions specified in Article IX.B.5 or B.6 above shall be acceptable to the Debtors, the Mortgage Lenders and FG, and (ii) any such other waiver shall be reasonably acceptable to the Successful Bidder, the Mortgage Lenders, FG and the Required Consenting Lenders and shall

not be inconsistent with the terms of the New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Agreement, the Committee Plan Support Stipulation, the Put Parties Purchase Agreement, the New Propco Purchase Agreement, the New Propco Transfer Agreement, the Second Amended MLCA or the Landco Assets Transfer Agreement.  The failure to satisfy or waive a condition to the Effective Date or Consummation may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

**D.    *Effect of Non Occurrence of Conditions to Consummation***

If the Effective Date or Consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

**ARTICLE X.**

**RELEASES, EXCULPATION, INJUNCTION, PRESERVATION OF CAUSES OF ACTION AND RELATED PROVISIONS**

**A.    *General***

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, Section 510 of the Bankruptcy Code or otherwise.

In accordance with the provisions of this Plan, including Article VIII hereof, and pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Plan Administrator may, in this sole and absolute discretion, compromise and settle Claims against the Debtors and (2) the Plan Administrator may, in its sole and absolute discretion, compromise and settle Causes of Action against other Entities.

**B.    *Comprehensive Settlement of Claims and Controversies.***

1.    <u>General</u>.  Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan, including the exculpation and release provisions contained in this Article X, constitute a good faith compromise and settlement of all Claims, Litigation Claims, Causes of Action or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Claim or

Interest against any Debtor, any distribution to be made pursuant to these Plans on account of any such Claim or Interest, and any and all Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction and all transactions relating thereto. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (x) the Debtors, the Non-Debtor Affiliates and their respective Estates and property, and (y) the Holders of Claims and Interests, and are fair, equitable and reasonable.

2.    <u>Global Settlement</u>.  Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, of all Going Private Transaction Causes of Action among the Debtors, the non-Debtor Affiliates of the Debtors, and the Debtors' Estates, and any Person (the "*Global Settlement*").  Any distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement, which, upon the Effective Date of the Plan, shall be binding on the Debtors and their Estates, the non-Debtor Affiliates of the Debtors, and all Holders of Claims or Interests (whether or not Allowed) that indicate on their Ballots their agreement to grant the releases provided for in Article X.C.2 of this Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, the Non-Debtor Affiliates, and the Holders of Claims and Interests providing such releases, and is fair, equitable and reasonable.

## C.    *Releases Among Releasing Parties and Released Parties*

1.    <u>RELEASES BY DEBTORS AND ESTATES</u>.  EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION, AS THE CASE MAY BE, THE DEBTORS' ESTATES, THE NON-DEBTOR AFFILIATES, AND EACH OF THEIR RESPECTIVE RELATED PERSONS (COLLECTIVELY, THE "RELEASING PARTIES") SHALL, AND SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE, WAIVE, VOID, EXTINGUISH AND DISCHARGE EACH AND ALL OF THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES AND RELATED PERSONS OF AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS, AVOIDANCE ACTIONS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, JUDGMENTS AND LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, THE GOING PRIVATE TRANSACTION CAUSES OF ACTION), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, EXISTING

AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR RESPECTIVE ASSETS, PROPERTY AND ESTATES, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THIS PLAN OR THE SOLICITATION OF VOTES ON THIS PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THIS PLAN OR ANY PLAN SUPPLEMENT; (II) WITH THE EXCEPTION OF THE GOING PRIVATE TRANSACTION CAUSES OF ACTION, ANY CAUSES OF ACTION ARISING FROM ACTUAL OR INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (III) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THIS PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS PLAN OR ASSUMED PURSUANT TO THIS PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON.

2.      Releases by Holders of Claims and Interests.  Effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in this Article X.C.2 shall, and shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish and discharge the Released Parties from any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other obligations, rights, suits, damages, judgments, debts, remedies and liabilities whatsoever (including, without limitation, the Going Private Transaction Causes of Action), including any Claims or Causes of Action that could be asserted on behalf of or against the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such holder of a Claim or Equity Interest would have been legally entitled to assert in its own right (whether individually, derivatively or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (v) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (w) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (x) the Chapter 11 Cases, (y) the

negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement; and (z) the Going Private Transaction Causes of Action; *provided*, *however*, that, with the exception of the Going Private Transaction Causes of Action, these releases will have no effect on the liability of any Released Party arising from any act, omission, transaction, agreement, event or other occurrence, constituting willful misconduct, gross negligence, fraud or criminal conduct as determined by a Final Order; *provided further*, *however*, the foregoing shall not constitute a waiver or release of any right of the Holder of an Allowed Claim or Equity Interest, obligee under any Assumed Liability (whether assumed under this Plan or in accordance with a prior Bankruptcy Court Order), or party to an Assumed Contract to payment under this Plan or otherwise on account of such Allowed Claim or any of the rights of any parties in respect of Assumed Liabilities or Assumed Contracts under or in connection with this Plan or prior order of the Bankruptcy Court.  The Releases set forth in this Article X shall be binding upon and shall inure to the benefit of the any chapter 7 trustee in the event the Chapter 11 Cases are converted to chapter 7.

3.    <u>Injunction Related to Releases</u>.    Except as provided in the Plan or the Confirmation Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other Cause of Action, Litigation Claim, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to this Article X.C of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and of all Equity Interests or other rights of a Holder of an equity security or other ownership interest:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person discharged under Article X.D; and (e) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

### D.    *Exculpation*

The Exculpated Parties shall neither have nor incur any liability to any Person for any Claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effecting the Consummation of this Plan, the Disclosure Statement or any sale, contract,

instrument, release or other agreement or document created or entered into in connection with this Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement, confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; *provided*, *further*, *however* that the foregoing provisions shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by this Plan or the Plan Supplement.

**E.**    ***Preservation of Causes of Action***

    **1.**    **Maintenance of Causes of Action**

Except as otherwise provided in this Article X or elsewhere in this Plan or the Confirmation Order, after the Effective Date, the Plan Administrator shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case. The Plan Administrator, as the successor in interest to the Debtors and their Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court.  To the extent any such Causes of Action or Litigation Claims exist as of the Effective Date, they may be assigned to a liquidating trust, distributions from which will be in accordance with this Plan.

    **2.**    **Preservation of All Causes of Action Not Expressly Settled or Released**

(a)    Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, the Confirmation Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or by the Plan Administrator (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the confirmation of this Plan or Consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in this Plan (including, without limitation, and for the avoidance of doubt, the Release contained in Article X.C hereof) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the

Debtors and the Plan Administrator expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor or Propco Debtor, respectively, is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.  For the avoidance of doubt, any litigation with respect to the Going Private Transaction is not preserved by any provision of this Plan including this section X.E.2.a.

(b)       Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors and the Plan Administrator reserve all rights to pursue:

(i)       Any other Causes of Action, whether legal, equitable or statutory in nature;

(ii)       Any and all actions arising under or actionable pursuant to the Bankruptcy Code, including, without limitation, sections 544, 545, 547 (except as provided below), 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code; and

(iii)       Any other Causes of Action that currently exist or may subsequently arise and which have not been otherwise set forth herein or in any schedule of Causes of Action, because the facts upon which such Causes of Action are based are not currently or fully known by the Debtors, (collectively, the "Unknown Causes of Action").  The failure to list or describe any such Unknown Cause of Action herein is not intended to limit the rights of the Debtors or the Plan Administrator to pursue any Unknown Cause of Action.

## F.       Supplemental Injunction

The Confirmation Order shall provide for the following injunctions to take effect as of the Effective Date.

1.       *Terms.  In order to preserve and promote the settlements contemplated by and provided for in the Plan and as described in this Article, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to*:

(a)    *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;*

(b)    *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;*

(c)    *creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;*

(d)    *except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest; and*

(e)    *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order relating to such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest*.

2.    ***Bankruptcy Rule 3016 Compliance***.  *The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code*.

## G.    *Integral to Plan*

Each of the releases and injunctions provided in this Article X of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties, the Debtors and the Reorganized Debtors and any other Person protected thereby, as applicable, shall have the right to seek independently the enforcement of such releases, discharges and injunctions.

## H.    *Binding Nature Of Plan*

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, ALL HOLDERS

OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN OR AFFIRMATIVELY VOTED TO REJECT THIS PLAN.

## ARTICLE XI.

## RETENTION OF JURISDICTION

A.    Pursuant to Sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest, and the resolution of any claim for taxes of any kind arising prior to the Effective Date or as a result of any transactions occurring on or before the Effective Date in accordance with this Plan and the rights of the Debtors or the Plan Administrator to apply tax attributes in satisfaction or offset of any such claims;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted after the Effective Date;

7.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

8.      resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan; *provided*, *however*, that any dispute arising under or in connection with the New Opco Credit Agreement, the New Opco PIK Credit Agreement and the New Propco Credit Agreement shall be addressed and resolved in accordance with the provisions of the applicable document;

9.      hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.      issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

11.      enforce the terms and condition of this Plan and the Confirmation Order;

12.      resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

13.      hear and determine the Litigation Claims by or on behalf of the Debtors or The Plan Administrator;

14.      enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15.      resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; *provided*, *however*, that any dispute arising under or in connection with the New Opco Credit Agreement, the New Opco PIK Credit Agreement or the New Propco Credit Agreement shall be addressed and resolved in accordance with the provisions of the applicable document; and

16.      enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.      *Dissolution of the Committee*

On the Effective Date, the Committee shall dissolve automatically and its members shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

**B.    *Payment of Statutory Fees***

All outstanding fees payable pursuant to Section 1930 of title 28, United States Code shall be paid on the Effective Date.  All such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 Cases when due or as soon thereafter as practicable.

**C.    *Modification of Plan***

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with Section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan, provided, however, that any amendment, modification or supplement to the Plan shall be reasonably acceptable to the Successful Bidder, the Mortgage Lenders, FG and the Required Consenting Lenders and shall not be inconsistent with the terms of the New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the Committee Plan Support Stipulation or the Put Parties Support Agreement.  A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder.

**D.    *Revocation of Plan***

The Debtors reserve the right to revoke or withdraw this Plan in its entirety for all Debtors, or in respect of any Debtor, prior to the Confirmation Date and, if applicable, to File subsequent chapter 11 plans or to amend this Plan to reflect such revocation or withdrawal of this Plan as to specific Debtor(s).  If the Debtors revoke or withdraw this Plan or if confirmation of this Plan or Consummation of this Plan or the Effective Date does not occur, then (as it pertains to any Debtor for which the Plan has been revoked or withdrawn):  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

**E.    *Successors and Assigns***

This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

## F.    *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order, the Effective Date occurs and this Plan is Consummated.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

## G.    *Further Assurances*

The Debtors or the Plan Administrator, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtors shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## H.    *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## I.    *Service of Documents*

All notices, requests, and demands to or upon the Debtors or the Plan Administrator to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**_To the Debtors_**:
Richard Haskins

Executive Vice President,
General Counsel & Secretary
Station Casinos, Inc.
1505 South Pavilion Center Drive
Las Vegas, NV 89135
Tel: 702-495-3000
Fax: 702-495-3000

**with copies to**:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Tel: 213-892-4000
Fax: 213-629-5063
Attention: Paul S. Aronzon, Esq.
Thomas R. Kreller, Esq.

### *J. Exemption from Registration Pursuant To Section 1145 of the Bankruptcy Code*

Pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of any securities or interests on account of, and in exchange for the Claims against the Debtors shall be exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and any other applicable non-bankruptcy law or regulation.

### *K. Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan, including without limitation the recordation of any mortgage pursuant to the New Propco Credit Agreement.

### *L. Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Nevada, without giving effect to the principles of conflicts of law of such jurisdiction.

### *M. Tax Reporting and Compliance*

The Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors are for all taxable periods ending after the Petition Date through, and including, the Effective Date.

# Exhibit 2

# Exhibit 2

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:    (213) 892-4000
Facsimile:    (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.<br><br>☒ Affects this Debtor<br>☐ Affects all Debtors<br>☒ Affects Northern NV Acquisitions, LLC<br>☒ Affects Reno Land Holdings, LLC<br>☒ Affects River Central, LLC<br>☒ Affects Tropicana Station, LLC<br>☒ Affects FCP Holding, Inc.<br>☒ Affects FCP Voteco, LLC<br>☒ Affects Fertitta Partners LLC<br>☒ Affects FCP MezzCo Parent, LLC<br>☒ Affects FCP MezzCo Parent Sub, LLC<br>☒ Affects FCP MezzCo Borrower VII, LLC<br>☒ Affects FCP MezzCo Borrower VI, LLC<br>☒ Affects FCP MezzCo Borrower V, LLC<br>☒ Affects FCP MezzCo Borrower IV, LLC<br>☒ Affects FCP MezzCo Borrower III, LLC<br>☒ Affects FCP MezzCo Borrower II, LLC<br>☒ Affects FCP MezzCo Borrower I, LLC<br>☒ Affects FCP PropCo, LLC<br>☐ Affects GV Ranch Station, Inc | Chapter 11<br><br>Case No. BK-09-52477<br>Jointly Administered BK 09-52470 through<br>BK 09-52487 and BK 10-50381<br><br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW<br>REGARDING CONFIRMATION OF<br>"FIRST AMENDED JOINT CHAPTER 11<br>PLAN OF REORGANIZATION FOR<br>STATION CASINOS, INC. AND ITS<br>AFFILIATED DEBTORS (DATED JULY<br>28, 2010)"** |

1

I.    **INTRODUCTION.**

2      1.      On July 28, 2010, Station Casinos, Inc. ("SCI") and the other above-captioned

3  debtors and debtors in possession (but excluding GV Ranch Station, Inc.[1]) (collectively, the

4  "Debtors") filed their "First Amended Joint Chapter 11 Plan of Reorganization for Station

5  Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 1863) (the "Plan").

6  Also on July 28, 2010, the Debtors filed their "Disclosure Statement to Accompany First

7  Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated

8  Debtors (Dated July 28, 2010)" (docket no. 1864) (the "Disclosure Statement").

9      2.      On July 29, 2010, the Court entered the "Amended Order (A) Approving

10  Disclosure Statement, (B) Establishing Voting Record Date, Voting Deadline and Other Dates,

11  (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on Plan and for Filing

12  Objections to Plan, (D) Setting Confirmation Hearing and Related Deadlines and (E) Approving

13  Forms of Notices and Ballots" (docket no. 1868) (the "Disclosure Statement Order").

14      3.      On August 11, 2010, the Debtors filed and served the Plan Supplement[2] (docket

15  no. 1914), which included drafts of the following Restructuring Transactions (defined below)

16  related documents: New FG Management Agreement (Propco); New Opco Credit Agreement;

17  New Opco PIK Credit Agreement; New Opco Asset Purchase Agreement; New Propco Credit

18  Agreement; New Propco Limited Liability Company Agreement; Opco Lender Support

19  Agreement; Propco Lender Support Agreement; Second Amended Master Lease Compromise

20  Agreement; Put Parties Support Agreement; and the Committee Plan Support Stipulation

21  (collectively the "Restructuring Transactions Related Documents").  On August 13, 2010, the

22  Debtors filed and served the Second Plan Supplement (docket no. 1935), which included a copy

23  of the following Restructuring Transactions Related Document: the New FG Management

24  Agreement (Opco).

25

26  [1]  GV Ranch Station, Inc. is a debtor in these jointly administered cases, but it is not a proponent of the
    Plan and its estate is not the subject of the Plan.

27

28  [2]  Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to
    them in the Plan or Disclosure Statement, as applicable. The rules of interpretation set forth in Article I.A.
    of the Plan shall apply to these Findings of Fact and Conclusions of Law.

4.      Among other things, the documents in the Plan Supplement disclosed that the parties intended to modify the $430 million term loan New Opco Credit Agreement by incorporating into it the $25 million loan that was intended to be an obligation under the New Opco PIK Credit Agreement, and make that $25 million loan an additional term loan tranche under the New Opco Credit Agreement (the "<u>PIK Credit Agreement Rollup</u>").

5.      On August 13, 2010, the Court entered its order (docket no. 1932) approving, and authorizing the Debtors to distribute a Supplement to the Disclosure Statement (the "<u>Disclosure Statement Supplement</u>"), which the Debtors then distributed to Holders of Claims and Equity Interests and other parties in interest that had previously been served with the Disclosure Statement.  Included with the Disclosure Statement Supplement were financial projections for New Opco, a copy of the Nave Report (defined and discussed below), and the Put Party Commitment Agreement.

6.      In connection with the Confirmation Hearing, the Debtors filed three motions to approve stipulations with key constituencies.  Specifically, the Debtors filed: (a) "Debtors' Motion for Order Approving Stipulation Between Debtors and the Shareholders of Station Casinos, Inc. Regarding Preservation of the Value of the Debtors' Net Operating Losses (docket no. 1922); (b) Debtors' Motion for Order: (1) Approving Stipulation with Official Committee Of Unsecured Creditors; and (2) Authorizing Payment of Certain Related Fees and Expenses (docket no. 1921); and (c) Debtors' Motion For Order  Approving Global Settlement With Independent Lender Group (docket no. 1965) (collectively the "<u>Plan Support Motions</u>").

7.      On August 23, 2010, the Debtors filed their "Debtors' Motion for Order Under 11 U.S.C. § 1127 Approving  Modifications to 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (docket no. 1997, the "<u>Plan Modifications Motion</u>").  On August 26, 2010, the Debtors filed an amendment to the Stalking Horse APA (docket no. 2031, the "<u>APA Amendment</u>").

8.      On August 16, 2010, declarations of service of the Solicitation Package in accordance with the requirements of the Disclosure Statement Order were filed with the Court

1    (docket no. 1944).  On August 25, 2010, the report of the Voting Agent was filed with the Court,

2    reporting that all Voting Classes, without exception, voted to accept the Plan (docket no. 2007).

3          9.      On August 24, 2010, the Debtors filed their "Notice of Submission of Stipulations

4    Between Debtors and Landlords Consenting to the Extension of Deadline to Assume or Reject

5    Leases" (docket no. 1997, the "Lease Stipulations").  Pursuant to the Lease Stipulations, the

6    applicable lessors agreed to extend to the Effective Date the Debtors' deadline to assume, assign

7    or reject the underlying real property leases (with the exception of the Wild Wild West Tiberti

8    lease, as to which the subject landlord agreed to extend the deadline to the earlier of Sept. 30,

9    2010 or the date that the non-debtor lessee breaches the lease).

10         10.     No objections to confirmation of the Plan, or any other objections to the terms of

11   the Plan, were filed by any Holder of Claims or Equity Interests or any other party in interest by

12   the deadline established in the Disclosure Statement Order, or otherwise.  On  August 20, 2010,

13   the Debtors filed their Memorandum of Law in support of confirmation of the Plan (docket no.

14   1984).  In support of the Memorandum of Law the Debtors filed the Declaration of Richard

15   Haskins, Executive Vice President, General Counsel and Secretary of SCI (docket no. 1986), and

16   the Declaration of Daniel Aronson, Managing Director of Lazard Frères & Co. LLC ("Lazard")

17   (docket no. 1985, the "Aronson Declaration").

18         11.     A hearing pursuant to Sections 1127, 1128 and 1129 of the Bankruptcy Code and

19   Federal Rules of Bankruptcy Procedure 2002, 3017, 3018, 3019(a), 3020(b) through (e) and

20   7052 to consider confirmation of the Plan was held on August 27, 2010 (the "Confirmation

21   Hearing").

22         12.     The Court has considered all of the papers filed in support of confirmation of the

23   Plan, including supporting declarations, and the testimony presented and evidence admitted at

24   the Confirmation Hearing.  In connection therewith, the Court takes judicial notice of all of the

25   papers and pleadings filed by the supporters and opponents of the Plan during the course of the

26   proceedings leading to the Confirmation Hearing.  The Court has entered a separate order

27   confirming the Plan (the "Confirmation Order"), and makes the following Findings of Fact and

28   Conclusions of Law in connection therewith.

#4844-2396-4935v21                               -4-

13.     These Findings of Fact and Conclusions of Law refer to, in summary fashion, numerous provisions of the Plan.  All such descriptions are qualified by the express terms of the Plan, which Plan terms control unless expressly modified in the Confirmation Order.  In addition, the failure to specifically include or discuss any particular provision of the Plan in these Findings of Fact and Conclusions of Law shall not diminish the effectiveness of any such provision, it being the intent of the Court that the Plan shall be confirmed in its entirety, and the Plan is incorporated herein in its entirety by this reference.

14.     Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact. These written Findings of Fact and Conclusions of Law shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Confirmation Hearing in accordance with Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014.

## II.     FINDINGS OF FACT.

### A.     JURISDICTION AND VENUE.

15.     On July 28, 2009 (the "Petition Date"), the Debtors commenced their respective Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors were and are qualified to be debtors under Section 109(a) of the Bankruptcy Code.  Each of the Debtors has its principal place of business and principal assets in Nevada.

### B.     COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

#### 1.     Section 1129(a)(1)[3] – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.

16.     The Plan complies with all applicable provisions of the Bankruptcy Code, as required by Section 1129(a)(1) of the Bankruptcy Code, including Sections 1122 and 1123 of the Bankruptcy Code.

---

[3]   Unless otherwise specified, all "Section" references are to chapter 11 of Title 11 of the U.S. Code, the "Bankruptcy Code."

a.    **Sections 1122 and 1123(a)(1)-(4) – Classification
and Treatment of Claims and Equity Interests.**

17.    In accordance with the requirements of Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Equity Interests, other than Administrative Claims and Priority Tax Claims.[4]  In accordance with the requirements of Section 1122(a), each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class. The Plan designates sixty Classes of Claims and eighteen Classes of Interests.  Such classification is proper under Section 1122(a) of the Bankruptcy Code because such Claims and Equity Interests have differing rights among each other and against the Debtors' assets or differing interests in the Debtors.  Valid business, factual and legal reasons exist for classifying the various Classes of Claims and Equity Interests in the manner set forth in the Plan.

18.    In accordance with the requirements of Sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies all Classes of Claims and Equity Interests that are not impaired under the Plan and specifies the treatment of all Classes of Claims and Equity Interests that are impaired under the Plan.  Consistent with Section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan also provides the same treatment for each Claim or Interest within a particular Class, unless the Holder of a Claim or Interest agrees to less favorable treatment of its Claim or Interest.

b.    **Section 1123(a)(5) – Adequate Means
for Implementation of the Plan.**

19.    Article V and certain other of the provisions of the Plan contain the principal means for the Plan's implementation.  Those provisions relate to, among other things: (a) the formation of the New Opco entities and New Propco entities; (b) the transfer of the Master Lease Collateral to Propco; (c) the transfer of the Landco Assets; (d) the transfer of the New Propco Transferred Assets from Propco to the New Propco entities; (e) the transfer of the New Propco

---

[4]  Pursuant to Section 1123(a)(1) of the Bankruptcy Code, classes of Administrative Claims and Priority Tax Claims are not required to be classified.

Purchased Assets from the Opco entities to the New Propco entities; (f) the transfer of the New Opco Acquired Assets to New Opco; (g) the New Propco Rights Offering; (h) the issuance of debt under, and the entering into the New Opco Credit Agreement and the related loan and collateral documents by New Opco and its affiliates; (i) the issuance of debt under, and the entering into the New Propco Credit Agreement and the related loan and collateral documents by New Propco and its affiliates; (j) the cancellation of prepetition instruments evidencing Claims and Equity Interest; and (k) the eventual dissolution of the Debtors (the foregoing transactions, the other implementation provisions of the Plan, and all of the transactions documented in the Restructuring Transactions Related Documents, are hereinafter referred to as the "Restructuring Transactions").  The Restructuring Transactions carry out several of the methods for implementing a chapter 11 plan expressly provided for in Section 1123(a)(5): Section 1123(A)(5)(B) (transfer of all or any part of the property of the estate to one or more entities); Section 1123(a)(5)(D) (sale of all or any part of property of the estate, and distribution of other property of the estate to the holders of interests in such property); Section 1123(a)(5)(E) (satisfaction or modification of liens); Section 1123(a)(5)(F) (cancellation of indentures and similar instruments); Section 1123(a)(5)(J) (issuance of securities by entities receiving property of the estate in exchange for claims against the Debtors).

### i.     The Sale of the Opco Assets

20.     On June 4, 2010, this Court entered its "Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos Inc. and Certain 'Opco' Subsidiaries" (the "Bidding Procedures Order") (docket no. 1563).  Pursuant to the Bidding Procedures Order, the Court, among other things, (a) authorized the Debtors to conduct a process for the marketing and sale of substantially all of the Debtors' Opco business and certain related assets (the "Opco Assets", which comprise the New Opco Acquired Assets and the New Propco Purchased Assets under the Plan), conduct an auction and select the successful bid, and (b) deemed the Stalking Horse Bidder to be a Qualified Bidder.

21.     In accordance with the Bidding Procedures Order, notice of the Opco Auction and Bidding Procedures was transmitted to: (a) the Office of the United States Trustee; (b) the

Official Committee of Unsecured Creditors (the "Official Creditors Committee"); (c) the Nevada
Gaming Commission; (d) all (i) creditors of the Debtors as defined in Section 101(1) of the
Bankruptcy Code; (ii) entities known to the Debtors to possess and/or exercise any control over
any of the Opco Assets; (iii) entities known to the Debtors to assert any rights in any of the Opco
Assets; (iv) parties in interest and other entities and persons so entitled and known to the
Debtors; (v) non-Debtor parties to the Assumed Contracts[5]; (vi) other entities that Debtors
believe may have a claim against any of the Debtors; (vii) applicable federal, state and local tax
authorities with jurisdiction over the Debtors or the Opco Assets, including the Internal Revenue
Service; (viii) federal, state and local environmental authorities in jurisdictions in which the
Debtors operate and/or in which the Opco Assets are located; and (ix) entities that requested
notice in the Debtors' Chapter 11 Cases; (e) the Securities and Exchange Commission; and
(f) any known party which has expressed a bona fide interest in writing to the Debtors regarding
any purchase of the Opco Assets.

22.    Pursuant to the "Order, Pursuant to 11 U.S.C. §§ 327(a) and 328(a), and Fed. R.
Bankr. P. 2014, Authorizing Employment and Retention of Lazard Freres & Co. LLC as
Financial Advisor and Investment Banker for the Debtors," entered on September 18, 2009
(docket no. 326), the Court authorized the Debtors to utilize the services of Lazard to market for
sale the New Opco Acquired Assets.

23.    The marketing of the New Opco Acquired Assets took place over a several month
period.  Notice of the Auction and the Bidding Procedures Order was published in the Las Vegas
Review-Journal, the Wall St. Journal, and the Financial Times.  Lazard contacted seventy nine
potential bidders, and received expressions of interest from thirty nine potential bidders; and
twenty six potential bidders signed confidentiality agreements and received a package of
preliminary due diligence information.  Of those initial twenty six parties conducting due
diligence, eight signed Letters of Intent that entitled them to additional, more comprehensive due
diligence.  *See* "Status Report of Dr. James E. Nave, Independent Director, Regarding

---

[5]  "Assumed Contracts" means the contracts and leases to be assumed by the Debtors and assigned to the
transferees of the New Opco Acquired Assets and New Propco Acquired Assets.

1    Compliance with Auction Procedures Procedures and Resulting Bids with Respect to the Order

2    Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of

3    the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries," filed August 5, 2010

4    (docket no. 1885) (the "Nave Report"), at ¶¶ 3-6.

5         24.    Dr. Nave was the independent director of SCI tasked with overseeing the Sale

6    Process.  The Opco Debtors, under the direction of Dr. Nave and in consultation with the

7    Consultation Parties, determined that six of the Letter of Intent signatories satisfied the

8    requirements to be Qualified Bidders (not including the Stalking Horse Bidder).[6]  However, by

9    the July 30, 2010 deadline under the Bidding Procedures for receipt of Qualified Bids, the

10   Debtors had received only one Qualified Bid, that of the Stalking Horse Bidder.  As a result,

11   there was no Opco Auction.  Nave Report at ¶¶ 7-10.

12        25.    Daniel Aronson, a Managing Director at Lazard, filed a Declaration in support of

13   the Nave Report (docket no. 1886) (the "Aronson Sale Process Report").  Aronson has worked as

14   restructuring professional for twenty two years, and has headed up Lazard's efforts as financial

15   advisor and investment banker for the Debtors.  In addition to confirming the facts in the Nave

16   Report, Aronson noted that the process of the selection of the Stalking Horse Bid resulted in an

17   increase of more than $135 million in the proposed purchase price.  Aronson Sale Process Report

18   at ¶ 9.

19        26.    Aronson reported that Lazard's efforts were especially focused on ensuring a

20   level playing field for all bidders, including in particular potential bidder Boyd Gaming.  He

21   opined that the Bidding Procedures approved by the Court provided an open and level playing

22   field for all potential bidders, and the Sale Process provided fair and open access to all

23   reasonable due diligence materials.  He noted that, following Court approval of the Bidding

24   Procedures, no bidder voiced any complaint about the Bidding Procedures, or that the Debtors

25   should deviate from or modify the Bidding Procedures.  He concluded that the Stalking Horse

26

27   _____

     [6]  The Consultation Parties were the Administrative Agent under the Prepetition Opco Credit Agreement,

28   the steering committee of lenders under the Prepetition Opco Credit Agreement and the Official Creditors
     Committee.  See Aronson Sale Process Report, infra, at p.4, fn. 2.

Bid is the highest and best bid for the Opco Assets to date.  Aronson Sale Process Report at ¶¶ 15-19.

27.      At a hearing on August 6, 2010, the date for which the Auction had been scheduled, the Court determined that the Stalking Horse Bid was the prevailing bid, and that the purchaser would be the Stalking Horse Bidder FG Opco Acquisitions LLC (together with any of its assignees permitted under the Stalking Horse APA, "Acquisitions LLC"), an entity that is a subsidiary of New Propco (Acquisitions LLC and its controlled Affiliates, IP Holdco, New Propco and the other New Propco affiliates receiving the New Opco Acquired Assets and the New Propco Acquired Assets, collectively, the "Purchaser").  On August 9, 2010, the Court entered its "Order Closing Auction and Designating Successful Bid With Respect to Order Establishing Bidding Procedures and Deadlines Related to Sale Process For Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries" (docket no. 1909), in which it designated Purchaser as the Successful Bidder.  In connection with confirmation of the Plan, the Debtors sought approval of the sale of the Opco Assets to Purchaser, free and clear[7] of all Liens, Claims, Equity Interests and any Liabilities (as defined in the Stalking Horse APA) arising or resulting from or related to the transactions contemplated by the Stalking Horse APA or by the 363 Sale Orders (as defined in the Stalking Horse APA) (such liabilities, "Other Liabilities") in accordance with the terms and conditions of the Stalking Horse APA and pursuant to Sections 363, 365, 1123, 1129 and 1141 of the Bankruptcy Code.

28.      Notice of the Bidding Procedures Order and the Sale Hearing, and of the Debtors' intent to seek approval and authorization of the Stalking Horse APA and of the Restructuring Transactions, and to assume and assign the Assumed Contracts, was proper, timely, adequate and sufficient notice under the circumstances of these Chapter 11 Cases and complied with the various applicable requirements of the Bankruptcy Code and the Bankruptcy Rules; and a reasonable opportunity to object and be heard with respect to the relief requested by the Debtors

---

[7]   All references in these Findings of Fact and Conclusions of Law to transfers of property free and clear of Liens, Claims, Equity Interests, Other Liabilities or other interests (or any combination of any of the foregoing), shall mean free and clear except as otherwise expressly provided in writing in the applicable transfer documents with respect to assumed liabilities and permitted exceptions.

was afforded to all interested parties.  Based upon the record of the Chapter 11 Cases and the Sale Process, all Holders of Claims and Equity Interests, and all other parties-in-interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the New Opco Acquired Assets.

29.    The Debtors have articulated good and sufficient business reasons justifying the approval of the Stalking Horse APA and the Restructuring Transactions.  Such business reasons include, but are not limited to, the following: (i) the Stalking Horse APA constitutes the highest and best offer for the Opco Assets; and (ii) the Stalking Horse APA and the closing thereon will present the best opportunity to realize the value of the Opco Assets and avoid the possible decline and devaluation of such assets in a protracted chapter 11 process.  The Debtors' entry into the Stalking Horse APA and consummation of the Restructuring Transactions constitute the Debtors' exercise of sound business judgment and the sale contemplated by the Stalking Horse APA is in the best interests of the Debtors, their estates and creditors and all other parties in interest, and is supported by each of the Debtors' key creditor constituencies.

30.    The purchase price provided by Purchaser for the Opco Assets is the highest and best offer received by the Debtors, and the purchase price constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia  ((a), (b)  and (c) collectively, "Value"), for the Opco Assets.

31.    Purchaser would not have entered into the Stalking Horse APA and would not consummate the Restructuring Transactions, thus adversely affecting the Debtors, their estates, and their creditors, if the transfer to Purchaser of the Opco Assets, including without limitation the Assumed Contracts, was not free and clear of all Liens, Claims, Equity Interests and Other Liabilities, or if Purchaser or any of their Related Persons would, or in the future could, be liable for any such Liens, Claims, Equity Interests and Other Liabilities, or if Purchaser or any of their Related Persons would otherwise be subject to any liability with respect to the operation of the

Debtors' businesses on or prior to the Effective Date.  Accordingly, a sale of the Opco Assets other than one free and clear of Liens, Claims, Equity Interests and Other Liabilities would impact materially and adversely the Debtors' estates, and would yield substantially less value for the Debtors' estates, with less certainty than the sale pursuant to the Stalking Horse APA.  In reaching this determination, the Court has taken into account both the consideration to be realized directly by the Debtors and their creditors, and the indirect benefits of the Restructuring Transactions for the Debtors' employees, the Debtors' vendors and suppliers and the public interest served, directly and indirectly, by the preservation of the value of the Opco Assets resulting from the transfer of such assets to the Purchaser.

32.    There was no evidence of insider influence or improper conduct by any of the Purchaser or their Related Persons, or by any other party in interest, in connection with the negotiation of the Stalking Horse APA with the Debtors, in connection with the marketing of the New Opco Acquired Assets, or otherwise in connection with the Sale Process.  The Debtors established a due diligence room in which the information provided to the Purchaser in connection with the negotiation of the Stalking Horse APA was also provided to other potential bidders for the New Opco Acquired Assets.  There was also no evidence of fraud or collusion among the Purchaser, their Related Persons and any other bidders for the Debtors' assets, or collusion between the Debtors and the Purchaser or their respective Related Persons to the detriment of any other bidders, the Sale Process or the Debtors' estates.

33.    The Debtors and the other Opco Group Sellers[8] are entering into the Stalking Horse APA and performing their obligations thereunder and under the other Restructuring Transactions in good faith and with lawful purpose, and have the legal power and authority to convey all of their right, title and interest in and to the Opco Assets to Purchaser.  Each Opco Group Seller has: (i) full power and authority to execute the Stalking Horse APA and all other documents contemplated thereby, and the sale of the Opco Assets by the Opco Group Sellers has been duly and validly authorized by all necessary company action of each Opco Group Seller; (ii) the necessary power and authority to perform its obligations under the Restructuring

---

[8] The Opco Group Sellers are defined in the Plan as the sellers under the Stalking Horse APA.

1    Transactions contemplated by the Plan; and (iii) taken all company action necessary to authorize,

2    approve and enter into the Stalking Horse APA and consummate the Restructuring Transactions

3    contemplated by the Plan.  No consents or approvals or further actions, other than those

4    expressly required by the terms of the Stalking Horse APA or in the Schedules thereto (including

5    the Nevada Gaming Commission consent), are required for the Opco Group Sellers to close the

6    sale and consummate the Restructuring Transactions.

7        34.    No brokers were involved in consummating the sale or the Restructuring

8    Transactions, and no brokers' commissions are due to any person or entity in connection with the

9    sale or the Restructuring Transactions.

10              **c.    Section 1123(a)(6) – Prohibition Against the**
                  **Issuance of Nonvoting Equity Securities and Adequate**

11                **Provisions for Voting Power of Classes of Securities.**

12        35.    The Plan complies with the requirements of Section 1123(a)(6) because the

13    Debtors are not issuing any equity securities.  Rather the Debtors will be dissolved as soon as

14    reasonably practical.

15              **d.    Section 1123(a)(7) – Selection of Directors and**
                  **Officers in a Manner Consistent with the Interests of**

16                **Creditors and Equity Security Holders and Public Policy.**

17        36.    The Plan complies with the requirements of Section 1123(a)(7) because, under the

18    Plan, on the Effective Date, all current boards of directors of the Debtors will be dissolved and

19    all current officers will be dismissed.  In their place, a Plan Administrator will be appointed prior

20    to the Effective Date.  The Plan requires that the appointment of the Plan Administrator shall be

21    subject to prior Court approval.  As a result, the Plan contains no provisions with respect to the

22    manner of selection of new officers and directors that is inconsistent with public policy or the

23    interests of Holders of Claim and Equity Interests.

24              **e.    Section 1123(b)(1)-(2) – Impairment of Claims and Equity**
                  **Interests and Assumption, Assumption and Assignment or**

25                **Rejection of Executory Contracts and Unexpired Leases.**

26        37.    In accordance with the requirements of Section 1123(b)(1) of the Bankruptcy

27    Code, Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of

28    Claims and Equity Interests.  Consistent with 1123(b)(2) of the Bankruptcy Code, Article VI of

the Plan provides for the assumption by the Debtors and assignment to the applicable transferee on the Effective Date of certain designated Executory Contracts and Unexpired Leases, and the rejection of all other Executory Contracts and Unexpired Leases, in all cases in accordance with, and subject to the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1123(b)(2) of the Bankruptcy Code.

> **f.      Section 1123(b)(3) – Retention, Enforcement
> and Settlement of Claims Held by the Debtors.**

38.      As authorized by Section 1123(b)(3), (i) Article X.E. of the Plan provides for the retention by the Debtors of Causes of Action and Litigation Claims not expressly released or settled under the Plan, and (ii) Articles X.B. and X.C. of the Plan provide for certain settlements and releases, as discussed in more detail below.

> **g.      Section 1123(b)(4) – Sale of Assets of the Estate.**

39.      The Plan does not provide for a sale of substantially all of the assets.  However, as discussed above, the New Opco Acquired Assets were marketed and will be sold to Purchaser pursuant to the Plan.

> **h.      Section 1123(b)(5) – Modification of
> the Rights of Holders of Claims.**

40.      In accordance with the requirements of Section 1123(b)(5), Article III of the Plan modifies, or leaves unaffected, as the case may be, the rights of holders of each Class of Claims. Some Classes of Claims receive nothing under the Plan.  Some Classes of Claims receive cash and new notes issued by Purchaser.  Some Classes of Claims receive real and personal property. Some Classes of Claims receive equity interests in certain of the Mezzco Debtors.  Some Classes of Claims receive the NPH Warrants, NPH Investment Rights and the NPH Post-Effective Investment Rights.  Some Classes of Claims are unimpaired.

\ \ \

**i.    Section 1123(b)(6) – Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code.**

41.    The Plan includes additional appropriate implementation provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including: (i) the provisions of Article VII of the Plan governing distributions on account of Allowed Claims; (ii) the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (iii) the provisions of Article X of the Plan regarding the treatment of the provisions of the Plan as a Comprehensive Settlement, releases by the Debtors, voluntary releases by Holders of Claims and Equity Interests, and certain exculpation provisions.

**j.    Section 1123(d) – Cure of Defaults.**

42.    In accordance with the requirements of Section 1123(d), Article VI of the Plan provides for the cure of defaults in respect of all executory contracts and unexpired leases that are being assumed under the Plan and assigned to the applicable transferee, and requires that such cure payments be made consistent with the requirements of Section 365(b) and 365(c).

**2.    Section 1129(a)(2) – Compliance with Applicable Provisions of the Bankruptcy Code.**

43.    In accordance with the requirements of Section 1129(a)(2), the Debtors have complied with all applicable provisions of the Bankruptcy Code, including Section 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  The Court finds that adequate disclosures of the current financial condition of the Debtors and their principal non-Debtor subsidiaries, and of the terms and purposes of the Restructuring Transactions (including the proposed dispositions of the New Opco Acquired Assets and New Propco Acquired Assets), were made during the course of the Chapter 11 Cases, the Sale Process, and the solicitation of acceptances of the Plan, and in connection with the Confirmation Hearing.

44.    The Court previously determined in the Disclosure Statement Order that the Disclosure Statement contained adequate information, and the Debtors provided Holders of Claims and Equity interests with substantial additional disclosure materials during the period

between entry of the Disclosure Statement Order and the commencement of the Confirmation Hearing.  The procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with Sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement Order.  The Debtors and the other Exculpated Parties, and their respective directors, officers, employees, agents, members and professionals, as applicable, have acted in good faith within the meaning of Section 1125(e) of the Bankruptcy Code.

### 3.    Section 1129(a)(3) – Proposal of the Plan in Good Faith.

45.    In accordance with the requirements of Section 1129(a)(3), the Debtors proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan, including the support thereof by the Mortgage Lenders, nearly all of the Opco Lenders, and the Official Creditors Committee.  Based on the evidence presented at the Confirmation Hearing, the Court finds and concludes that the Plan has been proposed with the legitimate and honest purpose of maximizing the returns available to creditors of the Debtors through the marketing and sale of the Opco Assets for the highest and best price and the transfer of the New Propco Acquired Assets to the secured creditors with the senior interests in such assets.  Moreover, the Plan itself and the arms' length negotiations among the Debtors, the Official Creditors Committee, the Opco Lenders and the Mortgage  Lenders, leading to the Plan's formulation and modification, and the public support of the Plan by the Official Creditors Committee, provide independent evidence of the Debtors' good faith in proposing the Plan.

### 4.    Section 1129(a)(4) – Bankruptcy Court Approval of Certain Payments as Reasonable.

46.    In accordance with the requirements of Section 1129(a)(4), Article II.A.2. of the Plan makes all payments on account of Professional Fee Claims for services rendered on or prior to the Effective Date subject to the requirements of Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, as applicable, by requiring Professionals to file final fee applications

1    with the Court.  The Court will review the reasonableness of such applications under Sections

2    328 and 330 of the Bankruptcy Code and any applicable case law.  Article XI. of the Plan

3    provides that the Court will retain jurisdiction after the Effective Date to hear and determine all

4    applications for allowance of compensation or reimbursement of expenses authorized pursuant to

5    the Bankruptcy Code or the Plan.

6            **5.        Section 1129(a)(5) – Disclosure of Post-Effective Date**

7                        **Management of Debtors and Compensation of any Insiders.**

8        47.    The Plan complies with the requirements of Section 1129(a)(5) because, pursuant

9    to the Plan, prior to the Effective Date, the Debtors will propose an individual to serve as the

10   Plan Administrator, and such appointment will be subject to prior Court approval.  None of the

11   entities receiving estate assets under the Restructuring Transactions is a successor to any Debtor

12   or an affiliate of any Debtor participating in a joint plan with the Debtors, therefore Section

13   1129(a)(5) does not apply to the transferees of the New Opco Acquired Assets and the New

14   Propco Acquired Assets.  No insider is currently proposed to be employed by the Debtors after

15   the Effective Date.  If an insider of the Debtors is proposed to serve as Plan Administrator or as

16   an employee of the Plan Administrator, any compensation arrangements will be disclosed.

17           **6.        Section 1129(a)(6) – Approval of Rate Changes.**

18       48.    The Debtors' current businesses do not involve the establishment of rates over

19   which any regulatory commission has jurisdiction.   Accordingly, Section 1129(a)(6) does not

20   apply to the Plan.

21           **7.        Section 1129(a)(7) – Best Interests of Holders of Claims and Equity**

22                       **Interests.**

23       49.    In accordance with the requirements of Section 1129(a)(7), with respect to each

24   impaired Class of Claims or Equity Interests, each holder of a Claim or Interest in such impaired

25   Class has either (a) accepted or is deemed to have accepted the Plan or, (b) as demonstrated by

26   the Liquidation Analysis included as Exhibit C to the Disclosure Statement, will receive or retain

27   under the Plan on account of such Claim or Interest property of a value, as of the Effective Date,

28

#4844-2396-4935v21

that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

50.      The Court finds that the methodology used by the Debtors and their financial advisors in estimating the liquidation value of the Debtors, as set forth in the Liquidation Analysis, is reasonable.  The Liquidation Analysis establishes that each Holder of a Claim or Equity Interest that voted to reject the Plan or was deemed to reject the Plan, will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  Further, no Holder of a Claim or Equity Interest objected to confirmation of the Plan on the basis that it was not receiving or retaining under the Plan as much as it would receive in a chapter 7 liquidation of the Debtors.

**8.      Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class.**

51.      As indicated in the Plan and Disclosure Statement: (a) the following are Classes of Unimpaired Claims that were deemed to have accepted the Plan and were not entitled to vote on the Plan – Classes P.1, S.1, NA.1, RL.1, RC.1 and  TS.1; (b) the following are Classes of Impaired Claims that are deemed to have rejected the Plan and were not entitled to vote on the Plan – Classes FHI.2, FHI.3, FHI.4, FHI.5, FHI.6, FP.2, FP.3, FP.4, FP.5, FP.6, VC.2, VC.3, VC.4, VC.5, VC.6, P.3, P.4, P.5, MP.1, MP.2,  MP.3,  MS.1, MS.2, MS.3, M7.1, M7.2, M7.3, M6.1, M6.2, M6.3, M5.1, M5.3, M5.4, M4.2, M4.3, M4.4, M3.2, M3.3, M3.4, M2.2, M2.3, M2.4, M1.2, M1.3, M1.4, S.8, S.9, NA.2, NA.3, RL.2, RL.3, RC.3, RC.4, TS.3 and TS.4; and (c) the Voting Classes were Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2.  Each of the seventeen Voting Classes, without exception, voted to accept the Plan.  However, the Plan does not comply with the requirement of Section 1129(a)(8) because certain Classes of Claims and Equity Interests were deemed to have rejected the Plan.  Nevertheless, the Plan is confirmable because, as determined below, the Plan satisfies the cramdown requirements of Section 1129(b) of the Bankruptcy Code with respect to all non-accepting Classes.

9.      **Section 1129(a)(9) – Treatment of Claims Entitled to
Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

52.      In accordance with the requirements of Section 1129(a)(9), the Plan provides that with respect to Administrative Claims (subject to certain consensual exceptions for DIP Facility Claims, Superpriority Claims and other adequate protection claims), on the later of the Effective Date or when an Administrative Claim becomes an Allowed Administrative Claim, the Allowed Administrative Claim shall be paid in cash in the full unpaid Allowed amount of the Claim, unless the Holder agrees to less favorable treatment.

53.      In accordance with the requirements of Section 1129(a)(9), the Plan provides that the rights of the Holders of Priority Tax Claims are unaltered under the Plan.  Under Section II.B. of the Plan, Holders of Priority Tax Claims will receive, at the election of the Debtors, (i) payment in full in cash of the Allowed amount of such claim, (ii) less favorable treatment if the Holder agrees, or (iii) installment payments in accordance with the requirements of Sections 1129(a)(9)(C) and (D).

54.      In accordance with the requirements of Section 1129(a)(9), the Plan provides that the rights of the Holders of Other Priority Claims are unaltered under the Plan.  Under Section II.B. of the Plan, Holders of Other Priority Claims will receive payment in full in cash of the Allowed amount of such Claim.

10.      **Section 1129(a)(10) – Acceptance by at Least One Impaired Class.**

55.      In accordance with the requirements of Section 1129(a)(10), as indicated in the report of the Voting Agent and as reflected in the record of the Confirmation Hearing, at least one Class of Claims or Equity Interests that is Impaired under the Plan voted to accept the Plan. Seventeen Classes of Claims voted to accept the Plan, in each case determined without including any acceptance of the Plan by any insider.  They are Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2.

11.      **Section 1129(a)(11) – Feasibility of the Plan.**

56.      The Plan is a liquidating Plan.  The record of these Chapter 11 Cases evidences that the parties to the Restructuring Transactions have the financial wherewithal and desire to

#4844-2396-4935v21                                    -19-

close on the Restructuring Transactions, including the transfer of the New Opco Acquired Assets

and New Propco Acquired Assets to the applicable transferees pursuant to the Plan.  Thus, the

liquidating Plan is feasible.

57.     Under the Plan, part of the consideration received by the Debtors for the Opco

Assets and transferred to the Opco Lenders are secured notes issued by Purchaser.  In addition,

certain unsecured creditors receive NPH Warrants, NPH Investment Rights and NPH Post-

Effective Investment Rights.  The Debtors have filed with Court and distributed as part of the

Disclosure Statement (Exhibit D to the Disclosure Statement) financial projections for New

Propco covering calendar years 2010 through 2014.  The Debtors stated in their Disclosure

Statement that they believe that the assumptions underlying the New Propco financial projections

are reasonable, and that New Propco will be able to meet its debt service obligations.  Based

upon the New Propco financials and the discussion in the Aronson Declaration with respect

thereto, it appears reasonably likely that New Propco will be able to service its debt obligations

issued in connection with the Plan.  No contrary evidence was submitted to the Court.

58.     After service of the Solicitation Packages that included the financial projections

for New Propco, the Debtors filed and served the Disclosure Statement Supplement, which

included a set of financial projections for New Opco, covering calendar years 2011 through

2014.  Based upon the New Opco financials and the discussion in the Aronson Declaration with

respect thereto, it appears reasonably likely that New Opco will be able to service its debt

obligations issued in connection with the Plan.  No contrary evidence was submitted to the

Court.

59.     Based upon the Aronson Declaration, the aggregate transaction value for the

acquisitions of the New Propco Acquired Assets and the New Opco Acquired Assets  is

$2.572 billion (based upon capitalization of $1.8 billion for New Propco prior to the acquisition

of the Opco Assets, and an additional $772 million based upon the acquisition of the Opco

Assets), and, after deducting the amount of debt issued by New Propco and New Opco, the

equity value of New Propco is $326 million (which equity value may be adjusted based upon

actual borrowings and cash on hand on the Effective Date); and the Confirmation Order shall so provide.

60.     Under the Plan, certain general unsecured creditors will receive the NPH Warrants.  Lazard analyzed the value of the NPH Warrants using the traditional Black-Scholes model, which, when analyzing non-dividend paying stock, is based upon an analysis of five principal factors: stock price, exercise price, volatility of the common stock, term and risk free rate.  Applying the Black Scholes model to the NPH Warrants and an equity value of $326 million for New Propco, it was determined that the value of the NPH Warrants is between $0.4 million and $2.3 million; and the Confirmation Order shall so provide.

**12.     Section 1129(a)(12) – Payment of Bankruptcy Fees.**

61.     In accordance with the requirements of Section 1129(a)(12), Article XII.B. of the Plan provides that Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash on the Effective Date.  After the Effective Date, the Reorganized Debtors shall pay all required fees pursuant to 28 U.S.C. § 1930 or any other statutory requirement and comply with all statutory reporting requirements.

**13.     Section 1129(a)(13) – Retiree Benefits.**

62.     The Debtors are liquidating and after the Effective Date will have no obligations regarding any retiree benefits of the kind referred to in Section 1114.  Therefore, Section 1129(a)(13) does not apply to the Plan.

**14.     Section 1129(a)(14), (15) and (16) Do Not Apply.**

63.     Sections 1129(a)(14), (15) and (16) address domestic support obligations, individual debtors, and non-moneyed businesses, and they do not apply to the Debtors.

**15.     Section 1129(b) – Confirmation of the Plan
Over the Nonacceptance of Impaired Classes.**

64.     Section 1129(b) of the Bankruptcy Code authorizes the Court to confirm the Plan even if not all Impaired Classes have accepted the Plan (a "cramdown"), provided that such Plan has been accepted by at least one impaired class and the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class that voted to reject the Plan.  Here,

Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2., each an impaired Class of Claims, voted to accept the Plan.

All classes of secured Claims are either unimpaired and deemed to have accepted the Plan, or impaired but voted to accept the Plan.  Therefore, Section 1129(b) does not apply to Classes of secured Claims.  In any event, the Plan expressly complies with the requirements of Section 1129(b)(2)(A) with respect to all Classes of secured Claims.

65.    The Plan is fair and equitable with respect to all non-accepting Classes of Unsecured Claims because: (a) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed Claim; or (b) the holders of any Claims (or Equity Interests) that are junior to the non-accepting Class will not receive any property under the Plan (the "absolute priority rule").  The Plan strictly adheres to the absolute priority rule for each Debtor and nowhere does the Plan provide for distributions to the holders of any Claims or Equity Interests that are junior to any non-accepting Class of Claims of the subject Debtor.

66.    The Plan is fair and equitable with respect to all non-accepting Classes of Equity Interests because: (a) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest; or (b) the holder of an interest that is junior to the Non Accepting Class will not receive or retain any property under the Plan.

67.    The Plan does not discriminate unfairly with respect to any non-accepting Class because the value of the cash and/or securities to be distributed to each Class under the Plan is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the non-accepting Class.  Exact parity is not required. The Court finds that any discrepancy in treatment or potential distributions to unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of

risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.  Accordingly, the Plan may be confirmed under Section 1129(b).

**16.      Bankruptcy Rule 3016(a).**

68.      In accordance with the requirements of Bankruptcy Rule 3016(a), the Plan is dated and identifies the entities submitting the Plan.

**17.      Section 1129(d) – Purpose of Plan.**

69.      The primary purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act.  There has been no objection filed by any Governmental Unit asserting any such avoidance.  The Plan and Disclosure Statement provide adequate notice to all Persons and Entities, including the Internal Revenue Service, the U.S. Securities and Exchange Commission and other applicable Governmental Units, of the intent of the Plan: (a) to preserve the ability of the Debtors to seek a Court determination of the tax liabilities arising from the implementation of the Plan; and (b) to cause the issuance of securities exempt from registration requirements under applicable state and federal securities laws.

**18.      Issuance of Securities to Eligible Opco Unsecured Creditors.**

70.      In connection with the Plan, Eligible Opco Unsecured Creditors (meaning Holders of Allowed Claims in Classes S.4, S.5 and S.6, excluding, however, Holders of Class S. 4 Claims that also hold Class S.2 Claims and vote to accept the Plan on account of such Class S.2 Claims), will receive on account of and in exchange for their Claims: (a) their Pro Rata Share of NPH[9] Warrants; (b) if they are Accredited Investors, their Allocated Pro Rata Share of NPH Investment Rights; and (c) if they are Qualified Eligible Opco Unsecured Creditors, the NPH Post-Effective Investment Rights ((a), (b) and (c), whether issued directly by New Propco Holdco or indirectly through Blockerco, collectively the "UC Securities").  A detailed description of the proposed UC Securities is contained in the New Propco Holdco Summary of Terms (the "NPH Term Sheet"), which was distributed as Exhibit E to the Disclosure Statement, to which was also attached the Support Agreement dated July 28, 2010, among certain affiliates of Fidelity Management & Research Company, Oaktree Capital Management, L.P. and Serengeti

---

[9]  NPH means New Propco Holdco, and it is also sometimes referred to as Holdco.

Asset Management, LP (collectively, the "Put Parties"), the Mortgage Lenders, Fertitta Gaming, LLC, and Frank and Lorenzo Fertitta (the "Put Parties Support Agreement").  Subsequently, as part of the Disclosure Statement Supplement, the Debtors filed and served the Put Party Commitment Agreement, dated August 5, 2010, among the parties to the Support Agreement (the "Put Party Commitment Agreement").  The NPH Term Sheet, the  Put Parties Support Agreement and the Put Party Commitment Agreement are hereinafter referred to as the "UC Securities Documents."

### C.   SETTLEMENTS, RELEASES, EXCULPATIONS AND INJUNCTIONS.

71.     The settlement, release and exculpation provisions set forth in Article X of the Plan are made in exchange for consideration, and are: (1) the result of a carefully-negotiated good-faith settlement among the Debtors and their major stakeholders; (2) meant to provide relief from future litigation and the prospect of future litigation that would have substantially derailed the Debtors' restructuring efforts; (3) fair and necessary for successful Plan confirmation; and (4) supported by creditors holding billions of dollars in allowed undisputed secured and unsecured Claims that will be impaired under the Plan, including all of the Debtors' key creditor constituencies.  In connection with the Confirmation Hearing, no party in interest filed an objection to Article X of the Plan, which also provides for an injunction in support of the settlements, releases and exculpations contained therein.

### 1.   Article X.B.1. of the Plan – The Comprehensive Settlement of Claims and Controversies.

72.     Article X.B.1. of the Plan provides that the Plan constitutes a general comprehensive settlement (the "Comprehensive Settlement") of all Claims, Litigation Claims, Causes of Action and controversies relating to (a) the rights that Holders of Claims or Equity Interests may have with respect to any Claim or Equity Interest against any Debtors, (b) the distributions, if any, made under the Plan on account of such Claims and Equity Interests, and (c) any Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction and all transactions relating thereto (discussed in more detail below).  In connection with the Confirmation Hearing, no party in interest objected to the Comprehensive Settlement.

73.    The Comprehensive Settlement is a fundamental component of the overall restructuring contained in the Plan because it assures the Debtors and the Estates that the Plan and the distributions made thereunder will result in the final settlement and satisfaction of the various Claims and Equity Interests against the Debtors.  The Comprehensive Settlement promotes the finality of the Plan and repose.  The Court finds that the Comprehensive Settlement is in the best interests of Holders of Claims and Equity Interests, and the Debtors and their respective Estates and  property, and is fair and equitable, and any distributions to be made pursuant to the Plan shall be deemed to have been made on account of the Comprehensive Settlement and in consideration thereof.

## 2.    Article X.B.2. of the Plan - The Global Settlement of the Going Private Transaction Causes of Action.

74.    Article X.B.2. of the Plan provides for the compromise and settlement of all of the Going Private Transaction Causes of Action among the Debtors, the non-Debtor Affiliates of the Debtors, the Debtors Estates and any Person (the "Global Settlement") .  Article X.C.1. provides for a release of the Going Private Transaction Causes of Action by the Releasing Parties, which Releasing Parties includes the Debtors, their Estates and any Holder of a Claim or Equity Interest that would have been able to assert the Going Private Transaction Causes of Action for or on behalf of the Debtors or their Estates. In connection with the Confirmation Hearing, no party in interest has objected to the Global Settlement.[10]

75.    As defined in the Plan, and discussed in greater detail in the Disclosure Statement and various reports discussed below, the Going Private Transaction means the buy-out transaction and related financings that occurred in November of 2007, pursuant to which, among

---

[10]    On December 28, 2009, the Official Creditors Committee filed a motion seeking standing and authority to prosecute the Going Private Transaction Causes of Action (the "Standing Motion").  The Debtors, the Administrative Agent for the Opco Lenders, the Mortgage Lenders and others filed oppositions to the Standing Motion.  A hearing was held on the motion but the Court deferred ruling on the motion until the hearing on approval of the Debtors' Disclosure Statement.  On July 8, 2010, the Official Creditors Committee filed a supplement to the Standing Motion.  On July 16, 2010, the Court entered an order further deferring a decision on the Standing Motion and establishing August 13, 2010 as the deadline for certain parties to file response to the supplement to the Standing Motion.  By the time the Court entered the Disclosure Statement Order, the Official Creditors Committee had (a) announced its support for the Plan, including the Global Settlement and the other terms of the Plan, and (b) announced that it would not be pursuing the Standing Motion.

other things, SCI was acquired by virtue of a merger of FCP Acquisition Sub with and into SCI, with SCI continuing as the surviving corporation, and the sale-and-leaseback transaction with respect to the Propco Properties was consummated. Also as defined in the Plan, the Going Private Transaction Causes of Action means any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other legal or equitable remedies against any Person arising from any transaction comprising or related to the Going Private Transaction, regardless of whether such Claims, Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

76.    As described in the Disclosure Statement at Article II.D.3., during the course of the Debtors' prepetition restructuring negotiation efforts, certain holders of the Senior Notes and Subordinated Notes expressed that SCI might have fraudulent conveyance and related claims against third parties that could be asserted by SCI in connection with the 2007 Going Private Transaction. SCI's Board of Directors authorized the formation of an independent Special Litigation Committee (the "SLC") to investigate and report to the Board regarding whether SCI had colorable claims that could be brought against lenders, former stockholders or others, in connection with the 2007 Going Private Transaction. The SLC retained its own independent legal counsel, Squire Sanders & Dempsey L.L.P., and hired its own independent financial advisor, Odyssey Capital Group, LLC, to perform expert financial analysis in connection with its investigation. Neither professional firm had ever performed work for SCI, its affiliates, the Fertitta family, or any of their affiliates.

77.    The SLC filed its findings with the Court on September 22, 2009 (docket no 353) (the "SLC Report"). The SLC determined that:

a.    The financial projections for the 2007 Going Private Transaction were reasonable when made and were not unduly optimistic or overly aggressive.

b.    SCI was not insolvent at the time of the Going Private Transaction and did not become insolvent as a result of the Going Private Transaction.

c.    SCI was not left with unreasonably small capital.

d.       SCI did not intend or expect to incur debts beyond its ability to pay those

debts as they matured.

e.       No person or entity intended to nor believed the Going Private Transaction

would defraud, hinder, or delay a creditor of SCI.

f.       The participants in the Going Private Transaction had a good faith belief

that the Going Private Transaction would succeed and that SCI would enjoy continued growth.

g.       No person or entity engaged in inequitable conduct in connection with the

Going Private Transaction.

78.    On December 18, 2009, the SLC filed its Supplemental SLC Report (docket no.

721) responsive to certain questions raised by the Official Creditors Committee.  In the

Supplemental SLC Report, the SLC concluded that the Master Lease[11] was a true lease, not a

disguised financing, and that any litigation seeking to recharacterize the Master Lease as

disguised secured financing would be unsuccessful and a waste of Estate resources.

79.    Based upon the SLC Report and Supplemental SLC Report, it was a reasonable

exercise of the Debtors' business judgment to propose a chapter 11 plan that avoids the years of

delay in effectuating a restructuring that would be caused by launching litigation based upon the

Going Private Transaction Causes of Action.  Among other things, the SLC Report and

Supplemental SLC Report demonstrate that any party attempting to pursue any of the Going

Private Transaction Causes of Action would face significant legal and factual obstacles.  In

addition, it is unclear what benefit, if any, the Estates would obtain from the pursuit of any such

claims.  When compared to the benefits received by the Estates from the consensual restructuring

---

[11]  The Master Lease (as discussed in the Disclosure Statement and in numerous pleadings filed with the Court in connection with Court approved amendments to the Master Lease) is between Debtor Propco as landlord and Debtor SCI as tenant, and was entered into at the same time as the Going Private Transaction.  Under the Master Lease, SCI leases the real property and improvements associated with Boulder Station Hotel & Casino, Red Rock Casino Resort Spa, Palace Station Hotel & Casino and Sunset Station Hotel & Casino (collectively, the "Leased Hotels").  The Leased Hotels, in turn, are operated by SCI and certain of its non-debtor operating subsidiaries.  The Master Lease provides for monthly rental payments from SCI to Propco in amounts that exceed the amounts that Propco requires to meet its ordinary debt service obligations and any other expenses not covered by SCI under the "triple net" provisions of the Master Lease.  Subject to certain conditions, the governing documents permit some of the surplus cash to be upstreamed as dividends to the Mezzanine Entities that own equity up the Propco "stack" to service such Mezzanine Entities' debt, with any residual amounts then ultimately "flowing back" to SCI as the ultimate parent entity.

that will be effectuated under the Plan, including benefits from the contributions of the Released Parties thereto, the likelihood of success in any litigation regarding the Going Private Transaction Causes of Action is sufficiently low to justify the release of the Going Private Transaction Causes of Action on the terms and conditions set forth in the Plan as being fair and equitable.

80.     The Court has also considered the fact that the Going Private Transaction litigation would be extremely complex litigation, extremely costly litigation, and the delay attendant to such litigation could put a serious damper on the ability of the Debtors to ever obtain the benefits of chapter 11.  Thus it is not surprising that the Debtors' principal creditor constituencies support the Plan and the release of the Going Private Transaction Causes of Action.  Based upon their contribution, the SLC, its members and agents (including attorneys and financial advisors) are entitled to be included in the Plan definitions of Released Parties and Exculpated Parties, and the Confirmation Order shall so provide.

### 3.     Article X.C. of the Plan – Releases Among Releasing Parties and Released Parties.

81.     Article X.C. of the Plan provides for certain releases.  The releases are (a) releases of claims held by the Debtors and their Estates (Article X.C.1.) against the identified released parties, to the fullest extent permissible under applicable law, and (b) voluntary releases of claims held by Holders of Claims and Equity Interests against the identified released parties, to the fullest extent permissible under applicable law (Article X.C.2.).

82.     The Debtors' Release.  Article X.C.1. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, the Debtors, the Debtors' Estates, the Non-Debtor Affiliates and each of their respective Related Persons fully releases and discharges (the "Debtors' Release") each of the following parties and their respective properties and Related Persons from any and all claims and causes of action (including, without limitation, the Going Private Transaction Causes of Action) based on any act, omission or event that takes place on or prior to the Effective Date and arises from or is related to the Debtors, the Reorganized Debtors or their respective assets, property,

Estates, the Chapter 11 Cases, the Disclosure Statement, the Plan or the solicitation of votes on the Plan that either the releasing parties could assert or that any Holder of a Claim or Equity Interest could assert for or on behalf of the Debtors or their Estates (whether directly or derivatively):  (a) the Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h) the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the Official Creditors Committee and its members, provided that the Committee Support Stipulation has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Effective Date; and (s) the respective Related Persons of each of the foregoing Entities (defined in the Plan as the "Released Parties").  Pursuant to the Plan Modifications, the Released Parties will include the Settling Lenders (subject to the satisfaction of certain terms and conditions in the Settling Lender Stipulation) and the Mezzco Lenders.

83.    The Debtors' Release reflects a sound exercise of the Debtors' business judgment. The Chapter 11 Cases involved a multitude of complex issues.  In order to effectively implement the Plan, the non-Debtor parties thereto need assurance that they will not be subject to any further liability to the Debtors, their Estates, or any party that seeks to bring a claim on behalf of the Debtors or their Estates.  Absent the Debtors' Release, it is likely that the various Released Parties would not commit to support the Plan because they would remain exposed to potential claims and causes of action.

84.    The Third Party Release.  Article X.C.2. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, each Holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in Article X.C.2 fully releases and discharges (the "Third Party Release") each of the Released Parties from any and all claims and causes of action

(including, without limitation, the Going Private Transaction Causes of Action) based on any act, omission or event that takes place on or before the Effective Date in any way relating or pertaining to (v) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (w) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (x) the Chapter 11 Cases, (y) the negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement; and (z) the Going Private Transaction Causes of Action.

85.     Similar to the Debtors' Release, the Third Party Release provides additional assurance to the parties to the Plan and the other parties in interest in the Chapter 11 Cases that their liability on account of claims related to the Debtors (including the Going Private Transaction Causes of Action) will be minimized, and provides an additional incentive for such parties to settle and consent to the Plan.

86.     The Third Party Releases set forth in Article X.C.2. of the Plan are being made on a wholly voluntary basis by such Holder of a Claim or Equity Interest that has indicated on its Ballot that it is consenting to such release.  The Ballots sent to each Holder of a Claim or Equity Interest entitled to vote on the Plan unambiguously stated that the election to consent to such release was at such Holder's option.  The entirely voluntary Third Party Release is an effective tool in winning the necessary support for the Plan, and does not unnecessarily trample on the rights of any party that did not agree to such Third Party Release.

87.     In connection with the Confirmation Hearing, no party in interest objected to the Debtors' Release or the Third Party Release.

### 4.    Article X.D. of the Plan – Exculpation.

88.     Article X.D. of the Plan provides, subject to certain identified exceptions, an exculpation of the following parties from any claims or causes of action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effecting the consummation of the Plan, the Disclosure

Statement or any sale, contract, instrument, release or other agreement or document created or

entered into in connection with the Plan or any other prepetition or postpetition act taken or

omitted to be taken in connection with or in contemplation of the restructuring of the Debtors,

the approval of the Disclosure Statement, confirmation or Consummation of the Plan: (a) the

Debtors and their respective Estates; (b) the Non-Debtor Affiliates; (c) FG; (d) Holdco; (e) the

Mortgage Lenders, solely in their capacity as such; (f) Colony Capital, LLC; (g) New Propco; (h)

the Stalking Horse Bidder; (i) the Successful Bidder; (j) New Opco; (k) the Administrative

Agent; (l) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured

Lenders; (m) the Land Loan Lenders, solely in their capacities as such; (n) the Plan

Administrator; (o) Voteco; (p) the Swap Counterparty, solely in its capacity as such; (q) the

Official Creditors Committee and its members, provided that the Committee Support Stipulation

has not been terminated as of the Effective Date; (r) the Put Parties, provided that the Put Parties

Support Agreement and the Propco Commitment have not been terminated as of the Effective

Date; and (s) the respective Related Persons of each of the foregoing Entities (the "Exculpated

Parties").  Pursuant to the Plan Modifications, the Exculpated Parties will include the Settling

Lenders (subject to the satisfaction of certain terms and conditions in the Settling Lender

Stipulation) and the Mezzco Lenders.

89.    The Plan's exculpation provision provides additional incentive for the various

major parties to the Chapter 11 Cases to commit to and support the Plan.  The exculpation

ensures that such parties will not be subject to any claims or causes of action relating to their

good faith acts or omissions in the restructuring efforts that began almost a year prior to the

Petition Date.  The exculpation ensures that the Plan will have finality, and that the parties

thereto will not be subject to collateral attacks through litigation against the Plan's proponents

and supporters.  In connection with the Confirmation Hearing, no party in interest objected to the

exculpation provisions of the Plan.

90.    The Court finds that the settlement, release, injunction and exculpation provisions

set forth in Article X. of the Plan (i) are integral to the agreement among the various parties in

interest and the overall objectives of the Plan, (ii) are essential to the formulation and successful

implementation of the Plan for the purposes of Section 1123(a)(5) of the Bankruptcy Code, (iv) are being provided for valuable consideration and have been negotiated in good faith and at arms' length, (v) confer material and substantial benefits on the Debtors' Estates, and (vi) are in the best interests of the Debtors, their Estates and other parties in interest and, as to the releases made by, or on behalf of, the Debtors or the Estates, are based on sound business judgment.

### 5. No Successor Liability

91. Section 1141(c) provides in relevant part that "after confirmation of a plan, the property dealt with by a plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners of the debtor. 11 U.S.C. § 1141(c).[12]  In addition, Section 363(f) provides statutory authority for the sale of estate property free and clear of "interests in the property," and courts have generally interpreted Section 363(f) to authorize sales free and clear of liens and claims.  *See e.g., In re Trans World Airlines*, 322 F.3d 283, 290 (3d Cir. 2003) (holding that unsecured claims of debtor's employees "are interests within the meaning of section 363(f) in the sense that they arise from the property being sold.*"); Meyers v. United States*, 297 B.R. 774, 781-82 (S.D.Cal. 2003) (concluding that purchaser had acquired assets of debtor free and clear of plaintiff's unsecured personal injury claims).  Courts have also expressly held that transferees of a debtor's assets pursuant to a sale approved under Section 363 or pursuant to confirmation of a chapter 11 plan are not liable for claims against the debtor under successor liability theories.  *See e.g., In re Trans World Airlines, supra* (Section 363 sale); *Myers v. United States*, *supra* (Section 363 sale); *In re White Motor Credit Corp.*, 75 B.R. 944, 950 (Bankr. N.D. Ohio 1987) (confirmation of plan).  The court in *White Motor Credit Corp.* held that state law successor liability theories are preempted by the Bankruptcy Code.  75 B.R. at 950.

92. The Plan provides that the entities receiving the New Opco Acquired Assets and New Propco Acquired Assets and their subsidiaries, creditors and equity holders, shall have no

---

[12]  Section 1141(c) is expressly subject to the provisions of Section 1141(d)(3), which provides that confirmation of a plan does not discharge a liquidating debtor, but Section 1141(c) refers to *property* of the debtor, not the debtor.  *See e.g., In re Regional Bldg. Sys., Inc.*, 251 B.R. 274, 282 (Bankr. D. Md. 2000), aff'd, 254 F.3d 528, 531 (4th Cir. 2001) (free and clear provision of Section 1141(c) applies to liquidating chapter 11 plans); *In re Shenandoah Realty,* 248 B.R. 505, 513 (W.D. Va. 2000) (same); *In re Van Dyke*, No. 88-81521, 1996 WL 33401578 at *4 (Bankr. C.D. Ill. Jan. 10, 1996) (same).

successor liability for creditors' Claims (including Claims of governmental entities) against the Debtors and the Non-Debtor Affiliates, or otherwise based upon the implementation of the Plan, and such intent of the Plan was plainly described in the Disclosure Statement.  During the course of the Chapter 11 Cases, and in connection with the Confirmation Hearing, no party in interest objected to such Plan term.

93.    Even when the Court applies applicable nonbankruptcy law to the analysis of the transfers of the New Opco Acquired Assets and New Propco Acquired Assets under the Plan, the default rule under state law is that purchasers have no successor liability.  *Village Builders 96, L.P. v. U.S. Laboratories, Inc.*, 112 P.3d 1082, 1087 (Nev. 2005) ("[I]t is the general rule that when one corporation sells all of its assets to another corporation the purchaser is not liable for the debts of the seller." (*quoting Lamb v. Leroy Corp.*, 454 P.2d 24, 26–27 (Nev. 1969)).  Successor liability against purchasers is only applied when one of the exceptions to the default rule against successor liability has been proven.  *Village Builders*, 121 Nev. at 268 (purchasers of assets have no successor liability unless one of the following four exceptions are met: (a) the transferee has agreed to assume the transferor's liabilities; (b) the transaction is a *de facto merger*; (c) the transferee is mere continuation of transferor; or (d) the transaction is a fraud to escape liabilities).

94.    There is no evidence of successor liability because none of the *Village Builders* exceptions to the general rule of no successor liability apply to the Restructuring Transactions and implementation of the Plan.  First, the transferees of the New Opco Acquired Assets and New Propco Acquired assets are not assuming the Debtors' liabilities (except with respect to certain expressly assumed liabilities and permitted exceptions); the Plan and the other Restructuring Transactions Related Documents are clear and unequivocal on that point.

95.    Second, courts generally will not find a *de facto* merger unless the consideration for the assets is the stock of the transferee, which is not the case here.  *See Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264-65 (9th Cir. 1990) (overruled on other grounds) (finding no continuity of shareholders where consideration paid by purchaser was a combination of cash, promissory note and payment of some debts, and no stock in purchaser or its parent

company was exchanged as part of the sale); *see also Ferguson v. Arcata Redwood Co., LLC*, No. C03-05632, 2004 WL 2600471, *4 (N.D.Cal. Nov. 12, 2004) (purchaser was not alleged to have purchased seller's assets with stock, precluding a finding of successor liability); *Kaleta v. Whittaker Corp.*, 221 Ill. App. 3d 705, 709 (1991) (when payment for assets by stock of transferee is not present, sound policy does not support imposing the predecessor's liabilities upon the successor "when it has already paid a substantial price for the assets of the predecessor."). Here, the consideration for the Opco Assets is cash and secured notes issued by Purchaser; and the New Propco Transferred Assets are being transferred in exchange for and on account of the secured claims of the creditors of Propco. None of the consideration for the assets being transferred under the Plan is the stock of transferee.

96. <u>Third</u>, courts will not find a *de facto* merger or that the transferee is a mere continuation of the transferor unless the stock, stockholders and directors of the transferor and transferee are substantially the same, which is not the case here. *See e.g. Village Builders*, 121 Nev. at 274 (no showing of mere continuation without "<u>identity</u> of stock, stockholders and directors between the two corporations") (emphasis added). *See also*, *Commercial Nat'l Bank v. Newtson,* 39 Ill.App.3d 216, 217 (1976) (applying the general rule against corporate successor liability in a situation where one shareholder owned 25% of the predecessor corporation, and after the asset transfer the same shareholder owned 40% of the successor corporation); *Joseph Huber Brewing Co., Inc. v. Pamado, Inc.*, No. 05 C 2783, 2006 WL 2583719, *12-13 (N.D.Ill., September 5, 2006) (finding that a continuity of minority ownership—approximately 15%—does not weigh in favor of a finding for the continuation exception); *Jeong v. Onada Cement Co., Ltd.*, No. CV 99-11092, 2000 WL 33954824, *4 fn 4 (C.D.Cal., May 17, 2000) (acknowledging that under California law, successor liability exists where shareholders are "practically" the same).

97. Here, there is no identity of stock, stockholders or directors between the transferor and the transferee. The transferors, the Debtors and their Non-Debtor Subsidiaries, are currently owned directly and indirectly by Colony Capital and the Fertitta family. Colony owns approximately 74% of the economic value of such stock, the Fertitta family approximately 26%.

The transferee, however, New Propco and its affiliates, will be owned 40% by the current Mortgage Lenders and Mezzco Lenders, 15% by the general unsecured creditors of the Debtors that acquire equity through the Propco Rights Offering, and 45% by Fertitta Gaming LLC. Not only will there be no identity of stock and stockholders between transferee and transferor, but a majority of the transferee stock will be held by entities that hold no stock in the transferor Debtors. Moreover, while all of the current directors of the Debtors are appointed by Colony and the Fertittas, three of the eight directors of the transferees will be appointed by the creditors receiving the stock in transferee, and they will have reasonable approval rights over the appointment of the two independent directors. Thus, the transferees of the New Opco Acquired Assets and New Propco Acquired Assets are not, under applicable law, including Nevada law, a mere continuation of the Debtors.

98.    Fourth, numerous courts, including Nevada courts, have not found the transferee to be a mere continuation of the transferor where the selling corporation continues to exist, even if the selling corporation ceases its business operations. For example, in *Village Builders*, *supra*, where the Nevada Supreme Court declined to find successor liability, the transferor had sold all of its assets, but the transferor corporation was maintained for the purpose of a pending lawsuit. 121 Nev. at 272. Other jurisdictions have reached similar conclusions. *See, e.g.*, *Schumacher v. Richards Shear Co.*, 59 N.Y.S.2d 239, 245 (1983) ("Since Richards Shear survived the instant purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly concluded that Logemann cannot be considered a mere continuation of Richards Shear."); *Gavette v. The Warner & Swasey Co.*, No. 90-CV-217, 1999 WL 118438, at *5 (N.D.N.Y. Mar. 5, 1999) (finding that *de facto* merger did not lie because the seller corporation continued to exist "at least transcendentally for one year."). Here, like the transferor in *Village Builders*, the Debtors will continue to exist after the Effective Date for the purpose of facilitating Plan implementation, claims adjudication and distribution related processes, including possibly pursuing retained causes of action.[13]

---

[13]   The Debtors will not be pursuing Avoidance Actions against counterparties to any Purchased Assets or Assumed Liabilities (as defined in the Stalking Horse APA), including, without limitation, Assumed Contracts, because they are being released pursuant to the Confirmation Order.

99.    Other facts relevant to a finding of no successor liability are: (a) Purchaser is not purchasing all of the Debtors' assets in that Purchaser is not purchasing any of the assets listed on Schedule 2.4 of the Stalking Horse APA; and (b) those of the Debtors' employees who are to be employed by New Opco and New Propco are being hired under new employment contracts or other arrangements to be entered into or to become effective at the time of the asset transfers.

100.    Finally, the Plan is unmistakably not a fraud to escape liabilities.  The record of the Chapter 11 Cases shows that the parties to the Plan have acted in good faith, the Plan has been proposed in good faith, and the Plan accomplishes the goals of maximizing the value of the Debtors' assets for the benefits of the Debtors' creditors.  Thus, based upon the facts of these Chapter 11 Cases, none of the exceptions to the rule against successor liability under Nevada law apply.

**D.    DEBTORS' PROPOSED PLAN MODIFICATIONS**

101.    The Plan Modifications Motion proposes four modifications to the Plan (the "Plan Modifications").  The first Plan Modification modifies Article I.B. of the Plan as follows:

(a)  The definition of Exculpated Parties shall include the Settling Lenders and Mezzco Lenders; provided, however, that the Settling Lenders shall be Exculpated Parties only if all of the applicable terms and conditions of the Settling Lender Stipulation are satisfied by the Settling Lenders.

(b)  "Mezzco Lenders" means the lenders to the Mezzco Debtors.

(c)  The definition of Released Parties shall include the Settling Lenders and Mezzco Lenders; provided, however, that the Settling Lenders shall be Released Parties only if all of the applicable terms and conditions of the Settling Lender Stipulation are satisfied by the Settling Lenders.

(d)  "Settling Lenders" means the Prepetition Opco Secured Lenders referred to as the Settling Lenders in the Stipulation (the "Settling Lender Stipulation") that is Exhibit 1 to the "Debtors' Motion For Order  Approving Global Settlement With Independent Lender Group" (docket no. 1965).

102.    The second Plan Modification: (a) amends Articles IX.B. of the Plan, entitled Conditions Precedent to Effective Date and Consummation of the Plan; and (b) amends Article IX.C. of the Plan, entitled Waiver of Conditions.  Article IX.B. is amended by adding, after the ninth condition, the following condition:

10.    All documentation relating to the issuance of the NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights, and all documentation and

other matters relating to the exemption of such issuances from any registration requirements imposed under any federal or state securities laws, shall be acceptable in all respects to the Debtors, FG and the Mortgage Lenders.

103.    Article IX.C. of the Plan is amended as follows:  The reference in Article IX.C. to ". . . the conditions specified in Article IX.B.5 or B.6 . . . "  shall be replaced with ". . . the conditions specified in Article IX.B.5, B.6 or B.10 . . . ".

104.    The <u>third</u> Plan Modification adds the following language to the Confirmation Order:

Notwithstanding anything in the Plan to the contrary, the Debtors shall have until December 1, 2010 to file and serve motions to assume, assume and assign, or reject Executory Contracts and Unexpired Leases (and may obtain additional time by filing a motion for additional time prior to such deadline and upon notice and a hearing and a showing of good cause).  If the Debtors reject an Executory Contract or Unexpired Lease, the non-debtor party shall have 30 days from entry of the order approving the rejection to file a Proof of Claim for rejection damages.

105.    The <u>fourth</u> Plan Modification modifies Article V.H. of the Plan by deleting clause (iii) and adding the following at the end of the paragraph:

The Debtors shall be dissolved as soon as practicable after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.  After the Effective Date, the Plan Administrator shall act as the sole officer or manager, as the case may be, of each of the Debtors.

106.    The Plan Modifications appear to be reasonable and non-material revisions to the Plan.  The additional condition precedent to the Effective Date with respect to the issuance and documentation of the NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights is based upon the practical reality that the settlement between the Debtors and the Official Creditors Committee did not leave sufficient time prior to the Confirmation Hearing to get the subscription and related documents prepared prior to the Confirmation Hearing.  Since there is expected to be a several month delay between the Confirmation Date and the Effective Date, the Plan Modification does not burden or change the treatment of the Claim of any creditor.  Similarly, the Plan Modification that adds additional time for completing the process of assuming and assigning contracts and leases to the transferees of the New Opco Acquired Assets and New Propco Acquired Assets rationalizes a process that might otherwise have delayed entry

of the Confirmation Order.  Since the Debtors are obligated to perform under these contracts and leases until they reject them, the counterparties are protected, and are not prejudiced by the delay in the final decision of assumption or rejection.  Finally, the Plan Modification that delays dissolution of the Debtors to some time after the Effective Date simply reflects the practical reality that there will likely be Plan implementation actions that will be required of the Debtors after the Effective Date.

107.    The Plan Modifications do not alter the classification and treatment of Claims and Equity Interests, and do not otherwise make the Plan unconfirmable.  The Plan Modifications do not require resolicitation of votes because the Plan Modifications do not materially affect the rights of any Holders of Claims and Equity Interests, and it is unlikely that Holders that voted to accept the Plan would reconsider their acceptance based upon the Plan Modifications.  Each non-Debtor party to an unexpired lease of real property consented in writing to extending until the Effective Date the deadline to assume or reject such lease.

### E.    AMENDMENTS TO THE STALKING HORSE APA

108.    The Required Consenting Lenders, FG and the Mortgage Lenders have each consented to the APA Amendment to the extent required under the Stalking Horse APA and related support agreements.  The APA Amendment modifies certain provisions of the Stalking Horse APA related to the timetable for assuming and assigning contracts and leases.

109.    The APA Amendment also modifies the definition of an acceptable Confirmation Order.  The original definition of "Confirmation Order" in the Stalking Horse APA required, among other things, that the Court find, in connection with confirmation of the Plan, that no administrative tax claims for income tax will result from or arise out of the implementation of the transactions contemplated by the Stalking Horse APA or the Plan, other than alternative minimum taxes that in the aggregate are less than $15 million (the "Maximum Tax Determination").  As the Debtors disclosed in their Disclosure Statement at Articles VIII.A.5. and X.A.1.: (i) the Debtors have requested a private letter ruling from the Internal Revenue Service regarding the application of Internal Revenue Code section 267 to the Restructuring Transactions, though, as set forth in the Disclosure Statement, the receipt of a ruling from the

Internal Revenue Service is not a closing condition under the Stalking Horse APA, as amended, nor is the failure to receive such a ruling a termination event thereunder; and (ii) the Debtors intend to seek a ruling from this Court regarding the Maximum Tax Determination.  By the APA Amendment, the requirement of the Stalking Horse APA that the Confirmation Order include the Maximum Tax Determination is deleted.  In its place, the Maximum Tax Determination becomes a condition precedent to the closing of the sale under the Stalking Horse APA, the Consummation of the Plan and the occurrence of the Effective Date, subject, in each case, to the cure rights during the Seller Excess AMT Period (as defined in the Stalking Horse APA), which rights are not modified by the APA Amendment and are preserved.

**F.      SATISFACTION OF CONDITIONS TO CONFIRMATION.**

110.    Each of the conditions precedent to the entry of these Findings of Fact and Conclusions of Law and the Confirmation Order, as set forth in Article IX.A. of the Plan, has been satisfied.

**III.    CONCLUSIONS OF LAW.**

**A.      JURISDICTION AND VENUE.**

111.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors were and are qualified to be debtors under Section 109 of the Bankruptcy Code.  Venue of the Chapter 11 Cases in the United States Bankruptcy Court for the District of Nevada was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.

**B.      COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.**

112.    As set forth above, the Plan complies in all respects with the applicable requirements of Section 1129(a) of the Bankruptcy Code, except Section 1129(a)(8). Notwithstanding the fact that Section 1129(a)(8) has not been satisfied, the Plan satisfies the requirements of Section 1129(b) with respect to all non-accepting Classes of Claims and Equity Interests.  The Court will confirm the Plan and enter the Confirmation Order contemporaneous with these Findings of Fact and Conclusions of Law.

1.      **The Classification of Claims Under the Plan**
        **Complies With the Requirements of the Bankruptcy Code.**

113.    Under the Plan, Claims of creditors holding general unsecured claims against Debtor SCI, Classes S.4 through S.7, are classified separately.  In the Memorandum of Law, the Debtors argue that the separately classified Claims are different in substance and nature, and the claimholders have different rights against SCI and, in some cases, *vis-à-vis* each other. Therefore, the Debtors argue, there are justifiable, nondiscriminatory economic and business reasons for separate classification of the unsecured claims in Classes S.4, S.5, S.6 and S.7 in compliance with the requirements of Bankruptcy Code Sections 1122(a) and 1129(a)(1).

114.    Section 1122(a) provides in relevant part that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Section 1122(a) does not require that similar claims be placed in the same class.  *See In re Montclair Retail Ctr., L.P.*, 177 B.R. 663, 665 (B.A.P. 9th Cir. 1995).  Rather, when a court is reviewing the propriety of separate classification of unsecured claims outside the context of a single, disproportionately large deficiency claim, the test is whether there is a nondiscriminatory, business justification for classifying similar claims separately.  *See e.g.*, *Steelecase, Inc. v. Johnston* (*In re Johnston*) 21 F.3d 323 (9th Cir. 1994); *State St. Bank & Trust Co. v. Elmwood, Inc.* (*In re Elmwood, Inc.*), 182 B.R. 845 (D. Nev. 1995); *In re Montclair Retail Ctr., L.P.*, 177 B.R. 663 (B.A.P. 9th Cir. 1995); *In re Hawaiian Telcom Commc'ns.*, No 08-2005, 2009 WL 5386130 (Bankr. D. Hawaii, Dec. 30, 2009).  In evaluating whether separate classification is proper, the Court may consider the kind, species, or character of each category of applicable claims.  *In re Johnston*, 21 F. 3d at 327; *In re Montclair Retail Ctr.*, 177 B.R. at 665; *In re Elmwood, Inc.*, 182 B.R. at 849.

115.    Class S.4 Claims are general unsecured claims consisting of trade claims, employee claims, rejection damages claims and deficiency claims of certain secured lenders. Class S.5 consists of Senior Notes Claims, which are general unsecured claims that are contractually senior in right of repayment to the Subordinated Notes Claims that comprise Class S.6.  The size, nature and underlying terms of the Claims held by vendors, employees and other

trade creditors in Class S.4 are distinctly different from the Senior Note Claims in Class S.5 held by large financial institutions, mutual funds, private equity funds and hedge funds.  Similarly, due to the contractual subordination of the Subordinated Note Claims, Class S.6, it is not appropriate under the distribution mechanisms of the Plan to classify those claims in the same Class as the Senior Note Claims, Class S.5.  Thus, under the circumstances of these Chapter 11 Cases, it is appropriate to separately classify Classes S.4, S.5 and S.6.  *See e.g.*, *In re Hawaiian Telcom Communc'ns.,* 2009 WL 5386130 at *17-18 (holding that senior note claims and subordinated note claims are different and thus may be classified separately, and that general unsecured claims are distinct from senior note claims and thus may be classified separately).

116.    Class S.7 consists of the Mortgage Lender claims against SCI.  Class S.7 Claims arise from Propco's prepetition, contractual assignment of all of Propco's rights under the Master Lease as collateral to the Mortgage Lenders to secure the Mortgage Loan.  Class S.7 Claims are based upon security interests granted by Propco to the Mortgage Lenders, pursuant to which the Mortgage Lenders are entitled to receive whatever Propco will receive from SCI on account of Propco's Master Lease rejection damages claim.  Thus, the Claims in Class S.7 are not substantially similar to the Class S.4, S.5 and S.6 Claims, and the Debtors were required to separately classify Class S.7.  *See e.g. In re Johnston,* 21 F.3d 323 at 326 (approving separate classification of unsecured claims where one class was comprised of disputed unsecured claims secured by valid perfected liens against property of a co-debtor and guaranteed by the debtor, another class contained claims based on the debtor's guarantor liability, and the third class contained claims for which the debtor was solely responsible).

117.    The Court concludes that the Debtors have posited good business reasons for the separate classification of Classes S.4 through S.7., and have shown that 3 of the 4 Classes have substantially differing legal rights that may indeed require separate classification.  Moreover, there does not appear to be any evidence that the separate classification is intended to effect an economic advantage for the Debtors, or for any group of creditors over another, and there is no evidence of any intent to  gerrymander a class for the purpose of creating an impaired consenting

class.  Accordingly, the Court concludes that the separate classification of Classes S.4, S.5, S.6 and S.7 complies with all of the applicable provisions of Sections 1122, 1123 and 1129.

**2.      The Plan Complies With the Requirements of Section 1129(a)(10).**

118.    Seventeen Classes of Claims voted to accept the Plan, in each case determined without including any acceptance of the Plan by any insider.  They are Classes FHI.1, FP.1, VC.1, P.2, M5.2, M4.1, M3.1, M2.1, M1.1, S.2, S.3, S.4, S.5, S.6, S.7, RC.2 and TS.2. However, several of the Debtors had no Voting Classes.  The bankruptcy courts that have expressly considered the matter have uniformly held that compliance with Section 1129(a)(10) is tested on a per-plan basis, not on a per-debtor basis, and that Section 1129(a)(10) therefore does not require an accepting impaired class for each debtor under a joint plan.  *See e.g. In re Charter Communcations, Inc.*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) (joint plan of 110 debtors that did not involve substantive consolidation; court held that only a single accepting impaired class under the plan required to satisfy Section 1129(a)(10)); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 at *234-235 (Bankr. S.D.N.Y. July 15, 2004) (joint chapter 11 plan for 177 debtors confirmed although majority of debtors lacked an impaired consenting class); *In re SGPA*, *Inc.*, Case No. 1-01-02609, 2001 WL 34750646, at p.7 (Bankr. M.D. Pa. Sept. 8, 2001) (bankruptcy court confirmed joint plan for multiple debtors and held that "in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan.").

119.    The Court agrees with the *Enron* court that the plain language and inherent fundamental policy behind Section 1129(a)(10) supports the view that the affirmative vote of one impaired class under the joint plan of multiple debtors is sufficient to satisfy Section 1129(a)(10).  *See In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *234-235.  The Court concludes, therefore, that the acceptance of the Plan by seventeen Classes of Claims is sufficient for the Plan to satisfy the requirements of Section 1129(a)(10).

**3.      The Plan Complies With the Requirements of Section 1129(a)(11).**

120.    Section 1129(a)(11) requires the Court to find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any

1    successor to the Debtors under the Plan.  Since the Debtors are being liquidated under the Plan,

2    the question of further financial reorganization of the Debtors is moot.  *See e.g., In re 47th and*

3    *Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (under the literal wording of

4    Section 1129(a)(11), it is unnecessary to show feasibility when liquidation is proposed in the

5    plan); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) (the feasibility test

6    has no application to a liquidation plan).  Moreover, none of the entities receiving the Debtors'

7    assets are successors to the Debtors; therefore, no feasibility finding is required with respect to

8    those entities either.

9         121.    Nevertheless, where, as here, all of the Opco Assets are being liquidated through

10   an approved Sale Process and all of the New Propco Transferred Assets are being transferred

11   under the Plan to the creditors with the senior interests in those assets, the Court can determine

12   that the Plan complies with the "feasibility" test of Section 1129(a)(11) as long as the liquidation

13   is contemplated under the Plan, as it is here, and can be consummated.  *See e.g.*, *In re*

14   *Cypresswood Land Partners, I*, 409 B.R. 396, 433 (Bankr. S.D. Tex. 2009) (plan that provides

15   for a sale of substantially all of a debtor's assets offers a reasonable probability of success and

16   can satisfy Section 1129(a)(11)).  Here, the New Opco Acquired Assets and New Propco

17   Acquired Assets will be transferred to the applicable transferees under the Plan on the Effective

18   Date.  Thus, the Debtors are able to satisfy the feasibility test of Section 1129(a)(1) by

19   demonstrating the financial wherewithal of the transferees to close on the Restructuring

20   Transactions in a manner that has a reasonable prospect of resulting in the consummation of the

21   Plan.  To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of

22   success.  *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

23        122.    Based upon (i) the financial projections for New Propco and New Opco, (ii) the

24   clear financial wherewith and desire of the parties to the Restructuring Transactions to close on

25   the Effective Date, (iii) the evidence that the Put Parties are willing to purchase up to

26   $100 million of equity in New Propco, and (v) the willingness of the Official Creditors

27   Committee to shift from zealous opponent to supporter of the Plan because the Plan now

28   provides general unsecured creditors with the UC Securities, the Court concludes that it is more

likely than not that: (a) Purchaser will close on the Stalking Horse APA, (b) New Propco, its affiliates and the Debtors will be able to effectuate all of the other Restructuring Transactions, and (c) New Propco and New Opco will be able to service the debt obligations they have agreed to issue in connection with the Restructuring Transactions.  Thus, the Court concludes that the Plan meets the feasibility test of Section 1129(a)(11).

C.    **THE TERMS OF THE SALE OF THE OPCO ASSETS TO THE SUCCESSFUL BIDDER ARE APPROVED IN ALL RESPECTS.**

123.    On the Effective Date, the transfer of the Opco Assets and the New Propco Transferred Assets to Purchaser will be a legal, valid, and effective transfer of the Opco Assets and the New Propco Transferred Assets, and will vest Purchaser with all right, title, and interest of the Debtors to the Opco Assets and the New Propco Transferred Assets free and clear of all Liens, Claims and Equity Interests, including but not limited to all claims arising under doctrines of successor liability.

124.    The Stalking Horse APA and the other Restructuring Transactions, including the transfer of the Propco Transferred Assets to Purchaser, were negotiated and have been and are undertaken by the Debtors and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code.  The Sale Process, including the marketing of the New Opco Acquired Assets and the negotiations surrounding the New Propco Purchased Assets, were conducted at arms' length and in good faith within the meaning of Section 363(m) of the Bankruptcy Code.  Purchaser is a purchaser in good faith of the Opco Assets as that term is used in Section 363(m) of the Bankruptcy Code, and Purchaser and the Debtors are entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to the Opco Assets and the Propco Transferred Assets.  Moreover, neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the Stalking Horse APA, the consummation of the Sale, the related Restructuring Transactions, including the transfer of the Propco Transferred Assets to Purchaser, or the assumption and assignment of the Assumed Contracts to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code.  All debt incurred by Purchaser in connection with the Restructuring

Transactions, and all Liens granted by Purchaser in connection with such incurrence of debt, are entitled to the protections of Section 364(e) of the Bankruptcy Code.

125. The consideration provided by Purchaser for the Opco Assets under the Stalking Horse APA is fair and reasonable and shall be deemed for all purposes to constitute Value under the Bankruptcy Code and any other applicable law.

126. The Debtors are authorized to sell the Opco Assets free and clear of all Liens, Claims, Equity Interests and Other Liabilities, because, with respect to each creditor asserting a Lien, Claim, Equity Interest or Other Liability, one or more of the standards set forth in Sections 363(f)(1)-(5) has been satisfied. Those Holders of Liens, Claims, Equity Interests and Other Liabilities who did not object or withdrew objections to the sale, Stalking Horse APA and the related Restructuring Transactions are deemed to have consented thereto pursuant to Section 363(f)(2) of the Bankruptcy Code. Those Holders of Liens, Claims, Equity Interests and Other Liabilities who did object fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code.

127. Except as expressly provided in the Stalking Horse APA, Purchaser is not assuming, nor shall it or any of its affiliates, or their respective Related Persons, be deemed in any way liable or responsible as a successor or otherwise for, any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership of the Opco Assets or use of such assets on or prior to the Effective Date. The Confirmation Order shall provide that all such liabilities, debts and obligations are extinguished as to all Persons, Entities and Governmental Units on the Effective Date insofar as they may give rise to liability, successor or otherwise, under any theory of law or equity against Purchaser and their Related Persons.

128. Pursuant to the terms of the Stalking Horse APA and Sections 363(b), 363(f) and 1141(c) of the Bankruptcy Code, the Debtors are authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the New Opco Acquired Assets and the New Propco Acquired Assets to Purchaser on the Effective Date free and clear of: (i) all Liens, Claims, Equity Interests and Other Liabilities, including without

limitation any Claim, whether arising prior to or subsequent to the commencement of these bankruptcy cases, arising under doctrines of successor liability; and (ii) any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership of the Opco Assets. The Confirmation Order shall provide that, except as otherwise expressly provided in the Stalking Horse APA, on the Effective Date all such Liens, Claims, Equity Interests and restrictions shall be released, terminated and discharged as to the Purchaser and the Opco Assets.

129. Purchaser shall not be deemed a successor of or to the Debtors or the Debtors' estates with respect to any Liens, Claims, Equity Interests and Other Liabilities against the Debtors or the Opco Assets, and Purchaser shall not be deemed liable in any way for any such Liens, Claims, Equity Interests and Other Liabilities, including, without limitation, the Excluded Liabilities or Excluded Assets (as those terms are used in the Stalking Horse APA). The Confirmation Order shall provide that, on the Effective Date, all creditors and equityholders of the Debtors, including all Governmental Units, are permanently and forever barred, restrained and enjoined from (a) asserting any claims or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against Purchaser, their Related Persons or the New Opco Acquired Assets or New Propco Acquired Assets on account of any Liens, Claims, Equity Interests and Other Liabilities, Excluded Liabilities or Excluded Assets, or (b) asserting any claims or enforcing remedies against Purchaser or their Related Persons under any theory of successor liability, merger, *de facto* merger, substantial continuity or similar theory.

130. Without limiting the generality of the foregoing paragraph, other than as specifically set forth in the Stalking Horse APA: (a) Purchaser and their Related Persons shall have no liability or obligation (x) to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or any other payment to employees of the Debtors, and (y) in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or

other termination of any such plan, program agreement or benefit); and (b) Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against Purchaser and their Related Persons any Claims arising from or relating to such employee benefit, agreement, plan or program.

131.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign and sell the Assumed Contracts to Purchaser in connection with the consummation of the sale of the Opco Assets to Purchaser, and the assumption, assignment, and sale of the Assumed Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed Contracts being assigned and sold to Purchaser are an integral part of the Opco Assets being purchased by Purchaser, and accordingly, such assumption, assignment, and sale of the Assumed Contracts are reasonable and enhance the value of the Debtors' estates.

132.    By implementing the Stalking Horse APA, (a) the Debtors will have provided adequate assurance of cure of any monetary default existing prior to the Closing under any of the Assumed Contracts, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code, and will have provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code, and (b) Purchaser will have  provided adequate assurance of its future performance of and under any of the Assumed Contracts, within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code.

**D.      APPROVAL OF THE SETTLEMENTS, RELEASES
AND EXCULPATIONS PROVIDED UNDER THE PLAN.**

133.    Based upon the wide ranging support for the Plan among secured and unsecured creditors, and the Court's finding that the Plan is the best option the Debtors' creditors have to preserve the economic viability and job sustaining value of the Debtors' assets, the Court concludes that each of the settlement, release, exculpation and related provisions of Article X. of the Plan are fair and necessary for the successful implementation of the Plan and are approved.

1          **1.      The Global Settlement in Article X.B.2. of the Plan is Approved.**

2          134.    The Official Creditors Committee announced its support of the Plan and

3    withdrawal of its motion for standing to prosecute the Going Private Transaction Causes of

4    Action around the time that the Solicitation Packages were distributed for voting purposes.

5    Based upon the record of the Chapter 11 Cases, the Court concludes that the Debtors were

6    justified in proposing to settle and release the Going Private Transaction Causes of Action

7    pursuant to the Plan, because such settlement and compromise is consistent with the factors

8    enunciated in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*

9    *Anderson*, 390 U.S. 414, 424 (1968), and *Martin v. Kane (In re A & C Properties)*, 784 F.2d

10   1377 (9th Cir. 1986), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854 (1986), for

11   approval of settlements in bankruptcy cases.  The low probability of success in the litigation, the

12   complexity, expense and delay necessarily associated with any such litigation, and the paramount

13   interest of the creditors and a proper deference to their reasonable views all weigh heavily in

14   favor of settlement here, not litigation.  Accordingly, the Court concludes that the Global

15   Settlement and the provisions of Article X.B.2. constitute a fair and equitable settlement that is in

16   the best interests of the creditors and their estates, and one that satisfies in all respects the

17   requirements of  *TMT Trailer* and *In re A & C Properties* for settlements proposed by chapter 11

18   debtors.

19          **2.      The Exculpation Provisions of Article X.D. of the Plan Are Approved.**

20          135.    Section 524(e) provides in relevant part that "discharge of a debt of the debtor

21   does not affect the liability of any other entity, on or the property of any other entity for, such

22   debt."  In *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), the Court of Appeals for the Ninth

23   Circuit held that Section 524(e) applies to chapter 11 plan bankruptcy discharges.  However,

24   bankruptcy courts generally recognize that Section 524(e) is silent on whether a chapter 11 plan

25   or confirmation order could affect the liability of a non-debtor on statutory grounds *other than* a

26   bankruptcy discharge.  Here the exculpation provision of Article X.D. does not violate section

27   524(e) because it is based upon the more limited exculpation provisions that are expressly

28   contemplated and permitted by Bankruptcy Code section 1125(e).

136.     Section 1125(e) provides a grant of immunity from liability not only under the securities laws, but also under any law, rule, or regulation governing solicitation or acceptance of a plan, to any person that participates in good faith in the solicitation of acceptances of a plan or the offer, issuance, sale or purchase of a security offered or sold in connection with the plan. Read literally, nothing in section 1125(e) limits that protection to post-petition activities. Moreover, another related provision of Section 1125, Section 1125(g), contemplates and authorizes solicitation of acceptances of a chapter 11 plan prior to commencement of a bankruptcy case if solicited in compliance with applicable non-bankruptcy law.

137.     Here, as discussed in Article II. of the Disclosure Statement, the Debtors conducted such pre-bankruptcy solicitations as part of their ongoing restructuring efforts dating back to late 2008.  Specifically, during 2008 and the first six months of 2009, the Debtors engaged in various discussions with the lenders under the Prepetition Opco Credit Agreement and the CMBS Loans and holders of the Senior Notes and Senior Subordinated Notes regarding restructuring alternatives for the Debtors' outstanding indebtedness.  Indeed, in November 2008, the Debtors made an offer to exchange new secured term loans for the outstanding Senior Notes and Senior Subordinated Notes, which would have included a restructuring of the Prepetition Opco Credit Agreement and the CMBS Loans.  The November 2008 exchange offer was unsuccessful.

138.     In February 2009, the Debtors solicited votes from the holders of the Senior Notes and Senior Subordinated Notes for a prepackaged plan of reorganization pursuant to which the holders of the Senior Notes and Senior Subordinated Notes would have received second and third lien notes, respectively, and cash in a plan of reorganization, and the outstanding indebtedness under the Prepetition Opco Credit Agreement and CMBS Loans would have been restructured.  The solicitation for the prepackaged plan of reorganization did not receive sufficient votes to approve the plan, and that plan did not proceed.

139.     In March 2009, the holders of a majority in principal amount of each series of Senior Notes and Senior Subordinated Notes entered a forbearance agreement with SCI with respect to the events of default resulting from SCI's failure to pay interest on the Senior Notes

and Senior Subordinated Notes.  Majority lenders under the Prepetition Opco Credit Agreement

likewise entered into a forbearance agreement with SCI relating to various purported events of

default.  During the period from March 2009 to the commencement of the Chapter 11 Cases, the

Debtors continued to negotiate the terms of a consensual restructuring with the various creditors

of the Debtors.

140.    The Court is of the view that, as long as the pre-petition restructuring efforts were

made in good faith and in compliance with the applicable provisions of chapter 11 (as expressly

required by Section 1125(e)), such conduct is precisely the type of activity that section 1125(e) is

designed to protect.  It would be inequitable, and would not comport with the plain intent of

Section 1125(e) if, after confirmation of the Plan and implementation of the Restructuring

Transactions, the Exculpated Parties -- the Persons and Entities on the Debtor and creditor sides

that actively participated in the process of reaching a consensual chapter 11 plan -- could then be

sued for their good faith prepetition and post-petition restructuring efforts.  Accordingly, the

Court concludes that each of the Exculpated Parties is entitled to the protections afforded them

by Section 1125(e) and Article X.D. of the Plan. [14]

### 3.    The Releases in Article X.C. of the Plan are Approved.

141.    A release of non-debtor third parties voluntarily and knowingly given by a

creditor or equity holder in connection with a chapter 11 plan does not implicate the concerns

regarding third party releases discussed by the Ninth Circuit Court of Appeals in *Lowenschuss*,

*supra.  See e.g., In re Pacific Gas & Elec. Co.*, 304 B.R. 395, 416-18 (Bankr. N.D. Cal. 2004)

(confirming plan that included governmental agency's release of debtor's parent entity and its

officers and directors because the agency had consented to the release); *In re Hotel Mt. Lassen,*

---

[14]    Other bankruptcy courts in recent contested chapter 11 cases have approved plan exculpation clauses at least as broad, if not broader, in scope than that proposed in these Chapter 11 Cases. *See, e.g., In re Citadel Broadcasting, Inc.*, Case No. 09-17442, 2010 WL 210808, at *30 (Bankr. S.D.N.Y. May 19, 2010) ("Exculpated Claims" included all claims relating to the debtors' in or out of court restructuring efforts, and "Exculpated Parties" included, among others, the holders of the senior secured debt and their agent, the agent and indenture trustee for the subordinated noteholders, and each of their respective professionals and affiliates); *In re CIT Group, Inc.*, Case No. 09-16565, 2009 WL 4824498 (Bankr. S.D.N.Y. Dec. 8, 2009) at *25 (the exculpated parties included a steering committee of prepetition lenders, the DIP lenders and their agent, the exit facility lenders and their agent, the indenture trustees for the unsecured note issuances).

*Inc.*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("[a]ny third-party release in connection with a

plan or reorganization, at a minimum, must be fully disclosed and purely voluntary on the part of

the releasing parties and cannot unfairly discriminate against others.").

142.    Here, the Third Party Release was plainly described on the Ballot used to solicit

votes in favor of the Plan.  Thus, the Third Party Release does not violate Section 524(e) or any

of the concerns discussed in *Lowenschuss* and is an appropriate term of the Plan under Section

1123(a)(5), and is an appropriate term of the Plan expressly authorized by Section 1123(b)(3)(A)

(the settlement or adjustment of any claim belong to the debtor or the estate).

143.    The Court concludes that the settlements, compromises, releases, exculpations,

discharges and injunctions set forth in the Plan are fair, equitable, reasonable and in the best

interests of the Debtors and their respective Estates and the Holders of Claims and Equity

Interests, and are approved.

**4.    The Transferees of the New Opco Acquired Assets
and New Propco Acquired Assets Shall Not be
Liable Under Any Successor Liability Theories.**

144.    The operation of Sections 363 and 1141 foreclose the ability of creditors to obtain

a finding of successor liability against the transferees of the Debtors' assets.  It would undermine

the purposes of chapter 11 if creditors could get around the effect of confirmation of a chapter 11

plan by asserting successor liability claims after confirmation.  *See e.g., In re Trans World

Airlines*, 322 F.3d at 292 (to allow some general unsecured creditors to assert successor liability

claims against transferee of debtors' assets, while limiting other creditors' recourse to proceeds

of sale, would be inconsistent with Bankruptcy Code's priority scheme).  In this case, if the Plan

did not foreclose successor liability, the purchaser of the Opco Assets likely would not go

forward with the sale, and the transferees of the New Propco Transferred Assets likely would not

support the Plan.  It is not insignificant that the Purchaser was the only entity at the end of the

day that made a Qualified Bid.

145.    Even if the Court performed the successor liability analysis under applicable non-

bankruptcy law, including under Nevada law, it would find no basis at all for successor liability.

Therefore, the Court concludes that the transferees of the New Opco Acquired Assets and the New Propco Acquired Assets and their Related Persons are not successors of the Debtors or the Debtors' non-debtor subsidiaries, and, therefore, the "no successor liability" provisions of the Plan are consistent with applicable law and shall be enforced in the Confirmation Order.

146.    **PLAN SUPPORT MOTIONS APPROVED**.

147.    The three Plan Support Motions reflect reasonable settlements of complicated disputed issues of bankruptcy law, and each settlement is in itself a significant achievement for the Estates.  The underlying settlements and compromises are consistent with the factors enunciated in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), and *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377 (9th Cir. 1986), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854 (1986), for approval of settlements in bankruptcy cases.  Each of the Plan Support Motions is independently approved, and the Confirmation Order shall provide that the terms of the underlying settlements, stipulations and agreements thereof are incorporated into the Plan and Confirmation Order, and the parties to such settlements, stipulations and agreements shall be authorized and directed to comply with their obligations thereunder.

### E.    THE PLAN MODIFICATIONS ARE APPROVED.

148.    The Plan Modifications comply with each of the applicable requirements of Section 1127 and Federal Rule of Bankruptcy Procedure 3019 concerning adequate notice, adequate disclosure, and compliance with the procedural and substantive requirements of Sections 1121 through 1129.  Accordingly, the Confirmation Order will provide that the Plan Modifications are approved and all references to the Plan in these Finding of Fact and Conclusions of Law and in the Confirmation Order shall mean as modified by the Plan Modifications.

### F.    THE AMENDMENT TO THE STALKING HORSE APA IS APPROVED

149.    The Court is of the view that the APA Amendment contains reasonable accommodations by the Parties consistent with the Plan Modification in respect of the assumption and assignment of contracts and leases.  Further, the parties agreement to push out

the deadline for any determination of the Debtors' tax liability arising from the Plan, the Stalking Horse APA and the other Restructuring Transactions to a time after the Confirmation Date and before the Effective Date is a reasonable accommodation to the reality that the Debtors have not yet received the private letter ruling they are seeking from the Internal Revenue Service, which request they disclosed and discussed in the Disclosure Statement. *See* Disclosure Statement at Articles VIII.A.5. and X.A.1. Accordingly, the Confirmation Order will provide that the APA Amendment is approved, and all references to the Stalking Horse APA in these Findings of Fact and Conclusions of Law and in the Confirmation Order shall mean as amended by the APA Amendment.

### G.    **EXEMPTIONS FROM SECURITIES LAWS.**

150.    Article VI.A. of the Disclosure Statement, entitled "U.S. Securities Law Matters," provides adequate notice to all parties in interest that, subject to certain exceptions discussed in Article VI, "all debt instruments, to the extent they constitute securities, and equity securities to be issued in conjunction with the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in Section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder."

### H.    **EXEMPTIONS FROM TAXATION.**

151.    Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any Stamp or Similar Tax. The Confirmation Order will provide that all federal, state or local governmental officials or agents shall forgo the collection of any such Stamp or Similar Tax or governmental assessment in connection with transfers of property under the Plan, and accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan and the transfers of property under

#4844-2396-4935v21

1   the Restructuring Transactions, including without limitation the recordation of any mortgage

2   pursuant to the New Propco Credit Agreement.

3

4   SUBMITTED BY:

5   Paul S. Aronzon (CA State Bar No. 88781)
    Thomas R. Kreller (CA State Bar No. 161922)

6   Fred Neufeld (CA State Bar No. 150759)
    MILBANK, TWEED, HADLEY & McCLOY LLP

7   601 South Figueroa Street, 30th Floor
    Los Angeles, California 90017

8
    Reorganization Counsel for
9   Debtors and Debtors in Possession

10  and

11
    Laury M. Macauley, NV State Bar No. 11413
12  Dawn M. Cica, NV State Bar No. 004595
    LEWIS AND ROCA LLP
13  50 W. Liberty Street, Ste. 410
    Reno, NV 89501
14

15  Local Reorganization Counsel
    For Debtors and Debtors in Possession
16                                              # # #

17

18

19

20

21

22

23

24

25

26

27

28

#4844-2396-4935v21                    -54-

# Exhibit 3

# Exhibit 3

## EXHIBIT 3

## TERMINATED LIENS, CLAIMS AND EQUITY INTERESTS

| **FERTITTA PARTNERS LLC** | 1. | An unrecorded Shareholder Pledge and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein; |
| | | Dated:           November 7, 2007 |
| | | Parties:        Station Casinos, Inc., a Nevada corporation; FCP Holding, Inc., a Nevada corporation; Fertitta Partners LLC, a Nevada limited liability  company; FCP Voteco, LLC, a Nevada limited liability company; and Deutsche Bank Trust Company Americas, as administrative agent to the lenders thereunder. |
| | 2. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Deutsche Bank Trust Company Americas, as Administrative Agent**, as Secured Party, and **Fertitta Partners LLC**, as Debtor, recorded on **November 7, 2007**, as Document No. **2007036997-9**. |
| **FCP HOLDING, INC.** | 1. | An unrecorded Shareholder Pledge and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein; |
| | | Dated:           November 7, 2007 |
| | | Parties:        Station Casinos, Inc., a Nevada corporation; FCP Holding, Inc., a Nevada corporation; Fertitta Partners LLC, a Nevada limited liability  company; FCP Voteco, LLC, a Nevada limited liability company; and Deutsche Bank Trust Company Americas, as administrative agent to the lenders thereunder. |
| | 2. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Deutsche Bank Trust Company Americas, as Administrative Agent**, as Secured Party, and **FCP Holding, Inc.**, as Debtor, recorded on **November 7, 2007**, as Document No. **2007036996-7**. |
| **FCP VOTECO, LLC** | 1. | An unrecorded Shareholder Pledge and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein; |
| | | Dated:           November 7, 2007 |
| | | Parties:        Station Casinos, Inc., a Nevada corporation; FCP Holding, Inc., a Nevada corporation; Fertitta Partners LLC, a Nevada limited liability  company; FCP Voteco, LLC, a Nevada limited liability company; and Deutsche Bank Trust Company Americas, as administrative agent to the lenders thereunder. |
| | 2. | Financing statement filed in the office of the Secretary of State of the |

| | | State of Nevada, showing **Deutsche Bank Trust Company Americas, as Administrative Agent**, as Secured Party, and **FCP Voteco, LLC**, as Debtor, recorded on **November 7, 2007**, as Document No. **2007036998-1**. |
|---|---|---|
| **FCP MEZZCO BORROWER I, LLC** | 1. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **German American Capital Corporation, as Collateral Agent**, as Secured Party, and **FCP MezzCo Borrower I, LLC**, as Debtor, recorded on **November 7, 2007**,  as Document No. **74255344**. |
| | 2. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **JPMorgan Chase Bank, N.A., a national banking association** and **German American Capital Corporation, a Maryland corporation**, as Secured Parties, and **FCP MezzCo Borrower I, LLC**, as Debtor, recorded on **November 7, 2007**,  as Document No. **74255377**. |
| | 3. | The lien evidenced by an unrecorded Amended and Restated Mezzanine Loan and Security Agreement (First Mezzanine) executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:          March 19, 2008<br>Parties:        FCP MezzCo Borrower I, LLC, a Delaware limited liability company; German American Capital Corporation, a Maryland corporation; and JPMorgan Chase Bank, N.A., a national banking association. |
| | 4. | An unrecorded Pledge and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:          November 7, 2007<br>Parties:        FCP MezzCo Borrower I, LLC, a Delaware limited liability company and German American Capital Corporation, a Maryland corporation, in its capacity as collateral agent for the lenders. |
| | 5. | An unrecorded Account Control Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:          November 7, 2007<br>Parties:        FCP MezzCo Borrower I, LLC, a Delaware limited liability company; JPMorgan Chase Bank, N.A., as a lender; German American Capital Corporation, as a lender and collateral agent for the lenders; and HSBC Bank USA, N.A., a national banking association. |

| **FCP MEZZCO BORROWER II, LLC** | 1. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **BSREMP DB Pool 1 – Bridge, L.L.C.** (as successor to German American Capital Corporation, as collateral agent), as Secured Party, and **FCP MezzCo Borrower II, LLC**, as Debtor, recorded on **November 7, 2007**, as Document No. **74255419**. |
| --- | --- | --- |
| | 2. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **BSREMP DB Pool 1 – Bridge, L.L.C.** (as successor to JPMorgan Chase Bank, N.A., a national banking association and German American Capital Corporation, a Maryland corporation), as Secured Party, and **FCP MezzCo Borrower II, LLC**, as Debtor, recorded on **November 7, 2007**, as Document No. **74255427**. |
| | 3. | The lien evidenced by an unrecorded Amended and Restated Mezzanine Loan and Security Agreement (Second Mezzanine) executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:        March 19, 2008<br>Parties:      FCP MezzCo Borrower II, LLC, a Delaware limited liability company; German American Capital Corporation, a Maryland corporation; and JPMorgan Chase Bank, N.A., a national banking association. |
| | 4. | An unrecorded Pledge and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:        November 7, 2007<br>Parties:      FCP MezzCo Borrower II, LLC, a Delaware limited liability company and German American Capital Corporation, a Maryland corporation, in its capacity as collateral agent for the lenders. |
| | 5. | An unrecorded Account Control Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:        November 7, 2007<br>Parties:      FCP MezzCo Borrower II, LLC, a Delaware limited liability company; JPMorgan Chase Bank, N.A., as a lender; German American Capital Corporation, as a lender and collateral agent for the lenders; and HSBC Bank USA, N.A., a national banking association. |

| FCP MEZZCO BORROWER III, LLC | 1. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **LaSalle Bank National Association, as custodian** (as successor to German American Capital Corporation, as collateral agent), as Secured Party, and **FCP MezzCo Borrower III, LLC**, as Debtor, recorded on **November 7, 2007**,  as Document No. **74255450**. |
|---|---|---|
| | 2. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **LaSalle Bank National Association, as custodian** (as successor to JPMorgan Chase Bank, N.A., a national banking association and German American Capital Corporation, a Maryland corporation), as Secured Party, and **FCP MezzCo Borrower III, LLC**, as Debtor, recorded on **November 7, 2007**,  as Document No. **74255468**. |
| | 3. | The lien evidenced by an unrecorded Amended and Restated Mezzanine Loan and Security Agreement (Third Mezzanine) executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:        March 19, 2008<br>Parties:       FCP MezzCo Borrower III, LLC, a Delaware limited liability company; German American Capital Corporation, a Maryland corporation; and JPMorgan Chase Bank, N.A., a national banking association. |
| | 4. | An unrecorded Pledge and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:        November 7, 2007<br>Parties:       FCP MezzCo Borrower III, LLC, a Delaware limited liability company and German American Capital Corporation, a Maryland corporation, in its capacity as collateral agent for the lenders. |
| | 5. | An unrecorded Account Control Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:        November 7, 2007<br>Parties:       FCP MezzCo Borrower III, LLC, a Delaware limited liability company; JPMorgan Chase Bank, N.A., as a lender; German American Capital Corporation, as a lender and collateral agent for the lenders; and HSBC Bank USA, N.A., a national banking association. |

| FCP MEZZCO BORROWER IV, LLC | 1. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **LaSalle Bank National Association, as custodian** (as successor to JPMorgan Chase Bank, N.A., a national banking association and German American Capital Corporation, a Maryland corporation), as Secured Party, and **FCP MezzCo Borrower IV, LLC**, as Debtor, recorded on **March 20, 2008**, as Document No. **80991651**. |
|---|---|---|
| | 2. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **LaSalle Bank National Association, as custodian** (as successor to German American Capital Corporation, as collateral agent), as Secured Party, and **FCP MezzCo Borrower IV, LLC**, as Debtor, recorded on **March 20, 2008**, as Document No. **80991677**. |
| | 3. | The lien evidenced by an unrecorded Mezzanine Loan and Security Agreement (Fourth Mezzanine) executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:    March 19, 2008<br>Parties:    FCP MezzCo Borrower IV, LLC, a Delaware limited liability company; German American Capital Corporation, a Maryland corporation; and JPMorgan Chase Bank, N.A., a national banking association. |
| | 4. | An unrecorded Pledge and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:    March 19, 2008<br>Parties:    FCP MezzCo Borrower IV, LLC, a Delaware limited liability company and German American Capital Corporation, a Maryland corporation, in its capacity as collateral agent for the lenders. |
| | 5. | An unrecorded Account Control Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:    March 19, 2008<br>Parties:    FCP MezzCo Borrower IV, LLC, a Delaware limited liability company; JPMorgan Chase Bank, N.A., as a lender; German American Capital Corporation, as a lender and collateral agent for the lenders; and HSBC Bank USA, N.A., a national banking association. |

| FCP MEZZCO BORROWER V, LLC | 1. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **LaSalle Bank National Association, as custodian** (as successor to German American Capital Corporation, as collateral agent), as Secured Party, and **FCP MezzCo Borrower V, LLC**, as Debtor, recorded on **March 20, 2008**,  as Document No. **80991784**. |
|---|---|---|
|  | 2. | An unrecorded Pledge and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:           March 19, 2008<br>Parties:        FCP MezzCo Borrower V, LLC, a Delaware limited liability company and German American Capital Corporation, a Maryland corporation, in its capacity as collateral agent for the lenders. |
| **FCP PROPCO, LLC** | 1. | The lien evidenced by an unrecorded Amended and Restated Loan and Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:           March 19, 2008<br>Parties:        FCP PropCo, LLC., as Borrower;<br>German American Capital Corporation, as lenders and noteholder;<br>and JPMorgan Chase Bank, N.A., as lenders and noteholder. |
|  | 2. | An unrecorded Account Control Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:           November 7, 2007<br>Parties:        FCP PropCo, LLC., as Borrower;<br>German American Capital Corporation, as a lender and collateral agent for the lenders;<br>JPMorgan Chase Bank, N.A., as a lender; and<br>HSBC Bank USA, N.A.. |
|  | 3. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **German American Capital Corporation, a Maryland corporation**, as Secured Party, and **FCP PropCo, LLC.**, as Debtor, recorded on **November 7, 2007**,  as Document No. **2007 4255393**. |
|  | 4. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **German American Capital Corporation, as Collateral Agent**, as Secured Party, and **FCP PropCo, LLC.**, as Debtor, recorded on **November 7, 2007**,  as Document No. **2007 4255401**. |

| | | |
|---|---|---|
| | 5. | Financing statement filed in the office of the Secretary of State of the State of Delaware, showing **German American Capital Corporation, a Maryland corporation**, as Secured Party, and **FCP PropCo, LLC.**, as Debtor, recorded on **November 7, 2007**,  as Document No. **2007 4255484**. |
| **FCP PROPCO, LLC** <br><br> **(Palace Station Hotel & Casino)** <br><br> County of Clark, State of Nevada | 1. | Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Master Lease, Subleases, Rents and Security Deposit to secure an indebtedness of $2,050,000,000.00 and any other amounts payable under the terms thereof: <br><br> Recorded: November 7, 2007 in Book 20071107 Document No. 01260 of Official Records. <br> Dated: November 7, 2007 <br> Trustor: FCP PropCo, LLC, a Delaware limited liability company <br> Trustee: Nevada Title Company, a Nevada corporation <br> Beneficiary: German American Capital Corporation, as Collateral Agent for the benefit of the Lenders <br><br> The above Deed of Trust was re-recorded November 29, 2007 in Book 20071129 as Document No. 04827 Official Records. |
| | 2. | Assignment of Master Lease, Subleases, Rents and Security Deposits, dated as of November 7, 2007, executed by FCP PropCo, LLC, a Delaware limited liability company and recorded November 7, 2007, in Book 20071107 as Document No. 01263 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04828, of Official Records, Clark County, Nevada. |
| | 3. | Memorandum of Master Lease, dated as of November 7, 2007, executed by FCP PropCo, LLC, a Delaware limited liability company, and Station Casinos, Inc., a Nevada corporation and recorded November 7, 2007, in Book 20071107 as Document No. 01264 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04829, of Official Records, Clark County, Nevada. |
| | 4. | Subordination, Non-Disturbance and Attornment Agreement, dated as of November 7, 2007, executed by German American Capital Corporation, as Collateral Agent, Station Casinos, Inc., a Nevada corporation, and consented to by FCP PropCo, LLC, a Delaware limited liability company, and recorded November 7, 2007, in Book 20071107 as Document No. 02781 and re-recorded January 3, 2008 in Book 20080103 as Document No. 00655, which document subordinates the Master Lease to the Deed of Trust recorded in Book 20071107 as Document No. 01260 Official Records. |
| | 5. | Memorandum of Sublease, dated as of November 7, 2007, executed by Station Casinos, Inc., a Nevada corporation and Palace Station, Inc., a Nevada corporation, and recorded November 7, 2007, in Book 20071107 as Document No. 01266 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04830, of Official Records, Clark County, |

|  |  | Nevada. |
|---|---|---|
|  | 6. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **FCP PropCo, LLC,** as Secured Party, and **Station Casinos, Inc.,** as Debtor, recorded on **January 11, 2008,** as Document No. **2008001251-0**. |
|  | 7. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |
| **FCP PROPCO, LLC** <br><br> **(Sunset Station Hotel & Casino)** <br><br> County of Clark, State of Nevada | 1. | Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Master Lease, Subleases, Rents, and Security Deposits to secure an indebtedness of $2,050,000,000.00 and any other amounts payable under the terms thereof: <br><br> Recorded:     November 7, 2007 in Book 20071107 Document No. 01262 of Official Records. <br> Dated:        November 7, 2007 <br> Trustor:      FCP PropCo, LLC, a Delaware limited liability company, as successor by merger to Sunset PropCo, LLC, a Delaware limited liability company <br> Trustee:      Nevada Title Company <br> Beneficiary:  German American Capital Corporation, as Collateral Agent for the Lenders |
|  | 2. | Assignment of Master Lease, Subleases, Rents and Security Deposits, dated as of November 7, 2007, executed by FCP PropCo, LLC, a Delaware limited liability company and recorded November 7, 2007, in Book 20071107 as Document No. 01263 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04828, of Official Records, Clark County, Nevada. |
|  | 3. | Memorandum of Master Lease, dated as of November 7, 2007, executed by FCP PropCo, LLC, a Delaware limited liability company, and Station Casinos, Inc., a Nevada corporation and recorded November 7, 2007, in Book 20071107 as Document No. 01264 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04829, of Official Records, Clark County, Nevada. |
|  | 4. | Memorandum of Sublease, dated as of November 7, 2007, executed by Station Casinos, Inc., a Nevada corporation and Sunset Station, Inc., a Nevada corporation, and recorded November 7, 2007, in Book 20071107 as Document No. 01267, of Official Records, Clark County, Nevada. |

|  | 5. | Subordination, Non-Disturbance and Attornment Agreement, dated as of November 7, 2007, executed by German American Capital Corporation, as Collateral Agent, Station Casinos, Inc., a Nevada corporation, and consented to by FCP PropCo, LLC, a Delaware limited liability company, and recorded November 7, 2007, in Book 20071107 as Document No. 02781 and re-recorded January 3, 2008 in Book 20080103 as Document No. 00655, which document subordinates the Master Lease disclosed by a Memorandum of Master Lease recorded in Book 20071107 as Document No. 01264 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04829 to the Deed of Trust recorded in Book 20071107 as Document No. 01263, of Official Records. |
|  | 6. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |
| **FCP PROPCO, LLC**<br><br>**(Boulder Station Hotel & Casino)**<br><br>County of Clark, State of Nevada | 1. | Combined Fee and Leasehold Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Master Lease, Subleases, Rents and Security Deposits to secure an indebtedness of $2,050,000,000.00 and any other amounts payable under the terms thereof:<br>Recorded:   November 7, 2007 in Book 20071107 Document No. 01259 of Official Records.<br>Dated:   November 7, 2007<br>Trustor:   FCP PropCo, LLC, a Delaware limited liability company, successor by merger to Boulder PropCo LLC, a Delaware limited liability company<br>Trustee:   Nevada Title Company<br>Beneficiary:   German American Capital Corporation, as Collateral Agent for the benefit of the Lenders |
|  | 2. | Assignment of Master Lease, Subleases, Rents and Security Deposits, dated as of November 7, 2007, executed by FCP PropCo, LLC, a Delaware limited liability company and recorded November 7, 2007, in Book 20071107 as Document No. 01263 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04828, of Official Records, Clark County, Nevada. |
|  | 3. | Memorandum of Master Lease, dated as of November 7, 2007, executed by FCP PropCo, LLC, a Delaware limited liability company, and Station Casinos, Inc., a Nevada corporation and recorded November 7, 2007, in Book 20071107 as Document No. 01264 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04829, of Official Records, Clark County, Nevada. |
|  | 4. | Subordination, Non-Disturbance and Attornment Agreement, dated as of November 7, 2007, executed by German American Capital Corporation, as Collateral Agent, Station Casinos, Inc., a Nevada corporation, and consented to by FCP PropCo, LLC, a Delaware limited liability company, and recorded November 7, 2007, in Book 20071107 as Document No. |

|  |  |  |
|---|---|---|
|  |  | 02781 and re-recorded January 3, 2008 in Book 20080103 as Document No. 00655, which document subordinates the Master Lease disclosed by a Memorandum of Master Lease recorded in Book 20071107 as Document No. 01264 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04829 to the Deed of Trust recorded in Book 20071107 as Document No. 01259, of Official Records. |
|  | 5. | Memorandum of Sublease, dated as of November 7, 2007, executed by Station Casinos, Inc., a Nevada corporation and Boulder Station, Inc., a Nevada corporation, and recorded November 7, 2007, in Book 20071107 as Document No. 01265, of Official Records, Clark County, Nevada. |
|  | 6. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |
| **FCP PROPCO, LLC**<br><br>**(Red Rock Casino Resort Spa)**<br><br>County of Clark, State of Nevada | 1. | Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Master Lease, Subleases, Rents and Security Deposits to secure an indebtedness of $2,050,000,000.00 and any other amounts payable under the terms thereof:<br>Recorded: November 7, 2007 in Book 20071107 Document No. 01261 of Official Records.<br>Dated: November 7, 2007<br>Trustor: FCP PropCo, LLC, a Delaware limited liability company, successor by merger to Red Rock PropCo, LLC, a Delaware limited liability company<br>Trustee: Nevada Title Company, a Nevada corporation<br>Beneficiary: German American Capital Corporation, as Collateral Agent for the benefit of the lenders |
|  | 2. | Assignment of Master Lease, Subleases, Rents and Security Deposits, dated as of November 7, 2007, executed by FCP PropCo, LLC, a Delaware limited liability company and recorded November 7, 2007, in Book 20071107 as Document No. 01263 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04828, of Official Records, Clark County, Nevada. |
|  | 3. | Memorandum of Master Lease, dated as of November 7, 2007, executed by FCP PropCo, LLC, a Delaware limited liability company, and Station Casinos, Inc., a Nevada corporation and recorded November 7, 2007, in Book 20071107 as Document No. 01264 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04829, of Official Records, Clark County, Nevada. |
|  | 4. | Memorandum of Sublease, dated as of November 7, 2007, executed by Station Casinos, Inc., a Nevada corporation and Charleston Station, LLC, a Nevada limited liability company, and recorded November 7, 2007, in Book 20071107 as Document No. 01268, of Official Records, Clark County, Nevada. |

| | | |
|---|---|---|
| | 5. | Subordination, Non-Disturbance and Attornment Agreement, dated as of November 7, 2007, executed by German American Capital Corporation, as Collateral Agent, Station Casinos, Inc., a Nevada corporation, and consented to by FCP PropCo, LLC, a Delaware limited liability company, and recorded November 7, 2007, in Book 20071107 as Document No. 02781 and re-recorded January 3, 2008 in Book 20080103 as Document No. 00655, which document subordinates the Master Lease disclosed by a Memorandum of Master Lease recorded in Book 20071107 as Document No. 01264 and re-recorded November 29, 2007 in Book 20071129 as Document No. 04829 to the Deed of Trust recorded in Book 20071107 as Document No. 01261, of Official Records. |
| | 6. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |
| **TROPICANA STATION, LLC**<br><br>**(APN: 017-011-02; 017-011-03; 017-011-20; 017-011-21; and 017-011-23)**<br><br>County of Washoe, State of Nevada | 1. | Deed executed by and between the parties named therein, subject to the terms, covenants and conditions therein provided, dated **September 22, 1938**, by and between **James S. Lyons, Jr., et al. and Katherine Squier Murray**, recorded on **September 27, 1938**, **in Book 119, Page 49** as Document No. **83710**, Deed Records of Washoe County, Nevada. |
| | 2. | Deed executed by and between the parties named therein, subject to the terms, covenants and conditions therein provided, dated **January 19, 1939**, by and between **James S. Lyons, Jr., Carol O. Lyons, and Silver State Properties Company**, recorded on **January 25, 1939**, **in Book 121, Page 69** as Document No. **85133**, Deed Records of Washoe County, Nevada. |
| **RENO LAND HOLDINGS, LLC**<br><br>**(APN: 049-392-11, 049-392-12 and 049-392-13)**<br><br>County of Washoe, State of Nevada | 1. | Financing statement filed in the office of the County Recorder, showing **Wachovia Bank, National Association as successor by merger to Southtrust Bank**, as Secured Party, and **Reno Retail Company II, L.L.C.**, as Debtor, recorded on **July 1, 2009**, as Document No. **3777392**, Official Records of Washoe County, Nevada. |
| **STATION CASINOS, INC.** | 1. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Deutsche Bank Trust Company Americas, as administrative agent**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **November 7, 2007**, as Document No. **2007036999-3** |
| | 2. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Deutsche Bank Trust Company Americas, as administrative agent**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **November 7, 2007**, as Document No. **2007037030-2** |

| | |
|---|---|
| 3. | An unrecorded Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:     November 7, 2007<br>Parties:    Station Casinos, Inc., as Borrower;<br>               Subsidiaries of the Borrower identified therein; and<br>               Deutsche Bank Trust Company Americas, as administrative agent for the secured parties. |
| 4. | An unrecorded Deposit Account Control Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:     November 7, 2007<br>Parties:    Station Casinos, Inc., a Nevada corporation;<br>               Bank of America, N.A.; and<br>               Deutsche Bank Trust Company Americas, as administrative agent for the secured parties. |
| 5. | An unrecorded Collateral Account Control Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:     November 7, 2007<br>Parties:    Station Casinos, Inc., a Nevada corporation;<br>               Banc of America Securities LLC; and<br>               Deutsche Bank Trust Company Americas, as administrative agent for the secured parties. |
| 6. | An unrecorded Pledge Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:     November 7, 2007<br>Parties:    Station Casinos, Inc., as Borrower;<br>               Subsidiaries of the Borrower identified therein; and<br>               Deutsche Bank Trust Company Americas, as administrative agent for the secured parties. |
| 7. | An unrecorded Intellectual Property Security Agreement executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:     November 7, 2007<br>Parties:    Station Casinos, Inc., as Borrower;<br>               Subsidiaries of the Borrower identified therein; and<br>               Deutsche Bank Trust Company Americas, as administrative agent for the secured parties. |

# Exhibit 4

# Exhibit 4

## EXHIBIT 4
## SURVIVING LIENS

| FCP PROPCO, LLC<br><br>**(Palace Station Hotel & Casino)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $12,599.01. |
|---|---|---|
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $317,745.17. |
| | 3. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $13,398.35. |
| | 4. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $2,042.95. |
| | 5. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $66,944.55. |
| | 6. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 7. | Reservations and Easements in the patent from the State of Nevada, recorded July 26, 1912, in Book 2 of Deeds, Page 390 as Document No. 4384 of Official Records. |
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded April 7, 1965, in Book 617 as Document No. 496780 of Official Records. |
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded September 29, 1975, in Book 556 as Document No. 515563 of Official Records. |
| | 10. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded September 29, 1975, in Book 556 as Document No. 515564 of Official Records. |
| | 11. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 4, 1976, in Book 627 as Document No. 586923 of Official Records. |
| | 12. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 4, 1976, in Book 627 as Document No. 586924 of Official Records. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | The effect of a "Partial Relinquishment of Right-of-Way", executed by Nevada Power, and recorded February 3, 1988 in Book 880203 as Document No. 00676, of Official Records. |
| | 13. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 4, 1976, in Book 627 as Document No. 586925 of Official Records. |
| | 14. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 4, 1976, in Book 627 as Document No. 586926 of Official Records.<br><br>The effect of a "Partial Relinquishment of Right-of-Way", executed by Nevada Power, and recorded February 3, 1988 in Book 880203 as Document No. 00675, of Official Records. |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded September 28, 1977, in Book 793 as Document No. 752316 of Official Records. |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded May 3, 1978, in Book 854 as Document No. 813875 of Official Records. |
| | 17. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded April 11, 1978, in Book 871 as Document No. 830377 of Official Records.<br><br>The effect of a "Partial Relinquishment of Right-of-Way", executed by Nevada Power, and recorded February 3, 1988 in Book 880203 as Document No. 00670, of Official Records. |
| | 18. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded December 21, 1983, in Book 1849 as Document No. 1808979 of Official Records. |
| | 19. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded March 12, 1984, in Book 1887 as Document No. 1846956 of Official Records.<br><br>The effect of a "Partial Relinquishment of Right-of-Way", executed by Central Telephone Company, and recorded October 27, 1987 in Book 871027 as Document No. 00701, of Official Records. |

| | | |
|---|---|---|
| | | The effect of a "Partial Relinquishment of Right-of-Way", executed by Nevada Power, and recorded February 3, 1988 in Book 880203 as Document No. 00673, of Official Records. |
| | 20. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded March 12, 1984, in Book 1887 as Document No. 1846958 of Official Records. |
| | | The above document was re-recorded on January 8, 1986 in Book 860108 as Document No. 00502. |
| | | The effect of a "Partial Relinquishment of Right-of-Way", executed by Central Telephone Company, and recorded October 27, 1987 in Book 871027 as Document No. 00703, of Official Records. |
| | | The effect of a "Partial Relinquishment of Right-of-Way", executed by Nevada Power, and recorded February 3, 1988 in Book 880203 as Document No. 00674, of Official Records. |
| | 21. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded October 3, 1984, in Book 2001 as Document No. 1960768 of Official Records. |
| | 22. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded April 18, 1985, in Book 2096 as Document No. 2055904 of Official Records. |
| | | The above document was re-recorded on June 3, 1985 in Book 2119 as Document No. 2078954. |
| | 23. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded July 2, 1990, in Book 900702 as Document No. 00421 of Official Records. |
| | 24. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded September 21, 1990, in Book 900921 as Document No. 00824 of Official Records. |
| | 25. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded May 28, 1991, in Book 910528 as Document No. 00483 of Official Records. |
| | 26. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded September 3, 1991, in Book 910903 as Document No. 00600 of Official Records. |
| | 27. | An easement affecting that portion of said land and for the purposes therein |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded March 5, 1992, in Book 920305 as Document No. 00970 of Official Records. |
| | 28. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded August 6, 2001, in Book 20010806 as Document No. 01134 of Official Records. |
| | 29. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded August 28, 2001, in Book 20010828 as Document No. 01829 of Official Records. |
| | 30. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded January 3, 2002, in Book 20020103 as Document No. 01137 of Official Records. |
| | 31. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of Regional Transportation Commission of Southern Nevada, for public pedestrian use and transit facilities, recorded March 8, 2010, in Book 20100308 as Document No. 04129 of Official Records. |
| | 32. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of The City of Las Vegas, for public pedestrian use, recorded March 8, 2010, in Book 20100308 as Document No. 04130 of Official Records, as re-recorded May 20, 2010 in Book 20100520 as Document No. 00705 Official Records. |
| | 33. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $41,827.42. |
| | 34. | Reservations and Easements in the patent from the State of Nevada, recorded July 26, 1912, in Book 2 of Deeds, Page 390 as Document No. 4384 of Official Records. |
| | 35. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded March 22, 1993, in Book 930322 as Document No. 00686 of Official Records.  The above document was re-recorded on December 16, 1994 in Book 941216 as Document No. 00805. |
| | 36. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded June 18, 2001, in Book 20010618 as Document No. 01426 of Official Records. |
| | 37. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $43,712.83. |
| | 38. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $11,118.54. |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| | 39. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $937,774.25. |
| | 40. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $21,038.73. |
| | 41. | Each of Parcels 7 through 10 lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |
| | 42. | Reservations and Easements in the patent from the State of Nevada, recorded July 26, 1912, in Book 2 of Deeds Page 390 as Document No. 4384 of Official Records. |
| | 43. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded April 3, 1972 in Book 220 as Document No. 179035 of Official Records.<br><br>The interest of Nevada Power Company was relinquished by a "Relinquishment of Right of Way", recorded January 11, 1995 in Book 950111 as Document No. 00904 of Official Records. |
| | 44. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded April 3, 1972, in Book 220 as Document No. 179036 of Official Records.<br><br>The interest of Nevada Power Company was relinquished by a "Relinquishment of Right of Way", recorded January 11, 1995 in Book 950111 as Document No. 00905 of Official Records. |
| | 45. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded June 9, 1972 in Book 237 as Document No. 196388 of Official Records. |
| | 46. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded August 23, 1972, in Book 257 as Document No. 216837 of Official Records. |
| | 47. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded January 31, 1977, in Book 702 as Document No. 661897 of Official Records.<br><br>The interest of Nevada Power Company was relinquished by a "Relinquishment of Right of Way", recorded January 4, 1995 in Book 950104 as Document No. 00985 of Official Records. |

#4833-9670-8615

| | | |
|---|---|---|
| | 48. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded March 12, 1984 in Book 1887 as Document No. 1846955 of Official Records.<br><br>The effect of a "Partial Relinquishment of Right-of-Way", executed by Central Telephone Company, and recorded October 27, 1987 in Book 871027 as Document No. 00702, of Official Records.<br><br>The effect of a "Partial Relinquishment of Right-of-Way", executed by Nevada Power, and recorded February 3, 1988 in Book 880203 as Document No. 00672, of Official Records. |
| | 49. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded March 12, 1984 in Book 1887 as Document No. 1846957 of Official Records.<br><br>The effect of a "Partial Relinquishment of Right-of-Way", executed by Nevada Power, and recorded January 11, 1995 in Book 950111 as Document No. 00908, of Official Records. |
| | 50. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded October 3, 1984, in Book 2001 as Document No. 1960767 of Official Records.<br><br>The effect of a "Partial Relinquishment of Right-of-Way", executed by Nevada Power, and recorded January 11, 1995 in Book 950111 as Document No. 00898, of Official Records. |
| | 51. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded May 13, 1986, in Book 860513 as Document No. 00590 of Official Records. |
| | 52. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 28, 1990, in Book 900628 as Document No. 01024 of Official Records. |
| | 53. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 28, 1990, in Book 900628 as Document No. 01026 of Official Records. |
| | 54. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded July 2, 1990, in Book 900702 as Document No. 00422 of Official Records. |
| | 55. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| | | WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded March 5, 1992, in Book 920305 as Document No. 00971 of Official Records. |
| | 56. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 26, 2001, in Book 20010626 as Document No. 01361 of Official Records. |
| | 57. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded June 18, 2001, in Book 20010618 as Document No. 01405 of Official Records. |
| | 58. | Order of Vacation: Any easements not vacated by that certain Order of Vacation recorded January 9, 2003 in Book 20030109 as Document No. 02446 of Official Records. |
| | 59. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 60. | Rights of tenants or person in possession, as tenants only, under unrecorded leases, with no rights of first refusal, entitlement to any reversionary interest relating to the property, or options to purchase all or any portion of the property. |
| **FCP PROPCO, LLC** <br><br> **(Sunset Station Hotel & Casino)** <br><br> County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $2,086,970.13. |
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $9,947.52. |
| | 3. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $15,696.34. |
| | 4. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $143.05. |
| | 5. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 6. | Reservations and Easements in the patent from the United States of America, recorded June 22, 1962, in Book 368 as Document No. 297503, of Official Records. |
| | 7. | Reservations and Easements in the patent from the United States of America, recorded December 17, 1962, in Book 406 as Document No. 327902, of Official Records. |
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 4, 1963, in Book 496 as Document |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| | | No. 399741 of Official Records. |
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded March 16, 1964, in Book 522 as Document No. 420243 of Official Records. |
| | 10. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded October 3, 1979, in Book 1127 as Document No. 1086811 of Official Records.<br><br>The interest of SPRINT/CENTRAL TELEPHONE-NEVADA has been relinquished by a RELINQUISHMENT OF RIGHT-OF-WAY, recorded September 19, 1996 in Book 960919 as Document No. 01763, of Official Records. |
| | 11. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of UNITED STATES, for construction, reconstruction, operation and maintenance of the Second State Southern Nevada Water Project Right of Way, recorded June 23, 1981, in Book 1421 as Document No. 1380338 of Official Records. |
| | 12. | Dedications and Easements as shown on the recorded Map referred to herein, on file in Book 60 of Plats, Page 67. |
| | 13. | Covenants, Conditions and Restrictions in the Declaration of Restrictions recorded May 23, 1994 in Book No. 940523 as Document No. 00606 of Official Records.<br><br>The above document was re-recorded on November 12, 1999 in Book 991112 as Document No. 01679.<br><br>The above document was re-recorded on May 5, 1997 in Book 970505 as Document No. 00025.<br><br>The above document was re-recorded on December 27, 1996 in Book 961227 as Document No. 01108.<br><br>EASTGATE ASSIGNMENT AND ASSUMPTION OF DECLARANT'S RIGHTS by and between PH PROPERTY DEVELOPMENT COMPANY, A DELAWARE CORPORATION, FORMERLY KNOWN AS P.H. PROPERTY DEVELOPMENT COMPANY ("PH"), and EASTGATE OWNERS' ASSOCIATION, A NEVADA CORPORATION ("EOA"), recorded September 28, 2000 in Book 20000928 as Document No. 01195 of Official Records. |
| | 14. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated:            December 9, 1994<br>Lessor:           SUNSET STATION, INC, A NEVADA CORPORATION<br>Lessee:           EASTGATE THEATRE, INC, AN OREGON<br>                       CORPORATION |

Exhibit 4 to Confirmation Order

#4833-9670-8615

|  |  | Term:          25 YEARS<br>Disclosed by:   MEMORANDUM OF LEASE AGREEMENT<br>Recorded:       July 10, 1996 in Book 960710 as Document No. 00013<br><br>Terms, covenants, conditions and provisions in an instrument entitled, "REAFFIRMATION OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT", recorded November 9, 1998, in Book 981109 as Document No. 00040 and recorded June 3, 1999 in Book 990603 as Document No. 00100 and recorded October 28, 1999 in Book 991028 as Document No. 00097 and recorded September 25, 2002 in Book 20020925 as Document No. 02219, of Official Records. |
|  | 15. | Dedications and Easements as shown on the recorded Map referred to herein, on file in Book 65 of Plats, Page 26, of Official Records. |
|  | 16. | The effect of the following Record of Survey, filed in File 74 of Surveys at Page 36, recorded December 19, 1994, in Book 941219, as Document No. 01090 of Official Records. |
|  | 17. | Terms, covenants, conditions and provisions in an instrument entitled, "RECIPROCAL NO-BUILD EASEMENT AGREEMENT", recorded August 27, 1996, in Book 960827 as Document No. 00022, of Official Records. |
|  | 18. | Terms, covenants, conditions and provisions in an instrument entitled, "Variance Order", recorded March 12, 1997, in Book 970312 as Document No. 01256, of Official Records. |
|  | 19. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of THE CITY OF HENDERSON, for municipal utilities, recorded February 12, 1997, in Book 970212 as Document No. 00861 of Official Records. |
|  | 20. | The effect of the following Record of Survey performed by ALAN R. RIEKKI, filed in File 105 of Surveys at Page 38, recorded October 27, 1999, in Book 991027, as Document No. 00565 of Official Records. |
|  | 21. | Terms, covenants, conditions and provisions in an instrument entitled, "SUNSET STATION MASTER DEVELOPMENT PLAN DESIGN GUIDELINES FOR SUNSET STATION HOTEL & CASINO", recorded February 24, 2000, in Book 20000224 as Document No. 01307, of Official Records. |
|  | 22. | Covenants, Conditions and Restrictions in the Declaration of Restrictions recorded February 24, 2000 in Book No. 20000224 as Document No. 01308 of Official Records. |
|  | 23. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated: June 18, 1999<br>Lessor:      SUNSET STATION, INC., A NEVADA CORPORATION<br>Lessee:      CHILDREN'S CHOICE NEVADA PROPERTY, L.L.C., A NEVADA LIMITED LIABILITY COMPANY<br>Term:        TWENTY (20) YEARS COMMENCING JUNE 1, 1999 |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| | | Disclosed by:   MEMORANDUM OF LEASE<br>Recorded:        September 26, 2000 in Book 20000926 as Document No. 00352<br><br>An unrecorded Sublease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated:  August 31, 2000<br>Sublessor:        CHILDREN'S CHOICE NEVADA PROPERTY, LLC, A NEVADA LIMITED LIABILITY COMPANY<br>Sublessee:        CHILDREN'S CHOICE NEVADA CORPORATION III, A NEVADA CORPORATION<br>Term:               TWENTY (20) YEARS<br>Disclosed by:   MEMORANDUM OF SUBLEASE<br>Recorded:        September 5, 2000 in Book 20000905 as Document No. 01107 |
| | 24. | Dedications and Easements as shown on the recorded Map referred to herein, on file in Book 94 of Plats, Page 1, and as amended by Certificate of Amendment recorded July 26, 2001 in Book 20010726 as Document No. 02591 and Certificate of Amendment recorded July 30, 2001 in Book 20010730 as Document No. 03409. |
| | 25. | Covenants, Conditions and Restrictions in the Declaration of Restrictions recorded July 25, 2001 in Book No. 20010725 as Document No. 01101 of Official Records. |
| | 26. | The effect of the following Record of Survey performed by GREGORY RICE, filed in File 116 of Surveys at Page 60, recorded June 13, 2001, in Book 20010613, as Document No. 01123 of Official Records. |
| | 27. | The effect of the following Record of Survey performed by DENNIS W. LAYTON, filed in File 119 of Surveys at Page 0012, recorded November 13, 2001, in Book 20011113, as Document No. 01087 of Official Records. |
| | 28. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CENTRAL TELEPHONE COMPANY, for communication facilities, recorded October 3, 2002, in Book 20021003 as Document No. 00943 of Official Records. |
| | 29. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CITY OF HENDERSON, for traffic signals, recorded January 14, 2003, in Book 20030114 as Document No. 01067 of Official Records. |
| | 30. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of City of Henderson, for ingress and egress, recorded January 28, 2003, in Book 20030128 as Document No. 1256 of Official Records. |
| | 31. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CENTRAL TELEPHONE COMPANY, for communication facilities, recorded June 4, 2003, in Book 20030604 as Document No. 01029 of Official Records. |
| | 32. | An easement affecting that portion of said land and for the purposes therein |

| | | |
|---|---|---|
| | | and incidental purposes thereto, in favor of CENTRAL TELEPHONE COMPANY, for communication facilities, recorded July 30, 2003, in Book 20030730 as Document No. 00059 of Official Records. |
| | 33. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CENTRAL TELEPHONE COMPANY, for communication systems, recorded October 30, 2003, in Book 20031030 as Document No. 00581 of Official Records. |
| | 34. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 35. | Rights of tenants or person in possession, as tenants only, under unrecorded leases, with no rights of first refusal, entitlements to any reversionary interest relating to the property, if any, or option to purchase all or any portion of the property. |
| **FCP PROPCO, LLC** **(Boulder Station Hotel & Casino)** County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $1,216,045.90. |
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $1,668.10 |
| | 3. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $5.88 and has been paid in full. |
| | 4. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $93,736.25. |
| | 5. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $12,339.17. |
| | 6. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $17,747.39. |
| | 7. | SPECIAL ASSESSMENTS: Improvement District No.: 126A Assessment No.: 7567 APN No. 161-07-702-016 Installment due on: 6/1 & 12/1 Initial Principal Balance: $95,416.45 Pay off        $64,546.77 |
| | 8. | SPECIAL ASSESSMENTS: Improvement District No.: 126B Assessment No.: 7581 APN No. 161-07-702-016 Installment due on: QTR 3, 6, 9 and 12 Initial Principal Balance: $7,205.95 Pay off        $0.01 |
| | 9. | SPECIAL ASSESSMENTS: Improvement District No.: 126A Assessment No.: 7567 |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| | | APN No.                  161-07-802-009<br>Installment due on:     6/1 & 12/1<br>Initial Principal Balance:   $26,334.94<br>Pay off             $17,814.92 |
| | 10. | SPECIAL ASSESSMENTS:<br>Improvement District No.:   126A<br>Assessment No.:         7567<br>APN No.             161-07-702-014<br>Installment due on:    6/1 & 12/1<br>Initial Principal Balance:  $186,062.08<br>Pay off           $125,866.26 |
| | 11. | The herein described property lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |
| | 12. | Reservations and Easements in the patent from the State of Nevada, recorded December 14, 1915, in Book 6 of Deeds, Page 183 as Document No. 12627 of Official Records. |
| | 13. | Covenants, Conditions and Restrictions in the Declaration of Restrictions recorded December 15, 1941 in Book No. 29 of Deeds, Pages 314 and 315 as Document No. 127428 of Official Records. |
| | 14. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CLARK COUNTY SANITATION DISTRICT NO. 1, for SEWAGE LINES AND APPURTENANT UNDERGROUND STRUCTURES, recorded January 17, 1963, in Book 414 as Document No. 333804 of Official Records. |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded July 23, 1963, in Book 463 as Document No. 372807 of Official Records. |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded July 24, 1969, in Book 964 as Document No. 774363 of Official Records.<br><br>**NOTE:** The interest of Nevada Power Company was superseded by that certain document recorded January 26, 2000 in Book 20000126 as Document No. 00423 of Official Records. |
| | 17. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded August 28, 1969, in Book 974 as Document No. 781875 of Official Records.<br><br>**NOTE:** The interest of Nevada Power Company was superseded by that certain document recorded January 26, 2000 in Book 20000126 as Document No. 00423 of Official Records. |

#4833-9670-8615

| | | |
|---|---|---|
| | 18. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded April 3, 1972, in Book 220 as Document No. 179010 of Official Records.<br><br>**NOTE:**  The interest of Nevada Power Company was superseded by that certain document recorded January 26, 2000 in Book 20000126 as Document No. 00423 of Official Records. |
| | 19. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded June 8, 1973, in Book 335 as Document No. 294506 of Official Records. |
| | 20. | Covenants, Conditions and Restrictions in the Declaration of Restrictions recorded September 9, 1976 in Book No. 658 as Document No. 617882 of Official Records. |
| | 21. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded September 25, 1978, in Book 948 as Document No. 907246 of Official Records. |
| | 22. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded September 18, 1979, in Book 1119 as Document No. 1078290 of Official Records. |
| | 23. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded February 15, 1980, in Book 1187 as Document No. 1146846 of Official Records. |
| | 24. | Dedications and Easements as shown on the recorded Map referred to herein, in File 34 of Parcel Maps, Page 54, of Official Records. |
| | 25. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded May 14, 1981, in Book 1400 as Document No. 1359935 of Official Records. |
| | 26. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded March 7, 1985, in Book 2074 as Document No. 2033457 of Official Records. |
| | 27. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded March 24, 1987, in Book 870324 as Document No. 00648 of Official Records. |
| | 28. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded January 5, 1989, in Book 890105 as Document No. 00491 of Official Records. |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| | 29. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded November 15, 1989, in Book 891115 as Document No. 00902 of Official Records. |
| | 30. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded April 3, 1991, in Book 910403 as Document No. 00950 of Official Records. |
| | 31. | Terms, covenants, conditions and provisions in an instrument entitled, "TRAFFIC CONTROL IMPROVEMENTS COST PARTICIPATION AGREEMENT, COMMERCIAL DEVELOPMENT", DATED SEPTEMBER 28, 1993, recorded October 11, 1993, in Book 931011 as Document No. 00816, of Official Records. |
| | 32. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded October 20, 1993, in Book 931020 as Document No. 01303 of Official Records. |
| | 33. | An easement affecting a portion of said land and for the purposes stated herein, and incidental purposes thereto, as granted to SOUTHWEST GAS CORPORATION, for gas pipes and appurtenances, recorded February 18, 1994 in Book 940218 as Document No. 01106, of Official Records. |
| | 34. | Terms, covenants, conditions and provisions in an instrument entitled, "WALL AGREEMENT", BY AND BETWEEN VARIOUS OWNERS OF THE LOTS ADJACENT TO SAID LAND AND BOULDER STATION, INC., A NEVADA CORPORATION recorded June 20, 1994, in Book 940620 as Document No. 00537 THROUGH 00548, INCLUSIVE AND RECORDED JULY 7, 1994 IN BOOK 940707 AS DOCUMENT NOS. 00797 AND 00798, of Official Records. |
| | 35. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded July 26, 1994, in Book 940726 as Document No. 00953 of Official Records. |
| | 36. | Terms, covenants, conditions and provisions in an instrument entitled, "TRAFFIC CONTROL IMPROVEMENTS COST PARTICIPATION AGREEMENT, COMMERCIAL DEVELOPMENT", BY AND BETWEEN STATION CASINOS, A.K.A. K.B. ENTERPRISES AND CLARK COUNTY, NEVADA recorded March 23, 1995, in Book 950323 as Document No. 01122, of Official Records. |
| | 37. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon and subject to all of the terms, covenants, and provisions contained therein;<br>Dated:          June 1, 1993<br>Lessor:          KB Enterprises<br>Lessee:          Boulder Station, Inc., a Nevada corporation<br>Term:          65 Years<br>Disclosed by:    Memorandum of Lease<br>Recorded:        July 5, 1995 in Book 950705 as Document No. 00674 |

#4833-9670-8615

| | | |
|---|---|---|
| | | Said Lease has been amended by that Certain First Amendment to Ground Lease and Sublease, dated as of June 30, 1995, that certain Lease and Sublease, dated as of June 30, 1995, that certain Lease Amendment No. 1, Dated as of December 23, 1996 and that certain Second Amendment to Ground Lease and Sublease dated as of January 7, 1997.<br><br>An Assignment of Lessee's Interest in Lease dated November 7, 2007 executed by Boulder Station, Inc., a Nevada corporation, Assignor in favor of Boulder PropCo, LLC, a Delaware limited liability company, Assignee, recorded November 7, 2007 in Book 20071107 as Document No. 00025 of Official Records, Clark County, Nevada. |
| | 38. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon and subject to all of the terms, covenants, and provisions contained therein;<br>Dated:          December 9, 1994<br>Lessor/Sub-Lessor:   BOULDER STATION, INC., A NEVADA CORPORATION<br>Lessee/SUB-LESSEE:  EASTGATE THEATRE, INC., AN OREGON CORPORATION<br>Term:          FROM DECEMBER 9, 1994 TO NOVEMBER 22, 2020 SUBJECT TO FOUR (4) OPTIONS TO EXTEND<br>Disclosed by:     MEMORANDUM OF LEASE AGREEMENT<br>Recorded:       July 10, 1996 in Book 960710 as Document No. 00012<br><br>BY AN INSTRUMENT RECORDED NOVEMBER 20, 1998 IN BOOK 981120 AS DOCUMENT NO. 02482 OF OFFICIAL RECORDS, THIS LEASE/SUB-LEASE HAS BEEN SUBORDINATED TO THE LIEN OF THE DEED OF TRUST RECORDED JULY 5, 1995 IN BOOK 950705 AS DOCUMENT NO. 00676. |
| | 39. | Terms, covenants, conditions and provisions in an instrument entitled, "Reaffirmation of Subordination, Nondisturbance and Attornment Agreement", by Eastgate Theatre, Inc., an Oregon corporation recorded November 20, 1998, in Book 981120 as Document No. 02482, of Official Records.<br><br>Terms, covenants, conditions and provisions in an instrument entitled, "Reaffirmation of Subordination, Nondisturbance and Attornment Agreement", by Eastgate Theatre, Inc., an Oregon corporation recorded September 25, 2002, in Book 20020925 as Document No. 02215, of Official Records. |
| | 40. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated:          August 21, 1995<br>Lessor:         SAM VENTURA, GERHARD SCHWARTZBLATT AND JAIME SIREBRENIK, A GENERAL PARTNERSHIP<br>Lessee:        PACIFIC BELL MOBILE SERVICES, A CALIFORNIA |

| | | |
|---|---|---|
| | | CORPORATION |
| | | Term:        COMMENCE ON OR ABOUT DECEMBER 31, 1996 AND SHALL EXPIRE (5) FIVE YEARS THEREAFTER |
| | | Disclosed by:   MEMORANDUM OF LEASE |
| | | Recorded:    October 29, 1996 in Book 961029 as Document No. 01194 |
| | 41. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded January 26, 2000, in Book 20000126 as Document No. 00423 of Official Records. |
| | 42. | An unrecorded SUBLEASE executed by and between the parties named herein, for the terms and upon and subject to all of the terms, covenants, and provisions contained therein;<br>Dated:        March 30, 2000<br>Sublessor:    BOULDER STATION, INC.<br>Sublessee:    CASINO AUTO SPA, INC.<br>Term:        COMMENCING MARCH 30, 2000 AND ENDING 25 YEARS AFTER THE LEASE COMMENCEMENT DATE<br>Disclosed by:   MEMORANDUM OF LEASE<br>Recorded:    June 27, 2000 in Book 20000627 as Document No. 01119 |
| | 43. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon and subject to all of the terms, covenants, and provisions contained therein;<br>Dated:        September 26, 2000<br>Lessor:      BOULDER STATION, INC., A NEVADA CORPORATION<br>Lessee:      CHILDREN'S CHOICE NEVADA PROPERTY, L.L.C., A NEVADA LIMITED LIABILITY COMPANY<br>Term:        TWENTY (20) YEARS<br>Disclosed by:   MEMORANDUM OF LEASE<br>Recorded:    September 26, 2000 in Book 20000926 as Document No. 00348 |
| | 44. | An unrecorded Sublease executed by and between the parties named herein, for the terms and upon and subject to all of the terms, covenants, and provisions contained therein;<br>Dated:        August 31, 2000<br>Lessor:      CHILDREN'S CHOICE NEVADA PROPERTY, L.L.C. NEVADA LIMITED LIABILITY COMPANY<br>Lessee:      CHILDREN'S CHOICE NEVADA CORPORATION I, A NEVADA CORPORATION<br>Term:        TWENTY (20) YEARS<br>Disclosed by:   MEMORANDUM OF SUBLEASE<br>Recorded:    September 5, 2000 in Book 20000905 as Document No. 01105 of Official Records. |
| | 45. | Terms, covenants, conditions, provisions and easements in an instrument entitled, "EASEMENT AGREEMENT", recorded January 19, 1981, in Book 1343 as Document No. 1302585, of Official Records. |
| | 46. | An unrecorded Lease executed by and between the parties named    herein, for the terms and upon and subject to all of the terms, conditions, and |

16                Exhibit 4 to Confirmation Order

|  |  |  |
|---|---|---|
|  |  | provisions contained therein;<br>Dated: January 25, 1990<br>Lessor: THE STARZYNSKI GENERAL PARTNERSHIP, a Partnership organized under the laws of the State of Nevada, comprised of Douglas L. Peterson, as Trustee of the Zigmunt M. Starzynski Irrevocable Trust U/A/D August 12, 1980, Deborah H. Starzynski and Jill S. Robbins, General Partners, and Alene H. Hemington, as Trustee of the Alene H. Hemington Family Trust U/A/D April 8, 1985, collectively<br><br>Lessee: KB Enterprises, a Nevada corporation<br>Term: Ninety-Nine (99) Years<br>Disclosed by: Memorandum of Lease<br>Recorded: February 9, 1990 in Book 900209 as Document No. 00978<br><br>An instrument entitled "Joinder and Consent to Lease", dated February 2, 1990 and recorded February 9, 1990 in Book 900209 as Document No. 00979 of Official Records. |
|  | 47. | A Grant of Easement – Memorandum of Agreement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COX COMMUNICATIONS LAS VEGAS, INC., for cable and information facilities, recorded June 6, 2007, in Book 20070606 as Document No. 00652 of Official Records. |
|  | 48. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for RIGHT-OF-WAY TO CONSTRUCT, ADD TO, RECONSTRUCT, AND MAINTAIN AND REPAIR UNDERGROUND AND ABOVE GROUND TRAFFIC SIGNAL, INTERSECTION LIGHTING FACILITIES AND PEDESTRIAN POLES, recorded February 6, 2009, in Book 20090206 as Document No. 01546 of Official Records. |
|  | 49. | Water rights, claims or title to water, whether or not shown by the public records. |
|  | 50. | Rights of tenants or person in possession, as tenants only, under unrecorded leases, with no right of first refusal, entitlements to any reversionary interest relating to property, if any or option to purchase all or any portion of the property. |
| **FCP PROPCO, LLC**<br><br>**(Red Rock Casino Resort Spa)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $3,327,167.26. |
|  | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $5.88 and have been paid in full. |
|  | 3. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $74,586.36. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 4. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 5. | The herein described property lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |
| | 6. | SPECIAL ASSESSMENTS: <br> Improvement District No.:        108 <br> Assessment No.:        7502 <br> APN No.        164-01-111-011 <br> Installment due on:        6/1-12/1 <br> Initial Principal Balance:        $1,229,613.25 <br> Pay off $482,735.82 |
| | 7. | SPECIAL ASSESSMENTS: <br> Improvement District No.:        128 <br> Assessment No.:        7572 <br> APN No.        164-01-111-011 <br> Installment due on:        6/1-12/1 <br> Initial Principal Balance:        $2,768,666.17 <br> Pay off $1,806,342.95 |
| | 8. | SPECIAL ASSESSMENTS: <br> Improvement District No.:        108 <br> Assessment No.:        7502 <br> APN No.        164-01-210-003 <br> Installment due on:        6/1-12/1 <br> Initial Principal Balance:        $97,070.73 <br> Pay off $38,109.14 |
| | 9. | SPECIAL ASSESSMENTS: <br> Improvement District No.:        128 <br> Assessment No.:        7572 <br> APN No.        164-01-210-003 <br> Installment due on:        6/1-12/1 <br> Initial Principal Balance:        $218,569.89 <br> Pay off $142,600.12 |
| | 10. | Reservations and Easements in the patent from the United States of America, recorded September 15, 1955, in Book 67 as Document No. 56940 and recorded March 27, 1956 in Book 88 as Document No. 73769, of Official Records. |
| | 11. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded October 14, 1996, in Book 961014 as Document No. 01501 of Official Records. |
| | 12. | Terms, covenants, conditions and provisions in an instrument entitled, "RESTRICTIVE COVENANT RUNNING WITH THE LAND", recorded May 22, 1997, in Book 970522 as Document No. 01587, of Official Records. |

#4833-9670-8615

| | | |
|---|---|---|
| | 13. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded July 9, 1997, in Book 970709 as Document No. 01126 of Official Records. |
| | 14. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 4, 1998, in Book 980604 as Document No. 00094 of Official Records. |
| | 15. | Terms, covenants, conditions and provisions in an instrument entitled, "RESTRICTIVE COVENANTS RUNNING WITH THE LAND", recorded December 30, 1999, in Book 991230 as Document No. 03307, of Official Records. |
| | 16. | Terms, covenants, conditions and provisions in an instrument entitled, "RIGHT OF ENTRY (NEVADA POWER COMPANY)", recorded March 26, 2001, in Book 20010326 as Document No. 01491, of Official Records. |
| | 17. | AMENDED & RESTATED Covenants, Conditions and Restrictions in the Declaration of Restrictions recorded May 6, 2004 in Book No. 20040506 as Document No. 01247 of Official Records. |
| | 18. | Terms, covenants, conditions and provisions in an instrument entitled, "OFF-SITE IMPROVEMENTS AGREEMENT", recorded April 14, 2003, in Book 20030414 as Document No. 01455 AND 01456, of Official Records. |
| | 19. | Dedications and Easements as shown on the recorded Map referred to herein, on file in Book 110 of Plats, Page 29, of Official Records. |
| | 20. | Terms, covenants, conditions and provisions in an instrument entitled, "DEVELOPMENT DECLARATION", recorded May 15, 2003, in Book 20030515 as Document No. 02091, of Official Records. |
| | 21. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded February 5, 2004, in Book 20040205 as Document No. 01778 of Official Records. |
| | 22. | The effect of the following Record of Survey performed by RANDY W. MROWICKI, filed in File 138 of Surveys at Page 69, recorded June 10, 2004, in Book 20040610, as Document No. 0001862 of Official Records. |
| | 23. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded July 29, 2004, in Book 20040729 as Document No. 0000759 of Official Records. |
| | 24. | Terms, covenants, conditions and provisions in an instrument entitled, "TRANSMISSION EASEMENT USE AGREEMENT", recorded August 18, 2004, in Book 20040818 as Document No. 0001201, of Official Records. |
| | 25. | Terms, covenants, conditions and provisions in an instrument entitled, "ENCROACHMENT AGREEMENT", recorded August 24, 2004, in Book 20040824 as Document No. 0000526, of Official Records. |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | 26. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded September 8, 2004, in Book 20040908 as Document No. 0000776 of Official Records. |
|---|---|---|
| | 27. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded October 6, 2004, in Book 20041006 as Document No. 0000710 of Official Records. |
| | 28. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated:  August 31, 2004<br>Lessor: Charleston Station, LLC<br>Lessee: Regal Cinemas, Inc.<br>Term:   20 years plus<br>Disclosed by:    Memorandum of Lease<br>Recorded:          June 21, 2005 in Book 20050621 as Document No. 0001421 |
| | 29. | Terms, covenants, conditions and provisions in an instrument entitled, "REVOCABLE APPLICATION AND PERMIT FOR OCCUPANCY OF NEVADA DEPARTMENT OF TRANSPORTATION RIGHT-OF-WAY", recorded October 20, 2005, in Book 20051020 as Document No. 0003476, of Official Records. |
| | 30. | The effect of the following Record of Survey performed by LYLE E. YENGLIN, filed in File 157 of Surveys at Page 6, recorded June 6, 2006, in Book 20060606, as Document No. 0002875 of Official Records. |
| | 31. | The effect of the following Record of Survey performed by LYLE E. YENGLIN, filed in File 157 of Surveys at Page 7, recorded June 6, 2006, in Book 20060606, as Document No. 0002976 of Official Records. |
| | 32. | The effect of the following Record of Survey performed by LYLE E. YENGLIN, filed in File 157 of Surveys at Page 8, recorded June 6, 2006, in Book 20060606, as Document No. 0002877 of Official Records. |
| | 33. | The effect of the following Record of Survey performed by JOHN E. FORSMAN, filed in File 158 of Surveys at Page 93, recorded August 4, 2006, in Book 20060804, as Document No. 0002278 of Official Records, and as amended by Certificate of Amendment recorded August 30, 2007 in Book 20070830 as Document No. 04277. |
| | 34. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded November 1, 2006, in Book 20061101 as Document No. 0002274 of Official Records. |
| | 35. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded November 1, 2006, in Book 20061101 as Document No. 02273 of Official |

#4833-9670-8615

| | | |
|---|---|---|
| | | Records. |
| | 36. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded January 31, 2001, in Book 20010131 as Document No. 01172 of Official Records. |
| | 37. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded June 18, 2001, in Book 20010618 as Document No. 01427 of Official Records. |
| | 38. | A Grant of Easement – Memorandum of Agreement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COX COMMUNICATIONS LAS VEGAS, INC., for cable and information facilities, recorded June 6, 2007, in Book 20070606 as Document No. 00649 of Official Records. |
| | 39. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded February 1, 2008, in Book 20080201 as Document No. 02727 of Official Records. |
| | 40. | Terms, covenants, conditions and provisions in an instrument entitled, "OFF-SITE IMPROVEMENTS AGREEMENT", recorded September 9, 2008, in Book 20080909 as Document No. 04624, of Official Records. |
| | 41. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 42. | Rights of tenants or person in possession, as tenants only, under unrecorded leases, with no rights of first refusal, entitlements to any reversionary interest relating to the property, if any, or option to purchase and portion of the property |
| **NORTHERN NV ACQUISITIONS, LLC**<br><br>**(APN: 024-140-14)**<br><br>County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable:<br><br>ASSESSORS PARCEL NUMBER:  **024-140-14**<br>Total        **$25,192.54** |
| | 2. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 3. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |
| | 4. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 5. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |

| | 6. | Water rights, claims or title to water, whether or not recorded. |
| | 7. | Right of way for the **Cochran Ditch**, and any easements pertaining thereto. |
| | 8. | Easement and right of way 5 feet in width along Peckham Lane, and incidental purposes, granted to **City of Reno, a municipal corporation** by **an instrument**, recorded on **November 3, 1970, in Book 501, Page 86,** as Document No. **189267**, Official Records of Washoe County, Nevada. |
| | 9. | Easement to construct, operate and maintain communication and electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company and Bell Telephone Company of Nevada**, by **an instrument**, recorded on **December 21, 1971, in Book 601, Page 522,** as Document No. **229568**, Official Records of Washoe County, Nevada. |
| | 10. | A Declaration of Reciprocal Easements, subject to the terms, conditions and provisions contained therein, by **Alda Old Town Associates**, recorded on **June 15, 1987, in Book 2567, Page 649,** as Document No. **1170676**, Official Records of Washoe County, Nevada. |
| | 11. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Grant of Easement**, recorded on **July 27, 1987, in Book 2589, Page 955,** as Document No. **1180801**, Official Records of Washoe County, Nevada |
| | 12. | An Agreement for Reciprocal Grant of Easements, subject to the terms, conditions and provisions contained therein, by **Alda Old Town Associates**, recorded on **March 3, 1988, in Book 2699, Page 725,** as Document No. **1230160**, Official Records of Washoe County, Nevada. |
| | 13. | Non-exclusive easement and right of way, and incidental purposes, granted to **Cochrane Ditch Company, Inc., a Nevada corporation** by **Grant of Easement**, recorded on **March 29, 1988, in Book 2711, Page 692,** as Document No. **1235324**, Official Records of Washoe County, Nevada. |
| | 14. | Easements, dedications, reservations, provisions, recitals, building set back lines, and any other matters as provided for or delineated on Parcel Map No. **2245**, filed in the office of the County Recorder of Washoe County, State of Nevada, on **March 17, 1988**, as Document No. **1232920**. Reference is hereby made to said map for particulars. If one is not included herewith, one will be furnished upon request. |
| | 15. | A Notice of Non-Responsibility executed by the party named therein, subject to the terms, covenants and conditions therein provided, by **Fantasy Inn No. 1, a California general partnership dba R.O.T.M.A., LLC**, recorded on **August 21, 1998, in Book 5356, Page 854** as Document No. **2245053**, Official Records of Washoe County, Nevada. |
| | 16. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **Apple One Nevada, Inc., a Nevada corporation**, as Lessee, disclosed by Estoppel, Subordination, Attornment and Non-Disturbance Agreement, recorded on **July 25, 2007,** as Document No. **3558157**, Official Records of Washoe County, Nevada. |
| | 17. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **Douglas** |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| | | and **Jennifer Brizuela d.b.a. Brizuela's Imports**, as Lessee, disclosed by Estoppel, Subordination, Attornment and Non-Disturbance Agreement, recorded on **July 25, 2007**, as Document No. **3558158**, Official Records of Washoe County, Nevada. |
| | 18. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **Reza and Farideh Mashhour, d.b.a., Express Smog**, as Lessee, disclosed by Estoppel, Subordination, Attornment and Non-Disturbance Agreement, recorded on **July 25, 2007**, as Document No. **3558159**, Official Records of Washoe County, Nevada. |
| | 19. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **American General Financial Services, Inc., a Delaware corporation**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558160**, Official Records of Washoe County, Nevada. |
| | 20. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **CCS and ZX, Inc., d.b.a. Toppers Food & Spirits**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558161**, Official Records of Washoe County, Nevada. |
| | 21. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **Tax Service of America, Inc.**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558162**, Official Records of Washoe County, Nevada. |
| | 22. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **Bryce Camacho**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558163**, Official Records of Washoe County, Nevada. |
| | 23. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **The Bridal Boutique & Tuxedo Shoppe**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558164**, Official Records of Washoe County, Nevada. |
| | 24. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **State of Nevada, Department of Motor Vehicles**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558165**, Official Records of Washoe County, Nevada. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 25. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **The Purple Pumpkin**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558166**, Official Records of Washoe County, Nevada. |
| | 26. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **Smoke, LLC**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558167**, Official Records of Washoe County, Nevada. |
| | 27. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **Florida's Beauty Salon**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. **3558168**, Official Records of Washoe County, Nevada. |
| | 28. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **E5D4 Systems**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. 3558169, Official Records of Washoe County, Nevada. |
| | 29. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **Han Woo Cho and Young Hee Kim d.b.a. Town Mall Cleaners**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. 3558170, Official Records of Washoe County, Nevada. |
| | 30. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC**, as Lessor, and **D & T Partnership, d.b.a. Hong Kong Diner**, as Lessee, disclosed by **Estoppel, Subordination, Attornment and Non-Disturbance Agreement**, recorded on **July 25, 2007**, as Document No. 3558171, Official Records of Washoe County, Nevada. |
| | 31. | Matters as disclosed by an unrecorded ALTA Survey, prepared by **CFA**, dated **September 4, 2007**, Job No. (Not Specified). |
| | 32. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC, a Nevada limited liability company**, as Assignor, and **Northern NV Acquisitions, LLC, a Nevada limited liability company**, as Assignee, disclosed by **Assignment Assumption of Leases**, recorded on **April 30, 2008**, as Document No. **3645446**, Official Records of Washoe County, Nevada. |
| | 33. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **R.O.T.M.A., LLC, a Nevada limited liability company**, as Lessor, and **Express Smog, et al.**, as Lessee, disclosed by **Assignment and Assumption of Leases**, recorded on **April 30, 2008**, as Document No. 3645446, Official Records of Washoe County, Nevada. |
| | 34. | An unrecorded lease with certain terms, covenants, conditions, and |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| | | provisions set forth therein, by **Northern NV. Acquisitions, LLC**, as Lessor, and **Frank and Gena Perez**, as Lessee, disclosed by **Notice of Nonresponsibility**, recorded on **December 11, 2008**,  as Document No. **3711982**, Official Records of  Washoe County, Nevada. |
| **NORTHERN NV ACQUISITIONS, LLC** (APN: 024-150-03) County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER:  024-150-03 Total        **$2,871.02** |
| | 2. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 3. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |
| | 4. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 5. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 6. | Water rights, claims or title to water, whether or not recorded. |
| | 7. | Reservations exceptions and conditions and incidental purposes, thereto subject to the terms and provisions contained therein, as set forth in instruments , recorded on **July 8, 1998**, **in Book 5330, Page 670,** as Document No. 2229152, Official Records of Washoe County, Nevada. And recorded, **December 18, 2000**, as Document No. **2508396**, Official Records of Washoe County, Nevada. And recorded, **April 19, 2001**, as Document No. **2544574**, Official Records of Washoe County, Nevada. |
| | 8. | An Access Agreement executed by and between the parties named herein, subject to the terms, covenants and conditions therein provided, dated **December 14, 2000**, by and between **Equilon Enterprises LLC, a Delaware limited liability company; and Cherokee Festival Holdings, LLC, a Delaware limited liability**, recorded on **December 18, 2000**,  as Document No. **2508397**, Official Records of  Washoe County, Nevada. |
| | 9. | An Environmental Baseline executed by and between the parties named herein, subject to the terms, covenants and conditions therein provided, dated **December 12, 2000**, by and between **Equilon Enterprises LLC, a Delaware limited liability company; and Cherokee Festival Holdings, LLC, a Delaware limited liability company**, recorded on **December 18, 2000**,  as Document No. **2508398**, Official Records of  Washoe County, Nevada. |
| | 10. | Covenants, conditions and restrictions as set forth in an instrument, recorded on **April 19, 2001**,  as Document No. **2544574**, Official Records of Washoe County, Nevada. |
| | 11. | The effect of a Resolution of Relinquishment of a Portion of State Highway |

| | | |
|---|---|---|
| | | Right-of-Way, dated **October 12, 2005,** by **State of Nevada, Department of Transportation Board of Directors,** recorded on **December 28, 2005**, as Document No. **3329604**, Official Records of Washoe County, Nevada. |
| **NORTHERN NV ACQUISITIONS, LLC** **(APN: 024-150-19 and 024-150-22)** County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER: **024-150-19** Total    **$8,417.10** |
| | 2. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER: **024-150-22** Total    **$5,805.70** |
| | 3. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 4. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe.** |
| | 5. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520 |
| | 6. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 7. | Water rights, claims or title to water, whether or not recorded |
| | 8. | Right of way for the **Cochran Ditch**, and any easements pertaining thereto. |
| | 9. | Easement to construct, operate and maintain communication and electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company and Bell Telephone Company of Nevada**, by **Deed, in Book 137, Page 186, Deed** Records of Washoe County, Nevada. And Southerly line extended Westerly, by an instrument, recorded on **June 28, 1954**, as Document No. **229626**, Records of Washoe County, Nevada. |
| | 10. | Agreement for right of way executed by the parties named herein, subject to the terms, covenants and conditions therein provided, by **Esther L. Converse and Juanita Louise Laiolo**, recorded on **October 02, 1958**, as Document No. **293084, Deed** Records of Washoe County, Nevada. |
| | 11. | Easement to construct, operate and maintain communication and electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company and Bell Telephone Company of Nevada**, by **an instrument**, recorded on **July 27, 1960**, as Document No. **323236, Deed** Records of Washoe County, Nevada. |
| | 12. | Waiver of any claims for damages by reason of the establishment of a **State Highway**, as set forth in a Deed, from **Pete Laiola and Juanita Laiola**, to |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | **State of Nevada**, recorded on **January 28, 1949**,  as Document No. **170655, Deed** Records of  Washoe County, Nevada. |
| | 13. | Easement to construct, operate and maintain communication and electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company, a corporation**, by **Right of Way Grant**, recorded on **November 17, 1954, in Book 363, Page 565**,  as Document No. **234737, Deed** Records of  Washoe County, Nevada. |
| | 14. | Easement to construct, operate and maintain communication and electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company and Bell Telephone Company of Nevada**, by **an instrument**, recorded on **April 05, 1956**,  as Document No. **260816, Deed** Records of Washoe County, Nevada. |
| | 15. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Right of Way Grant**, recorded on **March 14, 1983, in Book 1842, Page 711** as Document No. **843178**, Official Records of  Washoe County, Nevada. |
| | 16. | Easements, dedications, reservations, provisions, recitals, building set back lines, and any other matters as provided for or delineated on Parcel Map No. **2977**, filed in the office of the County Recorder of  Washoe County, State of Nevada, on **December 26, 1995**,  as Document No. **1952802**.  Reference is hereby made to said map for particulars. If one is not included herewith, one will be furnished upon request. |
| | 17. | Easements, dedications, reservations, provisions, recitals, building set back lines, and any other matters as provided for or delineated on Parcel Map No. **3279**, filed in the office of the County Recorder of  Washoe County, State of Nevada, on **December 08, 1997**,  as Document No. **2160107**.  Reference is hereby made to said map for particulars. If one is not included herewith, one will be furnished upon request. |
| | 18. | Reciprocal Ingress, Egress and Parking Easement executed by and between the parties named herein, subject to the terms, covenants and conditions therein provided, by and between **Lee N. Levin and Linda T. Levin, husband and wife;  Musa Realty Group, L.C., a limited liability company;  and Gary D. Klefman and Donna M. Klefman, husband and wife**, recorded on **August 13, 1998, in Book 5347, Page 567** as Document No. **2241961**, Official Records of  Washoe County, Nevada. |
| **NORTHERN NV ACQUISITIONS, LLC** **(APN: 024-150-13)** County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010 to June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER:  **024-150-13** Total      **$7,579.54** |
| | 2. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 3. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |

| | | |
|---|---|---|
| | 4. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 5. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 6. | Water rights, claims or title to water, whether or not recorded. |
| | 7. | Right of way for the **Cochran Ditch**, and any easements pertaining thereto. |
| | 8. | Easement to construct, operate and maintain communication and electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company and Bell Telephone Company of Nevada**, by **an instrument**, recorded **in Book 409** as Document No. **257775, Deed Records** of Washoe County, Nevada. |
| | 9. | Easement for foot and vehicular traffic, and incidental purposes, granted to **Reno Elks Home Company** by **an instrument**, recorded on **July 16, 1959, in Book 518** as Document No. **306342, Deed Records** of Washoe County, Nevada. |
| | 10. | Easements, dedications, reservations, provisions, recitals, building set back lines, and any other matters as provided for or delineated on Parcel Map No. **1411**, filed in the office of the County Recorder of Washoe County, State of Nevada, on **December 22, 1982**, as Document No. **829719**. Reference is hereby made to said map for particulars. If one is not included herewith, one will be furnished upon request. |
| **NORTHERN NV ACQUISITIONS, LLC**<br><br>**(APN: 024-150-17)**<br><br>County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable:<br><br>ASSESSORS PARCEL NUMBER:  **024-150-17**<br>Total      **$3,364.30** |
| | 2. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 3. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |
| | 4. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 5. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 6. | Water rights, claims or title to water, whether or not recorded. |
| | 7. | The fact that the ownership of said land does not include any rights of ingress or egress to or from **freeway, highway or roadway**. Said rights having been relinquished by , to , recorded on **July 14, 1948, in Book 220, Page 390** as Document No. **165333**, Deed Records of Washoe County, Nevada. |
| | 8. | Easement Agreement executed by and between the parties named therein, subject to the terms, covenants and conditions therein provided, dated |

| | | |
|---|---|---|
| | | **January 20, 1966**, by and between **Union Oil Company of California, and Charles Burton Orchard**, recorded on **February 10, 1966**, **in Book 152, Page 109** as Document No. **52313**, Official Records of Washoe County, Nevada. |
| | 9. | Access Agreement executed by and between the parties named therein, subject to the terms, covenants and conditions therein provided, dated **October 19, 2006**, by and between **Northern NV Acquisitions, LLC, a Nevada limited liability company, and Conocophillips Company, a Delaware corporation**, recorded on **October 24, 2006**, as Document No. **3454596**, Official Records of Washoe County, Nevada. |
| **TROPICANA STATION, LLC**<br><br>**(APN: 017-011-05)**<br><br>County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable:<br><br>ASSESSORS PARCEL NUMBER: **017-011-05**<br><br>Total      **$3,058.60** |
| | 2. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 3. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |
| | 4. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 5. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 6. | Water rights, claims or title to water, whether or not recorded. |
| | 7. | Provisions, Reservations, Easements and the effect thereof, contained in the Patent from the **United States of America**, recorded on **May 05, 1886**, **in Book A, Page 328**, Land Patent Records of Washoe County, Nevada. |
| | 8. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Right of Way Deed**, recorded on **August 31, 1928**, **in Book 74, Page 388** as Document No. **44502**, Records of Washoe County, Nevada. |
| | 9. | Waiver of any claims for damages by reason of the establishment of **State of Nevada right of way**, as set forth in a Deed, from **John Canson**, to **State of Nevada**, recorded on **December 20, 1932**, **in Book 91, Page 491** as Document No. **61538**, Records of Washoe County, Nevada. |
| | 10. | Easement for traffic signal, and incidental purposes, granted to **City of Reno** by **Easement Deed**, recorded on **February 15, 2006**, as Document No. **3349511**, Official Records of Washoe County, Nevada. |

| **TROPICANA STATION, LLC** **(APN: 017-011-02; 017-011-03; 017-011-20; 017-011-21; and 017-011-23)** County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER:  **017-011-02** Total       **$56,932.18** |
|---|---|---|
| | 2. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER:  **017-011-03** Total       **$1,308.92** |
| | 3. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER:  **017-011-20** Total       **$10,394.80** |
| | 4. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER:  **017-011-21** Total       **$1,373.32** |
| | 5. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable: ASSESSORS PARCEL NUMBER:  **017-011-23** Total       **$25,155.40** |
| | 6. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 7. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |
| | 8. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 9. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 10. | Water rights, claims or title to water, whether or not recorded. |
| | 11. | Provisions, Reservations, Easements and the effect thereof, contained in the Patent from the **United States of America**, recorded on **April 15, 1878**, **in Book A, Page 136,** Land Patent Records of  Washoe County, Nevada. |

#4833-9670-8615

| | | |
|---|---|---|
| | 12. | Provisions, Reservations, Easements and the effect thereof, contained in the Patent from the **United States of America**, recorded on **October 17, 1983, in Book A, Page 496**, Land Patent Records of Washoe County, Nevada. |
| | 13. | Provisions, Reservations, Easements and the effect thereof, contained in the Patent from the **State of Nevada**, recorded on **September 28, 1901, in Book A, Page 705**, Land Patent Records of Washoe County, Nevada. |
| | 14. | Provisions, Reservations, Easements and the effect thereof, contained in the Patent from the **United States of America**, recorded on **September 26, 1902, in Book A, Page 748**, Land Patent Records of Washoe County, Nevada. |
| | 15. | Rights of the public, county and/or city in that portion lying within the street as it now exists:<br><br>Street Name:    **Steamboat Creek, Crane Ditch and Clow Ditch** |
| | 16. | A right of way, together with the right to lay pipes, flumes and construct ditches or other such means for conveying water, and the right to enter upon said lands for the purpose of laying or constructing said means, as set forth in a Deed and other instruments of record, recorded on **February 16, 1904, in Book 25, Page 18**, Deed Records of Washoe County, Nevada. |
| | 17. | Easement for the transmission of electrical power and telephone or telegraph lines, and incidental purposes, granted to **Truckee River General Electric Co.** by **an instrument**, recorded on **May 23, 1911, in Book 39, Page 206** as Document No. **3287**, Deed Records of Washoe County, Nevada. |
| | 18. | `The fact that the ownership of said land does not include any rights of ingress or egress to or from **State Highway**. Said rights having been relinquished by **Nevada Steamboat Springs Co.**, to **State of Nevada**, recorded on **February 14, 1919**,  as Document No. **15332**, Deed Records of Washoe County, Nevada. |
| | 19. | The fact that the ownership of said land does not include any rights of ingress or egress to or from **State Highway**. Said rights having been relinquished by **Nevada Steamboat Springs**, to **State of Nevada**, recorded on **May 28, 1931, in Book 88, Page 11** as Document No. **55618**, Deed Records of Washoe County, Nevada. |
| | 20. | Memorandum of Agreement executed by and between the parties named therein, subject to the terms, covenants and conditions therein provided, dated **April 21, 1931**, by and between **State of Nevada, by and through its Department of Highways; and Nevada Steamboat Springs**, recorded on **May 26, 1931, in Book J, Page 495** as Document No. **55589**, Bonds and Agreements of Washoe County, Nevada. |
| | 21. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Right of Way**, recorded on **October 24, 1958, in Book 492,. Page 31** as Document No. **293940**, Deed Records of Washoe County, Nevada. |
| | 22. | The fact that the ownership of said land does not include any rights of ingress or egress to or from **State Highway**. Said rights having been relinquished by **Dural E. Towne**, to **State of Nevada**, recorded on **June 5, 1959, in Book 513, Page 671** as Document No. **304310**, Deed Records of |

| | | Washoe County, Nevada. |
|---|---|---|
| | 23. | The fact that the ownership of said land does not include any rights of ingress or egress to or from **State Highway**. Said rights having been relinquished by **Dural E. Towne**, to **State of Nevada**, recorded on **June 5, 1959**, **in Book 513, Page 575** as Document No. **304311**, Deed Records of Washoe County, Nevada. |
| | 24. | Reservation of all oil, gas, steam and minerals of whatsoever nature found under the property as set forth in, and incidental purposes, reserved by **Deed,** recorded on **January 25, 1961**, as Document No. **331710**, Deed Records of Washoe County, Nevada. |
| | 25. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Right of Way Grant**, recorded on **November 1, 1961**, as Document No. **346919**, Deed Records of Washoe County, Nevada. |
| | 26. | Easement and right of way 60 feet wide, and incidental purposes, by **Deed**, recorded on **July 23, 1962**, as Document No. **363531**, Deed Records of Washoe County, Nevada. |
| | 27. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Deed**, recorded on **September 8, 1954**, as Document No. **232109**, Deed Records of Washoe County, Nevada. |
| | 28. | Easement to construct, operate and maintain communication facilities, and incidental purposes, granted to **Bell Telephone Company of Nevada**, by **Deed**, recorded on **October 29, 1963**, as Document No. **398162**, Deed Records of Washoe County, Nevada. |
| | 29. | Easement to construct, operate and maintain communication facilities, and incidental purposes, granted to **Bell Telephone Company of Nevada**, by **an instrument**, recorded on **March 12, 1976**, **in Book 957, Page 571** as Document No. **399816**, Official Records of Washoe County, Nevada. |
| | 30. | Easement to construct, operate and maintain communication facilities, and incidental purposes, granted to **Bell Telephone Company of Nevada**, by **an instrument**, recorded on **April 14, 1976**, **in Book 966, Page 6** as Document No. **404235**, Official Records of Washoe County, Nevada. |
| | 31. | Easements, dedications, reservations, provisions, recitals, building set back lines, and any other matters as provided for or delineated on Parcel Map No. **903**, filed in the office of the County Recorder of Washoe County, State of Nevada, on **July 25, 1979**, as Document No. **619516**. Reference is hereby made to said map for particulars. If one is not included herewith, one will be furnished upon request. |
| | 32. | Easements, dedications, reservations, provisions, recitals, building set back lines, and any other matters as provided for or delineated on Parcel Map No. **1113**, filed in the office of the County Recorder of Washoe County, State of Nevada, on **June 11, 1980**, as Document No. **677273**. Reference is hereby made to said map for particulars. If one is not included herewith, one will be furnished upon request. |
| | 33. | Matters as disclosed on Record of Survey filed in the office of the County |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | Recorder of Washoe County, State of Nevada on **August 22, 1980**, as Document No. **689711**. Survey Map No. **1413**. |
| | 34. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Right of Way Grant**, recorded on **June 29, 1983**, **in Book 1885, Page 490** as Document No. **863894**, Official Records of Washoe County, Nevada. |
| | 35. | An unrecorded lease with certain terms, covenants, conditions, and provisions set forth therein, by **Dorothy A. Towne, individually and as Trustee of that certain Declaration of Trust made on September 24, 1984**, as Lessor, and **Fleetwood Corporation**, as Lessee, disclosed by **Abstract of Lease Agreement**, recorded on **June 4, 1991**, **in Book 3269, Page 951** as Document No. **1484315**, Official Records of Washoe County, Nevada.<br><br>Subsequent matters affecting said Leasehold Estate are not reflected herein. |
| | 36. | The effect of an easement for roadway access, and incidental purposes, granted to **Far West Capital, Inc., a Utah corporation** by **Grant of Use**, recorded on **January 8, 1992**, **in Book 3393, Page 865** as Document No. **1535828**, Official Records of Washoe County, Nevada. |
| | 37. | Easement for communication facilities, and incidental purposes, granted to **Nevada Bell** by **Grant of Easement**, recorded on **February 25, 1992**, **in Book 3424, Page 634** as Document No. **1548637**, Official Records of Washoe County, Nevada. |
| | 38. | The effect of an easement for private water service, and incidental purposes, granted to **Boyd Reno, Inc., a Nevada corporation** by **Easement**, recorded on **January 19, 2001**, as Document No. **2516820**, Official Records of Washoe County, Nevada. |
| | 39. | Easement Agreement executed by and between the parties named therein, subject to the terms, covenants and conditions therein provided, dated **November 29, 2006**, by and between **Reno Land Holdings, LLC, a Nevada limited liability company, and the County of Washoe, a political subdivision of the State of Nevada**, recorded on **March 26, 2007**, as Document No. **3513050**, Official Records of Washoe County, Nevada. |
| | 40. | Memorandum of First Amended and Restated Station Property Rights Agreement executed by and between the parties named therein, subject to the terms, covenants and conditions therein provided, dated **September 4, 2007**, by and between **Reno Land Holdings, LLC, a Nevada limited liability company, and Reno Retail Company II, L.L.C., a Delaware limited liability company**, recorded on **September 18, 2007**, as Document No. **3576402**, Official Records of Washoe County, Nevada. |
| **RENO LAND HOLDINGS, LLC**<br><br>**(APN: 024-055-12)**<br><br>County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable:<br><br>ASSESSORS PARCEL NUMBER: **024-055-12**<br>Total      **$64,771.68** |

33                    Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 2. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 3. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |
| | 4. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 5. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 6. | Water rights, claims or title to water, whether or not recorded. |
| | 7. | Easement to construct, operate and maintain communication facilities, and incidental purposes, granted to **Bell Telephone Company of Nevada**, by **Deed**, recorded on **January 19, 1970, in Book 439, Page 704** as Document No. **164658**, Official Records of Washoe County, Nevada. |
| | 8. | Easement to construct, operate and maintain communication facilities, and incidental purposes, granted to **Bell Telephone Company of Nevada**, by **Grant of Easement**, recorded on **June 13, 1980, in Book 1512, Page 463** as Document No. **677764**, Official Records of Washoe County, Nevada. |
| | 9. | Easements, dedications, reservations, provisions, recitals, building set back lines, and any other matters as provided for or delineated on Parcel Map No. **1816**, filed in the office of the County Recorder of Washoe County, State of Nevada, on **April 17, 1985**, as Document No. **991139**. Reference is hereby made to said map for particulars. If one is not included herewith, one will be furnished upon request. |
| | 10. | Right of way for the **Cochran Ditch**, and any easements pertaining thereto. |
| | 11. | Subject to any rights and/or provisions of the General Highway Act for improvements, repairs or landscaping to the public highway, located along the boundary of the herein described property. |
| | 12. | Terms and conditions contained in irrigation easement, recorded on **May 7, 1992**, as Document No. **1569194**, Official Records of Washoe County, Nevada. |
| | 13. | Easement for storm drainage, and incidental purposes, granted to **Breevast Reno, Inc., a California corporation** by **Grant of Temporary Construction Easement for Drainage**, recorded on **February 13, 1996, in Book 4498, Page 268** as Document No. **1967709**, Official Records of Washoe County, Nevada. |
| | 14. | Easement for public use, and incidental purposes, granted to **City of Reno, a Nevada municipal corporation** by **Public Use Easement**, recorded on **February 15, 1996, in Book 4500, Page 322** as Document No. **1968426**, Official Records of Washoe County, Nevada. |
| | 15. | Abandonment of Easement and Grant of Reciprocal Access Easement executed by and between the parties named therein, subject to the terms, covenants and conditions therein provided, dated **March 11, 2005**, by and between **The Nell J. Redfield Trust, and Pacific Firecreek Holdings, LLC, a Delaware limited liability company**, recorded on **March 16, 2005**, as Document No. **3183262**, Official Records of Washoe County, Nevada. |

Exhibit 4 to Confirmation Order

#4833-9670-8615

| | | |
|---|---|---|
| **RENO LAND HOLDINGS, LLC**<br><br>**(APN: 049-385-03)**<br><br>County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable:<br><br>ASSESSORS PARCEL NUMBER:  **049-385-03**<br><br>Total     **$19,962.42** |
| | 2. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 3. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |
| | 4. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 5. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 6. | Water rights, claims or title to water, whether or not recorded. |
| | 7. | Easement to construct, place, inspect, maintain and replace thereon poles, crossarms, wires, cables, fixtures, anchors, guys, underground conduits and manholes, and incidental purposes, granted to **Washoe County** by **an instrument**, recorded on **June 18, 1935**, **in Book 99, Page 265** as Document No. **70376**, Deed Records of  Washoe County, Nevada. |
| | 8. | Covenants, conditions and restrictions as set forth in an instrument, recorded on **September 4, 2007**,  as Document No. **3572083**, Official Records of Washoe County, Nevada.<br><br>Said covenants, conditions and restrictions were re-recorded in an instrument, recorded on **September 18, 2007**,  as Document No. **3576400**, Official Records of  Washoe County, Nevada |
| | 9. | Covenants, conditions and restrictions as set forth in an instrument, recorded on **September 4, 2007**,  as Document No. **3572084**, Official Records of Washoe County, Nevada. |

| | | |
|---|---|---|
| **RENO LAND HOLDINGS, LLC**<br><br>**(APN: 049-392-11, 049-392-12 and 049-392-13)**<br><br>County of Washoe, State of Nevada | 1. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable:<br><br>ASSESSORS PARCEL NUMBER:  **049-392-11**<br>Total     **$123,856.98** |
| | 2. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable:<br><br>ASSESSORS PARCEL NUMBER:  **049-392-12**<br>Total     **$49,084.12** |

| | | |
|---|---|---|
| | 3. | State and County Taxes for the fiscal year **July 1, 2010** to **June 30, 2011**, together with any other taxes or assessments collected therewith, a lien, now due and payable:<br><br>ASSESSORS PARCEL NUMBER: **049-392-13**<br>Total       **$28,945.62** |
| | 4. | The lien, if any, of supplemental taxes, assessed pursuant to the provision of the Nevada Revised Statutes. |
| | 5. | Any liens that may be created for Delinquent Sewer Charges by reason of said premises lying within the **City of Reno/Sparks or the County of Washoe**. |
| | 6. | Any liens that may be created for delinquent waste management charges pursuant to NRS 444.520. |
| | 7. | Rights of way for any existing roads, trails, canals, streams, ditches, drain ditches, pipe, pole or transmission lines traversing said premises. |
| | 8. | Water rights, claims or title to water, whether or not recorded. |
| | 9. | Provisions, Reservations, Easements and the effect thereof, contained in the Patent from the **United States of America**, recorded on **May 05, 1886**, **in Book A, Page 328**, Land Patent Records of  Washoe County, Nevada. |
| | 10. | Provisions, Reservations, Easements and the effect thereof, contained in the Patent from the **United States of America**, recorded on **October 17, 1893**, **in Book A, Page 496**, Land Patent Records of  Washoe County, Nevada. |
| | 11. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Right of Way Deed**, recorded on **August 31, 1928**, **in Book 74, Page 388** as Document No. **44502**, Records of  Washoe County, Nevada. |
| | 12. | Waiver of any claims for damages by reason of the establishment of **State of Nevada right of way**, as set forth in a Deed, from **John Canson**, to **State of Nevada**, recorded on **December 20, 1932**, **in Book 91, Page 491** as Document No. **61538**, Records of  Washoe County, Nevada. |
| | 13. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **an instrument**, recorded on **June 06, 1938**, **in Book M, Page 166** as Document No. **82212, Bonds and Agreements** of  Washoe County, Nevada. |
| | 14. | Easement to construct, operate and maintain communication and electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company and Bell Telephone Company of Nevada**, by **an instrument**, recorded on **October 29, 1949, in Book 242, Page 599** as Document No. **178372**, Records of  Washoe County, Nevada. |
| | 15. | Easement to construct, operate and maintain communication and electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company and Bell Telephone Company of Nevada**, by **an instrument**, recorded on **June 21, 1950**, **in Book 256, Page 142** as Document No. **185287**, Records of  Washoe County, Nevada. |
| | 16. | Waiver of any claims for damages by reason of the establishment of **public** |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | highway, as set forth in a Deed, from **John Canson**, to **State of Nevada**, recorded on **March 21, 1952**, **in Book 296, Page 403** as Document No. **204369**, Records of Washoe County, Nevada. |
| | 17. | A License to Pass, recorded on **March 13, 1953**, **in Book Y, Page 334** as Document No. **214294, Bonds and Agreements** of Washoe County, Nevada.<br><br>An Assignment of License to Pass, recorded on **June 13, 1980**, **in Book 1512, Page 451** as Document No. **677761**, Official Records of Washoe County, Nevada. |
| | 18. | Easement to construct, operate and maintain communication facilities, and incidental purposes, granted to **Bell Telephone Company of Nevada**, by **an instrument**, recorded on **May 08, 1953**, **in Book 321, Page 491** as Document No. **216078, Deed** Records of Washoe County, Nevada. |
| | 19. | Waiver of any claims for damages by reason of the establishment of **State of Nevada right of way**, as set forth in a Deed, from **John Canson**, to **State of Nevada**, recorded on **September 18, 1953**, **in Book 330, Page 425** as Document No. **220430, Deed** Records of Washoe County, Nevada. |
| | 20. | Waiver of any claims for damages by reason of the establishment of **State of Nevada right of way**, as set forth in a Deed, from **John Canson**, to **State of Nevada**, recorded on **May 14, 1954, in Book 348, Page 550** as Document No. **228188, Deed** Records of Washoe County, Nevada. |
| | 21. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **an instrument**, recorded on **June 25, 1962**, **in Book 635, Page 93** as Document No. **361734**, Official Records of Washoe County, Nevada. |
| | 22. | Easement to construct, operate and maintain electric facilities, and incidental purposes, granted to **Sierra Pacific Power Company**, by **Easement Agreement**, recorded on **November 03, 1971**, **in Book 589, Page 533** as Document No. **224422**, Official Records of Washoe County, Nevada. |
| | 23. | The fact that the ownership of said land does not include rights of access to or from **U.S. 395 (S.R. 430 Carson-Reno Highway)**. Said Rights having been relinquished by **Order of Abandonment**, recorded on **April 26, 1995**, **in Book 4290, Page 804** as Document No. **1888633**, Official Records of Washoe County, Nevada. |
| | 24. | The fact that the ownership of said land does not include rights of access to or from **SR-430 and SR-431**. Said Rights having been relinquished by **Quitclaim Deed**, recorded on **July 09, 2001**, as Document No. **2572241** Official Records of Washoe County, Nevada. |
| | 25. | Easement for traffic signal, and incidental purposes, granted to **City of Reno** by **Easement Deed**, recorded on **February 15, 2006**, as Document No. **3349511**, Official Records of Washoe County, Nevada. |
| | 26. | A Declaration of Restrictive Covenants, subject to the terms, covenants and conditions therein provided, dated **September 4, 2007**, by **Reno Land Holdings, LLC**, recorded on **September 4, 2007**, as Document No. **3572083**, Official Records of Washoe County, Nevada.<br>Said document was re-recorded on **September 18, 2007**, as Document No. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | **3576400**, Official Records of Washoe County, Nevada. |
| | 27. | Covenants, conditions and restrictions as set forth in an instrument, recorded on **September 4, 2007**, as Document No. **3572084**, Official Records of Washoe County, Nevada. |
| **STATION CASINOS, INC.** | 1. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **CIT Technology Financing Services, Inc.**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **June 4, 2007**, as Document No. **2007017780-7**. |
| | 2. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **CIT Technology Financing Services, Inc.**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **September 14, 2007**, as Document No. **2007030292-9**. |
| | 3. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **CIT Technology Financing Services, Inc.**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **November 26, 2007**, as Document No. **2007039044-3**. |
| | 4. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Xerox Corporation**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **January 17, 2008**, as Document No. **2008001811-8**. |
| | 5. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **CIT Technology Financing Services, Inc.**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **April 29, 2008**, as Document No. **2008013777-8**. |
| | 6. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Teradata Operations, Inc.**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **June 12, 2008**, as Document No. **2008018697-3**. |
| | 7. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Inland Hobbs Material Handling, Inc.**, as Secured Party, and **Station Casinos, Inc.**, as Debtor, recorded on **December 30, 2008**, as Document No. **2008039000-3**. |
| | 8. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Konami Gaming, Inc.**, as Secured Party, and **Station Casinos, Inc.** and **Palace Station Hotel & Casino, Inc.**, as Debtors, recorded on **April 23, 2009**, as Document No. **2009010364-2**. |
| | 9. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Konami Gaming, Inc.**, as Secured Party, and **Station Casinos, Inc.** and **Wildfire Casino Boulder**, as Debtors, recorded on **April 23, 2009**, as Document No. **2009010367-8**. |
| | 10. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Konami Gaming, Inc.**, as Secured Party, and **Santa Fe Station, Inc.** and **Santa Fe Station Hotel & Casino**, as Debtors, recorded on **April 23, 2009**, as Document No. **2009010365-4**. |
| | 11. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Konami Gaming, Inc.**, as Secured Party, and **Station** |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | **Casinos, Inc.**, as Debtor, recorded on **April 23, 2009**, as Document No. **2009010342-6**. |
| | 12. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Red Rock Gallery, LLC** and **Citibank, N.A.**, as Secured Parties, and **Station Casinos, Inc.**, as Debtor, recorded on **May 19, 2009**, as Document No. **2009012609-4**. |
| | 13. | Financing statement filed in the office of the Secretary of State of the State of Nevada, showing **Lonian Gallery, LLC** and **Citibank, N.A.**, as Secured Parties, and **Station Casinos, Inc.**, as Debtor, recorded on **May 19, 2009**, as Document No. **2009012606-8**. |

39                    Exhibit 4 to Confirmation Order

# Exhibit 5

# Exhibit 5

## EXHIBIT 5
## REAL PROPERTY LEGAL DESCRIPTION

| | |
|---|---|
| **FCP PROPCO, LLC**<br><br>**(Palace Station Hotel & Casino)** | **PARCEL ONE (1):  (APN:162-08-502-007)**<br><br>A PORTION OF THE NORTHEAST QUARTER (NE 1/4) OF THE NORTHEAST QUARTER (NE 1/4) OF SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>THE SOUTH 150 FEET OF THE NORTH 375 FEET OF THE WEST 245 FEET OF THE EAST 275 FEET OF THE NORTHEAST QUARTER (NE 1/4) OF SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. AND M.<br><br>**PARCEL TWO (2):  (APN: 162-08-502-011)**<br><br>A PORTION OF THE NORTHEAST QUARTER (NE 1/4) OF THE NORTHEAST QUARTER (NE 1/4) OF SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>COMMENCING AT THE NORTHEAST CORNER OF SAID SECTION 8; THENCE SOUTH 0°25'21" WEST ALONG THE EAST LINE THEREOF A DISTANCE OF 448.36 FEET; THENCE NORTH 89°34'39" WEST, A DISTANCE OF 30.00 FEET TO THE BEGINNING OF A CURVE NORMAL TO SAID LINE, HAVING A RADIUS OF 500.00 FEET AND CONCAVE NORTHWESTERLY; THENCE SOUTHERLY ALONG SAID CURVE AN ARC DISTANCE OF 106.51 FEET AND SUBTENDING AN ANGLE OF 12°12'18" TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID CURVE, AN ARC DISTANCE OF 199.84 FEET AND SUBTENDING AN ANGLE OF 22°54'01"; THENCE TANGENT TO SAID CURVE SOUTH 35°31'40" WEST A DISTANCE OF 652.98 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHERLY AND HAVING A RADIUS OF 15.00 FEET; THENCE WESTERLY ALONG SAID CURVE AN ARC DISTANCE OF 23.56 FEET AND SUBTENDING AN ANGLE OF 90°00'00"; THENCE TANGENT TO SAID CURVE NORTH 54°28'20" WEST, A DISTANCE OF 374.46 FEET; THENCE NORTH 35°31'40" EAST A DISTANCE OF 407.95 FEET; THENCE NORTH 69°45'14" EAST, A DISTANCE OF 483.95 FEET; THENCE SOUTH 89°26'29" EAST, A DISTANCE OF 95.00 FEET TO THE TRUE POINT OF BEGINNING.<br><br>TOGETHER WITH THAT PORTION OF RANCHO DRIVE AND KINGS WAY AS VACATED BY THAT CERTAIN ORDER OF VACATION RECORDED JANUARY 9, 2003 IN BOOK 20030109 AS DOCUMENT NO. 02446 OF OFFICIAL RECORDS<br><br>(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED |

MARCH 31, 2003 IN BOOK 20030331 AS DOCUMENT NO. 04536 OF OFFICIAL RECORDS.)

**PARCEL TWO-A (2-A):  (APN: 162-08-502-011)**

COMMENCING AT THE NORTHEAST CORNER OF SAID SECTION 8; THENCE SOUTH 0°25'21" WEST ALONG THE EAST LINE THEREOF A DISTANCE OF 75.00 FEET TO A POINT; THENCE NORTH 89°26'29" WEST, PARALLEL TO THE NORTH LINE OF SECTION 8, A DISTANCE OF 274.82 FEET TO THE NORTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED TO CHICAGO TITLE INSURANCE COMPANY BY DEED RECORDED MAY 6, 1974 AS DOCUMENT NO. 382176, CLARK COUNTY, NEVADA RECORDS; THENCE SOUTH 0°25'21" WEST A DISTANCE OF 435.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 56°01'54" WEST A DISTANCE OF 381.07 FEET TO A POINT; THENCE NORTH 69°45'14" EAST ALONG THE NORTHWESTERLY LINE OF THAT CERTAIN PARCEL LEASED TO MINI-PRICE MOTOR INN, INC., AS EVIDENCED BY A MEMORANDUM OF LEASE RECORDED SEPTEMBER 6, 1973 AS DOCUMENT NO. 320951, CLARK COUNTY NEVADA RECORDS, A DISTANCE OF 483.95 FEET TO THE NORTHWEST CORNER THEREOF; THENCE NORTH 71°46'27" WEST A DISTANCE OF 145.30 FEET TO THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED MARCH 31, 2003 IN BOOK 20030331 AS DOCUMENT NO. 04536 OF OFFICIAL RECORDS.)

**PARCEL THREE (3):  (APN: 162-08-502-010)**

A PORTION OF THE NORTHEAST QUARTER (NE 1/4) OF THE NORTHEAST QUARTER (NE 1/4) OF SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST (NE) CORNER OF SECTION 8,: THENCE SOUTH 0°25'21" WEST ALONG THE EAST LINE THEREOF A DISTANCE OF 448.36 FEET TO A POINT; THENCE NORTH 89°34'39" WEST A DISTANCE OF 30.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 0°25'21" EAST ALONG THE WEST LINE OF THE EAST 30 FEET OF SAID SECTION 8 A DISTANCE OF 72.86 FEET TO THE SOUTH LINE OF THE NORTH 375 FEET OF SAID SECTION 8; THENCE NORTH 89°26'29" WEST ALONG THE SOUTH LINE THEREOF A DISTANCE OF 245.00 FEET TO A POINT; THENCE SOUTH 0°25'21" WEST A DISTANCE OF 135.00 FEET TO THE NORTHWEST (NW) CORNER OF THAT CERTAIN PARCEL DESCRIBED IN MEMORANDUM OF LEASE MODIFICATION

BETWEEN TEDDY RICH ENTERPRISES AND MINI-PRICE MOTOR
INN, INC., RECORDED NOVEMBER 25, 1975 AS DOCUMENT NO.
532691, CLARK COUNTY RECORDS; THENCE SOUTH 71°46'27" EAST
A DISTANCE OF 145.30 FEET TO A POINT; THENCE SOUTH 89°26'29"
EAST A DISTANCE OF 95.00 FEET TO A POINT ON A CURVE,
CONCAVE WESTERLY, HAVING A RADIUS OF 500 FEET, (A RADIAL
TO SAID POINT BEARS SOUTH 77°22'21" EAST 500 FEET),
SUBTENDING A CENTRAL ANGLE OF 12°12'18" AN ARC DISTANCE
OF 106.51 FEET TO THE TRUE POINT OF BEGINNING.

TOGETHER WITH THAT PORTION OF RANCHO DRIVE AS VACATED
BY THAT CERTAIN ORDER OF VACATION RECORDED JANUARY 9,
2003 IN BOOK 20030109 AS DOCUMENT NO. 02446 OF OFFICIAL
RECORDS

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION
PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED
MARCH 31, 2003 IN BOOK 20030331 AS DOCUMENT NO. 04538 OF
OFFICIAL RECORDS.)

**PARCEL FOUR (4):  (APN: 162-08-502-003)**

A PORTION OF THE NORTHEAST QUARTER (NE 1/4) OF THE
NORTHEAST QUARTER (NE 1/4) OF SECTION 8, TOWNSHIP 21
SOUTH, RANGE 61 EAST, M.D.M., MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

THE WEST 100 FEET OF THE EAST 275 FEET OF THE NORTH 225
FEET OF THE NORTHEAST QUARTER (NE 1/4) OF SECTION 8,
TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M.

EXCEPTING THEREFROM THE INTEREST IN AND TO THE NORTH 75
FEET AS CONVEYED TO THE STATE OF NEVADA IN DEED
RECORDED NOVEMBER 9, 1964 AS DOCUMENT NO. 469888, CLARK
COUNTY, NEVADA RECORDS.

**PARCEL FIVE (5):  (APN: 162-08-502-006)**

A PORTION OF THE NORTHEAST QUARTER (NE 1/4) OF THE
NORTHEAST QUARTER (NE 1/4) OF SECTION 8, TOWNSHIP 21
SOUTH, RANGE 61 EAST, M.D.M., MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SECTION 8;
THENCE SOUTH 00°25'21" WEST, ALONG THE EAST LINE OF SAID
SECTION 8, 75.00 FEET; THENCE NORTH 89°26'29" WEST, PARALLEL
TO AND 75.00 FEET SOUTH OF THE NORTH LINE OF SAID SECTION
8, ALSO BEING THE SOUTH RIGHT-OF-WAY LINE OF SAHARA
AVENUE, 400.75 FEET TO THE TRUE POINT OF BEGINNING; THENCE
SOUTH 00°33'31" WEST, 522.53 FEET; THENCE SOUTH 56°01'54"

3                    Exhibit 5 to Confirmation Order

WEST, 226.75 FEET; THENCE NORTH 54°28'20" WEST 113.38 FEET; THENCE NORTH 35°31'40" EAST, 49.22 FEET; THENCE NORTH 00°33'31" EAST, 545.73 FEET TO A POINT ON THE SOUTH RIGHT-OF-WAY LINE OF SAHARA AVENUE; THENCE SOUTH 89°26'29" EAST, ALONG SAID RIGHT-OF-WAY LINE, 251.51 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE CITY OF LAS VEGAS, NEVADA BY THAT CERTAIN FINAL ORDER OF CONDEMNATION RECORDED JANUARY 7, 2003 IN BOOK 20030107 AS DOCUMENT NO. 01536 OF OFFICIAL RECORDS.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED MARCH 31, 2003 IN BOOK 20030331 AS DOCUMENT NO. 04537 OF OFFICIAL RECORDS.)

**PARCEL FIVE-A (5-A):  (APN: 162-08-502-006)**

COMMENCING AT THE NORTHEAST CORNER OF SAID SECTION 8; THENCE SOUTH 00°25'21" WEST ALONG THE EAST LINE OF SAID SECTION 8, 75.00 FEET; THENCE NORTH 89°26'29" WEST, PARALLEL TO AND 75.00 FEET SOUTH OF THE NORTH LINE OF SAID SECTION 8, ALSO BEING THE SOUTH RIGHT-OF-WAY LINE OF SAHARA AVENUE, 275.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 00°25'21" WEST 435.31 FEET; THENCE SOUTH 56°01'54" WEST, 153.89 FEET; THENCE NORTH 00°33'31" EAST, 522.53 FEET TO A POINT ON SAID SOUTH RIGHT-OF-WAY LINE OF SAHARA AVENUE; THENCE SOUTH 89°26'29" EAST ALONG SAID RIGHT-OF-WAY LINE, 125.75 FEET TO THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED MARCH 31, 2003 IN BOOK 20030331 AS DOCUMENT NO. 04537 OF OFFICIAL RECORDS.)

**PARCEL SIX (6):  (APN: 162-08-505-004)**

A PARCEL OF LAND BEING A PORTION OF THE NORTHEAST QUARTER (NEVADA 1/4) OF SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M. MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SECTION 8; THENCE NORTH 89°26'29" WEST ALONG THE NORTH LINE OF THE NORTHEAST QUARTER (NE 1/4) , 1268.32 FEET; THENCE SOUTH 00°33'31" WEST, 930.00 FEET TO THE POINT OF BEGINNING ON THE SOUTH RIGHT OF WAY LINE OF KINGS WAY; THENCE NORTH 89°26'29" WEST, 40.00 FEET TO A POINT OF CURVATURE OF A CURVE, CONCAVE TO THE SOUTH (RADIUS POINT BEARS SOUTH

4                    Exhibit 5 to Confirmation Order

00°33'31' WEST) HAVING A RADIUS OF 286.00 FEET; THENCE TURNING LEFT ALONG THE ARC OF SAID CURVE 40.13 FEET THROUGH A CENTRAL ANGEL OF 08°02'20" TO A NON TANGENT POINT (RADIAL LINE BEARS SOUTH 07°28'52" EAST) ; THENCE DEPARTING SAID RIGHT OF WAY SOUTH 00°33'31' WEST, 353.19 FEET: THENCE SOUTH 89°26'29" EAST, 216.48 FEET: THENCE SOUTH 54°28'20" EAST, 274.68 FEET; THENCE NORTH 35°31'40" EAST, 303.00 FEET TO A POINT ON THE SOUTH RIGHT OF WAY LINE OF KINGS WAY; THENCE ALONG SAID SOUTH RIGHT OF WAY LINE, NORTH 54°28'20" WEST, 421.65 FEET TO A POINT OF CURVATURE OF A 130.00 FOOT RADIUS CURVE, CONCAVE TO THE SOUTHWEST; THENCE LEFT ALONG THE ARC OF SAID CURVE, 79.34 FEET THROUGH A CENTRAL ANGLE OF 34°58'09"; THENCE NORTH 89°26'29" WEST, 115.20 FEET TO THE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED OCTOBER 23, 2003 IN BOOK 20031023 AS DOCUMENT NO. 00650 OF OFFICIAL RECORDS.)

TOGETHER WITH THAT PORTION VACATED BY ORDER OF VACATION RECORDED JANUARY 9, 2003 IN BOOK 20030109 AS DOCUMENT NO. 02446 OF OFFICIAL RECORDS.

EXCEPTING THEREFROM SAID LAND AS CONVEYED TO THE CITY OF LAS VEGAS BY GRANT DEED RECORDED MARCH 7, 2003 IN BOOK 20030307 AS DOCUMENT NO. 01943 OF OFFICIAL RECORDS

FURTHER EXCEPTING THEREFROM SAID LAND, THAT PORTION LYING SOUTHWEST OF TEDDY DRIVE AS IT CURRENTLY EXISTS.

**PARCEL SEVEN (7): (APN: 162-08-502-008)**

A PORTION OF THE NORTHEAST QUARTER (NE ¼) OF SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER (NE COR.) OF THE NORTHEAST QUARTER (NE ¼) OF SAID SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M.,
THENCE NORTH 89°26'29" WEST ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (NE ¼), A DISTANCE OF 1268.32 FEET TO A POINT;
THENCE SOUTH 0°33'31" WEST A DISTANCE OF 365.00 FEET TO THE TRUE POINT OF BEGINNING.
THENCE CONTINUING SOUTH 0°33'31" WEST A DISTANCE OF 205.00 FEET TO A POINT;
THENCE SOUTH 89°26'29" EAST A DISTANCE OF 150.00 FEET TO A POINT;
THENCE NORTH 0°33'31" EAST A DISTANCE OF 205.00 FEET TO A

POINT;
THENCE NORTH 89°26'29" WEST A DISTANCE OF 150.00 FEET TO
THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION
PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED JUNE
2, 1993 IN BOOK 930602 AS DOCUMENT NO. 00143 OF OFFICIAL
RECORDS.)

**PARCEL EIGHT (8):  (APN: 162-08-502-002)**

BEING A PORTION OF THE NORTHEAST QUARTER (NE ¼) OF
SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M.,
CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SECTION 8;
THENCE SOUTH 0°25'21" WEST ALONG THE EAST LINE THEREOF A
DISTANCE OF 75.00 FEET TO A POINT;
THENCE NORTH 89°26'29" WEST PARALLEL TO THE NORTH LINE
OF SECTION 8, A DISTANCE OF 652.26 FEET TO THE TRUE POINT OF
BEGINNING;
THENCE SOUTH 0°33'31" WEST A DISTANCE OF 200.00 FEET TO A
POINT;
THENCE NORTH 89°26'29" WEST A DISTANCE OF 160.00 FEET TO A
POINT;
THENCE NORTH 0°33'31" EAST A DISTANCE OF 200.00 FEET TO A
POINT ON THE SOUTH LINE OF SAHARA AVENUE (150 FEET WIDE);
THENCE SOUTH 89°26'29" EAST ALONG THE SOUTH LINE THEREOF
A DISTANCE OF 160.00 FEET TO THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION
PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED JUNE
2, 1993 IN BOOK 939692 AS DOCUMENT NO. 00143 OF OFFICIAL
RECORDS.)

**PARCEL NINE (9):  (APN: 162-08-502-009)**

BEING A PORTION OF THE NORTHEAST QUARTER (NE ¼) OF THE
NORTHEAST QUARTER (NE ¼) OF SECTION 8, TOWNSHIP 21 SOUTH,
RANGE 61 EAST, M.D.B. & M., CITY OF LAS VEGAS, MORE
PARTICULARLY DESCRIBED AS FOLLOWS, TO WIT:

COMMENCING AT THE NORTHEAST (NE) CORNER OF THE
NORTHEAST QUARTER (NE ¼) OF SAID SECTION 8;
THENCE NORTH 89°26'29" WEST ALONG THE NORTH LINE OF THE
NORTHEAST QUARTER (NE ¼) OF SECTION 8, A DISTANCE OF
1268.32 FEET TO A POINT;
THENCE SOUTH 0°33'31" WEST, A DISTANCE OF 570.00 FEET TO
THE TRUE POINT OF BEGINNING;
THENCE CONTINUING SOUTH 0°33'31" WEST, A DISTANCE OF

6                    Exhibit 5 to Confirmation Order

300.00 FEET TO A POINT;
THENCE SOUTH 89°26'29" EAST, A DISTANCE OF 115.20 FEET TO A
POINT OF CURVATURE OF A CURVE TO THE RIGHT, HAVING A
RADIUS OF 190.00 FEET AND SUBTENDING A CENTRAL ANGLE
34°58'09";
THENCE ALONG SAID CURVE AN ARC LENGTH, A DISTANCE OF
115.96 FEET TO A POINT OF TANGENCY;
THENCE SOUTH 54°28'20" EAST, A DISTANCE OF 270.34 FEET TO A
POINT;
THENCE NORTH 35°31'40" EAST, A DISTANCE OF 407.95 FEET TO A
POINT;
THENCE NORTH 54°28'20" WEST, A DISTANCE OF 270.34 FEET TO A
POINT;
THENCE NORTH 89°26'29" WEST, A DISTANCE OF 457.91 FEET TO
THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION
PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED JUNE
2, 1993 IN BOOK 939692 AS DOCUMENT NO. 00143 OF OFFICIAL
RECORDS.)

TOGETHER WITH THAT PORTION VACATED BY ORDER OF
VACATION RECORDED JANUARY 9, 2003 IN BOOK 20030109 AS
DOCUMENT NO. 02446 OF OFFICIAL RECORDS.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO CITY OF
LAS VEGAS BY GRANT DEED RECORDED MARCH 7, 2003 IN BOOK
20030307 AS DOCUMENT NO. 01943 OF OFFICIAL RECORDS.

**PARCEL NINE-A (9-A):  (APN: 162-08-502-009)**

THAT PORTION OF THE NORTHEAST QUARTER (NE 1/4) OF
SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M.,
CLARK COUNTY, NEVADA, BEING MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST (NE) CORNER OF SAID
SECTION 8;
THENCE SOUTH 0°25'21" WEST ALONG THE EAST LINE OF SAID
SECTION 8,
A DISTANCE OF 75.00 FEET TO A POINT;

THENCE NORTH 89°26'29" WEST ALONG A LINE PARALLEL TO THE
NORTH LINE OF SAID SECTION 8, A DISTANCE OF 652.26 FEET TO A
POINT BEING THE NORTHEAST (NE) CORNER OF THAT CERTAIN
PARCEL OF LAND AS CONVEYED TO RICHFIELD DEVELOPMENT
COMPANY, BY DEED RECORDED SEPTEMBER 30, 1976, AS
DOCUMENT NO. 624524, OFFICIAL RECORDS, CLARK COUNTY,
NEVADA;

7                    Exhibit 5 to Confirmation Order

THENCE SOUTH 0°33'31" WEST ALONG THE EAST LINE OF SAID RICHFIELD DEVELOPMENT CO. PARCEL, A DISTANCE OF 200.00 FEET TO A POINT BEING THE TRUE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 0°33'31" WEST, A DISTANCE OF 345.73 FEET TO A POINT;

THENCE SOUTH 35°31'40" WEST, A DISTANCE OF 49.22 FEET TO A POINT IN THE NORTHEASTERLY LINE OF THAT CERTAIN PARCEL OF LAND AS CONVEYED TO ROBERT RISHLING, ET AL, BY DEED RECORDED SEPTEMBER 2, 1969 AS DOCUMENT NO. 782497, OFFICIAL RECORDS, CLARK COUNTY, NEVADA;

THENCE ALONG THE NORTHEASTERLY AND NORTHERLY BOUNDARIES OF SAID RISHLING PARCEL THE FOLLOWING TWO COURSES:

NORTH 54°28'20" WEST, A DISTANCE 156.96 FEET TO A POINT; THENCE NORTH 89°26'29" WEST A DISTANCE OF 307.91 FEET TO A POINT BEING THE SOUTHEAST (SE) CORNER OF THAT CERTAIN PARCEL OF LAND AS CONVEYED TO DEXTER ENTERPRISES, INC., BY DEED RECORDED AUGUST 3, 1970 AS DOCUMENT NO. 41508, OFFICIAL RECORDS, CLARK COUNTY, NEVADA;

THENCE NORTH 00°33'31" EAST ALONG THE EAST LINE OF SAID DEXTER ENTERPRISES PARCEL, A DISTANCE OF 205.00 FEET TO A POINT BEING THE NORTHEAST (NE) CORNER THEREOF; THENCE NORTH 89°26'29" WEST ALONG THE NORTH LINE THEREOF, A DISTANCE OF 150.00 FEET TO A POINT IN THE EAST LINE OF RICHFIELD VILLAGE UNIT NO. 1, AS DELINEATED IN BOOK 5, PAGE 80, OF SUBDIVISION PLATS, OFFICIAL RECORDS, CLARK COUNTY, NEVADA;

THENCE NORTH 0°33'31" EAST ALONG SAID EAST LINE, A DISTANCE OF 40.00 FEET TO A POINT IN THE SOUTH LINE OF THAT CERTAIN PARCEL OF LAND AS CONVEYED TO BANK OF NEVADA, BY DEED RECORDED APRIL 2, 1974, AS DOCUMENT NO. 372937, OFFICIAL RECORDS, CLARK COUNTY, NEVADA;

THENCE SOUTH 89°26'29" EAST ALONG SAID SOUTH LINE, A DISTANCE OF 150.00 FEET TO A POINT BEING THE SOUTHEAST (SE) CORNER THEREOF; THENCE NORTH 0°33'31" EAST ALONG THE EAST LINE OF SAID BANK OF NEVADA PARCEL AND NORTHERLY EXTENSION THEREOF, A DISTANCE OF 250.00 FEET TO A POINT BEING THE NORTHEAST (NE) CORNER OF THAT CERTAIN PARCEL OF LAND AS CONVEYED TO RICHFIELD DEVELOPMENT COMPANY, BY DEED RECORDED MAY 6, 1965 AS DOCUMENT NO. 502743, OFFICIAL RECORDS, CLARK COUNTY, NEVADA, SAID POINT ALSO BEING THE SOUTH RIGHT-OF-WAY LINE OF SAHARA AVENUE (150.00 FEET WIDE),

THENCE SOUTH 89°26'29" EAST ALONG THE SOUTH RIGHT-OF-WAY LINE, A DISTANCE OF 304.74 FEET TO A POINT BEING THE NORTHWEST (NW) CORNER OF THE AFOREMENTIONED RICHFIELD

DEVELOPMENT COMPANY PARCEL;
THENCE SOUTH 0°33'31" WEST ALONG THE WEST LINE THEREOF, A DISTANCE OF 200.00 FEET TO A POINT BEING THE SOUTHWEST (SW) CORNER OF SAID PARCEL;
THENCE SOUTH 89°26'29" EAST ALONG THE SOUTH LINE THEREOF, A DISTANCE OF 160.00 FEET TO THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED JUNE 2, 1993 IN BOOK 939692 AS DOCUMENT NO. 00143 OF OFFICIAL RECORDS.)

EXCEPTING THEREFROM THAT PORTION GRANTED TO CITY OF LAS VEGAS BY GRANT DEED RECORDED OCTOBER 31, 2000 IN BOOK 20001031 AS DOCUMENT NO. 02465.

**PARCEL TEN (10):  (APN: 162-08-602-005)**

THAT PORTION OF THE NORTHEAST QUARTER (NE ¼) OF SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., IN THE CITY OF LAS VEGAS, STATE OF NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER (NE COR.) OF SAID SECTION 8; THENCE NORTH 89°26'29" WEST ALONG THE NORTH LINE THEREOF A DISTANCE OF 1268.12 FEET; THENCE SOUTH 00°33'31" WEST ALONG THE EAST LINE OF TEDDY DRIVE (80.00 FEET WIDE) A DISTANCE OF 870.00 FEET; THENCE SOUTH 89°26'29" EAST A DISTANCE OF 115.20 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE SOUTH HAVING A RADIUS OF 190.00 FEET AND SUBTENDING A CENTRAL ANGLE OF 34°58'09"; THENCE SOUTHEASTERLY AND TO THE RIGHT ALONG SAID CURVE AN ARC LENGTH DISTANCE OF 115.96 FEET TO A TANGENT POINT; THENCE SOUTH 54°28'20" EAST A DISTANCE OF 421.65 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTH 54°28'20" EAST A DISTANCE OF 288.15 FEET TO A POINT OF INTERSECTION WITH THE NORTH LINE OF AND SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SAID SECTION 8; THENCE NORTH 89°10'31" WEST ALONG SAID NORTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) THEREOF A DISTANCE OF 46.40 FEET, SAID POINT BEING 155.00 FEET DISTANT FROM THE CENTERLINE OF INTERSTATE HIGHWAY NO. 15, MEASURED AT RIGHT ANGLES; THENCE SOUTH 35°31'40" WEST AND PARALLEL WITH THE CENTERLINE OF SAID INTERSTATE HIGHWAY NO. 15 AND 165 FEET EQUIDISTANT THEREFROM A DISTANCE OF 1228.35 FEET TO A POINT OF INTERSECTION WITH THE WEST LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SAID SECTION 8; THENCE SOUTH 01°42'22" EAST ALONG SAID WEST LINE A DISTANCE OF 66.11 FEET, SAID POINT BEING

125.00 FEET DISTANT FROM THE CENTERLINE OF SAID INTERSTATE HIGHWAY NO. 15; THENCE SOUTH 35°31'40" WEST AND PARALLEL WITH THE CENTERLINE OF SAID INTERSTATE HIGHWAY NO. 15, AND 125.00 FEET EQUIDISTANT THEREFROM A DISTANCE OF 189.74 FEET; THENCE NORTH 89°26'29" WEST A DISTANCE OF 165.33 FEET TO THE MOST SOUTHEAST CORNER (SE COR.) OF RICHFIELD VILLAGE UNIT NO. 4-A (BOOK 7, PAGE 78); THENCE NORTH 00°33'31" EAST A DISTANCE OF 128.50 FEET; THENCE SOUTH 89°26'29" EAST A DISTANCE OF 58.65 FEET; THENCE NORTH 00°33'31" EAST A DISTANCE OF 338.00 FEET TO A POINT; THENCE SOUTH 89°26'29" EAST A DISTANCE OF 82.60 FEET TO A POINT; THENCE NORTH 00°33'31" EAST A DISTANCE OF 411.51 FEET TO A NON-RADIAL POINT ON A CURVE, A RADIAL BEARING THROUGH SAID POINT BEARS SOUTH 28°01'57" WEST; THENCE FROM A TANGENT BEARING SOUTH 61°58'03" EAST TO THE RIGHT ALONG A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 167.00 FEET AND SUBTENDING A CENTRAL ANGLE OF 07°29'43", AN ARC LENGTH DISTANCE OF 21.85 FEET TO A TANGENT POINT; THENCE SOUTH 54°28'20" EAST A DISTANCE OF 81.16 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTH, HAVING A RADIUS OF 130.00 FEET AND SUBTENDING A CENTRAL ANGLE OF 90°00'00"; THENCE EASTERLY AND TO THE LEFT ALONG SAID CURVE AN ARC LENGTH DISTANCE OF 204.20 FEET TO A TANGENT POINT; THENCE NORTH 35°31'40" EAST A DISTANCE OF 660.00 FEET TO THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED JUNE 2, 1993 IN BOOK 939692 AS DOCUMENT NO. 00143 OF OFFICIAL RECORDS.)

AND ALSO FURTHER EXCEPTING THEREFROM THAT PORTION OF SAID LAND CONVEYED TO CLIFTON K. CONK BY DEED RECORDED MAY 25, 1972 IN BOOK 234 OF OFFICIAL RECORDS AS DOCUMENT NO. 193013.

FURTHER EXCEPTING THAT PORTION OF SAID LAND CONVEYED TO CITY OF LAS VEGAS BY DEED RECORDED JULY 19, 1972 IN BOOK 248 AS DOCUMENT NO. 207223 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF LAND VACATED BY DOCUMENT RECORDED JANUARY 9, 2003 IN BOOK 20030109 AS DOCUMENT NO. 02446 OF OFFICIAL RECORDS.

AND FURTHER EXCEPTING THEREFROM SAID LAND AS CONVEYED TO THE CITY OF LAS VEGAS BY GRANT DEED RECORDED MARCH 7, 2003 IN BOOK 20030307 AS DOCUMENT NO. 01943 OF OFFICIAL RECORDS.

FURTHER EXCEPTING THEREFROM THAT PORTION OF SAID LAND

| | |
|---|---|
| | LYING SOUTHWESTERLY OF TEDDY DRIVE AS IT NOW EXISTS. ALSO EXCEPTING ANY STATE, COUNTY, OR CITY ROADS THAT MAY EXIST ON SAID LAND. |
| **FCP PROPCO, LLC**<br><br>**(Sunset Station Hotel & Casino)** | **PARCEL ONE (1): (APN 178-03-310-021)**<br><br>BEING A PORTION OF AN UNNUMBERED LOT OF "2ND AMENDED FINAL MAP OF A PORTION OF HENDERSON COMMERCE CENTER", AS SHOWN BY MAP THEREOF ON FILE IN BOOK 94 OF PLATS, PAGE 1, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.<br><br>**EXCEPTING THEREFROM** THAT PARCEL OF LAND DESCRIBED AS PARCEL 1-1B OF RECORD OF SURVEY FILE 119 PAGE 0012 OF SURVEYS, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER" RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, AND SITUATE WITHIN THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CLARK COUNTY, NEVADA, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:<br><br>COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 3, BEING AT THE CENTERLINE INTERSECTION OF STEPHANIE STREET AND WARM SPRINGS ROAD; THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER (SW 1/4) OF SAID SECTION 3 AND THE CENTERLINE OF SAID WARM SPRINGS ROAD, NORTH 88°54'05" EAST, 801.39 FEET TO THE SOUTHERLY PROLONGATION OF THE WEST LINE OF PARCEL 1-1A AS SHOWN IN FILE 116, PAGE 85 OF SURVEYS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE; THENCE ALONG SAID PROLONGATION, NORTH 01°05'55" WEST, 50.00 FEET TO THE SOUTHWEST CORNER OF SAID PARCEL 1-1A; THENCE ALONG THE SOUTHERLY AND EASTERLY LINES OF SAID PARCEL 1-1A THE FOLLOWING FIVE (5) COURSES AND DISTANCES:<br><br>(1) NORTH 88°54'05" EAST, 421.70 FEET TO THE POINT OF BEGINNING, AND BEING THE BEGINNING OF A 25.00 FOOT RADIUS CURVE CONCAVE TO THE NORTHWEST;<br>(2) NORTHEASTERLY ALONG SAID CURVE TO THE LEFT, THROUGH A CENTRAL ANGLE OF 89°37'13" AN ARC LENGTH OF 39.10 FEET;<br>(3) NORTH 00°43'08" WEST, 87.19 FEET TO THE BEGINNING OF A 105.00 FOOT RADIUS CURVE CONCAVE TO THE SOUTHEAST;<br>(4) NORTHEASTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 15°44'26" AN ARC LENGTH OF 28.85 FEET TO THE BEGINNING OF A 95.00 FOOT RADIUS REVERSE CURVE CONCAVE TO THE NORTHWEST;<br>(5) NORTHERLY ALONG SAID CURVE TO THE LEFT, THROUGH A |

Exhibit 5 to Confirmation Order

CENTRAL ANGLE OF 15°44'26" AN ARC LENGTH OF 26.10 FEET; THENCE SOUTH 00°43'08" EAST, DEPARTING THE EAST LINE OF SAID PARCEL 1-1A, 151.33 FEET TO THE BEGINNING OF A 15.00 FOOT RADIUS CURVE CONCAVE TO THE NORTHWEST; THENCE SOUTHWESTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 89°37'13" AN ARC LENGTH OF 23.46 FEET TO THE NORTH RIGHT-OF-WAY OF SAID WARM SPRINGS ROAD; THENCE ALONG SAID NORTH RIGHT-OF-WAY, SOUTH 88°54'05" WEST, 17.43 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL OF LAND DESCRIBED AS PARCEL 1-1A-1 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 121 OF SURVEYS, PAGE 75, BEING A PARCEL OF LAND SITUATED IN THE SOUTHWEST QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, SAID PARCEL OF LAND BEING A PORTION OF THAT TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF HENDERSON COMMERCE CENTER" RECORDED IN BOOK 94 OF PLATS, PAGE 1 ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, SAID PARCEL OF LAND ALSO BEING A PORTION OF PARCEL 1-1A AS SHOWN IN THAT CERTAIN RECORD OF SURVEY MAP RECORDED IN BOOK 116 OF SURVEYS, PAGE 85 ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, BEING MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 3, SAID POINT BEING AT THE INTERSECTION OF THE CENTERLINE OF WARM SPRINGS ROAD AND THE CENTERLINE OF STEPHANIE STREET; THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3 AND ALONG THE CENTERLINE OF SAID WARM SPRINGS ROAD, NORTH 88°54'05" EAST, 801.39 FEET; THENCE LEAVING THE SOUTH LINE OF SAID SOUTHWEST QUARTER AND THE CENTERLINE OF SAID WARM SPRINGS ROAD, NORTH 01°05'55" WEST 50.00 FEET TO THE NORTH RIGHT-OF-WAY LINE OF SAID WARM SPRINGS ROAD, SAID POINT BEING THE SOUTHWEST CORNER OF SAID PARCEL 1-1A AND BEING THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT; THENCE ALONG THE WEST LINE OF SAID PARCEL 1-1A, NORTH 01°05'55" WEST 460.17 FEET; THENCE CONTINUING ALONG SAID WEST LINE, NORTH 38°56'01" EAST 74.39 FEET TO THE MOST NORTHERLY NORTHWEST CORNER OF SAID PARCEL 1-1A; THENCE ALONG THE NORTH LINE OF SAID PARCEL 1-1A, NORTH 88°54'05" EAST 179.44 FEET; THENCE LEAVING SAID NORTH LINE, SOUTH 01°05'55" EAST 517.13 FEET TO THE SAID NORTH RIGHT-OF-WAY LINE OF WARM SPRINGS ROAD; THENCE ALONG SAID NORTH RIGHT-OF-WAY LINE, SOUTH 88°54'05" WEST 227.29 FEET TO THE TRUE POINT OF BEGINNING.

Exhibit 5 to Confirmation Order

#4843-6991-8215

**FURTHER EXCEPTING THEREFROM** THAT PARCEL OF LAND DESCRIBED AS PARCEL 1-1A-2 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 121 OF SURVEYS, PAGE 75, BEING A PARCEL OF LAND SITUATED IN THE SOUTHWEST QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, SAID PARCEL OF LAND BEING A PORTION OF THAT TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF HENDERSON COMMERCE CENTER" RECORDED IN BOOK 94 OF PLATS, PAGE 1 ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, SAID PARCEL OF LAND ALSO BEING A PORTION OF PARCEL 1-1A AS SHOWN IN THAT CERTAIN RECORD OF SURVEY MAP RECORDED IN BOOK 116 OF SURVEYS, PAGE 85 ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, BEING MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 3, SAID POINT BEING AT THE INTERSECTION OF THE CENTERLINE OF WARM SPRINGS ROAD AND THE CENTERLINE OF STEPHANIE STREET; THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3 AND ALONG THE CENTERLINE OF SAID WARM SPRINGS ROAD, NORTH 88°54'05" EAST 801.39 FEET; THENCE LEAVING THE SOUTH LINE OF SAID SOUTHWEST QUARTER AND THE CENTERLINE OF SAID WARM SPRINGS ROAD, NORTH 0°05'55" WEST 50.00 FEET TO THE NORTH RIGHT-OF-WAY LINE OF SAID WARM SPRINGS ROAD, SAID POINT BEING THE SOUTHWEST CORNER OF SAID PARCEL 1-1A; THENCE ALONG SAID NORTH RIGHT-OF-WAY LINE OF WARM SPRINGS ROAD NORTH 88°54'05" EAST 227.29 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT; THENCE LEAVING SAID NORTH RIGHT-OF-WAY LINE OF WARM SPRINGS ROAD NORTH 01°05'55" WEST 517.13 FEET TO THE NORTH LINE OF SAID PARCEL 1-1A; THENCE ALONG SAID NORTH LINE OF PARCEL 1-1A, NORTH 88°54'05" EAST 201.00 FEET TO THE BEGINNING OF A 150.00 FOOT RADIUS NON-TANGENT CURVE TO THE LEFT, TO WHICH A RADIAL LINE BEARS NORTH 62°46'32" EAST, SAID POINT BEING THE MOST NORTHERLY NORTHEAST CORNER OF SAID PARCEL 1-1A; THENCE ALONG THE EAST LINE OF SAID PARCEL 1-1A THE FOLLOWING 7 COURSES AND DISTANCES: ALONG SAID 150.00 FOOT RADIUS NON-TANGENT CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 08°01'49" (THE LONG CHORD OF WHICH BEARS SOUTH 31°14'23" EAST 21.01 FEET) FOR AN ARC DISTANCE OF 21.02 FEET TO THE BEGINNING OF A 105.00 FOOT RADIUS REVERSE CURVE TO THE RIGHT; ALONG SAID 105.00 FOOT RADIUS REVERSE CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 34°32'09" (THE LONG CHORD OF WHICH BEARS SOUTH 17°59'13" EAST 62.34 FEET) FOR AN ARC DISTANCE OF 63.29 FEET; SOUTH 00°43'08" EAST 273.09 FEET TO THE BEGINNING OF A 95.00 FOOT RADIUS CURVE TO THE RIGHT; ALONG SAID 95.00 FOOT RADIUS

13                      Exhibit 5 to Confirmation Order

CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 15°44'26" (THE LONG CHORD OF WHICH BEARS SOUTH 07°09'05" WEST 26.02 FEET) FOR AN ARC DISTANCE OF 26.10 FEET TO THE BEGINNING OF A 105.00 FOOT RADIUS REVERSE CURVE TO THE LEFT; ALONG SAID 105.00 FOOT RADIUS REVERSE CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 15°44'26" (THE LONG CHORD OF WHICH BEARS SOUTH 07°09'05" WEST 28.76 FEET) FOR AN ARC DISTANCE OF 28.85 FEET; SOUTH 00°43'08" EAST 87.19 FEET TO THE BEGINNING OF A 25.00 FOOT RADIUS CURVE TO THE RIGHT; ALONG SAID 25.00 FOOT RADIUS CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 89°37'13" (THE LONG CHORD OF WHICH BEARS SOUTH 44°05'29" WEST 35.24 FEET) FOR AN ARC DISTANCE OF 39.10 FEET TO THE SAID NORTH RIGHT-OF-WAY LINE OF WARM SPRINGS ROAD; THENCE ALONG SAID NORTH RIGHT-OF-WAY LINE OF WARM SPRINGS ROAD, SOUTH 88°54'05" WEST 194.41 FEET TO THE TRUE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL OF LAND DESCRIBED AS PADS 10 AND 11 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 110 OF SURVEYS, PAGE 53, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF HENDERSON COMMERCE CENTER" RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDERS OFFICE AND SITUATE WITHIN A PORTION OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 3, BEING AT THE CENTERLINE INTERSECTION OF STEPHANIE STREET AND WARM SPRINGS ROAD; THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3 AND THE CENTERLINE OF SAID WARM SPRINGS ROAD, NORTH 88°54'05" EAST, 1470.43 FEET; THENCE DEPARTING SAID SOUTH SECTION LINE AND STREET CENTERLINE, NORTH 01°05'55" WEST 50.00 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY OF SAID WARM SPRINGS ROAD, BEING THE POINT OF BEGINNING; THENCE DEPARTING SAID NORTH RIGHT-OF-WAY, NORTH 00°43'08" WEST, 255.19 FEET; THENCE NORTH 89°16'52" EAST, 281.85 FEET; THENCE SOUTH 08°33'46" EAST, 27.42 FEET TO THE BEGINNING OF A CURVE, CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 231.17 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE TO THE LEFT, THROUGH A CENTRAL ANGLE OF 14°58'53", AN ARC LENGTH OF 60.45 FEET TO A POINT OF REVERSE CURVATURE, A RADIAL LINE TO SAID POINT BEARS SOUTH 66°27'21" WEST, THENCE SOUTHWESTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 22°26'20", AN ARC LENGTH OF 156.65 FEET; THENCE SOUTH 01°05'55" EAST, 15.21 FEET TO THE NORTH RIGHT-OF-WAY OF SAID WARM

SPRINGS ROAD; THENCE ALONG SAID NORTH RIGHT-OF-WAY, SOUTH 88°54'05" WEST, 332.94 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL OF LAND DESCRIBED AS FAZOLI'S RESTAURANT ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 107 OF SURVEYS, PAGE 18 AND AS AMENDED BY CERTIFICATE OF AMENDMENT RECORDED SEPTEMBER 26, 2007 IN BOOK 20070926 AS DOCUMENT NO. 03096, BEING A PORTION OF PARCEL 1-1 OF "THE SECOND AMENDED RECORD OF SURVEY FOR A PORTION OF THE AMENDED PLAT OF A PORTION OF HENDERSON COMMERCE CENTER" ON FILE IN THE OFFICE OF THE COUNTY RECORDER IN FILE 78 OF SURVEYS, AT PAGE 39 SITUATED IN THE SOUTH HALF (S ½) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 3, BEING THE INTERSECTION OF THE CENTERLINE OF WARM SPRINGS ROAD (100 FEET WIDE ROAD) WITH THE CENTERLINE OF STEPHANIE STREET (100 FEET WIDE); THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER (SW 1/4) OF SAID SECTION 3, SAME LINE BEING ALONG THE CENTERLINE OF WARM SPRINGS ROAD NORTH 88°54'05" EAST, 1470.43 FEET; THENCE DEPARTING SAID CENTERLINE NORTH 01°05'55" WEST, 50.00 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY OF WARM SPRINGS ROAD ROAD, SAME POINT BEING THE POINT OF BEGINNING; THENCE ALONG SAID NORTH RIGHT OF WAY SOUTH 88°54'05" WEST 130.00 FEET; THENCE DEPARTING SAID RIGHT OF WAY NORTH 00°43'08" WEST 75.00 FEET; THENCE SOUTH 89°16'52" WEST 35.00 FEET; THENCE NORTH 00°43'08" WEST 114.77 FEET TO THE BEGINNING OF A 21.00 FEET RADIUS TANGENT CURVE CONCAVE TO THE SOUTHEAST; THENCE CURVING RIGHT THROUGH A CENTRAL ANGLE OF 90°00'00" AN ARC DISTANCE OF 32.99 FEET TO A POINT ON A REVERSE CURVE CONCAVE TO THE NORTHWEST HAVING A 45.00 FEET RADIUS; THENCE CURVING LEFT THROUGH A CENTRAL ANGLE OF 45°00'00" AND ARC DISTANCE OF 35.34 FEET; THENCE NORTH 44°16'52" EAST 32.97 FEET TO THE BEGINNING OF A 30.00 FEET RADIUS TANGENT CURVE CONCAVE TO THE SOUTHEAST; THENCE CURVING RIGHT THROUGH A CENTRAL ANGLE OF 45°00'00" AN ARC DISTANCE OF 23.56 FEET; THENCE NORTH 89°16'52" EAST 67.65 FEET; THENCE SOUTH 00°43'08" EAST 255.19 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD 4A ON THAT CERTAIN RECORD OF SURVEY ON FILE IN FILE 121 OF SURVEYS, PAGE 42, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER" RECORDED IN BOOK 94, PAGE 1 OF PLATS, ON FILE AT

THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND SITUATE WITHIN A PORTION OF THE SOUTHWEST QUARTER (SW ¼) AND THE SOUTHEAST QUARTER (SE ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 3; THENCE SOUTH 01°30'53" WEST, 301.18 FEET; THENCE NORTH 89°18'16" EAST, 40.03 FEET; THENCE SOUTH 01°30'53" WEST, 71.32 FEET TO THE POINT OF BEGINNING; THENCE NORTH 89°08'25" EAST, 7.84 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST AND HAVING A RADIUS OF 70.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 15°08'10", AN ARC LENGTH OF 18.49 FEET; THENCE SOUTH 75°43'25" EAST, 30.32 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE NORTHEAST AND HAVING A RADIUS OF 50.00 FEET; THENCE EASTERLY ALONG SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 14°52'22", AN ARC LENGTH OF 12.98 FEET; THENCE NORTH 89°24'13" EAST, 76.52 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST AND HAVING A RADIUS OF 32.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 33°56'35", AN ARC LENGTH OF 18.96 FEET TO A POINT OF NON-TANGENCY ON THE WEST RIGHT-OF-WAY OF MARKS STREET TO WHICH A RADIAL LINE BEARS NORTH 23°20'48" EAST; THENCE ALONG SAID WEST RIGHT-OF-WAY, SOUTH 01°32'25" WEST, 138.84 FEET ;THENCE DEPARTING SAID WEST RIGHT-OF-WAY, SOUTH 89°20'00" WEST, 287.99 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE TO THE NORTHEAST, AND HAVING A RADIUS OF 154.00 FEET, FROM WHICH BEGINNING THE RADIUS BEARS NORTH 46°29'35" EAST; THENCE NORTHWESTERLY ALONG SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 42°40'07", AN ARC LENGTH OF 114.69 FEET; THENCE NORTH 00°50'18" WEST, 31.33 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHEAST AND HAVING A RADIUS OF 20.00 FEET; THENCE NORTHEASTERLY ALONG SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 89°58'43", AN ARC LENGTH OF 31.41 FEET; THENCE NORTH 89°08'25" EAST, 151.95 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD 6 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 124 OF SURVEYS, PAGE 54, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER" RECORDED IN BOOK 94, PAGE 1 OF PLATS, ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND SITUATE WITHIN A PORTION OF THE SOUTHWEST QUARTER (SW ¼) AND THE

SOUTHEAST QUARTER (SE ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 3; THENCE SOUTH 01°30'53" WEST, 301.18 FEET; THENCE NORTH 89°18'16" EAST, 203.36 FEET TO THE WESTERLY RIGHT OF WAY OF MARKS STREET; THENCE ALONG SAID WESTERLY RIGHT OF WAY, SOUTH 01°32'25" WEST, 368.87 FEET TO THE SOUTHEAST CORNER OF PAD 5 AS SHOWN IN FILE 124, PAGE 53 OF SURVEYS IN FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND BEING A POINT OF BEGINNING; THENCE CONTINUING ALONG SAID WESTERLY RIGHT OF WAY, SOUTH 01°32'25" WEST, 126.27 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE WEST HAVING A RADIUS OF 1426.75 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 00°28'52" AN ARC LENGTH OF 11.98 FEET TO A POINT ON NON-TANGENCY, TO WHICH A RADIAL LINE BEARS SOUTH 87°58'43" EAST AND BEING THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 25.00 FEET, FROM WHICH BEGINNING THE RADIUS BEARS NORTH 24°28'11" WEST; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 23°43'42" AN ARC LENGTH OF 10.35 FEET; THENCE SOUTH 89°15'30" WEST, 207.18 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST HAVING A RADIUS OF 20.00 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 89°55'55" AN ARC LENGTH OF 31.39 FEET; THENCE NORTH 00°48'34" WEST, 120.60 FEET TO THE SOUTHWEST CORNER OF PAD 5; THENCE ALONG THE SOUTH LINE OF SAID PAD 5, NORTH 89°20'00" EAST, 242.94 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD 5 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 124 OF SURVEYS, PAGE 53, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER" RECORDED IN BOOK 94, PAGE 1 OF PLATS, ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND SITUATE WITHIN A PORTION OF THE SOUTHWEST QUARTER (SW ¼) AND THE SOUTHEAST QUARTER (SE ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 3; THENCE SOUTH 01°30'53" WEST, 301.18 FEET; THENCE NORTH 89°18'16" EAST, 203.36 FEET TO

17                         Exhibit 5 to Confirmation Order

THE WESTERLY RIGHT OF WAY OF MARKS STREET; THENCE ALONG SAID RIGHT OF WAY, SOUTH 01°32'25" WEST, 227.68 FEET TO THE SOUTHEAST CORNER OF PAD 4A AS SHOWN IN FILE 121, PAGE 42 OF SURVEYS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND BEING THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID WESTERLY RIGHT-OF-WAY, SOUTH 01°32'25" WEST, 141.19 FEET; THENCE DEPARTING SAID WESTERLY RIGHT-OF-WAY, SOUTH 89°20'00" WEST, 242.94 FEET; THENCE NORTH 00°48'34" WEST, 24.50 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 200.00 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 29°15'17" AN ARC LENGTH OF 102.12 FEET TO A POINT OF COMPOUND CURVATURE, CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 100.00 FEET, THROUGH WHICH A RADIAL LINE BEARS SOUTH 59°56'09" WEST; THENCE NORTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 13°26'34" AN ARC LENGTH OF 23.46 FEET TO A POINT OF NON-TANGENCY AT THE SOUTHWEST CORNER OF SAID PAD 4A, TO WHICH A RADIAL LINE BEARS NORTH 46°29'35" EAST; THENCE ALONG THE SOUTH LINE OF SAID PARCEL 4A, NORTH 89°20'00" EAST, 287.99 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD 8 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 135 OF SURVEYS, PAGE 48, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND LYING WITHIN THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 3, BEING AT THE CENTERLINE INTERSECTION OF WARM SPRINGS ROAD AND MARKS STREET; THENCE ALONG THE CENTERLINE OF SAID MARKS STREET, NORTH 1°05'55" WEST, 480.60 FEET TO A POINT OF CURVATURE; THENCE FOLLOWING THE CENTERLINE OF SAID MARKS STREET THE FOLLOWING TWO COURSES: NORTHEASTERLY ALONG THE ARC OF A 1783.54 FOOT RADIUS CURVE TO THE RIGHT A DISTANCE OF 821.54 FEET (CENTRAL ANGLE EQUALS 26°23'30" AND LONG CHORD BEARS NORTH 12°05'50" EAST 814.29 FEET) TO A POINT OF REVERSE CURVATURE; AND NORTHEASTERLY ALONG THE ARC OF A 1476.75 FOOT RADIUS CURVE TO THE LEFT A DISTANCE OF 198.16 FEET (CENTRAL ANGLE EQUALS 7°41'17" AND LONG CHORD BEARS NORTH 21°26'56" EAST 198.01 FEET); THENCE DEPARTING SAID CENTERLINE NORTH 72°23'42" WEST 50.00 FEET ALONG A LINE RADIAL TO SAID CENTERLINE TO THE

WESTERLY LINE OF SAID MARKS STREET AND BEING THE POINT OF BEGINNING; AND RUNNING THENCE SOUTHWESTERLY ALONG THE ARC OF A 1426.75 FOOT RADIUS CURVE TO THE RIGHT A DISTANCE OF 119.86 FEET (CENTRAL ANGLE EQUALS 4°48'47" AND LONG CHORD BEARS SOUTH 20°00'41" WEST 119.82 FEET) ALONG SAID WESTERLY LINE OF MARKS STREET; THENCE NORTH 73°19'34" WEST 150.98 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF A 165.00 FOOT RADIUS CURVE TO THE LEFT A DISTANCE OF 51.88 FEET (CENTRAL ANGLE EQUALS 18°00'57" AND LONG CHORD BEARS NORTH 9°30'36" EAST 51.67 FEET) TO A POINT OF TANGENCY; THENCE NORTH 0°30'07" EAST, 51.20 FEET TO A POINT OF CURVATURE; THENCE NORTHEASTERLY, EASTERLY, AND SOUTHEASTERLY ALONG THE ARC OF A 15.00 FOOT RADIUS CURVE TO THE RIGHT A DISTANCE OF 27.80 FEET (CENTRAL ANGLE EQUALS 106°10'19" AND LONG CHORD BEARS NORTH 53°35'17" EAST 23.99 FEET) TO A POINT OF TANGENCY; THENCE SOUTH 73°19'34" EAST 164.25 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD 9 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 135 OF SURVEYS, PAGE 48, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND LYING WITHIN THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 3, BEING AT THE CENTERLINE INTERSECTION OF WARM SPRINGS ROAD AND MARKS STREET; THENCE ALONG THE CENTERLINE OF SAID MARKS STREET, NORTH 1°05'55" WEST 480.60 FEET TO A POINT OF CURVATURE; THENCE FOLLOWING THE CENTERLINE OF SAID MARKS STREET THE FOLLOWING COURSE: NORTHEASTERLY ALONG THE ARC OF A 1783.54 FOOT RADIUS CURVE TO THE RIGHT A DISTANCE OF 780.51 FEET (CENTRAL ANGLE EQUALS 25°04'26" AND LONG CHORD BEARS NORTH 11°26'18" EAST 774.30 FEET); THENCE DEPARTING SAID STREET CENTERLINE NORTH 66°01'29" WEST 50.00 FEET ALONG A LINE RADIAL TO SAID CENTERLINE TO THE WESTERLY LINE OF SAID MARKS STREET AT THE NORTHEASTERLY CORNER OF PARCEL 1-3-2 AS SHOWN IN FILE 86, PAGE 8 OF SURVEYS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND BEING THE POINT OF BEGINNING; AND RUNNING THENCE WESTERLY ALONG A NON-TANGENTIAL CURVE TO THE LEFT (RADIUS POINT BEARS SOUTH 20°57'30" WEST) HAVING A RADIUS OF 460.00 FEET A DISTANCE OF 224.90 FEET (CENTRAL ANGLE EQUALS 28°00'47" AND LONG CHORD

BEARS NORTH 83°02'54" WEST 222.67 FEET (ALONG THE NORTHERLY LINE OF SAID PARCEL 1-3-2 TO A POINT BEING NON-TANGENTIAL (RADIUS POINT BEARS SOUTH 7°03'17" EAST); THENCE DEPARTING SAID PARCEL LINE NORTH 10°59'41" WEST 10.80 FEET ALONG A LINE RADIAL TO THE FOLLOWING CURVE DESCRIBED IN THE SUCCEEDING COURSE: THENCE NORTHEASTERLY ALONG THE ARC OF A 165.00 FOOT RADIUS CURVE TO THE LEFT A DISTANCE OF 174.19 FEET (CENTRAL ANGLE EQUALS 60°29'15" AND LONG CHORD BEARS NORTH 48°45'42" EAST 166.21 FEET) TO A POINT BEING NON-TANGENTIAL (RADIUS POINT BEARS NORTH 71°28'56" WEST); THENCE SOUTH 73°19'34" EAST 150.98 FEET TO THE WESTERLY LINE OF MARKS STREET; THENCE ALONG SAID WESTERLY LINE OF MARKS STREET THE FOLLOWING TWO COURSES: SOUTHWESTERLY ALONG A NON-TANGENTIAL CURVE TO THE RIGHT (RADIUS POINT BEARS NORTH 67°34'55" WEST) HAVING A RADIUS OF 1426.75 FEET A DISTANCE OF 71.59 FEET (CENTRAL ANGLE EQUALS 2°52'30" AND LONG CHORD BEARS SOUTH 23°51'20" WEST 71.58 FEET) TO A POINT OF REVERSE CURVATURE; AND SOUTHWESTERLY ALONG THE ARC OF AN 1833.54 FOOT RADIUS CURVE TO THE LEFT A DISTANCE OF 42.17 FEET (CENTRAL ANGLE EQUALS 1°19'04" AND LONG CHORD BEARS SOUTH 24°38'03" WEST 42.17 FEET) TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD 3 ON THAT CERTAIN RECORD OF SURVEY ON FILE IN FILE 118 OF SURVEYS, PAGE 50, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE IN THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND LYING WITHIN THE SOUTH HALF (S ½) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, BEING MARKED BY A BRASS CAP IN WELL STAMPED "PLS 6030"; THENCE ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, NORTH 89°18'43" EAST, 2515.01 FEET TO A POINT ON THE SOUTH RIGHT-OF-WAY OF SUNSET ROAD AND BEING THE POINT OF BEGINNING; THENCE ALONG SAID SOUTH RIGHT-OF-WAY AND CONTINUING ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, NORTH 89°18'43" EAST, 139.67 FEET TO THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, BEING MARKED BY A BRASS CAP IN WELL STAMPED "PLS 4541"; THENCE DEPARTING SAID SOUTH RIGHT-OF-WAY AND CENTER-SECTION LINE, SOUTH 01°30'53" WEST, 321.76 FEET; THENCE SOUTH 89°19'07" WEST, 114.11 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE

20                          Exhibit 5 to Confirmation Order

NORTHEAST AND HAVING A RADIUS OF 20.00 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 90°00'00", AN ARC LENGTH OF 31.42 FEET; THENCE NORTH 00°40'54" WEST, 286.51 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHEAST AND HAVING A RADIUS OF 20.00 FEET; THENCE NORTHEASTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 48°35'02", AN ARC LENGTH OF 16.96 FEET TO A POINT OF NON-TANGENCY, A RADIAL LINE TO SAID POINT BEARS NORTH 42°05'52" WEST AND BEING THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD A ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 122 OF SURVEYS, PAGE 71, BEING A PORTION OF LOT 1A AS SHOWN IN FILE 121, PAGE 45 OF SURVEYS AND BEING A PORTION OF THE LAND AS DESCRIBED IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND LYING WITHIN THE SOUTHWEST QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, BEING A POINT ON THE CENTERLINE OF STEPHANIE STREET; THENCE ALONG THE WEST LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3 AND THE CENTERLINE OF SAID STEPHANIE STREET, SOUTH 00°14'06" WEST, 293.47 FEET; THENCE DEPARTING SAID WEST SECTION LINE AND STREET CENTERLINE, SOUTH 89°45'54" EAST, 56.94 FEET TO THE EAST RIGHT-OF-WAY OF SAID STEPHANIE STREET AND BEING THE POINT OF BEGINNING; THENCE DEPARTING SAID EAST RIGHT-OF-WAY, NORTH 89°45'17" EAST, 274.58 FEET; THENCE SOUTH 45°53'44" EAST, 81.21 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 148.00 FEET FROM WHICH BEGINNING THE RADIUS BEARS SOUTH 63°23'56" EAST; THENCE SOUTHWESTERLY ALONG SAID CURVE TO THE LEFT, THROUGH A CENTRAL ANGLE OF 27°15'45", AN ARC LENGTH OF 70.42 FEET; THENCE SOUTH 00°39'41" EAST, 27.32 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST AND HAVING A RADIUS OF 25.00 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 89°59'29", AN ARC LENGTH OF 39.27 FEET; THENCE SOUTH 89°19'48" WEST, 264.79 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST AND HAVING A RADIUS OF 40.00 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 62°17'51", AN ARC LENGTH OF 43.49 FEET TO A POINT OF NON-TANGENCY ON THE EAST RIGHT-OF-WAY OF

21                     Exhibit 5 to Confirmation Order

SAID STEPHANIE STREET, TO WHICH POINT A RADIAL LINE BEARS SOUTH 61°37'39" WEST; THENCE ALONG SAID EAST RIGHT-OF-WAY, NORTH 00°14'06" EAST, 105.95 FEET; THENCE NORTH 07°49'22" EAST, ALONG SAID EAST RIGHT-OF-WAY, 52.58 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD C ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 123 OF SURVEYS, PAGE 80, BEING A PORTION OF LOT 1A AS SHOWN IN FILE 121, PAGE 45 OF SURVEYS AND BEING A PORTION OF THE LAND AS DESCRIBED IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND LYING WITHIN THE SOUTHWEST QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, BEING A POINT ON THE CENTERLINE OF STEPHANIE STREET; THENCE ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, NORTH 89°18'43" EAST, 628.60 FEET; THENCE DEPARTING SAID NORTH CENTER SECTION LINE, SOUTH 00°41'17" EAST, 20.79 FEET TO THE SOUTH RIGHT-OF-WAY OF SUNSET ROAD AND BEING THE POINT OF BEGINNING; THENCE DEPARTING THE SOUTH RIGHT-OF-WAY OF SAID SUNSET ROAD, SOUTH 00°42'27" EAST, 53.74 FEET; THENCE NORTH 89°17'33" EAST, 42.77 FEET; THENCE SOUTH 00°42'27" EAST, 151.94 FEET; THENCE SOUTH 89°17'33" WEST, 54.93 FEET; THENCE SOUTH 00°42'27" EAST, 47.05 FEET; THENCE SOUTH 89°17'28" WEST, 93.98 FEET; THENCE NORTH 00°38'03" WEST, 256.17 FEET TO THE SOUTH RIGHT-OF-WAY OF SAID SUNSET ROAD; THENCE ALONG SAID SOUTH RIGHT-OF-WAY, SOUTH 88°23'51" EAST, 79.30 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTH AND HAVING A RADIUS OF 300.00 FEET; THENCE EASTERLY ALONG SAID SOUTH RIGHT-OF-WAY AND CURVE, THROUGH A CENTRAL ANGLE OF 02°17'26", AN ARC LENGTH OF 11.99 FEET; THENCE NORTH 89°18'43" EAST, 14.59 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD D ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 123 OF SURVEYS, PAGE 80, BEING A PORTION OF LOT 1A AS SHOWN IN FILE 121, PAGE 45 OF SURVEYS AND BEING A PORTION OF THE LAND AS DESCRIBED IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND LYING WITHIN THE SOUTHWEST

Exhibit 5 to Confirmation Order

QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, BEING A POINT ON THE CENTERLINE OF STEPHANIE STREET; THENCE ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, NORTH 89°18'43" EAST, 628.60 FEET; THENCE DEPARTING SAID NORTH CENTER SECTION LINE, SOUTH 00°41'17" EAST, 20.79 FEET TO THE SOUTH RIGHT-OF-WAY OF SUNSET ROAD AND BEING THE POINT OF BEGINNING; THENCE ALONG THE SOUTH RIGHT-OF-WAY OF SAID SUNSET ROAD, NORTH 89°18'43" EAST, 196.56 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHWEST AND HAVING A RADIUS OF 35.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 90°02'24", AN ARC LENGTH OF 55.00 FEET; THENCE SOUTH 00°38'53" EAST, 197.63 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST AND HAVING A RADIUS OF 20.00 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 89°56'21", AN ARC LENGTH OF 31.39 FEET; THENCE SOUTH 89°17'28" WEST, 223.50 FEET; THENCE NORTH 00°42'27" WEST, 47.05 FEET; THENCE NORTH 89°17'33" EAST, 54.93 FEET; THENCE NORTH 00°42'27" WEST, 151.94 FEET; THENCE SOUTH 89°17'33" WEST, 42.77 FEET; THENCE NORTH 00°42'27" WEST, 53.74 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD B1 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 124 OF SURVEYS, PAGE 3, BEING A PORTION OF LOT 1A AS SHOWN IN FILE 121, PAGE 45 OF SURVEYS AND BEING A PORTION OF THE LAND AS DESCRIBED IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND LYING WITHIN THE SOUTHWEST QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, BEING A POINT ON THE CENTERLINE OF STEPHANIE STREET; THENCE ALONG THE WEST LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, SOUTH 00°14'06" WEST, 72.81 FEET; THENCE DEPARTING SAID WEST SECTION LINE, SOUTH 89°45'54" EAST, 58.50 FEET TO THE EAST RIGHT-OF-WAY OF SAID STEPHANIE STREET AND BEING THE POINT OF BEGINNING AND THE BEGINNING OF A NON-TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 65.00 FEET; FROM WHICH BEGINNING THE RADIUS

23                                      Exhibit 5 to Confirmation Order

BEARS SOUTH 89°45'54" EAST; THENCE ALONG SAID RIGHT-OF-WAY AND CURVE THROUGH A CENTRAL ANGLE OF 89°04'37" AN ARC LENGTH OF 101.05 FEET TO THE SOUTH RIGHT-OF-WAY OF SUNSET ROAD; THENCE ALONG SAID SOUTH RIGHT-OF-WAY, NORTH 89°18'43" EAST, 210.71 FEET; THENCE SOUTH 88°23'51" EAST, ALONG SAID RIGHT-OF-WAY, 37.94 FEET; THENCE DEPARTING SAID RIGHT-OF-WAY, SOUTH 00°25'21" EAST, 227.86 FEET; THENCE SOUTH 38°30'10" EAST, 85.68 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 148.00 FEET, FROM WHICH BEGINNING THE RADIUS BEARS SOUTH 39°53'04" EAST; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 23°30'52" AN ARC LENGTH OF 60.74 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS NORTH 63°23'56" WEST; THENCE NORTH 45°53'44" WEST, 81.21 FEET; THENCE SOUTH 89°45'17" WEST, 274.58 FEET TO THE EAST RIGHT-OF-WAY OF SAID STEPHANIE STREET; THENCE ALONG SAID RIGHT-OF-WAY, NORTH 07°49'22" EAST, 11.79 FEET; THENCE NORTH 00°14'06" EAST ALONG SAID RIGHT-OF-WAY, 208.97 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD B2 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 125 OF SURVEYS, PAGE 31, BEING A PORTION OF LOT 1A AS SHOWN IN FILE 121, PAGE 45 OF SURVEYS AND BEING A PORTION OF THE LAND AS DESCRIBED IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND LYING WITHIN THE SOUTHWEST QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, BEING A POINT ON THE CENTERLINE OF STEPHANIE STREET; THENCE ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, NORTH 89°18'43" EAST, 370.98 FEET; THENCE DEPARTING THE NORTH LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3, SOUTH 00°25'21" EAST, 11.30 FEET TO THE SOUTH RIGHT-OF-WAY OF SUNSET ROAD AND BEING THE POINT OF BEGINNING; THENCE ALONG SAID SOUTH RIGHT-OF-WAY SOUTH 88°23'51" EAST, 151.97 FEET; THENCE DEPARTING SAID SOUTH RIGHT OF WAY, SOUTH 00°38'03" EAST, 256.17 FEET; THENCE SOUTH 89°17'28" WEST, 6.65 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 148.00 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39°10'32" AN ARC LENGTH OF 101.19 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS

24                    Exhibit 5 to Confirmation Order

NORTH 39°53'04" WEST; THENCE NORTH 38°30'10" WEST, 85.68 FEET; THENCE NORTH 00°25'21" WEST, 227.86 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PADS 1 AND 2 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 124 OF SURVEYS, PAGE 90, BEING A TRACT OF LAND LYING WITHIN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER", RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE AND SITUATE WITHIN A PORTION OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE QUARTER CORNER COMMON TO SECTIONS 3 AND 4, BEING A POINT ON THE CENTERLINE OF STEPHANIE STREET; THENCE ALONG THE WEST LINE OF THE SOUTHWEST QUARTER (SW) OF SAID SECTION 3 AND THE CENTERLINE OF SAID STEPHANIE STREET, SOUTH 00°14'06" WEST, 807.99 FEET; THENCE DEPARTING SAID WEST SECTION LINE AND STREET CENTERLINE, NORTH 88°55'32" EAST, 50.01 FEET TO THE EAST RIGHT-OF-WAY OF SAID STEPHANIE STREET, AND THE BEING THE POINT OF BEGINNING; THENCE ALONG SAID EAST RIGHT-OF-WAY, NORTH 00°14'06" EAST, 233.41 FEET; THENCE NORTH 89°19'59" EAST 75.01 FEET; THENCE NORTH 00°14'06" EAST, 39.45 FEET; THENCE NORTH 89°19'59" EAST, 226.70 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 25.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 89°57'05" AN ARC LENGTH OF 39.25 FEET; THENCE SOUTH 00°42'56" EAST, 128.73 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 98.50 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 75°37'12" AN ARC LENGTH OF 130.00 FEET, TO WHICH A RADIAL LINE BEARS SOUTH 13°39'52" WEST AND BEING THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 50.00 FEET, FROM WHICH BEGINNING THE RADIUS BEARS SOUTH 13°39'25" WEST; THENCE WESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 14°19'53" AN ARC LENGTH OF 12.51 FEET; THENCE SOUTH 89°19'59" WEST 23.66 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 3.00 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90°00'00" AN ARC LENGTH OF 4.71 FEET; THENCE SOUTH 00°40'01" EAST, 19.73 FEET; THENCE SOUTH 88°55'32" WEST, 366.21 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED AS PAD 3A ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE

132 OF SURVEYS, PAGE 89, BEING A PORTION OF THAT CERTAIN
FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION
OF THE HENDERSON COMMERCE CENTER", RECORDED IN BOOK
94 OF PLATS, AT PAGE 01, LYING WITHIN THE SOUTH HALF (S ½)
OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY
OF HENDERSON, CLARK COUNTY, NEVADA, MORE
PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST
QUARTER (SW ¼) OF SAID SECTION 3; THENCE ALONG THE NORTH
LINE OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 3,
NORTH 89°18'43" EAST, 2189.85 FEET; THENCE DEPARTING SAID
NORTH LINE, SOUTH 00°41'17" EAST, 9.73 FEET TO THE SOUTH
RIGHT-OF-WAY OF SUNSET ROAD BEING THE POINT OF
BEGINNING; THENCE ALONG SAID SOUTH RIGHT-OF-WAY, NORTH
88°15'43" EAST, 257.07 FEET TO THE BEGINNING OF A CURVE,
CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 20.00 FEET;
THENCE DEPARTING SAID RIGHT-OF-WAY AND SOUTHEASTERLY
ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 91°02'57",
AN ARC LENGTH OF 31.78 FEET; THENCE SOUTH 00°41'19" EAST,
276.63 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE
NORTHWEST HAVING A RADIUS OF 20.00 FEET; THENCE
SOUTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL
ANGLE OF 90°00'00", AN ARC LENGTH OF 31.42 FEET; THENCE
SOUTH 89°18'41" WEST, 205.02 FEET TO THE BEGINNING OF A
CURVE, CONCAVE TO THE SOUTH AND HAVING A RADIUS OF
450.50 FEET; THENCE WESTERLY ALONG SAID CURVE, THROUGH
A CENTRAL ANGLE OF 06°40'35", AN ARC LENGTH OF 52.49 FEET
TO A POINT OF NON-TANGENCY, FROM WHICH THE RADIUS
BEARS SOUTH 07°21'54" EAST; THENCE NORTH 00°41'19" WEST,
314.97 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PARCEL DESCRIBED
AS LOT 1-A ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE
74 OF SURVEYS, PAGE 36, BEING A PORTION OF LOT 1 OF
"HENDERSON COMMERCE CENTER", ON FILE IN THE OFFICE OF
THE COUNTY RECORDER, IN BOOK 60 OF PLATS, AT PAGE 67,
SITUATED IN THE SOUTHEAST QUARTER (SE ¼) OF SECTION 3,
TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF
HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY
DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SOUTHEAST
QUARTER (SE ¼) THENCE S. 89°18'16" W., ALONG THE NORTH LINE
OF SAID SOUTHEAST QUARTER (SE ¼) 2109.31 FEET; THENCE S.
01°32'25" W., DEPARTING SAID NORTH LINE, 301.16 FEET; THENCE
S. 89°18'16" W., 187.75 FEET TO THE WEST LINE OF MARKS STREET
(100 FEET WIDE), BEING THE POINT OF BEGINNING;

THENCE S. 89°18'16" W., DEPARTING SAID WEST LINE, 12.25 FEET;

26                              Exhibit 5 to Confirmation Order

THENCE N. 01°32'25" E., 283.02 FEET TO THE SOUTH LINE OF SUNSET ROAD (120 FEET WIDE); THENCE S. 79°23'08" E., 4.01 FEET TO THE WEST LINE OF SAID MARKS STREET; THENCE S. 09°46'11" E., ALONG SAID WEST LINE, 42.23 FEET; THENCE S. 01°32'25" W., ALONG SAID WEST LINE, 240.50 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THAT PORTION AS CONVEYED TO THE CITY OF HENDERSON RECORDED APRIL 21, 2005 IN BOOK 20050421 AS DOCUMENT NO. 01962, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

**PARCEL TWO (2): (APN 178-03-413-010)**

THAT PARCEL OF LAND DESCRIBED AS PARCEL 1-1B OF RECORD OF SURVEY FILE 119 PAGE 0012 OF SURVEYS, BEING A TRACT OF LAND AS SHOWN IN THAT CERTAIN FINAL MAP ENTITLED "2ND AMENDED FINAL MAP OF A PORTION OF THE HENDERSON COMMERCE CENTER" RECORDED IN BOOK 94, PAGE 1 OF PLATS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, AND SITUATE WITHIN THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CLARK COUNTY, NEVADA, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 3, BEING AT THE CENTERLINE INTERSECTION OF STEPHANIE STREET AND WARM SPRINGS ROAD; THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER (SW 1/4) OF SAID SECTION 3 AND THE CENTERLINE OF SAID WARM SPRINGS ROAD, NORTH 88°54'05" EAST, 801.39 FEET TO THE SOUTHERLY PROLONGATION OF THE WEST LINE OF PARCEL 1-1A AS SHOWN IN FILE 116, PAGE 85 OF SURVEYS ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE; THENCE ALONG SAID PROLONGATION, NORTH 01°05'55" WEST, 50.00 FEET TO THE SOUTHWEST CORNER OF SAID PARCEL 1-1A; THENCE ALONG THE SOUTHERLY AND EASTERLY LINES OF SAID PARCEL 1-1A THE FOLLOWING FIVE (5) COURSES AND DISTANCES:

(1) NORTH 88°54'05" EAST, 421.70 FEET TO THE POINT OF BEGINNING, AND BEING THE BEGINNING OF A 25.00 FOOT RADIUS CURVE CONCAVE TO THE NORTHWEST;
(2) NORTHEASTERLY ALONG SAID CURVE TO THE LEFT, THROUGH A CENTRAL ANGLE OF 89°37'13" AN ARC LENGTH OF 39.10 FEET;
(3) NORTH 00°43'08" WEST, 87.19 FEET TO THE BEGINNING OF A 105.00 FOOT RADIUS CURVE CONCAVE TO THE SOUTHEAST;
(4) NORTHEASTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 15°44'26" AN ARC LENGTH OF

28.85 FEET TO THE BEGINNING OF A 95.00 FOOT RADIUS REVERSE CURVE CONCAVE TO THE NORTHWEST;
(5) NORTHERLY ALONG SAID CURVE TO THE LEFT, THROUGH A CENTRAL ANGLE OF 15°44'26" AN ARC LENGTH OF 26.10 FEET; THENCE SOUTH 00°43'08" EAST, DEPARTING THE EAST LINE OF SAID PARCEL 1-1A, 151.33 FEET TO THE BEGINNING OF A 15.00 FOOT RADIUS CURVE CONCAVE TO THE NORTHWEST; THENCE SOUTHWESTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 89°37'13" AN ARC LENGTH OF 23.46 FEET TO THE NORTH RIGHT-OF-WAY OF SAID WARM SPRINGS ROAD; THENCE ALONG SAID NORTH RIGHT-OF-WAY, SOUTH 88°54'05" WEST, 17.43 FEET TO THE POINT OF BEGINNING.

ALSO KNOWN AS PARCEL 1-1B ON FILE IN FILE 119 OF SURVEYS, PAGE 0012 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

**PARCEL THREE (3): (APN 178-03-411-030)**

BEING A PORTION OF LOT 1 OF "AMENDED HENDERSON COMMERCE CENTER", ON FILE IN BOOK 65 OF PLATS, PAGE 26, ALSO A PORTION PARCEL 1-3-3-1 OF THAT RECORD OF SURVEY ON FILE IN THE CLARK COUNTY RECORDER'S OFFICE IN FILE 94 OF SURVEYS, AT PAGE 86, LYING WITHIN THE SOUTH HALF (S 1/2) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY NORTHWEST CORNER OF SAID PARCEL 1-3-3-1; THENCE NORTH 84°56'41" EAST ALONG THE NORTHERLY BOUNDARY LINE OF SAID PARCEL 1-3-3-1, A DISTANCE OF 278.16 FEET; THENCE NORTH 83°38'24" EAST, CONTINUING ALONG SAID NORTHERLY BOUNDARY LINE, 135.82 FEET; THENCE SOUTH 07°48'12" WEST, DEPARTING SAID NORTHERLY BOUNDARY LINE, 27.59 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY HAVING A RADIUS OF 500.00 FEET; THENCE SOUTHERLY, 112.46 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 12°53'14"; THENCE SOUTH 05°05'02" EAST, 58.45 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHWESTERLY HAVING A RADIUS OF 120.00 FEET; THENCE SOUTHWESTERLY, 173.17 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 82°41'06"; THENCE SOUTH 77°36'03" WEST, 169.06 FEET; THENCE SOUTH 74°32'21" WEST, 120.79 FEET TO THE BEGINNING OF A CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 135.00 FEET; THENCE SOUTHWESTERLY, 46.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 19°42'35" TO THE WESTERLY BOUNDARY LINE OF SAID PARCEL 1-3-3-1; THENCE ALONG SAID WESTERLY BOUNDARY LINE THROUGH ITS VARIOUS CURVES AND COURSES AS FOLLOWS: NORTH 11°40'44" WEST, 100.70 FEET; THENCE NORTH 05°04'02" WEST, 98.51 FEET;

Exhibit 5 to Confirmation Order

THENCE NORTH 03°04'20" EAST, 149.49 FEET TO THE BEGINNING OF A CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 30.00 FEET; THENCE NORTHEASTERLY, 42.87 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 81°52'21" TO THE POINT OF BEGINNING.

ALSO KNOWN AS PARCEL 3 ON THAT CERTAIN RECORD OF SURVEY ON FILE IN FILE 105 OF SURVEYS, PAGE 38, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

**PARCEL FOUR (4): (APN 178-03-411-028)**

BEING A PORTION OF LOT 1 OF "AMENDED HENDERSON COMMERCE CENTER", ON FILE IN BOOK 65 OF PLATS, PAGE 26, ALSO BEING A PORTION OF PARCEL 1-3-2 OF THAT CERTAIN RECORD OF SURVEY ON FILE IN THE CLARK COUNTY, NEVADA, RECORDER'S OFFICE IN FILE 86 OF SURVEYS, AT PAGE 08 LYING WITHIN THE SOUTH HALF (S ½) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED THEREIN AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 1-3-2; THENCE NORTH 82°56'43" EAST ALONG THE NORTH BOUNDARY OF SAID PARCEL 1-3-2, A DISTANCE OF 537.39 FEET TO A POINT OF CUSP WITH A CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 100.00 FEET; THENCE SOUTHWESTERLY, 131.15 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 75°08'31"; THENCE SOUTH 07°48'12" WEST, 38.17 FEET TO THE BOUNDARY LINE OF SAID PARCEL 1-3-2; THENCE ALONG THE BOUNDARY LINE OF SAID PARCEL 1-3-2, THROUGH ITS VARIOUS CURVES AND COURSES AS FOLLOWS: SOUTH 83°38'24" WEST, 135.82 FEET; THENCE SOUTH 84°56'41" WEST, 278.16 FEET TO THE BEGINNING OF A CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 30.00 FEET; THENCE SOUTHWESTERLY, 42.87 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 81°52'21"; THENCE SOUTH 03°04'20" WEST, 149.49 FEET; THENCE SOUTH 05°04'02" EAST, 98.51 FEET; THENCE SOUTH 11°40'44" EAST, 100.70 FEET TO THE BEGINNING OF A NON TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 135.00 FEET, A RADIAL LINE TO SAID BEGINNING BEARS NORTH 35°10'14" WEST; THENCE DEPARTING THE BOUNDARY LINE OF SAID PARCEL 1-3-2, SOUTHWESTERLY, 151.15 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 64°08'53"; THENCE SOUTH 09°19'08" EAST, 86.65 FEET TO THE BOUNDARY OF SAID PARCEL 1-3-2, THENCE ALONG THE BOUNDARY LINE OF SAID PARCEL 1-3-2, THROUGH ITS VARIOUS CURVES AND COURSES AS FOLLOWS: NORTH 13°06'55" WEST, 317.36 FEET; THENCE NORTH 03°18'20" WEST, 254.38 FEET TO THE BEGINNING OF A CURVE CONCAVE

29                    Exhibit 5 to Confirmation Order

| | |
|---|---|
| | SOUTHEASTERLY HAVING A RADIUS OF 120.00 FEET; THENCE NORTHEASTERLY, 180.64 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 86°15'03" TO THE POINT OF BEGINNING.<br><br>ALSO KNOWN AS PARCEL 1 ON THAT CERTAIN RECORD OF SURVEY ON FILE IN FILE 105 OF SURVEYS, PAGE 38, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA. |
| **FCP PROPCO, LLC**<br><br>**(Boulder Station Hotel & Casino)** | **PARCEL A: (PTN: 161-07-702-014) LEASEHOLD**<br><br>A PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>BEGINNING AT THE SOUTHEAST CORNER OF SAID SECTION 7; THENCE NORTH 00°40'50" EAST 57.06 FEET ALONG THE EAST BOUNDARY OF SAID SECTION 7 TO ITS INTERSECTION WITH NORTHEASTERLY HIGHWAY RIGHT OF WAY LINE; THENCE NORTH 42°27' WEST ALONG SAID RIGHT OF WAY LINE 1321.50 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH 42°27' WEST 200.00 FEET; THENCE NORTH 47°33' EAST 500.00 FEET; THENCE SOUTH 42°27' EAST 200.00 FEET; THENCE SOUTH 47°33' WEST 500.00 FEET TO THE TRUE POINT OF BEGINNING.<br><br>(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED APRIL 27, 2001 IN BOOK 20010427 AS DOCUMENT NO. 01670 OF OFFICIAL RECORDS.)<br><br>**PARCEL B: (PTN: 161-07-702-014) LEASEHOLD**<br><br>BEING A PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>BEGINNING AT THE SOUTHEAST CORNER (SE COR.) OF SAID SECTION 7; THENCE NORTH 00°40'50" EAST, 57.06 FEET ALONG THE EAST BOUNDARY OF SAID SOUTHEAST QUARTER (SE 1/4) TO ITS INTERSECTION WITH THE NORTHEASTERLY RIGHT OF WAY LINE; THENCE NORTH 42°27'00" WEST ALONG SAID RIGHT OF WAY LINE, 421.50 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH 42°27'00" WEST, 200.00 FEET; THENCE NORTH 47°33'00" EAST, 500.00 FEET; THENCE NORTH 42°27'00" WEST, 395.00 FEET; THENCE NORTH 47°33'00" EAST, 452.24 FEET TO A POINT IN THE EAST BOUNDARY OF SAID SOUTHEAST QUARTER (SE 1/4); THENCE SOUTH 00°40'50" WEST ALONG SAID EAST BOUNDARY, 815.29 FEET; THENCE SOUTH 47°33'00" WEST, 394.86 FEET TO THE TRUE POINT OF BEGINNING.<br><br>EXCEPTING THEREFROM THOSE PORTIONS AS CONVEYED BY |

Exhibit 5 to Confirmation Order

DEED RECORDED DECEMBER 7, 1962 AS DOCUMENT NO. 326103 AND DEED RECORDED JANUARY 2, 1968 AS DOCUMENT NO. 681876.

ALSO EXCEPTING THEREFROM THE INTEREST IN THE EASTERLY 30.00 FEET OF SAID LAND AS CONVEYED TO CLARK COUNTY, NEVADA FOR ROAD PURPOSES BY DEED RECORDED SEPTEMBER 28, 1959 AS DOCUMENT NO. 174688, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM THAT PORTION LYING WITHIN THE SOUTHWESTERLY 200.00 FEET MEASURED AT RIGHT ANGLES AND ADJACENT TO U.S. HIGHWAY NO.S 93-95-466.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO CLARK COUNTY BY DEED RECORDED OCTOBER 11, 1988 IN BOOK 881011 AS DOCUMENT NO. 00211, OFFICIAL RECORDS.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED APRIL 27, 2001 IN BOOK 20010427 AS DOCUMENT NO. 01670 OF OFFICIAL RECORDS.)

**PARCEL C: (PTN: 161-07-702-014) LEASEHOLD**

**PARCEL ONE (1):**

BEING A PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.B. &M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID SECTION 7; THENCE NORTH 0°40'50" EAST 57.06 FEET ALONG THE EAST BOUNDARY OF SAID SECTION 7 TO ITS INTERSECTION WITH THE NORTHEASTERLY HIGHWAY RIGHT OF WAY LINE; THENCE NORTH 42°27' WEST ALONG THE RIGHT OF WAY LINE 1121.50 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH 42°27' WEST 200.00 FEET; THENCE NORTH 47°33' EAST 500.00 FEET; THENCE SOUTH 42°27' EAST 200.00 FEET; THENCE SOUTH 47°33' WEST 500.00 FEET THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED APRIL 27, 2001 IN BOOK 20010427 AS DOCUMENT NO. 01670 OF OFFICIAL RECORDS.)

**PARCEL TWO (2):**

BEING A PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.B. &M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:

31                    Exhibit 5 to Confirmation Order

BEGINNING AT THE SOUTHEAST CORNER OF SAID SECTION 7; THENCE NORTH 0°40'50" EAST 57.06 FEET ALONG THE EAST BOUNDARY OF SAID SECTION 7 TO ITS INTERSECTION WITH THE NORTHEASTERLY HIGHWAY RIGHT OF WAY LINE; THENCE NORTH 42°27' WEST ALONG SAID RIGHT OF WAY LINE 821.50 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH 42°27' WEST 300.00 FEET; THENCE NORTH 47°33' EAST 500.00 FEET; THENCE SOUTH 42°27' EAST 300.00 FEET; THENCE SOUTH 47°33' WEST 500.00 FEET TO THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED APRIL 27, 2001 IN BOOK 20010427 AS DOCUMENT NO. 01670 OF OFFICIAL RECORDS.)

**PARCEL D: (PTN: 161-07-702-014) LEASEHOLD**

**PARCEL ONE (1)**

BEING A PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.M., MORE PARTICULARLY AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SOUTHEAST QUARTER (SE 1/4); THENCE NORTH 89°35'20" WEST ALONG THE NORTH BOUNDARY OF SAID SOUTHEAST QUARTER (SE 1/4), 60.00 FEET; THENCE SOUTH 0°40'50" WEST, 251.90 FEET; THENCE SOUTH 47°33' WEST, 1572.62 FEET TO A POINT IN THE NORTHEASTERLY 200 FOOT RIGHT OF WAY LINE OF U.S. HIGHWAY 93; THENCE SOUTH 42°27' EAST, ALONG SAID RIGHT OF WAY LINE 60.00 FEET; THENCE NORTH 47°33' EAST, 500.00 FEET; THENCE SOUTH 42°27' EAST, 690.00 FEET; THENCE NORTH 47°33' EAST, 452.24 FEET TO A POINT IN THE EAST BOUNDARY OF SAID SOUTHEAST QUARTER (SE 1/4); THENCE NORTH 0°40'50" EAST, ALONG SAID EAST BOUNDARY 1223.65 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO CLARK COUNTY BY DEED RECORDED OCTOBER 11, 1988 IN BOOK 881011 AS DOCUMENT NO. 00211, OFFICIAL RECORDS.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED APRIL 27, 2001 IN BOOK 20010427 AS DOCUMENT NO. 01670 OF OFFICIAL RECORDS.)

**PARCEL TWO (2):**

BEING A PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.B. &M.,

MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID SECTION 7; THENCE NORTH 0°40'50" EAST 57.06 FEET ALONG THE EAST BOUNDARY OF SAID SECTION 7 TO ITS INTERSECTION WITH NORTHEASTERLY HIGHWAY RIGHT OF WAY LINE; THENCE NORTH 42°27' WEST ALONG SAID RIGHT OF WAY LINE 1521.50 TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH 42°27' WEST 185.00 FEET; THENCE NORTH 47°33' EAST, 500.00 FEET; THENCE SOUTH 42°27' EAST, 185.00 FEET; THENCE SOUTH 47°33' WEST, 500.00 FEET TO THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED APRIL 27, 2001 IN BOOK 20010427 AS DOCUMENT NO. 01670 OF OFFICIAL RECORDS.)

**PARCEL E: (PTN: 161-07-702-014) LEASEHOLD**

THAT PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.B.&M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SOUTHEAST QUARTER (SE 1/4); THENCE NORTH 89°35'20" WEST ALONG THE NORTH BOUNDARY OF SAID SOUTHEAST QUARTER (SE 1/4) 568.91 FEET; THENCE SOUTH 47°33' WEST, 871.78 FEET; THENCE SOUTH 42°27' EAST, 500.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 47°33' WEST, 500.00 FEET TO A POINT IN THE NORTHEASTERLY 200 FOOT RIGHT OF WAY LINE OF U.S. HIGHWAY 93; THENCE SOUTH 42°27' EAST ALONG SAID RIGHT OF WAY LINE, 30.00 FEET; THENCE NORTH 47°33' EAST, 500.00 FEET TO A POINT; THENCE NORTH 42°27' WEST, 30.00 FEET TO THE TRUE POINT OF BEGINNING, ALL IN CLARK COUNTY, NEVADA.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED APRIL 27, 2001 IN BOOK 20010427 AS DOCUMENT NO. 01670 OF OFFICIAL RECORDS.)

**PARCEL F: (PTN: 161-07-702-014) LEASEHOLD**

THAT PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.B.&M., CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST; THENCE NORTH 0°40'50" EAST AND ALONG THE EAST LINE OF SAID SECTION 7, A DISTANCE OF 57.06 FEET TO ITS INTERSECTION WITH THE

NORTHEASTERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NOS. 93-95-466; THENCE NORTH 42°27'00" WEST AND ALONG THE SAID NORTHEASTERLY HIGHWAY RIGHT OF WAY LINE A DISTANCE OF 291.50 FEET TO A POINT; THENCE NORTHERLY AND ALONG A CURVE CONCAVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 16°16'36" WITH A RADIUS OF 535.18 FEET AND ARC DISTANCE OF 152.03 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 42°27'00" WEST AND PARALLEL WITH THE SAID NORTHEASTERLY HIGHWAY RIGHT OF WAY LINE A DISTANCE OF 204.61 FEET TO A POINT; THENCE NORTH 47°33'00" EAST A DISTANCE OF 125.00 FEET TO A POINT; THENCE SOUTH 42°27'00" EAST A DISTANCE OF 150.00 FEET TO A POINT ON A CURVE; THENCE SOUTHERLY ALONG THE CURVE CONCAVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 14°38'37" WITH A RADIUS OF 535.18 FEET AN ARC DISTANCE OF 136.78 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY FOR ROAD AND INCIDENTAL PURPOSES BY DEED RECORDED MARCH 1, 1963 AS DOCUMENT NO. 342878 IN BOOK 425 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

FURTHER EXCEPTING THEREFROM THAT PORTION CONVEYED TO CLARK COUNTY FOR ROAD AND INCIDENTAL PURPOSES RECORDED JUNE 26, 1963 AS DOCUMENT NO. 367234 OF OFFICIAL RECORDS.

FURTHER EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY DEED RECORDED NOVEMBER 13, 2000, IN BOOK 20001113 AS DOCUMENT NO. 01268, AND RE-RECORDED MARCH 6, 2001 IN BOOK 20010306 AS DOCUMENT NO. 02384 OF OFFICIAL RECORDS.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED APRIL 27, 2001 IN BOOK 20010427 AS DOCUMENT NO. 01670 OF OFFICIAL RECORDS.)

**PARCEL G: (APN: 161-07-802-009) LEASEHOLD**

THAT PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.B.&M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 7; THENCE NORTH 00°39'58" EAST, 57.06 FEET ALONG THE EAST BOUNDARY OF SAID SOUTHEAST QUARTER (SE 1/4) TO ITS INTERSECTION WITH THE NORTHEASTERLY RIGHT OF WAY LINE OF BOULDER HIGHWAY (US 93-95); THENCE NORTH 42°27'00" WEST ALONG SAID RIGHT OF WAY LINE A DISTANCE OF 483.82 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH

Exhibit 5 to Confirmation Order

42°27'00" WEST, A DISTANCE OF 137.68 FEET; THENCE NORTH 47°33'00" EAST A DISTANCE OF 200.00 FEET; THENCE SOUTH 42°27'00" EAST A DISTANCE OF 103.94 FEET; THENCE SOUTH 47°33'00" WEST A DISTANCE OF 50.00 FEET; THENCE SOUTH 42°27'00" EAST A DISTANCE OF 33.74 FEET; THENCE SOUTH 47°33'00" WEST A DISTANCE OF 150.00 FEET TO THE TRUE POINT OF BEGINNING.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED OCTOBER 3, 2001 IN BOOK 20011003 AS DOCUMENT NO. 00980 OF OFFICIAL RECORDS.)

**PARCEL H: (APN: 161-07-802-011) LEASEHOLD**

THAT PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.B.&M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 7; THENCE NORTH 00°39'58" EAST, 57.06 FEET ALONG THE EAST BOUNDARY OF SAID SOUTHEAST QUARTER (SE 1/4) OF ITS INTERSECTION WITH THE NORTHEASTERLY RIGHT OF WAY LINE OF BOULDER HIGHWAY (US 93-95); THENCE NORTH 42°27'00" WEST ALONG SAID RIGHT OF WAY LINE A DISTANCE OF 311.50 FEET TO A POINT ON A NON-TANGENT CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 514.67 FEET SAID POINT BEING ON THE NORTHWESTERLY RIGHT OF WAY LINE OF LAMB BOULEVARD (80.00 FEET WIDE); THENCE FROM A RADIAL LINE THAT BEARS SOUTH 42°27'00" EAST NORTHEASTERLY ALONG THE ARC OF SAID CURVE AND ALONG SAID NORTHWESTERLY RIGHT OF LINE OF LAMB BOULEVARD THROUGH A CENTRAL ANGLE OF 32°17'53" AN ARC LENGTH OF 290.12 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID NORTHWESTERLY RIGHT OF WAY LINE OF LAMB BOULEVARD THROUGH A CENTRAL ANGLE OF 05°51'49" AN ARC LENGTH OF 52.67 FEET; THENCE SOUTH 47°33'00" WEST A DISTANCE OF 43.01 FEET; THENCE SOUTH 42°27'00" EAST A DISTANCE OF 30.37 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO CLARK COUNTY BY DEED RECORDED AUGUST 26, 1988 IN BOOK 880826 AS DOCUMENT NO. 00631, OFFICIAL RECORDS.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED OCTOBER 3, 2001 IN BOOK 20011003 AS DOCUMENT NO. 00980 OF OFFICIAL RECORDS.)

**PARCEL I: (APN: 161-07-702-002) FEE**

THAT PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SOUTHEAST QUARTER THENCE NORTH 89°35'20" WEST ALONG THE NORTH BOUNDARY OF SAID SOUTHEAST QUARTER 60.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH 89°35'20" WEST, 508.91 FEET; THENCE SOUTH 47°33' WEST, 871.78 FEET; THENCE SOUTH 42°27' EAST, 530.00 FEET; THENCE NORTH 47°33' EAST, 1072.62 FEET; THENCE NORTH 0°40'50" EAST 251.90 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THE INTEREST IN AND TO THE NORTH 30.00 FEET THEREOF AS CONDEMNED BY THE COUNTY OF CLARK FOR ROAD AND HIGHWAY PURPOSES BY JUDGMENT FILED MAY 12, 1954 AND RECORDED AS DOCUMENT NO. 30837, CLARK COUNTY, NEVADA RECORDS.

FURTHER EXCEPTING THE INTEREST IN AND TO THAT PORTION OF SAID PREMISES LYING WITHIN THE SOUTH 10.00 FEET OF THE NORTH 40.00 FEET OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SAID SECTION 7, CONVEYED TO THE COUNTY OF CLARK FOR ROADS, UTILITIES, OTHER PUBLIC AND INCIDENTAL PURPOSES BY DEED RECORDED JULY 24, 1969 AS DOCUMENT NO. 769595, CLARK COUNTY, NEVADA.

(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED MAY 17, 1994 IN BOOK 940517 AS DOCUMENT NO. 00473 OF OFFICIAL RECORDS.)

**PARCEL J: (APN: 161-07-702-015 AND 016)**

**PARCEL ONE (1): FEE**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, DESCRIBED AS FOLLOWS:

PARCELS ONE (1) AND TWO (2) AS SHOWN BY MAP THEREOF ON FILE IN BOOK 34 OF PARCEL MAPS, PAGE 54, CLARK COUNTY, OFFICIAL RECORDS.

**PARCEL TWO (2):**

A NON-EXCLUSIVE EASEMENT FOR SUBSURFACE SEWER LINE AS SET FORTH BY THAT CERTAIN EASEMENT AGREEMENT RECORDED JANUARY 19, 1981 IN BOOK 1343 AS DOCUMENT NO.

| | |
|---|---|
| | 1302585 OF OFFICIAL RECORDS. |
| **FCP PROPCO, LLC**<br><br>**(Red Rock Casino Resort Spa)** | **PARCEL I:**<br><br>ALL OF LOT 1 AS SHOWN ON THE FINAL MAP OF SUMMERLIN VILLAGE 13 WEST PARCEL "U/V/W" ON FILE IN BOOK 110 PAGE 29 OF PLATS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.<br><br>TOGETHER WITH:<br><br>A PARCEL OF LAND LYING WITHIN THE EAST HALF (E ½) OF SECTION 2, TOWNSHIP 21 SOUTH, RANGE 59 EAST, CLARK COUNTY, NEVADA AS SHOWN IN FILE 157, PAGE 06 OF SURVEYS, OFFICIAL RECORDS, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>COMMENCING AT THE SOUTHEAST CORNER OF SECTION 35, TOWNSHIP 20, SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA:<br>THENCE SOUTH 89°54'38" WEST, ALONG THE SOUTH LINE OF SAID SECTION 35, A DISTANCE OF 1154.55 FEET;<br>THENCE SOUTH 00°05'22" EAST, DEPARTING SAID SOUTH LINE, A DISTANCE OF 85.71 FEET TO THE POINT OF BEGINNING;<br>THENCE NORTH 89°26'14" EAST, A DISTANCE OF 11.28 FEET TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 100.00 FEET, A CENTRAL ANGLE OF 15°47'19" AND TO A POINT TO WHICH A RADIAL LINE BEARS SOUTH 74°47'09" EAST;<br>THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT AN ARC LENGTH OF 27.56 FEET;<br>THENCE NORTH 01°08'16" EAST, A DISTANCE OF 25.16 FEET TO THE POINT OF BEGINNING.<br><br>FURTHER DESCRIBED ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 157 OF SURVEYS, PAGE 06 RECORDED JUNE 6, 2006 IN BOOK 20060606 AS DOCUMENT NO. 02875 OF OFFICIAL RECORDS, CONTAINING THE SAME LEGAL DESCRIPTION.<br><br>**EXCEPTING THEREFROM** THE FOLLOWING PARCEL, FURTHER DESCRIBED AS PARCEL 1 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 158 OF SURVEYS, PAGE 93, RECORDED AUGUST 4, 2006 IN BOOK 20060804 AS DOCUMENT NO. 02278, AND AS AMENDED BY CERTIFICATE OF AMENDMENT RECORDED AUGUST 30, 2007 IN BOOK 20070830 AS DOCUMENT NO. 04277 OF OFFICIAL RECORDS, THEREIN DESCRIBED AS FOLLOWS:<br><br>A PORTION OF LOT 1 AS RECORDED IN THAT CERTAIN FINAL MAP TITLED "SUMMERLIN VILLAGE 13 WEST PARCEL "U/V/W", A COMMERCIAL SUBDIVISION" RECORDED IN BOOK 110, PAGE 29 OF |

Exhibit 5 to Confirmation Order

#4843-6991-8215

PLATS, ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, LYING WITHIN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE CENTERLINE INTERSECTION OF PAVILION CENTER DRIVE AND PARK CENTRE DRIVE; THENCE ALONG THE CENTERLINE OF SAID PARK CENTRE DRIVE, NORTH 89°55'18" WEST, 64.29 FEET; THENCE DEPARTING THE CENTERLINE OF SAID PARK CENTRE DRIVE, NORTH 00°04'42" EAST, 66.50 FEET TO THE SOUTHEAST CORNER OF SAID LOT 1 AND BEING THE POINT OF BEGINNING; THENCE ALONG THE SOUTHERLY BOUNDARY OF SAID LOT 1, NORTH 89°55'18" WEST, 462.43 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE NORTH, HAVING A RADIUS OF 3433.50 FEET; THENCE SOUTHERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 02°01'45", AN ARC LENGTH OF 121.60 FEET; THENCE TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 88.60 FEET, FROM WHICH BEGINNING THE RADIUS BEARS NORTH 73°52'43" EAST; THENCE NORTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 04°59'52", AN ARC LENGTH OF 7.73 FEET TO A POINT WHICH A RADIAL LINE BEARS SOUTH 78°52'35" WEST BEING A POINT OF CUSP WITH A CURVE CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 138.82 FEET, FROM WHICH POINT THE RADIUS BEARS NORTH 78°05'47" EAST; THENCE NORTHERWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 11°53'42", AN ARC LENGTH OF 28.82 FEET; THENCE NORTH 00°00'00" EAST, 52.92 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 138.00 FEET; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 47°12'03", AN ARC LENGTH OF 113.69 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 1006.00 FEET, THROUGH WHICH A RADIAL LINE BEARS NORTH 42°47'57" WEST; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 07°49'18", AN ARC LENGTH OF 137.33 FEET TO A POINT WHICH A RADIAL LINE BEARS SOUTH 50°37'15" EAST BEING A POINT OF CUSP WITH A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 889.52 FEET, FROM WHICH POINT THE RADIUS BEARS NORTH 50°19'42" WEST; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 05°58'05", AN ARC LENGTH OF 92.65 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS SOUTH 56°17'47" EAST; THENCE SOUTH 56°34'28" EAST, 4.75 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 25.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 52°34'28", AN ARC

38                    Exhibit 5 to Confirmation Order

LENGTH OF 22.94 FEET; THENCE SOUTH 04°00'00" EAST, 3.44 FEET; THENCE NORTH 86°00'00" EAST, 163.65 FEET; THENCE SOUTH 49°00'00" EAST, 12.73 FEET; THENCE NORTH 86°00'00" EAST, 58.56 FEET; THENCE NORTH 72°31'35" EAST, 38.63 FEET; THENCE NORTH 86°00'00" EAST, 135.62 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 28.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 45°00'00", AN ARC LENGTH OF 21.99 FEET; THENCE SOUTH 49°00'00" EAST, 19.27 FEET TO A POINT ON THE BOUNDARY OF SAID LOT 1 AND TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 102.00 FEET, FROM WHICH BEGINNING THE RADIUS BEARS NORTH 82°19'15" EAST; THENCE SOUTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 12°25'14", AN ARC LENGTH OF 22.11 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE WEST, HAVING A RADIUS OF 130.00 FEET, THROUGH WHICH A RADIAL LINE BEARS SOUTH 69°54'01" WEST; THENCE EASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 51°35'28", AN ARC LENGTH OF 117.06 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 170.00 FEET, THROUGH WHICH A RADIAL LINE BEARS SOUTH 58°30'31" EAST; THENCE SOUTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 13°52'32", AN ARC LENGTH OF 41.17 FEET TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE TO THE EAST, HAVING A RADIUS OF 817.00 FEET, FROM WHICH BEGINNING THE RADIUS BEARS SOUTH 72°23'03" EAST; THENCE SOUTHERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 12°52'07", AN ARC LENGTH OF 183.50 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS NORTH 85°15'10" WEST AND THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THE FOLLOWING PARCEL, FURTHER DESCRIBED AS PARCEL 2 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 164 OF SURVEYS, PAGE 93, RECORDED APRIL 24, 2007 IN BOOK 20070424 AS DOCUMENT NO. 03289, THEREIN DESCRIBED AS FOLLOWS:

A PORTION OF LOT 1 AS RECORDED IN THAT CERTAIN FINAL MAP TITLED "SUMMERLIN VILLAGE 13 WEST PARCEL "U/V/W", A COMMERCIAL SUBDIVISION" RECORDED IN BOOK 110, PAGE 29 OF PLATS, ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, LYING WITHIN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE CENTERLINE INTERSECTION OF PAVILION CENTER DRIVE AND PARK CENTRE DRIVE, BEING A POINT ON A

NON-TANGENT CURVE CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 750.00 FEET, FROM WHICH POINT THE RADIUS BEARS SOUTH 89°55'18" EAST; THENCE ALONG THE CENTERLINE OF SAID PAVILION CENTER DRIVE, THE FOLLOWING FOUR COURSES: (1) NORTHEASTERLY ALONG SAID CENTERLINE CURVE, THROUGH A CENTRAL ANGLE OF 16°19'07", AN ARC LENGTH OF 213.61 FEET; (2) NORTH 16°23'49" EAST, 258.25 FEET, TO THE BEGINNING OF A CURVE, CONCAVE TO THE WEST, HAVING A RADIUS OF 600.00 FEET; (3) NORTHERLY ALONG SAID CENTERLINE CURVE, THROUGH A CENTRAL ANGLE OF 16°19'07", AN ARC LENGTH OF 170.89 FEET; (4) NORTH 00°04'42" EAST, 237.17 FEET; THENCE DEPARTING THE CENTERLINE OF SAID PAVILION CENTER DRIVE, NORTH 89°55'18" WEST, 57.50 FEET TO A POINT ON THE WEST LINE OF COMMON LOT "B" AS SHOWN IN BOOK 110, PAGE 29 OF PLATS, AND BEING THE POINT OF BEGINNING; THENCE ALONG THE WEST LINE OF SAID COMMON LOT "B" THE FOLLOWING FIVE COURSES: (1) SOUTH 00°04'42" WEST, 200.20 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE EAST, HAVING A RADIUS OF 748.67 FEET; (2) SOUTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 05°59'34", AN ARC LENGTH OF 78.30 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 57.00 FEET, THROUGH WHICH A RADIAL LINE BEARS SOUTH 84°05'08" WEST; (3) SOUTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 49°36'39", AN ARC LENGTH OF 49.35 FEET; (4) SOUTH 43°41'47" WEST, 53.86 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE EAST, HAVING A RADIUS OF 102.00 FEET; (5) SOUTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 51°22'33", AN ARC LENGTH OF 91.46 FEET TO A POINT OF NON-TANGENCY TO WHICH THE RADIAL LINE BEARS SOUTH 82°19'15" WEST, SAID POINT ALSO BEING THE NORTHEAST CORNER OF PARCEL 1 AS SHOWN IN FILE 158, PAGE 93 OF SURVEYS; THENCE ALONG THE NORTHERLY LINE OF PARCEL 1, THE FOLLOWING TEN COURSES: (1) NORTH 49°00'00" WEST, 19.27 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 28.00 FEET; (2) WESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 45°00'00", AN ARC LENGTH OF 21.99 FEET; (3) SOUTH 86°00'00" WEST, 135.62 FEET; (4) SOUTH 72°31'35" WEST, 38.63 FEET; (5) SOUTH 86°00'00" WEST, 58.56 FEET; (6) NORTH 49°00'00" WEST, 12.73 FEET; (7) SOUTH 86°00'00" WEST, 163.65 FEET; (8) NORTH 04°00'00" WEST, 3.44 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 25.00 FEET; (9) NORTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 52°34'28", AN ARC LENGTH OF 22.94 FEET; (10) NORTH 56°34'28" WEST, 4.75 FEET TO NORTHWEST CORNER OF SAID PARCEL 1, BEING THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 953.29 FEET, FROM WHICH BEGINNING THE RADIUS BEARS NORTH 55°42'40" WEST; THENCE NORTHEASTERLY

40                    Exhibit 5 to Confirmation Order

ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 04°44'50", AN ARC LENGTH OF 78.99 FEET TO A POINT WHICH A RADIAL LINE BEARS SOUTH 60°27'30" EAST TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 177.00 FEET, FROM WHICH BEGINNING A RADIAL LINE BEARS SOUTH 60°23'46" EAST; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 26°38'29", AN ARC LENGTH OF 82.30 FEET; THENCE NORTH 56°14'43" EAST, 149.47 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 288.00 FEET; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 07°01'20", AN ARC LENGTH OF 35.30 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 204.00 FEET, THROUGH WHICH A RADIAL LINE BEARS NORTH 26°43'58" WEST; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 36°32'04", AN ARC LENGTH OF 130.08 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 287.84 FEET, THROUGH WHICH A RADIAL LINE BEARS SOUTH 63°16'09" EAST; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 01°44'54", AN ARC LENGTH OF 8.78 FEET; THENCE NORTH 28°28'45" EAST, 20.84 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 189.50 FEET; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 54°35'34", AN ARC LENGTH OF 180.56 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS NORTH 06°55'41" WEST; THENCE SOUTH 45°00'00" EAST, 16.42 FEET; THENCE NORTH 90°00'00" EAST, 18.16 FEET TO THE POINT OF BEGINNING.

**FURTHER EXCEPTING THEREFROM** THOSE PORTIONS CONVEYED BY DEEDS RECORDED MAY 18, 2004 IN BOOK 20040518 AS DOCUMENT NO. 05070, RECORDED JULY 26, 2004 IN BOOK 20040726 AS DOCUMENT NO. 04584 RECORDED SEPTEMBER 15, 2006 IN BOOK 20060915 AS DOCUMENT NO. 02037 AND RE-RECORDED DECEMBER 1, 2006 IN BOOK 20061201 AS DOCUMENT NO. 03881 AND RE-RECORDED JANUARY 5, 2007 IN BOOK 20070105 AS DOCUMENT NO. 01470 AND RE-RECORDED SEPTEMBER 11, 2007 IN BOOK 20070911 AS DOCUMENT NO. 03232; AND RECORDED SEPTEMBER 15, 2006 IN BOOK 20060915 AS DOCUMENT NO. 02038.

**PARCEL II:**

A PORTION OF LOT 1 AS RECORDED IN THAT CERTAIN FINAL MAP TITLED "SUMMERLIN VILLAGE 13 WEST PARCEL "U/V/W", A COMMERCIAL SUBDIVISION" RECORDED IN BOOK 110, PAGE 29 OF PLATS, ON FILE AT THE CLARK COUNTY, NEVADA RECORDER'S OFFICE, LYING WITHIN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 59

EAST, M.D.M., CLARK COUNTY, NEVADA, THEREIN DESCRIBED AS FOLLOWS:

COMMENCING AT THE CENTERLINE INTERSECTION OF PAVILION CENTER DRIVE AND PARK CENTRE DRIVE; THENCE ALONG THE CENTERLINE OF SAID PARK CENTRE DRIVE, NORTH 89°55'18" WEST, 64.29 FEET; THENCE DEPARTING THE CENTERLINE OF SAID PARK CENTRE DRIVE, NORTH 00°04'42" EAST, 66.50 FEET TO THE SOUTHEAST CORNER OF SAID LOT 1 AND BEING THE POINT OF BEGINNING; THENCE ALONG THE SOUTHERLY BOUNDARY OF SAID LOT 1, NORTH 89°55'18" WEST, 462.43 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE NORTH, HAVING A RADIUS OF 3433.50 FEET; THENCE SOUTHERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 02°01'45", AN ARC LENGTH OF 121.60 FEET; THENCE TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 88.60 FEET, FROM WHICH BEGINNING THE RADIUS BEARS NORTH 73°52'43" EAST; THENCE NORTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 04°59'52", AN ARC LENGTH OF 7.73 FEET TO A POINT WHICH A RADIAL LINE BEARS SOUTH 78°52'35" WEST BEING A POINT OF CUSP WITH A CURVE CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 138.82 FEET, FROM WHICH POINT THE RADIUS BEARS NORTH 78°05'47" EAST; THENCE NORTHERWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 11°53'42", AN ARC LENGTH OF 28.82 FEET; THENCE NORTH 00°00'00" EAST, 52.92 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 138.00 FEET; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 47°12'03", AN ARC LENGTH OF 113.69 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 1006.00 FEET, THROUGH WHICH A RADIAL LINE BEARS NORTH 42°47'57" WEST; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 07°49'18", AN ARC LENGTH OF 137.33 FEET TO A POINT WHICH A RADIAL LINE BEARS SOUTH 50°37'15" EAST BEING A POINT OF CUSP WITH A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 889.52 FEET, FROM WHICH POINT THE RADIUS BEARS NORTH 50°19'42" WEST; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 05°58'05", AN ARC LENGTH OF 92.65 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS SOUTH 56°17'47" EAST; THENCE SOUTH 56°34'28" EAST, 4.75 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 25.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 52°34'28", AN ARC LENGTH OF 22.94 FEET; THENCE SOUTH 04°00'00" EAST, 3.44 FEET; THENCE NORTH 86°00'00" EAST, 163.65 FEET; THENCE SOUTH 49°00'00" EAST, 12.73 FEET; THENCE NORTH 86°00'00" EAST, 58.56 FEET; THENCE NORTH 72°31'35" EAST, 38.63 FEET; THENCE NORTH

Exhibit 5 to Confirmation Order

86°00'00" EAST, 135.62 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 28.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 45°00'00", AN ARC LENGTH OF 21.99 FEET; THENCE SOUTH 49°00'00" EAST, 19.27 FEET TO A POINT ON THE BOUNDARY OF SAID LOT 1 AND TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 102.00 FEET, FROM WHICH BEGINNING THE RADIUS BEARS NORTH 82°19'15" EAST; THENCE SOUTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 12°25'14", AN ARC LENGTH OF 22.11 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE WEST, HAVING A RADIUS OF 130.00 FEET, THROUGH WHICH A RADIAL LINE BEARS SOUTH 69°54'01" WEST; THENCE EASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 51°35'28", AN ARC LENGTH OF 117.06 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 170.00 FEET, THROUGH WHICH A RADIAL LINE BEARS SOUTH 58°30'31" EAST; THENCE SOUTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 13°52'32", AN ARC LENGTH OF 41.17 FEET TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE TO THE EAST, HAVING A RADIUS OF 817.00 FEET, FROM WHICH BEGINNING THE RADIUS BEARS SOUTH 72°23'03" EAST; THENCE SOUTHERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 12°52'07", AN ARC LENGTH OF 183.50 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS NORTH 85°15'10" WEST AND THE POINT OF BEGINNING.

FURTHER DESCRIBED AS PARCEL 1 ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 158 OF SURVEYS, PAGE 93, RECORDED AUGUST 4, 2006 IN BOOK 20060804 AS DOCUMENT NO. 02278, AND AS AMENDED BY CERTIFICATE OF AMENDMENT RECORDED AUGUST 30, 2007 IN BOOK 20070830 AS DOCUMENT NO. 04277, OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

---

**NORTHERN NV ACQUISITIONS, LLC**

**(APN: 024-140-14)**

County of Washoe, State of Nevada

ALL THAT REAL PROPERTY SITUATE IN THE CITY OF RENO, COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:

BEING A PORTION OF SECTION 25, TOWNSHIP 19 NORTH, RANGE 19 EAST, M.D.B.&M., DESCRIBED AS FOLLOWS:

**PARCEL 1:**
PARCEL 2 OF PARCEL MAP NO. 2245, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON MARCH 17, 1988, DOCUMENT NO. 1232920, OFFICIAL RECORDS.

**PARCEL 1A:**
NON-EXCLUSIVE EASEMENT FOR PARKING, INGRESS AND EGRESS

43    Exhibit 5 to Confirmation Order

| | AND PUBLIC UTILITIES ON, OVER, UNDER, THROUGH AND ACROSS PARCEL 1 OF PARCEL MAP NO. 2245, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON MARCH 17, 1988, DOCUMENT NO. 1232920, OFFICIAL RECORDS, AS SET FORTH IN THE DECLARATION OF RECIPROCAL EASEMENTS RECORDED JUNE 15, 1987, IN BOOK 2567, PAGE 649, DOCUMENT NO. 1170676, AND IN THE AGREEMENT FOR RECIPROCAL GRANT OF EASEMENTS RECORDED MARCH 3, 1988, IN BOOK 2699, PAGE 725, DOCUMENT NO. 1230160, OFFICIAL RECORDS OF WASHOE COUNTY, NEVADA.<br><br>ASSESSOR'S PARCEL NUMBER(S): 024-140-14 |
|---|---|
| **NORTHERN NV ACQUISITIONS, LLC**<br>**(APN: 024-150-13)**<br>County of Washoe, State of Nevada | ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE CITY OF RENO, COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>PARCEL 2 OF PARCEL MAP NO. 1411, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON DECEMBER 22, 1982, AS DOCUMENT NO. 829719, OFFICIAL RECORDS.<br><br>EXCEPTING THEREFROM THOSE CERTAIN WATER RIGHTS CONVEYED BY AN INSTRUMENT RECORDED FEBRUARY 17, 1989, AS DOCUMENT NO. 839426, OFFICIAL RECORDS.<br><br>ASSESSOR'S PARCEL NUMBER(S): 024-150-13 |
| **NORTHERN NV ACQUISITIONS, LLC**<br>**(APN: 024-150-17)**<br>County of Washoe, State of Nevada | ALL THAT REAL PROPERTY SITUATE IN THE CITY OF RENO, COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>**PARCEL 1:**<br>THAT PORTION OF THE SOUTH ½ OF THE NORTHEAST ¼ OF SECTION 25, TOWNSHIP 19 NORTH, RANGE 19 EAST, M.D.B.&M., DESCRIBED AS FOLLOWS:<br><br>BEGINNING FOR REFERENCE AT A PIPE SET IN CONCRETE MONUMENTING THE CENTER OF SAID SECTION 25;  THENCE NORTH 89°26'06" EAST 911.61 FEET;  THENCE NORTH 6°14'43" WEST 263.40 FEET;  THENCE NORTH 58°40'17" EAST 325.22 FEET;  THENCE NORTH 78°19'17" EAST 308.69 FEET TO THE SOUTHWESTERLY LINE OF U.S. HIGHWAY 395;  THENCE SOUTH 20°52'13" EAST ALONG SAID LINE 165.87 FEET TO AN ANGLE POINT THEREIN;  THENCE CONTINUING ALONG SAID WESTERLY LINE SOUTH 20°34'25" EAST 168.22 FEET TO THE TRUE POINT OF BEGINNING;  THENCE CONTINUING SOUTH 20°34'25" EAST ALONG SAID WESTERLY LINE, A DISTANCE OF 125.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 20.00 FEET;  THENCE SOUTHWESTERLY ALONG SAID CURVE 38.40 FEET |

| | |
|---|---|
| | TO THE NORTHERLY LINE OF KUMLE LANE, 30 FEET WIDE; THENCE SOUTH 89°26'06" WEST TANGENT TO SAID CURVE ALONG SAID NORTHERLY LINE A DISTANCE OF 90.00 FEET; THENCE NORTH 20°34'25" WEST 113.00 FEET; THENCE NORTH 69°25'35" EAST 111.41 FEET TO THE TRUE POINT OF BEGINNING.<br><br>EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE CITY OF RENO BY INSTRUMENT RECORDED JULY 06, 1988 IN BOOK 2762, PAGE 831, AS DOCUMENT NO. 1258077 OF OFFICIAL RECORDS.<br><br>**PARCEL 2:**<br>A NON-EXCLUSIVE EASEMENT AND RIGHT OF WAY FOR DRIVEWAY PURPOSES AS SET FORTH IN AN EASEMENT AGREEMENT RECORDED FEBRUARY 10, 1966 IN BOOK 152, PAGE 109, AS DOCUMENT NO. 52313 OF OFFICIAL RECORDS.<br><br>NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN INSTRUMENT RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, NEVADA ON MAY 6, 1997, AS DOCUMENT NO. 2095870 OF OFFICIAL RECORDS.<br><br>ASSESSOR'S PARCEL NUMBER(S): 024-150-17 |
| **NORTHERN NV ACQUISITIONS, LLC**<br><br>**(APN: 024-150-03)**<br><br>County of Washoe, State of Nevada | ALL THAT REAL PROPERTY SITUATE IN THE CITY OF RENO, COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>**PARCEL 1:**<br>COMMENCING AT THE EASTERLY QUARTER CORNER OF SECTION 25, TOWNSHIP 19 NORTH, RANGE 19 EAST, M.D.B.&M.; THENCE SOUTH 89°26'06" WEST, A DISTANCE OF 1002.61 FEET ALONG THE CENTER LINE OF SAID SECTION 25 TO A POINT ON THE WESTERN LINE OF STATE HIGHWAY U. S. #395; THENCE NORTH 20°34'25" WEST, A DISTANCE OF 353.34 FEET TO AN ANGLE POINT; THENCE NORTH 20°52'13" WEST, ALONG THE WESTERLY LINE OF STATE HIGHWAY #395, A DISTANCE OF 637.87 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 20°52'13" EAST ALONG THE WEST RIGHT OF WAY LINE OF STATE HIGHWAY #395 SOUTH, A DISTANCE OF 160.00 FEET; THENCE SOUTH 68°48'51" WEST A DISTANCE OF 171.18 FEET; THENCE NORTH 60°15'51" WEST, A DISTANCE OF 17.05 FEET; THENCE NORTH 29°44'09" EAST, A DISTANCE OF 214.42 FEET; THENCE SOUTH 60°15'51" EAST, A DISTANCE OF 1.33 FEET TO A POINT; THENCE NORTH 29°44'09" EAST, A DISTANCE OF 20.00 FEET TO THE TRUE POINT OF BEGINNING.<br><br>EXCEPTING THEREFROM THOSE CERTAIN WATER RIGHTS, CONVEYED BY AN INSTRUMENT RECORDED NOVEMBER 30, 2006, AS FILE NO. 3469277, OFFICIAL RECORDS. |

Exhibit 5 to Confirmation Order

#4843-6991-8215

| | |
|---|---|
| | THE ABOVE DESCRIBED PARCEL LIES WHOLLY WITHIN THE NORTHEAST ¼ OF SECTION 25, TOWNSHIP 19 NORTH, RANGE 19 EAST, M.D.B.&M.<br><br>**PARCEL 2:**<br>AN EASEMENT FOR INGRESS AND EGRESS AS SET OUT IN THAT CERTAIN AGREEMENT FOR RIGHT-OF-WAY RECORDED OCTOBER 2, 1958, AS DOCUMENT NO. 293084 IN THE RECORDS OF WASHOE COUNTY, NEVADA.<br><br>NOTE:  THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN INSTRUMENT RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, NEVADA ON DECEMBER 19, 2007, AS DOCUMENT NO. 3604516 OF OFFICIAL RECORDS.<br><br>ASSESSOR'S PARCEL NUMBER(S): 024-150-03 |
| **NORTHERN NV ACQUISITIONS, LLC**<br><br>**(APN: 024-150-19 and 024-150-22)**<br><br>County of Washoe, State of Nevada | ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE CITY OF RENO, COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>**PARCEL 1:**<br>PARCEL A OF PARCEL MAP NO. 3279 FOR GARY D. KLEFMAN AND DONNA M. KLEFMAN, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON DECEMBER 08, 1997, AS FILE NO. 2160107.<br><br>EXCEPTING THEREFROM THOSE CERTAIN WATER RIGHTS CONVEYED BY AN INSTRUMENT RECORDED AUGUST 21, 1998, AS FILE NO. 2245095, OFFICIAL RECORDS.<br><br>**PARCEL 2:**<br>PARCEL A OF PARCEL MAP NO. 2977 FOR GARY D. KLEFMAN AND DONNA M. KLEFMAN, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON DECEMBER 26, 1995, AS FILE NO. 195282.<br><br>ASSESSOR'S PARCEL NUMBER(S): 024-150-19, 024-150-22 |

| | |
|---|---|
| **RENO LAND HOLDINGS, LLC**<br><br>**(APN: 049-392-11, 049-392-12 and 049-392-13)**<br><br>County of Washoe, State of Nevada | ALL THAT REAL PROPERTY SITUATE IN THE CITY OF RENO, COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>**PARCEL 1:**<br>THE SOUTH ½ OF THE NORTHWEST ¼ OF SECTION 28, TOWNSHIP 18 NORTH, RANGE 20 EAST, M.D.B.&M.<br>EXCEPTING THEREFROM ANY PORTION THEREOF LYING NORTHERLY OF THE SOUTHERLY LINE OF STATE ROUTE 431 (MT. ROSE HIGHWAY) AS THE SAME NOW EXISTS.<br><br>ALSO EXCEPTING THEREFROM ANY PORTION THEREOF LYING EASTERLY OF THE WESTERLY LINE OF U.S. 395 SOUTH AS DESCRIBED IN THE FINAL ORDER OF CONDEMNATION RECORDED APRIL 26, 1995 IN BOOK 4290, PAGE 804, AS DOCUMENT NO. 1888633 OF OFFICIAL RECORDS.<br><br>**PARCEL 2:**<br>PORTION OF THE NORTH ½ OF THE NORTHWEST ¼ OF SECTION 28, TOWNSHIP 18 NORTH, RANGE 20 EAST, M.D.B.&M., BEING MORE FULLY DESCRIBED AS FOLLOWS, TO WIT:<br><br>BEGINNING AT A POINT ON THE NORTH ONE-SIXTEENTH SECTION LINE OF  SECTION 28, TOWNSHIP 18 NORTH, RANGE 20 EAST, M.D.B.&M., 173.10 FEET LEFT OF AND MEASURED RADICALLY FROM THE CENTERLINE OF SR-430 (CARSON-RENO HIGHWAY) AT HIGHWAY ENGINEER'S STATION "CL"114+48.72P.O.C.;  SAID POINT OF BEGINNING FURTHER DESCRIBED AS BEARING SOUTH 25°09'42" WEST A DISTANCE OF 1,465.61 FEET FROM THE NORTH QUARTER CORNER OF SAID SECTION 28;  THENCE NORTH 89°28'56" WEST, ALONG SAID NORTH ONE-SIXTEENTH SECTION LINE, A DISTANCE OF 1,508.85 FEET TO AN INTERSECTION WITH THE RIGHT OR SOUTHERLY RIGHT-OF-WAY LINE OF SR-431 (MT. ROSE ROAD);  THENCE ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE THE FOLLOWING THREE (3) COURSES AND DISTANCES:  1.) NORTH 58°20'23" EAST, 743.49 FEET;  2.)  NORTH 65°17'46" EAST, 371.55 FEET;  3.)  FROM A TANGENT WHICH BEARS NORTH 58°20'23" EAST, CURVING TO THE RIGHT WITH A RADIUS OF 205 FEET, THROUGH AN ANGLE OF 99°33'00", AN ARC DISTANCE OF 356.18 FEET TO A POINT ON THE LEFT OR WESTERLY RIGHT-OF-WAY LINE OF SAID SR-430;  THENCE SOUTH 22°06'37" EAST, ALONG SAID WESTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 147.50 FEET TO A POINT;  THENCE SOUTH 29°41'04" EAST, ALONG SAID WESTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 374.29 FEET TO THE POINT OF BEGINNING.<br><br>NOTE:  THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN INSTRUMENT RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, NEVADA ON SEPTEMBER 4, 2007, AS DOCUMENT NO. 3572085 OF |

47                    Exhibit 5 to Confirmation Order

| | |
|---|---|
| | OFFICIAL RECORDS.<br><br>ASSESSOR'S PARCEL NUMBER(S):049-392-11, 12, AND 13 |
| **RENO LAND HOLDINGS, LLC**<br><br>**(APN: 049-385-03)**<br><br>County of Washoe, State of Nevada | ALL THAT REAL PROPERTY SITUATE IN THE COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>A PORTION OF THE SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 29, TOWNSHIP 18 NORTH, RANGE 20 EAST, M.D.B.&M. DESCRIBED AS BEGINNING AT A POINT ON THE SOUTH LINE OF SAID SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 29, DISTANT NORTH 89°41' WEST, 415.5 FEET FROM THE EAST ONE QUARTER SECTION CORNER OF SAID SECTION 29, SAID POINT OF BEGINNING IDENTICAL WITH THE SOUTHWEST CORNER OF THAT LAND DESCRIBED IN A DEED IN BOOK 236 OF "DEEDS", FILING NO. 174192, WASHOE COUNTY RECORDS AND IDENTICAL WITH THE MOST EASTERLY CORNER OF THAT LAND DESCRIBED IN A DEED FROM H. AL PEIGH TO SIERRA PACIFIC POWER CO., FILED JANUARY 21, 1960 UNDER FILING NO. 314274 WASHOE COUNTY RECORDS.  THENCE NORTH 52°07' WEST, 673.26 FEET ALONG THE NORTHEASTERLY LINE OF THE LAST DESCRIBED LAND TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF THE MOUNT ROSE STATE HIGHWAY.  THENCE NORTH 57°37'30" EAST, 1117.73 FEET ALONG SAID SOUTHERLY RIGHT OF WAY LINE TO ITS INTERSECTION WITH THE EAST LINE OF SAID SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 29.  THENCE SOUTH 0°09'45" EAST 431.22 FEET ALONG SAID EAST LINE TO THE NORTHEAST CORNER OF SAID LAND DESCRIBED IN A DEED IN BOOK 236 OF "DEEDS", FILING NO. 174192, WASHOE COUNTY RECORDS.  THENCE SOUTH 69°55'10" WEST, 257.00 FEET (SHOWN AS SOUTH 69°58' WEST, 257.0 FEET IN SAID DEED).  THENCE NORTH 81°00' WEST, 176.10 FEET (SHOWN AS NORTH 81°30' WEST, 176.10 FEET IN SAID DEED) TO THE NORTHWEST CORNER OF SAID LAND.  THENCE SOUTH 0°09'45" EAST, 520.00 FEET (SHOWN AS SOUTH 520 FEET IN SAID DEED) ALONG THE WEST LINE OF SAID LAND TO THE PLACE OF BEGINNING.<br><br>NOTE:  THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN INSTRUMENT RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, NEVADA ON SEPTEMBER 27, 2006, AS DOCUMENT NO. 3443297 OF OFFICIAL RECORDS.<br><br>ASSESSOR'S PARCEL NUMBER(S): 049-385-03 |

Exhibit 5 to Confirmation Order

| | |
|---|---|
| **RENO LAND HOLDINGS, LLC**<br><br>**(APN: 024-055-12)**<br><br>County of Washoe, State of Nevada | ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE CITY OF RENO, COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>**PARCEL A:**<br>PARCEL 1 AS SHOWN ON PARCEL MAP NO. 1816, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA ON APRIL 27, 1985 UNDER FILE NO. 991139, OFFICIAL RECORDS, AND AS REVISED BY BOUNDARY LINE ADJUSTMENT FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA ON JUNE 28, 1985 UNDER FILE NO. 1006476, OFFICIAL RECORDS.<br><br>EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE CITY OF RENO, BY DEED OF DEDICATION RECORDED FEBRUARY 20, 1987 AS FILE NO. 1141561, OFFICIAL RECORDS OF WASHOE COUNTY, NEVADA.<br><br>**PARCEL B:**<br>A PERPETUAL RECIPROCAL ACCESS EASEMENT AS SET FORTH IN A DOCUMENT RECORDED MARCH 15, 2005 AS DOCUMENT NO. 3183262 OF OFFICIAL RECORDS.<br><br>**PARCEL C:**<br>A 15 FOOT WIDE NON-EXCLUSIVE EASEMENT OVER ADJACENT PROPERTY FOR PURPOSES OF AN UNDERGROUND PIPELINE AND APPURTENANCES USED FOR THE TRANSPORTATION OF WATER FOR IRRIGATION OF THE ABOVE PARCEL 1 AS SET FORTH UPON THE TERMS AND CONDITIONS CONTAINED THEREIN IN AN INSTRUMENT RECORDED MAY 7, 1992 IN BOOK 3477, PAGE 390 AS DOCUMENT NO. 1569194, OFFICIAL RECORDS.<br><br>ASSESSOR'S PARCEL NUMBER(S): 024-055-12 |
| **TROPICANA STATION, LLC**<br><br>**(APN: 017-011-05)**<br><br>County of Washoe, State of Nevada | ALL THAT REAL PROPERTY SITUATE IN THE CITY OF RENO, COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>THE SOUTH ½ OF THE NORTHWEST ¼ OF SECTION 28, TOWNSHIP 18 NORTH, RANGE 20 EAST, M.D.B.&M.<br><br>ALSO EXCEPTING THEREFROM ANY PORTION THEREOF LYING WESTERLY OF THE EASTERLY LINE OF U.S. 395 SOUTH AS DESCRIBED IN THE FINAL ORDER OF CONDEMNATION RECORDED APRIL 26, 1995 IN BOOK 4290, PAGE 804, AS DOCUMENT NO. 1888633 OF OFFICIAL RECORDS.<br><br>ASSESSOR'S PARCEL NUMBER(S): 017-011-05 |

#4843-6991-8215

| | |
|---|---|
| **TROPICANA STATION, LLC**<br><br>**(APN: 017-011-02; 017-011-03; 017-011-20; 017-011-21; and 017-011-23)**<br><br>County of Washoe, State of Nevada | ALL THAT REAL PROPERTY SITUATE IN THE COUNTY OF WASHOE, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>**PARCEL A:**<br>PARCELS 1, 2 AND 4 AS SHOWN ON "AMENDED PARCEL MAP", AMENDING PARCELS 3 AND 4 OF PARCEL MAP NO. 903, FOR JOSEPH W. BALDECCHI, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON JUNE 11, 1980, AS FILE NO. 677273, OFFICIAL RECORDS, AS PARCEL MAP NO. 1113.<br><br>**PARCEL B:**<br>ALL THAT CERTAIN REAL PROPERTY BEING A PORTION OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 AND THE NORTHWEST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 28, TOWNSHIP 18 NORTH, RANGE 20 EAST, M.D.B.&M., SITUATE IN WASHOE COUNTY, NEVADA, THE BOUNDARY OF WHICH IS MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>BEGINNING AT THE SOUTHEAST CORNER OF SAID SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 28, IDENTICAL WITH THE NORTHEAST CORNER OF SAID NORTHWEST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 28; THENCE SOUTH 50.00 FEET (SOUTH 00°16'52" WEST ON THAT CERTAIN RECORD OF SURVEY FOR CARANO CONSTRUCTION CO., SURVEY MAP NO. 1413, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON AUGUST 22, 1980, FILE NO. 689711) ALONG THE EAST LINE OF SAID NORTHWEST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 28; THENCE NORTH 87°44'01" WEST 1249.07 FEET (NORTH 87°38'54" WEST 1248.40 FEET ON SAID RECORD OF SURVEY) TO A POINT ON THE EASTERLY RIGHT-OF-WAY LINE OF U. S. HIGHWAY 395; THENCE NORTH 10°51'30" WEST 51.29 FEET (NORTH 10°49'11" WEST 51.32 FEET ON SAID RECORD OF SURVEY) ALONG SAID EASTERLY RIGHT-OF-WAY LINE; THENCE SOUTH 87°44'02" EAST 1258.74 FEET (SOUTH 87°38'54" EAST 1258.28 FEET ON SAID RECORD OF SURVEY) TO THE POINT OF BEGINNING.<br><br>**PARCEL C:**<br>THE WEST ONE HALF OF THE SOUTHEAST 1/4 OF SECTION 28, TOWNSHIP 18 NORTH, RANGE 20 EAST, M.D.B.&M., EXCEPTING THEREFROM ALL THAT PORTION LYING WEST OF THE EAST RIGHT-OF-WAY LINE OF U. S. HIGHWAY 395, AS CONVEYED TO THE STATE OF NEVADA, BY DEEDS RECORDED JUNE 5, 1959, AS DOCUMENT NOS. 304310 AND 304311, WASHOE COUNTY, NEVADA, RECORDS.<br><br>EXCEPTING THEREFROM THE INTEREST CONVEYED TO THE STATE OF NEVADA, IN THE DEEDS RECORDED JUNE 5, 1959, UNDER DOCUMENT NOS. 30410 AND 304311, WASHOE COUNTY, NEVADA, RECORDS. |

Exhibit 5 to Confirmation Order

#4843-6991-8215

ALSO EXCEPTING THEREFROM THE PARCEL OF LAND CONVEYED TO SIERRA PACIFIC POWER COMPANY, A MAINE CORPORATION, BY DEED RECORDED JULY 23, 1962, UNDER DOCUMENT NO. 363531, DEED RECORDS.

ALSO EXCEPTING THEREFROM ANY WELL OR BORE HOLE (AND THE WELL SITE THEREOF) WHICH MAY HAVE BEEN HERETOFORE DRILLED UPON ANY PORTION OF THE ABOVE DESCRIBED PROPERTY, BY MAGMA POWER COMPANY, OR BY ITS WHOLLY OWNED SUBSIDIARY, NEVADA THERMAL POWER COMPANY; AND

EXCEPTING AND EXCLUDING AND RESERVING THE RIGHT TO USE SUCH WELL OR BORE HOLE FOR THE PRODUCTION, UTILIZATION AND SALE OF NATURAL STEAM OR THERMAL ENERGY PRODUCED THEREFROM AND WITH THE RIGHT TO GO TO AND FROM SUCH WELL OR BORE HOLE FOR THE PURPOSE OF DRILLING, REDRILLING, DEEPENING OR ANY REMEDIAL OR OTHER WORK TO BE PERFORMED THEREON OR THEREIN, AND TO INSTALL, MAINTAIN AND UTILIZE SUCH PIPE LINES, ROADS OR OTHER INSTALLATIONS REASONABLY NECESSARY FOR UTILIZATION OF ANY SUCH WELL OR BORE HOLES OR FOR EXERCISE OF THE SAID RIGHTS RESERVED AND EXCEPTED AND EXCLUDED THEREFROM.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, STEAM, AND MINERALS OF WHATSOEVER NATURE, FOUND UNDER THE PROPERTY HEREBY CONVEYED, THE SAID RESERVATION DOES NOT INCLUDE ANY RIGHT OF INGRESS AND EGRESS AND DOES NOT INCLUDE THE RIGHT TO REMOVE ANY OIL, GAS, STEAM OR MINERALS THROUGH THE SURFACE OF THE LAND OR TO MAINTAIN ANY WORKS THEREON FOR ANY PURPOSE, BUT RESERVES ONLY THE RIGHT TO REMOVE SAID OIL, GAS, STEAM, AND MINERALS FROM BENEATH THE SURFACE OF THE PROPERTY.

FURTHER EXCEPTING THEREFROM THOSE PORTIONS CONVEYED BY INSTRUMENTS RECORDED JULY 28, 1999, AS FILE NO. 2365669 AND RE-RECORDED JULY 5, 2001, AS FILE NO. 2571104, OFFICIAL RECORDS; RECORDED JULY 28, 1999, AS FILE NO. 2365670, OFFICIAL RECORDS; AND RECORDED JULY 28, 1999, AS FILE NO. NO. 2365671, OFFICIAL RECORDS.

NOTE (NRS 111.312):  THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN INSTRUMENT, RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF  WASHOE COUNTY, NEVADA ON SEPTEMBER 03, 2004, AS DOCUMENT NO. 3093407, OF  OFFICIAL RECORDS.

ASSESSOR'S PARCEL NUMBER(S):017-011-02,03,20,21 & 23