Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004565)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone: (775) 823-2900;
Facsimile: (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>**STATION CASINOS, INC.**, *et al.*,<br><br>☒ Affects this Debtor<br>☐ Affects all Debtors<br>☒ Affects Northern NV Acquisitions, LLC<br>☒ Affects Reno Land Holdings, LLC<br>☒ Affects River Central, LLC<br>☒ Affects Tropicana Station, LLC<br>☒ Affects FCP Holding, Inc.<br>☒ Affects FCP Voteco, LLC<br>☒ Affects Fertitta Partners LLC<br>☒ Affects FCP MezzCo Parent, LLC<br>☒ Affects FCP MezzCo Parent Sub, LLC<br>☒ Affects FCP MezzCo Borrower VII, LLC<br>☒ Affects FCP MezzCo Borrower VI, LLC<br>☒ Affects FCP MezzCo Borrower V, LLC<br>☒ Affects FCP MezzCo Borrower IV, LLC<br>☒ Affects FCP MezzCo Borrower III, LLC<br>☒ Affects FCP MezzCo Borrower II, LLC<br>☒ Affects FCP MezzCo Borrower I, LLC<br>☒ Affects FCP PropCo, LLC<br>☐ Affects GV Ranch Station, Inc. | Case No. BK-09-52477<br><br>Chapter 11<br><br>Jointly Administered Cases BK 09-52470 through BK 09-52487 and BK 10-50381<br><br>**DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. §§ 1127(b) AND 1142 (I) APPROVING PROCEDURES AND DISCLOSURE DOCUMENTS FOR (A) SOLICITING BINDING PARTICIPATIONS IN PROPCO RIGHTS OFFERING, (B) ESTABLISHING BLOCKERCOS TO HOLD NPH WARRANTS AND NPH INVESTMENT RIGHTS AND (C) DISTRIBUTING NPH WARRANTS, CASHING OUT CERTAIN OTHER NPH WARRANTS, AND MAKING *CY PRES* DISTRIBUTION IN LIEU OF CERTAIN OTHER NPH WARRANTS; (II) MODIFYING PLAN; AND (III) CONFIRMING MODIFIED PLAN**<br><br>Hearing Date:  January 10, 2010<br>Hearing Time: 10:00 a.m.<br>Place:          300 Booth Street<br>                    Reno, NV 89509 |

**TO THE HONORABLE GREGG ZIVE, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE U.S. TRUSTEE AND ALL PARTIES IN INTEREST**:

## I.    INTRODUCTION, FACTUAL BACKGROUND AND REQUEST FOR RELIEF

1.    On August 27, 2010, the Court entered its Confirmation Order confirming the chapter 11 Plan for Station Casinos, Inc. and its affiliated chapter 11 debtors (collectively, the "Debtors") in these chapter 11 cases.[1]  The Plan incorporates the terms of the settlement[2] between the Debtors and the Official Committee of Unsecured Creditors (the "Official Creditors Committee") pursuant to which (a) Eligible Opco Unsecured Creditors[3] will receive NPH Warrants to purchase up to 2.5% of the total equity interests in Station Holdco LLC ("Holdco"),[4] (b) Eligible Opco Unsecured Creditors that are Accredited Investors and hold a certain minimum amount of Allowed Claims may participate in the Propco Rights Offering and purchase up to approximately 15% in the aggregate of the total equity interests in Holdco, and (c) Qualified Eligible Opco Unsecured Creditors may participate in any Post-Effective Equity Raise.  The terms and conditions for the issuance of the NPH Warrants and NPH Investment Rights are

---

[1]  *See* "Order Confirming 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (docket no. 2039, the "Confirmation Order"), and related "Findings of Fact and Conclusions of Law Regarding Confirmation of 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (docket no. 2038, the "Findings and Conclusions").  The "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" can be found at docket no. 1863 (the "Plan"), and the Plan amendments that were approved by the Confirmation Order can be found in the "Debtors' Motion for Order Under 11 U.S.C. § 1127 Approving  Modifications to "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 1997).

[2]  *See*  "Debtors' Motion for Order: (1) Approving Stipulation With Official Committee of Unsecured Creditors; and (2) Authorizing Payment of Certain Related Fees and Expenses" (docket no. 1921).

[3]  "Eligible Opco Unsecured Creditors" are defined in the Plan as all Holders of Allowed Claims classified in Classes S.4, S.5 and S.6, except Holders of Class S.4 Claims that also hold Class S.2 Claims and vote to accept the Plan on account of such Class S.2 Claims.  Because the Plan effectuates the subordination provisions of the Subordinated Notes Indentures, Class S.6 Claims will not receive any distribution under the Plan; rather, all rights in respect of Class S.6 Claims to receive warrants or participate in the Rights Offering will be transferred to holders of Allowed Class S.5 Claims, *pro rata*.

[4]  Holdco is the entity that is referred to in the Confirmation Order and Findings and Conclusions as New Propco Holdco or Holdco, and it will own all of the non-voting equity interests in Station Casinos, LLC. Station Casinos LLC is the entity that is referred to in the Confirmation Order and the Findings and Conclusions as New Propco.  Pursuant to the confirmed Plan and the Confirmation Order, on the Effective Date, all of the New Opco Acquired Assets and New Propco Acquired Assets will be transferred to New Propco and its subsidiaries.

1    contained in the NPH Term Sheet that was attached as Schedule 6 to the Plan; and a copy of such

2    NPH Term Sheet is attached hereto as Exhibit 2. Unless otherwise indicated, capitalized terms

3    are used herein as used and defined in the Plan and/or the NPH Term Sheet, as the context may

4    require.

5         2.    In connection with the hearing to confirm the Plan, the Debtors explained that the

6    actual documentation of, as well as the practical and legal mechanisms for soliciting binding

7    commitments to participate in the Propco Rights Offering and for allocating and distributing the

8    NPH Warrants and NPH Investment Rights, would not be determined and resolved until after the

9    Confirmation Hearing. The Debtors, the Official Creditors Committee and the Put Parties[5] have

10    reached agreement on such Plan implementation mechanisms (including the documents attached

11    hereto and summarized herein), and, by this motion (the "Motion") the Debtors seek approval

12    thereof, under the authority of Bankruptcy Code Section 1142, so that the Debtors  may

13    commence solicitation of binding participation and funding commitments in respect of the

14    Propco Rights Offering from Eligible Opco Unsecured Creditors that are Accredited Investors.

15         3.    By this Motion, the Debtors also seek entry of an order authorizing certain

16    modifications to the Plan under the authority of Bankruptcy Code Section 1127(b), and

17    confirming the Plan as modified under Bankruptcy Code Section 1129, so that the Debtors may:

18    (a) distribute cash, rather than NPH Warrants, to Eligible Opco Unsecured Creditors that hold the

19    smallest Allowed Claims, for purposes of administrative convenience and very substantial cost

20    savings, as described below; and (b) make a charitable donation to the Boys and Girls Clubs

21    of Las Vegas, under the doctrine of *cy pres*, in lieu of distributing $2,850 in NPH Warrants or

22

23    [5]   The Put Parties are Fidelity Puritan Trust: Fidelity Puritan Fund; Fidelity Advisor Series I: Fidelity
24    Advisor High Income Advantage Fund; Fidelity School Street Trust: Fidelity Strategic Income Fund;
       Fidelity School Street Trust: Fidelity Capital & Income Fund; Fidelity Advisor Series II: Fidelity Advisor
       Strategic Income Fund; OCM Principal Opportunities Fund IV Delaware, L.P.; OCM Opportunities Fund
25    VIIb Delaware, L.P.; Serengeti Station Holdco Ltd.; and Serengeti Partners LP.  Pursuant to the NPH
       Term Sheet and the Put Parties Support Agreement, the Put Parties have agreed that Holdco can put
26    equity securities to the Put Parties through the relevant Blockercos in order to raise the agreed amount of
       funds, and they will receive a put premium and other rights in consideration therefor.  The Put Parties
27    Support Agreement is attached as Exhibit 3 to the Debtors' Motion for Order: (1) Approving Stipulation
       With Official Committee of Unsecured Creditors; and (2) Authorizing Payment of Certain Related Fees
28    and Expenses (docket no. 1921).

#4815-5479-4504                    -2-

cash, in the aggregate, to the 22,400 members of the Lukevich Plaintiffs Class, because, as

discussed below, the cost of making the individual distributions (of approximately 12¢ per

individual) would exceed $60,000. Attached hereto as <u>Exhibit 1</u> is a proposed order granting the

relief requested in this Motion.

### A.    <u>Overview of the Propco Rights Offering</u>

4.    In connection with voting on the Plan, creditors holding Class S.4 and Class S.5

Claims were afforded an opportunity to indicate whether they were interested in receiving

information regarding the Propco Rights Offering. The Debtors have prepared a "Description of

the Rights Offering" (the "<u>Rights Offering Disclosure Memorandum</u>") that, subject to Court

approval, they will send to each Eligible Opco Unsecured Creditor in Classes S.4 and S.5 that

indicated an interest in receiving information regarding the Propco Rights Offering and held

Allowed Claims on the Rights Offering Record Date, established as July 15, 2010, in at least an

amount sufficient such that its pro rata share of all eligible claims entitles it to purchase at least

$250,000 of Offered Units in the Propco Rights Offering (the "<u>Offerees</u>").[6] A copy of the

proposed Rights Offering Disclosure Memorandum is attached hereto as <u>Exhibit 3</u>. The Rights

Offering Disclosure Memorandum provides: (a) an overview of the Plan and the Propco Rights

Offering; (b) a discussion of certain tax considerations; (c) a discussion of the risks associated

with  investing in (i) the Offered Units (discussed below), (ii) the business to be owned by

Holdco, and (iii) the gaming industry generally; (d) a summary description of certain of the terms

of the LLC Agreement of Principal Blockerco I (as hereinafter defined), which all Offerees that

purchase Offered Units in the Propco Rights Offering will be required to execute; and (e) a

summary description of certain of the terms of the Equityholders Agreement, which all Offerees

that purchase Offered Units in  the Propco Rights Offering will be required to execute.

5.    Along with the Rights Offering Disclosure Memorandum, the Debtors will

distribute a Subscription Agreement pursuant to which Offerees will be invited to irrevocably

subscribe for and purchase the Offered Units. A proposed form of the Subscription Agreement is

---

[6]   The term Offerees does not include the Put Parties, who were closely involved in the negotiation of the
terms of the NPH Term Sheet.  Rather, the Rights Offering Disclosure Memorandum was drafted for the
benefit of the Eligible Opco Unsecured Creditors that are not also Put Parties.

attached hereto as <u>Exhibit 4</u>.  The Debtors seek to accomplish the distribution and execution of the Subscription Agreements and related documentation as soon as possible, so that the equity offered under the Propco Rights Offering can be distributed substantially at the same time as the Effective Date of the Plan, and, therefore, hereby seek Court approval of the Rights Offering Disclosure Memorandum.

6.    The principal terms and conditions of the Propco Rights Offering are contained in the (i) Rights Offering Disclosure Memorandum, Exhibit 3 hereto, (ii) Subscription Agreement, Exhibit 4 hereto, and (iii) NPH Term Sheet, Exhibit 2 hereto.  Offerees are urged to review these materials carefully.  An overview of the NPH Term Sheet is provided in the Rights Offering Disclosure Memorandum, and a summary, for the purposes of this Motion, is provided as follows:

a.    Pursuant to the Plan and the NPH Term Sheet, Holdco will grant to certain Blockercos the right to purchase up to approximately 15% in the aggregate of the total equity in Holdco for an aggregate purchase price of $35.3 million, which amount can be increased to $100 million upon the occurrence of certain events described in the NPH Term Sheet.  The total offering amount will vary depending on several factors including, without limitation, the amount of cash on hand at the Opco Group Sellers on the Effective Date, and the estimated general working capital needs of New Propco following the Effective Date.  The Blockercos will, in turn, provide the Offerees and the Put Parties with the right to purchase the Offered Units issued by the Blockercos.  The Offered Units issued by the Blockercos will give the Offerees and the Put Parties substantially similar economic rights to those they would have had if the equity interests in Holdco had been issued directly to them.  The Blockerco intermediary companies are being established in accordance with the NPH Term Sheet to minimize the risk of adverse tax consequences which might otherwise be occasioned by the issuance of the Holdco equity directly to the Offerees.  All Offerees will receive their Offered Units from one Blockerco ("<u>Principal Blockerco I</u>").  It is anticipated that one or more separate Blockercos will be established

1    for each Put Party; although the Put Parties may elect to share Blockercos among

2    themselves.

3           b.        Pursuant to the NPH Term Sheet and the Plan, the Rights Offering Record

4    Date was established as July 15, 2010.  In order to qualify as an Offeree, an Eligible

5    Opco Unsecured Creditor that is an Accredited Investor must have held Allowed Claims

6    on July 15, 2010 in at least an amount sufficient such that its pro rata share of all eligible

7    claims entitles it to purchase at least $250,000 of Offered Units in the Propco Rights

8    Offering.  Assuming that the Rights Offering is in an aggregate amount equal to

9    $100 million, the Debtors estimate that, in order to have an Allowed Class S.4 or Class

10   S.5 Claim eligible to purchase $250,000 of Offered Units, the Allowed Class S.4 or Class

11   S.5 Claim amount must be at least $5,844,000.

12          c.        The Propco Rights Offering Subscription Period will extend for a period

13   of at least twenty days, subject to extension as described in the Rights Offering

14   Disclosure Memorandum.  It is presently anticipated that the Propco Rights Offering

15   Subscription Period will commence soon after entry of an order approving this Motion,

16   however, such commencement date may be deferred in the event that the Debtors

17   determine a delay is appropriate or desirable in light of developments in these cases or

18   other matters relating to the implementation thereof.  Holdco or the applicable Blockerco

19   will give notice of the date that the subscription purchase price for the Offered Units must

20   be received from the Offerees by the designated escrow agent.  On the Effective Date, the

21   escrow agent will transmit the funds to the applicable Blockercos and the applicable

22   Blockercos will purchase equity in Holdco and hold such equity for the benefit of the

23   Offerees and Put Parties that purchased Offered Units in the applicable Blockerco.

24          d.        Qualified Eligible Opco Unsecured Creditors may also participate in

25   certain Equity Raises and Post-Effective Equity Raises.  The applicable procedures are

26   described in the NPH Term Sheet and summarized in the Rights Offering Disclosure

27   Memorandum.

28

#4815-5479-4504                              -5-

e.      Each Offeree that purchases equity interests in the Propco Rights Offering will be required to execute the LLC Agreement of Principal Blockerco I.

f.      Each Offeree and Put Party that purchases equity interests in the Propco Rights Offering will be required to execute the Equityholders Agreement to be entered into among the holders of equity interests in Holdco.  The Equityholders Agreement, among other things, contains agreements among the parties thereto with respect to certain restrictions on the transfer of equity interests, including certain  rights of first refusal, tag-along rights, drag-along rights and preemptive rights (the terms of which are described in the Rights Offering Disclosure Memorandum).  The Equityholders Agreement also contains provisions governing special approval requirements for certain actions, and provisions governing the establishment of the Blockerco entities.  A copy of the present form of the draft Equityholders Agreement is attached hereto as Exhibit 5 (and it remains subject to additional revisions).

g.      The Put Parties have reserved the right to cause their respective Blockercos to issue debt securities in addition to equity units so long as the same amount of net proceeds as would have been realized as a result of the sale of equity units alone by such Put Party Blockerco is ultimately realized by such Put Party Blockerco upon issuance of both debt securities and equity units to its Put Party.  Accordingly, all references to Offered Units in respect of the Put Parties in this Motion mean equity units and/or debt securities issued by any such Put Party Blockerco to a Put Party.

7.      The Debtors have negotiated and agreed upon these documents and mechanisms with the Official Creditors Committee and the Put Parties.  With the input of these parties, the Debtors believe that the proposed documents and procedures represent an appropriate means for implementing the Propco Rights Offering as contemplated by the Plan.

**B.      The NPH Warrants and the Requested Plan Modifications**

8.      The Plan and the NPH Term Sheet generally provide that Holdco will issue the NPH Warrants to the Blockercos, which will, in turn, issue warrants to all Eligible Opco

Unsecured Creditors, including the Put Parties.[7]  The NPH Warrants provide for the right of the Eligible Opco Unsecured Creditors to acquire up to 2.5% of the equity in Holdco.  The warrants issued by the Blockercos to the Eligible Opco Unsecured Creditors will give such creditors substantially similar economic rights to those they would have had if the warrants issued by Holdco had been issued directly to the creditors.  A separate single Blockerco will be established to hold the NPH Warrants for all Eligible Opco Unsecured Creditors other than the Put Parties ("Principal Blockerco II").  The Blockercos established to hold the equity in Holdco for the Put Parties that participate in the Propco Rights Offering will also hold for the Put Parties the NPH Warrants issued by Holdco (however, the Put Parties may elect not to have their Blockercos issue warrants to them).

(i)    **Proposed Plan Modification to Cash-Out Certain NPH Warrants**

9.    In the Confirmation Order, and based upon the evidence submitted by the Debtors' financial advisor Lazard Frères & Co. LLC, the Court determined that the value of the NPH Warrants, in the aggregate, is between $0.4 million and $2.3 million.

10.    The Debtors estimate that there are 22,400 Class S.4 Creditors holding approximately $38 million in Class S.4 Claims (22,400 of which creditors consist of the Lukevich Plaintiffs Class[8]), 700 Class S.5 Creditors holding $850 million in Class S.5 Claims, and 1,100 Class S. 6 Creditors holding $1.45 billion in Class S.6 Claims.  After giving effect to the subordination provisions of the Subordinated Notes Indentures for the Class S.6 Claims, the Debtors estimate that Principal Blockerco II will be obligated to distribute the NPH Warrants to

---

[7]   With respect to the Put Party Blockercos, it is expected that the debt or other claims of each Put Party will be contributed by such Put Party to the appropriate Put Party Blockerco in exchange for equity interests, rights and warrants in such Put Party Blockerco, and such Put Party Blockerco will be granted NPH Warrants, NPH Investment Rights and NPH Post-Effective Investment Rights issued by Holdco in satisfaction of the contributed debt or other claims.

[8]   *See Lukevich, et al. v. Station Casinos, Inc., et al.*, adversary case no. 10-05044-gwz, and "Settlement Agreement attached as Exhibit 1 to the "Joint Motion of Plaintiffs and Defendants for: (1) Preliminary Approval of Class Action Settlement; (2) Approval o Class Notice; (3) Conditional Certification of Class, Settlement Class, Direct Payment Subclass and Allowed Claim Subclass; and (4) Related Relief," entered on June 18, 2010 (docket no. 4 in adversary docket); *see also* "Order: (1)Granting Final Approval Of Class Action Settlement; and (2) Authorizing Entry Of Final Judgment Of Dismissal With Prejudice As To All Defendants," entered on October 26, 2010 (docket no. 18).

approximately 23,300 Class S.4 and Class S.5 creditors.  Even excluding the Lukevich Plaintiffs Class, Principal Blockerco II will be required to issue warrants to at least 900 Eligible Opco Unsecured Creditors.

11.    The number of creditors currently entitled to receive warrants from Principal Blockerco II is problematic from the perspective of maximizing the recovery to creditors, for several reasons.  First, with over 900 (let alone 23,300) eligible warrant holders and owners, Principal Blockerco II would be required to be a public reporting company under the federal securities laws (including, without limitation, the Securities Exchange Act of 1934, as amended), meaning it would be required to produce audited financials, and issue periodic, quarterly, annual and other reports consistent with the requirements of the securities laws and applicable Securities and Exchange Commission regulations.  Second, it would be required to hire a warrant agent to administer the warrant holdings program for such a large number of warrant holders.  But Principal Blockerco II has no source of revenues other than distributions it receives from Holdco, and restrictive covenants in the credit facilities of Holdco's subsidiaries are expected to limit the payment of dividends to Holdco to facilitate such distributions.  Nevertheless, the Debtors estimate that the costs associated with engaging professionals to prepare audited financials, 10-Ks, 10-Qs and 8-Ks, plus the cost of a warrant agent, is expected to exceed $300,000 per year.

12.    The Debtors believe that they can altogether avoid the costs associated with Principal Blockerco II being a public reporting company, and eliminate the need for a warrant agent, if they can cash out approximately 30% of the total amount of Claims held by Eligible Opco Unsecured Creditors and thereby reduce significantly the number of warrant holders in and owners of Blockerco II.  To achieve that goal, the Debtors propose to pay cash, rather than have Principal Blockerco II issue warrants, on account of all Allowed Claims of Eligible Opco Unsecured Creditors that are less than $5 million in amount.  The Debtors estimate that doing so would reduce the number of warrant holders to approximately 50, which class of warrants the Debtors believe can then be administered without the need for a warrant agent, and without causing Principal Blockerco II to incur the significant expense of being a public reporting

1    company.  The Official Creditors Committee shares these concerns and has indicated it will not

2    object to the  Debtors' proposal.

3    13.    The Debtors' proposal contemplates cashing out approximately $700 million of

4    the smallest Eligible Opco Unsecured Creditors Claims, leaving approximately another

5    $1.64 billion of the largest claims that would still receive only warrants, not cash (30% of the

6    total amount of claims held by Eligible Opco Unsecured Creditors would be cashed out; and

7    70% would receive NPH Warrants).  The Debtors' propose to base the cash-out price on the

8    midpoint of value for the NPH Warrants as determined in the Confirmation Order.  That range of

9    value was $0.4 million to $2.3 million; and the midpoint is $1.35 million.  Thirty percent of

10    $1.35 million is $405,000.  Therefore, the Debtors propose to pay out approximately $405,000 in

11    the aggregate to Eligible Opco Unsecured Creditors holding Allowed Claims that are less than

12    $5 million.[9]

13    14.    As a result of cashing out 30% of the total amount of Claims held by creditors in

14    Class S.4 and S.5, the remaining 70% of Class S.4 and S.5 Claims will receive NPH Warrants

15    exercisable to purchase 1.775% of the equity in Holdco (calculated as 70% of 2.5%).  This does

16    not change in any way the amount of equity originally contemplated to be received by such 70%

17    of the total of Class S.4 and S.5 Claims, because, even if no cash out was proposed, the

18    referenced 70% of Class S.4 and S.5 Claims would have received NPH Warrants exercisable to

19    purchase 1.775% of the equity in Holdco.

20    **(ii)    Proposed Plan Modification Regarding the Lukevich Plaintiffs Class**

21    15.    In addition to seeking authority to cash out those Eligible Opco Unsecured

22    Creditors whose Allowed Claims are less than $5 million, the Debtors seek authority to make the

23    expected $2,850 aggregate cash-out payment to the Lukevich Payment Class to a charity in the

24    Las Vegas area that serves the needs of the members of such class – the Boys and Girls Clubs of

---

[9]    The Debtors calculate the amount to be distributed as follows.  There are expected to be approximately
25    $2,337,887,000 in Allowed Eligible Opco Unsecured Claims.  Approximately 50 Eligible Opco
26    Unsecured Creditors hold $1.64 billion of such claims (approximately 70% of the total).  These 50
27    creditors would receive NPH Warrants.  The remaining Eligible Opco Unsecured Creditors, all holding
     Allowed Claims less than $5 million, hold an aggregate of $700 million of such claims (approximately
     30% of the total amount of the Claims of Eligible Opco Unsecured Creditors).  They will be cashed out,
28    based upon their pro rata share of $405,000 (30% of $1.35 million).

Las Vegas – under the doctrine of *cy pres*. The Debtors have investigated the cost of making the distribution of either cash or warrants of a value of approximately 12¢ to each of 22,400 present and former employees. The Settlement Administrator for the Lukevich Plaintiffs Class Settlement has estimated that the cost of issuing checks and mailing them would be, in the aggregate, in excess of $60,000 – all for the purpose of distributing $2,850. The annual cost of using a third party warrant agent to administer a warrant program for 22,400 holders also would be many multiples of the aggregate value of the warrants; for warrants that by their own terms are not exercisable for several years. In either event, whether distributing warrants or cashing them out, it is entirely impractical to make any payment other than a lump sum payment to a charity that would provides benefits to the Debtors' employees, like the Boys and Girls Clubs of Las Vegas. Accordingly, the Debtors seek an exemption from distributing warrants or cash to the individual members of the Lukevich Plaintiffs Class, and seek authority to make a lump sum $5,000 charitable contribution to the Boys and Girls Clubs of Las Vegas in lieu thereof.

II.    **THE COURT SHOULD APPROVE THE PROPCO RIGHTS OFFERING SOLICITATION MATERIALS AND AUTHORIZE THE <u>DEBTORS TO COMMENCE  SOLICITATION OF BINDING COMMITMENTS</u>**

16.    The Debtors served this Motion on all Eligible Opco Unsecured Creditors. The Rights Offering Disclosure Memorandum and the Subscription Agreement (collectively, the "<u>Rights Offering Solicitation Materials</u>") have been reviewed by counsel for the Debtors, the Official Creditors Committee, Fertitta Entertainment LLC (a Delaware limited liability company, formerly known as Fertitta Gaming LLC) and the Mortgage Lenders (the principal shareholders in Holdco), and the Put Parties. All other parties in interest will have had an opportunity to review and comment on the Right Offering Solicitation Materials before the hearing on the Motion.

17.    The Debtors believe that the Rights Offering Solicitation Materials are consistent with the requirements of the Plan, NPH Term Sheet and Put Parties Support Agreement. The Court should authorize the Debtors to begin solicitation of binding commitments from Offerees because the process will take several weeks, at least, not including additional time that may be

1   required to confirm the accuracy of Offeree representations regarding certain tax-related matters,

2   among other things.  As the amount of equity securities that will be put to the Put Parties will

3   depend on the level of interest of the Offerees, the Put Parties are also entitled to a reasonable

4   amount of time, consistent with the requirements of the NPH Term Sheet and Put Parties Support

5   Agreement, to raise the funds required of them.  And all of the foregoing must occur prior to the

6   Effective Date.  The Debtors request, therefore, that the Court enter an order, substantially in the

7   form attached hereto as Exhibit 1, approving the Rights Offering Solicitation Materials and

8   authorizing the Debtors to commence solicitation of binding commitments.

9          18.     Bankruptcy Code Section 1142 authorizes the Court to enter orders in aid of

10  implementation of the Plan and that are necessary for the consummation of the Plan.  *See In re*

11  *Jorgensen*, 66 B.R. 104, 108  (Bankr. 9th Cir. 1986) (under Section 1142, bankruptcy court may

12  make necessary orders to carry out provisions of plan).[10]  Here, the Confirmation Order

13  contemplated post-confirmation preparation of the documentation for issuance of the NPH

14  Warrants and for the solicitation of commitments to the Propco Rights Offering.  Thus, it is

15  appropriate that such documentation be presented to the Court for approval, upon Motion and a

16  hearing.

17  **III.    THE COURT SHOULD APPROVE THE PLAN MODIFICATIONS**

18  **REGARDING: (A) CASH-OUT OF CERTAIN NPH WARRANTS**
    **CONSISTENT WITH THE VALUATION OF SUCH WARRANTS IN**

19  **THE CONFIRMATION ORDER; AND (B) CY PRES TREATMENT OF**
    **THE CASH-OUT OF THE LUKEVICH PLAINTIFFS CLASS CLAIMS**

20

21         19.     Section 1127(b) of the Bankruptcy Code authorizes the Debtors to modify the

22  Plan after confirmation and before substantial consummation, as long as the Plan as modified

23  meets the requirements of Bankruptcy Code Sections 1122 and 1123, and the Debtors comply

24  with any requirements under Bankruptcy Code Section 1125.  The cash-out proposal contained

25  in this Motion is consistent with the requirements of Section 1122, because the cash-out of

26

27  [10]   *See also In re Century Inv. Fund VIII Ltd. Partnership*, 114 B.R. 1003, 1008-09 (Bankr. E.D. Wis.
    1990) (under Section 1142, court may enter orders to carry out intent of confirmed plan); *In re Baker*, 118

28  B.R. 24,27 (Bankr. S.D.N.Y. 1990) (same); *In re A.H. Robins Co., Inc.*, 182 B.R. 128, 133 (Bankr. E.D.
    Va. 1995) (same).

1   certain creditors for equal value does not change the classification of claims contained in the

2   Plan.  However, even if the cash-out were deemed the equivalent of separate classification,

3   creditors holding substantially similar claims may be separately classified as long as they receive

4   substantially similar treatment, and the purpose of the separate classification is not the creation

5   of an accepting impaired class.[11]  Moreover, Section 1122(b) expressly authorizes chapter 11

6   plans to designate a class of general unsecured creditors below a certain dollar amount for

7   separate treatment, if doing so is reasonable and necessary for administrative convenience.  That

8   is exactly what the cash-out proposal accomplishes.  All Eligible Opco General Unsecured

9   Creditors with Allowed Claims below $5 million will receive cash instead of warrants.  The

10  cash-out is necessary to avoid the costs associated with public company treatment of Principal

11  Blockerco II and the cost of administering such a large class of warrant holders, and such

12  administrative convenience justification is entirely appropriate in light of the fact that the

13  warrants issued to such holders may never achieve any value at all due to the strike price and

14  exercise restrictions contained in the NPH Warrants.

15          20.     The cash-out proposal is also consistent with Section 1123 because all Eligible

16  Opco Unsecured Creditors will receive substantially equivalent treatment, based upon the

17  valuation of the NPH Warrants performed by the Debtors financial advisor in connection with

18  the Confirmation Hearing.  Thus, holders of both small and large claims will receive

19  substantially equivalent treatment.

20          **A.      <u>The Cash-Out Proposal Does Not Require Resolicitation of the Plan</u>**

21          21.     Bankruptcy Code Section 1127 expressly authorizes the Debtors to modify the

22  Plan after confirmation and prior to the Effective Date, and, if the modifications do not affect the

23  rights of any objecting parties, the modifications can be approved without new disclosure and

24  resolicitation of votes.  *See In re Rhead*, 179 B.R. 169, 176 (Bankr. D. Ariz. 1995) (modified

25  plan did not impact upon or affect the rights of any of the objectors; as such, the plan can be

26

27  [11]  *See  In re Montclair Retail Ctr., L.P.*, 177 B.R. 663, 665 (B.A.P. 9th Cir. 1995).  There must be a
    reasonable, nondiscriminatory business or economic reason for the separate classification.  *In re Johnston*,
28  21 F.3d 323, 328 (9th Cir. 1994); *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994)
    (same).

modified without new disclosure and resolicitation of votes); *In re G-1 Holdings Inc.*, 420 B.R. 216, 256 (D. N.J. 2009) ("The best test is whether the modification so affects any creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance," quoting *Collier on Bankruptcy*).

22.     Other than the right of certain unsecured creditors that are Accredited Investors to participate in the Propco Rights Offering, the distribution of the NPH Warrants is the only distribution to general unsecured creditors in the Debtors' Chapter 11 Cases.  Based upon the valuation of the NPH Warrants at $0.4 million to $2.3 million, such distribution will be no more than one-tenth of one-percent on approximately $2.34 billion of Allowed Claims of Eligible Opco Unsecured Creditors.  Under the Plan, an Allowed General Unsecured Claim of $1 million would receive warrants worth approximately $571; an allowed general unsecured claim just under $5 million would receive warrants worth $2,850.  The Debtors propose to cash out these claims in full.

23.     The Debtors believe that the cash-out plan modification is an enhancement of the treatment of general unsecured claims and should be authorized without the need for resolicitation.  Given the administrative costs associated with trading the NPH Warrants, their extremely small current value, and the exercise price and related limitations, it may be several years before many creditors could convert their warrants into cash other than through this cash-out proposal.  Therefore, the treatment of creditors is enhanced, rather than prejudiced by the cash-out proposal, and resolicitation is not required.[12]

24.     The Debtors carefully calculated an appropriate claim amount threshold to implement the cash-out, after discussion with the Official Creditors Committee.  A $5 million threshold for issuance of the NPH Warrants (with all Eligible Unsecured Creditors holding Allowed Claims under $5 million receiving a cash equivalent of the warrant), allows the Debtors to shrink the number of holders of NPH Warrants down to a number that can be administered without engaging a warrant agent or Blockerco II being treated as a public company, while at the

---

[12]  *See In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988) (authorizing plan modification 8 months after confirmation of plan without need for resolicitation  because modified term of plan satisfied requirements of 1129(b) and plan modification provided creditor with value equal to value under pre-modified plan).

same time ensuring that at least 70% of the Allowed Claims held by Eligible Opco Unsecured Creditors receive the NPH Warrants as the Plan originally proposed. Accordingly, the Debtors request that the Court enter the proposed order attached hereto as Exhibit 1, which authorizes the cash-out Plan modification proposed by this Motion.

**B.    Cy Pres Treatment of the Lukevich Plaintiffs Class is Proper**

25.     At the time the Debtors and the Lukevich Plaintiffs entered into their Settlement Agreement on or about June 18, 2010, the Plan did not provide for any distribution to general unsecured creditors, the Official Creditors Committee was actively opposing confirmation of the Plan, and there was no reasonable expectation that Holdco would be issuing warrants to general unsecured creditors of the Debtors. After the Plan was confirmed, counsel for the Debtors and the Lukevich Plaintiffs Class jointly determined that a distribution of warrants worth $2,850 in the aggregate to 22,400 Class members was impractical, that the distribution of a cash-out of the warrants was just as impractical, and that the cost of modifying the Settlement Agreement, given the unique notice requirements associated with class action litigation, outweighed any additional $2,850 benefit to the class members.

26.     The Debtors have already transferred the $1.2 million settlement payment to the Settlement Administrator (plus an additional $97,000 to fund payroll tax obligations) and funds have been distributed to the settlement class members. If the cash value of the NPH Warrants is distributed to the Lukevich Plaintiffs Class, the Settlement Administrator estimates it would cost at least $60,000 (in postage and the cost of issuing 22,400 checks in the amount of 12¢ each) to distribute any additional $2,850 if NPH Warrants that the Lukevich plaintiff class. It is also very likely that many of the 12¢ checks would not be cashed by, or deposited into the bank accounts of, settlement class members. Similarly, the annual cost of hiring a warrant agent to administer a warrant program for the 22,400 members of the Lukevich Plaintiffs Class is several multiples of the actual value of the warrants. Therefore, it is impractical to either distribute the warrants or the aggregate $2,850 of cash to individual members of the Lukevich Plaintiffs Class.

27.     The Debtors obviously are not seeking a $2,850 windfall; only a practical solution. Accordingly, they propose to make the distribution indirectly, to a charity that provides

services to numerous of the families of the Debtors' employees – the Boys and Girls Clubs of Las Vegas – in the amount of $5,000, which is substantially in excess of what the members of the Class would receive in either paper or cash under the Settlement Agreement and the Plan.

28.    Federal courts are authorized to utilize the *cy pres* or "fluid recovery" doctrine to distribute funds from class action settlements where the administrative difficulties associated with small per individual damages make individual distributions impractical, as long as the *cy pres* award adequately targets the plaintiff class. *See Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990); see also, Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d. Cir 2007); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 33-34 (1st Cir. 2009). In those circumstances, courts may award a portion of the settlement amount to a charity that will benefit the plaintiff class. *See e.g., In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 2005 WL 1923446 (D. Me. Aug 9, 2005) (*cy pres* award to community school for the arts); *In re Infant Formula Multidistrict Litigation*, 2005 WL 2211312 (N.D. Fla. Sept. 8, 2005) (*cy pres* award to American Red Cross); *Ohio Public Interest Campaign v. Fisher Foods*, 546 F. Supp. 1 (N.D. Ohio 1982) (cy pres award to local food banks).

29.    Here, the amount of the proposed distribution to individual employees, approximately 12¢ each, is extremely small relative to the cost of making the distribution (total distribution of $2,850, total cost of distribution over $60,000). Thus, a *cy pres* award to a charity that will provide services to the plaintiff class is not only appropriate, it is the only practical solution. The overwhelming majority of the Debtors' employees reside in metropolitan Las Vegas. Hence, an organization that provides non-sectarian services to low and moderate income Las Vegas families is an appropriate recipient of such *cy pres* award as it carries out the intent of the Settlement Agreement to provide a benefit to the settlement class. The Debtors believe that the Boys and Girls Clubs of Las Vegas is one such entity.

30.    For the foregoing reasons, the Debtors respectfully request that the Court enter the proposed order attached hereto as Exhibit 1, which provides for the *cy pres* award on the Effective Date of the Plan.

#4815-5479-4504

-15-

1    **IV.    <u>CONCLUSION</u>**

2              31.      Based on the foregoing, the Debtors respectfully request that the Court enter an

3    order, substantially in the form of Exhibit 1 attached hereto, granting the relief requested in this

4    Motion.

5                                              Respectfully submitted,

6    Dated December 13, 2010              By:____/s/ Fred Neufeld _____
                                          Paul S. Aronzon (CA State Bar No. 88781)
7                                         Thomas R. Kreller (CA State Bar No. 161922)
                                          Fred Neufeld (CA State Bar No. 150759)
8                                         MILBANK, TWEED, HADLEY & McCLOY LLP
                                          601 South Figueroa Street, 30th Floor
9                                         Los Angeles, California 90017
                                          Telephone:    (213) 892-4000
10                                        Facsimile:    (213) 629-5063

11                                        Reorganization Counsel for Debtors

12                                                    and

13                                        Laury M. Macauley (NV SBN 11413)
14                                        Dawn M. Cica (NV SBN 004595)
                                          LEWIS AND ROCA LLP
15                                        50 West Liberty Street, Suite 410
                                          Reno, Nevada 89501
16                                        Telephone:    (775) 823-2900
                                          Facsimile:    (775) 823-2929
17                                        lmacauley@lrlaw.com; dcica@lrlaw.com

18                                        Local Reorganization Counsel for Debtors

19

20

21

22

23

24

25

26

27

28

#4815-5479-4504                          -16-

# Exhibit 1

# Exhibit 1

1

2

3

4

5

6

7   Paul S. Aronzon (CA State Bar No. 88781)                  Laury M. Macauley (NV SBN 11413)
    Thomas R. Kreller (CA State Bar No. 161922)              Dawn M. Cica (NV SBN 004565)
8   MILBANK, TWEED, HADLEY & McCLOY LLP                      LEWIS AND ROCA LLP
    601 South Figueroa Street, 30th Floor                    50 West Liberty Street, Suite 410
9   Los Angeles, California 90017                            Reno, Nevada 89501
    Telephone:      (213) 892-4000                           Telephone: (775) 823-2900;
10  Facsimile:      (213) 629-5063                           Facsimile: (775) 823-2929
                                                             lmacauley@lrlaw.com; dcica@lrlaw.com
11  Reorganization Counsel for
    Debtors and Debtors in Possession
12                                                           Local Reorganization Counsel for
                                                             Debtors and Debtors in Possession
13                  UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF NEVADA
14
15  In re:                                          Case No. BK-09-52477
                                                    Chapter 11
16  **STATION CASINOS, INC.**, *et al.*,            Jointly Administered Cases BK 09-52470 through
                                                    BK 09-52487 and BK 10-50381
17  ☒ Affects this Debtor
    ☐ Affects all Debtors                           **ORDER UNDER 11 U.S.C. §§ 1127(b) AND**
18  ☒ Affects Northern NV Acquisitions, LLC         **1142 (I) APPROVING PROCEDURES AND**
    ☒ Affects Reno Land Holdings, LLC               **DISCLOSURE DOCUMENTS FOR**
19  ☒ Affects River Central, LLC                    **(A) SOLICITING BINDING**
    ☒ Affects Tropicana Station, LLC                **PARTICIPATIONS IN PROPCO RIGHTS**
20  ☒ Affects FCP Holding, Inc.                     **OFFERING, (B) ESTABLISHING**
    ☒ Affects FCP Voteco, LLC                       **BLOCKERCOS TO HOLD NPH**
21  ☒ Affects Fertitta Partners LLC                 **WARRANTS AND NPH INVESTMENT**
    ☒ Affects FCP MezzCo Parent, LLC                **RIGHTS, AND (C) DISTRIBUTING NPH**
22  ☒ Affects FCP MezzCo Parent Sub, LLC            **WARRANTS, CASHING OUT CERTAIN**
    ☒ Affects FCP MezzCo Borrower VII, LLC          **OTHER NPH WARRANTS, AND MAKING**
23  ☒ Affects FCP MezzCo Borrower VI, LLC           ***CY PRES* DISTRIBUTION IN LIEU OF**
    ☒ Affects FCP MezzCo Borrower V, LLC            **CERTAIN OTHER NPH WARRANTS;**
24  ☒ Affects FCP MezzCo Borrower IV, LLC           **(II) MODIFYING PLAN; AND**
    ☒ Affects FCP MezzCo Borrower III, LLC          **(III) CONFIRMING MODIFIED PLAN**
25  ☒ Affects FCP MezzCo Borrower II, LLC
    ☒ Affects FCP MezzCo Borrower I, LLC
26  ☒ Affects FCP PropCo, LLC
    ☐ Affects GV Ranch Station, Inc.
27
28

#4843-6026-8040

A.     On August 27, 2010, the Court entered its Confirmation Order confirming the chapter 11 Plan for Station Casinos, Inc. and its affiliated chapter 11 debtors (collectively, the "Debtors") in these chapter 11 cases.[1]  The Plan incorporates the terms of the settlement[2] between the Debtors and the Official Committee of Unsecured Creditors (the "Official Creditors Committee") pursuant to which (a) Eligible Opco Unsecured Creditors[3] will receive NPH Warrants to purchase up to 2.5% of the total equity interests in Station Holdco LLC ("Holdco"),[4] (b) Eligible Opco Unsecured Creditors that are Accredited Investors and hold a certain minimum amount of Allowed Claims may participate in the Propco Rights Offering and purchase up to approximately 15% in the aggregate of the total equity interests in Holdco, and (c) Qualified Eligible Opco Unsecured Creditors may participate in any Post-Effective Equity Raise.  The terms and conditions for the issuance of the NPH Warrants and NPH Investment Rights are contained in the NPH Term Sheet that was attached as Schedule 6 to the Plan.  Unless otherwise

---

[1]   *See* "Order Confirming 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (docket no. 2039, the "Confirmation Order"), and related "Findings of Fact and Conclusions of Law Regarding Confirmation of 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (docket no. 2038, the "Findings and Conclusions").  The "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" can be found at docket no. 1863 (the "Plan"), and the Plan amendments that were approved by the Confirmation Order can be found in the "Debtors' Motion for Order Under 11 U.S.C. § 1127 Approving  Modifications to "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 1997).

[2]   *See* Debtors' Motion for Order: (1) Approving Stipulation With Official Committee of Unsecured Creditors; and (2) Authorizing Payment of Certain Related Fees and Expenses (docket no. 1921) (the NPH Term Sheet is an exhibit to such motion).

[3]   "Eligible Opco Unsecured Creditors" are defined in the Plan as all Holders of Allowed Claims classified in Classes S.4, S.5 and S.6, except Holders of Class S.4 Claims that also hold Class S.2 Claims and vote to accept the Plan on account of such Class S.2 Claims.  Because the Plan effectuates the subordination provisions of the Subordinated Notes Indentures, Class S.6 Claims will not receive any distribution under the Plan; rather, all rights in respect of Class S.6 Claims to receive warrants or participate in the Rights Offering will be transferred to holders of Allowed Class S.5 Claims, pro rata.

[4]   Holdco is the entity that is referred to in the Confirmation Order and Findings and Conclusions as New Propco Holdco or Holdco, and it will own all of the non-voting equity interests in Station Casinos, LLC.  Station Casinos LLC is the entity that is referred to in the Confirmation Order and the Findings and Conclusions as New Propco.  Pursuant to the confirmed Plan and the Confirmation Order, on the Effective Date, all of the New Opco Acquired Assets and New Propco Acquired Assets will be transferred to New Propco and its subsidiaries.

indicated, capitalized terms are used herein as used and defined in the Plan and/or the NPH Term Sheet, as the context may require.

B.      In connection with the hearing to confirm the Plan, the Debtors explained that the actual documentation of, and the practical and legal mechanisms for soliciting binding commitments to participate in the Propco Rights Offering, and for allocating and distributing the NPH Warrants and NPH Investment Rights, would not be determined and resolved until after the Confirmation Hearing.  The Debtors, the Official Creditors Committee and the Put Parties[5] have reached agreement on such Plan implementation mechanisms and the Debtors, with the support of the Official Creditors Committee, filed their "Debtors' Motion for Order Under 11 U.S.C. §§ 1127(b) and 1142 Approving Procedures and Disclosure Documents for: (A) Soliciting Binding Participations in Propco Rights  Offering; (B) Establishing Blockercos to Hold NPH Warrants and NPH Investment  Rights; and (C) Distributing NPH Warrants, Cashing Out Certain Other NPH Warrants, And Making *Cy Pres* Distribution In Lieu Of Certain Other NPH Warrants" (the "Motion").

C.      Notice of the Motion and the hearing thereon was given to Holders of Claims in Classes S.4 and S.5 (including the applicable Indenture Trustees) and those parties requesting special notice; and the Motion includes copies of drafts of certain of the disclosure and solicitation documents that Debtors intend to use in connection with the NPH Investment Rights. Notice of the Motion and the hearing thereon was properly given and is adequate under the circumstances of these cases.  Based upon the Motion, and the submissions and arguments of

---

[5]   The Put Parties are Fidelity Puritan Trust: Fidelity Puritan Fund; Fidelity Advisor Series I: Fidelity Advisor High Income Advantage Fund; Fidelity School Street Trust: Fidelity Strategic Income Fund; Fidelity School Street Trust: Fidelity Capital & Income Fund; Fidelity Advisor Series II: Fidelity Advisor Strategic Income Fund; OCM Principal Opportunities Fund IV Delaware, L.P.; OCM Opportunities Fund VIIb Delaware, L.P.; Serengeti Station Holdco Ltd.; and Serengeti Partners LP.  Pursuant to the NPH Term Sheet and the Put Parties Support Agreement, the Put Parties have agreed that Holdco can put equity securities to the Put Parties through the relevant Blockercos in order to raise the agreed amount of funds, and they will receive a put premium and other rights in consideration therefor.  The Put Parties Support Agreement is attached as Exhibit 3 to the Debtors' Motion for Order: (1) Approving Stipulation With Official Committee of Unsecured Creditors; and (2) Authorizing Payment of Certain Related Fees and Expenses (docket no. 1921).

counsel at the hearing on the Motion, the Court has determined that good cause exists to grant

the Motion as provided herein.  Accordingly, **IT IS HEREBY ORDERED AS FOLLOWS**:

1.    The Motion is granted in its entirety.

2.    The Debtors are authorized to solicit binding commitments to participate

in the NPH Rights Offering from Holders of Claims in Classes S.4 and S.5, using the Rights

Offering Disclosure Memorandum and the other materials attached to the Motion, and the Rights

Offering Disclosure Memorandum is approved as containing adequate information for the

purposes of soliciting binding commitments to participate in the NPH Rights Offering.

3.    The Debtors are authorized to make revisions to the Rights Offering

Disclosure Memorandum and the other materials (other than the NPH Term Sheet) attached to

the Motion prior to or during the NPH Rights Offering solicitation process, as long as such

revisions: (i) are approved by the Mortgage Lenders (as defined in the Plan), Fertitta

Entertainment LLC, the Official Creditors Committee and the Put Parties and are noticed in

subsequent filings with the Court; (ii) represent updates for the passage of time or changed

circumstances; or (iii) constitute revisions that (x) do not adversely affect the interests of Eligible

Opco Unsecured Creditors in a manner that is material, and (y) are consistent in all material

respects with the NPH Term Sheet.  The Debtors are also authorized to adjust the number and

structure of the Blockercos, and make non-material revisions to the NPH Term Sheet, as long as

such adjustments and revisions are approved by the Mortgage Lenders, Fertitta Entertainment

LLC, the Official Creditors Committee and the Put Parties and are noticed in subsequent filings

with the Court.

4.    The Plan is hereby modified so that, on the Effective Date, all  Class S.4

and S.5 Claims that are less than $5 million in allowed amount shall receive their *pro rata* share

of four hundred and five thousand dollars ($405,000.00) in cash instead of receiving NPH

Warrants.[6]  In connection therewith, the Plan is hereby modified so that, on the Effective Date,

the Debtors shall make a charitable contribution to the Boys and Girls Clubs of Las Vegas in the

---

[6]   The distributions to Holders of Class S.5 Claims shall, as provided in the Plan, take into account the
entitlement of Class S.5 to all distributions that would be made to Holders of Class S.6 Claims, as
required by the subordination provisions of the Subordinated Notes Indenture.

amount of five thousand dollars ($5,000.00) instead of distributing NPH Warrants to each of the approximate 22,400 members of the Allowed Claim Subclass (as defined in the Lukevich class action settlement[7]).  Absent this Plan modification, the distribution of NPH Warrants to the Allowed Claim Subclass would be worth approximately $2,700 in the aggregate, and the individual NPH Warrant issued to each of the 22,400 members of the Allowed Claim Subclass would be worth approximately 12¢.  The cost of making the distribution, however, would exceed the amount of the distribution by a multiple of 20 or more.  Therefore, the Court finds that the $5,000 *cy pres* charitable contribution to the Boys and Girls Clubs of Las Vegas, in lieu of making a distribution of NPH Warrants to the members of the Allowed Claim Subclass, is appropriate because it provides a benefit of equal or greater value to the members of the Allowed Claim Subclass than the value, if any, associated with attempting to distribute NPH Warrants to the members of such Allowed Claim Subclass.

        5.      The circumstances described in the Motion warrant the modifications of the Plan provided for herein.  The Plan as modified herein shall become the Plan.  The Plan as modified herein is confirmed under Bankruptcy Code Section 1129.

Submitted by:

     /s/  Fred Neufeld
Paul S. Aronzon (CA SBN 88781)
Thomas R. Kreller (CA SBN 161922)
Fred Neufeld (CA SBN 150759)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

Reorganization Counsel for
Debtors and Debtors in Possession

---

[7]  *See Lukevich, et al. v. Station Casinos, Inc., et al.*, adversary case no. 10-05044-gwz, and "Settlement Agreement attached as Exhibit 1 to the "Joint Motion of Plaintiffs and Defendants for: (1) Preliminary Approval of Class Action Settlement; (2) Approval o Class Notice; (3) Conditional Certification of Class, Settlement Class, Direct Payment Subclass and Allowed Claim Subclass; and (4) Related Relief," entered on June 18, 2010 (docket no. 4 in adversary docket); *see also* "Order: (1)Granting Final Approval Of Class Action Settlement; and (2) Authorizing Entry Of Final Judgment Of Dismissal With Prejudice As To All Defendants," entered on October 26, 2010 (docket no. 18).

1  and

2  Laury M. Macauley (NV SBN 11413)
   Dawn M. Cica (NV SBN 004595)

3  LEWIS AND ROCA LLP
   50 W. Liberty Street, Ste. 410

4  Reno, NV   89501

5  Local Reorganization Counsel
   For Debtors and Debtors in Possession

6

7                                        # # #

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28