Bruce Bennett (CA No. 105430)
Bennett J. Murphy (CA No. 174536)
Jason R. Wolf (CA No. 262952)
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, CA 90071
Tel:  (213) 621-6000
Fax: (213) 621-6100

Attorneys for Steering Committee of First Lien
Term Lenders to Green Valley Ranch Gaming, LLC

Amy N. Tirre (NV No. 006523)
LAW OFFICES OF AMY N. TIRRE, APC
3715 Lakeside Drive, Suite A
Reno, NV 89509
Tel:  (775) 828-0909
Fax: (775) 742-6681

Local Counsel for Steering Committee of
First Lien Term Lenders to Green Valley
Ranch Gaming, LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

STATION CASINOS, INC.

      Debtors and Debtors in Possession.[1]

☒   Affects all debtors listed in footnote 2[2]

Chapter 11

Case No. 09-52477
Jointly Administered 09-52470 through
09-52487 and 10-50381, 11-51188 and
11-51190 through 11-51219

Jointly Administered

**OPPOSITION TO CREDITORS'
COMMITTEE'S MOTION TO ADJOURN
THE CONFIRMATION HEARING AS IT
PERTAINS TO GREEN VALLEY RANCH
GAMING, LLC AND JOINDER TO
MOTION OF GVR FOR A PROTECTIVE
ORDER FORBIDDING DISCOVERY BY
THE UNSECURED CREDITORS'
COMMITTEE, OR IN THE
ALTERNATIVE LIMITING THE SCOPE
OF THE UNSECURED CREDITORS'
COMMITTEE'S DOCUMENT AND
DEPOSITION REQUESTS**

Hearing Date:    May 25, 2011
Hearing Time:    10:00 a.m.
Place:           300 Booth Street
                   Reno, NV 89509

---

[1]   The debtors in these jointly administered chapter 11 cases are:  (i) Station Casinos, Inc.; Northern NV Acquisitions, LLC; Reno Land Holdings, LLC; River Central, LLC; Tropicana Station, LLC; FCP Holding, Inc.; FCP Voteco, LLC; Fertitta Partners LLC; FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II, LLC; FCP MezzCo Borrower I, LLC and FCP PropCo, LLC, (ii) Auburn Development, LLC; Boulder Station, Inc.; Centerline Holdings, LLC; Charleston Station, LLC; CV HoldCo, LLC; Durango Station, Inc.; Fiesta Station, Inc.; Fresno Land Acquisitions, LLC; Gold Rush Station, LLC; Green Valley Station, Inc.; GV Ranch Station, Inc.; Inspirada Station, LLC; Lake Mead Station, Inc.; LML Station, LLC; Magic Star Station, LLC; Palace Station Hotel & Casinos, Inc.; Past Enterprises, Inc.; Rancho Station, LLC; Santa Fe Station, Inc.; SC Durango Development LLC; Sonoma Land Holdings, LLC; Station Holdings, Inc.;

**TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:**

The Steering Committee of First Lien Term Lenders to Green Valley Ranch Gaming, LLC (the "Steering Committee")[3] hereby objects to the "*Motion Of The Official Committee Of Unsecured Creditors Of Green Valley Ranch Gaming, LLC To Adjourn The Confirmation Hearing As It Pertains To Green Valley Ranch Gaming, LLC*" [Docket No. 2986] (the "Motion to Adjourn") filed by the Official Committee of Unsecured Creditors (the "Committee"), and joins and fully supports the "*Motion Of GVR For A Protective Order Forbidding Discovery By The Unsecured Creditors' Committee, Or In The Alternative Limiting The Scope Of The Unsecured Creditors' Committee's Document And Deposition Requests*" [Docket No. 3039] (the "Protective Order Motion").  The Motion to Adjourn is, in and of itself, an impermissible "action that would hinder, delay [and] impede . . . [the] sale [and] disposition of Collateral" and otherwise violates the Intercreditor Agreement (as defined herein).[4]  Moreover, the stated purpose for the adjournment is so that the members of the Committee can commit more violations of the Intercreditor Agreement by further interfering with the disposition of the Collateral (as defined herein) under the Plan (as defined herein).  The Steering Committee respectfully submits that the Court should enforce the Intercreditor Agreement by denying the Motion to Adjourn as a plain violation by the members of the Committee of their contractual obligations.  In support of the relief requested herein, the Steering Committee respectfully states as follows:

## BACKGROUND

1.    Green Valley Ranch Gaming, LLC ("GVR"), as borrower, Wilmington Trust FSB, as successor administrative agent (the "First Lien Agent"), and the lenders thereunder from time to time

---

STN Aviation, Inc.; Sunset Station, Inc.; Texas Station, LLC; Town Center Station, LLC; Tropicana Acquisitions, LLC; and Vista Holdings, LLC, (iii) Aliante Gaming, LLC, Aliante Holding, LLC, and Aliante Station, LLC, and (iv) Green Valley Ranch Gaming LLC ("GVR").

[2]    Affects:  GVR.

[3]    The Steering Committee consists of Ares Management LLC, Crescent Capital Group LP, GE Capital Corporation, Highland Capital Management, LP, Oaktree Capital Management, LP, P. Schoenfeld Asset Management LP, Wells Fargo Bank, N.A. and Wells Fargo Foothill.  The Steering Committee is filing a statement pursuant to Fed. R. Bankr. P. 2019(a) contemporaneously herewith.

[4]    Intercreditor Agreement, § 3.1(c).

2

(the "First Lien Lenders") are parties to that certain prepetition Credit Agreement dated as of February 16, 2007 (as amended, the "First Lien Credit Agreement").

2.      As of April 12, 2011 (the "Petition Date"), the First Lien Obligations (as defined herein) included $514,875,000.00 in principal amount of term loans, plus accrued and unpaid interest, costs, fees, and expenses thereon of not less than $34,912,852.85, plus approximately $56,532,385.06 (before interest) pursuant to a swap agreement in connection with the First Lien Credit Agreement.  The First Lien Obligations, all of which were in default as of the Petition Date, thus exceed $606.2 million and are secured by a valid and enforceable first lien on substantially all of GVR's assets, with certain immaterial exclusions (the "Collateral").

3.      GVR, as borrower, Bank of New York Mellon, as successor administrative agent (the "Second Lien Agent"), and the lenders thereunder from time to time (the "Second Lien Lenders") are parties to that certain prepetition Credit Agreement dated as of February 16, 2007 (as amended, the "Second Lien Credit Agreement").

4.      As of the Petition Date, the Second Lien Obligations (as defined herein) included $250 million in principal amount of term loans, plus accrued and unpaid interest, costs, fees and expenses thereon of not less than $22,657,191.71.  The Second Lien Obligations are secured by a second lien on the Collateral, with the same immaterial exclusions as applicable to the First Lien Obligations.

5.      GVR's obligations under the First Lien Credit Agreement (the "First Lien Obligations") and the Second Lien Credit Agreement (the "Second Lien Obligations") are both secured by the Collateral and the proceeds thereof.  In order to effect the subordination of the Second Lien Obligations to the First Lien Obligations, GVR, the Second Lien Agent, and the predecessor to the First Lien Agent entered into that certain Intercreditor Agreement dated as of February 16, 2007 (the "Intercreditor Agreement").  The Intercreditor Agreement provides for the full and complete subordination of the liens securing the Second Lien Obligations to the liens securing the First Lien Obligations, and, in particular, prohibits the Second Lien Lenders from taking any action which would interfere with the disposition of the Collateral by or on behalf of First Lien Lenders.

LA223333.7

6.      On the Petition Date, GVR commenced this case and filed its "Prepackaged Joint Chapter 11 Plan Of Reorganization For Subsidiary Debtors, Aliante Debtors And Green Valley Ranch Gaming, LLC (Dated March 22, 2011)" (the "Plan").  The Intercreditor Agreement is enforceable in this case.[5]

7.      Pursuant to the Plan, substantially all of the Collateral will be sold for $500 million plus a "ticking fee" of at most $1.75 million.  The Plan provides for the sale of the Collateral to Station GVR Acquisition, LLC for a purchase price that is approximately $105 million **less** than the First Lien Obligations.

8.      The First Lien Lenders holding well in excess of a majority of the First Lien Obligations approved and consented to the disposition of their Collateral under the Plan in two ways. Holders of 99% (in amount) of the First Lien Obligations executed a plan support agreement (the "Plan Support Agreement"), and holders of 99% (in amount) of the First Lien Obligations voted to accept the Plan.  The First Lien Agent, at the direction of the First Lien Lenders, has also approved and consented to the terms of the Plan.

9.      The signatories to the Plan Support Agreement include holders of a majority in amount of the Second Lien Obligations.  The Plan Support Agreement, by its terms, requires these holders to vote their claims as Second Lien Lenders in favor of the Plan.  *See* Plan Support Agreement at 3.[6]

10.     On April 29, 2011, the Office of the United States Trustee appointed the Committee. The Committee consists of no unsecured creditors and instead is comprised of three Second Lien Lenders: MFS Investment Management; Panton Capital Group; and Babson Capital Management LLC (the "members of the Committee" or "Committee Members").  It is not disputed that each of the Committee Members is a Second Lien Lender.

---

[5]  As stipulated by the First Lien Agent and GVR, and found by the Court, pursuant to the "Stipulation And Order Authorizing GVR's Use Of Cash Collateral And Granting Adequate Protection To First Lien Holders," (the "Cash Collateral Order") the Intercreditor Agreement is a "subordination agreement" enforceable in the above-captioned case pursuant to section 510(a) of title 11 of the United States Code (the "Bankruptcy Code").  Cash Collateral Order, at 5, 24; *see also* Intercreditor Agreement, § 6.13 (providing the parties' express acknowledgement the Intercreditor Agreement is enforceable in GVR's bankruptcy case under section 510(a) of the Bankruptcy Code.

[6]  A copy of the Plan Support Agreement (without signature pages) is attached hereto as **Exhibit A**.

LA223333.7

11.     In connection with the Motion to Adjourn, the Committee served document discovery requests on 16 people and entities, including Dewey & LeBoeuf LLP ("Dewey"), the Steering Committee's counsel, and Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan"), the Steering Committee's financial advisor.  The Committee also sought to depose 14 people and entities, also including Dewey and Houlihan.

12.     On May 12, 2011, GVR filed the Protective Order Motion.  Pursuant to the Protective Order Motion, GVR seeks an order prohibiting or curtailing discovery by the Committee.

## ARGUMENT

## I.     OBJECTION TO THE MOTION TO ADJOURN

A.     The Members of the Committee Violated the Intercreditor Agreement by Filing the Motion to Adjourn

13.     Under the Intercreditor Agreement, the liens on the Collateral securing the First Lien Obligations "shall be senior in all respects and prior to any Lien on the Collateral securing any of the Second Lien Obligations" and any lien on the Collateral securing any of Second Lien Obligations "shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations."  Intercreditor Agreement, § 2.1.[7]  The Second Lien Agent, for itself and on behalf of the Second Lien Lenders, agreed not to contest or support any other Person in contesting the "priority, validity or enforceability" of the liens held by or on behalf of the First Lien Lenders.  *Id.*, § 2.4.

14.     The Intercreditor Agreement includes an array of provisions enforcing the full and complete subordination of the Second Lien Obligations to the First Lien Obligations.  By filing the Motion to Adjourn, the members of the Committee breached their obligations to First Lien Lenders under sections 6.2 and 3.1 of the Intercreditor Agreement, at a minimum.

15.     Section 6.2 of the Intercreditor Agreement states that in a bankruptcy case of GVR, the Second Lien Agent, on behalf of the Second Lien Lenders, "**agrees that it will raise no objection to or oppose a sale or other disposition of any Collateral** . . . free and clear of its Liens

---

[7]     A copy of the Intercreditor Agreement is attached hereto as **Exhibit B**.

LA223333.7

or other claims under Section 363 of the Bankruptcy Code if [a majority in amount of the First Lien Lenders] have consented to such sale or disposition of such assets so long as the interests of the Second Lien [Lenders] attach to the proceeds thereof, subject to the terms of this Agreement."[8] Intercreditor Agreement, § 6.2 (emphasis added).  In addition, "[i]f requested by the First Lien [Agent] in connection therewith, **the Second Lien Collateral Agent shall affirmatively consent to such a sale or disposition**."  *Id*. (emphasis added).  The Motion to Adjourn "raises" numerous purported objections to a disposition of the Collateral that has the approval of more than a majority.  By filing the Motion to Adjourn, the members of the Committee violated section 6.2 of the Intercreditor Agreement.

16.    Section 3.1 of the Intercreditor Agreement places a comprehensive set of restrictions upon the Second Lien Lenders to enforce the First Lien Lenders' exclusive control over the disposition of the Collateral, whether in a bankruptcy case or not, unless and until the First Lien Obligations have been paid in full.  Under Section 3.1(a)(ii), the First Lien Agent and the First Lien Lenders have "the **exclusive right to enforce rights, exercise remedies . . and make determinations regarding the release, disposition, or restrictions with respect to the Collatera**l" and provides they may do so "**without any consultation with or the consent of the Second Lien [Agent] or any Second Lien [Lender]**."  Intercreditor Agreement, § 3.1(a)(ii) (emphasis added).  Section 3.1(c) of the Intercreditor Agreement also prohibits Second Lien Lenders from taking "**any action that would hinder, delay or impede any exercise of remedies under the First Lien Credit Documents, including any sale, lease, exchange, transfer or other disposition of the Collateral**."  Intercreditor Agreement, § 3.1(c) (emphasis added).  Under the Intercreditor Agreement, the Second Lien Lenders also "waive[ed] any and all rights" [they] **may have as a junior lien creditor or otherwise to object to the manner or order in which the First Lien Collateral Agent or the First Lien Lenders seek to enforce or collect the First Lien Obligations or the Liens granted in any of the First Lien Collatera**l."  *Id*. (emphasis added).

---

[8]    Because the proceeds from the disposition of Collateral under the Plan are less than less than the outstanding First Lien Obligations, the Second Lien Lenders have no "interests" which may attach to the sale proceeds.

LA223333.7

17.     The Motion to Adjourn, on its face, violates the Second Lien Lenders' agreement that First Lien Lenders would have exclusive control over the disposition of the Collateral.  *See* Intercreditor Agreement, §§ 5.1(a)(ii), 6.2.  It is also an unmistakable "action that would effort to hinder, delay or impede" the First Lien Lenders' exercise of remedies pursuant to the Plan. Intercreditor Agreement, § 3.1(c).  By raising objections to the manner in which the First Lien Lenders decided to enforce their rights, the members of the Committee have asserted objections they agreed to waive, a waiver that applies whether the objections are made as Second Lien Lenders "or otherwise."  Intercreditor Agreement, § 3.1(a)(i)(B).

18.     The members of the Committee offer no rationale to excuse them from their express obligations to First Lien Lenders.  Apparently, the Committee Members believe the Intercreditor Agreement permits them to violate the Intercreditor Agreement as much as they want so long as they claim to do so for the benefit of unsecured creditors.  The Committee Members are wrong for two reasons:  the Intercreditor Agreement provides nothing of the sort, and any claim to be acting for the benefit of unsecured creditors is objectively false.

19.     Section 3.1 of the Intercreditor Agreement (but *not* section 6.2) permits the filing in a Bankruptcy Case of "pleadings, objections, motions or agreements **which assert rights or interests available to unsecured creditors** of [GVR] arising under either Bankruptcy Law or applicable nonbankruptcy law, **in each case in accordance with the terms of Section 5.4**."  Intercreditor Agreement, §§ 3.1(a)(ii)(D), 3.1(c) (emphasis added).  The clause expressly cross-references section 5.4, which permits the Second Lien Agent and the Second Lien Claimholders to "**exercise rights and remedies as unsecured creditors** against any Grantor in accordance with the terms of the Second Lien Credit Documents and applicable law," but does not provide nor should be interpreted to mean "rights and remedies" that would interfere with the exclusive right of First Lien Lenders to determine the disposition of Collateral.[9]  Intercreditor Agreement, § 5.4.  Section 5.4, in fact, goes on to state that in exercising "rights and remedies as unsecured creditors," Second Lien Lenders may not receive any payment on their debt unless it "is not the direct or indirect result of the exercise . . .

---

[9]     Importantly, section 2.1 (prohibiting challenges to the liens securing the First Lien Obligations) lacks an exception for Second Lien Creditors asserting the rights of unsecured creditors.

LA223333.7

of remedies as a secured creditor . . . or enforcement of an [l]ien . . ." *Id*.  To the extent section

3.1(a)(ii)(D) provides an opportunity to assert "right or interests available to unsecured creditors," it

must be construed in accord with section 5.4, meaning the pleading cannot be one contemplating that

Second Lien Lenders would receive payments from Collateral, even "indirectly," which they are not

allowed to receive or retain under section 5.4.  Notably, this language does not qualify section 6.2,

meaning that the Motion to Adjourn, by seeking to oppose the sale or disposition of collateral in a

bankruptcy case in violation of Section 6.2, cannot be excused by Section 3.1 no matter how broadly

the latter might be construed.  In any event, Section 3.1 cannot sensibly be construed to overwrite the

detailed and express terms of the Intercreditor Agreement prohibiting interference with the

disposition of Collateral.  The Motion to Adjourn is plainly aimed at achieving a result prohibited by

section 5.4 – payments to Second Lien Lenders from the Collateral – and should be denied.

20.    Given the Committee members' agreement to grant strict and exclusive control over

the Collateral to the First Lien Lenders, it is manifest that the Motion to Adjourn violates the

Intercreditor Agreement and should be denied.

B.    <u>The Committee Members Purport to Justify an Adjournment by Their Plans to
Commit Further Violations of the Intercreditor Agreement</u>

21.    The Motion to Adjourn seeks to delay the hearing on confirmation of the Plan, for

what appear to be three purported reasons:  first, to investigate whether the sale process conducted

by GVR and the First Lien Lenders failed to obtain full value for the Collateral due to

mismanagement or insider misconduct; second, to investigate whether the Plan is "an appropriate

restructuring [sic] transaction for GVR" based on similar suspicions; and, third, to investigate lien

perfection and "potentially valuable estate causes of action."  Motion to Adjourn at 3-5.  The

members of the Committee are not permitted to do any of these things under the Intercreditor

Agreement and their request for time to do them should be denied.

22.    Under section 3.1(c) of the Agreement, the Second Lien Agent, on behalf of itself and

the Second Lien Lenders, expressly waived their right to "to object to the manner . . . in which the

First Lien Collateral Agent and the First Lien Lenders seek to enforce or collect the First Lien

Obligations or the Liens granted in any of the First Lien Collateral."  Intercreditor Agreement,

§ 3.1(c).  The sale process was among the means by which the First Lien Lenders determined how they would enforce their rights, including their right to dispose of their Collateral in a Chapter 11 plan.  The Committee Members have no proper purpose in pursuing an investigation of the sale process, since they have expressly waived their right to object to any aspect of it.

23.    Likewise, the question whether the Plan is an "appropriate restructuring [sic] transaction" is off-limits under the Intercreditor Agreement.  Once the First Lien Lenders duly approved the disposition of Collateral as set forth in the Plan, section 5.4 of the Intercreditor Agreement, which deals specifically with sales in a GVR bankruptcy, bars any objection or opposition from the Second Lien Lenders.  Indeed, the Second Lien Agent became obligated to consent affirmatively to the sale if requested by the First Lien Agent.  *See* Intercreditor Agreement, § 6.2.

24.    The members of the Committee also seek time to look for grounds to challenge the First Lien Lenders' liens and to investigate "estate causes of action."  Any lien challenge would violate the express obligation of the members of the Committee not to challenge, or even support a challenge, to the First Lien Lenders' liens.  *See* Intercreditor Agreement, § 2.4.  The goal of investigating "estate causes of action" once again, is another request for time to perform prohibited acts.  GVR's causes of action, and their proceeds, are Collateral under the governing security agreement[10] and were also made subject to adequate protection liens under the Cash Collateral Order.  *See* Cash Collateral Order at 11.  Under the Intercreditor Agreement, the Committee Members are prohibited from raising objections to the disposition both of Collateral and "postpetition assets subject to adequate protection liens in favor of the First Lien Agent."  Intercreditor Agreement at 6.2.

---

[10]    Pursuant to the "Third Amended And Restated Security Agreement (First Lien)" (the "Security Agreement") the First Lien Lenders were granted a security interest in, among other things, "[a]ll present and future general intangibles, all tax refunds of every kind and nature to which any Grantor now or hereafter may become entitled, however arising, all other refunds, and (to the extent assignable) all deposits, reserves, loans, royalties, cost savings, deferred payments, goodwill, choses in action, liquidated damages, rights to indemnification, trade secrets, computer programs, software, customer lists, trademarks, trade names, patents, licenses (except for gaming licenses, liquor licenses, and any other licenses which are not transferrable), copyrights, technology, processes, proprietary information and insurance proceeds of which any Grantor is a beneficiary."  Moreover, the First Lien Lenders were granted a security interest in "[a]ll other tangible and intangible Property of any Grantor (other than aircraft)."  A copy of the Security Agreement is attached hereto as **Exhibit C**.

LA223333.7

25.     Nothing in the Intercreditor Agreement excuses or qualifies the Committee Members'

contractual obligations under the Intercreditor Agreement nor suggests that actions specifically

prohibited in the Intercreditor Agreement may be undertaken merely by claiming to do so in an

alternative role.  Sound and universal principles of contract interpretation would not support an

interpretation of the phrase "rights and remedies of unsecured creditors" to overwrite specific terms

barring challenges to the First Lien Lenders' duly elected manner of disposing of Collateral.  *See*,

*e.g.*, *Feibusch v. Integrated Device Tech., Inc.*, 463 F.3d 880, 885-886 (9th Cir. 2006) ("Under well-

settled contract principles, specific provisions control over more general terms.  *Chan v. Society

Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997). . . . [W]e must interpret the contract in a

manner that gives full meaning and effect to all of the contract's provisions.  *Beal Bank v. Crystal

Props., Ltd. (In re Crystal Props., Ltd.)*, 268 F.3d 743, 748 (9th Cir. 2001)").

26.     In any event, the Committee Members are quite candid in admitting in the Motion to

Adjourn that the additional "value" that they would intend to search for during an adjournment

would be for their benefit as Second Lien Lenders.  See Motion to Adjourn at 7 ("[T]he Committee

needs to diligence GVR's consideration of alternative restructuring options that may generate value

for junior creditors."), 17 ("Interestingly, the number agreed to by the Debtors and the . . . Steering

Committee] generates value just short [sic: approximately $105 million] of what would be necessary

to deliver a dividend to junior creditors.").  The Motion to Adjourn makes clear that the Committee

Members seek to benefit themselves as out-of-the-money junior lien creditors, and not as parties

asserting rights and remedies as unsecured creditors.

27.     In order for any such "investigations" to actually benefit general unsecured creditors,

the "additional value" they would yield would have to be enough to pay an additional $106 million

to First Lien Lenders and pay the entire $272.6 million debt owed to Second Lien Lenders, plus

post-petition interest accruing at approximately $5.83 million per month.  Tellingly, the members of

the Committee make no effort to argue, or even speculate, how the quantum of "lost" value to be

identified through their "investigations" could possibly exceed $378 million, let alone the $5.83

million in monthly post-petition interest accruing on First Lien Obligations and Second Lien

Obligations as the "investigations" unfold.  Yet absent a convincing case how such a result could be

10

achieved, there is absolutely no basis to justify an adjournment as conveying a potential benefit to any unsecured creditors. In the absence of a $378 million upside, it is clear that the Committee Members seek to serve their self-interest as Second Lien Lenders, and to abuse their role on the Committee to escape their contractual obligations to First Lien Lenders.

## II.    JOINDER TO PROTECTIVE ORDER MOTION

28.    The Steering Committee joins and fully supports the Protective Order Motion. The broad and massively expensive discovery sought by the members of the Committee is wholly inconsistent with the Committee Members' obligations under the Intercreditor Agreement. It would also deny to First Lien Lenders a central benefit of the Intercreditor Agreement. When the Second Lien Lenders agreed to put the disposition of the Collateral in the exclusive domain of First Lien Lenders, they also agreed the cash portion of the Collateral would not be invaded over intercreditor disputes. In violation of that bargain, the members of the Committee wish to cause millions of dollars of the First Lien Lenders' cash Collateral to be expended in discovery and other litigation costs. This cannot be reconciled with the terms of the Intercreditor Agreement. The Steering Committee respectfully submits that entry of the protective order is necessary to enforce the Intercreditor Agreement, in particular to prevent the dissipation of cash Collateral in violation of its terms.[11]

## CONCLUSION

29.    The Intercreditor Agreement prevents the Committee Members and all other Second Lien Lenders from having any role in determining the disposition of the Collateral or contesting the First Lien Lenders' disposition of the Collateral through the Plan unless the First Lien Lenders are paid in full. The Committee Members violated their agreement by filing the Motion to Adjourn, and the Motion to Adjourn is premised on them doing more of the same rather than for any proper purpose. Accordingly, this Court should deny the Motion to Adjourn and should grant the Protective Order Motion.

Dated: May 13, 2011

---

[11]    The Steering Committee reserves all rights under the Cash Collateral Order with respect to expenditures relating to the Committee's discovery requests.

LA223333.7

1

2    _____/s Amy N. Tirre_____
     Amy N. Tirre (NV No. 006523
3    LAW OFFICES OF AMY N. TIRRE, APC
     3715 Lakeside Drive, Suite A
     Reno, NV 89509
4    Tel:  (775) 828-0909
     Fax: (775) 742-6681
5
     and
6

7    Bruce Bennett (CA No. 105430)
     Bennett J. Murphy (CA No. 174536)
     Jason R. Wolf (CA No. 262952)
8    DEWEY & LEBOEUF LLP
     333 South Grand Avenue, Suite 2600
9    Los Angeles, CA 90071
     Tel:  (213) 621-6000
10   Fax: (213) 621-6100

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA223333.7

# EXHIBIT "A"

# EXHIBIT "A"

Green Valley Ranch Gaming, LLC

March 3, 2011

To the Holders of the First Lien Debt Referred to Below:

Ladies and Gentlemen:

This letter agreement (this "Agreement") sets forth certain terms and conditions pursuant to which Green Valley Ranch Gaming, LLC ("GVR") will propose a pre-packaged plan of reorganization containing terms substantially in accordance with those contained in the term sheet annexed hereto as Exhibit A (the "Term Sheet") and incorporated herein in its entirety (the "Plan") in a voluntary case (the "Chapter 11 Case") to be filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").  All capitalized terms not otherwise defined herein have the meanings given to such terms in the Term Sheet.

### Proposed Plan of Reorganization

GVR anticipates filing the Plan at the outset of the Chapter 11 Case. Among other things, the Plan will provide for the sale of substantially all of GVR's assets to Station GVR Acquisition, LLC (the "Purchaser").  The Purchaser will be an indirect subsidiary of Station Casinos LLC ("Station Casinos").

So long as this Agreement shall not have terminated, GVR will propose and use all reasonable means to obtain prompt confirmation of the Plan and, prior to confirmation of the Plan, except as otherwise directed by the Bankruptcy Court, will take no action inconsistent with this Agreement, the Plan or the Term Sheet.

### Due Authority

Each undersigned Lender (the "Consenting Lenders") under that certain First Lien Credit Agreement dated as of February 16, 2007 (the "First Lien Credit Agreement" the lenders thereto, the "First Lien Lenders," and their claims thereunder, (which shall include claims arising from the termination of a Secured Hedging Obligation (as defined in the First Lien Credit Agreement) referred to on Schedule 1 attached hereto) (the "First Lien Claims") represents that, as of the date hereof, (i) such Consenting Lender either (A) is the beneficial owner of the unpaid principal amount of the First Lien Claim set forth opposite its name on the signature page hereof (for each such Consenting Lender, the "Consenting Lender Claims"), or (B) has management authority with respect to the Consenting Lender Claims and has the power and authority to vote in the solicitation of acceptances to the Plan on behalf of the beneficial owner(s) of such Consenting Lender Claims, and (ii) such Consenting Lender has full power and authority to vote on and consent to matters concerning such Consenting Lender Claims, subject to

LA222570.7

the terms and conditions of the First Lien Credit Agreement relating to the exchange, assignment, and transfer of the Consenting Lender Claims.  For the avoidance of doubt, no affiliate of any undersigned Consenting Lender shall be deemed a Consenting Lender nor be bound by this Agreement unless it shall have duly executed and delivered this Agreement as a Consenting Lender.

<u>Transfer of Consenting Lender Claims</u>

Each of the Consenting Lenders hereby agrees that, so long as this Agreement has not been terminated, it shall not (i) grant proxies to any person in connection with its Consenting Lender Claims to vote on the Plan, or (ii) sell, transfer or assign any of the Consenting Lender Claims or any option thereon or any right or interest therein (each such sale, transfer, or assignment being referred to as a "<u>Transfer</u>"), unless the transferee thereof either (A) is a Consenting Lender; or (B) agrees in writing for the benefit of GVR to be bound by all of the terms of this Agreement by executing and delivering to GVR (with a copy to the Administrative Agent (as defined in the First Lien Credit Agreement)) a joinder in the form attached hereto as <u>Exhibit B</u> upon no less than five (5) days written notice to GVR, in which event GVR shall be deemed to have acknowledged that its obligations to the Consenting Lenders hereunder shall also be deemed to constitute obligations in favor of such transferee.  Any Transfer that is made in violation of the immediately preceding sentence shall be null and void *ab initio*, and GVR shall have the right to enforce the voiding of such transfer.

<u>Acquisition of First Lien Claims and Other Claims Against GVR</u>

This Agreement shall in no way be construed to preclude the Consenting Lenders or any of their respective subsidiaries from acquiring additional First Lien Claims.  Any such additional First Lien Claims acquired by a Consenting Lender shall automatically be deemed to be Consenting Lender Claims or other First Lien Claims, as the case may be, and to be subject to the terms of this Agreement.

<u>Support for the Plan</u>

Each of the Consenting Lenders agrees that, subject to the conditions that (i) the proponent(s) of the Plan, in soliciting the acceptance of the Plan by Consenting Lenders, provides disclosure materials that the Bankruptcy Court determines to be in compliance with section 1126(b) of the Bankruptcy Code; and (ii) the Plan (including any amendments thereto) provides for treatment of the Consenting Lender Claims in a manner consistent with and no less beneficial to the holders of such claims than as contemplated in the Term Sheet, it will timely vote its Consenting Lender Claim and any other claims or interests that it holds in favor of the Plan and will not revoke or withdraw such vote.  Each Consenting Lender further agrees not to elect to preserve any claims, if any, that such Lender may have that may be affected by any releases provided for herein or in the Plan.

-2-

LA222570.7

Further, each of the Consenting Lenders agrees that, subject to the condition that the Plan (including any amendments thereto) provides for the treatment of Consenting Lender Claims consistent with and no less beneficial to the holders of such claims than that contemplated in the Term Sheet, it shall support the Plan and GVR's prosecution of the Chapter 11 Case consistent with the Plan. Such support shall include, without limitation, the following: each Consenting Lender (together with its officers, directors, employees, representatives and agents): (i) shall use its commercially reasonable efforts to request the Administrative Agent and its legal counsel to take all actions in its reasonable discretion to achieve confirmation and consummation of the Plan, including, to the extent practicable, not unlawful and not in violation of any contractual obligation of such Consenting Lender, advising other First Lien Lenders that such Consenting Lender supports and has committed to vote to approve the Plan, and agree to permit disclosure in the Disclosure Statement of the contents of this Agreement; and (ii) shall not: (A) object to the Plan on any basis or object to any efforts to obtain acceptance of, and to confirm and implement, the Plan; (B) vote any of its Consenting Lender Claims for or consent to, support or participate in the formulation of any plan other than the Plan, including, without limitation, any plan that may be proposed by holders of claims under that certain Second Lien Credit Agreement dated as of February 16, 2007; (C) solicit, intentionally encourage or engage in any negotiations regarding inquiries, offers or proposals, or enter into any agreements, relating to any disposition of GVR or its assets out of the ordinary course of business or any plan of reorganization or liquidation for GVR other than the Plan or any amendment thereto, this Agreement and any documents in support hereof; (D) intentionally encourage, in any fashion, any person or entity to vote against the Plan or to take any other action the Consenting Lenders are prohibited from taking in this Agreement or support any person taking any such action; (E) object to (i) any motion, application, or request for relief by GVR seeking authority to use of cash collateral, provided that the relief requested in such motion has been consented to by the Administrative Agent at the direction of a majority of the Consenting Lenders or by a majority of the Consenting Lenders, or (ii) any other motion, application, or request for relief by GVR, provided that the relief requested is not inconsistent with this Agreement or the Term Sheet; or (F) take any other action for the intended purpose or with the intended effect or that could reasonably be expected to have the effect of delaying, preventing, frustrating or impeding acceptance, confirmation or implementation of the Plan, including, without limitation, (y) exercising the right to credit bid any claim against GVR pursuant to section 363(k) of the Bankruptcy Code at any time and (z) objecting to, or otherwise commencing any proceeding to oppose or alter any of the terms of the Term Sheet or any other document filed in furtherance of confirmation of the Plan.

No later than the fifth (5th) business day following the Effective Date (as defined below), GVR shall pay $5,000,000 in cash by wire transfer of immediately available funds (the "Restructuring Fee") to an account designated by the Administrative Agent for distribution to each Consenting Lender on a *pro rata* basis as determined by (i) in the case of Loans (as defined in the First Lien Credit Agreement), the Administrative Agent's register of First Lien Claims held by such Consenting Lender as of the Effective

-3-

Date and (ii) in the case of a Secured Hedging Obligation, a certificate from the Consenting Lender holding such Secured Hedging Obligation, certifying to the Administrative Agent the principal amount of its First Lien Claim consisting of obligations arising from the termination of such Secured Hedging Obligation as of the Effective Date.

<u>Financial Reporting</u>

GVR hereby agrees that it shall promptly provide, subject to the confidentiality restrictions contained in the First Lien Credit Agreement, each Consenting Lender with (i) all financial information provided to Jefferies & Co. pursuant to Section 4 of Exhibit B to that certain Commitment Letter by and between Jefferies Finance LLC and Station GVR Acquisition, in the form attached hereto; (ii) monthly departmental income statements in the form previously provided to the professionals engaged on behalf of the Administrative Agent or the Steering Committee (as defined in the Term Sheet), and monthly balance sheets, each of which shall be provided to such professionals no later than the twenty-fifth (25th) day of the month following the month of such financial statements; and (iii) upon request, such other non-proprietary financial and non-proprietary operational information as is reasonably requested by such professionals; provided, however, that in no event shall GVR be required to provide any information to the Consenting Lenders under this paragraph that is propriety information of Station Casinos, Inc. ("<u>SCI</u>") or has been provided to GVR by SCI on a confidential basis.

<u>Termination of Obligations</u>

Consenting Lenders holding more than 50% in principal amount of the First Lien Claims as of the Effective Date (the "Majority Consenting Lenders") may terminate this Agreement by written notice to counsel to GVR (with a copy to the Administrative Agent), in which case this Agreement shall terminate and be of no further force and effect, only if any of the following occurs (other than as a result of any action taken by any Consenting Lender):  (i) GVR (A) publicly announces its intention not to pursue the confirmation of the Plan in accordance with the Term Sheet; or (B) files or supports the Chapter 11 Case, a chapter 11 plan, or the Bankruptcy Court confirms a plan or enters a final order confirming such plan, in each case providing for treatment of the Consenting Lender Claims that is inconsistent with and less favorable than the terms and conditions set forth in the Term Sheet, including without limitation, GVR's agreement to pay reasonable and documented out-of-pocket expenses of the First Lien Lenders, the reasonable and documented fees and expenses of professionals retained by the Steering Committee, and the fees and expenses of the Administrative Agent; (ii) GVR materially breaches this Agreement, including, without limitation, its obligations under the "Financial Reporting" section and such breach remains uncured for more than five (5) days following written notice to counsel of GVR of the alleged breach; (iii) all material transaction documents are not executed by or on behalf of the Purchaser, including without limitation, any and all commitment letter(s) evidencing the financing (including debt and equity financing) of Purchaser's acquisition of substantially all of GVR's assets,

-4-

prior to the commencement of the Chapter 11 Case; (iv) the Plan, any transaction documents or any commitment evidencing the financing of the transaction is materially modified, amended or withdrawn without the consent of the Majority Consenting Lenders; (v) any of the transaction documents or any commitment evidencing the financing (including debt and equity financing) of the transaction is terminated or, with respect to any commitment evidencing the financing of the transaction, such commitment expires and alternate financing is not obtained in accordance with the transaction documents; (vi) GVR seeks the use of cash collateral without the prior written consent of the Majority Consenting Lenders; (vii) any stipulation or order authorizing GVR to use cash collateral expires or is terminated or otherwise ceases to be in effect for any reason; (viii) this Agreement has not been executed by Consenting Lenders holding at least two-thirds in amount of First Lien Claims and constituting more than one-half in number of Lenders under the First Lien Credit Agreement on or before March 14, 2011; (ix) the Chapter 11 Case has not been commenced by April 15, 2011; (x) an order confirming the Plan is not entered by the Bankruptcy Court on or prior to June 15, 2011; (xi) the Plan is materially modified or amended without the consent of the Majority Consenting Lenders; (xii) confirmation of the Plan is denied and GVR does not take necessary steps to seek confirmation of the Plan (as may have to be modified) that otherwise is consistent with the Term Sheet and complies with the terms of this Agreement; (xiii) the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code or a trustee is appointed for GVR under any Chapter of the Bankruptcy Code; (xiv) GVR files any motion or pleading with the Bankruptcy Court that is not materially consistent with this Agreement, the Term Sheet or the Plan and such motion or pleading has not been appropriately modified or withdrawn prior to the earlier of (i) five (5) business days after GVR receives written notice from the Administrative Agent at the direction of the Majority Consenting Lenders that such motion or pleading is materially inconsistent with this Agreement, the Term Sheet or the Plan, as applicable, and adversely affects the Consenting Lenders in a material respect and (ii) the entry of an order of the Bankruptcy Court approving such motion; (xv) the Bankruptcy Court grants or denies relief in the Bankruptcy Case or the chapter 11 case of SCI or any of its affiliates that is materially inconsistent with this Agreement or the Plan in any material respect and such relief adversely affects the Consenting Lenders in any material respect (in each case with such amendments and modifications not having been agreed to by the Majority Consenting Lenders) or (xvi) any written representation or warranty made by GVR or its agents or representatives to the Consenting Lenders in this Agreement or the Term Sheet is false or misleading in any material respect when made.  No Consenting Lender shall have any liability to any other Consenting Lender or any other person as a result of the termination of this Agreement in accordance with this paragraph.  Notwithstanding the foregoing, upon the occurrence of the effective date of the Plan, all obligations under this Agreement shall terminate automatically without further action by any party.

        All notices under this Agreement to be served to the counsel of GVR, or the Administrative Agent shall be deemed given if in writing and delivered or sent by telecopy, courier or by registered or certified mail (return receipt requested) to the

LA222570.7

following addresses or facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

> *Counsel to the Debtors*
> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, IL 60654
> Attn:  David Seligman, Esq.
> Facsimile:  (312) 862-2200
>
> *Counsel to the Administrative Agent*
> Pillsbury Winthrop Shaw Pittman LLP
> 650 Town Center Drive, Suite 700
> Costa Mesa, California  92626
> Attn:  Craig A. Barbarosh, Esq.
> Facsimile:  (714) 436-2800
>
> and
>
> Pillsbury Winthrop Shaw Pittman LLP
> 1540 Broadway
> New York, New York  10036
> Attn:  Karen B. Dine, Esq.
> Facsimile:  (212) 858-1500
>
> with a copy to:
> Dewey & LeBoeuf LLP
> 333 South Grand Avenue, Suite 2600
> Los Angeles, CA 90071
> Attn:  Bennett J. Murphy, Esq.
> Facsimile:  (213) 621-6100

Release of Claims

Effective upon the consummation of the Plan, and in addition to, and in no way limiting or expanding the releases in the Plan, each Consenting Lender hereby releases and covenants not to:  (i) sue or otherwise seek recovery from GVR, any Consenting Lender, any reorganized successor of GVR, SCI, Station Casinos, Station Holdco, LLC, Fertitta Entertainment LLC (formerly Fertitta Gaming LLC), the Purchaser, any member of the Executive Committee of GVR, any current or former officer, director, equity holder, employee, agent, representative or professional of GVR, or any officer, affiliate, director, employee, agent, representative, partner, limited partner, member, trustee, manager or professional of any of the foregoing or any person controlling or controlled by any of the foregoing (collectively, the "Released Parties"), on

-6-

account of any claim (as defined in 11 U.S.C. § 101), including but not limited to any claim sounding in law or equity or asserting a tort, breach of duty or contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence or failure to act from the beginning of time through the consummation of the Plan, in any way related to GVR (or any claim against it) or its business or affairs; or (ii) assert against any of the Released Parties any claim, obligation, right, cause of action or liability which such Released Party may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act, omission, transaction or occurrence from the beginning of time through the consummation of the Plan and in any way relating to GVR (or any claim against it), the Chapter 11 Case or the Plan, including, without limitation, any pleading filed with respect thereto (the "Release"); provided, however, that the Release will not affect or release any parties' rights or obligations related to or arising under this Agreement; provided, further, however, that if the Asset Purchase Agreement between GVR and the Purchaser is terminated for any reason or if consummation of the Plan does not occur for any reason by June 30, 2011 or such later date as may be agreed to by the Majority Consenting Lenders the Release will be of no further force or effect.

Reservation of Rights

This Agreement and the Term Sheet are part of a proposed settlement of a dispute among the parties hereto.  Except as expressly provided in this Agreement and the Term Sheet: (i) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of the parties to protect and preserve their rights, remedies and interests; and (ii) nothing contained herein effects a modification of the rights of the parties, unless and until the Plan is confirmed and becomes effective.  If the transactions contemplated herein are not consummated, or if this Agreement is terminated for any reason pursuant to its terms, the parties hereto fully reserve any and all of their rights, including, without limitation, the right of the First Lien Lenders to credit bid the First Lien Claims under applicable law, including pursuant to section 363(k) of the Bankruptcy Code, in connection with any proposed sale of GVR's assets or under a plan of reorganization.  The parties agree that this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding involving the parties other than (i) in connection with the confirmation of the Plan, including the solicitation of acceptances thereof; and (ii) in a proceeding to enforce the terms of this Agreement.

Representations and Warranties

Each of GVR and the Consenting Lenders severally (but not jointly) represent and warrant to each other that the following statements are true, correct and complete as of the date hereof:  (i) it has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and to perform its obligations hereunder; (ii) it is duly organized, validly existing and in good standing under the laws of its state of organization and it has the requisite power and authority to execute and deliver this

-7-

Agreement and to perform its obligations hereunder; (iii) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part; (iv) the execution, delivery and performance of this Agreement does not and shall not: (A) to the best of its knowledge, violate any provision of law, rule or regulation applicable to it or any of its subsidiaries, (B) violate its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (C) to the best of its knowledge, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party; (v) delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body (other than the approval of the Bankruptcy Court in the case of GVR and any applicable approvals which may be required by gaming regulatory authorities); (vi) subject to the provision of Sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legally valid and binding obligation of such party, enforceable against such party in accordance with its terms.

Each of the Consenting Lenders confirms that it has reviewed, or has had the opportunity to review, with the assistance of professional financial and legal advisors of its choosing, the Term Sheet, and that its decision to execute this Agreement is based on its independent investigation, or opportunity to conduct an independent review of the information provided to them by GVR respecting the operations, business, financial, and other conditions and prospects of GVR.

Prior Negotiations

This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof.  No representations, oral or written, other than those set forth herein may be relied on by any party in connection with the subject matter hereof.

No Oral Amendments

No modification or amendment of the terms of this Agreement shall be valid unless such modification or amendment is in writing and has been signed by GVR and the Consenting Lenders.

Assignment

Notwithstanding anything to the contrary in the First Lien Credit Agreement, except as set forth in the Section of this Agreement entitled "Transfer of Consenting Lender Claims" above or in Section 10.9 of the First Lien Credit Agreement, no rights or obligations of any party under this Agreement may be assigned or transferred to any other person or entity.

-8-

LA222570.7

Governing Law

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEVADA, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL COURT IN THE STATE OF NEVADA AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT, OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASE, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT PRESIDING OVER THE CHAPTER 11 CASE SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREIN.

Specific Performance

It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court requiring any party to comply promptly with any of its obligations hereunder.

Effective Date

This Agreement shall become effective and binding on the parties (the "Effective Date") when counterpart signature pages shall have been executed and delivered to GVR or its counsel (with copies to the Administrative Agent) by holders of at least $380,583,333.33 in principal amount of First Lien Claims that also constitute more than one-half in number of Lenders under the First Lien Credit Agreement.  Any counterpart signature page received by GVR prior to the Purchaser delivering to GVR and the Administrative Agent copies of executed commitment letters in the form attached hereto evidencing the full amount of the purchase price to be financed (including debt

-9-

and equity financing) shall be deemed held in escrow and not released until the delivery of such executed documents.

### Headings

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

### Successors and Assigns, Several Obligations

This Agreement is intended to bind and inure to the benefit of the parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.  The agreements, representations and obligations of the Consenting Lenders under this Agreement are several and not joint in all respects.

### Third-Party Beneficiaries

Unless expressly stated herein and except as provided in the next succeeding sentence, this Agreement shall be solely for the benefit of the parties hereto and no other person or entity, other than the parties, shall be a third party beneficiary hereof.  The parties hereto agree that the Purchaser is an express third party beneficiary of the agreements and obligations of the Consenting Lenders under this Agreement.

### Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile which shall be deemed to be an original for the purposes of this paragraph.

### Consideration

It is hereby acknowledged by the parties that no consideration shall be due or paid to the Consenting Lenders in exchange for their support of the Plan, in accordance with the terms and conditions of this Agreement, other than the obligations imposed upon GVR pursuant to the terms of this Agreement, including, without limitation, GVR's obligations to pay the Restructuring Fee and to use reasonable best efforts to confirm the Plan in accordance with the terms and conditions of this Agreement.

### Acknowledgement

This Agreement is not, and shall not be deemed to be, a solicitation for votes in favor of the Plan, which shall be in compliance with applicable law including

-10-

LA222570.7

sections 1125 and 1126 of the Bankruptcy Code.  Each Consenting Lender's acceptance of the Plan shall not be solicited until it has received the disclosure statement for the Plan.

-11-

       IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

Green Valley Ranch Gaming, LLC

By: _____

Name:

Title:

Wilmington Trust FSB,
as Administrative Agent

By: _____

Name:

Title:

-12-

<u>CONSENTING LENDER</u>          <u>PRINCIPAL AMOUNT OF FIRST LIEN CLAIMS</u>

$

By: _____
Name:
Title:

-13-

## **Schedule 1**

Notice of Amount Due Following Early Termination from Wachovia Bank, National Association to Green Valley Ranch Gaming, LLC, dated March 17, 2010.

-14-

**<u>Exhibit A</u>**

**Green Valley Ranch Gaming, LLC**
**Plan Term Sheet**

| | |
|---|---|
| **Overview** | This term sheet outlines the key terms of a chapter 11 plan (the "Plan") for Green Valley Ranch Gaming, LLC (the "Company") pursuant to chapter 11 of the Bankruptcy Code through a consensual plan proposed by the Company. The Plan may be included as part of a joint plan with certain other SCI affiliates. |
| | This term sheet is confidential and is for discussion purposes only. It may not be used in litigation or disclosed to any party. All capitalized terms not defined herein shall have the meaning ascribed to them in the APA (as defined herein). |

**Treatment of Claims**

| | |
|---|---|
| *Administrative/Priority Tax/Other Priority Claims* | Administrative claims, priority tax claims and other priority claims, if any, shall be paid in full in cash on the effective date of the Plan (the "Effective Date"). |
| *First Lien Claims* | Claims arising from term loans (the "First Lien Claims") made under the First Lien Credit Agreement, dated as of February 16, 2007 (the "First Lien Credit Agreement"), together with any claims arising from any Secured Hedging Obligations (as defined therein the First Lien Credit Agreement and as determined by the Bankruptcy Court), shall be allowed in full in the aggregate outstanding principal amount thereof, plus all accrued and unpaid interest at the applicable rate as of the petition date. Holders of First Lien Claims shall receive their *pro rata* shares of the proceeds of the sale of substantially all of the Company's assets to Station GVR Acquisition, LLC (the "Purchaser") on the terms and conditions set forth in the APA. Pursuant to the Plan, the Company shall designate an account of the Agent to receive the wire transfer of such proceeds by the Purchaser pursuant to Section 3.3 of the APA, and the Agent shall promptly distribute to each such Holder its *pro rata* share thereof. |
| *Second Lien Claims* | Holders of claims arising from the Second Lien Credit Agreement shall receive no distributions on account of such claims. |

-16-

| | |
|---|---|
| *Other Secured Claims* | Other secured claims, if any, shall be reinstated, paid in full in cash on the Effective Date, satisfied by a return of the collateral or otherwise treated as unimpaired. |
| *General Unsecured Claims* | Holders of general unsecured claims shall receive no distributions on account of such claims under the Plan. |
| *Equity Interests* | All equity interests in the Company shall be extinguished. Holders of equity interests shall receive no distributions on account of such interests. |

**Sale of Company Assets**

| | |
|---|---|
| *Asset Purchase Agreement* | Upon consummation of the Plan, the Purchaser shall purchase the Purchased Assets from the Company and assume the Assumed Liabilities pursuant to that certain Asset Purchase Agreement (the "APA"), dated as of March 3, 2011 and the Company and the Purchaser shall promptly seek the entry of the Sale Order in accordance with each parties respective obligations under the APA. |
| *Consideration* | (a) $500,000,000 in cash plus, if applicable, (i) an amount in cash equal to the May Ticking Fee, (ii) an amount in cash equal to the June Ticking Fee and (iii) an amount in cash equal to the Gaming Delay Extension Fee and (b) the assumption of the Assumed Liabilities. |

**Gaming Approvals**

| | |
|---|---|
| *Regulatory Approvals* | The Purchaser and the Company shall use commercially reasonable efforts to obtain as promptly as practicable all Gaming Approvals. |

**Other Plan Terms**

| | |
|---|---|
| *Effective Date* | The Plan shall become effective on the Closing Date, provided that the First Lien Lender Plan Support Agreement and the APA remain in full force and effect, all material governmental and regulatory approvals have been obtained, and other standard prerequisites are met. |

-17-

| | |
|---|---|
| *Plan Administrator* | The Plan will provide that, on the Effective Date, a plan administrator, an individual designated by the debtor (the "<u>Plan Administrator</u>"), will be appointed.  The Plan Administrator's duties will include liquidating any Excluded Assets, making distributions to holders of administrative claims, priority tax claims, other priority claims, and First Lien Claims, and otherwise winding down the Company and closing the chapter 11 cases. |
| *Debtor Release* | The Plan will provide that, on the Effective Date, the Company and the estate will release the Company, the Company's current and former affiliates, managers, members, principals, employees, agents, advisors, attorneys, consultants, and other professionals, the holders of First Lien Claims, such holders' affiliates, directors, officers, members, agents, attorneys, consultants, and financial advisors, and the Purchaser (the "<u>Debtor Releasees</u>"), from all claims (defined broadly) arising from or in any way related to the Company, the APA, the restructuring transactions, the chapter 11 case, the purchase or sale of any security of the Company, the transactions giving rise to any claim that is treated in the Plan, business or contractual arrangements, the restructuring of claims and interests before or in the chapter 11 case, or the negotiation or formulation of the Plan or related documents (collectively, the "<u>Released Claims</u>") (with exceptions for contractual obligations owed to the debtor, claims that are preserved by the Plan and claims arising from gross negligence or willful misconduct). |
| *Third Party Release* | The Plan will provide that Wilmington Trust FSB in its capacity as administrative agent under the First Lien Credit Agreement, the lenders party from time to time to the First Lien Credit Agreement, Wachovia Bank, N.A. solely in its capacity as counterparty to the Company to certain first lien swap agreements, Fertitta Gaming LLC, SCI, GCR Gaming, LLC, GV Ranch Station, Inc., the Purchaser, the plan administrator appointed pursuant to the Plan, and each holder of a First Lien Claim that has voted to accept the Plan (the "<u>Releasing Parties</u>") will release the Debtor Releasees from the Released Claims (with exceptions for obligations arising under the APA or any under agreement pursuant to the Plan, claims that are preserved by the Plan and claims arising from gross negligence or willful misconduct). |

-18-

LA222570.7

| | |
|---|---|
| *Exculpation* | The Plan will provide that the Debtor Releasees will neither have nor incur any liability to any person (broadly defined) for any claims (broadly defined) arising after the filing of the chapter 11 case and prior to the Effective Date for any act or omission relating to formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effectuating the Plan, the APA or the Transition Services Agreement, or any document in connection with the Company's restructuring (with exceptions for claims that are preserved by the Plan and for any act or omission that is constitutes gross negligence or willful misconduct, subject to a right to rely on the advice of counsel). |

-19-

**Exhibit B**

**Form of Joinder**

-20-

# JOINDER

This Joinder to the Agreement, dated as of February __, 2011, by GVR, the Administrative Agent, and the Consenting Lenders (the "**Agreement**"), is executed and delivered by **[_____]** (the "**Joining Party**") as of [_____], 201_ in connection with the Transfer from a Consenting Lender to the Joining Party. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

1.    <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, which is attached to this Joinder as <u>Annex I</u> (as the same may be hereafter amended, restated or otherwise modified from time to time) as if the Joining Party were an original signatory to the Agreement.  From and after the date hereof, the Joining Party shall hereafter be deemed to be a "**Consenting Lender**" for all purposes under the Agreement.

2.    <u>Representations and Warranties</u>.  With respect to the amount of Consenting Lender Claims set forth below its name on the signature page hereof and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Consenting Lender Claim, the Joining Party hereby makes the representations and warranties of such Consenting Lender set forth in the "Representations and Warranties" section of the Agreement to each other party to the Agreement.

3.    <u>GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEVADA, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL COURT IN THE STATE OF NEVADA AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASE, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT PRESIDING OVER THE CHAPTER 11 CASE SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF

-21-

OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREIN.  THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

LA222570.7

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

[**JOINING PARTY**]

By: _____

Name:

Title:

Aggregate Principal Amount of Consenting Lender Claims:

$ _____

-23-

**[SIGNATURE PAGES OMITTED]**

**EXHIBIT "B"**

**EXHIBIT "B"**

INTERCREDITOR AGREEMENT

among

GREEN VALLEY RANCH GAMING, LLC,
as Borrower,

and

BANK OF AMERICA, N.A.,
as First Lien Collateral Agent

and

BANK OF AMERICA, N.A.,
as Second Lien Collateral Agent

and

BANK OF AMERICA, N.A.,
as Control Agent

Dated as of February 16, 2007

TABLE OF CONTENTS

Page

SECTION 1    Definitions.................................................................................................2
    1.1    Defined Terms ................................................................................2

    1.2    Terms Generally...........................................................................10

SECTION 2    Lien Priorities.............................................................................10
    2.1    Relative Priorities........................................................................10

    2.2    Failure to Perfect.........................................................................10

    2.3    Nature of First Lien Obligations ...............................................10

    2.4    Prohibition on Contesting Liens ................................................11

    2.5    No New Liens. ..............................................................................11

    2.6    Similar Liens and Agreements....................................................12

SECTION 3    Enforcement................................................................................13
    3.1    Exercise of Remedies..................................................................13

    3.2    Actions Upon Breach. .................................................................15

SECTION 4    Payments. ....................................................................................16
    4.1    Application of Proceeds...............................................................16

    4.2    Payment Turnover........................................................................16

SECTION 5    Other Agreements. ......................................................................16
    5.1    Releases........................................................................................16

    5.2    Insurance .....................................................................................17

    5.3    Amendments to First Lien Credit Documents and Second Lien Credit
           Documents. ..................................................................................18

    5.4    Rights As Unsecured Creditors...................................................21

    5.5    Control Agent for Perfection. .....................................................21

    5.6    When Discharge of First Lien Obligations Deemed to Not Have Occurred .........23

    5.7    Purchase Right .............................................................................23

SECTION 6    Insolvency or Liquidation Proceedings. .....................................24

| | | |
|---|---|---|
| **6.1** | Use of Cash Collateral and Financing Issues | 24 |
| **6.2** | Sale Issues | 24 |
| **6.3** | Relief from the Automatic Stay | 25 |
| **6.4** | Adequate Protection. | 25 |
| **6.5** | No Waiver | 26 |
| **6.6** | Avoidance Issues | 26 |
| **6.7** | Separate Grants of Security and Separate Classification | 27 |
| **6.8** | Reorganization Securities | 27 |
| **6.9** | Post-Petition Claims | 27 |
| **6.10** | Waiver | 28 |
| **6.11** | Expense Claims | 28 |
| **6.12** | Other Matters | 28 |
| **6.13** | Effectiveness in Insolvency or Liquidation Proceedings | 28 |
| SECTION 7 | Reliance; Waivers; Etc. | 28 |
| **7.1** | Non-Reliance. | 28 |
| **7.2** | No Warranties or Liability | 29 |
| **7.3** | No Waiver of Lien Priorities. | 30 |
| **7.4** | Obligations Unconditional | 32 |
| **7.5** | Certain Notices. | 32 |
| SECTION 8 | Miscellaneous. | 33 |
| **8.1** | Conflicts | 33 |
| **8.2** | Effectiveness; Continuing Nature of this Agreement; Severability | 33 |
| **8.3** | Amendments; Waivers | 33 |
| **8.4** | Information Concerning Financial Condition of Borrower and its Subsidiaries. | 34 |
| **8.5** | Subrogation | 35 |

**8.6**    Application of Payments ..........................................................................35

**8.7**    **SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.** ............35

**8.8**    Notices .....................................................................................................36

**8.9**    Further Assurances...................................................................................37

**8.10**   **APPLICABLE LAW** ..............................................................................37

**8.11**   Binding on Successors and Assigns.........................................................37

**8.12**   Specific Performance ...............................................................................37

**8.13**   Headings ..................................................................................................37

**8.14**   Counterparts.............................................................................................37

**8.15**   Authorization ...........................................................................................37

**8.16**   No Third Party Beneficiaries ..................................................................37

**8.17**   Provisions Solely to Define Relative Rights............................................38

## INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT**, is dated as of February 16, 2007, and entered into by and among Green Valley Ranch Gaming, LLC, a Nevada limited liability company ("**Borrower**"), and Bank of America, N.A., in its capacity as collateral agent for the First Lien Obligations (as defined below), including its successors and assigns from time to time (the "**First Lien Collateral Agent**"), and Bank of America, N.A., in its capacity as collateral agent for the Second Lien Obligations under the Second Lien Credit Agreement (as defined below), including its successors and assigns from time to time (the "**Second Lien Collateral Agent**") and Bank of America, N.A., in its capacity as control agent for the First Lien Collateral Agent and the Second Lien Collateral Agent, including its successors and assigns from time to time (the "**Control Agent**"). Capitalized terms used herein but not otherwise defined herein have the meanings set forth in Section 1 below.

## RECITALS

**WHEREAS**, Borrower, the lenders party thereto and Bank of America, N.A., as Administrative Agent, have entered into that certain First Lien Credit Agreement dated as of the date hereof providing for a revolving credit and term loan facility to the Borrower (as amended, restated, supplemented, modified or Refinanced from time to time, the "**Initial First Lien Credit Agreement**");

**WHEREAS**, Borrower, the lenders party thereto and Bank of America, N.A., as Administrative Agent, have entered into that certain Second Lien Credit Agreement dated as of the date hereof providing for a term loan to the Borrower (as amended, restated, supplemented, modified or Refinanced from time to time, the "**Initial Second Lien Credit Agreement**");

**WHEREAS**, the obligations of Borrower under the Initial First Lien Credit Agreement, any Bank Products Agreements with any First Lien Claimholders (or their affiliates) and any Hedge Agreements provided by any of the First Lien Claimholders (or their affiliates) will be secured by substantially all of the assets of Borrower and any Grantors pursuant to the terms of the First Lien Collateral Documents;

**WHEREAS**, the obligations of Borrower under the Initial Second Lien Credit Agreement will be secured by substantially all of the assets of Borrower and any Grantors pursuant to the terms of the Second Lien Collateral Documents;

**WHEREAS**, the obligations of Borrower under the Initial First Lien Credit Agreement will be secured by a pledge of 100% of the Equity Interests in Borrower and the obligations of Borrower under the Initial Second Lien Credit Agreement will also be secured by such a pledge;

**WHEREAS**, the First Lien Credit Documents and the Second Lien Credit Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

**WHEREAS**, in order to induce the First Lien Collateral Agent and the First Lien Claimholders to consent to the Grantors' incurring the Second Lien Obligations and to induce the

First Lien Claimholders to extend credit and other financial accommodations to or for the benefit of Borrower, or any other Grantor, the Second Lien Collateral Agent on behalf of the Second Lien Claimholders has agreed to the lien subordination, intercreditor and other provisions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### SECTION 1 Definitions.

      **1.1**    Defined Terms. As used in the Agreement, the following terms shall have the following meanings:

"**Affiliate**" of any specified Person means (1) any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person or (2) any executive officer or director of such specified Person. For purposes of this definition, "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that Beneficial Ownership of 10% or more of the Voting Stock of a Person shall be deemed to be control. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" shall have correlative meanings.

"**Agreement**" means this Intercreditor Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Bank Products Agreement**" means any agreement pursuant to which a bank or other financial institution agrees to provide credit cards, stored value cards or treasury and cash management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"**Bank Products Obligations**" means Obligations of any Grantor under any Bank Products Agreement entered into between such Grantor and any First Lien Claimholder or an Affiliate of any First Lien Claimholder at the time such Bank Products Agreement was entered into.

"**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Law**" means the Bankruptcy Code and all other liquidation, receivership, moratorium, conservatorship, assignment for the benefit of creditors, insolvency or similar federal, state or foreign law for the relief of debtors.

"**Beneficial Owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the Beneficial Ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" shall be

deemed to have Beneficial Ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficially Owns" and "Beneficially Owned" shall have a corresponding meaning.

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in the State of New York.

"**Capital Lease**" means any lease of property, real or personal, the obligations with respect to which are required to be capitalized on a balance sheet of the lessee in accordance with generally accepted accounting principles in effect in the United States of America applied on a consistent basis.

"**Capital Lease Obligations**" of a Person means any Obligation that is required to be classified and accounted for as a capital lease on the face of a balance sheet of such Person prepared in accordance with GAAP; the amount of such Obligation shall be the capitalized amount thereof, determined in accordance with GAAP; the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty; and such Obligation shall be deemed secured by a Lien on any property or assets to which such lease relates.

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents (including membership interests, partnerships or partnership interests) or ownership interests (however designated) of such Person, including each class of Common Stock and Preferred Stock of such Person, but excluding convertible Indebtedness.

"**Collateral**" means all of the assets and property of any Grantor, whether tangible or intangible, constituting both First Lien Collateral and Second Lien Collateral.

"**Common Stock**" means, with respect to any Person, any Capital Stock (other than Preferred Stock) of such Person, whether outstanding on the Closing Date or issued thereafter.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Collateral**" means any Collateral consisting of any Certificated Security, Instrument, Investment Property, Deposit Accounts (each as defined in the Uniform Commercial Code), cash and any other Collateral as to which a first priority Lien shall or may be perfected through possession or control by the secured party or any agent therefor.

**"Controlled Account"** means those certain Deposit Accounts (as defined in the Uniform Commercial Code) of any Grantor subject to Liens under the terms of the First Lien Collateral Documents and the Second Lien Collateral Documents.

**"DIP Financing"** has the meaning set forth in Section 6.1.

**"Discharge of First Lien Obligations"** means, except to the extent otherwise provided in Section 5.6, (i) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for such interest is, or would be, allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the First Lien Credit Documents and termination of all commitments to lend or otherwise extend credit under the First Lien Credit Documents, in each case, in accordance with the terms of such First Lien Credit Documents, (ii) payment in full in cash of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including legal fees and other expenses, costs or charges accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for such fees, expenses, costs or charges is, or would be, allowed in such Insolvency or Liquidation Proceeding, in each case, in accordance with the terms of such First Lien Credit Documents), (iii) termination, cancellation or cash collateralization (in an amount reasonably satisfactory to the First Lien Collateral Agent) of, all letters of credit issued under the First Lien Credit Documents and (iv) termination or cash collateralization (in an amount reasonably satisfactory to the First Lien Collateral Agent) of any Hedge Agreement and the payment in full in cash of all Hedging Obligations.

**"Disposition"** has the meaning set forth in Section 5.1(a)(ii).

**"Exercise of Remedies"** has the meaning set forth in Section 5.1(a)(i).

**"First Lien Claimholders"** means, at any relevant time, the holders of First Lien Obligations at such time, including without limitation the First Lien Lenders and any agent under the First Lien Credit Agreement.

**"First Lien Collateral Agent"** has the meaning set forth in the Recitals hereto.

**"First Lien Collateral"** means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

**"First Lien Collateral Documents"** means the Collateral Documents (as defined in the First Lien Credit Agreement as amended from time to time in accordance herewith) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

**"First Lien Credit Agreement"** means (i) the Initial First Lien Credit Agreement and (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase (subject to the limitations set

forth herein), Refinance in whole or in part the indebtedness and other obligations outstanding under the (x) Initial First Lien Credit Agreement or (y) any subsequent First Lien Credit Agreement, unless such agreement or instrument expressly provides that it is not intended to be and is not a First Lien Credit Agreement hereunder. Any reference to the First Lien Credit Agreement hereunder shall be deemed a reference to any First Lien Credit Agreement then in existence.

**"First Lien Credit Documents"** means the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement as amended from time to time in accordance herewith) and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations, including any intercreditor or joinder agreement among holders of First Lien Obligations, to the extent such are effective at the relevant time, as each may be modified from time to time in accordance with this Agreement.

**"First Lien Lenders"** means the "Lenders" under and as defined in the First Lien Credit Agreement.

**"First Lien Obligations"** means all Obligations outstanding under (i) the First Lien Credit Agreement, (ii) the other First Lien Credit Documents, (iii) any Bank Products Agreements and any Hedge Agreements entered into by Borrower (A) on or prior to the Closing Date with a counterparty which is a First Lien Claimholder on the Closing Date, or (B) thereafter, with any counterparty that is or was a First Lien Claimholder (or any of their affiliates) at the time such Hedge Agreement is entered into (it being understood, for the avoidance of doubt, that Bank Products Agreements and Hedging Obligations of a Person that is both a First Lien Claimholder and a Second Lien Claimholder at the time such Hedge Agreement was entered into by Borrower shall be considered First Lien Obligations); provided that the aggregate principal amount of, without duplication, any revolving credit commitments, revolving credit loans, letters of credit, term loans, bonds, debentures, notes or similar instruments (excluding, in any event, Bank Products Obligations and Hedging Obligations) provided for under the First Lien Credit Agreement or any other First Lien Credit Document (or any Refinancing thereof) in excess of $580,000,000 minus the amount of any mandatory prepayments of the Loans under the First Lien Credit Agreement required by Sections 3.1(f)(i) and 3.1(f)(iii) (other than to the extent that such prepayments result in a temporary reduction to the Revolving Loans thereunder) thereof (the **"Maximum First Lien Indebtedness"**), shall not constitute First Lien Obligations for purposes of this Agreement. "First Lien Obligations" shall include (x) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) in accordance with the rate specified in the relevant First Lien Credit Document and (y) all fees, costs and charges incurred in connection with the First Lien Credit Documents and provided for thereunder, in each case whether before or after commencement of an Insolvency or Liquidation Proceeding, irrespective of whether any claim for such interest, fees, costs or charges is allowed as a claim in such Insolvency or Liquidation Proceeding.

**"Grantors"** means Borrower, each of the Subsidiary Guarantors referred to in the Credit Agreement, the members in Borrower, and any other Person that that has executed and delivered,

or may from time to time hereafter execute and deliver, a First Lien Collateral Document or a Second Lien Collateral Document.

"**Guaranty Obligations**" means, with respect to any Person, without duplication, any obligations of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guaranteeing or intended to guarantee any Indebtedness of any other Person in any manner, whether direct or indirect, and including without limitation any obligation, whether or not contingent, (i) to purchase any such Indebtedness or any property constituting security therefor, (ii) to advance or provide funds or other support for the payment or purchase of any such Indebtedness or to maintain working capital, solvency or other balance sheet condition of such other Person (including without limitation keep well agreements, maintenance agreements, comfort letters or similar agreements or arrangements) for the benefit of any holder of Indebtedness of such other Person, (iii) to lease or purchase property, securities or services primarily for the purpose of assuring the holder of such Indebtedness, or (iv) to otherwise assure or hold harmless the holder of such Indebtedness against loss in respect thereof.

"**Hedge Agreements**" means with respect to any Person, any agreement entered into to protect such Person against fluctuations in interest rates, or currency or raw materials values, including, without limitation, any interest rate swap, cap or collar agreement or similar arrangement between such Person and one or more counterparties, any foreign currency exchange agreement, currency protection agreements, commodity purchase or option agreements or other interest or exchange rate hedging agreements.

"**Hedging Obligation**" of any Person means any obligation of such Person pursuant to any Hedge Agreements.

"**Indebtedness**" means and includes, with respect to any Person, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily made, (iii) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business), (iv) all obligations (including, without limitation, the reasonably anticipated amount of any earnout obligations) of such Person incurred, issued or assumed as the deferred purchase price of property or services purchased by such Person (other than trade debt incurred in the ordinary course of business and due within six months of the incurrence thereof) which would appear as liabilities on a balance sheet of such Person, (v) all obligations of such Person under take-or-pay or similar arrangements or under commodities agreements, (vi) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (vii) all Guaranty Obligations of such Person with respect to Indebtedness of another Person, (viii) the principal portion of all Capital Lease Obligations of such Person, (ix) all obligations of such Person under Hedge Agreements, excluding any portion thereof which would be accounted for as interest expense under generally accepted accounting principles in effect in the United States of America applied on a consistent basis, (x) the

maximum amount of all letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (xi) all preferred Capital Stock issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, mandatory redemption or other acceleration, (xii) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product, (xiii) the Indebtedness of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer and as such is generally liable for the debts of such partnership or unincorporated joint venture.

  **"Initial First Lien Credit Agreement"** has the meaning set forth in the recitals hereto.

  **"Initial Second Lien Credit Agreement"** has the meaning set forth in the recitals hereto.

  **"Insolvency or Liquidation Proceeding"** means (i) any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Bankruptcy Law with respect to any Grantor, (ii) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets, (iii) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (iv) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

  **"Lien"** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction..

  **"Maximum First Lien Indebtedness"** is defined within the definition of "First Lien Obligations.

  **"Obligations"** means any and all obligations, liquidated or contingent, with respect to the payment of (i) any principal of or interest or premium on any Indebtedness, including any reimbursement obligation in respect of any letter of credit, or any other liability, including, without limitation, interest and premiums accruing after the filing of a petition initiating any proceeding under the Bankruptcy Laws irrespective of whether a claim for such interest or premium is allowed or allowable in such proceeding, (ii) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing any Indebtedness, including, without limitation, fees, costs and other charges accruing or incurred after the filing of a petition initiating any proceeding under the Bankruptcy Laws irrespective of whether a claim for such fees, costs and other charges is allowed or allowable in such proceeding, (iii) any obligation to provide cash collateral in respect of letters of credit or any other Indebtedness, (iv) any Hedging Obligations or (v) any Bank Products Obligations.

**"Person"** means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

**"Preferred Stock"** means, with respect to any Person, any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions upon liquidation.

**"Recovery"** has the meaning set forth in Section 6.5.

**"Refinance"** means, in respect of any Indebtedness, to refinance, replace or repay, or to issue other Indebtedness, in exchange or replacement for, such indebtedness. **"Refinanced"** and **"Refinancing"** shall have correlative meanings.

**"Requisite Lenders"** has the meaning set forth in the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

**"Second Lien Claimholders"** means, at any relevant time, the holders of Second Lien Obligations at such time, including without limitation the Second Lien Lenders and any agent under the Second Lien Credit Agreement.

**"Second Lien Collateral"** means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

**"Second Lien Collateral Agent"** has the meaning set forth in the preamble hereof.

**"Second Lien Collateral Documents"** means the Collateral Documents (as defined in the Second Lien Credit Agreement as amended from time to time in accordance herewith) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

**"Second Lien Credit Agreement"** means (i) the Initial Second Lien Credit Agreement, (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase, Refinance in whole or in part the indebtedness and other obligations outstanding under the Initial Second Lien Credit Agreement or other agreement or instrument referred to in this clause (ii), subject to the limitations set forth herein and only to the extent permitted hereby. Any reference to the Second Lien Credit Agreement hereunder shall be deemed a reference to any Second Lien Credit Agreement then in existence.

**"Second Lien Credit Documents"** means the Second Lien Credit Agreement and the Loan Documents (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations, as the same may be modified from time to time,

including any intercreditor or joinder agreement among holders of Second Lien Obligations, to the extent such are effective at the relevant time, as each may be modified from time to time in accordance with this Agreement.

"**Second Lien Enforcement Date**" means the date which is 120 days after the occurrence of both (i) an Event of Default (under and as defined in the Second Lien Credit Agreement) and (ii) the First Lien Collateral Agent's receipt of written notice from the Second Lien Collateral Agent certifying that (x) an Event of Default (under and as defined in the Second Lien Credit Agreement) has occurred and is continuing and (y) the Second Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the Second Lien Credit Agreement; provided that the Second Lien Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the First Lien Collateral Agent or the First Lien Claimholders have commenced and be diligently pursuing any enforcement action with respect to the Collateral, (2) the First Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the First Lien Credit Agreement, (3) at any time any Grantor is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (4) if the acceleration of the Second Lien Obligations (if any) is rescinded in accordance with the terms of the Second Lien Credit Agreement.

"**Second Lien Lenders**" means the "Lenders" under and as defined in the Second Lien Credit Agreement.

"**Second Lien Obligations**" means all Obligations outstanding under the Second Lien Credit Agreement and the other Second Lien Credit Documents. "Second Lien Obligations" shall include (i) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) in accordance with the rate specified in the relevant Second Lien Credit Document and (ii) all fees, costs and charges incurred in connection with the Second Lien Credit Documents and provided for thereunder, in each case whether before or after commencement of an Insolvency or Liquidation Proceeding irrespective of whether any claim for such interest, fees, costs or charges is allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Subsidiary**" means, as of any date of determination and with respect to any Person, any corporation, limited liability company or partnership (whether or not, in either case, characterized as such or as a "joint venture"), whether now existing or hereafter organized or acquired: (a) in the case of a corporation or limited liability company, of which a majority of the securities having ordinary voting power for the election of directors or other governing body (other than securities having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person and/or one or more Subsidiaries of such Person, or (b) in the case of a partnership, of which a majority of the partnership or other ownership interests are at the time beneficially owned by such Person and/or one or more of its Subsidiaries.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of Nevada.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is ordinarily entitled to vote in the election of the board of directors or other similar management body of such Person.

**1.2**    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## SECTION 2  Lien Priorities.

**2.1**    Relative Priorities. Notwithstanding the date, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any applicable law or the Second Lien Credit Documents, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees that:  (a) any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the First Lien Collateral Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any of the Second Lien Obligations; and (b) any Lien on the Collateral now or hereafter held by or on behalf of the Second Lien Collateral Agent, any Second Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations.

**2.2**    Failure to Perfect. All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Lien Obligations for all purposes, notwithstanding any failure of the First Lien Collateral Agent or the First Lien Claimholders to adequately perfect its security interests in the Collateral, the subordination of any Lien on the Collateral securing any First Lien Obligations to any Lien securing any other obligation of any Grantor, or the avoidance, invalidation or lapse of any Lien on the Collateral securing any First Lien Obligations.

**2.3**    Nature of First Lien Obligations. The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Claimholders, acknowledges that (a) a portion of

the First Lien Obligations are revolving in nature, (b) the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (c) the terms of the First Lien Obligations may be modified, extended or amended from time to time in accordance with the terms hereof, and (d) subject to the limitations on the aggregate principal amount of First Lien Obligations set forth in the definition of "First Lien Obligations" or in Section 5.3, the aggregate amount of the First Lien Obligations may be increased or Refinanced, in either event, without notice to or consent by the Second Lien Claimholders and without affecting the provisions hereof. The lien priorities provided in Sections 2.1 and 2.2 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or Refinancing of either the First Lien Obligations or the Second Lien Obligations, or any portion thereof.

        **2.4**    <u>Prohibition on Contesting Liens</u>. Each of the Second Lien Collateral Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Collateral Agent, for itself and on behalf of each First Lien Claimholder, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, as the case may be; <u>provided</u> that nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Collateral Agent or any First Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the First Lien Obligations as provided in Sections 2.1 and 3.1.

        **2.5**    <u>No New Liens</u>.

        (a)    <u>Limitation on other Collateral for First Lien Claimholders</u>. So long as any Second Lien Obligations remain outstanding, and subject to Section 6, (i) the First Lien Collateral Agent agrees that, after the date hereof, neither the First Lien Collateral Agent nor any First Lien Claimholder shall acquire or hold any Lien on any assets of any Grantor securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Collateral Documents (unless a Lien is offered to the Second Lien Collateral Agent and rejected by the Second Lien Lenders), and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the First Lien Collateral Agent or the First Lien Claimholders unless it, or such Subsidiary, has offered to concurrently grant a similar Lien on such assets in favor of the Second Lien Collateral Agent or the Second Lien Claimholders. If the First Lien Collateral Agent or any First Lien Claimholder acquires any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Collateral Documents in violation of this clause (a), then the First Lien Collateral Agent (or the relevant First Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other First Lien Document (x) hold and be deemed to have held such Lien and security interest for the benefit of the Second Lien Collateral Agent as security for the Second Lien Obligations

subject to the priorities set forth herein, with any amounts received in respect thereof subject to distribution and turnover under Section 4 or (y) release such Lien.

(b)    Limitation on other Collateral for Second Lien Claimholders. Until the date upon which the Discharge of First Lien Obligations shall have occurred, (i) the Second Lien Collateral Agent agrees that, after the date hereof, neither the Second Lien Collateral Agent nor any Second Lien Claimholder shall acquire or hold any Lien on any assets of any Borrower, any Grantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Collateral Documents (unless a Lien is offered to the First Lien Collateral Agent and rejected by the First Lien Lenders), and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the Second Lien Collateral Agent or the Second Lien Claimholders unless it, or such Subsidiary, has offered to concurrently grant a similar Lien on such assets in favor of the First Lien Collateral Agent or the First Lien Claimholders. If the Second Lien Collateral Agent or any Second Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Collateral Documents, then the Second Lien Collateral Agent (or the relevant Second Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other Second Lien Document (x) hold and be deemed to have held such Lien and security interest also for the benefit of the First Lien Collateral Agent as security for the First Lien Obligations subject to the priorities set forth herein, with any amounts received in respect thereof subject to distribution and turnover under Section 4 or (y) release such Lien.

**2.6**    Similar Liens and Agreements.  The parties hereto agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical.  In furtherance of the foregoing and of Section 8.9, the parties hereto agree, subject to the other provisions of this Agreement:

(a)    upon request by the First Lien Collateral Agent or the Second Lien Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Credit Documents and the Second Lien Credit Documents; and

(b)    that the documents and agreements creating or evidencing the First Lien Collateral and the Second Lien Collateral and guarantees for the First Lien Obligations and the Second Lien Obligations shall be in all material respects the same forms of documents other than with respect to the senior and subordinate nature of the security interests in the Collateral securing the respective Obligations thereunder.

## SECTION 3  Enforcement.

### 3.1    Exercise of Remedies.

(a)    So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against Borrower or any other Grantor:

(i)    the Second Lien Collateral Agent and the Second Lien Claimholders:

(A)    from the date hereof until the occurrence of the Second Lien Enforcement Date, will not exercise or seek to exercise any rights or remedies (including any right of set-off or recoupment) with respect to any Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or similar agreement or arrangement to which the Second Lien Collateral Agent or any Second Lien Claimholder is a party) or institute or commence (or join with any other Person in commencing) any enforcement, collection, execution, levy or foreclosure action or proceeding (including, without limitation, any Insolvency or Liquidation Proceeding) with respect to any Lien held by it under the Second Lien Collateral Documents or any other Second Lien Credit Document or otherwise; and

(B)    will not contest, protest or object to any foreclosure proceeding or action brought by the First Lien Collateral Agent or any First Lien Claimholder or any other exercise by the First Lien Collateral Agent or any First Lien Claimholder, of any rights and remedies relating to the Collateral under the First Lien Credit Documents or otherwise, provided that the respective interests of the Second Lien Claimholders attach to the proceeds thereof, subject to the relative priorities described in Section 2 and Section 4; and

(C)    will not object to the forbearance by the First Lien Collateral Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral; and

(ii)    subject to Section 5.1, the First Lien Collateral Agent and the First Lien Claimholders shall have the exclusive right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Collateral Agent or any Second Lien Claimholder; provided, that:

(A)    in any Insolvency or Liquidation Proceeding commenced by or against Borrower or any other Grantor, the Second Lien

Collateral Agent may file a claim or statement of interest with respect to the Second Lien Obligations,

(B)    the Second Lien Collateral Agent may take any action (not adverse to the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Collateral Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Collateral,

(C)    the Second Lien Claimholders shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including without limitation any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement,

(D)    in any Insolvency or Liquidation Proceeding, the Second Lien Claimholders shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either Bankruptcy Law or applicable nonbankruptcy law, in each case in accordance with the terms of Section 5.4,

(E)    in any Insolvency or Liquidation Proceeding, the Second Lien Claimholders shall be entitled to vote on any plan of reorganization, but only to the extent consistent with the provisions hereof, and

(F)    the Second Lien Collateral Agent or any Second Lien Claimholder may exercise any of its rights or remedies with respect to the Collateral upon the occurrence and during the effective continuation of the Second Lien Enforcement Date.

In exercising rights and remedies with respect to the Collateral, the First Lien Collateral Agent and the First Lien Claimholders may enforce the provisions of the First Lien Credit Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by the First Lien Collateral Agent and the First Lien Claimholders to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)    The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any

proceeds of Collateral in connection with the exercise of any right or remedy (including set-off or recoupment) with respect to any Collateral, and that any Collateral or proceeds taken or received by it will be paid over to the First Lien Collateral Agent pursuant to Section 4.2, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Section 6.7. Without limiting the generality of the foregoing, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Section 3.1(a)(ii), the sole right of the Second Lien Collateral Agent and the Second Lien Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred in accordance with the terms of the Second Lien Credit Documents and applicable law.

(c)      The Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, agrees that (i) the Second Lien Collateral Agent and the Second Lien Claimholders will not take any action that would hinder, delay or impede any exercise of remedies under the First Lien Credit Documents, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise, and (ii) the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner or order in which the First Lien Collateral Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens granted in any of the First Lien Collateral, provided that this clause (c) shall not prevent that Second Lien Collateral Agent and the Second Lien Claimholders from exercising the rights listed in the proviso in clause (ii) of Section 3.1(a).

(d)      The Second Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Collateral Documents or any other Second Lien Credit Document shall be deemed to restrict in any way the rights and remedies of the First Lien Collateral Agent or the First Lien Claimholders with respect to the Collateral as set forth in this Agreement and the First Lien Credit Documents.

   **3.2**   Actions Upon Breach.

(a)      If any Second Lien Claimholder commences or participates in any action or proceeding against Borrower, any other Grantor or the Collateral at any time or in any manner which is in breach of this Agreement, the First Lien Collateral Agent may interpose in the name of the First Lien Claimholders or in the name of Borrower or such Grantor the making of this Agreement as a defense or dilatory plea.

(b)      Should any Second Lien Claimholder at any time or in any manner take, or attempt or threaten to take, any action with respect to the Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, the First Lien Collateral Agent (in its own name or in the name of any Grantor) may obtain relief

-15-

against such Second Lien Claimholder by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Lien Collateral Agent on behalf of each Second Lien Claimholder that (i) the First Lien Claimholders' damages from such actions may be difficult to ascertain and may be irreparable, and (ii) the Second Lien Collateral Agent on behalf of each Second Lien Claimholder waives any defense that the First Lien Claimholders cannot demonstrate damage or be made whole by the awarding of damages.

### SECTION 4  Payments.

**4.1**    Application of Proceeds.  So long as the Discharge of First Lien Obligations has not occurred, any proceeds of Collateral received in connection with the sale or other disposition of such Collateral, or collection on such Collateral upon the exercise of remedies, shall be applied by the First Lien Collateral Agent to the First Lien Obligations in such order as may be required by the relevant First Lien Credit Documents.  Upon the Discharge of the First Lien Obligations, then, except as required by applicable law, the First Lien Collateral Agent shall deliver to the Second Lien Collateral Agent any proceeds of Collateral held by it in the same form as received, with any necessary endorsements or, as a court of competent jurisdiction may otherwise direct, to be applied by the Second Lien Collateral Agent to the Second Lien Obligations in such order as specified in the Second Lien Collateral Documents.

**4.2**    Payment Turnover.  So long as the Discharge of First Lien Obligations has not occurred, any Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Lien Collateral Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set-off or recoupment) in respect of the Collateral shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The First Lien Collateral Agent is hereby authorized to make any such endorsements as agent for the Second Lien Collateral Agent or any such Second Lien Claimholders.  This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

### SECTION 5  Other Agreements.

**5.1**    Releases.

(a)    If, in connection with:

(i)    the exercise of any First Lien Collateral Agent's remedies in respect of the Collateral, including any sale, lease, exchange, transfer or other disposition of any such Collateral (an **"Exercise of Remedies"**); or

(ii)    any sale, lease, exchange, transfer or other disposition of any Collateral not prohibited under the terms of the First Lien Credit Documents (whether or not an event of default thereunder, and as defined therein, has occurred and is continuing) (a **"Disposition"**), or

(iii)    any release of Liens on the assets of any Grantor, all of the Capital Stock of which is being released pursuant to any other provision of this Section 5.1(a);

the First Lien Collateral Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral, or releases any Grantor from its obligations under its guaranty of the First Lien Obligations, in each case other than in connection with the Discharge of the First Lien Obligations, then the Liens, if any, of the Second Lien Collateral Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Grantor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released (the **"Second Lien Release"**) and the Second Lien Collateral Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent or such Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or such Grantor may request to effectively confirm such release; provided, however, that the Second Lien Release shall not occur without the consent of the Second Lien Collateral Agent (x) in the case of an Exercise of Remedies, as to any Collateral the net proceeds of the disposition of which will not be applied to repay (and, to the extent applicable, to reduce permanently the lending commitments with respect to) the First Lien Obligations or (y) in the case of a Disposition, if the Disposition is prohibited by any provision of the Second Lien Credit Agreement.

(b)    Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Collateral Agent and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Collateral Agent or such holder or in the First Lien Collateral Agent's own name, from time to time in the First Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(c)    Until the Discharge of First Lien Obligations occurs, to the extent that the First Lien Collateral Agent for itself and on behalf of the First Lien Claimholders (i) has released any Lien on Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtains any new Liens or additional guaranties from Grantors, then the Second Lien Collateral Agent for itself and on behalf of the Second Lien Claimholders shall be granted a Lien on any such Collateral and an additional guaranty, as the case may be, subject to the priorities set forth in Section 2.

**5.2**    Insurance. Until the date upon which the Discharge of First Lien Obligations occurs, as between the First Lien Collateral Agent and the First Lien Claimholders,

on the one hand, and the Second Lien Collateral Agent and the Second Lien Claimholders on the other, the First Lien Collateral Agent and the First Lien Claimholders shall have the sole and exclusive right (a) to adjust or settle any insurance policy or claim covering any Collateral in the event of any loss thereunder (including without limitation any title insurance policies in respect of Liens on the Collateral) and (b) to approve any award granted in any condemnation or similar proceeding affecting any Collateral. Until the date upon which the Discharge of First Lien Obligations occurs, all proceeds of any such policy and any such award in respect of any Collateral that are payable to the First Lien Collateral Agent or the Second Lien Collateral Agent shall be paid to the First Lien Collateral Agent for the benefit of the First Lien Claimholders to the extent required under the First Lien Credit Documents and thereafter to the Second Lien Collateral Agent for the benefit of the Second Lien Claimholders to the extent required under the applicable Second Lien Credit Documents and then to the owner of the subject property or as a court of competent jurisdiction may otherwise direct. If the Second Lien Collateral Agent or any Second Lien Claimholder shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the First Lien Collateral Agent in accordance with the terms of Section 4.2.

**5.3**    Amendments to First Lien Credit Documents and Second Lien Credit Documents.

(a)    The First Lien Credit Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Lien Credit Agreement may be Refinanced in each case, without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders; provided, however, that the holders of such Refinancing debt or their representatives bind themselves in writing to the terms of this Agreement and any such amendment, supplement, modification or Refinancing shall not:

(i)    provide for a principal amount of, without duplication, term loans, revolving loan commitments, letters of credit, bonds, debentures, notes or similar instruments (but excluding Hedging Obligations and Bank Product Obligations) in excess of the Maximum First Lien Indebtedness;

(ii)    increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the First Lien Obligations by more than 2.0% other than increases (A) resulting from application of the pricing grid set forth in the First Lien Credit Agreement as in effect on the date hereof, or (B) resulting from the accrual of interest at the default rate as provided in the First Lien Credit Agreement as in effect on the date hereof; or

(iii)    increase (or have the effect of increasing) the amount of, or the type of, dispositions of Collateral, the proceeds of which are not required to be used to prepay the First Lien Obligations and which may be retained by the Loan Parties for use as working capital to an amount greater than that permitted under the Second Lien Credit Agreement.

(b)    Until the Discharge of First Lien Obligations occurs, the Second Lien Credit Documents may be amended, supplemented or otherwise modified in

accordance with their terms and the Second Lien Credit Agreement may be Refinanced in each case, without the consent of the First Lien Collateral Agent or the First Lien Claimholders provided, however, that the holders of such Refinancing debt bind themselves in writing to the terms of this Agreement and any such amendment, supplement, modification or Refinancing shall not:

(i) increase the maximum principal amount of the Second Lien Obligations or the rate of interest on any of the Second Lien Obligations, other than (A) to the extent of any increase in the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the First Lien Obligations, or (B) in connection with the imposition of the default rate of interest in accordance with the Second Lien Credit Documents as in effect on the date hereof;

(ii) change to an earlier date any of the dates upon which payments of principal or interest on the Second Lien Obligations are due;

(iii) change or add any event of default or any covenant with respect to the Second Lien Obligations;

(iv) change any prepayment provisions of the Second Lien Obligations; or

(v) change or amend any other term of the Second Lien Credit Documents if such change or amendment would result in a default under the First Lien Credit Agreement, increase the obligations of any Grantor in any material respect or confer additional material rights on any Second Lien Claimholder in a manner adverse in any material respect to any Grantor or any of the First Lien Claimholders.

(c)    Notwithstanding the foregoing clauses (a) and (b) of this Section 5.3, until the date upon which the Discharge of First Lien Obligations shall have occurred, (i) without the prior written consent of the First Lien Collateral Agent, no Second Lien Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Lien Credit Agreement or Second Lien Collateral Document, would contravene any of the terms of this Agreement, and (ii) without the prior written consent of the Second Lien Collateral Agent, no First Lien Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new First Lien Credit Agreement or First Lien Collateral Document, would contravene any of the terms of this Agreement.

(d)    The Second Lien Collateral Agent agrees that each Second Lien Collateral Document shall include the following language:

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the collateral agent pursuant to this

Agreement and the exercise of any right or remedy by the collateral agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of February 16, 2007 as the same may be amended, supplemented, modified or replaced from time to time (the **"Intercreditor Agreement"**) among Bank of America, N.A., as First Lien Collateral Agent, Bank of America, N.A., as Second Lien Collateral Agent, Bank of America, N.A., as Control Agent, and the Grantors (as defined therein) from time to time a party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, as between the First Lien Claimholders and the Second Lien Claimholders the terms of the Intercreditor Agreement shall govern."

In addition, the Second Lien Collateral Agent agrees that each Second Lien Collateral Document under which any Lien on real property owned by any Loan Party is granted to secure the Second Lien Obligations covering any Collateral shall contain such other language as the First Lien Collateral Agent may reasonably request to reflect the priority of the First Lien Collateral Document covering such Collateral over such Second Lien Collateral Document.

(e) Notwithstanding the foregoing clauses (a) and (b) of this Section 5.3, until the date upon which the Discharge of First Lien Obligations shall have occurred, in the event the First Lien Collateral Agent or the First Lien Claimholders enter into any written amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any First Lien Collateral Document or changing in any manner the rights of the First Lien Collateral Agent, the First Lien Claimholders, the Grantors thereunder, then such amendment, waiver or consent shall automatically apply in a comparable manner to any comparable provision of the Second Lien Collateral Documents without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders and without any action by the Second Lien Collateral Agent or any Grantor; provided, however, that (A) no such amendment, waiver or consent shall be effective to (i) release any Lien of the Second Lien Collateral Documents, (ii) remove assets subject to the Lien of the Second Lien Collateral Documents, (iii) adversely affect the perfection or priority of any such Lien, (iv) reduce the principal of, or interest or other amounts payable on, any amount payable under the Second Lien Credit Agreement or any Second Lien Credit Document, (v) postpone any date fixed for any payment of principal of, or interest or other amounts payable on, any amounts payable under the Second Lien Credit Agreement or any Second Lien Credit Document, (vi) or permit any Liens on the Collateral not permitted under the Second Lien Credit Documents or Section 6, or (vii) impose duties on the Second Lien Collateral Agent without its consent, except, in the cases of clauses (i), (ii) and (iii), to the extent that a release of, or adverse effect on the perfection or priority of, such Lien is permitted by Section 5.1, Section 6 or the Second Lien Credit Agreement or any Second Lien Credit Document, and (B) notice of such amendment, waiver or consent shall have been given to the Second Lien Collateral Agent no later than 10 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness or validity thereof; and provided further that this paragraph is intended solely to set forth provisions

by which the Second Lien Collateral Documents shall be automatically affected by
amendments, waivers and consents given by the First Lien Collateral Agent and First
Lien Claimholders under the First Lien Credit Agreement and the First Lien Collateral
Documents and is not intended to impose any liability on the First Lien Collateral Agent
or First Lien Claimholders.

      **5.4**    Rights As Unsecured Creditors. Except as otherwise set forth in
Section 2.1 or Section 3.1, the Second Lien Collateral Agent and the Second Lien Claimholders
may exercise rights and remedies as unsecured creditors against any Grantor in accordance with
the terms of the Second Lien Credit Documents and applicable law. Except as otherwise set
forth in Section 2.1 and Section 4, nothing in this Agreement shall prohibit the receipt by the
Second Lien Collateral Agent or any Second Lien Claimholders of the required payments of
interest and principal so long as such receipt is not the direct or indirect result of the exercise by
the Second Lien Collateral Agent or any Second Lien Claimholders of rights or remedies as a
secured creditor (including set-off or recoupment) or enforcement of any Lien held by any of
them. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies
the First Lien Collateral Agent or the First Lien Claimholders may have with respect to the
Collateral. In the event that any Second Lien Claimholder becomes a judgment Lien creditor as
a result of its enforcement of its rights as an unsecured creditor, such judgment Lien shall be
subject to the terms of this Agreement for all purposes to the same extent as all other Liens
securing the Second Lien Obligations subject to this Agreement.

      **5.5**    Control Agent for Perfection.

      (a)    The First Lien Collateral Agent, on behalf of itself and the First
Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the
Second Lien Claimholders, each hereby appoint Bank of America, N.A. as its collateral
agent (in such capacity, together with any successor in such capacity appointed by the
First Lien Collateral Agent and the Second Lien Collateral Agent, the **"Control Agent"**)
for the limited purpose of acting as the agent on behalf of the First Lien Collateral Agent
(on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral
Agent (on behalf of itself and the Second Lien Claimholders) with respect to the Control
Collateral for purposes of perfecting the Liens of such parties on the Control Collateral.
The Control Agent accepts such appointment and agrees to hold the Control Collateral in
its possession or control (or in the possession or control of its agents or bailees) as
Control Agent for the benefit of the First Lien Collateral Agent (on behalf of itself and
the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself
and the Second Lien Claimholders) and any permitted assignee of any thereof solely for
the purpose of perfecting the security interest granted to such parties in such Control
Collateral, subject to the terms and conditions of this Section 5.5. The First Lien
Collateral Agent and the Second Lien Collateral Agent hereby acknowledge that the
Control Agent will obtain "control" under the UCC over each Controlled Account as
contemplated by the First Lien Collateral Documents and the Second Lien Collateral
Documents for the benefit of both the First Lien Collateral Agent (on behalf of itself and
the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself
and the Second Lien Claimholders) pursuant to the control agreements relating to each
respective Controlled Account. The First Lien Collateral Agent and the Second Lien

        -21-

Collateral Agent hereby also acknowledge and agree that the Control Agent will obtain landlord lien waivers as contemplated by the First Lien Collateral Documents and the Second Lien Collateral Documents for the benefit of (i) the First Lien Collateral Agent for the benefit of the First Lien Claimholders and (ii) the Second Lien Collateral Agent for the benefit of Second Lien Claimholders.

(b)     The Control Agent, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby agrees that the First Lien Collateral Agent shall have the sole and exclusive right and authority to give instructions to, and otherwise direct, the Control Agent in respect of the Control Collateral or any control agreement with respect to any Control Collateral until the earlier of (i) the date upon which the Discharge of First Lien Obligations shall have occurred and (ii) the Second Lien Enforcement Date and neither the Second Lien Collateral Agent nor any Second Lien Claimholder will impede, hinder, delay or interfere with the exercise of such rights by the First Lien Collateral Agent in any respect. The Grantors hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Control Agent to the same extent and on the same terms that the Grantors are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement. The First Lien Claimholders and the Second Lien Claimholders hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Control Agent to the same extent and on the same terms that the First Lien Claimholders are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement and the Second Lien Claimholders are required to do so for the Second Lien Collateral Agent in accordance with the Second Lien Credit Agreement.

(c)     Except as set forth below, the Control Agent shall have no obligation whatsoever to the Second Lien Collateral Agent or any Second Lien Claimholder including, without limitation, any obligation to assure that the Control Collateral is genuine or owned by any Grantor or one of their respective Subsidiaries or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.5. In acting on behalf of the Second Lien Collateral Agent and the Second Lien Claimholders and the First Lien Collateral Agent and the First Lien Claimholders, the duties or responsibilities of the Control Agent under this Section 5.5 shall be limited solely (i) to physically holding the Control Collateral delivered to the Control Agent by any Grantor as agent for the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) for purposes of perfecting the Lien held by the First Lien Collateral Agent and the Second Lien Collateral Agent and (ii) delivering such collateral as set forth in Section 5.5(d).

(d)     The rights of the Second Lien Collateral Agent shall at all times be subject to the terms of this Agreement and to the First Lien Collateral Agent's rights under the First Lien Credit Documents.

(e)     Neither the Control Agent nor the First Lien Collateral Agent shall have by reason of the Second Lien Credit Documents or this Agreement or any other

document a fiduciary relationship in respect of the Second Lien Collateral Agent or any Second Lien Claimholder.

(f)     Upon the Discharge of First Lien Obligations (other than in connection with a Refinancing of the First Lien Obligations), the Control Agent shall deliver to the Second Lien Collateral Agent the Control Collateral together with any necessary endorsements (or otherwise allow the Second Lien Collateral Agent to obtain control of such Control Collateral) or as a court of competent jurisdiction may otherwise direct and the Second Lien Collateral Agent shall accept and succeed to the role of the Control Agent as the agent for perfection on the Control Collateral.

(g)     The Control Agent shall have an unfettered right to resign as Control Agent upon 30 days notice to the First Lien Collateral Agent and the Second Lien Collateral Agent. If upon the effective date of such resignation no successor to the Control Agent has been appointed by the First Lien Collateral Agent and the Second Lien Collateral Agent, the Control Agent shall deliver to the First Lien Collateral Agent the Control Collateral together with any necessary endorsements (or otherwise allow the First Lien Collateral Agent to obtain control of such Control Collateral) or as a court of competent jurisdiction may otherwise direct and the First Lien Collateral Agent shall accept and succeed to the role of the Control Agent as the agent for perfection on the Control Collateral.

**5.6**     When Discharge of First Lien Obligations Deemed to Not Have Occurred. If substantially contemporaneously with the Discharge of First Lien Obligations, Borrower enters into any Refinancing of any First Lien Credit Document evidencing a First Lien Obligation which Refinancing is permitted hereby and by the terms of the Second Lien Credit Documents, then such Discharge of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of First Lien Obligations), and the obligations under such Refinancing First Lien Credit Document shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Lien Collateral Agent under such First Lien Credit Documents shall be a First Lien Collateral Agent for all purposes of this Agreement. Upon receipt of a notice stating that Borrower has entered into a new First Lien Credit Document (which notice shall include the identity of the new collateral agent, such agent, the **"New Agent"**), the Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as Borrower or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement. If the new First Lien Obligations under the new First Lien Credit Documents are secured by assets of the Grantors of the type constituting Collateral that do not also secure the Second Lien Obligations, then the Second Lien Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the Second Lien Collateral Documents.

**5.7**     Purchase Right. Without prejudice to the enforcement of the First Lien Claimholders' remedies, the First Lien Claimholders agree that at any time following

(a) acceleration of the First Lien Obligations in accordance with the terms of the First Lien Credit Agreement, (b) a payment default under the First Lien Credit Agreement that has not been cured or waived by the First Lien Claimholders within sixty (60) days of the occurrence thereof or (c) the commencement of an Insolvency or Liquidation Proceeding (each, a **"Purchase Event"**), one or more of the Second Lien Claimholders may request, and the First Lien Claimholders hereby offer the Second Lien Claimholders the option, to purchase all, but not less than all, of the aggregate amount of outstanding First Lien Obligations outstanding at the time of purchase at par, (including any applicable premium) without warranty or representation or recourse (except for representations and warranties required to be made by assigning lenders pursuant to the Assignment Agreement (as such term is defined in the First Lien Credit Agreement)). If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within thirty (30) Business Days of the request. If one or more of the Second Lien Claimholders exercise such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agent and the Second Lien Collateral Agent.

### SECTION 6  Insolvency or Liquidation Proceedings.

**6.1**     Use of Cash Collateral and Financing Issues.  Until the Discharge of First Lien Obligations has occurred, if Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Lien Collateral Agent shall desire to permit the use of cash collateral on which the First Lien Collateral Agent or any other creditor has a Lien or to permit Borrower or any other Grantor to obtain financing, from one or more of the First Lien Claimholders under Section 363 or Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (each, a **"DIP Financing"**), then, so long as the maximum amount of Indebtedness that may be outstanding from time to time in connection with such DIP Financing shall not exceed Maximum First Lien Indebtedness, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, (A) agrees that it will raise no objection to such use of cash collateral or DIP Financing nor support any other Person objecting to, such sale, use, or lease of cash collateral or DIP Financing and will not request any form of adequate protection or any other relief in connection therewith (except as agreed by the First Lien Collateral Agent or to the extent expressly permitted by Section 6.4) and, to the extent the Liens securing the First Lien Obligations are subordinated to or pari passu with such DIP Financing, the Second Lien Collateral Agent will subordinate its Liens in the Collateral to (x) the Liens securing such DIP Financing (and all Obligations relating thereto), (y) any adequate protection Liens provided to the First Lien Claimholders and (z) any "carveout" for professional or United States Trustee fees agreed to by the First Lien Collateral Agent; and (B) agrees that notice received two calendar days prior to the entry of an order approving such usage of cash collateral or approving such DIP Financing shall be adequate notice; provided that the foregoing shall not prohibit the Second Lien Collateral Agent or the Second Lien Claimholders from objecting solely to any provisions in any DIP Financing relating to, describing or requiring any provision or content of a plan of reorganization other than any provisions requiring that the DIP Financing be paid in full in cash.

**6.2**     Sale Issues.  The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to or oppose a sale or other disposition of any Collateral (and any postpetition assets subject to adequate protection liens in favor of the

First Lien Collateral Agent) free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the Requisite Lenders under the First Lien Credit Agreement have consented to such sale or disposition of such assets so long as the interests of the Second Lien Claimholders in the Collateral (and any postpetition assets subject to adequate protection liens, if any, in favor of the Second Lien Collateral Agent) attach to the proceeds thereof, subject to the terms of this Agreement. If requested by the First Lien Collateral Agent in connection therewith, the Second Lien Collateral Agent shall affirmatively consent to such a sale or disposition.

**6.3** Relief from the Automatic Stay. Until the Discharge of First Lien Obligations has occurred, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall (i) seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Lien Collateral Agent, or (ii) oppose any request by the First Lien Collateral Agent or any First Lien Claimholder to seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral.

**6.4** Adequate Protection.

(a) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall contest (or support any other person contesting) (i) any request by the First Lien Collateral Agent or the First Lien Claimholders for adequate protection or (ii) any objection by the First Lien Collateral Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Collateral Agent or the First Lien Claimholders claiming a lack of adequate protection. In any Insolvency or Liquidation Proceeding, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, may seek adequate protection in respect of the Second Lien Obligations, subject to the provisions of this Agreement, only if (A) the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of additional collateral including replacement liens on postpetition collateral and (B) such additional protection requested by the Second Lien Collateral Agent is in the form of a Lien on such additional collateral, which Lien, if granted, will be subordinated to the adequate protection Liens securing the First Lien Obligations and the Liens securing any DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any such DIP Financing. In the event the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of additional collateral, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent shall also be granted a Lien on such additional collateral as security for the First Lien Obligations and for any DIP Financing and that any Lien on such additional collateral securing the Second Lien Obligations shall be subordinated to the Liens on such collateral securing the First Lien Obligations and any DIP Financing (and all Obligations relating thereto) and to any other Liens granted to the First Lien Claimholders as adequate protection on the same basis as the other Liens securing the

Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any DIP Financing.

(b)    Similarly, if the First Lien Claimholders are granted adequate protection in the form of a superpriority claim, then the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, may seek or request a superpriority claim, which superpriority claim will be junior in all respects to the superpriority claim granted to the First Lien Collateral Agent and the First Lien Claimholders, and, in the event that the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of a superpriority claim, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent and the providers of any DIP Financing also shall be granted a superpriority claim, which superpriority claim will be senior in all respects to the superpriority claim granted to the Second Lien Collateral Agent and the Second Lien Claimholders.

(c)    Notwithstanding the foregoing, if the First Lien Claimholders are deemed by a court of competent jurisdiction to be fully secured on the petition date of any Insolvency or Liquidation Proceeding, then the Second Lien Collateral Agent and the Second Lien Claimholders shall not be prohibited from seeking adequate protection in the form of payments in the amount of current postpetition interest, incurred fees and expenses or other cash payments.

**6.5    No Waiver.** Nothing contained herein shall prohibit or in any way limit the First Lien Collateral Agent or any First Lien Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Lien Collateral Agent or any of the Second Lien Claimholders, including the seeking by the Second Lien Collateral Agent or any Second Lien Claimholders of adequate protection or the asserting by the Second Lien Collateral Agent or any Second Lien Claimholders of any of its rights and remedies under the Second Lien Credit Documents or otherwise; provided, however, that this Section 6.5 shall not limit the rights of the Second Lien Claimholders under the proviso in Section 3.1(a)(ii) or under Section 6.4 or Section 6.9.

**6.6    Avoidance Issues.** If any First Lien Claimholder is required in any Insolvency or Liquidation Proceeding, or otherwise, to turn over or otherwise pay to the estate of Borrower or any other Grantor any amount in respect of a First Lien Obligation (a **"Recovery"**), then such First Lien Claimholders shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement. Collateral or proceeds thereof received by the Second Lien Collateral Agent or any Second Lien Claimholder after a Discharge of First Lien Obligations and prior to the reinstatement of such First Lien Obligations shall be delivered to the First Lien Collateral Agent upon such reinstatement in accordance with Section 4.2.

**6.7**     Separate Grants of Security and Separate Classification. Each of the Grantors, the First Lien Claimholders and the Second Lien Claimholders acknowledges and agrees that (i) the grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Lien Claimholders and Second Lien Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the First Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them from, or in respect of, the Collateral in respect of principal, prepetition interest and other claims, all amounts owing in respect of postpetition interest, fees, costs and other charges, irrespective of whether a claim for such amounts is allowed or allowable in such Insolvency or Liquidation Proceeding, before any distribution from, or in respect of, any Collateral is made in respect of the claims held by the Second Lien Claimholders), with the Second Lien Claimholders hereby acknowledging and agreeing to turn over to the First Lien Claimholders amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Claimholders.

**6.8**     Reorganization Securities. If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**6.9**     Post-Petition Claims.

(a)     Neither the Second Lien Collateral Agent nor any other Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Collateral Agent or any First Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of post-petition interest, fees, costs, charges or expenses to the extent of the value of the First Lien Collateral Agents Lien held for the benefit of the First Lien Claimholders, without regard to the existence of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral.

(b)     Neither the First Lien Collateral Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Collateral Agent or any Second Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of Second Lien Obligations consisting of post-petition interest, fees, costs, charges or expenses to the extent of the value of the Lien of the Second Lien Collateral

Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account the First Lien Obligations).

**6.10**    Waiver. The Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it or they may hereafter have against the First Lien Collateral Agent or any First Lien Claimholder arising out of the election of the First Lien Collateral Agent or any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

**6.11**    Expense Claims. Neither Second Lien Collateral Agent nor any Second Lien Claimholder will (i) contest the payment of fees, expenses or other amounts to the First Lien Collateral Agent or any First Lien Claimholder under Section 506(b) of the Bankruptcy Code or otherwise to the extent provided for in the First Lien Credit Agreement or (ii) assert or enforce, at any time prior to the Discharge of First Lien Obligations, any claim under Section 506(c) of the Bankruptcy Code senior to or on parity with the First Lien Obligations for costs or expenses of preserving or disposing of any Collateral.

**6.12**    Other Matters. To the extent that the Second Lien Collateral Agent or any Second Lien Claimholder has or acquires rights under Section 361, Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Collateral, the Second Lien Collateral Agent agrees, on behalf of itself and the Second Lien Claimholders not to assert any of such rights without the prior written consent of the First Lien Collateral Agent; provided that if requested by the First Lien Collateral Agent, the Second Lien Collateral Agent shall timely exercise such rights in the manner requested by the First Lien Collateral Agent, including any rights to payments in respect of such rights.

**6.13**    Effectiveness in Insolvency or Liquidation Proceedings. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency or Liquidation Proceeding. All references in this Agreement to any Grantor shall include such Person as a debtor-in-possession and any receiver or trustee for such Person in any Insolvency or Liquidation Proceeding.

## SECTION 7    Reliance; Waivers; Etc.

**7.1**    Non-Reliance.

(a)    The consent by the First Lien Claimholders to the execution and delivery of the Second Lien Credit Documents and the grant to the Second Lien Collateral Agent on behalf of the Second Lien Claimholders of a Lien on the Collateral and all loans and other extensions of credit made or deemed made on and after the date hereof by the First Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Collateral Agent or any First Lien Claimholder, and based on documents and information deemed by them

appropriate, made their own credit analysis and decision to enter into the Second Lien Credit Agreement, the other Second Lien Credit Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Credit Agreement, the other Second Lien Credit Documents or this Agreement.

(b)    The consent by the Second Lien Claimholders to the execution and delivery of the First Lien Credit Documents and the grant to the First Lien Collateral Agent on behalf of the First Lien Claimholders of a Lien on the Collateral and all loans and other extensions of credit made or deemed made on and after the date hereof by the Second Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, acknowledges that it and the First Lien Claimholders have, independently and without reliance on the Second Lien Collateral Agent or any Second Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the First Lien Credit Agreement, the other First Lien Credit Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Agreement, the other First Lien Credit Documents or this Agreement.

7.2    No Warranties or Liability.  The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, acknowledges and agrees that each of the Second Lien Collateral Agent and the Second Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Obligations, acknowledges and agrees that the First Lien Collateral Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.  The Second Lien Collateral Agent and the Second Lien Claimholders shall have no duty to the First Lien Collateral Agent or any of the First Lien Claimholders, and the First Lien Collateral Agent and the First Lien Claimholders shall have no duty to the Second Lien Collateral Agent or any of the Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with Borrower or any Subsidiary thereof or other Grantor (including the First Lien Credit Documents and the Second Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with.

-29-

**7.3**    No Waiver of Lien Priorities.

(a)    No right of the First Lien Claimholders, the Control Agent, the First Lien Collateral Agent or any of them to enforce any provision of this Agreement or any First Lien Credit Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Borrower or any other Grantor or by any act or failure to act by the Control Agent, any First Lien Claimholder or the First Lien Collateral Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Credit Documents or any of the Second Lien Credit Documents, regardless of any knowledge thereof which the Control Agent, the First Lien Collateral Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with.

(b)    Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of Borrower and the other Grantors under the First Lien Credit Documents and subject to the provisions of Section 5.3(b)), the First Lien Claimholders, the First Lien Collateral Agent and any of them may, at any time and from time to time in accordance with the First Lien Credit Documents or applicable law, without the consent of, or notice to, the Second Lien Collateral Agent or any Second Lien Claimholders, without incurring any liabilities to the Second Lien Collateral Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second Lien Collateral Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(i)    make loans and advances to any Grantor or issue, guaranty or obtain letters of credit for account of any Grantor or otherwise extend credit to any Grantor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing (subject, in each case, to the limits set forth in the definition of "First Lien Obligations" and Section 5.3);

(ii)    change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of Borrower or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension, subject to the limits set forth in the definition of "First Lien Obligations and Section 5.3) or, subject to the provisions of this Agreement, otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Collateral Agent or any of the First Lien Claimholders, the First Lien Obligations or any of the First Lien Credit Documents; provided, however, the foregoing shall not prohibit the Second Lien Collateral Agent and the Second Lien Claimholders from enforcing, consistent with the other terms of this Agreement, any right arising under the

Second lien Credit Agreement as a result of any grantor's violation of the terms thereof;

          (iii)     subject to the provisions of this Agreement, sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral or any liability of Borrower or any other Grantor to the First Lien Claimholders or the First Lien Collateral Agent, or any liability incurred directly or indirectly in respect thereof;

          (iv)     settle or compromise any First Lien Obligation or any other liability of Borrower or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order;

          (v)     exercise or delay in or refrain from exercising any right or remedy against Borrower or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with Borrower, any other Grantor or any First Lien Collateral and any security and any Grantor or any liability of Borrower or any other Grantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof;

          (vi)     take or fail to take any Lien securing the First Lien Obligations or any other collateral security for any First Lien Obligations or take or fail to take any action which may be necessary or appropriate to ensure that any Lien securing First Lien Obligations or any other Lien upon any property is duly enforceable or perfected or entitled to priority as against any other Lien or to ensure that any proceeds of any property subject to any Lien are applied to the payment of any First Lien Obligation or any Obligation secured thereby; or

          (vii)     otherwise release, discharge or permit the lapse of any or all Liens securing the First Lien Obligations or any other Liens upon any property at any time securing any First Lien Obligations.

          (c)     The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the Control Agent, the First Lien Claimholders and the First Lien Collateral Agent shall have no liability to the Second Lien Collateral Agent or any Second Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any claim against the Control Agent, any First Lien Claimholder and the First Lien Collateral Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Collateral Agent may take or permit or omit to take with respect to: (i) the First Lien Credit Documents, (ii) the collection of the First Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any Collateral (including, without limitation, the Control Collateral, as applicable). The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien

Claimholders and the First Lien Collateral Agent have no duty to them in respect of the maintenance or preservation of the Collateral, the First Lien Obligations or otherwise.

(d)    The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

7.4    <u>Obligations Unconditional</u>. All rights, interests, agreements and obligations of the First Lien Collateral Agent and the First Lien Claimholders and the Second Lien Collateral Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any First Lien Credit Documents or any Second Lien Credit Documents or any setting aside or avoidance of any Lien;

(b)    except as otherwise set forth in the Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Credit Document or any Second Lien Credit Document;

(c)    any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency or Liquidation Proceeding in respect of Borrower or any other Grantor; or

(e)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, Borrower or any other Grantor in respect of the First Lien Obligations, or of the Second Lien Collateral Agent or any Second Lien Claimholder in respect of this Agreement.

7.5    <u>Certain Notices</u>.

(a)    Promptly upon the satisfaction of the conditions set forth in clauses (i), (ii), (iii) and (iv) of the definition of Discharge of First Lien Obligations, the First Lien Collateral Agent shall deliver written notice confirming same to the Second Lien Collateral Agent; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

        (b)      Promptly upon (or as soon as practicable following) the commencement by the First Lien Collateral Agent of any enforcement action or the exercise of any remedy with respect to any Collateral (including by way of a public or private sale of Collateral), the First Lien Collateral Agent shall notify the Second Lien Collateral Agent of such action; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

## SECTION 8   Miscellaneous.

        **8.1**     Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Credit Documents or the Second Lien Credit Documents, the provisions of this Agreement shall govern and control.  The parties hereto acknowledge that the terms of this Agreement are not intended to negate any specific rights granted to Borrower in the First Lien Credit Documents and the Second Lien Credit Documents.

        **8.2**     Effectiveness; Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of lien subordination and the First Lien Claimholders may continue, at any time and without notice to the Second Lien Collateral Agent or any Second Lien Claimholder subject to the Second Lien Credit Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of Borrower or any Grantor constituting First Lien Obligations in reliance hereof.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to Borrower or any other Grantor shall include Borrower or such Grantor as debtor and debtor-in-possession and any receiver or trustee for Borrower or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect, (i) with respect to the Second Lien Collateral Agent, the Second Lien Claimholders and the Second Lien Obligations, upon the later of (1) the date upon which the obligations under the Second Lien Credit Agreement terminate and payment has been made in full in cash of all other Second Lien Obligations outstanding on such date and (2) if there are other Second Lien Obligations outstanding on such date, the date upon which such Second Lien Obligations terminate and (ii) with respect to the First Lien Collateral Agent, the First Lien Claimholders and the First Lien Obligations, the date of Discharge of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 5.6 and Section 6.5.

        **8.3**     Amendments; Waivers.  No amendment, modification or waiver of any of the provisions of this Agreement by the Second Lien Collateral Agent or the First Lien Collateral Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to

the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, Borrower shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement.

              **8.4**    Information Concerning Financial Condition of Borrower and its Subsidiaries.

              (a)    The First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Claimholders and the Second Lien Collateral Agent, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of Borrower and its Subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations. The First Lien Collateral Agent and the First Lien Claimholders shall have no duty to advise the Second Lien Collateral Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event the First Lien Collateral Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Collateral Agent or any Second Lien Claimholder, it or they shall be under no obligation (w) to make, and the First Lien Collateral Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential. The Second Lien Collateral Agent and the Second Lien Claimholders shall have no duty to advise the First Lien Collateral Agent or any First Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event the Second Lien Collateral Agent or any of the Second Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the First Lien Collateral Agent or any First Lien Claimholder, it or they shall be under no obligation (w) to make, and the Second Lien Collateral Agent and the Second Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

              (b)    The Grantors agree that any information provided to the First Lien Collateral Agent, the Second Lien Collateral Agent, the Control Agent, any First Lien Claimholder or any Second Lien Claimholder may be shared by such Person with any First Lien Claimholder, any Second Lien Claimholder, the Control Agent, the First Lien

Collateral Agent or the Second Lien Collateral Agent notwithstanding a request or demand by such Grantor that such information be kept confidential; provided, that such information shall otherwise be subject to the respective confidentiality provisions in the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable.

**8.5** <u>Subrogation</u>. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees not to exercise any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred.

**8.6** <u>Application of Payments</u>. All payments received by the First Lien Collateral Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations provided for in the First Lien Credit Documents. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor made or filed in accordance with the terms hereof.

**8.7** **SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL; CALIFORNIA JUDICIAL REFERENCE.**

(a) **ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN LOS ANGELES COUNTY, CALIFORNIA TO THE EXTENT PERMITTED BY APPLICABLE LAW. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NON EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 8.8; AND (iv) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (iii) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.**

(b) **TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER. THE SCOPE OF THIS WAIVER IS**

**INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.7(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

(c)     **If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Agreement, (a) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (b) without limiting the generality of Section 11.3 of the First Lien Credit Agreement or Second Lien Credit Agreement, Borrower shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding**

8.8     Notices. All notices to the Control Agent, the Second Lien Claimholders and the First Lien Claimholders permitted or required under this Agreement shall also be sent to the Second Lien Collateral Agent and the First Lien Collateral Agent, respectively. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

**8.9**    Further Assurances.  The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under the First Lien Credit Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders under the Second Lien Credit Documents, and Borrower, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Collateral Agent or the Second Lien Collateral Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

**8.10    APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA.**

**8.11**    Binding on Successors and Assigns.  This Agreement shall be binding upon the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders, the Control Agent and their respective successors and assigns.

**8.12**    Specific Performance.  Each of the First Lien Collateral Agent and the Second Lien Collateral Agent may demand specific performance of this Agreement.  The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any First Lien Collateral Agent or the Second Lien Collateral Agent, as the case may be.

**8.13**    Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**8.14**    Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**8.15**    Authorization.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**8.16**    No Third Party Beneficiaries.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders, the Control

Agent and the Borrower.  No other Person shall have or be entitled to assert rights or benefits hereunder.

**8.17**    Provisions Solely to Define Relative Rights.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders on the one hand and the Second Lien Claimholders on the other hand. Nothing in this Agreement is intended to or shall impair the rights of Borrower or any other Grantor, or the obligations of Borrower or any other Grantor, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

BANK OF AMERICA, N.A.,
as First Lien Collateral Agent,

By: _Donna F. Kimbrough_

    Name: Donna F. Kimbrough
    Title: Assistant Vice President

Notice Address:

Bank of America, N.A.
Agency Management
901 Main Street, 14th Floor
Mail Code: TX1-492-14-11
Dallas, TX 95202-3714
Attention: Donna F. Kimbrough
Telephone: (702) 209-4129
Telecopier: (702) 290-9432

[GVR Intercreditor Agreement]

BANK OF AMERICA, N.A.,
as Second Lien Collateral Agent,

By: *Donna F. Kimbrough*
    Name:  Donna F. Kimbrough
    Title:    Assistant Vice President

Notice Address:

Bank of America, N.A.
Agency Management
901 Main Street, 14th Floor
Mail Code: TX1-492-14-11
Dallas, TX 95202-3714
Attention: Donna F. Kimbrough
Telephone: (702) 209-4129
Telecopier: (702) 290-9432

BANK OF AMERICA, N.A.,
as Control Agent,

By: *Donna F. Kimbrough*
Name:  Donna F. Kimbrough
Title:    Assistant Vice President

Notice Address:

Bank of America, N.A.
Agency Management
901 Main Street, 14th Floor
Mail Code:  TX1-492-14-11
Dallas, TX 95202-3714
Attention:  Donna F. Kimbrough
Telephone:  (702) 209-4129
Telecopier:  (702) 290-9432

[GVR Intercreditor Agreement]

GREEN VALLEY RANCH GAMING, LLC,
a Nevada limited liability company

By:  GV Ranch Station, Inc.
Its:  Manager

By:  *[signature]*
    Name:  Glenn C. Christenson
    Title:    Senior Vice President and Treasurer

Notice Address:

Green Valley Ranch Gaming, LLC
c/o Station Casinos, Inc.
10973 W. Summerlin Centre Drive
Las Vegas, NV 89135
Attention:  Glenn C. Christenson, Executive Vice President
Telephone:  (702) 495-4242
Telecopier:  (702) 495-4245

[GVR Intercreditor Agreement]

**EXHIBIT "C"**

**EXHIBIT "C"**

THIRD AMENDED AND RESTATED
SECURITY AGREEMENT
(First Lien)

This THIRD AMENDED AND RESTATED SECURITY AGREEMENT (First Lien) ("Agreement"), dated as of February 16, 2007, is made by Green Valley Ranch Gaming, LLC, a Nevada limited liability company ("Borrower"), in favor of Bank of America, N.A., as Administrative Agent ("Administrative Agent") under the Loan Agreement referred to below, and for the benefit of the Secured Party described herein, with reference to the following facts:

## RECITALS

A.    Borrower previously entered into a Second Amended and Restated Loan Agreement, dated as of December 17, 2004 (the "Second Amended Loan Agreement") and, in connection therewith, Borrower executed a Second Amended and Restated Security Agreement of even date therewith in favor of Administrative Agent (the "Existing Agreement")

B.    Borrower concurrently herewith is entering into a First Lien Credit Agreement of even date herewith among Borrower, the lenders from time to time parties thereto (collectively, the "Lenders" and individually, a Lender") and Administrative Agent (as the same may be further amended, extended, renewed, supplemented or otherwise modified, the "Loan Agreement"), which will amend and restate the Second Amended Loan Agreement in its entirety.

C.    This Agreement amends and restates the Existing Agreement in its entirety.

## AGREEMENT

NOW, THEREFORE, in order to induce Secured Party to extend the aforementioned credit facilities, and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, Borrower, and each of the other Grantors which may hereafter become a party hereby by means of the execution of a joinder hereto, hereby jointly and severally represent, warrant, covenant, agree, assign and grant as follows:

1.    Definitions. This Agreement is the Security Agreement referred to in the Loan Agreement and is one of the Loan Documents. Capitalized terms defined in the Loan Agreement and not otherwise defined in this Agreement shall have the meanings given those terms in the Loan Agreement when used herein and such definitions are incorporated herein as though set forth in full. Terms defined in the California Uniform Commercial Code and not otherwise defined in this Agreement or in the Loan Agreement shall have the meanings defined for those terms in the California Uniform Commercial Code. As used in this Agreement, the following terms shall have the meanings respectively set forth after each:

"Agreement" means this Third Amended and Restated Security Agreement (First Lien), and any extensions, modifications, renewals, restatements, supplements or amendments hereof, including, without limitation, any documents or agreements by which additional Grantors become Parties hereto.

"Collateral" means and includes all present and future right, title and interest of Grantors, or any one or more of them, in or to any Property or assets whatsoever, and all rights and powers of Grantors, or any one or more of them, to transfer any interest in or to any Property or assets whatsoever, including, without limitation, any and all of the following Property:

(a)    All present and future accounts, accounts receivable, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, chattel paper (whether tangible or electronic), security agreements, guaranties, letters of credit, letter-of-credit rights, undertakings, surety bonds, insurance policies (whether or not required by the terms of the Loan Documents), notes and drafts, and all forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

(b)    All present and future general intangibles, all tax refunds of every kind and nature to which any Grantor now or hereafter may become entitled, however arising, all other refunds, and (to the extent assignable) all deposits, reserves, loans, royalties, cost savings, deferred payments, goodwill, choses in action, liquidated damages, rights to indemnification, trade secrets, computer programs, software, customer lists, trademarks, trade names, patents, licenses (except for gaming licenses, liquor licenses, and any other licenses which are not transferrable), copyrights, technology, processes, proprietary information and insurance proceeds of which any Grantor is a beneficiary;

(c)    Whether characterized as accounts, general intangibles or otherwise, and subject to the provisions of the Deed of Trust, all rents (including, without limitation, prepaid rents, fixed, additional and contingent rents), issues, profits, receipts, earnings, revenue, income, security deposits, occupancy charges, hotel room charges, cabana charges, casino revenues, show ticket revenues, food and beverage revenues, room service revenues, merchandise sales revenues, parking, maintenance, common area, tax, insurance, utility and service charges and contributions, green fees, cart rental fees, instruction fees, membership charges, restaurant, snack bar and pro shop revenues;

(d)    All present and future deposit accounts of any Grantor, including, without limitation, any demand, time, savings, passbook or like account maintained by any Grantor with any bank, savings and loan association, credit union or like organization, and all money, Cash and Cash Equivalents of any Grantor, whether or not deposited in any such deposit account;

(e)    All present and future books and records, including, without limitation, books of account and ledgers of every kind and nature, all electronically recorded data relating to any Grantor or the business thereof, all receptacles and containers for such records, and all files and correspondence;

(f)    All present and future goods, including, without limitation, all consumer goods, farm products, inventory, equipment, gaming devices and associated equipment, machinery, tools, molds, dies, furniture, furnishings, fixtures, trade fixtures, and motor vehicles operated by Grantors, and all other goods used in connection with or in the conduct of any Grantor's business (other than aircraft);

(g)    All present and future inventory and merchandise, including, without limitation, all present and future goods held for sale or lease or to be furnished under a contract of service, all raw materials, work in process and finished goods, all packing materials, supplies and containers relating to or used in connection with any of the foregoing, and all bills of lading, warehouse receipts or documents of title relating to any of the foregoing;

(h)    All present and future stocks, bonds, debentures, securities (whether certificated or uncertificated), subscription rights, options, warrants, puts, calls, certificates,

-2-

partnership interests, limited liability company interests, member's or other interests, joint venture interests, Investments and/or brokerage accounts and all rights, preferences, privileges, dividends, distributions, redemption payments, or liquidation payments with respect thereto;

(i)     All present and future accessions, appurtenances, components, repairs, repair parts, spare parts, replacements, substitutions, additions, issue and/or improvements to or of or with respect to any of the foregoing;

(j)     All other tangible and intangible Property of any Grantor (other than aircraft);

(k)     All rights, remedies, powers and/or privileges of any Grantor with respect to any of the foregoing; and

(l)     Any and all proceeds and products of any of the foregoing, including, without limitation, all money, accounts, payment intangibles, general intangibles, deposit accounts, documents, instruments, chattel paper, goods, insurance proceeds, and any other tangible or intangible Property received upon the sale or disposition of any of the foregoing;

provided that the term "Collateral", as used in this Agreement, shall not include (i) Real Property or any interest therein and (ii) cash reserves or other Property required to be maintained by Grantors in accordance with the requirements of applicable Gaming Laws or directives of the applicable Gaming Authorities, but only to the extent such Gaming Laws or directives prohibit Grantors from granting a Lien in favor of Secured Party therein.

"Grantors" means Borrower and its Subsidiaries, whether now existing or hereafter arising, that become Parties hereto, and each of them, and any one or more of them, jointly and severally.

"Secured Obligations" means, collectively, any and all present and future obligations of any type or nature of Grantors or any one or more of them to Secured Party arising under or relating to the Loan Documents (as defined in the Loan Agreement) or any one or more of them, whether due or to become due, matured or unmatured, liquidated or unliquidated, or contingent or noncontingent, including obligations of performance as well as obligations of payment, and including interest that accrues after the commencement of any bankruptcy or insolvency proceeding by or against any Grantor.

"Secured Party" means collectively, (i) the Administrative Agent, (ii) the Lenders (including the Swing Line Lender), (iii) the Issuing Lender, and (iv) any party to a Secured Hedging Obligation or a Secured Bank Products Agreement. Subject to the terms of the Loan Agreement, any right, remedy, privilege or power of Secured Party may be exercised by the Administrative Agent or by any Lender acting with the consent of the Requisite Lenders.

2.     Further Assurances. At any time and from time to time at the request of Secured Party, each Grantor shall execute and deliver to Secured Party all such financing statements and other instruments and documents in form and substance satisfactory to Secured Party as shall be necessary or desirable to fully perfect, when filed and/or recorded, Secured Party's security interests granted pursuant to Section 3 of this Agreement. At any time and from time to time, Secured Party shall be entitled to file and/or record any or all such financing statements, documents and instruments held by it, and any or all such further financing statements, documents and instruments, and to take all such other actions, as Secured Party may deem appropriate to perfect and to maintain perfected the security interests granted in Section 3 of this Agreement. Before and after the occurrence of any Event of Default, at Secured Party's request, each Grantor shall execute all such further financing statements, instruments and documents, and

shall do all such further acts and things, as may be deemed necessary or desirable by Secured Party to create and perfect, and to continue and preserve, an indefeasible security interest in the Collateral in favor of Secured Party, or the priority thereof. With respect to any Collateral consisting of certificated securities, instruments, documents, certificates of title or the like, as to which Secured Party's security interest need be perfected by, or the priority thereof need be assured by, possession or control of such Collateral, Grantors will upon demand of Secured Party deliver possession or control, as applicable, of same in pledge to Secured Party. With respect to any Collateral consisting of securities, instruments, partnership or joint venture interests, limited liability company interests, member's interests or the like, Grantors hereby consent and agree that the issuers of, or obligors on, any such Collateral, or any registrar or transfer agent or trustee for any such Collateral, shall be entitled to accept the provisions of this Agreement as conclusive evidence of the right of Secured Party to effect any transfer or exercise any right hereunder or with respect to any such Collateral, notwithstanding any other notice or direction to the contrary heretofore or hereafter given by any Grantor or any other Person to such issuers or such obligors or to any such registrar or transfer agent or trustee.

3.    Security Agreement. For valuable consideration, Grantors and each of them hereby assign and pledge to Secured Party, and grant to Secured Party a security interest in, all presently existing and hereafter acquired Collateral, as security for the timely payment and performance of the Secured Obligations, and each of them. This Agreement is a continuing and irrevocable agreement and all the rights, powers, privileges and remedies hereunder shall apply to any and all Secured Obligations, including those arising under successive transactions which shall either continue the Secured Obligations, increase or decrease them and notwithstanding the bankruptcy of any Grantor or any other Person or any other event or proceeding affecting any Person.

4.    Grantors' Representations, Warranties and Agreements. Except as otherwise disclosed to Secured Party in writing concurrently herewith, Grantors represent, warrant and agree that: (a) Grantors will promptly notify Secured Party in writing in the event of any substantial or material damage to the Collateral in excess of $250,000 for any single occurrence and in excess of $1,500,000 in the aggregate for multiple occurrences (considered as a whole) from any source whatsoever, (b) except for the disposition of collections and other proceeds of the Collateral permitted by Section 6 hereof, Grantors will not remove or permit to be removed any part of the Collateral from their places of business without the prior written consent of Secured Party, except for such items of the Collateral as are removed in the ordinary course of business or in connection with any transaction or disposition otherwise permitted by the Loan Documents; (c) in the event any Grantor changes its name or its address as either are set forth herein or in the Loan Agreement, such Grantor will notify Secured Party of such name and/or address change promptly, but in any event, within thirty (30) days and; (d) other than as permitted under the Loan Agreement, Grantors have full title to the Collateral, free and clear of any Lien, security interest, encumbrance or claim.

5.    Secured Party's Rights Re Collateral. At any time (whether or not an Event of Default has occurred), without notice or demand and at the expense of each Grantor with regard to the portion of the Collateral owned by it, Secured Party may, to the extent it may be necessary or desirable to protect the security hereunder, but Secured Party shall not be obligated to: (a) subject to the applicable provisions of Gaming Laws, at all reasonable times on reasonable notice, enter upon any premises on which Collateral is situated and examine the same or (b) perform any obligation of any Grantor under this Agreement or any obligation of any other Person under the Loan Documents, provided that when no Default or Event of Default has occurred and remains continuing, Secured Party shall provide reasonable prior notice of its intention to do so. At any time and from time to time, at the expense of each Grantor with regard to the portion of the Collateral owned by it, Secured Party may, to the extent it may be necessary or desirable to protect the security hereunder, but Secured Party shall not be obligated to: (i) notify obligors on the Collateral that the Collateral has been assigned to Secured Party; and (ii) at any

time and from time to time request from obligors on the Collateral, in the name of any Grantor or in the name of Secured Party, information concerning the Collateral and the amounts owing thereon, provided, however, that any such action which involves communicating with customers of Grantors shall be carried out by Secured Party through Grantors' independent auditors unless Secured Party shall then have the right directly to notify obligors on the Collateral as provided in Section 9 hereof. Each Grantor shall maintain books and records pertaining to the Collateral in such detail, form and scope as Secured Party shall reasonably require consistent with Secured Party's interests hereunder. Each Grantor shall at any time at Secured Party's request mark the Collateral and/or such Grantor's ledger cards, books of account and other records relating to the Collateral with appropriate notations satisfactory to Secured Party disclosing that they are subject to Secured Party's security interests. Except to the extent required under applicable Law, Secured Party shall be under no duty or obligation whatsoever to take any action to preserve any rights of or against any prior or other parties in connection with the Collateral, to exercise any voting rights or managerial rights with respect to any Collateral, whether or not an Event of Default shall have occurred, or to make or give any presentments, demands for performance, notices of non-performance, protests, notices of protests, notices of dishonor or notices of any other nature whatsoever in connection with the Collateral or the Secured Obligations. Secured Party shall be under no duty or obligation whatsoever to take any action to protect or preserve the Collateral or any rights of any Grantor therein, or to make collections or enforce payment thereon, or to participate in any foreclosure or other proceeding in connection therewith.

6.      Collections on the Collateral. Except as otherwise provided in any Loan Document, Grantors shall have the right to use and to continue to make collections on and receive dividends and other proceeds of all of the Collateral in the ordinary course of business so long as no Event of Default shall have occurred and be continuing. Upon the occurrence and during the continuance of an Event of Default, at the option of Secured Party, Grantors' right to make collections on and receive dividends and other proceeds of the Collateral and to use or dispose of such collections and proceeds shall terminate, and any and all dividends, proceeds and collections, including all partial or total prepayments, then held or thereafter received on or on account of the Collateral will be held or received by Grantors in trust for Secured Party and immediately delivered in kind to Secured Party. Any remittance received by any Grantor from any Person shall be presumed to relate to the Collateral and to be subject to Secured Party's security interests. Upon the occurrence and during the continuance of an Event of Default, Secured Party shall have the right at all times to receive, receipt for, endorse, assign, deposit and deliver, in the name of Secured Party or in the name of the appropriate Grantor, any and all checks, notes, drafts and other instruments for the payment of money constituting proceeds of or otherwise relating to the Collateral; and each Grantor hereby authorizes Secured Party to affix, by facsimile signature or otherwise, the general or special endorsement of it, in such manner as Secured Party shall deem advisable, to any such instrument in the event the same has been delivered to or obtained by Secured Party without appropriate endorsement, and Secured Party and any collecting bank are hereby authorized to consider such endorsement to be a sufficient, valid and effective endorsement by the appropriate Grantor, to the same extent as though it were manually executed by the duly authorized officer of the appropriate Grantor, regardless of by whom or under what circumstances or by what authority such facsimile signature or other endorsement actually is affixed, without duty of inquiry or responsibility as to such matters, and each Grantor hereby expressly waives demand, presentment, protest and notice of protest or dishonor and all other notices of every kind and nature with respect to any such instrument.

7.      Possession of Collateral by Secured Party. All the Collateral now, heretofore or hereafter delivered to Secured Party shall be held by Secured Party in its possession, custody and control. Any or all of the Collateral delivered to Secured Party may be held in an interest-bearing or non-interest-bearing account, in Secured Party's sole and absolute discretion, and Secured Party may, in its discretion, apply any such interest to payment of the Secured Obligations. Nothing herein shall obligate Secured Party to invest any Collateral or obtain any particular return thereon. Upon the occurrence and during the

continuance of an Event of Default, whenever any of the Collateral is in Secured Party's possession, custody or control, Secured Party may use, operate and consume the Collateral, whether for the purpose of preserving and/or protecting the Collateral, or for the purpose of performing any of Grantors' Obligations with respect thereto, or otherwise, subject to compliance with the requirements of applicable Gaming Laws. Secured Party may at any time deliver or redeliver the Collateral or any part thereof to Grantors, and the receipt of any of the same by any Grantor shall be complete and full acquittance for the Collateral so delivered, and Secured Party thereafter shall be discharged from any liability or responsibility therefor. So long as Secured Party exercises reasonable care with respect to any Collateral in its possession, custody or control, Secured Party shall have no liability for any loss of or damage to such Collateral, and in no event shall Secured Party have liability for any diminution in value of Collateral occasioned by economic or market conditions or events. Secured Party shall be deemed to have exercised reasonable care within the meaning of the preceding sentence if the Collateral in the possession, custody or control of Secured Party is accorded treatment substantially equal to that which Secured Party accords its own Property, it being understood that Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any Person with respect to any Collateral.

8.    Events of Default.  There shall be an Event of Default hereunder upon the occurrence and during the continuance of an Event of Default under the Loan Agreement.

9.    Rights Upon Event of Default.  Upon the occurrence and during the continuance of an Event of Default, subject to compliance with the requirements of applicable Gaming Laws, Secured Party shall have, in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies that Secured Party may have under applicable Law or in equity or under this Agreement (including, without limitation, all rights set forth in Section 6 hereof) or under any other Loan Document, all rights and remedies of a secured party under the Uniform Commercial Code as enacted in any jurisdiction, and, in addition, the following rights and remedies, all of which may be exercised with or without notice to Grantors and without affecting the obligations of Grantors hereunder or under any other Loan Document, or the enforceability of the Liens and security interests created hereby: (a) to foreclose the Liens and security interests created hereunder or under any other agreement relating to any Collateral by any available judicial procedure or without judicial process; (b) to enter any premises where any Collateral may be located for the purpose of securing, protecting, inventorying, appraising, inspecting, repairing, preserving, storing, preparing, processing, taking possession of or removing the same; (c) to sell, assign, lease or otherwise dispose of any Collateral or any part thereof, either at public or private sale or at any broker's board, in lot or in bulk, for cash, on credit or otherwise, with or without representations or warranties and upon such terms as shall be acceptable to Secured Party, provided, however, that Secured Party shall first apply for and receive all required approvals of applicable Gaming Authorities for the sale or disposition of slot machines, mobile gaming systems and other gaming devices (and any other Collateral the disposition of which requires the prior approval of the Gaming Authorities under applicable Law); (d) to notify obligors on the Collateral that the Collateral has been assigned to Secured Party and that all payments thereon are to be made directly and exclusively to Secured Party; (e) to collect by legal proceedings or otherwise all dividends, distributions, interest, principal or other sums now or hereafter payable upon or on account of the Collateral; (f) to cause the Collateral to be registered in the name of Secured Party, as legal owner; (g) to enter into any extension, reorganization, deposit, merger or consolidation agreement, or any other agreement relating to or affecting the Collateral, and in connection therewith Secured Party may deposit or surrender control of the Collateral and/or accept other Property in exchange for the Collateral; (h) to settle, compromise or release, on terms acceptable to Secured Party, in whole or in part, any amounts owing on the Collateral and/or any disputes with respect thereto; (i) to extend the time of payment, make allowances and adjustments and issue credits in connection with the

Collateral in the name of Secured Party or in the name of any Grantor; (j) to enforce payment and prosecute any action or proceeding with respect to any or all of the Collateral and take or bring, in the name of Secured Party or in the name of any Grantor, any and all steps, actions, suits or proceedings deemed by Secured Party necessary or desirable to effect collection of or to realize upon the Collateral, including any judicial or nonjudicial foreclosure thereof or thereon, and each Grantor specifically consents to any nonjudicial foreclosure of any or all of the Collateral or any other action taken by Secured Party which may release any obligor from personal liability on any of the Collateral, and each Grantor waives any right not expressly provided for in this Agreement to receive notice of any public or private judicial or nonjudicial sale or foreclosure of any security or any of the Collateral; and any money or other Property received by Secured Party in exchange for or on account of the Collateral, whether representing collections or proceeds of Collateral, and whether resulting from voluntary payments or foreclosure proceedings or other legal action taken by Secured Party or Grantors may be applied by Secured Party without notice to Grantors to the Secured Obligations in such order and manner as Secured Party in its sole discretion shall determine; (k) to insure, process and preserve the Collateral; (l) to exercise all rights, remedies, powers or privileges provided under any of the Loan Documents; (m) to remove, from any premises where the same may be located, the Collateral and any and all documents, instruments, files and records, and any receptacles and cabinets containing the same, relating to the Collateral, and Secured Party may, at the cost and expense of each Grantor, use such of its supplies, equipment, facilities and space at its places of business as may be necessary or appropriate to properly administer, process, store, control, prepare for sale or disposition and/or sell or dispose of the portion of the Collateral owned by such Grantor or to properly administer and control the handling of collections and realizations thereon, and Secured Party shall be deemed to have a rent-free tenancy of any premises of any Grantor for such purposes and for such periods of time as reasonably required by Secured Party; (n) to receive, open and dispose of all mail addressed to any Grantor and notify postal authorities to change the address for delivery thereof to such address as Secured Party may designate; provided that Secured Party agrees that it will promptly deliver over to the appropriate Grantor such opened mail as does not relate to the Collateral; and (o) to exercise all other rights, powers, privileges and remedies of an owner of the Collateral; all at Secured Party's sole option and as Secured Party in its sole discretion may deem advisable. Grantors will, at Secured Party's request, assemble the Collateral and make it available to Secured Party at places which Secured Party may reasonably designate, whether at the premises of Grantors or elsewhere, and will make available to Secured Party, free of cost, all premises, equipment and facilities of Grantors for the purpose of Secured Party's taking possession of the Collateral or storing same or removing or putting the Collateral in salable form or selling or disposing of same.

Upon the occurrence and during the continuance of an Event of Default, Secured Party also shall have the right, without notice or demand, either in person, by agent or by a receiver to be appointed by a court (and Grantors hereby expressly consent upon the occurrence and during the continuance of an Event of Default to the appointment of such a receiver), and without regard to the adequacy of any security for the Secured Obligations, to take possession of the Collateral or any part thereof and to collect and receive the rents, issues, profits, income and proceeds thereof. Taking possession of the Collateral shall not cure or waive any Event of Default or notice thereof or invalidate any act done pursuant to such notice. The rights, remedies and powers of any receiver appointed by a court shall be as ordered by said court.

Any public or private sale or other disposition of the Collateral may be held at any office of Secured Party, or at Grantors' places of business, or at any other place permitted by applicable Law, and without the necessity of the Collateral's being within the view of prospective purchasers. The Secured Party may also request, in connection therewith, the Nevada Gaming Commission to petition a District Court of the State of Nevada for the appointment of a supervisor to conduct the normal gaming activities on the premises following the appointment of a receiver. Secured Party may direct the order and manner of sale of the Collateral, or portions thereof, as it in its sole and absolute discretion may

determine, and Grantors expressly waive any right to direct the order and manner of sale of any Collateral. Secured Party or any Person on Secured Party's behalf may bid and purchase at any such sale or other disposition. The net cash proceeds resulting from the collection, liquidation, sale, lease or other disposition of the Collateral shall be applied, first, to the expenses (including reasonable attorneys' fees and disbursements) of retaking, holding, storing, processing and preparing for sale or lease, selling, leasing, collecting, liquidating and the like, and then to the satisfaction of the Secured Obligations in such order as shall be determined by Secured Party in its sole and absolute discretion. Grantors and any other Person then obligated therefor shall pay to Secured Party on demand any deficiency with regard thereto which may remain after such sale, disposition, collection or liquidation of the Collateral. Notwithstanding the foregoing or any other provision contained in this Agreement, the remedies provided by this Agreement shall in no way include the right to take any action in contravention of applicable Gaming Laws.

Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will send or otherwise make available to the Borrower, as agent for Grantors and each of them, reasonable notice of the time and place of any public sale thereof or of the time on or after which any private sale thereof is to be made. The requirement of sending reasonable notice conclusively shall be met if such notice is mailed, first class mail, postage prepaid, to the Borrower at its address set forth in the Loan Agreement, or delivered or otherwise sent to the Borrower, at least ten days before the date of the sale. Each Grantor other than the Borrower hereby irrevocably appoints the Borrower as its agent for the purpose of receiving notice of sale hereunder, and agrees that such Grantor conclusively shall be deemed to have received notice of sale when notice of sale has been given to the Borrower. Each Grantor expressly waives any right to receive notice of any public or private sale of any Collateral or other security for the Secured Obligations except as expressly provided for in this paragraph.

With respect to any Collateral consisting of securities, partnership interests, joint venture interests, limited liability company interests, member's interests, Investments or the like, and whether or not any of such Collateral has been effectively registered under the Securities Act of 1933, as amended, or other applicable Laws, Secured Party may, in its sole and absolute discretion, subject to compliance with the requirements of applicable Gaming Laws, sell all or any part of such Collateral at private sale in such manner and under such circumstances as Secured Party may deem necessary or advisable in order that the sale may be lawfully conducted. Without limiting the foregoing, Secured Party may (i) approach and negotiate with a limited number of potential purchasers, and (ii) restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing such Collateral for their own account for investment and not with a view to the distribution or resale thereof. In the event that any such Collateral is sold at private sale, Grantors agree that if such Collateral is sold for a price which Secured Party in good faith believes to be reasonable under the circumstances then existing, then (a) the sale shall not be deemed to be commercially unreasonable by reason of price, (b) Grantors shall not be entitled to a credit against the Secured Obligations in an amount in excess of the purchase price, and (c) Secured Party shall not incur any liability or responsibility to Grantors in connection therewith, notwithstanding the possibility that a substantially higher price might have been realized at a public sale. Grantors recognize that a ready market may not exist for such Collateral if it is not regularly traded on a recognized securities exchange, and that a sale by Secured Party of any such Collateral for an amount substantially less than a pro rata share of the fair market value of the issuer's assets minus liabilities may be commercially reasonable in view of the difficulties that may be encountered in attempting to sell a large amount of such Collateral or Collateral that is privately traded.

Upon consummation of any sale of Collateral hereunder, Secured Party shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the Collateral so sold absolutely free from any claim or right

upon the part of any Grantor or any other Person, and each Grantor hereby waives (to the extent permitted by applicable Laws) all rights of redemption, stay and appraisal which it now has or may at any time in the future have under any rule of Law or statute now existing or hereafter enacted.

          10.    <u>Voting Rights; Dividends; etc</u>.  With respect to any Collateral consisting of securities, partnership interests, joint venture interests, limited liability company interests, member's interests, Investments or the like (referred to collectively and individually in this <u>Section 10</u> and in <u>Section 11</u> as the "<u>Investment Property</u>"), so long as no Event of Default occurs and remains continuing:

          10.1    <u>Voting Rights</u>.  Grantors shall be entitled to exercise any and all voting and other consensual rights pertaining to the Investment Property, or any part thereof, for any purpose not inconsistent with the terms of this Agreement, the Loan Agreement, or the other Loan Documents; <u>provided</u>, <u>however</u>, that Grantors shall not exercise, or shall refrain from exercising, any such right if it would result in a Default.

          10.2    <u>Dividend and Distribution Rights</u>.  Except as otherwise provided in any Loan Document, Grantors shall be entitled to receive and to retain and use any and all dividends or distributions paid in respect of the Investment Property; <u>provided</u>, <u>however</u>, that, subject to compliance with the requirements of applicable Gaming Laws, any and all such dividends or distributions received in the form of capital stock, certificated securities, warrants, options or rights to acquire capital stock or certificated securities forthwith shall be, and the certificates representing such capital stock or certificated securities, if any, forthwith shall be delivered to Secured Party to hold as pledged Collateral and shall, if received by any Grantor, be received in trust for the benefit of Secured Party, be segregated from the other Property of such Grantor, and forthwith be delivered to Secured Party as pledged Collateral in the same form as so received (with any necessary endorsements).

          11.    <u>Rights During Event of Default</u>.  With respect to any Investment Property, so long as an Event of Default has occurred and is continuing:

          11.1    <u>Voting, Dividend, and Distribution Rights</u>.  At the option of Secured Party, subject to compliance with the requirements of applicable Gaming Laws, all rights of Grantors to exercise the voting and other consensual rights which they would otherwise be entitled to exercise pursuant to <u>Section 10.1</u> above, and to receive the dividends and distributions which they would otherwise be authorized to receive and retain pursuant to <u>Section 10.2</u> above, shall cease, and all such rights thereupon shall become vested in Secured Party which thereupon shall have the sole right to exercise such voting and other consensual rights and to receive and to hold as pledged Collateral such dividends and distributions.

          11.2    <u>Dividends and Distributions Held in Trust</u>.  All dividends and other distributions which are received by Grantors contrary to the provisions of this Agreement shall be received in trust for the benefit of Secured Party, shall be segregated from other funds of Grantors, and forthwith shall be paid over to Secured Party as pledged Collateral in the same form as so received (with any necessary endorsements).

          11.3    <u>Irrevocable Proxy</u>.  Subject to compliance with the requirements of applicable Gaming Laws, each Grantor does hereby revoke all previous proxies with regard to the Investment Property and appoints Secured Party as its proxyholder to attend and vote at any and all meetings of the shareholders or other equity holders of the Persons that issued the Investment Property and any adjournments thereof, held on or after the date of the giving of this proxy and prior to the termination of this proxy, and to execute any and all written consents of shareholders or equity holders of such Persons executed on or after the date of the giving of this proxy and prior to the termination of this

proxy, with the same effect as if such Grantor had personally attended the meetings or had personally voted its shares or other interests or had personally signed the written consents; provided, however, that the proxyholder shall have rights hereunder only upon the occurrence and during the continuance of an Event of Default. Each Grantor hereby authorizes Secured Party to substitute another Person as the proxyholder and, upon the occurrence and during the continuance of any Event of Default, hereby authorizes the proxyholder to file this proxy and any substitution instrument with the secretary or other appropriate official of the appropriate Person. This proxy is coupled with an interest and is irrevocable until such time as all Secured Obligations have been paid and performed in full.

12.    Attorney-in-Fact. Each Grantor hereby irrevocably nominates and appoints Secured Party as its attorney-in-fact for the following purposes, subject to compliance with the requirements of applicable Gaming Laws: (a) to do all acts and things which Secured Party may deem necessary or advisable to perfect and continue perfected the security interests created by this Agreement and, upon the occurrence and during the continuance of an Event of Default, to preserve, process, develop, maintain and protect the Collateral; (b) upon the occurrence and during the continuance of an Event of Default, to do any and every act which any Grantor is obligated to do under this Agreement, at the expense of the Grantor so obligated and without any obligation to do so; (c) to prepare, sign, file and/or record, for any Grantor, in the name of the appropriate Grantor, any financing statement, application for registration, or like paper, and to take any other action deemed by Secured Party necessary or desirable in order to perfect or maintain perfected the security interests granted hereby; and (d) upon the occurrence and during the continuance of an Event of Default, to execute any and all papers and instruments and do all other things necessary or desirable to preserve and protect the Collateral and to protect Secured Party's security interests therein; provided, however, that Secured Party shall be under no obligation whatsoever to take any of the foregoing actions, and, absent bad faith or actual malice, Secured Party shall have no liability or responsibility for any act taken or omission with respect thereto.

13.    Costs and Expenses. Each Grantor agrees to pay to Secured Party all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Secured Party in the enforcement or attempted enforcement of this Agreement, whether or not an action is filed in connection therewith, and in connection with any waiver or amendment of any term or provision hereof. All advances, charges, costs and expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Secured Party in exercising any right, privilege, power or remedy conferred by this Agreement (including, without limitation, the right to perform any Secured Obligation of any Grantor under the Loan Documents), or in the enforcement or attempted enforcement thereof, shall be secured hereby and shall become a part of the Secured Obligations and shall be paid to Secured Party by each Grantor, immediately upon demand, together with interest thereon at the rate(s) provided for under the Loan Agreement.

14.    Statute of Limitations and Other Laws. Until the Secured Obligations shall have been paid and performed in full, the power of sale and all other rights, privileges, powers and remedies granted to Secured Party hereunder shall continue to exist and may be exercised by Secured Party at any time and from time to time irrespective of the fact that any of the Secured Obligations may have become barred by any statute of limitations. Each Grantor expressly waives the benefit of any and all statutes of limitation, and any and all Laws providing for exemption of Property from execution or for valuation and appraisal upon foreclosure, to the maximum extent permitted by applicable Law.

15.    Other Agreements. Nothing herein shall in any way modify or limit the effect of terms or conditions set forth in any other security or other agreement executed by any Grantor or in connection with the Secured Obligations, but each and every term and condition hereof shall be in addition thereto. All provisions contained in the Loan Agreement or any other Loan Document that apply

to Loan Documents generally are fully applicable to this Agreement and are incorporated herein by this reference.

16.    Continuing Effect. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets.

17.    Additional Grantors. From time to time following the Closing Date, additional Subsidiaries of the Borrower may become Parties hereto, as additional Grantors, by executing and delivering to the Administrative Agent a Joinder Agreement substantially in the form of Exhibit A hereto, accompanied by such documentation as the Administrative Agent may require in connection therewith, wherein such additional Grantors agree to become a Party hereto and to be bound hereby, provided, however, that prior approval of the applicable Gaming Authority must be obtained for the pledge of the capital stock of any additional Grantor that holds a gaming license. Upon delivery of such Joinder Agreement to and acceptance thereof by the Administrative Agent, notice of which acceptance is hereby waived by Grantors, each such additional Grantor shall be as fully a Party hereto as if such Grantor were an original signatory hereof. Each Grantor expressly agrees that its Secured Obligations and the Liens upon its Property granted herein shall not be affected or diminished by the addition or release of additional Grantors hereunder, nor by any election of Secured Party not to cause any other Subsidiary to become an additional Grantor hereunder. This Agreement shall be fully effective as to any Grantor who is or becomes a Party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

18.    Release of Grantors. This Agreement and all Secured Obligations of Grantors hereunder shall be released when all Secured Obligations have been paid in full in cash or otherwise performed in full and when no portion of the Commitments remain outstanding. Upon such release of Grantors' Secured Obligations hereunder, Secured Party shall return any pledged Collateral to Grantors, or to the Person or Persons legally entitled thereto, and shall endorse, execute, deliver, record and file all instruments and documents, and do all other acts and things, reasonably required for the return of the Collateral to Grantors, or to the Person or Persons legally entitled thereto, and to evidence or document the release of Secured Party's interests arising under this Agreement, all as reasonably requested by, and at the sole expense of, Grantors.

19.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same agreement.

20.    Additional Powers and Authorization. The Administrative Agent has been appointed as the Administrative Agent hereunder pursuant to the Loan Agreement and shall be entitled to the benefits of the Loan Agreement and the other Loan Documents. Notwithstanding anything contained herein to the contrary, the Administrative Agent may employ agents, trustees, or attorneys-in-fact and may vest any of them with any Property (including, without limitation, any Collateral pledged hereunder), title, right or power deemed necessary for the purposes of such appointment.

21.    GOVERNING LAW. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS EXECUTED AND PERFORMED IN THE STATE OF CALIFORNIA.

22.     WAIVER OF JURY TRIAL.  EACH GRANTOR AND SECURED PARTY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE LOAN AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  EACH GRANTOR AND SECURED PARTY AGREES THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED, TO THE FULLEST EXTENT PERMITTED BY LAW, BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, THE LOAN AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY TO THE FULLEST EXTENT PERMITTED BY LAW.

23.     California Judicial Reference.  If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Agreement or any other Loan Document, (a) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (b) without limiting the generality of Section 11.3 of the Loan Agreement, Borrower and/or Grantors shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding.

[signature page follows]

IN WITNESS WHEREOF, the Borrower, initially as the sole Grantor, has executed this Agreement by its duly authorized officer as of the date first written above.

"Grantor"

GREEN VALLEY RANCH GAMING, LLC,
a Nevada limited liability company

By:    GV Ranch Station, Inc., its Manager and Member

       By: _Glenn C Christenson_

       Name: Glenn C. Christenson

       Title: Senior Vice President and Treasurer


By:    GCR Gaming, LLC, its Member

       By:_____

       Name: Brian L. Greenspun

       Title: Manager

ACCEPTED AND AGREED
AS OF THE DATE FIRST
ABOVE WRITTEN:

"Secured Party"

BANK OF AMERICA, N.A.,
as Administrative Agent

By:_____
Donna Kimbrough, Assistant Vice President

[GVR First Lien Sec. Agr.]

IN WITNESS WHEREOF, the Borrower, initially as the sole Grantor, has executed this Agreement by its duly authorized officer as of the date first written above.

"Grantor"

GREEN VALLEY RANCH GAMING, LLC,
a Nevada limited liability company

By:   GV Ranch Station, Inc., its Manager and Member

By:_____

Name: Glenn C. Christenson

Title: Senior Vice President and Treasurer


By:   GCR Gaming, LLC, its Member

By: _____

Name: Brian L. Greenspun

Title: Manager

ACCEPTED AND AGREED
AS OF THE DATE FIRST
ABOVE WRITTEN:

"Secured Party"

BANK OF AMERICA, N.A.,
as Administrative Agent

By:_____
Donna Kimbrough, Assistant Vice President

IN WITNESS WHEREOF, the Borrower, initially as the sole Grantor, has executed this Agreement by its duly authorized officer as of the date first written above.

"Grantor"

GREEN VALLEY RANCH GAMING, LLC,
a Nevada limited liability company

By:     GV Ranch Station, Inc., its Manager and Member

      By:_____

      Name: Glenn C. Christenson

      Title: Senior Vice President and Treasurer


By:     GCR Gaming, LLC, its Member

      By:_____

      Name: Brian L. Greenspun

      Title: Manager

ACCEPTED AND AGREED
AS OF THE DATE FIRST
ABOVE WRITTEN:

"Secured Party"

BANK OF AMERICA, N.A.,
as Administrative Agent

By: _Donna Kimbrough_
Donna Kimbrough, Assistant Vice President

[GVR First Lien Sec. Agr.]

EXHIBIT A
TO
SECURITY AGREEMENT

### INSTRUMENT OF JOINDER

THIS INSTRUMENT OF JOINDER ("Joinder") is executed as of _____, 200_, by
_____, a _____ ("Joining Party"), and
delivered to Bank of America, N.A., as Administrative Agent, pursuant to the Third Amended and
Restated Security Agreement (First Lien) dated as of February 16, 2007 made by Green Valley Ranch
Gaming, LLC, a Nevada limited liability company (the "Borrower"), and those Subsidiaries of the
Borrower that are parties thereto collectively with the Borrower (collectively, the "Grantors" and
individually, a "Grantor"), in favor of the Administrative Agent for the benefit of the Secured Party
described therein (the "Security Agreement"). Terms used but not defined in this Joinder shall have the
meanings defined for those terms in the Security Agreement.

### RECITALS

(A)     The Security Agreement was made by the Grantors in favor of the Administrative Agent
for the benefit of the Secured Party referred to in the Security Agreement.

(B)     Joining Party has become a Subsidiary of the Borrower, and as such is required pursuant
to Section 5.10 of the Loan Agreement to become a party to the Security Agreement.

(C)     Joining Party expects to realize direct and indirect benefits as a result of the availability
to the Borrower of the credit facilities under the Loan Agreement.

NOW THEREFORE, Joining Party agrees as follows:

### AGREEMENT

(1)     By this Joinder, Joining Party becomes a Party to the Security Agreement as an additional
joint and several "Grantor." Joining Party agrees that, upon its execution hereof, it will become a Grantor
under the Security Agreement with respect to all Obligations of the Borrower heretofore or hereafter
incurred under the Loan Documents, and will be bound by all terms, conditions, and duties applicable to a
Grantor under the Security Agreement.

(2)    The effective date of this Joinder is _____, ____.

"Joining Party"

_____

a _____

By:_____
Name:_____
Title:_____

ACKNOWLEDGED:

BANK OF AMERICA, N.A.,
as Administrative Agent

By:_____
Name: _____
Title: _____