ROBERT J. STARK, ESQ.
(NY Bar No. 2739035)
(Admitted *Pro Hac Vice*)
HOWARD S. STEEL, ESQ.
(NY Bar No. 4338984)
(Admitted *Pro Hac Vice*)
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-Mail: rstark@brownrudnick.com
          hsteel@brownrudnick.com

– and –

JEREMY B. COFFEY, ESQ.
(MA Bar No. 666046)
(Admitted *Pro Hac Vice*)
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-Mail: jcoffey@brownrudnick.com

SALLIE B. ARMSTRONG, ESQ.
(NV Bar No. 1243)
MICHELLE N. KAZMAR, ESQ.
(NV Bar No. 10098)
DOWNEY BRAND LLP
West Plumb Lane
Reno, NV 89509
Telephone: (775) 329-5900
Email: sarmstrong@downeybrand.com
          mkazmar@downeybrand.com

*Proposed Counsel for the Official
Committee of Unsecured Creditors of
Green Valley Ranch Gaming, LLC*

*Proposed Local Counsel for the Official
Committee of Unsecured Creditors of
Green Valley Ranch Gaming, LLC*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

* * *

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC.<br><br>Debtors and Debtors in Possession.<br><br>Affects solely Green Valley Ranch Gaming, LLC | Case No. 09-52477<br>Jointly Administered 09-52470 through 09-52487 and 10-50381 and 11-51188 and 11-51190 through 11-51219.<br><br>Chapter 11 Cases<br><br>Judge Gregg W. Zive<br><br>**PRELIMINARY OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GREEN VALLEY RANCH GAMING, LLC TO PREPACKAGED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR SUBSIDIARY DEBTORS, ALIANTE DEBTORS AND GREEN VALLEY RANCH GAMING, LLC (DATED MARCH 22, 2011) AND ACCOMPANYING DISCLOSURE STATEMENT (DATED MARCH 22, 2011)** |

The Official Committee of Unsecured Creditors (the "Official Committee") appointed in the Chapter 11 case of Green Valley Ranch Gaming, LLC ("GVR"), by and through its undersigned proposed counsel, respectfully submits this Preliminary Objection[1] to the *Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated March 22, 2011)* [Docket No. 2797] (the "Plan").[2]  In support of its Preliminary Objection, the Official Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      According to GVR, this case does not need a principled approach, not since there was a "robust" pre-petition auction, and not since the presentation of an opposing viewpoint might offend important families in the Las Vegas business community.  GVR urges the Court to simply rubber-stamp its business judgment, undisturbed by fundamental notions of due process, the Chapter 11 adversary process so carefully constructed by Congress, or clear Bankruptcy Code mandates.  GVR contends that this Court need not concern itself with contrary evidence bearing on enterprise value or insider liability to the estates.

2.      GVR is wrong.  Legal principle does matter.  Evidence does matter.  The Chapter 11 adversary process needs an opportunity to breathe, and to perform its proper function.  The Plan should not be confirmed.

---

[1]  On May 9, 2011, the Official Committee filed its *Motion of the Official Committee of Unsecured Creditors of Green Valley Ranch Gaming, LLC to Adjourn the Confirmation Hearing as it Pertains to Green Valley Ranch Gaming, LLC* [Docket No. 2986] (the "Motion to Adjourn").  The Motion to Adjourn seeks an adjournment of the confirmation hearing for at least one month (with objection deadlines tolled to track the new hearing date), and scheduling the May 25, 2011 hearing as a status conference to establish certain pre-trial and trial procedures.  On May 12, 2011, the Court entered an Order scheduling the Motion to Adjourn for hearing on May 25, 2011 [Docket No. 3034].  The Motion to Adjourn is incorporated herein by reference.

[2]  Capitalized terms not defined herein shall have the meanings ascribed thereto in the Plan.

I.    **The Official Committee Has
      Been Deprived Of Due Process.**

3.    By now, it is beyond question that the Official Committee has been deprived of its due process rights to reasonable discovery and adequate opportunity to prepare for the confirmation trial. Despite the Official Committee's timely and targeted requests for production of documents, GVR and related third-parties have not agreed to provide the Official Committee with meaningful information, including but not limited to, discovery relating to: (1) potential avoidance actions; (2) good faith issues; (3) insider transactions; (4) estate causes of action; and (5) valuation. Without this information, the Official Committee cannot serve as GVR's case counter-balance, as mandated by the Bankruptcy Code, and deliver to this Court an informed opposing viewpoint. Confirmation would, at this point, violate Fifth Amendment liberties, and would run afoul of Bankruptcy Code Sections 1129(a)(2) and (a)(3).

4.    It is important to note that the "rush to judgment" demanded by GVR is not compelled by case circumstance. There is no dire business rationale for emergency confirmation. GVR has plenty of cash and its operations are not properly likened to a "melting ice cube." The sale contemplated by the Plan involves insiders – the Fertitta family – and they are not going away any time soon (they, in fact, run the property daily). Indeed, the Fertittas' bid for the property was accepted nearly six months ago; GVR certainly did not rush into Chapter 11 the moment the Fertitta bid was accepted, fearing that it might evaporate in short order. And, as far as the Official Committee is aware, the Fertitta family has not yet: (i) fully arranged the financing necessary for their re-acquisition of the property; or (ii) obtained necessary regulatory approval for the deal to consummate. The case exigency appears predicated exclusively on the desire to "steam-roll" over any potential opposition, as well as the senior secured lenders' desire to be paid as soon possible. That is woefully insufficient rationale under the law.

**II.    Based On This Record, GVR Cannot Establish
That The Auction Result Reflects Current Enterprise Value.**

5.      A direct consequence of GVR's unwillingness to facilitate reasonable discovery is that it may not use evidence at trial. That is the law. So, it is constrained to using only the same evidence now in the Official Committee's hands, which of course is very limited. That evidence does not inspire confidence in the auction process. Rather, it generates skepticism, and a perception of smoky-backroom dealing benefiting insiders.

6.      The auction began more than twelve months ago, and concluded nearly six months ago. The winning bid is dated and stale. The auction was conducted during what management itself admits and describes as the "trough" in the Las Vegas gaming business. The evidence now suggests that the local's market – and this property in particular – is ready for a profitability turnaround. ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Plan measures the validity of the Fertitta re-acquisition bid squarely in the trough and now, a half a year later, facilitates consummation in the up-swing. Bankruptcy law does not condone this.

7.      Regardless, the auction also was burdened by a heavy cloud. In terms of management and operations, the Fertittas "own" this property, and their re-acquisition intentions were announced at the commencement of the auction process. And, as this Court may recall, the Fertittas' partner in the GVR property (the Greenspun family), loudly contended that the Fertittas mismanaged the property for their own parochial benefit, siphoning away "whale" gamblers and minimizing marketing to prop up competing Station properties. It is hard to have confidence in an auction: (1) necessarily reliant on Fertitta management coaxing bids higher than the Fertitta bid; (2) that would leave the Fertittas in

4

control during the many months before an alternative, competing bid could consummate; and (3) where the bidders could not readily rely on the veracity of historic performance data.[3]

8.    Enterprise value in Chapter 11 is, to be sure, a multi-faceted inquiry, based on a host of data points.  An auction conducted far outside the Court's purview that raises more questions than it answers is only one valuation data point, and here not a very good one.  GVR cannot carry its burden of proving the Plan valuation is consistent with Bankruptcy Code Section 1129(b).  Confirmation should be denied.

**III.    Based On This Record, GVR Cannot Establish
That Insider Releases Are Consistent With The Law.**

9.    The Plan contemplates the release or purchase (by the Fertittas) of estate claims against insiders (including especially claims against the Fertittas and the Greenspuns) potentially worth hundreds of millions of dollars – unencumbered value that rightfully belongs to GVR's unsecured creditors but is being swept up in the Fertitta bid.

10.    As discussed herein, GVR holds <u>prima</u> <u>facie</u> valid insider fraudulent conveyance, corporate waste, and other related claims arising from GVR's January 1, 2008 forgiveness of $200+ million in debt owed by the Fertittas and the Greenspuns.  There is no evidence that GVR received reasonably equivalent value, or any consideration for that matter, in exchange for such loan forgiveness.  GVR's loan forgiveness occurred in the midst of the downturn of the Las Vegas housing market and rising local unemployment.  GVR operating performance was suffering at the time.  Not surprisingly, only a few months after the loan forgiveness, GVR first amended and then effectively cancelled its revolving credit facility to avoid looming covenant compliance issues.

---

[3]    The Court should also note that the auction result is a very low dollar threshold below the hurdle – before unsecured creditors slated to receive nothing would be "in the money."   That execution level does not obviously reflect the fair result of competitive bidding; it reflects an artificial pegging of the number at the very point satisfactory to the secured creditors.

11.     As noted above, GVR also holds prima facie contract breach, tort, and/or corporate law claims (i) emanating from the diversion of so-called "whale" gamblers from GVR to entities wholly-owned by the Fertittas' Station properties, and (ii) relating to mismanagement of GVR, including usurpation of corporate opportunities.  These estate claims may be the exegesis for why GVR's recent operating performance consistently underperformed (at significant variance) the "Boulder Strip" (as a whole) – in stark contrast to the property's prior history of exemplary comparative performance.

12.     By law, GVR's first lien lenders do not have liens on any of these estate causes of action. Thus, successful prosecution of these claims effectively renders significant unencumbered value available to GVR's unsecured creditors.  To date, GVR has not provided the Official Committee with any meaningful discovery establishing that the prima facie claims lack merit.  Subject to further investigation, the claims presently appear quite viable and worthy of pursuit.  And, to the extent a portion of the sale consideration pertains to the Fertittas' acquisition of such claims, that value portion rightfully belongs to unsecured creditors.  Confirmation should be denied.

## IV.     Other Legal Infirmities Prevent Confirmation Of The Plan.

13.     Virtually all other Plan defects stem from presumed insider desire to usurp future value inherent in reorganized GVR for their exclusive benefit, without providing a fair share to general unsecured creditors (other than those preferentially selected for special treatment as "critical" vendors or paid off pre-petition).

14.     The Plan fails to satisfy the standards for confirmation under the Bankruptcy Code because:  (a) the litigation settlements and other allocation of estate causes of action incorporated in the Plan are not fair and equitable and are otherwise inappropriate under the law; (b) the Plan violates the absolute priority rule; and (c) the Plan unfairly discriminates against certain "disfavored" unsecured creditors.

15.     For all these reasons, as discussed more fully herein, the Court should deny confirmation of the Plan.

## BACKGROUND

### I.    General Case Background.

16.    On April 12, 2011 (the "Petition Date"), GVR filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The GVR case is jointly administered with the cases of the SCI Debtors, SCI Subsidiary Debtors, GVRS and the Aliante Debtors. As of the date of this filing, GVR remains in possession of its assets and manages its business as debtor-in-possession, pursuant to Bankruptcy Code Sections 1107(a) and 1108.

### II.    GVR's Efforts To Stonewall Reasonable Discovery.

17.    Seventeen days after the Petition Date, in the early evening (Eastern time) of Friday, April 29, 2011, the United States Trustee appointed the Official Committee. The Official Committee convened its first meeting the following Monday, May 2, 2011, and selected Brown Rudnick LLP as its lead counsel. On May 4, 2011, the Official Committee selected Downey Brand LLP as its Nevada co-counsel. On May 5, 2011, the Official Committee selected its financial advisor, GLC Advisors & Co., LLC.

18.    On May 6, 2011, the Official Committee served *The Official Committee of Unsecured Creditors' First Request to Green Valley Ranch Gaming, LLC for Production of Documents* (the "Official Committee's First Request For Production Of Documents") on counsel for GVR.

19.    On May 9, 2011, the Official Committee served additional third-party discovery pursuant to Bankruptcy Rule 9016, as well as document requests on the SCI Debtors, related to issues relevant to the Official Committee's evaluation of the Plan.

20.    As more fully set forth in the *Declaration of Jeremy B. Coffey in Further Support of Motion of the Official Committee of Unsecured Creditors of Green Valley Ranch Gaming, LLC to Adjourn the Confirmation Hearing as it Pertains to Green Valley Ranch Gaming, LLC*, dated May 11,

2011 [Docket No. 3018], despite several "meet and confer" conferences with opposing counsel, GVR continues to obstruct reasonable document production.[4]

21.     On May 11, 2011, both GVR and the SCI Debtors served their *Objections and Responses to the Official Committee's First Request For Production Of Documents* on counsel for the Official Committee.  GVR's counsel also indicated that non-debtor parties who had received discovery requests from the Official Committee had adopted the positions expressed by GVR, meaning no reasonable discovery would be forthcoming.

22.     On May 12, 2011, GVR filed its *Motion of GVR for a Protective Order Forbidding Discovery by the Unsecured Creditors' Committee, or in the Alternative Limiting the Scope of the Unsecured Creditors' Committee's Document and Deposition Requests* [Docket No. 3039].[5]

23.     As of the filing of this Preliminary Objection, the Official Committee has not received any meaningful discovery.  GVR has provided the Official Committee (pursuant to onerous confidentiality restrictions) with access to a data room containing only 140 documents, comprising approximately 2,100 pages.  Most of the information is outdated and useless for a contested confirmation proceeding.[6]  GVR has also provided the Official Committee with two investigative reports authored by insiders and/or representatives of GVR, but none of the information or work papers underlying such reports.

---

[4]     Instead of providing good faith discovery, GVR instead seeks to distract attention from its discovery abuses with its baseless *Motion of GVR for an Order Directing the U.S. Trustee to Remove Second Lien Lenders from the Official Committee of Unsecured Creditors*, dated May 11, 2011 [Docket No. 3021].

[5]     The Court entered an Order scheduling a hearing on GVR's motion for protective order for May 18, 2011 [Docket No. 3055].

[6]     GVR has not, for example, provided the Official Committee with its long-range business plan, including forecasts of future operating performance.  As discussed herein, that information should have been provided in the Disclosure Statement and was most assuredly provided in connection with the auction – that is, if the auction was actually intended to generate competitive bidding.

24.     As more fully set forth in the *Official Committee of Unsecured Creditors' Motion (1) to Compel Discovery and (2) for Relief from Improper Confidentiality Restrictions*, dated May 13, 2011 [Docket No. 3078], fully incorporated herein by reference, GVR's document production to date wholly fails to adequately respond to the Official Committee's First Request For Production Of Documents.  It is patently obvious that GVR is engaging in a purposeful strategy of impeding the Official Committee's examination of, among other things, the auction process, GVR's valuation assumptions and conclusions, the Plan and its "global settlement," and estate causes of action against insiders.  Such restrictions should not be countenanced by the Court, especially in light of GVR's accelerated case calendar.

25.     In Chapter 11, all is not "fair in love and war."  Nor is corporate bankruptcy appropriately likened to hand-to-hand combat.  For a Chapter 11 debtor to have access to the substantial benefits that bankruptcy provides (such as, for example, being absolved of hundreds of millions of dollars in debt), it has to play by the rules carefully constructed by Congress and the United States Supreme Court.  GVR is not playing by those rules.

### III.     GVR's Pre-Petition Debt And Liabilities.

26.     On the Petition Date, GVR allegedly had funded debt obligations of approximately $879 million, including:

   a.    $549.8 million under the GVR First Lien Credit Agreement;

   b.    $56.5 million under the GVR First Lien Swap Agreement; and

   c.    $272.7 million under the GVR Second Lien Credit Agreement.

See *Declaration of Thomas M. Friel in Support of GVR's Chapter 11 Petition and First Day Motions*, dated April 13, 2011 [Docket No. 24] at 10-11.  GVR also allegedly has various unsecured debt obligations, including unsecured claims for management fees, licensing fees and gaming taxes, customer deposits and gaming currency.  Id. at 41-42, 54.

27.     At the outset of this bankruptcy proceeding, GVR received authority to pay certain pre-petition unsecured claims.  See *Order Authorizing GVR to Pay Prepetition Claims of Critical Vendors*,

dated April 15, 2011 [Docket No. 44]. It also appears that GVR may have paid favored unsecured creditors during the pre-petition preference period. On May 10, 2011, GVR filed its *Statements of Financial Affairs* [Docket No. 2989], in which it disclosed creditor payments aggregating more than $30.55 million in the 90-days preceding bankruptcy and insider payments aggregating more than $13.125 million in the year preceding bankruptcy.

## IV.    GVR's Corporate Structure And Management.

28.    GVR was formed on November 19, 1999 and the Green Valley Ranch Resort, Spa & Casino ("GVR Hotel") opened in December 2001. GVR is a 50/50 joint venture between GVRS, a Nevada corporation and a wholly-owned subsidiary of SCI, and GCR Gaming LLC, a Nevada limited liability company ("GCR Gaming") and a subsidiary of the American Nevada Company, which is an affiliate of the Greenspun Corporation. SCI is controlled by the Fertitta family, while the Greenspun Corporation is controlled by the Greenspun family. GVR owns GVR Hotel. The GVR Hotel caters primarily to Las Vegas area residents and is considered one of the premier locals-oriented resorts.

29.    GVRS is the manager of the GVR Hotel pursuant to an operating agreement, dated March 10, 2000 (the "GVR Operating Agreement"). In general, pursuant to the GVR Operating Agreement, GVRS is entitled to receive a management fee equal to 2% of revenues and approximately 5% of EBITDA. See Disclosure Statement at 20. From 2002 to 2009, it is estimated that SCI, through GVRS, received approximately $70 million in management fees from GVR.

30.    An executive committee (the "Executive Committee") comprised of Frank J. Fertitta III, Chairman, President and Chief Executive Officer of SCI and Brian L. Greenspun, Chief Executive Officer of Greenspun Corp. oversees the operations of GVR. Executive Committee approval is required for high level decisions including any sale of assets of a fair market value of more than $500,000 and any financing that subjects GVR to principal and interest payment obligations of more than $1,000,000 per fiscal year. See Disclosure Statement at 29.

## V.   Events Precipitating The Filing
## Of This Case; Present Cash Balance.

31.   In February 2007, GVR completed an $800 million dividend recapitalization.  GVR used the proceeds from this borrowing to pay down its revolving loan facility and to dividend value away from GVR to insiders.

32.   At the beginning of 2007, GVR used its borrowings to pay equal distributions totaling approximately $570 million to GVRS (Fertittas) and GCR Gaming (Greenspuns).  See Disclosure Statement at 21.  Of the $570 million in distributions, each of GVRS (Fertittas) and GCR Gaming (Greenspuns) received a dividend payment of approximately $185 million, and another $100 million corporate loan in exchange for promissory notes from each of GVRS and GCR Gaming (collectively, the "Notes").  GVR never called GVRS and GCR Gaming on the Note indebtedness.   In fact, effective January 1, 2008, without any consideration presently known to the Official Committee, GVR forgave the Notes and any related interest thereon.

33.   In other words, in the beginning of 2008, each of the Fertittas and the Greenspun families received a $100+ million distribution of debt forgiveness from GVR.

34.   There is ample reason to believe that this was a "last value grab" while heavy storm clouds hung overhead, giving rise to claims sounding in fraudulent conveyance, corporate waste, breach of fiduciary duty and other theories.  At that time, the Las Vegas economy was mired in recession.  Key economic indicators, like home prices and employment where showing negative growth.  Meanwhile, many gaming-specific metrics for Las Vegas were also demonstrating slowing or negative growth, including:  visitor volumes; convention attendance; Clark County gaming revenues; and "Boulder Strip" gaming revenues.  Accordingly, the securities prices of comparable gaming operators began to exhibit declines.  For example, Boyd Gaming Corporation's common stock price declined over 25% in 2007.  Like many of its peers, GVR's performance began to rapidly decline and the price of its debt began to deteriorate.

35.    To be sure, all of this had to have been known to the Fertittas and Greenspuns, who were well positioned to watch the slowdown in bookings and casino foot traffic each and every day.

36.    After the GVR Note forgiveness in January 2008, operating performance plummeted further.  GVR saw a drop in net revenue from $277.8 million in 2007 to $245 million in 2008 and $182.8 million in 2009.  See Disclosure Statement at 31.  GVR's EBITDAM declined from $111.6 million in 2007 to $82.5 million in 2009 and $49.9 million in 2009.  Id.

37.    GVR's financial performance may have been impacted further in the last two years by the introduction of The M Resort Spa Casino Las Vegas.  The M Resort opened in early 2009 generating transitory ("newness") interest in the competing property, especially in light of  promotional "Grand Opening" marketing efforts.  However, GVR's operating performance consistently underperformed the "Boulder Strip" at a significant variance.

is attached hereto as Exhibit A.

38.    It has also been alleged (by the Greenspuns no less) that during this time period, SCI, through its control of GVRS, engaged in a scheme to systematically divert "whale" gamblers from GVR to 100% SCI-owned casinos, and to artificially suppress GVR marketing.  See GCR Gaming, LLC's Motion to Dismiss GV Ranch Station's Chapter 11 Case, dated February 18, 2010, Case No. 10-50381 [Docket No. 16] (the "Greenspun Motion to Dismiss").  A copy of the Greenspun Motion to Dismiss is

7

attached hereto as Exhibit B, and the statements contained therein are incorporated herein by reference. The Greenspuns attributed GVR's "precipitous" decline in gross revenue during this time period, to these practices.

39.    In March 2008, GVR amended, and then in September 2008 (only 9 months after the $200+ million Note forgiveness in January), effectively cancelled its revolving credit facility to avoid looming covenant compliance issues. In February 2010, GVR failed to make a required payment on its interest rate swap resulting in an event of default under GVR's credit facilities. In March 2010, GVR failed to make scheduled payments on its first and second lien term loans. That debt remained in default for more than a year, before GVR finally filed for Chapter 11 relief.

40.    In its *Statement of Financial Affairs* [Docket No. 2989], GVR discloses that, as of March 31 2011, it had cash resources of nearly $41 million, inclusive of about $12 million in "cage" cash.

██████████████████████████████████████████████████████

████████████████████████████

## VI.    Last Year's Auction.

41.    Starting a year ago, right in the middle of an extended "trough" period in the Las Vegas gaming market, GVR began a process to sell or transfer management of its business.

42.    To that end, the Executive Committee authorized the formation of the GVR Transaction Committee (comprised of Dr. James A. Nave and William A. Bible) to oversee the sale process. See Disclosure Statement at 32. GVR also retained Kirkland & Ellis LLP and Oppenheimer & Co. Inc. ("Oppenheimer") to assist with marketing and restructuring efforts.

43.    Through May and June 2010, Oppenheimer purportedly contacted over 70 parties who potentially could have had an interest in owning or managing GVR's assets. From this group, purportedly 16 parties submitted preliminary letters of interest, including nine acquisition and 14 management proposals. However, only three parties, including the GVR Purchaser, submitted final acquisition bids for GVR.

44.    In early November 2010, a steering committee comprised of GVR First Lien Lenders (the "First Lien Lenders Steering Committee") informed GVR that it would not support a sale on the terms proposed by any of the bidders.  See Disclosure Statement at 34.  Thereafter, the GVR Transaction Committee "negotiated" with the GVR Purchaser to improve its bid.  The GVR Purchaser's bid ultimately was raised from $485 million on November 17, 2010 to $500 million on December 23, 2010.  The Executive Committee then approved the bid.

45.    Creating further insecurity about the veracity of the auction process to reveal true enterprise value, it was not competitive bidding that resulted in the actual final sale price.  Rather, the sale price ended up being simply the number on which the insiders and the GVR First Lien Lenders Steering Committee agreed, after the sale "process" ground to a halt as competing bidders walked away from what presumably appeared to be a stacked deck.  Interestingly, the number agreed to by GVR and the GVR First Lien Lenders Steering Committee generates value sufficient to deliver a significant dividend to First Lien Lenders, but short of what would be necessary to deliver any value to other constituencies (at least those not favored by insiders, as discussed below).

## VII.    The Prepackaged Plan.

46.    The Plan contemplates implementing the sale to the GVR Purchaser under the terms of the GVR Purchase Agreement.  Under the Plan, GVR shall assume the GVR Purchase Agreement under Bankruptcy Code Section 365 and the GVR Purchased Assets will be transferred to and vest in the GVR Purchaser free and clear of liens (except for certain permitted encumbrances provided for in the GVR Purchase Agreement).  See Disclosure Statement at 4.  Pursuant to the GVR Transition Services Agreement, SCI and/or New Propco (both entities controlled by the Fertitta family) will maintain management of GVR, entitling the Fertittas to substantial fees for providing GVR's operational and management functions.

47.    The proceeds derived from the sale will be used solely to pay GVR First Lien Lender Claims.  Other Administrative and Priority Tax Claims against GVR will be paid by the Plan

14

Administrator from GVR's cash on hand.  General unsecured creditors (including holders of GVR Second Lien Term Loan Claims) will not receive any distribution under the Plan, and are deemed to reject the Plan pursuant to Bankruptcy Code Section 1126(g).  Jefferies & Company, Inc. is currently marketing $310 million of financing in support of the Plan, ███████████████████████████

████████████████████████

48.    The Plan is supported by the GVR First Lien Lenders Steering Committee and certain other GVR First Lien Lenders who have executed a Plan Support Agreement effective as of March 9, 2011.  See Disclosure Statement at 3.  GVR purchased their support with, among other incentives, a $5,000,000 "restructuring" fee.

**VIII.    The Greenspun Family Contractually Obligates Itself
To Help The Fertittas Re-Acquire The Business And Is
Promised Participation In Going Forward Management Fees.**

49.    In May 2010, the Fertittas quietly settled the Greenspun Motion to Dismiss.  The terms of settlement were memorialized in an agreement (the "Fertitta/Greenspun Settlement Agreement") that, to the best of the Official Committee's knowledge, was never filed with the Court.  A copy of the Fertitta/Greenspun Settlement Agreement is attached hereto as Exhibit C.

50.    The Fertitta/Greenspun Settlement Agreement contains a number of terms designed to divert estate value to the Greenspun and the Fertitta families including an obligation to jointly:  (a) assist the Ferttita family to re-acquire the property;[8] (b) seek to cause the restructured GVR to enter into a management agreement with an entity controlled by the Fertitta family;[9] and (c) seek a "trademark

---

[8]    See Fertitta/Greenspun Settlement Agreement § 2(a) ("Each of the FG Entities agrees that it will use its reasonable best efforts to acquire the assets or equity interest of GVR and Aliante through the restructuring, sale or auction relating to those entities.").

[9]    Id. at § 3 ("Each of FG and the Greenspun Entities agrees that it will support a management fee payable FG for the management of each of Restructured JV in an amount equal to (a) 2% of the gross revenues of applicable Restructured JV and (b) 5% of EBITDA of the applicable Restructured JV.").

license fee" payable to entities controlled by the Greenspun family for a period of not less than 20 years.[10]

51.     In other words, at the very same time that GVR was commencing its auction, the Fertitta and the Greenspun families publicly declared their intention to facilitate a Fertitta re-acquisition of the property as part of a GVR bankruptcy.

52.     Under the Plan, the Fertitta/Greenspun Settlement Agreement is assumed and assigned to the GVR Purchaser. See Plan at Schedule 4.4 (in exchange for the exclusive use of the "Green Valley Ranch" name in connection with the Casino Business for a period of not less than 20 years, the Company shall pay to GCR Gaming (the Greenspuns) or its Affiliate a trademark license fee equal to 0.30% of gross revenues of the Company); see also Plan at 21-22.[11]

53.     It is an open question for discovery (which has been disallowed) as to whether the GVR estate owns or already has sufficient license to use the name.  But, preliminary evidence strongly suggests that GVR (not the Greenspuns) owns all branding rights.  Attached hereto as Exhibit D are copies of (i) Schedule 4.8 from the GVR First Lien Credit Agreement and (ii) that certain Trademark Collateral Assignment (First Lien), both of which documents indicate that GVR owns the "Green Valley Ranch" name.

---

[10]    Id. § 4 ("Each of the Greenspun Entities will support a trademark license fee for the Greenspun Entities equity to 0.30% of gross revenues of the applicable Restructure JV.").

[11]    At the Closing, the license agreement, by and between the Company and GCR Gaming, LLC or its Affiliate (the "License Agreement"), shall be entered into by the parties thereto and the License Agreement shall (i) provide that the Company shall have the continued use of the "Green Valley Ranch" name in exchange for a license fee, (ii) include such other terms and conditions as set forth on Schedule 4.4, with such changes thereto as the parties to the License Agreement may approve, and (iii) be duly assigned and transferred by the Company to Purchaser with the written consent of GCR Gaming, LLC or its Affiliate; provided, however, that failure of GCR Gaming, LLC or its Affiliate to enter into the License Agreement or consent to its assignment to Purchaser shall not relieve Purchaser of its obligations under the Agreement.  See Plan at 21-22.

54. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

This being a local's casino – as opposed to a destination property – serving a high-end Las Vegas demographic (foot traffic driven by geography and service/accommodations, not branding), it seems very hard to believe that the "Green Valley Ranch" name does in fact have any real impact on enterprise value.

55. So, why then does the Plan contemplate the Greenspuns' participation in forward-looking enterprise value? Case circumstance strongly suggests that it is being paid on account of the Greenspuns' equity position, to incentivize corporate governance assistance and to otherwise make litigation (derivative, company-owned) go away. Discovery, once allowed, presumably will prove this factual point conclusively.

## IX. Changed Circumstances Require A Fresh Look At GVR's Enterprise Value.

56. Despite concluding its auction process nearly six months ago, GVR now seeks to ram the sale through this Court on an accelerated time table, notwithstanding the markedly different state of the Las Vegas gaming market from one year ago (and even several months ago).

57. Since that time, the Las Vegas economy has clearly shown signs of stabilization. Home prices are beginning to turn around (a 5% decrease in 2010 as compared to a 21% decline in 2009), and unemployment appears to be recovering (dropping 2.4 percentage points from July 2010 to March 2011). Consumer spending also shows signs of recovery. Clark County taxable retail sales have averaged year-over-year increases of 2.5% for the last six months. Eating and drinking taxable sales have been up on a year-over-year basis for eight consecutive months and have averaged an increase of 5.8% for the most recent six months. Other important indicators of a rebound in the Las Vegas gaming industry include increasing visitor volumes (+3.2% in the last year), gaming revenue (+2.0% for the last

year trailing February 2011, excluding baccarat), and convention attendance (+5.6% for the last year trailing February 2011).

58.    GVR Hotel is well-positioned to take advantage of improving market conditions due to its breadth of upscale amenities, including 495 hotel rooms, 55,000 square feet of event space and a 2,000 seat theater.  Moreover, GVR Hotel occupies a location geographically superior to those of its competitors.  The Green Valley master planned community is the most affluent in Southeastern Las Vegas.  The average household income within a three mile radius of GVR Hotel is $97,406, thirty percent higher than the Las Vegas average.  138,000 people live within a three mile radius of GVR Hotel.  Further, Clark County's population is still expected to grow at a 1.7% compound annual growth rate until 2040.  Finally, GVR Hotel benefits from its stature as a well-established popular gaming destination immune from the strictures of the Nevada Senate Bill 208 a/k/a "The Neighborhood Casino Act," which places strict limits on the approval of new locations for additional neighborhood casinos.

59.    In fact, GVR's situation has been improving.  GVR has limited ongoing capital investment requirements following its development program.  This enables GVR to generate substantial cash flow even with reduced operating performance levels. ██████████████

████████████  GVR's customer loyalty continues to outperform its peers, ████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████

18

60.    GVR is in a very different place today than it was when the auction was being run and the Fertitta bid was accepted.    But, the Court need not take the Official Committee's word for it.  In the Re-Acquisition Financing Offering Memorandum attached hereto as <u>Exhibit A</u>, the Fertittas make the point themselves – and they do so powerfully.

## **BASES FOR OBJECTION**

I.    **The Plan Should Not Be Confirmed  Because**
      **The Official Committee Has Been Deprived Of**
      **Its Most Basic Due Process Rights To Discovery And**
      **<u>A Fair Opportunity To Present A Contrary Viewpoint.</u>**

    A.    **The Official Committee Has Been Deprived**
      **<u>Of Its Constitutional Entitlement To Due Process.</u>**

61.    It is beyond question that the Official Committee has procedural due process rights.  <u>See</u> <u>Joye v. Franchise Tax Bd. (In re Joye)</u>, 578 F.3d 1070, 1079 (9th Cir. 2009) (<u>citing</u> <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>), 339 U.S. 306, 314 (1950)).

62.    Among these due process rights is a meaningful opportunity to be heard, a concept that contemplates adequate time to prepare.  <u>See</u> <u>In re Acequia, Inc.</u>, 787 F.2d 1352, 1359 (9th Cir. 1986) (<u>citing</u> <u>Memphis Light, Gas & Water Div. v. Craft</u>, 436 U.S. 1, 14 (1978) ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impeding 'hearing'")); <u>see also</u> <u>Bostic v. Carlson</u>, 884 F.2d 1267, 1271 (9th Cir. 1989) (<u>citing</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539, 564 (1974) (part of the function of notice is to give a party "a chance to marshal facts in his defense")).

63.    A meaningful opportunity to be heard is not only essential for the party affected but also to our wider justice system.  As the United States Supreme Court noted:

> No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.  Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.

<u>Joint Anti-Fascist Refugee Comm. v. McGrath</u>, 341 U.S. 123, 171-72 (1951) (Frankfurter, J. concurring) (<u>quoting</u> Daniel Webster, "In a government like ours, entirely popular, care should be taken in every part of the system, *not only to do right, but to satisfy the community that right is done*" and Lord Chief Justice Goddard, *"[J]ustice must not only be done but must manifestly be seen to be done*." (emphasis added)).

64.    These procedural due process principles have been incorporated into the Bankruptcy Code. "[A]fter notice and a hearing, or a similar phrase – (A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. 102(1)(A).  Indeed, parties are to be afforded not only reasonable time, but also reasonable discovery, in connection with all contested matters.  <u>See</u> Fed. R. Bankr. P. 9014(c).

65.    Such is the importance of procedural due process that appellate courts have voided bankruptcy court orders that violated this sacred entitlement.  <u>See Owens-Corning Fiberglass Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.)</u>, 759 F.2d 1440, 1450 (9th Cir. 1985) (reversing and remanding because notice was inadequate to allow party to prepare adequately); <u>Smith v. Wheeler Tech., Inc. (In re Wheeler Tech., Inc.)</u>, 139 B.R. 235, 241 (B.A.P. 9th Cir. 1992) (allowing party only seven days to prepare did not comport with procedural due process).

66.    Rushed efforts by a debtor that deprive parties-in-interest procedural due process (either in terms of sufficient time to prepare or reasonable discovery), will not be sanctioned by the law.  <u>See,</u> e.g., <u>In re ASARCO LLC</u>, 420 B.R. 314, 343 (S.D. Tex. 2009) (declining to consider debtor's plan where "due process and fundamental fairness[] would require allowing additional time for discovery," and deadlines imposed by exit financing would prevent the plan from being "fully vetted by the parties."); <u>In re Bombay Co.</u>, 2007 Bankr. LEXIS 3218, at *9 (Bankr. N.D. Tex. Sept. 26, 2007) ("The court is extremely concerned by this time-trap.  The forced nature of its consideration of the Motion is inconsistent with the Code, due process of law, the exercise of the court's authority and simple common

sense.  The bankruptcy court is not a mindless business tool like a computer system or a delivery service

for use at the convenience of a debtor's management.").

67.    There is no justification for the forced nature of the Plan process in this case.    The

Official Committee respectfully submits that this Court should not condone GVR's procedural abuses in

its campaign for substantive gain.  Such a result would be contrary to no less authority than our very

Constitution.  It also runs contrary to Bankruptcy Code Sections 1129(a)(2) and (a)(3).  Confirmation

should be denied.

**B.    GVR Has Failed To Live Up To Its
Disclosure Responsibilities Under The Law.**

68.    Related to the Official Committee's due process concerns, GVR has not complied with

all applicable provisions of Title 11 because GVR has withheld meaningful discovery and adequate

disclosure.  "Compliance with the disclosure and solicitation requirements is the paradigmatic example

of what Congress had in mind when it enacted section 1129(a)(2)."  In re H.B. Michelson, 141 B.R. 715,

719 (Bankr. E.D. Cal. 1992) (quoting legislative history).  Indeed assessing the adequacy of disclosure at

the confirmation hearing is recognized as an "efficient safeguard of the integrity of the reorganization

process . . . by the time of the confirmation hearing . . . [w]hat once appeared to be adequate information

may have become plainly so inadequate and misleading as to cast doubt on the viability of the

acceptance of the plan and to necessitate starting over."  Id. at 719.

69.    The burden of disclosing adequate information rests squarely on GVR.  Id. at 719-20; In

re Mt. Highlands, LLC, 2007 Bankr. LEXIS 4268, at *30 (Bankr. D.N.M Dec. 14, 2007) (denying

confirmation of plan because of a failure to provide adequate information).

70.    The need for meaningful Official Committee participation is especially crucial here when the Plan contemplates an expedited sale to an insider[12] previously accused (by the Greenspuns) of wrongdoing.  See, e.g., In re Exaeris, Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008) (disapproving expedited sale to an insider where:  (i) the "emergency" nature of the motion was driven by the purchaser's insistence on closing in less than one month; (ii) there was insufficient evidence regarding the extent of marketing efforts; and (iii) questions regarding the adequacy of the insider's proposed purchase price); In re Univ. Heights Ass'n, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y Jan. 22, 2007) (recognizing that insider transactions require heightened scrutiny).

71.    GVR cannot meet its burden because it has failed to disclose, among other things, forward-looking financial projections and their underlying assumptions.  This is a material omission. See In re Brotby, 303 B.R. 177, 194 (B.A.P. 9th Cir. 2003) ("A debtor's projected future income is relevant both when a disclosure statement is approved and at confirmation.").  Because the Disclosure Statement did not contain these projections and GVR still has not disclosed such projections to the Official Committee, the Disclosure Statement does not provide "adequate information" within the ambit of Bankruptcy Code Section 1125.  Such failure to disclose adequate information harms not just general unsecured creditors but all parties-in-interest.  See In Everett v. Perez (In re Perez), 30 F.3d 1209, 1216-17 (9th Cir. 1994) ("one obvious injury from inadequate disclosure is, in essence, being tricked.").

72.    GVR has not complied with its Bankruptcy Code obligations.  The Plan does not pass muster under either Sections 1129(a)(2) or (a)(3).  Confirmation should be denied.

---

[12] The Bankruptcy Code defines an "insider" to include an "affiliate or insider of an affiliate as if such affiliate were the debtor."  11 U.S.C. § 101(31)(E).  The definition of  "insider" is illustrative rather than exhaustive.  See In re Krehl, 86 F.3d 737, 741 (7th Cir. 1996).  In ascertaining insider status, courts look to the closeness of the relationship between the parties and to whether any transactions between them were conducted at arm's length.  See Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.), 554 F.3d 382, 396-97 (3d Cir. 2009) ("the question 'is whether there is a close relationship and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length.'") (citation omitted).  Here, the GVR Purchaser is controlled by the Fertitta brothers, who, are no doubt, insiders of GVR.

**C.    Confirmation Denial At This Early Point In
The Chapter 11 Process Does Not Threaten The
Business Or Necessarily Result In Catastrophic Loss.**

73.    To be sure, Bankruptcy Courts at times are asked to address matters of business exigency. In fairly adjudicating those matters, the Courts are necessarily required to balance business need versus the rights of parties-in-interest to have their fair day in Court. The Bankruptcy Code acknowledges this dilemma, especially in areas like interim usage of cash collateral or early post-petition borrowing. But, even regarding critical issues like immediate post-petition access to working capital, the Bankruptcy Code safe-guards due process rights and the subsequent opportunity to present a contrary viewpoint. See, e.g., 11 U.S.C. § 363(c)(3). Creditors do not, in other words, check their due process rights at the Courthouse door just because the debtor cries emergency, even when it is legitimately an emergency.

74.    But, here, there is no emergency. The estates appear to have plenty of working capital availability. The Fertitta bid is not a "melting ice cube" – it has been around for almost half a year and there is every reason to believe it will stick around for months longer. Moreover, as noted above, it appears that there still remain substantial conditions to the Fertitta bid closing, including the final placement of re-acquisition financing and regulatory approval from the Nevada Gaming Commission.

75.    There is no legitimate business need here to rush to judgment. The balance does not tip in favor of GVR "steam rolling" its Plan through. The balance tips decidedly in favor of at least a short delay and a fair opportunity for the Official Committee to take discovery and to present an opposing viewpoint with evidence. Confirmation should be denied.

**II.    The Plan Should Not Be Confirmed Because
It Is Predicated On A Valuation Thesis That Cannot Be
Supported By Evidence Properly Admitted To This Court.**

**A.    GVR's "Heavy" Burdens Of Proof And Persuasion.**

76.    The provisions of the Bankruptcy Code dealing with confirmation are "among the most significant protections of Chapter 11." In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 881 (Bankr. S.D.N.Y. 1990).

77.    Prior to confirming a plan, the Bankruptcy Court has an affirmative duty to ensure that the plan satisfies all of the requirements for confirmation set forth in Bankruptcy Code Section 1129. See 11 U.S.C. § 1129; Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship. (In re Ambanc La Mesa Ltd. P'ship.), 115 F.3d 650, 653 (9th Cir. 1997) (citing In re L & J Anaheim Assoc., 995 F.2d 940, 942 (9th Cir. 1993)).

78.    GVR bears the burden of proof and persuasion respecting every applicable provision of Bankruptcy Code Section 1129 by a preponderance of the evidence. See Ambanc, 115 F.3d at 653.  The burden GVR bears has been described by the Ninth Circuit Court of Appeals as "heavy."   Perez, 30 F.3d at 1214 n. 5.

79.    Fundamentally, the Plan cannot be confirmed unless each impaired class votes to accept the Plan.  See 11 U.S.C. § 1129(a)(8).  Here, the Plan provides zero recovery for general unsecured creditors, and they are deemed to reject the Plan.  See 11 U.S.C. § 1126(g).  Accordingly, the Court can only confirm the Plan if GVR proves, among other things, that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  See 11 U.S.C. § 1129(b)(1); see also Wiersma v. Bank of the West (In re Wiersma), 227 F. App'x. 603, 606-607 (9th Cir. 2007).

80.    GVR is unable to prove these elements and, consequently, Plan confirmation should be denied.

## B.    Because GVR Has Not Provided Discovery, It Now Cannot Admit Evidence At Trial.

81.    Where a party places a matter into issue, it must provide full and fair discovery to its adversary, notwithstanding a privilege or immunity that would otherwise preclude discovery. See, e.g., Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1426 n. 12 (3d Cir. 1991) (if partial waiver of otherwise privileged materials would disadvantage the other party by allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all

communications on the same subject); Pitney-Bowes, Inc. v. Mestre, 86 F.R.D. 444, 447 (S.D. Fla. 1980) (discovery is to be allowed where the plaintiff had "placed in issue the very soul of this litigation the intent of the parties with regard to construction of certain terms of the Agreements" and there is "no other apparent source of direct proof going to the issue at hand.").

82.    If one party to a litigation fails to enable reasonable discovery of the matters put into issue, that party is to be prohibited from admitting evidence in support of its case in chief.  See Gutierrez–Rodriguez v. Cartagena, 882 F.2d 553, 576 (1st Cir. 1989) ("Courts have not been afraid to bar a party from testifying where doing so was necessary to prevent the thwarting [of] the purposes and policies of the discovery rules."); Columbia Pictures v. Krypton Broadcasting, 259 F.3d 1186 (9th Cir. 2001) (granting motion in limine is proper where attempt made to allow deposition in the "eleventh hour"); Mobil Oil Corp. v. Amoco Chemicals Corp., 779 F.Supp. 1429, 1485 n. 43 (D. Del. 1991) (granting motion in limine to preclude use at trial of evidence for which party had asserted privilege for "failure to clearly waive the privilege before the close of discovery").

83.    Given that GVR has refused to provide the Official Committee reasonable discovery and, in turn, a fair opportunity to present an alternative viewpoint, the law would not allow it to admit evidence at trial in support of its case in chief.  That is the natural repercussion of its own sharp litigation tactics.  GVR cannot meet its burden of proof under Section 1129, and confirmation therefore should be denied.

**C.    GVR Cannot Carry Its Burdens Of Proof
And Persuasion Regarding Enterprise Value.**

84.    As Plan proponent, GVR bears the burden of establishing the enterprise valuation upon which the Plan rests by a preponderance of the evidence.  See In re OCA, Inc., 357 B.R. 72, 83 (Bankr. E.D. La. 2006) (noting burden was on plan proponents to establish value of the debtors for purposes of plan confirmation); see also In re Armstrong World Indus., 348 B.R. 111, 120 & fn. 15 (D. Del. 2006)

(plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code Section 1129(a) and 1129(b)).

85.    As noted above, the Plan cannot be crammed down on GVR's unsecured creditors via Bankruptcy Code Section 1129(b) unless it is "fair and equitable" to such creditors.  The obligation of fair and equitable treatment obviously hinges on GVR's submission of sufficient proof as to enterprise valuation, given that the Plan is predicated on the contention that there is insufficient estate value to facilitate distribution at lower levels of the capital structure.  See, e.g., In re Penn Cent. Transp. Co., 596 F.2d 1102, 1110 (3d Cir. 1979); In re Granite Broad. Corp., 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007).

86.    In other words, GVR must prove and otherwise persuade this Court that it has an enterprise value below the "hurdle" level of GVR First Lien Allowed Claims.  See In re Rusty Jones, Inc., 110 B.R. 362, 373-74 (Bankr. N.D. Ill. 1990) (plan proponent's failure to present plausible evidence of the value of its assets left the court unable to find that the plan was in the best interests of creditors).  This it cannot do, certainly not with the evidentiary constraints it has voluntarily imposed on itself.  Confirmation should be denied.

### 1.    The Auction Result Is Not Necessarily A Reliable Proxy For GVR's Current Enterprise Value.

87.    In Chapter 11, enterprises are to be valued free of the insolvency "stigma," consistent with bankruptcy's ever-present fresh start philosophy.  This is why corporate debtors are usually valued based on forward-looking earnings capacity.  This rule was announced many years ago by the Supreme Court in the seminal case Consolidated Rock vs. Dubois:

> "[T]he commercial value of property consists in the expectation of income from it." Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties.  It is plain that valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earnings capacity …. The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable.

312 U.S. 510, 526 (emphasis added); see also Protective Comm. for Indep. Stockholders of TMT Trailer

Ferry v. Anderson, 390 U.S. 441 (1968) ("The appropriate standard for valuing a company undergoing

reorganization was set out at length in [Consolidated Rock]."); In re Bush Indus., 315 B.R. 292, 299

(Bankr. W.D.N.Y. 2004) ("[T]he appropriate valuation of Bush Industries is to be grounded upon its

earnings capacity as a reorganized entity.").

88.    An auction can, to be sure, serve as an alternative methodological approach to ferreting

out enterprise value. But, an auction does not, in and of itself, assure a valuation consistent with the

teachings of Consolidated Rock. If, hypothetically speaking, a debtor sheepishly presents to the Court a

bid arising from a rigged auction, marred by competitive failure, undue inside or outside influence, high

barriers to entry, insecurity of performance data, changed circumstance, or skepticism of value

preservation between bid acceptance and closing, it would not necessarily be a simple matter for the

Court to conclude that the bid is, in fact, a reliable proxy for the implicit worth of the business.

89.    Courts have made this point time and again. See, e.g., Calpine Corp. v. O'Brien Envtl

Energy, Inc., 181 F.3d 527, 535-37 (3d Cir. 1999) (recognizing that the auction process must have

robust, fair participation from all interested bidders to arrive at the actual value of the asset – more

competitive bidding will bring better benefit to the estate); In re Frances Michael Fitzgerald, 428 B.R.

872, 883 (B.A.P. 9th Cir. 2010) ("The price achieved by an auction is ordinarily assumed to

approximate market value when there is competition by an appropriate number of bidders. However,

when competition is constrained, the price is less likely to be reliable and should be examined more

carefully."); In re W.A. Mallory Co., 214 B.R. 834, 837 (E.D. Va. 1997) (holding that sale of assets to

insider was not for fair value where sale price was less than both appraisal and tax assessment value); In

re BMW Group I, Ltd., 168 B.R. 731 (Bankr. W.D. Okla. 1994) (the assumption that "an auction sale

must have brought the market price," has been criticized for "ignor[ing] the possibility of DIP self-

dealing."); In re Gen. Bearing Corp., 136 B.R. 361 (Bankr. S.D.N.Y. 1992) (refusing to approve sale of

debtor's assets to insider where debtor presented no evidence that sale price exceeded value of all liens on property).

90.    As discussed herein, GVR's auction facially reflects many infirmities.  GVR cannot simply show up at the confirmation trial, shout "auction result," and expect the law to readily apply its imprimatur no questions asked.  The law demands far more than that.

### 2. GVR's Auction Did Not (And Could Not Under The Circumstances Of This Case) Reflect The Efficient Market Hypothesis.

91.    At its core, bankruptcy's sometimes acceptance of auction processes depends on the following inquiry:  Do the circumstances surrounding the auction enable confidence that the winning bid reflects the execution level established by a willing buyer and a willing seller, negotiating freely over time in a competitive but unpressured environment?  That is the so-called "efficient marketplace hypothesis."  For this reason, a deal tantamount to a "forced sale" is not a sustainable reflection of the enterprise's going-concern value. Similarly, an empty "market test" – where the company is unflatteringly exposed to a hostile credit and/or M&A market – is not a sustainable valuation. See, e.g., Wolkowitz v. Am. Research Corp. (In re Dak Indus.), 170 F.3d 1197, 1200 (9th Cir. 1999).

92.    Despite GVR's self-serving representations that it ran a "robust" marketing effort, the Court must consider the efficacy of that unsupervised sale process in light of the following:  (i) the omnipresent control of GVR by the influential Fertitta family; (ii) bidder diligence necessarily required Fertitta openness and cooperation; (iii) bidder awareness that, at auction inception, the Fertittas and the Greenspuns had already publicly declared their intention (in the Fertitta/Greenspun Settlement Agreement) of ultimately facilitating the Fertittas re-acquisition of the property; (iv)  bidder awareness that, should its bid succeed, the disgruntled Fertitta family would remain at the helm until sale consummation, subjecting the enterprise to substantial pre-closing risk; (v) allegations from the Greenspun family that the Fertittas are not particular nice or honorable people with whom to do business, and that historic performance data is unreliable; (vi) awareness that the GVR auction was

being run at the same time other Station properties were being auctioned, and that the other auction generated hot litigation, suggesting a similar fate for any alternative GVR bidder; (vii) the industry was then in a "trough" period; and (viii) acquisition of gaming properties generally is a matter involving very high barriers to entry and significant time delays due to the industry's strict licensing requirements, further constraining bidding by potentially interested parties.

93.    The surrounding circumstances of this auction do not readily enable confidence that the Fertittas' winning bid reflects willing and unpressured commerce in a competitive and efficient M&A marketplace.    There is too much insider involvement, too much "hair" on the transaction, and too many internal and external bidding constraints.    It cannot be readily accepted for purposes of an expedited confirmation hearing, and thereby serve as the only valuation data point for the findings the Court must make to confirm the Plan.

### 3.    The Fertitta Bid Is Now Dated And Stale, And Fails To Account For Cyclicality In The Gaming Industry.

94.    When evaluating GVR's enterprise worth, the law requires that the valuation reflect the most current input data available.    See In re Mirant Corp., 334 B.R. 800, 829 (Bankr. N.D. Tex. 2005) ("It is incumbent upon this court in valuing [the debtor] to determine whether or not its value extends to [the alleged "out-of-the-money" constituency] to reach its decision using the best, most current information available."); In re Beker Indus. Corp., 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) ("adjustments to the . . . estimate of going concern value must be made to reflect the lower costs of raw materials that are currently being incurred.").

95.    Further, it is a textbook valuation principle that, for "cyclical" industries (and gaming is most assuredly a "cyclical" industry), the valuation is not to be a "snapshot" moment in time – especially if the "snapshot" is taken at the apex or nadir of the industry cycle.    Rather, the evaluation is to cut across the entirety of the business cycle.    In this way, transitory distortions, anomalies or phenomena are to be obviated in a valuation model.    See Peter Panteleo & Barry Ridings,

<u>Reorganization Value</u>, 51 Bus. Lawyer 419, 431 (1996) (the "goal" is to forecast through a complete business cycle until a steady state of growth or maturity is reached). If momentary snapshots are not truly representative of longer-term cash prospects, they are not truly representative of an enterprise's value, as defined by <u>Consolidated Rock</u> and its progeny. See <u>Mirant</u>, 334 B.R. at 819 (relative valuation methodologies difficult to employ because the energy industry "is, according to the testimony, a 'cyclical' industry. Yet the industry has never yet gone through a full cycle.").

96.    The Fertitta bid is nearly half a year old, and arose in the context of an auction that started more than a year ago. It was predicated on valuation data that is now dated and stale (and, according to the Greenspuns, manipulated and unreliable) and, so, the bid itself is now dated and stale. The bid also reflects a "snapshot" valuation taken at the nadir of the industry cycle, which in and of itself is highly inconsistent with the teachings of <u>Consolidated Rock</u>. ███████████

████████████████████████████████████

███████ Their bid is not a reliable indicator of enterprise value. The Plan is not consistent with Section 1129(b) and, therefore, should not be confirmed.

**III.    The Plan Should Not Be Confirmed Because The Litigation Settlements Embedded In The Plan Are Not Fair And Equitable And Do Not Pass Muster Under The Ninth Circuit's Analytical Requirements.**

**A.    The Insider "Global Settlement" Is Inappropriate.**

97.    As noted above, the Plan incorporates a "global settlement" of all estate claims and causes of action arising from pre-petition transactions, including claims: (1) against the Fertitta and Greenspun families for the $200+ million loan forgiveness in January 2008; and (2) against the Fertittas, the Stations entities, and related third-party affiliates and persons arising from the siphoning of "whale" gamblers, under-marketing the property, and the other allegations contained in the Greenspun Motion to Dismiss attached hereto as <u>Exhibit B</u>. Such estate claims are either acquired as part of the Fertitta bid, or are released, discharged, and exculpated for no consideration.

98.     Unsecured creditors do not receive any value under the "global settlement" or the Plan. See Plan at 132.  That is so notwithstanding the fact that: (i) fraudulent conveyance claims against the Fertitta and Greenspun families facially appear viable under Nevada's fraudulent conveyance statutes, see NRS § 112.180, as now enforceable by the estates pursuant to Bankruptcy Code Section 544(b); (ii) estate breach of contract and fiduciary duty claims against Fertitta and Greenspun families and affiliates also facially appear viable under Nevada law, see, e.g., Brown v. Kinross Gold U.S.A., Inc., 531 F.Supp.2d 1234, 1245 (D. Nev. 2008); and (iii) none of these claims are burdened by liens, meaning that this is unencumbered estate value.  See, e.g., In re Figearo, 79 B.R. 914, 917 (Bankr. D. Nev. 1987).

99.     When analyzing a proposed settlement of estate causes of action, the Ninth Circuit Court of Appeals directs the Court's consideration towards the following factors: "(a) [t]he probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."  Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1381 (9th Cir. 1985); see also Schnelling v. Thomas (In re Agribiotech), 2004 U.S. Dist. LEXIS 27629, at *16 (D. Nev. Sept. 27, 2004).

100.     This evaluation is not, however, taken from the perspective of those supporting the deal. Settlement fairness is evaluated from the perspective of those who are disenfranchised.  Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 645 (3d Cir. 2006) ("Under the 'fair and equitable' standard, [the Court looks] to the fairness of the settlement to the other parties, i.e., the parties who did not settle.").  Thus, settlements that fail to generate recoveries to unsecured creditors are viewed critically.  See In re QMect, Inc., 359 B.R. 270, 272-73 (Bankr. N.D. Ca. 2007) (court denied approval of settlement where unsecured creditors would recover no distribution resulting from the settlement).

101.     In that same vein, the burden of proof and persuasion does not shift to the objecting party. The burden of proof and persuasion always rests on the movant's shoulders – here GVR – to establish

31

that the settlement is fair and appropriate to those objecting. See, e.g., In re Key3Media Grp. Inc., 336 B.R. 8793 (Bankr. D. Del 2005) ("the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved."); Exide Technologies, 303 B.R. at 69 ("Because the Debtor has failed to demonstrate that the Creditors Committee is not likely to succeed at trial, this factor weighs against approval of the settlement."); In re Texaco Inc., 84 B.R. 889, 891 (Bankr. S.D.N.Y. 1988) (regarding confirmation of a plan that settled estate claims, "the debtor has the burden of establishing all of the requirements for confirmation delineated under 11 U.S.C. § 1129.").

102.    GVR must, therefore, prove to and persuade this Court that the estate claims do not have any value. This is a particularly onerous burden for GVR to carry, for two reasons. First, as dictated by the Supreme Court, GVR must produce evidence sufficient for this Court to appreciate the underlying facts and legal theories at issue, thereby facilitating detailed findings (that can be reviewed on appeal) supporting the Court's conclusion. See TMT Trailer Ferry, 390 U.S. at 424-25 (1968). Second, because GVR has refused the Official Committee's reasonable discovery requests, it is not allowed to introduce evidence in support of the settlement at the confirmation trial. See Gutierrez–Rodriguez, 882 F.2d at 576; Columbia Pictures, 259 F.3d at 1186; Mobil Oil Corp., 779 F.Supp. at 1485 n. 43.

103.    GVR cannot carry its burden of proving or persuading the Court that: (i) the insider claims are worthless, especially in light of the evidentiary constraints GVR voluntarily imposed on itself; (ii) the value of such claims, to the extent implied in the sale consideration offered by the Fertittas, does not rightfully belong to unsecured creditors; and (iii) that the Plan is not facially wrong in that it diverts such unencumbered value to secured creditors or the Fertittas. The Plan violates Bankruptcy Code Sections 1129(a)(1), (a)(3), (a)(7), and (b)(1). It should not be confirmed.

**B.    The Plan's Allocation Of Preserved
         Avoidance Claims Is Wrongful Under The Law.**

104.    To the extent not released as part of the "global settlement," the Plan preserves avoidance claims sound in, among other theories, preference and fraudulent conveyance. See Plan at 136. As part of their re-acquisition bid, the Fertittas also "buy" these claims. See GVR Purchase Agreement § 2.1(r).

105.    This may not be insignificant value. On May 10, 2011, GVR filed its *Statements of Financial Affairs* [Docket Number 2989] disclosing that, in the 90-days preceding bankruptcy, they paid more than $30.55 million to unsecured creditors and, in the one-year preceding bankruptcy, they paid an incremental $13.125 million to insiders. As noted above, avoidance claims are not lien-encumbered value; this is value belonging to unsecured creditors. See Figearo, 79 B.R. at 917.

106.    But, even if the claims generated a fraction of $43.7 million, the Plan still would be wrongful because not a penny of this value may be alienated from unsecured creditors for no return compensation. In fact, avoidance actions are not estate assets that GVR even has the capacity to "sell" to the Fertittas. See, e.g., Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.), 226 F.3d 237, 243 (3d Cir. 2000); Steffen v. Gray, Harris & Robinson, P.A., 283 F. Supp. 2d 1272, 1284 n. 24 (M.D. Fla. 2003), aff'd, 1238 F. App'x 297 (11th Cir. 2005); Richardson v. Huntington Nat'l Bank (In re CyberCo. Holdings, Inc.), 382 B.R. 118, 143 (Bankr. W.D. Mich. 2008); Moyer v. ABN AMRO Mortg. Corp. (In re Feringa), 376 B.R. 614, 624 (Bankr. W.D. Mich. 2007; Wagner v. Christiana Bank & Trust Co. (In re Wagner), 353 B.R. 106, 112 (Bankr. W.D. Pa. 2006); Rubera v. Rubera (In re Rubera), 289 B.R. 520, 523 (Bankr. D. Conn. 2003); In re Saunders, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989); see also 5 Collier on Bankruptcy ¶ 541.07 n.1 (16th ed. 2011) ("The avoiding powers of a debtor in possession granted in chapter 5 of the Code are not property of the estate but statutorily created powers to recover property.").

107.    The Plan wrongfully allocates away unsecured creditor value, is inconsistent with law and, in turn, violates Sections 1129(a)(1), (a)(3), (a)(7) and (b)(1). It should not be confirmed.

**C.    GVR Cannot Carry Its Burdens Of Proof And
Persuasion That Secured Creditor Treatment Is Appropriate.**

108.    GVR First Lien Secured Lenders take all Fertitta sale proceeds, that is the Plan thesis. But, GVR has failed to provide the Official Committee sufficient discovery and opportunity to investigate: (i) the sufficiency of such lenders' liens; (ii) whether such liens "blanket" enterprise value; (iii) whether they were properly perfected; or (iv) whether any such liens may be avoided.  Failing to provide such discovery and a reasonable opportunity to investigate, GVR cannot now admit evidence establishing that the secured lenders do, in fact, have entitlement to all sale proceeds.  It therefore cannot carry its burdens of proof and persuasion.  Confirmation should be denied.

**IV.    The Plan Should Not Be Confirmed
Because It Violates The Absolute Priority Rule.**

109.    The Court cannot confirm the Plan if it affords equity holders any distribution and, thus, violates the absolute priority rule.  See 11 U.S.C. § 1129(b)(2)(B); Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. La Salle St. P'ship., 526 U.S. 434, 442 (1999); Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988); Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.), 634 F.3d 79, 94 (2d Cir. 2010).

110.    Where a plan of reorganization affords an equity holder any form of distribution, including future participation in enterprise value or the release of estate causes of action, the question is whether the distribution is being made "on account of" that entity's equity position.  See 11 U.S.C. § 1129(b)(2)(B).

111.    "On account of" does not mean "in exchange for." 203 N. LaSalle, 526 U.S. at 449-50. Rather, it means "because of" or "a causal relationship between holding the prior interest and receiving [and] retaining property." Id. at 453-54.  "[R]eceipt of property partly on account of an existing equity interest [is] enough for the absolute priority rule to bar confirmation of the plan." DBSD, 634 F.3d at 96 (emphasis added).    Thus, it has been held that, where stock holders could not have gained access to a

plan distribution "but for their prior equity position," the distribution fails the absolute priority rule. See In re Coltex Loop Central Three Partners, L.P., 138 F.3d 39, 44-45 (2d Cir. 1998).

112.    Under the Plan, Greenspun affiliates receive value in the form of: (i) releases of estate causes of action, including claims stemming from the $100 million loan forgiveness in January 2008; and (ii) GVR's assumption and assignment of the Fertitta/Greenspun Settlement Agreement, and resultant rights to future cash flow from operations. The latter form of consideration is characterized as for the license to branding rights, but the documents attached hereto as Exhibit D suggest that characterization is artifice. The surrounding circumstances instead strongly suggest that this distribution of value is made "on account of" the Greenspun's equity ownership, attendant ability to participate in GVR management, resulting knowledge of what actually transpired behind closed doors at headquarters, and an ability to assert wrongdoing derivatively against the Fertitta family. Stated differently, this value distribution emanates and derives from, and is but for caused by, the Greenspun's equity position.

113.    The Plan affords equity distributions, even though unsecured creditors are not paid in full, in violation of Bankruptcy Code Section 1129(b)(2)(B). It violates the absolute priority rule and should not be confirmed.

## V.    The Plan Should Not Be Confirmed Because It Unfairly Discriminates Among Unsecured Creditors.

114.    The Plan facially discriminates against certain "disfavored" unsecured creditors. Before the Official Committee was appointed, GVR received authority to satisfy $745,000 of their unsecured trade claims during these cases; these "favored" unsecured creditors already received 100% cash payments.[13] The "favored" unsecured creditors are also immunized against preference exposure to the estate. All residual unsecured creditors receive nothing under the Plan, not even releases from preference exposure, thereby effectively creating two unsecured creditor classes: (a) the 100% class; and (b) the 0% class.

---

[13]    See Order Authorizing GVR to Pay Prepetition Claims of Critical Vendors, dated April 15, 2011 [Case No. 11-51213, Docket No. 44].

115.    Under the case law, the Court is not empowered to authorize "Critical Vendor" payments absent consent of all parties (which was not the case here, since the Official Committee was not yet formed) and, even if it has such power:  (x) early payment does not magically convert a general unsecured claim into an administrative claim (the payment is better viewed as an interim advance of a plan distribution); and (y) regardless, GVR may have provided "non-critical" creditor payments that exceed the bounds of the "Critical Vendor" allowance, thereby creating an independent unfair discrimination problem.

116.    Pursuant to Section 1129(b), a plan must not unfairly discriminate against like classes of creditors.  Indeed, equality of treatment of creditors is a fundamental precept of bankruptcy law.  Begier v. IRS, 496 U.S. 53, 58 (1990); Am. United Mut. Life Ins. Co. v. Avon Park, 311 U.S. 138, 147 (1940) ("[A] composition would not be confirmed where one creditor was obtaining some special favor or inducement not accorded the others, whether that consideration moved from the debtor or another. . . . That rule of composition is but part of the general rule of 'equality between creditors' applicable in all bankruptcy proceedings.").

117.    Although not explicitly defined by legislative history or case law, creditors "who are similarly situated regarding legal rights and priority cannot be given unequal treatment under a plan of reorganization." Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.), 166 B.R. 428, 436-37 (C.D. Cal. 1993); Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.), 407 B.R. 576, 592 (D. Del. 2009) ("[I]f claims within the same class are not receiving the same treatment, and the holders of those claims are being treated less favorably have not consented to the discrimination, the plan is not confirmable.").

118.    If a plan provides for discriminatory treatment among creditors within a particular class, the plan proponent bears the burden of establishing the reasonableness of the discrimination by a preponderance of the evidence.  See Coleman, 560 F.3d at 1011 (9th Cir. 2009); Ambanc, 115 F.3d at 653; In re Eddington Thread Mfg. Co., 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (observing, in the

context of assessing whether certain unsecured claims could be separately classified without violation of Bankruptcy Code Section 1123(a)(4)'s equality of treatment requirement, "the proponent of a Chapter 11 Plan bears the burden of proving a reasonable basis in the event a Plan discriminates in its treatment of creditors holding similar claims."); Ad Hoc Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.), 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.").

119.    The payment of favored unsecured creditors in full (pre-petition during the preference period, or post-petition under a "critical vendor" rubric) operates to deliver to a select group of general unsecured creditors more favorable treatment than less favored general unsecured creditors under the Plan (who do not stand to receive any distribution under the Plan). "The Code does not expressly authorize courts to allow preferential payment of pre-petition obligations in contravention of its claims priority scheme or outside of a confirmed plan of reorganization." In re Berry Good, LLC, 400 B.R. 741, 746 (Bankr. D. Ariz. 2008) (citing In re B & W Enters., Inc., 713 F.2d 534, 537 (9th Cir. 1983) (deeming it "unwise to tamper with the statutory priority scheme devised by Congress" . . . "absent compelling reasons"). As such, confirmation of the Plan must be denied.

120.    As the Court noted at GVR's first day hearing (prior to the Official Committee's appointment), payment of some, but not all, unsecured claims creates a fundamental confirmation problem for GVR because the Plan effectively creates two classes of similarly situated unsecured creditors: (a) those favored enough to receive high (100%) cash returns; and (b) the unfavored residual, which are not to receive any recovery (and may be required to disgorge).

121.    The Court reminded GVR's counsel that, at the time of plan confirmation, "[t]here cannot be unfair discrimination." Hr'g Tr., 101:18-19, Apr. 14, 2011. A copy of the relevant portions of the April 14, 2011 hearing transcript is attached hereto as Exhibit E. The Court noted that it was not foreclosed from considering an objection on unfair discrimination grounds at the time of plan

confirmation.  See id. at 103:1-3.  The Court continued:  "I'm being asked to discriminate against creditors that have the same status" as the so-called "critical" vendors. . . .  "I just wonder if that is going to cause a confirmation issue if it's raised."  Id. at 102:2-3.  It certainly does.  As the Kmart decision referenced by the Court noted, "every circuit that has considered the question has held that [the Bankruptcy Code] does not allow a bankruptcy judge to authorize full payment of any unsecured debt, unless all unsecured creditors in the class are paid in full."  In re Kmart Corp., 359 F.3d 866, 871 (7th Cir. 2004).

122.    In determining whether a plan unfairly discriminates, numerous courts have adopted the rebuttable presumption test derived from an influential article written by former professor, now Bankruptcy Judge, Bruce A. Markell.  See, e.g., Armstrong, 348 B.R. at 122; Kurak v. Dura Auto Sys., Inc. (In re Dura Auto Sys., Inc.), 379 B.R. 257, 271 (Bankr. D. Del. 2007); In re Quay Corp., Inc., 372 B.R. 378, 386 (Bankr. N.D. Ill. 2007); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 231 (Bankr. D.N.J. 2000); see also Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227 (1998).

123.    Under the so-called "Markell Test," there is a rebuttable presumption of unfair discrimination whenever there is:  (a) a dissenting class; (b) another class of the same priority; and (c) a difference in the plan's treatment of the two classes that results in either (i) a materially lower percentage recovery for the dissenting class, or (ii) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.  See Armstrong, 348 B.R. at 121.

124.    Where there is a materially lower percentage recovery, "the presumption [of unfair discrimination] can be rebutted 'by a showing that, outside of bankruptcy, the dissenting class would receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset[s] its gain.'"  Id.  Thus, absent structural or contractual

seniority/subordination, stark differences in unsecured class treatment rarely passes muster under the Markell Test.

125.    Here, GVR bears the burden of proving that the discrimination between the 100% class of unsecured creditors and 0% class of unsecured creditors is fair and appropriate.  Given that this case does not appear to involve issues of structural or contractual seniority/subordination, GVR must prove that each of the "preferred" unsecured creditors "infused new value into the reorganization which offset[s] its gain."   No pleading filed in this Court suggests that any of the "preferred" unsecured creditors provided any value into the reorganization, let alone off-setting value.  The Official Committee holds GVR to its burdens of proof and persuasion, burdens that cannot be carried in light of GVR's refusal to produce discovery.  Confirmation should be denied.

## **RESERVATION OF RIGHTS**

126.    The Official Committee reserves all of its rights to supplement this Preliminary Objection and add such additional confirmation objections as and when discovery becomes available.

**[THE REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

**WHEREFORE,** for all the foregoing reasons, the Official Committee respectfully requests that this Court: (i) deny confirmation of the Plan; and (ii) grant the Official Committee such other and further relief as this Court deems just, proper, and equitable.

Dated: May 16, 2011

**Brown Rudnick LLP**

By: */s/ Robert J. Stark*
Robert J. Stark, Esq.
(NY Bar No. 2739035)
(Admitted *Pro Hac Vice*)
Howard S. Steel, Esq.
(NY Bar No. 4338984)
(Admitted *Pro Hac Vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-Mail: rstark@brownrudnick.com
hsteel@brownrudnick.com

-and-

Jeremy B. Coffey, Esq.
(MA Bar No. 666046)
(Admitted *Pro Hac Vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-Mail: jcoffey@brownrudnick.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors of*
*Green Valley Ranch Gaming, LLC*

-and-

Sallie B. Armstrong, Esq.
(NV Bar No. 1243)
Michelle N. Kazmar, Esq.
(NV Bar No. 10089)
DOWNEY BRAND LLP

West Plumb Lane
Reno, Nevada 89509
Telephone:  (775) 329-5900
Email:  sarmstrong@downeybrand.com

*Proposed Local Counsel for the Official
Committee of Unsecured Creditors of Green
Valley Ranch Gaming, LLC*

EXHIBIT A
(filed under seal)