James H.M. Sprayregen, P.C. (IL No. 6190206)
David R. Seligman, P.C. (IL No. 6238064)
David A. Agay (IL No. 6244314)
Sarah H. Seewer (IL No. 6301437)
KIRKLAND & ELLIS LLP
300 North LaSalle St.
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
james.sprayregen@kirkland.com
david.seligman@kirkland.com
david.agay@kirkland.com
sarah.seewer@kirkland.com

Reorganization Counsel
for GVR

Candace Carlyon (NV No. 002666)
James Patrick Shea (NV No. 000405)
SHEA & CARLYON, LTD.
701 Bridger Avenue, Suite 850
Las Vegas, Nevada 89101
Telephone:    (702) 471-7432
Facsimile:    (702) 471-7435
ccarlyon@sheacarlyon.com
jshea@sheacarlyon.com

Special Local Reorganization Counsel
for GVR

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Chapter 11 |
| STATION CASINOS, INC. | Case No. 09-52477 |
| Debtors and Debtors in Possession.[1] | Jointly Administered 09-52470 through 09-52487, 10-50381, 11-51188, and 11-51190 through 11-51219 |
| ☒  Affects all debtors listed in footnote 2[2] | Jointly Administered |
| | **GVR'S OBJECTION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION (1) TO COMPEL DISCOVERY AND (2) FOR RELIEF FROM IMPROPER CONFIDENTIALITY RESTRICTIONS** |
| | Hearing Date:    May 18, 2011
Hearing Time:    3:00 p.m.
Place:    300 Booth Street
    Reno, NV 89509 |

---

[1]  The debtors in these jointly administered chapter 11 cases are: (i) Station Casinos, Inc.; Northern NV Acquisitions, LLC; Reno Land Holdings, LLC; River Central, LLC; Tropicana Station, LLC; FCP Holding, Inc.; FCP Voteco, LLC; Fertitta Partners LLC; FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II, LLC; FCP MezzCo Borrower I, LLC; and FCP PropCo, LLC (collectively, the "SCI Debtors"); (ii) Auburn Development, LLC; Boulder Station, Inc.; Centerline Holdings, LLC; Charleston Station, LLC; CV HoldCo, LLC; Durango Station, Inc.; Fiesta Station, Inc.; Fresno Land Acquisitions, LLC; Gold Rush Station, LLC; Green Valley Station, Inc.; GV Ranch Station, Inc.; Inspirada Station, LLC; Lake Mead Station, Inc.; LML Station, LLC; Magic Star Station, LLC; Palace Station Hotel & Casinos, Inc.; Past Enterprises, Inc.; Rancho Station, LLC; Santa Fe Station, Inc.; SC Durango Development LLC; Sonoma Land Holdings, LLC; Station Holdings, Inc.; STN Aviation, Inc.; Sunset Station, Inc.; Texas Station, LLC; Town Center Station, LLC; Tropicana Acquisitions, LLC; and Vista Holdings, LLC (collectively, the "Subsidiary Debtors"); (iii) Aliante Gaming, LLC, Aliante Holding, LLC, and Aliante Station, LLC (collectively, the "Aliante Debtors"); and (iv) Green Valley Ranch Gaming, LLC ("GVR").

TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:

1. Green Valley Ranch Gaming, LLC ("GVR"), as the debtor in possession in the above-captioned chapter 11 case, hereby submits this opposition to the Official Committee of Unsecured Creditors' Motion (1) to Compel Discovery and (2) for Relief from Improper Confidentiality Restrictions (the "Motion" or the "Motion to Compel").

I. **The Unsecured Creditors' Committee's Attempt to Extort Holdup Value From GVR and its First Lien Lenders**

2. With each passing day, filing and failure to properly meet and confer, it becomes more obvious that the Official Committee of Unsecured Creditors' (the "Unsecured Creditors' Committee" or the "Committee") only goal in this prepackaged restructuring is to extract holdup value through nuisance and delay at GVR's expense.

3. Cutting through the Committee's rhetoric, its core assertion is plain: it believes that GVR is more valuable than the market has indicated (and thus, by implication, that GVR's plan is not in the best interests of general unsecured creditors because they would receive a distribution in a chapter 7 liquidation). Following an extensive marketing process, the market determined that GVR's enterprise value is $500 million, more than $378 million below the threshold level for general unsecured creditors to recover under a liquidation waterfall analysis. The first lien lenders and their legal and financial advisors actively participated in the Marketing Process and accepted a $500 million offer, even though it left the first lien lenders over $100 million short of full payment and they had the right to credit-bid the value higher. The Committee alleges that the sophisticated bidders in the Marketing Process and the first lien lenders got it wrong, despite the fact that GVR's second lien lenders (who constitute the Committee's entire membership) had the opportunity to bid enough to pay the first lien lenders in full and acquire ownership of these supposedly undervalued assets. Instead, the Committee seeks to place its own theoretical value on

---

[2]  This Motion affects: GVR.

the Estate and claims that it needs broad and overwhelming discovery to do so. The Court should not condone this wild goose chase for a different, theoretical value.

4. As the Committee concedes, a "market test, of course, is one possible method of measuring enterprise value," and "under normal circumstances an auction generating a cash bid may be an appropriate indicator of fair market value." (Motion of the Official Committee of Unsecured Creditors of Green Valley Ranch Gaming, LLC to Adjourn the Confirmation Hearing as it Pertains to Green Valley Ranch Gaming, LLC ("Motion to Adjourn"), ¶¶ 5, 66, ECF No. 2986.) In fact, courts have repeatedly concluded that the market is the best indicator of value. *See, e.g., In re Granite Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007); *In re Iridium Operating, LLC*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2003) ("the public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation"). GVR already underwent the expense and burden of determining its market value.

5. GVR established an independent transaction committee (the "Transaction Committee") to oversee a sales process, and hired Oppenheimer & Co. to market the property to potential buyers (the "Marketing Process"). The Marketing Process was robust, conducted over nine months, with 73 participants, 29 executed confidentiality agreements, nine[3] bidders submitting first round bids and three bidders submitting second round bids. That process resulted in a bid for $485 million. The first lien lenders then actively engaged in negotiations with the potential purchaser, finally resulting in a $500 million offer, $100 million more than the next highest bidder. The winning bid came in at a purchase price of approximately 11x the trailing twelve months EBITDAM and approximately 10x projected EBITDAM for 2011.[4] These multiples significantly exceed recent comparable transactions, including the implied adjusted EBITDAM multiple in the Station Casinos Propco transaction.

---

[3] Eight bids were received by the first round deadline. A ninth bid was received late. The Transaction Committee decided to allow that party into the second round. *See* Declaration of William A. Bible, In re Stations Casinos, Inc. 11-51213, at ¶ 18 (Bankr. D. Nev. April 13, 2011, ECF No. 20).

[4] In other words, the winning offer was 2x 2011 EBITDAM greater than any other offer. Despite that remarkable result, the Committee claims there must be more enterprise value within GVR.

2

1    6.    The Committee says, "the key question in this case is whether the prior GVR sale process . . . is reflective of GVR's current enterprise value." (Motion to Adjourn, ¶ 5.) In the same breath, the Committee also acknowledges that a properly run sale process is an appropriate indicator of value. So if the Committee is entitled to any discovery at all, it should be limited to that question: was the Marketing Process run properly, thereby resulting in a determination of GVR's market value? Any inquiry beyond that question is not relevant to whether GVR's plan satisfies the "best interests" test for general unsecured creditors.

7.    Without conceding that the members of the Committee are entitled to any discovery, GVR produced documents (including sale process documents, as discussed below) and offered witnesses for deposition that allow the Committee to test its key question. Further, as second lien lenders, each of the Committee members already had access to additional documents that detail GVR's financial and operational performance. At least two of the three Committee members and the Committee's proposed counsel have been observers of the Marketing Process from the beginning—about nine months before the Committee was formed. Throughout the Marketing Process, two of the Committee members and their counsel asked for and received updates and information about the process as it unfolded. None took issue with the Marketing Process or the independence of those running the Marketing Process.

8.    Beyond the nature and extent of the Marketing Process, the Motion to Compel seeks documents and witnesses that far exceed the bounds of relevance, will not lead to the discovery of admissible evidence and impose burdens upon the recipients of the discovery that far outweigh any possible benefit to the Committee. These discovery requests will lead to significant costs and delay, all at GVR's expense, with no benefit to the Committee. The Court should deny the Committee's Motion.

II.    **The Committee's Irrelevant, Overbroad, Burdensome and Expensive Discovery Requests**

A.    **The "Very Specific" and "Targeted" Document Requests**

9.    The Motion asks the Court to force GVR and 15 other people and entities to produce purportedly "very specific" and "targeted" documents. (Motion ¶ 26.) These "very

3

1   specific" and "targeted" documents are described in **400 document requests** served on 16 different
2   people and entities.  (Declaration of Jeremy B. Coffey in Support of the Official Committee of
3   Unsecured Creditors' Motion (1) to Compel Discovery and (2) for Relief from Improper
4   Confidentiality Restriction ("Coffey Decl."), Exs. A-P, ECF No. 3080.)  On May 11, 2011, GVR
5   served responses and objections to the discovery requests.  (Coffey Decl. Ex. Q.)  On May 12, 2011,
6   GVR filed a motion for a protective order asking the Court to prevent this discovery, or in the
7   alternative, to limit the discovery.  (Application of GVR for a Protective Order Forbidding
8   Discovery by the Unsecured Creditors' Committee, or in the Alternative Limiting the Scope of the
9   Unsecured Creditors' Committee's Documents and Deposition Requests (the "Motion for Protective
10  Order") ECF No. 3039.)

### B.     Fourteen Depositions

12  10.     The Committee also seeks to take the depositions of 14 people and entities.
13  The Motion to Compel fails to even attempt to justify any deposition that the Committee seeks.

## III.    Legal Standard

15  11.     As the Court is well aware, discovery is limited to those things that are
16  "relevant to a party's claim or defense."  Fed. R. Civ. Pro. 26(b)(1).  The Court has the power "to
17  protect any party or person from annoyance, embarrassment, oppression or undue burden or expense,
18  including . . . forbidding the disclosure or discovery."  Fed. R. Civ. P. 26(c).  And "courts need not
19  condone the use of discovery to engage in "fishing expedition[s]."  *Rivera v. NIBCO, Inc.*, 364 F.3d
20  1057, 1072 (9th Cir. 2004) (citations omitted).

21  12.     The Committee argues that a "key issue" in the case is that it has a statutory
22  duty to investigate, so GVR is obligated to produce all documents demanded by the Committee,
23  regardless of the burden and expense imposed on GVR and the benefit (or lack of) to unsecured
24  creditors.  (*See* Official Committee of Unsecured Creditors' Response to GVR's Motion for a
25  Protective Order ¶ 12, ECF No. 3110 (noting that "'burden and expense of requested discovery' . . .
26  is not a sufficient basis for depriving the Official Committee of the tools needed to discharge its
27  duties").)  But the Committee's "duty" and its repeated reference to "liberal" discovery does not give
28  it carte blanche to serve irrelevant, burdensome discovery.  Although

> Rule 26(b) of the Federal Rules of Civil Procedure is widely recognized as a discovery rule which is liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence . . . this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case.

*Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). The Committee's discovery requests would require the production of massive quantities of documents and information, none of which reasonably bears upon the issue in the case: whether the Marketing Process was run properly so as to achieve an accurate value for GVR's assets.

13. The bulk of the discovery sought is not relevant or reasonably calculated to lead to the discovery of admissible evidence. There is no dispute that GVR underwent the Marketing Process and that the process ultimately resulted in a market value of $500 million. And there is no dispute that the best indicator of value is the price set by a willing buyer and a willing seller in the market. *See In re Iridium Operating, LLC*, 373 B.R. at 293. The only possible issue that the Committee should be permitted to raise is whether the Marketing Process was somehow fatally flawed.

14. All of the Committee's other arguments, such as the value of any potential claims belonging to the Estate, are tied to the issue of valuation. Valuation was established by the Marketing Process, and the Asset Purchase Agreement provides for the purchaser to purchase all claims of the Estate. So discovery should be limited, if permitted at all, to testing the fairness of the Marketing Process.

### IV. The Committee Seeks to Duplicate the Expense, Cost and Efforts of the Marketing Process and Special Investigation

15. Testing the fairness of the Marketing Process does not require the Committee to duplicate the Transaction Committee's work in its entirety. It is irrelevant whether the Committee's expert—who advised one of GVR's biggest competitors during the Marketing Process—is able to come up with a different, expert-driven, hypothetical valuation. Instead, the proper scope of discovery should be limited to the process that the Transaction Committee used for

5

1  the Marketing Process.  For purposes of confirmation, that is the only inquiry or evidence that need
2  be provided to the Court.

3        16.      The Committee provides no explanation for why it is entitled to massive
4  discovery to, in effect, redo what the transaction and special investigation committees have already
5  done.  If the role of the Committee was to undertake its own transaction process and to redo the
6  special investigation that has already been done, then there was no purpose for GVR to undertake
7  those efforts in the first place.

8        17.      The Marketing Process determined GVR's market value.  A market test can
9  be the **best** evidence of an enterprise's value.  *See In re Granite Broad. Corp.*, 369 B.R. 120, 143
10 (Bankr. S.D.N.Y. 2007).  That is because "there is no dispute that in many circumstances the best
11 evidence of value is what a third party is willing to pay in an arms' length transaction." *Id.*; *In re*
12 *Prince*, 85 F.3d 314, 320 (7th Cir. 1996) (actual purchase price best indicator of value of business
13 where purchaser "negotiated the stock's sale price at arm's length [and as a participant in the same
14 industry] . . . had considerable information concerning the probable worth of the [business]"); *Ellis*
15 *v. Mobil Oil*, 969 F.2d 784, 786 (9th Cir. 1992) (when offer to purchase a business "is in the form of
16 a single transaction for cash, the court can justifiably infer that the amount of an arms' length offer
17 represents the value of the [business]"); *In re Two S. Corp.*, 875 F.2d 240, 244 (9th Cir. 1989)
18 (regarding sale of debtor's equipment "[w]hen there has been a fair, arms-length transaction . . .
19 [e]vidence of other appraised values is also irrelevant, because the sale price is a better indicator of
20 the asset's value"); *see also, In re Iridium Operating, LLC*, 373 B.R. at 293.

21       18.      For this reason, GVR provided documents and offered witnesses for
22 deposition that would allow the Committee to test the fairness of the Marketing Process.  Nothing
23 more is necessary or relevant to confirm the value of GVR's assets.

24       19.      Also, as has been described in multiple filings, GVR undertook an
25 independent investigation of several potential causes of action.  The investigation, run by William
26 Bible, included dozens of witness interviews, review of tens of thousands of pages of documents and
27 resulted in an 89-page, 81 exhibit report to GVR's executive committee.  (Declaration of William A.
28 Bible in Support of GVR'S Objection to the Official Committee of Unsecured Creditors' Motion (1)

6

1  to Compel Discovery and (2) for Relief from Improper Confidentiality Restrictions, ("Bible Decl.")

2  Ex. A.)[5]  The investigation showed that there was no merit or value to the potential causes of action.

3  Furthermore, all of the potential causes of action that Mr. Bible investigated are assets sold under the

4  asset purchase agreement.

### V.    GVR's Reasonable Discovery Efforts

20.    Setting aside the issue that the Committee is not entitled to any discovery because its members should not be part of an unsecured creditors' committee, in a good faith effort to eliminate controversy, GVR produced documents related to the Marketing Process, the special investigation and the validity of the liens, including:

(1)    access to the data room established to assist the bidders in the Marketing Process;

(2)    all presentations to the Transaction Committee;

(3)    minutes of the Transaction Committee;

(4)    bid letters and letters expressing potential bidder interest;

(5)    executed confidentiality agreements with potential/actual bidders;

(6)    the special investigation report and its 81 exhibits; and

(7)    documents that allow verification of the validity of the liens.[6]

21.    GVR also offered to make William Bible, James Nave and Eben Perison available for deposition.  Messrs. Bible and Nave served on the Transaction Committee.  Mr. Bible also acted as a special investigator for potential causes of action.  Mr. Perison was the financial advisor to GVR and the Transaction Committee throughout the Marketing Process (first as a member of Oppenheimer & Co., Inc. and now as a member of The Seaport Group).

---

[5]    A true and accurate copy of the special investigation report is attached to the Bible Decl. as Exhibit A.  GVR did not file the 89 exhibits to the report due to the quantity and commercially sensitive nature of the information they contain.  The exhibits have been produced to the Committee, and GVR can make the exhibits available for *in camera* review, if the Court so desires.

[6]    GVR produced these documents in the interest of efficiency, without waiving any of its rights, including its right to contest the validity of the membership of the Unsecured Creditors' Committee.

7

**VI.**   **The Motion Fails to Explain Why the Committee Must Have the Discovery it Seeks**

22.  The Motion seeks nothing short of requiring GVR to produce every document requested in the 85 categories propounded on GVR. The Committee seeks an order saying, "The Producing Parties are hereby ordered and compelled immediately to conduct a search for documents responsive to the Official Committee's Document Requests and immediately to produce such documents to the Official Committee . . . ." (Motion, Ex. A.) Despite this sweeping request of the Court, the Committee failed to undertake any effort to explain why each of its requests is valid. That failure, in and of itself, is grounds to deny the motion:

> Where a responding party objects to discovery requests, it is the requesting party's burden on its motion to compel to demonstrate why the objection is not justified. The requesting party 'must inform the Court which discovery requests are the subject of his motion to compel, and, for each disputed response, inform the Court why the information sought is relevant and why [the responding party's] objections are not justified.'

*Trustees of Nevada Resort Ass'n-Int'l Alliance of Theatrical Stage Employees & Moving Picture Mach. Operators of U.S. & Canada Local 720 Pension Trust v. Encore Productions*, 2:10-CV-00386, 2010 WL 4833174, at * 2 (D. Nev. Nov. 23, 2010) (quoting *Ransom v. Johnson,* 2009 U.S. Dist. LEXIS 31513 at *5-6 (E.D. Cal. Apr. 13, 2009)) (evaluating a motion to compel responses to interrogatories).[7]

23.  The closest the Committee comes to undertaking the epic task of justifying each if its requests is in the declaration accompanying the Motion. In it, the Committee identifies 10 examples of its document requests. Not only does this leave **75** other requests to GVR plus hundreds to others that get no mention, the examples given show how outrageously broad, burdensome and expensive the discovery requests are. (Coffey Decl. ¶ 10.)

---

[7] *See also Kilgore v. Mandeville*, No. 07-2485, 2009 WL 806861, at * 2 (E.D. Cal. Mar. 26, 2009) (The moving party "has the burden of informing the court which discovery requests are the subject of his motion to compel, which of defendants' responses are disputed, why he believes defendants' responses are deficient, why defendants' objections are not justified, and why the information he seeks through discovery is relevant to the prosecution of this action." *See, e.g., Brooks v. Alameida*, No. CIV S-03-2343 JAM EFB P, 2009 WL 331358 at *2 (E.D. Cal. Feb.10, 2009) ("Without knowing which responses plaintiff seeks to compel or on what grounds, the court cannot grant plaintiff's motion."); *Ellis v. Cambra*, No. 1:02-CV-02-5646 AWI SMS PC, 2008 WL 860523 at *4 (E.D. Cal. Mar.27, 2008) (same)).

8

24.     The first example given shows the unreasonable burden the Committee seeks to impose on GVR:

> 7. All documents concerning operational metrics on a historical and projected basis, including, but not limited to, the number of gaming tables at GVR, the number of slot machines at GVR, table game hold percentages, slot hold percentages, slot handle, tabledrop, win per slot per day, win per table per day, number of hotel rooms, percentage occupancy of hotel rooms, the average daily room rate, revenue per available room, number of covers or tickets provided in connection with food and beverage services, average price per such cover or ticket, revenues per restaurant, revenues from retail and entertainment, any "flash reports" or other similar operating summaries provided to management, documents concerning GVR's market share, documents concerning visitor counts, and any other such historical and projected metrics, and any analyses thereof.

(Coffey Decl. ¶ 10.)  This request alone requires the production of "***all documents concerning operational metrics on a historical and projected basis***," and then provides a list of what those documents would include.  In other words, this single request requires the production of any document that concerns GVR's operation.  And this is just one of the 85 requests to GVR.

## VII.   GVR Produced All Documents Requested Through Meet and Confer

25.     ***GVR produced all documents requested by the Committee during the meet and confer process.***  The Committee stated that after review of GVR's initial production, it would "determine what (if any) additional production would be required."  (Coffey Decl. ¶ 19.)  Subsequently, the Committee requested three categories of documents:  (1) two exhibits to the special investigation report that were inadvertently not produced; (2) covenant compliance certificates; and (3) additional bid documents related to one bidder.  (Declaration of Eliot A. Adelson in Support of GVR'S Objection to the Official Committee of Unsecured Creditors' Motion (1) to Compel Discovery and (2) for Relief from Improper Confidentiality Restrictions ("Adelson Decl.") ¶ 18.)  GVR produced all of these documents.[8]

26.     Despite the Committee's assurance that it would review the documents produced "so that [it] could determine what (if any) additional production would be required," the

---

[8] GVR produced the exhibits and additional bid documents shortly after the Committee raised the issue.  After internal discussion, GVR produced the covenant compliance documents on May 15, 2011.  The covenant compliance documents are completely irrelevant to the issue of whether the Marketing Process was properly run so as to determine the market value of GVR's assets.  GVR produced the covenant compliance documents in another attempt to resolve any outstanding discovery issues.

9

1  Committee filed this motion to compel production of every document in GVR's possession without
2  any further discussion about the scope of its request.

### VIII. The Committee Already Has Access to Much of the Information It Seeks[9]

27. What is truly deceptive about the Committee's Motion is that it has, and has had, detailed information about GVR's financial performance and operating metrics. Not only have the Committee's proposed counsel and financial advisor had access to GVR's data room since last summer, and not only have they accessed that information for dozens of hours, but additionally, as second lien lenders, the members of the Committee have access to both historical and current financial data on an ongoing basis.

28. As the Committee members are well aware, GVR must report its financial and operating performance to its lenders. Through an Intralinks website, GVR makes these disclosures to the first and second lien lenders on a regular basis. Most recently, on April 28, 2011, GVR provided the second lien lenders with the audited financial reports for 2010. On May 16, 2011, the Company posted its first quarter financial report.

29. Furthermore, as displayed in the Committee's 38-page Motion to Adjourn, the Committee has the Confidential Information Memorandum prepared in connection with the solicitation of exit financing. That detailed presentation contains sufficient information for the Committee to be able to speak to GVR's current liquidity, free cash flow before debt service, average customer visits per month, increase in reward program membership, visitation, slot handle, table drop and food covers. (Motion to Adjourn, ¶¶ 7, 49.) Specifically, based on the Confidential Information Memorandum alone, the Committee has access to detailed operating revenues and expenses from 2007 to 2010, showing revenue and expenses for casino, food & beverage, room and other, as well as expenses for selling, general & administrative, depreciation, management fee, loss on disposal of equipment, lease termination and preopening expense. (Motion to Adjourn, Ex. A at

---

[9] In no way does GVR concede that this information is relevant to what an unsecured creditors' committee needs to fulfill its duties, or that the Committee's membership is appropriate.

10

21.) The Confidential Information Memorandum also provides a quarterly breakdown of net revenue and EBITDAM. (Id.)

30. Given the wealth of core financial information that has been available and accessed by the Committee for nearly a year, the Committee's complaint that it is unable to test the "current value of GVR" is without basis.

## IX.  The Transaction Committee and Special Investigation

31. Even though GVR has offered the Committee the opportunity to depose both Dr. Nave and Mr. Bible, it spends a good deal of the Motion attacking their purported, improper relationships with the Fertittas. Aside from professional contacts, Mr. Bible has no relationship with the Fertitta family. (*See* Bible Decl.) Dr. Nave's relationship with Fertitta-affilated entities is publicized and well known to this Court. (*See* Declaration of James E. Nave in Support of GVR'S Objection to the Official Committee of Unsecured Creditors' Motion (1) to Compel Discovery and (2) for Relief from Improper Confidentiality Restrictions.)

32. Further, the Committee members did not raise an issue with Dr. Nave or Mr. Bible throughout the Marketing Process or the special investigation. In late August 2010, as the Transaction Committee and special investigation were ramping up, GVR responded to a Brown Rudnick request to disclose certain information to its clients, an ad hoc committee of second lien lenders including at least two of the three members of the Unsecured Creditors' Committee. In response, GVR authorized Brown Rudnick to disclose to its clients:

> GVR has established two independent committees in connection with its restructuring process: (i) a Transaction Committee consisting of Dr. James E. Nave and Mr. Bill Bible; and (ii) a Special Committee, which consists solely of Mr. Bible.
>
> The Transaction Committee is overseeing a sale and marketing process for GVR. The Special Committee is overseeing an investigation of certain allegations made in connection with GVR. Kirkland and Oppenheimer are advising the Transaction Committee. Kirkland and a financial adviser to be determined are advising the Special Investigation Committee.

(Declaration of David A. Agay in Support of GVR'S Objection to the Official Committee of Unsecured Creditors' Motion (1) to Compel Discovery and (2) for Relief from Improper Confidentiality Restrictions ("Agay Decl.") ¶¶ 5-7.)

11

33. Despite this knowledge and raising no issue for nearly a year, the Committee now purports to need onerous, burdensome discovery to challenge Mr. Bible and Dr. Nave.

### X. The Committee Did Not Seek Leave of Court to Take More than 10 Depositions

34. The Unsecured Creditors' Committee "must obtain leave of court" to take more than 10 depositions. Fed. R. Civ. P. 30(a), applicable via Fed.R.Bankr. P. 7036 and 9014(c). ("A party must obtain leave of court . . . if the parties have not stipulated to the deposition and [] the deposition would result in more than 10 depositions being taken"). The Committee failed to do so.

### XI. The Unsecured Creditors' Committee Should be Prohibited from Seeking Any Discovery

35. As detailed in GVR's Motion For An Order Directing The U.S. Trustee To Remove Second Lien Lenders From The Official Committee, ECF No. 3021, and Motion for Protective Order, the Unsecured Creditors' Committee should be prohibited from attempting to engage in discovery because its members are not properly serving on the Committee.

### XII. In the Alternative, the Unsecured Creditors' Committee's Proposed Discovery Should be Significantly Limited

36. If the Court determines the Unsecured Creditors' Committee is properly constituted, document production should be limited to those documents already produced and depositions should be limited to the three individuals identified. As detailed in GVR's Motion for a Protective Order, the burden and expense of the Unsecured Creditors' Committee's discovery requests outweigh any possible benefit to unsecured creditors. Furthermore, the Unsecured Creditors' Committee's requests are unreasonably cumulative and duplicative and the Committee has had ample opportunity to seek the documents requested and failed to do so.

### XIII. Issues Related to Confidentiality Restrictions are Being Resolved.

37. After further deliberation, and in consideration of the documents already accessible by the members of the Unsecured Creditors' Committee, and in the interest of resolving discovery disputes, on May 15, 2011, GVR proposed to allow a designee of each member of the Committee to access discovery documents. (Adelson Decl. ¶ 21, Ex. A.)

1          38.    As of the time of this filing, the Committee has not responded to GVR's

2 proposal.  Given GVR's effort to meet and confer regarding this issue (and the Committee's failure

3 to do so), the Court should not grant the Committee relief from "improper confidentiality

4 restrictions."

## XIV. **Conclusion**

WHEREFORE, GVR respectfully requests that the Court deny the Unsecured Creditors' Committee's Motion (1) to Compel Discovery and (2) for Relief from Improper Confidentiality Restrictions.  The Unsecured Creditors' Committee should not be permitted to conduct discovery on the expansive scope requested because they are not unsecured creditors and are contractually prohibited from contesting the plan and because the Unsecured Creditors' Committee's discovery requests are overly broad and unduly burdensome, unreasonably cumulative and duplicative and the members of the Unsecured Creditors' Committee have had ample opportunity to collect documents from GVR.  As such, the Motion should be denied and for such other and further relief as the Court might deem just and proper..

| | | |
|---|---|---|
| 1 | | |
| 2 | Dated: May 18, 2011 | */s/ David R. Seligman* |
| | | James H.M. Sprayregen, P.C. (IL No. 6190206) |
| | | David R. Seligman, P.C. (IL No. 6238064) |
| 3 | | David A. Agay (IL No. 6244314) |
| | | Sarah H. Seewer (IL No. 6301437) |
| 4 | | KIRKLAND & ELLIS LLP |
| | | 300 North LaSalle St. |
| 5 | | Chicago, Illinois 60654 |
| | | Telephone:    (312) 862-2000 |
| 6 | | Facsimile:    (312) 862-2200 |
| | | james.sprayregen@kirkland.com |
| 7 | | david.seligman@kirkland.com |
| | | david.agay@kirkland.com |
| 8 | | sarah.seewer@kirkland.com |

Reorganization Counsel
for GVR

- and -

Candace Carlyon (NV No. 002666)
James Patrick Shea (NV No. 000405)
SHEA & CARLYON, LTD.
701 Bridger Avenue, Suite 850
Las Vegas, Nevada 89101
Telephone:    (702) 471-7432
Facsimile:    (702) 471-7435
ccarlyon@sheacarlyon.com
jshea@sheacarlyon.com

Special Local Reorganization Counsel
for GVR

14