Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:       (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:      (775) 823-2900
Facsimile:       (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com

Local Reorganization Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

In re

STATION CASINOS, INC., *et al.*,

Debtors and Debtors in Possession.[1]

☒ Affects all debtors listed in footnote 2[2]

Chapter 11
Case No. BK-09-52477

Jointly Administered Cases: BK-09-52470 through BK-09-52487; BK-10-50381; BK-11-51188; and BK-11-51190 through BK-11-51219

**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF "FIRST AMENDED PREPACKAGED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR SUBSIDIARY DEBTORS, ALIANTE DEBTORS AND GREEN VALLEY RANCH GAMING, LLC (DATED MAY 20, 2011)" WITH RESPECT TO SUBSIDIARY DEBTORS AND ALIANTE DEBTORS ONLY**

Hearing Date:     May 25, 2011
Hearing Time:    10:00 a.m.
Place:               300 Booth Street
                       Reno, NV 89509

---

[1]  The debtors in these jointly administered chapter 11 cases are: (i) Station Casinos, Inc.; Northern NV Acquisitions, LLC; Reno Land Holdings, LLC; River Central, LLC; Tropicana Station, LLC; FCP Holding, Inc.; FCP Voteco, LLC; Fertitta Partners LLC; FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II, LLC; FCP MezzCo Borrower I, LLC; FCP PropCo, LLC; and GV Ranch Station, Inc. (collectively, the "**SCI Debtors**"), (ii) Auburn Development, LLC; Boulder Station, Inc.; Centerline Holdings, LLC; Charleston Station, LLC; CV HoldCo, LLC; Durango Station, Inc.; Fiesta Station, Inc.; Fresno Land Acquisitions, LLC; Gold Rush Station, LLC; Green Valley Station, Inc.; GV Ranch Station, Inc.; Inspirada Station, LLC; Lake Mead Station, Inc.; LML Station, LLC; Magic Star Station, LLC; Palace Station Hotel & Casinos, Inc.; Past Enterprises, Inc.; Rancho Station, LLC; Santa Fe Station, Inc.; SC Durango Development LLC; Sonoma Land Holdings, LLC; Station Holdings, Inc.; STN Aviation, Inc.; Sunset Station, Inc.; Texas Station, LLC; Town Center Station, LLC; Tropicana Acquisitions, LLC; and Vista Holdings, LLC (collectively, the "**Subsidiary Debtors**"), (iii) Aliante Gaming, LLC, Aliante Holding, LLC, and Aliante Station LLC (collectively, the "**Aliante Debtors**"), and (iv) Green Valley Ranch Gaming LLC ("**GVR**").

[2]  **This Memorandum of Law applies to the Subsidiary Debtors and Aliante Debtors, and not to GVR.**

#4815-2779-4441v10

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 4

    A.    THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF
          THE BANKRUPTCY CODE ................................................................... 4

        1.    Section 1129(a)(1) – Plan Compliance with Title 11 Requirements .......... 4

              a.    Sections 1122 and 1123(a)(1) through (a)(4) –
                    Classification and Treatment of Claims and Equity Interests ........ 4

              b.    Section 1123(a)(5) – Adequate Means for Plan
                    Implementation .............................................................................. 5

              c.    Section 1123(a)(6) – Prohibition Against the Issuance by
                    Debtors and Certain Other Corporate Entities of Nonvoting
                    Equity Securities; Adequate Provisions by Such Entities for
                    Voting Power of Classes of Securities ......................................... 13

              d.    Section 1123(a)(7) – Selection of Directors and Officers in
                    a Manner Consistent with the Interests of Creditors, Equity
                    Security Holders and Public Policy .............................................. 13

               e.    Sections 1123(b)(1) – Impairment of Claims and Interests .......... 14

              f.    Sections 1123(b)(2) – Assumption, Assignment or
                    Rejection of Executory Contracts and Unexpired Leases............. 14

              g.    Section 1123(b)(3) – Retention, Enforcement and
                    Settlement of Claims Held by the Debtors ................................... 14

               h.    Section 1123(b)(4) – Sale of Assets of the Estate........................ 15

              i.    Section 1123(b)(5) – Modification of the Rights of Holders
                    of Claims ....................................................................................... 15

              j.    Section 1123(b)(6) – Other Appropriate Provisions.................... 15

              k.    Section 1123(d) – Cure of Defaults ............................................. 16

        2.    Section 1129(a)(2) – Plan Proponent Compliance with Applicable
            Provisions of the Bankruptcy Code .......................................................... 16

         3.    Section 1129(a)(3) – Good Faith Requirement........................................ 18

4. Section 1129(a)(4) – Bankruptcy Court Approval of Certain Payments as Reasonable ........................................................... 19

5. Section § 1129(a)(5) – Disclosure of New Management and Compensation of Insiders ...................................................... 20

6. Section 1129(a)(6) – Regulatory Rate Approvals.................................... 20

7. Section 1129(a)(7) – Best Interests of Creditors Test............................. 20

8. Section 1129(a)(8) – Acceptance by or Unimpairment of Each Class .................................................................................... 22

9. Section 1129(a)(9) – Priority Claims ...................................................... 23

10. Section § 1129(a)(10) – At Least One Consenting Impaired Class.......... 24

11. Section 1129(a)(11) – Plan is Not Likely to Be Followed By Liquidation or Need for Further Reorganization ..................................... 24

12. Section § 1129(a)(12) – Payment of Statutory Fees ................................ 26

13. Section 1129(a)(13) through (a)(16) – Inapplicable Provisions .............. 27

14. Section 1129(b) – Confirmation of Plan Over Nonacceptance of Impaired Classes ...................................................................... 27

15. Section 1129(d) – Purpose of Plan Not Tax Avoidance .......................... 29

16. Compliance With Bankruptcy Rule 3016(a)............................................ 29

B. THE PROVISIONS OF ARTICLE X OF THE PLAN ARE APPROPRIATE.................................................................................... 29

1. The Comprehensive Settlement ................................................................ 29

2. The Global Settlement of the Going Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action............... 30

3. The Plan's Release Provisions ................................................................. 32

4. The Plan's Exculpation of Certain Parties ................................................ 35

5. The "No Successor Liability" Provisions of the Plan .............................. 39

III. THE NEW SECURITIES AND INTERESTS ISSUED IN CONJUNCTION WITH THE PLAN ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES LAWS.................................................................................... 44

IV. CONCLUSION........................................................................................................ 45

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>CASES</u>

4

*Commercial Nat'l Bank v. Newtson,*
  39 Ill.App.3d 216 (1976) ......................................................................................41

5

*Ferguson v. Arcata Redwood Co., LLC,*
  2004 WL 2600471 (N.D.Cal. Nov. 12, 2004) ...........................................................41

6

7

*Gavette v. The Warner & Swasey Co.,*
  No. 90-CV-217, 1999 WL 118438 (N.D.N.Y. Mar. 5, 1999) ................................42

8

*In re 47th and Belleview Partners,*
  95 B.R. 117 (Bankr. W.D. Mo. 1988)......................................................................25

9

10

*In re Acequia, Inc.,*
  787 F.2d 1352 (9th Cir. 1986) .................................................................................25

11

12

*In re American Media, Inc.,*
  Case No. 10-16140 (MG) (Bankr. S.D.N.Y. Dec. 20, 2010)...................................16

13

*In re Blue Bird Body Co.,*
  Case No. 06-50026 (GWZ) (Bankr. D. Nev. Jan. 27, 2006) ...................................16

14

15

*In re Charter Commc'ns, Inc.,*
  419 B.R. 221 (Bankr. S.D.N.Y. 2009)......................................................................24

16

17

*In re CIT Group, Inc.,*
  2009 WL 4824498 (Bankr. S.D.N.Y. Dec. 8, 2009)................................................38

18

*In re Citadel Broadcasting, Inc.,*
  2010 WL 210808 (Bankr. S.D.N.Y. May 19, 2010)................................................38

19

20

*In re Cypresswood Land Partners, I,*
  409 B.R. 396 (Bankr. S.D. Tex. 2009) ....................................................................25

21

22

*In re Enron Corp.,*
  2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) ..................................24

23

24

*In re Hotel Mt. Lassen, Inc.,*
  207 B.R. 935 (Bankr. E.D. Cal. 1997)......................................................................35

25

*In re Lowenschuss,*
  67 F.3d 1394 (9th Cir. 1995) ..............................................................................35, 37

26

27

*In re Metro-Goldwyn-Mayer Studios Inc.,*
  Case No. 10-15774 (SMB) (Bankr. S.D.N.Y. Dec. 6, 2010)..................................16

28

**Page(s)**

*In re Pacific Gas & Elec. Co.*,
304 B.R. 395 (Bankr. N.D. Cal. 2004) ................................................................35

*In re Pero Bros. Farms, Inc.*,
90 B.R. 562 (Bankr. S.D. Fla. 1988)....................................................................25

*In re Sagewood Manor Assocs. Ltd. P'ship*,
223 B.R. 756 (Bankr. D. Nev. 1998) ...................................................................18

*In re SGPA, Inc.*,
2001 WL 34750646 (Bankr. M.D. Pa. Sept. 8, 2001) .........................................24

*In re Source Interlink Companies, Inc.*,
Case No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009).....................................16

*In re Trans World Airlines*,
322 F.3d 283 (3d Cir. 2003)...........................................................................39, 43

*In re White Motor Credit Corp.*,
75 B.R. 944 (Bankr. N.D. Ohio 1987) ..................................................................40

*Jeong v. Onada Cement Co., Ltd.*,
2000 WL 33954824 (C.D.Cal., May 17, 2000) ....................................................42

*Joseph Huber Brewing Co., Inc. v. Pamado, Inc.*,
No. 05 C 2783, 2006 WL 2583719 (N.D.Ill., September 5, 2006)........................42

*Kaleta v. Whittaker Corp.*,
221 Ill. App. 3d 705 (1991) .................................................................................41

*Lamb v. Leroy Corp.*,
85 Nev. 276, 454 P.2d 24 (Nev. 1969) ................................................................40

*Louisiana-Pacific Corp. v. Asarco, Inc.*,
909 F.2d 1260 (9th Cir. 1990) .............................................................................41

*Myers v. United States*,
297 B.R. 774 (S.D.Cal. 2003)..............................................................................39

*Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*,
314 F.3d 1070 (9th Cir. 2002) .............................................................................18

*Schumacher v. Richards Shear Co.*,
59 N.Y.S.2d 239 (1983)......................................................................................42

*Village Builders 96, L.P. v. U.S. Laboratories, Inc.*,
121 Nev. 261, 112 P.3d 1082 (Nev. 2005) ......................................40, 41, 42, 43

**Page(s)**

**STATUTES**

11 U.S.C. § 327 ...................................................................................................................19

11 U.S.C. § 327(a) ...............................................................................................................5

11 U.S.C. § 328 ...................................................................................................................19

11 U.S.C. § 328(a) ...............................................................................................................5

11 U.S.C. § 330 ...................................................................................................................19

11 U.S.C. § 331 ...................................................................................................................19

11 U.S.C. § 363 .........................................................................................................39, 40, 43

11 U.S.C. § 363(f) ...............................................................................................................39

11 U.S.C. § 365 ...................................................................................................................14

11 U.S.C. § 365(b) ...............................................................................................................16

11 U.S.C. § 365(c) ...............................................................................................................16

11 U.S.C. § 503(b) ...............................................................................................................19

11 U.S.C. § 507(a) ...............................................................................................................23

11 U.S.C. § 524(e) .........................................................................................................35, 37

11 U.S.C. § 1103 .................................................................................................................19

11 U.S.C. § 1114 .................................................................................................................27

11 U.S.C. § 1122 ...................................................................................................................4

11 U.S.C. § 1123 ..............................................................................................................4, 14

11 U.S.C. § 1123(a)(1) .........................................................................................................4

11 U.S.C. § 1123(a)(2) .........................................................................................................4

11 U.S.C. § 1123(a)(3) .........................................................................................................4

11 U.S.C. § 1123(a)(4) .........................................................................................................4

11 U.S.C. § 1123(a)(5) .................................................................................................. passim

11 U.S.C. § 1123(A)(5)(B) ................................................................................................12

11 U.S.C. § 1123(a)(5)(D) .............................................................................................12, 19

**Page(s)**

11 U.S.C. § 1123(a)(5)(E)..................................................................................................12

11 U.S.C. § 1123(a)(5)(F)..................................................................................................12

11 U.S.C. § 1123(a)(5)(J)..............................................................................................12, 19

11 U.S.C. § 1123(a)(6)......................................................................................................13

11 U.S.C. § 1123(a)(7)......................................................................................................13

11 U.S.C. § 1123(b)(1)......................................................................................................14

11 U.S.C. § 1123(b)(2)......................................................................................................14

11 U.S.C. § 1123(b)(3)......................................................................................................14

11 U.S.C. § 1123(b)(3)(A)............................................................................................14, 33

11 U.S.C. § 1123(b)(4)......................................................................................................14

11 U.S.C. § 1123(b)(5)......................................................................................................15

11 U.S.C. § 1123(b)(6)......................................................................................................15

11 U.S.C. § 1123(d).........................................................................................................15

11 U.S.C. § 1125....................................................................................................16, 17, 37

11 U.S.C. § 1125(e)................................................................................................37, 38, 39

11 U.S.C. § 1125(g).............................................................................................2, 16, 37, 38

11 U.S.C. § 1126....................................................................................................16, 17

11 U.S.C. § 1126(c).........................................................................................................22

11 U.S.C. § 1126(d).........................................................................................................22

11 U.S.C. § 1127....................................................................................................17, 18

11 U.S.C. § 1129..............................................................................................................4

11 U.S.C. § 1129(a)(1).......................................................................................................4

11 U.S.C. § 1129(a)(2)..................................................................................................16, 18

11 U.S.C. § 1129(a)(3)......................................................................................................18

11 U.S.C. § 1129(a)(4)......................................................................................................19

11 U.S.C. § 1129(a)(5)..................................................................................................19, 20

**Page(s)**

11 U.S.C. § 1129(a)(6)..............................................................................................................20

11 U.S.C. § 1129(a)(7)..................................................................................................20, 21, 22

11 U.S.C. § 1129(a)(8)........................................................................................................22, 23

11 U.S.C. § 1129(a)(9)..............................................................................................................23

11 U.S.C. § 1129(a)(9)(C)........................................................................................................23

11 U.S.C. § 1129(a)(9)(D)........................................................................................................23

11 U.S.C. § 1129(a)(10)............................................................................................................24

11 U.S.C. § 1129(a)(11)................................................................................................24, 25, 26

11 U.S.C. § 1129(a)(12)............................................................................................................26

11 U.S.C. § 1129(a)(13)............................................................................................................27

11 U.S.C. § 1129(a)(14)............................................................................................................27

11 U.S.C. § 1129(a)(15)............................................................................................................27

11 U.S.C. § 1129(a)(16)............................................................................................................27

11 U.S.C. § 1129(b)........................................................................................................22, 23, 27, 29

11 U.S.C. § 1129(b)(2).............................................................................................................27

11 U.S.C. § 1129(b)(2)(A)........................................................................................................27

11 U.S.C. § 1129(b)(2)(A)(ii)...................................................................................................27

11 U.S.C. § 1129(b)(2)(A)(iii)..................................................................................................28

11 U.S.C. § 1129(d)..................................................................................................................29

11 U.S.C. § 1141.......................................................................................................................43

11 U.S.C. § 1141(c)..................................................................................................................39

11 U.S.C. § 1141(d)(3).............................................................................................................39

11 U.S.C. § 1145.......................................................................................................................44

28 U.S.C. § 1930.......................................................................................................................26

Nevada Revised Statutes § 463.487............................................................................................9

Securities Act of 1933, § 5...............................................................................................29, 44

**Page(s)**

Securities Exchange Act of 1934 ................................................................................9

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 2014 ...........................................................................................5

Fed. R. Bankr. P. 3016 ......................................................................................16, 17

Fed. R. Bankr. P. 3016(a) ......................................................................................29

Fed. R. Bankr. P. 3017 ......................................................................................16, 17

Fed. R. Bankr. P. 3018 ......................................................................................16, 17

Fed. R. Bankr. P. 3018(b) ......................................................................................16

Fed. R. Bankr. P. 3019 ......................................................................................17, 18

*H.R. Rep. No. 95-595* (1977) ................................................................................16

*S. Rep. No. 95-989* (1978) ...................................................................................16

This Memorandum of Law applies to confirmation of the Plan for the Subsidiary Debtors and Aliante Debtors only. Confirmation of the Plan for GVR will be addressed separately, in other documents. With respect to the Subsidiary Debtors, the Plan is fully consensual, as it has been accepted by all Voting Classes and there have been no objections filed. This full consensus is a function of the fact that the Restructuring Transactions contemplated by Plan for the Subsidiary Debtors are merely a further implementation of the New Opco Purchase Agreement already approved through the rigorous process undertaken with all major constituents in the SCI Cases. With respect to the Aliante Debtors, the Plan likewise is fully consensual -- the only Voting Class has accepted and there have been no objections. In essence, the Plan for the Aliante Debtors is a straighforward turnover of the Aliante property to the Aliante Lenders on a consensual basis, with agreed upon transition and management.

## I.    **INTRODUCTION**

1.      On July 28, 2009, Station Casinos, Inc. ("SCI"), and certain of its affiliates commenced chapter 11 cases in this Court (the "SCI Cases"). On February 10, 2010, GV Ranch Station, Inc. commenced its chapter 11 case in this Court. On August 27, 2010, this Court entered its order confirming the "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (docket no. 2039) (the "SCI Plan"). The Effective Date of the SCI Plan has not yet occurred.

2.      On April 12, 2011 (the "Petition Date"), the above captioned Subsidiary Debtors (excluding GV Ranch Station, Inc. which had a chapter 11 case already pending), Aliante Debtors and GVR commenced their chapter 11 cases (the "Chapter 11 Cases") in this Court. Pursuant to an order of this Court, the Chapter 11 Cases are jointly administered with the SCI Cases.

3.      On April 12, 2011, the Subsidiary Debtors, Aliante Debtors and GVR also filed their "Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Gaming, LLC (Dated March 22, 2011)" (the "Plan"), and their "Disclosure Statement to Accompany Prepackaged Joint Chapter 11 Plan of Reorganization for

#4815-2779-4441v10

Subsidiary Debtors, Aliante Debtors and Green Valley Gaming, LLC (Dated March 22, 2011)" (both at docket no. 2797) (the "Disclosure Statement").

4. Commencing on March 23, 2011, the Subsidiary Debtors, Aliante Debtors and GVR distributed copies of the Plan and Disclosure Statement and related exhibits, schedules and other materials to certain of their creditors to solicit prepetition acceptances of the Plan pursuant Section 1125(g) of the Bankruptcy Code (the "Prepetition Solicitation"). On April, 27, 2011, the Voting Agent filed its "Ballot Summary Declaration in Support of Confirmation of Joint Plan, Certifying Ballots Accepting and Rejecting the Plan, and Submitting Ballot Reports" with respect to the votes of Holders of Claims against and Equity Interests in the Subsidiary Debtors and GVR (docket no. 2895) (the "First Tabulation of Ballots"). On May 6, 2011, the Voting Agent filed its "Ballot Summary Declaration in Support of Confirmation of Joint Plan, Certifying Ballots Accepting and Rejecting the Plan, and Submitting Ballot Reports" with respect to the votes of Holders of Claims against and Equity Interests in the Aliante Debtors (docket no. 2949) (the "Second Tabulation of Ballots"). The First and Second Tabulation of Ballots together show that all Voting Classes voted to accept the Plan.

5. On May 9 and 15, 2011, the Subsidiary Debtors filed their first and second Plan Supplements (docket nos. 2987 and 3092). On May 13, 2011, the Aliante Debtors and GVR filed their Plan Supplements (docket nos. 3074 and 3087, respectively).

6. On May 16, 2011, the Subsidiary Debtors commenced a solicitation of consents from the Prepetition Opco Secured Lenders for approval of certain modifications to the Plan that would have the effect of adding non-debtor Tropicana Station, Inc. ("TSI") as a Subsidiary Debtor under the Plan. The proposed modifications were premised upon TSI commencing a chapter 11 case in this Court on or about May 23, 2011, and the Court entering an order jointly administering the TSI case with the Chapter 11 Cases.

7. May 16, 2011 was also the deadline established by the Court for filing and serving objections to confirmation of the Plan. In fact, no objections to confirmation of the Plan or to any of the terms of the Plan in respect of the Subsidiary Debtors and the Aliante Debtors were filed by any Holder of Claims against or Equity Interests in the Subsidiary Debtors or the

Aliante Debtors, or by any other party in interest in the Chapter 11 Cases of the Subsidiary Debtors and Aliante Debtors, by that May 16, 2011 deadline. Objections were filed, however, to confirmation of the Plan with respect to GVR. As a result, GVR concluded that its bankruptcy Estate would be best served by submission of a separate brief in support of confirmation of the Plan with respect to GVR, and entry of a separate confirmation order and findings of fact and conclusions of law with respect to GVR.

8.      On May 20, 2011, the Subsidiary Debtors, Aliante Debtors and GVR filed their "First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 20, 2011)" (the "Amended Plan"). The Amended Plan adds TSI as a Subsidiary Debtor, provides additional detail regarding the implementation of the restructuring of the Aliante Debtors, and makes certain other revisions to the Plan. A redline showing the revisions to the Plan contained in the Amended Plan was filed on May 20, 2011 (the "Plan Modifications"). **All further references to the "Plan" in this Memorandum of Law means the Amended Plan.**

9.      This Memorandum of Law in support of confirmation of the Plan addresses confirmation of the Plan for the Subsidiary Debtors and Aliante Debtors, as to which no objections were filed; and filed contemporaneously herewith are a proposed confirmation order and findings of fact and conclusions of law with respect to the Subsidiary Debtors and Aliante Debtors only. Therefore, unless expressly stated otherwise herein, all references contained in this Memorandum of Law to: (a) the "Plan" means the Amended Plan; (b) the "Debtors" or "Plan proponents" means the Subsidiary Debtors and Aliante Debtors, and does not include GVR; (c) the "Estates" means the Estates of the Subsidiary Debtors and Aliante Debtors, and does not include the Estate of GVR; (d) the "Chapter 11 Cases" means the Chapter 11 Cases of the Subsidiary Debtors and Aliante Debtors, and does not include the Chapter 11 Case of GVR; and (e) the "Restructuring Transactions" means only as they apply to the Subsidiary Debtors and Aliante Debtors, and not as they apply to GVR.

10.      In support of this Memorandum of Law, the Debtors will file the Declaration of Richard Haskins, Executive Vice President, General Counsel and Secretary of SCI.

1

**II.    ARGUMENT**

2

    **A.    THE PLAN SATISFIES THE REQUIREMENTS**

3

        **OF SECTION 1129 OF THE BANKRUPTCY CODE**

4

    11.    The Debtors must demonstrate that the Plan satisfies the applicable provisions of

5

Section 1129[3] by a preponderance of the evidence.  As described below, all of the applicable

6

requirements of Section 1129 have been satisfied with respect to the Plan.

7

        **1.    Section 1129(a)(1) – Plan Compliance with Title 11 Requirements**

8

    12.    Section 1129(a)(1) requires that a plan comply with the applicable provisions of

9

the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  This provision encompasses the requirements of

10

Sections 1122 and 1123 governing classification of claims and contents of plans.  As

11

demonstrated below, the Plan complies fully with the requirements of Sections 1122 and 1123.

12

        **a.    Sections 1122 and 1123(a)(1) through (a)(4) –**

13

            **Classification and Treatment of Claims and Equity Interests**

14

    13.    Sections 1122 and 1123(a)(1) require that the Plan designate Classes of Claims

15

and Equity Interests (other than Administrative Claims and Priority Claims) and place a Claim or

16

an Equity Interest in a particular class only if such Claim or Equity Interest is substantially

17

similar to the other Claims or Equity Interests of such class.  In the Plan, each Class of Claims

18

and Equity Interests in the Plan contains only Claims or Equity Interests that are substantially

19

similar to the other Claims or Equity Interests within that Class.  Sections 1123(a)(2) and

20

1123(a)(3) require that the Plan specify all Classes of Claims and Equity Interests that are not

21

impaired under the Plan and specify the treatment of all Classes of Claims and Equity Interests

22

that are impaired under the Plan.  Article III of the Plan specifies which Classes of Claims are

23

not impaired, and specifies the treatment of each class of impaired Claims. Section 1123(a)(4)

24

requires that the Plan provide the same treatment for each Claim or Equity Interest within a

25

particular Class, unless the Holder of a Claim or Equity Interest agrees to less favorable

26

treatment of its Claim or Equity Interest.  In accordance with the requirements of Sections

27

1123(a)(2) and 1123(a)(3), Article III of the Plan provides the same treatment for each Claim or

28

---

[3]   Unless otherwise specified, all "Section" references are to the Bankruptcy Code.

Equity Interest within a particular Class, unless the Holder of the Claim or Equity Interest agrees to less favorable treatment of its Claim.

              **b.**      **Section 1123(a)(5) – Adequate Means for Plan Implementation**

14.      Section 1123(a)(5) requires that the Plan provide adequate means for implementation of the Plan and lists ten examples of such implementation provisions.  The Plan contains numerous of such implementation provisions.

15.      **The Sale of the Subsidiary Debtors' Assets**.  On June 4, 2010, the Court entered its "Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos Inc. and Certain 'Opco' Subsidiaries" (the "Bidding Procedures Order") (docket no. 1563).  Pursuant to the Bidding Procedures Order, the Court, among other things, (a) authorized the SCI Debtors to conduct a process for the marketing and sale of substantially all of the SCI Debtors' Opco business and certain related assets (the "New Opco Acquired Assets"), conduct an auction and select the successful bid, and (b) deemed the Stalking Horse Bidder (New Opco) to be a qualified bidder.  The New Opco Acquired Assets consist of substantially all of the assets of the Subsidiary Debtors.

16.      Pursuant to the "Order, Pursuant to 11 U.S.C. §§ 327(a) and 328(a), and Fed. R. Bankr. P. 2014, Authorizing Employment and Retention of Lazard Freres & Co. LLC ("Lazard") as Financial Advisor and Investment Banker for the [SCI] Debtors," entered on September 18, 2009 (docket no. 326), the Court authorized the SCI Debtors to utilize the services of Lazard to market for sale the New Opco Acquired Assets.  The marketing of the New Opco Acquired Assets took place over a several month period.  Notice of the Auction and the Bidding Procedures Order was published in the Las Vegas Review-Journal, the Wall St. Journal, and the Financial Times.  Lazard contacted seventy nine potential bidders, and received expressions of interest from thirty nine potential bidders; and twenty six potential bidders signed confidentiality agreements and received a package of preliminary due diligence information.  Of those initial twenty six parties conducting due diligence, eight signed Letters of Intent that entitled them to additional, more comprehensive due diligence.  *See* "Status Report of Dr. James E. Nave, Independent Director, Regarding Compliance with Auction Procedures and Resulting Bids with

Respect to the Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries," filed August 5, 2010 (docket no. 1885) (the "Nave Report"), at ¶¶ 3-6. Dr. Nave was the independent director of SCI tasked with overseeing the Sale Process.

17.    The SCI Debtors, under the direction of Dr. Nave and in consultation with the Consultation Parties,[4] determined that six of the Letter of Intent signatories satisfied the requirements to be Qualified Bidders (not including the Stalking Horse Bidder, New Opco). However, by the July 30, 2010 deadline under the Bidding Procedures for receipt of Qualified Bids, the Debtors had received only one Qualified Bid, that of the Stalking Horse Bidder (New Opco). As a result, there was no auction. Nave Report at ¶¶ 7-10. Daniel Aronson, a Managing Director at Lazard, filed a Declaration in support of the Nave Report (docket no. 1886) (the "Aronson Sale Process Report"). In addition to confirming the facts in the Nave Report, Aronson noted that the process of the selection of the Stalking Horse Bid resulted in an increase of more than $135 million in the proposed purchase price. Aronson reported that Lazard's efforts were especially focused on ensuring a level playing field for all bidders, including in particular potential bidder Boyd Gaming. He opined that the Bidding Procedures approved by the Court provided an open and level playing field for all potential bidders, and the Sale Process provided fair and open access to all reasonable due diligence materials. Aronson noted that, following Court approval of the Bidding Procedures, no bidder voiced any complaint about the Bidding Procedures, or requested that the Debtors deviate from or modify the Bidding Procedures. He concluded that the Stalking Horse Bid was the highest and best bid for the New Opco Acquired Assets. Aronson Sale Process Report, ¶¶ 9, 15-19.

18.    At a hearing on August 6, 2010, the date the auction had been scheduled for, the SCI Debtors reported that the Stalking Horse Bid was the prevailing bid, and that the purchaser would be the Stalking Horse Bidder FG Opco Acquisition LLC, an entity that is a subsidiary of New Propco (FG Opco Acquisition LLC, and the other New Propco subsidiaries receiving the

---

[4]   The Consultation Parties were the Administrative Agent under the Prepetition Opco Credit Agreement, the steering committee of lenders under the Prepetition Opco Credit Agreement, and the SCI Official Creditors Committee. *See* Aronson Sale Process Report, *infra*, at p.4, fn. 2.

New Opco Acquired Assets, collectively, "New Opco").  On August 9, 2010, the Court entered its "Order Closing Auction and Designating Successful Bid With Respect to Order Establishing Bidding Procedures and Deadlines Related to Sale Process For Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries" (docket no. 1909), in which it designated New Opco as the Successful Bidder.

19.    The transfer of the New Opco Acquired Assets, Landco Assets and New Propco Acquired Assets pursuant to the terms of the New Opco Purchase Agreement was approved in the Court's order approving the SCI Plan.  The Subsidiary Debtors are parties to the New Opco Purchase Agreement.  Pursuant to the Plan, the Subsidiary Debtors will assume the New Opco Purchase Agreement and effect the transfer of their assets to the applicable transferees thereunder.  Article V.B. of the Plan contains the principal means for the implementation of the Plan with respect to the Subsidiary Debtors.  Those provisions include, among other things: (a) formation of the New Opco and New Propco entities; (b) transfer of the Master Lease Collateral to Propco; (c) transfer of the Landco Assets to the designee of the Land Loan Lenders; (d) transfer of the New Propco Transferred Assets from Propco to the New Propco entities; (e) transfer of the New Propco Purchased Assets from the Opco entities to the New Propco entities; (f) transfer of the New Opco Acquired Assets to New Opco; (g) the distribution of equity pursuant to the Propco Rights Offering; (h) cancellation of prepetition instruments evidencing Claims and Equity Interests; and (i) the dissolution of the Subsidiary Debtors.

20.    Based on the foregoing, the Debtors submit that the Plan satisfies the requirement of Section 1123(a)(5) that the Plan provide adequate means for the implementation of the Plan in respect of the Subsidiary Debtors.

21.    **The Restructuring of Aliante Gaming**.  As set forth in the *Declaration of William A. Bible* (GVR docket no. 20)[5] and the *Declaration of James E. Nave, D.V.M.* (GVR docket no. 19), both of which were filed on April 13, 2011, starting in May 2010, Aliante Gaming undertook a thorough canvassing of the market and solicited bids from both (i) potential

---

[5]  The "GVR docket" means the docket of the chapter 11 case of Green Valley Ranch Gaming, LLC, case number 11-51213, which docket was used before an order was entered jointly administering the chapter 11 case of Green Valley Ranch Gaming, LLC with Case No. 09-52477.

purchasers of substantially all of Aliante Gaming's assets and (ii) parties to replace SCI as manager of Aliante Gaming's business should the restructuring proceed on a "standalone" basis (whereby the lenders would exchange their outstanding claims for equity and select managers of the process).  The Aliante Transaction Committee oversaw the marketing process with support from its advisors and analyzed all bids.  throughout May and June 2010, Oppenheimer and Co. ("Oppenheimer") contacted over 70 parties with a potential interest in owning or managing Aliante Gaming's assets.  Twenty-five of those parties entered into confidentiality agreements and upon doing so, received the first-round bid package, which consisted of a confidential information memorandum and other materials, as well as access to an on-line due diligence dataroom.  The Aliante Debtors believe that 13 parties submitted preliminary letters of interest ("LOIs") for the acquisition or management of Aliante Gaming's assets, including five acquisition and 12 management proposals.

22.    Each of the five acquisition LOIs reflected an offer far below the outstanding amount of the Lenders' secured debt.  In addition, all of the bids contained a portion of take-back financing, which certain of the Lenders advised was unacceptable.  In light of the proposals, certain significant Lenders informed the advisors to the Transaction Committee that they no longer supported the sale process.  Thereafter, the Aliante Debtors ceased their marketing efforts and instead proceeded with negotiating a standalone plan whereby the Lenders would assume ownership of Aliante Gaming's assets.  The Aliante Debtors then engaged in negotiations with the Aliante Lenders regarding a restructuring transaction whereby the Aliante Lenders would acquire the assets and/or equity of Aliante Gaming on account of their senior secured indebtedness.  During this time, the Aliante Lenders also engaged in negotiations with Fertitta Entertainment regarding the terms pursuant to which an affiliate of Fertitta Entertainment would manage Aliante Gaming on an interim or transitional basis.  These negotiations culminated in an agreement to enter into a series of restructuring transactions pursuant to which the Aliante Lenders would receive new equity and new debt of Reorganized Aliante Gaming, with management services to be provided by Fertitta Entertainment, all of which is described in more detail in the Plan and Disclosure Statement.

23.     Article V.C. of the Plan contains the principal means for the implementation of the Plan with respect to the Aliante Debtors.  Those provisions include, among other things, that prior to or on the Effective Date, as applicable:

(a)     ALST Casino Holdco will be formed.  The ALST Casino Holdco Operating Agreement will be adopted, and will, among other things, (i) establish the terms and rights of the ALST Casino Holdco Equity, (ii) establish certain restrictions on the transfer of ALST Casino Holdco Equity, (iii) provide for certain rights and obligations of holders of ALST Casino Holdco Equity, (iv) provide for the preparation and filing with any state or federal regulatory authority (or withdrawal of) any documents that the Required Aliante Consenting Lenders deem necessary or appropriate in connection with establishing ALST Casino Holdco as a "publicly traded company" within the meaning of the Nevada Revised Statutes, including, without limitation, any Form 10-K, Form 10-Q, Form 8-K, and other documents or amendments thereto to comply with the United States Securities Exchange Act of 1934, as amended, and (v) include such other provisions as may be necessary or appropriate to establish ALST Casino Holdco as a "publicly traded company" under Section 463.487 of the Nevada Revised Statutes.

(b)     The Registration Rights Agreement will be entered into.

(c)     ALST Casino Holdco will authorize and issue ALST Casino Holdco Equity for distribution to the Holders of Allowed Class AGL.1 Claims (or their respective designee(s)).  Each Holder of an Allowed Class AGL.1 Claim (or its designee) will receive its *Pro Rata* share of 100% of the ALST Casino Holdco Equity.

(d)     Reorganized Aliante Gaming will enter into the Amended Aliante Gaming Operating Agreement, which will amend the Aliante Operating Agreement to, among other things, establish Reorganized Aliante Gaming as a single member limited liability company and identify ALST Casino Holdco as its sole member.

(e)     Reorganized Aliante Gaming will authorize and issue the New Aliante Equity for distribution in accordance with the Plan.

(f)     The following transactions will be deemed to have occurred in the following order: (i) each Holder of an Allowed Class AGL.1 Claim shall be deemed to have

1   exchanged all of its Allowed Class AGL.1 Claim for its Pro Rata  share of New Aliante Equity

2   and New Secured Aliante Debt; and (ii) each Holder of New Aliante Equity shall be deemed to

3   have contributed all such New Aliante Equity to ALST Casino Holdco in exchange for its *Pro*

4   *Rata* share of ALST Casino Holdco Equity.

5            (g)      All of the Transferred Aliante Hotel Assets shall be conveyed, assigned,

6   transferred and delivered to Reorganized Aliante Gaming in accordance with a transfer

7   agreement to be negotiated and agreed to by and among the relevant parties.

8            (h)      All property of Aliante Gaming and all of the Transferred Aliante Hotel

9   Assets shall vest in Reorganized Aliante Gaming free and clear of all Liens, Claims, charges,

10  encumbrances, or other interests, except as provided in the Plan.

11           (i)      Fertitta Entertainment and Reorganized Aliante will enter into the New

12  Aliante Management Agreement.

13           (j)      As more fully described in the Plan, the Debtors or SCI Debtors that either

14  provide goods and services to Aliante Gaming or are party to contracts with third party vendors

15  for the provision of goods and services to Aliante Gaming, will use (and will cause their

16  respective Affiliates and Subsidiaries to use) commercially reasonable efforts, subject to the

17  terms and conditions described in the Plan, to ensure that such goods and services continue to be

18  available to Reorganized Aliante Gaming, either from the same source and on the same terms as

19  made available pre-petition, or by assisting in negotiating new agreements with third party

20  vendors.

21           (k)      Prepetition instruments evidencing Claims and Equity Interests against the

22  Aliante Debtors will be cancelled.

23           (l)      Aliante Holding, LLC ("Aliante Holding") and Aliante Station, LLC

24           ("Aliante Station") will be dissolved, provided that in no event will Aliante Holding,

25           LLC be wound down or dissolved before the Effective Date with respect to Aliante

26           Gaming, LLC.

27           24.      The Plan treats Claims against and Equity Interests in the three Aliante Debtors

28  follows:

(a)      With respect to Debtor Aliante Gaming, LLC, the Plan provides that the secured creditors, including the Aliante Lenders, will realize upon their collateral in full satisfaction of their secured claims.  Reorganized Aliante Gaming will enter into the Amended Aliante Gaming Operating Agreement and authorize and issue the New Aliante Equity to the Aliante Lenders.  In addition, the Aliante Lenders will receive a pro rata share of $45 million in new debt issued by Reorganized Aliante Gaming.  Holders of General Unsecured Claims against Aliante Gaming will receive payment in full in cash, and holders of equity interests in Aliante Gaming will receive no distribution.

(b)      With respect to Debtor Aliante Holding, LLC, which owns 100% of the Equity Interests in Aliante Gaming, LLC, the Plan provides that Holders of Secured Claims are unimpaired, Holders of General Unsecured Claims receive no distribution, and Holders of Equity Interests will receive all of the assets of Aliante Holding, LLC other than the Transferred Aliante Hotel Assets and the Equity Interests in Aliante Gaming, LLC.  The Aliante Lenders do not have an interest in Losee Elkhorn Properties, LLC, and the Debtors believe that there are no General Unsecured Claims against Aliante Holding, LLC.  The two Holders of Equity Interests in Aliante Holding, LLC (one of which is Debtor Aliante Station LLC, a wholly-owned subsidiary of SCI), were deemed to accept the Plan pursuant to the Joint Unanimous Written Consent of the Executive Committee, the Member and the Manager of Aliante Gaming dated March 21, 2011. Aliante Holding, LLC holds the equity interests in non-debtor Losee Elkhorn Properties, LLC, which owns approximately 60 acres of real property.  The Plan contemplates that the Holders of Equity Interests in Aliante Holding, LLC would remain the ultimate owners of Losee Elkhorn Properties, LLC.

(c)      With respect to Debtor Aliante Station LLC, the Plan provides that the Prepetition Opco Secured Lenders will receive, on account of their Class ASL.1 claims, a *pro rata* share of the consideration provided under the New Opco Purchase Agreement, all other Holders of Secured Claims are unimpaired, and Holders of General Unsecured Claims and Equity Interests receive no distribution. The Debtors believe that the only creditor of Aliante Station is Debtor Vista Holdings, LLC, which holds an Intercompany Claim that is being

extinguished under the Plan.  The Plan contemplates that Aliante Station's resulting 50% interest in Losee Elkhorn Properties, LLC will be transferred along with the other assets of the Subsidiary Debtors to a designee of New Opco or New Propco.

25.    The transactions contemplated by the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements, and the New Aliante Transaction Agreements, together with the other Plan implementation agreements, documents and instruments referred to in Article V of the Plan or otherwise contained in the Plan are hereinafter referred to collectively as the "Restructuring Transactions."  The Restructuring Transactions carry out several of the methods for implementing a chapter 11 plan expressly provided for in Section 1123(a)(5): Section 1123(A)(5)(B) (transfer of all or any part of the property of the estate to one or more entities); Section 1123(a)(5)(D) (sale of property of the estate, and distribution of other property of the estate to the holders of interests in such property); Section 1123(a)(5)(E) (satisfaction or modification of liens); Section 1123(a)(5)(F) (cancellation of indentures and similar instruments); Section 1123(a)(5)(J) (issuance of securities by entities receiving property of the estate in exchange for claims against the Debtors).

26.    Good and sufficient legal and business reasons justify approving the Restructuring Transactions.  Such reasons include that the New Opco Purchase Agreement constitutes the highest and best offers for the Subsidiary Debtors' assets, and the New Opco Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Subsidiary Debtors' assets and avoid the possible decline and devaluation of such assets in a protracted chapter 11 process.  In addition, like the Subsidiary Debtors, Aliante Gaming tested the marketplace for buyers, but was unable to come up with a buyer and terms acceptable to the Aliante Lenders.  Aliante Gaming and the Aliante Lenders then negotiated the terms of a consensual debt-for-equity swap chapter 11 reorganization, under which the Aliante Lenders will become the owners of Reorganized Aliante Gaming, and the General Unsecured Creditors of Aliante Gaming will be paid in full or their Claims will be Unimpaired.  That restructuring has the support of the former equity owners of Aliante Gaming, and effectuates a considerable

deleveraging of Aliante Gaming, which bodes well for its long term economic and financial

viability.  Therefore, the debt for equity chapter 11 restructuring of Aliante Gaming should be

approved as well.

27.    Thus, the Debtors submit that the Plan and related Restructuring Transactions

satisfy the requirements of Section 1123(a)(5) and are in the best interests of the Debtors, their

Estates, their creditors and all other parties in interest.

**c.    Section 1123(a)(6) – Prohibition Against the Issuance
by Debtors and Certain Other Corporate Entities of
Nonvoting Equity Securities; Adequate Provisions by
<u>Such Entities for Voting Power of Classes of Securities</u>**

28.    Section 1123(a)(6) contains certain requirements applicable to corporate debtors

and corporate entities acquiring debtor assets under a chapter 11 plan.  Section 1123(a)(6) does

not apply to the Plan.  The Subsidiary Debtors are not issuing equity securities, and the

purchasers of their assets are not corporations.  ALST Casino Holdco will authorize, issue, and

distribute the ALST Casino Holdco and Reorganized Aliante Gaming will authorize and issue

the New Aliante Equity, but neither ALST Casino Holdco nor Reorganized Aliante Gaming are a

corporation.  Thus, the Plan complies with the requirements of Section 1123(a)(6).  Thus, the

Plan complies with the requirements of Section 1123(a)(6).

**d.    Section 1123(a)(7) – Selection of Directors and
Officers in a Manner Consistent with the Interests
<u>of Creditors, Equity Security Holders and Public Policy</u>**

29.    The Plan complies with the requirements of Section 1123(a)(7) because, under the

Plan, on, or a soon as practical after, the Effective Date, all boards of directors of the Debtors

will be dissolved and all officers will be dismissed.  In their place, with the exception of Aliante

Gaming, Richard J. Haskins and Thomas M. Friel will be appointed, through the Confirmation

Order, as the Plan Administrators.  With respect to Aliante Gaming, pursuant to the Plan,

Reorganized Aliante Gaming will be a single member limited liability company with ALST

Casino Holdco as its sole member.  The holders of the Aliante Lenders' Allowed Claims will

own all of the equity interests in ALST Casino Holdco and will have the ability to select the

officers and directors of ALST Casino Holdco, subject to any applicable Nevada state gaming

suitability regulations and requirements.  As part of a Plan Supplement, Aliante Gaming filed a list of proposed officers and directors for ALST Casino Holdco.  As a result, the Plan contains no provisions with respect to the manner of selection of new officers and directors that is inconsistent with public policy or the interests of Holders of Claim and Equity Interests.

### e.    Sections 1123(b)(1) – Impairment of Claims and Interests

30.    Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(l).  Consistent with Section 1123(b)(1), Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Equity Interests.

### f.    Sections 1123(b)(2) – Assumption, Assignment or Rejection of Executory Contracts and Unexpired Leases

31.    Section 1123(b)(2) allows a Plan to provide for assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to Section 365.  Consistent with Section 1123(b)(2), Article VI of the Plan provides for the assumption by the Debtors (and assignment to the applicable transferee of the assets of the Subsidiary Debtors and the Aliante Debtors) on the Effective Date of certain designated Executory Contracts and Unexpired Leases, and the rejection of all other Executory Contracts and Unexpired Leases, in all cases in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123.  Accordingly, the Plan satisfies the requirements of Section 1123(b)(2).

### g.    Section 1123(b)(3) – Retention, Enforcement and Settlement of Claims Held by the Debtors

32.    Section 1123(b)(3)(A) provides that a plan may provide for the settlement or adjustment of any claim or interest belonging to the Debtors or their Estates.  In accordance with Section 1123(b)(3)(A), Article X.E. of the Plan provides for the retention by the Debtors of Causes of Action and Litigation Claims not expressly released or settled under the Plan, and Articles X.B. and X.C. of the Plan provide for certain settlements and releases.

**h.** 1 **Section 1123(b)(4) – Sale of Assets of the Estate**

2      33.      Section 1123(b)(4) provides that a plan may provide for the sale of all or

3 substantially all of the property of the estate, and the distribution of the proceeds of such sale

4 among holders of claims or equity interests.  Consistent with Section 1123(b)(4), the Plan

5 provides for the sale of substantially all of the Subsidiary Debtors' assets and the distribution of

6 the proceeds of the sale  to the respective Subsidiary Debtor's creditors in the order of priority of

7 their Claims.

8 **i.      Section 1123(b)(5) – Modification**
9 **of the Rights of Holders of Claims**

10      34.      Section 1123(b)(5) provides that a plan may modify the rights of holders of

11 certain secured or unsecured claims, or leave unaffected the rights of holders of any class of

12 claims.  Consistent with Section 1123(b)(5), Article III of the Plan modifies, or leaves

13 unaffected, as the case may be, the rights of Holders of each Class of Claims.  Some Classes of

14 Claims receive payment in full in cash and/or are Unimpaired.  Some Classes of Claims receive

15 cash, others receive cash and secured notes, and others receive equity securities and new secured

16 notes.

17 **j.      Section 1123(b)(6) – Other Appropriate Provisions**

18      35.      Section 1123(b)(6) is a catchall provision that permits inclusion in the Plan of any

19 appropriate implementation provision as long as it is not inconsistent with applicable provisions

20 of the Bankruptcy Code.  In accordance therewith, the Plan includes additional appropriate

21 implementation provisions that are not inconsistent with applicable provisions of the Bankruptcy

22 Code, including: (i) the provisions of Article VII of the Plan governing distributions on account

23 of Allowed Claims; (ii) the provisions of Article VIII of the Plan establishing procedures for

24 resolving Disputed Claims and making distributions on account of such Disputed Claims once

25 resolved; and (iii) the provisions of Article X of the Plan, including the treatment of the

26 provisions of the Plan as a Comprehensive Settlement, releases by the Debtors, releases by

27 Holders of Claims and Equity Interests, and certain exculpation provisions.

28

### k.    Section 1123(d) – Cure of Defaults

36.    Section 1123(d) provides that if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.  In accordance with Section 1123(d), Article VI of the Plan provides for the cure of defaults in respect of all executory contracts and unexpired leases that are being assumed under the Plan (including those assigned to New Opco), and requires that such cure payments be made consistent with the requirements of Section 365(b) and 365(c).

### 2.    Section 1129(a)(2) – Plan Proponent Compliance with Applicable Provisions of the Bankruptcy Code

37.    Section 1129(a)(2) provides that a court may confirm a plan only if the proponent of the plan complies with the applicable provisions of title 11.  The legislative history of Section 1129(a)(2) evidences that this provision is intended to encompass the disclosure and solicitation requirements of Sections 1125 and 1126.  *See H.R. Rep. No. 95-595*, at 412 (1977); *S. Rep. No. 95-989*, at 126 (1978) (Section 1129(a)(2) requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as Section 1125 regarding disclosure).  As set forth below, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of Sections 1125 and 1126 and Federal Rules of Bankruptcy Procedure 3016, 3017 and 3018 regarding disclosure and plan solicitation.

38.    The Debtors solicited prepetition acceptances of the Plan in accordance with the requirements of Section 1125(g).  Copies of the Plan and Disclosure Statement and related materials distributed to the solicited creditors were filed with the Court (docket no. 2797).  The Voting Agent submitted a declaration detailing the methods used to solicit the creditors and the Tabulation of Ballots (docket nos. 2895 and 2949).

39.    Bankruptcy Rule 3018(b) requires that a prepetition solicitation period not be unreasonably short.  Here the Debtors set March 18, 2011 as the Voting Record Date, and gave creditors 21 days to review the solicitation materials and make an informed decision.  Courts in this district and other districts have approved prepetition solicitation periods ranging from two

days to twenty two days.[6] Here, all of the Voting Classes are comprised of sophisticated financial institutions that have engaged in lengthy and detailed restructuring negotiations with the Debtors. Twenty one days was therefore an adequate solicitation period, as is evidenced by the absence of any objection from any of member of the Voting Classes regarding the length of the solicitation period.

40.     The Disclosure Statement contains a detailed description of (a) the business of the Debtors and the Restructuring Transactions contemplated under the Plan for the Subsidiary Debtors and the Aliante Debtors, (b) the classification and treatment of Claims against and Equity Interests in each of the Debtors under the Plan, and (c) the other principal provisions of the Plan. The Disclosure Statement also discusses certain securities laws, gaming regulations and federal income tax considerations that may be applicable to the transactions contemplated under the Plan and the decisions of Creditors whether to vote to accept or reject the Plan. Based upon the foregoing, the Debtors submit that the Disclosure Statement contains adequate information as defined in Section 1125 and should be approved, and that the Debtors have complied with all of the other requirements of Sections 1125 and 1126 and Federal Rules of Bankruptcy Procedure 3016, 3017 and 3018 regarding disclosure and vote solicitation.

41.     As provided in Section 1126, Classes of Claims that are not impaired under the Plan are conclusively deemed to accept the Plan, and Classes of Claims and Equity Interests that do not receive or retain any property under the Plan are conclusively deemed to reject the Plan. In both cases, Section 1126 provides that acceptances of the Plan need not be solicited from such Holders of Claims and Equity Interests, and the Debtors did not solicit acceptances from such Holders. The Debtors did not solicit acceptances from the Holders of Equity Interests in Aliante Holding for a different reason -- the only two Holders expressly consented to and approved the

---

[6]  S*ee e.g. In re Blue Bird Body Co.*, Case No. 06-50026 (GWZ) (Bankr. D. Nev. Jan. 27, 2006) [Docket No. 27] (approving solicitation period of two days where single voting class consisted of secured lenders that were sophisticated financial institutions that had engaged in lengthy and detailed restructuring negotiations with the debtors); *In re American Media, Inc.*, Case No. 10-16140 (MG) (Bankr. S.D.N.Y. Dec. 20, 2010) [Docket No. 123] (finding prepetition solicitation period of 15 days sufficient); *In re Metro-Goldwyn-Mayer Studios Inc.*, Case No. 10-15774 (SMB) (Bankr. S.D.N.Y. Dec. 6, 2010) [Docket No. 173] (finding prepetition solicitation period of 22 days sufficient); *In re Source Interlink Companies, Inc.*, Case No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009) [Docket No. 237] (finding prepetition solicitation period of two days sufficient).

restructuring contemplated by the Plan.  Accordingly, the Debtors submit that they complied with the requirements of Section 1126.

42.    The Plan proponents have also complied with the requirements of Section 1127 and Federal Rule of Bankruptcy Procedure 3019 with respect to the Plan Modifications.  On May 16, 2011, the Debtors sought, and subsequently obtained, the consent of the Prepetition Opco Secured Lenders for the Plan Modifications related to adding TSI as a Subsidiary Debtor under the Plan.  The Plan Modifications related to the Aliante Debtors have been consented to by the Aliante Lenders.  Therefore, all Voting Classes have consented to the Plan Modifications can be deemed, under Section 1127 and Federal Rule of Bankruptcy Procedure 3019, to have accepted the Plan as modified by the Plan Modifications.

43.    The Plan Modifications do not require any additional resolicitation of acceptances because: (a) the Prepetition Opco Secured Lenders, the only creditors impacted by the inclusion of TSI as a Subsidiary Debtor under the Plan, consented to such Plan modification, and no other creditor of TSI objected to the Plan; (b) the Plan Modifications in respect of the Aliante Debtors have the effect of resolving what had been, as of the Petition Date, unresolved issues relating to the management of the Aliante Station Casino and Hotel during these Chapter 11 Cases and after the Effective Date, and thereby only enhance the feasibility of the Plan with respect to the creditors of the Aliante Debtors; and (c) the Plan Modifications do not prejudice the treatment of the Claims of any Holder of Claims against or Equity Interests in  the Debtors under the Plan.  Accordingly the Plan, as modified by the Plan Modifications, may be confirmed without the need for any additional voting.  Therefore, the Plan proponents have complied with the requirements of Section 1129(a)(2).

### 3.    Section 1129(a)(3) – Good Faith Requirement

44.    Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law.  "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code." *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002).  The requisite good faith

determination is based on the "totality of the circumstances."  *In re Sagewood Manor Assocs.*

*Ltd. P'ship*, 223 B.R. 756, 761-62 (Bankr. D. Nev. 1998).

45.     The Plan is an effort to maximize the value of the Debtors' assets for the benefit

of the Debtors' creditors, through (a) the sale of the assets of the Subsidiary Debtors for the

highest and best price (with the respective creditors receiving the proceeds of the sales), and

(b) the emergence from bankruptcy of Reorganized Aliante, which will be owned by creditors

holding the senior most claims – the Aliante Lenders.  The Plan itself, based upon the  extensive

negotiations among the Debtors and their creditors leading to the Plan's formulation, evidences

the Debtors' good faith in proposing the Plan.  Those negotiations ultimately resulted in the Plan

being supported by a broad cross-section of the various stakeholders of the Debtors.

46.     There is express statutory authority, and ample precedent in numerous confirmed

chapter 11 plans for the implementation of the principal Restructuring Transactions under the

Plan.  Section 1123(a)(5)(D) expressly authorizes a chapter 11 plan to provide for the sale of

some or all of property of the estate (Subsidiary Debtors).  Section 1123(a)(5)(J) authorizes a

chapter 11 plan to issue securities of a debtor in exchange for claims (Aliante Gaming).  Thus,

the Plan falls well within the four corners of settled chapter 11 practice, and, if confirmed,

achieves a result consistent with the objectives and purposes of the Bankruptcy Code.

### 4.     Section 1129(a)(4) – Bankruptcy Court Approval of Certain Payments as Reasonable

47.     Section 1129(a)(4) provides in relevant part that all payments of professional fees

made from estate assets must be subject to review and approval by the Court as to their

reasonableness.  In accordance with the requirements of Section 1129(a)(4): (a) Article II.A.2. of

the Plan makes all payments on account of Professional Fee Claims for services rendered prior to

the Effective Date subject to the requirements of Sections 327, 328, 330, 331, 503(b) and 1103,

as applicable, by requiring Professionals to file final fee applications with the Court; and

(b) Article XI. of the Plan provides that the Court will retain jurisdiction after the Effective Date

to hear and determine all applications for allowance of compensation or reimbursement of

expenses authorized pursuant to the Bankruptcy Code or the Plan.

1

2

**5.      Section § 1129(a)(5) – Disclosure of New
Management and Compensation of Insiders**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

48.      The Plan complies with the requirements of Section 1129(a)(5) because, pursuant to the Plan, prior to the Effective Date, the Debtors have proposed that Richard J. Haskins and Thomas M. Friel shall serve as the Plan Administrators, and such appointments will be subject to prior Court approval.  None of the non-debtor entities receiving estate assets from the Subsidiary Debtors under the Plan and Restructuring Transactions is a successor to any Debtor or an affiliate of any Debtor participating in a joint plan with the Debtors, therefore Section 1129(a)(5) does not apply to the transferees of the Subsidiary Debtor assets.  The Aliante Restructuring Transactions comply with Section 1129(a)(5) because: (a)  the Plan discloses that Aliante Gaming has negotiated a long term management agreement with Fertitta Entertainment; (b) as part of a Plan Supplement, Aliante Gaming filed a list of proposed officers and directors for ALST Casino Holdco; and (c) Aliante Gaming will inform the Court, at or prior to the Confirmation Hearing, of the identities and compensation of any other directors, officers or insider employees of Reorganized Aliante Gaming that have been selected as of the Confirmation Hearing.

17

**6.      Section 1129(a)(6) – Regulatory Rate Approvals**

18

19

20

49.      The Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction, therefore Section 1129(a)(6) does not apply to the Plan.

21

**7.      Section 1129(a)(7) – Best Interests of Creditors Test**

22

23

24

25

26

27

28

50.      Section 1129(a)(7) requires that, with respect to each impaired Class of Claims or Equity Interests, each Holder of a Claim or Equity Interest in such impaired Class has either (a) accepted or is deemed to have accepted the Plan or, (b) as demonstrated by the Liquidation Analyses referred to in the Disclosure Statement, will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (the so-called "best interests of creditors test").

The starting point in determining whether the Plan meets the best interests of creditors test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors in the context of an hypothetical chapter 7 liquidation.

51.     **Secured Creditors**.   The Liquidation Analysis distributed with the SCI Plan showed that a liquidation of the assets of the Subsidiary Debtors would not be sufficient to satisfy the Prepetition Opco Secured Lenders Allowed Claim in the approximate amount of at least $882 million.  In fact, the purchase price for the Subsidiary Debtors' assets under the New Opco Purchase Agreement, $772 million in cash and secured notes, is approximately $110 million less than the Prepetition Opco Secured Lenders Allowed Claim.  If the assets of the Subsidiary Debtors were liquidated in a hypothetical chapter 7 case, and even if they were liquidated as going concerns, the net proceeds of the sale could only be less than what is being achieved under the Plan because, in a chapter 7 liquidation, one would have to factor in the substantial costs associated with: (i) the delay that would be incurred in connection with the appointment of a chapter 7 trustee and the time required for the trustee and his or her professionals to fully understand the Debtors' situations; (ii) the fees payable to a chapter 7 trustee and newly appointed estate professionals; and (iii) the likely discounts that would be realized in one or more chapter 7 auctions of the applicable assets.   Therefore, the secured creditors of the Subsidiary Debtors are receiving under the Plan at least as much as they would under an hypothetical chapter 7 liquidation proceeding.

52.     The Plan also satisfies the requirements of Section 1129(a)(7) with respect to the secured creditors of the Aliante Debtors.  The Aliante Liquidation Analysis shows that the net proceeds of the liquidation of Aliante Gaming would be in the range of $47 to $53 million.  The Aliante Lenders Allowed Claims, however, secured by substantially all of the assets of Aliante Gaming, exceed $378 million.  Under the Plan, Reorganized Aliante Gaming will issue 100% of the equity in Reorganized Aliante Gaming, and 100% of the New Secured Aliante Debt, to the Aliante Lenders in full satisfaction of the claims of the Aliante Lenders against the Aliante Debtors.  The Aliante Lenders are effectively receiving the full value of their collateral by receiving indirectly all of the equity and new secured debt of Reorganized Aliante Gaming.

They could not do better in a liquidation since it is reasonable to expect that the going concern value of Reorganized Aliante Gaming plus the value of the New Secured Aliante Debt exceeds the net proceeds of the liquidation of Aliante Gaming after reducing such proceeds for the costs of liquidation and delay attendant to the chapter 7 process discussed above.

53.    **Unsecured Creditors**    Under the Plan, Holders of General Unsecured Claims against the Subsidiary Debtors and Aliante Gaming are receiving payment in full or their Claims will be Unimpaired.  In a liquidation they would receive nothing, based upon the Liquidation Analyses discussed above.  Therefore, the Plan satisfies the best interests of creditors test as to those creditors.  The Aliante Debtors do not believe that there are any Holders of General Unsecured Claims against Debtor Aliante Holding.  Therefore, the retention of assets by the Equity Holders of Aliante Holding does not violate the requirements of Section 1129(a)(7).

54.    **Equity Interests**.    With the exception of Debtor Aliante Holding, Holders of Equity Interests in the Debtors are not receiving or retaining any property under the Plan, and they would not receive anything in a liquidation of any of the Debtors, since all of the proceeds of the liquidations would be paid to the creditors.  As a result, the Holders of Equity Interests in the Debtors are receiving under the Plan at least as much as they would receive in a chapter 7 liquidation, and the Plan satisfies the best interests of creditors test as to them as well.

55.    Based upon the foregoing, the Debtors submit that the Plan satisfies the requirements of Section 1129(a)(7) with respect to every Impaired Holder of Claims against or Equity Interests in the Debtors that has not accepted the Plan.

**8.    Section 1129(a)(8) – Acceptance by or Unimpairment of Each Class**

56.    Subject to the exceptions contained in Section 1129(b) including the "cram-down" provisions discussed below, Section 1129(a)(8) requires that each Class of Claims or Equity Interests must either have accepted the Plan or not be impaired under the Plan.  A Class of Claims accepts the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in the number of Claims that actually vote on the Plan vote to accept the Plan. 11 U.S.C. § 1126(c).  A Class of Equity Interests accepts the Plan if Holders of at least two thirds of the amount of Equity Interests that actually vote on the Plan vote to accept the Plan.  *See* 11 U.S.C.

§ 1126(d).  As indicated in the Plan and Disclosure Statement:  (a) Classes of Unimpaired Claims and Equity Interests that were deemed to have accepted the Plan were not entitled to vote on the Plan; (b) Classes of Impaired Claims that were deemed to have rejected the Plan and were not entitled to vote on the Plan; and (c) the Voting Classes were Classes AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a), CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a),  GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a), PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1, SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1, TS.3(a)  TSI.1 and TSI.3(a).  Based upon the Tabulation of Ballots prepared by the Voting Agent, all Voting Classes voted to accept the Plan, and no Classes of Claims voted to reject the Plan.

57.    The Plan does not comply with the requirement of Section 1129(a)(8) that all impaired Classes of Claims and Equity Interests vote to accept the Plan because Classes of Claims and Equity Interests that receive nothing under the Plan are deemed to have rejected the Plan.  Nevertheless, the Plan is confirmable because, as discussed below, the Plan satisfies the cramdown requirements of Section 1129(b) with respect to all non-accepting Classes.

### 9.    Section 1129(a)(9) – Priority Claims

58.    Section 1129(a)(9) encompasses several requirements concerning the payment of unsecured Claims entitled to priority distribution pursuant to Section 507(a).  *See* 11 U.S.C. § 1129(a)(9).  The Plan complies with each of those requirements because the Plan generally provides that with respect to Administrative Claims, on the later of the Effective Date or when an Administrative Claim becomes an Allowed Administrative Claim, the Administrative Claim shall be paid in cash in the full unpaid Allowed amount of the Claim, unless the Holder agrees to less favorable treatment. The Plan also provides that the rights of the Holders of Priority Tax Claims are unaltered under the Plan.  Under Section II.B. of the Plan, Holders of Priority Tax Claims will receive, at the election of the Debtors, (i) payment in full in cash of the Allowed amount of such Claim, (ii) less favorable treatment if the Holder agrees, or (iii) installment payments in accordance with the requirements of Sections 1129(a)(9)(C) and (D).  Finally, the Plan provides that the rights of the Holders of Other Priority  Claims are unaltered under the

Plan.  Under Section II.B. of the Plan Holders of Other Priority Claims will receive payment in full in cash of the Allowed amount of such Claim.  Accordingly, the Plan satisfies the requirements of Section 1129(a)(9).

### 10.    Section § 1129(a)(10) – At Least One Consenting Impaired Class

59.    Section 1129(a)(10) requires that at least one Class of Claims or Equity Interests that is impaired under the Plan, has accepted the Plan, determined without including any acceptance of the Plan by any insider.  Here, (based upon the reports of the Voting Agent) all Classes of Claims entitled to vote, voted to accept the Plan.  Most of the Debtors had Classes of Impaired Claims voting to accept the Plan, but 8 Debtors did not.  Nevertheless, the Plan complies with the requirements of Section 1129(a)(10) because Section 1129(a)(10) does not require an accepting impaired class for each Debtor under the joint Plan.  *See In re Charter Commc'ns, Inc.*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) (joint plan of 110 debtors that did not involve substantive consolidation; court held that only a single accepting impaired class under the plan required to satisfy Section 1129(a)(10)); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *234-235 (Bankr. S.D.N.Y. July 15, 2004) (joint chapter 11 plan for 177 debtors confirmed although majority of debtors lacked an impaired consenting class); *In re SGPA, Inc.*, 2001 WL 34750646, at p.7 (Bankr. M.D. Pa. Sept. 8, 2001) (bankruptcy court confirmed joint plan for multiple debtors and held that "in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan.").

60.    As stated by the *Enron* court, the plain language and inherent fundamental policy behind Section 1129(a)(10) supports the view that the affirmative vote of one impaired class under the joint plan of multiple debtors is sufficient to satisfy Section 1129(a)(10).  2004 Bankr. LEXIS 2549 at *234-235.  Accordingly, the acceptance of the Plan by the Voting Classes is sufficient to satisfy the requirements of Section 1129(a)(10).

### 11.    Section 1129(a)(11) – Plan is Not Likely to Be Followed By Liquidation or Need for Further Reorganization

61.    **Subsidiary Debtors**.  Section 1129(a)(11) requires the Court to find that confirmation of the Plan is not likely to be followed by the need for further financial

reorganization of the Debtors or any successor to the Debtors under the Plan. The Plan is a liquidating Plan for all of the Debtors except Aliante Gaming. The record of the SCI Cases and these Chapter 11 Cases evidences that the parties to the Restructuring Transactions have the financial wherewithal and desire to close on the Restructuring Transactions, including the transfer of the New Opco Acquired Assets, New Propco Acquired Assets and Landco Assets to the applicable transferees pursuant to the Plan; thus, the liquidating aspect of the Plan is feasible.

62.    Under the Plan, the Prepetition Opco Secured Lenders will received secured notes issued by New Opco. The SCI Debtors previously filed with Court financial projections for New Opco. The Subsidiary Debtors believe that the assumptions underlying the financial projections are reasonable, and that New Opco will be able to meet its debt service obligations.

63.    Since all of the Debtors except Aliante Gaming are being liquidated under the Plan, the question of further financial reorganization of the liquidating Debtors is, as a legal matter, moot. *See e.g., In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) ("under the literal wording of § 1129(a)(11) of the Bankruptcy Code, [it] is unnecessary to [show feasibility] when 'liquidation . . . is proposed in the plan.'"); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) ("The feasibility test has no application to a liquidation plan."). Moreover, none of the entities receiving the Subsidiary Debtors' assets are successors to the Debtors; therefore, no feasibility finding is required with respect to those acquirors either.

64.    Even if the feasibility test of Section 1129(a)(11) applies in circumstances where a debtors' assets are being sold and the debtor liquidated, such test is satisfied if the liquidation is contemplated under the Plan, as it is here, and can be consummated. *See e.g.*, *In re Cypresswood Land Partners, I*, 409 B.R. 396, 433 (Bankr. S.D. Tex. 2009) (plan that provides for a sale of substantially all of a debtor's assets offers a reasonable probability of success and can satisfy Section 1129(a)(11)). Here, the assets of the Subsidiary Debtors will be transferred to the applicable transferees under the Plan on the Effective Date. The Plan is feasible if the transferees of the Subsidiary Debtors' assets under the Plan have the financial wherewithal to close on the Restructuring Transactions in a manner that has a reasonable prospect of resulting in

the consummation of the Plan.  To demonstrate that a plan is feasible, a debtor need only show a

reasonable probability of success.  *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

65.    Based upon (i) the financial projections for New Propco and New Opco, (ii) the

clear financial wherewithal and desire of the parties to the Restructuring Transactions to close on

and implement the respective asset purchase agreements on the Effective Date, and (iii) the

evidence that the Backstop Parties are willing to purchase up to $100 million of equity in New

Propco, the Debtors submit that is more likely than not that: (a) New Opco will close on the New

Opco Purchase Agreement, and (b) New Propco and New Opco and their affiliates will be able

to service the debt obligations they are issuing in connection with the Restructuring Transactions.

No contrary evidence was submitted, and no objection to confirmation of the Plan was filed on

feasibility grounds, by any Holder of Claims or Equity Interests or any other party in interest.

66.    **Aliante Debtors**.  As a result of the debt for equity exchange on which the

Aliante Gaming restructuring is based (including the payment in full of the General Unsecured

Creditors), Reorganized Aliante Gaming will have a substantially deleveraged capital structure

and is projected to be able to operate its business and meet its obligations without the need for

further financial reorganization.  The financial projections for Reorganized Aliante Gaming

project: (a) increased gross revenues of 4-5% per year through 2014, based upon assumed

improvements in the economic conditions in the Las Vegas local market during that period; and

(b) EBITDAM of $7.842 million for calendar year 2011, $9.36 million  for calendar year 2012,

$11.541 million for calendar year 2013 and $13.872 million for calendar year 2014.  Therefore,

given the discharge under the Plan of more than $430 million of secured and unsecured claims

against Aliante Gaming, it is reasonable to expect, as the Aliante financial projections state, that

after consummation of the Plan Aliante will not require further financial reorganization.

67.    Accordingly, the Plan complies with the requirements of Section 1129(a)(11).

### 12.    Section § 1129(a)(12) – Payment of Statutory Fees

68.    Section 1129(a)(12) requires that all fees payable under 28 U.S.C. § 1930, be paid

or provided for in the Plan.  In accordance with the requirements of Section 1129(a)(12), Article

XII.A. of the Plan provides that Administrative Claims for fees payable pursuant to 28 U.S.C.

§ 1930 will be paid in Cash on the Effective Date.  After the Effective Date, the Plan

Administrator and Reorganized Aliante Gaming will pay all required fees pursuant to 28 U.S.C.

§ 1930 or any other statutory requirement and comply with all statutory reporting requirements.

### 13.    Section 1129(a)(13) through (a)(16) – Inapplicable Provisions

69.    The Subsidiary Debtors and Aliante Debtors (other than Aliante Gaming) are

liquidating, and after the Effective Date will have no obligations regarding any retiree benefits of

the kind referred to in Section 1114; therefore, Section 1129(a)(13) does not apply to such

Debtors.  Aliante Gaming does not believe that it is a party to any plan, fund or program that

provides "retiree benefits" as such term is used in Section 1114; therefore, Section 1129(a)(13)

does not apply to Reorganized Aliante Gaming.  Sections 1129(a)(14), (15) and (16) address

domestic support obligations, individual debtors, and non-moneyed businesses, and they do not

apply to the Debtors.

### 14.    Section 1129(b) – Confirmation of Plan
### Over Nonacceptance of Impaired Classes

70.    Section 1129(b) authorizes the Court to confirm the Plan even if not all Impaired

Classes have accepted the Plan (a "cramdown"), provided that such Plan has been accepted by at

least one impaired Class and the Plan does not discriminate unfairly and is fair and equitable

with respect to each Impaired Class that voted to reject the Plan.  Here, all impaired Voting

Classes voted to accept the Plan (based upon the report of the Voting Agent), but Impaired

Classes that will retain or receive no property under the Plan, are deemed to have rejected the

Plan.  The Court may "cram down" the Plan over the dissenting vote of such rejecting Impaired

Classes as long as the Plan does not "discriminate unfairly" and is "fair and equitable" with

respect to such dissenting Classes.  Section 1129(b)(2) outlines what may be considered "fair and

equitable" with respect to the various types of Claims asserted against the Debtors.

71.    **Fair and Equitable Treatment of Secured Claims**.  The report of the Voting

Agent shows that all Voting Classes of Secured Claims voted to accept the Plan.  However, even

if a Class of Secured Claims voted to reject the Plan,  the Plan is fair and equitable with respect

to such hypothetical non-accepting Class of Secured Claims and can be confirmed

notwithstanding such rejection, because the Plan expressly complies with the requirements of Section 1129(b)(2)(A).  With respect to the Prepetition Opco Secured Lenders, the Plan provides them with the cramdown treatment contained in Section 1129(b)(2)(A)(ii) – the assets that are subject to the liens of such secured creditors are being sold, with the creditors' liens not only attaching to the proceeds, but the creditors actually receiving the proceeds.  With respect to the Aliante Lenders, the Plan provides them with the cramdown treatment contained in Section 1129(b)(2)(A)(iii) – by receiving 100% of the equity interests in Reorganized Aliante and 100% of the New Secured Aliante Debt, the Aliante Lenders are receiving the indubitable equivalent of their prepetition claims.

72.    **Fair and Equitable Treatment of Unsecured Claims**. The Plan is fair and equitable with respect to all non-accepting Classes of Unsecured Claims because: (a) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed Claim; or (b) the Holders of any Claims (or Equity Interests) that are junior to the non-accepting Class will not receive any property under the Plan (the "absolute priority rule").  The Plan strictly adheres to the absolute priority rule for each Debtor and nowhere does the Plan provide for distributions to the Holders of any Claims or Equity Interests that are junior to any non-accepting Class of Claims of the subject Debtor.

73.    **Fair and Equitable Treatment of Equity Interests**.  The Plan is fair and equitable with respect to all non-accepting Classes of Equity Interests because: (a) each Holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the interest; or (b) the Holder of an interest that is junior to the Non Accepting Class will not receive or retain any property under the Plan.

74.    **No Unfair Discrimination**.  The Plan does not discriminate unfairly with respect to any non-accepting Class because the value of the cash and/or securities to be distributed to each Class under the Plan is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the non-accepting Class. Exact parity is not required.  Any discrepancy in treatment or potential distributions to unsecured

creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.   Accordingly, the Plan may be confirmed under Section 1129(b).

### 15.    Section 1129(d) – Purpose of Plan Not Tax Avoidance

75.    The primary purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act [and there has been no objection filed by any governmental unit, or any other party in interest, asserting any such purpose].  Accordingly, the Plan is in compliance with Section 1129(d).

### 16.    Compliance With Bankruptcy Rule 3016(a)

76.    In accordance with the requirements of Bankruptcy Rule 3016(a), the Plan is dated and identifies the entities submitting the Plan.

### B.    THE PROVISIONS OF ARTICLE X OF THE PLAN ARE APPROPRIATE

77.    Article X. of the Plan contains several settlement, release, exculpation and injunction provisions.  As discussed in greater detail below, based upon the wide ranging support for the Plan among the Debtors' creditors, and the fact that the Plan is the best option the Debtors' have to maximize the value of their assets for the creditors, the settlement, release, exculpation and related injunction provisions of Article X. of the Plan are fair and necessary for the successful implementation of the Plan.

### 1.    The Comprehensive Settlement

78.    Article X.B.1. of the Plan provides that the Plan constitutes a general comprehensive settlement (the "Comprehensive Settlement") of all Claims, Litigation Claims, Causes of Action and controversies relating to (a) the rights that Holders of Claims or Equity Interests may have with respect to any Claim or Equity Interest against any Debtors, (b) the distributions, if any, made under the Plan on account of such Claims and Equity Interests, and (c) any Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction or the  Prepetition Aliante Transactions, and all transactions relating thereto (discussed in more detail below).  No party in interest objected to the Comprehensive Settlement.

79.     The Comprehensive Settlement is a fundamental component of the overall restructuring contained in the Plan because it assures the Debtors and the Estates that the Plan and the distributions made thereunder will result in the final settlement and satisfaction of the various Claims against and Equity Interests in the Debtors.  The Comprehensive Settlement promotes the finality of the Plan and repose.

### 2.     The Global Settlement of the Going Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action

80.     Article X.B.2 of the Plan implements the Global Settlement, which provides for the compromise and settlement of: (a) all of the Going Private Transaction Causes of Action among the Debtors and the SCI Debtors and their respective Estates, and any Person, Entity or Governmental Unit; and (b) all of the Aliante Prepetition Transactions Causes of Action among the Aliante Debtors and their respective Estates, and any Person, Entity or Governmental Unit. Pursuant to the Article X.B.2 of the Plan, (x) all distributions made under the Plan are on account of and in consideration of the Global Settlement, and (y) the Global Settlement is binding on the Debtors and their Estates, and on all Creditors who indicate on their Ballot their agreement to grant the releases provided for in Article X of the Plan.  Article X.C.1. provides for a release of the Going Private Transaction Causes of Action by the Releasing Parties, which Releasing Parties includes the Debtors, their Estates and any Holder of a Claim or Equity Interest that would have been able to assert the Going Private Transaction Causes of Action or Aliante Prepetition Transactions Causes of Action for or on behalf of the Debtors or their Estates. No party in interest objected to the Global Settlement.

81.     **The Going Private Transaction**.  As defined in the Plan, and discussed in greater detail in the Disclosure Statement distributed to solicit acceptances of the SCI Plan, the Going Private Transaction means the buy-out transaction that occurred in November of 2007, pursuant to which, among other things, SCI was acquired by virtue of a merger of FCP Acquisition Sub with and into SCI, with SCI continuing as the surviving corporation, and the sale-and-leaseback transaction with respect to the Propco Properties was consummated.  Also as defined in the Plan, the Going Private Transaction Causes of Action means any and all Claims,

Causes of Action, Litigation Claims, Avoidance Actions and any other legal or equitable remedies against any Person arising from any transaction comprising or related to the Going Private Transaction, regardless of whether such Claims, Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

82.     As described in the Disclosure Statement distributed with the SCI Plan, SCI's Board of Directors authorized the formation of an independent Special Litigation Committee (the "SLC") to investigate and report to the Board regarding whether SCI had colorable claims that could be brought against lenders, former stockholders or others, in connection with the 2007 Going Private Transaction.  The SLC retained its own independent legal counsel and hired its own independent financial advisor to perform expert financial analysis in connection with its investigation.  Neither professional firm had ever performed work for SCI, its affiliates, the Fertitta family, or any of their affiliates.  The SLC filed its findings with the Court on September 22, 2009 (docket no 353) (the "SLC Report").[7]  On December 18, 2009, the SLC filed its Supplemental SLC Report (docket no. 721).  In the Supplemental SLC Report, the SLC concluded that the Master Lease[8] was a true lease, not a disguised financing, and that any litigation seeking to recharacterize the Master Lease as disguised secured financing would be unsuccessful and a waste of estate resources.

---

[7]  The SLC determined that: (a) the financial projections for the 2007 Going Private Transaction were reasonable when made and were not unduly optimistic or overly aggressive; (b) SCI was not insolvent at the time of the Going Private Transaction and did not become insolvent as a result of the Going Private Transaction; (c) SCI was not left with unreasonably small capital; (d) SCI did not intend or expect to incur debts beyond its ability to pay those debts as they matured; (e) no person or entity intended to nor believed the Going Private Transaction would defraud, hinder, or delay a creditor of SCI; (f) the participants in the Going Private Transaction had a good faith belief that the Going Private Transaction would succeed and that SCI would enjoy continued growth; and (g) no person or entity engaged in inequitable conduct in connection with the Going Private Transaction.

[8]  The Master Lease (as discussed in the Disclosure Statement and in numerous pleadings filed with the Court in connection with Court approved amendments to the Master Lease) is between SCI Debtor Propco as landlord and Debtor SCI as tenant, and was entered into at the same time as the Going Private Transaction.  Under the Master Lease, SCI leases the real property and improvements associated with Boulder Station Hotel & Casino, Red Rock Casino Resort Spa, Palace Station Hotel & Casino and Sunset Station Hotel & Casino (collectively, the "Leased Hotels").  The Leased Hotels, in turn, are operated by SCI and certain of its non-debtor operating subsidiaries.  The Master Lease provides for monthly rental payments from SCI to Propco in amounts that exceed the amounts that Propco requires to meet its ordinary debt service obligations and any other expenses not covered by SCI under the "triple net" provisions of the Master Lease.

83.    On August 27, 2010, the Court entered its order confirming the SCI Plan.  In the Court's findings of fact and conclusions of law, the Court found that the settlement and release of the Going Private Causes of Action was fair and equitable and an appropriate provision of the SCI Plan.

84.    **The Aliante Prepetition Transactions**.  The Aliante Prepetition Transactions refer to the negotiation, formulation, entry, performance and/or lack of performance of, and/or any transactions arising from or pertaining to, the Aliante Credit Agreement, the Aliante Security Agreement, the Aliante Swap Agreement, the Aliante Deed of Trust, Aliante Collateral Assignment, Aliante Trademark Collateral Assignment, Aliante Holding Pledge Agreement, the formation of Aliante Debtors, the Aliante Operating Agreement, and the actions taken by the Aliante Transaction Committee.  No such potential Aliante Prepetition Transactions Causes of Action were described in the Disclosure Statement.  Nevertheless, the Aliante Debtors represented that they believed it was in the best interests of the chapter 11 restructuring of Aliante Gaming that Reorganized Aliante Gaming not be encumbered by any uncertainty regarding these potential Causes of Action.  Accordingly, they included the compromise, settlement and release of the Aliante Prepetition Transactions Causes of Action as part of the Global Settlement.

### 3.    **The Plan's Release Provisions**

85.    Article X.C. of the Plan provides for certain releases.  The releases are: (a) releases of claims held by the Debtors and their Estates (Article X.C.1.) against the identified Released Parties, to the fullest extent permissible under applicable law; and (b) voluntary releases of claims held by Holders of Claims and Equity Interests against the identified Released Parties, to the fullest extent permissible under applicable law (Article X.C.2.).

86.    **The Debtors' Release**.  Article X.C.1. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, the Debtors, the Debtors' Estates and each of their respective Related Persons fully releases and discharges (the "Debtors' Release") each of the following parties and their respective properties and Related Persons from any and all claims and causes of action

(including, without limitation, the Going Private Transaction Causes of Action) based on any act, omission or event that takes place on or prior to the Effective Date and arises from or is related to the Debtors, the Reorganized Debtors or their respective assets, property, Estates, the Chapter 11 Cases, the Disclosure Statement, the Plan or the solicitation of votes on the Plan that either the releasing parties could assert or that any Holder of a Claim or Equity Interest could assert for or on behalf of the Debtors or their Estates (whether directly or derivatively): (a) the Subsidiary Debtors and their respective Estates; (b) the SCI Debtors and their respective Estates; (c) Fertitta Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco; (g) Voteco; (h) the Plan Administrators, solely in their capacity as such; (i) the Mortgage Lenders, solely in their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as such; (k) the Land Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders, solely in their capacity as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its capacity as such; (o) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (p) Colony Capital, LLC;  (q) the Settling Lenders, but only if all of the applicable terms and conditions of the Settling Lenders Stipulation are satisfied by the Settling Lenders; (r) the SCI Committee and its members, provided that the Committee Support Stipulation (as defined in the SCI Plan) has not been terminated as of the Subsidiary Debtors Effective Date; (s) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Subsidiary Debtors Effective Date; (t) the Aliante Debtors and their respective Estates; |(u) Reorganized Aliante Gaming; (v) the Aliante Lenders, solely in their capacities as Aliante Lenders and each and every Person or entity, including without limitation, a Registered Intermediary Company, designated by any Aliante Lender to receive all or any part of the Distribution in respect of such Aliante Lenders' Allowed Class AGL.1 Claim; (w) the Aliante Administrative Agent solely in its capacity as such; (x) the Aliante Transaction Committee and its members, solely in their capacities as such; (y) the Executive Committee of Aliante Gaming and its members, solely in their capacities as such; (z) ALST Casino Holdco; and (aa) the respective Related Persons of each of the foregoing Entities identified in subsections (a) through (z) (the "Released Parties").

87.     The Debtors' Release is an appropriate term of the Plan and expressly authorized by Section 1123(b)(3)(A) (the settlement or adjustment of any claim belong to the debtor or the estate).  Moreover, given the particular circumstances of these Chapter 11 Cases, the Debtors' Release reflects a sound exercise of the Debtors' business judgment.  The Chapter 11 Cases involved a multitude of complex issues.  In order to effectively implement the Plan and the Restructuring Transactions, the non-Debtor parties thereto need assurance that they will not be subject to any further liability to the Debtors, their Estates, or any party that seeks to bring a claim on behalf of the Debtors or their Estates.  Absent the Debtors' Release, it is likely that the various Released Parties would not commit to support the Plan because they would remain exposed to potential claims and causes of action.

88.     <u>The Third Party Release</u>.  Article X.C.2. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, each Holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in Article X.C.2 fully releases and discharges (the "<u>Third Party Release</u>") each of the Released Parties from any and all claims and causes of action (including, without limitation, the Going Private Transaction Causes of Action and the Aliante Prepetition Transactions Causes of Action) based on any act, omission or event that takes place on or before the Effective Date in any way relating or pertaining to (a) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (b) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (c) the Chapter 11 Cases, (d) the negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement, and (e) the Going Private Transaction Causes of Action and the Aliante Prepetition Transactions Causes of Action.

89.     Similar to the Debtors' Release, the Third Party Release provides additional assurance to the parties to the Restructuring Transactions and the other parties in interest in the Chapter 11 Cases that their liability on account of claims related to the Debtors (including with respect to the Going Private Transaction Causes of Action and Aliante Prepetition Transactions

Causes of Action) will be minimized, and provides an additional incentive for such parties to settle and consent to the Plan.  In addition, a release of non-debtor third parties voluntarily and knowingly given by a creditor or equity holder in connection with a chapter 11 plan is not an impermissible third party release.  Section 524(e) provides in relevant part that the "discharge of a debt of the debtor does not affect the liability of any other entity, on or the property of any other entity for, such debt."  In *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), the Court of Appeals for the Ninth Circuit held that Section 524(e) applies to chapter 11 plan bankruptcy discharges.  However, a voluntary creditor release does implicate the concerns expressed in *Lowenschuss*.  *See e.g., In re Pacific Gas & Elec. Co.*, 304 B.R. 395, 416-18 (Bankr. N.D. Cal. 2004) (confirming plan that included governmental agency's release of debtor's parent entity and its officers and directors because the agency had consented to the release); *see also In re Hotel Mt. Lassen, Inc.*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("[a]ny third-party release in connection with a plan or reorganization, at a minimum, must be fully disclosed and purely voluntary on the part of the releasing parties and cannot unfairly discriminate against others.").

90.    Here, the Third Party Releases set forth in Article X.C.2. of the Plan are being made on a wholly voluntary basis by such Holder of a Claim or Equity Interest that has indicated on its Ballot that it is consenting to such release.  The Ballots sent to each Holder of a Claim or Equity Interest entitled to vote on the Plan unambiguously stated that the election to consent to such release was at such Holder's option.  The entirely voluntary Third Party Release is an effective tool in winning the necessary support for the Plan and the Restructuring Transactions, and does not unnecessarily trample on the rights of any party that did not agree to such Third Party Release.  Accordingly, the Third Party Release does not violate Section 524(e) or any of the concerns discussed in *Lowenschuss* and is an appropriate term of the Plan under Section 1123(a)(5).  Also, in connection with the Confirmation Hearing, no party in interest objected to the Debtors' Release or the Third Party Release.

### 4.    The Plan's Exculpation of Certain Parties

91.    Article X.D. of the Plan provides, subject to certain identified exceptions, an exculpation of the following parties from any claims or causes of action arising prior to or on the

Effective Date for any act taken or omitted to be taken in connection with, or related to

formulating, negotiating, preparing, disseminating, implementing, administering, soliciting,

confirming or effecting the consummation of the Plan, the Disclosure Statement or any sale,

contract, instrument, release or other agreement or document created or entered into in

connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken

in connection with or in contemplation of the restructuring of the Debtor, the approval of the

Disclosure Statement, confirmation or Consummation of the Plan: (a) the Subsidiary Debtors and

their respective Estates; (b) the SCI Debtors and their respective Estates; (c) Fertitta

Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco; (g) Voteco;

(h) the Plan Administrators, solely in their capacity as such; (i) the Mortgage Lenders, solely in

their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as such; (k) the Land

Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders, solely in their capacity

as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its capacity as such; (o) the

Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders;

(p) Colony Capital, LLC;  (q) the Settling Lenders, but only if all of the applicable terms and

conditions of the Settling Lenders Stipulation are satisfied by the Settling Lenders; (r) the SCI

Committee and its members, provided that the Committee Support Stipulation (as defined in the

SCI plan) has not been terminated as of the Subsidiary Debtors Effective Date; (s) the Put

Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not

been terminated as of the Subsidiary Debtors Effective Date; (t) the Aliante Debtors and their

respective Estates; (u) Reorganized Aliante Gaming; (v) the Aliante Lenders, solely in their

capacities as Aliante Lenders and each and every Person or entity, including without limitation, a

Registered Intermediary Company, designated by any Aliante Lender to receive all or any part of

the Distribution in respect of such Aliante Lenders' Allowed Class AGL.1 Claim; (w) the

Aliante Administrative Agent solely in its capacity as such; (x) the Aliante Transaction

Committee and its members, solely in their capacities as such; (y) the Executive Committee of

Aliante Gaming and its members, solely in their capacities as such; (z) ALST Casino Holdco;

and (aa) the respective Related Persons of each of the foregoing Entities identified in subsections (a) through (z) (the "<u>Exculpated Parties</u>").

92.    The Plan's exculpation provision provides additional incentive for the various major parties to the Chapter 11 Cases to commit to and support the Plan and the Restructuring Transactions.  The exculpation ensures that such parties will not be subject to any claims or causes of action relating to their good faith acts or omissions in the restructuring efforts that began almost a year prior to the Petition Date.  The exculpation ensures that the Plan and Restructuring Transactions will have finality, and that the parties thereto will not be subject to collateral attacks through litigation against the Plan's proponents and supporters.

93.    The Plan exculpation provisions do not violate Section 524(e) or the concerns expressed in *Lowenschuss*, *supra*, because they are based upon the more limited exculpation provisions that are expressly contemplated and permitted by Bankruptcy Code Section 1125(e), which provides a grant of immunity from liability not only under the securities laws, but also under any law, rule, or regulation governing solicitation or acceptance of a plan, to any person that participates in good faith in the solicitation of acceptances of a plan or the offer, issuance, sale or purchase of a security offered or sold in connection with the plan.  Moreover, read literally, nothing in Section 1125(e) limits that protection to post-petition activities.  Indeed, another related provision of Section 1125, Section 1125(g), contemplates and authorizes solicitation of acceptances of a chapter 11 plan prior to commencement of a bankruptcy case if solicited in compliance with applicable non-bankruptcy law.

94.    Here, as discussed in Article II. of the Disclosure Statement for the SCI Plan, the Subsidiary Debtors and SCI Debtors conducted such pre-bankruptcy solicitations as part of their ongoing restructuring efforts dating back to late 2008.  Specifically, during 2008 and the first six months of 2009, the SCI Debtors and Subsidiary Debtors engaged in various discussions with the lenders under the Prepetition Opco Credit Agreement and the CMBS Loans and Holders of the Senior Notes and Senior Subordinated Notes regarding restructuring alternatives for the Debtors' outstanding indebtedness.  Indeed, in November 2008, the SCI Debtors made an offer to exchange new secured term loans for the outstanding Senior Notes and Senior Subordinated

Notes, which would have included a restructuring of the Prepetition Opco Credit Agreement and the CMBS Loans. The November 2008 exchange offer was unsuccessful.

95. In February 2009, the SCI Debtors solicited votes from the Holders of the Senior Notes and Senior Subordinated Notes for a prepackaged plan of reorganization pursuant to which the Holders of the Senior Notes and Senior Subordinated Notes would have received second and third lien notes, respectively, and cash in a plan of reorganization, and the outstanding indebtedness under the Prepetition Opco Credit Agreement and CMBS Loans would have been restructured. The solicitation for the prepackaged plan of reorganization did not receive sufficient votes to approve the plan, and that plan did not proceed. In March 2009, the Holders of a majority in principal amount of each series of Senior Notes and Senior Subordinated Notes entered into a forbearance agreement with SCI with respect to the events of default resulting from SCI's failure to pay interest on the Senior Notes and Senior Subordinated Notes. Majority lenders under the Prepetition Opco Credit Agreement entered into a forbearance agreement with SCI relating to various purported events of default. During the period from March 2009 to the commencement of the SCI Cases, the SCI Debtors and Subsidiary Debtors continued to negotiate the terms of a consensual restructuring with the various creditors of the Debtors.

96. Aliante Gaming also began negotiating the terms of a consensual restructuring with its principal creditor constituencies more than nine months prior to the Petition Date. In March 2011, the Subsidiary Debtors and Aliante Debtors conducted a formal pre-bankruptcy solicitation of acceptances of the Plan, as authorized under Section 1125(g).

97. The pre-petition restructuring efforts are precisely the type of activity that Section 1125(e) is designed to protect. It would be inequitable, and would not comport with the plain intent of Section 1125(e) if, after confirmation of the Plan and implementation of the Restructuring Transactions, the Exculpated Parties -- the persons and entities on the Debtor and creditor sides that actively participated in the process of reaching a consensual chapter 11 plan -- could then be sued for their good faith prepetition and post-petition restructuring efforts.[9]

---

[9]    Other bankruptcy courts in recent contested chapter 11 cases have approved plan exculpation clauses at least as broad, if not broader, in scope than that proposed in these Chapter 11 Cases. *See e.g., In re Citadel Broadcasting, Inc.*, 2010 WL 210808, at *30 (Bankr. S.D.N.Y. May 19, 2010) ("Exculpated

1  Accordingly, the Debtors submit that each of the Exculpated Parties is entitled to the protections

2  afforded them by Section 1125(e) and Article X.D. of the Plan.

3  98.    Based on the foregoing, the Debtors submit that the settlement, release, injunction

4  and exculpation provisions set forth in Article X. of the Plan (i) are integral to the agreement

5  among the various parties in interest and the overall objectives of the Plan and the Restructuring

6  Transactions, (ii) are essential to the formulation and successful implementation of the Plan and

7  the Restructuring Transactions for the purposes of Section 1123(a)(5), (iv) are being provided for

8  valuable consideration and have been negotiated in good faith and at arms' length, (v) confer

9  material and substantial benefits on the Debtors' Estates, and (vi) are in the best interests of the

10  Debtors, their Estates and other parties in interest and, as to the releases made by, or on behalf of,

11  the Debtors or the Estates, are based on sound business judgment.

12  ### 5.    The "No Successor Liability" Provisions of the Plan

13  99.    Section 1141(c) provides in relevant part that "after confirmation of a plan, the

14  property dealt with by a plan is free and clear of all claims and interests of creditors, equity

15  security Holders, and of general partners of the debtor.  11 U.S.C. § 1141(c).[10]  Section 363(f)

16  provides statutory authority for the sale of estate property free and clear of "interests in the

17  property," and courts have generally interpreted Section 363(f) to authorize sales free and clear

18  of liens and claims.  *See e.g., In re Trans World Airlines*, 322 F.3d 283, 290 (3d Cir. 2003)

19  (holding that unsecured claims of debtor's employees "are interests within the meaning of

20  Section 363(f) in the sense that they arise from the property being sold."); *Myers v. United*

21  *States*, 297 B.R. 774, 781-82 (S.D.Cal. 2003) (concluding that purchaser had acquired assets of

22  debtor free and clear of plaintiff's unsecured personal injury claims)  Courts have also expressly

23  held that transferees of a debtor's assets pursuant to a sale approved under Section 363 or

24

25  Claims" included all claims relating to the debtors' in or out of court restructuring efforts, and "Exculpated Parties" included, among others, the Holders of the senior secured debt and their agent, the agent and indenture trustee for the subordinated noteholders, and each of their respective professionals

26  and affiliates); *In re CIT Group, Inc.*, 2009 WL 4824498 (Bankr. S.D.N.Y. Dec. 8, 2009) at *25 (the exculpated parties included a steering committee of prepetition lenders, the DIP lenders and their agent,

27  the exit facility lenders and their agent, the indenture trustees for the unsecured note issuances).
[10] Section 1141(c) is expressly subject to the provisions of Section 1141(d)(3), which provides that

28  confirmation of a plan does not discharge a liquidating debtor, but Section 1141(c) refers to *property* of the debtor,  not the debtor.

pursuant to confirmation of a chapter 11 plan are not liable for claims against the debtor under

successor liability theories. *See e.g., In re Trans World Airlines, supra* (Section 363 sale); *Myers*

*v. United States*, *supra* (Section 363 sale); *In re White Motor Credit Corp.*, 75 B.R. 944, 950

(Bankr. N.D. Ohio 1987) (confirmation of plan). The court in *White Motor Credit Corp.* held

that state law successor liability theories are preempted by the Bankruptcy Code. 75 B.R. at 950.

100.     The Plan provides at Article V.A. that: (a) all conveyances, assignments, transfers

and deliveries made pursuant to the Plan, including, but not limited to pursuant to the

Restructuring Transactions described in Articles V.B, V.C and V.D of the Plan, shall be made,

and such assets shall vest in the applicable transferee, free and clear of all Liens, Claims, Equity

Interests, encumbrances and any other interests asserted by the Debtors, any creditors of the

Debtors, or other Persons or Entities; and (b) none of the transferees and their respective

subsidiaries, creditors, equity holders or Related Persons, shall be deemed a successor of any

Debtor or any SCI Debtor by reason of any theory of law or equity, and shall have no successor

or transferee liability, including liabilities arising from, resulting from, or related to the

implementation of the Plan and the Restructuring Transactions. Such provisions of the Plan

were plainly described in the Disclosure Statement and no party in interest objected. Moreover,

the Restructuring Transactions were expressly contemplated in the SCI Plan. This Court has

already determined that there would be no successor liability in the order confirming the SCI

Plan (docket no 2039) and the related Findings of Fact and Conclusions of Law (docket no.

2038). The order confirming the SCI Plan is a final and non-appealable order.

101.     In considering the application of non-bankruptcy law successor liability analysis

to the transfers of the Debtors' assets to New Opco, the Court applies the default rule under state

law that acquirors have no successor liability. *Village Builders 96, L.P. v. U.S. Laboratories,*

*Inc.*, 121 Nev. 261, 268, 112 P.3d 1082, 1087 (Nev. 2005) ("[I]t is the general rule that when one

corporation sells all of its assets to another corporation the purchaser is not liable for the debts of

the seller." (*quoting Lamb v. Leroy Corp.*, 85 Nev. 276, 279, 454 P.2d 24, 26–27 (Nev. 1969)).

Successor liability against acquirors is only applied when one of the exceptions to the default

rule against successor liability has been proven. *Village Builders*, 121 Nev. at 268, 112 P.3d at

1087 (purchasers of assets have no successor liability unless one of the following four exceptions are met: (a) the transferee has agreed to assume the transferor's liabilities; (b) the transaction is a *de facto merger*; (c) the transferee is mere continuation of transferor; or (d) the transaction is a fraud to escape liabilities).

102.     The evidence here strongly supports a finding of no successor liability because none of the *Village Builders* exceptions to the general rule of no successor liability apply to the Restructuring Transactions and implementation of the Plan in respect of the Subsidiary Debtors. First, the applicable transferees are not assuming the Debtors' liabilities; the Plan and the other Restructuring Transactions related documents are clear and unequivocal on that point.

103.     Second, courts generally will not find a *de facto* merger unless the consideration for the assets is the stock of the transferee, which is not the case here.  *See Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264-65 (9th Cir. 1990) (overruled on other grounds) (finding no continuity of shareholders where consideration paid by purchaser was a combination of cash, promissory note and payment of some debts, and no stock in purchaser or its parent company was exchanged as part of the sale); *see also Ferguson v. Arcata Redwood Co., LLC*, 2004 WL 2600471, *4 (N.D.Cal. Nov. 12, 2004) (purchaser was not alleged to have purchased seller's assets with stock, precluding a finding of successor liability); *Kaleta v. Whittaker Corp.*, 221 Ill. App. 3d 705, 709 (1991) (when payment for assets by stock of transferee is not present, sound policy does not support imposing the predecessor's liabilities upon the successor "when it has already paid a substantial price for the assets of the predecessor.").  Here, the consideration paid for the assets of the Subsidiary Debtors is cash and secured notes issued by New Opco. None of the consideration for the assets being sold under the Plan is the stock of transferee.

104.     Third, courts will not find a *de facto* merger or that the transferee is a mere continuation of the transferor unless the shareholders of the transferor and transferee are substantially the same, which is not the case here.  *See e.g. Village Builders*, 121 Nev. at 274, 112 P.3d at 1090-91 ( (no showing of mere continuation without "identity of stock, stockholders and directors between the two corporations") (emphasis added).  *See also*, *Commercial Nat'l Bank v. Newtson*, 39 Ill.App.3d 216, 217 (1976) (applying the general rule against corporate

successor liability in a situation where one shareholder owned 25% of the predecessor

corporation, and after the asset transfer the same shareholder owned 40% of the successor

corporation); *Joseph Huber Brewing Co., Inc. v. Pamado, Inc.*, No. 05 C 2783, 2006 WL

2583719, *12-13 (N.D.Ill., September 5, 2006) (finding that a continuity of minority

ownership—approximately 15%—does not weigh in favor of a finding for the continuation

exception); *Jeong v. Onada Cement Co., Ltd.*, 2000 WL 33954824, *4 fn. 4 (C.D.Cal., May 17,

2000) (acknowledging that under California law, successor liability exists where shareholders are

"practically" the same).  Here, there is no identity of stock, stockholders or directors between the

transferor and the transferee.  The transferors, the Subsidiary Debtors, are currently owned

directly and indirectly by Colony Capital and the Fertitta family.  Colony owns approximately

74%, and the Fertitta family approximately 26%, of the economic value of the Subsidiary

Debtors.  The transferee, however, New Propco and its affiliates, will be owned 40% by the

current Mortgage Lenders and Mezzco Lenders, 15% by the general unsecured creditors of the

SCI Debtors that acquire equity through the Propco Rights Offering, and 45% by Fertitta

Gaming LLC.  Not only will there be no identity of stock and stockholders between transferee

and transferor, but a majority of the transferee stock will be held by entities that hold no stock in

the transferor Debtors.  Moreover, while the majority of the current directors of the Subsidiary

Debtors are appointed by Colony and the Fertittas, the majority of the directors of the transferee

will be appointed by the creditors receiving the stock in transferee.  Thus, transferee is not, under

Nevada law, a mere continuation of the Subsidiary Debtors.

105.  Fourth, numerous courts, including Nevada courts, have not found the transferee

to be a mere continuation of the transferor where the selling corporation continues to exist, even

if the selling corporation ceases its business operations.  For example, in *Village Builders*, *supra*,

where the Nevada Supreme Court declined to find successor liability, the transferor had sold all

of its assets, but the transferor corporation was maintained for the purpose of a pending lawsuit.

121 Nev. at 272.  Other jurisdictions have reached similar conclusions.  *See e.g.*, *Schumacher v.*

*Richards Shear Co.*, 59 N.Y.S.2d 239, 245 (1983) ("Since Richards Shear survived the instant

purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly

1    concluded that Logemann cannot be considered a mere continuation of Richards Shear.");

2    *Gavette v. The Warner & Swasey Co.*, No. 90-CV-217, 1999 WL 118438, at *5 (N.D.N.Y. Mar.

3    5, 1999) (finding that *de facto* merger did not lie because the seller corporation continued to exist

4    "at least transcendentally for one year.").  Here, like the transferor in *Village Builders*, the

5    Subsidiary Debtors will continue to exist after the Effective Date for the purpose of facilitating

6    Plan implementation and distribution related processes, and possibly for pursuing retained causes

7    of action.

8        106.    Other facts relevant to a finding of no successor liability are: (a) New Opco is not

9    purchasing all of the Subsidiary Debtors' assets in that New Opco is not purchasing any of the

10    assets listed on Schedule 2.4 of the New Opco Purchase Agreement; and (b) those of the

11    Debtors' employees who are to be employed by New Opco are being hired under new

12    employment contracts or other arrangements to be entered into or to become effective at the time

13    of the asset transfers.

14        107.    Finally, the Plan is unmistakably not a fraud to escape liabilities.  The record of

15    the Chapter 11 Cases shows that the parties to the Plan have acted in good faith, the Plan has

16    been proposed in good faith and accomplishes the goals of maximizing the value of the Debtors'

17    assets for the benefits of the Debtors' creditors.  Thus, based upon the facts of these Chapter 11

18    Cases, none of the exceptions to the rule against successor liability under Nevada law apply.

19        108.    In summary, the operation of Sections 363 and 1141 foreclose the ability of

20    creditors to obtain a finding of successor liability against the transferees of the Debtors' assets.

21    It would undermine the purposes of chapter 11 if creditors could get around the effect of

22    confirmation of a chapter 11 plan by asserting successor liability claims after confirmation.  *See*

23    *e.g., In re Trans World Airlines*, 322 F.3d at 292 (to allow some general unsecured creditors to

24    assert successor liability claims against transferee of debtors' assets, while limiting other

25    creditors' recourse to proceeds of sale, would be inconsistent with Bankruptcy Code's priority

26    scheme).  Even if the Court performed the successor liability analysis under Nevada law, it

27    would find no basis at all for successor liability.  Accordingly, the "no successor liability"

28    provisions of the Plan are consistent with applicable law and should be enforced.

**III.    THE NEW SECURITIES AND INTERESTS ISSUED
IN CONJUNCTION WITH THE PLAN ARE EXEMPT
FROM REGISTRATION UNDER THE SECURITIES LAWS**

109.    Article XII.I. of the Plan provides in relevant part that the issuance of any

securities or interests on account of, and in exchange for the Claims against the Debtors shall be

exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and

any other applicable non-bankruptcy law or regulation.  Article IX. of the Disclosure Statement

contains a detailed description of the interplay between Section 1145 and the applicable

provisions of the Securities Act of 1933, as amended (the "Securities Act").  No party in interest

filed an objection to Article XII.I. of the Plan.

110.    The Debtors have relied on section 4(2) of the Securities Act and similar blue sky

law provisions, as well as the exemption to the Securities Act provided by section 1145, to

exempt from registration under the Securities Act and blue sky laws any securities and interests

issued on account of or in exchange for (in whole or in part) Claims against the Debtors, or

otherwise in conjunction with the Plan, including, without limitation, the New Aliante Equity

and New Secured Aliante Debt.  Section 4(2) of the Securities Act provides that the issuance of

securities by an issuer in transactions not involving any public offering are exempt from

registration under the Securities Act.  Section 1145 of the Bankruptcy Code provides that section

5 of the Securities Act and any state law requirements for the offer and sale of a security do not

apply to the offer or sale of stock, options, warrants, or other securities by a debtor if:  (a) the

offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a

claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the

securities are issued in exchange for a claim against or interest in a debtor or are issued

principally in such exchange and partly for cash and property.  All three of these requirements

are met here.  In reliance upon the foregoing exemptions, the securities and interests issued in

conjunction with the Plan including, without limitation, the New Aliante Equity, will not be

registered under the Securities Act or any state securities laws.

## IV.    **CONCLUSION**

111.    Contemporaneously herewith, the Debtors are filing their proposed:

(a) Order Confirming "First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors and Aliante Debtors (Dated May 20, 2011)" With Respect to Subsidiary Debtors and Aliante Debtors; and (b) Findings of Fact and Conclusions of Law Regarding Confirmation of "First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch, LLC (Dated May 20, 2011)" With Respect to Subsidiary Debtors and Aliante Debtors.  The Debtors respectfully request that the Court approve the Disclosure Statement and enter the proposed Confirmation Order and proposed Findings of Fact and Conclusions of Law.

Dated:  May 20, 2011                    Respectfully submitted,

By:    /s/ Fred Neufeld

Paul S. Aronzon (CA SBN 88781)              Laury M. Macauley (NV SBN 11413)
Thomas R. Kreller (CA SBN 161922)           Dawn M. Cica (NV SBN 004565)
Fred Neufeld (CA SBN 150759)                LEWIS AND ROCA LLP
MILBANK, TWEED, HADLEY & McCLOY LLP   50 West Liberty Street, Suite 410
601 South Figueroa Street, 30th Floor       Reno, Nevada 89501
Los Angeles, California 90017               Telephone:  (775) 823-2900
Telephone:  (213) 892-4000                  Facsimile:  (775) 823-2929
Facsimile:  (213) 629-5063                  lmacauley@lrlaw.com; dcica@lrlaw.com

Reorganization Counsel for the Subsidiary       Local Reorganization Counsel for the
Debtors                                     Subsidiary Debtors

James H.M. Sprayregen, P.C. (IL SBN 6190206)   Candace Carlyon (NV SBN 002666)
David R. Seligman, P.C. (IL SBN 6238064)       James Patrick Shea (NV SBN 000405)
David A. Agay (IL No. 6244314)              SHEA & CARLYON, LTD.
Sarah H. Seewer (IL No. 6301437)            701 Bridger Avenue, Suite 850
KIRKLAND & ELLIS LLP                        Las Vegas, Nevada  89101
300 North LaSalle St.                       Telephone:     (702) 471-7432
Chicago, Illinois  60654                    Facsimile:      (702) 471-7435
Telephone:     (312) 862-2000               ccarlyon@sheacarlyon.com
Facsimile:      (312) 862-2200              jshea@sheacarlyon.com

Reorganization Counsel for the Aliante Debtors   Local Reorganization Counsel for the
                                            Aliante Debtors

#4815-2779-4441v10                        -45-