1
         UNITED STATES BANKRUPTCY COURT
            DISTRICT OF NEVADA

2

3 _____ )

   In re:                       )

4                             )

   STATION CASINOS, INC.     CH: 11   )   09-52477-GWZ

5                             )

   MOTION OF GREEN VALLEY RANCH GAMING LLC  )

6   FOR A PROTECTIVE ORDER FORBIDDING     )

   DISCOVERY BY TGHE UNSECURED CREDITOR'S   )

7   COMMITTEE, OR IN THE ALTERNATIVE      )

   LIMITING THE SCOPE OF THE UNSECURED    )

8   CREDITORS' COMMITTEE'S DOCUMENT AND    )

   DEPOSITION REQUESTS                 )

9 _____ )

10

11 _____ )

   In re:                       )

12                             )

   STATION CASINOS, INC.     CH: 11   )   09-52477-GWZ

13                            )

   MOTION BY OFFICIAL COMMITTE OF      )

14   UNSECURED CREDITORS OF GREEN VALLEY   )

   RANCH GAMING (1) TO COMPEL DISCOVERY   )

15   AND (2) FOR RELIEF FROM IMPROPER     )

   CONFIDENTIALITY RESTRICTIONS       )

16 _____ )

17

18                     U.S. Bankruptcy Court
                    300 Booth Street

19                   Reno, Nevada 89509

20                   May 18, 2011
                  2:35 p.m.

21

22      BEFORE THE HONORABLE GREGG W. ZIVE, Judge

<u>APPEARANCES:</u>

23

   For the Debtors:         David Seligman

24                     Eliot Adelson
                    KIRKLAND & ELLIS

25                     Laury McCauley
                    LEWIS & ROCA

```
 1    APPEARANCES: (Continued)

 2    For Station Casinos:           Daniel Perry
                                     MILBANK TWEED HADLEY & MCCLOY
 3

 4    For Dr. Nave:                  Glen Walter
                                     SKADDEN ARPS SLATE MEAGHER FLOM
 5
                                     Laury Macauley
 6

 7    For the Official Committee:    Robert Stark
                                     Morton Siegel
 8                                   Jeremy Coffey
                                     Michelle Kazmer
 9                                   BROWNRUDNICK LLP

10    For the Steering Committee:    Ben Murphy
                                     Jason Wolf
11                                   DEWEY LEBOEUF LLP

12    For Lindholm, Greenspun
      Corporation and GCR Gaming:    Clark Vellis
13                                   BROWNSTEIN HYATT FARBER SCHRECK

14    For Wilmington Trust:          Louis Bubala, Jr.
                                     ARMSTRONG TEASDALE
15                                   Karen Dine
                                     PILLSBURY FIRM
16

17    Also Appearing:                James Patrick Shea
                                     Oganna Atamoh
18                                   James Brandt
                                     Thomas Kreller
19                                   Bonnie Steingart
                                     Sandy Qusba
20                                   Erika Pike Turner

21

22

23

24    Proceedings recorded by electronic sound technician, Spet;
      transcript produced by AVTranz.

25
```

1    THE COURT:  Please be seated.  This is in the matter

2    of Station Casino, Inc., jointly administered cases,

3    specifically in the GVR case.  May I have appearances in the

4    courtroom, please?  Only from those counsel that intend to

5    participate in the hearing, not those that are just monitoring

6    it.

7    MR. SELIGMAN:  Good afternoon, Your Honor. David

8    Seligman from the firm Kirkland Ellis on behalf of the GVR

9    debtors.

10    MR. ADELSON:  Good afternoon.  Eliot Adelson,

11    Kirkland and Ellis, on behalf of the debtors.

12    MR. PERRY:  Good afternoon, Your Honor.  Dan Perry

13    from Milbank Tweed on behalf of Station Casinos, Inc.

14    MR. WALTER:  Glen Walter from Skaaden Arps on behalf

15    of Dr. Nave.

16    MR. STARK:  Good afternoon, Your Honor.  Robert

17    Stark, Martin Siegel and Jeremy Coffey from Brown Rudnick LLP

18    on behalf of the Official Committee of Unsecured Creditors.

19    MS. KAZMER:  Good afternoon, Your Honor.  Michelle

20    Kazmer, the counsel for the Official Committee.

21    MR. MURPHY:  Good afternoon, Your Honor.  Ben Murphy

22    and Jason Wolf of Dewey LeBoeuf LLP for the steering committee

23    of first lien lenders.

24    MR. VELLIS:  Good afternoon, Your Honor.  Clark

25    Vellis from Brownstein Hyatt Farber Schreck on behalf of lender

1   Lindholm, Greenspun Corporation and GCR Gaming.

2         MR. BUBALA:  Your Honor, Lou Bubala from Armstrong

3   Teasdale and I'm joined with Karen Dine from the Pillsbury Firm

4   on behalf of Wilmington Trust.

5         MS. MACAULEY:  Good afternoon, Your Honor.  Laury

6   Macauley of Lewis and Roca, local counsel for the debtors.

7         THE COURT:  By telephone, please.

8         MR. SHEA:  Good afternoon, Your Honor.  James Patrick

9   Shea of Shea and Carylon appearing on behalf of the debtors as

10  Nevada counsel.

11        MS. ATAMOH:  Good afternoon, Your Honor.  Oganna

12  Atamoh, local counsel for Jeffries and Company, Inc.  Also

13  appearing telephonically is James Brandt, counsel for Jeffries

14  Company and Inc., and the pro hac application is pending, Your

15  Honor.

16        MR. BRANDT:  And this is James Brandt, Your Honor, of

17  Latham and Watkins, here for Jeffries.

18        MR. KRELLER:  Good afternoon, Your Honor.  Thomas

19  Kreller of Milbank Tweed Hadley and McCloy on behalf of Station

20  Casinos, Inc.

21        MS. STEINGART:  Good afternoon, Your Honor.  This is

22  Bonnie Steingart from Fried Frank on behalf of the Official

23  Committee of Unsecured Creditors for Stations, Inc.

24        MR. QUSBA:  Good afternoon, Your Honor.  Sandy Qusba,

25  Simpson Thacher and Bartlett, counsel for Deutsche Bank Trust

1    Company America -- the administrative agent on the Op-co credit

2    facility.

3          THE COURT:  All right.  I have two motions that are

4    pending today.  The first is the motion of Green Valley Ranch

5    Gaming, LLC, that's commonly referred to as GVR, the debtor,

6    seeking a protective order forbidding discovery by the

7    unsecured creditors committee, or in the alternative limiting

8    the scope of the unsecured creditors committee's document,

9    deposition request.  The second is a motion by the committee to

10    compel discovery and formerly -- improper confidentiality

11    restrictions.

12          All right.  Obviously these two motions interrelate,

13    therefore I'm going to make a record of all pleadings I

14    reviewed.  I'm going to ask counsel please pay attention

15    because I am going to limit argument.  We have a limited amount

16    of time.  One thing I've noted in many of these pleadings is

17    when we eliminate the hyperbole and the adjectives, they'd all

18    fit within the page restrictions that this Court has.  More

19    light can be shed by good reasoning and logic rather than by

20    what I call screaming briefs, and frankly my tolerance for

21    those is not very high.

22          All right.  Regarding the motion filed by the debtor,

23    I signed an order shortening time on May 13th, 2011, Docket

24    Number 3055, to hear this matter because I am aware that

25    there's a confirmation hearing set for May 25th.  Actually, I

Case 09-52477-gwz    Doc 3192    Entered 05/20/11 16:11:13    Page 6 of 58

6

1  think it's three confirmation hearings rolled into one.  I do

2  know that at the time that I conducted the April 14th hearings,

3  the transcript of which I have before me is Docket Number 2856,

4  and which I have read its entirety and some counsel here today

5  have not.  I indicated that I needed to know, I think it was by

6  May 6th, what would happen with the Aliante.  What is the

7  status of the Aliante case, please?

8       MR. SELIGMAN:  Your Honor, David Seligman again.  The

9  status of that is that there was the voting deadline of, I

10  believe it was April 29th.  The votes did come in.  I do not

11  have the exact figures, but they were well in excess of --

12       THE COURT:  Is there a plan?  Remember, I was to be

13  told whether or not there was even going to be a plan.

14       MR. SELIGMAN:  Yes, there is a plan and the Aliante

15  lenders have voted overwhelmingly in favor of that plan, so --

16       THE COURT:  Okay.  So actually what I have is a

17  disclosure statement and a joint plan and there are three plans

18  and they're to be considered separately.  They're the

19  subsidiary debtors, Aliante and GVR.  The only objection and

20  only request for adjournment is dealing with GVR; is that

21  correct?

22       MR. SELIGMAN:  Yes.

23       MR. STARK:  Yes, Your Honor.

24       THE COURT:  All right.  I will certainly conduct a

25  hearing regarding the subsidiary debtors and Aliante on the

1    25th of May.  In fact, that shouldn't be all that difficult

2    since there's no objection and they've been -- they're

3    consensual, as I understand it at this time.  Is that accurate?

4              MR. SELIGMAN:  That is accurate, Your Honor.

5              THE COURT:  Is that your understanding?

6              MR. STARK:  Yes, Your Honor.

7              THE COURT:  Ms. Steingart, is that your

8    understanding?  You're the committee -- Ms. Steingart, can you

9    hear me?

10             MS. STEINGART:  Yes, Your Honor, it's my

11   understanding as well.

12             THE COURT:  Thank you very much.  Mr. Kreller, is

13   that your understanding?

14             MR. KRELLER:  It is, Your Honor.

15             THE COURT:  Does anybody disagree with that?  All

16   right.

17             Before I signed the order shortening time, I reviewed

18   Docket Number 3050, which was the ex-parte application.  I

19   reviewed Docket Number 3051, which is the affidavit of James

20   Patrick Shea and I reviewed the attorney information sheet.

21   The conclusion that I drew was that the parties and the counsel

22   stipulated that I could hear the motion for protective order

23   together with the motion to compel on shortened time.  Is that

24   accurate?

25             MR. STARK:  Yes, Your Honor, from the committee.

1          MR. SELIGMAN:  Yes, Your Honor.

2          THE COURT:  Yep.  I read the motion for protective

3     order, Docket 3089, together with the exhibits attached

4     thereto.  I would ask, because it's very difficult for me to

5     find all the exhibits when they're simply separated by a sheet

6     that says Exhibit A or Exhibit B, it may be colored on the

7     original, but by the time it gets to me there's no color.  And

8     so -- and there's no tab, and that's why we ask to have them

9     tabbed, when you're looking at 26 of 39, 1 out of 6, it's very

10    difficult to find, it slows down the process, and obviously I

11    have enough to read in this case without spending time trying

12    to find the exhibits.  I read them.  So I need them properly

13    marked and I'd appreciate your assistance in that record.

14          At any rate, I read the motion.  I read the

15    declaration of Eliot Adelson that was filed in support thereof,

16    Docket Number 3040, and it contains a chronology of the request

17    for production, the notices, the notice of intent to take

18    depositions and notice of deposition, et cetera, and they're

19    consistent with the pleadings that were filed on behalf of the

20    committee.  So I'm familiar with those dates.

21          I read the -- the next pleading in order was the

22    joinder by Larry Lindholm, Greenspun Corporation, GCR Gaming,

23    that added nothing, simply joined.  Docket Number 3058, joinder

24    by Station Casinos, Inc. and Kevin Kelly.  And once again, it

25    simply joined, it didn't add any substantive argument.  Docket

1    Number 3060 is a little different.  This was a pleading filed

2    on behalf of the steering committee for the first lien term

3    lenders to GVR and that, as I indicated, was at Docket 3060

4    filed on the 13th of May.  It, first of all, is in opposition

5    to the creditor committee's motion to adjourn the confirmation

6    hearing as it applies GVR.  I'll wait until next week to deal

7    with that because that hearing is set.  I have reviewed the

8    inter-creditor agreement, I am familiar with the terms, I know

9    what 31 says, I know what 54 says, I know what 62 says.  And

10   frankly, I think it was the same law firm that dealt with some

11   of these issues in an unrelated case I had here a year or --

12   year or two ago when I also spent considerable time going

13   through an inter-creditor agreement.

14          The second part of the motion is a joinder in the

15   motion for protective order and that's the part of the motion

16   that I paid particular attention to today.  I reviewed the

17   verified statement of Dewey and LeBoeuf, pursuant to Federal

18   Rule of Bankruptcy Procedure 2019(a), which was helpful because

19   it contained some information that is only partially complete

20   in my mind.

21          Then in the next docket is Docket Number 3076, the

22   joinder in the motion by Seaport Group and Oppenheimer and

23   Company.  I think the reason they're both together, as I

24   understand it, some of the individuals who were involved on

25   behalf of debtor moved from Oppenheimer to Seaport and that's

1    why they're both here and I'm aware of that.  Once again, there

2    was nothing of real substance, simply a joinder.

3              I read the joinder filed as Docket Number 3077 by

4    Jeffries.  Once again, not much in terms of substance.  The

5    joinder filed by GVR is Docket Number 3086, and that's actually

6    also entered on behalf of Mr. Bible, who's a member of both the

7    transaction committee and the special investigation committee,

8    and who's consulting agreements were before me on April 14th of

9    this year.  So I've read that as well.  As I indicated, they're

10   simply joinders and I assume they would join in the arguments

11   that are being made.  I don't know that I'll pay any particular

12   -- that I'll even have time to hear any additional argument

13   from those.

14             I read the joinder of Wilmington Trust FSB as first

15   lien collateral agent, filed as Docket Number 3088 on the 14th

16   of May.  It's a little different.  First of all, it actually

17   contains some evidence, the declaration of David Crichlow,

18   filed as Docket Number 3089, which I've read.  And it also

19   indicates that it had agreed to provide certain information if

20   it received consent from GVR and GVR because hearings had been

21   set or whatever to not consent.  So those documents, as I

22   understand it, have not been produced.  Is that accurate?

23             MS. DINE:  Your Honor, Karen Dine again for

24   Wilmington FSB.  That is correct.

25             THE COURT:  Thank you very much.

1            MR. ADELSON:  Your Honor, actually, it's Eliot

2    Adelson from Kirkland and Ellis.  The documents that were

3    requested from Wilmington Trust, we produced some of those

4    documents over the weekend.  We can get into specific --

5            THE COURT:  They weren't produced by Wilmington.

6    That's all I needed to clarify.

7            MR. ADELSON:  Okay.

8            THE COURT:  Then there was a response filed in

9    opposition, it's called a response, but it's an opposition to

10   protective order filed on behalf of the committee on the 16th

11   of May, Docket Number 3110.  There was an amended response

12   filed the next day, on the 17th, as Docket Number 3148 that did

13   not change the substance, and the Docket Number 3148 is what

14   I've utilized and I think that was the intent; is that correct?

15           MR. STARK:  Yes, Your Honor.

16           THE COURT:  Thank you.  And then there was a file

17   joinder by transaction committee member, Dr. Nave.  I have read

18   that as well.  So those are the pleadings that I've read

19   regarding the motion filed by the debtor.

20           As to the motion for -- filed on behalf of the

21   committee, I reviewed the ex-parte application for an order

22   shortening time, Docket Number 3081.  I read the exhibits

23   thereto, which included the motion itself.  I read the

24   declaration of Mr. Coffey, filed as Docket Number 3082; the

25   attorney information is Docket 3083.  The notice of entry of

1   the order is Docket Number 3135 and the order itself, I

2   believe, is Docket Number 3125, is the order I entered on May

3   16th.

4           The motion is Docket Number 3078.  I have read the

5   motion itself.  I read the declaration of Mr. Coffey, filed as

6   Docket Number 3080, together with the exhibits, which I've

7   tabbed and annotated.  I read the opposition of Wilmington

8   Trust, filed as Docket Number 3102, and it also contained the

9   -- was supported, I should say, by Docket Number 3103, the

10  declaration of Mr. Crichlow, and it reiterated, for most part,

11  the substance of what was provided to me in support of the

12  debtors' motion, that there's documents that they offered to

13  provide, the compliance certificates and borrowing notices

14  under the first lien credit agreement, and financial reports

15  provided to Wilmington Trust by the borrower or any other

16  guarantor for distribution and simply did not provide them

17  because it needed consent, did not receive the consent, and now

18  I've been informed that some of those documents may have been

19  provided.

20          I read the joinder of Dr. Nave and the objection to

21  the motion to compel, Docket Number 3143, which is a little bit

22  unusual because the objection itself wasn't filed until the

23  next day as Docket Number 3149 and I've read that's the

24  objection by GVR.  I read the declaration of Mr. Adelson, filed

25  as Docket Number 3150.  Once again, for the most part, the

1  chronology, as well as detailing what the debtor had offered to

2  produce.  I read the declaration of David Agay, Docket Number

3  3151.  I read the declaration of Dr. Nave, filed as Docket

4  Number 3152.  I read the declaration of Mr. Bible, filed as

5  Docket Number 3155.  I'm a little bit perplexed and confused.

6  There is a motion to seal the exhibit, is what's attached to

7  the declaration that I read different than what is been

8  requested to be sealed?

9          MR. ADELSON:  It is the same exhibit, except that

10  we've redacted the information in what was attached because

11  it --

12          THE COURT:  So I had a redacted version?

13          MR. ADELSON:  That's correct.

14          THE COURT:  I'm going to grant the motion to seal,

15  just as I've done earlier.  There's no reason -- I don't think

16  there's any objection?

17          MR. STARK:  None from us, Your Honor.

18          THE COURT:  All right.  I don't think it makes much

19  difference for today.  In any event, the report is what the

20  report is.  I'm aware of it, I think it was dated what,

21  February of this year?  February 11th?

22          MR. ADELSON:  It was dated February 10th.

23          THE COURT:  February 10th, okay.  So we have signed

24  the order.

25          MR. ADELSON:  Thank you.

1      THE COURT:  And I have read Jeffrey and Companies'

2    joinder in the objection, filed on 3155.  I read the

3    declaration of James Brandt, filed in support of that joinder,

4    Docket Number 3156.  I read the joinder filed on behalf of Mr.

5    Lindholm, Greenspun Corporation, GCR Gaming, LLC, Docket Number

6    3157 and the joinder of the steering committee, Docket 3158.

7      Are there any pleadings that have been filed

8    regarding either of these motions to which I have not referred?

9    No?  Then I've read all the pleadings.

10      MR. SIEGEL:  Your Honor, Martin Siegel from Brown

11    Rudnick.

12      THE COURT:  Yes, sir.

13      MR. SIEGEL:  In I believe it's the motion to compel

14    -- or the opposition to the protective order, I believe we

15    incorporated by reference some of the facts in the motion to

16    adjourn.

17      THE COURT:  I had read the motion to adjourn last

18    week when I granted a request to allow the motion to exceed our

19    page limitation and I had made it clear that I would not grant

20    any such orders in the future for -- when the request was made

21    after the pleading was filed.  The reason for the page

22    limitation, I always assumed, was self-evident.  The idea is to

23    write as concisely and succinctly as possible, ask the Court

24    for the relief that you want, provide the authority and then

25    summarize.  There is really no need for a lot of hyperbole and

1    use of adjectives.  You're writing to a court and it should

2    have no other purpose other than to educate and persuade and

3    this Court generally is persuaded by good, concise writing

4    rather than what I consider to be very loud briefs, because I

5    have often found that there's usually a correlation between

6    volume and the absence of substance.  And you don't have to be

7    redundant.  We do read pleadings here.  So you usually only

8    have to tell me two or three times before I get it.  I don't

9    need to see it six or seven, all right?

10           MS. MACAULEY:  Your Honor, Laury Macauley, Lewis and

11   Roca.  I didn't want to interrupt, but there was one pleading

12   that was brought to my attention that you might have missed in

13   your reading.  There was a joinder today, Docket Number 3159,

14   filed by Stations, Inc., and that was a joinder to GVR's

15   objection --

16           THE COURT:  I did read that, if I didn't make

17   reference to it.  I have been provided with that.

18           MS. MACAULEY:  Okay.  Thank you.  Just wanted to --

19           THE COURT:  Thank you.  I think I did mention that.

20           MR. STARK:  Your Honor, this is a little off the

21   point, I don't have any additional pleadings that Your Honor

22   didn't run through in the litany, but I would make the comment,

23   just for education purposes, we were flying out here this

24   morning and the pleadings that were filed this morning,

25   frankly, haven't had any opportunity to review it from the

1    committee's perspective.  I think I understand what they say --

2              THE COURT:  I can't hear you, I'm sorry.

3              MR. STARK:  I apologize.  Is that better?

4              THE COURT:  Yes.

5              MR. STARK:  Because of the flight this morning,

6    certain pleadings were filed this morning and we frankly

7    haven't had an opportunity to review them and digest them as

8    well as we would like.  I think I understand what they say, I'm

9    just putting it out there for the sense that --

10             THE COURT:  In other words, you're in exactly the

11   same position I'm in.

12             MR. STARK:  Perhaps --

13             THE COURT:  Is that correct?

14             MR. STARK:  Perhaps that's the case, Your Honor.

15             THE COURT:  That -- it is the case.  I don't get to

16   read them in advance either.  Now, I may have had a few more

17   minutes to read them, that's all.

18             I really do not need to hear, for the purpose of

19   argument today, a reiteration of all the arguments that are

20   contained in the points and authorities.  I'm aware of the

21   chronology.  I know that, I think the committee was appointed

22   on or about the 29th of April.  The purported -- or proposed

23   counsel for the committee was selected around the 3rd of May.

24   That -- that's Brown and Rudnick.  That Brown and Rudnick had

25   represented some -- and I'm not sure which, of the -- what are

1  called the second lien lenders.  That Brown and Rudnick and its

2  financial advisor, was it GCL -- is that the right --

3          MR. STARK:  GLC Advisors.

4          THE COURT:  GLC had been involved in this case since

5  last summer, had access to the data room, apparently according

6  to the one declaration had spent about 60 hours in the data

7  room.  So there is some familiarity with this case.  I would

8  point out that the pleadings filed by the committee do not

9  really address that issue at any great length.

10         Oh, in addition, I also went back and reviewed all my

11 minutes and my handwritten notes that I made in preparation for

12 the hearing I conducted on the 14th of April, because I touched

13 on a number of issues that were raised.  I noticed there was

14 some concern about unfair discrimination due to critical

15 vendors.  One only has to go to the transcript to see that I

16 dealt with that directly starting at Page 101 of the transcript

17 and limited the payments to "critical vendors" in the GVR case

18 to slots and to those providing gaming service and no one else.

19 So it was not a general critical vendor pleading, because I

20 think I evidenced at that time my concern about potential

21 unfair discrimination and limited it, as opposed to the

22 critical vendor motion that I granted in the subsidiary

23 debtors' case, because they're -- all unsecured creditors were

24 to be paid and it was more a matter of timing than anything

25 else.  So that -- one point that I thought was -- should be

1  made.  I don't know what's ringing, but I certainly hope it's

2  off.

3          You know, I'm not startled by what I've read.  The

4  committee needs to conduct, it believes, a great deal of

5  discovery so that it can fulfill its fiduciary obligations of

6  conducting investigations that it thinks is necessary.  Of

7  course, that should recognize the reality of the case, and the

8  reality of the case is the three members of the committee,

9  which are MFS Investment Management, Panton Capital Group and

10  Babson Capital Management, LLC, at least two of them have been

11  involved in this case for some time.  They are parties to an

12  inter-creditor agreement, which I've indicated I have read.  It

13  was provided to me regarding the position of the steering

14  committee for the first lien creditors.

15          On February 16th, 2007 there was a first lien credit

16  agreement and a second lien credit agreement that were entered

17  into.  The amount due to the first lien creditors is slightly

18  in excess of -- at least it was on April 12th, the date of the

19  filing of these petitions, $602 million.  The second lien

20  credit agreement was in the principal amount of $250 million

21  and there was approximately $22,000,658 in interest and fees

22  that would be added to it for a total debt of approximately 273

23  million, and that's what I had before in the hearings that I

24  conducted on the 14th of April.

25          On the same date of those two agreements, there was

1    an inter-creditor agreement entered into, that is February

2    16th, 2007.  I am familiar with the terms of it.

3            The sale, which is the substance of the proposed plan

4    of reorganization provides for a purchase price of 500 million

5    and then there's, I think, about 175 million that -- excuse me,

6    1.75 million that's a kicker fee.  There was a plan support

7    agreement that had been -- that was also provided and the plan

8    support agreement was supported by a majority of the second

9    lien creditors as well as, of course, the first lien creditors,

10   and I'm aware of all of that.

11           What I don't know, and what I could not find, because

12   one, I may have run out of time, I do not know the amount of

13   the claims by the three members of the committee.  Could --

14   counsel, could you --

15           MR. STARK:  I wish I knew the numbers off-hand, Your

16   Honor.  I can certainly get them for you in relative quick

17   order, I just don't know them off the top of my head.  I

18   apologize.

19           THE COURT:  Okay.  I'm trying to figure out the

20   economic interests that are at play here, because I know --

21   because I did read the motion to adjourn, some time ago, as I

22   indicated.  If the sale, as proposed by the plan, is confirmed,

23   then the first lien creditors are short more than $103 million.

24   The second lien creditors would be short the 273 million.  You

25   add those together and that's $373 million and before there is

1   any money for unsecured creditors.  And, of course, that

2   doesn't address the administrative burden that these cases will

3   have to shoulder.  And, of course, I am assuming the committee

4   professionals will want to be paid from assets of the estates.

5   If that's correct, and if the 500 million is an accurate value

6   as dictated by market in a sales process that was, in fact,

7   fair, the result appears to be fairly straightforward.  I'm not

8   sure, but I went back and looked, but I believe all the second

9   lien creditors were noticed of the hearings that were conducted

10  on the 14th of April; is that correct?

11          MR. SELIGMAN:  That is correct, Your Honor.

12          THE COURT:  Yeah.  And I saw no objections from any

13  of these three to any of the relief that was being sought, that

14  raised any of these concerns.  I understand the committee

15  wasn't formed, but these were folks who had been involved pre-

16  petition and 1109(b) says that they are a -- and should be

17  permitted to speak.  They didn't.

18          Perhaps they felt constrained by the prohibitions

19  contained in the inter-creditor agreement.  I don't know

20  because I don't have any evidence, but now because they're

21  members of the committee, do not feel that they're bound by

22  their contractual obligations.  My problem is, until I approve

23  a settlement, they're still secured creditors, are they not?

24  Aren't you secured?  Aren't those three entities secured

25  creditors?

1          MR. STARK:  I'm -- would you like me to address this

2     now?

3          THE COURT:  Yes, are -- is that a difficult question.

4          MR. STARK:  No.

5          THE COURT:  Are they secured creditors?

6          MR. STARK:  Not according to the debtors.

7          THE COURT:  Why not?

8          MR. STARK:  506, Your Honor.

9          THE COURT:  Because they'd be unsecured because

10    there's not enough value, right?

11         MR. STARK:  Right, nor does that --

12         THE COURT:  Okay.  If you are correct, and your

13    allegations actually are based on some type of fact, and let's

14    assume that a sale could be had or other value for let's say

15    $700 million, which would be approximately a million dollars

16    over what's due the first lien creditors, where would that go?

17         MR. STARK:  Well, I would presume at that particular

18    point in time, if there was active bidding and the collateral

19    -- collateral, I want to come back to that -- is, in fact,

20    valued above the hurdle, whatever it may be, let's use 602

21    million, sounds like a good enough number, we have active

22    bidding that continues, we get above that hurdle, I think the

23    United States Trustee at that moment in time would have to

24    rethink the 506.  506 is generally cut as of the petition date,

25    but there is the right for -- to allow that collateral position

22

1  to grow, and we deal with this all the time, where collateral

2  grows and ebbs and flows and --

3          THE COURT:  And so, in effect, your clients then

4  could become secured?

5          MR. STARK:  Accurate.  And then they would be off the

6  committee.

7          THE COURT:  All right.

8          MR. STARK:  But that's --

9          THE COURT:  We agree?

10         MR. STARK:  We do.  May I address the other points,

11  Your Honor?

12         THE COURT:  No, I'm going to continue.  Thank you.

13         The point being that the position of the second lien

14  creditors may, in fact, be modified and they would be treated

15  as secured creditors, perhaps up to the total of the $873

16  million, the total secured debt.  So I do, just to let you

17  know, have some concern regarding the position of a committee

18  when it purports to act for the benefit of all unsecured

19  creditors when all unsecured creditors will not get any money,

20  depending upon the value of the collateral and perhaps the

21  ability then of the members of that -- of the committee, even

22  if they can act with -- outside the prohibitions if those

23  prohibitions are applicable, as interpreted by at least the

24  steering committee.  And I'm not saying that that's a correct

25  interpretation, but if it is then those prohibitions would

23

1    apply to them because they would not be unsecured creditors.

2    They can only act -- because Paragraph 3.1 only gives them

3    rights and remedies of unsecured creditors.  And I assume

4    that's the type of argument I'll see in opposition to the

5    position taken by the steering committee, that right now we are

6    unsecured, so we're not bound, but of course then, I'll have to

7    deal with the references to 5.4 and the specific prohibitions

8    of 6.2.  I understand that.  I don't know what I'll do with

9    those, those aren't properly before me.

10          But the point is, is that the position of the members

11   of the committee is certainly are not cast in stone at this

12   time.  And there is some question as to whether they are -- in

13   my mind, truly representative of "all" unsecured creditors.

14   Certainly, their position as secured creditors would be greatly

15   enhanced if there were liens to be avoided.

16          Now, the discovery.  This -- there's no question that

17   this is extensive and broad discovery.  It's referred to by

18   counsel for the committee as -- I think the word was albeit

19   comprehensive, it is far beyond comprehensive.  It is -- it

20   strikes me as the committee has asked for everything it could,

21   it has ignored the Federal Rules of Civil Procedure, limiting

22   the amount of depositions that can be taken.  It's asked for

23   times that aren't consistent and responses consistent with the

24   Federal Rules of Civil Procedure, nor with the local rules of

25   this Court.  It did not ask this Court for permission to act in

1  such a manner, simply presumed it could do so.  I have a

2  problem with that.

3          I understand that this is on a short schedule, but

4  the proper procedure is to seek relief from the Court and let's

5  deal with these issues upfront.  And then the Court can assist

6  in making sure that the discovery is consistent with the rules,

7  moreover is consistent with Federal Rule of Civil Procedure 1,

8  for the efficient and economic management of this case.  And

9  then this Court could assist if the parties could not arrive at

10  a prioritization of the discovery that might be appropriate.

11  That did not happen.

12          I do know that there were discussions that occurred

13  on May 6th, primarily between counsel for -- proposed counsel

14  for the committee and counsel for the debtor.  I know that the

15  composition of the committee was raised on the 6th of May.  I

16  know that on the -- also on the 6th of May that GVR was served

17  with a request for production of documents.  Then, three days

18  later, document request and depo notices were sent to SCI and

19  Wilmington Trust that were, I think, 13 depo notices on that

20  date.  Then on the 11th additional deposition notices regarding

21  Mr. Wright, I remember Mr. Wright from some of the original

22  pleadings that were filed in GVR before the settlement, and

23  with Oppenheimer.

24          I know that there were telephone calls placed and

25  actually discussions that occurred, Mr. Coffey was party to

1   one, on the 9th dealing with some of these discovery matters.

2   There were other discussions on the 10th.  Mr. Adelson said

3   that GVR would produce certain documents, those are the

4   documents in the data room, and would agree to certain

5   depositions.  That it would do so without waiving its right to

6   object.  There were issues regarding the confidentiality

7   agreement.  Counsel for the committee agreed to the

8   confidentiality agreement, reserved its right regarding certain

9   provisions, such as sharing the information with committee

10  members.

11          It is also alleged that the data room contains stale

12  information, about 140 documents, I forget how many thousands

13  of pages, but it's not current information and it, the

14  committee, wants current information, which when one reads, for

15  example, request number five in the request for production and

16  the -- so far as I can determine, on a time limited --

17  unlimited time of that and ask for all documents, that doesn't

18  appear to me to be current at all because it could have be

19  limited from the time of the documents in the data room to the

20  date forward, but that is not what the requests seek.

21          There were discussions that occurred on May 11th.

22  That's when the confidentiality agreement was signed with the

23  reservation by Brown Rudnick.  On the 12th there was additional

24  production.  Also on the 12th of May GLC signed a

25  confidentiality agreement and also had access to the data room.

1    It was on the 12th that the three depositions were offered by

2    the debtor.  And then I think on the 15th there were revised

3    confidentiality agreements regarding committee designees that

4    would be able to review information that had been provided and

5    I have not seen what has occurred since that date.

6           I think that generally, if not specifically,

7    summarizes the chronology that has occurred.  I have both, as I

8    indicated, declarations from committee counsel, as well as for

9    the debtor, and I think that that sums them up.  The committee

10   has asked, I think, for a great deal of discovery, obviously,

11   in my mind with the understanding that it would probably be

12   whittled down by the Court.  And, of course, the opposing

13   parties want to severely limit it, understanding that they

14   might well be ordered to provide more than they want.  And so,

15   each is staking out their positions, I think I understand that.

16          The debtor reiterated and repeated that there was no

17   meet and confer.  Well, I think the parties have, in fact,

18   attempted to meet and confer, they just haven't been able to

19   agree very much.  So I don't put a great deal of weight on that

20   particular argument.

21          I am very greatly concerned about the administrative

22   burden would be placed on this Court that might not have any

23   benefit.  And I've been through this exercise before, in the

24   day we get millions of dollars of fees, I'm told well, we

25   needed to do that just to make sure that we fulfilled our

27

1    fiduciary obligations and you can't look at a fee application

2    in hindsight, it must be prospective.  Well, I'm putting

3    everybody on warning; I will be looking at it in hindsight.

4    This is -- these cases are not opportunity for open coffers.

5    And that's why, in my opinion, the proper procedure, and there

6    are many cases that make this point, is that the discovery

7    should go forward, if at all, in an orderly manner.  You don't

8    need -- and of course you knew you didn't need 14 depositions.

9    You -- I am not going to permit at this point, I think, a

10   discovery that would just require that the work of the

11   transaction committee and the special investigation may be

12   totally disregarded and start over.

13        I do think that the committee is entitled to make a

14   determination and conduct reasonable discovery and being able

15   to make that determination that, in fact, the work of the --

16   that the process employed by both of those committees was

17   appropriate.  Any time that there are affiliates that are

18   insiders that are involved in a transaction, there is a higher

19   level of scrutiny that must be applied.  I went back and read

20   -- as I indicated, read the transcript of the April 14th

21   hearing.  At that time it was not anticipated -- either

22   anticipated or unanticipated, whether a committee would be

23   appointed, but as I read the opposition -- well, first as I

24   read the motion filed by the debtor it struck me, as well as it

25   in the opposition to the motion to compel filed by the

1    committee, that it is anticipated that, at least impliedly,

2    there may be a need to continue the hearing on the GVR plan.

3              Let me put my finger on what I'm talking about.

4    Paragraph 34 in the debtors' motion, that's at Page 9, Line 9.

5                   "If the Court determines the unsecured

6                   creditor's committee is properly constituted,

7                   document production should be limited to those

8                   documents already produced and depositions should be

9                   limited to the three individuals identified."

10             Obviously, I can't make that determination today and

11   there's a hearing set on the motion.  So my question is, why

12   are we putting the cart before the horse?  It appears to me

13   that it might be more appropriate to resolve that issue and

14   then make a determination of the discovery that has to be

15   accomplished.

16             The subsidiary debtors' cases relate to the plan that

17   has been confirmed in what I would call the main case -- the

18   first case of Station Casino.  If the committee is not properly

19   constituted then the Office of the U.S. Trustee has to make a

20   decision whether it's going to form a new committee.  Then the

21   new committee will have fiduciary obligations.  Certainly, the

22   debtor had to be aware that this possibility existed,

23   especially when the sale is to an entity in which the insider

24   is prominent.

25             So I am prepared to rule based upon the pleadings on

1    a number of the issues.  I would allow, if present -- if this

2    committee is properly constituted, certain discovery to occur,

3    rather than a shotgun approach, take everything, throw it

4    against the wall and let's see what sticks approach.  That is

5    not the way of managing a case, because all the committee is

6    entitled to is a reasonable opportunity to represent the

7    interest of unsecured creditors.  As I indicated, I need to be

8    able to be comfortable that, in fact, that's who it's

9    representing.  And that, of course, is balanced against the

10   strict scrutiny to which insider transactions are subject.

11           And I, frankly, intend to avoid the mistake that I

12   think I made in one of the earlier cases where the

13   administrative claims that provided no benefit to the estate,

14   as indicated even by the appeals and unrelated cases that

15   involved subordinated noteholders, that settled for one-third

16   of the attorney's fees that were being requested and nothing

17   for any of the claims.  I'm not going to let that happen again.

18           So now you have a general idea of how I have analyzed

19   these matters.  I don't know if the parties have been able to

20   arrive at any further accommodations since the filing of these

21   pleadings. I'm going to ask to hear from counsel for the debtor

22   at this time.  It's your motion for protective order.

23           MR. ADELSON:  Thank you, Your Honor.  May I have 30

24   seconds before I do that to confer?

25           THE COURT:  Sure can.  Thank you.  We're going to be

1   done by 4:30 folks.  And I appreciate and I want to thank

2   counsel for moving up their time a half an hour.

3        (Counsel Confer)

4            THE COURT:  While you're conferring, I should comment

5   on one other point.  I did read the motion to adjourn, it's

6   lengthy.  I took a look briefly at the -- what was called the

7   preliminary objection, which exceeded our page limitation and I

8   refused to sign the order because of the earlier order entered,

9   so I assume it's going to be reduced.  I think I limited that

10  to 25 pages.  I have a request for -- to extend the page

11  limitation now for response to that objection, all of which

12  indicates to me, that based upon the other motions that I have

13  set on that day, that there may not be sufficient time and that

14  taken light -- the position that's being advocated in the

15  pleadings before me today, that it might be far better and

16  efficient to use the 25th for the subsidiary debtors, Aliante

17  debtor plans, deal with some of the motions, most of which --

18  some of which are not the -- I don't know if there's going to

19  be objection, for example, the position may have changed

20  regarding proposed counsel for the committee, but we could save

21  time by not -- if I have to consider the motion to adjourn, I

22  will consider it, of course, on that date.

23            It makes it very difficult to -- for me to

24  contemplate having sufficient time then to deal with the

25  objections.  And it makes far more sense to deal with the

1   threshold issue, which is the constitution or composition of

2   the committee in any event.  That's -- if I were to put these

3   in order of how they should be resolved, that's how I'd do it.

4   I cannot use today, and will not use today, to provide any type

5   of an advisory opinion on that.  I'm not going to do that.  So

6   I realize while you were conferring that I probably hadn't

7   fully explained the various matters that I was looking at in

8   arriving at my tentative conclusion.  Now, if you need an

9   additional few seconds to converse --

10            MR. ADELSON:  I do.

11      (Counsel Confer)

12            THE COURT:  Go ahead.

13            MR. ADELSON:  Thank you, Your Honor.  It's Eliot

14  Adelson for Kirkland and Ellis.  To begin, that paragraph was

15  not meant to intend in any way that we wanted, anticipated or

16  looked forward to a continuation.

17            THE COURT:  No, but I thought it provided the correct

18  evidence, perhaps.

19            MR. ADELSON:  I will -- I'll address that in a

20  minute.

21            THE COURT:  I'm not saying that you were stipulating

22  to it.  What I'm saying is, I think that's a pretty good idea.

23            MR. ADELSON:  If I could put a question to you, if

24  the Court rules next week and determines that the committee is

25  not properly constituted and the U.S. Trustee is here and makes

32

1    -- has made a decision at that time that they will not appoint

2    new members, would the Court be prepared to move forward on

3    that day?

4              THE COURT:  Move forward on what?

5              MR. ADELSON:  On confirmation.

6              THE COURT:  No.  There's only so much time.  I really

7    don't want to sound petulant, or presumptuous, but there's a

8    whole bunch of you folks out there and there's only one here,

9    and I need to read and be able to understand and think about

10   what is the correct result.  Frankly, there's a matter of time.

11   I've already had to move hearings the day before so I could

12   read all the pleadings, prepare for the hearings on the 25th,

13   and frankly in a matter that, if the parties had said no, I

14   would have held.

15             I already know what I'm going to be doing this

16   weekend and I'm retired and failing at retirement badly.  My

17   point being, I don't know that I could do the job correctly and

18   that is troublesome to me.  And I know what the debtor wants.

19   I understand that and that's why I spent considerable time

20   going back to make sure that the linkage -- that I, in fact,

21   could separate those confirmation hearings, and I believe I

22   can.  And I don't think -- I was not told on the 14th of April

23   that they were all necessarily tied together.

24             The subsidiary debtors' plan clearly is directly

25   related to the plan I confirmed earlier.  That has to happen.

1    That will not be adjourned.  Even if there had been objection

2    by the committee, that would have been heard.  I understand

3    that, but I -- without reading all of the opposition, to the

4    motion to adjourn, I am willing, based upon my ruling on the

5    25th regarding the composition of the committee, I'll move

6    other matters to get this thing set.  I'll do that, so that we

7    do not have to wait a great amount of time.  And that will also

8    tie into an orderly discovery process if necessary.

9           I'm going to allow some discovery to occur even

10   before the 25th.  I'm not going to put a standstill in place.

11   And you folks have already recognized the reality of that

12   situation.  You've already begun to provide documents.

13   Certainly I will allow certain depositions and the committee

14   can begin to conduct a reasonable discovery program.  And --

15   with the understanding that if I rule against it that, of

16   course, that information might be available if there's another

17   committee, but there is a risk regarding any award of fees or

18   other ramifications down the line.  That's all I'm saying.

19   There's a certain assumption of risk that's going to go -- it's

20   already happened.  Look at the work that's been done since the

21   what, 3rd of May.  So yes, I'm trying to be as candid with you

22   as I can.

23          MR. ADELSON:  And I appreciate that.  And in response

24   to that, I would remind the Court, because I know you've read

25   the pleadings, that within there there are deadlines that we

1    outline regarding financing --

2           THE COURT:  I understand that.

3           MR. ADELSON:  -- and the APA.  And it looks like to

4    us that around June 15 is our -- we must be confirmed.

5           THE COURT:  If I -- as I said, if I have to move

6    other matters, I'll do it.

7           MR. ADELSON:  Okay.  With respect to next week and

8    discovery, although we don't believe that this committee is

9    properly formed --

10          THE COURT:  Everybody is reserving their arguments.

11   Nobody has to tell me that.  I understand that.

12          MR. ADELSON:  Excellent.  We have undertaken to do

13   the reasonable efforts that you've described.  We have given

14   them discovery in discrete categories that address --

15          THE COURT:  What about the language they objected to

16   in the confidentiality agreement?

17          MR. ADELSON:  They object -- I think that we have --

18   the confidentiality agreement, we now have let's call it two

19   versions.  Version one was professional eyes only.  They raised

20   the issue in one of their pleadings that they wanted their

21   members, that we were not allowing them to perform their

22   fiduciary duties.  We said fine, let's compromise, and on

23   Sunday I sent them a draft of a new confidentiality agreement.

24          THE COURT:  Yeah, I referred to that in my opening

25   statement.

1           MR. ADELSON:  Exactly.  We had not heard anything
2    about that until this --
3           THE COURT:  Where are we on the confidentiality
4    agreement?  I refuse to think that this has to be a major
5    issue.
6           MR. COFFEY:  It doesn't, Your Honor.  It -- because
7    it pertains to the members individually, we've sent it out them
8    for their general counsels' to review.  We'll get comments back
9    and I think we can resolve that very easily.
10          THE COURT:  I want that done.  There's no reason to
11   have that not being done.  And I really don't care what the
12   members of your committee say, you're here speaking on behalf
13   of.  I don't have a problem with the language.  It doesn't need
14   to have much tweaking.
15          MR. COFFEY:  We'll get it done, Your Honor.
16          THE COURT:  I think committee members are entitled,
17   but there should be strict confidentiality thereafter.  That's
18   what I'm saying and I think that's what the language says.  And
19   you folks could do a better job writing it than I could
20   speaking it, okay?
21          MR. COFFEY:  We'll take care of it, Your Honor.
22          THE COURT:  That takes care of that.
23          MR. ADELSON:  So what we have done is tried to do
24   exactly what Your Honor has indicated, an efficient and
25   economic process here.  We've offered up the discrete documents

1  that address the issues that they have raised and address the

2  issues that the Court has indicated would be considered next

3  week in our meeting.  We have also offered the depositions of

4  Dr. Nave, Mr. Bible and Evan Pearson, who is the

5  Oppenheimer/Seaport --

6          THE COURT:  You've offered Bible for what, the 18th,

7  Dr. Nave for the 19th and I assume Mr. Pearson was with

8  Oppenheimer, now with Seaport?

9          MR. ADELSON:  Exactly.  And in light of the Court

10 setting the hearing today, we informed the committee that we

11 weren't going to have Mr. Bible available, but that he would be

12 made available to them before the 25th.  We have offered Dr.

13 Nave tomorrow.  He will be sitting and the committee has issued

14 another subpoena and that deposition, we think, will be going

15 forward tomorrow morning.

16         THE COURT:  Is that correct?

17         MR. COFFEY:  Yes, it is, Your Honor.

18         THE COURT:  Thank you.

19         MR. ADELSON:  Mr. Pearson is available in New York on

20 Friday.  We've not heard any confirmation or location or

21 time --

22         THE COURT:  Any objection to taking that deposition?

23         MR. COFFEY:  Your Honor, we've been discussing with

24 counsel whether or not there are other days we can --

25         THE COURT:  I'm sorry, somebody on the telephone is

37

1   doing something that's interfering with our ability to record.

2   So I --

3           THE OPERATOR:  Yes, Your Honor, I have muted her line

4   now.  This is the operator.

5           THE COURT:  Thank you.  Are they on the line or not?

6           THE OPERATOR:  Yes, they are the line.  This is

7   coming from Ms. Bonnie Steingart.  I muted it.

8           THE COURT:  Thank you.  Ms. Steingart -- thank you.

9   Go ahead, sir.

10          MR. COFFEY:  Thank you, Your Honor.  Jeremy Coffey of

11  Brown Rudnick.  We have asked counsel whether or not Mr.

12  Pearson might be available on another day because of the

13  importance of his deposition, we're still getting documents as

14  late as this weekend --

15          THE COURT:  I know you are.

16          MR. COFFEY:  -- and have not had a chance to fully

17  digest those.  I think it'd be relevant to Mr. Pearson's

18  deposition, so we've asked if we could have an accommodation to

19  have him on another day.

20          THE COURT:  What about Mr. Bible?

21          MR. COFFEY:  Mr. Bible, we'll do on Monday when he's

22  been offered.

23          MR. ADELSON:  Yep, that's right.

24          THE COURT:  So you've got Mr. Bible, Mister -- and

25  Dr. Nave set and what you need to do is maybe have a day or two

38

1    more before Mr. Pearson.

2             MR. COFFEY:  We said we'd do it over the weekend,

3    next Monday, whenever it fits.

4             THE COURT:  Is that acceptable to counsel for the

5    debtor?

6             MR. ADELSON:  He's not available over the weekend and

7    we've informed counsel of that, that he is -- has other

8    commitments over the weekend and he's traveling on Monday.  And

9    that's why we -- he doesn't live in New York, but he is working

10   in New York this week.

11            THE COURT:  Where does he live?

12            MR. ADELSON:  He lives in LA.  So he may be available

13   next week in LA.  I can't confirm that right now.

14            THE COURT:  All right.

15            MR. COFFEY:  Your Honor, we can certainly work with

16   them to figure out a date.

17            THE COURT:  Let's get it done.  Those are the three I

18   was going to certainly order.  I see no reason of -- I think

19   you should take those depositions.  Do you have any idea of the

20   length of time that you need for those depositions?

21            MR. COFFEY:  I don't know that we can say for

22   certainty today.  I -- if -- in relative terms, I think Mr.

23   Pearson and Mr. Bible will be close to seven hours.  Mr. Nave,

24   I hope, will be shorter than that.

25            THE COURT:  I'll allow eight hours for Mr. Bible, and

1  that would include break time folks, so you control that.  You

2  obviously have to provide the witness with some opportunity to

3  take a break.

4        MR. COFFEY:  Understood.

5        THE COURT:  And it was Mr. Pearson you thought would

6  take some time as well?

7        MR. COFFEY:  Yes, Your Honor.

8        THE COURT:  Eight hours.  And Dr. Nave, six hours.

9        MR. COFFEY:  We'll make that work.

10        THE COURT:  And then, these are without prejudice if

11  necessary at a later time, seeking additional testimony.

12        MR. COFFEY:  I understand, Your Honor.  And our

13  approach was we certainly were not looking to take depositions

14  of those who we determined did not have or were likely to have

15  information about what we're doing.  So the broader list was

16  who we thought we would need, subject to finding out we didn't

17  through the documents.

18        THE COURT:  And, you know, that's fine, and you can

19  always tell your constituency that you asked and the Court said

20  no, okay.  I see counsel here.

21        MR. WALTER:  Just, I want to make a point of

22  clarification.  Glen Walter for Dr. Nave.

23        THE COURT:  Yes, sir.

24        MR. WALTER:  Dr. Nave is scheduled for tomorrow.  We

25  have offered him and that's fine.  He did receive a broad

1  document request and part of our joinder to the opposition was

2  that he didn't have to produce additional documents, that was

3  just going to be the debtors' production and that he'd be

4  available for oral testimony.  So I just wanted to clarify.

5          THE COURT:  And that would be my order as well.  I

6  think the debtor will produce documents.  I'm not going to

7  require all the other parties to satisfy those production

8  requests at this time.

9          MR. COFFEY:  Understood, Your Honor.  And if we

10 may --

11         THE COURT:  Okay.  Because they were not the ones

12 that necessarily sought relief in this Court, as opposed to the

13 debtor.

14         MR. COFFEY:  Understood, Your Honor.

15         THE COURT:  Thank you.

16         MR. ADELSON:  And I apologize, I missed -- are we

17 going forward with Mr. Pearson on Friday?  He is available, he

18 is ready to go on Friday --

19         MR. COFFEY:  We're going to need some more time to

20 prepare, so maybe we can talk after the hearing and pick a date

21 that works.

22         THE COURT:  Okay.  Why do you need more time?

23         MR. COFFEY:  Your Honor, some of the information that

24 we've gotten, even over this past weekend, we believe is

25 potentially relevant to the sale process that Mr. Pearson was

1    involved in.

2            THE COURT:  Right.

3            MR. COFFEY:  We'd like an opportunity to digest that,

4    understand it, hone our deposition to the extent we can --

5            THE COURT:  I'll give you additional time.  I'll tell

6    you what I'll do, if you need more documents so you can hone

7    the time, I'll give you six hours with him as well or you can

8    take it Friday for eight hours.

9        (Counsel Confer)

10            MR. COFFEY:  Your Honor, if we went forward on

11    Friday, I don't think it will be a productive use of anyone's

12    time.

13            THE COURT:  Fine.  Then I'll limit that to six hours

14    as well.  Because it -- I'll give you the time so that you can

15    be more surgical in your approach.  And, of course, as I said,

16    this does not preclude your ability to seek further discovery,

17    if cause is shown, all right?

18            MR. COFFEY:  Understood, Your Honor.  Thank you.

19            THE COURT:  Thank you.  Are any -- are there any

20    other depositions that you feel are essential prior to the

21    25th?

22            MR. COFFEY:  Not prior to the 25th.

23            THE COURT:  Thank you.

24            MR. COFFEY:  On the schedule we're talking about now.

25            THE COURT:  Thank you.

42

1            MR. ADELSON:  Your Honor, just to be clear, Mr.

2     Pearson is only available on Friday before the 25th.

3            THE COURT:  Well, then we won't have him on the 25th.

4     If he's not available -- I'm not going to order the gentleman

5     to be available if he's unavailable.  If you want to take his

6     deposition for whatever good you think it'd do, I'm -- on

7     Friday he's available.  That's clearly up to you folks.

8            MR. STARK:  Can I --

9            MR. ADELSON:  Go ahead.

10            MR. STARK:  May I ask for clarification, Your Honor?

11            THE COURT:  Sure, sir.

12            MR. STARK:  Thank you.  And I don't mean to be out of

13     order, but I'm trying to actually resolve issues and trying to

14     be constructive.

15            THE COURT:  I always like that.

16            MR. STARK:  Again, for the record, my name is Robert

17     Stark from Brown Rudnick.

18            THE COURT:  Yes.

19            MR. STARK:  Your Honor's proposal, as it was hinged

20     off of the debtors' paragraph, I think, 34 is perfectly

21     acceptable to us.  We certainly --

22            THE COURT:  I didn't see why it wouldn't be since it

23     basically grants the relief that you requested.

24            MR. STARK:  Certainly.  And, you know, obviously to

25     the extent that we take up the issue first about present

1    constitution and we deal with it and we're --

2          THE COURT:  That's why I don't know that Pearson is

3    necessary for the 25th.

4          MR. STARK:  And that's where I was headed for, in

5    fact.  It's useful and it's efficient to use time when it's

6    available.  And it's certainly useful and efficient, enable

7    people to know and understand so that we're knowledgeable when

8    we come here.  And so we're happy to take the discovery and --

9          THE COURT:  I mean, if it were one thing, if I knew

10   the proposed committee counsel and the members of the committee

11   had little or no familiarity with this case, and I know just

12   the opposite is true.

13         MR. STARK:  Well actually, to be honest with you, and

14   it is a point of contention I have with that, Your Honor, and I

15   don't want to belabor the record, but the reality of it is, is

16   that we had some conversations every now and then.  I met Mr.

17   Seligman for the first time today, okay.  We had access to a

18   data room at some point and it was -- it's not what it purports

19   to be in terms of data in the room.  I don't need to belabor

20   the point, but --

21         THE COURT:  I've read your pleadings.  I understand

22   what you said.

23         MR. STARK:  But it's wrongful to conclude, Your

24   Honor, based upon what you've been provided that we are very

25   familiar with everything that's going on, because it's just not

44

1    true.

2                THE COURT:  All right, then.  I accept that.

3                MR. STARK:  But for -- sorry.

4                THE COURT:  But I do know that your firm had

5    participated, to some degree, that the second lien creditors

6    had been involved, that the second lien creditors certainly had

7    to be aware of what their position was, the limitations on

8    their participation based upon their own agreements.  And so --

9                MR. STARK:  Oh no, they understand their inter-

10   creditor agreement.

11               THE COURT:  I mean, it is not as though I were

12   sitting here, frankly, with a number of trade vendors or other

13   unsecured creditors who really are at a loss to understand how

14   this came to occur, that were unaware of the restructuring

15   efforts, at least to some degree.

16               MR. STARK:  Oh, I think everybody in the world knows

17   about Stations and Green Valley and what's happened --

18               THE COURT:  Oh, you would be surprised.

19               MR. STARK:  Oh maybe --

20               THE COURT:  You would be startled.  You do, your

21   clients do and then the people on the street get very confused

22   about what they heard.

23               MR. STARK:  I understand, Your Honor, and I --

24               THE COURT:  My point being, I tend to agree with you.

25   I'm not sure Pearson is needed by the 25th.

1    MR. STARK:  I just came up to try to obviate and make

2  sure it was streamlined.  As I see it, the issue is it's useful

3  to get the information that's available, it's useful to get a

4  process started, it's useful to enable when we have time that's

5  efficient and appropriate.  If, on the other hand, he's not

6  available and they're not going to use him in the courtroom in

7  the next week --

8    THE COURT:  I won't allow him to be used in the

9  courtroom on the 25th for the purpose of this hearing.  If he's

10  not available, he's not available, he can't be used.  It's that

11  simple.

12    MR. STARK:  But the contours follow it a bit further.

13  If we're going into the room and we're going to say on the 25th

14  the issue number one, once we've gotten past the other plans,

15  is whether or not this committee is appropriately constituted,

16  and if it is appropriately constituted or it needs supplemental

17  or something like that, it will continue on in a going forward

18  way.  It will not be a committeeless case, in other words, and

19  then at that point in time we can reset on issues that are

20  relevant to plan confirmation.

21    THE COURT:  I would intend to use the remainder of

22  that day as a status conference and scheduling conference and

23  we will go forward.  And the parties should consider, and be

24  prepared on that date to provide me with information regarding

25  the discovery that is necessary.

46

1          MR. STARK:  Uh-huh.

2          THE COURT:  You will not have a great deal of time.

3     I will guarantee you, I'm going to be meeting with my courtroom

4     deputy and trying to find the time in the event that I believe

5     or find that the committee is presently constituted.

6          MR. STARK:  And we'll take the challenge --

7          THE COURT:  So everybody should understand that.

8     There is not going to be any long delay.  Now, I know that

9     there's certain deadlines, but I also know those deadlines are

10    imposed by those that have an interest in the result and a

11    certain amount of flexibility might exist, but they are what

12    they are at this time.  So I understand all of that and we

13    would do it on that basis.

14         MR. STARK:  We understand.  If he's not prepared to

15    go forward, and he won't be at the hearing, then we'll move

16    forward.  I gather what I think is, is Mr. Coffey and Mr. Agay

17    or Seligman can sit and talk about it and if --

18         THE COURT:  Look --

19         MR. STARK:  -- they can figure it out amongst

20    themselves.

21         THE COURT:  -- I've got good lawyers and good law

22    firms.  This is not the first time you've been in this

23    position.  Let's get it done.  I am not going to allow the

24    broad discovery that you wanted.  I am not going to limit it

25    necessarily to what you wanted to limit it to.  I am prepared

47

1  to issue rulings restricting that, but I really think that

2  going forward with the process that I've indicated might

3  assist.  Okay.  Thank you.

4          MR. STARK:  Thank you, Your Honor.

5          THE COURT:  Is there anything from -- I'm sorry, go

6  ahead, Mr. Murphy.

7          MR. MURPHY:  If I may be heard?

8          THE COURT:  Sure.

9          MR. MURPHY:  Thank you.  Once again, Ben Murphy of

10  Dewey LeBoeuf for the steering committee of first lien lenders.

11          THE COURT:  Yes, sir.

12          MR. MURPHY:  I wanted to follow up on two points that

13  were raised in argument, and begin with the last point, which

14  is timing.  Your Honor mentioned the ticking fees, $1.75

15  million, May 1 to June 1.  I think that's an illustration of

16  how deeply concerned about timing the first lien lenders were

17  in reaching their agreement over this matter of disclosing of

18  their collateral under the plan.

19          We appreciate the Court's comments about the need to

20  keep the process on track.  It's not only because that's going

21  to conceivably save money to the estate through -- save money

22  on the purchase price, but it's more importantly because the

23  parties have worked for a long period of time in a coordinated

24  process that involves proceedings in the bankruptcy court and

25  proceedings before other state authorities designed to get all

1    this done at the same time.

2          THE COURT:  I assume you're talking about the gaming

3    regulators?

4          MR. MURPHY:  I am.  So we appreciate the Court's

5    comments that long delays are not something that the record

6    would --

7          THE COURT:  I've already indicated, I'm going to

8    inconvenience other people to get this done.  And that's why my

9    tolerance level for long pleadings, argument, for unsupported

10   allegations, and I could even point out some now.  I went

11   through this -- but, you know, when I read some of these

12   statements, when the committee says it's understanding and I go

13   well, what's that based on?  That the aspersions of Mr. Bible,

14   I'm going, what's that based upon?  Who's understanding?  I'm

15   looking at Page 7, Line 1, Page 14 -- I mean, I went through

16   that.  I'm not -- my point is, if there are issues, let's deal

17   with the issues --

18         MR. MURPHY:  Well, Your Honor, we read --

19         THE COURT:  And don't waste -- and don't waste

20   everybody's time and money on matters that have no basis.  It's

21   almost like there should be a prima facie case before we invest

22   millions of dollars.

23         MR. MURPHY:  And -- and --

24         THE COURT:  And I'm just providing fair warning.

25   That's how I'm looking at it.

1    MR. MURPHY:  And, Your Honor, that's why we filed --

2    the steering committee filed the pleading we did, as an

3    objection to the motion to adjourn.  I mean, we're here on

4    discovery, but the fundamental reason these litigants don't

5    deserve discovery, we're not objecting to the arrangements that

6    have been put on the record for a moment --

7    THE COURT:  Oh, and I think the documents from

8    Wilmington Trust should be provided.  You said you provided

9    some over the weekend?

10    MR. ADELSON:  I think that they've all been provided.

11    THE COURT:  I was going to make that ruling too, just

12    before I forgot.

13    MR. MURPHY:  But we want to make sure that it's clear

14    that our position is not only the litigants don't deserve to be

15    on a committee, but that they don't have a right to begin the

16    litigation in which they're seeking documents and witnesses in

17    the first place.

18    THE COURT:  I understand your position and that's

19    what I have to resolve on the 25th.

20    MR. MURPHY:  And we appreciate that the concern for

21    the dollars has come through loud and clear from the Court so

22    many times today as well.  There is no question that the

23    benefit of the bargain --

24    THE COURT:  Well, that's why I made sure, and I

25    entered a separate order, even though I thought it was clear as

1  a result of the April 14th hearing, that the fee examiner will

2  be examining all fee requests, by any professional, in any of

3  these jointly administered cases.

4          MR. MURPHY:  Well, and it's part of the benefit of

5  the first lien lender's bargain.  If they can come forward to

6  dispose of their collateral in this Court -- they can do it

7  other ways too, but they can come forward to this Court without

8  the risk that second lien creditors will seek to disrupt that

9  transaction or threaten it in any way.  In fact, it's quite

10  clear that it is their bargain as well, that they don't have a

11  risk of delay even if there weren't a threat to the transaction

12  which, you know, we believe there is, but Your Honor has hit on

13  the key point that I wanted to emphasize.

14          The use of the first lien lender's cash collateral

15  for this effort is a fundamental violation of the bargain that

16  was struck through the inter-creditor agreement.  The senior

17  lenders were entitled to know that this sort of effort would

18  not impede their progress or take their money.  So we hope that

19  we can get through this in a way that vindicates and enforces

20  the rights of the senior creditors.

21          THE COURT:  I understand your position.

22          MR. MURPHY:  Thank you, Your Honor.

23          THE COURT:  Anybody else have anything?  Counsel?

24          MS. TURNER:  Good morning, Your Honor.  Erika Pike

25  Turner of Gordon Silver on behalf of the Seaport Group and

1    Oppenheimer.  I had a housekeeping question.  I know there's

2    been discussion of Mr. Pearson being deposed.  Can all of the

3    documents that are determined appropriate for production go

4    through the debtors or does he have a separate --

5              THE COURT:  At this time, in case there was any

6    question, that's my ruling as of this time.

7              MS. TURNER:  Okay.  Very good.  Thank you.

8              MR. ADELSON:  So, Your Honor, can we clarify what

9    will take place on the 25th --

10             THE COURT:  Yes, sir.

11             MR. ADELSON:  -- for GVR, please?

12             THE COURT:  That's a good idea.

13             MR. ADELSON:  My understanding is that the first

14   thing that will be taken up is whether or not the committee is

15   properly constituted.

16             THE COURT:  No, let me go through what's going to

17   happen on the 25th.

18             MR. ADELSON:  Thank you.

19             THE COURT:  I'm going to deal with the subsidiary

20   debtors' plan of reorganization.  I will deal with the Aliante

21   plan of reorganization.

22             I believe the motion to adjourn will be moot, based

23   upon what I'm doing now.  The issues raised in there -- in that

24   motion would be, if allowed, and would be heard if, in fact, I

25   find the committee is properly constituted, because the basis

1    for the motion to adjourn was the more substantive issues.

2    I've already tried to address one of them.  I'm not very

3    persuaded by the critical vendor issue.  I think I addressed

4    that two months ago, but that's -- you disagree, of course, I'd

5    be glad to hear that.

6            So I think after subsidiary debtors, after Aliante,

7    then I'll deal with the application by the debtor, it says to

8    direct the U.S. Trustee to remove the second lien creditors.

9    That's really the composition of the committee.  That would be

10   the third matter.  And the reason I would put that third is

11   then if I did find -- were to find that the committee is

12   properly constituted, is that I would deal with the employment

13   applications.  I would point out that I will allow Brown

14   Rudnick and Downey and Brand to make the arguments regarding

15   the composition of the committee.  I don't think there'd be any

16   objection to that?

17           MR. ADELSON:  There isn't.

18           THE COURT:  Then there's a motion to assume lease or

19   executory contract and cure amounts for the confirmed plan on

20   behalf of Northern Nevada Acquisition, but that has to deal, I

21   -- isn't that with the subsidiary debtors?

22           MR. KRELLER:  That is, Your Honor.

23           THE COURT:  And that's -- I'll deal with that issue

24   as well.  Then motion for turnover of cash collateral with

25   proposed filed on behalf of FCP Propco, but that's also with

53

1    the subsidiaries.  I'll hear that matter.

2         The application to employ Seaport as -- I will deal

3    with.  I will deal with the application -- oh, there's two

4    applications for Seaport.  One Aliante, one in the GVR case.

5    Then Oppenheimer, I guess I was a little confused.  If Seaport

6    -- why both Oppenheimer and Seaport in Aliante, especially if

7    I'm going to confirm the -- because there's no opposition to

8    the Aliante plan.  Can somebody explain to me what's occurring

9    there?

10        MR. SELIGMAN:  Your Honor, David Seligman on behalf

11   of the debtors.  Your Honor, because the -- Mr. Pearson and his

12   group went from Oppenheimer to Seaport, that's obviously the

13   Seaport application.  Because there obviously is residual

14   documents that couldn't go along --

15        THE COURT:  Why didn't I hear these on the 14th of

16   April?

17        MR. SELIGMAN:  Because the -- the movement was in the

18   process of taking place at that time and we didn't want to file

19   something prematurely.  So the retention of Oppenheimer is very

20   limited in scope.  It's just to the extent that there's clean

21   up stuff that people need.  We just wanted to make sure that

22   they were retained.

23        THE COURT:  I -- I don't -- thank you very much.  So

24   that's what I plan on hearing on that date.

25        MR. ADELSON:  And just for clarification --

54

1        THE COURT:  And to make it clear, I will conduct a

2   scheduling and status conference pursuant to Section 105(d) of

3   the code and also a scheduling conference pursuant to Rule 26

4   for discovery.

5        MR. ADELSON:  And for clarification, based on Your

6   Honor's indication --

7        THE COURT:  And I'm going to ask the parties to

8   prepare and file, without a lot of argument, but a proposed

9   discovery plan with specific -- not the broad 85 and 44

10  questions.  You don't have time to ask for them, you don't have

11  time to get the response, you don't have time to analyze it.

12       MR. ADELSON:  We understand, Your Honor.

13       THE COURT:  Okay.

14       MR. ADELSON:  Because the Court is moving the

15  confirmation hearing and the motion to adjourn is now moot, I

16  assume we don't have a deadline to file --

17       THE COURT:  I will give you -- no.

18       MR. ADELSON:  Okay.

19       THE COURT:  A deadline regarding what?

20       MR. ADELSON:  To file an opposition to the motion to

21  adjourn.

22       THE COURT:  Look, really as I see it, the motion --

23  you've got a different name for it, but dissolve the committee

24  really is in response to the motion to adjourn.  It's the

25  composition.  I need to make that determination.  Why -- I

1    don't need a lot of argument on adjournment because I've

2    adjourned it.

3            MR. ADELSON:  Right.

4            THE COURT:  The remainder of that motion really is an

5    objection to the proposed plan.  Without reading all of the

6    pleading, because it exceeded my page limitations, I would bet

7    a dollar that much of the argument would be similar to what was

8    contained in the motion to adjourn.

9            MR. ADELSON:  That's exactly right and that was my

10   point, is that we would rather not have to file an

11   opposition --

12           THE COURT:  You don't have to.

13           MR. ADELSON:  Great.  Thank you.  And the other --

14           THE COURT:  And I don't need a reply.  I -- the

15   motion to adjourn is moot.  The substantive matters, I assume,

16   are contained in your plan objection; is that correct?

17           MR. STARK:  Yes.  Would you prefer that we withdraw

18   it?

19           THE COURT:  Don't have to.  It's on file, it's there.

20   In effect, I've granted it for procedural reasons rather than

21   substantive reasons.

22           MR. ADELSON:  We understand.

23           THE COURT:  Just so that that's clear.  Is that

24   acceptable?

25           MR. STARK:  Yes, Your Honor.

56

1          THE COURT:  Okay.

2          MR. ADELSON:  And I assume that the deadlines for

3   filing confirmation briefs and things like that --

4          THE COURT:  We'll deal with all those on the 25th.

5          MR. ADELSON:  Perfect.  Thank you.

6          THE COURT:  Because by then I'll have a date.  Look,

7   there's not going to be a great deal of time.  My courtroom

8   deputy already hates me, so you know, we're just going to have

9   to do what we can to find time, and that's the best I can tell

10  you.

11         MR. ADELSON:  Good.  Thank you very much.

12         THE COURT:  These are not the only cases in this

13  Court.

14      (Court and Clerk Confer)

15         THE COURT:  Are there any other issues that I need to

16  resolve now?

17         MR. STARK:  Not from the committee's perspective,

18  Your Honor.

19         THE COURT:  I want you to prepare the order regarding

20  the motion to adjourn --

21         MR. STARK:  I'd be happy to.

22         THE COURT:  -- saying that it has been granted on

23  procedural rather than substantive issues and that it will be

24  reset at the hearing conducted May 25th.

25         MR. STARK:  That it will be reset?

1          THE COURT:  The confirmation hearing will be reset.

2          MR. STARK:  Yes, Your Honor, we'll prepare that.

3          THE COURT:  And have counsel for the debtor sign off

4    on that order pursuant to Local Rule 9021, please.

5          MR. STARK:  Happy to.

6          THE COURT:  I need counsel for the debtor to prepare

7    an order that grants in part and denies in part the request for

8    protective order.  And it also grants in part and denies in

9    part the motion to compel.  And set forth in exactly the

10   discovery I have ordered.  The depositions of Dr. Nave and Mr.

11   Bible with the time limitations, that none of the other

12   entities or individuals who were served with requests for

13   production need to respond until further order of this Court,

14   and that the parties have agreed, and will enter into, an

15   appropriate confidentiality agreement and that the debtor has

16   provided documents and has agreed, I believe, to provide

17   additional documents; is that correct?

18         MR. ADELSON:  No, Your Honor.

19         THE COURT:  No.  That it will provide all of the

20   documents that were requested of Wilmington Trust.

21         MR. STARK:  That's correct.

22         THE COURT:  That will be the document production to

23   date, and that's all I'm ordering.  And then the order should

24   contain that the order is not and shall not be a bar to any

25   further discovery requests and that I will conduct a discovery

58

1  and scheduling conference on May 25th pursuant to Sections

2  105(d) of the Code and Federal Bankruptcy Procedure 26.  I

3  think that will take care of it.  Is that acceptable?

4          MR. STARK:  From us yes, Your Honor.

5          THE COURT:  Submit that order to counsel for the

6  committee to sign off under Local Rule 9021.

7          I think that's all I need to enter at this time.

8  Have I missed anything?  Okay, thank you all very much.

9          Now, I don't -- if you're not going to argue on the

10  25th, you don't have to be here.  If you want to monitor it,

11  that's fine.  In other words, let's be efficient and economical

12  with the parties that are here as well, because I know it's

13  expensive to come here.  I know what airplane fares are now,

14  all right.  Thank you all very much.

15          THE CLERK:  All rise.

16      (Proceedings Concluded)

17

18

19      I certify that the foregoing is a correct transcript from

20  the record of proceedings in the above-entitled matter.

21

22  Dated: May 20, 2011                  _Stephanie McNeel_

23                                       AVTranz, Inc.
                                         845 N. Third Avenue
24                                       Phoenix, AZ  85004-1525

25