1

2

3

**Entered on Docket**
**May 25, 2011**

4

_____
Hon. Gregg W. Zive
United States Bankruptcy Judge

5

6  Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)

7  MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor

8  Los Angeles, California 90017
Telephone:    (213) 892-4000

9  Facsimile:    (213) 629-5063

10  Reorganization Counsel for
Debtors and Debtors in Possession

11

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:    (775) 823-2900
Facsimile:    (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com
Local Reorganization Counsel for
Debtors and Debtors in Possession

12

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

13

In re:

14  STATION CASINOS, INC., *et al.,*

15      Debtors and Debtors in Possession.[1]

16  ☒ Affects all debtors listed in footnote 2[2]

Chapter 11
Case No. BK-09-52477

Jointly Administered BK Cases: 09-52470
through 09-52487; 10-50381; 11-51188;
11-51190 through 11-51219; and 11-51702

17  **ORDER CONFIRMING "FIRST AMENDED**

18  **PREPACKAGED JOINT  CHAPTER 11**

**PLAN OF REORGANIZATION FOR**

19  **SUBSIDIARY DEBTORS, ALIANTE**

**DEBTORS AND GREEN VALLEY RANCH**

20  **GAMING, LLC (DATED MAY 20, 2011)"**

**WITH RESPECT TO SUBSIDIARY**

21  **DEBTORS AND ALIANTE DEBTORS**

22

23  [1]  The debtors in these jointly administered chapter 11 cases are:  (i) Station Casinos, Inc.; Northern NV Acquisitions, LLC; Reno Land Holdings, LLC; River Central, LLC; Tropicana Station, LLC; FCP Holding, Inc.; FCP Voteco, LLC; Fertitta Partners LLC;

24  FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II,

25  LLC; FCP MezzCo Borrower I, LLC and FCP PropCo, LLC (collectively, the "**SCI Debtors**"), (ii) Auburn Development, LLC; Boulder Station, Inc.; Centerline Holdings, LLC; Charleston Station, LLC; CV HoldCo, LLC; Durango Station, Inc.; Fiesta

26  Station, Inc.; Fresno Land Acquisitions, LLC; Gold Rush Station, LLC; Green Valley Station, Inc.; GV Ranch Station, Inc.; Inspirada Station, LLC; Lake Mead Station, Inc.; LML Station, LLC; Magic Star Station, LLC; Palace Station Hotel & Casinos, Inc.; Past Enterprises, Inc.; Rancho Station, LLC; Santa Fe Station, Inc.; SC Durango Development LLC; Sonoma Land

27  Holdings, LLC; Station Holdings, Inc.; STN Aviation, Inc.; Sunset Station, Inc.; Texas Station, LLC; Town Center Station, LLC; Tropicana Acquisitions, LLC; Tropicana Station, Inc.; and Vista Holdings, LLC (collectively, the "**Subsidiary Debtors**"),

28  (iii) Aliante Gaming, LLC, Aliante Holding, LLC, and Aliante Station LLC (collectively, the "**Aliante Debtors**"), and (iv) Green Valley Ranch Gaming LLC ("**GVR**").

[2]  **This Confirmation Order applies to the Subsidiary Debtors and Aliante Debtors, but not to GVR.**

#4831-0060-3657

1    On May 25, 2011, the Confirmation Hearing[3] with respect to the above-captioned

2    Debtors' "First Amended Prepackaged Joint  Chapter 11 Plan of Reorganization for Subsidiary

3    Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 20, 2011)" (docket

4    no. 3253, the "<u>Plan</u>") commenced before this Court in the above-captioned Chapter 11 Cases.

5    After receiving evidence submitted by the parties, hearing the arguments of counsel, and

6    weighing all the admitted evidence, and having determined that the Plan meets all of the

7    requirements for confirmation under section 1129 of the Bankruptcy Code and that there is good

8    cause to confirm the Plan for the Subsidiary Debtors and Aliante Debtors, and as set forth in the

9    "Findings of Fact and Conclusions of Law Regarding Confirmation of 'First Amended

10   Prepackaged Joint  Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors

11   and Green Valley Ranch Gaming, LLC (Dated May 20, 2011)' With Respect to the Subsidiary

12   Debtors and Aliante Debtors" (the "<u>Findings of Fact and Conclusions of Law</u>") entered

13   contemporaneously herewith, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED**

14   **THAT:**

15   1.    <u>Confirmation of the Plan</u>.  The Plan and each of its provisions are confirmed in

16   each and every respect pursuant to section 1129 of the Bankruptcy Code with respect to each of

17   the Subsidiary Debtors and Aliante Debtors listed on the first page hereof.  Unless expressly

18   provided otherwise herein, all references contained in these Findings of Fact and Conclusions of

19   Law to: (a) the "<u>Debtors</u>" mean the Subsidiary Debtors and Aliante Debtors, and do not include

20   GVR; (b) the "<u>Plan</u>" (docket no. 3253) means as it relates to the Subsidiary Debtors and Aliante

21   Debtors, and does not include GVR; (c) the "<u>Estates</u>" mean the Estates of the Subsidiary Debtors

22   and Aliante Debtors, and do not include the Estate of GVR; (d) the "<u>Chapter 11 Cases</u>" mean the

23   Chapter 11 Cases of the Subsidiary Debtors and Aliante Debtors, and do not include the Chapter

24   11 Case of GVR; and (e) the "<u>Restructuring Transactions</u>" mean only as they apply to the

25   Subsidiary Debtors and Aliante Debtors, and not as they apply to GVR.

26   _____

27   [3]  Unless otherwise specified, capitalized terms and phrases used in this Confirmation Order have the
     meanings assigned to them in the Plan, Disclosure Statement, or the Court's Findings of Fact and

28   Conclusions of Law, as applicable. The rules of interpretation set forth in Article I.A. of the Plan shall
     apply to this Confirmation Order.

2.      Any objections, responses to or reservations of rights regarding confirmation of the Plan or any terms of the Plan, whether filed on the docket or stated orally in court, and whenever filed or stated, other than those withdrawn with prejudice in their entirety prior to or on the record at the Confirmation Hearing, are denied and overruled on the merits.

3.      The failure to specifically make reference to any particular provision of the Plan in this Confirmation Order shall not impair or diminish the effectiveness of any such provision, it being the intent of the Court that the Plan is confirmed in its entirety, and that each term and provision of the Plan is valid and enforceable pursuant to its terms.  A copy of the Plan is attached hereto as Exhibit 1 and incorporated herein in its entirety by this reference.  A copy of the Findings of Fact and Conclusions of Law is attached hereto as Exhibit 2.[4]

4.      Restructuring Transactions.  The transactions contemplated by the New Opco Purchase Agreement,[5] New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and Restated Operating Agreement for NP IP Holdings LLC and the New Aliante Transaction Agreements, together with the other Plan implementation agreements, documents and instruments referred to in Article V of the Plan or otherwise contained in the Plan, or executed and delivered in connection with implementing the transactions contemplated under the Plan, are hereinafter referred to individually and collectively as the "Restructuring Transactions."  The New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante Transaction Agreements, together with the

---

[4]   On August 27, 2010, the Court entered its Order Confirming 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (docket no. 2039, the "SCI Confirmation Order"), and related "Findings of Fact and Conclusions of Law Regarding Confirmation of 'First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)'" (docket no. 2038, the "SCI Findings and Conclusions").  Nothing in this Confirmation Order modifies, amends or supersedes in any way the terms of the SCI Confirmation Order and SCI Findings and Conclusions.

[5]   As used herein, the "New Opco Purchase Agreement" means the Asset Purchase Agreement dated June 7, 2010, by and among the Sellers (as defined therein) and FG Opco Acquisitions LLC, a newly formed Nevada limited liability company, as amended, supplemented or otherwise modified from time to time, a form of which was filed with the Bankruptcy Court on May 25, 2010 (docket no. 1526) and was approved by the SCI Confirmation Order, and under the definition set forth in the SCI Plan is also known as the "New Propco Purchase Agreement."

other Plan implementation agreements, documents and instruments referred to in Article V of the Plan or otherwise contained in the Plan (collectively, the "Restructuring Agreements") are hereby approved in all respects and the parties to the Restructuring Agreements, including any Debtor or SCI Debtor, are authorized and directed to execute and deliver the Restructuring Agreements. Each and every one of the Restructuring Transactions and the transactions contemplated thereby is hereby approved in all respects, and the parties to the Restructuring Transactions, including any Debtor or SCI Debtor, are authorized and directed to execute, deliver and fully perform the Restructuring Transactions in accordance with the Plan, including without limitation the conveyance, assignment, transfer and delivery of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets[6] and the Transferred Aliante Hotel Assets to the applicable transferees pursuant to the Plan (such transferees, together with their Subsidiaries, designees, Affiliates and other Related Persons (individually a "Transferee Party" and collectively the "Transferee Parties"); and each such document and agreement, once executed and delivered, shall be enforceable in accordance with its terms.

5.       The Debtors are authorized to take or to cause to be taken all corporate actions necessary or appropriate to consummate and implement the provisions of the Plan and the Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Court, including, without limitation, the transfer of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets to the Transferee Parties without any requirement of further action by the stockholders, directors, managers, partners or members of any of the Debtors. On the Effective Date,[7] the appropriate officers, directors, members and managers of the Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, including the agreements, documents and instruments required to effectuate each and every one of the Restructuring Transactions. After

---

[6] "Aliante Holdings Assets" means all the assets of Aliante Debtor Aliante Holding, LLC other than the Transferred Aliante Hotel Assets and the Equity Interests in Aliante Gaming.

[7] "Effective Date" means the Applicable Effective Date for the applicable Debtor(s) as the facts and context may require.

the Effective Date, the Plan Administrator is authorized to take all such actions on behalf of all

Debtors except Aliante Gaming, and the appropriate officers of Reorganized Aliante Gaming is

authorized to take all such actions on behalf of Aliante Gaming.

6.      All conveyances, assignments, transfers and deliveries of the New Opco Acquired

Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the

Transferred Aliante Hotel Assets to a Transferee Party pursuant to the Plan are made to and shall

vest in the applicable Transferee Party free and clear[8] of all Liens, Claims, Equity Interests,

encumbrances, charges or other interests asserted by the Debtors, any creditors of the Debtors, or

any other Persons or Entities, including, without limitation, any Liens, Claims, Equity Interests,

encumbrances charges or other interests, whether presently known or unknown, in any way

relating to or arising from (a) the operations of the Debtors prior to the Effective Date, or

(b) consummation of the Plan, the Restructuring Transactions or any other transactions

consummated in accordance with the Plan ((a) and (b) collectively, the "Other Debts").  On and

after the Effective Date, all Holders of Liens, Claims, Equity Interests, encumbrances, charges,

Other Debts or other interests, and all other Persons and Entities, including Governmental Units,

are permanently and forever barred, restrained and enjoined from (x) asserting any claims or

enforcing remedies, or commencing or continuing in any manner any action or proceeding of any

kind, on account of any such Liens, Claims, Equity Interests, encumbrances, charges, Other

Debts or other interests against the Transferee Parties and their respective creditors, or (y)

otherwise interfering in any way with the Transferee Parties use and enjoyment of the New Opco

Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the

Transferred Aliante Hotel Assets.

7.      The Restructuring Transactions shall not constitute a merger or *de facto* merger as

between any Debtors or the SCI Debtors on the one hand, and any of the Transferee Parties and

their Related Persons on the other hand.  The Transferee Parties, the Mortgage Lenders, the

---

[8]   All references in this Confirmation Order to transfers of property free and clear of Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests (or any combination of any of the foregoing), shall mean free and clear except as otherwise expressly provided in writing in the applicable transfer documents with respect to assumed liabilities and permitted exceptions.

Prepetition Opco Secured Lenders, the Aliante Lenders and the Related Persons of the foregoing entities shall not be or be deemed to be a successor of any of the Debtors or the SCI Debtors by reason of any theory of law or equity and shall not have any successor or transferee liability of any kind, nature or character, including liabilities arising or resulting from or relating to the transactions contemplated under the Plan and Restructuring Transactions.  Without limiting the generality of the foregoing, except for any specific obligations expressly undertaken by a Transferee Party or its designee(s) in the Plan or in any agreement or other document to which such Transferee Party or designee is a party and which is entered into in connection with the Consummation of the Plan, none of the Transferee Parties, Holdco, Voteco, New Propco, New Opco, the Mortgage Lenders, the Land Loan Lenders, Reorganized Aliante Gaming, ALST Casino Holdco, FG, the Prepetition Opco Secured Lenders and the Aliante Lenders, or any of the foregoing Entities' respective designees, Subsidiaries or Affiliates, shall have any liability, obligation or responsibility with respect to any Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests against or in any of the Debtors or the SCI Debtors, including without limitation any amounts owed by the Debtors to holders of Claims or Equity Interests or any other obligations of the Debtors whether pursuant to the Plan or otherwise.  On and after the Effective Date, all Holders of Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests against or in any of the Debtors, and all other Persons and Entities, including Governmental Units, are permanently and forever barred, restrained and enjoined from asserting any claims or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind against any of the Transferee Parties, the Prepetition Opco Secured Lenders, the Mortgage Lenders, the Land Loan Lenders or the Aliante Lenders under any theory of successor liability, merger, *de facto* merger, mere continuation, substantial continuity or similar theory.

        8.     This Confirmation Order shall be construed and shall constitute for all purposes a full and complete general assignment and conveyance, and shall effect a legal, valid, enforceable and effective sale and transfer, of all of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets on the

Effective Date to the respective Transferee Parties pursuant to the Plan and the Restructuring Transactions, and shall vest each such Transferee Party with valid, recordable, marketable and insurable title to the applicable assets.  On and after the Effective Date, all of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets in the possession or control of any Person or Entity, including, without limitation, any vendor, supplier or employee of the Debtors, shall be transferred to the applicable Transferee Party free and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests.  In connection with the New Opco Purchase Agreement, all valid Liens on the transferred assets in existence immediately prior to the applicable Effective Date shall attach to the proceeds of the sales, except as otherwise expressly provided in such agreement with respect to Assumed Liabilities and Permitted Exceptions (as those terms are defined in the New Opco Purchase Agreement), and such proceeds shall be distributed in accordance with the Plan, the SCI Plan and the New Opco Purchase Agreement.

9.    On and after the Effective Date, each Transferee Party will own the assets conveyed to it and operate its business and manage its affairs free of any restrictions contained in the Bankruptcy Code.  The terms, provisions and conditions of the agreements, documents and instruments constituting the Restructuring Transactions shall govern the obligations of the Debtors and the other parties thereto and, to the extent inconsistent with the Plan, such agreements, documents and instruments  shall control.

10.    Subject to the terms of the New Opco Purchase Agreement and New Aliante Transaction Agreements as applicable, the Transferee Parties are hereby authorized to allocate the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets, including the Assumed Contracts,[9] among their Affiliates, Subsidiaries, designees, assignees, and/or successors in a manner as they in their sole discretion deem appropriate and to assign, sublease, sublicense, transfer or otherwise dispose of any of such assets or the rights under any Assumed Contract to their Affiliates, Subsidiaries,

---

[9] "Assumed Contracts" means the contracts and leases to be assumed by the Debtors and, where applicable, assigned to the Transferee Parties.

designees, assignees, and/or successors with all of the rights and protections accorded under this Confirmation Order and the Plan.

11.    The guaranties, mortgages, pledges, Liens and other security interests granted pursuant to, and to secure obligations entered into in connection with or under the Restructuring Transactions: (i) are granted in good faith as an inducement to the applicable lenders to provide credit thereunder; (ii) are legal, valid, enforceable and non-avoidable, and, with respect to the Liens, upon all necessary filings and recordings duly perfected; (iii) shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance; and (iv) the payment priorities among the tranches (if any) of debt included in each applicable credit agreement shall be fully enforceable as set forth therein.  As of the Effective Date, (a) all holders of Prepetition Opco Secured Lender claims shall be deemed to have executed the New Opco Credit Agreement and all other related collateral and loan documents, and (b) all holders of Aliante Lender Claims shall be deemed to have executed the New Aliante Credit Agreement and all other related collateral and loan documents.

12.    On and after the Effective Date, without the need for further approvals or notice, the Debtors and the Administrative Agents under the applicable prepetition loan agreements shall have the power and authority to terminate and discharge (and to consent to terminate and discharge), and shall terminate and discharge in writing on the Closing Dates (as defined in the applicable Restructuring Transaction documents) all Liens on any assets (including with respect to any related guaranties) granted to the applicable Administrative Agents prior to the Effective Date, in each case to effectuate the terms of the Plan and  the Restructuring Transactions (not including however the Liens listed on Exhibit 4 hereto).  On and after the Effective Date, the Debtors or Plan Administrator as applicable, and Reorganized Aliante Gaming, are hereby authorized to execute and file or record, as applicable, Lien termination documents with any filing or recording offices or officers of governmental units in order to provide public notice of the termination of Liens, Claims, Equity Interests, charges, encumbrances and Other Debts in respect of personal property or real property.

13.     For purposes of certainty and not in limitation of the terms, breadth and scope of any other provision of this Confirmation Order or of the Plan, on the Effective Date, the existing Liens, Claims, Equity Interests, charges, encumbrances and Other Debts evidenced by the instruments specified on Exhibit 3 attached hereto are declared terminated and of no force or effect.  The omission from Exhibit 3 of any Liens, Claims, Equity Interests, charges, encumbrances and Other Debts, whether such omission was intentional or inadvertent, shall not limit in any way the effect of the Plan and this Confirmation Order on any such omitted Lien, Claim, Equity Interest, charge, encumbrance or Other Debt.  Exhibit 3 is incorporated into this Confirmation Order by this reference.

14.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Liens listed on Exhibit 4 hereto survive the occurrence of the Effective Date and the transfer of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets to the applicable Transferee Parties. Exhibit 4 is incorporated into this Confirmation Order by this reference.

15.     Exhibit 5 hereto sets forth the legal descriptions of certain real property being transferred pursuant to the Plan and this Confirmation Order free and clear of Liens, Claims, Equity Interests, charges, encumbrances and Other Debts, and, on and after the Effective Date, this Confirmation Order may be recorded in the real property records of applicable jurisdictions as conclusive evidence of the removal of all Liens, Claims, Equity Interests, charges, encumbrances and Other Debts in existence against such real property on or prior to the Effective Date.  The omission from Exhibit 5 of any real property being transferred under the Plan or this Confirmation Order, whether such omission was intentional or inadvertent, shall not limit in any way the fact that such omitted real property is being transferred free and clear of Liens, Claims, Equity Interests, charges, encumbrances and Other Debts.  Exhibit 5 is incorporated into this Confirmation Order by this reference.

16.     On and after the Effective Date, each of the Debtors, the Plan Administrator and Reorganized Aliante Gaming, as applicable, shall take any and all actions to execute, deliver, file or record such contracts, deeds, assignments, instruments, terminations, reconveyances, releases

and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and Restructuring Transactions, and in each case without further notice to or order of the Court, act or action under applicable law, regulation, order or rule, or any requirement of further action, vote or other approval or authorization by the security holders, members, managers, partners, officers or directors of the Debtors.

17.    Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan and Restructuring Transactions that would otherwise require approval of the stockholders, directors, managers, partners or members of any Debtor (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers, members or partners of such Debtor, or the need for any approvals, authorizations, actions or consents of any Person or Entity.

18.    On and after the Effective Date, all matters provided for in the Plan involving the legal, corporate or limited liability company structure of any Debtor and any legal, corporate or limited liability company action required by any Debtor in connection with the Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule, or any requirement of further action, vote or other approval or authorization by the security holders, officers, managers, members, partners or directors of any Debtor, or by any other Person or Entity.

19.    The Restructuring Transactions may be specifically enforced against and shall be binding upon the parties thereto, and shall not be subject to rejection or avoidance by the Debtors or any trustee of such Debtors pursuant to chapter 7 or chapter 11 of the Bankruptcy Code.

20.    Section 9(f)(v) of the Amended and Restated Operating Agreement of NP IP Holdings LLC (the "IP Holdco Operating Agreement") shall be fully enforceable in accordance with its terms.  The prior written consent of each Member (as defined in the IP Holdco Operating Agreement) shall be required for each of the actions described in section 9(f)(v) of the IP Holdco

Operating Agreement, and any action taken by any Member or by IP Holdco in contravention, violation or breach of such section shall and will be void *ab initio* and of no force and effect.  IP Holdco and each of its Members has irrevocably waived any rights in law or equity, now or hereafter arising, to take an action that has the effect of, and is hereby enjoined from, contesting, challenging or frustrating the validity and enforceability of section 9(f)(v) of the IP Holdco Operating Agreement.

21. <u>Issuance of New Aliante Equity and New Secured Aliante Debt</u>.  Reorganized Aliante Gaming is authorized and directed to issue the New Aliante Equity and New Secured Aliante Debt pursuant to the terms and conditions of the Plan, the Amended Aliante Gaming Operating Agreement and the New Aliante Credit Agreement.

22. <u>Issuance of ALST Casino Holdco Equity</u>.  ALST Casino Holdco is authorized and directed to issue the ALST Casino Holdco Equity pursuant to the terms and conditions of the Plan.

23. <u>Assumed Contracts</u>.  The assumption, pursuant to section 365 of the Bankruptcy Code, of the New Opco Purchase Agreement by each of the Subsidiary Debtors that are sellers thereunder or otherwise parties thereto, is hereby approved.

24. The assumption, and assignment as applicable, of the contracts and leases listed on the applicable Schedule of Executory Contracts and Unexpired Leases for the Subsidiary Debtors and, with respect to Aliante Gaming, upon entry of a further order of this Court, the deemed assumption of all Executory Contracts and Unexpired Leases not identified on the "Schedule of Executory Contracts and Unexpired Leases To Be Rejected by Aliante Gaming and the Aliante Debtors," including, without limitation, all copyright, patent, trademark and other intellectual property contracts and licenses (collectively, the "<u>Assumed Contracts</u>"), is hereby approved pursuant to sections 365 and 1123 of the Bankruptcy Code.  The Debtors are hereby authorized to assume, and assign as applicable, the Assumed Contracts, execute and deliver such assignment documents as may be necessary to sell, assign and transfer the Assumed Contracts, and sell, assign and transfer each of the Assumed Contracts to the respective Transferee Party in accordance with the Plan.  The Assumed Contracts, including upon assignment to the respective

Transferee Party pursuant to the Plan, shall be deemed valid and binding, and in full force and effect in accordance with their terms, and the respective Transferee Party shall be fully and irrevocably vested in all right, title and interest of the Debtors in, to or under each such Assumed Contract.

26.     All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing on or prior to the Effective Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by the payment or other satisfaction of the Cure Amounts.  The Cure Amounts are not subject to further dispute or audit, including based on performance prior to the assumption, assignment and sale thereof, irrespective of whether such Assumed Contract contains an audit or similar clause.

26.     Each non-Debtor counter-party to an Assumed Contract is hereby forever barred, estopped, and permanently enjoined from asserting against any Transferee Party of the Assumed Contract any default, additional amounts or other Claims existing as of the Effective Date related to any Assumed Contract, whether declared or undeclared or known or unknown; and such non-Debtor parties to the Assumed Contracts are also forever barred, estopped, and permanently enjoined from asserting against the applicable Transferee Party any Liens, Claims, Equity Interests, encumbrances, charges, Other Debts, interests, counterclaims, defenses, setoffs or recoupments asserted or assertable against the Debtors related to any Assumed Contract.

27.     There shall be no rent accelerations, assignment fees, increases or any other fees charged or chargeable to the Transferee Parties as a result of the assumption, and, as applicable, the assignment of the Assumed Contracts.  Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract, allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions, and are void and of no force and effect.  The validity of the assumption of the Assumed Contracts and their assignment to the Transferee Parties under the Plan shall not be affected by any existing dispute between any of the Debtors and any non-

Debtor counter-party to such Assumed Contract.  Any party that may have had the right to consent to the assignment of its Assumed Contract is determined to have consented for the purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code.

28.    All Executory Contracts and Unexpired Leases of the Subsidiary Debtors and the Aliante Debtors (except Aliante Gaming), not otherwise assumed pursuant to the terms of the Plan, this Confirmation Order or other order of this Court, shall be deemed rejected on the Effective Date.   All Executory Contracts and Unexpired Leases of Aliante Gaming, not otherwise rejected pursuant to the terms of the Plan, this Confirmation Order or other order of this Court, shall be deemed assumed on the Effective Date.

29.    If Aliante Gaming has not already paid a non-Debtor counterparty to an Executory Contract in full, Aliante Gaming shall provide written notice to non-Debtor counterparties to Assumed Contracts of the proposed assumption and assignment at least twenty days prior to the Effective Date (the "Notice of Intent to Assume and Assign Executory Contracts or Unexpired Leases").  Any objection by a non-Debtor counterparty to a proposed assumption or assignment or any Cure Amount for any Assumed Contract must be filed, served and received by Aliante Gaming no less than ten days after service by Aliante Gaming of the Notice of Intent to Assume and Assign Executory Contracts or Unexpired Leases. Any non-Debtor counterparty to an Assumed Contract that fails to object timely to the proposed assignment or Cure Amount set forth in the Notice of Intent to Assume and Assign Executory Contracts or Unexpired Leases shall be deemed to have consented to the assumption and, if applicable, assignment of its Assumed Contract and the Cure Amount will not be subject to further dispute or audit, including based on performance prior to the assumption, assignment and sale thereof, irrespective of whether such Assumed Contract contains an audit or similar clause. Notwithstanding anything in the foregoing provisions of this paragraph to the contrary: (a) each of the Debtors shall have until the Effective Date to file additional schedules of assumed, assigned or rejected contracts and leases, and proposed Cure Amounts, and seek additional orders approving such assumption, assignment, rejection or Cure Amounts; and (b) nothing in

this Confirmation Order is intended to impair or does impair the rights of the Debtors or any

Holder of Claims or Equity Interests under Article VI. of the Plan.

30.    Notwithstanding anything in the Plan or this Confirmation Order to the contrary,

on the Effective Date, all Avoidance Actions against counterparties to any Purchased Assets or

Assumed Liabilities (each as defined in the New Opco Purchase Agreement), including, without

limitation, counterparties to Assumed Contracts, are hereby released by the Debtors with such

releases to be effective as of the Effective Date.

31.    Cancellation of Pre-Effective Date Notes, Certificates and Instruments.    Except

as otherwise provided in the Plan or this Confirmation Order, on the Effective Date, all notes,

stock, instruments, certificates, agreements and other documents evidencing Liens, Claims,

Equity Interests, charges, encumbrances, Other Debts or other interests against or in the Debtors

in existence prior to the Effective Date shall be canceled, and the obligations of the Debtors

thereunder or in any way related thereto shall be fully released, terminated, extinguished and

discharged, in each case without further notice to or order of the Court, act or action under

applicable law, regulation, order, or rule or any requirement of further action, vote or other

approval or authorization by any Person or Entity (not including however the Liens listed on

Exhibit 4 hereto).

32.    The SCI Plan provides at Articles III.B.3 that, on account of their Claims, Holders

of Class M5.2 Claims will receive the Equity Interests in FCP Mezzco Borrower IV, LLC and

Holders of Class M4.1 Claims will receive the Equity Interests in FCP Mezzco Borrower III,

LLC, and that in both instances, immediately upon receipt of the Equity Interests by such

Holders, the Equity Interests shall be cancelled and extinguished.  The Holders of Class M5.2

Claims and Class M4.1 Claims shall have the option to decline to receive the Equity Interests, in

which case, on the Effective Date of the SCI Plan, such Equity Interests shall be cancelled and

extinguished, and the foregoing is not and shall not be deemed to be an amendment or

modification of the SCI Plan or any of its terms.

33.    Dismissal of Officers and Directors.    Upon the occurrence of the Effective Date,

(i) the existing boards of directors, management committees, executive committees or other

governing bodies of each Debtor (excluding Aliante Gaming) shall be dissolved without any further action required on the part of any such Debtors, the partners, shareholders or members of any such Debtor, or the officers, managers or directors of such Debtors, and (ii) any and all remaining managers or officers of each Debtor (excluding Aliante Gaming) shall be dismissed without any further action required on the part of any such Debtors, the shareholders, partners or members of such Debtors, or the officers, managers or  directors of such Debtors.  After the Effective Date, the Plan Administrator shall have full legal and corporate authority, as if the Plan Administrator were an officer or manager of the Subsidiary Debtors and the Aliante Debtors (excluding Aliante Gaming), to take any action required or authorized by the Plan, this Confirmation Order or subsequent order of this Court in respect of the Subsidiary Debtors and the Aliante Debtors (excluding Aliante Gaming).  After the Effective Date, the officers designated by Reorganized Aliante Gaming shall have full legal and corporate authority, including in the name of and on behalf of Aliante Gaming, to take any action required or authorized by the Plan, this Confirmation Order or subsequent order of this Court in respect of Reorganized Aliante Gaming.  The Plan Administrator and Reorganized Aliante Gaming may use as their legal counsel the same law firms currently engaged as counsel to the respective Debtors.

34.    <u>Settlements, Releases, Injunctions Related to Release, and Exculpation</u>.  The Comprehensive Settlement and Global Settlement contained in Article X.B. of the Plan, the releases and related injunction contained in Article X.C. of the Plan (including the Third Party Release provided for in Article X.C.2. of the Plan consistent with the indications granting such third party release by those Holders of Claims or Equity Interests on their ballots), the exculpation contained in Article X.D. of the Plan, and the preservation of causes of action contained in Article X.E. of the Plan, are hereby approved in all respects as if fully restated herein.

35.    <u>Binding Effect</u>.  On the Effective Date, and effective as of the Effective Date, the Plan shall bind, and shall be deemed binding upon, the Debtors, Reorganized Debtors, all Holders of Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests

against or in the Debtors, and such Holder's respective successors and assigns, to the maximum

extent permitted by applicable law, notwithstanding whether or not such Holder (a) will receive

or retain any property or interest in property under the Plan, (b) has filed a proof of claim or

interest in the Chapter 11 Cases, or (c) failed to vote to accept or reject the Plan or affirmatively

voted to reject the Plan.

36.    <u>Supplemental Injunction</u>.    In order to preserve and promote the settlements

contemplated by and provided for in the Plan, and except as otherwise expressly provided in the

Plan or this Confirmation Order, all Persons and Entities and any Person or Entity claiming by or

through them, which have held or asserted, which currently hold or assert or which may hold or

assert any Claims or Equity Interests, including without limitation any Causes of Action,

Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities of

any nature whatsoever, against any of the Released Parties based upon, attributable to, arising

out of or relating to any Claim or Administrative Claim against or Equity Interest in any of the

Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the

world, whether sounding in tort, contract, warranty or any other theory of law, equity or

admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from

taking any action against any of the Released Parties for the purpose of directly or indirectly

collecting, recovering or receiving any payment or recovery with respect to any such Claims,

Equity Interests, Administrative Claims, Causes of Action, Litigation Claims, obligations, suits,

judgments, damages, debts, rights, remedies or liabilities, arising on or prior to the Effective

Date (including prior to the Petition Date), including, but not limited to:

(a)    commencing or continuing in any manner any action or other

proceeding of any kind with respect to any such Claims, Equity Interests, Administrative Claims

or Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights,

remedies or liabilities against any of the Released Parties or the assets or property of any

Released Party;

(b)    enforcing, attaching, collecting or recovering, by any manner or

means, any judgment, award, decree or order against any of the Released Parties or the assets or

property of any Released Party with respect to any such Claims, Administrative Claims Equity

Interests, Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts,

rights, remedies or liabilities;

(c) creating, perfecting or enforcing any Lien of any kind against any of

the Released Parties or the assets or property of any Released Party with respect to any such

Claims, Administrative Claims, Equity Interests, Causes of Action, Litigation Claims,

obligations, suits, judgments, damages, debts, rights, remedies or liabilities;

(d) except as otherwise expressly provided in the Plan or this

Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation,

indemnity, contribution or recoupment of any kind against any obligation due to any of the

Released Parties or against the property of any Released Party with respect to any such Claims,

Administrative Claims, Equity Interests, Causes of Action, Litigation Claims, obligations, suits,

judgments, damages, debts, rights, remedies or liabilities; and

(e) taking any act, in any manner, in any place whatsoever, that does not

conform to, or comply with, the provisions of the Plan or the Confirmation Order relating to such

Claims, Administrative Claims, Equity Interests, Causes of Action, Litigation Claims,

obligations, suits, judgments, damages, debts, rights, remedies or liabilities.

37. _Bankruptcy Rule 3016 Compliance_. The Debtors' compliance with the formal

requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides

for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

38. _Plan Classification Controlling_. The classifications of Claims and Equity

Interests for purposes of the distributions to be made under the Plan shall be governed solely by

the terms of the Plan. The classifications set forth on the Ballots tendered to the Debtors'

creditors in connection with voting on the Plan (a) were set forth on the Ballots solely for

purposes of voting to accept or reject the Plan, (b) do not necessarily represent and in no event

shall be deemed to modify or otherwise affect, the actual classifications of such Claims under the

Plan or for distribution purposes, and (c) shall not be binding on the Debtors, their Estates or the

Reorganized Debtors.  Nothing in this paragraph modifies or otherwise affects the validity or enforceability of the releases granted by creditors on their Ballots.

39.    Approval of Disclosure Statement.   The Disclosure Statement, in the form Filed with the Court at docket number 2797, contains adequate information within the meaning of Section 1125 of the Bankruptcy Code, satisfies all of the applicable requirements of sections 1125 and 1126 and Federal Rules of Bankruptcy Procedure 3016, 3017 and 3018, and is approved.  Each of the Exculpated Parties is entitled to and has the full protections and benefits of section 1125(e) of the Bankruptcy Code.

40.    The solicitation of votes on the Plan and the Plan Modifications were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and were in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

41.    Effect of Section 1145(a)(1).  Pursuant to section 1145 of the Bankruptcy Code, to the extent that the Debtors' solicitation of acceptances of the Plan and the Plan Modifications are deemed to constitute an offer and sale of new securities, the Debtors are exempt from the registration requirements of the Securities Act of 1933, as amended, and state or local laws of similar effect with respect to such solicitation.

42.    Pursuant to section 1145 of the Bankruptcy Code, any securities or interests issued on account of or in exchange for (in whole or in part) Claims against the Debtors, or otherwise in conjunction with the Plan, shall not be required to be registered under the Securities Act of 1933, as amended, or any similar federal, state, or local law or regulation.

43.    Plan Modifications Approved.   The Plan Modifications, as described in the Findings of Fact and Conclusions of Law and already incorporated into the Plan, are approved. All references herein to the Plan mean the version filed by the Debtors on May 24, 2011 (docket no. 3253).  No solicitation of acceptances of the Plan by Holders of Claims and Equity Interests, other than that conducted by the Debtors in connection with the Prepetition Solicitation, is or shall be required under sections 1125 or 1127 of the Bankruptcy Code, or Federal Rule of Bankruptcy Procedure 3019.

44.    <u>Retention of Jurisdiction</u>.  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, this Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Persons and Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

i.  allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest, and the resolution of any claim for taxes of any kind arising on or prior to the Effective Date or as a result of any transactions occurring on or before the Effective Date in accordance with the Plan and the rights of the Debtors, the Plan Administrator or Reorganized Aliante Gaming to apply tax attributes in satisfaction or offset of any such claims;

ii.  grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

iii.  resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor was a party prior to the Effective Date or with respect to which any Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

iv.  resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

v.  ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

vi.  decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted after the Effective Date;

vii.  enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted or entered into in connection with the Plan, the Plan Supplements or the Disclosure Statement;

viii.  resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Person's or Entity's obligations incurred in connection with the Plan; *provided*, *however*, that any dispute arising under or in connection with the New Opco Credit Agreement, the New Secured Aliante Debt and the New Propco Credit Agreement shall be addressed and resolved in accordance with the provisions of the applicable document;

ix.  hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

x.  issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

xi.  enforce the terms and condition of the Plan and the Confirmation Order;

xii.  resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, and other provisions contained in Article X of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions of Article X of the Plan;

xiii.  hear and determine the Litigation Claims by or on behalf of the Debtors, the Plan Administrator or Reorganized Aliante Gaming;

xiv.  enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

xv.  resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

xvi.  enter an order concluding or closing the Chapter 11 Cases.

45.  **Dissolution of Official Committees.**  On the Effective Date, any official committees appointed by the Office of the United States Trustee in or related to these Chapter 11 Cases shall dissolve automatically and its members shall be released and discharged from all rights, duties and responsibilities arising from or related to the Chapter 11 Cases.

46.  **Dissolution of Other Committees.**  On the Confirmation Date, the SLC and the Aliante  Transaction Committee shall be terminated, dissolved and discharged from any further duties and responsibilities, and the members of such committees and their agents (including attorneys and financial advisors) shall be released and discharged from any Claims of any Person or Entity arising from any acts or omissions related to the prepetition and post-petition activities of such committees.  Each such committee and its members and agents (including attorneys and financial advisors) shall be deemed included in the Plan definitions of Released Parties and Exculpated Parties (if not already so included).  On the Confirmation Date, the consulting agreement between Aliante Gaming and William A. Bible shall be shall be terminated and William A. Bible shall be discharged from further duties or responsibilities thereunder.

#4831-0060-3657

-19-

47.    <u>Payment of Statutory Fees</u>.  All outstanding fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the Effective Date.  All such fees payable after the Effective Date shall be paid by the Debtors prior to the closing of the Chapter 11 Cases when due or as soon thereafter as practicable.

48.    <u>Modifications of Plan</u>.   Subject to any limitations contained in the Plan, the Debtors, Plan Administrator or Reorganized Aliante Gaming, as applicable, may, upon order of the Court, amend or modify the Plan or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, provided, however, that any amendment, modification or supplement to the Plan shall be reasonably acceptable, as appropriate, to New Propco, New Opco Purchaser, the GVR Purchaser, the Mortgage Lenders, FG, the Consenting Opco Lenders, Required GVR Consenting Lenders and the Required Aliante Consenting Lenders and shall not be inconsistent with the terms of the SCI Plan, SCI Confirmation Order, New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the GVR Purchase Agreement, the GVR Lender Plan Support Agreement, the Put Parties Support Agreement and the New Aliante Transaction Agreements.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

49.    <u>Substantial Consummation</u>.  Upon the occurrence of the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

50.    <u>Successors and Assigns</u>.    The Plan is and shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan is and shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

51.     Further Assurances.   The Debtors or the Plan Administrator as applicable, Reorganized Aliante Gaming, ALST Casino Holdco, all Holders of Claims and Equity Interests receiving distributions under the Plan and all other Persons and Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and this Confirmation Order.  On or before the Effective Date, the Debtors may  File with the Court any agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and Restructuring Transactions.

52.     Filing and Recording.  This Confirmation Order is and shall be: (a) effective as a determination that, except as otherwise provided in the Plan or this Confirmation Order, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with Consummation of the Plan, on the Effective Date, all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests existing prior to such date have been unconditionally released, discharged, and terminated; and (b) binding upon and shall govern the acts of all Persons and Entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons and Entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.

53.     Exemption from Certain Transfer Taxes.   Any transfers of property pursuant to the Plan shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States.  All  federal, state or local governmental officials or agents are directed by this Confirmation Order to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to all actions, agreements and documents necessary to evidence and implement the provisions of, and the

distributions and transfers to be made under the Plan, including without limitation the recordation of any mortgage pursuant to any of the Restructuring Transactions.

54.  Bulk Sales Laws.  No bulk sales law or similar law of any state or other jurisdiction shall apply to any of transfers pursuant to any of the Restructuring Transactions.

55.  Bar Dates.  Within five business days after the occurrence of the Effective Date, the Debtors, Plan Administrator and/or Reorganized Aliante Gaming as applicable shall file and serve notice of the occurrence of Effective Date and of the following bar dates and deadlines: (a) the Administrative Claim Bar Date shall be 30 days after the Effective Date; (c) the Professional Fees Bar Date shall be 60 days after the Effective Date; and (b) the Claims Objection Bar Date shall be 120 days after the Effective Date.  Prior to the expiration of the foregoing deadlines and bar dates, the Debtors, Plan Administrator and/or Reorganized Aliante Gaming, as applicable, may move the Court for an order extending any of the foregoing bar dates and deadlines for good cause.

56.  The failure of any Person or Entity to file a proof of Administrative Claim or a Professional Fee Claim by the deadlines and bar dates referred to in the immediately preceding paragraph shall result in such Person or Entity being forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Debtors, the Estates or any of their respective property, and such Claim shall be forever discharged.

57.  Appointment of Plan Administrators.  Richard J. Haskins and Thomas M. Friel are each appointed to be Plan Administrators for the SCI Debtors, Reorganized SCI Debtors, Subsidiary Debtors, Reorganized Subsidiary Debtors, Aliante Debtors and Reorganized Aliante Debtors, excluding Aliante Gaming LLC and Reorganized Aliante Gaming LLC.

58.  Professional Fee Escrow Account. On the Applicable Effective Date, the Subsidiary Debtors, Aliante Debtors and GVR shall establish and fund a Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals (allocated among the Subsidiary Debtors, the Aliante Debtors and GVR based on the estimates of each Debtor's Professional Fee Claims); provided that no Distributions on account of the Prepetition Opco Secured Lenders' Allowed Claim shall be used for such purpose.

1  Aliante Gaming shall submit its estimate of Aliante Gaming's Professional Fee Claims to the

2  Required Aliante Consenting Lenders for review and consultation prior to funding its

3  Professional Fee Escrow Account.  The Professional Fee Escrow Account shall be maintained in

4  trust for the Professionals and such funds shall not be considered funds of any Debtor's Estate.

5       59.    Appeals.  The reversal or modification on appeal of the authorization provided

6  herein to transfer the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets,

7  Aliante Holdings Assets or the Transferred Aliante Hotel Assets to the applicable Transferee

8  Parties pursuant to the Plan shall not affect the validity of such transfers (including the

9  assumption, assignment, and sale of any of the Assumed Contracts) unless such authorization

10 and such transfers are duly stayed pending such appeal.  The reversal or modification on appeal

11 of the authorization provided herein to implement the Restructuring Transactions shall not affect

12 the validity of any debt incurred or the enforceability or priority of any Lien granted pursuant

13 any of the Restructuring Transactions.

14      60.    Separate Confirmation Orders.  This Confirmation Order is and shall be deemed

15 to be a separate Confirmation Order with respect to each of the Subsidiary Debtors and Aliante

16 Debtors, and it shall be sufficient for the purposes thereof that the Clerk of Bankruptcy Court

17 enters this Confirmation Order in the docket of the jointly administered case, Case No.

18 09-52477-GWZ.

19      61.    Waiver of F.R.B.P. Rule 3020(e) and F.R.C.P. Rule 62(a) Stays:  The fourteen

20 day stays of F.R.B.P. Rule 3020(e) and F.R.C.P. Rule 62(a) shall not apply to this Confirmation

21 Order, and this Confirmation Order shall be effective immediately upon entry.

22 \ \ \

23 \ \ \

24 \ \ \

25 \ \ \

26 \ \ \

27 \ \ \

28 \ \ \

#4831-0060-3657                                     -23-

SUBMITTED BY:

Paul S. Aronzon (CA SBN 88781)
Thomas R. Kreller (CA SBN 161922)
Fred Neufeld (CA SBN 150759)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000
Facsimile:  (213) 629-5063
paronzon@milbank.com
tkreller@milbank.com

Reorganization Counsel for the Subsidiary Debtors

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004565)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:  (775) 823-2900
Facsimile:  (775) 823-2929
lmacauley@lrlaw.com
dcica@lrlaw.com

Local Reorganization Counsel for the
Subsidiary Debtors

James H.M. Sprayregen, P.C. (IL SBN 6190206)
David R. Seligman, P.C. (IL SBN 6238064)
David A. Agay (IL No. 6244314)
Sarah H. Seewer (IL No. 6301437)
KIRKLAND & ELLIS LLP
300 North LaSalle St.
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Reorganization Counsel for the Aliante Debtors

Candace Carlyon (NV SBN 002666)
James Patrick Shea (NV SBN 000405)
SHEA & CARLYON, LTD.
701 Bridger Avenue, Suite 850
Las Vegas, Nevada  89101
Telephone:     (702) 471-7432
Facsimile:     (702) 471-7435
ccarlyon@sheacarlyon.com
jshea@sheacarlyon.com

Special Local Reorganization Counsel
for the Aliante Debtors

# # #

# **EXHIBIT 1**

# **EXHIBIT 1**

#4831-0060-3657

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:                                             Chapter 11

STATION CASINOS, INC., *et al.,*

    Debtors and Debtors in Possession.[1]

    Affects the Subsidiary Debtors, Aliante Debtors and/or Green Valley Ranch Gaming, LLC listed in footnote 1

**FIRST AMENDED PREPACKAGED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR SUBSIDIARY DEBTORS, ALIANTE DEBTORS AND GREEN VALLEY RANCH GAMING, LLC (DATED MAY 20, 2011)**

---

[1]   For purposes of this Joint Plan:  (i) the "Subsidiary Debtors" means: Auburn Development, LLC; Boulder Station, Inc.; Centerline Holdings, LLC; Charleston Station, LLC; CV HoldCo, LLC; Durango Station, Inc.; Fiesta Station, Inc.; Fresno Land Acquisitions, LLC ; Gold Rush Station, LLC; GV Ranch Station, Inc.; Green Valley Station, Inc.; Inspirada Station, LLC; Lake Mead Station, Inc.; LML Station, LLC; Magic Star Station, LLC; Palace Station Hotel & Casinos, Inc.; Past Enterprises, Inc.; Rancho Station, LLC; Santa Fe Station, Inc.; SC Durango Development, LLC; Sonoma Land Holdings, LLC; Station Holdings, Inc.; STN Aviation, Inc.; Sunset Station, Inc.; Texas Station, LLC; Town Center Station, LLC; Tropicana Acquisitions, LLC; Tropicana Station, Inc. and Vista Holdings, LLC, (ii) the "Aliante Debtors" means: Aliante Gaming, LLC; Aliante Holding, LLC; and Aliante Station LLC, and (iii) "GVR" means Green Valley Ranch Gaming, LLC.

**Prepared By**

Paul S. Aronzon (CA SBN 88781)
Thomas R. Kreller (CA SBN 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000
Facsimile:  (213) 629-5063
paronzon@milbank.com
tkreller@milbank.com

Reorganization Counsel for the Subsidiary
Debtors

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004565)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:  (775) 823-2900
Facsimile:  (775) 823-2929
lmacauley@lrlaw.com
dcica@lrlaw.com

Local Reorganization Counsel for the
Subsidiary Debtors

James H.M. Sprayregen, P.C. (IL SBN 6190206)
David R. Seligman, P.C. (IL SBN 6238064)
David A. Agay (IL No. 6244314)
Sarah H. Seewer (IL No. 6301437)
KIRKLAND & ELLIS LLP
300 North LaSalle St.
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
james.sprayregen@kirkland.com
david.seligman@kirkland.com
david.agay@kirkland.com
sseewer@kirkland.com

Reorganization Counsel for the
Aliante Debtors and Green Valley Ranch Gaming
LLC

Candace Carlyon (NV SBN 002666)
James Patrick Shea (NV SBN 000405)
SHEA & CARLYON, LTD.
701 Bridger Avenue, Suite 850
Las Vegas, Nevada  89101
Telephone:     (702) 471-7432
Facsimile:     (702) 471-7435
ccarlyon@sheacarlyon.com
jshea@sheacarlyon.com

Local Reorganization Counsel for the Aliante
Debtors and Green Valley Ranch Gaming
LLC

## LIST OF THE DEBTORS AFFECTED BY THIS JOINT PLAN

The proponents of the chapter 11 plan of reorganization contained herein (collectively, the "**Debtors**") are referred to as the Subsidiary Debtors, the Aliante Debtors and Green Valley Ranch Gaming, LLC, respectively, each of which is listed below.

**The Subsidiary Debtors**
Auburn Development, LLC
Boulder Station, Inc.
Centerline Holdings, LLC
Charleston Station, LLC
CV HoldCo, LLC
Durango Station, Inc.
Fiesta Station, Inc.
Fresno Land Acquisitions, LLC
Gold Rush Station, LLC
Green Valley Station, Inc.
GV Ranch Station, Inc.
Inspirada Station, LLC
Lake Mead Station, Inc.
LML Station, LLC
Magic Star Station, LLC
Palace Station Hotel & Casinos, Inc.
Past Enterprises, Inc.
Rancho Station, LLC
Santa Fe Station, Inc.
SC Durango Development LLC
Sonoma Land Holdings, LLC
Station Holdings, Inc.
STN Aviation, Inc.
Sunset Station, Inc.
Texas Station, LLC
Town Center Station, LLC
Tropicana Acquisitions, LLC
Tropicana Station, Inc.
Vista Holdings, LLC

**The Aliante Debtors**
Aliante Holding, LLC
Aliante Station LLC
Aliante Gaming, LLC

**GVR Debtor**
Green Valley Ranch Gaming, LLC

#4831-3215-8984

# TABLE OF CONTENTS

## ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION OF
### TIME AND DEFINED TERMS

A.    Rules of Interpretation ...................................................................................1
B.    Computation of Time .....................................................................................2
C.    Defined Terms ...............................................................................................2

## ARTICLE II.

### TREATMENT OF ADMINISTRATIVE CLAIMS,
### PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS

A.    Administrative Claims ..................................................................................32
      1.    Bar Date for Administrative Claims .................................................32
      2.    Professional Compensation and Reimbursement Claims ....................33
B.    Priority Tax Claims......................................................................................34
C.    Other Priority Claims...................................................................................34

## ARTICLE III.

### CLASSIFICATION AND TREATMENT
### OF ALL OTHER CLAIMS AND EQUITY INTERESTS

A.    Classification of Claims and Equity Interests Against Subsidiary Debtors......................35
      (1)    Auburn Development, LLC .................................................................35
      (2)    Boulder Station, Inc. ..........................................................................35
      (3)    Centerline Holdings, LLC ...................................................................36
      (4)    Charleston Station, LLC .....................................................................36
      (5)    CV HoldCo, LLC ................................................................................36
      (6)    Durango Station, Inc. .........................................................................37
      (7)    Fiesta Station, Inc................................................................................37
      (8)    Fresno Land Acquisitions, LLC...........................................................37
      (9)    Gold Rush Station, LLC ......................................................................38
      (10)   Green Valley Station, Inc. ...................................................................38
      (11)   GV Ranch Station, Inc. .......................................................................39
      (12)   Inspirada Station, LLC........................................................................39
      (13)   Lake Mead Station, Inc. ......................................................................39
      (14)   LML Station, LLC ...............................................................................40
      (15)   Magic Star Station, LLC......................................................................40
      (16)   Palace Station Hotel & Casinos, Inc.....................................................41
      (17)   Past Enterprises, Inc............................................................................41
      (18)   Rancho Station, LLC ...........................................................................42

|     | (19) | Santa Fe Station, Inc. | 42 |
|     | (20) | SC Durango Development LLC | 42 |
|     | (21) | Sonoma Land Holdings, LLC | 43 |
|     | (22) | Station Holdings, Inc. | 43 |
|     | (23) | STN Aviation, Inc. | 44 |
|     | (24) | Sunset Station, Inc. | 44 |
|     | (25) | Texas Station, LLC | 45 |
|     | (26) | Town Center Station, LLC | 45 |
|     | (27) | Tropicana Acquisitions, LLC | 45 |
|     | (28) | Tropicana Station, Inc. | 46 |
|     | (29) | Vista Holdings, LLC | 46 |
| B. | | Classification of Claims and Equity Interests Against Aliante Debtors | 46 |
|     | (1) | Aliante Holding, LLC | 46 |
|     | (2) | Aliante Station LLC | 47 |
|     | (3) | Aliante Gaming LLC | 47 |
| C. | | Classification of Claims and Equity Interests Against GVR | 47 |
|     | (1) | Green Valley Ranch Gaming, LLC | 47 |
| D. | | Treatment of Claims and Equity Interests Against the Subsidiary Debtors | 48 |
|     | (1) | Auburn Development, LLC | 48 |
|     | (2) | Boulder Station, Inc. | 49 |
|     | (3) | Centerline Holdings, LLC | 51 |
|     | (4) | Charleston Station, LLC | 52 |
|     | (5) | CV HoldCo, LLC | 54 |
|     | (6) | Durango Station, Inc. | 55 |
|     | (7) | Fiesta Station, Inc. | 56 |
|     | (8) | Fresno Land Acquisitions, LLC | 58 |
|     | (9) | Gold Rush Station, LLC | 60 |
|     | (10) | Green Valley Station, Inc. | 61 |
|     | (11) | GV Ranch Station, Inc. | 63 |
|     | (12) | Inspirada Station, LLC | 65 |
|     | (13) | Lake Mead Station, Inc. | 66 |
|     | (14) | LML Station, LLC | 68 |
|     | (15) | Magic Star Station, LLC | 69 |
|     | (16) | Palace Station Hotel & Casinos, Inc. | 71 |
|     | (17) | Past Enterprises, Inc. | 73 |
|     | (18) | Rancho Station, LLC | 74 |
|     | (19) | Santa Fe Station, Inc. | 76 |
|     | (20) | SC Durango Development, LLC | 78 |
|     | (21) | Sonoma Land Holdings, LLC | 79 |
|     | (22) | Station Holdings, Inc. | 81 |
|     | (23) | STN Aviation, Inc. | 82 |
|     | (24) | Sunset Station, Inc. | 84 |
|     | (25) | Texas Station, LLC | 85 |
|     | (26) | Town Center Station, LLC | 87 |
|     | (27) | Tropicana Acquisitions, LLC | 88 |
|     | (28) | Tropicana Station, Inc. | 90 |

(29)    Vista Holdings, LLC ................................................................91
E.    Treatment of Claims and Equity Interests Against the Aliante Debtors..........93
   (1)    Aliante Holding, LLC .................................................................93
   (2)    Aliante Station LLC ....................................................................94
   (3)    Aliante Gaming LLC ...................................................................96
F.    Treatment of Claims and Equity Interests Against GVR...........................97
G.    Reservation of Rights Regarding Unimpaired Claims.................................100
H.    Subordination Rights .....................................................................100
I.    Withholding Taxes ........................................................................100
J.    Set Offs ..................................................................................100
K.    Timing of Payments and Distributions and Allocation..............................101

ARTICLE IV.

ACCEPTANCE OR REJECTION OF THE PLAN

A.    Voting Classes ...........................................................................101
B.    Acceptance by Impaired Classes of Claims and Equity Interests...................101
C.    Presumed Acceptance of Joint Plan .....................................................101
D.    Presumed Rejection of Joint Plan ......................................................102
E.    Non-Consensual Confirmation Pursuant to 28 U.S.C. § 1129(b)...................102

ARTICLE V.

MEANS FOR IMPLEMENTATION OF THIS JOINT PLAN

A.    Transfers Under this Joint Plan, Generally ...........................................102
B.    Joint Plan Transactions – Subsidiary Debtors ........................................103
   1.    Assumption of New Opco Purchase Agreement .................................103
   2.    Formation of New Propco and New Opco Entities ............................104
   3.    Transfer of Master Lease Collateral to Propco .................................104
   4.    Landco Assets ...........................................................................104
   5.    Transfer of New Propco Transferred Assets from Propco to New Propco Entities................................................................104
   6.    Transfer of New Propco Purchased Assets from Opco Entities to New Propco Entities...............................................................104
   7.    Transfer of New Opco Acquired Assets to New Opco........................105
   8.    New Propco Transactions in Connection with Receipt of New Propco Acquired Assets....................................................105
   9.    New Propco Employment of Subsidiary Debtors' Employees and Related Matters ........................................................105
   10.    New Opco Transactions in Connection with Receipt of New Opco Acquired Assets.....................................................106
   11.    The New Opco Credit Agreement ................................................106
   12.    Second Amended MLCA ...........................................................107
C.    Joint Plan Transactions – Aliante Debtors...........................................107
   1.    Restructuring and other Corporate Transactions ..............................107

  2. New Aliante Management Agreement.................................................109
  3. Transactions in Connection with Consummation of this Joint Plan...............110
D. Joint Plan Transactions – GVR.................................................................110
  1. Assumption of GVR Purchase Agreement ........................................110
  2. Vesting of GVR Purchased Assets in GVR Purchaser .......................111
  3. Payment of Purchase Price to GVR ..................................................111
  4. Payment of GVR First Lien Lenders Steering Committee Professional
   Fees ....................................................................................................111
  5. Assumption of GVR Liabilities by the GVR Purchaser .....................111
  6. Powers of the GVR Purchaser ...........................................................111
  7. GVR Transition Services Agreement .................................................112
  8. GVR Purchaser's Employment of GVR's Employees ........................112
E. General Settlement of Claims .....................................................................112
F. Release of Liens, Claims, Administrative Claims and Equity Interests .........113
G. Corporate Action.......................................................................................113
H. Dissolution, Dismissal of Officers and Directors and Dissolution of the Boards of
 Directors of Each Subsidiary Debtor, Aliante Station, Aliante Holding and GVR.........114
I. Post-Applicable Effective Date Governance of the Subsidiary Debtors, Aliante
 Holding, Aliante Station and GVR .............................................................114
J. Cancellation of Securities and Agreements ................................................115
K. Exemption from Certain Taxes and Fees....................................................115
L. Post-Aliante Effective Date (with respect to Aliante Gaming) Existence and
 Management of Reorganized Aliante Gaming .............................................115
  1. Existence.............................................................................................115
  2. Directors and Officers of Reorganized Aliante Gaming.....................115
M. Management of ALST Casino Holdco ........................................................116
N. Wind Down and Dissolution of the Debtors................................................116
  1. The Subsidiary Debtors, Aliante Holding, Aliante Station and GVR ................116

ARTICLE VI.

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. Assumption of Executory Contracts and Unexpired Leases...........................117
  1. The Subsidiary Debtors, Aliante Holding, Aliante Station and GVR ................117
  2. Aliante Gaming ..................................................................................118
B. Assumption and Assignment of Executory Contracts or Unexpired Leases .................119
C. Claims on Account of the Rejection of Executory Contracts or Unexpired Leases........120

ARTICLE VII.

PROVISIONS GOVERNING DISTRIBUTIONS

A. Distributions for Claims Allowed as of an Applicable Effective Date............................120
B. No Proofs of Claims Required on Account of Claims Allowed Under This Joint
 Plan ........................................................................................................121
C. Post-Petition Interest on Claims.................................................................121

D.    Distributions under this Joint Plan ................................................................121
E.    Delivery and Distributions and Undeliverable or Unclaimed Distributions ...................121
    1.    Record Date for Distributions ..........................................................121
    2.    Delivery of Distributions in General .................................................122
    3.    Minimum Distributions ......................................................................122
    4.    Fractional Units ..................................................................................122
    5.    Undeliverable Distributions ..............................................................122
F.    Compliance with Tax Requirements/Allocations .........................................123
G.    Means of Cash Payment ...............................................................................124
H.    Timing and Calculation of Amounts to Be Distributed ................................124
I.    Setoffs and Recoupments .............................................................................124
J.    Preservation of Subordination Rights ..........................................................125

ARTICLE VIII.

PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED
AND DISPUTED CLAIMS, ADMINISTRATIVE CLAIMS AND EQUITY INTERESTS

A.    Authority to Prosecute Objections to Disputed Claims and Disputed
    Administrative Claims ..................................................................................125
B.    Resolution of Disputed Claims .....................................................................126
    1.    Allowance of Claims ..........................................................................126
    2.    Prosecution of Objections to Claims ................................................126
    3.    Estimation of Disputed Claims .........................................................127
    4.    Deadline to File Objections to Claims ..............................................127
C.    No Distributions Pending Allowance ............................................................127
D.    Reserves for Disputed Claims ......................................................................127
E.    Distributions on Account of Disputed Claims that Become Allowed ............128
F.    Disallowance of Claims ................................................................................128
G.    Administrative Claims ..................................................................................128

ARTICLE IX.

CONDITIONS PRECEDENT TO CONFIRMATION,
APPLICABLE EFFECTIVE DATES AND CONSUMMATION OF THE PLAN

A.    Separate Confirmation Hearings and Confirmation Orders ...........................129
B.    Conditions Precedent to Confirmation of this Joint Plan ..............................129
C.    Conditions Precedent to the Occurrence of an Applicable Effective Date and
    Consummation of this Joint Plan ..................................................................129
    1.    Conditions Precedent to the Subsidiary Debtors Effective Date .........130
    2.    Conditions Precedent to the GVR Effective Date ..............................131
    3.    Conditions Precedent to the Aliante Effective Date with Respect to Aliante
        Gaming ..............................................................................................132
    4.    Conditions Precedent to the Aliante Effective Date with Respect to Aliante
        Holding or Aliante Station ................................................................133
D.    Waiver of Conditions ...................................................................................133

E.      Effect of Non-Occurrence of an Applicable Effective Date ............................................134

## ARTICLE X.

## RELEASES, EXCULPATION, INJUNCTION, PRESERVATION OF CAUSES OF ACTION AND RELATED PROVISIONS

A.      General ...........................................................................................................................135
B.      Comprehensive Settlement of Claims and Controversies..............................................135
C.      Releases Among Releasing Parties and Released Parties...............................................137
D.      Exculpation ...................................................................................................................140
E.      Preservation of Causes of Action..................................................................................140
        1.      Maintenance of Causes of Action ......................................................................140
        2.      Preservation of All Causes of Action Not Expressly Settled or Released..........141
F.      Supplemental Injunction ...............................................................................................142
G.      Releases, Discharges, Exculpations, Injunctions and Preservation of Causes of
        Action are Integral to Joint Plan ...................................................................................143
H.      Binding Nature of Joint Plan.........................................................................................143

## ARTICLE XI.

## RETENTION OF JURISDICTION

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.      Payment of Statutory Fees ............................................................................................145
B.      Modification of Joint Plan .............................................................................................145
C.      Revocation of Joint Plan ...............................................................................................146
D.      Successors and Assigns..................................................................................................146
E.      Reservation of Rights.....................................................................................................146
F.      Further Assurances.........................................................................................................147
G.      Severability ...................................................................................................................147
H.      Service of Documents....................................................................................................147
I.      Exemption from Registration Pursuant to 28 U.S.C. § 1145.........................................149
J.      Governing Law ..............................................................................................................149

**FIRST AMENDED PREPACKAGED JOINT CHAPTER 11 PLAN OF
REORGANIZATION FOR SUBSIDIARY DEBTORS, ALIANTE DEBTORS
AND GREEN VALLEY RANCH GAMING, LLC (DATED MAY 20, 2011)**

This *First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 20, 2011)* (this "Joint Plan") is proposed by the Debtor entities listed on the first page of this Joint Plan. Reference is made to the Disclosure Statement distributed contemporaneously herewith for a discussion of such Debtor entities' businesses, operations, proposed prepackaged Chapter 11 Cases, and for a summary and analysis of this Joint Plan. There also are other agreements and documents that are referenced in this Joint Plan or the Disclosure Statement that have been or will be filed with the Bankruptcy Court (either in connection with this Joint Plan, the Chapter 11 Cases, the SCI Plan, the SCI Confirmation Order or in the SCI Cases). All such agreements or documents are incorporated into and are a part of this Joint Plan as, and to the extent, set forth herein. Subject to certain restrictions and requirements set forth in Bankruptcy Code Section 1127 and Bankruptcy Rule 3019, this Joint Plan, the SCI Plan, the SCI Confirmation Order, the New Opco Purchase Agreement, the GVR Purchase Agreement and any applicable orders of the Bankruptcy Court, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Joint Plan or any agreements or any documents related thereto prior to substantial consummation of this Joint Plan. This Joint Plan may be confirmed and/or may become effective as to one or more Debtors prior to confirmation or effectiveness for other Debtors as the conditions to confirmation and/or effectiveness of this Joint Plan in respect of such Debtor(s) are satisfied.

**ARTICLE I.**

**RULES OF INTERPRETATION, COMPUTATION OF
TIME AND DEFINED TERMS**

**A.    Rules of Interpretation**

For purposes herein:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions as amended, modified or supplemented; (iii) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (iv) unless otherwise specified, all references herein to "Articles" or "Sections" are references to Articles or Sections in this Joint Plan; (v) unless otherwise stated, the words "herein," "hereof," "hereunder" and ''hereto'' refer to this Joint Plan in its entirety rather than to a particular portion of this Joint Plan; (vi) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) any reference to a Person or Entity as a Holder of a Claim, Administrative Claim or Equity Interest includes such Person's and Entity's successors and assigns; (viii) the rules of construction set forth in Bankruptcy Code

Section 102 shall apply; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) except as expressly stated herein or as it relates to Aliante Gaming, the terms of this Joint Plan shall be construed, to the maximum extent possible, to be in accordance with all applicable prior orders of the Bankruptcy Court in the SCI Cases and the terms of the SCI Plan; and (xi) as used herein, "[Docket No. __]" refers to the docket number of filings in the SCI Cases as maintained on the electronic docket of the Bankruptcy Court (and which, upon the Bankruptcy Court's approval of the Debtors' First Day Motion to jointly administer the Chapter 11 Cases with each other and with the SCI Cases, will apply to the Chapter 11 Cases).

**B.    Computation of Time**

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**C.    Defined Terms**

The following terms shall have the following meanings when used in capitalized form herein:

1.     "*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Applicable Effective Date.

2.     "*Administrative Agents*" means, collectively, the Opco Administrative Agent, the GVR First Lien Administrative Agent, the GVR Second Lien Administrative Agent, and the Aliante Administrative Agent.

3.     "*Administrative Claim*" means a Claim for costs or expenses of administration of the Chapter 11 Cases that is Allowed under Section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs or expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and leased premises); (b) Accrued Professional Compensation and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under Section 327, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Applicable Effective Date; (c) all fees and charges assessed against the Estates under Section 1930, chapter 123, of title 28, United States Code; and (d) any payment to be made under this Joint Plan or otherwise to cure a default on an assumed executory contract or unexpired lease, including any "Seller Contract" that is to be a "Purchased Asset" (as such terms are defined in the New Opco Purchase Agreement) and any "Assumed Agreement" that is to be a "Purchased Asset" (as such terms are defined in the GVR Purchase Agreement); provided, however, that any determination that "Cure Costs" (as defined in the GVR Purchase Agreement) constitute Administrative Claims shall not be deemed to release or impair the obligation of the GVR Purchaser to pay Cure Costs that are not previously

paid by GVR on or prior to the GVR Effective Date as set forth in, and subject to the terms of, Section 2.6(c) of the GVR Purchase Agreement.

4.      "*Administrative Claims Bar Date*" means the applicable date or dates established by order of the Bankruptcy Court as the deadline or deadlines for asserting Administrative Claims.

5.      "*Affiliate*" means an "affiliate" as defined in Bankruptcy Code Section 101(2).

6.      "*Aliante Administrative Agent*" means Wilmington Trust FSB in its capacity as administrative agent under the Aliante Credit Agreement.

7.      "*Aliante Collateral Assignment*" means that certain Collateral Assignment of Contracts, dated as of October, 5, 2007, by Aliante Gaming, LLC in favor of Wilmington Trust FSB (as successor by assignment to Bank of America, N.A.), as Administrative Agent.

8.      "*Aliante Credit Agreement*" means that certain credit agreement dated as of October 5, 2007 by and among Aliante Gaming, as borrower, Wilmington Trust FSB, successor to Bank of America, N.A., as administrative agent, Wachovia Bank National Association, as syndication agent, Bank of Scotland PLC and Wells Fargo Bank, National Association, as documentation agents, and Banc of America Securities, LLC, Wachovia Capital Markets, LLC, and Wells Fargo Bank, National Association, as joint-lead arrangers and joint book managers, and the Aliante Lenders party thereto that provides for a $410 million term loan and a $20 million revolving loan secured by a lien on substantially all of the assets of Aliante Gaming, excluding certain specified assets.

9.      "*Aliante Credit Agreement Claims*" means any Claim arising from amounts due under the Aliante Credit Agreement, together with all interest accrued and unpaid thereon as of the Aliante Effective Date, and all unpaid reasonable fees, costs, expenses and other charges required to be paid or reimbursed (as applicable) pursuant to the terms of the Aliante Credit Agreement.  For the avoidance of doubt, the Aliante Credit Agreement Claims includes any deficiency Claim arising under the Aliante Credit Agreement.

10.      "*Aliante Debtors*" means, collectively, Aliante Holding, LLC, Aliante Station, LLC and Aliante Gaming, LLC.

11.      "*Aliante Deed of Trust*" means that certain Construction Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated as of October 5, 2007, executed and delivered by Aliante Gaming, LLC, as trustor, in favor of PRLAP, Inc., as trustee, for the benefit of Wilmington Trust FSB (as successor by assignment to Bank of America, N.A.), as Administrative Agent.

12.      "*Aliante Effective Date*" means, with regard to each Aliante Debtor, the Business Day that this Joint Plan becomes effective as to such Aliante Debtor.

13.      "*Aliante Gaming*" means Aliante Gaming, LLC.

14.      "*Aliante Holding*"  means Aliante Holding, LLC.

15. "*Aliante Holding Pledge Agreement*" means that certain Pledge Agreement, dated as of October 5, 2007, made by Aliante Holding, LLC in favor of Wilmington Trust FSB (as successor by assignment to Bank of America, N.A.), as Administrative Agent, and acknowledged and agreed to by Aliante Gaming, LLC.

16. "*Aliante Hotel*" means the Aliante Station Casino & Hotel.

17. "*Aliante IP License Agreement*" means one or more IP license agreements with Reorganized Aliante Gaming, substantially in the form and substance acceptable to the Required Aliante Consenting Lenders and the other parties thereto.

18. "*Aliante Lenders*" means (a) the lenders under the Aliante Credit Agreement, and (b) the swap lenders under the Aliante Swap Agreement.

19. "*Aliante Lenders' Allowed Claims*" means, collectively, the Aliante Credit Agreement Claims and the Aliante Swap Claims, in an aggregate principal amount of not less than $378,091,591, plus all interest accrued and unpaid thereon as of the Aliante Effective Date, and all unpaid fees, costs, expenses and other charges, claims and obligations (including indemnification claims) required to be paid or reimbursed, as applicable, pursuant to the Aliante Credit Agreement and the Aliante Swap Agreement, including, without limitation, the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Capital, Inc., and Lionel Sawyer & Collins, which Claims shall be Allowed Claims for all purposes under this Joint Plan in the full amount stated herein and shall not be subject to offset, setoff, recoupment, defense, counterclaim, reduction, subordination or credit of any kind whatsoever.

20. "*Aliante Operating Agreement*" means that certain Amended and Restated Operating Agreement of Aliante Gaming, LLC, dated as of January 6, 2006, by and among Aliante Gaming, LLC, Aliante Holding, LLC and Aliante Station, LLC and acknowledged and agreed to by G.C. Aliante, LLC.

21. "*Aliante Prepetition Transactions*" means the negotiation, formulation, entry, performance, lack of performance of and/or any transactions arising from or pertaining to the Aliante Credit Agreement, the Aliante Security Agreement, the Aliante Swap Agreement, the Aliante Deed of Trust, Aliante Collateral Assignment, Aliante Trademark Collateral Assignment, Aliante Holding Pledge Agreement, the formation of Aliante Debtors, the Aliante Operating Agreement, and the actions taken by the Aliante Transaction Committee.

22. "*Aliante Prepetition Transactions Causes of Action*" means any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other legal or equitable remedies against any Person or Entity arising from any transaction comprising or related to the Aliante Prepetition Transactions, regardless of whether such Claims, Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

23. "*Aliante Security Agreement*" means that certain Security Agreement, dated as of October 5, 2007, made by Aliante Gaming, LLC in favor of Wilmington Trust FSB (as successor by assignment to Bank of America, N.A.), as Administrative Agent.

24.    "*Aliante Station*"  means Aliante Station, LLC.

25.    "*Aliante Swap Agreement*" means that certain ISDA Master Agreement dated as of February 7, 2008 and the Schedule to the Master Agreement between Bank of America, N.A. and Aliante Gaming.

26.    "*Aliante Swap Claims*" means any Claim arising from amounts due under the Aliante Swap Agreement, together with all interest accrued and unpaid thereon as of the Aliante Effective Date, and all unpaid reasonable fees, costs, expenses and other charges required to be paid or reimbursed (as applicable) pursuant to the terms of the Aliante Swap Agreement.

27.    "*Aliante Trademark Collateral Assignment*" means that certain Trademark Collateral Assignment, dated as of October, 5, 2007, made by Aliante Gaming, LLC in favor of Wilmington Trust FSB (as successor by assignment to Bank of America, N.A.), as Administrative Agent.

28.    "*Aliante Transaction Committee*" means the independent transaction committee comprised of William Bible and Dr. James D. Nave formed on August 27, 2010 to oversee Aliante Gaming's sale process and which was and is authorized to:  (a) solicit bids from prospective acquirers of all or substantially all of Aliante Gaming's assets through an organized marketing process designed to produce the highest and best offer; (b) solicit bids from qualified managers to manage and operate Aliante Gaming as a reorganized, independently owned business; and (c) oversee and administer the sale process on behalf of Aliante Gaming by evaluating any proposals submitted to Aliante Gaming, and undertaking negotiations and finalizing proposals for final consideration and evaluation by the executive committee of Aliante Gaming.

29.    "*Allowed*" or "*Allowance*" or "*Allowing*" means, with respect to any Claim, Administrative Claim or Equity Interest, except as otherwise provided herein, any of the following: (a) a Claim or Equity Interest that has been Scheduled by a Debtors in its Schedules as other than disputed, contingent or unliquidated and as to which (i) a Debtors or any other party in interest have not filed an objection and (ii) no contrary Proof of Claim has been filed; (b) a Claim, Administrative Claim or Equity Interest that either is not a Disputed Claim, Disputed Administrative Claim or Disputed Equity Interest or has been allowed by a Final Order; (c) a Claim or Administrative Claim that is allowed:  (i) in any stipulation with a Debtor of the amount and nature of such Claim executed prior to the Confirmation Date and approved or authorized by the Bankruptcy Court; (ii) in any stipulation with a Debtor of the amount and nature of such Claim executed on or after the Confirmation Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture or other agreement entered into or assumed in connection with this Joint Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that (i) is not a Disputed Claim, Disputed Administrative Claim or Disputed Equity Interest or (ii) has been allowed by a Final Order; or (e) a Claim, Administrative Claim or Equity Interest that is allowed pursuant to the terms of this Joint Plan.

30.    "*ALST Casino Holdco*" means ALST Casino Holdco, LLC, a limited liability company, to be formed by the Aliante Lenders before the Aliante Effective Date or any successor thereto, by merger, consolidation or otherwise, on or after the Aliante Effective Date.

31.    "*ALST Casino Holdco Equity*" means the membership units of ALST Casino Holdco.

32.    "*ALST Casino Holdco Operating Agreement*" means an operating agreement for ALST Casino Holdco in form and substance acceptable to the Required Aliante Consenting Lenders and substantially in the form included in the Joint Plan Supplement.

33.    "*Applicable Effective Date*" means either the Aliante Effective Date, with respect to any of the Aliante Debtors, the GVR Effective Date or the Subsidiary Debtors Effective Date, as the context of the sentence in which the term "Applicable Effective Date" is used dictates.

34.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, recharacterization or other actions or remedies that may be brought by or on behalf of the applicable Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under Section 502, 510 or 542-553 of the Bankruptcy Code.

35.    "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Joint Plan.

36.    "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

37.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Nevada, or any other court having jurisdiction over the Chapter 11 Cases.

38.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

39.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

40.    "*Cash*" means the legal tender of the United States of America or other immediately available funds.

41.    "*Causes of Action*" means any and all claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counter-claims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way

of claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring at any time prior to the Applicable Effective Date.

42.    "*Chapter 11 Cases*" means, collectively, the Chapter 11 Cases commenced by the Debtors on the Petition Date in the Bankruptcy Court.

43.    "*Claim*" means any "claim" against any Debtor as defined in Bankruptcy Code Section 101(5), whether or not asserted or Allowed.

44.    "*Claims Bar Date*" means such date, if any, as ordered by the Bankruptcy Court in the Chapter 11 Cases as the deadline or deadlines for asserting Claims.

45.    "*Claims Objection Bar Date*" means, for each Claim and Equity Interest, the later of:  (a)  one hundred twenty (120) days after the Applicable Effective Date; and (b) such other date as may be specifically fixed by a Final Order of the Bankruptcy Court for the filing of objections to such Claim or Equity Interest including, but not limited, to the Confirmation Order.

46.    "*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

47.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to Bankruptcy Code Sections 1122(a) and 1123(a).

48.    "*Collateral*" means any property or interest in property of any Debtor's Estate that is subject to a valid and enforceable Lien to secure the payment or performance of a Claim.

49.    "*Committee Plan Support Stipulation*" means that certain Stipulation and Order dated July 28, 2010, by and between SCI and the SCI Committee, which sets forth the terms and conditions upon which the SCI Committee agreed to support the SCI Plan.

50.    "*Confirmation Date*" means, with respect to any Debtor(s), the date on which the clerk of the Bankruptcy Court enters a Confirmation Order on the docket of the Bankruptcy Court.

51.    "*Confirmation Hearing*" means the hearing or hearings held by the Bankruptcy Court pursuant to Bankruptcy Code Section 1128 to consider confirmation of this Joint Plan with respect to each of the Subsidiary Debtors, GVR and each of the Aliante Debtors, as such hearing may be adjourned or continued from time to time.

52.    "*Confirmation Order*" means one or more Final Orders of the Bankruptcy Court confirming this Joint Plan pursuant to Bankruptcy Code Section 1129 with respect to the Subsidiary Debtors, each of the Aliante Debtors and GVR, which Final Order(s) shall be consistent with the provisions of this Joint Plan.  Any Confirmation Order relating to the Subsidiary Debtors shall be consistent with the definitions of Confirmation Order and 363 Sale Orders in the New Opco Purchase Agreement and in form and substance reasonably satisfactory to the Subsidiary Debtors, New Propco, the Required Opco Consenting Lenders, the Mortgage Lenders and the New Opco Purchaser.  Any Confirmation Order relating to Aliante Gaming shall

be consistent with the New Aliante Transaction Agreements and in form and substance reasonably satisfactory to Aliante Gaming and the Required Aliante Consenting Lenders. Any Confirmation Order relating to GVR shall be consistent with the definition of Sale Order in the GVR Purchase Agreement and in form and substance reasonably satisfactory to GVR, the Required GVR Consenting Lenders and the GVR Purchaser. Any Confirmation Order relating to Aliante Station shall be acceptable to Aliante Station. Any Confirmation Order relating to Aliante Holding shall be in form and substance reasonably satisfactory to Aliante Holding and the Required Aliante Consenting Lenders.

53. "*Consenting GVR Lenders*" means those GVR First Lien Lenders that are parties to the GVR Lender Plan Support Agreement, including their permitted successors and assigns.

54. "*Consenting Opco Lenders*" means those Prepetition Opco Secured Lenders that are parties to the Opco Lender Restructuring Support Agreement, including their permitted successors and assigns.

55. "*Consummation*" means the occurrence of the Applicable Effective Date.

56. "*Cure Amount*" means amounts payable to non-Debtor counter-parties to cure defaults under Executory Contracts or Unexpired Leases to be assumed and assigned pursuant to Bankruptcy Code Section 365(b), including, as applicable, "Cure Costs" as defined in the GVR Purchase Agreement.

57. "*Debtor(s)*" means, individually and collectively, each of the Subsidiary Debtors, the Aliante Debtors and GVR.

58. "*Debtor(s) in Possession*" means, individually, each Debtor as a debtor in possession in its Chapter 11 Case and, collectively, all Debtors, as debtors in possession in these Chapter 11 Cases.

59. "*DIP Facility Claims*" means all obligations of any of the SCI Debtors arising under the financing agreements with Vista Holdings, LLC and Past Enterprises, Inc., respectively, pursuant to that certain "*Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 552 And Fed. R. Bankr. P. Rule 4001(b), (c) And (d): (I) Authorizing The Debtors To (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans To Non-Debtor Subsidiaries, (II) Granting Adequate Protection To Prepetition Secured Parties, And (IV) Granting Related Relief*" entered by the Bankruptcy Court on October 13, 2009 [Docket No. 481], as such order has been amended from time to time.

60. "*Disclosure Statement*" means that certain *Disclosure Statement to Accompany Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated March 22 2011)*, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to this Joint Plan.

61. "*Disputed*" means, with respect to a Claim, Administrative Claim, or Equity Interest, or any portion thereof, as applicable: (a) a Claim listed on the Schedules as unliquidated, disputed or contingent; (b) a Claim, Administrative Claim, or Equity Interest that is

the subject of a Filed objection or request for estimation or is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order; or (c) a Claim that is in excess of the amount scheduled as other than disputed, contingent or unliquidated.

62.    "*Distribution*" means a distribution pursuant to the SCI Plan or this Joint Plan.

63.    "*Distribution Agent*" means the Plan Administrator or any other entity designated, employed or contracted with by the Plan Administrator or Reorganized Aliante Gaming for purposes of making Distributions under this Joint Plan.

64.    "*Distribution Record Date*" means the Applicable Effective Date.

65.    "*Entity*" means an "entity" as defined in Bankruptcy Code Section 101(15).

66.    "*Equity*" or "*Equity Security*" means an "equity security" as defined in Bankruptcy Code Section 101(16).

67.    "*Equity Interest*" means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to such Debtor, and all rights arising with respect thereto and (ii) the rights of any Person or Entity to purchase or demand the issuance of any of the foregoing and shall include:  (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights, in each case as in existence immediately prior to the Applicable Effective Date.

68.    "*Estates*" means the bankruptcy estates of the Debtors created by virtue of Bankruptcy Code Section 541 upon the commencement of the Chapter 11 Cases.

69.    "*Excluded Propco Assets*" means, collectively, the Existing Propco Assets, the New Propco Purchased Assets and the SCI Retained Assets.

70.    "*Exculpated Parties*" means, individually and collectively:  (a) the Subsidiary Debtors and their respective Estates; (b) the SCI Debtors and their respective Estates; (c) Fertitta Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco; (g) Voteco; (h) the Plan Administrator, solely in its capacity as such; (i) the Mortgage Lenders, solely in their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as such; (k) the Land Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders, solely in their capacity as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its capacity as such; (o) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (p) Colony Capital, LLC;  (q) the Settling Lenders, but only if all of the applicable terms and conditions of the Settling Lenders Stipulation are satisfied by the Settling Lenders; (r) the SCI Committee and its members, underline provided that the Committee Support Stipulation (as defined in the SCI plan) has not been terminated as of the Subsidiary Debtors Effective Date; (s) the Put Parties, underline provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Subsidiary Debtors Effective Date; (t) GVR and its Estate; (u) the GVR First Lien Administrative Agent, solely in its capacity as such; (v) GVR Purchaser; (w) the

Consenting GVR Lenders, solely in their capacities as GVR First Lien Lenders; (x) the GVR Transaction Committee and its members; (y) the GVR Investigation Committee and its members; (z) the Aliante Debtors and their respective Estates; (aa) Reorganized Aliante Gaming; (bb) the Aliante Lenders, solely in their capacities as Aliante Lenders and each and every Person or entity, including without limitation, a Registered Intermediary Company, designated by any Aliante Lender to receive all or any part of the Distribution in respect of such Aliante Lenders' Allowed Class AGL.1 Claim; (cc) the Aliante Administrative Agent solely in its capacity as such; (dd) the Aliante Transaction Committee and its members, solely in their capacities as such; (ee) the Executive Committee of GVR and its members, solely in their capacities as such; (ff) the Executive Committee of Aliante Gaming and its members, solely in their capacities as such; (gg) ALST Casino Holdco; and (hh) the respective Related Persons of each of the foregoing Entities identified in subsections (a) through (gg) in this defined term.

71.    "*Exculpation*" means the exculpation provision set forth in Article X.D hereof.

72.    "*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under Bankruptcy Code Section 365.

73.    "*Existing Propco Assets*" means any assets owned by Propco as of the Subsidiary Debtors Effective Date, any Equity in or assets of any Subsidiary of SCI that directly or indirectly owns the Equity of Propco, and any assets encumbered by Liens in favor of Propco (excluding any assets not located on a Propco Property and on which Propco's Lien attaches to only an undivided percentage interest in, and less than 100% of, such assets).

74.    "*Fertitta Entertainment*" or "*FG*" means Fertitta Entertainment LLC f/k/a Fertitta Gaming LLC.

75.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases.

76.    "*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing does not exist or has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, no stay pending appeal has been granted or such order shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

77.    "*General Unsecured Claim*" means any Claim against any Debtor that is not: (a) a/an (i) Administrative Claim, (ii) Priority Tax Claim, (iii) Other Priority Claim, (iv) Prepetition

Opco Secured Lenders' Allowed Claim, (v) Prepetition Opco Secured Lenders' Allowed Secured Claim, (vi) GVR First Lien Allowed Claim, (vii) GVR Second Lien Term Loan Claim (viii) Aliante Lenders' Allowed Claim, (ix) Other Secured Claim, (x) Intercompany Claim, (xi) Equity Interest or (xii) Prepetition Opco Secured Lenders Allowed Deficiency Claim; or (b) otherwise classified in a Class other than and separate from a Class of General Unsecured Claims with respect to a Debtor.

78.    "*Global Settlement*" means the compromise and settlement referred to in Article X.B.2(a) of this Joint Plan.

79.    "*Going Private Transaction*" means the buy-out transaction that occurred in November of 2007, pursuant to which, among other things, SCI was acquired by virtue of a merger of FCP Acquisition Sub with and into SCI, with SCI continuing as the surviving corporation, and the sale-and-leaseback transaction with respect to the Propco Properties was consummated.

80.    "*Going Private Transaction Causes of Action*" means any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other legal or equitable remedies against any Person or Entity arising from any transaction comprising or related to the Going Private Transaction, regardless of whether such Claims, Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

81.    "*Governmental or Regulatory Approvals*" means all required or necessary licenses, registrations, findings of suitability, reports, notices, permits and other approvals, filings or submissions of the Nevada Gaming Commission, Nevada State Gaming Control Board and/or applicable local government gaming and liquor licensing body and any other governmental or regulatory licenses, registrations, permits, consents, reports, notices, and other approvals, filings or submissions.

82.    "*Governmental Unit*" means a "governmental unit" as defined in Bankruptcy Code Section 101(27).

83.    "*GVR*" means debtor and debtor in possession Green Valley Ranch Gaming, LLC.

84.    "*GVR 2007 Refinancing*" means the transactions taken by GVR and its members in or around February 16, 2007 whereby GVR incurred certain indebtedness issued in part to make distributions to the GVR members as described in Article III.H of the Disclosure Statement.

85.    "*GVR 2008 Note Distribution*" means all transactions that took place in or around January 2008, whereby the portion of the distribution made by GVR that constituted a loan was forgiven as described in Article III.H of the Disclosure Statement.

86.    "*GVR Assumed Liabilities*" means those Assumed Liabilities (as defined in the GVR Purchase Agreement) to be assumed by GVR Purchaser pursuant to Section 2.3 of the GVR Purchase Agreement.

87. "*GVR Effective Date*" means, the Business Day that this Joint Plan becomes effective as to GVR.

88. "*GVR First Lien Administrative Agent*" means Wilmington Trust FSB in its capacity as the successor administrative agent under the GVR First Lien Credit Agreement.

89. "*GVR First Lien Allowed Claims*" means, collectively, the GVR First Lien Term Loan Claims together with the GVR First Lien Swap Claims in an aggregate principal amount of not less than $571,407,385.06, plus all interest accrued and unpaid thereon as of the GVR Effective Date, and all unpaid fees, costs, expenses and other charges, claims and obligations (including indemnification claims) required to be paid or reimbursed, as applicable, pursuant to the GVR First Lien Credit Agreement and the GVR First Lien Swap Agreement, including, without limitation, the reasonable and documented fees and expenses of Pillsbury Winthrop Shaw Pittman LLP, counsel to the GVR First Lien Administrative Agent, Dewey & Leboeuf LLP and Lionel Sawyer & Collins, counsel to the GVR First Lien Lenders Steering Committee, and Houlihan Lokey Capital, Inc., financial advisor to the GVR First Lien Lenders Steering Committee, which Claims shall be Allowed Claims for all purposes under this Joint Plan in the full amount stated herein and shall not be subject to offset, setoff, recoupment, defense, counterclaim, reduction, subordination or credit of any kind whatsoever.

90. "*GVR First Lien Credit Agreement*" means that certain credit agreement dated as of February 16, 2007 by and between GVR, as borrower, and Bank of America, N.A., as administrative agent, Wells Fargo Bank, N.A., as syndication agent, and Banc of America Securities, LLC, as sole lead arranger and sole book manager, and the lenders from time to time party thereto that provides for a $550 million GVR First Lien Term Loan and for claims arising from the termination of the GVR First Lien Swap Agreement to be secured by a first lien on substantially all of the assets of GVR, excluding only certain specified assets as provided in the GVR Loan Documents.

91. "*GVR First Lien Deed of Trust*" means that certain deed of trust securing a first lien on the real property of GVR.

92. "*GVR First Lien Distribution*" means Cash in the amount of the Purchase Price (as defined in Section 3.1 of the GVR Purchase Agreement).

93. "*GVR First Lien Lenders*" means the GVR First Lien Administrative Agent and the lenders party from time to time to the GVR First Lien Credit Agreement.

94. "*GVR First Lien Security Agreement*" means that certain security agreement dated as of February 16, 2007 securing a first lien on substantially all the assets of GVR, excluding (a) any real property and (b) Cash reserves required to be maintained by GVR in accordance with applicable gaming laws, pursuant to the GVR First Lien Credit Agreement.

95. "*GVR First Lien Swap Agreement*" means that certain ISDA Master Agreement with Wachovia Bank, N.A., dated as of January 26, 2007, along with that certain interest rate swap transaction with a trade date of January 27, 2007 evidenced by an Amended and Restated Swap Transaction Confirmation dated February 8, 2008, and that certain interest rate swap

transaction with a trade date of August 27, 2008 evidenced by an Amended and Restated Swap Transaction Confirmation dated September 18, 2008.

96.    "*GVR First Lien Swap Claims*" means the Claim under the GVR First Lien Swap Agreement arising from termination of the swap transactions thereunder, together with all interest accrued and unpaid thereon as of the GVR Effective Date, and all unpaid reasonable fees, costs, expenses and other charges required to be paid or reimbursed (as applicable) pursuant to the terms of the GVR First Lien Swap Agreement.

97.    "*GVR First Lien Term Loan*" means the $550.0 million secured term loan provided under the GVR First Lien Credit Agreement.

98.    "*GVR First Lien Term Loan Claims*" means any Claim arising from amounts due under the GVR First Lien Term Loan, together with all interest accrued and unpaid thereon as of the GVR Effective Date, and all unpaid reasonable fees, costs, expenses and other charges required to be paid or reimbursed (as applicable) pursuant to the terms of the GVR First Lien Term Loan including, but not limited to, all fees, costs and expenses of the GVR First Lien Administrative Agent under and in connection with the GVR First Lien Credit Agreement.  For the avoidance of doubt, the GVR First Lien Term Loan Claim includes any deficiency Claim arising under the GVR First Lien Term Loan.

99.    "*GVR Investigation Committee*" means the independent investigation committee comprised of William Bible formed on August 27, 2010 to investigate the merits of allegations made by certain parties regarding:  (a) distributions made from the proceeds of the GVR First Lien Credit Agreement; and (b) issues raised in the motion to dismiss filed in the bankruptcy case of GVRS.

100.    "*GVR Lender Plan Support Agreement*" means that certain Plan Support Agreement dated as of March 3, 2011, entered into by and between (a) GVR, (b) certain GVR First Lien Lenders, and (c) Wilmington Trust FSB in its capacity as the administrative agent under the GVR First Lien Credit Agreement, as amended from time to time in accordance with the terms thereof.

101.    "*GVR License Agreement*" means that certain License and Support Agreement between SCI and GVR dated January 6, 2006.

102.    "*GVR Loan Documents*" means the "Loan Documents" as defined in the GVR First Lien Credit Agreement.

103.    "*GVR Operating Agreement*" means that certain operating agreement, dated March 10, 2000, among GVR, GCR Gaming, LLC, and GVRS.

104.    "*GVR Prepetition Transactions*" means the negotiation, formulation, entry, performance, lack of performance of and/or any transactions arising from or pertaining to the GVR First Lien Credit Agreement, the GVR First Lien Security Agreement, the GVR First Lien Swap Agreement, the GVR First Lien Deed of Trust, the GVR Second Lien Credit Agreement, the GVR Second Lien Security Agreement, the formation of GVR, the GVR Operating Agreement, the transactions and distributions that are the subject of the investigation performed

by the GVR Investigation Committee, the GVR 2007 Refinancing, the GVR 2008 Note Distribution, the actions taken by the GVR Transaction Committee and the GVR Transition Services Agreement.

105. "*GVR Prepetition Transactions Causes of Action*" means any and all Claims, Causes of Action, Litigation Claims, Avoidance Actions and any other legal or equitable remedies against any Person or Entity arising from any transaction comprising or related to the GVR Prepetition Transactions, regardless of whether such Claims, Causes of Action, Litigation Claims, Avoidance Actions, or other remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

106. "*GVR Purchase Agreement*" means that certain asset purchase agreement dated as of March 9, 2011 by and between GVR Purchaser and GVR.

107. "*GVR Purchase Price*" means all amounts paid by GVR Purchaser to GVR pursuant to the GVR Purchase Agreement for the purchase of the GVR Purchased Assets.

108. "*GVR Purchased Assets*" shall have the meaning set forth in Section 2.1 of the GVR Purchase Agreement.

109. "*GVR Purchaser*" means Station GVR Acquisition, LLC or its designee(s) or Subsidiaries.

110. "*GVR Second Lien Administrative Agent*" means Bank of New York, N.A. in its capacity as the administrative agent under the GVR Second Lien Credit Agreement.

111. "*GVR Second Lien Credit Agreement*" means that certain credit agreement dated as of February 16, 2007 by and between GVR, as borrower, and Bank of America, N.A., as administrative agent, Banc of America Securities, LLC, as sole lead arranger, and Banc of America Securities, LLC and Wachovia Capital Markets, LLC, as joint book managers and the lenders party thereto that provides for a $250 million GVR Second Lien Term Loan secured by a second lien on substantially all of the assets of GVR, excluding certain specified assets.

112. "*GVR Second Lien Deed of Trust*" means that certain Deed of Trust dated February 16, 2007.

113. "*GVR Second Lien Security Agreement*" means that certain Security Agreement dated as of February 16, 2007, as amended and restated.

114. "*GVR Second Lien Term Loan*" means the $250.0 million term loan provided under the GVR Second Lien Credit Agreement.

115. "*GVR Second Lien Term Loan Claims*" means any and all Claims arising under or related to the GVR Second Lien Term Loan.

116. "*GVR Transaction Committee*" means the independent transaction committee comprised of William Bible and Dr. James E. Nave formed on August 27, 2010 to oversee GVR's sale process and which was and is authorized to: (a) solicit bids from prospective

acquirers of all or substantially all of GVR's assets through an organized marketing process designed to produce the highest or best offer; (b) solicit bids from qualified managers to manage and operate GVR as a reorganized, independently owned business; and (c) oversee and administer the sale process on behalf of GVR by evaluating any proposals submitted to GVR, and undertaking negotiations and finalizing proposals for final consideration and evaluation by the executive committee of GVR.

117. "*GVR Transition Services Agreement*" means that certain form of agreement, along with related documents, in each case in form and substance reasonably satisfactory to the Required GVR Consenting Lenders and the GVR Purchaser, entered into by GVR, FG, SCI and the other parties identified therein which provides for, among other things, transition services to be provided to GVR by SCI during the Chapter 11 Cases, and after the effective date of the SCI Plan, by New Propco, as anticipated successor by assignment to FG.

118. "*GVRS*" means GV Ranch Station, Inc., a debtor and debtor in possession in the SCI Cases (and a Subsidiary Debtor in the Chapter 11 Cases).

119. "*Holdco*" means Station Holdco LLC, formerly known as NP Propco Holdings LLC, a Delaware limited liability company formed by an affiliate of Fertitta Entertainment to serve, along with Voteco, as one of the Equity Interest holders in New Propco. Upon occurrence of the Subsidiary Debtors Effective Date, Holdco will be owned by the Mortgage Lenders, FG and potentially other parties, with additional NPH Equity (as defined in the SCI Plan) available for acquisition through the NPH Investment Rights (as defined in the SCI Plan) and the NPH Warrants (as defined in the SCI Plan).

120. "*Holder*" means a Person or Entity holding a Claim or Administrative Claim against, or Equity Interest in, any Debtor.

121. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of Bankruptcy Code Section 1124.

122. "*Intercompany Claims*" means any Claims, Causes of Action, Avoidance Actions or Litigation Claims of (i) a Subsidiary Debtor against any other Subsidiary Debtor, any SCI Debtor, any Aliante Debtor, or GVR, (ii) an Aliante Debtor against any other Aliante Debtor, any Subsidiary Debtor, any SCI Debtor, or GVR, (iii) GVR against any Aliante Debtor, any Subsidiary Debtor, or any SCI Debtor or (iv) a SCI Debtor against Aliante Gaming, in each case excluding any DIP Facility Claims or any Claim for accrued and unpaid management fees or reimbursable expenses (other than: any management fees owing from Aliante Gaming to any other Debtor or SCI Debtor that accrued on or before the Petition Date, which shall be deemed to be Intercompany Claims).

123. "*IP Assets*" means those assets identified on Schedule 1 of the SCI Plan, all of which will be transferred to IP Holdco pursuant to the New Opco Purchase Agreement.

124. "*IP Holdco*" means the trust or other entity identified as "IP Holdco" in, and formed in accordance with, the New Opco Purchase Agreement.

125.    "*IP License Agreement*" means the license agreement with New Propco in the form attached to the New Opco Purchase Agreement.

126.    "*Joint Plan*" means this *First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 20, 2011).*

127.    "*Joint Plan Modifications Solicitation Letter*" means the "Solicitation Letter to Accompany Proposed Modifications to 'Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC  (Dated March 22, 2011)'  to Include Tropicana Station, Inc. as a Subsidiary Debtor,"  which was included in the Joint Plan Modifications Solicitation Package, dated May 16, 2011, sent by TSI to Holders of Claims in Classes TSI.1 and TSI.3(a).

128.    "*Joint Plan Modifications Solicitation Package*" means the package or packages of documents, including, among other things, the Joint Plan Modifications Solicitation Letter, the Joint Plan, the Disclosure Statement, and a Ballot, sent to holders of Claims in Classes TSI.1 and TSI.3(a) to solicit such holders' votes.

129.    "*Joint Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which hereby are incorporated by reference into, and are an integral part of, this Joint Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, all of which will be Filed with the Bankruptcy Court.

130.    "*Land Loan Agreement*" means that certain Credit Agreement, dated February 7, 2008 by and among CV PropCo, LLC, as borrower, and Deutsche Bank Trust Company Americas, JPMorgan Chase Bank, N.A. and the lenders from time to time party thereto.

131.    "*Land Loan Lenders*" means, collectively, Deutsche Bank Trust Company Americas, JPMorgan Chase Bank, N.A. and Deutsche Bank AG, each in their capacity as a lender under the Land Loan Agreement or holder under the related interest rate swap agreement (each, a "*Land Loan Lender*").

132.    "*Land Loan Lenders' Claims*" means the Claims of the Land Loan Lenders against Subsidiary Debtor CV Holdco, LLC arising in connection with the pledge by CV Holdco, LLC of its Equity Interests in its wholly-owned Subsidiary CV PropCo, LLC, which equity pledge was made in connection with the Land Loan Agreement.

133.    "*Landco Assets*" means those assets identified on Schedule 2 of the SCI Plan.

134.    "*Landco Assets Transfer Agreement*" means those certain agreements pursuant to which (a) all Landco Assets not now owned by CV PropCo, LLC will be transferred to CV PropCo, LLC and (b) all of the Equity Interests in CV PropCo, LLC will be transferred to the designee of the Land Loan Lenders.

135.    "*Lien*" means a "lien" as defined in Bankruptcy Code Section 101(37), and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

136.    "*Litigation Claims*" means the Claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor, Estate or Person may hold against any other Debtor, Estate, Person or Entity.

137.    "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Nevada.

138.    "*Master Lease and License*" means that certain (a) Master Lease, dated as of November 7, 2007, between Propco, as lessor, and SCI, as lessee, with respect to the Propco Properties (the "*Master Lease*") and (b) that certain License and Reservation Service Agreement, dated as of November 7, 2007 between Propco, as licensee, and SCI, as licensor, (the "*License Agreement*").

139.    "*Master Lease Collateral*" means:   (i) all "FF&E" and the "FF&E Reserve Collateral," each as defined in the Master Lease; and (ii) all "Collateral" under and as defined in the Propco Security Agreement.  Section 12.4 of the Master Lease contains a security agreement, pursuant to which SCI pledged, assigned and granted Propco a security interest and an express contractual lien in and to the FF&E and FF&E Reserve Collateral and the Subsidiary Debtor Subtenants pledged, assigned and granted Propco a security interest and an express contractual lien in all such "Collateral" under the Propco Security Agreement.

140.    "*Master Lease Rejection Damage Claim*" means any and all Claims assertable by Propco against SCI in connection with or relating to the rejection of the Master Lease and Master License Agreement pursuant to the SCI Plan.

141.     "*Mezzco Debtors*" means the following SCI Debtors that are proponents of and parties to the SCI Plan:   FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II, LLC; and FCP MezzCo Borrower I, LLC.

142.    "*Mezzco Lenders*" means the lenders to the Mezzco Debtors.

143.    "*Mortgage Lender/FG Restructuring Agreement*" means that certain agreement among FG, the Mortgage Lenders and the other parties thereto dated as of March 24, 2010 (as amended, supplemented or modified from time to time), a copy of which is included in the SCI Plan Supplement.

144.    "*Mortgage Lenders*" means German American Capital Corporation and JPMorgan Chase Bank N.A., as lenders to Propco under the Amended and Restated Loan and Security Agreement, dated as of March 19, 2008.

145.    "*New Aliante Credit Agreement*" means that certain Credit Agreement and related documents providing for the New Secured Aliante Debt in each case in form and substance acceptable to the Required Aliante Consenting Lenders.

146.    "*New Aliante Equity*" means the membership units of Reorganized Aliante Gaming.

147.    "*New Aliante Management Agreement*" means one or more management agreements to be entered into by Reorganized Aliante Gaming and Fertitta Entertainment (or, with the consent of the Required Aliante Consenting Lenders, Fertitta Entertainment's designee(s) or Subsidiaries) governing the management of the Aliante Hotel, substantially in the form(s) to be negotiated and agreed to by the relevant parties and included in the Joint Plan Supplement.

148.    "*New Aliante Transaction Agreements*" means the agreements and documents referred to in Article V.C.3 of the Joint Plan.

149.    "*New FG Management Agreement*" means one or more management agreements pursuant to which affiliates of Fertitta Entertainment will manage the casinos, hotel and other properties owned by New Propco, substantially in the form(s) included in the SCI Plan Supplement.

150.    "*New Land Loan Agreement*" means the Land Loan Agreement, and related documents, in each case in form and substance acceptable to the Mortgage Lenders, as it will be amended and restated upon the occurrence of the Subsidiary Debtors Effective Date.

151.    "*New Landco Holdco*" means New Landco Holdco, LLC.

152.    "*New Opco*" means the direct or indirect Subsidiary or Subsidiaries of New Propco that obtain or acquire ownership, directly or indirectly, of the New Opco Acquired Assets in accordance with the New Opco Purchase Agreement, the SCI Plan, the SCI Confirmation Order and this Joint Plan.

153.    "*New Opco Acquired Assets*" means substantially all of the assets of the Opco Group Sellers (including the IP Assets, and excluding the Excluded Assets (as defined in the SCI Plan)), which are to be acquired by New Propco pursuant to the New Opco Purchase Agreement.

154.    "*New Opco Credit Agreement*" means that certain credit agreement, along with related documents, in each case, in form and substance satisfactory to the Required Opco Consenting Lenders and New Propco, to be entered into by New Opco and the other parties identified therein in connection with New Opco's acquisition of the New Opco Acquired Assets, a copy of which is included in the SCI Plan Supplement and which provides for (i) a new revolving credit facility in the aggregate principal amount of $25 million and (ii) after giving effect to cash payments made to the Prepetition Opco Secured Lenders on the Subsidiary Debtors Effective Date as required hereunder, under the SCI Plan and under the New Opco Purchase Agreement, term loan facilities deemed issued on the Subsidiary Debtors Effective Date in the original aggregate principal amount of approximately $436 million.

155.    "*New Opco FG Management Agreement*"  means one or more management agreements pursuant to which affiliates of Fertitta Entertainment will manage the casinos, hotel and other properties owned by New Opco and its subsidiaries, substantially in the form(s) included in the SCI Plan Supplement.

156.    "*New Opco Implementation Agreement*" and "*New Opco Implementation Agreements*" means, individually, that certain agreement or, collectively, those certain agreements and related documents, in each case in form and substance acceptable to the Required Opco Consenting Lenders,  Mortgage Lenders and FG, pursuant to which New Opco or its designated Subsidiaries will operate the New Opco Acquired Assets, including, but not limited to those agreements identified in Article V.B.10 hereof.

157.    "*New Opco Purchase Agreement*" means that certain Asset Purchase Agreement dated June 7, 2010, by and among the Opco Group Sellers and FG Opco Acquisitions LLC, as amended, supplemented or otherwise modified from time to time, a form of which was filed with the Bankruptcy Court on May 25, 2010 [Docket No. 1526] and was approved by the SCI Confirmation Order.

158.    "*New Opco Purchaser*" means FG Opco Acquisitions, LLC or its designee(s) or Subsidiaries.

159.    "*New Opco Transition Services Agreement*" means that certain form of agreement, along with related documents, in each case in form and substance reasonably satisfactory to the Required Opco Consenting Lenders, New Opco and New Propco, to be entered into by New Opco, New Propco and the other parties identified therein in connection with New Opco's acquisition of the New Opco Acquired Assets, and which provides for, among other things, transition services to be provided to New Opco by New Propco, including reasonable cooperation and collaboration by New Propco with respect to diligence on existing systems, data transfer, testing and acceptance in connection with New Opco's development within one year of the closing of the New Opco Purchase Agreement, a computer system for New Opco that has at least the capacity and functions of the computer systems acquired by New Propco.

160.    "*New Propco*" means Station Casinos, LLC, formerly known as NP Propco LLC, a Nevada limited liability company, and its Subsidiaries, owned by Holdco and Voteco, that will acquire or obtain, directly or indirectly through one or more Subsidiaries, all of the New Propco Acquired Assets, the Equity Interests in CV PropCo, LLC and all of the Landco Assets, and all of the New Opco Acquired Assets, in each case under or in connection with the New Propco Implementation Agreements, the New Opco Purchase Agreement, the confirmed SCI Plan, the SCI Confirmation Order and this Joint Plan.

161.    "*New Propco Acquired Assets*" means, collectively, the New Propco Purchased Assets and the New Propco Transferred Assets.

162.    "*New Propco Credit Agreement*" means that certain Credit Agreement and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG.

163.    "*New Propco Implementation Agreement*" and "*New Propco Implementation Agreements*" means, individually, that certain agreement or, collectively, those certain agreements and related documents set forth in Article V.B.8 hereof pursuant to which New Propco or its designee(s) or designated Subsidiaries will acquire and operate the New Propco Acquired Assets.

164.    "*New Propco LLCA*" means that certain Limited Liability Company Agreement of New Propco and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG.

165.    "*New Propco Non-Compete Agreement*" means that certain Non-Compete Agreement and related documents, in each case in form and substance acceptable to the Mortgage Lenders and FG, by and among Holdco, New Propco, the Mortgage Lenders and their assigns, FG and Frank and Lorenzo Fertitta regarding certain obligations and commitments with respect to future investment and management opportunities (as contemplated by the Mortgage Lender/FG Restructuring Agreement).

166.    "*New Propco Purchased Assets*" means those assets identified on Schedule 2 to SCI Plan all of which will be transferred from SCI, the applicable Subsidiary Debtors, and the other SCI Debtors to New Propco or its designee(s) in accordance with, and subject to the payment of the consideration and, if applicable, assumption of specific liabilities identified in, the Second Amended MLCA and pursuant to the terms and conditions of the New Opco Purchase Agreement subject to the rights of New Propco to elect not to purchase certain of such assets or incur certain of such liabilities.

167.    "*New Propco Retained Available Cash*" means Propco Cash in the amount of $80 million, less any transition costs incurred by Propco or the Mortgage Lenders, which will be transferred to and retained by and for the benefit of New Propco.

168.    "*New Propco Transferred Assets*" means (a) all of Propco's right, title and interests in, to and under the Propco Properties and the Master Lease Collateral, and (b) Propco Cash in an amount equal to the New Propco Retained Available Cash.

169.    "*New Secured Aliante Debt*" means new secured debt in the amount of $45 million to be issued by Reorganized Aliante Gaming on the Aliante Effective Date on the terms set forth in the New Credit Facility Agreement included in the Joint Plan Supplement and secured by a first priority lien on substantially all of Reorganized Aliante Gaming's assets.

170.    "*Non-Guarantor Subsidiary Debtors*" means, collectively, Auburn Development, LLC, Durango Station, Inc., Inspirada Station, LLC, Town Center Station, LLC, Tropicana Acquisitions, LLC, and Vista Holdings, LLC.

171.    "*Notice of Proposed Cure Amounts for Executory Contracts or Unexpired Leases*" means a written notice setting forth (a) the applicable Cure Amount, if any, for executory contracts and unexpired leases to be assumed by Aliante Gaming hereunder, (b) the procedures for filing objections thereto, and (c) the process by which related disputes will be resolved by the Bankruptcy Court.

172.    "*Notice of Intent to Assume and Assign Executory Contract or Unexpired Leases*" has the meaning ascribed to such term in Article VI.B of this Joint Plan.

173.    "*NPH Term Sheet*" means that certain term sheet attached to the SCI Plan as Schedule 6.

174.    "*Opco Administrative Agent*" means Deutsche Bank Trust Company Americas in its capacity as (i) the administrative agent under the Prepetition Opco Credit Agreement and (ii) the collateral agent under the other Prepetition Opco Loan Documents.

175.    "*Opco Cash Collateral Order*" means the *Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(B), (C) and (D) (i) Authorizing the Debtors to (A) Use Cash Collateral; (B) Obtain Unsecured, Subordinated Post-Petition Financing; (C) Make Loans to Non-Debtor Subsidiaries, (ii) Granting Adequate Protection to Prepetition Opco Secured Lenders, and (iii) Granting Related Relief*, entered by the Bankruptcy Court on October 13, 2009 [Docket No. 481].

176.    "*Opco Group Sellers*" means all sellers under the New Opco Purchase Agreement, which are identified in Annex I of the New Opco Purchase Agreement and Schedule II of the SCI Disclosure Statement [Docket No. 1867] and annexed to the Disclosure Statement as Schedule II.

177.    "*Opco Lender Restructuring Support Agreement*" means that certain Restructuring Support Agreement dated as of April 16, 2010 (as amended, supplemented or modified from time to time) by and among the Consenting Opco Lenders, FG and certain of its principals, and certain Subsidiary Debtors.

178.    "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to §§ 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Used in the Ordinary Course of Business*, entered by the Bankruptcy Court in the SCI Cases [Docket No. 355], as such order may be amended from time to time, including during the Chapter 11 Cases.

179.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under Bankruptcy Code Section 507(a), other than a Priority Tax Claim or an Administrative Claim.

180.    "*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, a Secured Claim held by a Governmental Unit arising from a tax liability of a Debtor, GVR First Lien Allowed Claim, GVR Second Lien Term Loan Claim or Secured Claims arising under the Prepetition Opco Loan Documents, the Prepetition Opco Swap Agreement, the Land Loan Agreement, or Aliante Credit Agreement Claims or Aliante Swap Claims.

181.    "*Person*" means a "person" as defined in Section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

182.    "*Petition Date*" means the date on which the Debtors commence the Chapter 11 Cases.

183.    "*Plan Administrator*" means SCI, or such other entity, entities, individual or individuals as may be designated by the Subsidiary Debtors, GVR, Aliante Holding or Aliante Station and approved by the Bankruptcy Court to administer implementation of the SCI Plan and this Joint Plan as it relates to (a) the Subsidiary Debtors, (b) GVR, and (c) Aliante Holding, LLC and Aliante Station, LLC.

184.    "*Prepetition Opco Credit Agreement*" means that certain Credit Agreement, dated as of November 7, 2007, among SCI, as borrower, Deutsche Bank Trust Company Americas, as administrative agent, the other lenders from time to time party thereto, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as joint lead arrangers and joint book runners, JPMorgan Chase Bank, N.A., as syndication agent, and Bank of Scotland plc, Bank of America, N.A., and Wachovia Bank, N.A., as co-documentation agents, as amended, supplemented or otherwise modified from time to time.

185.    "*Prepetition Opco Credit Agreement Claims*" means any and all Claims arising under the Prepetition Opco Credit Agreement, the Opco Cash Collateral Order, and any order entered in the Chapter 11 Cases authorizing the Subsidiary Debtors' use of cash collateral.

186.    "*Prepetition Opco Guaranty Agreement*" means that certain Guaranty Agreement dated as of November 7, 2007 among SCI, certain of the Subsidiary Debtor Guarantors and the Opco Administrative Agent.

187.    "*Prepetition Opco Guaranty Claims*" means any and all Claims arising under the Prepetition Opco Guaranty Agreement.

188.    "*Prepetition Opco Loan Documents*" means, collectively, the Prepetition Opco Credit Agreement, the Prepetition Opco Guaranty Agreement, and each other loan document executed from time to time in connection therewith.

189.    "*Prepetition Opco Secured Lenders*" means the Opco Administrative Agent and the other lenders party from time to time to the Prepetition Opco Loan Documents and the Prepetition Opco Swap Agreement.

190.    "*Prepetition Opco Secured Lenders' Allowed Claim*" means, collectively, the Prepetition Opco Credit Agreement Claim, Prepetition Opco Guaranty Claims and the Prepetition Opco Swap Claim, in an amount of not less than $882,015,849.96, plus all interest accrued and unpaid thereon as of the Subsidiary Debtors Effective Date, and all unpaid fees, costs, expenses and other charges, claims and obligations (including indemnification claims) required to be paid or reimbursed, as applicable, pursuant to the Prepetition Opco Credit Agreement, the Prepetition Opco Swap Agreement, and the Prepetition Opco Guaranty Agreement, which Claim shall be an Allowed Claim for all purposes under this Joint Plan (as it was in the SCI Plan) and in these Chapter 11 Cases (as it was in the SCI Cases) in the full amount stated herein.

191.    "*Prepetition Opco Secured Lenders' Allowed Deficiency Claim*" means that portion of the Prepetition Opco Secured Lenders' Allowed Claim that is not secured by assets of the SCI Debtors or the Subsidiary Debtors, which Claim shall be an Allowed General Unsecured Claim for all purposes under this Joint Plan and in the Chapter 11 Cases.

192.    "*Prepetition Opco Secured Lenders' Allowed Secured Claim*" means that portion of the Prepetition Opco Secured Lenders' Allowed Claim that is secured by assets of the SCI Debtors and the Subsidiary Debtors, which Claim shall be an Allowed Secured Claim for all purposes under this Joint Plan and in these Chapter 11 Cases in an Allowed amount of at least $772 million.

193.    "*Prepetition Opco Swap Agreement*" means that certain Secured Hedge Agreement dated as of February 12, 2008, by and between JPMorgan Chase Bank, N.A. and SCI.

194.    "*Prepetition Opco Swap Claim*" means the secured termination Claim under the Prepetition Opco Swap Agreement, together with all interest accrued and unpaid thereon as of the Subsidiary Debtors Effective Date, and all unpaid reasonable fees, costs, expenses and other charges required to be paid or reimbursed (as applicable) pursuant to the terms of the Prepetition Opco Swap Agreement.

195.    "*Prepetition Solicitation*" or "*Solicitation*" means any and all action taken by the Debtors and their Related Persons in connection with and furtherance of the solicitation of acceptances of this Joint Plan prior to the commencement of the Chapter 11 Cases pursuant to, in furtherance of or otherwise authorized by Bankruptcy Code Section 1125(g).

196.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in Bankruptcy Code Section 507(a)(8).

197.    "*Pro Rata*" means the proportion that (a) the Allowed principal amount of a Claim in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed principal amount of all Claims in such Class (or several Classes taken as a whole), unless this Joint Plan provides otherwise.

198.    "*Professional*" means (a) any Person or Entity employed in the Chapter 11 Cases pursuant to Bankruptcy Code Section 327, 363 or 1103 or otherwise and (b) any Person or Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code Section 503(b)(4), excluding those Persons or Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to the Ordinary Course Professionals Order.

199.    "*Professional Fee Claim*" means a Claim under Bankruptcy Code Section 328, 330(a), 331, 363, or 503 for Accrued Professional Compensation.

200.    "*Professional Fee Escrow Account*" means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Applicable Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

201.    "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation Claims through the Applicable Effective Date as estimated in accordance with Article II.A.2(b) hereof.

202.    "*Professional Fees Bar Date*" means the Business Day that is sixty (60) days after the Applicable Effective Date or such other date as approved by Final Order of the Bankruptcy Court as the deadline or deadlines for asserting Professional Fee Claims.

203.    "*Proof of Claim*" means a proof of Claim or Equity Interest Filed against any Debtor in the Chapter 11 Cases.

204.    "*Propco*" means FCP Propco, LLC, a debtor and debtor in possession in the SCI Cases.

205.    "*Propco Cash*" means all Cash on hand at Propco as of the Subsidiary Debtors Effective Date, immediately prior to all the transfers and allocations pursuant to the SCI Plan as of and following the Subsidiary Debtors Effective Date; provided, however, Propco Cash does not include, and shall not be deemed to include, any "cage cash" utilized at any of the Propco Properties.

206.    "*Propco Commitment*" means that certain firm and irrevocable put commitment of the Put Parties, pursuant to that certain Put Party Commitment Agreement, dated August 5, 2010, which was approved by the Court pursuant to its Order [Docket No. 1932] entered on August 13, 2010, to purchase through Blockerco (as defined in the SCI Plan):  (a) $35.3 million of NPH Equity (as defined in the SCI Plan), to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors (as defined in the SCI Plan) or the Put Parties (pursuant to the proviso to the definition of "Allocated Pro Rata Share of NPH Investment Rights" contained in the SCI Plan) in accordance with the terms and conditions of the Propco Rights Offering (as defined in the SCI Plan); and (b) up to a maximum of $100 million (*i.e.*, up to a maximum of $64.7 million in addition to the $35.3 million commitment specified in clause (a)) of NPH Equity in connection with any Equity Raises (as defined in the NPH Term Sheet) consummated during the Upsizing Commitment Period (as defined in the NPH Term Sheet), to the extent such NPH Equity is not otherwise purchased by Eligible Opco Unsecured Creditors (pursuant to the proviso to the definition of "Allocated Pro Rata Share of NPH Investment Rights" contained in the SCI Plan) or the Put Parties in accordance with the terms and conditions of the NPH Term Sheet.

207.    "*Propco Lenders*" means the Mortgage Lenders.

208.    "*Propco Properties*" means, collectively:  (a) Palace Station Hotel & Casino, (b) Boulder Station Hotel & Casino, (c) Sunset Station Hotel & Casino, and (d) Red Rock Casino Resort Spa; each such individual property, a "Propco Property."

209.    "*Propco Security Agreement*" means that certain Security Agreement (All Furniture, Fixtures and Equipment), dated as of November 7, 2007 by and among Propco and the Subsidiary Debtor Subtenants.

210.    "*Put Parties*" means certain entities affiliated with Fidelity Management & Research Company, Oaktree Capital Management, L.P. and Serengeti Asset Management, L.P. that are reasonably acceptable to the SCI Debtors, FG and the Propco Lenders.

211.    "*Put Parties Support Agreement*" means that certain Support Agreement dated as of July 28, 2010 (as amended, supplemented or modified from time to time) by and among the Put Parties, the Mortgage Lenders, FG, Frank J. Fertitta III and Lorenzo Fertitta.

212.    "*Put Party Commitment Agreement*" means that certain Put Party Commitment Agreement, dated August 5, 2010, which was approved by the Court pursuant to its Order [Docket No. 1932] entered on August 13, 2010.

213.    "*Registered Intermediary Company*" means an entity (a) formed by a Holder of an Allowed Class AGL.1 Claim to hold and vote such Holder's allocable share of New Aliante Equity (after giving effect to the Election Mechanism) and (b) which may register and be found suitable as an intermediary company under Sections 463.486 and .585 of the Nevada Revised Statutes pursuant to an application with the Nevada Gaming Commission. Each Registered Intermediary Company shall issue two types of equity interests, one with voting rights to be held by individuals or entities who, as of the Aliante Effective Date with respect to Aliante Gaming, will be licensed for gaming regulatory purposes, and the other without voting rights to be held by individuals or entities who, as of the Aliante Effective Date with respect to Aliante Gaming, will not be licensed for gaming regulatory purposes.

214.    "*Related Persons*" means, with respect to any Person or Entity, such Person's or Entity's predecessors (other than any predecessors of the Aliante Administrative Agent), successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and Subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, and any Person or Entity claiming by or through any of them.

215.    "*Release*" or "*Releases*" means the release or releases given by the Releasing Parties to the Released Parties as set forth in Article X.C hereof.

216.    "*Released Party*" means, individually and collectively:   (a) the Subsidiary Debtors and their respective Estates; (b) the SCI Debtors and their respective Estates; (c) Fertitta Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco; (g) Voteco; (h) the Plan Administrator, solely in its capacity as such; (i) the Mortgage Lenders, solely in their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as such; (k) the Land Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders, solely in their capacity as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its capacity as such; (o) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (p) Colony Capital, LLC;   (q) the Settling Lenders, but only if all of the applicable terms and conditions of the Settling Lenders Stipulation are satisfied by the Settling Lenders; (r) the SCI Committee and its members, underlined provided that the Committee Support Stipulation (as defined in the SCI Plan) has not been terminated as of the Subsidiary Debtors Effective Date; (s) the Put

Parties, <u>provided</u> that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Subsidiary Debtors Effective Date; (t) GVR and its Estate; (u) the GVR First Lien Administrative Agent, solely in its capacity as such; (v) GVR Purchaser; (w) the GVR First Lien Lenders, solely in their capacities as GVR First Lien Lenders; (x) the GVR Transaction Committee and its members; (y) the GVR Investigation Committee and its members; (z) the Aliante Debtors and their respective Estates; (aa) Reorganized Aliante Gaming; (bb) the Aliante Lenders, solely in their capacities as Aliante Lenders and each and every Person or entity, including without limitation, a Registered Intermediary Company, designated by any Aliante Lender to receive all or any part of the Distribution in respect of such Aliante Lenders' Allowed Class AGL.1 Claim; (cc) the Aliante Administrative Agent solely in its capacity as such; (dd) the Aliante Transaction Committee and its members, solely in their capacities as such; (ee) the Executive Committee of GVR and its members, solely in their capacities as such; (ff) the Executive Committee of Aliante Gaming and its members, solely in their capacities as such; (gg) ALST Casino Holdco; and (hh) the respective Related Persons of each of the foregoing Entities identified in subsections (a) through (gg) in this defined term.

217.    "*Releasing Party*" has the meaning set forth in Article X.C hereof.

218.    "*Reorganized Aliante Gaming*" means Aliante Gaming, as reorganized as of the Aliante Effective Date with respect to Aliante Gaming in accordance with this Joint Plan, and its successors.

219.    "*Required Aliante Consenting Lenders*" means:

(a)    with respect to the following, Aliante Lenders holding not less than 70 % in amount of the Aliante Lenders' Allowed Claims:

(i)    any material amendment, modification, waiver or supplement of or to the Joint Plan;

(ii)    any material matter relating to the form or substance of an order confirming the Joint Plan; or

(iii)    any material matter relating to the form or substance of any document or agreement necessary to implement the transactions or restructuring contemplated in the Joint Plan with respect to the Aliante Debtors, including, without limitation, the New Aliante Management Agreement, the New Aliante Credit Agreement, the Amended Aliante Gaming Operating Agreement, the ALST Casino Holdco Operating Agreement and the Registration Rights Agreement or any material amendment, modification, waiver or supplement of or to any such document or agreement.

(b)    with respect to all other matters, Aliante Lenders holding more than 50 % in amount of the Aliante Lenders' Allowed Claims.

220.    "*Required Consenting Lenders*" means, collectively, the Required Aliante Consenting Lenders, the Required GVR Consenting Lenders, and the Required Opco Consenting Lenders.

221. "*Required GVR Consenting Lenders*" means Consenting GVR Lenders holding more than 50% in principal amount of the outstanding obligations under the GVR First Lien Credit Agreement.

222. "*Required Opco Consenting Lenders*" means three or more Consenting Opco Lenders holding greater than 66.6% of the aggregate Claims of all Consenting Opco Lenders (without including in such determination the termination value of the Prepetition Opco Swap Agreement prior to its termination) provided, that, all obligations under the Prepetition Opco Swap Agreement (whether or not terminated) remain *pari passu* with all other Prepetition Opco Secured Lenders' Allowed Claims held by all Consenting Opco Lenders.

223. "*Schedule of Executory Contracts and Unexpired Leases To Be Assumed and Assigned to GVR Purchaser*" means the Schedule to be Filed with the Bankruptcy Court that identifies each Executory Contract and Unexpired Lease that will be assumed by GVR and assigned to GVR Purchaser.

224. "*Schedule of Executory Contracts and Unexpired Leases To Be Assumed and Assigned to New Propco*" means the Schedule to be Filed with the Bankruptcy Court that identifies each Executory Contract and Unexpired Lease that will be assumed by a Subsidiary Debtor and assigned to New Propco.

225. *Schedule of Executory Contracts and Unexpired Leases To Be Assumed and Assigned to Reorganized Aliante Gaming*" means the Schedule to be Filed with the Bankruptcy Court that identifies each Executory Contract and Unexpired Lease that will be assumed and assigned to Reorganized Aliante Gaming.

226. "*Schedule of Executory Contracts and Unexpired Leases To Be Rejected by Aliante Gaming*" means the Schedule to be Filed with the Bankruptcy Court that identifies each Executory Contract and Unexpired Lease that will be rejected by Aliante Gaming.

227. "*Scheduled*" means with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules, if any, filed by the Debtors.

228. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs filed by the Debtors pursuant to Bankruptcy Code Section 521 and the applicable Bankruptcy Rules, unless the filing of such Schedules is excused by Bankruptcy Court Order, as such Schedules may be amended, modified, or supplemented from time to time.

229. "*Schedules of Executory Contracts and Unexpired Leases*" means, collectively, the Schedule of Executory Contracts and Unexpired Leases To Be Assumed and Assigned to GVR Purchaser, the Schedule of Executory Contracts and Unexpired Leases To Be Assumed and Assigned to New Propco and the Schedule of Executory Contracts and Unexpired Leases to Be Assumed and Assigned to Reorganized Aliante Gaming.

230. "*SCI*" means Station Casinos, Inc., debtor and debtor in possession in the SCI Cases.

231.    "*SCI Cases*" means the chapter 11 cases of SCI, Propco and their affiliated debtors and debtors in possession, United States Bankruptcy Court for the District of Nevada, Reno Division Case nos. 09-5240 through 09-52487 (commenced on July 28, 2009).

232.    "*SCI Committee*" means the official committee of unsecured creditors appointed by the United States Trustee in the SCI Cases pursuant to Bankruptcy Code Section 1102, as reconstituted from time to time.

233.    "*SCI Confirmation Order*" means the *Order Confirming* "*First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)*" entered in the SCI Cases on August 27, 2010 [Docket No. 2039].

234.    "*SCI Debtors*" means SCI, Propco and their Affiliates that commenced the SCI Cases, and whose bankruptcy estates are the subject of the SCI Plan and SCI Confirmation Order.

235.    "*SCI Findings and Conclusions*" means the *Findings of Fact and Conclusions of Law Regarding Confirmation of First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)*, entered in the SCI Cases on August 27, 2010 [Docket No. 2038].

236.    "*SCI Plan*" means the *First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)* [Docket No. 1863], as amended by *Debtors' Motion for Order under 11 U.S.C. § 1127 Approving Modifications to* "*First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)*" [Docket No. 1997] and confirmed by the SCI Confirmation Order and as modified pursuant to the Bankruptcy Court's *Order Under 11 U.S.C. §§ 1127(b) and 1142 (I) Approving Procedures and Disclosure Documents for (A) Soliciting Binding Participations in Propco Rights Offering, (B) Establishing Blockercos to Hold NPH Warrants and NPH Investment Rights, and (C) Distributing NPH Warrants, Cashing Out Certain Other NPH Warrants, and Making Cy Pres Distribution in Lieu of Certain Other NPH Warrants; (II) Modifying Plan; and (III) Confirming Modified Plan* [Docket No. 2518] which such order is a Final Order.

237.    "*SCI Plan Supplement*" means the supplement to the SCI Plan filed by the SCI Debtors on August 11, 2010 in the SCI Cases [Docket No. 1914].

238.    "*SCI Retained Assets*" means any assets of SCI or any of its Subsidiaries specified on Schedule 4 to the SCI Plan and such other assets of SCI and its Subsidiaries that are designated in or pursuant to the New Opco Purchase Agreement as Excluded Assets (as defined in the SCI Plan) (and are not Existing Propco Assets or New Propco Purchased Assets).

239.    "*SCI Swap Counterparty*" means Deutsche Bank AG, solely in its capacity as counterparty to Propco under that certain interest rate swap transaction dated as of November 29, 2007 with Reference Global No. N723525N between Propco and Deutsche Bank, AG, as further modified by that certain Novation Confirmation dated as of March 5, 2008.

240.    "*Second Amended MLCA*" means that certain *Second Amended and Restated Master Lease Compromise Agreement (2nd Revised) dated May 24, 2010,* by and among SCI and certain of its affiliates, on the one hand, and Propco, on the other hand, as and to the extent approved by the "*Order Approving Revised Second Amended and Restated Master Lease Compromise Agreement Pursuant to U.S.C. §§ 105(a), 363(b)(1), 365(d)(3) and 365(d)(4)(B)(ii) and Fed. R. Bankr. P. 9019*" entered by the Bankruptcy Court in the SCI Cases on July 14, 2010 [Docket No. 1778] and subject to the terms and conditions of the SCI Confirmation Order and SCI Findings and Conclusions.

241.    "*Secured Claim*" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code Section 506(a) or, in the case of setoff, pursuant to Bankruptcy Code Section 553.

242.    "*Settling Lenders*" means the Prepetition Opco Secured Lenders referred to as the "Settling Lenders" in the Settling Lenders Stipulation.

243.    "*Settling Lenders Stipulation*" means the stipulation that is Exhibit 1 to the *Debtors' Motion For Order Approving Global Settlement With Independent Lender Group* filed in the SCI Cases [Docket No. 1965].

244.    "*Solicitation Package*" means the package or packages of documents, including, among other things, this Joint Plan, the Disclosure Statement, the Joint Plan Modifications Solicitation Package, and a Ballot, sent to holders of Claims in Voting Classes to solicit such holders' votes in favor of this Joint Plan.

245.    "*Solicitation Procedures*" means one or more sets of procedures set forth by the Debtors that govern the solicitation of votes in favor of this Joint Plan.

246.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

247.    "*Subsidiary"* or "*Subsidiaries*" means, with respect to any Person or Entity, a wholly-owned or partially owned subsidiary, individually, or subsidiaries, collectively, of such Person or Entity.

248.    "*Subsidiary Debtor Guarantors*" means, collectively, Boulder Station, Inc., Centerline Holdings, LLC, Charleston Station, LLC, Fiesta Station, Inc., Fresno Land Acquisitions, LLC, Gold Rush Station, LLC, Green Valley Station, Inc., GVRS, Lake Mead Station, Inc., LML Station, LLC, Magic Star Station, LLC, Palace Station Hotel & Casinos, Inc., Past Enterprises, Inc., Rancho Station, LLC, Santa Fe Station, Inc., Sonoma Land Holdings, LLC, Station Holdings, Inc., STN Aviation, Inc., Sunset Station, Inc., Texas Station, LLC and Tropicana Station, Inc.

249. "*Subsidiary Debtor Secured Guarantors*" means, collectively, Boulder Station, Inc., Charleston Station, LLC, Fiesta Station, Inc., Fresno Land Acquisitions, LLC, Gold Rush Station, LLC, Green Valley Station, Inc., GVRS, Lake Mead Station, Inc., Magic Star Station, LLC, Palace Station Hotel & Casinos, Inc., Past Enterprises, Inc., Rancho Station, LLC, Santa Fe Station, Inc., Sonoma Land Holding, LLC, Station Holdings, Inc., Sunset Station, Inc., Texas Station, LLC and Tropicana Station, Inc.

250. "*Subsidiary Debtor Subtenants*" means, collectively, Charleston Station, LLC, Boulder Station, Inc., Palace Station Hotel and Casino, Inc. and Sunset Station, Inc.

251. "*Subsidiary Debtor Unsecured Guarantors*" means, collectively, Centerline Holdings, LLC, LML Station, LLC, and STN Aviation, Inc.

252. "*Subsidiary Debtors*" means the direct and indirect subsidiaries of SCI that are debtors in these Chapter 11 Cases and that are listed on the page immediately following the caption page of this Joint Plan under the heading "Subsidiary Debtors" and identified in footnote 1 hereof.

253. "*Subsidiary Debtors Effective Date*" means, as to the Subsidiary Debtors, the Business Day that this Joint Plan becomes effective as to the Subsidiary Debtors.

254. "*Superpriority Notes Election*" means the election available to New Propco under, and subject to the terms of, the New Opco Purchase Agreement to elect to pay up to $43 million of the cash purchase price required under the New Opco Purchase Agreement in the form of Super Priority Notes (as defined therein) issued pursuant to the New Propco Credit Agreement.

255. "*Texas Station Ground Lease*" means that certain Ground Lease, dated as of June 1, 1995 entered into by Texas Station, LLC, as tenant, and Texas Gambling Hall & Hotel, Inc., as landlord, as amended, restated, renewed, modified or supplemented from time to time, and subject to the terms and conditions of—but not amended by—that certain Agreement (Re Texas Ground Lease) entered into as of April 16, 2010 by and among: (i) the Propco Lenders (as defined therein), (ii) Texas Gambling Hall & Hotel, Inc., and (iii) Texas Station, LLC and filed with the Bankruptcy Court on May 28, 2010 [Docket No. 1542].

256. "*Transferred Aliante Hotel Assets*" means all of each Debtor's (other than Aliante Gaming or GVR) and each SCI Debtor's rights, title and interest to, in and under any property or assets owned by such entities that relate to and are associated exclusively with Aliante Gaming or the Aliante Hotel as more specifically described in "Transfer of Certain Assets" under the Management Agreement.

257. "*TSI*" means Tropicana Station, Inc.

258. "*TSI Voting Deadline*" means May 20, 2011 at 4:00 p.m. prevailing Pacific Time, which is the date and time by which all Ballots, as applicable, must be received by the Voting and Claims Agent, or such other date and time as may be established by the Bankruptcy Court with respect to Voting Classes TSI.1 and TSI.3(a).

259.    "*TSI Voting Record Date*" means the date for determining which Holders of Claims against and Equity Interests in TSI are entitled to vote to accept or reject the Joint Plan Modifications, which date is May 16, 2011 at 5:00 p.m.,  prevailing Pacific Time.

260.    "*Undeliverable*" means, with respect to Distributions, Distributions that are made pursuant to the SCI Plan or this Joint Plan and that are returned to the Debtors or their agent(s), as applicable, as not deliverable to the intended recipient of such Distribution for any reason.

261.    "*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under Bankruptcy Code Section 365.

262.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of Bankruptcy Code Section 1124.

263.    "*Unknown Causes of Action*" means any Causes of Action that currently exist or may subsequently arise and which have not been otherwise set forth herein or in any schedule of Causes of Action, because the facts upon which such Cause of Action are based are not currently or fully known by the Debtors.

264.    "*Voteco*" means Station Voteco LLC, formerly known as NP Voteco LLC, the Delaware limited liability company to be owned by certain individuals who, as of the Subsidiary Debtors Effective Date, will be licensed for gaming regulatory purposes, that will serve, along with Holdco, as one of the Equity Interest holders in New Propco as of the Subsidiary Debtors Effective Date.

265.    "*Voting and Claims Agent*" means Kurtzman Carson Consultants.

266.    "*Voting Classes*" means, collectively, AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a), CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a), GVRG.2, GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a), PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1, SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1, TS.3(a), TSI.1 and TSI.3(a).

267.    "*Voting Deadline*" means April 11, 2011 at 4:00 p.m. prevailing Pacific Time, which is the date and time by which all Ballots, as applicable, must be received by the Voting and Claims Agent, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

268.    "*Voting Record Date*" means the date for determining which Holders of Claims and Equity Interests are entitled to vote to accept or reject this Joint Plan, as applicable, which date is March 18, 2011 at 5:00 p.m. prevailing Pacific Time.

## ARTICLE II.

## TREATMENT OF ADMINISTRATIVE CLAIMS,
## PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS

Pursuant to Bankruptcy Code Section 1123(a)(1), the Claims against each of the Debtors set forth in this Article II are not classified within any Classes. The Holders of such Claims are not entitled to vote on this Joint Plan. The treatment of the Claims set forth below is consistent with the requirements of Bankruptcy Code Section 1129(a)(9)(A).

None of the Debtors' Chapter 11 Cases will be substantively consolidated for any purpose. Accordingly, Holders of unclassified Claims against a particular Debtor shall have their Claim allowed and treated only in such respective Debtor's Estate.

A.    **Administrative Claims**

Except as otherwise provided herein, on the later of an Applicable Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash (other than Cash comprising the GVR First Lien Distribution) from the applicable Debtor(s) against which the Administrative Claim is Allowed for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by such Holder.

Notwithstanding anything to the contrary in this Joint Plan, Aliante Gaming or Reorganized Aliante Gaming shall pay Allowed Administrative Claims of Aliante Gaming that remain unpaid after the Aliante Effective Date.

Any and all DIP Facility Claims shall receive no Distribution under this Joint Plan and shall be extinguished and discharged upon the Subsidiary Debtors Effective Date.

1.    **Bar Date for Administrative Claims**

Except as otherwise provided in this Article II.A hereof, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims but do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims and such Administrative Claims shall be deemed discharged as of the Applicable Effective Date. All such Claims, as of the Applicable Effective Date, shall be subject to the permanent injunction set forth in Article X.F hereof. Objections to such requests must be Filed by the later of (a) 120 days after the applicable Administrative Claims Bar Date and (b) 90 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by order of the Bankruptcy Court.

2.    **Professional Compensation and Reimbursement Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Applicable Effective Date must File an application for final allowance of such Professional Fee Claim against the applicable Debtor and its Estate no later than the Professional Fees Bar Date; <u>provided</u> that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered to the Debtors before the Applicable Effective Date in accordance with the terms of the Ordinary Course Professionals Order and without further Bankruptcy Court order.  Objections to any Professional Fee Claim must be Filed by the later of (a) 90 days after the Applicable Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim.

(a)    **Professional Fee Escrow Account**

Unless otherwise provided in an applicable Confirmation Order, on an Applicable Effective Date, the applicable Debtor(s) shall establish and fund a Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals (allocated among the Debtors based on the estimates of each Debtor's Professional Fee Claims); provided, however, that no portion of the GVR First Lien Distribution or Distributions on account of the Prepetition Opco Secured Lenders' Allowed Claim provided for under this Joint Plan shall be used for such purpose. Aliante Gaming shall submit its estimate of Aliante Gaming's Professional Fee Claims to the Required Aliante Consenting Lenders for review and consultation prior to funding its Professional Fee Escrow Account.

Unless otherwise provided in an applicable Confirmation Order, the Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of any Debtor's Estate.  The amount of Allowed Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order.  When all Allowed Accrued Professional Compensation Claims have been paid in full, any amounts remaining in the Professional Fee Escrow Account shall be distributed based on contributions from a specific Debtor, to, as applicable, the New Opco Purchaser, the GVR Purchaser or Reorganized Aliante Gaming.  The Professional Fee Claims will be paid by and apportioned among each of the Subsidiary Debtors and among the Aliante Debtors and GVR according to the Professional Fee Claims incurred and to be incurred by each such Debtor.

(b)    **Professional Fee Reserve Amount**

To ensure payment for unbilled fees and expenses incurred through the Applicable Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Applicable Effective Date and shall deliver such estimate to the Debtors no later than five (5) Business Days prior to the anticipated Applicable Effective Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such

Professional.  If a Professional does not provide an estimate, the Debtor (in consultation with the New Opco Purchaser, the GVR Purchaser or the Required Aliante Consenting Lenders as the case may be) may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Applicable Effective Date shall comprise the Professional Fee Reserve Amount.

**B.**      **Priority Tax Claims**

The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Applicable Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by such Holder; or (c) pursuant to and in accordance with Bankruptcy Code Sections 1129(a)(9)(C) and (D), Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; provided, further, that Priority Tax Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors without further notice to or order of the Bankruptcy Court; provided, however, that no portion of the GVR First Lien Distribution and no portion of the Distribution to be made to the Prepetition Opco Secured Lenders hereunder shall be used for such purpose under any circumstances.

**C.**      **Other Priority Claims**

Each Allowed Other Priority Claim, if any, shall, in full and final satisfaction of such Claim, be paid in full in Cash by the applicable Debtor upon the latest of:  (i) the Applicable Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor. Notwithstanding anything to the contrary in this Joint Plan, Aliante Gaming or Reorganized Aliante Gaming shall pay Allowed Priority Claims of Aliante Gaming that remain unpaid after the Aliante Effective Date; provided, however, that no portion of the GVR First Lien Distribution and no portion of the Distribution to be made to the Prepetition Opco Secured Lenders shall be used for such purpose under any circumstances.

**ARTICLE III.**

**CLASSIFICATION AND TREATMENT
OF ALL OTHER CLAIMS AND EQUITY INTERESTS**

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant hereto and pursuant to Bankruptcy Code Sections 1122 and 1123(a)(1).  This Joint Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the

Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Applicable Effective Date.  If there are no Claims or Equity Interests in a particular Class, then such Class of Claims or Equity Interests shall not exist for all purposes of this Joint Plan.

A.    **Classification of Claims and Equity Interests Against Subsidiary Debtors**

(1)    **Auburn Development, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| AD.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| AD.2 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| AD.3 | Intercompany Claims | Impaired | Deemed to Reject |
| AD.4 | Equity Interests | Impaired | Deemed to Reject |

(2)    **Boulder Station, Inc.**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| BS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| BS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| BS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| BS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| BS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| BS.5 | Equity Interests | Impaired | Deemed to Reject |

### (3)    Centerline Holdings, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| CH.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| CH.2(a) | Prepetition Opco Secured Lenders' Allowed Claims | Impaired | Entitled to Vote |
| CH.2(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| CH.3 | Intercompany Claims | Impaired | Deemed to Reject |
| CH.4 | Equity Interests | Impaired | Deemed to Reject |

### (4)    Charleston Station, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| CS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| CS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| CS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| CS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| CS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| CS.5 | Equity Interests | Impaired | Deemed to Reject |

### (5)    CV HoldCo, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| CVH.1 | Land Loan Lenders' Claims | Impaired | Entitled to Vote |
| CVH.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| CVH.3 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| CVH.4 | Intercompany Claims | Impaired | Deemed to Reject |
| CVH.5 | Equity Interests | Impaired | Deemed to Reject |

**(6)**    **Durango Station, Inc.**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| DS.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| DS.2 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| DS.3 | Intercompany Claims | Impaired | Deemed to Reject |
| DS.4 | Equity Interests | Impaired | Deemed to Reject |

**(7)**    **Fiesta Station, Inc.**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| FS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| FS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| FS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| FS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| FS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| FS.5 | Equity Interests | Impaired | Deemed to Reject |

**(8)**    **Fresno Land Acquisitions, LLC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| FLA.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| FLA.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| FLA.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| FLA.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| FLA.4 | Intercompany Claims | Impaired | Deemed to Reject |
| FLA.5 | Equity Interests | Impaired | Deemed to Reject |

### (9)    Gold Rush Station, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| GR.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| GR.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| GR.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| GR.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| GR.4 | Intercompany Claims | Impaired | Deemed to Reject |
| GR.5 | Equity Interests | Impaired | Deemed to Reject |

### (10)    Green Valley Station, Inc.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| GVS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| GVS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| GVS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| GVS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| GVS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| GVS.5 | Equity Interests | Impaired | Deemed to Reject |

### (11)    GV Ranch Station, Inc.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| GVRS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| GVRS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| GVRS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| GVRS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| GVRS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| GVRS.5 | Equity Interests | Impaired | Deemed to Reject |

### (12)    Inspirada Station, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| IS.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| IS.2 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| IS.3 | Intercompany Claims | Impaired | Deemed to Reject |
| IS.4 | Equity Interests | Impaired | Deemed to Reject |

### (13)    Lake Mead Station, Inc.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| LM.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| LM.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| LM.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| LM.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| LM.4 | Intercompany Claims | Impaired | Deemed to Reject |
| LM.5 | Equity Interests | Impaired | Deemed to Reject |

### (14)    LML Station, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| LML.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| LML.2(a) | Prepetition Opco Secured Lenders' Allowed Claims | Impaired | Entitled to Vote |
| LML.2(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| LML.3 | Intercompany Claims | Impaired | Deemed to Reject |
| LML.4 | Equity Interests | Impaired | Deemed to Reject |

### (15)    Magic Star Station, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| MS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| MS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| MS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| MS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| MS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| MS.5 | Equity Interests | Impaired | Deemed to Reject |

**(16)**  **Palace Station Hotel & Casinos, Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| PSHC.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| PSHC.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| PSHC.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| PSHC.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| PSHC.4 | Intercompany Claims | Impaired | Deemed to Reject |
| PSHC.5 | Equity Interests | Impaired | Deemed to Reject |

**(17)**  **Past Enterprises, Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| PE.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| PE.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| PE.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| PE.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| PE.4 | Intercompany Claims | Impaired | Deemed to Reject |
| PE.5 | Equity Interests | Impaired | Deemed to Reject |

### (18)    Rancho Station, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| RS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| RS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| RS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| RS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| RS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| RS.5 | Equity Interests | Impaired | Deemed to Reject |

### (19)    Santa Fe Station, Inc.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| SF.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| SF.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| SF.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| SF.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| SF.4 | Intercompany Claims | Impaired | Deemed to Reject |
| SF.5 | Equity Interests | Impaired | Deemed to Reject |

### (20)    SC Durango Development LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| SCDD.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| SCDD.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| SCDD.3 | Intercompany Claims | Impaired | Deemed to Reject |
| SCDD.4 | Equity Interests | Impaired | Deemed to Reject |

### (21)    **Sonoma Land Holdings, LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| SL.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| SL.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| SL.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| SL.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| SL.4 | Intercompany Claims | Impaired | Deemed to Reject |
| SL.5 | Equity Interests | Impaired | Deemed to Reject |

### (22)    **Station Holdings, Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| SH.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| SH.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| SH.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| SH.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| SH.4 | Intercompany Claims | Impaired | Deemed to Reject |
| SH.5 | Equity Interests | Impaired | Deemed to Reject |

### (23)    STN Aviation, Inc.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| STN.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| STN.2(a) | Prepetition Opco Secured Lenders' Allowed Claims | Impaired | Entitled to Vote |
| STN.2(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| STN.3 | Intercompany Claims | Impaired | Deemed to Reject |
| STN.4 | Equity Interests | Impaired | Deemed to Reject |

### (24)    Sunset Station, Inc.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| SS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| SS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| SS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| SS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| SS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| SS.5 | Equity Interests | Impaired | Deemed to Reject |

### (25)    Texas Station, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| TS.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| TS.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TS.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| TS.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| TS.4 | Intercompany Claims | Impaired | Deemed to Reject |
| TS.5 | Equity Interests | Impaired | Deemed to Reject |

### (26)    Town Center Station, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| TCS.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TCS.2 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| TCS.3 | Intercompany Claims | Impaired | Deemed to Reject |
| TCS.4 | Equity Interests | Impaired | Deemed to Reject |

### (27)    Tropicana Acquisitions, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| TA.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TA.2 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| TA.3 | Intercompany Claims | Impaired | Deemed to Reject |
| TA.4 | Equity Interests | Impaired | Deemed to Reject |

### (28)    Tropicana Station, Inc.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| TSI.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| TSI.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TSI.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| TSI.3(b) | General Unsecured Claims | Unimpaired | Deemed to Accept |
| TSI.4 | Intercompany Claims | Impaired | Deemed to Reject |
| TSI.5 | Equity Interests | Impaired | Deemed to Reject |

### (29)    Vista Holdings, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| VH.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| VH.2 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| VH.3 | Intercompany Claims | Impaired | Deemed to Reject |
| VH.4 | Equity Interests | Impaired | Deemed to Reject |

## B.    Classification of Claims and Equity Interests Against Aliante Debtors

### (1)    Aliante Holding, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| AHL.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| AHL.2 | General Unsecured Claims | Impaired | Deemed to Reject |
| AHL.3 | Intercompany Claims | Impaired | Deemed to Reject |
| AHL.4 | Equity Interests | Impaired | Deemed to Accept |

### (2)    Aliante Station LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| ASL.1 | Prepetition Opco Secured Lenders' Allowed Secured Claims | Impaired | Entitled to Vote |
| ASL.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| ASL.3(a) | Prepetition Opco Secured Lenders' Allowed Deficiency Claims | Impaired | Entitled to Vote |
| ASL.3(b) | General Unsecured Claims | Impaired | Deemed to Reject |
| ASL.4 | Intercompany Claims | Impaired | Deemed to Reject |
| ASL.5 | Equity Interests | Impaired | Deemed to Reject |

### (3)    Aliante Gaming LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| AGL.1 | Aliante Lenders' Allowed Claims | Impaired | Entitled to Vote |
| AGL.2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| AGL.3 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| AGL.4 | Intercompany Claims | Impaired | Deemed to Reject |
| AGL.5 | Equity Interests | Impaired | Deemed to Reject |

## C.    Classification of Claims and Equity Interests Against GVR

### (1)    Green Valley Ranch Gaming, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| GVRG.1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| GVRG.2 | GVR First Lien Allowed Claims | Impaired | Entitled to Vote |
| GVRG.3 | GVR Second Lien Term Loan Claims | Impaired | Deemed to Reject |
| GVRG.4 | General Unsecured Claims | Impaired | Deemed to Reject |
| GVRG.5 | Equity Interests | Impaired | Deemed to Reject |

**D.**     **Treatment of Claims and Equity Interests Against the Subsidiary Debtors**

**(1)**     **Auburn Development, LLC**

The assets of Auburn Development, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Auburn Development, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class AD.1 – Other Secured Claims against Auburn Development, LLC

*Classification:*  Each Class AD.1 Claim is a separate Secured Claim against Auburn Development, LLC.  Accordingly, this Class shall be divided into subclasses designated by letters of the alphabet (Class AD.1A, Class AD.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class AD.1 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class AD.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class AD.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class AD.1 is an Unimpaired Class, and the Holders of Class AD.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class AD.1 Claims are not entitled to vote to accept or reject this Joint Plan.

Class AD.2 – General Unsecured Claims against Auburn Development, LLC

*Treatment and Voting:*  Holders of Allowed Claims in Class AD.2 shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class AD.2 is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class AD.2 are not entitled to vote to accept or reject this Joint Plan.

Class AD.3 – Intercompany Claims against Auburn Development, LLC

*Treatment and Voting:*  Holders of Class AD.3 Intercompany Claims against Auburn Development, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class AD.3 is Impaired and is conclusively

deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class AD.3 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class AD.4 – Equity Interests in Auburn Development, LLC</u>

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class AD.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class AD.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class AD.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

## **(2)    Boulder Station, Inc.**

The assets of Boulder Station, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Boulder Station, Inc. that are New Propco Acquired Assets shall be transferred as required under the SCI Plan.

<u>Class BS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Boulder Station, Inc.</u>

*Classification/Allowance:* Class BS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Boulder Station, Inc.

*Treatment*: On account of their Allowed Class BS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*: This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

<u>Class BS.2 – Other Secured Claims against Boulder Station, Inc.</u>

*Classification:* Each Class BS.2 Claim is a separate Secured Claim against Boulder Station, Inc. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class BS.2A, Class BS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class BS.2 Claims are unaltered by this Joint Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class BS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim

shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class BS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class BS.2 is an Unimpaired Class, and the Holders of Class BS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class BS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class BS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class BS. 3(b) – General Unsecured Claims against Boulder Station, Inc.

*Classification:* Class BS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Boulder Station, Inc., and Class BS.3(b) consists of the General Unsecured Claims against Boulder Station, Inc.

*Treatment and Voting:* Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class BS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement. Class BS.3(a) is Impaired and Holders of Claims in Class BS.3(a) are entitled to vote to accept or reject this Joint Plan. Holders of Allowed Claims in Class BS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class BS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class BS.3(b) are not entitled to vote to accept or reject this Joint Plan.

Class BS.4 – Intercompany Claims against Boulder Station, Inc.

*Treatment and Voting:* Holders of Class BS.4 Intercompany Claims against Boulder Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class BS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class BS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class BS.5 –Equity Interests in Boulder Station, Inc.

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class BS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class BS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class BS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

  **(3)**  **Centerline Holdings, LLC**

  The assets of Centerline Holdings, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Centerline Holdings, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

  Class CH.1 – Other Secured Claims against Centerline Holdings, LLC

  *Classification:*  Each Class CH.1 Claim is a separate Secured Claim against Centerline Holdings, LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class CH.1A, Class CH.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

  *Treatment:*  The legal, equitable and contractual rights of the Holders of Class CH.1 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class CH.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class CH.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

  *Voting:*  Class CH.1 is an Unimpaired Class, and the Holders of Class CH.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class CH.1 Claims are not entitled to vote to accept or reject this Joint Plan.

  Class CH.2(a) – Prepetition Opco Secured Lenders' Allowed Claims and Class CH.2(b) – General Unsecured Claims against Centerline Holdings, LLC

  *Classification:*  Class CH.2(a) consists of the Prepetition Opco Secured Lenders' Allowed Claims against Centerline Holdings, LLC, and Class CH.2(b) consists of the General Unsecured Claims against Centerline Holdings, LLC.

  *Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Claims in Class CH.2(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class CH.2(a) is Impaired and Holders of Claims in Class CH.2(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class CH.2(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class CH.2(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class CH.2(b) are not entitled to vote to accept or reject this Joint Plan.

### Class CH.3 – Intercompany Claims against Centerline Holdings, LLC

*Treatment and Voting:*  Holders of Class CH.3 Intercompany Claims against Centerline Holdings, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class CH.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class CH.3 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class CH.4 – Equity Interests in Centerline Holdings, LLC

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class CH.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class CH.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class CH.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

### (4)    **Charleston Station, LLC**

The assets of Charleston Station, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Charleston Station, LLC that are New Propco Acquired Assets shall be transferred as required under the SCI Plan.

### Class CS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Charleston Station, LLC

*Classification/Allowance:*  Class CS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Charleston Station, LLC.

*Treatment*:  On account of their Allowed Class CS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

### Class CS.2 – Other Secured Claims against Charleston Station, LLC

*Classification:*  Each Class CS.2 Claim is a separate Secured Claim against Charleston Station, LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class CS.2A, Class CS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class CS.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class CS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class CS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class CS.2 is an Unimpaired Class, and the Holders of Class CS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class CS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class CS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class CS. 3(b) – General Unsecured Claims against Charleston Station, LLC</u>

*Classification:*  Class CS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Charleston Station, LLC, and Class CS.3(b) consists of the General Unsecured Claims against Charleston Station, LLC.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class CS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class CS.3(a) is Impaired and Holders of Claims in Class CS.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class CS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class CS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class CS.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class CS.4 – Intercompany Claims against Charleston Station, LLC</u>

*Treatment and Voting:*  Holders of Class CS.4 Intercompany Claims against Charleston Station, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class CS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class CS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class CS.5 – Equity Interests in Charleston Station, LLC</u>

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class CS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class CS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently,

the Holders of Class CS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(5)     CV HoldCo, LLC**

The assets of CV HoldCo, LLC shall be delivered to a designee of the Land Loan Lenders, which designee will be New Propco or a Subsidiary thereof, pursuant to the Landco Assets Transfer Agreement, Second Amended MLCA and New Opco Purchase Agreement.

Class CVH.1 – Land Loan Lenders' Claims Against CV HoldCo LLC

*Classification:*  Class CVH.1 consists of the Land Loan Lenders' Claims against CV HoldCo, LLC.

*Treatment*:  On account of their Class CVH.1 Claims, the Land Loan Lenders will receive their collateral, the Equity Interest of CV HoldCo, LLC in its wholly owned Subsidiary CV PropCo, LLC.

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class CVH.2 – Other Secured Claims against CV HoldCo, LLC

*Classification:*  Each Class CVH.2 Claim is a separate Secured Claim against CV HoldCo, LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class CVH.2A, Class CVH.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class CVH.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class CVH.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class CVH.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class CVH.2 is an Unimpaired Class, and the Holders of Class CVH.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class CVH.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class CVH.3 – General Unsecured Claims against CV HoldCo, LLC

*Classification; Treatment and Voting:* Holders of Allowed Class CVH.3 General Unsecured Claims against CV HoldCo, LLC shall be paid in full or otherwise left unimpaired by this Joint Plan. Class CVH.3 is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Class CVH.3 Claims are not entitled to vote to accept or reject this Joint Plan.

Class CVH.4 – Intercompany Claims against CV HoldCo, LLC

*Treatment and Voting:* Holders of Class CVH.4 Intercompany Claims against CV HoldCo, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class CVH.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class CVH.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class CVH.5 – Equity Interests in CV HoldCo, LLC

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class CVH.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class CVH.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class CVH.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(6)    Durango Station, Inc.**

The assets of Durango Station, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Durango Station, Inc. that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class DS.1 – Other Secured Claims against Durango Station, Inc.

*Classification:* Each Class DS.1 Claim is a separate Secured Claim against Durango Station, Inc. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class DS.1A, Class DS.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class DS.1 Claims are unaltered by this Joint Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class DS.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class DS.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of

all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class DS.1 is an Unimpaired Class, and the Holders of Class DS.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class DS.1 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class DS.2 – General Unsecured Claims against Durango Station, Inc.

*Classification; Treatment and Voting:* Holders of Allowed Claims in Class DS.2 General Unsecured Claims shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class DS.2 is not Impaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class DS.2 are not entitled to vote to accept or reject this Joint Plan.

### Class DS.3 – Intercompany Claims against Durango Station, Inc.

*Treatment and Voting:* Holders of Class DS.3 Intercompany Claims against Durango Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class DS.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class DS.3 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class DS.4 – Equity Interests in Durango Station, Inc.

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class DS.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class DS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class DS.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

### (7) **Fiesta Station, Inc.**

The assets of Fiesta Station, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Fiesta Station, Inc. that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

### Class FS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Fiesta Station, Inc.

*Classification/Allowance:* Class FS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Fiesta Station, Inc.

*Treatment*:  On account of their Allowed Class FS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class FS.2 – Other Secured Claims against Fiesta Station, Inc.

*Classification:*  Each Class FS.2 Claim is a separate Secured Claim against Fiesta Station, Inc.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class FS.2A, Class FS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class FS.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class FS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class FS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class FS.2 is an Unimpaired Class, and the Holders of Class FS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class FS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class FS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class FS. 3(b) – General Unsecured Claims against Fiesta Station, Inc.

*Classification:*  Class FS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Fiesta Station, Inc., and Class FS.3(b) consists of the General Unsecured Claims against Fiesta Station, Inc.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class FS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class FS.3(a) is Impaired and Holders of Claims in Class FS.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class FS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class FS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to

Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class FS.3(b) are not entitled to vote to accept or reject this Joint Plan.

### Class FS.4 – Intercompany Claims against Fiesta Station, Inc.

*Treatment and Voting:*  Holders of Class FS.4 Intercompany Claims against Fiesta Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class FS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class FS.5 – Equity Interests in Fiesta Station, Inc.

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class FS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class FS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class FS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

### (8)    Fresno Land Acquisitions, LLC

The assets of Fresno Land Acquisitions, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Fresno Land Acquisitions, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

### Class FLA.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Fresno Land Acquisitions, LLC

*Classification/Allowance:*  Class FLA.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Fresno Land Acquisitions, LLC.

*Treatment*:  On account of their Allowed Class FLA.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

### Class FLA.2 – Other Secured Claims against Fresno Land Acquisitions, LLC

*Classification:*    Each Class FLA.2 Claim is a separate Secured Claim. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class FLA.2A, Class FLA.2B and so on), so that each Holder of any Other Secured Claim

against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class FLA.2 Claims are unaltered by this Joint Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class FLA.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class FLA.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class FLA.2 is an Unimpaired Class, and the Holders of Class FLA.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class FLA.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class FLA.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class FLA. 3(b) – General Unsecured Claims against Fresno Land Acquisitions, LLC

*Classification:* Class FLA.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Fresno Land Acquisitions, LLC, and Class FLA.3(b) consists of the General Unsecured Claims against Fresno Land Acquisitions, LLC.

*Treatment and Voting:* Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class FLA.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement. Class FLA.3(a) is Impaired and Holders of Claims in Class FLA.3(a) are entitled to vote to accept or reject this Joint Plan. Holders of Allowed Claims in Class FLA.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class FLA.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class FLA.3(b) are not entitled to vote to accept or reject this Joint Plan.

Class FLA.4 – Intercompany Claims against Fresno Land Acquisitions, LLC

*Treatment and Voting:* Holders of Class FLA.4 Intercompany Claims against Fresno Land Acquisitions, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class FLA.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FLA.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class FLA.5 – Equity Interests in Fresno Land Acquisitions, LLC

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class FLA.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class FLA.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class FLA.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

### (9)  **Gold Rush Station, LLC**

The assets of Gold Rush Station, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Gold Rush Station, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class GR.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Gold Rush Station, LLC

*Classification/Allowance:* Class GR.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Gold Rush Station, LLC.

*Treatment*: On account of their Allowed Class GR.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*: This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class GR.2 – Other Secured Claims against Gold Rush Station, LLC

*Classification:* Each Class GR.2 Claim is a separate Secured Claim against Gold Rush Station, LLC. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class GR.2A, Class GR.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class GR.2 Claims are unaltered by this Joint Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class GR.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class GR.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the

Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class GR.2 is an Unimpaired Class, and the Holders of Class GR.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class GR.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class GR.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class GR. 3(b) – General Unsecured Claims against Gold Rush Station, LLC</u>

*Classification:*  Class GR.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Gold Rush Station, LLC, and Class GR.3(b) consists of the General Unsecured Claims against Gold Rush Station, LLC.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class GR.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class GR.3(a) is Impaired and Holders of Claims in Class GR.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class GR.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class GR.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class GR.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class GR.4 – Intercompany Claims against Gold Rush Station, LLC</u>

*Treatment and Voting:*  Holders of Class GR.4 Intercompany Claims against Gold Rush Station, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class GR.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class GR.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class GR.5 – Equity Interests in Gold Rush Station, LLC</u>

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class GR.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class GR.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class GR.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(10)    Green Valley Station, Inc.**

The assets of Green Valley Station, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Green Valley Station, Inc. that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

<u>Class GVS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Green Valley Station, Inc.</u>

*Classification/Allowance:*  Class GVS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Green Valley Station, Inc.

*Treatment*:  On account of their Allowed Class GVS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

<u>Class GVS.2 – Other Secured Claims against Green Valley Station, Inc.</u>

*Classification:*  Each Class GVS.2 Claim is a separate Secured Claim against Green Valley Station, Inc.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class GVS.2A, Class GVS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class GVS.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class GVS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class GVS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class GVS.2 is an Unimpaired Class, and the Holders of Class GVS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class GVS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class GVS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class GVS. 3(b) – General Unsecured Claims against Green Valley Station, Inc.</u>

*Classification:*  Class GVS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Green Valley Station, Inc., and Class GVS.3(b) consists of the General Unsecured Claims against Green Valley Station, Inc.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class GVS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class GVS.3(a) is Impaired and Holders of Claims in Class GVS.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class GVS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class GVS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class GVS.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class GVS.4 – Intercompany Claims against Green Valley Station, Inc.</u>

*Treatment and Voting:*  Holders of Class GVS.4 Intercompany Claims against Green Valley Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class GVS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class GVS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class GVS.5 – Equity Interests in Green Valley Station, Inc.</u>

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class GVS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class GVS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class GVS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(11)  GV Ranch Station, Inc.**

<u>Class GVRS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against GV Ranch Station, Inc.</u>

*Classification/Allowance:*  Class GVRS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against GV Ranch Station, Inc.

*Treatment*:  On account of their Allowed Class GVRS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

<u>Class GVRS.2 – Other Secured Claims against GV Ranch Station, Inc.</u>

*Classification:*  Each Class GVRS.2 Claim is a separate Secured Claim against GV Ranch Station, Inc.  Accordingly, this Class will be divided into subclasses designated by

letters of the alphabet (Class GVRS.2A, Class GVRS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class GVRS.2 Claims are unaltered by this Joint Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class GVRS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class GVRS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class GVRS.2 is an Unimpaired Class, and the Holders of Class GVRS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class GVRS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class GVRS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class GVRS. 3(b) – General Unsecured Claims against GV Ranch Station, Inc.</u>

*Classification:* Class GVRS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against GV Ranch Station, Inc., and Class GVRS.3(b) consists of the General Unsecured Claims against GV Ranch Station, Inc.

*Treatment and Voting:* Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class GVRS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement. Class GVRS.3(a) is Impaired and Holders of Claims in Class GVRS.3(a) are entitled to vote to accept or reject this Joint Plan. Holders of Allowed Claims in Class GVRS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class GVRS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class GVRS.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class GVRS.4 – Intercompany Claims against GV Ranch Station, Inc.</u>

*Treatment and Voting:* Holders of Class GVRS.4 Intercompany Claims against GV Ranch Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class GVRS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class GVS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class GVRS.5 – Equity Interests in GV Ranch Station, Inc.

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class GVRS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class GVRS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class GVRS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(12)**    **Inspirada Station, LLC**

The assets of Inspirada Station, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Inspirada Station, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class IS.1 – Other Secured Claims against Inspirada Station, LLC

*Classification:*  Each Class IS.1 Claim is a separate Secured Claim against Inspirada Station, LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class IS.1A, Class IS.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class IS.1 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class IS.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class IS.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class IS.1 is an Unimpaired Class, and the Holders of Class IS.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class IS.1 Claims are not entitled to vote to accept or reject this Joint Plan.

Class IS.2 – General Unsecured Claims against Inspirada Station, LLC

*Classification; Treatment and Voting:*  Holders of Allowed Claims in Class IS.2 General Unsecured Claims shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class IS.2 is not Impaired and is conclusively deemed to have accepted this Joint Plan

pursuant to section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class IS.2 is not entitled to vote to accept or reject this Joint Plan.

### Class IS.3 – Intercompany Claims against Inspirada Station, LLC

*Treatment and Voting:* Holders of Class IS.3 Intercompany Claims against Inspirada Station, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class IS.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class IS.3 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class IS.4 – Equity Interests in Inspirada Station, LLC

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class IS.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class IS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class IS.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(13)** **Lake Mead Station, Inc.**

The assets of Lake Mead Station, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Lake Mead Station, Inc. that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

### Class LM.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Lake Mead Station, Inc.

*Classification/Allowance:* Class LM.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Lake Mead Station, Inc.

*Treatment*: On account of their Allowed Class LM.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*: This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

### Class LM.2 – Other Secured Claims against Lake Mead Station, Inc.

*Classification:* Each Class LM.2 Claim is a separate Secured Claim against Lake Mead Station, Inc. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class LM.2A, Class LM.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other

Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class LM.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class LM.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class LM.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class LM.2 is an Unimpaired Class, and the Holders of Class LM.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class LM.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class LM.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class LM. 3(b) – General Unsecured Claims against Lake Mead Station, Inc.</u>

*Classification:*  Class LM.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Lake Mead Station, Inc., and Class LM.3(b) consists of the General Unsecured Claims against Lake Mead Station, Inc.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class LM.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class LM.3(a) is Impaired and Holders of Claims in Class LM.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class LM.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class LM.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class LM.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class LM.4 – Intercompany Claims against Lake Mead Station, Inc.</u>

*Treatment and Voting:*  Holders of Class LM.4 Intercompany Claims against Lake Mead Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class LM.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class LM.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class LM.5 – Equity Interests in Lake Mead Station, Inc.</u>

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class LM.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether

surrendered for cancellation or otherwise.  Class LM.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class LM.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

> **(14)**    **LML Station, LLC**

The assets of LML Station, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of LML Station, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class LML.1 – Other Secured Claims against LML Station, LLC

*Classification:*  Each Class LML.1 Claim is a separate Secured Claim against LML Station, LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class LML.1A, Class LML.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class LML.1 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class LML.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class LML.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class LML.1 is an Unimpaired Class, and the Holders of Class LML.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class LML.1 Claims are not entitled to vote to accept or reject this Joint Plan.

Class LML.2(a) – Prepetition Opco Secured Lenders' Allowed Claims and Class LML.2(b) – General Unsecured Claims against LML Station, LLC

*Classification:*   Class LML.2(a) consists of the Prepetition Opco Secured Lenders' Allowed Claims against LML Station, LLC, and Class CH.2(b) consists of the General Unsecured Claims against LML Station, LLC.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Claims in Class LML.2(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class LML.2(a) is Impaired and Holders of Claims in Class LML.2(a) are

entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class LML.2(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class LML.2(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class LML.2(b) are not entitled to vote to accept or reject this Joint Plan.

Class LML.3 – Intercompany Claims against LML Station, LLC

*Treatment and Voting:*  Holders of Class LML.3 Intercompany Claims against LML Station, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class LML.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class LML.3 Claims are not entitled to vote to accept or reject this Joint Plan.

Class LML.4 – Equity Interests in LML Station, LLC

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class LML.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class LML.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class LML.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(15)    Magic Star Station, LLC**

The assets of Magic Star Station, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Magic Star Station, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class MS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Magic Star Station, LLC

*Classification/Allowance:*  Class MS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Magic Star Station, LLC.

*Treatment*:  On account of their Allowed Class MS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

<u>Class MS.2 – Other Secured Claims against Magic Star Station, LLC</u>

*Classification:*  Each Class MS.2 Claim is a separate Secured Claim against Magic Star Station, LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class MS.2A, Class MS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class MS.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class MS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class MS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class MS.2 is an Unimpaired Class, and the Holders of Class MS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class MS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class MS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class MS.3(b) – General Unsecured Claims against Magic Star Station, LLC</u>

*Classification:*  Class MS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Magic Star Station, LLC, and Class MS.3(b) consists of the General Unsecured Claims against Magic Star Station, LLC.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class MS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class MS.3(a) is Impaired and Holders of Claims in Class MS.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class MS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class MS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class MS.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class MS.4 – Intercompany Claims against Magic Star Station, LLC</u>

*Treatment and Voting:*  Holders of Class MS.4 Intercompany Claims against Magic Star Station, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class MS.4 is Impaired and is conclusively deemed to

have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class MS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class MS.5 – Equity Interests in Magic Star Station, LLC

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class MS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class MS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class MS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

### (16)    Palace Station Hotel & Casinos, Inc.

The assets of Palace Station Hotel & Casino, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Palace Station Hotel & Casinos, Inc. that are New Propco Acquired Assets shall be transferred as required under the SCI Plan.

### Class PSHC.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Palace Station Hotel & Casinos, Inc.

*Classification/Allowance:* Class PSHC.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Palace Station Hotel & Casinos, Inc.

*Treatment*: On account of their Allowed Class PSHC.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*: This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

### Class PSHC.2 – Other Secured Claims against Palace Station Hotel & Casinos, Inc.

*Classification:* Each Class PSHC.2 Claim is a separate Secured Claim against Palace Station Hotel & Casinos, Inc. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class PSHC.2A, Class PSHC.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class PSHC.2 Claims are unaltered by this Joint Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class PSHC.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim

shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class PSHC.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class PSHC.2 is an Unimpaired Class, and the Holders of Class PSHC.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class PSHC.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class PSHC.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class PSHC. 3(b) – General Unsecured Claims against Palace Station Hotel & Casinos, Inc.

*Classification:* Class PSHC.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Palace Station Hotel & Casinos, Inc., and Class PSHC.3(b) consists of the General Unsecured Claims against Palace Station Hotel & Casinos, Inc.

*Treatment and Voting:* Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class PSHC.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement. Class PSHC.3(a) is Impaired and Holders of Claims in Class PSHC.3(a) are entitled to vote to accept or reject this Joint Plan. Holders of Allowed Claims in Class PSHC.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class PSHC.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class PSHC.3(b) are not entitled to vote to accept or reject this Joint Plan.

Class PSHC.4 – Intercompany Claims against Palace Station Hotel & Casinos, Inc.

*Treatment and Voting:* Holders of Class PSHC.4 Intercompany Claims against Palace Station Hotel & Casinos, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class PSHC.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class PSHC.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class PSHC.5 – Equity Interests in Palace Station Hotel & Casinos, Inc.

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class PSHC.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class PSHC.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the

Bankruptcy Code.  Consequently, the Holders of Class PSHC.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

### (17)    Past Enterprises, Inc.

The assets of Past Enterprises, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Past Enterprises, Inc. that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class PE.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Past Enterprises, Inc.

*Classification/Allowance:*  Class PE.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Past Enterprises, Inc.

*Treatment*:  On account of their Allowed Class PE.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class PE.2 – Other Secured Claims against Past Enterprises, Inc.

*Classification:*  Each Class PE.2 Claim is a separate Secured Claim against Past Enterprises, Inc.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class PE.2A, Class PE.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class PE.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class PE.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class PE.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class PE.2 is an Unimpaired Class, and the Holders of Class PE.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the

Bankruptcy Code.  Therefore, the Holders of Class PE.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class PE.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class PE.3(b) – General Unsecured Claims against Past Enterprises, Inc.

*Classification:*  Class PE.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Past Enterprises, Inc., and Class PE.3(b) consists of the General Unsecured Claims against Past Enterprises, Inc.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class PE.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class PE.3(a) is Impaired and Holders of Claims in Class PE.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class PE.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class PE.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class PE.3(b) are not entitled to vote to accept or reject this Joint Plan.

Class PE.4 – Intercompany Claims against Past Enterprises, Inc.

*Treatment and Voting:*  Holders of Class PE.4 Intercompany Claims against Past Enterprises, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class PE.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class PE.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class PE.5 – Equity Interests in Past Enterprises, Inc.

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class PE.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class PE.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class PE.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(18)    Rancho Station, LLC**

The assets of Rancho Station, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Rancho Station, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

<u>Class RS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Rancho Station, LLC</u>

*Classification/Allowance:*  Class RS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Rancho Station, LLC.

*Treatment*:  On account of their Allowed Class RS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

<u>Class RS.2 – Other Secured Claims against Rancho Station, LLC</u>

*Classification:*  Each Class RS.2 Claim is a separate Secured Claim against Rancho Station, LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class RS.2A, Class RS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class RS.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class RS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class RS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class RS.2 is an Unimpaired Class, and the Holders of Class RS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class RS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class RS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class RS. 3(b) – General Unsecured Claims against Rancho Station, Inc.</u>

*Classification:*  Class RS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Rancho Station, Inc., and Class RS.3(b) consists of the General Unsecured Claims against Rancho Station, Inc.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class RS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class RS.3(a) is Impaired and Holders of Claims in Class RS.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class RS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class RS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class RS.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class RS.4 – Intercompany Claims against Rancho Station, LLC</u>

*Treatment and Voting:*  Holders of Class RS.4 Intercompany Claims against Rancho Station, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class RS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class RS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class RS.5 – Equity Interests in Rancho Station, LLC</u>

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class RS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class RS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class RS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(19)    Santa Fe Station, Inc.**

The assets of Santa Fe Station, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Santa Fe Station, Inc. that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

<u>Class SF.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Santa Fe Station, Inc.</u>

*Classification/Allowance:*  Class SF.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Santa Fe Station, Inc.

*Treatment*:  On account of their Allowed Class SF.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

<u>Class SF.2 – Other Secured Claims against Santa Fe Station, Inc.</u>

*Classification:*  Each Class SF.2 Claim is a separate Secured Claim against Santa Fe Station, Inc.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class SF.2A, Class SF.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class SF.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class SF.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class SF.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class SF.2 is an Unimpaired Class, and the Holders of Class SF.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class SF.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class SF.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class SF. 3(b) – General Unsecured Claims against Santa Fe Station, Inc.</u>

*Classification:*  Class SF.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Santa Fe Station, Inc., and Class SF.3(b) consists of the General Unsecured Claims against Santa Fe Station, Inc.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class SF.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class SF.3(a) is Impaired and Holders of Claims in Class SF.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class SF.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class SF.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class SF.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class SF.4 – Intercompany Claims against Santa Fe Station, Inc.</u>

*Treatment and Voting:*  Holders of Class SF.4 Intercompany Claims against Santa Fe Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class SF.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class SF.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class SF.5 – Equity Interests in Santa Fe Station, Inc.

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class SF.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class SF.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class SF.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(20)    SC Durango Development, LLC**

Class SCDD.1 – Other Secured Claims against SC Durango Development, LLC

*Classification:*  Each Class SCDD.1 Claim is a separate Secured Claim against SC Durango Development LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class SCDD.1A, Class SCDD.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class SCDD.1 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class SCDD.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class SCDD.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class SCDD.1 is an Unimpaired Class, and the Holders of Class SCDD.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class SCDD.1 Claims are not entitled to vote to accept or reject this Joint Plan.

Class SCDD.2 – General Unsecured Claims against SC Durango Development LLC

*Treatment:*  Holders of Class SCDD.2 General Unsecured Claims against SC Durango Development LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class SCDD.2 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class SCDD.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class SCDD.3 – Intercompany Claims against SC Durango Development, LLC</u>

*Treatment and Voting:* Holders of Class SCDD.3 Intercompany Claims against SC Durango Development, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class SCDD.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class SCDD.3 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class SCDD.4 – Equity Interests in SC Durango Development LLC</u>

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class SCDD.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class SCDD.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class SCDD.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(21)    Sonoma Land Holdings, LLC**

The assets of Sonoma Land Holdings, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Sonoma Land Holdings, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

<u>Class SL.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Sonoma Land Holdings, LLC</u>

*Classification/Allowance:* Class SL.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Sonoma Land Holdings, LLC.

*Treatment*: On account of their Allowed Class SL.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*: This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

<u>Class SL.2 – Other Secured Claims against Sonoma Land Holdings, LLC</u>

*Classification:* Each Class SL.2 Claim is a separate Secured Claim against Sonoma Land Holdings, LLC. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class SL.2A, Class SL.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class SL.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class SL.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class SL.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class SL.2 is an Unimpaired Class, and the Holders of Class SL.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class SL.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class SL.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class SL.3(b) – General Unsecured Claims against Sonoma Land Holdings, LLC</u>

*Classification:*  Class SL.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Sonoma Land Holdings, LLC, and Class SL.3(b) consists of the General Unsecured Claims against Sonoma Land Holdings, LLC.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class SL.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class SL.3(a) is Impaired and Holders of Claims in Class SL.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class SL.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class SL.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class SL.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class SL.4 – Intercompany Claims against Sonoma Land Holdings, LLC</u>

*Treatment and Voting:*  Holders of Class SL.4 Intercompany Claims against Sonoma Land Holdings, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class SL.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class SL.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class SL.5 – Equity Interests in Sonoma Land Holdings, LLC</u>

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class SL.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class SL.5 is Impaired and is conclusively deemed to

have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class SL.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

### (22)   **Station Holdings, Inc.**

The assets of Station Holdings, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Station Holdings, Inc. that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class SH.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Station Holdings, Inc.

*Classification/Allowance:* Class SH.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Station Holdings, Inc.

*Treatment*: On account of their Allowed Class SH.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*: This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class SH.2 – Other Secured Claims against Station Holdings, Inc.

*Classification:* Each Class SH.2 Claim is a separate Secured Claim against Station Holdings, Inc. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class SH.2A, Class SH.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class SH.2 Claims are unaltered by this Joint Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class SH.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class SH.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class SH.2 is an Unimpaired Class, and the Holders of Class SH.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class SH.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class SH.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class SH. 3(b) – General Unsecured Claims against Station Holdings, Inc.</u>

*Classification:* Class SH.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Station Holdings, Inc., and Class SH.3(b) consists of the General Unsecured Claims against Station Holdings, Inc.

*Treatment and Voting:* Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class SH.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement. Class SH.3(a) is Impaired and Holders of Claims in Class SH.3(a) are entitled to vote to accept or reject this Joint Plan. Holders of Allowed Claims in Class SH.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class SH.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class SH.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class SH.4 – Intercompany Claims against Station Holdings, Inc.</u>

*Treatment and Voting:* Holders of Class SH.4 Intercompany Claims against Station Holdings, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class SH.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class SH.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class SH.5 – Equity Interests in Station Holdings, Inc.</u>

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class SH.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class SH.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class SH.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(23)    STN Aviation, Inc.**

The assets of STN Aviation, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of STN Aviation, Inc. that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

<u>Class STN.1 – Other Secured Claims against STN Aviation, Inc.</u>

*Classification:*  Each Class STN.1 Claim is a separate Secured Claim against STN Aviation, Inc.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class STN.1A, Class STN.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class STN.1 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class STN.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class STN.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class STN.1 is an Unimpaired Class, and the Holders of Class STN.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class STN.1 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class STN.2(a) – Prepetition Opco Secured Lenders' Allowed Claims and Class STN.2(b) – General Unsecured Claims against STN Aviation, Inc.</u>

*Classification:*  Class STN.2(a) consists of the Prepetition Opco Secured Lenders' Allowed Claims against STN Aviation, Inc., and Class STN.2(b) consists of the General Unsecured Claims against STN Aviation, Inc.

*Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Claims in Class STN.2(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement.  Class STN.2(a) is Impaired and Holders of Claims in Class STN.2(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class STN.2(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class STN.2(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class STN.2(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class STN.3 – Intercompany Claims against STN Aviation, Inc.</u>

*Treatment and Voting:*  Holders of Class STN.3 Intercompany Claims against STN Aviation, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class STN.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class STN.3 Claims are not entitled to vote to accept or reject this Joint Plan.

Class STN.4 – Equity Interests in STN Aviation, Inc.

*Treatment and Voting:*   On the Subsidiary Debtors Effective Date, all Class STN.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class STN.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class STN.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

### (24)   Sunset Station, Inc.

The assets of Sunset Station, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement.  To the extent applicable, the assets of Sunset Station, Inc. that are New Propco Acquired Assets shall be transferred as required under the SCI Plan.

Class SS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Sunset Station, Inc.

*Classification/Allowance:*   Class SS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Sunset Station, Inc. in the amount of not less than $772 million.

*Treatment*:  On account of their Allowed Class SS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class SS.2 – Other Secured Claims against Sunset Station, Inc.

*Classification:*  Each Class SS.2 Claim is a separate Secured Claim against Sunset Station, Inc.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class SS.2A, Class SS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class SS.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class SS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class SS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors

Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class SS.2 is an Unimpaired Class, and the Holders of Class SS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class SS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class SS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class SS. 3(b) – General Unsecured Claims against Sunset Station, Inc.

*Classification:* Class SS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Sunset Station, Inc., and Class SS.3(b) consists of the General Unsecured Claims against Sunset Station, Inc.

*Treatment and Voting:* Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class SS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement. Class SS.3(a) is Impaired and Holders of Claims in Class SS.3(a) are entitled to vote to accept or reject this Joint Plan. Holders of Allowed Claims in Class SS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class SS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class SS.3(b) are not entitled to vote to accept or reject this Joint Plan.

Class SS.4 – Intercompany Claims against Sunset Station, Inc.

*Treatment and Voting:* Holders of Class SS.4 Intercompany Claims against Sunset Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class SS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class SS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class SS.5 – Equity Interests in Sunset Station, Inc.

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class SS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class SS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class SS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

## (25)    **Texas Station, LLC**

The assets of Texas Station, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Texas Station, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

<u>Class TS.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Texas Station, LLC</u>

*Classification/Allowance:*  Class TS.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Texas Station, LLC.

*Treatment*:  On account of their Allowed Class TS.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

<u>Class TS.2 – Other Secured Claims against Texas Station, LLC</u>

*Classification:*  Each Class TS.2 Claim is a separate Secured Claim against Texas Station, LLC.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class TS.2A, Class TS.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class TS.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class TS.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class TS.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class TS.2 is an Unimpaired Class, and the Holders of Class TS.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class TS.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class TS.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class TS. 3(b) – General Unsecured Claims against Texas Station, LLC</u>

*Classification:*  Class TS.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Texas Station, LLC, and Class TS.3(b) consists of the General Unsecured Claims against Texas Station, LLC.

*Treatment and Voting:* Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class TS.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement. Class TS.3(a) is Impaired and Holders of Claims in Class TS.3(a) are entitled to vote to accept or reject this Joint Plan. Holders of Allowed Claims in Class TS.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class TS.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class TS.3(b) are not entitled to vote to accept or reject this Joint Plan.

<u>Class TS.4 – Intercompany Claims against Texas Station, LLC</u>

*Treatment and Voting:* Holders of Class TS.4 Intercompany Claims against Texas Station, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class TS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class TS.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class TS.5 – Equity Interests in Texas Station, LLC</u>

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class TS.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class TS.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class TS.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(26) Town Center Station, LLC**

The assets of Town Center Station, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Town Center Station, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

<u>Class TCS.1 – Other Secured Claims against Town Center Station, LLC</u>

*Classification:* Each Class TCS.1 Claim is a separate Secured Claim against Town Center Station, LLC. Accordingly, this Class shall be divided into subclasses designated by letters of the alphabet (Class TCS.1A, Class TCS.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class TCS.1 Claims are unaltered by this Joint Plan. Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class TCS.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class TCS.1 Claim, payment in full

in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class TCS.1 is an Unimpaired Class, and the Holders of Class TCS.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class TCS.1 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class TCS.2 – General Unsecured Claims against Town Center Station, LLC

*Treatment and Voting:* Holders of Allowed Claims in Class TCS.2 shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class TCS.2 is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class TCS.2 are not entitled to vote to accept or reject this Joint Plan.

### Class TCS.3 – Intercompany Claims against Town Center Station, LLC

*Treatment and Voting:* Holders of Class TCS.3 Intercompany Claims against Town Center Station, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class TCS.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class TCS.3 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class TCS.4 – Equity Interests in Town Center Station, LLC

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class TCS.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class TCS.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class TCS.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(27)    Tropicana Acquisitions, LLC**

The assets of Tropicana Acquisitions, LLC, shall be transferred to CV PropCo, LLC pursuant to the Landco Assets Transfer Agreement, Second Amended MLCA and the New Opco Purchase Agreement.

### Class TA.1 – Other Secured Claims against Tropicana Acquisitions, LLC

*Classification:* Each Class TA.1 Claim is a separate Secured Claim against Tropicana Acquisitions, LLC. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class TA.1A, Class TA.1B and so on), so that each Holder of any

Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class TA.1 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class TA.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class TA.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class TA.1 is an Unimpaired Class, and the Holders of Class TA.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class TA.1 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class TA.2 – General Unsecured Claims against Tropicana Acquisitions, LLC

*Classification; Treatment and Voting:*  Holders of Allowed Claims in Class TA.2, and General Unsecured Claims shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class TA.2 is not Impaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126 of the Bankruptcy Code.  Consequently, the Holders of Claims in Class TA.2 are not entitled to vote to accept or reject this Joint Plan.

### Class TA.3 – Intercompany Claims against Tropicana Acquisitions, LLC

*Treatment and Voting:*  Holders of Class TA.3 Intercompany Claims against Tropicana Acquisitions, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class TA.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class TA.3 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class TA.4 – Equity Interests in Tropicana Acquisitions, LLC

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class TA.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class TA.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class TA.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

(28)    **Tropicana Station, Inc.**

The assets of Tropicana Station, Inc. that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Tropicana Station, Inc. that are New Propco Acquired Assets shall be transferred as required under the SCI Plan.

Class TSI.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Tropicana Station, Inc.

*Classification/Allowance:* Class TSI.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Tropicana Station, Inc.

*Treatment*: On account of their Allowed Class TSI.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Subsidiary Debtors Effective Date the consideration provided to them under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*: This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class TSI.2 – Other Secured Claims against Tropicana Station, Inc.

*Classification:* Each Class TSI.2 Claim is a separate Secured Claim against Tropicana Station, Inc. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class TSI.2A, Class TSI.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:* The legal, equitable and contractual rights of the Holders of Class TSI.2 Claims are unaltered by this Joint Plan. Subject to Article VIII of the Joint Plan, made applicable here, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class TSI.2 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor): (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class TSI.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of: (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:* Class TSI.2 is an Unimpaired Class, and the Holders of Class TSI.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class TSI.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class TSI.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims
and Class TSI.3(b) – General Unsecured Claims against Tropicana Station, Inc.

*Classification:* Class TSI.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Tropicana Station, Inc., and Class TSI.3(b) consists of the General Unsecured Claims against Tropicana Station, Inc.

*Treatment and Voting:* Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class TSI.3(a) shall receive the treatment set forth in the SCI Plan and the New Opco Purchase Agreement. Class TSI.3(a) is Impaired and Holders of Claims in Class TSI.3(a) are entitled to vote to accept or reject this Joint Plan. Holders of Allowed Claims in Class TSI.3(b) shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class TSI.3(b) is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Claims in Class TSI.3(b) are not entitled to vote to accept or reject this Joint Plan.

Class TSI.4 – Intercompany Claims against Tropicana Station, Inc.

*Treatment and Voting:* Holders of Class TSI.4 Intercompany Claims against Tropicana Station, Inc. shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class TSI.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class TSI.4 Claims are not entitled to vote to accept or reject this Joint Plan.

Class TSI.5 –Equity Interests in Tropicana Station, Inc.

*Treatment and Voting:* On the Subsidiary Debtors Effective Date, all Class TSI.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class TSI.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class TSI.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(29)   Vista Holdings, LLC**

The assets of Vista Holdings, LLC that are New Opco Acquired Assets shall be transferred as required under the New Opco Purchase Agreement. To the extent applicable, the assets of Vista Holdings, LLC that are New Propco Purchased Assets shall be transferred as required under the SCI Plan.

Class VH.1 – Other Secured Claims against Vista Holdings, LLC

*Classification:* Each Class VH.1 Claim is a separate Secured Claim against Vista Holdings, LLC. Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class VH.1A, Class VH.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class VH.1 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Subsidiary Debtors Effective Date or the date on which such Class VH.1 Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall either (at the election of the Subsidiary Debtor):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class VH.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Subsidiary Debtors Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the eleventh (11th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the applicable Debtor.

*Voting:*  Class VH.1 is an Unimpaired Class, and the Holders of Class VH.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class VH.1 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class VH.2 – General Unsecured Claims against Vista Holdings, LLC

*Classification; Treatment and Voting:*  Holders of Allowed Claims in Class VH.2 General Unsecured Claims shall be paid in full or otherwise left Unimpaired under this Joint Plan.  Class VH.2 is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Consequently, the Holders of Claims in Class VH.2 are not entitled to vote to accept or reject this Joint Plan.

### Class VH.3 – Intercompany Claims against Vista Holdings, LLC

*Treatment and Voting:*  Holders of Class VH.3 Intercompany Claims against Vista Holdings, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class VH.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VH.3 Claims are not entitled to vote to accept or reject this Joint Plan.

### Class VH.4 – Equity Interests in Vista Holdings, LLC

*Treatment and Voting:*  On the Subsidiary Debtors Effective Date, all Class VH.4 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class VH.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class VH.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**E.**   **Treatment of Claims and Equity Interests Against the Aliante Debtors**

**(1)**   **Aliante Holding, LLC**

Class AHL.1 – Other Secured Claims against Aliante Holding, LLC

*Classification:*   Each Class AHL.1 Claim is a separate Secured Claim against Aliante Holding, LLC.   Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class AHL.1A, Class AHL.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*   The legal, equitable and contractual rights of the Holders of Class AHL.1 Claims are unaltered by this Joint Plan.   Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Aliante Effective Date with respect to Aliante Holding or the date on which such Class AHL.1 Claim shall either (at the election of Aliante Holding):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class ASL.1 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Aliante Effective Date with respect to Aliante Holding or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the fifteenth (15th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and Aliante Holding.

*Voting:*   Class AHL.1 is an Unimpaired Class, and the Holders of Class AHL.1 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.   Therefore, the Holders of Class AHL.1 Claims are not entitled to vote to accept or reject this Joint Plan.

Class AHL.2 – General Unsecured Claims against Aliante Holding, LLC

*Treatment:*   Holders of Class AHL.2 General Unsecured Claims against Aliante Holding, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.   Class AHL.2 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.   Consequently, the Holders of Class AHL.2 Claims are not entitled to vote to accept or reject this Joint Plan.

Class AHL.3 – Intercompany Claims against Aliante Holding, LLC

*Treatment and Voting:*   Holders of Class AHL.3 Intercompany Claims against Aliante Holding, LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.   Class AHL.3 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.   Consequently, the Holders of Class AHL.3 Claims are not entitled to vote to accept or reject this Joint Plan.

Class AHL.4 – Equity Interests in Aliante Holding, LLC

*Treatment and Voting:*   On the Aliante Effective Date with respect to Aliante Holding, Holders of Class AHL.4 Equity Interests shall receive, in a form to be determined, all assets of Aliante Holding other than the Transferred Aliante Hotel Assets and the Equity Interests of Aliante Gaming.   Class AHL.4 is Impaired and is conclusively deemed to have accepted this Joint Plan consistent with the Joint Unanimous Written Consent of the Executive Committee, the Member and the Manager of Aliante Gaming dated March 21, 2011. Consequently, the Holders of Class AHL.4 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**(2)      Aliante Station LLC**

Class ASL.1 – Prepetition Opco Secured Lenders' Allowed Secured Claims against Aliante Station LLC

*Classification/Allowance:*   Class ASL.1 consists of the Prepetition Opco Secured Lenders' Allowed Secured Claim against Aliante Station LLC, if any.

*Treatment*:   On account of their Allowed Class ASL.1 Claims, and without limiting or otherwise modifying the SCI Plan, including the "Reserved Claims" provisions thereof, the Prepetition Opco Secured Lenders shall receive *Pro Rata* on the Aliante Effective Date with respect to Aliante Station the consideration provided to them by the Opco Group Sellers under the New Opco Purchase Agreement and the SCI Plan (which treatment is incorporated herein *mutatis mutandis*).

*Voting*:   This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class ASL.2 – Other Secured Claims against Aliante Station LLC

*Classification:*   Each Class ASL.2 Claim is a separate Secured Claim against Aliante Station LLC.   Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class ASL.2A, Class ASL.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*   The legal, equitable and contractual rights of the Holders of Class ASL.2 Claims are unaltered by this Joint Plan.   Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Aliante Effective Date with respect to Aliante Station or the date on which such Class ASL.2 Claim shall either (at the election of Aliante Station):   (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class ASL.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:   (i) the Aliante Effective Date with respect to Aliante Station or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy

Court; (iii) the fifteenth (15th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Aliante Station.

      *Voting:*  Class ASL.2 is an Unimpaired Class, and the Holders of Class ASL.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class ASL.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class ASL.3(a) – Prepetition Opco Secured Lenders' Allowed Deficiency Claims and Class ASL. 3(b) – General Unsecured Claims against Aliante Station LLC</u>

      *Classification:*  Class ASL.3(a) consists of the Prepetition Opco Secured Lenders' Allowed Deficiency Claims against Aliante Station LLC, if any, and Class ASL.3(b) consists of the General Unsecured Claims against Aliante Station LLC.

      *Treatment and Voting:*  Holders of Prepetition Opco Secured Lenders' Allowed Deficiency Claims in Class ASL.3(a) shall receive the treatment provided to them by the Opco Group Sellers as set forth in the SCI Plan and the New Opco Purchase Agreement.  Class ASL.3(a) is Impaired and Holders of Claims in Class ASL.3(a) are entitled to vote to accept or reject this Joint Plan.  Holders of Allowed Claims in Class ASL.3(b) shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class ASL.3(b) is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class ASL.3(b) Claims are not entitled to vote to accept or reject this Plan.

<u>Class ASL.4 – Intercompany Claims against Aliante Station LLC</u>

      *Treatment and Voting:*  Holders of Class ASL.4 Intercompany Claims against Aliante Station LLC shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan.  Class ASL.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class ASL.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class ASL.5 – Equity Interests in Aliante Station LLC</u>

      *Treatment and Voting:*  On the Aliante Effective Date with respect to Aliante Station, all assets of Aliante Holding distributed to Aliante Station under this Joint Plan shall be distributed to NP Opco LLC and Station Casinos LLC, as designees of SCI, in equal portions.  All Class ASL.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Class ASL.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the Holders of Class ASL.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

(3)    **Aliante Gaming LLC**

Class AGL.1 – Aliante Lenders' Allowed Claims against Aliante Gaming

*Classification/Allowance:*  Class AGL.1 consists of the Aliante Lenders' Allowed Claims against Aliante Gaming.

*Treatment*:  On the Aliante Effective Date with respect to Aliante Gaming, each Holder of an Allowed Class AGL.1 Claim (or its designee(s)) shall receive, on account, and in full satisfaction, of such Claim, its *Pro Rata* share of (a) 100% of the New Aliante Equity and (b) 100% of the New Secured Aliante Debt.  (Each Holder of an Allowed Class AGL.1 Claim (or designee of a Holder of an Allowed Class AGL.1 Claim) shall contribute its *Pro Rata* share of New Aliante Equity to ALST Casino Holdco (an entity formed and owned by the Holders of the Allowed Class AGL.1 Claims or their designees) in accordance with Article V.C. below.)  The terms and rights of the New Aliante Equity and New Secured Aliante Debt will be more fully described in the Joint Plan Supplement.

In addition, on the Aliante Effective Date with respect to Aliante Gaming, Reorganized Aliante Gaming shall pay any outstanding fees and expenses of the Aliante Administrative Agent or any of the Aliante Lenders under the Aliante Credit Agreement or the Aliante Swap Agreement, including, without limitation, the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Capital, Inc., and Lionel Sawyer & Collins.

*Voting*:  This Class is Impaired, and the Holders of Claims in this Class are entitled to vote to accept or reject this Joint Plan.

Class AGL.2 – Other Secured Claims against Aliante Gaming

*Classification:*  Each Class AGL.2 Claim is a separate Secured Claim against Aliante Gaming.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class AGL.2A, Class AGL.2B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Class AGL.2 Claims are unaltered by this Joint Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of the Aliante Effective Date with respect to Aliante Gaming or the date on which such Class AGL.2 Claim shall either (at the election of Aliante Gaming):  (a) receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class AGL.2 Claim, payment in full in Cash; or (b) otherwise be left Unimpaired through assumption of such Claim and retention of all existing liens to secure such Claim, in either case upon the latest of:  (i) the Aliante Effective Date with respect to Aliante Gaming or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the fifteenth (15th) Business Day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and Aliante Gaming.

*Voting:* Class AGL.2 is an Unimpaired Class, and the Holders of Class AGL.2 Claims are conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class AGL.2 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class AGL.3 – General Unsecured Claims against Aliante Gaming</u>

*Classification:* Class AGL.3 consists of all General Unsecured Claims against Aliante Gaming.

*Treatment and Voting:* Holders of Class AGL.3 Allowed General Unsecured Claims against Aliante Gaming shall be paid in full or otherwise left Unimpaired under this Joint Plan. Class AGL.3 is Unimpaired and is conclusively deemed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code. Consequently, the Holders of Class AGL.3 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class AGL 4 – Intercompany Claims against Aliante Gaming</u>

*Classification:* Class AGL.4 consists of all Intercompany Claims against Aliante Gaming.

*Treatment and Voting:* Holders of Class AGL.4 Intercompany Claims against Aliante Gaming shall not receive or retain any property or other distributions on account of their Claims under this Joint Plan. Class AGL.4 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class AGL.4 Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class AGL.5 – Equity Interests in Aliante Gaming</u>

*Classification:* Class AGL.5 consists of all Equity Interests in Aliante Gaming.

*Treatment and Voting:* On the Aliante Effective Date with respect to Aliante Gaming, all Class AGL.5 Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class AGL.5 is Impaired and is conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the Holders of Class AGL.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan.

**F.** **Treatment of Claims and Equity Interests Against GVR**

The assets of GVR, to the extent constituting GVR Purchased Assets, shall be transferred to the GVR Purchaser as required under the GVR Purchase Agreement. The treatment and voting rights provided to each Class of Claims and Equity Interests against and in GVR, for distribution purposes, is specified below:

<u>Class GVRG.1 – Other Secured Claims</u>

*Classification*:  Each Class GVRG.1 Claim is a separate Secured Claim against GVR.  Accordingly, this Class will be divided into subclasses designated by letters of the alphabet (Class GVRG.1A, Class GVRG.1B and so on), so that each Holder of any Other Secured Claim against this Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

*Treatment:*  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment for such holder, in exchange for full and final satisfaction, settlement, release, compromise, and discharge of each and every Allowed Other Secured Claim, each holder of such Claim shall, at the sole option of GVR or the GVR Purchaser, as applicable:

(i)      be paid in full in Cash in an amount equal to such Allowed Other Secured Claim by GVR on the GVR Effective Date; or

(ii)      receive the collateral securing any such Allowed Other Secured Claim and be paid any interest required to be paid under Section 506(b) of the Bankruptcy Code; or

(iii)      otherwise be treated in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired on the later of the GVR Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or as soon as reasonably practicable thereafter.

*Voting*:  Class GVRG.1 is Unimpaired, and holders of Class GVRG.1 Other Secured Claims are conclusively presumed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class GVRG.1 Other Secured Claims are not entitled to vote to accept or reject this Joint Plan.

<u>Class GVRG.2 – GVR First Lien Allowed Claims</u>

*Classification*:  Class GVRG.2 consists of all GVR First Lien Allowed Claims.

*Allowance*:  The GVR First Lien Allowed Claims shall be Allowed and deemed to be Allowed Claims in the amount of $571,407,385.06, plus interest and fees and other amounts due and owing under the GVR First Lien Term Loan, the GVR First Lien Swap Agreement, and any order providing for the use of the cash collateral of the GVR First Lien Lenders as of the GVR Effective Date pursuant to the terms of the GVR First Lien Credit Agreement, the other GVR Loan Documents, the GVR First Lien Swap Agreement, or related documents, including, without limitation, the reasonable and documented fees and expenses of Pillsbury Winthrop Shaw Pittman LLP, counsel to the GVR First Lien Administrative Agent, Dewey & Leboeuf LLP and Lionel Sawyer & Collins, counsel to the GVR First Lien Lenders Steering Committee and Houlihan Lokey Capital, Inc., financial advisor to the GVR First Lien Lenders Steering Committee, which Claims shall be Allowed Claims for all purposes under this Joint Plan in the full amount stated herein and shall not be subject to offset, setoff, recoupment, defense, counterclaim, reduction, subordination or credit of any kind whatsoever.

*Treatment*:   Except to the extent that a holder of an Allowed GVR First Lien Allowed Claim agrees to a less favorable treatment for such holder, in exchange for full and final satisfaction, settlement, release, compromise, and discharge of each and every Allowed GVR First Lien Allowed Claim, (i) the GVR First Lien Administrative Agent shall receive the GVR First Lien Distribution and shall distribute to each holder of an Allowed GVR First Lien Claim its *Pro Rata* share of the GVR First Lien Distribution and (ii) GVR shall pay all amounts owed under and otherwise perform all of its obligations under any order providing for the use of the cash collateral of the GVR First Lien Lenders.

*Voting*:   Class GVRG.2 is Impaired.  Therefore, holders of Class GVRG.2 GVR First Lien Allowed Claims as of the Voting Record Date are entitled to vote to accept or reject this Joint Plan.

### Class GVRG.3 – GVR Second Lien Term Loan Claims

*Classification:*   Class GVRG.3 consists of all GVR Second Lien Term Loan Claims.

*Treatment:*   Holders of Class GVRG.3 GVR Second Lien Term Loan Claims shall not receive or retain any property on account of their Claims under this Joint Plan.

*Voting:*   Class GVRG.3 is Impaired.  The holders of Class GVRG.3 GVR Second Lien Term Loan Claims will not receive any distributions from GVR's Estate, and therefore are conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the holders of Class GVRG.3 GVR Second Lien Term Loan Claims are not entitled to vote to accept or reject this Joint Plan.

### Class GVRG.4 – General Unsecured Claims

*Classification*:  Class GVRG.4 consists of all General Unsecured Claims.

*Treatment*:   Holders of Class GVRG.4 General Unsecured Claims shall not receive or retain any property on account of their Claims under this Joint Plan.

*Voting*:   Class GVRG.4 is Impaired.  The holders of Class GVRG.4 General Unsecured Claims will not receive any distributions from GVR's Estate, and therefore are conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, the holders of Class GVRG.4 General Unsecured Claims are not entitled to vote to accept or reject this Joint Plan.

### Class GVRG.5 – Equity Interests

*Classification*:  Class GVRG.5 consists of all Equity Interests in the Debtor.

*Treatment*:  Holders of Class GVRG.5 Equity Interests shall not receive or retain any property on account of their Claims under this Joint Plan.

*Voting*:  Class GVRG.5 is Impaired.  The holders of Class GVRG.5 Equity Interests will not receive any distributions from GVR's Estate, and therefore are conclusively deemed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, the holders of Class GVRG.5 Equity Interests are not entitled to vote to accept or reject this Joint Plan

**G.**    **Reservation of Rights Regarding Unimpaired Claims**

Except as otherwise provided herein, nothing under this Joint Plan shall affect the rights of the Debtors in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, or the right to dispute or otherwise object to the Allowance of or the amount of any Unimpaired claim.

**H.**    **Subordination Rights**

The classification and treatment of all Claims and Equity Interests under this Joint Plan take into consideration all contractual, legal, and equitable subordination rights, whether arising under general principles of equitable subordination, Sections 510(b) and 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any distribution made in accordance with this Joint Plan.   As of the Applicable Effective Dates, all contractual, legal, or equitable subordination rights that a holder of a Claim or Equity Interest may have with respect to any Distribution to be made in accordance with this Joint Plan are discharged and terminated, and all actions related to the enforcement of such subordination rights are permanently enjoined. Distributions under this Joint Plan are not subject to payment to any beneficiaries of such terminated subordination rights, or to levy, garnishment, attachment, or other legal process by any beneficiary of such terminated subordination rights.

**I.**    **Withholding Taxes**

The Debtors, Reorganized Aliante Gaming, or the Plan Administrator, as the case may be, may deduct any applicable federal or state withholding taxes from any Distributions made pursuant to this Joint Plan.

**J.**    **Set Offs**

Except as otherwise provided herein, including, without limitation, with respect to the Aliante Lenders' Allowed Claims, the Debtors may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made pursuant to this Joint Plan in respect of such Claim, claims and counterclaims of any nature whatsoever which such Debtors or their Estates may have against the holder of such Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by a Debtor, by Reorganized Aliante Gaming, or by the Plan Administrator of any such claim or counterclaim that it may have against such holder.

**K.**    **Timing of Payments and Distributions and Allocation**

Except as otherwise required or provided for under the SCI Plan, the New Opco Purchase Agreement, the New Opco Implementation Agreements, the New Propco Implementation Agreements, the Landco Assets Transfer Agreement, the New Aliante Transaction Agreements or the GVR Purchase Agreement to effectuate the transactions contemplated by the New Opco Purchase Agreement, the New Opco Implementation Agreement, the New Propco Implementation Agreement, the Landco Assets Transfer Agreement, the New Aliante Transaction Agreements or the GVR Purchase Agreement, any payments or Distributions to be made under this Joint Plan (other than the GVR First Lien Distribution, Distributions on account of the Prepetition Opco Secured Lenders' Allowed Claims and other payments or Distributions that must be made on the Applicable Effective Date) shall be deemed to be timely made if made within twenty (20) days after the date specified in this Joint Plan, or as soon thereafter as reasonably practicable.  Whenever any Distribution to be made under this Joint Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.  The value of any Distributions received by Holders of Claims in satisfaction of interest-bearing obligations shall be allocated first to the full satisfaction of the principal of such interest-bearing obligations and second in satisfaction of any accrued and unpaid interest.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.**    **Voting Classes**

Each Holder of an Allowed Claim as of the Voting Record Date in each of the Voting Classes shall be entitled to vote to accept or reject this Joint Plan.

**B.**    **Acceptance by Impaired Classes of Claims and Equity Interests**

Pursuant to Section 1126(c) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Joint Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept this Joint Plan.  Pursuant to Section 1126(d) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, a Class of Equity Interests has accepted this Joint Plan if at least two-thirds in amount of the Allowed Equity Interests in such Class actually voting have voted to accept this Joint Plan.

**C.**    **Presumed Acceptance of Joint Plan**

Classes that are Unimpaired under this Joint Plan are presumed to have accepted this Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code.

**D.**    **Presumed Rejection of Joint Plan**

Classes that are Impaired and receive no Distribution under this Joint Plan on account of their Claims are presumed to have rejected this Joint Plan pursuant to Section 1126(g) of the Bankruptcy Code.

**E.**    **Non-Consensual Confirmation Pursuant to 28 U.S.C. § 1129(b)**

With respect to any Class that does not accept this Joint Plan pursuant to Section 1126 of the Bankruptcy Code, the Debtors will request confirmation of this Joint Plan under Section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify this Joint Plan in order to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

**ARTICLE V.**

**MEANS FOR IMPLEMENTATION OF THIS JOINT PLAN**

**A.**    **Transfers Under this Joint Plan, Generally**

As described in detail below, implementation of this Joint Plan will include, among other things, numerous conveyances, assignments, transfers and deliveries among various parties.  All conveyances, assignments, transfers and deliveries, including, but not limited to the transactions described in Articles V.B, V.C and V.D, below shall be made, and such assets shall vest in the applicable transferee, free and clear of all Liens, Claims, Equity Interests, and any other interests asserted by the Debtors, any creditors of the Debtors, or other Persons or Entities (including, without limitation, any Liens, Claims, Equity Interests, encumbrances or interests, whether presently known or unknown, in any way relating to or arising from (i) the operations of the Debtors prior to an Applicable Effective Date, or (ii) consummation of any of the transactions pursuant to this Joint Plan), in accordance with and as contemplated by, among other sections, Sections 105(a), 363, 1123, 1129 and 1141 of the Bankruptcy Code, save and excepting any specific obligations expressly undertaken by such transferee or its designee in this Joint Plan, the SCI Plan or in any document or agreement to which such transferee is a party and which is necessary for Consummation of this Joint Plan.

No such transferee or any of its Subsidiaries, creditors, equity holders or Related Persons shall be or be deemed to be a successor of any Debtor or any SCI Debtor by reason of any theory of law or equity and shall not have any successor or transferee liability of any kind, nature or character, including liabilities arising or resulting from or relating to the transactions contemplated hereby; provided that the Confirmation Order shall not provide that the sale of any property that constitutes New Opco Acquired Assets is free and clear of any environmental liability imposed by a Governmental Unit (as defined in the Stalking Horse APA (as defined in the SCI Plan)) arising from or related to such property to the extent that the Bankruptcy Court determines that such property cannot be sold to the New Opco Purchaser free and clear of such liability pursuant to the Bankruptcy Code.

The transactions consummated pursuant to this Joint Plan, the New Opco Purchase Agreement, the New Opco Implementation Agreements, the New Propco Implementation Agreements, the Landco Assets Transfer Agreement, the New Aliante Transaction Agreements

and the GVR Purchase Agreement shall not constitute a *de facto* merger, or a merger, as between any Debtors, any SCI Debtors or any of their Subsidiaries or Affiliates and any transferee or any of its Affiliates pursuant to this Joint Plan, the SCI Plan, the New Opco Purchase Agreement, the New Opco Implementation Agreements, the New Propco Implementation Agreements, the Landco Assets Transfer Agreement, New Aliante Transaction Agreements or the GVR Purchase Agreement under any applicable law (including Nevada law).

Except for any specific obligations expressly undertaken by such transferee or its designee(s) in this Joint Plan or in any agreement or other document to which such transferee or designee is a party and which is entered into in connection with the Consummation of this Joint Plan, none of such transferee, Holdco, Voteco, New Propco, the New Opco Purchaser, New Opco, the Mortgage Lenders, the GVR Purchaser, the GVR First Lien Lenders, the Prepetition Opco Secured Lenders, the Land Loan Lenders, FG, Reorganized Aliante Gaming, ALST Casino Holdco, the Aliante Lenders or any of their respective designees, Subsidiaries or Affiliates shall have any liability, obligation or responsibility with respect to any Claims against or Equity Interests in any of the Debtors or any of the SCI Debtors, including without limitation any amounts owed by the Debtors to Holders of Claims or Equity Interests or any obligations of the Debtors pursuant to this Joint Plan.

After an Applicable Effective Date, each such transferee and its designee(s) or designated Subsidiaries will own the assets conveyed to it and operate its business and manage its affairs free of any restrictions contained in the Bankruptcy Code or other applicable law. The terms, provisions and conditions of the agreements governing the transactions described in Article V.B, Article V.C and Article V.D below shall govern the obligations of the Debtors and the other parties thereto and to the extent inconsistent with this Joint Plan, such agreements shall control.

Without further approvals or notice, the Debtors, the Plan Administrator, Reorganized Aliante Gaming, the Administrative Agents and any other applicable Person or Entity shall have the power and authority to terminate and discharge (and to consent to terminate and discharge) Liens on any assets to effectuate the terms hereof and the terms of the New Opco Implementation Agreements, the New Propco Implementation Agreements, the Landco Assets Transfer Agreement, the New Opco Purchase Agreement, the New Aliante Transaction Agreements or the GVR Purchase Agreement on an Applicable Effective Date.

B.    **Joint Plan Transactions – Subsidiary Debtors**

The following transactions shall be consummated as specified below in the order specified below or in such other order as is set forth in the Joint Plan Supplement:

1.    **Assumption of New Opco Purchase Agreement**

On and as of the Subsidiary Debtors Effective Date, (i) each of the Subsidiary Debtors that is an Opco Group Seller under the New Opco Purchase Agreement shall assume the New Opco Purchase Agreement under Section 365 of the Bankruptcy Code and (ii) the New Opco Purchaser shall perform, or cause the performance of, its obligations under the New Opco Purchase Agreement, including the payment of the "Cash Purchase Price" (as such term is defined in the New Opco Purchase Agreement) and the issuance of debt as set forth in the New

Opco Credit Agreement and the assumption of the "Assumed Liabilities" (as set forth in the New Opco Purchase Agreement), in each case, in accordance with the terms thereof. The Confirmation Order shall be deemed to be an order under Section 365 of the Bankruptcy Code authorizing and approving the assumption of the New Opco Purchase Agreement on and as of the Subsidiary Debtors Effective Date by all Subsidiary Debtors that are Opco Group Sellers, and the effect of such assumption shall be binding on all Holders of Claims, Administrative Claims or Equity Interests, and all other Persons and Entities, including all Governmental Units.

## 2.    Formation of New Propco and New Opco Entities

Holdco, Voteco, New Propco, New Opco and their direct or indirect Subsidiaries have been formed for the purpose of acquiring all of New Propco Acquired Assets, New Opco Acquired Assets and all of the Equity Interests in CV PropCo, LLC as owner of the Landco Assets.

## 3.    Transfer of Master Lease Collateral to Propco

On the Subsidiary Debtors Effective Date, pursuant to the New Propco Implementation Agreements, the Subsidiary Debtors (including the Subsidiary Debtor Subtenants) that own New Propco Transferred Assets shall convey, assign, transfer and deliver all such assets to Propco or its designees in satisfaction of Propco's Lien on such assets under the Master Lease and License and in partial satisfaction of the Master Lease Rejection Damage Claim.

## 4.    Landco Assets

On or prior to the Subsidiary Debtors Effective Date, pursuant to the Landco Assets Transfer Agreement and the Second Amended MLCA:  (a) all of the Equity Interests in CV PropCo, LLC shall be conveyed, assigned, transferred and delivered by CV Holdco, LLC to New Propco or a Subsidiary thereof as the designee of the Land Loan Lenders, subject to the New Land Loan Agreement, and (b) all of the Landco Assets not then owned by CV PropCo, LLC and not otherwise designated as excluded assets under the Landco Assets Transfer Agreement, shall be conveyed, assigned, transferred and delivered to CV PropCo, LLC.

## 5.    Transfer of New Propco Transferred Assets from Propco to New Propco Entities

On the Subsidiary Debtors Effective Date, in accordance with and in compliance with the Second Amended MLCA, the SCI Plan and the SCI Confirmation Order, and pursuant to the New Propco Implementation Agreements and in implementation of the distributions to the Mortgage Lenders under the SCI Plan and SCI Confirmation Order, all of the New Propco Transferred Assets shall be conveyed, assigned, transferred and delivered to New Propco or any of its designee(s) or Subsidiaries, each in their capacities as designee of the Mortgage Lenders.

## 6.    Transfer of New Propco Purchased Assets from Opco Entities to New Propco Entities

On the Subsidiary Debtors Effective Date and subject to the receipt by the Holders of the Prepetition Opco Secured Lenders' Allowed Secured Claims of the consideration set forth in this

Joint Plan and in the SCI Plan, pursuant to, and in compliance with, the Second Amended MLCA, the SCI Plan, the SCI Confirmation Order and the New Opco Purchase Agreement, for good and valuable consideration, all of the New Propco Purchased Assets shall be sold, conveyed, assigned, transferred and delivered to New Propco or its applicable designee(s) or Subsidiaries.

### 7.    Transfer of New Opco Acquired Assets to New Opco

On the Subsidiary Debtors Effective Date and subject to the receipt by the Holders of the Prepetition Opco Secured Lenders' Allowed Secured Claims of the consideration set forth in this Joint Plan, the SCI Plan and the SCI Confirmation Order, for good and valuable consideration, all of the New Opco Acquired Assets shall be sold, conveyed, assigned, transferred and delivered to New Opco or its designee(s) or Subsidiaries pursuant to and in accordance with the New Opco Purchase Agreement.

### 8.    New Propco Transactions in Connection with Receipt of New Propco Acquired Assets

In connection with Consummation of this Joint Plan and New Propco's receipt of the New Propco Acquired Assets, and in accordance with and pursuant to the SCI Plan and the SCI Confirmation Order, Voteco, Holdco and New Propco will enter into or cause to be entered into a number of agreements and transactions designed to allow New Propco to operate the New Propco Acquired Assets as a going concern business.  Those agreements and transactions will include, without limitation, the following agreements (collectively, the "New Propco Implementation Agreements"):

a.    The New Propco LLCA [Docket No. 1914].

b.    The New FG Management Agreement [Docket No. 1914].

c.    The New Propco Credit Agreement [Docket No. 1914].

d.    The New Land Loan Agreement.

e.    The IP License Agreement.

f.    The New Propco Non-Compete Agreement.

Each of the foregoing New Propco Implementation Agreements is attached as a plan supplement to the SCI Plan or will be attached as a Joint Plan Supplement, as the case may be.

### 9.    New Propco Employment of Subsidiary Debtors' Employees and Related Matters

Upon or promptly following the Subsidiary Debtors Effective Date, New Propco contemplates taking steps to mitigate the impact of the restructuring process on the Subsidiary Debtors' employees.  Specifically, New Propco plans to make offers of employment to all of the

Subsidiary Debtors' hourly employees: (a) at not less than the same hourly wage rate and position in effect for the respective employee immediately prior to the Subsidiary Debtors Effective Date; (b) with substantially similar benefits as the current Section 401(k) plans provided to such employees of the Subsidiary Debtors; and (c) with health and welfare benefits that in the aggregate are substantially similar to those provided by the Subsidiary Debtors under the broad-based employee benefit plans in effect for Subsidiary Debtors' employees immediately prior to the Subsidiary Debtors Effective Date.

> **10.    New Opco Transactions in Connection with Receipt of New Opco Acquired Assets**

In connection with Consummation of this Joint Plan and New Opco's receipt of the New Opco Acquired Assets, and in accordance with and in compliance with the SCI Plan and the SCI Confirmation Order, New Opco will enter into or cause to be entered into a number of agreements and transactions designed to allow New Opco to operate the New Opco Acquired Assets as a going concern business (collectively, the "New Opco Implementation Agreements"). Those agreements and transactions will include, without limitation, the following:

a.    The New Opco Credit Agreement [Docket No. 1914].

b.    The New Opco FG Management Agreement [Docket No. 1935].

c.    The IP License Agreement.

d.    The New Opco Transition Services Agreement.

Each of the foregoing New Opco Implementation Agreements is attached as a plan supplement to the SCI Plan or will be attached as a Joint Plan Supplement, as the case may be.

> **11.    The New Opco Credit Agreement**

The collateral agent under the New Opco Credit Agreement shall have valid, binding and enforceable liens on the collateral specified in the relevant agreements executed by New Opco and its Subsidiaries in connection with the New Opco Credit Agreement. The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New Opco Credit Agreement are granted in good faith as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such claims, liens and security interests shall be as set forth in the definitive documentation executed in connection therewith. The New Opco Credit Agreement together with all notes, documents or agreements delivered in connection therewith shall be valid, binding and enforceable in accordance with their terms on and after the Subsidiary Debtors Effective Date (it being understood and agreed that each Holder of the Prepetition Opco Secured Lenders' Allowed Claim shall be deemed a party to the New Opco Credit Agreement and bound by the terms thereof without the requirement of any such Holder to execute a signature thereto). Notwithstanding anything to the contrary in the Confirmation Order or this Joint Plan, the Court's retention of jurisdiction shall

not govern the enforcement of the loan documentation executed in connection with the New Opco Credit Agreement or any rights or remedies related thereto.

### 12.    Second Amended MLCA

So long as the New Opco Purchase Agreement is not terminated, then, notwithstanding anything to the contrary in the Second Amended MLCA or in the SCI Plan, the entry of the Confirmation Order will not automatically trigger a Transition Event (as defined in the Second Amended MLCA) and the obligation of SCI and its Subsidiaries including the Subsidiary Debtors to provide transition services thereunder shall be suspended (other than such services as are required during the "Deferral Period" (as defined in the Second Amended MLCA)) and the "Deferral Period" shall be deemed to continue for all purposes under the Second Amended MLCA, including with respect to the payment of Reduced Rent (as defined in the Second Amended MLCA), and the Initial Transition Services Period (as defined in the Second Amended MLCA) shall not be deemed to commence, until the earlier of (i) the date on which a Transition Event (other than due solely to the occurrence of the Confirmation Date or the Subsidiary Debtors Effective Date) occurs or (ii) the date designated in writing by the Mortgage Lenders and acceptable to the Consenting Opco Lenders as the date on which transition services should commence.  Except as modified above, the Second Amended MLCA will remain in full force and effect and shall be enforceable pursuant to its terms.

### C.    Joint Plan Transactions – Aliante Debtors

### 1.    Restructuring and other Corporate Transactions

On the Aliante Effective Date with respect to Aliante Gaming, Aliante Gaming shall effect a corporate restructuring.  The restructuring shall be described in further detail in the Joint Plan Supplement.  The restructuring shall include, but will not be limited to:

(a)    Formation of ALST Casino Holdco.  ALST Casino Holdco, a Delaware limited liability company, shall be formed by the filing of the New Aliante Certificate of Formation with the Secretary of State of Delaware before the Aliante Effective Date with respect to Aliante Gaming, and shall elect to be taxed as a partnership.  (The name of this entity shall be subject to change in accordance with applicable law.)  The ALST Casino Holdco Operating Agreement shall be adopted, and shall, among other things, (i) establish the terms and rights of the ALST Casino Holdco Equity, (ii) establish certain restrictions on the transfer of ALST Casino Holdco Equity, (iii) provide for certain rights and obligations of holders of ALST Casino Holdco Equity, (iv) provide for the preparation and filing with any state or federal regulatory authority (or withdrawal of) any documents that the Required Aliante Consenting Lenders deem necessary or appropriate in connection with establishing ALST Casino Holdco as a "publicly traded company" within the meaning of the Nevada Revised Statutes, including, without limitation, any Form 10-K, Form 10-Q, Form 8-K, and other documents or amendments thereto to comply with the United States Securities Exchange Act of 1934, as amended, and (v) include such other provisions as may be necessary or appropriate to establish ALST Casino Holdco as a "publicly traded company" under Section 463.487 of the Nevada Revised Statutes.  On or before the Aliante Effective Date with respect to Aliante Gaming, a registration rights agreement (the

"Registration Rights Agreement") will be entered into, which shall be substantially in the form included in the Joint Plan Supplement.

(b)    Issuance of ALST Casino Holdco Equity.   On or before the Aliante Effective Date, ALST Casino Holdco shall authorize and issue ALST Casino Holdco Equity for distribution to the Holders of Allowed Class AGL.1 Claims (or their respective designee(s)). Each Holder of an Allowed Class AGL.1 Claim (or its designee) shall receive its *Pro Rata* share of 100% of the ALST Casino Holdco Equity.

(c)    Amended Aliante Gaming Operating Agreement.   Reorganized Aliante Gaming shall enter into the Amended Aliante Gaming Operating Agreement (the "Amended Aliante Gaming Operating Agreement"), which shall amend the Aliante Operating Agreement to, among other things, establish Reorganized Aliante Gaming as a single member limited liability company and identify ALST Casino Holdco as its sole member.  The adoption of the Amended Aliante Gaming Operating Agreement shall be hereby authorized without the need for any further limited liability company action.

(d)    Issuance of New Aliante Equity.   On the Aliante Effective Date with respect to Aliante Gaming, Reorganized Aliante Gaming shall authorize and issue the New Aliante Equity for distribution in accordance with this Joint Plan.

(e)    Transactions on the Aliante Effective Date.  On the Aliante Effective Date with respect to Aliante Gaming, the following transactions shall be deemed to have occurred in the following order: (A) each Holder of an Allowed Class AGL.1 Claim shall be deemed to have exchanged all of its Allowed Class AGL.1 Claim for its *Pro Rata*  share of New Aliante Equity and New Secured Aliante Debt; and (B) each Holder of New Aliante Equity shall be deemed to have contributed all such New Aliante Equity to ALST Casino Holdco in exchange for its *Pro Rata* share of ALST Casino Holdco Equity.

(f)    Assets and Executory Contracts Relating to the Operation of the Aliante Hotel Assets. On the Aliante Effective Date with respect to Aliante Gaming all of the Transferred Aliante Hotel Assets shall be conveyed, assigned, transferred and delivered to Reorganized Aliante Gaming in accordance with a transfer agreement to be negotiated and agreed to by and among the relevant parties.

To the extent that a third party vendor provides services or goods, directly or indirectly to Aliante Gaming or the Aliante Hotel pursuant to an executory contract entered into by a Debtor (other than Aliante Gaming) or a SCI Debtor to which Aliante Gaming is not a party, such Debtor(s) and SCI shall use (and shall cause their respective Affiliates and Subsidiaries to use) commercially reasonable efforts to (a) ensure that such goods and services continue to be available to Aliante Gaming or the Aliante Hotel pursuant to such executory contract during the Chapter 11 Cases and after the Aliante Effective Date with respect to Aliante Gaming on the same terms and conditions as existed immediately before the Petition Date; provided that, Aliante Gaming or Reorganized Aliante Gaming, as applicable, shall reimburse the applicable Debtor(s) consistent with their past practices and pay all costs, fees and expenses consistent with their past practices, including Allowed Administrative Expenses for the delivery of such goods or services, and such other Debtor or SCI shall not be obligated to assume any such third party

contract for goods or services without the concurrent assignment of the same or a portion of the same to Aliante Gaming or Reorganized Aliante Gaming; or (b) assist Aliante Gaming in negotiating a direct agreement with the third party vendor for the provision of the services or goods at issue.

        (g)    <u>Intercompany Agreements and Arrangements</u>.

With respect to intercompany agreements and arrangements pursuant to which, as of the Petition Date, any Debtor (other than Aliante Gaming) or SCI Debtor directly or indirectly provides services or goods to Aliante Gaming or the Aliante Hotel or otherwise relating to the operation of the Aliante Hotel, such Debtor(s) and/or SCI shall use (and shall cause their respective Affiliates and Subsidiaries to use) commercially reasonable efforts to (a) arrange for such goods and services to continue to be available to Aliante Gaming or the Aliante Hotel during the Chapter 11 Cases (and after the Aliante Effective Date with respect to Aliante Gaming to Reorganized Aliante Gaming) on the same terms and conditions as existed immediately before the Petition Date; <u>provided that</u>, to the extent that a Debtor is obligated to pay for any delivery of goods or services, Aliante Gaming or Reorganized Aliante Gaming shall reimburse the applicable Debtor(s) consistent with its past practices and such Debtor shall not be obligated to assume such third party contract for goods or services without the concurrent assignment of the same or portion of the same to Aliante Gaming or Reorganized Aliante Gaming; or (b) assist Aliante Gaming or Reorganized Aliante Gaming in negotiating a new agreement with a third party vendor for the provision of the services or goods at issue. Any amounts owing in respect of services or goods actually provided to Aliante Gaming or the Aliante Hotel after the Petition Date by a Debtor (other than Aliante Gaming) or a SCI Debtor pursuant to subsection (a) of the foregoing sentence shall constitute an Administrative Expense obligation of Aliante Gaming to the extent unpaid. If Aliante Gaming enters into a transition services agreement that is acceptable to the Required Aliante Consenting Lenders, then such transition services agreement shall govern with respect to Intercompany Agreements and Arrangements.

        (h)    <u>Vesting of Assets in Reorganized Aliante Gaming.</u>  Upon the Aliante Effective Date with respect to Aliante Gaming, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all property of Aliante Gaming and all of the Transferred Aliante Hotel Assets shall vest in the Reorganized Aliante Gaming free and clear of all Liens, Claims, charges, encumbrances, or other interests, except as provided in this Joint Plan. From and after the Aliante Effective Date with respect to Aliante Gaming, Reorganized Aliante Gaming may operate its business and may use, acquire, and dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without the supervision or approval by the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code.

    **2.**    **New Aliante Management Agreement**

On the Aliante Effective Date with respect to Aliante Gaming, subject to the terms and conditions to be agreed to by the parties thereto, Reorganized Aliante Gaming and Fertitta Entertainment (or, with the consent of the Required Aliante Consenting Lenders, Fertitta

Entertainment's designee(s) or Subsidiaries) shall enter into the New Aliante Management Agreement substantially in the form included in the Joint Plan Supplement.

### 3.    Transactions in Connection with Consummation of this Joint Plan

In connection with Consummation of this Joint Plan, Reorganized Aliante Gaming will enter into or cause to be entered into a number of agreements and transactions designed to implement the restructuring described above and allow Reorganized Aliante Gaming to operate the Aliante Hotel as a going concern business. Those agreements and transactions will include, without limitation, the following agreements (collectively, and together with any other agreements or documents necessary to implement the transactions contemplated hereby, the "New Aliante Transaction Agreements"):

a.    The New Aliante Management Agreement.

b.    The New Aliante Credit Agreement.

c.    The Amended Aliante Gaming Operating Agreement.

d.    The ALST Casino Holdco Operating Agreement.

e.    The Registration Rights Agreement.

f.    The Aliante IP License Agreement

Each of the foregoing New Aliante Transaction Agreements will be included in the Joint Plan Supplement.

In addition, upon reaching agreed terms and conditions acceptable to the Debtors and the SCI Debtors, on the one hand, and the Required Aliante Consenting Lenders, on the other, the Debtors and SCI Debtors shall take any and all actions necessary to consummate the transactions contemplated by the Joint Plan, and the New Aliante Transaction Agreements, including, without limitation, any action that is reasonable and customary for a seller relating to the application for or receipt of any necessary regulatory or licensing approvals.

### D.    Joint Plan Transactions – GVR

### 1.    Assumption of GVR Purchase Agreement

On and as of the GVR Effective Date, GVR shall assume the GVR Purchase Agreement under Section 365 of the Bankruptcy Code. The Confirmation Order shall be deemed to be an order under Section 365 of the Bankruptcy Code authorizing and approving the assumption of the GVR Purchase Agreement on and as of the GVR Effective Date by GVR, and the effect of such assumption shall be binding on all Holders of Claims, Administrative Claims or Equity Interests, and all other Persons and Entities, including all Governmental Units.

### 2.    Vesting of GVR Purchased Assets in GVR Purchaser

The Closing (as defined in the GVR Purchase Agreement) shall occur on the GVR Effective Date, except as otherwise provided herein or in the GVR Purchase Agreement, and on the Closing the GVR Purchased Assets shall be transferred to and vest in the GVR Purchaser, free and clear of all Liens, Claims, charges, or other encumbrances (except for Permitted Encumbrances (as defined in the GVR Purchase Agreement) or Encumbrances (as defined in the GVR Purchase Agreement) related to the GVR Assumed Liabilities which are set forth on Schedule 2.1 to the GVR Purchase Agreement.  On and after the GVR Effective Date, except as otherwise provided in this Joint Plan, the GVR Purchaser may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 3.    Payment of Purchase Price to GVR

Prior to the GVR Effective Date, GVR shall designate an account of the GVR First Lien Administrative Agent pursuant to Section 3.3 of the GVR Purchase Agreement to receive payment of the GVR Purchase Price by wire transfer from the GVR Purchaser.  On the GVR Effective Date, the GVR Purchaser shall pay the GVR Purchase Price (a portion of which shall consist of funds that have been deposited in an escrow account) to the GVR First Lien Administrative Agent, who shall promptly pay each Holder of a GVR First Lien Claim its *Pro Rata* share thereof.

### 4.    Payment of GVR First Lien Lenders Steering Committee Professional Fees

On the GVR Effective Date, GVR shall pay all reasonable and documented professional fees of the GVR First Lien Lenders Steering Committee, including, without limitation, the reasonable and documented fees and expenses of Pillsbury Winthrop Shaw Pittman LLP, counsel to the GVR First Lien Administrative Agent, Dewey & Leboeuf LLP and Lionel Sawyer & Collins, counsel to the GVR First Lien Lenders Steering Committee and Houlihan Lokey Capital, Inc., financial advisor to the GVR First Lien Lenders Steering Committee in full in Cash.

### 5.    Assumption of GVR Liabilities by the GVR Purchaser

On the GVR Effective Date, the GVR Purchaser shall assume the GVR Assumed Liabilities as and to the extent provided for in the GVR Purchase Agreement.

### 6.    Powers of the GVR Purchaser

From and after the GVR Effective Date and continuing through the date of entry by the Bankruptcy Court of a final decree closing the Chapter 11 Case, the GVR Purchaser shall possess the rights of a party in interest pursuant to Section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (1) have the right to appear, be heard on and participate in matters brought before the Bankruptcy Court or any other court with jurisdiction over the Chapter 11 Case; (2) be entitled to notice and opportunity for hearing on all such issues; (3) receive notice of all

applications, motions, and other papers and pleadings filed in the Bankruptcy Court; and (4) have the right to object to any and all Claims or Equity Interests against GVR.

## 7.    GVR Transition Services Agreement

The GVR Transition Services Agreement authorizes SCI to provide certain management, operating and shared services described in the GVR Transition Services Agreement until the effective date of the SCI Plan, at which point FG will assume responsibility for providing such services.    Unless earlier terminated by the parties thereto, the GVR Transition Services Agreement will be effective from the date it is approved by the Bankruptcy Court through the effective date of the SCI Plan, plus six additional months thereafter (during which period New Propco, as assignee of FG, will provide services), with two additional three month extension periods exercisable by GVR at least 45 days in advance of expiration of the initial six-month FG service term and at least 30 days in advance of expiration of the first three month extension period.

Pursuant to the GVR Transition Services Agreement, on or prior to the effective date of the SCI Plan, SCI or GVRS, as applicable, will sell to GVR, at an amount to be agreed upon by the parties (or if no agreement can be reached, as determined by the Bankruptcy Court), certain assets described in the GVR Transition Services Agreement that are used in the operation of GVR's business.

Pursuant to the GVR Transition Services Agreement, GVR or GVR Purchaser will pay to SCI and New Propco, as applicable, a management fee (as specified in the GVR Operating Agreement), together with all other fees incurred by SCI or New Propco in operating GVR's hotel business on GVR's behalf.    SCI's rights and interest in the GVR Transition Services Agreement and all products and proceeds thereof, now or hereafter acquired, shall be subject to the Liens of the Opco Administrative Agent for the benefit of the Prepetition Opco Secured Lenders.

## 8.    GVR Purchaser's Employment of GVR's Employees

Upon or promptly following the GVR Effective Date, GVR Purchaser contemplates taking steps to mitigate the impact of the restructuring process on GVR's employees. Specifically, the GVR Purchase Agreement provides that GVR Purchaser shall offer employment to all or substantially all of GVR's employees on terms such that:  (a) the base wages or base salary and other compensation (including bonus and incentive opportunity) offered to each employee are substantially equivalent in the aggregate to the base wage or base salary and other compensation provided to such employee as of the GVR Effective Date, and (b) employee benefits are, in the aggregate, substantially comparable to the employee benefits provided to each such employee immediately prior to the GVR Effective Date.

## E.    General Settlement of Claims

Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, Releases and other benefits provided under this Joint Plan, upon and as of an Applicable Effective Date, the provisions of this Joint Plan shall

constitute a good faith compromise and settlement of all Claims, Administrative Claims and Equity Interests and controversies resolved pursuant to this Joint Plan.

**F.    Release of Liens, Claims, Administrative Claims and Equity Interests**

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Joint Plan, on the Applicable Effective Date and concurrently with the applicable Distributions made pursuant to this Joint Plan, all Liens, Claims, Administrative Claims, Equity Interests, interests, encumbrances, mortgages, deeds of trust, or other security interests against the property of the Estates shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, Entity or Governmental Unit.  Any Person, Entity or Governmental Unit holding such Liens, Claims, interests, encumbrances mortgages, deeds of trust or other security interest or interests shall, pursuant to Section 1142 of the Bankruptcy Code, promptly execute and deliver such instruments of termination, release, satisfaction and/or assignment (in recordable form) and/or accept same as may be reasonably requested by the applicable Debtor, Reorganized Aliante Gaming or the Plan Administrator.

**G.    Corporate Action**

Each of the Debtors, Reorganized Aliante Gaming or the Plan Administrator, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, Releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Joint Plan, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors (except for those expressly required pursuant hereto), Person, Entity or Governmental Unit.

Prior to, on or after an Applicable Effective Date (as appropriate), all matters provided for pursuant to this Joint Plan that would otherwise require approval of the stockholders, directors, partners, managers or members of any Debtor shall be deemed to have been so approved and shall be in effect prior to, on or after an Applicable Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or partners of such Debtor, or the need for any approvals, authorizations, actions or consents of any Person, Entity or Governmental Unit.

All matters provided for in this Joint Plan involving the legal or corporate structure of any Debtor and any legal or corporate action required by any Debtor in connection with this Joint Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor, or by any other Person Entity or Governmental Unit.  On an Applicable Effective Date, the appropriate officers, managers or members of each Debtor or Reorganized Aliante Gaming, or the Plan Administrator

(as the case may be) is authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Joint Plan in the name of and on behalf of the Debtors, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person, Entity or Governmental Unit.  The secretary and any assistant secretary of each Debtor, Reorganized Aliante Gaming, or the Plan Administrator (as the case may be) shall be authorized to certify or attest to any of the foregoing actions.

**H.    Dissolution, Dismissal of Officers and Directors and Dissolution of the Boards of Directors of Each Subsidiary Debtor, Aliante Station, Aliante Holding and GVR**

As soon as practicable after each of the Applicable Effective Dates, unless otherwise set forth in this Joint Plan or the Confirmation Order, (i) the existing boards of directors or boards of managing members (as the case may be) of each of the Subsidiary Debtors, Aliante Station, Aliante Holding and GVR shall be dissolved without any further action required on the part of any such Subsidiary Debtor, Aliante Station, Aliante Holding or GVR, the shareholders of any such Subsidiary Debtor, Aliante Station, Aliante Holding or GVR, the officers and directors of such Subsidiary Debtor, Aliante Station, Aliante Holding or GVR or the members of such Subsidiary Debtor, Aliante Station, Aliante Holding or GVR and (ii) any and all remaining officers, directors, managers or managing members of each Subsidiary Debtor Aliante Station, Aliante Holding  or GVR shall be dismissed without any further action required on the part of any such Subsidiary Debtor,  Aliante Station, Aliante Holding or GVR, the shareholders of such Subsidiary Debtor, Aliante Holding, Aliante Station, or GVR, the officers and directors of such Subsidiary Debtor, Aliante Holding, Aliante Station or GVR or the members of such Subsidiary Debtor, Aliante Holding,  Aliante Station or GVR.  The Subsidiary Debtors, Aliante Holding, Aliante Station and GVR shall be dissolved as soon as practicable on or after the Subsidiary Debtors Effective Date, the Aliante Effective Date with respect to Aliante Holding and Aliante Station or the GVR Effective Date, as applicable, but in no event later than the closing of the Chapter 11 Cases.  The Subsidiary Debtors, Aliante Holding, Aliante Station and GVR shall be dissolved as soon as practicable on or after the Subsidiary Debtors Applicable Effective Date, the Aliante Effective Date with respect to Aliante Holding and Aliante Station or the GVR Effective Date, as applicable, but in no event later than the closing of the Chapter 11 Cases or, with respect to Aliante Holding, in no event before the Aliante Effective Date with respect to Aliante Gaming.  After the Subsidiary Debtors Effective Date, the Aliante Effective Date with respect to Aliante Station and Aliante Holding and the GVR Effective Date, as applicable, the Plan Administrator shall act as the sole officer, director, manager or managing member, as the case may be, of the Subsidiary Debtors, Aliante Holding,  Aliante Station and GVR, respectively.

**I.    Post-Applicable Effective Date Governance of the Subsidiary Debtors, Aliante Holding, Aliante Station and GVR**

On and after an Applicable Effective Date, operation, management, and control of the Subsidiary Debtors, Aliante Holding, Aliante Station and GVR shall be the general responsibility of the Plan Administrator.

### J.    Cancellation of Securities and Agreements

On each of the Applicable Effective Dates, except as otherwise specifically provided for in this Joint Plan:  (1) the obligations of the Debtors under the applicable credit documents, and any other certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any secured or unsecured indebtedness or obligation of or ownership interest, equity or profits interest in a debtor or securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in a Debtor giving rise to any Claim or Equity Interest, shall be extinguished and cancelled as to the applicable Debtor, and neither the applicable Debtor nor any purchaser of its assets, including the New Opco Purchaser or GVR Purchaser, shall have any continuing obligations thereunder; and (2) the obligations of each Debtor pursuant to any agreements, indentures, certificates of designation, bylaws or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of each Debtor shall be fully released, settled and compromised; provided that notwithstanding the confirmation of this Joint Plan or occurrence of an Applicable Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for purposes of allowing such Holder to receive distributions under this Joint Plan.

### K.    Exemption from Certain Taxes and Fees

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to this Joint Plan or any agreement or document related thereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### L.    Post-Aliante Effective Date (with respect to Aliante Gaming) Existence and Management of Reorganized Aliante Gaming

#### 1.    Existence

Reorganized Aliante Gaming shall continue to exist after the Aliante Effective Date with respect to Aliante Gaming as a separate limited liability company, with all the powers of a limited liability company, pursuant to the applicable Nevada State law and pursuant to the certificate of formation and bylaws (or other formation documents) in effect prior to the Aliante Effective Date with respect to Aliante Gaming, except to the extent such certificate of formation and bylaws (or other formation documents) are amended by or in accordance with this Joint Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Joint Plan and require no further action or approval.

#### 2.    Directors and Officers of Reorganized Aliante Gaming

The identities of the individuals who will serve as officers for Reorganized Aliante Gaming will be disclosed (to the extent identified) in the Joint Plan Supplement.  The

number of members on the initial board of managers of Reorganized Aliante Gaming and the identities of the individuals appointed to such board will be disclosed (to the extent identified) in the Joint Plan Supplement.

## M.    Management of ALST Casino Holdco

The identities of the individuals who will serve as officers for ALST Casino Holdco will be disclosed (to the extent identified) in the Joint Plan Supplement.  The number of members on the initial board of managers of ALST Casino Holdco and the identities of the individuals appointed to such board will be disclosed (to the extent identified) in the Joint Plan Supplement.

## N.    Wind Down and Dissolution of the Debtors

### 1.    The Subsidiary Debtors, Aliante Holding, Aliante Station and GVR

On and after the Subsidiary Debtors Effective Date, the Aliante Effective Date with respect to Aliante Holding or Aliante Station or the GVR Effective Date, as applicable, operation, management, and control of the Subsidiary Debtors, Aliante Holding, Aliante Station and GVR, respectively, shall be the general responsibility of the Plan Administrator, which shall have the power and authority to take any action necessary to wind down and dissolve the Subsidiary Debtors, Aliante Holding, Aliante Station or GVR, provided that in no event shall Aliante Holding be wound down or dissolved before the Aliante Effective Date with respect to Aliante Gaming.  All property of the foregoing Debtors' Estates not distributed to the Holders of Claims or Equity Interests on each of the aforementioned Applicable Effective Dates, or otherwise transferred pursuant to the New Opco Purchase Agreement or the GVR Purchase Agreement or any other agreement or document related thereto or to this Joint Plan, shall be managed and distributed by the Plan Administrator and shall be held in the name of the Subsidiary Debtors, Aliante Holding, Aliante Station  or GVR, as applicable, free and clear of all Liens, Claims, interests, other interests or encumbrances except for rights to such distributions provided to Holders of Allowed Claims or Allowed Equity Interests as provided in this Joint Plan.

After an Applicable Effective Date, the Subsidiary Debtors, Aliante Holding, Aliante Station  and GVR shall remain in existence until dissolved by the Plan Administrator.  The filing by the Plan Administrator of a Subsidiary Debtor's, Aliante Holding's, Aliante Station's or GVR's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule.

## ARTICLE VI.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    **Assumption of Executory Contracts and Unexpired Leases**

    **1.**    **The Subsidiary Debtors, Aliante Holding, Aliante Station and GVR:**

        a.    On an Applicable Effective Date, all Executory Contracts and Unexpired Leases identified on the Schedules of Executory Contracts and Unexpired Leases will be deemed assumed and assigned by the applicable Debtor to New Propco, CV PropCo or the GVR Purchaser, as applicable, in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.

        b.    On the Subsidiary Debtors Effective Date, the Texas Station Ground Lease shall be deemed assumed and assigned to NP Texas, LLC, the entity that will have title to the assets of Texas Station, LLC.

        c.    On an Applicable Effective Date, any Executory Contract or Unexpired Lease will be deemed rejected if such Executory Contract or Unexpired Lease:

            (i)    is not listed on any of the Schedules of Executory Contracts and Unexpired Leases;

            (ii)    has been rejected by order of the Bankruptcy Court;

            (iii)    is the subject of a motion to reject pending on the Applicable Effective Date;

            (iv)    is identified in a Joint Plan Supplement as a contract or lease to be rejected or in the New Opco Purchase Agreement or the GVR Purchase Agreement, as applicable, as an "Excluded Asset";

            (v)    is rejected pursuant to the terms of this Joint Plan;

            (vi)    expired by its own terms on, prior to, or as of the Applicable Effective Date; or

            (vii)    has not otherwise been assumed or is not the subject of a motion to assume pending on an Applicable Effective Date.

    Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease either in the SCI Cases or the Chapter 11 Cases, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease

assumed pursuant to this Joint Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by this Joint Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

2.    **Aliante Gaming**:

a.    On the Aliante Effective Date with respect to Aliante Gaming, all Executory Contracts and Unexpired Leases not identified on the Schedule of Executory Contracts and Unexpired Leases To Be Rejected by Aliante Gaming will be deemed assumed by Aliante Gaming in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.

b.    On the Aliante Effective Date with respect to Aliante Gaming, any Executory Contract or Unexpired Lease will be deemed rejected if such Executory Contract or Unexpired Lease:

(i)    is listed on the Schedule of Executory Contracts and Unexpired Leases To Be Rejected by Aliante Gaming;

(ii)    has been rejected by order of the Bankruptcy Court;

(iii)    is the subject of a motion to reject pending on the Aliante Effective Date with respect to Aliante Gaming;

(iv)    is rejected pursuant to the terms of this Joint Plan; or

(v)    expired by its own terms on, prior to, or as of the Aliante Effective Date with respect to Aliante Gaming.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease either in the SCI cases or the Chapter 11 Cases, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Joint Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by this Joint Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**B.**     <u>Assumption and Assignment of Executory Contracts or Unexpired Leases</u>

Unless and as otherwise provided by a prior order to the Bankruptcy Court either in the SCI Cases or the Chapter 11 Cases, in the event any Debtor proposes to assume and assign an Executory Contract or Unexpired Lease, including the Executory Contracts or Unexpired Leases set forth on any of the Schedules of Executory Contracts and Unexpired Leases, at least twenty (20) days prior to an Applicable Effective Date, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a written notice of the proposed assumption and assignment (the "<u>Notice of Intent to Assume and Assign Executory Contracts or Unexpired Leases</u>"), which such Notice of Intent to Assume and Assign Executory Contracts or Unexpired Leases will:  (a) list the applicable Cure Amount, if any; (b) identify the party to which an Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.  Any applicable Cure Amounts shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on an Applicable Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Subject to the foregoing, any Executory Contract or Unexpired Lease that is to be assigned to GVR Purchaser, New Opco or New Propco or its designee(s) or designated Subsidiary in accordance with the terms of the GVR Purchase Agreement or the New Opco Purchase Agreement shall be so assigned in accordance with the terms of this Joint Plan.

In the event Aliante Gaming proposes to assume an Executory Contract or Unexpired Lease for which it believes Cure Amounts are due, at least twenty (20) days prior to the Aliante Effective Date with respect to Aliante Gaming, Aliante Gaming shall serve upon the counterparties to such Executory Contracts and Unexpired Leases, a Notice of Proposed Cure Amounts For Executory Contracts or Unexpired Leases.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and/or assignment or any Cure Amount must be Filed, served and actually received by the Debtors no less than ten (10) days after service by the Debtors of Notice of Intent to Assume and Assign Executory Contracts or Unexpired Leases or Notice of Proposed Cure Amounts For Executory Contracts or Unexpired Leases.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or Cure Amount set forth in the Notice of Intent to Assume and Assign Executory Contracts or Unexpired Leases or Notice of Proposed Cure Amounts For Executory Contracts or Unexpired Leases will be deemed to have consented to the assumption and, if applicable, assignment of its Executory Contract or Unexpired Lease.

The Confirmation Order shall constitute a Final Order of the Bankruptcy Court approving any proposed assumptions and, if applicable, assignments of Executory Contracts or Unexpired Leases set forth on any of the Schedules of Executory Contracts and Unexpired Leases (or in the case of Aliante Gaming, excluded from the Schedule of Executory Contracts and Unexpired Leases To Be Rejected by Aliante Gaming) or set forth in the Notice of Intent to Assume and Assign Executory Contracts or Unexpired Leases or the Notice of Proposed Cure Amounts For Executory Contracts or Unexpired Leases pursuant to Sections 365 and 1123 of the Bankruptcy Code as of an Applicable Effective Date.

If, on an Applicable Effective Date there exists a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code), (c) the ability of a Debtor to assume and/or assume and assign an Executory Contract or Unexpired Lease or (d) any other matter pertaining to assignment, then, in that event, the applicable cure payments required to be made by a Debtor pursuant to Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and/or assumption and assignment of the subject, disputed Executory Contract or Unexpired Lease.

If an objection to assignment or Cure Amount related to an Executory Contract or Unexpired Lease that a Debtor intends to assume and assign under this Joint Plan or pursuant to the New Opco Purchase Agreement or the GVR Purchase Agreement is sustained by the Bankruptcy Court, then (i) the applicable Debtor, with the consent of New Opco Purchaser or GVR Purchaser (as the case may be), may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assuming and assigning such Executory Contract or Unexpired Lease; and (ii) either the New Opco Purchaser or the GVR Purchaser, as applicable, may designate such Executory Contract or Unexpired Lease as an Excluded Asset subject to the terms of the New Opco Purchase Agreement or the GVR Purchase Agreement, as applicable.

## C.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All claims based upon the rejection of an Executory Contract or an Unexpired Lease by a Debtor must be filed within thirty (30) days of the date of a Final Order rejecting such Executory Contract or Unexpired Lease, and must be filed by Proof of Claim.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.    Distributions for Claims Allowed as of an Applicable Effective Date

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, Distributions to be made on account of Allowed Claims as of an Applicable Effective Date shall be made as soon thereafter as is practicable.  Any Distribution to be made on an Applicable Effective Date pursuant to this Joint Plan shall be deemed as having been made on an Applicable Effective Date if such Distribution is made on an Applicable Effective Date or as soon thereafter as is authorized and practicable, provided that, Distributions to be made on account of the Prepetition Opco Secured Lenders' Allowed Claim shall be made on the Subsidiary Debtors Effective Date.  Any payment or Distribution required to be made under this Joint Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Disputed Claims, Disputed Administrative Claims or Disputed Equity Interests that first become Allowed after an Applicable Effective Date shall be made pursuant to Article VIII hereof.

**B.    No Proofs of Claims Required on Account of Claims Allowed Under This Joint Plan**

Any Claim Allowed or deemed Allowed as of an Applicable Effective Date in an amount set forth in this Joint Plan or in a Final Order of the Bankruptcy Court entered prior to an Applicable Effective Date shall be Allowed in such amount as of an Applicable Effective Date regardless of whether the Holder of such Allowed Claim files a proof of claim on account of such Claim or such Claim is scheduled in a Debtors' Schedules as disputed or undisputed or otherwise.  Accordingly, the Holder of a Claim described in the preceding sentence of this Article VII.B does not need to file a proof of claim in order to receive a Distribution under this Joint Plan if such Holder consents to and agrees with the Allowance of said Claim under the circumstances and conditions set forth in the preceding sentence.  If, however, a Holder of a Claim that is Allowed or deemed Allowed under this Joint Plan disagrees with the amount of such Claim as set forth in this Joint Plan or a Final Order of the Bankruptcy Court, said Holder must file a timely proof of claim, subject to all applicable deadlines for filing such a proof of claim set by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or an order of the Bankruptcy Court.

**C.    Post-Petition Interest on Claims**

Unless otherwise specifically provided for in this Joint Plan or the Confirmation Order or any other Final Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

**D.    Distributions under this Joint Plan**

Other than as specifically set forth in this Joint Plan or in the New Opco Purchase Agreement or the GVR Purchase Agreement, the Plan Administrator shall make all Distributions required to be distributed under this Joint Plan to Holders of Claims against the Subsidiary Debtors, Aliante Holding, Aliante Station or GVR and Reorganized Aliante Gaming shall make all Distributions required to be distributed under this Joint Plan to Holders of Claims against, or Equity Interests in, Aliante Gaming; provided, however, that the Plan Administrator and Reorganized Aliante Gaming may employ or contract with other entities to assist in or make the Distributions required by this Joint Plan.  Neither New Propco, New Opco, the New Opco Purchaser,  the GVR Purchaser nor Reorganized Aliante Gaming shall have any obligation to fund the expenses incurred by the Plan Administrator from and after an Applicable Effective Date other than as may be set forth in the New Opco Purchase Agreement, the GVR Purchase Agreement, or the Confirmation Order applicable to a Debtor.

**E.    Delivery and Distributions and Undeliverable or Unclaimed Distributions**

**1.    Record Date for Distributions**

On the Distribution Record Date, the Claims Register shall be closed.  Accordingly, none of the Debtors, Reorganized Aliante Gaming or the Plan Administrator will have any obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and the Debtors, Reorganized Aliante Gaming and the Plan Administrator will be entitled for all purposes herein to recognize and

distribute securities, property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Debtors, Reorganized Aliante Gaming and the Plan Administrator shall be entitled to recognize and deal for all purposes under this Joint Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date.

### 2. Delivery of Distributions in General

Except as otherwise provided herein, the Debtors, Reorganized Aliante Gaming and/or the Plan Administrator (as the case may be) shall make distributions to Holders of Allowed Claims, Allowed Administrative Claims and Allowed Equity Interests (if any), or in case of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' books and records as of the Distribution Record Date; provided, however, that if a Holder of an Allowed Claim, Allowed Administrative Claim or an Allowed Equity Interest (if any) Files a Proof of Claim, the address for such Holder shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

### 3. Minimum Distributions

Notwithstanding anything herein to the contrary, none of the Debtors, Reorganized Aliante Gaming or the Plan Administrator shall be required to make distributions or payments of less than Five Hundred Dollars ($500.00) (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar under this Joint Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### 4. Fractional Units

Notwithstanding anything contained herein to the contrary, no fractional units of New Aliante Equity shall be distributed under this Joint Plan. For purposes of distribution hereunder, fractional units shall be rounded to the nearest whole unit (with any amount less than one-half unit to be rounded down). No consideration shall be provided in lieu of fractional units that are rounded down.

### 5. Undeliverable Distributions

#### (a) Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim, Allowed Administrative Claim or Allowed Equity Interest (if any) is returned to a Debtor, Reorganized Aliante Gaming or the Plan Administrator as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until a Debtor, Reorganized Aliante Gaming or the Plan Administrator is notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next subsequent distribution date. Undeliverable distributions shall remain in the possession of a Debtor, Reorganized Aliante Gaming or the Plan Administrator, subject to Article VII.D.4.(b) and VII.D.4.(d) below, until

such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(b)    <u>Failure to Claim Undeliverable Distributions</u>

Any Holder of an Allowed Claim or Allowed Administrative Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to this Joint Plan for an undeliverable or unclaimed distribution within six (6) months after an Applicable Effective Date shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors, their Estates or their property.  In such cases, any unclaimed property or interest in property shall become the property of New Propco, GVR Purchaser or  Reorganized Aliante Gaming (as the case may be) or its designee(s) or Subsidiary free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Nothing contained in this Joint Plan shall require a Debtor, Reorganized Aliante Gaming or the Plan Administrator to attempt to locate any Holder of an Allowed Claim or an Allowed Administrative Claim.

(c)    <u>Failure to Present Checks</u>

Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Plan Administrator (with respect to distributions relating to the Subsidiary Debtors, Aliante Station, Aliante Holding or GVR) or Reorganized Aliante Gaming (with respect to distribution relating to Aliante Gaming) by the Holder of the relevant Allowed Claim or Allowed Administrative Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim or Allowed Administrative Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred eighty (180) days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Debtors, the Debtors' Estates or their property, Reorganized Aliante Gaming or the Plan Administrator.

(d)    <u>Return of Undeliverable Funds</u>

On the one-year anniversary of an Applicable Effective Date, any and all Undeliverable Distributions related to a Debtor shall be deemed to have been abandoned for all purposes and the Plan Administrator or Reorganized Aliante Gaming shall deliver, in a commercially reasonable manner, any and all property or interests in property representing such Undeliverable distributions to New Opco Purchaser, GVR Purchaser or Reorganized Aliante Gaming (as the case may be) or its designee(s) or Subsidiary.

## F.    <u>Compliance with Tax Requirements/Allocations</u>

In connection with this Joint Plan and all Distributions hereunder, the Debtors, Reorganized Aliante Gaming and the Plan Administrator shall comply with all withholding and

reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Debtors, Reorganized Aliante Gaming or the Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of this Joint Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.  Any Cash and documents and/or other consideration or property to be distributed pursuant to this Joint Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to this Joint Plan.  To the extent that any Allowed Claim entitled to a Distribution under this Joint Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## G.    **Means of Cash Payment**

Payments of Cash made pursuant to this Joint Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of Reorganized Aliante Gaming or the Plan Administrator, by (a) checks drawn on, or (b) wire transfer from, a domestic bank selected by a Debtor, Reorganized Aliante Gaming or the Plan Administrator.  Cash payments to foreign creditors may be made, at the option of a Debtor, Reorganized Aliante Gaming or the Plan Administrator, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## H.    **Timing and Calculation of Amounts to Be Distributed**

On an Applicable Effective Date (or if a Claim is not an Allowed Claim on an Applicable Effective Date, on the date on which such Claim becomes Allowed, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the Distributions that this Joint Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable Class treatment or in Article VIII hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after an Applicable Effective Date.

## I.    **Setoffs and Recoupments**

Except as expressly provided herein, without altering or limiting any of the rights and remedies of the Debtors or any other party in interest under Section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the Distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action

and Litigation Claims of any nature that the Debtors may hold against the Holder of any such Allowed Claim.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors may, pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off or exercise recoupment against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff or exercise recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claims, Causes of Action or Litigation Claims.

Notwithstanding anything herein to the contrary, the Prepetition Opco Secured Lenders' Allowed Claims (other than the "Reserved Claims" as defined in and to the extent provided in the SCI Plan), the Aliante Lenders' Allowed Claims and the GVR First Lien Allowed Claims shall be Allowed Claims for all purposes under this Joint Plan in the full amount stated herein and shall not be subject to offset, setoff, recoupment, defense, counterclaim, reduction, subordination or credit of any kind whatsoever.

**J.      Preservation of Subordination Rights**

Except as otherwise provided herein, all subordination rights and claims relating to the subordination by the Debtors, Reorganized Aliante Gaming or Plan Administrator of any Allowed Claim shall remain valid, enforceable and unimpaired in accordance with Section 510 of the Bankruptcy Code or otherwise.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS, ADMINISTRATIVE CLAIMS AND EQUITY INTERESTS

**A.      Authority to Prosecute Objections to Disputed Claims and Disputed Administrative Claims**

On an Applicable Effective Date, the Plan Administrator (with respect to matters pertaining to the any of Subsidiary Debtors, Aliante Holding, Aliante Station or GVR) and Reorganized Aliante Gaming or its designee (with respect to matters pertaining to Aliante Gaming) shall be responsible for pursuing any objection to the allowance of all Disputed Claims, Disputed Administrative Claims and Disputed Equity Interests with respect to which an objection has been Filed with the Bankruptcy Court (or in the case of a rejection damages claims, will be Filed) and notice thereof has been given to the Holder of the Disputed Claim, Disputed Administrative Claim or Disputed Equity Interest.  None of the Debtors, Reorganized Aliante Gaming or the Plan Administrator is under any obligation to dispute any Claims.  Prior to each of the Applicable Effective Dates, the Debtors shall have the right to object to the allowance of Claims with respect to which they dispute liability or allowance in whole or in part.  After an Applicable Effective Date, the Plan Administrator (with respect to matters pertaining to any of the Subsidiary Debtors, Aliante Holding, Aliante Station or GVR) and Reorganized Aliante Gaming or its designee (with respect to matters pertaining to Aliante Gaming), shall have the

authority to file, settle, compromise or withdraw any objections to Disputed Claims, Disputed Administrative Claims or Disputed Equity Interests against the Debtor(s) it acts on behalf of under this Joint Plan without approval of the Bankruptcy Court.

## B.    Resolution of Disputed Claims

### 1.    Allowance of Claims

After an Applicable Effective Date, the Plan Administrator (with respect to any Claim against any of the Subsidiary Debtors, Aliante Holding, Aliante Station or GVR) and Reorganized Aliante Gaming (with respect to any Claim or Administrative Claim against, or Equity Interest in, Aliante Gaming) shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Joint Plan on an Applicable Effective Date.  Except as expressly provided in this Joint Plan or in any Final Order entered in the Chapter 11 Cases prior to the Applicable Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under or in connection with this Joint Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases Allowing such Claim.

### 2.    Prosecution of Objections to Claims

After the Confirmation Date but before an Applicable Effective Date, the Debtors, and after an Applicable Effective Date, the Plan Administrator (with respect to any Claim against any of the Subsidiary Debtors, Aliante Holding, Aliante Station or any Claim against GVR other than the GVR First Lien Allowed Claims) and Reorganized Aliante Gaming or its designee (with respect to any Claim against, or Equity Interest in, Aliante Gaming), shall have the exclusive authority to File objections to Claims and Equity Interests and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; provided, however, this provision shall not apply to Professional Fee Claims; provided further that (a) New Propco or the New Opco Purchaser may object to the allowance of any Administrative Claim against the Subsidiary Debtors, Aliante Holding or Aliante Station, (b) GVR Purchaser may object to the allowance of any Administrative Claim against GVR and (c) the Aliante Lenders may object to the allowance of any Administrative Claim against Aliante Gaming.  Subject to the foregoing, from and after an Applicable Effective Date, the Plan Administrator (with respect to any Disputed Claim or Disputed Administrative Claim against, or any Disputed Equity Interest in, any of the Subsidiary Debtors, Aliante Holding, Aliante Station or GVR) or Reorganized Aliante Gaming or its designee (with respect to any Disputed Claim or Disputed Administrative Claim against, or any Disputed Equity Interest in,  Aliante Gaming) may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  Subject to the provisions of this Joint Plan, the Plan Administrator (with respect to the Subsidiary Debtors, Aliante Holding, Aliante Station or GVR) or Reorganized Aliante Gaming or its designee (with respect to Aliante Gaming) shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

### 3.    Estimation of Disputed Claims

After the Confirmation Date but before an Applicable Effective Date, the Debtors, and after an Applicable Effective Date, the Plan Administrator (with respect to any Disputed Claim or Disputed Administrative Claim against, or any Disputed Equity Interest in, any of the Subsidiary Debtors, Aliante Holding, Aliante Station or GVR) or Reorganized Aliante Gaming or its designee (with respect to any Disputed Claim or Disputed Administrative Claim against, or any Disputed Equity Interest in, Aliante Gaming) shall be entitled to seek the estimation by the Bankruptcy Court of any Disputed, contingent, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, and all Holders of Claims retaining or receiving property or other distributions under this Joint Plan shall be deemed to have consented to the estimation of such Claim for the purposes of this Joint Plan, confirmation thereof and the payment of Claims.

### 4.    Deadline to File Objections to Claims

Any objections to Claims shall be Filed within sixty (60) days after an Applicable Effective Date or in the case of a rejection damages claim, sixty (60) days after the Proof of Claim for such rejection damages claims filed; provided, however, that the Bankruptcy Court may extend the foregoing deadline upon (i) motion of the Debtors or Plan Administrator filed prior to an Applicable Effective Date and (ii) a showing of good cause.  In addition, notwithstanding the expiration of any bar date, the Debtors, and, after an Applicable Effective Date, the Plan Administrator (with respect to any Disputed Claim or Disputed Administrative Claim against, or any Disputed Equity Interest in, any of the Subsidiary Debtors, Aliante Holding, Aliante Station or GVR) or Reorganized Aliante Gaming or its designee (with respect to any Disputed Claim or Disputed Administrative Claim against, or any Disputed Equity Interest in, Aliante Gaming), shall continue to have the right to amend any Claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.

### C.    No Distributions Pending Allowance

Notwithstanding any other provision of this Joint Plan to the contrary, no payments or Distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and such Disputed Claim has become an Allowed Claim.

### D.    Reserves for Disputed Claims

To the extent necessary or appropriate for Classes entitled to receive Distributions hereunder, each Debtor may separately maintain a reserve for any distributable amounts required to be set aside on account of Disputed Claims and shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein as, when and if such Disputed Claims are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Applicable Effective Date, provided that no interest shall be

distributable or accrue with respect thereto.  No such reserves shall be necessary for any Classes that will not receive any distributions under this Joint Plan.

**E.**    **Distributions on Account of Disputed Claims that Become Allowed**

On each subsequent distribution date (or such earlier date as determined by the Debtors, Reorganized Aliante Gaming or the Plan Administrator in their sole discretion, as applicable), the Debtors, Reorganized Aliante Gaming, or the Plan Administrator or another applicable Distribution Agent will make Distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding ninety (90) days, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claim on the dates Distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or disallowed by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates.  Such Distributions will be made pursuant to the applicable provisions of this Joint Plan.

**F.**    **Disallowance of Claims**

All Claims of any Person or Entity from which property is sought by a Debtor or by the New Opco Purchaser, Reorganized Aliante Gaming or the GVR Purchaser under Section 542, 543, 550 or 553 of the Bankruptcy Code or that a Debtor, the New Opco Purchaser, Reorganized Aliante Gaming or GVR Purchaser allege is a transferee of a transfer that is avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Person or Entity, on the one hand, and a Debtor, the New Opco Purchaser, Reorganized Aliante Gaming or the GVR Purchaser, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Person, Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Person, Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

EXCEPT AS OTHERWISE AGREED BY A DEBTOR, THE NEW OPCO PURCHASER, REORGANIZED ALIANTE GAMING OR GVR PURCHASER, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE APPLICABLE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

**G.**    **Administrative Claims**

All of the procedures contained in this Article VIII for paying, objecting to, estimating, reserving for and otherwise resolving Disputed, contingent or unliquidated Claims shall apply with equal force and effect to Disputed, contingent and unliquidated Administrative Claims.

# ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION,
## APPLICABLE EFFECTIVE DATES AND CONSUMMATION OF THE PLAN

**A.    Separate Confirmation Hearings and Confirmation Orders**

This Joint Plan is severable with respect to the Subsidiary Debtors, each Aliante Debtor and GVR for purposes of confirmation and Consummation of this Joint Plan.  Accordingly, the Debtors reserve the right to seek to confirm separately this Joint Plan with regard to the Subsidiary Debtors, each Aliante Debtor and GVR at one or more Confirmation Hearings.  In addition, each Debtor reserves the right to seek and obtain a Confirmation Order or separate Confirmation Orders.

**B.    Conditions Precedent to Confirmation of this Joint Plan**

Confirmation of this Joint Plan shall be conditioned upon the satisfaction, or waiver pursuant to the provisions of Article IX.D hereof, of the following:

1.    The Bankruptcy Court shall have entered a Final Order in form and in substance satisfactory to the Debtors approving the Prepetition Solicitation under Section 1126 of the Bankruptcy Code.

2.    The Bankruptcy Court shall have entered a Final Order in form and in substance satisfactory to the Debtors and reasonably satisfactory to the New Opco Purchaser, New Propco, the GVR Purchaser, the Required Opco Consenting Lenders, the Mortgage Lenders, the Required GVR Consenting Lenders and the Required Aliante Consenting Lenders approving the Disclosure Statement as containing adequate information within the meaning of Section 1125 of the Bankruptcy Code.

3.    The proposed Confirmation Order(s) shall be in form and substance acceptable to (i) the applicable Debtor(s), and (ii)(w) if confirming this Joint Plan as to the Subsidiary Debtors, the Required Opco Consenting Lenders, the Mortgage Lenders, the SCI Debtors, New Propco and the New Opco Purchaser, (x) if confirming this Joint Plan as to GVR, the Required GVR Consenting Lenders and the GVR Purchaser, (y) if confirming this Joint Plan as to Aliante Gaming, the Required Aliante Consenting Lenders and consistent with the New Aliante Transaction Agreements, and (z) if confirming this Joint Plan as to Aliante Holding, the Required Aliante Consenting Lenders.

**C.    Conditions Precedent to the Occurrence of an Applicable Effective Date and Consummation of this Joint Plan**

This Joint Plan remains severable with respect to the Subsidiary Debtors, each of the Aliante Debtors and GVR for purposes of confirmation and Consummation.  As a result, Consummation of this Joint Plan as to a particular Debtor(s) shall be conditioned upon, and an Applicable Effective Date for such Debtors shall not occur until the satisfaction or waiver, pursuant to the provisions of Article IX.C hereof, of the following:

1.    **Conditions Precedent to the Subsidiary Debtors Effective Date**

(a)    The Confirmation Order, applicable to the Subsidiary Debtors, shall have been entered in a form and in substance satisfactory to the Subsidiary Debtors, the New Opco Purchaser, New Propco the Mortgage Lenders, and the Required Opco Consenting Lenders and no stay of the Confirmation Order shall have been entered.  The Confirmation Order shall provide that, among other things, the Subsidiary Debtors or the Plan Administrator, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate this Joint Plan as to the Subsidiary Debtors, including, without limitation, entering into, implementing and consummating the contracts, instruments, Releases, leases, indentures and other agreements or documents created in connection with or described in this Joint Plan.

(b)    The Bankruptcy Court shall have entered one or more orders authorizing the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases by the Subsidiary Debtors as contemplated in this Joint Plan and any Joint Plan Supplement; which such order may be the Confirmation Order, including, but not limited to the Executory Contracts and Unexpired Leases set forth on the Schedule of Executory Contracts and Unexpired Leases to be assumed and assigned to New Propco.

(c)    All documents and agreements necessary to implement this Joint Plan, including, without limitation, all documents included in this Joint Plan Supplement, the New Opco Implementation Agreements, the New Propco Implementation Agreements, in each case in form and substance acceptable to the Subsidiary Debtors shall (a) be in full force and effect and not terminated, (b) have been tendered for delivery, and (c) been effected by executed by, or otherwise deemed binding upon, all Entities or Governmental Units party thereto or affected thereby.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

(d)    All actions necessary to implement this Joint Plan shall have been effected, including, without limitation, all actions specified in and in furtherance of the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the Committee Plan Support Stipulation, the Put Parties Support Agreement, the New Opco Purchase Agreement, the New Opco Implementation Agreements, the New Propco Implementation Agreements, and the Landco Assets Transfer Agreement.

(e)    Each of the Put Parties Support Agreement and the Propco Commitment has not been terminated.

(f)    On or before the occurrence of the Subsidiary Debtors Effective Date, each of the New Opco Purchase Agreement, the Landco Assets Transfer Agreement, the New Propco Implementation Agreements, and the New Opco Implementation Agreements shall close according to its respective terms.

(g)    All material consents, actions, documents, certificates and agreements necessary to implement this Joint Plan as to the Subsidiary Debtors, including any required Governmental or Regulatory Approvals, shall have been obtained, effected or executed and

delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

(h)     The Effective Date of the SCI Plan (as defined in Article IX.B of the SCI Plan) shall have occurred or shall occur contemporaneously.

## 2.     Conditions Precedent to the GVR Effective Date

(a)     The Confirmation Order, applicable to GVR, shall have been entered in a form and in substance satisfactory to GVR, the Required GVR Consenting Lenders, and the GVR Purchaser and no stay of the Confirmation Order shall have been entered.   The Confirmation Order shall provide that, among other things, GVR or the Plan Administrator, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate this Joint Plan as to GVR, including, without limitation, entering into, implementing and consummating the contracts, instruments, Releases, leases, indentures and other agreements or documents created in connection with or described in this Joint Plan.

(b)     The Bankruptcy Court shall have entered one or more orders authorizing the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases by GVR as contemplated in this Joint Plan and any Joint Plan Supplement; which such order may be the Confirmation Order, including, but not limited to the Executory Contracts and Unexpired Leases set forth on the Schedule of Executory Contracts and Unexpired Leases to be Assumed and Assigned to GVR Purchaser.

(c)     All documents and agreements necessary to implement this Joint Plan as to GVR, including, without limitation, all documents included in the Joint Plan Supplement and the GVR Purchase Agreement, in each case in form and substance acceptable to the Required GVR Consenting Lenders, shall (i) be in full force and effect and not terminated, (ii) have been tendered for delivery, and (iii) been effected by executed by, or otherwise deemed binding upon, all Entities or Governmental Units party thereto or affected thereby.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

(d)     All actions necessary to implement this Joint Plan as to GVR shall have been effected, including, without limitation, all actions specified in and in furtherance of the GVR Lender Plan Support Agreement and the GVR Purchase Agreement, including GVR designating an account of the GVR First Lien Administrative Agent to receive the GVR Purchase Price, and each such agreement shall be in full force and effect.

(e)     On or before the occurrence of the GVR Effective Date, the GVR Purchase Agreement shall close according to its terms.

(f)     All material consents, actions, documents, certificates and agreements necessary to implement this Joint Plan as to GVR, including any required Governmental or Regulatory Approvals, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

(g)     The Confirmation Date as it relates to GVR shall have occurred.

(h)     The Effective Date of the SCI Plan (as defined in Article IX.B of the SCI Plan) shall have occurred or shall occur contemporaneously.

**3.     Conditions Precedent to the Aliante Effective Date with Respect to Aliante Gaming**

(a)     The Confirmation Order, applicable to Aliante Gaming, shall have been entered in a form and in substance satisfactory to Aliante Gaming and the Required Aliante Consenting Lenders and no stay of the Confirmation Order shall have been entered.   The Confirmation Order shall provide that, among other things, that Aliante Gaming or Reorganized Aliante Gaming, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate this Joint Plan as to Aliante Gaming, including, without limitation, entering into, implementing and consummating the contracts, instruments, Releases, leases, indentures and other agreements or documents created in connection with or described in this Joint Plan.

(b)     The Bankruptcy Court shall have entered one or more orders authorizing the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases as contemplated in this Joint Plan and any Joint Plan Supplement; which such order may be the Confirmation Order, including, but not limited to the Executory Contracts and Unexpired Leases set forth on the Schedule of Executory Contracts and Unexpired Leases To Be Rejected by Aliante Gaming and the Schedule of Executory Contracts and Unexpired Leases to Be Assumed and Assigned to Reorganized Aliante Gaming.

(c)     All documents and agreements necessary to implement this Joint Plan as to Aliante Gaming, including, without limitation, all documents included in this Joint Plan Supplement relating to or concerning the Aliante Debtors, if any, shall (i) be in full force and effect and not terminated, (ii) have been tendered for delivery, and (iii) been effected by executed by, or otherwise deemed binding upon, all Entities or Governmental Units party thereto or affected thereby.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

(d)     All actions necessary to implement this Joint Plan shall have been effected, including, without limitation, all actions specified in and in furtherance of the Aliante Transaction Agreements; and each such agreement shall be in full force and effect.

(e)     All material consents, actions, documents, certificates and agreements necessary to implement this Joint Plan as to Aliante Gaming, including any required Governmental or Regulatory Approvals, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

(f)     The Confirmation Date as it relates to Aliante Gaming shall have occurred.

4.      **Conditions Precedent to the Aliante Effective Date with Respect to Aliante Holding or Aliante Station**

(a)      The Confirmation Order, applicable to Aliante Holding or Aliante Station, shall have been entered in a form and in substance satisfactory to Aliante Holding or Aliante Station, as applicable, and as to Aliante Holding, the Required Aliante Consenting Lenders and no stay of the Confirmation Order shall have been entered.  The Confirmation Order shall provide that, among other things, that the Plan Administrator is authorized and directed to take all actions necessary or appropriate to consummate this Joint Plan as to Aliante Holding and Aliante Station, including, without limitation, entering into, implementing and consummating the contracts, instruments, Releases, leases, indentures and other agreements or documents created in connection with or described in this Joint Plan.

(b)      The Subsidiary Debtors Effective Date shall have occurred or shall occur contemporaneously.

(c)      All documents and agreements necessary to implement this Joint Plan as to Aliante Station or Aliante Holding, in each case in form and substance acceptable to Aliante Holding and Aliante Station shall (a) be in full force and effect and not terminated, (b) have been tendered for delivery, and (c) been effected by executed by, or otherwise deemed binding upon, all Entities or Governmental Units party thereto or affected thereby.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

(d)      All actions necessary to implement this Joint Plan as to Aliante Station or Aliante Holding shall have been effected.

(e)      As to Aliante Holding, the Aliante Effective Date with respect to Aliante Gaming shall have occurred or shall occur contemporaneously.

D.      **Waiver of Conditions**

The conditions to confirmation of this Joint Plan and to Consummation of this Joint Plan and the occurrence of an Applicable Effective Date set forth in Article IX may be waived by the Subsidiary Debtors, GVR and each Aliante Debtor with regard to the Subsidiary Debtors Effective Date, the GVR Effective Date and the Aliante Effective Date with respect to such Aliante Debtor, respectively, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirmation or Consummation of this Joint Plan; provided, however, that (i) any waiver of the conditions specified in Article IX.B above shall be acceptable to (x) the Subsidiary Debtors, the SCI Debtors, the Required Opco Consenting Lenders, the Mortgage Lenders, New Propco, and the New Opco Purchaser in connection with the confirmation of this Joint Plan as to the Subsidiary Debtors, (y) GVR, the GVR Purchaser and the Required GVR Consenting Lenders in connection with confirmation of this Joint Plan as to GVR and (z)(1) Aliante Gaming and the Required Aliante Consenting Lenders with respect to Aliante Gaming, (2) the Required Aliante Consenting Lenders and Aliante Holding with respect to Aliante Holding, and (3) Aliante Station with respect to Aliante Station, (ii) any waiver of the conditions specified in Article IX.C.1 above (x) shall be acceptable to the Subsidiary Debtors

and the SCI Debtors, (y) shall be reasonably acceptable to the Required Opco Consenting Lenders, New Propco, the New Opco Purchaser and (z) shall not be inconsistent with the terms of the New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the Committee Plan Support Stipulation, the Put Parties Support Agreement, the New Opco Purchase Agreement, the New Propco Implementation Agreements, the Second Amended MLCA, the Landco Assets Transfer Agreement, the SCI Plan or the SCI Confirmation Order; (iii) any waiver of the conditions specified in Article IX.C.2 above (x) shall be acceptable to GVR, (y) shall be reasonably acceptable to the Required GVR Consenting Lenders and the GVR Purchaser and (z) shall not be inconsistent with the terms of the GVR Purchase Agreement or the GVR Lender Plan Support Agreement; (iv) any waiver of the conditions specified in Article IX.C.3 above (x) shall be acceptable to Aliante Gaming, (y) shall be acceptable to the Required Aliante Consenting Lenders and (z) shall not be inconsistent with the terms of the New Aliante Transaction Agreements; and (v) any waiver of the conditions specified in Article IX.C.4(a) through (d) above (x) shall be acceptable to Aliante Station or Aliante Holding, as applicable and, with respect to the condition specified in Article IX.C.4(e) above, shall be acceptable to the Required Aliante Consenting Lenders.

With regard to the provision of this Article IX.D, the failure to satisfy or waive a condition to an Applicable Effective Date or Consummation of this Joint Plan may be asserted by a Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of a Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

## E.    **Effect of Non-Occurrence of an Applicable Effective Date**

If an Applicable Effective Date or Consummation of this Joint Plan does not occur with regard to a particular Debtor, then only as to such particular Debtor, this Joint Plan shall be null and void in all respects and nothing contained in this Joint Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in such Debtor(s); (2) prejudice in any manner the rights of such Debtor(s), any Holders or any other Person or Entity; (3) constitute an Allowance of any Claim; or (4) constitute an admission, acknowledgment, offer or undertaking by such Debtor(s), any Holders or any other Person or Entity in any respect.  If an Applicable Effective Date does occur and this Joint Plan is consummated as to a particular Debtor(s); the failure of an Applicable Effective Date or Consummation of this Joint Plan as to another Debtor(s) shall not, in any way, affect, modify, supplement, nullify or void this Joint Plan or the Confirmation Order as to any other Debtor(s) that have confirmed or confirmed or consummated this Joint Plan.  For the avoidance of doubt, any Debtor(s) that confirms and Consummates this Joint Plan and has this Joint Plan go effective and achieve such Debtor(s)' Applicable Effective Date shall be unaffected by the non-occurrence of another Debtor(s)' Applicable Effective Date and the Confirmation Order shall remain a Final Order as to such Debtor(s).

# ARTICLE X.

## RELEASES, EXCULPATION, INJUNCTION, PRESERVATION OF CAUSES OF ACTION AND RELATED PROVISIONS

### A.    General

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective Distributions and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, Section 510 of the Bankruptcy Code or otherwise.

In accordance with the provisions of this Joint Plan and pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after an Applicable Effective Date, Reorganized Aliante Gaming, the Plan Administrator may, as provided herein and in their sole and absolute discretion, compromise and settle (1) Claims against the Debtors and (2) Causes of Action against other Entities.

### B.    Comprehensive Settlement of Claims and Controversies

1.    General.    Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under this Joint Plan, the provisions of this Joint Plan, including the exculpation and release provisions contained in this Article X, constitute a good faith compromise and settlement of all Claims, Administrative Claims, Litigation Claims, Causes of Action or controversies relating to the rights that a Holder of a Claim, Administrative Claim or Equity Interest may have with respect to any Claim, Administrative Claim or Equity Interest against any Debtor, any Distribution to be made pursuant to this Joint Plan on account of any such Claim, Administrative Claim or Equity Interest, and any and all Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction, the Aliante Prepetition Transactions and the GVR Prepetition Transactions and all transactions relating thereto. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Applicable Effective Dates, of the compromise or settlement of all such Claims, Administrative Claims and Equity Interests or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of (x) the Debtors, the SCI Debtors and their respective Estates and property, and (y) the Holders of Claims, Administrative Claims and Equity Interests, and are fair, equitable and reasonable.

2.    Global Settlement.

(a)    In accordance with the terms and settlements set forth in the SCI Plan and approved by the SCI Confirmation Order, pursuant to Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under this Joint Plan, the provisions of this Joint Plan constitute a good faith compromise and settlement, and this Joint Plan constitutes a request to authorize and approve such compromise and settlement, of all Going

Private Transaction Causes of Action among the Subsidiary Debtors and the SCI Debtors and their respective Estates, and any Person, Entity or Governmental Unit.  Any distributions to be made pursuant to this Joint Plan on behalf of any Claim or Equity Interest against or in a Subsidiary Debtor shall be made on account of and in consideration of the Global Settlement, which, upon the Subsidiary Debtors Effective Date, shall be binding on the Subsidiary Debtors and their respective Estates, and all Holders of Claims, Administrative Claims and Equity Interests (whether or not Allowed) that indicate on their Ballots their agreement to grant the releases provided for in Article X of this Joint Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Subsidiary Debtors Effective Date of this Joint Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Subsidiary Debtors and their respective Estates, and the Holders of Claims, Administrative Claims and Equity Interests providing such releases, and is fair, equitable and reasonable.

(b)    Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under this Joint Plan, the provisions of this Joint Plan constitute a good faith compromise and settlement, and this Joint Plan constitutes a request to authorize and approve such compromise and settlement, of all Aliante Prepetition Transactions Causes of Action among the Aliante Debtors and their respective Estates and any Person, Entity or Governmental Unit.  Any distributions to be made pursuant to this Joint Plan shall be made on account of and in consideration of the Global Settlement, which, upon the Aliante Effective Date for each Aliante Debtor, shall be binding on such Aliante Debtor and its respective Estate and all Holders of Claims, Administrative Claims and Equity Interests (whether or not Allowed) that indicate on their Ballots their agreement to grant the releases provided for in Article X of this Joint Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Aliante Effective Date for each Aliante Debtor, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of such Aliante Debtor and its respective Estate and the Holders of Claims, Administrative Claims and Equity Interests providing such releases, and is fair, equitable and reasonable.

(c)    Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under this Joint Plan, the provisions of this Joint Plan constitute a good faith compromise and settlement, and this Joint Plan constitutes a request to authorize and approve such compromise and settlement, of all GVR Prepetition Transactions Causes of Action, to the extent not purchased by the GVR Purchaser pursuant to the GVR Purchase Agreement, among GVR and its Estate and any Person, Entity or Governmental Unit.  Any distributions to be made pursuant to this Joint Plan shall be made on account of and in consideration of the Global Settlement, which, upon the GVR Effective Date of this Joint Plan, shall be binding on GVR and its Estate and all Holders of Claims, Administrative Claims and Equity Interests (whether or not Allowed) that indicate on their Ballots their agreement to grant the releases provided for in Article X of this Joint Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the GVR Effective Date of this Joint Plan, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of GVR and its Estate, and the Holders of Claims, Administrative Claims and Equity Interests providing such releases, and is fair, equitable and reasonable.

The foregoing paragraphs (a), (b) and (c) are referred to as the "Global Settlement."

C.    **Releases Among Releasing Parties and Released Parties**

1.    RELEASES BY DEBTORS AND ESTATES. EFFECTIVE AS OF THE APPLICABLE EFFECTIVE DATES, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, AS THE CASE MAY BE, THE DEBTORS' ESTATES, AND EACH OF THEIR RESPECTIVE RELATED PERSONS (COLLECTIVELY, THE "RELEASING PARTIES") SHALL, AND SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE, WAIVE, VOID, EXTINGUISH AND DISCHARGE EACH AND ALL OF THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES AND RELATED PERSONS OF AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS, AVOIDANCE ACTIONS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, JUDGMENTS AND LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, THE GOING PRIVATE TRANSACTION CAUSES OF ACTION, THE ALIANTE PREPETITION TRANSACTIONS CAUSES OF ACTION AND THE GVR PREPETITION TRANSACTIONS CAUSES OF ACTION), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, EXISTING AS OF THE APPLICABLE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE APPLICABLE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR RESPECTIVE ASSETS, PROPERTY AND ESTATES, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THIS JOINT PLAN OR THE PREPETITION SOLICITATION OF VOTES ON THIS JOINT PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM, ADMINISTRATIVE CLAIM OR EQUITY INTEREST OR OTHER PERSON OR ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THIS JOINT PLAN OR ANY JOINT PLAN SUPPLEMENT; (II) WITH THE EXCEPTION OF THE GOING PRIVATE TRANSACTION CAUSES OF ACTION, THE GVR 2007 REFINANCING AND THE GVR 2008 NOTE DISTRIBUTION, ANY CAUSES OF ACTION ARISING FROM ACTUAL OR INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (III) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THIS JOINT PLAN AND THE

CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS JOINT PLAN OR ASSUMED PURSUANT TO THIS JOINT PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF AN APPLICABLE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON OR ENTITY.

2.    <u>RELEASES BY HOLDERS OF CLAIMS</u>.    EFFECTIVE AS OF THE APPLICABLE EFFECTIVE DATES, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, EACH HOLDER OF A CLAIM THAT HAS INDICATED ON ITS BALLOT ITS AGREEMENT TO GRANT THE RELEASE CONTAINED IN THIS ARTICLE X SHALL, AND SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE, WAIVE, VOID, EXTINGUISH AND DISCHARGE THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS, AVOIDANCE ACTIONS AND ANY OTHER OBLIGATIONS, RIGHTS, SUITS, DAMAGES, JUDGMENTS, DEBTS, REMEDIES AND LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, THE GOING PRIVATE TRANSACTION CAUSES OF ACTION, THE ALIANTE PREPETITION TRANSACTIONS CAUSES OF ACTION AND THE GVR PREPETITION TRANSACTIONS CAUSES OF ACTION), INCLUDING ANY CLAIMS OR CAUSES OF ACTION THAT COULD BE ASSERTED ON BEHALF OF OR AGAINST THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH HOLDER OF A CLAIM OR EQUITY INTEREST WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY, DERIVATIVELY OR COLLECTIVELY), BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE APPLICABLE EFFECTIVE DATE, IN ANY WAY RELATING OR PERTAINING TO (V) THE PURCHASE OR SALE, OR THE RESCISSION OF A PURCHASE OR SALE, OF ANY SECURITY OF THE DEBTORS, (W) THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR RESPECTIVE ASSETS, PROPERTY AND ESTATES, (X) THE CHAPTER 11 CASES, (Y) THE NEGOTIATION, FORMULATION AND PREPARATION OF THIS JOINT PLAN, THE DISCLOSURE STATEMENT, OR ANY RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENT INCLUDING, WITHOUT LIMITATION, ALL OF THE DOCUMENTS INCLUDED IN THIS JOINT PLAN SUPPLEMENT; AND (Z) THE GOING PRIVATE TRANSACTION CAUSES OF ACTION, THE ALIANTE PREPETITION TRANSACTIONS CAUSES OF ACTION AND THE GVR PREPETITION TRANSACTIONS CAUSES OF ACTION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT, WITH THE EXCEPTION OF THE GOING PRIVATE TRANSACTION CAUSES OF ACTION, THE GVR 2007 REFINANCING AND THE GVR 2008 NOTE DISTRIBUTION, THESE RELEASES WILL HAVE NO EFFECT ON THE LIABILITY OF ANY RELEASED PARTY ARISING FROM ANY ACT, OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE, CONSTITUTING WILLFUL MISCONDUCT, GROSS

NEGLIGENCE, FRAUD OR CRIMINAL CONDUCT AS DETERMINED BY A FINAL ORDER; PROVIDED FURTHER, HOWEVER, THE FOREGOING SHALL NOT CONSTITUTE A WAIVER OR RELEASE OF ANY RIGHT OF THE HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST, OBLIGEE UNDER ANY ASSUMED LIABILITY (WHETHER ASSUMED UNDER THIS JOINT PLAN OR IN ACCORDANCE WITH A PRIOR BANKRUPTCY COURT ORDER), OR PARTY TO AN ASSUMED CONTRACT TO PAYMENT UNDER THIS JOINT PLAN OR OTHERWISE ON ACCOUNT OF SUCH ALLOWED CLAIM OR ANY OF THE RIGHTS OF ANY PARTIES IN RESPECT OF ASSUMED LIABILITIES OR ASSUMED CONTRACTS UNDER OR IN CONNECTION WITH THIS JOINT PLAN OR PRIOR ORDER OF THE BANKRUPTCY COURT. THE RELEASES SET FORTH IN THIS ARTICLE X SHALL BE BINDING UPON AND SHALL INURE TO THE BENEFIT OF ANY CHAPTER 7 TRUSTEE IN THE EVENT THE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7.

3.      Injunction Related to Releases.  Except as provided in this Joint Plan or the Confirmation Order, as of an Applicable Effective Date, (i) all Persons and Entities that hold, have held, or may hold a Claim, Administrative Claim or any other Cause of Action, Litigation Claim, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, relating to any of the Debtors or any of their respective assets, property and Estates, that is released pursuant to this Article X of this Joint Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released Claims, Administrative Claims, Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and of all Equity Interests or other rights of a Holder of an Equity Security or other ownership interest:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person or Entity discharged under this Article X or otherwise under this Joint Plan; and (e) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Joint Plan or the Confirmation Order.

4.      Limitation on Releases.  Notwithstanding anything herein to the contrary, nothing in this Joint Plan is intended or shall operate to waive or release the rights of any Person or Entity, including any Holder of an Allowed Claim, to enforce this Joint Plan or any contract, instrument, release or other agreement or document delivered under or in connection with, or otherwise contemplated by, this Joint Plan or assert any claim or cause of action arising under, or relating to any of the foregoing.

D.    **Exculpation**

The Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any Claims, Administrative Claims or Causes of Action arising prior to or on an Applicable Effective Date for any act taken or omitted to be taken in connection with or related to the Chapter 11 Cases, including but not limited to the filing of the Chapter 11 Cases, any relief sought by the Debtors on a first day basis or otherwise and any amounts disbursed by the Debtors pursuant thereto, the Prepetition Solicitation, formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effecting the Consummation of this Joint Plan, the Disclosure Statement or any sale, contract, instrument, release or other agreement or document created or entered into in connection with this Joint Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement, confirmation or Consummation of this Joint Plan; provided, however, that the foregoing provisions shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by this Joint Plan or this Joint Plan Supplement.

E.    **Preservation of Causes of Action**

1.    **Maintenance of Causes of Action**

Except as otherwise provided in this Article X or elsewhere in this Joint Plan or the Confirmation Order, after the Subsidiary Debtors Effective Date, the Aliante Effective Date with respect to Aliante Holding and Aliante Station or the GVR Effective Date, as the case may be, the Plan Administrator shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims relating to the Subsidiary Debtors, Aliante Holding, Aliante Station, or GVR, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case.  The Plan Administrator shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action or Litigation Claims relating to the Subsidiary Debtors, Aliante Holding, Aliante Station, or GVR, except for any Causes of Action or Litigation Claims against the Prepetition Opco Secured Lenders, without notice to or approval from the Bankruptcy Court.

Except as otherwise provided in this Article X or elsewhere in this Joint Plan or the Confirmation Order, after the Aliante Effective Date with respect to Aliante Gaming, Reorganized Aliante Gaming shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims relating to Aliante Gaming, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case.

Reorganized Aliante Gaming may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all such Litigation Claims without notice to or approval from the Bankruptcy Court.

For the avoidance of doubt, the provisions of this Article X.E shall not limit the Releases, exculpation or injunction provisions contained in Article X of this Joint Plan.

## 2.    Preservation of All Causes of Action Not Expressly Settled or Released

(a)    Unless a Cause of Action or Litigation Claim against a Holder of a Claim, Administrative Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised, transferred or settled in this Joint Plan, or an agreement or document related thereto or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or by the Plan Administrator (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the confirmation of this Joint Plan or Consummation of this Joint Plan based on the Disclosure Statement, this Joint Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in this Joint Plan (including, without limitation, and for the avoidance of doubt, the Release contained in this Article X) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtors and the Plan Administrator expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits other than to the extent the same is waived, purchased, transferred or otherwise released pursuant to the terms of this Joint Plan or the Confirmation Order or related agreement or document.  For the avoidance of doubt, any litigation with respect to the Going Private Transaction, the Aliante Prepetition Transactions and the GVR Prepetition Transactions is not preserved by any provision of this Joint Plan including this Article X.E.2.

(b)    Unless a Cause of Action or Litigation Claim against a Holder of a Claim, Administrative Claim or Equity Interest or other Person or Entity is expressly waived, relinquished, released, compromised or settled in this Joint Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors and the Plan Administrator reserve all rights to pursue:

(i)    Any other Causes of Action, whether legal, equitable or statutory in nature;

(ii)    Any and all actions arising under or actionable pursuant to the Bankruptcy Code, including, without limitation, Sections 544, 545, 547 (except as provided below), 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code; and

(iii)    Any other Causes of Action that currently exist or may subsequently arise and which have not been otherwise set forth herein or in any schedule of Causes of Action, because the facts upon which such Causes of Action are based are not currently or fully known by the Debtors (collectively, the "Unknown Causes of Action").  The failure to list or describe any such Unknown Cause of Action herein is not intended to limit the rights of the Debtors or the Plan Administrator to pursue any Unknown Cause of Action.

## F.    **Supplemental Injunction**

The Confirmation Order shall provide for the following injunctions to take effect as of an Applicable Effective Date.

1.    ***Terms.  In order to preserve and promote the settlements contemplated by and provided for in this Joint Plan and as described in this Article X, except as otherwise expressly provided in this Joint Plan or the Confirmation Order, all Persons and Entities and any Person or Entity claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims, Administrative Claims or any other Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities of any nature whatsoever, and all interests, or other rights of a Holder of an Equity Security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim or Administrative Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims, Administrative Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Equity Interests or other rights of a Holder of an Equity Security or other ownership interest, arising prior to the Applicable Effective Date (including prior to the Petition Date), including, but not limited to***:

(a)    ***commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims, Administrative Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all interests, or other rights of a Holder of an Equity Security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;***

(b)    ***enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims, Administrative Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all interests or other rights of a Holder of an Equity Security or other ownership interest;***

(c)    ***creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such***

*Claims, Administrative Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Equity Interests or other rights of a Holder of an Equity Security or other ownership interest;*

(d)    *except as otherwise expressly provided in this Joint Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims, Administrative Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all Equity Interests or other rights of a Holder of an Equity Security or other ownership interest; and*

(e)    *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Joint Plan or the Confirmation Order relating to such Claims or other Causes of Action, Litigation Claims, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, and all interests or other rights of a Holder of an Equity Security or other ownership interest*.

2.    *Bankruptcy Rule 3016 Compliance*.  *The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that this Joint Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

## G.    Releases, Discharges, Exculpations, Injunctions and Preservation of Causes of Action are Integral to Joint Plan

Each of the settlements, releases, discharges, exculpations, injunctions and preservation of causes of action provided in this Article X of this Joint Plan is an integral part of this Joint Plan and is essential to its implementation.  Each of the Released Parties, the Debtors and any other Person or Entity protected thereby, as applicable, shall have the right to seek independently the enforcement of such settlements, releases, discharges, exculpations, injunctions and preservation of causes of action.

## H.    Binding Nature of Joint Plan

ON EACH OF THE APPLICABLE EFFECTIVE DATES, AND EFFECTIVE AS OF AN APPLICABLE EFFECTIVE DATE, THIS JOINT PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AND ADMINISTRATIVE CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THIS JOINT PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS JOINT PLAN OR AFFIRMATIVELY VOTED TO REJECT THIS JOINT PLAN.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to Sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Applicable Effective Dates, the Bankruptcy Court shall, after the Applicable Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Joint Plan as legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, Administrative Claim or Equity Interest, the resolution of any and all objections to the allowance or priority of any Claim, Administrative Claim or Equity Interest, and the resolution of any claim for taxes of any kind arising prior to an Applicable Effective Date or as a result of any transactions occurring on or before an Applicable Effective Date in accordance with this Joint Plan and the rights of the Debtors or the Plan Administrator to apply tax attributes in satisfaction or offset of any such claims;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Joint Plan, for periods ending on or before the Confirmation Date;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Joint Plan after an Applicable Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.      resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Joint Plan;

6.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of an Applicable Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Applicable Effective Dates or instituted after an Applicable Effective Date;

7.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Joint Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Joint Plan, this Joint Plan Supplement or the Disclosure Statement;

8.      resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Joint Plan or any Person's or Entity's obligations incurred in connection with this Joint Plan; provided, however, that any

dispute arising under or in connection with the New Opco Credit Agreement, the New Secured Aliante Debt and the New Propco Credit Agreement shall be addressed and resolved in accordance with the provisions of the applicable document;

9.      hear and determine all Causes of Action that are pending as of each of the Applicable Effective Dates or that may be commenced in the future;

10.     issue and enforce injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of this Joint Plan, except as otherwise provided in this Joint Plan;

11.     enforce the terms and condition of this Joint Plan and the Confirmation Order;

12.     resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

13.     hear and determine the Litigation Claims by or on behalf of the Debtors or the Plan Administrator;

14.     enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15.     resolve any other matters that may arise in connection with or relate to this Joint Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Joint Plan or the Disclosure Statement; and

16.     enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees

All outstanding fees payable pursuant to Section 1930 of title 28 of the United States Code shall be paid on an Applicable Effective Date.  All such fees payable after the Applicable Effective Dates shall be paid prior to the closing of the Chapter 11 Cases when due or as soon thereafter as practicable.

### B.    Modification of Joint Plan

Subject to the limitations and rights contained in this Joint Plan:  (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Joint Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Plan Administrator, as applicable, may, upon order of the

Bankruptcy Court, amend or modify this Joint Plan, in accordance with Section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Joint Plan in such manner as may be necessary to carry out the purpose and intent of this Joint Plan, provided, however, that any amendment, modification or supplement to this Joint Plan shall be reasonably acceptable, as appropriate, to New Propco, New Opco, the New Opco Purchaser, the GVR Purchaser, the Mortgage Lenders, FG, the Consenting Opco Lenders, the Required GVR Consenting Lenders and the Required Aliante Consenting Lenders and shall not be inconsistent with the terms of the SCI Plan, SCI Confirmation Order, New Opco Purchase Agreement, the Mortgage Lender/FG Restructuring Agreement, the Opco Lender Restructuring Support Agreement, the GVR Purchase Agreement, the GVR Lender Plan Support Agreement, the Put Parties Support Agreement or the New Aliante Transaction Agreements. A Holder of a Claim or Equity Interest that has accepted this Joint Plan shall be deemed to have accepted this Joint Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change (a) the treatment of such Claim or Equity Interest of such Holder, or (b) the provisions of any agreement included in the Joint Plan Supplement.

## C.    **Revocation of Joint Plan**

The Debtors reserve the right to revoke or withdraw this Joint Plan in its entirety for all Debtors, or in respect of any Debtor, prior to the Confirmation Date and, if applicable, to File subsequent chapter 11 plans or to amend this Joint Plan to reflect such revocation or withdrawal of this Joint Plan as to specific Debtor(s). If the Debtors revoke or withdraw this Joint Plan or if confirmation of this Joint Plan or Consummation of this Joint Plan or an Applicable Effective Date does not occur, then (solely as it pertains to any Debtor for which this Joint Plan has been revoked or withdrawn):   (1) this Joint Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Joint Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Joint Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Joint Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person or Entity; (b) prejudice in any manner the rights of the Debtors or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Person or Entity.

## D.    **Successors and Assigns**

This Joint Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns. The rights, benefits, and obligations of any Person or Entity named or referred to in this Joint Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

## E.    **Reservation of Rights**

Except as expressly set forth herein, this Joint Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order, an Applicable Effective Date occurs and this Joint Plan is consummated with regard to a particular Debtor(s). Neither the filing of this Joint Plan, any statement or provision contained herein, nor the taking of any action

by the Debtors or any other Person or Entity with respect to this Joint Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Person or Entity; or (2) any Holder of a Claim or an Equity Interest or other Person or Entity prior to an Applicable Effective Date.

**F.     Further Assurances**

The Debtors or the Plan Administrator, as applicable, all Holders of Claims, Administrative Claims and Equity Interests and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Joint Plan or the Confirmation Order. On or before an Applicable Effective Date, the Debtors shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**G.     Severability**

If, prior to the Confirmation Date, any term or provision of this Joint Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Joint Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Joint Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**H.     Service of Documents**

All notices, requests, and demands to or upon the Debtors or the Plan Administrator to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

***To the Subsidiary Debtors***

Mr. Richard Haskins
Executive Vice President,
General Counsel & Secretary
Station Casinos, Inc.
1505 South Pavilion Center Drive
Las Vegas, Nevada 89135
Tel: 702-495-3000
Fax: 702-495-4252

**with copies to**:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Tel:  213-892-4000
Fax:  213-629-5063
Attention:      Paul S. Aronzon, Esq.
                       Thomas R. Kreller, Esq.

### *To the Aliante Debtors*

Aliante Gaming, LLC
c/o Aliante Station, LLC, its Manager
1505 South Pavilion Center Drive
Las Vegas, Nevada 89135
Tel:  702-495-3000
Fax:  702-495-4252
Attention:      Mr. Richard Haskins

**with copies to**:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Tel:  312-862-2000
Fax:  312-862-2200
Attention:      David Seligman, P.C., Esq.
                       David Agay, Esq.

### *To Green Valley Ranch Gaming, LLC*

Green Valley Ranch Gaming, LLC
c/o GV Ranch Station, Inc., its Manager
1505 South Pavilion Center Drive
Las Vegas, Nevada 89135
Tel:  702-495-3000
Fax:  702-495-4252
Attention:      Mr. Richard Haskins

**with copies to**:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654

Tel:  312-862-2000
Fax:  312-862-2200
Attention:      David Seligman, P.C., Esq.
                       David Agay, Esq.


**_To the GVR Purchaser_**

Station GVR Acquisition, LLC
c/o Fertitta Entertainment LLC
10801 W. Charleston Boulevard, Suite 600
Las Vegas, Nevada 89135
Tel:  702-495-3000
Fax:  702-495-3290
Attention:      Mr. Marc J. Falcone

**with copies to**:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa St., Ste. 3000
Los Angeles, California 90017
Tel:  213-892-4000
Fax:  213-892-7333
Attention:      Kenneth J. Baronsky, Esq
                       Alexander M. Kaye, Esq.


## I.        Exemption from Registration Pursuant to 28 U.S.C. § 1145

Pursuant to Section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of any securities or interests on account of, and in exchange for the Claims against the Debtors shall be exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and any other applicable non-bankruptcy law or regulation.

## J.        Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Joint Plan provides otherwise, the rights and obligations arising under this Joint Plan shall be governed by, and construed and enforced in accordance with, the laws of Nevada, without giving effect to the principles of conflicts of law of such jurisdiction.

**<u>EXHIBIT 2</u>**

**<u>EXHIBIT 2</u>**

#4831-0060-3657

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:     (213) 892-4000
Facsimile:     (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:     (775) 823-2900
Facsimile:     (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com
Local Reorganization Counsel for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re : <br> STATION CASINOS, INC., *et al.,* <br><br>     Debtors and Debtors in Possession.[1] <br><br> ☒ Affects all debtors listed in footnote 2[2] | Chapter 11 <br> Case No. BK-09-52477 <br><br> Jointly Administered BK Cases: 09-52470 through 09-52487; 10-50381; 11-51188; 11-51190 through 11-51219; and 11-51702 <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF "FIRST AMENDED PREPACKAGED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR SUBSIDIARY DEBTORS, ALIANTE DEBTORS AND GREEN VALLEY RANCH GAMING, LLC (DATED MAY 20, 2011)" WITH RESPECT TO SUBSIDIARY DEBTORS AND ALIANTE DEBTORS** |

[1] The debtors in these jointly administered chapter 11 cases are: (i) Station Casinos, Inc.; Northern NV Acquisitions, LLC; Reno Land Holdings, LLC; River Central, LLC; Tropicana Station, LLC; FCP Holding, Inc.; FCP Voteco, LLC; Fertitta Partners LLC; FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II, LLC; FCP MezzCo Borrower I, LLC and FCP PropCo, LLC (collectively, the "**SCI Debtors**"), (ii) Auburn Development, LLC; Boulder Station, Inc.; Centerline Holdings, LLC; Charleston Station, LLC; CV HoldCo, LLC; Durango Station, Inc.; Fiesta Station, Inc.; Fresno Land Acquisitions, LLC; Gold Rush Station, LLC; Green Valley Station, Inc.; GV Ranch Station, Inc.; Inspirada Station, LLC; Lake Mead Station, LLC; LML Station, LLC; Magic Star Station, LLC; Palace Station Hotel & Casinos, Inc.; Past Enterprises, Inc.; Rancho Station, LLC; Santa Fe Station, Inc.; SC Durango Development LLC; Sonoma Land Holdings, LLC; Station Holdings, Inc.; STN Aviation, Inc.; Sunset Station, Inc.; Texas Station, LLC; Town Center Station, LLC; Tropicana Acquisitions, LLC; Tropicana Station, Inc.; and Vista Holdings, LLC (collectively, the "**Subsidiary Debtors**"), (iii) Aliante Gaming, LLC, Aliante Holding, LLC, and Aliante Station LLC (collectively, the "**Aliante Debtors**"), and (iv) Green Valley Ranch Gaming LLC ("**GVR**").

[2] These Findings of Fact and Conclusions of Law apply to the Subsidiary Debtors and Aliante Debtors, and not to GVR.

# I.    **INTRODUCTION.**

1.      On July 28, 2009, Station Casinos, Inc. ("SCI"), and certain of its affiliates commenced chapter 11 cases in this Court (the "SCI Cases").  On February 10, 2010, GV Ranch Station, Inc. commenced its chapter 11 case in this Court.  On August 27, 2010, this Court entered its order confirming the "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (the "SCI Plan") (docket no. 2039).[3]  The Effective Date of the SCI Plan has not yet occurred.

2.      On April 12, 2011 (the "Petition Date"), the above captioned Subsidiary Debtors (excluding GV Ranch Station, Inc. which had a chapter 11 case already pending), Aliante Debtors and GVR commenced their chapter 11 cases (the "Chapter 11 Cases") in this Court.  Pursuant to an order of this Court, the Chapter 11 Cases are jointly administered with the SCI Cases.  Also on April 12, 2011, the Subsidiary Debtors, Aliante Debtors and GVR filed their "Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Gaming, LLC (Dated March 22, 2011)" (the "Plan"), and their "Disclosure Statement to Accompany Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Gaming, LLC (Dated March 22, 2011)" (the "Disclosure Statement") (both at docket no. 2797).  On April 15, 2011, the Court entered an order setting May 25, 2011 as the hearing to consider approval of the Disclosure Statement and confirmation of the Plan, and setting certain deadlines for objections and briefing (the "Confirmation Hearing Order").

3.      On May 9 and 15, 2011, the Subsidiary Debtors filed their first and second Plan Supplements (docket nos. 2987 and 3092).  On May 13, 2011, the Aliante Debtors and GVR filed their Plan Supplements (docket nos. 3074 and 3087, respectively).  On May 19, 2011, the Aliante Debtors filed the First Amendment to their Plan Supplement (docket no. 3175).

4.      Prior to the Petition Date, commencing on March 23, 2011, the Subsidiary Debtors, Aliante Debtors and GVR distributed copies of the Plan and Disclosure Statement and

---

[3]   Unless otherwise specified, all "docket no." references mean the docket in Case No. 09-52477 in this Court.

related exhibits, schedules and other materials to certain of their creditors, and solicited

prepetition acceptances of the Plan pursuant Section 1125(g) of the Bankruptcy Code (the

"Prepetition Solicitation").  On April, 27, 2011, the Voting and Claims Agent[4] filed its "Ballot

Summary Declaration in Support of Confirmation of Joint Plan, Certifying Ballots Accepting

and Rejecting the Plan, and Submitting Ballot Reports" with respect to the votes of Holders of

Claims against and Equity Interests in the Subsidiary Debtors and GVR (docket no. 2895) (the

"First Tabulation of Ballots").  On May 6, 2011, the Voting and Claims Agent filed its "Ballot

Summary Declaration in Support of Confirmation of Joint Plan, Certifying Ballots Accepting

and Rejecting the Plan, and Submitting Ballot Reports" with respect to the votes of Holders of

Claims against and Equity Interests in the Aliante Debtors (docket no. 2949) (the "Second

Tabulation of Ballots").  The First and Second Tabulation of Ballots together show that all

Voting Classes voted to accept the Plan.

   5. On May 16, 2011, the Subsidiary Debtors commenced a solicitation of consents

from the Prepetition Opco Secured Lenders for approval of certain modifications to the Plan that

would have the effect of adding non-debtor Tropicana Station, Inc. ("TSI") as a Subsidiary

Debtor under the Plan.  The proposed modifications were premised upon TSI commencing a

chapter 11 case in this Court on or about May 23, 2011, and the Court entering an order jointly

administering the TSI case with the Chapter 11 Cases.  On May 23, 2011, TSI commenced a

chapter 11 case in this Court, Case No. 11-51702.  On May 25, 2011, the Court entered an order

jointly administering the TSI chapter 11 case with the other Chapter 11 Cases.

   6. May 16, 2011 was also the deadline established by the Court for filing and

serving objections to confirmation of the Plan.  In fact, no objections to confirmation of the Plan

or to any of the terms of the Plan in respect of the Subsidiary Debtors and the Aliante Debtors

were filed by any Holder of Claims against or Equity Interests in the Subsidiary Debtors or

Aliante Debtors or by any other party in interest in the Chapter 11 Cases of the Subsidiary

Debtors and Aliante Debtors, by that May 16, 2011 deadline.  Objections were filed, however, to

---

[4] Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to them in the Confirmation Order, Plan, or Disclosure Statement, as applicable.  The rules of interpretation set forth in Article I.A. of the Plan shall apply to these Findings of Fact and Conclusions of Law.

confirmation of the Plan with respect to GVR.  As a result, GVR concluded that its bankruptcy Estate would be best served by submission of a separate brief in support of confirmation of the Plan with respect to GVR, and entry of a separate confirmation order and findings of fact and conclusions of law with respect to GVR.

7.    On May 20, 2011, the Subsidiary Debtors, Aliante Debtors and GVR filed their "First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 20, 2011)" (docket no. 3186) (the "Amended Plan").  The Amended Plan adds TSI as a Subsidiary Debtor, provides additional detail regarding the implementation of the restructuring of the Aliante Debtors, and makes certain other revisions to the Plan.  A redline showing the revisions to the Plan contained in the Amended Plan was filed on May 20, 2011 (docket no. 3186, Exhibit 2).  On May 24, 2011, an additional revision to the Amended Plan, providing for the addition of the Aliante IP License Agreement as a New Aliante Transaction Agreement, was filed with the Court, including a redline showing the changes over the prior filed version (docket no. 3253).  The revisions to the first filed Plan contained in the Amended Plan, and the revisions filed on May 24, 2011 are hereinafter collectively referred to as the "Plan Modifications."  All further references in these Findings of Fact and Conclusions of Law to the Plan mean the version filed by the Debtors on May 24, 2011 (docket no.3253).

8.    Also on May, 20, 2011, the Subsidiary Debtors and Aliante Debtors filed their: (a) Memorandum of Law in Support of Confirmation of the Plan solely for the Subsidiary Debtors and Aliante Debtors, and expressly excluding GVR (docket no. 3187); and (b) proposed Confirmation Order and proposed Findings of Fact and Conclusions of Law, in both cases with respect to the Subsidiary Debtors and Aliante Debtors only, and expressly excluding GVR (docket no. 3188). In support of the Memorandum of Law, the Subsidiary Debtors and Aliante Debtors filed the Declaration of Richard Haskins, Executive Vice President, General Counsel and Secretary of SCI (docket no.3226).

9.    Unless expressly stated otherwise herein, all further references contained in these Findings of Fact and Conclusions of Law to: (a) the "Debtors" mean the Subsidiary Debtors and

Aliante Debtors, and do not include GVR; (b) the "<u>Estates</u>" mean the Estates of the Subsidiary Debtors and Aliante Debtors and do not include the Estate of GVR; (c) the "<u>Chapter 11 Cases</u>" mean the Chapter 11 Cases of the Subsidiary Debtors and Aliante Debtors and do not include the Chapter 11 Case of GVR; and (d) the "<u>Restructuring Transactions</u>" mean only as they apply to the Subsidiary Debtors and Aliante Debtors, and not as they apply to GVR.

10.    A hearing pursuant to Sections[5] 1127, 1128 and 1129 and Federal Rules of Bankruptcy Procedure 2002, 3017, 3018, 3019(a), 3020(b) through (e) and 7052 to consider confirmation of the Plan and approval of the Disclosure Statement was held on May 25, 2011 (the "<u>Confirmation Hearing</u>").

11.    The Court has considered all of the papers filed in support of confirmation of the Plan, including supporting declarations, and the testimony presented and evidence admitted at the Confirmation Hearing.  In connection therewith, the Court takes judicial notice of all of the papers and pleadings filed by the supporters and opponents of the Plan during the course of the proceedings leading to the Confirmation Hearing.  The Court has entered a separate order confirming the Plan for the Subsidiary Debtors and Aliante Debtors (the "<u>Confirmation Order</u>"), and makes the following Findings of Fact and Conclusions of Law in connection therewith.

12.    These Findings of Fact and Conclusions of Law refer to, in summary fashion, numerous provisions of the Plan.  All such descriptions are qualified by the express terms of the Plan, which Plan terms control unless expressly modified in the Confirmation Order.  In addition, the failure to specifically include or discuss any particular provision of the Plan in these Findings of Fact and Conclusions of Law shall not diminish the effectiveness of any such provision, it being the intent of the Court that the Plan shall be confirmed in its entirety, and the Plan is incorporated herein in its entirety by this reference.

13.    Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact. These written Findings of Fact and Conclusions of Law shall also

---

[5]   Unless otherwise specified, all "Section" references are to chapter 11 of Title 11 of the U.S. Code, the "Bankruptcy Code."

1  include any oral findings of fact and conclusions of law made by the Court during or at the

2  conclusion of the Confirmation Hearing in accordance with Bankruptcy Rule 7052, made

3  applicable to these proceedings by Bankruptcy Rule 9014.

4  **II.    FINDINGS OF FACT.**

5        **A.    JURISDICTION AND VENUE.**

6        14.    The Debtors commenced their respective Chapter 11 Cases by filing voluntary

7  petitions for relief under chapter 11.  Each of the Debtors has its principal place of business or

8  principal assets in Nevada.

9        **B.    COMPLIANCE WITH THE REQUIREMENTS OF

10        SECTION 1129 OF THE BANKRUPTCY CODE.**

11            **1.    Section 1129(a)(1) – Compliance of the Plan

12            with Applicable Provisions of the Bankruptcy Code.**

13        15.    The Plan complies with all applicable provisions of the Bankruptcy Code, as

14  required by Section 1129(a)(1), including Sections 1122 and 1123.

15              **a.    Sections 1122 and 1123(a)(1)-(4) – Classification

16              and Treatment of Claims and Equity Interests.**

17        16.    In accordance with the requirements of Sections 1122(a) and 1123(a)(1), Article

18  III of the Plan designates Classes of Claims and Equity Interests, other than Administrative

19  Claims and Priority Tax Claims (pursuant to Section 1123(a)(1), classes of Administrative

20  Claims and Priority Tax Claims are not required to be classified).  In accordance with the

21  requirements of  Section 1122(a), each Class of Claims and Equity Interests contains only

22  Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests

23  within that Class.  The Plan designates 134 Classes of Claims and 30 Classes of Equity Interests

24  for the Subsidiary Debtors and Aliante Debtors.  Such classification is proper under Section

25  1122(a) because such Claims and Equity Interests have differing rights among each other and

26  against the Debtors' assets or differing interests in the Debtors.  Valid business, factual and legal

27  reasons exist for classifying the various Classes of Claims and Equity Interests in the manner set

28  forth in the Plan.

#4827-8452-4809

1      17.    In accordance with the requirements of Sections 1123(a)(2) and 1123(a)(3),

2  Article III of the Plan specifies all Classes of Claims and Equity Interests that are not impaired

3  under the Plan and specifies the treatment of all Classes of Claims and Equity Interests that are

4  impaired under the Plan.  Consistent with Section 1123(a)(4), Article III of the Plan also

5  provides the same treatment for each Claim or Equity Interest within a particular Class, unless

6  the Holder of a Claim or Equity Interest agrees to less favorable treatment of its Claim or Equity

7  Interest.

8                    **b.      Section 1123(a)(5) – Adequate Means
9                              for Implementation of the Plan.**

10      18.    Article V and certain other of the provisions of the Plan contain the principal

11  means for the Plan's implementation.  Those provisions relate to, among other things, the

12  conveyances, assignments, transfers and deliveries of the New Opco Acquired Assets, New

13  Propco Acquired Assets, Landco Assets, Aliante Holdings Assets[6] and the Transferred Aliante

14  Hotel Assets to the applicable Transferee Parties, pursuant to the Plan and the Restructuring

15  Transactions.  All references herein to the "Restructuring Transactions" means the transactions

16  contemplated by the New Opco Purchase Agreement,[7] New Opco Implementation Agreements,

17  Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and

18  Restated Operating Agreement for NP IP Holdings LLC, the New Aliante Transaction

19  Agreements and the other Plan implementation agreements, documents and instruments referred

20  to in Article V of the Plan or otherwise contained in the Plan, or executed and delivered to

21  implement the transactions contemplated under the Plan.  The Persons and Entities receiving the

22  New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings

23  Assets and the Transferred Aliante Hotel Assets pursuant to the Restructuring Transactions,

24

25  [6]  "Aliante Holdings Assets" means all the assets of Aliante Debtor Aliante Holding, LLC other than the
     Transferred Aliante Hotel Assets and the Equity Interests in Aliante Gaming.

26  [7]  As used herein, the "New Opco Purchase Agreement" means the Asset Purchase Agreement dated
     June 7, 2010, by and among the Sellers (as defined therein) and FG Opco Acquisitions LLC, a newly

27  formed Nevada limited liability company, as amended, supplemented or otherwise modified from time to
     time, a form of which was filed with the Bankruptcy Court on May 25, 2010 (docket no. 1526) and was

28  approved by the SCI Confirmation Order, and under the definition set forth in the SCI Plan is also known
     as the "New Propco Purchase Agreement."

together with such Persons' and Entities' Subsidiaries, designees, Affiliates and other Related Persons, are hereinafter referred to individually as a "<u>Transferee Party</u>" and collectively as the "<u>Transferee Parties</u>."

19.     The Restructuring Transactions carry out several of the methods for implementing a chapter 11 plan expressly provided for in Section 1123(a)(5): Section 1123(A)(5)(B) (transfer of all or any part of the property of the estate to one or more entities); Section 1123(a)(5)(D) (sale of property of the estate, and distribution of other property of the estate to the holders of interests in such property); Section 1123(a)(5)(E) (satisfaction or modification of liens); Section 1123(a)(5)(F) (cancellation of indentures and similar instruments); Section 1123(a)(5)(J) (issuance of securities by entities receiving property of the estate in exchange for claims against the Debtors).

i.     **The Sale of the Subsidiary Debtors' Assets**

20.     On June 4, 2010, in the SCI Cases, the Court entered its "Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos Inc. and Certain 'Opco' Subsidiaries" (the "<u>Bidding Procedures Order</u>") (docket no. 1563).  Pursuant to the Bidding Procedures Order, the Court, among other things, (a) authorized the SCI Debtors to conduct a process for the marketing and sale of substantially all of the SCI Debtors' Opco business and certain related assets (the "<u>New Opco Acquired Assets</u>," which, for the avoidance of doubt, includes the New Propco Purchased Assets), conduct an auction and select the successful bid, and (b) deemed the Stalking Horse Bidder to be a qualified bidder.  The New Opco Acquired Assets include substantially all of the assets of the Subsidiary Debtors.

21.     The SCI Debtors provided notice of the auction and Bidding Procedures to: (a) the Office of the United States Trustee; (b) the Official Committee of Unsecured Creditors in the SCI Cases (the "<u>SCI Official Creditors Committee</u>"); (c) the Nevada Gaming Commission; (d) all (i) creditors of the SCI Debtors as defined in Section 101(1); (ii) entities known to the SCI Debtors to possess and/or exercise any control over any of the New Opco Acquired Assets; (iii) entities known to the SCI Debtors to assert any rights in any of the New Opco Acquired

Assets; (iv) parties in interest and other entities and persons so entitled and known to the SCI Debtors; (v) parties to the proposed Assumed Contracts (which included parties to all of the contracts and leases that the Subsidiary Debtors intend to assume and assign); (vi) applicable federal, state and local tax authorities with jurisdiction over the SCI Debtors or the New Opco Acquired Assets, including the Internal Revenue Service; (vii) federal, state and local environmental authorities in jurisdictions in which the SCI Debtors operate their businesses or in which the New Opco Acquired Assets are located; and (viii) any known party which has expressed a bona fide interest in writing to the SCI Debtors regarding any purchase of the New Opco Acquired Assets.

22.    Pursuant to the "Order, Pursuant to 11 U.S.C. §§ 327(a) and 328(a), and Fed. R. Bankr. P. 2014, Authorizing Employment and Retention of Lazard Freres & Co. LLC ("Lazard") as Financial Advisor and Investment Banker for the [SCI] Debtors," entered on September 18, 2009 (docket no. 326), the Court authorized the SCI Debtors to utilize the services of Lazard to market for sale the New Opco Acquired Assets.  The marketing of the New Opco Acquired Assets took place over a several month period.  Notice of the Auction and the Bidding Procedures Order was published in the Las Vegas Review-Journal, the Wall St. Journal, and the Financial Times.  Lazard contacted seventy nine potential bidders, and received expressions of interest from thirty nine potential bidders; and twenty six potential bidders signed confidentiality agreements and received a package of preliminary due diligence information.  Of those initial twenty six parties conducting due diligence, eight signed Letters of Intent that entitled them to additional, more comprehensive due diligence.  *See* "Status Report of Dr. James E. Nave, Independent Director, Regarding Compliance with Auction Procedures and Resulting Bids with Respect to the Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries," filed August 5, 2010 (docket no. 1885) (the "Nave Report"), at ¶¶ 3-6.  Dr. Nave was the independent director of SCI tasked with overseeing the Sale Process.

23.     The SCI Debtors, under the direction of Dr. Nave and in consultation with the Consultation Parties,[8] determined that six of the Letters of Intent signatories satisfied the requirements to be Qualified Bidders (not including the Stalking Horse Bidder). However, by the July 30, 2010 deadline under the Bidding Procedures for receipt of Qualified Bids, the Debtors had received only one Qualified Bid, that of the Stalking Horse Bidder. As a result, there was no auction. Nave Report at ¶¶ 7-10.

24.     Daniel Aronson, a Managing Director at Lazard, filed a Declaration in support of the Nave Report (docket no. 1886) (the "Aronson Sale Process Report"). Aronson has worked as restructuring professional for twenty two years, and has headed up Lazard's efforts as financial advisor and investment banker for the SCI Debtors. In addition to confirming the facts in the Nave Report, Aronson noted that the process of the selection of the Stalking Horse Bid resulted in an increase of more than $135 million in the proposed purchase price. Aronson Sale Process Report at ¶ 9.

25.     Aronson reported that Lazard's efforts were especially focused on ensuring a level playing field for all bidders, including in particular potential bidder Boyd Gaming. He opined that the Bidding Procedures approved by the Court provided an open and level playing field for all potential bidders, and the Sale Process provided fair and open access to all reasonable due diligence materials. Aronson noted that, following Court approval of the Bidding Procedures, no bidder voiced any complaint about the Bidding Procedures, or requested that the Debtors deviate from or modify the Bidding Procedures. He concluded that the Stalking Horse Bid was the highest and best bid for the New Opco Acquired Assets. Aronson Sale Process Report at ¶¶ 15-19.

26.     At a hearing on August 6, 2010, the date the auction had been scheduled for, the SCI Debtors reported that the Stalking Horse Bid was the prevailing bid, and that the purchaser would be the Stalking Horse Bidder FG Opco Acquisition LLC (the "New Opco Purchaser"), an entity that is a subsidiary of New Propco (New Opco Purchaser and the other New Propco

---

[8]   The Consultation Parties were the Administrative Agent under the Prepetition Opco Credit Agreement, the steering committee of lenders under the Prepetition Opco Credit Agreement, and the SCI Official Creditors Committee. *See* Aronson Sale Process Report, *infra*, at p.4, fn. 2.

subsidiaries receiving the New Opco Acquired Assets, collectively, "New Opco").  On August 9,

2010, the Court entered its "Order Closing Auction and Designating Successful Bid With

Respect to Order Establishing Bidding Procedures and Deadlines Related to Sale Process For

Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries" (docket

no. 1909), in which it designated New Opco Purchaser as the Successful Bidder.

27.    The transfer of the New Opco Acquired Assets, Landco Assets and New Propco

Acquired Assets pursuant to the terms of the New Opco Purchase Agreement was approved in

the Court's order approving the SCI Plan.  The Subsidiary Debtors are parties to the New Opco

Purchase Agreement.  Pursuant to the Plan, on the Subsidiary Debtors Effective Date, the

Subsidiary Debtors will assume the New Opco Purchase Agreement and effect the transfer of

their assets to the applicable Transferee Parties, free and clear of all Liens, Claims, Equity

Interests, encumbrances, charges, Other Debts[9] or other interests, and New Opco Purchaser will

pay the consideration as required under the New Opco Purchase Agreement.

28.    Article V.B. of the Plan contains the principal means for the implementation of

the Plan and Restructuring Transactions with respect to the Subsidiary Debtors.  Those

provisions include, among other things (all as more particularly described in, and subject to the

terms of, the Plan):

(a)  the assumption of the New Opco Purchase Agreement by the Subsidiary Debtors;

(b)  the formation of the New Opco and New Propco entities;

(c)  the transfer of the Master Lease Collateral to Propco;

(d)  the transfer of the Landco Assets to the designee of the Land Loan Lenders;

(e)  the transfer of the New Propco Transferred Assets from Propco to the New Propco

entities;

(f)  the transfer of the New Propco Purchased Assets from the Opco entities to the New

Propco entities;

---

[9]  As used herein and in the Confirmation Order, "Other Debts" means Liens, Claims, Equity Interests, encumbrances charges or other interests, whether presently known or unknown, in any way relating to or arising from: (a) the operations of the Debtors prior to the Effective Date; or (b) consummation of the Plan, the Restructuring Transactions or any other transactions consummated in accordance with the Plan.

#4827-8452-4809

(g)  the transfer of the New Opco Acquired Assets to New Opco Purchaser;

(h)  the New Propco Transactions in connection with Receipt of New Propco Acquired Assets, including the New Propco Implementation Agreements;

(h)  the employment of Subsidiary Debtors' employees by New Propco and the general terms thereof;

(i)  the New Opco Transactions in connection with receipt of the New Opco Acquired Assets;

(j)  the effectiveness of the New Opco Credit Agreement;

(k)  certain modifications to the Second Amended and Restated Master Lease; and Compromise Agreement (2nd Revised).

29.     NP IP Holdings LLC (IP Holdco") is an affiliate of New Opco Purchaser that will own certain of the intellectual property necessary for the operation of the businesses of New Opco and New Propco, and which will license certain of such intellectual property to the affiliates operating those businesses.  Pursuant to the agreement of the parties contemplated to become members of IP Holdco, and as part and parcel of the Restructuring Transactions, the Confirmation Order shall specifically affirm certain of the provisions of the Amended and Restated Operating Agreement for IP Holdco without diminishing the effectiveness of enforceability of any other provisions thereof.

**(ii)     The Restructuring of Aliante Gaming**

30.     Starting in May 2010, Aliante Gaming undertook a thorough canvassing of the market and solicited bids from both (i) potential purchasers of substantially all of Aliante Gaming's assets and (ii) parties to replace SCI as manager of Aliante Gaming's business should the restructuring proceed on a "standalone" basis (whereby the lenders would exchange their outstanding Claims for equity and select managers of the process). The Aliante Transaction Committee oversaw the marketing process with support from its advisors and analyzed all bids. Throughout May and June 2010, Oppenheimer & Co., Inc., financial advisor and investment banker to Aliante Gaming, contacted over 70 parties with a potential interest in owning or managing Aliante Gaming's assets. Twenty-five of those parties entered into confidentiality

agreements and received the first-round bid package, which consisted of a confidential

information memorandum and other materials, as well as access to an on-line due diligence data

room. From this group, 13 parties submitted preliminary letters of interest ("LOIs") for the

acquisition or management of Aliante Gaming's assets, including five acquisition and 12

management proposals.

31.    Each of the five acquisition LOIs reflected an offer far below the outstanding

amount of the Lenders' secured debt.  In addition, all of the bids contained a portion of take-back

financing, which certain of the Lenders advised was unacceptable.  In light of the proposals,

certain significant Lenders informed the advisors to the Aliante Transaction Committee that they

no longer supported the sale process.  Thereafter, the Aliante Debtors ceased their marketing

efforts and instead proceeded with negotiating a standalone plan whereby the Aliante Lenders

would assume ownership of Aliante Gaming's assets.

32.    The Aliante Debtors then engaged in negotiations with the Aliante Lenders

regarding a restructuring transaction whereby the Aliante Lenders would acquire the assets

and/or equity of Aliante Gaming on account of their senior secured indebtedness.  During this

time, the Aliante Lenders also engaged in negotiations with Fertitta Entertainment regarding the

terms pursuant to which an affiliate of Fertitta Entertainment would manage Aliante Gaming on

an interim or transitional basis.  These negotiations culminated in an agreement to enter into a

series of restructuring transactions pursuant to which the Aliante Lenders would receive new

equity and new debt of Reorganized Aliante Gaming, with management services to be provided

by Fertitta Entertainment, all of which is described in more detail in the Plan and Disclosure

Statement.

33.    Article V.C. of the Plan contains the principal means for the implementation of

the Plan with respect to the Aliante Debtors.  Those provisions include, among other things, that

prior to or on the Effective Date, as applicable:

(a)    ALST Casino Holdco will be formed.  The ALST Casino Holdco

Operating Agreement will be adopted, and will, among other things, (i) establish the terms and

rights of the ALST Casino Holdco Equity, (ii) establish certain restrictions on the transfer of

ALST Casino Holdco Equity, (iii) provide for certain rights and obligations of holders of ALST Casino Holdco Equity, (iv) provide for the preparation and filing with any state or federal regulatory authority (or withdrawal of) any documents that the Required Aliante Consenting Lenders deem necessary or appropriate in connection with establishing ALST Casino Holdco as a "publicly traded company" within the meaning of the Nevada Revised Statutes, including, without limitation, any Form 10-K, Form 10-Q, Form 8-K, and other documents or amendments thereto to comply with the United States Securities Exchange Act of 1934, as amended, and (v) include such other provisions as may be necessary or appropriate to establish ALST Casino Holdco as a "publicly traded company" under Section 463.487 of the Nevada Revised Statutes.

(b)     The Registration Rights Agreement will be entered into.

(c)     ALST Casino Holdco will authorize and issue ALST Casino Holdco Equity for distribution to the Holders of Allowed Class AGL.1 Claims (or their respective designee(s)).  Each Holder of an Allowed Class AGL.1 Claim (or its designee) will receive its *Pro Rata* share of 100% of the ALST Casino Holdco Equity.

(d)     Reorganized Aliante Gaming will enter into the Amended Aliante Gaming Operating Agreement, which will amend the Aliante Operating Agreement to, among other things, establish Reorganized Aliante Gaming as a single member limited liability company and identify ALST Casino Holdco as its sole member.

(e)     Reorganized Aliante Gaming will authorize and issue the New Aliante Equity for distribution in accordance with the Plan.

(f)     The following transactions will be deemed to have occurred in the following order: (i) each Holder of an Allowed Class AGL.1 Claim shall be deemed to have exchanged all of its Allowed Class AGL.1 Claim for its Pro Rata  share of New Aliante Equity and New Secured Aliante Debt; and (ii) each Holder of New Aliante Equity shall be deemed to have contributed all such New Aliante Equity to ALST Casino Holdco in exchange for its *Pro Rata* share of ALST Casino Holdco Equity.

1                 (g)      All of the Transferred Aliante Hotel Assets shall be conveyed, assigned,

2  transferred and delivered to Reorganized Aliante Gaming in accordance with a transfer

3  agreement to be negotiated and agreed to by and among the relevant parties.

4                 (h)      All property of Aliante Gaming and all of the Transferred Aliante Hotel

5  Assets shall vest in Reorganized Aliante Gaming free and clear of all Liens, Claims, charges,

6  encumbrances, or other interests, except as provided in the Plan.

7                 (i)       Fertitta Entertainment and Reorganized Aliante will enter into the New

8  Aliante Management Agreement.

9                 (j)       As more fully described in the Plan, the Debtors or SCI Debtors that either

10  provide goods and services to Aliante Gaming or are party to contracts with third party vendors

11  for the provision of goods and services to Aliante Gaming, will use (and will cause their

12  respective Affiliates and Subsidiaries to use) commercially reasonable efforts, subject to the

13  terms and conditions described in the Plan, to ensure that such goods and services continue to be

14  available to Reorganized Aliante Gaming, either from the same source and on the same terms as

15  made available pre-petition, or by assisting in negotiating new agreements with third party

16  vendors.

17                (k)      Prepetition instruments evidencing Claims and Equity Interests against the

18  Aliante Debtors will be cancelled.

19                (l)       Aliante Holding, LLC ("Aliante Holding") and Aliante Station, LLC

20  ("Aliante Station") will be dissolved, provided that in no event will Aliante Holding, LLC be

21  wound down or dissolved before the Effective Date with respect to Aliante Gaming, LLC.

22        34.      The Debtors have articulated good and sufficient legal and business reasons that

23  justify approving the Restructuring Transactions.  Such reasons include that the New Opco

24  Purchase Agreement (a) constitutes the highest and best offer for the Subsidiary Debtors' assets,

25  (b) presents the best opportunity to realize the value of the Subsidiary Debtors' assets, and

26  (c) will allow the Subsidiary Debtors to avoid the possible decline and devaluation of such assets

27  in a protracted chapter 11 process.

28

35.    With respect to Aliante Holding, the Plan provides that Holders of General Unsecured Claims will not receive any distribution on account of their Claims and that Holders of Equity Interests will receive the Aliante Holdings Assets.  The two Holders of Equity Interests of Aliante Holdings (one of which is Aliante Station, a wholly-owned subsidiary of SCI), were deemed to accept the Plan pursuant to the Joint Unanimous Written Consent of the Executive Committee, the Member and the Manager of Aliante Gaming dated March 21, 2011.  Aliante Holdings owns Losee Elkhorn Properties, LLC, which owns approximately 60 acres of real property.  The Plan contemplates that the Holders of Equity Interests in Aliante Holdings will receive the ownership of Losee Elkhorn Properties, LLC.  The Aliante Lenders do not have an interest in Losee Elkhorn Properties, LLC, and the Debtors do not believe that there are any General Unsecured Claims against Aliante Holding.

36.    The Debtors' entry into the New Opco Purchase Agreement and consummation of the Restructuring Transactions with respect to the Subsidiary Debtors constitute the Debtors' exercise of sound business judgment.  The sales and related Restructuring Transactions contemplated by the New Opco Purchase Agreement are in the best interests of the Debtors, their estates and creditors and all other parties in interest, and they are supported by each of the applicable Debtors' key creditor constituencies.

37.    The total consideration provided by the New Opco Purchaser for the purchased assets is the highest and best offer received by the Debtors, the consideration is a fair and reasonable price for the purchased assets and constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia  ((a), (b) and (c), individually and collectively, "Value").

38.    New Opco Purchaser would not have entered into the New Opco Purchase Agreement and would not consummate the Restructuring Transactions, thus adversely affecting the Debtors, their estates, and their creditors, if: (a) the transfer of the purchased assets to New Opco Purchaser, including without limitation the Assumed Contracts, were not being transferred

free and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests; (b) New Opco Purchaser or any of its Related Persons would, or in the future could, be liable for any such Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests; or (c) New Opco Purchaser or any of its Related Persons would otherwise be subject to any liability with respect to the operation of the Debtors' businesses on or prior to the Effective Date.  Accordingly, a sale other than one free and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests would impact materially and adversely the Debtors' estates, and would yield substantially less value for the Debtors' estates, with less certainty than the sale pursuant to the New Opco Purchase Agreement.  In reaching this determination, the Court has taken into account both the consideration to be realized directly by the Debtors and their creditors, and the indirect benefits of the Restructuring Transactions for the Debtors' employees, the Debtors' vendors and suppliers and the public interest served, directly and indirectly, by the preservation of the value of the New Opco Acquired Assets resulting from the transfer of such assets to the applicable Transferee Parties.

39.      There was no evidence of insider influence or improper conduct by any of the Transferee Parties or their Related Persons, or by any other party in interest, in connection with the negotiation of the New Opco Purchase Agreement with the Subsidiary Debtors, in connection with the marketing of the assets, or otherwise in connection with the sale processes.  The Subsidiary Debtors established due diligence rooms in which the information provided to the successful purchasers was also provided to other potential bidders.  There was also no evidence of fraud or collusion among the successful purchaser, its Related Persons and any other bidders for the Subsidiary Debtors' assets, or collusion between the Debtors and the successful purchaser or their respective Related Persons to the detriment of any other bidders, the sale process or the Debtors' estates.

40.      The Subsidiary Debtors are entering into the New Opco Purchase Agreement and performing their obligations thereunder and under the other Restructuring Transactions in good faith and with lawful purpose, and have the legal power and authority to convey all of their right, title and interest in and to the New Opco Acquired Assets, New Propco Acquired Assets and

Landco Assets to the applicable Transferee Parties.  Each applicable Debtor has: (i) full power and authority to execute the New Opco Purchase Agreement, as amended, and the New Opco Credit Agreement, and all other documents contemplated thereby, and the sales, and incurrence of debt under the New Opco Credit Agreement, have been duly and validly authorized by all necessary company action of each Debtor as applicable; (ii) the necessary power and authority to perform its obligations under the Restructuring Transactions contemplated by the Plan; and (iii) taken all company action necessary to authorize, approve and enter into the New Opco Purchase Agreement and the New Opco Credit Agreement and consummate the Restructuring Transactions contemplated by the Plan.  No consents or approvals or further actions, other than those expressly required by the terms of the New Opco Purchase Agreement or in the Schedules thereto (including the Nevada Gaming Commission consent), are required for the Debtors to close the sales and consummate the Restructuring Transactions.

41.    No brokers were involved in consummating the sale or the Restructuring Transactions, and no brokers' commissions are due to any person or entity in connection with the sale or the Restructuring Transactions.

42.    Like the Subsidiary Debtors, Aliante Gaming tested the marketplace for buyers, but was unable to locate a buyer on terms acceptable to the Aliante Lenders.  Aliante Gaming and the Aliante Lenders then negotiated the terms of a consensual chapter 11 reorganization, under which the Aliante Lenders will become the owners of Reorganized Aliante Gaming, and the General Unsecured Creditors of Aliante Gaming will be paid in full or their Claims will be Unimpaired.  That restructuring has the support of the former equity owners of Aliante Gaming, and effectuates a considerable deleveraging of Aliante Gaming, which bodes well for its long term economic and financial viability.

### c.    Section 1123(a)(6) – Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.

43.    The Subsidiary Debtors are not issuing equity securities, and the purchaser of their assets is not a corporation.  ALST Casino Holdco will authorize, issue, and distribute the ALST Casino Holdco and Reorganized Aliante Gaming will authorize and issue the New Aliante

1    Equity, but neither ALST Casino Holdco nor Reorganized Aliante Gaming are a corporation.

2    Thus, the Plan complies with the requirements of Section 1123(a)(6).

3                    **d.**       **Section 1123(a)(7) – Selection of Directors and**
                           **Officers in a Manner Consistent with the Interests of**

4                               <u>**Creditors and Equity Security Holders and Public Policy**</u>.

5           44.     The Plan complies with the requirements of Section 1123(a)(7) because, under the

6    Plan, on, or a soon as practical after, the Effective Date, all boards of directors of the Debtors

7    will be dissolved and all officers will be dismissed.  In their place, with the exception of Aliante

8    Gaming, Richard J. Haskins and Thomas M. Friel will be appointed, through the Confirmation

9    Order, as the Plan Administrators.  With respect to Aliante Gaming, pursuant to the Plan,

10   Reorganized Aliante Gaming will be a single member limited liability company with ALST

11   Casino Holdco as its sole member.  The holders of the Aliante Lenders' Allowed Claims will

12   own all of the equity interests in ALST Casino Holdco and will have the ability to select the

13   officers and directors of ALST Casino Holdco, subject to any applicable Nevada state gaming

14   suitability regulations and requirements.  As part of a Plan Supplement, Aliante Gaming filed a

15   list of proposed officers and directors for ALST Casino Holdco.  As a result, the Plan contains no

16   provisions with respect to the manner of selection of new officers and directors that is

17   inconsistent with public policy or the interests of Holders of Claim and Equity Interests.

18                   **e.**       **Section 1123(b)(1)-(2) – Impairment of Claims and Equity**
                           **Interests and Assumption, Assumption and Assignment or**

19                              <u>**Rejection of Executory Contracts and Unexpired Leases**</u>.

20          45.     In accordance with the requirements of Section 1123(b)(1), Article III of the Plan

21   impairs or leaves unimpaired, as the case may be, each Class of Claims and Equity Interests.

22   Consistent with 1123(b)(2), Article VI of the Plan provides for the assumption by the Debtors

23   and assignment to the applicable Transferee Parties on the Effective Date of certain designated

24   Executory Contracts and Unexpired Leases, the assumption of certain other Executory Contracts,

25   and the rejection of all other Executory Contracts and Unexpired Leases, in all cases in

26   accordance with, and subject to, the provisions and requirements of Sections 365 and 1123.

27   Accordingly, the Plan satisfies the requirements of Sections 1123(b)(1) and (b)(2).

28

#4827-8452-4809

1

2

    **f.**  **Section 1123(b)(3) – Retention, Enforcement
and Settlement of Claims Held by the Debtors.**

3

   46.  As authorized by Section 1123(b)(3), (i) Article X.E. of the Plan provides for the

4

retention by the Debtors or Estate representatives of Causes of Action and Litigation Claims not

5

expressly released or settled under the Plan, and (ii) Articles X.B. and X.C. of the Plan provide

6

for certain settlements and releases.

7

    **g.**  **Section 1123(b)(4) – Sale of Assets of the Estate.**

8

   47.  Consistent with Section 1123(b)(4), the Plan provides for the sale of substantially

9

all of the Subsidiary Debtors' assets to New Opco Purchaser, and the distribution of the proceeds

10

of the sale to the respective Debtors' creditors in the order of priority of their Claims.

11

    **h.**  **Section 1123(b)(5) – Modification of
the Rights of Holders of Claims.**

12

13

   48.  In accordance with the requirements of Section 1123(b)(5), Article III of the Plan

14

modifies, or leaves unaffected, as the case may be, the rights of holders of each Class of Claims.

15

Some Classes of Claims receive payment in full in cash and/or are Unimpaired.  Some Classes of

16

Claims receive cash, others receive cash and secured notes, and others receive equity securities

17

and new secured notes.

18

    **i.**  **Section 1123(b)(6) – Other Provisions Not Inconsistent
with Applicable Provisions of the Bankruptcy Code.**

19

20

   49.  The Plan includes additional appropriate implementation provisions that are not

21

inconsistent with applicable provisions of the Bankruptcy Code, including: (i) the provisions of

22

Article VII of the Plan governing distributions on account of Allowed Claims; (ii) the provisions

23

of Article VIII of the Plan establishing procedures for resolving Disputed Claims and making

24

distributions on account of such Disputed Claims once resolved; (iii) the provisions of Article X

25

of the Plan regarding the treatment of the provisions of the Plan as a Comprehensive Settlement

26

(as hereinafter defined), releases by the Debtors, voluntary releases by Holders of Claims and

27

Equity Interests, and certain exculpation provisions.

28

#4827-8452-4809

1

### j.     Section 1123(d) – Cure of Defaults.

2       50.     In accordance with the requirements of Section 1123(d), Article VI of the Plan

3 provides for the cure of defaults in respect of all executory contracts and unexpired leases that

4 are being assumed under the Plan and assigned to the applicable Transferee Parties, and requires

5 that such cure payments be made consistent with the requirements of Section 365(b) and 365(c).

6       **2.     Section 1129(a)(2) – Compliance with**
7 **Applicable Provisions of the Bankruptcy Code.**

8       51.     In accordance with the requirements of Section 1129(a)(2), the Debtors have

9 complied with all applicable provisions of the Bankruptcy Code, including Section 1125 and

10 1126 and Bankruptcy Rules 3016, 3017 and 3018.  Adequate disclosures of the prepetition

11 financial condition of the Debtors and of the terms and purposes of the Restructuring

12 Transactions were made during the course of the SCI Cases, the extensive prepetition marketing

13 of the assets of the respective Debtors, and the Prepetition Solicitation.  The Disclosure

14 Statement contained a detailed description of (a) the business of the Debtors and the terms and

15 purposes of the Restructuring Transactions contemplated under the Plan for the Subsidiary

16 Debtors and Aliante Debtors, (b) the classification and treatment of Claims against and Equity

17 Interests in each of the Debtors under the Plan, and (c) the other principal provisions of the Plan.

18 The Disclosure Statement also discusses certain securities laws, gaming regulations and federal

19 income tax considerations that may be applicable to the transactions contemplated under the Plan

20 and the decisions of Holders of Claims whether to vote to accept or reject the Plan.  Accordingly,

21 the Disclosure Statement distributed in connection with the Prepetition Solicitation contained

22 adequate information as defined in Section 1125(a), and the other materials that were included in

23 the Solicitation Package provided members of the Voting Classes with substantial additional

24 material information.

25       52.     The twenty one day period for voting provided to the members of the Voting

26 Classes for voting on the Plan complied with the requirements of Bankruptcy Rule 3018(b) that

27 the solicitation period not be unreasonably short.  The four days solicitation of consents from the

28 Prepetition Opco Secured Lenders with respect to including TSI as a Subsidiary Debtor was also

not unreasonably short under the circumstances.  The Disclosure Statement was filed with the

Court on the Petition Date in compliance with Bankruptcy Rule 3016(b).  The Solicitation

Packages complied with the requirements of Bankruptcy Rule 3017 regarding the contents of

Solicitation Packages, and the Solicitation Procedures by which the Ballots for acceptance or

rejection of the Plan, and for consents for the TSI related Plan Modifications, were solicited and

tabulated were fair and properly conducted, all in accordance with the requirements of Sections

1125 and 1126, and Bankruptcy Rules 3016, 3017 and 3018.  The Debtors and the other

Exculpated Parties have acted in good faith within the meaning of Section 1125(e) and are

entitled to the benefits thereof.

### 3.    Section 1129(a)(3) – Proposal of the Plan in Good Faith.

53.    In accordance with the requirements of Section 1129(a)(3), the Debtors proposed

the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has

been proposed in good faith, the Court has examined the totality of the circumstances

surrounding the formulation of the Plan, including the support thereof by the Prepetition Opco

Secured Lenders, Mortgage Lenders and the Aliante Lenders.  Based on the record of the

Chapter 11 Cases and the evidence presented at the Confirmation Hearing, the Court finds and

concludes that the Plan has been proposed with the legitimate and honest purpose of maximizing

the returns available to creditors of the Debtors through the marketing and sale of the Subsidiary

Debtors' assets for the highest and best price, and the marketing of the Aliante Debtors assets

leading to the debt for equity swap that forms the basis of the New Aliante Transaction

Agreements.  Moreover, the Plan itself, the arms' length negotiations among the Debtors, the

Prepetition Opco Secured Lenders, Mortgage Lenders, Aliante Lenders, New Opco Purchaser

and New Propco leading to the Plan's formulation, and the concerted efforts of the Debtors and

the new owners of the Debtors' assets to accommodate the liquidity needs of the Debtors'

numerous trade creditors during extremely difficult economic times in Nevada provide

independent evidence of the Debtors' good faith in proposing the Plan.

54.    There is express statutory authority, and ample precedent in numerous confirmed

chapter 11 plans for the implementation of the principal Restructuring Transactions under the

Plan:  Section 1123(a)(5)(D) expressly authorizes a chapter 11 plan to provide for the sale of some or all of property of the estate (Subsidiary Debtors); and Section 1123(a)(5)(J) authorizes a chapter 11 plan to issue securities of a debtor in exchange for claims (Aliante Gaming).  Thus, the Plan falls well within the four corners of settled chapter 11 practice, and, if confirmed, achieves a result consistent with the objectives and purposes of the Bankruptcy Code.

            **4.**        **Section 1129(a)(4) – Bankruptcy Court**
                         **Approval of Certain Payments as Reasonable**.

      55.    In accordance with the requirements of Section 1129(a)(4), Article II.A.2. of the Plan makes all payments on account of Professional Fee Claims for services rendered on or prior to the Effective Date subject to the requirements of Sections 327, 328, 330, 331, 503(b) and 1103, as applicable, by requiring Professionals to file final fee applications with the Court.  The Court will review the reasonableness of such applications under Sections 328 and 330 and any applicable case law.  Article XI. of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.

            **5.**        **Section 1129(a)(5) – Disclosure of Post-Effective Date**
                         **Management of Debtors and Compensation of any Insiders**.

      56.    The Plan complies with the requirements of Section 1129(a)(5) because, pursuant to the Plan, the Debtors have proposed and disclosed that Richard J. Haskins and Thomas M. Friel will serve as the Plan Administrators, subject to Court approval, which approval is granted in the Confirmation Order.  None of the non-debtor entities receiving estate assets from the Subsidiary Debtors under the Plan and Restructuring Transactions is a successor to any Debtor or an affiliate of any Debtor participating in a joint plan with the Debtors, therefore Section 1129(a)(5) does not apply to the Transferee Parties.  The Aliante Restructuring Transactions comply with Section 1129(a)(5) because the Plan discloses that Reorganized Aliante Gaming and Fertitta Entertainment will enter into the New Aliante Management Agreement, which will be substantially in the form filed with the Plan Supplement, and, as part of a Plan Supplement, Aliante Gaming filed a list of proposed officers and directors for ALST Casino Holdco.

#4827-8452-4809

**6.** **Section 1129(a)(6) – Approval of Rate Changes.**

57.     The Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction.  Accordingly, Section 1129(a)(6) does not apply to the Plan.

**7.** **Section 1129(a)(7) – Best Interests of Holders of Claims and Equity Interests.**

**58.**     Section 1129(a)(7) requires that the Debtors show that, with respect to each impaired Class of Claims or Equity Interests, each holder of a Claim or Equity Interest in such impaired Class has either (a) accepted or is deemed to have accepted the Plan or, (b) as demonstrated by the Liquidation Analyses included as Exhibits to the Disclosure Statement, will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  Even though no Holder of a Claim or Equity Interest in an impaired Class objected to confirmation of the Plan on the basis that it was not receiving or retaining under the Plan as much as it would receive in a chapter 7 liquidation of the Debtors, the Debtors have nevertheless submitted substantial evidence to show that the Plan complies with Section 1129(a)(7) with respect any such hypothetical objecting Holder.

**(a)** **Secured Creditors**

59.     The Liquidation Analysis distributed with the SCI Plan showed that a liquidation of the assets of the Subsidiary Debtors would not be sufficient to satisfy the senior secured claims of the Prepetition Opco Secured Lenders in the approximate allowed amount of at least $882 million, as evidenced by the fact that the purchase price for the Subsidiary Debtors' assets under the New Opco Purchase Agreement ($772 million in cash and secured notes), achieved after a very substantial marketing effort, is approximately $110 million less than the Prepetition Opco Secured Lenders Allowed Claim.  Thus the Liquidation Analysis adequately shows that if the assets of the Subsidiary Debtors were liquidated in a hypothetical chapter 7 case, and even if they were liquidated as going concerns, the net proceeds of the sale could only be less than what

is being achieved under the Plan because, in a chapter 7 liquidation, one would have to factor in the substantial costs associated with: (i) the delay that would be incurred in connection with the appointment of a chapter 7 trustee and the time required for the trustee and his or her professionals to fully understand the Debtors' situations; (ii) the fees payable to a chapter 7 trustee and newly appointed estate professionals; and (iii) the likely discounts that would be realized in one or more chapter 7 auctions of the applicable assets.  Therefore, the secured creditors of the Subsidiary Debtors are receiving under the Plan at least as much as they would under an hypothetical chapter 7 liquidation proceeding.

60.     The Plan also satisfies the requirements of Section 1129(a)(7) with respect to the secured creditors of the Aliante Debtors.  The Aliante Liquidation Analysis shows that the net proceeds of the liquidation of Aliante Gaming would be in the range of $47 to $53 million.  The Aliante Lenders Allowed Claims, which are secured by substantially all of the assets of Aliante Gaming, exceed $377 million.  Under the Plan, Reorganized Aliante Gaming will issue 100% of the equity in Reorganized Aliante Gaming and 100% of the New Secured Aliante Debt to the Aliante Lenders in full satisfaction of the claims of the Aliante Lenders against the Aliante Debtors.  The Aliante Lenders are receiving the full value of their collateral by receiving under the Plan all of the equity and new secured debt of Reorganized Aliante Gaming.  They could not do better in a liquidation, as is evidence by the liquidation value reached in the Liquidation Analysis.

### (b)    Unsecured Creditors

61.     Under the Plan, Holders of General Unsecured Claims against the Subsidiary Debtors and Aliante Gaming are either receiving payment in full or their Claims will be Unimpaired.  In a liquidation scenario they would receive nothing, based upon the Liquidation Analyses discussed above.  Nevertheless, because the best interests of creditors test applies to impaired classes of claims only, the Debtors are not required to demonstrate that the Plan meets the test with respect to the classes of General Unsecured Claims against the Subsidiary Debtors and Aliante Gaming.  With respect to Aliante Holding, the Plan provides that Holders of Equity Interests will receive certain property while Holders of General Unsecured Claims will receive

no distribution. However, there are no Claims against Aliante Holdings and therefore no Holder

of a Claim is receiving less than it would receive in a liquidation scenario.

### (c)    Equity Interests

62.    Holders of Equity Interests in the Subsidiary Debtors, Aliante Station and Aliante

Gaming are not receiving or retaining any property under the Plan, and they would not receive

anything in a liquidation of any of the Debtors, since all of the proceeds of the liquidations would

be paid to the creditors.  As a result, the Holders of Equity Interests in the Subsidiary Debtors,

Aliante Station and Aliante Gaming are receiving under the Plan at least as much as they would

receive in a chapter 7 liquidation, and the Plan satisfies the best interests of creditors test as to

them as well.

63.    Under the Plan, the Holders of Equity Interests in Aliante Holdings will receive

the  Aliante Holdings Assets.  These assets include the rights to Losee Elkhorn Properties, LLC,

which Holders of Equity Interests would likely also recover in a liquidation scenario because

there are no General Unsecured Claims against Aliante Holding. The Court finds that, under the

circumstances described, such Plan provision also complies with the requirements of Section

1129(a)(7).

64.    The Court finds that (a) the methodology used by the Debtors and their financial

advisors in estimating the liquidation value of the Debtors, as set forth in the Liquidation

Analyses, is reasonable, (b) the Liquidation Analyses were prepared in good faith, and (c) the

results of the Liquidation Analyses fall well within the four corners of traditional best interests of

creditors analysis.  The Court further finds that the Plan complies with the requirements of

Section 1129(a)(7) with respect to each Holder of Claims or Equity Interest.

### 8.    Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class.

65.    As indicated in the Plan and Disclosure Statement:

(a) the following Classes of Unimpaired Claims and Equity Interests were deemed

to have accepted the Plan and were not entitled to vote on the Plan – Classes AD.1, AD.2,

BS.2, BS.3(b), CH.1, CH.2(b), CS.2, CS.3(b), CVH.2, CVH.3, DS.1, DS.2, FS.2,

FS.3(b), FLA.2, FLA.3(b), GR.2, GR.3(b), GVS.2, GVS.3(b), GVRS.2, GVRS.3(b), IS.1,

1   IS.2, LM.2, LM.3(b), LML.1, LML.2(b), MS.2, MS.3(b), PSHC.2, PSHC.3(b), PE.2,

2   PE.3(b), RS.2, RS.3(b), SF.2, SF.3(b), SCDD.1, SL.2, SL.3(b), SH.2, SH.3(b), STN.1,

3   STN.2(b), SS.2, SS.3(b), TS.2, TS.3(b), TCS.1, TCS.2, TA.1, TA.2, TSI.2, TSI.3(b),

4   VH.1, VH.2, AHL.1, AHL.4, ASL.2, AGL.2 and AGL.3;

5              (b) the following Classes of Impaired Claims and Equity Interests are not

6   retaining or receiving any property under the Plan, are therefore deemed to have rejected

7   the Plan, and were not entitled to vote on the Plan – Classes AD.3, AD.4, BS.4, BS.5,

8   CH.3, CH.4, CS.4, CS.5, CVH.4, CVH.5, DS.3, DS.4, FS.4, FS.5, FLA.4, FLA.5, GR.4,

9   GR.5, GVS.4, GVS.5, GVRS.4, GVRS.5, IS.3, IS.4, LM.4, LM.5, LML.3, LML.4, MS.4,

10  MS.5, PSHC.4, PSHC.5, PE.4, PE.5, RS.4, RS.5, SF.4, SF.5, SCDD.2, SCDD.3,

11  SCDD.4, SL.4, SL.5, SH.4, SH.5, STN.3, STN.4, SS.4, SS.5, TS.4, TS.5, TCS.3, TCS.4,

12  TA.3, TA.4, TSI.4, TSI.5, VH.3, VH.4, AHL.2, AHL.3, ASL.3(b), ASL.4, ASL.5,

13  AGL.4 and AGL.5; and

14             (c) the Voting Classes were Classes AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a),

15  CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a),

16  GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a),

17  PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1,

18  SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1, TS.3(a), TSI.1 and TSI.3(a).

19  Based upon the Tabulation of Ballots prepared by the Voting and Claims Agent, all Voting

20  Classes voted to accept the Plan, and no Classes of Claims voted to reject the Plan.

21         66.    The Plan does not comply with the requirement of Section 1129(a)(8) that all

22  impaired Classes of Claims and Equity Interests vote to accept the Plan because Classes of

23  Claims and Equity Interests that receive nothing under the Plan are deemed to have rejected the

24  Plan.  Nevertheless, the Plan is confirmable because, as discussed below, the Plan satisfies the

25  cramdown requirements of Section 1129(b) with respect to all non-accepting Classes.

26

27

28

#4827-8452-4809

9.      **Section 1129(a)(9) – Treatment of Claims Entitled to
Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

67.     In accordance with the requirements of Section 1129(a)(9), the Plan provides that: (a) with respect to Administrative Claims, on the later of the Effective Date or when an Administrative Claim becomes an Allowed Administrative Claim, the Allowed Administrative Claim shall be paid in cash in the full unpaid Allowed Amount of such Claim, unless the Holder agrees to less favorable treatment; (b) the rights of the Holders of Priority Tax Claims are unaltered under the Plan -- under Section II.B. of the Plan, Holders of Priority Tax Claims will receive, at the election of the Debtors, (i) payment in full in cash of the Allowed amount of such Claim, (ii) less favorable treatment if the Holder agrees, or (iii) installment payments in accordance with the requirements of Sections 1129(a)(9)(C) and (D); and (c) Holders of Allowed Other Priority Claims will receive payment in full in cash of the Allowed amount of such Claim.

10.     **Section 1129(a)(10) – Acceptance by at Least One Impaired Class.**

68.     In accordance with the requirements of Section 1129(a)(10), as indicated in the report of the Voting and Claims Agent and as reflected in the record of the Confirmation Hearing, at least one Class of Claims or Equity Interests that is Impaired under the Plan voted to accept the Plan.  Indeed, all Voting Classes voted to accept the Plan, in each case determined without including any acceptance of the Plan by any insider.  Those Classes of Claims voting to accept the are Classes AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a), CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a), GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a), PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1, SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1 and TS.3(a).

11.     **Section 1129(a)(11) – Feasibility of the Plan.**

69.     The Plan is a liquidating Plan for all of the Debtors except Aliante Gaming.  The record of these Chapter 11 Cases evidences that the parties to the Subsidiary Debtors' Restructuring Transactions have the financial wherewithal and desire to close on the Restructuring Transactions.  Thus, the liquidating aspect of the Plan is feasible.

#4827-8452-4809

70.     Under the Plan, the Prepetition Opco Secured Lenders will receive secured notes issued by New Opco.  The SCI Debtors previously filed with Court financial projections for New Opco.  The Subsidiary Debtors assert that the assumptions underlying those financial projections are reasonable, and that New Opco will be able to meet its debt service obligations.  Based upon the New Opco financials and the discussion in the Aronson Declaration with respect thereto, it appears reasonably likely that New Opco will be able to service its debt obligations issued in connection with the Plan.  No contrary evidence was submitted to the Court.

71.     As a result of the debt for equity exchange on which the Aliante Gaming restructuring is based (including the payment in full of the General Unsecured Creditors), Reorganized Aliante Gaming will have a substantially deleveraged capital structure and is projected to be able to operate its business and meet its obligations without the need for further financial reorganization.  The financial projections for Reorganized Aliante Gaming project: (a) increased gross revenues of 4-5% per year through 2014, based upon assumed improvements in the economic conditions in the Las Vegas local market during that period; and (b) EBITDAM of $7.842 million for calendar year 2011, $9.36 million  for calendar year 2012, $11.541 million for calendar year 2013 and $13.872 million for calendar year 2014.  Therefore, given the discharge under the Plan of more than $440 million of secured and unsecured claims against Aliante Gaming, it is reasonable to expect that, as the Reorganized Aliante Gaming financial projections demonstrate, after consummation of the Plan, Reorganized Aliante Gaming will not require further financial reorganization.

72.     Accordingly, the Plan satisfies the requirements of Section 1129(a)(11).

**12.     Section 1129(a)(12) – Payment of Bankruptcy Fees.**

73.     In accordance with the requirements of Section 1129(a)(12), Article XII.A. of the Plan provides that Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash on the Effective Date.  After the Effective Date, the Plan Administrator and Reorganized Aliante Gaming will pay all required fees pursuant to 28 U.S.C. § 1930 or any other statutory requirement and comply with all statutory reporting requirements.

#4827-8452-4809

-28-

**13.**    **Section 1129(a)(13) – Retiree Benefits.**

74.    The Debtors (other than Aliante Gaming) are liquidating, and after the Effective Date will have no obligations regarding any retiree benefits of the kind referred to in Section 1114; therefore, Section 1129(a)(13) does not apply to such Debtors.  Aliante Gaming is not a party to any plan, fund or program that provides "retiree benefits" as such term is used in Section 1114; therefore, Section 1129(a)(13) does not apply to Reorganized Aliante Gaming.

**14.**    **Section 1129(a)(14), (15) and (16) Do Not Apply.**

75.    Sections 1129(a)(14), (15) and (16) address domestic support obligations, individual debtors, and non-moneyed businesses, and they do not apply to the Debtors.

**15.**    **Section 1129(b) – Confirmation of the Plan**
        **Over the Nonacceptance of Impaired Classes.**

76.    Section 1129(b) authorizes the Court to confirm the Plan even if not all Impaired Classes have accepted the Plan (a "cramdown"), provided that such Plan has been accepted by at least one impaired class and the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class that voted to reject the Plan.  Here, Classes AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a), CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a), GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a), PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1, SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1 and TS.3(a), each an Impaired Class of Claims, voted to accept the Plan.  Thus, the requirement that at least one Impaired Class vote to accept the Plan is satisfied.

77.    All classes of secured Claims are either Unimpaired and deemed to have accepted the Plan, or Impaired but voted to accept the Plan.  Therefore, the requirements of Section 1129(b) do not apply to Classes of secured Claims.  In any event, the Plan expressly complies with the requirements of at least one of the subsections of Section 1129(b)(2)(A) with respect to all Classes of secured Claims.

78.    The Plan is fair and equitable with respect to all non-accepting Classes of Unsecured Claims because: (a) each impaired unsecured creditor receives or retains under the

Plan property of a value equal to the amount of its allowed Claim; or (b) the holders of any Claims (or Equity Interests) that are junior to the non-accepting Class will not receive any property under the Plan (the "absolute priority rule").  The Plan strictly adheres to the absolute priority rule for each Subsidiary Debtor, Aliante Station and Aliante Gaming, and nowhere does the Plan provide for distributions to the holders of any Claims or Equity Interests that are junior to any non-accepting Class of Claims of such Debtors.  The Plan permits Holders of Equity Interests of Aliante Holdings to receive a distribution while Holders of General Unsecured Claims receive no value; however, there are no Claims against Aliante Holding, and therefore, that class can be disregarded for cramdown purposes.

79.    The Plan is fair and equitable with respect to all non-accepting Classes of Equity Interests because: (a) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest; or (b) the holder of an interest that is junior to the Non-Accepting Class will not receive or retain any property under the Plan.

80.    The Plan does not discriminate unfairly with respect to any Non-Accepting Class because the value of the cash and/or securities to be distributed to each Class under the Plan is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the non-accepting Class.  Exact parity is not required.  The Court finds that any discrepancy in treatment or potential distributions to unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.  Accordingly, the Plan may be confirmed under Section 1129(b).

**16.    Bankruptcy Rule 3016(a).**

81.    In accordance with the requirements of Bankruptcy Rule 3016(a), the Plan is dated and identifies the entities submitting the Plan.

**17.    Section 1129(d) – Purpose of Plan.**

82.    No allegation was made during the course of the Chapter 11 Cases that the primary purpose of the Plan was avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and no objection was filed by any Governmental Unit asserting any such avoidance.  Based upon a review of the record of the Chapter 11 Cases, the Court finds no evidence of any intent to avoid payment of taxes or the requirements of Section 5 of the Securities Act.  The Plan and Disclosure Statement, which  were filed with the Court upon the commencement of the Chapter 11 Cases, provide adequate notice to all Persons and Entities, including the Internal Revenue Service, the U.S. Securities and Exchange Commission and other applicable Governmental Units of the intent of the Plan to cause the issuance of securities exempt from registration requirements under applicable state and federal securities laws, and the Disclosure Statement provides adequate notice of the federal income tax consequences of the Plan for the Debtors and certain Holders of Claims and Equity Interests.

**C.    SETTLEMENTS, RELEASES, EXCULPATIONS AND INJUNCTIONS.**

83.    The settlement, release and exculpation provisions set forth in Article X of the Plan are made in exchange for consideration, and are: (a) the result of a carefully-negotiated good-faith settlement among the Debtors and their major stakeholders; (b) meant to provide relief from future litigation and the prospect of future litigation that would have substantially derailed the Debtors' restructuring efforts; (c) fair and necessary for successful Plan confirmation; and (d) supported by creditors holding billions of dollars in allowed undisputed secured Claims that will be impaired under the Plan.  In connection with the Confirmation Hearing, no party in interest filed an objection to Article X of the Plan, which also provides for an injunction in support of the settlements, releases and exculpations contained therein.

**1.    Article X.B.1. of the Plan – The Comprehensive Settlement of Claims and Controversies**

84.    Article X.B.1. of the Plan provides that the Plan constitutes a general comprehensive settlement (the "Comprehensive Settlement") of all Claims, Litigation Claims, Causes of Action and controversies relating to (a) the rights that Holders of Claims or Equity

Interests may have with respect to any Claim or Equity Interest against any Debtors, (b) the distributions, if any, made under the Plan on account of such Claims and Equity Interests, and (c) any Claims or Causes of Action of any party arising out of or relating to the Going Private Transaction and the Aliante Prepetition Transactions, and all transactions relating thereto. The Comprehensive Settlement is a fundamental component of the overall restructuring contained in the Plan because it assures the Debtors and the Estates that the Plan and the distributions made thereunder will result in the final settlement and satisfaction of the various Claims against and Equity Interests in the Debtors. The Comprehensive Settlement promotes the finality of the Plan and repose. No party in interest objected to the Comprehensive Settlement. The Court finds that the Comprehensive Settlement is in the best interests of Holders of Claims and Equity Interests and the Debtors and their respective Estates and property, and is fair and equitable, and any distributions to be made pursuant to the Plan shall be deemed to have been made on account of the Comprehensive Settlement and in consideration thereof.

### 2. Article X.B.2. of the Plan - The Global Settlement of the Going Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action

85. Article X.B.2 of the Plan implements the Global Settlement, which provides for the compromise and settlement of: (a) all of the Going Private Transaction Causes of Action among the Debtors and the SCI Debtors and their respective Estates, and any Person, Entity or Governmental Unit; and (b) all of the Aliante Prepetition Transactions Causes of Action among the Aliante Debtors and their respective Estates, and any Person, Entity or Governmental Unit. Pursuant to the Article X.B.2 of the Plan, (x) all distributions made under the Plan are on account of and in consideration of the Global Settlement, and (y) the Global Settlement is binding on the Debtors and their Estates and on all Creditors who indicate on their Ballot their agreement to grant the releases provided for in Article X of the Plan. Article X.C.1., in turn, provides for a release of the Going Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action by the Releasing Parties, which Releasing Parties includes the Debtors, their Estates and any Holder of a Claim or Equity Interest that would have been able to assert the

Going Private Transaction Causes of Action or the Aliante Prepetition Transactions Causes of Action for or on behalf of the Debtors or their Estates.  In connection with the Confirmation Hearing, no party in interest has objected to the Global Settlement.

### (a)    The Going Private Transaction

86.    As defined in the Plan, and discussed in greater detail in the Disclosure Statement distributed with the SCI Plan (which was distributed in the Prepetition Solicitation Package), the Going Private Transaction means the buy-out transaction that occurred in November of 2007, pursuant to which, among other things, SCI was acquired by virtue of a merger of FCP Acquisition Sub with and into SCI, with SCI continuing as the surviving corporation, and the sale-and-leaseback transaction with respect to the Propco Properties was consummated.  In March 2009, prior to the commencement of the SCI Cases, SCI's Board of Directors authorized the formation of an independent Special Litigation Committee (the "SLC") to investigate and report to the Board regarding whether SCI had colorable claims that could be brought against lenders, former stockholders or others, in connection with the 2007 Going Private Transaction. The SLC filed its findings with the Court on September 22, 2009 (docket no 353) (the "SLC Report").  The SLC determined that:

i.    The financial projections for the 2007 Going Private Transaction were reasonable when made and were not unduly optimistic or overly aggressive.

ii.    SCI was not insolvent at the time of the Going Private Transaction and did not become insolvent as a result of the Going Private Transaction.

iii.    SCI was not left with unreasonably small capital.

iv.    SCI did not intend or expect to incur debts beyond its ability to pay those debts as they matured.

v.    No person or entity intended to nor believed the Going Private Transaction would defraud, hinder, or delay a creditor of SCI.

vi.    The participants in the Going Private Transaction had a good faith belief that the Going Private Transaction would succeed and that SCI would enjoy continued growth.

vii.    No person or entity engaged in inequitable conduct in connection with the Going Private Transaction.

87.    On December 18, 2009, the SLC filed its Supplemental SLC Report (docket no. 721).  In the Supplemental SLC Report, the SLC concluded that the Master Lease[10] was a true lease, not a disguised financing, and that any litigation seeking to recharacterize the Master Lease as disguised secured financing would be unsuccessful and a waste of estate resources.

88.    On August 27, 2010, the Court entered its order confirming the SCI Plan.  In the Court's findings of fact and conclusions of law, the Court found that the settlement and release of the Going Private Causes of Action pursuant to the SCI Plan was fair and equitable and an appropriate provision of the SCI Plan.

**(b)      The Aliante Prepetition Transactions**

89.    The Aliante Prepetition Transactions refer to the negotiation, formulation, entry, performance and/or lack of performance of, and/or any transactions arising from or pertaining to, the Aliante Credit Agreement, the Aliante Security Agreement, the Aliante Swap Agreement, the Aliante Deed of Trust, Aliante Collateral Assignment, Aliante Trademark Collateral Assignment, Aliante Holdings Pledge Agreement, the formation of Aliante Debtors, the Aliante Operating Agreement, and the actions taken by the Aliante Transaction Committee.  No such potential Aliante Prepetition Transactions Causes of Action were described in the Disclosure Statement. Nevertheless, the Aliante Debtors determined that it was in the best interests of the chapter 11 restructuring of Aliante Gaming that Reorganized Aliante Gaming not be encumbered by any uncertainty regarding these potential Causes of Action and that the Plan should include a compromise, settlement and release of all Aliante Prepetition Transactions Causes of Action.

90.    Based in part, and among other things, upon the reports of the various investigative committees discussed above, it was a reasonable exercise of the Debtors' business

---

[10]   The Master Lease (as discussed in the Disclosure Statement and in numerous pleadings filed with the Court in connection with Court approved amendments to the Master Lease) is between SCI Debtor Propco as landlord and Debtor SCI as tenant, and was entered into at the same time as the Going Private Transaction.  Under the Master Lease, SCI leases the real property and improvements associated with Boulder Station Hotel & Casino, Red Rock Casino Resort Spa, Palace Station Hotel & Casino and Sunset Station Hotel & Casino (collectively, the "Leased Hotels").  The Leased Hotels, in turn, are operated by SCI and certain of its non-debtor operating subsidiaries.  The Master Lease provides for monthly rental payments from SCI to Propco in amounts that exceed the amounts that Propco requires to meet its ordinary debt service obligations and any other expenses not covered by SCI under the "triple net" provisions of the Master Lease.

judgment to propose a chapter 11 plan that avoids the years of delay in effectuating a restructuring that would be caused by launching litigation based upon any of the Going Private Transaction Causes of Action or Aliante Prepetition Transactions Causes of Action. Among other things, the SLC Report and the Supplemental SLC Report demonstrate that any party attempting to pursue any of the Causes of Action considered by those committees would face significant legal and factual obstacles. In addition, it is unclear what benefit, if any, the Estates would obtain from the pursuit of any such claims. When compared to the benefits received by the Estates from the consensual restructuring that will be effectuated under the Plan, including benefits from the contributions of the Released Parties thereto, the likelihood of success in any litigation regarding the Causes of Action is sufficiently low to justify the release of the Going Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action, on the terms and conditions set forth in the Plan, as being fair and equitable.

91.     The Court has also considered the fact that litigation regarding the Going Private Transaction and Aliante Prepetition Transactions would be extremely complex litigation, extremely costly litigation, and the delay attendant to such litigation could put a serious damper on the ability of the Debtors to ever obtain the benefits of chapter 11. Thus it is not surprising that the Debtors' principal creditor constituencies support the Plan and the release of the Going Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action. Based upon their contribution, the SLC and their respective members and agents (including attorneys and financial advisors) are entitled to be included in the Plan definitions of Released Parties and Exculpated Parties.

**3.     Article X.C. of the Plan – Releases Among Releasing Parties and Released Parties.**

92.     Article X.C. of the Plan provides for certain releases. The releases are (a) releases of claims held by the Debtors and their Estates (Article X.C.1.) against the identified released parties, to the fullest extent permissible under applicable law, and (b) voluntary releases of claims held by Holders of Claims and Equity Interests against the identified released parties, to the fullest extent permissible under applicable law (Article X.C.2.).

#4827-8452-4809

93.    <u>The Debtors' Release</u>. Article X.C.1. of the Plan provides that, upon the Effective

Date, to the fullest extent permissible under applicable law, and subject to certain identified

exceptions, the Debtors, the Debtors' Estates and each of their respective Related Persons fully

releases and discharges each of the following parties and their respective properties and Related

Persons from any and all claims and causes of action, Avoidance Actions and Other Debts

(including, without limitation, the Going Private Transaction Causes of Action and the Aliante

Prepetition Transactions Causes of Action) based upon any act, omission or event that takes

place on or prior to the Effective Date and arises from or is related to the Debtors, the

Reorganized Debtors or their respective assets, property, Estates, the Chapter 11 Cases, the

Disclosure Statement, the Plan or the solicitation of votes on the Plan that either the releasing

parties could assert or that any Holder of a Claim or Equity Interest could assert for or on behalf

of the Debtors or their Estates (whether directly or derivatively): (a) the Subsidiary Debtors and

their respective Estates; (b) the SCI Debtors and their respective Estates; (c) Fertitta

Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco; (g) Voteco;

(h) the Plan Administrators, solely in their capacity as such; (i) the Mortgage Lenders, solely in

their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as such; (k) the Land

Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders, solely in their capacity

as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its capacity as such; (o) the

Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (p)

Colony Capital, LLC;  (q) the Settling Lenders, but only if all of the applicable terms and

conditions of the Settling Lenders Stipulation are satisfied by the Settling Lenders; (r) the SCI

Committee and its members, provided that the Committee Plan Support Stipulation (as defined in

the SCI Plan) has not been terminated as of the Subsidiary Debtors Effective Date; (s) the Put

Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not

been terminated as of the Subsidiary Debtors Effective Date; (t) the Aliante Debtors and their

respective Estates; (u) Reorganized Aliante Gaming; (v) the Aliante Lenders, solely in their

capacities as Aliante Lenders and each and every Person or entity, including without limitation, a

Registered Intermediary Company, designated by any Aliante Lender to receive all or any part of

the Distribution in respect of such Aliante Lenders' Allowed Class AGL.1 Claim; (w) the Aliante Administrative Agent solely in its capacity as such; (x) the Aliante Transaction Committee and its members, solely in their capacities as such; (y) the Executive Committee of Aliante Gaming and its members, solely in their capacities as such; (z) ALST Casino Holdco; (aa) the respective Related Persons of each of the foregoing Entities identified in subsections (a) through (aa) (as defined in the Plan, the "<u>Released Parties</u>") (the "<u>Debtors' Release</u>").

94.    The Debtors' Release reflects a sound exercise of the Debtors' business judgment. In order to effectively implement the Plan, the non-Debtor parties thereto need assurance that they will not be subject to any further liability to the Debtors, their Estates, or any party that seeks to bring a claim on behalf of the Debtors or their Estates. Absent the Debtors' Release, it is likely that the various Released Parties would not commit to support the Plan because they would remain exposed to potential claims and causes of action.

95.    <u>The Third Party Release</u>. Article X.C.2. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, each Holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in Article X.C.2 fully releases and discharges each of the Released Parties from any and all claims and causes of action, Avoidance Actions and Other Debts (including, without limitation, the Going Private Transaction Causes of Action and the Aliante Prepetition Transactions Causes of Action) based on any act, omission or event that takes place on or before the Effective Date in any way relating or pertaining to (a) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (b) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (c) the Chapter 11 Cases, (d) the negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement, and (d) the Going Private Transaction Causes of Action or the Aliante Prepetition Transactions Causes of Action (the "<u>Third Party Release</u>").

96.    Similar to the Debtors' Release, the Third Party Release provides assurance to the parties to the Plan and the other parties in interest in the Chapter 11 Cases that their liability on

account of claims related to the Debtors (including with respect to the Going Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action) will be minimized, and provides an additional incentive for such parties to settle and consent to the Plan.  The Third Party Releases set forth in Article X.C.2. of the Plan are being made on a wholly voluntary basis by Holders of Claims or Equity Interests that have indicated on their Ballot that they are consenting to such release.  The Ballots sent to each Holder of a Claim or Equity Interest entitled to vote on the Plan unambiguously stated that the election to consent to such release was at such Holder's option.  The entirely voluntary Third Party Release is an effective tool in winning the necessary support for the Plan, and does not prejudice the rights of any party that did not agree to such Third Party Release.  In connection with the Confirmation Hearing, no party in interest objected to the Debtors' Release or the Third Party Release.

### 4.    Article X.D. of the Plan – Exculpation.

97.    Article X.D. of the Plan provides, subject to certain identified exceptions, an exculpation of the following parties from any Claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to the Chapter 11 Cases, including formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any sale, contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement, confirmation or Consummation of the Plan: (a) the Subsidiary Debtors and their respective Estates; (b) the SCI Debtors and their respective Estates; (c) Fertitta Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco; (g) Voteco; (h) the Plan Administrators, solely in their capacity as such; (i) the Mortgage Lenders, solely in their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as such; (k) the Land Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders, solely in their capacity as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its capacity as such; (o) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco

Secured Lenders; (p) Colony Capital, LLC;  (q) the Settling Lenders, but only if all of the

applicable terms and conditions of the Settling Lenders Stipulation are satisfied by the Settling

Lenders; (r) the SCI Committee and its members, provided that the Committee Support

Stipulation (as defined in the SCI plan) has not been terminated as of the Subsidiary Debtors

Effective Date; (s) the Put Parties, provided that the Put Parties Support Agreement and the

Propco Commitment have not been terminated as of the Subsidiary Debtors Effective Date;

(t) the Aliante Debtors and their respective Estates; (u) Reorganized Aliante Gaming; (v) the

Aliante Lenders, solely in their capacities as Aliante Lenders and each and every Person or

entity, including without limitation, a Registered Intermediary Company, designated by any

Aliante Lender to receive all or any part of the Distribution in respect of such Aliante Lenders'

Allowed Class AGL.1 Claim; (w) the Aliante Administrative Agent solely in its capacity as

such; (x) the Aliante Transaction Committee and its members, solely in their capacities as such;

(y) the Executive Committee of Aliante Gaming and its members, solely in their capacities as

such; (z) ALST Casino Holdco; and (aa) the respective Related Persons of each of the foregoing

Entities identified in subsections (a) through (aa) (the "Exculpated Parties").

98.     The Plan's exculpation provision provides additional incentive for the various

major parties to the Chapter 11 Cases to commit to and support the Plan.  The exculpation

ensures that such parties will not be subject to any claims or causes of action relating to their

good faith acts or omissions in the restructuring efforts that began in late 2008.  The exculpation

ensures that the Plan will have finality, and that the parties thereto will not be subject to

collateral attacks through litigation against the Plan's proponents and supporters.  In connection

with the Confirmation Hearing, no party in interest objected to the exculpation provisions of the

Plan.

99.     The Court previously found with respect to the SCI Plan that no successor

liability arises in connection with the Restructuring Transactions therein.  The Court finds that

the settlement, release, injunction and exculpation provisions set forth in Article X. of the Plan

(i) are integral to the agreement among the various parties in interest and the overall objectives of

the Plan, (ii) are essential to the formulation and successful implementation of the Plan for the

1    purposes of Section 1123(a)(5), (iii) are being provided for valuable consideration and have been

2    negotiated in good faith and at arms' length, (iv) confer material and substantial benefits on the

3    Debtors' Estates, and (v) are in the best interests of the Debtors, their Estates and other parties in

4    interest and, as to the releases made by, or on behalf of, the Debtors or the Estates, are based on

5    sound business judgment.

6                           **5.    No Successor Liability**

7            100.    Section 1141(c) provides in relevant part that "after confirmation of a plan, the

8    property dealt with by a plan is free and clear of all claims and interests of creditors, equity

9    security holders, and of general partners in the debtor." 11 U.S.C. § 1141(c).[11]  In addition,

10   Section 363(f) provides statutory authority for the sale of estate property free and clear of

11   "interests in the property," and courts have generally interpreted Section 363(f) to authorize sales

12   free and clear of liens and claims.  *See e.g., In re Trans World Airlines*, 322 F.3d 283, 290 (3d

13   Cir. 2003) (holding that unsecured claims of debtor's employees "are interests within the

14   meaning of Section 363(f) in the sense that they arise from the property being sold.*"); Meyers v.*

15   *United States*, 297 B.R. 774, 781-82 (S.D.Cal. 2003) (concluding that purchaser had acquired

16   assets of debtor free and clear of plaintiff's unsecured personal injury claims).  Courts have also

17   expressly held that transferees of a debtor's assets pursuant to a sale approved under Section 363

18   or pursuant to confirmation of a chapter 11 plan are not liable for claims against the debtor under

19   successor liability theories.  *See e.g., In re Trans World Airlines, supra* (Section 363 sale); *Myers*

20   *v. United States*, *supra* (Section 363 sale); *In re White Motor Credit Corp.*, 75 B.R. 944, 950

21   (Bankr. N.D. Ohio 1987) (confirmation of plan).  The court in *White Motor Credit Corp.* held

22   that state law successor liability theories are preempted by the Bankruptcy Code.  75 B.R. at 950.

23           101.    The Plan provides that the entities receiving the New Opco Acquired Assets, the

24   New Propco Acquired Assets, the Landco Assets, the Aliante Holdings Assets and the

25

26   [11]    Section 1141(c) is expressly subject to the provisions of Section 1141(d)(3), which provides that
     confirmation of a plan does not discharge a liquidating debtor, but Section 1141(c) refers to *property* of

27   the debtor, not the debtor.  *See e.g., In re Regional Bldg. Sys., Inc.*, 251 B.R. 274, 282 (Bankr. D. Md.
     2000), aff'd, 254 F.3d 528, 531 (4th Cir. 2001) (free and clear provision of Section 1141(c) applies to

28   liquidating chapter 11 plans); *In re Shenandoah Realty,* 248 B.R. 505, 513 (W.D. Va. 2000) (same); *In re
     Van Dyke*, No. 88-81521, 1996 WL 33401578 at *4 (Bankr. C.D. Ill. Jan. 10, 1996) (same).

1    Transferred Aliante Hotel Assets and their respective subsidiaries, creditors and equity holders,

2    shall have no successor liability for creditors' Claims (including Claims of governmental

3    entities) against the Debtors and the SCI Debtors, including any Claims arising out of or related

4    to the Restructuring Transactions, or otherwise based upon the implementation of the Plan, and

5    such intent of the Plan was plainly described in the Disclosure Statement.  During the course of

6    the Chapter 11 Cases, and in connection with the Confirmation Hearing, no party in interest

7    objected to such Plan term.  Moreover, the Restructuring Transactions were entirely

8    contemplated in the SCI Plan previously approved by the Court pursuant to a confirmation order

9    that is final and non-appealable.  As a result, the Court already previously determined that there

10   would be no successor liability in connection with the Restructuring Transactions.

11          102.    In considering how traditional successor liability analysis would apply to the

12   transfers of the Subsidiary Debtors' assets to New Opco Purchaser and New Propco, the Court is

13   mindful of the fact that the default rule under state law is that acquirors have no successor

14   liability.  *Village Builders 96, L.P. v. U.S. Laboratories, Inc.*, 121 Nev. 261, 268, 112 P.3d 1082,

15   1087 (Nev. 2005) ("[I]t is the general rule that when one corporation sells all of its assets to

16   another corporation the purchaser is not liable for the debts of the seller." (*quoting Lamb v. Leroy

17   Corp.*, 85 Nev. 276, 279, 454 P.2d 24, 26–27 (Nev. 1969)).  Successor liability against acquirors

18   is only applied when one of the exceptions to the default rule against successor liability has been

19   proven.  *Village Builders*, 121 Nev. at 268, 112 P.3d at 1087 (purchasers of assets have no

20   successor liability unless one of the following four exceptions are met: (a) the transferee has

21   agreed to assume the transferor's liabilities; (b) the transaction is a *de facto merger*; (c) the

22   transferee is mere continuation of transferor; or (d) the transaction is a fraud to escape liabilities).

23          103.    In reviewing the relevant facts, there does not appear to be any evidence of

24   successor liability since none of the *Village Builders* exceptions to the general rule of no

25   successor liability apply to the Restructuring Transactions and implementation of the Plan.  <u>First</u>,

26   New Opco Purchaser and the other Transferee Parties are not assuming the Debtors' liabilities;

27   the Plan and the other Restructuring Transactions related documents are clear and unequivocal

28   on that point.

#4827-8452-4809

104.   <u>Second</u>, courts generally will not find a *de facto* merger unless the consideration for the assets is the stock of the transferee, which is not the case here.  *See Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264-65 (9th Cir. 1990) (overruled on other grounds) (finding no continuity of shareholders where consideration paid by purchaser was a combination of cash, promissory note and payment of some debts, and no stock in purchaser or its parent company was exchanged as part of the sale); *see also Ferguson v. Arcata Redwood Co., LLC*, 2004 WL 2600471, *4 (N.D.Cal. Nov. 12, 2004) (purchaser was not alleged to have purchased seller's assets with stock, precluding a finding of successor liability); *Kaleta v. Whittaker Corp.*, 221 Ill. App. 3d 705, 709 (1991) (when payment for assets by stock of transferee is not present, sound policy does not support imposing the predecessor's liabilities upon the successor "when it has already paid a substantial price for the assets of the predecessor.").  Here, the consideration paid for the assets of the Subsidiary Debtors is cash and secured notes issued by New Opco. None of the consideration for the assets being sold under the Plan is the stock of transferee.

105.   <u>Third</u>, courts will not find a *de facto* merger or that the transferee is a mere continuation of the transferor unless the shareholders of the transferor and transferee are substantially the same, which is not the case here.  *See e.g. Village Builders*, 121 Nev. at 274, 112 P.3d at 1090-91 ( (no showing of mere continuation without "<u>identity</u> of stock, stockholders and directors between the two corporations") (emphasis added).  *See also*, *Commercial Nat'l Bank v. Newtson,* 39 Ill.App.3d 216, 217 (1976) (applying the general rule against corporate successor liability in a situation where one shareholder owned 25% of the predecessor corporation, and after the asset transfer the same shareholder owned 40% of the successor corporation); *Joseph Huber Brewing Co., Inc. v. Pamado, Inc.*, No. 05 C 2783, 2006 WL 2583719, *12-13 (N.D.Ill., September 5, 2006) (finding that a continuity of minority ownership—approximately 15%—does not weigh in favor of a finding for the continuation exception); *Jeong v. Onada Cement Co., Ltd.*, 2000 WL 33954824, *4 fn. 4 (C.D.Cal., May 17, 2000) (acknowledging that under California law, successor liability exists where shareholders are "practically" the same).

#4827-8452-4809

-42-

106.    Here, there the shareholders of the transferors are not substantially the same as the shareholders of the transferee.  The transferors, the Subsidiary Debtors, are currently owned directly and indirectly by Colony Capital and the Fertitta family.  Colony owns approximately 74%, and the Fertitta family approximately 26%, of the economic value of the Subsidiary Debtors.  The transferee, however, New Propco and its affiliates, will be owned 40% by the current Mortgage Lenders and Mezzco Lenders, 15% by the general unsecured creditors of the SCI Debtors that acquire equity through the Propco Rights Offering, and 45% by Fertitta Gaming LLC.  As a result, the majority of the transferee stock will be held by entities that hold no stock in the transferor Debtors.

107.    The board of directors of the transferors also is not substantially the same as the boards of directors of the transferees.  Of the proposed six person board of directors of the transferee, three proposed directors are current directors of SCI and three are not.

108.    <u>Fourth</u>, numerous courts, including Nevada courts, have not found the transferee to be a mere continuation of the transferor where the selling corporation continues to exist, even if the selling corporation ceases its business operations.  For example, in *Village Builders*, *supra*, where the Nevada Supreme Court declined to find successor liability, the transferor had sold all of its assets, but the transferor corporation was maintained for the purpose of a pending lawsuit. 121 Nev. at 272.  Other jurisdictions have reached similar conclusions.  *See e.g.*, *Schumacher v. Richards Shear Co.*, 59 N.Y.S.2d 239, 245 (1983) ("Since Richards Shear survived the instant purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly concluded that Logemann cannot be considered a mere continuation of Richards Shear."); *Gavette v. The Warner & Swasey Co.*, No. 90-CV-217, 1999 WL 118438, at *5 (N.D.N.Y. Mar. 5, 1999) (finding that *de facto* merger did not lie because the seller corporation continued to exist "at least transcendentally for one year.").  Here, like the transferor in *Village Builders*, the Subsidiary Debtors will continue to exist after the Effective Date for the purpose of implementing the Plan.

109.    Finally, the Plan is unmistakably not a fraud to escape liabilities.  The record of the Chapter 11 Cases shows that the parties to the Plan have acted in good faith, the Plan has

been proposed in good faith, and the Plan accomplishes the goals of maximizing the value of the Debtors' assets for the benefits of the Debtors' creditors. Thus, based upon the facts of these Chapter 11 Cases, none of the exceptions to the rule against successor liability under Nevada law apply.

**D.    SATISFACTION OF CONDITIONS TO CONFIRMATION.**

110.    Each of the conditions precedent to the entry of these Findings of Fact and Conclusions of Law and the Confirmation Order, as set forth in Article IX.A. of the Plan, has been satisfied.

**III.    CONCLUSIONS OF LAW.**

**A.    JURISDICTION AND VENUE.**

111.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtors were and are qualified to be debtors under Section 109. Venue of the Chapter 11 Cases in the United States Bankruptcy Court for the District of Nevada was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.

**B.    COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.**

112.    As set forth above, the Plan complies in all respects with the applicable requirements of Section 1129(a), except Section 1129(a)(8). Notwithstanding the fact that Section 1129(a)(8) has not been satisfied, the Plan satisfies the requirements of Section 1129(b) with respect to all non-accepting Classes of Claims and Equity Interests. The Court will confirm the Plan and enter the Confirmation Order contemporaneous with these Findings of Fact and Conclusions of Law.

**1.    The Classification of Claims Under the Plan
Complies With the Requirements of the Bankruptcy Code.**

113.    Under the Plan, General Unsecured Claims against the Subsidiary Debtors are separately classified from the unsecured deficiency claims and other unsecured claims of the Prepetition Opco Secured Lenders against the Subsidiary Debtors, and the creditors are treated differently. General Unsecured Claims against the Subsidiary Debtors will be paid in full and

General Unsecured Claims ; in contrast, the Prepetition Opco Secured Lenders will receive the consideration provided to them under the New Opco Purchase Agreement and SCI Plan in satisfaction of their Claims (secured and unsecured) against the Subsidiary Debtors, which is not payment in full (the Prepetition Opco Secured Lenders Allowed Claim is at least $882 million, while they will receive on their Claims, in the aggregate, approximately $772 million in cash and new secured notes).

114.    There are good business and legal reasons for this separate classification and treatment.  First, the treatment of the creditors is materially different, thereby counseling in favor of separate classification.  Second, the Prepetition Opco Secured Lenders have consented to the Plan treatment of their unsecured claims, and such consent is reflected in the vote of Classes BS.3(a), CS.3(a), FS.3(a), FLA.3(a), GR.3(a), GVS.3(a), GVRS.3(a), LM.3(a), MS.3(a), PSHC.3(a), PE.3(a), RS.3(a), SF.3(a), SL.3(a), SH.3(a), SS.3(a), TS.3(a), CH.2(a), LML.2(a), STN.2(a) and TSI.3(a) in favor of the Plan.  Third, the separate classification of the Prepetition Opco Secured Lenders' unsecured claims does not appear to result in any economic advantage for the Debtors or any group of creditors over another group of creditors (other than as such creditors have consented).  Fourth, the separate classification of the Prepetition Opco Secured Lenders' unsecured claims does not appear to constitute gerrymandering for the purpose of creating an impaired consenting Class.  Proof of the absence of gerrymandering is found in the fact that all of the Classes of Claims actually adversely affected by the separate classification and treatment voted to accept the Plan.  Therefore, under the circumstances of these Chapter 11 Cases, it is appropriate to separately classify the General Unsecured Claims against the Subsidiary Debtors from the unsecured deficiency claims and other unsecured claims of the Prepetition Opco Secured Lenders against the Subsidiary Debtors, and such separate classification complies with all of the applicable provisions of Sections 1122 and 1123(a)(1).

### 2.    The Plan Complies With the Requirements of Section 1129(a)(10).

115.    All Voting Classes voted to accept the Plan, in each case determined without including any acceptance of the Plan by any insider.  They are Classes AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a), CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a),

GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a), PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1, SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1 and TS.3(a), TSI.1 and TSI.3(a).  However, eight of the Debtors had no Voting Classes.  The bankruptcy courts that have expressly considered the matter have uniformly held that compliance with Section 1129(a)(10) is tested on a per-plan basis, not on a per-debtor basis, and that Section 1129(a)(10) therefore does not require an accepting impaired class for each debtor under a joint plan.  *See e.g. In re Charter Communcations, Inc.*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) (joint plan of 110 debtors that did not involve substantive consolidation; court held that only a single accepting impaired class under the plan required to satisfy Section 1129(a)(10)); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 at *234-235 (Bankr. S.D.N.Y. July 15, 2004) (joint chapter 11 plan for 177 debtors confirmed although majority of debtors lacked an impaired consenting class); *In re SGPA*, *Inc.*, Case No. 1-01-02609, 2001 WL 34750646, at p.7 (Bankr. M.D. Pa. Sept. 8, 2001) (bankruptcy court confirmed joint plan for multiple debtors and held that "in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan.").

116.    The Court agrees with the *Enron* court that the plain language and inherent fundamental policy behind Section 1129(a)(10) supports the view that the affirmative vote of one impaired class under the joint plan of multiple debtors is sufficient to satisfy Section 1129(a)(10).  *See In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *234-235.  The Court concludes, therefore, that the acceptance of the Plan by all Voting Classes is sufficient for the Plan to satisfy the requirements of Section 1129(a)(10).

### 3.    The Plan Complies With the Requirements of Section 1129(a)(11).

117.    The Subsidiary Debtors.  Section 1129(a)(11) requires the Court to find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan.  Since the Plan is a liquidating Plan for all of the Debtors except Aliante Gaming, the question of further financial reorganization of those Debtors is moot.  *See e.g., In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (under the literal wording of Section 1129(a)(11), it is

unnecessary to show feasibility when liquidation is proposed in the plan); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) (the feasibility test has no application to a liquidation plan).  Moreover, none of the Transferee Parties receiving the Subsidiary Debtors' assets are successors to the Debtors; therefore, no feasibility finding is required with respect to those entities either.

118.    Even if the feasibility test of Section 1129(a)(11) applies in circumstances where a debtor's assets are being sold and the debtor liquidated, such test is satisfied if the liquidation is contemplated under the Plan, as it is here, and can be consummated.  *See e.g.*, *In re Cypresswood Land Partners, I*, 409 B.R. 396, 433 (Bankr. S.D. Tex. 2009) (plan that provides for a sale of substantially all of a debtor's assets offers a reasonable probability of success and can satisfy Section 1129(a)(11)).  Here, the assets of the Subsidiary Debtors will be transferred to the Transferee Parties under the Plan on the Effective Date.  The Plan is feasible if the Transferee Parties have the financial wherewithal to close on the Restructuring Transactions in a manner that has a reasonable prospect of resulting in the consummation of the Plan.  To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success.  *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).  Based upon (i) the financial projections for New Propco and New Opco, (ii) the clear financial wherewithal and desire of the parties to the Restructuring Transactions to close on and implement the respective asset purchase agreements on the Effective Date, and (iii) the evidence that the Backstop Parties are willing to purchase up to $100 million of equity in New Propco, it appears that: (a) New Opco Purchaser will close on the New Opco Purchase Agreement, and (b) New Propco and New Opco Purchaser and their affiliates will be able to service the debt obligations they are issuing in connection with the Restructuring Transactions.

119.    The Aliante Debtors.   As a result of the debt for equity exchange on which the Aliante Gaming restructuring is based (including the payment in full of the General Unsecured Creditors), Reorganized Aliante Gaming will have a substantially deleveraged capital structure and is projected in the Aliante Gaming financial projections to be able to operate its business and meet its obligations without the need for further financial reorganization. Given the discharge

1   under the Plan of more than $430 million of secured and unsecured claims against Aliante

2   Gaming, it is reasonable to expect that, as the Aliante Gaming financial projections demonstrate,

3   after consummation of the Plan, Reorganized Aliante Gaming will not require further financial

4   reorganization.

5          120.    The Court concludes that the Plan meets the feasibility test of Section 1129(a)(11)

6   as to all Debtors.

7       **C.    THE TERMS OF THE RESTRUCTURING
            TRANSACTIONS ARE APPROVED IN ALL RESPECTS**
8

9          121.    Each Subsidiary Debtor provided good and sufficient notice of the assumption, or

10  assumption and assignment, as the case may be, of the contracts and leases that are transferred

11  assets under the New Opco Purchase Agreement, New Opco Implementation Agreements,

12  Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante

13  Transaction Agreements.  Aliante Gaming provided good and sufficient notice of the rejection of

14  any contracts or leases.  Each of the Debtors has, under the terms of the Plan, until the Effective

15  Date to file additional schedules of assumed, assigned, or rejected contracts and leases, and

16  notice of proposed Cure Amounts.

17         122.    New Opco Purchaser is not an insider of the Sellers as that term is used in the

18  New Opco Purchase Agreement; and in each case as "insider" is defined in Section 101(31).

19         123.    On the Effective Date, the transfer of the New Opco Acquired Assets, New

20  Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante

21  Hotel Assets to the applicable Transferee Parties under the Plan (a) will be legal, valid, and

22  effective transfers of the New Opco Acquired Assets, New Propco Acquired Assets, Landco

23  Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets, and (b) will vest the

24  Transferee Parties with all right, title, and interest of the Debtors in such assets free and clear of

25  all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests,

26  including but not limited to all claims arising under doctrines of successor liability.

27         124.    The Restructuring Transactions, including, without limitation, the New Opco

28  Purchase Agreement, New Opco Credit Agreement, New Opco Implementation Agreements,

Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and Restated Operating Agreement for IP Holdco, the New Aliante Transaction Agreements and the other Plan implementation agreements, documents and instruments referred to in Article V of the Plan or otherwise contained in the Plan, or executed and delivered in connection with implementing the transactions contemplated under the Plan, were negotiated and have been and are undertaken by the Debtors and the applicable Transferee Parties and other parties at arms' length without collusion or fraud, and in good faith within the meaning of Section 363(m). The prepetition marketing of the Debtors' assets were conducted at arms' length and in good faith within the meaning of Section 363(m). New Opco Purchaser is a purchaser in good faith as that term is used in Section 363(m), and New Opco Purchaser and the Subsidiary Debtors are entitled to the protections of Section 363(m) with respect to the assets they are transferring to New Opco Purchaser. Moreover, none of the Subsidiary Debtors or New Opco Purchaser engaged in conduct that would cause or permit the New Opco Purchase Agreement, the consummation of the sale, the related Restructuring Transactions, or the assumption and assignment of the Assumed Contracts to be avoided, or costs or damages to be imposed, under Section 363(n). All debts incurred by New Opco Purchaser in connection with the Restructuring Transactions, and all Liens granted by New Opco Purchaser and its subsidiaries and affiliates in connection with such incurrence of debt, are entitled to the protections of Section 364(e).

125. The consideration provided by the Transferee Parties for the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets is fair and reasonable and shall be deemed for all purposes to constitute Value under the Bankruptcy Code and any other applicable law.

126. The Debtors are authorized to convey, assign, transfer and deliver the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets to the Transferee Parties free and clear of all free and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests, because, with respect to each creditor asserting a Lien, Claim, Equity Interest, encumbrance, charge, Other Debt or other interest, one or more of the standards set forth in Sections 363(f)(1)-

(5), 1129 or 1141 has been satisfied; including without limitation because the New Opco Purchase Agreement satisfies the requirements of Section 363(f). Those Holders of Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests who did not object or withdrew objections to the Plan and related Restructuring Transactions are deemed to have consented thereto pursuant to Sections 363(f)(2) and 1141. Those Holders of Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests who did object fall within one or more of the other subsections of Section 363(f), or their objections were overruled pursuant to Section 1129 and 1141.

127.     Except as otherwise expressly provided in the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante Transaction Agreements, the Transferee Parties are not assuming, nor shall they or any of their affiliates, or their respective Related Persons, be deemed in any way liable or responsible as a successor or otherwise for, any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets or use of such assets on or prior to the Effective Date. The Confirmation Order shall provide that all such liabilities, debts and obligations are extinguished as to all Persons, Entities and Governmental Units on the Effective Date insofar as they may give rise to liability, successor or otherwise, under any theory of law or equity against the Transferee Parties and their Related Persons.

128.     Pursuant to the terms of the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and Restated Operating Agreement for IP Holdco, the New Aliante Transaction Agreements and Sections 363(b), 363(f) and 1141(c), the Debtors are authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets to the applicable Transferee Parties on the Effective Date free and clear of (i) all Liens, Claims, Equity Interests,

encumbrances, charges, Other Debts or other interests, including without limitation any Claim, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, or arising under doctrines of successor liability, and (ii) any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership of such assets.  The Confirmation Order shall provide that, except as otherwise expressly provided in the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante Transaction Agreements, on the Effective Date all such Liens, Claims, Equity Interests, encumbrances, charges, Other Debts, other interests and restrictions shall be released, terminated and discharged as to the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets and the Transferee Parties.

129.    The Transferee Parties shall not be deemed a successor of or to the Debtors or the Debtors' estates with respect to Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests against or in the Debtors or the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets, and the Transferee Parties shall not be deemed liable in any way for any such Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests, including, without limitation, the Excluded Liabilities or Excluded Assets (as those terms are used in the New Opco Purchase Agreement).  The Confirmation Order shall provide that, on the Effective Date, all creditors and equityholders of the Debtors, including all Governmental Units, are permanently and forever barred, restrained and enjoined from (a) asserting any claims or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Transferee Parties, their Related Persons or the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets on account of any Liens, Claims, Equity Interests, encumbrances, charges, Other Debts, other interests, Excluded Liabilities or Excluded Assets, or (b) asserting any claims or enforcing remedies against any of the Transferee Parties or their

Related Persons under any theory of successor liability, merger, *de facto* merger, substantial continuity or similar theory.

130.    Without limiting the generality of the foregoing paragraph, other than as specifically set forth in the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante Transaction Agreements: (a) the Transferee Parties and their Related Persons shall have no liability or obligation (x) to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or any other payment to employees of the Debtors, and (y) in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program  to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit); and (b) the Transferee Parties and their Related Persons shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against the Transferee Parties and their Related Persons any Claims arising from or relating to such employee benefit, agreement, plan or program.

131.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the applicable Transferee Parties in connection with the consummation of the conveyances and assignments under the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and Restated Operating Agreement for IP Holdco and the New Aliante Transaction Agreements, and the assumption and assignment of the Assumed Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed Contracts being assigned and sold to the applicable Transferee Parties are an integral part of the Restructuring Transactions, and

#4827-8452-4809

-52-

1   accordingly, such assumptions and assignments of the Assumed Contracts are reasonable and

2   enhance the value of the Debtors' estates.

3       132.    By implementing the New Opco Purchase Agreement, New Opco Implementation

4   Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements, the

5   Amended and Restated Operating Agreement for IP Holdco and the New Aliante Transaction

6   Agreements, (a) the Debtors will have provided adequate assurance of cure of any monetary

7   default existing prior to the Closing under any of the Assumed Contracts, within the meaning of

8   Section 365(b)(1)(A), and will have provided adequate assurance of compensation to any party

9   for any actual pecuniary loss to such party resulting from a default prior to the date hereof under

10   any of the Assumed Contracts within the meaning of Section 365(b)(1)(B), and (b) the

11   Transferee Parties will have provided adequate assurance of future performance of and under any

12   of the Assumed Contracts, within the meaning of Sections 365(b)(1)(C) and 365(f).

13       **D.**    **APPROVAL OF THE SETTLEMENTS, RELEASES**

14       **AND EXCULPATIONS PROVIDED UNDER THE PLAN.**

15       133.    Based upon the wide ranging support for the Plan among secured and unsecured

16   creditors, and the Court's finding that the Plan is the best option the Debtors' creditors have to

17   preserve the economic viability and job sustaining value of the Debtors' assets, the Court

18   concludes that each of the settlement, release, exculpation and related provisions of Article X. of

19   the Plan are fair and necessary for the successful implementation of the Plan and are approved.

20       **1.**    **The Global Settlement in Article X.B.2. of the Plan is Approved.**

21       134.    Based upon the record of the Chapter 11 Cases, the Court concludes that the

22   Debtors were justified in proposing to settle and release the Going Private Transaction and the

23   Aliante Prepetition Transactions pursuant to the Plan, because such settlement and compromise

24   is consistent with the factors enunciated in *Protective Committee for Independent Stockholders of*

25   *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), and *Martin v. Kane (In re A & C*

26   *Properties)*, 784 F.2d 1377 (9th Cir. 1986), *cert. denied sub nom. Martin v. Robinson*, 479 U.S.

27   854 (1986), for approval of settlements in bankruptcy cases.  The low probability of success in

28   the litigation, the complexity, expense and delay necessarily associated with any such litigation,

1    and the paramount interest of the creditors and a proper deference to their reasonable views all

2    weigh heavily in favor of settlement here, not litigation.  Accordingly, the Court concludes that

3    the Global Settlement and the provisions of Article X.B.2. constitute a fair and equitable

4    settlement that is in the best interests of the creditors and their estates, and one that satisfies in all

5    respects the requirements of *TMT Trailer* and *In re A & C Properties* for settlements proposed

6    by chapter 11 debtors.

7        135.    The Global Settlement is in the best interest of each Debtor and its respective

8    Estate and the Holders of Claims, Administrative Claims and Equity Interests providing such

9    releases, and is fair, equitable and reasonable.

10              **2.       The Exculpation Provisions of Article X.D. of the Plan Are Approved.**

11       136.    Section 524(e) provides in relevant part that "discharge of a debt of the debtor

12   does not affect the liability of any other entity, on or the property of any other entity for, such

13   debt."  In *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), the Court of Appeals for the Ninth

14   Circuit held that Section 524(e) applies to chapter 11 plan bankruptcy discharges.  However,

15   bankruptcy courts generally recognize that Section 524(e) is silent on whether a chapter 11 plan

16   or confirmation order could affect the liability of a non-debtor on statutory grounds *other than* a

17   bankruptcy discharge.  Here the exculpation provision of Article X.D. does not violate Section

18   524(e) because it is based upon the more limited exculpation provisions that are expressly

19   contemplated and permitted by Bankruptcy Code Section 1125(e).

20       137.    Section 1125(e) provides a grant of immunity from liability not only under the

21   securities laws, but also under any law, rule, or regulation governing solicitation or acceptance of

22   a plan, to any person that participates in good faith in the solicitation of acceptances of a plan or

23   the offer, issuance, sale or purchase of a security offered or sold in connection with the plan.

24   Read literally, nothing in Section 1125(e) limits that protection to post-petition activities.

25   Moreover, another related provision of Section 1125, Section 1125(g), contemplates and

26   authorizes solicitation of acceptances of a chapter 11 plan prior to commencement of a

27   bankruptcy case if solicited in compliance with applicable non-bankruptcy law.

28

#4827-8452-4809                              -54-

138.    Here, as discussed in Article II. of the Disclosure Statement for the SCI Plan, the Subsidiary Debtors and SCI Debtors conducted such pre-bankruptcy solicitations as part of their ongoing restructuring efforts dating back to late 2008.  Specifically, during 2008 and the first six months of 2009, the SCI Debtors and Subsidiary Debtors engaged in various discussions with the lenders under the Prepetition Opco Credit Agreement and the CMBS Loans and Holders of the Senior Notes and Senior Subordinated Notes regarding restructuring alternatives for the Debtors' outstanding indebtedness.  In November 2008, the SCI Debtors made an offer to exchange new secured term loans for the outstanding Senior Notes and Senior Subordinated Notes, which would have included a restructuring of the Prepetition Opco Credit Agreement and the CMBS Loans.  The November 2008 exchange offer was unsuccessful.

139.    In February 2009, the SCI Debtors solicited votes from the Holders of the Senior Notes and Senior Subordinated Notes for a prepackaged plan of reorganization pursuant to which the Holders of the Senior Notes and Senior Subordinated Notes would have received second and third lien notes, respectively, and cash in a plan of reorganization, and the outstanding indebtedness under the Prepetition Opco Credit Agreement and CMBS Loans would have been restructured.  The solicitation for the prepackaged plan of reorganization did not receive sufficient votes to approve the plan, and that plan did not proceed.

140.    In March 2009, the Holders of a majority in principal amount of each series of Senior Notes and Senior Subordinated Notes entered into a forbearance agreement with SCI with respect to the events of default resulting from SCI's failure to pay interest on the Senior Notes and Senior Subordinated Notes.  Majority lenders under the Prepetition Opco Credit Agreement likewise entered into a forbearance agreement with SCI relating to various purported events of default.  During the period from March 2009 to the commencement of the SCI Cases, the SCI Debtors and Subsidiary Debtors continued to negotiate the terms of a consensual restructuring with the various creditors of the Debtors.

141.    Aliante Gaming also began negotiating the terms of a consensual restructuring with its principal creditor constituencies more than nine months prior to the Petition Date.  In

#4827-8452-4809

-55-

March 2011, the Subsidiary Debtors and the Aliante Debtors conducted a formal pre-bankruptcy solicitation of acceptances of the Plan, as authorized under Section 1125(g).

142.    The Court is of the view that, since the pre-petition restructuring efforts were made in good faith and the parties sought a result consistent with the relief available under chapter 11, such conduct is precisely the type of activity that Section 1125(e) is designed to protect.  It would be inequitable, and would not comport with the plain intent of Section 1125(e) if, after confirmation of the Plan and implementation of the Restructuring Transactions, the Exculpated Parties -- the Persons and Entities on the Debtor and creditor sides that actively participated in the process of reaching a consensual chapter 11 plan -- could then be sued for their good faith prepetition and post-petition restructuring efforts.  Accordingly, the Court concludes that each of the Exculpated Parties is entitled to the protections afforded them by Section 1125(e) and Article X.D. of the Plan. [12]

### 3.    The Releases in Article X.C. of the Plan are Approved.

143.    A release of non-debtor third parties voluntarily and knowingly given by a creditor or equity holder in connection with a chapter 11 plan does not implicate the concerns regarding third party releases discussed by the Ninth Circuit Court of Appeals in *Lowenschuss*, *supra*.  *See e.g., In re Pacific Gas & Elec. Co.*, 304 B.R. 395, 416-18 (Bankr. N.D. Cal. 2004) (confirming plan that included governmental agency's release of debtor's parent entity and its officers and directors because the agency had consented to the release); *In re Hotel Mt. Lassen, Inc.*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("[a]ny third-party release in connection with a plan or reorganization, at a minimum, must be fully disclosed and purely voluntary on the part of the releasing parties and cannot unfairly discriminate against others.").

---

[12]   Other bankruptcy courts in recent contested chapter 11 cases have approved plan exculpation clauses at least as broad, if not broader, in scope than that proposed in these Chapter 11 Cases. *See, e.g., In re Citadel Broadcasting, Inc.*, Case No. 09-17442, 2010 WL 210808, at *30 (Bankr. S.D.N.Y. May 19, 2010) ("Exculpated Claims" included all claims relating to the debtors' in or out of court restructuring efforts, and "Exculpated Parties" included, among others, the holders of the senior secured debt and their agent, the agent and indenture trustee for the subordinated noteholders, and each of their respective professionals and affiliates); *In re CIT Group, Inc.*, Case No. 09-16565, 2009 WL 4824498 (Bankr. S.D.N.Y. Dec. 8, 2009) at *25 (the exculpated parties included a steering committee of prepetition lenders, the DIP lenders and their agent, the exit facility lenders and their agent, the indenture trustees for the unsecured note issuances).

144.     Here, the Third Party Release was plainly described on the Ballot used to solicit votes in favor of the Plan.  Thus, the Third Party Release does not violate Section 524(e) or any of the concerns discussed in *Lowenschuss*, and is an appropriate term of the Plan under Section 1123(a)(5) (and is expressly authorized by Section 1123(b)(3)(A), the settlement or adjustment of any claim belong to the debtor or the estate).

145.     The Court concludes that the settlements, compromises, releases, exculpations, discharges and injunctions set forth in Article X of the Plan are fair, equitable, reasonable and in the best interests of the Debtors and their respective Estates and the Holders of Claims and Equity Interests, and are approved.

### 4.     The Transferee Parties Shall Not be Liable Under Any Successor Liability Theories

146.     The operation of Sections 363 and 1141 foreclose the ability of creditors to obtain a finding of successor liability against the transferees of the Debtors' assets.  It would undermine the purposes of chapter 11 if creditors could get around the effect of confirmation of a chapter 11 plan by asserting successor liability claims after confirmation.  *See e.g., In re Trans World Airlines*, 322 F.3d at 292 (to allow some general unsecured creditors to assert successor liability claims against transferee of debtors' assets, while limiting other creditors' recourse to proceeds of sale, would be inconsistent with Bankruptcy Code's priority scheme).  In this case, if the Plan did not foreclose successor liability, the purchasers of the Subsidiary Debtor assets likely would not go forward with the sales, and the creditors receiving equity in Reorganized Aliante Gaming in exchange for their first priority secured claims likely would not support the Plan.

147.     The Court has performed the successor liability analysis under applicable non-bankruptcy law, including under Nevada law, and the Court finds no basis at all for successor liability.  Therefore, the Court concludes that the applicable transferees of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets and their Related Persons are not successors of the Debtors or the SCI Debtors, and, therefore, the "no successor liability" provisions of the Plan are consistent with applicable law and shall be enforced in the Confirmation Order.

**E.    EXEMPTIONS FROM SECURITIES LAWS.**

148.    Article IX.A. of the Disclosure Statement, entitled "U.S. Securities Law Matters," provides adequate notice to all parties in interest that, subject to certain exceptions discussed in Article IX, "all debt instruments, to the extent they constitute securities, and equity securities that are offered and issued in conjunction with the Joint Plan will not be registered under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in Section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth in Section 4(2) of the Securities Act or Regulation D promulgated thereunder."

**F.    EXEMPTIONS FROM TAXATION.**

149.    Pursuant to Section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any Stamp or Similar Tax.  The Confirmation Order will provide that all federal, state or local governmental officials or agents shall forgo the collection of any such Stamp or Similar Tax or governmental assessment in connection with transfers of property under the Plan, and accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan and the transfers of property under the Restructuring Transactions, including without limitation the recordation of any mortgage pursuant to the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante Transaction Agreements.

**G.    THE PLAN MODIFICATIONS ARE APPROVED**

150.    The Plan Modifications do not require resolicitation of acceptances of the Plan for the following reasons.  First, the Prepetition Opco Secured Lenders, the only creditors impacted by the inclusion of TSI as a Subsidiary Debtor under the Plan, consented to such Plan modification, and no other creditor of TSI objected to the Plan.  Second, the Plan Modifications in respect of the Aliante Debtors have the effect of resolving what had been, as of the Petition Date, unresolved issues relating to the management of the Aliante Station Casino and Hotel

1   during these Chapter 11 Cases and after the Effective Date, and thereby only enhance the

2   feasibility of the Plan with respect to the creditors of the Aliante Debtors, and add the Aliante IP

3   License Agreement as a New Aliante Transaction Agreement.  Third, the Plan Modifications do

4   not prejudice the treatment of the Claims of any Holder of Claims against or Equity Interests in

5   the Debtors under the Plan.  Accordingly, all Voting Classes that voted to accept the Plan are

6   deemed to have accepted the Plan Modifications as well.

7           151.    The Subsidiary Debtors' solicitation of consents from the Prepetition Opco

8   Secured Lenders with respect to the Plan Modifications satisfied the requirements of Section

9   1125; and the Plan, inclusive of the Plan Modifications, meets the requirements of Sections 1121

10  through 1129, including, without limitation, the requirements of Section 1127 and Federal Rule

11  of Bankruptcy Procedure 3019 with respect to plan modifications before confirmation of a plan.

12          152.    The Plan, inclusive of the Plan Modifications, shall be confirmed pursuant to

13  Section 1129.

14  SUBMITTED BY:

15  Paul S. Aronzon (CA SBN 88781)               Laury M. Macauley (NV SBN 11413)

16  Thomas R. Kreller (CA SBN 161922)            Dawn M. Cica (NV SBN 004565)
    Fred Neufeld (CA SBN 150759)                 LEWIS AND ROCA LLP
17  MILBANK, TWEED, HADLEY & McCLOY LLP          50 West Liberty Street, Suite 410
    601 South Figueroa Street, 30th Floor        Reno, Nevada 89501
18  Los Angeles, California 90017                 Telephone:  (775) 823-2900
    Telephone:  (213) 892-4000                   Facsimile:  (775) 823-2929
19  Facsimile:  (213) 629-5063                    lmacauley@lrlaw.com
    paronzon@milbank.com                         dcica@lrlaw.com
20  tkreller@milbank.com

21                                               Local Reorganization Counsel for the
    Reorganization Counsel for the Subsidiary Debtors   Subsidiary Debtors
22

23  and

24

25

26

27

28

#4827-8452-4809                       -59-

1   James H.M. Sprayregen, P.C. (IL SBN 6190206)        Candace Carlyon (NV SBN 002666)
    David R. Seligman, P.C. (IL SBN 6238064)            James Patrick Shea (NV SBN 000405)
2   David A. Agay (IL No. 6244314)                      SHEA & CARLYON, LTD.
    Sarah H. Seewer (IL No. 6301437)                    701 Bridger Avenue, Suite 850
3   KIRKLAND & ELLIS LLP                                Las Vegas, Nevada  89101
    300 North LaSalle St.                               Telephone:     (702) 471-7432
4   Chicago, Illinois  60654                            Facsimile:     (702) 471-7435
    Telephone:     (312) 862-2000                       ccarlyon@sheacarlyon.com
5   Facsimile:     (312) 862-2200                       jshea@sheacarlyon.com
6
7   Reorganization Counsel for the Aliante Debtors      Local Reorganization Counsel for the
                                                        Aliante Debtors

8                                  # # #

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#4827-8452-4809                        -60-

# **EXHIBIT 3**

# **EXHIBIT 3**

#4831-0060-3657

## EXHIBIT 3

### TERMINATED LIENS, CLAIMS AND EQUITY INTERESTS

| | | |
|---|---|---|
| **ALIANTE GAMING, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing ALIANTE GAMING, LLC, as Debtor and WILMINGTON TRUST FSB, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on October 5, 2007 as Document No. 2007033175-4. |

| | | |
|---|---|---|
| **ALIANTE HOLDING, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing ALIANTE HOLDING, LLC, as Debtor and WILMINGTON TRUST FSB, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on October 5, 2007 as Document No. 2007033173-0. |

| | | |
|---|---|---|
| **ALIANTE STATION LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing ALIANTE STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037000-9. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing ALIANTE STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037031-4. |

| | | |
|---|---|---|
| **BOULDER STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing BOULDER STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037032-6. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing BOULDER STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037001-1. |

| | | |
|---|---|---|
| **CHARLESTON STATION, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037033-8. |

Exhibit 3 to Confirmation Order

| | | |
|---|---|---|
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037002-3. |
| **FIESTA STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037003-5. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037034-0. |
| **FRESNO LAND ACQUISITIONS, LLC**<br><br>California Secretary of State | 1. | The effect of a Financing Statement with the California Secretary of State showing FRESNO LAND ACQUISITIONS, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 07-7136238926. |
| **GOLD RUSH STATION, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing GOLD RUSH STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037004-7. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing GOLD RUSH STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037035-2. |
| **GREEN VALLEY STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing GREEN VALLEY STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037006-1. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing GREEN VALLEY STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037024-9. |

| | | |
|---|---|---|
| **GV RANCH STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing GV RANCH STATION, INC., as Debtor and WILMINGTON TRUST FSB, AS ADMINISTRATIVE AGENT UNDER THE FIRST LIEN CREDIT AGREEMENT, as Secured Party and recorded on February 16, 2007 as Document No. 2007005247-3. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing GV RANCH STATION, INC., as Debtor and THE BANK OF NEW YORK MELLON, AS ADMINISTRATIVE AGENT UNDER THE SECOND LIEN CREDIT AGREEMENT, as Secured Party and recorded on February 20, 2007 as Document No. 2007005513-8. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing GV RANCH STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037007-3. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing GV RANCH STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037025-1. |

| | | |
|---|---|---|
| **LAKE MEAD STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing LAKE MEAD STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037008-5. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing LAKE MEAD STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037026-3. |

| | | |
|---|---|---|
| **MAGIC STAR STATION, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing MAGIC STAR STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037009-7. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing MAGIC STAR STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037027-5. |

Exhibit 3 to Confirmation Order

#4827-4900-4297

| | | |
|---|---|---|
| **PALACE STATION HOTEL AND CASINO, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL AND CASINO, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037028-7. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL AND CASINO, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037011-2 |

| | | |
|---|---|---|
| **PAST ENTERPRISES, INC.**<br><br>Arizona Secretary of State | 1. | The effect of a Financing Statement with the Arizona Secretary of State showing PAST ENTERPRISES, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on May 4, 2009 as Document No. 200915788513. |

| | | |
|---|---|---|
| **RANCHO STATION, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing RANCHO STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037012-4. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing RANCHO STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037018-6. |

| | | |
|---|---|---|
| **SANTA FE STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037023-7. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037013-6. |

| | | |
|---|---|---|
| **STATION HOLDINGS, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing STATION HOLDINGS, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037014-8. |

Exhibit 3 to Confirmation Order

| | | |
|---|---|---|
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing STATION HOLDINGS, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037022-5. |
| **SONOMA LAND HOLDINGS, LLC**<br><br>California Secretary of State | 1. | The effect of a Financing Statement with the California Secretary of State showing SONOMA LAND HOLDINGS, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 07-7136238784. |
| **SUNSET STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037015-0. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037019-8. |
| **TEXAS STATION, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037016-2. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037020-1. |
| **TROPICANA STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing TROPICANA STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037021-3. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing TROPICANA STATION, INC., as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on November 7, 2007 as Document No. 2007037017-4. |

Exhibit 3 to Confirmation Order

| | | |
|---|---|---|
| **ALIANTE GAMING, LLC**<br><br>**(Aliante Station Casino & Hotel)**<br><br>County of Clark, State of Nevada | 1. | A Deed of Trust to secure an original indebtedness of $430,000,000.00 recorded October 05, 2007 in Book 20071005 as Instrument No. 03622 of Official Records.<br>Dated:         October 05, 2007<br>Trustor:      Aliante Gaming, LLC, a Nevada limited liability company<br>Trustee:      Prlap, Inc.<br>Beneficiary:   Bank of America, N.A.<br><br>According to the public records, the beneficial interest under the deed of trust was assigned to Wilmington Trust FSB as successor Administrative Agent by assignment recorded January 31, 2011 in Book 20110131 as Instrument No. 01425 of Official Records. |
| | 2. | A claim of Mechanic's Lien by Clearwater Mechanical, Inc., recorded November 19, 2008 in Book 20081119 of Official Records as document number 00302.<br><br>Amount: $49,174.29 (Capriotti's Sandwich Shop @ Aliante Station)<br><br>A claim of Mechanic's Lien by Atlas Building & Development LLC, recorded February 12, 2009 in Book 20090212 of Official Records as document number 05152.<br><br>Amount: $26,399.92 (Dunkin Donuts – Aliante Station)<br><br>An action commenced in the District Court, dated April 23, 2009, Case No. A588595, entitled, ATLAS BUILDING & DEVELOPMENT, LLC – VS – KAINOS PARTNERS, LLC, ALIANTE GAMING, ET AL Notice of Pendency of said Action was recorded April 29, 2009 in Book 20090429 as Document No. 02071 of Official Records. |
| | 3. | A claim of Mechanic's Lien by Hansen Mechanical Contractors, Inc., recorded February 27, 2009 in Book 20090227 of Official Records as document number 02963.<br><br>Amount: $189,570.00 |
| | 4. | A claim of Mechanic's Lien by Clearwater mechanical, Inc., recorded March 12, 2009 in Book 20090312 of Official Records as document number 04117.<br><br>Amount: $7,643.20 (Dunkin' Donuts @ Aliante Station) |
| | 5. | A claim of Mechanic's Lien by ADT Construction Group, Inc., recorded March 23, 2009 in Book 20090323 of Official Records as document number 05052. |

| | | |
|---|---|---|
| | | Amount: $35,683.00 |
| | 6. | An action commenced in the District Court, dated March 25, 2009, Case No. A586246-C, entitled, "Walters Metal Fabrication, Inc., dba Dittmeier Steel Services", -vs- Aliante Gaming, LLC etal Notice of Pendency of said Action was recorded March 26, 2009 in Book 20090326 as Document No. 01392, and as amended by Amended Notice of Lis Pendens recorded April 13, 2009 in Book 20090413 as Document No. 04083 of Official Records. |

| | | |
|---|---|---|
| **CENTERLINE HOLDINGS, LLC**<br><br>**(Las Vegas – Castaways Site)**<br><br>County of Clark, State of Nevada | 1. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by VSS ENTERPRISES, LLC, DBA SHOWBOAT HOTEL CASINO, in favor of FEDERAL SIGN DIV. OF FEDERAL SIGNAL CORP, and recorded June 30, 2000 in Book 20000630 as Document No. 01342 of Official Records. |
| | 2. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by VSS ENTERPRISES, LLC, in favor of FEDERAL SIGN DIV. OF DEDRAL SIGNAL CORP, and recorded January 10, 2001 in Book 20010110 as Document No. 00741 of Official Records. |
| | 3. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by VSS ENTERPRISES, LLC, in favor of FEDERAL SIGN DIV. OF FEDERAL SIGNAL CORP., and recorded February 16, 2001 in Book 20010216 as Document No. 00906 of Official Records. |
| | 4. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |

| | | |
|---|---|---|
| **DURANGO STATION, INC.**<br><br>**(Las Vegas – Durango Site)**<br><br>County of Clark, State of Nevada | 1. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |

Exhibit 3 to Confirmation Order

#4827-4900-4297

| | | |
|---|---|---|
| **FIESTA STATION, INC.**<br><br>**(Fiesta Rancho Casino Hotel)**<br><br>County of Clark, State of Nevada | 1. | Deed of Trust to secure an indebtedness of $900,000,000.00 and any other amounts payable under the terms thereof:<br><br>Recorded:  November 7, 2007 in Book 20071107 Document No. 01252 of Official Records.<br>Dated:  November 7, 2007<br>Trustor:  FIESTA STATION INC., A NEVADA CORPORATION<br>Trustee:  NEVADA TITLE COMPANY, A NEVADA CORPORATION<br>Beneficiary:  DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS ADMINISTRATIVE AGENT FOR THE BENEFIT OF THE SECURED PARTIES |
| | 2. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by FIESTA STATION, INC., in favor of DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS ADMINISTRATIVE AGENT, and recorded November 7, 2007 in Book 20071107 as Document No. 01257 of Official Records. |

| | | |
|---|---|---|
| **INSPIRADA STATION, LLC**<br><br>**(Las Vegas – Inspirada Site)**<br><br>County of Clark, State of Nevada | 1. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |

| | | |
|---|---|---|
| **LAKE MEAD STATION, INC.**<br><br>**(Fiesta Henderson Casino Hotel)**<br><br>County of Clark, State of Nevada | 1. | Deed of Trust to secure an indebtedness of $900,000,000.00 and any other amounts payable under the terms thereof:<br><br>Recorded:  November 7, 2007 in Book 20071107 Document No. 01253 of Official Records.<br>Dated:  November 7, 2007<br>Trustor:  LAKE MEAD STATION, INC., A NEVADA CORPORATION<br>Trustee:  NEVADA TITLE COMPANY, A NEVADA CORPORATION<br>Beneficiary:  DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS ADMINISTRATIVE AGENT FOR THE BENEFIT OF THE SECURED PARTIES |
| | 2. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by LAKE MEAD STATION, INC., in favor of DEUTSCHE BANK TRUST COMPANY AMERICAS, |

#4827-4900-4297

| | | |
|---|---|---|
| | | AS ADMINISTRATIVE AGENT, and recorded November 7, 2007 in Book 20071107 as Document No. 01258 of Official Records. |
| | 3. | Subordination, Nondisturbance Agreement and Attornment Agreement, dated November 7, 2007 executed by LAKE MEAD STATION, INC., A NEVADA CORPORATION, REGAL CINEMAS, INC., A TENNESSEE CORPORATION AND DEUTSCHE BANK TRUST COMPANY AMERICAS, recorded November 14, 2007 in Book 20071114 of Official Records as document number 03736. |
| | 4. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |

| | | |
|---|---|---|
| **LAKE MEAD STATION, INC.**<br><br>**(Fiesta Henderson – Excess Land)**<br><br>County of Clark, State of Nevada | 1. | Subordination. Nondisturbance and Attornment Agreement, dated November 7, 2007 executed by LAKE MEAD STATION, INC., A NEVADA CORPORATION, REGAL CINEMAS, INC., A TENNESSEE CORPORATION AND DEUTSCHE BANK TRUST COMPANY AMERICAS, recorded November 14, 2007 in Book 20071114 of Official Records as document number 03736. |
| | 2. | Deed of Trust to secure an indebtedness of $900,000,000.00 and any other amounts payable under the terms thereof:<br><br>Recorded: November 7, 2007 in Book 20071107 Document No. 01253 of Official Records.<br>Dated: November 7, 2007<br>Trustor: LAKE MEAD STATION, INC., A NEVADA CORPORATION<br>Trustee: NEVADA TITLE COMPANY, A NEVADA CORPORATION<br>Beneficiary: DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS ADMINISTRATIVE AGENT FOR THE BENEFIT OF THE SECURED PARTIES |
| | 3. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by LAKE MEAD STATION, INC., in favor of DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, and recorded November 7, 2007 in Book 20071107 as Document No. 01258 of Official Records. |

| | | |
|---|---|---|
| **LAKE MEAD STATION, INC.**<br><br>**(Fiesta Henderson - NDOT)**<br><br>County of Clark, State of | 1. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |

#4827-4900-4297

| | | |
|---|---|---|
| Nevada | | |

| | | |
|---|---|---|
| **SANTA FE STATION, LLC**<br><br>**(Santa Fe Station Hotel & Casino)**<br><br>County of Clark, State of Nevada | 1. | Subordination, Nondisturbance and Attornment Agreement, dated November 7, 2007 executed by CENTURY THEATRES, INC., AN DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT AND SANTA FE STATION, INC., recorded November 7, 2007 in Book 20071107 of Official Records as document number 01254. |
| | 2. | Deed of Trust to secure an indebtedness of $900,000,000.00  and any other amounts payable under the terms thereof:<br>Recorded:    November 7, 2007 in Book 20071107 Document No. 01251 of Official Records.<br>Dated:    November 7, 2007<br>Trustor:    SANTA FE STATION, INC, A NEVADA CORPORATION<br>Trustee:    Nevada Title Company, a Nevada corporation<br>Beneficiary:    Deutsche Bank Trust Company Americas, in its capacity as Administrative Agent for the benefit of the Secured Parties |
| | 3. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by SANTA FE STATION, INC., A NEVADA CORPORATION, in favor of DEUTSCHE BANK TRUST COMPANYS AMERICA, AS ADMINISTRATIVE AGENT, and recorded November 7, 2007 in Book 20071107 as Document No. 01256 of Official Records. |
| | 4. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |

| | | |
|---|---|---|
| **TEXAS STATION, LLC**<br><br>**(Texas Station Gambling Hall & Casino)**<br><br>County of Clark, State of Nevada | 1. | Subordination, Nondisturbance and Attornment Agreement, dated November 7, 2007 executed by EASTGATE THEATRE, INC., TEXAS STATION LLC AND DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, recorded November 14, 2007 in Book 20071114 of Official Records as document number 03735. |

    Exhibit 3 to Confirmation Order

| | 2. | Deed of Trust to secure an indebtedness of $900,000,000.00 and any other amounts payable under the terms thereof:<br>Recorded:    November 7, 2007 in Book 20071107 Document No. 01250 of Official Records.<br>Dated:    November 7, 2007<br>Trustor:    TEXAS STATION, LLC, AS SUCCESSOR BY MERGER TO TEXAS STATION, INC., A NEVADA CORPORATION<br>Trustee:    NEVADA TITLE COMPANY, A NEVADA CORPORATION<br>Beneficiary:    DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS ADMINISTRATIVE AGENT FOR THE BENEFIT OF THE SECURED PARTIES |
| | 3. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by TEXAS STATION, LLC, in favor of DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, and recorded November 7, 2007 in Book 20071107 as Document No. 01255 of Official Records. |
| **TOWN CENTER STATION, LLC**<br><br>**(Las Vegas – Flamingo/Town Center Site)**<br><br>County of Clark, State of Nevada | 1. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |
| **TROPICANA ACQUISITIONS, LLC**<br><br>**(Las Vegas – Viva Site (Part of WWW Assemblage Fee))**<br><br>County of Clark, State of Nevada | 1. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |
| **TROPICANA STATION, INC.**<br><br>**(Wild Wild West Gambling Hall & Hotel)**<br><br>County of Clark, State of Nevada | 1. | Any Claim of Lien for labor and/or materials that may be filed against said land by reason of work or improvement thereon, as disclosed by an inspection of said premises. |

Exhibit 3 to Confirmation Order

Exhibit 3 to Confirmation Order

#4827-4900-4297

**<u>EXHIBIT 4</u>**

**<u>EXHIBIT 4</u>**

#4831-0060-3657

<u>EXHIBIT 4</u>

**SURVIVING LIENS**

| ALIANTE GAMING, LLC<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing ALIANTE GAMING, LLC, as Debtor and WMS GAMING, INC., as Secured Party and recorded on September 8, 2008 as Document No. 2008027704-1. |
|---|---|---|
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing  ALIANTE GAMING, LLC, as Debtor and IGT, as Secured Party and recorded on February 27, 2009 as Document No. 2009005144-9. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing ALIANTE GAMING, LLC, as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on June 30, 2010 as Document No. 2010016411-2. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing ALIANTE GAMING, LLC, as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on December 30, 2010 as Document No. 2010033059-5 |

| BOULDER STATION, INC.<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing BOULDER STATION, INC., as Debtor and NAMCO CYBERTAINMENT INC., as Secured Party and recorded on March 10, 2006 as Document No. 2006007750-0. |
|---|---|---|
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, SUNSET STATION, INC., PALACE STATION HOTEL & CASINO, INC., and BOULDER STATION, INC., as Debtors and FCP PROPCO, LLC, as Secured Party and recorded on November 7, 2007 as Document No. 2007037063-1. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing BOULDER STATION, INC., as Debtor and WMS GAMING, INC., as Secured Party and recorded on September 17, 2008 as Document No. 2008028811-9. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing BOULDER STATION, INC., as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on April 23, 2009 as Document No. 2009010342-6 |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing  BOULDER STATION, INC., as Debtor and IGT, as Secured Party and recorded on June 25, 2009 as Document No. 2009015814-2. |

| | | |
|---|---|---|
| | 6. | The effect of a Financing Statement with the Nevada Secretary of State showing BOULDER STATION, INC., as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on August 4, 2010 as Document No. 2010019513-1. |
| | 7. | The effect of a Financing Statement with the Nevada Secretary of State showing BOULDER STATION, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on December 23, 2010 as Document No. 2010032313-4. |
| | 8. | The effect of a Financing Statement with the Nevada Secretary of State showing BOULDER STATION, INC., as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on December 28, 2010 as Document No. 2010032846-3. |
| **CHARLESTON STATION, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, SUNSET STATION,INC., PALACE STATION HOTEL & CASINO, INC., and BOULDER STATION, INC., as Debtors and FCP PROPCO, LLC, as Secured Party and recorded on November 7, 2007 as Document No. 2007037063-1. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and WMS GAMING, INC., as Secured Party and recorded on January 12, 2006 as Document No. 2006001325-3. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and IGT, as Secured Party and recorded on April 14, 2009 as Document No. 2009009562-9. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and IGT, as Secured Party and recorded on April 14, 2009 as Document No. 2009009535-2 |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and IGT, as Secured Party and recorded on April 14, 2009 as Document No. 2009009544-1. |
| | 6. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and IGT, as Secured Party and recorded on July 31, 2009 as Document No. 2009018879-1. |
| | 7. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and IGT, as Secured Party and recorded on August 5, 2009 as Document No. 2009019281-5. |

2                              Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 8. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on December 23, 2010 as Document No. 2010032314-6. |
| | 9. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on December 30, 2010 as Document No. 2010033053-3. |
| **CV HOLDCO, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing CV HOLDCO, LLC, as Debtor and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT, as Secured Party and recorded on February 7, 2008 as Document No. 2008004142-2. |
| **FIESTA STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and WMS GAMING, INC., as Secured Party and recorded on September 16, 2008 as Document No. 2008028620-4. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and IGT, as Secured Party and recorded on April 20, 2009 as Document No. 2009009926-1. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and IGT, as Secured Party and recorded on July 10, 2009 as Document No. 2009017024-9. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on July 15, 2010 as Document No. 2010017759-9. |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on July 15, 2010 as Document No. 2010017758-7. |
| | 6. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on December 28, 2010 as Document No. 2010032842-5. |
| | 7. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | | recorded on February 15, 2011 as Document No. 2011003833-3. |
|---|---|---|
| | 8. | The effect of a Financing Statement with the Nevada Secretary of State showing FIESTA STATION, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party, and recorded on February 15, 2011 as Document No. 2011003841-0. |

| **GOLD RUSH STATION, LLC** <br><br> Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing GOLD RUSH STATION, LLC, as Debtor and WMS GAMING, INC., as Secured Party and recorded on September 1, 2004 as Document No. 2004027080-9. |
|---|---|---|
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing GOLD RUSH STATION, LLC, as Debtor and IGT, as Secured Party and recorded on July 10, 2009 as Document No. 2009017008-5. |

| **LAKE MEAD STATION, INC.** <br><br> Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing LAKE MEAD STATION, INC., as Debtor and WMS GAMING, INC., as Secured Party and recorded on September 11, 2008 as Document No. 2008028067-0. |
|---|---|---|
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing LAKE MEAD STATION, INC., as Debtor and IGT, as Secured Party and recorded on April 14, 2009 as Document No. 2009009561-7. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing LAKE MEAD STATION, INC., as Debtor and IGT, as Secured Party and recorded on April 14, 2009 as Document No. 2009009558-0. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing LAKE MEAD STATION, INC., as Debtor and IGT, as Secured Party and recorded on June 29, 2009 as Document No. 2009016040-2. |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing LAKE MEAD STATION, INC., as Debtor and IGT, as Secured Party and recorded on June 29, 2009 as Document No. 2009016028-6. |
| | 6. | The effect of a Financing Statement with the Nevada Secretary of State showing LAKE MEAD STATION, INC., as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on December 30, 2010 as Document No. 2010033050-7. |

4

Exhibit 4 to Confirmation Order

| LML STATION, LLC<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing LML STATION, LLC, as Debtor and IGT, as Secured Party and recorded on June 18, 2009 as Document No. 2009015152-8. |
|---|---|---|

| MAGIC STAR STATION, LLC<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing MAGIC STAR STATION, LLC, as Debtor and WMS GAMING INC., as Secured Party and recorded on May 5, 2006 as Document No. 2006014409-6. |
|---|---|---|
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing MAGIC STAR STATION, LLC, as Debtor and YOUNG ELECTRIC SIGN COMPANY, as Secured Party and recorded on November 20, 2006 as Document No. 2006038454-9 |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing MAGIC STAR STATION, LLC, STATION CASINOS, INC., and WILDFIRE CASINO - BOULDER, as Debtors and KONAMI GAMING, INC., as Secured Party and recorded on April 23, 2009 as Document No. 2009010367-8. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing MAGIC STAR STATION, LLC, as Debtor and IGT, as Secured Party and recorded on June 18, 2009  as Document No. 2009015157-8. |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing MAGIC STAR STATION, LLC, as Debtor and IGT, as Secured Party and recorded on June 18, 2009  as Document No. 2009015165-5. |

| PALACE STATION HOTEL & CASINO, INC.<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, SUNSET STATION, INC., PALACE STATION HOTEL & CASINO, INC., and BOULDER STATION, INC., as Debtors and FCP PROPCO, LLC, as Secured Party and recorded on November 7, 2007 as Document No. 2007037063-1. |
|---|---|---|
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL & CASINO, INC., as Debtor and NAMCO CYBERTAINMENT INC., as Secured Party and recorded on March 10, 2006 as Document No. 2006007751-2. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL & CASINO, INC., as Debtor and WMS GAMING INC., as Secured Party and recorded on September 11, 2008 as Document No. 2008028065-6. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL & CASINO, INC., as |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | Debtor and IGT, as Secured Party and recorded on April 20, 2009 as Document No. 2009009930-0. |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL & CASINO, INC., as Debtor and IGT, as Secured Party and recorded on April 20, 2009 as Document No. 2009009927-3 |
| | 6. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL & CASINO, INC., as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on April 23, 2009 as Document No. 2009010364-2. |
| | 7. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL & CASINO, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on February 15, 2011 as Document No. 2011003844-6. |
| | 8. | The effect of a Financing Statement with the Nevada Secretary of State showing PALACE STATION HOTEL & CASINO, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on July 15, 2010 as Document No. 2010017771-5. |
| **RANCHO STATION, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing RANCHO STATION, LLC, as Debtor and WMS GAMING INC., as Secured Party and recorded on June 21, 2004 as Document No. 2004019487-1. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing RANCHO STATION, LLC, as Debtor and IGT, as Secured Party and recorded on July 10, 2009 as Document No. 2009017015-0. |
| **SANTA FE STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and WMS GAMING INC., as Secured Party and recorded on June 15, 2004 as Document No. 2004018845-0. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and IGT, as Secured Party and recorded on February 27, 2009 as Document No. 2009005146-3. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and IGT, as Secured Party and recorded on April 10, 2009 as Document No. 2009009194-8. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and KONAMI |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | GAMING, INC., as Secured Party and recorded on April 23, 2009 as Document No. 2009010365-4. |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and IGT, as Secured Party and recorded on April 27, 2009 as Document No. 2009010593-7. |
| | 6. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and IGT, as Secured Party and recorded on June 29, 2009 as Document No. 2009016016-1. |
| | 7. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and IGT, as Secured Party and recorded on July 16, 2009 as Document No. 2009017547-7. |
| | 8. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and IGT, as Secured Party and recorded on July 24, 2009 as Document No. 2009018242-2. |
| | 9. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on July 15, 2010 as Document No. 2010017767-6 |
| | 10. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on December 30, 2010 as Document No. 2010033051-9. |
| | 11. | The effect of a Financing Statement with the Nevada Secretary of State showing SANTA FE STATION, INC., as Debtor and WMS GAMING INC., as Secured Party and recorded on February 9, 2011 as Document No. 2011003305-4. |
| **STN AVIATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing STN AVIATION, INC., as Debtor and CIT GROUP/CORPORATE AVIATION, INC., as Lessor and recorded on November 30, 1999 as Document No. 9916863. |
| **SUNSET STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing CHARLESTON STATION, LLC, SUNSET STATION, INC., PALACE STATION HOTEL & CASINO, INC., and BOULDER STATION, INC., as Debtors and FCP PROPCO, LLC, as Secured Party and recorded on November 7, 2007 as Document No. 2007037063-1. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and NAMCO CYBERTAINMENT INC., as Secured Party and recorded on March |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | | |
|---|---|---|
| | | 10, 2006 as Document No. 2006007744-7. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and WMS GAMING INC., as Secured Party and recorded on September 11, 2008 as Document No. 2008028068-2. |
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and IGT, as Secured Party and recorded on April 10, 2009 as Document No. 2009009260-9. |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and IGT, as Secured Party and recorded on June 26, 2009 as Document No. 2009015907-9. |
| | 6. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and IGT, as Secured Party and recorded on June 29, 2009 as Document No. 2009015994-2. |
| | 7. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and IGT, as Secured Party and recorded on July 24, 2009 as Document No. 2009018250-9. |
| | 8. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on December 30, 2010 as Document No. 2010033052-1. |
| | 9. | The effect of a Financing Statement with the Nevada Secretary of State showing SUNSET STATION, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on July 15, 2010 as Document No. 2010017772-7. |
| **TEXAS STATION, LLC**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and WMS GAMING INC., as Secured Party and recorded on September 11, 2008 as Document No. 2008028069-4. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and IGT, as Secured Party and recorded on April 15, 2009 as Document No. 2009009619-0. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and IGT, as Secured Party and recorded on April 15, 2009 as Document No. 2009009612-6. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and IGT, as Secured Party and recorded on June 29, 2009 as Document No. 2009015995-4. |
| | 5. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and IGT, as Secured Party and recorded on June 29, 2009 as Document No. 2009015998-0. |
| | 6. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and IGT, as Secured Party and recorded on June 29, 2009 as Document No. 2009016007-2. |
| | 7. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and IGT, as Secured Party and recorded on July 10, 2009 as Document No. 2009017029-9. |
| | 8. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on October 15, 2010 as Document No. 2009024987-8. |
| | 9. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on December 23, 2010 as Document No. 2010032322-3. |
| | 10. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and KONAMI GAMING, INC., as Secured Party and recorded on December 28, 2010 as Document No. 2010032843-7. |
| | 11. | The effect of a Financing Statement with the Nevada Secretary of State showing TEXAS STATION, LLC, as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on February 15, 2011 as Document No. 2011003847-2. |
| **TROPICANA STATION, INC.**<br><br>Nevada Secretary of State | 1. | The effect of a Financing Statement with the Nevada Secretary of State showing TROPICANA STATION, INC. and WILD WILD WEST TRUCK PLAZA, as Debtors and INTERSTATE SCALE COMPANY, LLC (SUCCESSOR-IN-INTEREST TO HARGETT ENTERPRISES, INC.), as Secured Party and recorded on February 1, 2005 as Document No. 2005003804-9. |
| | 2. | The effect of a Financing Statement with the Nevada Secretary of State showing TROPICANA STATION, INC., as Debtor and WMS GAMING INC., as Secured Party and recorded on September 11, 2008 as Document No. 2008028070-7. |
| | 3. | The effect of a Financing Statement with the Nevada Secretary of State showing TROPICANA STATION, INC., as Debtor and IGT, as |

Exhibit 4 to Confirmation Order

|  |  | Secured Party and recorded on July 16, 2009 as Document No. 2009017555-4. |
|  | 4. | The effect of a Financing Statement with the Nevada Secretary of State showing TROPICANA STATION, INC., as Debtor and ARISTOCRAT TECHNOLOGIES, INC., as Secured Party and recorded on September 7, 2010 as Document No. 2010022309-3. |

| **ALIANTE GAMING, LLC**<br><br>(Aliante Station Casino & Hotel)<br><br>County of Clark, State of Nevada | 1. | Water rights, claims or title to water, whether or not shown by the public records. |
|---|---|---|
| | 2. | Any taxes that may be due, but not assessed, for new construction which can be assessed on the unsecured property rolls, in the Office of the County Assessor, per Nevada Revised Statute 361.260. |
| | 3. | Special assessments for improvement purposes:<br>City of North Las Vegas improvement district no. 60<br>Reference no.:        7107/12417811001<br>Initial Principal Amount of assessment set at $1,326,447.53<br>Payable each year on or before: 3/1 - 9/1 |
| | 4. | Rights, rights of way, reservation, easements, provisions and exceptions in the patent, recorded January 9, 2002, in Book 20020109 of Official Records, as Instrument No. 00432.<br><br>Relinquishment of interest by County of Clark recorded May 30, 2002 in Book 20020530 as Document No. 02552, of Official Records. |
| | 5. | Covenants, conditions, and restrictions in a Development Agreement recorded April 8, 2002, in Book 20020408 as Instrument No. 00884 of Official Records.<br><br>Document(s) declaring modifications thereof recorded February 22, 2005 in Book 20050222 as Instrument No. 00615 of Official Records. |
| | 6. | Covenants, conditions, and restrictions in a Traffic Control Improvements Agreement recorded July 15, 2002, in Book 20020715 as Instrument No. 01918 of Official Records. |
| | 7. | Covenants, conditions, and restrictions in a District Financing Agreement recorded October 24, 2002, in Book 20021024 as Instrument No. 00611 of Official Records. |
| | 8. | Easements as shown and/or dedicated upon the final map of Aliante North, on file in Book 110 of plats, Page 72 , of Official Records.<br><br>And amended by that certain Certificate of Amendment recorded September 15, 2004 in Book 20040915 as Instrument No. 00410 of Official Records.<br><br>And amended by that certain Certificate of Amendment recorded January 18, 2005 in Book 20050118 as Instrument No. 01373 of Official Records. |

Exhibit 4 to Confirmation Order

| | 9. | The terms and provisions contained in the document entitled "Memorandum of Agreement" recorded May 17, 2004 in Book 20040517 as Instrument No. 02849 of Official Records. |
|---|---|---|
| | 10. | An easement for drainage and incidental purposes in the document recorded July 21, 2004 in Book 20040721 as Instrument No. 01243 of Official Records. |
| | 11. | Covenants, conditions, restrictions and easements in the document recorded January 06, 2006 in Book 20060106 as Instrument No. 03358 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the Nevada Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status. |
| | 12. | An easement for underground drainage and incidental purposes in the document recorded January 09, 2007 in Book 20070109 as Instrument No. 01224 of Official Records. |
| | 13. | An easement for utility and incidental purposes in the document recorded February 27, 2007 in Book 20070227 as Instrument No. 01934 of Official Records. |
| | 14. | An easement for public utilities and incidental purposes in the document recorded June 01, 2007 in Book 20070601 as Instrument No. 03221 of Official Records. |
| | 15. | The terms and provisions contained in the document entitled "Grant of Easement – Memorandum of Agreement" recorded June 06, 2007 in Book 20070606 as Instrument No. 00653 of Official Records. |
| | 16. | Terms and provisions of an unrecorded lease dated July 16, 2007, by and between Aliante Gaming, LLC, a Nevada limited liability company as lessor and Regal Cinemas, Inc., a Tennessee corporation as lessee, as disclosed by a Memorandum of Lease recorded July 23, 2007 in Book 20070723 as Instrument No. 00220 of Official Records.<br><br>An Agreement which states that this document was subordinated to Deed of Trust recorded October 5, 2007 in Book 20071005 of Official Records as Document No. 03622; By agreement executed by Regal Cinemas, Inc., Aliante Gaming, LLC and Bank of America, N.A., recorded October 5, 2007 in Book 20071005 of Official Records as document number 03623 |

12                    Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 17. | The terms and provisions contained in the document entitled "Participation Agreement" recorded September 07, 2007 in Book 20070907 as Instrument No. 04789 of Official Records. |
| | 18. | An easement for public utilities and incidental purposes in the document recorded October 05, 2007 in Book 20071005 as Instrument No. 02240 of Official Records. |
| | 19. | The terms and provisions contained in the document entitled "Access to Equipment Agreement" recorded January 03, 2008 in Book 20080103 as Instrument No. 01939 of Official Records. |
| | 20. | A financing statement recorded November 07, 2008 in Book 20081107 as Instrument No. 03405 of Official Records.<br><br>Debtor:        Aliante Gaming, LLC<br>Secured party: Young Electric Sign Company<br><br>An amendment to the financing statement was recorded December 29, 2008 in Book 20081229 as Instrument No. 01553 of Official Records. |
| | 21. | Terms and provisions of an unrecorded lease dated (Not Set Out), by and between Briad Restaurant Group, L.L.C., as lessor and Bank of America, N.A., Administrative Agent as lessee, as disclosed by a UCC Financing Statement recorded February 19, 2009 in Book 20090219 as Instrument No. 01720 of Official Records.<br><br>Defects, liens, encumbrances or other matters affecting the leasehold estate, whether or not shown by the public records. |
| | 22. | Terms, covenants, conditions and provisions in an instrument entitled, "ASSESSMENT ROLL DISTRICT NO. 60", recorded January 8, 2003, in Book 20030108 as Document No. 01457, of Official Records. |
| | 23. | State and County Taxes for the fiscal period of 2010-2011. |

| | | |
|---|---|---|
| **AUBURN DEVELOPMENT, LLC**<br><br>**(Thunder Valley – Development Site)**<br><br>County of Placer, State of California | 1. | General and special taxes and assessments for the fiscal year 2011-2012, a lien not yet due or payable. |
| | 2. | The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code. |
| | 3. | Rights of the public, County and/or City, in and to that portion of said land lying within the lines of any public road. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 4. | An easement for gas pipe line and incidental purposes, recorded January 16, 1942 as Book 420, Page 187 of Official Records.<br><br>In Favor of:    Pacific Gas and Electric Company<br>Affects:    Parcel Three |
| | 5. | An easement for line of poles and incidental purposes, recorded May 27, 1966 as Book 1113, Page 460 of Official Records.<br><br>In Favor of:    Pacific Gas and Electric Company<br>Affects:    Northerly 22 feet of Parcel Three |
| | 6. | An easement for ingress and egress and/or for utility purposes and incidental purposes, recorded July 24, 1981 as Book 2414, Page 439 of Official Records.<br><br>In Favor of:    Whitney Industrial Park, Ltd.<br>Affects:    Parcel Three |
| | 7. | An easement shown or dedicated on the map of Parcel Map No. 74599 on file or recorded April 20, 1987 in Book 23, Page 37, of Parcel Maps.<br><br>For: Public utilities and incidental purposes.<br><br>Affects an Easterly 30 feet of Parcel One |
| | 8. | An offer of dedication for road and access purposes and incidental purposes, recorded April 20, 1987 as Book 3170, Page 400 of Official Records.<br><br>To:    The public<br><br>Affects the Westerly 55 feet of Parcel One, also designated as Area "M" of Parcel Map No. 74599. |
| | 9. | An offer of dedication for all utility uses and incidental purposes, recorded April 20, 1987 as Instrument No. 22101 in Book 3170, Page 402 of Official Records.<br><br>To:    public use<br><br>Affects an Easterly 30 feet |
| | 10. | Matter contained in the document entitled "Offer of Dedication" recorded April 20, 1987 as Instrument No. 22101 in Book 3170, Page 402 of Official Records. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 11. | An easement for road and utilities and incidental purposes, recorded April 20, 1987 as Book 3170, Page 404 of Official Records.<br><br>In Favor of:     County of Placer<br>Affects:         Parcel One, also designated as Area "K" of Parcel Map No. 74599 |
| | 12. | The terms and provisions contained in the document entitled "Road Maintenance Agreement" recorded April 20, 1987 as Book 3170, Page 406 of Official Records.<br><br>(Affects Parcel One) |
| | 13. | An easement for underground pipes and for the conveyance of gas and incidental purposes, recorded September 01, 1988 as Book 3469, Page 502 of Official Records.<br><br>In Favor of:     Pacific Gas and Electric Company<br>Affects:         Parcel Three |
| | 14. | An easement for public utility purposes and incidental purposes, recorded December 05, 1994 as Serial No. 94-083442 of Official Records.<br><br>In Favor of:     The County of Placer<br>Affects:         The Northerly portions of Parcel One |
| | 15. | An easement for public utility purposes (P.U.E.) and temporary construction and incidental purposes, recorded February 14, 1995 as Serial No. 95-007430 of Official Records.<br><br>In Favor of:     The County of Placer<br>Affects:         Parcel Three |
| | 16. | The terms, provisions and easement(s) contained in the document entitled "Easement Agreement" recorded May 5, 1995 as Serial No. 95-023264 of Official Records.<br><br>(Affects Parcel Three) |
| | 17. | The effect of a map purporting to show the land and other property, filed in Book 14, Page 89 of Record of Surveys.<br><br>(Affects Parcel Three) |

       Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 18. | The fact that the land lies within the boundaries of the Redevelopment Plan for the Sunset Industrial Area Redevelopment Project Area, as disclosed by the document recorded June 25, 1997 as Serial No. 97-0036700 of Official Records.<br><br>Document re-recorded November 25, 1997 as Serial No. 97-0074312 of Official Records. |
| | 19. | The terms, provisions and easement(s) contained in the document entitled "Easement Agreement" recorded July 01, 1997 as Serial No. 97-0038408 of Official Records.<br><br>(Affects Parcel Three) |
| | 20. | An easement for road and utilities and incidental purposes, recorded October 15, 2002 as Instrument No. 2002-0124552 of Official Records.<br><br>In Favor of:    Whitney Industrial Park, Limited, a California limited partnership<br>Affects:    Parcel One and also those portions of said land lying within Area "L" as shown on said Parcel Map. No. 74599 |
| | 21. | An easement for gas pipe lines and incidental purposes, recorded April 29, 2005 as Instrument No. 2005-0053665 of Official Records.<br><br>In Favor of:    Pacific Gas and Electric Company, a California corporation<br>Affects:    Parcel Three<br><br>Terms and provisions contained in the above document. |
| | 22. | An easement for public utility purposes (P.U.E.) and incidental purposes, recorded October 18, 2005 as Instrument No. 2005-0139963 of Official Records.<br><br>In Favor of:    The County of Placer, State of California<br>Affects:    An Easterly 30 feet of Parcel One |
| | 23. | An easement for a line of poles with such wires and cables and incidental purposes, recorded September 30, 2008 as Instrument No. 2008-0077484-00 of Official Records.<br><br>In Favor of:    Pacific Gas and Electric Company, a California corporation<br>Affects:    Parcel One<br><br>Terms and provisions contained in the above document. |

Exhibit 4 to Confirmation Order

| | 24. | An offer of dedication for road purposes and incidental purposes, recorded January 29, 2010 as Instrument No. 2010-0007438-00 of Official Records.<br><br>To:        County of Placer, State of California<br>Affects a Northerly portion of Parcel One |
| | 25. | An offer of dedication for road purposes and incidental purposes, recorded January 29, 2010 as Instrument No. 2010-0007439-00 of Official Records.<br><br>To:        County of Placer, State of California<br><br>Affects the Northerly 22' x 693' of Parcel Three |
| | 26. | Rights of parties in possession. |
| | 27. | The terms and provisions contained in the document entitled "Road Maintenance Agreement" recorded April 20, 1987 as Book 3170, Page 406 of Official Records. |

| | | |
|---|---|---|
| **BOULDER STATION, INC.**<br><br>**(Las Vegas – Horizon Trailer Park Site)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $21,251.96.<br>Parcel No.  161-07-702-001 |
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | The herein described property lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |
| | 4. | Reservations and Easements in the patent from the State of Nevada, recorded March 31, 1919, in Book 6 of Deeds, Page 183 as Document No. 12627 of Official Records. |
| | 5. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded June 6, 1972, in Book 236 as Document No. 195375 of Official Records. |

        Exhibit 4 to Confirmation Order

#4839-0682-8809

| | 6. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded October 12, 1993, in Book 931012 as Document No. 01080 of Official Records. |
| --- | --- | --- |
| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded July 16, 1998, in Book 980716 as Document No. 00840 of Official Records. |
| | 8. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 9. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |

| **CENTERLINE HOLDINGS, LLC**<br><br>**(Las Vegas – Castaways Site)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $53,755.33.<br><br>Parcel No.  162-01-201-001 |
| --- | --- | --- |
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $23,991.49.<br><br>Parcel No.  162-01-201-002 |
| | 3. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 4. | Reservations and Easements in the patent from the State of Nevada, recorded September 11, 1911, in Book 2 of Deeds, Page 62 as Document No. 3168 of Official Records. |
| | 5. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded October 14, 1959, in Book 27 as Document No. 176384 of Official Records.<br><br>Affects Parcel Eight (8) |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 6. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of SOUTHERN NEVADA POWER COMPANY, for electrical lines, recorded April 18, 1961, in Book 293 as Document No. 237213 of Official Records.<br><br>Affects Parcel Four (4)<br><br>A portion of said right-of-way has been relinquished by instrument entitled "PARTIAL RELINQUISHMENT OF RIGHT-OF-WAY GRANT" executed by NEVADA POWER COMPANY, RECORDED July 27, 1972 in Book 250 as Document No. 209184 of Official Records.<br><br>Affects Parcel Three (3) |
| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of SOUTHERN NEVADA POWER COMPANY, for electrical lines, recorded June 20, 1961, in Book 303 as Document No. 245546 of Official Records.<br><br>Affects Parcel Five (5) |
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 19, 1962, in Book 338 as Document No. 273434 of Official Records. |
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 5, 1962, in Book 365 as Document No. 294462 of Official Records.<br><br>Affects Parcel Nine (9) |
| | 10. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded April 4, 1963, in Book 434 as Document No. 350080 of Official Records.<br><br>Affects Parcel One (1) |
| | 11. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded April 26, 1963, in Book 440 as Document No. 355007 of Official Records.<br><br>Affects Parcel Six (6) |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 12. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 21, 1963, in Book 454 as Document No. 366400 of Official Records.<br><br>Affects Parcel Six (6) |
| | 13. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 21, 1963, in Book 455 as Document No. 366415 of Official Records.<br><br>Affects Parcel Seven (7) |
| | 14. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CENTRAL TELEPHONE COMPANY, for communication lines, recorded November 23, 1971, in Book 184 as Document No. 147041 of Official Records.<br><br>Affects Parcel Nine (9) |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication lines, recorded March 21, 1972, in Book 216 as Document No. 175649 of Official Records.<br><br>Affects Parcel Six (6) |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded April 3, 1975, in Book 507 as Document No. 466430 of Official Records.<br><br>Affects Parcels Four (4), Five (5) & Seven (7) |
| | 17. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical substation, recorded April 29, 1975, in Book 514 as Document No. 473255 of Official Records.<br><br>Affects Parcel Five (5) |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | | |
|---|---|---|
| | 18. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded November 1, 1978, in Book 964 as Document No. 923075 of Official Records.<br><br>Affects Parcel One (1) & Two (2) |
| | 19. | The effect of the following Record of Survey performed by STEPHEN F. TURNER, filed in File 39 of Surveys at Page 54, recorded December 7, 1982, in Book 1657, as Document No. 1616128 of Official Records. |
| | 20. | Terms, covenants, conditions and provisions in an instrument entitled, "ENCROACHMENT AGREEMENT", by and between CITY OF LAS VEGAS, a municipal corporation and SHOWBOAT, INC. recorded October 27, 1986, in Book 861027 as Document No. 00778, of Official Records. |
| | 21. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded September 21, 1990, in Book 900921 as Document No. 00787 of Official Records.<br><br>Affects Parcels Two (2) & Three (3) |
| | 22. | The effect of the following Record of Survey performed by WILLIAM T. AVERY, filed in File 80 of Surveys at Page 33, recorded January 4, 1996, in Book 960104, as Document No. 00892 of Official Records. |
| | 23. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded June 30, 1997, in Book 970630 as Document No. 00792 of Official Records.<br><br>Affects Parcel Five (5) |
| | 24. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $8,956.06.<br>Parcel No.  162-01-201-003 |
| | 25. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $2,415.89.<br>Parcel No.  162-01-201-004 |
| | 26. | Reservations and Easements in the patent from the State of Nevada, recorded September 11, 1911, in Book 2 of Deeds, Page 62 as Document No. 3168 of Official Records. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 27. | An easement for road or alley purposes together with rights incidental thereto, as reserved in the Deed, recorded December 16, 1953, in Book 73 of Deeds, Page 240 as Document No. 420230, of Official Records.<br><br>Affects Parcels Ten (10) & Eleven (11) |
| | 28. | An easement for road or alley purposes together with rights incidental thereto, as reserved in the Deed, recorded December 16, 1953, in Book 73 of Deeds,  Page 241 as Document No. 420232, of Official Records.<br><br>Affects Parcel Twelve (12) |
| | 29. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded February 19, 1962, in Book 344 as Document No. 277638 of Official Records.<br><br>Affects Parcel Twelve (12) |
| | 30. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded February 19, 1962, in Book 344 as Document No. 277639 of Official Records.<br><br>Affects Parcels Ten (10) & Eleven (11) |
| | 31. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 5, 1962, in Book 365 as Document No. 294479 of Official Records.<br><br>Affects Parcels Ten (10) & Eleven (11) |
| | 32. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded February 3, 1967, in Book 775 as Document No. 622909 of Official Records.<br><br>Affects Parcel Ten (10) & Eleven (11) |
| | 33. | The effect of the following Record of Survey performed by WILLIAM T. AVERY, filed in File 80 of Surveys at Page 33, recorded January 4, 1996, in Book 960104, as Document No. 00892 of Official Records. |

| | 34. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded March 12, 1997, in Book 970312 as Document No. 01715 of Official Records. |
|---|---|---|
| | 35. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded June 4, 1997, in Book 970604 as Document No. 00833 of Official Records. |
| | 36. | The terms and provisions contained in instrument entitled CITY OF LAS VEGAS REVISED DOWNTOWN DEVELOPMENT AREA recorded March 11, 1986 in Book 860311 as Document No. 00777 of Official Records.<br><br>Said instrument contains, among other things, provisions for rehabilitation of the downtown area financed by additional tax assessments.<br><br>Said instrument has been revised by an instrument recorded February 11, 1988 in Book 880211 as Document No. 00382 of Official Records.<br><br>Said instrument has been amended by an instrument recorded November 22, 1996 in Book 961122 as Document No. 00847 of Official Records.<br><br>A Notice of Adoption of Amendment To The Redevelopment Plan Recorded November 22, 1996 in Book 961122 as Document No. 00848; re-recorded November 25, 1996 in Book 961125 as Document No. 00566 and as set forth in Record of Survey performed by Rita M. Lumas, filed in File LG of Local Government Plats at Page 78 recorded November 22, 1996 in Book 961122 as Document No. 00849 of Official Records.<br><br>An Ordinance to Adopt an Amended and Restated Redevelopment Plan recorded June 2, 2006 in Book 20060602 as Document No. 0001395 of Official Records. |
| | 37. | Terms, covenants, conditions and provisions in an instrument entitled, "INTENT TO RECLASSIFY REAL PROPERTY", recorded November 1, 1996, in Book 961101 as Document No. 00589, of Official Records. |
| | 38. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded November 1, 1996, in Book 961101 as Document No. 00590 of Official Records. |

Exhibit 4 to Confirmation Order

| | 39. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 40. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |

| **DURANGO STATION, INC.** **(Las Vegas – Durango Site)** County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $365,341.16. Parcel No.  176-05-601-028 |
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | SPECIAL ASSESSMENTS: Improvement District No.:     144A Assessment No.:               7590 APN No.                         176-05-601-028 Installment due on:           6/1 & 12/1 Initial Principal Balance:   $48,877.53 Pay off                         $33,469.86 |
| | 4. | The herein described property lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | | |
|---|---|---|
| | 5. | Reservations and Easements in the patent from the United States of America, recorded April 15, 1958, in Book 158 as Document No. 128886, of Official Records.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width to be located along the boundaries of said land, for roadway and public utility purposes.<br><br>THE INTEREST OF THE U.S.A. IN AND TO ALL MINERAL RIGHTS AND RIGHTS-OF-WAY WERE TRANSFERRED TO CLARK COUNTY, BY INSTRUMENT RECORDED JANUARY 28, 2000 IN BOOK 20000128 AS DOCUMENT NO. 00926 OF OFFICIAL RECORDS.<br><br>A Partial Relinquishment of Easement Rights executed by NEVADA POWER COMPANY, recorded November 12, 2004 in Book 20041112 as Document No. 0001938, of Official Records.<br><br>The above Rights of Way, not dedicated, has been vacated by an instrument recorded August 18, 2005, in Book 20050818, as Document No. 0005587 Official Records, Clark County, Nevada. |
| | 6. | Reservations and Easements in the patent from the United States of America, recorded February 9, 1959, in Book 186 as Document No. 151747, of Official Records.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width to be located along the boundaries of said land, for roadway and public utility purposes.<br><br>The interest of the U.S.A. in and to all mineral rights and rights-of-way were transferred to Clark County, by instrument recorded January 28, 2000, in Book No. 20000128 as Document No. 00926 of Official Records.<br><br>A Partial Relinquishment of Easement Rights executed by NEVADA POWER COMPANY, recorded November 12, 2004 in Book 20041112 as Document No. 01938, of Official Records.<br><br>The above Rights of Way, not dedicated, has been vacated by an instrument recorded August 18, 2005, in Book 20050818, as Document No. 0005587 Official Records, Clark County, Nevada. |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | | |
|---|---|---|
| | 7. | Reservations and Easements in the patent from the United States of America, recorded October 24, 1960, in Book 266 as Document No. 215220, of Official Records.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width to be located along the boundaries of said land, for roadway and public utility purposes.<br><br>The interest of the U.S.A. in and to all mineral rights and rights-of-way were transferred to Clark County, by instrument recorded January 28, 2000, in Book No. 20000128 as Document No. 00926 of Official Records.<br><br>A Partial Relinquishment of Easement Rights executed by NEVADA POWER COMPANY, recorded November 12, 2004 in Book 20041112 as Document No. 01938, of Official Records.<br><br>The above Rights of Way, not dedicated, has been vacated by an instrument recorded August 18, 2005, in Book 20050818, as Document No. 0005587 Official Records, Clark County, Nevada. |
| | 8. | Reservations and Easements in the patent from the United States of America, recorded June 28, 1961, in Book 305 as Document No. 246734, of Official Records.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width, for roadway and public utility purposes.<br><br>A Partial Relinquishment of Easement Rights executed by NEVADA POWER COMPANY, recorded November 12, 2004 in Book 20041112 as Document No. 01938, of Official Records.<br><br>The above Rights of Way, not dedicated, has been vacated by an instrument recorded August 18, 2005, in Book 20050818, as Document No. 0005587 Official Records, Clark County, Nevada. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 9. | Reservations and Easements in the patent from the United States of America, recorded June 28, 1961, in Book 305 as Document No. 246735, of Official Records.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding<br>Thirty-three (33) feet in width, for roadway and public utility purposes.<br><br>The interest of the U.S.A. in and to all mineral rights and rights-of-way were transferred to Clark County, by instrument recorded January 28, 2000, in Book No. 20000128 as Document No. 00926 of Official Records.<br><br>A Partial Relinquishment of Easement Rights executed by NEVADA POWER COMPANY, recorded November 12, 2004 in Book 20041112 as Document No. 0001938, of Official Records.<br><br>The above Rights of Way, not dedicated, has been vacated by an instrument recorded August 18, 2005, in Book 20050818, as Document No. 0005587 Official Records, Clark County, Nevada. |
| | 10. | Reservations and Easements in the patent from the United States of America, recorded August 14, 1961, in Book 313 as Document No. 253138, of Official Records.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width, for roadway and public utility purposes.<br><br>The interest of the U.S.A. in and to all mineral rights and rights-of-way were transferred to Clark County, by instrument recorded January 28, 2000, in Book No. 20000128 as Document No. 00926 of Official Records.<br><br>A Partial Relinquishment of Easement Rights executed by NEVADA POWER COMPANY, recorded November 12, 2004 in Book 20041112 as Document No. 0001938, of Official Records.<br><br>The above Rights of Way, not dedicated, has been vacated by an instrument recorded August 18, 2005, in Book 20050818, as Document No. 0005587 Official Records, Clark County, Nevada. |

Exhibit 4 to Confirmation Order

| | 11. | Reservations and Easements in the patent from the United States of America, recorded March 15, 1962, in Book 348 as Document No. 281030, of Official Records.

Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width, for roadway and public utility purposes.

The interest of the U.S.A. in and to all mineral rights and rights-of-way were transferred to Clark County, by instrument recorded January 28, 2000, in Book No. 20000128 as Document No. 00926 of Official Records.

A Partial Relinquishment of Easement Rights executed by NEVADA POWER COMPANY, recorded November 12, 2004 in Book 20041112 as Document No. 01938, of Official Records.

The above Rights of Way, not dedicated, has been vacated by an instrument recorded August 18, 2005, in Book 20050818, as Document No. 0005587 Official Records, Clark County, Nevada. |
| | 12. | Reservations and Easements in the patent from the United States of America, recorded August 13, 1968, in Book 892 as Document No. 716454, of Official Records.

Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width along said boundaries, for roadway and public utility purposes.

The interest of the U.S.A. in and to all mineral rights and rights-of-way were transferred to Clark County, by instrument recorded January 28, 2000, in Book No. 20000128 as Document No. 00926 of Official Records. |
| | 13. | Reservations and Easements in the patent from the United States of America, recorded August 12, 1994, in Book 940812 as Document No. 01254, of Official Records.

The interest of the U.S.A. in and to all mineral rights and rights-of-way were transferred to Clark County, by instrument recorded January 28, 2000, in Book No. 20000128 as Document No. 00927 of Official Records. |
| | 14. | Reservations and Easements in the patent from the United States of America, recorded April 2, 1999, in Book 990402 as Document No. 01626, of Official Records. |

28                    Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 15. | Any rights, interest, or claims which may exist or arise by reason of a Certificate of Land Division, L.D. No. 214-79, recorded January 21, 1980, in Book 1175 as Document No. 1134865, of Official Records. |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded May 23, 1994, in Book 940523 as Document No. 00665 of Official Records. |
| | 17. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 13, 1994, in Book 940613 as Document No. 04966 of Official Records. |
| | 18. | Terms, covenants, conditions and provisions in an instrument entitled, "EASEMENT AND OPTION AGREEMENT", recorded August 12, 1994, in Book 940812 as Document No. 01259, of Official Records. <br><br> The above document was re-recorded on December 14, 1994 in Book 941214 as Document No. 00392. <br><br> Terms, covenants, conditions and provisions in an instrument entitled, "ASSIGNMENT OF EASEMENT AND OPTION AGREEMENT", recorded SEPTEMBER 27, 1996, in Book 960927 as Document No. 02310, of Official Records. |
| | 19. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of County of Clary, for Public Utility and Road Purposes, recorded August 12, 1994, in Book 940812 as Document No. 01260 of Official Records. <br><br> The above document was re-recorded on December 20, 1994 in Book 941220 as Document No. 00621. <br><br> A Partial Relinquishment of Easement Rights executed by NEVADA POWER COMPANY, recorded November 12, 2004 in Book 20041112 as Document No. 01933, of Official Records. <br><br> The above Public Utility and Road, not dedicated, has been vacated by an instrument recorded August 18, 2005, in Book 20050818, as Document No. 0005587 Official Records, Clark County, Nevada. |
| | 20. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded October 18, 1995, in Book 951018 as Document No. 01159 of Official Records. |
| | 21. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CLARK COUNTY, for roadway purposes, recorded May 15, 1996, in Book 960515 as Document No. 01948 of Official Records. |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | | |
|---|---|---|
| | 22. | Terms, covenants, conditions and provisions in an instrument entitled, "NOTICE OF AMENDMENT TO RIGHT-OF-WAY GRANT FOR SOUTHERN SEGMENT OF THE LAS VEGAS BELTWAY", recorded May 3, 1996, in Book 960523 as Document No. 01512, of Official Records. |
| | 23. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded July 5, 1996, in Book 960705 as Document No. 00843 of Official Records. |
| | 24. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded January 9, 1997, in Book 970109 as Document No. 00840 of Official Records. |
| | 25. | Terms, covenants, conditions and provisions in an instrument entitled, "AN ORDINANCE TO ADOPT A DEVELOPMENT AGREEMENT", recorded February 11, 1997, in Book 970211 as Document No. 01333, of Official Records. The above document was re-recorded March 31, 1997 in Book 970331 as Document No. 00606 |
| | 26. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded February 18, 1997, in Book 970218 as Document No. 00683 of Official Records. |
| | 27. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded April 28, 1997, in Book 970428 as Document No. 01234 of Official Records. |
| | 28. | The effect of the following Record of Survey for Boundary Line Adjustment performed by Thomas D. Montemayor, PLS No. 9882, filed in File 90 of Surveys at Page 57, recorded July 29, 1997, in Book 970726, as Document No. 01560 of Official Records. |
| | 29. | Terms, covenants, conditions and provisions in an instrument entitled, "RESTRICTIVE COVENANTS RUNNING WITH THE LAND", recorded July 13, 1999, in Book 990713 as Document No. 00092, of Official Records. |
| | 30. | The effect of the following Record of Survey performed by RICHARD M. CUMMOCK, filed in File 108 of Surveys at Page 60, recorded April 4, 2000, in Book 20000404, as Document No. 00457 of Official Records. |

| | | |
|---|---|---|
| | 31. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CLARK COUNTY, for road and drainage purposes, recorded July 21, 2000, in Book 20000721 as Document No. 01114 of Official Records. |
| | 32. | The effect of the following Record of Survey performed by ESLYN BRENNER, filed in File 110 of Surveys at Page 91, recorded August 16 2000, in Book 20000816, as Document No. 00887 of Official Records. |
| | 33. | Terms, covenants, conditions and provisions in an instrument entitled, "EASEMENT AND RIGHTS-OF-WAY", recorded November 3, 2000, in Book 20001103 as Document No. 01964, of Official Records. |
| | 34. | The effect of the following Record of Survey performed by PAUL BURN, filed in File 114 of Surveys at Page 75, recorded March 2 2001, in Book 20010302, as Document No. 1270 of Official Records. |
| | 35. | The effect of the following Record of Survey performed by RALPH R. MATECKI, JR., filed in File 114 of Surveys at Page 97, recorded March 14, 2001, in Book 20010314, as Document No. 1609 of Official Records. |
| | 36. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded April 4, 2001, in Book 20010404 as Document No. 00842 of Official Records. |
| | 37. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded APRIL 4, 2001, in Book 20010404 as Document No. 00844 of Official Records. |
| | 38. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded April 4, 2001, in Book 20010404 as Document No. 00846 of Official Records. |
| | 39. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded May 10, 2001, in Book 20010510 as Document No. 01883 of Official Records. |
| | 40. | Terms, covenants, conditions and provisions in an instrument entitled, "GRANT, BARGAIN, SALE DEED", recorded August 6, 2001, in Book 20010806 as Document No. 00266, of Official Records. |

| | | |
|---|---|---|
| | 41. | The effect of the following Record of Survey performed by BRUCE L. STRATTON, filed in File 119 of Surveys at Page 30, recorded November 27, 2001, in Book 20011127, as Document No. 01379 of Official Records. |
| | 42. | An easement together with rights incidental thereto, as reserved in the Deed, recorded June 7, 2002, in Book 20020607 as Document No. 0002009, of Official Records. |
| | 43. | The effect of the following Record of Survey performed by THE OWENS SURVEYING OUTFIT, INC., filed in File 129 of Surveys at Page 85, recorded APRIL 15, 2003, in Book 20030415, as Document No. 3049 of Official Records. |
| | 44. | Terms, covenants, conditions and provisions in an instrument entitled, "SOUTHERN SEGMENT OF THE LAS VEGAS BELTWAY RAINBOW BOULEVARD, SUNSET ROAD TO MAULE AVENUE NOTICE OF PUBLIC STREET PROJECT COMMENCEMENT", recorded August 26, 2003, in Book 20030826 as Document No. 02324, of Official Records. |
| | 45. | Terms, covenants, conditions and provisions in an instrument entitled, "NO CUT LETTER", recorded May 5, 2004, in Book 20040504 as Document No. 0002112, of Official Records. |
| | 46. | Dedications and Easements as shown on the recorded Map referred to herein, in File 110 of Parcel Maps, Page 40, of Official Records. The above parcel map has been amended by CERTIFICATE OF AMENDMENT Recorded on October 19, 2005 in Book 20051019 as Document No. 03123 of Official Records. The above parcel map has been amended by CERTIFICATE OF AMENDMENT Recorded on November 9, 2005 in Book 20051109 as Document No. 01479 of Official Records. |
| | 47. | Dedications and Easements as shown on the recorded Reversionary Map referred to herein, in File 111 of Parcel Maps, Page 21, of Official Records. |
| | 48. | Relinquishment of Abutter's Rights as disclosed by Quitclaim Deed recorded July 25, 2006 in Book 20060725 as Document No. 0004869 of Official Records. |
| | 49. | An easement for road and drainage purposes together with rights incidental thereto, as reserved in the Quitclaim Deed, recorded July 25, 2006, in Book 20060725 as Document No. 0004869, of Official Records. |

32                   Exhibit 4 to Confirmation Order

| | 50. | Terms, covenants, conditions, provisions and easements in an instrument entitled, "GRANT OF EASEMENT – MEMORANDUM OF AGREEMENT", recorded June 6, 2007, in Book 20070606 as Document No. 0000658, of Official Records. |
| --- | --- | --- |
| | 51. | Terms, covenants, conditions and provisions in an instrument entitled, "Development Agreement", recorded June 3, 2008, in Book 20080603 as Document No. 02844, of Official Records. |
| | 52. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 53. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |
| **FIESTA STATION, INC.**<br><br>**(Fiesta Rancho Casino Hotel)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $385,257.32. |
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | Reservations of certain mineral rights and Easements for ditches, tunnels, telephone and transmission lines in the patent from the State of Nevada, recorded July 26, 1913, in Book 3 of Deeds, page 146 as Document No. 5533 of Official Records. |
| | 4. | Reservations of certain mineral rights and Easements for ditches, tunnels, telephone and transmission lines in the patent from the State of Nevada, recorded February 28, 1946, in Book 42 of Deeds, page 4 as Document No. 215441 of Official Records.<br><br>The 100-Foot easement reserved in the above patent does not affect the subject property. |
| | 5. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded July 16, 1965, in Book 643 as Document No. 517012 of Official Records. |
| | 6. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 16, 1994, in Book 941216 as Document No. 00798 of Official Records. |

Exhibit 4 to Confirmation Order

| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 9, 1997, in Book 971209 as Document No. 01157 of Official Records.<br><br>Said easements affects Private Streets and all of the herein described property exclusive of "Building Areas" |
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded March 10, 1998, in Book 980310 as Document No. 01838 of Official Records. |
| | 9. | Dedications and Easements as shown on the recorded Map referred to herein, in File 95 of Reversionary Parcel Maps, Page 25, of Official Records.<br><br>5-foot wide Nevada Power easement<br>10-foot wide public utility easement |
| | 10. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of City of North Las Vegas, for street, road and utility purposes, recorded July 13, 1999, in Book 990713 as Document No. 00478 of Official Records.<br><br>The above document was re-recorded on March 11, 2004 in Book 20040311 as Document No. 00966. |
| | 11. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated: August 12, 1999<br>Lessor:       FIESTA HOTEL CORPORATION<br>Lessee:       SUBWAY REALESTATE CORP., A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE<br>Term:         FIVE (5) YEARS<br>Disclosed by: MEMORANDUM OF LEASE<br>Recorded:     May 8, 2001 in Book 20010508 as Document No. 01177 |
| | 12. | Terms, covenants, conditions and provisions in an instrument entitled, "SHARED ACCESS EASEMENT", recorded July 6, 2005, in Book 20050706 as Document No. 0006433, of Official Records. |

34                    Exhibit 4 to Confirmation Order

| | 13. | Terms, covenants, conditions and provisions in an instrument entitled, "COVENANT NOT TO BUILD", recorded July 6, 2005, in Book 20050706 as Document No. 0006434, of Official Records. |
| --- | --- | --- |
| | 14. | Terms, covenants, conditions and provisions in an instrument entitled, "TRANSMISSION EASEMENT USE AGREEMENT" by and between Nevada Power Company, a Nevada Corporation and Fiesta Station Holdings, LLC, recorded September 18, 2006, in Book 20060918 as Document No. 0002236, of Official Records. |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CITY OF NORTH LAS VEGAS, NEVADA, for ROADWAY, recorded August 27, 2008, in Book 20080827 as Document No. 03526 of Official Records. |
| | 16. | Water rights, claims or title to water, whether or not shown by the public records.There are NO deeds affecting said land, recorded within twenty-four (24) months of the date of this report. |
| | 17. | Rights of tenants or person in possession, as tenant only, under unrecorded leases, with no right of first refusal, entitlements to any reversionary interest relating to the property, if any, or option to purchase all or any portion of the property. |

| **FRESNO LAND ACQUISITIONS, LLC**<br><br>**(North Fork Site)**<br><br>County of Madera, State of California | 1. | General and special taxes and assessments for the fiscal year 2010-2011, a lien not yet due or payable. |
| --- | --- | --- |
| | 2. | Taxes and assessments are unavailable at this time.  Please verify all tax and assessment information prior to closing. |
| | 3. | Any unpaid amounts now due or owing to the Madera Irrigation District. Contact the Madera Irrigation District at (559) 673-3514 prior to closing |
| | 4. | The lien of supplemental The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code. |
| | 5. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 6. | An easement for rights of way for roads, telephone, telegraph, and electric power, pipe lines, sewers, drainage ditches, canals and other reclamation and irrigation works, and the easement to maintain, operate and repair the same and incidental purposes, recorded January 30, 1942 as Book 291, Page 284 of Official Records. |

|   |   |   |
|---|---|---|
|   |   | In Favor of:     Miller & Lux Incorporated<br>Affects:     As described therein |
|   | 7. | An easement for rights of way for roads, telephone, telegraph, and electric power, pipe lines, sewers, drainage ditches, canals and other reclamation and irrigation works, and the easement to maintain, operate and repair the same and incidental purposes, recorded January 11, 1943 as Book 314, Page 471 of Official Records.<br><br>In Favor of:     Miller & Lux Incorporated<br>Affects:     As described therein |
|   | 8. | An easement for rights of way for roads, telephone, telegraph, and electric power, pipe lines, sewers, drainage ditches, canals and other reclamation and irrigation works, and the easement to maintain, operate and repair the same and incidental purposes, recorded June 16, 1943 as Book 331, Page 191 of Official Records.<br><br>In Favor of:     Miller & Lux Incorporated<br>Affects:     As described therein |
|   | 9. | Abutter's rights of ingress and egress to or from The Adjoining Freeway have been relinquished in the document recorded June 7, 1950 as Book 490, Page 112 of Official Records. |
|   | 10. | An easement for right of way for the construction, repair, improvement and maintenance of a canal and banks and incidental purposes, recorded December 3, 1957 as Book 706, Page 320 of Official Records.<br><br>In Favor of:     Madera Irrigation District<br>Affects:     As described therein |
|   | 11. | An easement for a pipe line 18 inches in diameter, with the right to flow water therein of whatever nature and from whatever source; together with the right to enter upon said real property with men and equipment for the purpose of repairing and maintaining and improving the said pipe line and incidental purposes, recorded December 22, 1967 as Book 1000, Page 183 of Official Records.<br><br>In Favor of:     Madera Irrigation District<br>Affects:     As described therein |
|   | 12. | Terms, provisions, covenants, restrictions and conditions contained in a document executed pursuant to the California Land Conservation Act of 1965 (Williamson Act) and recorded February 20, 1987 as Book 1953, Page 391 of Official Records.<br><br>The terms and provisions contained in the document entitled "Notice of Nonrenewal of Agricultural Preserve Contract" recorded October 22, 1987 as Book 2005, Page 55 of Official Records. |

36         Exhibit 4 to Confirmation Order

| | 13. | An easement shown or dedicated on the map of on September 7, 1995 file in book 44, page 15 and 16 of Parcel Map No. 3426, of Parcel Map.<br><br>For: Driveway and incidental purposes. |
| --- | --- | --- |
| | 14. | The terms and provisions contained in the document entitled "Right-To-Farm Notice" recorded September 8, 1995 as Instrument No. 95-22453 of Official Records. |
| | 15. | An easement for avigation and right of way and incidental purposes, recorded September 15, 1995 as Instrument No. 95-23329 of Official Records.<br><br>In Favor of:    The City of Madera, a municipal corporation<br>Affects:    As described therein |
| | 16. | Lack of direct access onto the freeway as disclosed by various documents of records, Affects Parcel 2, 3, 4 and 5. |
| | 17. | Rights of parties in possession. |
| | 18. | The following matters disclosed by an ALTA/ACSM survey made by RAK Civil Engineering on February 23, 2011, designated Job No. A10048:<br><br><br>A) Unrecorded easement or lesser rights for utility telerisers, utility panel, concrete transformer, utility meter, water valves, water tank, canals, and underground telephone lines as shown and delineated on said survey |

| **GOLD RUSH STATION, LLC**<br><br>**(Gold Rush Casino)**<br><br>County of Clark,  State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $19,866.74 |
| --- | --- | --- |
| | 2. | Any supplemental taxes which may become a lien on the subject property by reason of increased valuations due to land use or improvement, NRS 361.260, or otherwise. |
| | 3. | Reservations and Easements in the patent from the United States of America, recorded June 22, 1962, in Book 368 as Document No. 297503, of Official Records. |
| | 4. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 4, 1963, |

    Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | | in Book 496 as Document No. 399745 of Official Records. |
| | 5. | Dedications and Easements as shown on the recorded Map referred to herein, in File 30 of Parcel Maps, Page 36, of Official Records. |
| | 6. | Covenants, Conditions and Restrictions; affecting said land (but deleting restrictions, if any, indicating any preference, limitation or discrimination based upon race, color, religion, sex, handicap, familial status or national origin contained in the Deed recorded July 16, 1980 in Book 1253 as Document No. 1212977 of Official Records. |
| | 7. | Dedications and Easements as shown on the recorded Map referred to herein, in File 61 of Parcel Maps, Page 16, of Official Records. |
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded January 18, 1990, in Book 900118 as Document No. 00740 of Official Records. |
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded March 20, 1990, in Book 900320 as Document No. 01035 of Official Records. |
| | 10. | DEDICATIONS AND EASEMENTS AS SHOWN ON THE RECORDED MAP REFERRED TO HEREIN, IN FILE 1 OF MISCELLANEOUS MAPS, PAGE 71 OF OFFICIAL RECORDS. |
| | 11. | Any easements not vacated by that certain Order of Vacation recorded May 17, 1994 in Book 940517 as Document No. 01244 of Official Records. |
| | 12. | A Grant of Easement – Memorandum of Agreement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COX COMMUNICATIONS LAS VEGAS, INC., for cable and information facilities, recorded June 6, 2007, in Book 20070606 as Document No. 00657 of Official Records. |
| | 13. | Water rights, claims or title to water, whether or not shown by the public records.. |
| | 14. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |
| **INSPIRADA STATION, LLC**<br><br>**(Las Vegas – Inspirada Site)** | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $73,106.56.<br><br>Parcel No.  191-15-811-006 |

| County of Clark, State of Nevada | | |
|---|---|---|
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $6,530.22.<br><br>Parcel No.  191-14-411-004 |
| | 3. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 4. | Reservations and Easements in the patent from the United States of America, recorded November 18, 2004, in Book 20041118 as Document No. 0001280, of Official Records. |
| | 5. | Terms, covenants, conditions and provisions in an instrument entitled, "NOTICE OF INTENT TO OCCUPY AND USE", by THE LAS VEGAS VALLEY WATER DISTRICT, recorded April 26, 2002, in Book 20020426 as Document No. 00888, of Official Records.<br><br>AFFECTS:  PARCEL I |
| | 6. | Terms, covenants, conditions and provisions in an instrument entitled, "DEVELOPMENT AGREEMENT BETWEEN THE CITY OF HENDERSON AND SOUTH EDGE, LLC", recorded June 1, 2005, in Book 20050601 as Document No. 0003076, of Official Records. |
| | 7. | Order of Vacation: Any easements not vacated by that certain Order of Vacation recorded August 30, 2007 in Book 20070830 as Document No. 0001310 of Official Records. |
| | 8. | Dedications and Easements as shown on the recorded Map referred to herein, on file in Book 137 of Plats, Page 100, of Official Records. |
| | 9. | Terms, covenants, conditions and provisions in an instrument entitled, "Inspirada Town Center Development Agreement", recorded June 20, 2007, in Book 20070620 as Document No. 01842, of Official Records. |
| | 10. | Terms, covenants, conditions and provisions in an instrument entitled, "Commercial Charter for Inspirada", recorded October 18, 2007, in Book 20071018 as Document No. 02310, of Official Records.<br><br>An Assignment of Founders Rights recorded October 25, 2007 in Book 20071025 as Document No.  02651.<br><br>An Assignment of Founder's Rights recorded October 30, 2007 in Book 20071030 as Document No.  02538. |
| | 11. | Covenants, Conditions and Restrictions:  In the declaration of restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, |

39                    Exhibit 4 to Confirmation Order

|  |  |  |
|--|--|--|
|  |  | sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law as contained in the Declaration of Easements and Covenants to Share Costs for Inspirada recorded October 18, 2007 in Book No. 20071018 as Document No. 02311 of Official Records. |
|  | 12. | Covenants, Conditions and Restrictions:  In the declaration of restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law as contained in the Declaration of Special Land Use Restrictions recorded October 18, 2007 in Book No. 20071018 as Document No. 02312 of Official Records. |
|  | 13. | Covenants, Conditions and Restrictions:  In the declaration of restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law as contained in the Declaration of Development Covenants and Restrictions recorded October 25, 2007 in Book No. 20071025 as Document No. 02649 of Official Records. |
|  | 14. | Terms, covenants, conditions and provisions in an instrument entitled, "CITY OF HENDERSON ZONING ORDINANCE NO. 2775", recorded December 2, 2008, in Book 20081202 as Document No. 03071, of Official Records. |
|  | 15. | Water rights, claims or title to water, whether or not shown by the public records. |
|  | 16. | Rights of tenants, as tenants only under unrecorded leases, with no options to purchase or rights of first refusal |
| **LAKE MEAD STATION, INC.** <br><br> **(Fiesta Henderson Casino Hotel)** <br><br> County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $479,359.79. |

Exhibit 4 to Confirmation Order

| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| --- | --- | --- |
| | 3. | Reservations and Easements in the patent from the United States of America, recorded October 24, 1941, in Book 29, Page 129-30 of Deeds as Document No. 123295, of Official Records. |
| | 4. | LACK OF ABUTTER'S RIGHTS TO ACCESS TO THE EXPRESSWAY OR FREEWAY, AS SET FORTH IN DEED RECORDED SEPTEMBER 22, 1955 IN BOOK 68 OF OFFICIAL RECORDS AS INSTRUMENT NO. 57419. THEREAFTER, A PORTION WAS ABANDONED BY INSTRUMENT RECORDED DECEMBER 3, 1986 IN BOOK 861203 AS DOCUMENT NO. 00475. |
| | 5. | LACK OF ABUTTER'S RIGHTS OR EASEMENT OF ACCESS TO THE FREEWAY AND LAKE MEAD DRIVE AS SET FORTH IN FINAL ORDER OF CONDEMNATION RECORDED JULY 14, 1987 IN BOOK 870714 AS DOCUMENT NO. 00794. |
| | 6. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded August 26, 1997, in Book 970826 as Document No. 01886 of Official Records. |
| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded October 7, 1998, in Book 981007 as Document No. 01088 of Official Records. |
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of THE CITY OF HENDERSON, for public drainage facilities, recorded February 27, 2002, in Book 20020227 as Document No. 01476 of Official Records. |
| | 9. | Dedications and Easements as shown on the recorded Map referred to herein, in File 103 of Parcel Maps, Page 55, of Official Records. |

Exhibit 4 to Confirmation Order

| | 10. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:     February 8, 2006<br>Lessor:    REGAL CINEMAS, INC., A TENNESSEE CORPORATION<br>Lessee:    LAKE MEAD STATION, INC., A NEVADA CORPORATION<br>Term:     NOT SET OUT<br>Disclosed by: SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT<br>Recorded:  November 14, 2007 in Book 20071114 as Document No. 03736 |
| | 11. | Dedications and Easements as shown on the recorded Map referred to herein, in File 115 of Parcel Maps, Page 25, of Official Records. |
| | 12. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 13. | Rights of tenants or person in possession, as tenant only, under unrecorded leases, with no right of first refusal, entitlements to any reversionary interest relating to the property, if any, or option to purchase all or any portion of the property. |
| **LAKE MEAD STATION, INC.**<br><br>**(Fiesta Henderson – Excess Land)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $55,872.84.<br><br>Parcel No.  178-13-401-015 |
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | Reservations and Easements in the patent from the State of Nevada, recorded October 15, 1941, in Book 29 of Deeds, Page 94 as Document No. 122041 of Official Records. |
| | 4. | Reservations and Easements in the patent from the United States of America, recorded October 24, 1941, in Book 29, Pages 129-30 of Deeds as Document No. 123295, of Official Records. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 5. | LACK OF ABUTTER'S RIGHTS TO ACCESS TO THE EXPRESSWAY OR FREEWAY, AS SET FORTH IN DEED RECORDED SEPTEMBER 22, 1955 IN BOOK 68 OF OFFICIAL RECORDS AS INSTRUMENT NO. 57419. THEREAFTER, A PORTION WAS ABANDONED BY INSTRUMENT RECORDED DECEMBER 3, 1986 IN BOOK 861203 AS DOCUMENT NO. 00475. |
| | 6. | LACK OF ABUTTER'S RIGHTS OR EASEMENT OF ACCESS TO THE FREEWAY AND LAKE MEAD DRIVE AS SET FORTH IN FINAL ORDER OF CONDEMNATION RECORDED JULY 14, 1987 IN BOOK 870714 AS DOCUMENT NO. 00794. |
| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of THE CITY OF HENDERSON, for public drainage facilities, recorded February 27, 2002, in Book 20020227 as Document No. 01477 of Official Records. |
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of THE CITY OF HENDERSON, for public drainage facilities, recorded February 27, 2002, in Book 20020227 as Document No. 01478 of Official Records. |
| | 9. | Dedications and Easements as shown on the recorded Reversionary Parcel Map referred to herein, in File 103 of Parcel Maps, Page 55, of Official Records. |
| | 10. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein; <br> Dated:　　　　February 8, 2006 <br> Lessor:　　　　REGAL CINEMAS, INC., A TENNESSEE CORPORATION <br> Lessee:　　　　LAKE MEAD STATION, INC., A NEVADA CORPORATION <br> Term:　　　　NOT SET OUT <br> Disclosed by: SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT <br> Recorded:　　November 14, 2007 in Book 20071114 as Document No. 03736 |
| | 11. | Dedications and Easements as shown on the recorded Map referred to herein, in File 115 of Parcel Maps, Page 25, of Official Records. |
| | 12. | Any rights, interests or claims (including, but not limited to, rights-of-way, easement rights, and the rights of use occupancy, or possession) which may exist or arise by reason of the existence of the Union Pacific Railroad, as disclosed by various instruments of record. |
| | 13. | Water rights, claims or title to water, whether or not shown by the public records. |

　　　　Exhibit 4 to Confirmation Order

| | 14. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of THE CITY OF HENDERSON, for public drainage facilities, recorded February 27, 2002, in Book 20020227 as Document No. 01476 of Official Records. |
| **LAKE MEAD STATION, INC.** <br><br> **(Fiesta Henderson - NDOT)** <br><br> County of Clark, State of Nevada | 1. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 2. | Reservations and Easements in the patent from the United States of America, recorded October 24, 1941, in Book 29, Page 129-30 of Deeds as Document No. 123295, of Official Records. |
| | 3. | LACK OF ABUTTER'S RIGHTS TO ACCESS TO THE EXPRESSWAY OR FREEWAY, AS SET FORTH IN DEED RECORDED SEPTEMBER 22, 1955 IN BOOK 68 OF OFFICIAL RECORDS AS INSTRUMENT NO. 57419. THEREAFTER, A PORTION WAS ABANDONED BY INSTRUMENT RECORDED DECEMBER 3, 1986 IN BOOK 861203 AS DOCUMENT NO. 00475. |
| | 4. | LACK OF ABUTTER'S RIGHTS OR EASEMENT OF ACCESS TO THE FREEWAY AND LAKE MEAD DRIVE AS SET FORTH IN FINAL ORDER OF CONDEMNATION RECORDED JULY 14, 1987 IN BOOK 870714 AS DOCUMENT NO. 00794. |
| | 5. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 6. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |
| **LML STATION, LLC** <br><br> **(Lake Mead Casino)** <br><br> County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $14,997.25. |

| | | |
|---|---|---|
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | Reservations and Easements in the patent from the United States of America, recorded March 11, 1948, in Book 55 of Deeds, Pages 384-385 as Document No. 280166, of Official Records. |
| | 4. | Reservations and Easements in the patent from the United States of America, recorded February 5, 1962, in Book 341 as Document No. 275520, of Official Records. |
| | 5. | Reservations and Easements in the patent from the United States of America, recorded May 3, 1963, in Book 442 as Document No. 356352, of Official Records. |
| | 6. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CITY OF HENDERSON, for utility purposes, recorded January 14, 1965, in Book 599 as Document No. 481707 of Official Records. |
| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CALIFORNIA-PACIFIC UTILITIES COMPANY, for utilities, recorded December 23, 1977, in Book 827 as Document No. 786013 of Official Records. |
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CALIFORNIA-PACIFIC UTILITIES COMPANY, for utilities, recorded December 23, 1977, in Book 827 as Document No. 786014 of Official Records. |
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of CALIFORNIA-PACIFIC UTILITIES COMPANY, for utilities, recorded December 23, 1977, in Book 827 as Document No. 786015 of Official Records. |
| | 10. | Dedications and Easements as shown on the recorded Map referred to herein, in File 28 of Parcel Maps, Page 86, of Official Records. |
| | 11. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded February 3, 1987, in Book 870203 as Document No. 00763 of Official Records. |
| | 12. | Terms, covenants, conditions and provisions in an instrument entitled, "CITY OF HENDERSON ZONING ORDINANCE NO. 2469 ZCO-05-670061-A1", recorded June 7, 2006, in Book 20060607 as Document No. 02509, of Official Records. |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | | |
|---|---|---|
| | 13. | A Grant of Easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COX COMMUNICATIONS LAS VEGAS, INC., for cable and information facilities, recorded April 20, 2010, in Book 20100420 as Document No. 01886 of Official Records. |
| | 14. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 15. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |

| | | |
|---|---|---|
| **MAGIC STAR STATION, LLC**<br><br>**(Wildfire Casino – Boulder Highway)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $21,164.79. |
| | 2. | Any supplemental taxes which may become a lien on the subject property by reason of increased valuations due to land use or improvement, NRS 361.260, or otherwise. |
| | 3. | Reservations and Easements in the patent from the United States of America, recorded December 3, 1962, in Book 403 as Document No. 325204, of Official Records. |
| | 4. | Reservations and Easements in the patent from the United States of America, recorded May 3, 1963, in Book 442 as Document No. 356353, of Official Records. |
| | 5. | Reservation of an easement for road and utility purposes together with rights incidental thereto, as reserved in the Deed, recorded May 29, 1963, in Book 446 as Document No. 359538, of Official Records. |
| | 6. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded September 14, 1981, in Book 1462 as Document No. 1421414 of Official Records. |
| | 7. | Easements and other matters on the STREET VACATION set forth in Record of Survey performed by BEN G SWEET, JR, filed in File 56 of Surveys at Page 66, recorded September 12, 1990, in Book 900912, as Document No. 00757 of Official Records. |
| | 8. | The effect of the following Record of Survey performed by ROBERT FULSTONE, filed in File 90 of Surveys at Page 37, recorded July 22, 1997, in Book 970722, as Document No. 00984 of Official Records. |

| | | |
|---|---|---|
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded October 21, 1998, in Book 981021 as Document No. 00731 of Official Records. |
| | 10. | Terms, covenants, conditions and provisions in an instrument entitled, "MULTI-USE LICENSE", recorded November 17, 1998, in Book 981117 as Document No. 00744, of Official Records. |
| | 11. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA DIVISION CENTRAL TELEPHONE, A DELAWARE CORPORATION DBA SPRINT, for above ground electronic switching site, recorded November 30, 1998, in Book 981130 as Document No. 01062 of Official Records. |
| | 12. | Terms, covenants, conditions and provisions in an instrument entitled, "RESTRICTIVE COVENANT RUNNING WITH THE LAND", recorded December 10, 2008, in Book 20081210 as Document No. 02314, of Official Records. |
| | 13. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 14. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |
| **PALACE STATION HOTEL AND CASINO, INC.** **(Palace Station – NDOT)** County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $3,382.27. Parcel No.  162-08-502-012 |
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | Reservations and Easements in the patent from the State of Nevada, recorded July 26, 1912, in Book 2 of Deeds, Page 390 as Document No. 4384 of Official Records. |

Exhibit 4 to Confirmation Order

| | 4. | The abutters rights in and to the following described property have been relinquished to the State of Nevada by Deed recorded November 9, 1964 in Book 584 as Document No. 469888 of Official Records. |
| | | A portion of the rights of way relinquished above have been released to the City of Las Vegas by that Resolution Relinquishing Portion of Control Access of Highway, recorded December 20, 1973 in Book 389 as Document No. 348207 of Official Records. |
| | 5. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded April 7, 1965, in Book 617 as Document No. 496780 of Official Records. |
| | 6. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 7. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |

| **RANCHO STATION, LLC**<br><br>**(Wildfire Casino)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $5,757.33.<br><br>Parcel No.  139-19-703-005 |
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $1,262.71.<br><br>Parcel No.  139-19-703-008 |
| | 3. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $751.61.<br><br>Parcel No.  139-19-703-011 |
| | 4. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $35,166.42.<br><br>Parcel No.  139-19-703-034 |
| | 5. | Any supplemental taxes which may become a lien on the subject property by reason of increased valuations due to land use or improvement, NRS 361.260, or otherwise. |
| | 6. | Reservations in the patent from the State of Nevada, recorded March 23, 1942, in Book 30 of Deeds, Page 163 as Document No. 135784 of Official Records. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of SOUTHERN NEVADA POWER COMPANY, for electrical lines, recorded March 8, 1950, in Book 61 Of Deeds, Page 551 as Document No. 334462 of Official Records. |
| | 8. | An easement for utilities together with rights incidental thereto, as reserved in the Deed, recorded January 22, 1952, in Book 65 of Deeds, Page 276 as Document No. 380100, of Official Records.<br><br>Affects Parcel VIII |
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of SOUTHERN NEVADA POWER COMPANY, for electrical lines, recorded December 20, 1951, in Book 65 of Deeds, Page 508 as Document No. 378801 of Official Records. |
| | 10. | Covenants, Conditions and Restrictions:  (But deleting restrictions, if any, indicating any preference, limitation or discrimination based upon race, color, religion, sex, handicap, familial status or national origin) as contained in the Declaration of Restrictions recorded October 21, 1953 in Book 36 of Miscellaneous Records, Pages 275-276 as Document No. 416483 of Official Records.<br><br>Said instrument does not provided for a right of reversion or an option to purchase.<br><br>Affects Parcel V |
| | 11. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of SOUTHERN NEVADA POWER COMPANY, for electrical lines, recorded December 10, 1953, in Book 73 of Deeds, Page 204 as Document No. 419855 of Official Records. |
| | 12. | Terms, covenants, conditions and provisions in an instrument entitled, "Resolution of the Clark County District Board of Health Relating to Moratorium on Septic Tank-Leach Field Construction in the Eastland Heights Area", recorded February 23,1 972, in Book 209 as Document No. 168586, of Official Records. |
| | 13. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded February 8, 1979, in Book 1007 as Document No. 966272 of Official Records. |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | 14. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated:      September 1, 1987<br>Lessor:     Jerry Bruner<br>Lessee:    Young Electric Sign Company<br>Term:      Not Set Out<br>Disclosed by: Subordination Agreement<br>Recorded:   January 7, 1994 in Book 940107 as Document No. 00396 and by a Notice of Interest executed by Young Electric Sign Company recorded August 7, 1995 in 950807 as Document No. 01176.<br><br>Affects: 1999 N. Rancho Dr to place one double face 14' x 48' outdoor advertising structure on property |
| | 15. | The effect of an instrument entitled, "ASSIGNMENT & ASSUMPTION AGREEMENT", executed by Jerry L. Bruner and Las Vegas Mortgage Company, Inc., a Nevada corporation and RLM Minwarehouses, L.L.C., a Nevada limited liability company to Vista Holdings, LLC, a Nevada limited liability company, dated January 2002, Recorded January 2, 2002 in Book 20020102 as Document No. 00124 of Official Records. |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded November 19, 1997, in Book 971119 as Document No. 01939 of Official Records.<br><br>Affects Parcel VIII |
| | 17. | Terms, covenants, conditions and provisions in an instrument entitled, "Covenant Running With Land", recorded September 21, 1998, in Book 980921 as Document No. 00495, of Official Records.<br><br>Affects: Parcels III and IV |
| | 18. | Terms, covenants, conditions and provisions in an instrument entitled, "Ordinance No. 5167", recorded September 22, 1999, in Book 990922 as Document No. 00549, of Official Records.<br><br>Affects Parcel V |
| | 19. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of Bauhman Gaming Ventures, LLC, a Nevada Limited Liability Company, for water lines, ingress and egress, recorded April 13, 2001, in Book 20010413 as Document No. 00043 of Official Records. |

| | | |
|---|---|---|
| | 20. | Terms, covenants, conditions and provisions in an instrument entitled, "Restrictive Covenants Running with the Land", recorded July 16, 2001, in Book 20010716 as Document No. 02031, of Official Records. |
| | 21. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded August 24, 2001, in Book 20010824 as Document No. 01115 of Official Records. |
| | 22. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded August 24, 2001, in Book 20010824 as Document No. 01116 of Official Records. |
| | 23. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded August 24, 2001, in Book 20010824 as Document No. 01117 of Official Records. |
| | 24. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded November 8, 2001, in Book 20011108 as Document No. 02022 of Official Records. |
| | 25. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of The City of Las Vegas, for drainage purposes, recorded December 5, 2001, in Book 20011205 as Document No. 01601 of Official Records.<br><br>The above document was re-recorded on May 17, 2002 in Book 20020517 as Document No. 02403. |
| | 26. | Terms, covenants, conditions and provisions in an instrument entitled, "Covenant Running with Land", recorded August 14, 2003, in Book 20030814 as Document No. 03229, of Official Records.<br><br>Affects Parcels V through X |
| | 27. | Terms, covenants, conditions and provisions in an instrument entitled, "Off-Site Improvements Agreement", recorded January 20, 2004, in Book 20040120 as Document No. 03907, of Official Records.<br><br>Affects Parcels V through X |
| | 28. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded March 15, 2004, in Book 20040315 as Document No. 01086 of Official Records. |

Exhibit 4 to Confirmation Order

| | 29. | Terms, covenants, conditions and provisions in an instrument entitled, "CITY OF LAS VEGAS NOTICE OF ZONING ACTION", recorded January 4, 2008, in Book 20080104 as Document No. 04213, of Official Records. |
|---|---|---|
| | 30. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 31. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |
| **SANTA FE STATION, LLC**<br><br>**(Santa Fe Station Hotel & Casino)**<br><br>County of Clark,  State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $2,290,387.30 |
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | Reservations and Easements in the patent from the State of Nevada, recorded January 8, 1921, in Book 7 of Deeds, Page 257 as Document No. 14913 of Official Records. |
| | 4. | Reservations and Easements in the patent from the State of Nevada, recorded December 2, 1947, in Book 53 of Deeds Page 297 as Document No. 272074 of Official Records. |
| | 5. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded September 10, 1965, in Book 657 as Document No. 528117 of Official Records. |
| | 6. | Lack of abutter's rights and controlled access as condemned by the State of Nevada by "FINAL ORDER OF CONDEMNATION" recorded September 19, 1978 in Book 945 as Document No. 904738 of Official Records. |
| | 7. | The effect of the following Record of Survey performed by GARY F. PENNINGTON, filed in File 53 of Surveys at Page 82, recorded February 6, 1990, in Book 900206, as Document No. 00763 of Official Records. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 8. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded March 14, 1990, in Book 900314 as Document No. 00493 of Official Records. |
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of LAS VEGAS VALLEY WATER DISTRICT, a Quasi Municipal Corporation, for pipelines, recorded March 14, 1990, in Book 900314 as Document No. 00494 of Official Records. |
| | 10. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded January 17, 1991, in Book 910117 as Document No. 00875 of Official Records. |
| | 11. | Order of Vacation: Any easements not vacated by that certain Order of Vacation recorded December 5, 1991 in Book 911205 as Document No. 00484 of Official Records. |
| | 12. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded January 9, 1992, in Book 920109 as Document No. 00494 of Official Records. |
| | 13. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded January 9, 1992, in Book 920109 as Document No. 00495 of Official Records. |
| | 14. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 16, 1994, in Book 941216 as Document No. 00764 of Official Records. |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded September 29, 1997, in Book 970929 as Document No. 00901 of Official Records. |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded February 10, 1999, in Book 990210 as Document No. 00822 of Official Records. |

Exhibit 4 to Confirmation Order

| | 17. | A lease executed by and between the parties named herein, for the term and upon and subject to all of the terms, covenants, and provisions contained therein;<br><br>Dated:        March 23, 2004<br>Lessor:      SANTA FE STATION, INC., A NEVADA CORPORATION<br>Lessee:      CENTURY THEATRES, INC., A CALIFORNIA CORPORATION<br>Term:        10 YEARS (initial)<br>Recorded:  September 12, 2005 in Book 20050912 as Document No. 0003415 |
| | 18. | Dedications and Easements as shown on the recorded Map referred to herein, in File 115 of Parcel Maps, Page 31, of Official Records. |
| | 19. | Any rights, interest, or claims which may exist or arise by reason of the following facts as disclosed on the ALTA/ACSM Land Title Survey:<br><br>Performed by:  Paul Burn<br>Dated:        August 1, 2007 and last revised on October 24, 2007<br>Job No.:     902.0016AL1-8<br><br>A.  Encroachment of the building over a portion of the easement shown at Exception 10. |
| | 20. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 21. | Rights of tenants or person in possession, as tenant only, under unrecorded leases, with no right of first refusal, entitlements to any reversionary interest relating to the property, if any, or option to purchase all or any portion of the property. |
| **TEXAS STATION, LLC**<br><br>**(Texas Station Gambling Hall & Casino)**<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $457,851.34.<br><br>Parcel No.  139-19-602-001 |
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $39,582.78.<br><br>Parcel No.  139-19-502-001 |

54                  Exhibit 4 to Confirmation Order

| | 3. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
|---|---|---|
| | 4. | Reservations and Easements in the patent from the State of Nevada, recorded July 26, 1913, in Book 3 of Deeds, page 146 of Official Records. |
| | 5. | Dedications and Easements as shown on the recorded Map referred to herein, in File 66 of Parcel Maps, Page 11, of Official Records. |
| | 6. | The effect of the following Record of Survey performed by John R. Rinaldi Jr., filed in File 69 of Surveys at Page 97, recorded March 4, 1994, in Book 940304, as Document No. 00896 of Official Records. |
| | 7. | Terms, covenants, conditions and provisions in an instrument entitled, "Restrictive Covenant Running with the Land", recorded November 22, 1994, in Book 941122 as Document No. 01789, of Official Records. |
| | 8. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein:<br>Dated:      December 9, 1994<br>Lessor:     Texas Gambling Hall & Hotel, Inc., a Nevada corporation<br>          (Formerly known as "V & F, INC.")<br>Lessee:     EastGate Theatre, Inc., an Oregon corporation<br>Term:      25 years after commencement subject to the option to renew the lease for four (4) successive terms of five (5) years each<br>Disclosed by: Memorandum of Lease Agreement<br>Recorded:  February 13, 1996 in Book 960213 as Document No. 00190 and Recorded June 11, 1996 in Book 960611 as document No. 00006 of Official Records. |
| | 9. | Deed of Trust to secure an indebtedness of $25,000,000.00 and any other amounts payable under the terms thereof:<br><br>Recorded:    June 3, 1999 in Book 990603 Document No. 01417 of Official Records.<br>Dated:       May 27, 1999<br>Trustor:     Bank of America NT&SA as Trustee of The TGH&H Real Estate Trust u/a/d January 8, 1997<br>Trustee:     United Title of Nevada, a Nevada corporation<br>Beneficiary: Bank of America National Trust and Savings Association |
| | 10. | Terms, covenants, conditions and provisions in an instrument entitled, "Assignment and Assumption Agreement", recorded April 27, 2001, |

| | | |
|---|---|---|
| | | in Book 20010427 as Document No. 01675, of Official Records. |
| | 11. | Specific Assignment of Lease, Non-Disturbance and Attornment Agreement, dated May 27, 1999 by and among Bank of America NT&SA as Trustee of The TGH&H Real Estate Trust, Texas Station Inc., and Bank of America National Trust and Savings Association Recorded June 3, 1999 in Book 990603 as Document No. 01418 of Official Records.<br><br>Terms, covenants, conditions and provisions in an instrument entitled, "First Amendment to Specific Assignment of Lease, Non-Disturbance and Attornment Agreement", recorded march 6, 2009, in Book 20090306 as Document No. 04305, of Official Records. |
| | 12. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of City of North Las Vegas, for street, road and utility purposes, recorded May 10, 2000, in Book 20000510 as Document No. 01795 of Official Records. |
| | 13. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated:          June 18, 1999<br>Lessor:          Texas Station Inc., a Nevada corporation<br>Lessee:          Children's Choice Nevada Property L.L.C., a Nevada limited liability company<br>Term:          Twenty (20) years commencing June 1, 1999<br>Disclosed by:  Memorandum of Lease<br>Recorded:      September 26, 2000 in Book 20000926 as Document No. 00354 |
| | 14. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated:          August 31, 2000<br>Lessor:          Children's Choice Nevada Property L.L.C., a Nevada limited liability company<br>Lessee:          Children's Choice Nevada Corporation II, a Nevada corporation<br>Term:          Twenty (20) years<br>Disclosed by:  Memorandum of SubLease<br>Recorded:      September 5, 2000 in Book 20000905 as Document No. 01106 |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of City of Las Vegas, for right of way grant for streetlight & traffic purposes, recorded January 12, 2001, in Book 20010112 as Document No. 00962 of Official Records. |

Exhibit 4 to Confirmation Order

| | 16. | Terms, covenants, conditions and provisions in an instrument entitled, "MEMORANDUM OF GRANT OF EASEMENT, FUNDING AGREEMENT AND ESCROW INSTRUCTIONS", recorded October 10, 2006, in Book 20061010 as Document No. 0004378, of Official Records. |
|---|---|---|
| | 17. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded June 9, 1997, in Book 970609 as Document No. 00580 of Official Records. |
| | 18. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of City of North Las Vegas, for Street, Road and Utility purposes, recorded October 27, 1998, in Book 981027 as Document No. 00825 of Official Records. |
| | 19. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of City of North Las Vegas, for Utility purposes, recorded October 27, 1998, in Book 981027 as Document No. 00826 of Official Records. |
| | 20. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 21. | Rights of tenants or person in possession, as tenant only, under unrecorded leases, with no right of first refusal, entitlements to any reversionary interest relating to the property, if any, or option to purchase all or any portion of the property. |
| **TOWN CENTER STATION, LLC** <br> **(Las Vegas – Flamingo/Town Center Site)** <br> County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $299,412.81. <br> Parcel No.  164-13-301-002 |
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | The herein described property lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |

| | 4. | SPECIAL ASSESSMENTS:<br>Improvement District No.:   132<br>Assessment No.:   7528<br>APN No.   164-13-301-002<br>Installment due on:   6/1 – 12/1<br>Initial Principal Balance:   $1,524,490.00<br>Pay off   $1,022,782.66 |
|---|---|---|
| | 5. | Reservations and Easements in the patent from the United States of America, recorded September 30, 1988, in Book 880930 as Document No. 00307, of Official Records. |
| | 6. | Terms, covenants, conditions and provisions in an instrument entitled, "Development Agreement between the County of Clark and Howard Hughes Properties, Limited Partnership", recorded September 4, 1996, in Book 960904 as Document No. 01725, of Official Records.<br><br>The above document was re-recorded on September 10, 1996 in Book 960910 as Document No. 01379.<br><br>The above stated Covenants, Conditions and Restrictions were purportedly modified by an instrument recorded February 20, 1998 in Book 980220 as Document No. 00976, of Official Records.<br><br>The above stated Covenants, Conditions and Restrictions were purportedly modified by an instrument recorded June 9, 1999 in Book 990609 as Document No. 00520, of Official Records.<br><br>The above stated Covenants, Conditions and Restrictions were purportedly modified by an instrument recorded June 30, 1999 in Book 990630 as Document No. 02335, of Official Records. |
| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded October 14, 1996 in Book 961014 as Document No. 01501 of Official Records. |
| | 8. | Terms, covenants, conditions and provisions in an instrument entitled, "Restrictive Covenant Running with the Land", recorded May 22, 1997, in Book 970522 as Document No. 01587, of Official Records. |
| | 9. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of County of Clark, for flood control facilities, recorded March 16, 1999, in Book 990316 as Document No. 01459 of Official Records. |
| | 10. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of County of Clark, for flood control facilities, recorded June 9, 1999, in Book 990609 as Document No. 00694 of Official Records. |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 11. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of County of Clark, for temporary construction easement, recorded June 9, 1999, in Book 990609 as Document No. 00713 of Official Records. |
| | 12. | Terms, covenants, conditions and provisions in an instrument entitled, "Off-Site Improvements Agreement", recorded July 8, 1999, in Book 990708 as Document No. 00929, of Official Records. |
| | 13. | Terms, covenants, conditions and provisions in an instrument entitled, "Restrictive Water Covenant and Conditions Running with the Land", recorded August 27, 1997, in Book 970827 as Document No. 01420 and recorded September 12, 1997 in Book 970912 as Document No. 01476 and October 14, 1999 in Book 991014 as Document No. 00681, of Official Records. |
| | 14. | Dedications and Easements as shown on the recorded Map referred to herein, in File 96 of Parcel Maps, Page 38, of Official Records. |
| | 15. | Terms, covenants, conditions and provisions in an instrument entitled, "Restrictive Covenants Running with the Land", recorded December 30, 1999, in Book 991230 as Document No. 03307, of Official Records. |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of Clark County Sanitation District, for sewage lines, recorded January 5, 2000, in Book 20000105 as Document No. 01325 of Official Records. |
| | 17. | Terms, covenants, conditions and provisions in an instrument entitled, "Development Declaration and Option to Repurchase", recorded March 15, 2000, in Book 20000315 as Document No. 01146, of Official Records. The above stated Covenants, Conditions and Restrictions were purportedly modified by an instrument recorded November 27, 2000 in Book 20001127 as Document No. 02345, of Official Records. The above stated Covenants, Conditions and Restrictions were purportedly modified by an instrument recorded May 15, 2003 in Book No. 20030515 as Document No. 02092, of Official Records. |

Exhibit 4 to Confirmation Order

| | 18. | Covenants, Conditions and Restrictions:  In the declaration of restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law as contained in the Declaration of Restrictions recorded November 14, 2000 in Book 20001114 as Document No. 02128 of Official Records. |
| | 19. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of County of Clark, for temporary construction easement, recorded February 22, 2001, in Book 20010222 as Document No. 01349 of Official Records. |
| | 20. | Terms, covenants, conditions and provisions in an instrument entitled, "Traffic Control Improvements Cost Participation Agreement", recorded May 3, 2002, in Book 20020503 as Document No. 01105, of Official Records. |
| | 21. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of Nevada Power Company, for electrical lines, recorded May 9, 2002, in Book 20020509 as Document No. 00710 of Official Records. |
| | 22. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for shared use path and bridge, recorded October 9, 2003, in Book 20031009 as Document No. 01805 of Official Records. |
| | 23. | The effect of the following Record of Survey performed by DennisLayton, filed in File 172 of Surveys at Page 56, recorded April 10, 2008, in Book 20080410, as Document No. 03442 of Official Records. |
| | 24. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 25. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |

60          Exhibit 4 to Confirmation Order

| TROPICANA ACQUISITIONS, LLC<br><br>(Las Vegas – Viva Site (Part of WWW Assemblage Fee))<br><br>County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $24,415.75.<br><br>Parcel No.  162-20-401-007 |
|---|---|---|
| | 2. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 3. | The herein described property lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |
| | 4. | Reservations and Easements in the patent from the United States of America, recorded December 29 1961, in Book 335 as Document No. 270458, of Official Records.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width for roadway and public utility purposes.<br><br>The North and East thirty-three feet were vacated by Quit Claim Deed recorded June 13, 1978 in Book 901 as Document No. 860158. |
| | 5. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded December 5, 1984, in Book 2031 as Document No. 1990804 of Official Records. |
| | 6. | The effect of the following Record of Survey performed by PAUL BURN, filed in File 170 of Surveys at Page 14, recorded December 4, 2007, in Book 20071204, as Document No. 0002547 of Official Records. |
| | 7. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 16, 2008, in Book 20081216 as Document No. 02304 of Official Records. |
| | 8. | A Temporary Construction Easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 16. 2008, in Book 20081216 as Document No. 2307 of Official Records. |

| | | |
|---|---|---|
| | 9. | Covenants, Conditions and Restrictions and Reservations in the declaration of restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law affecting said land contained in the Deed recorded December 17, 2008 in Book 20081217 as Document No. 02306 of Official Records. |
| | 10. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of Cox Communications Las Vegas, Inc., for cable and information facilities, recorded April 20, 2010, in Book 20100420 as Document No. 01887 of Official Records. |
| | 11. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $9,628.43.<br><br>Parcel No.  162-20-401-010 |
| | 12. | Reservations and Easements in the patent from the United States of America, recorded December 19, 1973, in Book 388 as Document No. 347851, of Official Records.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width, for roadway and public utility purposes. |
| | 13. | Dedications and Easements as shown on the recorded Map referred to herein, in File 80 of Parcel Maps, Page 94, of Official Records.<br><br>The above MAP has been amended by instrument recorded February 6, 1995 in Book 950206 as Document No. 00615 of Official Records. |
| | 14. | Terms, covenants, conditions and provisions in an instrument entitled, "DECLARATION OF RESTRICTIONS AND EASEMENT AGREEMENT", recorded December 9, 1994, in Book 941209 as Document No. 01257, of Official Records. |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded October 7, 1998, in Book 981007 as Document No. 00877 of Official Records. |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 16, 2008, in Book 20081216 as Document No. 02305 of Official Records. |

#4839-0682-8809

| | 17. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, for electrical lines, recorded December 16, 2008, in Book 20081216 as Document No. 02308 of Official Records. |
| --- | --- | --- |
| | 18. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 19. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |

#4839-0682-8809

| **TROPICANA STATION, INC.** **(Wild Wild West Gambling Hall & Hotel)** County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $18,053.50. Parcel No. 162-20-402-003 (Parcel 1) |
|---|---|---|
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $64,238.90. Parcel No. 162-20-403-001 (Parcel 2) |
| | 3. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $26,373.09. Parcel No. 162-20-403-004 (Parcel 3) |
| | 4. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $41,182.01. Parcel No. 162-20-403-006 (Parcels 4 and 5) |
| | 5. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $37,521.48. Parcel No. 162-20-402-008 (Parcel 6) |
| | 6. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 7. | The herein described property lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |
| | 8. | Reservations and Easements in the patent from the United States of America, recorded May 18, 1959, in Book 198 as Document No. 160906, of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying. Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width, for roadway and public utility purposes. Order of Vacation: Vacating patent easement recorded October 19, 2006 in Book 20061019 as Document No. 04613 of Official Records. **AFFECTS PARCEL SIX (6)** |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 9. | Reservations and Easements in the patent from the United States of America, recorded October 8, 1959, in Book 216 as Document No. 175772, of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width, for roadway and public utility purposes.<br><br>Order of Vacation: Vacating patent easement recorded October 19, 2006 in Book 20061019 as Document No. 04613 of Official Records.<br>**AFFECTS PARCEL ONE (1)** |
| | 10. | Reservations and Easements in the patent from the United States of America, recorded March 1, 1965, in Book 609 as Document No. 490120, of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width, for roadway and public utility purposes.<br><br>Order of Vacation: Vacating patent easement recorded October 19, 2006 in Book 20061019 as Document No. 04613 of Official Records.<br>**AFFECTS PARCEL SIX (6)** |
| | 11. | Reservations and Easements in the patent from the United States of America, recorded July 11, 1966, in Book 729 as Document No. 586190, of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width, for roadway and public utility purposes.<br><br>**AFFECTS PARCELS FOUR (4) AND FIVE (5)** |
| | 12. | Reservations and Easements in the patent from the United States of America, recorded February 20, 1974, in Book 402 as Document No. 361923, of Official Records.<br>**AFFECTS PARCEL TWO (2)** |
| | 13. | Reservations and Easements in the patent from the United States of America, recorded September 23, 1974, in Book 462 as Document No. 421154, of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br>**AFFECTS PARCELS TWO (2), THREE (3), FOUR (4) AND FIVE (5)** |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 14. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of BELL TELEPHONE COMPANY OF NEVADA, for communication purposes, recorded May 15, 1942, in Book 30, Pages 373 and 374, of Deeds as Document No. 139860 of Official Records. |
| | 15. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded November 10, 1969, in Book 990 as Document No. 795199 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying. **AFFECTS PARCELS FOUR (4) AND FIVE (5)** |
| | 16. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded December 9, 1969, in Book 997 as Document No. 800089 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying. **AFFECTS PARCEL THREE (3)** |
| | 17. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded December 9, 1969, in Book 997 as Document No. 800092 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying. **AFFECTS PARCEL ONE (1)** |
| | 18. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded February 13, 1970, in Book 11 as Document No. 8123 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying. **AFFECTS PARCEL SIX (6)** |
| | 19. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of BELL TELEPHONE COMPANY OF NEVADA, for communication purposes, recorded July 17, 1970, in Book 49 as Document No. 38578 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying. **AFFECTS PARCELS TWO (2), FOUR (4) AND FIVE (5)** |

Exhibit 4 to Confirmation Order

#4839-0682-8809

| | | |
|---|---|---|
| | 20. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded June 6, 1972, in Book 236 as Document No. 195354 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br>**AFFECTS PARCEL ONE (1)** |
| | 21. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded October 17, 1973, in Book 373 as Document No. 332073 of Official Records.<br>**AFFECTS PARCEL TWO (2)** |
| | 22. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of BELL TELEPHONE COMPANY OF NEVADA, for electrical and communication purposes, recorded February 22, 1974, in Book 403 as Document No. 362808 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br>**AFFECTS PARCEL TWO (2)** |
| | 23. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded March 21, 1974, in Book 410 as Document No. 369638 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br>**AFFECTS PARCEL TWO (2)** |
| | 24. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded August 20, 1975, in Book 545 as Document No. 504347 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br>**AFFECTS PARCEL TWO (2)** |
| | 25. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded October 3, 1978, in Book 952 as Document No. 911452 of Official Records.<br>**AFFECTS PARCEL SIX (6)** |

67    Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 26. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded March 7, 1984, in Book 1885 as Document No. 1844899 of Official Records.<br>**AFFECTS PARCEL ONE (1)** |
| | 27. | Terms, covenants, conditions and provisions in an instrument entitled, "AGREEMENT FOR ELECTRIC SERVICE", recorded January 21, 1985, in Book 2051 as Document No. 2010621, of Official Records.<br>**AFFECTS PARCEL TWO (2)** |
| | 28. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded April 25, 1988, in Book 880425 as Document No. 00424 of Official Records.<br>**AFFECTS PARCEL ONE (1)** |
| | 29. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of COUNTY OF CLARK, for perpetual avigation, recorded April 25, 1988, in Book 880425 as Document No. 00428 of Official Records.<br>**AFFECTS PARCELS TWO (2), THREE (3), FOUR (4) AND FIVE (5)** |
| | 30. | The effect of the following Record of Survey performed by LYNN R ELAM, filed in File 48 of Surveys at Page 44, recorded May 11, 1988, in Book 880511, as Document No. 00390 of Official Records.<br>**AFFECTS ALL PARCELS** |
| | 31. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY and CENTRAL TELEPHONE COMPANY, for electrical and communication facilities, recorded September 28, 1988, in Book 880928 as Document No. 01022 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying.<br>**AFFECTS PARCEL ONE (1)** |
| | 32. | The effect of the following Record of Survey performed by JOHN E. FORSMAN, filed in File 85 of Surveys at Page 69, recorded October 20, 1996, in Book 961030, as Document No. 03085 of Official Records.<br>**AFFECTS ALL PARCELS** |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 33. | An unrecorded Lease executed by and between the parties named herein, for the terms and upon the subject to all of the terms, covenants, and provisions contained therein;<br>Dated:           May 7, 1998<br>Lessor:         J.A.TIBERTI CONSTRUCTION COMPANY, INC.<br>Lessee:         STATION CASINOS, INC.<br>Term:          July 1, 1998 to 11:59 p.m., June 30, 2063<br>Disclosed by:  MEMORANDUM OF LEASE<br>Recorded:      May 7, 1998 in Book 980507 as Document No. 02011<br><br>An Assignment of the Lessee's interest in said Lease was:<br>Executed by:   J.A.TIBERTI CONSTRUCTION COMPANY, INC. and STATION CASINOS, INC.<br>To:            TROPICANA STATION, INC.<br>Recorded:      June 26, 1998 in Book 980626 as Document No. 03891 |
| | 34. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by TROPICANA STATION, INC., as Debtor, and WILD WILD WEST TRUCK PLAZA, as Additional Debtor in favor of HARGETT ENTERPRISES, INC., d/b/a INTERSTATES AUTOMATED SCALE SYSTEMS, and recorded July 2, 1999 in Book 990702 as Document No. 02011 of Official Records. |
| | 35. | The effect of a Financing Statement to secure an indebtedness of the amount stated herein, by TROPICANA STATION, INC., as Debtor, and WILD WILD WEST TRUCK PLAZA, as Additional Debtor in favor of HARGETT ENTERPRISES, INC., d/b/a INTERSTATES AUTOMATED SCALE SYSTEMS, and recorded January 21, 2005 in Book 20050121 as Document No. 0000001 of Official Records.<br><br>A Continuation State recorded August 19, 2009 in Book 20090819 as Document No. 00660 Official Records. |
| | 36. | Terms, covenants, conditions and provisions in an instrument entitled, "NOTICE OF PUBLIC STREET PROJECT COMMENCEMENT", recorded November 20, 2000, in Book 20001120 as Document No. 00740, of Official Records.<br>**AFFECTS PARCELS TWO (2), FOUR (4) AND FIVE (5)** |
| | 37. | Terms, covenants, conditions and provisions in an instrument entitled, "Underground Transmission Use Agreement", recorded September 18, 2008, in Book 20080918 as Document No. 03138, of Official Records.<br>**AFFECTS PARCEL FOUR (4)** |

Exhibit 4 to Confirmation Order

| | | |
|---|---|---|
| | 38. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, d/b/a NV Energy, for electrical lines, recorded December 16, 2008, in Book 20081216 as Document No. 02306 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying. **AFFECTS PARCEL TWO (2), THREE (3) FOUR (4) FIVE (5) AND SIX (6)** |
| | 39. | An easement affecting that portion of said land and for the purposes therein and incidental purposes thereto, in favor of NEVADA POWER COMPANY, d/b/a NV Energy for electrical lines, recorded December 12, 2008, in Book 20081216 as Document No. 02309 of Official Records, as shown on Survey No. 902.0033.01 dated February 23, 2009 by Heritage Surveying. **AFFECTS PARCELS TWO (2), FOUR (4) AND FIVE (5)** |
| | 40. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 41. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |
| **VISTA HOLDINGS, LLC** **(Las Vegas – Sunset/Lindell Property)** County of Clark, State of Nevada | 1. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $4,560.92. Parcel No. 176-01-501-002 |
| | 2. | State and County Taxes for the fiscal period of 2010 to 2011, a lien now due and payable in the total amount of $18,243.70. Parcel No. 176-01-501-005 |
| | 3. | Any supplemental or recapture taxes under NRS Chapter 361, as amended, which may become a lien on the subject property by reason of increased valuations due to land use, improvements or otherwise. |
| | 4. | The herein described property lies within the boundaries of CLARK COUNTY WATER RECLAMATION DISTRICT and may be subject to all assessments and obligation thereof. |

#4839-0682-8809

| | | |
|---|---|---|
| | 5. | Reservations and Easements in the patent from the United States of America, recorded January 2, 1963, in Book 409 as Document No. 330138, of Official Records.<br><br>Affects:  Parcel 1<br><br>Said patent further reserves, and is subject to, a right-of-way not exceeding Thirty-three (33) feet in width along the boundaries, for roadway and public utility purposes.<br>The interest of the U.S.A. in and to all mineral rights and rights-of-way were transferred to Clark County, by instrument recorded January 28, 2000, in Book No. 20000128 as Document No. 00926 of Official Records. |
| | 6. | Reservations and Easements in the patent from the United States of America, recorded April 2, 1999, in Book 990402 as Document No. 01632, of Official Records.<br><br>Affects:  Parcel 2 |
| | 7. | Terms, covenants, conditions, provisions and easements in an instrument entitled, "RESTRICTIVE COVENANTS AND RESERVATIONS OF AVIGATION EASEMENT", recorded November 19, 2002, in Book 20021119 as Document No. 02896, of Official Records.<br><br>Affects:  Parcel 2 |
| | 8. | Water rights, claims or title to water, whether or not shown by the public records. |
| | 9. | Subject to the rights of party or parties in possession in accordance with any unrecorded leases affecting portions of said land for the term and upon the terms, covenants, conditions and provisions therein contained. |

# **EXHIBIT 5**

# **EXHIBIT 5**

**EXHIBIT 5**

**REAL PROPERTY LEGAL DESCRIPTION**

| | |
|---|---|
| **ALIANTE GAMING, LLC**<br><br>(Aliante Station Casino & Hotel)<br><br>County of Clark, State of Nevada | ALL OF PARCEL 34 AS SHOWN ON THE FINAL MAP OF ALIANTE NORTH, RECORDED IN BOOK 110 OF PLATS, PAGE 72, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA. |
| **AUBURN DEVELOPMENT, LLC**<br><br>(Thunder Valley – Development Site)<br><br>County of Placer, State of California | Real property in the unincorporated area of the County of Placer, State of California, described as follows:<br><br>PARCEL ONE:<br><br>PARCEL A, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF PLACER, STATE OF CALIFORNIA, ON APRIL 20, 1987, IN BOOK 23 OF PARCEL MAPS, AT PAGE 37.<br><br>PARCEL TWO:<br><br>AN EASEMENT FOR ROAD AND UTILITIES OVER AREA "L" AS SHOWN ON THE PARCEL MAP REFERRED TO ABOVE.<br><br>PARCEL THREE:<br><br>A PORTION OF SECTION 4; TOWNSHIP 11 NORTH, RANGE 6 EAST, M.D.M., DESCRIBED AS FOLLOWS:<br><br>BEGINNING AT THE NORTHWEST CORNER OF THAT CERTAIN 74.076-ACRE PARCEL OF LAND AS SHOWN ON THAT CERTAIN RECORD OF SURVEY NO. 1270 FILED IN BOOK 10 OF SURVEYS, AT PAGE 137, OFFICIAL RECORDS OF SAID COUNTY;<br><br>THENCE, FROM SAID POINT OF BEGINNING, ALONG THE BOUNDARY OF SAID 74.076-ACRE PARCEL AND ALONG THE BOUNDARY OF THE 49.245-ACRE PARCEL AS SHOWN ON SAID RECORD OF SURVEY THE FOLLOWING ELEVEN (11) COURSES: (1) ALONG THE SOUTH LINE OF ATHENS ROAD, NORTH 89° 01' 35" EAST 800.85 FEET; (2) NORTH 89° 23' 02" EAST 700.00 FEET; (3) NORTH 89° 51' 41" EAST 92.23 FEET; (4) SOUTH 00° 00' 02" WEST 2947.05 FEET; (5) NORTH 74° 42' 30" EAST 300.64 FEET; (6) SOUTH 89° 59' 58" EAST 900.00 FEET; (7) NORTH 00° 00' 02" EAST 20.00 FEET; (8) SOUTH 89° 59' 58" EAST 1268.38 FEET TO THE POINT ON THE WEST LINE OF SOUTHERN PACIFIC RAILROAD; (9) ALONG SAID WEST LINE, SOUTH 00° 06' 22" WEST 238.00 FEET; (10) LEAVING SAID WEST LINE, NORTH 89° 55' 47" WEST 2663.67 FEET; AND (11) NORTH 89° 53' 16" WEST 142.52 FEET; THENCE, LEAVING SAID BOUNDARY, NORTH 00° 50' 02" WEST 970.14 FEET;<br>THENCE NORTH 89° 09' 58" EAST 142.72 FEET;<br>THENCE, NORTH 00° 50' 02" WEST 711.14 FEET;<br>THENCE, SOUTH 89° 09' 58" WEST 285.10 FEET;<br>THENCE, SOUTH 39° 35' 32" WEST 1630.90 FEET TO A POINT ON THE WEST |

Exhibit 5 to Confirmation Order

| | |
|---|---|
| | LINE OF SAID SECTION 4;<br>THENCE, ALONG SAID WEST LINE, NORTH 00° 50' 02" WEST 2638.90 FEET TO THE POINT OF BEGINNING.<br><br>SAID LAND BEING THE SAME REAL PROPERTY DESCRIBED IN EXHIBIT "A", DESIGNATED "MBR #10171B", TO THAT CERTAIN RESOLUTION TO APPROVE A MINOR BOUNDARY LINE ADJUSTMENT RECORDED MAY 08, 1995, AS INSTRUMENT NO. 95-023278, OFFICIAL RECORDS.<br><br>EXCEPTING AND RESERVING UNTO GRANTOR ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES, INERT GASES, MINERALS AND METALS LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND AND REAL PROPERTY, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, INCLUDING BUT NOT LIMITED TO THE RIGHTS TO EXPLORE FOR DEVELOP, AND REMOVE SUCH OIL, GAS AND OTHER HYDROCARBON SUBSTANCES, INERT GASES, MINERALS AND METALS WITHOUT, HOWEVER, ANY RIGHT TO USE THE SURFACE OF SUCH LAND AND REAL PROPERTY OR ANY OTHER PORTION THEREOF ABOVE A DEPTH OF 500 FEET FROM THE SURFACE OF SUCH LAND AND REAL PROPERTY FOR ANY PURPOSE WHATSOEVER.<br><br>APN:  APN 017-061-038-000 is now 017-063-033-000 (parcel 1) and 017-061-072-000 is now 017-063-010-000 (parcel 3) |
| **BOULDER STATION, INC.**<br><br>(Las Vegas – Horizon Trailer Park Site)<br><br>County of Clark, State of Nevada | A PORTION OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION 7, TOWNSHIP 21 SOUTH, RANGE 62 EAST, M.D.M., DESCRIBED AS FOLLOWS:<br><br>COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 7; THENCE NORTH 0°40'50" EAST ALONG THE EAST LINE OF SECTION 7, A DISTANCE OF 57.06 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 93-95-466; THENCE NORTH 42°27' WEST ALONG THE NORTHEASTERLY LINE THEREOF, A DISTANCE OF 2296.50 FEET TO A POINT; THENCE NORTH 47°33' EAST A DISTANCE OF 293.75 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH 47°33' EAST A DISTANCE OF 1033.85 FEET TO A POINT ON THE SOUTH LINE OF VEGAS VALLEY DRIVE (60 FEET WIDE); THENCE NORTH 89°35'20" WEST ALONG SAID SOUTH LINE THEREOF, A DISTANCE OF 661.43 FEET TO A POINT; THENCE SOUTH 47°33' WEST A DISTANCE OF 546.98 FEET TO A POINT, SAID POINT BEING NORTH 47°33' EAST A DISTANCE OF 293.75 FEET FROM   THE NORTHEASTERLY LINE OF THE AFOREMENTIONED RIGHT OF WAY LINE OF U.S. HIGHWAY 93-95-466; THENCE SOUTH 42°27' EAST A DISTANCE OF 450.00 FEET TO THE TRUE POINT OF BEGINNING.<br><br>EXCEPTING THEREFROM THE MOST NORTHERLY 10 FEET THEREOF, AS CONVEYED TO THE COUNTY OF CLARK FOR ROAD PURPOSES.<br><br>EXCEPT THE INTEREST IN AND TO THE SOUTHERLY 10 FEET OF THE NORTHERLY 10 FEET OF SAID LAND, AS CONVEYED TO CLARK COUNTY, NEVADA FOR ROAD, UTILITIES AND OTHER PUBLIC PURPOSES, BY DEED RECORDED JANUARY 21, 1964 AS DOCUMENT NO. 408688 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS.<br><br>FURTHER EXCEPTING THEREFROM ANY MOBILE HOME STRUCTURE LOCATED UPON SAID LAND. |

Exhibit 5 to Confirmation Order

| | Subject property commonly known as: 2950 South Sandhilll Road, Las Vegas, NV |
|---|---|
| **CENTERLINE HOLDINGS, LLC**<br><br>(Las Vegas – Castaways Site)<br><br>County of Clark, State of Nevada | **PARCEL ONE (1):**<br><br>THAT PORTION OF GOVERNMENT LOT THREE (3) IN SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M. DESCRIBED AS FOLLOWS:<br><br>BEGINNING AT THE POINT OF INTERSECTION OF THE WEST LINE OF SAID GOVERNMENT LOT THREE (3) WITH THE SOUTHWESTERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NOS. 93-95-466 (200 FEET WIDE);<br><br>THENCE SOUTH 42°27' EAST ALONG THE SAID RIGHT OF WAY LINE A DISTANCE OF 244.63 FEET TO THE TRUE POINT OF BEGINNING;<br><br>THENCE CONTINUING SOUTH 42°27' EAST A DISTANCE OF 404.01 FEET TO A POINT OF THE SOUTH LINE OF SAID LOT THREE (3);<br><br>THENCE SOUTH 89°37' WEST ALONG THE SAID SOUTH LINE A DISTANCE OF 405.99 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF ATLANTIC STREET (60 FEET WIDE);<br><br>THENCE NORTH 0°10'30" WEST ALONG THE SAID EASTERLY RIGHT OF WAY LINE, A DISTANCE OF 173.12 FEET TO A POINT;<br><br>THENCE NORTH 47°33' EAST A DISTANCE OF 181.63 FEET TO THE TRUE POINT OF BEGINNING.<br><br>**PARCEL TWO (2):**<br><br>THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., LYING WESTERLY OF U.S. HIGHWAY #93-95-466 (BOULDER HIGHWAY), MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>BEGINNING AT THE INTERSECTION OF THE NORTH LINE OF THE SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) WITH THE WEST LINE OF THE U.S. HIGHWAY #93-95-466;<br><br>THENCE SOUTH 42°27' EAST ALONG THE SAID WEST LINE OF THE HIGHWAY A DISTANCE OF 135.87 FEET TO A POINT;<br>THENCE SOUTH 47°33' WEST A DISTANCE OF 500 FEET TO A POINT;<br><br>THENCE NORTH 42°27' WEST AND PARALLEL WITH THE AFOREMENTIONED WEST LINE OF THE U.S. HIGHWAY TO A POINT IN THE WEST LINE OF THE SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1;<br><br>THENCE  NORTH ALONG THE LAST MENTIONED WEST LINE TO THE NORTHWEST CORNER OF SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1;<br><br>THENCE NORTH 89°37'50" EAST ALONG THE NORTH LINE OF SAID |

Exhibit 5 to Confirmation Order

SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) A DISTANCE OF 435.99 FEET TO THE POINT OF BEGINNING.

EXCEPT THE INTEREST IN THE WEST 30 FEET OF THE ABOVE DESCRIBED PROPERTY AS CONVEYED TO THE COUNTY OF CLARK BY DEED DATED APRIL 17, 1950 AS DOCUMENT NO. 131015 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS, FOR STREET PURPOSES.

**PARCEL THREE (3):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, WITH THE WEST LINE OF THE STATE HIGHWAY (BOULDER HIGHWAY);

THENCE SOUTH 42°27' EAST ALONG THE SAID WEST LINE OF THE STATE HIGHWAY A DISTANCE OF 135.87 FEET TO THE TRUE POINT OF BEGINNING;

THENCE SOUTH 47°33' WEST A DISTANCE OF 500 FEET TO A POINT;

THENCE SOUTH 42°27" EAST AND PARALLEL WITH THE WEST LINE OF THE SAID STATE HIGHWAY A DISTANCE OF 200 FEET TO A POINT;

THENCE NORTH 47°33' EAST A DISTANCE OF 500 FEET TO A POINT IN THE AFOREMENTIONED WEST LINE OF THE STATE HIGHWAY;
THENCE NORTH 42°27" WEST ALONG THE SAID WEST LINE OF THE HIGHWAY A DISTANCE OF 200 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL FOUR (4):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE POINT OF INTERSECTION OF THE NORTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1, WITH THE SOUTHWESTERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NOS. 93-95-466 (200 FEET WIDE);

THENCE SOUTH 42°27' EAST ALONG THE SAID RIGHT OF WAY LINE A DISTANCE OF 735.87 FEET TO A POINT;

THENCE SOUTH 47°33' WEST A DISTANCE OF 500 FEET TO THE MOST SOUTHERLY CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED BY HARRY MACK ET AL TO RICHARD M. CLOUGH ET UX BY DEED RECORDED JUNE 3, 1949 AS DOCUMENT NO. 314105, CLARK COUNTY, NEVADA RECORDS, THE TRUE POINT OF BEGINNING;

THENCE SOUTH 89°57'35" WEST AND PARALLEL TO THE SOUTH LINE OF

Exhibit 5 to Confirmation Order

THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1 A DISTANCE OF 560.41 FEET MORE OR LESS TO A POINT ON THE WEST LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1;

THENCE NORTH 01°12'57" WEST ALONG THE LAST MENTIONED WEST LINE A DISTANCE OF 615.67 FEET MORE OR LESS TO A POINT DISTANT SOUTH 47°33' WEST 500 FEET FROM THE AFOREMENTIONED SOUTHWEST RIGHT OF WAY LINE;

THENCE SOUTH 42°27' EAST PARALLEL TO A DISTANT 500 FEET FROM THE SAID SOUTHWESTERLY RIGHT OF WAY LINE A DISTANCE OF 833.74 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPT THE INTEREST IN THE WEST THIRTY (30) FEET OF THE ABOVE DESCRIBED PROPERTY AS CONVEYED TO THE COUNTY OF CLARK BY DEED DATED APRIL 17, 1950 AS DOCUMENT NO. 131015 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS, FOR STREET PURPOSES.

**PARCEL FIVE (5):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1;

THENCE NORTH 0°12'57" WEST ALONG THE WEST LINE THEREOF A DISTANCE OF 477.8 FEET TO THE SOUTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED TO IRVING KING, ET UX, BY DEED RECORDED MAY 3, 1951, AS DOCUMENT NO. 370209 OF CLARK COUNTY, NEVADA RECORDS.

THENCE ALONG THE SOUTH LINE OF SAID CONVEYED PARCEL NORTH 89°57'35" EAST, 560.41 FEET TO THE SOUTHEAST CORNER OF SAID CONVEYED PARCEL, SAID SOUTHEAST CORNER BEING DISTANT SOUTH 47°33'00" WEST, 500 FEET FROM THE SOUTHWESTERLY LINE OF U.S. HIGHWAY NOS. 93-95-466 (BOULDER HIGHWAY);

THENCE SOUTH 42°27'00" EAST, PARALLEL WITH THE SOUTHWESTERLY LINE OF SAID HIGHWAY, 579.45 FEET TO A POINT DISTANT 50 FEET NORTH OF AND MEASURED AT RIGHT ANGLES TO THE SOUTH LINE OF THE SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼);

THENCE NORTH 89°56'35" EAST, PARALLEL WITH THE LAST MENTIONED SOUTH LINE, 179.23 FEET TO THE SOUTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED TO I.A. STUB BY DEED RECORDED JANUARY 4, 1950 AS DOCUMENT NO. 330010 OF SAID COUNTY RECORDS;

THENCE SOUTH 47°33'00" WEST, ALONG THE SOUTHWESTERLY PROLONGATION OF THE SOUTHEASTERLY LINE OF SAID PARCEL

Exhibit 5 to Confirmation Order

CONVEYED BY DOCUMENT NO. 330010, A DISTANCE OF 74.13 FEET;

THENCE SOUTH 89°57'43" WEST, ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1, A DISTANCE OF 1074.24 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THE INTEREST IN AND TO THE SOUTH 40.00 FEET OF SAID LAND, AS CONVEYED TO THE COUNTY OF CLARK, FOR ROAD PURPOSES, BY DEED RECORDED MARCH 22, 1951, AS DOCUMENT NO. 366543 OF CLARK COUNTY, NEVADA RECORDS.
ALSO EXCEPT THEREFROM THE INTEREST IN AND TO THE WEST 30 FEET OF SAID LAND AS CONVEYED TO THE CITY OF LAS VEGAS, FOR ROAD PURPOSES BY DEED RECORDED OCTOBER 9, 1962, AS DOCUMENT NO. 316163 OF OFFICIAL RECORDS OF CLARK COUNTY, NEVADA.

ALSO EXCEPT THEREFROM THAT CERTAIN SPANDREL AREA IN THE SOUTHWEST CORNER THEREOF AS CONVEYED TO THE CITY OF LAS VEGAS BY DEED RECORDED JUNE 23, 1966 IN BOOK 725 AS DOCUMENT NO. 582913 AND JULY 19, 1966 IN BOOK 731 AS DOCUMENT NO. 587980, OF OFFICIAL RECORDS.

FURTHER EXCEPTING THEREFROM THE FOLLOWING PARCEL:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER  (NE ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. &M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1 WITH THE WEST LINE OF U.S. HIGHWAY NOS. 93-95-466 (200 FEET WIDE);
THENCE SOUTH 42°27' EAST ALONG THE SAID WEST LINE A DISTANCE OF 1435.87 FEET TO A POINT;
THENCE SOUTH 47°33' WEST A DISTANCE OF 367.61 FEET TO THE SOUTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED BY I.A. STUBB TO FRANK A. SAGRTATTER, ET AL BY DEED RECORDED APRIL 3, 1950 AS DOCUMENT NO. 336399, CLARK COUNTY, NEVADA RECORDS, THE TRUE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 47°33' WEST A DISTANCE OF 14.83 FEET TO A POINT ON THE NORTH LINE OF OAKEY BOULEVARD;
THENCE SOUTH 89°56'35" WEST ALONG THE SAID NORTH LINE A DISTANCE OF 159.15 FEET TO A POINT; THENCE NORTH 42°27' WEST A DISTANCE OF 13.54 FEET TO THE SOUTHWEST CORNER OF THE SAID CONVEYED PARCEL;
THENCE NORTH 89°56'35" EAST A DISTANCE OF 179.23 FEET TO THE TRUE POINT OF BEGINNING.

FURTHER EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO THE CITY OF LAS VEGAS RECORDED AUGUST 2, 1999 IN BOOK 990802 AS DOCUMENT NO. 01340, MORE PARTICULARLY DESCRIBED AS THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., IN THE CITY OF LAS VEGAS, COUNTY OF CLARK, STATE OF

#4843-6001-0249

NEVADA, BOUNDED AS FOLLOWS:
BOUNDED ON THE SOUTH BY THE NORTH LINE OF THE SOUTH 40.00
FEET OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST
QUARTER (NW ¼) OF SAID SECTION 1;
BOUNDED ON THE WEST BY THE EAST LINE OF THE WEST 30.00 FEET OF
THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW
¼) OF SAID SECTION 1;
BOUNDED ON THE NORTHEAST BY THE ARC OF A CURVE CONCAVE
NORTHEASTERLY, HAVING A RADIUS OF 25.00 FEET AND BEING
TANGENT TO THE NORTH LINE OF SAID SOUTH 40.00 FEET AND
TANGENT TO THE EAST LINE OF SAID WEST 30.00 FEET;
AND BOUNDED ON THE SOUTHWEST BY THE ARC OF A CURVE
CONCAVE NORTHEASTERLY, HAVING A RADIUS OF 15.00 FEET AND
BEING TANGENT TO THE NORTH LINE OF SAID SOUTH 40.00 FEET AND
TANGENT TO THE EAST LINE OF SAID WEST 30.00 FEET.

**PARCEL SIX (6):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE
NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH,
RANGE 61 EAST, M.D.M., LYING WEST OF U.S. HIGHWAY NOS. 93-95-466,
MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE SAID
SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼)
WITH THE WESTERLY LINE OF THE U.S. HIGHWAY NOS. 93-95-466
(BOULDER HIGHWAY);

THENCE SOUTH 42°27' EAST ALONG THE WEST LINE OF SAID U.S.
HIGHWAY A DISTANCE OF 335.87 FEET TO THE TRUE POINT OF
BEGINNING;

THENCE SOUTH 47°33' WEST A DISTANCE OF 500.00 FEET TO A POINT;

THENCE SOUTH 42°27' EAST AND PARALLEL WITH THE
AFOREMENTIONED WEST LINE OF THE U.S. HIGHWAY A DISTANCE OF
100 FEET TO A POINT;

THENCE NORTH 47°33' EAST A DISTANCE OF 500 FEET TO A POINT IN
THE WEST LINE OF THE U.S. HIGHWAY;

THENCE NORTH 42°27' WEST ALONG THE LAST MENTIONED WEST LINE
A DISTANCE OF 100 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL SEVEN (7):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE
NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH,
RANGE 61 EAST, M.D.M., LYING SOUTHWESTERLY OF U.S. HIGHWAY
NOS. 93-95-466, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF SAID
SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼)
WITH THE SOUTHWESTERLY LINE OF SAID U.S. HIGHWAY NOS. 93-95-466
(BOULDER HIGHWAY);

Exhibit 5 to Confirmation Order

#4843-6001-0249

THENCE SOUTH 42°27' EAST ALONG THE SOUTHWESTERLY LINE OF THE SAID HIGHWAY A DISTANCE OF 435.87 FEET TO THE MOST EASTERLY CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED BY LOUIS MACK, ET AL TO VAUGHN O. HOLT, ET UX, BY DEED DATED SEPTEMBER 13, 1948 AND RECORDED SEPTEMBER 16, 1948 AS DOCUMENT NO. 295909, CLARK COUNTY, NEVADA RECORDS, BEING THE POINT OF BEGINNING;

THENCE SOUTH 47°33' WEST ALONG THE SOUTHEASTERLY LINE OF THE SAID CONVEYED PARCEL, A DISTANCE OF 500 FEET TO THE MOST SOUTHERLY CORNER OF THE PARCEL CONVEYED TO SAID VAUGHN O. HOLT;

THENCE SOUTH 42°27' EAST AND PARALLEL WITH THE SAID SOUTHWESTERLY LINE OF THE U.S. HIGHWAY A DISTANCE OF 100 FEET TO A POINT;

THENCE NORTH 47°33' EAST A DISTANCE OF 500 FEET TO A POINT IN SAID SOUTHWESTERLY LINE OF THE HIGHWAY;

THENCE NORTH 47°27' WEST, ALONG THE LAST MENTIONED SOUTHWESTERLY LINE A DISTANCE OF 100 FEET TO THE TRUE PINT OF BEGINNING.

## PARCEL EIGHT (8):

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., LYING SOUTHWESTERLY OF U.S. HIGHWAY NOS. 93-95-466, MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) WITH THE SOUTHWESTERLY LINE OF SAID U.S. HIGHWAY NOS. 93-95-466 (BOULDER HIGHWAY);

THENCE NORTH 42°27' EAST ALONG THE SOUTHWESTERLY LINE OF THE SAID HIGHWAY A DISTANCE OF 535.87 FEET TO THE MOST EASTERLY CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED BY LOUIS MACK, ET AL TO KARL L. SCHOTT BY DEED RECORDED NOVEMBER 22, 1948, AS SHOWN AS DOCUMENT NO. 300678, CLARK COUNTY, NEVADA RECORDS, BEING THE TRUE POINT OF BEGINNING;

THENCE SOUTH 47°33' WEST ALONG THE SOUTHEASTERLY LINE OF THE LAST MENTIONED CONVEYED PARCEL A DISTANCE OF 500 FEET TO THE MOST SOUTHERLY CORNER OF THE SAID PARCEL CONVEYED TO KARL L. SCHOTT;

THENCE SOUTH 42°27' EAST AND PARALLEL WITH THE SAID SOUTHWESTERLY LINE OF U.S. HIGHWAY NOS. 93-95-466 A DISTANCE OF 100 FEET TO A POINT;

THENCE NORTH 47°33' EAST A DISTANCE OF 500 FEET TO A POINT IN THE AFOREMENTIONED SOUTHWESTERLY LINE OF THE U.S. HIGHWAY;

Exhibit 5 to Confirmation Order

THENCE NORTH 42°27' WEST ALONG THE LAST MENTIONED SOUTHWESTERLY LINE A DISTANCE OF 100 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL NINE (9):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST M.D.B. & M., (CLARK COUNTY, NEVADA) BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1, AND THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY NOS. 93-95-466 (200.00 FEET WIDE);
THENCE SOUTH 42°27'00" EAST ALONG THE SAID SOUTHWESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 635.87 FEET TO A POINT BEING THE MOST EASTERLY CORNER OF THAT CERTAIN PARCEL OF LAND AS CONVEYED TO FIRST NATIONAL BANK OF NEVADA, A NATIONAL BANKING ASSOCIATION, BY DEED RECODED DECEMBER 12,1962 AS DOCUMENT NO. 3271435 OFFICIAL RECORDS, CLARK COUNTY, NEVADA, SAID POINT ALSO BEING THE TRUE POINT OF BEGINNING;

THENCE SOUTH 47°33'00" WEST ALONG THE SOUTHEASTERLY LINE OF SAID FIRST NATIONAL BANK PARCEL A DISTANCE OF 500.00 FEET TO A POINT IN THE NORTHEASTERLY LINE OF THAT CERTAIN PARCEL OF LAND CONVEYED TO IRVING KING, ET UX BY DEED RECORDED MAY 3, 1951 AS DOCUMENT NO. 37209 OFFICIAL RECORDS, CLARK COUNTY, NEVADA;

THENCE SOUTH 42°27'00" EAST ALONG THE NORTHEASTERLY LINE OF SAID KING PARCEL A DISTANCE OF 400.00 FEET TO A POINT BEING THE MOST WESTERLY CORNER OF THAT CERTAIN PARCEL OF LAND AS CONVEYED TO I.A. STUB BY AN AGREEMENT DATED AUGUST 19, 1948 AS DOCUMENT NO. 294205 OFFICIAL RECORDS, CLARK COUNTY, NEVADA;

THENCE NORTH 47°33'00" EAST ALONG THE NORTHWESTERLY LINE OF SAID STUB PARCEL A DISTANCE OF 500.00 FEET TO A POINT IN THE AFOREMENTIONED SOUTHWESTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY NOS. 93-95-466;

THENCE NORTH 42°27'00" WEST ALONG SAID RIGHT-OF-WAY LINE A DISTANCE OF 400.00 FEET TO THE TRUE POINT OF BEGINNING.

TOGETHER WITH:

AN ENCROACHMENT RIGHT OF WAY OVER A PORTION OF EAST FREMONT STREET GRANTED IN THE SUBJECT TO THE TERMS, COVENANTS, CONDITION AND PROVISIONS OF THAT CERTAIN "ENCROACHMENT AGREEMENT" BY AND BETWEEN THE CITY OF LAS VEGAS, A MUNICIPAL CORPORATION OF THE STATE OF NEVADA AND SHOWBOAT INC. RECORDED OCTOBER 27, 1986, IN BOOK 861027 AS DOCUMENT NO. 00778 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

Exhibit 5 to Confirmation Order

#4843-6001-0249

**PARCEL TEN (10):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE
NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH,
RANGE 61 EAST, M.D.B.&M., LYING WEST OF U.S. HIGHWAY NO. 93-95-466
(BOULDER HIGHWAY) MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE SAID
SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼)
WITH THE WEST LINE OF SAID BOULDER HIGHWAY (200 FEET WIDE);
THENCE SOUTH 42°27' EAST ALONG THE SAID WEST LINE OF BOULDER
HIGHWAY A DISTANCE OF 1035.87 FEET TO THE TRUE POINT OF
BEGINNING; THENCE CONTINUING SOUTH 42°27' EAST ALONG THE LAST
MENTIONED WEST LINE A DISTANCE OF 250.00 FEET TO A POINT;
THENCE SOUTH 47°33' WEST A DISTANCE OF 250.00 FEET TO A POINT;
THENCE SOUTH 42°27' EAST A DISTANCE OF 150.00 FEET TO A POINT;
THENCE SOUTH 47°33' WEST A DISTANCE OF 117.61 FEET TO A POINT
DISTANT 50 FEET NORTH MEASURED AT RIGHT ANGLES TO THE SOUTH
LINE OF THE SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST
QUARTER (NW ¼); THENCE SOUTH 89°56'35" WEST AND PARALLEL WITH
THE LAST MENTIONED SOUTH LINE, A DISTANCE OF 179.23 FEET TO A
POINT DISTANT SOUTH 47°33' WEST 500 FEET MEASURED AT RIGHT
ANGLE TO THE SAID WEST LINE OF U.S. HIGHWAY NO. 93-95-466;
THENCE NORTH 42°27' WEST AND PARALLEL WITH THE LAST
MENTIONED WEST LINE A DISTANCE OF 279.07 FEET TO A POINT;
THENCE NORTH 47°33' EAST A DISTANCE OF 500 FEET TO THE TRUE
POINT OF BEGINNING.

**PARCEL ELEVEN (11):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE
NORTHEAST QUARTER (NE ¼) OF SECTION 1, TOWNSHIP 21 SOUTH,
RANGE 61 EAST, M.D.B.&M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE
SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF
SAID SECTION 1 WITH THE WEST LINE OF U.S. HIGHWAY 93-95-466 (200
FEET WIDE); THENCE SOUTH 42°27' EAST ALONG THE SAID WEST LINE A
DISTANCE OF 1435.87 FEET TO A POINT; THENCE SOUTH 47°33' WEST, A
DISTANCE OF 367.61 FEET TO THE SOUTHEAST CORNER OF THAT
CERTAIN PARCEL OF LAND CONVEYED BY I.A. STUFF TO FRANK A
SAGRTATTER, ET AL BY DEED RECORDED APRIL 3, 1950 AS DOCUMENT
NO. 336399, CLARK COUNTY, NEVADA RECORDS, THE TRUE POINT OF
BEGINNING; THENCE CONTINUING SOUTH 47°33' WEST A DISTANCE OF
14.83 FEET TO A POINT ON THE NORTH LINE OF OAKEY BOULEVARD;
THENCE SOUTH 89°56'35" WEST ALONG THE SAID NORTH LINE A
DISTANCE OF 159.15 FEET TO A POINT; THENCE NORTH 42°27' WEST A
DISTANCE OF 13.54 FEET TO THE SOUTHWEST CORNER OF THE SAID
CONVEYED PARCEL; THENCE NORTH 89°56'35" EAST A DISTANCE OF
179.23 FEET TO THE TRUE POINT OF BEGINNING.
AND ALSO KNOWN AS:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE
NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH,

Exhibit 5 to Confirmation Order

RANGE 61 EAST, M.D.B.&M., IN THE COUNTY OF CLARK, STATE OF NEVADA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) WITH THE SOUTHWESTERLY LINE OF U.S. HIGHWAY 93-95-466 (200 FEET WIDE); THENCE ALONG SAID SOUTHWESTERLY LINE SOUTH 42°27' EAST 1035.87 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID SOUTHWESTERLY LINE SOUTH 42°27' EAST 250.00 FEET; THENCE SOUTH 47°33' WEST A DISTANCE OF 250.00 FEET; THENCE SOUTH 42°27' EAST 150.00 FEET; THENCE SOUTH 47°33' WEST 132.44 FEET TO THE NORTH LINE OF OAKEY BOULEVARD, AS SAID BOULEVARD IS DESCRIBED IN THE DEED TO SAID COUNTY, RECORDED MARCH 22, 1951 AS DOCUMENT NO. 366543 OF RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTH LINE SOUTH 89°56'35" WEST 159.15 FEET TO THE SOUTHEASTERLY PROLONGATION OF THE SOUTHWESTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO MARY A OLSON, RECORDED MARCH 4, 1960 AS DOCUMENT NO. 190293 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID SOUTHEASTERLY PROLONGATION AND SOUTHWESTERLY LINE OF SAID OLSON LAND NORTH 42°27' WEST 292.61 FEET TO THE MOST WESTERLY CORNER OF SAID LAND; THENCE ALONG THE NORTHWESTERLY LINE OF SAID LAND NORTH 47°33' EAST 500.00 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL TWELVE (12):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) AND THAT PORTION OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., LYING WEST OF U.S. HIGHWAY 93-95-466 (BOULDER HIGHWAY) MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE SAID SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) WITH THE WEST LINE OF SAID BOULDER HIGHWAY; THENCE SOUTH 42°27' EAST ALONG THE SAID WEST LINE OF BOULDER HIGHWAY A DISTANCE OF 1285.87 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTH 42°27' EAST ALONG THE LAST MENTIONED WEST LINE, A DISTANCE OF 150 FEET TO A POINT (SAID POINT BEING THE NORTHEAST CORNER OF THE PARCEL OF LAND HERETOFORE CONVEYED TO FRANK A SAGSTETTER AND WIFE MARY AGNES OLSEN BY I.A. STUB BY DEED DATED MARCH 28, 1950 AND RECORDED AS DOCUMENT NO. 336399 ON THE 3RD DAY OF APRIL, 1950 IN BOOK 62 OF DEEDS, PAGE 41, CLARK COUNTY, NEVADA RECORDS); THENCE SOUTH 47°33' WEST ALONG THE EASTERLY LINE OF THE SAID PARCEL OF LAND DESCRIBED IN THE SAID DEED FROM I.A. STUB TO FRANK A SAGSTETTER, ET AL, A DISTANCE OF 250 FEET TO A POINT; THENCE NORTH 42°27' WEST 150 FEET TO A POINT; THENCE NORTH 47°33' EAST A DISTANCE OF 250 FEET TO THE TRUE POINT OF BEGINNING.

ALSO AN UNDIVIDED ONE-EIGHTH (1/8TH) INTEREST OF, IN AND TO THAT CERTAIN ARTESIAN WELL DRILLED UNDER PERMIT NO. 13373, ISSUED BY THE STATE ENGINEER OF THE STATE OF NEVADA, AND LOCATED

Exhibit 5 to Confirmation Order

| | |
|---|---|
| | WESTERLY FROM THE PARCEL OF LAND ABOVE DESCRIBED AND IN AND TO THE CASING PLACED IN SAID WELL, AND THE WATER FLOWING OR PUMPED, THEREFROM, TOGETHER WITH A RIGHT OF WAY THREE FEET IN WIDTH, FOR A PIPELINE, RUNNING FROM SAID WELL TO THE NEAREST POINT ON THE PARCEL OF LAND HEREINABOVE DESCRIBED.<br><br>SUBJECT TO A RIGHT OF WAY AND EASEMENT FOR THE CONSTRUCTION, OPERATION, MAINTENANCE, REPAIR, AND RENEWAL OF WATER PIPE LINES WITH THE RIGHT OF EGRESS AND INGRESS, OVER, ACROSS, AND UNDER THE FOLLOWING DESCRIBED PORTION OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., COMMENCING AT THE POINT OF INTERSECTION OF THE NORTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SAID SECTION 1 WITH THE SOUTHWESTERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NOS. 93-95-466 (200 FEET WIDE); THENCE SOUTH 42°27' EAST ALONG THE SAID RIGHT OF WAY LINE A DISTANCE OF 1285.87 FEET TO A POINT; THENCE SOUTH 47°33' WEST A DISTANCE OF 250.00 FEET TO THE MOST WESTERLY CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED BY FRANK A SAGSTETTER ET UX TO ROSE, LTD, BY DEED RECORDED MARCH 7, 1951 AS DOCUMENT NO. 365221, CLARK COUNTY, NEVADA RECORDS, THE TRUE POINT OF BEGINNING; THENCE SOUTH 42°27' EAST A DISTANCE OF 6.00 FEET TO A POINT; THENCE NORTH 47°33' EAST A DISTANCE OF 10.00 FEET TO A POINT; THENCE NORTH 42°27' WEST A DISTANCE OF 6.00 FEET TO A POINT; THENCE SOUTH 47°33' WEST A DISTANCE OF 10.00 FEET TO THE TRUE POINT OF BEGINNING.<br>TOGETHER WITH AN EASEMENT AT RIGHT OF WAY FOR ROAD OR ALLEY PURPOSES GRANTED TO GRANTORS HEREIN BY ANNA SAGSTETTER AND MARY SAGSTETTER OLSON BY DEED DATED OCTOBER 4, 1953, DESCRIBED AS FOLLOWS:<br><br>COMMENCING AT THE POINT OF INTERSECTION OF THE NORTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 1, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., WITH THE SOUTHWESTERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NOS. 93-95-466 (200 FEET WIDE); THENCE SOUTH 42°27' EAST ALONG THE SAID RIGHT OF WAY LINE A DISTANCE OF 1285.87 FEET TO THE MOST NORTHERLY CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED BY FRANK A SAGSTETTER ET UX TO ROSE, LTD., BY DEED RECORDED MARCH 7, 1951 AS DOCUMENT NO. 365221, CLARK COUNTY, NEVADA RECORDS, THE TRUE POINT OF BEGINNING; THENCE SOUTH 47°33' WEST ALONG THE NORTHWESTERLY LINE OF THE SAID CONVEYED PARCEL A DISTANCE OF 240.00 FEET TO A POINT; THENCE NORTH 42°27' WEST A DISTANCE OF 6.00 FEET TO A POINT; THENCE NORTH 47°33' EAST A DISTANCE OF 240.00 FEET TO A POINT; THENCE SOUTH 42°27' EAST A DISTANCE OF 6.00 FEET TO THE TRUE POINT OF BEGINNING. |
| **DURANGO STATION, INC**.<br><br>(Las Vegas – Durango Site)<br><br>County of Clark, State of Nevada | A portion of the South Half (S 1/2) of the Northeast Quarter (NE 1/4) together with a portion of the North Half (N 1/2) of the Southeast Quarter (SE 1/4) of Section 5, Township 22 South, Range 60 East, M.D.M., Clark County, Nevada, described as follows:<br><br>Commencing at the northeast corner of the Southeast Quarter (SE 1/4) of the Northeast Quarter (NE 1/4) of said Section 5; thence along the east line thereof, South 01°02'19" East, 686.48 feet; thence departing said east line, South 88°57'41" West, 130.00 feet to a point on the westerly right-of-way of Durango Drive as described in |

Exhibit 5 to Confirmation Order

| | |
|---|---|
| | that certain Final Order of Condemnation, recorded February 14, 2003 in Book 20030214, Instrument No. 02863 of Official Records on file at the Clark County, Nevada Recorder's Office and being the Point of Beginning; thence along said westerly right-of-way the following five (5) courses: (1) South 01°02'19" East, 127.99 feet; (2) South 11°03'30" East, 459.81 feet; (3) South 01°02'19" East, 99.48 feet; (4) South 01°03'32" East, 579.55 feet to the beginning of a curve, concave to the northwest, having a radius of 54.00 feet; (5) southwesterly along said curve, through a central angle of 90°30'19", an arc length of 85.30 feet to a point on the northerly right-of-way of Maule Avenue (presently 40.00 feet in half width); thence along said northerly right-of-way the following three (3) courses: (1) South 89°26'47" West, 1231.48 feet to the beginning of a non-tangent curve, concave to the northeast, having a radius of 810.00 feet, from which beginning the radius bears North 00°10'02" East; (2) northwesterly along said curve, through a central angle of 52°29'59", an arc length of 742.20 feet to the beginning of a reverse curve, concave to the southwest, having a radius of 890.00 feet, through which a radial line bears South 52°40'01" West; (3) northwesterly along said curve, through a central angle of 03°41'07", an arc length of 57.25 feet to a point of non-tangency to which a radial line bears North 48°58'54" East; thence departing said northerly right-of-way, North 01°34'12" West, 270.49 feet; thence North 01°35'42" West, 1347.36 feet to a point on the north line of the South Half (S 1/2) of the Northeast Quarter (NE 1/4) of said Section 5; thence along said north line, North 89°03'24" East, 98.97 feet to a point on the southerly right-of-way of the Las Vegas Beltway; thence along said southerly right-of-way the following five (5) courses: (1) South 60°23'34" East, 243.43 feet; (2) South 71°23'39" East, 1105.52 feet; (3) South 01°14'23" East, 50.00 feet; (4) South 79°14'54" East, 343.71 feet; (5) South 71°23'39" East, 218.96 feet to the Point of Beginning. |
| **FIESTA STATION, INC.**<br><br>(Fiesta Rancho Casino Hotel)<br><br>County of Clark, State of Nevada | THAT PARCEL OF LAND BEING A PORTION OF THE NORTHWEST QUARTER (NW1/4) AND OF THE NORTHEAST QUARTER (NE1/4) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEGAS, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>COMMENCING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER (NE1/4) OF SAID SECTION 19; THENCE ALONG THE NORTH LINE OF THE NORTHEAST QUARTER (NE1/4) OF SAID SECTION 19, NORTH 89°32'59" EAST 835.29 FEET SAME LINE BEING THE CENTER LINE OF CAREY AVENUE; THENCE DEPARTING SAID CENTER LINE SOUTH 00°27'01" EAST 50.00 FEET TO A POINT ON THE SOUTH RIGHT OF WAY LINE OF CAREY AVENUE, SAME BEING THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 00°27'01" EAST 335.00 FEET ALONG THE WEST PROPERTY LINE OF PARCEL 1 OF THE PARCEL MAP IN FILE 92 PAGE 34 OF CLARK COUNTY OFFICIAL RECORDS; THENCE NORTH 89°32'59" EAST 397.00 FEET ALONG THE SOUTH PROPERTY LINE OF PARCEL 1 OF SAID PARCEL MAP RECORDED IN FILE 92 PAGE 34 OF CLARK COUNTY OFFICIAL RECORDS; THENCE SOUTH 00°27'01" EAST 708.37 FEET ALONG THE WEST PROPERTY LINE OF PARCEL 2 OF PARCEL MAP IN FILE 92 PAGE 34 OF CLARK COUNTY OFFICIAL RECORDS TO A POINT ON THE NORTH RIGHT OF WAY OF LAKE MEAD BOULEVARD, SAME POINT BEING ON A NON TANGENT CURVE WHERE THE RADIUS POINT BEARS SOUTH 32°26'24" WEST, HAVING A 1550.00 FEET RADIUS, CONCAVE TO THE SOUTH; THENCE CURVING TO THE LEFT ALONG SAID CURVE AN ARC LENGTH OF 1179.13 FEET THROUGH A CENTRAL ANGLE OF 43°35'12" TO A POINT OF REVERSE CURVATURE WHERE THE RADIUS POINT BEARS NORTH 11°08'48" WEST, HAVING A RADIUS OF 54.00 FEET, CONCAVE TO THE NORTH; THENCE CURVING TO THE RIGHT ALONG |

13                                    Exhibit 5 to Confirmation Order

| | |
|---|---|
| | SAID CURVE, AN ARC LENGTH OF 60.73 FEET THROUGH A CENTRAL ANGLE OF 64°26'23" TO A POINT ON THE EAST RIGHT OF WAY LINE OF RANCHO DRIVE; THENCE ALONG SAID EAST RIGHT OF WAY NORTH 36°42'25" WEST 885.37 FEET TO A POINT OF TANGENCY OF A 54.00 FEET RADIUS, CONCAVE TO THE EAST; THENCE CURVING RIGHT ALONG SAID CURVE AN ARC LENGTH OF 118.89 FEET THROUGH A CENTRAL ANGLE OF 126°08'36" TO A POINT ON THE SOUTH RIGHT OF WAY OF CAREY AVENUE' THENCE ALONG SAID RIGHT OF WAY NORTH 89°26'11" EAST 432.51 FEET; THENCE NORTH 89°32'59" EAST 833.61 FEET TO THE POINT OF BEGINNING.<br><br>(THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DEED RECORDED JANUARY 3, 2001 IN BOOK 20010103 AS DOCUMENT NO. 01582 OF OFFICIAL RECORDS.)<br><br>EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE CITY OF NORTH LAS VEGAS BY GRANT DEED RECORDED FEBRUARY 26, 2004, IN BOOK 20040226 DOCUMENT NO. 01463 OF OFFICIAL RECORDS. |
| **FRESNO LAND ACQUISITIONS, LLC**<br><br>(North Fork Site)<br><br>County of Madera, State of California | PARCELS 1, 2, 3, 4, 5, 6 AND 8 OF PARCEL MAP 3426 IN THE UNINCORPORATED AREA OF THE COUNTY OF MADERA, STATE OF CALIFORNIA, AS PER MAP RECORDED SEPTEMBER 7, 1995 IN BOOK 44, PAGES 15 AND 16 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.<br><br>APN:  033-030-010 thru 015 and 033-030-017 |
| **GOLD RUSH STATION, LLC**<br><br>(Gold Rush Casino)<br><br>County of Clark, State of Nevada | THAT PORTION OF THE NORTH HALF (N ½) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 3, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.B.&M., MORE PARTICULARLY DESCRIBED AS PARCEL 2-A, AS SHOWN BY PARCEL MAP IN FILE 61, PAGE 16, RECORDED JUNE 19, 1989 IN BOOK 890619 AS DOCUMENT NO. 03608 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.<br><br>TOGETHER WITH THAT VACATED PORTION OF NORCROSS STREET AS DISCLOSED BY THAT CERTAIN ORDER OF VACATION RECORDED MAY 17, 1994 IN BOOK 940517 OF OFFICIAL RECORDS AS DOCUMENT NO. 01244.<br><br>EXCEPTING THEREFROM THAT PORTION OF SAID LAND AS CONVEYED TO THE CITY OF HENDERSON BY DEED RECORDED JULY 13, 2005 IN BOOK 20050713 AS DOCUMENT NO. 02343 AND RE-RECORDED SEPTEMBER 28, 2005 IN BOOK 20050928 AS DOCUMENT NO. 03018 OF OFFICIAL RECORDS.<br><br>Subject property commonly known as: 1195 WEST SUNSET ROAD, Las Vegas, NV |

14                                    Exhibit 5 to Confirmation Order

| | |
|---|---|
| **INSPIRADA STATION, LLC**<br><br>(Las Vegas – Inspirada Site)<br><br>County of Clark, State of Nevada | **PARCEL ONE (1):**<br><br>LOT ELEVEN (11) OF AMENDED PARENT FINAL MAP OF "SOUTH EDGE" AS SHOWN BY MAP THEREOF ON FILE IN BOOK 137 OF PLATS, PAGE 100, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.<br><br>**PARCEL TWO (2):**<br><br>LOT TWENTY-NINE (29) OF AMENDED PARENT FINAL MAP OF "SOUTH EDGE" AS SHOWN BY MAP THEREOF ON FILE IN BOOK 137 OF PLATS, PAGE 100, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.<br><br>**PARCEL THREE (3)**<br><br>RECIPROCAL NON-EXCLUSIVE EASEMENTS FOR USE, ACCESS AND ENJOYMENT AS CONTAINED IN THE COMMERCIAL CHARTER FOR INSPIRADA RECORDED ON OCTOBER 18, 2007 IN BOOK 20071018 AS DOCUMENT NO. 02310, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.<br><br>**PARCEL FOUR (4)**<br><br>RECIPROCAL NON-EXCLUSIVE EASEMENTS FOR USE, ACCES AND ENJOYMENT AS CONTAINED IN THE DECLARATION OF EASEMENTS AND COVENANTS TO SHARE FOR INSPIRADA RECORDED ON OCTOBER 18, 2007 IN BOOK 20071018 AS DOCUMENT NO. 02311, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA |
| **LAKE MEAD STATION, INC.**<br><br>(Fiesta Henderson – Excess Land)<br><br>County of Clark, State of Nevada | THAT PORTION OF THE SOUTH HALF (S ½) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 13, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:<br><br>PARCEL TWO (2) AS SHOWN BY MAP THEREOF IN FILE 115 OF PARCEL MAPS, PAGE 25, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.<br><br>Subject property commonly known as: 777 West Lake Mead Parkway, Henderson, NV |

Exhibit 5 to Confirmation Order

| | |
|---|---|
| **LAKE MEAD STATION, INC.**<br><br>(Fiesta Henderson - NDOT)<br><br>County of Clark, State of Nevada | BEING A PORTION OF THE SOUTH HALF OF LAKE MEAD DRIVE, LYING WITHIN THE SOUTHWEST QUARTER (SW ¼) OF SECTION 13, TOWNSHIP 22 SOUTH, RANGE 62 EAST, M.D.M., CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:<br><br>COMMENCING AT THE CENTERLINE INTERSECTION OF LAKE MEAD DRIVE AND RESERVE BOULEVARD; THENCE ALONG THE CENTERLINE OF RESERVE BOULEVARD, SOUTH 08°51'37" EAST, 106.00 FEET TO THE EASTERLY PROLONGATION OF THE SOUTHERLY RIGHT-OF-WAY OF SAID LAKE MEAD DRIVE; THENCE ALONG SAID SOUTHERLY RIGHT-OF-WAY; SOUTH 81°08'23" WEST, 506.04 FEET, BEING THE POINT OF BEGGINNING; THENCE CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY, SOUTH 81°08'23" WEST, 655.64 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHEAST AND HAVING A RADIUS OF 100.00 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE TO THE LEFT, THROUGH A CENTRAL ANGLE OF 49°51'07", AN ARC LENGTH OF 87.01 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS NORTH 58°42'44" WEST; THENCE NORTH 58°42'44" WEST ALONG A RADIAL LINE, 57.33 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE TO THE SOUTHEAST AND HAVING A RADIUS OF 136.47 FEET, FROM WHICH BEGINNING THE RADIUS BEARS SOUTH 43°42'05" EAST; THENCE NORTHEASTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 28°33'42"; AN ARC LENGTH OF 68.03 FEET TO A POINT OF NON-TANGENCY, TO WHICH A RADIAL LINE BEARS NORTH 15°08'23" WEST; THENCE NORTH 73°02'27" EAST, 72.90 FEET; THENCE NORTH 75°01'40" EAST, 18.06 FEET TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE SOUTH, HAVING A RADIUS OF 393.00 FEET, FROM WHICH THE RADIUS BEARS SOUTH 16°43'27" EAST; THENCE EASTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 7°47'28", AN ARC LENGTH OF 53.44 FEET; THENCE NORTH 81°04'01" EAST, 446.46 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHWEST AND HAVING A RADIUS OF 193.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 16°34'46", AN ARC LENGTH OF 55.85 FEET TO A POINT OF NON-TANGENCY, FROM WHICH THE RADIUS BEARS SOUTH 07°38'47" WEST AND BEING THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 203.44 FEET, FROM WHICH BEGINNING THE RADIUS BEARS SOUTH 06°43'28" WEST; THENCE SOUTHEASTERLY ALONG SAID CURVE TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 21°27'51", AN ARC LENGTH OF 76.21 FEET TO THE POINT OF BEGINNING. |

Exhibit 5 to Confirmation Order

#4843-6001-0249

| | |
|---|---|
| **LAKE MEAD STATION, INC.**<br><br>(Fiesta Henderson Casino Hotel)<br><br>County of Clark, State of Nevada | THAT PORTION OF THE SOUTH HALF (S ½) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 13 TOWNSHIP 22 SOUTH RANGE 62 EAST, M.D.M, DESCRIBED AS FOLLOWS:<br><br>PARCEL ONE (1) AS SHOWN BY MAP THEREOF IN FILE 115 OF PARCEL MAPS, PAGE 25, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.<br><br>EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO THE CITY OF HENDERSON FOR DRIVEWAY PURPOSES IN THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED DECEMBER 31, 2007 IN BOOK 20071231 AS DOCUMENT NO. 01417 OFFICIAL RECORDS, AS RE-RECORDED ON FEBRUARY 20, 2008 IN BOOK 20080220 AS DOCUMENT NO. 02330 OFFICIAL RECORDS. |
| **LML STATION, LLC**<br><br>(Lake Mead Casino)<br><br>County of Clark, State of Nevada | THAT PORTION OF THE NORTH HALF (N ½) OF SECTION 8, TOWNSHIP 22 SOUTH, RANGE 63 EAST, M.D.M., DESCRIBED AS FOLLOWS:<br><br>LOT ONE (1) AS SHOWN BY MAP THEREOF IN FILE 28 OF PARCEL MAPS, PAGE 86, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.<br><br>Subject property commonly known as: 846 EAST LAKE MEAD PARKWAY, Las Vegas, NV |
| **MAGIC STAR STATION, LLC**<br><br>(Wildfire Casino – Boulder Highway)<br><br>County of Clark, State of Nevada | A PORTION OF THE EAST HALF (E 1/2) OF SECTION 28, TOWNSHIP 22 SOUTH, RANGE 63 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:<br><br>BEGINNING AT THE NORTHEAST CORNER OF THE NORTHEAST QUARTER (NE 1/4) OF THE SOUTHEAST QUARTER (SE 1/4) OF SAID SECTION 28; THENCE ALONG THE EAST LINE THEROF, SOUTH 00°06'22" WEST, 535.50 FEET TO THE EAST RIGHT-OF-WAY OF BOULDER HIGHWAY; THENCE ALONG SAID EAST RIGHT-OF-WAY, NORTH 42°25'00" WEST, 452.58 FEET TO THE SOUTH RIGHT-OF-WAY OF MAGIC WAY; THENCE DEPARTING SAID EAST BOULDER HIGHWAY RIGHT-OF-WAY AND ALONG THE SAID SOUTH RIGHT-OF-WAY OF MAGIC WAY, NORTH 47°35'00" EAST, 99.83 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 569.78 FEET; THENCE NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 23°53'53", AN ARC LENGTH OF 237.66 FEET; THENCE NORTH 23°41'07" EAST, 21.02 FEET TO THE BEGINNING OF A CURVE, CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 25.00 FEET; THENCE DEPARTING SAID SOUTH RIGHT-OF-WAY AND SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 113°53'53", AN ARC LENGTH OF 49.70 FEET TO THE WEST RIGHT-OF-WAY OF SAUSALITO DRIVE; THENCE ALONG THE WEST LINE THEREOF, SOUTH 42°25'00" EAST, 67.25 FEET TO A POINT ON THE EAST LINE OF THE NORTHEAST QUARTER (NE 1/4) OF SAID SECTION 28; THENCE DEPARTING SAID WEST RIGHT-OF-WAY AND ALONG THE EAST LINE OF SAID SECTION 28, SOUTH 00°04'55" WEST, 34.14 FEET TO THE POINT OF BEGINNING.<br><br><br>PREPARED BY:<br>PAUL BURN<br>HORIZON SURVEYS |

Exhibit 5 to Confirmation Order

| | |
|---|---|
| | 9901 COVINGTON CROSS, SUITE 190<br>LAS VEGAS, NV 89134<br><br>Subject property commonly known as: 2000 SOUTH BOULDER HIGHWAY, Henderson, NV |
| **PALACE STATION HOTEL AND CASINO, INC.**<br><br>(Palace Station – NDOT)<br><br>County of Clark, State of Nevada | THE EAST ONE HUNDRED SEVENTY-FIVE (175) FEET OF THE SOUTH ONE HUNDRED FIFTY (150) FEET OF THE NORTH TWO HUNDRED TWENTY-FIVE (225) FEET OF THE NORTHEAST QUARTER (NE ¼) OF SECTION 8, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M.<br><br>EXCEPTING THEREFROM THAT PORTION OF LAND AS CONVEYED TO THE CITY OF LAS VEGAS BY GRANT DEED RECORDED MAY 15, 1975 IN BOOK 518 AS DOCUMENT NO. 477543 OF OFFICIAL RECORDS, AND BEING DESCRIBED AS FOLLOWS:<br><br>COMMENCING AT THE NORTHEAST CORNER OF SAID SECTION 8; THENCE A SOUTH 00°25'21" WEST ALONG THE EAST LINE OF SAID SECTION 8 A DISTANCE OF 75.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTH 00°25'21" WEST ALONG SAID EAST LINE 150.00 FEET; THENCE NORTH 89°26'29" WEST ALONG THE SOUTH LINE OF THE NORTH 225 FEET OF SAID SECTION 8 A DISTANCE OF 30.00 FEET; THENCE NORTH 00°25'21" EAST ALONG THE WEST LINE OF THE EAST 30.00 FEET OF A TANGENT CURVE TO THE LEFT, CONCAVED SOUTHWESTERLY, HAVING A RADIUS OF 25.00 FEET; THENCE NORTHWESTERLY ALONG SAID TANGENT CURVE, THROUGH A CENTRAL ANGLE OF 89°51'50", AN ARC DISTANCE OF 39.21 FEET TO THE POINT OF TANGENCY OF SAID CURVE WITH THE SOUTH LINE OF THE NORTH 75.00 FEET OF SAID SECTION 8; THENCE SOUTH 89°26'29" EAST ALONG THE SOUTH LINE OF SAID NORTH 75.00 FEET A DISTANCE OF 54.94 FEET TO THE TRUE POINT OF BEGINNING.<br><br>FURTHER EXCEPTING THEREFROM SAID LAND AS CONVEYED BY QUITCLAIM DEED RECORDED MARCH 4, 2003 IN BOOK 20030304 AS DOCUMENT NO. 01303 OF OFFICIAL RECORDS.<br><br>Subject property commonly known as: Unassigned Situs, Las Vegas, NV |
| **RANCHO STATION, LLC**<br><br>(Wildfire Casino)<br><br>County of Clark, State of Nevada | **PARCEL I:**<br><br>ALL OF THAT PART OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS BEGINNING AT A POINT IN THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY 95 WHICH BEARS SOUTH 35°15'40" EAST 36.98 FEET AND SOUTH 89°27'40" EAST, 1236.97 FEET FROM THE CENTER OF SAID SECTION 19; THENCE SOUTH 35°15'40" EAST 154.32 FEET TO A POINT; THENCE SOUTH 54°44'20" WEST 195.67 FEET TO A POINT IN THE EAST LINE OF CYPRESS TRAIL; THENCE NORTH 1°36'32" EAST 239.65 FEET TO A POINT; THENCE SOUTH 89°27'40" EAST 63.40 FEET TO THE POINT OF BEGINNING.<br><br>EXCEPTING THEREFROM THAT PORTION OF SAID LAND AS CONVEYED TO THE CITY OF LAS VEGAS BY DEED RECORDED SEPTEMBER 11, 2003 IN BOOK 20030911 AS DOCUMENT NO. 01608 OF OFFICIAL RECORDS. |

Exhibit 5 to Confirmation Order

#4843-6001-0249

**PARCEL II:**

ALL OF THAT PART OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼) AND THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS BEGINNING AT A POINT IN THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY 95 WHICH BEARS SOUTH 35°15'40" EAST, 191.30 FEET AND SOUTH 89°27'40" EAST 1236.97 FEET FROM THE CENTER OF SAID SECTION 19; THENCE SOUTH 35°15'40" EAST ALONG THE HIGHWAY RIGHT-OF-WAY LINE 250.00 FEET TO A POINT; THENCE SOUTH 54°44'20" WEST 205.45 FEET TO A POINT IN THE EAST LINE OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 19; THENCE NORTH 1°35'50" EAST ALONG SAID LINE 52.88 FEET TO A POINT; THENCE NORTH 35°15'40" WEST 120.91 FEET TO A POINT; THENCE NORTH 89°33'08" WEST 60.71 FEET TO A POINT, SAID POINT BEARS SOUTH 89°33'08" EAST 25 FEET FROM THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 19; THENCE NORTH 1°36'32" EAST, 57.77 FEET TO A POINT; THENCE NORTH 54°44'20" EAST 195.67 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION OF SAID LAND AS CONVEYED TO THE CITY OF LAS VEGAS BY DEED RECORDED SEPTEMBER 11, 2003 IN BOOK 20030911 AS DOCUMENT NO. 01608 OF OFFICIAL RECORDS.

**PARCEL III:**

THAT PORTION OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.M., IN THE COUNTY OF CLARK, STATE OF NEVADA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 19, ALSO BEING THE NORTHEAST CORNER OF PARCEL NO. 2 OF ANNEXATION ORDINANCE 1053 AS SHOWN BY MAP THEREOF IN FILE 15 OF SURVEYS, PAGE 59 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA; THENCE SOUTH 1°40'08" WEST ALONG THE WEST LINE OF SAID NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼), ALSO BEING ALONG THE EAST LINE OF SAID ORDINANCE 1053, A DISTANCE OF 163.72 FEET TO THE SOUTH LINE OF SAID NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼), ALSO BEING THE NORTHWEST CORNER OF ANNEXATION ORDINANCE

Exhibit 5 to Confirmation Order

1033 AS SHOWN BY SAID MAP IN FILE 15 OF SURVEYS, PAGE 59; THENCE SOUTH 89°32'08" EAST ALONG SAID SOUTH LINE, ALSO BEING ALONG THE NORTH LINE OF SAID ANNEXATION ORDINANCE 1033, A DISTANCE OF 167.28 FEET TO THE EAST LINE OF SAID NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼), ALSO BEING A POINT IN THE WESTERLY BOUNDARY OF ANNEXATION ORDINANCE 957 AS SHOWN BY MAP THEREOF IN FILE 12 OF SURVEYS, PAGE 88 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA; THENCE NORTH 1°39'56" EAST ALONG SAID EAST LINE AND SAID WESTERLY BOUNDARY A DISTANCE OF 65.54 FEET; THENCE NORTH 38°53'00" WEST, CONTINUING ALONG SAID WESTERLY BOUNDARY, A DISTANCE OF 126.29 FEET TO THE NORTH LINE OF SAID NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼); THENCE CONTINUING ALONG SAID WESTERLY BOUNDARY, NORTH 89°30'52" WEST, ALONG SAID NORTH LINE A DISTANCE OF 85.71 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION OF SAID LAND AS CONVEYED TO THE CITY OF LAS VEGAS BY DEED RECORDED SEPTEMBER 11, 2003 IN BOOK 20030911 AS DOCUMENT NO. 01608 OF OFFICIAL RECORDS.

**PARCEL IV:**

THE NORTH HALF (N ½) OF THE SOUTHEAST QUARTER (SE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼) IN SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION OF SAID LAND AS CONVEYED TO THE CITY OF LAS VEGAS BY DEED RECORDED SEPTEMBER 11, 2003 IN BOOK 20030911 AS DOCUMENT NO. 01608 OF OFFICIAL RECORDS.

**PARCEL V:**

THE SOUTH HALF (S ½) OF THE SOUTHEAST QUARTER (SE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.B. & M.

EXCEPTING THEREFROM THE WEST 30 FEET THEREOF AS RESERVED BY CLARK COUNTY FOR ROAD PURPOSES BY DEED RECORDED NOVEMBER 23, 1970 IN BOOK 81 AS DOCUMENT NO. 64157, OFFICIAL RECORDS.

**PARCEL VI:**

THAT PORTION OF THE WEST HALF (W ½) OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF SAID PARCEL; THENCE

Exhibit 5 to Confirmation Order

NORTH 01°35'50" EAST, ALONG THE WEST BOUNDARY OF THE WEST HALF (W ½) OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 19, A DISTANCE OF 176.35 FEET; THENCE NORTH 54°44'20" EAST, A DISTANCE OF 205.45 FEET TO A POINT IN THE SOUTHWEST RIGHT-OF-WAY LINE OF U.S. HIGHWAY 95, WHICH BEARS SOUTH 89°27'40" EAST A DISTANCE OF 1236.97 FEET AND SOUTH 35°15'40", 441.30 FEET FROM THE CENTER OF SAID SECTION 19; THENCE SOUTH 35°15'40" EAST, ALONG THE SAID RIGHT-OF-WAY OF U.S. HIGHWAY 95, A DISTANCE OF 150.00 FEET; THENCE SOUTH 54°44'20" WEST 173.73 FEET TO A POINT; THENCE SOUTH 58°28' WEST, A DISTANCE OF 137.79 FEET TO THE POINT OF BEGINNING.

**PARCEL VII:**

THAT PORTION OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 19; THENCE NORTH 58°45'10" EAST, A DISTANCE OF 136.43 FEET TO A POINT; THENCE NORTH 54°44'20" EAST, 173.73 FEET TO A POINT IN THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY 95, WHICH BEARS SOUTH 35°15'40" EAST, 591.30 FEET AND SOUTH 89°27'40 EAST, 1236.97 FEET FROM THE CENTER OF SAID SECTION 19; THENCE SOUTH 35°15'40" EAST, 100.00 FEET TO A POINT; THENCE SOUTH 54°44'20" WEST, A DISTANCE OF 173.73 FEET TO A POINT; THENCE NORTH 35°15'40" WEST, A DISTANCE OF 11.85 FEET TO A POINT IN THE SOUTH LINE OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 19; THENCE NORTH 89°38'36" WEST, A DISTANCE OF 167.80 FEET TO THE POINT OF BEGINNING.

**PARCEL VIII:**

THAT PORTION OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 19; THENCE SOUTH 89°38'36" EAST, A DISTANCE OF 167.80 FEET TO A POINT; THENCE SOUTH 35°15'40" EAST, A DISTANCE OF 11.85 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTH 35°15'40" EAST, A DISTANCE OF 150.00 FEET TO A POINT; THENCE NORTH 54°44'20" EAST, A DISTANCE OF 173.73 FEET TO A POINT ON THE WEST LINE OF SAID U.S. HIGHWAY; THENCE NORTH 35°15'40" WEST, A DISTANCE OF 150.00 FEET TO A POINT; THENCE SOUTH 54°44'20" WEST, A DISTANCE OF 173.73 FEET TO THE TRUE POINT OF BEGINNING.

Exhibit 5 to Confirmation Order

#4843-6001-0249

EXCEPTING THEREFROM THAT PORTION OF SAID LAND CONVEYED TO THE CITY OF LAS VEGAS BY DEED RECORDED AUGUST 3, 1965 IN BOOK 648 AS DOCUMENT NO. 520889, OFFICIAL RECORDS.

**PARCEL IX:**

A PORTION OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.B. &. M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION 19, ALSO BEING THE NORTHWEST CORNER OF THAT PARCEL CONVEYED BY VAN O. EASTLAND AND JESSIE L. EASTLAND TO CHARLES C. BAILEY AND MABEL L. BAILEY BY DEED RECORDED MAY 29, 1953 AS DOCUMENT NO. 405991, OFFICIAL RECORDS; THENCE SOUTH 89°38'36 EAST ALONG THE NORTH LINE OF SAID CONVEYED PARCEL, A DISTANCE OF 125.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTH 89°38'36" EAST, A DISTANCE OF 44.14 FEET TO THE NORTHEAST CORNER OF SAID CONVEYED PARCEL; THENCE SOUTH 35°15'40" EAST, A DISTANCE OF 160.46 FEET TO THE MOST EASTERLY CORNER OF SAID CONVEYED PARCEL, ALSO BEING A POINT IN THE NORTHERLY LINE OF SPRING ROAD; THENCE SOUTH 54°44'20" WEST, A DISTANCE OF 13.54 FEET TO AN ANGLE POINT IN THE SOUTHERLY LINE OF SAID CONVEYED PARCEL; THENCE NORTH 89°41'20" WEST ALONG THE NORTH LINE OF SPRING ROAD, A DISTANCE OF 129.54 FEET TO A POINT; THENCE NORTH 01°35'50" EAST, A DISTANCE OF 138.53 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM ANY PORTION OF LAND LYING WITHIN THAT PORTION OF LAND CONVEYED TO HERBERT W. HOLTMAN, ET UX, BY DEED RECORDED JANUARY 22, 1952 IN BOOK 65 OF DEEDS, PAGE 276 AS DOCUMENT NO. 380100, OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

THAT PORTION OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTH LINE OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) WHICH BEARS 167.80 FEET FROM THE SOUTHWEST CORNER THEREOF, THE TRUE POINT OF BEGINNING; THENCE SOUTH 35°15'40" EAST, 161.85 FEET TO A POINT IN THE NORTH LINE OF SPRING ROAD; THENCE NORTH 54°44'20" EAST 173.73 FEET TO A POINT IN THE SOUTHWESTERLY LINE OF U.S. HIGHWAY 95; THENCE NORTH 35°15'40" WEST ALONG SAID RIGHT-OF-WAY LINE 161.85 FEET TO A POINT WHICH BEARS SOUTH 35°15'40" EAST, 679.45 FEET AND SOUTH 89°27'40" EAST, 1,236.97 FEET FROM THE CENTER OF SAID SECTION 19; THENCE SOUTH 54°44'20" WEST, 173.73 FEET TO THE TRUE POINT OF BEGINNING.

FURTHER EXCEPTING THEREFROM THE SOUTHERLY FIVE (5) FEET OF SAID LAND CONVEYED TO CLARK COUNTY FOR ROAD PURPOSES BY

Exhibit 5 to Confirmation Order

#4843-6001-0249

| | |
|---|---|
| | DEED RECORDED DECEMBER 1, 1960 IN BOOK 271 AS DOCUMENT NO. 219615, OFFICIAL RECORDS.<br><br>**PARCEL X:**<br><br>A PORTION OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.B. &. M., CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS:<br><br>BEGINNING AT THE NORTHWEST CORNER (NW COR) OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 19; THENCE SOUTH 89°38'36" EAST ALONG THE NORTH LINE OF PARCEL CONVEYED BY VAN O. EASTLAND AND JESSIE L. EASTLAND TO CHARLES C. BAILEY AND MABEL L. BAILEY, BY DEED RECORDED MAY 29, 1953 AS DOCUMENT NO. 405991 OF CLARK COUNTY RECORDS, A DISTANCE OF 125.00 FEET TO A POINT; THENCE SOUTH 01°35'50" WEST, A DISTANCE OF 138.53 FEET TO A POINT IN THE NORTH LINE OF SPRING ROAD, SAID NORTH LINE OF SPRING ROAD, BEING ALSO THE SOUTH LINE OF SAID PARCEL CONVEYED BY EASTLAND TO BAILEY; THENCE ALONG SAID NORTH LINE OF SPRING ROAD, NORTH 89°41'20" WEST, A DISTANCE OF 125.00 FEET TO THE SOUTHWEST CORNER (SW COR) OF SAID CONVEYED PARCEL; THENCE NORTH 01°35'50" EAST A DISTANCE OF 138.63 FEET TO THE POINT OF BEGINNING.<br><br>EXCEPTING THEREFROM THAT PORTION OF SAID LAND AS CONVEYED TO THE CITY OF LAS VEGAS BY DEED RECORDED SEPTEMBER 11, 2003 IN BOOK 20030911 AS DOCUMENT NO. 01608 OF OFFICIAL RECORDS.<br><br>Subject property commonly known as: 1901 North Rancho Drive, Las Vegas, NV |
| **SANTA FE STATION, LLC**<br><br>(Santa Fe Station Hotel & Casino)<br><br>County of Clark, State of Nevada | THAT PORTION OF THE EAST HALF (E ½) OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 34 AND A PORTION OF THE SOUTHWEST QUARTER (SW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 35, TOWNSHIP 19 SOUTH, RANGE 60 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:<br><br>LOT ONE (1) AS SHOWN BY MAP THEREOF IN FILE 115 OF PARCEL MAPS, PAGE 31, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA. |
| **TEXAS STATION, LLC**<br><br>(Texas Station Gambling Hall & Casino)<br><br>County of Clark, State of Nevada | THAT PORTION OF THE NORTH HALF (N1/2) OF SECTION 19, TOWNSHIP 20 SOUTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEGAS, COUNTY OF CLARK, STATE OF NEVADA, DESCRIBED AS FOLLOWS:<br><br>PARCEL TWO (2) AS SHOWN ON PARCEL MAP, FILE 66, PAGE 11, RECORDED AUGUST 28, 1990, OFFICIAL RECORDS, BOOK NO. 900828, AS DOCUMENT NO. 00879, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.<br><br>TOGETHER WITH THAT PORTION OF CORAN LANE (FORMERLY KNOW AS EAST LAKE MEAD BOULEVARD) AS DESCRIBED IN ORDER OF VACATION DATED DECEMBER 15,1999 BY THE CITY COUNCIL OF THE CITY OF NORTH LAS VEGAS, RECORDED FEBRUARY 7, 2000 IN BOOK |

| | |
|---|---|
| | 20000207 AS DOCUMENT NO. 00411, OFFICIAL RECORDS.<br><br>EXCEPTING THEREFROM THAT PORTION OF SAID LOT TWO (2) LYING NORTHERLY OF THE SOUTHERLY RIGHT OF WAY LINE OF LAKE MEAD BOULEVARD (100 FEET WIDE) REALIGNMENT AND ANY PORTION OF SAID LAND LYING WITHIN ANY PUBLIC ROADS AS CONVEYED IN THAT GRANT DEED, RECORDED JANUARY 25, 1991 IN BOOK 910125 AS DOCUMENT NO. 00903 OFFICIAL RECORDS.<br><br>FURTHER EXCEPTING THEREFROM THOSE PORTIONS CONVEYED TO THE CITY OF NORTH LAS VEGAS FOR ROAD PURPOSES BY DEEDS RECORDED NOVEMBER 8, 2007 IN BOOK 20071108 AS DOCUMENTS NO. 01378 AND 01379, OFFICIAL RECORDS.<br><br>BEING FURTHER SHOWN ON THAT CERTAIN RECORD OF SURVEY FILED IN FILE 69 OF SURVEYS, AT PAGE 97, RECORDED MARCH 4, 1994 IN BOOK 940304 AS DOCUMENT NO. 00896 OF OFFICIAL RECORDS. |
| **TOWN CENTER STATION, LLC**<br><br>(Las Vegas – Flamingo/Town Center Site)<br><br>County of Clark, State of Nevada | THAT PORTION OF THE SOUTHWEST QUARTER (SW1/4) OF SECTION 13 AND THE SOUTHEAST QUARTER (SE1/4) OF SECTION 14, TOWNSHIP 21 SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:<br><br>PARCEL TWO (2) AS SHOWN BY MAP THEREOF ON FILE IN FILE 96 OF PARCEL MAPS, PAGE 38, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.<br><br>EXCEPTING THEREFROM THOSE PORTIONS OF SAID LAND AS CONVEYED TO CLARK COUNTY FOR ROAD PURPOSES BY DEED RECORDED FEBRUARY 11, 2000 IN BOOK 20000211 AS DOCUMENT NO. 00901, OFFICIAL RECORDS, AND BY DEED RECORDED AUGUST 8, 2000 IN BOOK 20000808 AS DOCUMENT NO. 01234, OFFICIAL RECORDS.<br><br>FURTHER EXCEPTING THEREFROM THAT PORTION DEEDED TO THE COUNTY OF CLARK FOR R-4 FLOOD CONTROL CHANNEL BY DEED RECORDED FEBRUARY 22, 2001 IN BOOK 20010222 AS DOCUMENT NO. 01348 OF OFFICIAL RECORDS.<br><br>FURTHER EXCEPTING THEREFROM THAT PORTION DEEDED TO THE COUNTY OF CLARK FOR R-4 FLOOD CONTROL CHANNEL BY DEED RECORDED JUNE 18, 2001 IN BOOK 20010618 AS DOCUMENT NO. 00906 OF OFFICIAL RECORDS. |

Exhibit 5 to Confirmation Order

#4843-6001-0249

| | |
|---|---|
| **TROPICANA ACQUISITIONS, LLC**<br><br>(Las Vegas Viva Site)<br><br>County of Clark, State of Nevada | PARCEL ONE (1)<br><br>THE SOUTHWEST QUARTER (SW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 20, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M.<br><br>EXCEPTING THEREFROM THE SOUTHERLY 50 FEET, THE WESTERLY 40 FEET AND THAT CERTAIN SPANDREL AREA DEEDED TO THE COUNTY OF CLARK FOR ROAD AND INCIDENTAL PURPOSES BY DEEDS RECORDED FEBRUARY 7, 1964 IN BOOK 512 AS DOCUMENT NO. 412320, MARCH 9, 1973 IN BOOK 326 AS DOCUMENT NO. 285357 AND JULY 10, 1978 IN BOOK 913 AS DOCUMENT NO. 872046, OFFICIAL RECORDS, CLARK COUNTY NEVADA<br><br><br>PARCEL TWO (2)<br><br>A PORTION OF THE SOUTHWEST QUARTER (SW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 20, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:<br><br>LOT TWO (2) AS SHOWN BY PARCEL MAP ON FILE IN FILE 80, PAGE 94, RECORDED DECEMBER 05, 1994 IN BOOK 941205, AS DOCUMENT NO. 00825, AND AS AMENDED BY THAT CERTIFICATE OF AMENDMENT RECORDED FEBRUARY 06, 1995 IN BOOK 950206, AS DOCUMENT NO. 00615, OFFICIAL RECORDS, CLARK COUNTY, NEVADA. |
| **TROPICANA STATION, INC.**<br><br>(Wild Wild West Gambling Hall & Hotel)<br><br>County of Clark, State of Nevada | **PARCEL ONE (1):**<br><br>THAT PORTION OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SECTION 20, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:<br><br>**COMMENCING** AT THE NORTHWEST CORNER OF THE NORTHWEST QUARTER (NW¼) OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20, SAID POINT ALSO BEING ON THE CENTERLINE OF PROCYON AVENUE;<br>THENCE ALONG THE NORTH LINE OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20, NORTH 89°17'13" EAST, 30.01 FEET TO THE EAST RIGHT OF WAY OF PROCYON AVENUE AND THE **POINT OF BEGINNING;**<br>THENCE CONTINUING ALONG SAID NORTH LINE, 89°17'13" EAST, 286.72 FEET;<br>THENCE SOUTH 00°03'04" EAST, 330.24 FEET;<br>THENCE SOUTH 89°03'16" EAST, 285.72 FEET TO THE EAST RIGHT OF WAY OF PROCYON AVENUE;<br>THENCE ALONG SAID RIGHT OF WAY NORTH 00°13'33" WEST, 331.39 FEET TO THE **POINT OF BEGINNING.**<br><br>BEING SHOWN AS PARCEL 7 ON THAT CERTAIN RECORD OF SURVEY IN FILE 85, PAGE 69 OF SURVEYS, IN THE OFFICE OF THE COUNTY |

25

Exhibit 5 to Confirmation Order

RECORDER OF CLARK COUNTY, NEVADA.

**PARCEL TWO (2):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF SECTION 20, AND THE NORTHEAST QUARTER (NE¼) OF THE NORTHWEST QUARTER (NW¼) OF SECTION 29, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

**COMMENCING** AT THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20, SAID POINT ALSO BEING THE CENTERLINE OF POLARIS AVENUE; THENCE ALONG SAID CENTERLINE NORTH 00°07'37" EAST, 42.83 FEET; THENCE SOUTH 89°52'23" EAST, A DISTANCE OF 30.00 FEET TO THE EAST RIGHT OF WAY LINE OF POLARIS AVENUE AND THE **POINT OF BEGINNING;**
THENCE ALONG SAID RIGHT OF WAY NORTH 00°07'37" EAST, 615.56 FEET TO THE NORTH LINE OF THE SOUTH HALF (S½) OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20;
THENCE ALONG SAID NORTH LINE, NORTH 89°16'42" EAST, 308.72 FEET;
THENCE SOUTH 01°11'44" EAST, 707.51 FEET TO THE NORTH RIGHT OF WAY LINE OF TROPICANA AVENUE AND THE BEGINNING OF A CURVE CONCAVE NORTHERLY AND HAVING A RADIUS OF 1,950.00 FEET, WHERE A RADIUS POINT BEARS NORTH 06°48'03" EAST;
THENCE CURVING TO THE RIGHT THROUGH A CENTRAL ANGLE OF 05°26'11 AN ARC DISTANCE OF 185.03 FEET;
THENCE NORTH 77°45'45" WEST, 52.36 FEET TO THE BEGINNING OF A CURVE CONCAVE SOUTHERLY HAVING A RADIUS OF 2,050.00 FEET;
THENCE CURVING TO THE LEFT THROUGH A CENTRAL ANGLE OF 01°48'26" AN ARC DISTANCE OF 64.66 FEET TO A POINT OF REVERSE CURVATURE CONCAVE NORTHEASTERLY HAVING A RADIUS OF 34.00 FEET;
THENCE CURVING TO THE RIGHT THROUGH A CENTRAL ANGLE OF 79°41'47" AN ARC DISTANCE OF 47.29 FEET TO THE EAST RIGHT OF WAY LINE OF POLARIS AVENUE AND THE **POINT OF BEGINNING.**

BEING SHOWN AS PARCEL 4 ON THAT CERTAIN RECORD OF SURVEY IN FILE 85, PAGE 69 OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

TOGETHER WITH SAID LAND ON THAT CERTAIN ORDER OF VACATION RECORDED OCTOBER 19, 2006 IN BOOK 20061019 AS DOCUMENT NO. 04613 OF OFFICIAL RECORDS

**PARCEL THREE (3):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF SECTION 20, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

**COMMENCING** AT THE SOUTH QUARTER (S¼) CORNER OF SAID

Exhibit 5 to Confirmation Order

SECTION 20; THENCE ALONG THE SOUTH LINE THEREOF SOUTH
88°48'16" WEST, 540.55 FEET TO THE WEST RIGHT OF WAY LINE OF
INDUSTRIAL ROAD AND THE BEGINNING OF A CURVE CONCAVE TO THE
SOUTHEAST AND HAVING A RADIUS OF 735.00 FEET AND A RADIUS
POINT WHICH BEARS SOUTH 82°21'48" EAST; THENCE CURVING TO THE
RIGHT THROUGH A CENTRAL ANGLE OF 32°50'14" AN ARC DISTANCE OF
421.24 FEET TO THE POINT OF TANGENCY; THENCE NORTH 40°28'26"
EAST, 94.99 FEET TO THE **POINT OF BEGINNING;**
THENCE SOUTH 88°48'16" WEST, 605.59 FEET;
THENCE NORTH 01°11'44" WEST, 208.22 FEET TO THE NORTH LINE OF
THE SOUTH HALF (S½) OF THE SOUTHEAST QUARTER (SE¼) OF THE
SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20;
THENCE ALONG SAID NORTH LINE, NORTH 89°16'42" EAST, 785.15 FEET
TO THE WEST RIGHT OF WAY LINE OF INDUSTRIAL ROAD;
THENCE ALONG SAID RIGHT OF WAY SOUTH 40°28'26" WEST, 270.05
FEET TO THE **POINT OF BEGINNING.**

BEING SHOWN AS PARCEL 1 ON THAT CERTAIN RECORD OF SURVEY IN
FILE 85, PAGE 69 OF SURVEYS, IN THE OFFICE OF THE COUNTY
RECORDER OF CLARK COUNTY, NEVADA.

**EXCEPTING THEREFROM** THAT PORTION CONDEMNED BY FINAL
ORDER OF CONDEMNATION RECORDED MARCH 9, 1999 IN BOOK 990309
AS DOCUMENT NO. 01324 OF OFFICIAL RECORDS, CLARK COUNTY,
NEVADA.

**PARCEL FOUR (4):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE¼) OF THE
SOUTHWEST QUARTER (SW¼) OF SECTION 20, AND THE NORTHEAST
QUARTER (NE¼) OF THE NORTHWEST QUARTER (NW¼) OF SECTION 29,
TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., CLARK COUNTY,
NEVADA, DESCRIBED AS FOLLOWS:

**COMMENCING** AT THE SOUTH QUARTER (S¼) CORNER OF SAID
SECTION 20; THENCE ALONG THE SOUTH LINE THEREOF SOUTH
88°48'16" WEST, 540.55 FEET TO THE WEST RIGHT OF WAY LINE OF
INDUSTRIAL ROAD AND THE **POINT OF BEGINNING;**
THENCE CONTINUING SOUTH 88°48'16" WEST, 89.23 FEET;
THENCE SOUTH 01°20'20" EAST, 71.49 FEET TO THE SOUTH RIGHT OF
WAY LINE OF TROPICANA AVENUE (100' WIDE) AND THE BEGINNING OF
A CURVE CONCAVE NORTHERLY HAVING A RADIUS OF 1,950.00 FEET;
THENCE CURVING TO THE RIGHT THROUGH A CENTRAL ANGLE OF
08°08'24" AN ARC DISTANCE OF 277.03 FEET, WHERE THE RADIUS POINT
BEARS NORTH 06°48'03" EAST;
THENCE DEPARTING SAID RIGHT OF WAY NORTH 01°11'44" WEST, 499.29
FEET;
THENCE NORTH 88°48'16" EAST, 605.59 FEET TO A POINT ON THE
NORTHWESTERLY RIGHT OF WAY LINE OF INDUSTRIAL ROAD;
THENCE ALONG SAID RIGHT OF WAY SOUTH 40°28'26" WEST, 94.99 FEET
TO THE BEGINNING OF A CURVE CONCAVE SOUTHEASTERLY HAVING A
RADIUS OF 735.00 FEET; THENCE CURVING TO THE LEFT THROUGH A
CENTRAL ANGLE OF 32°50'14" AN ARC DISTANCE OF 421.24 FEET TO THE
**POINT OF BEGINNING.**

Exhibit 5 to Confirmation Order

#4843-6001-0249

BEING SHOWN AS PARCEL 2 ON THAT CERTAIN RECORD OF SURVEY IN FILE 85, PAGE 69 OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

**EXCEPTING THEREFROM** THAT PORTION CONDEMNED BY FINAL ORDER OF CONDEMNATION RECORDED MARCH 9, 1999 IN BOOK 990309 AS DOCUMENT NO. 01324 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

**PARCEL FIVE (5):**

THAT PORTION OF THE NORTHEAST QUARTER (NE¼) OF THE NORTHWEST QUARTER (NW¼) OF SECTION 29, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

**COMMENCING** AT THE SOUTH QUARTER (S¼) CORNER OF SAID SECTION 20; THENCE ALONG THE SOUTH LINE THEREOF SOUTH 88°48'16" WEST, 540.55 FEET TO THE WEST RIGHT OF WAY LINE OF INDUSTRIAL ROAD AND THE **POINT OF BEGINNING;**
THENCE CONTINUING SOUTH 88°48'16" WEST, 89.23 FEET;
THENCE SOUTH 01°20'20" EAST, 71.49 FEET TO THE SOUTH RIGHT OF WAY LINE OF TROPICANA AVENUE (100' WIDE);
THENCE ALONG SAID RIGHT OF WAY NORTH 88°39'40" EAST, 31.83 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 54.00 FEET;
THENCE CURVING TO THE LEFT THROUGH A CENTRAL ANGLE OF 81°01'28" AN ARC DISTANCE OF 76.36 FEET TO THE WEST RIGHT OF WAY OF INDUSTRIAL ROAD;
THENCE ALONG SAID RIGHT OF WAY NORTH 07°38'12" EAST, 26.01 FEET TO THE **POINT OF BEGINNING.**

BEING SHOWN AS PARCEL 3 ON THAT CERTAIN RECORD OF SURVEY IN FILE 85, PAGE 69 OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

**EXCEPTING THEREFROM** THAT PORTION CONDEMNED BY FINAL ORDER OF CONDEMNATION RECORDED MARCH 9, 1999 IN BOOK 990309 AS DOCUMENT NO. 01324 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

**PARCEL SIX (6):**

THAT PORTION OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SECTION 20, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

**COMMENCING** AT THE SOUTHEAST CORNER OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20, SAID POINT BEING ALSO ON THE CENTERLINE OF POLARIS AVENUE; THENCE NORTH 00°07'37" EAST, 657.95 FEET; THENCE ALONG THE NORTH LINE OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20, SOUTH 89°17'13"

Exhibit 5 to Confirmation Order

WEST, 30.00 FEET TO THE WEST RIGHT OF WAY LINE OF POLARIS AVENUE AND THE **POINT OF BEGINNING;**
THENCE ALONG SAID RIGHT OF WAY SOUTH 00°07'37 WEST, 329.10 FEET;
THENCE DEPARTING SAID RIGHT OF WAY SOUTH 89°03'16" WEST, 285.71 FEET;
THENCE NORTH 00°03'04" WEST, 330.24 FEET TO THE NORTH LINE OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20;
THENCE ALONG SAID NORTH LINE, NORTH 89°17'13" EAST, 286.71 FEET TO THE WEST RIGHT OF WAY OF POLARIS AVENUE AND THE **POINT OF BEGINNING.**

BEING SHOWN AS PARCEL 5 ON THAT CERTAIN RECORD OF SURVEY IN FILE 85, PAGE 69 OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

TOGETHER WITH SAID LAND ON THAT CERTAIN ORDER OF VACATION RECORDED OCTOBER 19, 2006 IN BOOK 20061019 AS DOCUMENT NO. 04613 OF OFFICIAL RECORDS

AND

THAT PORTION OF THE SOUTHEAST QUARTER (SE¼) OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SECTION 20, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B.&M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

**COMMENCING** AT THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER (SW¼) OF THE SOUTHWEST QUARTER (SW¼) OF SAID SECTION 20, SAID POINT BEING ALSO ON THE CENTERLINE OF POLARIS AVENUE; THENCE NORTH 00°07'37" EAST, 49.32 FEET; THENCE NORTH 89°52'23" WEST, 30.00 FEET TO THE INTERSECTION OF THE WEST RIGHT OF WAY LINE OF POLARIS AVENUE AND THE NORTH RIGHT OF WAY LINE OF TROPICANA AVENUE AND THE **POINT OF BEGINNING;**
THENCE ALONG SAID NORTH RIGHT OF WAY SOUTH 88°49'15" WEST, 284.86 FEET;
THENCE DEPARTING SAID RIGHT OF WAY NORTH 00°03'04" WEST, 280.23 FEET;
THENCE NORTH 89°03'16" EAST, 285.71 FEET TO THE WEST RIGHT OF WAY LINE OF POLARIS AVENUE;
THENCE ALONG SAID WEST RIGHT OF WAY SOUTH 00°07'37" WEST, 279.09 FEET TO THE **POINT OF BEGINNING.**

BEING SHOWN AS PARCEL 6 ON THAT CERTAIN RECORD OF SURVEY IN FILE 85, PAGE 69 OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

TOGETHER WITH SAID LAND ON THAT CERTAIN ORDER OF VACATION RECORDED OCTOBER 19, 2006 IN BOOK 20061019 AS DOCUMENT NO. 04613 OF OFFICIAL RECORDS

Exhibit 5 to Confirmation Order

| | |
|---|---|
| **VISTA HOLDINGS, LLC**<br><br>(Las Vegas – Sunset/Lindell Property)<br><br>County of Clark, State of Nevada | **PARCEL 1:**<br><br>THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHWEST QUARTER (NW ¼) OF NORTHEAST QUARTER (NE ¼) OF SECTION 1, TOWNSHIP 22 SOUTH, RANGE 60 EAST M.D.M., SAID PROPERTY BEING ALSO KNOWN AS GOVERNMENT LOT TWENTY-NINE (29) IN SECTION 1, TOWNSHIP 22 SOUTH, RANGE 60 EAST M.D.M.<br><br>**PARCEL 2:**<br><br>THAT PORTION OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SECTION 1, TOWNSHIP 22 SOUTH, RANGE 60 EAST M.D.M., DESCRIBED AS FOLLOWS:<br><br>GOVERNMENT LOTS ELEVEN (11), THIRTY (30), FORTY-THREE (43) AND FOURTY-FOUR (44) IN SAID SECTION 1.<br><br>**EXCEPTING THEREFROM** THAT PORTION OF SAID LAND DEDICATED FOR FLOOD CONTROL PURPOSES BY THAT CERTAIN INSTRUMENT ENTITLED "DEDICATION" RECORDED APRIL 17, 2000 IN BOOK 20000417 AS DOCUMENT NO. 01068, OFFICIAL RECORDS.<br><br>**FURTHER EXCEPTING THEREFROM** THE WEST FORTY (40) FEET OF SAID GOVERNMENT LOT 44, AS DEDICATED FOR PUBLIC STREET AND UTILITY PURPOSES BY THAT CERTAIN INSTRUMENT ENTITLED "DEDICATION" RECORDED APRIL 25, 2002 IN BOOK 20020425 AS DOCUMENT NO. 01055, OFFICIAL RECORDS.<br><br>**FURTHER EXCEPTING THEREFROM** THE NORTH SIXTY (60) FEET OF GOVERNMENT LOT 11 AS DEDICATED FOR PUBLIC STREET AND UTILITY PURPOSES BY THAT CERTAIN INSTRUMENT ENTITLED "DEDICATION" RECORDED NOVEMBER 27, 2002 IN BOOK 20021127 AS DOCUMENT NO. 01766, OFFICIAL RECORDS.<br><br>**FURTHER EXCEPTING THEREFROM** THAT PORTION OF GOVERNMENT LOT 43 LYING SOUTHEASTERLY OF THE FLOOD CONTROL CHANNEL AS SET FORTH IN BOOK 20000417 AS DOCUMENT NO. 01068 OF OFFICIAL RECORDS.<br><br>Subject property commonly known as: VACANT LAND, Las Vegas, NV |

Exhibit 5 to Confirmation Order