1

2

3

**Entered on Docket**
**May 25, 2011**

_____
**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

4

5

6   Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:     (213) 892-4000
Facsimile:     (213) 629-5063

Reorganization Counsel for
Debtors and Debtors in Possession

Laury M. Macauley (NV SBN 11413)
Dawn M. Cica (NV SBN 004595)
LEWIS AND ROCA LLP
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone:     (775) 823-2900
Facsimile:     (775) 823-2929
lmacauley@lrlaw.com; dcica@lrlaw.com
Local Reorganization Counsel for
Debtors and Debtors in Possession

7

8

9

10

11

12      **UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

13

In re :
STATION CASINOS, INC., _et al.,_

Debtors and Debtors in Possession.[1]

☒ Affects all debtors listed in footnote 2[2]

Chapter 11
Case No. BK-09-52477

Jointly Administered BK Cases: 09-52470
through 09-52487; 10-50381; 11-51188;
11-51190 through 11-51219; and 11-51702

**FINDINGS OF FACT AND CONCLUSIONS
OF LAW REGARDING CONFIRMATION
OF "FIRST AMENDED PREPACKAGED
JOINT CHAPTER 11 PLAN OF
REORGANIZATION FOR SUBSIDIARY
DEBTORS, ALIANTE DEBTORS AND
GREEN VALLEY RANCH GAMING, LLC
(DATED MAY 20, 2011)" WITH RESPECT
TO SUBSIDIARY DEBTORS AND
ALIANTE DEBTORS**

14

15

16

17

18

19

20

21

22

23   [1]   The debtors in these jointly administered chapter 11 cases are: (i) Station Casinos, Inc.; Northern NV Acquisitions, LLC; Reno
Land Holdings, LLC; River Central, LLC; Tropicana Station, LLC; FCP Holding, Inc.; FCP Voteco, LLC; Fertitta Partners LLC;
FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC;
FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II,
LLC; FCP MezzCo Borrower I, LLC and FCP PropCo, LLC (collectively, the "**SCI Debtors**"), (ii) Auburn Development, LLC;
Boulder Station, Inc.; Centerline Holdings, LLC; Charleston Station, LLC; CV HoldCo, LLC; Durango Station, Inc.; Fiesta
Station, Inc.; Fresno Land Acquisitions, LLC; Gold Rush Station, LLC; Green Valley Station, Inc.; GV Ranch Station, Inc.;
Inspirada Station, LLC; Lake Mead Station, LLC; LML Station, LLC; Magic Star Station, LLC; Palace Station Hotel & Casinos,
Inc.; Past Enterprises, Inc.; Rancho Station, LLC; Santa Fe Station, Inc.; SC Durango Development LLC; Sonoma Land
Holdings, LLC; Station Holdings, Inc.; STN Aviation, Inc.; Sunset Station, Inc.; Texas Station, LLC; Town Center Station, LLC;
Tropicana Acquisitions, LLC; Tropicana Station, Inc.;  and Vista Holdings, LLC (collectively, the "**Subsidiary Debtors**"), (iii)
Aliante Gaming, LLC, Aliante Holding, LLC, and Aliante Station LLC (collectively, the "**Aliante Debtors**"), and (iv) Green
Valley Ranch Gaming LLC ("**GVR**").

24

25

26

27

28

[2]   **These Findings of Fact and Conclusions of Law apply to the Subsidiary Debtors and Aliante Debtors, and not to GVR.**

#4827-8452-4809

**I.    INTRODUCTION.**

1.    On July 28, 2009, Station Casinos, Inc. ("SCI"), and certain of its affiliates commenced chapter 11 cases in this Court (the "SCI Cases").  On February 10, 2010, GV Ranch Station, Inc. commenced its chapter 11 case in this Court.  On August 27, 2010, this Court entered its order confirming the "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (the "SCI Plan") (docket no. 2039).[3]  The Effective Date of the SCI Plan has not yet occurred.

2.    On April 12, 2011 (the "Petition Date"), the above captioned Subsidiary Debtors (excluding GV Ranch Station, Inc. which had a chapter 11 case already pending), Aliante Debtors and GVR commenced their chapter 11 cases (the "Chapter 11 Cases") in this Court.  Pursuant to an order of this Court, the Chapter 11 Cases are jointly administered with the SCI Cases.  Also on April 12, 2011, the Subsidiary Debtors, Aliante Debtors and GVR filed their "Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Gaming, LLC (Dated March 22, 2011)" (the "Plan"), and their "Disclosure Statement to Accompany Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Gaming, LLC (Dated March 22, 2011)" (the "Disclosure Statement") (both at docket no. 2797).  On April 15, 2011, the Court entered an order setting May 25, 2011 as the hearing to consider approval of the Disclosure Statement and confirmation of the Plan, and setting certain deadlines for objections and briefing (the "Confirmation Hearing Order").

3.    On May 9 and 15, 2011, the Subsidiary Debtors filed their first and second Plan Supplements (docket nos. 2987 and 3092).  On May 13, 2011, the Aliante Debtors and GVR filed their Plan Supplements (docket nos. 3074 and 3087, respectively).  On May 19, 2011, the Aliante Debtors filed the First Amendment to their Plan Supplement (docket no. 3175).

4.    Prior to the Petition Date, commencing on March 23, 2011, the Subsidiary Debtors, Aliante Debtors and GVR distributed copies of the Plan and Disclosure Statement and

---

[3]    Unless otherwise specified, all "docket no." references mean the docket in Case No. 09-52477 in this Court.

related exhibits, schedules and other materials to certain of their creditors, and solicited

prepetition acceptances of the Plan pursuant Section 1125(g) of the Bankruptcy Code (the

"Prepetition Solicitation").  On April, 27, 2011, the Voting and Claims Agent[4] filed its "Ballot

Summary Declaration in Support of Confirmation of Joint Plan, Certifying Ballots Accepting

and Rejecting the Plan, and Submitting Ballot Reports" with respect to the votes of Holders of

Claims against and Equity Interests in the Subsidiary Debtors and GVR (docket no. 2895) (the

"First Tabulation of Ballots").  On May 6, 2011, the Voting and Claims Agent filed its "Ballot

Summary Declaration in Support of Confirmation of Joint Plan, Certifying Ballots Accepting

and Rejecting the Plan, and Submitting Ballot Reports" with respect to the votes of Holders of

Claims against and Equity Interests in the Aliante Debtors (docket no. 2949) (the "Second

Tabulation of Ballots").  The First and Second Tabulation of Ballots together show that all

Voting Classes voted to accept the Plan.

5.      On May 16, 2011, the Subsidiary Debtors commenced a solicitation of consents

from the Prepetition Opco Secured Lenders for approval of certain modifications to the Plan that

would have the effect of adding non-debtor Tropicana Station, Inc. ("TSI") as a Subsidiary

Debtor under the Plan.  The proposed modifications were premised upon TSI commencing a

chapter 11 case in this Court on or about May 23, 2011, and the Court entering an order jointly

administering the TSI case with the Chapter 11 Cases.  On May 23, 2011, TSI commenced a

chapter 11 case in this Court, Case No. 11-51702.  On May 25, 2011, the Court entered an order

jointly administering the TSI chapter 11 case with the other Chapter 11 Cases.

6.      May 16, 2011 was also the deadline established by the Court for filing and

serving objections to confirmation of the Plan.  In fact, no objections to confirmation of the Plan

or to any of the terms of the Plan in respect of the Subsidiary Debtors and the Aliante Debtors

were filed by any Holder of Claims against or Equity Interests in the Subsidiary Debtors or

Aliante Debtors or by any other party in interest in the Chapter 11 Cases of the Subsidiary

Debtors and Aliante Debtors, by that May 16, 2011 deadline.  Objections were filed, however, to

---

[4]   Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to them in the Confirmation Order, Plan, or Disclosure Statement, as applicable.  The rules of interpretation set forth in Article I.A. of the Plan shall apply to these Findings of Fact and Conclusions of Law.

confirmation of the Plan with respect to GVR. As a result, GVR concluded that its bankruptcy Estate would be best served by submission of a separate brief in support of confirmation of the Plan with respect to GVR, and entry of a separate confirmation order and findings of fact and conclusions of law with respect to GVR.

7.    On May 20, 2011, the Subsidiary Debtors, Aliante Debtors and GVR filed their "First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 20, 2011)" (docket no. 3186) (the "Amended Plan"). The Amended Plan adds TSI as a Subsidiary Debtor, provides additional detail regarding the implementation of the restructuring of the Aliante Debtors, and makes certain other revisions to the Plan. A redline showing the revisions to the Plan contained in the Amended Plan was filed on May 20, 2011 (docket no. 3186, Exhibit 2). On May 24, 2011, an additional revision to the Amended Plan, providing for the addition of the Aliante IP License Agreement as a New Aliante Transaction Agreement, was filed with the Court, including a redline showing the changes over the prior filed version (docket no. 3253). The revisions to the first filed Plan contained in the Amended Plan, and the revisions filed on May 24, 2011 are hereinafter collectively referred to as the "Plan Modifications." All further references in these Findings of Fact and Conclusions of Law to the Plan mean the version filed by the Debtors on May 24, 2011 (docket no.3253).

8.    Also on May, 20, 2011, the Subsidiary Debtors and Aliante Debtors filed their: (a) Memorandum of Law in Support of Confirmation of the Plan solely for the Subsidiary Debtors and Aliante Debtors, and expressly excluding GVR (docket no. 3187); and (b) proposed Confirmation Order and proposed Findings of Fact and Conclusions of Law, in both cases with respect to the Subsidiary Debtors and Aliante Debtors only, and expressly excluding GVR (docket no. 3188). In support of the Memorandum of Law, the Subsidiary Debtors and Aliante Debtors filed the Declaration of Richard Haskins, Executive Vice President, General Counsel and Secretary of SCI (docket no.3226).

9.    Unless expressly stated otherwise herein, all further references contained in these Findings of Fact and Conclusions of Law to: (a) the "Debtors" mean the Subsidiary Debtors and

Aliante Debtors, and do not include GVR; (b) the "Estates" mean the Estates of the Subsidiary Debtors and Aliante Debtors and do not include the Estate of GVR; (c) the "Chapter 11 Cases" mean the Chapter 11 Cases of the Subsidiary Debtors and Aliante Debtors and do not include the Chapter 11 Case of GVR; and (d) the "Restructuring Transactions" mean only as they apply to the Subsidiary Debtors and Aliante Debtors, and not as they apply to GVR.

10.     A hearing pursuant to Sections[5] 1127, 1128 and 1129 and Federal Rules of Bankruptcy Procedure 2002, 3017, 3018, 3019(a), 3020(b) through (e) and 7052 to consider confirmation of the Plan and approval of the Disclosure Statement was held on May 25, 2011 (the "Confirmation Hearing").

11.     The Court has considered all of the papers filed in support of confirmation of the Plan, including supporting declarations, and the testimony presented and evidence admitted at the Confirmation Hearing.  In connection therewith, the Court takes judicial notice of all of the papers and pleadings filed by the supporters and opponents of the Plan during the course of the proceedings leading to the Confirmation Hearing.  The Court has entered a separate order confirming the Plan for the Subsidiary Debtors and Aliante Debtors (the "Confirmation Order"), and makes the following Findings of Fact and Conclusions of Law in connection therewith.

12.     These Findings of Fact and Conclusions of Law refer to, in summary fashion, numerous provisions of the Plan.  All such descriptions are qualified by the express terms of the Plan, which Plan terms control unless expressly modified in the Confirmation Order.  In addition, the failure to specifically include or discuss any particular provision of the Plan in these Findings of Fact and Conclusions of Law shall not diminish the effectiveness of any such provision, it being the intent of the Court that the Plan shall be confirmed in its entirety, and the Plan is incorporated herein in its entirety by this reference.

13.     Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact. These written Findings of Fact and Conclusions of Law shall also

---

[5]   Unless otherwise specified, all "Section" references are to chapter 11 of Title 11 of the U.S. Code, the "Bankruptcy Code."

1    include any oral findings of fact and conclusions of law made by the Court during or at the

2    conclusion of the Confirmation Hearing in accordance with Bankruptcy Rule 7052, made

3    applicable to these proceedings by Bankruptcy Rule 9014.

4    **II.    FINDINGS OF FACT.**

5           **A.    JURISDICTION AND VENUE.**

6           14.    The Debtors commenced their respective Chapter 11 Cases by filing voluntary

7    petitions for relief under chapter 11.  Each of the Debtors has its principal place of business or

8    principal assets in Nevada.

9           **B.    COMPLIANCE WITH THE REQUIREMENTS OF
10                  SECTION 1129 OF THE BANKRUPTCY CODE.**

11                 **1.    Section 1129(a)(1) – Compliance of the Plan
12                         with Applicable Provisions of the Bankruptcy Code.**

13          15.    The Plan complies with all applicable provisions of the Bankruptcy Code, as

14    required by Section 1129(a)(1), including Sections 1122 and 1123.

15                 **a.    Sections 1122 and 1123(a)(1)-(4) – Classification
16                         and Treatment of Claims and Equity Interests.**

17          16.    In accordance with the requirements of Sections 1122(a) and 1123(a)(1), Article

18    III of the Plan designates Classes of Claims and Equity Interests, other than Administrative

19    Claims and Priority Tax Claims (pursuant to Section 1123(a)(1), classes of Administrative

20    Claims and Priority Tax Claims are not required to be classified).  In accordance with the

21    requirements of  Section 1122(a), each Class of Claims and Equity Interests contains only

22    Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests

23    within that Class.  The Plan designates 134 Classes of Claims and 30 Classes of Equity Interests

24    for the Subsidiary Debtors and Aliante Debtors.  Such classification is proper under Section

25    1122(a) because such Claims and Equity Interests have differing rights among each other and

26    against the Debtors' assets or differing interests in the Debtors.  Valid business, factual and legal

27    reasons exist for classifying the various Classes of Claims and Equity Interests in the manner set

28    forth in the Plan.

#4827-8452-4809

17.     In accordance with the requirements of Sections 1123(a)(2) and 1123(a)(3),

Article III of the Plan specifies all Classes of Claims and Equity Interests that are not impaired

under the Plan and specifies the treatment of all Classes of Claims and Equity Interests that are

impaired under the Plan.  Consistent with Section 1123(a)(4), Article III of the Plan also

provides the same treatment for each Claim or Equity Interest within a particular Class, unless

the Holder of a Claim or Equity Interest agrees to less favorable treatment of its Claim or Equity

Interest.

**b.      Section 1123(a)(5) – Adequate Means
for Implementation of the Plan.**

18.     Article V and certain other of the provisions of the Plan contain the principal

means for the Plan's implementation.  Those provisions relate to, among other things, the

conveyances, assignments, transfers and deliveries of the New Opco Acquired Assets, New

Propco Acquired Assets, Landco Assets, Aliante Holdings Assets[6] and the Transferred Aliante

Hotel Assets to the applicable Transferee Parties, pursuant to the Plan and the Restructuring

Transactions.  All references herein to the "Restructuring Transactions" means the transactions

contemplated by the New Opco Purchase Agreement,[7] New Opco Implementation Agreements,

Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and

Restated Operating Agreement for NP IP Holdings LLC, the New Aliante Transaction

Agreements and the other Plan implementation agreements, documents and instruments referred

to in Article V of the Plan or otherwise contained in the Plan, or executed and delivered to

implement the transactions contemplated under the Plan.  The Persons and Entities receiving the

New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings

Assets and the Transferred Aliante Hotel Assets pursuant to the Restructuring Transactions,

---

[6]  "Aliante Holdings Assets" means all the assets of Aliante Debtor Aliante Holding, LLC other than the Transferred Aliante Hotel Assets and the Equity Interests in Aliante Gaming.

[7]  As used herein, the "New Opco Purchase Agreement" means the Asset Purchase Agreement dated June 7, 2010, by and among the Sellers (as defined therein) and FG Opco Acquisitions LLC, a newly formed Nevada limited liability company, as amended, supplemented or otherwise modified from time to time, a form of which was filed with the Bankruptcy Court on May 25, 2010 (docket no. 1526) and was approved by the SCI Confirmation Order, and under the definition set forth in the SCI Plan is also known as the "New Propco Purchase Agreement."

together with such Persons' and Entities' Subsidiaries, designees, Affiliates and other Related Persons, are hereinafter referred to individually as a "<u>Transferee Party</u>" and collectively as the "<u>Transferee Parties</u>."

19.    The Restructuring Transactions carry out several of the methods for implementing a chapter 11 plan expressly provided for in Section 1123(a)(5): Section 1123(A)(5)(B) (transfer of all or any part of the property of the estate to one or more entities); Section 1123(a)(5)(D) (sale of property of the estate, and distribution of other property of the estate to the holders of interests in such property); Section 1123(a)(5)(E) (satisfaction or modification of liens); Section 1123(a)(5)(F) (cancellation of indentures and similar instruments); Section 1123(a)(5)(J) (issuance of securities by entities receiving property of the estate in exchange for claims against the Debtors).

### i.    The Sale of the Subsidiary Debtors' Assets

20.    On June 4, 2010, in the SCI Cases, the Court entered its "Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially all of the Assets of Station Casinos Inc. and Certain 'Opco' Subsidiaries" (the "<u>Bidding Procedures Order</u>") (docket no. 1563).  Pursuant to the Bidding Procedures Order, the Court, among other things, (a) authorized the SCI Debtors to conduct a process for the marketing and sale of substantially all of the SCI Debtors' Opco business and certain related assets (the "<u>New Opco Acquired Assets</u>," which, for the avoidance of doubt, includes the New Propco Purchased Assets), conduct an auction and select the successful bid, and (b) deemed the Stalking Horse Bidder to be a qualified bidder.  The New Opco Acquired Assets include substantially all of the assets of the Subsidiary Debtors.

21.    The SCI Debtors provided notice of the auction and Bidding Procedures to: (a) the Office of the United States Trustee; (b) the Official Committee of Unsecured Creditors in the SCI Cases (the "<u>SCI Official Creditors Committee</u>"); (c) the Nevada Gaming Commission; (d) all (i) creditors of the SCI Debtors as defined in Section 101(1); (ii) entities known to the SCI Debtors to possess and/or exercise any control over any of the New Opco Acquired Assets; (iii) entities known to the SCI Debtors to assert any rights in any of the New Opco Acquired

Assets; (iv) parties in interest and other entities and persons so entitled and known to the SCI Debtors; (v) parties to the proposed Assumed Contracts (which included parties to all of the contracts and leases that the Subsidiary Debtors intend to assume and assign); (vi) applicable federal, state and local tax authorities with jurisdiction over the SCI Debtors or the New Opco Acquired Assets, including the Internal Revenue Service; (vii) federal, state and local environmental authorities in jurisdictions in which the SCI Debtors operate their businesses or in which the New Opco Acquired Assets are located; and (viii) any known party which has expressed a bona fide interest in writing to the SCI Debtors regarding any purchase of the New Opco Acquired Assets.

22.    Pursuant to the "Order, Pursuant to 11 U.S.C. §§ 327(a) and 328(a), and Fed. R. Bankr. P. 2014, Authorizing Employment and Retention of Lazard Freres & Co. LLC ("Lazard") as Financial Advisor and Investment Banker for the [SCI] Debtors," entered on September 18, 2009 (docket no. 326), the Court authorized the SCI Debtors to utilize the services of Lazard to market for sale the New Opco Acquired Assets.  The marketing of the New Opco Acquired Assets took place over a several month period.  Notice of the Auction and the Bidding Procedures Order was published in the Las Vegas Review-Journal, the Wall St. Journal, and the Financial Times.  Lazard contacted seventy nine potential bidders, and received expressions of interest from thirty nine potential bidders; and twenty six potential bidders signed confidentiality agreements and received a package of preliminary due diligence information.  Of those initial twenty six parties conducting due diligence, eight signed Letters of Intent that entitled them to additional, more comprehensive due diligence.  *See* "Status Report of Dr. James E. Nave, Independent Director, Regarding Compliance with Auction Procedures and Resulting Bids with Respect to the Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries," filed August 5, 2010 (docket no. 1885) (the "Nave Report"), at ¶¶ 3-6.  Dr. Nave was the independent director of SCI tasked with overseeing the Sale Process.

23. The SCI Debtors, under the direction of Dr. Nave and in consultation with the Consultation Parties,[8] determined that six of the Letters of Intent signatories satisfied the requirements to be Qualified Bidders (not including the Stalking Horse Bidder). However, by the July 30, 2010 deadline under the Bidding Procedures for receipt of Qualified Bids, the Debtors had received only one Qualified Bid, that of the Stalking Horse Bidder. As a result, there was no auction. Nave Report at ¶¶ 7-10.

24. Daniel Aronson, a Managing Director at Lazard, filed a Declaration in support of the Nave Report (docket no. 1886) (the "Aronson Sale Process Report"). Aronson has worked as restructuring professional for twenty two years, and has headed up Lazard's efforts as financial advisor and investment banker for the SCI Debtors. In addition to confirming the facts in the Nave Report, Aronson noted that the process of the selection of the Stalking Horse Bid resulted in an increase of more than $135 million in the proposed purchase price. Aronson Sale Process Report at ¶ 9.

25. Aronson reported that Lazard's efforts were especially focused on ensuring a level playing field for all bidders, including in particular potential bidder Boyd Gaming. He opined that the Bidding Procedures approved by the Court provided an open and level playing field for all potential bidders, and the Sale Process provided fair and open access to all reasonable due diligence materials. Aronson noted that, following Court approval of the Bidding Procedures, no bidder voiced any complaint about the Bidding Procedures, or requested that the Debtors deviate from or modify the Bidding Procedures. He concluded that the Stalking Horse Bid was the highest and best bid for the New Opco Acquired Assets. Aronson Sale Process Report at ¶¶ 15-19.

26. At a hearing on August 6, 2010, the date the auction had been scheduled for, the SCI Debtors reported that the Stalking Horse Bid was the prevailing bid, and that the purchaser would be the Stalking Horse Bidder FG Opco Acquisition LLC (the "New Opco Purchaser"), an entity that is a subsidiary of New Propco (New Opco Purchaser and the other New Propco

---

[8] The Consultation Parties were the Administrative Agent under the Prepetition Opco Credit Agreement, the steering committee of lenders under the Prepetition Opco Credit Agreement, and the SCI Official Creditors Committee. *See* Aronson Sale Process Report, *infra*, at p.4, fn. 2.

subsidiaries receiving the New Opco Acquired Assets, collectively, "New Opco").  On August 9, 2010, the Court entered its "Order Closing Auction and Designating Successful Bid With Respect to Order Establishing Bidding Procedures and Deadlines Related to Sale Process For Substantially All of the Assets of Station Casinos, Inc. and Certain 'Opco' Subsidiaries" (docket no. 1909), in which it designated New Opco Purchaser as the Successful Bidder.

27.    The transfer of the New Opco Acquired Assets, Landco Assets and New Propco Acquired Assets pursuant to the terms of the New Opco Purchase Agreement was approved in the Court's order approving the SCI Plan.  The Subsidiary Debtors are parties to the New Opco Purchase Agreement.  Pursuant to the Plan, on the Subsidiary Debtors Effective Date, the Subsidiary Debtors will assume the New Opco Purchase Agreement and effect the transfer of their assets to the applicable Transferee Parties, free and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts[9] or other interests, and New Opco Purchaser will pay the consideration as required under the New Opco Purchase Agreement.

28.    Article V.B. of the Plan contains the principal means for the implementation of the Plan and Restructuring Transactions with respect to the Subsidiary Debtors.  Those provisions include, among other things (all as more particularly described in, and subject to the terms of, the Plan):

(a)  the assumption of the New Opco Purchase Agreement by the Subsidiary Debtors;

(b)  the formation of the New Opco and New Propco entities;

(c)  the transfer of the Master Lease Collateral to Propco;

(d)  the transfer of the Landco Assets to the designee of the Land Loan Lenders;

(e)  the transfer of the New Propco Transferred Assets from Propco to the New Propco entities;

(f)  the transfer of the New Propco Purchased Assets from the Opco entities to the New Propco entities;

---

[9]  As used herein and in the Confirmation Order, "Other Debts" means Liens, Claims, Equity Interests, encumbrances charges or other interests, whether presently known or unknown, in any way relating to or arising from: (a) the operations of the Debtors prior to the Effective Date; or (b) consummation of the Plan, the Restructuring Transactions or any other transactions consummated in accordance with the Plan.

(g)  the transfer of the New Opco Acquired Assets to New Opco Purchaser;

(h)  the New Propco Transactions in connection with Receipt of New Propco Acquired Assets, including the New Propco Implementation Agreements;

(h)  the employment of Subsidiary Debtors' employees by New Propco and the general terms thereof;

(i)  the New Opco Transactions in connection with receipt of the New Opco Acquired Assets;

(j)  the effectiveness of the New Opco Credit Agreement;

(k)  certain modifications to the Second Amended and Restated Master Lease; and Compromise Agreement (2nd Revised).

29.    NP IP Holdings LLC (IP Holdco") is an affiliate of New Opco Purchaser that will own certain of the intellectual property necessary for the operation of the businesses of New Opco and New Propco, and which will license certain of such intellectual property to the affiliates operating those businesses.  Pursuant to the agreement of the parties contemplated to become members of IP Holdco, and as part and parcel of the Restructuring Transactions, the Confirmation Order shall specifically affirm certain of the provisions of the Amended and Restated Operating Agreement for IP Holdco without diminishing the effectiveness of enforceability of any other provisions thereof.

**(ii)    The Restructuring of Aliante Gaming**

30.    Starting in May 2010, Aliante Gaming undertook a thorough canvassing of the market and solicited bids from both (i) potential purchasers of substantially all of Aliante Gaming's assets and (ii) parties to replace SCI as manager of Aliante Gaming's business should the restructuring proceed on a "standalone" basis (whereby the lenders would exchange their outstanding Claims for equity and select managers of the process). The Aliante Transaction Committee oversaw the marketing process with support from its advisors and analyzed all bids. Throughout May and June 2010, Oppenheimer & Co., Inc., financial advisor and investment banker to Aliante Gaming, contacted over 70 parties with a potential interest in owning or managing Aliante Gaming's assets. Twenty-five of those parties entered into confidentiality

1   agreements and received the first-round bid package, which consisted of a confidential

2   information memorandum and other materials, as well as access to an on-line due diligence data

3   room. From this group, 13 parties submitted preliminary letters of interest ("LOIs") for the

4   acquisition or management of Aliante Gaming's assets, including five acquisition and 12

5   management proposals.

6          31.    Each of the five acquisition LOIs reflected an offer far below the outstanding

7   amount of the Lenders' secured debt.  In addition, all of the bids contained a portion of take-back

8   financing, which certain of the Lenders advised was unacceptable.  In light of the proposals,

9   certain significant Lenders informed the advisors to the Aliante Transaction Committee that they

10  no longer supported the sale process.  Thereafter, the Aliante Debtors ceased their marketing

11  efforts and instead proceeded with negotiating a standalone plan whereby the Aliante Lenders

12  would assume ownership of Aliante Gaming's assets.

13         32.    The Aliante Debtors then engaged in negotiations with the Aliante Lenders

14  regarding a restructuring transaction whereby the Aliante Lenders would acquire the assets

15  and/or equity of Aliante Gaming on account of their senior secured indebtedness.  During this

16  time, the Aliante Lenders also engaged in negotiations with Fertitta Entertainment regarding the

17  terms pursuant to which an affiliate of Fertitta Entertainment would manage Aliante Gaming on

18  an interim or transitional basis.  These negotiations culminated in an agreement to enter into a

19  series of restructuring transactions pursuant to which the Aliante Lenders would receive new

20  equity and new debt of Reorganized Aliante Gaming, with management services to be provided

21  by Fertitta Entertainment, all of which is described in more detail in the Plan and Disclosure

22  Statement.

23         33.    Article V.C. of the Plan contains the principal means for the implementation of

24  the Plan with respect to the Aliante Debtors.  Those provisions include, among other things, that

25  prior to or on the Effective Date, as applicable:

26         (a)    ALST Casino Holdco will be formed.  The ALST Casino Holdco

27  Operating Agreement will be adopted, and will, among other things, (i) establish the terms and

28  rights of the ALST Casino Holdco Equity, (ii) establish certain restrictions on the transfer of

ALST Casino Holdco Equity, (iii) provide for certain rights and obligations of holders of ALST

Casino Holdco Equity, (iv) provide for the preparation and filing with any state or federal

regulatory authority (or withdrawal of) any documents that the Required Aliante Consenting

Lenders deem necessary or appropriate in connection with establishing ALST Casino Holdco as

a "publicly traded company" within the meaning of the Nevada Revised Statutes, including,

without limitation, any Form 10-K, Form 10-Q, Form 8-K, and other documents or amendments

thereto to comply with the United States Securities Exchange Act of 1934, as amended, and (v)

include such other provisions as may be necessary or appropriate to establish ALST Casino

Holdco as a "publicly traded company" under Section 463.487 of the Nevada Revised Statutes.

(b)     The Registration Rights Agreement will be entered into.

(c)     ALST Casino Holdco will authorize and issue ALST Casino Holdco

Equity for distribution to the Holders of Allowed Class AGL.1 Claims (or their respective

designee(s)).  Each Holder of an Allowed Class AGL.1 Claim (or its designee) will receive its

*Pro Rata* share of 100% of the ALST Casino Holdco Equity.

(d)     Reorganized Aliante Gaming will enter into the Amended Aliante Gaming

Operating Agreement, which will amend the Aliante Operating Agreement to, among other

things, establish Reorganized Aliante Gaming as a single member limited liability company and

identify ALST Casino Holdco as its sole member.

(e)     Reorganized Aliante Gaming will authorize and issue the New Aliante

Equity for distribution in accordance with the Plan.

(f)     The following transactions will be deemed to have occurred in the

following order: (i) each Holder of an Allowed Class AGL.1 Claim shall be deemed to have

exchanged all of its Allowed Class AGL.1 Claim for its Pro Rata  share of New Aliante Equity

and New Secured Aliante Debt; and (ii) each Holder of New Aliante Equity shall be deemed to

have contributed all such New Aliante Equity to ALST Casino Holdco in exchange for its *Pro

Rata* share of ALST Casino Holdco Equity.

(g)     All of the Transferred Aliante Hotel Assets shall be conveyed, assigned, transferred and delivered to Reorganized Aliante Gaming in accordance with a transfer agreement to be negotiated and agreed to by and among the relevant parties.

(h)     All property of Aliante Gaming and all of the Transferred Aliante Hotel Assets shall vest in Reorganized Aliante Gaming free and clear of all Liens, Claims, charges, encumbrances, or other interests, except as provided in the Plan.

(i)     Fertitta Entertainment and Reorganized Aliante will enter into the New Aliante Management Agreement.

(j)     As more fully described in the Plan, the Debtors or SCI Debtors that either provide goods and services to Aliante Gaming or are party to contracts with third party vendors for the provision of goods and services to Aliante Gaming, will use (and will cause their respective Affiliates and Subsidiaries to use) commercially reasonable efforts, subject to the terms and conditions described in the Plan, to ensure that such goods and services continue to be available to Reorganized Aliante Gaming, either from the same source and on the same terms as made available pre-petition, or by assisting in negotiating new agreements with third party vendors.

(k)     Prepetition instruments evidencing Claims and Equity Interests against the Aliante Debtors will be cancelled.

(l)     Aliante Holding, LLC ("Aliante Holding") and Aliante Station, LLC ("Aliante Station") will be dissolved, provided that in no event will Aliante Holding, LLC be wound down or dissolved before the Effective Date with respect to Aliante Gaming, LLC.

34.     The Debtors have articulated good and sufficient legal and business reasons that justify approving the Restructuring Transactions.  Such reasons include that the New Opco Purchase Agreement (a) constitutes the highest and best offer for the Subsidiary Debtors' assets, (b) presents the best opportunity to realize the value of the Subsidiary Debtors' assets, and (c) will allow the Subsidiary Debtors to avoid the possible decline and devaluation of such assets in a protracted chapter 11 process.

35.     With respect to Aliante Holding, the Plan provides that Holders of General Unsecured Claims will not receive any distribution on account of their Claims and that Holders of Equity Interests will receive the Aliante Holdings Assets.  The two Holders of Equity Interests of Aliante Holdings (one of which is Aliante Station, a wholly-owned subsidiary of SCI), were deemed to accept the Plan pursuant to the Joint Unanimous Written Consent of the Executive Committee, the Member and the Manager of Aliante Gaming dated March 21, 2011.  Aliante Holdings owns Losee Elkhorn Properties, LLC, which owns approximately 60 acres of real property.  The Plan contemplates that the Holders of Equity Interests in Aliante Holdings will receive the ownership of Losee Elkhorn Properties, LLC.  The Aliante Lenders do not have an interest in Losee Elkhorn Properties, LLC, and the Debtors do not believe that there are any General Unsecured Claims against Aliante Holding.

36.     The Debtors' entry into the New Opco Purchase Agreement and consummation of the Restructuring Transactions with respect to the Subsidiary Debtors constitute the Debtors' exercise of sound business judgment.  The sales and related Restructuring Transactions contemplated by the New Opco Purchase Agreement are in the best interests of the Debtors, their estates and creditors and all other parties in interest, and they are supported by each of the applicable Debtors' key creditor constituencies.

37.     The total consideration provided by the New Opco Purchaser for the purchased assets is the highest and best offer received by the Debtors, the consideration is a fair and reasonable price for the purchased assets and constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia  ((a), (b) and (c), individually and collectively, "Value").

38.     New Opco Purchaser would not have entered into the New Opco Purchase Agreement and would not consummate the Restructuring Transactions, thus adversely affecting the Debtors, their estates, and their creditors, if: (a) the transfer of the purchased assets to New Opco Purchaser, including without limitation the Assumed Contracts, were not being transferred

1   free and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other

2   interests; (b) New Opco Purchaser or any of its Related Persons would, or in the future could, be

3   liable for any such Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other

4   interests; or (c) New Opco Purchaser or any of its Related Persons would otherwise be subject to

5   any liability with respect to the operation of the Debtors' businesses on or prior to the Effective

6   Date.  Accordingly, a sale other than one free and clear of all Liens, Claims, Equity Interests,

7   encumbrances, charges, Other Debts or other interests would impact materially and adversely the

8   Debtors' estates, and would yield substantially less value for the Debtors' estates, with less

9   certainty than the sale pursuant to the New Opco Purchase Agreement.  In reaching this

10  determination, the Court has taken into account both the consideration to be realized directly by

11  the Debtors and their creditors, and the indirect benefits of the Restructuring Transactions for the

12  Debtors' employees, the Debtors' vendors and suppliers and the public interest served, directly

13  and indirectly, by the preservation of the value of the New Opco Acquired Assets resulting from

14  the transfer of such assets to the applicable Transferee Parties.

15      39.    There was no evidence of insider influence or improper conduct by any of the

16  Transferee Parties or their Related Persons, or by any other party in interest, in connection with

17  the negotiation of the New Opco Purchase Agreement with the Subsidiary Debtors, in connection

18  with the marketing of the assets, or otherwise in connection with the sale processes.  The

19  Subsidiary Debtors established due diligence rooms in which the information provided to the

20  successful purchasers was also provided to other potential bidders.  There was also no evidence

21  of fraud or collusion among the successful purchaser, its Related Persons and any other bidders

22  for the Subsidiary Debtors' assets, or collusion between the Debtors and the successful purchaser

23  or their respective Related Persons to the detriment of any other bidders, the sale process or the

24  Debtors' estates.

25      40.    The Subsidiary Debtors are entering into the New Opco Purchase Agreement and

26  performing their obligations thereunder and under the other Restructuring Transactions in good

27  faith and with lawful purpose, and have the legal power and authority to convey all of their right,

28  title and interest in and to the New Opco Acquired Assets, New Propco Acquired Assets and

Landco Assets to the applicable Transferee Parties. Each applicable Debtor has: (i) full power and authority to execute the New Opco Purchase Agreement, as amended, and the New Opco Credit Agreement, and all other documents contemplated thereby, and the sales, and incurrence of debt under the New Opco Credit Agreement, have been duly and validly authorized by all necessary company action of each Debtor as applicable; (ii) the necessary power and authority to perform its obligations under the Restructuring Transactions contemplated by the Plan; and (iii) taken all company action necessary to authorize, approve and enter into the New Opco Purchase Agreement and the New Opco Credit Agreement and consummate the Restructuring Transactions contemplated by the Plan. No consents or approvals or further actions, other than those expressly required by the terms of the New Opco Purchase Agreement or in the Schedules thereto (including the Nevada Gaming Commission consent), are required for the Debtors to close the sales and consummate the Restructuring Transactions.

41.     No brokers were involved in consummating the sale or the Restructuring Transactions, and no brokers' commissions are due to any person or entity in connection with the sale or the Restructuring Transactions.

42.     Like the Subsidiary Debtors, Aliante Gaming tested the marketplace for buyers, but was unable to locate a buyer on terms acceptable to the Aliante Lenders. Aliante Gaming and the Aliante Lenders then negotiated the terms of a consensual chapter 11 reorganization, under which the Aliante Lenders will become the owners of Reorganized Aliante Gaming, and the General Unsecured Creditors of Aliante Gaming will be paid in full or their Claims will be Unimpaired. That restructuring has the support of the former equity owners of Aliante Gaming, and effectuates a considerable deleveraging of Aliante Gaming, which bodes well for its long term economic and financial viability.

### c.     Section 1123(a)(6) – Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.

43.     The Subsidiary Debtors are not issuing equity securities, and the purchaser of their assets is not a corporation. ALST Casino Holdco will authorize, issue, and distribute the ALST Casino Holdco and Reorganized Aliante Gaming will authorize and issue the New Aliante

Equity, but neither ALST Casino Holdco nor Reorganized Aliante Gaming are a corporation.

Thus, the Plan complies with the requirements of Section 1123(a)(6).

**d.    Section 1123(a)(7) – Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

44.    The Plan complies with the requirements of Section 1123(a)(7) because, under the

Plan, on, or a soon as practical after, the Effective Date, all boards of directors of the Debtors

will be dissolved and all officers will be dismissed.  In their place, with the exception of Aliante

Gaming, Richard J. Haskins and Thomas M. Friel will be appointed, through the Confirmation

Order, as the Plan Administrators.  With respect to Aliante Gaming, pursuant to the Plan,

Reorganized Aliante Gaming will be a single member limited liability company with ALST

Casino Holdco as its sole member.  The holders of the Aliante Lenders' Allowed Claims will

own all of the equity interests in ALST Casino Holdco and will have the ability to select the

officers and directors of ALST Casino Holdco, subject to any applicable Nevada state gaming

suitability regulations and requirements.  As part of a Plan Supplement, Aliante Gaming filed a

list of proposed officers and directors for ALST Casino Holdco.  As a result, the Plan contains no

provisions with respect to the manner of selection of new officers and directors that is

inconsistent with public policy or the interests of Holders of Claim and Equity Interests.

**e.    Section 1123(b)(1)-(2) – Impairment of Claims and Equity Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.**

45.    In accordance with the requirements of Section 1123(b)(1), Article III of the Plan

impairs or leaves unimpaired, as the case may be, each Class of Claims and Equity Interests.

Consistent with 1123(b)(2), Article VI of the Plan provides for the assumption by the Debtors

and assignment to the applicable Transferee Parties on the Effective Date of certain designated

Executory Contracts and Unexpired Leases, the assumption of certain other Executory Contracts,

and the rejection of all other Executory Contracts and Unexpired Leases, in all cases in

accordance with, and subject to, the provisions and requirements of Sections 365 and 1123.

Accordingly, the Plan satisfies the requirements of Sections 1123(b)(1) and (b)(2).

**f.      Section 1123(b)(3) – Retention, Enforcement
and Settlement of Claims Held by the Debtors.**

46.      As authorized by Section 1123(b)(3), (i) Article X.E. of the Plan provides for the retention by the Debtors or Estate representatives of Causes of Action and Litigation Claims not expressly released or settled under the Plan, and (ii) Articles X.B. and X.C. of the Plan provide for certain settlements and releases.

**g.      Section 1123(b)(4) – Sale of Assets of the Estate.**

47.      Consistent with Section 1123(b)(4), the Plan provides for the sale of substantially all of the Subsidiary Debtors' assets to New Opco Purchaser, and the distribution of the proceeds of the sale to the respective Debtors' creditors in the order of priority of their Claims.

**h.      Section 1123(b)(5) – Modification of
the Rights of Holders of Claims.**

48.      In accordance with the requirements of Section 1123(b)(5), Article III of the Plan modifies, or leaves unaffected, as the case may be, the rights of holders of each Class of Claims. Some Classes of Claims receive payment in full in cash and/or are Unimpaired.  Some Classes of Claims receive cash, others receive cash and secured notes, and others receive equity securities and new secured notes.

**i.      Section 1123(b)(6) – Other Provisions Not Inconsistent
with Applicable Provisions of the Bankruptcy Code.**

49.      The Plan includes additional appropriate implementation provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including: (i) the provisions of Article VII of the Plan governing distributions on account of Allowed Claims; (ii) the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (iii) the provisions of Article X of the Plan regarding the treatment of the provisions of the Plan as a Comprehensive Settlement (as hereinafter defined), releases by the Debtors, voluntary releases by Holders of Claims and Equity Interests, and certain exculpation provisions.

1

### j.    Section 1123(d) – Cure of Defaults.

2       50.    In accordance with the requirements of Section 1123(d), Article VI of the Plan

3  provides for the cure of defaults in respect of all executory contracts and unexpired leases that

4  are being assumed under the Plan and assigned to the applicable Transferee Parties, and requires

5  that such cure payments be made consistent with the requirements of Section 365(b) and 365(c).

6       ### 2.    Section 1129(a)(2) – Compliance with
                   Applicable Provisions of the Bankruptcy Code.
7

8       51.    In accordance with the requirements of Section 1129(a)(2), the Debtors have

9  complied with all applicable provisions of the Bankruptcy Code, including Section 1125 and

10 1126 and Bankruptcy Rules 3016, 3017 and 3018.  Adequate disclosures of the prepetition

11 financial condition of the Debtors and of the terms and purposes of the Restructuring

12 Transactions were made during the course of the SCI Cases, the extensive prepetition marketing

13 of the assets of the respective Debtors, and the Prepetition Solicitation.  The Disclosure

14 Statement contained a detailed description of (a) the business of the Debtors and the terms and

15 purposes of the Restructuring Transactions contemplated under the Plan for the Subsidiary

16 Debtors and Aliante Debtors, (b) the classification and treatment of Claims against and Equity

17 Interests in each of the Debtors under the Plan, and (c) the other principal provisions of the Plan.

18 The Disclosure Statement also discusses certain securities laws, gaming regulations and federal

19 income tax considerations that may be applicable to the transactions contemplated under the Plan

20 and the decisions of Holders of Claims whether to vote to accept or reject the Plan.  Accordingly,

21 the Disclosure Statement distributed in connection with the Prepetition Solicitation contained

22 adequate information as defined in Section 1125(a), and the other materials that were included in

23 the Solicitation Package provided members of the Voting Classes with substantial additional

24 material information.

25       52.    The twenty one day period for voting provided to the members of the Voting

26 Classes for voting on the Plan complied with the requirements of Bankruptcy Rule 3018(b) that

27 the solicitation period not be unreasonably short.  The four days solicitation of consents from the

28 Prepetition Opco Secured Lenders with respect to including TSI as a Subsidiary Debtor was also

1    not unreasonably short under the circumstances.  The Disclosure Statement was filed with the

2    Court on the Petition Date in compliance with Bankruptcy Rule 3016(b).  The Solicitation

3    Packages complied with the requirements of Bankruptcy Rule 3017 regarding the contents of

4    Solicitation Packages, and the Solicitation Procedures by which the Ballots for acceptance or

5    rejection of the Plan, and for consents for the TSI related Plan Modifications, were solicited and

6    tabulated were fair and properly conducted, all in accordance with the requirements of Sections

7    1125 and 1126, and Bankruptcy Rules 3016, 3017 and 3018.  The Debtors and the other

8    Exculpated Parties have acted in good faith within the meaning of Section 1125(e) and are

9    entitled to the benefits thereof.

10    **3.    Section 1129(a)(3) – Proposal of the Plan in Good Faith.**

11    53.    In accordance with the requirements of Section 1129(a)(3), the Debtors proposed

12    the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has

13    been proposed in good faith, the Court has examined the totality of the circumstances

14    surrounding the formulation of the Plan, including the support thereof by the Prepetition Opco

15    Secured Lenders, Mortgage Lenders and the Aliante Lenders.  Based on the record of the

16    Chapter 11 Cases and the evidence presented at the Confirmation Hearing, the Court finds and

17    concludes that the Plan has been proposed with the legitimate and honest purpose of maximizing

18    the returns available to creditors of the Debtors through the marketing and sale of the Subsidiary

19    Debtors' assets for the highest and best price, and the marketing of the Aliante Debtors assets

20    leading to the debt for equity swap that forms the basis of the New Aliante Transaction

21    Agreements.  Moreover, the Plan itself, the arms' length negotiations among the Debtors, the

22    Prepetition Opco Secured Lenders, Mortgage Lenders, Aliante Lenders, New Opco Purchaser

23    and New Propco leading to the Plan's formulation, and the concerted efforts of the Debtors and

24    the new owners of the Debtors' assets to accommodate the liquidity needs of the Debtors'

25    numerous trade creditors during extremely difficult economic times in Nevada provide

26    independent evidence of the Debtors' good faith in proposing the Plan.

27    54.    There is express statutory authority, and ample precedent in numerous confirmed

28    chapter 11 plans for the implementation of the principal Restructuring Transactions under the

#4827-8452-4809

Plan:  Section 1123(a)(5)(D) expressly authorizes a chapter 11 plan to provide for the sale of some or all of property of the estate (Subsidiary Debtors); and Section 1123(a)(5)(J) authorizes a chapter 11 plan to issue securities of a debtor in exchange for claims (Aliante Gaming).  Thus, the Plan falls well within the four corners of settled chapter 11 practice, and, if confirmed, achieves a result consistent with the objectives and purposes of the Bankruptcy Code.

**4.    Section 1129(a)(4) – Bankruptcy Court
Approval of Certain Payments as Reasonable.**

55.    In accordance with the requirements of Section 1129(a)(4), Article II.A.2. of the Plan makes all payments on account of Professional Fee Claims for services rendered on or prior to the Effective Date subject to the requirements of Sections 327, 328, 330, 331, 503(b) and 1103, as applicable, by requiring Professionals to file final fee applications with the Court.  The Court will review the reasonableness of such applications under Sections 328 and 330 and any applicable case law.  Article XI. of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.

**5.    Section 1129(a)(5) – Disclosure of Post-Effective Date
Management of Debtors and Compensation of any Insiders.**

56.    The Plan complies with the requirements of Section 1129(a)(5) because, pursuant to the Plan, the Debtors have proposed and disclosed that Richard J. Haskins and Thomas M. Friel will serve as the Plan Administrators, subject to Court approval, which approval is granted in the Confirmation Order.  None of the non-debtor entities receiving estate assets from the Subsidiary Debtors under the Plan and Restructuring Transactions is a successor to any Debtor or an affiliate of any Debtor participating in a joint plan with the Debtors, therefore Section 1129(a)(5) does not apply to the Transferee Parties.  The Aliante Restructuring Transactions comply with Section 1129(a)(5) because the Plan discloses that Reorganized Aliante Gaming and Fertitta Entertainment will enter into the New Aliante Management Agreement, which will be substantially in the form filed with the Plan Supplement, and, as part of a Plan Supplement, Aliante Gaming filed a list of proposed officers and directors for ALST Casino Holdco.

6.       **Section 1129(a)(6) – Approval of Rate Changes**.

57.    The Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction.  Accordingly, Section 1129(a)(6) does not apply to the Plan.

7.       **Section 1129(a)(7) – Best Interests of Holders of Claims and Equity Interests**.

**58.**    Section 1129(a)(7) requires that the Debtors show that, with respect to each impaired Class of Claims or Equity Interests, each holder of a Claim or Equity Interest in such impaired Class has either (a) accepted or is deemed to have accepted the Plan or, (b) as demonstrated by the Liquidation Analyses included as Exhibits to the Disclosure Statement, will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  Even though no Holder of a Claim or Equity Interest in an impaired Class objected to confirmation of the Plan on the basis that it was not receiving or retaining under the Plan as much as it would receive in a chapter 7 liquidation of the Debtors, the Debtors have nevertheless submitted substantial evidence to show that the Plan complies with Section 1129(a)(7) with respect any such hypothetical objecting Holder.

(a)       **Secured Creditors**

59.    The Liquidation Analysis distributed with the SCI Plan showed that a liquidation of the assets of the Subsidiary Debtors would not be sufficient to satisfy the senior secured claims of the Prepetition Opco Secured Lenders in the approximate allowed amount of at least $882 million, as evidenced by the fact that the purchase price for the Subsidiary Debtors' assets under the New Opco Purchase Agreement ($772 million in cash and secured notes), achieved after a very substantial marketing effort, is approximately $110 million less than the Prepetition Opco Secured Lenders Allowed Claim.  Thus the Liquidation Analysis adequately shows that if the assets of the Subsidiary Debtors were liquidated in a hypothetical chapter 7 case, and even if they were liquidated as going concerns, the net proceeds of the sale could only be less than what

is being achieved under the Plan because, in a chapter 7 liquidation, one would have to factor in the substantial costs associated with: (i) the delay that would be incurred in connection with the appointment of a chapter 7 trustee and the time required for the trustee and his or her professionals to fully understand the Debtors' situations; (ii) the fees payable to a chapter 7 trustee and newly appointed estate professionals; and (iii) the likely discounts that would be realized in one or more chapter 7 auctions of the applicable assets.  Therefore, the secured creditors of the Subsidiary Debtors are receiving under the Plan at least as much as they would under an hypothetical chapter 7 liquidation proceeding.

60.    The Plan also satisfies the requirements of Section 1129(a)(7) with respect to the secured creditors of the Aliante Debtors.  The Aliante Liquidation Analysis shows that the net proceeds of the liquidation of Aliante Gaming would be in the range of $47 to $53 million.  The Aliante Lenders Allowed Claims, which are secured by substantially all of the assets of Aliante Gaming, exceed $377 million.  Under the Plan, Reorganized Aliante Gaming will issue 100% of the equity in Reorganized Aliante Gaming and 100% of the New Secured Aliante Debt to the Aliante Lenders in full satisfaction of the claims of the Aliante Lenders against the Aliante Debtors.  The Aliante Lenders are receiving the full value of their collateral by receiving under the Plan all of the equity and new secured debt of Reorganized Aliante Gaming.  They could not do better in a liquidation, as is evidence by the liquidation value reached in the Liquidation Analysis.

### (b)    Unsecured Creditors

61.    Under the Plan, Holders of General Unsecured Claims against the Subsidiary Debtors and Aliante Gaming are either receiving payment in full or their Claims will be Unimpaired.  In a liquidation scenario they would receive nothing, based upon the Liquidation Analyses discussed above.  Nevertheless, because the best interests of creditors test applies to impaired classes of claims only, the Debtors are not required to demonstrate that the Plan meets the test with respect to the classes of General Unsecured Claims against the Subsidiary Debtors and Aliante Gaming.  With respect to Aliante Holding, the Plan provides that Holders of Equity Interests will receive certain property while Holders of General Unsecured Claims will receive

no distribution. However, there are no Claims against Aliante Holdings and therefore no Holder of a Claim is receiving less than it would receive in a liquidation scenario.

### (c) Equity Interests

62. Holders of Equity Interests in the Subsidiary Debtors, Aliante Station and Aliante Gaming are not receiving or retaining any property under the Plan, and they would not receive anything in a liquidation of any of the Debtors, since all of the proceeds of the liquidations would be paid to the creditors. As a result, the Holders of Equity Interests in the Subsidiary Debtors, Aliante Station and Aliante Gaming are receiving under the Plan at least as much as they would receive in a chapter 7 liquidation, and the Plan satisfies the best interests of creditors test as to them as well.

63. Under the Plan, the Holders of Equity Interests in Aliante Holdings will receive the Aliante Holdings Assets. These assets include the rights to Losee Elkhorn Properties, LLC, which Holders of Equity Interests would likely also recover in a liquidation scenario because there are no General Unsecured Claims against Aliante Holding. The Court finds that, under the circumstances described, such Plan provision also complies with the requirements of Section 1129(a)(7).

64. The Court finds that (a) the methodology used by the Debtors and their financial advisors in estimating the liquidation value of the Debtors, as set forth in the Liquidation Analyses, is reasonable, (b) the Liquidation Analyses were prepared in good faith, and (c) the results of the Liquidation Analyses fall well within the four corners of traditional best interests of creditors analysis. The Court further finds that the Plan complies with the requirements of Section 1129(a)(7) with respect to each Holder of Claims or Equity Interest.

### 8. Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class.

65. As indicated in the Plan and Disclosure Statement:

(a) the following Classes of Unimpaired Claims and Equity Interests were deemed to have accepted the Plan and were not entitled to vote on the Plan – Classes AD.1, AD.2, BS.2, BS.3(b), CH.1, CH.2(b), CS.2, CS.3(b), CVH.2, CVH.3, DS.1, DS.2, FS.2, FS.3(b), FLA.2, FLA.3(b), GR.2, GR.3(b), GVS.2, GVS.3(b), GVRS.2, GVRS.3(b), IS.1,

1    IS.2, LM.2, LM.3(b), LML.1, LML.2(b), MS.2, MS.3(b), PSHC.2, PSHC.3(b), PE.2,

2    PE.3(b), RS.2, RS.3(b), SF.2, SF.3(b), SCDD.1, SL.2, SL.3(b), SH.2, SH.3(b), STN.1,

3    STN.2(b), SS.2, SS.3(b), TS.2, TS.3(b), TCS.1, TCS.2, TA.1, TA.2, TSI.2, TSI.3(b),

4    VH.1, VH.2, AHL.1, AHL.4, ASL.2, AGL.2 and AGL.3;

5           (b) the following Classes of Impaired Claims and Equity Interests are not

6    retaining or receiving any property under the Plan, are therefore deemed to have rejected

7    the Plan, and were not entitled to vote on the Plan – Classes AD.3, AD.4, BS.4, BS.5,

8    CH.3, CH.4, CS.4, CS.5, CVH.4, CVH.5, DS.3, DS.4, FS.4, FS.5, FLA.4, FLA.5, GR.4,

9    GR.5, GVS.4, GVS.5, GVRS.4, GVRS.5, IS.3, IS.4, LM.4, LM.5, LML.3, LML.4, MS.4,

10   MS.5, PSHC.4, PSHC.5, PE.4, PE.5, RS.4, RS.5, SF.4, SF.5, SCDD.2, SCDD.3,

11   SCDD.4, SL.4, SL.5, SH.4, SH.5, STN.3, STN.4, SS.4, SS.5, TS.4, TS.5, TCS.3, TCS.4,

12   TA.3, TA.4, TSI.4, TSI.5, VH.3, VH.4, AHL.2, AHL.3, ASL.3(b), ASL.4, ASL.5,

13   AGL.4 and AGL.5; and

14          (c) the Voting Classes were Classes AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a),

15   CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a),

16   GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a),

17   PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1,

18   SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1, TS.3(a), TSI.1 and TSI.3(a).

19   Based upon the Tabulation of Ballots prepared by the Voting and Claims Agent, all Voting

20   Classes voted to accept the Plan, and no Classes of Claims voted to reject the Plan.

21          66.    The Plan does not comply with the requirement of Section 1129(a)(8) that all

22   impaired Classes of Claims and Equity Interests vote to accept the Plan because Classes of

23   Claims and Equity Interests that receive nothing under the Plan are deemed to have rejected the

24   Plan.  Nevertheless, the Plan is confirmable because, as discussed below, the Plan satisfies the

25   cramdown requirements of Section 1129(b) with respect to all non-accepting Classes.

26

27

28

#4827-8452-4809

9.    **Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

67.    In accordance with the requirements of Section 1129(a)(9), the Plan provides that: (a) with respect to Administrative Claims, on the later of the Effective Date or when an Administrative Claim becomes an Allowed Administrative Claim, the Allowed Administrative Claim shall be paid in cash in the full unpaid Allowed Amount of such Claim, unless the Holder agrees to less favorable treatment; (b) the rights of the Holders of Priority Tax Claims are unaltered under the Plan -- under Section II.B. of the Plan, Holders of Priority Tax Claims will receive, at the election of the Debtors, (i) payment in full in cash of the Allowed amount of such Claim, (ii) less favorable treatment if the Holder agrees, or (iii) installment payments in accordance with the requirements of Sections 1129(a)(9)(C) and (D); and (c) Holders of Allowed Other Priority Claims will receive payment in full in cash of the Allowed amount of such Claim.

10.    **Section 1129(a)(10) – Acceptance by at Least One Impaired Class.**

68.    In accordance with the requirements of Section 1129(a)(10), as indicated in the report of the Voting and Claims Agent and as reflected in the record of the Confirmation Hearing, at least one Class of Claims or Equity Interests that is Impaired under the Plan voted to accept the Plan.  Indeed, all Voting Classes voted to accept the Plan, in each case determined without including any acceptance of the Plan by any insider.  Those Classes of Claims voting to accept the are Classes AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a), CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a), GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a), PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1, SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1 and TS.3(a).

11.    **Section 1129(a)(11) – Feasibility of the Plan.**

69.    The Plan is a liquidating Plan for all of the Debtors except Aliante Gaming.  The record of these Chapter 11 Cases evidences that the parties to the Subsidiary Debtors' Restructuring Transactions have the financial wherewithal and desire to close on the Restructuring Transactions.  Thus, the liquidating aspect of the Plan is feasible.

70.     Under the Plan, the Prepetition Opco Secured Lenders will receive secured notes issued by New Opco.  The SCI Debtors previously filed with Court financial projections for New Opco.  The Subsidiary Debtors assert that the assumptions underlying those financial projections are reasonable, and that New Opco will be able to meet its debt service obligations.  Based upon the New Opco financials and the discussion in the Aronson Declaration with respect thereto, it appears reasonably likely that New Opco will be able to service its debt obligations issued in connection with the Plan.  No contrary evidence was submitted to the Court.

71.     As a result of the debt for equity exchange on which the Aliante Gaming restructuring is based (including the payment in full of the General Unsecured Creditors), Reorganized Aliante Gaming will have a substantially deleveraged capital structure and is projected to be able to operate its business and meet its obligations without the need for further financial reorganization.  The financial projections for Reorganized Aliante Gaming project: (a) increased gross revenues of 4-5% per year through 2014, based upon assumed improvements in the economic conditions in the Las Vegas local market during that period; and (b) EBITDAM of $7.842 million for calendar year 2011, $9.36 million  for calendar year 2012, $11.541 million for calendar year 2013 and $13.872 million for calendar year 2014.  Therefore, given the discharge under the Plan of more than $440 million of secured and unsecured claims against Aliante Gaming, it is reasonable to expect that, as the Reorganized Aliante Gaming financial projections demonstrate, after consummation of the Plan, Reorganized Aliante Gaming will not require further financial reorganization.

72.     Accordingly, the Plan satisfies the requirements of Section 1129(a)(11).

**12.     Section 1129(a)(12) – Payment of Bankruptcy Fees.**

73.     In accordance with the requirements of Section 1129(a)(12), Article XII.A. of the Plan provides that Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash on the Effective Date.  After the Effective Date, the Plan Administrator and Reorganized Aliante Gaming will pay all required fees pursuant to 28 U.S.C. § 1930 or any other statutory requirement and comply with all statutory reporting requirements.

1       **13.    Section 1129(a)(13) – Retiree Benefits.**

2       74.     The Debtors (other than Aliante Gaming) are liquidating, and after the Effective

3    Date will have no obligations regarding any retiree benefits of the kind referred to in Section

4    1114; therefore, Section 1129(a)(13) does not apply to such Debtors.  Aliante Gaming is not a

5    party to any plan, fund or program that provides "retiree benefits" as such term is used in Section

6    1114; therefore, Section 1129(a)(13) does not apply to Reorganized Aliante Gaming.

7       **14.    Section 1129(a)(14), (15) and (16) Do Not Apply.**

8       75.     Sections 1129(a)(14), (15) and (16) address domestic support obligations,

9    individual debtors, and non-moneyed businesses, and they do not apply to the Debtors.

10      **15.    Section 1129(b) – Confirmation of the Plan
11              Over the Nonacceptance of Impaired Classes.**

12      76.     Section 1129(b) authorizes the Court to confirm the Plan even if not all Impaired

13   Classes have accepted the Plan (a "cramdown"), provided that such Plan has been accepted by at

14   least one impaired class and the Plan does not discriminate unfairly and is fair and equitable with

15   respect to each Impaired Class that voted to reject the Plan.  Here, Classes AGL.1, ASL.1,

16   ASL.3(a), BS.1, BS.3(a), CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a),

17   GR.1, GR.3(a), GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1,

18   MS.3(a), PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1,

19   SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1 and TS.3(a), each an Impaired Class of Claims, voted to

20   accept the Plan.  Thus, the requirement that at least one Impaired Class vote to accept the Plan is

21   satisfied.

22      77.     All classes of secured Claims are either Unimpaired and deemed to have accepted

23   the Plan, or Impaired but voted to accept the Plan.  Therefore, the requirements of Section

24   1129(b) do not apply to Classes of secured Claims.  In any event, the Plan expressly complies

25   with the requirements of at least one of the subsections of Section 1129(b)(2)(A) with respect to

26   all Classes of secured Claims.

27      78.     The Plan is fair and equitable with respect to all non-accepting Classes of

28   Unsecured Claims because: (a) each impaired unsecured creditor receives or retains under the

Plan property of a value equal to the amount of its allowed Claim; or (b) the holders of any Claims (or Equity Interests) that are junior to the non-accepting Class will not receive any property under the Plan (the "absolute priority rule").  The Plan strictly adheres to the absolute priority rule for each Subsidiary Debtor, Aliante Station and Aliante Gaming, and nowhere does the Plan provide for distributions to the holders of any Claims or Equity Interests that are junior to any non-accepting Class of Claims of such Debtors.  The Plan permits Holders of Equity Interests of Aliante Holdings to receive a distribution while Holders of General Unsecured Claims receive no value; however, there are no Claims against Aliante Holding, and therefore, that class can be disregarded for cramdown purposes.

79.    The Plan is fair and equitable with respect to all non-accepting Classes of Equity Interests because: (a) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest; or (b) the holder of an interest that is junior to the Non-Accepting Class will not receive or retain any property under the Plan.

80.    The Plan does not discriminate unfairly with respect to any Non-Accepting Class because the value of the cash and/or securities to be distributed to each Class under the Plan is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the non-accepting Class.  Exact parity is not required.  The Court finds that any discrepancy in treatment or potential distributions to unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.  Accordingly, the Plan may be confirmed under Section 1129(b).

### 16.    Bankruptcy Rule 3016(a).

81.    In accordance with the requirements of Bankruptcy Rule 3016(a), the Plan is dated and identifies the entities submitting the Plan.

**17.**     **Section 1129(d) – Purpose of Plan.**

82.     No allegation was made during the course of the Chapter 11 Cases that the primary purpose of the Plan was avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and no objection was filed by any Governmental Unit asserting any such avoidance.  Based upon a review of the record of the Chapter 11 Cases, the Court finds no evidence of any intent to avoid payment of taxes or the requirements of Section 5 of the Securities Act.  The Plan and Disclosure Statement, which  were filed with the Court upon the commencement of the Chapter 11 Cases, provide adequate notice to all Persons and Entities, including the Internal Revenue Service, the U.S. Securities and Exchange Commission and other applicable Governmental Units of the intent of the Plan to cause the issuance of securities exempt from registration requirements under applicable state and federal securities laws, and the Disclosure Statement provides adequate notice of the federal income tax consequences of the Plan for the Debtors and certain Holders of Claims and Equity Interests.

**C.**     **SETTLEMENTS, RELEASES, EXCULPATIONS AND INJUNCTIONS.**

83.     The settlement, release and exculpation provisions set forth in Article X of the Plan are made in exchange for consideration, and are: (a) the result of a carefully-negotiated good-faith settlement among the Debtors and their major stakeholders; (b) meant to provide relief from future litigation and the prospect of future litigation that would have substantially derailed the Debtors' restructuring efforts; (c) fair and necessary for successful Plan confirmation; and (d) supported by creditors holding billions of dollars in allowed undisputed secured Claims that will be impaired under the Plan.  In connection with the Confirmation Hearing, no party in interest filed an objection to Article X of the Plan, which also provides for an injunction in support of the settlements, releases and exculpations contained therein.

**1.**     **Article X.B.1. of the Plan – The Comprehensive Settlement of Claims and Controversies**

84.     Article X.B.1. of the Plan provides that the Plan constitutes a general comprehensive settlement (the "Comprehensive Settlement") of all Claims, Litigation Claims, Causes of Action and controversies relating to (a) the rights that Holders of Claims or Equity

Interests may have with respect to any Claim or Equity Interest against any Debtors, (b) the

distributions, if any, made under the Plan on account of such Claims and Equity Interests, and

(c) any Claims or Causes of Action of any party arising out of or relating to the Going Private

Transaction and the Aliante Prepetition Transactions, and all transactions relating thereto.  The

Comprehensive Settlement is a fundamental component of the overall restructuring contained in

the Plan because it assures the Debtors and the Estates that the Plan and the distributions made

thereunder will result in the final settlement and satisfaction of the various Claims against and

Equity Interests in the Debtors.  The Comprehensive Settlement promotes the finality of the Plan

and repose.  No party in interest objected to the Comprehensive Settlement.  The Court finds that

the Comprehensive Settlement is in the best interests of Holders of Claims and Equity Interests

and the Debtors and their respective Estates and property, and is fair and equitable, and any

distributions to be made pursuant to the Plan shall be deemed to have been made on account of

the Comprehensive Settlement and in consideration thereof.

> **2.      Article X.B.2. of the Plan - The Global Settlement**
> **of the Going Private Transaction Causes of Action**
> **and Aliante Prepetition Transactions Causes of Action**

85.      Article X.B.2 of the Plan implements the Global Settlement, which provides for

the compromise and settlement of: (a) all of the Going Private Transaction Causes of Action

among the Debtors and the SCI Debtors and their respective Estates, and any Person, Entity or

Governmental Unit; and (b) all of the Aliante Prepetition Transactions Causes of Action among

the Aliante Debtors and their respective Estates, and any Person, Entity or Governmental Unit.

Pursuant to the Article X.B.2 of the Plan, (x) all distributions made under the Plan are on account

of and in consideration of the Global Settlement, and (y) the Global Settlement is binding on the

Debtors and their Estates and on all Creditors who indicate on their Ballot their agreement to

grant the releases provided for in Article X of the  Plan.  Article X.C.1., in turn, provides for a

release of the Going Private Transaction Causes of Action and Aliante Prepetition Transactions

Causes of Action by the Releasing Parties, which Releasing Parties includes the Debtors, their

Estates and any Holder of a Claim or Equity Interest that would have been able to assert the

1   Going Private Transaction Causes of Action or the Aliante Prepetition Transactions Causes of

2   Action for or on behalf of the Debtors or their Estates.  In connection with the Confirmation

3   Hearing, no party in interest has objected to the Global Settlement.

4                    (a)      **The Going Private Transaction**

5          86.     As defined in the Plan, and discussed in greater detail in the Disclosure Statement

6   distributed with the SCI Plan (which was distributed in the Prepetition Solicitation Package), the

7   Going Private Transaction means the buy-out transaction that occurred in November of 2007,

8   pursuant to which, among other things, SCI was acquired by virtue of a merger of FCP

9   Acquisition Sub with and into SCI, with SCI continuing as the surviving corporation, and the

10  sale-and-leaseback transaction with respect to the Propco Properties was consummated.  In

11  March 2009, prior to the commencement of the SCI Cases, SCI's Board of Directors authorized

12  the formation of an independent Special Litigation Committee (the "SLC") to investigate and

13  report to the Board regarding whether SCI had colorable claims that could be brought against

14  lenders, former stockholders or others, in connection with the 2007 Going Private Transaction.

15  The SLC filed its findings with the Court on September 22, 2009 (docket no 353) (the "SLC

16  Report").  The SLC determined that:

17      i.      The financial projections for the 2007 Going Private Transaction were reasonable
                when made and were not unduly optimistic or overly aggressive.
18

19      ii.     SCI was not insolvent at the time of the Going Private Transaction and did not
                become insolvent as a result of the Going Private Transaction.
20

21      iii.    SCI was not left with unreasonably small capital.

22      iv.     SCI did not intend or expect to incur debts beyond its ability to pay those debts as
                they matured.
23

24      v.      No person or entity intended to nor believed the Going Private Transaction would
                defraud, hinder, or delay a creditor of SCI.

25      vi.     The participants in the Going Private Transaction had a good faith belief that the
26              Going Private Transaction would succeed and that SCI would enjoy continued
                growth.
27

28      vii.    No person or entity engaged in inequitable conduct in connection with the Going
                Private Transaction.

#4827-8452-4809                          -33-

87.     On December 18, 2009, the SLC filed its Supplemental SLC Report (docket no. 721).  In the Supplemental SLC Report, the SLC concluded that the Master Lease[10] was a true lease, not a disguised financing, and that any litigation seeking to recharacterize the Master Lease as disguised secured financing would be unsuccessful and a waste of estate resources.

88.     On August 27, 2010, the Court entered its order confirming the SCI Plan.  In the Court's findings of fact and conclusions of law, the Court found that the settlement and release of the Going Private Causes of Action pursuant to the SCI Plan was fair and equitable and an appropriate provision of the SCI Plan.

### (b)      The Aliante Prepetition Transactions

89.     The Aliante Prepetition Transactions refer to the negotiation, formulation, entry, performance and/or lack of performance of, and/or any transactions arising from or pertaining to, the Aliante Credit Agreement, the Aliante Security Agreement, the Aliante Swap Agreement, the Aliante Deed of Trust, Aliante Collateral Assignment, Aliante Trademark Collateral Assignment, Aliante Holdings Pledge Agreement, the formation of Aliante Debtors, the Aliante Operating Agreement, and the actions taken by the Aliante Transaction Committee.  No such potential Aliante Prepetition Transactions Causes of Action were described in the Disclosure Statement. Nevertheless, the Aliante Debtors determined that it was in the best interests of the chapter 11 restructuring of Aliante Gaming that Reorganized Aliante Gaming not be encumbered by any uncertainty regarding these potential Causes of Action and that the Plan should include a compromise, settlement and release of all Aliante Prepetition Transactions Causes of Action.

90.     Based in part, and among other things, upon the reports of the various investigative committees discussed above, it was a reasonable exercise of the Debtors' business

---

[10]   The Master Lease (as discussed in the Disclosure Statement and in numerous pleadings filed with the Court in connection with Court approved amendments to the Master Lease) is between SCI Debtor Propco as landlord and Debtor SCI as tenant, and was entered into at the same time as the Going Private Transaction.  Under the Master Lease, SCI leases the real property and improvements associated with Boulder Station Hotel & Casino, Red Rock Casino Resort Spa, Palace Station Hotel & Casino and Sunset Station Hotel & Casino (collectively, the "Leased Hotels").  The Leased Hotels, in turn, are operated by SCI and certain of its non-debtor operating subsidiaries.  The Master Lease provides for monthly rental payments from SCI to Propco in amounts that exceed the amounts that Propco requires to meet its ordinary debt service obligations and any other expenses not covered by SCI under the "triple net" provisions of the Master Lease.

1    judgment to propose a chapter 11 plan that avoids the years of delay in effectuating a

2    restructuring that would be caused by launching litigation based upon any of the Going Private

3    Transaction Causes of Action or Aliante Prepetition Transactions Causes of Action.  Among

4    other things, the SLC Report and the Supplemental SLC Report demonstrate that any party

5    attempting to pursue any of the Causes of Action considered by those committees would face

6    significant legal and factual obstacles.  In addition, it is unclear what benefit, if any, the Estates

7    would obtain from the pursuit of any such claims.  When compared to the benefits received by

8    the Estates from the consensual restructuring that will be effectuated under the Plan, including

9    benefits from the contributions of the Released Parties thereto, the likelihood of success in any

10   litigation regarding the Causes of Action is sufficiently low to justify the release of the Going

11   Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action, on

12   the terms and conditions set forth in the Plan, as being fair and equitable.

13       91.    The Court has also considered the fact that litigation regarding the Going Private

14   Transaction and Aliante Prepetition Transactions would be extremely complex litigation,

15   extremely costly litigation, and the delay attendant to such litigation could put a serious damper

16   on the ability of the Debtors to ever obtain the benefits of chapter 11.  Thus it is not surprising

17   that the Debtors' principal creditor constituencies support the Plan and the release of the Going

18   Private Transaction Causes of Action and Aliante Prepetition Transactions Causes of Action.

19   Based upon their contribution, the SLC and their respective members and agents (including

20   attorneys and financial advisors) are entitled to be included in the Plan definitions of Released

21   Parties and Exculpated Parties.

### 3. Article X.C. of the Plan – Releases Among Releasing Parties and Released Parties.

24       92.    Article X.C. of the Plan provides for certain releases.  The releases are (a) releases

25   of claims held by the Debtors and their Estates (Article X.C.1.) against the identified released

26   parties, to the fullest extent permissible under applicable law, and (b) voluntary releases of

27   claims held by Holders of Claims and Equity Interests against the identified released parties, to

28   the fullest extent permissible under applicable law (Article X.C.2.).

93.    <u>The Debtors' Release</u>.  Article X.C.1. of the Plan provides that, upon the Effective

Date, to the fullest extent permissible under applicable law, and subject to certain identified

exceptions, the Debtors, the Debtors' Estates and each of their respective Related Persons fully

releases and discharges each of the following parties and their respective properties and Related

Persons from any and all claims and causes of action, Avoidance Actions and Other Debts

(including, without limitation, the Going Private Transaction Causes of Action and the Aliante

Prepetition Transactions Causes of Action) based upon any act, omission or event that takes

place on or prior to the Effective Date and arises from or is related to the Debtors, the

Reorganized Debtors or their respective assets, property, Estates, the Chapter 11 Cases, the

Disclosure Statement, the Plan or the solicitation of votes on the Plan that either the releasing

parties could assert or that any Holder of a Claim or Equity Interest could assert for or on behalf

of the Debtors or their Estates (whether directly or derivatively): (a) the Subsidiary Debtors and

their respective Estates; (b) the SCI Debtors and their respective Estates; (c) Fertitta

Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco; (g) Voteco;

(h) the Plan Administrators, solely in their capacity as such; (i) the Mortgage Lenders, solely in

their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as such; (k) the Land

Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders, solely in their capacity

as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its capacity as such; (o) the

Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (p)

Colony Capital, LLC;  (q) the Settling Lenders, but only if all of the applicable terms and

conditions of the Settling Lenders Stipulation are satisfied by the Settling Lenders; (r) the SCI

Committee and its members, provided that the Committee Plan Support Stipulation (as defined in

the SCI Plan) has not been terminated as of the Subsidiary Debtors Effective Date; (s) the Put

Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not

been terminated as of the Subsidiary Debtors Effective Date; (t) the Aliante Debtors and their

respective Estates; (u) Reorganized Aliante Gaming; (v) the Aliante Lenders, solely in their

capacities as Aliante Lenders and each and every Person or entity, including without limitation, a

Registered Intermediary Company, designated by any Aliante Lender to receive all or any part of

the Distribution in respect of such Aliante Lenders' Allowed Class AGL.1 Claim; (w) the Aliante Administrative Agent solely in its capacity as such; (x) the Aliante Transaction Committee and its members, solely in their capacities as such; (y) the Executive Committee of Aliante Gaming and its members, solely in their capacities as such; (z) ALST Casino Holdco; (aa) the respective Related Persons of each of the foregoing Entities identified in subsections (a) through (aa) (as defined in the Plan, the "Released Parties") (the "Debtors' Release").

94.    The Debtors' Release reflects a sound exercise of the Debtors' business judgment. In order to effectively implement the Plan, the non-Debtor parties thereto need assurance that they will not be subject to any further liability to the Debtors, their Estates, or any party that seeks to bring a claim on behalf of the Debtors or their Estates.  Absent the Debtors' Release, it is likely that the various Released Parties would not commit to support the Plan because they would remain exposed to potential claims and causes of action.

95.    The Third Party Release.  Article X.C.2. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, each Holder of a Claim or Equity Interest that has indicated on its Ballot its agreement to grant the release contained in Article X.C.2 fully releases and discharges  each of the Released Parties from any and all claims and causes of action, Avoidance Actions and Other Debts (including, without limitation, the Going Private Transaction Causes of Action and the Aliante Prepetition Transactions Causes of Action) based on any act, omission or event that takes place on or before the Effective Date in any way relating or pertaining to (a) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (b) the Debtors, the Reorganized Debtors or their respective assets, property and Estates, (c) the Chapter 11 Cases, (d) the negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other document including, without limitation, all of the documents included in the Plan Supplement, and (d) the Going Private Transaction Causes of Action or the Aliante Prepetition Transactions Causes of Action (the "Third Party Release").

96.    Similar to the Debtors' Release, the Third Party Release provides assurance to the parties to the Plan and the other parties in interest in the Chapter 11 Cases that their liability on

account of claims related to the Debtors (including with respect to the Going Private Transaction

Causes of Action and Aliante Prepetition Transactions Causes of Action) will be minimized, and

provides an additional incentive for such parties to settle and consent to the Plan.  The Third

Party Releases set forth in Article X.C.2. of the Plan are being made on a wholly voluntary basis

by Holders of Claims or Equity Interests that have indicated on their Ballot that they are

consenting to such release.  The Ballots sent to each Holder of a Claim or Equity Interest entitled

to vote on the Plan unambiguously stated that the election to consent to such release was at such

Holder's option.  The entirely voluntary Third Party Release is an effective tool in winning the

necessary support for the Plan, and does not prejudice the rights of any party that did not agree to

such Third Party Release.  In connection with the Confirmation Hearing, no party in interest

objected to the Debtors' Release or the Third Party Release.

### 4. **Article X.D. of the Plan – Exculpation.**

97.    Article X.D. of the Plan provides, subject to certain identified exceptions, an

exculpation of the following parties from any Claims or Causes of Action arising prior to or on

the Effective Date for any act taken or omitted to be taken in connection with, or related to the

Chapter 11 Cases, including formulating, negotiating, preparing, disseminating, implementing,

administering, soliciting, confirming or effecting the Consummation of the Plan, the Disclosure

Statement or any sale, contract, instrument, release or other agreement or document created or

entered into in connection with the Plan or any other prepetition or postpetition act taken or

omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the

approval of the Disclosure Statement, confirmation or Consummation of the Plan: (a) the

Subsidiary Debtors and their respective Estates; (b) the SCI Debtors and their respective Estates;

(c) Fertitta Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco;

(g) Voteco; (h) the Plan Administrators, solely in their capacity as such; (i) the Mortgage

Lenders, solely in their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as

such; (k) the Land Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders,

solely in their capacity as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its

capacity as such; (o) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco

Secured Lenders; (p) Colony Capital, LLC;  (q) the Settling Lenders, but only if all of the

applicable terms and conditions of the Settling Lenders Stipulation are satisfied by the Settling

Lenders; (r) the SCI Committee and its members, provided that the Committee Support

Stipulation (as defined in the SCI plan) has not been terminated as of the Subsidiary Debtors

Effective Date; (s) the Put Parties, provided that the Put Parties Support Agreement and the

Propco Commitment have not been terminated as of the Subsidiary Debtors Effective Date;

(t) the Aliante Debtors and their respective Estates; (u) Reorganized Aliante Gaming; (v) the

Aliante Lenders, solely in their capacities as Aliante Lenders and each and every Person or

entity, including without limitation, a Registered Intermediary Company, designated by any

Aliante Lender to receive all or any part of the Distribution in respect of such Aliante Lenders'

Allowed Class AGL.1 Claim; (w) the Aliante Administrative Agent solely in its capacity as

such; (x) the Aliante Transaction Committee and its members, solely in their capacities as such;

(y) the Executive Committee of Aliante Gaming and its members, solely in their capacities as

such; (z) ALST Casino Holdco; and (aa) the respective Related Persons of each of the foregoing

Entities identified in subsections (a) through (aa) (the "Exculpated Parties").

98.     The Plan's exculpation provision provides additional incentive for the various

major parties to the Chapter 11 Cases to commit to and support the Plan.  The exculpation

ensures that such parties will not be subject to any claims or causes of action relating to their

good faith acts or omissions in the restructuring efforts that began in late 2008.  The exculpation

ensures that the Plan will have finality, and that the parties thereto will not be subject to

collateral attacks through litigation against the Plan's proponents and supporters.  In connection

with the Confirmation Hearing, no party in interest objected to the exculpation provisions of the

Plan.

99.     The Court previously found with respect to the SCI Plan that no successor

liability arises in connection with the Restructuring Transactions therein.  The Court finds that

the settlement, release, injunction and exculpation provisions set forth in Article X. of the Plan

(i) are integral to the agreement among the various parties in interest and the overall objectives of

the Plan, (ii) are essential to the formulation and successful implementation of the Plan for the

1  purposes of Section 1123(a)(5), (iii) are being provided for valuable consideration and have been

2  negotiated in good faith and at arms' length, (iv) confer material and substantial benefits on the

3  Debtors' Estates, and (v) are in the best interests of the Debtors, their Estates and other parties in

4  interest and, as to the releases made by, or on behalf of, the Debtors or the Estates, are based on

5  sound business judgment.

6            **5.**     **No Successor Liability**

7        100.    Section 1141(c) provides in relevant part that "after confirmation of a plan, the

8  property dealt with by a plan is free and clear of all claims and interests of creditors, equity

9  security holders, and of general partners in the debtor." 11 U.S.C. § 1141(c).[11]  In addition,

10  Section 363(f) provides statutory authority for the sale of estate property free and clear of

11  "interests in the property," and courts have generally interpreted Section 363(f) to authorize sales

12  free and clear of liens and claims.  *See e.g., In re Trans World Airlines*, 322 F.3d 283, 290 (3d

13  Cir. 2003) (holding that unsecured claims of debtor's employees "are interests within the

14  meaning of Section 363(f) in the sense that they arise from the property being sold.*"); Meyers v.*

15  *United States*, 297 B.R. 774, 781-82 (S.D.Cal. 2003) (concluding that purchaser had acquired

16  assets of debtor free and clear of plaintiff's unsecured personal injury claims).  Courts have also

17  expressly held that transferees of a debtor's assets pursuant to a sale approved under Section 363

18  or pursuant to confirmation of a chapter 11 plan are not liable for claims against the debtor under

19  successor liability theories.  *See e.g., In re Trans World Airlines, supra* (Section 363 sale); *Myers*

20  *v. United States*, *supra* (Section 363 sale); *In re White Motor Credit Corp.*, 75 B.R. 944, 950

21  (Bankr. N.D. Ohio 1987) (confirmation of plan).  The court in *White Motor Credit Corp.* held

22  that state law successor liability theories are preempted by the Bankruptcy Code.  75 B.R. at 950.

23        101.    The Plan provides that the entities receiving the New Opco Acquired Assets, the

24  New Propco Acquired Assets, the Landco Assets, the Aliante Holdings Assets and the

---

26  [11]  Section 1141(c) is expressly subject to the provisions of Section 1141(d)(3), which provides that
confirmation of a plan does not discharge a liquidating debtor, but Section 1141(c) refers to *property* of

27  the debtor, not the debtor.  *See e.g., In re Regional Bldg. Sys., Inc.*, 251 B.R. 274, 282 (Bankr. D. Md.
2000), aff'd, 254 F.3d 528, 531 (4th Cir. 2001) (free and clear provision of Section 1141(c) applies to

28  liquidating chapter 11 plans); *In re Shenandoah Realty,* 248 B.R. 505, 513 (W.D. Va. 2000) (same); *In re
Van Dyke*, No. 88-81521, 1996 WL 33401578 at *4 (Bankr. C.D. Ill. Jan. 10, 1996) (same).

Transferred Aliante Hotel Assets and their respective subsidiaries, creditors and equity holders, shall have no successor liability for creditors' Claims (including Claims of governmental entities) against the Debtors and the SCI Debtors, including any Claims arising out of or related to the Restructuring Transactions, or otherwise based upon the implementation of the Plan, and such intent of the Plan was plainly described in the Disclosure Statement. During the course of the Chapter 11 Cases, and in connection with the Confirmation Hearing, no party in interest objected to such Plan term. Moreover, the Restructuring Transactions were entirely contemplated in the SCI Plan previously approved by the Court pursuant to a confirmation order that is final and non-appealable. As a result, the Court already previously determined that there would be no successor liability in connection with the Restructuring Transactions.

102.    In considering how traditional successor liability analysis would apply to the transfers of the Subsidiary Debtors' assets to New Opco Purchaser and New Propco, the Court is mindful of the fact that the default rule under state law is that acquirors have no successor liability. *Village Builders 96, L.P. v. U.S. Laboratories, Inc.*, 121 Nev. 261, 268, 112 P.3d 1082, 1087 (Nev. 2005) ("[I]t is the general rule that when one corporation sells all of its assets to another corporation the purchaser is not liable for the debts of the seller." (*quoting Lamb v. Leroy Corp.*, 85 Nev. 276, 279, 454 P.2d 24, 26–27 (Nev. 1969)). Successor liability against acquirors is only applied when one of the exceptions to the default rule against successor liability has been proven. *Village Builders*, 121 Nev. at 268, 112 P.3d at 1087 (purchasers of assets have no successor liability unless one of the following four exceptions are met: (a) the transferee has agreed to assume the transferor's liabilities; (b) the transaction is a *de facto merger*; (c) the transferee is mere continuation of transferor; or (d) the transaction is a fraud to escape liabilities).

103.    In reviewing the relevant facts, there does not appear to be any evidence of successor liability since none of the *Village Builders* exceptions to the general rule of no successor liability apply to the Restructuring Transactions and implementation of the Plan. First, New Opco Purchaser and the other Transferee Parties are not assuming the Debtors' liabilities; the Plan and the other Restructuring Transactions related documents are clear and unequivocal on that point.

104.    <u>Second</u>, courts generally will not find a *de facto* merger unless the consideration

for the assets is the stock of the transferee, which is not the case here.  *See Louisiana-Pacific*

*Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264-65 (9th Cir. 1990) (overruled on other grounds)

(finding no continuity of shareholders where consideration paid by purchaser was a combination

of cash, promissory note and payment of some debts, and no stock in purchaser or its parent

company was exchanged as part of the sale); *see also Ferguson v. Arcata Redwood Co., LLC*,

2004 WL 2600471, *4 (N.D.Cal. Nov. 12, 2004) (purchaser was not alleged to have purchased

seller's assets with stock, precluding a finding of successor liability); *Kaleta v. Whittaker Corp.*,

221 Ill. App. 3d 705, 709 (1991) (when payment for assets by stock of transferee is not present,

sound policy does not support imposing the predecessor's liabilities upon the successor "when it

has already paid a substantial price for the assets of the predecessor.").  Here, the consideration

paid for the assets of the Subsidiary Debtors is cash and secured notes issued by New Opco.

None of the consideration for the assets being sold under the Plan is the stock of transferee.

105.    <u>Third</u>, courts will not find a *de facto* merger or that the transferee is a mere

continuation of the transferor unless the shareholders of the transferor and transferee are

substantially the same, which is not the case here.  *See e.g. Village Builders*, 121 Nev. at 274,

112 P.3d at 1090-91 ( (no showing of mere continuation without "<u>identity</u> of stock, stockholders

and directors between the two corporations") (emphasis added).  *See also*, *Commercial Nat'l*

*Bank v. Newtson,* 39 Ill.App.3d 216, 217 (1976) (applying the general rule against corporate

successor liability in a situation where one shareholder owned 25% of the predecessor

corporation, and after the asset transfer the same shareholder owned 40% of the successor

corporation); *Joseph Huber Brewing Co., Inc. v. Pamado, Inc.*, No. 05 C 2783, 2006 WL

2583719, *12-13 (N.D.Ill., September 5, 2006) (finding that a continuity of minority

ownership—approximately 15%—does not weigh in favor of a finding for the continuation

exception); *Jeong v. Onada Cement Co., Ltd.*, 2000 WL 33954824, *4 fn. 4 (C.D.Cal., May 17,

2000) (acknowledging that under California law, successor liability exists where shareholders are

"practically" the same).

106.    Here, there the shareholders of the transferors are not substantially the same as the shareholders of the transferee.  The transferors, the Subsidiary Debtors, are currently owned directly and indirectly by Colony Capital and the Fertitta family.  Colony owns approximately 74%, and the Fertitta family approximately 26%, of the economic value of the Subsidiary Debtors.  The transferee, however, New Propco and its affiliates, will be owned 40% by the current Mortgage Lenders and Mezzco Lenders, 15% by the general unsecured creditors of the SCI Debtors that acquire equity through the Propco Rights Offering, and 45% by Fertitta Gaming LLC.  As a result, the majority of the transferee stock will be held by entities that hold no stock in the transferor Debtors.

107.    The board of directors of the transferors also is not substantially the same as the boards of directors of the transferees.  Of the proposed six person board of directors of the transferee, three proposed directors are current directors of SCI and three are not.

108.    <u>Fourth</u>, numerous courts, including Nevada courts, have not found the transferee to be a mere continuation of the transferor where the selling corporation continues to exist, even if the selling corporation ceases its business operations.  For example, in *Village Builders*, *supra*, where the Nevada Supreme Court declined to find successor liability, the transferor had sold all of its assets, but the transferor corporation was maintained for the purpose of a pending lawsuit. 121 Nev. at 272.  Other jurisdictions have reached similar conclusions.  *See e.g.*, *Schumacher v. Richards Shear Co.*, 59 N.Y.S.2d 239, 245 (1983) ("Since Richards Shear survived the instant purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly concluded that Logemann cannot be considered a mere continuation of Richards Shear."); *Gavette v. The Warner & Swasey Co.*, No. 90-CV-217, 1999 WL 118438, at *5 (N.D.N.Y. Mar. 5, 1999) (finding that *de facto* merger did not lie because the seller corporation continued to exist "at least transcendentally for one year.").  Here, like the transferor in *Village Builders*, the Subsidiary Debtors will continue to exist after the Effective Date for the purpose of implementing the Plan.

109.    Finally, the Plan is unmistakably not a fraud to escape liabilities.  The record of the Chapter 11 Cases shows that the parties to the Plan have acted in good faith, the Plan has

1    been proposed in good faith, and the Plan accomplishes the goals of maximizing the value of the

2    Debtors' assets for the benefits of the Debtors' creditors.  Thus, based upon the facts of these

3    Chapter 11 Cases, none of the exceptions to the rule against successor liability under Nevada law

4    apply.

5              **D.     SATISFACTION OF CONDITIONS TO CONFIRMATION.**

6              110.    Each of the conditions precedent to the entry of these Findings of Fact and

7    Conclusions of Law and the Confirmation Order, as set forth in Article IX.A. of the Plan, has

8    been satisfied.

9    **III.    CONCLUSIONS OF LAW.**

10             **A.     JURISDICTION AND VENUE.**

11             111.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

12   1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors were and are

13   qualified to be debtors under Section 109.  Venue of the Chapter 11 Cases in the United States

14   Bankruptcy Court for the District of Nevada was proper as of the Petition Date, pursuant to 28

15   U.S.C. § 1408, and continues to be proper.

16             **B.     COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.**

17             112.    As set forth above, the Plan complies in all respects with the applicable

18   requirements of Section 1129(a), except Section 1129(a)(8).  Notwithstanding the fact that

19   Section 1129(a)(8) has not been satisfied, the Plan satisfies the requirements of Section 1129(b)

20   with respect to all non-accepting Classes of Claims and Equity Interests.  The Court will confirm

21   the Plan and enter the Confirmation Order contemporaneous with these Findings of Fact and

22   Conclusions of Law.

23                   **1.     The Classification of Claims Under the Plan**
                            **Complies With the Requirements of the Bankruptcy Code.**
24

25             113.    Under the Plan, General Unsecured Claims against the Subsidiary Debtors are

26   separately classified from the unsecured deficiency claims and other unsecured claims of the

27   Prepetition Opco Secured Lenders against the Subsidiary Debtors, and the creditors are treated

28   differently.  General Unsecured Claims against the Subsidiary Debtors will be paid in full and

General Unsecured Claims ; in contrast, the Prepetition Opco Secured Lenders will receive the consideration provided to them under the New Opco Purchase Agreement and SCI Plan in satisfaction of their Claims (secured and unsecured) against the Subsidiary Debtors, which is not payment in full (the Prepetition Opco Secured Lenders Allowed Claim is at least $882 million, while they will receive on their Claims, in the aggregate, approximately $772 million in cash and new secured notes).

114.    There are good business and legal reasons for this separate classification and treatment.  First, the treatment of the creditors is materially different, thereby counseling in favor of separate classification.  Second, the Prepetition Opco Secured Lenders have consented to the Plan treatment of their unsecured claims, and such consent is reflected in the vote of Classes BS.3(a), CS.3(a), FS.3(a), FLA.3(a), GR.3(a), GVS.3(a), GVRS.3(a), LM.3(a), MS.3(a), PSHC.3(a), PE.3(a), RS.3(a), SF.3(a), SL.3(a), SH.3(a), SS.3(a), TS.3(a), CH.2(a), LML.2(a), STN.2(a) and TSI.3(a) in favor of the Plan.  Third, the separate classification of the Prepetition Opco Secured Lenders' unsecured claims does not appear to result in any economic advantage for the Debtors or any group of creditors over another group of creditors (other than as such creditors have consented).  Fourth, the separate classification of the Prepetition Opco Secured Lenders' unsecured claims does not appear to constitute gerrymandering for the purpose of creating an impaired consenting Class.  Proof of the absence of gerrymandering is found in the fact that all of the Classes of Claims actually adversely affected by the separate classification and treatment voted to accept the Plan.  Therefore, under the circumstances of these Chapter 11 Cases, it is appropriate to separately classify the General Unsecured Claims against the Subsidiary Debtors from the unsecured deficiency claims and other unsecured claims of the Prepetition Opco Secured Lenders against the Subsidiary Debtors, and such separate classification complies with all of the applicable provisions of Sections 1122 and 1123(a)(1).

**2.    The Plan Complies With the Requirements of Section 1129(a)(10).**

115.    All Voting Classes voted to accept the Plan, in each case determined without including any acceptance of the Plan by any insider.  They are Classes AGL.1, ASL.1, ASL.3(a), BS.1, BS.3(a), CH.2(a), CS.1, CS.3(a), CVH.1, FS.1, FS.3(a), FLA.1, FLA.3(a), GR.1, GR.3(a),

GVRS.1, GVRS.3(a), GVS.1, GVS.3(a), LM.1, LM.3(a), LML.2(a), MS.1, MS.3(a), PSHC.1, PSHC.3(a), PE.1, PE.3(a), RS.1, RS.3(a), SF.1, SF.3(a), SL.1, SL.3(a), SH.1, SH.3(a), SS.1, SS.3(a), STN.2(a), TS.1 and TS.3(a), TSI.1 and TSI.3(a).  However, eight of the Debtors had no Voting Classes.  The bankruptcy courts that have expressly considered the matter have uniformly held that compliance with Section 1129(a)(10) is tested on a per-plan basis, not on a per-debtor basis, and that Section 1129(a)(10) therefore does not require an accepting impaired class for each debtor under a joint plan.  *See e.g. In re Charter Communcations, Inc.*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) (joint plan of 110 debtors that did not involve substantive consolidation; court held that only a single accepting impaired class under the plan required to satisfy Section 1129(a)(10)); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 at *234-235 (Bankr. S.D.N.Y. July 15, 2004) (joint chapter 11 plan for 177 debtors confirmed although majority of debtors lacked an impaired consenting class); *In re SGPA*, *Inc.*, Case No. 1-01-02609, 2001 WL 34750646, at p.7 (Bankr. M.D. Pa. Sept. 8, 2001) (bankruptcy court confirmed joint plan for multiple debtors and held that "in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan.").

116.    The Court agrees with the *Enron* court that the plain language and inherent fundamental policy behind Section 1129(a)(10) supports the view that the affirmative vote of one impaired class under the joint plan of multiple debtors is sufficient to satisfy Section 1129(a)(10).  *See In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *234-235.  The Court concludes, therefore, that the acceptance of the Plan by all Voting Classes is sufficient for the Plan to satisfy the requirements of Section 1129(a)(10).

**3.    The Plan Complies With the Requirements of Section 1129(a)(11).**

117.    The Subsidiary Debtors.  Section 1129(a)(11) requires the Court to find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan.  Since the Plan is a liquidating Plan for all of the Debtors except Aliante Gaming, the question of further financial reorganization of those Debtors is moot.  *See e.g., In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (under the literal wording of Section 1129(a)(11), it is

1    unnecessary to show feasibility when liquidation is proposed in the plan); *In re Pero Bros.*

2    *Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) (the feasibility test has no application to a

3    liquidation plan).  Moreover, none of the Transferee Parties receiving the Subsidiary Debtors'

4    assets are successors to the Debtors; therefore, no feasibility finding is required with respect to

5    those entities either.

6          118.    Even if the feasibility test of Section 1129(a)(11) applies in circumstances where

7    a debtor's assets are being sold and the debtor liquidated, such test is satisfied if the liquidation is

8    contemplated under the Plan, as it is here, and can be consummated.  *See e.g.*, *In re Cypresswood*

9    *Land Partners, I*, 409 B.R. 396, 433 (Bankr. S.D. Tex. 2009) (plan that provides for a sale of

10    substantially all of a debtor's assets offers a reasonable probability of success and can satisfy

11    Section 1129(a)(11)).  Here, the assets of the Subsidiary Debtors will be transferred to the

12    Transferee Parties under the Plan on the Effective Date.  The Plan is feasible if the Transferee

13    Parties have the financial wherewithal to close on the Restructuring Transactions in a manner

14    that has a reasonable prospect of resulting in the consummation of the Plan.  To demonstrate that

15    a plan is feasible, a debtor need only show a reasonable probability of success.  *In re Acequia,*

16    *Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).  Based upon (i) the financial projections for New

17    Propco and New Opco, (ii) the clear financial wherewithal and desire of the parties to the

18    Restructuring Transactions to close on and implement the respective asset purchase agreements

19    on the Effective Date, and (iii) the evidence that the Backstop Parties are willing to purchase up

20    to $100 million of equity in New Propco, it appears that: (a) New Opco Purchaser will close on

21    the New Opco Purchase Agreement, and (b) New Propco and New Opco Purchaser and their

22    affiliates will be able to service the debt obligations they are issuing in connection with the

23    Restructuring Transactions.

24          119.    The Aliante Debtors.  As a result of the debt for equity exchange on which the

25    Aliante Gaming restructuring is based (including the payment in full of the General Unsecured

26    Creditors), Reorganized Aliante Gaming will have a substantially deleveraged capital structure

27    and is projected in the Aliante Gaming financial projections to be able to operate its business and

28    meet its obligations without the need for further financial reorganization. Given the discharge

1  under the Plan of more than $430 million of secured and unsecured claims against Aliante

2  Gaming, it is reasonable to expect that, as the Aliante Gaming financial projections demonstrate,

3  after consummation of the Plan, Reorganized Aliante Gaming will not require further financial

4  reorganization.

5         120.    The Court concludes that the Plan meets the feasibility test of Section 1129(a)(11)

6  as to all Debtors.

7       **C.     THE TERMS OF THE RESTRUCTURING**

8              **TRANSACTIONS ARE APPROVED IN ALL RESPECTS**

9         121.    Each Subsidiary Debtor provided good and sufficient notice of the assumption, or

10  assumption and assignment, as the case may be, of the contracts and leases that are transferred

11  assets under the New Opco Purchase Agreement, New Opco Implementation Agreements,

12  Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante

13  Transaction Agreements.  Aliante Gaming provided good and sufficient notice of the rejection of

14  any contracts or leases.  Each of the Debtors has, under the terms of the Plan, until the Effective

15  Date to file additional schedules of assumed, assigned, or rejected contracts and leases, and

16  notice of proposed Cure Amounts.

17         122.    New Opco Purchaser is not an insider of the Sellers as that term is used in the

18  New Opco Purchase Agreement; and in each case as "insider" is defined in Section 101(31).

19         123.    On the Effective Date, the transfer of the New Opco Acquired Assets, New

20  Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante

21  Hotel Assets to the applicable Transferee Parties under the Plan (a) will be legal, valid, and

22  effective transfers of the New Opco Acquired Assets, New Propco Acquired Assets, Landco

23  Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets, and (b) will vest the

24  Transferee Parties with all right, title, and interest of the Debtors in such assets free and clear of

25  all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests,

26  including but not limited to all claims arising under doctrines of successor liability.

27         124.    The Restructuring Transactions, including, without limitation, the New Opco

28  Purchase Agreement, New Opco Credit Agreement, New Opco Implementation Agreements,

Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and Restated Operating Agreement for IP Holdco, the New Aliante Transaction Agreements and the other Plan implementation agreements, documents and instruments referred to in Article V of the Plan or otherwise contained in the Plan, or executed and delivered in connection with implementing the transactions contemplated under the Plan, were negotiated and have been and are undertaken by the Debtors and the applicable Transferee Parties and other parties at arms' length without collusion or fraud, and in good faith within the meaning of Section 363(m). The prepetition marketing of the Debtors' assets were conducted at arms' length and in good faith within the meaning of Section 363(m). New Opco Purchaser is a purchaser in good faith as that term is used in Section 363(m), and New Opco Purchaser and the Subsidiary Debtors are entitled to the protections of Section 363(m) with respect to the assets they are transferring to New Opco Purchaser. Moreover, none of the Subsidiary Debtors or New Opco Purchaser engaged in conduct that would cause or permit the New Opco Purchase Agreement, the consummation of the sale, the related Restructuring Transactions, or the assumption and assignment of the Assumed Contracts to be avoided, or costs or damages to be imposed, under Section 363(n). All debts incurred by New Opco Purchaser in connection with the Restructuring Transactions, and all Liens granted by New Opco Purchaser and its subsidiaries and affiliates in connection with such incurrence of debt, are entitled to the protections of Section 364(e).

125.    The consideration provided by the Transferee Parties for the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets is fair and reasonable and shall be deemed for all purposes to constitute Value under the Bankruptcy Code and any other applicable law.

126.    The Debtors are authorized to convey, assign, transfer and deliver the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets to the Transferee Parties free and clear of all free and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests, because, with respect to each creditor asserting a Lien, Claim, Equity Interest, encumbrance, charge, Other Debt or other interest, one or more of the standards set forth in Sections 363(f)(1)-

(5), 1129 or 1141 has been satisfied; including without limitation because the New Opco Purchase Agreement satisfies the requirements of Section 363(f). Those Holders of Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests who did not object or withdrew objections to the Plan and related Restructuring Transactions are deemed to have consented thereto pursuant to Sections 363(f)(2) and 1141. Those Holders of Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests who did object fall within one or more of the other subsections of Section 363(f), or their objections were overruled pursuant to Section 1129 and 1141.

127.    Except as otherwise expressly provided in the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante Transaction Agreements, the Transferee Parties are not assuming, nor shall they or any of their affiliates, or their respective Related Persons, be deemed in any way liable or responsible as a successor or otherwise for, any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets or use of such assets on or prior to the Effective Date. The Confirmation Order shall provide that all such liabilities, debts and obligations are extinguished as to all Persons, Entities and Governmental Units on the Effective Date insofar as they may give rise to liability, successor or otherwise, under any theory of law or equity against the Transferee Parties and their Related Persons.

128.    Pursuant to the terms of the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and Restated Operating Agreement for IP Holdco, the New Aliante Transaction Agreements and Sections 363(b), 363(f) and 1141(c), the Debtors are authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets to the applicable Transferee Parties on the Effective Date free and clear of (i) all Liens, Claims, Equity Interests,

encumbrances, charges, Other Debts or other interests, including without limitation any Claim, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, or arising under doctrines of successor liability, and (ii) any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership of such assets.  The Confirmation Order shall provide that, except as otherwise expressly provided in the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante Transaction Agreements, on the Effective Date all such Liens, Claims, Equity Interests, encumbrances, charges, Other Debts, other interests and restrictions shall be released, terminated and discharged as to the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets and the Transferee Parties.

129.    The Transferee Parties shall not be deemed a successor of or to the Debtors or the Debtors' estates with respect to Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests against or in the Debtors or the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets, and the Transferee Parties shall not be deemed liable in any way for any such Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests, including, without limitation, the Excluded Liabilities or Excluded Assets (as those terms are used in the New Opco Purchase Agreement).  The Confirmation Order shall provide that, on the Effective Date, all creditors and equityholders of the Debtors, including all Governmental Units, are permanently and forever barred, restrained and enjoined from (a) asserting any claims or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Transferee Parties, their Related Persons or the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets on account of any Liens, Claims, Equity Interests, encumbrances, charges, Other Debts, other interests, Excluded Liabilities or Excluded Assets, or (b) asserting any claims or enforcing remedies against any of the Transferee Parties or their

Related Persons under any theory of successor liability, merger, *de facto* merger, substantial continuity or similar theory.

130.    Without limiting the generality of the foregoing paragraph, other than as specifically set forth in the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements and New Aliante Transaction Agreements: (a) the Transferee Parties and their Related Persons shall have no liability or obligation (x) to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or any other payment to employees of the Debtors, and (y) in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program  to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit); and (b) the Transferee Parties and their Related Persons shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against the Transferee Parties and their Related Persons any Claims arising from or relating to such employee benefit, agreement, plan or program.

131.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the applicable Transferee Parties in connection with the consummation of the conveyances and assignments under the New Opco Purchase Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements, the Amended and Restated Operating Agreement for IP Holdco and the New Aliante Transaction Agreements, and the assumption and assignment of the Assumed Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed Contracts being assigned and sold to the applicable Transferee Parties are an integral part of the Restructuring Transactions, and

#4827-8452-4809

1    accordingly, such assumptions and assignments of the Assumed Contracts are reasonable and

2    enhance the value of the Debtors' estates.

3        132.    By implementing the New Opco Purchase Agreement, New Opco Implementation

4    Agreements, Landco Assets Transfer Agreement, New Propco Implementation Agreements, the

5    Amended and Restated Operating Agreement for IP Holdco and the New Aliante Transaction

6    Agreements, (a) the Debtors will have provided adequate assurance of cure of any monetary

7    default existing prior to the Closing under any of the Assumed Contracts, within the meaning of

8    Section 365(b)(1)(A), and will have provided adequate assurance of compensation to any party

9    for any actual pecuniary loss to such party resulting from a default prior to the date hereof under

10    any of the Assumed Contracts within the meaning of Section 365(b)(1)(B), and (b) the

11    Transferee Parties will have provided adequate assurance of future performance of and under any

12    of the Assumed Contracts, within the meaning of Sections 365(b)(1)(C) and 365(f).

13        **D.    APPROVAL OF THE SETTLEMENTS, RELEASES**

14        **AND EXCULPATIONS PROVIDED UNDER THE PLAN.**

15        133.    Based upon the wide ranging support for the Plan among secured and unsecured

16    creditors, and the Court's finding that the Plan is the best option the Debtors' creditors have to

17    preserve the economic viability and job sustaining value of the Debtors' assets, the Court

18    concludes that each of the settlement, release, exculpation and related provisions of Article X. of

19    the Plan are fair and necessary for the successful implementation of the Plan and are approved.

20        **1.    The Global Settlement in Article X.B.2. of the Plan is Approved.**

21        134.    Based upon the record of the Chapter 11 Cases, the Court concludes that the

22    Debtors were justified in proposing to settle and release the Going Private Transaction and the

23    Aliante Prepetition Transactions pursuant to the Plan, because such settlement and compromise

24    is consistent with the factors enunciated in *Protective Committee for Independent Stockholders of*

25    *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), and *Martin v. Kane (In re A & C*

26    *Properties)*, 784 F.2d 1377 (9th Cir. 1986), *cert. denied sub nom. Martin v. Robinson*, 479 U.S.

27    854 (1986), for approval of settlements in bankruptcy cases.  The low probability of success in

28    the litigation, the complexity, expense and delay necessarily associated with any such litigation,

1   and the paramount interest of the creditors and a proper deference to their reasonable views all

2   weigh heavily in favor of settlement here, not litigation.  Accordingly, the Court concludes that

3   the Global Settlement and the provisions of Article X.B.2. constitute a fair and equitable

4   settlement that is in the best interests of the creditors and their estates, and one that satisfies in all

5   respects the requirements of *TMT Trailer* and *In re A & C Properties* for settlements proposed

6   by chapter 11 debtors.

7       135.    The Global Settlement is in the best interest of each Debtor and its respective

8   Estate and the Holders of Claims, Administrative Claims and Equity Interests providing such

9   releases, and is fair, equitable and reasonable.

10                      **2.      The Exculpation Provisions of Article X.D. of the Plan Are Approved.**

11      136.    Section 524(e) provides in relevant part that "discharge of a debt of the debtor

12  does not affect the liability of any other entity, on or the property of any other entity for, such

13  debt."  In *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), the Court of Appeals for the Ninth

14  Circuit held that Section 524(e) applies to chapter 11 plan bankruptcy discharges.  However,

15  bankruptcy courts generally recognize that Section 524(e) is silent on whether a chapter 11 plan

16  or confirmation order could affect the liability of a non-debtor on statutory grounds *other than* a

17  bankruptcy discharge.  Here the exculpation provision of Article X.D. does not violate Section

18  524(e) because it is based upon the more limited exculpation provisions that are expressly

19  contemplated and permitted by Bankruptcy Code Section 1125(e).

20      137.    Section 1125(e) provides a grant of immunity from liability not only under the

21  securities laws, but also under any law, rule, or regulation governing solicitation or acceptance of

22  a plan, to any person that participates in good faith in the solicitation of acceptances of a plan or

23  the offer, issuance, sale or purchase of a security offered or sold in connection with the plan.

24  Read literally, nothing in Section 1125(e) limits that protection to post-petition activities.

25  Moreover, another related provision of Section 1125, Section 1125(g), contemplates and

26  authorizes solicitation of acceptances of a chapter 11 plan prior to commencement of a

27  bankruptcy case if solicited in compliance with applicable non-bankruptcy law.

28

#4827-8452-4809                                -54-

138.    Here, as discussed in Article II. of the Disclosure Statement for the SCI Plan, the Subsidiary Debtors and SCI Debtors conducted such pre-bankruptcy solicitations as part of their ongoing restructuring efforts dating back to late 2008.  Specifically, during 2008 and the first six months of 2009, the SCI Debtors and Subsidiary Debtors engaged in various discussions with the lenders under the Prepetition Opco Credit Agreement and the CMBS Loans and Holders of the Senior Notes and Senior Subordinated Notes regarding restructuring alternatives for the Debtors' outstanding indebtedness.  In November 2008, the SCI Debtors made an offer to exchange new secured term loans for the outstanding Senior Notes and Senior Subordinated Notes, which would have included a restructuring of the Prepetition Opco Credit Agreement and the CMBS Loans.  The November 2008 exchange offer was unsuccessful.

139.    In February 2009, the SCI Debtors solicited votes from the Holders of the Senior Notes and Senior Subordinated Notes for a prepackaged plan of reorganization pursuant to which the Holders of the Senior Notes and Senior Subordinated Notes would have received second and third lien notes, respectively, and cash in a plan of reorganization, and the outstanding indebtedness under the Prepetition Opco Credit Agreement and CMBS Loans would have been restructured.  The solicitation for the prepackaged plan of reorganization did not receive sufficient votes to approve the plan, and that plan did not proceed.

140.    In March 2009, the Holders of a majority in principal amount of each series of Senior Notes and Senior Subordinated Notes entered into a forbearance agreement with SCI with respect to the events of default resulting from SCI's failure to pay interest on the Senior Notes and Senior Subordinated Notes.  Majority lenders under the Prepetition Opco Credit Agreement likewise entered into a forbearance agreement with SCI relating to various purported events of default.  During the period from March 2009 to the commencement of the SCI Cases, the SCI Debtors and Subsidiary Debtors continued to negotiate the terms of a consensual restructuring with the various creditors of the Debtors.

141.    Aliante Gaming also began negotiating the terms of a consensual restructuring with its principal creditor constituencies more than nine months prior to the Petition Date.  In

#4827-8452-4809

1    March 2011, the Subsidiary Debtors and the Aliante Debtors conducted a formal pre-bankruptcy

2    solicitation of acceptances of the Plan, as authorized under Section 1125(g).

3        142.    The Court is of the view that, since the pre-petition restructuring efforts were

4    made in good faith and the parties sought a result consistent with the relief available under

5    chapter 11, such conduct is precisely the type of activity that Section 1125(e) is designed to

6    protect.  It would be inequitable, and would not comport with the plain intent of Section 1125(e)

7    if, after confirmation of the Plan and implementation of the Restructuring Transactions, the

8    Exculpated Parties -- the Persons and Entities on the Debtor and creditor sides that actively

9    participated in the process of reaching a consensual chapter 11 plan -- could then be sued for

10   their good faith prepetition and post-petition restructuring efforts.  Accordingly, the Court

11   concludes that each of the Exculpated Parties is entitled to the protections afforded them by

12   Section 1125(e) and Article X.D. of the Plan. [12]

13                    **3.    The Releases in Article X.C. of the Plan are Approved.**

14       143.    A release of non-debtor third parties voluntarily and knowingly given by a

15   creditor or equity holder in connection with a chapter 11 plan does not implicate the concerns

16   regarding third party releases discussed by the Ninth Circuit Court of Appeals in *Lowenschuss*,

17   *supra.  See e.g., In re Pacific Gas & Elec. Co.*, 304 B.R. 395, 416-18 (Bankr. N.D. Cal. 2004)

18   (confirming plan that included governmental agency's release of debtor's parent entity and its

19   officers and directors because the agency had consented to the release); *In re Hotel Mt. Lassen,*

20   *Inc.*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("[a]ny third-party release in connection with a

21   plan or reorganization, at a minimum, must be fully disclosed and purely voluntary on the part of

22   the releasing parties and cannot unfairly discriminate against others.").

23

24   [12]   Other bankruptcy courts in recent contested chapter 11 cases have approved plan exculpation clauses
     at least as broad, if not broader, in scope than that proposed in these Chapter 11 Cases. *See, e.g., In re*
25   *Citadel Broadcasting, Inc.*, Case No. 09-17442, 2010 WL 210808, at *30 (Bankr. S.D.N.Y. May 19,
     2010) ("Exculpated Claims" included all claims relating to the debtors' in or out of court restructuring
26   efforts, and "Exculpated Parties" included, among others, the holders of the senior secured debt and their
     agent, the agent and indenture trustee for the subordinated noteholders, and each of their respective
27   professionals and affiliates); *In re CIT Group, Inc.*, Case No. 09-16565, 2009 WL 4824498 (Bankr.
     S.D.N.Y. Dec. 8, 2009) at *25 (the exculpated parties included a steering committee of prepetition
28   lenders, the DIP lenders and their agent, the exit facility lenders and their agent, the indenture trustees for
     the unsecured note issuances).

144.    Here, the Third Party Release was plainly described on the Ballot used to solicit votes in favor of the Plan.  Thus, the Third Party Release does not violate Section 524(e) or any of the concerns discussed in *Lowenschuss*, and is an appropriate term of the Plan under Section 1123(a)(5) (and is expressly authorized by Section 1123(b)(3)(A), the settlement or adjustment of any claim belong to the debtor or the estate).

145.    The Court concludes that the settlements, compromises, releases, exculpations, discharges and injunctions set forth in Article X of the Plan are fair, equitable, reasonable and in the best interests of the Debtors and their respective Estates and the Holders of Claims and Equity Interests, and are approved.

### 4.    The Transferee Parties Shall Not be Liable Under Any Successor Liability Theories

146.    The operation of Sections 363 and 1141 foreclose the ability of creditors to obtain a finding of successor liability against the transferees of the Debtors' assets.  It would undermine the purposes of chapter 11 if creditors could get around the effect of confirmation of a chapter 11 plan by asserting successor liability claims after confirmation.  *See e.g., In re Trans World Airlines*, 322 F.3d at 292 (to allow some general unsecured creditors to assert successor liability claims against transferee of debtors' assets, while limiting other creditors' recourse to proceeds of sale, would be inconsistent with Bankruptcy Code's priority scheme).  In this case, if the Plan did not foreclose successor liability, the purchasers of the Subsidiary Debtor assets likely would not go forward with the sales, and the creditors receiving equity in Reorganized Aliante Gaming in exchange for their first priority secured claims likely would not support the Plan.

147.    The Court has performed the successor liability analysis under applicable non-bankruptcy law, including under Nevada law, and the Court finds no basis at all for successor liability.  Therefore, the Court concludes that the applicable transferees of the New Opco Acquired Assets, New Propco Acquired Assets, Landco Assets, Aliante Holdings Assets and the Transferred Aliante Hotel Assets and their Related Persons are not successors of the Debtors or the SCI Debtors, and, therefore, the "no successor liability" provisions of the Plan are consistent with applicable law and shall be enforced in the Confirmation Order.

1    **E.    EXEMPTIONS FROM SECURITIES LAWS.**

2         148.    Article IX.A. of the Disclosure Statement, entitled "U.S. Securities Law Matters,"

3    provides adequate notice to all parties in interest that, subject to certain exceptions discussed in

4    Article IX, "all debt instruments, to the extent they constitute securities, and equity securities that

5    are offered and issued in conjunction with the Joint Plan will not be registered under the

6    Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth

7    in Section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth

8    in Section 4(2) of the Securities Act or Regulation D promulgated thereunder."

9    **F.    EXEMPTIONS FROM TAXATION.**

10        149.    Pursuant to Section 1146(a), any transfers of property pursuant to the Plan shall

11   not be subject to any Stamp or Similar Tax.  The Confirmation Order will provide that all

12   federal, state or local governmental officials or agents shall forgo the collection of any such

13   Stamp or Similar Tax or governmental assessment in connection with transfers of property under

14   the Plan, and accept for filing and recordation instruments or other documents pursuant to such

15   transfers of property without the payment of any such Stamp or Similar Tax or governmental

16   assessment.  Such exemption specifically applies, without limitation, to all actions, agreements

17   and documents necessary to evidence and implement the provisions of and the distributions to be

18   made under the Plan and the transfers of property under the Restructuring Transactions,

19   including without limitation the recordation of any mortgage pursuant to the New Opco Purchase

20   Agreement, New Opco Implementation Agreements, Landco Assets Transfer Agreement, New

21   Propco Implementation Agreements and New Aliante Transaction Agreements.

22   **G.    THE PLAN MODIFICATIONS ARE APPROVED**

23        150.    The Plan Modifications do not require resolicitation of acceptances of the Plan for

24   the following reasons.  First, the Prepetition Opco Secured Lenders, the only creditors impacted

25   by the inclusion of TSI as a Subsidiary Debtor under the Plan, consented to such Plan

26   modification, and no other creditor of TSI objected to the Plan.  Second, the Plan Modifications

27   in respect of the Aliante Debtors have the effect of resolving what had been, as of the Petition

28   Date, unresolved issues relating to the management of the Aliante Station Casino and Hotel

1   during these Chapter 11 Cases and after the Effective Date, and thereby only enhance the

2   feasibility of the Plan with respect to the creditors of the Aliante Debtors, and add the Aliante IP

3   License Agreement as a New Aliante Transaction Agreement.  Third, the Plan Modifications do

4   not prejudice the treatment of the Claims of any Holder of Claims against or Equity Interests in

5   the Debtors under the Plan.  Accordingly, all Voting Classes that voted to accept the Plan are

6   deemed to have accepted the Plan Modifications as well.

7   　　　　151.　　The Subsidiary Debtors' solicitation of consents from the Prepetition Opco

8   Secured Lenders with respect to the Plan Modifications satisfied the requirements of Section

9   1125; and the Plan, inclusive of the Plan Modifications, meets the requirements of Sections 1121

10  through 1129, including, without limitation, the requirements of Section 1127 and Federal Rule

11  of Bankruptcy Procedure 3019 with respect to plan modifications before confirmation of a plan.

12  　　　　152.　　The Plan, inclusive of the Plan Modifications, shall be confirmed pursuant to

13  Section 1129.

14  SUBMITTED BY:

15  Paul S. Aronzon (CA SBN 88781)                 Laury M. Macauley (NV SBN 11413)
16  Thomas R. Kreller (CA SBN 161922)              Dawn M. Cica (NV SBN 004565)
    Fred Neufeld (CA SBN 150759)                   LEWIS AND ROCA LLP
17  MILBANK, TWEED, HADLEY & McCLOY LLP            50 West Liberty Street, Suite 410
    601 South Figueroa Street, 30th Floor          Reno, Nevada 89501
18  Los Angeles, California 90017                  Telephone:  (775) 823-2900
19  Telephone:  (213) 892-4000                     Facsimile:  (775) 823-2929
    Facsimile:  (213) 629-5063                     lmacauley@lrlaw.com
20  paronzon@milbank.com                           dcica@lrlaw.com
    tkreller@milbank.com
21                                                 Local Reorganization Counsel for the
22  Reorganization Counsel for the Subsidiary Debtors    Subsidiary Debtors

23  and

24

25

26

27

28

#4827-8452-4809                              -59-

James H.M. Sprayregen, P.C. (IL SBN 6190206)
David R. Seligman, P.C. (IL SBN 6238064)
David A. Agay (IL No. 6244314)
Sarah H. Seewer (IL No. 6301437)
KIRKLAND & ELLIS LLP
300 North LaSalle St.
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Reorganization Counsel for the Aliante Debtors

Candace Carlyon (NV SBN 002666)
James Patrick Shea (NV SBN 000405)
SHEA & CARLYON, LTD.
701 Bridger Avenue, Suite 850
Las Vegas, Nevada  89101
Telephone:      (702) 471-7432
Facsimile:      (702) 471-7435
ccarlyon@sheacarlyon.com
jshea@sheacarlyon.com

Local Reorganization Counsel for the
Aliante Debtors

# # #

#4827-8452-4809