**Entered on Docket**
**June 08, 2011**

_____
**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

| | |
|---|---|
| James H.M. Sprayregen, P.C. (IL No. 6190206)<br>David R. Seligman, P.C. (IL No. 6238063)<br>Sarah H. Seewer (IL No. 6301437)<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle St.<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200<br>james.sprayregen@kirkland.com<br>david.seligman@kirkland.com<br>sarah.seewer@kirkland.com | Candace Carlyon (NV No. 002666)<br>James Patrick Shea (NV No. 000405)<br>Brandon P. Johansson (NV No. 012003)<br>SHEA & CARLYON, LTD.<br>701 Bridger Avenue, Suite 850<br>Las Vegas, Nevada 89101<br>Telephone:    (702) 471-7432<br>Facsimile:    (702) 471-7435<br>ccarlyon@sheacarlyon.com<br>jshea@sheacarlyon.com<br>bjohansson@sheacarlyon.com |
| Reorganization Counsel<br>for GVR | Special Local Reorganization Counsel<br>for GVR |

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>STATION CASINOS, INC., *et al.*,<br><br>    Debtors and Debtors in Possession.[1]<br><br>☒    Affects the debtor listed in footnote 2[2] | Chapter 11<br>Case No. 09-52477<br><br>Jointly Administered 09-52470 through 09-52487, 10-50381, 11-51188, 11-51190 through 11-51219, and 11-51702<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF "FIRST AMENDED PREPACKAGED JOINT  CHAPTER 11 PLAN OF REORGANIZATION FOR SUBSIDIARY DEBTORS, ALIANTE DEBTORS AND GREEN VALLEY RANCH GAMING, LLC (DATED MAY 24, 2011)" WITH RESPECT TO GVR**<br><br>Hearing Date:      June 8, 2011<br>Hearing Time:     10:00 a.m.<br>Place:              300 Booth Street<br>                     Reno, NV 89509 |

---

[1]    The debtors in these jointly administered chapter 11 cases are:  (i) Station Casinos, Inc.; Northern NV Acquisitions, LLC; Reno Land Holdings, LLC; River Central, LLC; Tropicana Station, LLC; FCP Holding, Inc.; FCP Voteco, LLC; Fertitta Partners LLC; FCP MezzCo Parent, LLC; FCP MezzCo Parent Sub, LLC; FCP MezzCo Borrower VII, LLC; FCP MezzCo Borrower VI, LLC; FCP MezzCo Borrower V, LLC; FCP MezzCo Borrower IV, LLC; FCP MezzCo Borrower III, LLC; FCP MezzCo Borrower II, LLC; FCP MezzCo Borrower I, LLC; and FCP PropCo, LLC (collectively, the "SCI Debtors"); (ii) Auburn Development, LLC; Boulder

K&E 19099664.16

I.      **INTRODUCTION.**

1.      On July 28, 2009, Station Casinos, Inc. ("SCI"), and certain of its affiliates commenced chapter 11 cases in this Court (the "SCI Cases"). On February 10, 2010, GV Ranch Station, Inc. ("GV Ranch") commenced its chapter 11 case in this Court. On August 27, 2010, this Court entered its order confirming the "First Amended Joint Chapter 11 Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)" (the "SCI Plan") (docket no. 2039).[3] The Effective Date of the SCI Plan has not yet occurred.

2.      On April 12, 2011 (the "Petition Date"), the above captioned Subsidiary Debtors (excluding GV Ranch which had a chapter 11 case already pending and Tropicana Station, Inc., which did not commence its chapter 11 case until May 23, 2011), Aliante Debtors and GVR (collectively, the "Debtors") commenced their chapter 11 cases (the "Chapter 11 Cases") in this Court. Pursuant to an order of this Court, the Chapter 11 Cases are jointly administered with the SCI Cases. Also on April 12, 2011, the Debtors filed their "Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Gaming, LLC (Dated March 22, 2011)" (the "Plan"), and their "Disclosure Statement to Accompany Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated March 22, 2011)" (the "Disclosure Statement") (both at docket no. 2797). On May 25, 2011, the Court entered the "Order Confirming 'First Amended Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors, and Green Valley Ranch Gaming, LLC (Dated May 26, 2011)' with

---

Station, Inc.; Centerline Holdings, LLC; Charleston Station, LLC; CV HoldCo, LLC; Durango Station, Inc.; Fiesta Station, Inc.; Fresno Land Acquisitions, LLC; Gold Rush Station, LLC; Green Valley Station, Inc.; GV Ranch Station, Inc.; Inspirada Station, LLC; Lake Mead Station, Inc.; LML Station, LLC; Magic Star Station, LLC; Palace Station Hotel & Casinos, Inc.; Past Enterprises, Inc.; Rancho Station, LLC; Santa Fe Station, Inc.; SC Durango Development LLC; Sonoma Land Holdings, LLC; Station Holdings, Inc.; STN Aviation, Inc.; Sunset Station, Inc.; Texas Station, LLC; Town Center Station, LLC; Tropicana Acquisitions, LLC; Tropicana Station, Inc.; and Vista Holdings, LLC (collectively, the "Subsidiary Debtors"); (iii) Aliante Gaming, LLC, Aliante Holding, LLC, and Aliante Station, LLC (collectively, the "Aliante Debtors"); and (iv) Green Valley Ranch Gaming, LLC ("GVR").

[2]    These Findings of Fact and Conclusions of Law apply to GVR.

[3]    Unless otherwise specified, all "docket no." references mean the docket in Case No. 09-52477 in this Court.

1  Respect to Subsidiary Debtors and Aliante Debtors" (docket no. 3261), which confirmed the

2  Plan with respect to the Subsidiary Debtors and the Aliante Debtors.

3      3.    On May 13, 2011, GVR filed its Plan Supplement (docket no. 3087).  On

4  June 6, 2011, GVR filed its "Notice of Filing of First Amendment to Plan Supplement" (docket

5  no. 3382).

6      4.    Prior to the Petition Date, commencing on March 23, 2011, the Debtors

7  distributed copies of the Plan and Disclosure Statement and related exhibits, schedules and other

8  materials to certain of their creditors, and solicited prepetition acceptances of the Plan pursuant

9  Section 1125(g) of the Bankruptcy Code (the "Prepetition Solicitation").  On April, 27, 2011, the

10  Voting Agent[4] filed its "Ballot Summary Declaration in Support of Confirmation of Joint Plan,

11  Certifying Ballots Accepting and Rejecting the Plan, and Submitting Ballot Reports" with

12  respect to the votes of Holders of Claims against and Equity Interests in the Subsidiary Debtors

13  and GVR (docket no. 2895) (the "First Tabulation of Ballots").  On May 6, 2011, the Voting

14  Agent filed its "Ballot Summary Declaration in Support of Confirmation of Joint Plan, Certifying

15  Ballots Accepting and Rejecting the Plan, and Submitting Ballot Reports" with respect to the

16  votes of Holders of Claims against and Equity Interests in the Aliante Debtors (docket no. 2949)

17  (the "Second Tabulation of Ballots").  The First and Second Tabulation of Ballots together show

18  that all forty two Voting Classes voted to accept the Plan, including Class GVRG.2, the sole

19  Voting Class under the Joint Plan with respect to GVR.

20      5.    May 16, 2011 was the deadline established by the Court for filing and

21  serving objections to confirmation of the Plan with respect to GVR.  However, at the conclusion

22  of a status conference held on June 1, 2011 following this Court's entry of an order removing

23  MFS Investment Management, Panton Capital Group and Babson Capital Management, LLC

24  (collectively, the "Second Lien Lenders") from the Official Committee of Unsecured Creditors

25  (the "Committee"), the Court fixed June 6, 2011 as the deadline for the Second Lien Lenders to

26  object to confirmation of the Plan with respect to GVR.  Three objections were timely filed to

27  [4]  Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to them in the
28     Plan.  The rules of interpretation set forth in Article I.A. of the Plan shall apply to these Findings of Fact and
       Conclusions of Law.

confirmation of the Plan with respect to GVR. One objection, filed by the Official Committee of Unsecured Creditors (the "Committee") (docket no. 3127) is deemed overruled, given this Court's May 25 ruling and the fact that the Committee presently has no members. The remaining two objections were filed by personal injury claimants Dianne Dahlheimer (docket no. 3124, 3386) and Cathie Green (docket no. 3130). The objection of Dianne Dahlheimer has now been resolved and withdrawn (docket no. 3376). The objection of Cathie Green is resolved on terms similar to the resolution of the objection of Dianne Dahlheimer. No party in interest objected to the Comprehensive Settlement or the Global Settlement.

6.      On May 20, 2011, the Subsidiary Debtors, Aliante Debtors and GVR filed their "First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 20, 2011)" (docket no. 3186) (the "Amended Plan"). The Amended Plan adds Tropicana Station, Inc. ("TSI") as a Subsidiary Debtor, provides additional detail regarding the implementation of the restructuring of the Aliante Debtors, and makes certain other revisions to the Plan. A redline showing the revisions to the Plan contained in the Amended Plan was filed on May 20, 2011 (docket no. 3186, Exhibit 2). On May 24, 2011, an additional revision to the Amended Plan, providing for the addition of the Aliante IP License Agreement as a New Aliante Transaction Agreement, was filed with the Court, including a redline showing the changes over the prior filed version (docket no. 3253). The revisions to the first filed Plan contained in the Amended Plan, and the revisions filed on May 24, 2011 are hereinafter collectively referred to as the "Plan Modifications." The Plan Modifications do not alter the terms of the Plan related to GVR, including the treatment of Claims and Equity Interests against GVR and the terms of the transfer of the GVR Purchased Assets to the GVR Purchaser. All further references in these Findings of Fact and Conclusions of Law to the Plan mean the version filed by the Debtors on May 24, 2011 (docket no. 3253).

7.      On May 25, 2011, this Court entered an order confirming the Plan as it relates to the Subsidiary Debtors and Aliante Debtors (docket no. 3261). The Plan will become effective as to the Subsidiary Debtors and the Aliante Debtors upon the satisfaction of certain conditions described in the Plan.

8.      At a status conference on June 1, 2011, the Court set June 8, 2011 as the date for the hearing to consider approval of the Disclosure Statement and confirmation of the Plan, as to GVR.

9.      On June 6, 2011, GVR filed its Memorandum of Law in support of confirmation of the Plan (docket no. 3390).  With respect to the Memorandum of Law, the Court considered the Declaration of Tom Friel, Treasurer and Senior Vice President of GV Ranch (GVR docket no. 24), Declarations of William Bible, Member of the GVR Transaction Committee (GVR docket no. 20 and SCI docket no. 3153), Declarations of Dr. James Nave, Member of the GVR Transaction Committee (GVR docket no. 19 and SCI docket no. 3152), Declaration of Richard Haskins, Secretary and Senior Vice President of GV Ranch (docket no. 3391), the Declaration of Eben Perison, Managing Director and Head of the Special Situations and Restructuring Group of Sea Port Group Securities, LLC (docket no. 3393), the Declaration of Walt L. Brown, FTI Consulting, Inc. (docket no. 3392), and the Declaration of Lawrence Taylor, Managing Director of Odyssey Capital Group, LLC (docket no. 3394).  A hearing pursuant to Sections[5] 1127, 1128 and 1129 and Federal Rules of Bankruptcy Procedure 2002, 3017, 3018, 3019(a), 3020(b) through (e) and 7052 to consider confirmation of the Plan and approval of the Disclosure Statement was held on June 8, 2011 (the "Confirmation Hearing").

10.      The Court has considered all of the papers filed in support of confirmation of the Plan, including supporting declarations, transcripts of hearings and status conferences dated April 14, May 18, May 25, May 31, and June 1, 2011, and the testimony presented and evidence admitted at the Confirmation Hearing.  In connection therewith, the Court takes judicial notice of all of the papers and pleadings filed by the supporters and opponents of the Plan during the course of the proceedings leading to the Confirmation Hearing.  The Court has entered a separate order confirming the Plan with respect to GVR (the "Confirmation Order"), and makes the following Findings of Fact and Conclusions of Law in connection therewith.

---

[5]      Unless otherwise specified, all "Section" references are to chapter 11 of Title 11 of the U.S. Code, the "Bankruptcy Code."

11.     These Findings of Fact and Conclusions of Law refer to, in summary fashion, numerous provisions of the Plan.  All such descriptions are qualified by the express terms of the Plan, which Plan terms control unless expressly modified in the Confirmation Order. In addition, the failure to specifically include or discuss any particular provision of the Plan in these Findings of Fact and Conclusions of Law shall not diminish the effectiveness of any such provision, it being the intent of the Court that the Plan shall be confirmed in its entirety, and the Plan is incorporated herein in its entirety by this reference.

12.     Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact. These written Findings of Fact and Conclusions of Law shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Confirmation Hearing in accordance with Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014.

## II.     **FINDINGS OF FACT.**

### A.     **JURISDICTION AND VENUE.**

13.     GVR commenced its chapter 11 case by filing a voluntary petition for relief under chapter 11.  GVR has its principal place of business and principal assets in Nevada.

### B.     **COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.**

#### 1.     **Section 1129(a)(1) – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

14.     The Plan complies with all applicable provisions of the Bankruptcy Code, as required by Section 1129(a)(1), including Sections 1122 and 1123.

##### a.     **Sections 1122 and 1123(a)(1)-(4) – Classification and Treatment of Claims and Equity Interests.**

15.     In accordance with the requirements of Sections 1122(a) and 1123(a)(1), Article III of the Plan designates Classes of Claims and Equity Interests, other than Administrative Claims and Priority Tax Claims (pursuant to Section 1123(a)(1), Classes of

Administrative Claims and Priority Tax Claims are not required to be classified). In accordance with the requirements of Section 1122(a), each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class. With respect to GVR, the Plan designates four Classes of Claims and one Class of Equity Interests. Such classification is proper under Section 1122(a) because the Classes of Claims and Equity Interests have differing rights among each other and against GVR's assets or differing interests in GVR. Valid business, factual and legal reasons exist for classifying the various Classes of Claims and Equity Interests in the manner set forth in the Plan.

16.    In accordance with the requirements of Sections 1123(a)(2) and 1123(a)(3), Article III of the Plan specifies all Classes of Claims and Equity Interests that are not Impaired under the Plan and specifies the treatment of all Classes of Claims and Equity Interests that are Impaired under the Plan. Consistent with Section 1123(a)(4), Article III of the Plan also provides the same treatment for each Claim or Equity Interest within a particular Class, unless the Holder of a Claim or Equity Interest agrees to less favorable treatment of its Claim or Equity Interest.

### b.    Section 1123(a)(5) – Adequate Means for Implementation of the Plan.

17.    Article V and certain other of the provisions of the Plan contain the principal means for the Plan's implementation. Those provisions relate to, among other things, the conveyance, assignment, transfer and delivery of the GVR Purchased Assets to the GVR Purchaser, pursuant to the Plan and the Restructuring Transactions, and the payment of the GVR Purchase Price to the First Lien Administrative Agent for distribution to each Holder of a GVR First Lien Allowed Claim on a *pro rata* basis. All references herein to the "Restructuring Transactions" means the transactions contemplated by the GVR Purchase Agreement and the other Plan implementation agreements, documents and instruments referred to in Article V of the Plan or otherwise contained in the Plan, or executed and delivered to implement the transactions contemplated under the Plan.

18.     The Restructuring Transactions carry out several of the methods for implementing a chapter 11 plan expressly provided for in Section 1123(a)(5):  Section 1123(A)(5)(B) (transfer of all or any part of the property of the estate to one or more entities); Section 1123(a)(5)(D) (sale of property of the estate, and distribution of other property of the estate to the holders of interests in such property); Section 1123(a)(5)(E) (satisfaction or modification of liens);  and Section 1123(a)(5)(F) (cancellation of indentures and similar instruments).  Most importantly, the Plan implements the sale of substantially all of GVR's assets to GVR Purchaser.

**i.     The Marketing Process for the<br>Sale of the GVR Purchased Assets.**

19.     Approximately one year prior to the Petition Date, GVR undertook a marketing process to sell its business as a going concern or, alternatively, to find a new manager for GVR Hotel if GVR's secured lenders opted to take ownership of GVR Hotel in a "standalone" plan.  GVR engaged restructuring counsel and Oppenheimer & Co. Inc. ("Oppenheimer") as its investment banker and financial advisor for the marketing and sale process.  Starting in May 2010, GVR solicited bids from both potential purchasers of substantially all of GVR's assets and parties to replace SCI as manager of GVR's business should GVR's reorganization plan proceed on a "standalone" basis whereby the GVR First Lien Lenders would exchange their outstanding claims for equity and select managers for the property.  The marketing process to solicit interest included two formal rounds of bidding.  The GVR Transaction Committee (consisting of Dr. James Nave and William Bible) oversaw the marketing process with support from its advisors and analyzed all bids in connection with securing the transactions embodied in the Plan.

20.     Throughout May and June 2010, Oppenheimer contacted over 70 parties with a potential interest in owning or managing GVR's assets.  Twenty-nine of those parties entered into confidentiality agreements and received the first round bid package, which consisted of a confidential information memorandum and other relevant materials, as well as access to an on-line due diligence data room.  From this group, nine parties submitted preliminary letters of

interest ("LOIs") in connection with acquisition proposals and 14 parties submitted management proposals. After evaluating the LOIs, GVR (acting through the GVR Transaction Committee) and its professionals identified six parties who would be invited to a second round of bidding. After consultation with Oppenheimer and GVR's other professionals, the Transaction Committee also selected eight potential managers to advance to the second round. GVR invited these parties to tour its property, sponsored due diligence calls and interviews, and sent those parties a second round package consisting of a second round bid letter, a form asset purchase agreement, a form transition services agreement, and a management transition services agreement (for both bidders on the assets and parties proposing to manage the property). In September 2010, the Steering Committee informed the GVR Transaction Committee that any bids with "take-back" (*i.e.*, seller-provided) financing would be unacceptable to the GVR First Lien Lenders. Three parties submitted final acquisition bids for GVR. Purchase prices ranged from a $316 million bid to a $430 million bid, the highest of which contemplated "take-back" financing. In addition, seven parties submitted final proposals to serve as the manager of GVR.

21.    Following the submission of final acquisition bids, in early November 2010, the GVR Transaction Committee consulted with the Steering Committee, which informed GVR that none of the third party acquisition bids was at an acceptable price and, therefore, the Steering Committee would not support a sale on the terms proposed by the bidders. Concurrently, the Steering Committee provided a term sheet in support of the "standalone" plan to the GVR Transaction Committee. After that meeting, Oppenheimer contacted the three parties that had submitted final acquisition bids and informed them of the Steering Committee's position. Two of the parties indicated that they would not be interested in raising their bids to compete with the GVR First Lien Lenders' "standalone" term sheet. Only the GVR Purchaser increased its bid for GVR's assets, to $485 million in cash, on or about November 17, 2010. Immediately following the GVR Purchaser's increased all-cash bid, the remaining two bidders were contacted by Oppenheimer and encouraged to submit competing bids. Both bidders declined to do so.

22.     During the following month, GVR, acting through the GVR Transaction Committee, and with input from and consultation with the GVR First Lien Lenders Steering Committee, negotiated the purchase price and terms of the GVR Purchase Agreement with GVR Purchaser.  On December 23, 2010, the GVR Purchaser submitted a further revised bid, which included a $500 million cash purchase price and the agreement to pay certain ticking and delay extension fees if the closing of the sale did not occur by April 30, 2011 (all as more particularly described in the Disclosure Statement and GVR Purchase Agreement).  GVR, acting through the GVR Transaction Committee and in consultation with the GVR First Lien Lenders, determined that the final revised bid by GVR Purchaser was the highest and best bid to acquire the GVR Purchased Assets, and on March 2, 2011, the Executive Committee of GVR executed a consent authorizing the transaction.  The sale of the GVR Purchased Assets to the GVR Purchaser is implemented through the Plan.  Time is of the essence in closing the sale in order to ensure that GVR can meet all of the closing conditions contained in the GVR Purchase Agreement and realize the benefits of such agreement for its Estate.  In part, the closing of the sale under the GVR Purchase Agreement must proceed as soon as practicable because the terms of the GVR Purchaser's third-party financing commitment will otherwise expire.  GVR and the GVR Purchaser intend to close the sale of the GVR Purchased Assets as soon as practicable.

23.     Article V.D. of the Plan contains the principal means for the implementation of the Plan with respect to the GVR.  Those provisions include, among other things:

(a)  assumption by GVR of the GVR Purchase Agreement;

(b)  transfer on the Effective Date[6] of the GVR Purchased Assets to the GVR Purchaser;

(c)  assumption by the GVR Purchaser of the GVR Assumed Liabilities;

(d)  payment of the GVR Purchase Price to the GVR First Lien Administrative Agent for distribution to each Holder of a GVR First Lien Allowed Claim on a *pro rata* basis;

(e)  payment of the reasonable and documented professional fees of the GVR First Lien Lenders Steering Committee and the GVR First Lien Administrative Agent;

---

[6]   "Effective Date" means the GVR Effective Date, which shall occur no later than June 30, 2011.

(f)  implementation of the GVR Transition Services Agreement;

(g)  cancellation of prepetition instruments evidencing Claims and Equity Interest against GVR;

(h)  employment of GVR's employees; and

(i)  eventual dissolution of GVR.

24.  GVR has articulated good and sufficient legal and business reasons that justify approving the Restructuring Transactions.  Such reasons include that the GVR Purchase Agreement constitutes the highest and best offer for the GVR Purchased Assets, and the GVR Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the GVR Purchased Assets and will avoid the possible decline and devaluation of such assets in a protracted chapter 11 process.

25.  GVR's entry into the GVR Purchase Agreement and consummation of the Restructuring Transactions with respect to GVR constitute GVR's exercise of sound business judgment.  The sales and related Restructuring Transactions contemplated by the GVR Purchase Agreement are in the best interests of GVR, its Estate, its creditors and all other parties in interest.

26.  The total consideration provided by the GVR Purchaser for the GVR Purchased Assets is the highest and best offer received by GVR, is a fair and reasonable price for the GVR Purchased Assets, and is (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia  ((a), (b) and (c), individually and collectively, "Value").

27.  The GVR Purchaser would not have entered into the GVR Purchase Agreement and would not consummate the Restructuring Transactions, thus adversely affecting GVR, its Estate, and its creditors, if the transfer of the GVR Purchased Assets to the GVR

1   Purchaser, including without limitation the Assumed Contracts,[7] were not being transferred free

2   and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts[8] or other

3   interests, or if the GVR Purchaser or any of its Related Persons would, or in the future could, be

4   liable for any such Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other

5   interests, or if the GVR Purchaser or any of its Related Persons would otherwise be subject to

6   any liability with respect to the operation of GVR's business on or prior to the Effective Date.

7   Accordingly, a sale other than one free and clear of all Liens, Claims, Equity Interests,

8   encumbrances, charges, Other Debts or other interests would impact materially and adversely

9   GVR's Estate and would yield substantially less value for GVR's Estate, with less certainty than

10  the sale pursuant to the GVR Purchase Agreement.  In reaching this determination, the Court has

11  taken into account both the consideration to be realized directly by GVR and its creditors, and

12  the indirect benefits of the Restructuring Transactions for GVR's employees, GVR's vendors

13  and suppliers and the public interest served, directly and indirectly, by the preservation of the

14  value of the GVR Purchased Assets resulting from the transfer of such assets to the GVR

15  Purchaser.

16          28.     There was no evidence of insider influence or improper conduct by the

17  GVR Purchaser, or by any other party in interest, in connection with the negotiation of the GVR

18  Purchase Agreement with GVR, in connection with the marketing of the assets, or otherwise in

19  connection with the sale process. Negotiations with the GVR Purchaser were conducted by

20  GVR, through the GVR Transaction Committee, advised by GVR's advisors, and with input

21  from and consultation with the GVR First Lien Lenders Steering Committee and its counsel and

22  financial advisors and were not conducted by any insiders of GVR.  GVR established a due

23  diligence data room in which the information provided to the successful purchasers was also

24  provided to other potential bidders.  There was also no evidence of fraud or collusion among the

25  _____

26  [7]   Assumed Contracts is defined as the contracts and leases listed on the Schedule of Executory Contracts and
       Unexpired Leases of GVR.

27  [8]   As used herein and in the Confirmation Order, "Other Debts" means Liens, Claims, Equity Interests,
       encumbrances charges or other interests, whether presently known or unknown, in any way relating to or arising
       from: (a) the operations of GVR prior to the Effective Date; or (b) consummation the Plan, the Restructuring
28     Transactions or any other transactions consummated in accordance with the Plan.

GVR Purchaser and any other bidders for GVR's assets, or collusion between GVR and the GVR Purchaser to the detriment of any other bidders, the sale process or GVR's Estate.

29.    During the marketing process, GVR negotiated with GV Ranch and SCI, the terms of a Transition Services Agreement, pursuant to which SCI, through GV Ranch, will continue to provide the services enumerated under the GVR Operating Agreement until the effective date of the SCI Plan, after which Fertitta Entertainment LLC will replace SCI as manager and will provide these services to GVR.  GVR began negotiating the terms of the Transition Services Agreement early in the marketing process, anticipating the needs of the purchaser if an outside party not affiliated with FG were to submit the highest and best offer for GVR's assets and seek to manage GVR Hotel independently.  GVR's arms'-length negotiations in connection with the Transition Services Agreement further evidences its good faith in achieving the best and highest price for its creditors.

30.    GVR is entering into the GVR Purchase Agreement and performing its obligations thereunder and under the other Restructuring Transactions in good faith and with lawful purpose, and has the legal power and authority to convey all of its right, title and interest in and to the GVR Purchased Assets to the GVR Purchaser.  GVR has:  (a) full power and authority to execute the GVR Purchase Agreement and all other documents contemplated thereby, and the sales have been duly and validly authorized by all necessary company action of each Debtor as applicable; (b) the necessary power and authority to perform its obligations under the Restructuring Transactions contemplated by the Plan; and (c) taken all company action necessary to authorize, approve and enter into the GVR Purchase Agreement and consummate the Restructuring Transactions contemplated by the Plan.  No consents or approvals or further actions, other than those expressly required by the terms of the GVR Purchase Agreement or in the Schedules thereto (including the Nevada Gaming Commission consent), are required for GVR to close the sale and consummate the Restructuring Transactions.

31.    No brokers were involved in consummating the sale or the Restructuring Transactions, and no brokers' commissions are due to any Person or Entity in connection with the sale or the Restructuring Transactions.

1
2

        **c.     Section 1123(a)(6) – Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

3        32.     GVR is not issuing equity securities.  The Plan complies with the

4    requirements of Section 1123(a)(6).

5
6

        **d.     Section 1123(a)(7) – Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

7        33.     The Plan complies with the requirements of Section 1123(a)(7) because,

8    under the Plan, on, or a soon as practical after, the Effective Date, GVR will be dissolved and all

9    officers will be dismissed.  In their place, Richard J. Haskins and Thomas M. Friel will be

10    appointed, through the Confirmation Order, as the Plan Administrators.  As a result, the Plan

11    contains no provisions with respect to the manner of selection of new officers and directors that

12    is inconsistent with public policy or the interests of Holders of Claim and Equity Interests.

13
14

        **e.     Section 1123(b)(1)-(2) – Impairment of Claims and Equity Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.**

15        34.     In accordance with the requirements of Section 1123(b)(1), Article III of

16    the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Equity

17    Interests.  Consistent with 1123(b)(2), Article VI of the Plan provides for the assumption by

18    GVR and assignment to the GVR Purchaser on the Effective Date of certain designated

19    Executory Contracts and Unexpired Leases, and the rejection of all other Executory Contracts

20    and Unexpired Leases, in all cases in accordance with, and subject to, the provisions and

21    requirements of Sections 365 and 1123.  Accordingly, the Plan satisfies the requirements of

22    Sections 1123(b)(1) and (b)(2).

23
24

        **f.     Section 1123(b)(3) – Retention, Enforcement and Settlement of Claims Held by the Debtors.**

25        35.     As authorized by Section 1123(b)(3), (i) Article X.E. of the Plan provides

26    for the retention by GVR of Causes of Action and Litigation Claims, if any exist, not expressly

27    released or settled under the Plan, and (ii) Articles X.B. and X.C. of the Plan provide for certain

28    settlements and releases.

1        **g.        Section 1123(b)(4) – Sale of Assets of the Estate.**

2        36.    Consistent with Section 1123(b)(4), the Plan provides for the sale of

3    substantially all of the GVR Purchased Assets to the GVR Purchaser and the distribution of the

4    proceeds of the sale to GVR's creditors in the order of priority of their Claims.

5        **h.        Section 1123(b)(5) – Modification of**

6        **the Rights of Holders of Claims.**

7        37.    In accordance with the requirements of Section 1123(b)(5), Article III of

8    the Plan modifies, or leaves unaffected, as the case may be, the rights of holders of each Class of

9    Claims.  Some Classes of Claims receive payment in full in cash and/or are Unimpaired.  Some

10   Classes of Claims receive cash.  Some Classes of Claims receive nothing under the Plan.

11       **i.        Section 1123(b)(6) – Other Provisions Not Inconsistent**

12       **with Applicable Provisions of the Bankruptcy Code.**

13       38.    The Plan includes additional appropriate implementation provisions that

14   are not inconsistent with applicable provisions of the Bankruptcy Code, including:  (i) the

15   provisions of Article VII of the Plan governing distributions on account of Allowed Claims; (ii)

16   the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims

17   and making distributions on account of such Disputed Claims once resolved; (iii) the provisions

18   of Article X of the Plan regarding the treatment of the provisions of the Plan as a Comprehensive

19   Settlement, releases by GVR, voluntary releases by Holders of Claims and Equity Interests, and

20   certain exculpation provisions.

21       **j.        Section 1123(d) – Cure of Defaults.**

22       39.    In accordance with the requirements of Section 1123(d), Article VI of the

23   Plan provides for the cure of defaults in respect of all Executory Contracts and Unexpired Leases

24   that are being assumed under the Plan and assigned to the GVR Purchaser, and requires that such

25   cure payments be made consistent with the requirements of Section 365(b) and 365(c).

26

27

28

2.      **Section 1129(a)(2) – Compliance with**
        **Applicable Provisions of the Bankruptcy Code.**

40.      In accordance with the requirements of Section 1129(a)(2), GVR has complied with all applicable provisions of the Bankruptcy Code, including Sections 1125 and 1126 and Bankruptcy Rules 3016, 3017 and 3018. Adequate disclosures of the prepetition financial condition of GVR and of the terms and purposes of the Restructuring Transactions were made during the course of the extensive prepetition marketing of GVR's assets and the Prepetition Solicitation. The Disclosure Statement contained a detailed description of (a) the business of GVR and the terms and purposes of the Restructuring Transactions contemplated under the Plan, (b) the classification and treatment of Claims against and Equity Interests in GVR under the Plan, and (c) the other principal provisions of the Plan. The Disclosure Statement also discusses certain securities laws, gaming regulations and federal income tax considerations that may be applicable to the transactions contemplated under the Plan and the decisions of creditors whether to vote to accept or reject the Plan. Accordingly, the Disclosure Statement distributed in connection with the Prepetition Solicitation contained adequate information as defined in Section 1125(a), and the other materials that were included in the Solicitation Package provided members of the Voting Classes with substantial additional material information.

41.      The twenty-one day period for voting provided to the members of the Voting Classes complied with the requirements of Bankruptcy Rule 3018(b) that the solicitation period not be unreasonably short. The Disclosure Statement was filed with the Court on the Petition Date in compliance with Bankruptcy Rule 3016(b). The Solicitation Package complied with the requirements of Bankruptcy Rule 3017 regarding the contents of Solicitation Packages, and the Solicitation Procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair and properly conducted, all in accordance with the requirements of Sections 1125 and 1126, and Bankruptcy Rules 3016, 3017 and 3018. GVR and the other Exculpated Parties have acted in good faith within the meaning of Section 1125(e) and are entitled to the benefits thereof.

**3.**     <u>Section 1129(a)(3) – Proposal of the Plan in Good Faith</u>.

42.     In accordance with the requirements of Section 1129(a)(3), GVR proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan, including the support thereof by the GVR First Lien Lenders.  Based on the record of this chapter 11 case and the evidence presented at the Confirmation Hearing, the Court finds and concludes that the Plan has been proposed with the legitimate and honest purpose of maximizing the returns available to creditors of GVR through the marketing and sale of the GVR Purchased Assets for the highest and best price.  Moreover, the Plan itself, the extensive arms' length negotiations among the GVR Transaction Committee, on behalf of GVR, and the GVR Purchaser in connection with the GVR First Lien Lenders leading to the Plan's formulation, and the concerted efforts of GVR and the GVR Purchaser under the GVR Purchase Agreement to accommodate the liquidity needs of GVR's numerous trade creditors during extremely difficult economic times in Nevada provide independent evidence of GVR's good faith in proposing the Plan.

43.     There is express statutory authority and ample precedent in numerous confirmed chapter 11 plans for the implementation of the principal Restructuring Transactions under the Plan.  Section 1123(a)(5)(D) expressly authorizes a chapter 11 plan to provide for the sale of some or all of property of the estate.  Thus, the Plan falls well within the four corners of settled chapter 11 practice, and, if confirmed, achieves a result consistent with the objectives and purposes of the Bankruptcy Code.

**4.**     **Section 1129(a)(4) – Bankruptcy Court**
                <u>Approval of Certain Payments as Reasonable</u>.

44.     In accordance with the requirements of Section 1129(a)(4), Article II.A.2. of the Plan makes all payments on account of Professional Fee Claims for services rendered on or prior to the Effective Date subject to the requirements of Sections 327, 328, 330, 331, 503(b) and 1103, as applicable, by requiring Professionals to file final fee applications with the Court. The Court will review the reasonableness of such applications under Sections 328 and 330 and

any applicable case law.  Article XI. of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.

**5.    Section 1129(a)(5) – Disclosure of Post-Effective Date Management of Debtors and Compensation of any Insiders.**

45.    The Plan complies with the requirements of Section 1129(a)(5) because GVR has proposed and disclosed that Richard J. Haskins and Thomas M. Friel will serve as the Plan Administrators, pursuant to the Plan, and such appointment will be subject to Court approval, which approval is granted in the Confirmation Order.  The GVR Purchaser is not a successor to GVR or an affiliate of GVR participating in a joint plan with the Debtors, and therefore Section 1129(a)(5) does not apply to the GVR Purchaser.

**6.    Section 1129(a)(6) – Approval of Rate Changes.**

46.    GVR's current businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction.  Accordingly, Section 1129(a)(6) does not apply to the Plan.

**7.    Section 1129(a)(7) – Best Interests of Holders of Claims and Equity Interests.**

47.    Section 1129(a)(7) requires that GVR show that, with respect to each Impaired Class of Claims or Equity Interests, each holder of a Claim or Equity Interest in such Impaired Class has either (a) accepted or is deemed to have accepted the Plan or, (b) as demonstrated by the GVR Liquidation Analysis included as Exhibit B to the Disclosure Statement, will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if GVR were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  Even though no Holder of a Claim or Equity Interest in an impaired Class objected to confirmation of the Plan on the basis that it was not receiving or retaining under the Plan as much as it would receive in a chapter 7 liquidation of GVR, GVR has nevertheless submitted

1   substantial evidence to show that the Plan complies with Section 1129(a)(7) with respect any

2   such hypothetical objecting Holder.

3                   **(a)**      **Secured Creditors.**

4                   48.     The Liquidation Analysis distributed with the Plan showed that a

5   liquidation of the assets of GVR would not be sufficient to satisfy the GVR First Lien Allowed

6   Claims, which are at least $603.2 million, leaving no proceeds available for distributions to

7   Holders of Allowed GVR Second Lien Term Loan Claims, allowed General Unsecured Claims,

8   or Equity Interests in GVR.  After a substantial marketing process, the highest and best price

9   obtained for the GVR Purchase Assets was the purchase price under the GVR Purchase

10  Agreement, which is $500 million in cash.  If those very same GVR Purchased Assets were

11  liquidated in a chapter 7 proceeding, the net proceeds would be substantially less than $500

12  million because of, among other things:  (i) the substantial delay that would be incurred in

13  connection with the appointment of a chapter 7 trustee and the time required  for the trustee and

14  his or her professionals to fully understand GVR's situation; (ii) the fees payable to a chapter 7

15  trustee and newly appointed estate professionals; (iii) the likely discounts that would be realized

16  in one or more chapter 7 auctions of the applicable assets; and (iv) the likelihood that GVR

17  Purchaser would terminate the GVR Purchase Agreement based on a number of termination

18  triggers that would likely occur if the case were converted to a case under chapter 7, including

19  the failure to confirm a plan by June 15, 2011.  As a result, the GVR Liquidation Analysis takes

20  the actual purchase price obtained by GVR after a thorough arm's length marketing process and

21  discounts such price to reflect the forced sale nature of a chapter 7 process.  Indeed, the GVR

22  Liquidation Analysis shows that the range of chapter 7 liquidation values is between $325 and

23  $375 million.  Therefore, the distributions provided to GVR First Lien Allowed Claims under the

24  Plan are greater than under the GVR Liquidation Analysis, and the Holders of GVR Second Lien

25  Term Loan Claims are receiving at least as much under the Plan as they would under an

26  hypothetical chapter 7 liquidation proceeding.

27

28

**(b)     Unsecured Creditors.**

49.     Under the Plan, the Holders of General Unsecured Claims and Second Lien Term Loan Claims against GVR will receive no distributions, and they would also not receive anything in a liquidation, since all of the proceeds of the liquidation would be exhausted to pay to the holders of administrative and other priority claims and Holders of GVR First Lien Claims.  As a result, the Holders of General Unsecured Claims against GVR are receiving under the Plan at least as much as they would receive in a chapter 7 liquidation, and the Plan satisfies the best interests of creditors test as to those creditors.

**(c)     Equity Interests.**

50.     Holders of Equity Interests in GVR are not receiving or retaining any property under the Plan, and they would not receive anything in a liquidation of GVR, because all of the proceeds of the liquidation would be paid to holders of administrative and other priority claims and GVR First Lien Claims.  As a result, the Holders of Equity Interests in GVR are receiving under the Plan at least as much as they would receive in a chapter 7 liquidation, and the Plan satisfies the best interests of creditors test as to them as well.

51.     The Court finds that (a) the methodology used by GVR and its financial advisors in estimating the liquidation value of GVR, as set forth in the GVR Liquidation Analysis, is reasonable, (b) the GVR Liquidation Analysis was prepared in good faith, and (c) the results of the GVR Liquidation Analysis fall well within the four corners of a traditional best interests of creditors analysis.  The Court further finds that the Plan complies with the requirements of Section 1129(a)(7) with respect to each Holder of Claims or Equity Interest.

**8.     Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class.**

52.     As indicated in the Plan and Disclosure Statement with respect to GVR:

(a) the following Class of Unimpaired Claims was deemed to have accepted the Plan and was not entitled to vote on the Plan – Class GVRG.1;

(b) the following Class of Impaired Claims and Equity Interests are not retaining or receiving any property under the Plan, are therefore deemed to have rejected the Plan, and were not entitled to vote on the Plan – Classes GVRG.3, GVRG.4 and GVRG.5; and

-20-

(c)  the Voting Class was Class GVRG.2.

As demonstrated by the Tabulation of Ballots prepared by the Voting Agent, the Voting Class voted to accept the Plan, and no Classes of Claims voted to reject the Plan.

53.    The Plan does not comply with the requirement of Section 1129(a)(8) that all impaired Classes of Claims and Equity Interests vote to accept the Plan because Classes of Claims and Equity Interests that receive nothing under the Plan are deemed to have rejected the Plan.  Nevertheless, the Plan is confirmable because, as discussed below, the Plan satisfies the cramdown requirements of Section 1129(b) with respect to all non-accepting Classes.

**9.    Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

54.    In accordance with the requirements of Section 1129(a)(9), the Plan provides that: (a) with respect to Administrative Claims, on the later of the Effective Date or when an Administrative Claim becomes an Allowed Administrative Claim, the Allowed Administrative Claim shall be paid in cash in the full unpaid Allowed amount of the Claim, unless the Holder agrees to less favorable treatment; (b) the rights of the Holders of Priority Tax Claims are unaltered under the Plan as under Section II.B. of the Plan, Holders of Priority Tax Claims will receive, at the election of GVR, (i) payment in full in cash of the Allowed amount of such Claim, (ii) less favorable treatment if the Holder agrees, or (iii) installment payments in accordance with the requirements of Sections 1129(a)(9)(C) and (D); and (c) the rights of the Holders of Other Priority Claims either are unaltered or Holders of Other Priority Claims will receive payment in full in cash of the Allowed amount of such Claim.

**10.    Section 1129(a)(10) – Acceptance by at Least One Impaired Class.**

55.    In accordance with the requirements of Section 1129(a)(10), as indicated in the report of the Voting Agent and as reflected in the record of the Confirmation Hearing, at least one Class of Claims or Equity Interests that is Impaired under the Plan voted to accept the Plan.  Indeed, Holders of Claims in Class GVRG.2, the sole Voting Class under the Plan with respect to GVR, voted to accept the Plan, representing over 99% in dollar amount and over 95% in number.  Finally, Holders of GVR First Lien Claims are not insiders.

**11.    Section 1129(a)(11) – Feasibility of the Plan.**

56.    The Plan is a liquidating Plan for GVR.  The record of this chapter 11 case evidences that the GVR Purchaser has the financial wherewithal and desire to close on the Restructuring Transactions.  Thus, the liquidating aspect of the Plan is feasible.  Accordingly, the Plan satisfies the requirements of Section 1129(a)(11).

**12.    Section 1129(a)(12) – Payment of Bankruptcy Fees.**

57.    In accordance with the requirements of Section 1129(a)(12), Article XII.A. of the Plan provides that Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash on the Effective Date.  After the Effective Date, the Plan Administrators will pay all required fees pursuant to 28 U.S.C. § 1930 or any other statutory requirement and comply with all statutory reporting requirements.

**13.    Section 1129(a)(13) – Retiree Benefits.**

58.    GVR is liquidating, and after the Effective Date will have no obligations regarding any retiree benefits of the kind referred to in Section 1114; therefore, Section 1129(a)(13) does not apply to GVR.

**14.    Section 1129(a)(14), (15) and (16) Do Not Apply.**

59.    Sections 1129(a)(14), (15) and (16) address domestic support obligations, individual debtors, and non-moneyed businesses, and they do not apply to GVR.

**15.    Section 1129(b) – Confirmation of the Plan
Over the Nonacceptance of Impaired Classes.**

60.    Section 1129(b) authorizes the Court to confirm the Plan even if not all Impaired Classes have accepted the Plan (a "cramdown"), provided that the Plan has been accepted by at least one impaired class and the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class that voted to reject the Plan. Here, Class GVRG.2, an Impaired Class of Claims, voted to accept the Plan.  Thus, the requirement that at least one Impaired Class vote to accept the Plan is satisfied.

61.    The Plan is fair and equitable with respect to Class GVRG.3 because it satisfies the cramdown test contained in Section 1129(b)(2)(A)(ii).  GVR's assets that are subject

-22-

to the liens of the Holders of GVR Second Lien Term Loan Claims are being sold to GVR Purchaser under the Plan and the subordinated liens of the Holders of GVR Second Lien Term Loan Claims will attach to the sale proceeds. Under the Plan, the sale proceeds will be paid to the GVR First Lien Administrative Agent for distribution *pro rata* to Holders of GVR's First Lien Allowed Claims, which by the terms of the Intercreditor Agreement are entitled to payment in full prior to any distribution being made to the Holders of GVR's Second Lien Term Loan Claims. Because the GVR First Lien Allowed Claims will not be fully satisfied, there are no proceeds available for payment to Holders of GVR Second Lien Term Loan Claims.

62.    Section 1129(b)(2)(B)(ii) requires, with respect to a class of unsecured claims, that (1) each holder of a claim receive on account of its claim property equal to the allowed amount of such claim or (2) no holder of a claim or interest that is junior to the claims in such class will receive or retain any property on account of such junior claim or interest in any property (the "absolute priority rule"). The Plan meets this test with respect to the General Unsecured Claims in Class GVRG.4 and the Second Lien Term Loan Claims in Class GVRG.3 because it does not provide for any distributions to the only junior Class - Class GVRG.5. Holders of Equity Interests in GVR are not receiving any property on account of their interests under the Plan.

63.    The Plan is fair and equitable with respect to the Class of Equity Interest in GVR, GVRG.5, because there are no junior interest holders to the non-accepting Class.

64.    The Plan does not discriminate unfairly with respect to any non-accepting Class because there are no substantially similar Classes of Claims. Thus, all similar Claims are treated similarly.

**16.    Bankruptcy Rule 3016(a).**

65.    In accordance with the requirements of Bankruptcy Rule 3016(a), the Plan is dated and identifies the entities submitting the Plan.

**17.    Section 1129(d) – Purpose of Plan.**

66.    No allegation was made during the course of the chapter 11 case that the primary purpose of the Plan was avoidance of taxes or avoidance of the requirements of

1    Section 5 of the Securities Act, and no objection was filed by any Governmental Unit asserting

2    any such avoidance.  Based upon a review of the record of the chapter 11 case, the Court finds

3    no evidence of any intent to avoid payment of taxes or the requirements of Section 5 of the

4    Securities Act.  The Plan and Disclosure Statement, which were filed with the Court upon the

5    commencement of the chapter 11 case, provide adequate notice to all Persons and Entities,

6    including the Internal Revenue Service, the U.S. Securities and Exchange Commission and other

7    applicable Governmental Units of the intent of the Plan to cause the issuance of securities

8    exempt from registration requirements under applicable state and federal securities laws, and the

9    Disclosure Statement provides adequate notice of the federal income tax consequences of the

10   Plan for GVR and certain Holders of Claims and Equity Interests.

11              **C.    SETTLEMENTS, RELEASES, EXCULPATIONS AND INJUNCTIONS.**

12              67.    The settlement, release and exculpation provisions set forth in Article X of

13   the Plan are made in exchange for consideration, and are:  (a) the result of a carefully-negotiated

14   good-faith settlement among GVR and its major stakeholders; (b) meant to provide relief from

15   future litigation and the prospect of future litigation that would have substantially derailed

16   GVR's restructuring efforts; (c) fair and necessary for successful Plan confirmation; and (d)

17   supported by creditors holding allowed undisputed secured Claims that will be impaired under

18   the Plan.  In connection with the Confirmation Hearing, no party in interest filed an objection to

19   Article X of the Plan, which also provides for an injunction in support of the settlements, releases

20   and exculpations contained therein.

21              **1.    Article X.B.1. of the Plan – The Comprehensive**
                       **Settlement of Claims and Controversies.**

22

23              68.    Article X.B.1. of the Plan provides that the Plan constitutes a general

24   comprehensive settlement (the "Comprehensive Settlement") of all Claims, Litigation Claims,

25   Causes of Action and controversies relating to (a) the rights that Holders of Claims or Equity

26   Interests may have with respect to any Claim or Equity Interest against any Debtors, (b) the

27   distributions, if any, made under the Plan on account of such Claims and Equity Interests, and

28   (c) any Claims or Causes of Action of any party arising out of or relating to the Prepetition GVR

Transactions and all transactions relating thereto.  The Comprehensive Settlement is a

fundamental component of the overall restructuring contained in the Plan because it assures

GVR and its Estate that the Plan and the distributions made thereunder will result in the final

settlement and satisfaction of the various Claims against and Equity Interests in GVR.  The

Comprehensive Settlement promotes the finality of the Plan and repose.  The Court finds that the

Comprehensive Settlement is in the best interests of Holders of Claims and Equity Interests and

GVR and its Estate and property, and is fair and equitable, and any distributions to be made

pursuant to the Plan shall be deemed to have been made on account of the Comprehensive

Settlement and in consideration thereof.

### 2.    Article X.B.2. of the Plan - The Global Settlement of the GVR Prepetition Transactions Causes of Action.

69.    Article X.B.2 of the Plan implements the Global Settlement, which

provides for the compromise and settlement of all of the GVR Prepetition Transactions Causes of

Action among GVR and its Estate, and any Person, Entity or Governmental Unit.  Pursuant to

the Article X.B.2 of the Plan, (x) all distributions made under the Plan are on account of and in

consideration of the Global Settlement, and (y) the Global Settlement is binding on GVR and its

Estate and on all creditors who indicate on their Ballot their agreement to grant the releases

provided for in Article X of the Plan.  Article X.C.1., in turn, provides for a release of the GVR

Prepetition Transactions Causes of Action by the Releasing Parties, which Releasing Parties

includes GVR, its Estate, and any Holder of a Claim or Equity Interest that would have been able

to assert the GVR Prepetition Transactions Causes of Action for or on behalf of GVR or its

Estate.  In connection with the Confirmation Hearing, no party in interest has objected to the

Global Settlement.

### (a)    The GVR Prepetition Transactions.

70.    In August 2010, GVR formed the GVR Investigation Committee to

conduct an investigation of certain prepetition transactions and events, and William Bible was

appointed to serve as the sole member of the GVR Investigation Committee.  The GVR

Investigation Committee was charged with investigating:  (a) the distribution to the owners of

1   GVR occurring in connection with the 2007 refinancing that resulted in the First Lien

2   Obligations and the Second Lien Obligations (the "GVR 2007 Distribution") and (b) the

3   forgiveness in January 2008 of certain notes issued in connection with the 2007 Distribution (the

4   "GVR 2008 Note Forgiveness"); and (c) the management of GVR by GV Ranch as alleged in the

5   Motion to Dismiss filed in the GV Ranch chapter 11 case ("Motion to Dismiss").

6           71.     To conduct its investigation, the GVR Investigation Committee collected

7   and reviewed nearly 30,000 documents and interviewed 25 witnesses, and presented its findings

8   to the Executive Committee on February 14, 2011.  The GVR Investigation Committee found

9   that there was not sufficient evidence to support a claim challenging:  (a) the GVR 2007

10  Distribution and GVR 2008 Note Forgiveness; or (b) the management of GVR as alleged in the

11  Motion to Dismiss.  The GVR Investigation Committee made the following findings regarding

12  the GVR 2007 Distribution and GVR 2008 Forgiveness:

13          (a) the financial projections in connection with the GVR 2007 Distribution

14  and the GVR 2008 Note Forgiveness were reasonable at the time they were made ; and

15          (b) GVR: (i) was not insolvent at the time of the GVR 2007 Distribution

16  or GVR 2008 Note Forgiveness and did not become insolvent as a result of the GVR 2007

17  Distribution or GVR 2008 Note Forgiveness; (ii) was not left with unreasonably small assets in

18  relation to its business at the time of the GVR 2007 Distribution or GVR 2008 Note Forgiveness;

19  (iii) did not intend to incur, did not believe it would incur, or should not have reasonably

20  believed it would incur debts beyond its ability to pay at the time of the GVR 2007 Distribution

21  or GVR 2008 Note Forgiveness; (iv) did not intend to hinder, delay, or defraud any creditor by

22  completing the GVR 2007 Distribution or GVR 2008 Note Forgiveness; and (v) did not violate

23  Nevada Revised Statute Section 86.343 because GVR was able to pay its debts in the usual

24  course of business and GVR's assets exceeded its total liabilities following the GVR 2007

25  Distribution and GVR 2008 Note Forgiveness.

26          72.     The GVR Investigation Committee made the following findings regarding

27  the allegations in the Motion to Dismiss:

28

(a) there is no credible evidence that GV Ranch attempted to systematically divert high-end table play from GVR;

(b) although the salary of one GV Ranch employee was misallocated to GVR for one month, the misallocation was immaterial to GVR's financial and business operations;

(c) there is no evidence that GV Ranch implemented a company-wide marketing program with the intent to harm GVR;

(d) the steakhouse allegations are immaterial to GVR's financial and business operations; and

(e) GV Ranch complied with its contractual obligations and fiduciary duties in managing GVR.

73.    Based upon the thorough and independent investigation completed by the GVR Investigation Committee, the Executive Committee did not pursue any claims relating to the GVR 2007 Distribution, the GVR 2008 Note Forgiveness, or the allegations raised in the Motion to Dismiss.  The Executive Committee adopted the conclusions of the GVR Investigation Committee and determined: (1) success in litigation pursuing the claims would be unlikely and (2) the pursuit of such claims would not be in the best interests of GVR and its estate.

3.    **Article X.C. of the Plan – Releases Among Releasing Parties and Released Parties.**

74.    Article X.C. of the Plan provides for certain releases.  The releases are (a) releases of claims held by GVR and its Estate (Article X.C.1.) against the identified released parties, to the fullest extent permissible under applicable law, and (b) voluntary releases of claims held by Holders of Claims and Equity Interests against the identified released parties, to the fullest extent permissible under applicable law (Article X.C.2.).

75.    GVR's Release.  Article X.C.1. of the Plan provides that, upon the Effective Date, to the fullest extent permissible under applicable law, and subject to certain identified exceptions, GVR, GVR's Estate, and each of its Related Persons fully releases and discharges each of the following parties and their respective properties and Related Persons from any and all claims and causes of action, Avoidance Actions and Other Debts (including, without

limitation, the GVR Prepetition Transactions Causes of Action) based upon any act, omission or event that takes place on or prior to the Effective Date and arises from or is related to GVR or its respective assets, property, Estate, this chapter 11 case, the Disclosure Statement, the Plan, or the solicitation of votes on the Plan that either the releasing parties could assert or that any Holder of a Claim or Equity Interest could assert for or on behalf of GVR or its Estate (whether directly or derivatively): (a) the Subsidiary Debtors and their respective Estates; (b) the SCI Debtors and their respective Estates; (c) Fertitta Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco; (g) Voteco; (h) the Plan Administrators, solely in their capacity as such; (i) the Mortgage Lenders, solely in their capacity as such; (j) the SCI Swap Counterparty, solely in its capacity as such; (k) the Land Loan Lenders, solely in their capacities as such; (l) the Mezzco Lenders, solely in their capacity as such; (m) New Opco; (n) the Opco Administrative Agent, solely in its capacity as such; (o) the Consenting Opco Lenders, solely in their capacity as Prepetition Opco Secured Lenders; (p) Colony Capital, LLC; (q) the Settling Lenders, but only if all of the applicable terms and conditions of the Settling Lenders Stipulation are satisfied by the Settling Lenders; (r) the SCI Committee and its members, provided that the Committee Plan Support Stipulation (as defined in the SCI Plan) has not been terminated as of the Subsidiary Debtors Effective Date; (s) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Subsidiary Debtors Effective Date; (t) the GVR First Lien Administrative Agent, solely in its capacity as such; (u) GVR Purchaser; (v) the GVR First Lien Lenders, solely in their capacities as GVR First Lien Lenders; (w) the GVR Transaction Committee and its members; (x) the GVR Investigation Committee and its members; (y) the Aliante Debtors and their respective Estates; (z) Reorganized Aliante Gaming; (aa) the Aliante Lenders, solely in their capacities as Aliante Lenders and each and every Person or entity, including without limitation, a Registered Intermediary Company, designated by any Aliante Lender to receive all or any part of the Distribution in respect of such Aliante Lenders' Allowed Class AGL.1 Claim; (bb) the Aliante Administrative Agent solely in its capacity as such; (cc) the Aliante Transaction Committee and its members, solely in their capacities as such; (dd) the Executive Committee of GVR and its members, solely in their capacities as such; (ee)

the Executive Committee of Aliante Gaming and its members, solely in their capacities as such;
(ff) ALST Casino Holdco; and (gg) the respective Related Persons of each of the foregoing
Entities identified in subsections (a) through (ee) (as defined in the Plan, the "Released Parties")
("GVR's Release").

76.     GVR's Release reflects a sound exercise of GVR's business judgment.  In
order to effectively implement the Plan, the non-Debtor parties thereto need assurance that they
will not be subject to any further liability to GVR, its Estate, or any party that seeks to bring a
claim on behalf of GVR or its Estate.  Absent GVR's Release, it is likely that the various
Released Parties would not commit to support the Plan because they would remain exposed to
potential claims and causes of action.

77.     The Third Party Release.  Article X.C.2. of the Plan provides that, upon
the Effective Date, to the fullest extent permissible under applicable law, and subject to certain
identified exceptions, each Holder of a Claim or Equity Interest that has indicated on its Ballot
its agreement to grant the release contained in Article X.C.2 fully releases and discharges each of
the Released Parties from any and all claims and causes of action, Avoidance Actions, and Other
Debts (including, without limitation, the GVR Prepetition Transactions Causes of Action) based
on any act, omission or event that takes place on or before the Effective Date in any way relating
or pertaining to (a) the purchase or sale, or the rescission of a purchase or sale, of any security of
GVR, (b) GVR or its respective assets, property and Estate, (c) the Chapter 11 Cases, (d) the
negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related
agreements, instruments or other document including, without limitation, all of the documents
included in the Plan Supplement, and (d) the GVR Prepetition Transactions Causes of Action
(the "Third Party Release").

78.     Similar to GVR's Release, the Third Party Release provides assurance to
the parties to the Plan and the other parties in interest in this chapter 11 case that their liability on
account of claims related to GVR (including the GVR Prepetition Transactions Causes of
Action) will be minimized, and provides an additional incentive for such parties to settle and
consent to the Plan.  The Third Party Releases set forth in Article X.C.2. of the Plan are being

1  made on a wholly voluntary basis by Holders of Claims or Equity Interests that have indicated on

2  their Ballot that they are consenting to such release. The Ballots sent to each Holder of a Claim

3  or Equity Interest entitled to vote on the Plan unambiguously stated that the election to consent to

4  such release was at such Holder's option. The entirely voluntary Third Party Release is an

5  effective tool in winning the necessary support for the Plan, and does not prejudice the rights of

6  any party that did not agree to such Third Party Release. No party in interest objected to GVR's

7  Release or the Third Party Release.

8          **4.**      **Article X.D. of the Plan – Exculpation.**

9          79.      Article X.D. of the Plan provides, subject to certain identified exceptions,

10  an exculpation of the following parties from any Claims or Causes of Action arising prior to or

11  on the Effective Date for any act taken or omitted to be taken in connection with, or related to the

12  Chapter 11 Cases, including formulating, negotiating, preparing, disseminating, implementing,

13  administering, soliciting, confirming or effecting the Consummation of the Plan, the Disclosure

14  Statement or any sale, contract, instrument, release or other agreement or document created or

15  entered into in connection with the Plan or any other prepetition or postpetition act taken or

16  omitted to be taken in connection with or in contemplation of the restructuring of GVR, the

17  approval of the Disclosure Statement, confirmation or Consummation of the Plan: (a) the

18  Subsidiary Debtors and their respective Estates; (b) the SCI Debtors and their respective Estates;

19  (c) Fertitta Entertainment (f/k/a FG); (d) New Propco; (e) the New Opco Purchaser; (f) Holdco;

20  (g) Voteco; (h) the Plan Administrators; (i) the Mortgage Lenders, solely in their capacity as

21  such, (j) the SCI Swap Counterparty, solely in its capacity as such, the Land Loan, (k) GVR and

22  its Estate; (l) the GVR First Lien Administrative Agent, solely in its capacity as such; (m) GVR

23  Purchaser; (n) the Consenting GVR Lenders, solely in their capacities as GVR First Lien

24  Lenders; (o) the GVR Transaction Committee and its members; (p) the GVR Investigation

25  Committee and its members; (q) the Executive Committee of GVR and its members, solely in

26  their capacities as such; (r) the Mezzco Lenders, solely in their capacity as such; (s) New Opco;

27  (t) the Opco Administrative Agent, solely in its capacity as Prepetition Opco Secured Lenders;

28  (u) Colony Capital, LLC; (v) the Settling Lenders, but only if all of the applicable terms and

conditions of the Settling Lenders Stipulation are satisfied by the Settling Lenders; (x) the SCI Committee and its members, provided that the Committee Support Stipulation (as defined in the SCI plan) has not been terminated as of the Subsidiary Debtors Effective Date; (y) the Put Parties, provided that the Put Parties Support Agreement and the Propco Commitment have not been terminated as of the Subsidiary Debtors Effective Date; (z) the Aliante Debtors and their respective Estates; (aa) Reorganized Aliante Gaming; (bb) the Aliante Lenders, solely in their capacities as Aliante Lenders and each and every Person or Entity, including without limitation, a Registered Intermediary Company, designated by any Aliante Lender to receive all or any part of the Distribution in respect of such Aliante Lenders' Allowed Class AGL.1 Claim; (cc) the Aliante Administrative Agent solely in its capacity as such; (dd) the Aliante Transaction Committee and its members, solely in their capacities as such; (ee) the Executive Committee of Aliante Gaming and its members, solely in their capacities as such; (ff) ALST Casino Holdco (gg) the respective Related Persons of each of the foregoing Entities identified in subsections (a) through (gg).

80.    The Plan's exculpation provision provides additional incentive for the various major parties to the Chapter 11 Cases to commit to and support the Plan. The exculpation ensures that such parties will not be subject to any claims or causes of action relating to their good faith acts or omissions in the restructuring efforts that began in May 2010. The exculpation ensures that the Plan will have finality, and that the parties thereto will not be subject to collateral attacks through litigation against the Plan's proponents and supporters. In connection with the Confirmation Hearing, no party in interest objected to the exculpation provisions of the Plan.

81.    The Court finds that the settlement, release, injunction and exculpation provisions set forth in Article X. of the Plan (i) are integral to the agreement among the various parties in interest and the overall objectives of the Plan, (ii) are essential to the formulation and successful implementation of the Plan for the purposes of Section 1123(a)(5), (iii) are being provided for valuable consideration and have been negotiated in good faith and at arms' length, (iv) confer material and substantial benefits on GVR's Estate, and (v) are in the best interests of

GVR, its Estate and other parties in interest and, as to the releases made by, or on behalf of, GVR or its Estate, are based on sound business judgment.

### 5.    No Successor Liability.

82.    Section 1141(c) provides in relevant part that "after confirmation of a plan, the property dealt with by a plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." 11 U.S.C. § 1141(c).[9]  In addition, Section 363(f) provides statutory authority for the sale of estate property free and clear of "interests in the property," and courts have generally interpreted Section 363(f) to authorize sales free and clear of liens and claims. *See, e.g., In re Trans World Airlines*, 322 F.3d 283, 290 (3d Cir. 2003) (holding that unsecured claims of debtor's employees "are interests within the meaning of section 363(f) in the sense that they arise from the property being sold."); *Meyers v. United States*, 297 B.R. 774, 781-82 (S.D.Cal. 2003) (concluding that purchaser had acquired assets of debtor free and clear of plaintiff's unsecured personal injury claims).  Courts have also expressly held that transferees of a debtor's assets pursuant to a sale approved under Section 363 or pursuant to confirmation of a chapter 11 plan are not liable for claims against the debtor under successor liability theories. *See, e.g., In re Trans World Airlines,* 322 F.3d at 290 (Section 363 sale); *Myers v. United States*, 297 B.R. at 781-82 (Section 363 sale); *In re White Motor Credit Corp.*, 75 B.R. 944, 950 (Bankr. N.D. Ohio 1987) (confirmation of plan).  The court in *White Motor Credit Corp.* held that state law successor liability theories are preempted by the Bankruptcy Code.  75 B.R. at 950.

83.    In considering how traditional successor liability analysis would apply to the transfer of GVR's assets to the GVR Purchaser, the Court is mindful of the fact that the default rule under state law is that acquirors have no successor liability. *Village Builders 96, L.P. v. U.S. Laboratories, Inc.*, 121 Nev. 261, 268, 112 P.3d 1082, 1087 (2005) ("[I]t is the

---

[9]    Section 1141(c) is expressly subject to the provisions of Section 1141(d)(3), which provides that confirmation of a plan does not discharge a liquidating debtor, but Section 1141(c) refers to *property* of the debtor, not the debtor.  *See, e.g., In re Regional Bldg. Sys., Inc.*, 251 B.R. 274, 282 (Bankr. D. Md. 2000), *aff'd*, 254 F.3d 528, 531 (4th Cir. 2001) (free and clear provision of Section 1141(c) applies to liquidating chapter 11 plans); *In re Shenandoah Realty*, 248 B.R. 505, 513 (W.D. Va. 2000) (same); *In re Van Dyke*, No. 88-81521, 1996 WL 33401578 at *4 (Bankr. C.D. Ill. Jan. 10, 1996) (same).

general rule that when one corporation sells all of its assets to another corporation the purchaser is not liable for the debts of the seller." (*quoting Lamb v. Leroy Corp.*, 85 Nev. 276, 279, 454 P.2d 24, 26-27 (1969)). Successor liability against acquirors is only applied when one of the exceptions to the default rule against successor liability has been proven. *Village Builders*, 121 Nev. at 268, 112 P.3d at 1087 (purchasers of assets have no successor liability unless one of the following four exceptions are met: (a) the transferee has agreed to assume the transferor's liabilities; (b) the transaction is a *de facto merger*; (c) the transferee is mere continuation of transferor; or (d) the transaction is a fraud to escape liabilities).

84.    In reviewing the relevant facts, there does not appear to be any evidence of successor liability since none of the *Village Builders* exceptions to the general rule of no successor liability apply to the Restructuring Transactions and implementation of the Plan. <u>First</u>, the GVR Purchaser is not assuming GVR's liabilities; the Plan and the other Restructuring Transactions related documents are clear and unequivocal on that point.

85.    <u>Second</u>, courts generally will not find a *de facto* merger unless the consideration for the assets is the stock of the transferee, which is not the case here. *See Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264-65 (9th Cir. 1990) (overruled on other grounds) (finding no continuity of shareholders where consideration paid by purchaser was a combination of cash, promissory note and payment of some debts, and no stock in purchaser or its parent company was exchanged as part of the sale); *see also Ferguson v. Arcata Redwood Co., LLC*, 2004 WL 2600471, *4 (N.D.Cal. Nov. 12, 2004) (purchaser was not alleged to have purchased seller's assets with stock, precluding a finding of successor liability); *Kaleta v. Whittaker Corp.*, 221 Ill. App. 3d 705, 709 (1991) (when payment for assets by stock of transferee is not present, sound policy does not support imposing the predecessor's liabilities upon the successor "when it has already paid a substantial price for the assets of the predecessor"). Here, the consideration paid for the GVR Purchased Assets is cash, not the stock of GVR Purchaser.

86.    <u>Third</u>, courts will not find a *de facto* merger or that the transferee is a mere continuation of the transferor unless the shareholders of the transferor and transferee are

substantially the same, which is not the case here. *See, e.g., Village Builders,* 121 Nev. at 274,

112 P.3d at 1090-91 (no showing of mere continuation without "*identity* of stock, stockholders

and directors between the two corporations") (emphasis added). *See also Commercial Nat'l*

*Bank v. Newtson,* 39 Ill.App.3d 216, 217 (1976) (applying the general rule against corporate

successor liability in a situation where one shareholder owned 25% of the predecessor

corporation, and after the asset transfer the same shareholder owned 40% of the successor

corporation); *Joseph Huber Brewing Co., Inc. v. Pamado, Inc.,* No. 05 C 2783, 2006 WL

2583719, *12-13 (N.D.Ill., September 5, 2006) (finding that a continuity of minority

ownership - approximately 15% - does not weigh in favor of a finding for the continuation

exception); *Jeong v. Onada Cement Co., Ltd.,* 2000 WL 33954824, *4 n.4 (C.D. Cal., May 17,

2000) (acknowledging that under California law, successor liability exists where shareholders are

"practically" the same).

87.    Here, there is no substantial similarity between the shareholders of GVR

and the shareholders of GVR Purchaser, and thus no "identity" that would give rise to a finding

of successor liability. GVR is a 50/50 joint venture between GV Ranch, a wholly-owned

subsidiary of SCI, and GCR Gaming, LLC, an affiliate of the Greenspun Corporation. GVR

Purchaser is an indirect, wholly-owned subsidiary of Station Casinos, LLC ("New Propco"). On

the Effective Date and pursuant to the SCI Plan, New Propco will be owned 45% by FI Station

Investor LLC (ultimately owned by the Fertitta family), 40% by German American Capital

Corporation and JP Morgan Chase Bank, N.A. (the "Mortgage Lenders"), and 15% by the

general unsecured creditors of the SCI Debtors that acquire equity in New Propco through a

rights offering. Therefore, a majority of equity interests in GVR Purchaser will be held by the

Mortgage Lenders and former unsecured creditors of SCI, who have no interests in GVR.

88.    Currently, the Executive Committee, comprised of Frank J. Fertitta III,

Chairman, President, and Chief Executive Officer of SCI and Brian L. Greenspun, Chief

Executive Officer of Greenspun Corp., oversees the operations of GVR. Upon the Effective

Date, GVR Purchaser will be indirectly wholly-owned and managed by New Propco.

-34-

89.    Fourth, numerous courts, including Nevada courts, have not found the transferee to be a mere continuation of the transferor where the selling corporation continues to exist, even if the selling corporation ceases its business operations. For example, in *Village Builders*, where the Nevada Supreme Court declined to find successor liability, the transferor had sold all of its assets, but the transferor corporation was maintained for the purpose of a pending lawsuit. 121 Nev. at 272. Other jurisdictions have reached similar conclusions. *See e.g.*, *Schumacher v. Richards Shear Co.*, 59 N.Y.S.2d 239, 245 (1983) ("Since Richards Shear survived the instant purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly concluded that Logemann cannot be considered a mere continuation of Richards Shear."); *Gavette v. The Warner & Swasey Co.*, No. 90-CV-217, 1999 WL 118438, at *5 (N.D.N.Y. Mar. 5, 1999) (finding that *de facto* merger did not lie because the seller corporation continued to exist "at least transcendentally for one year"). Here, like the transferor in *Village Builders*, GVR will continue to exist after the Effective Date for the purpose of implementing the Plan.

90.    Finally, the Plan is unmistakably not a fraud to escape liabilities. The record of this chapter 11 case shows that the parties to the Plan have acted in good faith, the Plan has been proposed in good faith, and the Plan accomplishes the goals of maximizing the value of GVR's assets for the benefits of GVR's creditors. Thus, based upon the facts of this chapter 11 case, none of the exceptions to the rule against successor liability under Nevada law apply.

**D.    SATISFACTION OF CONDITIONS TO CONFIRMATION.**

91.    Each of the conditions precedent to the entry of these Findings of Fact and Conclusions of Law and the Confirmation Order, as set forth in Article IX.A. of the Plan, has been satisfied.

**III.    CONCLUSIONS OF LAW.**

**A.    JURISDICTION AND VENUE.**

92.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). GVR was and is qualified to be a debtor under Section 109. Venue of the chapter 11 case in the United States

-35-

1    Bankruptcy Court for the District of Nevada was proper as of the Petition Date, pursuant to 28

2    U.S.C. § 1408, and continues to be proper.

3    **B.**    **NOTICE OF THE CONFIRMATION HEARING.**

4    93.    Notice of the Confirmation Hearing was appropriate and satisfactory, and

5    in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local

6    Rules.

7    **C.**    **COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.**

8    94.    As set forth above, the Plan complies in all respects with the applicable

9    requirements of Section 1129(a), except Section 1129(a)(8). Notwithstanding the fact that

10    Section 1129(a)(8) has not been satisfied, the Plan satisfies the requirements of Section 1129(b)

11    with respect to all non-accepting Classes of Claims and Equity Interests. The Court will confirm

12    the Plan and enter the Confirmation Order contemporaneous with these Findings of Fact and

13    Conclusions of Law.

14    **1.**    **The Classification of Claims Under the Plan**
              **Complies With the Requirements of the Bankruptcy Code.**

15

16    95.    Under the Plan, the GVR First Lien Allowed Claims are separately

17    classified from the GVR Second Lien Term Loan Claims because the Claims in those Classes

18    have distinct legal rights under the First Lien Credit Agreement, the Second Lien Credit

19    Agreement and the Intercreditor Agreement. In addition, Class GVRG.4 contains all General

20    Unsecured Claims against GVR. Although Classes GVRG.4 (General Unsecured Claims)

21    receive the same treatment under the Plan, they are classified separately because the Second Lien

22    Term Loan Claims are structurally superior to the General Unsecured Claims. Moreover, no

23    party has challenged the classification scheme set forth in the Plan. Accordingly, the Plan's

24    classification with respect to GVR complies with Sections 1122 and 1123(a)(1).

25    **2.**    **The Plan Complies With the Requirements of Section 1129(a)(10).**

26    96.    One Class of Impaired Claims, GVRG.2, voted to accept the Plan,

27    determined without including any acceptance of the Plan by any insider. The Court concludes,

28

1   therefore, that the acceptance of the Plan by one Voting Class of Claims is sufficient for the Plan

2   to satisfy the requirements of Section 1129(a)(10).

3                       **3.     The Plan Complies With the Requirements of Section 1129(a)(11).**

4           97.     Section 1129(a)(11) requires the Court to find that confirmation of the

5   Plan is not likely to be followed by the need for further financial reorganization of GVR or any

6   successor to GVR under the Plan.  Since the Plan is a liquidating Plan for GVR, the question of

7   further financial reorganization is moot.  *See, e.g.*, *In re 47th and Belleview Partners*, 95 B.R.

8   117, 120 (Bankr. W.D. Mo. 1988) (under the literal wording of Section 1129(a)(11), it is

9   unnecessary to show feasibility when liquidation is proposed in the plan); *In re Pero Bros.*

10  *Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) (the feasibility test has no application to a

11  liquidation plan).  Moreover, the GVR Purchaser is not a successor to GVR; therefore, no

12  feasibility finding is required with respect to GVR Purchaser either.

13          98.     Even if the feasibility test of Section 1129(a)(11) applies in circumstances

14  where a debtor's assets are being sold and the debtor liquidated, such test is satisfied if the

15  liquidation is contemplated under the Plan, as it is here, and can be consummated.  *See, e.g.*, *In*

16  *re Cypresswood Land Partners, I*, 409 B.R. 396, 433 (Bankr. S.D. Tex. 2009) (plan that provides

17  for a sale of substantially all of a debtor's assets offers a reasonable probability of success and

18  can satisfy Section 1129(a)(11)).  Here, GVR's assets will be transferred to the GVR Purchaser

19  under the Plan on the Effective Date.  The Plan is feasible if the GVR Purchaser has the financial

20  wherewithal to close on the Restructuring Transactions in a manner that has a reasonable

21  prospect of resulting in the consummation of the Plan.  To demonstrate that a plan is feasible, a

22  debtor need only show a reasonable probability of success.  *In re Acequia, Inc.*, 787 F.2d 1352,

23  1364 (9th Cir. 1986).  Based upon (i) the financing that the GVR Purchaser has secured and

24  represented to GVR that it has secured to consummate the transactions, and (ii) the clear

25  financial wherewithal and desire of the GVR Purchaser to close on and implement the GVR

26  Purchase Agreement on the Effective Date, it appears that the GVR Purchaser will close on the

27  GVR Purchase Agreement and the Plan will be consummated.

28

99.     The Court concludes that the Plan meets the feasibility test of Section 1129(a)(11) as to GVR.

**D.     THE TERMS OF THE RESTRUCTURING TRANSACTIONS ARE APPROVED IN ALL RESPECTS.**

100.    GVR provided good and sufficient notice of the assumption or assignment, as the case may be, of the Assumed Contracts that are transferred assets under the GVR Purchase Agreement.  All other contracts and leases will be deemed rejected.  GVR has, under the terms of the Plan, until the Effective Date to file additional schedules of assumed, assigned, or rejected contracts and leases, and notice of proposed Cure Amounts.

101.    On the Effective Date, the transfer of the GVR Purchased Assets to the GVR Purchaser under the Plan (a) will be a legal, valid, and effective transfer of the GVR Purchased Assets and (b) will vest the GVR Purchaser with all right, title, and interest of GVR in such assets free and clear of all Liens, Claims, Equity Interests, encumbrances, charges, Other Debts or other interests, including but not limited to all claims arising under doctrines of successor liability.

102.    The Restructuring Transactions, including the transactions contemplated under the GVR Purchase Agreement and the other Plan implementation agreements, documents and instruments referred to in Article V of the Plan or otherwise contained in the Plan, or executed and delivered in connection with implementing the transactions contemplated under the Plan, were negotiated and have been and are undertaken by GVR (through the GVR Transaction Committee) and the GVR Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Section 363(m).  The prepetition marketing of GVR's business assets was conducted at arms' length and in good faith within the meaning of Section 363(m).  GVR Purchaser is a purchaser in good faith as that term is used in Section 363(m), and GVR Purchaser and GVR are entitled to the protections of Section 363(m) with respect to the GVR Purchased Assets to be transferred to the GVR Purchaser.  Moreover, the GVR Purchaser did not engage in conduct that would cause or permit the GVR Purchase Agreement, the consummation of the sale, the related Restructuring Transactions, or the assumption and assignment of the Assumed

1    Contracts to be avoided, or costs or damages to be imposed, under Section 363(n). All debts

2    incurred by the GVR Purchaser in connection with the Restructuring Transactions, and all Liens

3    granted by the GVR Purchaser in connection with such incurrence of debt, are entitled to the

4    protections of Section 364(e).

5         103.    The consideration provided by the GVR Purchaser for the GVR Purchased

6    Assets is fair and reasonable and shall be deemed for all purposes to constitute Value under the

7    Bankruptcy Code and any other applicable law.

8         104.    GVR is authorized to convey, assign, transfer and deliver the GVR

9    Purchased Assets to the GVR Purchaser free and clear of all Liens, Claims, Equity Interests,

10   encumbrances, charges, Other Debts or other interests, because, with respect to each creditor

11   asserting a Lien, Claim, Equity Interest, encumbrance, charge, Other Debt or other interest, one

12   or more of the standards set forth in Sections 363(f)(1)-(5), 1129 or 1141 has been satisfied;

13   including without limitation because the GVR Purchase Agreement satisfies the requirements of

14   Section 363(f). Those Holders of Liens, Claims, Equity Interests, encumbrances, charges, Other

15   Debts or other interests who did not object or withdrew objections to the Plan and related

16   Restructuring Transactions are deemed to have consented thereto pursuant to Sections 363(f)(2)

17   and 1141. Those Holders of Liens, Claims, Equity Interests, encumbrances, charges, Other

18   Debts or other interests who did object fall within one or more of the other subsections of

19   Section 363(f), or their objections were overruled pursuant to Section 1129 and 1141.

20         105.    Except as otherwise expressly provided in the GVR Purchase Agreement,

21   the GVR Purchaser is not assuming, nor shall it or any of its affiliates, or its Related Persons, be

22   deemed in any way liable or responsible as a successor or otherwise for, any liabilities, debts, or

23   obligations of GVR in any way whatsoever relating to or arising from GVR's ownership of the

24   GVR Purchased Assets or use of such assets on or prior to the Effective Date. The Confirmation

25   Order shall provide that all such liabilities, debts and obligations are extinguished as to all

26   Persons, Entities and Governmental Units on the Effective Date insofar as they may give rise to

27   liability, successor or otherwise, under any theory of law or equity against the Transferee Parties

28   and their Related Persons.

106.    Pursuant to the terms of the GVR Purchase Agreement and Sections

363(b), 363(f) and 1141(c), GVR is authorized to consummate, and shall be deemed for all

purposes to have consummated, the sale, transfer and assignment of the GVR Purchased Assets

to the GVR Purchaser on the Effective Date free and clear of (i) all Liens, Claims, Equity

Interests, encumbrances, charges, Other Debts or other interests, including without limitation any

Claim, whether arising prior to or subsequent to the commencement of this chapter 11 case,

arising under doctrines of successor liability, and (ii) any restriction on the use, voting, transfer,

receipt of income or other exercise of any attributes of ownership of such assets.  The

Confirmation Order shall provide that, except as otherwise expressly provided in the GVR

Purchase Agreement, on the Effective Date all such Liens, Claims, Equity Interests,

encumbrances, charges, Other Debts, other interests and restrictions shall be released, terminated

and discharged as to the GVR Purchased Assets and the GVR Purchaser.

107.    The GVR Purchaser shall not be deemed a successor of or to GVR or

GVR's Estate with respect to Liens, Claims, Equity Interests, encumbrances, charges, Other

Debts or other interests against or in GVR or the GVR Purchased Assets, and the GVR Purchaser

shall not be deemed liable in any way for any such Liens, Claims, Equity Interests,

encumbrances, charges, Other Debts or other interests, including, without limitation, the

Excluded Liabilities or Excluded Assets (as those terms are used in the GVR Purchase

Agreement).  The Confirmation Order shall provide that, on the Effective Date, all creditors and

equityholders of GVR, including all Governmental Units, are permanently and forever barred,

restrained and enjoined from (a) asserting any claims or enforcing remedies, or commencing or

continuing in any manner any action or other proceeding of any kind, against the GVR Purchaser

or the GVR Purchased Assets on account of any Liens, Claims, Equity Interests, encumbrances,

charges, Other Debts, other interests, Excluded Liabilities or Excluded Assets, or (b) asserting

any claims or enforcing remedies against the GVR Purchaser or its Related Persons under any

theory of successor liability, merger, *de facto* merger, substantial continuity or similar theory.

108.    Without limiting the generality of the foregoing paragraph, other than as

specifically set forth in the GVR Purchase Agreement:  (a) the GVR Purchaser shall have no

1    liability or obligation (x) to pay wages, bonuses, severance pay, benefits (including, without

2    limitation, contributions or payments on account of any under-funding with respect to any

3    pension plans) or any other payment to employees of GVR, and (y) in respect of any employee

4    pension plan, employee health plan, employee retention program, employee incentive program or

5    any other similar agreement, plan or program to which GVR is a party (including, without

6    limitation, liabilities or obligations arising from or related to the rejection or other termination of

7    any such plan, program agreement or benefit); and (b) the GVR Purchaser shall in no way be

8    deemed a party to or assignee of any such employee benefit, agreement, plan or program, and all

9    parties to any such employee benefit, agreement, plan or program are enjoined from asserting

10   against the GVR Purchaser and its Related Persons any Claims arising from or relating to such

11   employee benefit, agreement, plan or program.

12          109.    GVR has demonstrated that it is an exercise of its sound business

13   judgment to assume and assign the Assumed Contracts to the GVR Purchaser in connection with

14   the consummation of the conveyances and assignments under the GVR Purchase Agreement and

15   the assumption and assignment of the Assumed Contracts is in the best interests of GVR, its

16   Estate, its creditors, and all parties in interest.  The Assumed Contracts being assigned and sold

17   to the GVR Purchaser are an integral part of the Restructuring Transactions, and accordingly,

18   such assumptions and assignments of the Assumed Contracts are reasonable and enhance the

19   value of GVR's Estate.

20          110.    By implementing the GVR Purchase Agreement, (a) GVR will have

21   provided adequate assurance of cure of any monetary default existing prior to the Closing under

22   any of the Assumed Contracts, within the meaning of Section 365(b)(1)(A), and will have

23   provided adequate assurance of compensation to any party for any actual pecuniary loss to such

24   party resulting from a default prior to the date hereof under any of the Assumed Contracts within

25   the meaning of Section 365(b)(1)(B), and (b) the GVR Purchaser will have provided adequate

26   assurance of its future performance of and under any of the Assumed Contracts, within the

27   meaning of Sections 365(b)(1)(C) and 365(f).

28

E.    **APPROVAL OF THE SETTLEMENTS, RELEASES
AND EXCULPATIONS PROVIDED UNDER THE PLAN.**

111.    Based upon the support for the Plan, and the Court's finding that the Plan is the best option for GVR's creditors to preserve the economic viability and job sustaining value of GVR's business assets, the Court concludes that each of the settlement, release, exculpation and related provisions of Article X. of the Plan are fair and necessary for the successful implementation of the Plan and are approved.

1.    **The Global Settlement in Article X.B.2. of the Plan is Approved.**

112.    Based upon the record of the Chapter 11 Cases and the prepetition investigation performed by the GVR Investigation Committee, the Court concludes that GVR was justified in proposing to settle and release the Prepetition GVR Transactions pursuant to the Plan, because such settlement and compromise is consistent with the factors enunciated in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), and *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377 (9th Cir. 1986), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854 (1986), for approval of settlements in bankruptcy cases.  The low probability of success in the litigation, the complexity, expense and delay necessarily associated with any such litigation, and the paramount interest of the creditors and a proper deference to their reasonable views all weigh heavily in favor of settlement here, not litigation.  Accordingly, the Court concludes that the Global Settlement and the provisions of Article X.B.2. constitute a fair and equitable settlement that is in the best interests of the creditors and the Estate, and one that satisfies in all respects the requirements of *TMT Trailer* and *In re A & C Properties* for settlements proposed by chapter 11 debtors.

2.    **The Exculpation Provisions of Article X.D. of the Plan Are Approved.**

113.    Section 524(e) provides in relevant part that "discharge of a debt of the debtor does not affect the liability of any other entity, on or the property of any other entity for, such debt."  In *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), the Court of Appeals for the Ninth Circuit held that Section 524(e) applies to chapter 11 plan bankruptcy discharges.  However, bankruptcy courts generally recognize that Section 524(e) is silent on whether a

chapter 11 plan or confirmation order could affect the liability of a non-debtor on statutory grounds *other than* a bankruptcy discharge.  Here the exculpation provision of Article X.D. does not violate Section 524(e) because it is based upon the more limited exculpation provisions that are expressly contemplated and permitted by Bankruptcy Code Section 1125(e).

114.    Section 1125(e) provides a grant of immunity from liability not only under the securities laws, but also under any law, rule, or regulation governing solicitation or acceptance of a plan, to any person that participates in good faith in the solicitation of acceptances of a plan or the offer, issuance, sale or purchase of a security offered or sold in connection with the plan.  Read literally, nothing in Section 1125(e) limits that protection to post-petition activities.  Moreover, another related provision of Section 1125, Section 1125(g), contemplates and authorizes solicitation of acceptances of a chapter 11 plan prior to commencement of a bankruptcy case if solicited in compliance with applicable non-bankruptcy law.

115.    Here, GVR began negotiating the terms of a consensual restructuring with its principal creditor constituencies more than nine months prior to the Petition Date.  In March 2011, the Subsidiary Debtors, GVR and the Aliante Debtors conducted a formal pre-bankruptcy solicitation of acceptances of the Plan, as authorized under Section 1125(g).

116.    The Court is of the view that, since the pre-petition restructuring efforts were made in good faith and the parties sought a result consistent with the relief available under chapter 11, such conduct is precisely the type of activity that Section 1125(e) is designed to protect.  It would be inequitable, and would not comport with the plain intent of Section 1125(e) if, after confirmation of the Plan and implementation of the Restructuring Transactions, the Exculpated Parties - the Persons and Entities that actively participated in the process of reaching a consensual chapter 11 plan - could then be sued for their good faith prepetition and post-petition restructuring efforts.  Accordingly, the Court concludes that each of the Exculpated

Parties is entitled to the protections afforded them by Section 1125(e) and Article X.D. of the Plan. [10]

**3.    The Releases in Article X.C. of the Plan are Approved.**

117.    A release of non-debtor third parties voluntarily and knowingly given by a creditor or equity holder in connection with a chapter 11 plan does not implicate the concerns regarding third party releases discussed by the Ninth Circuit Court of Appeals in *Lowenschuss*. *See, e.g., In re Pacific Gas & Elec. Co.*, 304 B.R. 395, 416-18 (Bankr. N.D. Cal. 2004) (confirming plan that included governmental agency's release of debtor's parent entity and its officers and directors because the agency had consented to the release); *In re Hotel Mt. Lassen, Inc.*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("[a]ny third-party release in connection with a plan or reorganization, at a minimum, must be fully disclosed and purely voluntary on the part of the releasing parties and cannot unfairly discriminate against others.").

118.    Here, the Third Party Release was plainly described on the Ballot used to solicit votes in favor of the Plan.  Thus, the Third Party Release does not violate Section 524(e) or any of the concerns discussed in *Lowenschuss*, and is an appropriate term of the Plan under Section 1123(a)(5) (and is expressly authorized by Section 1123(b)(3)(A) (the settlement or adjustment of any claim belong to the debtor or the estate)).

119.    The Court concludes that the settlements, compromises, releases, exculpations, discharges and injunctions set forth in Article X of the Plan are fair, equitable, reasonable and in the best interests of GVR and its Estate and the Holders of Claims and Equity Interests, and are approved.

---

[10]    Other bankruptcy courts in recent contested chapter 11 cases have approved plan exculpation clauses at least as broad, if not broader, in scope than that proposed in these Chapter 11 Cases.  *See, e.g., In re Citadel Broadcasting, Inc.*, Case No. 09-17442, 2010 WL 210808, at *30 (Bankr. S.D.N.Y. May 19, 2010) ("Exculpated Claims" included all claims relating to the debtors' in or out of court restructuring efforts, and "Exculpated Parties" included, among others, the holders of the senior secured debt and their agent, the agent and indenture trustee for the subordinated noteholders, and each of their respective professionals and affiliates); *In re CIT Group, Inc.*, Case No. 09-16565, 2009 WL 4824498 (Bankr. S.D.N.Y. Dec. 8, 2009) at *25 (the exculpated parties included a steering committee of prepetition lenders, the DIP lenders and their agent, the exit facility lenders and their agent, the indenture trustees for the unsecured note issuances).

**4.      The GVR Purchaser Shall Not be
Liable Under Any Successor Liability Theories.**

120.      The operation of Sections 363 and 1141 forecloses the ability of creditors to obtain a finding of successor liability against the GVR Purchaser.  It would undermine the purposes of chapter 11 if creditors could get around the effect of confirmation of a chapter 11 plan by asserting successor liability claims after confirmation.  *See, e.g.*, *In re Trans World Airlines*, 322 F.3d at 292 (to allow some general unsecured creditors to assert successor liability claims against transferee of debtors' assets, while limiting other creditors' recourse to proceeds of sale, would be inconsistent with Bankruptcy Code's priority scheme).  In this case, if the Plan did not foreclose successor liability, the GVR Purchaser likely would not go forward with the sale.

121.      The Court has performed the successor liability analysis under applicable non-bankruptcy law, including under Nevada law, and the Court finds no basis at all for successor liability.  Therefore, the Court concludes that the GVR Purchaser is not a successor of GVR, the Debtors, or the SCI Debtors, and, therefore, the "no successor liability" provisions of the Plan are consistent with applicable law and shall be enforced in the Confirmation Order.

**F.      EXEMPTIONS FROM SECURITIES LAWS.**

122.      Article IX.A. of the Disclosure Statement, entitled "U.S. Securities Law Matters," provides adequate notice to all parties in interest that, subject to certain exceptions discussed in Article IX, "all debt instruments, to the extent they constitute securities, and equity securities that are offered and issued in conjunction with the Joint Plan will not be registered under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in Section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth in Section 4(2) of the Securities Act or Regulation D promulgated thereunder."

**G.      EXEMPTIONS FROM TAXATION.**

123.      Pursuant to Section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any Stamp or Similar Tax.  The Confirmation Order will provide that all

1    federal, state or local governmental officials or agents shall forgo the collection of any such

2    Stamp or Similar Tax or governmental assessment in connection with transfers of property under

3    the Plan, and accept for filing and recordation instruments or other documents pursuant to such

4    transfers of property without the payment of any such Stamp or Similar Tax or governmental

5    assessment. Such exemption specifically applies, without limitation, to all actions, agreements

6    and documents necessary to evidence and implement the provisions of and the distributions to be

7    made under the Plan and the transfers of property under the Restructuring Transactions,

8    including without limitation the recordation of any mortgage pursuant to the GVR Purchase

9    Agreement.

10       **H.**    **NO STAY OF CONFIRMATION ORDER**.

11       124.    The Confirmation Order shall be effective and enforceable immediately

12   upon its entry notwithstanding any applicable stay provisions in the Bankruptcy Rules or the

13   Federal Rules of Civil Procedure, or otherwise. Good cause exists to waive any applicable stays.

14   The Confirmation Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

15   Any party objecting to these Findings of Fact or Conclusions of Law or the Confirmation Order

16   must exercise due diligence in filing an appeal and pursuing a stay, or risk such appeal being

17   foreclosed as moot.

18       **I.**    **THE PLAN MODIFICATIONS ARE APPROVED**.

19       125.    The Plan Modifications do not require resolicitation of acceptances of the

20   Plan for the following reasons. First, the Prepetition Opco Secured Lenders, the only creditors

21   impacted by the inclusion of TSI as a Subsidiary Debtor under the Plan, consented to such Plan

22   modification, and no other creditor of TSI objected to the Plan. Second, the Plan Modifications

23   in respect of the Aliante Debtors have no impact on any creditors or parties in interest with

24   respect to GVR. Third, the Plan Modifications do not prejudice the treatment of the Claims of

25   any Holder of Claims against or Equity Interests in GVR under the Plan. Accordingly, all

26   Voting Classes that voted to accept the Plan are deemed to have accepted the Plan Modifications

27   as well.

28

1    126.    The Plan, inclusive of the Plan Modifications, shall be confirmed pursuant

2  to Section 1129.

3  SUBMITTED BY:

4

5

6  James H.M. Sprayregen, P.C. (IL No. 6190206)         Candace Carlyon (NV No. 002666)
   David R. Seligman, P.C. (IL No. 6238064)             James Patrick Shea (NV No. 000405)
7  Sarah H. Seewer (IL No. 6301437)                     Brandon P. Johansson (NV No. 012003)
   KIRKLAND & ELLIS LLP                                 SHEA & CARLYON, LTD.
8  300 North LaSalle St.                                701 Bridger Avenue, Suite 850
   Chicago, Illinois 60654                              Las Vegas, Nevada 89101
9  Telephone:    (312) 862-2000                         Telephone:    (702) 471-7432
   Facsimile:    (312) 862-2200                         Facsimile:    (702) 471-7435
10 james.sprayregen@kirkland.com                        ccarlyon@sheacarlyon.com
11 david.seligman@kirkland.com                          jshea@sheacarlyon.com
   sarah.seewer@kirkland.com                            bjohansson@sheacarlyon.com
12

13 Reorganization Counsel                               Special Local Reorganization Counsel
   for GVR                                              for GVR

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-47-

## RULE 9021 DECLARATION

In accordance with Local Rule 9021, the undersigned certifies:

☒ The Court waived the requirements of LR 9021.

☐ I have delivered a copy of proposed order to all attorneys and unrepresented parties who appeared at the hearing regarding this matter and/or who filed a written objection and each has:

    ☐ approved the form of this order;

    ☐ waived the right to review this order; and/or

    ☐ failed to file and serve papers in accordance with LR 9021(c).

☐ I have delivered a copy of this proposed order to all attorneys and unrepresented parties who appeared at the hearing regarding this matter and/or who filed a written objection and all have either approved the form of this order, waived the right to review the order, failed to file and serve papers in accordance with LR 9021(c) and the following have disapproved the order:

☐ No opposition was filed to the motion and no other party or counsel appeared at the hearing.

DATED this 8th of June 2011.

SHEA & CARLYON, LTD.

Candace Carlyon (NV No. 002666)
James Patrick Shea (NV No. 000405)
Brandon P. Johansson (NV No. 012003)
701 Bridger Avenue, Suite 850
Las Vegas, Nevada 89101
Telephone:     (702) 471-7432
Facsimile:     (702) 471-7435
ccarlyon@sheacarlyon.com
jshea@sheacarlyon.com
bjohansson@sheacarlyon.com

Special Local Reorganization Counsel
for GVR

### # #